# ADDENDUM 1
# Volume 3

W2003- 00669-CCA-R3-PD

# CIRCUIT COURT OF MADISON COUNTY
## – TO –
# COURT OF CRIMINAL APPEALS

JUDGE___ROY B. MORGAN_____ DIVISION__I____

CIRCUIT COURT CLERK____JUBY BARNHILL_____

VOLUME __III____ OF __VIII____ VOLUMES

STATE OF TENNESSEE

VS.

CASE NO. C-00-422

JON HALL_____

| | | | | |
|---|---|---|---|---|
| FELONY | XX | MISDEMEANOR ☐ | ROR ☐ | TDOC ☒ |
| BOND | ☐ | $_____ | INDIGENT ☐ | |
| POST CONVICTION | XX | | HABEAS CORPUS | ☐ |

MR. ALFRED EARLS
ASSISTANCE DISTRICT ATTORNEY
P.O. BOX 2825
JACKSON, TN 38305

MR. DANNY ELLIS
ATTORNEY AT LAW
P.O. BOX 3512
JACKSON, TN 38303

Attorney For: APPELLEE

Attorney For: APPELLANT

Attorney For:

Attorney For:

OFFENSE: FIRST DEGREE MURDER

SENTENCE: DEATH

FILED
JUL 2 4 2003
Clerk of the Courts
Rec'd By_____

Vol. 3

Filed the ____ day of _____JULY_____, __2003__.

COURT OF CRIMINAL APPEALS

BY: _T. ROBERSON_____

LAYCOOK, JACKSON

INDEX

CERTIFICATE & SEAL                                                451

MOTION FOR ORDER DIRECTING RELEASE OF MENTAL
HEALTH INFORMATION                                                307

MOTION TO CORRECT AND /OR DETERMINE LEGITIMACY
OF COUNSEL'S REPRESENTATION  OF THE PETITIONER
BY COURT                                                      310-372

NOTICE OF HEARING ON STATE'S MOTION FOR ORDER
DIRECTING RELEASE OF MENTAL HEALTH INFORMATION           308

ORDER                                                             306

ORDER DIRECTING CLERK OF THE COURT OF
CRIMINAL APPEALS TO FILE CERTIFIED COPIES OF THE
RECORD IN THE CIRCUIT COURT                                       305

ORDER FOR RELEASE OF RECORDS                                      309

STATE'S BRIEF AT THE CLOSE OF EVIDENCE                        373-450

IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE **FILED**
DIVISION I

JUDY BARNHILL, CIRCUIT COURT CLERK

| | | |
|---|---|---|
| JON DOUGLAS HALL | ) | |
| | ) | MAR 27 2002 |
| VS | ) | NO. C-00-422 |
| | ) | DEPUTY CLERK |
| STATE OF TENNESSEE | ) | A.M. 2:30 |

## ORDER DIRECTING CLERK OF THE COURT OF CRIMINAL APPEALS TO
## FILE CERTIFIED COPIES OF THE RECORD IN THE CIRCUIT COURT

Upon motion of the State pursuant to Rule 28(7)(B) of the Tennessee Supreme Court
showing that the above named petitioner has filed a petition for post conviction relief
with this Court and that the underlying case was first degree murder wherein the
petitioner received the death sentence and it appearing that copies of the record in his
matter would be essential to the Court's ability to hear the case:

It is therefore Ordered that the Clerk of the Court of Criminal Appeals prepare
certified copies of the record in **State of Tennessee vs Jon Hall,** No.W1997-00023-SC-
DDT-DD  state case number 96-589 including copies of the trial transcript, jury
instructions, any and all motions filed together with all orders pertaining thereto.

It is further Ordered that the Clerk of the Court of Criminal Appeals cause said copies
to be filed in the Circuit Court of Madison County in the above styled case wherein Jon
Hall is the petitioner and the State of Tennessee is the Respondent.

The Clerk of this Court shall cause a certified copy of this Order to be delivered to the
Clerk of the Court of Criminal Appeals.

Enter this the 26th day of March, 2002.

Roy Morgan, Jr.
Circuit Court Judge

Approved for Entry:

Assistant District Attorney

305

**IN THE CIRCUIT COURT OF THE 26TH JUDICIAL DISTRICT,
MADISON COUNTY, TENNESSEE**

JON HALL,                          )
                                   )
            Petitioner,            )     **Madison County No.  96-58**
                                   )
v.                                 )
                                   )
STATE OF TENNESSEE,                )     **Post-Conviction No.  CO422**
                                   )        *Coo-422*
            Respondent.            )     **DEATH PENALTY CASE**
                                   )

## ORDER

Be it remembered that on the 15th and 16st day of May, 2002, the Court took evidence in this cause and adjourned the case and made the following orders.  It is, therefore:

**ORDERED, ADJUDGED, AND DECREED** this cause is adjourned until September 4, 2002 at 7:30 a.m.  All Parties and all witness are to be at the Court at that time.  No continuances will be granted.  All parties are to be prepared to stay at Court until September 22, 2002 and be prepared to work Saturdays and Sundays.  All Parties and witnesses will not be excused from this appearance until the testimony in this cause is completed.  The testimony expected by the Court is experts, lay witnesses that were mentioned at the hearing on May 16, 2002, and any other lay witness approved by the court after a request is made by the defense.  The Court expects to hear all the witnesses for the State during this time period and expects to conclude all of the testimony in this cause during this period form September 4-22, 2002.

Mr. Buchanan is further ordered to report progress to this Court on the first of each month hereafter until this Cause is finally heard.

ENTERED THIS THE 3rd DAY OF June 2002.

_____
Judge

Approved for Entry:

_____
Paul N. Buchanan, BPR 017697
1526 Crockett Hills Blvd.
Brentwood, Tennessee 37027
615-370-4503

*A D AG*

306

IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE

JUDY BARNHILL, CIRCUIT COURT CLERK

DIVISION I

JON HALL )

OCT 29 2002 )

VS. )  NO. C-00-422

DEPUTY CLERK

STATE OF TENNESSEE )

## MOTION FOR ORDER DIRECTING RELEASE OF MENTAL HEALTH INFORMATION

Comes now the State of Tennessee and hereby requests that the Court direct Middle Tennessee Health Institute to release records in their custody and control to the State of Tennessee and its expert and discuss the case of Jon Hall with the Assistant District Attorney handling the pending post conviction as well as with the State's expert Dr. Kim Stalford pursuant to Tennessee Code Annotated § 33-3-103 et.seq.

Respectfully Submitted

Assistant District Attorney

Certificate of Service

I hereby certify that a true and exact copy of the foregoing was delivered to  Paul Buchanan and Danny Ellis    on or before the filing date as affixed by the Clerk  of this Court this the  21   day of  October  ,2002.

Assistant District Attorney

307

IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE
DIVISION I

JON HALL )
)
VS. )    NO. C-00-422
)
STATE OF TENNESSEE )

**OCT 29 2002**
JUDY BARNHILL, CIRCUIT COURT CLERK
DEPUTY CLERK
8:33 A.M._____ P.M.

### NOTICE OF HEARING ON STATE'S
### MOTION FOR ORDER DIRECTING RELEASE OF MENTAL HEALTH
### INFORMATION

Comes now the State of Tennessee and hereby gives notice that a hearing will be held on the above styled motion on October 30th, 2002 at 8:30 in Division I of Madison County Circuit Court.

Certificate of Service

I hereby certify that a true and exact copy of the foregoing was delivered to Paul Buchanan and Danny Ellis  on or before the filing date as affixed by the Clerk of this Court this the 21  day of October ,2002.

Assistant District Attorney

IN THE CIRCUIT COURT MADISON COUNTY, TENNESSEE
FILED
JUDY BARNHILL, CIRCUIT COURT CLERK DIVISION I

JON HALL                                    )
                          OCT 2 9 2002       )
VS                                           )          NO.    C-00-422
                                             )
STATE OF TENNESSEE   8:50   DEPUTY CLERK      )
                     A.M. _____ P.M.       )

## ORDER FOR RELEASE OF RECORDS

This cause having come before the Circuit Court of Madison County, Tennessee
Division I, upon motion of the Madison County District Attorney General;  the
prosecution having requested access to mental health records on Mr. Jon Hall, which are
currently in the custody and control of Middle Tennessee Health Institute.

The prosecution has also requested that the employees of MTHI be directed to discuss
Jon Hall's case with their office and Dr. Kim Stlalford.

This Court having heard the matter under the provisions of Tennessee Code Annotated
§ 33-3-105(3) and makes the following findings:

1.  Disclosure of the records is necessary for the conduct of the proceedings currently
    before this Court.
2.  Failure to make disclosure would be contrary to the public interest; and
3.  Failure to make disclosure would be detrimental to the parties in this case.


THEREFORE, IT IS HEREBY ORDERED  that Middle Tennessee Health Institute
will provide both parties a complete set of all records, papers, documents, and any other
similar items in the case of Mr. Jon Hall.  In addition, the MTMHI employees will
discuss this case with the Assistant District Attorney and Dr. Kim Stalford and defense
counsel.

Enter this the 29th day of October, 2002.

Roy B. Morgan, Jr.
CIRCUIT COURT JUDGE
26th Judicial District

IN THE CRIMINAL COURT OF THE TWENTY-SIXTH JUDICIAL DISTRICT



JACKSON, TENNESSEE

Jon Douglas Hall,                              *

   Petitioner,                              *

Vs.                                              *       CASE NO. C-00-422

State of Tennessee                               *

   Respondent,                              *

---

MOTION TO CORRECT AND / OR DETERMINE LEGITIMACY OF COUNSEL'S REPRESENTATION OF THE PETITIONER BY COURT

---

    Comes now the Petitioner, Jon Hall, and moves this honorable court to correct and / or clarify the record in the above styled case case pursuant to the Fifth, and Fourteenth Amendment of the United States Constitution and Article 1, §§§ 7, 8, & 9 of the Tennessee Constitution to hold a hearing to determine the legitimacy of appointed counsel's representation by the Court to prevent the needless litigation in the future. In support of this motion the Petitioner will show forth the following:

    1. That throughout the course of these proceedings, the Petitioner has: (1) filed a motion in this court on December 12, 2000, objecting to the State's Response to this proceeding, in violation of Tenn. R. Supreme Court Rule 28 (5) (G), and T.C.A. § 40-30-208 (D); and (2) during the course of these proceedings the Petitioner has asked counsel to provide him with the statutorily mandated state response, all to no avail (verifiable through April Higuera [e-mail dated 8/22/02]).

    2. That the Petitioner has asked counsel to provide him with numerous records that should have been turned over by the State pre-trial of the original trial (police incident reports, court hearings, 911 tapes etcetera) all to no avail.

    3. That the petitioner has wrote letters to both Mr. Buchanan and Mr. Ellis on September 24, 2002, and asked counsel to respond to certain things to see how these things would be handled, in accordance with Tennessee Supreme Court Rule 8, DR 7-101 (A) (2), all to no avail.

    4. The Petitioner has asked counsel submit various records (e.g. Brief of Proper Party with its supporting exhibits A-Z, with letters in support of a Clemmons v. Delo, 124 F.3d 944, 948 FN. 4 (8th Cir. 1997) (protect & preserve issues on direct appeal)); and the original audio tapes of the February 3 - 5, 1997 jury trial. This statement can be verified through Ms. Higuera. Although some of these items may have been filed in the technical record, the Petitioner is in the dark as to whether it has been done properly, due to the behind the scenes records submissions practices.

CORRECT AND / OR DETERMINE LEGITIMACY OF COUNSEL'S REPRESENTATION OF THE PETITIONER BY COURT

___ THE PETITIONER, JON HALL, AND MOVES THIS HONORABLE COURT TO CORRECT AND / OR CLARIFY
IN THE ABOVE STYLED CASE CASE PURSUANT TO THE FIFTH, AND FOURTEENTH AMENDMENT OF THE UNITED
STITUTION AND ARTICLE 1, §§§ 7, 8, & 9 OF THE TENNESSEE CONSTITUTION TO HOLD A HEARING TO
THE LEGITIMACY OF APPOINTED COUNSEL'S REPRESENTATION BY THE COURT TO PREVENT THE NEEDLESS
IN THE FUTURE. IN SUPPORT OF THIS MOTION THE PETITIONER WILL SHOW FORTH THE FOLLOWING:

AT THROUGHOUT THE COURSE OF THESE PROCEEDINGS, THE PETITIONER HAS: (1) FILED A MOTION IN
· ON DECEMBER 12, 2000, OBJECTING TO THE STATE'S RESPONSE TO THIS PROCEEDING, IN VIOLATION
. SUPREME COURT RULE 28 (5) (G), AND T.C.A. § 40-30-208 (D); AND (2) DURING THE COURSE OF
EEDINGS THE PETITIONER HAS ASKED COUNSEL TO PROVIDE HIM WITH THE STATUTORILY MANDATED STATE
ALL TO NO AVAIL (VERIFIABLE THROUGH APRIL HIGUERA [E-MAIL DATED 8/22/02]).

AT THE PETITIONER HAS ASKED COUNSEL TO PROVIDE HIM WITH NUMEROUS RECORDS THAT SHOULD HAVE
D OVER BY THE  STATE PRE-TRIAL OF THE ORIGINAL TRIAL (POLICE INCIDENT REPORTS, COURT
311 TAPES ETCETERA) ALL TO NO AVAIL.

AT THE PETITIONER HAS WROTE LETTERS TO BOTH MR. BUCHANAN AND MR. ELLIS ON SEPTEMBER 24,
ASKED COUNSEL TO RESPOND TO CERTAIN THINGS TO SEE HOW THESE THINGS WOULD BE HANDLED, IN
TENNESSEE SUPREME COURT RULE 8, DR 7-101 (A) (2), ALL TO NO AVAIL.

E PETITIONER HAS ASKED COUNSEL SUBMIT VARIOUS RECORDS (E.G. BRIEF OF PROPER PARTY WITH ITS
EXHIBITS A-Z, WITH LETTERS IN SUPPORT OF A CLEMMONS V. DELO, 124 F.3D 944, 948 FN. 4 (8TH
(PROTECT & PRESERVE ISSUES ON DIRECT APPEAL)); AND THE ORIGINAL AUDIO TAPES OF THE FEBRUARY
7 JURY TRIAL. THIS STATEMENT CAN BE VERIFIED THROUGH MS. HIGUERA. ALTHOUGH SOME OF THESE
HAVE BEEN FILED IN THE TECHNICAL RECORD, THE PETITIONER IS IN THE DARK AS TO WHETHER IT
ONE PROPERLY, DUE TO THE BEHIND THE SCENES RECORDS SUBMISSIONS PRACTICES.

E COURT'S PREVIOUS RULING. SEE E.G., POST CONVICTION TRANSCRIPT PAGE 22 (THE VENUE ISSUE IS
ASSUME WAS ADDRESSED AT ANOTHER POINT IN TIME BY OTHER COURTS, [WRONG*] BUT ITS NOT PROPER
ES OF THIS PROCEEDING ...). COMPARE: MOTION FOR POST-CONVICTION RELIEF, DECEMBER 7, 2000
18 (JURISDICTION ISSUE RAISED PROPERLY). SEE ALSO: MITCHELL, SUPRA AT 288 ("A PETITION
JFFICIENT FACTS TO ESTABLISH THAT PETITIONER'S CONVICTION WAS VOID BECAUSE OF ALLEGED
_TUTIONAL RIGHTS, FEDERAL OR STATE, NECESSITATES A TRIAL OF THESE FACTS UNDER THE
CT... IMPRISONMENT PURSUANT TO THEM IS NOT MERELY ERRONEOUS BUT VOID).

- 2 -

C-103



STATE OF TENNESSEE
**DEPARTMENT OF CORRECTION**
4TH FLOOR RACHEL JACKSON BLDG.
320 SIXTH AVENUE NORTH
NASHVILLE, TENNESSEE 37243-0465

R.M.S.I. GRIEVANCE

FEB 0 4 2002

OFFICE

## MEMORANDUM

Inmate Name: _____Jon Hall_____    TDOC Number: ____238941____

Institution: _____RMSI_____    Housing ___ ____2____

Institution Grievance Number: __02-0010__    TOMIS Grievance Number: __127932__

Commissioner's Response and Reasons:

☐ Concur with Warden    ☒ Concur with Supervisor    ☒ Appeal Denied

___1/30/2002___
/Date

_____
Assistant Commissioner, Operations

GR-1A

INMATE GRIEVANCE RESPONSE

| Jon Hall | #238941 | RMSI Unit 2 | 02-0010(127937) |
|---|---|---|---|
| NAME | NUMBER | INSTITUTION & UNIT | GRIEVANCE NUMBER |

Summary of Evidence and Testimony Presented to Committee _____

Inmate Grievance Committee's Proposed Response and Reasons ___Inappropriate
501.01 VI C-1 addressing more than one subject/incident.

| 1-17-2002 | Sgt. E. Staples | |
|---|---|---|
| DATE | CHAIRMAN | MEMBER |

| | | |
|---|---|---|
| MEMBER | MEMBER | MEMBER |

========================================================================

Warden's Response:  Agrees with Proposed Response     ☒
                    Disagrees with Proposed Response   ☐

If Disagrees, Reason(s) for Disagreement _____

Action Taken:
DATE ___1/18/02___          WARDEN'S SIGNATURE  Ricky J. Bell
Do you wish to appeal this response?   _X_ YES  ___ NO  See attached Petition for
                                                         Declaratory order.
If yes:  Sign, date, and return to chairman for processing.  Grievant may at-
         tach supplemental clarification of issues or rebuttal/reaction to
         previous responses if so desired.

| Jon Hall | 1/23/02 | Sean Moore  CCO |
|---|---|---|
| GRIEVANT | DATE | WITNESS |

========================================================================

Commissioner's Response and Reasons _____

DATE _____          SIGNATURE _____

Distribution Upon
 Final Resolution:   1.  Grievant    3.  Grievance Committee
                     2.  Warden      4.  Commissioner (if ap-
                                         plicable)

CR-1393 (Rev. 7/87)

RDA-1167

Reviewed 12-31-01
[signature] B. Higuera
April

# INMATE GRIEVANCE

INSTITUTION

NAME _Jon Hall_                    NUMBER _238941_        & UNIT _R.M.S.I. U-2_

DESCRIPTION OF PROBLEM _On December 27, 2001, R.M.S.I. Mailroom personnel, knowingly and intentionally_
_opened the Grievant's clearly marked legal mail outside his presence and had C/O Perry hand it out as regular_
_mail at 8:00 P.M. The legal mail was sent by Investigator, April Higuero, P.O. Box 198683 - Nashville, Tenn. 37219_
_and had the words "attorney-client confidential legal work" in big letters from a red magic marker. See: Continuance._

REQUESTED SOLUTION _I want to know the name of the nosey R.M.S.I. Officer and his reason for committing_
_official misconduct and official oppression under T.C.A. §§ 39-16-402 (a) (3) and 39-16-403 (a) (2). Moreover,_
_I want to know how many photocopies they made and who they give them to. Finally, I want them prosecuted to_
_the full extent of the law for violating the laws of the State of Tennessee, if they were not acting under the_
_color of the law._

SIGNATURE OF GRIEVANT _Jon Hall_                    DATE _12/31/01_

=====================================================================

127937

02-0010          To be Completed by Grievance Clerk

_1-3-2002_          _Davis_
Grievance Number    Date Received         Signature of Grievance Clerk

Inmate Grievance Committee's Response Due Date _1-14-2002_

Authorized Extension _____

New Due Date          Signature of Grievant

R.M.S.I. GRIEVANCE
===========================================================================

JAN 0 3 2002

OFFICE          Inmate Grievance Response

Summary of Supervisor's Response/Evidence _____

Chairperson's Response and Reasons _Inappropriate - 501.01 VI_
_C-1. Addressing more than one subject/incident._

Date _1-14-2002_          Chairperson _Sgt. E. Staples_

Do you wish to appeal this response?  _X_ YES          There is no clause in policy
                                       NO          about addressing related
If yes: Sign, date, and return to chairman for processing within five (5)  subjects
        days of receipt of first-level response.                           + specify
                                                                           one problem

_Jon Hall_                    _1/17/02_          _Sean A. Moore_ CCO
GRIEVANT                       DATE               WITNESS

Distribution Upon    1.  Grievant  3.  Grievance Committee
Final Resolution:    2.  Warden    4.  Commissioner (if ap-
                                       plicable)

RDA-1167

## INMATE GRIEVANCE CONTINUATION SHEET

DESCRIPTION OF PROBLEM:  April Higuera has been out to see the grievant at R.M.S.I. as a legal visitor numerous times since she has been appointed. Therefore, there is numerous records in R.M.S.I.'s possession to realize that she is an approved legal investigator and her legal mail should be treated as such. SEE: Attached Affidavit of April D. Higuera, dated XXXXX December 31, 2001.

This is the second time that R.M.S.I. has invaded my attorney-client mail. See: e.g. Grievance # 96-1-394 (48428)(Glori Shettles mitigation investigator atty.-client mail opened pre-trial).

The only person than can benefit from this is the State of Tennessee and the only person harmed by this action is the grievant. I'm tired of the deliberate and intentional acts of R.M.S.I. employees getting into my business to my detriment. You all have access to the photocopy machines and with all the information gathered by staff outside my presence, I will never be afforded a fair hearing in the State of Tennessee. I've been illegally arrested, illegally indicted, illegally tried and convicted, without the opportunity of bond and / or a good lawyer. Is this what the State of Tennessee means by "just us?" You want to prosecute the grievant with the law, but you will not go by the law to fulfill this duty. I'll see if you follow the law and prosecute the personnel that violated the law and interfered with my right to attorney-client confidentiality. Otherwise, I take it as an act committed under the color of the law for the State's benefit (criminal conspiracy).

NOTE: Let's not forget Hall v. McClesky, M2000-01857-COA-R3-CV (interference to access to courts via the phone to the grievant's detriment. See: e.g. grievance # 99-0422 (88516). Coincidence or pattern of abuse !

OTHER: See: the attached envelope from April Higuera, received December 27, 2001.

CR-1394 (4/86)
Page 2 of 2 pages                                        RDA-1167

*INP*
*MAI*

*Cpl. Barbed*

**TENNESSEE DEPARTMENT OF CORRECTION**
**RESPONSE OF SUPERVISOR OF GRIEVED EMPLOYEE OR DEPARTMENT**

DATE: *1-3-2002*

Please respond to the attached grievance, indicating any action taken.
Date Due: *1-8-2002*

*127937*
*02-0010*
Grievance Number

*John Hall*
Inmate Name

*238941*
Inmate Number

*MAiL FRom INVesTigaToRs. IS NoT CoNsiDeReD LeqAL MAiL.
ReAD PoLicY # 507.02.  This LeTTeR Does NoT Meet
PoLicY GVioeLiNes. As SeT FoRTh. iN. iN Jhis PoLicY*

R.M.S.I. GRIEVANCE

JAN 0 8 2002

OFFICE

_____
SIGNATURE

*5-7-02*
DATE

White – Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner

CR-3148 (Rev. 3-00)

RDA 2244

*3·6*

I, April Higuera, a licensed private investigator state as follows:

On December 21, 2001, I mailed Jon Hall #238941 a package marked "Attorney-Client Confidential — Legal Work" (in large red letters on both front + back of envelope). The contents of the envelope included: 2 rolls of 34¢ stamps, family photographs and all my interview notes with client + witnesses through December 20, 2001.

The contents of my interviews consisted of highly confidential attorney-client privileged information and were properly marked as such.

12-31-01

April D. Higuera, Investigator

3 · 7

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

AT NASHVILLE

JON DOUGLAS HALL'          *
                           *
    PETITIONER,            *
                           *
Vs.                        *   GRIEVANCE / ORDER # 02-0010 (127937)
                           *
STATE OF TENNESSEE         *   CHANCERY COURT NO. _____
                           *
DEPARTMENT OF CORRECTIONS  *
                           *
    RESPONDENT.            *

---

## PETITION FOR DECLARATORY ORDER

---

COMES NOW THE PETITIONER, JON HALL, WITH THIS PETITION FOR DECLARATORY ORDER
TO CHANGE THE RULES OF A POORLY WRITTEN DEPARTMENTAL POLICY ON PRIVILEGED MAIL.
IN SUPPORT OF THIS POSITION, THE PETITIONER CHALLENGES THE LANGUAGE / DEFINITION
OF POLICY 501.02-1 IV. (A) (ACCESS TO THE COURTS / LEGAL COUNSEL) AND ANY OTHER
DEPARTMENTAL POLICY DEFINING "PRIVILEGED MAIL," AS THE FOLLOWING:

> PRIVILEGED MAIL: ALL INCOMING MAIL BEARING THE NAME, TITLE AND / OR
> POSITION OF ATTORNEY, LAW STUDENTS ON BEHALF OF ATTORNEY, COURTS,
> INCLUDING LAW SCHOOLS THAT CONDUCT LEGAL AID CLINICS WITHIN THE
> INSTITUTION, CLERK OF COURT, TENNESSEE CLAIMS COMMISSION, RECOGNIZED
> LEGAL DEFENSE FUND, OR GOVERNMENT OFFICIAL.

THE PETITIONER REQUESTS THAT POLICY TO INCLUDE DEFENSE INVESTIGATORS AND EXPERTS.

THE REASON FOR THE REQUEST FOR THE CHANGE IN POLICY IS, BECAUSE: ON DECEMBER
21, 2001, INVESTIGATOR, MS. APRIL HIGUERA, SENT HER CLIENT JON HALL (38) THIRTY
EIGHT PAGES OF CONFIDENTIAL ATTORNEY WORK PRODUCT OF (16) SIXTEEN DIFFERENT
CLIENT INTERVIEWS CONDUCTED AT RIVERBEND MAXIMUM SECURITY INSTITUTION. THE MAIL
IN QUESTION CONTAINED INTERVIEWS CONDUCTED ON OCT. 9, 2001 TO DEC. 20, 2001. THE
MAIL WAS CLEARLY MARKED "ATTORNEY CLIENT CONFIDENTIAL LEGAL WORK," WROTE IN LARGE
LETTERS IN MARKER ON BOTH THE FRONT AND BACK. WHEN THE LEGAL MAIL ARRIVED IT WAS
INSPECTED OUTSIDE HIS PRESENCE AND ONLY THE MAIL ROOM EMPLOYEE AND GOD KNOW WHAT
HAS BEEN DONE WITH THE CONTENTS, I.E. READ, PHOTOCOPIED, AND / OR SENT TO THE
PROSECUTION. C/O PERRY HANDED THE CONFIDENTIAL LEGAL MAIL OUT AS REGULAR MAIL AT
8:00 P.M. ON DECEMBER 27, 2001. AFTER FILING A GRIEVANCE # 02-0010 (127937), THE
PETITIONER WAS INFORMED BY THE RESPONDENT, THAT MAIL FROM AN INVESTIGATOR DID
NOT MEET THE POLICY 507.02 GUIDELINES ON PRIVILEGED MAIL.

THE REASON BEHIND THIS PETITION FOR DECLARATORY ORDER IS BASED UPON THE PRESERVATION OF RIGHTS FROM UNLAWFUL CENSORSHIP AS STATED IN <u>WOLFF V. MCDONNEL</u>, 418 U.S. 539, 577 94 S.CT. 2963, 2985 (1974), WHICH PROVIDES IN PERTINENT PART:

> "AS TO THE ABILITY TO OPEN THE MAIL IN THE PRESENCE OF INMATES, THIS COULD NO WAY CONSTITUTE CENSORSHIP, SINCE THE MAIL WILL NOT BE READ. NEITHER COULD IT CHILL SUCH COMMUNICATIONS, SINCE THE INMATE'S PRESENCE INSURES THAT PRISON OFFICIALS WILL NOT READ THE MAIL."

SINCE THE OPENING OF THE INVESTIGATOR'S MAIL WAS NOT DONE IN MR. HALL'S PRESENCE, MR. HALL RELIES UPON THE COMMON UNDERSTANDING THAT INVESTIGATORS ARE THE ATTORNEY'S ASSISTANT AND HANDLE A VARIETY OF CONFIDENTIAL MATTERS ON BEHALF OF THE ATTORNEY.

THE NEED FOR THE PROPER LANGUAGE IN POLICY IS BASED UPON THE COMMON BELIEF PUBLISHED IN <u>TAYLOR V. STERRETT</u>, 532 F.2D 462, 475 (1976), WHICH PROVIDES:

> "THE BASIC PRISONER INTEREST IS AN UNINHIBITED COMMUNICATION WITH ATTORNEY'S.... PRISONERS HAVE A VITAL NEED TO COMMUNICATE EFFECTIVELY WITH THEIR ATTORNEYS. THIS IS TO INSURE ULTIMATELY THAT THE JUDICIAL PROCEEDINGS BROUGHT AGAINST OR INITIATED BY PRISONERS ARE CONDUCTED FAIRLY. SINCE THE PRISONER'S MEANS OF COMMUNICATING WITH THESE PARTIES ARE RESTRICTED SHARPLY BY THE FACT OF INCARCERATION, THE ESSENTIAL ROLE OF POSTAL COMMUNICATION CANNOT BE IGNORED."

WHEREFORE, THE PETITIONER MOVES THE TENNESSEE DEPARTMENT OF CORRECTIONS TO CHANGE THEIR POORLY WRITTEN POLICY, TO PREVENT THE UNCONSTITUTIONAL CENSORSHIP OF PRIVILEGED COMMUNICATIONS. IN SUPPORT OF THIS CHANGE, THE PETITIONER RELIES ON THE FOLLOWING SIGNATURES OF PEOPLE AFFECTED BY TDOC'S POORLY WRITTEN POLICY;

Jon Hall 238941 1/20/02
Ricky Thompson #204359 1-20-02
Snuf Sutton #213364
Sharon Hill 167488
Daniel Smith #74257
Jesse David 224671

- 2 -

3±9

## PAUL N. BUCHANAN

**ATTORNEY AT LAW**
LICENSED IN TENNESSEE AND TEXAS
E-mail: pnbuchanan@yahoo.com

4150 CROW RD. #10
BEAUMONT, TEXAS 77706
409-347-1041
fax: 409-892-0862

1526 CROCKETT HILLS BLVD.
BRENTWOOD, TENNESSEE 37027
615-370-4503   phone/fax

September 19, 2001

Warden Ricky Bell
Riverbend Maximum Security Institution
Nashville, Tennessee

RE: April Higuera, Court-appointed private investigator for Jon D. Hall

Dear Warden Bell:

This letter is to inform you that April Higuera has been appointed by the Court to be an investigator on the post-conviction case of Jon Hall. I would ask that she, and her associate Elizabeth Trinkler, be accorded the same visitation rights, including unshackled private contact visitation, as myself or Linda Taylor, his attorneys. All communications between Ms. Higuera, Ms. Trinkler and Jon Hall are to be considered attorney-client privileged communications as they are working directly at our direction.

Thank you for your consideration in this matter.

Sincerely yours,

Paul N. Buchanan

Not Submitted with Grievance but See: McCann v. Coughlin
698 F.2d 112, 125 (1983) (Records in custody or control of the warden) See also: Hawks v. City of Westmoreland, 960 S.W.2d 10, 15 (Tn. 1997) (Constructive Notice).

## MEMORANDUM OF LAW

THE BASIC PRISONER INTEREST IS AN UNINHIBITED COMMUNICATION WITH ATTORNEYS... PRISONERS HAVE A VITAL NEED TO COMMUNICATE EFFECTIVELY WITH THEIR ATTORNEYS. THIS IS TO INSURE ULTIMATELY THAT THE JUDICIAL PROCEEDINGS BROUGHT AGAINST OR INITIATED BY PRISONERS ARE CONDUCTED FAIRLY. SINCE THE PRISONER'S MEANS OF COMMUNICATING WITH THE PARTIES ARE RESTRICTED SHARPLY BY INCARCERATION, THUS THE ESSENTIAL ROLE OF POSTAL COMMUNICATION CANNOT BE IGNORED. CITED: TAYLOR V. STERRETT, 532 F.2D 462, 475 (1976). SEE: T.C.A. § 24-1-209 (COMMUNICATION BETWEEN ATTORNEY & PRIVATE DETECTIVE PRIVILEGED).

AS TO THE ABILITY TO OPEN THE MAIL IN THE PRESENCE OF INMATES, THIS COULD IN NO WAY CONSTITUTE CENSORSHIP, SINCE THE MAIL WILL NOT BE READ. NEITHER COULD IT CHILL SUCH COMMUNICATIONS, SINCE THE INMATE'S PRESENCE INSURES THAT PRISON OFFICIALS WILL NOT READ THE MAIL. CITED: WOLFF V. MCDONNEL, 418 U.S. 539, 577, 94 S.CT. 2963, 2985 (1974).

A LAWYER SHALL EXERCISE REASONABLE CARE TO PREVENT EMPLOYEES, ASSOCIATES, AND OTHERS WHOSE SERVICES ARE UTILIZED BY THE LAWYER FROM DISCLOSING OR USING CONFIDENCES OR SECRETS OF A CLIENT, EXCEPT THAT A LAWYER MAY REVEAL THE INFORMATION ALLOWED BY DR 4-101 (C). CITED: TENN. R. S.CT. RULE 8 DR 4-101 (D). NOTE; SEE: TENN. RULES OF EVID. RULE 501 (PRIVILEGES RECOGNIZED ONLY AS PROVIDED).

AN ATTORNEY OWES A DUTY TO HIS OR HER CLIENT TO PROTECT ALL OF THE CLIENT'S RIGHTS AND ASSERT ALL CLAIMS TO WHICH THE CLIENT IS ENTITLED. CITED: BOSTON, BATES, AND HOLT V. TENNESSEE FARMER'S MUTUAL INSURANCE COMPANY, 857 S.W.2D 32 (TENN.)

TWO EXCEPTIONS EXIST WHERE COURTS WILL HEAR QUESTIONS THAT ARE OTHERWISE MOOT; FIRST WHERE CASE INVOLVES MATTER OF "GREAT PUBLIC INTEREST", AND SECOND WHERE ACTION INVADING RIGHT IS CAPABLE OF REPETITION YET WILL EVADE REVIEW IF NOT ADDRESSED BY THE COURTS.... THE OBJECT SOUGHT BY AFFORDING REVIEW IN A CASE OTHERWISE MOOT, IS CLARIFICATION OF THE LAW THAT WILL SETTLE SOME DISPUTE THAT IS LIKELY TO RISE IN THE FUTURE. CITED: LAROUCHE V. CROWELL, 709 S.W.2D 585-587-88 (TN. APP. 1985).

IN THE CIRCUIT COURT OF THE 26TH JUDICIAL DISTRICT,
MADISON COUNTY, TENNESSEE

JON HALL,                              )
                                       )
                    Petitioner,        )         Madison County  No.  96-589
     v.                                )
                                       )
     STATE OF TENNESSEE,               )         Post-Conviction No.   CO422
                                       )
                    Respondent.        )         DEATH PENALTY CASE
                                       )

PETITIONER'S ARGUMENT AT THE CLOSE OF EVIDENCE

TO THE HONORABLE JUDGE OF SAID COURT:

        This argument is directed at the Court much as if it is a final argument before a

fact-finder in the courtroom, with the inclusion of some law, and the benefit of the

record which will referred to as needed.  Also included as attachments are the Supreme

Court decision in this case as well as a digest prepared by counsel for the Court's

benefit.

        This argument will primarily refer to the deficiencies of trial counsel in what is

universally known as "ineffective assistance of counsel," hereinafter referred to as IAC.

The digest of the record of the trial as well as the Supreme Court opinion are, in

undersigned counsel's opinion, important in comparing what was done, and what we

feel was shown could have been done in order to properly represent the Petitioner at

his trial.

        Before applying the facts to the law in this case, we feel that a general

1

discussion of what constitutes IAC is in order.

## THE LAW

### A.    THE PREJUDICE PRONG: A "REASONABLE PROBABILITY" THAT "THE RESULT OF THE PROCEEDINGS WOULD HAVE BEEN DIFFERENT."

We discuss the prejudice prong of the *Strickland* test first because it has proved a great obstacle for capital defendants. *Strickland* encourages courts "to dispose of an ineffectiveness claim on a ground of lack of sufficient prejudice" if it is "easier" to do so.[1] Thus, in many cases, courts will deny relief on a claim of ineffective assistance of counsel for insufficient prejudice without ever considering whether counsel's actions were professionally unreasonable.[2]

In order to satisfy the prejudice prong, we must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* That is, "a criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (*quoting Strickland*, 466 U.S. at 687).

---

[1]    *Strickland v. Washington*, 466 U.S. at 697, 104 S. Ct. at 2069.

[2]    *See, e.g., Williams*, 52 F.3d at 1470 (commending district court for denying for lack of prejudice ineffectiveness claim raised in capital case).

2

This is not an outcome-determinative test. *Nix v. Whiteside*, 475 U.S. 157, 175 (1986). The question is not whether the defendant would have more likely than not received a different verdict but for counsel's performance, but whether "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 454 (1995).[3]

As applied to sentencing in a death penalty case, prejudice requires a showing that a reasonable probability exists that, but for counsel's deficient performance, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Thus, where through trial counsel's unprofessional errors, the jury fails to learn of mitigating evidence, prejudice may be shown. *See, e.g., Harris v. Dugger*, 874 F.2d 756, 764 (11th Cir.), *cert. denied*, 493 U.S. 1011 (1989); *Thomas v. Kemp*, 796 F.2d 1322, 1325 (11th Cir. 1986), *cert. denied*, 479 U.S. 996 (1987).

Because the prejudice inquiry is so fact-intensive and case-specific, it is almost impossible to generalize about the showing necessary to demonstrate prejudice under *Strickland*.

How do we demonstrate prejudice? First, we do so by negating a core

---

[3]    Although *Kyles* involves the determination of prejudice following the state's suppression of evidence favorable to the defense (*Brady* error), the standard for prejudice employed in such cases is adopted from, and is identical to, that in *Strickland*. *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); *id*. at 685 (White, J., concurring in part and concurring in the judgment). In both circumstances, to demonstrate prejudice a petitioner must show that "'there is a reasonable probability that . . . the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433-434 (quoting *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.); *id*. at 685 (White, J., concurring in part and concurring in the judgment)).

3

component of the State's case. We focus on what was the most damaging evidence
against Petitioner. In this case, we believe it was the disconnecting of the phone lines,
which trial counsel allowed to be referred to as "cutting". We believe that "cutting" is
worse than disconnecting in that it implies a permanent disconnection. We believe that
the true facts are indeed different in critical ways from those presented to the trial court.
However, we are not contending that the true picture would have resulted in a complete
exoneration of the Petitioner, but certainly that he would have been found "not guilty" of
first degree murder and guilty of some lesser charge.

Second, we believe we have proven prejudice by filling an evidentiary void in the
trial record. Trial counsel presented no real defensive theory, but contemplated using
intoxication and a hope for mercy. However, they put on no testimony to support either
theory, yet our investigation uncovered credible witnesses to demonstrate prejudice
from counsel's failure to investigate. We have presented this testimony to the this
Court.

B.    THE PERFORMANCE PRONG: COUNSEL'S REPRESENTATION WAS
      "OBJECTIVELY UNREASONABLE."

In addition to demonstrating prejudice, to obtain relief on an ineffectiveness
claim, we must also satisfy the performance prong -- that "counsel's representation fell
below an objective standard of reasonableness . . . considering all of the circumstances
. . . under prevailing professional norms." *Strickland*, 466 U.S. at 688. That is, your we
must overcome the presumption that, under the circumstances, trial counsel's actions

4

investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. When counsel makes a decision not to investigate further, that decision is reasonable only to the extent professional judgment makes the limitations placed on further investigation reasonable in the circumstances. *Id.* In general, any trial "strategy" that flows "from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir.), *cert. denied*, 502 U.S. 964 (1991).

Did counsel essentially conduct virtually no investigation in this case? Then his actions are likely unreasonable. *See Henderson*, 926 F.2d at 711, 714; *Turner*, 158 F.3d at 453; *Crandell v. Bunnell*, 144 F.3d 1213, 1217 (9th Cir. 1998). A thorough pretrial investigation is "[o]ne of the primary duties defense counsel owes to his client." *Magill v. Dugger*, 824 F.2d 879, 886 (11th Cir. 1987). This duty includes the "investigation of the defendant's background, for possible mitigating evidence." *Middleton*, 849 F.2d at 493.

Was it is apparent from evidence concerning the crime, from conversations with the defendant, or from other readily available sources of information that there was evidence to support a potential defense or that would have qualified as a mitigating factor? Would simple investigatory steps, such as seeking pretrial discovery, have revealed helpful information but counsel did not take those steps? Then counsel's failure to investigate may be objectively unreasonable. *See, e.g., Kimmelman*, 477 U.S. at 386; *Middleton*, 849 F.2d at 494; *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir.), *cert. denied*, 522 U.S. 907 (1997). The same is true if counsel failed to follow-up on the

6

information he already had. *See, e.g., Turner*, 158 F.3d at 457; *Harris*, 64 F.3d at 1436; *Kenley*, 937 F.2d at 1304. "This does not mean that only a scorch-the-earth strategy will suffice, but it does mean that the attorney must look into **readily available sources** of evidence." *Hall*, 106 F.3d at 749 (internal citation omitted). Moreover, if it never occurred to counsel to investigate some critical fact, or he simply overlooked it, then the "decision" not to investigate cannot be considered an informed strategic one. *See, e.g., Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir. 1991); *Cook v. Lynaugh*, 821 F.2d 1072, 1078 (5th Cir. 1987).

Did counsel fail to locate and interview material witnesses, including witnesses who could provide mitigating evidence? This failure may be objectively unreasonable. *See, e.g., Hall*, 106 F.3d at 746; *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994); *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994); *Chambers v. Armontrout*, 907 F.2d 825, 833 (8th Cir.) (*en banc*), *cert. denied*, 498 U.S. 950 (1990); *Montgomery v. Peterson*, 846 F.2d 407, 413 (7th Cir. 1988).

Finally, if counsel describes a trial strategy, did counsel fail to investigate evidence that would have supported the purported "strategy"? That failure may be objectively unreasonable. *See e.g., Deutscher v. Whitley*, 884 F.2d 1152, 1160 (9th Cir. 1989), *vacated on other grounds*, 500 U.S. 901 (1992), *reaffirmed*, 16 F.3d 981, 984 (9th Cir. 1994). The same is true if only one viable line of defense existed, and counsel failed to investigate it. *See, e.g., Chambers*, 907 F.2d at 828; *Profitt*, 831 F.2d at 1249.

7

## CONCLUSION

In conclusion, if you are to succeed on a claim of ineffective assistance of counsel, you must dramatically alter the picture of what occurred at the trial. You can do this only by thoroughly investigating, and presenting to the postconviction court, compelling facts demonstrating what *would* have occurred but for trial counsel's unreasonable conduct. This, we believe, we have done.

## THE EVIDENCE

Almost every witness we produced said they were never contacted by either trial counsel. Yet, four were the siblings of the Petitioner. The mother of Petitioner and another brother appeared by stipulated affidavit. They were full of a wealth of information, both on guilt-innocence and punishment. Let's take it witness by witness.

First off, Debbie Davis, the sister of the Petitioner was called. No one ever contacted her before Petitioner's trial. (P.37). Her testimony lasted some 72 pages, telling a story that made the Petitioner seem human as opposed to the animal that trial counsel let stand in the record. Time after time we have heard at seminars that in the punishment phase, it is not enough to call someone from the family to say he was a good boy and put pictures into evidence. Trial counsel did neither, yet we produced a powerful video showing the Petitioner to be a fine father, (P. 58) as well as powerful testimony showing the good side of the Petitioner. By contrast, when she as called at the trial on punishment only, her testimony was **only** 12 pages long, focusing on the violence that he was exposed to as a child as opposed to the numerous positives

8

elicited in the post conviction hearing. We would argue that, had she been talked to in the pretrial investigation, counsel would have been better prepared to produce this testimony and put these pictures on the video into evidence. She had personally seen the deceased use violence against the Petitioner. (P. 40). She also produced testimony that Petitioner had a habit of disconnecting phone lines to talk to people and get their undivided attention, without ever doing any harm to anyone. (P. 47). This is particularly important as trial counsel left it unrebutted in the trial record that these lines were "cut" with no explanation. The Supreme Court of Tennessee cited this phone line disconnection as one of the most powerful things which established the critical "premedation" to establish first-degree murder. We believe that had this witness been talked to in the pretrial investigation, they would have had this evidence to use. As, noted in the law above, trial counsel has a duty to investigate. Surely that means, in a capital case, contacting the immediate family members. But trial counsel admitted that he believed that his job was to believe what the Petitioner told him and not to go "much further" in his investigation. (P. 455). We produced the Stanfields, Brittians and Foremans, all of whom had valuable testimony. Most all of them stated that they were never talked to by the trial counsel or a representative of the trial team. Yet, trial counsel Ford stated that if they were available and had something good to say, they would have called them. (P. 428). How can you if you do not know about them or interviewed them?

For instance, the next witness, Clarence Stanfield, testified that Petitioner was an excellent father (P. 111) and that no one ever contacted him. (P. 113). He was not called at trial. There was no strategical reason not to call this witness.

9

Likewise, Joe Stanfield testified that Petitioner was a good father. (PP. 115-116). He was not called at trial. There was no strategical reason not to call this witness.

Another witness, Valene Foreman, testified that he always provided for the children and their needs and that he was always nice. (PP. 119-124). There was no strategical reason not to call this witness.

Paula Foreman testified that he was good at taking care of the kids. (P. 128). She was not called at trial. There was no strategical reason not to call this witness.

Pamela Foreman testified that Petitioner treated the children well and that no one contacted her from the trial team. (PP.214-216). She was not called at trial. There was no strategical reason not to call this witness.

Jackie Brittain testified that he was a good father and told of a "white-knight" story in which Petitioner came to the aid of a helpless female. (P. 231). He knew that the deceased carried a gun. (P. 235). He was not called at trial. There was no strategical reason not to call this witness.

Pamela Brittain testified that she never saw the Petitioner be violent. (P. 249). She had seen the deceased be physically abusive to the Petitioner and kick him and downgrade him. (P. 250) She also knew the "white -knight" story mentioned above. (P. 255). She testified he was an excellent caregiver to the children. (P. 254). She was not called at trial. There was no strategical reason not to call this witness.

Trial counsel before Mr. Hall and Mr. Ford had plenty of notice that the brother of the Petitioner was dying of AIDS, yet they failed to get his testimony. (P. 265). Of course, since trial counsel never contacted any of the siblings, save a few phone calls

10

initiated by the sister Sheryl Arbogast, it is a stretch to think they would have contacted him.

Trial counsel testified that one of their theories was to show intoxication and therefore try to negate the premeditation, yet they produced no testimony of intoxication.

(P. 302 on Mayo; P 390 on Ford).  Yet we produced Diana Pearson and Alice Pearson to show that there was at least some evidence of him drinking that night that they failed to use. (PP. 170-173 of 9-4-02 hearing).

Kathy Hugo, another sister of the Petitioner, whose testimony only took up **3 pages** in the original record, testified in some 17 pages that she was never contacted by trial counsel before trial.  (P. 272)  She said she told counsel before she testified of the Petitioner's being a good father to the children.  (P. 274)  Yet, that was never used at trial.  She, too, had testimony that the disconnecting of the wires was NOT an indication of premeditation.  (P. 279).  Of course, trial counsel never talked to her until the guilt/innocence phase was over.

Another sister, Sheryl Arbogast testified at this hearing.  She is the only sister called or contacted before trial by the trial counsel.  She was called at both phases of the trial.  Her testimony took up **ONE PAGE** in the punishment phase.  Yet it took up **79 pages** at the post conviction hearing.  She, like the other sisters, knew of many good things about her brother.  She knew of the phone disconnect that had been practiced by the Petitioner.  Yet she was never used on this point at trial.  She testified that she tried many times to contact trial counsel, but rarely was a phone call returned.  (P. 150).

11

The brother Joel and the mother of Petitioner appeared by stipulated affidavit and both testified to many of the things to which the sisters testified. None of them were contacted before trial.

Why did trial counsel not investigate this case? Why were the siblings and the mother, save Ms. Arbogast never contacted? It might be that they just did not like him much. (P. 340). Maybe he believed that he could rely on whatever was told to him by the client. (P. 455). However, that does not relieve counsel of his duty to investigate.

Attorney Mayo testified that he handled the punishment phase, while Ford handled the guilt/innocence phase. He admits that the Petitioner's immediate family should have been interviewed. (P. 299). He admits that he probably only spoke to Ms. Arbogast. (P. 300) He remembers the phone lines being a "problem", but left it naked in the record. (P. 303) He remembers that he thought that only Petitioner could testify about the phone wires, (P. 306) but, as we have shown, it could have been proved by several other witnesses. His "hope" was to get manslaughter, yet no provocation testimony was produced. (P. 311). As discussed in the law section, a theory with no evidence is unacceptable when the evidence could have been discovered through a reasonable investigation. He testified that they never asked the Court for a psychiatrist because the Petitioner did not want to go with an insanity defense. (P. 315). He has no excuse for not using the "good guy" testimony that we produced in this hearing. (P. 321).

There was no strategy in not using pictures showing the Petitioner in a good light. (P. 323).

Attorney Ford testified, like Mr. Mayo, that getting the testimony of brother Jeff is

12

something that should have been done. (P. 383). In what may be the most honest thing to which Ford testified, he said that one of their theories was to "hope for mercy." (P.392). Surely it is trial counsel's duty to do more than hope.

Attorney Ford demonstrated a commanding **lack** of knowledge of the case. He thought the only way to prove that the deceased was abusive to Petitioner was through the Petitioner. This record shows otherwise.

He, too, admits that the phone line testimony in the record appears sinister, but balked at any explanation showing that it had been done before on many occasions with NO violence. (P. 403).

He never talked to the siblings. (P. 404). Then, he says that he thinks talking to them would not have helped. (P. 405) Not only does this record show the contrary, one must ask how an attorney can know if talking to the siblings helps unless he tries. "Death is different" as so many appellate courts have stated. To assume that talking to family members would not help is absurd!

He thinks the Petitioner has to supply the history for the experts. (P. 410). His explanation of IED (intermittent explosive disorder) versus insanity is laughable. (P. 414). It is Petitioner's position that had trial counsel done a thorough background on the Petitioner, he would have more likely recognized the need for a psychiatrist. Then, as Dr. Caruso testified, the thorough history would have keyed the investigation by the expert into IED. (PP. 119-121). However, if trial counsel sees no duty to provide this thorough history, it is understandable that diagnoses will be missed.

Dr. Caruso testified that this science was available at the time. (P. 122 of the 9-402 hearing). He testified that knowing that Petitioner had disconnected phone lines in

13

the past was important to his findings. (PP. 119-121 of the 9-4-02 hearing) Since trial counsel had never talked to most of the siblings, they never knew this to pass along to the professional that they hired. Surely, this testimony would have been helpful both in an effort to show manslaughter and mitigation in punishment. The failure stems back to lack of contacting the siblings.

Lastly, Ford says he never asked for good pictures of the Petitioner, because he was having a hard enough time dealing with the autopsy pictures. (P. 420). It sounds as if he is saying that when he saw the autopsy pictures, he gave up. It is the very essence of his duty to find a way to stem the damage done by such pictures. Yet, he appears to be in a trance at the viewing of those pictures.

Lastly, Attorney Ford's veracity must be questioned when he says he read all the reports of the witnesses that were never contacted by him or his team. If he means that he read some of the State's statements, if any, isn't it the duty of a defense attorney to do more than read the State's file and give up? The cases above clearly indicate so.

It is the position of Petitioner that not even the absolute minimum was done to benefit him. The investigation was almost non-existent. We have shown that the evidence was there. It is our position that, properly presented, Defendant had an excellent chance of something other than first-degree murder and SURELY a real shot a something less than the penalty of death.

Respectfully submitted,

14

Paul N. Buchanan
Attorney at Law
1526 Crockett Hills Blvd.
Brentwood, Tennessee 37027
(615) 370-4503
BOPR: 017697


Danny Ellis
Attorney at Law
213 E. Layfayette
Jackson, TN 38301
(731) 424-2151
BOPR: _02 0 7 4 7_


## CERTIFICATE OF SERVICE

A copy of this document was served on all parties this _1_ day of December,

2002.


Danny Ellis

15

335

State of Tennessee vs. Jon Douglas Hall
Case No. 96-589
In the Criminal Court of Madison County, Tennessee, at Jackson, Division I

Transcript of Evidence
Volume II

186-188    DISCUSSION OUTSIDE THE PRESENCE OF THE JURY:

Hall tells Court he wants to dismiss Attorney Jesse Ford because Ford made a
comment in his opening statement regarding suppression of statements and
illegally seized evidence at Jackie and Darlene's residence, and Hall no longer
trusts him.

Judge reminds the Defendant of the prior lawyers appointed, says it's too late to
bring the motion, and overrules.

Defendant says he has already done it.

Judge warns him, "You're not to make statements in this courtroom in the
presence of the jury unless I allow you to, and these witnesses - if you want
something asked, you confer with your lawyers, and if you don't want to do that,
if you misbehave, the law allows me to just take you out of the room and the trial
goes on.

188-189    Hall tells court he wants to voir dire the jury for pretrial publicity because: (1) Bill
and Delere Lambert sat amongst the jurors the whole time they were being seated;
and (2) "And when the grand jury was in session, they brought around - I believe

16

it was grand jury witnesses in the jail while I was put in a strip cell, while Jason Blankenship made off-the-record comments to the jurors as they were walking through.

Court says "I'll take that into consideration. We'll take it up after the trial.

189-189    (Bench conference) Earls tells Court that Hall has asked to represent himself in the past, and warns Court that overruling him may be raised on appeal, but Court says the trial is going to continue.

190-191    Court asks Hall if he has a problem with Mr. Ford, and indicates the he ruled in favor of Defendant regarding an officer, and Hall says that, in that case, "there should have been a petition for writ for certiorari on the probable cause of a preliminary hearing" and his "motion to dismiss and abate should be considered". Judge says the motion came too late and is overruled, and Hall pointed out "It was filed November 8th of '95, before the other motion hearing, you overruled it then", and the Court said "I'm still overruling it", and Hall said he believed the Court was violating his constitutional rights. Judge instructs Hall and his attorneys that they should get in early if they wish to confer because they're starting on time in the morning.

JURY WAS BROUGHT INTO OPEN COURT

## TESTIMONY OF WITNESS **JERRY BINGHAM**

192-194    Direct Examination by Earls
1.    Witness indicated he was employed by Henderson County Sheriff's Department, and participated in the investigation of a death that occurred in Henderson County.
2.    He was first on the scene, arriving at approximately 11:55 pm, and found a body in the pool. Earls showed him a photograph, and he identified it as accurately depicting what he found.
3.    He indicated he stayed at the crime scene, preserved and protected it until Investigator Brent Booth arrived sometime before 1:00 a.m., at which time he left.

194-195    Cross by Mayo:
Witness indicated he had first-hand knowledge that Booth performed the investigation.

## TESTIMONY OF WITNESS **BRIAN BYRD**

17

195-211     Direct Examination by Earls:

1. Witness indicated he is employed by Tennessee Bureau of Investigation, and participated in investigation of the death of Billy Jo Hall at the scene on Pleasant Hill Road in Henderson County, arriving at the scene in the early morning hours of the 30th.

2. Described scene as a house which sat off the road on top of a small knoll. Inside some disarray, indicating a struggle. There was a trail of skids and blood stains leading down to a pool. Identified a sketch he made of the scene. Identified various parts of the diagram of the scene.

3. Stated physical evidence in the bedroom included a number of blood stains and spatters, some in corner, some on the bed, a "transfer stain" on a white wedding gown in the closet, and large amounts of spatter on a counter top. There was also an ashtray with a red stain on it that came back inconclusive, and a lighter and a pack of cigarettes on top of the bed.

4. Living room area here was a blood splotch, but little disarray. "There was a weight pin laying on the floor. But I didn't see other signs of struggle there." Phones were off the hook.

5. Deck area, there was a phone junction box that was open and phone was disconnected. The grass beneath the phone junction box was matted down.

6. Driveway area there was a LeBaron that was up on jacks, and the transmission was out. There was a storage shed and an empty parking space with 2 skids kind of curving where tires had broke tracks. There was also a yellow or light-colored Dodge K car. There was another skid down the driveway.

7. Located blood in the driveway. A blood spot about 106 feet from the front door. A blood stain or spot near the sandbox. Two more down by the pool, along with some grass that was pulled up out of the ground, and a pinkish color to the water in the pool.

8. The ground was very dry with a lot of dead grass. The ground had disturbances that looked as if someone had been drug for a while. There were impressions in the ground which resembled footprints, but they were twisted and turned as if there was a great struggle going on along this trial. Grass with roots attached was also in the pool, similar to the grass on the trail.

9. Pool was 80 feet to the central area of the pinkish colored water.

10. Pool sat erect, probably three feet high add 20 or 25 feet, and full with water to the top. Did not observe any blood or drag marks on the side of the pool. Believed the pool was a very rigid fiberglass or possibly aluminum.

11. As a result of his investigation, he suspected Jon Hall. He identified him in the courtroom.

12. Sketch was entered into evidence as Exhibit 2.

13. Byrd stated he assisted in the arrest of Hall in Bell County.

14. Byrd identified photos of the crime scene, including a black T-shirt identified by Billie Hall's family members as what she wore to bed that night. Pictures admitted

18

as Exhibit 3.

15. Byrd identified photos of the phone junction box, the disconnected wires, and the trampled vegetation. Photos admitted as Exhibit 4.

16. Byrd identified photos of the view from the storage building near the driveway back to the residence. Photos admitted as Exhibit 5.

17. Byrd said there were wet footprints on the carpet in the house and wet impressions on the wooden deck on the front porch leading out to the pathway leading up to the driveway. Said they were "well-soaked" and were still there later at 10:am in the hot sun.

18. Byrd stated there was a red van or mini van gon e from the scene.

212-222    Cross-Examination by Mayo.

1. Mayo indicated he did a crime scene search and found a money order, he thought was probably to Billie Hall for 24 or 5 dollars, he believed was from Mr. Hall. Mayo asked if Byrd had the money order with him, and he said yes and started looking for it. The Judge asked Ford if he had a copy , and he said no, and Mayo said he provided one to the Public Defender's office. The Judge said, "Well he says he don't have a copy of it. Step it along. Go on, Mr. Ford, and let him search for that later." Mayo indicated he didn't think Byrd could answer question and search for it at the same time. Judge said "It's a money order that's been furnished to you, and I say what else do we need?" May said we need to know who it's from and to and the amount and date. Judge said, "Wasn't it shown on it when you were shown it?" and May said, "the jury needs to know about it", and the Judge said, "Well can you tell us?", and Mayo said "I can't testify". Witness stated he didn't have it with him, but felt it was possibly locked in his vehicle. Mayo indicated he could finish his cross, but reserved the right to call him back, which the Court indicated would be allowed.

2. Bingham indicated there were fingerprints in the home. He sent them to Nashville for dusting, but they were inconclusive. He thought there was one identifiable print, but was never sent for comparison because, in his opinion, he didn't need them.

3. Found no weapons, other than a golf putter, which didn't appear to have been involved, an ashtray that had a speck of red stain, the analysis of which came back inconclusive, and a weight pin near a eight bench in the entry area of the residence.

4. Stated that a large amount of the struggle occurred in the master bedroom, through the trail along the driveway and down to the pool.

5. Stated he traveled to Texas to bring Hall back. Hall had already been arrested at his brother's house without a weapon on him.

19

6.    First saw him in an interview room there at the Bell County justice complex. He was calm and had some injury, minor cuts, to his hands. He cried at one point and seemed remorseful. His brother is now deceased.

7.    Looked in van Hall took to Texas. Found soiled jeans in the van, but didn't appear to be blood. There were maps in the vehicle. Believed vehicle was registered to Billie Jo Hall. Believed money order was payable to Billie Jo Hall.

## TESTIMONY OF WITNESS **CHRIS DUTTON**

222-232    Direct Examination by Earls

1.    Dutton currently incarcerated at Cole Creek Correctional Facility for burglary, theft, theft of auto, aggravated assault and escape (two counties).

2.    37 years old, 14 or 15 of them behind bars. Escaped from Hamblin County and was reincarcerated at maximum security level at Riverbend in Nashville. Currently at minimum restricted level at Cole Creek.

3.    Communicated with Jon Hall through the ventilation system, and identified him in courtroom. Said Hall confided in him that:

A.    He killed his wife.

B.    He said he contacted her earlier in the day and made arrangements to take her some money. When he took the money out there to her house, that he tried to get her to listen to him. All she was interested in was the money. He tried to talk about reconciliation ... that's the word I was looking for - but all she was interested in was the money, and when she refused to listen to him and demanded that he leave, his temper go the best of him and he began to strike her.

C.    He disconnected the wires on the pole hooked to the telephone outside the trailer so she couldn't call the cops.

D.    That he wanted to make her feel as he did. He wanted her to suffer as he did, fell the helplessness that he was feeling because she took his world away from him.

E.    The girls were there, his two girls. It started in the house and ended up in the yard. He hit her on the head until he panicked, and then he threw her in the swimming pool. Then went into the house and got her keys and took her van and left.

F.    Witness was uncertain how Hall got to victim's house.

G.    Witness said he sent a letter to the Attorney General relaying the information. Said he got no response until a week ago.

H.    In exchange for his truthful testimony, Woodall said he would

20

340

speak at witness' parole hearing, and that's the only promise he received. Has received no benefit at all at this point for providing that information to the authorities.

2.    Dutton served as an informant one other time, which allowed him to testify in North Carolina.

232-236    Cross by Ford:

1.    Dutton was unable to recall that Hall said he was drunk when he got to the trailer, but was apparently given something to look at that refreshed his memory. Writing said that Hall was drunk and had been drinking since he called Billie earlier. Dutton acknowledged that (A) Hall was extremely depressed about his family situation; ,(B) had been out to Billie's earlier in the week working on her car (3) was concerned about his children, particularly the little one who had cerebral palsy; (4) tried to reconcile with Billie and discuss problems; (5) went out there to give her money; (5) that he disconnected the phone when he went out there sometimes because Billie would call the police.

2.    Ford asked, "Did you gather that the real reason he went out there was to try to reconcile with his wife and pay child support?", to which Dutton answered "No". Ford asked, "That's what he told you, didn't he?", and Dutton answered "Yes".

236    Redirect by Woodall:
The reason he went out there was to "Make her feel the way she made him feel". If she didn't reconcile, "He was going to make her hurt the way she made him hurt, feel as helpless as he felt."

## EXAMINATION OF WITNESS **BRIAN BYRD**

237-238    Recross by Mayo
Money order is to Billie Hall from Jon Hall, dated July 29th (ink is a little messed up, but thinks it's the 29th), for $25.00. Receipt was admitted as Exhibit 6. Byrd believes he found money order on night stand at the end of the couch, but inside the residence.

## EXAMINATION OF WITNESS **STEPHANIE LAMBERT**

Indicated she knows to tell the truth and if she doesn't she'll get a whippin'. Judge qualified her.

240-246    Direct Examination by Woodall:

A.    8 years old, living with grandparents for last 2-1/2 years. Before that, lived with her mom, Billie Jo Hall, and her three sisters (Jessica: now 5; Cynthia: now 10; Jennifer, now 11). Her dad lived elsewhere, but came to visit.

21

B.   Dad came over that night. He knocked at the door, and her mom and
     Cynthia went to the door. "My mom told Jon not to hurt her, but then he
     pushed his way through and then ..." She didn't know if she told him not
     to come in. Then he went in the kitchen. She was sitting in the chair, then
     Jon told us to go to bed three times and we didn't, then he tipped my
     mama over in the chair." After chair was pushed over, her mom went into
     the bedroom. She could hear her mom yelling. They tried but couldn't get
     in the bedroom because he had the sewing machine by the door. Their
     mom told them to go "up Pam's", who lived next door. One of them tried
     to use the phone, but it didn't work. She didn't see her mother come out
     of the bedroom. She and Cynthia went over to Pam's. The little sister and
     Jennifer were in the bedroom, and Jennifer came out when their Mama
     came out and ran to Pam's. She said she heard Jon say, "You'll never live
     to graduate."

247-248   Cross by Ford
          Stephanie said she couldn't remember about her dad's job, if he cooked
          meals for them or took them to McDonald's. Ford kept making the point
          that she couldn't remember because she was only 5 then.

249-250   Redirect by Woodall
          Stephanie said she did finally get inside the bedroom and they tried to help
          their mom. Jennifer got her a rag and tried to give it to her and they tried
          to get Jon to stop hurting her.

251-252   Recross by Ford
          Stephanie said she talked to the lady downstairs, her grandma and her
          sisters about coming to court. She had talked to police that were there in
          the courtroom more than once. Ford said, "And you really didn't
          remember a lot about what happened because you were six years old, and
          you just really know what somebody else told you about it, don't you?",
          and she answered "Yes, sir."

          The Court asked, "Well you were there and saw it; is that correct?", and
          she answered "Yes, sir".

252-252   Redirect by Woodall
          Woodall said, "Sweetie, what you told us happened, is that something you
          saw and you heard?", and she said, "Yes, sir".

          Defendant said, "I love you Stephanie. Thank you Stephanie. You're sweet."

          BENCH CONFERENCE

22

(Apparently Woodall left the courtroom and headed in direction of or talked to the
children or something.) Ford objected to Woodall's conduct. Woodall said he
has the right to talk to his witnesses, and Judge said he didn't want the jury to get
the wrong idea. Judge instructed jurors that Woodall was merely making sure
they knew when to bring them in.

Ford told the Court that Mrs. Lambert had come up to one of the deputies just a
minute ago and had a complaint about Mr. Hall's conduct, and spectators
shouldn't interfere. Court instructed Mrs. Lambert to go outside and remain there.

BENCH CONFERENCE
Ford asked that the grandmother be removed from the courtroom. She
approached one of the deputies and said Mr. Hall was trying to communicate with
these girls with sign language or whatever. I think we need to hear from the
deputy. Jury was sent to jury room and children were removed.

Hall offered to leave the courtroom while the children testified so as not to upset
or make them feel uncomfortable, intimated, threatened, or for it to weigh on their
conscience. Ford advised against it. Judge said it's Hall's choice, but he also
recommended Hall stay and listen to the testimony.

Jury returned.

EXAMINATION OF WITNESS **CYNTHIA LAMBERT**

257-258    Witness indicated she is 10, in 4th grade, and knew it's wrong and she could be
punished if she did not tell the trust.

258-263    Direct Examination by Woodall:
   A.    Indicated prior to living with her grandparents, she lived on Hollow Rock
         in Lexington, that her parents had problems and Jon moved out and didn't
         come back.
   B.    Said she saw Jon at the door, her mama went to the door but wouldn't let
         him in and he pushed his way in. He went down to the living room and
         told us to go to bed, so we went to bed. Jennifer's bedroom was between
         Cynthia's and her mom's. She heard things slamming around in her
         mama's bedroom. It was hard to get in because stuff was blocking the
         door. She tried to stop the fight by jumping on his back and biting him.
         She and Stephanie tried to call 911, but the "phones were off the hook".
         "He told us if we went for help he was going to kill Mama." They went
         anyway over to Pam's and used the phone. Pam's mom took her and
         Stephanie for a ride. I don't know of anything he was saying to Mama.

23

264-271      Cross by Ford:

Asked if she called Jon "dad" when they lived together, and she said yes. Said they call him Jon now because of what he did. Said he never fixed them meals or took them places. Said he would always be working outside on cars and things like that. Said he came 2 or 3 times the week before it happened and worked on her mom's car. Ford asked if she remembered telling the officers that her mother let jJon in and she told him they didn't want to fight.

The Court said: "Now he's asked you did that happen? If it didn't, tell him what - explain it."

When asked "did you tell them that Jon had pushed his way in or did they tell you that?, and she answered "I didn't remember that at that time". Ford then asked "You didn't remember. So that's really not something that you recall from your memory, is it?" and she answered, "No."

Ford asked if John was drinking, she said, "He got one out and started drinking it", and indicated he brought some beer with you. Child indicated her father didn't really babysit them when their mom was at school or work, and that her father was not kind to their mom some of the time.

Woodall wanted to question her since she had refreshed her memory by reading the statement and the Judge said, "You can. He opened it up." Witness is reading the statement while the bench conference goes on.

BENCH CONFERENCE

Ford said that defense questioned the child for about 2 minutes on the first page of a statement and didn't go into the second page, and said Woodall can go into what they questioned her about, not the entire statement. Court overruled. Mayo said the State was limited to what was put on, not things they didn't ask about, but Court said he's going to allow him to allow her to look at that statement and ask her about anything else in the statement.

Court instructed the witness to answer if she remembers the answer, and say she doesn't remember if she doesn't. She said, "Yes, sir."

Redirect by Woodall:

Witness indicates she read the entire statement, but never knew anything about the second page because she wasn't even around when that happened, so he didn't question her on it.

EXAMINATION OF WITNESS **JENNIFER LAMBERT**

24

344

275-280    Direct Examination by Woodall:

Stated she is 11 years old, in the 6th grade, knows to tell the truth and if
she doesn't she'll get a spanking. Judge indicated he could continue.
Stated when she lived in Henderson County, her mom was married to Jon,
but separated. When asked if Jon was living with them at the time the
situation occurred, she said "I don't think so."
Court said, "Young lady, were you there at home that night? Di your
father come out there? She answered affirmatively, and the Court told her
just tell what happened. She said, "He told us to go to bed. He went into
the bedroom and started a fight. She said she heard them fighting and
tried to go into their room, but was barely able to because of the vacuum
cleaner and sewing machine behind the door.
She saw them fighting and couldn't remember what she did, but tried to
stop them. Said her mama left the bedroom and went out into the parking
lot, and Jon went after her. She said he dragged her mama to the pool and
that he said he would kill her mom if anybody went for help. She said she
went and carried Jessica with her because Jessica was unable to walk. She
acknowledged her mama was kicking and screaming or making noise
while being drug down to the pool. She pointed him out.

280-282    Cross by Ford

1.    Asked if father took them to the lake, and she acknowledged it was some lake, but
didn't remember which one. She didn't remember if her mother went or how long
ago it was. She acknowledged her father took them places, but couldn't
remember if he made them meals or if he worked.
2.    When asked if she talked to anybody about coming to court today and testifying,
she first said no, but then said Mr. Woodall and the police.

EXAMINATION OF WITNESS **DR. OBRIEN CLARY SMITH**

282-307    Direct Examination by Woodall
1.    Smith is a physician licensed in 1980 in Tennessee and described his educational
background. Ford stipulated to his qualifications. Court said, "By agreement, this
doctor's qualifications are stipulated. This means that he's a well-qualified doctor
who will be able to testify to matters in this case." Woodall still wanted jury to
understand his educational background, so court said go ahead. Went through
background, and stated he holds the rank of associate professor of pathology in the
division of forensic pathology at the University of Tennessee at Memphis. Also
captain in the United States Naval Reserve. Defined anatomic, clinical and
forensic pathology.

25

345

2.  Smith acknowledged that he had the opportunity during the performance of his
    official duties as a forensic pathologist and assistant medical examiner to perform
    an autopsy upon Billie Hall's body. The body was received in his department at
    the Regional Forensic Center on 7/30/94 at 6:30 a.m., and began the autopsy at
    8:30 that morning. Indicated he reviewed several documents before the autopsy,
    including the investigation report from the county medical examiner, Dr. Reggie
    Henderson. He described the protocol for performing an autopsy.

3.  Billie Hall's blood tested positive for caffeine and an insignificant level of alcohol
    which could reflect some decomposition of the body. Visual inspection revealed
    she had numerous injuries to her body, predominant bruises, skin scrapes, skin
    tears, fracture of the nose, and she was wet. Anatomic diagnosis revealed she died
    primarily as a result of asphyxia. She had evidence of strangulation. There were
    also changes that indicated she may have drowned or drowned and been strangled
    at the same time. Her stomach contained about 2 ounces of water sitting on top of
    her normal gastric contents. When asked if those finding indicated that she was
    alive in the swimming pool and died after being placed in it, the doctor responded
    by saying yes, if the water in her stomach truly came from the pool, which would
    be difficult to prove since drinking water and pol water are both chlorinated
    purified water, but if water in stomach was from the pool, then it entered her
    stomach while she was still alive. Doctor said the other lab findings indicate
    dilution of her blood, which occurs when a person drowns and takes water into
    their lungs. Such a finding was found in Mrs. Hall's case, but that finding was not
    so extensive to say that drowning was the exclusive cause of death. Doctor said
    he could not separate the strangulation and drowning possibility, so cause of death
    was a lack of oxygen arising from compressive forces applied about the neck with
    a possible contribution of drowning.

4.  Found bruises on the left and right sides of the front neck, the dep muscles in the
    neck and in the tissues surround a bond known as the hyoid bone which is
    frequently damaged in strangulation. There was hemorrhaging around neck
    muscles and that bone, and also left side of thyroid gland, indicating strangulation.
    Also, in the back of throat and in front of the spine, there was about 2 ounces of
    blood in the retro-pharyngeal space, further indicated manual strangulation.

5.  Also there were small hemorrhages in the whites of her eyes and various surfaces
    of the internal organs as can be seen in asphyxial-type deaths.

6.  Water in the stomach. Lungs had filled with fluid and begun to collapse. The
    right side of the heart was dilated which can be seen in both drowning and
    strangulation.

7.  She also had blunt trauma to the head, fracture of the nose, she had swallowed
    some blood and also breathed blood down her windpipe and into her lungs. There
    were also multiple skin tears, bruises and scrapes of the chest, abdomen, genitals,

26

extremities, arms and legs and her back. These injuries may play some role in her death, but by themselves would not have been sufficient to produce death. Injuries occurred while she was alive, but there were some injuries that actually occurred after death, but may have been due to manipulation of the body.

8.    Witness described the forensic term "defensive wounds", and indicated there was evidence of those on the back of the hands, the forearm, front of thighs, knee and shin.

A mannequin is brought in as a visual aid.

9.    Doctor said Billie Hall was 5'4", 122 pounds.

Autopsy report is admitted as Exhibit #7.

10.    Doctor uses a green color to indicate the areas of injury, to scalp, behind left ear, right ear area (no skull fractures or brain injury indicated) Contusions to head could occur from a blow or by pulling hair. Continuing with the back, she had a pattern of bruises indicating an object that had parallel object that may have been more square than rounded. When asked about scrapings being consisting with being drug on the pavement, he didn't find any grit in the scrapes, but could have washed out. He went over her body telling all the bruises, scrapes and lacerations. He counted 83 areas that were separate enough to suggest them having been inflicted by a separate blow, but could have overlapped and been more. Indicated that each blow was painful and collectively were painful (duh), but then went into describing how pain works and could not testify if her pain mechanism was working. Stated that the blunt force injuries and abrasions and contusions would not have produced death. Indicated neck injuries resulting in bleeding and clotting behind the throat could cause enough pressure to actually cause death. Since no inflammatory response, estimated death within 2 hours after infliction.

11.    Doctor indicated the pattern of the injury suggests the person targeted her face, head and neck. Neck injuries go with the greatest weight of obtaining control because it is a very easy area to gain either dominance or total control of the individual by controlling their airway.

12.    Doctor could not state specifically that the final means of strangulation and preventing her from breathing occurred in the swimming pool. The most profound changes in her body were consistent with strangulation, although, considering the water in her stomach, drowning may have been contributory.

307-309    Cross by Ford

27

1. Dr. Smith confirmed that the injuries were contemporaneous, but could not medically say which occurred first so as to imply a sequence. Probably talking about a matter of several minutes to 15 minutes during which the injuries could occur with not much difference between them. In this case, he could only separate on bruise to the right thigh that was several hours old.

2. Based his reference to aggressive wounds to the fact that they are predominantly to the head, neck, top of head, sides of head involving the ears, fracture of the nose, and numerous bruises and scrapes around the eyes and the bruises to the inside of the lips under the chin and inside the neck.

3. Said anger can progress into violent behavior.

STATE RESTS.

MOTION FOR ACQUITTAL:
For moves for judgment of acquittal for reason that State has not met its burden of premeditated first degree murder. Motion OVERRULED.

END OF VOLUME II

28

348

State of Tennessee vs. Jon Douglas Hall
Case No. 96-589
In the Criminal Court of Madison County, Tennessee, at Jackson, Division I

Transcript of Evidence
Volume III

## TESTIMONY OF WITNESS **CHERYL ARBOGAST**

313-327    Direct Examination by Mayo
    13.    Witness indicated she is Hall's sister, 37 years old, a registered nurse living in
           Cincinnati.

BENCH CONFERENCE
Woodall questioned the relevance/admissibility of this witness' testimony at this point in
the trial and wanted the Judge to hear the witness' testimony before the jury did. Judge
sent jury out. Judge tells Mayo he's going to let him put it in the record, but no hearsay.

    14.    Witness says that on 7/29/94, she was talking with her brother Jeff trying to get
           him some psychiatric counseling for Jon. Jon had been very distraught over Jeff's
           impending death, his marriage, his children, no family support nearby. She was
           trying to get Jeff committed or some sort of psychiatric help.

    15.    Witness says she called Jon Hall's house repeatedly the night of 7/29. She tried
           calling the Lamberts, but got busy signal the next morning and then got the
           answering machine, but left no message.

Mayo starts asking about Jeff's contacts with Jon, and Judge instructs him not to lead the
witness. Mayo says he wants o make an offer of proof as to what Jeff Hall would have
said if he could testify. Judge asks if he's trying to get the statement into evidence
through the witness and Mayo says no, he's trying to make an offer of proof. Finally,
after arguing about it, Judge tells Mayo, "You concede it's not admissible, so I don't
know why you want to make an offer of proof of something that's not admissible, but I'm

29

going to let you do it. Go ahead."

16.    Witness says she had asked Jeff to please take him to the hospital, and he
       indicated he didn't think he could make him go. Mayo asks if these are things Jeff
       told her, and she said "He had no support." Woodall chimes in and asks "Yes or
       No", and Mayo asked Judge to tell Woodall to make an objection if he wants to
       talk to the witness. Court says Woodall is trying to help, the jury is not here, and
       he's allowing it all in. Court asks witness if, prior to the event, had she ever
       attempted to have Jon committed, and she answered no. Witness testified Jon
       went back to Jeff's house in Texas on July 29.

Judge tells Mayo he is going to exclude any conversations with Jeff and anything she
doesn't know. Mayo said he just offered it as an offer of proof, and the Court said, "It's
in".

327-329    Cross by Earls
Witness testified that she never talked to Jon in the days prior to Billie's death and that
everything she's testifying to is based upon what someone else told her. She had not
spoken to Jon for several months prior to the event.

Woodall says it's the State's position that none of this is admissible into evidence.
Mayo said no argument, just an offer of proof.
Defendant stated: "Just argument ineffective assistance of counsel".
Woodall complains that "Jon Hall keeps running his mouth over there about his lawyers
and about these girls". Judge warns Hall if he doesn't keep his mouth shut he'll gag him
or remove him.
Defendant said he just wanted to make it on the record that they could have preserved his
brother's testimony before he died and that's why he's been claiming ineffective
assistance of counsel.

## TESTIMONY OF WITNESS **DR. DONNA ZAGER**

331-335    Direct Examination by Mayo
    1.    Witness indicated she is a clinical psychologist, and was qualified.  No training in
          medicine.
    2.    First saw Hall in 11/18/95 and again on 11/1/96, and then once again on 1/3/97.
          Reviewed her own interview and psychological testing, records from Middle
          Tennessee Mental Health Institute where Hall was for about a month, the
          Riverbend Institute mental health records, and reports of interviews with people
          who knew Hall.
    3.    Diagnosed depression based on his depressed mood, crying spells, thoughts of
          death and suicide, difficulty concentrating, disturbed sleep pattern and psycho-
          social retardation, meaning things that he normally did at a much quicker pace he

30

was doing at a much slower pace. Alcohol dependency problem, with a significant family history of alcohol problems. Jon exhibited personality characteristics of paranoia and dependency.

4. Felt like his abilities were compromised due to psycho-stressors he was suffering at the time. For approximately 2 years, he was primary care giver for child born prematurely with cerebral palsy and other health problems, and had to give her breathing treatments and things like that. He and his wife lost their job, so finances were a problem. His brother was dying with AIDS.

5. "It's my impression, based on everything that I know about the case, that Mr. Hall was acting in an impulsive manner versus a well thought out plan."

336-340 Cross by Earls

1. Acknowledged she first interviewed Hall on 11/18/85 and homicide was 7/29/94.
2. Defined "malingering" as feigning symptoms of an illness that doesn't exist..
3. Admitted that, in her 11/19/95 report, she stated "I am somewhat concerned at this time that the only information to suggest that he was intoxicated is Mr. Hall's self report", but she said his statement was supported by people who were with him shortly before the incident. "What I mean is there were people who were with him who will say that he was drinking beer, that there was beer missing from the refrigerator, and that he was at a pub and had beer there." Earls asked "Is that all they said?" and she said "That's what I recall". She stated based on that information she believed he was intoxicated and, based on that information and his family history of alcohol dependence", she believed he had an alcohol problem.
4. She stated the diagnostic criteria for alcohol intoxication included alcohol ingestion, physiological signs like slurred speech, unsteady gait, and usually a change in behavior. She didn't recall anyone talking about him having slurred speech, incoordination, unsteady gait, nystagmus, or being in a stupor or a coma. She said only Hall told her about him having an impaired attention or memory.

340-342    Redirect by Mayo

Witness testified that records from Middle Tennessee Mental Health Institute indicate they too diagnosed him as suffering from alcohol dependence.

342-343    Recross by Earls

Witness testified that she inferred Hall was intoxicated at the time based on information from Hall and other information available to her.


TESTIMONY OF WITNESS **RANDY HELMS**

343-3 Direct Examination by Mayo

1. Lives in Lexington, Tennessee, 49 years of age, owns Helms Motor Company.

31

2. Hall worked for him in '93 through about middle of '94. Testified that Hall had been severely depressed. Hall stopped by his place on July 27 to tell him he got a new job with Columbus-McKinnon and was fixing to go to work and hopefully get on with his life.

3. Hall had told him about their family problems, problems with his wife, effect it was having on the children and his problem dealing with it.

346   DEFENSE RESTED. Jury was excused.

Motion for Judgment of Acquittal was renewed and OVERRULED.

346   Woodall says the Defendant needs to be put under oath and asked ...

The Court asks Jon Hall to raise his right hand. Defendant said, "Are you trying to coerce me inside the bar - the sanctuary of the bar? See, you didn't remove that flag of war." Judge ordered him to raise his right hand.

348   Hall said, "Your Honor, they're trying to take my life away. I have my constitutional rights. What do I have to be sworn in for? You know who I am.", at which point the Judge said "All right, just have a seat."

Judge addresses Ford and asks if this man has been - "has had a negotiated plea discussed with him" and Ford says yes, it's on the record earlier. Woodall says it should be on the record that it is Hall's decision not to testify in his own behalf. Ford said he fully discussed the possibility about testifying and not testifying. Judge asked what Hall said and Ford said he thought that might be privileged. Ford indicated they discussed his testifying, Hall absolutely understood the discussion, was advised as to whether or not he would testify (in pencil, someone wrote "wrong answer"), and made the decision freely.

(At Line 17, there's a penciled in note stating "Large Discussions Removed From the transcript But on tape Judge's Ruling)

Defendant says "I'll testify if you take down the flag of war or sign that judicial contract." "I sent it to you and you signed a certified receipt."

Court calls jury back.

(On bottom of page 348 is a note that says: Perjury - I don't know what (omitted). Line 21. Compare TRE V, IV 435 L.17-25)

349-350   Judge gives jury instructions regarding what they can and can't consider. Jury excused.

32

350        Woodall says "Judge, you're charging first and second, and I'm just wondering and ask the defense lawyers what they think. I don't see anything in there and the evidence has been presented that's voluntary manslaughter or criminally negligent homicide", and Ford said, "We have no problem with what the Court's charging, Your Honor, except for flight." No witnesses said he fled to avoid arrest or anything like that, but Court said he's going to charge it. (At the top of page 351 is a note that says TPI Instructions invalid - see State v. Martin, 702 SW2d 560,564) Added Zager on the expert witness charge.

351-371    COURT CHARGES THE JURY

1.    Advises of the charges and Defendant's plea of not guilty. Offense includes lesser offenses and grades of murder.

2.    Advised to apply law as stated in instructions and consider each. Do not concern themselves with rulings.    Attorney statements are not evidence.

3.    Law presumes Defendant innocent unless juror convinced of guilt beyond a reasonable doubt. Burden is on State.

4.    "Reasonable doubt (penciled in - See TCA §39-11-201 [Burden of Proof]) is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a capricious (Sticky note - captious - adj - marked by an inclination to find fault - did the Judge use the wrong word?), possible or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but oral certainty is required as to every proposition of proof requisite to constitute offense (Penciled in: TAI Crim. 2.03). Reasonable doubt - not guilty.

5.    Jurors should consult and deliberate and open to reexamine views and opinions, but do not surrender honest conviction.

6.    First Degree Murder:

    A    That the defendant unlawfully killed the alleged victim and acted intentionally - when the person's conscious objective or desire to engage in the conduct or cause the result;

    B    Killing was deliberate - after the exercise of reflection and judgment. The mental state of the accused mst be considered to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation. If killing was premeditated, it is immaterial that the accused was in a state of passion or excitement when done or after heat of passion has subsided.

    C    If you find from the proof beyond a reasonable doubt that the Defendant is guilty of murder in the first degree, you will so report and you verdict in that event shall be, "We, the jury, find the Defendant guilty of murder in the first degree." (Penciled in - No mandatory language to second, voluntary manslaughter, reckless or criminally negligent homicide).

2.    Second Degree Murder

33

    A    Unlawfully killed and acted knowingly

    B.    Knowingly defined (penciled in TAI 7.05 and words "Added by Judge")

3.    Voluntary Manslaughter

    A.    Unlawfully killed victim

    B.    Acted intentionally or knowingly

    C.    Killing resulted from state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

    (Penciled in: TAI 7.06 - Knowingly is removed from instruction)

4.    Reckless Homicide

    A.    Killed the alleged victim

    B.    Defendant acted recklessly - Recklessly defined.

    (Penciled in: TAI 7.09 - "Intentionally" and "Knowingly"

5.    Criminally Negligent Homicide

    A.    Defendant's conduct resulted in death of victim

    B.    Defendant acted with criminal negligence. Criminal negligence defined

Jury is instructed that no significance is to be placed on Defendant not taking stand, that he is presumed innocent and his not taking the stand cannot be considered for any purpose nor can any inference be drawn from the fact.

6.    Flight. Flight is defined and jury instructed.

7.    Credibility of Witnesses: Jury instructed.

8.    Defense: Intoxication - Judge instructs jury that included in the Defendant's plea of not guilty is his plea of intoxication as a defense. Judge instructs jury that intoxication is generally not a defense and, if a person becomes intoxicated voluntarily, person is responsible for his conduct. State must prove defendant's culpable mental state in each offense listed in the charge. "If you find that the Defendant was intoxicated to the extent that he could not have possessed the required culpable mind, then he cannot be guilty of the offense charged. If you are not satisfied beyond a reasonable doubt that the Defendant possessed the culpable mental state, then you must find him not guilty. If recklessness establishes an element of the offense and the Defendant is unaware of a risk because of voluntary intoxication, the Defendant's unawareness is immaterial and is no defense to that element in the prosecution of the offense.

9.    Expert Witness - Given instructions as to expert testimony.

10.    Verdict - Given instructions in reaching; Judge tells jury not to attempt to fix any punishment or sentence, but, for information only, he informed them of the ranges of punishment.

Ford and Woodall have no exceptions to the charge; Jury retired to begin deliberations at 5:05 PM and deliberated until 6:00 PM. Jury was admonished and court recessed for the day.

END OF VOLUME III

34

State of Tennessee vs. Jon Douglas Hall
Case No. 96-589
In the Criminal Court of Madison County, Tennessee, at Jackson, Division I

Transcript of Evidence
Volume IV

375    JURY REPORTS THEIR VERDICT:

Found Defendant guilty of first degree murder.

376-377    Judge instructed jury regarding sentencing and aggravating circumstances. Jury
was polled as to their verdict, and it was unanimous.

377-379    Discussion concerning State vs. Brimmer, 876 SW2d 75. Court decides the third
aggravating circumstance (burglary?) should not be considered.

Jury returned.

TESTIMONY OF WITNESS **O. C. SMITH**

381-398    Direct Examination by Earls
    11.    Identified autopsy pictures he took. Admitted as Exhibits 9-25. Demonstration
also using mannequin.
    12.    Court asks Ford if he saw the first photo before it is presented to the jury. Court
says, "Mr. Ford, unless there's some objection made, I'm going to – if you –" and
Ford says, "we object, but –", then Court said, "Well overruled for now." Ford
says, "We'll have a standing objection. We understand it's overruled."
    13.    Smith said the concentration of damage is in excess of anything that could occur
accidentally. They appear intentional and focused. Acknowledged that torture
was present in the beating.
    14.    Ford objects to Earls being "argumentative", and Woodall rephrases his
questioning. Smith confirms it is his medical opinion that there was physical

35

abuse inflicted on Billie Jo Hall beyond that necessary to produce death.

15. Ford had no objections and witness was excused.

THE STATE RESTS

TESTIMONY OF WITNESS **DR. LYNN DONNA ZAGER**

398-405    Direct examination by Mayo

1. Mayo says Dr. Zager's qualification has been stipulated.
2. Mayo said she met Jon 3 times face-to-face, and took histories from him and reviewed interviews of family members and people who knew him.
3. He was the youngest child, his father and grandfather were alcoholics, his father denied paternity and they didn't have much of a relationship   His was significantly close to his mother.  There was spousal abuse and he witnessed it.  She felt he didn't have very good role models for dealing with relationships and conflict and did not grow up in a secure loving, secure environment.
4. She felt he was remorseful, depressed, and suicidal.  She described his anxieties over his children.  She indicated he was dependent on alcohol.  She explained problems alcoholics have.  She said Jon is dependent on alcohol and on significant people in his life.  His domestic problems were one of his stressors.

Woodall had no questions.

TESTIMONY OF WITNESS **DR. JOE MOUNT**

398-405    Direct examination by Mayo

1. He's a psychological examiner at Riverbend Maximum Security.  Woodall stipulated to his qualifications as a psychological examiner.
2. Met with Jon 6 to 8 times formally, and informally numerous other times.
3. Said his main concern was that he was extremely distraught and depressed regarding his case.  Mayo asked about what, and witness said, "The episode that led to his charges."
4. Said Jon showed "extreme remorse" "crying" "appearing extremely sad", "statements of regret" and believed he was sincere.  Was suicidal at one point.
5. Said he suffered from "adjustment disorder with mixed emotional features", and a dependency abuse.  Individual counseling and medication,
6. Extremely concerned about his children and in particular the child with CP.

Woodall had no questions.

TESTIMONY OF WITNESS **RANDY HELMS**

36

398-405    Direct examination by Mayo

1.    Helms gave him a job because he explained he had 4 daughters and a wife and
      needed money. Was a good mechanic and good employee. Had to bring the kids
      with him a two or three times, and he took excellent care of them.
2.    Helms liked Billie and considered her a friend. He said Jon loved his wife and
      kids and just wanted to make a good life.
3.    Jon quit his job because, over the last 2 months, his performance got bad because
      of his personal problems and, since he knew Helms would not fire him, he was
      man enough to quit.

## TESTIMONY OF WITNESS **DEBBIE DAVIS**

Described their home life and episodes of family violence, one in particular where father
beat mom's head on the floor and hair and blood were on the floor and coming from her
ears and nose. He came to live with her and her husband, but moved out because the
rules were strict. She talked about how he met Billie, that she got pregnant, and that Jon
really loved the two little girls she already had. She said he played with the children and
took them to her house. Witness specialized in working with developmentally
handicapped children, and he asked her to make up tapes for Jessie to help her. Father
made Jon know he favored the other boys.
Woodall had no questions.

## TESTIMONY OF WITNESS **KATHY HUGO**

Jon's oldest sister and lived in same house with Jon. Testified to the family violence and
that Jon wasn't treated very well.

## TESTIMONY OF WITNESS **CHERYL ARBOGAST**

Jon's sister. Testified to family violence.

## TESTIMONY OF WITNESS **CAROL ALEXANDER**

Jon's mother. Testified to family violence and that Jon was a good father.

434-435    Jury retired and following proceedings:
1.    Earls says he wants to make sure Hall has a right to testify and that's put on the
      record. Ford said he understands, but doesn't think it is necessary.
2.    Defendant said, "Remember I told you that -- (penciled in, it talks about removing
      the flag of war).
3.    Defendant indicated he would testify if the Court would remove the flag, but
      won't bring himself inside the sanctuary of the bar with the flag there, so requests

37

357

that the Court remove the flag. Judge told him he could abide by the rules if he wanted to testify.

4.  Ford objected to State's notice #2 charging that the "murder was committed for the purpose of avoiding, interfering with or defending a lawful arrest or prosecution of the defendant or another because there was no evidence of avoiding arrest. OVERRULED.

5.  Jurors were instructed on deliberations, including aggravating circumstances, mitigating circumstances, sentences, death penalty. Judge read the mitigating circumstances (including the last mitigating circumstance (about confessing and remorse? - see page 5 of transcript), but it was supposed to have been marked through. Ford inadvertently gave the Judge a charge that wasn't marked out. Judge asked if Ford wanted Judge to tell the jury. "What do you want me to do?", and Ford said, "Just make sure it's marked through" and that would be satisfactory.

6.  Woodall wants to send the photos and mannequin with the jury, and Ford says only if they ask for them. Judge says he's sending them. They agreed to exchange photos for the mannequin for the purposes of this record, and Ford said he agreed with that.

450   Jury returned and sentenced Hall to death.

38

353

8 S.W.3d 593
(Cite as: 8 S.W.3d 593)

▷         Supreme Court of Tennessee,
              at Jackson.

         STATE of Tennessee, Appellee,
                      v.
         Jon Douglas HALL, Appellant.

           **W1997-00023-SCDDTDD.**

              Nov. 15, 1999.
         Rehearing Denied Dec. 27, 1999.

  Defendant was convicted in the Circuit Court, Madison County, Whit Lafon, J., of first-degree murder, and he was sentenced to death. On appeal, the Court of Criminal Appeals affirmed. On automatic review, the Supreme Court, Barker, J., held that: (1) evidence was sufficient to support conviction; (2) evidence supported especially heinous, atrocious, or cruel aggravating circumstance; (3) graphic autopsy photographs were relevant to aggravating circumstance; (4) statements by defendant's brother regarding defendant's mental state did not come within hearsay exception for statements by unavailable declarant; (5) refusal to remove the United States flag from the courtroom during trial did not violate defendant's rights; and (6) death sentence was not disproportionate.

  Affirmed.

             West Headnotes

[1] Criminal Law ⬅1144.13(3)
110k1144.13(3) Most Cited Cases

[1] Criminal Law ⬅1159.2(7)

110k1159.2(7) Most Cited Cases

When the sufficiency of the evidence is challenged, the standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

[2] Criminal Law ⬅1144.13(3)
110k1144.13(3) Most Cited Cases

[2] Criminal Law ⬅1144.13(5)
110k1144.13(5) Most Cited Cases

On appeal from conviction, state is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.

[3] Criminal Law ⬅1159.2(8)
110k1159.2(8) Most Cited Cases

[3] Criminal Law ⬅1159.2(9)
110k1159.2(9) Most Cited Cases

In determining the sufficiency of the evidence to support conviction, appellate court does not reweigh the evidence or substitute its inferences for those drawn by the trier of fact.

[4] Criminal Law ⬅308
110k308 Most Cited Cases

[4] Criminal Law ⬅1160
110k1160 Most Cited Cases

A guilty verdict rendered by the jury and approved by

39

the trial judge accredits the testimony of the witnesses for the state, and a presumption of guilt replaces the presumption of innocence.

**[5] Criminal Law** 1141(2)
110k1141(2) Most Cited Cases

On appeal, defendant bears the burden of proving that the evidence is insufficient to support the jury verdict.

**[6] Homicide** 915
203k915 Most Cited Cases
(Formerly 203k152)

**[6] Homicide** 936
203k936 Most Cited Cases
(Formerly 203k152)

**[6] Homicide** 933
203k933 Most Cited Cases
(Formerly 203k152, 203k147)

A homicide, once proven, is presumed to be second-degree murder, and state has the burden of proving the elements of premeditation and deliberation to raise the offense to first-degree murder. T.C.A. § 39-13-202(a)(1) (1994).

**[7] Homicide** 535
203k535 Most Cited Cases
(Formerly 203k14(1))

Proving premeditation for murder requires evidence of a previously formed design or intent to kill, and the exercise of reflection and judgment. T.C.A. §§ 39-13-201(b)(2), 39-13-202(a)(1) (1994).

**[8] Homicide** 535
203k535 Most Cited Cases
(Formerly 203k14(1))

**[8] Homicide** 536
203k536 Most Cited Cases
(Formerly 203k14(2))

Proving deliberation for murder requires evidence of a cool purpose formed in the absence of passion or provocation, as well as some period of reflection during which the mind is free from the influence of excitement. T.C.A. §§ 39-13-201(b)(1), 39-13-202(a)(1) (1994).

**[9] Homicide** 542
203k542 Most Cited Cases
(Formerly 203k14(1))

A killing committed during a state of passion may rise to the level of first- degree murder if state can prove that premeditation and deliberation preceded the struggle. T.C.A. §§ 39-13-201(b)(1, 2), 39-13-202(a)(1) (1994).

**[10] Homicide** 1213
203k1213 Most Cited Cases
(Formerly 203k238)

Premeditation and deliberation required for first-degree murder were established, despite claim of intoxication, by evidence that defendant used child support as ruse to meet with estranged wife to attempt reconciliation, intended to make her "feel the helplessness" that he felt, disconnected telephone lines to her house, threatened to kill her if her children went for help, severely beat her and inflicted at least 83 separate wounds, and caused her death through combination of strangulation and drowning. T.C.A. §§ 39-11-503(a); §§ 39-13-201(b)(1, 2), 39-13-202(a)(1) (1994).

**[11] Sentencing and Punishment** 1684
350Hk1684 Most Cited Cases
(Formerly 203k357(11))

Evidence that defendant inflicted mental torture upon his estranged wife by beating her in her children's presence and threatening to kill children if they went for help, as well as evidence of extent and severity of beating, during which estranged wife sustained at least 83 separate wounds before her death through combination of strangulation and drowning, supported especially heinous, atrocious, or cruel aggravating circumstance during penalty phase of capital murder trial. T.C.A. § 39-13-204(i)(5).

**[12] Sentencing and Punishment** 1767
350Hk1767 Most Cited Cases
(Formerly 203k358(1))

Graphic photographs taken of victim's body during autopsy were admissible during sentencing phase of capital murder trial as relevant to the existence of torture and serious physical abuse, necessary elements of the especially heinous, atrocious or cruel aggravating circumstance. T.C.A. § 39-13-204(i)(5).

40

**[13]** Criminal Law ⬥438(1)
110k438(1) Most Cited Cases

**[13]** Criminal Law ⬥1153(1)
110k1153(1) Most Cited Cases

The admissibility of photographs is generally within the
sound discretion of the trial judge, and his or her ruling
on admissibility will not be disturbed on appeal absent
an abuse of that discretion.

**[14]** Criminal Law ⬥872.5
110k872.5 Most Cited Cases

Unanimity instruction given during sentencing phase of
capital murder trial, in referring to state's burden to
prove aggravating circumstances outweighed mitigating
circumstances beyond a reasonable doubt, did not
improperly limit jury's consideration of mitigating
circumstances, in violation of Eighth Amendment,
where jury was further instructed that there was no
requirement of jury unanimity as to any particular
mitigating circumstance or of agreement as to same
mitigating circumstances. U.S.C.A. Const.Amend. 8.

**[15]** Criminal Law ⬥419(6)
110k419(6) Most Cited Cases

Statements by defendant's brother regarding defendant's
mental state on day of murder did not come within
hearsay exception for statements by unavailable
declarant, though brother died before trial; statements
were not made in court, were not under belief of
impending death, were not against interest, and were
not of personal and family history. Rules of Evid., Rule
804(a)(4).

**[16]** United States ⬥5.5
393k5.5 Most Cited Cases

Trial court's refusal to remove the United States flag
from the courtroom during capital murder trial did not
violate defendant's right to testify, despite his refusal to
testify in presence of alleged "flag of war."

**[17]** United States ⬥5.5
393k5.5 Most Cited Cases

Gold fringe appearing on the United States flag in a
courtroom has no inherent or established symbolism,
and has nothing to do with the jurisdiction of the court
or with martial law, but is purely a decorative addition

to enhance the appearance of the flag.

**[18]** Sentencing and Punishment ⬥1684
350Hk1684 Most Cited Cases
(Formerly 203k357(11))

Death sentence imposed upon defendant who severely
beat his estranged wife in presence of her children,
inflicted at least 83 separate wounds, and caused her
death through combination of strangulation and
drowning, without any provocation, was not
disproportionate to penalty imposed in similar cases.
T.C.A. § 39-13-206(c)(1)(D).

**[19]** Criminal Law ⬥1134(3)
110k1134(3) Most Cited Cases

Comparative proportionality is for the purpose of
determining whether the death penalty is unacceptable
in a particular case because it is disproportionate to the
punishment imposed on others convicted of the same
crime. T.C.A. § 39-13-206(c)(1)(D).

**[20]** Criminal Law ⬥1134(3)
110k1134(3) Most Cited Cases

In theory, comparative review of capital cases insures
rationality and consistency in the imposition of the
death penalty. T.C.A. § 39-13-206(c)(1)(D).

**[21]** Criminal Law ⬥1134(2)
110k1134(2) Most Cited Cases

In addition to backgrounds of defendants and
aggravating and mitigating factors applicable, other
factors relevant to identifying and comparing cases for
proportionality review of death sentence include:
means of death; manner of death; motivation for the
killing; place of death; similarity of the victims'
circumstances and treatment; absence or presence of
premeditation; absence or presence of provocation;
absence or presence of justification; and injury to and
effects on surviving victims.    T.C.A. §
39-13-206(c)(1)(D).

**[22]** Criminal Law ⬥1134(2)
110k1134(2) Most Cited Cases

Matters relevant when comparing cases for
proportionality review of death sentence include
defendant's prior criminal record or prior criminal
activity; defendant's age, race, and gender; defendant's

41

mental, emotional or physical condition; defendant's involvement or role in the murder; defendant's cooperation with authorities; defendant's remorse; defendant's knowledge of helplessness of the victim; and defendant's capacity for rehabilitation. T.C.A. § 39-13-206(c)(1)(D).

*595 Jesse H. Ford, III, Clayton F. Mayo, Jackson, Tennessee (At Trial), C. Mark Donahoe Jackson, Tennessee (On Appeal), for Appellant.

Paul G. Summers, Attorney General and Reporter, Michael C. Moore, Solicitor General, Alice B. Lustre, Assistant Attorney General, Nashville, Tennessee, James G. Woodall, District Attorney General, Alfred Lynn Earls, Asst. District Attorney General, Jackson, Tennessee, for Appellee.

## *OPINION*

### BARKER, J.

The defendant, Jon Douglas Hall, was indicted for first degree premeditated murder in the strangulation and drowning death of his wife, Billie Jo Hall. The State filed notice of its intent to seek the death penalty. Pursuant to the defendant's motion for a change of venue, the case was transferred from Henderson County to Madison County for a trial by jury. Following presentation of evidence in the guilt phase, the jury found the defendant guilty of first degree murder as charged. After a sentencing hearing, the jury concluded that the evidence established one aggravating circumstance: that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39-13-204(i)(5) (1991). Finding that this aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death. On appeal, the Court of Criminal Appeals affirmed both the conviction and sentence. Thereafter, pursuant to Tenn.Code Ann. § 39-13-206(a)(1) (1997), the case was docketed in this Court for automatic review.

The defendant raises the following issues for our review:

1. Whether the evidence was sufficient to convict the defendant of first degree premeditated murder;
2. Whether the evidence was sufficient to support the finding of aggravating circumstance (i)(5)(torture

or serious physical abuse);

3. Whether the trial court erred in admitting photographs of the victim's body at sentencing;

*596 4. Whether the trial court erred in instructing the jury that it must agree unanimously to impose a life sentence;

5. Whether the trial court erred in excluding the testimony of Cheryl Arbogast at the guilt phase;

6. Whether the trial court's refusal of defendant's request to remove the United States Flag from the courtroom violated the defendant's right to testify on his own behalf under the Fourth, Fifth, and Sixth Amendments to the United States Constitution; and

7. Whether the sentence of death is disproportionate to the penalty in similar cases; [FN1]

> FN1. During oral argument, the defendant raised two additional issues for the first time: first, whether the trial court erred in permitting the State to use a mannequin as demonstrative evidence to document the location and extent of the victim's injuries, and second, whether the trial court erred during the guilt phase by instructing the jury, in reference to the intoxication defense, that "[i]ntoxication is irrelevant [sic] to the issue of the essential element of the Defendant's culpable mental state." Neither the use of the mannequin nor the misstatement of the pattern jury instruction were objected to at trial. Moreover, they were not listed as errors in either the Motion for New Trial or in the appeal to the Court of Criminal Appeals. We find that the failure to raise these issues in previous proceedings constitutes waiver, and we decline to address them at this time. Tenn. R.App. P. 3(e); Tenn. R.App. P. 36(a).

After thoroughly reviewing the record of the trial, the legal principles at issue, and the arguments of the parties, we find no error. The defendant's conviction and sentence are affirmed.

## *FACTS*

When she met the defendant, Billie Jo Hall had two daughters, Jennifer and Cynthia, from a former relationship. After their marriage, she and the defendant had two more daughters, Stephanie and Jessica. The youngest, Jessica, suffered from cerebral palsy. At the time of her murder, Mrs. Hall and the

42

defendant were estranged and living separately.

On the night of July 29, 1994, the defendant went to Mrs. Hall's house to discuss a reconciliation. He brought a $25.00 money order made out to Mrs. Hall as a payment toward child support. Prior to entering the house, the defendant disconnected the telephone line at the utility box on the outside wall of the house. [FN2] When Mrs. Hall answered the door, the defendant pushed his way into the room where she and the children were watching television. The defendant told the girls to go to bed. When they did not immediately obey his order, the defendant tipped over the chair in which Mrs. Hall was sitting. The defendant and Mrs. Hall then went back into her bedroom. The children, who had gone into their bedrooms, could hear "[t]hings slamming around" and their parents yelling at each another. When the children tried to enter the room, they found the door blocked. The three oldest children, Jennifer, Cynthia and Stephanie, persisted in their efforts to get into the room and finally succeeded. They attempted to stop the defendant from hurting their mother. When Mrs. Hall told the children to go to a neighbor's house, the defendant told them that if they went for help, "he was going to kill Mama." He also told Mrs. Hall, a college student, that she would never live to graduate. Cynthia and Stephanie tried to use the telephone to call for help, but they discovered the telephones would not work. At that point, they went to a neighbor's house where they called 911. Jennifer, the oldest child, was the last to leave the house, carrying her sister Jessica. Before she left, she saw her mother and the defendant leave the bedroom and go outside. She watched the defendant drag her mother, "kicking and *597 screaming," to the small pool in the back yard.

> FN2. The photographs of the utility box show that the telephone lines are plugged into a jack in the utility box in the same way that individual telephones are plugged into the wall jacks inside the home. Thus, disconnecting the telephone lines involved no more than simply unplugging the connecting wire from the jack in the utility box.

The first officer to arrive on the scene was Chief Jerry Bingham of the Henderson County Sheriff's Department. Upon his arrival, he was directed by a neighbor to check the pool where he found Mrs. Hall's

body floating face down in the water. He immediately called Emergency Medical Services and a Tennessee Bureau of Investigation (TBI) investigator. TBI Agent Brian Byrd arrived on the scene shortly after midnight.

Agent Byrd entered the house and found the master bedroom in disarray. Bloodstains marked the bed, a counter top, and a wedding dress. The telephones inside the house were off their hooks. A $25.00 money order made out to Mrs. Hall and dated the day of the murder was found inside the house. No weapons were found. A trail of drag marks and bloodstains led from the master bedroom, out the front door, over the driveway, past the sandbox, and down to the pool in the back yard. Mrs. Hall's t-shirt was lying beside the pool. Clumps of grass ripped from the ground floated in the blood-tinged water of the pool. Outside the front door of the house the telephone junction box was opened and the phone line was disconnected. The grass and weeds near this box were matted down.

Dr. O'Brien Clay Smith, the forensic pathologist who performed the autopsy on Mrs. Hall, testified that the primary cause of death was asphyxia resulting from a combination of manual strangulation and drowning. He could not say with certainty that either strangulation or drowning was the exclusive cause of death. Evidence supporting strangling as a contributing cause of death included bruising on the left and right sides of Mrs. Hall's neck, hemorrhaging in the neck muscles around the hyoid bone in the neck, and bleeding in the thyroid gland, which indicated that extensive compression had been applied to the neck. Evidence supporting drowning as a contributing cause of death was water found in both Mrs. Hall's stomach and in her bloodstream. The water in her stomach could have collected when Mrs. Hall swallowed water as she was being drowned. The water in her bloodstream would have entered when she took water into her lungs, and the water passed through the lungs into her bloodstream.

Before dying, Mrs. Hall sustained at least eighty-three separate wounds, including several blows to the head, a fractured nose, multiple lacerations, and bruises and abrasions to the chest, abdomen, genitals, arms, legs and back. Abrasions on Mrs. Hall's back were consistent with having been dragged across pavement. Dr. Smith used a mannequin during his testimony to demonstrate the size and location of the various wounds on Mrs. Hall's body, marking each wound with a black magic marker. He described some of the

43

36.3

injuries to Mrs. Hall's arms, legs and hands as defensive wounds. He characterized the injuries to the neck, face and head as intentional "target" wounds. Except for the physical trauma associated with the strangulation, however, none of the injuries would have proven fatal.

Chris Dutton, who was confined in a cell next to the defendant, testified that while both men were incarcerated, the defendant confided in him about his wife's murder. When describing what happened on the night of the murder, the defendant told Dutton that he had tried to talk with Mrs. Hall about reconciling but "[a]ll she was interested in was the money." When she refused to consider his plea for reconciliation and demanded that he leave, "his temper got the best of him and he began to strike her." According to Dutton, the defendant had determined, even before he arrived at his wife's house, "to make her feel as he did. He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him." The defendant told Dutton that he hit his wife in the head until he panicked, threw her in the swimming pool, then re-entered the house, took the car *598 keys, and drove away in Mrs. Hall's minivan.

On cross-examination, Dutton admitted that the defendant also told him that he was depressed and had been drinking since he telephoned his wife earlier that day. The defendant also told Dutton that he was very concerned about the welfare of his two daughters, especially Jessica. The defendant explained that he disconnected the telephone line, because, when he and his wife argued in the past, she had called the police.

Two witnesses testified on the defendant's behalf during the guilt phase of trial. Dr. Lynn Donna Zager, a clinical psychologist, interviewed the defendant several times after his arrest. She diagnosed him as depressed and suffering from alcohol dependence. In addition, she noted personality characteristics of paranoia and dependency. In Dr. Zager's opinion, at the time of the killing the defendant suffered from depression and alcohol intoxication. These factors were compounded by his personality characteristics and various psycho-social stressors, including a sick child, loss of employment with the resulting financial problems, his impending divorce, and the terminal illness of a brother. Dr. Zager testified that, in her opinion, the defendant acted in an impulsive manner in killing his wife, rather than pursuant to a preconceived plan.

On cross-examination, Dr. Zager admitted that she based her opinion concerning the defendant's intoxicated state on statements he made to her and statements of other witnesses who saw him drinking on the day of the murder. She agreed that no one she interviewed remarked on whether the defendant exhibited any of the typical physical signs of intoxication, such as slurred speech or lack of coordination.

Randy Helms, the defendant's prior employer, also testified on behalf of the defendant. According to Helms, prior to the killing the defendant had been severely depressed because of his family problems.

The defendant attempted to call his sister, Cheryl Arbogast, to testify regarding his state of mind at the time of the murder, but she had no first- hand knowledge of the defendant's state of mind on the night of the murder. In fact, Ms. Arbogast admitted she had not spoken to the defendant for several months prior to the murder. Her testimony regarding the defendant's state of mind was based on a conversation she had with her brother, Jeff Hall, since deceased, on the day of the murder. The trial court would not permit this hearsay testimony to be admitted before the jury. [FN3] At the conclusion of the evidence, the jury found the defendant guilty as charged of first degree premeditated murder.

> FN3. The court did, however, elicit the following information during an offer of proof: on the day of the murder the defendant had called his brother Jeff in Texas. He was crying and distraught over the state of his personal affairs. His brother Jeff was dying of AIDS; the defendant had lost his job; now he was facing the possibility of divorce and losing his children. Jeff was concerned about the defendant and called Ms. Arbogast who lived in Cincinnati. They discussed arranging psychiatric counseling for the defendant on an urgent basis. Ms. Arbogast attempted to call the defendant on the night of the murder but was unable to reach him.

During the sentencing phase the State recalled Dr. Smith to testify in more detail concerning the extent of Mrs. Hall's injuries. The State introduced photographs of the injuries taken at the autopsy to illustrate Dr.

44

Smith's testimony. These photographs depicted the numerous external wounds the defendant inflicted while struggling with Mrs. Hall.

The defendant called Dr. Zager and Dr. Joe Mount, a psychological examiner who counseled defendant at Riverbend Maximum Security Institution. Both described the defendant as depressed, remorseful, suicidal and extremely concerned about his children. Dr. Mount testified that the defendant had been diagnosed as suffering from an adjustment disorder with mixed *599 emotional features (anxiety and depression) and "substance abuse of dependence by history."

Helms also testified again. He described the defendant as a good, dependable employee and told how the defendant had cared for his children when he brought them to work with him. Helms stated that the defendant loved his wife and children and had hoped to reconcile with Mrs. Hall.

The defendant also presented his three sisters and his mother to recount the history of the defendant and his family. The defendant was the youngest of seven children. His father, an alcoholic, physically and verbally abused his wife until he died from a heart attack in 1974 when the defendant was ten. The defendant's father denied that the defendant was his son and snubbed the defendant. The witnesses' descriptions of the fights between the defendant's parents eerily paralleled the defendant's final confrontation with his own wife. All of the defendant's relatives described him as a good father who loved his children.

## SUFFICIENCY OF THE EVIDENCE

The defendant contends that the record establishes a killing premised on anger, passion, and alcohol rather than a premeditated and deliberate murder. His is a two-part argument: first, he claims that the passion and anger aroused by his fight with his wife had not subsided when he killed her; second, he claims that his intoxication rendered him unable to form the mental state necessary for first degree murder.

[1][2][3][4][5] When the sufficiency of the evidence is challenged, the standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Burns,* 979 S.W.2d 276, 286- 87 (Tenn.1998); Tenn. R.App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. *See State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). In determining the sufficiency of the evidence, this Court does not reweigh the evidence, *see id.,* or substitute its inferences for those drawn by the trier of fact, *see Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *See Burns,* 979 S.W.2d at 287; *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973). On appeal, the appellant bears the burden of proving that the evidence is insufficient to support the jury verdict. *See State v. Pike,* 978 S.W.2d 904, 914 (Tenn.1998); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982).

[6] At the time of this homicide, the Code defined first degree murder as "[a]n intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39-13-202(a)(1) (1991). A homicide, once proven, is presumed to be second degree murder, and the State has the burden of proving the elements of premeditation and deliberation to raise the offense to first degree murder. *State v. Nesbit,* 978 S.W.2d 872, 898 (Tenn.1998).

[7][8][9] "Intentional" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn.Code Ann. § 39- 11-106(a)(18) (1991). Proving premeditation requires evidence of "a previously formed design or intent to kill," *Nesbit,* 978 S.W.2d at 898; *State v. West,* 844 S.W.2d 144, 147 (Tenn.1992), and "the exercise of reflection and judgment." Tenn.Code Ann. § 39-13- 201(b)(2) (1991) (repealed 1995). Proving deliberation requires evidence of a cool purpose formed in the absence of passion or provocation. *600 See Tenn.Code Ann. § 39-13-201(b)(1) (1991) & Sentencing Commission Comments; *State v. Brown,* 836 S.W.2d 530, 539-40 (Tenn.1992) (citations and internal quotations omitted). Deliberation also requires "some period of reflection during which the mind is free from the influence of excitement." *Brown,* 836 S.W.2d at 540. A killing committed during a state of passion, however, may still rise to the level of first degree

45

murder if the State can prove that premeditation and deliberation preceded the struggle.   *See Franks v. State*, 187 Tenn. 174, 213 S.W.2d 105, 107 (1948); *Leonard v. State*, 155 Tenn. 325, 292 S.W. 849 (1927).

[10] The evidence in this case, when viewed in the light most favorable to the State, demonstrates the following.  The defendant contacted Mrs. Hall on the day of the murder to arrange for a meeting.  Although the defendant arranged the meeting under the guise of delivering a child-support check, he actually wanted to meet with Mrs. Hall to attempt to persuade her to reconcile.  As the defendant later told fellow prisoner Dutton, if Mrs. Hall were unwilling to reconcile, he intended "to make her feel as he did.  He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him." Prior to entering the house, the defendant disconnected the telephone lines to prevent Mrs. Hall from calling for help.  At some point either before or during his attack, the defendant told Mrs. Hall that she "would never live to graduate."  Finally, during the attack, the defendant told the children that he would kill their mother if they went for help.    The evidence of planning, the expression of defendant's intent to kill or hurt Mrs. Hall, the severity of the beating, and the manner of death establish the existence of premeditation and deliberation and support a conviction for first degree murder beyond a reasonable doubt.

Our Code provides that while voluntary intoxication is not a defense to prosecution for an offense, evidence of such intoxication may be admitted to negate a culpable mental state.   *See* Tenn.Code Ann. § 39-11-503(a) (1991); *see also State v. Phipps*, 883 S.W.2d 138, 148 (Tenn.Crim.App.1994).  The defendant's argument that his intoxication rendered him unable to form the mental state necessary for first degree murder, however, is not persuasive.  The defendant's own statements to Dutton and Dr. Zager constitute the only evidence of intoxication.  No witness described the defendant as drunk or intoxicated.  Furthermore, the defendant's conduct in traveling to Mrs. Hall's house, disconnecting the telephone, barricading the bedroom door, and completing his escape after the killing belies the claim that he was incapable of premeditation and deliberation.

Having reviewed the entire record, we conclude that a rational trier of fact could have found the essential elements of premeditated and deliberate first degree murder beyond a reasonable doubt.   Tenn. R.App. P.

13(e).  This issue, therefore, is without merit.

### SUFFICIENCY OF (i)(5) AGGRAVATING CIRCUMSTANCE

[11] The defendant also contends that the evidence was insufficient to support the jury's finding of aggravating circumstance (i)(5) that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."  [FN4] *601 Pursuant to Tenn.Code Ann. § 39-13-206(c) (1997), this Court must review the sufficiency of the aggravating evidence against the mitigating evidence offered and determine the following:  whether the sentence of death was imposed in an arbitrary fashion; whether the evidence supports the jury's finding of the existence of each aggravating circumstance beyond a reasonable doubt; whether the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt; and whether the sentence of death is disproportionate.

> FN4.  The defendant compares his case to that of Richard Odom whom a jury convicted of first degree felony murder committed in the course of a rape.  *State v. Odom*, 928 S.W.2d 18 (Tenn.1996).  The defendant reasons that stabbing and raping a murder victim is more "heinous" than merely beating and strangling the victim.  Because Odom's death sentence was overturned on appeal, defendant urges this Court to do the same in his case.  The defendant misconstrues this Court's ruling in *Odom*.  A majority of the Court stated that, because Odom was convicted of felony-murder as opposed to deliberate, premeditated murder, the mere fact of the felony, *i.e.*, the rape, alone would be insufficient to constitute "torture" or "serious physical abuse beyond that necessary to produce death" without further proof.  Use of the underlying felony to both convict the defendant of first degree murder and to impose the death penalty would not sufficiently narrow the class of persons eligible for the death penalty pursuant to *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).  Otherwise, all defendants convicted of murder in the perpetration of a rape would automatically be eligible for the death penalty under the (i)(5)

46

366

aggravating circumstance without any further proof of torture or serious physical abuse. That is not to say that during re- sentencing the State could not have produced additional evidence of torture or serious physical abuse in addition to the rape, which would have possibly established the (i)(5) aggravator.

The "especially heinous, atrocious or cruel" aggravating circumstance may be proved under either of two prongs: torture or serious physical abuse. This Court has defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985). The terms "serious physical abuse beyond that necessary to produce death" are self-explanatory; the abuse must be physical rather than mental in nature. "Abuse" is defined as "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.' " *Odom*, 928 S.W.2d at 26 (quoting Black's Law Dictionary 11 (6th ed.1990)).

The evidence presented in this case supports a finding of the "heinous, atrocious or cruel" aggravating circumstance under either, or both, of the two prongs. We agree with the Court of Criminal Appeals that Mrs. Hall suffered mental torture over the welfare of her children as the defendant beat her in their presence. After hearing the defendant's threats to kill her if the children went for help, she most certainly would have feared for her own fate as well.    This Court has repeatedly held that the anticipation of physical harm to one's self or a loved one constitutes mental torture. *State v. Carter*, 988 S.W.2d 145, 150 (Tenn.1999); *Nesbit*, 978 S.W.2d at 886-87; *State v. Cauthern*, 967 S.W.2d 726, 732 (Tenn.1998); *State v. Hodges*, 944 S.W.2d 346, 358 (Tenn.1997).    The evidence here clearly supports a finding of mental torture.

Furthermore, the extent and severity of the beating support a finding of either physical torture or "serious physical abuse beyond that necessary to produce death" due to the pain Mrs. Hall suffered before she finally died. Therefore, we find the evidence sufficient to support the existence of the (i)(5) aggravating circumstance beyond a reasonable doubt.

As proof of mitigating circumstances, the jury may reasonably have found that the defendant did not have

a significant history of prior criminal activity, that he was a good worker and employee, and that he was a caring and nurturing father.    Nevertheless, we agree with the jury's conclusion that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt.    This issue is wholly without merit.

### ADMISSION OF AUTOPSY PHOTOGRAPHS

[12] During the sentencing phase of the defendant's trial, the trial court admitted into evidence several photographs taken of Mrs. Hall's body during the autopsy.    These photographs rather graphically depicted *602 the nature and extent of the external injuries sustained by Mrs. Hall prior to her death. The defendant argues that the photographs were unnecessary and cumulative to Dr. Smith's testimony and the demonstration done with the mannequin during the guilt phase of trial.    The State argues, to the contrary, that the photographs were the best evidence of the nature and extent of the injuries and were necessary to support the State's position that the murder involved torture or serious physical abuse beyond that necessary to cause death.

[13] The admissibility of photographs is generally within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent an abuse of that discretion.    *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978).    The admissibility of evidence at a capital sentencing hearing is controlled by Tenn.Code Ann. § 39-13-204(c) (1991), which allows the admission of any evidence "the court deems relevant to the punishment ... regardless of its admissibility under the rules of evidence," subject to a defendant's opportunity to rebut any hearsay statements and to constitutional limitations. [FN5]

> FN5. To decide this issue, the Court of Criminal Appeals applied Tenn. R. Evid. 401 and 403 and weighed the probative value of the photographs against their prejudicial effect upon the defendant's case.

Historically, photographs depicting a victim's injuries have been held admissible to establish torture or serious physical abuse under aggravating circumstance (i)(5). *See, e.g., State v. Smith*, 893 S.W.2d 908, 924

47

(Tenn.1994) (photographs depicting the victim's body, including one of the slash wound to the throat, which was "undeniably gruesome," were relevant to prove that the killing was "especially heinous, atrocious, or cruel" and were admissible for that purpose); _State v. McNish,_ 727 S.W.2d 490, 494-95 (Tenn.1987) (photographs of the body of the victim who was beaten to death were relevant and admissible to show the heavy, repeated and vicious blows to the victim and to prove that the killing was "especially heinous, atrocious, or cruel").

The photographs in question depicted Mrs. Hall's body during the autopsy, prior to any surgical examination of her internal organs.   While certainly not pleasant to view, they were illustrative of the testimony of Dr. Smith and highly relevant to the extent of abuse endured by Mrs. Hall prior to her death.   They were not so gruesome as to have unduly inflamed the members of the jury.   We find that the photographs were directly relevant to the existence of torture and serious physical abuse, necessary elements of the "especially heinous, atrocious or cruel" aggravating circumstance of Tenn.Code Ann. § 39-13-204(i)(5) (1991), and were properly admitted into evidence.

### UNANIMITY INSTRUCTION IN SENTENCING PHASE

[14] The defendant argues that the trial court's instruction to the jury that they must unanimously agree on whether the statutory aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt violates his Eighth Amendment right to have each juror consider and give effect to mitigating circumstances.     _See McKoy v. North Carolina,_ 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and _Mills v. Maryland,_ 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).   In _McKoy_ and _Mills,_ the Court held that sentencing schemes that permit jurors to consider only unanimously found mitigating circumstances in determining whether the aggravating circumstances are sufficient to justify imposition of death penalty impermissibly limit the jurors' consideration of mitigating evidence in violation of the Eighth Amendment.   _See McKoy,_ 494 U.S. at 438-44, 110 S.Ct. 1227; _Mills,_ 486 U.S. at 383-84, 108 S.Ct. 1860.

*603 The challenged instruction read as follows:
  If you unanimously determine that at least one statutory aggravating circumstance have [sic] been

proven by the State beyond a reasonable doubt and said circumstance or circumstances have been proven by the State to outweigh any mitigating circumstance or circumstances beyond a reasonable doubt, the sentence shall be death.
  We note that the defendant did not object to this instruction when it was given, nor did he raise it as an issue in his Motion for New Trial or in the Court of Criminal Appeals.   Normally, the defendant's failure to take any action to call this issue to the trial court's attention will preclude review on appeal.     Tenn. R.App. P. 3(e), 36(a).   In any event, we note that this instruction fully complied with the requirements of Tenn.Code Ann. § 39-13-204(g)(1) (1991), requiring proof of at least one aggravating circumstance beyond a reasonable doubt and a determination that such aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. Furthermore, the trial court also instructed the jurors that "[t]here is no requirement of jury unanimity as to any particular mitigating circumstance or that you agree on the same mitigating circumstance."  This instruction satisfies any Eighth Amendment concerns under _McKoy_ or _Mills._  This issue is without merit.

### EXCLUSION OF CHERYL ARBOGAST TESTIMONY

[15] During the guilt phase of his trial, the defendant attempted to call his sister, Cheryl Arbogast, to testify about statements his brother Jeff had made to her concerning the defendant's mental state around the time of the killing.   Because Arbogast had no personal knowledge of facts regarding her brother's mental state, the trial court excluded her testimony as inadmissible hearsay.   The defendant argues that Jeff's statements were admissible under Tenn. R. Evid. 804(a)(4) because Jeff had died and was unavailable to testify.

Rule 804 provides for certain exceptions to the hearsay exclusionary rule when a witness is "unavailable." "Unavailability" is defined at subsection (a)(4) as including situations in which the declarant "[i]s unable to be present or to testify at the hearing because of the declarant's death or then existing physical or mental illness or infirmity."

However, under subsection (b) of Rule 804, the hearsay exception for unavailable witnesses applies only to (1) former testimony, (2) statements under belief of impending death, (3) statements against interest, and (4) statements of personal and family

48

history.    *See* Tenn. R. Evid. 804(b). Jeff Hall's descriptions to Arbogast of the defendant's mental state do not fall within any of these exceptions.    The trial court properly excluded this testimony during the guilt phase of defendant's trial.

### DENIAL OF RIGHT TO TESTIFY

[16][17] At the conclusion of proof in both the guilt phase and the penalty phase, the trial court sought to have the defendant take the stand to confirm that he knowingly and intelligently decided not to testify at trial after consultation with his attorneys.    On both occasions, the defendant refused to be sworn to testify unless the trial court removed "the flag of war," *i.e.*, the United States flag, from the courtroom. [FN6] The trial court refused to remove *604 the flag and proceeded to inquire of defense counsel whether counsel had explained the defendant's right to testify and whether the defendant had knowingly and voluntarily waived this right. Counsel indicated that they fully explained to the defendant the complementary rights to testify in one's own defense and to be free from self-incrimination, after which he chose not to testify.

> FN6.    Although the record is not completely clear, the trial court apparently perceived gold fringe ornamentation on the courtroom flag to be symbolic of martial law jurisdiction.    We note that the display of the United States flag with gold fringe is common in many ceremonial settings, including courtrooms. From a historical and legal standpoint, the use of fringe on the flag has no inherent or established symbolism.    It has nothing to do with the jurisdiction of the court or with martial law.    It is purely a decorative addition to enhance the appearance of the flag. *See Fringe on the Flag?*, New England Journal of Vexillology (Online edition, 1997); *Data Summary Sheet No. 1 3/95* , Flag Research Center (1995);    *see also Schneider v. Schlaefer,* 975 F.Supp. 1160, 1163 (E.D.Wis.1997) (finding that fringe on flag was not of any legal significance affecting the jurisdiction of the court and holding all future claims based on this argument "frivolous and sanctionable"); *Sadlier v. Payne,* 974 F.Supp. 1411, 1414 (D.Utah 1997) (holding yellow fringe on flag does not convert state courtroom into a "foreign state or power");

*McCann v. Greenway,* 952 F.Supp. 647, 650 (W.D.Mo.1997) (reviewing history of the American flag); *United States v. Greenstreet,* 912 F.Supp. 224, 229 (N.D.Tex.1996) (finding fringed flag did not limit federal district court's jurisdiction); *Vella v. McCammon,* 671 F.Supp. 1128, 1129 (S.D.Tex.1987) (holding yellow fringed flag did not divest federal court of jurisdiction to impose penalties for civil and criminal contempt).

The defendant now asserts that the trial court's refusal to remove the flag infringed on his right to testify in his own defense.    We note that the defendant did not file any motion during either the guilt or sentencing phase expressly requesting removal of the flag so that he could exercise his right to testify.    This issue was not raised in either the Motion for New Trial or in the Court of Criminal Appeals.    Technically, the issue has been waived.    Tenn. R.App. P. 3(e), 36(a).    In any event, a trial court's refusal to remove the United States flag from the courtroom does not violate anyone's constitutional rights.    This issue is wholly without merit.

### PROPORTIONALITY REVIEW

[18][19][20][21][22] The defendant next claims that his sentence is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.    This Court's decision in *State v. Bland,* 958 S.W.2d 651 (Tenn.1997), set out the methodology for comparative proportionality review under Tenn.Code Ann. § 39-13-206(c)(1)(D)(1997).    Comparative proportionality is for the purpose of determining whether the death penalty is unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime.    Our Court applies the precedent-seeking approach, in which it compares a particular case with other cases in which the defendants were convicted of the same or similar crimes.    The Court conducts the comparison by examining the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved.    *See id.* at 564.    In theory, comparative review of capital cases insures rationality and consistency in the imposition of the death penalty.    *See id.* at 665 (citing *State v. Barber,* 753 S.W.2d 659, 665-66 (Tenn.1988); *State v.*

49

_Kandies_, 342 N.C. 419, 467 S.E.2d 67, 86 (1996)). In addition to comparing the backgrounds of the various defendants and the aggravating and mitigating factors applicable to the various cases, other factors relevant to the process of identification and comparison of similar cases include: (1) the means of death; (2) the manner of death, _e.g.,_ violent or torturous; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on surviving victims. _See id._ at 667. Also relevant when comparing the various cases are: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; **\*605** (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of the victim; and (8) the defendant's capacity for rehabilitation. _See id._

In conducting our proportionality review in this case we have attempted to review cases in which the defendant and victim shared a close relationship; the defendant used a similar method to cause the resulting death (beating/strangulation); and the jury found the (i)(5) aggravator. For example, in _State v. Smith_, 868 S.W.2d 561 (Tenn.1993), the defendant shot his estranged wife in the shoulder and neck, severing her spinal cord. The medical examiner testified that following the wound to the neck, the victim would have been immediately paralyzed from the neck down. She would have quickly lost consciousness, but may have lived from two to six minutes following the fatal wound. Following the victim's death, the defendant slit her throat, then stabbed her numerous times with both a knife and an "awl" or ice pick. After convicting the defendant of first degree premeditated murder, the jury found the existence of four aggravating circumstances, including the (i)(5) "especially heinous, atrocious or cruel" aggravator, and imposed a sentence of death by electrocution. This Court upheld such conviction and sentence on appeal.

In _State v. Johnson_, 743 S.W.2d 154 (Tenn.1987), the defendant forced a large plastic garbage bag into his wife's mouth, resulting in her strangulation and asphyxiation. She bled from the nose and ears, and traces of blood were found on a couch in the office where her death occurred. There was testimony that she would have been conscious during the terrifying ordeal and that from one to four minutes would have elapsed before she expired. The jury found that Johnson had a previous record of committing violent offenses, and that the manner in which he committed his crime was "especially heinous, atrocious or cruel" in that it involved torture or depravity of mind. Accordingly, the jury sentenced him to death. This Court upheld the finding of the (i)(5) aggravating circumstance and affirmed both the conviction and sentence on appeal.

In _State v. Cooper_, 718 S.W.2d 256 (Tenn.1986), the defendant, who was separated from his wife pending finalization of divorce proceedings, called his wife's mother and told her he was going to kill his wife. In the early morning hours of the following day, he went to his wife's place of employment and told her he was going to kill her. He then left the premises and purchased a shotgun. Later that morning, he returned and, in the presence of her supervisor, told her he was going to kill her. When the supervisor called the police during that incident, police advised the wife to take an arrest warrant out on her husband. Before she had the opportunity to do so, however, the defendant returned to her workplace and shot her four times with a single- action shotgun. Although death was instantaneous, or nearly so, this Court, found that the defendant's threats and harassment throughout the day had constituted mental torture and depravity of mind. We therefore upheld the jury's finding that the killing was "especially heinous, atrocious, or cruel" under Tenn.Code Ann. § 39-2-203(i)(5) (1982) (repealed 1989), and the imposition of the death penalty.

In _State v. Miller_, 674 S.W.2d 279 (Tenn.1984), _on remand,_ 771 S.W.2d 401 (Tenn.1989), the defendant, possibly under the influence of LSD, beat his girlfriend to death with his fists and a fire poker, then stabbed her numerous times with a knife. The jury found as the sole aggravating circumstance that the murder was "especially heinous, atrocious or cruel," under the (i)(5) aggravator, and this Court affirmed the sentence of death on appeal.

In _State v. Teague_, 645 S.W.2d 392 (Tenn.1983), _on remand,_ 680 S.W.2d 785 (Tenn.1984), the defendant struck his estranged wife in the head rendering her unconscious and drowned her in her own bathtub. The motive for the killing was to prevent the victim from

50

testifying against *606 him in an upcoming murder trial. After finding the defendant guilty of first degree premeditated murder, the jury found two aggravating circumstances: (1) that the defendant was previously convicted of a felony other than the present charge, which involved the use or threat of violence to the person, Tenn.Code Ann. § 39-2-203(i)(2) (1982) (repealed 1989), and (2) that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another, Tenn.Code Ann. § 39-2-203(i)(6) (1982) (repealed 1989), and sentenced Teague to death. This Court upheld both the conviction and sentence on appeal.

Although no two cases are identical, the cases discussed above are similar in many respects to this case. In each, domestic disagreements bred animosity between the defendant and the victim. As a result of the relationship between the parties, a heightened state of emotion suffused the events. In most of these cases, the defendant made prior threats to kill the spouse well before actually carrying out the threats. In each of the cases, the defendant attacked the victim mercilessly and without provocation, and each victim died a horrific death. The juries in most of these cases relied, at least in part, on the (i)(5) aggravating circumstance to justify the imposition of the death penalty. We have also examined other cases in which defendants convicted of the first degree murder of their spouse or significant other received a sentence of life imprisonment or life without parole. [FN7] After reviewing the body of cases as a whole, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

> FN7. *See, e.g., State v. Dick,* 872 S.W.2d 938 (Tenn.Crim.App.1993), *app. denied* (Defendant hit his estranged wife in the head with an object fracturing her skull, stabbed her three times, stuffed her into the back seat of her car, and poured gasoline over the body and interior of the car in an attempt to set the car on fire; State did not seek death penalty); *State v. Parks A. Bryan,* No. 01C01-9711-CC-00521, 1999 WL 22992 (Tenn.Crim.App. at Nashville, filed Jan. 22, 1999) (Defendant viciously beat his wife, causing extensive bruising all over her body and multiple fractured ribs; ribs penetrated lungs, causing victim to slowly suffocate to

death over the course of up to two days; State did not seek death penalty, and jury found killing was "especially heinous, atrocious or cruel," imposing a sentence of life without parole); *State v. Terry Lynn Anthony,* No. 02C01-9605-CC-00159, 1997 WL 119516 (Tenn.Crim.App. at Jackson, filed Mar. 18, 1997) (Jealous defendant shot his wife three times after finding her in another man's car; State did not seek death penalty, and defendant was sentenced to life in prison); *State v. Randall Pennell,* No. 19, 1991 WL 23515 (Tenn.Crim.App. at Jackson, filed Feb. 27, 1991) (Enraged defendant beat girlfriend to head with claw end of hammer, then shot her in the chest; jury found killing was "especially heinous, atrocious or cruel," but that the aggravating circumstance did not outweigh the mitigating circumstances beyond a reasonable doubt, and sentenced defendant to life imprisonment); *State v. Donald Ferguson,* Grainger Circuit No. 2922 (Rule 12 report filed Nov. 1, 1994) (Defendant beat estranged wife to death with aluminum baseball bat; he pled guilty to first degree murder in return for agreed sentence of life imprisonment); *State v. Terry Lee Hicks,* Shelby Co. No. 85-02764 (Rule 12 report filed Apr. 1, 1986) (Defendant beat his wife severely enough that she was hospitalized, then went to hospital and shot her to death; he pled guilty in return for agreed sentence of life imprisonment).

### *CONCLUSION*

After thoroughly reviewing the record of the trial and the issues presented before us in accordance with Tenn.Code Ann. § 39-13-206(b), -(c) (1997), we conclude that the evidence is sufficient to support the finding of guilt of first degree premeditated and deliberate murder. The jury did not impose the death sentence in an arbitrary fashion. Furthermore, the evidence supports the jury's findings of the aggravating circumstance and that the aggravating circumstance outweighs any mitigating circumstances. Also, a comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that *607 the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, the decision of

the Court of Criminal Appeals upholding the conviction and sentence of death is affirmed. The sentence of death will be carried out as provided by law.

ANDERSON, C.J., DROWOTA, BIRCH and HOLDER, J.J., concur.

8 S.W.3d 593

END OF DOCUMENT

52

IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE
DIVISION I

JON HALL            )
                    )
VS.                 )            NO. C-00-422
                    )
STATE OF TENNESSEE  )

FILED

JUDY BARNHILL, CIRCUIT COURT CLERK

DEC 0 5 2002

DEPUTY CLERK

A.M. _____ P.M.

### STATE'S BRIEF AT THE CLOSE OF EVIDENCE

Comes now the State of Tennessee and hereby submits to the Honorable Court the
State's argument in support of its motion to dismiss the above styled petition.

I.    **Effective Assistance of Counsel**

The primary emphasis of the petitioner and counsel in this matter was directed at the
ineffectiveness of trial counsel and the State begins with that issue. During the hearing
and in the petitioner's brief several witnesses were called and reference is made to their
testimony for the proposition that there was a great deal of evidence that the defendant
was a good person or as he was sometimes referred to as a "white knight".

The Court should note that none of these witnesses were fact witnesses and none of
them had any pertinent information as to the events surrounding the murder for which the
petitioner was duly convicted. All of the evidence offered by Debbie Davis, Clarence
Stanfield, Joe Stanfield, Valene Foreman, Paula Foreman, Jackie Brittain, Pamela
Brittain and others is simply irrelevant to the guilt phase of the trial. It should be noted as
well that the Brittains had given statements to TBI agents that were highly prejudicial to
the defendant (Hearing transcript volume II p.241, and 257). The State further points out
that much of the evidence alluded to by the petitioner was in fact brought out during the
trial through several witnesses. ( See testimony of Chris Dutton at trial transcript Vol. II
p. 234. Testimony of Stephanie Lambert, trial transcript vol. II p. 247and 248, and
testimony of Cynthia Lambert, trial transcript vol. II p. 265, 266). Furthermore, defense
counsel testified that they chose to limit the use  "white Knight" evidence because there
was a lot of proof of domestic abuse and that by attempting to demonstrate how good the
defendant was would allow the State to introduce very damming evidence.(hearing
transcript vol.III at 327, 429, 430). Some of this evidence include convictions for Arson
and marijuana convictions. These is very sound trial strategy and the Court should not
second guess such tactics based upon hind sight.  *Goad v. State,* 938 S.W.2d 363, 370
(Tenn.1996). On claims of ineffective assistance of counsel, the petitioner is not entitled
to the benefit of hindsight, may not second-guess a reasonably based trial strategy and
cannot criticize a sound, but unsuccessful, tactical decision made during the course of the
proceedings. *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn.Crim.App.1994). Such
deference to the tactical decisions of counsel, however, applies only if the choices are

made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

Moreover, we are compelled to note that allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics rarely provide a basis for post-conviction relief. Counsel has some discretion in conducting the defense and is entitled to use his best judgment in matters of trial strategy or tactics. *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1991) (citing *McBee v. State*, 655 S.W.2d 191, 193 (Tenn.Crim.App.1983)).

If the petitioner fails to prove one of the prongs of the test, this Court need not analyze further because the petitioner has then not met his burden. *Burns v. State*, 6 S.W.3d 453, 461 (Tenn.1999). Decisions based upon trial strategy are generally not subject to post-conviction challenge. *See Goad*, 938 S.W.2d at 369; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn 1982).

The evidence of family members concerning Jon Hall's family history was thoroughly developed at the sentencing hearing and was rejected by the jury. Helms also testified again. He described the defendant as a good, dependable employee and told how the defendant had cared for his children when he brought them to work with him. Helms stated that the defendant loved his wife and children and had hoped to reconcile with Mrs. Hall.

   **The defendant also presented his three sisters and his mother to recount the history of the defendant and his family. The defendant was the youngest of seven children. His father, an alcoholic, physically and verbally abused his wife until he died from a heart attack in 1974 when the defendant was ten. The defendant's father denied that the defendant was his son and snubbed the defendant. The witnesses' descriptions of the fights between the defendant's parents eerily paralleled the defendant's final confrontation with his own wife. All of the defendant's relatives described him as a good father who loved his children.**

 **State v. Hall**, 8 S.W.3d 593, (Tenn. 1999).

   The issue of the petitioner's brother dying of Aids and the use of that testimony was pursued by trial counsel and on was an issue on appeal. **State v. Hall**, 8 S.W.3d 593, (Tenn. 1999). This matter is previously determined. Further the affidavit introduced by the petitioner constitutes rank hearsay in and of itself and it is doubtful whether the brother if living would have been allowed to testify to the matters stated in the affidavit had he been living and at the trial.

   The petitioner in his brief argues that the strategy at trial was to prove intoxication and yet there was no proof of intoxication. The defendant's expert testified that the defendant was under the influence but much of this proof was limited by the defendant's own refusal to testify even after being advised by the Court that he had the right to testify.

The defendant was the only competent fact witness who was not called and that was
based upon his own refusal after advise by the trial judge of his right to testify. The
petitioner's allusion to the testimony of Alice Pearson and Diane Pearson for the
proposition that the defendant was intoxicated is faulty since there is nothing in their
testimony that indicated that the petitioner was intoxicated.

The issue of the fact that the petitioner routinely disconnected phone wires is a very
tenuous argument. The trial Court was in a position to observe the reaction of defense
counsel when he testified. When asked whether he would use such evidence, he stated
he would not but the witnesses physical reaction to the question indicated just how absurd
he thought the idea was. It should be noted that disconnecting telephone wires in and of
its self is a felony offense under Tennessee laws. Tennessee Code Annotated § 39-14-
411. Furthermore, the idea that Jon Hall's family must be isolated by Jon from help is
very damning evidence. (See Hearing Transcript May15th, Vol. II at 205). In the words
of Mr. Mayo such evidence doesn't help very much and it makes the defendant look
sinister.( Hearing Transcript May 15 Vol. III at 330). Not much like a "white knight" at
all.

Much of the petitioner's evidence at the post conviction hearing was spent on
developing as alternative defense called Intermittent Explosive Disorder. If should be
noted by the Court that the defendant's mental health was well investigated and that the
Court took the extraordinary step of having the defendant hospitalized at Western Mental
Health for purposes of diagnosis. Tennessee law does not allow a petitioner to attack trial
counsels strategy by seeking to prove a different defense when his original defense was
unsuccessful. Moreover, we are compelled to note that allegations of ineffective
assistance of counsel relating to matters of trial strategy or tactics rarely provide a basis
for post-conviction relief. Counsel has some discretion in conducting the defense and is
entitled to use his best judgment in matters of trial strategy or tactics. *Taylor v. State,*
814 S.W.2d 374, 378 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1991) (citing
*McBee v. State,* 655 S.W.2d 191, 193 (Tenn.Crim.App.1983)).

First the State notes that the defense used two expert witnesses at the trial and
sentencing phases of the case. Neither of these witnesses were called by the petitioner to
testify that their evaluation or diagnosis was incomplete or that they would have
diagnosed the petitioner any different than what they had prior to trial. As such their
testimony stands in the record as given at trial.

The attempt by the petitioner to convince the Court that he was misdiagnosed must fail
simply because the diagnosis is in direct contradiction to the Diagnostic and Statistical
Manual of Mental Disorders. The DSMIV simply does not allow for such diagnosis
when there are other conditions or intoxication that explain the defendant's behavior.
This is probably why the defense experts did not make any such diagnosis simply
because it is improper. The petitioner has spent much effort in trying to develop the
proof that he should have been tested for low seratonin and therefore been diagnosed as
havening Intermittent Explosive Disorder. However, the State's witness testified that a
test for seratonin is usually not done simply because it is little use in making any

diagnosis because low seratonin is common in many illnesses and can be caused by intoxication. This testimony is backed up by the DSMIV which lists the criteria for Intermittent Explosive Disorder. Low seratonin levels are not part of the diagnostic criteria for Intermittent Explosive Disorder.(See Hearing Transcript November 4 at 27, 25, 75 and 78).

**It should be remembered by the Court that Intermittent Explosive Disorder is also inconsistent with the testimony of the petitioner's witnesses. Sherryl Arbogast testified that Jon was a "tenderhearted easy going guy, and that she never saw him angry with his children, Jackie Brittain, and Kathy Hugo testimony (see May 15[th] hearing Transcript p. 204, 230, 251, 282, 283) where all of these witnesses deny Jon having an explosive temper even when being confronted by his wife.**

In short the petitioner has failed to show anything that trial counsel could have done that was not done that would have in any way made any difference in this case. All of the evidence clearly demonstrates that the petitioner killed with premeditation and the most damming evidence of that is the fact that he told his children and the victim that he would kill her and that she would never live to graduate. **State v. Hall,** 8 S.W.3d 593, (Tenn. 1999).

## II.    Issue M(3) on page 20 of the amended petition raising the Constitutionality of Tennessee's murder statute under Article II section 17

No proof was presented on this issue and it is waived.

However, the well established rule in Tennessee is that the subsequent codification cures any such defects. Plaintiffs concede that the well-established rule in this jurisdiction is that if an act has been reenacted as codified, then the subsequent legislation supersedes the earlier and the breadth of the initial caption becomes moot. As our Supreme Court noted in Pace v. State, 566 S.W.2d 861, 864 (Tenn.1978):

As to the holding that the caption of the amending act was defective under the requirements of Article II, Section 17 of the Constitution of Tennessee, it is fundamental that defects in the caption of the amendatory act, if any, were cured through subsequent action of the legislature codifying the amendment.

The Court, in Harmon v. Angus R. Jessup Associates, Inc., 619 S.W.2d 522 (Tenn.1981), reiterated the rule:

We do not deem it necessary to analyze the caption of the statute as originally enacted, because the statute was reenacted in its entirety as a part of Tennessee Code Annotated. It is well settled in this state that the subsequent reenactment and codification of the statutes eliminated any question concerning the original caption.

640 S.W.2d 13, Nichols v. Tullahoma Open Door, Inc., (Tenn.Ct.App. 1982)

State ex rel. Blanton v. Durham, 526 S.W.2d 109, 111 (Tenn.1975) (citations omitted);
see Tennessee Mun. League v. Thompson, 958 S.W.2d 333, 336 (Tenn.1977).  However,
the subsequent codification of the bill cures any defects in the caption.  > State v.
Chastain, 871 S.W.2d 661, 666 (Tenn.1994);  Howard v. State, 569 S.W.2d 861, 863
(Tenn.Crim.App.1978).  The 1995 amendments to  section 40-35-120 added the
subdivisions that apply to the defendant.  See 1995 Tenn.Pub.Acts, ch. 499, §§ 1-2.
These amendments were codified in  section 40-35-120 and became effective July 1,
1995.  If any defect in the caption existed, it was cured by this codification.
2001 WL 472849, State v. Wyrick, (Tenn.Crim.App. 2001)


III.  **Counsel's Failure to withdraw motion for change of Venue**.

The issue hear is not the impropriety of the granting or the filing of the motion for the
change of venue.  The proof at the hearing was conclusive that the petitioner himself filed
for a change of venue pro se.  The Tennessee Supreme Court has ruled that once a
petitioner requests a change of venue he waives the right to be tried in the venue where
the offense occurred.  Although venue is a jurisdictional matter, Tennessee courts have
consistently held that venue can be waived in certain circumstances.  **See  State v.
Nichols, 877 S.W.2d 722, 727-29 (Tenn.1994) (motion for change of venue constitutes
waiver of claim that court lacked jurisdiction);**  State v. Turner, 919 S.W.2d 346, 358
(Tenn.Crim.App.1995) (rejecting the defendant's claim that the trial court was without
jurisdiction to accept his guilty plea and holding that he waived the issue by raising the
issue for the first time on appeal);  State v. Smith, 906 S.W.2d 6, 9
(Tenn.Crim.App.1995) (waiver by consenting to trial court's ruling that prosecution
would be more appropriate in another county);  State v. Gilbert, 751 S.W.2d 454, 462
(Tenn.Crim.App.1988) (waiver by failing to stand on motion for judgment of acquittal
and by failing to make references to the record).  Obviously, if venue could not be
waived, a defendant's request for a change of venue could never be granted.
Ellis v. Carlton, 986 S.W.2d 600 (Tenn.Crim.App. 1998).

But the issue raised is not the filing for change of venue but the failure to withdraw the
motion.  There was simply no showing that the trial Court would have granted such a
request.  The issue was raised at the beginning of the trial and the Court overruled the
motion.

III.     **No evidence or argument having been made on the remaining issues they
are therefore waive or unproven.  However for the Court's convenience I
have researched and addressed the constitutionality Tennessee's death
penalty statutes.**


IV. **DEATH PENALTY ISSUES**

Issues are addressed as numbered in the petition:

### **7(a)(2)  The sentencing statute does not sufficiently narrow the population of defendants convicted of first degree murder who are eligible for the death sentence.**

Rejected:

XI. Constitutionality of the Death Penalty

The appellant concedes that the constitutionality of the death penalty has been upheld by the Tennessee Supreme Court, however, he raises the following issues in order to preserve them for later review.  The appellant contends that **(1) the death penalty statute fails to meaningfully narrow the class of eligible defendants** (FN12);  (2) the prosecution has unlimited discretion in seeking the death penalty;  (3) the death penalty is imposed in a discriminatory manner based upon economics, race, geography, and sex;  (4) there are no uniform standards for jury selection;  (5) juries tend to be prone to returning guilty verdicts;  (6) the defendant is denied the opportunity to address the jury's popular misconceptions about parole eligibility, cost of incarceration, deterrence, and method of execution;  (7) the jury is instructed it must unanimously agree to a life sentence, and is prevented from being told the effect of a non-unanimous verdict;  (8) courts fail to instruct the juries on the meaning and function of mitigating circumstances;  (9) the jury is deprived of making the final decision about the death penalty;  (10) the defendant is denied the final argument during the sentencing phase;  (11) electrocution is cruel and unusual punishment;  and (12) the appellate review process in death penalty cases is constitutionally inadequate.

These issues have repeatedly been rejected by our supreme court.  See  Smith, 893 S.W.2d at 908;  Brimmer, 876 S.W.2d at 75;  Cazes, 875 S.W.2d at 253;  Smith, 857 S.W.2d at 1;  Black, 815 S.W.2d at 166;  Boyd, 797 S.W.2d 589;  State v. Teel, 793 S.W.2d 236 (Tenn.1990);  Thompson, 768 S.W.2d at 239.  See also  Keen, 926 S.W.2d at 741-44.

State v. Keen, 31 S.w.3rd 196 (Tenn.2000).

### **7(a)(3)  The sentencing statute does not sufficiently limit the juries discretion because once it finds the existence of one aggravating factor the jury can impose a sentence of death no matter what evidence of mitigation is shown.**

Rejected:

Since  Gregg, these procedural aspects of the Eighth Amendment's evolving standards of decency doctrine have focused on ensuring that the system used to impose death is not one "of standardless jury discretion."  Id. at  428 U.S. 153, 195 n. 47, 96 S.Ct. 2909, 49 L.Ed.2d 859.  A review of the case law reveals that these procedural issues generally arise in two areas:  (1) issues related to the channeling of the jury's discretion to impose death, see  Walton v. Arizona, 497 U.S. 639, 110 S.Ct.

3047, 111 L.Ed.2d 511 (1990);  Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988);  Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980);  and (2) issues related to the notion of individualized sentencing and consideration of mitigating evidence, see  Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982);  Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).  As these cases demonstrate, so long as the system used to impose death is not rendered arbitrary or capricious in that the sentencing authority lacks adequate information or guidance, the procedural protections of the Eighth Amendment in capital cases have no application.

The appellant argues that, given the option, juries in Tennessee have sentenced defendants to life without parole more times than they have imposed death. He draws from this statistic that "the reliability of death sentences actually imposed subsequent to inclusion of the life without parole option has been enhanced."  Once again, though, the focus of the Eighth Amendment--and of Article I, section sixteen--is on the capital sentencing process as a whole.  Simply stated, we can little see how the absence of this instruction has rendered the process so unreliable, or so arbitrary and capricious, as to violate the ban on cruel and unusual punishments. The jury in this case still heard all of the appellant's evidence presented in mitigation of sentence, and the jury was given constitutionally acceptable instruction and guidance as to the use of that evidence.  Moreover, the jury independently considered and weighed this evidence against the two aggravating circumstances it found beyond a reasonable doubt, and it unanimously concluded that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

The appellant argues that, given the option, juries in Tennessee have sentenced defendants to life without parole more times than they have imposed death. He draws from this statistic that "the reliability of death sentences actually imposed subsequent to inclusion of the life without parole option has been enhanced."  Once again, though, the focus of the Eighth Amendment--and of Article I, section sixteen--is on the capital sentencing process as a whole.  Simply stated, we can little see how the instruction.  Neither the Eighth Amendment, nor Article I, section 16, requires anything more.  Cf. Lockett, 438 U.S. at 605, 98 S.Ct. 2954.

31 S.W.3d 196, State v. Keen, (Tenn. 2000)


### (4) Sentencing statute limits the juries discretion in exercising mercy.

Rejected:

Melson, 638 S.W.2d at 366-368 (holding that neither written findings concerning mitigating circumstances, nor an instruction allowing the jury to impose a life sentence based on mercy are constitutionally required); Black, 815 S.W.2d at 185 (holding that the statute does not violate the constitutional rights of a defendant by

mandating that a jury impose death upon finding that aggravating circumstances outweigh mitigating circumstances);  Smith, 857 S.W.2d at 22-23 (holding that the statute does sufficiently limit exercise of the jury's discretion once matters in aggravation are found, and that the statute is not unconstitutional because it allows the admission of hearsay evidence at sentencing).

875 S.W.2d 253, State v. Cazes, (Tenn. 1994)

### (5) weight of non statutory mitigating factors

rejected

The appellant raises several constitutional objections to the Tennessee death penalty statute.  Specifically, the appellant contends that the death penalty statute is unconstitutional in that:

(a) it provides insufficient guidance to the jury concerning who has the burden of proving whether mitigation outweighs aggravation and what standard the jury should use in making that determination;

(b) it fails to sufficiently narrow the class of death penalty eligible defendants;

(c) it insufficiently limits the jury's discretion in that once it finds an aggravating circumstance beyond a reasonable doubt, it can impose death, regardless of what mitigation is shown;

(d) it requires that if the jury finds that the aggravating circumstances outweigh the mitigating circumstances, it must impose death;

**(e) it allows the jury to afford too little weight to non-statutory mitigating factors.  The statute requires that the jury consider "any mitigating circumstances";**

(f) it does not require the jury to make the ultimate determination that death is appropriate in that it is "merely filling in the blanks" in determining and comparing mitigating and aggravating circumstances.;

(g) it does not inform the jury of its ability to impose mercy;

(h) it provides no requirement that the jury make findings of fact as to the presence or absence of mitigating circumstances, thereby preventing effective appellate review;

(i) it prohibits the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase of the trial;

(j) it allows the imposition of a cruel and unusual punishment and in that it allows
death to be imposed by electrocution;

(k) it has been imposed discriminately on the basis of race, sex, geographic region,
and economic and political status of the defendant;

(l) the proportionality of arbitrariness review conducted by the Tennessee Supreme
Court pursuant to Tenn.Code Ann. § 39-13-205 is inadequate and deficient;

(m) it permits the introduction of relatively unreliable evidence in the State's proof of
aggravating circumstances and in its rebuttal of mitigating circumstances;

(n) it allows the State to make final closing arguments to the jury in the penalty phase
of the trial;

   All of the appellant's arguments except (g) have been rejected by the Tennessee
Supreme Court. See State v. Cazes, 875 S.W.2d 253, 268-269 (Tenn.1994);. State
v. Smith, 857 S.W.2d 1, 16-17, 23 (Tenn.1993);  State v. Howell, 868 S.W.2d 238,
258 (Tenn.1993);  State v. Black, 815 S.W.2d 166, 185, 187 (Tenn.1991);  State v.
Boyd, 797 S.W.2d 589, 596 (Tenn.1990);  State v. Melson, 638 S.W.2d 342, 366, 368
(Tenn.1982);  State v. Groseclose, 615 S.W.2d 142, 150 (Tenn.1981).  With respect
to the argument in (g), in consideration of the jury instructions given in a capital case,
we find this issue to be without merit.

   State v. Bush, 942 S.W.2d 489 (Tenn. 1997).

### (6) Requiring jury to make the ultimate determination that death is the appropriate sentence.

Rejected:

The appellant raises several constitutional objections to the Tennessee death penalty
statute.  Specifically, the appellant contends that the death penalty statute is
unconstitutional in that:

(a) it provides insufficient guidance to the jury concerning who has the burden of
proving whether mitigation outweighs aggravation and what standard the jury should
use in making that determination;

(b) it fails to sufficiently narrow the class of death penalty eligible defendants;

(c) it insufficiently limits the jury's discretion in that once it finds an aggravating
circumstance beyond a reasonable doubt, it can impose death, regardless of what
mitigation is shown;

(d) it requires that if the jury finds that the aggravating circumstances outweigh the mitigating circumstances, it must impose death;

(e) it allows the jury to afford too little weight to non-statutory mitigating factors. The statute requires that the jury consider "any mitigating circumstances";

**(f) it does not require the jury to make the ultimate determination that death is appropriate in that it is "merely filling in the blanks" in determining and comparing mitigating and aggravating circumstances.;**

(g) it does not inform the jury of its ability to impose mercy;

(h) it provides no requirement that the jury make findings of fact as to the presence or absence of mitigating circumstances, thereby preventing effective appellate review;

(i) it prohibits the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase of the trial;

(j) it allows the imposition of a cruel and unusual punishment and in that it allows death to be imposed by electrocution;

(k) it has been imposed discriminately on the basis of race, sex, geographic region, and economic and political status of the defendant;

(l ) the proportionality of arbitrariness review conducted by the Tennessee Supreme Court pursuant to Tenn.Code Ann. § 39-13-205 is inadequate and deficient;

(m) it permits the introduction of relatively unreliable evidence in the State's proof of aggravating circumstances and in its rebuttal of mitigating circumstances;

(n) it allows the State to make final closing arguments to the jury in the penalty phase of the trial;

All of the appellant's arguments except (g) have been rejected by the Tennessee Supreme Court. See State v. Cazes, 875 S.W.2d 253, 268-269 (Tenn.1994);. State v. Smith, 857 S.W.2d 1, 16-17, 23 (Tenn.1993); State v. Howell, 868 S.W.2d 238, 258 (Tenn.1993); State v. Black, 815 S.W.2d 166, 185, 187 (Tenn.1991); State v. Boyd, 797 S.W.2d 589, 596 (Tenn.1990); State v. Melson, 638 S.W.2d 342, 366, 368 (Tenn.1982); State v. Groseclose, 615 S.W.2d 142, 150 (Tenn.1981). With respect to the argument in (g), in consideration of the jury instructions given in a capital case, we find this issue to be without merit.

State v. Bush, 942 S.W.2d 489 (Tenn. 1997).

**(7) that the jury be instructed in writing that it can impose a life sentence based upon mercy alone.**

Rejected:

The appellant raises several constitutional objections to the Tennessee death penalty statute. Specifically, the appellant contends that the death penalty statute is unconstitutional in that:

(a) it provides insufficient guidance to the jury concerning who has the burden of proving whether mitigation outweighs aggravation and what standard the jury should use in making that determination;

(b) it fails to sufficiently narrow the class of death penalty eligible defendants;

(c) it insufficiently limits the jury's discretion in that once it finds an aggravating circumstance beyond a reasonable doubt, it can impose death, regardless of what mitigation is shown;

(d) it requires that if the jury finds that the aggravating circumstances outweigh the mitigating circumstances, it must impose death;

(e) it allows the jury to afford too little weight to non-statutory mitigating factors. The statute requires that the jury consider "any mitigating circumstances";

(f) it does not require the jury to make the ultimate determination that death is appropriate in that it is "merely filling in the blanks" in determining and comparing mitigating and aggravating circumstances.;

**(g) it does not inform the jury of its ability to impose mercy;**

(h) it provides no requirement that the jury make findings of fact as to the presence or absence of mitigating circumstances, thereby preventing effective appellate review;

(i) it prohibits the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase of the trial;

(j) it allows the imposition of a cruel and unusual punishment and in that it allows death to be imposed by electrocution;

(k) it has been imposed discriminatorily on the basis of race, sex, geographic region, and economic and political status of the defendant;

(l) the proportionality of arbitrariness review conducted by the Tennessee Supreme Court pursuant to Tenn.Code Ann. § 39-13-205 is inadequate and deficient;

(m) it permits the introduction of relatively unreliable evidence in the State's proof of aggravating circumstances and in its rebuttal of mitigating circumstances;

(n) it allows the State to make final closing arguments to the jury in the penalty phase of the trial;

   All of the appellant's arguments except (g) have been rejected by the Tennessee Supreme Court. See State v. Cazes, 875 S.W.2d 253, 268-269 (Tenn.1994);. State v. Smith, 857 S.W.2d 1, 16-17, 23 (Tenn.1993); State v. Howell, 868 S.W.2d 238, 258 (Tenn.1993); State v. Black, 815 S.W.2d 166, 185, 187 (Tenn.1991); State v. Boyd, 797 S.W.2d 589, 596 (Tenn.1990); State v. Melson, 638 S.W.2d 342, 366, 368 (Tenn.1982); State v. Groseclose, 615 S.W.2d 142, 150 (Tenn.1981). With respect to the argument in (g), in consideration of the jury instructions given in a capital case, we find this issue to be without merit.

942 S.W.2d 489, State v. Bush, (Tenn. 1997)


   **(8) written instruction on actual terms of life sentences and death sentences.**

Rejected:

5. Definition of Life and Death Sentence

   Defendant also claims that he was entitled to an instruction informing the jury that a sentence of life means life and death means death. This Court has previously held that such an instruction is not required. State v. Caughron, 855 S.W.2d 526, 543 (Tenn.1993); State v. Payne, 791 S.W.2d 10, 21 (Tenn.1990).

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)


   **(9) Jury not required to make specific findings with respect to mitigating circumstances.**

Rejected: (see "h" above)

Appellant broadly attacks the Howell harmless error analysis because the jury is not required to specify the mitigating circumstances it considered. He contends that it is virtually impossible to determine harmlessness without knowing which facts the jury considered in mitigation. Our supreme court, acknowledging that juries do not specify mitigating circumstances, has nevertheless found that a harmless error analysis can be performed. The court quoted with approval from Clemons v. Mississippi, 494 U.S. 738, 756, 110 S.Ct. 1441, 1452, 108 L.Ed.2d 725 (1990):

Nor are we impressed with the claim that without written jury findings concerning mitigating circumstances appellate courts cannot perform their proper role. In Fonzeo and Proffit, we upheld the Florida death penalty scheme permitting a trial judge to override a jury's recommendation of life, even though there were no written jury findings. An appellate court also is able adequately to evaluate any evidence relating to mitigating factors without the assistance of written jury findings.

Howell, 868 S.W.2d at 260.    Appellant's argument is without merit.

958 S.W.2d 799, Harries v. State, (Tenn.Crim.App. 1997)

see also T.C.A. § 39-13-201 (c ) (1) requiring the Court to reweigh all factors raised and the Court is not bound by the determination of the Jury.


### (10) Death as cruel and unsusual.

Rejected:

3. Death by electrocution constitutes cruel and unusual punishment. This argument has been rejected. See Black, 815 S.W.2d at 179; see also Hines, 919 S.W.2d at 582. (FN15)

46 S.W.3d 147, Terry v. State, (Tenn. 2001)


### (11) Electrocution and lethal injection are cruel and unusual.

Rejected:

3. Death by electrocution constitutes cruel and unusual punishment. This argument has been rejected. See Black, 815 S.W.2d at 179; see also Hines, 919 S.W.2d at 582. (FN15)

46 S.W.3d 147, Terry v. State, (Tenn. 2001)

In State v. Adkins, 725 S.W.2d 660, 664 (Tenn.1987), the Defendant also alleged that the use of electrocution, when there are more humane forms of legal killing, such as lethal injection, violates the constitutional prohibition against cruel and unusual punishment. Justice Fones, speaking for the Court, stated: "The validity and humanity of that complaint should be addressed to the Legislature. This Court's authority over punishment for crime ends with the adjudication of constitutionality." See State v. Barber, 753 S.W.2d 659, 670 (Tenn.1988); State v. Caldwell, 671 S.W.2d 459, 466 (Tenn.1984). [For a list of Tennessee and federal cases rejecting this argument, see Teague v. State, 772 S.W.2d 915, 924, n. 13 (Tenn.Crim.App.1988)

815 S.W.2d 166, State v. Black, (Tenn. 1991).

**No Proof was given on this issue and should be overruled.**

### (12) discriminatory application of the death penalty.

Rejected:

Defendant says the death sentence is imposed capriciously and arbitrarily. This argument is predicated in part on defendant's assertion that unlimited discretion vested in the prosecutor in selecting the persons to be charged with capital murder invalidates the statutes. This assertion is invalid, See Gregg v. Georgia, 428 U.S. 153, 198-99, 224-26, 96 S.Ct. 2909, 2937, 2949, 49 L.Ed.2d 859 (1976). The contention that the death penalty is imposed in a discriminatory manner based on economic, racial, geographic and gender differences, is submitted without any proof on this issue in the trial court and no effort has been made to show that the decision makers in this case acted with discriminatory purpose. See McCleskey v. Kemp, 481 U.S. 279, 290-91, 107 S.Ct. 1756, 1766, 95 L.Ed.2d 262 (1987).

926 S.W.2d 727, State v. Keen, (Tenn. 1994)

This issue was already addressed by the Tennessee Supreme Court under is proportionality review of the sentence.

### (13) The statute does not provide for adequate review by Tennessee Supreme Court.

### (14) Prosecutors abuse of discretion.
#### Trial Court reviewed; jury reviewed; Court of Criminal appeals reviewed; Tennessee Supreme Court had reviewed. All agreed.

Relative to the defendant's first argument that prosecutors have unlimited discretion as to whether to seek the death penalty in a given case, our supreme court has held that opportunities for discretionary action that inhere in the processing of a murder case, including the authority of the prosecutor to select those persons whom he or she wishes to prosecute for a capital offense, do "not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty freakish or arbitrary." Brimmer, 876 S.W.2d at 86 (quoting Gregg v. Georgia, 428 U.S. 153, 198-200, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976). See also Cooper v. State, 847 S.W.2d 521, 536-38 (Tenn.Crim.App.1992)) (rejecting similar claim in post-conviction context). This issue is without merit.

958 S.W.2d 679, State v. Hall, (Tenn. 1997)

### (15) Uniform standard for qualifying jurors.

Rejected:

IV. Constitutional Challenges to Death Penalty

The appellant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. The appellant concedes that these issues have been previously rejected by the Tennessee Supreme Court, however, he raises these challenges to preserve them for future appellate review. Specifically, included within his challenge that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and Article I, Sections 8, 9, 16, and 17, and Article II, Section 2 of the Tennessee Constitution are the following:

1. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, specifically, the statutory aggravating circumstances set forth in Tenn.Code Ann. § 39-2-203(i)(2), (i)(5), (i)(6), and (i)(7) have been so broadly interpreted whether viewed singly or collectively, fail to provide such a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. (FN14) This argument has been rejected by our supreme court. See State v. Vann, 976 S.W.2d 93, 117 118 (Tenn.1998) (Appendix),cert. denied, 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); State v. Keen, 926 S.W.2d 727, 742 (Tenn.1994).

**2. The death sentence is imposed capriciously and arbitrarily in that**

**(a) Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has been rejected. See State v. Hines, 919 S.W.2d 573, 582 (Tenn.1995), cert. denied, 519 U.S. 847, 117 S.Ct. 133, 136 L.Ed.2d 82 (1996).**

**(b) The death penalty is imposed in a discriminatory manner based upon economics, race, geography, and gender. This argument has been rejected. See Hines, 919 S.W.2d at 582; State v. Brimmer, 876 S.W.2d 75, 87 (Tenn.), cert. denied, 513 U.S. 1020,**

115 S.Ct. 585, 130 L.Ed.2d 499 (1994); Cazes, 875 S.W.2d at 268; State v. Smith, 857 S.W.2d 1, 23 (Tenn.), cert. denied, 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993).

(c) There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter. This argument has been rejected. See State v. Caughron, 855 S.W.2d 526, 542 (Tenn.),cert. denied, 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993).

**(d) The death qualification process skews the make-up of the jury and results in a relatively prosecution prone guilty-prone jury. This argument has been rejected. See State v. Teel, 793 S.W.2d 236, 246 (Tenn.), cert. denied, 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); State v. Harbison, 704 S.W.2d 314, 318 (Tenn.), cert. denied, 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986).**

**(e) Defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, i.e., the cost of incarceration versus cost of execution, deterrence, method of execution. This argument has been rejected. See Brimmer, 876 S.W.2d at 86 87; Cazes, 875 S.W.2d at 268; Black, 815 S.W.2d at 179.**

(f) The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non-unanimous verdict. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 22 23.

(g) Requiring the jury to agree unanimously to a life verdict violates Mills v. Maryland and McKoy v. North Carolina. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Thompson, 768 S.W.2d at 250; State v. King, 718 S.W.2d 241, 249 (Tenn.1986), superseded by statute as recognized by, State v. Hutchison, 898 S.W.2d 161 (Tenn.1994).

(h) The jury is not required to make the ultimate determination that death is the appropriate penalty. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Smith, 857 S.W.2d at 22.

(i) The defendant is denied final closing argument in the penalty phase of the trial. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 24; Caughron, 855 S.W.2d at 542.

3. Death by electrocution constitutes cruel and unusual punishment. This argument has been rejected. See Black, 815 S.W.2d at 179; see also Hines, 919 S.W.2d at 582.

4. The reasonable doubt instruction violates due process. This argument has been routinely rejected. See Vann, 976 S.W.2d at 116 (Appendix); State v. Nichols, 877 S.W.2d 722, 734 (Tenn.1994);
   State v. Bush, 942 S.W.2d 489, 504-05 (Tenn.1997).

5. The appellate review process in death penalty cases is constitutionally inadequate in that (1) the reviewing court cannot properly evaluate the proof due to the absence of written findings concerning mitigating circumstances; (2) the information relied upon for comparative review is inadequate and incomplete; (3) the methodology is flawed because the pool of cases is unduly narrow, the determination is entirely subjective, and the review fails to properly function as a safeguard. This argument has been rejected by our supreme court on numerous occasions. See Cazes, 875 S.W.2d at 270-71; State v.

Harris, 839 S.W.2d 54, 77 (Tenn.1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368, 122
L.Ed.2d 746 (1993);  Barber, 753 S.W.2d at 664.  Moreover, the supreme court has
recently held that, "while important as an additional safeguard against arbitrary or
capricious sentencing, comparative proportionality review is not constitutionally
required."  See State v. Bland, 958 S.W.2d 651, 663 (Tenn.1997), cert. denied, 523 U.S.
1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998).

Based upon the above case decisions, the appellant's constitutional challenges to
Tennessee's death penalty statutes are rejected.

46 S.W.3d 147, Terry v. State, (Tenn. 2001).

### (16) Sentencing statute allows unreliable evidence in support of aggravating circumstances.

This is just another way of challenging the sufficiency of the evidence which was
challenged on appeal.

(c) In the sentencing proceeding, evidence may be presented as to any matter that the
court deems relevant to the punishment and may include, but not be limited to, the nature
and circumstances of the crime;  the defendant's character, background history, and
physical condition;  any evidence tending to establish or rebut the aggravating
circumstances enumerated in subsection (i);  and any evidence tending to establish or
rebut any mitigating factors.  Any such evidence which the court deems to have probative
value on the issue of punishment may be received regardless of its admissibility under the
rules of evidence;  provided, that the defendant is accorded a fair opportunity to rebut any
hearsay statements so admitted.  However, this subsection shall not be construed to
authorize the introduction of any evidence secured in violation of the constitution of the
United States or the constitution of Tennessee.  In all cases where the state relies upon the
aggravating factor that the defendant was previously convicted of one (1) or more
felonies, other than the present charge, whose statutory elements involve the use of
violence to the person, either party shall be permitted to introduce evidence concerning
the facts and circumstances of the prior conviction.  Such evidence shall not be construed
to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury
and shall not be subject to exclusion on the ground that the probative value of such
evidence is outweighed by prejudice to either party.  Such evidence shall be used by the
jury in determining the weight to be accorded the aggravating factor.

### TCA § 39-13-204, First degree murder;  sentencing;  factors

### (17) state makes final argument

385

Rejected:

The following arguments raised by the appellant were rejected by the supreme court in State v. Caughron, 855 S.W.2d 526, 542 (Tenn.), cert. denied, 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993):

(1) by excluding jurors who have scruples against the death penalty, the jury selection process skews the make-up of the jury to make it prosecution-prone and thereby violates the defendant's constitutional rights; and

(2) the death penalty is arbitrarily and capriciously imposed because the State has the right of final closing argument at the penalty phase.

947 S.W.2d 156, Harris v. State, (Tenn.Crim.App. 1996)


**(18) Instruction regarding the consequences of failure to reach a unanimous verdict**

Rejected:

(f) The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non-unanimous verdict. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 22 23.

46 S.W.3d 147, Terry v. State, (Tenn. 2001)

(6) The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non-unanimous verdict. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 22-23.


24 S.W.3d 788, State v. Morris, (Tenn. 2000)

**(19) The sentencing statute requires a unanimous verdict to in order to impose a life sentence.**

Rejected:

(f) The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non-unanimous verdict. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 22 23.

46 S.W.3d 147, Terry v. State, (Tenn. 2001)

**(20) By restricting the discretion of the jury to life, life without parole or death the statute denies the discretion of the sentencer.**

Rejected:

Since Gregg, these procedural aspects of the Eighth Amendment's evolving standards of decency doctrine have focused on ensuring that the system used to impose death is not one "of standardless jury discretion."  Id. at 428 U.S. 153, 195 n. 47, 96 S.Ct. 2909, 49 L.Ed.2d 859.   A review of the case law reveals that these procedural issues generally arise in two areas:  (1) issues related to the channeling of the jury's discretion to impose death, see  Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988);   Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980);  and (2) issues related to the notion of individualized sentencing and consideration of mitigating evidence, see Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982);   Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).  As these cases demonstrate, so long as the system used to impose death is not rendered arbitrary or capricious in that the sentencing authority lacks adequate information or guidance, the procedural protections of the Eighth Amendment in capital cases have no application.

31 S.W.3d 196, State v. Keen, (Tenn. 2000)

The jury cannot be permitted unbridled discretion.

**(9) the jury is deprived of making the final decision about the death penalty;  (10) the defendant is denied the final argument during the sentencing phase;** (11) electrocution is cruel and unusual punishment;  and (12) the appellate review process in death penalty cases is constitutionally inadequate.

These issues have repeatedly been rejected by our supreme court.  See  Smith, 893 S.W.2d at 908;  Brimmer, 876 S.W.2d at 75;  Cazes, 875 S.W.2d at 253;  Smith, 857 S.W.2d at 1;  Black, 815 S.W.2d at 166;  Boyd, 797 S.W.2d 589;  State v. Teel, 793 S.W.2d 236 (Tenn.1990);  Thompson, 768 S.W.2d at 239.  See also  Keen, 926 S.W.2d at 741-44.

31 S.W.3d 196, State v. Keen, (Tenn. 2000).

**(21) Statute does not require the Court to instruct on all mitigating circumstances raised by the evidence.**

Plain language of statute regarding punishment for murder, T.C.A. § 39-2-203(j), requires that trial judges instruct jury to consider any mitigating circumstances which may be raised by evidence at either guilt or sentencing hearing, or both.   State v. Hartman, 1985, 703 S.W.2d 106, certiorari denied  106 S.Ct. 3308, 478 U.S. 1010, 92 L.Ed.2d 721, dismissal of post-conviction relief affirmed, appeal granted in part, affirmed

and remanded 896 S.W.2d 94, denial of post-conviction relief affirmed, appeal denied.
Homicide K 311

**(e)(1) After closing arguments in the sentencing hearing, the trial judge shall**
**include in the instructions for the jury to weigh and consider any of the statutory**
**aggravating circumstances set forth in subsection (i) which may be raised by the**
**evidence at either the guilt or sentencing hearing, or both. The trial judge shall also**
**include in the instructions for the jury to weigh and consider any mitigating**
**circumstances raised by the evidence at either the guilt or sentencing hearing, or**
**both, which shall include, but not be limited to, those circumstances set forth in**
**subsection (j).** These instructions and the manner of arriving at a sentence shall be given
in the oral charge and in writing to the jury for its deliberations. However, a reviewing
court shall not set aside a sentence of death or of imprisonment for life without the
possibility of parole on the ground that the trial court did not specifically instruct the jury
as to a requested mitigating factor that is not enumerated in subsection (j).

TCA § 39-13-204, First degree murder; sentencing; factors

### (22) Heinous, atrocious and cruel is vague and overbroad.

Rejected: (see also Coe v. Bell, 6th Circuit opinion)

At the time of this offense, this aggravating circumstance provided that the
"murder was especially heinous, atrocious, or cruel in that it involved torture or depravity
of mind." Tenn.Code Ann. § 39-2-203(i)(5) (1982). In State v. Williams, we explained
that the terms of the (i)(5) aggravating circumstance must be given their plain and natural
meaning as follows: "torture" means the infliction
of severe physical or mental pain while the victim is alive and conscious; "heinous"
means grossly wicked or reprehensible, abominable, odious, vile; "atrocious" means
extremely evil or cruel, monstrous, exceptionally bad, abominable; "cruel" means
disposed to inflict pain or suffering, causing suffering, painful; and "depravity of mind"
means moral corruption, wicked or perverse act. 690 S.W.2d 517, 527-30 (Tenn.1985).
Moreover, we have repeatedly rejected the argument that this aggravating circumstance is
vague, overly broad, or otherwise invalid. See Terry v. State, 46 S.W.3d at 159; >
Strouth v. State, 999 S.W.2d 759, 764 (Tenn.1999);  State v. Middlebrooks, 995 S.W.2d
550, 555-56 (Tenn.1999).

57 S.W.3d 411, State v. Bane, (Tenn. 2001)

*See Maynard v. Cartwright, 486 U.S. 356, 364-65 (1988) (implying that "torture"*
*limitation suffices to cure vagueness of HAC); Walton v. Arizona, 497 U.S. 639, 654*
*(1990) (confirming implication); Duvall v. Reynolds, 139 F.3d 768, 793 (10th Cir. 1998)*
*(holding that "torture of the victim or serious physical abuse" language in the instruction*

cures vagueness of HAC); *cf. Wade v. Calderon,* 29 F.3d 1312, 1319-20 (9th Cir. 1994) (holding that intentional torture suffices), *c*

*Coe vs Bell*

### (23) Election between electrocution and lethal injection as cruel and unusual punishment/

Rejected:

In 1998, our Legislature gave defendants sentenced to death the option of lethal injection. See Tenn. Code Ann. § 40-23-114 (Supp.1998). While our Courts have not addressed the issue of whether lethal injection constitutes cruel and unusual punishment, such challenges have been rejected by the federal courts. See LaGrand v. Stewart, 133 F.3d 1253, 1264-65 (9th Cir.1998); > Poland v. Stewart, 117 F.3d 1094, 1104-05 (9th Cir.1997); Kelly v. Lynaugh, 862 F.2d 1126, 1135 (5th Cir.1988); Woolls v. McCotter, 798 F.2d 695, 698 (5th Cir.1986). We likewise conclude that lethal injection is not constitutionally prohibited.

1999 WL 817205, State v. Suttles, (Tenn.Ct.App. 1999) but see review by Supreme Court below.

Lethal injection was not a method of execution in Tennessee at the time the defendant was tried and sentenced. Accordingly, the defendant had no opportunity to specifically challenge and litigate the constitutionality of lethal injection in the trial court. In 1998, following the defendant's trial, the General Assembly enacted legislation which afforded to defendants sentenced to death the option of choosing lethal injection as the method of execution. See 1998 Tenn.Pub.Acts 982 (effective May 18, 1998) (amending Tenn.Code Ann. § 40-23-114). Recently, the General Assembly enacted legislation which adopted lethal injection as the default method of execution in Tennessee. See 2000 Tenn.Pub.Acts 614 (effective March 30, 2000) (amending Tenn.Code Ann. § 40-23-114). Even though this defendant had no opportunity to challenge the constitutionality of lethal injection prior to his trial and sentencing, the State in its supplemental brief argues that this Court should declare lethal injection a constitutional method of execution. In support of its argument, the State points out that thirty-six states utilize lethal injection as a method of execution, that cases from many other jurisdictions have upheld the constitutionality of lethal injection as a method of execution, (FN3) and that lethal injection has been upheld each and every time a defendant has raised a cruel and unusual punishment challenge. Although we appreciate the thorough legal research provided by the State, we decline to determine the constitutionality of lethal injection in this appeal. In light of the fact that lethal injection became a method of execution in Tennessee only after this defendant was tried and sentenced, we conclude that a determination of the constitutionality of lethal injection in this case would deprive this defendant of an

opportunity to fully and fairly litigate this issue. In this case, the issue can be raised and determined in a petition for post conviction relief. (FN4)

30 S.W.3d 252, State v. Suttles, (Tenn. 2000)

### (24) sufficiently narrows the number of those eligible for death sentence.

Rejected:

murderers. See, e.g. Gilson v. State, 8 P.3d 883, 923 (Okla.Crim.App.2000) (finding legislative action that protects vulnerable children legally justified). Thus, we hold that the (i)(1) aggravating circumstance sufficiently and meaningfully narrows the class of death-eligible defendants, even defendants who have been convicted of felony murder in the perpetration of aggravated child abuse. See also Ex parte Woodard, 631 So.2d 1065, 1071-72 (Ala.1993) (upholding the constitutionality of a similar age of victim aggravating circumstance);
2001 WL 1517225, State v. Godsey, (Tenn. 2001)

In Stephenson, the supreme court held that the (i)(4) aggravator sufficiently narrowed those death eligible defendants because it provides a "principled way in which to distinguish the cases in which the
death penalty is imposed from the many cases in which it is not...." Stephenson, 878 S.W.2d at 557. The court further reasoned:

The aggravating circumstance--the defendant employed another to commit the murder for remuneration or the promise of remuneration--does not duplicate the elements of the offense, even incorporating the criminal responsibility statutes. Constitutional narrowing is accomplished because at the sentencing hearing, the State was required to prove that this defendant hired someone to kill his wife. Obviously, not every defendant who is guilty of first-degree murder pursuant to the criminal responsibility statutes has also hired another or promised to pay another to commit the murder. Thus, the aggravating circumstance found by the jury in this case narrows the class of death-eligible defendants as required by State v. Middlebrooks, supra.

Id. at 557 (emphasis added); see also Richard H. Austin v. State, No. 02C01-9310-CR-00238, 1995 WL 263930 (Tenn.Crim.App. at Jackson, May 3, 1995),perm. to appeal denied, (Tenn. Nov. 6, 1995).

The appellant was convicted of accessory before the fact to first-degree murder. Accessory before the fact was defined as "any person who shall feloniously move, incite, counsel, hire, command, or procure any other person to commit a felony, is an accessory before the fact." Tenn.Code Ann. § 39-1-301 (1982) (repealed 1989). (FN16) This definition was replaced by the criminal responsibility provisions of Tenn.Code Ann. § 39-11-402(2). Thus, we conclude that we are bound by the supreme court's decision in Stephenson that the (i)(4) aggravator achieves the constitutionally required narrowing of

the death eligible defendants even where the conviction is predicated on a criminal
responsibility theory. Accordingly, this issue is without merit.

### VI. Reasonable Doubt Jury Instructions

Next, the appellant challenges the constitutionality of the reasonable doubt jury
instruction given at both stages of the trial including the language "moral certainty"
which she contends falls below the requirements of the Due Process Clause. This
argument had been rejected on numerous occasions. State v. Nichols, 877 S.W.2d 722,
734 (Tenn.1994), cert. denied, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995);
Pettyjohn v. State, 885 S.W.2d 364, 365-66 (Tenn.Crim.App.), perm. to appeal denied,
(Tenn.1994);  State v.. Hallock, 875 S.W.2d 285, 294 (Tenn.Crim.App.1993), perm. to
appeal denied, (Tenn.1994).  See also Austin v. Bell, 126 F.3d 843, 846-47 (6th
Cir.1997),cert. denied,  523 U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998).

VII. Constitutionality of the Death Penalty

The appellant concedes that the constitutionality of the death penalty has been
upheld by the Tennessee Supreme Court, however, she raises the following issues in
order to preserve them for later review. **The appellant contends that (1) the death
penalty statute fails to meaningfully narrow the class of eligible defendants** ; (2) the
prosecution has unlimited discretion in seeking the death penalty;  (3) the death penalty is
imposed in a discriminatory manner based upon economics, race, and geography; (4)
there are no uniform standards for jury selection;  (5) juries tend to
be prone to returning guilty verdicts;  (6) the defendant is denied the opportunity to
address the jury's popular misconceptions about parole eligibility, cost of incarceration,
deterrence, and method of execution;  (7) the jury is instructed it must unanimously agree
to a life sentence, and is prevented from being told the effect of a non-unanimous verdict;
(8) courts fail to instruct the juries on the meaning and function of mitigating
circumstances;  (9) the jury is deprived of making the final decision about the death
penalty;  and (10) electrocution is cruel and unusual punishment.

These Issues have repeatedly been rejected by our supreme court. See State v.
Smith, 893 S.W.2d 908 (Tenn.1994);  State v. Brimmer, 876 S.W.2d 75 (Tenn.1994);
State v. Cazes, 875 S.W.2d 253 (Tenn.1994);  State v. Smith, 857 S.W.2d 1
(Tenn.1993);  Black, 815 S.W.2d at 188-190;  State v. Boyd, 797 S.W.2d 589
(Tenn.1990);  State v. Teel, 793 S.W.2d 236 (Tenn.1990);  Thompson, 768 S.W.2d at
252-253.  See also  State v. Keen, 926 S.W.2d 727 (Tenn.1994).

IMPROPER JURY INSTRUCTION

Citing  State v. Williams, 690 S.W.2d 517, 529 (Tenn.1985), the Defendant
maintains that the jury was improperly instructed on this aggravator because the
instruction omitted "any requirement that the jury find that severe physical or mental pain
was 'willfully' inflicted by the Defendant."  The following instruction, in pertinent part,
was given by the trial court:

Tennessee law provides that no death penalty shall be imposed by a jury but upon a unanimous finding that the State has proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances which shall be limited to the following:

...

(3) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.

You are instructed that the word:

...

'Torture' means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious.

**The Defendant has misconstrued the holding in  Williams.  No saving restriction that the Defendant must have "willfully" inflicted severe pain on the victim was placed upon  Tennessee Code Annotated section 39-13-204(i)(5), but rather the court has repeatedly held that the instruction sufficiently narrows the class of death-eligible defendants. See  State v. Odom**, 928 S.W.2d 18, 26 (Tenn.1996);   State v. Black, 815 S.W.2d 166, 181 (Tenn.1991);   State v. Cazes, 875 S.W.2d 253, 267 (Tenn.1994), cert. denied,  513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995). This issue is without merit.

WHETHER THE "REASONABLE DOUBT" INSTRUCTION VIOLATES DUE PROCESS.

The Defendant contends that he was denied his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the jury was unconstitutionally instructed concerning the meaning of "reasonable doubt" at the guilt and sentencing phase of the trial.  However, as the Defendant accurately notes, the supreme court and this court have consistently upheld the constitutionality of the instruction.  See  State v. Nichols, 877 S.W.2d 722, 734 (Tenn.1994), cert. denied, > 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995);   State v. Michael Dean Bush, 942 S.W.2d 489, 504-05 (Tenn.1997)(for publication)(petition for reh'g, filed 4/14/97). This issue is also without merit.

WHETHER THE CUMULATIVE EFFECT OF ALL ERRORS VIOLATES THE DEFENDANT'S CONSTITUTIONAL RIGHTS.

The Defendant contends that the cumulative effect of all errors alleged both at trial and at sentencing violates his constitutional rights.  However, as this court finds no

reversible error with respect to the Defendant's prior issues, this issue is without merit
also.

WHETHER TENNESSEE'S DEATH PENALTY STATUTE IS CONSTITUTIONAL.

The Defendant submits that the "Tennessee death penalty statute and the
imposition of the sentence of death in this State violate the Fifth, Sixth, Eighth and
Fourteenth Amendments to the United States Constitution, as well as Article I, Sections
8, 9, 16 and 17, and Article II, Section 2 of the Tennessee Constitution" because (a) the
statute fails to narrow the class of death-eligible defendants; (b) the sentence is imposed
arbitrarily and capriciously; (c) electrocution is cruel and unusual punishment; and (d)
the appellate review process is constitutionally inadequate. Defendant has acknowledged
in his brief "that the majority of the issues raised" regarding the constitutionality of the
Tennessee death penalty statute have been decided adversely to his arguments by the
Tennessee Supreme Court. Defendant also admits he raised the issues "in order to
preserve them for later review."

THE STATUTE FAILS TO NARROW THE CLASS OF DEATH ELIGIBLE
DEFENDANTS.

**The Defendant first asserts that the aggravating circumstances set forth in
Tennessee Code Annotated section 39-13-204, "have been so broadly interpreted
that they fail to provide such a 'meaningful basis' for narrowing the population of
those convicted of first degree murder to those eligible for the sentence of death" as
mandated in Furman v. Georgia, 408 U.S. 238, 313, 92 S.Ct. 2726, 33 L.Ed.2d 346
(1972). We disagree.**

976 S.W.2d 93, State v. Vann, (Tenn. 1998)

**(25) The death penalty infringes on fundamental right to life.**

Rejected:

The petitioner next complains that the death penalty unlawfully infringes on his right to
life. In State v. Bush, 942 S.W.2d 489, 507 (Tenn.), cert. denied, 522 U.S. 953, 118
S.Ct. 376, 139 L.Ed.2d 293 (1997), the supreme court affirmed our court's determination
that the death penalty does not unlawfully infringe upon one's right to life. (Court of
Criminal Appeals' opinion affirmed and appendixed to the supreme court's opinion). The
court quoted from Gregg v. Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859
(1976):

[C]apital punishment is an expression of society's moral outrage at particularly offensive
conduct. This function may be unappealing to many, but it is essential in an ordered
society that asks its citizens to rely on legal processes rather than self-help to vindicate
their wrongs.

Bush, 942 S.W.2d at 523 (alteration in original).  This issue is therefore without merit.

29 S.W.3d 497, Brimmer v. State, (Tenn.Crim.App. 1998)

### (25) (g) Reasonable Doubt intruction

Rejected:

In  State v. Nichols, 877 S.W.2d 722, 734-35 (Tenn.1994), our supreme court considered a challenge to a jury instruction which included the term "moral certainty" used in conjunction with a charge that "[r]easonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict."  Id. The court concluded that the instruction properly reflected "the evidentiary certainty required by the 'due process' clause of the federal constitution and the 'law of the land' provision in our state constitution."  Id. In our view,  Nichols controls in this instance.

29 S.W.3d 497, Brimmer v. State, (Tenn.Crim.App. 1998)

In Coe vs. Bell 97-5148/5503 the 6th Circuit Court of Appeals held:

1. Reasonable doubt

The district court ruled that the following instruction on reasonable doubt at the guilt phase was impermissible, and reversed all of Coe's convictions:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to *let the mind rest easily* upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. *Absolute certainty* of guilt is not demanded by the law to convict of any criminal charge, but *moral certainty* is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

(emphasis added). A functionally equivalent instruction was given at the sentencing stage.

395

Subsequent to the district court's decision, we approved the identical instruction in *Austin*, 126 F.3d at 846-47. Coe concedes this and offers no reason why we should overrule ourselves, and we shall not.

### (25)(g)(6)  lingering doubt instructions

16. WHETHER THE TRIAL COURT FAILED TO PROVIDE THE JURY WITH PROPOSED INSTRUCTIONS NECESSARY FOR THE PROPER DETERMINATION OF SENTENCE.

The appellant contends that the trial court erred in refusing to give certain requested jury instructions during the penalty phase of the trial. The trial court rejected the following special instructions:

1. (2) Burden of proof--generally;

2. (4) Life means life--death means death--sentence will be carried out;

3. (5) Definition of life and death--sentencing;

4. (6) Jury has responsibility for final decision--sentencing;

5. (7) Decision to be made by individual jurors--sentencing;

6. (9) Aggravating circumstance--definition--sentencing;

7. (10) Weighing aggravation and mitigation--defining mitigation-- sentencing;

8. (13) Aggravating circumstance--standards for consideration-- sentencing;

9. (14) Presumption regarding aggravating circumstances--sentencing;

10. (15) Aggravating circumstances--unanimity--sentencing;

11. (16) Aggravating circumstance--individual consideration but requirement of unanimity--sentencing;

12. (18) Sentence--crime in society;

13. (19) Deterrence--cost sentencing;

14. (20) Definition--weight and unanimity--sentencing;

15.  (21) Definition--mitigating circumstances--sentencing;

16.  (22) Mitigating circumstance--definition--sentencing;

17.  (23) Mitigating circumstance--definition--sentencing;

18.  (24) Standard of proof--sentencing;

19.  (26) Weighing aggravating and mitigating circumstances--sentencing;

20.  (27) Doubt inures to the benefit of the defendant--sentencing;

21.  (28) Mercy--sentencing;

22.  (29) Consideration for sentence less than death--sentencing;

23.  (30) Mitigation--reason for sentence less than death--sentencing;

24.  (31) Sympathy--sentencing;

25.  (32) Compassion--mercy--sentencing;

26.  (33) Mitigation--reason for sentence less than death--sentencing;

27.  (34) Mitigating circumstances--basis for sentence less than death--sentencing;

28.  (35) Imposing a sentence less than death;

29.  (36) May vote life--sentencing;

30.  (37) Finding beyond a reasonable doubt that death is appropriate--sentencing;

## 31.  (38) Lingering doubt--sentencing;

32.  (39) Jury verdict--inability to agree--sentencing;

33.  (40) No evidence except that introduced at trial--sentencing;

34.  (42) Mitigating circumstance--age--sentencing;

35.  (44) Mitigating circumstance--mental illness--sentencing;

36.  (46) Mitigating circumstance--capacity to appreciate criminality--sentencing;

37.  (47) Mitigating circumstance--emotional development--sentencing;

40

38.  (50) Mitigating circumstance--adolescent--sentencing;

39.  (51) Mitigating circumstance--parental expectations--sentencing;

40.  (53) Mitigating circumstance--health of another--sentencing;

41.  (54) Mitigating circumstance--domination--sentencing;

42.  (55) Mitigating circumstance--planning of crime--sentencing;

43.  (56) Mitigating circumstance--death of victim--sentencing;

**44.  (57) Mitigating circumstance--lingering doubt--sentencing**.

When a trial court's instructions correctly charge the applicable law, the court does not err by refusing special requests.  Tillery v. State, 565 S.W.2d 509, 511(Tenn.Crim.App.1978).  Nor is it error to refuse to give an inaccurate special request. State v. Moore, 751 S.W.2d 464, 467 (Tenn.Crim.App.), perm. to appeal denied, (Tenn.1988).  After reviewing the instructions given by the trial court, we conclude that the instructions adequately charge the applicable law.  This issue is without merit.

17. WHETHER THE DEATH PENALTY UNCONSTITUTIONALLY INFRINGES UPON THE APPELLANT'S FUNDAMENTAL RIGHT TO LIFE.

The appellant contends that the Tennessee death penalty statute is unconstitutional in that the right to life is fundamental and the punishment of death is not necessary to promote any compelling state interest.  The appellant argues that less severe penalties are available to serve the state's interest in punishing the appellant.  Moreover, the appellant asserts that "compelling state interests are those which secure our democratic institutions and/or insure national security."  While this argument is somewhat novel in its approach, we note that one of the state's most basic functions is to enforce the penal laws as established by the legislature.  We quote from the United States Supreme Court decision, Gregg v. Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976):

[C]apital punishment is an expression of society's moral outrage at particularly offensive conduct.  This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

The Tennessee Supreme Court has held that the state's death penalty statute,per se, meets due process requirements.  See State v. Black, 815 S.W.2d 166, 190 (Tenn.1991); see also  State v. Groseclose, 615 S.W.2d 142 (Tenn.),cert. denied, 454 U.S. 882, 102 S.Ct. 366, 70 L.Ed.2d 193 (1981).  This issue is therefore without merit.

18. WHETHER THE STATE'S DEATH PENALTY STATUTE IS
CONSTITUTIONAL.

The appellant raises several constitutional objections to the Tennessee death
penalty statute. Specifically, the appellant contends that the death penalty statute is
unconstitutional in that:

(a) it provides insufficient guidance to the jury concerning who has the burden of proving
whether mitigation outweighs aggravation and what standard the jury should use in
making that determination;

(b) it fails to sufficiently narrow the class of death penalty eligible defendants;

(c) it insufficiently limits the jury's discretion in that once it finds an aggravating
circumstance beyond a reasonable doubt, it can impose death, regardless of what
mitigation is shown;

(d) it requires that if the jury finds that the aggravating circumstances outweigh the
mitigating circumstances, it must impose death;

(e) it allows the jury to afford too little weight to non-statutory mitigating factors. The
statute requires that the jury consider "any mitigating circumstances";

(f) it does not require the jury to make the ultimate determination that death is appropriate
in that it is "merely filling in the blanks" in determining and comparing mitigating and
aggravating circumstances.;

(g) it does not inform the jury of its ability to impose mercy;

(h) it provides no requirement that the jury make findings of fact as to the presence or
absence of mitigating circumstances, thereby preventing effective appellate review;

(i) it prohibits the jury from being informed of the consequences of its failure to reach a
unanimous verdict in the penalty phase of the trial;

(j) it allows the imposition of a cruel and unusual punishment and in that it allows death
to be imposed by electrocution;

(k) it has been imposed discriminately on the basis of race, sex, geographic region, and
economic and political status of the defendant;

(l ) the proportionality of arbitrariness review conducted by the Tennessee Supreme Court
pursuant to Tenn.Code Ann. § 39-13-205 is inadequate and deficient;

(m) it permits the introduction of relatively unreliable evidence in the State's proof of
aggravating circumstances and in its rebuttal of mitigating circumstances;

(n) it allows the State to make final closing arguments to the jury in the penalty phase of the trial;

All of the appellant's arguments except (g) have been rejected by the Tennessee Supreme Court. See State v. Cazes, 875 S.W.2d 253, 268-269 (Tenn.1994);. State v. Smith, 857 S.W.2d 1, 16-17, 23 (Tenn.1993); State v. Howell, 868 S.W.2d 238, 258 (Tenn.1993); State v. Black, 815 S.W.2d 166, 185, 187 (Tenn.1991); State v. Boyd, 797 S.W.2d 589, 596 (Tenn.1990); State v. Melson, 638 S.W.2d 342, 366, 368 (Tenn.1982); State v. Groseclose, 615 S.W.2d 142, 150 (Tenn.1981). With respect to the argument in (g), in consideration of the jury instructions given in a capital case, we find this issue to be without merit.

942 S.W.2d 489, State v. Bush, (Tenn. 1997)

### (25)(h)  Right to allocution

Rejected:

We agree that the rationale and conclusion of the Burkhart court should apply in this capital case. The practice of allowing unsworn statements was designed to alleviate the harshness of common-law rules. The practice is no longer necessary or desirable in light of the abolition of those harsh rules and the development of rules protecting the rights of criminal defendants. Moreover, allocution is not necessary to protect the right of a capital defendant to present mitigating evidence in person to the sentencing jury. We have recently held in State v. Cazes, 875 S.W.2d 253 (1994) that cross-examination of a capital defendant at the sentencing trial is limited to the subject matter discussed on direct examination. Accordingly, a capital defendant may present mitigating evidence at the sentencing hearing and have cross-examination limited to that issue. **Based on the foregoing, we conclude that there is no statutory, common-law, or constitutional right to allocution in a capital case. The trial court properly denied the defendant's motion.**

878 S.W.2d 530, State v. Stephenson, (Tenn. 1994)

### (25)(I)  challenging the arrest in Texas.

In view of the petition filed by the attorney general on March 23, 1974, and the proceedings that had occurred incident thereto, together with the written notice given by the police officer, we do not see that the defendant was prejudiced by reason of this technical non-compliance with the statute, for it is obvious that he had adequate actual notice of the commencement of this criminal action. Furthermore, the fact the attorney general himself did not give the notice provided by T.C.A. s 39-3014, became inconsequential after the grand jury returned the indictment.

T.C.A. s 40-1605 provides that, "The grand jury shall have inquisitorial powers over all indictable or presentable offenses committed or triable within the county."

T.C.A. s 40-1606 provides that, "The grand jury shall inquire into all indictable or presentable offenses committed or triable within the county, and present them to the court by indictment or presentment."

**In our opinion, even if it is conceded that there was a technical non-compliance regarding the required statutory notice, it is immaterial in this case. The defendant's conviction depends not upon the validity of the arrest warrant or proceedings incident thereto, but upon the indictment, and the grand jury having inquisitorial powers over this offense, the indictment was valid without regard to whether the defendant had received proper notice that an application would be made for the arrest warrant.**

The provisions of T.C.A. s 39-3014 must not and cannot be interpreted so as to preclude a grand jury from investigating and returning indictments and presentments for violations of the obscenity laws in the exercise of its inquisitorial powers over all indictable or presentable offenses committed within the county. T.C.A. ss 40-1605, 40-1606, 40-1609, 40-1617. Logic and the law say otherwise.

In Jones v. State, 206 Tenn. 245, 256-57, 332 S.W.2d 662, 667 (1960), our Supreme Court, in holding that all questions about the sufficiency of a warrant are foreclosed by the finding of an indictment, said:

"Counsel has cited no authority and we think none will be found in this State holding that the validity of an indictment is to be tested and limited by what is found in the warrant. The purpose of a warrant is to give an accused person notice that he is charged with some offense and if the warrant is defective, objection may be raised before the committing magistrate or upon a habeas corpus proceeding before indictment. The correct rule is, however, that all questions as to the sufficiency of the warrant are foreclosed by the finding of an indictment, because under T.C.A. ss 40-1605 to 40-1625 grand juries in this State are given inquisitorial powers over all indictable or presentable offenses committed or triable within the county. Consequently, it would be a miscarriage of justice to hold that when the probability of the commission of a crime has been called to the attention of the grand jury by either a defective or even a void warrant, the grand jury would be powerless to investigate the situation further and to find a valid indictment for whatever offense or offenses their investigation might develop."

In following the above rule in Manier v. Henderson, 1 Tenn.Cr.App. 341, 343, 442 S.W.2d 281, 282 (1969), our Court said, "The manner of arrest is immaterial to the validity of the indictment."

In Mullins v. State, 214 Tenn. 366, 369-70, 380 S.W.2d 201, 202 (1964), our Supreme Court said:

"This binding over does not have to be by warrant or anything else as when the facts were properly presented to the Grand Jury an indictment might be found under these facts regardless of how the man was bound to the Grand Jury. Numerous cases are in the books and otherwise where defendants are prosecuted under indictments without being arrested prior to the return of the indictments; defendants are indicted after being released at a preliminary hearing; and in other cases defendants are prosecuted under indictments although the initial arrest was invalid."

The case of French v. Shriver, 225 Tenn. 727, 731, 476 S.W.2d 636, 637-38 (1972), cited by the defendant in his brief, is not controlling here. That case dealt with the provisions of our former obscenity act, and involved the seizure of evidence contrary to the express provisions of that act. In that case the petitioners conceded that the obscenity statutes there involved did not "preclude the use of other legal methods of procedure for the prosecution of actions arising thereunder." They did insist, and the court agreed, that those statutes were "exclusive with respect to Seizure and suppression of any obscene material." (emphasis added).

587 S.W.2d 103, State v. Southland News Co., Inc., (Tenn.Crim.App. 1979)

### (25)(r)(1)  presumption of truthfulness of witnesses.

Rejected:

In the next issue the appellant questions whether the trial judge erred by instructing the jury on the presumption of the truthfulness of witnesses. The court charged the jury:

You are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. If there are conflicts in the testimony of the different witnesses, you must reconcile them, if you can, and not hastily or rashly conclude that any witness has sworn falsely, for the law presumes that all witnesses are truthful. In forming your opinion as to the credibility of a witness, you may look to the reasonableness of the witness' testimony; to the proof, if any, of general character; the evidence, if any, of the reputation for truth and veracity; the intelligence and respectability of the witness; interest or lack of interest in the outcome of the trial; the witness' feelings; apparent fairness or bias; means of knowledge; appearance and demeanor while testifying; contradictory statements as to material matters, if any are shown; and all the evidence in the case tending to corroborate or to contradict the witness.

This charge has been found to be a correct statement of Tennessee law. State v. Glebock, 616 S.W.2d 897, 906 (Tenn.Cr.App.1981). Furthermore, when considered in conjunction with the other instructions concerning the state's burden of proof and the presumption of innocence, the instruction was fair in every regard. This issue has no merit.

643 S.W.2d 343, State v. Chestnut, (Tenn.Crim.App. 1982)

### (25)(r )(5)  intended to inflict serious physical abuse.

Rejected:

B. Instruction on Aggravating Circumstance (i)(5)

The appellant again argues that the instruction regarding the heinous, atrocious, or cruel aggravating circumstance was vague and overbroad. Specifically, he contends that the instruction failed to require that the jury find an intent to inflict severe mental or physical pain upon the victim.

As stated earlier in this opinion, our Supreme Court has repeatedly held that this aggravating circumstance is not unconstitutionally vague or overbroad. See State v. Williams, 690 S.W.2d 517, 526-30. see also State v. Black, 815 S.W.2d 166, 181; State v. Barber, 753 S.W.2d 659, 670. This issue is without merit.

State v. Blanton, 1996 WL 219609, (Tenn.Crim.App. 1996).

Because the petitioner chose not to present any evidence or arguments as to most of the issues raised in the petition and the amended petition they are waived.

Wherefore premises considered the State moves this Honorable Court to deny the above styled pleading.

Respectfully Submitted

_Assistant District Attorney_

Certificate of Service

I hereby certify that a true and exact copy of the foregoing was mailed or delivered to counsel for the petitioner  on or before the filing date as affixed by the Clerk of this Court this the 5th day of December,  2002.

_Assistant District Attorney_

particular, Defendants claim that the "record is devoid of any evidence indicating premeditation or deliberation." Following a careful examination of the record, we

*St. v. Saulbery*

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Steffen G. Schreiner, Memphis, TN, for Appellant Saulsberry.
Joseph S. Ozment, Memphis, TN, James V. Ball, Memphis, TN, for Appellant Howard.
John Knox Walkup, Attorney General and Reporter, Peter M. Coughlan, Assistant Attorney General, Nashville, TN, William L. Gibbons, District Attorney General, Terrell L. Harris, J. Robert Carter, Phillip Gerald Harris, Assistant District Attorneys General, Memphis, TN, for the Appellee.

*OPINION*

SUMMERS.
*1 The Defendants, Antonio L. Saulsberry and Franklin C. Howard, pursuant to Tennessee Rule of Appellate Procedure 3(b), appeal as of right their convictions for first degree premeditated murder, especially aggravated robbery, and conspiracy to commit aggravated robbery. In addition, Defendants appeal the trial court's application of consecutive sentencing. These convictions arose from the robbery of a Memphis T.G.I. Friday's restaurant and the murder of its manager, Gene Frieling. Defendants present ten assignments of error: (1) the trial court erroneously admitted a photograph of the deceased victim; (2) the evidence was insufficient to show premeditation or intent for first degree murder; (3) criminal responsibility for first degree premeditated murder is not supported by the proof and the trial court erroneously charged the jury on criminal responsibility; (4) the trial court erroneously charged the jury on the elements of first degree premeditated murder; (5) the trial court failed to charge the jury of the need for moral certainty to convict; (6) the trial court failed to instruct the jury that a prior inconsistent statement could be considered for impeachment purposes only; (7) the trial court erroneously admitted a videotape of the crime scene and commented on the portion of tape not shown to the jury; (8) the errors made by the trial court amount to cumulative error, requiring a new trial; (9) the trial court erroneously imposed consecutive sentences; and (10) the trial court failed to grant a necessary mistrial based upon an alleged discovery violation by the State. [FN1]

> FN1. In the interest of clarity, we address these points of alleged error in a different order.

Defendants were indicted by the Shelby County Grand Jury in July of 1995 on charges of premeditated murder in violation of Tennessee Code Annotated § 39-13-202(a)(1), murder committed during the perpetration of a robbery in violation of § 39-13-202(a)(2), murder committed in perpetration of a burglary in violation of § 39-13-202(a)(2), especially aggravated robbery in violation of § 39-13-403, and conspiracy to commit a felony in violation of § 39-12-103. Defendants were convicted by a jury on February 14, 1997, of first degree premeditated murder, especially aggravated robbery, and conspiracy to commit aggravated robbery.

Following a sentencing hearing, the trial court sentenced Defendant Saulsberry as a Range II offender to forty years for especially aggravated robbery and ten years for conspiracy. Defendant Howard was sentenced as a Range I offender to twenty-five years for especially aggravated robbery and six years for conspiracy. The trial court ordered all sentences, including life imprisonment, to run consecutively.

I. SUFFICIENCY OF THE EVIDENCE
In their second and third issues, Defendants maintain that the evidence presented was

407

heard, it was like two in one--the swiftness of it that followed behind--one behind the other." Then Frieling said, "Jesus Christ, he shot me, he shot me."

Shea had been repeatedly kicked during this episode, and as the men left the office, he was shot three times--twice in the leg and once in his lower back, through his bladder and intestines. He then crawled into the office and called 911, but he was too injured to stay with the telephone. As he fell back to the floor, Wong took the telephone and finished the 911 call.

Jessica Hoard, a server at Friday's, also testified for the State. Hoard was the only other employee still present on the morning of January 28, and she was in the dining room of the restaurant when the perpetrators arrived. One of the men ordered her to walk into the kitchen and commanded, "Get on the floor before I shoot you." She heard one person say, "Where's the money," a couple of times, and she then heard at least two gunshots. When she believed the perpetrators were gone and she could safely stand up, Hoard helped John Wong attend to the wounded Frieling and Shea. Because Frieling was only barely breathing, the two uninjured employees decided to lift him from a prone position to an upright position. Frieling remained in this sitting, slumped posture until he was found by police and determined dead. An autopsy revealed that the cause of death was a gunshot wound to the heart.

On February 9, 1995, Defendant Saulsberry made a statement to police recounting his involvement in the events preceding the robbery:

It was first brought up on my way home a day before the robbery. Me, Claude, Shaun, and Kevin [Wilson] were in Claude's car. He was taking me home from the neighborhood. And, we were smoking "bud" (marijuana) on our way home. And, ah, Claude said, "Hey, what's up with Friday's"? I said, what do you mean what's up-- you're ready to start working there? Then, he said, "Nall, man, nall, man, I'm talking about hitting that joint." I said, man, you're crazy than a motherf__ker. Then, he said, "Nall, nigger, I'm serious!". So, we didn't say anything else about that. When we got to my house, we sat in the car on the parking lot outside my house. Then, "Little Kevin" said, "What time the joint closes"? And, I said, at one (1) o'clock A.M. Then, Claude had showed me a silver gun. And, I said, hurry up and get me out of here. I got out of the car and Shaun got out with me. Then, I said, Shaun, man, is that boy serious? Shaun said, "Yes, man, he's broke, man". I said, man, y'all can try that dumb shit if you want too [sic], but I ain't got nothing to do with it. Basically, that's it, really.

Saulsberry denied telling anyone where the safe was located within the restaurant or how much money would be available there, but he admitted informing Claude, Shaun, and Wilson how to gain entry from the back of the restaurant. The State introduced testimony that Saulsberry was ultimately paid $50 for his role in the robbery and that he was dissatisfied with this amount-- facts that Saulsberry disputed in his statement. It is undisputed, however, that Saulsberry was not present at T.G.I. Friday's the night of the robbery and murder.

*4 Defendant Howard was present at the crime scene, and his statement to police on February 7, 1995, related events at the restaurant:

I was riding with them [Claude, Shaun, and Wilson]. Claude said he said man we need to go on and do that. I was sleeping in the back seat and I heard him say we need to go on and do this right. So we rode up to T.G.I. Friday's and sat up there in the back part behind the Steakhouse Restaurant and we went on and walked up there. I stayed all the way in the back and they ran in the restaruant [sic] and I heard some shots fired so I ran to the car and they ran to the car and Kevin [Wilson] said I shot him man I shot him. So we left and went back to Claude's house and then we just stayed over there until the morning came and I told him to take me home.

According to Howard's statement, Claude, Shaun, and Wilson were armed when they entered the restaurant. After the robbery, Howard received a portion of the proceeds, although the amount is disputed.

While we agree with both the State and Defendants that this is quite a typical felony murder prosecution, we cannot agree with the State that the evidence supports a verdict of premeditated murder against Saulsberry. [FN4] To support findings of premeditation and deliberation, the State relies on circumstantial evidence, specifically:

> FN4. Nor, however, can we agree that Saulsberry cannot be retried for felony murder, although this issue is not before us. The jury was strictly instructed to cease deliberations upon finding Defendants guilty of

premeditated murder. When the jury found them guilty of premeditated murder, it did not render any further verdicts on homicide charges. This does not equate to an acquittal. *State v. Burns,* S.W.2d Appendix (Tenn.1998).

Given the perpetrators' commands to each other to shoot the employees, the murder of the manager after he had done everything asked of him, and Shea's testimony that they came back, stood over him and shot him three times after he had given them his wallet, a rational jury could find that the perpetrators deliberately went into the restaurant with a plan.

In our view, more is required to sustain a conviction for first degree premeditated murder rather than felony murder. *See State v. West,* 844 S.W.2d 144, 147-48 (Tenn.1992); *State v. Brown,* 836 S.W.2d 530, 540-43 (Tenn.1992); *State v. Boyd,* 909 S.W.2d 50 (Tenn.Crim.App.1995). *Cf. State v. Leroy Hall,* C.C.A. No. 03C01-9303-CR-00065, Hamilton County (Tenn.Crim.App., Knoxville, Dec. 30, 1996), *aff'd by partial incorporation, State v. Hall,* 958 S.W.2d 679, 703-06 (Tenn.1997); *State v. Frank Whitmore,* C.C.A. No. 03C01-9404-CR00141, Blount County (Tenn.Crim.App., Knoxville, June 19, 1997). Because this crime was committed prior to our legislature's modification of the elements of premeditated murder, we must analyze these facts under prior law requiring deliberation as an element of the offense.

In *State v. Brown,* our supreme court re-examined premeditation and deliberation, recognizing that over time, "prosecutors and judges had apparently fallen into the error of commingling these two elements by using the terms interchangeably." 836 S.W.2d at 539. According to the *Brown* court, this perception constituted a "substantial departure from the traditional law of homicide"--a departure which prompted the legislature to redraft the first degree murder statute to define premeditation and deliberation. *Id.* at 542. As defined by statute, a premeditated act was "one done after the exercise of reflection and judgment," and a deliberate act was "one performed with a cool purpose." *Id.* (quoting former Tenn.Code Ann. § 39-13-201(b)).

*5 In light of this legislative clarification and what the *Brown* court perceived to be persistent infidelity to the historical foundation of first degree murder, the court emphatically rejected an amalgamation of the two formerly distinct mental states. *Id.* at 543. In addition, the court stated:

[W]e think it is time to recognize ... that "[m]ore than a split-second intention to kill is required to constitute premeditation," which "by its very nature is not instantaneous, but requires some time interval." ... [I]t is now abundantly clear that the deliberation necessary to establish first-degree murder cannot be formed in an instant. It requires proof ... that the homicide was "committed with a 'cool purpose' and without passion or provocation...."

*Id.* (quoting Sentencing Commission Comments to former § 39-13-201(b)) (alterations in originals). In *Brown,* the defendant's premeditated murder conviction could not stand where the State offered circumstantial proof "that the defendant acted maliciously toward the child, in the heat of passion or anger, and without adequate provocation." *Id.* (footnote omitted). Furthermore, the court refused to find that repeated blows to the victim can alone support an inference of premeditation or deliberation. *See id.*

In *State v. West,* decided just six months after *Brown,* the supreme court considered a case much like the one at bar. 844 S.W.2d 144 (Tenn.1992). The State argued that the defendant's emotional state and actions after the crime-- calmness, failure to tell others about the crime, and concealment of the murder weapon--indicated premeditation and deliberation. *Id.* at 148. Rejecting this argument, the court explained, "The element of premeditation requires a previously formed design or intent to kill.... Deliberation, on the other hand, requires that the killing be done with a cool purpose--in other words, that the killer be free from the passions of the moment." *Id.* at 147 (citations omitted); *see State v. Boyd,* 909 S.W.2d 50, 54-55 (Tenn.Crim.App.1995).

The *West* court declined to recognize concealment of evidence after a crime as probative of intent held *prior* to the crime, stating, "One who kills another in a passionate rage may dispose of the weapon when reason returns just as readily as the cool, dispassionate killer." 844 S.W.2d at 148. While the court acknowledged that proof of calmness after a crime may be plausible evidence of premeditation and

deliberation, it failed to find any evidence material to show a calm emotional state and noted that the defendant's behavior indicated simply "indifference to the victim and fear of detection." *Id.* Finally, the court rejected the State's theory that the defendant left the scene of a heated argument with the victim, obtained his gun at home, and went back to the scene to kill the victim:

*6 While the state's theory may be true, it remains only a theory, because the prosecution has no evidence to support it. No one witnessed the defendant's retrieval of a gun, nor does any circumstantial evidence exist to support this theory.... Thus, a jury would have to engage in pure speculation to conclude that the defendant had returned to his house in order to get a gun with which to shoot [the victim]. Although the jury is permitted to disbelieve the defendant's testimony, it may not construct a theory based on no evidence at all.

*Id.*

In the case at bar, we find no evidence--direct or circumstantial--sufficient to permit a jury to find premeditation and deliberation on the part of Antonio Saulsberry, who was not even present when the murder was committed. The record clearly reveals that Antonio Saulsberry did not participate in the actual robbery; therefore, his conviction must be based upon criminal responsibility for the conduct of the shooter, rather than direct liability.

By statute, criminal responsibility requires that a defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, ... solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn.Code Ann. § 39-11-402(2). The record contains some evidence which, if believed by the jury, would at best support an inference that Saulsberry (1) aided a *robbery,* with the intent that a *robbery* be committed; and (2) intended or expected to receive some proceeds from the *robbery.* The record does not, however, contain any evidence that Saulsberry intended to assist in the commission of a murder, intended that a murder take place, or intended to benefit in the proceeds or results of a murder, whatever they may be. There is no evidence tending to show an intention, or even an expectation, prior to the robbery, that murder would facilitate the robbery.

Although the State directs our attention to Saulsberry's statement, in which he recalls that Claude Sharkey showed him a silver gun, to demonstrate Saulsberry knew and intended that a murder occur; we believe this evidence tends to show only that Saulsberry knew an armed robbery could occur. Next, the State points to Claude's statement to Saulsberry, "I'm talking about hitting that joint." Here again, we find no evidence to support *knowledge* of any act other than robbery, much less intent for any other act to occur. Though murder is a consequence of many armed robberies, a finding of intent in this case requires "pure speculation" of the type warned against in *West.* We again emphasize that our focus is on whether the evidence is sufficient to support convictions for premeditated first degree murder, rather than felony murder. Saulsberry's premeditated murder conviction is reversed.

Likewise, with respect to Franklin Howard, the Defendant argues that all circumstantial evidence presented by the State to show premeditation and deliberation is probative only of an intent to rob. The State produced evidence sufficient to permit a jury to find that Howard participated in the robbery by entering Friday's restaurant carrying a weapon, though this testimony was disputed. The State offered no proof, however, that Howard murdered the victim in this case, Gene Frieling. In fact, the only gun found in Howard's possession was conclusively determined *not* to match shells and bullet fragments recovered. Therefore, Howard's conviction must also be based upon his criminal responsibility for the conduct of the shooter.

*7 The State argues that intent can be inferred from the general conduct of the perpetrators: commands by one to shoot the employees of the restaurant, the fact that the victim was killed despite compliance with the robbery, and the fact that Shea was shot despite giving them his wallet. Evidence regarding the severity or cruelty of the act can be relevant to premeditation and deliberation on the part of the principal actor. *See State v. Brown,* 836 S.W.2d 530, 541-42 (Tenn.1992); *State v. Leroy Hall,* C.C.A. No. 03C01-9303- CR-00065, Hamilton County (Tenn.Crim.App., Knoxville. Dec. 30. 1996), *aff'd by partial incorporation, State v. Hall,* 958 S.W.2d 679, 705 (Tenn.1997). In *State v. Frank Whitmore,* a principal's actions cast a circumstantial shadow of intent onto a companion, in the absence of direct evidence of the companion's intent prior to the murder--evidence such as an agreement to kill, words of encouragement, or assistance in preparatory operations with knowledge that a murder would occur.

C.C.A. No. 03C01-9404-CR-00141, Blount County (Tenn.Crim.App., Knoxville, June 19, 1997). In *Whitmore,* a panel of this Court affirmed the defendant's conviction for premeditated murder based upon criminal responsibility where the evidence showed that the defendant drove with Williams, the principal in the murder, to the victim's home for the purpose of committing a burglary and theft. The testimony indicated that the defendant and Williams intended only to scare the victim with a knife carried by Williams--in fact, they waited until they thought he had gone to bed before entering. However, the evidence also revealed that, once inside the house, they encountered the victim, and Williams began to fight with him. As the armed Williams wrestled for several minutes with the victim, who was vigorously fighting back, the defendant moved through the house searching for money. The defendant made no attempts to stop the struggle or disassociate himself from the enterprise at that point. From this evidence, we believed the jury could have reasonably concluded that, once the struggle began within the home, the defendant formed or shared or acquiesced in the intent that a murder occur.

We think the resolution of Defendant Howard's criminal liability for premeditated murder is governed by the Tennessee Supreme Court's 1997 case of *State v. Carson.* 950 S.W.2d 951 (Tenn.1997). In *Carson,* the defendant, Gary, and Stover met to discuss robbing a TV repair store in Knoxville. The defendant Carson had been in the store before. He described the layout and where money could be found. Carson gave a weapon to each of his cohorts. The trio drove to the store. Carson waited in the car while Gary and Stover entered the store under a ruse that they needed to have a stereo repaired.

*8 Gary and Stover held two employees, Adams and McGaha, at gunpoint. They forced the victims into a rear room, searched them, and stole $130 from Adams. Gary and Stover bound the victims with telephone cord, closed the door, and told the victims not to attempt to escape. They then fired three shots through the door and almost hit the victims.

Upon leaving the store, Gary and Stover were surprised to find the car and Carson gone. They exchanged gunfire with police, and they fled. All three culprits were later found and arrested.

Carson was charged like his codefendants. Gary and Stover pled guilty and testified against Carson. Although Carson did not testify, his police statement admitted driving his codefendants to the scene but denied knowledge that a robbery would occur. He said he believed Gary and Stover were going to the store to sell the guns they brought. The jury found Carson guilty of aggravated robbery, aggravated assault (two counts), and felony reckless endangerment. Carson argued on appeal that he lacked the culpable mental state for the offenses committed by his partners in crime.

*Carson* adopted the "natural and probable consequence" rule. *See id.* at 955. This rule is based on the premise that criminal aiders and abettors should be responsible for crimes "they have naturally, probably and foreseeably put in motion." *Id.* Carson's convictions were all affirmed. The Court opined "that the evidence was sufficient to find that the defendant, having directed and aided in the aggravated robbery with the intent to promote or benefit from its commission, was criminally responsible for all of the offenses committed by his codefendants, to wit: aggravated assault and felony reckless endangerment." *Id.* at 956.

We are of the opinion that *Carson* dictates Howard's criminal responsibility for premeditated murder. While in the parking lot and before entering the restaurant, one of the perpetrators stated, "Shoot the mother ...," referring to Wong. All four perpetrators then entered the restaurant armed, acted with a common purpose, committed acts of violence against various employees, shot and wounded one employee, and shot and killed another. Under these circumstances, Howard cannot escape criminal responsibility for premeditated murder by claiming he did not share the criminal intent or premeditation with the actual triggerman. Hence, we find the evidence sufficient to find Howard guilty of premeditated murder.

## II. ADMISSION OF EVIDENCE

In their first and seventh issues, Defendants contest the decision of the trial court to admit a photograph of the deceased victim and a videotape of the crime scene made by police. They allege that admission of these pieces of evidence was error, prejudicing their right to a fair trial. We find no error in the trial court's decision to admit this evidence.

*A. Photograph of the Deceased Victim*

*9 The photograph to which Defendants object depicts the victim after his death,
seated on the floor of the restaurant office. The photograph was taken by police at the
scene and introduced as an exhibit to testimony. Defendants argue both that the
probative value was substantially outweighed by its prejudicial value and that its
admission constituted the needless presentation of cumulative evidence. Defendants
claim that the only possible function of the evidence was to inflame the jury. We
disagree.

Tennessee Rule of Evidence 403 governs Defendants' claim: "Although relevant,
evidence may be excluded if its probative value is substantially outweighed by the
danger of unfair prejudice, confusion of the issues, or misleading the jury, or by
considerations of undue delay, waste of time, or needless presentation of cumulative
evidence." Tenn.R.Evid. 403. In Tennessee, we have long "followed a policy of
liberality in the admission of evidence." *State v. Banks,* 564 S.W.2d 947, 949
(Tenn.1978); *see State v. Odell Smith,* C.C.A. No. 02C01-9707-CR-00259, Shelby
County (Tenn.Crim.App., Jackson, Aug. 10, 1998). In this respect, the trial court is
entrusted with wide discretion to admit or refuse a tendered piece of evidence. *See*
*State v. Harbison,* 704 S.W.2d 314, 317 (Tenn.1986); *Banks,* 564 S.W.2d at 949.
Our supreme court has prescribed factors for a trial judge to consider when deciding
whether to admit a certain photograph, including:

the value of photographs as evidence, that is, their accuracy and clarity, and whether
they were taken before the corpse was moved, if the position and location of the body
when found is material; the inadequacy of testimonial evidence in relating the facts to
the jury; and the need for the evidence to establish a prima facie case of guilt or to
rebut the defendant's contentions.

*Banks,* 564 S.W.2d at 951. Here, the photograph was accurate and clear; and although
the victim had been moved, the photograph correctly depicted the position in which he
died and was found by police--he was still breathing when moved. Furthermore, the
photograph was not inflammatory or gruesome. No blood was evident, and no wounds
were exposed.

Defendants' claim that the value of the photograph could only be to inflame the jury is
incorrect. The State presented three witnesses to this crime, all of whom testified
extensively to the manner in which the events happened, including the shooting of the
victim in his office and the moving of his body to permit him to breathe. The
introduced photograph served to corroborate this testimony and to bolster the
credibility of the State's witnesses. For this reason, the photograph was relevant yet not
needlessly cumulative. *See State v. Robinson,* 930 S.W.2d 78, 84
(Tenn.Crim.App.1995).

*B. Videotape of Crime Scene and Victim*

*10 The same general policies should be considered by the trial court ruling on
admissibility of a videotape. *See State v. Bigbee,* 885 S.W.2d 797, 807 (Tenn.1994);
*State v. Ronnie Michael Cauthern,* C.C.A. No. 02C01-9506-CC- 00164, Gibson
County (Tenn.Crim.App., Jackson, Dec. 2, 1996), *aff'd by partial incorporation, State
v. Cauthern,* 967 S.W.2d 726, 743 (Tenn.1998). Our supreme court has stated that "the
admissibility of authentic, relevant videotapes of the crime scene or victim is within
the sound discretion of the trial judge, and his ruling on the admissibility of such
evidence will not be overturned without a clear showing of abuse of discretion." *State
v. Van Tran,* 864 S.W.2d 465, 477 (Tenn.1993); *see State v. McCary,* 922 S.W.2d 511,
515 (Tenn.1996) (in dicta).

Although Defendant Saulsberry failed to raise this assignment of error in his motion
for new trial, we will address the issue with respect to both Defendants. At trial, the
State played a videotape for the jury containing scenes of the restaurant shortly after
the police arrived. Defendants present no argument for exclusion of the videotape, and
we find no reason why the tape would fail to satisfy Tennessee Rule of Evidence 401
for relevancy. Tenn.R.Evid. 401 (" 'Relevant evidence' means evidence having any
tendency to make the existence of any fact that is of consequence to the determination
of the action more probable or less probable than it would be without the evidence."). 
In addition, we find no prejudice that would substantially outweigh the probative value
of the videotape. *See* Tenn.R.Evid. 403.

Defendants argue that the trial court erred by announcing to the jury that portions of
the tape displaying removal of the victim's body would not be shown to them.
Defendants claim that by informing the jury exactly what it would *not* see, the trial
judge prejudiced their right to a fair trial. We disagree and find no error. The trial

judge's simple statement that the videotape showed removal of the deceased's body could not have communicated information of a prejudicial nature to the jury. *Cf. Cauthern,* 967 S.W.2d at 744 (affirming by incorporation this Court's decision that a videotape of police removing the defendant's body from the scene was admissible when it was relevant and when the probative value did not outweigh the prejudicial value). Therefore, Defendants' claim of error regarding admission of the photograph and videotape are without merit.

### III. JURY INSTRUCTIONS

In issues three through six, Defendants charge error in the instructions given by the trial court to the jury. Because Defendants presented only the sixth issue in their motions for new trial, we are permitted to consider the others waived as a matter of procedure. *See* Tenn.R.App.P. 3(e). However, in the interest of facilitating further review of this case, and because the State did not object, we have examined all alleged errors. We conclude that Defendants' claims are without merit.

\*11 Generally, a jury charge "should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges,* 944 S.W.2d 346, 352 (Tenn.1997) (citing *Graham v. State,* 547 S.W.2d 531 (Tenn.1977), and *State v. Forbes,* 918 S.W.2d 431, 447 (Tenn.Crim.App.1995)). In addition, "[i]t is the duty of a trial judge to give a complete charge of the law applicable to the facts of a case." *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn.1986) (citing *State v. Thompson,* 519 S.W.2d 789, 792 (Tenn.1975)); *see State v. Burkley,* 804 S.W.2d 458, 461 (Tenn.Crim.App.1990). This Court also stated in *Burkley,* "In delivering its charge, a court should guard against an instruction which would withdraw from the jury's consideration any issue or evidence which they are entitled to consider." 804 S.W.2d at 461.

#### A. Instructions on Premeditated Murder

Defendants' fourth issue assigns error to the trial court's charge on first degree premeditated murder for two reasons: (1) because the judge used the phrase, "that the killing was intentional," rather than "that the defendant acted intentionally"; and (2) because the element of deliberation was separated on the page from the other elements of the offense. We find no prejudicial error.

Tennessee Pattern Jury Instruction 7.01(a), the proper instruction for this case, [FN5] reads, in relevant part:

FN5. Tennessee Pattern Jury Instruction 7.01(a) is the proper

instruction for offenses committed prior to July 1, 1995, the effective date of legislative changes to the statute.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant unlawfully killed the alleged victim;

and

(2) that the defendant acted intentionally. A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result;

and

(3) that the killing was deliberate. A deliberate act is one performed with a cool purpose;

and

(4) that the killing was premeditated.

Tenn. Pattern Jury Instructions 7.01(a) (4th ed.1995). Because Defendants' latter argument concerns the visual impact of the **instructions** on the jury, we reprint the relevant portion as written in this case:

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

that the defendant unlawfully killed the alleged victim; and that the **killing** was **intentional**. A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result; and that the killing was deliberate. A deliberate act is

one performed with cool purpose; and that the killing was premeditated.
*12 Although the elements "that the killing was intentional" and "that the defendant
acted intentionally" do convey different meanings, we decline to find the distinction
substantial enough to mislead the jury to Defendants' prejudice. Consideration of the
first element, "that *the defendant* unlawfully killed the alleged victim," should have
eliminated any confusion in the minds of the jurors. (Emphasis added.) Clearly,
conviction upon this particular instruction, as opposed to criminal responsibility,
requires a finding that the defendant himself was the "triggerman."
Second, we find no error in the visual appearance of the elements. Though the second
element--intent--contains a period prior to its explanation, so does the third element of
deliberation. At a mere glance, the instruction could be slightly confusing to the jury;
but we find that even a careful reading is unnecessary to clearly understand the
instruction.

### B. Instruction on Moral Certainty

Defendants next complain that the jury instruction on reasonable doubt violated due
process protections. In their fifth issue, briefly consisting of a single quote, Defendants
contest the trial court's use of Tennessee Pattern Jury Instruction--Criminal (T.P.I.)
2.03(a). [FN6] Specifically, they argue that omission of the term "moral certainty"
reduced the jury's perception of the degree of certainty required to convict to a point
less than that required by the Due Process Clause. We find no violation of Defendants'
due process rights.

> FN6. We also note that the single case used by Defendants to show
> error by the trial court, *State v. Derek Denton,* C.C.A. No. 02C01-9409-
> CR-00186, Shelby County (Tenn.Crim.App., Jackson, Aug. 2, 1996),
> actually *held* that giving an instruction identical to the one in this case
> was not error.

"[T]he Constitution neither prohibits trial courts from defining reasonable doubt nor
requires them to do so as a matter of course." *Victor v. Nebraska,* 511 U.S. 1, 5, 114
S.Ct. 1239, 127 L.Ed.2d 583 (1994). Furthermore, "so long as the court instructs the
jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt,
the Constitution does not require that any particular form of words be used in advising
the jury of the government's burden of proof." *Id.* (citations omitted). Therefore, it
seems that, with respect to reasonable doubt, a trial court's error must typically be one
of commission, rather than omission. There can be no mistake in failing to employ
distinctive words or phrases, so long as the charge given is complete and accurate.
Because we find that T.P.I. 2.03(a)--currently the alternate reasonable doubt jury
instruction for this state--accurately conveys the level of certainty mandated by *In re
Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), we conclude that
absence of the term "moral certainty" is of no consequence.
Our supreme court has expressly permitted the use of "moral certainty" in this state's
jury instructions. See *Carter v. State,* 958 S.W.2d 620, 626 (Tenn.1997) ("The phrase
is permissible if the context in which the instruction is given 'clearly convey[s] the
jury's responsibility to decide the verdict based on the facts and law.' ") (quoting *State
v. Nichols,* 877 S.W.2d 722, 734 (Tenn.1994)). *Cf. Austin v. Bell,* 126 F.3d 843, 847
(6th Cir.1997), *cert. denied,* 523 U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998)
(also accepting a "moral certainty" instruction). We note carefully and explicitly,
however, that our supreme court has allowed use of the term, not encouraged its use.
*But cf. State v. Jose Hoimes,* C.C.A. No. 02C01-9505-CR00154, Shelby County
(Tenn.Crim.App., Jackson, Dec. 10, 1997); *State v. Derek Denton,* C.C.A. No. 02C01-
9409-CR-00186, Shelby County (Tenn.Crim.App., Jackson, Aug. 2, 1996) (both
expressing a preference for T.P.I. 2.03, rather than T.P.I. 2.03(a)).
*13 Our courts have upheld a "moral certainty" jury instruction when confronted with
defendants' arguments that the instruction itself, when given, permits a level of proof
lower than that constitutionally required for conviction. See *Carter,* 958 S.W.2d at
625-26; *Nichols,* 877 S.W.2d at 734 (use of "moral certainty" permissible when
context further explained reasonable doubt and properly reflected evidentiary
certainty); *Pettyjohn v. State,* 885 S.W.2d 364, 365-66 (Tenn.Crim.App.1994); *State v.
Hallock,* 875 S.W.2d 285, 294 (Tenn.Crim.App.1993); *see also* Amy K. Collignon,

Note, *Searching for an Acceptable Reasonable Doubt Jury Instruction in Light of
Victor v. Nebraska*, 40 St. Louis U. L.J. 145, 171 (1996) ("[A]lthough the Supreme
Court hesitated upon the acceptability of phrases such as 'moral certainty' ...,
interpreting courts have gleaned only that the instruction must pass constitutional
muster having been read as a whole.").

Now, however, these particular Defendants complain that *failure* to provide a "moral
certainty" instruction also encourages conviction upon a reduced degree of proof. We
recently addressed this very issue with respect to T.P.I. 2.03(a) in *State v. Henning*,
C.C.A. No. 02C01-9703-CC-00126, Madison County (Tenn.Crim.App., Jackson, Oct.
24, 1997); and we find no reason to deviate from our conclusion in that case that the
instruction is not constitutionally deficient. *See id.* at 9; *see also Denton*, C.C.A. No.
02C01-9409-CR-00186, slip op. at 8 ("[W]e cannot conclude that the trial court erred
by refusing to include the phrase 'moral certainty' in its charge.").

In *Henning*, we noted that T.P.I. 2.03(a) "tracks virtually identical language of pattern
reasonable doubt instructions approved by a majority of the federal circuits." *Id.; see
also* Collignon, *supra*, at 171 ("Clearly, the instruction with the most support comes
from the Federal Judicial Center. That charge excludes all reference to 'moral certainty'
or 'substantial doubt.' ") (footnote omitted).

Reasonable doubt instructions not including the term "moral certainty" have been more
widely used since the Supreme Court's opinion in *Victor v. Nebraska*, 511 U.S. 1, 114
S.Ct. 1239, 127 L.Ed.2d 583 (1994), in which the Court expressed concern that the
term could have "lost its historical meaning." *Id.* at 13. There, the Court held "moral
certainty" constitutional within an instruction that "lends content to the phrase." *Id.* at
14, 16 ("The instruction thus explicitly told the jurors that their conclusion had to be
based on the evidence in the case. Other instructions reinforced this message.").
Because of the changing nature of the phrase over time, however, the *Victor* Court
clearly stated that it did not condone use of the phrase in reasonable doubt jury
instructions. *See id.* at 16. As the Court noted, "the definitions of reasonable doubt
most widely used in the federal courts do not contain any reference to moral certainty."
*Id.* at 16-17; *see id.* at 24 (Ginsburg J., concurring in part and concurring in the
judgment) ("I agree ... with the Court's suggestion that the term 'moral certainty,' while
not in itself so misleading as to render the instructions unconstitutional, should be
avoided as an unhelpful way of explaining what reasonable doubt means.").
*\*14* In the case at bar, we are convinced that T.P.I. 2.03(a) is not constitutionally
deficient for lack of the phrase "moral certainty." Therefore, we find no error in the
trial court's use of this alternative jury instruction.

### C. Instruction on Prior Inconsistent Statements

Defendants' sixth assignment of error concerns the trial court's refusal to issue a
contemporaneous curative instruction to the jury when the prior inconsistent statements
of Claude Sharkey were introduced for impeachment purposes. Defendants claim that
the judge should have instructed the jury that the statement could be used only for
impeachment, not as substantive evidence.

Defendants correctly assert that failure by a trial court to issue a contemporaneous
curative instruction for prior inconsistent statements could, under some circumstances,
constitute reversible error. According to *State v. Reece*, 637 S.W.2d 858 (Tenn.1982),
failure to give a limiting instruction creates reversible error when "the impeaching
testimony is extremely damaging, the need for the limiting instruction is apparent, and
the failure to give it results in substantial prejudice to the rights of the accused." *Id.* at
861.

This case is readily distinguishable from *Reece*, however. In *Reece*, the limiting
instruction was never given, not even as part of the general jury charge. In this case,
the jury was instructed at the end of testimony that it could consider impeaching prior
inconsistent statements only for purposes of assessing credibility.

Although we are aware of cases in which federal courts have held a limiting instruction
as part of the general jury charge insufficient where the impeaching testimony is
extremely damaging, we need not determine whether this issue is a matter of
constitutional or evidentiary import, because Defendants have failed to properly cite to
the record. *See* Tenn.R.App.P. 27(g) ( "[R]eference in the briefs to the record shall be
to the pages of the record involved."). In their brief, Defendants inform the Court that
the impeached witness' testimony can be found between pages 422 and 450 of the
record, but they do not identify which portions of the testimony they consider
damaging and do not establish how improper use of the testimony prejudiced them.

4 2 5

The only guidance provided by Defendants is this:

The testimony of Claude Sharkey can be found in the trial transcript from pages 422 thru [sic] 450. (Vol. VII and VIII) The testimony of Sharkey occurred on February 13, 1997. A review of that testimony clearly leaves room for confusion by the jury as to what they could consider for guilt or innocence versus impeachment especially where the jury was not charged with the proper use of such testimony until the afternoon of February 14, 1997, during the court's regular charge to the jury. It is also clear that certain statements in Sharkey's previous statement if taken as substantive evidence would be extremely damaging to both Appellants.
*15 ...

In the present case if the jury took Sharkey's statements as substantive evidence, which Appellants submit they did, it is an understatement to say that it resulted in substantial prejudice.

The whole of Claude Sharkey's testimony consists of impeachment by prior inconsistent statements. Where Defendants fail to meaningfully cite to the record such that alleged prejudicial error can be identified, we decline to search the record for it.

### D. Instruction on Criminal Responsibility

Defendants' third issue for review alleges that the trial court erred by failing to specifically instruct the jury that it must reach a unanimous decision on the theory behind their verdict. For example, if a portion of the jury convicted them as directly liable for the murder, a portion of the jury convicted based upon criminal responsibility for the conduct of Claude Sharkey, and a portion of the jury convicted based upon criminal responsibility for the conduct of Kevin Wilson, then Defendants claim the decision would have violated their constitutional right to a unanimous verdict.

This issue is moot as to Defendant Saulsberry. As to Defendant Howard, we find the argument meritless. In *State v. Williams,* 920 S.W.2d 247 (Tenn.Crim.App.1995), this Court did not accept a similar argument. In *Williams,* the victim could not pinpoint which criminal held her down and which one of the two actually raped her. The defendant argued the possibility of a nonunanimous jury verdict because the State could not prove if he was the actual rapist or an aider. Our Court found that in Tennessee, under our criminal responsibility statute, it makes no difference. A defendant criminally responsible for a principal's acts is just as guilty as the principal actor.

### IV. CONSECUTIVE SENTENCING

In their ninth issue, Defendants argue that the trial court erred in imposing consecutive sentences, contending that the evidence does not indicate Defendants are dangerous offenders with little or no regard for human life. We find no error in the trial court's consideration or decision.

This Court reviews the length, range, or manner of service of sentence imposed by the trial court based upon a de novo standard. *See* Tenn.Code Ann. § 40- 35-401(d). However, we owe the trial court's determination a presumption of correctness. *see id.*. so long as the trial court "place[s] on the record its reasons for arriving at the final sentencing decision" and exhibits compliance with the statutory sentencing guidelines and principles. *State v. Wilkerson,* 905 S.W.2d 933, 934 (Tenn.1995). Here, the record contains a lengthy and comprehensive deliberation by the trial court regarding Defendants' sentencing, and we therefore accord the sentence a presumption of correctness.

Defendants bear the burden of showing that the sentence is improper. *See State v. Ashby,* 823 S.W.2d 166, 169 (Tenn.1991). Defendants allege that the aggregate term of life imprisonment "is quite reasonably sufficient in the terms of length to adequately punish [Defendants] and to adequately protect society," but they have nowhere identified any errors committed by the trial court or *why* consecutive sentencing is not appropriate in this case. They have failed to carry their burden.

*16 In the interest of justice, however, we have examined the sentencing transcript and are satisfied that consecutive sentencing is appropriate in this case. Tennessee Code Annotated § 40-35-115 governs our analysis:

(a) If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.

(b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

...

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

*Id.* § 40-35-115(a), (b)(4). Moreover,

The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentencing.

*Wilkerson*, 905 S.W.2d at 938; *see also State v. Dale Nolan*, C.C.A. No. 01C01-9511-CC-00387, Sequatchie County (Tenn.Crim.App., Nashville, June 26, 1997), *perm. to app. denied* (Tenn.1998).

In the case at bar, the trial court explicitly found that Defendants satisfied the requirements of § 40-35-115(b)(4):

As to the consecutive request, Mr. Howard does have an extensive record. And in my judgment, he is clearly a dangerous offender. He has shown no hesitation to commit a crime when the risk to human life was high.

The facts of this case were so shocking and appalling that it is inconceivable to me that under any interpretation of the dangerous offender category these individuals would not be considered to be dangerous offenders. The facts that are in the record with regard to all four of them being armed, all four of them showing up at that back door, single file, marching into the store, each one having his own responsibility with regard to the completion of this robbery. The shootings that occurred with Mr. Frieling and Mr. Shea.

Their absolute and total lack of remorse after this is over, as evidenced by testimony from several individuals of the fact that they went back to the home of the one individual and played Nintendo for the rest of the night. That's just pretty amazing testimony that we heard during the course of this trial. That individuals after having participated in a crime of this sort would go back to a house and play Nintendo for several hours until, I guess, they got sleepy and went to sleep. It is just--it's unbelievable. Clearly dangerous offenders.

With respect to Defendant Saulsberry, the court stated,

*17 In my judgment, for the same reasons as those I indicated with regard to Mr. Howard, I think that consecutive sentencing is appropriate in this case as well.

The offense is so reprehensible and so atrocious, so unfathomable, that it is hard for me to imagine anyone defining this, these individuals, as anything other than dangerous offenders.

The court also found no hesitation to commit an offense when the risk to human life was high:

I think that's clearly established. And I think the case law supports it. I think there were--well, I know that the record reflects that there were other individuals in the restaurant, the dishwasher, the waitress, others who were all put at risk. The potential to--or the risk to their life was high. They were very much endangered during this whole episode, even though they were fortunate enough to have been spared. So I think that factor clearly applies.

Finally, the trial court specifically addressed whether an aggregate sentence reasonably related to the severity of the offenses involved. The court stated,

You have a robbery that was taking place, and a store manager who is saying, here, take the money, doing everything to comply with what the robbers were asking, and yet was shot. And then beyond that, the assistant manager, lying on the ground, doing everything he could to comply with what was being demanded, who was then gratuitously shot and left to die.

I mean, I think it is a situation where it is clearly distinguishable from, for example, a holdup where in the process of struggling over the money, somebody gets shot or something of that sort. [That] is all part and parcel of the robbery itself.

These events were all separate, independent, inexplicable, inexcusable, outrageous, unconscionable acts that are clearly distinguishable, I think.

We also find in the sentencing transcript ample evidence to show that the term imposed was necessary to protect the public from further crimes committed by these Defendants. At the time of sentencing, each Defendant had an extensive history of criminal behavior. In addition, the court found, for both, at least a limited history of

unwillingness to comply with the conditions of a sentence involving release into the community. Our review of the above evidence is not affected by our finding of insufficient evidence to support premeditation and deliberation on the part of Defendant Saulsberry. We are convinced the trial judge fulfilled his duty in sentencing as to both Defendants.

## V. DISCOVERY MOTION

Defendants' ninth issue assigns error to the trial court's failure to grant a mistrial based upon an alleged discovery violation by the State. Defendants argue that the State did not comply with Tennessee Rule of Criminal Procedure 16, which requires disclosure of certain evidence by the State:

Upon request of the defendant, the state shall permit the defendant to inspect and copy or photograph any results or reports of ... scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

*18 Tenn.R.Crim.P. 16(a)(1)(D). Specifically, Defendants argue that the State should have produced, in response to their Rule 16 discovery request, a report of tests performed on the .32 caliber revolver seized from Defendant Howard's residence. The State replies first that Rule 16 is inapplicable because the test performed on the weapon was not a "scientific test" and because the expert made no "report." Rather, the State argues, the expert simply observed whether the barrel of the gun contained residue, to determine whether it had been cleaned since last fired, and he made only handwritten notes of the result. Although we do not accept the State's argument, we need not find this test within Rule 16 because we conclude that even if there was a violation, Defendants were not prejudiced.

Rule 16 prescribes the remedies for violation of its provisions: "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn.R.Crim.P. 16(d)(2). Here, the trial court offered to allow Defendants' counsel an opportunity to inspect the notes, which he declined to do. The record reflects that counsel objected to the existence of the alleged violation, but that he did not, in fact, move for a mistrial at this point. Although Defendants assert that they moved for a mistrial, they have not provided a citation to the record to permit meaningful appellate review.

Furthermore, the evidence not disclosed to Defendants revealed only that the gun found in Defendant Howard's home had not been cleaned since last fired; the evidence did not reveal when the gun *had* been last fired. Defendants have identified no prejudice--they have simply asserted that prejudice resulted--and we cannot ourselves identify any prejudice. The trial judge was within his discretion in refusing any request for a mistrial.

## VI. CUMULATIVE ERROR

We have concluded that only one error occurred and have remedied that error by reversing one Defendant's conviction for first degree premeditated murder. We find no cumulative error warranting further modification.

## VII. CONCLUSION

In conclusion, Defendant Saulsberry's conviction for first degree premeditated murder is not supported by sufficient evidence, and such conviction is therefore reversed and his case is remanded for a new trial on the charge of felony murder as alleged in Counts 2 and 3 of the indictment. We conclude that the trial court committed no other error. We affirm convictions for especially aggravated robbery and conspiracy as to both Defendants. We affirm Defendant Howard's murder conviction. Consecutive sentencing is affirmed. This case is remanded for such other proceedings as may be warranted and consistent with this opinion.


WELLES and RILEY, JJ., concur.

## OPINION DISSENTING IN PART

The evidence in this case would unquestionably be sufficient to support a conviction of Defendant Howard for felony murder in the first degree. His guilt of felony murder would obviously be predicated on his participation in the aggravated robbery. *19 As I understand our law, to convict Howard of premeditated first degree murder

would require proof that he acted with the intent to assist the shooter in the commission of the premeditated and intentional first degree murder of the victim. I agree with the majority that Howard cannot escape criminal responsibility for premeditated murder by "claiming he did not share the criminal intent or premeditation with the actual triggerman." Our law mandates, however, that Howard escape criminal responsibility for premeditated murder unless the State proves beyond a reasonable doubt that Howard *did* share the shooter's criminal intent for premeditated and intentional murder. I do not find this proof in the record. I also cannot agree that a *premeditated* murder is a natural and probable consequence of an especially aggravated robbery.

I must therefore respectfully dissent from the majority's conclusion that the evidence is sufficient to support Defendant Howard's conviction of premeditated first degree murder. In all other respects, I concur.

DAVID H. WELLES, JUDGE
Tenn.Crim.App.,1998.
State v. Saulsberry
1998 WL 892281 (Tenn.Crim.App.)
END OF DOCUMENT

Copr. (C) West 2002 No Claim to Orig. U.S. Govt. Works

120 S.Ct. 1740                                                                Page 1 of 43

146 L.Ed.2d 658, 68 USLW 4351, 82 Fair Empl.Prac.Cas. (BNA) 1313, 77 Empl. Prac. Dec. P
46,376, 144 Ed. Law Rep. 28, 00 Cal. Daily Op. Serv. 3788, 2000 Daily Journal D.A.R. 5061, 2000
CJ C.A.R. 2583

Supreme Court of the United States
UNITED STATES; Petitioner,
v.
Antonio J. MORRISON, et al.
Christy Brzonkala, Petitioner,
v.
Antonio J. Morrison et al.
Nos. 99-5, 99-29.
Argued Jan. 11, 2000.
Decided May 15, 2000.

Former university student brought claims under Violence Against Women Act (VAWA) against
students who allegedly raped her. The United States District Court for the Western District of
Virginia, Jackson L. Kiser, Senior District Judge, 935 F.Supp. 779, dismissed claims. Former student
appealed. Following reversal, 132 F.3d 949, and following rehearing en banc, the Fourth Circuit Court
of Appeals, Luttig, Circuit Judge, 169 F.3d 820, affirmed. Certiorari was granted. The Supreme Court,
Justice Rehnquist, held that: (1) Commerce Clause did not provide Congress with authority to enact
civil remedy provision of VAWA, inasmuch as provision was not regulation of activity that
substantially affected interstate commerce, and (2) enforcement clause of Fourteenth Amendment did
not provide Congress with authority to enact provision.
Affirmed.
Justice Thomas concurred and filed opinion.
Justice Souter filed dissenting opinion in which Justices Stevens, Ginsburg, and Breyer joined.
Justice Breyer filed dissenting opinion in which Justices Stevens joined, and in which Justices Souter
and Ginsburg joined in part.

West Headnotes

[1] KeyCite Notes

⟜361 Statutes
  ⟜361I Enactment, Requisites, and Validity in General
    ⟜361k4 k. Powers and Duties of Legislature in General. Most Cited Cases

Every law enacted by Congress must be based on one or more of its powers enumerated in the
Constitution.

[2] KeyCite Notes

⟜92 Constitutional Law
  ⟜92III Distribution of Governmental Powers and Functions
    ⟜92III(A) Legislative Powers and Delegation Thereof
      ⟜92k50 k. Nature and Scope in General. Most Cited Cases

The powers of the legislature are defined and limited; and that those limits may not be mistaken or
forgotten, the Constitution is written.

[3] KeyCite Notes

120 S.Ct. 1740                                                    Page 2 of 43

⇐92 Constitutional Law
  ⇐92III Distribution of Governmental Powers and Functions
    ⇐92III(B) Judicial Powers and Functions
      ⇐92k70 Encroachment on Legislature
        ⇐92k70.1 In General
          ⇐92k70.1(3) k. Invalidation, Annulment, or Repeal of Statutes. Most Cited Cases

Due respect for the decisions of a coordinate branch of Government demands that the Supreme Court
invalidate a congressional enactment only upon a plain showing that Congress has exceeded its
constitutional bounds.

[4] KeyCite Notes

⇐83 Commerce
  ⇐83I Power to Regulate in General
    ⇐83k2 Constitutional Grant of Power to Congress
      ⇐83k3 k. In General. Most Cited Cases

Congress' regulatory authority under the Commerce Clause is not without effective bounds. U.S.C.A.
Const. Art. 1, § 8, cl. 3.

[5] KeyCite Notes

⇐83 Commerce
  ⇐83I Power to Regulate in General
    ⇐83k2 Constitutional Grant of Power to Congress
      ⇐83k7 Internal Commerce of States
        ⇐83k7(2) k. Activities Affecting Interstate Commerce. Most Cited Cases

The scope of the interstate commerce power must be considered in the light of our dual system of
government and may not be extended so as to embrace effects upon interstate commerce so indirect
and remote that to embrace them, in view of our complex society, would effectually obliterate the
distinction between what is national and what is local and create a completely centralized government.
U.S.C.A. Const. Art. 1, § 8, cl. 3.

[6] KeyCite Notes

⇐83 Commerce
  ⇐83I Power to Regulate in General
    ⇐83k2 Constitutional Grant of Power to Congress
      ⇐83k5 k. Commerce Among the States. Most Cited Cases

⇐83 Commerce
  ⇐83I Power to Regulate in General
    ⇐83k2 Constitutional Grant of Power to Congress
      ⇐83k7 Internal Commerce of States
        ⇐83k7(2) k. Activities Affecting Interstate Commerce. Most Cited Cases

There are three broad categories of activity that Congress may regulate under its commerce power:
first, Congress may regulate the use of the channels of interstate commerce; second, Congress is
empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things

120 S.Ct. 1740                                        Page 3 of 43

in interstate commerce, even though the threat may come only from intrastate activities; and, finally, Congress' commerce authority includes thepower to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that sunstantially affect interstate commerce. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[7] KeyCite Notes

⇐83 Commerce
  ⇐83II Application to Particular Subjects and Methods of Regulation
    ⇐83II(J) Offenses and Prosecutions
      ⇐83k82.5 Federal Offenses and Prosecutions
        ⇐83k82.6 k. In General. Most Cited Cases

Commerce Clause did not provide Congress with authority to enact civil remedy provision of Violence Against Women Act (VAWA), inasmuch as provision was not regulation of activity that substantially affected interstate commerce; gender- motivated crimes of violence were not economic activity, provision contained no jurisdictional element establishing that federal cause of action was in pursuance of Congress' power to regulate interstate commerce, and, although Congress made findings regarding impact of gender-motivated violence on victims and their families, such findings were based on unworkable "but-for" reasoning. U.S.C.A. Const. Art. 1, § 8, cl. 3; Violent Crime Control and Law Enforcement Act of 1994, § 40302, 42 U.S.C.A. § 13981.

[8] KeyCite Notes

⇐83 Commerce
  ⇐83I Power to Regulate in General
    ⇐83k2 Constitutional Grant of Power to Congress
      ⇐83k7 Internal Commerce of States
        ⇐83k7(2) k. Activities Affecting Interstate Commerce. Most Cited Cases

Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[9] KeyCite Notes

⇐83 Commerce
  ⇐83I Power to Regulate in General
    ⇐83k2 Constitutional Grant of Power to Congress
      ⇐83k7 Internal Commerce of States
        ⇐83k7(2) k. Activities Affecting Interstate Commerce. Most Cited Cases

While Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce, the existence of such findings may enable the Supreme Court to evaluate the legislative judgment that the activity in question substantially affects interstate commerce, even though no such substantial effect is visible to the naked eye. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[10] KeyCite Notes

⇐83 Commerce



⟸83I Power to Regulate in General
  ⟸83k2 Constitutional Grant of Power to Congress
    ⟸83k5 k. Commerce Among the States. <u>Most Cited Cases</u>

A jurisdictional element establishing that the federal cause of action created by a federal statute is in pursuance of Congress' power to regulate interstate commerce would lend support to the argument that the statute was sufficiently tied to interstate commerce to withstand a Commerce Clause challenge. <u>U.S.C.A.</u> <u>Const.</u> <u>Art. 1, § 8, cl. 3.</u>

[11] KeyCite Notes 

⟸83 Commerce
  ⟸83I Power to Regulate in General
    ⟸83k2 Constitutional Grant of Power to Congress
      ⟸83k3 k. In General. <u>Most Cited Cases</u>

The existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. <u>U.S.C.A. Const. Art. 1, § 8, cl. 3.</u>

[12] KeyCite Notes 

⟸83 Commerce
  ⟸83I Power to Regulate in General
    ⟸83k2 Constitutional Grant of Power to Congress
      ⟸83k7 Internal Commerce of States
        ⟸83k7(2) k. Activities Affecting Interstate Commerce. <u>Most Cited Cases</u>

Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so; rather, whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by the Supreme Court. <u>U.S.C.A. Const. Art. 1, § 8, cl. 3.</u>

[13] KeyCite Notes 

⟸83 Commerce
  ⟸83II Application to Particular Subjects and Methods of Regulation
    ⟸83II(J) Offenses and Prosecutions
      ⟸83k82.5 Federal Offenses and Prosecutions
        ⟸83k82.6 k. In General. <u>Most Cited Cases</u>

The but-for causal chain from the initial occurrence of violent crime, the suppression of which has always been the prime object of the States' police power, to every attenuated effect upon interstate commerce must have its limits in the Commerce Clause area. <u>U.S.C.A. Const. Art. 1, § 8, cl. 3.</u>

[14] KeyCite Notes 

⟸92 Constitutional Law
  ⟸92III Distribution of Governmental Powers and Functions
    ⟸92III(A) Legislative Powers and Delegation Thereof



120 S.Ct. 1740                                                    Page 5 of 43

⟺92k50 k. Nature and Scope in General. Most Cited Cases

Under our written Constitution, the limitation of congressional authority is not solely a matter of legislative grace.

[15] KeyCite Notes [KC]

⟺92 Constitutional Law
  ⟺92III Distribution of Governmental Powers and Functions
    ⟺92III(A) Legislative Powers and Delegation Thereof
      ⟺92k50 k. Nature and Scope in General. Most Cited Cases

The Framers of the Constitution crafted the federal system of government so that the people's rights would be secured by the division of power.

[16] KeyCite Notes [KC]

⟺92 Constitutional Law
  ⟺92III Distribution of Governmental Powers and Functions
    ⟺92III(A) Legislative Powers and Delegation Thereof
      ⟺92k50 k. Nature and Scope in General. Most Cited Cases

Departing from their parliamentary past, the Framers adopted a written Constitution that further divided authority at the federal level so that the Constitution's provisions would not be defined solely by the political branches nor the scope of legislative power limited only by public opinion and the legislature's self-restraint.

[17] KeyCite Notes [KC]

⟺92 Constitutional Law
  ⟺92III Distribution of Governmental Powers and Functions
    ⟺92III(B) Judicial Powers and Functions
      ⟺92k67 k. Nature and Scope in General. Most Cited Cases

It is a permanent and indispensable feature of our constitutional system that the federal judiciary is supreme in the exposition of the law of the Constitution.

[18] KeyCite Notes [KC]

⟺92 Constitutional Law
  ⟺92III Distribution of Governmental Powers and Functions
    ⟺92III(B) Judicial Powers and Functions
      ⟺92k67 k. Nature and Scope in General. Most Cited Cases

The political branches have a role in interpreting and applying the Constitution, but the Supreme Court remains the ultimate expositor of the constitutional text.

[19] KeyCite Notes [KC]



120 S.Ct. 1740                                                          Page 6 of 43

⟸92 Constitutional Law
    ⟸92III Distribution of Governmental Powers and Functions
        ⟸92III(A) Legislative Powers and Delegation Thereof
            ⟸92k50 k. Nature and Scope in General. Most Cited Cases

⟸92 Constitutional Law
    ⟸92III Distribution of Governmental Powers and Functions
        ⟸92III(B) Judicial Powers and Functions
            ⟸92k67 k. Nature and Scope in General. Most Cited Cases

In the performance of assigned constitutional duties each branch of the Government must initially
interpret the Constitution, and the interpretation of its powers by any branch is due great respect from
the others; however, it is emphatically the province and duty of the judicial department to say what the
law is.

[20] KeyCite Notes

⟸83 Commerce
    ⟸83II Application to Particular Subjects and Methods of Regulation
        ⟸83II(J) Offenses and Prosecutions
            ⟸83k82.5 Federal Offenses and Prosecutions
                ⟸83k82.6 k. In General. Most Cited Cases

Congress may not regulate noneconomic, violent criminal conduct based solely on that conduct's
aggregate effect on interstate commerce; the Constitution requires a distinction between what is truly
national and what is truly local. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[21] KeyCite Notes

⟸83 Commerce
    ⟸83II Application to Particular Subjects and Methods of Regulation
        ⟸83II(J) Offenses and Prosecutions
            ⟸83k82.5 Federal Offenses and Prosecutions
                ⟸83k82.6 k. In General. Most Cited Cases

The regulation and punishment of intrastate violence that is not directed at the instrumentalities,
channels, or goods involved in interstate commerce has always been the province of the States.
U.S.C.A. Const. Art. 1, § 8, cl. 3.

[22] KeyCite Notes

⟸92 Constitutional Law
    ⟸92IV Police Power in General
        ⟸92k81 k. Nature and Scope in General. Most Cited Cases

⟸360 States
    ⟸360I Political Status and Relations
        ⟸360I(A) In General
            ⟸360k4.4 Powers Reserved to States
                ⟸360k4.4(2) k. Police Power. Most Cited Cases

There is no better example of the police power, which the Founders of the Constitution denied the

National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

[23] KeyCite Notes

⇐92 Constitutional Law
  ⇐92II Construction, Operation, and Enforcement of Constitutional  Provisions
    ⇐92k25 Grant or Limitation of Powers
      ⇐92k27 k. Constitution of United States. Most Cited Cases

With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution does not grant the Federal Government an unlimited license to regulate.

[24] KeyCite Notes

⇐92 Constitutional Law
  ⇐92III Distribution of Governmental Powers and Functions
    ⇐92III(B) Judicial Powers and Functions
      ⇐92k67 k. Nature and Scope in General. Most Cited Cases

The Constitution's separation of federal power and the creation of the Judicial Branch indicate that disputes regarding the extent of congressional power are largely subject to judicial review.

[25] KeyCite Notes

⇐92 Constitutional Law
  ⇐92II Construction, Operation, and Enforcement of Constitutional  Provisions
    ⇐92k25 Grant or Limitation of Powers
      ⇐92k27 k. Constitution of United States. Most Cited Cases

⇐360 States
  ⇐360I Political Status and Relations
    ⇐360I(A) In General
      ⇐360k4.4 Powers Reserved to States
        ⇐360k4.4(2) k. Police Power. Most Cited Cases

The Constitution created a Federal Government of limited powers, while reserving a generalized police power to the States.

[26] KeyCite Notes

⇐78 Civil Rights
  ⇐78I Rights Protected and Discrimination Prohibited
    ⇐78I(A) In General
      ⇐78k102 Statutory Provisions
        ⇐78k103 k. Power to Enact and Validity. Most Cited Cases

⇐92 Constitutional Law
  ⇐92XI Equal Protection of Laws

⇐92k224 Sex Discrimination
⇐92k224(2) k. Particular Discriminatory Practices. Most Cited Cases

Enforcement clause of Fourteenth Amendment did not provide Congress with authority to enact civil
remedy provision of Violence Against Women Act (VAWA); although state-sponsored gender
discrimination could violate equal protection under certain circumstances, Fourteenth Amendment did
not prohibit private conduct, provision was not aimed at proscribing discrimination by officials which
Fourteenth Amendment might not itself proscribe, and provision applied uniformly throughout the
Nation even though Congress found that discrimination against victims of gender-motivated violence
did not exist in all States. U.S.C.A. Const.Amend. 14, § 5; Violent Crime Control and Law
Enforcement Act of 1994, § 40302, 42 U.S.C.A. § 13981.

[27] KeyCite Notes

⇐92 Constitutional Law
⇐92XI Equal Protection of Laws
⇐92k209 k. Constitutional Guaranties in General. Most Cited Cases

⇐92 Constitutional Law
⇐92XII Due Process of Law
⇐92k251 k. Constitutional Guaranties in General. Most Cited Cases

The enforcement clause of the Fourteenth Amendment states that Congress may "enforce," by
"appropriate legislation" the constitutional guarantee that no State shall deprive any person of "life,
liberty or property, without due process of law," nor deny any person "equal protection of the laws."
U.S.C.A. Const.Amend. 14, § 5.

[28] KeyCite Notes

⇐92 Constitutional Law
⇐92V Personal, Civil and Political Rights
⇐92k82 Constitutional Guaranties in General
⇐92k82(6) Particular Rights, Limitations, and Applications
⇐92k82(6.1) k. In General. Most Cited Cases

The enforcement clause of the Fourteenth Amendment is a positive grant of legislative power that
includes authority to prohibit conduct which is not itself unconstitutional and to intrude into
legislative spheres of autonomy previously reserved to the States. U.S.C.A. Const.Amend. 14, § 5.

[29] KeyCite Notes

⇐92 Constitutional Law
⇐92V Personal, Civil and Political Rights
⇐92k82 Constitutional Guaranties in General
⇐92k82(6) Particular Rights, Limitations, and Applications
⇐92k82(6.1) k. In General. Most Cited Cases

As broad as the Fourteenth Amendment congressional enforcement power is, it is not unlimited.
U.S.C.A. Const.Amend. 14, § 5.

120 S.Ct. 1740    Page 9 of 43

[30] KeyCite Notes 

⇐92 Constitutional Law
  ⇐92XI Equal Protection of Laws
    ⇐92k224 Sex Discrimination
      ⇐92k224(1) k. In General. Most Cited Cases

State-sponsored gender discrimination violates equal protection unless it serves important governmental objectives and the discriminatory means employed are substantially related to the achievement of those objectives. U.S.C.A. Const.Amend. 14.

[31] KeyCite Notes 

⇐92 Constitutional Law
  ⇐92XI Equal Protection of Laws
    ⇐92k211 Nature and Scope of Prohibitions in General
      ⇐92k211(1) k. In General; Discrimination. Most Cited Cases

The language and purpose of the Fourteenth Amendment place certain limitations on the manner in which Congress may attack discriminatory conduct; these limitations are necessary to prevent the Fourteenth Amendment from obliterating the Framers' carefully crafted balance of power between the States and the National Government. U.S.C.A. Const.Amend. 14.

[32] KeyCite Notes 

⇐92 Constitutional Law
  ⇐92V Personal, Civil and Political Rights
    ⇐92k82 Constitutional Guaranties in General
      ⇐92k82(5) k. Application to Governmental or Private Action. Most Cited Cases

The Fourteenth Amendment, by its terms, prohibits only state action. U.S.C.A. Const.Amend. 14.

[33] KeyCite Notes 

⇐92 Constitutional Law
  ⇐92XI Equal Protection of Laws
    ⇐92k213 Control Over Governmental Agencies; State Action
      ⇐92k213(2) k. Limitation to States and State Action. Most Cited Cases

⇐92 Constitutional Law
  ⇐92XII Due Process of Law
    ⇐92k254 Application to Governmental or Private Action
      ⇐92k254(2) k. Relation to State or State Action. Most Cited Cases

The action inhibited by the Fourteenth Amendment's first section, which, inter alia, prohibits States from denying due process or equal protection, is only such action as may fairly be said to be that of the States. U.S.C.A. Const.Amend. 14, § 1.

[34] KeyCite Notes 

120 S.Ct. 1740                                                    Page 10 of 43

⟸92 Constitutional Law
   ⟸92XI Equal Protection of Laws
      ⟸92k213 Control Over Governmental Agencies; State Action
         ⟸92k213(4) k. Private Persons, Corporations, or Associations. Most Cited Cases

The Fourteenth Amendment erects no shield against merely private conduct, however discriminatory or wrongful. U.S.C.A. Const.Amend. 14.

[35] KeyCite Notes

⟸92 Constitutional Law
   ⟸92V Personal, Civil and Political Rights
      ⟸92k82 Constitutional Guaranties in General
         ⟸92k82(6) Particular Rights, Limitations, and Applications
            ⟸92k82(6.1) k. In General. Most Cited Cases

Under the enforcement clause of the Fourteenth Amendment, where a subject has not submitted to the general legislative power of Congress, but is only submitted thereto for the purpose of rendering effective some prohibition against particular State legislation or State action in reference to that subject, the power given is limited by its object, and any legislation by Congress in the matter must necessarily be corrective in its character, adapted to counteract and redress the operation of such prohibited state laws or proceedings of State officers. U.S.C.A. Const.Amend. 14, § 5.

[36] KeyCite Notes

⟸92 Constitutional Law
   ⟸92V Personal, Civil and Political Rights
      ⟸92k82 Constitutional Guaranties in General
         ⟸92k82(6) Particular Rights, Limitations, and Applications
            ⟸92k82(6.1) k. In General. Most Cited Cases

Prophylactic legislation under the enforcement clause of the Fourteenth Amendment must have a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. U.S.C.A. Const.Amend. 14, § 5.

                              West Codenotes

Held Unconstitutional
42 U.S.C.A. § 13981

                         **1743 Syllabus [FN*]

   FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Petitioner Brzonkala filed suit, alleging, *inter alia,* that she was raped by respondents while the three were students at Virginia Polytechnic Institute, and that this attack violated 42 U.S.C. § 13981, which provides a federal civil remedy for the victims of gender-motivated violence. Respondents moved to dismiss on the grounds that the complaint failed to state a claim and that § 13981's civil remedy is **1744 unconstitutional. Petitioner United States intervened to defend the section's constitutionality.

In dismissing the complaint, the District Court held that it stated a claim against respondents, but that Congress lacked authority to enact § 13981 under either the Commerce Clause or § 5 of the Fourteenth Amendment, which Congress had explicitly identified as the sources of federal authority for § 13981. The en banc Fourth Circuit affirmed.

*Held:* Section 13981 cannot be sustained under the Commerce Clause or § 5 of the Fourteenth Amendment. Pp. 1748-1759.

(a) The Commerce Clause does not provide Congress with authority to enact § 13981's federal civil remedy. A congressional enactment will be invalidated only upon a plain showing that Congress has exceeded its constitutional bounds. See *United States v. Lopez,* 514 U.S. 549, 568, 577-578, 115 S.Ct. 1624, 131 L.Ed.2d 626. Petitioners assert that § 13981 can be sustained under Congress' commerce power as a regulation of activity that substantially affects interstate commerce. The proper framework for analyzing such a claim is provided by the principles the Court set out in *Lopez.* First, in *Lopez,* the noneconomic, criminal nature of possessing a firearm in a school zone was central to the Court's conclusion that Congress lacks authority to regulate such possession. Similarly, gender-motivated crimes of violence are not, in any sense, economic activity. Second, like the statute at issue in *Lopez,* § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' regulation of interstate commerce. Although *Lopez* makes clear that such a jurisdictional element would lend support to the argument that § 13981 is sufficiently tied to interstate commerce *599 to come within Congress' authority, Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime. Third, although § 13981, unlike the *Lopez* statute, *is* supported by numerous findings regarding the serious impact of gender-motivated violence on victims and their families, these findings are substantially weakened by the fact that they rely on reasoning that this Court has rejected, namely, a but-for causal chain from the initial occurrence of violent crime to every attenuated effect upon interstate commerce. If accepted, this reasoning would allow Congress to regulate any crime whose nationwide, aggregated impact has substantial effects on employment, production, transit, or consumption. Moreover, such reasoning will not limit Congress to regulating violence, but may be applied equally as well to family law and other areas of state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant. The Constitution requires a distinction between what is truly national and what is truly local, and there is no better example of the police power, which the Founders undeniably left reposed in the States and denied the central Government, than the suppression of violent crime and vindication of its victims. Congress therefore may not regulate noneconomic, violent criminal conduct based solely on the conduct's aggregate effect on interstate commerce. Pp. 1748-1754.

(b) Section 5 of the Fourteenth Amendment, which permits Congress to enforce by appropriate legislation the constitutional guarantee that no State shall deprive any person of life, liberty, or property without due process, or deny any person equal protection of the laws, *City of Boerne v. Flores,* 521 U.S. 507, 517, 117 S.Ct. 2157, 138 L.Ed.2d 624, also does not give Congress the authority to enact § 13981. Petitioners' assertion that there is pervasive bias in various state justice systems against victims of gender-motivated violence is supported by a voluminous congressional record. However, the Fourteenth Amendment places limitations on the manner in which Congress may attack discriminatory conduct. Foremost among **1745 them is the principle that the Amendment prohibits only state action, not private conduct. This was the conclusion reached in *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290, and the *In re Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, which were both decided shortly after the Amendment's adoption. The force of the doctrine of *stare decisis* behind these decisions stems not only from the length of time they have been on the books, but also from the insight attributable to the Members of the Court at that time, who all had intimate knowledge and familiarity with the events surrounding the Amendment's adoption. Neither *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239, nor *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613, casts any doubt on the enduring vitality of the *Civil Rights Cases* and *Harris.* *600 Assuming that there has been gender-based disparate treatment by state authorities in these cases, it would not be enough to save § 13981's civil remedy, which is directed not at a State or state actor but at individuals who have committed criminal acts motivated by gender bias. Section 13981 visits no consequence on any Virginia public official involved in investigating or prosecuting Brzonkala's assault, and it is thus unlike any of the § 5 remedies this Court has previously upheld. See, *e.g., South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769. Section 13981 is also different from previously upheld remedies in that it applies uniformly throughout the Nation, even though Congress' findings indicate that the problem

addressed does not exist in all, or even most, States. In contrast, the § 5 remedy in *Katzenbach* was directed only to those States in which Congress found that there had been discrimination. Pp. 1754-1759.
169 F.3d 820, affirmed.
REHNQUIST, C.J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. THOMAS, J., filed a concurring opinion, *post*, p. 1759. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post*, p. 1759. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined, and in which SOUTER and GINSBURG, JJ., joined as to Part I-A, *post*, p. 1774.
Julie Goldscheid, Brooklyn, NY, for petitioner in case No. 99-29.
Seth P. Waxman, Washington, DC, for petitioner in case No. 99-5.
Michael E. Rosman, Washington, DC, for respondents.
For U.S. Supreme Court Briefs See:
1999 WL 1276924 (Reply.Brief)
1999 WL 1269316 (Reply.Brief)
1999 WL 1146897 (Resp.Brief)
1999 WL 1146894 (Resp.Brief)
1999 WL 1566657 (Amicus.Brief)
1999 WL 1223769 (Amicus.Brief)
1999 WL 1191432 (Amicus.Brief)
1999 WL 1186267 (Amicus.Brief)
1999 WL 1186266 (Amicus.Brief)
1999 WL 1186265 (Amicus.Brief)
1999 WL 1186264 (Amicus.Brief)
1999 WL 1186263 (Amicus.Brief)
1999 WL 1133771 (Amicus.Brief)
1999 WL 1034475 (Amicus.Brief)
1999 WL 1032805 (Amicus.Brief)
For Transcript of Oral Argument See:
2000 WL 41232 (U.S.Oral.Arg.)

*601 Chief Justice REHNQUIST delivered the opinion of the Court.
In these cases we consider the constitutionality of 42 U.S.C. § 13981, which provides a federal civil remedy for the *602 victims of gender- motivated violence. The United States Court of Appeals for the Fourth Circuit, sitting en banc, struck down § 13981 because it concluded that Congress lacked constitutional authority to enact the section's civil remedy. Believing that these cases are controlled by our decisions in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), *United States v. Harris*, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883), and the *In re Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), we affirm.
                                                    I
Petitioner Christy Brzonkala enrolled at Virginia Polytechnic Institute (Virginia Tech) in the fall of 1994. In September of that year, Brzonkala met respondents Antonio Morrison and James Crawford, who **1746 were both students at Virginia Tech and members of its varsity football team. Brzonkala alleges that, within 30 minutes of meeting Morrison and Crawford, they assaulted and repeatedly raped her. After the attack, Morrison allegedly told Brzonkala, "You better not have any ... diseases." Complaint ¶ 22. In the months following the rape, Morrison also allegedly announced in the dormitory's dining room that he "like[d] to get girls drunk and...." *Id.,* ¶ 31. The omitted portions, quoted verbatim in the briefs on file with this Court, consist of boasting, debased remarks about what Morrison would do to women, vulgar remarks that cannot fail to shock and offend.
Brzonkala alleges that this attack caused her to become severely emotionally disturbed and depressed. She sought assistance from a university psychiatrist, who prescribed *603 antidepressant medication. Shortly after the rape Brzonkala stopped attending classes and withdrew from the university.
In early 1995, Brzonkala filed a complaint against respondents under Virginia Tech's Sexual Assault Policy. During the school-conducted hearing on her complaint, Morrison admitted having sexual contact with her despite the fact that she had twice told him "no." After the hearing, Virginia Tech's Judicial Committee found insufficient evidence to punish Crawford, but found Morrison guilty of

120 S.Ct. 1740                                                          Page 13 of 43

sexual assault and sentenced him to immediate suspension for two semesters.
Virginia Tech's dean of students upheld the judicial committee's sentence. However, in July 1995,
Virginia Tech informed Brzonkala that Morrison intended to initiate a court challenge to his
conviction under the Sexual Assault Policy. University officials told her that a second hearing would
be necessary to remedy the school's error in prosecuting her complaint under that policy, which had
not been widely circulated to students. The university therefore conducted a second hearing under its
Abusive Conduct Policy, which was in force prior to the dissemination of the Sexual Assault Policy.
Following this second hearing the Judicial Committee again found Morrison guilty and sentenced him
to an identical 2-semester suspension. This time, however, the description of Morrison's offense was,
without explanation, changed from "sexual assault" to "using abusive language."
Morrison appealed his second conviction through the university's administrative system. On August
21, 1995, Virginia Tech's senior vice president and provost set aside Morrison's punishment. She
concluded that it was " 'excessive when compared with other cases where there has been a finding of
violation of the Abusive Conduct Policy.' " *Brzonkala v. Virginia Polytechnic and State Univ.,* 132
F.3d 949, 955 (C.A.4 1997). Virginia Tech did not inform Brzonkala of this decision. After learning
from a *604 newspaper that Morrison would be returning to Virginia Tech for the fall 1995 semester,
she dropped out of the university.
In December 1995, Brzonkala sued Morrison, Crawford, and Virginia Tech in the United States
District Court for the Western District of Virginia. Her complaint alleged that Morrison's and
Crawford's attack violated § 13981 and that Virginia Tech's handling of her complaint violated Title
IX of the Education Amendments of 1972, 86 Stat. 373-375, 20 U.S.C. §§ 1681-1688. Morrison and
Crawford moved to dismiss this complaint on the grounds that it failed to state a claim and that §
13981's civil remedy is unconstitutional. The United States, petitioner in No. 99-5, intervened to
defend § 13981's constitutionality.
The District Court dismissed Brzonkala's Title IX claims against Virginia Tech for failure to state a
claim upon which relief can be granted. See *Brzonkala v. Virginia Polytechnic and State Univ.,* 935
F.Supp. 772 (W.D.Va.1996). It then held that Brzonkala's complaint stated a claim against Morrison
and Crawford under § 13981, but dismissed the complaint because **1747 it concluded that Congress
lacked authority to enact the section under either the Commerce Clause or § 5 of the Fourteenth
Amendment. *Brzonkala v. Virginia Polytechnic and State Univ.,* 935 F.Supp. 779 (W.D.Va.1996).
A divided panel of the Court of Appeals reversed the District Court, reinstating Brzonkala's § 13981
claim and her Title IX hostile environment claim. [FN1] *Brzonkala v. Virginia Polytechnic and State
Univ.,* 132 F.3d 949 (C.A.4 1997). The full Court of Appeals vacated the panel's opinion and reheard
the case en banc. The en banc court then issued an opinion affirming the District Court's conclusion
that Brzonkala stated a claim under § 13981 because her complaint alleged a crime of violence and the
allegations of Morrison's crude and derogatory statements regarding his *605 treatment of women
sufficiently indicated that his crime was motivated by gender animus. [FN2] Nevertheless, the court
by a divided vote affirmed the District Court's conclusion that Congress lacked constitutional
authority to enact § 13981's civil remedy. *Brzonkala v. Virginia Polytechnic and State Univ.,* 169 F.3d
820 (C.A.4 1999). Because the Court of Appeals invalidated a federal statute on constitutional
grounds, we granted certiorari. 527 U.S. 1068, 120 S.Ct. 11, 144 L.Ed.2d 842 (1999).

     FN1. The panel affirmed the dismissal of Brzonkala's Title IX disparate treatment claim.
     See 132 F.3d, at 961-962.

     FN2. The en banc Court of Appeals affirmed the District Court's

     conclusion that Brzonkala failed to state a claim alleging disparate treatment under Title
     IX, but vacated the District Court's dismissal of her hostile environment claim and
     remanded with instructions for the District Court to hold the claim in abeyance pending
     this Court's decision in *Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 119 S.Ct.
     1661, 143 L.Ed.2d 839 (1999). *Brzonkala v. Virginia Polytechnic and State Univ.,* 169
     F.3d 820, 827, n. 2 (C.A.4 1999). Our grant of certiorari did not encompass Brzonkala's
     Title IX claims, and we thus do not consider them in this opinion.

120 S.Ct. 1740                                                    Page 14 of 43

Section 13981 was part of the Violence Against Women Act of 1994, § 40302, 108 Stat. 1941-1942. It states that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). To enforce that right, subsection (c) declares: "A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate."
Section 13981 defines a "crim[e] of violence motivated by gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an *606 animus based on the victim's gender." § 13981(d)(1). It also provides that the term "crime of violence" includes any "(A) ... act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States;" and
"(B) includes an act or series of acts that would constitute a felony described in subparagraph (A) but for the relationship between the person who takes such action and the individual against whom such action is taken." § 13981(d)(2).
**1748 Further clarifying the broad scope of § 13981's civil remedy, subsection (e)(2) states that "[n]othing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under subsection (c) of this section." And subsection (e)(3) provides a § 13981 litigant with a choice of forums: Federal and state courts "shall have concurrent jurisdiction" over complaints brought under the section.
Although the foregoing language of § 13981 covers a wide swath of criminal conduct, Congress placed some limitations on the section's federal civil remedy. Subsection (e)(1) states that "[n]othing in this section entitles a person to a cause of action under subsection (c) of this section for random acts of violence unrelated to gender or for acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender." Subsection (e)(4) further states that § 13981 shall not be construed "to confer on the courts of the United States jurisdiction over any State law claim seeking *607 the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree."

[1] [KC] [2] [KC] Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution. "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." Marbury v. Madison, 1 Cranch 137, 176, 2 L.Ed. 60 (1803) (Marshall, C. J.). Congress explicitly identified the sources of federal authority on which it relied in enacting § 13981. It said that a "Federal civil rights cause of action" is established "[p]ursuant to the affirmative power of Congress ... under section 5 of the Fourteenth Amendment to the Constitution, as well as under section 8 of Article I of the Constitution." 42 U.S.C. § 13981(a). We address Congress' authority to enact this remedy under each of these constitutional provisions in turn.

II

[3] [KC] Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds. See United States v. Lopez, 514 U.S., at 568, 577-578, 115 S.Ct. 1624 (KENNEDY, J., concurring); United States v. Harris, 106 U.S., at 635, 1 S.Ct. 601. With this presumption of constitutionality in mind, we turn to the question whether § 13981 falls within Congress' power under Article I, § 8, of the Constitution. Brzonkala and the United States rely upon the third clause of the section, which gives Congress power "[t]o regulate Commerce with foreign

Nations, and among the several States, and with the Indian Tribes."
As we discussed at length in *Lopez,* our interpretation of the Commerce Clause has changed as our Nation has developed. See 514 U.S., at 552-557, 115 S.Ct. 1624; *id.,* at 568-574, 115 S.Ct. 1624 (KENNEDY, J., concurring); *id.,* at 584, 593-599, 115 S.Ct. 1624 (THOMAS, J., concurring). We need not repeat that detailed review of *\*608* the Commerce Clause's history here; it suffices to say that, in the years since *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), Congress has had considerably greater latitude in regulating conduct and transactions under the Commerce Clause than our previous case law permitted. See *Lopez,* 514 U.S., at 555-556, 115 S.Ct. 1624; *id.,* at 573-574, 115 S.Ct. 1624 (KENNEDY, J., concurring).

[4]  [5]  *Lopez* emphasized, however, that even under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds. *Id.,* at 557, 115 S.Ct. 1624.
"[E]ven [our] modern-era precedents which have expanded congressional power *\*\*1749* under the Commerce Clause confirm that this power is subject to outer limits. In *Jones & Laughlin Steel,* the Court warned that the scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.' " *Id.,* at 556-557, 115 S.Ct. 1624 (quoting *Jones & Laughlin Steel, supra,* at 37, 57 S.Ct. 615). [FN3]

> FN3. Justice SOUTER's dissent takes us to task for allegedly abandoning *Jones & Laughlin Steel* in favor of an inadequate "federalism of some earlier time." *Post,* at 1766-1767, 1774. As the foregoing language from *Jones & Laughlin Steel* makes clear however, this Court has always recognized a limit on the commerce power inherent in "our dual
>
> system of government." 301 U.S., at 37, 57 S.Ct. 615. It is the dissent's remarkable theory that the commerce power is without judicially enforceable boundaries that disregards the Court's caution in *Jones & Laughlin Steel* against allowing that power to "effectually obliterate the distinction between what is national and what is local." *Ibid.*

[6]  As we observed in *Lopez,* modern Commerce Clause jurisprudence has "identified three broad categories of activity that Congress may regulate under its commerce power." *\*609* 514 U.S., at 558, 115 S.Ct. 1624 (citing *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 276-277, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)). "First, Congress may regulate the use of the channels of interstate commerce." 514 U.S., at 558, 115 S.Ct. 1624 (citing *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 256, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *United States v. Darby,* 312 U.S. 100, 114, 61 S.Ct. 451, 85 L.Ed. 609 (1941)). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S., at 558, 115 S.Ct. 1624 (citing *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); *Southern R. Co. v. United States,* 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911); *Perez, supra,* at 150, 91 S.Ct. 1357). "Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... *i.e.,* those activities that substantially affect interstate commerce." 514 U.S., at 558-559, 115 S.Ct. 1624 (citing *Jones & Laughlin Steel, supra,* at 37, 57 S.Ct. 615).

[7]  Petitioners do not contend that these cases fall within either of the first two of these categories of Commerce Clause regulation. They seek to sustain § 13981 as a regulation of activity that

120 S.Ct. 1740

substantially affects interstate commerce. Given § 13981's focus on gender-motivated violence wherever it occurs (rather than violence directed at the instrumentalities of interstate commerce, interstate markets, or things or persons in interstate commerce), we agree that this is the proper inquiry.

Since *Lopez* most recently canvassed and clarified our case law governing this third category of Commerce Clause regulation, it provides the proper framework for conducting the required analysis of § 13981. In *Lopez*, we held that the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal crime to knowingly possess a firearm in a school zone, exceeded Congress' authority under the Commerce Clause. See 514 U.S., at 551, 115 S.Ct. 1624. Several significant considerations contributed to our decision.

[8]    *610 First, we observed that § 922(q) was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however **1750 broadly one might define those terms." *Id.,* at 551, 115 S.Ct. 1624. Reviewing our case law, we noted that "we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." *Id.,* at 559, 115 S.Ct. 1624. Although we have cited only a few examples, including *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *Hodel, supra; Perez, supra; Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); and *Heart of Atlanta Motel, supra,* we stated that the pattern of analysis is clear. *Lopez,* 514 U.S., at 559-560, 115 S.Ct. 1624. "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.,* at 560, 115 S.Ct. 1624. Both petitioners and Justice SOUTER's dissent downplay the role that the economic nature of the regulated activity plays in our Commerce Clause analysis. But a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case. See, *e.g., id.,* at 551, 115 S.Ct. 1624 ("The Act [does not] regulat[e] a commercial activity"), 560 ("Even *Wickard,* which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not"), 561 ("Section 922(q) is not an essential part of a larger regulation of economic activity"), 566 ("Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender 'legal uncertainty' "), 567 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition *611 elsewhere, substantially affect any sort of interstate commerce"); see also *id.,* at 573-574, 115 S.Ct. 1624 (KENNEDY, J., concurring) (stating that *Lopez* did not alter our "practical conception of commercial regulation" and that Congress may "regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy"), 577 ("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur"), 580 ("[U]nlike the earlier cases to come before the Court here neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute has an evident commercial nexus. The statute makes the simple possession of a gun within 1,000 feet of the grounds of the school a criminal offense. In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far" (citation omitted)). *Lopez's* review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor. See *id.,* at 559-560, 115 S.Ct. 1624. [FN4]

FN4. Justice SOUTER's dissent does not reconcile its analysis with our holding in *Lopez* because it apparently would cast that decision aside. See *post,* at 1764-1767. However, the dissent cannot persuasively contradict *Lopez's* conclusion that, in every case where we have sustained federal regulation under the aggregation principle in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the regulated activity was of an apparent commercial character. See, *e.g., Lopez,* 514 U.S., at 559-560, 580, 115 S.Ct. 1624.

The second consideration that we found important in analyzing § 922(q) was that **1751 the statute contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have *612 an explicit connection with or effect on interstate commerce." Id., at 562, 115 S.Ct. 1624. Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce.

[9]  Third, we noted that neither § 922(q) " 'nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone.' " Ibid. (quoting Brief for United States, O.T.1994, No. 93-1260, pp. 5-6). While "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," 514 U.S., at 562, 115 S.Ct. 1624 (citing McClung, supra, at 304, 85 S.Ct. 377; Perez, 402 U.S., at 156, 91 S.Ct. 1357), the existence of such findings may "enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye." 514 U.S., at 563, 115 S.Ct. 1624. Finally, our decision in Lopez rested in part on the fact that the link between gun possession and a substantial effect on interstate commerce was attenuated. Id., at 563-567, 115 S.Ct. 1624. The United States argued that the possession of guns may lead to violent crime, and that violent crime "can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." Id., at 563-564, 115 S.Ct. 1624 (citation omitted). The Government also argued that the presence of guns at schools poses a threat to the educational process, which in turn threatens to produce a less efficient and productive work force, which will negatively affect national productivity and thus interstate commerce. Ibid.
We rejected these "costs of crime" and "national productivity" arguments because they would permit Congress *613 to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." Id., at 564, 115 S.Ct. 1624.
We noted that, under this but-for reasoning:
"Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the[se] theories ..., it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." Ibid.
With these principles underlying our Commerce Clause jurisprudence as reference points, the proper resolution of the present cases is clear. Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity. While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature. See, e.g., id., at 559-560, 115 S.Ct. 1624, and the cases cited therein.

[10]  Like the Gun-Free School Zones Act at issue in Lopez, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce. Although Lopez makes clear that such a jurisdictional element would lend support to the argument that § 13981 **1752 is sufficiently tied to interstate commerce, Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime. [FN5]

FN5. Title 42 U.S.C. § 13981 is not the sole provision of the Violence Against Women Act of 1994 to provide a federal remedy for gender- motivated crime. Section 40221(a) of the Act creates a federal criminal remedy to punish "interstate crimes of abuse including crimes committed against spouses or intimate partners during interstate travel and crimes

committed by spouses or intimate partners who cross State lines to continue the abuse."
S.Rep. No. 103-138, p. 43 (1993). That criminal provision has been codified at 18 U.S.C.
§ 2261(a)(1), which states:

"A person who travels across a State line or enters or leaves Indian country with the
intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in
the course of or as a result of such travel, intentionally commits a crime of violence and
thereby causes bodily injury to such spouse or intimate partner, shall be punished as
provided in subsection (b)."

The Courts of Appeals have uniformly upheld this criminal sanction as an appropriate
exercise of Congress' Commerce Clause authority, reasoning that "[t]he provision
properly falls within the first of *Lopez's* categories as it regulates the use of channels of
interstate commerce-- i.e., the use of the interstate transportation routes through which
persons and goods move." *United States v. Lankford*, 196 F.3d 563, 571-572 (C.A.5
1999) (collecting cases) (internal quotation marks omitted).

[11] [KC] [12] [KC] *614 In contrast with the lack of congressional findings that we faced in *Lopez*, §
13981 *is* supported by numerous findings regarding the serious impact that gender-motivated violence
has on victims and their families. See, *e.g.*, H.R. Conf. Rep. No. 103-711, p. 385 (1994), U.S.Code
Cong. & Admin.News 1994, pp. 1803, 1853; S.Rep. No. 103-138, p. 40 (1993); S.Rep. No. 101-545,
p. 33 (1990). But the existence of congressional findings is not sufficient, by itself, to sustain the
constitutionality of Commerce Clause legislation. As we stated in *Lopez*, " '[S]imply because
Congress may conclude that a particular activity substantially affects interstate commerce does not
necessarily make it so.' " 514 U.S., at 557, n. 2, 115 S.Ct. 1624 (quoting *Hodel*, 452 U.S., at 311, 101
S.Ct. 2389 (REHNQUIST, J., concurring in judgment)). Rather, " '[w]hether particular operations
affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate
them is ultimately a judicial rather than a legislative question, and can be settled finally only by this
Court.' " 514 U.S., at 557, n. 2, 115 S.Ct. 1624 (quoting *Heart of Atlanta Motel*, 379 U.S., at 273, 85
S.Ct. 348 (Black, J., concurring)).
*615 In these cases, Congress' findings are substantially weakened by the fact that they rely so heavily
on a method of reasoning that we have already rejected as unworkable if we are to maintain the
Constitution's enumeration of powers. Congress found that gender-motivated violence affects
interstate commerce
"by deterring potential victims from traveling interstate, from engaging in employment in interstate
business, and from transacting with business, and in places involved in interstate commerce; ... by
diminishing national productivity, increasing medical and other costs, and decreasing the supply of
and the demand for interstate products." H.R. Conf. Rep. No. 103-711, at 385, U.S.Code Cong. &
Admin.News 1994, pp. 1803, 1853.
Accord, S.Rep. No. 103-138, at 54. Given these findings and petitioners' arguments, the concern that
we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the
Constitution's distinction between national and local authority seems well founded. See *Lopez, supra,*
at 564, 115 S.Ct. 1624. The reasoning that petitioners advance seeks to follow the but-for causal chain
from the initial occurrence of violent crime (the suppression of which has always been the prime
object of the States' police power) to every attenuated effect upon interstate commerce. If accepted,
petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide,
aggregated impact of that crime has substantial **1753 effects on employment, production, transit, or
consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to
regulate murder or any other type of violence since gender- motivated violence, as a subset of all

violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

[13]   [14]   [15]   [16]   [17]   [18]   [19]   Petitioners' reasoning, moreover, will not limit Congress to regulating violence but may, as we suggested in *Lopez,* be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of *\*616* marriage, divorce, and childrearing on the national economy is undoubtedly significant. Congress may have recognized this specter when it expressly precluded § 13981 from being used in the family law context. [FN6] See 42 U.S.C. § 13981(e)(4). Under our written Constitution, however, the limitation of congressional authority is not solely a matter of legislative grace. [FN7] See *Lopez, supra,* at 575-579, 115 S.Ct. 1624 (KENNEDY, J., concurring); *Marbury,* 1 Cranch, at 176-178, 2 L.Ed. 60.

> FN6. We are not the first to recognize that the but-for causal chain must have its limits in the Commerce Clause area. In *Lopez,* 514 U.S., at 567, 115 S.Ct. 1624, we quoted Justice Cardozo's concurring opinion in *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935):
>
> "There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.' " *Id.,* at 554, 55 S.Ct. 837 (quoting *United States v. A.L.A. Schechter Poultry Corp.,* 76 F.2d 617, 624 (C.A.2 1935) (L.Hand, J.,
>
> concurring)).

> FN7. Justice SOUTER's theory that *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23 (1824), *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), and the Seventeenth Amendment provide the answer to these cases, see *post,* at 1768-1772, is remarkable because it undermines this central principle of our constitutional system. As we have repeatedly noted, the Framers crafted the federal system of Government so that the people's rights would be secured by the division of power. See, *e.g., Arizona v. Evans,* 514 U.S. 1, 30, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (GINSBURG, J., dissenting); *Gregory v. Ashcroft,* 501 U.S. 452, 458-459, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (cataloging the benefits of the federal design); *Atascadero State Hospital v. Scanlon.* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ("The 'constitutionally mandated balance of power' between the States and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties' ") (quoting *Garcia, supra,* at 572, 105 S.Ct. 1005 (Powell, J., dissenting)). Departing from their parliamentary past, the Framers adopted a written Constitution that further divided authority at the federal level so that the Constitution's provisions would not be defined
>
> solely by the political branches nor the scope of legislative power limited only by public opinion and the Legislature's self-restraint. See, *e.g., Marbury v. Madison,* 1 Cranch 137, 176, 2 L.Ed. 60 (1803) (Marshall, C.J.) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written"). It is thus a " 'permanent and indispensable feature of our constitutional system' " that " 'the federal judiciary is supreme in the exposition of the law of the Constitution.' " *Miller v. Johnson,* 515 U.S. 900, 922-923, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (quoting *Cooper v. Aaron,* 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958)).

120 S.Ct. 1740

No doubt the political branches have a role in interpreting and applying the Constitution, but ever since _Marbury_ this Court has remained the ultimate expositor of the constitutional text. As we emphasized in _United States v. Nixon,_ 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974): "In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others.... Many decisions of this Court, however, have unequivocally reaffirmed the holding of _Marbury_ that '[i]t is emphatically the province and duty of the judicial department to say what the law is.' " _Id.,_ at 703, 94 S.Ct. 3090 (citation omitted).

Contrary to Justice SOUTER's suggestion, see _post,_ at 1769-1772, and n. 14, _Gibbons_ did not exempt the commerce power from this cardinal rule of constitutional law. His assertion that, from _Gibbons_ on, public opinion has been the only restraint on the congressional exercise of the commerce power is true only insofar as it contends that political accountability is and has been the only limit on Congress' exercise of the commerce power _within that power's outer bounds._ As the language surrounding that relied upon by Justice SOUTER makes clear, _Gibbons_ did not remove from this Court the authority to draw that boundary. See _Gibbons, supra,_ at 194-195 ("It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States.... Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or

the subject of the sentence, must be the exclusively internal commerce of a State").

**1754** [20] 🔲 [21] 🔲 [22] 🔲 [23] 🔲 [24] 🔲 [25] 🔲 *617 We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is *618 truly national and what is truly local. _Lopez,_ 514 U.S., at 568, 115 S.Ct. 1624 (citing _Jones & Laughlin Steel,_ 301 U.S., at 30, 57 S.Ct. 615). In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. See, _e.g., Cohens v. Virginia,_ 6 Wheat. 264, 426, 428, 5 L.Ed. 257 (1821) (Marshall, C.J.) (stating that Congress "has no general right to punish murder committed within any of the States," and that it is "clear ... that congress cannot punish felonies generally"). Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims. [FN8] See, _e.g., Lopez,_ 514 U.S., at 566, 115 S.Ct. 1624 ("The Constitution ... withhold[s] from Congress a plenary police power"); _id.,_ at 584-585, 115 S.Ct. 1624 (THOMAS, J., concurring) ("[W]e _always_ have rejected readings *619 of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power"), 596-597, and n. 6, 115 S.Ct. 1624 (noting that the first Congresses did not enact nationwide punishments for criminal conduct under the Commerce Clause).

FN8. Justice SOUTER disputes our assertion that the Constitution reserves the general police power to the States, noting that the Founders failed to adopt several proposals for

additional guarantees against federal encroachment on state authority. See *post,* at 1768-1769, and n. 14. This argument is belied by the entire structure of the Constitution. With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate. See, *e.g., New York v. United States,* 505 U.S. 144, 156-157, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). And, as discussed above, the Constitution's separation of federal power and the creation of the Judicial Branch indicate that disputes regarding the extent of congressional power are largely subject to judicial review. See n. 7, *supra.* Moreover, the principle that " '[t]he Constitution created a

Federal Government of limited powers,' " while reserving a generalized police power to the States, is deeply ingrained in our constitutional history. *New York, supra,* at 155, 112 S.Ct. 2408 (quoting *Gregory v. Ashcroft, supra,* at 457, 111 S.Ct. 2395); see also *Lopez,* 514 U.S., at 584-599, 115 S.Ct. 1624 (THOMAS, J., concurring) (discussing the history of the debates surrounding the adoption of the Commerce Clause and our subsequent interpretation of the Clause); *Maryland v. Wirtz,* 392 U.S. 183, 196, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968).

### III

[26] Because we conclude that the Commerce Clause does not provide Congress **1755** with authority to enact § 13981, we address petitioners' alternative argument that the section's civil remedy should be upheld as an exercise of Congress' remedial power under § 5 of the Fourteenth Amendment. As noted above, Congress expressly invoked the Fourteenth Amendment as a source of authority to enact § 13981.

[27] [28] [29] The principles governing an analysis of congressional legislation under § 5 are well settled. Section 5 states that Congress may " 'enforce' by 'appropriate legislation' the constitutional guarantee that no State shall deprive any person of 'life, liberty, or property, without due process of law,' nor deny any person 'equal protection of the laws.' " *City of Boerne v. Flores,* 521 U.S. 507, 517, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Section 5 is "a positive grant of legislative power," *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), that includes authority to "prohibit conduct which is not itself unconstitutional and [to] intrud[e] into 'legislative spheres of autonomy previously reserved to the States.' " *Flores, supra,* at 518, 117 S.Ct. 2157 (quoting *Fitzpatrick v. Bitzer,* 427 U.S. 445, 455, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)); see also *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 81, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). However, "[a]s broad as the congressional enforcement power is, it is not unlimited." *Oregon v. Mitchell.* 400 U.S. 112, 128, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); see also *Kimel, supra,* at 81, 120 S.Ct. 631. In fact, as we discuss in detail below, several limitations inherent in § 5's text and constitutional context have been recognized since the Fourteenth Amendment was adopted. Petitioners' § 5 argument is founded on an assertion that there is pervasive bias in various state justice systems against victims of gender- motivated violence. This assertion *620* is supported by a voluminous congressional record. Specifically, Congress received evidence that many participants in state justice systems are perpetuating an array of erroneous stereotypes and assumptions. Congress concluded that these discriminatory stereotypes often result in insufficient investigation and prosecution of gender-motivated crime, inappropriate focus on the behavior and credibility of the victims of that crime, and unacceptably lenient punishments for those who are actually convicted of gender-motivated violence. See H.R. Conf. Rep. No. 103-711, at 385-386; S.Rep. No. 103-138, at 38, 41-55; S.Rep. No. 102-197, at 33-35, 41, 43-47. Petitioners contend that this bias denies victims of gender-motivated violence the equal protection of the laws and that Congress therefore acted appropriately in enacting a private civil remedy against the perpetrators of gender-motivated violence to both remedy the States' bias and deter future instances of discrimination in the state courts.

120 S.Ct. 1740                                                    Page 22 of 43

[301] [KC] [31] [KC] [32] [KC] [33] [KC] [34] [KC]   As our cases have established, state- sponsored gender discrimination violates equal protection unless it " 'serves "important governmental objectives and ... the discriminatory means employed" are "substantially related to the achievement of those objectives." ' " *United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), in turn quoting *Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980)). See also *Craig v. Boren,* 429 U.S. 190, 198-199, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). However, the language and purpose of the Fourteenth Amendment place certain limitations on the manner in which Congress may attack discriminatory conduct. These limitations are necessary to prevent the Fourteenth Amendment from obliterating the Framers' carefully crafted balance of power between the States and the National Government. See *Flores, supra,* at 520-524, 117 S.Ct. 2157 (reviewing the history of the Fourteenth Amendment's enactment and discussing the contemporary belief **1756 that the Amendment " 'does *621 not concentrate power in the general government for any purpose of police government within the States' ") (quoting T. Cooley, Constitutional Limitations 294, n. 1 (2d ed. 1871)). Foremost among these limitations is the time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action. "[T]he principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer,* 334 U.S. 1, 13, and n. 12, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).
Shortly after the Fourteenth Amendment was adopted, we decided two cases interpreting the Amendment's provisions, *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883), and the *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). In *Harris,* the Court considered a challenge to § 2 of the Civil Rights Act of 1871. That section sought to punish "private persons" for "conspiring to deprive any one of the equal protection of the laws enacted by the State." 106 U.S., at 639, 1 S.Ct. 601. We concluded that this law exceeded Congress' § 5 power because the law was "directed exclusively against the action of private persons, without reference to the laws of the State, or their administration by her officers." *Id.,* at 640, 1 S.Ct. 601. In so doing, we reemphasized our statement from *Virginia v. Rives,* 100 U.S. 313, 318, 25 L.Ed. 667 (1879), that " 'these provisions of the fourteenth amendment have reference to State action exclusively, and not to any action of private individuals.' " *Harris, supra,* at 639, 1 S.Ct. 601 (misquotation in *Harris* ).
We reached a similar conclusion in the *Civil Rights Cases.* In those consolidated cases, we held that the public accommodation provisions of the Civil Rights Act of 1875, which applied to purely private conduct, were beyond the scope of the § 5 enforcement power. 109 U.S., at 11, 3 S.Ct. 18 ("Individual invasion of individual rights is not the subject-matter of the [Fourteenth] [A]mendment"). See also, *e.g.,* *622 *Romer v. Evans,* 517 U.S. 620, 628, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ("[I]t was settled early that the Fourteenth Amendment did not give Congress a general power to prohibit discrimination in public accommodations"); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) ("Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power"); *Blum v. Yaretsky,* 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 147, n. 2, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Cruikshank,* 92 U.S. 542, 554, 23 L.Ed. 588 (1875) ("The fourteenth amendment prohibits a state from depriving any person of life, liberty, or property, without due process of law; but this adds nothing to the rights of one citizen as against another. It simply furnishes an additional guaranty against any encroachment by the States upon the fundamental rights which belong to every citizen as a member of society").
The force of the doctrine of *stare decisis* behind these decisions stems not only from the length of time they have been on the books, but also from the insight attributable to the Members of the Court at that time. Every Member had been appointed by President Lincoln, Grant, Hayes, Garfield, or Arthur--and each of their judicial appointees obviously had intimate knowledge and familiarity with the events surrounding the adoption of the Fourteenth Amendment.
Petitioners contend that two more recent decisions have in effect overruled this longstanding limitation on Congress' § 5 authority. They rely on **1757 *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), for the proposition that the rule laid down in the *Civil Rights*

*Cases* is no longer good law. In *Guest,* the Court reversed the construction of an indictment under 18 U.S.C. § 241, saying in the course of its opinion that "we deal here with issues of statutory construction, not with issues of constitutional power." 383 U.S., at 749, 86 S.Ct. 1170. Three Members of the Court, in a separate opinion by Justice Brennan, expressed the view that the *Civil Rights Cases \*623* were wrongly decided, and that Congress could under § 5 prohibit actions by private individuals. 383 U.S., at 774, 86 S.Ct. 1170 (opinion concurring in part and dissenting in part). Three other Members of the Court, who joined the opinion of the Court, joined a separate opinion by Justice Clark which in two or three sentences stated the conclusion that Congress could "punis[h] all conspiracies--with or without state action-- that interfere with Fourteenth Amendment rights." *Id.,* at 762, 86 S.Ct. 1170 (concurring opinion). Justice Harlan, in another separate opinion, commented with respect to the statement by these Justices:
"The action of three of the Justices who joined the Court's opinion in nonetheless cursorily pronouncing themselves on the far-reaching constitutional questions deliberately not reached in Part II seems to me, to say the very least, extraordinary." *Id.,* at 762, n. 1, 86 S.Ct. 1170 (opinion concurring in part and dissenting in part).
Though these three Justices saw fit to opine on matters not before the Court in *Guest,* the Court had no occasion to revisit the *Civil Rights Cases* and *Harris,* having determined "the indictment [charging private individuals with conspiring to deprive blacks of equal access to state facilities] in fact contain [ed] an express allegation of state involvement." 383 U.S., at 756, 86 S.Ct. 1170. The Court concluded that the implicit allegation of "active connivance by agents of the State" eliminated any need to decide "the threshold level that state action must attain in order to create rights under the Equal Protection Clause." *Ibid.* All of this Justice Clark explicitly acknowledged. See *id.,* at 762, 86 S.Ct. 1170 (concurring opinion) ("The Court's interpretation of the indictment clearly avoids the question whether Congress, by appropriate legislation, has the power to punish private conspiracies that interfere with Fourteenth Amendment rights, such as the right to utilize public facilities").
*\*624* To accept petitioners' argument, moreover, one must add to the three Justices joining Justice Brennan's reasoned explanation for his belief that the *Civil Rights Cases* were wrongly decided, the three Justices joining Justice Clark's opinion who gave no explanation whatever for their similar view. This is simply not the way that reasoned constitutional adjudication proceeds. We accordingly have no hesitation in saying that it would take more than the naked dicta contained in Justice Clark's opinion, when added to Justice Brennan's opinion, to cast any doubt upon the enduring vitality of the *Civil Rights Cases* and *Harris.*

[35] [KC] Petitioners also rely on *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). *Carter* was a case addressing the question whether the District of Columbia was a "State" within the meaning of Rev. Stat. § 1979, 42 U.S.C. § 1983--a section which by its terms requires state action before it may be employed. A footnote in that opinion recites the same litany respecting *Guest* that petitioners rely on. This litany is of course entirely dicta, and in any event cannot rise above its source. We believe that the description of the § 5 power contained in the *Civil Rights Cases* is correct:
"But where a subject is not submitted to the general legislative power of Congress, but is only submitted thereto for the purpose of rendering effective some prohibition against particular [s]tate legislation or [s]tate action in reference to that subject, the power given is limited *\*\*1758* by its object, and any legislation by Congress in the matter must necessarily be corrective in its character, adapted to counteract and redress the operation of such prohibited state laws or proceedings of [s]tate officers." 109 U.S., at 18, 3 S.Ct. 18.
Petitioners alternatively argue that, unlike the situation in the *Civil Rights Cases,* here there has been gender-based disparate treatment by state authorities, whereas in those cases there was no indication of such state action. There is *\*625* abundant evidence, however, to show that the Congresses that enacted the Civil Rights Acts of 1871 and 1875 had a purpose similar to that of Congress in enacting § 13981: There were state laws on the books bespeaking equality of treatment, but in the administration of these laws there was discrimination against newly freed slaves. The statement of Representative Garfield in the House and that of Senator Sumner in the Senate are representative:
"[T]he chief complaint is not that the laws of the State are unequal, but that even where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them." Cong.

Get the original (un**BOLD**ed) document.

 Case in WordPerfect Format                Return to Sixth Circuit Home Page 

*RECOMMENDED FOR FULL-TEXT PUBLICATION*

Pursuant to Sixth Circuit Rule 24

ELECTRONIC CITATION: 1998 FED App. 0336P (6th Cir.)

File Name: 98a0336p.06

**UNITED STATES COURT OF APPEALS**

FOR THE SIXTH CIRCUIT

---

Robert Glen Coe,

*Petitioner-Appellee/*

*Cross-Appellant,*

*v.*

Ricky Bell, Warden,

*Respondent-Appellant/*

*Cross-Appellee.*

>

Nos. 97-5148/5503

Appeal from the United States District Court

for the Middle District of Tennessee at Nashville.

No. 92-00180--John T. Nixon, District Judge.

Argued: April 29, 1998

Decided and Filed: November 16, 1998

Before: BOGGS, NORRIS, and MOORE, Circuit Judges.

---

#### COUNSEL

**ARGUED:** Gordon W. Smith, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE DIVISION, Nashville, Tennessee, for Appellant. Henry A. Martin, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Gordon W. Smith, John Knox Walkup, Glenn R. Pruden, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE DIVISION, Nashville, Tennessee, Michael E. Moore, John H. Baker, III, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. Henry A. Martin, Paul R. Bottei, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellee.

BOGGS, J., delivered the opinion of the court, in which NORRIS, J., joined. MOORE, J. (pp. 61-65), delivered a separate dissenting opinion.

---

#### OPINION

BOGGS, Circuit Judge. Ricky Bell, a warden for the State of Tennessee, appeals from the district court's grant to Robert Coe of a writ of habeas corpus, which vacated his murder conviction and death sentence. Coe cross-appeals from the district court's denial of habeas corpus on several other grounds he raised below. On the state's appeal, we reverse on all counts. On Coe's cross-appeal, we affirm on all counts.

I

A

Cary Medlin, an eight-year-old girl, was murdered in 1979. She disappeared at around 5:30 p.m. on September 1 while riding bicycles with her eight-year-old step-brother, Michael. She was seen talking to a man in a brown car, and then getting into the car. At trial, Michael identified the driver of the car as Coe.

Medlin's body was discovered the next day at about 2:00 p.m. She had been raped, sodomized, strangled, and stabbed in the neck, in that order. The list of suspects was initially quite long, and at least one other suspect was taken into custody, though he was released for lack of evidence. The search for the killer soon focused on Coe, who was arrested on September 4th while waiting to take a bus to Georgia under an assumed name.

Shortly after arriving at the police station, Coe confessed. He was interrogated, and he offered details of the crime. On the 5th, Coe led officers on a trek to retrace his steps in committing the murder. He pointed out a house where a witness had seen him and his victim, though the witness could identify only the victim, Medlin, as having been in a car that drove by.

On the 7th, Coe gave a statement in which he gave the following account of the events leading to Medlin's death. Coe said that he took Medlin to the spot where her body was eventually found. He exposed himself to her, fondled her, masturbated in front of her, and got on top of her, though he was vague as to what the latter action entailed. At that point, Medlin told Coe that Jesus loved him, a statement that he said caused him to snap. He tried to choke her, and when that did not work, he stabbed her and watched her bleed to death. He then disposed of her body, her shoes, and the knife.

Other evidence incriminated Coe. He apparently came home the night of the 1st and told his family that he had stabbed a state trooper in the throat. He had his wife dye his hair a darker color. The day he was arrested, Coe had traded in his silver and brown car for a blue one.

There was relatively little physical evidence. Coe's car yielded no evidence of a sexual assault. No hairs or fingerprints were found and used against Coe. However, the police did find fecal matter beneath his foreskin, and stains on the front inside of his pants that matched stains found on Medlin's underpants (both were reddish-brown and contained potato starch).

Coe had a history of mental illness. His childhood, according to one expert witness, was "like something out of Erskine Caldwell." His father sexually abused Coe, and forced him to watch while he also sexually abused Coe's sisters. Although several experts testified that Coe was not legally insane at the time of the murder, others testified that he was psychotic, schizophrenic, intoxicated, and under the influence of drugs. In 1975, Coe had been found incompetent to stand trial in Florida after he attempted to rape and then stab a forty-year-old woman.

B

In 1981, a Tennessee jury convicted Coe of first-degree murder, aggravated rape, and aggravated kidnapping. He was sentenced to death on the first charge, and life imprisonment on the other two. The Tennessee Supreme Court affirmed the conviction and sentence, *State v. Coe*, 655 S.W.2d 903 (Tenn. 1983), and the United States Supreme Court denied certiorari, *Coe v. Tennessee*, 464 U.S. 1063 (1984).

Coe first applied for post-conviction relief in state court in 1984. The trial court denied relief after an evidentiary hearing in 1986, and the court of appeals affirmed. *Coe v. State*, No. C.C.A. 15, 1986 WL 14453 (Tenn. Crim. App. Dec. 23, 1986). The Tennessee Supreme Court denied Coe's request for permission to appeal because he did not timely file for it (JA 227).

In 1987, Coe filed his first petition for habeas corpus relief in federal court. The court dismissed the petition without prejudice in 1989, because Coe had not exhausted his state remedies.

Coe filed his second motion for state post-conviction relief in 1989. It was dismissed and the court of appeals again affirmed. *Coe v. State*, No. 138, 1991 WL 2873 (Tenn. Crim. App. Jan. 16, 1991). The Tennessee Supreme Court denied permission to appeal, this time on the merits (JA 316).

Coe filed the present federal habeas petition in 1992. During the pendency of this case, he filed a third motion for state post-conviction relief, which was denied. The court of appeals affirmed. *Coe v. State*, No. 02C01-9606-CR-00200, 1997 WL 88917 (Tenn. Crim. App. Mar. 4, 1997). The Tennessee Supreme Court granted permission to appeal in December 1997. *Ibid.*

Coe amended his federal petition in 1995 and 1996. The latter amendment included only part of what Coe wanted to add, as discussed further below, *see infra*, at 29-31. The district court disposed of some of Coe's claims in April 1996, when it granted partial summary judgment in favor of the state. It disposed of the rest in December when, after an evidentiary hearing, it granted Coe relief on five of his claims, and denied relief on all of the others. Both parties timely appealed.

II

All of the grounds on which the district court granted habeas relief had to do with jury instructions. To warrant habeas relief, the jury instructions must have been so infirm that they rendered the entire trial fundamentally unfair. An ambiguous, potentially erroneous instruction violates the Constitution only if there is a **reasonable** likelihood that the jury has applied the instruction improperly. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Austin v. Bell*, 126 F.3d 843, 846 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 1547 (1998). For capital sentencing factors, there are additional considerations, which we discuss below.

A. Guilt Phase Instructions

The district court granted habeas and vacated Coe's conviction on two grounds from the guilt phase: **reasonable doubt** instructions and malice instructions.

1. **Reasonable doubt**

The district court ruled that the following instruction on **reasonable doubt** at the guilt phase was impermissible, and reversed all of Coe's convictions:

> **Reasonable doubt** is that **doubt** engendered by an investigation of all the proof in the case and an inability, after such investigation, to *let the mind rest easily* upon the **certainty** of guilt. **Reasonable doubt** does not mean a **doubt** that may arise from possibility. *Absolute certainty* of guilt is not demanded by the law to convict of any criminal charge, but *moral certainty* is required and this **certainty** is required as to every proposition of proof requisite to constitute the offense.

(emphasis added). A functionally equivalent instruction was given at the sentencing stage.

Subsequent to the district court's decision, we approved the identical instruction in *Austin*, 126 F.3d at 846-47. Coe concedes this and offers no reason why we should overrule ourselves, and we shall not.

2. Malice

The district court found that two parts of the jury instructions on malice were constitutionally flawed, and vacated Coe's murder conviction.

We do not reach the merits of these challenges, because Coe's claim is procedurally barred from being considered here. Procedural bar applies when a state prisoner defaults his federal claims in state court pursuant to an independent and adequate state procedural rule. *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir. 1996). There are exceptions to this rule when the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Ibid.* When a state-court judgment rested primarily on federal law or was interwoven with federal law, the bar applies only if the state court clearly and expressly stated that its judgment rested on a state procedural bar. *Ibid.*

Coe did not raise his malice instruction argument at trial, on direct appeal, or in his first state post-conviction motion. He did so in his second effort at state post-conviction relief, but the state trial court held that the claim was procedurally barred because it had not been raised before. The court of appeals agreed, holding that Coe's failure to raise the claim was not excusable based on the argument that its basis was new. The claim was based on *Yates v. Aiken*, 484 U.S. 211 (1988), but that case held only that *Francis v. Franklin*, 471 U.S. 307 (1985), applied retroactively. Coe could have asserted a *Francis* claim in his first state motion for post-conviction relief, which was not decided until 1986. Because he had not done so, the court said, the claim was barred.

The court also said:

> Even if we assume that the instructions on malice were erroneous under *Francis*, and these issues

were not waived in *Coe I*, any error was clearly harmless under the facts of this case. The facts established both felony murder and common-law murder beyond a **reasonable doubt**. *State v. Coe*, 655 S.W.2d 903 (Tenn. 1983). Malice is immaterial to felony murder. *State v. McKay*, 680 S.W.2d 447 (Tenn. 1984). The facts in this case clearly demonstrate an overwhelming amount of evidence of malice. Ground 7 is without merit.

*Coe*, 1991 WL 2873, at *6. Coe appears to have challenged the waiver holding in his effort to appeal, but the Tennessee Supreme Court denied Coe permission to appeal because his filing was untimely.

Coe claims that the court of appeals's alternative holding -- that he would lose on the merits anyway -- means that he is not procedurally barred, because the state courts in fact reached the merits. This argument fails due to the Supreme Court's decision in *Harris v. Reed*, 489 U.S. 255 (1989). *Harris* states that

a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.

*Id.* at 264 n.10 (citing *Fox Film Corp. v. Muller*, 296 U.S. 207, 210 (1935)); *see also Sochor v. Florida*, 504 U.S. 527, 533 (1992). The alternative holding thus does not require us to disregard the state court's finding of procedural bar.

Coe next argues that the court of appeals ruling does not represent a "clear and express" statement of procedural bar. Although it could be clearer and more express, the court's statement that (1) Coe's argument did not "present a cognizable claim" because it was not based on new law; coupled with (2) the self-consciousness of the alternative argument ("even if . . . these issues were not waived in *Coe I*"), suffices as a clear and express statement. Furthermore, it is worth noting that Coe's appeal to the state supreme court from this ruling discussed only procedural bar, and not the court's holding on the merits.

By way of comparison, the state-court statement in *Harris*, the case that established the "clear and express" doctrine, was held to be unclear:

In its order, the Appellate Court referred to the "well-settled" principle of Illinois law that "those [issues] which could have been presented [on direct appeal], but were not, are considered waived." The court found that . . . petitioner's ineffective-assistance allegations "could have been raised in [his] direct appeal." The court, however, went on to consider and reject petitioner's ineffective-assistance claim on its merits.

*Harris*, 489 U.S. at 258 (alterations in *Harris*) (citations omitted). In other words, the state appellate court in *Harris* said "X means waiver, and this case has X." Coe's court took things one step further, however, and explicitly and clearly said that Coe had no cognizable claim. There was, therefore, a sufficiently clear and express statement here.

Coe next argues that his violation of state procedural standards was not "knowing and understanding" as required by state statute. That is, he claims that the court of appeals was wrong to hold that his claim was procedurally barred (if it so held) because he did not know that omitting the claim from his first state motion for post-conviction relief would prevent him from raising it later. This argument is foreclosed by *House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995), *cert. denied*, 517 U.S. 1193 (1996), in which the Tennessee Supreme Court decided to use an objective waiver standard rather than a subjective one.

Although the petitioner in *House* was represented by counsel in his first post-conviction proceeding (in which he waived certain claims), and Coe proceeded *pro se*, the holding in *House* does not turn on this distinction. The court in *House* takes pains to say that there is no right to counsel in post-conviction proceedings, and so the ineffectiveness of post-conviction counsel does not excuse waiver. *Id.* at 712. In other words, even if Coe had had ineffective counsel (i.e. the functional equivalent of no counsel at all) he would still be bound by his omissions in his first motion for post-conviction relief. The key is that Coe had a full and fair hearing in his first motion on whatever claims he chose to raise, *see id.*, and he does not allege otherwise here.

Coe offers one more rejoinder. He cites *Hathorn v. Lovorn*, 457 U.S. 255 (1982) for the proposition that "a state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed.'" *Id.* at 262-63 (quoting *Barr v. City of Columbia*, 378 U.S. 146, 149 (1964)). Coe says that because Tennessee's waiver practice has not been consistent in cases with similar circumstances, it cannot serve as the basis for a procedural bar. The state responds by citing numerous cases that establish waiver, and it has the better of the argument. Coe's cases are mostly either adverse, or too old to constitute current "strict and regular" practice. The few that remain are isolated and unpublished, and so are also insufficient to defeat an otherwise "strict and regular" practice. *See Delbridge v. State*, 742 S.W.2d 266 (Tenn. 1987) (not mentioning waiver); *Moore v. State*, No. 03C01-9212-CR-00445, 1994 WL 17864, at *3 (Tenn. Crim. App. Jan 25, 1994) (holding that record

did not establish knowing waiver); *Sneed v. State*, No. 03C01-9201-CR-00027, 1992 WL 200951 (Tenn Crim. App. Aug. 21, 1992) (not mentioning waiver); *Bates v. State*, No. 03C01-9102-CR-00055, 1991 WL 172999 (Tenn. Crim. App. Sept. 10, 1991) (same); *Brewer v. State*, No. 1179, 1991 WL 21605, at *2-*3 (Tenn. Crim. App. Feb. 22, 1991) (finding that petitioner did not knowingly waive claim); *State v. Bounds*, No. C.C.A. 88-170-III, 1989 WL 92215, at *1 (Tenn. Crim. App. Aug. 17, 1989) (finding of no waiver, because of intervening case law). Furthermore, even if the cases were not any of these things, Coe's argument proves too much. Under Coe's theory, the state would never be able to begin using a procedural bar doctrine, because it would not be able to wipe the slate clean of any precedent that accrued before the institution of the procedural bar.

We pause to note that, were we to reach the merits, we would be inclined to reverse anyway.

The first problematic instruction on malice read as follows:

If a deadly weapon is handled in a manner so as to make the killing a natural or probable result of such conduct, then that may be considered by you as to the existence of malice sufficient to support a conviction of murder in the second degree *unless it is rebutted by other facts and circumstances*.

(emphasis added).

In *Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir.), *cert. denied*, 516 U.S. 905 (1995), a case originating in Tennessee, we invalidated the use of a "deadly weapon" instruction. In that case, however, the instruction said that such handling of a deadly weapon "raises a presumption of malice," subject to rebuttal. *Ibid* (emphasis omitted). In this case, by contrast, the court said that the use of the weapon "may be considered." This distinction is important. In *Francis v. Franklin*, 471 U.S. 307, 313-14 (1985), the Supreme Court drew a distinction between "mandatory" inferences, which are problematic, and permissive ones, which are not. The language here is unambiguously permissive. *See Peterson v. Murray*, 904 F.2d 882, 888 (4th Cir.) (deeming similar "may" language permissive), *cert. denied*, 498 U.S. 992 (1990); *United States v. Washington*, 819 F.2d 221, 225-26 (9th Cir. 1987) (same).

The district court argued that the "unless" language in the rebuttal clause implied mandatoriness, since there would be no need for a rebuttal unless there was a mandatory presumption. We disagree. The "deadly weapon" instruction merely sets up a possible inference, and then notes a situation in which even that inference is impermissible. *See Elam v. Nix*, 951 F.2d 890, 891 (8th Cir. 1991) (reaching same conclusion); *cf. United States v. Reeves*, 594 F.2d 536, 541 (6th Cir.) (disapproving of "unless" language with less clearly permissive inference), *cert. denied*, 442 U.S. 946 (1979).

The second challenged instruction reads as follows:

Implied malice may be found to exist where the wrongdoer did not intend to slay the person killed but death resulted from a *consciously unlawful act done intentionally and with knowledge on the wrongdoer's part that the act was directly perilous to human life*. In this event there is implied such a high degree of conscious and willful recklessness as to amount to that malignity of heart constituting malice.

According to the district court, this instruction *requires* a finding of malice when the other elements of murder are found; once the jury finds that the defendant acted intentionally and caused the victim's death, the instruction leaves no alternative but to find malice, and so the prosecution is relieved of its burden of proving malice.

The inference in this instruction ("may be found") appears to us to be a permissive one. The several cases cited by the district court in finding this instruction impermissible all involve clearly mandatory language, and none of them contain the "directly perilous to human life" language present here. *See Yates v. Evatt*, 500 U.S. 391, 401-02 (1991) (disapproving of an instruction that: "'[m]alice is implied or presumed' from the 'willful, deliberate, and intentional doing of an unlawful act . . . .'"); *Mullaney v. Wilbur*, 421 U.S. 684, 686-87 (1975) (disapproving of standard that malice is established by unlawful intentional act, unless heat of passion or provocation were established too); *Alexander v. Foltz*, 838 F.2d 140, 146 (6th Cir.) (quoting *People v. Richardson*, 293 N.W.2d 332, 340 (Mich. 1980)) (Ryan, J.) ("The necessary factual element of malice may be permissibly inferred from the facts and circumstances of the killing, but it can never be *established as a matter of law* by proof of other facts."), *cert. denied*, 486 U.S. 1033 (1988).

Our certitude is tempered by the next sentence (not considered by the district court), but that sentence appears simply to explain the permissive inference, rather than convert it into a mandatory one. In any event, however, we do not reach the merits on this question, because Coe's claim is procedurally barred.

B. Sentencing Phase

We have previously had occasion to explore the nature of the Tennessee death penalty process:

Tennessee is a "weighing" state -- that is, the jury determines whether any aggravating circumstances have been established beyond a **reasonable doubt** by the State and then balances this against any mitigating circumstances found by the individual jurors. If the jury unanimously finds that the aggravators outweigh the mitigators, death must be imposed.

*Houston v. Dutton*, 50 F.3d 381, 387 (6th Cir.), *cert. denied*, 516 U.S. 905 (1995) (emphasis omitted).

1. "Heinous, atrocious, or cruel" instruction

At the sentencing phase, the jury found four aggravating factors that applied and which, on the whole, were not outweighed by mitigating factors. These can be summarized as:

(1) The victim was under 12 and the defendant over 18;

(2) The murder was especially heinous, atrocious, or cruel and involved torture;

(3) The murder was committed for the purpose of avoiding prosecution; and

(4) The murder was committed while the defendant was engaged in committing and fleeing after committing aggravated rape and aggravated kidnapping.

At issue on appeal is the second ground. The district court had defined this factor for the jury as follows:

The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

"HEINOUS" means extremely wicked or shockingly evil.

"ATROCIOUS" means outrageously wicked and vile.

"CRUEL" means designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others, pitiless.

In holding this factor to be impermissible, the district court cited *Houston*, and *Shell v. Mississippi*, 498 U.S. 1 (1990) (per curiam). In *Houston*, we held that this same Tennessee instruction (minus the appended definitions of the three terms) was unconstitutionally vague. *Houston*, 50 F.3d at 387. Established Supreme Court precedent had held that simple "heinous, atrocious, or cruel" language is unconstitutionally vague. *See Richmond v. Lewis*, 506 U.S. 40 (1992); *Maynard v. Cartwright*, 486 U.S. 356 (1988). We gave no explanation in *Houston* for why the limitation to "torture and depravity of mind" did not suffice to cure this vagueness problem. Indeed, the Supreme Court suggested that such a limitation might suffice in dicta in *Maynard*, 486 U.S. at 365. But in *Houston*, the state conceded that the instruction was vague and we held accordingly.

In *Shell*, the Supreme Court disapproved of a set of instructions similar to the ones here. The instructions in *Shell* lacked the "torture and depravity" modifier, but appended individual definitions of "heinous, atrocious, and cruel" that are functionally and virtually equivalent to those used in this case. *Shell*, 498 U.S. at 2 (Marshall, J., concurring). The Court held that these definitions did not suffice to cure the vagueness problem. *Id.* at 1; *see id.* at 2 (Marshall, J., concurring).

In combination, then, *Houston* and *Shell* require us to hold that the instructions on this point in this case were constitutionally infirm.

The state offers two arguments against overturning the sentence on this ground. First, it asserts that this claim is procedurally barred for Coe. Despite the state's assertion, however, Coe did raise the issue in his direct appeal, apparently by incorporating an argument from his motion for a new trial that the potential aggravating circumstances presented to the jury were (federally) unconstitutionally vague. Regardless of whether the state supreme court should not have addressed an issue raised in that manner, it upheld the statute on the merits against Coe's challenge. *Coe*, 655 S.W.2d at 913. The court cited a case that upheld the state statute. *State v. Austin*, 618 S.W.2d 738, 742 (Tenn.), *cert. denied*, 454 U.S. 1128 (1981). That case relied on an earlier case, *State v. Dicks*, 615 S.W.2d 126, 131 (Tenn.), *cert. denied*, 454 U.S. 933 (1981), that approved the "heinous, atrocious, or cruel . . . torture or depravity of mind" instruction on the purported grounds of a United States Supreme Court decision (*Proffitt v. Florida*, 428 U.S. 242, 255-56 (1976)). Therefore, the claim is not procedurally barred.

The state next argues that any error stemming from this aggravating factor is harmless. To answer this question, unfortunately, we must venture into a thicket; it is unclear if we may engage in harmless-error analysis when dealing with an infirm aggravating factor, or if instead this is a matter reserved for the state trial and appellate courts. We join the four other circuits that have squarely

addressed this question and hold that we are indeed permitted to perform a harmless-error analysis here. *See Billiot v. Puckett*, 135 F.3d 311 (5th Cir. 1998), *cert. denied*, ___ S. Ct. ___, 1998 WL 396478 (Nov. 2, 1998); *Davis v. Executive Dir. of Dep't of Correc.*, 100 F.3d 750, 768 n.18 (10th Cir. 1996), *cert. denied*, 117 S. Ct. 1703 (1997); *Williams v. Clarke*, 40 F.3d 1529, 1539-40 (8th Cir. 1994), *cert. denied*, 514 U.S. 1033 (1995); *Smith v. Dixon*, 14 F.3d 956, 974-81 (4th Cir.) (en banc), *cert. denied*, 513 U.S. 841 (1994); *see also O'Guinn v. Dutton*, 88 F.3d 1409, 1461 (6th Cir. 1996) (en banc) (Batchelder, J., dissenting) (six judges of this court espousing this conclusion in a dissent from a majority opinion that did not reach the merits), *cert. denied*, 117 S. Ct. 754 (1997).

We must make an initial distinction. This discussion is only an issue in this case because Tennessee is a "weighing" state, in which the jury weighs aggravating factors against mitigating factors. In non-weighing states, the sentencer must find at least one aggravating circumstance to make a convicted murderer eligible for the death penalty. Once the factor is found, the jury weighs the totality of the circumstances. Therefore, if multiple aggravators are found but an appellate court strikes one of them down, the death sentence can stand as it is. This is because the sentencer has still found at least one aggravating factor, and the invalidation of another aggravator does not necessarily change the totality of the circumstances that are considered to arrive at a sentence (though other errors might do so, and could necessitate reversal). *See Stringer v. Black*, 503 U.S. 222, 229 (1992); *Zant v. Stephens*, 462 U.S. 862 (1983); *see also Tuggle v. Netherland*, 516 U.S. 10 (1995). In a weighing state, by contrast, when a court invalidates one of the aggravators, it has removed a mass from one side of the scale. There is no way to know if the jury's analysis -- how the aggravating and mitigating circumstances balanced -- would have reached the same result even without the invalid factor. *Stringer*, 503 U.S. at 231-32.

Therefore, whenever an aggravating factor has been invalidated in a weighing state, the sentence must be re-weighed or analyzed for harmless error if the sentence is to be affirmed. *Ibid*. The question before us, then, is who is permitted to perform such analyses. The state concedes that we may not perform reweighing, but it claims that it is perfectly acceptable for us to engage in harmless-error analysis. We agree that this distinction is warranted. In reweighing, a state court effectively vacates the original sentence and resentences the defendant; this process is hardly appropriate in the course of collateral review by a federal court. In harmless-error analysis, by contrast, a court determines that the original sentence is not constitutionally infirm in the first place, a process that is quite appropriately performed on federal collateral review. Indeed, we would perform a similar analysis if, say, Coe claimed ineffective assistance of counsel based on a failure to raise his vagueness argument on direct appeal. *See Smith*, 14 F.3d at 976. In that instance, we would have to apply the test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and determine whether Coe had been prejudiced by his counsel's lapse. The analysis we are performing here is not appreciably different.

Coe responds that however sensible the above holding may seem, we are prevented from performing harmless-error analysis by the express language of Supreme Court and Sixth Circuit case law. Although this argument is superficially convincing, we cannot agree.

In *Stringer*, the Supreme Court held that "[u]se of a vague or imprecise aggravating factor in the weighing process invalidates the sentence and at the very least requires constitutional harmless-error analysis or reweighing in the state judicial system." *Stringer*, 503 U.S. at 237. The Court subsequently reiterated and clarified this principle, ruling that "[w]here the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the *state* appellate court or some other *state* sentencer must actually perform a new sentencing calculus, if the sentence is to stand." *Richmond v. Lewis*, 506 U.S. 40, 49 (1992) (emphasis added). Finally, in *Houston*, we cited *Richmond* and affirmed the grant of a writ of habeas corpus, because the state court had not recognized the error and thus had not "performed a new sentencing calculus." *Houston*, 50 F.3d at 387 (quotation marks omitted).

Significantly, though, we did not address the harmless-error question in *Houston*. Our holding, therefore, applied only to reweighing. Indeed, the portion of *Richmond* that we quoted (the same portion set forth in the paragraph above) makes this clear: it is only when "the death sentence has been infected by a constitutionally . . . invalid aggravating factor" that state reweighing is required to preserve the verdict. By definition, though, an error that is harmless does not "infect" the sentence and does not require reweighing by the state.

As a final note, the language of *Stringer* requiring "constitutional harmless-error analysis or reweighing in the state judicial system" is consistent with our conclusion. For the reasons discussed above, the phrase "state judicial system" modifies "reweighing" only, and not "harmless-error analysis." Indeed, the Supreme Court has never held otherwise. Rather, the Court has taught that "[f]ederal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)). Therefore, "before overturning final and presumptively correct state convictions or sentences on habeas review, [we] must assess for harmlessness those errors that are eligible for this review in order to assure that the extraordinary relief provided by the writ is granted only to those 'persons whom society has grievously wronged.'" *Smith*, 14 F.3d at 976 (quoting *Brecht*, 507 U.S. at 634 (quoting *Fay v. Noia*, 372 U.S. 391, 441 (1963))).

We turn, therefore, to analyze this error for harmfulness. The question we ask is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

The important criterion in a vagueness analysis of an aggravating circumstance is narrowing: "A capital sentencing scheme must, in short, provide a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (quotation marks omitted; alteration in original).

Our analysis is relatively simple in this case. Even though the aggravator at issue was phrased as "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," the jury held more narrowly that "the murder was especially heinous, atrocious, or cruel and involved torture." As is evident from the facts recited above, there is more than ample evidence to support such a conclusion.

This distinction -- finding torture but not depravity of mind -- is significant. The vagueness problem of the "heinous, atrocious, and cruel" ("HAC") instruction is curable with appropriately narrowing language. We have held, of course, that requiring "torture or depravity of mind" does not solve the vagueness problem. Requiring only torture, however, does. *See Maynard v. Cartwright*, 486 U.S. 356, 364-65 (1988) (implying that "torture" limitation suffices to cure vagueness of HAC); *Walton v. Arizona*, 497 U.S. 639, 654 (1990) (confirming implication); *Duvall v. Reynolds*, 139 F.3d 768, 793 (10th Cir. 1998) (holding that "torture of the victim or serious physical abuse" language in the instruction cures vagueness of HAC); *cf. Wade v. Calderon*, 29 F.3d 1312, 1319-20 (9th Cir. 1994) (holding that intentional torture suffices), *cert. denied*, 513 U.S. 1120 (1995). In this case, the jury ignored the problematic "depravity" factor and limited its finding to the appropriately narrowing "torture" factor, confirming that finding in a specific, handwritten verdict form. Furthermore, in *Maynard* and *Walton*, the narrowing factor was only applied by a reviewing court, not by the jury itself -- the fact that we have this evidence from the jury itself confirms our conclusion that the jury's discretion was channeled and narrowed appropriately. The error in this case was harmless, and the district court erred in granting habeas corpus relief on this basis.

2. Unanimity

Next at issue is the district court's determination that the jury instructions on unanimity in sentencing were unacceptable.

The state first contends that this claim is procedurally barred. When Coe raised this issue in his third state motion for post-conviction relief, the trial court said that he was procedurally barred because he should have raised the issue before, and the court of appeals said that the issue was part of a group of questions that were "waived, previously determined on direct appeal, and/or time barred." The state trial court's statement suffices as a clear statement, and the court of appeals's line-blurring mass affirmance does not change that conclusion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[W] here, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.").

As with the "heinous" instruction discussed above, however, Coe did raise this issue in his direct appeal, apparently by incorporating it from his motion for a new trial. Also as mentioned above, the state supreme court held that the death-sentence statute was not constitutionally infirm. It is not clear if this holding applies to the unanimity provisions, however, and the cases cited by the state supreme court on direct appeal do not cover unanimity. *See State v. Austin*, 618 S.W.2d 738, 742 (Tenn.), *cert. denied*, 454 U.S. 1128 (1981); *State v. Dicks*, 615 S.W.2d 126 (Tenn.), *cert. denied*, 454 U.S. 933 (1981). The district court responded to this by citing Tennessee Code § 39-2-205 and *State v. Martin*, 702 S.W.2d 560, 564 (Tenn. 1985) for the notion that, in capital cases, the state supreme court has to review significant errors, whether or not they were raised by the defendant.

As phrased by the district court, this proposition is too broad, as it would eliminate the entire doctrine of procedural bar in Tennessee in capital cases. *See Kornahrens v. Evatt*, 66 F.3d 1350, 1362-63 (4th Cir. 1995) (accepting similar reasoning in South Carolina case), *cert. denied sub nom. Kornahrens v. Moore*, 517 U.S. 1171 (1996). *Martin*, though, cited § 39-2-205 and reviewed a question that had been discussed but not preserved for review at trial. *Martin*, 702 S.W.2d at 564. *A fortiori*, because the issue in this case was not only discussed but formally contested, *Martin* applies to eliminate the procedural bar problem for Coe. The state court's suggestion of waiver in dismissing Coe's third petition for post-conviction review was only a successive-petition type of waiver: it did not address the issue of whether the question had been raised on direct appeal. Even if it had, furthermore, the third petition is currently pending before the state supreme court.

Therefore, we find that this claim is not procedurally barred, and so we turn to the merits. The jury was told:

If you unanimously determine that at least one statutory aggravating circumstance or . . .

**CERTIFICATE & SEAL**

**STATE OF TENNESSEE**

**COUNTY OF MADISON**

I, Judy Barnhill, Clerk of the Circuit Court for the County of Madison, in the State

aforesaid, do certify that the foregoing is a correct transcript of the record and proceedings had

in said Court in the case heretofore prosecuted and determined therein between

**JON HALL** APPELLANT **and  STATE OF TENNESSEE** ,   APPELLEE,  as the same

remains of record in said Court.

**STATE OF TENNESSEE**

**COUNTY OF MADISON**

In testimony whereof, I subscribe my name and affix the seal of said Court at office, in

Jackson, Tennessee the **21ST**  DAY  OF  **JULY**  in the year Two Thousand  Three  in the

224th year of American Independence.

_____
JUDY BARNHILL, CLERK