# ADDENDUM 1
# Volume 4

W2003-00669-CCA-R3-PD

# CIRCUIT COURT OF MADISON COUNTY
– TO –
# COURT OF CRIMINAL APPEALS

JUDGE ROY B. MORGAN DIVISION I

CIRCUIT COURT CLERK JUDY BARNHILL

VOLUME IV OF VIII VOLUMES

STATE OF TENNESSEE

VS. CASE NO. C-00-422

JON HALL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| FELONY | XX | MISDEMEANOR | ☐ | ROR | ☐ | TDOC | ☒ |
| BOND | ☐ | $ | | INDIGENT | ☐ | | |
| POST CONVICTION | XX | | | HABEAS CORPUS | | | ☐ |

MR. ALFRED EARLS
ASSISTANCE DISTRICT ATTORNEY
P.O. BOX 2825
JACKSON, TN 38302

Attorney For: APPELLEE

MR. DANNY ELLIS
ATTORNEY AT LAW
P.O. BOX 3512
JACKSON, TN 38303

Attorney For: APPELLANT

Attorney For:

Attorney For:

OFFENSE: FIRST DEGREE MURDER

SENTENCE: DEATH

FILED
JUL 2 4 2003
Clerk of the Courts
Rec'd By: ST

Vol. 4

Filed the ___ day of JULY, 2003.

COURT OF CRIMINAL APPEALS

BY: T. ROBERSON

LAYCOOK, JACKSON

# INDEX

CERTIFICATE & SEAL 607

STATE'S BRIEF AT THE CLOSE OF EVIDENCE (CONTINUED) 452-606

circumstances have been proved by the State, beyond a **reasonable doubt**, and said circumstance or circumstances are not outweighed by any mitigating circumstances, the sentence shall be death. The Jury shall state in writing the statutory aggravating circumstance or . . . circumstances so found, and signify in writing that there were no mitigating circumstances sufficiently substantial to outweigh the [aggravating circumstances].

The jury was then given the form its verdict should take:

(1) We, the Jury, unanimously find the following listed statutory aggravating circumstance or circumstances;

. . . .

(2) We, the Jury, unanimously find that there are no mitigating circumstances sufficiently substantial to outweigh the [aggravating circumstances] so listed above.

(3) Therefore, we, the Jury, unanimously find that the punishment shall be death.

The alternate result was then provided for and explained:

If you unanimously determine that no statutory aggravating circumstance has been proved by the State beyond a **reasonable doubt**; or if the Jury unanimously determine that [aggravating circumstances] have been proved by the State beyond a **reasonable doubt**; but that said [aggravating circumstances] are outweighed by one or more mitigating circumstances, the sentence shall be life imprisonment.

For both the death verdict and the life imprisonment verdict, the jury was told that its verdict must be unanimous.

The district court, relying on two of its own precedents, concluded that these instructions were unacceptable because there was a **reasonable** probability that the jurors believed that they could consider only those mitigating circumstances that they unanimously agreed were present. *See McKoy v. North Carolina*, 494 U.S. 433, 439-41, 444 & n.8 (1990); *Mills v. Maryland*, 486 U.S. 367, 373-75 (1988) (declaring such a requirement unconstitutional). The district court also held that the instructions improperly failed to inform the jury of the consequence of a non-unanimous verdict (i.e., a life sentence).

We first note that this same issue was raised in a recent case, *Austin v. Bell*, 938 F. Supp. 1308 (M.D. Tenn. 1996), in which the district court reached the same conclusion as it did in this case. *See id.* at 1320-21. We affirmed *Austin* on ineffective assistance grounds, and so specifically did not reach the unanimity question, but we noted that although we were not reaching the issue, we had "serious concerns" about the instruction. *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 1547 (1998). We cited, among other cases, *Mills v. Maryland*, 486 U.S. 367 (1988).

In *Mills*, a similar issue was raised; the Supreme Court ruled that the proper inquiry is whether a **reasonable** jury *might have interpreted* the instructions in a way that is constitutionally impermissible. *Mills*, 486 U.S. at 375-76. The relevant portion of the form in *Mills* read as follows: "Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist by a preponderance of the evidence and each mitigating circumstance marked 'no' has not been proven by a preponderance of the evidence." *Mills*, 486 U.S. at 387 (emphasis omitted). The Supreme Court held this to be impermissible. *Id.* at 377-84. (1)

In *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1108-10, 1120-21 (6th Cir. 1990) (en banc), *cert. denied*, 499 U.S. 970 (1991), the trial court had given a unanimity instruction with regard to aggravating factors, but not with regard to mitigating ones. We held that the only **reasonable** reading of the instruction was that, by omission, no unanimity was required as to mitigating factors. *Kordenbrock*, 919 F.2d at 1121.(2)

We find that the instructions challenged by Coe do not violate *Mills*. Their language requires unanimity as to the results of the *weighing*, but this is a far different matter than requiring unanimity as to the *presence* of a mitigating factor. Nothing in this language could reasonably be taken to require unanimity as to the presence of a mitigating factor. The instructions say clearly and correctly that in order to obtain a *unanimous verdict*, each juror must conclude that the mitigators do not outweigh the aggravators.

The language certainly is not as directly problematic as that in cases that have followed *Mills*. *See, e.g.*, *McKoy*, 494 U.S. at 436 ("Do you unanimously find from the evidence the existence of one or more of the following mitigating circumstances?"); *United States ex rel. Kubat v. Thieret*, 679 F. Supp. 788, 813 (N.D. Ill. 1988) ("If . . . you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should sign the form which so indicates."), *aff'd*, 867 F.2d 351 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989). Those cases

did not require any sort of inferential leap to conclude that the jury had to be unanimous before it could even *consider* a particular mitigating factor; the instruction specifically so stated. In Coe's case, by contrast, it is fairly clear that, as with the first challenged instruction, the unanimity refers to the weighing process and not to the finding of a mitigating factor. Coe argues that the unanimity instruction in the weighing process is improper too, an issue that is addressed below.

We also note that the problematic language did not appear in the section of the instructions on finding mitigating factors. Rather, it appeared in the section on weighing. By contrast, the instructions that precede the section on finding mitigating factors says nothing at all about unanimity. Rather, they say that the jury "shall consider . . . any mitigating circumstance[]." This is in direct contradistinction to the immediately previous section on aggravating circumstances, where the jury is told that "no death penalty shall be imposed by a Jury but upon an [sic] unanimous finding of the existence of one or more of the statutory aggravating circumstances . . . ." The contrast between the unanimity required for "finding . . . one or more" aggravators and the silence accompanying the instructions on "consider [ing] any" mitigators is precisely what we found dispositive in *Kordenbrock*. The instructions, therefore, are not improper.

The dissent emphasizes the use of the words "as heretofore indicated" in the instructions on considering mitigation, and argues that those words can easily be understood by the jury to refer to the earlier unanimity discussion on finding aggravating circumstances. However, in context, that construction is very unlikely. The instructions condensed to 12 lines at page 63 of the dissent actually occupy over two pages in the record. There is a whole page omitted at the ellipsis in the block quotation before the crucial language "as heretofore indicated." Also omitted is the key language explaining that it is the statute that provides for the jury to consider "as heretofore indicated" all mitigating factors. The words "as heretofore indicated" are taken directly from § 39-2404(j) of the Tennessee Code, and obviously refer to the whole process of "consideration" that has just been explained, including burden of proof, signing of the verdict form, weighing of mitigating factors against aggravating factors, etc. It is not a plausible construction that those words import a process of unanimity that was required only and specifically of the finding of aggravating circumstances.

Coe naturally emphasizes the less clear-cut weighing language, and valiantly attempts to bring the language within the prohibition of *Mills*. Coe has noted that an instruction that gets the law right does not necessarily save another, contradictory instruction, since it is impossible to know which of the two contradictory propositions the jury relied upon. *See Francis v. Franklin*, 471 U.S. 307, 322 (1985). In this case, however, the two passages are not contradictory. One is clear and the other is less clear, to be sure, but they are not incompatible. In *Francis*, the Court considered whether "taken as a whole [the correct language] might have explained the [law] with sufficient clarity that any ambiguity in the [challenged language] could not have been [misconstrued] by a **reasonable** juror . . . ." *Id.* at 318-19. The Supreme Court reminded us, in other words, that we should read the whole of the instructions, and should not isolate and parse text until we find something wrong with it. In *Francis*, the Court found that the context did not cure the potential for misunderstanding, but in this case we find that it does, to the extent that there is any potential for misunderstanding to begin with.

The next aspect of the unanimity instructions that Coe successfully challenged in the district court is that the jurors were not told that Coe would receive a life sentence if they failed to reach a unanimous sentence. *See* Tenn. Code. Ann. § 39-2404 (1982) (mandating life sentence if jury is unable to achieve unanimity, but precluding court from informing the jury of this); *State v. Simon*, 635 S.W.2d 498, 505 (Tenn.), *cert. denied*, 459 U.S. 1055 (1982). Coe argues that by requiring unanimity for either life or death, a holdout juror preferring a life sentence might vote for death because he thought that a unanimous verdict was *required* in every case. Therefore, he says, the jury should have been informed of the consequences of a failure by it to achieve unanimity.

We are unpersuaded by this argument.[(3)] Two circuits have considered and rejected similar arguments regarding similar proceedings and similar state laws. *See United States v. Chandler*, 996 F.2d 1073, 1089 (11th Cir. 1993); *Barfield v. Harris*, 540 F. Supp. 451, 472 (E.D.N.C. 1982), *aff'd*, 719 F.2d 58 (4th Cir. 1983), *cert. denied*, 467 U.S. 1210 (1984). Coe cites Supreme Court precedent for his proposition, but that precedent is inapt. He cites *Beck v. Alabama*, 447 U.S. 625 (1980), for the proposition that a jury must be aware of its options if the sentence is to be seen as reliable, but *Beck* held only that a jury should be informed of its ability to convict of applicable lesser-included offenses, and Coe's jury was so instructed. *Beck* does not consider the necessity of informing a jury of the consequences of its inability to reach a unanimous verdict.

Coe also cites *Romano v. Oklahoma*, 512 U.S. 1, 8-9 (1994), which cited *Caldwell v. Mississippi*, 472 U.S. 320, 336 (1985), for the proposition that the "jury must not be misled regarding the role it plays in the sentencing decision." True enough. But it does not mislead the jury to impress upon it the importance of unanimity. *Romano* dealt with the admission of potentially misleading evidence (a previous death sentence imposed on the same defendant), but the Court held that this did not mislead the jury as to its role, or minimize its sense of responsibility. *Romano*, 512 U.S. at 9.

These necessary indicia are not present in this case either. The jury's role was to deliberate and to attempt to reach a unanimous verdict. The fact that there was a statutorily defined default rule in case the jury could not agree does not change this fact. Indeed, it does not necessarily mislead a jury regarding its role to avoid disclosing what will happen if the jury fails to achieve unanimity. If Coe

were correct here, the Supreme Court surely would not have decided *Lowenfield v. Phelps*, 484 U.S. 231 (1988), the way it did. In that case, the Court approved use of an *Allen* charge in a capital case. *Id.* at 237-38. It cited approvingly the Court's statement in *Allen* that "[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Id.* at 237 (quoting *Allen v. United States*, 164 U.S. 492, 501 (1896)).

The jury was given incomplete information, but not misleading information. Coe's scenario -- a minority juror who interprets the unanimity requirement as directing him to give in to the majority -- is simply not **reasonable**. Unanimity means the opposite: that the majority does not win simply because it is a majority. The jury was told precisely this when instructed regarding unanimity at the guilt phase; the jury was instructed to "not surrender your honest conviction . . . for the mere purpose of returning a verdict." The state law did not unconstitutionally deceive the jury and infect the verdict in this case with unreliability, and the district court erred in holding otherwise.

C. Cumulative Effect

Coe and the district court claim that the errors committed by the state trial court cumulatively represent error. Since we have found only one (harmless) error, there is no basis to conclude that there is any cumulative effect here.

D. Conclusion

Based on the foregoing, then, we REVERSE the district court's grant of habeas corpus relief to Coe.

III

Coe raises a myriad of issues on cross-appeal. He contends that the district court should have granted, rather than denied, habeas corpus on each of these issues. We affirm the district court, though we rely on different reasons with respect to several of the issues.

A. Suppression

Coe petitioned the district court on the grounds that his statement to the police (the heart of the evidence against him) should not have been admitted. He offered many arguments why the statement was suspect: that Coe was both gullible and mentally ill; that the police asked Coe leading questions; that the police knew the details surrounding the crime, raising suspicion that they wrote Coe's statement themselves; that the police continued investigating another suspect even after Coe confessed; that Officer Daniel, who took the statement, allegedly lied to the jury; and that there was evidence that Coe had been physically harmed when he was taken into custody.

The district court rejected those arguments. It applied the standard for voluntariness stated in *Miranda v. Arizona*, 384 U.S. 436 (1966), and credited various pieces of evidence in the record that supported a finding that the statements were proper. A tape was admitted at trial in which Coe heard his rights and said that he understood them. Later on the tape, he said that he was not mistreated and that he was making the statement of his own free will. Coe signed a *Miranda* waiver form, which was admitted at trial. The officer who took the statement testified that Coe did not appear to be intoxicated. The district court noted testimony that friends saw Coe with bruises in jail, but rejected that testimony in favor of contrary evidence. Coe says that the discrediting of these witnesses is based on a misunderstanding. He also points to evidence suggesting that police harassed his wife, which allegedly intimidated him into making a statement (even though he was already in custody and there is no evidence that he had any inkling of the alleged harassment). The district court surveyed the evidence, heard from the witnesses first hand, and on the face of the record came to a proper conclusion regarding the alleged coercion underlying Coe's statement.

The district court acted properly in considering coercion rather than credibility. To the extent that Coe argued that his statements were the product of his gullibility and of leading questions, the proper vehicle for such claims is cross-examination at trial. The proper inquiry under *Miranda* is only whether the government coerced the statement, not whether the statement was the product of Coe's abstract free will. *See Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986). To the extent that Coe was addressing coercion, the district court's evaluation of the evidence was appropriate.

B. Motion to Amend

Under a scheduling order entered in April 1995, Coe was given until mid-May 1995 to file any amendments. He did so, adding 15 new issues. Discovery was to be completed in July 1995 and dispositive motions filed by August. In December 1995, Coe moved to amend his federal habeas petition a second time, attempting to add 17 new issues. As Coe tells it, this motion was put forward a year before the district court's decision, and seven months before the conclusion of the evidentiary hearing. As the state notes, it was 3 years and 10 months after the filing of the first petition in February 1992.

Seven months later, in July 1996, the district court granted Coe's motion with regard to several law-

based claims, but rejected the motion with regard to the other eight fact-based ones. The district court
held that the only explanation given by Coe -- that he had a new (additional) federal public defender
on his team -- was insufficient, since he had had ample and expert representation from a federal
public defender from the early days of the case, and had had a second lawyer assisting on the case
since Summer 1994. The court held that granting the motion fully would unduly prejudice the state,
since the state would have to file a large new answer, prepare for a new round of discovery, re-write
dispositive motions, and prepare for additional evidentiary hearings. The state claimed that the
discovery alone would take three or four months. Reasoning that the legal claims would not spur any
new discovery, the district court let them in, while keeping the new fact-based claims out. The court
also threw out two legal claims it deemed frivolous: claims that the death penalty in general, and
electrocution in particular, violated Coe's rights.

Coe filed a motion for reconsideration, noting that his fact-based claims involved information already
known to the state (e.g. *Brady* claims), so that there would be no discovery burden. He also said that
the three to four months of extra discovery projected by the state was both unrealistic and moot, since
it took seven months for the district court to resolve the motion; in the meantime the evidentiary
hearing had been moved from February to April.

The standard for reviewing denials of motions to amend is abuse of discretion. We have held that:

Under Rule 15(a), leave to amend a pleading shall be freely given when justice so requires. This court
has explained the factors that a district court should consider when deciding whether to grant leave to
amend. Several elements may be considered in determining whether to permit an amendment. Undue
delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to
cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of
amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to
deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in
determining whether an amendment should be granted.

*Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir. 1994) (citations omitted and punctuation regularized).

"Delay by itself" is not sufficient to deny a motion to amend, but the delay in this case was
substantial. When combined with the prejudice cited by the district court, there were sufficient
grounds for the district court to deny the motion. Coe may be right that, in hindsight, there would
have been much less prejudice than the state initially predicted if the district court had granted the
motion to amend promptly. However, we do not review the district court's hindsight. At the time the
district court rendered its decision, allowing amendment of the complaint would have caused
prejudice. The district court did not abuse its discretion. *Compare Semco, Inc. v. Amcast, Inc.*, 52
F.3d 108, 114 (6th Cir. 1995) (affirming district court when plaintiff had previously amended its
complaint, and moved to amend a mere month before trial after extensive discovery had been
conducted) *with Security Ins. Co. v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1009 (6th Cir. 1995)
(reversing district court despite plaintiff's 16-month delay in filing motion to amend, because the
action had been dormant for 13 of those months and the case was at its earliest stage of pretrial
activity, with discovery cut-off and trial dates not having been set).

C. Ineffective Assistance of Counsel

Coe's next argument is that his trial lawyer: (1) did not sufficiently investigate other suspects,
exculpatory evidence, and vital inconsistencies in the testimony of key eyewitnesses; (2) did not
investigate or pursue vital physical exculpatory evidence; and (3) did not develop an alibi defense for
Coe, which would have been highly plausible.

The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to
detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is
what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual
performance, not counsel's (hindsight) potential for improvement. *See Sims v. Livesay*, 970 F.2d
1575, 1580 (6th Cir. 1992). Furthermore, our review is highly deferential. *Ibid.*

According to *Strickland v. Washington*, 466 U.S. 668, 687 (1984), to satisfy the "effectiveness"
portion of the test (we need not reach the question of prejudice), Coe would have to demonstrate "that
counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the
defendant by the Sixth Amendment." Alternately, combining both elements of the *Strickland* test,
counsel is ineffective if the "trial cannot be relied on as having produced a just result." *Id.* at 686. In
this case, although there are things that Coe's lawyer could have done better, Coe has not convinced
us that his lawyer did not function adequately at trial, or that the trial produced an unjust result.

Coe points to exculpatory physical and alibi evidence as examples of things that his lawyer would
have pursued were he competent. But, as the district court noted, Coe's lawyer investigated what he
could. For instance, the entomological evidence that Coe now marshals (refuting the prosecution's
asserted time of death based on the extent of insect infestation on Medlin's corpse) does not seem to
have been such an obvious or common part of a defense in the time and place of Coe's trial that
counsel was ineffective for neglecting it. Further, while Coe claims that counsel failed to interview
numerous alibi witnesses, most of these witnesses were unavailable or would not cooperate with

counsel at the time of pre-trial preparation. Others were available, to be sure, but while Coe claims that these witnesses supplied him with an air-tight alibi, we agree with the district court that his lawyer had **reasonable** doubts about that.

Counsel presented a vigorous insanity defense for Coe which, as a matter of trial strategy, was eminently **reasonable**. Given the damning confession in the record and the evidence that corroborated it, it was not unconstitutionally ineffective lawyering to put Coe's "wrong man" defense to one side and try to convince the jury that he was responsible but insane. As we have elsewhere noted, the Supreme Court in *Strickland* "recognized that in the context of ineffective assistance claims based on counsel's failure to investigate, the temptation to rely on hindsight is particularly strong. Consequently, . . . 'strategic choices made after less than complete investigation are **reasonable** precisely to the extent that **reasonable** professional judgments support the limitations on investigation.'" *Sims*, 970 F.2d at 1580 (quotation marks omitted) (quoting *Strickland*, 466 U.S. at 690-91). In this case, the record convinces us that counsel's judgments were similarly **reasonable**, and that the district court was correct in rejecting Coe's claim.

D. Insufficient Evidence

Coe claims that there was insufficient evidence of premeditation and cool reflection to support his conviction for first-degree common-law murder. Pointing to his own confession, he notes that the record suggests that the murder was a snap reaction to Medlin telling Coe that Jesus loved him. The district court noted, though, that when Coe's initial attempt to kill Medlin by choking her failed, he coolly turned to a different method, the entire deliberate process apparently taking several minutes. In addition, as noted by the district court, Coe appears to have acted with premeditation in selecting his victim. We defer to the district court's **reasonable** determination of the facts, *see* 28 U.S.C. § 2254(d)(2), and hold that this evidence suffices.

E. *Brady* Violations and Prosecutorial Misconduct

Coe's most substantial claim is that the prosecution put on deliberately false testimony, and that it withheld *Brady* information from him.

1. False testimony

The standard for claims such as this is as follows:

The knowing use of false or perjured testimony constitutes a denial of due process if there is any **reasonable** likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted).

Coe's charges center on Officer Alvin Daniel, a key prosecution witness. Coe claims that Daniel knowingly lied about two important pieces of evidence. The first concerns the absence of Coe's tire tracks around the murder scene; Daniel testified that there were no tire tracks from Coe's vehicle because other vehicles' tracks had contaminated the site. However, Coe has not sufficiently proven that Daniel's testimony was false and that the prosecution knew so. At most, the record shows that Daniel's statements fall under the "mere inconsistencies" distinction.

The second item -- that there was no physical evidence found in Coe's car -- also fails. Daniel implied that there was no evidence found because Coe's vinyl-type seats were the sort you could "wipe off." The problem, as Coe points out, is that the seats were cloth, and appear to stain easily. Once again, though, there is no evidence that Daniel and the prosecution knowingly perpetrated this fabricated testimony (indeed, Daniel himself seemed confused when he testified about it).

Coe's final claim in this category is that the prosecutor lied when he said that his decision to pursue the death penalty was not a quick one. However, statements by counsel are not "testimony." Even if we found this to be false testimony, we would not find that there is a **reasonable** likelihood that it could have affected the judgment of the jury.

2. *Brady* violations

The rule of *Brady v. Maryland*, 373 U.S. 83 (1963), obligates the government "to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). Materiality is not found by determining (as the district court did in this case) whether there was sufficient evidence to convict even when the exculpatory evidence is added in. Rather, the proper inquiry is whether the *Brady* violation undermines confidence in the verdict, because there is a **reasonable** probability that there would have

been a different result had the evidence been disclosed. *See Kyles v. Whitley*, 514 U.S. 419, 434-35 & n.8 (1995).

In this case, Coe says that the state committed a massive *Brady* violation by not turning over its investigative files to him. The contents include contemporaneous testimony from witnesses who later said different things at trial; inculpatory evidence about other suspects; and exculpatory laboratory results revealing a lack of physical evidence.

The state has a ready and effective reply. First of all, *Brady* obviously does not apply to information that is not wholly within the control of the prosecution. There is no *Brady* violation "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available . . . from another source," because in such cases there is really nothing for the government to disclose. *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.) (quoting *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988), *cert. denied*, 488 U.S. 1040 (1989)), *cert. denied*, 502 U.S. 885 (1991); *see United States v. McMahon*, 715 F.2d 498, 501 (11th Cir. 1983), *cert. denied*, 465 U.S. 1065 (1984). Several of the things about which Coe complains fit into this category, such as the fact that when Coe was searched for scratch marks, he had none, and that a knife taken from his home offered no inculpatory evidence. Another such category is witnesses -- people that Coe identified during his statements to the police, and to whom he had as much access as the police. Such information was not under the sole control of the government or improperly kept from Coe.

The next problem for Coe is that it is unclear whether the government did in fact deprive him of these materials. As the state points out, many of the materials that Coe cites appear to have been used by the defense at trial. Coe says, for instance, that he would have subjected certain witnesses to "withering cross-examinations" and thus exposed the inconsistencies in their stories, but the record shows that he did just that, thus suggesting that his lawyer had the materials after all. Indeed, his lawyer testified in the habeas corpus evidentiary hearing that he was confident that the prosecution would have complied with *Brady*, but that he did not remember what *Brady* materials he had received, and that his files had been lost. The government has no record of what was handed over to Coe's defense and when. Though it would be a good precautionary policy for the government to keep such records, the burden remains on Coe to prove that the evidence was not disclosed to him. *See United States v. Aubin*, 87 F.3d 141, 148 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 965 (1997); *Weeks v. Jones*, 26 F.3d 1030, 1047 (11th Cir. 1994), *cert. denied*, 513 U.S. 1193 (1995); *United States v. Pedraza*, 27 F.3d 1515, 1527 (10th Cir.), *cert. denied*, 513 U.S. 1004 (1994); *cf. United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir. 1992) (placing burden on defendant to show that withheld materials contained material exculpatory evidence), *cert. denied*, 506 U.S. 1083 (1993). We find that he has not met this burden.

Even if Coe had met his burden, we are not convinced that the evidence in question, viewed as a whole, is material. The two most potentially damning sets of allegedly withheld evidence are physical evidence and evidence about a Mr. Gant, the "other" suspect. There were hairs found on the victim's body, for instance, that matched the hair of neither the victim nor Coe. And there was disturbing evidence about Gant -- a shifting alibi, a disturbing past, a certain amount of investigation of him, and similar matters -- of which Coe could have made good use. Coe's appellate counsel has done an excellent job of presenting this and other evidence to us.

Nevertheless, even if we assume *arguendo* that this evidence was not disclosed to Coe, and even if we further assume that it should have been,[(4)] when we view the record as a whole, we cannot conclude that our confidence in the verdict has been undermined. That is, we agree with the district court that there is not a **reasonable** probability that Coe would have been acquitted had this evidence been disclosed.

F. Jury Instructions

1. Instructions on expert testimony, insanity, and parole ineligibility

Coe claims that certain matters of jury instruction -- on the treatment of expert testimony, on the disposition of a defendant acquitted by reason of insanity, and on parole ineligibility -- were improper. However, these claims are procedurally barred. Coe raised them for the first time in his third state motion for post-conviction relief. The state trial court held that these claims were procedurally barred, because Coe should have raised them earlier. The state trial court's statement suffices as a clear and express statement.

Coe points to the ambiguity of the court of appeals's affirmance, which treated the issues as part of a group that were "waived, previously determined on direct appeal, and/or time barred." Given the trial court's treatment of the claims, however, this does not serve to undo the procedural bar. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[W]here, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.").

Coe has appealed to the state supreme court, but if that court somehow has a basis to reverse this

procedural finding (and Coe has given us no basis to conclude that it does), we would hold instead that Coe had not yet exhausted his state remedies. Even in the unlikely event that the supreme court clearly rejects the lower courts' finding of procedural bar (consistent with *Ylst*), we would still reject Coe's claims, on the merits.

The trial court gave the following instruction on expert testimony:

Expert testimony has been introduced in this case. You should consider this proof in connection with all the other proof in the case, and give it the same consideration as all the other proof, governed by the rules and tests in arriving at the truth. However, expert testimony should be received with caution, while this testimony is sometimes the only means or the best way to arrive at the truth, yet, it is largely a field of speculation beset with many theories and uncertainties, and requires patient and intelligent consideration to determine its truthfulness or falsity.

The instructions for treating general witnesses were not as skeptical, mainly telling the jurors that they were the ultimate decisionmakers, and so should treat the evidence carefully. Another portion of the instructions, on lay witnesses, noted that untrained people are not always good at realizing when someone is mentally diseased or defective, which would seem to *bolster* the testimony of the experts.

Coe claims that this instruction on expert witnesses "repudiated" his expert testimony, which was an essential part of his insanity defense. He does not explain why he feels that this instruction affected his experts any more negatively than the state's. Given that both sides' evidence on Coe's insanity relied heavily on expert testimony, we will not conclude that this instruction unfairly prejudiced Coe. Coe did have the burden of proof on insanity, to be sure, but we cannot see how directing the jurors toward skepticism and "patient and intelligent consideration" served to "deprive[] [Coe] of the benefit of [the experts'] testimony." *Quercia v. United States*, 289 U.S. 466, 471 (1933).

Furthermore, as the district court noted, Tennessee has long used such skeptical instructions. *See, e.g.*, *Edwards v. State*, 540 S.W.2d 641, 647 (Tenn. 1976), *cert. denied*, 429 U.S. 1061 (1977). Though it recently softened this language, the Tennessee Court of Appeals noted that it was doing so only prospectively, and noted further that much psychological testimony is still speculative, *State v. Givens*, No. 01C01-9110-CC-00312, 1993 WL 31710, at *3 (Tenn. Crim. App. Feb. 11, 1993). There is no basis under federal law for attacking these old Tennessee instructions, and so we cannot in this collateral proceeding overrule Tennessee's own law of instructions and evidence.

Regarding the insanity instructions, Coe argues that the jury was given "extraneous information" that biased it in favor of finding him guilty. That is, the jury was allegedly led to believe that if Coe were found not guilty by reason of insanity, he might be able to reenter society after a very short period of time. The instructions do, indeed, suggest this possibility, though the requisite safeguards (institutionalization and evaluation) are mentioned too.

Coe is correct that the Supreme Court has held, in the context of the federal system, that such instructions should generally not be given, unless, to take one example, a witness or prosecutor stated to the jury that the defendant will "go free" if acquitted by reason of insanity. *Shannon v. United States*, 512 U.S. 573, 587-88 (1994). The Court also noted in *Shannon* that the opposite problem may arise, just as Coe has argued -- a juror may vote to convict so as to prevent the insane acquitee from going free after the limited hospitalization and evaluation provided for in the statutes. *Id.* at 586. Nevertheless, the Court counseled against working under the assumption that jurors will not follow their general instruction to base their decisions on the law and facts, and not on extraneous consequences.

For our purposes, the important fact is that the Court's decision in *Shannon* to limit these instructions came as both a federal prudential matter and a federal statutory one. *Id.* at 579-84. Because bright-line rules of constitutional law were not at issue (in *Shannon* or any other case), Coe has not sufficiently demonstrated that the state courts in this case violated a principle of federal law that bound them.

As for parole eligibility, Coe argues that the jury should have been informed that, if he was given a life sentence for the murder, he would not be eligible for parole until he was 113 years old. That is, since his life sentences for rape and kidnapping meant that, under Tennessee law, he would have served 30 years on each sentence before he could be paroled, a life sentence for the murder would have been, effectively, a sentence of life without parole. Knowing this, Coe argues, the jury might have seen a life sentence as a more serious punishment, and therefore sufficient in lieu of a death sentence.

The sole grounding of the district court's rejection of this claim was that the claim was based on a "new rule" under *Teague v. Lane*, 489 U.S. 288 (1989). We agree that *Teague* would foreclose this claim if the procedural bar did not, since Coe relies on a case, *Simmons v. South Carolina*, 512 U.S. 154 (1994), that was decided well after Coe's conviction became final in 1984, and was not sufficiently dictated by prior precedent. *See O'Dell v. Netherland*, 117 S. Ct. 1969, 1977-79 (1997) (holding that *Simmons* announced a new rule and retrospective application of the rule was barred by *Teague*).

Coe's claim fails anyway. There is no reason to assume or conclude that the sentencing judge in Coe's alternative scenario would have ordered Coe to serve his three life sentences consecutively instead of concurrently. *See* Tenn. R. Crim. P. 32(c)(1) (according such discretion to the trial court). Put another way, a juror would not necessarily have been wrong to believe that a death sentence was the only way to make sure that Coe never left prison alive.

Coe cites *Simmons*, in which three justices (and three more, concurring in the result) held that a jury should have been told of the defendant's parole ineligibility. There are three important differences between that case and this one, however. First of all, the defendant in *Simmons*, if convicted, was definitely going to be ineligible for parole. *Simmons*, 512 U.S. at 156. Second, the prosecution's appeal to the jury for a death sentence was explicitly based on the defendant's future dangerousness, with the implication being that only death would protect the public for sure. *Id.* at 162. Finally, the defendant in that case specifically requested the instruction at trial. *Ibid. Simmons* therefore does not apply to this case.

2. Instructions on malice

Coe next contends that his conviction is illegitimate because the jury was not instructed that it *must* find malice to find murder, even felony murder. Coe bases this argument on the language of the old Tennessee murder statutes, Tenn. Code. Ann. §§ 39-2401-02 (1982), since repealed, which defined murder as requiring malice aforethought and defined felony murder as first-degree murder. He also points to the jury instructions in this case, which said that malice is an element of second-degree murder.

Because we defer to the Tennessee Supreme Court's construction of the elements of Tennessee crimes, Coe's argument is decisively rejected by the clear holding of the Tennessee Supreme Court in *State v. Middlebrooks*, 840 S.W.2d 317, 335-41 (Tenn. 1992), *cert. dismissed*, 510 U.S. 124 (1993). In *Middlebrooks*, a capital case, the Tennessee Supreme Court held that the prosecution does not need to prove malice (or premeditation or specific intent) in order to convict a defendant of felony murder. *Id.* at 336. The court said that malice is implied from the underlying felony, *ibid.*, but the court did not thereby set up an impermissibly mandatory jury instruction as discussed above. Rather, the court simply explained as a theoretical matter how the required *mens rea* was automatically supplied in this particular type of murder. *Ibid.*

G. "Avoiding Arrest or Prosecution" Aggravating Circumstance

One of the aggravating circumstances the jury found was that "the murder was committed for the purpose of avoiding prosecution." Coe argues that there was no evidence, beyond rank speculation, to support this aggravating circumstance. The only direct evidence in the record of Coe's motivations came in his confession, when he said that he snapped when Medlin told him that Jesus loved him. But, as the state supreme court noted, there was testimony at trial (concerning Medlin's personality and Coe's veracity) that cast **doubt** on the "Jesus" explanation. *State v. Coe*, 655 S.W.2d 903, 913 (Tenn. 1983), *cert. denied*, 464 U.S. 1063 (1984). Also, as the prosecutor noted in his closing statement, Coe had a strong motivation to kill Medlin, because she would have been a key witness in Coe's prosecution for kidnapping and rape.

As with other sentencing issues, we review the evidence in the light most favorable to the jury's decision; the finding can be invalidated only if no rational trier of fact could have found the factor beyond a **reasonable doubt.** *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The circumstantial evidence in this case, though thin, is enough to satisfy the standard of review we apply here.

H. Felony-Murder Aggravating Circumstance

Coe challenges the use of the "felony-murder" aggravating circumstance, because the fact that Coe was convicted of killing someone during a felony serves both as a basis for making him a first-degree murderer (and thus eligible for the death penalty), and as an aggravating circumstance that moves him closer to actually receiving the death penalty. Coe cites *Middlebrooks* for this argument. *Middlebrooks* held that such double counting is prohibited by the Tennessee Constitution, art. I, § 16, the state's version of the federal Eighth Amendment. *Middlebrooks*, 840 S.W.2d at 341. The argument accepted by *Middlebrooks* is that a felony murderer enters sentencing with one strike already against him, even though there is no particular reason why he should receive treatment that is disparate from ordinary common-law premeditated murderers. *Id.* at 342.

As the district court noted, *Middlebrooks* is a rule of Tennessee constitutional law, *see State v. Howell*, 868 S.W.2d 238, 259 n.7 (Tenn. 1993), *cert. denied*, 510 U.S. 1215 (1994), and so is not cognizable in federal habeas proceedings.[5] This is true despite *Middlebrooks*'s discussion of federal case law (specifically, *Enmund v. Florida*, 458 U.S. 782, 797 (1982) (accepting application of death penalty to felony murder only for one who kills, attempts to kill, or intends that lethal force or killing occur); and *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987) (accepting application of death penalty to felony murder only for one whose personal involvement in the underlying felony is substantial and who exhibits a reckless disregard or indifference to the value of human life)). *See Howell*, 868

S.W.2d at 259 n.7 (characterizing *Middlebrooks* as such).

However, Coe is not relying wholly on *Middlebrooks*. Rather, he claims that this "double counting" violates the federal constitution as well. Coe's federal claim rests on the proposition that, "[t]o pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quotation marks omitted). There is thus no federalism barrier to raising this claim.

The district court and the state suggest that Coe's claim is foreclosed by *Teague v. Lane*, 489 U.S. 288 (1989), because he is using *Lowenfield* to argue for a new rule of law. Coe replies that he is not "breaking new ground" but instead is merely applying the "narrowing" mandate of *Zant v. Stephens*, 462 U.S. 862, 877 (1983), a case decided six months before Coe's conviction became final. Coe has the better of this argument. He is arguing for nothing more than an application of the plain language of *Zant* upon which *Lowenfield* relied ("[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.").

On the merits, however, Coe's claim fails.

The district court rejected this claim because it held that Coe was convicted of common-law murder (either alone or in addition to being convicted of felony murder), and so there was no cognizable problem caused by the alleged "double counting." *See Carter v. State*, 958 S.W.2d 620, 624-25 (Tenn. 1997) (reaching same conclusion on similar set of facts). We are reluctant to affirm on these grounds.

The indictment against Coe charged, in a single count, both common-law murder and felony murder. The jury's verdict was simply one of guilt "as charged in the indictment," and did not distinguish which theory it was convicting under. The jury instructions presented the two theories as *alternative* bases, and the prosecution told the jury in its closing statement that it could convict under *either* theory.

Admittedly, it is acceptable for a first-degree murder conviction to be based on two alternative theories even if there is no basis to conclude which one (if only one) the jury used. *Schad v. Arizona*, 501 U.S. 624, 636-37 (1991); Tenn. Code. Ann. § 40-18-112 (requiring such a result in Tennessee). This does not mean, however, that an alternative conviction such as Coe's represents a conviction on *both* theories. Put another way, if six jurors believed that Coe was guilty only of felony murder, and six others believed that he was guilty only of common-law murder, it would be proper to say that the jury believed unanimously that Coe was guilty of first-degree murder. It might be improper, by contrast, to say that the jury believed unanimously that Coe was guilty of both forms of murder at the same time.

The state contends that Tennessee law dictates that a conviction like Coe's, where the indictment charges the defendant under both theories, represents a finding of guilt on both theories. *Carter*, 958 S.W.2d at 625 (holding that such an indictment and conviction cures the *Middlebrooks* problem). However, there is no evidence of jury instructions or prosecution arguments phrased in the alternative in *Carter*, and so we cannot conclude that *Carter* necessarily defeats Coe's "double counting" claim here.

On direct appeal, Coe claimed that he had been subjected to double jeopardy, because he was convicted of both aggravated rape and felony murder predicated on rape. The state supreme court's response to the argument was that there was sufficient evidence in the record to support a conviction for common-law murder, thus preventing any double- jeopardy problem with the first-degree murder conviction.[(6)] Here too, however, we cannot conclude that the alternative conviction defeats the double-counting claim. If it did, the state could cure double-jeopardy and double-counting problems simply by charging in the alternative, even if there is a basis only for one of the two types of first-degree murder.

We are not holding that the alternative indictment and conviction cannot cure the double-counting problem. Neither are we holding that *Carter* cannot do so. Instead, we will address the double-counting issue head on; since we conclude that there is no double-counting problem, there is no need for us to hew a path through the problematic thicket of *Carter*, *Schad*, and Tennessee Code § 40-18-112.

Double-counting analysis -- the consideration of when a single factor can be used both to make a murderer eligible to receive the death penalty, and as an aggravating circumstance leading to actual imposition of the death penalty -- must begin with *Lowenfield*. In that case, the Supreme Court allowed double counting of the factor of knowingly exposing multiple people to a risk of death. *Lowenfield*, 484 U.S. at 241-46. There were no other aggravating circumstances found by the jury.

Contrary to Coe's implication on appeal, the Court noted in *Lowenfield* that narrowing is required at *either* the eligibility *or* the imposition stage. *Id.* at 244-45. That is, a state's system can limit the

possible application of the death penalty to certain types of murders, or it can limit the actual imposition of the death penalty to a certain subset of eligible convicts; it must do one of the two, but it need not do both. In allowing double use of the factor, the Court held in *Lowenfield* that

[T]he narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, . . . so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty . . . . The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.

*Id.* at 246 (citation omitted).

The exact same thing can be said of the Tennessee scheme in this case. Admittedly, distinctions can be drawn between the "exposing multiple people to a risk of death" factor in *Lowenfield* (which clearly narrows the death-eligible pool to more heinous killers) and the felony-murder factor in this case (which arguably sweeps both heinous and relatively non-heinous killers into the pool). But felony murder can function as a proper and permissible narrowing factor at the eligibility stage. In *Tison v. Arizona*, 481 U.S. 137 (1987), the Supreme Court held that even a non-triggerman convicted of felony murder could constitutionally be executed if he was a major participant in the crime and if he exhibited a reckless disregard for human life. *Cf. Enmund v. Florida*, 458 U.S. 782 (1982) (reversing death penalty on accomplice to felony murder, and limiting death penalty to defendants who kill, attempt to kill, or at least intend to kill). Thus, if felony murder sometimes has the potential for sweeping less nefarious killers into the pool of the death-eligible, the factor is nevertheless generally permissible. Coe's particular case meets the strictures of both *Enmund* and *Tison*. The elements of felony murder for Coe were [1] killing Medlin [2] during a rape [3] when the rape was specifically intended. Therefore, even if Coe's conviction was for felony murder alone, the jury necessarily would have found that all of these elements were met, and so would have found that Coe killed Medlin.

Neither is there anything wrong with using felony murder as an aggravating circumstance. *See, e.g., Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990). Since, therefore, felony murder can serve to narrow at either the eligibility and imposition stages, and since narrowing need only occur at one of the two stages, there is no double-counting problem here. *See Deputy v. Taylor*, 19 F.3d 1485, 1497-98, 1500-02 (3d Cir.) (allowing double counting of felony-murder factor), *cert. denied*, 512 U.S. 1230 (1994); *Johnson v. Dugger*, 932 F.2d 1360 (11th Cir.) (same), *cert. denied*, 502 U.S. 961 (1991); *Perry v. Lockhart*, 871 F.2d 1384, 1393 (8th Cir.) (allowing double-counting of felony-murder factor, and holding that *Lowenfield* overruled contrary holding in *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.), *cert. denied*, 474 U.S. 1013 (1985)), *cert. denied*, 493 U.S. 959 (1989); *Byrne v. Butler*, 845 F.2d 501, 515 n.12 (5th Cir.) (allowing felony murder double-counting because of narrowing guilt-phase element that "offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration . . . of . . . armed robbery, or simple robbery."), *cert. denied*, 487 U.S. 1242 (1988); *Julius v. Johnson*, 840 F.2d 1533, 1540 (11th Cir.) (allowing double-counting of felony-murder factor), *cert. denied*, 488 U.S. 960 (1988).

I. Improper Prosecution Arguments

Coe cites four statements made by the prosecution at the sentencing stage that he claims were improper.

First, Coe complains that the prosecutor improperly injected his expertise into his death-penalty argument. The prosecutor said that he took his decision to seek the death penalty very seriously; that the decision was difficult; that he had only ever requested the death penalty once before. Coe cites Eleventh Circuit precedent that is directly on point. *See, e.g., Brooks v. Kemp*, 762 F.2d 1383, 1410 (11th Cir. 1985) (en banc) (holding very similar comments to be prejudicial). But *Kemp* ultimately held the error to be harmless, because the jury was well aware of the factors it had to consider, and the proceedings were permeated with similar hand-wringing. *Id.* at 1414. This case follows that pattern, and we cannot conclude that these comments had a substantial or injurious effect on the jury's verdict. Therefore, even if the comments were improper, they were harmless.(7)

Coe claims next that the prosecutor denigrated mercy, suggesting to the jury that Coe did not deserve any, and allowed the jury to abdicate its responsibility by saying that it represented the community. First, these statements hardly seem so inflammatory that they would have convinced a jury inclined to be merciful to change its mind. Second, when read in context, the prosecutor was not denigrating mercy. Instead, he was responding to arguments by the defense that Coe had had a difficult childhood

and so deserved mercy. The prosecutor was simply saying that Coe was responsible for his actions, and that it was for *that* reason that Coe deserved no mercy. These comments were not improper.

Coe's next argument also fails. The prosecutor said: "[Y]ou're not here as one person, or two persons individually. You're here as representatives of this community, as representatives of justice to do your duty, to be true to your conscience, to be true to God." This was a far cry from saying, as Coe interprets the statement, that the community or God demanded the death sentence.

More problematic is the last prosecutorial statement at issue. In his closing statement, the prosecutor said the following:

I'm not a biblical scholar, ladies and gentlemen, and I don't pretend to be. But I would simply emphasize to you that the whole cornerstone of our law, the law of this land, the law of society is based upon those scriptures where it was established from, and the Bible and the scriptures themselves are replete with those circumstances where capital punishment has been applied. It's applied in reference to both the Old Testament and the New Testament. Whosoever sheddeth man's blood, by man shall his blood be shed. Terms are mentioned regularly throughout the Old and the New. And I just want to ask you to put your mind at rest if that in any way has created any conflict because there's certainly foundation for capital punishment in the Bible and in the scriptures themselves.

Although we find these statements inappropriate, we cannot conclude that they so tainted the proceedings that they constitute reversible error. The cases that Coe cites for the contrary proposition involve cases in which a Bible was in the jury room; there is error in those cases not because the book was the Bible, but because the book was not properly admitted evidence. *See Jones v. Kemp*, 706 F. Supp. 1534, 1558 (N.D. Ga. 1989); *State v. Harrington*, 627 S.W.2d 345, 350 (Tenn. 1981), *cert. denied*, 457 U.S. 1110 (1982).

Therefore, none of these alleged errors represent (either individually or collectively) sufficient grounds to vacate Coe's conviction or sentence.

J. Cumulative Effect

Coe argues that even if none of the errors he alleges are harmful individually, they are harmful in combination with each other. We reject this claim.

K. State Supreme Court Review

Coe claims that he has a federal due-process liberty interest, created by Tennessee in its mandatory death-penalty review statute, Tenn. Code Ann. § 39-2-205 (1982). He claims that by failing to live up to the statutory mandate, the state supreme court contributed to a violation of his due-process rights, and by extension his Eighth Amendment rights.

The statute requires the state supreme court to review a death sentence for (1) arbitrariness; (2) evidence supporting the aggravating and mitigating circumstances found by the jury; and (3) excessiveness or proportionality compared to other death sentences. The supreme court is also empowered by the statute to promulgate such rules as it deems appropriate to carry out the mandate.

Contrary to Coe's claims, however, Tennessee has not created a liberty interest here. To qualify as producing a state-created liberty interest, a statute setting up procedures must put specific limits on official discretion. An implicit requirement recognized by the Supreme Court is including "'explicitly mandatory language,' *i.e.*, specific directives to the decision-maker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (1989) (promulgating those requirements in the context of prisons). In this case, by contrast, the statute only tells the supreme court what questions it must ask. It does not tell the supreme court *how* it must do so, and it does not even define the terms (*e.g.*, arbitrariness) of these questions. As a result, Coe has no federal due-process right that was violated by the state supreme court's procedural lapses, if any.

Even if there were a liberty interest here, any error in fulfilling that interest would be harmless. Although the state supreme court did not make detailed findings as to arbitrariness or to the sufficiency of the evidence on the mitigating and aggravating circumstances, our review of the record reveals that the jury's conclusions were neither arbitrary nor lacking in evidentiary support. Furthermore, Coe admits that he has no Eighth Amendment right to proportionality review. *Pulley v. Harris*, 465 U.S. 37, 44-45 (1984).

L. Exclusion of Women from the Grand Jury

Finally, Coe complains that his Fourteenth Amendment rights were violated because the grand jury that indicted him systematically under-represented women. There is ample evidence in the record that women were very substantially under-represented on the grand jury, apparently because Tennessee used a "key man" system to choose grand jurors. Despite comprising 50.8% of the eligible

population, women represented only 29.6% of the grand jury pool (200 of 676 people) from which Coe's grand jury was drawn, a non-random distribution if we have ever seen one (*p*.00001). We need not enter into the question of whether there was impermissible exclusion of women, however, because the only question before us is whether Coe had standing to assert this claim. We conclude that he does not, because of *Teague*.

The district court held that Coe lacked standing. It cited among other cases our decision in *Ford v. Seabold*, 841 F.2d 677 (6th Cir.), *cert. denied*, 488 U.S. 928 (1988), which held specifically that a man does not have standing to raise an equal-protection challenge regarding the exclusion of women from a grand jury. The state supreme court had rejected Coe's challenge on the same grounds, five years earlier. *State v. Coe*, 655 S.W.2d 903, 910 (Tenn. 1983), *cert. denied*, 464 U.S. 1063 (1984).

Coe responds by noting the Supreme Court's recent decision in *Campbell v. Louisiana*, 118 S. Ct. 1419 (1998). In *Campbell*, the Court decided that a white criminal defendant had standing to challenge the exclusion of Blacks from a grand jury, under both equal-protection and due-process theories. *Id.* at 1424-25.

Regarding the equal-protection claim, the Court cited its prior decision in *Powers v. Ohio*, 499 U.S. 400, 411 (1991), in which a defendant was found to have third-party standing to raise a *Batson* challenge to the exclusion from his jury of members of another race. *Campbell*, 118 S. Ct. at 1422-24. The Court applied *Powers*, a petit jury case, to the grand jury, and held that "[i]f [the grand jury] process is infected with racial discrimination, **doubt** is cast over the fairness of all subsequent decisions," which represents injury in fact for Campbell even though he was not a member of the excluded group. *Id.* at 1423-24. The other two parts of third-party standing (common interest, and a first party who is much less likely to vindicate his own interest) were held to apply as well. *Id.* at 1424.

Unfortunately for Coe, we have already held that the *Powers* principle of third-party standing represented a new rule, and Coe's conviction became final seven years before *Powers* was decided. *Echlin v. LeCureux*, 995 F.2d 1344, 1351 (6th Cir. 1993), *cert. denied*, 510 U.S. 993 (1994); *accord Nguyen v. Reynolds*, 131 F.3d 1340, 1351-52 (10th Cir. 1997), *cert. denied*, 119 S. Ct. 128 (1998); *Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995), *cert. denied*, 517 U.S. 1143 (1996); *Van Daalwyk v. United States*, 21 F.3d 179, 180 (7th Cir. 1994); *Farrell v. Davis*, 3 F.3d 370, 372 (11th Cir. 1993) (per curiam). Therefore, the state courts acted reasonably in rejecting Coe's claim of third-party standing.[(8)] *Cf. United States v. Ovalle*, 136 F.3d 1092, 1102-04 (6th Cir. 1998) (allowing third-party standing to bring equal-protection claim on direct appeal).

This leaves the due-process portion of Coe's claim. We hold that this too is barred by *Teague*, though the issue is closer here. Before proceeding, a more detailed account of our task under *Teague* is in order:

*Teague* applies when the Supreme Court announces a new rule of criminal procedure. Essentially, if a decision announces a "new rule" of criminal procedure, it is not to be applied retroactively to convictions that have already become final when the decision is announced . . . . A decision announces a new rule if it breaks new ground, imposes new obligations on the states or federal government, or was not dictated by precedent existing at the time the defendant's conviction became final.

*In re Green*, 144 F.3d 384, 386 (6th Cir. 1998) (citations, quotation marks, and emphasis omitted).[(9)] One indication that a result is not "dictated by precedent" is when courts have reached divergent results on an issue before resolution by the Supreme Court. *See Butler v. McKellar*, 494 U.S. 407, 415 (1990).

In *Campbell*, the Court pointed to two sources in its prior case law for its holding that a defendant can challenge, on due-process grounds, the exclusion of members of another race from a state grand jury. The first was *Peters v. Kiff*, 407 U.S. 493 (1972). In that case, decided well before Coe's case came along, six justices agreed that the defendant, Peters, was entitled to relief. Three justices (Marshall, Douglas, and Stewart) believed that this entitlement stemmed from the Constitution and from the criminal statute, 18 U.S.C. § 243, that forbids public officials from excluding people from grand jury service because of their race. *Peters*, 407 U.S. at 497-98. Three other justices (White, Brennan, and Powell) believed that the entitlement stemmed, more narrowly, from the statute alone. *Id.* at 505-07; *see id.* at 511 (Burger, J., dissenting) (characterizing concurrence as such); *Campbell*, 118 S. Ct. at 1424 (same). Justice White wrote in the concurrence that:

By this unambiguous provision, . . . Congress put cases involving exclusions from jury service on grounds of race in a class by themselves. For us the majestic generalities of the Fourteenth Amendment are thus reduced to a concrete statutory command when cases involve race or color *which is wanting in every other case of alleged discrimination.*

*Peters*, 407 U.S. at 505-06 (quotation marks omitted) (emphasis added).

Because "the holding of the Court may be viewed as that position taken by those Members who

concurred in the judgments on the narrowest grounds," *Marks v. United States*, 430 U.S. 188, 193 (1977), *Peters* cannot be said to stand for the proposition that the constitution gave Peters (or Coe) the ability to raise a due-process challenge to the exclusion of Blacks (or women) from his grand jury. Indeed, six justices declined so to hold. Rather, *Peters* stands only for the proposition that the criminal statute forbidding such exclusion produced the ability to assert such a claim. Unfortunately for Coe, 18 U.S.C. § 243 addressed only race, and there was no parallel gender-based statute in operation at the time of his trial. Therefore, *Peters* did not establish that Coe was entitled to relief, and *a fortiori* did not do so as a matter of "existing precedent."

The next source relied upon by *Campbell* is *Hobby v. United States*, 468 U.S. 339 (1984). *Hobby* was decided several months after the Supreme Court denied Coe's writ of certiorari on direct appeal. In *Hobby*, a white male defendant challenged his indictment because he said that the grand jury excluded Blacks and women. Because Hobby's claim had been dismissed as a matter of law, the Supreme Court assumed that the violation had occurred and proceeded to consider if Hobby had any remedy. *Id.* at 343. The Court began by noting that purposeful exclusion of women and Blacks from grand jury service was unconstitutional, without distinguishing between gender and race. In proceeding next to the question of remedy, therefore, the Court seemed to be assuming implicitly that Hobby had standing to raise his claim, both on gender and racial grounds, though it noted the narrow holding of *Peters*. *Id.* at 343 & n.2. In the end, the Court decided (for reasons that do not concern us) that Hobby was not entitled to a remedy. The *Campbell* Court read *Hobby* approvingly, as establishing some sort of due-process protection with regard to race (the only issue Campbell pursued), though it left the determination of the bounds of that protection, which it said were "still open," for the lower court to determine on remand.

We do not **doubt** that *Hobby* and *Campbell* can be read as extending due-process protection to men challenging the exclusion of women, though neither case provided detail on the extent of that protection. The casual manner in which these cases suggest such an extension does not mean, however, that the holdings followed necessarily from "existing precedent." Indeed, the failure of *Hobby* even to mention the gender/standing question paved the way for conclusions such as the one we reached later in *Ford v. Seabold*. At any rate, because *Hobby* was decided after Coe's final appeal to the Supreme Court was turned away, and because it declared a "new rule" if any, *Teague* bars Coe's claim.

We pause to note additional (though not necessary) evidence that supports this conclusion. First, the Supreme Court denied Coe's petition for certiorari. Ordinarily we would not put much weight on such a denial, but there is more information than usual to be drawn from this particular one. Justices Brennan and Marshall dissented from the denial of Coe's petition, noting that they believed the death penalty to be cruel and unusual punishment. *Coe v. Tennessee*, 464 U.S. 1063 (1984) (Brennan and Marshall, JJ., dissenting). They did not comment on Coe's prominent objection to the composition of the grand jury that indicted him.

But *Coe* had not escaped Justice Marshall's notice. He dissented, alone, from the denial of certiorari in another case, *Ford v. Kentucky*, 469 U.S. 984 (1984), that came after *Hobby*. In that case, the petitioner asserted a claim identical to Coe's. The Kentucky state courts rejected the gender-based claim on standing grounds, but did not do so on the race-based claim. In significant contrast to the pre-*Hobby* denial of certiorari in *Coe*, Justice Marshall addressed head-on the question of standing to bring a due-process claim based on gender, noting the confusion surrounding the issue and citing *Coe* as an example:

> Because the opinion announcing the judgment in *Peters* was joined by only three Justices, *Peters* did not definitively resolve the standing question raised in this petition for certiorari. The Court also declined in *Alexander v. Louisiana*, 405 U.S. 625, 633-34 (1972), to decide whether males could challenge the statutory exemption of women from state grand jury service, although Justice Douglas would have reached the question and invalidated the statute on federal due process grounds. . . .
>
> These conflicting pronouncements from the Court and our failure to speak definitively to the issue have spawned the sort of confusion in the lower courts that calls for the exercise of this Court's certiorari jurisdiction. In contrast to the views of the Kentucky Supreme Court, which are shared by the Supreme Court of Tennessee, *see State v. Coe*, 655 S.W.2d 903 (1983), at least two Federal Courts of Appeals have stated that a male defendant does have a due process right not to have women systematically underrepresented on the state grand jury that indicts him. *Gibson v. Zant*, 705 F.2d 1543 (11th Cir. 1983); *Folston v. Allsbrook*, 691 F.2d 184, 186 n.3 (4th Cir. 1982), *cert. denied*, 461 U.S. 939 (1983).

*Id.* at 985-86 (citations omitted and simplified).

There are three interesting things about Justice Marshall's dissent. First, although he is writing in the shadow of *Hobby*, he does not mention that case, suggesting that it did not serve as a clear statement of Coe's position. Second, Justice Marshall admits that *Peters* did not resolve the question of standing in the due-process/gender context. Third, Justice Marshall notes that there were lower-court decisions on both sides of the question -- evidence of the sort of difference of opinion among **reasonable** jurists that makes a decision resolving that difference a "new rule."

The difference of opinion among courts was both wider and narrower than Justice Marshall suggested. In addition to the Kentucky and Tennessee Supreme Courts, federal courts, including this one, have held that claimants in Coe's posture lack standing. *See, e.g., Ford v. Seabold,* 841 F.2d at 687-88 (6th Cir.), *cert. denied*, 488 U.S. 928 (1988); *Beal v. Rose*, 532 F. Supp. 306, 311 (M.D. Tenn. 1981), *vacated and remanded on other grounds*, 703 F.2d 558 (6th Cir. 1982); *see also Sheffield v. Lack*, 702 F. Supp. 634, 636 (M.D. Tenn. 1987) (citing *Beal* approvingly); *aff'd*, No. 88-5459, 1988 WL 121252 (6th Cir. Nov. 15, 1988). *See generally United States v. Abell*, 552 F. Supp. 316, 320 (D. Me. 1982) (listing cases). However, neither of the circuit-court cases that Justice Marshall cited even mentioned due-process protection; these and many other cases that have extended standing to claimants such as Coe have done so either in the context of federal juries or with regard to equal-protection claims. *See generally Abell*, 552 F. Supp. at 320 ("conceding that the authority in this area is not unambiguous" and listing cases -- of varying applicability -- on each side of the question, before finding standing in context of federal equal-protection rights and federal Jury Selection and Service Act).

Thus, when Coe's conviction became final, it was considerably less than clear that he had standing to assert his due-process claim that women were purposely excluded from his grand jury venire. The courts that handled Coe's conviction and direct appeal were not violating any precedent when they determined that Coe did not have standing. Therefore, *Teague* bars us from applying *Campbell* retroactively, thereby overruling the determination of the state courts, and from reversing the district court in this case.

**IV**

Based on the foregoing, we REVERSE the district court insofar as it granted habeas corpus relief, and AFFIRM insofar as it denied relief. Therefore, the award to Coe of habeas corpus relief is REVERSED.

---

**DISSENT**

---

KAREN NELSON MOORE, dissenting. I believe that the jury could reasonably have understood its instructions as requiring it to agree unanimously on the existence of a particular mitigating circumstance before any juror could weigh that circumstance against the aggravating circumstances. I therefore dissent from the majority's reversal of the district court's grant of relief from the death sentence.

The majority correctly states that our inquiry is how a **reasonable** jury might have understood the instructions. *See Mills v. Maryland*, 486 U.S. 367, 375-76 (1988). In *Mills*, the jury was required to indicate which mitigating circumstances it had found by marking "yes" or "no" next to each possible mitigator. The verdict form stated, "[W]e unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist . . . and each mitigating circumstance marked 'no' has not been proven." *Id.* at 387. Although the state claimed that in the event of non-unanimity the jury would leave that space blank, the judge had clearly instructed the jury that, with respect to aggravating circumstances, non-unanimity required a "no" response. *See id.* at 378. The Supreme Court held that a **reasonable** jury could have understood the same rule to apply to mitigating circumstances, since the wording of the verdict form was the same in each section. *See id.* at 378-79. Because the trial judge had done nothing to dispel such a belief, the Court could not "rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground." *Id.* at 377.

A majority of this court applied *Mills* in *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1120-21 (6th Cir. 1990) (en banc) (Kennedy, J., joined by eight others, dissenting from majority opinion that did not reach this issue), *cert. denied*, 499 U.S. 970 (1991). *Kordenbrock* characterized the sentencing instructions at issue as requiring unanimity on aggravators but remaining silent as to mitigators. The instructions there stated:

In recommending a sentence . . . you shall consider the following aggravating circumstance, if you believe from the evidence beyond a **reasonable doubt** that it exists. . . .

In recommending a sentence . . . you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in evidence and you believe to be true, including but not limited to such of the following as you believe from the evidence to be true.

*Kordenbrock*, 919 F.2d at 1108 (Merritt, J., dissenting in part). This court held that "it cannot be reasonably inferred that silence as to finding a mitigating factor would likely cause the jury to assume that unanimity was also a requirement. Indeed it would indicate the opposite." *Kordenbrock*, 919 F.2d at 1121. In explaining its conclusion, the court distinguished the following instructions, which

the Seventh Circuit held improper in *Kubat v. Thieret*, 867 F.2d 351 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989):

If, after your deliberations, you *unanimously* determine that there is no sufficiently mitigating factor or factors to preclude the imposition of the death sentence on the defendant, . . . .

If, after your deliberations, you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude the imposition of the death sentence, . . . .

*Id.* at 1121 (quoting *Kubat*, 867 F.2d at 369) (first emphasis added by *Kordenbrock* court; second emphasis added by *Kubat* court). These instructions were not silent but "specifically told [the jury] that they must find mitigating factors unanimously." *Kordenbrock*, 919 F.2d at 1121. The *Kordenbrock* court also noted, with apparent approval, *Kubat*'s holding that these faulty instructions were not cured by other portions of the instructions permitting the jury to state their inability to reach a unanimous verdict. *See id.* at 1121.

The instructions given at Coe's trial are virtually indistinguishable from those held unconstitutional in *Kubat*. Coe's jury was told:

If you *unanimously* determine that . . . [the aggravating circumstances] are not outweighed by any mitigating circumstances, the sentence shall be death. . . .

If you *unanimously* determine that . . . [the aggravating circumstances] are outweighed by one or more mitigating circumstances, the sentence shall be life imprisonment.

Joint Appendix (J.A.) at 1838-39 (emphasis added). Similarly, the verdict form stated, "We, the jury, unanimously find that there are no mitigating circumstances sufficiently substantial to outweigh the [aggravating circumstances]." J.A. at 1839. If one diagrams these sentences, as the state has done, State Reply Br. at 19-20, one can see that they are technically correct, since "unanimously" modifies "determine" (or "find") and refers to the weighing process rather than to the selection of mitigators. However, the same was true in *Kubat*. Other than using the word "outweighed" instead of "there is no sufficiently mitigating factor," the instructions before us are the same as the *Kubat* instructions. Both sets of instructions use the word "unanimously" when describing the jury's analysis of mitigating circumstances and are more confusing than mere silence. Three judges of this court recognized this when they expressed their "serious concerns" that these instructions were misleading. *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997).

The majority believes it significant that the language quoted above "did not appear in the section of the instructions on finding mitigating factors" but in the later "section on weighing." Ante at 24. The trial judge did not make such a clear division between sections when instructing the jury, and, as *Kubat* held, the presence of a correct instruction does not necessarily cure an improper instruction. Moreover, taking into consideration the "non-weighing" section of the instructions only increases my **certainty** that a **reasonable** jury could have improperly interpreted these instructions. The earlier instructions said:

It is now your duty to determine . . . the penalty . . . . In arriving at this determination, you are authorized to weigh and consider any mitigating circumstances and any of the statutory aggravating circumstances which may have been raised by the evidence . . . .

[N]o death penalty shall be imposed by a Jury but upon an unanimous finding of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following: . . . .

[I]n arriving at the punishment, the Jury shall consider, *as heretofore indicated*, any mitigating circumstances which shall include but not be limited to the following: . . . .

J.A. at 1836-38 (emphasis added). While the sentence that introduces the list of mitigators does not contain any form of the word "unanimous," it is not silent about whether unanimity is required. The italicized phrase instructed the jury to consider mitigating circumstances in a manner that had previously been described. This phrase may have been intended to refer generally to the weighing process, which was mentioned in the first quoted sentence. The most natural understanding of this phrase, however, would be that the jury was to apply the parallel instructions it had just received on how to evaluate aggravating circumstances.[(10)] As in *Mills*, the parallels between the instructions on aggravators and mitigators would lead the jury to believe that the same approach was required unless something in the instructions signaled a difference. *Kordenbrock* held that the absence of any reference to unanimity in the instructions on mitigators would be a sufficient signal. Here, however, we have not silence but a specific instruction to incorporate earlier instructions. The most natural earlier instructions to incorporate required unanimity.

There is a substantial probability that the jury misunderstood its mandate and thus failed to give proper weight to mitigating circumstances found by some, but not all, of its members. I would therefore affirm the district court's order insofar as it vacated Coe's death sentence on this ground.

FOOTNOTES

1. We have some concern that it is inappropriate to apply *Mills* in this case, because it represents a "new rule" under *Teague v. Lane*, 489 U.S. 288 (1989). Coe's direct appeal process ended in 1984, four years before *Mills* was decided. Other courts have split on this question. *Compare Miller v. Lockhart*, 65 F.3d 676, 685-86 (8th Cir. 1995) (finding bar) and *Cordova v. Collins*, 953 F.2d 167, 173 (5th Cir.) (same), *cert. denied*, 502 U.S. 1067 (1992), *with Williams v. Dixon*, 961 F.2d 448, 456 (4th Cir.) (holding that exception to *Teague* applies), *cert. denied*, 506 U.S. 991 (1992) and *DeShields v. Snyder*, 829 F. Supp. 676, 687-88 (D. Del. 1993) (holding that *Mills* is not a "new rule"). *See also Zettlemoyer v. Fulcomer*, 923 F.2d 284, 316 n.3 (3d Cir.) (Sloviter, J., dissenting on other grounds), *cert. denied*, 502 U.S. 902 (1991). The state has not raised the *Teague* issue, however, and we need not do so *sua sponte*. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994).

2. Our three colleagues who expressed **doubt** in their dicta in *Austin v. Bell* dissented from this holding.

3. Such a holding would probably represent a "new rule" for the purposes of *Teague v. Lane*, 489 U.S. 288 (1989). It is far from clear that current case law requires such a conclusion, much less that it required that conclusion when Coe's conviction and sentence became final in 1984. *See Daniels v. Burke*, 83 F.3d 760, 764 (6th Cir.) ("*Teague* constrains our ability to announce new rules in collateral proceedings."), *cert. denied*, 117 S. Ct. 327 (1996).

There is a fair chance that one of the exceptions to *Teague* might apply here, namely that "the rule announces a new 'watershed' rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *In re Green*, 144 F.3d 384, 386-87 (6th Cir. 1998). Because we are unsure of *Teague*'s applicability, and because we reject Coe's argument anyway, we will not reach the *Teague* issue. Because the state has not asserted the *Teague* issue, we are allowed to so refrain. *See Caspari v. Bohlen*, 510 U.S. 383, 389 (1994).

4. Coe would face an uphill battle on this point as well. The information on Gant is only exculpatory if the *whole* truth about Gant is; if the reason that the police did not turn over inculpatory evidence about Gant is that they had substantial exculpatory evidence to conclude that he was no longer a suspect, *Brady* would not apply. *Brady* does not exist to provide fodder for *misleading* **reasonable-doubt** defenses.

5. Indeed, Coe is pursuing his *Middlebrooks* claim in his third state petition for post-conviction relief. The claim has been rejected by the trial and appeals courts, and is pending before the state supreme court.

6. This double-jeopardy argument is not before us.

7. In the subsequent history of *Brooks*, there was some wrangling between the court of appeals and the Supreme Court over the proper harmless-error standard to be used. *See Kemp v. Brooks*, 478 U.S. 1016 (1986) (vacating and remanding); *Brooks v. Kemp*, 809 F.2d 700, 700-01 (11th Cir.) (en banc) (per curiam) (reaffirming previous decision using standard of *Chapman v. California*, 386 U.S. 18 (1967)), *cert. denied*, 483 U.S. 1010 (1987). This is irrelevant for our purposes, because we use the *Brecht* standard (under which it is harder to find that an error was harmful) and so would reach the same result as the Eleventh Circuit in *Kemp*, *a fortiori*.

8. Because *Powers* represents a new rule, we do not need to determine whether applying *Powers* and *Campbell* to gender-based exclusions would itself represent a new rule.

9. *Green* also sets forth the two exceptions to *Teague*, neither of which apply here:

Two exceptions to the *Teague* rule, however, permit the retroactive application of a new rule whenever: 1) the rule places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, or otherwise prohibits imposition of a certain type of punishment for a class of defendants because of their status or offense; or 2) the rule announces a new "watershed" rule of criminal procedure implicating the fundamental fairness and accuracy of the

criminal proceeding.

*Green*, 144 F.3d at 386-87. The first exception clearly does not apply. As for the second exception, Coe has given us no basis to conclude that the gender-balance problem with the grand jury "implicat [es]" the "accuracy" of Coe's indictment.

---

10. The majority notes that the phrase "as heretofore indicated" is quoted from the Tennessee Code. What matters for this case, however, is not what the phrase means in the context of the statute but how it would be understood in the context in which it was presented to the jury.

---

 Case in WordPerfect Format

Return to Sixth Circuit Home Page 

LIBK DISCIPLINARY DATE: 08/21/02
BIDA327 SELECT TIME: 08:38 AM

TOMIS ID: 00238941 HALL, JOHN
Status: ACTV Sex: M Race: W Age: 38 Location: RMSI

| S | Incident Date | Disc Incident ID | Class | First Infraction Type |
|---|---|---|---|---|
| | 02/12/2001 | 00442587 | C | FIG FIGHTING |
| | 02/05/1996 | 00232970 | B | TEM THREATENING EMPLOYEE |
| | 02/05/1996 | 00232986 | A | ASL ASSAULT |
| | 01/20/1996 | 00231177 | C | DIS CREATING A DISTURBANCE |
| | 01/19/1996 | 00231064 | C | VPR VIOL. OF TDOC/INST. POLIC |

**Westlaw Attached Printing Summary Report**
**for**
**EARLS, ALFRED 3569690 Monday, November 04, 2002 05:45:40 Central**

(C) 2000 West Group. Copyright is not claimed as to any part of the original work prepared by a U.S. government officer or employee as part of that person's official duties. All rights reserved. No part of a Westlaw transmission may be copied, downloaded, stored in a retrieval system, further transmitted or otherwise reproduced, stored, disseminated, transferred or used, in any form or by any means, except as permitted in the Westlaw Subscriber Agreement, the Additional Terms Governing Internet Access to Westlaw or by West's prior written agreement. Each reproduction of any part of a Westlaw transmission must contain notice of West's copyright as follows: "Copr. (C) 2000 West Group. No claim to orig. U.S. govt. works."Registered in U.S. Patent and Trademark Office and used herein under license: KeyCite, Westlaw and WIN. WIN Natural Language is protected by U.S. Patent Nos. 5,265,065, 5,418,948 and 5,488,725.

| | |
|---|---|
| Request Created Date/Time: | Monday, November 04, 2002 05:45:00 Central |
| Client Identifier: | JNJI |
| DataBase: | TN-CS |
| Citation Text: | Slip Copy |
| Query Text: | PREMEDITATION /S INSTRUCTION |
| Print Command: | Current document,Complete result |
| Lines: | 165 |
| Lines Charged: | 165 |
| Documents: | 1 |
| Documents Charged: | 0 |
| Images: | 0 |
| Images Charged: | 0 |

Premed. Instruction
Brown
not for
P.C.
p. 3

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Knoxville.

James E. SWIGGETT,
v.
STATE of Tennessee.

**No. E2002-00174-CCA-R3-PC.**

Oct. 15, 2002.

Appeal from the Criminal Court for Greene County, No. 02CR001; James E. Beckner, Judge.

James E. Swiggett, Mountain City, Tennessee, Pro Se.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; and C. Berkeley Bell, District Attorney General, for the appellee, State of Tennessee.

DAVID H. WELLES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ALAN E. GLENN, JJ., joined.

**OPINION**

DAVID H. WELLES, J.

*1 The Defendant, James E. Swiggett, was convicted by a jury in 1992 of first degree premeditated murder. His conviction was affirmed on direct appeal. *See State v. James Swiggett*, No. 03C01-9209-CR-00312, 1994 Tenn.Crim.App. LEXIS 766 (Knoxville, Nov. 23, 1994), *perm. appeal den.* (Tenn.1995). The Defendant subsequently filed for post-conviction relief, which petition was denied by the trial court as barred by the statute of limitations. This ruling was affirmed on direct appeal. *See James E. Swiggett v. State*, No. 03C01- 9804-CR-00161, 1999 Tenn.Crim.App. LEXIS 422 (Knoxville, May 4, 1999), *perm. appeal den.* (Tenn.1999). The Defendant then filed the instant petition for post-conviction relief, claiming grounds for tolling the statute of limitations. The trial court summarily dismissed the instant petition on the grounds that a prior petition had already been filed. This appeal followed. We affirm the judgment of the trial court.

The Defendant asserts as grounds for post-conviction relief that he has newly discovered evidence; that his indictment was unconstitutional; and that his jury instructions were unconstitutional. [FN1] We first note that this petition was filed on January 4, 2002, more than six years after the supreme court denied the Defendant permission to appeal from his conviction. The statute of limitations for post-conviction relief in this case expired on May 10, 1996. *See* Tenn.Code Ann. § 40-30-201, Compiler's Notes (1997). [FN2]

FN1. The record before us contains no description of the allegedly newly discovered evidence, no copy of the allegedly unconstitutional indictment, and no copy of the allegedly unconstitutional jury instructions.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

FN2. Our supreme court denied permission to appeal from the Defendant's original conviction on March 27, 1995. *See State v. James Swiggett*, No. 03C01-9209-CR-00312, 1995 Tenn. LEXIS 152 (Knoxville, Mar. 27, 1995).

Thetrial court summarily dismissed the instant petition on the basis of Tennessee Code Annotated section 40-30-202(c), which provides in pertinent part that, "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment." However, the section provides for the summary dismissal of additional post-conviction petitions only where the prior petition "was resolved on the merits by a court of competent jurisdiction." *Id.* The Defendant's prior petition was not resolved on the merits but was dismissed as time-barred. Accordingly, the trial court erred by summarily dismissing the instant petition on the grounds set forth.

Nevertheless, the instant petition is subject to summary dismissal on the grounds that it is time-barred. As set forth above, the limitations period for the filing of post-conviction claims in the Defendant's case expired in 1996. Tennessee Code Annotated section 40-30-202(a) provides in pertinent part that

> [t]he statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file such an action and is a condition upon its exercise. Except as specifically provided in subsections (b) and (c), the right to file a petition for post-conviction relief or a motion to reopen under this chapter shall be extinguished upon the expiration of the limitations period.

*2 The Defendant contends that the instant petition meets the exception provided in subsection (b)(1):

> The claim in the petition is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. Such petition must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial.

Tenn.Code Ann. § 40-30-202(b)(1). The gist of the Defendant's argument is that, in *Fiore v. White*, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001), the United States Supreme Court created a constitutional right not previously recognized: that a state court's recent interpretation of prior law must be retroactively applied. We conclude, however, that the Defendant misapprehends the holding of *Fiore*.

In *Fiore*, the defendant had been convicted by a Pennsylvania state court of operating a hazardous waste facility without a permit. After the defendant's conviction had become final, Pennsylvania's supreme court interpreted the relevant statute for the first time and "made clear that Fiore's conduct was not within its scope." *Id.*, 531 U.S. at 226. Nevertheless, Pennsylvania's courts refused to grant Fiore collateral relief. Upon query by the Supreme Court, the Pennsylvania Supreme Court indicated that its interpretation of the statute was not a new interpretation, but rather a correct statement of the law at the time Fiore's conviction became final. The United States Supreme Court set forth the issue before it as "whether Pennsylvania can, consistently with the Federal Due Process Clause, convict Fiore for conduct that its criminal statute, as properly interpreted, does not prohibit[?]" *Id.*, 531 U.S. at 228. The Supreme Court held that it could not. *See id.*, 531 U.S. at 228-29.

The holding of *Fiore*, in a nutshell, is that when a defendant is convicted of violating a statute which is eventually determined not to ban the conduct in which the defendant engaged, the defendant's conviction cannot withstand a federal due process challenge.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

*Fiore* does not apply to the Defendant's case. The Defendant's complaint is not that he was convicted of murder based on conduct that was later recognized as not constituting murder, but that his indictment and jury **instructions** did not sufficiently differentiate the terms **"premeditation"** and "deliberation." The Defendant relies on *State v. Brown,* 836 S.W.2d 530 (Tenn.1992), which addressed the propriety of the jury **instruction "premeditation** may be formed in an instant," and determined that it should be abandoned as potentially confusing. *See id.* at 543.

However, our supreme court has since held that "*Brown* did not announce a new state constitutional rule, did not implicate any constitutional right, is not retroactive, and may not serve as the basis for post-conviction relief." *Miller v. State,* 54 S.W.3d 743, 744 (Tenn.2001). Contrary to the Defendant's assertions, *Fiore* does not create a new constitutional right requiring this Court to reexamine the Defendant's indictment and jury instructions in light of *Brown.* Accordingly, *Fiore* does not provide the Defendant relief from the application of the statute of limitations to his post-conviction claims.

*3 Furthermore, although the Defendant refers in his petition to "newly discovered evidence," this allegation is completely unsupported by any assertions of fact. *Cf.* Tenn.Code Ann. § 40-30-204(e) (requiring a post- conviction petitioner to "include allegations of fact supporting each claim for relief set forth in the petition"). Moreover, the Defendant's bare assertion does not rise to the level of new evidence required to toll the statute of limitations. *See id.* § 40-30-202(b)(2) ("[n]o court shall have jurisdiction to consider a petition filed after [the statute of limitations has expired] unless: [t]he claim in the petition is based upon new scientific evidence establishing that such petitioner is actually innocent of the offense or offenses for which the petitioner was convicted.")

In short, the Defendant has offered no grounds upon which the statute of limitations governing his post-conviction petition may be tolled, and this issue is therefore without merit.

We note that the Defendant styled his pleading in the alternative as a writ of error coram nobis. Although the trial court did not specifically address the Defendant's claim as a writ of error coram nobis, we conclude that the Defendant's claim for relief upon this ground is also time-barred, because it was not filed within one year of the date on which the judgment of conviction became final in the trial court. *See* Tenn.Code Ann. §§ 40-26-105; 27-7-103; *State v. Mixon,* 983 S.W.2d 661, 670 (Tenn.1999). Nor has the Defendant alleged grounds sufficient to toll the running of the statute of limitations upon principles of due process. *Cf. Workman v. State,* 41 S.W.3d 100, 101 (Tenn.2001) (due process concerns may justify tolling the limitations period applicable to writs of error coram nobis where "newly discovered evidence may prove that the defendant is actually innocent of the capital crime of which he was convicted.") In short, the Defendant's claims are time-barred, no matter how he chooses to style them.

The judgment of the trial court is affirmed.

2002 WL 31309174 (Tenn.Crim.App.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

146 L.Ed.2d 658, 68 USLW 4351, 82 Fair Empl.Prac.Cas. (BNA) 1313, 77 Empl. Prac. Dec. P 46,376, 144 Ed. Law Rep. 28, 00 Cal. Daily Op. Serv. 3788, 2000 Daily Journal D.A.R. 5061, 2000 CJ C.A.R. 2583

Supreme Court of the United States
UNITED STATES, Petitioner,
v.
Antonio J. MORRISON, et al.
Christy Brzonkala, Petitioner,
v.
Antonio J. Morrison et al.
Nos. 99-5, 99-29.
Argued Jan. 11, 2000.
Decided May 15, 2000.

Former university student brought claims under Violence Against Women Act (VAWA) against students who allegedly raped her. The United States District Court for the Western District of Virginia, Jackson L. Kiser, Senior District Judge, 935 F.Supp. 779, dismissed claims. Former student appealed. Following reversal, 132 F.3d 949, and following rehearing en banc, the Fourth Circuit Court of Appeals, Luttig, Circuit Judge, 169 F.3d 820, affirmed. Certiorari was granted. The Supreme Court, Justice Rehnquist, held that: (1) Commerce Clause did not provide Congress with authority to enact civil remedy provision of VAWA, inasmuch as provision was not regulation of activity that substantially affected interstate commerce, and (2) enforcement clause of Fourteenth Amendment did not provide Congress with authority to enact provision.
Affirmed.
Justice Thomas concurred and filed opinion.
Justice Souter filed dissenting opinion in which Justices Stevens, Ginsburg, and Breyer joined.
Justice Breyer filed dissenting opinion in which Justice Stevens joined, and in which Justices Souter and Ginsburg joined in part.

West Headnotes

[1] KeyCite Notes

361 Statutes
 361I Enactment, Requisites, and Validity in General
  361k4 k. Powers and Duties of Legislature in General. Most Cited Cases

Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution.

[2] KeyCite Notes

92 Constitutional Law
 92III Distribution of Governmental Powers and Functions
  92III(A) Legislative Powers and Delegation Thereof
   92k50 k. Nature and Scope in General. Most Cited Cases

The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the Constitution is written.

[3] KeyCite Notes

146 L.Ed.2d 658, 68 USLW 4351, 82 Fair Empl.Prac.Cas. (BNA) 1313, 77 Empl. Prac. Dec. P 46,376, 144 Ed. Law Rep. 28, 00 Cal. Daily Op. Serv. 3788, 2000 Daily Journal D.A.R. 5061, 2000 CJ C.A.R. 2583

Former university student brought claims under Violence Against Women Act (VAWA) against students who allegedly raped her. The United States District Court for the Western District of Virginia, Jackson L. Kiser, Senior District Judge, 935 F.Supp. 779, dismissed claims. Former student appealed. Following reversal, 132 F.3d 949, and following rehearing en banc, the Fourth Circuit Court of Appeals, Luttig, Circuit Judge, 169 F.3d 820, affirmed. Certiorari was granted. The Supreme Court, Justice Rehnquist, held that: (1) Commerce Clause did not provide Congress with authority to enact civil remedy provision of VAWA, inasmuch as provision was not regulation of activity that substantially affected interstate commerce, and (2) enforcement clause of Fourteenth Amendment did not provide Congress with authority to enact provision.
Affirmed.
Justice Thomas concurred and filed opinion.
Justice Souter filed dissenting opinion in which Justices Stevens, Ginsburg, and Breyer joined.
Justice Breyer filed dissenting opinion in which Justice Stevens joined, and in which Justices Souter and Ginsburg joined in part.

West Headnotes

[1] KeyCite Notes

361 Statutes
361I Enactment, Requisites, and Validity in General
361k4 k. Powers and Duties of Legislature in General. Most Cited Cases

Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution.

[2] KeyCite Notes

92 Constitutional Law
92III Distribution of Governmental Powers and Functions
92III(A) Legislative Powers and Delegation Thereof
92k50 k. Nature and Scope in General. Most Cited Cases

The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the Constitution is written.

[3] KeyCite Notes

92 Constitutional Law
92III Distribution of Governmental Powers and Functions
92III(B) Judicial Powers and Functions
92k70 Encroachment on Legislature
92k70.1 In General
92k70.1(3) k. Invalidation, Annulment, or Repeal of Statutes. Most Cited Cases

Due respect for the decisions of a coordinate branch of Government demands that the Supreme Court invalidate a congressional enactment only upon a plain showing that Congress has exceeded its

constitutional bounds.

[4] KeyCite Notes

83 Commerce
83I Power to Regulate in General
83k2 Constitutional Grant of Power to Congress
83k3 k. In General. Most Cited Cases

Congress' regulatory authority under the Commerce Clause is not without effective bounds. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[5] KeyCite Notes

83 Commerce
83I Power to Regulate in General
83k2 Constitutional Grant of Power to Congress
83k7 Internal Commerce of States
83k7(2) k. Activities Affecting Interstate Commerce. Most Cited Cases

The scope of the interstate commerce power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[6] KeyCite Notes

83 Commerce
83I Power to Regulate in General
83k2 Constitutional Grant of Power to Congress
83k5 k. Commerce Among the States. Most Cited Cases

83 Commerce
83I Power to Regulate in General
83k2 Constitutional Grant of Power to Congress
83k7 Internal Commerce of States
83k7(2) k. Activities Affecting Interstate Commerce. Most Cited Cases

There are three broad categories of activity that Congress may regulate under its commerce power: first, Congress may regulate the use of the channels of interstate commerce; second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities; and, finally, Congress' commerce authority includes thepower to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that sunstantially affect interstate commerce. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[7] KeyCite Notes

83 Commerce

⇐83II Application to Particular Subjects and Methods of Regulation
⇐83II(J) Offenses and Prosecutions
⇐83k82.5 Federal Offenses and Prosecutions
⇐83k82.6 k. In General. Most Cited Cases

Commerce Clause did not provide Congress with authority to enact civil remedy provision of Violence Against Women Act (VAWA), inasmuch as provision was not regulation of activity that substantially affected interstate commerce; gender- motivated crimes of violence were not economic activity, provision contained no jurisdictional element establishing that federal cause of action was in pursuance of Congress' power to regulate interstate commerce, and, although Congress made findings regarding impact of gender-motivated violence on victims and their families, such findings were based on unworkable "but-for" reasoning. U.S.C.A. Const. Art. 1, § 8, cl. 3; Violent Crime Control and Law Enforcement Act of 1994, § 40302, 42 U.S.C.A. § 13981.

[8] KeyCite Notes

⇐83 Commerce
⇐83I Power to Regulate in General
⇐83k2 Constitutional Grant of Power to Congress
⇐83k7 Internal Commerce of States
⇐83k7(2) k. Activities Affecting Interstate Commerce. Most Cited Cases

Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[9] KeyCite Notes

⇐83 Commerce
⇐83I Power to Regulate in General
⇐83k2 Constitutional Grant of Power to Congress
⇐83k7 Internal Commerce of States
⇐83k7(2) k. Activities Affecting Interstate Commerce. Most Cited Cases

While Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce, the existence of such findings may enable the Supreme Court to evaluate the legislative judgment that the activity in question substantially affects interstate commerce, even though no such substantial effect is visible to the naked eye. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[10] KeyCite Notes

⇐83 Commerce
⇐83I Power to Regulate in General
⇐83k2 Constitutional Grant of Power to Congress
⇐83k5 k. Commerce Among the States. Most Cited Cases

A jurisdictional element establishing that the federal cause of action created by a federal statute is in pursuance of Congress' power to regulate interstate commerce would lend support to the argument that the statute was sufficiently tied to interstate commerce to withstand a Commerce Clause challenge. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[11] KeyCite Notes

83 Commerce
  83I Power to Regulate in General
    83k2 Constitutional Grant of Power to Congress
      83k3 k. In General. Most Cited Cases

The existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[12] KeyCite Notes

83 Commerce
  83I Power to Regulate in General
    83k2 Constitutional Grant of Power to Congress
      83k7 Internal Commerce of States
        83k7(2) k. Activities Affecting Interstate Commerce. Most Cited Cases

Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so; rather, whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by the Supreme Court. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[13] KeyCite Notes

83 Commerce
  83II Application to Particular Subjects and Methods of Regulation
    83II(J) Offenses and Prosecutions
      83k82.5 Federal Offenses and Prosecutions
        83k82.6 k. In General. Most Cited Cases

The but-for causal chain from the initial occurrence of violent crime, the suppression of which has always been the prime object of the States' police power, to every attenuated effect upon interstate commerce must have its limits in the Commerce Clause area. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[14] KeyCite Notes

92 Constitutional Law
  92III Distribution of Governmental Powers and Functions
    92III(A) Legislative Powers and Delegation Thereof
      92k50 k. Nature and Scope in General. Most Cited Cases

Under our written Constitution, the limitation of congressional authority is not solely a matter of legislative grace.

[15] KeyCite Notes 

92 Constitutional Law

92III Distribution of Governmental Powers and Functions
92III(A) Legislative Powers and Delegation Thereof
92k50 k. Nature and Scope in General. Most Cited Cases

The Framers of the Constitution crafted the federal system of government so that the people's rights would be secured by the division of power.

[16] KeyCite Notes

92 Constitutional Law
92III Distribution of Governmental Powers and Functions
92III(A) Legislative Powers and Delegation Thereof
92k50 k. Nature and Scope in General. Most Cited Cases

Departing from their parliamentary past, the Framers adopted a written Constitution that further divided authority at the federal level so that the Constitution's provisions would not be defined solely by the political branches nor the scope of legislative power limited only by public opinion and the legislature's self-restraint.

[17] KeyCite Notes

92 Constitutional Law
92III Distribution of Governmental Powers and Functions
92III(B) Judicial Powers and Functions
92k67 k. Nature and Scope in General. Most Cited Cases

It is a permanent and indispensable feature of our constitutional system that the federal judiciary is supreme in the exposition of the law of the Constitution.

[18] KeyCite Notes

92 Constitutional Law
92III Distribution of Governmental Powers and Functions
92III(B) Judicial Powers and Functions
92k67 k. Nature and Scope in General. Most Cited Cases

The political branches have a role in interpreting and applying the Constitution, but the Supreme Court remains the ultimate expositor of the constitutional text.

[19] KeyCite Notes

92 Constitutional Law
92III Distribution of Governmental Powers and Functions
92III(A) Legislative Powers and Delegation Thereof
92k50 k. Nature and Scope in General. Most Cited Cases

92 Constitutional Law
92III Distribution of Governmental Powers and Functions
92III(B) Judicial Powers and Functions
92k67 k. Nature and Scope in General. Most Cited Cases

In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others; however, it is emphatically the province and duty of the judicial department to say what the law is.

[20] KeyCite Notes

83 Commerce
83II Application to Particular Subjects and Methods of Regulation
83II(J) Offenses and Prosecutions
83k82.5 Federal Offenses and Prosecutions
83k82.6 k. In General. Most Cited Cases

Congress may not regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce; the Constitution requires a distinction between what is truly national and what is truly local. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[21] KeyCite Notes

83 Commerce
83II Application to Particular Subjects and Methods of Regulation
83II(J) Offenses and Prosecutions
83k82.5 Federal Offenses and Prosecutions
83k82.6 k. In General. Most Cited Cases

The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. U.S.C.A. Const. Art. 1, § 8, cl. 3.

[22] KeyCite Notes

92 Constitutional Law
92IV Police Power in General
92k81 k. Nature and Scope in General. Most Cited Cases

360 States
360I Political Status and Relations
360I(A) In General
360k4.4 Powers Reserved to States
360k4.4(2) k. Police Power. Most Cited Cases

There is no better example of the police power, which the Founders of the Constitution denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

[23] KeyCite Notes 

92 Constitutional Law
92II Construction, Operation, and Enforcement of Constitutional Provisions

48



92k25 Grant or Limitation of Powers
 92k27 k. Constitution of United States. Most Cited Cases

With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution does not grant the Federal Government an unlimited license to regulate.

[24] KeyCite Notes 

92 Constitutional Law
 92III Distribution of Governmental Powers and Functions
  92III(B) Judicial Powers and Functions
   92k67 k. Nature and Scope in General. Most Cited Cases

The Constitution's separation of federal power and the creation of the Judicial Branch indicate that disputes regarding the extent of congressional power are largely subject to judicial review.

[25] KeyCite Notes 

92 Constitutional Law
 92II Construction, Operation, and Enforcement of Constitutional Provisions
  92k25 Grant or Limitation of Powers
   92k27 k. Constitution of United States. Most Cited Cases

360 States
 360I Political Status and Relations
  360I(A) In General
   360k4.4 Powers Reserved to States
    360k4.4(2) k. Police Power. Most Cited Cases

The Constitution created a Federal Government of limited powers, while reserving a generalized police power to the States.

[26] KeyCite Notes 

78 Civil Rights
 78I Rights Protected and Discrimination Prohibited
  78I(A) In General
   78k102 Statutory Provisions
    78k103 k. Power to Enact and Validity. Most Cited Cases

92 Constitutional Law
 92XI Equal Protection of Laws
  92k224 Sex Discrimination
   92k224(2) k. Particular Discriminatory Practices. Most Cited Cases

Enforcement clause of Fourteenth Amendment did not provide Congress with authority to enact civil remedy provision of Violence Against Women Act (VAWA); although state-sponsored gender discrimination could violate equal protection under certain circumstances, Fourteenth Amendment did not prohibit private conduct, provision was not aimed at proscribing discrimination by officials which Fourteenth Amendment might not itself proscribe, and provision applied uniformly throughout the Nation even though Congress found that discrimination against victims of gender-motivated violence

did not exist in all States. U.S.C.A. Const.Amend. 14, § 5; Violent Crime Control and Law Enforcement Act of 1994, § 40302, 42 U.S.C.A. § 13981.

[27] KeyCite Notes

92 Constitutional Law
 92XI Equal Protection of Laws
  92k209 k. Constitutional Guaranties in General. Most Cited Cases

92 Constitutional Law
 92XII Due Process of Law
  92k251 k. Constitutional Guaranties in General. Most Cited Cases

The enforcement clause of the Fourteenth Amendment states that Congress may "enforce," by "appropriate legislation" the constitutional guarantee that no State shall deprive any person of "life, liberty or property, without due process of law," nor deny any person "equal protection of the laws." U.S.C.A. Const.Amend. 14, § 5.

[28] KeyCite Notes

92 Constitutional Law
 92V Personal, Civil and Political Rights
  92k82 Constitutional Guaranties in General
   92k82(6) Particular Rights, Limitations, and Applications
    92k82(6.1) k. In General. Most Cited Cases

The enforcement clause of the Fourteenth Amendment is a positive grant of legislative power that includes authority to prohibit conduct which is not itself unconstitutional and to intrude into legislative spheres of autonomy previously reserved to the States. U.S.C.A. Const.Amend. 14, § 5.

[29] KeyCite Notes

92 Constitutional Law
 92V Personal, Civil and Political Rights
  92k82 Constitutional Guaranties in General
   92k82(6) Particular Rights, Limitations, and Applications
    92k82(6.1) k. In General. Most Cited Cases

As broad as the Fourteenth Amendment congressional enforcement power is, it is not unlimited. U.S.C.A. Const.Amend. 14, § 5.

[30] KeyCite Notes

92 Constitutional Law
 92XI Equal Protection of Laws
  92k224 Sex Discrimination
   92k224(1) k. In General. Most Cited Cases

State-sponsored gender discrimination violates equal protection unless it serves important governmental objectives and the discriminatory means employed are substantially related to the

achievement of those objectives. U.S.C.A. Const.Amend. 14.

[31] KeyCite Notes

92 Constitutional Law
92XI Equal Protection of Laws
92k211 Nature and Scope of Prohibitions in General
92k211(1) k. In General; Discrimination. Most Cited Cases

The language and purpose of the Fourteenth Amendment place certain limitations on the manner in which Congress may attack discriminatory conduct; these limitations are necessary to prevent the Fourteenth Amendment from obliterating the Framers' carefully crafted balance of power between the States and the National Government. U.S.C.A. Const.Amend. 14.

[32] KeyCite Notes

92 Constitutional Law
92V Personal, Civil and Political Rights
92k82 Constitutional Guaranties in General
92k82(5) k. Application to Governmental or Private Action. Most Cited Cases

The Fourteenth Amendment, by its terms, prohibits only state action. U.S.C.A. Const.Amend. 14.

[33] KeyCite Notes

92 Constitutional Law
92XI Equal Protection of Laws
92k213 Control Over Governmental Agencies; State Action
92k213(2) k. Limitation to States and State Action. Most Cited Cases

92 Constitutional Law
92XII Due Process of Law
92k254 Application to Governmental or Private Action
92k254(2) k. Relation to State or State Action. Most Cited Cases

The action inhibited by the Fourteenth Amendment's first section, which, inter alia, prohibits States from denying due process or equal protection, is only such action as may fairly be said to be that of the States. U.S.C.A. Const.Amend. 14, § 1.

[34] KeyCite Notes

92 Constitutional Law
92XI Equal Protection of Laws
92k213 Control Over Governmental Agencies; State Action
92k213(4) k. Private Persons, Corporations, or Associations. Most Cited Cases

The Fourteenth Amendment erects no shield against merely private conduct, however discriminatory or wrongful. U.S.C.A. Const.Amend. 14.

[35] KeyCite Notes 

92 Constitutional Law
92V Personal, Civil and Political Rights
92k82 Constitutional Guaranties in General
92k82(6) Particular Rights, Limitations, and Applications
92k82(6.1) k. In General. Most Cited Cases

Under the enforcement clause of the Fourteenth Amendment, where a subject has not submitted to the general legislative power of Congress, but is only submitted thereto for the purpose of rendering effective some prohibition against particular State legislation or State action in reference to that subject, the power given is limited by its object, and any legislation by Congress in the matter must necessarily be corrective in its character, adapted to counteract and redress the operation of such prohibited state laws or proceedings of State officers. U.S.C.A. Const.Amend. 14, § 5.

[36] KeyCite Notes 

92 Constitutional Law
92V Personal, Civil and Political Rights
92k82 Constitutional Guaranties in General
92k82(6) Particular Rights, Limitations, and Applications
92k82(6.1) k. In General. Most Cited Cases

Prophylactic legislation under the enforcement clause of the Fourteenth Amendment must have a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. U.S.C.A. Const.Amend. 14, § 5.

West Codenotes

Held Unconstitutional
42 U.S.C.A. § 13981

***1743 Syllabus* [FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Petitioner Brzonkala filed suit, alleging, *inter alia,* that she was raped by respondents while the three were students at Virginia Polytechnic Institute, and that this attack violated 42 U.S.C. § 13981, which provides a federal civil remedy for the victims of gender-motivated violence. Respondents moved to dismiss on the grounds that the complaint failed to state a claim and that § 13981's civil remedy is ***1744* unconstitutional. Petitioner United States intervened to defend the section's constitutionality. In dismissing the complaint, the District Court held that it stated a claim against respondents, but that Congress lacked authority to enact § 13981 under either the Commerce Clause or § 5 of the Fourteenth Amendment, which Congress had explicitly identified as the sources of federal authority for § 13981. The en banc Fourth Circuit affirmed.
*Held:* Section 13981 cannot be sustained under the Commerce Clause or § 5 of the Fourteenth Amendment. Pp. 1748-1759.
(a) The Commerce Clause does not provide Congress with authority to enact § 13981's federal civil remedy. A congressional enactment will be invalidated only upon a plain showing that Congress has exceeded its constitutional bounds. See *United States v. Lopez,* 514 U.S. 549, 568, 577-578, 115 S.Ct.

1624, 131 L.Ed.2d 626. Petitioners assert that § 13981 can be sustained under Congress' commerce power as a regulation of activity that substantially affects interstate commerce. The proper framework for analyzing such a claim is provided by the principles the Court set out in *Lopez.* First, in *Lopez,* the noneconomic, criminal nature of possessing a firearm in a school zone was central to the Court's conclusion that Congress lacks authority to regulate such possession. Similarly, gender-motivated crimes of violence are not, in any sense, economic activity. Second, like the statute at issue in *Lopez,* § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' regulation of interstate commerce. Although *Lopez* makes clear that such a jurisdictional element would lend support to the argument that § 13981 is sufficiently tied to interstate commerce ***599** to come within Congress' authority, Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime. Third, although § 13981, unlike the *Lopez* statute, *is* supported by numerous findings regarding the serious impact of gender-motivated violence on victims and their families, these findings are substantially weakened by the fact that they rely on reasoning that this Court has rejected, namely, a but-for causal chain from the initial occurrence of violent crime to every attenuated effect upon interstate commerce. If accepted, this reasoning would allow Congress to regulate any crime whose nationwide, aggregated impact has substantial effects on employment, production, transit, or consumption. Moreover, such reasoning will not limit Congress to regulating violence, but may be applied equally as well to family law and other areas of state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant. The Constitution requires a distinction between what is truly national and what is truly local, and there is no better example of the police power, which the Founders undeniably left reposed in the States and denied the central Government, than the suppression of violent crime and vindication of its victims. Congress therefore may not regulate noneconomic, violent criminal conduct based solely on the conduct's aggregate effect on interstate commerce. Pp. 1748-1754.

(b) Section 5 of the Fourteenth Amendment, which permits Congress to enforce by appropriate legislation the constitutional guarantee that no State shall deprive any person of life, liberty, or property without due process, or deny any person equal protection of the laws, *City of Boerne v. Flores,* 521 U.S. 507, 517, 117 S.Ct. 2157, 138 L.Ed.2d 624, also does not give Congress the authority to enact § 13981. Petitioners' assertion that there is pervasive bias in various state justice systems against victims of gender-motivated violence is supported by a voluminous congressional record. However, the Fourteenth Amendment places limitations on the manner in which Congress may attack discriminatory conduct. Foremost among ****1745** them is the principle that the Amendment prohibits only state action, not private conduct. This was the conclusion reached in *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290, and the *In re Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, which were both decided shortly after the Amendment's adoption. The force of the doctrine of *stare decisis* behind these decisions stems not only from the length of time they have been on the books, but also from the insight attributable to the Members of the Court at that time, who all had intimate knowledge and familiarity with the events surrounding the Amendment's adoption. Neither *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239, nor *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613, casts any doubt on the enduring vitality of the *Civil Rights Cases* and *Harris.* ***600** Assuming that there has been gender-based disparate treatment by state authorities in these cases, it would not be enough to save § 13981's civil remedy, which is directed not at a State or state actor but at individuals who have committed criminal acts motivated by gender bias. Section 13981 visits no consequence on any Virginia public official involved in investigating or prosecuting Brzonkala's assault, and it is thus unlike any of the § 5 remedies this Court has previously upheld. See, *e.g., South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769. Section 13981 is also different from previously upheld remedies in that it applies uniformly throughout the Nation, even though Congress' findings indicate that the problem addressed does not exist in all, or even most, States. In contrast, the § 5 remedy in *Katzenbach* was directed only to those States in which Congress found that there had been discrimination. Pp. 1754-1759.

169 F.3d 820, affirmed.

REHNQUIST, C.J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. THOMAS, J., filed a concurring opinion, *post,* p. 1759. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post,* p. 1759. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined, and in which SOUTER and GINSBURG, JJ., joined as to Part I-A, *post,* p. 1774.

Julie Goldscheid, Brooklyn, NY, for petitioner in case No. 99-29.
Seth P. Waxman, Washington, DC, for petitioner in case No. 99-5.
Michael E. Rosman, Washington, DC, for respondents.

**601* Chief Justice REHNQUIST delivered the opinion of the Court.
In these cases we consider the constitutionality of 42 U.S.C. § 13981, which provides a federal civil remedy for the **602* victims of gender- motivated violence. The United States Court of Appeals for the Fourth Circuit, sitting en banc, struck down § 13981 because it concluded that Congress lacked constitutional authority to enact the section's civil remedy. Believing that these cases are controlled by our decisions in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883), and the *In re Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), we affirm.

I

Petitioner Christy Brzonkala enrolled at Virginia Polytechnic Institute (Virginia Tech) in the fall of 1994. In September of that year, Brzonkala met respondents Antonio Morrison and James Crawford, who ***1746* were both students at Virginia Tech and members of its varsity football team. Brzonkala alleges that, within 30 minutes of meeting Morrison and Crawford, they assaulted and repeatedly raped her. After the attack, Morrison allegedly told Brzonkala, "You better not have any ... diseases." Complaint ¶ 22. In the months following the rape, Morrison also allegedly announced in the dormitory's dining room that he "like[d] to get girls drunk and...." *Id.,* ¶ 31. The omitted portions, quoted verbatim in the briefs on file with this Court, consist of boasting, debased remarks about what Morrison would do to women, vulgar remarks that cannot fail to shock and offend.
Brzonkala alleges that this attack caused her to become severely emotionally disturbed and depressed. She sought assistance from a university psychiatrist, who prescribed **603* antidepressant medication. Shortly after the rape Brzonkala stopped attending classes and withdrew from the university.
In early 1995, Brzonkala filed a complaint against respondents under Virginia Tech's Sexual Assault Policy. During the school-conducted hearing on her complaint, Morrison admitted having sexual contact with her despite the fact that she had twice told him "no." After the hearing, Virginia Tech's Judicial Committee found insufficient evidence to punish Crawford, but found Morrison guilty of sexual assault and sentenced him to immediate suspension for two semesters.
Virginia Tech's dean of students upheld the judicial committee's sentence. However, in July 1995, Virginia Tech informed Brzonkala that Morrison intended to initiate a court challenge to his conviction under the Sexual Assault Policy. University officials told her that a second hearing would be necessary to remedy the school's error in prosecuting her complaint under that policy, which had not been widely circulated to students. The university therefore conducted a second hearing under its Abusive Conduct Policy, which was in force prior to the dissemination of the Sexual Assault Policy. Following this second hearing the Judicial Committee again found Morrison guilty and sentenced him to an identical 2-semester suspension. This time, however, the description of Morrison's offense was, without explanation, changed from "sexual assault" to "using abusive language."
Morrison appealed his second conviction through the university's administrative system. On August 21, 1995, Virginia Tech's senior vice president and provost set aside Morrison's punishment. She concluded that it was " 'excessive when compared with other cases where there has been a finding of violation of the Abusive Conduct Policy,' " *Brzonkala v. Virginia Polytechnic and State Univ.,* 132 F.3d 949, 955 (C.A.4 1997). Virginia Tech did not inform Brzonkala of this decision. After learning from a **604* newspaper that Morrison would be returning to Virginia Tech for the fall 1995 semester, she dropped out of the university.
In December 1995, Brzonkala sued Morrison, Crawford, and Virginia Tech in the United States District Court for the Western District of Virginia. Her complaint alleged that Morrison's and Crawford's attack violated § 13981 and that Virginia Tech's handling of her complaint violated Title IX of the Education Amendments of 1972, 86 Stat. 373-375, 20 U.S.C. §§ 1681-1688. Morrison and Crawford moved to dismiss this complaint on the grounds that it failed to state a claim and that § 13981's civil remedy is unconstitutional. The United States, petitioner in No. 99-5, intervened to defend § 13981's constitutionality.
The District Court dismissed Brzonkala's Title IX claims against Virginia Tech for failure to state a claim upon which relief can be granted. See *Brzonkala v. Virginia Polytechnic and State Univ.,* 935 F.Supp. 772 (W.D.Va.1996). It then held that Brzonkala's complaint stated a claim against Morrison

and Crawford under § 13981, but dismissed the complaint because **1747 it concluded that Congress lacked authority to enact the section under either the Commerce Clause or § 5 of the Fourteenth Amendment. *Brzonkala v. Virginia Polytechnic and State Univ.*, 935 F.Supp. 779 (W.D.Va.1996). A divided panel of the Court of Appeals reversed the District Court, reinstating Brzonkala's § 13981 claim and her Title IX hostile environment claim. [FN1] *Brzonkala v. Virginia Polytechnic and State Univ.*, 132 F.3d 949 (C.A.4 1997). The full Court of Appeals vacated the panel's opinion and reheard the case en banc. The en banc court then issued an opinion affirming the District Court's conclusion that Brzonkala stated a claim under § 13981 because her complaint alleged a crime of violence and the allegations of Morrison's crude and derogatory statements regarding his *605 treatment of women sufficiently indicated that his crime was motivated by gender animus. [FN2] Nevertheless, the court by a divided vote affirmed the District Court's conclusion that Congress lacked constitutional authority to enact § 13981's civil remedy. *Brzonkala v. Virginia Polytechnic and State Univ.*, 169 F.3d 820 (C.A.4 1999). Because the Court of Appeals invalidated a federal statute on constitutional grounds, we granted certiorari. 527 U.S. 1068, 120 S.Ct. 11, 144 L.Ed.2d 842 (1999).

FN1. The panel affirmed the dismissal of Brzonkala's Title IX disparate treatment claim. See 132 F.3d, at 961-962.

FN2. The en banc Court of Appeals affirmed the District Court's

conclusion that Brzonkala failed to state a claim alleging disparate treatment under Title IX, but vacated the District Court's dismissal of her hostile environment claim and remanded with instructions for the District Court to hold the claim in abeyance pending this Court's decision in *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). *Brzonkala v. Virginia Polytechnic and State Univ.*, 169 F.3d 820, 827, n. 2 (C.A.4 1999). Our grant of certiorari did not encompass Brzonkala's Title IX claims, and we thus do not consider them in this opinion.

Section 13981 was part of the Violence Against Women Act of 1994, § 40302, 108 Stat. 1941-1942. It states that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). To enforce that right, subsection (c) declares:
"A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate."
Section 13981 defines a "crim[e] of violence motivated by gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an *606 animus based on the victim's gender." § 13981(d)(1). It also provides that the term "crime of violence" includes any
"(A) ... act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States;" and
"(B) includes an act or series of acts that would constitute a felony described in subparagraph (A) but for the relationship between the person who takes such action and the individual against whom such action is taken." § 13981(d)(2).
**1748 Further clarifying the broad scope of § 13981's civil remedy, subsection (e)(2) states that "[n]othing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under subsection (c) of this section." And subsection (e)(3) provides a § 13981 litigant with a choice of forums: Federal and state courts "shall have concurrent jurisdiction"

over complaints brought under the section.
Although the foregoing language of § 13981 covers a wide swath of criminal conduct, Congress placed some limitations on the section's federal civil remedy. Subsection (e)(1) states that "[n]othing in this section entitles a person to a cause of action under subsection (c) of this section for random acts of violence unrelated to gender or for acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender." Subsection (e)(4) further states that § 13981 shall not be construed "to confer on the courts of the United States jurisdiction over any State law claim seeking *607 the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree."

[1] [2] Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution. "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison,* 1 Cranch 137, 176, 2 L.Ed. 60 (1803) (Marshall, C. J.). Congress explicitly identified the sources of federal authority on which it relied in enacting § 13981. It said that a "Federal civil rights cause of action" is established "[p]ursuant to the affirmative power of Congress ... under section 5 of the Fourteenth Amendment to the Constitution, as well as under section 8 of Article I of the Constitution." 42 U.S.C. § 13981(a). We address Congress' authority to enact this remedy under each of these constitutional provisions in turn.

II

[3] Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds. See *United States v. Lopez,* 514 U.S., at 568, 577-578, 115 S.Ct. 1624 (KENNEDY, J., concurring); *United States v. Harris,* 106 U.S., at 635, 1 S.Ct. 601. With this presumption of constitutionality in mind, we turn to the question whether § 13981 falls within Congress' power under Article I, § 8, of the Constitution. Brzonkala and the United States rely upon the third clause of the section, which gives Congress power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."
As we discussed at length in *Lopez,* our interpretation of the Commerce Clause has changed as our Nation has developed. See 514 U.S., at 552-557, 115 S.Ct. 1624; *id.,* at 568-574, 115 S.Ct. 1624 (KENNEDY, J., concurring); *id.,* at 584, 593-599, 115 S.Ct. 1624 (THOMAS, J., concurring). We need not repeat that detailed review of *608 the Commerce Clause's history here; it suffices to say that, in the years since *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), Congress has had considerably greater latitude in regulating conduct and transactions under the Commerce Clause than our previous case law permitted. See *Lopez,* 514 U.S., at 555-556, 115 S.Ct. 1624; *id.,* at 573-574, 115 S.Ct. 1624 (KENNEDY, J., concurring).

[4] [5] *Lopez* emphasized, however, that even under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds. *Id.,* at 557, 115 S.Ct. 1624.
"[E]ven [our] modern-era precedents which have expanded congressional power **1749 under the Commerce Clause confirm that this power is subject to outer limits. In *Jones & Laughlin Steel,* the Court warned that the scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.' " *Id.,* at 556-557, 115 S.Ct. 1624 (quoting *Jones & Laughlin Steel, supra,* at 37, 57 S.Ct. 615). [FN3]

FN3. Justice SOUTER's dissent takes us to task for allegedly abandoning *Jones & Laughlin Steel* in favor of an inadequate "federalism of some earlier time." *Post,* at 1766-1767, 1774. As the foregoing language from *Jones & Laughlin Steel* makes clear however, this Court has always recognized a limit on the commerce power inherent in "our dual

system of government." 301 U.S., at 37, 57 S.Ct. 615. It is the dissent's remarkable theory that the commerce power is without judicially enforceable boundaries that disregards the Court's caution in *Jones & Laughlin Steel* against allowing that power to "effectually obliterate the distinction between what is national and what is local." *Ibid.*

[6] As we observed in *Lopez,* modern Commerce Clause jurisprudence has "identified three broad categories of activity that Congress may regulate under its commerce power." ***609** 514 U.S., at 558, 115 S.Ct. 1624 (citing *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 276-277, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)). "First, Congress may regulate the use of the channels of interstate commerce." 514 U.S., at 558, 115 S.Ct. 1624 (citing *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 256, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *United States v. Darby,* 312 U.S. 100, 114, 61 S.Ct. 451, 85 L.Ed. 609 (1941)). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S., at 558, 115 S.Ct. 1624 (citing *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); *Southern R. Co. v. United States,* 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911); *Perez, supra,* at 150, 91 S.Ct. 1357). "Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... *i.e.,* those activities that substantially affect interstate commerce." 514 U.S., at 558-559, 115 S.Ct. 1624 (citing *Jones & Laughlin Steel, supra,* at 37, 57 S.Ct. 615).

[7] Petitioners do not contend that these cases fall within either of the first two of these categories of Commerce Clause regulation. They seek to sustain § 13981 as a regulation of activity that substantially affects interstate commerce. Given § 13981's focus on gender-motivated violence wherever it occurs (rather than violence directed at the instrumentalities of interstate commerce, interstate markets, or things or persons in interstate commerce), we agree that this is the proper inquiry.

Since *Lopez* most recently canvassed and clarified our case law governing this third category of Commerce Clause regulation, it provides the proper framework for conducting the required analysis of § 13981. In *Lopez,* we held that the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal crime to knowingly possess a firearm in a school zone, exceeded Congress' authority under the Commerce Clause. See 514 U.S., at 551, 115 S.Ct. 1624. Several significant considerations contributed to our decision.

[8] ***610** First, we observed that § 922(q) was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however ****1750** broadly one might define those terms." *Id.,* at 561, 115 S.Ct. 1624. Reviewing our case law, we noted that "we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." *Id.,* at 559, 115 S.Ct. 1624. Although we cited only a few examples, including *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *Hodel, supra; Perez, supra; Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); and *Heart of Atlanta Motel, supra,* we stated that the pattern of analysis is clear. *Lopez,* 514 U.S., at 559-560, 115 S.Ct. 1624. "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.,* at 560, 115 S.Ct. 1624.

Both petitioners and Justice SOUTER's dissent downplay the role that the economic nature of the regulated activity plays in our Commerce Clause analysis. But a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case. See, *e.g., id.,* at 551, 115 S.Ct. 1624 ("The Act [does not] regulat[e] a commercial activity"), 560 ("Even *Wickard,* which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not"), 561 ("Section 922(q) is not an essential part of a larger regulation of economic activity"),

566 ("Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender 'legal uncertainty' "), 567 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition *611 elsewhere, substantially affect any sort of interstate commerce"); see also id., at 573-574, 115 S.Ct. 1624 (KENNEDY, J., concurring) (stating that *Lopez* did not alter our "practical conception of commercial regulation" and that Congress may "regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy"), 577 ("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur"), 580 ("[U]nlike the earlier cases to come before the Court here neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute has an evident commercial nexus. The statute makes the simple possession of a gun within 1,000 feet of the grounds of the school a criminal offense. In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far" (citation omitted)). *Lopez's* review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor. See *id.*, at 559-560, 115 S.Ct. 1624. [FN4]

FN4. Justice SOUTER's dissent does not reconcile its analysis with our holding in *Lopez* because it apparently would cast that decision aside. See *post*, at 1764-1767. However, the dissent cannot persuasively contradict *Lopez's* conclusion that, in every case where we have sustained federal regulation under the aggregation principle in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the regulated activity was of an apparent commercial character. See, *e.g., Lopez,* 514 U.S., at 559-560, 580, 115 S.Ct. 1624.

The second consideration that we found important in analyzing § 922(q) was that ***1751* the statute contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have *612 an explicit connection with or effect on interstate commerce." *Id.*, at 562, 115 S.Ct. 1624. Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce.

[9] Third, we noted that neither § 922(q) " 'nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone.' " *Ibid.* (quoting Brief for United States, O.T.1994, No. 93-1260, pp. 5-6). While "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," 514 U.S., at 562, 115 S.Ct. 1624 (citing *McClung, supra,* at 304, 85 S.Ct. 377; *Perez,* 402 U.S., at 156, 91 S.Ct. 1357), the existence of such findings may "enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye." 514 U.S., at 563, 115 S.Ct. 1624. Finally, our decision in *Lopez* rested in part on the fact that the link between gun possession and a substantial effect on interstate commerce was attenuated. *Id.*, at 563-567, 115 S.Ct. 1624. The United States argued that the possession of guns may lead to violent crime, and that violent crime "can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." *Id.*, at 563-564, 115 S.Ct. 1624 (citation omitted). The Government also argued that the presence of guns at schools poses a threat to the educational process, which in turn threatens to produce a less efficient and productive work force, which will negatively affect national productivity and thus interstate commerce. *Ibid.*
We rejected these "costs of crime" and "national productivity" arguments because they would permit

Congress *613 to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." Id., at 564, 115 S.Ct. 1624. We noted that, under this but-for reasoning:

"Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the[se] theories ..., it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Ibid.*

With these principles underlying our Commerce Clause jurisprudence as reference points, the proper resolution of the present cases is clear. Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity. While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature. See, *e.g.*, id., at 559-560, 115 S.Ct. 1624, and the cases cited therein.

[10] Like the Gun-Free School Zones Act at issue in *Lopez*, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce. Although *Lopez* makes clear that such a jurisdictional element would lend support to the argument that § 13981 ***1752* is sufficiently tied to interstate commerce, Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime. [FN5]

FN5. Title 42 U.S.C. § 13981 is not the sole provision of the Violence Against Women Act of 1994 to provide a federal remedy for gender- motivated crime. Section 40221(a) of the Act creates a federal criminal remedy to punish "interstate crimes of abuse including crimes committed against spouses or intimate partners during interstate travel and crimes committed by spouses or intimate partners who cross State lines to continue the abuse." S.Rep. No. 103-138, p. 43 (1993). That criminal provision has been codified at 18 U.S.C. § 2261(a)(1), which states:

"A person who travels across a State line or enters or leaves Indian country with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner, shall be punished as provided in subsection (b)."

The Courts of Appeals have uniformly upheld this criminal sanction as an appropriate exercise of Congress' Commerce Clause authority, reasoning that "[t]he provision properly falls within the first of *Lopez's* categories as it regulates the use of channels of interstate commerce-- i.e., the use of the interstate transportation routes through which persons and goods move." *United States v. Lankford*, 196 F.3d 563, 571-572 (C.A.5 1999) (collecting cases) (internal quotation marks omitted).

[11] [12] **614* In contrast with the lack of congressional findings that we faced in *Lopez*, § 13981 *is* supported by numerous findings regarding the serious impact that gender-motivated violence has on victims and their families. See, *e.g.*, H.R. Conf. Rep. No. 103-711, p. 385 (1994), U.S.Code Cong. & Admin.News 1994, pp. 1803, 1853; S.Rep. No. 103-138, p. 40 (1993); S.Rep. No. 101-545,

p. 33 (1990). But the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. As we stated in *Lopez,* " '[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.' " 514 U.S., at 557, n. 2, 115 S.Ct. 1624 (quoting *Hodel,* 452 U.S., at 311, 101 S.Ct. 2389 (REHNQUIST, J., concurring in judgment)). Rather, " '[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.' " 514 U.S., at 557, n. 2, 115 S.Ct. 1624 (quoting *Heart of Atlanta Motel,* 379 U.S., at 273, 85 S.Ct. 348 (Black, J., concurring)).

**615* In these cases, Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers. Congress found that gender-motivated violence affects interstate commerce

"by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; ... by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." H.R. Conf. Rep. No. 103-711, at 385, U.S.Code Cong. & Admin.News 1994, pp. 1803, 1853.

Accord, S.Rep. No. 103-138, at 54. Given these findings and petitioners' arguments, the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded. See *Lopez, supra,* at 564, 115 S.Ct. 1624. The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce. If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial ***1753* effects on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender- motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

[13] KC [14] KC [15] KC [16] KC [17] KC [18] KC [19] KC Petitioners' reasoning, moreover, will not limit Congress to regulating violence but may, as we suggested in *Lopez,* be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of **616* marriage, divorce, and childrearing on the national economy is undoubtedly significant. Congress may have recognized this specter when it expressly precluded § 13981 from being used in the family law context. [FN6] See 42 U.S.C. § 13981(e)(4). Under our written Constitution, however, the limitation of congressional authority is not solely a matter of legislative grace. [FN7] See *Lopez, supra,* at 575-579, 115 S.Ct. 1624 (KENNEDY, J., concurring); *Marbury,* 1 Cranch, at 176-178, 2 L.Ed. 60.

FN6. We are not the first to recognize that the but-for causal chain must have its limits in the Commerce Clause area. In *Lopez,* 514 U.S., at 567, 115 S.Ct. 1624, we quoted Justice Cardozo's concurring opinion in *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935):

"There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.' " *Id.,* at 554, 55 S.Ct. 837 (quoting *United States v. A.L.A. Schechter Poultry Corp.,* 76 F.2d 617, 624 (C.A.2 1935) (L.Hand, J.,

concurring)).

FN7. Justice SOUTER's theory that *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23 (1824), *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), and the Seventeenth Amendment provide the answer to these cases, see *post,* at 1768-1772, is remarkable because it undermines this central principle of our constitutional system. As we have repeatedly noted, the Framers crafted the federal system of Government so that the people's rights would be secured by the division of power. See, *e.g., Arizona v. Evans,* 514 U.S. 1, 30, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (GINSBURG, J., dissenting); *Gregory v. Ashcroft,* 501 U.S. 452, 458-459, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (cataloging the benefits of the federal design); *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ("The 'constitutionally mandated balance of power' between the States and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties' ") (quoting *Garcia, supra,* at 572, 105 S.Ct. 1005 (Powell, J., dissenting)). Departing from their parliamentary past, the Framers adopted a written Constitution that further divided authority at the federal level so that the Constitution's provisions would not be defined

solely by the political branches nor the scope of legislative power limited only by public opinion and the Legislature's self-restraint. See, *e.g., Marbury v. Madison,* 1 Cranch 137, 176, 2 L.Ed. 60 (1803) (Marshall, C.J.) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written"). It is thus a " 'permanent and indispensable feature of our constitutional system' " that " 'the federal judiciary is supreme in the exposition of the law of the Constitution.' " *Miller v. Johnson,* 515 U.S. 900, 922-923, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (quoting *Cooper v. Aaron,* 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958)).

No doubt the political branches have a role in interpreting and applying the Constitution, but ever since *Marbury* this Court has remained the ultimate expositor of the constitutional text. As we emphasized in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974): "In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others.... Many decisions of this Court, however, have unequivocally reaffirmed the holding of *Marbury* that '[i]t is emphatically the province and duty of the judicial department to say what the law is.' " *Id.,* at 703, 94 S.Ct. 3090 (citation omitted).

Contrary to Justice SOUTER's suggestion, see *post,* at 1769-1772, and n. 14, *Gibbons* did not exempt the commerce power from this cardinal rule of constitutional law. His assertion that, from *Gibbons* on, public opinion has been the only restraint on the congressional exercise of the commerce power is true only insofar as it contends that political accountability is and has been the only limit on Congress' exercise of the commerce power *within that power's outer bounds.* As the language surrounding that relied upon by Justice SOUTER makes clear, *Gibbons* did not remove from this Court the authority to define that boundary. See *Gibbons, supra,* at 194-195 ("It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States.... Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or

the subject of the sentence, must be the exclusively internal commerce of a State").

***1754* [20] [21] [22] [23] [24] [25] **617* We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is **618* truly national and what is truly local. *Lopez,* 514 U.S., at 568, 115 S.Ct. 1624 (citing *Jones & Laughlin Steel,* 301 U.S., at 30, 57 S.Ct. 615). In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. See, *e.g., Cohens v. Virginia,* 6 Wheat. 264, 426, 428, 5 L.Ed. 257 (1821) (Marshall, C.J.) (stating that Congress "has no general right to punish murder committed within any of the States," and that it is "clear ... that congress cannot punish felonies generally"). Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims. [FN8] See, *e.g., Lopez,* 514 U.S., at 566, 115 S.Ct. 1624 ("The Constitution ... withhold[s] from Congress a plenary police power"); *id.,* at 584-585, 115 S.Ct. 1624 (THOMAS, J., concurring) ("[W]e *always* have rejected readings **619* of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power"), 596-597, and n. 6, 115 S.Ct. 1624 (noting that the first Congresses did not enact nationwide punishments for criminal conduct under the Commerce Clause).

FN8. Justice SOUTER disputes our assertion that the Constitution reserves the general police power to the States, noting that the Founders failed to adopt several proposals for additional guarantees against federal encroachment on state authority. See *post,* at 1768-1769, and n. 14. This argument is belied by the entire structure of the Constitution. With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate. See, *e.g., New York v. United States,* 505 U.S. 144, 156-157, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). And, as discussed above, the Constitution's separation of federal power and the creation of the Judicial Branch indicate that disputes regarding the extent of congressional power are largely subject to judicial review. See n. 7, *supra.* Moreover, the principle that " '[t]he Constitution created a

Federal Government of limited powers,' " while reserving a generalized police power to the States, is deeply ingrained in our constitutional history. *New York, supra,* at 155, 112 S.Ct. 2408 (quoting *Gregory v. Ashcroft, supra,* at 457, 111 S.Ct. 2395); see also *Lopez,* 514 U.S., at 584-599, 115 S.Ct. 1624 (THOMAS, J., concurring) (discussing the history of the debates surrounding the adoption of the Commerce Clause and our subsequent interpretation of the Clause); *Maryland v. Wirtz,* 392 U.S. 183, 196, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968).

III

[26] Because we conclude that the Commerce Clause does not provide Congress ***1755* with authority to enact § 13981, we address petitioners' alternative argument that the section's civil remedy should be upheld as an exercise of Congress' remedial power under § 5 of the Fourteenth Amendment. As noted above, Congress expressly invoked the Fourteenth Amendment as a source of authority to

A-16

enact § 13981.

[27] [28] [29] The principles governing an analysis of congressional legislation under § 5 are well settled. Section 5 states that Congress may " 'enforce' by 'appropriate legislation' the constitutional guarantee that no State shall deprive any person of 'life, liberty, or property, without due process of law,' nor deny any person 'equal protection of the laws.' " *City of Boerne v. Flores,* 521 U.S. 507, 517, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Section 5 is "a positive grant of legislative power," *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), that includes authority to "prohibit conduct which is not itself unconstitutional and [to] intrud[e] into 'legislative spheres of autonomy previously reserved to the States.' " *Flores, supra,* at 518, 117 S.Ct. 2157 (quoting *Fitzpatrick v. Bitzer,* 427 U.S. 445, 455, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)); see also *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 81, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). However, "[a]s broad as the congressional enforcement power is, it is not unlimited." *Oregon v. Mitchell,* 400 U.S. 112, 128, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); see also *Kimel, supra,* at 81, 120 S.Ct. 631. In fact, as we discuss in detail below, several limitations inherent in § 5's text and constitutional context have been recognized since the Fourteenth Amendment was adopted.
Petitioners' § 5 argument is founded on an assertion that there is pervasive bias in various state justice systems against victims of gender- motivated violence. This assertion ***620** is supported by a voluminous congressional record. Specifically, Congress received evidence that many participants in state justice systems are perpetuating an array of erroneous stereotypes and assumptions. Congress concluded that these discriminatory stereotypes often result in insufficient investigation and prosecution of gender-motivated crime, inappropriate focus on the behavior and credibility of the victims of that crime, and unacceptably lenient punishments for those who are actually convicted of gender-motivated violence. See H.R. Conf. Rep. No. 103-711, at 385-386; S.Rep. No. 103-138, at 38, 41-55; S.Rep. No. 102-197, at 33-35, 41, 43-47. Petitioners contend that this bias denies victims of gender-motivated violence the equal protection of the laws and that Congress therefore acted appropriately in enacting a private civil remedy against the perpetrators of gender-motivated violence to both remedy the States' bias and deter future instances of discrimination in the state courts.

[30] [31] [32] [33] [34] As our cases have established, state- sponsored gender discrimination violates equal protection unless it " 'serves "important governmental objectives and ... the discriminatory means employed" are "substantially related to the achievement of those objectives." ' " *United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), in turn quoting *Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980)). See also *Craig v. Boren,* 429 U.S. 190, 198-199, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). However, the language and purpose of the Fourteenth Amendment place certain limitations on the manner in which Congress may attack discriminatory conduct. These limitations are necessary to prevent the Fourteenth Amendment from obliterating the Framers' carefully crafted balance of power between the States and the National Government. See *Flores, supra,* at 520-524, 117 S.Ct. 2157 (reviewing the history of the Fourteenth Amendment's enactment and discussing the contemporary belief ****1756** that the Amendment " 'does ***621** not concentrate power in the general government for any purpose of police government within the States' ") (quoting T. Cooley, Constitutional Limitations 294, n. 1 (2d ed. 1871)). Foremost among these limitations is the time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action. "[T]he principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v. Kraemer,* 334 U.S. 1, 13, and n. 12, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).
Shortly after the Fourteenth Amendment was adopted, we decided two cases interpreting the Amendment's provisions, *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883), and the *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). In *Harris,* the Court considered a challenge to § 2 of the Civil Rights Act of 1871. That section sought to punish "private persons" for "conspiring to deprive any one of the equal protection of the laws enacted by the State." 106 U.S., at 639, 1 S.Ct. 601. We concluded that this law exceeded Congress' § 5 power because the

law was "directed exclusively against the action of private persons, without reference to the laws of the State, or their administration by her officers." Id., at 640, 1 S.Ct. 601. In so doing, we reemphasized our statement from *Virginia v. Rives,* 100 U.S. 313, 318, 25 L.Ed. 667 (1879), that " 'these provisions of the fourteenth amendment have reference to State action exclusively, and not to any action of private individuals.' " *Harris, supra,* at 639, 1 S.Ct. 601 (misquotation in *Harris* ).

We reached a similar conclusion in the *Civil Rights Cases.* In those consolidated cases, we held that the public accommodation provisions of the Civil Rights Act of 1875, which applied to purely private conduct, were beyond the scope of the § 5 enforcement power. 109 U.S., at 11, 3 S.Ct. 18 ("Individual invasion of individual rights is not the subject-matter of the [Fourteenth] [A]mendment"). See also, *e.g.,* ***622** *Romer v. Evans,* 517 U.S. 620, 628, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ("[I]t was settled early that the Fourteenth Amendment did not give Congress a general power to prohibit discrimination in public accommodations"); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) ("Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power"); *Blum v. Yaretsky,* 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 147, n. 2, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Cruikshank,* 92 U.S. 542, 554, 23 L.Ed. 588 (1875) ("The fourteenth amendment prohibits a state from depriving any person of life, liberty, or property, without due process of law; but this adds nothing to the rights of one citizen as against another. It simply furnishes an additional guaranty against any encroachment by the States upon the fundamental rights which belong to every citizen as a member of society").

The force of the doctrine of *stare decisis* behind these decisions stems not only from the length of time they have been on the books, but also from the insight attributable to the Members of the Court at that time. Every Member had been appointed by President Lincoln, Grant, Hayes, Garfield, or Arthur--and each of their judicial appointees obviously had intimate knowledge and familiarity with the events surrounding the adoption of the Fourteenth Amendment.

Petitioners contend that two more recent decisions have in effect overruled this longstanding limitation on Congress' § 5 authority. They rely on ****1757** *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), for the proposition that the rule laid down in the *Civil Rights Cases* is no longer good law. In *Guest,* the Court reversed the construction of an indictment under 18 U.S.C. § 241, saying in the course of its opinion that "we deal here with issues of statutory construction, not with issues of constitutional power." 383 U.S., at 749, 86 S.Ct. 1170. Three Members of the Court, in a separate opinion by Justice Brennan, expressed the view that the *Civil Rights Cases* ***623** were wrongly decided, and that Congress could under § 5 prohibit actions by private individuals. 383 U.S., at 774, 86 S.Ct. 1170 (opinion concurring in part and dissenting in part). Three other Members of the Court, who joined the opinion of the Court, joined a separate opinion by Justice Clark which in two or three sentences stated the conclusion that Congress could "punis[h] all conspiracies--with or without state action-- that interfere with Fourteenth Amendment rights." *Id.,* at 762, 86 S.Ct. 1170 (concurring opinion). Justice Harlan, in another separate opinion, commented with respect to the statement by these Justices:

"The action of three of the Justices who joined the Court's opinion in nonetheless cursorily pronouncing themselves on the far-reaching constitutional questions deliberately not reached in Part II seems to me, to say the very least, extraordinary." *Id.,* at 762, n. 1, 86 S.Ct. 1170 (opinion concurring in part and dissenting in part).

Though these three Justices saw fit to opine on matters not before the Court in *Guest,* the Court had no occasion to revisit the *Civil Rights Cases* and *Harris,* having determined "the indictment [charging private individuals with conspiring to deprive blacks of equal access to state facilities] in fact contain [ed] an express allegation of state involvement." 383 U.S., at 756, 86 S.Ct. 1170. The Court concluded that the implicit allegation of "active connivance by agents of the State" eliminated any need to decide "the threshold level that state action must attain in order to create rights under the Equal Protection Clause." *Ibid.* All of this Justice Clark explicitly acknowledged. See *id.,* at 762, 86 S.Ct. 1170 (concurring opinion) ("The Court's interpretation of the indictment clearly avoids the question whether Congress, by appropriate legislation, has the power to punish private conspiracies that interfere with Fourteenth Amendment rights, such as the right to utilize public facilities").

***624** To accept petitioners' argument, moreover, one must add to the three Justices joining Justice Brennan's reasoned explanation for his belief that the *Civil Rights Cases* were wrongly decided, the three Justices joining Justice Clark's opinion who gave no explanation whatever for their similar view.

This is simply not the way that reasoned constitutional adjudication proceeds. We accordingly have no hesitation in saying that it would take more than the naked dicta contained in Justice Clark's opinion, when added to Justice Brennan's opinion, to cast any doubt upon the enduring vitality of the *Civil Rights Cases* and *Harris.*

[35] Petitioners also rely on *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). *Carter* was a case addressing the question whether the District of Columbia was a "State" within the meaning of Rev. Stat. § 1979, 42 U.S.C. § 1983--a section which by its terms requires state action before it may be employed. A footnote in that opinion recites the same litany respecting *Guest* that petitioners rely on. This litany is of course entirely dicta, and in any event cannot rise above its source. We believe that the description of the § 5 power contained in the *Civil Rights Cases* is correct:

"But where a subject is not submitted to the general legislative power of Congress, but is only submitted thereto for the purpose of rendering effective some prohibition against particular [s]tate legislation or [s]tate action in reference to that subject, the power given is limited ***1758* by its object, and any legislation by Congress in the matter must necessarily be corrective in its character, adapted to counteract and redress the operation of such prohibited state laws or proceedings of [s]tate officers." 109 U.S., at 18, 3 S.Ct. 18.

Petitioners alternatively argue that, unlike the situation in the *Civil Rights Cases,* here there has been gender-based disparate treatment by state authorities, whereas in those cases there was no indication of such state action. There is **625* abundant evidence, however, to show that the Congresses that enacted the Civil Rights Acts of 1871 and 1875 had a purpose similar to that of Congress in enacting § 13981: There were state laws on the books bespeaking equality of treatment, but in the administration of these laws there was discrimination against newly freed slaves. The statement of Representative Garfield in the House and that of Senator Sumner in the Senate are representative:

"[T]he chief complaint is not that the laws of the State are unequal, but that even where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them." Cong. Globe, 42d Cong., 1st Sess., App. 153 (1871) (statement of Rep. Garfield).

"The Legislature of South Carolina has passed a law giving precisely the rights contained in your 'supplementary civil rights bill.' But such a law remains a dead letter on her statute-books, because the State courts, comprised largely of those whom the Senator wishes to obtain amnesty for, refuse to enforce it." Cong. Globe, 42d Cong., 2d Sess., 430 (1872) (statement of Sen. Sumner).

See also, *e.g.,* Cong. Globe, 42d Cong., 1st Sess., at 653 (statement of Sen. Osborn); *id.,* at 457 (statement of Rep. Coburn); *id.,* at App. 78 (statement of Rep. Perry); 2 Cong. Rec. 457 (1874) (statement of Rep. Butler); 3 Cong. Rec. 945 (1875) (statement of Rep. Lynch).

[36] But even if that distinction were valid, we do not believe it would save § 13981's civil remedy. For the remedy is simply not "corrective in its character, adapted to counteract and redress the operation of such prohibited [s]tate laws or proceedings of [s]tate officers." *Civil Rights Cases, supra,* at 18, 3 S.Ct. 18. Or, as we have phrased it in more recent cases, prophylactic legislation under § 5 must have a "congruenceand**626* proportionality between the injury to be prevented or remedied and the means adopted to that end." *Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank,* 527 U.S. 627, 639, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *Flores,* 521 U.S., at 526, 117 S.Ct. 2157. Section 13981 is not aimed at proscribing discrimination by officials which the Fourteenth Amendment might not itself proscribe; it is directed not at any State or state actor, but at individuals who have committed criminal acts motivated by gender bias.

In the present cases, for example, § 13981 visits no consequence whatever on any Virginia public official involved in investigating or prosecuting Brzonkala's assault. The section is, therefore, unlike any of the § 5 remedies that we have previously upheld. For example, in *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), Congress prohibited New York from imposing literacy tests as a prerequisite for voting because it found that such a requirement disenfranchised thousands of Puerto Rican immigrants who had been educated in the Spanish language of their home territory. That law, which we upheld, was directed at New York officials who administered the State's election law and prohibited them from using a provision of that law. In *South Carolina v. Katzenbach,*

383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), Congress imposed voting rights requirements on States that, Congress found, had a history of discriminating against blacks in voting. ***1759* The remedy was also directed at state officials in those States. Similarly, in *Ex parte Virginia,* 100 U.S. 339, 25 L.Ed. 676 (1879), Congress criminally punished state officials who intentionally discriminated in jury selection; again, the remedy was directed to the culpable state official. Section 13981 is also different from these previously upheld remedies in that it applies uniformly throughout the Nation. Congress' findings indicate that the problem of discrimination against the victims of gender-motivated crimes does not exist in all States, or even most States. By contrast, the § 5 remedy upheld in *Katzenbach v. Morgan, supra,* **627* was directed only to the State where the evil found by Congress existed, and in *South Carolina v. Katzenbach, supra,* the remedy was directed only to those States in which Congress found that there had been discrimination.

For these reasons, we conclude that Congress' power under § 5 does not extend to the enactment of § 13981.

IV

Petitioner Brzonkala's complaint alleges that she was the victim of a brutal assault. But Congress' effort in § 13981 to provide a federal civil remedy can be sustained neither under the Commerce Clause nor under § 5 of the Fourteenth Amendment. If the allegations here are true, no civilized system of justice could fail to provide her a remedy for the conduct of respondent Morrison. But under our federal system that remedy must be provided by the Commonwealth of Virginia, and not by the United States. The judgment of the Court of Appeals is

*Affirmed.*

Justice THOMAS, concurring.

The majority opinion correctly applies our decision in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and I join it in full. I write separately only to express my view that the very notion of a "substantial effects" test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with this Court's early Commerce Clause cases. By continuing to apply this rootless and malleable standard, however circumscribed, the Court has encouraged the Federal Government to persist in its view that the Commerce Clause has virtually no limits. Until this Court replaces its existing Commerce Clause jurisprudence with a standard more consistent with the original understanding, we will continue to see Congress appropriating state police powers under the guise of regulating commerce.

**628* Justice SOUTER, with whom Justice STEVENS, Justice GINSBURG, and Justice BREYER join, dissenting.

The Court says both that it leaves Commerce Clause precedent undisturbed and that the Civil Rights Remedy of the Violence Against Women Act of 1994, 42 U.S.C. § 13981, exceeds Congress's power under that Clause. I find the claims irreconcilable and respectfully dissent. [FN1]

FN1. Finding the law a valid exercise of Commerce Clause power, I have no occasion to reach the question whether it might also be sustained as an exercise of Congress's power to enforce the Fourteenth Amendment.

I

Our cases, which remain at least nominally undisturbed, stand for the following propositions. Congress has the power to legislate with regard to activity that, in the aggregate, has a substantial effect on interstate commerce. See *Wickard v. Filburn,* 317 U.S. 111, 124-128, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 277, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). The fact of such a substantial effect is not an issue for the courts in the first instance, *ibid.,* but for the Congress, whose institutional capacity for gathering evidence and taking testimony ***1760* far exceeds ours. By passing legislation, Congress indicates its conclusion, whether explicitly or not, that facts support its exercise of the commerce power. The business of the

courts is to review the congressional assessment, not for soundness but simply for the rationality of concluding that a jurisdictional basis exists in fact. See *ibid.* Any explicit findings that Congress chooses to make, though not dispositive of the question of rationality, may advance judicial review by identifying factual authority on which Congress relied. Applying those propositions in these cases can lead to only one conclusion.

One obvious difference from *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), is the mountain of data assembled by Congress, ***629** here showing the effects of violence against women on interstate commerce. [FN2] Passage of the Act in 1994 was preceded by four years of hearings, [FN3] which included testimony from physicians and law professors; [FN4]from survivors ***630** of rape and domestic violence; [FN5]and from representatives of state law enforcement and private business. [FN6] The record includes reports on gender bias from task forces in 21 States, [FN7] and we have the benefit of specific factual ****1761** findings ***631** in the eight separate Reports issued by Congress and its committees over the long course leading to enactment. [FN8] Cf. *Hodel,* 452 U.S., at 278-279, 101 S.Ct. 2352 (noting "extended hearings," "vast amounts of testimony and documentary evidence," and "years of the most thorough legislative consideration").

FN2. It is true that these data relate to the effects of violence against women generally, while the civil rights remedy limits its scope to "crimes of violence motivated by gender"--presumably a somewhat narrower subset of acts. See 42 U.S.C. § 13981(b). But the meaning of "motivated by gender" has not been elucidated by lower courts, much less by this one, so the degree to which the findings rely on acts not redressable by the civil rights remedy is unclear. As will appear, however, much of the data seems to indicate behavior with just such motivation. In any event, adopting a cramped reading of the statutory text, and thereby increasing the constitutional difficulties, would directly contradict one of the most basic canons of statutory interpretation. See *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Having identified the problem of violence against women, Congress may address what it sees as the most threatening manifestation; "reform may take one step at a time." *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

FN3. See, *e.g.,* Domestic Violence: Terrorism in the Home, Hearing before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 101st Cong., 2d Sess. (1990); Women and Violence, Hearing before the Senate Committee on the Judiciary, 101st Cong., 2d Sess. (1990); Violence Against Women: Victims of the System, Hearing on S. 15 before the Senate Committee on the Judiciary, 102d Cong., 1st Sess. (1991) (S. Hearing 102-369); Violence Against Women, Hearing before the Subcommittee on Crime and Criminal Justice of the House Committee on the Judiciary, 102d Cong., 2d Sess. (1992); Hearing on Domestic Violence, Hearing before the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993) (S. Hearing 103-596); Violent Crimes Against Women, Hearing before the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993); Violence Against Women: Fighting the Fear, Hearing before the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993) (S. Hearing 103-878); Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess. (1993); Domestic Violence: Not Just a Family Matter, Hearing before the Subcommittee on Crime and Criminal Justice of the House Committee on the Judiciary, 103d Cong., 2d Sess. (1994).

FN4. See, *e.g.*, S. Hearing 103-596, at 1-4 (testimony of Northeastern Univ. Law School Professor Clare Dalton); S. Hearing 102-369, at 103-105 (testimony of Univ. of Chicago Professor Cass Sunstein); S. Hearing 103- 878, at 7-11 (testimony of American Medical Assn. president-elect Robert McAfee).

FN5. See, *e.g.*, *id.*, at 13-17 (testimony of Lisa); *id.*, at 40- 42 (testimony of Jennifer Tescher).

FN6. See, *e.g.*, S. Hearing 102-369, at 24-36, 71-87 (testimony of attorneys general of Iowa and Illinois); *id.*, at 235-245 (testimony of National Federation of Business and Professional Women); S. Hearing No. 103-596, at 15-17 (statement of James Hardeman, Manager, Counseling Dept., Polaroid Corp.).

FN7. See Judicial Council of California Advisory Committee on Gender Bias in the Courts, Achieving Equal Justice for Women and Men in the California Courts (July 1996) (edited version of 1990 report); Colorado Supreme Court Task Force on Gender Bias in the Courts, Gender and Justice in the Colorado Courts (1990); Connecticut Task Force on Gender, Justice and the Courts, Report to the Chief Justice (Sept.1991); Report of the Florida Supreme Court Gender Bias Study Commission (Mar.1990); Supreme Court of Georgia, Commission on Gender Bias in the Judicial System, Gender and Justice in the Courts (1991), reprinted in 8 Ga. St. U.L.Rev. 539 (1992); Report of the Illinois Task Force on Gender Bias in the Courts (1990); Equality in the Courts Task Force, State of Iowa, Final Report (Feb.1993); Kentucky Task Force on Gender Fairness in the Courts, Equal Justice for Women and Men (Jan.1992); Louisiana Task Force on Women in the Courts, Final Report (1992); Maryland Special Joint Comm., Gender Bias in the Courts (May 1989); Massachusetts Supreme Judicial Court, Gender Bias Study of the Court System in Massachusetts (1989); Michigan Supreme Court Task Force on Gender Issues in the Courts, Final Report (Dec.1989); Minnesota Supreme Court Task Force for Gender Fairness in the Courts, Final Report (1989), reprinted in 15 Wm. Mitchell L.Rev. 825 (1989); Nevada

Supreme Court Gender Bias Task Force, Justice for Women (1988); New Jersey Supreme Court Task Force on Women in the Courts, Report of the First Year (June 1984); Report of the New York Task Force on Women in the Courts (Mar.1986); Final Report of the Rhode Island Supreme Court Committee on Women in the Courts (June 1987); Utah Task Force on Gender and Justice, Report to the Utah Judicial Council (Mar.1990); Vermont Supreme Court and Vermont Bar Assn., Gender and Justice: Report of the Vermont Task Force on Gender Bias in the Legal System (Jan.1991); Washington State Task Force on Gender and Justice in the Courts, Final Report (1989); Wisconsin Equal Justice Task Force, Final Report (Jan.1991).

FN8. See S.Rep. No. 101-545 (1990); Majority Staff of Senate Committee on the Judiciary, Violence Against Women: The Increase of Rape in America, 102d Cong., 1st Sess. (Comm. Print 1991); S.Rep. No. 102-197 (1991); Majority Staff of Senate Committee on the Judiciary, Violence Against Women: A Week in the Life of America, 102d Cong., 2d Sess. (Comm. Print 1992); S.Rep. No. 103-138 (1993); Majority Staff of Senate Committee on the Judiciary, The Response to Rape: Detours on the Road to Equal

Justice, 103d Cong., 1st Sess. (Comm. Print 1993); H.R.Rep. No. 103- 395 (1993); H.R. Conf. Rep. No. 103-711 (1994).

With respect to domestic violence, Congress received evidence for the following findings:
"Three out of four American women will be victims of violent crimes sometime during their life." H.R.Rep. No. 103-395, p. 25 (1993) (citing U.S. Dept. of Justice, Report to the Nation on Crime and Justice 29 (2d ed.1988)).
"Violence is the leading cause of injuries to women ages 15 to 44...." S.Rep. No. 103-138, p. 38 (1993) (citing Surgeon General Antonia Novello, From the Surgeon General, U.S. Public Health Services, 267 JAMA 3132 (1992)).
"[A]s many as 50 percent of homeless women and children are fleeing domestic violence." S.Rep. No. 101-545, p. 37 (1990) (citing E. Schneider, Legal Reform Efforts for Battered Women: Past, Present, and Future (July 1990)).
"Since 1974, the assault rate against women has outstripped the rate for men by at least twice for some age groups and far more for others." S.Rep. No. 101-*632 545, at 30 (citing Bureau of Justice Statistics, Criminal Victimization in the United States (1974) (Table 5)).
"[B]attering 'is the single largest cause of injury to women in the United States.' " S.Rep. No. 101-545, at 37 (quoting Van Hightower & McManus, Limits of State Constitutional Guarantees: Lessons from Efforts to Implement Domestic Violence Policies, 49 Pub. Admin. Rev. 269 (May/June 1989)).
"An estimated 4 million American women are battered each year by their ***1762*** husbands or partners." H.R.Rep. No. 103-395, at 26 (citing Council on Scientific Affairs, American Medical Assn., Violence Against Women: Relevance for Medical Practitioners, 267 JAMA 3184, 3185 (1992)).
"Over 1 million women in the United States seek medical assistance each year for injuries sustained [from] their husbands or other partners." S.Rep. No. 101-545, at 37 (citing Stark & Flitcraft, Medical Therapy as Repression: The Case of the Battered Woman, Health & Medicine (Summer/Fall 1982)).
"Between 2,000 and 4,000 women die every year from [domestic] abuse." S.Rep. No. 101-545, at 36 (citing Schneider, *supra* ).
"[A]rrest rates may be as low as 1 for every 100 domestic assaults." S.Rep. No. 101-545, at 38 (citing Dutton, Profiling of Wife Assaulters: Preliminary Evidence for Trimodal Analysis, 3 Violence and Victims 5-30 (1988)).
"Partial estimates show that violent crime against women costs this country at least 3 billion--not million, but billion--dollars a year." S.Rep. No. 101-545, at 33 (citing Schneider, *supra,* at 4).
"[E]stimates suggest that we spend $5 to $10 billion a year on health care, criminal justice, and other social costs of domestic violence." S.Rep. No. 103-138, at **633* 41 (citing Biden, Domestic Violence: A Crime, Not a Quarrel, Trial 56 (June 1993)).
The evidence as to rape was similarly extensive, supporting these conclusions:
"[The incidence of] rape rose four times as fast as the total national crime rate over the past 10 years." S.Rep. No. 101-545, at 30 (citing Federal Bureau of Investigation Uniform Crime Reports (1988)).
"According to one study, close to half a million girls now in high school will be raped before they graduate." S.Rep. No. 101-545, at 31 (citing R. Warshaw, I Never Called it Rape 117 (1988)).
"[One hundred twenty--five thousand] college women can expect to be raped during this--or any--year." S.Rep. No. 101-545, at 43 (citing testimony of Dr. Mary Koss before the Senate Judiciary Committee, Aug. 29, 1990).
"[T]hree-quarters of women never go to the movies alone after dark because of the fear of rape and nearly 50 percent do not use public transit alone after dark for the same reason." S.Rep. No. 102-197, p. 38 (1991) (citing M. Gordon & S. Riger, The Female Fear 15 (1989)).
"[Forty-one] percent of judges surveyed believed that juries give sexual assault victims less credibility than other crime victims." S.Rep. No. 102-197, at 47 (citing Colorado Supreme Court Task Force on Gender Bias in the Courts, Gender & Justice in the Colorado Courts 91 (1990)).
"Less than 1 percent of all [rape] victims have collected damages." S.Rep. No. 102-197, at 44 (citing report by Jury Verdict Research, Inc.).
" '[A]n individual who commits rape has only about 4 chances in 100 of being arrested, prosecuted, and found guilty of any offense.' " S.Rep. No. 101-545, at 33, n. 30 **634* quoting H. Feild & L.

Bienen, Jurors and Rape: A Study in Psychology and Law 95 (1980)).

"Almost one-quarter of convicted rapists never go to prison and another quarter received sentences in local jails where the average sentence is 11 months." S.Rep. No. 103-138, at 38 (citing Majority Staff Report of Senate Committee on the Judiciary, The Response to Rape: Detours on the Road to Equal Justice, 103d Cong., 1st Sess., 2 (Comm. Print 1993)).

"[A]lmost 50 percent of rape victims lose their jobs or are forced to quit because of the crime's severity." S.Rep. No. 102-197, at 53 (citing Ellis, Atkeson, & Calhoun, An Assessment of Long-Term Reaction to Rape, 90 J. Abnormal Psych., No. 3, p. 264 (1981)).

***1763*** Based on the data thus partially summarized, Congress found that

"crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce ... [,] by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products...." H.R. Conf. Rep. No. 103- 711, p. 385 (1994), U.S.Code Cong. & Admin.News 1994, pp. 1803, 1853.

Congress thereby explicitly stated the predicate for the exercise of its Commerce Clause power. Is its conclusion irrational in view of the data amassed? True, the methodology of particular studies may be challenged, and some of the figures arrived at may be disputed. But the sufficiency of the evidence before Congress to provide a rational basis for the finding cannot seriously be questioned. Cf. Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 199, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) ****635*** "The Constitution gives to Congress the role of weighing conflicting evidence in the legislative process").

Indeed, the legislative record here is far more voluminous than the record compiled by Congress and found sufficient in two prior cases upholding Title II of the Civil Rights Act of 1964 against Commerce Clause challenges. In *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), the Court referred to evidence showing the consequences of racial discrimination by motels and restaurants on interstate commerce. Congress had relied on compelling anecdotal reports that individual instances of segregation cost thousands to millions of dollars. See Civil Rights--Public Accommodations, Hearings on S. 1732 before the Senate Committee on Commerce, 88th Cong., 1st Sess., App. V, pp. 1383-1387 (1963). Congress also had evidence that the average black family spent substantially less than the average white family in the same income range on public accommodations, and that discrimination accounted for much of the difference. H.R.Rep. No. 88- 914, pt. 2, pp. 9-10, and Table II (1963) (Additional Views on H.R. 7152 of Hon. William M. McCulloch, Hon. John V. Lindsay, Hon. William T. Cahill, Hon. Garner E. Shriver, Hon. Clark MacGregor, Hon. Charles McC. Mathias, Hon. James E. Bromwell).

While Congress did not, to my knowledge, calculate aggregate dollar values for the nationwide effects of racial discrimination in 1964, in 1994 it did rely on evidence of the harms caused by domestic violence and sexual assault, citing annual costs of $3 billion in 1990, see S. Rep. 101-545, at 33, and $5 to $10 billion in 1993, see S.Rep. No. 103-138, at 41. [FN9] Equally important, though, gender-based violence in the 1990's was shown to operate in a manner similar to racial ****636*** discrimination in the 1960's in reducing the mobility of employees and their production and consumption of goods shipped in interstate commerce. Like racial discrimination, "[g]ender-based violence bars its most likely targets--women--from full partic[ipation] in the national economy." *Id.,* at 54.

FN9. In other cases, we have accepted dramatically smaller figures. See, *e.g., Hodel v. Indiana,* 452 U.S. 314, 325, n. 11, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) (stating that corn production with a value of $5.16 million "surely is not an insignificant amount of commerce").

If the analogy to the Civil Rights Act of 1964 is not plain enough, one can always look back a bit further. In *Wickard,* we upheld the application of the Agricultural Adjustment Act to the planting and consumption of homegrown wheat. The effect on interstate commerce in that case followed from the possibility that wheat ***1764*** grown at home for personal consumption could either be drawn into the

market by rising prices, or relieve its grower of any need to purchase wheat in the market. See 317 U.S., at 127-129, 63 S.Ct. 82. The Commerce Clause predicate was simply the effect of the production of wheat for home consumption on supply and demand in interstate commerce. Supply and demand for goods in interstate commerce will also be affected by the deaths of 2,000 to 4,000 women annually at the hands of domestic abusers, see S.Rep. No. 101-545, at 36, and by the reduction in the work force by the 100,000 or more rape victims who lose their jobs each year or are forced to quit, see *id.,* at 56; H.R.Rep. No. 103-395, at 25-26. Violence against women may be found to affect interstate commerce and affect it substantially. [FN10]

FN10. It should go without saying that my view of the limit of the congressional commerce power carries no implication about the wisdom of exercising it to the limit. I and other Members of this Court appearing before Congress have repeatedly argued against the federalization of traditional state crimes and the extension of federal remedies to problems for which the States have historically taken responsibility and may deal with today if they have the will to do so. See Hearings before a Subcommittee of the House Committee on Appropriations, 104th Cong., 1st Sess., pt. 7, pp. 13-14 (1995) (testimony of Justice KENNEDY); Hearings on H.R. 4603 before a Subcommittee of the Senate Committee on Appropriations, 103d Cong., 2d Sess., 100-107 (1994) (testimony of Justices KENNEDY and SOUTER). The Judicial Conference of the United States originally opposed the Act, though after the original bill was amended to include the gender- based animus requirement, the objection was withdrawn for reasons that are not apparent. See Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess., 70-71 (1993).

**637* II

The Act would have passed muster at any time between *Wickard* in 1942 and *Lopez* in 1995, a period in which the law enjoyed a stable understanding that congressional power under the Commerce Clause, complemented by the authority of the Necessary and Proper Clause, Art. I, § 8, cl. 18, extended to all activity that, when aggregated, has a substantial effect on interstate commerce. As already noted, this understanding was secure even against the turmoil at the passage of the Civil Rights Act of 1964, in the aftermath of which the Court not only reaffirmed the cumulative effects and rational basis features of the substantial effects test, see *Heart of Atlanta, supra,* at 258, 85 S.Ct. 348; *McClung, supra,* at 301-305, 85 S.Ct. 377, but declined to limit the commerce power through a formal distinction between legislation focused on "commerce" and statutes addressing "moral and social wrong[s]," *Heart of Atlanta,* 379 U.S., at 257, 85 S.Ct. 348.

The fact that the Act does not pass muster before the Court today is therefore proof, to a degree that *Lopez* was not, that the Court's nominal adherence to the substantial effects test is merely that. Although a new jurisprudence has not emerged with any distinctness, it is clear that some congressional conclusions about obviously substantial, cumulative effects on commerce are being assigned lesser values than the once-stable doctrine would assign them. These devaluations are accomplished not by any express repudiation of the substantial effects test or its application through the aggregation of individual conduct, but by supplanting rational basis scrutiny with a new criterion of review.

**638* Thus the elusive heart of the majority's analysis in these cases is its statement that Congress's findings of fact are "weakened" by the presence of a disfavored "method of reasoning." *Ante,* at 1752. This seems to suggest that the "substantial effects" analysis is not a factual enquiry, for Congress in the first instance with subsequent judicial review looking only to the rationality of the congressional conclusion, but one of a rather different sort, ***1765* dependent upon a uniquely judicial competence. This new characterization of substantial effects has no support in our cases (the self-fulfilling prophecies of *Lopez* aside), least of all those the majority cites. Perhaps this explains why the majority is not content to rest on its cited precedent but claims a textual justification for moving toward its new system of congressional deference subject to selective discounts. Thus it purports to rely on the sensible and traditional understanding that the listing in the Constitution of some powers implies the

exclusion of others unmentioned. See Gibbons v. Ogden, 9 Wheat. 1, 195, 6 L.Ed. 23 (1824); *ante,* at 1749-1750; The Federalist No. 45, p. 313 (J. Cooke ed. 1961) (J. Madison). [FN11] The majority stresses that Art. I, § 8, enumerates **639* the powers of Congress, including the commerce power, an enumeration implying the exclusion of powers not enumerated. It follows, for the majority, not only that there must be some limits to "commerce," but that some particular subjects arguably within the commerce power can be identified in advance as excluded, on the basis of characteristics other than their commercial effects. Such exclusions come into sight when the activity regulated is not itself commercial or when the States have traditionally addressed it in the exercise of the general police power, conferred under the state constitutions but never extended to Congress under the Constitution of the Nation, see Lopez, 514 U.S., at 566, 115 S.Ct. 1624. *Ante,* at 1753.

FN11. The claim that powers not granted were withheld was the chief Federalist argument against the necessity of a bill of rights. Bills of rights, Hamilton claimed, "have no application to constitutions professedly founded upon the power of the people, and executed by their immediate representatives and servants. Here, in strictness, the people surrender nothing, and as they retain every thing, they have no need of particular reservations." The Federalist No. 84, at 578. James Wilson went further

in the Pennsylvania ratifying convention, asserting that an enumeration of rights was positively dangerous because it suggested, conversely, that every right not reserved was surrendered. See 2 J. Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution 436-437 (2d ed. 1863) (hereinafter Elliot's Debates). The Federalists did not, of course, prevail on this point; most States voted for the Constitution only after proposing amendments and the First Congress speedily adopted a Bill of Rights. See *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 569, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (Powell, J., dissenting). While that document protected a range of specific individual rights against federal infringement, it did not, with the possible exception of the Second Amendment, offer any similarly specific protections to areas of state sovereignty.

The premise that the enumeration of powers implies that other powers are withheld is sound; the conclusion that some particular categories of subject matter are therefore presumptively beyond the reach of the commerce power is, however, a non sequitur. From the fact that Art. I, § 8, cl. 3 grants an authority limited to regulating commerce, it follows only that Congress may claim no authority under that section to address any subject that does not affect commerce. It does not at all follow that an activity affecting commerce nonetheless falls outside the commerce power, depending on the specific character of the activity, or the authority of a State to regulate it along with Congress. [FN12] My disagreement **640* with the majority is not, however, confined to logic, for history has ***1766* shown that categorical exclusions have proven as unworkable in practice as they are unsupportable in theory.

FN12. To the contrary, we have always recognized that while the federal commerce power may overlap the reserved state police power, in such cases federal authority is supreme. See, *e.g., Lake Shore & Michigan Southern R. Co. v. Ohio,* 173 U.S. 285, 297-298, 19 S.Ct. 465, 43 L.Ed. 702 (1899) ("When Congress acts with reference to a matter confided to it by the Constitution, then its statutes displace all conflicting local regulations touching that matter, although such regulations may have been established in pursuance of a power not surrendered by the States to the General Government"); *United States v. California,* 297 U.S. 175, 185, 56 S.Ct. 421, 80 L.Ed. 567 (1936) ("[W]e look to the activities in which the states have traditionally engaged as marking the boundary of the

restriction upon the federal taxing power. But there is no such limitation upon the plenary power to regulate commerce").

A

Obviously, it would not be inconsistent with the text of the Commerce Clause itself to declare "noncommercial" primary activity beyond or presumptively beyond the scope of the commerce power. That variant of categorical approach is not, however, the sole textually permissible way of defining the scope of the Commerce Clause, and any such neat limitation would at least be suspect in the light of the final sentence of Art. I, § 8, authorizing Congress to make "all Laws ... necessary and proper" to give effect to its enumerated powers such as commerce. See *United States v. Darby,* 312 U.S. 100, 118, 61 S.Ct. 451, 85 L.Ed. 609 (1941) ("The power of Congress ... extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce"). Accordingly, for significant periods of our history, the Court has defined the commerce power as plenary, unsusceptible to categorical exclusions, and this was the view expressed throughout the latter part of the 20th century in the substantial effects test. These two conceptions of the commerce power, plenary and categorically limited, are in fact old rivals, and today's revival of their competition summons up familiar history, a brief reprise of which may be helpful in posing what I take to be the key question going to the legitimacy of the majority's decision to breathe new life into the approach of categorical limitation.

**641* Chief Justice Marshall's seminal opinion in *Gibbons v. Ogden,* 9 Wheat., at 193-194, 22 U.S. 1, 6 L.Ed. 23, construed the commerce power from the start with "a breadth never yet exceeded," *Wickard v. Filburn,* 317 U.S., at 120, 63 S.Ct. 82. In particular, it is worth noting, the Court in *Wickard* did not regard its holding as exceeding the scope of Chief Justice Marshall's view of interstate commerce; *Wickard* applied an aggregate effects test to ostensibly domestic, noncommercial farming consistently with Chief Justice Marshall's indication that the commerce power may be understood by its exclusion of subjects, among others, "which do not affect other States," *Gibbons,* 9 Wheat., at 195, 6 L.Ed. 23. This plenary view of the power has either prevailed or been acknowledged by this Court at every stage of our jurisprudence. See, *e.g., id.,* at 197, 6 L.Ed. 23; *Nashville, C. & St. L.R. Co. v. Alabama,* 128 U.S. 96, 99-100, 9 S.Ct. 28, 32 L.Ed. 352 (1888); *Lottery Case,* 188 U.S. 321, 353, 23 S.Ct. 321, 47 L.Ed. 492 (1903); *Minnesota Rate Cases,* 230 U.S. 352, 398, 33 S.Ct. 729, 57 L.Ed. 1511 (1913); *United States v. California,* 297 U.S. 175, 185, 56 S.Ct. 421, 80 L.Ed. 567 (1936); *United States v. Darby, supra,* at 115, 61 S.Ct. 451; *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S., at 255, 85 S.Ct. 348; *Hodel v. Indiana,* 452 U.S., at 324, 101 S.Ct. 2376. And it was this understanding, free of categorical qualifications, that prevailed in the period after 1937 through *Lopez,* as summed up by Justice Harlan: " 'Of course, the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court. But where we find that the legislators ... have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end.' " *Maryland v. Wirtz,* 392 U.S. 183, 190, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) (quoting *Katzenbach v. McClung,* 379 U.S., at 303-304, 85 S.Ct. 377).

Justice Harlan spoke with the benefit of hindsight, for he had seen the result of rejecting the plenary view, and today's attempt to distinguish between primary activities affecting commerce in terms of the relatively commercial or noncommercial character of the primary conduct proscribed ***1767* comes with the pedigree of near tragedy that I outlined in **642* *United States v. Lopez,* 514 U.S., at 603, 115 S.Ct. 1624 (dissenting opinion). In the half century following the modern activation of the commerce power with passage of the Interstate Commerce Act in 1887, this Court from time to time created categorical enclaves beyond congressional reach by declaring such activities as "mining," "production," "manufacturing," and union membership to be outside the definition of "commerce" and by limiting application of the effects test to "direct" rather than "indirect" commercial consequences. See, *e.g., United States v. E.C. Knight Co.,* 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895) (narrowly construing the Sherman Antitrust Act in light of the distinction between "commerce" and "manufacture"); *In re Heff,* 197 U.S. 488, 505-506, 25 S.Ct. 506, 49 L.Ed. 848 (1905) (stating that Congress could not regulate the intrastate sale of liquor); *The Employers' Liability Cases,* 207 U.S. 463, 495-496, 28 S.Ct. 141, 52 L.Ed. 297 (1908) (invalidating law governing tort liability for common

carriers operating in interstate commerce because the effects on commerce were indirect); *Adair v. United States,* 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908) (holding that labor union membership fell outside "commerce"); *Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918) (invalidating law prohibiting interstate shipment of goods manufactured with child labor as a regulation of "manufacture"); *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 545-548, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (invalidating regulation of activities that only "indirectly" affected commerce); *Railroad Retirement Bd. v. Alton R. Co.,* 295 U.S. 330, 368-369, 55 S.Ct. 758, 79 L.Ed. 1468 (1935) (invalidating pension law for railroad workers on the grounds that conditions of employment were only indirectly linked to commerce); *Carter v. Carter Coal Co.,* 298 U.S. 238, 303-304, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) (holding that regulation of unfair labor practices in mining regulated "production," not "commerce").

Since adherence to these formalistically contrived confines of commerce power in large measure provoked the judicial crisis of 1937, one might reasonably have doubted that Members of this Court would ever again toy with a return to the days before ***643** *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), which brought the earlier and nearly disastrous experiment to an end. And yet today's decision can only be seen as a step toward recapturing the prior mistakes. Its revival of a distinction between commercial and noncommercial conduct is at odds with *Wickard,* which repudiated that analysis, and the enquiry into commercial purpose, first intimated by the *Lopez* concurrence, see *Lopez, supra,* at 580, 115 S.Ct. 1624 (opinion of KENNEDY, J.), is cousin to the intent-based analysis employed in *Hammer, supra,* at 271-272, 38 S.Ct. 529, but rejected for Commerce Clause purposes in *Heart of Atlanta, supra,* at 257, 85 S.Ct. 348, and *Darby,* 312 U.S., at 115, 61 S.Ct. 451.

Why is the majority tempted to reject the lesson so painfully learned in 1937? An answer emerges from contrasting *Wickard* with one of the predecessor cases it superseded. It was obvious in *Wickard* that growing wheat for consumption right on the farm was not "commerce" in the common vocabulary, [FN13] but that did not ****1768** matter constitutionally so long as the aggregated activity of domestic wheat growing affected commerce substantially. Just a few years before ***644** *Wickard,* however, it had certainly been no less obvious that "mining" practices could substantially affect commerce, even though *Carter Coal Co., supra,* had held mining regulation beyond the national commerce power. When we try to fathom the difference between the two cases, it is clear that they did not go in different directions because the *Carter Coal* Court could not understand a causal connection that the *Wickard* Court could grasp; the difference, rather, turned on the fact that the Court in *Carter Coal* had a reason for trying to maintain its categorical, formalistic distinction, while that reason had been abandoned by the time *Wickard* was decided. The reason was laissez-faire economics, the point of which was to keep government interference to a minimum. See *Lopez, supra,* at 605-606, 115 S.Ct. 1624 (SOUTER, J., dissenting). The Court in *Carter Coal* was still trying to create a laissez-faire world out of the 20th-century economy, and formalistic commercial distinctions were thought to be useful instruments in achieving that object. The Court in *Wickard* knew it could not do any such thing and in the aftermath of the New Deal had long since stopped attempting the impossible. Without the animating economic theory, there was no point in contriving formalisms in a war with Chief Justice Marshall's conception of the commerce power.

FN13. Contrary to the Court's suggestion, *ante,* at 1750, n. 4, *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), applied the substantial effects test to domestic agricultural production for domestic consumption, an activity that cannot fairly be described as commercial, despite its commercial consequences in affecting or being affected by the demand for agricultural products in the commercial market. The *Wickard* Court admitted that Filburn's activity "may not be regarded as commerce" but insisted that "it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce...." *Id.,* at 125, 63 S.Ct. 82. The characterization of home wheat production as "commerce" or not is, however, ultimately beside the point. For if substantial effects on commerce are

proper subjects of concern under the Commerce Clause, what difference should it make whether the causes of those effects are themselves commercial? Cf., *e.g., National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 258, 114 S.Ct. 798, 127

L.Ed.2d 99 (1994) ("An enterprise surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives"). The Court's answer is that it makes a difference to federalism, and the legitimacy of the Court's new judicially derived federalism is the crux of our disagreement. See *infra,* at 1768-1769.

If we now ask why the formalistic economic/noneconomic distinction might matter today, after its rejection in *Wickard,* the answer is not that the majority fails to see causal connections in an integrated economic world. The answer is that in the minds of the majority there is a new animating theory that makes categorical formalism seem useful again. Just as the old formalism had value in the service of an economic conception, the new one is useful in serving a conception of federalism. It is the instrument by which assertions of national power are to be limited in favor of preserving a supposedly discernible, proper sphere of state autonomy to legislate or refrain from legislating as the individual ***645** States see fit. The legitimacy of the Court's current emphasis on the noncommercial nature of regulated activity, then, does not turn on any logic serving the text of the Commerce Clause or on the realism of the majority's view of the national economy. The essential issue is rather the strength of the majority's claim to have a constitutional warrant for its current conception of a federal relationship enforceable by this Court through limits on otherwise plenary commerce power. This conception is the subject of the majority's second categorical discount applied today to the facts bearing on the substantial effects test.

B

The Court finds it relevant that the statute addresses conduct traditionally subject to state prohibition under domestic criminal law, a fact said to have some heightened significance when the violent conduct in question is not itself aimed directly at interstate commerce or its instrumentalities. *Ante,* at 1749. Again, history seems to be recycling, for the theory of traditional state concern as grounding a limiting principle has been rejected previously, and more than once. It was disapproved in *Darby,* 312 U.S., at 123-124, 61 S.Ct. 451, and held insufficient standing ****1769** alone to limit the commerce power in *Hodel,* 452 U.S., at 276-277, 101 S.Ct. 2352. In the particular context of the Fair Labor Standards Act it was rejected in *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), with the recognition that "[t]here is no general doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other." *Id.,* at 195, 88 S.Ct. 2017 (internal quotation marks omitted). The Court held it to be "clear that the Federal Government, when acting within a delegated power, may override countervailing state interests, whether these be described as 'governmental' or 'proprietary' in character." *Ibid.* While *Wirtz* was later overruled by ***646** *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), that case was itself repudiated in *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), which held that the concept of "traditional governmental function" (as an element of the immunity doctrine under *Hodel* ) was incoherent, there being no explanation that would make sense of the multifarious decisions placing some functions on one side of the line, some on the other. 469 U.S., at 546-547, 105 S.Ct. 1005. The effort to carve out inviolable state spheres within the spectrum of activities substantially affecting commerce was, of course, just as irreconcilable with *Gibbons's* explanation of the national commerce power as being as "absolut[e] as it would be in a single government," 9 Wheat., at 197, 6 L.Ed. 23. [FN14]

FN14. The Constitution of 1787 did, in fact, forbid some exercises of the commerce power. Article I, § 9, cl. 6, barred Congress from giving preference to the ports of one State over those of another. More strikingly, the Framers protected the slave trade from federal interference, see Art. I, § 9, cl. 1, and confirmed the power of a State to guarantee the chattel status of slaves who fled to another State, see Art. IV, § 2, cl. 3. These reservations demonstrate the plenary nature of the federal power; the exceptions prove the rule. Apart from them, proposals to carve islands of state authority out of the stream of commerce power were entirely unsuccessful. Roger Sherman's proposed definition of federal legislative power as excluding "matters of internal police" met Gouverneur Morris's response that "[t]he internal police ... ought to be infringed in many cases" and

was voted down eight to two. 2 Records of the Federal Convention of 1787, pp. 25-26 (M. Farrand ed.1911) (hereinafter Farrand). The Convention similarly rejected Sherman's attempt to include in Article V a proviso that "no state shall ... be affected in its internal police." 5 Elliot's Debates 551- 552. Finally, Rufus King suggested an explicit bill of rights for the States, a device that might indeed have set aside the areas the Court now

declares off-limits. 1 Farrand 493 ("As the fundamental rights of individuals are secured by express provisions in the State Constitutions; why may not a like security be provided for the Rights of States in the National Constitution"). That proposal, too, came to naught. In short, to suppose that enumerated powers must have limits is sensible; to maintain that there exist judicially identifiable areas of state regulation immune to the plenary congressional commerce power even though falling within the limits defined by the substantial effects test is to deny our constitutional history.

**647* The objection to reviving traditional state spheres of action as a consideration in commerce analysis, however, not only rests on the portent of incoherence, but is compounded by a further defect just as fundamental. The defect, in essence, is the majority's rejection of the Founders' considered judgment that politics, not judicial review, should mediate between state and national interests as the strength and legislative jurisdiction of the National Government inevitably increased through the expected growth of the national economy. [FN15] ***1770* Whereas today's majority takes a leaf from the book of the old judicial economists in saying that the Court should somehow draw the line to keep the federal relationship in a proper balance, Madison, Wilson, and Marshall understood the Constitution very differently.

FN15. That the national economy and the national legislative power expand in tandem is not a recent discovery. This Court accepted the prospect well over 100 years ago, noting that the commerce powers "are not confined to the instrumentalities of commerce, or the postal service known or in use when the Constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances." *Pensacola Telegraph Co. v. Western Union Telegraph Co.,* 96 U.S. 1, 9, 24 L.Ed. 708 (1877). See also, *e.g., Farmers' Loan & Trust Co. v. Minnesota,* 280 U.S. 204, 211-212, 50 S.Ct. 98, 74 L.Ed. 371 (1930) ("Primitive conditions have passed; business is now transacted on a national scale").

Although Madison had emphasized the conception of a National Government of discrete powers (a conception that a number of the ratifying conventions thought was too indeterminate to protect civil liberties), [FN16] Madison himself must have sensed the potential scope of some of the powers granted (such as the authority to regulate commerce), for he **648* took care in The Federalist No. 46 to hedge his argument for limited power by explaining the importance of national politics in protecting the States' interests. The National Government "will partake sufficiently of the spirit [of the States], to be disinclined to invade the rights of the individual States, or the prerogatives of their governments." The Federalist No. 46, P. 319 (J. Cooke ed. 1961). James Wilson likewise noted that "it was a favorite object in the Convention" to secure the sovereignty of the States, and that it had been achieved through the structure of the Federal Government. 2 Elliot's Debates 438-439. [FN17] The Framers of the Bill of Rights, in turn, may well have sensed that Madison and Wilson were right about politics as the determinant of the federal balance within the broad limits of a power like commerce, for they formulated the Tenth Amendment without any provision comparable to the specific guarantees proposed for individual liberties. [FN18] In any case, this Court recognized the political component of federalism in the seminal *Gibbons* opinion. After declaring the plenary character of congressional power within the sphere of activity affecting commerce, the Chief Justice spoke for the Court in explaining that there was only one restraint on its valid exercise:

FN16. As mentioned in n. 11, *supra,* many state conventions voted in favor of the Constitution only after proposing amendments. See 1 Elliot's

Debates 322-323 (Massachusetts), 325 (South Carolina), 325-327 (New Hampshire), 327 (Virginia), 327-331 (New York), 331-332 (North Carolina), 334-337 (Rhode Island).

FN17. Statements to similar effect pervade the ratification debates. See, *e.g.,* 2 *id.,* at 166-170 (Massachusetts, remarks of Samuel Stillman); 2 *id.,* at 251-253 (New York, remarks of Alexander Hamilton); 4 *id.,* at 95-98 (North Carolina, remarks of James Iredell).

FN18. The majority's special solicitude for "areas of traditional state regulation," *ante,* at 1753, is thus founded not on the text of the Constitution but on what has been termed the "*spirit* of the Tenth Amendment," *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S., at 585, 105 S.Ct. 1005 (O'CONNOR, J., dissenting) (emphasis in original). Susceptibility to what Justice Holmes more bluntly called "some invisible radiation from the general terms of the Tenth Amendment," *Missouri v. Holland,* 252 U.S. 416, 434, 40 S.Ct. 382, 64 L.Ed. 641 (1920), has increased in recent years, in disregard of his admonition that "[w]e must consider what this country has become in deciding what that Amendment has reserved," *ibid.*

***649** "The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments." *Gibbons,* 9 Wheat., at 197, 22 U.S. 1.

Politics as the moderator of the congressional employment of the commerce power was the theme many years later in *Wickard,* for after the Court acknowledged the breadth of the *Gibbons* formulation it invoked Chief Justice Marshall yet again in adding that "[h]e made emphatic the embracing and penetrating nature of this power by warning that effective restraints on its exercise must proceed from political rather than judicial processes." ***1771** *Wickard,* 317 U.S., at 120, 63 S.Ct. 82 (citation omitted). Hence, "conflicts of economic interest ... are wisely left under our system to resolution by Congress under its more flexible and responsible legislative process. Such conflicts rarely lend themselves to judicial determination. And with the wisdom, workability, or fairness, of the plan of regulation we have nothing to do." *Id.,* at 129, 63 S.Ct. 82 (footnote omitted).

As with "conflicts of economic interest," so with supposed conflicts of sovereign political interests implicated by the Commerce Clause: the Constitution remits them to politics. The point can be put no more clearly than the Court put it the last time it repudiated the notion that some state activities categorically defied the commerce power as understood in accordance with generally accepted concepts. After confirming Madison's and Wilson's views with a recitation of the sources of state influence in the structure of the National Constitution, *Garcia,* 469 U.S., at 550-552, 105 S.Ct. 1005, the Court disposed of the possibility of identifying "principled constitutional limitations on the scope of Congress' Commerce Clause powers over the States merely ***650** by relying on *a priori* definitions of state sovereignty," *id.,* at 548, 105 S.Ct. 1005. It concluded that

"the Framers chose to rely on a federal system in which special restraints on federal power over the States inhered principally in the workings of the National Government itself, rather than in discrete limitations on the objects of federal authority. State sovereign interests, then, are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." *Id.,* at 552, 105 S.Ct. 1005.

The *Garcia* Court's rejection of "judicially created limitations" in favor of the intended reliance on national politics was all the more powerful owing to the Court's explicit recognition that in the

centuries since the framing the relative powers of the two sovereign systems have markedly changed. Nationwide economic integration is the norm, the national political power has been augmented by its vast revenues, and the power of the States has been drawn down by the Seventeenth Amendment, eliminating selection of senators by state legislature in favor of direct election.

The *Garcia* majority recognized that economic growth and the burgeoning of federal revenue have not amended the Constitution, which contains no circuit breaker to preclude the political consequences of these developments. Nor is there any justification for attempts to nullify the natural political impact of the particular amendment that was adopted. The significance for state political power of ending state legislative selection of senators was no secret in 1913, and the amendment was approved despite public comment on that very issue. Representative Franklin Bartlett, after quoting Madison's Federalist No. 62, as well as remarks by George Mason and John Dickinson during the Constitutional Convention, concluded, "It follows, therefore, that the ***651** framers of the Constitution, were they present in this House to-day, would inevitably regard this resolution as a most direct blow at the doctrine of State's rights and at the integrity of the State sovereignties; for if you once deprive a State as a collective organism of all share in the General Government, you annihilate its federative importance." 26 Cong. Rec. 7774 (1894). Massachusetts Senator George Hoar likewise defended indirect election of the Senate as "a great security for the rights of the States." S. Doc. No. 232, 59th Cong., 1st Sess., 21 (1906). And Elihu Root warned that if the selection of senators should be taken from state legislatures, "the tide that now sets toward the Federal Government will swell in volume and power." 46 Cong. Rec. 2243 (1911). "The time will come," he continued, "when the Government of the United States will be driven to the exercise of more arbitrary and unconsidered ****1772** power, will be driven to greater concentration, will be driven to extend its functions into the internal affairs of the States." *Ibid.* See generally Rossum, The Irony of Constitutional Democracy: Federalism, the Supreme Court, as the Seventeenth Amendment, 36 San Diego L.Rev. 671, 712-714 (1999) (noting federalism-base objections to the Seventeenth Amendment). These warnings did not kill the proposal; the Amendment was ratified, and today it is only the ratification, not the predictions, which this Court can legitimately heed. [FN19]

FN19. The majority tries to deflect the objection that it blocks an intended political process by explaining that the Framers intended politics

to set the federal balance only within the sphere of permissible commerce legislation, whereas we are looking to politics to define that sphere (in derogation even of *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803)), *ante,* at 1753-1754. But we all accept the view that politics is the arbiter of state interests only within the realm of legitimate congressional action under the commerce power. Neither Madison nor Wilson nor Marshall, nor the *Jones* & *Laughlin, Darby, Wickard,* or *Garcia* Courts, suggested that politics defines the commerce power. Nor do we, even though we recognize that the conditions of the contemporary world result in a vastly greater sphere of influence for politics than the Framers would have envisioned. Politics has legitimate authority, for all of us on both sides of the disagreement, only within the legitimate compass of the commerce power. The majority claims merely to be engaging in the judicial task of patrolling the outer boundaries of that congressional authority. See *ante,* at 1753-1754, n. 7. That assertion cannot be reconciled with our statements of the substantial effects test, which have not drawn the categorical distinctions the majority favors. See, *e.g., Wickard,* 317 U.S., at 125, 63 S.Ct. 82; *United States v. Darby,* 312 U.S. 100, 118-119, 61 S.Ct. 451, 85 L.Ed. 609 (1941). The majority's attempt to circumscribe the commerce power by defining it in terms of

categorical exceptions can only be seen as a revival of similar efforts that led to near tragedy for the Court and incoherence for the law. If history's lessons are accepted as guides for Commerce Clause interpretation today, as we do accept them, then the subject matter of the Act falls within the commerce power and the choice to legislate nationally on that subject, or to except it from national legislation because the States have traditionally dealt with it, should be a political choice and only a political choice.

*652 Amendments that alter the balance of power between the National and State Governments, like the Fourteenth, or that change the way the States are represented within the Federal Government, like the Seventeenth, are not rips in the fabric of the Framers' Constitution, inviting judicial repairs. The Seventeenth Amendment may indeed have lessened the enthusiasm of the Senate to represent the States as discrete sovereignties, but the Amendment did not convert the judiciary into an alternate shield against the commerce power.

C

The Court's choice to invoke considerations of traditional state regulation in these cases is especially odd in light of a distinction recognized in the now-repudiated opinion for the Court in *Usery.* In explaining that there was no inconsistency between declaring the States immune to the commerce power exercised in the Fair Labor Standards Act, but subject to it under the Economic Stabilization Act of 1970, as decided in *Fry v. United States,* 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975), the Court spoke of the latter statute as dealing with a serious threat affecting all the political components of the federal *653 system, "which only collective action by the National Government might forestall." *Usery,* 426 U.S., at 853, 96 S.Ct. 2465. Today's majority, however, finds no significance whatever in the state support for the Act based upon the States' acknowledged failure to deal adequately with gender-based violence in state courts, and the belief of their own law enforcement agencies that national action is essential. [FN20]

FN20. See n. 7, *supra.* The point here is not that I take the position that the States are incapable of dealing adequately with domestic violence if their political leaders have the will to do so; it is simply that the Congress had evidence from which it could find a national statute necessary, so that its passage obviously survives Commerce Clause scrutiny.

The National Association of Attorneys General supported the Act unanimously, see Violence Against Women: Victims of the System, Hearing on S. 15 before the Senate Committee on the Judiciary, 102d Cong., 1st Sess., 37-38 (1991), and Attorneys **1773 General from 38 States urged Congress to enact the Civil Rights Remedy, representing that "the current system for dealing with violence against women is inadequate," see Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess., 34-36 (1993). It was against this record of failure at the state level that the Act was passed to provide the choice of a federal forum in place of the state-court systems found inadequate to stop gender-biased violence. See Women and Violence, Hearing before the Senate Committee on the Judiciary, 101st Cong., 2d Sess., 2 (1990) (statement of Sen. Biden) (noting importance of federal forum). [FN21] The Act accordingly offers a federal civil rights remedy aimed exactly *654 at violence against women, as an alternative to the generic state tort causes of action found to be poor tools of action by the state task forces. See S.Rep. No. 101-545, at 45 (noting difficulty of fitting gender- motivated crimes into common-law categories). As the 1993 Senate Report put it, "The Violence Against Women Act is intended to respond both to the underlying attitude that this violence is somehow less serious than other crime and to the resulting failure of our criminal justice system to address such violence. Its goals are both symbolic and practical...." S.Rep. No. 103-138, at 38.

FN21. The majority's concerns about accountability strike me as entirely misplaced. Individuals, such as the defendants in this action, haled into federal court and sued under the United States Code, are quite aware of which of our dual sovereignties is attempting to regulate their behavior. Had Congress chosen, in the exercise of its powers under § 5 of the Fourteenth Amendment, to proceed instead by regulating the States, rather than private individuals, this accountability would be far less plain.

The collective opinion of state officials that the Act was needed continues virtually unchanged, and when the Civil Rights Remedy was challenged in court, the States came to its defense. Thirty-six of them and the Commonwealth of Puerto Rico have filed an *amicus* brief in support of petitioners in these cases, and only one State has taken respondents' side. It is, then, not the least irony of these cases that the States will be forced to enjoy the new federalism whether they want it or not. For with the Court's decision today, Antonio Morrison, like Carter Coal's James Carter before him, has "won the states' rights plea against the states themselves." R. Jackson, The Struggle for Judicial Supremacy 160 (1941).

III

All of this convinces me that today's ebb of the commerce power rests on error, and at the same time leads me to doubt that the majority's view will prove to be enduring law. There is yet one more reason for doubt. Although we sense the presence of Carter Coal, Schechter, and Usery once again, the majority embraces them only at arm's-length. Where such decisions once stood for rules, today's opinion points to considerations by which substantial effects are discounted. Cases standing for the sufficiency of substantial effects are not overruled; cases overruled since 1937 are not quite revived. The Court's thinking betokens less clearly **655* a return to the conceptual straitjackets of Schechter and Carter Coal and Usery than to something like the unsteady state of obscenity law between Redrup v. New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967) *(per curiam)*, and Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), a period in which the failure to provide a workable definition left this Court to review each case ad hoc. See *id.*, at 22, n. 3, 93 S.Ct. 2607; *Interstate Circuit, Inc. v. Dallas,* 390 U.S. 676, 706-708, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968) (Harlan, J., dissenting). As our predecessors learned then, the practice of such ad hoc review cannot preserve the distinction between the judicial and the legislative, and this Court, in any event, lacks the institutional ***1774* capacity to maintain such a regime for very long. This one will end when the majority realizes that the conception of the commerce power for which it entertains hopes would inevitably fail the test expressed in Justice Holmes's statement that "[t]he first call of a theory of law is that it should fit the facts." O. Holmes, The Common Law 167 (Howe ed.1963). The facts that cannot be ignored today are the facts of integrated national commerce and a political relationship between States and Nation much affected by their respective treasuries and constitutional modifications adopted by the people. The federalism of some earlier time is no more adequate to account for those facts today than the theory of laissez-faire was able to govern the national economy 70 years ago.

Justice BREYER, with whom Justice STEVENS joins, and with whom Justice SOUTER and Justice GINSBURG join as to Part I-A, dissenting.

No one denies the importance of the Constitution's federalist principles. Its state/federal division of authority protects liberty--both by restricting the burdens that government can impose from a distance and by facilitating citizen participation in government that is closer to home. The question is how the judiciary can best implement that **656* original federalist understanding where the Commerce Clause is at issue.

I

The majority holds that the federal commerce power does not extend to such "noneconomic" activities as "noneconomic, violent criminal conduct" that significantly affects interstate commerce only if we "aggregate" the interstate "effect[s]" of individual instances. *Ante,* at 1754. Justice SOUTER explains why history, precedent, and legal logic militate against the majority's approach. I agree and join his opinion. I add that the majority's holding illustrates the difficulty of finding a workable judicial Commerce Clause touchstone--a set of comprehensible interpretive rules that courts might use to impose some meaningful limit, but not too great a limit, upon the scope of the legislative authority that the Commerce Clause delegates to Congress.

A

Consider the problems. The "economic/noneconomic" distinction is not easy to apply. Does the local street corner mugger engage in "economic" activity or "noneconomic" activity when he mugs for money? See *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (aggregating local "loan sharking" instances); *United States v. Lopez,* 514 U.S. 549, 559, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (loan sharking is economic because it consists of "intrastate extortionate credit transactions"); *ante,* at 1749-1750. Would evidence that desire for economic domination underlies many brutal crimes against women save the present statute? See United States General Accounting

Office, Health, Education, and Human Services Division, Domestic Violence: Prevalence and Implications for Employment Among Welfare Recipients 7-8 (Nov.1998); Brief for Equal Rights Advocates et al. as *Amicus Curiae* 10-12.

The line becomes yet harder to draw given the need for exceptions. The Court itself would permit Congress to aggregate, hence regulate, "noneconomic" activity taking place **657* at economic establishments. See *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (upholding civil rights laws forbidding discrimination at local motels); *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (same for restaurants); *Lopez, supra,* at 559, 115 S.Ct. 1624 (recognizing congressional power to aggregate, hence forbid, noneconomically motivated discrimination at public accommodations); *ante,* at 1749-1750 (same). And it would permit Congress to regulate where that regulation ***1775* is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez, supra,* at 561, 115 S.Ct. 1624; cf. Controlled Substances Act, 21 U.S.C. § 801 *et seq.* (regulating drugs produced for home consumption). Given the former exception, can Congress simply rewrite the present law and limit its application to restaurants, hotels, perhaps universities, and other places of public accommodation? Given the latter exception, can Congress save the present law by including it, or much of it, in a broader "Safe Transport" or "Workplace Safety" act?

More important, why should we give critical constitutional importance to the economic, or noneconomic, nature of an interstate-commerce-affecting *cause?* If chemical emanations through indirect environmental change cause identical, severe commercial harm outside a State, why should it matter whether local factories or home fireplaces release them? The Constitution itself refers only to Congress' power to "regulate Commerce ... among the several States," and to make laws "necessary and proper" to implement that power. Art. I, § 8, cls. 3, 18. The language says nothing about either the local nature, or the economic nature, of an interstate-commerce-affecting cause.

This Court has long held that only the interstate commercial effects, not the local nature of the cause, are constitutionally relevant. See *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 38-39, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (focusing upon interstate effects); *Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (aggregating interstate effects of wheat grown for home consumption); *Heart of Atlanta Motel, supra,* at 258, 85 S.Ct. 348 (" '[I]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze' " (quoting *United States v. Women's Sportswear Mfrs. Assn.,* 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805 (1949))). Nothing in the Constitution's language, or that of earlier cases prior to *Lopez,* explains why the Court should ignore one highly relevant characteristic of an interstate-commerce-affecting cause (how "local" it is), while placing critical constitutional weight upon a different, less obviously relevant, feature (how "economic" it is).

Most importantly, the Court's complex rules seem unlikely to help secure the very object that they seek, namely, the protection of "areas of traditional state regulation" from federal intrusion. *Ante,* at 1752-1753. The Court's rules, even if broadly interpreted, are underinclusive. The local pickpocket is no less a traditional subject of state regulation than is the local gender- motivated assault. Regardless, the Court reaffirms, as it should, Congress' well-established and frequently exercised power to enact laws that satisfy a commerce-related jurisdictional prerequisite--for example, that some item relevant to the federally regulated activity has at some time crossed a state line. *Ante,* at 1749-1750, 1751, 1752, and n. 5; *Lopez, supra,* at 558, 115 S.Ct. 1624; *Heart of Atlanta Motel, supra,* at 256, 85 S.Ct. 348 (" '[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question' " (quoting *Caminetti v. United States,* 242 U.S. 470, 491, 37 S.Ct. 192, 61 L.Ed. 442 (1917))); see also *United States v. Bass,* 404 U.S. 336, 347-350, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (saving ambiguous felon-in-possession statute by requiring gun to have crossed state line); *Scarborough v. United States,* 431 U.S. 563, 575, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977) (interpreting same statute to require only that gun passed "in interstate commerce" "at some time," without questioning constitutionality); cf., *e.g.,* 18 U.S.C. § 2261(a)(1) (making it a federal crime for a person to cross state lines to commit **659* a crime of violence against a spouse or intimate partner); § 1951(a) (federal crime to commit ***1776* robbery, extortion, physical violence or threat thereof, where "article or commodity in commerce" is affected, obstructed, or delayed); § 2315 (making unlawful the knowing receipt or possession of certain stolen items that have "crossed a State ... boundary"); § 922(g)(1) (prohibiting felons from shipping, transporting, receiving, or possessing firearms "in interstate ... commerce").

And in a world where most everyday products or their component parts cross interstate boundaries, Congress will frequently find it possible to redraft a statute using language that ties the regulation to the interstate movement of some relevant object, thereby regulating local criminal activity or, for that matter, family affairs. See, *e.g.,* Child Support Recovery Act of 1992, 18 U.S.C. § 228. Although this possibility does not give the Federal Government the power to regulate everything, it means that any substantive limitation will apply randomly in terms of the interests the majority seeks to protect. How much would be gained, for example, were Congress to reenact the present law in the form of "An Act Forbidding Violence Against Women Perpetrated at Public Accommodations or by Those Who Have Moved in, or through the Use of Items that Have Moved in, Interstate Commerce"? Complex Commerce Clause rules creating fine distinctions that achieve only random results do little to further the important federalist interests that called them into being. That is why modern (pre-*Lopez* ) case law rejected them. See *Wickard, supra,* at 120, 63 S.Ct. 82; *United States v. Darby,* 312 U.S. 100, 116-117, 61 S.Ct. 451, 85 L.Ed. 609 (1941); *Jones & Laughlin Steel Corp., supra,* at 37, 57 S.Ct. 615.
The majority, aware of these difficulties, is nonetheless concerned with what it sees as an important contrary consideration. To determine the lawfulness of statutes simply by asking whether Congress could reasonably have found that *aggregated* local instances significantly affect interstate commerce will allow Congress to regulate almost anything. ***660** Virtually all local activity, when instances are aggregated, can have "substantial effects on employment, production, transit, or consumption." Hence Congress could "regulate any crime," and perhaps "marriage, divorce, and childrearing" as well, obliterating the "Constitution's distinction between national and local authority." *Ante,* at 1752-1753; *Lopez,* 514 U.S., at 558, 115 S.Ct. 1624; cf. *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 548, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (need for distinction between "direct" and "indirect" effects lest there "be virtually no limit to the federal power"); *Hammer v. Dagenhart,* 247 U.S. 251, 276, 38 S.Ct. 529, 62 L.Ed. 1101 (1918) (similar observation).
This consideration, however, while serious, does not reflect a jurisprudential defect, so much as it reflects a practical reality. We live in a Nation knit together by two centuries of scientific, technological, commercial, and environmental change. Those changes, taken together, mean that virtually every kind of activity, no matter how local, genuinely can affect commerce, or its conditions, outside the State--at least when considered in the aggregate. *Heart of Atlanta Motel,* 379 U.S., at 251, 85 S.Ct. 348. And that fact makes it close to impossible for courts to develop meaningful subject-matter categories that would exclude some kinds of local activities from ordinary Commerce Clause "aggregation" rules without, at the same time, depriving Congress of the power to regulate activities that have a genuine and important effect upon interstate commerce.
Since judges cannot change the world, the "defect" means that, within the bounds of the rational, Congress, not the courts, must remain primarily responsible for striking the appropriate state/federal balance. *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 552, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *ante,* at 1768-1771 (SOUTER, J., dissenting); ****1777** *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 93-94, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (STEVENS, J., dissenting) (Framers designed important structural safeguards to ensure that, when Congress legislates, "the normal operation of the legislative process itself would adequately defend ***661** state interests from undue infringement"); see also Kramer, Putting the Politics Back into the Political Safeguards of Federalism, 100 Colum. L.Rev. 215 (2000) (focusing on role of political process and political parties in protecting state interests). Congress is institutionally motivated to do so. Its Members represent state and local district interests. They consider the views of state and local officials when they legislate, and they have even developed formal procedures to ensure that such consideration takes place. See, *e.g.,* Unfunded Mandates Reform Act of 1995, Pub.L. 104-4, 109 Stat. 48 (codified in scattered sections of 2 U.S.C.). Moreover, Congress often can better reflect state concerns for autonomy in the details of sophisticated statutory schemes than can the Judiciary, which cannot easily gather the relevant facts and which must apply more general legal rules and categories. See, *e.g.,* 42 U.S.C. § 7543(b) (Clean Air Act); 33 U.S.C. § 1251 *et seq.* (Clean Water Act); see also *New York v. United States,* 505 U.S. 144, 167-168, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (collecting other examples of "cooperative federalism"). Not surprisingly, the bulk of American law is still state law, and overwhelmingly so.

B

I would also note that Congress, when it enacted the statute, followed procedures that help to protect the federalism values at stake. It provided adequate notice to the States of its intent to legislate in an "are[a] of traditional state regulation." *Ante,* at 1753. And in response, attorneys general in the

overwhelming majority of States (38) supported congressional legislation, telling Congress that "[o]ur experience as Attorneys General strengthens our belief that the problem of violence against women is a national one, requiring federal attention, federal leadership, and federal funds." Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess., 34-36 (1993); see also Violence Against Women: Victims of **662* the System, Hearing on S. 15 before the Senate Committee on the Judiciary, 102d Cong., 1st Sess., 37-38 (1991) (unanimous resolution of the National Association of Attorneys General); but cf. Crimes of Violence Motivated by Gender, *supra,* at 77-84 (Conference of Chief Justices opposing legislation).

Moreover, as Justice SOUTER has pointed out, Congress compiled a "mountain of data" explicitly documenting the interstate commercial effects of gender- motivated crimes of violence. *Ante,* at 1760-1763, 1772-1773 (dissenting opinion). After considering alternatives, it focused the federal law upon documented deficiencies in state legal systems. And it tailored the law to prevent its use in certain areas of traditional state concern, such as divorce, alimony, or child custody. 42 U.S.C. § 13981(e)(4). Consequently, the law before us seems to represent an instance, not of state/federal conflict, but of state/federal efforts to cooperate in order to help solve a mutually acknowledged national problem. Cf. §§ 300w-10, 3796gg, 3796hh, 10409, 13931 (providing federal moneys to encourage state and local initiatives to combat gender-motivated violence).

I call attention to the legislative process leading up to enactment of this statute because, as the majority recognizes, *ante,* at 1752, it far surpasses that which led to the enactment of the statute we considered in Lopez. And even were I to accept Lopez as an accurate statement of the law, which I do not, that distinction provides a possible basis for upholding the law here. This Court on occasion has pointed to the importance of procedural limitations in ***1778* keeping the power of Congress in check. See *Garcia, supra,* at 554, 105 S.Ct. 1005 ("Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a 'sacred province of state autonomy' " (quoting *EEOC v. Wyoming,* 460 U.S. 226, 236, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983))); see **663* also *Gregory v. Ashcroft,* 501 U.S. 452, 460-461, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (insisting upon a "plain statement" of congressional intent when Congress legislates "in areas traditionally regulated by the States"); cf. *Hampton v. Mow Sun Wong,* 426 U.S. 88, 103-105, 114-117, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Fullilove v. Klutznick,* 448 U.S. 448, 548-554, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (STEVENS, J., dissenting).

Commentators also have suggested that the thoroughness of legislative procedures--*e.g.,* whether Congress took a "hard look"--might sometimes make a determinative difference in a Commerce Clause case, say, when Congress legislates in an area of traditional state regulation. See, *e.g.,* Jackson, Federalism and the Uses and Limits of Law: *Printz* and Principle?, 111 Harv. L.Rev. 2180, 2231-2245 (1998); Gardbaum, Rethinking Constitutional Federalism, 74 Texas L.Rev. 795, 812-828, 830-832 (1996); Lessig, Translating Federalism: *United States v. Lopez,* 1995 S.Ct. Rev. 125, 194-214 (1995); see also Treaty Establishing the European Community Art. 5; Bermann, Taking Subsidiarity Seriously: Federalism in the European Community and the United States, 94 Colum. L.Rev. 331, 378-403 (1994) (arguing for similar limitation in respect to somewhat analogous principle of subsidiarity for European Community); Gardbaum, *supra,* at 833-837 (applying subsidiarity principles to American federalism). Of course, any judicial insistence that Congress follow particular procedures might itself intrude upon congressional prerogatives and embody difficult definitional problems. But the intrusion, problems, and consequences all would seem less serious than those embodied in the majority's approach. See *supra,* at 1774-1776.

I continue to agree with Justice SOUTER that the Court's traditional "rational basis" approach is sufficient. *Ante,* at 1759-1760 (dissenting opinion); see also Lopez, 514 U.S., at 603-615, 115 S.Ct. 1624 (SOUTER, J., dissenting); *id.,* at 615-631, 115 S.Ct. 1624 (BREYER, J., dissenting). But I recognize that the law in this area is unstable and that time and experience may demonstrate both the unworkability of the majority's rules and the superiority **664* of Congress' own procedural approach--in which case the law may evolve toward a rule that, in certain difficult Commerce Clause cases, takes account of the thoroughness with which Congress has considered the federalism issue.

For these reasons, as well as those set forth by Justice SOUTER, this statute falls well within Congress' Commerce Clause authority, and I dissent from the Court's contrary conclusion.

II

Given my conclusion on the Commerce Clause question, I need not consider Congress' authority

under § 5 of the Fourteenth Amendment. Nonetheless, I doubt the Court's reasoning rejecting that source of authority. The Court points out that in *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883), and the *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the Court held that § 5 does not authorize Congress to use the Fourteenth Amendment as a source of power to remedy the conduct of *private persons. Ante,* at 1756-1757. That is certainly so. The Federal Government's argument, however, is that Congress used § 5 to remedy the actions of *state actors,* namely, those States which, through discriminatory design or the discriminatory conduct of their officials, failed to provide ***1779** adequate (or any) state remedies for women injured by gender-motivated violence--a failure that the States, and Congress, documented in depth. See *ante,* at 1760-1761, n. 7, 1772-1773 (SOUTER, J., dissenting) (collecting sources).

Neither *Harris* nor the *Civil Rights Cases* considered this kind of claim. The Court in *Harris* specifically said that it treated the federal laws in question as "directed *exclusively* against the action of private persons, without reference to the laws of the State or their administration by her officers." 106 U.S., at 640, 1 S.Ct. 601 (emphasis added); see also *Civil Rights Cases, supra,* at 14, 3 S.Ct. 18 (observing that the statute did "not profess to be corrective of any constitutional wrong committed by the States" and that it established "rules for the conduct ***665** of individuals in society towards each other, ... without referring in any manner to any supposed action of the State or its authorities").

The Court responds directly to the relevant "state actor" claim by finding that the present law lacks " 'congruence and proportionality' " to the state discrimination that it purports to remedy. *Ante,* at 1758; see *City of Boerne v. Flores,* 521 U.S. 507, 526, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). That is because the law, unlike federal laws prohibiting literacy tests for voting, imposing voting rights requirements, or punishing state officials who intentionally discriminated in jury selection, *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); *Ex parte Virginia,* 100 U.S. 339, 25 L.Ed. 676 (1879), is not "directed ... at any State or state actor." *Ante,* at 1758.

But why can Congress not provide a remedy against private actors? Those private actors, of course, did not themselves violate the Constitution. But this Court has held that Congress at least sometimes can enact remedial "[l]egislation ... [that] prohibits conduct which is not itself unconstitutional." *Flores, supra,* at 518, 117 S.Ct. 2157; see also *Katzenbach v. Morgan, supra,* at 651, 86 S.Ct. 1717; *South Carolina v. Katzenbach, supra,* at 308, 86 S.Ct. 803. The statutory remedy does not in any sense purport to "determine what constitutes a constitutional violation." *Flores, supra,* at 519, 117 S.Ct. 2157. It intrudes little upon either States or private parties. It may lead state actors to improve their own remedial systems, primarily through example. It restricts private actors only by imposing liability for private conduct that is, in the main, already forbidden by state law. Why is the remedy "disproportionate"? And given the relation between remedy and violation--the creation of a federal remedy to substitute for constitutionally inadequate state remedies--where is the lack of "congruence"?

The majority adds that Congress found that the problem of inadequacy of state remedies "does not exist in all States, ***666** or even most States." *Ante,* at 1759. But Congress had before it the task force reports of at least 21 States documenting constitutional violations. And it made its own findings about pervasive gender-based stereotypes hampering many state legal systems, sometimes unconstitutionally so. See, *e.g.,* S.Rep. No. 103-138, pp. 38, 41-42, 44-47 (1993); S.Rep. No. 102-197, pp. 39, 44-49 (1991); H.R. Conf. Rep. No. 103-711, p. 385 (1994). The record nowhere reveals a congressional finding that the problem "does not exist" elsewhere. Why can Congress not take the evidence before it as evidence of a national problem? This Court has not previously held that Congress must document the existence of a problem in every State prior to proposing a national solution. And the deference this Court gives to Congress' chosen remedy under § 5, *Flores, supra,* at 536, 117 S.Ct. 2157, suggests that any such requirement would be inappropriate.

Despite my doubts about the majority's § 5 reasoning, I need not, and do not, ***1780** answer the § 5 question, which I would leave for more thorough analysis if necessary on another occasion. Rather, in my view, the Commerce Clause provides an adequate basis for the statute before us. And I would uphold its constitutionality as the "necessary and proper" exercise of legislative power granted to Congress by that Clause.

U.S.,2000.

END OF DOCUMENT

circumstances as objectively as possible, is more consistent with the circumstances of similar capital cases and capital defendants wherein the death penalty was not imposed.

Reforming the test used to identify disproportionate sentences, however, is but one part of the analysis. If proportionality review is to be effective, this Court also must ensure that relevant cases are not omitted from the comparison pool. Concerning the paucity of the pool, in *Bland,* I expressed grave concern that the pool of cases used by the majority in comparative proportionality review analysis was too small. 958 S.W.2d at 679 n. 1 (Birch, J., concurring and dissenting). I reiterate that concern today. I would expand the pool to include, at a minimum, all cases in which the defendant has been convicted of first degree murder regardless of penalty. Ideally, however, the pool should include all cases in which the defendant was initially indicted for a capital offense. In determining proportionality, one must compare all similar crimes and defendants, not just those defendants whose prosecution is more vigorously pursued by the State. Omitting cases in which the death penalty was not sought skews the proportionality analysis, for similar life cases upon which the defendant otherwise could rely often will be excluded. (FN1) While it is acceptable and appropriate that the State should have discretion in seeking the death penalty, it is neither logical nor appropriate for the State to indirectly determine, by the use of prosecutorial discretion, the cases this Court ultimately may consider in determining comparative proportionality aspects of an individual defendant's death sentence.

****29** Other states have approved comparison of all death-eligible cases regardless of whether the death penalty was sought. *See, e.g., New Jersey v. Morton,* 165 N.J. 235, 757 A.2d 184, 189 (2000) (holding that the court would "consider all death-eligible cases, whether or not they were capitally prosecuted, because the State's decision not to prosecute the defendant capitally does not necessarily reflect on the defendant's lack of deathworthiness"); *Washington v. Brown,* 132 Wash.2d 529, 940 P.2d 546, 561 (1997) ("This pool of similar cases includes those in which the death penalty was sought and those in which it was not."); *see also Tichnell,* 468 A.2d at 18 (Md.1983) (including in the pool cases in which the State sought the death penalty, but noting that "we do not preclude any defendant ... [from arguing] that designated non-capital murder cases are similar to the case then under scrutiny and should be taken into account"). Only by implementing such a standard will the Court ensure that our protocol provides a reliable proportionality assessment.

Beyond broadening the pool to more effectively consider all similar first degree murder cases, I submit that one of the primary means for review of that pool of cases, this Court's Rule 12 database, may also need intensive scrutiny and extensive supplemention. Recently, questions have begun to surface concerning whether the Rule 12 database is sufficiently accurate or complete to justify reliance by this Court in crucial reviews of death penalty cases. Especially significant is a series of articles which appeared in The Tennessean newspaper. One of the articles suggests that glaring and pervasive flaws exist in the Rule 12 database. *See* John Shiffman, *Missing Files Raise Doubts About Death Sentences,* The Tennessean (Nashville), July 22, 2001, at A1. The majority's admission that "Rule 12 reports have not been filed in every prior case" is, at best, a substantial understatement. Shiffman writes, "Three of every five first-degree murder convictions [for which a report was required] are missing from the database. So, too, is one of every five death penalty cases, records show. What's more, hundreds of cases included in the database ... are missing important details about the crime, defendant, and victim." *Id.* As irony would have it, *State v. Bland,* 958 S.W.2d 651 (Tenn.1997), the case in which this Court unveiled the "preparation of a Tennessee CD Rom death penalty database which will be used [for proportionality analysis] by this Court and accessible to litigants," is not included in the database. More disturbingly, the fact that life cases are much more likely to be omitted from the database than death cases suggests that defendants are placed at a significant disadvantage in their effort to locate those cases upon which claims of disproportionality may be based. While "traditional research methods" may, as the majority suggests, supplement the Rule 12 reports, such methods are at once more expensive, time consuming, and difficult than a search of the Rule 12 database. Thus, the errors and omissions from the Rule 12 database, whether as extensive as suggested or not, present a very real obstacle for defendants. Moreover, the majority's platitudinous assertion that "experienced judgment and institutional knowledge" (FN2) will somehow overcome the flaws plaguing other facets of the proportionality analysis is likely to be of little comfort to defendants facing a review protocol which is already too subjective. In my view, the errors and omissions in the Rule 12 database, whether many or few, inject into this Court's proportionality review a real possibility of error. Until remedied, this flawed database stands as yet another obstacle to a fair and reliable comparative proportionality review in Tennessee.

****30** Beyond the test used in the majority protocol and the cases to be included in the comparison pool, there remains one additional area of concern in proportionality analysis-the lack of objectivity in identifying which cases are "similar" to the case under review for the purposes of proportionality analysis. I would provide a more objective means for identifying the cases to be used for comparison. As I stated in *Chalmers,* "[w]ithout some objective standard to guide reviewing courts, 'proportionality' becomes nothing more than a statement that the reviewing court was able to describe the case before it in terms comparable to other capital cases." 28 S.W.3d at 924 (Birch, J., concurring and dissenting). The approach taken in Washington may be instructive. In *Washington v. Pirtle,* the Washington Supreme Court noted that quantifiable details such as the number of aggravating circumstances, victims, and prior convictions should be emphasized "in order to be objective as possible." 127 Wash.2d 628, 904 P.2d 245, 276 (1995). Although the *Pirtle* court noted that proportionality is not a task reducible to statistics, it nonetheless emphasized that "numbers can point to areas of concern." *Id.* (FN3)

Within the framework provided by *Bland,* objective criteria could be used to more clearly

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

select which cases should be used for comparison, thus lessening the inclination to subjectively characterize cases in order to reach desired results. Many factors recorded in the trial court's Rule 12 report in first degree murder cases, such as the number and type of aggravating and mitigating factors found by the jury, the defendant and victim's age, race, and gender, the existence or lack of prior convictions, and the number of victims, may be objectively quantified. A case which does not share a significant number of these objective criteria should be used only in rare instances. While more subjective factors such as motive and manner of death may further refine the comparison, these factors are too malleable to justify primary reliance. Emphasis on objective factors would ensure consistency in the review protocol.

The scope of the analysis employed by the majority appears to be rather amorphous and undefined-expanding, contracting, and shifting as the analysis moves from case to case. The difficulties inherent in applying this protocol become evident when applied to the case under submission. The majority lists several factors that it considered in its proportionality analysis. *Inter alia,* it notes that (1) the defendant reacted violently when the victim would not stop crying; (2) the defendant inflicted serious, and ultimately fatal, injuries; (3) the defendant's conduct was not provoked or justified; (4) the victim was helpless; (5) the killing did not appear to be premeditated; (6) the defendant was caring for the victim while the victim's mother was at work; and (7) the defendant delayed seeking assistance for the victim. *See* Majority op. at ----. All of these factors, however, are also present in *State v. Torres,* (FN4) one of the "death" cases the majority includes in its comparison pool. Indeed, except for one additional aggravating circumstance found by the jury (FN5) and evidence that the victim in *Torres* suffered prior abuse, the two cases are remarkably similar.

**31 While the victim in *Torres* may have suffered more serious abuse, the majority's conclusion that this case is "plainly lacking in circumstances" similar to *Torres* seems inconsistent with prior cases in which the majority has sometimes upheld death sentences by comparison to cases so widely divergent that they share no similarity but a single aggravating circumstance found by the jury. In *State v. Bane,* (FN6) for example, the defendant was convicted of choking and stabbing an elderly victim during a planned robbery; the Court upheld the death sentence on a finding that the case was not "plainly lacking in circumstances" with such cases as *State v. Vann,* (FN7) involving an eight-year-old victim killed during the perpetration of aggravated rape and incest; *State v. Hall,* (FN8) involving a defendant who burned his ex-girlfriend to death after pouring gasoline on her while she was lying in the front seat of her car; and *State v. Mann,* (FN9) involving the aggravated rape and murder of an elderly woman. *See Bane,* 57 S.W.3d at 416 n. 2 (Birch, J., concurring and dissenting) (noting that the majority's "notion of similarity appears to be highly malleable"). Given the variety and dissimilarity of cases relied on in the *Bane* proportionality analysis, the majority's finding that the pending case is "plainly lacking in circumstances" similar to *Torres* seems difficult to justify. The majority's analysis, it would seem, may have been guided more by subjective, result-oriented judgment than by an objectively measurable evaluation of the pool of comparison cases.

In sum, then, I would reform the Court's review protocol as follows: First, in order to more reliably identify disproportionate sentences, I would ask whether the case under review was more consistent with "life" or "death" cases, rather than requiring that the case be "plainly lacking in circumstances" comparable to death penalty cases. Second, I would expand the pool of comparison cases to include all first degree murder cases, not just those cases in which the State chose to seek the death penalty, and I would revamp the Court's Rule 12 database to ensure that it is complete, reliable, and accurate. Finally, I would more heavily emphasize objectivity in selecting which cases are "similar" to the case under review for the purposes of comparison. The soundness of the changes I propose may be illustrated through application to the case under submission. This case may not plainly lack circumstances similar to *Torres,* but its objectively measurable aspects certainly are more consistent with the numerous "life" cases cited by the majority. In addition to those cases, I would also include several "life" cases in which the State did not seek the death penalty, thus further reinforcing the conclusion that the death sentence in the case under submission is comparatively disproportionate.

My research and review of the current Rule 12 database of capital cases reveals a number of first degree murder cases involving child abuse which were excluded from comparison by the majority because the State opted not to seek the death penalty. In *State v. Davis,* No. 02C01-9511-CR-00343, 1997 WL 287646 (Tenn.Crim.App.1997), the 22 month old victim, who had been left with the defendant while the victim's mother was at work, died of extreme injuries including organ contusions, broken ribs, broken blood vessels and cuts, bruises, and marks on the neck, face, and abdomen. The defendant originally claimed the victim was injured in a fall, but later admitted spanking and kicking the victim on multiple occasions. The defendant received a life sentence. In *State v. Rhodes,* No. M1999-959-CCA-R3-CD, 2000 WL 264327 (Tenn.Crim.App.2000), the 18 month old victim was brought to the hospital unconscious and in cardiac arrest, with extensive bruising to the arms, legs, and face. The victim died of blunt force trauma to the head. The defendant later confessed to beating the victim with a switch and striking him in the head. The defendant received a life sentence. In *State v. Anthony Hodges,* 7 S.W.3d 609 (Tenn.Crim.App.1999), (FN10) and *State v. Kena Hodges,* No. 01C01-9804-CR-00170, 1999 WL 618861 (Tenn.Crim.App.1999), the 2 year old victim was found dead in the Hodges' residence, already in rigor mortis. The victim had died of blunt force trauma to the head and torso causing intracranial bleeding, swelling, and laceration of the liver. Though the victim was alone with Anthony Hodges for much of the day before her death, there was evidence to indicate that both parents had participated in beating and abusing the victim. Anthony Hodges received a sentence of life without the possibility of parole; Kena Hodges received a life sentence. In *State v. Lyons,* No.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

M1999-00249-CCA-R3-CD, 2000 WL 218131 (Tenn.Crim.App.2000), the defendant babysat the victim while the victim's mother was at work. When the victim's mother returned home, the victim appeared sick. The victim stopped breathing the next day and was transported to the hospital, where she died. An autopsy revealed extensive contusions and scrapes to the head and multiple tears of the mesentery caused by blunt trauma to the abdomen. While left alone during a police interrogation, the defendant was videotaped talking to himself about punching the victim in the stomach. The defendant received a life sentence. In *State v. Burgess,* No. M1999-02040-CCA-R3-CD, 2001 WL 43216 (Tenn.Crim.App.2001), the 16 month old victim was briefly left unsupervised with the defendant by the victim's mother. The mother subsequently discovered the victim was unresponsive, lethargic, and unable to sit or stand. The victim was taken to the hospital, where she died; the cause of death was identified as massive internal bleeding caused by blows of considerable force to the abdomen. The defendant later confessed to hitting the victim in the stomach. The defendant received a life sentence. In *State v. Lacy,* 983 S.W.2d 686 (Tenn.Crim.App.1997), the defendant beat and abused the 5-year-old victim over an extended period of time. The victim was found dead after being left alone for the day with the defendant. The cause of death was determined to be multiple blunt force injuries which caused severe internal bleeding; the victim also had evidence ****31** of burns, scratches, abrasions, scars, and fractures. One doctor testified that the victim had suffered the most severe blunt trauma injuries he had ever seen. The defendant received a sentence of life without the possibility of parole. In *State v. Shephard,* No. E2000-00628-CCA-R3-CD, 2001 WL 767010 (Tenn.Crim.App.2001), (FN11) the victim began crying uncontrollably and showing signs of sickness after being left unsupervised with the defendant. The victim's sickness grew progressively worse. The victim's mother then left the victim unsupervised with the defendant again the following night, and at some point in the evening, the defendant appeared at a hospital with the victim, who was not breathing and had no pulse. The defendant claimed he "accidentally hit [the victim] on the back of the head with a little [toy] TV." The victim died from a cerebral hemorrhage and extensive bilateral hemorrhage in the back layer of both eyes. The victim also suffered from two broken ribs caused by "enormous pressure of squeezing." The defendant received a sentence of life without the possibility of parole.

****32.** When the facts of the case under submission are compared to the cases listed above and to those cases listed by the majority in which the defendant received a death sentence, (FN12) it is clear that the State typically does not seek the death penalty, and juries typically do not impose the death penalty, in cases similar to Godsey's case. Indeed, most of the "life" cases listed above exhibit significantly more egregious circumstances than the case before the Court. Thus, Godsey's death sentence appears to be aberrant. Because Godsey's case is more consistent with cases for which defendants typically receive a sentence of life or life without the possibility of parole, I concur in the majority's decision to modify his sentence to life imprisonment.

In light of the issues I have discussed above, I continue to be dissatisfied with the comparative proportionality review protocol embraced by the majority. Until the flaws in our review protocol are corrected, I am constrained to hold that comparative proportionality review, as applied by the majority, "creates an impression of enormous regulatory effort but achieves negligible regulatory effects." *Cf.* Carol S. Steiker and Jordan M. Steiker, *Sober Second Thoughts: Reflections on Two Decades of Constitutional Regulation of Capital Punishment,* 109 Harv. L.Rev. 355 (1995) (generally discussing capital punishment). Accordingly, I respectfully dissent.

(FN1.) Tenn.Code Ann. § 39-13-204(i)(1).

(FN2.) At this time, Ms. Marshall's other children were visiting her mother.

(FN3.) Ms. Marshall testified that she was gone six minutes. The defendant stated that she was gone three minutes at most.

(FN4.) The defendant did not accompany Ms. Marshall to the emergency room because he was not dressed and because he had to arrange care for Christian's daughter who had remained with Ms. Marshall after Christian went home.

(FN5.) A CAT scan, or computerized axial tomography, involves the use of x-rays to gather "anatomical information from a cross-sectional plane of the body...." Steadman's Medical Dictionary 1459 (5th ed.1984).

(FN6.) *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(FN7.) *People v. Holt,* 15 Cal.4th 619, 63 Cal.Rptr.2d 782, 937 P.2d 213 (1997) (holding that the failure to record statements did not violate the due process clause of either the state or federal constitution); *People v. Raibon,* 843 P.2d 46 (Colo.Ct.App.1992) (holding that the failure to videotape or audiotape the defendant's statements did not violate the defendant's due process rights under the Colorado Constitution); *Coleman v. State,* 189 Ga.App. 366, 375 S.E.2d 663 (1988) (holding that police were not required to electronically record the defendant's custodial statements in order for the statements to be admissible); *State v. Kekona,* 77 Hawai'i 403, 886 P.2d 740 (1994) (holding that the failure to electronically record custodial interrogation was not a due process violation); *State v. Rhoades,* 120 Idaho 795, 820 P.2d 665 (1991) (holding that statements made in custody do not have to be tape-recorded in order to be admissible); *People v. Everette,* 187 Ill.App.3d 1063, 135 Ill.Dec. 472, 543 N.E.2d 1040 (1989) (holding that the failure to record defendant's statements did not violate the due process clause of the Illinois Constitution); *Stoker v. State,* 692 N.E.2d 1386 (Ind.Ct.App.1998) (holding that the Indiana Constitution imposed no specific duty upon law enforcement officers to record or preserve custodial interrogations in places of detention); *State v. Buzzell,* 617 A.2d 1016 (Me.1992) (holding that the due process clause of the Maine Constitution does not require recording of custodial interrogations); *Commonwealth v. Diaz,* 422 Mass. 269, 661 N.E.2d 1326 (1996) (holding

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

that custodial statements did not have to be suppressed even though they were not electronically recorded); *People v. Fike,* 228 Mich.App. 178, 577 N.W.2d 903 (1998)(holding that the due process clause of the Michigan Constitution does not require the recording of custodial confessions); *Williams v. State,* 522 So.2d 201 (Miss.1988)(refusing to require electronic recording of custodial interrogation as a prerequisite to admissibility); *Commonwealth v. Craft,* 447 Pa.Super.371, 669 A.2d 394 (Pa.Super.Ct.1995) (holding that the Pennsylvania Constitution does not require recording of custodial interrogations); *State v. James,* 858 P.2d 1012 (Utah Ct.App.1993) (holding that the Utah Constitution does not require electronic recording of custodial interrogations); *State v. Gorton,* 149 Vt. 602, 548 A.2d 419 (1988) (refusing to adopt a constitutional rule requiring the taping of custodial interrogations); *State v. Kilmer,* 190 W.Va. 617, 439 S.E.2d 881 (1993) (holding that the due process clause of the West Virginia Constitution does not require that police electronically record custodial interrogations).

**32_ (FN8.) 1995 Tenn. Pub. Acts 460.

(FN9.) *See, e.g., Barnett,* 783 So.2d at 930-31 (applying the merger doctrine where the first degree felony murder statute allowing conviction based upon certain enumerated felonies and "any other felony clearly dangerous to human life"); *Hansen,* 36 Cal.Rptr.2d 609, 885 P.2d at 1025-1026 (applying the merger doctrine where the second degree felony murder statute authorized conviction for a killing committed during any felony inherently dangerous to human life); *Foster v. State,* 264 Ga. 369, 444 S.E.2d 296, 297 (1994) (applying the merger doctrine where a first degree felony murder statute authorized a conviction for a killing committed during the perpetration of "a felony"); *People v. Morgan,* 307 Ill.App.3d 707, 240 Ill.Dec. 725, 718 N.E.2d 206, 209 (1999) (applying the merger doctrine where a first degree felony murder statute authorized conviction for a killing committed during the perpetration of any forcible felony); *Commonwealth v. Wade,* 428 Mass. 147, 697 N.E.2d 541, 545-546 (1998) (applying the merger doctrine where the first degree felony murder statute authorized conviction for a killing committed during the perpetration of any felony punishable by life imprisonment); *Campos,* 921 P.2d at 1270-1272 (applying the merger doctrine where the first degree felony murder statute did not enumerate possible predicate felonies); *State v. Branch,* 244 Or. 97, 415 P.2d 766, 767 (1966)(applying the merger doctrine where the second degree felony murder statute authorized conviction for a killing during the perpetration of any felony other than those specifically designated by the legislature as capable of supporting a first degree felony murder conviction).

(FN10.) That statute was effective until July 1, 1995 and provided in pertinent part as follows: "First Degree murder is ... (4)[a] reckless killing of a child less than sixteen (16) years of age, if the child's death results from aggravated child abuse, as defined by § 39-15-402, committed by the defendant against the child."

(FN11.) The statute under which Godsey was convicted provides in pertinent part as follows:

"(a) First degree murder is ... (2) A killing of another committed in the perpetration of or attempt to perpetrate ... aggravated child abuse...." Tenn.Code Ann. § 39-13-202(a)(2) & (b).

(FN12.) *Cf.* footnote 3 in *State v. James Lloyd Julian, II,* No. 03C01-9511-CV-00371, 1997 WL 412539 (Tenn.Crim.App., July 24, 1997) (suggesting that the trial court might err if it allowed a jury considering the death penalty to consider aggravating circumstance (i)(1) where the indictment charged rape of a child or especially aggravated kidnapping as the underlying felony of felony murder).

(FN13.) In its entirety the statute provides:

(a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:

(1) The act of abuse or neglect results in serious bodily injury to the child; or

(2) A deadly weapon is used to accomplish the act of abuse.

(b) A violation of this section is a Class B Felony; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

(FN14.) In so stating we are aware that aggravated child abuse is punishable as a Class A felony if the victim is under six years of age. In fact, in *Ducker,* this Court held that when the State is invoking this enhanced punishment portion of the aggravated child abuse statute, the age of the victim is an essential element of the Class A felony, aggravated child abuse, and as such, must be charged to the jury. *Id.,* 27 S.W.3d at 899. The defendant in *Ducker* had been convicted of two counts of aggravated child abuse. Therefore, the key issue was the appropriate felony classification for purposes of sentencing. However, when the State is seeking a conviction for felony murder by aggravated child abuse, the enhanced punishment portion of the aggravated child abuse statute is not relevant. If the defendant is found guilty of felony murder by aggravated child abuse, the sentencing provisions for first degree murder will apply, not the sentencing provisions for aggravated child abuse. Therefore, the age of the victim contained in subsection (b) of the aggravated child abuse statute is not an essential element of the offense of felony murder by aggravated child abuse.

**32_ (FN15.) *See, Willett v. State,* 322 Ark. 613, 911 S.W.2d 937, 945-46 (1995) (stating that Arkansas Supreme Court will no longer conduct proportionality reviews); *State v. Salazar,* 173 Ariz. 399, 844 P.2d 566, 583-84 (1992) (stating that the Arizona Supreme Court will discontinue proportionality review); 1995 Conn. Acts 16, § 3(b) (Reg.Sess.) (repealing the statutory provision requiring proportionality review); 1994 Idaho

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Sess. Laws 127 (S.B.1302) (same); 1992 Md. Laws 331 (H.B.590) (same); 1985 Nev. Stat. 527 (same); 1985 Okla. Sess. Laws, Ch. 265, § 1 (same); 1997 Pa.Legis.Serv. Act 1997-28, § 1 (S.B.423) (same); Wyo. Stat. § 6-4-103(d) (same).

(FN16.) *Gregg,* 428 U.S. at 206, 96 S.Ct. at 2940; *Bland,* 958 S.W.2d at 665; *State v. Webb,* 238 Conn. 389, 680 A.2d 147, 211 (1996); *State v. Welcome,* 458 So.2d 1235, 1258 (La.1983); *Tichnell,* 468 A.2d at 15; *State v. McNeill,* 346 N.C. 233, 485 S.E.2d 284, 289 (1997); *State v. Bey,* 137 N.J. 334, 645 A.2d 685 (1994); *State v. Rhines,* 548 N.W.2d 415, 457 (S.D.1996); *Pirtle,* 127 Wash.2d 628, 904 P.2d 245, 276 (1995).

(FN17.) As pointed out in *Bland,* defendants are not precluded from relying upon and utilizing the entire "universe" of first degree murder cases when attempting to establish a claim for selective prosecution under the Equal Protection Clause, *see Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). *See Bland,* 958 S.W.2d at 666, n. 17.

(FN18.) Of the twenty states which still require comparative review, only three states include in the pool all death-eligible homicide convictions or indictments. *See* Ga.Code Ann. § 17-10-37(a); *State v. Martin,* 376 So.2d 300, 312-13 (La.1979); N.Y. Jud. Law § 211 a (death-eligible indictments). New Hampshire has not defined the pool for comparison because it has no one on death row, even though it has a capital sentencing scheme. Of the remaining sixteen states, eight limit the pool for comparison to cases in which a death sentence actually has been imposed. *See Beck v. State,* 396 So.2d 645, 664 (Ala.1980); *Williams v. State,* 437 So.2d 133, 137 (Fla.1983); *Gall v. Commonwealth,* 607 S.W.2d 97 (Ky.1980) ; *King v. State,* 421 So.2d 1009 (Miss.1982); *State v. Palmer,* 224 Neb. 282, 399 N.W.2d 706, 733 (1986); N.J. Stat. Ann. § 2C:11-3; *State v. Steffen,* 31 Ohio St.3d 111, 509 N.E.2d 383, 395 (1987); *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63 (1982). Eight other states consider cases in which a capital sentencing hearing actually was held and death was a sentencing option, regardless of the sentence actually imposed. *See Flamer v. State,* 490 A.2d 104, 139 (Del.1983); *State v. Whitfield,* 837 S.W.2d 503, 515 (Mo.1992) (en banc); *State v. Smith,* 280 Mont. 158, 931 P.2d 1272, 1285 (1996); *State v. Garcia,* 99 N.M. 771, 664 P.2d 969 (1983); *State v. Williams,* 308 N.C. 47, 301 S.E.2d 335, 355 (1983); *Rhines,* 548 N.W.2d at 455 (S.D.1996); *Jenkins v. Commonwealth,* 244 Va. 445, 423 S.E.2d 360, 371 (1992); Wash. Rev.Code Ann. § 10.95.130(2)(b).

(FN19.) Under current law a sentencing hearing may be conducted to determine whether the sentence should be life imprisonment or life imprisonment without the possibility of parole, even if the State does not seek the death penalty. Tenn.Code Ann. § 39-13-204(a). Under prior law, a penalty hearing was held only if the State sought the death penalty.

**32_ (FN20.) Before the CD-ROM became available in June of 1999, the only available source for attorneys statewide to review the Rule 12 Reports was in the Appellate Court Clerk's Office in Nashville.

(FN21.) *Cazes,* 875 S.W.2d at 270-71.

(FN22.) As the North Carolina Supreme Court noted in *State v. Williams,* 308 N.C. 47, 301 S.E.2d 335, 355 (1983), "[e]ven those with extensive training in data collection and statistical evaluation and analysis are unable to agree concerning the type of statistical methodology which should be employed if statistical or mathematical models are adopted for purposes of proportionality review." (Citing Baldus, Pulaski, Woodworth and Kyle, *Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach,* 33 Stan. L.Rev. 1 (1980); Dix, *Appellate Review of the Decision to Impose Death,* 68 Geo. L.J. 97 (1979)).

(FN23.) The dissent asserts that our discussion of *Middlebrooks* and *Teel* is inappropriate because they are not "similar" cases as required by statute. We agree with the dissent that these cases are not factually similar to the case under consideration; however, they were relied upon by the defendant to illustrate that every other capital case in Tennessee involving a child victim is much more aggravated than the killing in the instant case. Given the defendant's assertion, our consideration of every prior capital case involving minor victims is appropriate.

(FN24.) We do not agree with the dissent's assertion that discussion of *Torres* in this case "may be problematic" since *Torres* will be reviewed by this Court pursuant to Tenn.Code Ann. § 39-13-206(a)(1)(2000). As previously stated, the pool of similar cases for comparison includes all first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and a sentencing jury determines whether the sentence should be life, life without the possibility of parole, or death. Whether or not an appeal is taken and whether or not any appeal taken is concluded is not relevant to determining which cases are included in the pool. Comparative proportionality review focuses upon the sentencing decisions made by jurors across the State in similar cases, involving similar defendants. *Torres* clearly is a part of the pool for purposes of comparative proportionality review, and therefore may appropriately be considered and discussed, regardless of the status of any appeal. We emphasize that our discussion of *Torres* does not constitute a judgment or prejudgment of the validity of his conviction or sentence. It is pertinent here because it is a similar case in which a jury imposed the death penalty, and both the State and the defendant herein relied upon *Torres.* Unlike the dissent, we discern no problem with discussing *Torres* in this context.

(FN1.) Moreover, one of the greatest sources of inconsistency in capital sentencing may arise at the prosecutorial level, where the State possesses almost unbridled discretion to choose which cases will be prosecuted as death penalty cases. For example, a cursory review of the Rule 12 reports filed in first degree murder cases seems to suggest

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

that prosecutors in some counties frequently seek the death penalty in cases for which prosecutors of other counties do not seek the death penalty. While this conclusion is admittedly unscientific, there exists at least the possibility that a given defendant's chances of receiving the death penalty may depend more upon the county where the crime occurred than upon the nature of the crime itself. The legislature has expressed its intent, in the Criminal Sentencing Reform Act of 1989, that defendants be fairly and consistently treated and that "unjustified disparity in sentencing" be eliminated. *See* Tenn.Code Ann. § 40-35-102(2), (3) (2000); *see also id.* § 40-35-103(3)(noting that "[i]nequalities in sentences that are unrelated to a purpose of [the Sentencing Reform Act] should be avoided"). Thus, under principles espoused in the Sentencing Reform Act, this Court should strive to ensure that inconsistencies in death sentencing such as regional disparities in prosecutorial decision-making are corrected. It is difficult, however, for this Court to squarely address whether the death penalty is being inconsistently applied if comparative proportionality review cannot take into account those cases in which prosecutors choose not to seek the death penalty.

****32** (FN2.) Majority op. at ----.

(FN3.) This is not to say that the Court must engage in complex statistical analysis in order to conduct a reliable proportionality review. A statistical analysis likely would result in a significant increase in expense and complexity without appreciably increasing the overall reliability of the review. New Jersey, for example, has implemented a statistical protocol based upon a complex, subdivided database of capital cases, but the small sample size of the comparison pool and problems inherent in quantifying such abstractions as motive and type of murder have forced the Court to focus upon a precedent-seeking process similar to that used in Tennessee. *See generally* *New Jersey v. Loftin,* 157 N.J. 253, 724 A.2d 129, 148-52 (1999) ("Because frequency analysis is statistically based, and because conclusions drawn from small sample sizes are inherently unreliable, we have not had confidence in the results produced by the models.").

(FN4.) No. E1999-00866-CCA-R3-DD, 2001 WL 245137 (Tenn.Crim.App.2001). The death sentence imposed in *Torres* is presently before this Court on automatic appellate review pursuant to Tenn.Code Ann. § 39-13-206(a)(1) (2000). That review is currently pending. I note in passing that it may be problematic for this Court to rely upon *Torres* in its proportionality analysis when we have not yet decided whether the death sentence imposed in *Torres* is proportionate.

(FN5.) The jury in *Torres* found the aggravating factors listed at Tenn.Code Ann. § 39-13-204(i)(1) (1993) ("victim was less than twelve years of age, and the defendant was eighteen years of age or older") and Tenn.Code Ann. § 39-13-204(i)(5) ("especially heinous, atrocious or cruel in that [the killing] involved torture or serious physical abuse beyond that necessary to produce death"). *Torres,* 2001 WL 245137 at *1.

(FN6.) 57 S.W.3d 411 (Tenn.2001).

(FN7.) 976 S.W.2d 93 (Tenn.1998).

(FN8.) 958 S.W.2d 679 (Tenn.1997).

(FN9.) 959 S.W.2d 503 (Tenn.1997).

(FN10.) This case is missing from the Rule 12 database.

(FN11.) This case is missing from the Rule 12 database.

(FN12.) Moreover, I question whether some of the "death" cases relied upon by the majority are sufficiently similar to merit comparison to the case under submission. For instance, when the objectively measurable details of *State v. Middlebrooks* and *State v. Teel* are examined, it becomes apparent that these cases bear little relationship to the circumstances of Godsey's case. Both of these cases involved teenage victims rather than infants, the jury in both cases found the "heinous, atrocious, or cruel" aggravating circumstance that was not found in this case, both cases involved brutal rapes, and neither case involved circumstances typically found in child abuse cases. As the majority correctly notes, no two cases are exactly alike, and therefore any one of these distinctions in isolation might not render a case "dissimilar." The multitude and significance of the dissimilar factors in *Middlebrooks* and *Teel,* however, are sufficient to make those cases inappropriate in light of the statutory requirement that proportionality analysis be restricted to "similar cases." *See* Tenn.Code Ann. § 39-13-206(c)(1)(D) (2000).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*411 57 S.W.3d 411

Supreme Court of Tennessee
at Jackson.

STATE of Tennessee
v.
John Michael BANE.
July 3, 2001.

Defendant was convicted in the Criminal Court, Shelby County, John P. Colton, Jr., J., of murder in the first degree in the perpetration of a robbery, and was sentenced to death, and he appealed. The Supreme Court, O'Brien, J., 853 S.W.2d 483, affirmed conviction but remanded for resentencing. On remand, jury again imposed sentence of death, and defendant appealed. The Court of Criminal Appeals affirmed, and case was docketed for automatic review. The Supreme Court, Anderson, C.J., held that: (1) jury was properly instructed as to use of accomplice testimony; (2) accomplice's mental and psychological records were cumulative to his own testimony and were properly excluded; (3) court's refusal to exempt defendant's expert witness from rule of witness sequestration was harmless error; (4) evidence of defendant's relationships with several women was admissible to rebut defendant's mitigating evidence concerning his marriage and children; (5) prosecutor's references to defendant as co-defendant's "sweetheart" during closing argument were not improper; (6) evidence supported application of all aggravating circumstances; and (7) death penalty was not disproportionate.

Affirmed.

Birch, J., concurred in part and dissented in part with opinion.

West Headnotes

[1] Criminal Law ⚷510
110 ----
110XVII Evidence
110XVII(S) Testimony of Accomplices and Codefendants
110XVII(S)2 Corroboration
110k510 Necessity.
Conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense.

[2] Sentencing and Punishment ⚷1756
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1756 In General.
Corroboration requirement does not apply to an accomplice testifying in the sentencing phase of a capital trial.

[3] Sentencing and Punishment ⚷1756
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1756 In General.
No statutory provision requires corroboration of an accomplice's testimony for the finding of an aggravating circumstance in the sentencing phase of a capital trial; statute governing the admissibility of evidence in the sentencing phase of a capital trial contains no express provision regarding the corroboration of accomplice testimony and instead affords the trial court wide discretion in ruling upon the admissibility of evidence. T.C.A. § 39-13-204(c).

[4] Sentencing and Punishment ⚷1756
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1756 In General.
There is no basis or rationale for applying the corroboration requirement in a capital sentencing proceeding; in a capital sentencing proceeding, the defendant has already been convicted of the offense, and the testimony of any accomplice has been subject to the corroboration requirement during the guilt phase of the trial.

[5] Criminal Law ⚷510
110 ----
110XVII Evidence
110XVII(S) Testimony of Accomplices and Codefendants
110XVII(S)2 Corroboration
110k510 Necessity.
Purpose of the corroboration requirement is to assure that a conviction is not predicated solely upon the testimony of a witness who was also involved in the commission of the offense.

[6] Sentencing and Punishment ⚷1756
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1756 In General.
Capital sentencing scheme as a whole contains numerous specific provisions to ensure a high degree of reliability in deciding whether a death sentence is appropriate, obviating the need for corroboration of an accomplice's testimony at sentencing. T.C.A. §§ 39-2-203(g), 39-2-205(c) (Repealed).

[7] Sentencing and Punishment ⚷1780(3)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1780 Conduct of Hearing
350Hk1780(3) Instructions.
Instruction permitting jury to consider one witness' uncorroborated accomplice status, lack of credibility, and fact that he was not charged with or convicted of any crime in connection with capital murder, as part of any non-statutory mitigation, was not warranted during sentencing phase of capital murder prosecution, where under version of applicable statute then in effect, trial court was not required to instruct jury on non-statutory mitigating factors.

[8] Sentencing and Punishment ⚷1789(9)

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1789 Review of Proceedings to Impose Death Sentence
350Hk1789(9) Harmless and Reversible Error.
Any error in sentencing court's refusal of capital murder defendant's proposed jury instructions, permitting jury to consider one witness' uncorroborated accomplice status, lack of credibility, and fact that he was not charged with or convicted of any crime as part of any non-statutory mitigation, did not prejudice defendant and was therefore harmless, where evidence of witness' involvement in murder and his inconsistent statements was heard by jury, and defense vigorously argued that such evidence impeached witness and cast doubt on defendant's involvement in murder.

[9] Sentencing and Punishment ⚿1782
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1782 Reception of Evidence.
Sentencing court did not abuse its discretion, in penalty phase of capital murder prosecution, in ruling that mental and psychological records of a witness were cumulative to witness' own testimony and therefore inadmissible, especially where records were irrelevant to witness's alleged impaired capacity at time of murder or at time of witness' testimony; defense was allowed to inquire extensively into witness' medical and psychological background, and witness testified concerning his two suicide attempts, his treatment in two mental health facilities, his sister's suicide, and his history of using marijuana, cocaine, alcohol, and speed. Rules of Evid., Rule 617.

[10] Sentencing and Punishment ⚿2265
350H ----
350HXII Reconsideration and Modification of Sentence
350HXII(B) Grounds and Considerations
350Hk2265 Death Sentence.
Defendant is permitted to present evidence of "residual doubt" as a non-statutory mitigating factor in a re-sentencing proceeding.

[11] Sentencing and Punishment ⚿1782
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1782 Reception of Evidence.
Trial court improperly refused to exempt capital murder defendant's expert witness, a pathologist, from rule of witness sequestration during retrial of penalty phase, where purpose of rule was not served by sequestering an expert witness; allowing expert witness to remain in courtroom would not have created risk that expert would alter or change factual testimony based on what was heard in courtroom, especially given that rules of evidence specifically permitted expert to base opinion testimony on evidence or facts made known to him at or before a hearing, whether or not such evidence ***411** or facts were admissible at trial. Rules of Evid., Rules 615, 703.

[12] Criminal Law ⚿665(1)
110 ----
110XX Trial
110XX(C) Reception of Evidence
110k665 Separation and Exclusion of Witnesses
110k665(1) Power and Duty of Court.
Purpose of the rule of witness sequestration, simply put, is to prevent a witness from changing or altering his or her testimony based on testimony heard or facts learned from other testifying witnesses. Rules of Evid., Rule 615.

[13] Sentencing and Punishment ⚿1789(9)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1789 Review of Proceedings to Impose Death Sentence
350Hk1789(9) Harmless and Reversible Error.
Trial court's erroneous failure to exempt capital murder defendant's expert witness from rule of witness sequestration during retrial of penalty phase did not prejudice defendant and was harmless, despite defendant's contention that his expert's assistance was required to enable him to rebut testimony of medical examiner, absent any offer of proof as to how cross-examination of medical examiner would have differed had his expert not been sequestered; defendant and his expert had benefit of medical examiner's testimony and evidence from defendant's initial trial, and medical examiner's testimony was not so detailed or complex as to be beyond ability of defense counsel to comprehend unaided. Rules of Evid., Rule 615.

[14] Sentencing and Punishment ⚿1782
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1782 Reception of Evidence.
Evidence of capital murder defendant's relationships with several women was admissible, during retrial of penalty phase, to rebut defendant's mitigating evidence of his family background, marriage and children, and did not amount to evidence of a non-statutory aggravating factor.

[15] Sentencing and Punishment ⚿1782
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1782 Reception of Evidence.
Prosecution is permitted to rebut any mitigating factors relied on by a capital defendant. T.C.A. § 39-2-203(c) (Repealed).

[16] Sentencing and Punishment ⚿1780(2)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1780 Conduct of Hearing
350Hk1780(2) Arguments and Conduct of Counsel.
Prosecutor's references to capital murder defendant as co-defendant's "sweetheart" during closing argument in retrial of penalty phase, and argument that defendant was seeing another woman

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

despite having "moved in" with co-defendant, were based on evidence, were not designed to assert non-statutory aggravating circumstance, and were in large part proper response to defendant's frequent attacks on credibility of co-defendant's son, a principal witness for the state.

[17] Criminal Law 708.1
110 ----
110XX Trial
110XX(E) Arguments and Conduct of Counsel
110k708 Scope and Effect of Summing Up
110k708.1 In General.
Closing argument is a valuable privilege that should not be unduly restricted.

[18] Criminal Law 724(1)
110 ----
110XX Trial
110XX(E) Arguments and Conduct of Counsel
110k722 Comments on Character or Conduct
110k724 Abusive Language
110k724(1) In General.
Prosecutor may not engage in derogatory remarks or name calling during closing argument

[19] Criminal Law 699
110 ----
110XX Trial
110XX(E) Arguments and Conduct of Counsel
110k699 Control by Court in General.

[See headnote text below]

[19] Criminal Law 1154
110 ----
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1154 Arguments and Conduct of Counsel.
Trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of that discretion.

[20] Criminal Law 1171.1(1)
110 ----
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1171 Arguments and Conduct of Counsel
110k1171.1 In General
110k1171.1(1) Conduct of Counsel in General.
Prosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome to the prejudice of the defendant.

[21] Sentencing and Punishment 1789(9)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1789 Review of Proceedings to Impose Death Sentence
350Hk1789(9) Harmless and Reversible Error.
Any error in prosecutor's references to capital murder defendant as co-defendant's "sweetheart" during closing argument in retrial of penalty phase, or prosecutorial argument that defendant was seeing another woman despite having "moved in" with co-defendant, in no way affected verdict to defendant's prejudice and was therefore harmless.

[22] Sentencing and Punishment 1684
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1684 Vileness, Heinousness, or Atrocity.
Evidence on retrial of penalty phase of capital murder prosecution was sufficient to support application of "heinous, atrocious, or cruel" aggravating circumstance; defendant repeatedly beat 60-year-old victim, causing bruises and injuries to victim's face, eyes, head, arms and hip, victim was forcibly gagged, plastic bag was placed over his head and tied around his neck with electrical cord, victim was then strangled, forensic evidence permitted inference that unconsciousness was not instantaneous and that victim was still alive when placed in bathtub full of water, where his face was held by a plunger. T.C.A. § 39-2-203(i)(5) (Repealed).

[23] Sentencing and Punishment 1625
350H ----
350HVIII The Death Penalty
350HVIII(A) In General
350Hk1622 Validity of Statute or Regulatory Provision
350Hk1625 Aggravating or Mitigating Circumstances.
"Heinous, atrocious, or cruel" aggravating circumstance is not vague, overly broad, or otherwise invalid. T.C.A. § 39-2-203(i)(5) (Repealed).

[24] Sentencing and Punishment 1789(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1789 Review of Proceedings to Impose Death Sentence
350Hk1789(6) Presumptions.

[See headnote text below]

[24] Sentencing and Punishment 1789(8)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1789 Review of Proceedings to Impose Death Sentence
350Hk1789(8) Verdict and Findings.
In determining whether the evidence in the penalty phase of a capital trial was sufficient to support the jury's application of an aggravating circumstance, the Supreme Court must determine whether, after viewing the evidence in a light most favorable to the state, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt.

[25] Sentencing and Punishment 1682
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1682 Escape or Other Obstruction of Justice.
"Avoiding, interfering with, or preventing a lawful arrest or prosecution" aggravating circumstance does not unconstitutionally fail to narrow the class of death-eligible offenders. T.C.A. § 39-2-203(i)(6) (Repealed).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[26] Sentencing and Punishment ⚿1660
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1660 Dual Use *411 of Evidence or Aggravating Factor.

[See headnote text below]

[26] Sentencing and Punishment ⚿1682
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1682 Escape or Other Obstruction of Justice.

"Avoiding, interfering with, or preventing a lawful arrest or prosecution" aggravating circumstance, as applied on retrial of penalty phase of capital murder prosecution, did not duplicate elements of underlying offense of felony murder in perpetration of robbery and sufficiently narrowed class of persons eligible for penalty of death; underlying offense required state to establish that victim was killed in perpetration or attempt to perpetrate robbery of victim, and did not require evidence that killing was for purpose of avoiding, interfering with, or preventing lawful arrest or prosecution. T.C.A. §§ 39-2-202(a), 39-2-203(i)(6) (Repealed).

[27] Sentencing and Punishment ⚿1789(10)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1789 Review of Proceedings to Impose Death Sentence
350Hk1789(10) Determination and Disposition.

Prosecution's failure to rely upon "avoiding, interfering with, or preventing a lawful arrest or prosecution" aggravating circumstance in original capital sentencing proceeding did not bar reliance thereon upon retrial of penalty phase, where prosecution had also sought death penalty in original trial. T.C.A. § 39-2-203(i)(6) (Repealed).

[28] Sentencing and Punishment ⚿1682
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1682 Escape or Other Obstruction of Justice.

Evidence on retrial of penalty phase of capital murder prosecution was sufficient to support application of "avoiding, interfering with, or preventing a lawful arrest or prosecution" aggravating circumstance; defendant planned robbery of victim with co-defendant, an acquaintance of victim, defendant said that victim would have to be killed because he knew co-defendant and could report that she was involved, and defendant and co-defendant robbed victim of over $700 and various personal property. T.C.A. § 39-2-203(i)(6) (Repealed).

[29] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.

Where a defendant has been sentenced to death, the Supreme Court is required to undertake a comparative proportionality review; the analysis is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is disproportionate to the punishment imposed on others convicted of the same crime. T.C.A. § 39-13-206(c)(1) (Repealed).

[30] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.

If a capital case is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed, then a death sentence is "disproportionate." T.C.A. § 39-13-205(c)(1) (Repealed).

[31] Criminal Law ⚿1134(2)
110 ----
110XXIV Review
110XXIV(L) Scope of Review in General
110k1134 Scope and Extent in General
110k1134(2) Matters or Evidence Considered.

"Precedent-seeking method of comparative proportionality review" compares a case with cases involving similar defendants and similar crimes. T.C.A. § 39-13-205(c)(1) (Repealed).

[32] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.

In conducting comparative proportionality review of a death sentence, the Supreme Court considers numerous factors regarding the offense: (1) means of death; (2) manner of death; (3) motivation for the killing; (4) place of death; (5) victim's age, physical condition, and psychological condition; (6) absence or presence of premeditation; (7) absence or presence of provocation; (8) absence or presence of justification; and (9) injury to and effect on non-decedent victims. T.C.A. § 39-13-205(c)(1) (Repealed).

[33] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.

In conducting comparative proportionality review of a death sentence, the Supreme Court considers multiple factors about the defendant: (1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. T.C.A. § 39-13-205(c)(1) (Repealed).

[34] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Since no two capital defendants and no two crimes are precisely alike, the Supreme Court's proportionality review of a death sentence is not mechanical or based on a rigid formula. T.C.A. § 39-13-205(c)(1) (Repealed).

[35] Sentencing and Punishment 1669
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1669 Extent of Offender's Personal Participation.

[See headnote text below]

[35] Sentencing and Punishment 1676
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1676 Planning, Premeditation, and Calculation.

[See headnote text below]

[35] Sentencing and Punishment 1718
350H ----
350HVIII The Death Penalty
350HVIII(E) Factors Related to Offender
350Hk1718 Remorse and Actual or Potential Rehabilitation.

[See headnote text below]

[35] Sentencing and Punishment 1719
350H ----
350HVIII The Death Penalty
350HVIII(E) Factors Related to Offender
350Hk1719 Assistance to Authorities and Cooperation.
Death penalty was neither arbitrary nor disproportionate, given circumstances of murder, where defendant played major role in offense and did not cooperate with authorities or express remorse; defendant and co-defendant actively planned robbery of an acquaintance of co-defendant's, defendant stated that victim would have to be killed to keep him from reporting robbery, defendant repeatedly beat 60-year-old victim as victim tried to resist, gagged victim with a cloth, placed plastic bag over his head, tied bag around his neck with electrical cord, and strangled him, and victim was placed in bathtub while still alive and plunger was used to hold his head under water. T.C.A. § 39-13-205(c)(1) (Repealed).

***415** Joseph S. Ozment, Memphis, TN, and Charles S. Kelly, Dyersburg, TN, for the appellant, John Michael Bane.

Michael E. Moore, Solicitor General; Amy L. Tarkington, Deputy Attorney General; William L. Gibbons, District Attorney General; and Thomas D. Henderson and Kevin R. Rardin, Assistant District Attorneys General, for the appellee, State of Tennessee.

OPINION

E. RILEY ANDERSON, C.J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.

The defendant, John Michael Bane, was convicted of felony murder in the perpetration ***416** of a robbery for an offense committed in November of 1988. The jury originally imposed a sentence of death after it found that evidence of two aggravating circumstances--(1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind and (2) the murder was committed during the perpetration of a felony--outweighed evidence of any mitigating factors. See Tenn.Code Ann. § 39-2-203(i)(5), (7) (1982). On appeal, this Court affirmed the conviction, but remanded for a new sentencing hearing because the jury's application of the felony murder aggravating circumstance duplicated the offense of felony murder in violation of article I, section 16 of the Tennessee Constitution. See **State v. Bane**, 853 S.W.2d 483 (Tenn.1993). After a new sentencing hearing, the jury again imposed a sentence of death after it found that evidence of two aggravating circumstances--(1) the murder was "especially atrocious or cruel in that it involved torture and depravity of mind" and (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another--outweighed evidence of any mitigating factors. See Tenn.Code Ann. § 39-2-203(i)(5), (6) (1982).

After the Court of Criminal Appeals affirmed the death sentence, the case was docketed in this Court. See Tenn.Code Ann. § 39-13-206(a) (1997) ("The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee supreme court."). After reviewing the record, the briefs, and applicable authority, we designated seven issues for oral argument. (FN1) We now hold as follows: (1) the trial court did not err in refusing to instruct the jury that a witness for the prosecution, Brian Lovett, was an accomplice whose testimony had to be corroborated in order to find an aggravating circumstance; (2) the trial court did not err in refusing to admit Bryan Lovett's medical and psychological records; (3) the trial court did not err in refusing to allow the defendant's expert witness to remain in the courtroom; (4) the trial court did not err in allowing the prosecution to argue a "non-statutory" aggravating circumstance; (5) the evidence was sufficient to support the jury's application of the aggravating circumstance set forth in Tenn.Code Ann. § 39-2-203(i)(5) (1982); (6) the evidence was sufficient to support the jury's application of the aggravating circumstance set forth in Tenn.Code Ann. § 39-2-203(i)(6) (1982); and (7) the sentence of death was not arbitrary or disproportionate as applied in this case to the defendant. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

BACKGROUND

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

On November 19, 1988, police found the body of the victim, Royce D. Frazier, age 60, lying in a bathtub full of water in his home near Memphis, Tennessee. Frazier had been gagged; a plastic bag had been placed over his head; and an electrical cord was tied around his neck. A plunger had been placed over his face apparently to keep his head submerged. Frazier's house had been ransacked: several lamps and ashtrays had been overturned and numerous items were scattered in disarray.

Brian Lovett, who was 16 at the time of the offense, testified that his mother, Donna *417 Lovett, and the defendant, John Michael Bane, had discussed a plan to rob the victim several days before he was killed. The plan was for Donna Lovett to visit Frazier, whom she knew, and render him unconscious by putting Visine eye drops in his beer. Bane would then enter Frazier's home and carry out the robbery with Donna Lovett. According to Brian Lovett, Bane said that Frazier would have to be killed because he "knew [Lovett] and would tell on her." Brian Lovett said that he and Bane discussed choking or stabbing the victim.

On the day after the robbery plan discussion, Donna Lovett and the defendant Bane experimented by giving Brian Lovett a beer containing eye drops to see whether it would render him unconscious. Brian Lovett testified that it caused him to fall asleep within five minutes of drinking the beer. Thomas Lovett, Brian's younger brother, also testified that he recalled Brian drinking a beer containing eye drops.

Sometime in the late afternoon of November 17, 1988, Bane, accompanied by Donna Lovett and her two sons, Brian and Thomas Lovett, drove his car past Frazier's home several times, but no one appeared to be home. Bane explained that he was going to borrow money from the occupant. When they saw Frazier's car at the home, Donna Lovett got out of the car and went into the house alone. Bane then left and drove Brian and Thomas to Brian's girlfriend's home. A short time later, Bane picked up the boys and took them to the Lovetts' trailer in Ripley, Tennessee. Thereafter, Bane, along with Brian Lovett, returned to Frazier's home. When Donna Lovett signaled by "flickering" the porch light on two occasions, Bane entered Frazier's home, leaving Brian Lovett in the car.

According to Brian Lovett's testimony, approximately thirty minutes later Bane and Donna Lovett ran to the car carrying several items of Frazier's property. Bane had blood on his gloves and Donna Lovett was crying and upset. While driving from the scene, Bane told Brian that he had beaten the victim several times because he kept getting up and that he had "cut [the victim's] nuts off." Bane also said that he had taken $726 and that he "had done such a good job he deserved a beer." Bane was arrested two days later when Donna Lovett reported the events of November 17, 1988 to the police. (FN2)

Brian Lovett testified that his sister committed suicide several months before the killing of the victim and that he himself had attempted suicide on two occasions before November 17, 1988. He admitted that he had been treated at Charter Lakeside and Memphis Mental Health Institute and that he had a history of using cocaine, speed, marijuana, and alcohol. Lovett also admitted that he had made conflicting statements about the murder. In one statement, he had told authorities that he had looked in Frazier's window and saw Bane holding a knife to the victim's groin while Donna Lovett placed a bag over the victim's head. He did not recall why he had made the statement and conceded that he had never left Bane's car. Lovett testified that he had been arrested for theft after Bane was convicted and that he had been placed in the same prison cell as the defendant. He conceded that he signed a statement that he had lied at trial because he feared the defendant.

Dr. Jerry Francisco, Shelby Counter Medical Examiner, testified that the cause of the victim's death was ligature strangulation *418 with asphyxia. The combination of the cloth gag, plastic bag, and electrical cord had cut off the supply of blood to the victim's brain and the supply of oxygen to his lungs. The victim's tongue had been pushed into the back of his mouth from the cloth gag. Dr. Francisco stated that the victim could have been rendered unconscious in seconds or minutes, depending on the severity and force of the ligature strangulation, but that the victim's death required several minutes. Dr. Francisco testified that the victim had extensive bruising around his eyes, head, neck, arms, and hip; a tear and scrape below his left eye; and abrasions around his neck. There was no evidence of injury to the victim's groin area or scrotum. Dr. Francisco testified that fluid found in the victim's lungs was consistent with a finding that the victim had been alive when placed in the water.

The defendant Bane called several witnesses to testify on his behalf. Brian Lovett identified the handwriting of Donna Lovett in two letters that she had written to Bane after the murder. One of the letters indicated that Brian Lovett had lied at trial and was coerced by the prosecution. Donna Lovett also wrote that only she and Bane knew what happened in Frazier's home.

Wilma McNeill, the defendant's aunt, testified that Bane had been "very close" to his mother, who died of cancer in April of 1988. McNeill testified that Bane had grown up working on a farm. She stated that she loved Bane and asked the jury to spare his life. Maybelle Cunningham, also an aunt of the defendant, testified that both of Bane's parents were deceased. Cunningham testified that Bane had two sons, ages 14 and 10.

Marvin Ramey testified that Bane had worked on his farm when he was young and was a good worker. Ramey testified that his wife looked after Bane and that he had never caused any trouble.

Teresa Goforth, a co-worker of Bane and Donna Lovett at J.P.W. Enterprises, testified that Bane was a good, hard worker. She testified that Bane and Donna Lovett were dating and that Lovett was extremely jealous. About one week before the murder, Donna Lovett told Goforth that "if she couldn't have [the defendant], no one would and that she would see him locked away so far he would never get out."

Alicia Shadell Gray, Bane's cousin, likewise testified that Donna Lovett was very possessive and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

jealous. Three weeks before the murder, Gray heard Lovett say, "If I can't have Michael, no woman would have Michael, and I'll see us both behind bars." Donna Lovett attempted suicide later that day at Gray's home by overdosing on pills, and Bane took her to the emergency room. Gray testified that after Bane was convicted, Brian Lovett told her that his mother had agreed to plead guilty in exchange for a sentence of 35 years and that he did not want to see "an innocent man" go to prison. He said he planned to write an affidavit stating that Bane had no part in the offense.

Diane Bane testified that she met Bane while he was in prison and fell in love with him after talking regularly to him on the telephone. She married Bane in March of 1995 and travels 200 miles round trip every Saturday to visit him. Her former husband died in August of 1994, and she had three sons from that marriage.

After deliberating on all of the above evidence, the jury found that there was evidence supporting two aggravating circumstances: (1) that the murder was "especially atrocious or cruel in that it involved torture and depravity of mind" (FN3) ***419** and (2) that the murder was "committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn.Code Ann. § 39-2-203(i)(5), (6) (1982). (FN4 ) After further finding that the aggravating circumstances outweighed the evidence of mitigating circumstances, the jury imposed a sentence of death.

ANALYSIS

*Corroboration of Accomplice Testimony*

The defendant argues that the trial court erred in failing to instruct the jury that Brian Lovett was an accomplice to the offense and that an aggravating circumstance cannot be predicated upon the uncorroborated testimony of an accomplice. The State maintains that corroboration of an accomplice's testimony is not required for sentencing; that the trial court did not err in refusing to instruct the jury that corroboration was required as a non-statutory mitigating circumstance; and that, in any event, Brian Lovett's testimony was corroborated by the testimony of his younger brother, Thomas Lovett.

[1][2] This Court has repeatedly held that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense. *See State v. Stout,* 46 S.W.3d 689, 696-97 (Tenn.2001); *State v. Bigbee,* 885 S.W.2d 797, 803 (Tenn.1994); *Monts v. State,* 214 Tenn. 171, 379 S.W.2d 34, 43 (1964). We have described the nature of this requirement as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; *it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.* It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Bigbee,* 885 S.W.2d at 803 (quoting *Hawkins v. State,* 4 Tenn.Crim.App. 121, 469 S.W.2d 515, 520 (1971) (citations omitted)) (emphasis added). As the State correctly argues, this Court has never extended the corroboration requirement to an accomplice testifying in the sentencing phase of a capital trial. *See State v. Henley,* 774 S.W.2d 908, 913 (Tenn.1989) (conviction may not be based on accomplice's testimony unless there is some corroboration).

[3] There is likewise no statutory provision that requires corroboration of an accomplice's testimony for the finding of an aggravating circumstance in the sentencing phase of a capital trial. Instead, at the time of this offense, the statute governing the admissibility of evidence in the sentencing phase of a capital trial provided as follows:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited ***420** to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the state of Tennessee.

Tenn.Code Ann. § 39-2-203(c) (1982). The statute obviously contains no express provision regarding the corroboration of accomplice testimony and instead affords the trial court wide discretion in ruling upon the admissibility of evidence. *See State v. Sims,* 45 S.W.3d 1 (Tenn.2001) (discussing trial court's broad discretion under the identical provisions of Tenn.Code Ann. § 39-13-204(c) (1997)).

[4][5] In addition to the absence of case law or statutory authority, we likewise find no other basis or rationale for applying the corroboration requirement in a capital sentencing proceeding. The purpose of the corroboration requirement is to assure that a *conviction* is not predicated solely upon the testimony of a witness who was also involved in the commission of the offense. *See Bigbee,* 885 S.W.2d at 803. In a capital sentencing proceeding, the defendant has already been convicted of the offense and the testimony of any accomplice has been subject to the corroboration requirement during the guilt phase of the trial. (FN5) *See People v. Hamilton,* 48 Cal.3d 1142, 259 Cal.Rptr. 701, 774 P.2d 730, 752 (1989).

[6] Moreover, the capital sentencing scheme as a

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

whole contains numerous specific provisions to ensure a high degree of reliability in deciding whether a death sentence is appropriate. The jury is required to find, for example, that any aggravating circumstance has been proven by the prosecution beyond a reasonable doubt and that the evidence of the aggravating circumstances outweighed evidence of mitigating factors. Tenn.Code Ann. § 39-2-203(g) (1982). (FN6) The jury's consideration of mitigating factors may include "any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *State v. Stout,* 46 S.W.3d at 704 (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)). Finally, every sentence of death must also be carefully scrutinized on appeal to determine whether the jury's findings are supported by the evidence and whether the sentence of death is arbitrary, excessive, or disproportionate to sentences imposed in other cases. *See* Tenn.Code Ann. § 39-2-205(c) (1982). (FN7) In light of these specific statutory provisions governing capital sentencing, we conclude that there is no basis or rationale for ***421** applying the corroboration requirement to the sentencing phase of a capital trial.

[7] In a related issue, we agree with the Court of Criminal Appeals' conclusion that the trial court did not err in failing to charge accomplice corroboration as part of any "non-statutory mitigating factors" requested by the defendant. The defendant had requested two special instructions that stated, in part, that Brian Lovett was an accomplice; that he lacked credibility due to his inconsistent statements and testimony; and that he was not charged or convicted for his role in the offense.

[8] Under statutory law at the time of this offense, however, a trial court was not required to instruct the jury on non-statutory mitigating factors. *See State v. Hartman,* 703 S.W.2d 106, 118 (Tenn.1985). Although a 1989 statutory amendment requires instructions on non-statutory mitigating factors that are supported by the evidence, it is not applicable to offenses committed before the effective date of the amendment. *See State v. Smith,* 993 S.W.2d 6, 32 (Tenn.1999). In any event, the evidence of Brian Lovett's involvement in the offense and his inconsistent statements was heard by the jury. The defense vigorously argued that the evidence impeached the witness and cast doubt on Bane's involvement in the murder. Therefore, even if a specific instruction had been appropriate, its absence did not affect the outcome to the prejudice of the defendant.

*Psychological and Medical Records*

[9] The defendant argues that the trial court erred in refusing to admit records regarding Brian Lovett's medical and psychological treatment for the purpose of impeaching the witness and raising "residual doubt" as to the defendant's role in the offense. The State counters that the defense was allowed to inquire extensively into Brian Lovett's medical and psychological background and that the trial court did not abuse its discretion in refusing to admit the underlying medical records.

The defendant relies in part upon Tenn. R. Evid. 617, which provides that a "party may offer evidence that a witness suffered from impaired capacity at the time of an occurrence or testimony." As we discussed above, however, the admissibility of evidence in a capital sentencing proceeding is largely governed by a statute that "should be interpreted to allow trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence...." *State v. Sims,* 45 S.W.3d at 14. (FN8) We also observed in *Sims:*

> The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. *The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence.* ***422** These rules are too restrictive and unwieldy in the arena of capital sentencing.

*Id.* at 14 (emphasis added).

[10] The defendant also correctly asserts that a defendant is permitted to present evidence of "residual doubt" as a non-statutory mitigating factor in a re-sentencing proceeding. *State v. Teague,* 897 S.W.2d 248, 256 (Tenn.1995). We recently have explained:

> By definition, residual doubt is established by proof that casts doubt on the defendant's guilt. It is not limited to proof that mitigates the defendant's culpability for the crimes.
>
> While we agree ... that not all impeachment proof will be relevant to show residual doubt, it does not logically follow that impeachment proof will never be relevant to establish residual doubt about the defendant's guilt. Where ... the proffered residual doubt is impeachment of the testimony of the only witness who offered direct rather than circumstantial proof of the defendant's involvement in the crime, such proof clearly is relevant and admissible to establish residual doubt as a mitigating circumstance.

*State v. Hartman,* 42 S.W.3d 44, 57 (Tenn.2001).

With these principles in mind, the defendant argued that he wanted to use the records to show that Brian Lovett had a history of mental health problems; that he had been discharged from treatment against medical advice shortly before the offense; and that his capacity to recall and relate facts was impaired. Moreover, the defendant argued that because Brian Lovett was the main witness against him, the impeachment evidence necessarily raised doubt as to the defendant's role in

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

the offense.

The record reveals that the trial court gave careful consideration to this issue. The court conducted several jury-out hearings on the issue and did not foreclose any efforts made by the defendant to question the witness with regard to his history of suicide attempts, mental health treatment, and drug abuse. The trial court even signed an order allowing the defense to obtain certain medical and psychological records. During the sentencing, Brian Lovett testified about his two suicide attempts, one of which occurred one month before the offense, and he testified that he had been treated in two mental health facilities. He testified that his sister had committed suicide several months before the murder. Finally, Lovett admitted his history of using marijuana, cocaine, alcohol, and speed. When denying the motion for a new trial on this issue, the trial court made the following findings:

> Defense counsel asked Bryan [sic] Lovett about the information in the records and the witness admitted everything. Thus, the jury heard the evidence from the witness himself, there was nothing to impeach, and the defense was free to argue Bryan [sic] Lovett's credibility to the jury in closing argument.

Moreover, as the Court of Criminal Appeals observed, the evidence failed to show that the witness's alleged impaired capacity existed at the time of the offense or at the time of the witness's testimony. *See* Tenn. R. Evid. 617.

Accordingly, we conclude that the defendant was not denied an opportunity to use evidence of Brian Lovett's medical and psychological history for the purpose of impeaching the witness's testimony or raising any doubts about the defendant's role in the offense. In short, the trial court did not abuse its discretion in ruling that the mental and psychological records ***423** were cumulative to the testimony and therefore inadmissible.

*Sequestration of Defense Expert Witness*

[11] The defendant contends that the trial court committed reversible error and violated his rights to due process and confrontation by refusing to exempt the defendant's expert witness, a pathologist, from the rule of witness sequestration. The defendant specifically argues that the presence of his expert witness in the courtroom was essential for the purpose of responding to and rebutting the testimony of the Shelby County Medical Examiner. The State responds that the trial court did not abuse its discretion and that, in any event, the defendant has failed to demonstrate how he was prejudiced by the trial court's ruling.

[12] The defendant relies in part upon Tenn. R. Evid. 615, which provides that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing." The rule also provides, however, that it does not authorize the exclusion of "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Tenn. R. Evid. 615. The comments to the rule suggest that an essential witness may be "an expert witness a lawyer needs to help the lawyer understand opposing testimony." *See* Tenn. R. Evid. 615 (advisory commission comments). The purpose of the rule, simply put, is to prevent a witness from changing or altering his or her testimony based on testimony heard or facts learned from other testifying witnesses. *See State v. Harris,* 839 S.W.2d 54, 68 (Tenn.1992).

As the defendant points out, we recently said that Rule 615 is not applicable in a proceeding to determine whether a defendant is competent to be executed. *Coe v. State,* 17 S.W.3d 193, 222 (Tenn.2000). In ruling that mental health experts were permitted to remain in the courtroom despite the general rule of witness sequestration, we focused on the unique nature of such a competency proceeding:

> Allowing the mental health experts to remain in the courtroom during the presentation of the proof is entirely consistent with the purpose of competency proceedings which is to accurately ascertain the prisoner's mental state.... *Also, the dangers Rule 615 is intended to prevent do not arise in a proceeding to determine competency to be executed.* In light of the fact that both the State and the prisoner have access to the reports of the experts prior to the hearing, there is little or no risk that one of the expert witnesses will change his or her testimony or adopt facts testified to by other witnesses.
>
> *Id.* at 222-23 (emphasis added).

Although *Coe* involved a mental competency proceeding, we believe that the dangers Rule 615 is intended to prevent generally do not arise with regard to expert witnesses in any proceeding. In fact, the rules of evidence provide that an expert witness may testify and base an opinion on evidence or facts made known to the expert *at or before* a hearing and the facts need not be admissible at trial. *See* Tenn. R. Evid. 703. Moreover, an expert witness often may need to hear the substance of the testimony of other witnesses in order to formulate an opinion or respond to the opinions of other expert witnesses. In short, allowing an expert witness to remain in the courtroom as an "essential person" generally does not create the risk that the expert will alter or change factual testimony based on what is heard in the courtroom. Accordingly, we conclude that the trial court erred by refusing to allow the ***424** defendant's expert witness to remain in the courtroom without considering the purpose and application of Rule 615.

[13] We must therefore determine whether the error affected the outcome of the proceedings to the defendant's prejudice. We observe first that the defendant and his expert pathologist had the benefit of the medical examiner's testimony from the initial trial. The defendant and his expert also had the benefit of the autopsy report and the findings with respect to the victim's injury and death. Moreover, there is no indication that the medical examiner's testimony was so detailed or complex as to be beyond the ability of defense counsel to comprehend and prepare a defense. Finally, the defendant did not call the expert to testify at the motion for new trial hearing or otherwise attempt to make an offer of proof as to how the evidence or cross-examination of the medical examiner would have

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

differed had his expert witness been allowed to remain in the courtroom. Accordingly, for all of these reasons, we conclude that the trial court's refusal to allow the defendant's expert witness to remain in the courtroom did not affect the outcome to the prejudice of the defendant.

*Non-Statutory Aggravating Circumstances*

[14] The defendant argues that the prosecution was permitted to introduce and argue a non-statutory aggravating circumstance by referring to the defendant's relationships with women and his "promiscuity." The defendant's argument is based largely upon the prosecution's questioning of his aunt, Wilma McNeill, with regard to how many times the defendant had been married and the number of women with whom he had been involved in a relationship. McNeill replied that the defendant had been married twice, but that she did not know about his personal life. The State maintains that the evidence was proper to rebut evidence of mitigating factors presented by the defendant.

[15] The defendant asserts that the prosecution may not argue that the jury impose a death sentence based on any factor that is not a statutory aggravating circumstance. *See Cozzolino v. State,* 584 S.W.2d 765, 768 (Tenn.1979). As the State points out, however, the prosecution is permitted to rebut any mitigating factors relied on by a defendant. *See* Tenn.Code Ann. § 39-2-203(c) (1982); *Terry v. State,* 46 S.W.3d 147 (Tenn.2001) . In this case, the defendant introduced mitigating evidence of his family background, marriage, and two sons. The prosecution responded by detailing the defendant's relationships with several women. We agree with the Court of Criminal Appeals that the trial court did not abuse its discretion in allowing the prosecution to rebut the mitigating evidence in this manner. (FN9) Moreover, there is no indication that the prosecution used the evidence as a non-statutory aggravating circumstance or otherwise argued that the jury was permitted to consider any non-statutory aggravating circumstance.

[16] In a related argument, the defendant contends that the prosecution engaged in misconduct by calling him "sweetheart" several times during closing argument and by arguing that the defendant was seeing another woman despite having "moved in" with Donna Lovett. The State contends that the prosecutor's closing argument was properly based on the evidence.

*425 [17][18][19][20] This Court has often observed that closing argument is a valuable privilege that should not be unduly restricted. *See State v. Bigbee,* 885 S.W.2d at 809. We have likewise recognized that the prosecutor may not engage in derogatory remarks or name calling. *State v. Bates,* 804 S.W.2d 868, 881 (Tenn.1991) (referring to defendant as a "rabid dog"). The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of that discretion. Moreover, prosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome to the prejudice of the defendant. *See Terry v. State,* 46 S.W.3d at 156.

[21] In reviewing the record, we agree with the Court of Criminal Appeals' conclusion that the prosecutor's closing arguments in this case were based on the evidence and were not designed to assert a non-statutory aggravating circumstance. To the contrary, it appears that the arguments were in response to the defendant's frequent attacks on the credibility of Brian Lovett. The prosecutor argued, in part:

> Brian Lovett, whose sister committed suicide, who was not even in school, could not even live with his father, ended up living with his mother, Donna Lovett, and her 'sweetheart,' the defendant.... Brian Lovett, because of the problems in his life, like a lot of young kids got involved with drugs. After his sister's suicide, [he] checked himself into a hospital for help. He ... attempted to commit suicide by taking Tylenol, which may be a suicide attempt, it may just be a cry for help. But he did it twice. And he ended up trying to get help or maybe getting help because he did go to two mental institutions....
>
> He returned safe to the bosom of his mother and her 'sweetheart' over here. And they sit around and talk about robbing somebody. His mother is talking with her 'sweetheart' who has moved in with her about robbing some old man. So he joins in on the conversation. They practice their knockout drops on him. His mother and his mother's 'sweetheart' practice knockout drops on him? Yeah, he's got a real good start, hasn't he?

Accordingly, when viewed in context, there is no indication that the arguments were inflammatory or intended for the jury to impose the death penalty based on a non-statutory aggravating circumstance. Moreover, although the prosecution should refrain from engaging in any sort of personal name-calling, the arguments in no way affected the verdict to the prejudice of the defendant.

*Heinous, Atrocious, or Cruel Aggravating Circumstance*

[22] The defendant contends that the evidence was insufficient to support the jury's application of the "heinous, atrocious, or cruel" aggravating circumstance set forth in Tenn.Code Ann. § 39-2-203(i)(5) (1982). Specifically, the defendant argues that the prosecution failed to prove "torture and depravity of mind" because there was no evidence that the victim was alive when he was placed in the bathtub full of water. The State maintains that the evidence was sufficient to support the jury's application of this aggravating circumstance.

[23] At the time of this offense, this aggravating circumstance provided that the "murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn.Code Ann. § 39-2-203(i)(5) (1982). In *State v. Williams,* we explained that the terms of the (i)(5) aggravating circumstance must be given their plain and natural meaning as follows: "torture" means the infliction *426 of severe physical or mental pain while the victim is alive and conscious; "heinous" means grossly wicked or reprehensible, abominable, odious, vile; "atrocious" means extremely evil or cruel, monstrous, exceptionally bad, abominable;

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

"cruel" means disposed to inflict pain or suffering, causing suffering, painful; and "depravity of mind" means moral corruption, wicked or perverse act. 690 S.W.2d 517, 527-30 (Tenn.1985). Moreover, we have repeatedly rejected the argument that this aggravating circumstance is vague, overly broad, or otherwise invalid. *See Terry v. State,* 46 S.W.3d at 159; *Strouth v. State,* 999 S.W.2d 759, 764 (Tenn.1999); *State v. Middlebrooks,* 995 S.W.2d 550, 555-56 (Tenn.1999).

[24] We now address whether the evidence in this case was sufficient to support the jury's application of the aggravating circumstance. Our analysis requires that we determine whether, after viewing the evidence in a light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Terry v. State,* 46 S.W.3d at 160-61.

In this case, the evidence revealed that the defendant Bane planned the robbery of the victim along with Donna Lovett. The defendant repeatedly beat the 60-year-old victim, causing bruises and injuries to the victim's face, eyes, head, arms and hip, while the victim struggled for his life. The victim was forcibly gagged, displacing his tongue to the back of his mouth; a plastic bag was placed over his head and then tied around his neck with an electrical cord. The victim was then strangled, cutting off the blood supply and air supply to his body. Although the medical examiner could not testify with complete certainty how long the victim may have remained conscious, it can be inferred from the proof of numerous blows, the victim's struggle, the gagging, the placing of a plastic bag over the victim's head, and the strangulation with the electrical cord that the ordeal lasted minutes and that unconsciousness was not instantaneous. Moreover, the medical examiner testified within a reasonable degree of certainty that the victim was still alive when placed in the bathtub full of water. This is likewise supported by the fact that a plunger had to be used to hold the victim's face and head underwater and by Lovett's testimony that the defendant stated he had beaten the victim several times because the victim kept getting up.

Accordingly, in reviewing the record in a light most favorable to the State, we conclude that the evidence supported the jury's finding that the murder was especially atrocious or cruel in that it involved torture and depravity of mind. (FN10)

*Avoiding, Interfering With, or Preventing a Lawful Arrest or Prosecution*

The defendant asserts that the aggravating circumstance in Tenn.Code Ann. § 39-2-203(i)(6) (1982) was improperly applied for several reasons. He contends that the aggravating circumstance applies in every case in which the victim knows the defendant and therefore fails to narrow the class of death-eligible offenders; that the prosecution should not have been allowed to use this aggravating circumstance since it was not relied upon in the *427 original sentencing proceeding; and that the evidence was insufficient to support the jury's application of this aggravating circumstance. The State maintains that the aggravating circumstance was properly applied and that the jury's finding was supported by the evidence.

*Constitutionality*

[25] At the time of this offense, this aggravating circumstance was applicable where "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn.Code Ann. § 39-2-203(i)(6) (1982). We have upheld the application of this factor in a number of circumstances. *See Terry v. State,* 46 S.W.3d at 161. Moreover, we have previously rejected the defendant's argument that the aggravating circumstance is unconstitutional for failing to narrow the class of death-eligible offenders. *State v. Bush,* 942 S.W.2d 489, 504-05 (Tenn.1997).

[26] In this case, the defendant Bane was charged with the felony murder of the victim in the perpetration of a robbery. *See* Tenn.Code Ann. § 39-2-202(a) (1982). The offense required the State to establish that the victim was killed in the perpetration or attempt to perpetrate the robbery of the victim. Obtaining a *conviction* for felony murder did *not* require evidence that the killing was for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution. Instead, that additional evidence was necessary to establish the aggravating circumstance for sentencing. *See* Tenn.Code Ann. § 39-2-203(i)(6) (1982). Thus, the aggravating circumstance did not duplicate the elements of the underlying offense and sufficiently narrowed the class of persons eligible for the penalty of death. *See State v. Bush,* 942 S.W.2d at 505 (upholding (i)(6) aggravating circumstance as applied to premeditated murder).

*Prosecution's Reliance in Re-sentencing*

[27] We also conclude that the prosecution was not barred from relying on this aggravating circumstance for the re-sentencing. In *State v. Harris,* we held that where a defendant is sentenced to death and then receives relief on appeal, the prosecution is not prohibited from again seeking the death penalty at re-sentencing. 919 S.W.2d 323, 330 (Tenn.1996). Moreover, we concluded that under the so-called "clean slate" rule, the prosecution is free "to introduce proof of any aggravating circumstance which is otherwise legally valid." *Id.* We explained that a death sentence is not a series of "mini-trials" on each aggravating circumstance and that there is no such thing as an "acquittal" of an individual aggravating circumstance. *Id.* (citing *Poland v. Arizona,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986)). Finally, we observed that there was no other legal impediment precluding the prosecution from relying on any aggravating circumstance and strengthening its case in any way it can "by the introduction of new evidence." *Id.* at 331.

The defendant's reliance on *State v. Phipps,* 959 S.W.2d 538 (Tenn.1997), is misplaced. In *Phipps,* the defendant was convicted of first-degree murder and sentenced to life imprisonment following a trial at which the State did *not* seek the death penalty. After the defendant successfully appealed his conviction and obtained a new trial, the prosecution filed notice of its intent to seek the death penalty.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

We held that since the prosecution had not sought the death penalty at the original trial, its decision to do so after the defendant's successful appeal created a presumption of vindictiveness. 959 ***428** S.W.2d at 546. To view preceding link please click here Moreover, we held that the prosecution would have to rebut the presumption of vindictiveness with clear and convincing evidence that its decision was motivated by a legitimate purpose. *Id.* at 547.

In contrast, the prosecution in the present case filed notice of its intent to seek the death penalty at the defendant's initial trial, and the jury did in fact impose a death sentence. After the case was remanded for re-sentencing, the prosecution again sought the death penalty, which it was entitled to do. Although the prosecution did not rely on the (i)(6) aggravating circumstance at the initial sentencing proceeding, our decision in *Harris* makes it clear that the "clean slate" rule applied to re-sentencing. Thus, the prosecution was not barred from relying upon the aggravating circumstance in Tenn.Code Ann. § 39-2-203(i)(6) (1982) in re-sentencing.

*Sufficiency of Evidence*

As discussed above, when considering the sufficiency of the evidence supporting an aggravating circumstance, we must review the evidence in a light most favorable to the State and determine whether a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt.

[28] In this case, the defendant planned the robbery of the victim with Donna Lovett, who was an acquaintance of the victim. The defendant said that the victim would have to be killed because he knew Donna Lovett and could report that she was involved in the offense. In committing the murder, the defendant and Donna Lovett robbed the victim of over $700 and various personal property. In short, a rational trier of fact could conclude that the defendant killed the victim to avoid, interfere with, or prevent a lawful arrest or prosecution of himself and Donna Lovett. Accordingly, we conclude that the evidence was sufficient to support the jury's application of this aggravating circumstance.

*Proportionality*

[29][30] Where a defendant has been sentenced to death, we must undertake a comparative proportionality review pursuant to Tenn.Code Ann. § 39-13-206(c)(1) (1997). The analysis is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." *State v. Bland,* 958 S.W.2d 651, 662 (Tenn.1997) (quoting *Pulley v. Harris,* 465 U.S. 37, 42-43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. *Id.* at 668; *see also State v. Burns,* 979 S.W.2d 276, 283 (Tenn.1998).

[31][32][33][34] This Court has consistently employed the precedent-seeking method of comparative proportionality review, which compares a case with cases involving similar defendants and similar crimes. *State v. Bland,* 958 S.W.2d at 667. We consider numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. *Id.* We also consider multiple factors about the defendant: (1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; ***429** (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Id.* Since no two defendants and no two crimes are precisely alike, our review is not mechanical or based on a rigid formula. *See id.* at 668.

[35] In reviewing the facts and circumstances of the offense, the evidence shows that the defendant actively planned the robbery of the victim, who was an acquaintance of the defendant's girlfriend, Donna Lovett. The defendant said that the victim would have to be killed because he would recognize Lovett and report the offense. The defendant discussed stabbing or choking the victim. On the day of the murder, Bane, Lovett, and Lovett's two teenage sons drove past the victim's home several times, waiting for the victim to arrive home. When the victim arrived home, Donna Lovett approached his house while Bane left the scene with Lovett's sons. When Bane later returned, he waited for a prearranged signal from Donna Lovett before entering the victim's home.

Bane repeatedly beat the 60-year-old victim as the victim tried to resist. The victim suffered bruises and injuries to his head, eyes, hip, and arm. Bane and Lovett eventually gagged the victim with a cloth, placed a plastic bag over his head, tied the bag around his neck with an electrical cord, and strangled him. The victim was placed in a bathtub of water and a plunger was used to hold his head under the water. There was evidence of fluid in the victim's lungs consistent with a finding that the victim had been alive when placed in the water. The cause of the victim's death was ligature strangulation with asphyxia.

Bane presented witnesses in mitigation who testified that he formerly worked on a farm and was a good worker. The defendant has two sons by a former marriage. He also has a wife who he married while incarcerated for the conviction in this case. Although Bane's precise age is not in the record, one witness said that the defendant was "in his twenties" or much younger than the 60-year-old victim. There was no evidence that the defendant had any medical, emotional, or mental problems. Bane played a major role in the offense and did not cooperate with authorities or express remorse for the victim. The main theory of the defense in mitigation was impeaching the testimony of Brian Lovett and attempting to raise doubts about the defendant's involvement in the offense.

As the State asserts on appeal, this Court has upheld the death penalty in many cases bearing

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

similarities to this one. In the following cases, for example, the victims were killed in the course of a robbery. *State v. Chalmers,* 28 S.W.3d 913, 919 (Tenn.2000); *State v. Smith,* 993 S.W.2d 6, 18 (Tenn.1999); *State v. Burns,* 979 S.W.2d 276, 283 (Tenn.1998); *State v. Howell,* 868 S.W.2d 238, 262 (Tenn.1993); *State v. Bates,* 804 S.W.2d 868, 883 (Tenn.1991); *State v. Boyd,* 797 S.W.2d 589, 595 (Tenn.1990); *State v. King,* 718 S.W.2d 241, 245 (Tenn.1986). In several cases, the victim was known to the defendant or an accomplice. *See, e.g., State v. Bush,* 942 S.W.2d 489, 507 (Tenn.1997); *State v. McNish,* 727 S.W.2d 490, 491 (Tenn.1987).

Several cases involve facts and circumstances of a killing similar to the present case. In the following cases, the victim was beaten by the defendant. *State v. Hall,* 8 S.W.3d 593, 606 (Tenn.1999); *State v. Mann,* 959 S.W.2d 503, 516 (Tenn.1997); *State v. Bush,* 942 S.W.2d at 507; *State v. Barber,* 753 S.W.2d 659, 668 (Tenn.1988); *State v. McNish,* 727 S.W.2d at 491. In numerous cases, the victim has been beaten and strangled. *State v. Carruthers,* 35 S.W.3d 516, 527 (Tenn.2000); *State v. Keen,* 31 S.W.3d 196, 208 (Tenn.2000); *State v. Vann,* 976 S.W.2d 93, 99 (Tenn.1998) ***430** ; *State v. Cauthern,* 967 S.W.2d 726, 732 (Tenn.1998); *State v. Mann,* 959 S.W.2d at 507; *State v. Hodges,* 944 S.W.2d 346, 350 (Tenn.1997).

The Court has upheld similar death sentences in which one of the aggravating circumstances was that the killing was heinous, atrocious, or cruel in that it involved torture or depravity of mind, *see* Tenn.Code Ann. § 39-2-203(i)(5) (1982), or the killing was heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, *see* Tenn.Code Ann. § 39-13-204(i)(5) (2000). *See State v. Carruthers,* 35 S.W.3d at 531; *State v. Keen,* 31 S.W.3d at 211; *State v. Hall,* 8 S.W.3d at 606; *State v. Vann,* 976 S.W.2d at 98; *State v. Cauthern,* 967 S.W.2d at 729; *State v. Mann,* 959 S.W.2d at 507; *State v. Bush,* 942 S.W.2d at 507; *State v. Barber,* 753 S.W.2d at 668; *State v. McNish,* 727 S.W.2d at 491. The Court has likewise upheld similar death sentences where the killing was committed to avoid arrest or prosecution. *See State v. Bush,* 942 S.W.2d at 504; *State v. Smith,* 857 S.W.2d 1, 14 (Tenn.1993); *State v. Thompson,* 768 S.W.2d 239, 252 (Tenn.1989); *State v. Carter,* 714 S.W.2d 241, 250 (Tenn.1986).

Finally, in considering characteristics regarding this defendant, it appears that we have upheld the death sentence in several cases where the defendant has presented similar mitigating evidence, such as an employment record, a marriage, or children. *See State v. Burns,* 979 S.W.2d at 283; *State v. Cauthern,* 967 S.W.2d at 740-41; *State v. Hall,* 958 S.W.2d 679, 700 (Tenn.1997); *State v. Bland,* 958 S.W.2d at 670; *State v. Van Tran,* 864 S.W.2d 465, 482 (Tenn.1993).

In sum, our review requires a determination of whether a case plainly lacks circumstances found in similar cases where the death penalty has been imposed. *See State v. Burns,* 979 S.W.2d at 285. The defendant has cited no specific case as authority for his argument that the death penalty is arbitrary or disproportionate as applied in this case. Likewise, although the dissent asserts that the comparative proportionality analysis is flawed, it fails to assert or establish that the sentence of death is either arbitrary or disproportionate as applied in this case to this defendant. Moreover, a majority of the Court has already addressed and rejected the views of the dissent and has consistently adhered to the proportionality analysis carefully detailed in *Bland. See State v. Keen,* 31 S.W.3d at 223-24. Finally, as we have discussed, the similarity of the facts and circumstances of this case to numerous cases in which the death penalty has been upheld reveals that the death sentence is not arbitrary or disproportionate as applied in this case.

CONCLUSION

In accordance with Tenn.Code Ann. § 39-2-205(c) (1982) and the principles adopted in prior decisions, we have considered the entire record and conclude that the evidence supports the jury's finding of the statutory aggravating circumstances; that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances; and that the sentence is not arbitrary, excessive, or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge David H. Welles and joined by Judge Jerry L. Smith and Judge James Curwood Witt, Jr. The relevant portions of that opinion are attached as an appendix to this opinion. The defendant's sentence of death is affirmed ***431** and shall be carried out on the 6th day of November, 2001, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of the appeal are taxed to the State.

ADOLPHO A. BIRCH, Jr., dissenting.

ADOLPHO A. BIRCH, Jr., J., concurring and dissenting.

I concur in the majority decision to affirm the conviction in this case. I continue to believe, however, that the comparative proportionality review protocol embraced by the majority is inadequate and fails to satisfy this Court's duty, mandated by statute, (FN1) to ensure that no death sentence will be upheld unless it is proportionate to sentences imposed upon comparable defendants in similar cases. Because the protocol fails to provide convincing assurance that this defendant's death sentence is proportionate, I cannot join the majority decision to impose the death penalty in this case.

In a series of dissents, I have repeatedly urged the majority to correct the shortcomings I perceive in Tennessee's comparative proportionality review protocol. *See, e.g., State v. Chalmers,* 28 S.W.3d 913, 923-25 (Tenn.2000) (Birch, J.; concurring and dissenting); *State v. Carruthers,* 35 S.W.3d 516, 581 (Tenn.2000) (Birch, J., concurring and dissenting); *State v. Keen,* 31 S.W.3d 196, 234 (Tenn.2000) (Birch, J., concurring and dissenting); *Terry v. State,* 46 S.W.3d 147 (Tenn.2001) (Birch, J., dissenting). The need for reform, I have

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

suggested, centers upon three failings of the current protocol: "the 'test' we employ [for comparative proportionality review] is so broad that nearly any sentence could be found proportionate; our review procedures are too subjective; and the 'pool' of cases which are reviewed for proportionality is too small." *Chalmers,* 28 S.W.3d at 923 (Birch, J., concurring and dissenting). If this Court is to adequately ensure that disproportionate sentences of death will not be upheld, these flaws must be corrected.

To date, the majority has made no discernible effort to remedy the flaws I have pointed out in our comparative proportionality review protocol. Because the protocol embraced by the majority does not, in my view, reliably ensure that the defendant's death sentence is proportionate, (FN2) the ***432** Court has not effectively met the requirements of the comparative proportionality review statute. A death sentence imposed under such circumstances should not be allowed to stand. Accordingly, I respectfully dissent.

APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

Filed Jan. 24, 2000

IN THE TENNESSEE COURT OF CRIMINAL APPEALS

AT JACKSON

AUGUST 1999 SESSION

STATE OF TENNESSEE, Appellee,

v.

JOHN MICHAEL BANE, Appellant.

C.C.A. NO. W1997-02158-CCA-R3-DD

SHELBY COUNTY

HONORABLE JOHN P. COLTON, JR., JUDGE

(Sentencing-Death Penalty)

ON APPEAL FROM THE JUDGMENT OF THE CRIMINAL COURT OF SHELBY COUNTY

Joseph S. Ozment, Memphis, TN, Charles S. Kelly, Dyersburg, TN, for the appellant.

Paul G. Summers, Attorney General and Reporter, Amy L. Tarkington, Assistant Attorney General, Nashville, TN, William L. Gibbons, District Attorney General, Thomas D. Henderson, Kevin R. Rardin, Assistant District Attorneys General, Memphis, TN, for the appellee.

DAVID H. WELLES, Judge.

OPINION

[Deleted: Summary of Facts and Testimony]

ANALYSIS

[Deleted: Especially Heinous, Atrocious or Cruel Aggravating Circumstance]

[Deleted: Avoiding Arrest Aggravating Circumstance]

[Deleted: Impeachment of Witness]

[Deleted: Accomplice Instruction]

Sentencing Instructions:

Because the murder in this case occurred before the 1989 amendments to the death penalty statute, the trial court instructed the jury under the law in existence at the time of the crime. The appellant insists, however, that the trial court should have instructed the jury pursuant to the 1989 changes. Specifically, the appellant asserts the judge should have instructed the jury that it must find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. Prior to 1989, the statute called for the death penalty upon a finding that the aggravating circumstances are not outweighed by the mitigating circumstances. T.C.A. § 39-2-203 (1982). The supreme court has consistently held that a trial court does not err by instructing the jury under the statute as it existed at the time of the offense. *See, e.g., State v. Walker,* 910 S.W.2d 381, 397 (Tenn.1995); ****433*** *State v. Brimmer,* 876 S.W.2d 75, 82 (Tenn.1994). This issue is without merit.

Similarly, the appellant contends the trial court should have provided the jury instructions on the nonstatutory mitigating circumstances he submitted to the court. In *State v. Cauthern,* 967 S.W.2d 726, 746-47, (Tenn.1998), a capital case in which a resentencing hearing was ordered for a pre-1989 murder, the supreme court adopted the portion of this Court's opinion that addressed this very issue. Citing *State v. Odom,* 928 S.W.2d 18 (Tenn.1996), the court held that the trial court was not compelled to provide nonstatutory instructions on mitigating evidence and should have instructed the jury under the law as it existed. The trial court in this case did precisely that. Accordingly, there is no merit to the appellant's contention.

[Deleted: Prosecutorial Misconduct]

[Deleted: Exclusion of Witness]

Removal of Juror for Cause:

The appellant contends the trial court erroneously excused a prospective juror during voir dire. He argues that, although the juror initially stated he could not vote for imposing the death penalty, upon further questioning by defense counsel the juror acknowledged that he could follow the mandates of the law as instructed by the trial judge. The appellant further argues the trial judge improperly and excessively questioned the juror even after he had allegedly been rehabilitated by defense, thereby forcing his removal from the panel.

Upon questioning by the prosecutor, prospective juror Yual Carpenter stated that no matter what the case he could not personally agree to sentence someone to death. The prosecutor asked for

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

excusal. The following exchange then occurred:

Prospective Juror Carpenter: The question he asked, well, if I did find like that, I couldn't-- because of my heart I couldn't live with myself by doing that, by putting my name on that I just--

Defense Counsel: You don't think under--if His Honor instructed you that it was the law and all that--

Juror: Yes.

Counsel:--and you went through that instruction that even if you found that that enhancement factor exists you're saying you wouldn't be able to do it?

Juror: I don't believe so because, you know ...

Counsel: You don't think you'd be able to follow the law?

Juror: I could follow the law, but, you know, it would probably be--

Counsel: Well, I mean, you regard death as a very serious thing?

Juror: Yes.

Counsel: And having the power to take someone's life is a very--

Juror: Yes. I don't think--my signature shouldn't have that pull.

...

Juror: What I'm trying to get you to understand is that like I couldn't put my name on it.

Counsel: You don't think you could do it even if His Honor instructed you to follow the law?

Juror: See, then it would be forcing me to do something against my will.

Counsel: Let me ask you this. If His Honor were to instruct you to follow the law would you follow the law?

Juror: Yeah, I'll follow the law.

The trial court then asked Carpenter several questions regarding his position:

Court: All right. Mr. Carpenter, let me ask you, sir, you say you couldn't write *434 your name down. Now, the--you understand what the law is in this?

Juror: Yes, sir.

Court:--that you have the choice of life imprisonment or death by electrocution; is that correct?

Juror: Yes, sir.

Court: Now, that's the law in the state of Tennessee.

Juror: Yes, sir.

Court: You understand that? Now, are you saying that you could not follow that law if it were presented to you beyond a reasonable doubt and to a moral certainty by the aggravating circumstances overcoming the mitigating circumstances you could not follow the law as far as death is concerned?

Juror: No, sir.

Court: You could not?

Juror: (No audible response.)

Court: All right. You'll be excused. The Court finds that this juror irrevocably is committed prior to trial in this case that he will not follow the law of the state of Tennessee.

The applicable standard for determining whether a juror was properly excused for cause because of his or her beliefs on the death penalty was delineated in *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), and is as follows: "whether the juror's views would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.' " *See State v. Alley,* 776 S.W.2d 506, 518 (Tenn.1989) (Tennessee Supreme Court adopts *Wainwright* standard). Furthermore, the United States Supreme Court held that "this standard does not require that a juror's bias be proved with 'unmistakable clarity.' " *Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852. The Court also noted that "deference must be paid to the trial judge who sees and hears the jurors." *Id.* at 426, 105 S.Ct. at 853.

It appears to us that Carpenter's answers "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.* at 424, 105 S.Ct. at 852. *See also, State v. Smith,* 893 S.W.2d 908, 915-16 (Tenn.1994). Although this determination might not be "unmistakably clear," it need not be. Moreover, as the United States Supreme Court has held, great deference should be given to the trial judge, who is "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright,* 469 U.S. at 426, 105 S.Ct. at 853. The trial judge's findings "shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that [those findings were] erroneous." *State v. Alley,* 776 S.W.2d at 518 (Tenn.1989). Although the appellant claims that Carpenter was rehabilitated by defense counsel's questions, the record simply does not support this argument. This issue is without merit.

[Deleted: Statutory Review]

CONCLUSION

Accordingly, for the reasons stated above, we affirm the appellant's sentence of death. Because this case must automatically be reviewed by the Tennessee Supreme Court, we will not set an execution date. *See* T.C.A. § 39-13-206.

CONCUR:

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

__JERRY L. SMITH, JUDGE

__ *435. JAMES CURWOOD WITT, JR., JUDGE

(FN1.) "Prior to the setting of oral argument, the Court shall review the records and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup.Ct. R. 12.2.

(FN2.) The evidence indicated that Donna Lovett reported the events to authorities after she learned that the defendant was at a motel with another woman on the day after the offense.

(FN3.) As will be discussed herein, the jury's verdict did not track the specific language of Tenn.Code Ann. § 39-2-203(i)(5) (1982).

(FN4.) Although all of the capital sentencing provisions were amended and recodified in 1989, the jury in this case was properly instructed with the law as it existed at the time of the offense. *See State v. Brimmer,* 876 S.W.2d 75, 82 (Tenn.1994). The aggravating circumstances at issue in this case are now codified in Tenn.Code Ann. § 39-13-204(i)(5), (6) (1997 & Supp. 2000).

(FN5.) For example, although the present case involved only re-sentencing, it appears that the trial court instructed the jury that Brian Lovett was an accomplice during the guilt phase of the trial.

(FN6.) The present version of this statute requires that the jury conclude that the evidence of aggravating circumstances outweighs evidence of mitigating factors beyond a reasonable doubt. Tenn.Code Ann. § 39-13-204(g) (1997 & Supp.2000).

(FN7.) Presently codified at Tenn.Code Ann. § 39-13-206(c) (1997).

(FN8.) Although *Sims* discussed the present statute governing admissibility of evidence, *see* Tenn Code Ann. § 39-13-204(c) (1997), our comments are equally applicable to the statute in effect at the time of the defendant's offense, *i.e.,* Tenn.Code Ann. § 39-2-203(c) (1982).

(FN9.) We do observe, however, that the Court of Criminal Appeals incorrectly stated that the defendant "himself testified that he had been married twice and was dating two women at the same time." The record reveals that the defendant did not testify at the re-sentencing.

(FN10.) Although the jury's finding that the murder was "especially atrocious or cruel in that it involved torture and depravity of mind" did not track the language of the statute, the defendant has not asserted the discrepancy as error. We conclude, however, that by finding "torture *and* depravity of mind" the jury's finding was even more comprehensive than required by statute and, therefore, did not prejudice the defendant.

(FN1.) *See* Tenn.Code Ann. § 39-13-206(c) (2000).

(FN2.) The majority suggests that I have failed "to assert or establish that the sentence of death is either arbitrary or disproportionate as applied in this case to this defendant." Majority op. at ______. This view, however, misconstrues the crux of my dissent. My concern is that, under the majority analysis, it is impossible to conclude with any certainty that the defendant's sentence is *not* disproportionate. Thus, in my view, the majority has failed to sufficiently fulfill its statutory duty to ensure that the defendant's death sentence was not arbitrarily or disproportionately imposed.

Despite the majority's assertion that proportionality in this case is proven by "the similarity of the facts and circumstances of this case to numerous cases in which the death penalty has been upheld," its notion of similarity appears to be highly malleable. Among the cases held to have exhibited "similar facts and circumstances" to the case at bar, which involves an elderly victim who was choked and stabbed in his home during a planned robbery, are *State v. Vann,* 976 S.W.2d 93 (Tenn.1998) (eight-year-old victim killed during the perpetration of aggravated rape and incest); *State v. Chalmers,* 28 S.W.3d 913 (Tenn.2000) (young victim shot during unplanned, roadside robbery); *State v. Mann,* 959 S.W.2d 503 (Tenn.1997) (elderly woman stabbed to death during aggravated rape); and *State v. Hall,* 958 S.W.2d 679 (Tenn.1997) (defendant poured gasoline on his ex-girlfriend, who was lying in the front seat of her car, and burned her to death).

Given the subjectivity of the comparison protocol employed by the majority and the widely divergent cases included in the comparison pool, I must conclude that the finding of proportionality in this case is "nothing more than a statement that the reviewing court was able to describe the case before it in terms comparable to other capital cases." *Chalmers,* 28 S.W.3d at 924 (Birch, J., concurring and dissenting).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*788 24 S.W.3d 788

Supreme Court of Tennessee,
at Jackson.

STATE of Tennessee
v.
Farris Genner MORRIS, Jr.
July 10, 2000.

Defendant was convicted after jury trial in the Criminal Court, Madison County, Franklin Murchison, J., of two counts of premeditated first-degree murder and one count of aggravated rape and was sentenced to death. Defendant appealed. The Court of Criminal Appeals affirmed. On automatic review, the Supreme Court, Anderson, C.J., held that: (1) evidence was sufficient for jury to infer premeditation and deliberation; (2) evidence supported jury's determination that the aggravating circumstances outweighed the mitigating circumstances; and (3) death sentence was not arbitrary, excessive, or disproportionate.

Affirmed.

West Headnotes

[1] Criminal Law 🔑1159.2(7)
110 ----
110XXIV Review
110XXIV(P) Verdicts
110k1159 Conclusiveness of Verdict
110k1159.2 Weight of Evidence in General
110k1159.2(7) Reasonable Doubt.
When evaluating the sufficiency of the evidence, the Supreme Court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

[2] Criminal Law 🔑1144.13(3)
110 ----
110XXIV Review
110XXIV(M) Presumptions
110k1144 Facts or Proceedings Not Shown by Record
110k1144.13 Sufficiency of Evidence
110k1144.13(2) Construction of Evidence
110k1144.13(3) Construction in Favor of Government, State, or Prosecution.

[See headnote text below]

[2] Criminal Law 🔑1144.13(5)
110 ----
110XXIV Review
110XXIV(M) Presumptions
110k1144 Facts or Proceedings Not Shown by Record
110k1144.13 Sufficiency of Evidence
110k1144.13(5) Inferences or Deductions from Evidence.
The Supreme Court is required, when evaluating the sufficiency of the evidence to sustain a conviction, to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn therefrom.

[3] Criminal Law 🔑737(1)
110 ----
110XX Trial
110XX(F) Province of Court and Jury in General
110k733 Questions of Law or of Fact
110k737 Issues of Fact in General
110k737(1) In General.

[See headnote text below]

[3] Criminal Law 🔑741(1)
110 ----
110XX Trial
110XX(F) Province of Court and Jury in General
110k733 Questions of Law or of Fact
110k741 Weight and Sufficiency of Evidence in General
110k741(1) In General.

[See headnote text below]

[3] Criminal Law 🔑742(1)
110 ----
110XX Trial
110XX(F) Province of Court and Jury in General
110k733 Questions of Law or of Fact
110k742 Credibility of Witnesses
110k742(1) In General.
Questions concerning the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact.

[4] Homicide 🔑253(3)
203 ----
203VII Evidence
203VII(E) Weight and Sufficiency
203k251 Degree of Murder
203k253 First Degree
203k253(3) Circumstances of Cool Blood, Deliberation, and Premeditation.
Evidence was sufficient to allow jury to infer premeditation and deliberation, as required for capital murder conviction under statute in effect at time offense was committed, where defendant threatened victim just prior to shooting him, defendant procured shotgun and ammunition and lay in wait for an opportunity to enter victim's home, and defendant used a deadly weapon on the unarmed victim after deliberately covering the victim's head with a pillow. T.C.A. § 39-13-202 (1994).

[5] Homicide 🔑253(3)
203 ----
203VII Evidence
203VII(E) Weight and Sufficiency
203k251 Degree of Murder
203k253 First Degree
203k253(3) Circumstances of Cool Blood, Deliberation, and Premeditation.
Evidence was sufficient to allow jury to infer premeditation and deliberation, as required for capital murder conviction under statute in effect at time offense was committed, where defendant beat and stabbed victim 37 times in the face, head, and chest, the wounds were inflicted in a targeted fashion, defendant calmly bathed and ate after the murder, and defendant's account of the incident was nearly identical to that of an eyewitness. T.C.A. § 39-13-202 (1994).

[6] Homicide 🔑270
203 ----

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

203VIII Trial
203VIII(B) Questions for Jury
203k270 Insanity or Intoxication.
Weight to be given evidence of defendant's crack cocaine use prior to his committing double murder and the determination of whether voluntary intoxication negated the culpable mental elements were matters for the jury. T.C.A. § 39-11-503(a); § 39-13-202 (1994).

[7] Sentencing and Punishment 1788(5)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(5) Scope of Review.
Whether electrocution of defendant convicted of capital murder was cruel and unusual punishment was not properly before the Supreme Court, as death penalty statute was amended during the pendency of the appeal to provide for lethal injection as the default manner of execution. U.S.C.A. Const.Amend. 8; Const. Art. 1, § 16; T.C.A. §§ 39-13-202, 40-23-114(c).

[8] Sentencing and Punishment 1684
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1684 Vileness, Heinousness, or Atrocity.
Evidence was sufficient to support jury's finding at penalty phase the aggravating circumstance that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical injury beyond that necessary to produce death, where medical examiner testified that defendant stabbed victim 37 times, that 23 of those wounds were inflicted while victim was still alive, that the wounds that struck bone would have caused severe pain, and that the wounds were inflicted in a targeted, selective manner. T.C.A. § 39-13-202; § 39-13-204(i)(5) (1994).

[9] Sentencing and Punishment 1681
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1681 Killing While Committing Other Offense or in Course of Criminal Conduct.
Evidence was sufficient to support jury's finding at penalty phase the aggravating circumstance that the murder was committed while defendant was engaged in committing a felony; victim witnessed defendant's burglary of the residence as he forced his way in at gunpoint, she also witnessed defendant's murder of second victim, she was the victim of a kidnapping when defendant forced her into a closet, and victim was murdered just moments after the commission of these offenses and just before defendant's aggravated rape of third victim. T.C.A. § 39-13-202; § 39-13-204(i)(7)(1994).

[10] Sentencing and Punishment 1681
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1681 Killing While Committing Other Offense or in Course of Criminal Conduct.

Although the analysis to determine applicability of aggravating circumstance that murder was committed during a felony must focus upon the *788 relationship between the felony and the murder, it is not required that the felony be committed either before or contemporaneously with the murder. T.C.A. § 39-13-202; § 9-13-204(i)(7) (1994).

[11] Constitutional Law 270(2)
92 ----
92XII Due Process of Law
92k256 Criminal Prosecutions
92k270 Judgment and Sentence
92k270(2) Matters Considered; Presentence Report.

[See headnote text below]

[11] Sentencing and Punishment 1757
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1757 Evidence in Mitigation in General.
The Eighth and Fourteenth Amendments and the state constitution require that a sentencer in a death penalty case consider mitigating evidence. U.S.C.A. Const.Amends. 8, 14; Const. Art. 1, § 16; T.C.A. § 39-13-202.

[12] Sentencing and Punishment 1759
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1759 Nature and Circumstances of Offense.

[See headnote text below]

[12] Sentencing and Punishment 1760
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1760 Defendant's Character and Conduct.
The sentencer is permitted to hear evidence about the defendant's background, record and character, as well as any circumstances about the offense that may mitigate against the death penalty and serve as a basis for imposing a lesser sentence. T.C.A. §§ 39-13-202, 39-13-204(j).

[13] Sentencing and Punishment 1661
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1661 Determinations Based on Multiple Factors.
Evidence supported jury's determination at penalty phase of capital murder trial that the two aggravating circumstances, that the murder was committed during a felony and that it was especially heinous, atrocious, or cruel, outweighed defendant's proffered mitigating circumstances that his judgment

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

was impaired due to use of crack cocaine, that he was under extreme mental and emotional disturbance at the time of the crime, that he released a victim that he raped after the murders, that he was a good, dependable employee, that he was a good prisoner and student, and that he accepted responsibility for the crimes. T.C.A. §§ 39-13-202, 39-13-204(i, j); § 39-13-204(i)(7) (1994).

[14] Sentencing and Punishment ⚿1777
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1777 Questions of Law or Fact.
Whether mitigating evidence exists and the weight to be given to aggravating and mitigating circumstances are issues for the jury at penalty phase of capital murder prosecution. T.C.A. §§ 39-13-202, 39-13-204(j).

[15] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Supreme Court's comparative proportionality analysis, when reviewing murder cases in which defendant received a death sentence, is designed to identify aberrant, arbitrary or capricious sentencing by determining whether the death penalty in a given case is disproportionate to the punishment imposed on others convicted of the same crime. T.C.A. §§ 39-13-202, 39-13-206(c)(1).

[16] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Supreme Court, when conducting comparative proportionality analysis on review of murder cases in which the death sentence is imposed, employs the precedent-seeking method of comparative proportionality, by which it compares a case with cases involving similar crimes and similar defendants. T.C.A. §§ 39-13-202, 39-13-206(c)(1).

[17] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Supreme Court, when conducting comparative proportionality analysis on review of murder cases in which the death sentence is imposed, considers numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on other victims. T.C.A. §§ 39-13-202, 39-13-206(c)(1).

[18] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Supreme Court, when conducting comparative proportionality analysis on review of murder cases in which the death sentence is imposed, considers numerous factors about the defendant: (1) prior criminal record; (2) age, race and gender; (3) mental, emotional and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. T.C.A. §§ 39-13-202, 39-13-206(c)(1).

[19] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Since no two defendants and no two crimes are precisely alike, Supreme Court's comparative proportionality analysis, conducted on review of murder cases in which the death sentence is imposed, is not mechanical or based on a rigid formula. T.C.A. §§ 39-13-202, 39-13-206(c)(1).

[20] Sentencing and Punishment ⚿1654
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1654 Availability of Other Sentence.

[See headnote text below]

[20] Sentencing and Punishment ⚿1655
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1655 Sentence or Disposition of Co-Participant or Codefendant.
That a defendant in a similar case or even the same case has received a sentence less than death does not render a death sentence arbitrary, excessive or disproportionate. T.C.A. §§ 39-13-202, 39-13-206(c)(1).

[21] Sentencing and Punishment ⚿1712
350H ----
350HVIII The Death Penalty
350HVIII(E) Factors Related to Offender
350Hk1712 Intoxication or Drug Impairment at Time of Offense.
Death sentence was not arbitrary, excessive, or disproportionate to other cases in which that sentence was imposed, though murder was committed while defendant was suffering the effects of crack cocaine; evidence supported jury's finding of aggravating circumstances that the murder was committed during a felony and that it was especially heinous, atrocious, or cruel, and death penalty was upheld in numerous cases in which a defendant argued that the offense was mitigated by intoxication

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

due to drugs or alcohol. T.C.A. § § 39-13-202, 39-13-204(i), 39-13-206(c)(1); § 39-13-204(i)(7) (1994).

[22] Sentencing and Punishment 1712
350H ----
350HVIII The Death Penalty
350HVIII(E) Factors Related to Offender
350Hk1712 Intoxication or *788 Drug Impairment at Time of Offense.

Although drug usage or intoxication has been evident in some cases in which the defendant received a sentence less than death, it does not alone render a death sentence arbitrary, excessive or disproportionate. T.C.A. § § 39-13-202, 39-13-206(c)(1).

***790** George Morton Googe, District Public Defender, Jackson, Tennessee, (On Appeal and At Trial), and Daniel J. Taylor, Assistant Public Defender, and Jesse H. Ford, III, Jackson, Tennessee, (At Trial), for the appellant, Farris Genner Morris, Jr.

Paul G. Summers, Attorney General & Reporter and Michael E. Moore, Solicitor General and Elizabeth T. Ryan, Assistant ***791** Attorney General, Nashville, Tennessee (On Appeal), and James G. (Jerry) Woodall, District Attorney General, and Al Earls, Assistant District Attorney General, Jackson, Tennessee (At Trial), for the appellee, State of Tennessee.

OPINION

ANDERSON, C. J., delivered the opinion of the court, in which BIRCH, HOLDER and BARKER, J.J., joined.

A jury convicted the defendant of two counts of premeditated first degree murder and one count of aggravated rape. The jury imposed the death penalty for one of the first degree murders after finding that evidence of two aggravating circumstances--that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death and that the murder was committed in the course of a first degree murder, rape, burglary or kidnapping--outweighed mitigating evidence beyond a reasonable doubt. The jury imposed life without parole for the other first degree murder after finding that evidence of two aggravating circumstances--that the defendant knowingly created a risk of death to two or more persons other the victim murdered during the act of murder and that the murder was committed in the course of a first degree murder, rape, burglary or kidnapping--did not outweigh mitigating evidence beyond a reasonable doubt. The trial court imposed a 25-year sentence for aggravated rape to run consecutively to the sentence of life without parole. The Court of Criminal Appeals affirmed the convictions and the sentences. We hold that the evidence was sufficient to support the convictions, that the defendant is not entitled to relief based on the constitutionality of death by electrocution, and that the evidence was sufficient to support the jury's determination that evidence of two aggravating circumstances outweighed mitigating evidence beyond a reasonable doubt. We also hold that the death sentence is not arbitrary, excessive or disproportionate as applied in this case.

The defendant, Farris Genner Morris, Jr., was convicted of two counts of premeditated first degree murder and one count of aggravated rape. The jury imposed the death penalty for the premeditated first degree murder of Erica Hurd after finding that evidence of two aggravating circumstances, i.e., the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death and the murder was committed in the course of any first degree murder, rape, burglary or kidnapping, (FN1) outweighed evidence of mitigating circumstances beyond a reasonable doubt. The jury imposed life without parole for the premeditated first degree murder of Charles Ragland after finding that evidence of two aggravating circumstances, i.e., the defendant knowingly created a risk of death to two or more persons other than the victim during the act of murder and the murder was committed in the course of any first degree murder, rape, burglary or kidnapping, (FN2) did not outweigh evidence of mitigating circumstances beyond a reasonable doubt. The trial court imposed a 25-year sentence for the aggravated rape of Angela Ragland, to be served consecutively to the sentence of life without parole.

After the Court of Criminal Appeals affirmed the convictions and the sentences imposed, the case was docketed in this Court for automatic review. (FN3) We reviewed the Court of Criminal Appeals' decision, the record, and the applicable law, and ***792** entered an order specifying the following issues for argument: whether the evidence was sufficient to support the convictions for premeditated first degree murder; whether electrocution constitutes cruel and unusual punishment; whether the evidence was sufficient to support the aggravating circumstances and the jury's finding that the evidence of the aggravating circumstances outweighed the mitigating evidence beyond a reasonable doubt with regard to the first degree murder of Erica Hurd; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.

We conclude that the evidence was sufficient to support the verdicts of premeditated first degree murder and that the defendant is not entitled to relief on the issue of whether electrocution is cruel and unusual punishment. We further conclude that the evidence was sufficient to support the two aggravating circumstances with regard to the murder of Erica Hurd, as well as the jury's finding that the evidence of these aggravating circumstances outweighed mitigating evidence beyond a reasonable doubt. Finally, we hold that the sentence of death is not arbitrary, excessive or disproportionate to the sentence imposed in cases involving similar crimes and defendants. Therefore, we affirm the Court of Criminal Appeals' judgment.

*BACKGROUND*

*Guilt Phase*

Charles and Angela Ragland lived in a duplex residence in Jackson, Tennessee. The defendant, Farris Genner Morris, lived with his wife in the adjoining residence.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

In the early morning hours of September 17, 1994, Angela Ragland arrived at her home along with her 15-year-old cousin, Erica Hurd. Charles Ragland was awake in the bedroom with the light on. Shortly after arriving, Erica went outside to retrieve something from the car. When Erica came back into the house, Angela heard a scream and saw that Morris was holding a shotgun to Erica's head.

Morris pushed Erica onto the bed in the Raglands' bedroom and asked Charles "where the dope was." Charles Ragland replied that he "didn't have any" and asked Morris if he wanted money. (FN4) After Morris responded that he would "find it himself," Morris fired a shot into the floor and ordered Charles Ragland to get on the floor. He placed a pillow on Ragland's head and shot him one time in the head.

Morris ordered Erica to get into a closet by threatening to "blow her head off." He forced Angela into another bedroom, tied her wrists and ankles, and covered the window with a mattress so that "nobody could see if they walked by." Morris then retrieved Erica from the closet. Angela Ragland testified that she heard Erica pleading for Morris not to kill her and that she heard Morris say "shut up." She testified that she heard Erica screaming and gasping for breath, and then silence.

Morris returned to the bedroom and, still holding the shotgun, forced Angela Ragland to bathe him. Afterward he ordered Angela to put on a negligee and make him something to eat, which she did. Morris then forced Angela to have sexual intercourse with him "three or four times" and to perform oral sex upon him. Morris told her that he had once been "accused of raping someone and ... if he was going to jail, he was going to go to jail for doing something." He told Angela that "society made him the way he was" and "was the reason that he was doing what he did."

Around 6:30 a.m., Morris heard his wife in the adjoining residence and told Angela that he would let her go. He instructed her to tell police that she found the bodies of her husband and cousin when she arrived home that morning. Morris used a cloth to wipe off objects he had touched and he warned Angela not to go to the ***793** police. Angela fled to the house of a nearby friend, who drove her to the police station. The police found Morris at his home shortly thereafter and arrested him.

The bodies of Charles Ragland and Erica Hurd were later discovered in the Ragland residence. Charles Ragland had been shot in the head. Erica Hurd had been beaten and stabbed repeatedly. A blood-stained steak knife was found behind a couch and a large butcher knife with traces of blood was found in a chair in the living room. Angela Ragland testified that neither knife belonged to her or her husband. A 12-gauge pistol grip, pump action shotgun was later found underneath Morris's dresser drawer.

After being advised of and waiving his constitutional rights, Morris gave a statement to Officers Patrick Willis and James Golden of the Jackson Police Department. (FN5) Morris said that on the day of the offense he had purchased and smoked $250 worth of cocaine. He admitted that he had an exchange with Charles Ragland at 1:00 a.m., just a few hours prior to the murders, in which he asked Ragland to sell him drugs and, when Ragland declined, told Ragland that "he was going to regret disrespecting me." Morris admitted that he went to his house, got his shotgun, loaded two shells into the shotgun, and waited for Ragland's wife, Angela, to get home. Morris admitted that he entered the Ragland's residence with the shotgun and demanded that Charles Ragland sell him drugs. He admitted that after Ragland said he didn't have any drugs, he fired a shot into the floor, put a pillow over the barrel of the gun and shot him in the head. Morris admitted that he put Erica Hurd in a closet and tied up Angela Ragland. Morris told officers that he intended only to tie up Erica Hurd but that he stabbed her because she acted crazy and they struggled over a knife. Morris admitted he had sexual intercourse and oral sex with Angela Ragland.

Dr. O.C. Smith, the Deputy Chief Medical Examiner for West Tennessee, testified that Charles Ragland died from a shotgun wound to the head. Dr. Smith testified that he found evidence of an "intermediate target" between the weapon and Ragland's head, but that Ragland's death was "instantaneous because the brain [was] destroyed."

Dr. Smith testified that Erica Hurd had died as a result of multiple injuries including, stab wounds, blunt trauma to the head, skull fractures, and damage to the brain. Dr. Smith found that there were 37 stab wounds, 23 of which were sustained prior to death and 14 of which were post-mortem. Dr. Smith testified that 25 of the stab wounds were to the victim's neck and face and that the force of the stabbings was great enough to cause the knife blades to bend upon striking bone.

The defense theory focused on Morris's use of crack cocaine. In addition to Morris's own statement to police, Russell Morris, the defendant's brother, testified that he saw the defendant smoking crack around 5:15 p.m. on the evening before the murders.

Dr. Robert Parker, a doctor of pharmacology at the University of Tennessee, testified about the effects of crack cocaine use. Parker testified that smoking crack cocaine produces an intense euphoria and symptoms such as excitability, paranoia, mania, and impaired judgment. Parker testified that most users of crack cocaine go on a "cocaine run" or "binge." When users become unable to duplicate the feeling of euphoria from the initial uses of the drug, judgment is further impaired and there is "an increased risk of violent or homicidal behavior." Parker explained that an acute withdrawal or "crash phase" occurs when the drug is not used. It can be marked by depression, exhaustion, paranoia, anxiety, and suicidal thoughts. Parker testified that the evidence of Morris's ***794** behavior was "consistent with the ingestion of cocaine."

Dr. William Bernet, medical director of the Psychiatric Hospital at Vanderbilt University, testified that he evaluated Morris based on an interview and a review of various records and documents. Dr. Bernet concluded that due to false accusations of rape prior to these offenses, Morris became suicidal and a crack cocaine user. Dr.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Bernet stated that the mental stress and use of crack cocaine "affected [Morris's] judgment" and "may have prevented him from forming the intent" to commit the murders of Charles Ragland and Erica Hurd.

The jury convicted Morris of two counts of premeditated first degree murder and one count of aggravated rape.

*Penalty Phase*

Dr. O.C. Smith again testified regarding his findings from the autopsy of Erica Hurd, including the blunt trauma, skull fractures, and 37 stab wounds. Dr. Smith said that the wounds would have been painful and that the stab wounds that struck bone would have caused severe pain. Dr. Smith explained that the wounds were "in areas that may be targeted, the face, the head, the chest, the back," and that they showed "sites of selection, as opposed to a random pattern of distribution." Dr. Smith, noting that some of the wounds were severe and others were superficial, testified that it "may imply an element of control ... or it may imply an element of torment by being very superficial in nature."

Several witnesses testified on behalf of the defendant. Mickey Granger, the defendant's employer, testified that Morris was a good, dependable employee who suffered a "downhill slide" in performance when accused of rape shortly before these offenses. Granger became aware of Morris's drug problem when he found a crude crack pipe fashioned from a soft drink can.

Jack Thomas, a friend of the defendant's, testified that when he visited Morris in prison, Morris admitted his responsibility for the killings but denied that he raped Angela Ragland. According to Thomas, Morris said that he had used a large amount of cocaine on the night of the offenses in an effort to overdose. Several other witnesses, including teachers and prison employees, testified that Morris is a good student, participates in class, and is punctual. Several of the witnesses testified that Morris helps others inmates, studies frequently, and uses reference material from the library. The defendant did not testify.

The jury imposed a death sentence for the first degree murder of Erica Hurd after finding that the evidence of two aggravating circumstances--that the murder was "especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," and that the murder was "committed while the defendant was engaged in committing ... any first degree murder, rape, burglary or kidnapping"--outweighed mitigating evidence beyond a reasonable doubt. *See* Tenn.Code Ann. § 39-13-204(i)(5) and (7).

The jury imposed a sentence of life without parole for the murder of Charles Ragland after finding that the evidence of two aggravating circumstances--that the defendant "knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder" and that the murder was committed while the defendant was engaged in committing any "first degree murder, rape, burglary or kidnapping"--did not outweigh mitigating evidence beyond a reasonable doubt. Tenn.Code Ann. § 39-13-204(i)(3) and (7). In a separate sentencing hearing, the trial court imposed a 25-year sentence for the aggravated rape conviction and ordered that it be served consecutively to the sentence of life without parole.

***795** The Court of Criminal Appeals affirmed the convictions and the sentences. The case was then docketed in this Court for automatic review.

*ANALYSIS*

*Sufficiency of the Evidence*

The defendant argues that there was insufficient evidence of premeditation and deliberation to support the first degree murder convictions. The defense theory at trial was that Morris's use of crack cocaine rendered him incapable of forming the culpable mental states to commit the offenses. The State maintains that the evidence was sufficient to support the convictions.

[1][2][3] When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We are required to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *E.g., State v. Bland,* 958 S.W.2d 651, 659 (Tenn.1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998). Questions concerning the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. *Id.; State v. Cazes,* 875 S.W.2d 253, 259 (Tenn.1994),*cert. denied,* 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995).

At the time these offenses were committed, first degree murder included an "intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39-13-202(a)(1)(1991). (FN6) By statute, "intentionally" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn.Code Ann. § 39-11-106(a)(18)(1991). A "deliberate" act meant one performed with a cool purpose, and a "premeditated" act was one done "after the exercise of reflection and judgment." Tenn.Code Ann. § 39-13-201(b)(1) and (2)(1991).

In *Bland,* we identified and discussed circumstances that, if established by the proof, may warrant the trier of fact to find or infer premeditation. The circumstances include the use of a deadly weapon upon an unarmed victim, the particular cruelty of a killing, any threats or declarations of intent to kill made by the defendant, proof that the defendant procured a weapon, any preparations to conceal the crime undertaken before the crime is committed, and the defendant's calm demeanor immediately after a killing. *Bland,* 958 S.W.2d at 660. The element of deliberation, on the other hand, "requires that the killing be done with a cool purpose--in other words, that the killer be free from the passions of the moment." *State v. West,*

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

844 S.W.2d 144, 147 (Tenn.1992).

[4][5] We agree with the Court of Criminal Appeals' conclusion that the evidence was sufficient to support both first degree murder convictions. The evidence, indeed the defendant's own statement, indicated that Morris confronted Charles Ragland just hours before the offense and warned Ragland that he would "regret disrespecting me." Morris then went to his home, which adjoined the Ragland's, procured a shotgun, loaded it with two shells, and waited for Ragland's wife to arrive home so as to effect his entry into the Ragland's home. Morris abducted Erica Hurd and forced his way into the Ragland's residence at gunpoint.

Once in the home, Morris demanded that Charles Ragland give him "dope" and refused Ragland's offer of money. He fired one shot, forcing Ragland to the ***796** floor, and after placing a pillow over Ragland's head, fired one shot into his head from close range. Morris proceeded to put Erica Hurd into a closet and tie Angela Ragland in another room. He covered a window with a mattress. He retrieved Erica from the closet, beat her, and stabbed her 37 times in the face, head, and chest. The medical examiner testified that the wounds were inflicted in a "targeted" fashion that showed "sites of selection." Having killed both Ragland and Hurd, Morris calmly ordered Angela Ragland to bathe him and then fix him something to eat prior to forcing her to engage in sexual intercourse. Before leaving the scene some three hours after the offenses began, Morris tried to wipe off his fingerprints and then hid the shotgun.

Accordingly, the evidence revealed numerous circumstances from which the jury could infer both premeditation and deliberation: the threats against Charles Ragland just prior to offenses; the procurement of a shotgun and ammunition; Morris's lying in wait for an opportunity to enter the victims' home; the use of a deadly weapon on the unarmed Charles Ragland after deliberately covering the victim's head with a pillow; the savage stabbings of Erica Hurd in a severe yet targeted fashion; Morris's calm demeanor in bathing and eating after committing two murders; and Morris's efforts to conceal his fingerprints and hide the murder weapon. Moreover, despite Morris's use of cocaine prior to the offense, his detailed recounting of the offenses in his statement to officers was nearly identical to that of eyewitness Angela Ragland. When viewed under the appropriate standards of appellate review, we conclude that the evidence was legally sufficient to support the jury's verdicts as to both counts of first degree murder.

The defense theory was that Morris was unable to form the culpable mental states of intent and premeditation due to his excessive use of crack cocaine prior to committing the offenses. The trial court allowed evidence of Morris's use of cocaine and properly instructed the jury that a defendant's "voluntary intoxication" could "negate a culpable mental state." *See* Tenn.Code Ann. § 39-11-503(a)(1991).

[6] The weight to be given the evidence and the determination of whether the voluntary intoxication negated the culpable mental elements were matters for the jury. Given the overwhelming evidence of Morris's intentional, deliberate and premeditated acts, the jury obviously elected to reject the defense theory. Moreover, the defense theory that Morris's use of cocaine rendered him incapable of forming the culpable mental **states** was refuted by **Morris's** own confession in which he recounted the offenses in full detail. Accordingly, we find no merit to Morris's contention that his cocaine use rendered the evidence insufficient to support the jury's verdict as a matter of law.

*Electrocution*

[7] Throughout these proceedings, the defendant has maintained that electrocution is cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution. Conceding that this issue has been rejected by this Court on numerous occasions, (FN7) the defendant relies on authority from other states and argues that an evidentiary hearing should be held on such issues as the construction of the electric chair, the manner of its use and maintenance, the possibility of malfunction, and the potential harm and suffering inflicted on those executed through electrocution. The State argues that the issue is no longer ripe for review.

Morris was sentenced to the death penalty in January of 1997. As the State notes, in May of 1998, the Tennessee legislature ***797** amended statutory law and allowed a defendant who was sentenced to death before January 1, 1999, to sign a written waiver and elect to be executed by lethal injection. Tenn.Code Ann. 40-23-114(c) (Supp.1999). The State argues that the issue is not ripe for review because the defendant has not chosen electrocution as the means of death and that, if he does so, any objection to electrocution is waived.

Since the filing of briefs, the legislature has again amended Tenn.Code Ann. 40-23-114(c), lending further support to the State's argument. As amended, the statute now provides for lethal injection as the default manner of execution in all cases in which a defendant has been sentenced to death. 2000 Tenn. Pub. Acts, ch. 614 (enacted March 30, 2000). A defendant may now waive lethal injection and elect electrocution.

The result of the legislation is this--the defendant is no longer under a penalty of death by electrocution, but rather, death by lethal injection. The issue of whether electrocution is cruel and unusual punishment is no longer properly before the Court. Moreover, the United States Supreme Court has said that a defendant who elects a certain means of death such as electrocution waives his constitutional challenges to the manner of executing the sentence. *Stewart v. LaGrand,* 526 U.S. 115, 119 S.Ct. 1018, 1020, 143 L.Ed.2d 196 (1999).

Accordingly, the defendant is not entitled to relief on this issue. (FN8)

*Sufficiency of Aggravating Circumstances*

In reviewing a sentence of death, we are to determine whether the evidence supports the jury's findings with respect to aggravating circumstances and whether the evidence supports the jury's

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

conclusion that the aggravating circumstances outweighed mitigating factors beyond a reasonable doubt. Tenn.Code Ann. § 39-13-206(c)(1)(1997). We will review each issue in turn.

*Heinous, Atrocious or Cruel*

[8] The jury found that the murder of Erica Hurd was "especially heinous, atrocious or cruel in that it involved torture or serious physical injury beyond that necessary to produce death." Tenn.Code Ann. § 39-13-204(i)(5). Morris argues that the evidence was insufficient to support this aggravating circumstance because the State did not establish with certainty whether the victim was alive and conscious when she was stabbed to death.

We have defined "torture" as "the infliction of severe mental or physical pain upon the victim while he or she remains alive and conscious." *State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985); *State v. Mann,* 959 S.W.2d 503, 511 (Tenn.1997), *cert. denied,* 524 U.S. 956, 118 S.Ct. 2376, 141 L.Ed.2d 743 (1998). We have defined "serious physical abuse beyond that necessary to produce death" as follows:

> Because the legislature added the words 'serious physical abuse,' it must be assumed that the legislature intended the words ... to mean something distinct from 'torture.' The word 'serious' alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be 'beyond that' or more than what is 'necessary to produce death.' 'Abuse' is defined as an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.'

*State v. Odom,* 928 S.W.2d 18, 26 (Tenn.1996) (quoting Black's Law Dictionary 11 (6 th ed.1990)).

The evidence revealed that Erica Hurd was present when Morris shot Charles Ragland in the head at close range. She was then forced into a closet while Morris ***798** tied up Angela Ragland in another room. When Hurd was retrieved from the closet, Angela Ragland testified that she heard the victim pleading for her life, screaming, and gasping for air for fifteen or twenty minutes. The medical examiner testified that the victim suffered blunt trauma to her head that resulted in fracturing of her skull and 37 stab wounds in the face, head, back and chest. The medical examiner testified that 23 of the stab wounds were inflicted while the victim was still alive and that the stab wounds that struck bone would have caused severe pain. According to the medical examiner, the wounds were inflicted in a targeted, selective manner.

The evidence overwhelmingly supports both torture and serious physical injury beyond that necessary to produce death. *E.g., State v. Mann,* 959 S.W.2d at 511 (victim beaten, strangled and stabbed 11 times); *State v. Bush,* 942 S.W.2d 489 (Tenn.), *cert. denied,* 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997)(victim beaten and stabbed 43 times); *State v. Smith,* 868 S.W.2d 561 (Tenn.1993), *cert. denied,* 513 U.S. 960, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994)(victim shot, throat slashed, and stabbed). We therefore conclude that the evidence in this case was sufficient to support the jury's finding that the murder was "especially heinous, atrocious or cruel in it that involved torture or serious physical injury beyond that necessary to produce death."

*Murder Committed During Felony*

[9] The jury also found that the murder of Erica Hurd was committed while the defendant "was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after having committed or attempted to commit any first degree murder, rape, burglary or kidnapping." Tenn.Code Ann. § 39-13-204(i)(7)(Supp.1994). (FN9) Morris argues that the evidence was insufficient to support this aggravating circumstance because the evidence did not reveal that a felony was committed during the murder of Erica Hurd and the jury made no findings in this regard.

In *State v. Terry,* 813 S.W.2d 420 (Tenn.1991), we discussed the application of this aggravating circumstance and the issue of whether the evidence supports a finding that another felony has been committed during a murder:

> Whether the evidence supports a finding that the murder was committed in the course of, during, or while engaged in the commission of another felony ... generally depends on an analysis of the temporal, spatial and motivational relationships between the capital homicide and the collateral felony, as well as on the nature of the felony and the identity of its victim.

*Terry,* 813 S.W.2d at 423.

In *Terry,* the defendant had been stealing money from his church congregation over a period of months and then subsequently killed a church employee. We found that the evidence did not support a finding of a "nexus" between the murder and the perpetration of a larceny. In contrast, we observed that the aggravating circumstance had been properly applied in numerous cases where the murder involved the victim of the felony, a witness to the felony, or a police officer attempting to apprehend the defendant after the commission of the felony, and was committed "within close temporal proximity to the commission of the aggravating felony." *Id.* at 424; *see also State v. Hall,* 958 S.W.2d 679, 693 (Tenn.1997), *cert. denied,* ***799** 524 U.S. 941, 118 S.Ct. 2348, 141 L.Ed.2d 718 (1998)(applying *Terry* and concluding that the aggravating circumstance was applicable because the felony of arson was committed when the defendant murdered the victim by setting fire to the car she occupied).

[10] Moreover, although the analysis must focus upon the relationship between the felony and the murder, it is not required that the felony be committed either before or contemporaneously with the murder. *See State v. Wright,* 756 S.W.2d 669, 673 (Tenn.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 848, 102 L.Ed.2d 979 (1989)(where evidence showed two killings occurred within short period of time, precise sequence was not dispositive of whether aggravating circumstance was applicable);

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*State v. Jones,* 288 S.C. 1, 340 S.E.2d 782, 784 (1985)(rape of second victim occurred after murder but aggravating circumstance applied because the offenses were a continuous series of acts with no significant lapse of time).

Here, Erica Hurd was a witness to Morris's burglary of the residence as he forced his way in at gunpoint; she was a witness to Morris's murder of Charles Ragland; and she was the victim of a kidnapping when Morris forced her into the closet. Hurd was murdered just moments after the commission of these offenses and just before Morris's aggravated rape of Angela Ragland. All of these offenses were committed at the same place, close in time, and as part of Morris's single criminal spree against these three victims. There was no distinction or separation of these offenses with regard to time, location, motivation or any other factor that would render this aggravating circumstance inapplicable. We therefore conclude that the evidence was sufficient to support the jury's finding.

*Mitigating Factors*

We now turn to the question of whether the evidence supported the jury's determination that the two aggravating circumstances outweighed the evidence of mitigating circumstances.

[11][12] The Eighth and Fourteenth Amendments to the United States Constitution and article I, § 16 of the Tennessee Constitution require that a sentencer in a death penalty case consider mitigating evidence. *McKoy v. North Carolina,* 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990) ; *State v. Cauthern,* 967 S.W.2d 726, 738 (Tenn.), *cert. denied,* 525 U.S. 967, 119 S.Ct. 414, 142 L.Ed.2d 336 (1998). The sentencer is permitted to hear evidence about the defendant's background, record and character, as well as any circumstances about the offense that may mitigate against the death penalty and serve as a basis for imposing a lesser sentence. *Cauthern,* 967 S.W.2d at 738; *see also* Tenn.Code Ann. § 39-13-204(j) (1997).

[13] Morris argues that the evidence supported numerous mitigating circumstances, including: that his judgment was impaired due to his use of crack cocaine; that he was under extreme mental and emotional disturbance at the time of the crime; that he released Angela Ragland; that he had been a good, dependable employee; that he is a good prisoner and student; and that he accepted responsibility for the crimes. We observe that there was evidence in the record to support several of these mitigating circumstances--indeed, in imposing a sentence of life without parole for the murder of Charles Ragland, it is obvious that the jury gave careful consideration to the mitigating evidence.

[14] Whether mitigating evidence exists and the weight to be given to aggravating and mitigating circumstances are issues for the jury. *Bland,* 958 S.W.2d at 661. Given the overwhelming strength of the two aggravating circumstances, and the jury's careful consideration of the mitigating evidence, we conclude that the evidence is sufficient to support the jury's finding that the aggravating circumstances ***800** outweighed mitigating evidence beyond a reasonable doubt.

*Proportionality*

[15] Where a defendant has received a death sentence, we must apply a comparative proportionality analysis. Tenn.Code Ann. § 39-13-206(c)(1)(1997). The review is designed to identify aberrant, arbitrary or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." *Bland,* 958 S.W.2d at 662 (quoting *Pulley v. Harris,* 465 U.S. 37, 42-43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. *Bland,* 958 S.W.2d at 668.

[16][17] We employ the precedent-seeking method of comparative proportionality, by which we compare a case with cases involving similar crimes and similar defendants. *Bland,* 958 S.W.2d at 667. We consider numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on other victims.

[18][19][20] We also consider numerous factors about the defendant: (1) prior criminal record; (2) age, race and gender; (3) mental, emotional and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Id.* at 667. Since no two defendants and no two crimes are precisely alike, our review is not mechanical or based on a rigid formula. *Id.* at 668. Similarly, that a defendant in a similar case or even the same case has received a sentence less than death does not render a death sentence arbitrary, excessive or disproportionate. *State v. Cauthern,* 967 S.W.2d at 741.

[21] In this case, the evidence showed that the defendant had a confrontation with one of the victims, Charles Ragland, a short time before the offenses. He procured his shotgun, loaded it with two shells, and waited for an opportunity to gain entry to the Raglands' home. When that opportunity came, Morris forced his way into the home by holding a second victim, 15-year-old Erica Hurd, at gunpoint. He demanded drugs, refused Charles Ragland's offer of money, and shot Ragland in the head at close range. He forced Erica Hurd into a closet and tied up a third victim, Angela Ragland. When he retrieved Hurd from the closet, he beat her and stabbed her 37 times. After killing two unarmed victims in brutal fashion, Morris took a bath, ate a meal, and forced Angela Ragland to engage in sexual intercourse. There was no provocation or justification for Morris's actions, which were at all times intentional, deliberate, and premeditated.

We have found the death penalty neither excessive

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

nor disproportionate in many similar cases involving brutal and gruesome facts that supported the "heinous, atrocious or cruel" aggravating circumstance. *E.g., State v. Carter,* 988 S.W.2d 145 (Tenn.1999)(defendant broke into victims' home, shot husband in head, raped wife and shot her in the head); *State v. Mann,* 959 S.W.2d at 511 (defendant broke into victim's home, beat and raped the victim, and stabbed her 11 times); *State v. Bush,* 942 S.W.2d at 507 (defendant broke into victim's home, beat the victim and stabbed her 43 times); *State v. Cazes,* 875 S.W.2d at 259 (defendant broke into victim's home, beat and raped the victim); *State v. Jones,* 789 S.W.2d 545 (Tenn.1990)(defendant broke into victim's home, bound, gagged and stabbed victim); *State v. West,* 767 S.W.2d 387 (Tenn.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3254, ***801** 111 L.Ed.2d 764 (1990)(defendant broke into victims' home, raped and stabbed mother and daughter); *State v. Cone,* 665 S.W.2d 87 (Tenn.), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 357 (1984) (defendant broke into victims' home and beat victims to death). Moreover, as can be seen, in each of these cases the defendant broke into the victim's residence before committing the murders.

Similarly, the death penalty has been upheld where the jury, as it did in this case, found the felony murder aggravating circumstance based on a kidnapping, rape, murder or burglary. *State v. Mann,* 959 S.W.2d at 512; *State v. Smith,* 868 S.W.2d at 583; *State v. West,* 767 S.W.2d at 397. Finally, like the present case, numerous cases have involved multiple victims in addition to the murder of the victim for whom the death penalty was imposed. *State v. Smith,* 868 S.W.2d at 583; *State v. Payne,* 791 S.W.2d 10, 12 (Tenn.1990); *State v. Jones,* 789 S.W.2d at 550; *State v. Henley,* 774 S.W.2d 908, 917 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 800 (1990) ; *State v. West,* 767 S.W.2d at 397; *State v. Cone,* 665 S.W.2d at 90.

With regard to the characteristics of the defendant, the record indicated that Morris, age 37, was a good employee, student and prisoner. He contends that he has the potential for rehabilitation, adapting to incarceration, and that he accepted responsibility for his conduct. We observe, however, that Morris did not testify in mitigation and did not express any remorse whatsoever when confessing the offenses to police officers.

[22] The defendant offers two primary reasons in support of his contention that the death sentence is disproportionate: that the evidence did not support the aggravating circumstances; and that the defendant committed the offenses while suffering the effects of crack cocaine. We have already addressed the first argument by having found that the evidence was sufficient to support both aggravating circumstances. With regard to the second argument, we observe that the death penalty has been upheld in numerous cases where the defendant argued that the offense was mitigated by intoxication due to drugs or alcohol. *E.g., State v. Payne,* 791 S.W.2d at 16; *State v. Henley,* 774 S.W.2d at 912; *State v. O'Guinn,* 709 S.W.2d 561 (Tenn.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986); *State v. Cone,* 665 S.W.2d at 90. Moreover, although drug usage or intoxication has been evident in some cases in which the defendant received a sentence less than death, *e.g., State v. Gregory,* 862 S.W.2d 574 (Tenn.Crim.App.1993), it does not alone render a death sentence arbitrary, excessive or disproportionate.

Accordingly, having reviewed the nature and circumstance of the offense and the characteristics of this defendant pursuant to the analysis in *Bland,* we conclude that the death sentence imposed in this case was not arbitrary, excessive, or disproportionate.

*CONCLUSION*

We have reviewed the entire record and the arguments raised in this case and we conclude that the evidence was sufficient to support the conviction and that the issues raised by the defendant do not warrant relief. We have also determined that the evidence supported the jury's findings of two aggravating circumstances, that the evidence supported the jury's finding that these aggravating circumstances outweighed mitigating evidence beyond a reasonable doubt, and that the death sentence in this case was not arbitrary, excessive, or disproportionate.

Accordingly, we affirm the decision of the Court of Criminal Appeals and attach hereto as an appendix the relevant portions of that opinion. The sentence of death is affirmed and shall be carried out on the 10th day of October, 2000, unless otherwise ordered by this Court or proper authority. It appearing that the defendant, ***802** Ferris Genner Morris, is indigent, the costs of appeal are taxed to the State.

DROWOTA, J., not participating.

APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
JANUARY SESSION, 1999

Feb. 5, 1999.

State of Tennessee, Appellee

vs.

Farris Genner Morris, Jr., Appellant

No. 02C01-9801-CC-00012
Madison County
Hon. Franklin Murchison, Judge
Capital Case
(Premeditated First Degree Murder, Two Counts; Aggravated Rape)

George Morton Googe, District Public Defender, Jackson, Daniel J. Taylor, Assistant Public Defender, Jesse H. Ford, III, Jackson, for Appellant.

John Knox Walkup, Attorney General and Reporter, Michael E. Moore, Solicitor General,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Elizabeth T. Ryan, Assistant Attorney General, Criminal Justice Division, Nashville, James G. (Jerry) Woodall, District Attorney General, Al Earls, Asst. District Attorney General, Jackson, for Appellee.

*OPINION*

DAVID G. HAYES, Judge.

(Deleted Summary of Testimony)

Background

A. Guilt/Innocence Phase

....

... During this interview, the appellant made the following statement:

On September 16, 1994, I got off of work at 1:00 [p.m.]. I bought $250 worth of cocaine during the evening. I made several purchases. I smoked the whole $250 worth up.

Around 1:00 a.m. on September the 17th, 1994, I was sitting on my porch at 120 Ridgemont. My next door neighbor rode up with someone. He got out and came to the duplex. I asked him what was up. I asked dude, 'Why don't you sell me something?' He said he didn't sell dope. I asked him why he would walk out of his house every day and not speak to me, why he didn't show me any respect? He said he didn't have to listen to me and that he was going in his house and going to bed. I told him he was going to regret disrespecting me.

I went into my house. I knew that his wife wasn't at home yet. I knew that she would come in sooner or later. I got my shotgun from my bedroom. I loaded two shells into it. I sat in my living room waiting to hear her pull up.

I heard his wife and someone else pull up, but I missed them. They went in the house and locked the door behind them, I assumed.

I heard someone go out to the car. I looked out and it was his wife. When she opened the door, I got behind her with the shotgun. I pointed it at her and walked in behind her. A young girl was on the couch. I told her to get up. I told them to walk on back to the bedroom. They went into the bedroom and got onto the bed. The girl's husband was lying on the bed. I told him to give me the dope. He said he didn't have any. I fired the shotgun into the floor. He rolled off the bed. I asked him again for the dope. He said he didn't have any. He asked me if I wanted money. I told him, 'No, I don't want your money.'

I picked a pillow up off of the bed and put it over the barrel of the shotgun and I shot him. The girls were on the bed under a blanket or something. I tried ***803** to put the young girl in the closet. She started acting crazy. We were in the hallway. She picked up a knife from somewhere. We struggled from the hallway into the front room. We wrestled on the couch. I took the knife from her. I laid the shotgun on the couch. I stabbed her down low with the knife. I hit her with my hand. I think I broke my finger. I can't raise it back up.

Before the struggle with the young girl, I had put her in the hall closet. I took the dude's wife into the other bedroom. I had her tied down on the big bed to the right as you walk into the bedroom. I used a black belt and some type of material to tie her hands and feet. It was dark in the room.

I went to the closet and got the young girl out. That's when she started to struggle and acting crazy, as I explained earlier. My intentions for getting her out of the closet was to tie her up, but she got to struggling and got the knife. After I stabbed her and she was lying there on the couch, I went and got a blanket that was already in the living room. I covered the young girl up. The dude's wife didn't want to see her.

I went into the bedroom and untied the other girl and we talked. We talked in the bedroom for a while. I told her I wanted to take a bath. We went into the bathroom. I undressed by taking off my pants and shirt.... I got in the tub and I told her to take my shorts off of me. She did. She gave me a bath. I held a gun in my hand.

We went back to the bedroom. I dried off with a sheet. I asked her if she had anything to eat. She fixed me a sandwich and Kool-Aid. I ate and then I laid the shotgun on the other bed and we had sex. We had sex three or four times. She gave me oral sex. I took the mattress off the other bed and put it up against the window because of the light coming through. She didn't act afraid.

About 6 or 7 this morning I told her I was going to let her go. I told her not to try and make a story up, just do what she was supposed to do.

I put my clothes in a plastic bag and took them home. I put the bag in the trash can in the bedroom where my dope was. I put the shotgun up under the chest of drawers in my bedroom.

(Deleted B. Penalty Phase)

I. Motion to Suppress

Nine hours after his arrest on September 17, 1994, the appellant executed a written waiver of his *Miranda* rights and provided law enforcement officers a complete statement of his involvement in the deaths of Charles Ragland and Erica Hurd and the aggravated rape of Angela Ragland. *See supra.* Prior to trial, the appellant filed a motion to suppress this statement alleging that the statement was not knowingly and voluntarily given due to the fact that he was under the influence of crack cocaine. A hearing on the motion was heard on September 10, 1996.

The evidence at the suppression motion revealed that the appellant had been smoking crack cocaine on the evening of Friday, September 16, 1994. Russell Morris, the appellant's brother, verified that, when he saw the appellant at 5:30 p.m. that evening, the appellant had informed him that he had spent $200 on crack cocaine and was going to obtain more. He also testified that the appellant appeared to be intoxicated. Next, the defense attempted to

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

call the victim, Angela Ragland, to the stand to testify regarding the appellant's appearance and actions during the commission of these offenses. The State objected on the basis that Angela Ragland was not "in any position to know anything about the condition that [the appellant] was in at the time that the statement was given." The trial court sustained the State's objection on the same ground, expressly finding that Ms. Ragland had no knowledge of the appellant's state of mind or whether he was under the ***804** influence of cocaine when he gave his statement some fourteen hours after he committed these offenses.

Dr. Robert Parker was called as an expert witness on the effects of crack cocaine on the human body. *See supra.* Specifically, Dr. Parker testified that mania was present during the "crash phase" when the appellant's statement was given. He explained that, during the "crash phase," one's judgment was impaired and usually was accompanied with confusion and suicidal thoughts. Moreover, "crash phase" symptoms could cause one not to care about or understand the consequences of their actions.

At the conclusion of Dr. Parker's testimony, the defense again attempted to introduce the testimony of Angela Ragland. However, the trial court refused to admit such testimony finding that "there's been no proof here presented, notwithstanding the use of cocaine, that he, because of the ingestion of cocaine, didn't understand what he was doing when he gave his statement. There's been no proof of that." (FN1)

The defense then offered to call the appellant to testify regarding "how [the drugs] affected his body, ... the way he was ... acting, how he was feeling about those things at the time he gave his statement and before that." Defense counsel asked the court to limit the examination of the appellant to these matters and to prohibit questioning as to the "facts of what happened on this alleged incident about the killings." The trial court refused this request, finding that there was no reason to prohibit the State from eliciting the contents of the statement on cross-examination and how it "reflects the truth of what occurred." Moreover, the trial court concluded that the appellant "can't exercise [his] Fifth Amendment privilege on examination of things which are relative to the things that he said...." After this ruling, the defense elected not to call the appellant to the stand. (FN2)

The defense next called Officer James Golden to the stand. Officer Golden testified that he first encountered the appellant between 8:30 and 9:00 a.m. on the morning of September 17, 1994. At this time, the appellant "appeared normal to [him]." Later that afternoon, approximately 5:20 p.m., Golden, accompanied by Officer Willis, advised the appellant of his *Miranda* rights, witnessed the appellant waive these rights, and proceeded to obtain a confession from the appellant. Investigator Golden testified that, at the time the statement was obtained, the appellant did not appear to be under the influence of crack cocaine.

No further proof was presented. Based on this evidence, the trial court denied the appellant's motion to suppress. The trial court stated:

> ... The basic premise here is that when he gave the statement, that statement was not the product of a free mind and rational intellect.
>
> ...
>
> ***805** ... The only proof that we have is from Officer Golden who said he was normal.
>
> ...
>
> Now to adopt your idea, I would have to say that the rule of law is that you could prove that a person has had drugs. There's an inference that he didn't know--- that he couldn't give a rational statement. There is no such inference that's drawn from the proof that a person has used drugs that they can't give a good statement. You've got to first give me some proof that he didn't give a good statement.
>
> ...
>
> ... Well, what you've done is given me the corroborative proof, but you don't have any proof--- You have zero proof that the statement ... was the product of an irrational mind. You have zero proof of that.

The appellant now contests the ruling of the trial court arguing (1) that the trial court erred in refusing to permit Angela Ragland to testify at the hearing and (2) that the testimony of Dr. Parker was sufficient to show that the appellant was in the "crash phase" of cocaine intoxication, suffering from impaired judgment, confusion, and suicidal thoughts, at the time his statement was given to the police.

Analysis

The trial court's determination that a confession has been given voluntarily and without coercion is binding upon the appellate court unless the evidence preponderates against the ruling. *See State v. Odom,* 928 S.W.2d 18, 22 (Tenn.1996); *State v. Stephenson,* 878 S.W.2d 530, 544 (Tenn.), *reh'g denied,* (1994). Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact. *Odom,* 928 S.W.2d at 23. On appeal, the appellant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. *See State v. Tate,* No. 02C01-9605-CR-00164, 1997 WL 746441 (Tenn.Crim.App. at Jackson, Dec. 3, 1997), *perm. to appeal denied,* (Tenn. Oct. 5, 1998) (citation omitted).

The law in this state is well-established that "[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary." *See State v. Robinson,* 622 S.W.2d 62, 67 (Tenn.Crim.App.1980), *cert. denied,* 454 U.S. 1096, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981); *see also State v. Beasley,* No. 03C01-9509-CR-00268, 1996 WL 591203 (Tenn.Crim.App. at Knoxville, Oct. 10, 1996), *reh'g denied,* (Sept. 15, 1997), *perm. to appeal denied,* (Tenn. Apr. 27, 1998); *State v. Teeters,* No. 0201-9304-CC-0051, 1994 WL 29855 (Tenn.Crim.App. at Jackson, Feb. 2, 1994).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

"It is only when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect that it should be suppressed." *Robinson,* 622 S.W.2d at 67 (citing *Lowe v. State,* 584 S.W.2d 239 (Tenn.Crim.App.1979)). The test to be applied in these cases is whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime. *Beasley,* No. 03C01-9509-CR-00268 (citations omitted).

In the present case, the defense presented the testimony of Officer Golden who stated that, at the time the appellant's statement was obtained, the appellant was acting normal, was calm, and did not appear to be under the influence of cocaine. He further testified that the appellant provided a complete narrative of the events surrounding the double homicides/aggravated rape. No proof was presented to rebut this observation other than the expert testimony of Dr. Parker whose testimony was limited to the general effects of cocaine intoxication and not those effects actually experienced by the appellant. Indeed, we find no proof that preponderates against the trial court's finding that the ***806** appellant made a voluntary and knowing statement to law enforcement officials.

Moreover, we conclude that the trial court properly prohibited the defense from calling Angela Ragland to the stand. Per the appellant's offer of proof, Angela Ragland would only have been able to testify about the appellant's state of mind and physical condition during the actual perpetration of the crimes, which was not at issue at the suppression hearing. There is no dispute that the appellant had ingested a large amount of crack cocaine the prior evening and was intoxicated at the time the crimes were committed. However, Ms. Ragland *was not present* at the time the appellant's statement was given, some fourteen hours after the crimes occurred, and, therefore, could not testify regarding his demeanor during the police interview, *i.e.,* the issue at the suppression hearing. *See* Tenn. R. Evid. 402 and 602. Accordingly, the motion to suppress was properly denied. This issue is without merit.

II. *Witherspoon* Violations

The appellant next contends that the jury selection process in his capital trial violated *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Specifically, he argues that the statements of two of the prospective jurors, Barbara Brooks and Dennis Spellings, concerning the death penalty did not justify their excusal for cause.

"The right to trial by jury secured by our state and federal constitutions necessarily contemplates that the jury will be unbiased and impartial." *See Wolf v. Sundquist,* 955 S.W.2d 626, 629 (Tenn.App.), *perm. to appeal denied,* (Tenn.1997) (citing *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946); *Ricketts v. Carter,* 918 S.W.2d 419, 421 (Tenn.1996); *Durham v. State,* 182 Tenn. 577, 188 S.W.2d 555, 558 (1945)). "In its constitutional sense, impartiality envisions not only freedom from jury bias against the defendant but also freedom from jury bias in the defendant's favor." *Id.* (citing *Swain v. Alabama,* 380 U.S. 202, 219-20, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965); *Hayes v. Missouri,* 120 U.S. 68, 70-71, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887); *Houston v. State,* 593 S.W.2d 267, 272 (Tenn.1980), *rev'd on other grounds, State v. Brown,* 836 S.W.2d 530, 543 (Tenn.1992); *Toombs v. State,* 197 Tenn. 229, 270 S.W.2d 649, 650 (1954)). Essentially, an impartial juror is one who is free from personal bias or prejudice and will find the facts and apply them to the law. *See Wolf v. Sundquist,* 955 S.W.2d at 629; *see also Buchanan v. Kentucky,* 483 U.S. 402, 417, 107 S.Ct. 2906, 2914, 97 L.Ed.2d 336 (1987); *Wainwright v. Witt,* 469 U.S. 412, 423, 105 S.Ct. 844, 851-52, 83 L.Ed.2d 841 (1985); *Eason v. State,* 65 Tenn. 466, 469 (1873).

To ensure an impartial jury, the Tennessee Supreme Court has adopted the rationale of the United States Supreme Court in determining the eligibility of prospective jurors in a capital case. In *Witherspoon v. Illinois,* the Supreme Court held that a prospective juror may be excluded for cause because of his or her views on capital punishment. This standard was clarified in *Wainwright v. Witt,* 469 U.S. at 424, 105 S.Ct. at 852:

> That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon's* reference to "automatic decision making," this standard likewise does not require that a juror's bias be proved with "unmistakable clarity."

*See also State v. Alley,* 776 S.W.2d 506 (Tenn.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990); *State v. Williams,* 690 S.W.2d 517, 522 (Tenn.1985). The Supreme Court also acknowledged that the questions asked and answered during the voir dire process do not always reveal a juror's bias with absolute certainty; "however, there will be situations ***807** where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *See Wainwright v. Witt,* 469 U.S. at 425-26, 105 S.Ct. at 853. Therefore, "deference must be paid to the trial judge who sees and hears the juror." *Id.* Indeed, in *State v. Alley,* our supreme court held that "the trial court's finding of bias of a juror because of his views of capital punishment shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that determination was erroneous." *Alley,* 776 S.W.2d at 518; *see also Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

A. Prospective Juror Brooks

During individual voir dire, Barbara Brooks was called as a potential juror. When asked by District Attorney General Woodall whether she could impose the death penalty in this case, Ms. Brooks responded that she could not do so for religious reasons. Despite further questioning by General Woodall, Ms. Brooks maintained that she did not believe in the death penalty and that she could not and would not impose such a sentence.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

The trial court, as well, questioned Ms. Brooks regarding whether she could impose the death penalty. In response to the court's questioning, she again stated that she could not impose the death penalty no matter what the crime was because she does not "believe that a person's life should be taken because of it." She further admitted that "the death penalty is out of the question for [her]" and she would never consider imposing the death penalty on the appellant or anyone else.

Defense counsel, in an attempt to rehabilitate Ms. Brooks, asked her whether she could fairly consider the aggravating and mitigating circumstances and keep an open mind as to the three possibilities for sentencing in this case, to which Ms. Brooks responded affirmatively. The court again questioned Ms. Brooks as to whether she could impose the death penalty if it was called for by the law and the facts. Although Ms. Brooks responded that she could consider the sentence of life without the possibility of parole and that she could hear the evidence, she stated "I don't think I could be fair at that because of the death penalty ... the only thing that hinders me is when you said death penalty. That's where it stops with me."

Despite this statement, defense counsel was again able to illicit answers from Ms. Brooks that raised concern as to her position on the death penalty. As a result, the trial court instructed Ms. Brooks to "just say how you feel." After further equivocation by the prospective juror, the trial court asked her point blank if the death penalty was out; she responded, "Forget it."

At that point, the State challenged Barbara Brooks for cause and the court sustained the challenge finding:

> ... I finally put it to her as blank, I said, "The death penalty is out?" She said, "The death penalty is out, the death penalty is out. I will not impose it" and she said it multiple, multiple times.

Although Ms. Brooks' position on the death penalty was ambiguous at certain times during her voir dire examination, we can reach no rational conclusion other than finding that Ms. Brooks had a definite opposition to imposing the death penalty. Giving deference to the trial court who was able to observe this prospective juror, we conclude that the constitutional standard for excusing jurors due to their views on the death penalty was met.

B. Dennis Spellings

Later that same day, Dennis Spellings was called for individual voir dire. The following dialogue occurred between Mr. Spellings and General Woodall:

> ***808** GENERAL WOODALL: ... Can you fairly consider the death penalty along with other forms of punishment?
>
> MR. SPELLINGS: That's a tough question.
>
> GENERAL WOODALL: As it should be.... [T]he law in the State of Tennessee is if the aggravating circumstances ... outweigh the mitigating circumstances, you shall impose the death penalty. Can you do that or do you have personal convictions or religious convictions that would prevent you from doing it?
>
> MR. SPELLINGS: It's a tough question to ask straight forward. I really don't have an answer.
>
> ...
>
> GENERAL WOODALL: Well, can you make that decision? Do you think that you could vote to impose the death penalty?
>
> MR. SPELLINGS: Honestly I don't.
>
> GENERAL WOODALL: Are you saying you don't think you could or maybe you could or you just don't know?
>
> MR. SPELLINGS: When we're talking about when push comes to shove, I don't know.
>
> GENERAL WOODALL: ... So are you saying you don't know whether you could or you won't?
>
> MR. SPELLINGS: I don't know.

Defense counsel also attempted to elicit a definite position from Mr. Spellings, but was unsuccessful. The trial court interrupted and asked Mr. Spellings, "After you hear all the proof, then you could make a decision as to whether or not death should apply?" Mr. Spellings responded, "I'll be honest with you. I'd rather not make that decision." During the court's discourse with Mr. Spellings, Mr. Spellings replied, at one point, that he could follow the law as instructed by the court, but later admitted that "he did not know" if he could follow the law as related to the death penalty.

The State challenged Mr. Spellings for cause, relying on Mr. Spellings admission that he did not know whether he would follow the law. The trial court sustained the challenge, explicitly finding:

> This is the first time we've run into this where a person just ... won't answer the question or he feels like he can't answer the question. As I interpret the law that means that we have to get commitment from a juror that they would follow the law and that they would consider the death penalty under certain circumstances. I don't think that a juror is disqualified if they just continue to persistently say, "I don't know what I would do." That's like a juror who's really saying--- will you affirm to uphold the law and he would say, "Well, I just can't answer that." If you had a juror and you put him in the box and you say "Do you swear to tell the truth?" and he says, "I can't say whether I will or not," you wouldn't let him testify. It takes an affirmative statement by a juror that he would consider all the penalties ... and would not exclude the death penalty as a possibility. I think the statements by this juror render him unqualified to served on the jury.

Again, this court gives deference to the decision of the trial court who was able to observe the prospective juror. The record demonstrates that Mr. Spellings could not state with certainty that he could perform his duties as a juror in accordance with his oath. Accordingly, the trial court properly excused

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

this juror for cause. This issue is without merit.

(Deleted--III. Sufficiency of the Evidence)

IV. Statement of Intent of Future Wrongdoing and Prior Bad Act

Prior to the testimony of Angela Ragland, a jury-out hearing was held to determine the admissibility of testimony regarding the appellant's prior rape charge and ***809** statements made by the appellant to Angela Ragland regarding his intent to kill Marvin Eckford, to rob a bank, and to leave town. The trial court permitted the introduction of the testimony, finding that

> it would be rare that any statements made by any defendant during the course of a criminal enterprise to be excluded if there are crimes that require proof of culpability, state of mind, et cetera, they would usually be considered res gestae, so closely connected with the crime, with the offense, that they can't be separated from it. All of these statements reflect upon that, that he is on a killing spree, going to kill ... that clearly is some proof of the defendant's mental state, that he was on a violent binge. You know, he commits one murder, he commits two murders, he might as well commit three, what-difference-does-it-make sort of attitude. It's also proof of, of course, the mental state. Words like, "I've been accused of one rape" ... [w]ould serve as a motive. That's another thing, motive, intent, state of mind.... Certainly shows intent ... that he knew what he had done.... Arguably evidence that the defendant was coherent, that he knew what he had done, he knew what he was going to do and that he had presence of mind about all of these things.... In summary, all of these remarks are clearly admissible.... But all of these things, particularly when you're thinking about the requirements of culpability being proven, when you're thinking about the position that's going to be taken.... Statements made during the course of the crime or even afterwards which would reflect upon the defendant's thinking, mental state, what he had on his mind, and all of these things do that. So they're going to be admissible for these numerous reasons, not to mention res gestae.

A. Statements of Future Intent

Again, during the guilt phase of the appellant's trial, the trial court permitted the State to question Angela Ragland about statements made to her by the appellant. On direct examination, Angela Ragland testified that, between instances of rape, the appellant told her that he was going home to tell his children goodbye, that he was going to kill Marvin Eckford because Eckford had provided his name to the woman accusing the appellant of raping her, and that he was going to rob a bank and leave town. On appeal, the appellant contends that such evidence is irrelevant and is unduly prejudicial.

The trial court correctly found such testimony admissible under the "state of mind" exception to the hearsay rule. *See* Tenn. R. Evid. 803(3); *State v. Roe,* No. 02C01-9702-CR-00054, 1998 WL 7107 (Tenn.Crim.App. at Jackson, Jan. 12, 1998); Neil P. Cohen et al., *Tennessee Law of Evidence* § 803(3). 2 (3d ed.1995). The testimony is relevant to show the appellant's existing state of mind at the time of the crimes, *i.e.,* to show his intent, plan, and motive, including the fact that he was capable of understanding the import of his actions. *Id.; see also* Tenn. R. Evid. 402. Moreover, the trial court instructed the jury that the appellant did not kill Marvin Eckford, did not rob a bank, and did not leave town. Accordingly, we cannot conclude that introduction of this evidence was more prejudicial than probative. *See* Tenn. R. Evid. 403. This issue is without merit.

B. Evidence of Prior Bad Act: Alleged Rape

Angela Ragland also testified that, during the crimes, the appellant told her that "[h]e had been accused of raping someone and that he didn't, and if he was going to go to jail, he was going to go to jail for doing something." The appellant objected and a jury-out hearing was held to conduct a Tenn. R. Evid. 404(b) analysis. The trial court found the testimony admissible, but ***810** determined that it should only be considered on the issue of mental intent. The trial court instructed the jury that "they're not to presume that he's guilty of any previous rape."

Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Nonetheless, such evidence may be admissible for other purposes. *Id.* Other acts may be admitted to prove such issues as motive, intent, knowledge, absence of mistake or accident, common scheme or plan, identity, completion of the story, opportunity, and preparation. Neil P. Cohen et al., *Tennessee Law of Evidence* § 404.6. Thus, the trial court properly found that testimony concerning the alleged rape was admissible pursuant to Tenn. R. Evid. 404(b), as it was highly relevant to the issue of intent and its probative value outweighed the danger of unfair prejudice.

V. Photographs of Victim at Sentencing Phase

During the sentencing phase, the State was permitted, over objection, to introduce multiple photographs of the body of the deceased victim, Erica Hurd. (FN3) The trial court permitted the introduction of the photographs on the issue of establishing the aggravating circumstance "heinous, atrocious, or cruel." On appeal, the appellant complains that the admission of the photographs was error. Specifically, he argues that (1) the photographs were more prejudicial than probative and (2) the photographs were cumulative to the testimony of Dr. Smith and the demonstrative evidence of the mannequin.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *State v. Banks,* 564 S.W.2d 947, 949 (Tenn.1978) (citations omitted). Accordingly, "the admissibility of photographs lies within the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* However, before a photograph may be admitted into evidence, it must be relevant to an issue that the jury must decide and the probative value of the photograph must outweigh any prejudicial effect that it may

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

have upon the trier of fact. *See State v. Braden,* 867 S.W.2d 750, 758 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1993) (citation omitted); *see also* Tenn. R. Evid. 401 and 403.

Of the ten photographs contested on appeal, two are of the victim at the crime scene and the remaining are photographs from the autopsy. Eight of the ten photographs depict wounds to the victim's face and neck. The appellant contends that the facial pictures are unduly prejudicial in that they are "gruesome and inflammatory" and the "facial expression on the victim's face ... could produce a terrible reaction in the jury." The appellant argues that the introduction of the photographs was unnecessary and cumulative due to the testimony of Dr. Smith describing the wounds and his use of a mannequin to demonstrate the various points of injury. The trial court permitted the photographs of Erica Hurd into evidence, finding that "[g]ruesome pictures are admissible in these situations if it would tend to show some of these factors that are involved in the heinous, atrocious or cruel category, torture, physical abuse."

Although we concede that the photographs are not pleasant to view, they accurately depict the nature and the extent of the victim's injuries. There is no dispute that the photographs were introduced to prove the aggravating circumstance of "heinous, atrocious, or cruel." This evidence was relevant to support the State's proof of the "heinous, atrocious, and cruel" ***811** aggravating circumstance. *See, e.g., State v. Hall,* 976 S.W.2d 121, 162 (Tenn.1998); *State v. Smith,* 893 S.W.2d 908, 924 (Tenn.1994), *cert. denied,* 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995); *State v. Smith,* 868 S.W.2d 561, 579 (Tenn.1993), *cert. denied,* 513 U.S. 960, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994) (citing *State v. Payne,* 791 S.W.2d 10, 19-20 (Tenn.1990), *judgment aff'd. by,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v. Miller,* 771 S.W.2d 401, 403-404 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3292, 111 L.Ed.2d 801 (1990); *State v. Porterfield,* 746 S.W.2d 441, 449-450 (Tenn.), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988) ; *State v. McNish,* 727 S.W.2d 490, 494-495 (Tenn.), *cert. denied,* 484 U.S. 873, 108 S.Ct. 210, 98 L.Ed.2d 161 (1987)).

Notwithstanding, as a general rule, where medical testimony adequately describes the degree or extent of the injury, gruesome and graphic photographs should not be admitted. *See State v. Duncan,* 698 S.W.2d 63 (Tenn.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986). The photographs were used by the physician who performed the autopsy to assist in explaining his testimony about the manner and cause of death. The photographs clarify the complex testimony of Dr. Smith regarding the severity of the injuries. *See Stephenson,* 878 S.W.2d at 542; *Smith,* 868 S.W.2d at 576 (photographs used to illustrate witnesses' testimony admissible for this purpose). Moreover, a relevant photograph is not rendered inadmissible merely because it is cumulative. *See State v. Bigbee,* 885 S.W.2d 797, 807 (Tenn.1994); *Van Tran,* 864 S.W.2d at 477.

We conclude that the photographs were not especially gruesome or shocking in nature so as to preclude their admission. Although any such photographs would be prejudicial to the appellant's case, the photographs introduced at the sentencing hearing were highly probative in determining an aggravating circumstance. We cannot conclude that the trial court abused its discretion by admitting these photographs during the sentencing process. *See* Tenn. R. Evid. 403; *State v. Evans,* 838 S.W.2d 185 (Tenn.1992); *Banks,* 564 S.W.2d at 947. *See also State v. Brown,* 756 S.W.2d 700, 704 (Tenn.Crim.App.1988); *Freshwater v. State,* 2 Tenn.Crim.App. 314, 453 S.W.2d 446, 451-52 (1969); *State v. Beckham,* No. 02C01-9406-CR-00107, 1995 WL 568471 (Tenn.Crim.App. at Jackson, Sept. 27, 1995 ), *perm. to appeal granted,* (Tenn. July 8, 1996), *perm. to appeal denied,* (Tenn. Sept. 9, 1996). This issue is without merit.

VI. Victim Impact Evidence

During closing argument during the penalty phase, General Woodall made the following statements:

> It's up. We know for sure that Erica is now gone, at peace and out of pain. There's a lot of other pain here and that's the families of these victims. That's what Angela Ragland went through and will have to go through and there are just not any mitigating circumstances that outweigh these aggravating circumstances, absolutely none. That's why we have this law and where the aggravating circumstances do not (sic) outweigh the mitigating circumstances, the punishment shall be death.

The appellant objects to this argument; contending that this statement constitutes victim impact evidence which is inadmissible, irrelevant to any aggravating or mitigating circumstance, and constitutes argument of matters not in evidence. (FN4) ***812** Additionally, he asserts that the inflammatory argument posed a substantial risk that the death penalty was imposed arbitrarily, jeopardizing the reliability requirements of the Eighth Amendment.

The issues raised by the appellant herein were recently addressed in detail by our supreme court in *State v. Nesbit*, 978 S.W.2d 872 (Tenn. at Jackson, 1998) (*for publication* ). In a thorough review of the case law development of the admissibility of victim impact evidence, the supreme court reached several conclusions on the issue.

First, noting prior decisions of the United States Supreme Court and its own precedent, the court held that "victim impact evidence and argument is [not] barred by the federal and state constitutions." *Nesbit. See also Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597,2609, 115 L.Ed.2d 720 (1991) (holding that the Eight Amendment erects no *per se* bar against the admission of victim impact evidence and prosecutorial argument); *State v. Shepherd,* 902 S.W.2d 895, 907 (Tenn.1995) (holding that victim impact evidence and prosecutorial argument is not precluded by the Tennessee Constitution); *State v. Brimmer,* 876 S.W.2d 75, 86 (Tenn.), *cert. denied,* 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994) (same). Thus, the appellant's argument challenging the constitutionality of the admissibility of victim impact evidence and argument under the Eighth Amendment has been precluded by the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Tennessee Supreme Court.

Additionally, the court addressed the relevancy of argument and evidence regarding the impact of the crime(s) on the victim's family. The court noted that, although "[Tenn.Code Ann. § 39-13-204(c) ] ... permits admission of all relevant mitigating evidence, whether or not the category of mitigation is listed in the statutory scheme," (FN5) "this Court repeatedly has held that the State may not rely upon nonstatutory aggravating circumstances to support imposition of the death penalty." *Nesbit* (citing *State v. Thompson,* 768 S.W.2d 239, 251 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990); *Cozzolino v. State,* 584 S.W.2d 765, 768 (Tenn.1979)). Notwithstanding, the court stated that, "in several subsequent decisions we have expressly recognized that a sentencing jury must be permitted to hear evidence about the *nature and circumstances of the crime* even though the proof is not necessarily related to a statutory aggravating circumstance." *Nesbit* (citing *State v. Harris,* 919 S.W.2d 323, 331 (Tenn.1996); *State v. Teague,* 897 S.W.2d 248, 251 (Tenn.1995); *Bigbee,* 885 S.W.2d at 813; *State v. Nichols,* 877 S.W.2d 722, 731 (Tenn.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995)). (Emphasis in original). Accordingly, the court concluded that "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language *nature and circumstances of the crime.*" *Id.* (emphasis in original).

In so holding, the court reasoned:

The Tennessee statute delineates a procedure which enables the sentencing jury to be informed about the presence of statutory aggravating circumstances, the presence of mitigating circumstances, and the nature and circumstances of the crime. The statute allows the sentencing jury to be reminded 'that ***813** just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608 (internal citations and quotations omitted). As this Court emphasized in its decision in *Payne,* it would be 'an affront to the civilized members of the human race' to allow unlimited mitigation proof at sentencing in a capital case, but completely preclude proof of the specific harm resulting from the homicide. Accordingly, the defendant's claim that victim impact evidence is not admissible under the Tennessee capital sentencing statute is without merit.

*Nesbit.*

The supreme court, however, limited this ruling, by holding that "victim impact evidence may [not] be introduced 'that is so unduly prejudicial that it renders the trial fundamentally unfair,' thus implicating the Due Process Clause of the Fourteenth Amendment." *Id.* (citing *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608). Moreover, the trial court, in its discretion, "may exclude victim impact proof if its probative value is substantially outweighed by its prejudicial effect." *Id.* (citing Tenn. R. Evid. 403). Indeed, "victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." *Id.* (internal citations omitted) (citing *Payne,* 501 U.S. at 822, 111 S.Ct. at 2607; *Payne,* 501 U.S. at 830, 111 S.Ct. at 2611 (O'Connor, J., concurring); *Cargle v. State,* 909 P.2d 806, 826 (Ok.Ct.Crim.App.1995)). Similarly, the court "cautioned the State against engaging in victim impact argument which is little more than an appeal to the emotions of the jurors as such argument may be unduly prejudicial." *Id.* (citing *Shepherd,* 902 S.W.2d at 907 (parenthetical omitted); *Bigbee,* 885 S.W.2d at 808 (parenthetical omitted)).

In the present case, the victim impact argument, in essence, is limited to "[t]hat's what Angela Ragland went through and will have to go through." It would be farfetched to conclude that this statement prejudiced the outcome of the sentencing phase as the effects of the double homicide on Angela Ragland were directly fashioned by the appellant and were clearly foreseeable. *See Payne v. Tennessee,* 501 U.S. at 838, 111 S.Ct. at 2615-2616 (Souter, J., concurring). Indeed, the fact that the death of a loved one is devasting requires no proof. Accordingly, the challenged argument was properly admitted. (FN6) This issue is without merit.

VII. Separate Jury for Penalty Phase

The appellant claims that a separate jury should have been impaneled for the penalty phase of his trial. He asserts that, by requiring the same jury to hear both the guilt and penalty phases of his capital trial, he was deprived of his right to a fair and impartial jury under the Tennessee and United States Constitutions. Specifically, he contends that "he was denied a cross-section of the community because those jurors that could not enforce the death penalty were removed and he got a jury that was prone to give the death penalty."

This argument has been previously considered and rejected by our supreme court. In *State v. Harbison,* 704 S.W.2d 314, 318-319 (Tenn.1986), *cert. denied,* 476 ***814** U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986), the court rejected a claim by the defendant that separate juries should have been sworn to hear the guilt and sentencing phases of the trial and held that a single jury in a capital case neither denied a fair cross section of the community nor resulted in a conviction prone process. *See also State v. Teel,* 793 S.W.2d 236, 246 (Tenn.), *cert. denied,* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990) (guilt prone jury argument "has been rejected by both the Tennessee and United States Supreme Courts"); *State v. Jones,* 789 S.W.2d 545, 547 (Tenn.), *cert. denied,* 498 U.S. 908, 111 S.Ct. 280, 112 L.Ed.2d 234 (1990) (rejecting guilt prone jury claim); *State v. Zagorski,* 701 S.W.2d 808, 814-15 (Tenn.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986) (rejecting cross section claim);. This issue is without merit. (FN7)

VIII. Constitutional Challenges

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Finally, the appellant raises a myriad of challenges to the constitutionality of Tennessee's death penalty provisions. The appellant concedes that these issues have been previously rejected by the Tennessee Supreme Court, however, he raises these challenges to preserve them for future appellate review.

A. Death by Electrocution

The appellant first contends that "[t]he electric chair constitutes cruel and unusual punishment," emphasizing that "the Eighth Amendment forbids inhuman and barbarous methods of execution that go beyond the mere extinguishment of life and cause torture or a lingering death." (citing *Glass v. Louisiana,* 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985)). As support for his argument, the appellant refers to recent legislation in this state moving beyond death by electrocution and substituting lethal injection. *See* Tenn.Code Ann. § 40-23-114 (1998 Supp.) (changes the method of execution from electrocution to lethal injection for those persons sentenced to death after January 1, 1999). (FN8) We do not see how this amendment renders death by electrocution unconstitutional. The appellate courts of this state are of the opinion that electrocution is a constitutionally permissible method of execution and have routinely rejected this argument. *See Black,* 815 S.W.2d at 179; *see also Hines,* 919 S.W.2d at 582.

B. Death penalty is cruel and unusual punishment.

Within this challenge, the appellant makes numerous challenges alleging that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 8, 9, 16, and, 17, and Article II, Section 2 of the Tennessee Constitution. These arguments have previously been rejected by our supreme court:

1. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, specifically because Tenn.Code Ann. § 39-13-204(i)(4), (5), (6), and (7) encompass a majority of the homicides committed in Tennessee, (FN9) have been ***815** rejected by our supreme court. *See State v. Keen,* 926 S.W.2d 727, 742 (Tenn.1994).

2. The death sentence is imposed capriciously and arbitrarily in that:

(1) Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has been rejected. *See Hines,* 919 S.W.2d at 582.

(2) The death penalty is imposed in a discriminatory manner based upon economics, race, geography, and gender. This argument has been rejected. *See Hines,* 919 S.W.2d at 582; *Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268; *State v. Smith,* 857 S.W.2d 1, 23 (Tenn.), *cert. denied,* 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993).

(3) There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter. This argument has been rejected. *See State v. Caughron,* 855 S.W.2d 526, 542 (Tenn.), *cert. denied,* 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993).

(4) The death qualification process skews the make-up of the jury and results in a relatively prosecution prone guilt-prone jury. This argument has been rejected. *See Teel,* 793 S.W.2d at 246; *Harbison,* 704 S.W.2d at 318.

(5) Defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, *i.e.,* the cost of incarceration versus cost of execution, deterrence, method of execution. This argument has been rejected. *See Brimmer,* 876 S.W.2d at 86-87; *Cazes,* 875 S.W.2d at 268; *Black,* 815 S.W.2d at 179.

(6) The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non-unanimous verdict. This argument has been rejected. *See Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268; *Smith,* 857 S.W.2d at 22-23.

(7) Requiring the jury to agree unanimously to a life verdict violates *Mills v. Maryland* and *McKoy v. North Carolina.* This argument has been rejected. *See Brimmer,* 876 S.W.2d at 87; *Thompson,* 768 S.W.2d at 250; *State v. King,* 718 S.W.2d 241, 249 (Tenn.1986), *superseded by statute as recognized by, State v. Hutchison,* 898 S.W.2d 161 (Tenn.1994).

(8) The jury is not required to make the ultimate determination that death is the appropriate penalty. This argument has been rejected. *See Brimmer,* 876 S.W.2d at 87; *Smith,* 857 S.W.2d at 22.

(9) The defendant is denied final closing argument in the penalty phase of the trial. This argument has been rejected. *See Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 269; *Smith,* 857 S.W.2d at 24; *Caughron,* 855 S.W.2d at 542.

3. Appellate Review process in death penalty cases is constitutionally inadequate.

The defendant argues that the appellate review process in death penalty cases is constitutionally inadequate in its application. He contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete, and because the appellate courts' methodology of review is flawed. This argument has been specifically rejected by our supreme court on numerous occasions. *See Cazes,* 875 S.W.2d at 270-71; *see also Harris,* 839 S.W.2d at 77; *Barber,* 753 S.W.2d at 664. Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." *Bland,* 958 S.W.2d at 663.

***816.** (Deleted: IX. Proportionality Review)

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*Conclusion*

In accordance with the mandate of Tenn.Code Ann. § 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39-13-206(c)(1)(A)-(C). A comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Likewise, we have considered the appellant's assignments of error as to each of his convictions on appeal and the respective sentences and determined that none have merit. Additionally, we conclude, in reference to the murder of Charles Ragland, that the jury appropriately found two statutory aggravating circumstances and did not arbitrarily impose a sentence of life without the possibility of parole as to that count. Thus, we affirm the appellant's conviction for the first degree murder of Charles Ragland and the accompanying sentence of life without the possibility of parole, his conviction for the first degree murder of Erica Hurd and the accompanying sentence of death by electrocution, and his conviction for the aggravated rape of Angela Ragland and the accompanying sentence of twenty-five years. (FN10)

CONCUR:

JOE G. RILEY, Judge

JOHN EVERETT WILLIAMS, Judge

(FN1.) Tenn.Code Ann. § 39-13-204(i)(5) and (7) (1991 and Supp.1994).

(FN2.) Tenn.Code Ann. § 39-13-204(i)(3) and (7) (1991 and Supp.1994).

(FN3.) Tenn.Code Ann. § 39-13-206(a)(1)(1997) ("The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee supreme court.").

(FN4.) Angela Ragland testified that her husband did not sell or use drugs.

(FN5.) The statement in its entirety is contained in the opinion of the Court of Criminal Appeals, which is attached to this opinion as an appendix.

(FN6.) Effective July 1, 1995, the statute was amended to delete the element of deliberation from this definition of first degree murder. Tenn.Code Ann. § 39-13-202(a)(1)(Supp.1996).

(FN7.) *E.g., State v. Nichols,* 877 S.W.2d 722, 737 (Tenn.1994),*cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *State v. Black,* 815 S.W.2d 166, 179 (Tenn.1991).

(FN8.) We express no opinion on the constitutionality of lethal injection as the defendant did not have the opportunity to raise or litigate that issue in the courts below.

(FN9.) Although this aggravating circumstance lists other felonies as well, the trial court properly charged the jury only on those that were raised by the evidence. *See* Tenn.Code Ann. § 39-13-303 (1991)(rape); Tenn.Code Ann. § 39-14-402 (1991)(burglary); Tenn.Code Ann. § 39-13-303 (1991)(kidnapping). In *State v. Blanton,* 975 S.W.2d 269, 281 (Tenn.1998), *cert. denied,* 525 U.S. 1180, 119 S.Ct. 1118, 143 L.Ed.2d 113 (1999), we held that the trial court erroneously charged the jury on every felony contained in the aggravating circumstance but that the error was harmless.

(FN1.) At the conclusion of the appellant's proof, the trial court permitted defense counsel to make an offer of proof regarding the proffered testimony of Angela Ragland. Specifically, defense counsel stated that Angela Ragland would testify that she observed the appellant sweating and in an agitated state, talking and moving at a rapid pace, and looking for drugs when he came to her residence. Defense counsel contended that this testimony was corroborative of Dr. Parker's testimony regarding the effects of crack cocaine on a person.

***816_** (FN2.) At this point at the suppression hearing, the defense did make an offer of proof relative to the appellant's anticipated testimony. Specifically, the proof would show that the appellant and Darryl Godwin purchased $250 worth of crack cocaine on September 16, 1994. Later that same day, the appellant purchased an additional $200-$250 worth of crack cocaine. The appellant consumed the entire amount of crack cocaine, with his cocaine binge ending at approximately 11:00 p.m. The appellant would further allege that he was in the "crash phase" at the time he gave his statement to the police.

(FN3.) The State also sought to introduce photographs of Charles Ragland. The trial court refused to admit these photographs into evidence. The State later voluntary withdrew these photographs.

(FN4.) As correctly noted by the State and conceded by the appellant, the appellant failed to make a contemporaneous objection to the prosecutor's statements resulting in waiver of this issue. Tenn. R.Crim. P. 52(a); *see State v. Renner,* 912 S.W.2d 701, 705 (Tenn.1995); *Teague v. State,* 772 S.W.2d 915, 926 (Tenn.Crim.App.1988), *cert. denied,* 493 U.S. 874, 110 S.Ct. 210, 107 L.Ed.2d 163 (1989); *State v. Killebrew,* 760 S.W.2d 228, 235 (Tenn.Crim.App.1988). Due to the qualitative differences between death and other sentences, the appellate courts of this state consider issues occurring during the sentencing hearing in a capital case. *See Bigbee,* 885 S.W.2d at 805; *Duncan,* 698 S.W.2d at 67-68; *State v. Strouth,* 620 S.W.2d 467, 471 (Tenn.1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 692 (1982). Thus, notwithstanding waiver of this claim, this court elects to consider this issue on the merits.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

(FN5.) *See Nesbit* (citing *Cazes,* 875 S.W.2d at 266 (discussing *McKoy v. North Carolina,* 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990) and *Mills v. Maryland,* 486 U.S. 367, 375, 108 S.Ct. 1860, 1865-66, 100 L.Ed.2d 384 (1988) )).

(FN6.) Although not applicable to the present case as the murders occurred prior to the supreme court's decision in *Nesbit,* we note that the supreme court established procedures under which victim impact evidence may be introduced during capital sentencing phases. *See Nesbit.*

(FN7.) Additionally, we note that Tennessee's statutory scheme for first degree murder mandates that the "same jury that determined guilt" "shall fix the punishment in a separate sentencing hearing." *See* Tenn.Code Ann. § 39-13-204(a) (1994 Supp.).

(FN8.) The bill also provides that those persons sentenced to death prior to January 1, 1999, may choose to be executed by lethal injection by signing a written waiver. *See* Constitutionality of House Bill 2085 as amended--Change in Method of Execution, Tenn. Op. Atty. Gen. No. 98-074 (Mar. 31, 1998); Constitutionality of House Bill 2085--Change in Method of Execution, Tenn. Op. Atty. Gen. No. 98-068 (Mar. 25, 1998).

(FN9.) We note that factors (i)(4) and (i)(6) do not pertain to this case as they were not relied upon by the State. Thus, any individual claim with respect to these factors is without merit. *See, e.g., Hall,* 958 S.W.2d at 715; *Brimmer,* 876 S.W.2d at 87.

(FN10.) No execution date is set. Tenn.Code Ann. § 39-13-206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty. If the death sentence is upheld by the higher court on review, the supreme court will set the execution date.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

## CERTIFICATE & SEAL

**STATE OF TENNESSEE**

**COUNTY OF MADISON**

I, Judy Barnhill, Clerk of the Circuit Court for the County of Madison, in the State aforesaid, do certify that the foregoing is a correct transcript of the record and proceedings had in said Court in the case heretofore prosecuted and determined therein between **JON HALL** APPELLANT **and** **STATE OF TENNESSEE**, APPELLEE, as the same remains of record in said Court.

**STATE OF TENNESSEE**

**COUNTY OF MADISON**

In testimony whereof, I subscribe my name and affix the seal of said Court at office, in Jackson, Tennessee the **21ST** DAY OF **JULY** in the year Two Thousand Three in the 224th year of American Independence.

Judy Barnhill
JUDY BARNHILL, CLERK

Copr. (C) West 2002 No Claim to Orig. U.S. Govt. Works

*1517225 Only the Westlaw citation is currently available.

Supreme Court of Tennessee,
at Knoxville.

STATE of Tennessee
v.
Bobby G. **GODSEY**.
Nov. 29, 2001.

Defendant was convicted following jury trial in the Criminal Court, Sullivan County, R. Jerry Beck, J., of first degree felony murder by aggravated child abuse and of aggravated child abuse and was sentenced to death. Defendant appealed. The Court of Criminal Appeals, Wade, P.J., affirmed conviction for first degree murder, modified sentence for that offense to life imprisonment without possibility of parole, and vacated conviction for aggravated child abuse. Granting applications by both sides for permission to appeal, the Supreme Court, Frank F. Drowota, III, C.J., held that: (1) neither State nor Federal Constitution requires electronic recording of custodial interrogations; (2) statute defining offense of first degree murder by aggravated child abuse did not violate due process by requiring, as culpable mental state, only that the aggravated child abuse be committed knowingly; (3) merger doctrine did not bar conviction for first degree murder by aggravated child abuse; (4) aggravated child abuse is not a lesser included offense of felony murder, and dual convictions for those offenses are permissible; (5) aggravating circumstance that murder was committed against a person less than 12 years of age meaningfully narrows class of death-eligible defendants in prosecutions for first-degree murder by aggravated child abuse; (6) out-of-state cases should not be included in the pool of similar cases for purposes of comparative proportionality review of death sentence; and (7) death sentence was disproportionate to sentences imposed in similar capital cases involving child victims.

Judgment of Court of Criminal Appeals affirmed in part, reversed in part.

Adolpho A. Birch, Jr., J., filed a concurring and dissenting opinion.

West Headnotes

[1] Criminal Law 🔑412(4)
110 ----
110XVII Evidence
110XVII(M) Declarations
110k411 Declarations by Accused
110k412 In General
110k412(4) Circumstances Affecting Admissibility in General.

Sound policy considerations, including reducing the amount of time spent in court resolving disputes over what occurred during an interrogation, would support the adoption of electronically recording custodial interrogations as a law enforcement practice.

[3] Constitutional Law 🔑50
92 ----
92III Distribution of Governmental Powers and Functions
92III(A) Legislative Powers and Delegation Thereof
92k50 Nature and Scope in General.

Determination of public policy is primarily a function of the legislature.

[4] Constitutional Law 🔑70.1(10)
92 ----
92III Distribution of Governmental Powers and Functions
92III(B) Judicial Powers and Functions
92k70 Encroachment on Legislature
92k70.1 In General
92k70.1(7) Particular Subjects, Application to
92k70.1(10) Crimes.

Issue of whether electronic recording of custodial interrogations should be required is one more properly directed to the General Assembly than to courts.

[5] Constitutional Law 🔑258(3.1)
92 ----
92XII Due Process of Law
92k256 Criminal Prosecutions
92k258 Creation or Definition of Offense
92k258(3) Particular Statutes and Ordinances
92k258(3.1) In General.

[See headnote text below]

[5] Homicide 🔑8
203 ----
203II Murder
203k8 Statutory Provisions.

Statute defining offense of first degree murder by aggravated child abuse did not violate due process by requiring, as culpable mental state, only that the aggravated child abuse be committed knowingly. U.S.C.A. Const.Amend. 14; T.C.A. § 39-13-202(a)(2), (b), 39-15-402.

[6] Sentencing and Punishment 🔑1678
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1678 Extreme or Reckless Indifference.

"Knowing" conduct that is required as culpable mental state for aggravated child abuse also ...

when the underlying felony directly results in, or is an integral part of, the homicide, is a rule of statutory construction, not a principle of constitutional law, and applies only when the legislature has not enumerated the felonies that will support a conviction for felony murder.

[8] Criminal Law 30
110 ----
110I Nature and Elements of Crime
110k30 Merger of Offenses.
Where a legislature explicitly states that a particular felony is a predicate felony for felony-murder, no "merger" of the offenses occurs.

[9] Criminal Law 30
110 ----
110I Nature and Elements of Crime
110k30 Merger of Offenses.
Merger doctrine did not bar conviction for first degree murder by aggravated child abuse, though charge carried death penalty; General Assembly expressed unmistakable intent to have aggravated child abuse qualify as a felony capable of supporting conviction of first degree felony murder. T.C.A. § 39-13-202(a)(2), (b), 39-15-402.

[10] Constitutional Law 258(3.1)
92 ----
92XII Due Process of Law
92k256 Criminal Prosecutions
92k258 Creation or Definition of Offense
92k258(3) Particular Statutes and Ordinances
92k258(3.1) In General.

[See headnote text below]

[10] Homicide 18(1)
203 ----
203II Murder
203k18 Homicide in Commission of or Intent to Commit Other Offense
203k18(1) In General.
For purposes of predicating felony murder on aggravated child abuse, there is no due process requirement that the aggravated child abuse substantially increase the risk of harm over and above that necessarily present in the crime itself. U.S.C.A. Const.Amend. 14; T.C.A. § 39-13-202(a)(2), (b), 39-15-402.

[11] Double Jeopardy 150(2)
135H ----
135HV Offenses, Elements, and Issues Foreclosed
135HV(A) In General
135Hk139 Particular Offenses, Identity of
135Hk150 Homicide
135Hk150(2) Felony-Murder or Misdemeanor-Manslaughter Prosecution.

135Hk150(2) Felony-Murder or Misdemeanor-Manslaughter Prosecution.
Double jeopardy does not require dismissal or merger of underlying felony in felony murder prosecution where the two statutes on which charges are based are directed to separate evils. U.S.C.A. Const.Amend. 5.

[13] Double Jeopardy 150(2)
135H ----
135HV Offenses, Elements, and Issues Foreclosed *1517225
135HV(A) In General
135Hk139 Particular Offenses, Identity of
135Hk150 Homicide
135Hk150(2) Felony-Murder or Misdemeanor-Manslaughter Prosecution.
Key issue in determining whether double jeopardy principles preclude dual convictions for felony murder and the underlying felony is whether the legislature intended cumulative punishment. U.S.C.A. Const.Amend. 5.

[14] Statutes 186
361 ----
361VI Construction and Operation
361VI(A) General Rules of Construction
361k180 Intention of Legislature
361k186 Cases and Matters Omitted.
Omissions are significant when statutes are express in certain categories but not others.

[15] Statutes 212.1
361 ----
361VI Construction and Operation
361VI(A) General Rules of Construction
361k212 Presumptions to Aid Construction
361k212.1 Knowledge of Legislature.
General Assembly is presumed to know the state of the law at the time it acts.

[16] Criminal Law 29(14)
110 ----
110I Nature and Elements of Crime
110k29 Different Offenses in Same Transaction
110k29(5) Particular Offenses
110k29(14) Homicide.

[See headnote text below]

[16] Indictment and Information 191(4)
210 ----
210XIII Included Offenses
210k191 Different Offense Included in Offense Charged
210k191(4) Charge of Homicide.
Aggravated child abuse is not a lesser included offense of felony murder, and dual convictions for those offenses are permissible. T.C.A. §§ 39-13-202(a)(2), (b), 39-15-402.

18 years of age or older sufficiently and meaningfully narrows the class of death-eligible defendants, even defendants who have been convicted of felony murder in the perpetration of aggravated child abuse. U.S.C.A. Const.Amend. 8; T.C.A. §§ 39-13-202(a)(2), (b), 39-13-204(i)(1).

[18] Sentencing and Punishment 1482
350H ----
350HVII Cruel and Unusual Punishment in General
350HVII(E) Excessiveness and Proportionality of Sentence
350Hk1482 Proportionality.
Eighth Amendment proportionality analysis is the abstract evaluation of the appropriateness of a sentence for a particular crime. U.S.C.A. Const.Amend. 8.

[19] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.

[See headnote text below]

[19] Sentencing and Punishment 1788(7)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(7) Presumptions.
Statutory comparative proportionality review presumes that death penalty is not disproportionate to the crime in the traditional sense; it purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime. T.C.A. § 39-13-206(c)(1)(D).

[20] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Comparative proportionality review of a death sentence is not a constitutional imperative or mandate, but is instead a creature of statute. T.C.A. § 39-13-206(c)(1)(D).

[21] Sentencing and Punishment 1788(6)
350H ----

crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved. T.C.A. § 39-13-206(c)(1)(D).

[22] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Function of Supreme Court in performing comparative proportionality review of death sentence is not to search for proof that sentence is perfectly symmetrical with the penalty imposed in all other first degree murder cases, but to identify and invalidate the aberrant death sentence. T.C.A. § 39-13-206(c)(1)(D).

[23] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
In conducting comparative proportionality review of death sentence, state Supreme Court does not act as a "super jury," nor does it second-guess the jury's decision. T.C.A. § 39-13-206(c)(1)(D).

[24] Sentencing and Punishment 1657
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1657 Proportionality in General.
If capital murder case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed, the sentence of death is disproportionate. T.C.A. § 39-13-206(c)(1)(D).

[25] Sentencing and Punishment 1657
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1657 Proportionality in General.
When the sentencing jury is properly instructed by the trial court and appropriately considers the evidence of aggravating and mitigating circumstances under a statutory scheme that is constitutional, disproportionate death sentences should be the rare exception, not the norm. T.C.A. § 39-13-206(c)(1)(D).

[26] Sentencing and Punishment 1657
350H ----

350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Comparative proportionality review is a final safeguard in the initial appellate process to ensure that no aberrant death sentence is affirmed. T.C.A. § 39-13-206(c)(1)(D).

[28] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
State Supreme Court selects similar cases for comparative proportionality from a pool that includes only those first degree murder cases in which state seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death, regardless of the sentence actually imposed. T.C.A. § 39-13-206(c)(1)(D).

[29] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality. *1517225
Because the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar are those in which imposition of the death penalty was properly before the sentencing authority for determination. T.C.A. § 39-13-206(c)(1)(D).

[30] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Not included in the pool of similar cases, for purposes of comparative proportionality review of death sentence, are first degree murder cases in which state did not seek the death penalty or first degree murder cases in which a sentence other than death was agreed upon as part of a plea bargaining agreement. T.C.A. § 39-13-206(c)(1)(D).

[31] Sentencing and Punishment 38
350H ----

a substantial benefit to the criminal justice system, and in exchange, the state is entitled to extend a less harsh sentence than might otherwise be given if the case is submitted to a jury; therefore, while the sentence imposed as part of a plea agreement likely will be less harsh than the sentence imposed by a jury after a trial and sentencing hearing, it does not follow that the less harsh sentence resulting from the plea renders the jury sentence aberrant or disproportionate.

[32] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Comparative proportionality review of death sentences is not, and was never intended to be, a vehicle for reviewing the exercise of prosecutorial discretion. T.C.A. § 39-13-206(c)(1)(D).

[33] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Even if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where reviewing court can discern some basis for the lesser sentence imposed in other case. T.C.A. § 39-13-206(c)(1)(D).

[34] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the death penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice. T.C.A. § 39-13-206(c)(1)(D).

[35] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition

350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
In conducting comparative proportionality review of death sentence, state Supreme Court does not employ a statistical analysis that attempts to quantify the various factors leading to imposition or non-imposition of the death penalty. T.C.A. § 39-13-206(c)(1)(D).

[37] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Comparative proportionality review of death sentence is not a rigid, objective test that employs mathematical or scientific techniques. T.C.A. § 39-13-206(c)(1)(D).

[38] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
In comparing similar cases during a comparative proportionality review of death sentence, state Supreme Court considers many variables including: (1) means of victim's death; (2) manner of death; (3) motivation for the killing; (4) place of death; (5) similarity of victims' circumstances including age, physical and mental conditions, and victims' treatment during the killing; (6) absence or presence of premeditation; (7) absence or presence of provocation; (8) absence or presence of justification; and (9) injury to and effects on nondecedent victims. T.C.A. § 39-13-206(c)(1)(D).

[39] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
For purposes of comparative proportionality review of death sentences, several criteria are relevant to a comparison of the characteristics of defendants which include: (1) defendant's prior criminal record or prior criminal activity; (2) defendant's age, race, and gender; (3) defendant's mental, emotional, or physical condition; (4) defendant's involvement or role in murder; (5) [illegible]

Out-of-state cases should not be included in the pool of similar cases for purposes of comparative proportionality review of death sentences. T.C.A. § 39-13-206(c)(1)(D).

[41] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Reviewing the record in each case in isolation is not the appropriate analysis when conducting comparative proportionality review of a death sentence. T.C.A. § 39-13-206(c)(1)(D).

[42] Sentencing and Punishment 1657
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1657 Proportionality in General.
Death sentence, imposed for first degree murder by aggravated child abuse on defendant who threw seven-month-old victim onto floor, was disproportionate to death sentences imposed in other cases involving child victims, where defendant had no history of abusing victim and had previously ***1517225** treated victim with affection, eventually admitted his actions, appeared remorseful, was the only person sentenced to death in the state based solely on aggravating circumstance that victim was less than 12 years old, and offered mitigation evidence of unstable childhood in poor, dysfunctional family. T.C.A. §§ 39-13-202(a)(2), (b), 39-13-204(i)(1), 39-13-206(c)(1)(D), 39-15-402.

Stephen M. Wallace, District Public Defender, Blountville, Tennessee and James T. Bowman, Johnson City, Tennessee, for the appellant/appellee, Bobby G. Godsey.

Paul G. Summers, Attorney General & Reporter; Michael Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; H. Greeley Wells, District Attorney General; and Barry Staubus, Assistant District Attorney General, for the appellee/appellant, State of Tennessee.

OPINION

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER and WILLIAM M. BARKER, JJ. joined.

****1** Bobby G. Godsey was convicted of first degree felony murder during the perpetration of

abuse, concluding that the General Assembly did not intend to permit a separate conviction and punishment for aggravated child abuse when the defendant has been convicted of first degree felony murder during the perpetration of aggravated child abuse. The Court of Criminal Appeals affirmed Godsey's conviction for first degree murder. However, the Court of Criminal Appeals found the sentence of death comparatively disproportionate to the penalty imposed in similar cases and modified Godsey's sentence to life imprisonment without the possibility of parole. Both **Godsey** and the **State** filed applications for permission to appeal, which were granted by this Court. After carefully reviewing the record and the relevant legal authorities, we affirm that portion of the Court of Criminal Appeals' decision finding the sentence of death disproportionate and modifying the defendant's sentence to life imprisonment without the possibility of parole. We reverse that portion of the Court of Criminal Appeals' decision finding dual convictions for felony murder by aggravated child abuse and aggravated child abuse inappropriate and reinstate the defendant's separate conviction and sentence for aggravated child abuse. In all other respects, the decision of the Court of Criminal Appeals is affirmed.

*Guilt Phase Proof*

The proof offered during the guilt phase of the trial demonstrates that during the fall of 1995, the defendant, twenty-two-year-old Bobby Godsey, moved into an apartment with his girlfriend, Robin Marshall, and her three children: five-year-old Ginger, four-year-old Dylan, and seven-month-old Evan Price, the victim in this case. On January 1, 1996, Ms. Marshall spent the day with her children and her friend, Christy Christian, and Christian's children. Godsey arrived home from work around 4:30 p.m. A short time later, Ms. Marshall left the victim alone with Godsey while she drove Christian to her apartment on the other side of the complex. (FN2) When Ms. Marshall returned a short time later, (FN3) the victim was lying on her bed. She offered to put the victim to bed in his crib, but the defendant said he would do it. Ms. Marshall went downstairs and began preparing dinner. Godsey came downstairs a short time later, and Ms. Marshall and Godsey watched a videotaped movie for approximately one hour. When Godsey went upstairs around 7:15 p.m. to wake the victim for dinner, he discovered the victim was not breathing. Godsey brought the victim downstairs, and while Ms. Marshall called 911, the defendant attempted CPR. Because the hospital was next door to the apartment complex, Ms. Marshall decided to drive the victim to the hospital herself. (FN4) When Ms. Marshall arrived at the hospital, the victim was not breathing and his heart was not beating. He had

****2** Because further tests were needed, the victim was transferred to the pediatric intensive care unit at the Johnson City Medical Center. A CAT (FN5) scan revealed three skull fractures, two on one side and one on the other side of the back half of the victim's skull. The scan also showed moderately severe to severe brain swelling. Further medical examinations revealed bilateral retinal hemorrhages.

Ms. Marshall and the defendant spent the night and most of the next day at the hospital waiting for news about the victim. At noon on January 2, Detective Darla Anderson of the Kingsport Police Department came to the hospital and interviewed Godsey about the victim's injuries. He told Detective Anderson that for approximately five months he had lived with Ms. Marshall and her three children. He stated that he provided care for the children in the evenings from 8:00 or 9:00 p.m. until approximately 10:45 or 11:00 p.m., while Ms. Marshall worked. Godsey admitted that he had put the victim down for a nap before going downstairs to watch a movie with Ms. Marshall, but Godsey said the victim was fine at that time. When Godsey returned an hour later, he noticed the victim was not breathing. Godsey suggested that the victim's arm may have been injured when Godsey moved him onto the toddler bed and unsuccessfully attempted CPR. Godsey said some "yellow stuff" came out of the victim's mouth, but the victim was not breathing. Godsey then carried the victim downstairs and asked Ms. Marshall to call 911.

Later that afternoon, Detective Anderson drove to the victim's apartment and met Godsey as he was returning to the hospital. Godsey drove back to the apartment and allowed Detective Anderson to inspect and photograph the victim's bedroom, even though Detective Anderson did not have a search warrant. Detective Anderson photographed the room and noted that the crib was located approximately two feet from the toddler bed and that the toddler bed was approximately six inches from the floor. Detective Anderson found toys scattered inside the crib and stains on the sheet. Detective Anderson did not notice any blood or damaged items in the room. Godsey also allowed Detective Anderson to remove the crib sheet and blanket from the victim's bed, and Godsey gave Detective Anderson the t-shirt he had worn the previous day. Godsey explained that the victim had been teething, his gums had been bleeding, and the t-shirt had the victim's teething blood on it. Godsey also told Detective Anderson about the victim vomiting in the car on the way to the emergency room, and Detective Anderson photographed the stains. Detective Anderson stated that the defendant freely provided information and described him as cooperative at the time she examined the apartment. At trial, the State offered DNA test results to show

personnel testified that both Ms. Marshall and Godsey were distraught and upset about the child's death.

An autopsy revealed that the victim had suffered a severe blow to the back of his head, causing skull fractures, brain swelling, and a lack of oxygen to the brain, which led to his death. Bleeding into the soft tissue of the scalp around the fractures was also discovered, but no intracranial bleeding was present, and no bone displacement was detected. The autopsy confirmed that the skull fractures and the arm fracture occurred at approximately the same time. In addition, the autopsy revealed a laceration of one of the victim's intervertebral discs. The autopsy also revealed that the victim was suffering from hypostatic pneumonia, which occurs when the brain is so damaged that it cannot produce coughing or clear secretions. In this case, the condition was worsened because a small amount of vomit had been inhaled into the victim's lungs. The autopsy revealed no evidence of prior injuries or abuse.

Ms. Marshall and Godsey returned to their apartment after the victim died, and shortly thereafter, officers of the Kingsport Police Department arrived and asked them to come to the police department for further interviews. After being advised of his *Miranda* (FN6) warnings, Godsey signed a waiver, agreeing to talk to police. Godsey's recollection of the events leading up to Ms. Marshall's departure from the apartment was consistent with his earlier statement. He again initially denied any wrongdoing. Eventually, however, Godsey revealed that, during the short time Ms. Marshall had been gone, he had become angry and had physically abused the victim because he would not stop crying.

Godsey, however, gave the police several differing accounts of what had happened. In three very similar statements, Godsey said that he had been swinging the victim by his ankles to stop his crying and had hit the victim's head on the toddler bed rail and his head and arm on the floor. In another statement, which he prefaced by saying, "I'm going to tell you the truth," Godsey admitted he became irritated by the victim's crying, grabbed him by the arm and leg, jerked him out of the crib, even though the child's arm was caught between the crib railing, and threw the victim toward the toddler bed, two feet away. The victim missed the bed, landed on the tile floor, slid under the bed, and hit the wall. Following a break in the interview, Godsey gave a final statement, which was reduced to writing and signed at 3:40 a.m. In it, the defendant said that, angered by the victim's crying, he squeezed the victim's head between his biceps and forearm for about ten seconds, until the victim stopped crying. When he stopped squeezing, the victim was huffing

with an antibiotic for sinusitis some twelve days before this incident, and at that time, there was no evidence of abuse. Dr. Craven also testified that the child's medical records from the Family Practice Center, where the child had been seen several times for ear and respiratory infections, did not indicate prior abuse.

Dr. Mohon, a pediatric physician who treated the victim at the Johnson City Medical Center, opined that most of the explanations given by the defendant could not have caused the victim's severe injuries. However, he testified that the injuries were consistent with the account that the defendant had grabbed the victim by the arm and leg, caught the victim's arm in the crib railing, and then thrown the victim so forcefully that he hit the tile floor and slid under the bed and against the wall. However, Dr. Mohon acknowledged that there was no sign of older injuries indicative of previous child abuse and conceded that the injuries could have been caused by reckless or grossly negligent behavior.

Testifying for the defense, Ms. Marshall, the victim's mother, said the defendant usually was responsible for the care of her children between 8:00 and 10:30 p.m. each night, that he had a good relationship with the victim and with her other two children, and that she had not seen or heard the defendant abuse the victim on the night of the incident, although she conceded that she did not know what occurred while she was driving her friend home. Ms. Marshall testified that the victim suffered frequent respiratory infections, and at the time of this incident, he had been cutting teeth, which caused his gums to bleed. She said that the blood stains on the defendant's t-shirt came from the victim's bleeding gums. She asserted that the defendant had never struck the victim or been "mean to him."

Daniel Christian, a friend and former roommate and co-worker of the defendant, testified that the defendant loved the victim and had served in a "fatherly role" to the victim, providing both monetary and emotional support. Christian recalled that the defendant had turned down his invitation to attend the Citrus Bowl in Florida so that he could spend the holidays with Ms. Marshall and her children.

The defendant's employer, Silas Jenkins, characterized the defendant as an excellent worker. Jenkins had seen the defendant with the victim on two occasions and noticed the defendant had a good relationship with the victim and provided good care to the victim.

Christy Christian, a neighbor and friend, testified that the defendant had always been kind with the

inside, screaming for help. Trivett also testified that the defendant arrived at the hospital about thirty minutes later, very upset, crying and hugging Ms. Marshall. Trivett called police to report what he had witnessed when he heard a television account indicating that the defendant had been charged with murder. On cross-examination, Trivett acknowledged that the victim appeared to be dead when Ms. Marshall carried him into the hospital.

Ruby Metros, an oncology social worker at the Johnson City Medical Center, stayed with Ms. Marshall and the defendant throughout most of the day on January 2, 1996. She testified that, at times, they appeared relatively calm, and at other times, they appeared very upset. Metros said the defendant was very emotional when he learned that the victim would be disconnected from life support and when he was allowed to go into the victim's hospital room for the last time.

Dr. Geoffrey Boercker, a specialist in trauma medication, testified that most of the victim's brain injuries were caused by heart stoppage and that the arm fracture probably occurred around the time of the cardiac arrest. He opined that the victim's torn disc could have been caused by the victim striking the metal frame on the toddler bed. Dr. Boercker also testified that misplacement of the endotracheal tube lessened what little chance the victim had for survival. Dr. Boercker noted that the victim had, in fact, been teething at the time of his death. Dr. Boercker testified at length as to the various classes of injuries associated with an abused child and noted an absence of any of these injuries and of any indication of prior abuse. Dr. Boercker also noted the absence of either epidural or subdural hematomas, which are normally present in severe deceleration head injuries. The absence of these injuries led Dr. Boercker to conclude that the victim's death was caused by a cardiopulmonary arrest rather than "traumatic brain injury, child abuse/non-accidental trauma," as noted by the autopsy. Dr. Boercker said that the head trauma in this case was not severe enough to cause a cardiac arrest. Dr. Boercker opined that the head trauma likely caused vomiting, which resulted in a laryngospasm that closed the victim's airways and caused respiratory arrest, and eventually, cardiac arrest. Dr. Boercker conceded that even if his opinion as to cause of death is correct, the head trauma precipitated the cardiopulmonary arrest, which caused the victim's death.

In rebuttal, Dr. William McCormick, the medical examiner who performed the autopsy, testified that the victim's spinal injury and broken arm had occurred simultaneously with the cardiopulmonary arrest. Dr. McCormick also stated that the victim's death was not caused by aspirating vomit because

*Sentencing Phase Proof*

The State presented no further proof at the sentencing hearing, relying upon the proof at trial to establish the single aggravating circumstance, "[t]he murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." Tenn.Code Ann. § 39-13-204(i)(1).

The defendant presented the testimony of several witnesses, all of whom testified about his background and life. The defendant had suffered an unstable childhood in a poor, dysfunctional family that moved frequently. The defendant had moved at least ten times by age seventeen. He had been trapped in a house fire at the age of four; and his father was an alcoholic, who became emotionally abusive upon discovering that the defendant's mother had a child as the result of an extramarital affair. The defendant's parents divorced when he was five years old, and his father had provided no financial or emotional support to the defendant thereafter. The defendant's step-father also abused alcohol and was emotionally abusive toward the defendant, often totally ignoring the defendant, who looked like his biological father, while showering attention on the defendant's brother and sister.

The defendant was of above average intelligence and performed very well in elementary school. He was described by his teachers as a sweet child, very shy, studious, but accident-prone. When the defendant was thirteen years old, his mother began caring for a baby girl, the child of a friend. The defendant was left on his own and began using alcohol and marijuana. By fourteen, the defendant was adjudged a delinquent and lived in a juvenile home for several months. He was released to return to his own high school by his sophomore year, but he did not perform well. His grades were very poor, and he skipped school a great deal. He quit school during his junior year of high school and began working. He was seriously involved with his girlfriend and was devastated when she moved. She was pregnant with his child when she left, but the defendant was not aware of the pregnancy. She returned when the child was two and one-half months old and left the child with the defendant and his mother. The defendant helped his mother care for the baby, and he bought the child diapers and other needed items. The defendant and his family cared for the child for six and one-half months, but when the child was eight and one-half months old, the child's mother took the baby on the pretext of having a photograph taken and never returned. Later, the defendant's mother learned from a newspaper notice that the child had been placed for adoption. The defendant's mother wrote a letter, but was informed that she had no legal right or

he turned eighteen because the military had changed its policy by that time and would not accept persons who had no high school diploma. Since turning eighteen, the defendant has been convicted of joyriding, driving under the influence of an intoxicant, underage possession of alcohol, and driving on a revoked license-all misdemeanor offenses. The defense rested after the defendant's mother testified, expressing love for her son and asking the jury to spare his life.

The trial court instructed the jury as to the single aggravating circumstance and as to seventeen mitigating circumstances raised by the evidence. The jury determined that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt and sentenced the defendant to death. The trial court imposed a consecutive twenty-five-year sentence for the aggravated child abuse conviction.

As stated, the Court of Criminal Appeals affirmed the first degree murder conviction, but found the death sentence disproportionate and modified the sentence to life imprisonment without the possibility of parole. The Court of Criminal Appeals also vacated the conviction for aggravated child abuse, finding no legislative intent to permit a separate conviction and punishment for aggravated child abuse when the defendant has been convicted of first degree felony murder during the perpetration of aggravated child abuse. We granted both the State's and the defendant's applications for permission to appeal and now affirm in part and reverse in part the decision of the Court of Criminal Appeals.

*Electronic Recording of Statement*

When initially interviewed by the police, the defendant denied knowing anything about how the victim sustained the injuries resulting in his death. Questioning proceeded and the defendant gave about nine different versions of what occurred. One of the officers present during the interrogation testified that the defendant prefaced the eighth version by saying he was "going to tell ... the whole truth." The defendant then acknowledged that he had attempted to throw the victim onto the bed, that the victim missed, hit the floor, slid under the bed, and hit the wall. This account, the eighth version, was most consistent with the physical injuries sustained by the victim. After this statement, there was a break in the interview, and when it resumed, the defendant refused to sign the written statement recounting the eighth version. Instead, he maintained that he did not throw the victim but had squeezed the victim's head in an effort to stop his crying, and he signed a written statement to this effect. No part of the interrogation was electronically recorded. The [illegible]

In *Stephan,* the Alaska Supreme Court held that the failure of police to create an electronic recording of a custodial interrogation occurring in a place of detention generally violates the due process rights of a suspect under the Alaska Constitution. *Stephan,* 711 P.2d at 1159. Specifically, the court found that because of its ease and inexpense, particularly in the context of custodial interrogations in detention facilities, recording "is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." *Id.* at 1159-60. The Alaska court concluded that absent a justifiable excuse, the failure to record a custodial interrogation will render any statement received therein inadmissible during trial. *Id.*

The Minnesota Supreme Court imposed a similar electronic recording obligation pursuant to its supervisory powers. *Scales,* 518 N.W.2d at 592. In establishing this prospective rule, the Minnesota Supreme Court concluded that statements obtained from a suspect in substantial violation of the recording requirement would be suppressed. *Id.* at 592. Unlike the Alaska Supreme Court, the Minnesota Supreme Court refused to determine whether the Minnesota Constitution supported imposition of the requirement.

The defendant admits that there is no authority in Tennessee requiring that interrogations be electronically recorded. The defendant relies upon *State v. Livesay,* 941 S.W.2d 63, 65 (Tenn.Crim.App.1996), which held that refusing to allow a defendant to obtain an independent blood analysis in a drunk driving prosecution is tantamount to suppression of evidence favorable or useful to the defense and is a violation of a defendant's statutory and due process rights. The defendant asserts that the failure of the officers in this case to electronically record the interrogation violated his due process rights by denying him the only opportunity to have an exact record of what he said to the police.

In our view, the Court of Criminal Appeals properly distinguished *Livesay.* There, independent blood tests were necessary to enable the defendant to test the accuracy of and to rebut the State's proof. Here, in contrast, the defendant does not ask that evidence be preserved; he asks that it be gathered in a certain form. The evidence is not lost merely because the interrogation was not recorded. The officers were present at the interrogation, and more importantly, the defendant was present at the interrogation. Lack of an electronic recording did not preclude the defendant from challenging the accuracy of the officers' recollection of the interrogation.

spent in court resolving disputes over what occurred during the interrogation. As a result, the judiciary would be relieved of much of the burden of resolving these disputes. In light of the slight inconvenience and expense associated with electronically recording custodial interrogations, sound policy considerations support its adoption as a law enforcement practice. However, "[t]he determination of public policy is primarily a function of the legislature." *Griffin v. Shelter Mut. Ins. Co.,* 18 S.W.3d 195, 200-01 (Tenn.2000). As we commented in *State v. Odom,* 928 S.W.2d 18, 23-24 (Tenn.1996), the issue of electronically recording custodial interrogations "is one more properly directed to the General Assembly." *Id.* The defendant's claim that his statement should have been suppressed because it was not electronically recorded is without merit.

*Constitutionality of the Felony Murder Statute*

The next general issue raised by the defendant is whether the 1995 amendment (FN8) to Tennessee's first degree murder statute violates due process or amounts to cruel and unusual punishment under the state and federal constitutions. Specifically, the statute under which the defendant was prosecuted and convicted provides in pertinent part as follows:

> (a) First degree murder is ... (2) A killing of another committed in the perpetration of or attempt to perpetrate ... aggravated child abuse .... (b) No culpable mental state is required for conviction under subdivision (a)(2) ... except the intent to commit the enumerated offenses or acts in such subdivisions.

Tenn.Code Ann. § 39-13-202(a)(2) & (b). Prior to 1995, aggravated child abuse was not one of the enumerated felonies capable of supporting a charge or conviction of first degree felony murder. Additionally, between 1989 and 1995, the required mental state for felony murder was recklessness. Tenn.Code Ann. 39-13-202(a)(2) (1991 Repl.).

[5] The defendant first contends that by deleting the culpable mental state of reckless, the 1995 amendment rendered the statute unconstitutional. We disagree. In *State v. Barber,* 753 S.W.2d 659, 671 (Tenn.1988), this Court considered and upheld the constitutionality of the pre 1989 statute, which did not contain a culpable mental state. In *State v. Middlebrooks,* 840 S.W.2d 317, 336 (Tenn.1992), we reaffirmed our decision in *Barber* and upheld the constitutionality of the felony murder statute even though it did not contain a culpable mental state. Even more recently in *State v. Kimbrough,* 924 S.W.2d 888, 890 (Tenn.1996), we described the felony murder doctrine as follows:

as to render the statute unconstitutional. With respect to the culpable mental state, the 1995 amendment merely returned the felony murder statute to its pre 1989 form. Moreover, like the other enumerated felonies, the predicate felony in this case, aggravated child abuse, includes a culpable mental state--"knowingly." Consistent with the traditional felony murder doctrine, the statute as amended in 1995 requires the State to prove that the predicate felony was committed with the applicable culpable mental state. Therefore, the defendant's claim that the statute violates due process by failing to include a culpable mental state is without merit.

[6] The defendant also asserts that because the killing in this case resulted from knowing conduct, the facts do not establish a "reckless disregard for human life," as required by *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), to constitutionally support imposition of the death penalty. We disagree. First, as the Court of Criminal Appeals also correctly pointed out, *Tison* involved defendants who themselves did not kill the victims. Here the defendant's own actions killed the victim. In *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court approved the imposition of the death penalty on the actual killer in a felony murder, and the Court in *Tison* reaffirmed this position with respect to participants in a felony murder who exhibit reckless indifference to human life. Furthermore, the culpable mental state for aggravated child abuse, "knowing," is a higher standard than "reckless indifference." *See* Tenn.Code Ann. § 39-11-106(a)(2)(20) (defining knowing). Therefore, the Court of Criminal Appeals correctly concluded that both the statutory elements and the facts of this case establish reckless indifference.

[7] The defendant's next argument is that the statute violates due process because the acts constituting the aggravated child abuse upon which the felony murder conviction is based are the same acts that caused the victim's death. The defendant contends that due process requires that the underlying felony be based upon acts separate from those causing death. The defendant points to other jurisdictions that apply the merger doctrine to preclude a felony murder conviction based on assaultive offenses. *See* *State v. Wanrow,* 91 Wash.2d 301, 588 P.2d 1320, 1322-1324 (1978); *see generally Annotation,* "Application of Felony Murder Doctrine Where the Felony Relied upon Is an Includible Offense with the Homicide," 40 A.L.R.3d 1341 (1971). The State responds that the merger doctrine is a rule of statutory construction, not a principle of constitutional law, and that the rule applies only when the legislature has not

*People v. Hansen,* 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022, 1028 (1994) (emphasis in original). More broadly, "the merger doctrine bars the use of the felony murder rule when the underlying felony directly results in, or is an integral part of, the homicide." *Barnett v. State,* 783 So.2d 927, 930 (Ala.Crim.App.2000); *see also State v. Campos,* 122 N.M. 148, 921 P.2d 1266, 1270-72 (1996)(outlining varying applications of the merger doctrine in different jurisdictions).

[8] Courts have generally declined to hold that the merger doctrine implicates any principle of constitutional law. *See e.g., Rhode v.. Olk-Long,* 84 F.3d 284, 289 (8th Cir.1996)(rejecting the defendant's due process challenge to her conviction of felony murder based upon child endangerment because the argument lacked a constitutional basis, depending instead upon the merger doctrine); *State v. Lopez,* 174 Ariz. 131, 847 P.2d 1078, 1089 (1992)(observing that the court could conceive of no constitutional impediment "precluding the legislature from classifying child abuse that results in the death of the child as a predicate felony that triggers the felony-murder statute"); *Mapps v. State,* 520 So.2d 92, 93-94 (Fla.Dist.Ct.App.1988)(rejecting the argument that the felony murder statute that included aggravated child abuse as a predicate offense was unconstitutional); *State v. Tremblay,* 4 Or.App. 512, 479 P.2d 507, 511 (1971)(observing that the merger doctrine does not implicate any principle of constitutional law). Instead, courts have viewed the merger doctrine as a principle for discerning legislative intent and, more specifically, as a principle that preserves "some meaningful domain in which the Legislature's careful graduation of homicide offenses can be implemented." *Hansen,* 36 Cal.Rptr.2d 609, 885 P.2d at 1028. Accordingly, the merger doctrine has not been widely accepted. *See Cotton v. Commonwealth,* 35 Va.App. 511, 546 S.E.2d 241, 244 (2001). The doctrine has been applied largely in those states where the felony murder statute fails to specifically list the felonies capable of supporting a felony murder conviction. (FN9) Where a "legislature explicitly states that a particular felony is a predicate felony for felony-murder, no 'merger' occurs." *Lopez,* 847 P.2d at 1089; *see also Mapps,* 520 So.2d at 93; *Huntley v. State,* 271 Ga. 227, 518 S.E.2d 890, 893 (1999); *State v. Rhomberg,* 516 N.W.2d 803, 805 (Iowa 1994); *People v. Jones,* 209 Mich.App. 212, 530 N.W.2d 128, 129 (1995); *State v. Cromey,* 348 N.W.2d 759, 760 (Minn.1984); *Faraga v. State,* 514 So.2d 295, 302-03 (Miss.1987) ; *State v. Williams,* 24 S.W.3d 101, 115-17 (Mo.Ct.App.2000); *State v. McCann,* 907 P.2d 239, 241 (Okla.Crim.App.1995); *Tremblay,* 479 P.2d at 511; *see generally* 40 Am.Jur.2d. *Homicide* § 66 (1999).

[10] Finally, the defendant argues that predicating felony murder on aggravated child abuse violates the due process restrictions of *State v. Anthony,* 817 S.W.2d 299, 306 (Tenn.1991), unless the aggravated child abuse substantially increases the risk of harm over and above that necessarily present in the crime itself. We disagree. In *Anthony,* this Court held that dual convictions for kidnapping and robbery are inappropriate if the kidnapping is essentially incidental to the robbery. In contrast, a murder qualifies as felony murder only if the underlying felony is closely connected to the killing in time, place, causation, and continuity of action. *State v. Pierce,* 23 S.W.3d 289, 295 (Tenn.2000). In other words, the felony murder doctrine requires that underlying felonies be "incidental" to the killing in time, place, causation, and continuity of action. *Id.* Applying *Anthony* as the defendant suggests would require rejection of this long-standing portion of the felony murder doctrine. The analysis employed in *Anthony* to determine the permissibility of dual convictions is simply inapplicable in the context of determining whether a felony may properly support a conviction of felony murder.

*Aggravated Child Abuse: Lesser Included Offense*

The State charged the defendant with both felony murder and aggravated child abuse, the felony upon which the murder charge was based. The jury convicted the defendant of both offenses, but the Court of Criminal Appeals set aside the conviction for aggravated child abuse, concluding that it is a lesser included offense of felony murder.

Initially we note that the issue presented in this case, whether dual convictions for felony murder and the predicate offense of aggravated child abuse are permitted under Tenn.Code Ann. § 39-13-202(a)(2), the felony murder statute, was expressly pretermitted in *State v. Ducker. See* 27 S.W.3d 889, 893, n. 2 (Tenn.2000). The issue in *Ducker* was whether aggravated child abuse was a lesser-included offense of reckless killing of a child, pursuant to Tenn.Code Ann. 39-13-202(a)(4) (1994) , (FN10) the statute in effect at that time. This crime, reckless killing of a child, was defined in a statutory provision entirely separate and distinct from the statutory provision defining felony murder. As a result, we concluded that a legislative intent to permit dual convictions and sentences did not appear to be present under the 1994 reckless killing of a child provision. *Ducker,* 27 S.W.3d at 893. We acknowledged that the statute defining as first degree murder the reckless killing of a child by aggravated child abuse was adopted by the General Assembly in response to *State v. Kerry Phillip Bowers,* No. 115, 1989 WL 86576 (Tenn.Crim.App., filed Aug. 2, 1989), and that the statute was commonly known as

statute to add aggravated child abuse as one of the felonies capable of supporting a conviction of first degree felony murder. As previously stated, Godsey was prosecuted and convicted under the felony murder statute as amended in 1995. (FN11) Therefore, the issue in this appeal is whether, under the 1995 felony murder statute, dual convictions for felony murder by aggravated child abuse and aggravated child abuse are permissible.

The State contends that by adding aggravated child abuse to the list of felonies capable of supporting a conviction for felony murder, the Legislature expressed its intent to permit convictions and punishment both for felony murder and for the underlying felony, aggravated child abuse. In support of this argument, the State relies upon this Court's decision in *State v. Blackburn,* 694 S.W.2d 934, 936 (Tenn.1985), where this Court concluded that the Legislature intended to allow multiple convictions and punishments for felony murder and the underlying felony. The State points out that in *Blackburn* this Court observed that "[n]othing in the statutory definitions of murder in the first degree and of the felonies listed in [the felony murder statute] indicates a legislative intent that conviction and punishment for both offenses should not be permitted." *Id.* 694 S.W.2d at 937.

In response, the defendant says that the Court of Criminal Appeals correctly found that the General Assembly did not intend to permit dual convictions under these circumstances. In support of this argument, the defendant relies upon Tenn.Code Ann. § 39-15-401(d) which designates child abuse and neglect as a lesser included offense "of any kind of homicide." The defendant argues that if child abuse and neglect is a lesser included offense of homicide, then aggravated child abuse, which refers to the child abuse and neglect statute, also is a lesser included offense of homicide.

While agreeing that the General Assembly has designated child abuse and neglect a lesser included offense of any kind of homicide, the State argues that the General Assembly did not designate aggravated child abuse a lesser included offense of homicide. Therefore, according to the State, the Legislature did not intend to preclude dual convictions for felony murder and aggravated child abuse. As support for this assertion, the State points to this Court's comment in *Ducker,* 27 S.W.3d at 893, n. 1 (Tenn.2000): "[w]hile child abuse has been explicitly designated as a lesser-include offense 'of any kind of homicide' in Tenn.Code Ann. § 39-15-401(d), the legislature has not designated *aggravated* child abuse as a lesser-included offense of 'any kind of homicide.' " (Emphasis in original.)

*Lewis,* 919 S.W.2d 62, 69 (Tenn.Crim.App.1995). The key issue is "whether the legislature intended cumulative punishment." *Blackburn,* 694 S.W.2d at 936; *see also* *Denton,* 938 S.W.2d at 379. To determine legislative intent, we look to the language of the relevant statutes.

****14** Child abuse and neglect is defined by Tenn.Code Ann. § 39-15-401(a), which provides:

(a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused or neglected child is six years of age or less, the penalty is a Class D felony.

Subsections (b) and (c) of this statute are procedural in nature. Subsection (b) addresses the authority of juvenile courts to hear matters arising under this section, and subsection (c) states that the provisions of the section are supplementary or cumulative to other statutory provisions. Subsection (d) provides in relevant part that child abuse and neglect "may be a lesser included offense of any kind of homicide, statutory assault, or sexual offense if the victim is a child and the evidence supports a charge under this section." Tenn.Code Ann. § 39-15-401(d).

[14] Aggravated child abuse is governed by Tenn.Code Ann. § 39-15-402, which provides in relevant part as follows:

(a) A person commits the offense of aggravated child abuse or aggravated child neglect *who commits the offense of child abuse or neglect as defined in § 39-15-401 and:*

(1) The act of abuse or neglect results in serious bodily injury to the child; or

(2) A deadly weapon is used to accomplish the act of abuse.

(b) A violation of this section is a Class B Felony; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

(Emphasis added.) While the Legislature has specifically provided that child abuse and neglect "may be a lesser included offense of any kind of homicide," the aggravated child abuse statute is silent and contains no similar designation. "Omissions are significant when statutes are express in certain categories but not others." *Carver v.*

[15][16] Finally, and perhaps most importantly, this Court's decision in *Blackburn*, permitting dual convictions for felony murder and the underlying felony in the absence of a clearly expressed legislative intent to the contrary, was rendered in 1985. The General Assembly is presumed to know the state of the law at the time it acts. *See, e.g., Washington v. Robertson County*, 29 S.W.3d 466, 473 (Tenn.2000). Therefore, when the General Assembly amended the felony murder statute in 1995 to add aggravated child abuse to the list of felonies capable of supporting a felony murder conviction, the General Assembly is presumed to have known that dual convictions for felony murder and aggravated child abuse would be permissible in the absence of a clear intent to the contrary. Although the General Assembly specifically designated child abuse and neglect a lesser included offense of homicide, there is no similar designation for aggravated child abuse. Indeed, we have evaluated the relevant statutes and find no clearly expressed legislative intent to prohibit dual convictions. As previously stated, the key issue in multiple punishment cases is legislative intent. *Denton*, 938 S.W.2d at 379. Where the Legislature has indicated that cumulative punishment is intended, the double jeopardy analysis need not proceed any further. *Id.*, 938 S.W.2d at 379, n. 14. In this case, reading the child abuse and neglect, aggravated child abuse, and felony murder statutes together, we conclude that the legislative intent to allow cumulative punishment is clear. Therefore, we hold that aggravated child abuse is not a lesser included offense of felony murder and that dual convictions are permissible in this context. Accordingly, the judgment of the Court of Criminal Appeals vacating the defendant's aggravated child abuse conviction is reversed and the judgment of the trial court is reinstated.

*Aggravating Circumstance (i)(1)--Narrowing*

**15 Relying upon *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992), the defendant next contends that the State may not seek the death penalty for a felony murder in the perpetration of aggravated child abuse where the sole aggravating circumstance is Tenn.Code Ann. § 39-13-204(i)(1)--"the murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." The defendant contends that the aggravating circumstance duplicates the age element of the offense of aggravated child abuse and therefore does not sufficiently narrow the class of death-eligible defendants under the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution. Acknowledging that this aggravating circumstance has been allowed to support a sentence of life without the possibility of (FN12)

The State contends that, unlike *Middlebrooks*, the (i)(1) aggravating circumstance at issue in this case provides meaningful narrowing because the underlying offense, felony murder by aggravated child abuse, applies to all defendants whose murder victims are under eighteen years of age, while the aggravating circumstance applies only to those defendants whose murder victims are under twelve years of age. The State asserts that by narrowing the class of murderers to those whose victims are under the age of twelve, the General Assembly has chosen to recognize the discrepancy in size, strength, and ability between victim and assailant, as well as the heightened vulnerability of younger children, who, generally are less able to defend themselves, describe their assailant, seek assistance, flee the attack, or even to articulate the nature of the crime. Given these factors, the State says that making those who kill such vulnerable victims death-eligible is more than reasonable and constitutes a meaningful narrowing of the class of all murderers.

We begin our analysis with *Middlebrooks*, where, a majority of this Court held that "when the defendant is convicted of first degree murder solely on the basis of felony murder," use of the felony murder aggravating circumstance is not permissible because it "does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution because it duplicates the elements of the offense." *Id.*, 840 S.W.2d at 346. In so holding, we observed that

> **16 Automatically instructing the sentencing body on the underlying felony in a felony-murder case does nothing to aid the jury in its task of distinguishing between first-degree homicides and defendants for the purpose of imposing the death penalty. Relevant distinctions dim, since *all participants in a felony murder*, regardless of varying degrees of culpability, enter the sentencing stage with at least one aggravating factor against them.

*Id.* at 342 (emphasis added).

[17] To determine whether the concern addressed in *Middlebrooks* exists in this case, we must look again to the felony murder statute under which the defendant was convicted, which defines first degree murder as "[a] killing of another committed in the perpetration of or attempt to perpetrate ... aggravated child abuse...." Tenn.Code Ann. § 39-13-202(a)(2). Child abuse and neglect is defined

Child abuse becomes aggravated when the "act of abuse results in serious bodily injury to the child; or ... a deadly weapon is used." Tenn.Code Ann. § 39-15-402. (FN13) Under these statutes, felony murder by aggravated child abuse may be committed against a person less than eighteen years old. However, the (i)(1) aggravating circumstance applies only if the victim is less than twelve years old. Unlike the felony murder aggravating circumstance at issue in *Middlebrooks,* which applied equally to all felony murderers, the (i)(1) aggravating circumstance does not by its terms apply to all aggravated child abuse murderers. This aggravating circumstance simply does not duplicate the elements of the underlying offense, felony murder by aggravated child abuse. (FN14) It narrows the class of death-eligible defendants because it applies to only those defendants whose murder victims are less than twelve years of age. We agree with the State that, in adopting this aggravating circumstance, the General Assembly no doubt recognized that victims under twelve years of age are typically more vulnerable than those between thirteen and seventeen years of age. A younger victim is less able to defend himself or herself and less able to flee. The General Assembly reasonably concluded that persons who attack and abuse these young victims are among the most culpable murderers. *See, e.g. Gilson v. State,* 8 P.3d 883, 923 (Okla.Crim.App.2000) (finding legislative action that protects vulnerable children legally justified). Thus, we hold that the (i)(1) aggravating circumstance sufficiently and meaningfully narrows the class of death-eligible defendants, even defendants who have been convicted of felony murder in the perpetration of aggravated child abuse. *See also Ex parte Woodard,* 631 So.2d 1065, 1071-72 (Ala.1993) (upholding the constitutionality of a similar age of victim aggravating circumstance); *State v. Wood,* 132 Idaho 88, 967 P.2d 702, 716-17 (1998); (upholding a similar age of victim aggravating circumstance against a constitutional narrowing challenge); *People v. Rissley,* 165 Ill.2d 364, 209 Ill.Dec. 205, 651 N.E.2d 133, 152-53 (1995) (upholding a similar age of the victim aggravating circumstance); *State v. Wilson,* 685 So.2d 1063, 1071-72 (La.1996) (upholding a similar age of the victim aggravating circumstance).

*Statutory Comparative Proportionality Review*

**17 The Court of Criminal Appeals in a well-reasoned opinion concluded that the sentence of death in this case is disproportionate to the penalty imposed in similar cases. As a result, the Court of Criminal Appeals modified the sentence to life imprisonment without the possibility of parole. In this Court, the State argues that the Court of Criminal Appeals invaded the province of the jury in crime and the defendant." Tenn.Code Ann. § 39-13-206(c)(1)(D). In *State v. Bland,* 958 S.W.2d 651 (Tenn.1997), we undertook an exhaustive analysis of this statutory provision that involved a full inquiry into the language, purpose, jurisprudential background, and legislative history of comparative proportionality review. We emphasized that statutory comparative proportionality is different from traditional Eighth Amendment proportionality analysis, which is the "abstract evaluation of the appropriateness of a sentence for a particular crime." *Pulley v. Harris,* 465 U.S. 37, 42-43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). In contrast, statutory comparative proportionality review "presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Bland,* 958 S.W.2d at 662 (Tenn.1997) (quoting *Pulley,* 465 U.S. at 42-43, 104 S.Ct. at 875-76). The United States Supreme Court has characterized statutory comparative proportionality review as "a check against the random or arbitrary imposition of the death penalty." *Gregg v. Georgia,* 428 U.S. 153, 206, 96 S.Ct. 2909, 2940-41, 49 L.Ed.2d 859 (1976).

[20] Comparative proportionality review, however, is not a constitutional imperative or mandate; it is instead a creature of statute. *Pulley,* 465 U.S. at 50-51, 104 S.Ct. at 879-80 ("There is ... no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); *Bland,* 958 S.W.2d at 663-64 ("While important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required."). Indeed, following the United States Supreme Court decision in *Pulley,* nine of the twenty-nine other states which initially conducted comparative proportionality review have either repealed the statutory provisions requiring it or have overruled court decisions mandating it. (FN15) Significantly, the Tennessee General Assembly has not seen fit to repeal the statute which directs this Court and the Court of Criminal Appeals to conduct comparative proportionality review in all death penalty cases. In addition, the General Assembly has not amended the statute since our comprehensive decision in *Bland* fully explained the analysis we employ to conduct comparative proportionality review. Accordingly, we will conduct the comparative proportionality review in this case in accordance with the analysis adopted in *Bland.*

*Bland,* 958 S.W.2d at 664; *see also* *Tichnell v. State,* 297 Md. 432, 468 A.2d 1, 13-23 (1983).

[22][23][24] While statutory comparative proportionality review insures rationality and consistency in the imposition of the death penalty, our function in performing this review is not to search for proof that a defendant's death sentence is perfectly symmetrical with the penalty imposed in all other first degree murder cases, but to identify and invalidate the aberrant death sentence. (FN16) In conducting comparative review, we do not act as a "super jury," nor do we second-guess the jury's decision. *Bland,* 958 S.W.2d at 668. Simply stated, if the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed, the sentence of death is disproportionate. *Bland,* 958 S.W.2d at 651; *State v. Ramsey,* 864 S.W.2d 320, 328 (Mo.1993).

[25][26][27] Admittedly, this standard is not easily satisfied. When the sentencing jury is properly instructed by the trial court and appropriately considers the evidence of aggravating and mitigating circumstances under a statutory scheme that is constitutional, disproportionate death sentences should be the rare exception, not the norm. The fact that no death sentence has previously been invalidated as disproportionate in Tennessee is an indication that our capital sentencing scheme is functioning properly. *See State v. Cobb,* 251 Conn. 285, 743 A.2d 1, 125 (1999) (noting that disproportionate sentences will be unlikely where the sentencing authority is correctly instructed and appropriately follows the statute); *State v. Jacobs,* 2001 WL 507878 (La.2001) (noting that since 1976 only one death sentence had been set aside in Louisiana as disproportionate). Comparative proportionality review is simply a final safeguard in the initial appellate process to ensure that no aberrant death sentence is affirmed.

[28][29][30][31] While we receive Rule 12 reports from trial judges in "all cases in which the defendant is convicted of first degree murder," Tenn. Sup.Ct. Rule 12; *Bland,* 958 S.W.2d at 666, we select similar cases for comparative proportionality (FN17) from a pool that includes only those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, (FN18) and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death, regardless of the sentence actually imposed. (FN19) "[B]ecause the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar ... are those in which imposition of the death at 211, *Whitfield,* 837 S.W.2d at 515. When a defendant pleads guilty, he or she extends a substantial benefit to the criminal justice system, and in exchange, the State is entitled to extend a less harsh sentence than might otherwise be given if the case is submitted to a jury. *See State v. Mann,* 959 S.W.2d 503, 509 (Tenn.1997) (citing *Brady v. United States,* 397 U.S. 742, 752-53, 90 S.Ct. 1463, 1471-72, 25 L.Ed.2d 747 (1970)). Therefore, while the sentence imposed as part of a plea agreement likely will be less harsh than the sentence imposed by a jury after a trial and sentencing hearing, it does not follow that the less harsh sentence resulting from the plea renders the jury sentence aberrant or disproportionate. A sentence imposed by a jury simply cannot logically be compared to a sentence that results from a plea agreement. The circumstances are different in all respects.

****19** [32] In addition, consideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. *See* *Webb,* 680 A.2d at 211-12. We previously have declined to review the exercise of prosecutorial discretion, *see Cazes,* 875 S.W.2d at 253, and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying *potential* capital cases. Consideration of cases in which the State did not seek the death penalty, in effect, would be using a prior decision of the State as a basis for invalidating a death penalty in an unrelated case. *Webb,* 680 A.2d at 211-12. Such a course could potentially discourage the State both from exercising its discretion to not seek the death penalty and from engaging in plea bargaining with a defendant charged with first degree murder. Indeed, such a course could result in the State seeking the ultimate penalty in every first degree murder case. *Id.* Proportionality review is not, and was never intended to be, a vehicle for reviewing the exercise of prosecutorial discretion. For these reasons, we do not consider cases in which the State did not seek the death penalty when conducting comparative proportionality review.

[33][34] Comparative proportionality review also is not a search for disproportionate or aberrant life cases. As we have previously stated, even if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence. *See* *Bland,* 958 S.W.2d at 665; *State v. Carter,* 714 S.W.2d 241, 251 (Tenn.1986). Our duty under the similarity standard is to assure

[35] Having defined and explained the pool, we must emphasize that selecting similar cases from that pool is not an exact science because no two crimes or defendants are precisely identical. *Bland,* 958 S.W.2d at 667. We have various tools available to use in locating similar cases. We review Rule 12 reports, which are not only on file in the Appellate Court Clerk's office in Nashville, but are also now available on CD ROM, making them more accessible, particularly for defendants. (FN20) While Rule 12 reports have not been filed in every prior case, (FN21) this Court and trial judges across this State are working together to ensure that these reports are being filed in current cases and will be filed in future cases. Nonetheless, we emphasize that Rule 12 reports are merely a starting point when conducting comparative proportionality review. These reports are always supplemented by traditional methods of legal research, which enables us to locate written appellate court opinions, which generally are available on first degree murder cases included within the pool for comparison. These written opinions detail the facts and circumstances of each case. Furthermore, like other appellate courts, this Court draws on the experienced judgment and institutional knowledge of its members when evaluating the comparative proportionality of a death sentence. *See Bland,* 958 S.W.2d at 668 (citing cases); *see also State v. Fowler,* 353 N.C. 599, 548 S.E.2d 684, 704 (2001). Such institutional knowledge is an important tool for purposes of comparative proportionality review. Id. To further assist this Court, we have directed the State and the defendant to fully brief the issue in each case and to discuss cases and factors relevant to the comparative proportionality inquiry. *Bland,* 958 S.W.2d at 667. This Court utilizes all the tools at its disposal to conduct a thorough and complete comparative proportionality review in every case.

****20** [36][37] However, we do not employ a statistical analysis that attempts to quantify the various factors leading to imposition or non-imposition of the death penalty. *Id.* at 664. Comparative proportionality review is not a rigid, objective test which employs mathematical or scientific techniques. *Bland,* 958 S.W.2d at 668; *Cazes,* 875 S.W.2d at 270. This sort of approach has been rightly criticized as an unworkable attempt "to quantify the unquantifiable." *See Bland,* 958 S.W.2d at 664 (quoting, *Webb,* 680 A.2d at 209); *see also Ramsey,* 864 S.W.2d at 327-28. (FN22) As previously explained, a sentence of death is not disproportionate, unless, the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.

[38][39] In comparing similar cases, this Court considers many variables including: (1) the means of [partially cut off] defendants which include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation. *Id.*

Before we consider the record in this case in light of these factors, we first consider the State's assertion that the Court of Criminal Appeals erred when conducting comparative proportionality review by considering Tennessee cases in which the death penalty was not sought and by considering cases from other jurisdictions. We note that the Court of Criminal Appeals indicated in an order denying the State's petition to rehear that the Tennessee cases in which the death penalty were not sought were used only to provide context and to illustrate the possible remedies, in view of the conclusion that the sentence was disproportionate. The Court of Criminal Appeals also explained that the out-of-state cases were cited to demonstrate "the extensiveness of our research and our concerted effort to reach the right result." Accordingly, the Court of Criminal Appeals did not base its decision upon the cases in which the State did not seek the death penalty or the out-of-state cases.

[40] In any event, it is worth reiterating that the pool of similar cases includes only cases in which the death penalty was sought, a sentencing hearing was held, and a sentencing jury determined the appropriate sentence. Whether out-of-state cases should be included in the pool of similar cases for purposes of comparative proportionality review is an issue this Court has not previously addressed. In its jurisprudential history there is no indication that comparative proportionality review was to be conducted on a national scale. Such review generally is performed by at least one state appellate court that has statewide appellate jurisdiction, and therefore, is able to compare a particular death sentence to the penalty imposed in similar cases throughout the state. In Tennessee, comparative proportionality review is a duty imposed upon this Court and the Court of Criminal Appeals by a statute that is part of the Tennessee capital sentencing scheme. Nothing in the statute indicates that the General Assembly intended the term "similar cases" to include out-of-state cases. In addition, given that capital sentencing statutes differ from state to state, cases from other jurisdictions are likely not "similar" for purposes of comparative proportionality review. Accordingly, we agree with the State that out-of-state cases should not be included in the pool of similar cases for purposes of

reason as opposed to whim or prejudice." According to the State, if the sentence "is not unreasonable it cannot be deemed aberrant, arbitrary, or capricious."

The defendant responds that the appropriate inquiry in determining whether the sentence is disproportionate is whether the case is "plainly lacking in circumstances consistent with those in which the death penalty has been imposed...." *Bland,* 958 S.W.2d at 665. According to the defendant, the two cases the State relies upon are not similar to the instant case and, in fact, support the Court of Criminal Appeals' conclusion that the sentence in this case is disproportionate. In addition, the defendant asserts that every other capital case in this state involving a child victim is much more aggravated than the killing in the instant case.

[41] Initially we note that reviewing the record in each case in isolation, as the State suggests, is not the appropriate analysis when conducting *comparative* proportionality review. The defendant is correct. The relevant inquiry for comparative proportionality review is whether this case, taken as a whole, is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed. *Bland,* 958 S.W.2d at 665. To determine whether this case can be said to be plainly lacking in circumstances consistent with those in which the death penalty has been imposed, we will now consider prior capital cases in which the defendant was convicted of murdering a child victim, including those cases relied upon by the State and the defendant.

In *Torres,* the jury applied two aggravating circumstances: (1) "the victim was less than twelve years of age, and the defendant was eighteen years of age or older;" and (2) "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39-13-204(i)(1) & (5). As stated in the decision of the Court of Criminal Appeals, the evidence in *Torres* showed that the twenty-five-year-old defendant was the father of the fifteen-month-old male victim and was caring for the victim on the day of the murder while the child's mother was at work. When the child awoke from a nap and would not stop crying, the defendant struck the child a minimum of five times in the head and abdomen with extreme force. According to Torres' own statement, the child was conscious during and after the abuse and appeared to be in pain. The child had severe internal injuries including hemorrhaging in his brain and in his abdomen, indicating extreme force. In addition, some of the medical experts testified that the victim had marks indicating prior offense and in a statement to police, blamed the victim's mother for spoiling him and encouraging him to cry. Torres' amenability to rehabilitation was called into question by the testimony of a fellow inmate who stated that Torres had indicated he was participating in a Legal Lives Program to "juke [i.e., mislead] the people, whoever was charging him." Also, proof offered at the sentencing hearing by Torres indicated that at about age fifteen, he had pled guilty to sexually abusing his five-year-old step-brother.

**22 In *State v. Keen,* 31 S.W.3d 196 (Tenn.2000), the twenty-seven-year-old defendant was convicted of first degree felony murder of his girlfriend's eight-year-old daughter, committed during the perpetration of a rape. In sentencing the defendant, the jury applied two aggravating circumstances, including the young age of the victim, and the fact that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. *Id.* at 205; Tenn.Code Ann. § 39-13-204(i)(1) & (5). The evidence established that the defendant raped the child while choking her, possibly with a shoelace. *Id.* at 203-204. When the child stopped breathing, the defendant threw her into a river. *Id.* at 203. An autopsy revealed multiple scrapes and bruises to the child's face and neck and a deep ligature mark around the front of her neck. *Id.* at 204. The autopsy further indicated that the child was alive when she was thrown into the river. *Id.* The defendant was highly intelligent but was suffering from attention deficit disorder, post-traumatic stress disorder, and serious depression. *Id.* Additionally, the defendant had been sexually abused as a child. *Id.* at 205. The defendant had no prior criminal record and demonstrated remorse following the offense. *Id.* at 221.

In *State v. Middlebrooks,* 995 S.W.2d 550, 561-62 (Tenn.1999), Middlebrooks, a twenty-four-year-old white male, participated in the brutal torture murder of a fourteen-year-old black male victim and was convicted of felony murder. The evidence showed that the victim was mocked, urinated upon, burned, severely beaten with brass knuckles, cut, raped with a stick, and his genitals were beaten. Two large lacerations formed an "X" across his chest, and two deep stab wounds to his chest eventually caused his death. The victim was alive and conscious during the torture, which lasted for hours, and he was pleading with the defendant, saying that he just wanted to go to school and get an education. The evidence strongly indicated that the torture and killing were racially motivated. Middlebrooks offered evidence in mitigation to show that he had mental problems. No evidence indicated that he felt

result of ligature strangulation. The jury applied three aggravating circumstances in sentencing the defendant to death: the young age of the victim, the defendant's prior convictions for aggravated rape, and the fact that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn.Code Ann. § 39-13-204(i)(1), (2) & (5). Medical testimony indicated that the condition of the victim's anus was consistent with ongoing, repeated anal penetration. Witnesses testified that the defendant showed no remorse at the hospital about his daughter's death, and nothing in the record indicated a capacity for rehabilitation.

****23** In *State v. Teel,* 793 S.W.2d 236 (Tenn.1990), the defendant admitted to the rape and murder of a fourteen-year-old girl. The evidence established that the defendant drove the victim, a person with whom he was well acquainted, to a remote and secluded location by telling her that he was taking her to see her boyfriend. Once there, he forced her to perform fellatio and then vaginally raped her. The cause of death was some type of neck trauma consisting of either manual strangulation, ligature strangulation, or a blow or cut to the neck. The jury found two aggravating circumstances, that the murder was especially heinous atrocious or cruel in that it involved torture or depravity of mind and that the murder was committed during the perpetration of a felony, rape. Tenn.Code Ann. § 39-2-203(i)(5) & (7) (1982)

In *State v. Irick,* 762 S.W.2d 121 (Tenn.1988), the twenty-six-year-old defendant was babysitting a friend's children, including the victim. The defendant raped the seven-year-old victim vaginally and anally. The victim suffocated as the defendant held his hand over her mouth to keep her from screaming. The defendant was convicted by a jury of first degree felony murder and aggravated rape. Following a sentencing hearing, the jury found four aggravating circumstances: the victim was less than twelve years of age; the murder was especially heinous, atrocious or cruel in that it involved torture, or depravity of mind; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was committed during the perpetration of a felony. Tenn.Code Ann. § 39-2-203(i)(1),(5), (6) & (7) (1982). The defendant had offered mitigating evidence that he had been under the influence of marijuana or alcohol at the time he committed the offense, and that he had a past mental impairment.

In *State v. Coe,* 655 S.W.2d 903 (Tenn.1983), the defendant was a stranger to the eight-year-old victim. He lured her into his car, drove to an was committed against a person less than twelve years of age; the murder was especially heinous, atrocious or cruel in that it involved torture, or depravity of mind; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was committed while the defendant was engaged in committing or attempting to commit rape. Tenn.Code Ann. § 39-2-203(i)(1),(5),(6) & (7) (1982). The defendant had offered as mitigating evidence the theory that he had been under the influence of extreme mental or emotional disturbance at the time he committed the offense.

****24** [42] Having reviewed these similar capital cases involving child victims, (FN23) we next consider the record in this case in light of the factors adopted in *Bland.* The record reveals that the twenty-two-year-old defendant reacted angrily and unexpectedly when the seven-month-old victim would not stop crying. The defendant threw the victim, inflicting serious and ultimately fatal injuries. The episode occurred in the home the defendant shared with the victim, and the assault had a total duration of only moments. The defendant's conduct certainly was not the result of adequate provocation or justification. Indeed the victim was helpless against the attack. However, there is no evidence to show that the violent acts were premeditated. In fact, the evidence indicates that the defendant's behavior was entirely unexpected and highly unusual. The defendant had no history of abusing the victim. The defendant had been responsible for caring for the victim for several hours in the evening while the victim's mother worked, and the evidence indicated he had treated the victim kindly and with affection, as if the victim were his own child. The defendant had no prior record of felony convictions, although he had prior misdemeanor convictions for joyriding, driving under the influence, and driving on a revoked license. The defendant did not immediately seek assistance for the victim, but the evidence offered at trial indicated that the victim's injuries would not have been immediately apparent, as there were no external injuries. The defendant cooperated with the authorities during the investigation, allowing them access to the apartment without a search warrant, and turning over to them the crib sheet and blanket as well as his own t-shirt. Although the defendant was not immediately forthcoming with police, he eventually admitted his actions. Disinterested witnesses consistently testified that the defendant appeared genuinely remorseful for the victim's injuries and his eventual death. The defendant offered evidence to suggest that he had been a dependable and capable worker and that he had above average intelligence. Overall, the record suggests an amenability to rehabilitation.

the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind or serious physical abuse beyond that necessary to produce death. Also, unlike the present case, in each of these prior cases, there was some evidence of sexual abuse. In only one prior case, *Middlebrooks*, was the jury's sentence of death based upon a single aggravating circumstance, and the evidence to support that aggravating circumstance, evidence of severe and protracted torture, was so clear that to say it was overwhelming is an understatement. Of these prior cases, *Torres* is most similar to the present case, yet, there are several significant distinctions. (FN24) Unlike *Torres*, the evidence in this case indicates that the fatal injuries were consistent with a single act of violence that occurred in a matter of minutes. Although, like Torres, Godsey did not call for emergency assistance immediately, the medical testimony in this case indicates that the victim sustained no apparent external injuries, so it is not clear that Godsey realized the extent of the victim's injuries. When Godsey discovered the victim was not breathing, he immediately alerted the victim's mother, attempted to perform CPR, and called 911. Torres did not immediately call 911, nor did he call when he realized the victim was not breathing. Also unlike *Torres*, and other capital cases involving child victims, the evidence in this case does not establish torture or serious physical abuse beyond that necessary to produce death. Significantly, there is also no evidence in this case to indicate that the defendant had a prior history of abusive behavior toward the victim or other children. To the contrary, the proof indicated that the defendant had treated the victim well, caring for him and providing for him as if he were his own son. Moreover, unlike *Torres*, the medical experts agreed that there was no evidence to indicate prior abuse in this case. Also unlike Torres, according to disinterested witnesses, Godsey demonstrated genuine remorse for the victim at the hospital, both upon arrival and upon learning of the victim's death. In addition, the record in this case indicates that Godsey cooperated with the police in providing access to the apartment and in providing physical evidence. Finally, as the Court of Criminal Appeals observed, the record in this case indicates that Godsey is a reliable worker, who has above average intelligence, and is generally amenable to rehabilitation.

****25** Having reviewed and compared this case to prior similar cases in which a sentence of death has been imposed, we conclude that the Court of Criminal Appeals correctly held that the sentence of death in this case is disproportionate. Taken as a whole, this case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed. As the Court of Criminal Appeals observed:

rejected a death sentence and imposed a sentence of life or life imprisonment without the possibility of parole sentence.

In *State v. Paul William Ware*, No. 03C01-9705-CR-00164, 1999 WL 233592 (Tenn.Crim.App., April 20, 1999), the twenty-five-year-old defendant was convicted of the first degree felony murder of a four-year-old child during the perpetration of rape. The jury found two aggravating circumstances including the young age of the victim and the fact that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Nevertheless, the jury chose to impose a sentence of life imprisonment without the possibility of parole. The evidence established that the defendant was an acquaintance of the victim's family and was found in the victim's apartment lying unclothed and unconscious beside the nude body of the victim. An autopsy revealed that the child had been vaginally and anally raped and had died as a result of asphyxiation. There was evidence that the defendant was extremely intoxicated at the time of the offense. The defendant had no prior record of criminal convictions.

In *State v. James Lloyd Julian, II*, No. 03C01-9511-CV-00371, 1997 WL 412539 (Tenn.Crim.App., July 24, 1997), the twenty-three-year-old defendant was convicted of first degree felony murder of the three-year-old victim, committed during the perpetration of a kidnapping and rape. The jury found two aggravating circumstances, including the young age of the victim and the fact that the murder was especially heinous, atrocious, and cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Nonetheless, the jury imposed a sentence of life imprisonment without the possibility of parole. The evidence established that the defendant was a friend of the victim's parents. He raped the victim and choked her to death. At the time of the offense, the defendant had consumed a fifth of bourbon and smoked marijuana. Moreover, the defendant had himself been sexually abused as a child by his grandfather and was suffering from a mixed personality disorder and a depressive disorder. He had a prior criminal record which included convictions for drug possession, driving under the influence of an intoxicant, assault, evading arrest, and reckless endangerment.

****26** In *State v. Terrence L. Davis*, No. 02C01-9511-CR-00343, 1997 WL 287646 (Tenn.Crim.App., June 2, 1997), the twenty-year-old defendant was convicted of the first degree murder by aggravated child abuse of his girlfriend's twenty-two-month-old daughter. As in this case, the

child's body. The victim's mother testified that she had never previously observed the defendant abuse the child. The defendant had no prior criminal record. The jury imposed a sentence of life imprisonment.

All first degree murders are horrible, and they are particularly tragic, where, as here, the victim is an innocent, defenseless infant. Yet, our statutory duty in conducting comparative proportionality review is to identify and invalidate aberrant death sentences. Having considered the record in this case in comparison to the circumstances of similar cases, we are of the opinion that, taken as a whole, this case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed. In fact, the circumstances of this case are substantially less egregious, overall, than the circumstances of similar cases in which a sentence less than death has been imposed. Accordingly, we agree with the Court of Criminal Appeals that the sentence of death imposed in this case is disproportionate to the penalty imposed in similar cases. We therefore affirm the decision of the Court of Criminal Appeals modifying the sentence for the defendant's first degree murder conviction to life imprisonment without the possibility of parole. *See* Tenn.Code Ann. § 39-13-206(d).

*Conclusion*

After carefully reviewing the record and the relevant legal authorities, we conclude that the Court of Criminal Appeals correctly found the sentence of death disproportionate and correctly modified the defendant's sentence to life imprisonment without the possibility of parole. We reverse that portion of the Court of Criminal Appeals' decision setting aside the defendant's separate conviction for aggravated child abuse. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Presiding Judge Gary R. Wade and joined in by Judge James Curwood Witt and Judge Norma McGee Ogle.

ADOLPHO A. BIRCH, JR., J., concurs and dissents.

ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

****27** The majority has today, for the first time, found the sentence of death to be disproportionate to the penalty imposed in similar cases and, as a consequence, has modified the defendant's sentence to life imprisonment without the possibility of parole. I concur in this result. If, however, there are those who would trumpet the majority opinion as proof positive that the proportionality protocol facts, receive sentences of life imprisonment (with or without parole). Using the appropriate protocol, a properly conducted proportionality review responds to this problem by permitting the judiciary to engage in a "judicial field leveling" process, for lack of a better description. Thus, proportionality review serves a crucial role as an "additional safeguard against arbitrary or capricious sentencing." *State v. Bland,* 958 S.W.2d 651, 663 (Tenn.1997). In a line of dissents beginning with *State v. Chalmers,* I have identified three perceived flaws in the protocol currently embraced by the majority: (1) the proportionality test is overbroad; (2) the "pool" of cases used for comparison is inadequate; and (3) the review is too subjective. *See* 28 S.W.3d 913, 923 (Tenn.2000) (Birch, J., concurring and dissenting). I continue to offer my objections to the majority analysis in the hope that comparative proportionality review may be reformed to more effectively fulfill the goals for which it was intended.

In order to remedy the first of these perceived flaws, the overbreadth of the protocol, I submit that the protocol should be refined to more accurately identify disproportionate sentences. The majority holds a sentence is disproportionate only if the case under review "is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." *Bland,* 958 S.W.2d at 665. Even if a defendant can show that others received life sentences for similar crimes and no discernible basis exists to distinguish the cases, the sentence will "not necessarily [be found] disproportionate." *Id.* This test, however, does not seem reliably gauged to identify *disproportionate* sentences. Under the current protocol, a sentence may be found "proportionate" based on minimal similarities to a prior death penalty case even if the defendant can point to similar cases in which a life sentence was imposed. "Proportionality" implies consistency and balance in sentencing, neither of which is accomplished when distinguishable penalties are imposed in indistinguishable cases.

****28** Other jurisdictions provide models for a more meaningful and objective proportionality protocol. In these jurisdictions, the circumstances of each case are analyzed to determine whether its characteristics are *more consistent* with other capital cases wherein a death sentence has been imposed. Typical of those jurisdictions is New Jersey, whose Supreme Court has stated that "[a] capital sentence is excessive and thus disproportionate if other defendants with characteristics similar to those of the defendant ... generally receive sentences other than death for committing factually-similar crimes in the same jurisdiction." *New Jersey v. DiFrisco,* 142 N.J. 148, 662 A.2d 442, 448 (1995) (citing *New Jersey v. Martini,* 139 N.J. 3, 651 A.2d 949 (1994)

circumstances as objectively as possible, is more consistent with the circumstances of similar capital cases and capital defendants wherein the death penalty was not imposed.

Reforming the test used to identify disproportionate sentences, however, is but one part of the analysis. If proportionality review is to be effective, this Court also must ensure that relevant cases are not omitted from the comparison pool. Concerning the paucity of the pool, in *Bland,* I expressed grave concern that the pool of cases used by the majority in comparative proportionality review analysis was too small. 958 S.W.2d at 679 n. 1 (Birch, J., concurring and dissenting). I reiterate that concern today. I would expand the pool to include, at a minimum, all cases in which the defendant has been convicted of first degree murder regardless of penalty. Ideally, however, the pool should include all cases in which the defendant was initially indicted for a capital offense. In determining proportionality, one must compare all similar crimes and defendants, not just those defendants whose prosecution is more vigorously pursued by the State. Omitting cases in which the death penalty was not sought skews the proportionality analysis, for similar life cases upon which the defendant otherwise could rely often will be excluded. (FN1) While it is acceptable and appropriate that the State should have discretion in seeking the death penalty, it is neither logical nor appropriate for the State to indirectly determine, by the use of prosecutorial discretion, the cases this Court ultimately may consider in determining comparative proportionality aspects of an individual defendant's death sentence.

****29** Other states have approved comparison of all death-eligible cases regardless of whether the death penalty was sought. *See, e.g., New Jersey v. Morton,* 165 N.J. 235, 757 A.2d 184, 189 (2000) (holding that the court would "consider all death-eligible cases, whether or not they were capitally prosecuted, because the State's decision not to prosecute the defendant capitally does not necessarily reflect on the defendant's lack of deathworthiness"); *Washington v. Brown,* 132 Wash.2d 529, 940 P.2d 546, 561 (1997) ("This pool of similar cases includes those in which the death penalty was sought and those in which it was not."); *see also Tichnell,* 468 A.2d at 18 (Md.1983) (including in the pool cases in which the State sought the death penalty, but noting that "we do not preclude any defendant ... [from arguing] that designated non-capital murder cases are similar to the case then under scrutiny and should be taken into account"). Only by implementing such a standard will the Court ensure that our protocol provides a reliable proportionality assessment.

flaws exist in the Rule 12 database. *See* John Shiffman, *Missing Files Raise Doubts About Death Sentences,* The Tennessean (Nashville), July 22, 2001, at A1. The majority's admission that "Rule 12 reports have not been filed in every prior case" is, at best, a substantial understatement. Shiffman writes, "Three of every five first-degree murder convictions [for which a report was required] are missing from the database. So, too, is one of every five death penalty cases, records show. What's more, hundreds of cases included in the database ... are missing important details about the crime, defendant, and victim." *Id.* As irony would have it, *State v. Bland,* 958 S.W.2d 651 (Tenn.1997), the case in which this Court unveiled the "preparation of a Tennessee CD Rom death penalty database which will be used [for proportionality analysis] by this Court and accessible to litigants," is not included in the database. More disturbingly, the fact that life cases are much more likely to be omitted from the database than death cases suggests that defendants are placed at a significant disadvantage in their effort to locate those cases upon which claims of disproportionality may be based. While "traditional research methods" may, as the majority suggests, supplement the Rule 12 reports, such methods are at once more expensive, time consuming, and difficult than a search of the Rule 12 database. Thus, the errors and omissions from the Rule 12 database, whether as extensive as suggested or not, present a very real obstacle for defendants. Moreover, the majority's platitudinous assertion that "experienced judgment and institutional knowledge" (FN2) will somehow overcome the flaws plaguing other facets of the proportionality analysis is likely to be of little comfort to defendants facing a review protocol which is already too subjective. In my view, the errors and omissions in the Rule 12 database, whether many or few, inject into this Court's proportionality review a real possibility of error. Until remedied, this flawed database stands as yet another obstacle to a fair and reliable comparative proportionality review in Tennessee.

****30** Beyond the test used in the majority protocol and the cases to be included in the comparison pool, there remains one additional area of concern in proportionality analysis-the lack of objectivity in identifying which cases are "similar" to the case under review for the purposes of proportionality analysis. I would provide a more objective means for identifying the cases to be used for comparison. As I stated in *Chalmers,* "[w]ithout some objective standard to guide reviewing courts, 'proportionality' becomes nothing more than a statement that the reviewing court was able to describe the case before it in terms comparable to other capital cases." 28 S.W.3d at 924 (Birch, J., concurring and dissenting). The approach taken in Washington may

538

select which cases should be used for comparison, thus lessening the inclination to subjectively characterize cases in order to reach desired results. Many factors recorded in the trial court's Rule 12 report in first degree murder cases, such as the number and type of aggravating and mitigating factors found by the jury, the defendant and victim's age, race, and gender, the existence or lack of prior convictions, and the number of victims, may be objectively quantified. A case which does not share a significant number of these objective criteria should be used only in rare instances. While more subjective factors such as motive and manner of death may further refine the comparison, these factors are too malleable to justify primary reliance. Emphasis on objective factors would ensure consistency in the review protocol.

The scope of the analysis employed by the majority appears to be rather amorphous and undefined-expanding, contracting, and shifting as the analysis moves from case to case. The difficulties inherent in applying this protocol become evident when applied to the case under submission. The majority lists several factors that it considered in its proportionality analysis. *Inter alia,* it notes that (1) the defendant reacted violently when the victim would not stop crying; (2) the defendant inflicted serious, and ultimately fatal, injuries; (3) the defendant's conduct was not provoked or justified; (4) the victim was helpless; (5) the killing did not appear to be premeditated; (6) the defendant was caring for the victim while the victim's mother was at work; and (7) the defendant delayed seeking assistance for the victim. *See* Majority op. at ----. All of these factors, however, are also present in *State v. Torres,* (FN4) one of the "death" cases the majority includes in its comparison pool. Indeed, except for one additional aggravating circumstance found by the jury (FN5) and evidence that the victim in *Torres* suffered prior abuse, the two cases are remarkably similar.

**31 While the victim in *Torres* may have suffered more serious abuse, the majority's conclusion that this case is "plainly lacking in circumstances" similar to *Torres* seems inconsistent with prior cases in which the majority has sometimes upheld death sentences by comparison to cases so widely divergent that they share no similarity but a single aggravating circumstance found by the jury. In *State v. Bane,* (FN6) for example, the defendant was convicted of choking and stabbing an elderly victim during a planned robbery; the Court upheld the death sentence on a finding that the case was not "plainly lacking in circumstances" with such cases as *State v. Vann,* (FN7) involving an eight-year-old victim killed during the perpetration of aggravated rape and [illegible] *State v. Hall,* (FN8) involving a defendant

would seem, may have been guided more by subjective, result-oriented judgment than by an objectively measurable evaluation of the pool of comparison cases.

In sum, then, I would reform the Court's review protocol as follows: First, in order to more reliably identify disproportionate sentences, I would ask whether the case under review was more consistent with "life" or "death" cases, rather than requiring that the case be "plainly lacking in circumstances" comparable to death penalty cases. Second, I would expand the pool of comparison cases to include all first degree murder cases, not just those cases in which the State chose to seek the death penalty, and I would revamp the Court's Rule 12 database to ensure that it is complete, reliable, and accurate. Finally, I would more heavily emphasize objectivity in selecting which cases are "similar" to the case under review for the purposes of comparison. The soundness of the changes I propose may be illustrated through application to the case under submission. This case may not plainly lack circumstances similar to *Torres,* but its objectively measurable aspects certainly are more consistent with the numerous "life" cases cited by the majority. In addition to those cases, I would also include several "life" cases in which the State did not seek the death penalty, thus further reinforcing the conclusion that the death sentence in the case under submission is comparatively disproportionate.

My research and review of the current Rule 12 database of capital cases reveals a number of first degree murder cases involving child abuse which were excluded from comparison by the majority because the State opted not to seek the death penalty. In *State v. Davis,* No. 02C01-9511-CR-00343, 1997 WL 287646 (Tenn.Crim.App.1997), the 22 month old victim, who had been left with the defendant while the victim's mother was at work, died of extreme injuries including organ contusions, broken ribs, broken blood vessels and cuts, bruises, and marks on the neck, face, and abdomen. The defendant originally claimed the victim was injured in a fall, but later admitted spanking and kicking the victim on multiple occasions. The defendant received a life sentence. In *State v. Rhodes,* No. M1999-959-CCA-R3-CD, 2000 WL 264327 (Tenn.Crim.App.2000), the 18 month old victim was brought to the hospital unconscious and in cardiac arrest, with extensive bruising to the arms, legs, and face. The victim died of blunt force trauma to the head. The defendant later confessed to beating the victim with a switch and striking him in the head. The defendant received a life sentence. In *State v. Anthony Hodges,* 7 S.W.3d 609 (Tenn.Crim.App.1999), (FN10) and *State v. Kena Hodges,* No. 01C01-9804-CR-00170, 1999 WL

53

M1999-00249-CCA-R3-CD, 2000 WL 218131 (Tenn.Crim.App.2000), the defendant babysat the victim while the victim's mother was at work. When the victim's mother returned home, the victim appeared sick. The victim stopped breathing the next day and was transported to the hospital, where she died. An autopsy revealed extensive contusions and scrapes to the head and multiple tears of the mesentery caused by blunt trauma to the abdomen. While left alone during a police interrogation, the defendant was videotaped talking to himself about punching the victim in the stomach. The defendant received a life sentence. In *State v. Burgess*, No. M1999-02040-CCA-R3-CD, 2001 WL 43216 (Tenn.Crim.App.2001), the 16 month old victim was briefly left unsupervised with the defendant by the victim's mother. The mother subsequently discovered the victim was unresponsive, lethargic, and unable to sit or stand. The victim was taken to the hospital, where she died; the cause of death was identified as massive internal bleeding caused by blows of considerable force to the abdomen. The defendant later confessed to hitting the victim in the stomach. The defendant received a life sentence. In *State v. Lacy*, 983 S.W.2d 686 (Tenn.Crim.App.1997), the defendant beat and abused the 5-year-old victim over an extended period of time. The victim was found dead after being left alone for the day with the defendant. The cause of death was determined to be multiple blunt force injuries which caused severe internal bleeding; the victim also had evidence **31 of burns, scratches, abrasions, scars, and fractures. One doctor testified that the victim had suffered the most severe blunt trauma injuries he had ever seen. The defendant received a sentence of life without the possibility of parole. In *State v. Shephard*, No. E2000-00628-CCA-R3-CD, 2001 WL 767010 (Tenn.Crim.App.2001), (FN11) the victim began crying uncontrollably and showing signs of sickness after being left unsupervised with the defendant. The victim's sickness grew progressively worse. The victim's mother then left the victim unsupervised with the defendant again the following night, and at some point in the evening, the defendant appeared at a hospital with the victim, who was not breathing and had no pulse. The defendant claimed he "accidentally hit [the victim] on the back of the head with a little [toy] TV." The victim died from a cerebral hemorrhage and extensive bilateral hemorrhage in the back layer of both eyes. The victim also suffered from two broken ribs caused by "enormous pressure of squeezing." The defendant received a sentence of life without the possibility of parole.

**32. When the facts of the case under submission are compared to the cases listed above and to those cases listed by the majority in which the defendant received a death sentence, (FN12) it is clear that the

In light of the issues I have discussed above, I continue to be dissatisfied with the comparative proportionality review protocol embraced by the majority. Until the flaws in our review protocol are corrected, I am constrained to hold that comparative proportionality review, as applied by the majority, "creates an impression of enormous regulatory effort but achieves negligible regulatory effects." *Cf.* Carol S. Steiker and Jordan M. Steiker, *Sober Second Thoughts: Reflections on Two Decades of Constitutional Regulation of Capital Punishment*, 109 Harv. L.Rev. 355 (1995) (generally discussing capital punishment). Accordingly, I respectfully dissent.

(FN1.) Tenn.Code Ann. § 39-13-204(i)(1).

(FN2.) At this time, Ms. Marshall's other children were visiting her mother.

(FN3.) Ms. Marshall testified that she was gone six minutes. The defendant stated that she was gone three minutes at most.

(FN4.) The defendant did not accompany Ms. Marshall to the emergency room because he was not dressed and because he had to arrange care for Christian's daughter who had remained with Ms. Marshall after Christian went home.

(FN5.) A CAT scan, or computerized axial tomography, involves the use of x-rays to gather "anatomical information from a cross-sectional plane of the body...." Steadman's Medical Dictionary 1459 (5th ed.1984).

(FN6.) *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(FN7.) *People v. Holt*, 15 Cal.4th 619, 63 Cal.Rptr.2d 782, 937 P.2d 213 (1997) (holding that the failure to record statements did not violate the due process clause of either the state or federal constitution); *People v. Raibon*, 843 P.2d 46 (Colo.Ct.App.1992) (holding that the failure to videotape or audiotape the defendant's statements did not violate the defendant's due process rights under the Colorado Constitution); *Coleman v. State*, 189 Ga.App. 366, 375 S.E.2d 663 (1988) (holding that police were not required to electronically record the defendant's custodial statements in order for the statements to be admissible); *State v. Kekona*, 77 Hawai'i 403, 886 P.2d 740 (1994) (holding that the failure to electronically record custodial interrogation was not a due process violation); *State v. Rhoades*, 120 Idaho 795, 820 P.2d 665 (1991) (holding that statements made in custody do not have to be tape-recorded in order to be admissible); *People v. Everette*, 187 Ill.App.3d 1063, 135 Ill.Dec. 472,

that custodial statements did not have to be suppressed even though they were not electronically recorded); *People v. Fike,* 228 Mich.App. 178, 577 N.W.2d 903 (1998)(holding that the due process clause of the Michigan Constitution does not require the recording of custodial confessions); *Williams v. State,* 522 So.2d 201 (Miss.1988)(refusing to require electronic recording of custodial interrogation as a prerequisite to admissibility); *Commonwealth v. Craft,* 447 Pa.Super.371, 669 A.2d 394 (Pa.Super.Ct.1995) (holding that the Pennsylvania Constitution does not require recording of custodial interrogations); *State v. James,* 858 P.2d 1012 (Utah Ct.App.1993) (holding that the Utah Constitution does not require electronic recording of custodial interrogations); *State v. Gorton,* 149 Vt. 602, 548 A.2d 419 (1988) (refusing to adopt a constitutional rule requiring the taping of custodial interrogations); *State v. Kilmer,* 190 W.Va. 617, 439 S.E.2d 881 (1993) (holding that the due process clause of the West Virginia Constitution does not require that police electronically record custodial interrogations).

**32_ (FN8.) 1995 Tenn. Pub. Acts 460.

(FN9.) *See, e.g., Barnett,* 783 So.2d at 930-31 (applying the merger doctrine where the first degree felony murder statute allowing conviction based upon certain enumerated felonies and "any other felony clearly dangerous to human life"); *Hansen,* 36 Cal.Rptr.2d 609, 885 P.2d at 1025-1026 (applying the merger doctrine where the second degree felony murder statute authorized conviction for a killing committed during any felony inherently dangerous to human life); *Foster v. State,* 264 Ga. 369, 444 S.E.2d 296, 297 (1994) (applying the merger doctrine where a first degree felony murder statute authorized a conviction for a killing committed during the perpetration of "a felony"); *People v. Morgan,* 307 Ill.App.3d 707, 240 Ill.Dec. 725, 718 N.E.2d 206, 209 (1999) (applying the merger doctrine where a first degree felony murder statute authorized conviction for a killing committed during the perpetration of any forcible felony); *Commonwealth v. Wade,* 428 Mass. 147, 697 N.E.2d 541, 545-546 (1998) (applying the merger doctrine where the first degree felony murder statute authorized conviction for a killing committed during the perpetration of any felony punishable by life imprisonment); *Campos,* 921 P.2d at 1270-1272 (applying the merger doctrine where the first degree felony murder statute did not enumerate possible predicate felonies); *State v. Branch,* 244 Or. 97, 415 P.2d 766, 767 (1966)(applying the merger doctrine where the second degree felony murder statute authorized conviction for a killing during the perpetration of any felony other than those

(FN11.) The statute under which Godsey was convicted provides in pertinent part as follows:

"(a) First degree murder is ... (2) A killing of another committed in the perpetration of or attempt to perpetrate ... aggravated child abuse...." Tenn.Code Ann. § 39-13-202(a)(2) & (b).

(FN12.) *Cf.* footnote 3 in *State v. James Lloyd Julian, II,* No. 03C01-9511-CV-00371, 1997 WL 412539 (Tenn.Crim.App., July 24, 1997) (suggesting that the trial court might err if it allowed a jury considering the death penalty to consider aggravating circumstance (i)(1) where the indictment charged rape of a child or especially aggravated kidnapping as the underlying felony of felony murder).

(FN13.) In its entirety the statute provides:

(a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:

(1) The act of abuse or neglect results in serious bodily injury to the child; or

(2) A deadly weapon is used to accomplish the act of abuse.

(b) A violation of this section is a Class B Felony; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

(FN14.) In so stating we are aware that aggravated child abuse is punishable as a Class A felony if the victim is under six years of age. In fact, in *Ducker,* this Court held that when the State is invoking this enhanced punishment portion of the aggravated child abuse statute, the age of the victim is an essential element of the Class A felony, aggravated child abuse, and as such, must be charged to the jury. *Id.,* 27 S.W.3d at 899. The defendant in *Ducker* had been convicted of two counts of aggravated child abuse. Therefore, the key issue was the appropriate felony classification for purposes of sentencing. However, when the State is seeking a conviction for felony murder by aggravated child abuse, the enhanced punishment portion of the aggravated child abuse statute is not relevant. If the defendant is found guilty of felony murder by aggravated child abuse, the sentencing provisions for first degree murder will apply, not the sentencing provisions for aggravated child abuse. Therefore, the age of the victim contained in subsection (b) of the aggravated child abuse statute is not an

Sess. Laws 127 (S.B.1302) (same); 1992 Md. Laws 331 (H.B.590) (same); 1985 Nev. Stat. 527 (same); 1985 Okla. Sess. Laws, Ch. 265, § 1 (same); 1997 Pa.Legis.Serv. Act 1997-28, § 1 (S.B.423) (same); Wyo. Stat. § 6-4-103(d) (same).

(FN16.) *Gregg,* 428 U.S. at 206, 96 S.Ct. at 2940; *Bland,* 958 S.W.2d at 665; *State v. Webb,* 238 Conn. 389, 680 A.2d 147, 211 (1996); *State v. Welcome,* 458 So.2d 1235, 1258 (La.1983); *Tichnell,* 468 A.2d at 15; *State v. McNeill,* 346 N.C. 233, 485 S.E.2d 284, 289 (1997); *State v. Bey,* 137 N.J. 334, 645 A.2d 685 (1994); *State v. Rhines,* 548 N.W.2d 415, 457 (S.D.1996); *Pirtle,* 127 Wash.2d 628, 904 P.2d 245, 276 (1995).

(FN17.) As pointed out in *Bland,* defendants are not precluded from relying upon and utilizing the entire "universe" of first degree murder cases when attempting to establish a claim for selective prosecution under the Equal Protection Clause, *see Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). *See Bland,* 958 S.W.2d at 666, n. 17.

(FN18.) Of the twenty states which still require comparative review, only three states include in the pool all death-eligible homicide convictions or indictments. *See* Ga.Code Ann. § 17-10-37(a); *State v. Martin,* 376 So.2d 300, 312-13 (La.1979); N.Y. Jud. Law § 211 a (death-eligible indictments). New Hampshire has not defined the pool for comparison because it has no one on death row, even though it has a capital sentencing scheme. Of the remaining sixteen states, eight limit the pool for comparison to cases in which a death sentence actually has been imposed. *See Beck v. State,* 396 So.2d 645, 664 (Ala.1980); *Williams v. State,* 437 So.2d 133, 137 (Fla.1983); *Gall v. Commonwealth,* 607 S.W.2d 97 (Ky.1980) ; *King v. State,* 421 So.2d 1009 (Miss.1982); *State v. Palmer,* 224 Neb. 282, 399 N.W.2d 706, 733 (1986); N.J. Stat. Ann. § 2C:11-3; *State v. Steffen,* 31 Ohio St.3d 111, 509 N.E.2d 383, 395 (1987); *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63 (1982). Eight other states consider cases in which a capital sentencing hearing actually was held and death was a sentencing option, regardless of the sentence actually imposed. *See Flamer v. State,* 490 A.2d 104, 139 (Del.1983); *State v. Whitfield,* 837 S.W.2d 503, 515 (Mo.1992) (en banc); *State v. Smith,* 280 Mont. 158, 931 P.2d 1272, 1285 (1996); *State v. Garcia,* 99 N.M. 771, 664 P.2d 969 (1983); *State v. Williams,* 308 N.C. 47, 301 S.E.2d 335, 355 (1983); *Rhines,* 548 N.W.2d at 455 (S.D.1996); *Jenkins v. Commonwealth,* 244 Va. 445, 423 S.E.2d 360, 371 (1992); Wash. Rev.Code Ann. §

available in June of 1999, the only available source for attorneys statewide to review the Rule 12 Reports was in the Appellate Court Clerk's Office in Nashville.

(FN21.) *Cazes,* 875 S.W.2d at 270-71.

(FN22.) As the North Carolina Supreme Court noted in *State v. Williams,* 308 N.C. 47, 301 S.E.2d 335, 355 (1983), "[e]ven those with extensive training in data collection and statistical evaluation and analysis are unable to agree concerning the type of statistical methodology which should be employed if statistical or mathematical models are adopted for purposes of proportionality review." (Citing Baldus, Pulaski, Woodworth and Kyle, *Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach,* 33 Stan. L.Rev. 1 (1980); Dix, *Appellate Review of the Decision to Impose Death,* 68 Geo. L.J. 97 (1979)).

(FN23.) The dissent asserts that our discussion of *Middlebrooks* and *Teel* is inappropriate because they are not "similar" cases as required by statute. We agree with the dissent that these cases are not factually similar to the case under consideration; however, they were relied upon by the defendant to illustrate that every other capital case in Tennessee involving a child victim is much more aggravated than the killing in the instant case. Given the defendant's assertion, our consideration of every prior capital case involving minor victims is appropriate.

(FN24.) We do not agree with the dissent's assertion that discussion of *Torres* in this case "may be problematic" since *Torres* will be reviewed by this Court pursuant to Tenn.Code Ann. § 39-13-206(a)(1)(2000). As previously stated, the pool of similar cases for comparison includes all first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and a sentencing jury determines whether the sentence should be life, life without the possibility of parole, or death. Whether or not an appeal is taken and whether or not any appeal taken is concluded is not relevant to determining which cases are included in the pool. Comparative proportionality review focuses upon the sentencing decisions made by jurors across the State in similar cases, involving similar defendants. *Torres* clearly is a part of the pool for purposes of comparative proportionality review, and therefore may appropriately be considered and discussed, regardless of the status of any appeal. We emphasize that our discussion of *Torres* does not constitute a judgment or prejudgment of the validity of his conviction or sentence. It is pertinent here because it is a similar case in which

that prosecutors in some counties frequently seek the death penalty in cases for which prosecutors of other counties do not seek the death penalty. While this conclusion is admittedly unscientific, there exists at least the possibility that a given defendant's chances of receiving the death penalty may depend more upon the county where the crime occurred than upon the nature of the crime itself. The legislature has expressed its intent, in the Criminal Sentencing Reform Act of 1989, that defendants be fairly and consistently treated and that "unjustified disparity in sentencing" be eliminated. *See* Tenn.Code Ann. § 40-35-102(2), (3) (2000); *see also id.* § 40-35-103(3)(noting that "[i]nequalities in sentences that are unrelated to a purpose of [the Sentencing Reform Act] should be avoided"). Thus, under principles espoused in the Sentencing Reform Act, this Court should strive to ensure that inconsistencies in death sentencing such as regional disparities in prosecutorial decision-making are corrected. It is difficult, however, for this Court to squarely address whether the death penalty is being inconsistently applied if comparative proportionality review cannot take into account those cases in which prosecutors choose not to seek the death penalty.

**32_ (FN2.) Majority op. at ----.

(FN3.) This is not to say that the Court must engage in complex statistical analysis in order to conduct a reliable proportionality review. A statistical analysis likely would result in a significant increase in expense and complexity without appreciably increasing the overall reliability of the review. New Jersey, for example, has implemented a statistical protocol based upon a complex, subdivided database of capital cases, but the small sample size of the comparison pool and problems inherent in quantifying such abstractions as motive and type of murder have forced the Court to focus upon a precedent-seeking process similar to that used in Tennessee. *See generally New Jersey v. Loftin,* 157 N.J. 253, 724 A.2d 129, 148-52 (1999) ("Because frequency analysis is statistically based, and because conclusions drawn from small sample sizes are inherently unreliable, we have not had confidence in the results produced by the models.").

(FN4.) No. E1999-00866-CCA-R3-DD, 2001 WL 245137 (Tenn.Crim.App.2001). The death sentence imposed in *Torres* is presently before this Court on automatic appellate review pursuant to Tenn.Code Ann. § 39-13-206(a)(1) (2000). That review is currently pending. I note in passing that it may be problematic for this Court to rely upon *Torres* in its proportionality analysis when we have not yet decided whether the death sentence imposed in *Torres* is proportionate.

(FN5.) The jury in *Torres* found the aggravating factors listed at Tenn.Code Ann. § 39-13-204(i)(1) (1993) ("victim was less than twelve years of age, and the defendant was eighteen years of age or older") and Tenn.Code Ann. § 39-13-204(i)(5) ("especially heinous, atrocious or cruel in that [the killing] involved torture or serious physical abuse beyond that necessary to produce death"). *Torres,* 2001 WL 245137 at *1.

(FN6.) 57 S.W.3d 411 (Tenn.2001).

(FN7.) 976 S.W.2d 93 (Tenn.1998).

(FN8.) 958 S.W.2d 679 (Tenn.1997).

(FN9.) 959 S.W.2d 503 (Tenn.1997).

(FN10.) This case is missing from the Rule 12 database.

(FN11.) This case is missing from the Rule 12 database.

(FN12.) Moreover, I question whether some of the "death" cases relied upon by the majority are sufficiently similar to merit comparison to the case under submission. For instance, when the objectively measurable details of *State v. Middlebrooks* and *State v. Teel* are examined, it becomes apparent that these cases bear little relationship to the circumstances of Godsey's case. Both of these cases involved teenage victims rather than infants, the jury in both cases found the "heinous, atrocious, or cruel" aggravating circumstance that was not found in this case, both cases involved brutal rapes, and neither case involved circumstances typically found in child abuse cases. As the majority correctly notes, no two cases are exactly alike, and therefore any one of these distinctions in isolation might not render a case "dissimilar." The multitude and significance of the dissimilar factors in *Middlebrooks* and *Teel,* however, are sufficient to make those cases inappropriate in light of the statutory requirement that proportionality analysis be restricted to "similar cases." *See* Tenn.Code Ann. § 39-13-206(c)(1)(D) (2000).

*411 57 S.W.3d 411

Supreme Court of Tennessee
at Jackson.

STATE of Tennessee
v.
John Michael BANE.
July 3, 2001.

Defendant was convicted in the Criminal Court, Shelby County, John P. Colton, Jr., J., of murder in the first degree in the perpetration of a robbery, and was sentenced to death, and he appealed. The Supreme Court, O'Brien, J., 853 S.W.2d 483, affirmed conviction but remanded for resentencing. On remand, jury again imposed sentence of death, and defendant appealed. The Court of Criminal Appeals affirmed, and case was docketed for automatic review. The Supreme Court, Anderson, C.J., held that: (1) jury was properly instructed as to use of accomplice testimony; (2) accomplice's mental and psychological records were cumulative to his own testimony and were properly excluded; (3) court's refusal to exempt defendant's expert witness from rule of witness sequestration was harmless error; (4) evidence of defendant's relationships with several women was admissible to rebut defendant's mitigating evidence concerning his marriage and children; (5) prosecutor's references to defendant as co-defendant's "sweetheart" during closing argument were not improper; (6) evidence supported application of all aggravating circumstances; and (7) death penalty was not disproportionate.

Affirmed.

Birch, J., concurred in part and dissented in part with opinion.

West Headnotes

[1] Criminal Law 🔑510
110 ----
110XVII Evidence
110XVII(S) Testimony of Accomplices and Codefendants
110XVII(S)2 Corroboration
110k510 Necessity.
Conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense.

[2] Sentencing and Punishment 🔑1756
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1756 In General.

No statutory provision requires corroboration of an accomplice's testimony for the finding of an aggravating circumstance in the sentencing phase of a capital trial; statute governing the admissibility of evidence in the sentencing phase of a capital trial contains no express provision regarding the corroboration of accomplice testimony and instead affords the trial court wide discretion in ruling upon the admissibility of evidence. T.C.A. § 39-13-204(c).

[4] Sentencing and Punishment 🔑1756
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1756 In General.
There is no basis or rationale for applying the corroboration requirement in a capital sentencing proceeding; in a capital sentencing proceeding, the defendant has already been convicted of the offense, and the testimony of any accomplice has been subject to the corroboration requirement during the guilt phase of the trial.

[5] Criminal Law 🔑510
110 ----
110XVII Evidence
110XVII(S) Testimony of Accomplices and Codefendants
110XVII(S)2 Corroboration
110k510 Necessity.
Purpose of the corroboration requirement is to assure that a conviction is not predicated solely upon the testimony of a witness who was also involved in the commission of the offense.

[6] Sentencing and Punishment 🔑1756
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1756 In General.
Capital sentencing scheme as a whole contains numerous specific provisions to ensure a high degree of reliability in deciding whether a death sentence is appropriate, obviating the need for corroboration of an accomplice's testimony at sentencing. T.C.A. §§ 39-2-203(g), 39-2-205(c) (Repealed).

[7] Sentencing and Punishment 🔑1780(3)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)3 Hearing
350Hk1780 Conduct of Hearing
350Hk1780(3) Instructions.

*1517225 Only the Westlaw citation is currently available.

Supreme Court of Tennessee,
at Knoxville.

STATE of Tennessee
v.
Bobby G. GODSEY.
Nov. 29, 2001.

Defendant was convicted following jury trial in the Criminal Court, Sullivan County, R. Jerry Beck, J., of first degree felony murder by aggravated child abuse and of aggravated child abuse and was sentenced to death. Defendant appealed. The Court of Criminal Appeals, Wade, P.J., affirmed conviction for first degree murder, modified sentence for that offense to life imprisonment without possibility of parole, and vacated conviction for aggravated child abuse. Granting applications by both sides for permission to appeal, the Supreme Court, Frank F. Drowota, III, C.J., held that: (1) neither State nor Federal Constitution requires electronic recording of custodial interrogations; (2) statute defining offense of first degree murder by aggravated child abuse did not violate due process by requiring, as culpable mental state, only that the aggravated child abuse be committed knowingly; (3) merger doctrine did not bar conviction for first degree murder by aggravated child abuse; (4) aggravated child abuse is not a lesser included offense of felony murder, and dual convictions for those offenses are permissible; (5) aggravating circumstance that murder was committed against a person less than 12 years of age meaningfully narrows class of death-eligible defendants in prosecutions for first-degree murder by aggravated child abuse; (6) out-of-state cases should not be included in the pool of similar cases for purposes of comparative proportionality review of death sentence; and (7) death sentence was disproportionate to sentences imposed in similar capital cases involving child victims.

Judgment of Court of Criminal Appeals affirmed in part, reversed in part.

Adolpho A. Birch, Jr., J., filed a concurring and dissenting opinion.

West Headnotes

[1] Criminal Law 🔑412(4)
110 ----
110XVII Evidence
110XVII(M) Declarations
110k411 Declarations by Accused
110k412 In General
110k412(4) Circumstances Affecting Admissibility in General.
Neither the State nor the Federal Constitution requires electronic recording of interrogations.

[2] Criminal Law 🔑412(4)
110 ----
110XVII Evidence
110XVII(M) Declarations
110k411 Declarations by Accused
110k412 In General
110k412(4) Circumstances Affecting Admissibility in General.
Sound policy considerations, including reducing the amount of time spent in court resolving disputes over what occurred during an interrogation, would support the adoption of electronically recording custodial interrogations as a law enforcement practice.

[3] Constitutional Law 🔑50
92 ----
92III Distribution of Governmental Powers and Functions
92III(A) Legislative Powers and Delegation Thereof
92k50 Nature and Scope in General.
Determination of public policy is primarily a function of the legislature.

[4] Constitutional Law 🔑70.1(10)
92 ----
92III Distribution of Governmental Powers and Functions
92III(B) Judicial Powers and Functions
92k70 Encroachment on Legislature
92k70.1 In General
92k70.1(7) Particular Subjects, Application to
92k70.1(10) Crimes.
Issue of whether electronic recording of custodial interrogations should be required is one more properly directed to the General Assembly than to courts.

[5] Constitutional Law 🔑258(3.1)
92 ----
92XII Due Process of Law
92k256 Criminal Prosecutions
92k258 Creation or Definition of Offense
92k258(3) Particular Statutes and Ordinances
92k258(3.1) In General.

[See headnote text below]

[5] Homicide 🔑8
203 ----
203II Murder
203k8 Statutory Provisions.
Statute defining offense of first degree murder by aggravated child abuse did not violate due process by requiring, as culpable mental state, only that the aggravated child abuse be committed knowingly. U.S.C.A. Const.Amend. 14; T.C.A. § 39-13-202(a)(2), (b), 39-15-402.

[6] Sentencing and Punishment 🔑1678
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1678 Extreme or Reckless Indifference.
"Knowing" conduct that is required as culpable mental state for aggravated child abuse also meets the lower standard of reckless indifference for human life that is required in order to permit imposition of death penalty for first degree murder by aggravated child abuse. T.C.A. §§ 39-11-106(a)(20), 39-13-202(a)(2), (b), 39-15-402.

[7] Criminal Law 🔑30
110 ----
110I Nature and Elements of Crime
110k30 Merger of Offenses.
Merger doctrine, barring use of felony murder rule

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

when the underlying felony directly results in, or is an integral part of, the homicide, is a rule of statutory construction, not a principle of constitutional law, and applies only when the legislature has not enumerated the felonies that will support a conviction for felony murder.

[8] Criminal Law 30
110 ----
110I Nature and Elements of Crime
110k30 Merger of Offenses.
Where a legislature explicitly states that a particular felony is a predicate felony for felony-murder, no "merger" of the offenses occurs.

[9] Criminal Law 30
110 ----
110I Nature and Elements of Crime
110k30 Merger of Offenses.
Merger doctrine did not bar conviction for first degree murder by aggravated child abuse, though charge carried death penalty; General Assembly expressed unmistakable intent to have aggravated child abuse qualify as a felony capable of supporting conviction of first degree felony murder. T.C.A. § 39-13-202(a)(2), (b), 39-15-402.

[10] Constitutional Law 258(3.1)
92 ----
92XII Due Process of Law
92k256 Criminal Prosecutions
92k258 Creation or Definition of Offense
92k258(3) Particular Statutes and Ordinances
92k258(3.1) In General.

[See headnote text below]

[10] Homicide 18(1)
203 ----
203II Murder
203k18 Homicide in Commission of or Intent to Commit Other Offense
203k18(1) In General.
For purposes of predicating felony murder on aggravated child abuse, there is no due process requirement that the aggravated child abuse substantially increase the risk of harm over and above that necessarily present in the crime itself. U.S.C.A. Const.Amend. 14; T.C.A. § 39-13-202(a)(2), (b), 39-15-402.

[11] Double Jeopardy 150(2)
135H ----
135HV Offenses, Elements, and Issues Foreclosed
135HV(A) In General
135Hk139 Particular Offenses, Identity of
135Hk150 Homicide
135Hk150(2) Felony-Murder or Misdemeanor-Manslaughter Prosecution.
Generally, a defendant can be tried and convicted for first degree felony murder and the underlying felony in a single trial without violating the constitutional prohibitions against double jeopardy. U.S.C.A. Const.Amend. 5.

[12] Double Jeopardy 150(2)
135H ----
135HV Offenses, Elements, and Issues Foreclosed
135HV(A) In General
135Hk139 Particular Offenses, Identity of
135Hk150 Homicide
135Hk150(2) Felony-Murder or Misdemeanor-Manslaughter Prosecution.
Double jeopardy does not require dismissal or merger of underlying felony in felony murder prosecution where the two statutes on which charges are based are directed to separate evils. U.S.C.A. Const.Amend. 5.

[13] Double Jeopardy 150(2)
135H ----
135HV Offenses, Elements, and Issues Foreclosed ***1517225**
135HV(A) In General
135Hk139 Particular Offenses, Identity of
135Hk150 Homicide
135Hk150(2) Felony-Murder or Misdemeanor-Manslaughter Prosecution.
Key issue in determining whether double jeopardy principles preclude dual convictions for felony murder and the underlying felony is whether the legislature intended cumulative punishment. U.S.C.A. Const.Amend. 5.

[14] Statutes 186
361 ----
361VI Construction and Operation
361VI(A) General Rules of Construction
361k180 Intention of Legislature
361k186 Cases and Matters Omitted.
Omissions are significant when statutes are express in certain categories but not others.

[15] Statutes 212.1
361 ----
361VI Construction and Operation
361VI(A) General Rules of Construction
361k212 Presumptions to Aid Construction
361k212.1 Knowledge of Legislature.
General Assembly is presumed to know the state of the law at the time it acts.

[16] Criminal Law 29(14)
110 ----
110I Nature and Elements of Crime
110k29 Different Offenses in Same Transaction
110k29(5) Particular Offenses
110k29(14) Homicide.

[See headnote text below]

[16] Indictment and Information 191(4)
210 ----
210XIII Included Offenses
210k191 Different Offense Included in Offense Charged
210k191(4) Charge of Homicide.
Aggravated child abuse is not a lesser included offense of felony murder, and dual convictions for those offenses are permissible. T.C.A. §§ 39-13-202(a)(2), (b), 39-15-402.

[17] Sentencing and Punishment 1618
350H ----
350HVIII The Death Penalty
350HVIII(A) In General
350Hk1613 Requirements for Imposition
350Hk1618 Narrowing Class of Eligible Offenders.
For purposes of Eighth Amendment prohibition against cruel and unusual punishment, aggravating circumstance that murder was committed against a person less than 12 years of age and defendant was

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

18 years of age or older sufficiently and meaningfully narrows the class of death-eligible defendants, even defendants who have been convicted of felony murder in the perpetration of aggravated child abuse. U.S.C.A. Const.Amend. 8; T.C.A. §§ 39-13-202(a)(2), (b), 39-13-204(i)(1).

[18] Sentencing and Punishment 1482
350H ----
350HVII Cruel and Unusual Punishment in General
350HVII(E) Excessiveness and Proportionality of Sentence
350Hk1482 Proportionality.
Eighth Amendment proportionality analysis is the abstract evaluation of the appropriateness of a sentence for a particular crime. U.S.C.A. Const.Amend. 8.

[19] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.

[See headnote text below]

[19] Sentencing and Punishment 1788(7)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(7) Presumptions.
Statutory comparative proportionality review presumes that death penalty is not disproportionate to the crime in the traditional sense; it purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime. T.C.A. § 39-13-206(c)(1)(D).

[20] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Comparative proportionality review of a death sentence is not a constitutional imperative or mandate, but is instead a creature of statute. T.C.A. § 39-13-206(c)(1)(D).

[21] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Supreme Court employs the precedent-seeking method of analysis when conducting comparative proportionality review of death sentence; this approach requires careful consideration and examination of the case on appeal and other cases in which the defendants were convicted of the same or similar crimes, with attention to the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved. T.C.A. § 39-13-206(c)(1)(D).

[22] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Function of Supreme Court in performing comparative proportionality review of death sentence is not to search for proof that sentence is perfectly symmetrical with the penalty imposed in all other first degree murder cases, but to identify and invalidate the aberrant death sentence. T.C.A. § 39-13-206(c)(1)(D).

[23] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
In conducting comparative proportionality review of death sentence, state Supreme Court does not act as a "super jury," nor does it second-guess the jury's decision. T.C.A. § 39-13-206(c)(1)(D).

[24] Sentencing and Punishment 1657
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1657 Proportionality in General.
If capital murder case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed, the sentence of death is disproportionate. T.C.A. § 39-13-206(c)(1)(D).

[25] Sentencing and Punishment 1657
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1657 Proportionality in General.
When the sentencing jury is properly instructed by the trial court and appropriately considers the evidence of aggravating and mitigating circumstances under a statutory scheme that is constitutional, disproportionate death sentences should be the rare exception, not the norm. T.C.A. § 39-13-206(c)(1)(D).

[26] Sentencing and Punishment 1657
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1657 Proportionality in General.
Fact that no death sentence had previously been invalidated as disproportionate in state was an indication that state's capital sentencing scheme was functioning properly. T.C.A. § 39-13-206(c)(1)(D).

[27] Sentencing and Punishment 1788(6)
350H ----
350HVIII The Death Penalty

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Comparative proportionality review is a final safeguard in the initial appellate process to ensure that no aberrant death sentence is affirmed. T.C.A. § 39-13-206(c)(1)(D).

[28] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
State Supreme Court selects similar cases for comparative proportionality from a pool that includes only those first degree murder cases in which state seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death, regardless of the sentence actually imposed. T.C.A. § 39-13-206(c)(1)(D).

[29] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality. ***1517225**
Because the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar are those in which imposition of the death penalty was properly before the sentencing authority for determination. T.C.A. § 39-13-206(c)(1)(D).

[30] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Not included in the pool of similar cases, for purposes of comparative proportionality review of death sentence, are first degree murder cases in which state did not seek the death penalty or first degree murder cases in which a sentence other than death was agreed upon as part of a plea bargaining agreement. T.C.A. § 39-13-206(c)(1)(D).

[31] Sentencing and Punishment ⚿38
350H ----
350HI Punishment in General
350HI(B) Extent of Punishment in General
350Hk38 Proportionality to Offense.

[See headnote text below]

[31] Sentencing and Punishment ⚿60
350H ----
350HI Punishment in General
350HI(C) Factors or Purposes in General
350Hk60 Plea Bargain or Other Agreement.
When a defendant pleads guilty, he or she extends a substantial benefit to the criminal justice system, and in exchange, the state is entitled to extend a less harsh sentence than might otherwise be given if the case is submitted to a jury; therefore, while the sentence imposed as part of a plea agreement likely will be less harsh than the sentence imposed by a jury after a trial and sentencing hearing, it does not follow that the less harsh sentence resulting from the plea renders the jury sentence aberrant or disproportionate.

[32] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Comparative proportionality review of death sentences is not, and was never intended to be, a vehicle for reviewing the exercise of prosecutorial discretion. T.C.A. § 39-13-206(c)(1)(D).

[33] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Even if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where reviewing court can discern some basis for the lesser sentence imposed in other case. T.C.A. § 39-13-206(c)(1)(D).

[34] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the death penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice. T.C.A. § 39-13-206(c)(1)(D).

[35] Sentencing and Punishment ⚿1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
State Supreme Court draws on the experienced judgment and institutional knowledge of its members when evaluating the comparative proportionality of a death sentence; such institutional knowledge is an important tool for purposes of comparative proportionality review. T.C.A. § 39-13-206(c)(1)(D).

[36] Sentencing and Punishment ⚿1788(6)
350H ----

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
In conducting comparative proportionality review of death sentence, state Supreme Court does not employ a statistical analysis that attempts to quantify the various factors leading to imposition or non-imposition of the death penalty. T.C.A. § 39-13-206(c)(1)(D).

[37] Sentencing and Punishment ⚿ 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Comparative proportionality review of death sentence is not a rigid, objective test that employs mathematical or scientific techniques. T.C.A. § 39-13-206(c)(1)(D).

[38] Sentencing and Punishment ⚿ 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
In comparing similar cases during a comparative proportionality review of death sentence, state Supreme Court considers many variables including: (1) means of victim's death; (2) manner of death; (3) motivation for the killing; (4) place of death; (5) similarity of victims' circumstances including age, physical and mental conditions, and victims' treatment during the killing; (6) absence or presence of premeditation; (7) absence or presence of provocation; (8) absence or presence of justification; and (9) injury to and effects on nondecedent victims. T.C.A. § 39-13-206(c)(1)(D).

[39] Sentencing and Punishment ⚿ 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
For purposes of comparative proportionality review of death sentences, several criteria are relevant to a comparison of the characteristics of defendants which include: (1) defendant's prior criminal record or prior criminal activity; (2) defendant's age, race, and gender; (3) defendant's mental, emotional, or physical condition; (4) defendant's involvement or role in murder; (5) defendant's cooperation with authorities; (6) defendant's remorse; (7) defendant's knowledge of helplessness of victim; and (8) defendant's capacity for rehabilitation. T.C.A. § 39-13-206(c)(1)(D).

[40] Sentencing and Punishment ⚿ 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Out-of-state cases should not be included in the pool of similar cases for purposes of comparative proportionality review of death sentences. T.C.A. § 39-13-206(c)(1)(D).

[41] Sentencing and Punishment ⚿ 1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.
Reviewing the record in each case in isolation is not the appropriate analysis when conducting comparative proportionality review of a death sentence. T.C.A. § 39-13-206(c)(1)(D).

[42] Sentencing and Punishment ⚿ 1657
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in General
350Hk1657 Proportionality in General.
Death sentence, imposed for first degree murder by aggravated child abuse on defendant who threw seven-month-old victim onto floor, was disproportionate to death sentences imposed in other cases involving child victims, where defendant had no history of abusing victim and had previously ***1517225** treated victim with affection, eventually admitted his actions, appeared remorseful, was the only person sentenced to death in the state based solely on aggravating circumstance that victim was less than 12 years old, and offered mitigation evidence of unstable childhood in poor, dysfunctional family. T.C.A. §§ 39-13-202(a)(2), (b), 39-13-204(i)(1), 39-13-206(c)(1)(D), 39-15-402.

Stephen M. Wallace, District Public Defender, Blountville, Tennessee and James T. Bowman, Johnson City, Tennessee, for the appellant/appellee, Bobby G. Godsey.

Paul G. Summers, Attorney General & Reporter; Michael Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; H. Greeley Wells, District Attorney General; and Barry Staubus, Assistant District Attorney General, for the appellee/appellant, State of Tennessee.

OPINION

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER and WILLIAM M. BARKER, JJ. joined.

**1 Bobby G. Godsey was convicted of first degree felony murder during the perpetration of aggravated child abuse. Following a sentencing hearing, the jury imposed a sentence of death upon finding that the single aggravating circumstance, "[t]he murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older," (FN1) outweighed mitigating circumstances beyond a reasonable doubt. The defendant was also convicted of aggravated child abuse, and the trial court imposed a consecutive sentence of twenty-five years for this conviction. The Court of Criminal Appeals reversed Godsey's conviction for aggravated child

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

abuse, concluding that the General Assembly did not intend to permit a separate conviction and punishment for aggravated child abuse when the defendant has been convicted of first degree felony murder during the perpetration of aggravated child abuse. The Court of Criminal Appeals affirmed Godsey's conviction for first degree murder. However, the Court of Criminal Appeals found the sentence of death comparatively disproportionate to the penalty imposed in similar cases and modified Godsey's sentence to life imprisonment without the possibility of parole. Both **Godsey** and the **State** filed applications for permission to appeal, which were granted by this Court. After carefully reviewing the record and the relevant legal authorities, we affirm that portion of the Court of Criminal Appeals' decision finding the sentence of death disproportionate and modifying the defendant's sentence to life imprisonment without the possibility of parole. We reverse that portion of the Court of Criminal Appeals' decision finding dual convictions for felony murder by aggravated child abuse and aggravated child abuse inappropriate and reinstate the defendant's separate conviction and sentence for aggravated child abuse. In all other respects, the decision of the Court of Criminal Appeals is affirmed.

*Guilt Phase Proof*

The proof offered during the guilt phase of the trial demonstrates that during the fall of 1995, the defendant, twenty-two-year-old Bobby Godsey, moved into an apartment with his girlfriend, Robin Marshall, and her three children: five-year-old Ginger, four-year-old Dylan, and seven-month-old Evan Price, the victim in this case. On January 1, 1996, Ms. Marshall spent the day with her children and her friend, Christy Christian, and Christian's children. Godsey arrived home from work around 4:30 p.m. A short time later, Ms. Marshall left the victim alone with Godsey while she drove Christian to her apartment on the other side of the complex. (FN2) When Ms. Marshall returned a short time later, (FN3) the victim was lying on her bed. She offered to put the victim to bed in his crib, but the defendant said he would do it. Ms. Marshall went downstairs and began preparing dinner. Godsey came downstairs a short time later, and Ms. Marshall and Godsey watched a videotaped movie for approximately one hour. When Godsey went upstairs around 7:15 p.m. to wake the victim for dinner, he discovered the victim was not breathing. Godsey brought the victim downstairs, and while Ms. Marshall called 911, the defendant attempted CPR. Because the hospital was next door to the apartment complex, Ms. Marshall decided to drive the victim to the hospital herself. (FN4) When Ms. Marshall arrived at the hospital, the victim was not breathing and his heart was not beating. He had vomit on his face, and small bruises on his jaw, forehead, and ear, but he was not bleeding externally. After approximately 27 minutes, medical personnel successfully resuscitated him and inserted an endotracheal tube. X-rays revealed a "twist-type" fracture of the victim's arm above the right elbow and suggested a skull fracture. X-rays also revealed that the endotracheal tube was not properly positioned and therefore was not properly ventilating both lungs. The tube was retracted to correct the problem.

**2 Because further tests were needed, the victim was transferred to the pediatric intensive care unit at the Johnson City Medical Center. A CAT (FN5) scan revealed three skull fractures, two on one side and one on the other side of the back half of the victim's skull. The scan also showed moderately severe to severe brain swelling. Further medical examinations revealed bilateral retinal hemorrhages.

Ms. Marshall and the defendant spent the night and most of the next day at the hospital waiting for news about the victim. At noon on January 2, Detective Darla Anderson of the Kingsport Police Department came to the hospital and interviewed Godsey about the victim's injuries. He told Detective Anderson that for approximately five months he had lived with Ms. Marshall and her three children. He stated that he provided care for the children in the evenings from 8:00 or 9:00 p.m. until approximately 10:45 or 11:00 p.m., while Ms. Marshall worked. Godsey admitted that he had put the victim down for a nap before going downstairs to watch a movie with Ms. Marshall, but Godsey said the victim was fine at that time. When Godsey returned an hour later, he noticed the victim was not breathing. Godsey suggested that the victim's arm may have been injured when Godsey moved him onto the toddler bed and unsuccessfully attempted CPR. Godsey said some "yellow stuff" came out of the victim's mouth, but the victim was not breathing. Godsey then carried the victim downstairs and asked Ms. Marshall to call 911.

Later that afternoon, Detective Anderson drove to the victim's apartment and met Godsey as he was returning to the hospital. Godsey drove back to the apartment and allowed Detective Anderson to inspect and photograph the victim's bedroom, even though Detective Anderson did not have a search warrant. Detective Anderson photographed the room and noted that the crib was located approximately two feet from the toddler bed and that the toddler bed was approximately six inches from the floor. Detective Anderson found toys scattered inside the crib and stains on the sheet. Detective Anderson did not notice any blood or damaged items in the room. Godsey also allowed Detective Anderson to remove the crib sheet and blanket from the victim's bed, and Godsey gave Detective Anderson the t-shirt he had worn the previous day. Godsey explained that the victim had been teething, his gums had been bleeding, and the t-shirt had the victim's teething blood on it. Godsey also told Detective Anderson about the victim vomiting in the car on the way to the emergency room, and Detective Anderson photographed the stains. Detective Anderson stated that the defendant freely provided information and described him as cooperative at the time she examined the apartment. At trial, the State offered DNA test results to show that the stains on the crib sheet and on the defendant's t-shirt were blood stains and that the blood had come from the victim. However, hospital personnel testified that the victim was not bleeding externally when he arrived at the emergency room, and the autopsy showed no signs of external bleeding.

**3 Godsey returned to the hospital after speaking with Detective Anderson, and later that evening, around 6 p.m., life support was withdrawn because the victim was brain dead. Hospital

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

personnel testified that both Ms. Marshall and Godsey were distraught and upset about the child's death.

An autopsy revealed that the victim had suffered a severe blow to the back of his head, causing skull fractures, brain swelling, and a lack of oxygen to the brain, which led to his death. Bleeding into the soft tissue of the scalp around the fractures was also discovered, but no intracranial bleeding was present, and no bone displacement was detected. The autopsy confirmed that the skull fractures and the arm fracture occurred at approximately the same time. In addition, the autopsy revealed a laceration of one of the victim's intervertebral discs. The autopsy also revealed that the victim was suffering from hypostatic pneumonia, which occurs when the brain is so damaged that it cannot produce coughing or clear secretions. In this case, the condition was worsened because a small amount of vomit had been inhaled into the victim's lungs. The autopsy revealed no evidence of prior injuries or abuse.

Ms. Marshall and Godsey returned to their apartment after the victim died, and shortly thereafter, officers of the Kingsport Police Department arrived and asked them to come to the police department for further interviews. After being advised of his *Miranda* (FN6) warnings, Godsey signed a waiver, agreeing to talk to police. Godsey's recollection of the events leading up to Ms. Marshall's departure from the apartment was consistent with his earlier statement. He again initially denied any wrongdoing. Eventually, however, Godsey revealed that, during the short time Ms. Marshall had been gone, he had become angry and had physically abused the victim because he would not stop crying.

Godsey, however, gave the police several differing accounts of what had happened. In three very similar statements, Godsey said that he had been swinging the victim by his ankles to stop his crying and had hit the victim's head on the toddler bed rail and his head and arm on the floor. In another statement, which he prefaced by saying, "I'm going to tell you the truth," Godsey admitted he became irritated by the victim's crying, grabbed him by the arm and leg, jerked him out of the crib, even though the child's arm was caught between the crib railing, and threw the victim toward the toddler bed, two feet away. The victim missed the bed, landed on the tile floor, slid under the bed, and hit the wall. Following a break in the interview, Godsey gave a final statement, which was reduced to writing and signed at 3:40 a.m. In it, the defendant said that, angered by the victim's crying, he squeezed the victim's head between his biceps and forearm for about ten seconds, until the victim stopped crying. When he stopped squeezing, the victim was huffing short breaths. Nonetheless, the defendant claimed that the child was still breathing when the defendant returned him to his crib. When asked by the officers why he had given so many differing statements about the incident, Godsey responded, "I wanted it to look like an accident." Godsey was immediately arrested for the murder of Evan Price.

**4 The State offered several medical expert witnesses including, Dr. Bickley Craven, who treated the victim at Holston Valley Hospital. Dr. Craven confirmed that the victim had been treated with an antibiotic for sinusitis some twelve days before this incident, and at that time, there was no evidence of abuse. Dr. Craven also testified that the child's medical records from the Family Practice Center, where the child had been seen several times for ear and respiratory infections, did not indicate prior abuse.

Dr. Mohon, a pediatric physician who treated the victim at the Johnson City Medical Center, opined that most of the explanations given by the defendant could not have caused the victim's severe injuries. However, he testified that the injuries were consistent with the account that the defendant had grabbed the victim by the arm and leg, caught the victim's arm in the crib railing, and then thrown the victim so forcefully that he hit the tile floor and slid under the bed and against the wall. However, Dr. Mohon acknowledged that there was no sign of older injuries indicative of previous child abuse and conceded that the injuries could have been caused by reckless or grossly negligent behavior.

Testifying for the defense, Ms. Marshall, the victim's mother, said the defendant usually was responsible for the care of her children between 8:00 and 10:30 p.m. each night, that he had a good relationship with the victim and with her other two children, and that she had not seen or heard the defendant abuse the victim on the night of the incident, although she conceded that she did not know what occurred while she was driving her friend home. Ms. Marshall testified that the victim suffered frequent respiratory infections, and at the time of this incident, he had been cutting teeth, which caused his gums to bleed. She said that the blood stains on the defendant's t-shirt came from the victim's bleeding gums. She asserted that the defendant had never struck the victim or been "mean to him."

Daniel Christian, a friend and former roommate and co-worker of the defendant, testified that the defendant loved the victim and had served in a "fatherly role" to the victim, providing both monetary and emotional support. Christian recalled that the defendant had turned down his invitation to attend the Citrus Bowl in Florida so that he could spend the holidays with Ms. Marshall and her children.

The defendant's employer, Silas Jenkins, characterized the defendant as an excellent worker. Jenkins had seen the defendant with the victim on two occasions and noticed the defendant had a good relationship with the victim and provided good care to the victim.

Christy Christian, a neighbor and friend, testified that the defendant had always been kind with the children, providing for them financially. She said the defendant had an especially good relationship with the victim, treating the victim as his own child. Christian heard the defendant playing with the victim just before she left with Ms. Marshall to go to her own apartment on the evening the incident occurred.

**5 Scotty Trivett, who had been at the hospital on the night the victim was admitted, testified that the victim's head struck the hospital door when Ms. Marshall jerked it open and carried the victim

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

inside, screaming for help. Trivett also testified that the defendant arrived at the hospital about thirty minutes later, very upset, crying and hugging Ms. Marshall. Trivett called police to report what he had witnessed when he heard a television account indicating that the defendant had been charged with murder. On cross-examination, Trivett acknowledged that the victim appeared to be dead when Ms. Marshall carried him into the hospital.

Ruby Metros, an oncology social worker at the Johnson City Medical Center, stayed with Ms. Marshall and the defendant throughout most of the day on January 2, 1996. She testified that, at times, they appeared relatively calm, and at other times, they appeared very upset. Metros said the defendant was very emotional when he learned that the victim would be disconnected from life support and when he was allowed to go into the victim's hospital room for the last time.

Dr. Geoffrey Boercker, a specialist in trauma medication, testified that most of the victim's brain injuries were caused by heart stoppage and that the arm fracture probably occurred around the time of the cardiac arrest. He opined that the victim's torn disc could have been caused by the victim striking the metal frame on the toddler bed. Dr. Boercker also testified that misplacement of the endotracheal tube lessened what little chance the victim had for survival. Dr. Boercker noted that the victim had, in fact, been teething at the time of his death. Dr. Boercker testified at length as to the various classes of injuries associated with an abused child and noted an absence of any of these injuries and of any indication of prior abuse. Dr. Boercker also noted the absence of either epidural or subdural hematomas, which are normally present in severe deceleration head injuries. The absence of these injuries led Dr. Boercker to conclude that the victim's death was caused by a cardiopulmonary arrest rather than "traumatic brain injury, child abuse/non-accidental trauma," as noted by the autopsy. Dr. Boercker said that the head trauma in this case was not severe enough to cause a cardiac arrest. Dr. Boercker opined that the head trauma likely caused vomiting, which resulted in a laryngospasm that closed the victim's airways and caused respiratory arrest, and eventually, cardiac arrest. Dr. Boercker conceded that even if his opinion as to cause of death is correct, the head trauma precipitated the cardiopulmonary arrest, which caused the victim's death.

In rebuttal, Dr. William McCormick, the medical examiner who performed the autopsy, testified that the victim's spinal injury and broken arm had occurred simultaneously with the cardiopulmonary arrest. Dr. McCormick also stated that the victim's death was not caused by aspirating vomit because the victim had only a small amount of vomit in his lungs. On cross-examination, Dr. McCormick opined that the injuries sustained by the victim could have been the result of either reckless or intentional conduct.

**6 Based upon this proof, the jury found the defendant guilty of first degree murder by aggravated child abuse and aggravated child abuse. The trial proceeded to the sentencing phase on the first degree murder conviction.

*Sentencing Phase Proof*

The State presented no further proof at the sentencing hearing, relying upon the proof at trial to establish the single aggravating circumstance, "[t]he murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." Tenn.Code Ann. § 39-13-204(i)(1).

The defendant presented the testimony of several witnesses, all of whom testified about his background and life. The defendant had suffered an unstable childhood in a poor, dysfunctional family that moved frequently. The defendant had moved at least ten times by age seventeen. He had been trapped in a house fire at the age of four; and his father was an alcoholic, who became emotionally abusive upon discovering that the defendant's mother had a child as the result of an extramarital affair. The defendant's parents divorced when he was five years old, and his father had provided no financial or emotional support to the defendant thereafter. The defendant's step-father also abused alcohol and was emotionally abusive toward the defendant, often totally ignoring the defendant, who looked like his biological father, while showering attention on the defendant's brother and sister.

The defendant was of above average intelligence and performed very well in elementary school. He was described by his teachers as a sweet child, very shy, studious, but accident-prone. When the defendant was thirteen years old, his mother began caring for a baby girl, the child of a friend. The defendant was left on his own and began using alcohol and marijuana. By fourteen, the defendant was adjudged a delinquent and lived in a juvenile home for several months. He was released to return to his own high school by his sophomore year, but he did not perform well. His grades were very poor, and he skipped school a great deal. He quit school during his junior year of high school and began working. He was seriously involved with his girlfriend and was devastated when she moved. She was pregnant with his child when she left, but the defendant was not aware of the pregnancy. She returned when the child was two and one-half months old and left the child with the defendant and his mother. The defendant helped his mother care for the baby, and he bought the child diapers and other needed items. The defendant and his family cared for the child for six and one-half months, but when the child was eight and one-half months old, the child's mother took the baby on the pretext of having a photograph taken and never returned. Later, the defendant's mother learned from a newspaper notice that the child had been placed for adoption. The defendant's mother wrote a letter, but was informed that she had no legal right or claim to the child. The defendant and his family never saw the child again. The defendant's mother said the child's adoption had a devastating effect on the defendant.

**7 Later, the defendant attempted to join the army with his best friend. The defendant scored very high on the recruitment screening test, but he was seventeen years old and needed parental consent to complete the process. The defendant was very disappointed when his father refused to give his consent, and the defendant was unable to join when

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

he turned eighteen because the military had changed its policy by that time and would not accept persons who had no high school diploma. Since turning eighteen, the defendant has been convicted of joyriding, driving under the influence of an intoxicant, underage possession of alcohol, and driving on a revoked license-all misdemeanor offenses. The defense rested after the defendant's mother testified, expressing love for her son and asking the jury to spare his life.

The trial court instructed the jury as to the single aggravating circumstance and as to seventeen mitigating circumstances raised by the evidence. The jury determined that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt and sentenced the defendant to death. The trial court imposed a consecutive twenty-five-year sentence for the aggravated child abuse conviction.

As stated, the Court of Criminal Appeals affirmed the first degree murder conviction, but found the death sentence disproportionate and modified the sentence to life imprisonment without the possibility of parole. The Court of Criminal Appeals also vacated the conviction for aggravated child abuse, finding no legislative intent to permit a separate conviction and punishment for aggravated child abuse when the defendant has been convicted of first degree felony murder during the perpetration of aggravated child abuse. We granted both the State's and the defendant's applications for permission to appeal and now affirm in part and reverse in part the decision of the Court of Criminal Appeals.

*Electronic Recording of Statement*

When initially interviewed by the police, the defendant denied knowing anything about how the victim sustained the injuries resulting in his death. Questioning proceeded and the defendant gave about nine different versions of what occurred. One of the officers present during the interrogation testified that the defendant prefaced the eighth version by saying he was "going to tell ... the whole truth." The defendant then acknowledged that he had attempted to throw the victim onto the bed, that the victim missed, hit the floor, slid under the bed, and hit the wall. This account, the eighth version, was most consistent with the physical injuries sustained by the victim. After this statement, there was a break in the interview, and when it resumed, the defendant refused to sign the written statement recounting the eighth version. Instead, he maintained that he did not throw the victim but had squeezed the victim's head in an effort to stop his crying, and he signed a written statement to this effect. No part of the interrogation was electronically recorded. The detectives acknowledged that they could have easily obtained a tape recorder, but explained that "we don't normally, as a rule, record our interviews."

****8** As in the Court of Criminal Appeals, the defendant contends in this Court that his statements to the police should have been suppressed because they were not electronically recorded. He relies upon decisions from two other state supreme courts requiring that custodial interrogations be recorded. *See Stephan v. State,* 711 P.2d 1156 (Alaska 1985); *State v. Scales,* 518 N.W.2d 587 (Minn.1994).

In *Stephan,* the Alaska Supreme Court held that the failure of police to create an electronic recording of a custodial interrogation occurring in a place of detention generally violates the due process rights of a suspect under the Alaska Constitution. *Stephan,* 711 P.2d at 1159. Specifically, the court found that because of its ease and inexpense, particularly in the context of custodial interrogations in detention facilities, recording "is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." *Id.* at 1159-60. The Alaska court concluded that absent a justifiable excuse, the failure to record a custodial interrogation will render any statement received therein inadmissible during trial. *Id.*

The Minnesota Supreme Court imposed a similar electronic recording obligation pursuant to its supervisory powers. *Scales,* 518 N.W.2d at 592. In establishing this prospective rule, the Minnesota Supreme Court concluded that statements obtained from a suspect in substantial violation of the recording requirement would be suppressed. *Id.* at 592. Unlike the Alaska Supreme Court, the Minnesota Supreme Court refused to determine whether the Minnesota Constitution supported imposition of the requirement.

The defendant admits that there is no authority in Tennessee requiring that interrogations be electronically recorded. The defendant relies upon *State v. Livesay,* 941 S.W.2d 63, 65 (Tenn.Crim.App.1996), which held that refusing to allow a defendant to obtain an independent blood analysis in a drunk driving prosecution is tantamount to suppression of evidence favorable or useful to the defense and is a violation of a defendant's statutory and due process rights. The defendant asserts that the failure of the officers in this case to electronically record the interrogation violated his due process rights by denying him the only opportunity to have an exact record of what he said to the police.

In our view, the Court of Criminal Appeals properly distinguished *Livesay.* There, independent blood tests were necessary to enable the defendant to test the accuracy of and to rebut the State's proof. Here, in contrast, the defendant does not ask that evidence be preserved; he asks that it be gathered in a certain form. The evidence is not lost merely because the interrogation was not recorded. The officers were present at the interrogation, and more importantly, the defendant was present at the interrogation. Lack of an electronic recording did not preclude the defendant from challenging the accuracy of the officers' recollection of the interrogation.

****9** [1][2][3][4] Moreover, as the Court of Criminal Appeals observed, neither the state nor the federal constitution requires electronic recording of interrogations. We have found at least fifteen other states that have declined to impose such a requirement when faced with the issue. (FN7) *See* Daniel Donovan & John Rhodes, *Comes a Time: The Case for Recording Interrogations,* 61 Mont. L.Rev. 223, 232, n. 52 (Winter 2000). There can be little doubt that electronically recording custodial interrogations would reduce the amount of time

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

spent in court resolving disputes over what occurred during the interrogation. As a result, the judiciary would be relieved of much of the burden of resolving these disputes. In light of the slight inconvenience and expense associated with electronically recording custodial interrogations, sound policy considerations support its adoption as a law enforcement practice. However, "[t]he determination of public policy is primarily a function of the legislature." *Griffin v. Shelter Mut. Ins. Co.,* 18 S.W.3d 195, 200-01 (Tenn.2000). As we commented in *State v. Odom,* 928 S.W.2d 18, 23-24 (Tenn.1996), the issue of electronically recording custodial interrogations "is one more properly directed to the General Assembly." *Id.* The defendant's claim that his statement should have been suppressed because it was not electronically recorded is without merit.

*Constitutionality of the Felony Murder Statute*

The next general issue raised by the defendant is whether the 1995 amendment (FN8) to Tennessee's first degree murder statute violates due process or amounts to cruel and unusual punishment under the state and federal constitutions. Specifically, the statute under which the defendant was prosecuted and convicted provides in pertinent part as follows:

> (a) First degree murder is ... (2) A killing of another committed in the perpetration of or attempt to perpetrate ... aggravated child abuse .... (b) No culpable mental state is required for conviction under subdivision (a)(2) ... except the intent to commit the enumerated offenses or acts in such subdivisions.

Tenn.Code Ann. § 39-13-202(a)(2) & (b). Prior to 1995, aggravated child abuse was not one of the enumerated felonies capable of supporting a charge or conviction of first degree felony murder. Additionally, between 1989 and 1995, the required mental state for felony murder was recklessness. Tenn.Code Ann. 39-13-202(a)(2) (1991 Repl.).

[5] The defendant first contends that by deleting the culpable mental state of reckless, the 1995 amendment rendered the statute unconstitutional. We disagree. In *State v. Barber,* 753 S.W.2d 659, 671 (Tenn.1988), this Court considered and upheld the constitutionality of the pre 1989 statute, which did not contain a culpable mental state. In *State v. Middlebrooks,* 840 S.W.2d 317, 336 (Tenn.1992), we reaffirmed our decision in *Barber* and upheld the constitutionality of the felony murder statute even though it did not contain a culpable mental state. Even more recently in *State v. Kimbrough,* 924 S.W.2d 888, 890 (Tenn.1996), we described the felony murder doctrine as follows:

> ****10** In the typical case of felony-murder, there is no malice in 'fact' with respect to the homicide; the malice is supplied by the 'law'. There is an intended felony and an unintended homicide. The malice which plays a part in the commission of the felony is transferred by law to the homicide. As a result of the fictional transfer, the homicide is deemed committed with malice.

Contrary to the defendant's assertion, the 1995 amendment to the first degree murder statute did not fundamentally change the felony murder doctrine so as to render the statute unconstitutional. With respect to the culpable mental state, the 1995 amendment merely returned the felony murder statute to its pre 1989 form. Moreover, like the other enumerated felonies, the predicate felony in this case, aggravated child abuse, includes a culpable mental state--"knowingly." Consistent with the traditional felony murder doctrine, the statute as amended in 1995 requires the State to prove that the predicate felony was committed with the applicable culpable mental state. Therefore, the defendant's claim that the statute violates due process by failing to include a culpable mental state is without merit.

[6] The defendant also asserts that because the killing in this case resulted from knowing conduct, the facts do not establish a "reckless disregard for human life," as required by *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), to constitutionally support imposition of the death penalty. We disagree. First, as the Court of Criminal Appeals also correctly pointed out, *Tison* involved defendants who themselves did not kill the victims. Here the defendant's own actions killed the victim. In *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court approved the imposition of the death penalty on the actual killer in a felony murder, and the Court in *Tison* reaffirmed this position with respect to participants in a felony murder who exhibit reckless indifference to human life. Furthermore, the culpable mental state for aggravated child abuse, "knowing," is a higher standard than "reckless indifference." *See* Tenn.Code Ann. § 39-11-106(a)(2)(20) (defining knowing). Therefore, the Court of Criminal Appeals correctly concluded that both the statutory elements and the facts of this case establish reckless indifference.

[7] The defendant's next argument is that the statute violates due process because the acts constituting the aggravated child abuse upon which the felony murder conviction is based are the same acts that caused the victim's death. The defendant contends that due process requires that the underlying felony be based upon acts separate from those causing death. The defendant points to other jurisdictions that apply the merger doctrine to preclude a felony murder conviction based on assaultive offenses. *See* *State v. Wanrow,* 91 Wash.2d 301, 588 P.2d 1320, 1322-1324 (1978); *see generally Annotation,* "Application of Felony Murder Doctrine Where the Felony Relied upon Is an Includible Offense with the Homicide," 40 A.L.R.3d 1341 (1971). The State responds that the merger doctrine is a rule of statutory construction, not a principle of constitutional law, and that the rule applies only when the legislature has not enumerated the felonies that will support a conviction for felony murder. We agree.

> ****11** Conceived in the nineteenth century, the merger doctrine was developed ... as a shorthand explanation for the conclusion that the felony-murder rule should not be applied in circumstances where the only underlying (or "predicate") felony committed by the defendant was *assault.* The name of the doctrine derived from the characterization of the assault as an offense that "merged" with the resulting homicide.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*People v. Hansen,* 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022, 1028 (1994) (emphasis in original). More broadly, "the merger doctrine bars the use of the felony murder rule when the underlying felony directly results in, or is an integral part of, the homicide." *Barnett v. State,* 783 So.2d 927, 930 (Ala.Crim.App.2000); *see also State v. Campos,* 122 N.M. 148, 921 P.2d 1266, 1270-72 (1996)(outlining varying applications of the merger doctrine in different jurisdictions).

[8] Courts have generally declined to hold that the merger doctrine implicates any principle of constitutional law. *See e.g., Rhode v.. Olk-Long,* 84 F.3d 284, 289 (8th Cir.1996)(rejecting the defendant's due process challenge to her conviction of felony murder based upon child endangerment because the argument lacked a constitutional basis, depending instead upon the merger doctrine); *State v. Lopez,* 174 Ariz. 131, 847 P.2d 1078, 1089 (1992)(observing that the court could conceive of no constitutional impediment "precluding the legislature from classifying child abuse that results in the death of the child as a predicate felony that triggers the felony-murder statute"); *Mapps v. State,* 520 So.2d 92, 93-94 (Fla.Dist.Ct.App.1988)(rejecting the argument that the felony murder statute that included aggravated child abuse as a predicate offense was unconstitutional); *State v. Tremblay,* 4 Or.App. 512, 479 P.2d 507, 511 (1971)(observing that the merger doctrine does not implicate any principle of constitutional law). Instead, courts have viewed the merger doctrine as a principle for discerning legislative intent and, more specifically, as a principle that preserves "some meaningful domain in which the Legislature's careful graduation of homicide offenses can be implemented." *Hansen,* 36 Cal.Rptr.2d 609, 885 P.2d at 1028. Accordingly, the merger doctrine has not been widely accepted. *See Cotton v. Commonwealth,* 35 Va.App. 511, 546 S.E.2d 241, 244 (2001). The doctrine has been applied largely in those states where the felony murder statute fails to specifically list the felonies capable of supporting a felony murder conviction. (FN9) Where a "legislature explicitly states that a particular felony is a predicate felony for felony-murder, no 'merger' occurs." *Lopez,* 847 P.2d at 1089; *see also Mapps,* 520 So.2d at 93; *Huntley v. State,* 271 Ga. 227, 518 S.E.2d 890, 893 (1999); *State v. Rhomberg,* 516 N.W.2d 803, 805 (Iowa 1994); *People v. Jones,* 209 Mich.App. 212, 530 N.W.2d 128, 129 (1995); *State v. Cromey,* 348 N.W.2d 759, 760 (Minn.1984); *Faraga v. State,* 514 So.2d 295, 302-03 (Miss.1987); *State v. Williams,* 24 S.W.3d 101, 115-17 (Mo.Ct.App.2000); *State v. McCann,* 907 P.2d 239, 241 (Okla.Crim.App.1995); *Tremblay,* 479 P.2d at 511; *see generally* 40 Am.Jur.2d. *Homicide* § 66 (1999).

****12** [9] As the Court of Criminal Appeals in this case recognized, the General Assembly has expressed an unmistakable intent to have aggravated child abuse qualify as a felony capable of supporting a conviction of first degree felony murder. Under such circumstances, the merger doctrine should not be applied to preclude a conviction for first degree felony murder, even though death is the consequence of an aggravated child abuse. The defendant's assertion that the merger doctrine bars his conviction for felony murder is without merit.

[10] Finally, the defendant argues that predicating felony murder on aggravated child abuse violates the due process restrictions of *State v. Anthony,* 817 S.W.2d 299, 306 (Tenn.1991), unless the aggravated child abuse substantially increases the risk of harm over and above that necessarily present in the crime itself. We disagree. In *Anthony,* this Court held that dual convictions for kidnapping and robbery are inappropriate if the kidnapping is essentially incidental to the robbery. In contrast, a murder qualifies as felony murder only if the underlying felony is closely connected to the killing in time, place, causation, and continuity of action. *State v. Pierce,* 23 S.W.3d 289, 295 (Tenn.2000). In other words, the felony murder doctrine requires that underlying felonies be "incidental" to the killing in time, place, causation, and continuity of action. *Id.* Applying *Anthony* as the defendant suggests would require rejection of this long-standing portion of the felony murder doctrine. The analysis employed in *Anthony* to determine the permissibility of dual convictions is simply inapplicable in the context of determining whether a felony may properly support a conviction of felony murder.

*Aggravated Child Abuse: Lesser Included Offense*

The State charged the defendant with both felony murder and aggravated child abuse, the felony upon which the murder charge was based. The jury convicted the defendant of both offenses, but the Court of Criminal Appeals set aside the conviction for aggravated child abuse, concluding that it is a lesser included offense of felony murder.

Initially we note that the issue presented in this case, whether dual convictions for felony murder and the predicate offense of aggravated child abuse are permitted under Tenn.Code Ann. § 39-13-202(a)(2), the felony murder statute, was expressly pretermitted in *State v. Ducker. See* 27 S.W.3d 889, 893, n. 2 (Tenn.2000). The issue in *Ducker* was whether aggravated child abuse was a lesser-included offense of reckless killing of a child, pursuant to Tenn.Code Ann. 39-13-202(a)(4) (1994), (FN10) the statute in effect at that time. This crime, reckless killing of a child, was defined in a statutory provision entirely separate and distinct from the statutory provision defining felony murder. As a result, we concluded that a legislative intent to permit dual convictions and sentences did not appear to be present under the 1994 reckless killing of a child provision. *Ducker,* 27 S.W.3d at 893. We acknowledged that the statute defining as first degree murder the reckless killing of a child by aggravated child abuse was adopted by the General Assembly in response to *State v. Kerry Phillip Bowers,* No. 115, 1989 WL 86576 (Tenn.Crim.App., filed Aug. 2, 1989), and that the statute was commonly known as the "Scotty Trexler Law." *Ducker,* 27 S.W.3d at 893. The intent of this provision, we found, was not to permit dual convictions but to punish the reckless killing of a child as first degree murder. *Id.* Accordingly, in the absence of legislative intent to the contrary, we found aggravated child abuse to be a lesser included offense of reckless killing of a child.

****13** However, in 1995, the General Assembly again amended the first degree murder statute by repealing the separate provision defining reckless killing of a child and by amending the felony murder

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

statute to add aggravated child abuse as one of the felonies capable of supporting a conviction of first degree felony murder. As previously stated, Godsey was prosecuted and convicted under the felony murder statute as amended in 1995. (FN11) Therefore, the issue in this appeal is whether, under the 1995 felony murder statute, dual convictions for felony murder by aggravated child abuse and aggravated child abuse are permissible.

The State contends that by adding aggravated child abuse to the list of felonies capable of supporting a conviction for felony murder, the Legislature expressed its intent to permit convictions and punishment both for felony murder and for the underlying felony, aggravated child abuse. In support of this argument, the State relies upon this Court's decision in *State v. Blackburn,* 694 S.W.2d 934, 936 (Tenn.1985), where this Court concluded that the Legislature intended to allow multiple convictions and punishments for felony murder and the underlying felony. The State points out that in *Blackburn* this Court observed that "[n]othing in the statutory definitions of murder in the first degree and of the felonies listed in [the felony murder statute] indicates a legislative intent that conviction and punishment for both offenses should not be permitted." *Id.* 694 S.W.2d at 937.

In response, the defendant says that the Court of Criminal Appeals correctly found that the General Assembly did not intend to permit dual convictions under these circumstances. In support of this argument, the defendant relies upon Tenn.Code Ann. § 39-15-401(d) which designates child abuse and neglect as a lesser included offense "of any kind of homicide." The defendant argues that if child abuse and neglect is a lesser included offense of homicide, then aggravated child abuse, which refers to the child abuse and neglect statute, also is a lesser included offense of homicide.

While agreeing that the General Assembly has designated child abuse and neglect a lesser included offense of any kind of homicide, the State argues that the General Assembly did not designate aggravated child abuse a lesser included offense of homicide. Therefore, according to the State, the Legislature did not intend to preclude dual convictions for felony murder and aggravated child abuse. As support for this assertion, the State points to this Court's comment in *Ducker,* 27 S.W.3d at 893, n. 1 (Tenn.2000): "[w]hile child abuse has been explicitly designated as a lesser-include offense 'of any kind of homicide' in Tenn.Code Ann. § 39-15-401(d), the legislature has not designated *aggravated* child abuse as a lesser-included offense of 'any kind of homicide.' " (Emphasis in original.)

[11][12][13] Generally, the State is correct in asserting that a defendant can be tried and convicted for first degree felony murder and the underlying felony in a single trial without violating the constitutional prohibitions against double jeopardy. *Blackburn,* 694 S.W.2d at 936-37. Indeed, double jeopardy does not require dismissal or merger where "the two statutes are directed to separate evils." *Blackburn,* 694 S.W.2d at 936 (citing *Albernaz v. United States,* 450 U.S. 333, 343, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981)); *see also State v. Denton,* 938 S.W.2d 373, 377 n. 11 (Tenn.1996); *State v. Lewis,* 919 S.W.2d 62, 69 (Tenn.Crim.App.1995). The key issue is "whether the legislature intended cumulative punishment." *Blackburn,* 694 S.W.2d at 936; *see also Denton,* 938 S.W.2d at 379. To determine legislative intent, we look to the language of the relevant statutes.

****14** Child abuse and neglect is defined by Tenn.Code Ann. § 39-15-401(a), which provides:

(a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused or neglected child is six years of age or less, the penalty is a Class D felony.

Subsections (b) and (c) of this statute are procedural in nature. Subsection (b) addresses the authority of juvenile courts to hear matters arising under this section, and subsection (c) states that the provisions of the section are supplementary or cumulative to other statutory provisions. Subsection (d) provides in relevant part that child abuse and neglect "may be a lesser included offense of any kind of homicide, statutory assault, or sexual offense if the victim is a child and the evidence supports a charge under this section." Tenn.Code Ann. § 39-15-401(d).

[14] Aggravated child abuse is governed by Tenn.Code Ann. § 39-15-402, which provides in relevant part as follows:

(a) A person commits the offense of aggravated child abuse or aggravated child neglect *who commits the offense of child abuse or neglect as defined in § 39-15-401 and:*

(1) The act of abuse or neglect results in serious bodily injury to the child; or

(2) A deadly weapon is used to accomplish the act of abuse.

(b) A violation of this section is a Class B Felony; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

(Emphasis added.) While the Legislature has specifically provided that child abuse and neglect "may be a lesser included offense of any kind of homicide," the aggravated child abuse statute is silent and contains no similar designation. "Omissions are significant when statutes are express in certain categories but not others." *Carver v. Citizen Util. Co.,* 954 S.W.2d 34, 35 (Tenn.1997). In addition, as the State contends, the aggravated child abuse statute incorporates only subsection (a), that portion containing the definition of child abuse and neglect. The aggravated child abuse statute does not even refer to subsection (d), the portion of the statute designating child abuse and neglect a lesser included offense of homicide. Given that subsection (a) is separate and distinct from subsection (d), incorporation of subsection (a) does not mean that subsection (d) has also been incorporated.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[15][16] Finally, and perhaps most importantly, this Court's decision in *Blackburn,* permitting dual convictions for felony murder and the underlying felony in the absence of a clearly expressed legislative intent to the contrary, was rendered in 1985. The General Assembly is presumed to know the state of the law at the time it acts. *See, e.g., Washington v. Robertson County,* 29 S.W.3d 466, 473 (Tenn.2000). Therefore, when the General Assembly amended the felony murder statute in 1995 to add aggravated child abuse to the list of felonies capable of supporting a felony murder conviction, the General Assembly is presumed to have known that dual convictions for felony murder and aggravated child abuse would be permissible in the absence of a clear intent to the contrary. Although the General Assembly specifically designated child abuse and neglect a lesser included offense of homicide, there is no similar designation for aggravated child abuse. Indeed, we have evaluated the relevant statutes and find no clearly expressed legislative intent to prohibit dual convictions. As previously stated, the key issue in multiple punishment cases is legislative intent. *Denton,* 938 S.W.2d at 379. Where the Legislature has indicated that cumulative punishment is intended, the double jeopardy analysis need not proceed any further. *Id.,* 938 S.W.2d at 379, n. 14. In this case, reading the child abuse and neglect, aggravated child abuse, and felony murder statutes together, we conclude that the legislative intent to allow cumulative punishment is clear. Therefore, we hold that aggravated child abuse is not a lesser included offense of felony murder and that dual convictions are permissible in this context. Accordingly, the judgment of the Court of Criminal Appeals vacating the defendant's aggravated child abuse conviction is reversed and the judgment of the trial court is reinstated.

*Aggravating Circumstance (i)(1)--Narrowing*

****15** Relying upon *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), the defendant next contends that the State may not seek the death penalty for a felony murder in the perpetration of aggravated child abuse where the sole aggravating circumstance is Tenn.Code Ann. § 39-13-204(i)(1)--"the murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." The defendant contends that the aggravating circumstance duplicates the age element of the offense of aggravated child abuse and therefore does not sufficiently narrow the class of death-eligible defendants under the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution. Acknowledging that this aggravating circumstance has been allowed to support a sentence of life without the possibility of parole for felony aggravated child abuse murder, *see State v. Lacy,* 983 S.W.2d 686, 696 (Tenn.Crim.App.1997), the defendant points out that *Middlebrooks* does not apply outside the death penalty context. *See State v. Butler,* 980 S.W.2d 359 (Tenn.1998). The defendant also relies upon a law review article which expressed the theory that *Middlebrooks* precludes the use of aggravating circumstance (i)(1) to impose the death penalty for felony murders based on aggravated child abuse. *See* Gary R. Wade, *The Trexler Saga: Hale & Middlebrooks,* 23 Mem. St. L.Rev. 319 (1993). (FN12)

The State contends that, unlike *Middlebrooks,* the (i)(1) aggravating circumstance at issue in this case provides meaningful narrowing because the underlying offense, felony murder by aggravated child abuse, applies to all defendants whose murder victims are under eighteen years of age, while the aggravating circumstance applies only to those defendants whose murder victims are under twelve years of age. The State asserts that by narrowing the class of murderers to those whose victims are under the age of twelve, the General Assembly has chosen to recognize the discrepancy in size, strength, and ability between victim and assailant, as well as the heightened vulnerability of younger children, who, generally are less able to defend themselves, describe their assailant, seek assistance, flee the attack, or even to articulate the nature of the crime. Given these factors, the State says that making those who kill such vulnerable victims death-eligible is more than reasonable and constitutes a meaningful narrowing of the class of all murderers.

We begin our analysis with *Middlebrooks,* where, a majority of this Court held that "when the defendant is convicted of first degree murder solely on the basis of felony murder," use of the felony murder aggravating circumstance is not permissible because it "does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution because it duplicates the elements of the offense." *Id.,* 840 S.W.2d at 346. In so holding, we observed that

> ****16** Automatically instructing the sentencing body on the underlying felony in a felony-murder case does nothing to aid the jury in its task of distinguishing between first-degree homicides and defendants for the purpose of imposing the death penalty. Relevant distinctions dim, since *all participants in a felony murder,* regardless of varying degrees of culpability, enter the sentencing stage with at least one aggravating factor against them.

*Id.* at 342 (emphasis added).

[17] To determine whether the concern addressed in *Middlebrooks* exists in this case, we must look again to the felony murder statute under which the defendant was convicted, which defines first degree murder as "[a] killing of another committed in the perpetration of or attempt to perpetrate ... aggravated child abuse...." Tenn.Code Ann. § 39-13-202(a)(2). Child abuse and neglect is defined as follows:

> (a) Any person who knowingly, other than by accidental means, treats *a child under eighteen (18) years of age* in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused or neglected child is six years of age or less, the penalty is a Class D felony.

Tenn.Code Ann. § 39-15-401(a) (emphasis added).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Child abuse becomes aggravated when the "act of abuse results in serious bodily injury to the child; or ... a deadly weapon is used." Tenn.Code Ann. § 39-15-402. (FN13) Under these statutes, felony murder by aggravated child abuse may be committed against a person less than eighteen years old. However, the (i)(1) aggravating circumstance applies only if the victim is less than twelve years old. Unlike the felony murder aggravating circumstance at issue in *Middlebrooks,* which applied equally to all felony murderers, the (i)(1) aggravating circumstance does not by its terms apply to all aggravated child abuse murderers. This aggravating circumstance simply does not duplicate the elements of the underlying offense, felony murder by aggravated child abuse. (FN14) It narrows the class of death-eligible defendants because it applies to only those defendants whose murder victims are less than twelve years of age. We agree with the State that, in adopting this aggravating circumstance, the General Assembly no doubt recognized that victims under twelve years of age are typically more vulnerable than those between thirteen and seventeen years of age. A younger victim is less able to defend himself or herself and less able to flee. The General Assembly reasonably concluded that persons who attack and abuse these young victims are among the most culpable murderers. *See, e.g.* *Gilson v. State,* 8 P.3d 883, 923 (Okla.Crim.App.2000) (finding legislative action that protects vulnerable children legally justified). Thus, we hold that the (i)(1) aggravating circumstance sufficiently and meaningfully narrows the class of death-eligible defendants, even defendants who have been convicted of felony murder in the perpetration of aggravated child abuse. *See also Ex parte Woodard,* 631 So.2d 1065, 1071-72 (Ala.1993) (upholding the constitutionality of a similar age of victim aggravating circumstance); *State v. Wood,* 132 Idaho 88, 967 P.2d 702, 716-17 (1998); (upholding a similar age of victim aggravating circumstance against a constitutional narrowing challenge); *People v. Rissley,* 165 Ill.2d 364, 209 Ill.Dec. 205, 651 N.E.2d 133, 152-53 (1995) (upholding a similar age of the victim aggravating circumstance); *State v. Wilson,* 685 So.2d 1063, 1071-72 (La.1996) (upholding a similar age of the victim aggravating circumstance).

*Statutory Comparative Proportionality Review*

**17 The Court of Criminal Appeals in a well-reasoned opinion concluded that the sentence of death in this case is disproportionate to the penalty imposed in similar cases. As a result, the Court of Criminal Appeals modified the sentence to life imprisonment without the possibility of parole. In this Court, the State argues that the Court of Criminal Appeals invaded the province of the jury in several respects when it held the defendant's sentence comparatively disproportionate under Tenn.Code Ann. 39-13-206(D). The defendant responds that the Court of Criminal Appeals properly concluded that a death sentence in this case is disproportionate. We agree.

[18][19] The Tennessee General Assembly has directed appellate courts reviewing capital cases to determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn.Code Ann. § 39-13-206(c)(1)(D). In *State v. Bland,* 958 S.W.2d 651 (Tenn.1997), we undertook an exhaustive analysis of this statutory provision that involved a full inquiry into the language, purpose, jurisprudential background, and legislative history of comparative proportionality review. We emphasized that statutory comparative proportionality is different from traditional Eighth Amendment proportionality analysis, which is the "abstract evaluation of the appropriateness of a sentence for a particular crime." *Pulley v. Harris,* 465 U.S. 37, 42-43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). In contrast, statutory comparative proportionality review "presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Bland,* 958 S.W.2d at 662 (Tenn.1997) (quoting *Pulley,* 465 U.S. at 42-43, 104 S.Ct. at 875-76). The United States Supreme Court has characterized statutory comparative proportionality review as "a check against the random or arbitrary imposition of the death penalty." *Gregg v. Georgia,* 428 U.S. 153, 206, 96 S.Ct. 2909, 2940-41, 49 L.Ed.2d 859 (1976).

[20] Comparative proportionality review, however, is not a constitutional imperative or mandate; it is instead a creature of statute. *Pulley,* 465 U.S. at 50-51, 104 S.Ct. at 879-80 ("There is ... no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); *Bland,* 958 S.W.2d at 663-64 ("While important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required."). Indeed, following the United States Supreme Court decision in *Pulley,* nine of the twenty-nine other states which initially conducted comparative proportionality review have either repealed the statutory provisions requiring it or have overruled court decisions mandating it. (FN15) Significantly, the Tennessee General Assembly has not seen fit to repeal the statute which directs this Court and the Court of Criminal Appeals to conduct comparative proportionality review in all death penalty cases. In addition, the General Assembly has not amended the statute since our comprehensive decision in *Bland* fully explained the analysis we employ to conduct comparative proportionality review. Accordingly, we will conduct the comparative proportionality review in this case in accordance with the analysis adopted in *Bland.*

**18 [21] As we have stressed on prior occasions, we do not take lightly our statutory duty to conduct comparative proportionality review in every capital case. *See, e.g.,* *State v. Cazes,* 875 S.W.2d 253, 270-71 (Tenn.1994). We employ the precedent-seeking method of analysis. *Bland,* 958 S.W.2d at 665. This approach requires careful consideration and examination of the case on appeal and other cases in which the defendants were convicted of the same or similar crimes. We examine the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*Bland,* 958 S.W.2d at 664; *see also Tichnell v. State,* 297 Md. 432, 468 A.2d 1, 13-23 (1983).

[22][23][24] While statutory comparative proportionality review insures rationality and consistency in the imposition of the death penalty, our function in performing this review is not to search for proof that a defendant's death sentence is perfectly symmetrical with the penalty imposed in all other first degree murder cases, but to identify and invalidate the aberrant death sentence. (FN16) In conducting comparative review, we do not act as a "super jury," nor do we second-guess the jury's decision. *Bland,* 958 S.W.2d at 668. Simply stated, if the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed, the sentence of death is disproportionate. *Bland,* 958 S.W.2d at 651; *State v. Ramsey,* 864 S.W.2d 320, 328 (Mo.1993).

[25][26][27] Admittedly, this standard is not easily satisfied. When the sentencing jury is properly instructed by the trial court and appropriately considers the evidence of aggravating and mitigating circumstances under a statutory scheme that is constitutional, disproportionate death sentences should be the rare exception, not the norm. The fact that no death sentence has previously been invalidated as disproportionate in Tennessee is an indication that our capital sentencing scheme is functioning properly. *See State v. Cobb,* 251 Conn. 285, 743 A.2d 1, 125 (1999) (noting that disproportionate sentences will be unlikely where the sentencing authority is correctly instructed and appropriately follows the statute); *State v. Jacobs,* 2001 WL 507878 (La.2001) (noting that since 1976 only one death sentence had been set aside in Louisiana as disproportionate). Comparative proportionality review is simply a final safeguard in the initial appellate process to ensure that no aberrant death sentence is affirmed.

[28][29][30][31] While we receive Rule 12 reports from trial judges in "all cases in which the defendant is convicted of first degree murder," Tenn. Sup.Ct. Rule 12; *Bland,* 958 S.W.2d at 666, we select similar cases for comparative proportionality (FN17) from a pool that includes only those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, (FN18) and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death, regardless of the sentence actually imposed. (FN19) "[B]ecause the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar ... are those in which imposition of the death penalty was properly before the sentencing authority for determination." *Tichnell,* 468 A.2d at 15-16; *see also State v. Whitfield,* 837 S.W.2d, 503, 515 (Mo.1992); State v. *Smith,* 280 Mont. 158, 931 P.2d 1272, 1285 (1996); State v. *Rhines,* 548 N.W.2d at 455-56 (S.D.1996). *Accord, Flamer v. State,* 490 A.2d 104, 139 (Del.1983). Not included in the pool of similar cases are first degree murder cases in which the State did not seek the death penalty or first degree murder cases in which a sentence other than death was agreed upon as part of a plea bargaining agreement. *See Webb,* 680 A.2d at 211, *Whitfield,* 837 S.W.2d at 515. When a defendant pleads guilty, he or she extends a substantial benefit to the criminal justice system, and in exchange, the State is entitled to extend a less harsh sentence than might otherwise be given if the case is submitted to a jury. *See State v. Mann,* 959 S.W.2d 503, 509 (Tenn.1997) (citing *Brady v. United States,* 397 U.S. 742, 752-53, 90 S.Ct. 1463, 1471-72, 25 L.Ed.2d 747 (1970)). Therefore, while the sentence imposed as part of a plea agreement likely will be less harsh than the sentence imposed by a jury after a trial and sentencing hearing, it does not follow that the less harsh sentence resulting from the plea renders the jury sentence aberrant or disproportionate. A sentence imposed by a jury simply cannot logically be compared to a sentence that results from a plea agreement. The circumstances are different in all respects.

**19 [32] In addition, consideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. *See Webb,* 680 A.2d at 211-12. We previously have declined to review the exercise of prosecutorial discretion, *see Cazes,* 875 S.W.2d at 253, and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying *potential* capital cases. Consideration of cases in which the State did not seek the death penalty, in effect, would be using a prior decision of the State as a basis for invalidating a death penalty in an unrelated case. *Webb,* 680 A.2d at 211-12. Such a course could potentially discourage the State both from exercising its discretion to not seek the death penalty and from engaging in plea bargaining with a defendant charged with first degree murder. Indeed, such a course could result in the State seeking the ultimate penalty in every first degree murder case. *Id.* Proportionality review is not, and was never intended to be, a vehicle for reviewing the exercise of prosecutorial discretion. For these reasons, we do not consider cases in which the State did not seek the death penalty when conducting comparative proportionality review.

[33][34] Comparative proportionality review also is not a search for disproportionate or aberrant life cases. As we have previously stated, even if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence. *See Bland,* 958 S.W.2d at 665; *State v. Carter,* 714 S.W.2d 241, 251 (Tenn.1986). Our duty under the similarity standard is to assure that no aberrant death sentence is affirmed. *Bland,* 958 S.W.2d at 665 (citing *Webb,* 680 A.2d at 203). As the United States Supreme Court so aptly stated: "Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice." *Gregg,* 428 U.S. at 203, 96 S.Ct. at 2939.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[35] Having defined and explained the pool, we must emphasize that selecting similar cases from that pool is not an exact science because no two crimes or defendants are precisely identical. *Bland,* 958 S.W.2d at 667. We have various tools available to use in locating similar cases. We review Rule 12 reports, which are not only on file in the Appellate Court Clerk's office in Nashville, but are also now available on CD ROM, making them more accessible, particularly for defendants. (FN20) While Rule 12 reports have not been filed in every prior case, (FN21) this Court and trial judges across this State are working together to ensure that these reports are being filed in current cases and will be filed in future cases. Nonetheless, we emphasize that Rule 12 reports are merely a starting point when conducting comparative proportionality review. These reports are always supplemented by traditional methods of legal research, which enables us to locate written appellate court opinions, which generally are available on first degree murder cases included within the pool for comparison. These written opinions detail the facts and circumstances of each case. Furthermore, like other appellate courts, this Court draws on the experienced judgment and institutional knowledge of its members when evaluating the comparative proportionality of a death sentence. *See Bland,* 958 S.W.2d at 668 (citing cases); *see also State v. Fowler,* 353 N.C. 599, 548 S.E.2d 684, 704 (2001). Such institutional knowledge is an important tool for purposes of comparative proportionality review. Id. To further assist this Court, we have directed the State and the defendant to fully brief the issue in each case and to discuss cases and factors relevant to the comparative proportionality inquiry. *Bland,* 958 S.W.2d at 667. This Court utilizes all the tools at its disposal to conduct a thorough and complete comparative proportionality review in every case.

****20** [36][37] However, we do not employ a statistical analysis that attempts to quantify the various factors leading to imposition or non-imposition of the death penalty. *Id.* at 664. Comparative proportionality review is not a rigid, objective test which employs mathematical or scientific techniques. *Bland,* 958 S.W.2d at 668; *Cazes,* 875 S.W.2d at 270. This sort of approach has been rightly criticized as an unworkable attempt "to quantify the unquantifiable." *See Bland,* 958 S.W.2d at 664 (quoting, *Webb,* 680 A.2d at 209); *see also Ramsey,* 864 S.W.2d at 327-28. (FN22) As previously explained, a sentence of death is not disproportionate, unless, the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.

[38][39] In comparing similar cases, this Court considers many variables including: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. *Bland,* 958 S.W.2d at 667 (citing cases). In addition, several criteria are relevant to a comparison of the characteristics of defendants which include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation. *Id.*

Before we consider the record in this case in light of these factors, we first consider the State's assertion that the Court of Criminal Appeals erred when conducting comparative proportionality review by considering Tennessee cases in which the death penalty was not sought and by considering cases from other jurisdictions. We note that the Court of Criminal Appeals indicated in an order denying the State's petition to rehear that the Tennessee cases in which the death penalty were not sought were used ouly to provide context and to illustrate the possible remedies, in view of the conclusion that the sentence was disproportionate. The Court of Criminal Appeals also explained that the out-of-state cases were cited to demonstrate "the extensiveness of our research and our concerted effort to reach the right result." Accordingly, the Court of Criminal Appeals did not base its decision upon the cases in which the State did not seek the death penalty or the out-of-state cases.

[40] In any event, it is worth reiterating that the pool of similar cases includes only cases in which the death penalty was sought, a sentencing hearing was held, and a sentencing jury determined the appropriate sentence. Whether out-of-state cases should be included in the pool of similar cases for purposes of comparative proportionality review is an issue this Court has not previously addressed. In its jurisprudential history there is no indication that comparative proportionality review was to be conducted on a national scale. Such review generally is performed by at least one state appellate court that has statewide appellate jurisdiction, and therefore, is able to compare a particular death sentence to the penalty imposed in similar cases throughout the state. In Tennessee, comparative proportionality review is a duty imposed upon this Court and the Court of Criminal Appeals by a statute that is part of the Tennessee capital sentencing scheme. Nothing in the statute indicates that the General Assembly intended the term "similar cases" to include out-of-state cases. In addition, given that capital sentencing statutes differ from state to state, cases from other jurisdictions are likely not "similar" for purposes of comparative proportionality review. Accordingly, we agree with the State that out-of-state cases should not be included in the pool of similar cases for purposes of comparative proportionality review.

****21** The State identifies two cases in which the death penalty has been imposed, *State v. Keen,* 31 S.W.3d 196 (Tenn.2000) and *State v. Torres,* No. E1999-00866-CCA-R3-DD, 2001 WL 245137 (Tenn.Crim.App., March 13, 2001), and argues that these cases support its assertion that the Court of Criminal Appeals erred in finding the death sentence in this case disproportionate. The State argues that the question in determining whether a sentence is disproportionate should be "whether, viewing the entire record, the decision of the jury was based in

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

reason as opposed to whim or prejudice." According to the State, if the sentence "is not unreasonable it cannot be deemed aberrant, arbitrary, or capricious."

The defendant responds that the appropriate inquiry in determining whether the sentence is disproportionate is whether the case is "plainly lacking in circumstances consistent with those in which the death penalty has been imposed...." *Bland,* 958 S.W.2d at 665. According to the defendant, the two cases the State relies upon are not similar to the instant case and, in fact, support the Court of Criminal Appeals' conclusion that the sentence in this case is disproportionate. In addition, the defendant asserts that every other capital case in this state involving a child victim is much more aggravated than the killing in the instant case.

[41] Initially we note that reviewing the record in each case in isolation, as the State suggests, is not the appropriate analysis when conducting *comparative* proportionality review. The defendant is correct. The relevant inquiry for comparative proportionality review is whether this case, taken as a whole, is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed. *Bland,* 958 S.W.2d at 665. To determine whether this case can be said to be plainly lacking in circumstances consistent with those in which the death penalty has been imposed, we will now consider prior capital cases in which the defendant was convicted of murdering a child victim, including those cases relied upon by the State and the defendant.

In *Torres,* the jury applied two aggravating circumstances: (1) "the victim was less than twelve years of age, and the defendant was eighteen years of age or older;" and (2) "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39-13-204(i)(1) & (5). As stated in the decision of the Court of Criminal Appeals, the evidence in *Torres* showed that the twenty-five-year-old defendant was the father of the fifteen-month-old male victim and was caring for the victim on the day of the murder while the child's mother was at work. When the child awoke from a nap and would not stop crying, the defendant struck the child a minimum of five times in the head and abdomen with extreme force. According to Torres' own statement, the child was conscious during and after the abuse and appeared to be in pain. The child had severe internal injuries including hemorrhaging in his brain and in his abdomen, indicating extreme force. In addition, some of the medical experts testified that the victim had marks indicating prior abuse, such as cigarette burns, bite marks, and suspicious scarring around the child's anal area. The defendant did not call for emergency assistance right away; instead he called the child's mother and awaited her arrival. While he waited, the victim stopped breathing, yet the defendant still did not call for emergency assistance. The child's mother called 911 upon her arrival. The defendant refused to provide medical information concerning the victim to nurses at the emergency room, and according to witnesses, appeared unconcerned about his son. The defendant demonstrated little or no remorse for the offense and in a statement to police, blamed the victim's mother for spoiling him and encouraging him to cry. Torres' amenability to rehabilitation was called into question by the testimony of a fellow inmate who stated that Torres had indicated he was participating in a Legal Lives Program to "juke [i.e., mislead] the people, whoever was charging him." Also, proof offered at the sentencing hearing by Torres indicated that at about age fifteen, he had pled guilty to sexually abusing his five-year-old step-brother.

**22 In *State v. Keen,* 31 S.W.3d 196 (Tenn.2000), the twenty-seven-year-old defendant was convicted of first degree felony murder of his girlfriend's eight-year-old daughter, committed during the perpetration of a rape. In sentencing the defendant, the jury applied two aggravating circumstances, including the young age of the victim, and the fact that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. *Id.* at 205; Tenn.Code Ann. § 39-13-204(i)(1) & (5). The evidence established that the defendant raped the child while choking her, possibly with a shoelace. *Id.* at 203-204. When the child stopped breathing, the defendant threw her into a river. *Id.* at 203. An autopsy revealed multiple scrapes and bruises to the child's face and neck and a deep ligature mark around the front of her neck. *Id.* at 204. The autopsy further indicated that the child was alive when she was thrown into the river. *Id.* The defendant was highly intelligent but was suffering from attention deficit disorder, post-traumatic stress disorder, and serious depression. *Id.* Additionally, the defendant had been sexually abused as a child. *Id.* at 205. The defendant had no prior criminal record and demonstrated remorse following the offense. *Id.* at 221.

In *State v. Middlebrooks,* 995 S.W.2d 550, 561-62 (Tenn.1999), Middlebrooks, a twenty-four-year-old white male, participated in the brutal torture murder of a fourteen-year-old black male victim and was convicted of felony murder. The evidence showed that the victim was mocked, urinated upon, burned, severely beaten with brass knuckles, cut, raped with a stick, and his genitals were beaten. Two large lacerations formed an "X" across his chest, and two deep stab wounds to his chest eventually caused his death. The victim was alive and conscious during the torture, which lasted for hours, and he was pleading with the defendant, saying that he just wanted to go to school and get an education. The evidence strongly indicated that the torture and killing were racially motivated. Middlebrooks offered evidence in mitigation to show that he had mental problems. No evidence indicated that he felt any remorse for the crime, and there was little evidence to show a strong potential for rehabilitation. The jury imposed the death penalty upon finding a single aggravating circumstance, the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn.Code Ann. § 39-2-203(i)(5) (1982).

In *State v. Vann,* 976 S.W.2d 93 (Tenn.1998), the defendant was convicted of felony murder during the perpetration of a rape of his eight-year-old daughter. The proof indicated that the victim's death was the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

result of ligature strangulation. The jury applied three aggravating circumstances in sentencing the defendant to death: the young age of the victim, the defendant's prior convictions for aggravated rape, and the fact that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn.Code Ann. § 39-13-204(i)(1), (2) & (5). Medical testimony indicated that the condition of the victim's anus was consistent with ongoing, repeated anal penetration. Witnesses testified that the defendant showed no remorse at the hospital about his daughter's death, and nothing in the record indicated a capacity for rehabilitation.

**23 In *State v. Teel,* 793 S.W.2d 236 (Tenn.1990), the defendant admitted to the rape and murder of a fourteen-year-old girl. The evidence established that the defendant drove the victim, a person with whom he was well acquainted, to a remote and secluded location by telling her that he was taking her to see her boyfriend. Once there, he forced her to perform fellatio and then vaginally raped her. The cause of death was some type of neck trauma consisting of either manual strangulation, ligature strangulation, or a blow or cut to the neck. The jury found two aggravating circumstances, that the murder was especially heinous atrocious or cruel in that it involved torture or depravity of mind and that the murder was committed during the perpetration of a felony, rape. Tenn.Code Ann. § 39-2-203(i)(5) & (7) (1982)

In *State v. Irick,* 762 S.W.2d 121 (Tenn.1988), the twenty-six-year-old defendant was babysitting a friend's children, including the victim. The defendant raped the seven-year-old victim vaginally and anally. The victim suffocated as the defendant held his hand over her mouth to keep her from screaming. The defendant was convicted by a jury of first degree felony murder and aggravated rape. Following a sentencing hearing, the jury found four aggravating circumstances: the victim was less than twelve years of age; the murder was especially heinous, atrocious or cruel in that it involved torture, or depravity of mind; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was committed during the perpetration of a felony. Tenn.Code Ann. § 39-2-203(i)(1),(5), (6) & (7) (1982). The defendant had offered mitigating evidence that he had been under the influence of marijuana or alcohol at the time he committed the offense, and that he had a past mental impairment.

In *State v. Coe,* 655 S.W.2d 903 (Tenn.1983), the defendant was a stranger to the eight-year-old victim. He lured her into his car, drove to an isolated spot, and raped her. When Coe completed the rape, the victim told him that Jesus loved him. At that point, the defendant strangled the victim until she turned blue. When the victim did not immediately die from the strangulation, he stabbed her in the neck with a pocket knife and watched as she suffered agonizing death throes. Eventually, he left her to die in the wooded area. Coe was convicted of first degree murder, kidnapping, and aggravated rape. Following the sentencing hearing the jury sentenced the defendant to death upon finding four aggravating circumstances: the murder was committed against a person less than twelve years of age; the murder was especially heinous, atrocious or cruel in that it involved torture, or depravity of mind; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was committed while the defendant was engaged in committing or attempting to commit rape. Tenn.Code Ann. § 39-2-203(i)(1),(5),(6) & (7) (1982). The defendant had offered as mitigating evidence the theory that he had been under the influence of extreme mental or emotional disturbance at the time he committed the offense.

**24 [42] Having reviewed these similar capital cases involving child victims, (FN23) we next consider the record in this case in light of the factors adopted in *Bland.* The record reveals that the twenty-two-year-old defendant reacted angrily and unexpectedly when the seven-month-old victim would not stop crying. The defendant threw the victim, inflicting serious and ultimately fatal injuries. The episode occurred in the home the defendant shared with the victim, and the assault had a total duration of only moments. The defendant's conduct certainly was not the result of adequate provocation or justification. Indeed the victim was helpless against the attack. However, there is no evidence to show that the violent acts were premeditated. In fact, the evidence indicates that the defendant's behavior was entirely unexpected and highly unusual. The defendant had no history of abusing the victim. The defendant had been responsible for caring for the victim for several hours in the evening while the victim's mother worked, and the evidence indicated he had treated the victim kindly and with affection, as if the victim were his own child. The defendant had no prior record of felony convictions, although he had prior misdemeanor convictions for joyriding, driving under the influence, and driving on a revoked license. The defendant did not immediately seek assistance for the victim, but the evidence offered at trial indicated that the victim's injuries would not have been immediately apparent, as there were no external injuries. The defendant cooperated with the authorities during the investigation, allowing them access to the apartment without a search warrant, and turning over to them the crib sheet and blanket as well as his own t-shirt. Although the defendant was not immediately forthcoming with police, he eventually admitted his actions. Disinterested witnesses consistently testified that the defendant appeared genuinely remorseful for the victim's injuries and his eventual death. The defendant offered evidence to suggest that he had been a dependable and capable worker and that he had above average intelligence. Overall, the record suggests an amenability to rehabilitation.

The defendant is the only person in Tennessee to receive a death sentence based solely on the (i)(1) aggravating circumstance, the victim was less than twelve years of age. With respect to mitigation, the defendant offered a great deal of proof, previously summarized herein, about his unstable childhood in a poor, dysfunctional family; indeed, the trial court instructed the jury as to seventeen mitigating circumstances raised by the evidence offered.

Unlike this case, in each of the prior capital cases

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind or serious physical abuse beyond that necessary to produce death. Also, unlike the present case, in each of these prior cases, there was some evidence of sexual abuse. In only one prior case, *Middlebrooks,* was the jury's sentence of death based upon a single aggravating circumstance, and the evidence to support that aggravating circumstance, evidence of severe and protracted torture, was so clear that to say it was overwhelming is an understatement. Of these prior cases, *Torres* is most similar to the present case, yet, there are several significant distinctions. (FN24) Unlike *Torres,* the evidence in this case indicates that the fatal injuries were consistent with a single act of violence that occurred in a matter of minutes. Although, like Torres, Godsey did not call for emergency assistance immediately, the medical testimony in this case indicates that the victim sustained no apparent external injuries, so it is not clear that Godsey realized the extent of the victim's injuries. When Godsey discovered the victim was not breathing, he immediately alerted the victim's mother, attempted to perform CPR, and called 911. Torres did not immediately call 911, nor did he call when he realized the victim was not breathing. Also unlike *Torres,* and other capital cases involving child victims, the evidence in this case does not establish torture or serious physical abuse beyond that necessary to produce death. Significantly, there is also no evidence in this case to indicate that the defendant had a prior history of abusive behavior toward the victim or other children. To the contrary, the proof indicated that the defendant had treated the victim well, caring for him and providing for him as if he were his own son. Moreover, unlike *Torres,* the medical experts agreed that there was no evidence to indicate prior abuse in this case. Also unlike Torres, according to disinterested witnesses, Godsey demonstrated genuine remorse for the victim at the hospital, both upon arrival and upon learning of the victim's death. In addition, the record in this case indicates that Godsey cooperated with the police in providing access to the apartment and in providing physical evidence. Finally, as the Court of Criminal Appeals observed, the record in this case indicates that Godsey is a reliable worker, who has above average intelligence, and is generally amenable to rehabilitation.

****25** Having reviewed and compared this case to prior similar cases in which a sentence of death has been imposed, we conclude that the Court of Criminal Appeals correctly held that the sentence of death in this case is disproportionate. Taken as a whole, this case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed. As the Court of Criminal Appeals observed:

> [w]hen measured against other capital cases in this State ... this case stands at one end of the spectrum, with the least evidence of traditional criminal culpability, and with a young defendant having a comparatively favorable prior history and no history of abusing the victim.

Not only is the sentence in this case at one end of the spectrum when considered against capital cases, it is at one end of the spectrum when considered against the following similar cases in which the jury rejected a death sentence and imposed a sentence of life or life imprisonment without the possibility of parole sentence.

In *State v. Paul William Ware,* No. 03C01-9705-CR-00164, 1999 WL 233592 (Tenn.Crim.App., April 20, 1999), the twenty-five-year-old defendant was convicted of the first degree felony murder of a four-year-old child during the perpetration of rape. The jury found two aggravating circumstances including the young age of the victim and the fact that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Nevertheless, the jury chose to impose a sentence of life imprisonment without the possibility of parole. The evidence established that the defendant was an acquaintance of the victim's family and was found in the victim's apartment lying unclothed and unconscious beside the nude body of the victim. An autopsy revealed that the child had been vaginally and anally raped and had died as a result of asphyxiation. There was evidence that the defendant was extremely intoxicated at the time of the offense. The defendant had no prior record of criminal convictions.

In *State v. James Lloyd Julian, II,* No. 03C01-9511-CV-00371, 1997 WL 412539 (Tenn.Crim.App., July 24, 1997), the twenty-three-year-old defendant was convicted of first degree felony murder of the three-year-old victim, committed during the perpetration of a kidnapping and rape. The jury found two aggravating circumstances, including the young age of the victim and the fact that the murder was especially heinous, atrocious, and cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Nonetheless, the jury imposed a sentence of life imprisonment without the possibility of parole. The evidence established that the defendant was a friend of the victim's parents. He raped the victim and choked her to death. At the time of the offense, the defendant had consumed a fifth of bourbon and smoked marijuana. Moreover, the defendant had himself been sexually abused as a child by his grandfather and was suffering from a mixed personality disorder and a depressive disorder. He had a prior criminal record which included convictions for drug possession, driving under the influence of an intoxicant, assault, evading arrest, and reckless endangerment.

****26** In *State v. Terrence L. Davis,* No. 02C01-9511-CR-00343, 1997 WL 287646 (Tenn.Crim.App., June 2, 1997), the twenty-year-old defendant was convicted of the first degree murder by aggravated child abuse of his girlfriend's twenty-two-month-old daughter. As in this case, the sole aggravating circumstance applied by the jury was the young age of the victim. At trial, the evidence established that, the defendant had cared for the victim during the week that she died, while her mother worked. According to the defendant's confession, he "whipped" the victim several days prior to her death for breaking a glass, and "spanked" the victim on the day of her death. When the victim stopped breathing, he called 911. An autopsy revealed that the victim's death was caused by "multiple blunt force injuries," including abrasions, contusions, and broken ribs. The pathologist noted more than fifty impact sites on the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

child's body. The victim's mother testified that she had never previously observed the defendant abuse the child. The defendant had no prior criminal record. The jury imposed a sentence of life imprisonment.

All first degree murders are horrible, and they are particularly tragic, where, as here, the victim is an innocent, defenseless infant. Yet, our statutory duty in conducting comparative proportionality review is to identify and invalidate aberrant death sentences. Having considered the record in this case in comparison to the circumstances of similar cases, we are of the opinion that, taken as a whole, this case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed. In fact, the circumstances of this case are substantially less egregious, overall, than the circumstances of similar cases in which a sentence less than death has been imposed. Accordingly, we agree with the Court of Criminal Appeals that the sentence of death imposed in this case is disproportionate to the penalty imposed in similar cases. We therefore affirm the decision of the Court of Criminal Appeals modifying the sentence for the defendant's first degree murder conviction to life imprisonment without the possibility of parole. *See* Tenn.Code Ann. § 39-13-206(d).

*Conclusion*

After carefully reviewing the record and the relevant legal authorities, we conclude that the Court of Criminal Appeals correctly found the sentence of death disproportionate and correctly modified the defendant's sentence to life imprisonment without the possibility of parole. We reverse that portion of the Court of Criminal Appeals' decision setting aside the defendant's separate conviction for aggravated child abuse. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Presiding Judge Gary R. Wade and joined in by Judge James Curwood Witt and Judge Norma McGee Ogle.

ADOLPHO A. BIRCH, JR., J., concurs and dissents.

ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

****27** The majority has today, for the first time, found the sentence of death to be disproportionate to the penalty imposed in similar cases and, as a consequence, has modified the defendant's sentence to life imprisonment without the possibility of parole. I concur in this result. If, however, there are those who would trumpet the majority opinion as proof positive that the proportionality protocol works as it should, I move quickly to temper their voices. This result comes from a protocol I perceive as flawed and unreliable. Consequently, in my view, the holding evidences neither reliability nor consistency. Rather, the protocol remains flawed, and a flawed protocol, by definition, produces a flawed result.

The principle underlying comparative proportionality review is that it is unjust to impose a death sentence upon one defendant when other defendants, convicted of similar crimes with similar facts, receive sentences of life imprisonment (with or without parole). Using the appropriate protocol, a properly conducted proportionality review responds to this problem by permitting the judiciary to engage in a "judicial field leveling" process, for lack of a better description. Thus, proportionality review serves a crucial role as an "additional safeguard against arbitrary or capricious sentencing." *State v. Bland,* 958 S.W.2d 651, 663 (Tenn.1997). In a line of dissents beginning with *State v. Chalmers,* I have identified three perceived flaws in the protocol currently embraced by the majority: (1) the proportionality test is overbroad; (2) the "pool" of cases used for comparison is inadequate; and (3) the review is too subjective. *See* 28 S.W.3d 913, 923 (Tenn.2000) (Birch, J., concurring and dissenting). I continue to offer my objections to the majority analysis in the hope that comparative proportionality review may be reformed to more effectively fulfill the goals for which it was intended.

In order to remedy the first of these perceived flaws, the overbreadth of the protocol, I submit that the protocol should be refined to more accurately identify disproportionate sentences. The majority holds a sentence is disproportionate only if the case under review "is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." *Bland,* 958 S.W.2d at 665. Even if a defendant can show that others received life sentences for similar crimes and no discernible basis exists to distinguish the cases, the sentence will "not necessarily [be found] disproportionate." *Id.* This test, however, does not seem reliably gauged to identify *disproportionate* sentences. Under the current protocol, a sentence may be found "proportionate" based on minimal similarities to a prior death penalty case even if the defendant can point to similar cases in which a life sentence was imposed. "Proportionality" implies consistency and balance in sentencing, neither of which is accomplished when distinguishable penalties are imposed in indistinguishable cases.

****28** Other jurisdictions provide models for a more meaningful and objective proportionality protocol. In these jurisdictions, the circumstances of each case are analyzed to determine whether its characteristics are *more consistent* with other capital cases wherein a death sentence has been imposed. Typical of those jurisdictions is New Jersey, whose Supreme Court has stated that "[a] capital sentence is excessive and thus disproportionate if other defendants with characteristics similar to those of the defendant ... generally receive sentences other than death for committing factually-similar crimes in the same jurisdiction." *New Jersey v. DiFrisco,* 142 N.J. 148, 662 A.2d 442, 448 (1995) (citing *New Jersey v. Martini,* 139 N.J. 3, 651 A.2d 949 (1994) ). Essentially the same test has been cited with approval by the Court of Appeals of Maryland. *See Tichnell v. Maryland,* 297 Md. 432, 468 A.2d 1, n. 18 (1983). Even the Supreme Court of Virginia, which has never reversed a case on comparative proportionality grounds, focuses on "whether generally juries in [the same] jurisdiction impose a death sentence for conduct similar to that of the defendant." *Stamper v. Virginia,* 220 Va. 260, 257 S.E.2d 808, 824 (1979). Thus, I would urge the adoption of a similarly gauged test to more accurately assess whether a given case, viewing its

Copyright (c) West Group 2002 No claim to original U.S. Govt. works