# ADDENDUM 1
## Volume 5

W2003-00669-CCA-R3-PD

# CIRCUIT COURT OF MADISON COUNTY
## - TO -
# COURT OF CRIMINAL APPEALS

JUDGE ___ROY B. MORGAN_____ DIVISION _I___

CIRCUIT COURT CLERK___ JUDY BARNHILL _____

VOLUME __V___ OF __VIII___ VOLUMES

STATE OF TENNESSEE

VS.

JON HALL

CASE NO. C-00-422

| | | | | |
|---|---|---|---|---|
| FELONY | XX MISDEMEANOR ☐ | ROR ☐ | TDOC | ☒ |
| BOND | ☐ $_____ | INDIGENT ☐ | | |
| POST CONVICTION | XX | HABEAS CORPUS | | ☐ |

MR. ALFRED EARLS
ASSISTANCE DISTRICT ATTORNEY
P.O. BOX 2825
JACKSON, TN  38302

MR. DANNY ELLIS
ATTORNEY AT LAW
P.O. BOX 3512
JACKSON, TN  38303

Attorney For: APPELLEE

Attorney For: APPELLANT

Attorney For:

Attorney For:

OFFENSE:  FIRST DEGREE MURDER

SENTENCE: DEATH

**FILED**
JUL 2 4 2003
Clark of the Courts

Vol.5

Filed Rec'd By 21ST  day of _____JULY_____ _____

COURT OF CRIMINAL APPEALS

BY:_____

LAYCOOK, JACKSON

INDEX

CERTIFICATE & SEAL                                          758

STATE'S BRIEF AT THE CLOSE OF EVIDENCE
(CONTINUED)                                                 608-757

947 S.W.2d 156, Harris v. State, (Tenn.Crim.App. 1996)    Page 1

**\*156**  947 S.W.2d 156

Court of Criminal Appeals of Tennessee,
at Knoxville.

Edward Leroy **HARRIS**, Appellant,
v.
**STATE** of Tennessee, Appellee.
Feb. 28, 1996.
Permission to Appeal Denied by
Supreme Court Feb. 3, 1997.

Defendant was convicted in the Criminal Court,
Sevier County, J. Kenneth Porter, J., of murder and
sentenced to death, and he appealed. The Supreme
Court, Drowota, J., 839 S.W.2d 54, affirmed. The
Supreme Court, 507 U.S. 954, 113 S.Ct. 1368, 122
L.Ed.2d 746, denied petition for certiorari.
Defendant filed petition for postconviction relief.
The Criminal Court, Sevier County, J. Kenneth
Porter, J., denied petition, and appeal was taken.
The Court of Criminal Appeals, Hayes, J., held that
counsel's strategic decision not to attempt to
suppress exculpatory statements made by defendant
to law enforcement officers did not constitute
deficient performance.

Affirmed.

Petition for Rehearing

West Headnotes

[1] Criminal Law ☞641.13(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
      110k641.13(1) In General.
  When claim of ineffective assistance of counsel is
raised, burden is on defendant to show that counsel's
performance was deficient and that counsel's
deficient performance prejudiced him. U.S.C.A.
Const.Amend. 6.

[2] Criminal Law ☞641.13(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
      110k641.13(1) In General.
  Defendant claiming ineffective assistance of
counsel must prove that counsel made errors so
serious that counsel was not functioning as counsel
guaranteed by Sixth Amendment and that counsel's
errors were so serious as to deprive defendant of
fair trial, meaning trial whose result is reliable.
U.S.C.A. Const.Amend. 6.

[3] Criminal Law ☞641.13(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
      110k641.13(1) In General.

Defendant must establish both deficient
performance and prejudice in order to prevail on
ineffective assistance of counsel claim. U.S.C.A.
Const.Amend. 6.

[4] Criminal Law ☞641.13(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
      110k641.13(1) In General.
  Court need not consider    *Strickland's*  deficient
performance and prejudice prongs in any particular
order, and if defendant fails to establish one prong,
court need not consider other prong for purposes of
ineffectiveness inquiry. U.S.C.A. Const.Amend. 6.

[5] Criminal Law ☞641.13(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
      110k641.13(1) In General.
  With respect to deficient performance prong of
ineffectiveness inquiry, proper measure of attorney
performance is reasonableness under prevailing
professional norms; attorney's performance must be
within range of competence demanded of attorneys
in criminal cases. U.S.C.A. Const.Amend. 6.

[6] Criminal Law ☞641.13(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
      110k641.13(1) In General.
  When presented with ineffectiveness claim, court
must indulge strong presumption that counsel's
conduct falls within wide range of reasonable
professional assistance; that is, defendant must
overcome presumption that, under circumstances,
challenged action might be considered sound trial
strategy. U.S.C.A. Const.Amend. 6.

[7] Criminal Law ☞641.13(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
      110k641.13(1) In General.
  For purposes of ineffectiveness inquiry, court
should defer to counsel's trial strategy or tactical
choices if they are informed ones based upon
adequate preparation. U.S.C.A. Const.Amend. 6.

[8] Criminal Law ☞641.13(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
      110k641.13(1) In General.
  When presented with ineffectiveness claim, court

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

947 S.W.2d 156, Harris v. State, (Tenn.Crim.App. 1996)                    Page 2

should avoid distorting effects of hindsight and judge
reasonableness of counsel's challenged conduct on
facts of case, viewed as of time of counsel's
conduct.  U.S.C.A. Const.Amend. 6.

[9] Criminal Law ⬅641.13(1)
    110 ----
      110XX Trial
        110XX(B) Course and Conduct of Trial in
          General
          110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
          110k641.13(1) In General.
  Defendants are not entitled to perfect
representation by counsel, only constitutionally
adequate representation.  U.S.C.A. Const.Amend. 6

[10] Criminal Law ⬅641.13(1)
    110 ----
      110XX Trial
        110XX(B) Course and Conduct of Trial in
          General
          110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
          110k641.13(1) In General.
  To establish prejudice, defendant must show that
there is reasonable probability that, but for counsel's
deficient performance, result of proceeding would
have been different, and reasonable probability is
one sufficient to undermine confidence in outcome.
U.S.C.A. Const.Amend. 6.

[11] Criminal Law ⬅1615
    110 ----
      110XXX Post-Conviction Relief
        110XXX(C) Proceedings
          110XXX(C)2 Affidavits and Evidence
          110k1615 Degree of Proof.

(Formerly 110k998(17))
  In postconviction proceedings, defendant has
burden of proving allegations in his petition by
preponderance of evidence.

[12] Criminal Law ⬅1158(1)
    110 ----
      110XXIV Review
        110XXIV(O) Questions of Fact and Findings
          110k1158 In General
          110k1158(1) In General.
  Findings of fact and conclusions of law made by
trial court after evidentiary hearing are afforded
weight of jury verdict, and Court of Criminal
Appeals will not set aside judgment of trial court
unless evidence contained in record preponderates
against its findings.

[13] Criminal Law ⬅1519(17)
    110 ----
      110XXX Post-Conviction Relief
        110XXX(B) Grounds for Relief
          110k1511 Counsel
            110k1519 Effectiveness of Counsel
            110k1519(17) Other Particular Miscellaneous
              Issues.

(Formerly 110k998(8))
  Postconviction relief petitioner claiming ineffective
assistance of counsel could not attribute to counsel
situation which he, himself, created.  U.S.C.A.
Const.Amend. 6;  Rules App.Proc., Rule 36(a).

[14] Criminal Law ⬅641.13(1)
    110 ----
      110XX Trial
        110XX(B) Course and Conduct of Trial in
          General
          110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
          110k641.13(1) In General.
  Counsel's strategic choices made after thorough
investigation of law and facts relevant to plausible
options are virtually unchallengeable, and counsel's
strategic choices made after less than complete
investigation are reasonable precisely to extent that
reasonable professional judgment supports
limitations on investigation.  U.S.C.A.
Const.Amend. 6.

[15] Criminal Law ⬅641.13(6)
    110 ----
      110XX Trial
        110XX(B) Course and Conduct of Trial in
          General
          110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
            110k641.13(2) Particular Cases and Problems
            110k641.13(6) Evidence; Procurement,
              Presentation and Objections.
  Counsel has duty to make reasonable investigations
or to make reasonable decision that makes particular
investigation unnecessary.  U.S.C.A. Const.Amend.
6.

[16] Criminal Law ⬅641.13(6)
  *156  110 ----
      110XX Trial
        110XX(B) Course and Conduct of Trial in
          General
          110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
            110k641.13(2) Particular Cases and Problems
            110k641.13(6) Evidence; Procurement,
              Presentation and Objections.
  In any ineffectiveness case, counsel's decision not
to investigate must be directly assessed for
reasonableness in all circumstances, applying heavy
measure of deference to counsel's judgments.
U.S.C.A. Const.Amend. 6.

[17] Criminal Law ⬅641.13(6)
    110 ----
      110XX Trial
        110XX(B) Course and Conduct of Trial in
          General
          110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
            110k641.13(2) Particular Cases and Problems
            110k641.13(6) Evidence; Procurement,
              Presentation and Objections.
  Trial counsel's investigation was constitutionally
adequate, and counsel made reasonable, strategic
decision to forego further investigation and to rely at
trial upon cross-examination of state's expert
witness, and thus counsel was not ineffective.
U.S.C.A. Const.Amend. 6.

[18] Criminal Law ⬅641.13(2.1)
    110 ----
      110XX Trial
        110XX(B) Course and Conduct of Trial in
          General
          110k641 Counsel for Accused

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(2.1) In General.
Trial counsel who repeatedly and intently advised defendant of consequences of his refusal to comply with trial court's order to provide additional handwriting exemplars was not ineffective. U.S.C.A. Const.Amend. 6.

[19] Criminal Law ⟨⟩641.13(1)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(1) In General.
Initially, in considering claims of ineffective assistance of counsel, court addresses not what is prudent or appropriate, but only what is constitutionally compelled. U.S.C.A. Const.Amend. 6.

[20] Criminal Law ⟨⟩641.13(6)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(6) Evidence; Procurement, Presentation and Objections.
Further investigation of background of codefendant was not constitutionally compelled, and thus, counsel was not ineffective for failing to conduct such investigation; counsel did not investigate codefendant's background more thoroughly because codefendant had record from many areas of country. U.S.C.A. Const.Amend. 6.

[21] Criminal Law ⟨⟩641.13(2.1)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(2.1) In General.
Trial counsel was not ineffective for failing to request funds for expert to review findings of state's expert in forensic pathology; defendant did not state what, if anything, in state expert's report was erroneous or explain why his findings were suspect, and counsel had examined expert's reports and interviewed expert. U.S.C.A. Const.Amend. 6.

[22] Criminal Law ⟨⟩641.13(6)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(6) Evidence; Procurement, Presentation and Objections.
Any error in defense counsel's failure to contemporaneously object to state's forensic pathology expert's testimony that sharp, sawtoothed markings surrounded victim's wounds did not

unduly prejudice defendant, and thus, counsel was not ineffective; counsel vigorously cross-examined state's expert who conceded that he had not compared victim's wounds to any knife involved in investigation. U.S.C.A. Const.Amend. 6.

[23] Criminal Law ⟨⟩641.13(6)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(6) Evidence; Procurement, Presentation and Objections.
Defense counsel's strategic decision not to attempt to suppress exculpatory statements made by defendant to law enforcement officers did not constitute deficient performance; defendant's statements were general denials of participation in killings and were in conformity with defendant's position at trial that he was not present during crime. U.S.C.A. Const.Amend. 6.

[24] Criminal Law ⟨⟩641.13(7)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(7) Post-Trial Procedure and Review.
Strategy of silence during penalty phase of capital murder trial may be adopted by counsel only after reasonable investigation for mitigating evidence or reasonable decision that investigation would be fruitless. U.S.C.A. Const.Amend. 6.

[25] Criminal Law ⟨⟩641.13(7)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(7) Post-Trial Procedure and Review.
Extent of counsel's required investigation during penalty phase of capital trial depends upon information supplied by defendant for purposes of ineffectiveness inquiry. U.S.C.A. Const.Amend. 6.

[26] Criminal Law ⟨⟩641.13(2.1)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(2.1) In General.

[See headnote text below]

[26] Criminal Law ⟨⟩641.13(6)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

947 S.W.2d 156, Harris v. State, (Tenn.Crim.App. 1996)    **Page 4**

General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(6) Evidence; Procurement,
Presentation and Objections.

When facts that support certain line of defense are generally known to counsel because of what defendant has said, need for further investigation may be considerably diminished or eliminated altogether, and when defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or harmful, counsel's failure to pursue those investigations may not be later challenged as unreasonable. U.S.C.A. Const.Amend. 6.

[27]Criminal Law ☜641.13(7)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in
General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(7) Post-Trial Procedure and
Review.

Under certain circumstances, trial counsel's decision not to investigate defendant's family childhood background, for purposes of penalty phase of capital murder trial, may legitimately be product of reasoned tactical choice. U.S.C.A. Const.Amend. 6.

[28]Criminal Law ☜641.13(7)
110 ----
110XX Trial
110XX(B) Course and Conduct of Trial in
General
110k641 Counsel for Accused
110k641.13 Adequacy of Representation
110k641.13(2) Particular Cases and Problems
110k641.13(7) Post-Trial Procedure and
Review.

Performance of defense counsel, who allegedly failed to adequately investigate and obtain available evidence regarding defendant's background and mental condition, was constitutionally adequate at penalty phase of capital murder trial, and defendant suffered no prejudice as result of counsel's performance. U.S.C.A. Const.Amend. 6.

[29]Criminal Law ☜1669
110 ----
110XXX Post-Conviction Relief
110XXX(C) Proceedings
110XXX(C)3 Hearing and Determination
110k1669 Costs; Transcripts.

(Formerly 110k998(16), 110k998(14.1))
At hearing, postconviction petitioner **\*156** must demonstrate by specific factual proof that services of expert or investigator are necessary to establish ground for postconviction relief and that he is unable to establish that ground by other available evidence.

[30]Costs ☜302.2(2)
102 ----
102XIV In Criminal Prosecutions
102k301.1 Security for Payment; Proceedings in
Forma Pauperis
102k302.2 Production of Witnesses or Evidence

102k302.2(2) Expert Witnesses or Assistance in
General.

[See headnote text below]

[30]Costs ☜302.3
102 ----
102XIV In Criminal Prosecutions
102k301.1 Security for Payment; Proceedings in
Forma Pauperis
102k302.3 Investigative Assistance.

Trial court should grant motion for support services if postconviction relief petitioner demonstrates that investigative or expert services are necessary to ensure protection of his constitutional rights; in other words, within postconviction context, support services sought must implicate constitutional right.

[31] Judges ☜51(4)
227 ----
227IV Disqualification to Act
227k51 Objections to Judge, and Proceedings
Thereon
227k51(4) Determination of Objections.

Motion to recuse judge is addressed to sound discretion of trial court.

[32] Judges ☜49(1)
227 ----
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) In General.

Generally, when trial judge has no doubt of his ability to preside fairly over matters presented, there is no need to grant motion for recusal.

[33] Judges ☜49(1)
227 ----
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) In General.

Standard for recusal of judge is ultimately objective one, and thus, recusal is warranted when person of ordinary prudence in judge's position, knowing all facts known to judge, would find reasonable basis for questioning judge's impartiality.

[34] Criminal Law ☜1148
110 ----
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1148 Preliminary Proceedings.

Standard of review on appeal is whether trial court abused its discretion by denying recusal motion.

[35] Judges ☜49(1)
227 ----
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) In General.

Prior knowledge of facts about case is not sufficient in and of itself to require disqualification of judge.

[36] Judges ☜47(2)
227 ----
227IV Disqualification to Act
227k47 Acting as Counsel or Other Participation
in Cause
227k47(2) Presiding at Former Trial Relating to
Same or Similar Matter.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Judge is in no way disqualified merely because he has participated in other legal proceedings against same person.

[37] Judges ⬥═49(1)
227 ----
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) In General.
To disqualify judge, prejudice must stem from extrajudicial source and result in opinion on merits on some basis other than what judge learned from participation in case.

[38] Judges ⬥═47(2)
227 ----
227IV Disqualification to Act
227k47 Acting as Counsel or Other Participation in Cause
227k47(2) Presiding at Former Trial Relating to Same or Similar Matter.
Judge who presided at trial in which conviction occurred is permitted, although not required, to preside over postconviction proceedings when competency of trial counsel has been challenged by defendant. West's Tenn.Code, § 40-30-103 (1994).

[39] Witnesses ⬥═68
410 ----
410II Competency
410II(A) Capacity and Qualifications in General
410k68 Judges, Jurors, and Officers Acting at Trial, as Witnesses.
Trial judge cannot both preside at postconviction proceeding and serve as witness in that proceeding. Rules of Evid., Rule 605.

[40] Judges ⬥═49(1)
227 ----
227IV Disqualification to Act
227k49 Bias and Prejudice
227k49(1) In General.
Adverse rulings by judge are not usually sufficient grounds to establish bias so as to warrant judge's recusal.

[41] Criminal Law ⬥═1134(3)
110 ----
110XXIV Review
110XXIV(L) Scope of Review in General
110k1134 Scope and Extent in General
110k1134(3) Questions Considered in General.
Issue to be determined on appeal of motion for recusal is not propriety of judicial conduct of judge, but whether he committed error which resulted in unjust disposition.

[42] Constitutional Law ⬥═268(8)
92 ----
92XII Due Process of Law
92k256 Criminal Prosecutions
92k268 Trial
92k268(2) Particular Cases and Problems
92k268(8) Qualifications, Actions, and Comments of Judge, Jury, or Prosecutor.

[See headnote text below]

[42] Judges ⬥═49(1)
227 ----
227IV Disqualification to Act

227k49 Bias and Prejudice
227k49(1) In General.
Trial judge's remarks and actions at postconviction hearing, albeit on occasion ill-advised, did not diminish overall fairness of proceeding, even applying heightened standard of due process applicable in capital murder case, and thus, recusal of judge was not warranted. U.S.C.A. Const.Amend. 14.

[43] Criminal Law ⬥═586
110 ----
110XIX Continuance
110k586 Discretion of Court.
Whether to grant continuance rests within discretion of trial court.

[44] Criminal Law ⬥═1151
110 ----
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1151 Continuance.

[See headnote text below]

[44] Criminal Law ⬥═1166(7)
110 ----
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1166 Preliminary Proceedings
110k1166(7) Time for Trial or Hearing; Continuance.
Denial of continuance will not be disturbed unless it appears upon face of record that trial judge abused his discretion and prejudice enured to defendant as result of trial judge's ruling.

[45] Criminal Law ⬥═1499
110 ----
110XXX Post-Conviction Relief
110XXX(B) Grounds for Relief
110k1499 Continuance.

(Formerly 110k998(6.1))
To trigger postconviction relief, denial of continuance must implicate constitutional right.

[46] Habeas Corpus ⬥═479
197 ----
197II Grounds for Relief: Illegality of Restraint
197II(B) Particular Defects and Authority for Detention in General
197k479 Time for Trial; Continuance.
Habeas petitioner must demonstrate that trial court abused its discretion in denying continuance and that its action rendered proceeding fundamentally unfair.

[47] Criminal Law ⬥═578
110 ----
110XIX Continuance
110k578 Power and Duty of Court as to Continuance.
Grant or refusal of continuance rarely reaches constitutional proportions.

[48] Criminal Law ⬥═1650
110 ----
110XXX Post-Conviction Relief
110XXX(C) Proceedings
110XXX(C)3 Hearing and Determination
110k1650 In General.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

(Formerly 110k998(18))
Petitioner was not entitled to continuance of postconviction evidentiary hearing on ground that he had not completed investigation of his claims; petitioner failed to identify any prejudice affecting his conviction or sentence, and he sought continuance in order to gather information which, at time of continuance motion, was largely unknown and of entirely speculative value.

[49] Constitutional Law ⚖=270.5
92 ----
92XII Due Process of Law
92k256 Criminal Prosecutions
92k270.5 Post-Conviction Proceedings.

[See headnote text below]

[49] Criminal Law ⚖=1650
110 ----
110XXX Post-Conviction Relief
110XXX(C) Proceedings
110XXX(C)3 Hearing and Determination
110k1650 In General.

(Formerly 110k998(18))
Postconviction court's denial of petitioner's motion for continuance did not implicate his due process rights. U.S.C.A. Const.Amend. *156 14.

[50] Criminal Law ⚖=1433(2)
110 ----
110XXX Post-Conviction Relief
110XXX(A) In General
110k1433 Matters Already Adjudicated
110k1433(2) Affirmation of Conviction.

(Formerly 110k998(13))
Issues that have been previously determined on direct appeal cannot support petition for postconviction relief. West's Tenn.Code,    § § 40-30-111, 40-30-112 (1990).

[51] Criminal Law ⚖=627.5(3)
110 ----
110XX Trial
110XX(A) Preliminary Proceedings
110k627.5 Discovery Prior to and Incident to Trial
110k627.5(3) Prosecution's Right to Disclosure.
Defense counsel would not have been required to disclose to state any unfavorable opinion by expert whom he did not intend to call at trial or whose report he did not intend to introduce at trial. Rules Crim.Proc., Rule 16(b)(1)(B), (b)(2).

[52] Criminal Law ⚖=1119(1)
110 ----
110XXIV Review
110XXIV(G) Record and Proceedings Not in Record
110XXIV(G)15 Questions Presented for Review
110k1113 Questions Presented for Review
110k1119 Conduct of Trial in General
110k1119(1) In General.
In evaluating possible prejudice to defendant for purposes of ineffectiveness inquiry, Court of Criminal Appeals' review was limited to those mitigating factors reflected in record of capital murder trial. U.S.C.A. Const.Amend. 6.

[53] Sentencing and Punishment ⚖=1757

350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1757 Evidence in Mitigation in General.

(Formerly 110k1208.1(5))
It is neither Court of Criminal Appeals' right nor prerogative to impose any limitation on mitigating evidence that might be considered by jury in capital case.

**\*160** Paul J. Morrow and Brock Mehler, Nashville, for Appellant.

Charles W. Burson, Attorney General and Reporter, Christian S. Chevalier, Assistant Attorney General, Criminal Justice Division, Nashville, Al C. Schmutzer, Jr., District Attorney **\*161** General, Richard Vance, Asst. District Attorney General, Sevierville, for Appellee.

*OPINION*

HAYES, Judge.

The appellant, Edward Leroy Harris, alias "Tattoo Eddie," seeks post-conviction relief from his convictions of one count of armed robbery and two counts of premeditated first degree murder, entered by the Circuit Court of Sevier County in May, 1988, and the consequent imposition of one sentence of life imprisonment and two sentences of death by electrocution. The convictions and sentences were affirmed on appeal by the Tennessee Supreme Court. *State v. Harris*, 839 S.W.2d 54 (Tenn.1992) , *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

On August 10, 1993, the appellant filed a petition for post-conviction relief. On November 29, 1993, the post-conviction court conducted a hearing on the merits of the appellant's petition. At the conclusion of the hearing, the post-conviction court denied the petition. A written judgment of dismissal was filed on December 6, 1993.

The appellant raises the following eight issues on appeal:

(1) Whether the appellant received the effective assistance of counsel at trial and on appeal;

(2) Whether the post-conviction court erred by denying the appellant's motion for an    *ex parte* hearing and support services;

(3) Whether the post-conviction court abused its discretion in denying the appellant's motion to recuse;

(4) Whether the post-conviction court abused its discretion in denying the appellant's motion for a continuance;

(5) Whether the evidence presented at trial was sufficient to establish the elements of premeditation and deliberation and whether the instructions to the jury on premeditation and deliberation misled the jury;

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

(6) Whether the use of the felony murder aggravating circumstance violated the holding in *State v. Middlebrooks;*

(7) Whether the jury was prevented from considering lesser included offenses by the use of a sequential jury instruction; and

(8) Whether Tennessee's death penalty statute is constitutional.

After reviewing the record, we affirm the judgment of the post-conviction court.

## BACKGROUND FACTS

The appellant was convicted of the September 13, 1986, murders of two employees of the Rocky Top Village Inn in Gatlinburg. Also charged in the murders were Kimberly Pelley, the appellant's girlfriend; Joseph DeModica, a Georgia state penitentiary acquaintance of the appellant; and transvestite, Rufus Doby, also known as Ashley Silvers. At trial, two key sources of evidence for the State were the testimony of the co-defendant, DeModica, which implicated the appellant in the murders, and a letter describing the murders, recovered in a phone booth near the police station in Maggie Valley, North Carolina.

At trial, Joseph DeModica testified that, on the day of the murders, he, Doby, Pelley, and the appellant drove to Gatlinburg. Following a visit to the Great Smoky Mountains National Park, the group drove to the Rocky Top Village Inn. DeModica observed the appellant, Pelley, and one of the victims, Melissa Hill, enter the motel room in which Hill's body was subsequently discovered. Pelley carried a knife in her hand. DeModica remained in the parking lot. He heard several screams. A security guard, Troy Valentine, arrived, but encountered the appellant, who had come out of the motel room. Valentine and the appellant began to fight. Pelley also came out of the motel room, took the guard's flashlight, and struck him over the head with it. The appellant and Pelley then dragged Valentine into the motel room. DeModica heard two gunshots. He testified that, when the appellant and Pelley again came out of the motel room, they looked as if someone had sprayed them with red paint.

The State presented evidence to corroborate various aspects of DeModica's testimony. For example, with respect to the knife    **\*162**    that DeModica observed in Pelley's hand, an acquaintance testified that the appellant carried a lock-blade knife and a hunting knife with a serrated edge. Moreover, each victim suffered a deep neck wound from a serrated knife. Each victim had also been shot in the head. The massive amount of blood at the crime scene and the number of injuries inflicted upon each victim were consistent with DeModica's description of the appellant and Pelley following the murders. Finally, DeModica knew that Valentine had been clubbed with his flashlight. This information was not released to the media and would have been known only to the killers.

The Maggie Valley letter, which was found three days after the murders, also contained information which only the killers would have known. The State's document examiner excluded DeModica,

Pelley, and Silvers as the writer of the letter. Expert testimony further established strong indications that the appellant wrote this letter. A former girlfriend of the appellant, Antonia Jones, identified the handwriting in the Maggie Valley letter as being that of the appellant.

Following his arrest, the appellant made a series of statements to Tennessee Bureau of Investigation agents and Georgia law enforcement officers. Initially, the appellant denied going to Gatlinburg. However, he subsequently stated that he and his companions had eaten in a restaurant in Pigeon Forge, and that, while he and Pelley were in Gatlinburg with DeModica and Silvers, he had purchased a chain for Pelley. He denied participating in the killings and implied that DeModica and Silvers were the murderers.

The appellant did not testify at the guilt phase of his trial. Essentially, his defense, as advanced through the appellant's statements to the police following his arrest, was a denial of any participation in the crime. However, reviewing the sufficiency of the evidence on direct appeal, the supreme court remarked that "the overwhelming evidence supported the verdict of the jury...." *Harris,* 839 S.W.2d at 76. Similarly, the post-conviction court observed, "And the proof came in. The proof continued to come in.... This evidence as it rolled in, was overwhelming."

At the penalty phase of the trial, the State introduced the appellant's prior convictions involving violence to the person and otherwise relied upon the proof introduced during the guilt phase. (FN1) Defense counsel initially indicated that they would offer no proof during the penalty phase. However, following a conference with the trial judge in chambers, the appellant testified on his own behalf. The appellant stated that he was 32 years old and grew up in North Carolina. He informed the jury that he had only completed the third grade in school and could neither read nor write. He admitted that his difficulties in school stemmed largely from a lack of motivation. The appellant further testified that, during his youth, his relationship with his parents was troubled, and that he left home at the age of 14. The appellant admitted that, when he was 18, he pled guilty to several offenses in Georgia and spent 10 years in the Georgia penitentiary. While at the penitentiary, the appellant became involved in the Golden Gloves boxing program and won several trophies. The appellant testified that he has two children by a prior marriage, whom he visited on occasion. In conclusion, he asked that the jury spare his life.

The jury imposed the punishment of death, finding that three aggravating circumstances, Tenn.Code Ann. § 39-2-203(i)(2), (5), and (7) (1982), (FN2) outweigh any mitigating circumstances.

## \*163 INEFFECTIVE ASSISTANCE OF COUNSEL

[1][2][3][4] When a claim of ineffective assistance of counsel is raised, the burden is upon the appellant to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Thus, the appellant must prove that counsel "made

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *and* the appellant must demonstrate that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The appellant must establish *both* deficient performance *and* prejudice in order to prevail. *Id.* A reviewing court need not consider the two prongs of *Strickland* in any particular order. *Id.* at 697, 104 S.Ct. at 2069. Moreover, if the appellant fails to establish one prong, a reviewing court need not consider the other. *Id.*

[5][6][7][8][9] With respect to deficient performance, the proper measure of attorney performance is reasonableness under prevailing professional norms. *Id.* at 688, 104 S.Ct. at 2065. In other words, the attorney's performance must be within the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975); *Wright v. State,* No. 01C01-9105-CR-00149, 1994 WL 115955 (Tenn.Crim.App. at Nashville), *perm. to appeal denied,* (Tenn.1994), *cert. denied,* 513 U.S. 1163, 115 S.Ct. 1129, 130 L.Ed.2d 1091 (1995). This court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. We should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Wright,* No. 01C01-9105-CR-00149 (citing *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn.1982)). Additionally, this court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-690, 104 S.Ct. at 2065-2066. Finally, we note that defendants are not entitled to perfect representation, only constitutionally adequate representation. *Harries v. State,* No. 833, 1990 WL 125023 (Tenn.Crim.App. at Knoxville, August 29, 1990), *perm. to appeal denied,* (Tenn.1991).

[10] In order to establish prejudice, the appellant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.*

At the conclusion of the hearing in this case, the post-conviction court entered the following findings of fact:

(1) Mr. Sexton, Mr. Goddard, and Mr. Strand (appointed appellate counsel) had supporting staff and resources, including the Capital Case Resource Center, to utilize in the preparation for trial and the anticipated appeal.

(2) Defense counsel utilized every advantage available to them under the law and the facts as they found them. Defense counsel investigated every fact related to them by the petitioner, pursued every lead and prepared as best as they were enabled by the defendant.

(3) The defendant/petitioner did not at any time furnish information to defense counsel that would have justified seeking special support services, and they were diligent in not pursuing a mental investigation.

(4) Defense counsel did all they could to prevent the introduction of incriminating evidence and to discredit it to the extent they could when it was introduced over timely objection.

In denying the appellant's petition, the post-conviction court described counsel's trial performance in the following manner: "... [W]ell tried. Ably tried. Diligently tried. Conscientiously tried...."

*164 [11][12] In post-conviction proceedings, the appellant has the burden of proving the allegations in his petition by a preponderance of the evidence. *McBee v. State,* 655 S.W.2d 191, 195 (Tenn.Crim.App.1983). *See also State v. Buford,* 666 S.W.2d 473, 475 (Tenn.Crim.App.1983), *perm. to appeal denied,* (Tenn.1984). Moreover, "[t]he findings of fact and conclusions of law made by the trial court after an evidentiary hearing are afforded the weight of a jury verdict; this court will not set aside the judgment of the trial court unless the evidence contained in the record preponderates against its findings." *State v. Dick,* 872 S.W.2d 938, 943 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1993); *see also Harries,* No. 833. The appellant contends that the evidence preponderates against the judgment entered by the post-conviction court that the appellant was afforded effective assistance of counsel.

At the post-conviction hearing, the appellant called Charles Sexton, one of the appellant's trial attorneys. Sexton was appointed to represent the appellant immediately following the appellant's arraignment in December, 1987. (FN3) Sexton has been licensed to practice law in this state since 1979. At the time of his appointment, he was serving as the attorney for a local indigent defender program created by private act for Sevier County. Additionally, Sexton remained active in the private practice of law as a partner in a local law firm. He had an extensive criminal trial practice, and, in 1987, was averaging twenty to twenty-five felony cases each term of court. Before his appointment to this case, Sexton had represented ten or more defendants charged with some degree of homicide, including several charged with capital first degree murder. (FN4) Shortly after the appointment of Sexton to represent the appellant, the State announced its intention to seek the death penalty, and the trial court appointed William Goddard as co-counsel. The record reflects that Goddard was an experienced trial lawyer in both the civil and criminal areas of the law. (FN5) Both Sexton and Goddard utilized various members of their respective law firms, primarily in the area of legal research, throughout the course of the appellant's trial.

### I. Guilt Phase

Sexton testified at the post-conviction hearing that, in preparation for the guilt phase of the trial, he visited the crime scene, interviewed potential

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

witnesses, and obtained and reviewed discovery
information concerning handwriting exemplars and
autopsy reports. Additionally, proof at the hearing
established that trial counsel conducted pre-trial
interviews with all of the State's material witnesses
on at least one occasion. Finally, Sexton testified
that he spent a great deal of time on the case, and
that, between January and May of 1988, "there were
very few days that went by that at least some portion
of the day wasn't spent dealing with some issue on
the case." Benjamin Strand, Goddard's former law
partner, who assisted in the appeal after Goddard's
death, testified that Goddard also spent a great deal
of time on the appellant's case and, in fact, devoted
the two weeks prior to trial exclusively to trial
preparation.

Nevertheless, the appellant argues that trial
counsel's performance at the guilt phase of the trial
was not within the range of competence demanded
of attorneys. Specifically, he contends that defense
counsel failed to reasonably investigate the
authorship of the Maggie Valley note and failed to
properly advise the appellant of the consequences of
his refusal to provide additional handwriting
exemplars. Moreover, the appellant asserts that
counsel failed to adequately investigate the co-
defendant DeModica's background and the autopsy
and crime scene evidence. Finally, he contends that
defense counsel's performance was deficient in that
counsel failed to object to Dr. Blake's testimony
concerning *165 the victims' wounds and failed to
move to suppress the appellant's statements to the
police. (FN6) We conclude that the appellant has
failed to carry his burden of proof, and that the
evidence in the record preponderates in favor of the
post-conviction court's judgment.

[13] With respect to counsel's investigation of the
Maggie Valley letter, we initially note that the
appellant was afforded, at the trial level, the
opportunity to exonerate himself as the author of the
Maggie Valley letter, which opportunity he rejected.
Indeed, the Tennessee Supreme Court, on direct
appeal, observed:

It is clear from the record that from at least late
February 1988, three months before trial, the
defendant knew that the State was seeking
handwriting samples and was consulting an expert.
The Defendant was aware of ... the significance of
the handwriting issue. When the court ordered
additional samples, the Defendant refused to
comply.

*Harris,* 839 S.W.2d at 67. Thus, the appellant
cannot now attribute to counsel's performance a
situation which he, himself, created.
Tenn.R.App.P. 36(a); *see also      Waterhouse v.
Perry,* 195 Tenn. 458, 260 S.W.2d 176, 178 (1953).

[14][15][16][17] Moreover, the record reveals that
counsel's investigation was constitutionally
adequate. Prior to trial in this case, defense counsel
contacted a handwriting expert, James Kelly, an
agent with the Georgia Bureau of Investigation, and
filed a motion for a certificate of need for Kelly.
However, the information that they obtained from
Kelly was ultimately no more conclusive than the
opinion of the State's expert, Thomas Vastrick, a
document examiner with the United States Postal
Service. The record reflects that defense counsel

reviewed Vastrick's reports, and that Goddard
interviewed Vastrick on at least one occasion. With
respect to Vastrick's opinion, Sexton testified that
defense counsel "felt very comfortable in what Mr.
Vastrick's position was. That he couldn't say that
Mr. Harris was the author of that note." Faced
with two inconclusive opinions, counsel could
reasonably determine that the possibility of obtaining
a favorable expert opinion was outweighed by the
risk that counsel would merely provide the State an
adverse expert opinion. *See Dees v. Caspiri,* 904
F.2d 452, 455 (8th Cir.), *cert. denied,* 498 U.S.
970, 111 S.Ct. 436, 112 L.Ed.2d 419 (1990).

[S]trategic choices made after thorough
investigation of law and facts relevant to plausible
options are virtually unchallengeable; and
strategic choices made after less than complete
investigation are reasonable precisely to the extent
that reasonable professional judgments support the
limitations on investigation. In other words,
counsel has a duty to make reasonable
investigations or to make a reasonable decision that
makes particular investigations unnecessary. In
any ineffectiveness case, a particular decision not
to investigate must be directly assessed for
reasonableness in all circumstances, applying a
heavy measure of deference to counsel's
judgments.

*Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct.
3114, 3126, 97 L.Ed.2d 638 (1987). Defense
counsel made a reasonable strategic decision to
forgo further investigation and rely at trial upon the
cross-examination of the State's expert witness.

Unfortunately, defense counsel was informed only
a few days prior to trial of another witness, Antonia
Jones, who was familiar with the appellant's
handwriting. When, on the first day of trial,
defense counsel learned that both Antonia Jones and
Vastrick were to testify, counsel requested an
opportunity to have an independent expert examine
the Maggie Valley letter and the appellant's
handwriting. The trial court denied the request,
holding that the request came too late. In any event,
defense counsel vigorously cross-examined Jones.
Moreover, counsel was able to locate and interview
Jones' mother, Julia Jones. Mrs. Jones testified for
the defense in an attempt to discredit her daughter's
testimony. Based upon the foregoing, we cannot
conclude that counsel's performance was deficient.

*166 [18] The appellant also claims that counsel
failed to properly advise him of the consequences of
his refusal to comply with the trial court's order to
provide additional handwriting exemplars. This
issue, the appellant contends, is significant in view
of the trial court's ruling that his refusal could be
considered by the jury as an inference of guilt.
However, the post-conviction court found that the
appellant was advised of the consequences of his
refusal "repeatedly, and intently." The record
supports the finding of the post-conviction court. At
the post-conviction hearing, Sexton was asked
whether he recalled informing the appellant of the
inferences that could be drawn at trial from the
appellant's failure to submit additional samples.
Trial counsel responded, "I believe we talked about
it at the bench on the 11th. I believe that it was
probably talked about at the hearing in Dandridge....
We talked with Mr. Harris about it. And I know it

was brought up on this occasion. And I believe probably at one or two other occasions in the proceedings." This contention is without merit.

[19][20] The appellant next complains that defense counsel failed to reasonably investigate the background of co-defendant, Joe DeModica. Counsel testified at the post-conviction hearing that he examined DeModica's criminal record. The appellant contends that defense counsel should have further investigated DeModica's past in order to determine whether DeModica has a propensity for violence. The appellant argues that such information would have rebutted DeModica's claim that he was afraid of the appellant and was "forced" to remain with the appellant throughout this criminal episode. Sexton testified at the post-conviction hearing that he did not investigate DeModica's background more thoroughly "because Mr. Demodica had been around many parts of the country, and had lived in many areas, and had a record from many areas of this country." Nevertheless, the appellant asserts that defense counsel should have requested funds for an investigator. Initially, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.' " *Burger,* 483 U.S. at 794, 107 S.Ct. at 3126 (citation omitted). Moreover, there is nothing in the record that would have triggered further investigation by defense counsel of DeModica's background. (FN7) Thus, we cannot conclude that further investigation was constitutionally compelled.

[21] The appellant contends that counsel was ineffective for failing to request funds for an expert to review the findings of Dr. Blake, the State's expert in forensic pathology. However, the appellant does not state what, if anything, in Dr. Blake's report is erroneous or explain why his findings are suspect. The record reflects that, prior to trial, defense counsel examined Dr. Blake's reports and interviewed Dr. Blake. Again, we cannot conclude that counsel's performance was deficient.

[22] The appellant also claims that counsel erroneously failed to object to Dr. Blake's testimony at trial that two of the victims' wounds had "serrated margins." The record reveals that defense counsel did, in fact, object to the introduction of Dr. Blake's testimony, citing the State's failure to comply with discovery rules. Prior to trial, defense counsel had repeatedly requested any additional reports by Dr. Blake, yet no additional reports were furnished until trial. At trial, the State delivered to defense counsel for the first time a report by Dr. Blake, describing Dr. Blake's observations at the crime scene. The trial judge overruled defense counsel's objection to Dr. Blake's testimony, concluding that Dr. Blake was an ordinary witness with respect to the matters contained in the report. However, the judge invited the defense to renew their objection if Dr. Blake's testimony touched on an area of expertise of which the defense had not received notice. At trial, Dr. Blake did, in fact, testify concerning wound analysis, conducted only a few days prior to trial, and the "sharp, sawtoothed markings" surrounding two of the wounds. The defense failed to make a contemporaneous **\*167** objection. However, counsel vigorously cross-examined Dr. Blake, who

conceded that he had not compared the victim's wounds to any knife involved in the investigation. Thus, even if defense counsel's failure to contemporaneously object constituted deficient performance, we conclude that such error did not unduly prejudice the defense.

[23] Finally, the appellant complains that counsel did not attempt to suppress statements made by the appellant to law enforcement officers. However, the record reveals that the statements were not inculpatory, but rather exculpatory. The statements were general denials of participation in the killings and were in conformity with the appellant's position at trial that he was not present during the criminal episode. Counsel testified at the post-conviction hearing that, at the time of trial, he "didn't feel [that the statements] would become relevant ... but if they did, [h]e didn't mind ... the exculpat[ory] part getting in." The appellant has not demonstrated that this strategic decision of counsel was deficient performance.

We conclude that the appellant has failed to establish his allegations of ineffective assistance of counsel at the guilt phase of the trial by a preponderance of the evidence.

## II. Penalty Phase

The appellant also contends that he was afforded ineffective assistance of counsel at the sentencing phase of the trial. Again, in imposing two death penalties, the jury found that the appellant had previously been convicted of one or more felonies involving the use or threat of violence to the person, that the murders were especially heinous, atrocious, or cruel, and that the murders were committed while the appellant was engaged in a robbery. Tenn.Code Ann. § 39-2-203(i)(2), (5), and (7). The jury further found that these aggravating circumstances outweigh any mitigating factors. The appellant argues that defense counsel failed to adequately prepare for the sentencing phase of the trial. Specifically, the appellant asserts that counsel failed to adequately investigate and obtain available evidence regarding the appellant's background and mental condition. (FN8)

[24][25][26] At the penalty phase, defense counsel offered no proof, other than the appellant's testimony, in support of mitigation. Our supreme court has observed that there is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial. *State v. Melson,* 772 S.W.2d 417, 421 (Tenn.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). However, "[a] strategy of silence may be adopted only after a reasonable investigation for mitigating evidence or a reasonable decision that an investigation would be fruitless." *Tafero v. Wainwright,* 796 F.2d 1314, 1320 (11th Cir.1986), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 782 (1987). Courts have held counsel's representation beneath professionally competent standards when sentencing counsel did not conduct enough investigation to formulate an "accurate life profile" of a defendant. *Jackson v. Herring,* 42 F.3d 1350, 1367 (11th Cir.), *cert. dismissed,* 515 U.S. 1189, 116 S.Ct. 38, 132 L.Ed.2d 919 (1995). We note that the extent of investigation required depends critically upon information supplied by the

defendant. *Burger,* 483 U.S. at 795, 107 S.Ct. at 3126. *See also Whitmore v. Lockhart,* 8 F.3d 614, 621 (8th Cir.1993).

[W]hen the facts that support a certain line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Burger,* 483 U.S. at 795, 107 S.Ct. at 3126.

In this case, defense counsel did not act "in a factual void in an unjustified manner." *Knighton v. Maggio,* 740 F.2d 1344, 1350 (5th   **\*168** Cir.), *cert. denied,* 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 241 (1984). With respect to the appellant's background, Sexton testified at the post-conviction hearing that he spoke with the appellant "many, many times." Moreover, during an early interview, Sexton utilized a standardized eight to ten page form to gather background information from the appellant. Trial counsel acknowledged that he was familiar with the appellant's limited educational background and the fact that he had resided in institutions in North Carolina as a juvenile and in penal institutions as an adult. Sexton testified that the appellant was "able to outline where he had been and ... why he was there." Sexton also contacted the appellant's mother in Georgia on two occasions. Defense counsel asked the appellant's mother to testify at the sentencing hearing. She refused to participate.

Sexton attempted to contact other individuals whose names were supplied by his client, but to no avail as they could not be found. Sexton testified at the post-conviction hearing that "it was hard to find somebody that would take an interest in this man, and would make an effort to come up here and ... and show some concern for him. And it got down to the point where it looked like it was just me and Bill Goddard, and nobody else was going to give a hoot about what happened to this man."

Thus, the appellant and his mother were the primary sources of background information relevant to the sentencing phase of the appellant's trial. Sexton indicated that the information obtained from the appellant and his mother suggested that further investigation would be unproductive. Sexton stated that if he "had thought anything would have helped this man, [he] would have had it [at the sentencing hearing]."

[27] Sexton admitted that defense counsel did not request funds for investigative services. However, "[u]nder certain circumstances, trial counsel's decision not to investigate family childhood background may legitimately be the product of a reasoned tactical choice. Given the particular circumstances of [a] case including, among other things, the fact that [a defendant] [is] thirty-one years old when he murder[s] [the victim], evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight." *Francis v. Dugger,* 908 F.2d 696, 703 (11th Cir.1990), *cert.*

*denied,* 500 U.S. 910, 111 S.Ct. 1696, 114 L.Ed.2d 90 (1991). The appellant in this case was approximately thirty years of age at the time of the murders.

With respect to the appellant's mental health, Sexton testified that he and Goddard discussed the possibility of requesting a psychological evaluation of the appellant, but concluded that there was no evidence that any such evaluation was warranted. At the post-conviction hearing, Sexton testified:

But at no point in time, during this proceeding did I ever feel like Mr. Harris was less than competent. He always communicated with us. He was always very cooperative with us. He always talked very freely with us. Was able to understand the questions when we would ask them, was able to give us answers. And, frankly, was ... was as cooperative as you could ask him to be. In most areas. Now there were some things we had some difficulties with. But as far as him understanding, and having any mental deficiencies, I was never ... it really never became an issue ... with me. (FN9)

We note that the post-conviction court also observed, "This court has noticed nothing to indicate anything to raise a question about this defendant's ability to understand these proceedings and defend himself, participate in them." Finally, trial counsel testified that at no time during any pre-trial interview did the appellant mention a learning disability. Furthermore, the appellant never alluded to any psychological problems or any past treatment **\*169** or institutionalization for psychological disorders.

[28] Thus, we conclude that defense counsel's performance was constitutionally adequate at the penalty phase. Moreover, the appellant suffered no prejudice as a result of counsel's performance. We base our conclusion upon the findings of Robert Steele, an investigator for the Capital Case Resource Center. At the post-conviction hearing, Steele testified that, after the appointment of Brock Mehler and Paul Morrow, attorneys for the Capital Case Resource Center, he began interviewing and collecting records in an attempt to identify mitigating themes. In addition to interviewing the appellant and his mother, the investigator contacted one hundred and forty individuals by phone or letter and received twenty-three responses. Steele's conclusions are summarized in his affidavit, submitted in support of the appellant's motion for support services.

Steele states in his affidavit that the appellant's father, Artie Harris, died in an automobile accident when the appellant was four years old. Following his father's death, the appellant's mother, Merlene Harris, lived with a man, Bob Turner, who physically abused both the appellant and his mother. The appellant and his brother were then placed in foster homes, where they remained until Mrs. Harris married a man named Melvin Nelms. The family moved to North Carolina. At this time, the appellant began running away from home, and was placed in various foster homes and institutions, including the Western Carolina Center. (FN10)

Concerning the appellant's mental health, the affidavit reflects that his mother was hospitalized for

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

measles and pneumonia while pregnant with the appellant. Furthermore, at the age of two, the appellant was struck by a car and suffered a severe head injury. While attending school, the appellant was placed in special education classes. As an adult, the appellant used drugs. While incarcerated at the Georgia penitentiary, the appellant was "stabbed in the head." While incarcerated at the DeKalb County Jail in Georgia, the appellant attempted to commit suicide. Finally, the appellant contends that the Western Carolina Center records indicate that he is "mentally defective" and has an I.Q. of 65; that, in 1966 and 1967, the appellant was diagnosed as "brain damage[d];" and that, in 1969, the Western Carolina Center diagnosed him as mentally retarded.

Assuming the accuracy of Steele's findings, we conclude that neither these findings nor the Western Carolina Center records are uniformly helpful to the appellant. *See, e.g., Whitmore,* 8 F.3d at 623. While many people have unhappy childhoods, few brutally murder two people. *Strouth v. State,* 755 S.W.2d 819, 827 (Tenn.Crim.App.1986). Moreover, the Western Carolina Center records document the appellant's propensity to engage in violent or antisocial behavior and may well have alienated the jury had they been introduced at the penalty phase of the appellant's trial. Finally, contrary to the appellant's assertion, the record before us establishes that further investigation by trial counsel of the appellant's mental condition would not have changed the jury's sentencing determination. In other words, further investigation would not have produced facts sufficient to tip the scales in favor of a sentence other than death.

The information contained in the Western Carolina Center admission and progress notes is ambiguous. (FN11) The initial admission interview with the Western Carolina Center, dated March 17, 1969, consisted of an interview with the appellant's mother, who was attempting to place her son at the Center. At the time of the interview, the appellant had completed two one-year commitments with the Juvenile Evaluation Center and was eligible for release. The records do not identify the particular state agency under which either center is operated i.e. mental health, education, social services, or correction. The **\*170** records do reflect that the appellant's placement in the Juvenile Evaluation Center, pursuant to a juvenile court order, resulted from the appellant's frequent attempts to run away from home.

An initial report notes that the appellant is "an ambulatory, fully verbal, 11-year old boy with a serious behavior problem." The social services worker further observed, "Mrs. Nelms [the appellant's mother] told me that Eddie has 'brain damage' and is 'disturbed.' ... I feel that the unstable home situation has played a very large role in Eddie's behavior.... *'Brain damage' is the alibi she prefers to use to cover up her own inadequacies as a mother."* (Emphasis added).

The same report recites the following, "Dr. Nale at the Evaluation Center at Western Carolina University, has told Mr. and Mrs. Nelms [the appellant's parents] that Eddie's I.Q. was 'approximately average.' " In the only documented examination of the appellant by a physician, the

physician concluded that the appellant suffered "[m]ild mental retardation *on a [s]ocio-cultural basis."* (Emphasis added).

Only one psychological report is contained in the Center's records. A school psychologist prepared this report, dated July 14, 1970. The psychologist conducted a personal interview with the appellant. Additionally, the psychologist administered a number of psychological tests to determine the appellant's level of functioning. The psychologist concluded:

Eddie has assumed a style of aggression, retaliation, and lack of patience with others and himself, which would indicate little toleration for formal school structure and any other formal environment. Rules and regulations and good behavior frustrate him.... *I have no facts or reasons to suspect that he is mentally retarded.* His social behavior is so immature that it seems he is functioning as a poorly adjusted six year old.... He also shows indications that he can grasp a good deal of academically related material on a concrete level and that he could learn to develop moderate academic skills.

(Emphasis added).

The "Admission Summary" from the Western Carolina Center does reflect that "[a]t one time [the appellant was] on Prolixin and had reaction to this with his eyes rolling back and getting stiff." However, contrary to Steele's affidavit, there is nothing in the Center's records to indicate that the appellant was ever administered Thorazine, much less "medicated with thorazine the entire time."

The above conclusions contradict the following undocumented observation in the Western Carolina clinical record: "Eddie has been quite healthy in general. His diagnosis by Dr. Nale at Cullowhee was brain damage 2 1/2 years ago." They similarly contradict the following comment, included in an additional report of the Western Carolina admission interview: "The psychological report from the Juvenile Evaluation Center indicated that Eddie is 'mentally defective, mild with behavior disorder.' He achieved an I.Q. of 65."

The last report from the Western Carolina Center, prepared by the appellant's social worker on May 3, 1971, reveals the following:

Presently, Eddie is not on campus. He recently went home with his mother on a 30 day trial visit, contrary to the staff's recommendations. This occurred after Eddie's most recent AWOL episode.... Since Eddie's admission to the Center, he has presented many problems. He refuses to follow his scheduled routine and frequently wanders about doing as he pleases. He has a problem taking orders from and relating to people in authority. Running away has also proved to be a great problem with Eddie.... [T]he family is very unstable and the prognosis for Eddie's getting along well at home on this 30 day trial visit is very poor. I have seen little progress in my work with this family and feel that here, too, the prognosis for much improvement in this family's pattern of relationships and the mother's functioning in her role as wife and mother is poor.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Finally, assuming once again the accuracy of information contained in Steele's affidavit and considering the aggravating circumstances of this case, we conclude that the appellant has failed to meet his burden under *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. "It cannot be gainsaid that the cruelty of the    **\*171**    [murders] made it more difficult for [the appellant] to alter the final sentence by adducing mitigating circumstances." *Elledge v. Dugger,* 823 F.2d 1439, 1447 (11th Cir.1987). This issue is without merit.

## MOTION FOR *EX PARTE* HEARING AND SUPPORT SERVICES

The appellant contends that the post-conviction court erred by denying his motion for an    *ex parte* hearing and for support services. The basis of the appellant's motion is that his "claim of ineffective assistance of counsel involves a number of areas where the service of an expert is 'the single means of establishing prejudice.' "    Specifically, the appellant contends that the appointment of a document examiner, a forensic pathologist, a criminal investigator, and a psychologist are necessary to protect his Sixth Amendment right to the effective assistance of counsel.

The post-conviction court denied the appellant's motion. Relying upon this court's decision in *Teague v. State,*        772 S.W.2d 915, 927 (Tenn.Crim.App.1988), *perm. to appeal denied,* (Tenn.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 210, 107 L.Ed.2d 163 (1989), the post-conviction court ruled that "Tenn.Code Ann.    § 40-14-407(b) does not authorize special support services in a post-conviction proceeding...." (FN12)  The court added that "[t]he constitutional issue raised is whether joint trial counsel effectively represented petitioner according to constitutional standards.  What trial counsel did or failed to do is of record."

[29][30] In *Owens and Payne,* 908 S.W.2d at 928, the Tennessee Supreme Court held that Tenn.Code Ann.  § 40-14-207(b) (1995 Supp.) applies to post-conviction capital cases. (FN13)  The court further held that, in order to obtain an    *ex parte* hearing, a post-conviction petitioner must comply with the procedural guidelines set forth in Tenn.Sup.Ct.Rule 13(2)(B)(10).  *Id.*   Moreover, at the hearing, "a petitioner must demonstrate by specific factual proof that the services of an expert or an investigator are necessary to establish a ground for post-conviction relief, and that the petitioner is unable to establish that ground for post-conviction relief by other available evidence."  *Id.*  Thus, "[t]he trial court should grant the motion if ... the petitioner demonstrates that investigative or expert services are necessary to ensure the *protection of the petitioner's constitutional rights.* "  *Id.*  (emphasis added).  In other words, within the post-conviction context, the support services sought must implicate a constitutional right.

In the case before us, the appellant seeks support services to ensure the protection of his Sixth Amendment right to the effective assistance of counsel.  However, based upon the record before us, we have already determined that the appellant's claim of ineffectiveness is without merit.  We agree with the post-conviction court's judgment that the

record is adequate to the task.  This issue is without merit.

## MOTION TO RECUSE

The appellant contends that the post-conviction judge abused his discretion in failing to recuse himself from these proceedings because (1) the judge, at the time of his designation, was seeking the office of United States Senator, (2) the judge was a material witness with respect to the issues raised in the post-conviction proceeding, and (3) the impartiality of the trial judge might reasonably be questioned.

First, Tenn.Sup.Ct.Rule 10, Cannon 7(A)(3), in pertinent part, requires a judge to resign his office "when he becomes a candidate in a party primary or in a general election for a non-judicial office."  The appellant correctly argues that it would be inappropriate for one seeking national office to **\*172** preside over a highly publicized death penalty post-conviction proceeding.  However, absent the bald allegation by the appellant, nothing in the record suggests that the post-conviction judge was a candidate in the primary or general election for the position of United States Senator at the time of his designation as a special judge.  Rather, the record contains the following facts relevant to this issue: On August 31, 1993, the judge resigned his office as Circuit Judge for the Fourth Judicial District of Tennessee in anticipation of his candidacy for the United States Senate.  However, the judge subsequently reconsidered his position and chose not to seek elective office.  Therefore, on September 29, 1993, when the Supreme Court of Tennessee designated him as a special judge to preside over the post-conviction proceeding in this case, the judge was not running for the United States Senate.  This contention is without merit.

The appellant also alleges that the trial judge had personal knowledge of disputed facts relevant to issues raised at the post-conviction proceeding. Specifically, the appellant contends that the trial judge was aware of the following facts:  the significance of Vastrick's and Jones' testimony concerning the Maggie Valley letter;  when defense counsel became aware that Vastrick and Jones would testify;  whether and when defense counsel were led to believe that the State was no longer seeking handwriting exemplars from the appellant;  and whether the appellant was advised of the consequences of his refusal to provide additional exemplars.

[31][32][33][34] A motion to recuse is addressed to the sound discretion of the trial court.    *State v. Parton,* 817 S.W.2d 28, 30 (Tenn.Crim.App.1991). Generally, "[w]hen a trial judge has no doubt of his ability to preside fairly over the matters presented, there is no need to grant a motion for recusal." *Johnson v. State,*  No. 83-241-III, 1988 WL 3632 (Tenn.Crim.App. at Nashville, January 20, 1988), *aff'd in part. rev'd in part,*        797 S.W.2d 578 (Tenn.1990). However, the standard is ultimately an objective one.  Thus, recusal is warranted "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality."    *Alley v. State,*      882 S.W.2d 810, 820 (Tenn.Crim.App.1994).  The

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

standard of review on appeal is whether the trial court abused its discretion by denying the motion. *State v. Cash,*      867 S.W.2d 741, 749 (Tenn.Crim.App.1993).

[35][36][37] Tenn.Sup.Ct.Rule 10, Cannon 3(C) provides, "A judge should disqualify himself in a proceeding in which his impartiality·might reasonably be questioned, including but not limited to instances where: He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." However, prior knowledge of facts about the case is not sufficient in and of itself to require disqualification. *Alley,* 882 S.W.2d at 822. Moreover, we note that a judge is in no way disqualified merely because he has participated in other legal proceedings against the same person. *King v. State,* 216 Tenn. 215, 391 S.W.2d 637, 642 (1965). *See also State v. Demodica,* No. 99, 1990 WL 21233 (Tenn.Crim.App. at Knoxville), *perm. to appeal denied,* (Tenn.1990). The supreme court has observed that "[j]udicial knowledge upon which a decision may be based is ... the cognizance of certain facts the judge becomes aware of by virtue of the legal procedures in which he plays a neutral role." *Vaughn v. Shelby Williams of Tennessee, Inc.,* 813 S.W.2d 132, 133 (Tenn.1991). The court of appeals in       *Embry v. Chimenti,*       No. 02A01-9305-CV-00116, 1994 WL 81221 (Tenn.App. March 15, 1994), citing       *Vaughn,* distinguished between a judge's knowledge obtained by virtue of his position in an earlier, related proceeding and knowledge obtained outside the courtroom. Thus, to disqualify, prejudice " 'must stem from an *extrajudicial* source and result in an opinion on the merits on some basis other than what the judge learned from ... participation in the case.' " *Alley,* 882 S.W.2d at 821 (citation omitted) (emphasis added).

[38] Accordingly, pursuant to Tenn.Code Ann. § 40-30-103 (1994 Supp.), the judge who presided at the trial in which a conviction occurred is permitted, although not required, to preside over post-conviction proceedings when the competency of trial **\*173** counsel has been challenged by the appellant. This practice is pervasive. Indeed, in this case, upon request of the Supreme Court, the trial judge suspended his retirement in order to preside over the post-conviction proceedings. (FN14) As suggested by the State, to require recusal whenever a trial judge in a post-conviction proceeding has knowledge of disputed facts would wreak havoc in the criminal justice system.

[39] It is true that a trial judge cannot both preside at a post-conviction proceeding and serve as a witness in that proceeding. *See* Tenn.R.Evid. 605; Cohen, Paine, and Sheppeard, *Tennessee Law of Evidence* (1990) § 605.1, pp. 247-248. However, having reviewed the record of the post-conviction proceedings, we conclude that the judge was not a significant source of information at the hearing, nor was the judge's decision ultimately influenced by that information. *Vaughn,* 813 S.W.2d at 134. Moreover, the record reflects that other witnesses were available to address the factual issues.

[40][41][42] The appellant nevertheless complains that the trial judge's conduct of the post-conviction

hearing, including his findings at the conclusion of the hearing, render his impartiality suspect. Initially, we note that adverse rulings by a court are not usually sufficient grounds to establish bias. *Alley,* 882 S.W.2d at 821. Moreover, "[t]he issue to be determined is not the propriety of the judicial conduct of the judge, but whether he committed an error which resulted in an unjust disposition...." *State v. Hawk,*      688 S.W.2d 467, 472 (Tenn.Crim.App.1985). We conclude that the judge's remarks and actions at the post-conviction hearing, albeit on occasion ill-advised, did not diminish the overall fairness of the proceeding, even applying the heightened standards of due process applicable in a capital case. (FN15)     *See State v. Cazes,* 875 S.W.2d 253, 260 (Tenn.1994),      *cert. denied,* 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995). This issue is without merit.

MOTION FOR CONTINUANCE

On November 9, 1993, the appellant filed a motion to continue the post-conviction evidentiary hearing. In support of his motion, the appellant alleged that he had not completed the investigation of his claims. On November 23, 1993, the post-conviction court denied the appellant's motion.

On November 29, 1993, at the evidentiary hearing, the appellant renewed his motion for a continuance and made an offer of proof in the form of Robert Steele's testimony. Steele is an investigator and litigation specialist with the Capital Case Resource Center. As mentioned earlier, Steele testified that he had been coordinating the penalty phase investigation of this case since August, and that he had contacted 140 individuals in order to collect records relating to the appellant. He stated that he had received 23 responses, including the report from the Western Carolina Center. Steele stated that it would take approximately 6 to 9 months to complete the penalty phase investigation of this case. The court denied the renewed motion.

Additionally, on the morning of the post-conviction hearing, the appellant amended his petition, alleging in part that the grand and petit juries in this case were not representative of the community. The defense argued that they would require at least sixty days in order to investigate the systematic exclusion of certain cognizable groups from the Sevier County jury system. This motion for a continuance was also denied.

[43][44][45][46][47] It is well established that the decision whether to grant a continuance "rests within the discretion of the trial court." *State v. Morgan,* 825 S.W.2d 113, 117 (Tenn.Crim.App.1991), *perm. to appeal denied,* (Tenn.1992). Moreover, the denial of a continuance will not be disturbed "unless it **\*174** appears upon the face of the record that the trial judge abused his discretion and prejudice enured to the accused as a direct result of the trial judge's ruling." *State v. Dykes,*      803 S.W.2d 250, 257 (Tenn.Crim.App.1990). Additionally, in order to trigger post-conviction relief, the denial of a motion for continuance must implicate a constitutional right. Thus, the habeas petitioner "must demonstrate, first, that the ... court abused its.discretion and, second, that its action rendered the [proceeding] fundamentally.unfair." *Conner v. Bowen,* 842 F.2d 279, 283 (11th Cir.),

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*cert. denied,* 488 U.S. 840, 109 S.Ct. 107, 102 L.Ed.2d 82, *and cert. denied,* 488 U.S. 864, 109 S.Ct. 164, 102 L.Ed.2d 135 (1988). We note that the grant or refusal of a continuance "rarely reaches constitutional proportions." *Knighton,* 740 F.2d at 1351.

[48] We conclude that the trial court did not abuse his discretion. The proof indicates that the Capital Case Resource Center first became involved in this case when its attorney, Brock Mehler, filed a petition for writ of certiorari to the United States Supreme Court. In February, 1993, the Supreme Court denied the petition. In June, 1993, the Capital Case Resource Center was appointed to represent the appellant in his post-conviction proceedings. At this time, post-conviction counsel withdrew the record, and, in July, 1993, reviewed the record. On August 10, 1993, counsel filed a petition. As previously noted, the evidentiary hearing was held on November 29, 1993. Thus, the appellant's counsel had access to the records in this case for at least five months prior to the post-conviction hearing, including three months following the filing of the appellant's petition.

Moreover, the appellant has failed to identify any prejudice affecting his conviction or sentence. It is undisputed that a continuance may be granted for the purpose of securing the presence of identifiable witnesses if the witnesses' testimony is material and admissible. However, in this case, the appellant sought a continuance in order to gather information which, at the time of the motion, was largely unknown and of entirely speculative value.

[49] Thus, while we do not wish to douse the flames of post-conviction counsel's zealous representation, a continuance of six to nine months under the facts presented is not warranted. Moreover, for the reasons already discussed, the post-conviction court's denial of the appellant's motions does not implicate his due process rights. This issue is without merit.

*PREMEDITATION AND DELIBERATION*

The appellant next contends that, in light of the Supreme Court's decision in *State v. Brown,* 836 S.W.2d 530, 534 (Tenn.1992), the evidence introduced at trial was insufficient to support premeditation and deliberation. Moreover, the appellant argues that, pursuant to *Brown,* the trial court's instruction to the jury, that premeditation may be formed in an instant, was improper.

In *Brown,* our supreme court held that "it is prudent to abandon an instruction that tells the jury that 'premeditation may be formed in an instant.' " *Id.* at 543. However, the *Brown* case was decided on June 1, 1992. The appellant's trial occurred in 1988. We have held that *Brown* is not to be applied retroactively. *Lofton v. State,* 898 S.W.2d 246, 249-250 (Tenn.Crim.App.1994), *perm. to appeal denied,* (Tenn.1995); *Peters v. State,* No. 03C01-9409-CR-00331, 1995 WL 632346 (Tenn.Crim.App. at Knoxville, October 30, 1995). Moreover, the supreme court's holding in *Brown* does not implicate a constitutional right or new rule of law. Accordingly, this court has repeatedly held that *Brown* may not be used as a basis for relief within the post-conviction context. *See, e.g.,*

*Lofton,* 898 S.W.2d at 249-250; *Peters,* No. 03C01-9409-CR-00331; *State v. Slate,* No. 03C01-9201-CR-00014, 1994 WL 228751 (Tenn.Crim.App. at Knoxville, May 23, 1994).

[50] This court in *Slate,* No. 03C01-9201-CR-00014, held that sufficiency of the evidence, generally, may implicate the due process rights of the appellant and is therefore a cognizable claim in post-conviction proceedings pursuant to Tenn.Code Ann. § 40-30-105 (1990). However, issues that have been previously determined on direct appeal cannot support a petition for post-conviction relief. Tenn.Code Ann. § 40-30-111, -112 **\*175** (1990). *See also Harvey v. State,* 749 S.W.2d 478, 479 (Tenn.Crim.App.1987); *Gribble v. State,* No. 02C01-9303-CC-00039, 1995 WL 46379 (Tenn.Crim.App. at Jackson), *perm. to appeal denied,* (Tenn.1995); *Randolph v. State,* No. 03C01-9309-CR-00309, 1994 WL 421325 (Tenn.Crim.App. at Knoxville), *perm. to appeal denied,* (Tenn.1994), *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1699, 115 S.Ct. 1699 (1995).

The appellant challenged the sufficiency of the evidence on direct appeal. *Harris,* 839 S.W.2d at 75-76. As noted earlier, the Supreme Court found that "[s]ince the overwhelming evidence supported the verdict of the jury, the judgment of conviction must be affirmed." *Id.* at 76. The appellant contends that, in evaluating the sufficiency of the evidence, the supreme court concentrated upon the evidence implicating the appellant in the crime and did not directly address the issues of premeditation and deliberation. The appellant cites this court's decision in *Slate,* No. 03C01-9201-CR-00014, in support of his argument. However, on direct appeal in *Slate,* the appellate court, without discussing the merits, held that the issue of sufficiency of the evidence was entirely waived. Therefore, the post-conviction appellate court found that the issue had not been previously determined. In contrast, in the instant case, the supreme court addressed the merits of the appellant's challenge to the sufficiency of the evidence. Thus, this issue has been previously determined and is not subject to review in this proceeding.

*MIDDLEBROOKS ISSUE*

The appellant also contends that because he was convicted of felony murder, the supreme court's decision in *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), *cert. dismissed,* 510 U.S. 124, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993), should be applied to invalidate the aggravating circumstance of felony murder. The record reveals that the jury found the appellant guilty of both felony murder and premeditated first degree murder, as to each victim. (FN16) Prior to the sentencing phase of the trial, the trial court "merged" the felony murder and premeditated murder verdicts, in effect dismissing the felony murder verdicts. (FN17)

In *Middlebrooks,* the Tennessee Supreme Court held that the state is precluded from using felony murder as an aggravating circumstance when the underlying conviction is felony murder. *Id.* at 346. In so holding, the court stated the following:

[W]hen the defendant is convicted of first-degree

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

murder solely on the basis of felony murder, the aggravating circumstance set out in Tenn.Code Ann. § 39-13-203(i)(7) (1982) and 39-13-204(i)(7) (1991), does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the U.S. Constitution and Article I, § 16 of the Tennessee Constitution because it duplicates the elements of the offense.

*Id.*

As the state correctly asserts, the appellant was not convicted "solely on the basis of felony murder." The jury returned guilty verdicts on counts of both premeditated and felony murder. This issue is without merit.

#### *SEQUENTIAL JURY INSTRUCTIONS*

The appellant next contends that "the jury's deliberative process was unfairly skewed by the Court's instruction." At the conclusion of the guilt phase of the trial, the judge instructed the jury on the elements of first degree murder. The judge then instructed the jury that it could only consider the lesser included offense of second degree murder if it first acquitted the appellant of the greater offense.

This court has repeatedly upheld the giving of so-called "acquittal first" instructions. *See State v. Raines,* 882 S.W.2d 376, 381-382 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1994); *State v. McPherson,* 882 S.W.2d *176 365, 375-376 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1994); *State v. Rutherford,* 876 S.W.2d 118, 119-120 (Tenn.Crim.App.1993), *perm. to appeal denied,* (Tenn.1994); *State v. Beckham,* No. 02C01-9406-CR-00107, 1996 WL 389321 (Tenn.Crim.App. at Jackson, September 27, 1995). Accordingly, this issue is without merit.

#### *THE TENNESSEE DEATH PENALTY STATUTE*

The appellant raises numerous constitutional challenges to Tennessee's death penalty statute. Although he acknowledges that the Tennessee Supreme Court has rejected each of these arguments in the past, he nevertheless raises them in order to preserve the issues for later review by the federal appellate courts.

The appellant first contends that Tennessee's death penalty statute fails to meaningfully narrow the class of death eligible defendants. Specifically, the appellant maintains that, in combination, aggravating circumstances (i)(2), (FN18) (5), (FN19) (6), (FN20 ) and (7) (FN21) apply to a majority of the homicides committed in Tennessee. He submits that, if he possessed the resources to investigate and obtain statistical evidence, he could show that "it is the exception rather than the rule that a homicide does not involve a collateral felony (i)(7) and, consequently, the killing of the victim/witness to that felony (i)(6), or does not involve the infliction of .severe mental or physical pain (i)(5), or that the person who commits the homicide does not have a prior conviction for assault or any felony 'whose statutory elements involve the use of violence to the person' (i)(2)." This argument was rejected by this court in *State v. Odom,* No. 02C01-9305-CR-00080, 1994 WL 568433 (Tenn.Crim.App. at Jackson,

October 19, 1994), *perm. to appeal granted,* (Tenn.1995). *See generally State v. Smith,* 868 S.W.2d 561, 582 (Tenn.1993), *cert. denied,* 513 U.S. 960, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994); *State v. Cauthern,* 778 S.W.2d 39, 47 (Tenn.1989), *cert. denied,* 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990). This issue has no merit.

The appellant also claims that the (i)(5) aggravating circumstance is vague and overbroad. Again, our supreme court has held that this statutory aggravating circumstance is constitutional. *See State v. Black,* 815 S.W.2d 166, 181-182 (Tenn.1991). This issue is without merit.

The appellant contends that the (i)(6) aggravating circumstance has been construed and applied in such a manner as to be duplicative of the (i)(7) aggravating circumstance. We conclude, however, that this issue need not be addressed, since the jury did not find that the (i)(6) aggravating circumstance is applicable in this case.

The following arguments raised by the appellant were rejected in *State v. Smith,* 857 S.W.2d 1 (Tenn.), *cert. denied,* 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993), *and cert. denied,* 510 U.S. 1040, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994):

(1) the statute is unconstitutional because the death penalty has been imposed in a discriminatory manner based upon economics, race, geography, and gender, *Id.* at 23;

(2) the lack of uniform procedures mandating individual sequestered voir dire during jury selection renders the imposition *177 of the death penalty arbitrary and capricious, *Id.* at 20;

(3) the death penalty statute is unconstitutional because it limits the consideration of mitigating evidence by requiring the jury to unanimously agree on a life sentence, *Id.* at 18; and

(4) the death penalty statute is unconstitutional because the jury is not required to make the ultimate determination that the death penalty is appropriate, *Id.* at 22.

The following arguments raised by the appellant were rejected by the supreme court in *State v. Caughron,* 855 S.W.2d 526, 542 (Tenn.), *cert. denied,* 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993):

(1) by excluding jurors who have scruples against the death penalty, the jury selection process skews the make-up of the jury to make it prosecution-prone and thereby violates the defendant's constitutional rights; and

(2) the death penalty is arbitrarily and capriciously imposed because the State has the right of final closing argument at the penalty phase.

The following arguments raised by the appellant were rejected by the supreme court in *State v. Brimmer,* 876 S.W.2d 75, 86-87 (Tenn.), *cert. denied,* 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994):

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

(1) the death penalty is imposed in an arbitrary and capricious manner because the defendant is not allowed to address issues such as parole eligibility, cost of incarceration versus cost of execution, deterrence, and method of execution;

(2) the death sentence is imposed in an arbitrary and capricious manner because the jury is not instructed as to the effect of a non-unanimous verdict;

(3) the death penalty is arbitrarily and capriciously imposed because the prosecutor is allowed discretion in deciding whether to seek the death penalty; and

(4) the death penalty statute is unconstitutional because there is a reasonable likelihood that the Tennessee Pattern Jury Instructions lead the jurors to believe that they are required to unanimously agree as to the existence of mitigating circumstances.

The appellant also argues that electrocution is a cruel and unusual punishment, thereby violating the appellant's constitutional rights. This argument was specifically rejected in *Black*, 815 S.W.2d at 178-179.

Finally, the appellant argues that the appellate review process in Tennessee is constitutionally inadequate. Specifically, he argues that appellate review in Tennessee is not meaningful for the following reasons: there is no uniform, state-wide procedure for collecting and evaluating data concerning the disposition of homicide cases; the cases of defendants convicted of some degree of homicide less than first degree murder and/or the cases of defendants who received a sentence of less than life imprisonment are not reported to the supreme court; the information collected by the trial judges in the Tenn.Sup.Ct.Rule 12 form is inadequate; the jury verdict form mandated by Tenn.Code Ann. § 39-2-203(f) (1982) did not require the jury to report mitigating circumstances and thereby renders appellate review of these circumstances impossible; and no published standard for review of proportionality is available. In short, the appellant asserts that "there is no meaningful body of collected data to which the defendant can refer and no standard upon which the defendant can rely to plead his case." This argument was specifically rejected by this court in *Odom*, No. 02C01-9305-CR-00080. *See also Cazes*, 875 S.W.2d at 270-271.

### CONCLUSION

The record fully supports the post-conviction court's findings and conclusions. The appellant has clearly not met his burden of proof. We conclude that the petition for post-conviction relief was properly denied. For the reasons we have stated, the judgment of the post-conviction court is affirmed.

SUMMERS and BARKER, JJ., concur.

### ORDER DENYING PETITION TO REHEAR

The appellant has filed a Petition to Rehear requesting that this court reconsider **\*178** our

opinion holding that the appellant received the effective assistance of counsel at the guilt and sentencing phases of his trial. He contends that the court's opinion incorrectly states the material facts established by the evidence and set forth in the record, is in conflict with prior decisions, and overlooks material facts and propositions of law. Tenn.R.App.P. 39(a)(1), (2), and (3). Having thoroughly re-examined the record, we conclude that the issue of ineffective assistance of counsel has been adequately considered. Accordingly, the appellant's Petition to Rehear is denied. Nevertheless, recognizing the heightened standard of scrutiny applicable to the review of a sentence of death and to insure that our conclusions are sufficiently reflected on the record, we elect to address certain points raised by the appellant in his Petition. *See* Tenn.Code Ann. § 39-13-206(c)(1)(B), (c)(1)(C) (1994 Supp.).

[51] First, the appellant contests this court's citation to *Dees v. Caspiri*, 904 F.2d 452, 455 (8th Cir.), *cert. denied*, 498 U.S. 970, 111 S.Ct. 436, 112 L.Ed.2d 419 (1990), in support of the proposition that trial counsel's failure to further investigate the authorship of the Maggie Valley letter was a reasonable strategic decision. We acknowledge, as correctly pointed out by the appellant, that under Tennessee law trial counsel would *not* have been required to disclose to the State any unfavorable opinion by an expert whom he did not intend to call at trial or whose report he did not intend to introduce at trial. Tenn.R.Crim.P. 16(b)(1)(B) and (b)(2). *See also State v. Nichois*, 877 S.W.2d 722, 729-730 (Tenn.1994), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *State v. Vilvarajah*, 735 S.W.2d 837, 839 (Tenn.Crim.App.1987); *State v. Bell*, 690 S.W.2d 879, 883 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1985). However, the appellant incorrectly infers that our evaluation of trial counsel's investigation of the Maggie Valley Letter relied upon *Dees*, 904 F.2d at 452.

Initially, we noted in our opinion that the appellant, by refusing to submit additional handwriting samples to the State, rejected an opportunity to exonerate himself as the author of the Maggie Valley letter. Moreover, the record does not support the appellant's position that defense counsel failed to further explore a November 20, 1987, report by document examiner James Kelly, in which Kelly indicated that "[c]omparison of the writing of Rufus Edward Doby with the writing in [the Maggie Valley letter] discloses similarities, but there are not enough for a positive identification." Kelly suggested in his report that the original copy of the Maggie Valley letter be submitted, along with additional writing samples from Doby.

For the purpose of clarification, we will outline the events concerning defense counsel's investigation of the Maggie Valley letter, as reflected in the record. Defense counsel received a copy of the Maggie Valley letter on February 2, 1988. They received samples of the appellant's handwriting on February 26, 1988. On or about February 29, 1988, defense counsel Charles Sexton communicated with Kelly. Kelly apparently informed Sexton that he had eliminated co-defendants Doby, Pelley, and DeModica as the author of the Maggie Valley letter. Defense counsel received Kelly's report on

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

approximately March 11, 1988. On the same day, defense counsel also received reports completed by the State's document examiner, Thomas Vastrick, which indicated that neither Pelley, DeModica, nor Doby had written the Maggie Valley letter. Vastrick's reports also reflected a possibility that the appellant had written the letter, but Vastrick required additional handwriting samples. Notes recovered from the file of defense counsel William Goddard, dated March 15, 1988, indicated that Sexton and Goddard contemplated consulting another handwriting expert, Buster Brown. At the post-conviction hearing, Sexton testified that defense counsel spoke with Mr. Brown but did not request an analysis. On April 5, 1988, the State submitted a motion for additional samples of the appellant's handwriting. Defense Counsel submitted a motion requesting a certificate of need which would allow the appellant to subpoena James Kelly for trial. On April 7, 1988, defense counsel received a report from Thomas Vastrick indicating that he was still unable to establish that the appellant was the author of the Maggie Valley letter. On April 11, 1988, defense counsel discussed with the court their efforts to obtain an opinion from ***179** Kelly that Doby, rather than the appellant, was the author of the letter. They indicated that they would like to send the original Maggie Valley letter and additional samples of Doby's handwriting to Kelly. On April 13, 1988, the court ordered the State to provide the requested materials to defense counsel, with the exception of the original Maggie Valley letter. However, the court indicated that, should the original letter prove indispensable, the State and defense counsel might, on their own, arrange to send the letter to Kelly, or defense counsel could submit additional motions to the court. Sexton testified at the post-conviction hearing that he could not recall specifically what happened after this hearing with respect to Mr. Kelly. However, he did state, "I believe at some point, in time, additional information [was] obtained, and I do believe that in the course of the proceedings those were eventually provided to Mr. Kelly." He also testified that defense counsel did engage in further communication with Kelly. However, he could not recall the outcome of those communications. Sexton also stated that defense counsel spoke with Vastrick and determined that Vastrick was unable to testify that the appellant wrote the Maggie Valley letter.

Thus, the record does not reveal whether or not Kelly was ever provided with the original Maggie Valley letter, additional samples of Doby's handwriting, or samples of the appellant's handwriting. As to the "eleventh-hour request for an expert on the eve of trial," this request was not necessarily a reflection of "haphazard" investigation, but rather a reaction to the "eleventh-hour" production by the State of an additional witness prepared to testify that the handwriting in the Maggie Valley letter was that of the appellant. The burden is on the appellant at a post-conviction proceeding to prove the allegations in his petition by a preponderance of the evidence. *McBee v. State,* 655 S.W.2d 191, 195 (Tenn.Crim.App.1983). *See also State v. Buford,* 666 S.W.2d 473, 475 (Tenn.Crim.App.1983), *perm. to appeal denied,* (Tenn.1984). While admittedly the issue of ineffective assistance of counsel in this case is a close one, we conclude that the appellant simply did not meet his burden of proof.

With respect to counsel's investigation at the penalty phase of the trial, we acknowledge that this court in *Cooper v. State,* 847 S.W.2d 521, 529 (Tenn.Crim.App.1992), indicated that there is a greater burden placed on defense counsel to investigate possible mitigating evidence at the penalty phase of a capital trial. However, in *Cooper,* 847 S.W.2d at 525-526, the defendant's sister told defense counsel about "the defendant's depression, attempted suicide, and his seeing [a clinical psychologist] ninety days before the killing.... she told the attorney about the involuntary commitment order which she had obtained for [the defendant] on the day of the killing." This court found that the attorney's failure to further investigate the defendant's psychological background and condition was ineffective assistance of counsel. Similarly, in *Adkins v. State,* 911 S.W.2d 334, 355 (Tenn.Crim.App.1994),*perm. to appeal dismissed,* (Tenn.1995), defense counsel learned from family members and friends that the defendant's father was an alcoholic who had abused the appellant. This court found that defense counsel's decision to forgo further investigation of mitigating evidence and his failure to present mitigating evidence were ineffective assistance of counsel. In *Bell v. State,* No. 03C01-9210-CR-00364, 1995 WL 113420 (Tenn.Crim.App. at Knoxville), *perm. to appeal denied,* (Tenn.1995), this court found that counsel's investigation and preparation for the penalty phase of the trial, including counsel's failure to request a psychological examination of the defendant, constituted ineffective assistance of counsel. As in the instant case, counsel failed to obtain juvenile records that arguably revealed the defendant's low I.Q. However, in *Bell,* No. 03C01-9210-CR-00364, counsel personally believed that the defendant was suffering psychological difficulties. Moreover, at the post-conviction hearing, counsel conceded that less preparation was done for the penalty phase of the trial than for the guilt/innocence phase. Counsel described the investigative effort as "not overwhelming."

In the instant case, the record does not support the appellant's assertion that defense counsel only began to prepare for the sentencing phase the weekend before trial. Rather, Sexton testified at the post-conviction ***180** hearing that, prior to that weekend, he "had looked at that, and worked on that...." As stated in our opinion, defense counsel interviewed the appellant on many occasions. During an early interview, counsel used an eight to ten page form to gather background information from the appellant. Defense counsel contacted the appellant's mother on several occasions. They also attempted to contact other individuals named by the appellant, largely without success. Sexton observed that "it was hard to find somebody that would take an interest in this man...." Sexton also testified that he could not recall being informed of either an abusive family situation or psychological or mental difficulties. There is no evidence in the record that defense counsel was aware of any psychological or mental difficulties. Indeed, Sexton testified that the appellant did not appear to suffer any "mental deficiencies." (FN1) The appellant testified at the sentencing phase that his poor performance in school resulted from a lack of motivation, rather than a lack of intelligence. With respect to medication administered to the appellant while he was in jail

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

awaiting trial, we would simply note that in *Elledge v. Dugger,* 823 F.2d 1439, 1444-1445 n. 10 (11th Cir.1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988), the court found that trial counsel should have pursued the issue of the defendant's mental condition, upon learning that he was being treated with antipsychotic medications while in jail, because of trial counsel's personal conviction that the defendant was "crazy." In the instant case, Sexton testified that, at no time during the proceedings, did he feel that the appellant was suffering psychological difficulties.

The appellant also argues that the jury had no choice but to return a verdict of death. *Adkins,* 911 S.W.2d at 356. We disagree. During the penalty phase, defense counsel emphasized to the jury the appellant's limited education, the appellant's difficult relationship with his parents during his childhood, the fact that the appellant ran away from home at an early age, remaining doubt concerning the appellant's role in the murders, the fact that the appellant has two children, and testimony adduced during the guilt phase of the trial concerning various attempts by the appellant to "help[ ] people." Defense counsel and the appellant asked that the jury exercise mercy.

The appellant also suggests the presence of Eighth Amendment and Fourteenth Amendment claims stemming from the alleged errors of his trial counsel. This court acknowledges that the Supreme Court has held that it is a violation of the Eighth and Fourteenth Amendments for a state, by statute, or a judge to preclude a jury from considering mitigating evidence in a capital case. *See, e.g., Hitchcock v. Dugger,* 481 U.S. 393, 394, 107 S.Ct. 1821, 1822, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 1670-1671, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 111-114, 102 S.Ct. 869, 875-876, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978). However, the Supreme Court has consistently analyzed *counsel's* failure to present mitigating evidence against the standards of the Sixth Amendment. *See, e.g., Burger v. Kemp,* 483 U.S. 776, 788-795, 107 S.Ct. 3114, 3122-3126, 97 L.Ed.2d 638 (1987); *Strickland v. Washington,* 466 U.S. 668, 687-692, 698-699, 104 S.Ct. 2052, 2065-2066, 2070-2071, 80 L.Ed.2d 674 (1984).

[52][53] With respect to prejudice at the sentencing phase, under *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069, we must consider whether the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Thus, contrary to the appellant's assertion, in noting the brutal nature of the crimes involved, we in no way implied that the appellant's crimes are "unmitigatable." Moreover, in evaluating possible prejudice to the appellant, **\*181.** our review is limited to those mitigating factors reflected in the record. Therefore, our observation concerning the mitigating evidence arguably available to the appellant was only intended to describe the evidence reflected in the record. (FN2) In conclusion, we agree that it is neither this court's right nor prerogative to impose any limitation on mitigating evidence that may be considered by the jury in a capital case. *Hitchcock,* 481 U.S. at 394, 107 S.Ct. at 1822; *Skipper,* 476 U.S. at 4, 106

S.Ct. at 1670-1671; *Eddings,* 455 U.S. at 111-114, 102 S.Ct. at 875-876; *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964-2965.

For the reasons stated above, the appellant's Petition to Rehear is denied.

(FN1.) The prior convictions were for the offenses of rape, aggravated robbery, and aggravated sodomy.

(FN2.) Tenn.Code Ann. § 39-2-203(i)(2), (5), and (7) provide as follows:

(2) The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

(5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and

(7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, ....

(FN3.) The appellant was arrested on December 16, 1987, in Atlanta, Georgia.

(FN4.) The record indicates that the case before us is the first capital case to culminate in a jury verdict of death in Sevier County during this century.

(FN5.) Goddard did not testify at the post-conviction hearing, as he was killed in an automobile accident approximately eight days after the completion of the appellant's trial.

(FN6.) The appellant also alleges that counsel failed to adequately investigate the appellant's mental condition at the guilt, penalty, and direct appellate stages of these proceedings. We fully address this issue in our discussion of the penalty phase.

(FN7.) The appellant mentions in his brief that DeModica exploded and struck at his counsel during his sentencing hearing. The record before us does not reveal whether this incident in fact occurred, or whether defense counsel were aware of the incident, assuming that it occurred.

(FN8.) The *only* feasible mitigating, factors available to the appellant were mental disease or defect, pursuant to Tenn.Code Ann.        §
39-2-203(j)(8) (1982), and his troubled background, pursuant, generally, to Tenn.Code Ann. § 39-2-203(j) (1982).

(FN9.) At the post-conviction hearing, the appellant filed as an exhibit medical records from the Sevier County jail which show that, prior to trial, the appellant was given Haldol and Xanax, because he was suffering some anxiety and depression and was experiencing difficulty sleeping. A "Statement of General Health Condition" noted that the appellant is allergic to Thorazine. Arguably, these records would not have alerted

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

947 S.W.2d 156, Harris v. State, (Tenn.Crim.App. 1996)                                    **Page 20**

defense counsel that the appellant was suffering any psychological difficulties other than those understandably experienced by one awaiting trial for the murders of two individuals where the State was seeking the death penalty.

(FN10.) We note that, other than Steele's testimony, there is no proof in this record that the Western Carolina Center is a state institution for the mentally retarded.

(FN11.) The admission and progress notes were prepared by social workers. They frequently fail to cite the source of information included in the notes and provide no documentation to establish the accuracy of the information.

(FN12.) The post-conviction court's ruling preceded the Tennessee Supreme Court's decision in the consolidated cases of *Owens and Payne v. State,* 908 S.W.2d 923, 928 (Tenn.1995), which expressly overruled the dicta of *Teague.*

(FN13.) Tenn.Code Ann. § 40-14-207(b) provides in pertinent part:

[I]n capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, such court in an *ex parte* hearing may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the *constitutional rights of the defendant are properly protected ...*

(Emphasis added).

(FN14.) At the post-conviction proceeding, the trial judge remarked, "The Judges asked me to hear it. I thought well we don't want anything for someone to grasp at on these proceedings ... let us do it by the numbers, ... and so the supreme court appointed me to hear it...."

(FN15.) The appellant also challenged the impartiality of this judge on direct appeal. The Tennessee Supreme Court found, "An examination of the entire record establishes that the trial court did not conduct the trial in a manner showing bias in favor of the State.", *Harris,* 839 S.W.2d at 66.

**\*181**_  (FN16.) The appellant was indicted on two counts of premeditated first degree murder and two counts of felony murder. All four counts were

submitted to the jury.

(FN17.) Similarly, in *State v. Hurley,* 876 S.W.2d 57, 69-70 (Tenn.1993), where the defendant was convicted of both felony murder and premeditated first degree murder of one victim, the supreme court dismissed the felony murder count.

(FN18.) Tenn.Code Ann. § 39-2-203(i)(2) (1982) sets forth the aggravating circumstance that "[t]he defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person."

(FN19.) Tenn.Code Ann. § 39-2-203(i)(5) (1982) sets forth the aggravating factor that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind."

(FN20.) Tenn.Code Ann. § 39-2-203(i)(6) (1982) sets forth the aggravating factor that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the defendant or another."

(FN21.) Tenn.Code Ann. § 39-2-203(i)(7) (1982) sets forth the aggravating factor that "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb."

(FN1.) When counsel has no reason to know of a client's mental problems, the Sixth Amendment does not impose a general duty to explore the defendant's mental capacity. *See, e.g., Riley v. Snyder,* 840 F.Supp. 1012, 1027 (D.Del.1993) (citing *United States ex rel. Rivera v. Franzen,* 794 F.2d 314 (7th Cir.), *cert. denied,* 479 U.S. 991, 107 S.Ct. 588, 93 L.Ed.2d 590 (1986), and *Clanton v. Bair,* 826 F.2d 1354 (4th Cir.1987), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 779 (1988)).

(FN2.) Our consideration of possible prejudice pursuant to *Strickland* has encompassed the appellant's background, possible mental difficulties, and other mitigating factors argued by defense counsel during the penalty phase.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, State v. Caughron, (Tenn. 1993)    Page 1

**\*526** 855 S.W.2d 526

Supreme Court of Tennessee,
at Knoxville.

STATE of Tennessee, Appellee,
v.
Gary June CAUGHRON, Appellant.
May 10, 1993.

Defendant was convicted in the Criminal Court,
Sevier County, J. Kenneth Porter, J., of first-degree
premeditated murder, first-degree burglary, and
assault with intent to commit rape and was sentenced
to death. Defendant appealed. The Supreme Court,
Drowota, J., held that: (1) trial court did not abuse
its discretion in refusing to grant defendant pretrial
continuance; (2) accomplice's testimony was
sufficiently corroborated; and (3) evidence
supported finding of aggravated circumstance for
purposes of death penalty.

Affirmed.

Daughtrey, J., dissented and filed opinion in which
Reid, C.J., joined.

West Headnotes

[1] Criminal Law ⬦⬦1151
110 ----
  110XXIV Review
    110XXIV(N) Discretion of Lower Court
    110k1151 Continuance.
  It must be clearly shown that trial court has abused
its discretion in refusing to grant continuance before
that decision will be disturbed on appeal.

[2] Criminal Law ⬦⬦596(1)
110 ----
  110XIX Continuance
    110k588 Grounds for Continuance
    110k596 Cumulative or Impeaching Evidence
  110k596(1) Cumulative Evidence in General.
  Trial court did not abuse its discretion in refusing
to grant murder defendant continuance before trial to
take testimony or deposition of investigating officer
on grounds that officer possessed crucial knowledge
that groceries were in victim's truck when body was
discovered; trial court determined that officer's
testimony would have been cumulative in light of
existence of other officers who should have
possessed same knowledge and victim's daughter
testified that she had unloaded bags of groceries
from truck after she had found victim.

[3] Criminal Law ⬦⬦595(1)
110 ----
  110XIX Continuance
    110k588 Grounds for Continuance
    110k595 Competency or Materiality of
        Expected Evidence
    110k595(1) Materiality of Evidence in
        Prosecution for Homicide in General.
  Trial court did not abuse its discretion in refusing
to grant murder defendant continuance before trial to
investigate additional suspects in statements given to
defense by state; defendant failed to show
materiality and relevance of any evidence such
investigation would yield or that different result
would have been reached if continuance had been

granted.

[4] Criminal Law ⬦⬦589(1)
110 ----
  110XIX Continuance
    110k588 Grounds for Continuance
    110k589 In General
  110k589(1) In General.
  Trial court did not abuse its discretion in refusing
to grant murder defendant continuance before trial to
examine broken-in door of victim's bedroom so as
to show that footprint on door was larger than
defendant's; door had been made available to
defense attorney for examination three days before
defendant's motion for continuance and
inconsistency of footprint on door with defendant's
footprint was explored during forensic scientist's
testimony.

[5] Criminal Law ⬦⬦594(1)
110 ----
  110XIX Continuance
    110k588 Grounds for Continuance
    110k594 Absence of Witness or Evidence in
        General
  110k594(1) In General.
  Trial court did not abuse its discretion in refusing
to grant murder defendant continuance before trial to
permit FBI agent to testify, despite fact that trial
court denied continuance on mistaken belief that
agent would testify, where agent's testimony was
presented to jury through stipulation and defense
counsel later stated that he did not want continuance
because of stipulation.

[6] Criminal Law ⬦⬦627.7(3)
110 ----
  110XX Trial
    110XX(A) Preliminary Proceedings
      110k627.5 Discovery Prior to and Incident to
          Trial
      110k627.7 Statements, Disclosure of
      110k627.7(3) Statements of Witnesses or
          Prospective Witnesses.
  Purpose of rule requiring party to provide
opponent with statements of witness relating to
subject matter of witness' testimony is to enable
counsel to examine witness' statements to test
credibility of witness at trial. Rules Crim.Proc.,
Rule 26.2.

[7] Criminal Law ⬦⬦627.8(2)
110 ----
  110XX Trial
    110XX(A) Preliminary Proceedings
      110k627.5 Discovery Prior to and Incident to
          Trial
      110k627.8 Proceedings to Obtain Disclosure
      110k627.8(2) Time When Disclosure Is
          Permitted.
  Trial court did not abuse its discretion by denying
request of counsel for murder defendant second
night in which to review statements relating to direct
testimony of state witness for cross-examination;
state had provided statements to defense on previous
evening approximately 22 hours before cross-
examination and witness was young girl who had
required several recesses for her to regain her
composure. Rules Crim.Proc., Rule 26.2(d).

[8] Criminal Law ⬦⬦627.8(2)
110 ----

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, State v. Caughron, (Tenn. 1993)                    Page 2

110XX Trial
  110XX(A) Preliminary Proceedings
    110k627.5 Discovery Prior to and Incident to
      Trial
    110k627.8 Proceedings to Obtain Disclosure
    110k627.8(2) Time When Disclosure Is
      Permitted.
  Trial judges cannot require advance disclosure of
witness' statements under rule requiring party after
direct examination to provide opponent with
statements of witness relating to subject matter of
witness' testimony.  Rules Crim.Proc., Rule 26.2.

[9] Criminal Law ☜473
  110 ----
   110XVII Evidence
    110XVII(P) Documentary Evidence
    110k431 Private Writings and Publications
    110k438 Photographs and Other Pictures
    110k438(4) Depiction of Places;  Scene of
      Crime.

[See headnote text below]

[9] Criminal Law ☜438(8)
  110 ----
   110XVII Evidence
    110XVII(P) Documentary Evidence
    110k431 Private Writings and Publications
    110k438 Photographs and Other Pictures
    110k438(8) Special Types of Photographs;
      Enlargements, Motion and Sound
      Pictures, X-Rays.
  Trial court did not abuse its discretion in admitting
photographs and videotape taken at murder scene;
photographs and videotape were highly probative
and depictions were not shocking or gruesome.

[10] Criminal Law ☜656(9)
  110 ----
   110XX Trial
    110XX(B) Course and Conduct of Trial in
      General
    110k654 Remarks and Conduct of Judge
    110k656 Comments on Evidence or Witnesses
    110k656(9) Expressions as to Weight and
      Sufficiency of Evidence and Guilt of
      Accused.
  Trial court did not indicate to jury that it believed
that defendant was guilty so as to constitute
reversible error in murder prosecution by virtue of
interrupting defendant's cross-examination of
witnesses, commenting during defendant's direct
examination of witness, and telling jury that they did
not have to look at potentially distasteful physical
evidence;  trial court's behavior did not so clearly
violate mandate of impartiality as to infringe upon
right to fair trial and no prejudice was shown.
U.S.C.A. Const.Amend. 6.

[11] Criminal Law ☜655(1)
  110 ----
   110XX Trial
    110XX(B) Course and Conduct of Trial in
      General
    110k654 Remarks and Conduct of Judge
    110k655 In General
   110k655(1) In General.
  Trial judge should exercise care not to express any
thought that might lead jury to infer that judge is in
favor of or against defendant.

[12] Criminal Law ☜473
  110 ----
   110XVII Evidence
    110XVII(R) Opinion Evidence
    110k468 Subjects of Expert Testimony
   **526** 110k473 Bodily Condition.
  Trial court did not abuse its discretion in allowing
forensic pathologist to characterize injuries on
murder victim's back as "whipping marks" and
those on victim's buttock as slap injury;  pathologist
was board certified and had conducted 2500 forensic
investigations.

[13] Criminal Law ☜469.2
  110 ----
   110XVII Evidence
    110XVII(R) Opinion Evidence
    110k468 Subjects of Expert Testimony
   110k469.2 Discretion.
  Admission of expert testimony is largely in
discretion of trial judge.

[14] Criminal Law ☜419(2.20)
  110 ----
   110XVII Evidence
    110XVII(N) Hearsay
    110k419 Hearsay in General
    110k419(2.20) Then-Existing State of Mind or
      Body.

[See headnote text below]

[14] Criminal Law ☜419(2.40)
  110 ----
   110XVII Evidence
    110XVII(N) Hearsay
    110k419 Hearsay in General
    110k419(2.40) Evidence Showing Intent,
      Motive, or Nature of Act.
  Testimony of murder defendant's girlfriend, that
she was upset with victim because of conversation
victim had had with girlfriend's mother, that she
was mad at victim because victim did not approve of
defendant and girlfriend, and that she hurt victim
because she hated victim for going to girlfriend's
mother and trying to separate girlfriend from
defendant, was not inadmissible hearsay, as
testimony was not offered to prove truth of matter
asserted, but to show girlfriend's state of mind and
what provoked her to harm victim.  Rules of Evid.,
Rule 801(c).

[15] Criminal Law ☜419(2)
  110 ----
   110XVII Evidence
    110XVII(N) Hearsay
    110k419 Hearsay in General
    110k419(2) Evidence as to Fact of Making
      Declarations and Not as to Subject-
      Matter.
  Testimony of mother of murder defendant's
girlfriend that victim had told mother that victim did
not trust defendant was not inadmissible hearsay, as
import of testimony was that conversation occurred,
not that victim's statement was true.  Rules of
Evid., Rule 801(c).

[16] Witnesses ☜77
  410 ----
   410II Competency
    410II(A) Capacity and Qualifications in General
    410k77 Examination of Witness as to

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, State v. Caughron, (Tenn. 1993)                                    Page 3

Competency.

Trial court did not abuse its discretion by failing to ask juvenile witness in competency evaluation in murder prosecution whether she understood difference between telling truth and lie and whether she comprehended importance of telling truth; trial judge asked witness general questions and questions about her awareness of her testimony before declaring her competent to testify. Rules of Evid., Rule 601; T.C.A. § 24-1-101 (Repealed).

[17] Witnesses ☞40(1)
410 ----
  410II Competency
    410II(A) Capacity and Qualifications in General
    410k40 Age and Maturity of Mind
    410k40(1) In General.

Under rule and statute governing witness competency, no one is automatically barred from testifying simply because of age or mental status. Rules of Evid., Rule 601; T.C.A.        § 24-1-101 (Repealed).

[18] Witnesses ☞35
410 ----
  410II Competency
    410II(A) Capacity and Qualifications in General
    410k35 Capacity in General.

Question of witness competency is matter for trial court's discretion.

[19] Criminal Law ☞1170.5(1)
110 ----
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
    110k1170.5 Witnesses
    110k1170.5(1) Rulings in General.

(Formerly 110k11701/2(1))

Any error was not reversible in trial court allowing prosecution to ask leading questions of murder defendant's girlfriend on direct examination; girlfriend was young and highly emotional witness, it was necessary to lead her to develop her testimony, and prejudice was not clearly shown. Rules of Evid., Rule 611(c).

[20] Criminal Law ☞1063(1)
110 ----
  110XXIV Review
    110XXIV(E) Presentation and Reservation in
          Lower Court of Grounds of Review
    110XXIV(E)3 Motions for New Trial or in
          Arrest
    110k1063 Necessity of Motion for New Trial
          or in Arrest
    110k1063(1) In General.

Murder defendant waived for appellate review issue of admissibility of testimony by failing to raise alleged errors in motion for new trial. Rules App.Proc., Rule 3(e).

[21] Criminal Law ☞510.5
110 ----
  110XVII Evidence
    110XVII(S) Testimony of Accomplices and
          Codefendants
    110XVII(S)2 Corroboration
    110k510.5 Admissibility.

(Formerly 110k5101/2)

[See headnote text below]

[21] Homicide ☞162
203 ----
  203VII Evidence
    203VII(B) Admissibility in General
    203k162 Commission of or Participation in Act
          by Accused in General.

Testimony of murder defendant's former friend that defendant had pool stick that broke down into three pieces, had material similar to that used in murder in defendant's automobile, talked about tying up women during sex, and made statement regarding slapping women on buttocks was relevant to connect defendant to murder and corroborate accomplice's testimony.

[22] Criminal Law ☞1169.2(3)
110 ----
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
    110k1169 Admission of Evidence
    110k1169.2 Curing Error by Facts Established
          Otherwise
    110k1169.2(3) Other Offenses and Character
          of Accused.

Erroneous admission of testimony of murder defendant's former friend respecting defendant's drug use, satanic sketches, and listening to rock music, which corroborated accomplice's statements, was harmless error, as accomplice's testimony had already presented those features of defendant's character. Rules of Evid., Rule 404(b).

[23] Criminal Law ☞338(6)
110 ----
  110XVII Evidence
    110XVII(D) Facts in Issue and Relevance
    110k338 Relevancy in General
    110k338(6) Evidence for Purpose of Testing,
          Sustaining, or Impeaching Credibility
          or Character of Witnesses and Others.

Testimony of mother of murder defendant's girlfriend that around time of murder girlfriend was having trouble in school and crying and that defendant "sneaked around" her house after murder was admissible, despite its marginal relevance; testimony tended to bolster credibility of girlfriend, who testified for prosecution as accomplice.

[24] Witnesses ☞262
410 ----
  410III Examination
    410III(A) Taking Testimony in General
    410k261 Recalling Witnesses
    410k262 In General.

Trial court did not abuse its discretion in allowing state to recall murder victim's daughter to testify that victim owned shot glasses and pink toothbrush; evidence was relevant because of accomplice's testimony about drinking victim's blood from shot glass and testimony about defendant's pink toothbrush.

[25] Criminal Law ☞1153(1)
110 ----
  110XXIV Review
    110XXIV(N) Discretion of Lower Court
    110k1153 Reception of Evidence
    110k1153(1) In General.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, State v. Caughron, (Tenn. 1993)                                    Page 4

[See headnote text below]

[25] Witnesses ☞262
  410 ----
    410III Examination
      410III(A) Taking Testimony in General
      410k261 Recalling Witnesses
    410k262 In General.
  Allowing recall of witness is left to sound
discretion of trial judge, whose decision will only be
disturbed upon showing of abuse of discretion.

[26] Criminal Law ☞1166(10.10)
  110 ----
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1166 Preliminary Proceedings
        110k1166(10.10) Discovery and Disclosure;
                Transcripts of Prior Proceedings.
  Any error was not reversible in admission of law
enforcement officer's testimony respecting murder
defendant's statements concerning his attempted
suicide after state's alleged failure to supply
defendant's statements to defense as **526 required
by rule, as defendant failed to show actual
prejudice. Rules Crim.Proc., Rule 16(a)(1)(A).

[27] Criminal Law ☞868
  110 ----
    110XX Trial
      110XX(J) Issues Relating to Jury Trial
      110k868 Objections and Exceptions.
  When juror is not legally disqualified or there is no
inherent prejudice, burden is on defendant to show
that juror is in some way biased or prejudiced.

[28] Jury ☞149
  230 ----
    230VI Impaneling for Trial, and Oath
      230k149 Discharge of Juror or Jury Pending
            Trial.
  Murder defendant was not entitled to mistrial by
virtue of juror's remark, "What's the difference?"
during defense counsel's cross-examination of
accomplice witness as to why witness had lied to
law enforcement officers regarding whom she had
told about crime; juror was subsequently removed,
there was no indication that remaining jurors were
prejudiced against defendant by remark, and remark
was comment upon counsel's repetitive questioning
and not upon merits of case.

[29] Jury ☞149
  230 ----
    230VI Impaneling for Trial, and Oath
      230k149 Discharge of Juror or Jury Pending
            Trial.
  In absence of proof to the contrary, it is assumed
that all jurors who rendered verdict were impartial
and qualified and that mistrial was not warranted.

[30] Criminal Law ☞1170.5(1)
  110 ----
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1170.5 Witnesses
        110k1170.5(1) Rulings in General.

  (Formerly 110k11701/2(1))
  Trial court's actions in restricting murder
defendant's direct examination of crime laboratory
personnel did not constitute reversible error, despite

fact that court was unusually active in directing form
that questioning should take; defendant was not
precluded from developing his theory, court did not
prohibit any testimony shown to be relevant, and
actions did not reflect court's views on defendant's
innocence or its opinion of merit of defendant's
proof. U.S.C.A. Const.Amend. 6.

[31] Criminal Law ☞667(1)
  110 ----
    110XX Trial
      110XX(C) Reception of Evidence
        110k667 Taking Oral Testimony in General
        110k667(1) In General.

[See headnote text below]

[31] Criminal Law ☞1153(4)
  110 ----
    110XXIV Review
      110XXIV(N) Discretion of Lower Court
        110k1153 Reception of Evidence
        110k1153(4) Examination of Witnesses.
  Propriety, scope, manner, and control of
examination of witnesses is matter within discretion
of trial judge, subject to appellate review for abuse
of discretion.

[32] Criminal Law ☞627.8(4)
  110 ----
    110XX Trial
      110XX(A) Preliminary Proceedings
        110k627.5 Discovery Prior to and Incident to
            Trial
        110k627.8 Proceedings to Obtain Disclosure
        110k627.8(4) Examination by Court;
            . Inspection in Camera.
  Trial court did not abuse its discretion in refusing
to examine state's entire files in murder prosecution
to determine whether state had failed to hand over
anything that might be vital to preparation of
defense; defendant never requested court to
examine any specific document or evidence.

[33] Criminal Law ☞632(4)
  110 ----
    110XX Trial
      110XX(A) Preliminary Proceedings
        110k632 Dockets and Pretrial Procedure
        110k632(3) Motions
        110k632(4) Motions in Limine.

[See headnote text below]

[33] Criminal Law ☞693
  110 ----
    110XX Trial
      110XX(D) Procedures for Excluding Evidence
      110k693 Time for Objection.
  Trial court did not abuse its discretion in murder
prosecution by refusing to allow defense counsel to
present motions in limine prior to testimony of state
witnesses and requiring counsel to object to
questions as they were asked; court was not
required as a regular practice to speculate on
admissibility of evidence without context in which
evidence would be presented.

[34] Criminal Law ☞695.5
  110 ----
    110XX Trial
      110XX(D) Procedures for Excluding Evidence

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

110k695.5 Hearing, Ruling, and Objections.

(Formerly 110k695l/2)
Trial court is generally given broad discretion in timing of its decisions on admissibility of evidence.

[35]Criminal Law ⟨⟩633(1)
 110 ----
  110XX Trial
   110XX(B) Course and Conduct of Trial in General
   110k633 Regulation in General
   110k633(1) In General.
  Trial court has broad discretion in controlling course and conduct of trial.

[36]Criminal Law ⟨⟩417(10)
 110 ----
  110XVII Evidence
   110XVII(M) Declarations
    110k416 Declarations by Third Persons
     110k417 In General
     110k417(10) Declarations Exculpating Accused.
  Murder defendant was not entitled to admission of inmate's extrajudicial statement exculpating defendant on ground that inmate was "unavailable," despite inmate's refusal to testify; inmate stated that statement was lie concocted to get reward for evidence helping to solve murder and statement did not bear persuasive assurances of trustworthiness. Rules of Evid., Rule 804.

[37]Criminal Law ⟨⟩823(1)
 110 ----
  110XX Trial
   110XX(G) Instructions: Necessity, Requisites, and Sufficiency
    110k823 Error in Instructions Cured by Withdrawal or Giving Other Instructions
   110k823(1) In General.
  Trial judge's corrective reinstruction respecting aggravating circumstance of murder being especially cruel in that it involved torture or depravity of mind did not improperly draw undue attention to that part of jury charge where trial court specifically instructed jury that it had acted, not to emphasize that part of charge, but to comport with law. T.C.A. § 39-2-203(i)(5) (now § 39-13-204(i)(5)).

[38] Criminal Law ⟨⟩645
 110 ----
  110XX Trial
   110XX(B) Course and Conduct of Trial in General
   110k645 Right to Open and Close.
  Murder defendant was not entitled to make final closing argument at sentencing phase. T.C.A. § 39-13-204(d).

[39]Sentencing and Punishment ⟨⟩1780(3)
 350H ----
  350HVIII The Death Penalty
   350HVIII(G) Proceedings
    350HVIII(G)3 Hearing
     350Hk1780 Conduct of Hearing
     350Hk1780(3) Instructions.

(Formerly 203k311)
Murder defendant was not entitled to instruction

that jurors should presume that sentence they assess would actually be carried out, that if life sentence was imposed a life sentence would be served and that if death penalty was assessed defendant would be executed.

[40]Criminal Law ⟨⟩511.4
 110 ----
  110XVII Evidence
   110XVII(S) Testimony of Accomplices and Codefendants
    110XVII(S)2 Corroboration
     110k511 Sufficiency
     110k511.4 Competency and Sufficiency of Particular Facts in General.
  Other evidence sufficiently corroborated inculpatory testimony of murder defendant's accomplice; two witnesses testified about fabrics in defendant's possession such as those used in murder, there was inculpatory testimony respecting defendant's appearance and behavior on morning after murder, ring of type owned by defendant was present at victim's house, and defendant made inculpatory statements to his cellmates.

[41] Sentencing and Punishment ⟨⟩1684
 350H ----
  350HVIII The Death Penalty
   350HVIII(D) Factors Related to Offense
   350Hk1684 Vileness, Heinousness, or Atrocity.

(Formerly 203k357(11))
Evidence showed that murder involved torture and depravity of mind so as to support jury finding of aggravating circumstance for purposes of death penalty; defendant told victim that she was going to die as she begged *526 for her life, inflicted head injuries, tied victim to bed, attempted to rape her, beat her with pool stick, slapped victim's buttocks so as to leave imprint of defendant's hand, gagged and strangled victim, drank victim's blood, and had sex with accomplice near dying victim. T.C.A.        § 39-2-203(i)(5) (now § 39-13-204(i)(5)).

*529 Charles W. Burson, Atty. Gen. and Reporter, Merrilyn Feirman, Asst. Atty. Gen., Nashville, Al Schmutzer, Jr., Dist. Atty., Sevierville, for appellee.

Carl R. Ogle, Jr., Jefferson City, for appellant.

*530 OPINION

DROWOTA, Justice.

The Defendant, Gary June Caughron, appeals directly to this Court his conviction of first degree premeditated murder and the sentence of death imposed by the jury, and his convictions of first degree burglary, and assault with intent to commit rape. He raises numerous issues in this appeal; but, after careful review of the entire record and the law, we find these issues to be without merit. The verdict and judgment are supported by material evidence, and the sentence of death is in no way arbitrary or disproportionate. We therefore affirm the convictions and the sentences.

THE FACTS

In the early afternoon of July 11, 1987, Christy

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Jones Scott, the daughter of the victim, 42-year-old Ann Robertson Jones, discovered her mother's partially clothed body lying facedown on a bed in her home in Pigeon Forge. Jones's legs and arms had been bound and tied to the bed with strips of blue terry cloth and pieces of sheer, off-white material like that used for table cloths and curtains. There was a gag tied across her mouth, and strips of the blue terry cloth had been wrapped tightly around her neck.

According to the state's forensic pathologist, Dr. Cleland Blake, Jones had suffered several "blunt traumatic contusions" to her head. These injuries were consistent with those caused by a blunt or rounded object and would have rendered Jones unconscious at some point. Her skull had been fractured and the cartilage in her nose displaced by the beating. She had bled extensively from her mouth and nose. There was a "patch" of "scraping type of injuries caused by some kind of slender linear object ... like whipping marks" on the left back side of her chest beneath her shoulder blades. On the right buttock were "three linear imprints, ... superficial bruises that fit perfectly with four fingers of a hand." Dr. Blake stated that these represented a "hard slap injury to the buttock" inflicted while the victim was still alive. The terry cloth strips around the victim's neck had been pulled so tightly that they had cut off the flow of blood to the victim's brain. The gag, bound so tightly that it cut a deep groove into the corners of the victim's mouth, combined with the hemorrhaging in the nasal passages, had caused her to suffocate. Dr. Blake concluded that Jones had died as a result of asphyxiation while unconscious.

Examination of the scene of the crime revealed that the door to the bedroom where the body was found had been forced open. A purse and its contents lay strewn in the hall. The phone lines to the house had been cut. Sometime within the following two or three weeks, Christy Jones Scott discovered a silver, turquoise and coral ring with a thunderbird design lying on the ground beside her mother's truck, which was still parked at her mother's house.

The key witness in this case was April Marie Ward, who was 14 years old at the time of the killing. Almost everything that the jury learned about Ann Jones's death, other than the description of the crime scene given by investigators, came from April's testimony. That testimony is summarized below.

In early summer 1987, according to April, she and the 27-year-old Defendant met and became romantically involved. April Ward's mother, Lettie Marie Cruze, worked at the Turquoise Jewelry Shop in Settler's Village, a group of shops in Pigeon Forge. Ann Jones ran the Wild Hare Tee Shirt Shop in this same shopping center. April and the Defendant, who was working on a nearby construction project, met on the covered portico (commonly referred to as "the porch") of Settler's Village almost every day.

One night, two or three weeks before the murder, Ann Jones made the Defendant Caughron, who had been drinking, leave her shop because he was acting in a disorderly manner. Jones instructed him to stay

away. This upset Caughron, who told April Ward that he would like to catch Ann Jones "out one night" and "slice her throat." The Defendant suggested that April accompany Jones to her house after *531 work and give him directions on how to get there. He also asked April to watch Jones as she closed her shop and see where she put her money, and to find out if Jones was married and had a telephone or pets.

Because she knew that her mother would have disapproved of her relationship with the Defendant if she had known his true age, April had told her mother that the Defendant was 18. April then became upset with Ann Jones because of a conversation Jones had had with her mother that led to her mother's disapproval of the relationship. April testified that she hated Jones because she had tried to separate her and the Defendant by going to her mother. April also said that she had told the Defendant what Jones had done.

The week before the murder, according to April, she and the Defendant began talking about going to the victim's house. She said that the Defendant instructed her to bring a towel and a knife "to gut" Ann Jones. On the afternoon of Friday, July 10, around 3:00 or 4:00 p.m., the Defendant came by April's house in an older model green and white 442 Oldsmobile Cutlass that he had just purchased. He told April that he would return that night and that the two would go to the victim's house as planned.

April further testified that after her mother went to sleep, she cut a blue terry cloth towel into strips and waited for Caughron to arrive. He picked her up sometime after midnight. He had been drinking but, according to April was "not drunk." (Another witness, Vicky Worth, testified that she had seen the Defendant drinking beer and smoking marijuana at a restaurant around 10 or 11 o'clock that night.) On their way to Ann Jones's house April and the Defendant drank alcohol and took drugs. They walked to the victim's house from the parking lot of a nearby nursing home, where they had left the Oldsmobile. The Defendant carried with him the handle of a pool stick, around which he had placed gray duct tape, and pieces of the sheer material that he already had in his car. The Defendant gave April a survival knife.

April testified that Caughron entered the house by himself and then summoned her inside. As they went down the hall to Jones's bedroom, April could hear her calling, "Who is it? What are you doing?" She testified that the Defendant kicked in the bedroom door, which was locked. According to April, Jones cried and pleaded with them not to hurt her, but the two told her she was going to die. April later testified that after the Defendant hit Jones several times with the pool stick, Jones fell across her bed, became silent and stopped moaning. As April described the scene, the Defendant turned Jones on her stomach and tried unsuccessfully to have sex with her. Complaining that she had "tightened up on him," he then slapped the victim on the right buttock. Unable to complete the sex act with Jones, the Defendant suggested sex with April. She said that after the two of them undressed, Caughron rubbed the victim's blood on both their bodies as they engaged in sex on the floor beside the bed where Jones lay. Finally, April testified,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Caughron insisted that they drink some of the victim's blood from shot glasses that he produced for the occasion.

Although April's testimony was confused as to exact chronology, it appears that at some point, Jones was gagged to stop her screaming and tied up with the strips of towel and sheer material. April said that the Defendant tightened the terry cloth strip around Jones's neck, causing the victim to gasp. April testified that she then hit the victim in the head two times. After drinking the blood, April said, she went to the bathroom to throw up, but did not. When she returned to the bedroom, she saw the Defendant striking Jones's back with the pool stick. According to April, the Defendant dumped out the contents of Jones's purse as they left and took what appeared to be a large amount of money. Outside, she said, the Defendant used the knife he had given her to cut the telephone lines to make it appear that whoever had killed Jones had not wanted her to use the telephone.

April testified that she and the Defendant tried to wash the blood off their bodies in the river behind a store in Pigeon *532 Forge. They next drove to Dollywood, where they met several people, one of whom, Kevin Carver, threatened April with harm if she "got the Defendant in trouble."

Later that same morning, several witnesses saw the Defendant when he arrived at Settler's Village around 10:00-11:00 a.m. Caughron was wearing only cut-off jeans and tennis shoes; he had scratches on his back, stomach and face. Several witnesses saw what they described as dried blood on him. When April's mother commented that "he looked like some sort of wild woman got a hold of him the night before," he "sniggered" and said, "No, I just got in a fight over a beer in a bar in Newport." Caughron cleaned himself in the store's restroom. When Robert Yoakum, Cruze's boyfriend, teased the Defendant about the blood, Caughron told him that "a bitch had hit him in the head with a beer bottle." Caughron then took April aside and warned her not to tell what had happened. The two of them left the shops with Yoakum and went to April's mother's house, where the Defendant bathed. Later that day, Caughron spray-painted his car silver, as he told April, to prevent anyone who might have seen it the night before from identifying it.

Tom Bentley, who worked on the Defendant's car sometime after the killing, testified that he had used pieces of blue terry cloth towel from the trunk of the Defendant's car as grease rags. Bentley testified that the rags matched the towelling that he was shown at trial, which had been tied around the victim's body. When Bentley had asked the Defendant why he wanted to paint the car, Caughron replied, "Well, the lady that got killed, somebody might recognize it and I need to paint it."

Jimmy Lynn Huskey testified that in 1986, when he and the Defendant were friends, the Defendant had a pool stick that came apart like the one Ward had described and that Defendant kept light-colored lace table cloth or curtain material in his car similar to the sheer material used to tie up Jones. The Defendant had also talked to Huskey about tying up women during sex and said that "slapping them on

the butt really turned him on."

Lettie Marie Cruze, April's mother, testified that she had sold the Defendant a silver ring with turquoise and coral inlay and a thunderbird design. This description matched that of the ring Christy Jones Scott had found in her mother's driveway after the killing. While the Defendant was staying at her house shortly after the murder, Cruze noticed that he had "an odd toothbrush for a man," a pink brush with a little rubber tip. Christy Jones Scott testified that her mother's toothbrush, a pink Oral-B brush, was missing after the killing.

The police made little progress in the investigation of the Jones homicide during the year after the homicide. They developed several leads, but none of them panned out. Then, on June 22, 1988, they took the first of six statements they would obtain from April Ward. In it, she disavowed any knowledge of the details of the murder, but made allegations that implicated Caughron, with whom she was no longer romantically engaged. During the summer of 1988, Caughron himself gave law enforcement officers various statements. In turn, he denied knowing the victim, denied any involvement in her death, and denied his actions the day after the killing. He also denied being in a fight in a bar in Newport and told different stories about how he had gotten scratched and bloodied up. Caughron said that he stayed at his grandmother's house on the night of the killing and had been riding around with a friend and his wife at the time of the murder. Over the course of these interviews, the Defendant became more and more nervous. One time when asked who had killed Ann Jones, Defendant stated, "Whoever done it needs help." Another time he said, "If I'm convicted of what I've done, someone will have to pay." When asked why he had tried to kill himself after one of the interrogation sessions with police, he said that "he was depressed and had a lot on his mind." At his last interview, when confronted with falsehoods in his prior statements, Caughron became upset and walked out of the room.

*533 Three inmates who had been incarcerated with the Defendant in the Sevier and Cocke County jails testified about statements that he had made to them concerning the victim and her death. When, in the summer of 1988, Tim McGaha had asked the Defendant if he had committed the murder, Caughron "just smiled." He told McGaha that he had been drunk and partying the night of the murder. He called the victim a "bitch." He also told McGaha he had lost a ring. Caughron told another prisoner, Roy Haynes, that on the night of the murder, he and his girlfriend had driven to a house on Cove Road or Cove Mill Road (the victim lived on Cole Drive) in Pigeon Forge and that from that point "he couldn't remember nothing ... he was so messed up on cocaine." The Defendant told Haynes that when he woke up the next morning he had blood all over him and that he did not know whether or not he had killed the victim. After looking at a newspaper article mentioning the homicide, the Defendant told Haynes that he thought his girlfriend was "snitching" on him. A third inmate, Bobby Floyd, testified that Defendant told him that the victim was a "bitch," who had threatened to "tell some girl's mother how old he was;" that the only evidence police had against him was an article of clothing with blood on it; and that

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

"the only mistake he [had] made was involving
April."

The Defendant presented evidence that, based on
evidence gathered at the crime scene, none of the
tests or analyses performed by forensic scientists
from TBI and the FBI had connected him with the
killing. His fingerprints were not found in the
house. A plaster cast of a shoe print found outside
the house was consistent with a boot owned by
Kenneth Ogle. Ogle had been a boyfriend of Teresa
Goad, one of the victim's daughters. In September
1986, he had broken into the victim's home and at
knifepoint had pushed Teresa to the bed and
attempted to tie her hands with strips of sheet.
Three witnesses testified that the Defendant was in
the habit of spray painting his "junker" cars different
colors. His aunt testified that, on the Friday night
after he bought a green and white Oldsmobile, he
came to his grandmother's house around 11 or 12
o'clock and went to bed.

Based on this evidence, presented over four days
of trial, the jury found the Defendant not guilty of
felony-murder, robbery, and larceny, but guilty of
premeditated first-degree murder, first-degree
burglary, and assault with intent to commit rape.

The sentencing phase of the trial was much
briefer, primarily because the state presented no
further proof and the Defendant called only four
witnesses. The first was his aunt, Gladys Green,
who told how his mother and father had divorced
when the Defendant was three or four years old.
According to Green, the Defendant's childhood had
been very unsettled. She described her nephew as
"slow" and said that he had a good attitude since he
had been in jail.

Harold Stoffell, a minister, testified that the
Defendant had accepted the word of God, was
respectful and was "the finest young prisoner I've
ever saw." Edward Moore, the jailer at the Sevier
County Jail, testified that he had never had any "real
problems" from Defendant while he had been in jail.

Dr. Madeline Pareau, a clinical psychologist,
testified that Defendant's full IQ was 78, "just a
little above mentally retarded classification." She
said that he had been in special education classes,
where he had done well. His father, whom Pareau
described as "overtly psychotic," was an alcoholic
and had physically abused his mother until their
divorce. According to the history given by the
Defendant, his mother had started acting "quite
wild" after the divorce, drinking and dating. In Dr.
Pareau's opinion, Caughron had received inadequate
parenting, and there had been no consistency in his
relationships. His stepfather, for example, had
beaten him and humiliated him for bedwetting. Dr.
Pareau felt that Defendant would not be a physical
threat to society or other prison inmates. On cross-
examination, however, she conceded that Caughron
was not insane and could conform his conduct to the
dictates of the law.

**534 I.

MOTION FOR CONTINUANCE

The Defendant first avers that the trial court
abused its discretion in denying his motion for a

continuance. Shortly before trial, the Defendant
moved for a continuance on four grounds: (1) to
take the testimony or deposition of George Tippens,
an investigating officer who had moved to Florida;
(2) to investigate additional suspects in the case
whose names had been supplied to the defense on
January 19, 1990; (3) to examine the door to the
victim's bedroom; and (4) to permit FBI Agent
Doug Dedrick to testify.

[1] It must be clearly shown that a trial court has
abused its discretion in refusing to grant a
continuance before that decision will be disturbed on
appeal. *State v. Melson,*    638 S.W.2d 342, 359
(Tenn.1982). No abuse of discretion warranting
reversal is shown in this case.

[2] Officer Tippens was one of the first officers on
the scene the day the murder was discovered. The
crucial evidence Defendant alleged Tippens
possessed was his knowledge that there were
groceries in the victim's truck when the body was
discovered. This testimony, according to
Defendant, would tend to show that the victim never
had a chance to bring in her groceries before she
died and thus was first attacked outside the house.
Tippens was unable to come to trial because of a
back condition. The trial court refused to continue
the case because Tippens' testimony would be
cumulative in light of the fact that there were several
other investigating officers who should have
possessed the same knowledge. At trial the
Defendant elicited from Christy Jones Scott the
testimony that she had unloaded two or three bags of
laundry detergent from her mother's truck after she
had found her mother.

[3] Regarding the need to investigate persons
named as suspects in certain statements given to the
defense by the State on January 19, 1990, the
Defendant failed to show the materiality and
relevance of any evidence such an investigation
would yield. The Defendant has also failed to show
that a different result would have been reached if the
continuance had been granted. *See Baxter v. State,*
503 S.W.2d 226, 230 (Tenn.Crim.App.1973).

[4] On the allegations regarding the need to
examine the bedroom door, the Defendant sought to
show that the footprint on the door was larger than
the Defendant's would have been. The door had
been made available to the defense attorney for
examination on January 26, three days before his
motion. The trial court felt that the Defendant had
failed to exercise due diligence in examining the
door. Also, the point that Defendant wished to
make, i.e., that the footprint on the door was not
Defendant's, was explored during the testimony of
Sandra Lee Paltorah, a forensic scientist at the
T.B.I. specializing in shoe track analysis. Paltorah
testified that the print on the door was consistent
with a smooth-soled shoe as opposed to the tennis
shoe worn by the Defendant.

[5] Finally, although the trial court denied the
motion for continuance on the mistaken belief that
FBI Agent Doug Dedrick would testify, Agent
Dedrick's testimony was presented to the jury
through stipulation. When it became apparent that
Dedrick would not be at trial, defense counsel
expressly stated he did not want a continuance
because of the stipulation. We do not find that the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

trial court abused its discretion in refusing to grant Defendant's motion for a continuance.

## II.

### ALLEGED T.R.CR.P. 26.2 ERROR

The Defendant avers that the trial court's denial of counsel's request for sufficient time to review the statements under Rule 26.2(d) constitutes reversible error.

The progenitor of Tennessee Rule of Criminal Procedure 26.2 is the 1957 decision of the United States Supreme Court in *Jencks v. United States,* 77 S.Ct. 1007, 353 U.S. 657, 1 L.Ed.2d 1103 (1957). In that case the Court held that defense counsel has a right to inspect prior statements or reports by a government witness, following **\*535** direct examination of the witness, to the extent that those reports or statements are related to the witness's testimony on direct examination, for the purpose of using them to prepare or conduct cross-examination. *Jencks* caused some controversy in the months after it was announced, centering on fears that it would force government prosecutors to turn over investigatory files, in their entirety, upon defense demand. To ensure against such an interpretation of the opinion in *Jencks,* the United States Congress enacted 18 U.S.C.A. § 3500, known from the time of its passage in 1957 as the Jencks Act. Its language was also incorporated into Federal Rule of Criminal Procedure 26. In Tennessee the right to inspect pretrial statements of a witness called to testify at trial, for the purpose of effectively cross-examining that witness, did not exist prior to the adoption of the Tennessee Rules of Criminal Procedure in July 1978. (FN1) This new production rule was initially included in Rule 16, which otherwise governs *pretrial* discovery and inspection, despite the fact that it involved "discovery" during trial and not before. Its misplacement in Rule 16 caused some confusion. *See, e.g., State v. Robinson,* 618 S.W.2d 754 (Tenn.Crim.App.1981).

In order to clarify the purpose and timing of the production of witness statements at trial, the provisions formerly contained in Rule 16(a)(1)(E) and (F) were recast as Rule 26.2 in 1984.

[6] Rule 26.2(a) states: " *After* a witness ... has testified on direct examination, the trial court, on motion ... shall order the attorney ... to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified." [Emphasis added.] Subsection (d) states that the court " *may* recess proceedings in the trial for the examination of such statement and for preparation for its use in the trial." [Emphasis added.] The purpose of Rule 26.2 is to enable counsel to examine a witness's statements in order to test the credibility of that witness at trial. Our Court in interpreting Rule 26.2 has held that even in a capital case, the State is not required to produce witness statements until the conclusion of the witness's testimony on direct examination. *State v. Taylor,* 771 S.W.2d 387, 391 (1989). Today, for the first time, we address what constitutes a sufficient time to review Rule 26.2 statements.

It should be emphasized that this case does not involve the denial of Rule 26.2 statements. The statements here were produced the evening before direct and cross-examination took place the following afternoon. The sole issue is whether counsel was afforded a reasonable opportunity to examine the statements. The time needed for a reasonable examination is necessarily related to the length and complexity of the statements. In this case six statements, totaling 64 pages, were given to counsel for overnight study and reflection.

[7] Had April Ward been the State's first witness the morning of trial and had the State produced her statements *after* her direct examination, we are of the opinion that a two hour recess would have been adequate for counsel to properly prepare for cross-examination. Here, the statements were given to counsel the night before (7:15 p.m.) and cross-examination began at approximately 5 p.m., the next afternoon just short of twenty-two hours later. We are of the opinion that defense counsel, and his defense team, were given a reasonable opportunity to examine and prepare to use the statements in cross-examining April Ward.

[8] While neither state nor federal trial judges can require advance disclosure of statements, *U.S. v. Algie,* 667 F.2d 569 (6th Cir.1982) and *State v. Taylor, supra,* prosecutors **\*536** should nevertheless avoid needless delay by following the State's example here. We would strongly recommend early production of statements of witnesses in order to expedite the trial of the case and avoid lengthy recesses during trial. The District Attorney in this case provided defense counsel with April Ward's six statements at 7:15 p.m. on the evening before April Ward's testimony. This advance production satisfied the State's duty under Rule 26.2 and avoided the needless delay of the trial.

At 4:05 p.m. the next day, shortly before the conclusion of the direct examination of April Ward, counsel for Defendant asked the court to allow him to start his cross-examination the next morning. The trial court responded by pointing out that the defense team, consisting of attorneys Carl Ogle, Jr., Stephen Ward, and an investigator, had "had the statements overnight." The court denied counsel's request for another night in which to review the statements. The trial court wished to proceed, apparently to allow April Ward to finish her testimony that day. The court was presented with a young girl who had participated in a brutal, ritualistic-type murder, who repeatedly cried on the witness stand, and who required several recesses in order for her to regain her composure. The trial judge did not abuse his discretion by completing April Ward's testimony that afternoon.

## III.

### PHOTOGRAPHS AND VIDEOTAPE

[9] The photographs and the videotape taken at the murder scene are highly probative, in that they show the condition of the body and clarify oral testimony. These depictions are certainly not pleasant, but they are not shocking or gruesome. Under *State v. Banks,* 564 S.W.2d 947 (Tenn.1978), the trial court

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, State v. Caughron, (Tenn. 1993)

did not abuse its discretion in permitting their
introduction.

### IV.

### INTERRUPTIONS BY THE TRIAL COURT

[10] The Defendant next asserts that the trial court
prejudiced Defendant's case by indicating to the jury
throughout the trial that the court believed that the
Defendant was guilty. The Defendant specifically
complains of the trial court's interruption of his
cross-examination of Christy Jones Scott and of
Officer Sam Owenby, both of which interruptions
were apparently attempts to keep the examination
moving along; and of the court's statements during
the cross-examination of Dr. Cleland Blake that
what the doctor had told the jury was "just what he's
told them" and that questions about why the doctor
took fingernail clippings were academic and the
answer obvious to anyone who had watched the
television show *Quincy*. The Defendant also
challenges comments by the court during the direct
examination of T.B.I. scientist Robert E. McFadden
to the effect that the record was "full of proof" that
the bedroom door had been knocked off its hinges.
This last statement was incorrect; but the proof
elsewhere, including the photographs and
McFadden's subsequent testimony as well as the
court's own comments, made the mistake patent to
the jury so that the Defendant could not have been
prejudiced by the misstatement.

Finally, Defendant complains that the judge told
the jury that they did not have to look at Ogle's boot
and a full-scale photograph of the footprint on the
door when these items were passed as exhibits. The
Defendant says that the court was disparaging the
Defendant's evidence. The record reveals,
however, that the court was in the habit of telling
the jurors that they did not have to look at
potentially distasteful physical evidence, such as the
cloth that had bound the victim, when it was passed
to them. The boot comment was one episode of this
behavior.

[11] It is axiomatic that a trial judge should
exercise care not to express any thought that might
lead the jury to infer that the judge is in favor of or
against the defendant in a criminal trial. *Brooks v.
State*, 187 Tenn. 67, 213 S.W.2d 7, 10 (1948).
While we caution restraint in a trial court's
interjections and comments **\*537** during trial, in
the overall context of this case, the trial court's
behavior in the cited instances did not so clearly
violate the mandate of impartiality as to infringe
upon the Defendant's right to a fair trial.
Furthermore, no prejudice has been shown. We
find no reversible error. *See State v. Jenkins*, 733
S.W.2d 528, 532 (Tenn.Crim.App.1987); *State v.
Howell*, 698 S.W.2d 84, 86-87
(Tenn.Crim.App.1985); *State v. Hardin*,      691
S.W.2d 578, 581 (Tenn.Crim.App.1985).

### V.

### DR. BLAKE'S TESTIMONY

[12][13] The Defendant next argues that Dr. Blake
was not qualified to characterize the injuries on the
victim's back as "whipping marks" and those on her
buttock as a slap injury. The admission of expert

testimony is largely in the discretion of the trial
judge. *Arterburn v. State*,    216 Tenn. 240, 391
S.W.2d 648, 655 (1965);    *State v. Taylor*,    645
S.W.2d 759, 762 (Tenn.Crim.App.1982). Dr.
Blake was a board certified forensic pathologist in
practice in that field since 1963. He had conducted
2500 forensic investigations. The trial court did not
abuse its discretion in allowing Dr. Blake to give his
opinions on what had caused these injuries.    *See,
e.g., Bryant v. State*,    539 S.W.2d 816, 819
(Tenn.Crim.App.1976).

### VI.

### STATEMENTS MADE BY VICTIM

[14] The Defendant insists that certain testimony of
April Ward and her mother, Lettie Cruze,
concerning statements made by the victim was
inadmissible hearsay. The first such testimony
objected to by Defendant was that of April Ward, to
the effect that she was upset with Jones because of a
conversation that Jones had had with her mother;
that she was mad at Jones because "no one approved
of us on the porch"; and that she hurt Jones because
she hated her for going to her mother and trying to
separate her from the Defendant. The trial court
rejected the Defendant's hearsay objections on the
grounds that any statements of the victim described
by Ward were not offered for their truth but to show
Ward's state of mind and what provoked her to
harm the victim. We are in agreement with the
conclusion of the trial judge that Ward's testimony,
as it related to the victim's statements, was not
hearsay inasmuch as it was not offered to prove the
truth of the matter asserted.    *See* T.R.E. § 801(c);
*State v. Coker*, 746 S.W.2d 167, 173 (1987).

[15] Defendant's next objection was to the
testimony of April's mother that the victim had told
her that as a rule she did not get involved in other
people's affairs but that she thought "April was a
sweet little girl and she didn't trust Gary Caughron."
Informing the jury that "[t]rue or untrue, you may
consider that this conversation took place," the trial
court overruled Defendant's objection. Again, the
import of this testimony was that the conversation
between April's mother and the victim occurred, not
that the victim's statement was true. No hearsay
was involved. The trial court did not err in
admitting the testimony.

### VII.

### COMPETENCY OF WARD TO TESTIFY

[16] Defendant argues that the failure of the trial
court to ask April Ward whether she understood the
difference between telling the truth and a lie and
whether she comprehended the importance of telling
the truth rendered the competency evaluation
conducted before she testified inadequate. Prior to
trial, the court granted the Defendant's request for a
competency hearing as to Ward, then seventeen,
because she was a juvenile. At the hearing, the trial
judge asked Ward some general questions, some
questions about how she was doing in school and
how her counseling was proceeding, and some
questions about her awareness of her testimony. He
then declared her competent to testify.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[17][18] Under T.R.E. 601, *see also* T.C.A. § 24-1-101, no one is automatically barred from testifying simply because of **\*538** age or mental status. (FN2) So long as a witness is of sufficient capacity to understand the obligation of an oath or affirmation, and some rule or statute does not provide otherwise, the witness is competent. The question of competency is a matter for the trial court's discretion. *Arterburn v. State, supra,* 391 S.W.2d at 657; *State v. Braggs,* 604 S.W.2d 883, 886 (Tenn.Crim.App.1980); *State v. Nelson,* 603 S.W.2d 158, 168 (Tenn.Crim.App.1980). The court did not abuse its discretion here.

## VIII.

### LEADING QUESTIONS

[19] The Defendant avers that the trial court erred in allowing the prosecution to ask leading questions of April Ward on direct examination. The State asserts that this issue should be treated as waived because, as the State correctly points out, the Defendant has failed to cite to the location in the record of the specific questions of which he complains. Our examination of the record shows at least five occasions when Defendant objected to the State's questioning of Ward as leading.

Some of the questions objected to were leading, some were not. T.R.E. 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as to develop testimony." In D. Paine, *Tennessee Law of Evidence,* § 611.6 (2nd ed. 1990), the writers suggest that leading questions may be used to shorten the time needed for a witness to testify or to facilitate the direct examination of a young or otherwise impaired witness. Ward was a young and highly emotional witness and at times it was necessary to lead her "to develop" her testimony. Furthermore, there was no reversible error, if any, in failing to sustain the Defendant's objections since prejudice is not clearly shown. *See Hale v. State,* 198 Tenn. 461, 281 S.W.2d 51, 58 (1955); *Mothershed v. State,* 578 S.W.2d 96, 99 (Tenn.Crim.App.1978).

## IX.

### JIMMY HUSKEY'S TESTIMONY

[20] Defendant challenges the admissibility of Huskey's testimony that in 1986 the Defendant listened to hard rock music, drew sketches of "demons and stuff" like that on record album covers, had a pool stick that broke down into three pieces, had a light-colored tablecloth or curtain material in the back of his car, talked about tying up women during sex and told Huskey that slapping women "on the butt really turned him on." The State asserts, correctly under T.R.A.P. 3(e), that all of these alleged errors except that involving the Defendant's drawings of demons have been waived because of the failure to raise them in the motion for new trial.

[21][22] The Defendant argues that the evidence about his purported drug use, sexual practices, attachment to rock music, and drawing pictures of demons is evidence of other crimes, wrongs or acts,

prohibited by T.R.E. 404(b). He also contends that this evidence was irrelevant. The testimony concerning the pool stick, the table cloth material, and slapping women on the buttocks was relevant to connect Defendant to this crime and corroborate the accomplice's testimony. The testimony involving drug use, "satanic" sketches and listening to rock music, while corroborating statements made by the accomplice, should not have been admitted but there is no harmful error under the facts of this record since April Ward's testimony had already presented these features of the Defendant's character.

## X.

### LETTIE CRUZE TESTIMONY

[23] The Defendant further complains that the trial court erred in admitting testimony **\*539** by Lettie Cruze that around the time of the murder, her daughter, April Ward, was having trouble in school and crying a lot. He also objects to Cruze's testimony that the Defendant "sneaked around" her house for some period of time after the murder. We find no error, although the relevance of this evidence is marginal. Testimony about April's emotional reaction to the murder tends to bolster her credibility, as does testimony about her continued contact with the Defendant.

## XI.

### RECALL OF CHRISTY SCOTT

[24][25] Over the Defendant's objection the trial court allowed the State to recall the victim's daughter, Christy Jones Scott, to testify that her mother owned a collection of shot glasses and a pink Oral B toothbrush. The evidence was relevant because of Ward's testimony about drinking the victim's blood from a shot glass and Cruze's testimony about the Defendant's pink toothbrush. Allowing the recall of a witness is left to the sound discretion of the trial judge, whose decision will only be disturbed upon a showing of abuse of discretion. *State v. Hartman,* 703 S.W.2d 106, 116 (Tenn.1985); *Lillard v. State,* 528 S.W.2d 207, 212 (Tenn.Crim.App.1975). There was no abuse of discretion here.

## XII.

### ATTEMPTED SUICIDE

[26] The Defendant complains that the court should not have allowed TBI Agent David Davenport and Detective Kenny Bean to testify about Defendant's attempted suicide because information about the attempt was part of a statement made by the Defendant but not supplied to the defense as required by T.R.Cr.P. 16(a)(1)(A). Agent Davenport did not testify about the attempted suicide. There is therefore no merit to this part of the issue. Detective Bean did testify that on August 25, 1988, when he asked Defendant why he attempted to kill himself after Davenport had initially talked with him about Jones's murder, Defendant replied that he was depressed and had a lot on his mind. The proof is ambiguous as to whether the State gave Defendant this statement under Rule 16. The State asserts that it did. It is not clearly established in the record that the State

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

violated Rule 16(a)(1)(A); but, if the State did violate the Rule, the Defendant has not shown any actual prejudice caused by failure to comply with the discovery order which would require exclusion of this evidence. *See State v. Payne,* 791 S.W.2d 10, 16 (Tenn.1990); *State v. James,* 688 S.W.2d 463, 466 (Tenn.Crim.App.1984).

### XIII.

### QUALIFICATIONS OF TWO JURORS

The record shows that juror Jerry McGill was related to State's witness John Brown by marriage. Brown was a patrolman with the Sevier County Sheriff's Department who had investigated the Defendant when he received a call on July 13, 1987, about Defendant's car being in a ditch. At trial, he testified that the Defendant appeared nervous and had a small cut on his face. Although the trial court told defense counsel that he could explore this situation "later at a proper time," counsel never did so.

[27] The second episode occurred when State's witness Tom Diddly recognized one of the jurors as the owner of the wrecker service that had towed Defendant's car when the witness worked on it. Again defense counsel indicated he would address any problem later but apparently failed to do so. Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the Defendant to show that a juror is in some way biased or prejudiced. *Bowman v. State,* 598 S.W.2d 809, 812 (Tenn.Crim.App.1980); *see also State v. Taylor,* 669 S.W.2d 694, 698-700 (Tenn.Crim.App.1983). Defendant has not done this and we find no error.

### XIV.

### JUROR'S COMMENTS

[28] The Defendant avers that the trial court erred in not declaring a mistrial because of a juror's comments. During **\*540** cross-examination of April Ward, when defense counsel asked Ward why she had lied to law enforcement officers regarding whom she had told about the crime, a juror whispered loudly, "What's the difference?" No further mention was made of the episode until the next morning, when counsel indicated he would like to address it later that day; but no action was taken until just before the jurors began deliberations, when Van Helton, counsel's assistant, testified that the juror who had made the statement was Roy Hodge, an ex-constable, and that his manner was aggravated and "put out." Because there were questions about the juror's objectivity and the Defendant was at "enormous risk," the court removed the juror. Defendant requested no further action and did not request the court to declare a mistrial. The State asserts that the Defendant waived this issue.

[29] If the issue is not considered waived, there is no indication in the record and no reason to believe that the jurors who remained were prejudiced against the Defendant by the juror's remark, which was a comment upon counsel's repetitive questioning not upon the merits of the case. In the absence of proof to the contrary, it is assumed that all of the jurors who rendered the verdict were

impartial and qualified and that a mistrial was not warranted. *See Graves v. State,* 489 S.W.2d 74, 81 (Tenn.Crim.App.1972).

### XV.

### TRIAL JUDGE'S ACTIONS

[30] The Defendant next avers that the trial court erred in unduly restricting his direct examination of T.B.I. Crime Laboratory personnel. The Defendant specifically cites to interruptions by the court occurring during defense counsel's direct examination of Robert McFadden, a fingerprint expert from the T.B.I. lab, who was Defendant's first witness. The defense sought to show that, despite a thorough and meticulous investigation, there was absolutely no evidence connecting Defendant with the crime scene. When defense counsel appeared to be developing this theory by an unnecessarily detailed examination of the forensic scientist, the trial court began interrupting to curtail what it considered irrelevant and unnecessary testimony. The court urged the defense counsel to move along by directing the examination to the evidence that was material and important for the jury to consider.

[31] It is well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion. *State v. Elliott,* 703 S.W.2d 171, 176 (Tenn.Crim.App.1985). The court in the present case, however, was unusually active in directing the form that questioning should take. The most serious episode of interjection occurred when the trial judge literally took over the questioning of the witness. Another interjection concerned McFadden's examination regarding whether the door was knocked off its hinges and has already been addressed in Section IV. A further complaint involves a bench conference at which the court urged the Defendant to get to the point before he exhausted the patience of the court and jury.

The trial judge's actions were unnecessary but did not deprive Defendant of a fair trial or prejudice him in any way. *See, e.g., State v. Jenkins, supra,* 733 S.W.2d at 532; *Pique v. State,* 480 S.W.2d 546, 550-551 (Tenn.Crim.App.1971). Defendant was not precluded from developing his theory, although it was not done in the detailed, point by point manner his counsel preferred; and the court did not prohibit any testimony that was shown to be relevant. Furthermore, the court's actions did not reflect the trial court's views on the Defendant's innocence or its opinion of the merit of Defendant's proof. We find no reversible error in the court's conduct during McFadden's testimony.

### XVI.

### IN CAMERA INSPECTION OF THE STATE'S FILE

Defendant filed a pretrial motion for the court to conduct an in camera inspection of **\*541** the State's entire files, as well as the files of any agencies or individuals that had investigated the case for the State, and to determine if the State had failed to hand over anything that might be vital to the

preparation of the defense. The court was also
requested to have copies of all these files sealed and
filed for any appeal. At the beginning of trial the
Defendant asked the court to inspect the files in
camera to look for any possible exculpatory
evidence. The court refused and pointed out that the
district attorney general was aware of his ethical
duties and stated that the court would look at
anything the Defendant called to its attention but
would not "plow" through all the files and evidence.

[32] Despite assertions that he had been informed
that the State had failed and refused to disclose
certain material, Defendant never requested the
court to examine any specific document or evidence.
The record does not support any allegation that the
State has failed to comply with its duties under
*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10
L.Ed.2d 215 (1963), or Rule 16, T.R.Cr.P. The
trial court did not abuse its discretion in refusing to
examine the State's files. *State v. Daniel,* 663
S.W.2d 809 (Tenn.Crim.App.1983), cited by
Defendant, only indicates that an in camera
inspection is necessary once it has been shown that
there is material producible under Rule 16, in that
case *Jencks* material.

## XVII.

### BENCH CONFERENCES

Defense counsel repeatedly asked to approach the
bench prior to the testimony of certain State's
witnesses to present motions *in limine* objecting to
the admission of matters that might potentially come
out during the witnesses' testimony. These were
objections ordinarily made when and if the
potentially objectionable testimony occurred. After
allowing the Defendant to approach the bench prior
to the testimony of Dr. Cleland Blake, April Ward,
Jimmy Lynn Huskey, and Lettie Marie Cruze, when
the State called witness Robert Yoakum, and defense
counsel again approached the bench, the trial court
refused to continue to "pre-review" the testimony,
told defense counsel to object to questions as they
were asked, and promised that it would then rule on
the objections.

[33][34][35] With a few exceptions,   *see, e.g.,*
Tenn.R.Evid. 608 and 609, the trial court is given
broad discretion in the timing of its decisions on the
admissibility of evidence. D. Paine, *Tennessee Law
of Evidence,* § 103.3 (2d ed. 1990). The trial court
also has broad discretion in controlling the course
and conduct of the trial. *Pique v. State, supra,* 480
S.W.2d at 550-551. Defense counsel was in effect
asking the court as a regular practice, to speculate
on the admissibility of evidence, without any idea of
the context in which the evidence would be
presented. The trial court did not abuse its
discretion in requiring the Defendant to object when
questions were actually asked.

## XVIII.

### STATEMENT OF KENNY PHILLIPS

[36] The Defendant alleges that the trial court
erred in refusing to allow introduction of an
extrajudicial statement made by one Kenny Phillips,
an inmate at one of the state prison facilities, who
was called as a witness for the defense. Phillips had

given a statement to law enforcement officials on
July 15, 1987, in which he stated that two persons, a
man and a woman who were not the defendant and
April Ward, had approached him about robbing and
killing a woman in Pigeon Forge, possibly the
victim Dorothy Ann Jones, although Phillips did not
give the woman's name. The defendant also took a
statement to this effect from Phillips.

When the time came for Phillips to testify, he
refused because, he said, his earlier statements were
lies concocted to get a reward offered for any
evidence that would help solve Jones's murder.
Phillips seemed to think that by testifying he would
be risking a charge of perjury. Even though the trial
court explained to him that as long as he testified
truthfully he would not be committing perjury,
Phillips refused to testify.   **\*542**   The trial court
held him in contempt. Defense counsel then argued
that he should be allowed to read Phillips' previous
statements into evidence because Phillips was
"unavailable" under T.R.E. 804. Noting that the
statements were admitted falsehoods, the trial court
refused to allow their introduction.

The Defendant asserts on appeal that the
statements should have been admitted because of
constitutional considerations and cites *Chambers v.
Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35
L.Ed.2d 297 (1973), and F.R.E. 804(b)(5).   *See
also* Tenn.R.Evid. 804, Advisory Commission
Comments. The hearsay statements sought to be
admitted, however, bore none of the "persuasive
assurances of trustworthiness" present in *Chambers,
see* 410 U.S. at 302, 93 S.Ct. at 1048-1049
(confession made spontaneously to a close
acquaintance soon after murder, corroborating
evidence present, statement was self-incriminatory
and unquestionably against interest). The Defendant
asserts that Phillips' recantation is a lie, pointing out
that no reward was being offered on July 15, 1987.
With nothing more to go on than these allegations,
the trial court did not err in excluding the
statements.

## XIX.

### UNDUE EMPHASIS TO AGGRAVATING
### CIRCUMSTANCE

[37] At sentencing the trial court instructed as an
aggravating circumstance: "the defendant allowed
the victim to be treated with exceptional cruelty
during the commission of the offense." This is not
a statutory aggravating circumstance although it is
similar to the circumstance in T.C.A. § 39-13-204(i)
(5) [previously § 39-2-203(i)(5) ]. After a recess,
during which the jury went to lunch, the judge
informed counsel that after reflection he had
concluded that he should change the charge to
conform more to the language of T.C.A.          §
39-2-203(i)(5) requiring torture or depravity of mind
and should define "cruel," "torture" and
"depravity." Defense counsel did not object to a
corrected charge. The jury, which had not begun
deliberations, was called in; and the trial judge
informed them that he was striking the charge on the
first aggravating circumstance and inserting in place
of it the instruction that "[t]he murder was especially
cruel in that it involved torture or depravity of
mind." The court next defined "cruel," "torture"

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

and "depravity" in accord with *State v. Williams,* 690 S.W.2d 517, 529-530 (Tenn.1985). Defense counsel then requested that the court also tell the jury that it had not changed the instruction simply to draw attention to that factor. The court therefore specifically instructed the jury that it had acted, not to emphasize that part of the charge, but to "comport exactly" with the law. There is no merit to Defendant's assertion that the trial court's actions drew undue attention to this part of the charge.

## XX.

### CLOSING ARGUMENT

[38] The Defendant avers that the trial court erred in not permitting him to make the final closing argument at sentencing. The statute, T.C.A.  § 39-13-204(d), specifically grants the State the right of closing. This Court has previously found this issue meritless. *See State v. Melson,* 638 S.W.2d 342, 368 (Tenn.1982), *cert. denied,* 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

## XXI.

### DEATH QUALIFIED

The Defendant argues that questioning jurors about their beliefs on the death penalty biases the jury toward a finding of guilt and acceptance of the death penalty in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I,  § § 8 and 9, of the Tennessee Constitution. Both this Court and the United States Supreme Court have rejected this and similar arguments. *See Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *State v. Coker,* 746 S.W.2d 167, 171 (Tenn.1987); *State v. McKay,* 680 S.W.2d 447, 450, 453-455 (Tenn.1984).

### *543 XXII.

### PROPOSED INSTRUCTION

[39] We find no error with regard to the trial court's refusal to instruct the jurors that they should presume that the sentence they assess will actually be carried out--that if a life sentence is imposed, a life sentence will be served and, likewise, that if the death penalty is assessed, the Defendant will be executed. This proposed instruction was rejected by the Court in *State v. Payne,* 791 S.W.2d 10, 21 (Tenn.1990), and *State v. Melson,* 638 S.W.2d 342, 367 (Tenn.1982), cert. denied. 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983).

## XXIII.

### SUFFICIENCY OF EVIDENCE TO SUPPORT THE VERDICT

[40] The Defendant asserts that no evidence corroborates the testimony of April Ward, his accomplice. There is sufficient corroboration; *e.g.,* Jimmy Huskey's and Tom Bentley's testimony about the fabrics (blue terry cloth and lacy material) in the Defendant's possession; testimony of Defendant's appearance and behavior the morning after the murder; the presence of the turquoise ring at the

victim's house;  and Defendant's statements to his cellmates, Roy Haynes, Bobby Floyd, and Tim McGaha. *See State v. Henley,* 774 S.W.2d 908, 913 (Tenn.1989); *State v. Sparks,* 727 S.W.2d 480, 483 (Tenn.1987); *State v. Carter,* 714 S.W.2d 241, 244-245 (Tenn.1986).

## XXIV.

### SUFFICIENCY OF EVIDENCE TO SUPPORT AGGRAVATING CIRCUMSTANCE

[41] Citing *State v. Pritchett,* 621 S.W.2d 127, 139 (Tenn.1981), in which the victim died instantaneously from the first gunshot fired, the Defendant argues that the record does not support a finding that the Defendant tortured the victim before her death. He argues that Jones was unconscious during most of the acts that occurred that night. The proof shows that while Jones was alive and conscious, *see State v. Williams, supra,* 690 S.W.2d at 529-530, the Defendant told her that she was going to die as she begged for her life. He then struck her brutally and repeatedly about her head until, according to April Ward, she no longer moved. Dr. Blake's testimony was that the head injuries would have rendered her unconscious. It was April's testimony that it was only after the victim stopped moving that the other abuse occurred. The fact that the victim was tied and gagged, however, raises a question as to whether she was really unconscious during the subsequent abuse, as does the fact that she reportedly "tightened up" when the Defendant tried to achieve sexual penetration.

In any event, the proof shows that in addition to inflicting the head injuries, the Defendant tied Ann Jones to the bed, attempted to rape her (probably anally), beat her with a pool stick, slapped her buttocks so hard that an imprint of his hand was left on her skin, gagged and strangled her, and drank her blood after smearing it on himself and his accomplice, with whom he had sex as the victim lay dying nearby. These facts undeniably satisfy the definition of depravity of mind in *State v. Williams,* 690 S.W.2d at 529, and illustrate a "consciousness materially more 'depraved' than that of any person guilty of murder." *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980).

Similar beating of a victim was held to support a finding of aggravating circumstance (i)(5) in *State v. Barber,* 753 S.W.2d 659, 668 (Tenn.1988); *State v. McNish,* 727 S.W.2d 490, 494 (Tenn.1987); and *State v. Cone,* 665 S.W.2d 87, 94-95 (Tenn.1984). In *State v. Groseclose,*          615 S.W.2d 142 (Tenn.1981), and *State v. Strouth,* 620 S.W.2d 467 (Tenn.1981), in which the victims were unconscious for part of the time, death penalties rendered under this aggravating circumstance were upheld.

In this case the proof vividly shows that this murder involved both torture*and* depravity of mind. The Defendant taunted the victim, despite her pleading, "Please don't hurt me," and told her she was going to die. The evidence fully supports the *544 jury's finding of the aggravating circumstance in § 39-2-203(i)(5) (1982).

## XXV.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

## CONCLUSION

We find no error in the guilt phase or sentencing phase of this case. In accordance with the mandate of T.C.A. § 39-13-206(c)(1)(D) [formerly T.C.A. § 39-2-205(c)(4) ], we find that the sentence of death was not imposed in an arbitrary fashion, that the evidence supports the jury's finding of the statutory aggravating circumstance, and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance so found. Further, our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. *See State v. West,* 767 S.W.2d 387 (Tenn.1989);    *State v. O'Guinn,* 709 S.W.2d 561 (Tenn.1986);    *State v. Alley,* 776 S.W.2d 506 (Tenn.1989). This is one of the most brutal and sadistic killings this Court has reviewed. We are of the opinion that this senseless, and brutal killing clearly warrants the imposition of the death penalty. We therefore affirm the conviction of first degree murder and the sentence of death. The sentence will be carried out as provided by law on the 10th day of August, 1993, unless otherwise ordered by this Court or by other proper authority. Costs are adjudged against the Defendant.

O'BRIEN and ANDERSON, JJ., concur.

DAUGHTREY, J., and REID, C.J., dissent. See separate dissenting opinion.

DAUGHTREY, Justice, dissenting.

I believe that this case should be remanded for a new trial because of unwarranted interference with the defendant's right to due process--by the police, by the prosecution, and by the trial court. Hence, I respectfully dissent from the majority opinion.

The majority's recapitulation of the evidence in this case demonstrates that the testimony of the defendant's teenaged accomplice, April Ward, was not only crucial to the    state's  case against Gary **Caughron**, it *was* the state's case against him. The FBI developed no forensic evidence implicating Caughron, despite extensive testing on fingerprints, shoeprints, blood and other fluids, and fibers. The boot print on the victim's bedroom door established that someone other than the defendant had kicked in the door. Statements that Caughron made to friends and associates were incriminating to some extent, but for the most part were brief and ambiguous. These statements certainly would not support a murder conviction in the absence of April Ward's testimony.

The police department and the district attorney's office clearly understood April Ward's significance as a prosecution witness. But, at least initially, she was not a cooperative witness. Beginning in June 1988 with the first statement she gave police, and ending with the sixth and last one she gave them in November 1988, April Ward made a total of six pretrial statements, no two of which were completely consistent with each other.

From the beginning, the police and the prosecution

sought to shield April Ward and the information she had given them from the defendant's attorneys. During the course of their investigation, the police directed April Ward's mother, Lettie Cruze, not to permit April to talk with defense counsel. Because April Ward was effectively under "house arrest" during the months immediately before trial, this directive cut off any access that defense counsel might have had to this crucial witness during his investigation of the case and preparation for trial.

In response to the defendant's pretrial "    *Brady* motion"--seeking pretrial disclosure of material evidence favorable to the defense--the prosecutor failed to provide defense counsel with copies of April Ward's prior inconsistent statements. And when, finally, the prosecutor turned over copies of witness statements to the defendant's    *545 attorneys on the first night of trial, counsel was faced with the prospect of digesting over 100 pages, constituting the statements of 20 potential state witnesses, in the few hours before trial resumed the next morning. The next day, the trial judge refused to recess trial following April Ward's testimony on direct examination, despite counsel's representation that he had not had adequate time to review her pretrial statements and was unprepared to cross-examine her. As a result, defense counsel was not only prevented from gathering information that could have been developed from interviewing April Ward. He was also denied discovery of her statements prior to trial, and he was forced to conduct cross-examination of the state's crucial witness without the benefit of adequate preparation.

The trial court laid the blame for this predicament on the defendant's attorney. The majority here finds no error in the trial court's ruling. I conclude, to the contrary, that the combined action of the police, the prosecutors, and the trial judge operated effectively to deprive the defendant of his right to due process. (FN1)

Moreover, the cumulative prejudice resulting from the due process violations in this case, in which the defendant has been convicted and sentenced to death, cannot be written off as harmless error. While the defendant's lead attorney did cross-examine April Ward at trial, there is no way to measure how much more vigorous and effective his cross-examination might have been if he had been able to interview the witness in person prior to trial, or had been furnished with her prior inconsistent statements in response to his timely discovery motion, or had been given an adequate opportunity to review those statements *and* use them to prepare an effective cross-examination following her testimony on direct examination, all of which he was entitled to do under state and federal law and under our rules of procedure.

To use a colloquialism that summarizes the situation most descriptively, **Caughron's** attorneys were effectively "stonewalled" by    state  officials involved in the investigation and prosecution of this case. Without any realistic gauge with which to measure the extent of prejudice to the defendant as a result of the due process violations apparent in this record, I conclude that the only appropriate relief is to grant the defendant a new trial, at which the defense will have the benefit of the discovery and disclosure that it should have had prior to and during

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

the first trial. In reaching this conclusion, I do not wish to minimize in any way the wholly reprehensible nature of the homicide committed in this case, against an innocent and ultimately helpless victim. To insist on honoring the due process rights of the accused is an obligation imposed on courts and the judicial system by the state and federal constitutions. It in no way minimizes the heinousness of the guilty party's conduct.

## I. POLICE INTERFERENCE WITH TRIAL PREPARATION

The due process violation in this case began with a police directive to April Ward's mother, Lettie Marie Cruze, not to let April talk to the defendant's counsel during the investigatory stage of this case. It was only the first in a series of efforts to thwart defense access to information about the case.

The due process implications of government interference with a defendant's right to interview potential witnesses may best be seen as a continuum, at one end of which is the active concealment of key witnesses. When a prosecutor deliberately conceals a material witness and the defense is thereby prejudiced, a due process violation results. *See, e.g., Freeman v. State of *546 Georgia,* 599 F.2d 65, 69 (5th Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 641 (1980); *Lockett v. Blackburn,* 571 F.2d 309, 313 (5th Cir.), *cert. denied,* 439 U.S. 873, 99 S.Ct. 207, 58 L.Ed.2d 186 (1978).

Falling somewhere along the continuum of cases illustrating prosecutorial interference with a defendant's right of access to witnesses are those cases in which a prosecutor has instructed a witness not to talk to defense counsel. The law is well-settled that prospective witnesses do not belong to either party, and for this reason neither side should suggest that a witness refrain from talking to opposing counsel. *Gammon v. State,* 506 S.W.2d 188, 190 (Tenn.Crim.App.1973); *United States v. Matlock,* 491 F.2d 504 (6th Cir.), *cert. denied,* 419 U.S. 864, 95 S.Ct. 119, 42 L.Ed.2d 100 (1974). Of course, a witness has the right to refuse to be interviewed. *Byrnes v. United States,* 327 F.2d 825, 832 (9th Cir.1964). Nevertheless, when the state instructs a witness not to talk to defense counsel and defendant's trial preparation is thereby hindered, or other prejudice results, due process may be violated.

For example, in *Gregory v. United States,* 369 F.2d 185 (D.C.Cir.1966),*remanded,* 410 F.2d 1016 (D.C.Cir.1969), *cert. denied,* 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969), the prosecuting attorney advised the witnesses to two robberies not to talk to anyone in his absence. The court stated:

It is not suggested here that there was any direct suppression of evidence. But there was unquestionably a suppression of the means by which the defense could obtain evidence. The defense could not know what the eye witnesses to the events in suit were to testify to or how firm they were in their testimony unless defense counsel was provided a fair opportunity for interview. ....

*Id.* 369 F.2d at 189. The *Gregory* court, therefore, found that the state had prejudiced the defendant's pre-trial preparation and thereby

deprived him of a fair trial.

In *Nichols v. State,* 581 So.2d 1245 (Ala.Cr.App.1991), the Alabama Court of Criminal Appeals reversed a conviction after the district attorney sent letters to prospective witnesses asking them not to discuss the case without a government attorney present. The court quoted *Gregory* at length, as well as *Gallman v. State,* 29 Ala.App. 264, 195 So. 768 (1940), to the effect that it is "a mistake of a serious nature for a trial court, or opposing counsel, to assume or intimate that counsel for the defendant is not at full liberty to question ... any person who knows or is presumed to know the facts [of the case]...." *Nichols,* 581 So.2d at 1249 (citing *Gallman,* 195 So. at 770). Based on this authority, "the serious nature of [the] case," and the witness's testimony that the prosecutor's letter influenced his decision not to talk to defense counsel, the court reversed the conviction and remanded the case for a new trial.

Another court recognized the potential for a due process violation when the state advised witnesses that they "couldn't or shouldn't" give statements to defense counsel. In *United States v. Peter Kiewit Sons' Co.,* 655 F.Supp. 73 (D.Colo.1986), a court ordered the witnesses to submit to depositions in order to cure the problem. That court noted that the witnesses were "particularly vulnerable to suggestion and anxious not to offend the prosecutors" because they were concerned that they, too, could be indicted. The court found it "grossly unfair" to permit this kind of prosecutorial misconduct, which had "unfairly hampered the defendants' investigation." *Id.* at 78. Both this case and *Gregory* are examples of courts perceiving the obvious hindrance to defense counsel's trial preparation when the state instructs witnesses not to talk.

Although instructing a witness not to talk with defense counsel may constitute a due process violation, some courts, emphasizing the requirement of prejudice, have found no constitutional error when the defendant does not appear to have been harmed by the misconduct. For example, in *Kines v. Butterworth,* 669 F.2d 6 (1st Cir.1981), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982), a state trooper instructed three witnesses, the correctional *547 officers present after a prison assault, not to discuss the case with the defense attorney. However, the officers were not eyewitnesses; their testimony contained no surprises; counsel did not request a recess after the direct examinations; and cross-examination of the witnesses was thorough. The court, finding "nothing that unfairly affected or handicapped appellants in preparation for trial," held that due process was not violated because defendant could show no prejudice to his case. *Id.* 669 F.2d at 11.

In judging whether a defendant has been denied due process by the state's directive to a potential witness not to talk to defense counsel, the courts use an analysis much like that used in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), governing the right to pretrial discovery of exculpatory evidence material to the issue of the defendant's guilt, discussed further in Section II. *infra.* The defendant must show that the state withheld favorable, material evidence and that its

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

suppression was prejudicial to the defendant's case. Courts will find prejudice, however, when defendant's pre-trial preparation is hampered by the inability of counsel to assess the credibility of witnesses. The courts also consider the other information available to defense counsel, such as pretrial statements, and they look for such indicia of prejudice as requests for recesses and poorly prepared cross-examinations. These factors contribute to what inevitably becomes a subjective assessment of the damage likely to have been done by the state's misconduct.

In this case, prejudice is clear. Unlike the government officials in *Freeman* and *Lockett,* the state prosecutor here did not physically conceal April Ward. The prosecution did, however, insist that she be kept at home and then took advantage of her vulnerability and fear of punishment by advising her mother not to let April discuss the case with the defendant's attorneys. The actual damage to defendant's trial preparation is incapable of qualitative assessment, but defense counsel's efforts to secure copies of April Ward's statement(s) prior to trial, as well as his repeated requests for time to review the statements provided to him the night before her direct examination, suggest that unlike the efforts of the attorneys in several of the cases discussed above, Caughron's counsel's efforts to defend his client were hampered by the complete lack of access to the state's crucial witness.

## II. STATE'S REFUSAL TO SUPPLY BRADY MATERIAL

Of course, the prosecution might have overcome any prejudice caused by police interference with the defendant's efforts to prepare his defense, had the state produced April Ward's various conflicting statements in response to the defendant's motion for pretrial disclosure. Although there is no general right to discovery in a criminal trial, (FN2) the United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland, supra,* 373 U.S. at 87, 83 S.Ct. at 1196-97. (FN3) While *Brady* contemplates the suppression of many types of exculpatory evidence, the Supreme Court has specifically held that evidence impeaching a government witness's credibility may be exculpatory within the meaning of *Brady. See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Likewise, in *State v. Williams,* 690 S.W.2d 517, 525 (Tenn.1985), this Court held that "when the reliability of a witness may well        **\*548**    be determinative of guilt or innocence, the non-disclosure of evidence affecting his credibility may justify a new trial, regardless of the good faith or bad faith of the prosecutor." Moreover, the inconsistent statements of a witness are considered impeachment evidence favorable to a defendant. *See, e.g., United States v. Polisi,* 416 F.2d 573 (2d Cir.1969); *United States v. Shaffer,* 789 F.2d 682, 689 (9th Cir.1986). The witness to be impeached cannot, however, be one whose credibility does not affect defendant's guilt or innocence, a limitation that is clearly met in this case. *See generally United*

*States v. Starusko,* 729 F.2d 256 (3d Cir.1984).

When asked to decide whether suppressed evidence is material, the courts have generally held that "the materiality of the withheld evidence may depend on the closeness of the case." *Carter v. Rafferty,* 826 F.2d 1299, 1308 (3d Cir.1987). *See also Boone v. Paderick,* 541 F.2d 447 (4th Cir.1976);    *United States v. Sutton,* 542 F.2d 1239 (4th Cir.1976). For example, in *Starusko, supra,* the court found that the impeachment of a "key government witness" was material because "his credibility may well be determinative of guilt or innocence.... He is the linchpin of the prosecution's case." ' 729 F.2d at 260-61. Thus, a reviewing court must consider the materiality of the withheld evidence in light of the other evidence presented.

A due process violation requires more than the suppression of significant exculpatory evidence, however. The Fourth Circuit noted in *United States v. Smith Grading & Paving, Inc.,*    760 F.2d 527, 532 (4th Cir.), *cert. denied sub nom. Dellinger v. United States,* 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985) (citing *United States v. Higgs,* 713 F.2d 39 (3d Cir.1983)), that "no violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *See also United States v. McCrary,* 699 F.2d 1308 (11th Cir.1983). In *United States v. Darwin,* 757 F.2d 1193 (11th Cir.1985), the Eleventh Circuit faced a situation in which the government had disclosed impeachment evidence after a witness had testified. Noting the conclusions of the Seventh, Tenth, Third and Eighth Circuits, that court held that "[t]he point in the trial when a disclosure is made ... is not in itself determinative.... We agree with those circuits holding that a defendant must show that the failure to earlier disclose prejudiced him because it came so late that the information disclosed could not be effectively used at trial." 757 F.2d at 1201.

Although the complete non-disclosure of significant exculpatory evidence often makes an easy case for a due process violation, delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case. *United States v. Ingraldi,*    793 F.2d 408 (1st Cir.1986). In *Ingraldi,* by failing to move for a continuance and then thoroughly cross-examining the witness, the defense counsel cured a potential *Brady* violation. *Id.* 793 F.2d at 413. In *United States v. Enright,*    579 F.2d 980 (6th Cir.1978), the Sixth Circuit held that no due process *Brady* violation occurred because the failure to disclose material exculpatory evidence had been discovered in time for "full and adequate correction." Finally, in *United States v. Moceri,* 359 F.Supp. 431, 438 (N.D.Ohio 1973), the court reviewed an order requiring the government to show cause why it should not make a witness's prior statements available to the defense before trial. That court found that "only in the context of either a complete deprivation of discovery or resulting prejudice" does a due process violation occur. Only if the suppression prevents material exculpatory evidence from effectively being used at trial is there a due process violation. *See also United States v. Peters,* 732 F.2d 1004 (1st Cir.1984); *United States v. Higgs,* 713 F.2d 39, 44 (3d Cir.1983);    *United States v. Xheka,* 704 F.2d 974, 981 (7th Cir.1983);

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*United States v. McPartlin,* 595 F.2d 1321, 1346 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

The record in this case indicates that despite the defendant's timely motion for disclosure, the prosecutor did not produce the inconsistent statements of April Ward, **\*549** the key witness for the state, until the night before she testified at trial. The evidence was clearly favorable to the defendant as impeachment evidence and also material to the issue of guilt, given the fact that the witness's testimony was the "linchpin of the case." Nevertheless, if defense counsel had been given an opportunity to make effective use of the material, that is, time to review those contradictory statements *and* time to prepare for April Ward's cross-examination based on what was contained in those statements, the due process problem in this case might have been avoided. Hence, both the due process violation by police in directing April Ward's mother not to let her talk to defense counsel, and the extenuation of that due process violation by the prosecutor in wrongfully withholding *Brady* material, could have been overcome in this case, had the trial court given defense counsel an adequate opportunity to review that material at an appropriate point during the trial. Unfortunately, in the name of expediency, that opportunity was not forthcoming.

### III. THE RULE 26.2 VIOLATION

The majority opinion contains a brief history of Tennessee Rule of Criminal Procedure 26.2 and its genesis in federal law, and a passing reference to *State v. Taylor,* 771 S.W.2d 387 (Tenn.1989), the only reported decision of this Court directly interpreting Rule 26.2. *Taylor,* of course, stands for the obvious proposition that on motion, "a[ ] statement of the witness ... that relates to the subject matter concerning which the witness has testified" must be "produce[d] for the examination and use of the moving party," but only " *[a]fter* [that] witness ... has testified on direct examination." Tennessee Rules of Criminal Procedure 26.2(a) (emphasis added). Hence, under Tennessee law, as under federal law, a prosecutor's refusal to produce the statements prior to direct examination cannot be held to be prejudicial error, even though it is often extolled as "the better practice." *Taylor,* 771 S.W.2d at 391. The majority then correctly identifies the question of first impression we face in this case: Given the provision in Rule 26.2(d) permitting a "recess ... in the trial for the examination of such statement *and for preparation of its use in the trial* ", was counsel in this case afforded a reasonable opportunity to examine April Ward's prior statements and prepare for her cross-examination? (Emphasis added.)

Answering this inquiry in the affirmative, the majority postulates that because the defense "team" was given a copy of April's six statements "for overnight study and reflection," defense counsel had 22 hours in which to "study and reflect" on those 64 pages. In the majority's judgment, two hours would have been sufficient time to comply with the requirements of Rule 26.2. Thus, the majority concludes, the prosecution's "advance production satisfied the State's duty under Rule 26.2 and avoided the needless delay of the trial," and the trial

court's decision "to proceed, apparently to allow April Ward to finish her testimony that day" was not an abuse of discretion. There was, in short, no violation of Rule 26.2 and thus no error, in the majority's view.

If this were a routine case, and if the majority's description of the problem posed for defense counsel in this case were more complete, one might not quibble with the decision to assign the matter to that legal limbo known as "trial court discretion." But this is not a routine case--it is a capital case, one in which the defendant was ultimately sentenced to execution, based entirely on the testimony of 16-year-old April Ward, an accomplice who had given police a total of six contradictory statements, all of which had been systematically withheld from defense counsel despite legitimate efforts, both informal and formal, to obtain them prior to and at the time of trial. To condone the trial court's action in the name of avoiding delay in the trial, or from some misplaced sympathy for the accomplice, is to make a mockery of the procedural guarantees expressed in our modern rules of procedure and in case law interpreting the reach of due process in criminal trials. At the very least, the majority should offer some guidance on the nature and extent of the trial court's discretion in this area of    **\*550** the law and should set standards for determining when an abuse of that discretion has occurred.

#### A. *The Provisions of Rule 26.2*

The majority notes that the provisions of Rule 26.2 can be traced directly to Federal Rule of Criminal Procedure 26.2, which in turn was based on the federal "Jencks Act," 18 U.S.C. § 3500 (1957), passed in response to the United States Supreme Court's opinion in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). In pertinent part, the Tennessee Rule reads as follows: (FN4)

*Production of Statements of Witnesses.--*

(a) Motion for Production. After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and his attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

\*    \*    \*    \*    \*    \*

(d) Recess for Examination of Statement. Upon delivery of the statement to the moving party, the court, upon application of that party, may recess proceedings in the trial for the examination of such statement and for preparation for its use in the trial.

(e) Sanction for Failure to Produce Statement. If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

required by the interest of justice....

Obviously, whether any one of these provisions
has been violated and what action must be taken to
correct the error can only be determined on a case-
by-case basis, in context both the evidence in the
record and the procedure followed at trial.

### B. *Procedural History of the Rule Violation*

The factual background of the state's case against
Gary Caughron is set out in detail in the majority
opinion. It points out the obvious--that April
Ward's testimony not only made her the
prosecution's "linchpin witness," but also constituted
virtually the entire case for the state. What is not
*551 included in the majority opinion is a recitation
of the procedural background of the trial, putting in
context the "Jencks motion" made by defense
counsel at various points during the proceedings.

The trial of this case lasted four days. The first
day was consumed by arguments and rulings on
unfinished pretrial business, including defense
counsel's request that the trial court order early
production of witness statements, and by selection of
the jury. Sometime after court adjourned at 7:15
p.m., the district attorney handed defense counsel a
package containing the pretrial statements of all
prospective witnesses for the state, including April
Ward. In the package were over 100 pages of
typewritten and handwritten materials, comprising
the statements of 20 different persons. Defense
counsel apparently did not know until he received
these documents from the prosecutor that April
Ward had made six separate statements to police.

When court resumed the next morning at 9:00
a.m., the defendant's lead attorney, Carl R. Ogle,
told the trial judge even before the first witness was
called that he appreciated having received copies of
the witnesses' statements the night before, but that
he had not had a chance to review all the material
that had been turned over to him. When, later that
day, the state called April Ward as its fourth
witness, Ogle told the trial judge that he had had
time to review only one of April's statements and
asked that trial be adjourned until the next morning
to permit him to examine the rest of her statements
before she testified. This request was denied, and
April Ward's direct examination followed
immediately.

Near the end of the direct examination, during a
break in testimony taken to deal with an unrelated
question, Ogle noted that it was 4:05 p.m.; he
again reminded the trial judge that he had not had an
opportunity to read all of April's prior statements;
and he said, "I would ask the Court to allow me to
start my cross-examination in the morning, because
I am not prepared and there's no way in the world I
can cross-examine this witness today." To this the
trial judge responded:

No sir. You have your assistant with you, Mr.
Ward. You have your [investigator] with you ...
They do a lot of work for you and do good work
for you and they've been doing good work for you
for the last ... since about 1:30. They've been
looking at that. I glanced at it. It seems to have
nothing worthwhile, relevant, or germane. You've
had the statements overnight. This Court will not

delay it but I will tell you this, I intend to quit
about 5:00. Got a new rule. It may turn my hair
brown again. My complexion may return. My
vigor may return. I'm going to start working
about eight or ten hours a day and quit.... I've
been working 10, 12, 14 hours a day for the last
three weeks and I shouldn't do that. So I'm going
to try to do better and if we can let's do it. I know
that I can't quit before 5:00. There's no way in
the world I can do it but at 5:00 I'm going to start
up [sic] and quit.

The jury was brought back to the courtroom, and
the district attorney continued his direct examination
of April Ward. Less than ten minutes later, he
completed his questioning and tendered the witness
to the defense for cross-examination. Ogle, noting
that it was 4:12 p.m., again asked for an overnight
recess. He reminded the trial judge that he had not
received the package of statements until after court
adjourned the previous night. He pointed out that he
and his co-counsel had had to consult with their
client and his family before leaving the courthouse at
9:15 p.m. to return to Ogle's office, which was
located in Jefferson City, some 40 miles away in an
adjoining county. They were due back in court in
Sevierville at 9:00 the next morning. Ogle said that
he had turned over the package of witness statements
to his investigator to review overnight, and that he
had been able to read only one of April Ward's
statements in the interim. He apologized to the trial
judge for having to ask for a recess, and indicated
that the defense had tried to avoid the delay by
seeking pretrial discovery of the witnesses'
statements, an effort that had proved unsuccessful.
When the trial judge responded *552 that he was
"powerless to require the Attorney General to do
something the rules and the law do not require," that
is, to order early production of the statements, Ogle
made the following, thoroughly reasonable response:

But you could cure that [problem] at this point by
giving me the amount of time necessary to
properly prepare [for cross-examination. [T]his
witness is the whole case. I mean, we rise or fall
here if they believe her. It's that important. I've
been in your court for a long time and don't
regularly ask for this and you know that, but this is
a very important case. It's a very dangerous
situation for this witness to step in here without
[my] being properly prepared to cross-examine
her. It would just be suicide.

The trial judge denied defense counsel's request
for a recess on the ground that the "material is not
that complex. [The statements are] not that different
[from each other]." After further discussion,
during which the prosecution argued against further
delay, the trial judge finally allowed counsel a ten-
minute recess, which actually stretched into 16
minutes. Although the record does not show the
exact time that court resumed following this recess,
the hour must have been very close to 5:00 p.m.,
which was the trial judge's previously announced
adjournment time. Nevertheless, the trial judge not
only forced defense counsel to begin his cross-
examination of April Ward at that late hour, but he
also failed to recess until cross-examination was
completed, some considerable period of time later
that evening.

It is clear from the record that the trial court's

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, State v. Caughron, (Tenn. 1993)

decision to deny a recess was not due to any misunderstanding on his part about the crucial nature of April Ward's testimony. Berating defense counsel for his repeated efforts to secure a recess, the trial judge said:

> I will give you a ten minute recess but you're going to cross-examine. But the court observes this. Before anybody came in the courthouse, before anybody got involved in this at all, even the most thickest neophyte in the world would know that [April Ward] is the crucial witness, the devastating witness and you knew, as an experienced, seasoned lawyer, from the front, throughout and now, this is the witness and this is the witness. And so, I hold you to that standard. I'll give you ten minutes to talk with whomsoever you want to. We're going to cross-examine this lady.

Following the brief recess, the trial judge added:

> Right now your client is at enormous risk for the death penalty. At enormous, enormous risk. Your statement that you weren't ready to cross-examine, if the death penalty is imposed, and it may well be. It's a jury question. Of course, this lawsuit's half-tried, and we don't know what course it will take or what proof is to come but at this time you are in imminent peril. You have put incompetency of counsel in this record by not being diligent, by not going over these statements and by not being prepared to cross-examine this crucial and devastating witness. That's what concerns the Court but the Court cannot stop and wait and procrastinate.

Before beginning an analysis of the legal principles applicable to these facts, two observations seem pertinent, both based on a careful reading of the transcript in this case. First, there is no reasonable basis in fact for the trial court's allegation that defense counsel had not been diligent, either in his representation of his client or in the discharge of his duties as an officer of the court. The trial court found as a matter of fact that the attorney had received the witness statements at 7:45 p.m. on the first night of trial. The lawyer was due back in court at 9:00 a.m. the next morning, approximately 13 hours later, ready for trial. In that 13-hour interval, he was called upon to confer with his client, to spend the patter part of two hours driving to and from his out-of-county office, to review the day's events with his co-counsel, to prepare his opening statement for the next morning, and to tend to such personal matters as eating, sleeping, and maintaining personal hygiene. To ask in addition that he read over 100 pages of witness   **\*553** statements, including 64 pages of April Ward's statements, make a study of the many inconsistencies revealed in those statements, and devise a strategy for cross-examination based on his review, is simply unreasonable. The courts already demand much of attorneys appointed to represent indigent defendants, especially those who (like Caughron) face imposition of the ultimate penalty. Their efforts are unappreciated by the public generally and undercompensated by the justice system they serve. The burden they assume is difficult, and when acting in good faith, they should be accommodated by the courts in their efforts to discharge their professional obligation to their clients.

Second, despite the trial court's assessment of the statements in question as "not that complex," "not that different" from one another, and containing "nothing worthwhile, relevant or germane," a review of April Ward's statements demonstrates clearly that they were a powerful source of ammunition with which to impeach her testimony, had defense counsel been permitted the time necessary to review them and prepare his cross-examination in light of their content.

### C. Analysis of Relevant Case Law Interpreting Rule 26.2

Although, as previously noted, there have been few Tennessee cases interpreting Rule 26.2, there is a rich mine of federal case law involving the production of what is now universally referred to as "Jencks material." While federal authority is not binding on Tennessee state courts, it is obviously persuasive in resolving disputes such as the one now before us, not only because the drafters of the Tennessee rule opted to follow the federal model so closely, but also because of the thoroughness the federal courts have brought to the analysis of Jencks disputes.

Like the Tennessee rule, the Jencks Act and the federal rule require not only that the defendant be furnished with the prior statements of witnesses following direct examination, but also that defense counsel be afforded a reasonable opportunity to examine those statements and prepare for cross-examination based on their contents. Although the duty of the trial court to order a recess under subsection (d) is couched in permissive terms, the federal cases make it clear that failure to permit counsel reasonable time for review constitutes error.

For example, in a case very close on its facts to the one now before us, the prosecution turned over Jencks material to defense counsel on a Sunday morning at 10:00 a.m., preceding the start of a three-day trial the next day, Monday. The material consisted of "a stack of paper at least eight inches thick, including a thousand pages of testimony obtained from ten witnesses, a forty-five minute tape recording and other documents." *United States v. Holmes,* 722 F.2d 37, 40 (4th Cir.1983). The record reflects that "it took an experienced attorney twenty-four hours to read through this material once in preparation for this appeal." (FN5) *Id.*

The facts of *Holmes* bear an almost uncanny resemblance to the facts in this case:

> The government completed the direct examination of its first witness, Creta, late in the afternoon of the first day of trial. One of the lawyers for the defense requested the district court to adjourn for the day [because] ... counsel had not sufficiently completed their study of the Jencks material so as to be prepared to cross-examine. The district court ruled that ... since the Jencks material had been furnished the day before, when under a strict interpretation of the Act it need not have been furnished until the witness had completed his direct testimony, the district court would give counsel only a five-minute recess before cross-examination would begin. [Footnote: In  **\*554** fact, counsel

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

were given a sixteen minute recess. The record
shows that the recess began at 4:40 p.m., and the
jury did not return to the jury box until 4:56 p.m.]
The requested adjournment was denied and cross-
examination of Creta began. The court remained
in session until the cross-examination, redirect and
recross-examination of Creta was completed. The
jury was excused at 6:51 p.m. and the court
adjourned at 7:06 p.m.

*Id.*

The *Holmes* court held that it was "clear that
defendants were not afforded a reasonable
opportunity to examine and digest the mass of
material furnished them on the Sunday before the
Monday trial began." *Id.* at 41. The reviewing
court found an abuse of discretion amounting to a
violation of the defendants' rights under the Jencks
Act and ordered a new trial. *Id.*

A similar error occurred in this case. When the
trial judge refused to order a recess, as requested
pursuant to Rule 26.2(d)--or even more reasonably,
to adjourn court for the day a mere half-hour earlier
than scheduled--he did so without justification. As a
result, defense counsel was forced to begin cross-
examination under circumstances amounting to a
deprivation of Rule 26.2 statements that were
rightfully his to inspect. The majority "emphasize
[s] that this case does not involve the denial of Rule
26.2 statements." But, the production of Jencks
material without adequate time to read and make use
of it undoubtedly constitutes the functional
equivalent of a denial. In my judgment, the
violation of subsection (d) in this case is so clear that
the only remaining question concerns the relief that
should be granted in light of this error.

As one commentator has noted, once a Jencks
statement is deemed producible, "the defendant's
right to the statement is virtually absolute."
*Wharton on Criminal Procedure.* (13th ed.) § 378.
Because the original *Jencks* opinion was founded on
the United States Supreme Court's supervisory
powers, and not on constitutional grounds, a denial
of that right does not, *per se,* result in constitutional
error. *Palermo v. United States,*    360 U.S. 343,
345, 362, 79 S.Ct. 1217, 1221, 1229-30, 3 L.Ed.2d
1287 (1959). The federal courts have noted,
however, "that in some situations denial of
production of a Jencks Act type of statement might
be a denial of a Sixth Amendment right."    *United
States v. Augenblick,* 393 U.S. 348, 356, 89 S.Ct.
528, 533, 21 L.Ed.2d 537 (1969). Hence, courts
have suggested that both the Sixth Amendment's
right to compulsory process, *Id.,* and the right to
confrontation are implicated in the violation of the
procedural guarantees of Rule 26.2.    *Krilich v.
United States,* 502 F.2d 680 (7th Cir.1974). As to
the latter right, the United States Court of Appeal
has noted:

Clearly, the principal purpose of requiring the
government to disclose prior written statements of
a witness which relate to that witness' direct
testimony is to facilitate cross-examination. It is
principally through cross-examination that a
defendant exercises his right to confront witnesses
called to testify against him. Conversely, the
failure to provide material to which the defense is
entitled under the Jencks Act may adversely affect

a defendant's ability to cross-examine a
government witness and thereby infringe upon his
constitutional right of confrontation.

*Krilich, supra,* at 682 (holding that a Jencks
violation "presents an issue of sufficient
constitutional dimension to warrant consideration
under 28 U.S.C. § 2255" ).

Moreover, it has been held that the failure of an
attorney to seek a recess for the purpose of
reviewing recently proffered Jencks material
(instead the defense attorney tried to read through
the documents while direct examination was in
progress) constitutes ineffective assistance of
counsel, yet another Sixth Amendment deprivation.
*United States v. Hinton,*     631 F.2d 769, 771,
778-780 (D.C.Cir.1980). The *Hinton* court faulted
the attorney for failing to seek "adequate time to
make an informed tactical decision as to the use of
the information contained in the [statements],"
thereby producing "a harried trial attorney, attending
to direct examination with one part of her
consciousness, and with the    **\*555**  other rifling
through the 'massive Jencks material' ... in a
hurried attempt to isolate and scan the relevant
documents." *Id.* at 778. In   *Hinton,* the defense
attorney was "harried" through her own fault, while
in this case counsel was "harried" by the action of
the trial court. The cause may be different, but the
result is the same. Here, as in   *Hinton,* counsel's
conduct was not "the product of deliberate and
informed decision" but is marked by "inadequate
preparation," resulting in the deprivation of the
defendant's right to the effective assistance of
counsel. *Hinton, supra,* at 780.

Such a deprivation violates the right-to-counsel
provision found in Article I, Section 9 of the
Tennessee Constitution, as well as the Sixth
Amendment of the federal constitution.     *See
generally Baxter v. Rose,*   523 S.W.2d 930, 936
(Tenn.1975). This constitutional violation is made
all the more egregious by the fact that the trial court
took note that it was imminent, but did nothing to
prevent it. (FN6) Whatever value there is in
maintaining efficiency in the trial of criminal cases
(and it is considerable under normal circumstances),
efficiency must be assigned a low priority where
procedural rights of an accused are at stake. In this
case, the trial judge's misguided decision not to
adjourn court before 5:00 p.m., regardless of the
circumstances, amounts to an arbitrary and
capricious abuse of discretion, resulting in the
necessity of retrial. Put simply, the price of saving
less than a half-hour of trial time turned out to be
"penny wise but pound foolish."

For there can be no dispute, given the facts of this
case, that the error committed by the trial court was
prejudicial. Federal case analysis on this point is
compelling. The United States Supreme Court held
early on that a *Jencks* violation could be considered
harmless error. *Palermo, supra,* at 355-6, 79 S.Ct.
at 1226-7. But in the wake of this initial ruling, the
Court has set the threshold for determining
harmlessness at a very high level. For example, in
*Clancy v. United States,* 365 U.S. 312, 81 S.Ct.
645, 5 L.Ed.2d 574 (1961), the Court said:

Since the production of at least some of the
[Jencks] statements was a right of the defense, it is

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, State v. Caughron, (Tenn. 1993)

not for us to speculate whether they could have been utilized effectively. As we said in *Jencks v. United States:* "Flat contradiction between the witness's testimony and the version of events given in his reports is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, or even a different order of treatment, are also relevant to the cross-examination process of testing the credibility of a witness's trial testimony."

*Clancy,* at 316, 81 S.Ct. at 648 quoting *Jencks, supra,* at 667, 77 S.Ct. at 1012-13 (citations omitted).

Building on its ruling in *Clancy,* the United States Supreme Court noted in *Goldberg v. United States:*

Since courts cannot "speculate whether [Jencks material] could have been utilized effectively" at trial, ... the harmless-error doctrine must be strictly applied in Jencks Act cases.

425 U.S. 94, 111, note 21, 96 S.Ct. 1338, 1348, note 21, 47 L.Ed.2d 603 (1967). The *Goldberg* court cited with approval Justice Brennan's dissenting opinion in *Rosenberg v. United States,* 360 U.S. 367, 373, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959):

Although we need not go so far as those courts which have suggested that the harmless error doctrine can never apply to statements producible under the statute, ... fidelity to the principle underlying **\*556** Jencks and the Jencks statute requires that when the defense has been denied a statement producible under the statute, an appellate court should order a new trial unless the circumstances justify the conclusion that a finding that such a denial was harmful error would be clearly erroneous. In that determination, appellate courts should be hesitant to take it upon themselves to decide that the defense could not have effectively utilized a producible statement.

Thus, federal law permits the courts to overlook Jencks violations only in the narrowest of circumstances: (FN7)

The requirements of the Jencks Act are intended to provide defendants in federal prosecutions with an opportunity for thorough cross-examination of government witnesses, making the constitutionally guaranteed right of confrontation more meaningful. Violations of the statute are necessarily attended by the danger that this precious right will be impaired. For this reason, and also because it is ordinarily difficult upon review of a cold record to ascertain the value to the defense of a statement withheld, *violation of the [Jencks] Act is excused only in extraordinary circumstances. Unless it is perfectly clear that the defense was not prejudiced by the omission, reversal is indicated.*

*United States v. Missler,*    414 F.2d 1293, 1303-1304 (4th Cir.1969) (citations omitted) (emphasis added). *Accord, United States v. Winner,* 666 F.2d 447, 448-449 (10th Cir.1981);    *United States v. Knowles,* 594 F.2d 753, 755 (9th Cir.1979) ;    *United States v. Aaron,* 457 F.2d 865, 869 (2nd

Cir.1972).

Given the centrality of April Ward's testimony, the inherent unreliability which attaches to that testimony by virtue of the half-dozen contradictory statements she made over a five-month period prior to trial, and the trial court's failure to grant counsel a reasonable period of time in which to capitalize upon those various pretrial statements, it appears that the Rule 26.2(d) error in this case was prejudicial. Moreover, appellate judges are in a poor position to second-guess counsel on the question of whether a recess to permit full utilization of the statements in this case would have been efficacious. It should be noted, however, that perhaps the most ghoulish aspect of April Ward's testimony, to the effect that she and Caughron drank the victim's blood out of shot-glasses as she lay dying nearby, nowhere appears in any of Ward's prior statements, (FN8) a fact of which counsel may have been totally unaware, (FN9) since he had not had an adequate opportunity to read and compare all the statements.

It is true that defense counsel engaged in a vigorous cross-examination of April Ward, confronting her repeatedly with the fact that she had made contradictory statements to police. But, he did not cross-examine her with regard to the details of **\*557.** those statements, conceivably as a matter of strategy, but more likely from ignorance of their contents. It is this latter possibility that should lead this Court to hold that the trial court's denial of counsel's request for a recess or a reasonable time to review the statements under Rule 26.2(d) constitutes reversible error.

Finally, it must be emphasized that the majority's calculation that defense counsel had    *22 hours*  in which to "study and reflect on the pretrial statements of April Ward" (and some 20 other witnesses) is purely illusory. It fails to take into account the fact that almost half this period of time, nine hours, was spent in court during the course of the trial. It makes no provision for two hours of travel, for time that the attorney spent consulting with his colleagues and his client, for time devoted to planning trial strategy for the next day (including opening argument), or for a reasonable period of time for rest and sustenance. The trial judge and a majority of this court apparently expect defense counsel to be able to prepare cross-examination from notes taken by an investigator (notes which the lawyer and the investigator may not have had a chance to discuss) while trial is actually in progress. Had the attorney done *voluntarily* what he was forced to do by the trial court in this case, there can be little doubt that he would be subject to a charge of incompetency and found to have rendered ineffective assistance of counsel--much like the attorney in  *United States v. Hinton, supra,*  who opted to review a witness's statement while direct examination of that witness was being conducted.

The physical and psychological demands on an attorney in trial, especially a criminal trial involving a capital offense, are heavy. The expectations placed on defense counsel in this case were completely unrealistic, and they resulted in a deprivation of due process with respect to his client. For the reasons set out above, I dissent from the majority's decision to affirm the defendant's

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, State v. Caughron, (Tenn. 1993)                                          Page 23

conviction in this case.

I am authorized to say that Chief Justice REID
joins in this opinion.

(FN1.) T.C.A. § 40-2441, enacted in 1963,
permitted pretrial discovery of a confession or
statement against interest made by the accused. It
did not provide for the production of statements by
witnesses under any circumstances. T.C.A.      §
40-2044, enacted in 1968, permitted pretrial
discovery of documents, photographs, and tangible
objects. Under caselaw interpreting this statute,
discovery of statements by witnesses other than the
defendant was not permitted. *See, e.g., Hudgins
v. State,* 3 Tenn.Cr.App. 148, 458 S.W.2d 627
(1970).

(FN2.) T.C.A. § 24-1-101 was repealed in 1991
(Caughron was tried in 1990). Also, the language
of T.R.E. 601 ("Every person of sufficient
capacity to understand the obligation of an oath or
affirmation is competent to be a witness except as
otherwise provided in these rules or by statute.")
has since been changed to "Every person is
presumed competent to be a witness except as
otherwise provided in these rules or by statute."

(FN1.) The action of the police in blocking pretrial
access to the state's most crucial witness and the
prosecution's failure to disclose summaries of her
pretrial statements are not raised as discrete issues
on appeal. For this reason, it would be necessary
to hold that they constitute "plain error" in order to
avoid a finding of waiver on the defendant's part
and grant relief on either ground. However, they
are treated in this opinion not as independent
grounds for relief, but as due process violations
that exacerbated the *Jencks* error in this case,
making it obvious reversible error.

(FN2.) *Weatherford v. Bursey,* 429 U.S. 545, 97
S.Ct. 837, 51 L.Ed.2d 30 (1977);      *State v.
Brownell,* 696 S.W.2d 362, 363
(Tenn.Crim.App.1985).

(FN3.) In *Brady,* the defendant requested the out-
of-court statements of his companion during the
murder. The government showed him all
statements except the one in which the companion
admitted the actual killing. Although this
information would not affect the conviction, the
jury's knowledge of the defendant's level of
participation could have affected his punishment.
373 U.S. at 84, 83 S.Ct. at 1195.

(FN4.) As to the remainder of Rule 26.2,
subsections (b) and (c) set out the procedure for
determining whether the entire statement of a
witness, or only part of it, is producible;
subsection (f) requires application of the rule to
pretrial hearings in the criminal court; and
subsection (g) defines what constitutes a statement
under the rule.

According to the Advisory Commission
Comments:

"The language of Rule 26.2 is substantially
identical to the language in Rule 26.2 of the
Federal Rules of Criminal Procedure. There are,
however, two other differences that deserve

comment.

"First, as formerly was evident in Rule 16, the
Committee deliberately did not incorporate that
provision of subdivision (e)(3) of the Jencks Act,
which applies to statements of witnesses before a
grand jury, and such statements are not meant to
be obtainable simply because a grand jury witness
testifies for the State. Such statements may only
be obtained under the limited provisions of existing
law now contained in Rule 6(k)(2).

"Second, Rule 26.2(f) now makes it clear that this
rule applies not only to trial situations, but also to
pretrial testimony such as might be given at a
suppression hearing. There would be little logic in
requiring statement production only at trial, and
not at pretrial hearings where testimony as to the
facts of the case is being given under oath. This
provision is similar to language found in Rule 12(i)
of the Federal Rules of Criminal Procedure but the
Tennessee Rules Commission elected to treat all
witness statements in one rule. However, the
Tennessee rule applies to all pretrial motions under
Rule 12(b). Further, the Federal rule treats law
enforcement officials as witnesses called by the
state, but the commission elected not to adopt this
provision. Obviously, Rule 26.2(c) applies to such
pretrial motion hearings. Thus, only a part of a
witness' statement may be relevant to    *557. the
hearing. The remainder may then be discussed at
trial under the provisions of Rule 26.2(a)."

(FN5.) Likewise, it took the author of this opinion
a full hour to read rapidly through the statements
of April Ward, without taking notes or marking
the statements for comparison purposes. A careful
reading would consume much more than the two-
hour estimate given in the majority opinion. A list
of the contradictions in the six statements and the
development of a strategy for their effective use on
cross-examination would, of course, take even
longer.

**\*557** (FN6.) Following the conclusion of April
Ward's testimony, the trial judge attempted to
rescue defense counsel from a later charge of
ineffectiveness by commenting on the fact that
Ogle had been handed "yellow sheets" of "check
lists" by his investigator and noting, "I find
counsel's assistance has been full, complete,
meticulous as reflected by the questions put, as by
the notes you should retain in case some question
is raised at some later time about competency of
counsel." Of course, no post-hoc pronouncement
of competency by the trial court can make up for
the fact that counsel was hobbled in his
representation of Caughron by the denial of his
motion for a Rule 26.2(d) recess.

(FN7.) The federal courts have held a Jencks
violation harmless only where the statement and
the witness's testimony are consistent,      *United
States v. Tashjian,* 660 F.2d 829 (1st Cir.1981);
where the statement is of marginal value, because
the witness is not an integral part of the
government's case, *United States v. Weidman,* 572
F.2d 1199 (7th Cir.1978); where the statement
contains only cumulative material, *i.e.,* it is the
same as the information in grand jury transcripts
that have already been disclosed, *United States v.
Anthony,* 565 F.2d 533 (8th Cir.1977); where lost

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, State v. Caughron, (Tenn. 1993)

notes would have supported the prosecution's case, *United States v. Miranda,* 526 F.2d 1319 (2nd Cir.1975), cert. denied 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82; or where the statement is not exculpatory and there was no advantage to the government in non-production, *United States v. Principe,* 499 F.2d 1135 (1st Cir.1974). At least one state court has applied harmless error analysis to the violation of production rule. In *State v. Tanner,* 175 W.Va. 264, 332 S.E.2d 277, 279 (1985), the Court held: "The question of whether the error was harmless or prejudicial hinges upon whether there was a substantial discrepancy between the contents of the prior statement or report and the witness's testimony during trial."

Obviously, the error in this case could not be considered harmless under any of the foregoing formulations.

(FN8.) And, no bloody shot-glasses were found at the scene of the crime.

(FN9.) There is no way to know to what extent this aspect of April's testimony may have affected the jury's decision to impose the death penalty. The record reflects that the state relied on it in arguing aggravating circumstances during the penalty phase of the proceedings.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

**\*75** 876 S.W.2d 75

Supreme Court of Tennessee;
at Knoxville.

STATE of Tennessee, Appellee,
v.
David Allen BRIMMER, Appellant.
Feb. 7, 1994.
Rehearing Denied May 2, 1994.

Defendant was convicted in the Anderson County Court, James B. Scott, Jr., J., of first-degree premeditated homicide and sentenced to death. Defendant appealed. The Supreme Court, O'Brien, J., held that: (1) evidence was sufficient for conviction; (2) evidence was sufficient to support finding of aggravating circumstance of murder in perpetration of robbery; and (3) death sentence was not disproportionate or excessive.

Affirmed.

Reid, C.J., filed concurring and dissenting opinion.

Daughtrey, J., filed opinion concurring in part and dissenting in part.

West Headnotes

[1] Criminal Law ☞412.2(3)
 110 ----
  110XVII Evidence
   110XVII(M) Declarations
    110k411 Declarations by Accused
    110k412.2 Right to Counsel; Caution
    110k412.2(3) Informing Accused as to His Rights.

[See headnote text below]

[1] Criminal Law ☞412.2(5)
 110 ----
  110XVII Evidence
   110XVII(M) Declarations
    110k411 Declarations by Accused
    110k412.2 Right to Counsel; Caution
    110k412.2(5) Failure to Request Counsel; Waiver.
 Defendant's oral and written statements to police were not unlawfully obtained in violation of defendant's *Miranda* rights where defendant had acquired experience in procedures observed by law enforcement officers in soliciting accused to give his statement, was advised of his right to remain silent, and signed four waivers. U.S.C.A. Const.Amend. 5.

[2] Criminal Law ☞486(6)
 110 ----
  110XVII Evidence
   110XVII(R) Opinion Evidence
    110k482 Examination of Experts
    110k486 Facts Forming Basis of Opinion
   110k486(6) Mental Condition.
 Exclusion of testimony of doctor, who would have testified that defendant could have been coerced in making confession to police, did not deprive defendant of his constitutional right to present a defense in homicide trial where trial court found that

basis for doctor's opinion was not sufficiently trustworthy to go to jury on issue as to who and what may have influenced defendant's mental state at time that he gave his confession and defendant was not deprived in any manner from showing the physical and psychological environment that yielded his confession. U.S.C.A. Const.Amend. 6.

[3] Criminal Law ☞661
 110 ----
  110XX Trial
   110XX(C) Reception of Evidence
   110k661 Necessity and Scope of Proof.
 It is well within authority of states to exclude evidence through application of evidentiary rules that themselves serve interest of fairness and reliability even if defendant would prefer to see that evidence admitted.

[4] Criminal Law ☞1153(1)
 110 ----
  110XXIV Review
   110XXIV(N) Discretion of Lower Court
   ·110k1153 Reception of Evidence
   110k1153(1) In General.
 Trial court's decision to admit or exclude expert testimony cannot be disturbed on appeal unless there is clear showing that trial court has abused its discretion.

[5] Criminal Law ☞1169.11
 110 ----
  110XXIV Review
   110XXIV(Q) Harmless and Reversible Error
   110k1169 Admission of Evidence
   110k1169.11 Evidence of Other Offenses.

[See headnote text below]

[5] Criminal Law ☞1171.1(3)
 110 ----
  110XXIV Review
   110XXIV(Q) Harmless and Reversible Error
    110k1171 Arguments and Conduct of Counsel
    110k1171.1 In General
    110k1171.1(2) Statements as to Facts, Comments, and Arguments
     110k1171.1(3) Particular Statements, Comments, and Arguments.
 Admission of testimony and argument in homicide trial to the effect that defendant had "killed before" did not constitute reversible error where defendant did not object when any of the remarks were made, defendant did not request trial court to instruct jury to disregard comments about other killings, state did not intentionally elicit remarks, and testimony clearly demonstrated defendant's mental condition as significant factor in determination of voluntariness of defendant's statements to police.

[6] Homicide ☞253(6)
 203 ----
  203VII Evidence
   203VII(E) Weight and Sufficiency
    203k251 Degree of Murder
    203k253 First Degree
    203k253(6) Commission of or Attempt to Commit Other Offense.
 Evidence was sufficient for conviction of first-degree premeditated homicide; defendant came to county with intent to rob and kill while armed with gun and knife, handcuffed victim to tree and choked

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

876 S.W.2d 75, State v. Brimmer, (Tenn. 1994)                                    Page 2

him to death with wire and slipknot.

[7] Criminal Law ⬖⇒438(6)
  110 ----
    110XVII Evidence
      110XVII(P) Documentary Evidence
        110k431 Private Writings and Publications
        110k438 Photographs and Other Pictures
        110k438(5) Depiction of Injuries or Dead
            Bodies
        110k438(6) Purpose of Admission.

[See headnote text below]

[7] Criminal Law ⬖⇒438(7)
  110 ----
    110XVII Evidence
      110XVII(P) Documentary Evidence
        110k431 Private Writings and Publications
        110k438 Photographs and Other Pictures
        110k438(7) Photographs Arousing Passion or
            Prejudice; Gruesomeness.

Probative value of photograph of victim wearing
watch found on his dead body and photograph of
body of victim in hayfield where it was found
outweighed photograph's prejudicial effect in
homicide trial; defendant was not prejudiced by
admission of photograph of defendant wearing watch
and photograph of victim's body was probative to
establish time of death by showing clothing victim
was wearing at time of his murder.

[8] Homicide ⬖⇒311
  203 ----
    203VIII Trial
      203VIII(C) Instructions
    203k311 Punishment.
Defendant was not entitled to jury instruction, as
provided by capital sentencing statute, that
aggravating circumstances should outweigh
mitigating circumstances beyond a reasonable doubt;
there was no constitutional requirement that state
prove that aggravating circumstances outweigh
mitigating circumstances beyond a reasonable doubt
before death penalty could be imposed and statute
requiring requested instruction became effective
after victim was murdered and there was no
indication statute was to apply retroactively.
T.C.A. § 39-13-204(g).

[9] Criminal Law ⬖⇒1038.1(1)
  110 ----
    110XXIV Review
      110XXIV(E) Presentation and Reservation in
            Lower Court of Grounds of Review
      110XXIV(E)1 In General
      110k1038 Instructions
      110k1038.1 Objections in General
      110k1038.1(1) In General.

[See headnote text below]

[9] Criminal Law ⬖⇒1137(3)
  110 ----
    110XXIV Review
      110XXIV(L) Scope of Review in General
      110k1135 Parties Entitled to Allege Error
      110k1137 Estoppel
    110k1137(3) Instructions.
Defendant's failure to object to trial court's jury
instruction and active procurement of instruction he
later claims is erroneous precludes review of

instruction on appeal.

[10] Statutes ⬖⇒263
  361 ----
    361VI Construction and Operation
      361VI(D) Retroactive Operation
    361k263 Retrospective Construction in General.
Most statutes are presumed to operate
prospectively unless legislature indicates contrary
intention.

[11] Homicide ⬖⇒311
  203 ----
    203VIII Trial
      203VIII(C) Instructions
    203k311 Punishment.
Defendant was not entitled to jury instructions in
homicide trial on mitigating factor that murder was
committed while defendant was under influence of
extreme emotional disturbance, nor on mitigating
factor that capacity of defendant to appreciate
wrongfulness of his conduct or conform his conduct
to requirements of law    *75    was substantially
impaired as a result of mental illness; although
there was evidence that defendant was mentally ill,
there was no evidence supporting a relationship
between defendant's mental illness and the
homicide.

[12] Homicide ⬖⇒311
  203 ----
    203VIII Trial
      203VIII(C) Instructions
    203k311 Punishment.
Jury instruction in homicide trial as to meaning
and function of mitigating circumstances was
sufficient and appropriate where trial judge followed
statute in delivering instructions and defendant was
allowed to introduce such proof as he saw fit in
mitigation.

[13] Homicide ⬖⇒311
  203 ----
    203VIII Trial
      203VIII(C) Instructions
    203k311 Punishment.
Jury instruction in homicide trial that jury should
have no sympathy or prejudice or allow anything but
law and evidence to have any influence upon them in
determining their verdict did not prevent jury from
considering and giving effect to defendant's
evidence in mitigation.

[14] Homicide ⬖⇒311
  203 ----
    203VIII Trial
      203VIII(C) Instructions
    203k311 Punishment.
Jury instructions in homicide trial did not lead any
juror to believe that he or she was precluded from
considering any mitigating circumstances unless all
jurors unanimously agreed on circumstances
existence.

[15] Homicide ⬖⇒341
  203 ----
    203X Appeal and Error
      203k333 Harmless Error
    203k341 Failure or Refusal to Give Instructions.
Trial court's error in failing to instruct jury on
elements of robbery in penalty phase of homicide
trial was harmless where trial court previously

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

876 S.W.2d 75, State v. Brimmer, (Tenn. 1994)                                Page 3

defined robbery in its guilt phase instructions on
felony-murder.

[16] Sentencing and Punishment ☞1681
350H ----
  350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
    350Hk1681 Killing While Committing Other
              Offense or in Course of Criminal
              Conduct.

  (Formerly 203k357(7))
  Evidence was sufficient to support aggravating
circumstance of murder in perpetration of robbery;
defendant came to area with intent to steal motor
vehicle and, when he was unable to accomplish theft
of acquaintance's car, he then victimized victim,
whom he strangled during course of robbery.

[17] Sentencing and Punishment ☞1681
350H ----
  350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
    350Hk1681 Killing While Committing Other
              Offense or in Course of Criminal
              Conduct.

  (Formerly 203k357(7))

  [See headnote text below]

[17] Sentencing and Punishment ☞1710
350H ----
  350HVIII The Death Penalty
    350HVIII(E) Factors Related to Offender
    350Hk1710 Emotional Distress or Disturbance.

  (Formerly 203k357(7))
  Death sentence was not excessive or
disproportionate to penalty imposed in similar first-
degree premeditated homicides committed in course
of robbery, despite fact defendants in similar cases
did not suffer psychological impairment; trial court
and jury gave due consideration to fact that
defendant had significant psychological impairment
stemming from abuse and neglect when he was child
and found that it did not outweigh aggravating
circumstance that defendant murdered victim during
commission of robbery.

[18] Sentencing and Punishment ☞1788(6)
350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
    350HVIII(G)4 Determination and Disposition
    350Hk1788 Review of Death Sentence
    350Hk1788(6) Proportionality.

  (Formerly 110k1134(2))
  In conducting proportionality review of defendant's
death sentence, Supreme Court is not limited to
using in comparison only those cases in which same
aggravating factors are found; what is important is
individualized determination based on character and
individual and circumstances of the crime.

[19] Criminal Law ☞723(1)
110 ----
  110XX Trial
    110XX(E) Arguments and Conduct of Counsel
    110k722 Comments on Character or Conduct
    110k723 Appeals to Sympathy or Prejudice

  110k723(1) In General.
  Prosecutor's statement during closing argument of
homicide trial, that in order to impose life sentence,
if jury found aggravating circumstances had been
proved beyond a reasonable doubt, jury would have
to find that mitigating circumstances outweighed
aggravating circumstances, was accurate statement
of law and did not impermissibly shift burden of
proof.

[20] Criminal Law ☞720(9)
110 ----
  110XX Trial
    110XX(E) Arguments and Conduct of Counsel
    110k712 Statements as to Facts, Comments, and
            Arguments
    110k720 Comments on Evidence or Witnesses
    110k720(7) Inferences from and Effect of
               Evidence in Particular Prosecutions
  110k720(9) Homicide.
  Prosecutor's statement during closing argument of
homicide trial, "that there were no mitigating
circumstances in the case and that Dr. Engum's
testimony concerning the defendant should be
entitled little weight," did no more than set out
state's interpretation of proof and did not limit jury's
consideration of mitigating factors.

[21] Sentencing and Punishment ☞1780(2)
350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
    350HVIII(G)3 Hearing
    350Hk1780 Conduct of Hearing
    350Hk1780(2) Arguments and Conduct of
                 Counsel.

  (Formerly 110k723(1))
  Prosecutor's statements during closing argument of
penalty phase of homicide trial, urging jury that
defendant must accept responsibility for his actions,
did not mislead jury to believe that unless death
penalty was imposed defendant was not being held
responsible for his behavior; argument was attack
on defendant's personal blameworthiness or
culpability.

[22] Criminal Law ☞723(1)
110 ----
  110XX Trial
    110XX(E) Arguments and Conduct of Counsel
    110k722 Comments on Character or Conduct
    110k723 Appeals to Sympathy or Prejudice
  110k723(1) In General.
  Prosecutor's statement during closing argument of
homicide trial urging jury not to decide case on basis
of sympathy for defendant was appropriate argument
where comment was closely followed by admonition
to jury to decide case on basis of law and facts.

[23] Criminal Law ☞723(1)
110 ----
  110XX Trial
    110XX(E) Arguments and Conduct of Counsel
    110k722 Comments on Character or Conduct
    110k723 Appeals to Sympathy or Prejudice
    110k723(1) In General.

  [See headnote text below]

[23] Sentencing and Punishment ☞1464
350H ----

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

876 S.W.2d 75, State v. Brimmer, (Tenn. 1994)                                        Page 4

350HVII Cruel and Unusual Punishment in
        General
  350HVII(D) Prosecutions
    350Hk1464 Arguments and Conduct of
        Counsel.

(Formerly 110k1213.3)
  Prosecutor's statement in closing argument of
homicide trial invoking memory of victim did not
violate state constitutional provisions prohibiting
imposition of punishment unless by jury of peers or
prohibiting cruel and unusual punishment. Const.
Art. 1, §§ 8, 16.

[24] Sentencing and Punishment ☞1616
  350H ----
  350HVIII The Death Penalty
    350HVIII(A) In General
      350Hk1613 Requirements for Imposition
        350Hk1616 Avoidance of Arbitrariness or
            Capriciousness.

(Formerly 110k1208.1(4.1))

[See headnote text below]

[24] Sentencing and Punishment ☞1743
  350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)1 In General
        350Hk1741 Notice of Intent to Seek Death
            Penalty
        350Hk1743 Time for Giving.

(Formerly 110k1208.1(4.1))
  Selection of defendant as candidate for death
penalty was not arbitrary and capricious or result of
abuse of prosecutorial discretion; there was nothing
in record to support defendant's contention and fact
that prosecutor had discretion to choose defendant
did  *75  not render death penalty unconstitutionally
arbitrary.

[25] Homicide ☞311
  203 ----
  203VIII Trial
    203VIII(C) Instructions
    203k311 Punishment.
  Jury instruction that jury must agree unanimously
in order to impose life sentence in penalty phase of
homicide trial did not violate Eighth Amendment
requirement that jury may not be required to find a
mitigating circumstance unanimously before it can
be considered;  jury could not have imposed any
sentence if it was not unanimous in its decision and
if jury had not agreed as to defendant's punishment,
life imprisonment would have been imposed.
T.C.A. § 39-13-204(h);  U.S.C.A. Const.Amend. 8

[26] Criminal Law ☞872.5
  110 ----
  110XX Trial
    110XX(K) Verdict
    110k872.5 Assent of Required Number of Jurors.

(Formerly 110k8721/2)
  There is no way jury can impose sentence if it is
not unanimous in its decision.

[27] Sentencing and Punishment ☞1612
  350H ----
  350HVIII The Death Penalty
    350HVIII(A) In General
      350Hk1612 Death Penalty as Cruel or Unusual
          Punishment.

(Formerly 203k356)
  Provision of state constitution providing that state
shall provide for humane treatment of prisoners did
not add any additional restriction to use of death
penalty beyond that imposed by prohibition against
cruel and unusual punishment and, thus, as death
penalty had been repeatedly upheld against cruel and
unusual punishment challenges, imposition of death
penalty was not unconstitutional. Const. Art. 1,   §
32.

  *77  Charles Burson, Atty. Gen. & Reporter,
Merrilyn Feirman, Asst. Atty. Gen., Nashville and
Jan Hicks, Asst. Atty. Gen., Clinton, for appellee.

  J. Michael Clement, Clinton, J. Thomas Marshall,
Dist. Public Defender, and Brock Mehler,
Nashville, for appellant.

OPINION

O'BRIEN, Justice.

  Defendant was found guilty of the first degree
premeditated homicide of Rodney Compton, on or
about 22 October 1989.  The indictment included
three statutory aggravating circumstances:  (1) The
murder was committed while defendant was engaged
in committing a robbery;  (2) the murder was
committed for the purpose of avoiding lawful arrest;
(3) the murder was especially heinous, atrocious or
cruel.  The jury found one (1) statutory aggravating
circumstance: the  *78  murder was committed
while defendant was engaged in committing
robbery.

  The proof in this case shows that the victim,
Rodney Compton, disappeared sometime after 6:30
p.m. on 22 October 1989.  Compton had just
returned from a cruise to the Bahamas and had
failed to arrive, as planned, at his mother's home on
the evening of his disappearance.  Compton's body
was discovered in a hayfield in rural Loudon County
on 7 November 1989.  He was dressed in the
clothing he had worn when he returned from his trip
on 22 October.  Decomposition of the body
prevented determination of the cause of death, but
Compton's neck had been cut and the pathologist
who had performed an autopsy on the body testified
that suffocation and strangulation were potential
causes of death.

  On 3 February 1990, the defendant was arrested in
Refugio, Texas, on charges unrelated to this case.
He was driving Compton's pickup truck, in which
officers found the victim's jacket and a pair of
handcuffs.  On 24 February 1990, the defendant
confessed to law enforcement officers that he had
killed Compton.  He said that the victim had given
him a ride in the truck on the evening of 22
October, and he admitted that he had intended to rob
the victim at that time.  The defendant claimed that,
when the victim made sexual advances toward him,
he told Compton he was a policeman and "arrested"
and handcuffed him.  The defendant said he had

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

driven Compton to another location where he choked him to death. The defendant stated he then drove to Loudon County, where he disposed of the body. While being transported to Tennessee from Texas, the defendant also identified the park in Anderson County where he had killed the victim.

Other proof established that the defendant had been in Anderson County at the time Compton disappeared, purportedly to see an acquaintance, David Parten. It was also shown that, when the defendant was seen a few days after Compton's disappearance, he had in his possession not only the victim's truck but also the victim's jacket and several souvenirs Compton had purchased in the Bahamas.

[1] Defendant has raised 13 separate issues, each of which are divided into multiple sub-issues. The first complaint is that his oral and written statements introduced into evidence were unlawfully obtained and admitted in violation of his constitutional rights.

At the conclusion of a motion to suppress his written and oral admissions, the trial judge took the matter under advisement and subsequently issued an order denying the motion in which he held that defendant was advised of his constitutional rights to remain silent and that he knowingly and voluntarily waived those rights. Based on the totality of the circumstances he overruled the motion to suppress the statements. He made certain findings of fact, stating in pertinent part, that, in conjunction with his previous criminal record, defendant had acquired experience in the procedures observed by law enforcement officers in soliciting an accused to give his statement. He found that the police took care to inform defendant of his rights and took care to see that he understood them. He further found defendant had signed four (4) waivers, although some were signed with false names. The court did not find defendant to be a credible witness.

Defendant makes the same charges here. We are constrained to say that defendant's brief is very difficult to follow due to innuendo and incomplete citations to the law in a seeming effort to convey the impression that the citations are authority for the point to be made. His claim that he was denied the right to counsel and the claims that he was held for 22 days in solitary confinement and refused medical attention when requested were refuted by the law enforcement officers involved. There is no evidence in the record, other than being kept apart from the other inmates, that defendant was subjected to any other potentially coercive treatment. He says he asked for a doctor, but never stated that he was subject to any need for medical attention. To bolster his argument, defendant says the trial court's ultimate conclusion that his confession was voluntary was made without the benefit of hearing the testimony of Dr. Eric Engum during the jury-out sentencing hearing. No effort was made at the suppression hearing to present the testimony *79 of the doctor. The United States Supreme Court case of *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986), is cited for the statement "as interrogators have turned to more subtle forms of psychological persuasion, courts have found mental condition of the defendant a more significant factor in the 'voluntariness' calculus." (FN1) The complete statement continues, "but this

fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness'."

The *Connelly* case stands for the proposition that coercive police activity is a necessary predicate to finding that a confession is not voluntary within the meaning of the due process clause and that the State need prove waiver of *Miranda* rights only by a preponderance of the evidence. In stating those principles the Court reminds us that "[T]he central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence," citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), and further comments that while the exclusion of evidence may be necessary to protect constitutional guarantees, both the necessity for the collateral inquiry and the exclusion of evidence deflect a criminal trial from its basic purpose. The trial court in this case properly applied the "totality of the circumstances" rule and there was no violation of either federal or state constitutional rights in the admission of defendant's oral and written statements, including the oral statement made to the police officer who returned him from Texas to Tennessee.

[2][3][4] Equally without merit is defendant's insistence that the exclusion of Dr. Engum's testimony at the guilt phase of the trial violated his constitutional right to present a defense. He cites *Crane v. Kentucky*, 476 U.S. 683, 687, 106 S.Ct. 2142, 2145, 90 L.Ed.2d 636 (1986), for the statement that "evidence surrounding the making of a confession bears on its credibility as well as its voluntariness." The exclusion of this evidence does not rise to a deprivation of defendant's right to present a defense under *Crane*, supra. In that case the defendant was completely foreclosed from offering any evidence at all concerning the circumstances of his confession. Dr. Engum's testimony was to be, that after listening to a 30-minute tape of defendant's interrogation by police officers when he confessed to the homicide, he believed with a reasonable degree of certainty that defendant was an individual who very plausibly could have been coerced. The trial judge denied the admission of this testimony to the jury. He ruled that the information elicited by the doctor from the tape was only a part of the interrogation procedure in which defendant confessed. He found that the basis for the doctor's opinion was not sufficiently trustworthy to go to the jury on the issue as to who and what may have influenced defendant's mental state at the time that he gave his confession. He further ruled that the doctor's testimony would be available in the sentencing phase of the proceedings in the event defendant was found guilty. Defendant was not deprived in any manner from showing the physical and psychological environment that yielded his confession. It is well within the authority of States to exclude evidence through the application of evidentiary rules that themselves serve the interest of fairness and reliability--even if the defendant would prefer to see that evidence admitted. *Crane*, *supra*, 476 U.S. at 689, 106 S.Ct. at 2146. A trial court's decision to admit or exclude expert testimony cannot be disturbed on appeal unless there is a clear showing that the trial court has abused its discretion. *State v. Hawk*, 688 S.W.2d 467, 472

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

(Tenn.Cr.App.1985). We find no such abuse in this case.

[5] Defendant says it was a denial of his right to due process and that he was prejudiced by the erroneous admission of testimony and argument that he had "killed before." A review of that part of the proceedings where this testimony occurred is essential to a resolution of this issue. While describing the circumstances of defendant's confession, the sheriff of Refugio County, Texas, where defendant had been apprehended, testified **80** that he had been talking with defendant and was of the opinion defendant was pretty close to the place where he really wanted to talk about the Compton homicide. He decided to postpone any further inquiry and sent for the jailer to take defendant back to the jail. The jailer and defendant left the office and were gone approximately 30 seconds to a minute when they returned. The jailer said that Mr. Brimmer wanted to talk to the officers. It was the sheriff's testimony, "we talked to him, and he said that he did kill this Mr. Compton and that the reason--I had told him that I felt like he had killed before and that was the reason he was holding back, because he didn't want to tell about everything. And so he said, yeah, you're right. I have killed before, and I did kill Mr. Compton."

Defendant also complained of testimony of Sheriff Hodges relating to his confession which occurred after they had taken a lunch break. The sheriff testified the interview with defendant continued over "probably two (2) to three (3) hours, because we did break for lunch and let him compose himself a little bit. He was pretty emotional." The sheriff testified that after the lunch break defendant was no longer crying and it got a lot better. Initially, after he came back with the jailer, he started answering the questions. Sheriff Hodges related that "the more we got into it, you know, it was catching up with him and, like I say, he was just unloading and he had this burden that was bothering him a lot about this murder and some others."

A further protest was to the State Attorney's final argument when she quoted Sheriff Hodges' comment, "Son, you killed before."

Our investigation of these complaints indicates initially that the issue was waived. There was no contemporaneous objection when any of these allegedly objectionable remarks were made. Defendant did not request the Court to instruct the jury to disregard comments about other killings. The record indicates that Sheriff Hodges was not being responsive to the State's questions when the reference to prior killings was made. There is no indication the State intentionally elicited these remarks. Moreover, this issue was not raised on the motion for new trial. Certainly it would have been better if none of the remarks had been made; however, defendant cannot on one hand complain that in excluding Dr. Engum's testimony defendant was stripped of the power to describe to the jury the circumstances that prompted his confession and, on the other, complain about the admission of evidence which clearly demonstrated his mental condition as a significant factor in determination of voluntariness. Under the circumstances and evidence in this case we do not think these incidents constitute reversible error. We note that defense counsel as well as the Attorney General made inquiry with regard to the circumstances under which the confession was made.

[6] Defendant contends the evidence adduced at trial was insufficient to support a finding by a rational trier of fact that the victim was killed intentionally, with malice, deliberation and premeditation. These contentions are not sustained by the record which clearly shows that defendant handcuffed the victim to a tree and choked him to death with a wire and slipknot. Defendant said first, that he did not intend to kill the victim, and second, that he committed the homicide because he became angry when the victim confessed he had sexually abused children at the school where he worked. There is evidence in the record to the effect that defendant came to Anderson County with the intent to rob and kill David Parten. He was armed with a gun and a knife. Fortuitous circumstances thwarted this course of action and brought the ultimate victim into defendant's path. The jury could reasonably assume that a theft and killing had been defendant's intent from the beginning. Only the victim changed. The substitution of a garrote as the instrument of death did not diminish the intent, the premeditation, or the deliberate homicide.

Defendant raises inferences of conflict in the evidence and testimony which, he claims, justified a directed verdict. We think not. The trial judge submitted the case to the jury and approved their verdict, thus accrediting the testimony of the State's witnesses and resolving all conflicts in favor of the State. Under the evidence in this record any **81** rational trier of fact could have found beyond a reasonable doubt that the defendant killed the victim and that the killing was malicious, premeditated and deliberate. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); T.R.A.P. 13(e).

We note that the trial court instructed the jury that "intent or desire to kill may be conceived and deliberately formed in an instant." This instruction, which was in accord with the case law at the time it was given, has been discussed at length in the recent case of *State v. Brown,* 836 S.W.2d 530 (Tenn.1992). What the Court said in *Brown* was, "[It] is now abundantly clear that the deliberation necessary to establish first degree murder *cannot* be formed in an instant. It requires proof, as the sentencing commission comment to § 39-13-201(b) further provides, that the homicide was 'committed' with 'a cool purpose' and without passion or provocation, which would reduce the offense either to second degree murder or to manslaughter, respectively." We conclude that the evidence in this case meets the *Brown* standard for premeditation and deliberation.

[7] Defendant says the trial court erred by allowing certain irrelevant, prejudicial and misleading photographs of the victim to be introduced into evidence. He says the photographs which were entered into evidence were irrelevant, cumulative, and a waste of time. He cites the appropriate rules of evidence and *State v. Banks,* 564 S.W.2d 947, 949 (Tenn.1978) as authority. Several photographs are specifically objected to. The first is Exhibit 6 which is a picture of the victim during his lifetime wearing a watch similar to that found on his dead

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

876 S.W.2d 75, State v. Brimmer, (Tenn. 1994)    Page 7

body. The watch also was introduced into evidence. While the relevance of this photograph is minimal, it certainly did not prejudice the defendant in any manner. The second photograph depicts the body of the victim in a hayfield where it was found. The picture was offered in evidence to establish the time of death by showing the clothing he was wearing at the time of his murder. The probative value of this Exhibit was not outweighed by any of the factors enumerated in Evidence Rule 403. We are of the opinion it was properly admitted. There is some suggestion that there was an objection to the admission of Exhibits numbered 18.3 through 18.6. The record shows that the Court, in referring to collective Exhibit 18, denied the admission of these exhibits to the jury in any form. We find the issue without merit.

Defendant has made a complaint that the trial court erred by allowing the State to violate a preliminary order requiring counsel to approach the bench prior to introducing any photographs of the victim's body. This complaint is totally without merit. The record contains no evidence of defendant's allegations of violation of the court's ruling by the State's counsel. The trial court expressly found there was no breach of its ruling in spirit or by communications to the jury.

[8] We find defendant's complaints in reference to the trial court's instructions to the jury to be without merit. Defendant asserts that the trial judge erred in not instructing the jury that aggravating circumstances should outweigh mitigating circumstances beyond a reasonable doubt. Defendant refers to T.C.A. § 39-13-204(g) (FN2) enacted by Ch. 591, Pub. Acts 1989, effective 1 November 1989, which amended the statute to require the jury to determine that any aggravating circumstances found to be proven by the State must outweigh any mitigating circumstances *beyond a reasonable doubt* in order to impose a death sentence. Prior to the enactment of Chapter 591, the statute only required the jury to determine that any aggravating circumstances were not outweighed by any mitigating circumstances and did not include the reasonable doubt provision. The offense for which defendant was convicted occurred before the effective date of the 1989 amendment, but the defendant was tried and sentenced after the effective date of that Act. The import of defendant's argument is that the 1989 amendment should have been applied to his case despite the fact the offense occurred before its effective date.

We initially point out that the defendant submitted a requested instruction as follows:

**\*82** If you find that one or more aggravating circumstances exist, you cannot sentence the defendant to death unless you find that these aggravating circumstances outweigh the mitigating circumstances. Mitigating circumstances need not be *proved beyond a reasonable doubt,* but proof by a mere preponderance of the evidence is sufficient.

It is apparent this instruction omitted the reasonable doubt standard defendant now asserts was required. The trial court expressly told counsel that he would charge the first sentence but not the second. The instructions as given were not objected to at trial nor was the issue raised on motion for new trial.

[9] Normally, defendant's failure to take any action to call this issue to the trial court's attention and his active procurement of an instruction he now claims is erroneous would preclude review on appeal. *See* T.R.A.P. 3(e) and 36(a). In the present case, however, if defendant was tried under law inapplicable to his case, his substantial rights may have been affected. Under these circumstances we exercise our discretion to review this issue in order to insure substantial justice is done. *See* T.R.Cr.P. 52(b).

[10] This Court has previously held that there is no constitutional requirement that the State prove that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt before the death penalty may be imposed. *See State v. Payne,* 791 S.W.2d 10, 20-21 (Tenn.1990); *State v. Boyd,* 797 S.W.2d 589, 597 (Tenn.1990). The defendant's right to a "reasonable doubt" charge therefore must depend on the 1989 Act. Thus, the question presented is whether the General Assembly intended that the amendments to the capital sentencing statute apply to cases arising before but tried after the effective date of amendment. Most statutes are presumed to operate prospectively unless the legislature indicates a contrary intention. *Cates v. T.I.M.E. DC, Inc.,* 513 S.W.2d 508, 510 (Tenn.1974); *Morford v. Yong Kyun Cho,* 732 S.W.2d 617, 620 (Tenn.App.1987); *see also United States v. Rewald,* 835 F.2d 215, 216 (9th Cir.1987); *State v. Sutherland,* 248 Kan. 96, 804 P.2d 970 (1991). We have found no retroactivity clause either specifically or expressly applicable to the 1989 amendments to the capital sentencing statute.

T.C.A. § 39-11-112, enacted as § 1 of Chapter 591 of the 1989 Acts, states specifically:

Repealed or amended laws--Application in prosecution for offense.--Whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect *shall be prosecuted under the act or statute in effect at the time of the commission of the offense.* Except as provided under the provisions of § 40-35-117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act. [Acts 1989, ch. 591, § 1.] (Emphasis supplied.)

T.C.A. § 40-35-117, enacted as Ch. 591, § 6, Pub. Acts 1989, and a part of the Criminal Sentencing Reform Act of 1989, provides in subsection (b) for the sentencing of persons for offenses committed between 1 July 1982 and 1 November 1989 under the 1989 Act except where constitutionally prohibited. Sentencing Commission Comments to T.C.A. § 40-35-117 and 118. however, indicate that first degree murder is excluded from the provisions of these sections. We, therefore, find controlling the general provisions of § 39-11-112 and the principles against retroactive application of statutes. The trial court correctly instructed the sentencing law in effect at the time the murder was committed.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[11] Defendant says he was prejudiced by failure to instruct mitigating circumstances raised by the evidence. He refers specifically to T.C.A. § 39-13-204(j)(2), that the murder was committed while defendant was under the influence of extreme mental or emotional disturbance, and T.C.A. § 39-13-204(j)(8), the capacity of the defendant to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect. The trial court **\*83** declined to instruct the jury on these factors because he found no evidence in the record that *as a result* of mental disease the defendant could not conform his conduct to the requirements of the law. Defendant argued that the testimony of his witness, Dr. Eric Engum, a clinical psychologist and a licensed attorney, was sufficient to require an instruction on this mitigating circumstance. Dr. Engum testified that defendant was angry and impulsive and prone to outbursts of temper as the result of a personality disorder. The trial court was of the opinion that the disorder was prevalent even among law abiding persons, and in the absence of specific proof or a statement of causation about the relationship between the disorder and the offense, the instruction was not warranted. We do not find anything in the record to dispute this finding. The issue is without merit.

[12] Defendant insists the jury was inadequately instructed as to the meaning and function of mitigating circumstances. He says the trial judge did not define the term mitigating beyond the reference to any aspect of defendant's character or record, or "any aspect of any circumstances of the offense favorable to the defendant which is supported by the evidence." The trial judge followed the statute in delivering his instructions. Defendant was allowed to introduce such proof as he saw fit in mitigation. We are satisfied that the instruction was sufficient and appropriate. *See State v. Bell,* 745 S.W.2d 858, 864 (Tenn.1988).

[13] The trial judge instructed the jury that they should have no sympathy or prejudice or allow anything but the law and the evidence to have any influence upon them in determining their verdict. Defendant avers that this instruction prevented the jury from considering and giving effect to his evidence in mitigation. Defendant takes a negative approach to our rejection of a similar complaint in *State v. Boyd,* supra, in which the Court cited from *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), inter alia, "it is no doubt constitutionally permissible, but not constitutionally required, see *Gregg v. Georgia,* 428 U.S. 153, 189-195, 96 S.Ct. 2909, 2932-2935, 49 L.Ed.2d 859 (1976), ... for the State to insist that 'the individualized assessment of the appropriateness of the death penalty be [a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence],' " citing Justice O'Connor, concurring, in *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987). The issue is without merit.

[14] Defendant says there is a reasonable likelihood that the jury understood the trial court's instructions as precluding them from considering any mitigating circumstances unless they unanimously agreed on its existence. We do not

agree. As we noted in *State v. Bates,* 804 S.W.2d 868 (Tenn.1991), cert. denied 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 98 (10/7/91), there is nothing in the Tennessee statutes, in the instructions given to the jury, or in the verdict form submitted to the jury, likely to lead any juror to believe that he or she was precluded from considering mitigating circumstances unless all jurors agreed that such circumstance existed. In this instance, too, no objection was raised at trial and the issue was not raised in the motion for new trial.

[15] Defendant states a number of issues, or sub-issues, involving the aggravating circumstance found in this case, (i)(7) (the murder occurred during a robbery) beginning with the charge that the trial court committed reversible error by failing to instruct the elements of robbery at the penalty phase. It is true that he did not. This was error. However, the Court previously defined robbery in its guilt phase instructions on felony murder. The error was harmless. *State v. Wright,* 756 S.W.2d 669, 675 (Tenn.1988).

[16] Defendant questions whether the evidence is sufficient to support the aggravating circumstance of murder in the perpetration of robbery. Citing *State v. Terry,* 813 S.W.2d 420, 423 (Tenn.1991), he says there is no proof of motivational relationship between the homicide and the felony. It is argued that the victim's truck and other property were taken only as an afterthought to the murder, which occurred because of defendant's inappropriate intense anger and lack of control. The evidence clearly bears out **\*84** that a reasonable jury could conclude defendant left Alabama with the intent to steal a motor vehicle and, when he was unable to accomplish the theft of David Parten's Porsche, he then victimized Rodney Compton, whom he strangled during the course of the robbery.

Defendant returns to plow the ground of aggravating and mitigating circumstances, arguing that the evidence does not support the jury's finding. There is no doubt that the evidence clearly supported the jury's verdict. The jurors were justified in rejecting his theory of the homicide: that he killed the victim in angry rage. The jury was not required to accept his version of the events.

[17][18] Defendant argues that the sentence of death is excessive and disproportionate to the penalty imposed in similar cases. T.C.A. § 39-13-206(c)(1)(D) requires this Court to review the sentence of death to make that determination, considering both the nature of the crime and the defendant. Defendant seems to imply that this Court is limited to using in comparison only those cases in which the same aggravating factors are found. Of course, to do so would limit the proportionality review which is required of the Court. As defendant reminds us, what is important is an individualized determination based on the character of the individual and the circumstances of the crime. Insofar as the defense in this case is concerned, defendant's confession includes the admission that when he was invited into the victim's pickup truck, he got into the truck with the intention to rob him. He also stated that the victim made homosexual advances toward him and masturbated him. When that act was concluded he placed a pair of handcuffs on the victim and put him back in his truck. He

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

drove the two of them to another location where, he says, he intended to leave him unhurt. The victim began a loud outcry during which he admitted engaging in sexual abuse of children at the school where he worked as a teacher. This angered defendant, who then handcuffed the victim to a tree and began choking him. When he would not be quiet, defendant found some wire on the ground and wrapped it around his neck several times. He put a slip knot around the victim's neck and kept pulling on it. When the victim finally went limp, defendant says he thought the man passed out and tried to loosen the knot but could not get it loose. He observed the victim was not breathing and thought he was dead. He was scared they might be seen. He put the man back into the pickup truck and drove off to the place several miles down the road where Mr. Compton's body was subsequently found. He cut the wire off his neck with a hunting knife he carried, unlocked the handcuffs, covered the body with some hay and then returned to Birmingham, Alabama in Compton's pickup. He also had some of the victim's clothes and his wallet. He was subsequently apprehended in Refugio County, Texas, for speeding while driving the stolen truck. This admission, in conjunction with the other evidence and testimony in the record, was sufficient for the jury to find that defendant was guilty of first degree premeditated murder committed while he was engaged in committing a robbery, as opposed to the defense version of the circumstances of the offense.

Defendant says the homicide was not in furtherance of the robbery but was a separate, distinct and independent event produced by his mental disorder. Dr. Eric Engum testified to the background and psychological impairments of the defendant based on his early childhood background and records from earlier mental examinations. Dr. Engum diagnosed the defendant to be suffering from borderline personality disorder, a condition characterized by impulsive and unpredictible behavior, emotional withdrawal, marked shifts in behavior and attitude, intense anger, suicidal gestures, and the inability to maintain any kind of enduring relationship with others. He opined that the defendant adjusted well to institutionalization, where there was external control. He was not aggressive or violent in such an environment and only had difficulties when released.

The State presented Dr. Samuel Craddock, a clinical psychologist at the Middle Tennessee Mental Health Institute, who had observed the defendant for over two months. Dr. Craddock described the defendant as responsible for most part during evaluation *85   although he may have been exaggerating some symptoms of mental illness. His IQ was 100. The jury heard all of this evidence and had the opportunity to observe the defendant's manner and demeanor during his testimony in open court. We cannot say from our review of this record that their judgment was inappropriate.

Defendant cites a number of cases in which the death sentence was based on the same aggravating circumstance involved in this case. He argues there is no indication in any of these that the defendant presented evidence of significant psychological impairment stemming from abuse and neglect when they were children. This has become a not

uncommon defense in cases of this nature. (FN3) It is a defense to which the trial court and jury must give due consideration and one which this Court must scrutinize carefully in carrying out a proportionality review. These precautions were observed in this case. We find that the sentence of death was not imposed arbitrarily. The evidence supports the jury's finding that the murder was committed while defendant was engaged in committing a robbery and the absence of any mitigating circumstance sufficiently substantial to outweigh the aggravating circumstance found. Having considered the facts and circumstances of the offense, as well the background and nature of defendant, we hold that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases.

Defendant says the prosecution's misleading arguments in the penalty phase of the case undermined the reliability of the jury's sentencing determination.

The defendant raises these issues for the first time in this Court. No contemporaneous objections were made at trial nor were the issues raised on the motion for new trial. Nonetheless, we have examined the errors charged and find them to be without merit.

[19] Defendant says the prosecution argument shifted the burden of proof. The prosecutor stated during argument that in order to impose a life sentence, if the jury found an aggravating circumstance had been proved beyond a reasonable doubt, the jury would have to find that mitigating circumstances outweighed aggravating circumstances. This was an accurate statement of the law in effect at the time of the trial of this case. This argument did not shift the burden of proof. *See State v. Boyd, supra; State v. Cauthern,* 778 S.W.2d 39, 47 (Tenn.1989).

[20] It is complained the State's argument "that there were no mitigating circumstances in the case and that Dr. Engum's testimony concerning the defendant should be entitled little weight" limited the jury's consideration of mitigating factors. This argument did no more than set out the State's interpretation of the proof.

[21] Defendant says here that the prosecution's argument purposely confused the issue of culpability with criminal responsibility. The State argued to the jury, 'There comes a time when you become responsible for your actions. I'm going to talk about responsibility. There comes a time where you just can't deny the responsibility as an adult. David Brimmer is a human being who must accept responsibility for his actions.' It is defendant's position that he became criminally responsible for his actions when the jury convicted him. In the penalty phase the jury was required to make a moral inquiry into personal culpability, and to give individualized consideration to the defendant's background and character in making the determination that death was the appropriate penalty. He says the prosecution arguments could easily have misled the jury to believe that unless the death penalty was imposed defendant was not being held responsible for his behavior.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Our legal dictionary defines "culpable," in the criminal sense, to be "involving the breach of a legal duty or the commission of a fault," while "responsible" is defined in that sense as being "legally accountable or answerable." *Black's Law Dictionary* 379, 312 (6th Ed.1990). It is doubtful that the jury made the difference in their interpretation of **\*86** the meaning to be given the State Attorney's words. However, looking at the argument as a whole, it appears to be the State's interpretation of the proof. Taken in context it appears that this argument went to the weight to be accorded the psychological factors urged in mitigation, i.e., the defendant had a bad childhood, which should excuse his actions in the premises. We look upon this argument to be a foray attacking defendant's personal blameworthiness or culpability.

[22] The defendant next argues that the State Attorney exceeded the bounds of closing argument by stating the case should not be decided on the basis of sympathy for the defendant. We have discussed this issue heretofore. This comment in the State's argument was closely followed by the admonition to the jury to decide the case on the basis of the law and facts. This was appropriate argument.

[23] Additionally, defendant complains that the prosecutor improperly diverted the jury's attention away from the defendant by invoking the memory of the victim. Defendant concedes that    *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), upon which he relies, has been overruled. He suggests that we should find the argument in violation of Article I, Secs. 8 and 16 of the Tennessee Constitution. We decline that invitation. We consider the law on this issue to be well stated in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

[24] Defendant says the selection of the defendant as a candidate for the death penalty was arbitrary and capricious and resulted from an abuse of prosecutorial discretion. This issue is raised and presented for the first time in this Court. There is nothing in the record to support the facts on which the defendant relies. This argument is basically an attack on the "unlimited discretion vested in the prosecutor" as a violation of the principles stated in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). This argument has been rejected by the United States Supreme Court. In *Gregg v. Georgia,* 428 U.S. 153, 198-99, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976), the Court specifically noted that opportunities for discretionary action which inhere in processing of a murder case ..., including authority of the state prosecutor to select those persons whom he wishes to prosecute for a capital offense, ... do not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty arbitrary or freakish. We apply that rule in this case.

Defendant makes a broad based attack on the constitutionality of the Tennessee Death Penalty Statute. The principal arguments made on this issue are identical to or similar to issues previously addressed by the Court. The majority of these complaints are not personal to the defendant and have no effect on the outcome of this case. He

makes reference to the aggravating circumstances set forth in T.C.A.    § 39-13-204(i). He first complains of subsection (i)(6) (murder committed to avoid a lawful arrest or prosecution). Although the State sought the death penalty on (i)(6) in this case, the jury only found (i)(7) (the murder was committed while defendant was engaged in committing a robbery). He says the (i)(7) aggravating circumstance has been construed and applied in such a manner as to be synonymous with the felony murder rule. However, the jury in this case found defendant guilty of premeditated murder. The analogy is inappropriate. He alleges that circumstance (i)(5) is unconstitutionally vague or overbroad. The jury did not find this aggravating circumstance against him. He makes a sweeping charge that in combination, subsections (i)(2), (5), (6) and (7) encompass a majority of the homicides committed in Tennessee and results in the same wanton and freakish imposition of the death penalty upon a randomly selected handful of offenders as was found objectionable in    *Furman v. Georgia,* supra.    The above combination did not effect the judgment in defendant's case and does not warrant further discussion beyond the fact that this argument has been repeatedly rejected by this Court.

Defendant avers that the Tennessee Death Penalty Statute is imposed capriciously and arbitrarily because defendants may not address issues of parole eligibility, costs of **\*87** imposing the death penalty, deterrent effect of the death penalty and cruelty of the method of execution. He finds fault with the instructions submitted to the jury in capital cases to the effect that jurors may rely upon their own common knowledge and experiences in reaching their verdict. He argues that these various restrictions stifle the preference for a broad range of sentencing information as expressed in   *Gregg v. Georgia,* supra, and cites various decisions from other states and law journal articles to sustain this theory of defense, ignoring the decisional law in this State on these issues. (FN4)

He urges that this Court reconsider past decisions on the issue of whether or not the jury should be told the effect of its failure to agree on a verdict. We are satisfied that our past decisions on this issue meet both State and Federal muster.    *See State v. Barber,* 753 S.W.2d 659, 670-671 (Tenn.1988).

[25][26] He argues the jury is instructed that it must agree unanimously in order to impose a life sentence and is prohibited from being told the effect of a non-unanimous verdict. He suggests this rule violates the principle of *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). These cases stand for the principle that any requirement that the jury must find a mitigating circumstance unanimously before it can be considered violates the Eighth Amendment. A requirement of a unanimous verdict does not violate these principles. As this Court said in *State v. King,* 718 S.W.2d 241, 249 (Tenn.1986), "[t]here is no way a jury can impose a sentence if it is not unanimous in its decision." T.C.A. § 39-13-204(h) specifically provides that if the jury cannot ultimately agree as to punishment the trial judge shall dismiss the jury and impose a sentence of life imprisonment.    *See      State v.*

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*Thompson,* 768 S.W.2d 239, 252 (Tenn.1989).

Defendant argues a number of issues which have long been settled by this Court. He says there is reasonable likelihood that jurors believe they are required to unanimously agree as to the existence of mitigating circumstances because of the failure to instruct on the meaning and function of mitigating circumstances. We have previously responded to this issue in this opinion. He argues the jury is not required to make the ultimate determination that death is the appropriate penalty. This issue has been considered and rejected in numerous cases.     *See State v. Black,* supra.

The Constitution does not require and the Court does not approve the uniform standards or procedures for qualifying juries in capital cases which defendant requests. Defendant raises a variety of generalized issues which do not merit response because they have previously been considered in this opinion or have been decided adversely to defendant's position heretofore. (FN5) Defendant deprecates appellate review of capital sentences in Tennessee for several reasons. He says there is no requirement for written findings concerning mitigating circumstances. This argument was rejected in *State v. Melson,* 638 S.W.2d 342, 368 (Tenn.1982). He says information relied upon for comparative review is inadequate and incomplete. His particular complaint is that Rule 12 reports filed by the trial judge do not contain sufficient information for determination of whether a death sentence is excessive or disproportionate. The simple answer to this complaint is that use of the trial judge's Rule 12 report by this Court is only one facet of the Court's appellate review. T.C.A.      § 39-13-206 is explicit in its directions to the Court in making its proportionality review to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in     **\*88** similar cases considering the nature of the crime and the defendant. The Court has made its individualized determination on the basis of the evidence contained in the record of the case and in accordance with the statute.

[27] Finally, defendant has raised an issue of first impression alleging in part that the death penalty per se and as applied violates Article I, Sec. 32 of the Tennessee Constitution. Defendant hypothesizes that Article I, Sec. 32 was meant to proscribe "government-sponsored vengeance against those the government considered outside its law." He then argues that in light of a contemporary standard of humanity and the main purpose of the death penalty (retribution), the death penalty is therefore inhumane and a form of "government-sponsored vengeance." Article I, Sec. 32 provides in its entirety: "That the erection of safe and comfortable prisons, the inspection of prisons, and the humane treatment of prisoners, shall be provided for."

We preface our consideration of this issue with the verity that the federal government has, by and large, preempted both the operation and construction of the prison system in the State of Tennessee to the extent that its supervision has been under federal control and the State has had very little to say about the treatment of prisoners in any respect. We do not believe the treatment of prisoners in this State falls outside the parameters described by defendant,

which must be drawn in accordance with "evolving standards of decency that mark the progress of a maturing society."

Insofar as the issue of whether or not the death penalty constitutes cruel and unusual punishment is concerned, this Court has repeatedly held that this State is not prohibited from imposing the death penalty in the manner set forth in conformity with the penal statutes, by the restraints imposed by the United States Constitution, or by any of the provisions of the Tennessee Constitution previously considered. We hold that Article I, Sec. 32 does not add any additional restriction.

In accordance with the mandate of T.C.A.      § 39-13-206 we find that the sentence of death was not imposed in an arbitrary fashion; that the evidence supports the jury's finding of the aggravating circumstance that the homicide was committed while defendant was engaged in committing a robbery; that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance found. Our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. (FN6) The sentence of death will be carried out as provided by law on the --- day of _____, 1994, unless otherwise ordered by this Court or other proper authority. Costs on this appeal are adjudged against the defendant.

DROWOTA and ANDERSON, JJ., concur.

REID, C.J., files separate concurring and dissenting opinion.

DAUGHTREY, J., files opinion concurring in part and dissenting in part.

REID, Chief Justice, concurring and dissenting.

I concur with the conclusion reached by the majority that the record supports the conviction of premeditated first degree murder.

I join Justice Daughtrey's dissent that the failure of the trial court to charge mitigating circumstance (j)(8) requires a re-sentencing hearing. T.C.A.      § 39-2-203(j)(8) (1982) provides:

The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a     **\*89**    defense to the crime but which substantially affected his judgment.

A clinical psychologist, who had examined the defendant and studied his records from earlier mental examinations, diagnosed the defendant as suffering from borderline personality disorder, a condition characterized by impulsive and unpredictable behavior, emotional withdrawal, marked shifts in behavior and attitude, intense anger, suicidal gestures, and the inability to maintain any kind of enduring relationship with others. After

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

876 S.W.2d 75, State v. Brimmer, (Tenn. 1994)                                                    Page 12

having been abandoned as a small child, the
defendant was placed with various foster families,
until, at the age of 13, he was placed in an
institution for children with behavioral problems,
where he remained for four years. The records of
that institution describe the defendant as suffering
"burned child syndrome," a condition characterized
by feelings of fear and internal anger generated by
parental abandonment. Later, while hospitalized in
the psychiatric unit of a Texas hospital, the
defendant was diagnosed as having "factitious
disorder," a condition where the sufferer seeks to
play the role of patient because of the absence of
any emotional connections with others. While
incarcerated awaiting trial, he was sent to the
Lakeshore Mental Health Center in Knoxville
because of suicidal behavior. This evidence was
proof that the defendant suffered a mental disease.

However, the majority opinion approves the trial
court's refusal to charge mitigating circumstance
(j)(8) because there was no proof that, *as a result* of
the mental disease, the defendant could not conform
his conduct to the requirements of the law. Of
course, proof that the killing was the    *result* of a
mental disease would be proof of insanity and the
defendant would be entitled to a verdict of not guilty
by reason of insanity.

Insanity is a defense to prosecution if, at the time
of such conduct, as a result of mental disease or
defect, the person lacked substantial capacity either
to appreciate the wrongfulness of the person's
conduct or to conform that conduct to the
requirements of law.

T.C.A. § 39-11-501(a) (1991);  *Graham v. State*,
547 S.W.2d 531, 543 (Tenn.1977).

In all criminal cases in which the trial judge
charges the jury on the law relating to the defense
of insanity, the judge shall also charge the jury that
if it should find the defendant to be not guilty by
reason of insanity that it shall so state in its
verdict.

T.C.A. § 40-18-117 (1990). By requiring proof
that the defendant could not conform his conduct to
the requirements of law,    *supra* at 13-14, the
majority seems to eliminate any mental condition
less severe than insanity as a mitigating
circumstance.

I would remand for re-sentencing, because the
failure to charge mitigating circumstance (j)(8) was
reversible error.

DAUGHTREY, Justice, concurring in part and
dissenting in part.

The defendant was convicted of the premeditated
murder of Rodney Compton and was sentenced to
death based on a single aggravating circumstance,
the fact that he killed the victim while committing
robbery. Most of the alleged trial errors that serve
as the basis for this appeal are, as the majority
concludes, meritless challenges to the guilt and
sentencing phases of his trial. One, however,
deserves the Court's careful attention. During the
sentencing hearing the trial court refused to instruct
the jury that it was permitted to consider as

mitigating evidence any mental disease or defect that
substantially impaired Brimmer's ability to
appreciate the wrongfulness of his conduct or to
conform his conduct to the law.    *See*  T.C.A. §
39-2-203(j)(8) (1982),  *amended by*  T.C.A.  §
39-13-204 (1992). This failure to instruct the jury
on this mitigating evidence denied the defendant his
right to have the jury charged on every defense to
the death penalty raised by the evidence and,
therefore, denied the defendant substantial justice.
Because of this error, I would remand this case to
the trial court for resentencing.

It is fair to conclude, as the majority does, that the
proof at trial was sufficient to convict Brimmer of
premeditated murder. The majority opinion,
however, fails to summarize that evidence. The
record shows that the defendant, an unemployed
drifter, was stopped in February of 1990 for
speeding in  *90 Texas after leading the Texas
authorities on a twenty-mile high-speed chase. The
police determined that the defendant was driving
Rodney Compton's truck and, after contacting the
Tennessee authorities, discovered that Compton had
been murdered in October of 1989. The Texas
police tried to interview Brimmer several times, but
Brimmer gave false names and provided no
information. After about 20 days in solitary
confinement, however, the defendant confessed to
the Compton murder. Moreover, as the police
transported him to Tennessee, he identified the site
of the murder.

The defendant admitted the killing, but denied
planning the murder. Instead, he said that Compton
offered him a ride and insisted that he accepted with
the intent only to rob Compton. Brimmer stated that
Compton made sexual advances toward him, and
that the defendant then handcuffed Compton,
intending to leave him unharmed in a park.
According to the defendant, however, when
Compton began to tell the defendant about his sexual
abuse of children, the defendant grew angry and
choked Compton to death. Then, frightened that
someone might have seen him at the site of the
murder, he drove Compton's body to the field where
it was later discovered.

Other evidence, however, supported the state's
theory that the defendant had planned both the
robbery and the murder. Ann Marie Hill testified
that the defendant had lived with her in Alabama
before the murder, but that he was known to her by
a different name. Ms. Hill testified that Brimmer
told her before the murder that he intended to pick
up his Porsche in Tennessee. She testified that she
drove Brimmer part of the way to Tennessee on the
afternoon of October 21, 1989, and that he carried a
gun and a large knife on the trip. David Parten, the
defendant's former cellmate, testified that he
previously had told the defendant about a Porsche
that Parten owned, and that the defendant had
arranged to meet Parten in Oak Ridge around
October 22. Parten testified that he met Brimmer
once in Oak Ridge, but decided not to meet him
again because he felt uneasy about the situation.
From the testimony of these two witnesses, the jury
could have inferred that Brimmer drove to
Tennessee with the intent to steal Parten's car and
that he resorted to the robbery and murder of
Compton only after Parten failed to show up.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

...

...

...

...

...

In addition to this testimony, the victim's mother and brother stated that on October 22, Compton had been returning home from a vacation to celebrate his mother's birthday and thus, impliedly, would not have been searching for a sexual encounter. Additional evidence indicating that Brimmer gave false names to everyone he met and repeatedly lied about his background weakened his credibility and diminished the likelihood that his story was true. The evidence was sufficient for the jury to have found him guilty of premeditated murder.

Despite the sufficiency of the evidence, the Court should not overlook the trial court's failure to instruct the jury, in accordance with T.C.A. § 39-2-203(j)(8) (1982), (FN1) that it must consider any evidence that

[t]he capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment.

During the sentencing hearing, Brimmer presented the testimony of Dr. Eric Engum, a clinical psychologist, who concluded that the defendant was suffering from a borderline personality disorder marked by sudden changes in behavior, intense anger, suicidal attempts, and the inability to maintain relationships. Dr. Engum testified that between 500,000 and two million people in the United **91.  States probably suffer from this disorder, and that many of these people violate the law. The trial court, however, concluded that the defendant's disorder was common, that it was "not quite" a mental disease or disorder, and that Dr. Engum did not state the "magical words" that the disease "caused" the defendant to commit the crime. The trial judge therefore refused to instruct the jury on this mitigating evidence.

Although the defendant requested this instruction at trial, he failed to present the issue of the denial of the instruction in his motion for a new trial. On appeals as of right, Tenn R.App.P. 3(e) provides that:

[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in ... jury instructions granted or refused, ... unless the same was specifically stated in a motion for a new trial.

Nevertheless,

[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial ... where necessary to do substantial justice.

Tenn.R.Crim.P. 52(b). Such error, called "plain error," can therefore be noticed by an appellate court despite the failure to include the issue in the motion for a new trial.

The trial court plainly erred by refusing to instruct the jury on a matter that is indisputably fundamental in a capital case--the jury's consideration of the mitigating evidence. The capital sentencing statute in effect at the time of Brimmer's offense provided

that "the trial judge shall include in his instructions for the jury to weigh and consider any mitigating circumstance ... which may be raised by the evidence...." T.C.A. § 39-2-203(e) (1982) (amended 1989). Dr. Engum testified extensively on the defendant's psychological background and concluded that he suffered from a borderline personality disorder that did affect his judgment. Certainly the jury was entitled and, pursuant to the statute, *required* to consider whether this disorder substantially impaired "the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." Under the circumstances of this case, the failure to instruct the jury on this mitigating evidence clearly violated the sentencing statute. By failing to instruct the jury on "fundamental" evidence required by statute, the court denied the defendant substantial justice, as it is defined in Tennessee case law.

In my judgment, the only appropriate remedy for this error is a remand of this case to the trial court for resentencing.

### ORDER ON PETITION TO REHEAR

Filed May 2, 1994.

Defendant has filed a respectful petition to rehear which the Court has considered and finds that the petition does not contain new material or argument which warrants reconsideration.

The petition to rehear is denied.

REID, C.J., and DROWOTA and ANDERSON, JJ., concur.

DAUGHTREY, J., not participating.

(FN1.) *See Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

(FN2.) The statute was originally enacted as T.C.A. § 39-13-203 by the 1989 Act, and was redesignated as T.C.A. § 39-13-204 by Ch. 1038, § 3 Pub. Acts 1990.

(FN3.) *See    State v. Irick*,    762 S.W.2d 121 (Tenn.1988); *State v. Jones*,    789 S.W.2d 545 (Tenn.1990); *State   v. Bates*,  804 S.W.2d 868 (Tenn.1991); *State v. Smith*,    868 S.W.2d 561 (Tenn.1993).

(FN4.) *See   State v. Johnson*,    632 S.W.2d 542, 547-548 (Tenn.1982); *State v. Aakins*,        725 S.W.2d 660, 664 (Tenn.1989); *State v. Black*, 815 S.W.2d 166, 179 (Tenn.1991).

(FN5.) Denial to defendant of final closing argument at the penalty phase;      *see    State v. Thompson*, 768 S.W.2d 239, 252 (Tenn.1989). The death penalty is inflicted based on economic, racial, geographical, and gender discrimination. Defendant has presented no evidence on this issue. *See generally, McClesky v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *State v. Porterfield*, 746 S.W.2d 441, 451 (Tenn.1988). Electrocution is cruel and unusual punishment. This argument was rejected by a majority of this

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

876 S.W.2d 75, State v. Brimmer, (Tenn. 1994)                                      Page 14

Court in *State v. Black,* 815 S.W.2d 166, 178-179 (Tenn.1991).

**\*91** (FN6.) *State v. Poe,* 755 S.W.2d 41 (Tenn.1988) similar brutal murder; *State v. Carter,* 714 S.W.2d 241 (Tenn.1986) murder to steal car; *State v. Zagorski,* 701 S.W.2d 808 (Tenn.1985) murder to steal money; *State v. Caldwell,* 671 S.W.2d 459 (Tenn.1984) similar claim by defendant that victim made sexual advances; *State v. Morris,* 641 S.W.2d 883 (Tenn.1982).

(FN1.) The defendant was sentenced in March of 1991. At that time, the capital sentencing statute had been amended since the date of his offense, and is now codified as T.C.A. § 39-13-204 (1991). However, in implementing the new statute, the General Assembly specifically provided in T.C.A. § 39-11-112 (1991) that "any offense, as defined by the statute ... being ... amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense." This statute apparently requires the application of the capital sentencing statute in effect at the time of Brimmer's offense.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                    Page 1

**\*679**  958 S.W.2d 679

Supreme Court of Tennessee,
at Knoxville.

**STATE** of Tennessee, Appellee,
v.
Leroy **HALL**, Jr., Appellant.
Dec. 15, 1997.

Defendant was convicted in the Criminal Court,
Hamilton County, Stephen M. Bevil, J., of first-
degree murder and aggravated arson and was
sentenced to death by execution. Defendant
appealed. The Court of Appeals, Tipton, J.,
affirmed. Defendant appealed. The Supreme
Court, Drowota, J., held that: (1) trial court
properly excluded expert psychiatric testimony from
guilt phase of trial; (2) evidence supported jury's
findings as to aggravating circumstances; (3) trial
court's refusal to give instructions on nonstatutory
mitigating circumstances was harmless error; and
(4) sentence was not disproportionate to penalty
imposed in similar cases.

Affirmed.

Reid, J., concurred and filed opinion.

West Headnotes

[1] Criminal Law ☜46
110 ----
  110VI Capacity to Commit and Responsibility for
      Crime
  110k46 Capacity in General.
  "Diminished capacity" is not considered a
justification or excuse for a crime, but rather an
attempt to prove that defendant, incapable of
requisite intent of crime charged, is innocent of that
crime but most likely guilty of lesser included
offense; thus, defendant claiming diminished
capacity contemplates full responsibility, but only
for the crime actually committed.

[2] Criminal Law ☜46
110 ----
  110VI Capacity to Commit and Responsibility for
      Crime
  110k46 Capacity in General.
  "Diminished capacity" is actually defendant's
presentation of expert, psychiatric evidence aimed at
negating requisite culpable mental state; properly
understood, it is not a defense at all but merely a
rule of evidence.

[3] Criminal Law ☜354
110 ----
  110XVII Evidence
  110XVII(D) Facts in Issue and Relevance
  110k354 Insanity.
  Evidence which tends to prove or disprove
required mental state for offense is relevant and
generally admissible in criminal prosecution. Rules
of Evid., Rule 401.

[4] Criminal Law ☜474
110 ----
  110XVII Evidence
  110XVII(R) Opinion Evidence
  110k468 Subjects of Expert Testimony
  110k474 Mental Condition or Capacity.
  To be admissible in criminal prosecution, expert

testimony regarding defendant's incapacity to form
required mental state must substantially assist trier
of fact to understand evidence or to determine fact
in issue. Rules of Evid., Rule 702.

[5] Criminal Law ☜469.2
110 ----
  110XVII Evidence
  110XVII(R) Opinion Evidence
  110k468 Subjects of Expert Testimony
  110k469.2 Discretion.
  Admissibility of expert opinion testimony in
criminal prosecution is matter which largely rests
within sound discretion of trial court. Rules of
Evid., Rule 702.

[6] Criminal Law ☜474
110 ----
  110XVII Evidence
  110XVII(R) Opinion Evidence
  110k468 Subjects of Expert Testimony
  110k474 Mental Condition or Capacity.
  To gain admissibility in criminal prosecution,
expert testimony regarding defendant's incapacity to
form required mental state for offense must satisfy
general relevancy standards as well as evidentiary
rules which specifically govern expert testimony.
Rules of Evid., Rules 401-403, 702, 703.

[7] Criminal Law ☜474
110 ----
  110XVII Evidence
  110XVII(R) Opinion Evidence
  110k468 Subjects of Expert Testimony
  110k474 Mental Condition or Capacity.
  Assuming that general relevancy standards as well
as evidentiary rules which specifically govern expert
testimony are satisfied, psychiatric evidence that
defendant lacks capacity, because of mental disease
or defect, to form requisite culpable mental state to
commit offense charged is admissible in criminal
prosecution. Rules of Evid., Rules 401-403, 702,
703.

[8] Criminal Law ☜474
110 ----
  110XVII Evidence
  110XVII(R) Opinion Evidence
  110k468 Subjects of Expert Testimony
  110k474 Mental Condition or Capacity.
  To be admissible in criminal prosecution,
psychiatric testimony must demonstrate that
defendant's inability to form requisite culpable
mental state was product of mental disease or defect,
not just particular emotional state or mental
condition; it is the showing of lack of capacity to
form requisite culpable mental intent that is central
to evaluating admissibility of expert psychiatric
testimony on issue.

[9] Criminal Law ☜474
110 ----
  110XVII Evidence
  110XVII(R) Opinion Evidence
  110k468 Subjects of Expert Testimony
  110k474 Mental Condition or Capacity.
  Expert psychiatric testimony was not relevant to
show that defendant lacked capacity to form
requisite intent because of mental disease or defect
or intoxication, and, therefore, was properly
excluded from guilt phase of capital murder trial;
testimony related to defendant's personality type and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                    Page 2

character traits and, while psychiatrist testified that
defendant had borderline personality disorder and
that such people could have brief episodes of rage
during temporary states of mental illness, he did not
state that defendant was experiencing such an
episode when he killed his former girlfriend.

[10] Criminal Law ⬡1036.1(9)
   110 ----
   110XXIV Review
      110XXIV(E) Presentation and Reservation in
                    Lower Court of Grounds of Review
      110XXIV(E)1 In General
         110k1036 Evidence
            110k1036.1 In General
      110k1036.1(9) Exclusion of Evidence.
   If offer of proof is not made, evidentiary issue is
generally deemed waived and appellate review is
precluded.

[11] Criminal Law ⬡1036.6
   110 ----
   110XXIV Review
      110XXIV(E) Presentation and Reservation in
                    Lower Court of Grounds of Review
      110XXIV(E)1 In General
         110k1036 Evidence
      110k1036.6 Opinion Evidence.
   Although defendant did not make offer of proof,
Supreme Court could review issue of whether expert
psychiatric testimony was properly excluded from
guilt phase of capital trial, based upon substance of
psychiatrist's testimony at sentencing hearing.

[12] Criminal Law ⬡474
   110 ----
   110XVII Evidence
      110XVII(R) Opinion Evidence
         110k468 Subjects of Expert Testimony
      110k474 Mental Condition or Capacity.
   While evidence that particular defendant, because
of mental disease or defect, lacks capacity to form
requisite intent is admissible in criminal prosecution,
expert opinion testimony about typical reactions of
certain personality types is not relevant to capacity
of the particular defendant on trial.

[13] Sentencing and Punishment ⬡1660
   350H ----
   350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in
                    General
      350Hk1660 Dual Use of Evidence or
                    Aggravating Factor.

   (Formerly 203k357(10))
   Jury's finding, in capital murder prosecution, of
aggravating circumstance for especially heinous or
cruel murder and aggravating circumstance that
murder was committed while defendant was
committing arson were not based upon same
evidence, so as to constitute unconstitutional double
counting, even though victim was killed when she
was set on fire inside her automobile; jury's finding
of the first aggravating circumstance was based upon
torturous means by which defendant chose to kill
victim, and suffering she endured prior to her death,
and jury's finding of second aggravating
circumstance was based upon defendant's
commission of murder during perpetration of
separate felony, the destruction    *679   of the
automobile by arson. West's Tenn.Code,         §

39-13-204(i)(5, 7).

[14] Criminal Law ⬡878(4)
   110 ----
   110XX Trial
      110XX(K) Verdict
         110k878 Several Counts
      110k878(4) Inconsistent Findings.
   Jury's finding, in capital murder prosecution, of
felony murder aggravating circumstance was not
inconsistent with its verdict of premeditated murder;
evidence demonstrated that defendant had
relentlessly searched for victim's automobile
intending to burn it, and when victim refused to
leave automobile, defendant refused to be deterred
from his original purpose and then proceeded, with
premeditation and deliberation, to murder victim by
pouring gasoline directly onto her body and igniting
the accelerant. West's Tenn.Code,              §
39-13-204(i)(7).

[15] Sentencing and Punishment ⬡1681
   350H ----
   350HVIII The Death Penalty
      350HVIII(D) Factors Related to Offense
         350Hk1681 Killing While Committing Other
                    Offense or in Course of Criminal
                    Conduct.

   (Formerly 203k357(7))
   Sufficient nexus existed between arson and murder
to warrant felony murder aggravating circumstance;
victim was killed when defendant set fire to victim's
automobile while victim was inside it, and
defendant's motivation for killing victim and in
burning her automobile were the same, anger over
the victim's decision to discontinue their
relationship. West's Tenn.Code, § 39-13-204(i)(7).

[16] Criminal Law ⬡829(22)
   110 ----
   110XX Trial
      110XX(H) Instructions: Requests
         110k829 Instructions Already Given
      110k829(22) Punishment and Powers of
                    Recommendation to Mercy.
   Trial court's refusal, in capital murder case, to
give requested instructions on nonstatutory
mitigating circumstances was harmless error, since
court's instructions generally encompassed subjects
contained within defendant's special requests and
fairly conveyed to jury its ability consider wide
range of proof as mitigating circumstances, trial
court permitted defendant to introduce substantial
proof of nonstatutory mitigating circumstances, and
trial court allowed defense counsel broad latitude to
argue nonstatutory mitigating circumstances to jury
during closing argument at sentencing phase.

[17] Criminal Law ⬡769
   110 ----
   110XX Trial
      110XX(G) Instructions: Necessity, Requisites,
                    and Sufficiency
      110k769 Duty of Judge in General.

[See headnote text below]

[17] Criminal Law ⬡1172.1
   110 ----
   110XXIV Review

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                                                 Page 3

110XXIV(Q) Harmless and Reversible Error
110k1172 Instructions
110k1172.1 In General.
Jury charge should be considered prejudicially
erroneous if it fails to fairly submit legal issues or if
it misleads jury as to applicable law.

[18] Sentencing and Punishment ⊛═1788(7)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(7) Presumptions.

(Formerly 110k1134(3))
In conducting comparative proportionality review
of death sentence, court begins with presumption
that sentence of death is proportional to crime of
first degree murder; however, if capital case, taken
as a whole, is plainly lacking in circumstances
consistent with those in similar cases in which death
penalty has been imposed, sentence of death in case
being reviewed is disproportionate.

[19] Sentencing and Punishment ⊛═1657
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in
General
350Hk1657 Proportionality in General.

(Formerly 110k1208.1(4.1))
Even if defendant receives death sentence when
circumstances of offense are similar to those of
offense for which another defendant has received a
life sentence, death sentence is not disproportionate
if court can discern some basis for lesser sentence
given in similar case.

[20] Sentencing and Punishment ⊛═1657
350H ----
350HVIII The Death Penalty
350HVIII(C) Factors Affecting Imposition in
General
350Hk1657 Proportionality in General.

(Formerly 110k1208.1(4.1))
Where there is no discernable basis for difference
in sentencing, death sentence is not necessarily
disproportionate; court is not required to determine
that sentence less than death has never been imposed
in case with similar characteristics, but rather, its
duty under similarity standard is to assure that no
aberrant death sentence is affirmed.

[21] Sentencing and Punishment ⊛═1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.

(Formerly 110k1134(3))
Since proportionality requirement on review of
death sentence is intended to prevent caprice in
decision to inflict death penalty, isolated decision of
a jury to afford mercy does not render
unconstitutional death sentences imposed on
defendants who were sentenced under system that
does not create substantial risk of arbitrariness or

caprice.

[22] Sentencing and Punishment ⊛═1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.

(Formerly 110k1134(3), 110k1134(2))
Comparative proportionality review of death
sentence is not a rigid, objective test; court does not
employ mathematical formula or scientific grid, nor
it is bound to consider only those cases in which
exactly the same aggravating circumstances have
been found by jury.

[23] Sentencing and Punishment ⊛═1788(6)
350H ----
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1788 Review of Death Sentence
350Hk1788(6) Proportionality.

(Formerly 110k1134(3))
Under comparative proportionality review of death
sentence, after identifying pool of similar cases,
court considers multitude of variables in light of
experienced judgment and intuition of members of
the court.

[24] Sentencing and Punishment ⊛═1681
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1681 Killing While Committing Other
Offense or in Course of Criminal
Conduct.

(Formerly 203k357(7))

[See headnote text below]

[24] Sentencing and Punishment ⊛═1684
350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1684 Vileness, Heinousness, or Atrocity.

(Formerly 203k357(11))
Imposition of death penalty for defendant's
torturous and cruel premeditated killing of his
former girlfriend by pouring gasoline over her and
igniting the accelerant was not disproportionate to
penalty imposed in similar cases.

**\*682** Brock Mehler (Appeal Only), Nashville,
William R. Heck (Trial and Appeal), Karla G.
Gothard (Trial Only), Chattanooga, for Appellant.

John Knox Walkup, Attorney General and
Reporter, Michael E. Moore, Solicitor General,
Amy L. Tarkington, Assistant Attorney General,
Nashville, William H. Cox, III, District Attorney
General, Thomas J. Evans, Assistant District
Attorney General, Chattanooga, for Appellee.

OPINION

DROWOTA, Judge.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

In this capital case, the defendant, LeRoy Hall, Jr., was convicted of premeditated first degree murder and aggravated arson. (FN1) In the sentencing hearing, the jury found two aggravating circumstances: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed while the defendant was engaged in committing or was attempting to commit, arson." Tenn.Code Ann. § 39-13-204(i)(5) and (7) (1991). Finding that the two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction and sentence, raising thirteen claims of error, some with numerous subparts. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn.Code Ann.    § 39-13-206(a)(1) (1996 Supp.), (FN2) the case was docketed in this Court.

The defendant raised numerous issues in this Court, but after carefully examining the        *683 entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court, on August, 27, 1997, entered an Order, limiting review at oral argument to four issues and setting the cause for the September, 1997, term of this Court in Knoxville. *See* Tenn. S.Ct. R. 12. (FN3)

After reviewing the record, we have determined that none of the alleged errors require reversal. Moreover, the evidence supports the jury's findings as to the aggravating and mitigating circumstances, and the sentence of death is not arbitrary or disproportionate to the sentence imposed in similar cases, considering the nature of the crime and the defendant. Accordingly, the judgment of the Court of Criminal Appeals upholding the defendant's conviction for first degree murder and sentence of death by electrocution is affirmed.

### FACTUAL BACKGROUND

The evidence presented at the guilt phase of the trial demonstrated that around midnight on April 16, 1991, the defendant threw gasoline on the victim, Traci Crozier, his ex-girlfriend, as she was lying in the front seat of her car. The victim received third degree burns to more than ninety percent of her body and died several hours later in the hospital. When questioned by police, the defendant initially denied involvement in the offense. Eventually, however, Hall admitted responsibility, but claimed that he did not intend to kill the victim: he intended to burn her car.

The victim met the defendant in December of 1984. They began living together in January of 1986, and continuously resided together until, three weeks prior to her murder. On March 26, 1991, the victim left and moved into the house with her grandmother, Gloria Mathis, and her uncle, Chris Mathis. After the separation, the defendant would frequently, and often late at night, call the Mathis

home in search of the victim. In the early morning hours of April 6, 1991, the Mathis household was awakened by a dog barking and looked outside to see the victim's car, a two-door Nissan Pulsar, burning. The victim's uncle saw the defendant running away from the burning car and fired a gunshot into the air. The fire department was called to extinguish the fire and investigate the arson. When the defendant called the Mathis house thereafter, the victim's uncle threatened Hall in the event he did not leave the victim alone. The defendant responded: "If I can't have her, nobody can't." [sic]

On the night of April 16, 1991, shortly before midnight, Viola Wylene Price was sitting in her car outside her home when she saw "a ball of fire" in the middle of the street. As she started to get out of her car, a black car, later identified as being similar to the defendant's, sped away from the scene. After the car passed, Price ran into her house and called 911. Her son, Billy Ray Wilson, was inside and when he heard his mother call for emergency assistance, he ran outside to see what was happening. When he saw the burning car and heard someone inside it screaming for help, Wilson ran to the driver's side of the car. Though the door was open, he could not see anyone through the flames. Wilson ran around to the passenger side of the car where he saw the victim attempting to get out through the window. Wilson pulled the victim from the car, removed her burning shoes and clothes, helped her extinguish the flames on her body, and assisted her to a safe distance from the burning car in the event of an explosion.

Price returned to the scene after calling for emergency assistance. Though the victim had been so badly burned that her hair was melted and skin was hanging from her arms, she remained coherent and alert. The victim expressed concern about her appearance and the likelihood of permanent scarring from the burns. She gave Price her name and telephone number. When Price asked the victim for the identity of the perpetrator, the victim responded, "Lee Hall." The victim also told Price that Hall twice previously had set fire to her car. The *684 victim told Wilson that the defendant "threw gas on me, gas bomb." She repeated,"it was gas, gas bomb. He set me on fire."

Earl Atchley, Commander of the Chattanooga Fire Department, received the 911 call at 12:06 a.m. on April 17, 1991. When he arrived at the scene the victim's car was "fully involved" in fire and the victim was badly burned. Though Commander Atchley did not recognize her, the victim remembered him as the person who had investigated the burning of her car on April 6, 1991. (FN4) The victim told Commander Atchley that the same person was responsible for both incidents. Commander Atchley recovered a melted plastic container next to the driver's side of the victim's car, and a tupperware lid, which was not as badly melted, near the car.

The victim was taken to Erlanger Hospital where she was treated by Dr. Sonya Merriman, a plastic surgeon and burn specialist. Describing the victim's condition, Dr. Merriman stated, "She had a 95 percent, what we call a total body surface area burn, 95 percent of her body was burned, and all but about

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                      Page 5

two to three percent of that was third degree burns."
The victim's teeth were charred, and the hair was
burned off her body. Based upon the consistency
and uniformity of the burns over the victim's entire
body, except the soles of her feet, Dr. Merriman
opined that the victim's body had been doused with
gasoline, rather than splattered or splashed.
Although Dr. Merriman had treated nearly one
hundred burn cases, she had never seen a worse or
more uniform pattern of burning on an individual.

The victim was treated with intravenous fluids and
incisions in her body designed to allow tissue
expansion. Nonetheless, the victim's condition
deteriorated. Her tongue swelled until it protruded
from her mouth, and her eyelids became inverted
from the swelling. Despite the gravity and extent of
her injuries, however, Dr. Merriman testified that
the victim remained conscious. She was also in
constant pain. According to Dr. Merriman, the
medication administered to the victim would not
have been strong enough to alleviate her pain, and
the victim did not sleep for long periods of time or
lose consciousness until just before her death. The
victim, according to Dr. Merriman, sustained an
unsurvivable burn from which there was never any
chance of recovery.

Ed Forester, an investigator with the Arson
Division of the Chattanooga Police Department,
examined the victim's car after both the April 6 and
April 16 fires. His investigation of the April 6 fire
revealed that an accelerant had been poured around
the exterior edges of the car which melted the
fenders and bumpers. A yellow plastic jug found at
the scene tested positive for gasoline. Forester
obtained an arrest warrant for the defendant based,
in part, upon the statements of the victim's uncle.

Forester testified that the vehicle burned on April 6
was the same automobile involved in the fire on
April 16, 1991. The most extensive damage
resulting from the fire on April 16 was to the
driver's side of the car. The metal was discolored;
the roof sagged; and the seat springs were
weakened. The glass on the passenger side was fire
and carbon stained; however, glass found on the
driver's side had no such markings. The lack of fire
or carbon staining indicated that the glass on the
driver's side had been broken out before the fire was
started. A melted plastic container was found near
the open driver's door of the victim's vehicle. The
victim's socks, shoes, and clothing remains were
recovered and later tested positive for the presence
of gasoline. Car keys were found some thirty feet
away from the victim's car.

Mike Donnelly, an arson investigator with the
State of Tennessee Fire Marshall's Office, also
examined the victim's car. He found evidence of
three separate fires to the car. Based upon the
extent of damage, Donnelly opined that the April 16
fire had been started on the driver's side of the
vehicle. Based upon his examination of the car and
his review of photographs of the victim, Donnelly
testified that gasoline had been poured directly onto
the victim.

*685 Testifying for the defense during the guilt
phase of the trial were Morris Forester and Jeffery
Scott Green. Forester and Green had been drinking
with the defendant in the early evening of April 16,

1991. The trio consumed about two and one-half
cases of beer and were intoxicated. Forester went to
bed around 10:30 p.m. and did not see the
defendant thereafter. Green recalled seeing the
defendant between 10:30 and 11:00 p.m. Because
he knew the defendant was intoxicated and unable to
drive, Green tried to persuade the defendant to
spend the night at Forester's home. Eventually,
however, the defendant left, and neither Green nor
Forester saw him again until after the murder.

The defendant also testified in his own behalf.
According to his testimony, he and the victim began
living together in January of 1986, when he was
eighteen and she was sixteen years old. Even
though the victim moved out in March of 1991, they
continued to see one another after the separation.
The defendant said he was upset by the separation,
and as a result, had been drinking and smoking
crack cocaine. On the day of the murder, Hall and
Green went directly to Forester's house and began
drinking beer. At one point, Hall left and obtained a
hammer at a pawn shop. After attempting to call
the victim several times, without success, Hall
returned to Forester's home about 6:30 p.m. or
7:00 p.m. and continued drinking.

Hall consumed approximately one case of beer,
then left Forester's home, taking with him five more
cans of beer. After purchasing another six cans of
beer, Hall drove to the mobile home he had shared
with the victim and destroyed some of her
possessions because he was angry with her for not
coming home. Hall left the trailer after a short time
and took with him a two-quart tea jug which he
intended to use to burn the victim's car. Searching
for the victim and her car, Hall drove by her work
place, her grandmother's house, and several bars,
but he did not find her. Hall was threatened by the
victim's uncle and a second man whom he did not
know when he drove by the victim's grandmother's
house. Thereafter, Hall stopped at a service station,
filled the tea jug with gasoline, and purchased a
cigarette lighter. Hall removed paper towels from a
dispenser near the gas pumps, placed them in the
opening of the tea jug, put the container in his car,
and returned to the area near the victim's
grandmother's house.

As Hall was preparing to leave the neighborhood,
he encountered the victim as she drove up in her
car. According to Hall, he left his car and entered
the victim's car on the driver's side to talk. Hall
asked her to move back in with him and told her that
he was drunk and needed her. He asked the victim
if she was pregnant and told her that she could not
have another abortion. Finally, Hall questioned why
he had been blamed for the earlier burnings of her
car. An argument ensued. The victim called the
defendant a "crazy S.O.B.," and told him to turn
himself into the authorities.

At that point, Hall got out of her car and told the
victim to do likewise because he was going to burn
it. When the victim tried to lock the door, Hall
reached inside the car, grabbed the keys, threw them
towards his car, and ordered the victim to get out of
her car. Hall then ran to his car and grabbed the jug
of gasoline. He ignited the paper towels and threw
the jug into the driver's side of the victim's car.
The defendant knew the victim was lying in the front
seat crying when he threw the gas bomb into the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                              Page 6

car.

According to the defendant, after he threw the gasoline jug, the victim came running toward him, out of the burning car, and caught him on fire. The defendant extinguished the flame on himself and then just looked at the victim, who according to the defendant, ran to the passenger's side of the car, and rolled on the ground. Unsure of what to do and believing that the fire on the victim was almost extinguished, the defendant drove away from the scene. Although he claimed to have returned two or three minutes later, he did not see the victim, and he fled again when a black shadowy figure ran toward him.

On cross-examination, the defendant denied pouring gasoline onto the victim, claiming that it splattered on her when he threw the jug into the car. He also denied breaking the glass on the driver's window, insisting that the door was open. He proclaimed **\*686** that he loved the victim and intended only to burn her car. The defendant admitted that he initially denied the offense when questioned by police. He also claimed to the police that he never meant to hurt the victim and had the gas bomb for protection from the victim's uncle, but he threw it at the victim after she laughed at him.

Based upon the proof summarized above, the jury found the defendant guilty of first degree premeditated murder and aggravated arson. (FN5)

The trial proceeded to the sentencing phase on the conviction for first degree murder. The State presented only one witness, Detective Ed Forester who had investigated and obtained warrants for Hall's arrest for the burning of the victim's car on April 1 and 6, 1991. (FN6) According to Forester, at the time of the victim's murder, the defendant was aware that he was a suspect in the April 1 and 6 incidents. Forester also testified that the victim had given a statement following the April 6 fire in which she said that Hall previously had threatened to kill her and to "total" her car, and, on one prior occasion, actually had tried to force her off the road. (FN7)

The proof for the defense at sentencing included the testimony of Dr. Roger Meyer, a clinical psychologist, who evaluated the defendant after his arrest for this murder. Dr. Meyer interviewed Hall for three hours and reviewed the results of tests administered to Hall by one of Dr Meyer's associates.

Dr. Meyer testified that a mental status examination revealed that the defendant was not insane or psychotic. A Slosson Intelligence test indicated that the defendant's IQ was eighty-seven, and that his mental age was thirteen years, eleven months. The defendant's basic skills, as measured by a Wide Range Achievement test, showed a grade level 6 to 9 education in the general areas of reading, spelling, and arithmetic. A neuropsychological examination did not reveal any evidence of significant neurological trauma to Hall's brain. A sixteen-factor personality test revealed that Hall is introverted, emotionally unstable, easily influenced, and has low self-esteem. According to Dr. Meyer, the test reflects that the defendant has little self-control and is not rule abiding or

moralistic. Though the defendant is not a psychopath or sociopath, Dr. Meyer opined that Hall has problems controlling rage and anger.

A Rorschach "Ink Blot" test showed that Hall has a great deal of difficulty reacting appropriately to stressful situations. Dr. Meyer described Hall and the victim's relationship as an "emotional tug of war," and said that it would have created a great deal of tension and frustration in a person with the defendant's psychological makeup. Though some of the test results indicated that the defendant was "faking bad" or malingering, Dr. Meyer explained that such results do not necessarily mean that a patient is faking, but can also reflect that a patient is simply overemphasizing the stress and emotional problems he or she is experiencing.

Dr. Meyer diagnosed the defendant as suffering from borderline personality disorder. Dr. Meyer testified that persons with this disorder characteristically have severe emotional problems and problems with thinking **\*687** and judgment. Dr. Meyer also concluded that the defendant suffered from post-traumatic stress disorder, but admitted that it may have resulted from the circumstances of the victim's death.

On cross-examination, Dr. Meyer testified that the defendant is not mentally retarded. He also conceded that his conclusions about the defendant's mental condition were based, at least in part, upon a typographical error indicating that the defendant's IQ was seventy-eight (78), rather than eighty-seven (87). Despite his reliance upon this erroneous information, Dr. Meyer did not revise his conclusions about the defendant. He restated his diagnosis that the defendant exhibited signs often associated with borderline personality disorder and post-traumatic stress disorder and said that the defendant was under extreme emotional distress when he committed the murder in this case.

Dr. Meyer admitted, however, that he did not discuss the facts of the murder with the defendant, but considered only the events which occurred before and after the killing in making his diagnosis. Dr. Meyer also did not reconsider his diagnosis after receiving an investigator's report which chronicled the defendant's behavior since childhood. Dr. Meyer admitted that the behavior described in the report would support a diagnosis of antisocial personality disorder. The behavior included the defendant's burning of his own bed in 1972, setting fire to his mother's boyfriend's car seat in 1973, setting fire to a wooded area in 1975, driving under the influence of an intoxicant, fighting, sneaking up on his mother's boyfriend with a knife, and truancy.

In addition to Dr. Meyer's testimony, the defense also presented proof about the relationship between Hall and the victim and about the defendant's abuse of drugs and alcohol. For example, Green testified that the victim and the defendant had a "rocky" relationship and that the defendant abused alcohol, marijuana, and crack cocaine. The defendant's cousin testified that Hall came to live with him in Oklahoma in December of 1990 seeking employment and recovery from drug abuse, but the victim telephoned, and shortly thereafter, Hall returned to Tennessee.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Christie Griffin, the defendant's step-sister, testified that Hall was very sad when he and the victim were at odds, but always believed they could work through their problems. According to Griffin, Hall and the victim had been out together several times following their separation in the weeks prior to the murder. Griffin stated on cross-examination that she observed the defendant hiding his shirt when he returned to his mother's home on the night of the victim's murder. In fact, Griffin had told the police where the shirt had been hidden.

The defendant's brother, David Hall, said that the defendant and the victim argued once a week, and the victim would address the defendant in abusive and vulgar language. According to his brother, the defendant was abusing crack cocaine during the time period of the murder, and had been for sometime prior to the murder. To support that drug habit, Hall would borrow money and pawn property.

The defendant's mother, Sarah Griffin, testified that her family had moved several times when Hall was young. When Hall's family moved to Alabama, he was only fourteen years old, but he remained in the Chattanooga area, residing with another family for three years until his own family returned. According to Hall's mother, the victim and her son began having problems two years before the murder. The couple had separated and reconciled on several occasions. She recalled that in December of 1990, the defendant moved to Oklahoma, where he planned to find employment and help for his drug problem, but returned in early January of 1991 to reconcile with the victim. During the separation preceding the murder, Griffin testified that Hall was very upset and would often cry and drink alcohol in excess. Although the victim and the defendant were separated, they had been out together several times in the weeks before the murder. According to Griffin, Hall was a "basket case" when he was unable to see the victim.

Finally, the defense introduced medical records and insurance forms to establish that the victim had undergone two abortions in **688** 1985 and one abortion in 1990. The prosecution, in rebuttal, presented the testimony of a friend of the victim who related that Hall was aware of one of the abortions in 1985 and had encouraged the victim to undergo the procedure.

Based upon the proof, the jury determined that the State had proven the existence of two aggravating circumstances beyond a reasonable doubt (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed while the defendant was engaged in committing or was attempting to commit, arson." Tenn.Code Ann. § 39-13-204(i)(5) and (7) (1991). In addition, the jury found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and as a result, sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors assigned by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals.

## EXPERT TESTIMONY

In this Court, the defendant first contends that he is entitled to a new trial because during the guilt phase of the trial, the trial court refused to admit the expert proof regarding his mental state at the time the offense was committed. The defendant asserts that the testimony of Dr. Roger Meyer was relevant to negate intent, an essential element of premeditated first degree murder, (FN8) the offense for which the defendant was convicted. Exclusion of the relevant evidence constitutes prejudicial error, the defendant argues, and entitles him to a new trial. The State responds that the trial court properly excluded Dr. Meyer's testimony at the guilt phase because the defendant's proffer failed to inform the trial court that the testimony was being offered to negate intent. The State also asserts that the substance of Dr. Meyer's testimony was not relevant to show that the defendant lacked the capacity to form the requisite intent to commit premeditated first degree murder.

In resolving this issue we must revisit a principle recently endorsed by this Court in *State v. Abrams,* 935 S.W.2d 399 (Tenn.1996). In that case, we approved the "general holding" of *State v. Phipps,* 883 S.W.2d 138, 149 (Tenn.Crim.App.1994), that "evidence of a defendant's mental condition can be relevant and admissible in certain cases to rebut the mens rea element of an offense." *Abrams,* 935 S.W.2d at 402. We deferred until "another day" further development of the rule of " 'diminished capacity.' " *Id.* Another day has arrived.

[1][2] We begin with a brief historical review. The rule of diminished capacity originated in Scotland more than a century ago and was designed "to reduce the punishment of the 'partially insane' from murder to culpable homicide, a non-capital offense." *State v. Wilcox,* 70 Ohio St.2d 182, 436 N.E.2d 523, 525 (1982). The doctrine was widely accepted in other countries before it gained acceptance in American jurisdictions. *Id.* In modern application, diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. *United States v. Cameron,* 907 F.2d 1051, 1067 (11th Cir.1990). Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. *State v. Padilla,* 347 P.2d 312 (N.M.1959). In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state. "Properly understood, it is ... not a defense at all but merely a rule of **689** evidence." *United States v. Pohlot,* 827 F.2d 889, 897 (3rd Cir.1987).

It was that proper description of "diminished capacity" that was adopted by the Court of Criminal Appeals in *Phipps.* Indeed, while recognizing that diminished capacity is not an enumerated defense under the 1989 revision of the criminal code. *See* Tenn.Code Ann. §§ 39-11-501--621 (1991 Repl. & Supp.1996), the Court of Criminal Appeals in *Phipps* concluded that a defendant's capacity to form the requisite mental state to commit an offense is an issue in criminal prosecutions because the general criminal law in Tennessee provides that "[n]o person

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

may be convicted of an offense unless ... [t]he culpable mental state required is proven beyond a reasonable doubt," Tenn.Code Ann.          § 39-11-201(a)(2) (1991 Repl.). We agree with that conclusion, and in addition observe that the negation of an element of a criminal offense is recognized as a defense in Tennessee. Tenn.Code Ann.          § 39-11-203(e)(2) (1991 Repl & Supp.1996) ("A ground of defense, *other than one (1) negating an element of the offense ...* ") (emphasis added).

[3] Under Tennessee law, evidence is deemed relevant if it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401 Moreover, relevant evidence is generally admissible in Tennessee, unless its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 402 and 403. Since the general criminal law requires that mental state be proven by the State beyond a reasonable doubt, it is certainly a "fact of consequence" to the outcome of a criminal prosecution. Therefore, evidence which tends to prove or disprove the required mental state is relevant and generally admissible under Tennessee law.

[4][5] In addition to the general relevance rules, expert testimony in Tennessee is governed by Rule 702, Tenn. R. Evid. which provides:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Under this evidentiary rule, expert testimony regarding the defendant's incapacity to form the required mental state must "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." *See State v. Shuck,* 953 S.W.2d 662 (Tenn.1997). Though the facts or data upon which the expert testimony is based need not be admissible in evidence, they must be made known to the expert at or before the hearing and must be of a type reasonably relied upon by experts in the particular field. Rule 703, Tenn. R. Evid. In fact, under Tennessee law, "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Rule 703, Tenn. R. Evid. Of course, as with most other evidentiary questions, the admissibility of expert opinion testimony is a matter which largely rests within the sound discretion of the trial court. *State v. Ballard,* 855 S.W.2d 557, 562 (Tenn.1993).

[6][7] Therefore, to gain admissibility, expert testimony regarding a defendant's incapacity to form the required mental state must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony. Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee

law. As the intermediate court recognized

[t]o find otherwise would deprive a criminal defendant of the right to defend against one of the essential elements of every criminal case. In effect, then, such a finding would deprive the defendant of the means to challenge an aspect of the prosecution's case and remove the burden of proof on that element in contravention of constitutional and statutory law. While the law presumes sanity it does not presume mens rea. Due process requires **\*690** that the government prove every element of an offense beyond a reasonable doubt.

*Phipps,* 883 S.W.2d at 149. To avoid confusion, however, we caution that such evidence should not be proffered as proof of "diminished capacity." Instead, such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried. (FN9)

[8] As did the Court of Criminal Appeals in this case, we emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of a lack of    *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.    *State v. Shelton,* 854 S.W.2d 116, 122 (Tenn.Crim.App.1992), perm. app. denied (Tenn.1993). Applying the above stated principles to the facts of this case, we conclude that the trial court did not err in excluding the testimony of Dr. Meyer.

[9] After the State rested its case-in-chief in the guilt phase of the trial, defense counsel requested the trial court to rule on whether or not Dr. Meyer's testimony could be admitted. The trial court inquired about the nature of the testimony and the purpose for which it was being offered. The following discussion ensued.

[DEFENSE COUNSEL]: Talking about the type of individual that--what his testing revealed about the defendant in this case, and then take him to the situation where--I mean there's going to be proof--there's already been proof put on about alcohol consumption, and what that consumption--what effect that consumption would have had on him with his type of personality, in addition to exploring his state of mind, given his personality makeup, posing facts that have been presented here in court about the incident and how it occurred, what his expert opinion would be about how he would react under those circumstances.

[THE COURT]:   *I don't understand--of course, state of mind is important if it goes to a defense. If it goes to negating key elements in the case--*

[DEFENSE COUNSEL]: Intent, Your Honor.

[THE COURT]: But just general state of mind, what his feelings are, what his attitude was toward the victim in general, I don't see how that particular state of mind contributes toward a

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                                                    **Page 9**

defense. I assume at this time, based on what I've
heard up to this point, his defense is intoxication,
and he could not form the requisite intent to
premeditate and deliberate and commit an
intentional murder. Is that correct?

[DEFENSE COUNSEL]: Well, it's not only with
reference to intoxication, but it's also with
reference to emotional distress and stress that was
produced by the relationship between the parties.

(Emphasis added.)

After further discussions, the trial court ruled as
follows:

*Anything going towards state of mind that would
create a defense or an excuse for this killing, the
Court will allow.* But just a general state of mind
of the defendant about attitudes toward the
deceased, I don't think it's relevant at this time. I
don't think it's admissible. I'm not going to allow
that testimony about drugs and whatever between
the two people just to show generally what the
defendant was thinking, unless it goes specifically
toward a defense. And, as I understand what you
said, it does not.

*691 Also, the law of the State of Tennessee
does not recognize diminished capacity in this
state. And the only relevancy I see as far as the
doctor's testimony would be going toward insanity
as a defense in this case and not as to diminished
capacity.

Now, as far as the defense of intoxication, if
there is credible testimony from the doctor and he
can give an opinion as to the extent of the **state** of
intoxication of Mr. **Hall** at the time of commission
of the offense, then that would be relevant, but just
general stress or general attitude toward life would
not be a defense in this case. *Any testimony going
toward the defense of intoxication, I will allow....*

(Emphasis added.)

[10][11] Following this ruling, the defense did not
attempt to present Dr. Meyer's testimony as an offer
of proof, nor did the defense make any further
statement about the nature and purpose of the
testimony. (FN10) It is clear from this ruling that
the trial court did not bar Dr. Meyer from
testifying, but actually stated that he would allow
testimony probative either to negate intent or to
establish intoxication. In fact, the trial court
recognized, without the benefit of appellate court
decisions, that expert testimony relevant to negating
intent is admissible in Tennessee even though
diminished capacity is not a defense. (FN11)
Moreover, the trial court correctly applied that legal
principle to the testimony in this case. From the
description of the expert testimony offered by the
defense, as well as a review of the testimony of Dr.
Meyer at the penalty phase, it is clear that Dr.
Meyer's testimony was not relevant to show that the
defendant lacked the requisite intent because of
mental disease or defect or
intoxication.

[12] Instead, Dr. Meyer testified generally about
the defendant's personality type and character traits
which he gleaned from tests results and a single

three hour interview. At no point in his testimony
did Dr. Meyer state that the defendant lacked the
capacity to premeditate and deliberate the killing
because of a mental disease or defect. Though Dr.
Meyer testified at the penalty phase that he believed
the defendant to have a borderline personality
disorder and that such people could have brief
episodes of rage during "temporary states of mental
illness," he did not state that the defendant was
experiencing such an episode when he committed the
murder for which he was on trial. In fact, had Dr.
Meyer made such a statement it would have been
suspect since he acknowledged that he never
discussed the facts of the murder with the defendant.
(FN12) While evidence that a particular defendant,
because of a mental disease or defect, lacks the
capacity to form the requisite intent is admissible in
Tennessee, expert opinion testimony about the
typical reactions of certain personality types is not
relevant to the capacity of the particular defendant
on trial. *Compare   Ballard,* 855 S.W.2d at 561
(expert testimony describing the typical behavior of
a sexually abused child does not substantially assist a
jury in an inquiry of whether the specific crime
charged has actually taken place). Moreover, proof
of personality type is not relevant to a defendant's
*capacity* to form the mental intent. As Judge Tipton
correctly stated in the decision of the Court of
Criminal Appeals in this case:

Society is comprised of myriad individuals with
diverse personalities and temperaments who are
jointly and severally bound   *692 by society's
common codes of conduct and responsibility. The
mere fact that one is more apt, by personality type,
to become emotional in response to a particular
stimulus does not provide a means for that person
to be absolved from the same responsibility to
which the law holds another who might be less apt
to respond as passionately to the same stimulus. If
it did, then each person would be the law unto him
or herself based solely upon his or her particular
personality makeup.

Though expert testimony is admissible to show that
because of a mental disease or defect, a defendant
lacked the capacity to form the mental state required
to constitute the offense for which he or she is being
tried, the testimony in this case did not meet that
standard. The trial court appropriately excluded the
evidence.

### AGGRAVATING CIRCUMSTANCES

The defendant next challenges the validity of the
aggravating circumstances found by the jury. First,
he argues that unconstitutional double counting
exists in this case because the separate aggravating
circumstances were proven by the same underlying
facts, the burning of the victim's car. Secondly, he
asserts that the jury's finding that the murder
occurred in the perpetration of a felony is
inconsistent with its verdict of premeditated first
degree murder, and he urges that there was not a
sufficient nexus between the felony and the
homicide.

[13] In *State v. Middlebrooks,* 840 S.W.2d 317,
346 (Tenn.1992) (Drowota and O'Brien, JJ.,
dissenting), a majority of this Court concluded that
when a defendant is "convicted of first-degree
murder solely on the basis of felony murder, the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

**Page 10**

aggravating circumstance set out in Tenn.Code Ann.
§§ 39-2-203(i)(7) (1982) and 39-13-204(i)(7) (1991)
does not narrow the class of death-eligible
murderers sufficiently under the Eighth Amendment
to the United States Constitution, and Article I, § 16
of the Tennessee Constitution *because it duplicates
the elements of the offense.*    " The decision in
*Middlebrooks* was based upon the narrow principle
that an aggravating circumstance may not duplicate
the elements of the underlying death-eligible
offense. Contrary to the defendant's assertion,
*Middlebrooks* did not embrace the broad principle of
double counting, which has been adopted by the
Florida courts, (FN13) and which precludes the use
of the same evidence to establish more than one
aggravating circumstance. *See State v. Bush,* 942
S.W.2d 489, 505 (Tenn.1997) (holding that use of
murder to prevent arrest aggravating circumstance
was appropriate because it did not duplicate the
statutory elements of the underlying offense); *State
v. Stephenson,*    878 S.W.2d 530, 556-57
(Tenn.1994) (holding that use of the murder for
renumeration aggravating circumstance was
appropriate because it did not duplicate the statutory
elements of the underlying offense). In any event,
we observe that the jury's finding of the two
aggravating circumstances, (1) "[t]he murder was
especially heinous, atrocious or cruel in that it
involved torture or serious physical abuse beyond
that necessary to produce death;" and (2) "[t]he
murder was committed while the defendant was
engaged in committing or was attempting to commit,
arson," Tenn.Code Ann. § 39-13-204(i)(5) and (7)
(1991), were not based upon the same evidence.
The jury's finding of the (i)(5) circumstance was
based upon the torturous means by which the
defendant chose to kill the victim, and the suffering
she endured prior to her death. The jury's finding
of the (i)(7) circumstance was based upon the
defendant's commission of the murder during the
perpetration of a separate felony, the destruction of
the victim's car by arson.

[14] As to the defendant's contention that the
finding of the felony murder aggravating
circumstance is inconsistent with its verdict of
premeditated murder, we disagree. As previously
explained, in *Middlebrooks* a majority of this Court
held that application of the felony murder
aggravating circumstance is inappropriate only if the
defendant is convicted *solely* on the basis of felony
murder. Implicit in that statement is the recognition
that the circumstance properly may be applied if a
defendant is convicted of premeditated first degree
murder. In fact, we recognized *693 in *State v.
Hurley,* 876 S.W.2d 57, 70 (Tenn.1993), that
premeditated and felony murder are simply
alternative means by which the offense of first
degree murder may be committed. While a
defendant who murders one victim may only be
convicted of one offense of first degree murder, the
circumstances of a particular case may support a
jury finding that the *offense* of first degree murder
was committed both with premeditation and during
the course of perpetrating another felony.
Tenn.Code Ann. § 40-18-112 (1990 Repl.). (FN14)
Indeed, that was the situation in *Hurley* where we
affirmed the defendant's conviction of premeditated
first degree murder and his death sentence based
upon the felony murder aggravating circumstance.

In this case, the defendant admitted that he
intended to burn the victim's car, while at the same
time denying that he intentionally, with
premeditation and deliberation, killed the victim.
The jury convicted the defendant of both aggravated
arson and premeditated first degree murder,
obviously disbelieving his assertions that he did not
intend to kill the victim. The fact that the victim's
murder was accomplished by pouring gasoline onto
her body at the same time as gasoline was applied to
the car to accomplish the underlying felony does not
vitiate the applicability of the aggravating
circumstance. In fact, application of the felony
murder aggravating circumstance is particularly
appropriate in this case. The defendant relentlessly
searched for the victim's car intending to burn it.
When he found the object of his search with the
victim inside, the defendant achieved his original
purpose, arson of the victim's car. When the victim
would not heed his warning to leave the car, the
defendant refused to be deterred from his original
purpose and then proceeded, with premeditation and
deliberation, to murder the victim by pouring
gasoline directly onto her body and igniting the
accelerant. The defendant's relentless determination
to commit the arson of the victim's car ultimately
culminated in his decision to kill her. Accordingly,
the evidence is sufficient to support the jury's
finding that the premeditated murder in this case was
committed while the defendant was also engaged in
committing arson.

[15] The defendant's claim that there is an
insufficient nexus between the arson and the murder
is without merit. In *State v. Terry,* 813 S.W.2d 420
(Tenn.1991), the defendant, a church pastor,
embezzled substantial sums of money from his
congregation over a period of time. He began
taking the money in March of 1987, In June of
1987, he killed the church handyman, placed the
body inside the church building, and torched the
building. At the sentencing hearing, the jury found
the felony murder aggravating circumstance on the
basis of the underlying larceny. The trial judge
granted the defendant's motion for a new trial,
finding that the State had failed to prove that the
murder was committed while the defendant was
engaged in the perpetration of larceny. This Court
agreed with the trial judge that there was an
insufficient nexus between the murder and the
larceny. In so holding, we stated that application of
the felony murder aggravating circumstance depends
upon the temporal, spatial and motivational
relationships between the capital murder and the
collateral felony. *Id.* at 423.

Applying those factors to the circumstances of this
case, it is clear that the defendant's argument is
without merit. Here, the capital murder and
collateral felony occurred at the same time and in
the same place. The defendant's motivation for
killing the victim in this case and burning her car
were likewise the same, anger over her decision to
discontinue their relationship.

We conclude that the evidence is sufficient to
support the jury's findings as to aggravating
circumstances. We also conclude that the
aggravating circumstances were constitutionally
applied in this case.

*694 NONSTATUTORY MITIGATING*

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                                    **Page 11**

### CIRCUMSTANCES

In 1989, the General Assembly amended the capital sentencing statute to provide, with respect to nonstatutory mitigating circumstances, as follows:

After closing arguments in the sentencing hearing, the trial judge shall include in the instructions for the jury to weigh and consider any of the statutory aggravating circumstances set forth in subsection (i) which may be raised by the evidence at either the guilt or sentencing hearing, or both. The trial judge shall also include in the instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing or both which shall include, but not be limited to, those circumstances set forth in subsection (j). No distinction shall be made between mitigating circumstances as set forth in subsection (j) and those otherwise raised by the evidence which are specifically requested by either the state or the defense to be instructed to the jury. These instructions and the manner of arriving at a sentence shall be given in the oral charge and in writing to the jury for its deliberations.

Tenn.Code Ann. § 39-13-204(e)(1) (1991 Repl. & 1996 Supp.).

In this Court, the defendant argues that the trial court violated that statute by refusing to instruct the jury with respect to nonstatutory mitigating circumstances. The offense for which the defendant was tried and convicted was committed after November 1, 1989, so the above statute is without question applicable to his case. However, the case was tried before this Court's decision in *State v. Odom,* 928 S.W.2d 18 (Tenn.1996), in which we first interpreted the amended statute to require jury instructions on nonstatutory mitigating circumstances raised by the evidence and proffered by a defendant as having mitigating value. There, we stated that instructions on nonstatutory mitigating circumstances must not be fact specific and imply to the jury that the judge has made a finding of fact. Instead, such instructions must be drafted so that they are indistinguishable from the statutory mitigating circumstances when considered by a jury. *Id.* at 32. Finally, we interpreted the "no distinction" portion of the statute to preclude the trial judge from revealing to the jury that a request for instruction on nonstatutory mitigating circumstances has been made, and from revealing the identity of the party making the request. *Id.* More recently, in *State v. Hodges,* 944 S.W.2d 346 (Tenn.1997), we stated that nonstatutory mitigating circumstances must be phrased in general categories similar to the statutory mitigating circumstances, and we emphasized that a trial judge has no duty to give such instructions absent a timely and proper request from the defense. If the defense proffers a timely, but overly specific requested instruction, the trial court must revise and generalize the instruction to conform to the evidence and the law. *Id.* at 356.

Of course, the trial court in this case ruled without the benefit of our decisions in *Odom* and *Hodges.* In denying the defendant's requests, the trial court relied upon decisions of this Court interpreting pre-1989 law which found no constitutional or statutory provision mandating instruction on nonstatutory mitigating circumstances. *State v.*

*Thompson,* 768 S.W.2d 239 (Tenn.1989); *State v. Wright,* 756 S.W.2d 669 (Tenn.1988). The defendant argues that he is entitled to a new sentencing hearing because the trial court's denial of his request constitutes prejudicial error.

The State argues that the trial court's refusal to charge the jury on nonstatutory mitigating circumstances does not require reversal. The State first points to a statute enacted while this case has been pending on appeal and effective April 29, 1997, which amends Tenn.Code Ann.            §
39-13-204(e)(1), quoted above, by deleting the sentence "No distinction shall be made between mitigating circumstances as set forth in subsection (j) and those otherwise raised by the evidence which are specifically requested by either the state or the defense to be instructed to the jury" and substituting instead the following language at the end of subsection (e)(1): "However, a reviewing court shall not set aside a sentence of death or of imprisonment **\*695** for life without the possibility of parole on the ground that the trial court did not specifically instruct the jury as to a requested mitigating factor that is not enumerated in subsection (j)." 1997 Tenn. Pub. Acts, Chapter 139. While conceding that the statute was not applicable at the trial of this cause, the State nonetheless argues that the provision precluding a reviewing court from setting aside a sentence of death on the ground that the trial court did not instruct the jury on nonstatutory mitigating circumstances is binding in this appeal and prevents this Court from granting relief to the defendant, even if it concludes that the failure to charge nonstatutory mitigating circumstances constitutes error which affirmatively appears to have affected the verdict. *Hodges,* 944 S.W.2d at 352; Tenn. R.Crim. P. 52(a). Even if this Court determines that Public Chapter 139 does not apply to the appeal of this case, the State argues that the defendant is not entitled to relief because the trial court's refusal to give instructions on nonstatutory mitigating circumstances was harmless error. For the reasons that follow, we conclude that the error was harmless and does not require reversal. (FN15)

[16] In this case, the defendant submitted seventy-one special requests for jury instructions at trial, many of which purported to explain the role and purpose of mitigating circumstances to the jury. Though the trial court refused to grant any of the defendant's requested instructions on nonstatutory mitigating circumstances, he granted five (FN16) of the other requested instructions, one which stressed that the sentencing decision was to be made by each individual juror; one which emphasized that the defendant was entering the penalty phase of the trial with the presumption that there were no aggravating circumstances warranting a sentence of death; and three other instructions which broadly defined and explained the nature and function of mitigating circumstances. With respect to the remaining sixty-six special requests the trial court stated, "I found that many of them are already included in the charge that the Court is giving ... or some of them are what I felt like are ... repetitious.... And I've also found that many of them are not appropriate as far as accurate statements of the law."

Implicitly conceding the accuracy of the trial court's finding with respect to duplicity, in this

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                    Page 12

Court the defendant points to only seven requested
instructions on nonstatutory mitigating circumstances
which he says the trial court erroneously refused to
charge. They are as follows:

*Special Request No. 20.*    In determining the
sentence for Leroy Hall, Jr. you shall consider as a
mitigating circumstance the fact that Leroy Hall,
Jr., was immature for his age, and lacked the
normal emotional development at the time of the
commission of the crime. This may be sufficient
by itself to impose the punishment of life
imprisonment and reject death by electrocution.

*Special Request No. 21.*    In determining the
sentence for Leroy Hall, Jr. you shall consider as a
mitigating circumstance the fact that Leroy Hall,
Jr.'s criminal activity was caused by various
psychological factors and alcohol-related problems
that can be treated and will diminish with age.
This may be sufficient by itself to impose the
punishment of life imprisonment and reject death
by electrocution.

*Special Request No. 26.*    In determining the
sentence for Leroy Hall, Jr. you shall consider as a
mitigating circumstance the fact that Leroy Hall,
Jr. suffers from post-    *696  traumatic stress
disorder even though it did not cause the crime.
This may be sufficient by itself to impose the
punishment of life imprisonment and reject death
by electrocution.

*Special Request No. 27.*    In determining the
sentence for Leroy Hall, Jr. you shall consider as a
mitigating circumstance the fact that Leroy Hall,
Jr. at a very early age, exhibited signs of mental or
emotional disturbance that went untreated. This
may be sufficient by itself to impose the
punishment of life imprisonment and reject death
by electrocution.

*Special Request No. 30.*    In determining the
sentence for Leroy Hall, Jr. you shall consider as a
mitigating circumstance the fact that.. Leroy Hall,
Jr. never developed the ability to cope with daily
tensions or to become self-dependent. This may
be sufficient by itself to impose the punishment of
life imprisonment and reject death by
electrocution.

*Special Request No. 37.*    In determining the
sentence for Leroy Hall, Jr. you shall consider as a
mitigating circumstance the fact that.. Leroy Hall,
Jr. has for a long time had serious personality
disorders that are, to a large extent, caused by the
problems that developed in his childhood with his
family. This may be sufficient by itself to impose
the punishment of life imprisonment and reject
death by electrocution.

*Special Request No. 45.*    In determining the
sentence for Leroy Hall, Jr. you shall consider as a
mitigating circumstance the fact that Leroy Hall,
Jr. has a history of family instability.

[17] Assuming the refusal to give these
instructions, in some form, was error pursuant to
our pronouncements in *Odom* and *Hodges,* we must
determine whether the error affirmatively appears to
have affected the verdict. A charge should be
considered prejudicially erroneous if it fails to fairly

submit the legal issues or if it misleads the jury as to
the applicable law. *Hodges,* 944 S.W.2d at 352.
In evaluating claims of error in jury instructions, the
United States Supreme Court has cautioned
reviewing courts to remember that

[j]urors do not sit in solitary isolation booths
parsing instructions for subtle shades of meaning in
the same way that lawyers might. Differences
among them in interpretation of instructions may
be thrashed out in the deliberative process, with
commonsense understanding of the instructions in
the light of all that has taken place at the trial
likely to prevail over technical hairsplitting.

*Boyde v. California,* 494 U.S. 370, 380-81, 110
S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990);    *see
also State v. Van Tran,*    864 S.W.2d 465, 479
(Tenn.1993). We review the following jury charge
regarding mitigating circumstances to determine if it
fairly submitted the legal issues to the jury in this
case.

### *Mitigating Circumstances*

Tennessee law provides that in arriving at the
punishment, the jury shall consider as heretofore
indicated, any mitigating circumstances which
shall include, but are not limited to, the following:

(1) The murder was committed while the
defendant was under the influence of extreme
mental or emotional disturbance.

(2) The youth or advanced age of the defendant
at the time of the crime.

(3) The capacity of the defendant to appreciate
the wrongfulness of his conduct or to conform his
conduct to the requirements of the law was
substantially impaired as a result of mental disease
or defect or intoxication which was insufficient to
establish a defense to the crime but which
substantially affected his judgment.

(4) any other mitigating factor which is raised by
the evidence produced by either the prosecution or
defense at either the guilt or sentencing hearing;
that is, you shall consider any aspect of the
defendant's character or record, or any aspect of
the circumstances of the offense favorable to the
defendant which is supported by the evidence.

No distinction shall be made between mitigating
circumstances one (1) through four (4) and those
otherwise raised by the evidence.

The defendant does not have a burden of proving
a mitigating circumstance. If there is some
evidence that a mitigating    *697  circumstance
exists, then the burden of proof is upon the state to
prove, beyond a reasonable doubt, that mitigating
circumstance does not exist.

There is no requirement of jury unanimity as to
any particular mitigating circumstance, or that you
agree on the same mitigating circumstance.

*Special Request No. 4: Decision to be Made by
Individual Jurors.*

Both the prosecution and Leroy Hall, Jr., are

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                          Page 13

entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. Do not decide any question in a particular way simply because a majority of the jurors, or any one of them, favors such a decision. Do not decide any issues in this case by chance, such as the drawing of lots or by any other chance determination.

*Special Request No. 12: Presumption Regarding Aggravating Circumstances:*

The defendant enters this phase of the trial with the presumption that there are no aggravating circumstances that would warrant a sentence of death. This presumption may be overcome only if the prosecution convinces you beyond a reasonable doubt that one or more of the specified aggravating circumstances exists and that the aggravating circumstance or circumstances outweigh any mitigating factors.

*Special Request No. 57: Mitigation-Definition, Weight, Unanimity:*

When you deliberate on the punishment for Leroy Hall, Jr., life imprisonment or death by electrocution, you must consider any mitigating circumstance supported by any evidence presented by either party at either the guilt-innocence or sentencing phase, or both, of the trial. A mitigating circumstance is any aspect of Leroy Hall, Jr's., character, background history, or physical condition or the nature and circumstances of the crime which in fairness or mercy, calls for a sentence less than death. If you find that there are any mitigating circumstances, you must decide how much weight they deserve. The law does not identify or limit what you can consider concerning Leroy Hall, Jr's., character, background history, and physical condition or the nature and circumstances of the crime that are mitigating. The law does not impose a formula for determining how much weight a mitigating circumstance deserves. Each of you is the sole judge of whether mitigating circumstances exist and if so, how much weight they deserve.

You may deliberate as a body about mitigating circumstances, but you are not required to reach a unanimous verdict as to their existence or weight. When you vote on whether any aggravating circumstances have been proven beyond a reasonable doubt to outweigh mitigating, each of you must decide for yourself whether any mitigating circumstances exist and, if so, how much weight they deserve.

*Special Request No. 58: Mitigation-Definition:*

Mitigating circumstances are factors put forth to show that the appropriate sentence is life imprisonment. Mitigating circumstances are not a justification or excuse for the offense, but are factors that, in fairness and mercy, may extenuate or mitigate the degree of moral culpability as far as punishment is concerned. Mitigating circumstances are not limited by the law; they may be unlimited in number, as long as they are

based upon the evidence introduced by either the prosecution or the defense at the trial or sentencing.

*Special Request No. 59: Mitigation-Definition:*

A mitigating circumstance is not a justification or excuse for the offense. A mitigating circumstance is a fact about the offense, or about Leroy Hall, Jr., which in fairness, sympathy, compassion, or mercy may be considered in extenuating or reducing the degree of moral culpability, or which justifies a sentence of less than death, although it does not justify or excuse the offense.

*696 Clearly, the instructions on statutory mitigating circumstances given the jury in this case directly relate, and encompass generally the specific subject matter that is contained within the defendant's special requests. For example, circumstance (j)(7), (FN17) the youth of the defendant at the time of the crime directly relates to special requests twenty-one and twenty-two. Circumstance (j)(2), (FN18) and circumstance (j)(8), (FN19) relate to all of the requested instructions. Finally, the general instructions given by the trial court broadly informed the jury of its unlimited ability to consider all types of factors by defining mitigating circumstance as

any aspect of Leroy Hall, Jr.'s, character, background history, or physical condition or the nature and circumstances of the crime which in fairness or mercy, calls for a sentence less than death.... The law does not identify or limit what you can consider concerning Leroy Hall, Jr.'s character, background history, and physical condition or the nature and circumstances of the crime [as] mitigating.

Though neither the statutory mitigating factors charged, nor the general instruction on mitigating circumstances were as specific as the defendant's special requests, the instructions generally encompassed the subjects contained within the special requests and fairly conveyed to the jury its ability to consider a wide range of proof as mitigating circumstances. In addition, the trial court permitted the defendant to introduce substantial proof of nonstatutory mitigating circumstances. Moreover, during closing argument at the sentencing phase, the trial court allowed defense counsel broad latitude to argue nonstatutory mitigating circumstances to the jury. In fact, counsel made detailed arguments regarding virtually every point of the mitigation on which he sought to have instructions given to the jury. (FN20) Therefore, considering the instructions actually given the jury on mitigating circumstances, in conjunction with the broad latitude appropriately afforded the defendant to introduce evidence and present argument about nonstatutory mitigating circumstances, we conclude that the trial court's refusal to charge the jury on nonstatutory mitigating circumstances does not constitute prejudicial error requiring a reversal. *See* Tenn. R.Crim. P. 52(a).

*COMPARATIVE PROPORTIONALITY REVIEW*

The defendant next claims that his sentence is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                         Page 14

the defendant. The defendant is asserting that his
sentence is comparatively disproportionate because
"[c]urrently there is no one under a death sentence
in Tennessee who him- or herself murdered a
girlfriend or spouse." The State responds that Hall
is not the only person in Tennessee under a death
sentence for the killing of a spouse or a girlfriend.
We agree. *See State v. Johnson*, 743 S.W.2d 154
(Tenn.1987); *State v. Miller*,     674 S.W.2d 279
(Tenn.1984) **699    and 771 S.W.2d 401
(Tenn.1989); *State v. Smith*,    868 S.W.2d 561
(Tenn.1993).

[18][19][20][21] Our comparative proportionality
review does not end with that finding, however.
Recently, in *State v. Bland*,    958 S.W.2d 651
(Tenn.1997), we analyzed in detail the precedent-
seeking method this Court has employed over the
past eighteen years in determining whether the death
sentence imposed in a particular case is
*disproportionate* to the sentence imposed in similar
cases. In conducting comparative proportionality
review, we begin with the presumption that the
sentence of death is proportional to the crime of first
degree murder. However, if a capital case, taken as
a whole, is plainly lacking in circumstances
consistent with those in similar cases in which the
death penalty has been imposed, the sentence of
death in the case being reviewed is disproportionate.
*State v. Ramsey*,  864 S.W.2d 320, 328 (Mo. banc
1993). Even if a defendant receives a death
sentence when the circumstances of the offense are
similar to those of an offense for which another
defendant has received a life sentence, the death
sentence is not disproportionate if this Court can
discern some basis for the lesser sentence given in
the similar case. *See State v. Carter*, 714 S.W.2d
241, 251 (Tenn.1986). Moreover, where there is no
discernable basis for the difference in sentencing,
the death sentence is not necessarily
disproportionate. This Court is not required to
determine that a sentence less than death has never
been imposed in a case with similar characteristics.
To the contrary, our duty under the similarity
standard is to assure that no aberrant death sentence
is affirmed. *State v.    Webb*, 680 A.2d 147, 203
(Conn. 1996). "Since the proportionality
requirement on review is intended to prevent caprice
in the decision to inflict the [death] penalty, the
isolated decision of a jury to afford mercy does not
render unconstitutional death sentences imposed on
defendants who were sentenced under a system that
does not create a substantial risk of arbitrariness or
caprice." *Cf.    Gregg v. Georgia*, 428 U.S. 153,
203, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976).

[22][23] As we had previously explained, and
reaffirmed in *Bland*,  comparative proportionality
review is not a rigid, objective test.       *Id.*,  958
S.W.2d at 662; *State v. Cazes*,  875 S.W.2d 253,
270 (Tenn.1994). We do not employ a
mathematical formula or scientific grid, nor are we
bound to consider only those cases in which exactly
the same aggravating circumstances have been found
by the jury. *State v. Brimmer*,  876 S.W.2d 75, 84
(Tenn.1994). After identifying a pool of similar
cases, we consider a multitude of variables, some of
which were listed in     *Bland*,  in light of the
experienced judgment and intuition of the members
of the Court. *Bland*, 958 S.W.2d at 667. With
respect to the circumstances of the offenses relevant
factors enumerated in *Bland* include: (1) the means

of death; (2) the manner of death (e.g., violent,
torturous, etc.); (3) the motivation for the killing;
(4) the place of death; (5) the similarity of the
victims' circumstances including age, physical and
mental conditions, and the victims' treatment during
the killing; (6) the absence or presence of
premeditation; (7) the absence or presence of
provocation; (8) the absence or presence of
justification; and (9) the injury to and effects on
nondecedent victims. With respect to comparing the
character of the defendants, the following factors
were listed in *Bland* as relevant: (1) the defendant's
prior criminal record or prior criminal activity; (2)
the defendant's age, race, and gender; (3) the
defendant's mental, emotional or physical condition;
(4) the defendant's involvement or role in the
murder; (5) the defendant's cooperation with
authorities; (6) the defendant's remorse; (7) the
defendant's knowledge of helplessness of victim(s);
(8) the defendant's capacity for rehabilitation.

[24] Considering the nature of the crime and the
defendant, we conclude that imposition of the death
penalty for the torturous and cruel premeditated
killing of this young woman is not disproportionate
to the penalty imposed in similar cases. Not only
did Hall show a total disregard for human life, he
exhibited complete indifference to human suffering.
The twenty-two-year-old victim had cohabitated with
the defendant since she was sixteen years old. In
fact, it was her decision to end the relationship
which proved fatal. For the three weeks following
the *700  separation and prior to her murder, the
victim was consistently pursued by the defendant.
He telephoned her residence at all hours of the day
and night. He threatened her, stating at one point,
"[i]f I can't have her, nobody can't." [sic] His
mother described him as a "basket case" when he
was unable to see her. Attempting to gain control
over her, the defendant decided to destroy her
means of transportation. While in the process of
accomplishing that objective, Hall decided that
destroying her life would more effectively and
efficiently accomplish his purpose of preventing her
from seeking a life apart from him. He
demonstrated uncommon cruelty by choosing to
murder his ex-girlfriend by igniting her gasoline
soaked body. Hall by his own admission never
offered assistance to his victim. The pain and
suffering which the victim endured in the hours
preceding her death is unimaginable. She was alive,
conscious, coherent, and alert as her tongue swelled
to the extent that it protruded from her mouth and
her eyelids became inverted. She experienced not
only the initial pain of the burn injuries, but also the
pain from the incisions that were part of the medical
treatment for the burns. The only provocation or
motive for this horrendous killing was the
defendant's anger with the victim for leaving him
and refusing to return. Following the murder, Hall
did not turn himself into the authorities and report
the crime. Instead, he went to his mother's house
and attempted to hide the shirt he had been wearing.
Fortunately, his step-sister witnessed his attempt and
later reported the location of the shirt to the police.
When Hall initially spoke with the police, he denied
involvement in the murder. Later, he admitted his
involvement, but denied that he killed the victim
with premeditation and deliberation. In fact he
attempted to plead guilty to felony murder in front
of the jury. The jury disbelieved his testimony and
found the existence of premeditation and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

deliberation. There is no evidence in this record to indicate that Hall had a prior criminal record; however, he admitted to abusing alcohol and drugs, and warrants had been issued for the defendant's arrest for the prior arson of the victim's car. With respect to his mental state, the evidence shows that he is a person prone to rage who has little self control. Though the precise psychological diagnosis may vary, the defendant clearly displayed symptoms of both borderline personality disorder and antisocial personality disorder. He was not insane at the time this crime was committed. Though Hall was young at the time of the killing, only twenty-four years old, he is not, by any means, the youngest person on death row. (FN21) Moreover, contrary to his assertion, he is not the only person in Tennessee to receive a death penalty for the killing of a spouse or a girlfriend. Considering the nature of this crime and the character of this defendant, this murder places Hall into the class of defendants for whom the death penalty is an appropriate punishment. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In *State v. Johnson*, 743 S.W.2d 154 (Tenn.1987), the thirty-three year old defendant murdered his wife by forcing a large plastic garbage bag into her mouth which resulted in strangulation and asphyxiation. She bled from the nose and ears and traces of blood were found on a couch in the office where her death occurred. There was testimony that she would have been conscious during the terrifying ordeal and that from one to four minutes would have elapsed before she died. This Court stated that she suffered "a most terrible death," and declined to state all the "horrible details" of it. As in this case, the jury in *Johnson* found that the murder was "especially heinous, atrocious or cruel in that it involved torture or depravity of mind." Tenn.Code Ann. § 39-2-203(i)(5)(1982). As in this case, the jury also found a second, but different, aggravating circumstance, that the defendant had been previously convicted of violent felony offenses, armed robbery and aggravated assault. Tenn.Code Ann.         § 39-2-203(i)(2)(1982). The only possible motive for the unprovoked killing was the defendant's    **\*701** desire to prevent his wife, who had previously threatened to leave him, from learning that he had been found in a compromising position with a woman a few weeks before the murder. As did the relationship of the victim and Hall in this case, the relationship between Johnson and his wife had a history of difficulties. Though Johnson denied the murder and attempted to place blame for the killing upon a prisoner who was on work release, the jury disbelieved Johnson and sentenced him to death by electrocution.

In *State v. Miller*, 674 S.W.2d 279 (Tenn.1984) and 771 S.W.2d 401 (Tenn.1989), the twenty-four-year-old defendant was sentenced to death for murdering the twenty-three-year-old victim he had been dating. The victim had been born with brain damage and was mildly retarded. The defendant killed the victim by beating and repeatedly stabbing her. Some of the wounds were inflicted before death and some after death. Some of the stab wounds extended so deep into the bone that the forensics testimony indicated that a hammer had been used to drive the knife as if it were a nail. The

victim had also been raped. As in this case, the issue of intoxication from drugs and alcohol and whether its degree was sufficient to negate premeditation was a contested issue in the trial. The jury rejected Miller's proof and found him guilty of premeditated murder. The jury imposed the death penalty upon finding that the murder "was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn.Code Ann. 39-2-203(i)(5) (1982)(repealed). The sentence was reversed on direct appeal by this Court because irrelevant and prejudicial evidence was admitted at the sentencing phase. However, at the resentencing hearing the jury again imposed the death penalty upon the basis of the (i)(5) aggravating circumstance and the sentence was affirmed upon appeal.

In *State v. Smith*, 868 S.W.2d 561 (Tenn.1993), the forty-year-old defendant was found guilty of the triple premeditated murders of his estranged wife, age thirty-five and her two sons by a previous marriage, age sixteen and thirteen. The jury sentenced the defendant to death on the murder counts as to all three victims. With respect to the killing of his estranged wife, the jury found two aggravating circumstances: (1) that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind, Tenn.Code Ann. § 39-2-203(i)(5) (1982), and (2) the defendant committed "mass murder" which is defined as the murder of three or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan, Tenn.Code Ann.          § 39-2-203(i)(12) (1982). Like the defendant in this case, Smith harassed his estranged wife in the weeks prior to the murder. In fact, at the time of the killing, warrants had been issued charging the defendant with aggravated assault of the victim. Smith killed his wife by shooting her in the left arm and the neck. The gunshot to her neck had severed her spinal cord, producing paralysis and death within two to six minutes. Though she would have been able to hear during some portion of this time, Smith's victim would have been unable to move. Therefore, she may have been able to hear the sounds of her children being murdered. After her death, the defendant slashed her neck and stabbed her with a knife and an awl. In mitigation, the defendant offered proof to show that he had been a good prisoner, and in addition, several of his co-workers testified that he was a good employee. His mother and daughter said that he had a severely retarded teenage son who depended upon the defendant emotionally. As in this case, the defendant presented expert psychological proof that he had personality disorders.

In *State v. O'Guinn*, 709 S.W.2d 561 (Tenn.1986), the thirty-two-year-old defendant was convicted of the rape and strangulation death of a seventeen-year-old woman. The defendant and the victim met at a nightclub in Jackson, Tennessee. Both were intoxicated from alcohol and drugs. They left the bar together and rode around in the defendant's car. At some point, the defendant became angry with the victim and assaulted and murdered her. The victim suffered a horrible ordeal. She had offensive and defensive wounds to her chest, arms, and head, indicating that she had been severely and brutally **\*702** beaten. The cause of her death was ligature

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                    Page 16

strangulation. She was choked to death with her
halter top. A contusion with parallel bruises on
either side of the nipple of her left breast might have
been made by pliers or a similar object. A metal
tire tool had been forcefully inserted into her vagina.
Semen was also found in her vagina. Abrasions on
her buttocks indicated that her body had been
dragged across the ground. The injuries to her
head, neck, breast, and vagina had occurred prior to
her death. The jury convicted the defendant of first
degree murder. At the sentencing hearing, the State
introduced the photographs of the victim. The
defendant's mother testified on her son's behalf and
told how his father, from whom she had been
divorced, had run the defendant from home when he
was thirteen or fourteen years old. The defendant
was divorced and had three children, and his former
wife had engaged in an affair with his father. Upon
finding one aggravating circumstance, that the
murder was especially heinous, atrocious or cruel in
that it involved torture or depravity of mind,
Tenn.Code Ann. § 39-2-203(i)(5) (1982), the jury
sentenced the defendant to death by electrocution.

In *State v. Henley,* 774 S.W.2d 908 (Tenn.1989),
the jury imposed the death penalty after finding, as
in this case, that the murder was especially heinous,
atrocious, or cruel in that it involved torture or
depravity of mind. Tenn.Code Ann.                §
39-2-203(i)(5) (1982). Thirty-one-year-old Henley
had been drinking and taking drugs on the day of the
murder. He forced the victims, a married couple
with whom he was acquainted, from the road to
their house at gunpoint, demanding money. When
the victims attempted to comply, Henley refused to
take the money, and without provocation, shot the
husband and then the wife. When the helpless,
unresisting wife began moaning, Henley shot her
two more times, poured gasoline on her body, and
set the house on fire. Though the husband died
from the gunshot wound, the wife died from burns
and smoke inhalation.

As we have repeatedly emphasized, no two cases
are identical, but the above cases have many
similarities with Hall. In all five cases, the victims
suffered particularly cruel and painful deaths.
Though all murders are totally reprehensible, the
means of death in this case was extremely heartless.
In fact, it is difficult to conceive of a death more
painful or torturous than that suffered by the victim
in this case. In all of the cases, the defendants were
acquainted with the victims, and in three of the five
cases, like this case, the defendants received the
death penalty for murdering their girlfriend or
spouse. Like this case, in all of the five cases the
victims remained conscious for some time after they
were assaulted and experienced the pain from the
injuries inflicted by the defendants. A motive for
the murder in at least two of the cases was the
defendant's desire to control his estranged wife.
Likewise, one motive for the murder in this case
was the defendant's desire to control the victim's
life. In all five of the cases, the jury found that the
murder was especially heinous, atrocious, or cruel
in that it involved torture or depravity of mind.
Similarly, in this case, the jury found that the
murder was especially heinous, atrocious, or cruel
in that it involved torture or serious physical abuse
beyond that necessary to produce death. Like Hall,
many of the defendants relied upon their youth and

mental disabilities as mitigation of the punishment.
In at least one other case, the issue of premeditation
and deliberation was strongly disputed, and in three
of the five cases, the defendants claimed to have
been intoxicated at the time of the murders. After
reviewing the cases discussed above and many other
cases not herein detailed, we are of the opinion that
the penalty imposed by the jury in this case is not
disproportionate to the penalty imposed for similar
crimes.

*CONCLUSION*

In accordance with the mandate of Tenn.Code
Ann. § 39-13-206(c)(1) (1991 Repl.), and the
principles adopted in prior decisions of this Court,
we have considered the entire record in this cause
and find that the sentence of death was not imposed
in any arbitrary fashion, that the evidence supports,
as previously discussed, the jury's finding of the
statutory aggravating circumstances, and the jury's
finding that the aggravating circumstances
outweighed mitigating circumstances beyond a
reasonable doubt. Tenn.Code Ann.        *703     §
39-13-206(c)(1)(A)--(C) (1991 Repl. & 1996 Supp.).
We have considered the defendant's assignments of
error and determined that none require reversal.
With respect to issues not specifically addressed
herein, we affirm the decision of the Court of
Criminal Appeals, authored by Judge Joseph M.
Tipton, and joined in by Judge Gary R. Wade and
Judge John H. Peay. Relevant portions of that
opinion are published hereafter as an appendix. The
defendant's sentence of death by electrocution is
affirmed. The sentence shall be carried out as
provided by law on the 22nd day of April, 1998,
unless otherwise ordered by this Court or other
proper authorities.

ANDERSON, C.J., and BIRCH and HOLDER,
JJ., concur.

REID, J., separate concurring opinion.

APPENDIX

(Excerpts from the Court of Criminal Appeals'
Decision)

IN THE COURT OF CRIMINAL APPEALS OF
TENNESSEE
AT KNOXVILLE
DECEMBER SESSION, 1993

State of Tennessee, Appellee,

v.

Leroy Hall, Jr., Appellant.

No. 03C01-9303-CR-00065
Hamilton County
Hon. Stephen M. Bevil, Judge
(First degree murder and aggravated arson)

*For the appellant:*

Karla G. Gothard
701 Cherry Street
Suite 300
Chattanooga, TN 37402

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                    Page 18

Scott, *Substantive Criminal Law*, . § 7.7 (1986))
(emphasis in original).

We conclude that, in the light most favorable to
the prosecution, the evidence was sufficient for a
rational trier of fact to conclude  **\*705** beyond a
reasonable doubt that the defendant was guilty of a
premeditated and deliberated first degree murder.
There was evidence that the defendant and the
victim had a troubled relationship and were in the
midst of a separation. The defendant, according to
one witness, had made threats toward the victim,
including telling Chris Mathis to the effect that no
one could have her if he could not. The defendant
admitted that, on the night of the killing, he was
angry because he felt that the victim had lied to him.

The defendant's testimony included his
procurement of materials used to commit the
offense. He located a tea jug to fill with gasoline in
order to burn the victim's car and he set out to find
the victim. He related how he went to a gas station,
filled the jug with gasoline, purchased a cigarette
lighter and put paper towels in the opening of the
jug. Also, the defendant's testimony clearly
recounted his actions in searching for the victim.
He went to the victim's place of employment and to
her grandmother's house. He drove through the
parking lots of numerous bars and nightclubs in his
effort to find the victim. His testimony included the
names of each establishment, the roads he traveled
and his actions. Notwithstanding the defendant's
testimony that he only intended to burn the victim's
car, a rational trier of fact could infer planning
activity from such evidence.

When finally locating the victim, he told her that
he was going to burn her car, but he prevented her
from leaving the scene or locking herself inside the
car by taking her car keys. According to the
defendant's own testimony, an argument ensued and
he returned to his car to retrieve the gasoline jug.
The defendant further admitted that he was aware
the victim was lying prone on the front seat when he
lit the gasoline jug and threw it into the car. The
defendant fled the scene and later denied to police
that he committed the offense.

We conclude that this evidence was sufficient for a
rational trier of fact to find the elements of
premeditation and deliberation beyond a reasonable
doubt. The defendant's contentions that his actions
were indicative of anger, passion and an intent to
burn the victim's car are unavailing. The jury heard
the defendant's testimony in this regard and could
rationally conclude that his actions were consistent
with an intent to kill and deliberation. Moreover,
although the defendant testified that he had been
drinking on the night in question, he recounted his
actions and whereabouts with clarity and detail.

The defendant attacks certain aspects of the state's
proof that purportedly demonstrate the elements of
premeditation and deliberation and offers other
inferences that could have been drawn. For
instance, he argues that the evidence regarding the
extent of the victim's injuries did not by itself
establish premeditation. *See, e.g., Brown*, 836
S.W.2d at 546. He contends that the opinion
testimony relative to the "pouring" of gasoline on
the victim was speculative and inadmissible, and, in
any event, not probative of the elements of the

offense. He contends that the inference that he
broke the driver's side window of the victim's car
before setting it ablaze conflicted with testimony that
the driver's door was open and that, in any event,
such evidence would indicate anger, not
deliberation. The defendant further argues that
evidence relative to his prior threats against the
victim must be viewed in contrast to the evidence
that he and the victim continued to have contact with
one another after their separation. Finally, he
argues that evidence that he procured the materials
with which to make the bomb was not probative of
premeditation, but rather could have been done in a
state of passion. *See, e.g., West*, 844 S.W.2d at
148.

Essentially, the defendant's contentions require a
reweighing of the evidence, something this court
may not do. That is, it is of no consequence that
alternative inferences might exist depending upon
what view of the evidence is made, because our
review is limited to whether or not the jury's guilty
verdict is rationally supported by the evidence when
viewed in the light most favorable to the state.
Under such a review, we conclude that the
circumstances of the killing and the inferences that
can be rationally drawn from the evidence by the
jury are sufficient to  **\*706** sustain the first degree
murder conviction. T.R.A.P. 13(e); *Jackson v.
Virginia*, 443 U.S. at 318, 99 S.Ct. at 2789.

II.

The defendant contends that the trial court erred in
allowing evidence about the previous fires set to the
victim's car on April 1, 1991 and April 6, 1991.
He argues that said evidence was not relevant to a
material trial issue and it was improperly used to
prove that he committed the offenses on April 17,
1991. The state insists that the trial court's rulings
with respect to evidence of the earlier fires were
correct.

Testimony regarding fires to the victim's car on
April 1st and April 6th 1991 was elicited through
several witnesses. Gloria Mathis, the victim's
grandmother, testified that the defendant had burned
the victim's car twice before the offenses in
question. The defendant objected based upon a lack
of proof that the defendant committed either fire.
The defendant requested that Ms. Mathis' statement
be stricken from the record and that a curative
instruction be issued or that the trial court grant a
mistrial. The prosecution contended that the
evidence of the earlier fires was intended to show
the victim's state of mind and a show a "pattern of
conduct by the defendant" through the similarity of
the offenses.

The trial court ruled that it would allow testimony
only about prior burnings that related to the
defendant. The state assured the court that it would
present a witness who would testify that the
defendant had set the April 6th fire. The trial court
overruled the defendant's objection relative to any
evidence of prior fires "on the stipulation that if [the
defendant's involvement is] disproven, [it would]
sustain the motion for a mistrial." The trial court
sustained the defendant's objection to Ms. Mathis'
statement and instructed the jury to disregard the
witness' statement that the car had been burned
"twice before."

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Ms. Mathis was then questioned about the April 6th fire but did not implicate the defendant as the person who had caused the fire. The trial court instructed the jury that Ms. Mathis' testimony relative to the April 6th fire was being admitted contingent upon it being made relevant at a later time. Her son, Chris Mathis, was later permitted to relate facts regarding the April 6th incident. In fact, it was Chris Mathis, an eyewitness, who connected the defendant to the April 6th fire. The defense, who had earlier noted an "ongoing objection," did not contemporaneously object to Chris Mathis' testimony.

Before the testimony of Viola Wylene Price, the prosecution advised the court that Price and Commander Earl Atchley of the Chattanooga Fire Department would relate statements made by the victim on the scene to the effect that the defendant had burned her car on two previous occasions. The prosecutor argued that the evidence was relevant to the victim's state of mind, insofar as she knew the defendant's prior acts and therefore would not have associated with him voluntarily. The defense again noted that such evidence of prior acts would lead the jury to conclude that the defendant had committed the acts for which he was being tried. The trial court ruled that the victim's statements were admissible as "excited utterances." *See* Tenn. R. Evid. 803(2). The court further ruled that it would instruct the jury that the statements were admitted to show the victim's existing state of mind but not "as to whether there were in fact two prior fires or whether there weren't two prior fires."

Price was allowed to testify that the victim told her that the defendant had tried to set fire "to her twice before." Likewise, Atchley testified that the victim said that the defendant had committed the offense and that he was the "same guy that set the automobile on fire on the 6th." The trial court, on each occasion, instructed the jury that the statements were "excited utterances," and not offered to prove the defendant committed the prior fires.

Ed Forester and Mike Donnelly testified relative to the prior fires in the course of their testimony about their investigations. Before Forester's testimony, the prosecution informed the trial court that the witness would relate his findings with regard to his April 1st and April 6th investigations. The *707 state argued that the evidence was relevant to show the victim's state of mind with regard to her relationship with the defendant and to rebut the defendant's theory that the victim was with the defendant willingly on the night of her death. The defense objected on the grounds that Forester's statement that the victim suspected the defendant of the April 1st fire had nothing to do with her state of mind and that there had been no evidence connecting the defendant to the April 1st fire. The trial court sustained the defendant's objection relative to evidence of the April 1st fire, stating that it was too remote and that the victim's mere suspicion of the defendant for the April 1st fire was not enough to allow its introduction. The trial court also ruled that Forester could testify to the April 6th fire because there had been proof of the defendant's involvement. The court further noted that evidence of the April 6th fire had been admitted because "it was relevant and probative to the issue of premeditation and intent of the defendant when he ... set the fire on

April the 17th, ... since there was proof that he himself actually set the fire."

Forester then testified that he had met the victim on April 1, 1991, and that he had investigated a fire to the victim's car on April 6, 1991. He related the details of the April 6th fire. At one point in this testimony, he refers to "both previous fires." The defendant later objected out of the presence of the jury but stated no basis for the objection. The trial court stated that it did not hear the reference to more than one previous fire and never ruled on the defendant's objection..

Donnelly testified that the investigation of the victim's car revealed evidence of "three separate and distinct fires." He added that he learned fires had been set to the car on April 1st and April 6th, in addition to the day of the offenses being tried. The defense objected to his testimony and moved for a mistrial on the basis of the cumulative references that had been made to the earlier fires. The trial court denied the mistrial motion because it did not think that the defendant had suffered any prejudice. However, the trial court offered a curative instruction for the jury to disregard the reference to the April 1st fire, but the defendant declined the instruction.

As the defendant correctly notes, evidence that an accused has committed some other crime or bad act independent of that for which he is charged is generally inadmissible, even though it may be a crime or act of the same character as that on trial. Tenn. R. Evid. 404(b);    *State v. Howell,*    868 S.W.2d 238, 254 (Tenn.1993); *Bunch v. State,* 605 S.W.2d 227, 229 (Tenn.1980). However, if evidence that a defendant has committed a crime separate and apart from the one on trial is relevant to some matter actually in issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. Tenn. R. Evid. 404(b);    *Howell,* 868 S.W.2d at 254. Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent or the rebuttal of accident or mistake defenses. In *State v. Parton,* 694 S.W.2d 299, 301 (Tenn.1985), the supreme court stated that admissibility was also contingent upon the trial court finding clear and convincing evidence that the prior crime, wrong or act was committed by the defendant. *See, e.g., State v. Holman,* 611 S.W.2d 411, 412-13 (Tenn.1981).

As our previous recital of the facts indicates, the record does not provide a pattern of clear cut testimony, objections and rulings regarding the previous fires. Sometimes the defendant objected without specifying the basis of the objections, one time he claimed a continuing objection, while other times there was no specific objection made. The trial court's rulings were, similarly, often not specific. In this respect, we note that at no time did either of the parties refer to Rule 404(b) or request a jury-out hearing as provided by Rule 404(b) at which specific rulings upon each questioned proffer of evidence could be made. *See, e.g., State v. Bigbee,* 885 S.W.2d 797, 806 (Tenn.1994). As the rule indicates, the trial court was not obligated to conduct such a hearing absent a request. In any event, the ultimate result is that there is no record of a trial court analysis and determination regarding

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                          Page 20

issue relevance and potential prejudice.

    *708 Nevertheless, as the state contends, the
record indicates that the evidence of the previous
fires is relevant to the defendant's motive and intent
regarding his conduct for which he is now being
tried. In this respect, we note that the trial court
stated at one point that the April 6th fire was
relevant to intent and premeditation. We agree. In
*State v. Smith*, 868 S.W.2d 561 (Tenn.1993), the
defendant objected to the introduction of evidence
that he committed previous assaults against his
estranged wife, one of the murder victims. The
defendant claimed that the evidence violated Rule
404(b). The supreme court stated:

    In response to the Defendant's assertions that the
    evidence of the two episodes was irrelevant and
    inadmissible under Tenn. R. Evid. 404(b), the
    State cites a line of cases,    *see, e.g.,    State v.
    Turnbill*, 640 S.W.2d 40, 46-7
    (Tenn.Crim.App.1982); and   *State v. Glebock*,
    616 S.W.2d 897, 905-906 (Tenn.Crim.App.1981),
    which hold that    *violent acts indicating the
    relationship between the victim of a violent crime
    and the defendant prior to the commission of the
    offense are relevant to show defendant's hostility
    toward the victim, malice, intent, and a settled
    purpose to harm the victim.*    Also, in the present
    case, the victims, despite the Defendant's threats
    to kill them if they did so, had filed charges
    against the Defendant based on these prior
    assaults. The evidence of these violent episodes
    was admitted not to prove the Defendant acted in
    accord with his character but as part of the proof
    establishing his motive for the killings. The
    probative value of this evidence is not outweighed
    by the danger of unfair prejudice.

*Smith* at 574 (emphasis added) (citations omitted).
We believe the facts in the present case are similar
to those in *Smith*. The defendant committed prior
acts of arson toward the victim and charges were
brought. The defendant was aware of the charges.
As in *Smith*, these facts were highly probative of the
defendant's motive and intent. We conclude that the
probative value of the evidence is not outweighed by
the danger of unfair prejudice and was, therefore,
admissible.

                            III.

    The defendant argues that the trial court erred by
admitting a photograph taken of the victim at an
autopsy. He argues that the victim's appearance in
the photograph had been altered by medical
procedures and that the prosecution's expert witness,
as well as lay witnesses, were able to describe the
victim's condition without the use of photographs.
The state contends that the photograph was relevant
to show the nature of the victim's injuries and that
the trial court did not abuse its discretion in this
regard.

    The record indicates that the prosecution sought to
introduce a series of four photographs, contending
that they accurately depicted the consistency of the
burns received by the victim. Dr. Merriman
testified that the photographs would best illustrate
her testimony, although she conceded that she could
describe the victim's condition, including her
charred, hardened and discolored skin, without

them. Dr. Merriman also admitted that the
photographs, taken at the autopsy, did not reflect the
victim's condition at the time of her admittance to
the hospital. In this regard, she acknowledged that
incisions had been made in the victim's skin and that
fluids provided to the victim produced a swelling to
her body, eyes, lips and tongue.

    Nonetheless, the *trial* court ruled that one of the
photographs, which depicted the victim's back as
she lay on her side, was admissible, stating that it
was representative of all the burns and was relevant
to assist the jury in understanding the seriousness
and degree of the burns. The trial court ruled that
the other photographs, which more graphically
depicted the victim's head, torso, face and
extremities, were inadmissible because their
probative value was outweighed by the danger of
unfair prejudice.

    The leading case regarding the admissibility of
photographs of murder victims is    *State v. Banks*,
564 S.W.2d 947 (Tenn.1978), in which the supreme
court indicated that the determination of
admissibility is within the discretion of the trial
court after considering the relevance, probative
value and potential *709 unfair prejudicial effect of
such evidence. The general rule, as stated in *Banks*,
is that "photographs of the corpse are admissible in
murder prosecutions if they are relevant to the issues
on trial, notwithstanding their gruesome and
horrifying character." *Id.* at 950-951 (citing *People
v. Jenko*, 410 Ill. 478, 102 N.E.2d 783 (1951)). On
the other hand, "if they are not relevant to prove
some part of the prosecution's case, they may not be
admitted solely to inflame the jury and prejudice
them against the defendant." *Banks*, 564 S.W.2d at
951 (citing *Milam v. Commonwealth*, 275 S.W.2d
921 (Ky.1955)).

    Thus, even relevant evidence should be excluded if
its probative value is substantially outweighed by the
danger of unfair prejudice to the defendant. *Banks*,
564 S.W.2d at 951;  *see also* Tenn. R. Evid. 403.
In *Banks*, the court stated that "[t]he more gruesome
the photographs, the more difficult it is to establish
that their probative value and material characters outweigh
their prejudicial effect." 564 S.W.2d at 951
(citation omitted). Also, it noted that autopsy
photographs are often condemned "because they
present an even more horrifying sight and show the
body in an altered condition...." *Id.* (FN3)

    In the present case, the admitted photograph did
depict the victim in a different condition due to the
treatment procedures that had been administered.
This factor weighs against admissibility. *Banks*, 564
S.W.2d at 951. Likewise, the testimony of Dr.
Merriman and several lay witnesses conveyed the
graphic and extensive nature of the victim's burns
and the extent of her injuries, further weighing
against the admission of the photograph. *Id.* On the
other hand, the trial court found that the photograph
was relevant to "the seriousness and the degree of
the burns." The trial court ruled that the
photograph showed the nature of the injury and the
consistency of the burns received by the victim.
This, in turn, was relevant to an assessment of how
the offense was committed by the defendant. We
note that part of the prosecution's theory, as related
by Dr. Merriman and Mike Donnelly, was that the
victim's injuries were consistent with a dousing of

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

flammable material, and not just a splashing or splattering. In this regard, the evidence was relevant to the manner in which the offense occurred and to clarify testimony on the issue. *See, e.g., Banks,* 564 S.W.2d at 951. *See also Smith,* 868 S.W.2d at 576 (trial court did not abuse its discretion in allowing autopsy photograph of victim during guilt phase in part to illustrate testimony); *State v. Caughron,* 855 S.W.2d 526, 536 (Tenn. 1993).

The trial court excluded several other photographs that were more graphic in nature on the ground that their probative value was substantially outweighed by the risk of prejudice to the defendant. By contrast, the photograph that was admitted was more limited in nature, revealing the victim's back as she lay on her side. Given the trial court's full consideration of this issue, as evidenced by its admission of one photograph and exclusion of several others, we conclude that the trial court did not abuse its discretion in this regard. *Banks,* 564 S.W.2d at 951. *See also Smith,* 868 S.W.2d at 576; *State v. Van Tran,* 864 S.W.2d 465, 477 (Tenn. 1993); *Caughron,* 855 S.W.2d at 536; *Cazes,* 875 S.W.2d 253, 263 (Tenn. 1994). It was not error for the trial court to admit this photograph.

### IV.

The defendant contends that the trial court erred in allowing "misleading and speculative" opinion testimony about how gasoline was used in the homicide. In essence, Mike Donnelly, a Tennessee Fire Marshall arson investigator, gave his opinion that the gasoline had been "poured rather than thrown" onto the victim. The defendant contends that Donnelly's testimony does not meet the four-part test for admission of scientific expert     **\*710** testimony provided in *State v. Williams,* 657 S.W.2d 405, 412 (Tenn. 1983). In *Williams,* our supreme court recognized the following requirements for expert testimony: (1) the witness must be an expert, (2) the subject matter of the witness' testimony must be proper, (3) the subject matter must conform to a generally accepted explanatory theory, and (4) the probative value of the witness' testimony must outweigh its prejudicial effect. *Id.* at 412. In fact, the defendant now claims that Donnelly's testimony met none of these factors.

Unfortunately, the defendant's objections at trial were not so plainly stated. Donnelly testified in detail to substantial training and experience relative to fire and explosion investigations. Without objection, the trial court accepted him as an expert witness in the field of arson investigation. Donnelly testified that he believed that the fire had been started on the driver's side of the car, both front and rear seat areas. He indicated that these areas had suffered the greatest amount of damage and were where the greatest amount of combustibles had been consumed. Donnelly said that gasoline had been applied to the driver's side of the car as an accelerant. He also testified that based on his examination of the car and his viewing of the photographs of the victim's burns, he believed that the gasoline had been poured directly onto the victim. He said that his belief was based upon the fact that damage was limited to the interior of the car, being confined to the driver's side of the car, both front and rear. Likewise, he relied upon the

fact that both the front and back of the victim's body was burned, an indication that accelerant was not just splashed onto her while she was in the car.

During the course of this testimony, the defendant's objection primarily related to the fact that Donnelly was not a doctor, in terms of his attempting to interpret how an accelerant was applied to the victim's body. The trial court concluded that Donnelly was entitled to give his opinion based upon his expertise, his review of the autopsy photographs, the lab and investigative reports, and his personal inspection of the materials and car. In this respect, the trial court's ruling was within its discretion and was appropriate. *See State v. Ballard,* 855 S.W.2d 557, 562 (Tenn. 1993).

The more specific attacks upon Donnelly's testimony that the defendant now raises under *Williams* cannot be pursued because they were not previously raised. Obviously, if any question had been raised in the trial court about the reliability of the scientific principles involving fire accelerators and paths of burning, full explanation may have been forthcoming from Donnelly or other experts. Without proper objection, we will not fault the trial court or the state for not presenting a greater foundation for the opinions Donnelly gave. Otherwise, we note that expert testimony regarding the nature of accelerants or the paths that fires take is not uncommon. *See, e.g., Otis v. Cambridge Mutual Fire Insurance Company,* 850 S.W.2d 439, 443-444 (Tenn. 1992). In this respect, given the record of Donnelly's expertise, the items he reviewed, and the nature of the conclusions he reached, we are unable to hold that his testimony was improperly speculative or otherwise inadmissible.

### V.

The defendant claims that the trial court gave incorrect instructions to the jury on the first degree murder elements of premeditation and deliberation. As we noted, our supreme court has held that an instruction to the jury that premeditation may be formed "in an instant" should be abandoned. *Brown,* 836 S.W.2d at 546. The court concluded that such an instruction improperly blurs the distinction between premeditation and deliberation and does not properly allow the jury to consider whether a defendant's actions were done with reflection and a cool purpose. *Id. See also West,* 844 S.W.2d at 147.

In the present case the trial court properly instructed the jury on the separate elements of intent, premeditation, and deliberation. However, the instructions also charged that:

Premeditation means that the intent to kill must have been formed prior to the act itself. Such intent to kill may be conceived and deliberately formed in an instant. It     **\*711** is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. It is sufficient that it preceded the act, however short the interval, as long as it was the result of reflection and judgment.

The instruction contained the language the court in *Brown* held should be abandoned. The defendant

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                         Page 22

did not object to the instruction at trial in March of
1992 nor did he raise the erroneous instruction as an
issue in his initial motion for a new trial.    *Brown*
was decided in June 1992 and the defendant included
the issue in his amended motion for a new trial filed
in August 1992.  In denying relief on this ground
during the motion for a new trial hearing, the trial
court noted that   *Brown*   was not to be applied
retroactively and that, in any event, there was
sufficient evidence of premeditation and deliberation
in this case to render any error harmless.  The state
on appeal argues these identical grounds and claims
that the issue is without merit.  We agree.

In *Meadows   v. State,*  849 S.W.2d 748, 754
(Tenn.1993), our supreme court reaffirmed its
position regarding retroactivity when it stated that
"newly announced state constitutional rules will be
given retroactive application to cases which are still
in the trial or appellate process at the time such rules
are announced, unless some compelling reason exists
for not so doing."  The first step in determining
whether a case will be given retroactive application
is whether it announces a new constitutional rule.
"[A] case announces a new constitutional rule when
it breaks new ground or imposes a new obligation on
the States or the Federal Government."  *Teague v.
Lane,* 489 U.S. 288, 301, 109 S.Ct. 1060, 1070,
103 L.Ed.2d 334 (1989).

This court has held on numerous occasions that the
*Brown* decision did not create a new constitutional
rule.  *See, eg.,   Lofton v. State,*  898 S.W.2d 246
(Tenn.Crim.App.1994), *app. denied,*  (Tenn. Feb.
27, 1995);    *State v. Jimmy Sills,*          No.
03C01-9410-CR-00370, 1995 WL 271726, Hamilton
Co.  (Tenn.Crim.App. May 10, 1995), *app. denied,*
(Tenn. Sept. 11, 1995);      *State v. Joe Nathan
Person,* No. 02C01-9205-CC-00106, Madison Co.,
1993 WL 381218 (Tenn.Crim.App. Sept. 29, 1993);
*State v. Willie Bacon, Jr.,* No. 1164, Hamilton Co.,
1992 WL 183534 (Tenn.Crim.App. Aug. 4, 1992),
*app. denied.*  Also, as stated in *Lofton,* the supreme
court did not hold in  *Brown* that the instruction on
premeditation violated a constitutional right.  *Lofton,*
898 S.W.2d at 249-250.  It only stated that it would
be prudent to abandon the instruction because of the
potential for confusion.  *Id.*  We conclude that the
trial court did not err in its instructions relative to
the elements of premeditated and deliberated first
degree murder.

SENTENCING PHASE

I.

The defendant argues that the trial court erred by
requiring the defense to disclose a report that had
been prepared by his court-appointed investigator,
Colin Mitchell, through the testimony of Dr. Meyer.
The defendant argues that the report was attorney
work product and was privileged.  He argues that he
was prejudiced by the disclosure because the
prosecution was then permitted to cross-examine Dr.
Meyer regarding numerous acts committed by the
defendant as a child, and then argue these acts to the
jury during summation.  The state concedes that the
report was undiscoverable work product under Rule
16(b)(2), Tenn. R.Crim. P., (FN4) but argues that
because the defendant allowed Dr. Meyer to review
the report before testifying, the report is
discoverable as a basis of his evaluation.  They also

argue that the specific instances of conduct were
properly admitted as an impeachment of Dr.
Meyer's evaluation that the defendant exhibited
various character traits consistent with both a
borderline personality disorder and a post-traumatic
stress disorder by showing,   *712  instead, that the
defendant also exhibited several character traits of
an antisocial personality disorder.  We agree.

Rule 703, Tenn. R. Evid., provides that an expert
may base his or her opinion on facts or data
"perceived by or made known to the expert at or
before the hearing."  Furthermore, Rule 705, Tenn.
R. Evid., provides that the court may require
disclosure of the underlying facts or data relied upon
by the expert in formulating his opinion.  Dr. Meyer
testified that he completed his evaluation and report
of the defendant in December 1991.  On cross-
examination, he testified that he relied upon the
defendant's statements and the investigator's report
to develop facts surrounding the defendant's
background.  In a jury-out hearing, Dr. Meyer
testified that he received the investigator's report
about one week prior to trial, used it to verify
various aspects of the defendant's childhood and
educational background, and considered it before
testifying at trial.  When cross-examination
resumed, Dr. Meyer admitted that he altered his
opinion of the defendant's evaluation somewhat after
reviewing the investigator's report relative to the
defendant's childhood background and behavior.
Thus, information in the investigator's report helped
form a basis for Dr. Meyer's opinions and it was
then subject to disclosure to the state.

Relative to the defendant's claim that he was
prejudiced by the cross-examination of Dr. Meyer
about several instances of the defendant's setting fire
to things as a child, the state argues that the specific
instances of conduct were used as a basis to impeach
Dr. Meyer's evaluation and to show that the
defendant exhibited character traits associated with
an antisocial personality disorder.  As discussed
earlier, Rule 404(b), Tenn. R. Evid., deals with the
admission of prior bad acts of the defendant.  A
jury-out hearing was held in which the trial court
ruled that specific instances of conduct could be
discussed relative to the reliability of Dr. Meyer's
diagnosis.  We conclude that the prior bad acts
contained in the investigator's report upon which
Dr. Meyer, in part, based his evaluation of the
defendant were admissible to impeach the doctor's
diagnosis and that the danger of their prejudicial
effect did not outweigh their probative value.

II.

The defendant contends that the trial court erred
with regard to its instructions to the jury on the
mitigating circumstances in T.C.A.              §
39-13-204(j)(2) and (j)(8).  The T.C.A.         §
39-13-204(j)(2) circumstance is that the "murder
was committed while the defendant was under the
influence of extreme mental or emotional
disturbance."   The T.C.A.     §  39-13-204(j)(8)
circumstance is that the "capacity of the defendant to
appreciate the wrongfulness of [his] conduct or to
conform [his] conduct to the requirements of the law
was substantially impaired as a result of mental
disease or defect or intoxication which was
insufficient to establish a defense to the crime but

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

which substantially affected the defendant's judgment." The defendant contends that the use of "extreme" in the former provision and "substantially" in the latter, deprived the jury of potential mitigation evidence that falls short of these standards.

The defendant's argument was rejected by our supreme court in addressing the identically worded provisions under the previous death penalty statute. *State v. Smith*, 857 S.W.2d 1, 16-17 (Tenn.1993). *See also* T.C.A. § 39-2-203(j)(2)and (j)(8). The defendant in *Smith* argued that "the use of the modifier in (j)(2) and (j)(8), misled the jury in its consideration of evidence of his mental and emotional impairments and intoxication at the time of the offense." The supreme court, however, concluded that there was no likelihood of the jury being misled by these provisions. *Smith,* 857 S.W.2d at 17.

Also, the defendant's contention that the jury is not provided a basis upon which to consider mitigating evidence that falls short of being "extreme" or "substantial" is unavailing. As the state notes, the jury was instructed on T.C.A. § 39-13-204(j)(9), which provides that the jury may consider " *[a]ny* other mitigating factor that is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearings." (Emphasis added). We note as well that a considerable portion of the defense *713 argument to the jury related to the various aspects of the defendant's mental and emotional states, from his youth to the time of trial. Thus, the qualifiers in the statutory provisions in question did not unconstitutionally limit the jury's consideration of mitigating evidence. *Cazes,* 875 S.W.2d at 268. We conclude that the defendant is not entitled to relief on this issue. (FN5)

### III.

As a corollary to the preceding issue, the defendant argues that the trial court erred in refusing to allow certain evidence that the defense claimed was mitigating in nature. We note, of course, that under the Eighth and Fourteenth Amendments to the United States Constitution, a capital sentencer must not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and any circumstances of the offense offered by the defendant as a basis for a sentence less than death. *Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 1670, 90 L.Ed.2d 1 (1986); *Lockett v. State,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). In addition, T.C.A. § 39-13-204(c) provides:

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; and evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. *Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its*

*admissibility under the rules of evidence;* provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted....

(emphasis added). The trial court therefore maintains its authority to determine the admissibility of evidence offered in the sentencing phase and to exclude any evidence not relevant to the above factors. *See, e.g., Smith,* 857 S.W.2d at 17; *State v. Johnson,* 632 S.W.2d 542, 548 (Tenn.1982); *see also Lockett,* 438 U.S. at 604, n. 12, 98 S.Ct. at 2964, n. 12.

In determining the effect of an error excluding relevant mitigating evidence, we look to the standard set forth in *Skipper.* There, the United States Supreme Court held that an error in excluding evidence is not harmless if the exclusion of the evidence "may have affected the jury's decision to impose the death sentence." *Id.* at 8, 106 S.Ct. at 1673. In *Skipper,* the trial court had excluded the testimony offered relative to the defendant's good behavior and adjustments since his incarceration for the offense. The Supreme Court concluded that the "exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender." *Id.*

In the present case, the defendant sought to elicit testimony from the defendant's mother relative to the nature of the defendant's relationship with the victim. The witness related that the couple was very happy for the first few years of their relationship but started having problems the past two years. The couple separated and reconciled several times. The trial court sustained an objection as to what the victim told the witness about the relationship in November 1990; however, the defendant made no proffer of evidence in this regard. *See* Tenn. R. Evid. 103. We, therefore, cannot conclude *714 that the ruling was improper. *See* Tenn. R. Evid. 103(a)(2).

The defendant further elicited from the defendant's mother statements made by the defendant regarding his feelings toward the victim. The prosecution objected because the defense had not specified a time period with regard to the question. The trial court overruled the objection, but limited the defense to questions "within the approximate period of time when the murder took place." The witness was then permitted to testify as to the nature of the relationship from December 1990 to the time of the offense. Again, the defense made no proffer of any additional testimony it sought to admit. The nature of the relationship between the victim and the defendant, insofar as it was a troubled one and had a potential effect on the defendant's mental state, was clearly conveyed to the jury through the testimony of this witness and others. We cannot conclude that the trial court erroneously excluded additional mitigating evidence in this regard. *See, e.g., Smith,* 857 S.W.2d at 17-18.

The defendant also claims that the trial court should have allowed admission of certain photographs as mitigating evidence. The photographs included one of the defendant at thirteen years of age, and several of the victim. The

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

defendant argued that the jury should consider the photos because they depicted how he looked at his mental age of thirteen, and how, according to the defense, the victim "really did look in reality" and not how the state had "represented her to be." The trial court ruled that the photographs were not relevant to any factors in mitigation and excluded them on that basis.

The testimony of Dr. Meyer established clearly his opinion relative to the defendant's emotional and intellectual levels, as well as his mental age. Introduction of the defendant's photo in this regard would arguably have been cumulative. Thus, exclusion of the defendant's photograph, we conclude, did not affect the jury's decision to impose the death penalty. *See, Skipper,* 476 U.S. at 8, 106 S.Ct. at 1672-73. The defendant's claim with regard to the victim's photographs are also without merit. First, he failed to show how such evidence, purporting to show what the victim "really" looked like, would have been relevant in mitigation. T.C.A. § 39-13-204(c). Second, we cannot, on this record, conclude that the exclusion of such photographs affected the jury's decision to impose the death penalty. Accordingly, the trial court did not abuse its discretion in excluding this evidence. *See Smith,* 857 S.W.2d at 17-18.

Finally, the defendant argues that the jury should have been allowed to consider the medical histories of the victim's past abortions as mitigation evidence. In ruling on this issue, the trial court said:

There's proof before this jury, the defendant testified about [the victim] having an abortion, that it was weighing on his mind, and that ... he was concerned about the fact that she might be pregnant and have another abortion. That testimony was introduced without objection from the state and it is before this jury. Whether he was or was not suffering under the fact that she had had abortions ... is a question the jury will have to decide.... It's something that the jury can consider as a mitigating factor.

Thus, the trial court allowed evidence that the victim had abortions in the past. The prosecution objected to admitting the entire records of the procedures and the trial court sustained the objection:

There are some pages that I don't think are relevant, and I don't think it's necessary for the jury to ... know the exact procedure used. The gross description I don't think is necessary to prove at this point what the defense is trying to prove in this case, which is the fact that the defendant knew that she'd had an abortion.

On appeal the defendant has advanced no basis upon which to hold that the trial court's ruling in this regard was an abuse of discretion. The trial court's ruling that the particulars of the abortion procedures were not relevant mitigating factors is supported by the record. *See* T.C.A. § 39-13-204(c) . The evidence in the record, in particular the defendant's testimony in the guilt phase, reveals that the *fact* of the victim's abortions may have affected the defendant's mental *\*715* state, but not the particulars of such procedures. Accordingly, the

defendant is not entitled to relief on the ground that the trial court unconstitutionally deprived the jury of mitigating circumstances. *See Smith,* 857 S.W.2d at 17-18.

IV.

The defendant's final issue consists of numerous constitutional attacks against the Tennessee Death Penalty statute, T.C.A. § § 39-13-204 and--206, under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 8, 9, 16, and 17 of the Tennessee Constitution; and Article II, Section 2 of the Tennessee Constitution. His contentions, generally, are: (A) that the statute fails to narrow in a meaningful manner the class of death eligible defendants, (B) that the death sentence in Tennessee is imposed arbitrarily and capriciously, (C) that death by electrocution is cruel and unusual punishment, and (D) that the manner of conducting a proportionality review of death sentences in Tennessee is constitutionally inadequate.

(a)

The defendant argues that the death penalty provisions fail to narrow in a meaningful manner the class of death eligible defendants in Tennessee. He asserts three arguments in support of this position. First, he contends that the aggravating circumstance in T.C.A. § 39-13-204(i)(6), that the murder was committed "for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," duplicates the felony murder aggravating factor in T.C.A. § 39-13-204(i)(7) (1991). His claim is without merit. Although the state attempted to prove factor (6) in this case, and the jury was so instructed, the jury rejected it. Moreover, the jury's finding of factor (7) has been held to be proper for a conviction of premeditated first degree murder. *See Middlebrooks,* 840 S.W.2d at 346.

Second, the defendant contends that the aggravating circumstance in T.C.A. § 39-13-204(i)(5), that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," is unconstitutionally vague and overbroad. Our supreme court rejected similar contentions, however, in analyzing the former version of this factor, T.C.A. § 39-2-203(i)(5), which read: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." *See State v. Black,* 815 S.W.2d 166, 181-82 (Tenn.1991); *State v. Barber,* 753 S.W.2d 659, 670 (Tenn.1988); *State v. Williams,* 690 S.W.2d 517, 526-30 (Tenn.1985). Likewise, this court has rejected this contention with respect to its current version. *State v. Richard Odom, a/k/a Otis Smith,* No. 02C01-9305-CR-00080, Shelby Co., slip op. at 35, 1994 WL 568433 (Tenn.Crim.App. Oct. 19, 1994), *app. granted on other grounds* (Tenn. Feb. 6, 1995).

Third, the defendant contends that the aggravating factors in T.C.A. § 39-13-204(i)(2), (i)(5), (i)(6), and (i)(7) fail to narrow the class of death eligible defendants because they combine to encompass the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

majority of the homicides in this jurisdiction. There is nothing in the record to support the defendant's argument. Moreover, (i)(2) and (i)(6) do not pertain to this case. Factor (i)(2) was not relied upon by the state and factor (i)(6) was rejected by the jury. Thus the claim with respect to these factors is without merit. *See, e.g., State v. Brimmer,* 876 S.W.2d 75, 87 (Tenn.1994); *State v. Cauthern,* 778 S.W.2d 39, 47 (Tenn.1989).

(b)

The defendant argues that the death penalty in Tennessee is imposed capriciously and arbitrarily. (FN6) He asserts ten arguments in support of this contention. First, he complains that the prosecutors in this state have unlimited discretion as to whether to seek the death penalty in a given case. Second, the defendant argues that the prosecutor's unfettered discretion to subject any defendant *716 charged with first degree murder to a capital sentencing hearing constitutes an improper delegation of judicial power and of legislative power in violation of Article II, Section 2 of the Tennessee Constitution. Third, he argues that such discretion violates state and federal guarantees of equal protection and results in the wanton and freakish imposition of the death penalty that was condemned in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Fourth, the defendant argues that the failure to create a uniform system of jury selection results in unequal treatment for capital defendants that necessarily results in the arbitrary and capricious imposition of the death penalty. Fifth, he argues that the manner of selecting "death qualified" jurors results in juries that are prone to conviction. Sixth, the defendant argues that capital defendants should be allowed to address jurors' popular "misconceptions" regarding parole eligibility, the cost of incarceration versus the cost of execution, general deterrence and the method of execution. Seventh, he argues that it is constitutional error to instruct juries that they must agree unanimously in order to impose a life sentence without telling juries the effect of a nonunanimous verdict. Eighth, he argues that the Tennessee Pattern Jury Instructions create a reasonable likelihood that jurors believe that they must unanimously agree on the existence of any mitigating factors. Ninth, the defendant argues that the Tennessee death penalty statute fails to require that the jury make the ultimate determination of whether death is appropriate in a specific case. And tenth, the defendant submits that it is constitutional error to deny the defendant the right to give final closing argument in the penalty phase of a capital trial based upon his contention that once an aggravating circumstance is proven, the burden of proof shifts to the defendant to present mitigating evidence.

Relative to the defendant's first argument that prosecutors have unlimited discretion as to whether to seek the death penalty in a given case, our supreme court has held that opportunities for discretionary action that inhere in the processing of a murder case, including the authority of the prosecutor to select those persons whom he or she wishes to prosecute for a capital offense, do "not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty freakish or arbitrary." *Brimmer,* 876 S.W.2d at 86 (quoting

*Gregg v. Georgia,* 428 U.S. 153, 198-200, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976). *See also Cooper v. State,* 847 S.W.2d 521, 536-38 (Tenn.Crim.App.1992)) (rejecting similar claim in post-conviction context). This issue is without merit.

Second, the defendant argues that the discretion accorded the prosecution is an improper delegation of legislative and judicial power in violation of Article II, Section 2 of the Tennessee Constitution. The defendant makes reference to costs and expenditures that result from a prosecutor's decision to seek the death penalty and argues that such appropriations must be made by the legislature. He does not, however, offer support for his contention in the record. The state does not address this issue in its brief.

In *State v. Brackett,* 869 S.W.2d 936 (Tenn.Crim.App.1993), the defendant argued that Tenn. R.Crim. P. 5(a), which allows the prosecution to object to the defendant's waiver of a grand jury investigation and jury trial so as to submit to the jurisdiction of the general sessions court, violated Article II, Sections 1 and 2. This court noted:

Article II, § 1 of the Tennessee Constitution provides that the powers of government are to be divided into the Legislative, Executive, and Judicial Departments. In general, the "legislative power" is the authority to make, order, and repeal law; the "executive power" is the authority to interpret and apply law; and the "judicial power" is the authority to interpret and apply law. The Tennessee Constitution provision prohibits an encroachment by any of the departments upon the powers, functions and prerogatives of the others.... The branches of government, however, are guided by the doctrine of checks and balances; the doctrine of separation of powers is not absolute....

*717 Brackett,* 869 S.W.2d at 939 (citations omitted). The court also noted that Article II, Section 2 states, "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." *Brackett,* 869 S.W.2d at 940 n. 3. In addressing the defendant's claim, the court noted that the supreme court has the authority to enact rules for our courts, T.C.A. § 16-3-402, and that the rules are approved by resolution of the General Assembly. T.C.A. § 16-3-404. Thus, the court concluded:

The rule to which the defendant objects in this instance was, of course, initiated by the supreme court as a means of improving the criminal procedure in this state. Because the judiciary promulgated and the Legislature approved the rule granting the prosecution the right to reject a non-jury proceeding in the general sessions court, we find no intrusion by either of the other branches of government.

*Brackett,* 869 S.W.2d at 939-40.

We conclude that the reasoning of *Brackett* applies here as well. The district attorney general is given

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

statutory authority to prosecute criminal cases in his or her jurisdiction. T.C.A. § 8-7-103(1). When the death penalty will be sought in a first degree murder case, the prosecutor must afford notice to the defendant of the intent to seek the death penalty, as well as notice regarding the aggravating factors that will be relied upon. Tenn. R.Crim. P. 12.3(b). Thereafter, the proceedings are governed by the provisions passed by the Legislature in T.C.A. § 39-13-204. The defendant in this case has not shown, nor has he cited authority to show, that this functioning violates the separation of powers doctrine under Tennessee law. This issue is without merit.

Third, the defendant argues that the death penalty statute has been imposed discriminatorily on the basis of economics, race, gender and geographic region in the state. This argument has been rejected by the supreme court. *See Brimmer,* 876 S.W.2d at 87 n. 5; *Cazes,* 875 S.W.2d at 268; *Smith,* 857 S.W.2d at 23; *State v. Evans,* 838 S.W.2d 185, 196 (Tenn.1992). Moreover, the record is devoid of evidence indicative of an individualized showing of improper discrimination with regard to the sentencing of the defendant in this case. *See, e.g., McCleskey v. Kemp,* 481 U.S. 279, 292-93, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987); *Cooper,* 847 S.W.2d at 531.

Fourth, the defendant submits that the failure to create a uniform system of jury selection results in unequal treatment for capital defendants and necessarily results in arbitrary and capricious imposition of the death penalty. Specifically, the defendant contends that all capital defendants should be guaranteed individual sequestered voir dire and a questioning process which would maximize the prospective jurors' candor.

Our supreme court has rejected the argument that the lack of uniform procedures mandating individual sequestered voir dire during jury selection renders the imposition of the death penalty arbitrary and capricious. In *Cazes,* 875 S.W.2d at 269, the court concluded, without discussion, that this argument had been previously rejected in *Caughron,* 855 S.W.2d at 542. Further, the court has said that the "ultimate goal of voir dire is to insure that jurors are competent, unbiased and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." *Cazes,* 875 S.W.2d at 269. *See also Black,* 815 S.W.2d at 180. In this case, the defendant has not challenged any of the jurors selected or the manner in which the trial court conducted voir dire. This issue is without merit.

Fifth, the defendant argues that the manner of selecting "death qualified" jurors results in juries that are prone to conviction. In *State v. Teel,* 793 S.W.2d 236, 246 (Tenn.1990), *cert. denied,* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990), however, our supreme court stated that "[t]his argument has been rejected by both the Tennessee and United States Supreme Court." *See also State v. Harbison,* 704 S.W.2d 314, 318 (Tenn.1986). The defendant has not offered any evidence in which to substantiate his claim, nor has he presented a principled basis with which to distinguish the supreme court holdings in this area.

**\*718** Sixth, the defendant contends that capital defendants should be allowed to address jurors' popular "misconceptions" concerning parole eligibility, the cost of incarceration versus the cost of execution, general deterrence, and the method of execution in order to avoid arbitrary decision making. This argument, however, has been rejected on several occasions by our supreme court. *See Black,* 815 S.W.2d at 179; *See also Brimmer,* 876 S.W.2d at 86-87; *Cazes,* 875 S.W.2d at 268. Moreover, the defendant did not present any evidence with respect to his contentions.

As his seventh argument, the defendant submits that it is constitutional error to instruct juries that they must agree unanimously in order to impose a life sentence and to prohibit juries from being told the effect of a nonunanimous verdict. *See* T.C.A. § 39-13-204(h). However, this contention also has been repeatedly rejected by the supreme court. *See Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268; *Smith,* 857 S.W.2d at 22-23; *Barber,* 753 S.W.2d at 670-71.

Relative to this issue, the defendant contends that requiring the jury to agree unanimously to a life verdict violates the holding in *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The claim has been held to be without merit under Tennessee law. *See Brimmer,* 876 S.W.2d at 87; *Thompson,* 768 S.W.2d at 250; *State v. King,* 718 S.W.2d 241, 249 (Tenn.1986). In *Brimmer,* the court noted that *McKoy* and *Mills* stand for the principle that any requirement that the jury must unanimously find a mitigating circumstance before it can be considered violates the Eighth Amendment. The court went on to state that the unanimous *verdict* instruction does not violate these principles. *Brimmer,* 876 S.W.2d at 87. *See also Teel,* 793 S.W.2d at 252. In any event, the trial court in the present case instructed the jury that there was no requirement for jury unanimity or agreement as to any particular mitigator. Also, it followed with instructions for each juror to decide the case individually and for each to know that they were *not* required to reach a unanimous verdict regarding mitigators or their weight. Thus, the concerns expressed in *McKoy* and *Mills* are not present in this case.

Eighth, the defendant argues that the Tennessee Pattern Jury Instructions create a reasonable likelihood that jurors are led to believe they must unanimously agree on the existence of any mitigating factors. The supreme court has repeatedly rejected this argument. *See Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268. Moreover, the trial court instructed the jury that "[t]here is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance." It is a well-established rule in Tennessee that a jury is presumed to have followed the instructions of the trial court. *State v. Lawson,* 695 S.W.2d 202, 204 (Tenn.Crim.App.1985).

Ninth, the defendant claims that the statute fails to require that the jury make the ultimate determination of whether death is the appropriate penalty in a

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

specific case. This argument has likewise been rejected by the supreme court. *See Brimmer,* 876 S.W.2d at 87; *Smith,* 857 S.W.2d at 22. The defendant's claim that there is no weighing process for aggravating and mitigating factors is also without merit. In *State v. Bane,* 853 S.W.2d 483, 488 (Tenn.1993), the supreme court said that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is not constitutionally required."

As his tenth and final argument in support of his contention that the death penalty is imposed arbitrarily and capriciously in Tennessee, the defendant contends that once an aggravating circumstance is proven, the burden of proof shifts to the defendant to present mitigating evidence. Therefore, the defendant argues, it is constitutional error to deny the defense the right to give the final closing argument in the penalty phase. This issue has been rejected by the supreme court on numerous occasions. *See Brimmer,* 876 S.W.2d at 87 n. 5; *Cazes,* 875 S.W.2d at 269; *Smith,* 857 S.W.2d at 24; *Caughron,* 855 S.W.2d at 542. In *Smith,* the court said that the "order [of argument] is not inherently **\*719** prejudicial to the defendant or favorable to the state in its use at the sentencing stage of a death penalty proceeding." *Smith,* 857 S.W.2d at 24.

(c)

In another challenge to the death penalty statute, the defendant argues that electrocution is cruel and unusual punishment, therefore, violating the Eighth Amendment of the United States Constitution and Article I, Section 16 of the Tennessee Constitution. Our supreme court rejected this argument in *Black,* 815 S.W.2d at 179, and has since reaffirmed its holding on several occasions. *See State v. Nichols,* 877 S.W.2d 722, 737 (Tenn.1994); *Cazes,* 875 S.W.2d at 268; *Howell,* 868 S.W.2d at 258; *Smith,* 857 S.W.2d at 23; *Bane,* 853 S.W.2d at 489.

(d)

The defendant argues that the appellate review process in death penalty cases is constitutionally inadequate in its application. He contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete and because the appellate courts' methodology of review is flawed. This argument has been specifically rejected by our supreme court on numerous occasions. *Cazes,* 875 S.W.2d at 270-71; *see also State v. Harris,* 839 S.W.2d 54, 77 (Tenn.1992); *Barber,* 753 S.W.2d at 664.

Moreover, the defendant contends that the statutorily mandated proportionality review is conducted in violation of due process and the law of the land. He argues that there is no comprehensive procedure for gathering information in capital cases and no published set of criteria for the review. In support of his claim, the defendant argues that since the promulgation of the current statute in 1977, the supreme court has found no death sentence to be imposed in a disproportionate manner. (FN7)

As previously noted, the appellate review provided for in the statute has been held to afford a meaningful proportionality review. *Brimmer,* 876 S.W.2d at 87-88; *Cazes,* 875 S.W.2d at 270-71. Moreover, our supreme court has relied upon and upheld the use of trial court reports in capital cases pursuant to Rule 12, Tennessee Supreme Court Rules. In *Harris,* 839 S.W.2d at 77, the court noted that it has considered the information in such reports and that, because no two cases or defendants are exactly alike, each review for proportionality must be based on the individual defendant and the nature of the crime. *See also Cazes,* 875 S.W.2d at 270-71 (Rule 12 report not prepared; supreme court's review for proportionality based on its thorough review of the record and Rule 12 reports in other cases). Accordingly, the defendant is not entitled to relief on this basis.

CONCLUSION

In consideration of the foregoing and the record as a whole, the defendant's conviction for first degree murder and sentence of death are affirmed.

/s/ Joseph M. Tipton
Joseph M. Tipton, Judge

CONCUR:

/s/ Gary R. Wade
Gary R. Wade, Judge

/s/ John H. Peay
John H. Peay, Judge

------

REID, Justice, concurring.

I concur in affirming the verdict of guilty of premeditated murder and the sentence of death.

Four issues are before the Court--jury instructions regarding nonstatutory mitigating circumstances, the admissibility of expert testimony, the validity of arson as an aggravating circumstance, and the comparative proportionality review. (FN1)

**\*720.** Any error with regard to mitigating circumstances was not prejudicial.

As discussed in the lead opinion, the testimony of Dr. Roger Meyer as an expert witness was not excluded by the court. When the court advised counsel that any evidence "going towards state of mind that would create a defense or an excuse for this killing" would be allowed, counsel, without explanation, did not call Dr. Meyer as a witness. The error, if any, was not a legal error committed by the court.

I also agree that arson is a valid aggravating circumstance in this case, in which the defendant was convicted of premeditated murder. I would argue that the principle on which *Middlebrooks* is based would preclude the establishment of more than one aggravating circumstance with the same evidence, (FN2) but that is not the situation in this case. Here, the facts that established arson of the vehicle were relevant and admissible evidence

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

694

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                   **Page 28**

concerning the offense, not proof of another aggravating circumstance or an element of premeditated murder.

Although I think the procedure for conducting comparative proportionality review set forth in *State v. Bland* can be further developed, *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997) (Reid, J., dissenting), application of that procedure to the circumstances of the crime and the character of the defendant does not show the sentence of death to be disproportionate. Some of the cases in which the sentence of death was affirmed relied upon in the lead opinion may be similar to this case. The absence of similar cases in which the defendant was sentenced to life imprisonment may be explained by the egregious means whereby the murder was accomplished in this case.

Consequently, I concur.

(FN1.) Although not raised as an issue in this appeal, the trial judge imposed a twenty-five year sentence on the conviction for aggravated arson, consecutive to the death penalty.

(FN2.) "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

(FN3.) Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

(FN4.) In addition to the fire on April 6, 1991, the victim's car was burned on April 1, 1991. The defendant was indicted for arson related to these fires, but the trial court severed these counts, and they were later dismissed.

(FN5.) The defendant went to trial on three charges: (1) first degree murder by an unlawful, intentional, premeditated and deliberate killing, (2) first degree murder by a reckless killing committed during the perpetration of arson (felony murder), and (3) aggravated arson. He entered guilty pleas before the jury to arson and felony murder. After the trial court refused to accept the guilty pleas, the defendant persisted in admitting guilt to those crimes before the jury, contesting only the charge that the killing was premeditated and deliberated. At the conclusion of the proof, the trial court instructed the jury that it could return a guilty verdict for either felony murder or premeditated murder, but not for both. Acting in accordance with the instructions, the jury found the defendant guilty of aggravated assault and premeditated first degree murder. The jury did not report a verdict on the charge of felony murder.

(FN6.) *See* Footnote 4, *supra*.

(FN7.) This evidence was admitted during the sentencing phase as part of the prosecution's attempt to establish the aggravating circumstance in Tenn.Code Ann.   § 39-13-204(i)(6), which provides that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." The jury, however, rejected this factor.

(FN8.) At the time this offense was committed, Tenn.Code Ann.   § 39-13-202(a)(1) (1991) provided that the "intentional, premeditated and deliberate killing of another" constitutes first degree murder. The definition was amended in 1995 and first degree murder is now defined as "the intentional and premeditated killing of another." Tenn.Code Ann.   § 39-13-202(a)(1) (1991 & Supp.1996).

\*720_ (FN9.) Our holding closely resembles the American Law Institute's Model Penal Code which does not mention the term "diminished capacity," but nevertheless provides that "[e]vidence that the defendant suffered from a mental disease or defect shall be admissible whenever it is relevant to prove that the defendant did or did not have the state of mind which is an element of the offense." A.L.I. Model Penal Code § 4.02(1) (Official Draft 1962). The Comment to that Section explains: "[i]f states of mind such as deliberation or premeditation are accorded legal significance, psychiatric evidence should be admissible when relevant to prove or disprove their existence to the same extent as any other relevant evidence."

(FN10.) It is not clear from the record why defense counsel chose not to make a testimonial offer of proof. Whenever counsel sought to do so during this trial, the trial court appropriately granted the request. We have repeatedly stressed the importance of an offer of proof. Not only does it ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded. *State v. Coker,* 746 S.W.2d 167, 171 (Tenn.1987); *State v. Goad,* 707 S.W.2d 846, 853 (Tenn.1986). However, in this case, we can review the issue based upon the substance of Dr. Meyer's testimony at the sentencing hearing.

(FN11.) The trial court in this case did not have the benefit of *Shelton, Phipps,* or *Abrams,* when this ruling was made.

(FN12.) Though not pertinent to admissibility, we note that Dr. Meyer's testimony was greatly weakened by his admission that his conclusions were partially based upon inaccurate and incomplete information, and his refusal, despite that fact, to revise his conclusions.

(FN13.) *See e.g. Provence v. State,* 337 So.2d 783 (Fla.1976).

(FN14.) "Where the intent with which, the mode in, or the means by which, an act is done, are essential to the commission of the offense, and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

such offense may be committed with different intents, in different modes, or by different means, if the jury is satisfied that the act was committed with one (1) of the intents, in one (1) of the modes, or by either of the means charged, it shall convict, although uncertain as to which of the intents charged existed, or which mode, or by which of the means charged, such act was committed."

(FN15.) Because of our conclusion that the error was harmless in this case, we do not address the separation of powers question which arises from the State's assertion that Public Chapter 139 divests reviewing courts of authority to grant relief in a case regardless of a conclusion that prejudicial error has resulted from the failure to give instructions on nonstatutory mitigating circumstances. In reserving this issue for another day, we are mindful of our duty to resolve constitutional conflicts only when absolutely necessary for a determination of the case and the rights of the parties. *Owens v. State,* 908 S.W.2d 923 (Tenn.1995).

(FN16.) The trial judge granted Special Request No. 4, Decision To Be Made By Individual Jurors; Special Request No. 12, Presumption Regarding Aggravating Circumstances; Special Request No. 57, Mitigation-Definition, Weight, Unanimity; Special Request No. 58, Mitigation-Definition; Special Request No. 59, Mitigation-Definition.

(FN17.) "The youth or advanced age of the defendant at the time of the crime."

(FN18.) "The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance."

(FN19.) "The capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment."

(FN20.) Defense counsel argued the following factors should be considered as mitigation. Hall expressed remorse; Hall was young when the offense was committed; Hall had a mental or emotional disturbance because of the failed relationship with the victim; Hall had a mental disease or defect; Hall was intoxicated; Hall was unusually immature for his age; Hall lacked normal emotional development; Hall is a follower and not a leader; Hall, at an early age, exhibited signs of mental or emotional disturbance that went untreated; At the time of the murder Hall's mental or emotional development was significantly below that of persons of his chronological age; Hall is an insecure man with low intelligence; Hall has low self-esteem and self-worth; Hall's basic personality inadequacy created stress and erosion of his self-confidence; Hall has a history of alcohol, drug and/or narcotic abuse and addiction; Hall expressed sorrow for the murder and was willing to plead guilty; Hall's capacity to appreciate the wrongfulness of his conduct was impaired.

*720_ (FN21.) At least 44 of the persons sentenced to death in Tennessee since 1977 were between the ages of 19 and 25 when they committed the murder and at least ten were 18 or 19 when the offense was committed.

(FN1.) The defendant went to trial on three charges: (1) first degree murder by an unlawful, intentional, premeditated and deliberate killing, (2) first degree murder by a reckless killing committed during the perpetration of arson (felony murder), and (3) aggravated arson. However, he entered guilty pleas before the jury to arson and felony murder. After the trial court refused to "accept" the guilty pleas, the defendant persisted in such pleas before the jury, contesting only the charges that the killing was premeditated and deliberate. At the conclusion of the proof, the trial court instructed the jury that it could return a guilty verdict for either felony murder or for a premeditated and deliberated murder, but not for both. Under this instruction, the jury reported that the defendant was found guilty of aggravated arson and premeditated and deliberate murder. No finding regarding a felony murder was reported.

(FN2.) Although not relevant to our inquiry, we note that the definition of first degree murder contained in T.C.A. § 39-13-202 was amended in 1995. *See* T.C.A. § 39-13-202 (Supp.1996).

(FN3.) The defendant relies upon *State v. McCall,* 698 S.W.2d 643 (Tenn.Crim.App.1985), in which the victim had been shot in the chest and later run over and dragged by a car. This court held that it was error to admit photographs of the victim because, with the exception of the gunshot wound, all of the harm to the victim was caused by the subsequent passing of a vehicle. Conversely, in the present case, the photograph that was admitted, although altered, was limited in nature and depicted injuries the victim received as a result of the defendant's conduct. Thus, we do not consider *McCall* to be dispositive of this issue.

(FN4.) In *State v. Nichols,* 877 S.W.2d 722, 730 (Tenn.1994), the supreme court concluded that "when a psychologist or psychiatrist does not prepare a summary report, but instead relies on extensive memoranda to record not only observations and hypotheses but also evaluations, such records are discoverable under Rule 16(b)(1)(B)." In this case, Dr. Meyer prepared an evaluation report in advance of trial and therefore, the investigator's report is considered an internal memorandum and is generally nondiscoverable, as the state concedes, under Tenn. R.Crim. P. Rule 16(b)(2).

(FN5.) We note that the defendant also relies on *Smith v. McCormick,* 914 F.2d 1153, 1163-65 (9th Cir.1990), which we conclude is distinguishable. The Ninth Circuit reversed the denial of habeas corpus relief in part because Montana's death penalty structure interfered with the consideration of mitigating evidence. The defendant is correct that Montana statutes contained similar mitigation factors modified by "extreme" and "substantial." However, Montana statutes also provided that the death penalty was required if the sentencer found

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 679, State v. Hall, (Tenn. 1997)                                   **Page 30**

one or more aggravating circumstance and no mitigating circumstances "sufficiently substantial" to call for leniency. *Id.* at 1163. Tennessee provisions do not contain such a limitation. *See* T.C.A. § 39-13-204(f) and (g).

(FN6.) In support of his contentions, the defendant cites to numerous studies, newspaper articles, law review articles, and journals. There is no evidence in the record, however, with respect to any of his contentions. *See, e.g., Smith,* 857 S.W.2d at 23.

(FN7.) We note, however, that in *State v. Branam,* 855 S.W.2d 563 (Tenn.1993), the supreme court found the death penalty to be disproportionate and reduced the defendant's sentence to life. *Id.* at 570-71.

(FN1.) No issue is made regarding the sufficiency of the evidence to support the aggravating circumstances or the finding that the aggravating circumstances outweigh the mitigating circumstances. Tenn Code Ann. § 39-13-204(g)(1) (Supp. 1996).

\*720_  (FN2.) *State v. Middlebrooks,* 840 S.W.2d 317, 352 (Tenn. 1992) ("the constitutional deficiency is that the aggravating circumstance does not narrow the class, not that it duplicates the elements of the offense.").

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

**\*147** 46 S.W.3d 147

Supreme Court of Tennessee,
at Nashville.

John David **TERRY**
v.
**STATE** of Tennessee.
April 25, 2001.
Rehearing Denied May 18, 2001.

Defendant was convicted in a jury trial in the
Criminal Court, Davidson County, Randall Wyatt,
J., of premeditated first-degree murder and arson,
and was sentenced to death. Defendant appealed.
The Court of Criminal Appeals affirmed.
Defendant appealed. The Supreme Court, Barker,
J., held that: (1) prosecutor's closing argument did
not improperly present jury with non-statutory
aggravating circumstances to be weighed against
mitigating circumstances; (2) evidence supported
death penalty aggravating circumstances of murder
that was especially heinous, atrocious, or cruel; (3)
evidence supported aggravating circumstance of
murder to prevent arrest; and (4) death penalty was
not disproportionate.

Affirmed.

Birch, J., dissented and filed opinion.

West Headnotes

[1] Sentencing and Punishment ⬤⇒1789(9)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)4 Determination and Disposition
          350Hk1789 Review of Proceedings to Impose
                   Death Sentence
    350Hk1789(9) Harmless and Reversible Error.
  Any irregularity in trial court's instructions
regarding the weighing standard under language of
amended capital sentencing statute was harmless,
where instructions required jury to impose death
penalty on a higher standard of proof. T.C.A.    §
39-13-204.

[2] Criminal Law ⬤⇒713
  110 ----
    110XX Trial
      110XX(E) Arguments and Conduct of Counsel
        110k712 Statements as to Facts, Comments, and
                Arguments
        110k713 In General.

[See headnote text below]

[2] Criminal Law ⬤⇒730(1)
  110 ----
    110XX Trial
      110XX(E) Arguments and Conduct of Counsel
        110k730 Action of Court
        110k730(1) In General.

[See headnote text below]

[2] Criminal Law ⬤⇒1154
  110 ----
    110XXIV Review
      110XXIV(N) Discretion of Lower Court

        110k1154 Arguments and Conduct of Counsel.
  Attorneys are given greater leeway in arguing their
positions before jury, and trial court has significant
discretion in controlling these arguments, to be
reversed only upon a showing of abuse of discretion.

[3] Sentencing and Punishment ⬤⇒1756
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)2 Evidence
          350Hk1755 Admissibility
    350Hk1756 In General.
  In a capital sentencing hearing, evidence may be
presented tending to establish or rebut any statutory
aggravating circumstances or mitigating
circumstances.

[4] Sentencing and Punishment ⬤⇒1759
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)2 Evidence
          350Hk1755 Admissibility
          350Hk1759 Nature and Circumstances of
                   Offense.
  In a capital sentencing hearing, jury must be
permitted to consider evidence pertaining to nature
and circumstances of crime even if proof is not
necessarily related to a statutory aggravating
circumstance.

[5] Sentencing and Punishment ⬤⇒1656
  350H ----
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in
               General
        350Hk1656 Factors Extrinsic to Statute or
                 Guideline in General.
  State may not rely upon non-statutory aggravating
circumstances in seeking imposition of death
penalty.

[6] Sentencing and Punishment ⬤⇒1645
  350H ----
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in
               General
        350Hk1645 In General.
  In determining whether death is appropriate
punishment for offense and for individual defendant,
jury is free to consider "a myriad of factors"
relevant to punishment, that is, relevant to
establishing and assigning weight to aggravating and
mitigating circumstances. T.C.A. § 39-13-204(g)(1)

[7] Sentencing and Punishment ⬤⇒1780(2)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
          350Hk1780(2) Arguments and Conduct of
                     Counsel.
  Prosecutor's penalty-phase closing argument in
which prosecutor listed six factors, such as
"brutality of murder" and "concealment of crime,"
on one side of handwritten chart and mitigating
factors next to those factors did not improperly
present jury with non-statutory aggravating
circumstances to be weighed against mitigating

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                              Page 2

circumstances; rather, prosecutor properly asked jury to consider certain facts and circumstances of offense establishing and giving weight to existence of two death penalty aggravating circumstances that murder was heinous, atrocious, or cruel, and that murder was committed for purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of defendant.

[8] Sentencing and Punishment ☞1652
  350H ----
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
      350Hk1652 Aggravating Circumstances in General.
  Role of death penalty aggravating circumstance is to circumscribe the class of persons eligible for death penalty.

[9] Sentencing and Punishment ☞1625
  350H ----
    350HVIII The Death Penalty
      350HVIII(A) In General
      350Hk1622 Validity of Statute or Regulatory Provision
      350Hk1625 Aggravating or Mitigating Circumstances.
  Statutory death penalty aggravating circumstance is constitutional if it meets two requirements: (1) circumstance may not apply to every defendant convicted of a murder, but must apply only to a subclass of defendants convicted of murder; and (2) circumstance may not be unconstitutionally vague.

[10] Sentencing and Punishment ☞1625
  350H ----
    350HVIII The Death Penalty
      350HVIII(A) In General
      350Hk1622 Validity of Statute or Regulatory Provision
      350Hk1625 Aggravating or Mitigating Circumstances.
  Pre-1989 death penalty aggravating circumstance that murder was especially heinous, atrocious, or cruel was not vague or overbroad. T.C.A. § 39-2-203(i)(5) (Repealed).

[11] Courts ☞97(1)
  106 ----
    106II Establishment, Organization, and Procedure
      106II(G) Rules of Decision
      106k88 Previous Decisions as Controlling or as Precedents
      106k97 Decisions of United States Courts as Authority in State Courts
    106k97(1) In General.
  Supreme Court is not bound by federal court decisions other than those of United States Supreme Court.

[12] Sentencing and Punishment ☞1789(5)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
      350HVIII(G)4 Determination and Disposition
      350Hk1789 Review of Proceedings to Impose Death Sentence
    350Hk1789(5) Scope of Review.
  When sufficiency of evidence supporting a death penalty aggravating circumstance is challenged, appellate court must determine whether, after

viewing evidence in light most favorable to state, a rational trier of fact could have found existence of aggravating circumstance beyond a reasonable doubt.

[13] Sentencing and Punishment ☞1772
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
      350HVIII(G)2 Evidence
    350Hk1772 Sufficiency.
  Evidence supported application of pre-1989 death penalty aggravating circumstance that murder was especially heinous, atrocious, or cruel, in case involving defendant's elaborate murder/arson scheme in which he attempted to simulate his own death and then disappear under an assumed identity; defendant's plan involved murdering an individual similar in size to himself and dismembering corpse to remove identifiable body parts so as to make body appear to be his own, defendant selected victim, who was approximately same size and often wore defendant's clothes, defendant worked for months to foster a close relationship with victim, defendant used his position  *147  as pastor to counsel victim, employ him, find and pay for housing for victim, and eventually earn his trust and friendship, at same time, defendant was hiding weapons at scene of crime in preparation for murder, and on pretense of taking victim on fishing trip, defendant shot and killed victim at his own church, and dismembered corpse as soon as 15 minutes to one hour after victim's death. T.C.A. § 39-2-203(i)(5) (Repealed).

[14] Sentencing and Punishment ☞1772
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
      350HVIII(G)2 Evidence
    350Hk1772 Sufficiency.
  Evidence was sufficient to support finding that defendant committed murder, at least in part, to prevent his apprehension for embezzlement of church funds, so as to warrant application of pre-1989 death penalty aggravating circumstance that murder was committed to prevent arrest, in case involving defendant's elaborate murder/arson scheme in which he attempted to simulate his own death and then disappear under an assumed identity; defendant painstakingly planned his escape to leave behind his old self and start his life anew, under a new identity and with a new appearance such that he could remain "dead" forever, for several months, defendant purchased legal documents under a new name, purchased additional life insurance for provision of his family, and carefully planned murder itself to make it look like he died at hands of victim, and once murder was committed, defendant altered his appearance so as to avoid detection and possible apprehension. T.C.A.  § 39-2-203(i)(6) (Repealed).

[15] Sentencing and Punishment ☞1788(6)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
      350HVIII(G)4 Determination and Disposition
      350Hk1788 Review of Death Sentence
    350Hk1788(6) Proportionality.
  Purpose of comparative proportionality review is to ensure that death penalty is applied consistently

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                                    Page 3

and not arbitrarily or capriciously. T.C.A.    §
39-13-206(c)(1)(D).

[16] Sentencing and Punishment ⊗═══1788(7)
  350H ----
   350HVIII The Death Penalty
    350HVIII(G) Proceedings
     350HVIII(G)4 Determination and Disposition
      350Hk1788 Review of Death Sentence
    350Hk1788(7) Presumptions.
   Presumption is that a sentence of death is
proportional to crime of first-degree murder, as long
as sentencing procedures focus discretion on
particularized nature of crime and particularized
characteristics of individual defendant. T.C.A.    §
39-13-206(c)(1)(D).

[17] Sentencing and Punishment ⊗═══1788(6)
  350H ----
   350HVIII The Death Penalty
    350HVIII(G) Proceedings
     350HVIII(G)4 Determination and Disposition
      350Hk1788 Review of Death Sentence
    350Hk1788(6) Proportionality.
   Applying precedent-seeking approach for
comparative proportionality review of death
sentence, Supreme Court undertakes to compare
current case to other cases in which defendants were
convicted of same or similar crimes, and looks at
facts and circumstances of crime, characteristics of
defendant, and aggravating and mitigating factors
involved. T.C.A. § 39-13-206(c)(1)(D).

[18] Sentencing and Punishment ⊗═══1788(6)
  350H ----
   350HVIII The Death Penalty
    350HVIII(G) Proceedings
     350HVIII(G)4 Determination and Disposition
      350Hk1788 Review of Death Sentence
    350Hk1788(6) Proportionality.
   Because no two cases involve identical
circumstances, Supreme Court's objective in
conducting comparative proportionality review of
death sentence cannot be to limit comparison to
those cases where a defendant's death sentence is
perfectly symmetrical, but only to identify and to
invalidate the aberrant death sentence. T.C.A.    §
39-13-206(c)(1)(D).

[19] Sentencing and Punishment ⊗═══1788(6)
  350H ----
   350HVIII The Death Penalty
    350HVIII(G) Proceedings
     350HVIII(G)4 Determination and Disposition
      350Hk1788 Review of Death Sentence
    350Hk1788(6) Proportionality.
   Nonexclusive factors relevant to process of
identifying and comparing similar cases in
comparative proportionality review of death
sentence include: (1) means of death; (2) manner of
death (e.g., violent or torturous); (3) motivation for
killing; (4) place of death; (5) similarity of victim's
circumstances including age, race, and physical and
mental conditions; and victim's treatment during
killing; (6) absence or presence of premeditation; (7)
absence or presence of provocation; (8) absence or
presence of justification; and (9) injury to and
effects on nondecedent victims. T.C.A.    §
39-13-206(c)(1)(D).

[20] Sentencing and Punishment ⊗═══1788(6)

350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
     350HVIII(G)4 Determination and Disposition
      350Hk1788 Review of Death Sentence
    350Hk1788(6) Proportionality.
   Nonexclusive factors relevant to comparison of
characteristics of defendants in comparative
proportionality review of death sentence include: (1)
defendant's prior criminal record or prior criminal
activity; (2) defendant's age, race, and gender; (3)
defendant's mental, emotional, or physical
condition; (4) defendant's involvement or role in
murder; (5) defendant's cooperation with
authorities; (6) defendant's remorse; (7) defendant's
knowledge of helplessness of victim(s); and (8)
defendant's capacity for rehabilitation. T.C.A.    §
39-13-206(c)(1)(D).

[21] Homicide ⊗═══354(1)
  203 ----
   203XI Sentence and Punishment
    203k354 Nature and Extent of Punishment
    203k354(1) In General.
   Death sentence for premeditated murder of victim
in connection with elaborate murder/arson scheme in
which defendant attempted to simulate his own death
and then disappear under an assumed identity, in
part to avoid apprehension for embezzlement of
church funds, was neither disproportionate to
penalty imposed in similar cases, nor arbitrarily
applied. T.C.A. § 39-13-206(c)(1)(D).

[22] Sentencing and Punishment ⊗═══1657
  350H ----
   350HVIII The Death Penalty
    350HVIII(C) Factors Affecting Imposition in
       General
    350Hk1657 Proportionality in General.
   Although death penalty may be imposed for
offense involving circumstances similar to those of
an offense in which only a sentence of life
imprisonment is imposed, death sentence is not
disproportionate if Supreme Court can ascertain
some basis for imposition of the lesser sentence.
T.C.A. § 39-13-206(c)(1)(D).

   **150  Brock Mehler and Michael E. Terry,
Nashville, TN, for the appellant, John David Terry.

   Michael E. Moore, Solicitor General; Tonya G.
Miner, Assistant Attorney General, Nashville, TN,
for the appellee, State of Tennessee.

OPINION

   BARKER, J., delivered the opinion of the court,
in which ANDERSON, C.J., and DROWOTA, and
HOLDER, JJ., joined.

   The defendant was first convicted of premeditated
first degree murder and arson in 1989.  The jury
found two statutory aggravating circumstances:  (1)
that the murder was especially heinous, atrocious, or
cruel in that it involved torture or depravity of mind;
and (2) that the murder was committed while the
defendant was engaged in committing a larceny.
Finding that the aggravating circumstances
outweighed the mitigating circumstances, the jury
sentenced the defendant to death by electrocution.
This Court granted a new sentencing hearing after

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                                         Page 4

determining that the trial court had erroneously
charged the jury that the murder was committed
while the defendant was committing a larceny. In
1997, a jury again sentenced the defendant to death,
finding that (1) the murder was especially heinous,
atrocious, or cruel in that it involved depravity of
mind, and (2) the murder was committed for the
purpose of avoiding, interfering with, or preventing
a lawful arrest or prosecution of the defendant. The
Court of Criminal Appeals affirmed. On automatic
appeal, we affirm and hold that: (1) no
prosecutorial misconduct occurred when the
prosecutor asked the jury to consider certain facts
and circumstances when weighing statutory
aggravating circumstances against mitigating
evidence; (2) the trial court did not err in allowing
the jury to consider relevant facts and circumstances
tending to establish aggravating circumstances or to
rebut mitigating circumstances; (3) the evidence is
sufficient to support a finding that the murder was
especially heinous, atrocious, or cruel in that it
involved depravity of mind; (4) the evidence is
sufficient to support a finding that the defendant
committed murder to avoid lawful arrest or
prosecution; and (5) the sentence of death is not
disproportionate to the sentence imposed in similar
cases. For all other issues not specifically discussed
in this opinion, we agree with and affirm the Court
of Criminal Appeals.

BACKGROUND

On June 15, 1987, the defendant, John David
Terry, shot and killed church handyman James
Matheney and was sentenced to death in 1989. This
Court remanded the case for resentencing after
determining that the trial court erred in charging the
jury the aggravating circumstance that the murder
was committed while the defendant was engaged in
committing a larceny. (FN1) The resentencing
hearing was conducted *151 in August 1997, and
the jury again returned a verdict of death based upon
its finding of two aggravating circumstances. The
case is now before us on appeal from that judgment.

The events giving rise to the murder occurred
predominantly in March of 1987. At that time, the
defendant was the Associate Bishop Overseer of the
Emmanuel Churches of Christ, a centrally organized
governing body of local churches. He was also the
pastor of one of those local churches--the Woodland
Street Church--in Nashville. For several years, the
defendant believed that the current Bishop Overseer
would retire at the age of 65, and that he would be
appointed the next Bishop. In March 1987,
however, his expectations were disappointed when
the Bishop announced that he was not going to
resign. The defendant testified that soon thereafter,
he became overwhelmed by the sense that he had
failed in life, and he began to contemplate suicide.
However, he ultimately pursued a plan to stage his
death and assume a new identity.

In furtherance of this plan, the defendant, who had
been misappropriating church funds since 1984,
began to withdraw large sums of money from the
church account. He withdrew five thousand dollars
to purchase a motorcycle and another ten thousand
dollars to keep in cash. In April, the defendant
ordered several books advertised in    *Soldier of
Fortune* magazine to learn how to change his
identity. Based on the information he read in these

books, he randomly searched the obituaries at the
local library until he found the obituary of seven-
year-old drowning victim, Jerry Milam, whose birth
date was similar to that of the defendant. He
obtained a copy of Jerry Milam's birth certificate
and forged a copy of a baptismal certificate. Using
these documents, the defendant was able to get a
driver's license, a social security number, a
fictitious mailing address, and the title to the
purchased motorcycle--all in the name of Jerry
Milam.

The defendant also made concerted efforts to
befriend the victim, James Matheney, whose ex-
wife, Teresa Seagraves, was a parishioner at the
defendant's church. The defendant testified that he
had wanted to incorporate Mr. Matheney into his
plan to disappear by staging "some kind of a hoax or
some kind of robbery and have ... [Mr. Matheney]
be the one that would come in and ... find blood or
find some kind of robbery attempt." (FN2)
Accordingly, he spent time fostering a relationship
with Mr. Matheney by counseling him through some
personal problems, hiring the unemployed Mr.
Matheney as the church's second handyman, and
renting an apartment for him, paying the first six
weeks' rent.

On the day of the murder, the defendant and Mr.
Matheney prepared to set out on a fishing trip lasting
for several days. That morning, the defendant
picked up Mr. Matheney at his apartment and drove
*152 to the church. He testified that he gave Mr.
Matheney the keys to his car and his credit card to
buy gasoline for his car while he returned phone
calls made to the church.

The defendant stated that approximately thirty
minutes later, he heard someone come into the
church. When he went to investigate, he noticed
that the fold-down stairwell leading up to the church
attic had been lowered. He climbed the stairs, saw
James Matheney, and shot him in the "side of the
back of the head" with a .38 caliber pistol. (FN3)

He later cut off the victim's head and right
forearm. (FN4) After undressing the victim down
to his underwear and putting his own belt around the
victim's waist, he placed the clothes in one sack and
the body parts in another sack. Leaving the body up
in the attic, he drove off in his car to first dump the
bag containing the victim's clothes, the hacksaw,
and the knife used to dismember the body, into a
dumpster. Thereafter, he purchased two five-gallon
cans, which he filled with gasoline. He loaded them
in the car and drove to a "mini-warehouse" where
his motorcycle was hidden. Leaving the bag of
body parts there, he then drove back to the church to
drop off the gasoline cans.

From there, the defendant drove to the boarding
house where the victim had been renting a room.
He parked his car a few streets away, walked over
to the house, and placed his own wallet in the front
room area. He then took a taxi back to the
warehouse, leaving his car parked near the boarding
house. Inside his car he left the following items: a
beer bottle; a towel smeared with the defendant's
own blood that he had withdrawn the previous night;
some of the defendant's credit cards; and the
victim's tackle box, rod, and reel. The defendant
had placed the victim's fingerprints on the beer

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                                                                    Page 5

bottle and credit cards by taking the victim's severed forearm and applying the hand to these items.

Back at the warehouse, he then proceeded on motorcycle, taking the bag of body parts with him, to Kentucky Lake where he rented a boat. Once on the lake, the defendant tied a weight of some sort to this bag and dropped it into the water. He returned to the church after dark, and, according to his testimony, he removed tattooed pieces of flesh from each of the victim's arms, flushing the pieces down the toilet. Finally, he wrapped the body in a carpet, placed chopped wood in the attic, and then doused the church with gasoline. After one false start, the defendant finally set the church ablaze during the early morning hours of Tuesday, June 16, 1987.

Later that day, the defendant traveled to Memphis and paid cash for a two-night stay in a motel. He only stayed the first night, during which he entertained himself by attending a Double A baseball game. The following day, June 17, he threw his .38 caliber pistol into the Mississippi river and called his lawyer. He testified that he "just knew that [he] was in trouble ... that [he] had killed somebody." He then **153 drove back home to Nashville to turn himself in for the murder.

Meanwhile, the fire department officials conducted a search of the burned church and discovered the body wrapped in a carpet. Medical examiner Dr. Charles Harlan, who conducted the autopsy on the victim's body, testified that the decapitation, the amputation of the right forearm, and the excisions of skin from both shoulders all occurred after the victim's death. However, he further testified that "the cause of death [was] not present in the dismembered body, [but was] located somewhere within the head." His examination at the Forensic Science Center revealed that the head

was very neatly cut all the way across any flesh area. It was just as smooth as if a steak were to be fileted.... When it came to the bone in the back-- through the vertebra in the back, then those areas were--had real distinct saw marks.... The right arm was cut just below the elbow. It also was obvious that it was cut very straight, very neat, until it got to the bone portion and it was a sawing and grains going across the bone that were obvious to my eye.

On June 18, 1987, police apprehended the defendant. Detective Robert Moore testified that the defendant's demeanor upon arrest was "very matter of fact," not demonstrating any emotion whatsoever. Although the defendant was cooperative, Sergeant Moore explained, "I guess I was looking for some remorse or some signs. After being involved in a three day manhunt, like we had, I expected an awful lot more than what I saw. But I saw nothing but just plain straight up-just no sign of emotion at all."

The State also presented the testimony of Bishop Ronald Banks. Bishop Banks described in general the organization of the Emmanuel Churches of Christ, the financial structure of the church as a whole, the responsibilities of the Bishop and Assistant Bishop Overseer, and the role of a pastor for a local congregation. According to Bishop Banks, as the pastor of a local church, David Terry, had ultimate control over all business matters, the

theological doctrine, and any administrative matters concerning his individual church; however, he was required to abide by the rules and bylaws of the church organization. He failed to follow church rules when he deposited the proceeds of the sale of some church property into the tithing account, from which he was required to draw his salary, instead of into the general fund of the church. Moreover, the defendant's withdrawal of money in excess of his salary was in direct violation of church rules.

In mitigation of the sentence, the defense presented testimony from some members of the defendant's family, former parishioners, prison personnel, and the defendant himself. The testimony from the defendant's deceased father, John Calvin Terry, recorded from a previous proceeding, was read to the jury. Mr. Terry, Sr., explained how he and his son worked together in the ministry and further testified to his son's devotion to his family and to his ministry. Rita Kemp, a member of the Emmanuel Churches of Christ, described how the defendant, of his own volition, visited her ailing father each time he was admitted to the hospital. She stated that her father always felt uplifted by the defendant's prayers and seemed comforted after his visits. Fellow prison inmate Michael Whitsey testified that the defendant helped him turn his life around through prayer sessions and bible study while they were both incarcerated.

Mr. Frank Bainbridge, an ordained deacon in the Catholic Church, testified that he holds ecumenical nondenominational **154 Christian services in prison. After meeting the defendant in 1990, he has maintained a steady relationship with the defendant. He testified that the defendant often appears "terribly depressed [and] guilt-ridden about what had happened."

The defendant's brother, Fred Russell Terry, maintained that the defendant, as a child, was one who never caused any trouble or problems but was well-loved by everyone. He testified to the defendant's "total commitment" to the "church, family, mom and dad, his family, our family." However, he noticed a change in his brother's disposition when, in early 1987, he visited the defendant and found him to appear "troubled, maybe from the stress of the church or stress from something." The defendant's wife, Brenda Terry, also testified as to his changing behavior during the period between 1984 and 1987. She stated that he initially experienced intense mood swings and, over time, he became very withdrawn. Moreover, she testified that during that time, he had difficulty sleeping, he was gaining weight, and he was unable to perform sexually.

Dr. Robert Begtrup, a retired psychiatrist, who had originally evaluated the defendant's competency to stand trial, testified that although the defendant was not insane at the time of the offense and was legally competent to stand trial, the defendant was suffering from major depression when he committed the murder. Dr. Begtrup characterized the defendant's depression as a serious mental illness. He testified that the defendant's problem probably started four years prior with the death of his mother, with whom he was very close and who he regarded as his "only confidante." Dr. Begtrup found that the defendant had never recovered from his mother's

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

death.

The defendant testified on his own behalf. He described his disappointment when the Bishop refused to retire, his subsequent feelings of inadequacy and lack of control over his life, and his attempts to commit suicide. The defendant conceded that he contemplated killing James Matheney before the date of the incident and expressed his sorrow and remorse over "the worst thing that [he had] ever done."

The defense also presented other witnesses who testified that the defendant frequently helped others while he was incarcerated by holding prayer sessions, bible study, and otherwise counseling his fellow inmates. Several witnesses described the defendant as a model prisoner, a model employee in the prison's data processing unit, and a regular participant in worship services at the prison.

At the close of the proof, the jury was instructed on the following statutory aggravating factors: (1) the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind; and (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant for his underlying crime of embezzlement of church funds. The jury was also instructed to consider the following non-exclusive list of mitigating circumstances:

(1) The defendant has no significant history of prior criminal activity.

(2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(3) Prior to the commission of the murder, the defendant had been a positive and contributing member of the community, as a caring pastor, husband, and parent.

(4) The defendant has accepted responsibility for his crime and has exhibited remorse.

*155 (5) For the last ten (10) years, the defendant has exhibited a serious and consistent effort to rehabilitate himself, by functioning at a high level within the limits of his confinement.

(6) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication [,] which was insufficient to establish a defense to the crime but which substantially affect[ed] his judgment.

(7) Any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

[1] The jury found that the State proved the two statutory aggravating circumstances beyond a reasonable doubt, and that these two aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. (FN5) Consequently, on August 6, 1997, the defendant was

again sentenced to death. The trial court entered a judgment in accordance with the jury's verdict, and the Court of Criminal Appeals later affirmed the sentence.

The case was automatically docketed in this Court for review of the death sentence. (FN6) After considering the record in this case, this Court requested additional briefing and argument on the following issues: (1) whether the prosecutor presented non-statutory aggravating circumstances to be weighed against the mitigating evidence, and if so, whether such error adversely affected the sentence; (2) whether Tennessee Code Annotated section 39-13-204 confines the jury to weighing only statutory aggravating circumstances against the mitigating evidence, and whether allowing the jury to consider a "myriad of factors" in deciding whether death is the appropriate punishment violates the defendant's federal right to due process of law; (3) whether Tennessee Code Annotated section 39-2-203(i)(5) is unconstitutionally vague, and whether the evidence is sufficient to support the finding of the aggravator in this case; (4) whether the Tennessee Code Annotated section 39-2-203(i)(6) aggravating circumstance is unconstitutionally overbroad as applied, and whether the evidence is sufficient to support the finding of the aggravator in this case; and (5) whether the death sentence is an excessive and disproportionate punishment given the nature of the defendant and the circumstances of this case.

After reviewing the record and considering the issues raised by the defendant, we find no reversible error and affirm the judgment of the trial court and the judgment of the Court of Criminal Appeals.

*156 ANALYSIS

*I. Prosecutorial Misconduct*

The defendant first contends that the State erred in its closing argument when it asked the jury to "consider in the balance," "weigh ... in the balance," and "put in the balance" six "unique circumstances" against the mitigating proof. Specifically, the prosecutor listed the following factors on a handwritten chart for the jury to consider: (1) "extreme premeditation"; (2) "innocent victim"; (3) "brutality of murder"; (4) "violated private trust"; (5) "burning a church"; and (6) "concealment of crime." Next to these factors, the prosecutor then listed several of the mitigating factors in this case.

The defendant argues that the prosecution was improperly urging the jury to treat these "unique circumstances" in the same manner as aggravating circumstances, *i.e.,* as non-statutory aggravating circumstances to be weighed in the balance against the mitigating evidence. Although the defendant concedes that the prosecutor cautioned the jury that these six "unique circumstances" were not aggravating factors, his concern is that the State proceeded to treat those circumstances or factors as non-statutory aggravators by urging the jury to weigh them against the mitigating evidence. As a result, the defendant contends that the prosecutor engaged in misconduct that created a " 'substantial risk that the death penalty [was] inflicted in an arbitrary or capricious manner,' *i.e.,* on the basis of

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                                                        Page 7

factors other than those deemed by the legislature to be proper predicates for the sentencing determination." *Cozzolino v. State,* 584 S.W.2d 765, 768 (Tenn.1979) (quoting *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976)). In response, the State maintains that it was properly arguing facts and circumstances to establish and assign weight to the two statutory aggravating circumstances.

[2][3][4][5] This Court has long recognized that closing arguments are a valuable privilege that should not be unduly restricted. *See State v. Sutton,* 562 S.W.2d 820, 823 (Tenn.1978) (citing *Smith v. State,* 527 S.W.2d 737 (Tenn.1975)). Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion. *Id.* In a capital sentencing hearing, evidence may be presented tending to establish or rebut any statutory aggravating circumstances or mitigating circumstances. Moreover, a jury must be permitted to consider evidence pertaining to the nature and circumstances of the crime even if the proof is not necessarily related to a statutory aggravating circumstance. *State v. Nesbit,* 978 S.W.2d 872, 890 (Tenn.1998). However, the State may not rely upon *non-statutory aggravating circumstances* in seeking the imposition of the death penalty. *See id.; see also State v. Thompson,* 768 S.W.2d 239, 251 (Tenn.1989).

[6] At the time of the defendant's offense, Tennessee's capital sentencing procedure required the jury to make two separate determinations before imposing a sentence of death: (1) that the State has proven at least one statutory aggravating circumstance beyond a reasonable doubt; and (2) that the proven statutory aggravating circumstance(s) outweigh any mitigating circumstances. Tenn.Code Ann. § 39-13-204(g)(1). Therefore, in determining whether death is the appropriate punishment for the offense and for the individual defendant, the jury is free to consider "a myriad of factors" relevant to punishment, that is, relevant to establishing and assigning weight to aggravating and mitigating *157 circumstances. *Nesbit,* 978 S.W.2d at 890. This "myriad of factors" serves to individualize the sentence imposed on each defendant to insure that the sentence is just and appropriate considering the characteristics of the defendant and the circumstances of the crime. *See Zant v. Stephens,* 462 U.S. 862, 875, 879, 103 S.Ct. 2733, 2741, 2744, 77 L.Ed.2d 235 (1983). Evidence appropriate for the jury's consideration can include the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances; and any evidence tending to establish or rebut any mitigating factors. Tenn.Code Ann. § 39-13-204(c).

[7] We have examined the record in light of the defendant's claims and find that the State's argument concerning "unique circumstances" was not improper for two reasons. First, the six factors were within the realm of permissible evidence contemplated by the statute. Second, after reviewing the closing argument as a whole, we

conclude that the prosecutor properly offered these "unique circumstances" as specific evidence to support and give weight to the two statutory aggravating circumstances: (1) that the murder was heinous, atrocious, or cruel in that it involved depravity of mind, Tenn.Code Ann.                  § 39-2-203(i)(5); and (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant, Tenn.Code Ann. § 39-2-203(i)(6).

The record reflects that the prosecutor began his closing argument by introducing the two statutory aggravating circumstances to be established and by informing the jury that it had to find that at least one of them had been proven beyond a reasonable doubt before considering a sentence of death. Specifically, the prosecutor stated:

We've talked about your duties as jurors. And the Judge is going to get very specific with you. But, basically, it's like there's two charges here that we have to prove beyond a reasonable doubt. You have to find at least one of them before you go to the next part of your consideration. Have we proved this was heinous, atrocious, or cruel? Have we proved the defendant murdered James Matheney as part of the plan to avoid being prosecuted?

The prosecutor then prefaced his discussion of the evidence tending to establish these two aggravating circumstances as follows:

Now, when you analyze and balance and you talk all about this, individually, and now, collectively, and the Judge will give you more instructions about that, these two Aggravating Factors, if you decide that one of them has been proven beyond a reasonable doubt, then you have to balance them against anything favorable to the defendant that's been introduced. They're called Mitigating Factors. And how do you balance them?

Well, there are murders and there are murders. You can kill someone to avoid an arrest by driving by in a car and shooting them, no thought, no planning. But that's not exactly the same thing we have here. Every case is different. Every case depends on its facts. So it's the facts, Ladies and Gentlemen, that decides how important, how serious, how bad this crime is.

Well, let me show you some of the facts, some of [the] things that I think you should consider in the balance, on how important, how weighty what he did or things that make it bad. These are not Aggravating Factors, but they are *158 evidence that make this crime more serious.

The defendant argues that urging the jury to consider some of the facts in the balance was "prosecutorial sleight of hand" for treating the specific facts, or "unique circumstances," in the same manner as aggravating circumstances, *i.e.,* to be weighed in the balance against mitigating evidence. Although the prosecutor did approach the line of impermissible conduct in his argument, we find that the trial judge did not err in failing to restrict the prosecutor's line of argument. The complained of portion of the closing argument,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

when viewed in context with the prosecutor's argument as a whole, reveals that the prosecutor first, properly identified the two aggravating circumstances to be proven, and second, offered six factors to establish or give weight to these aggravating circumstances.

Even assuming that the prosecutor approached the line of impermissible conduct, any adverse effects from his closing argument were erased by the trial court's instructions to the jury as to its role in considering the evidence. Specifically, the trial judge first instructed the jury that it could only consider the two statutory aggravating circumstances presented by the State as the basis for determining whether the death penalty would be appropriate in this case. The jury was then told that it had to unanimously find that the State had proven at least one of the two aggravators beyond a reasonable doubt before considering a penalty of death; only upon this unanimous determination could the jury then consider mitigating evidence. The trial court explained, "If you conclude that any evidence supports a mitigating circumstance or circumstances, then you should consider that mitigating circumstance or circumstances to be established, and then determine the weight to which it is entitled." Finally, the trial court instructed the jury that if it unanimously found that the aggravators outweighed any mitigating circumstances, the jury shall impose a sentence of death.

It is a well-established presumption in law that jurors are deemed to have followed the instructions given by the court, *Nesbit,* 978 S.W.2d at 894, and we see no evidence from the record to rebut this presumption. In fact, the record reflects that after the verdict was read, each juror was polled to determine whether that individual imposed a sentence of death in accordance with the trial court's instructions. The record indicates that all twelve jurors, individually and collectively, imposed the death penalty after finding first, that the two statutory aggravating circumstances were proven beyond a reasonable doubt, and second, that the aggravators outweighed the mitigating circumstances.

Therefore, after carefully reviewing the record, we simply do not find evidence that the jury was presented with non-statutory aggravating circumstances to be weighed against mitigating circumstances. Rather, the jury was properly asked to consider certain facts and circumstances of the offense establishing and giving weight to the existence of the two aggravating circumstances. Accordingly, we hold that the prosecutorial argument was not improper, and therefore, this issue is without merit.

### II. Consideration of Non-Statutory Aggravating Factors

The defendant continues to argue that the trial court erred in allowing the jury to consider and weigh non-statutory aggravating circumstances as a basis for imposing the death penalty, thereby violating the defendant's constitutional rights. As we have previously discussed at length, the prosecutor clearly explained to the jury that the State sought to prove only two **\*159** statutory aggravating circumstances. All evidence presented

served only to establish and give weight to these aggravators. Because we hold that the State did not advance non-statutory aggravating circumstances, this issue is without merit.

### III. Heinous, Atrocious, or Cruel Aggravating Circumstance (i)(5)

The defendant also challenges the application of the statutory "heinous, atrocious, or cruel" aggravating circumstance. At the time of the offense, this aggravator, set out in Tennessee Code Annotated section 39-2-203(i)(5) (1982), provided that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." (FN7) The defendant, citing as authority the decisions in *Houston v. Dutton,* 50 F.3d 381 (6th Cir.1995), and *Coe v. Bell,* 161 F.3d 320, 332-33 (6th Cir.1998), asserts that the definitions of "heinous," "atrocious," and "cruel" are unconstitutionally vague and that the modifier "torture or depravity of mind" does not serve to cure this problem of vagueness.

[8][9] The role of the aggravating circumstance is to "circumscribe the class of persons eligible for the death penalty." *See Barclay v. Florida,* 463 U.S. 939, 952-56, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); *Zant,* 462 U.S. at 877-78, 103 S.Ct. 2733. Statutory aggravating circumstances are constitutional if they meet two requirements: " 'First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.' " *Carter v. Bell,* 218 F.3d 581, 607 (6th Cir.2000) (quoting *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994)). Therefore, the nature of the aggravator must be sufficiently definite so as to prevent arbitrary or discriminatory imposition of death.

[10] We have consistently upheld the constitutionality of this pre-1989 aggravating circumstance, and we have rejected the argument that the terms are vague or overbroad. *See Strouth v. State,* 999 S.W.2d 759, 764 (Tenn.1999); *State v. Middlebrooks,* 995 S.W.2d 550, 555-56 (Tenn.1999); *State v. Blanton,* 975 S.W.2d 269, 280 (Tenn.1998); *State v. Thompson,* 768 S.W.2d 239, 252 (Tenn.1989). In *State v. Williams,* 690 S.W.2d 517, 527-30 (Tenn.1985), we examined the language of the (i)(5) aggravating circumstance and clarified its application by defining each term according to its ordinary and natural meaning. The trial court in this case used the definitions set forth in *Williams* in its instructions to the jury:

"Heinous" means grossly wicked or reprehensible; abominable; odious; vile.

"Atrocious" means extremely evil or cruel, monstrous, exceptionally bad, abominable.

"Cruel" means disposed to inflict pain or suffering; causing suffering; painful.

"Depravity" means moral corruption, wicked or perverse act. (FN8)

**\*160** [11] We continue to reject the claim that this

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

aggravating circumstance is vague or overbroad. Furthermore, we conclude that the defendant's reliance on *Houston v. Dutton* and *Coe v. Bell*, Sixth Circuit habeas corpus decisions holding the (i)(5) aggravating circumstance unconstitutionally vague, is misplaced. In *Middlebrooks*, we recognized that the trial courts in those cases either failed to define the terms in their instructions to the jury or provided only incomplete definitions of the terms. (FN9) *Middlebrooks*, 995 S.W.2d at 557. This was not the situation in this case. Moreover, and more importantly, this Court is not bound by federal court decisions other than those of the United States Supreme Court, *id.* (citing *State v. McKay*, 680 S.W.2d 447, 450 (Tenn.1984)), which has not yet held this aggravating circumstance unconstitutional. Therefore, for the foregoing reasons, we hold that the (i)(5) aggravating circumstance is sufficiently definite so as to prevent arbitrary or discriminatory imposition of the death sentence.

[12] The defendant next contends that the evidence is insufficient to support the jury's finding that this murder involved "depravity of mind." When the sufficiency of the evidence supporting an aggravating circumstance is challenged, the appellate court must determine whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *See State v. Nesbit*, 978 S.W.2d 872, 886 (Tenn.1998); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn.1994).

[13] The evidence demonstrates that the defendant had devised an elaborate scheme to simulate his own death and then disappear under an assumed identity. His plan involved murdering an individual similar in size to himself and dismembering the corpse to remove identifiable body parts so as to make the body appear to be his own. Consequently, the defendant selected James Matheney, who was approximately the same size and often wore the defendant's clothes. For months, he worked to foster a close relationship with the victim. Using his position as pastor, he counseled the victim, employed him, found and paid for his housing, and eventually earned his trust and friendship. At the same time, he was hiding weapons at the scene of the crime in preparation for the murder. Finally, on the pretense of taking the victim on a fishing trip, the defendant shot and killed the victim at his own church. After examining the record, we conclude that this extensive plan to single out the victim for execution illustrates the "wickedness" and "perverseness" of the murder and is evidence from which a rational jury could infer the defendant's depraved mind at the time he fatally shot the victim.

Moreover, the dismemberment of the corpse establishes depravity of mind in this case. The key inquiry is the defendant's state of mind at the time of the murder. In *Williams*, we held that if acts occurring after the death of the victim are relied upon to show the defendant's depravity **\*161** of mind, then such acts must be shown to have occurred close to the time of the death to provide a rational basis for the trier of fact to infer that the defendant's state of mind at the time of the killing was depraved. *Williams*, 690 S.W.2d at 529-30. The defendant argues that the time factor propounded by *Williams* is too relative and uncertain

a standard for distinguishing those persons eligible for the death penalty. However, the time factor merely assists in directly relating the post-mortem mutilation to the commission of the murder, thereby establishing the defendant's depravity of mind at the time of the murder. As the Court of Criminal Appeals reasoned in this case, any dismemberment of a corpse can establish depravity of mind if the acts can be considered "incident to the murder and not ... separate, distinct or independent from it."

Viewing the evidence in the light most favorable to the State, the record demonstrates that the defendant dismembered the victim's body as soon as fifteen minutes to one hour after the victim's death. Additionally, the defendant concedes that the murder was committed to simulate his own death, and that the dismemberment of identifying body parts was required to conceal the victim's identity. Specifically, the defendant decapitated the body and removed a forearm; bagged the body parts and disposed of them in a lake; sliced off pieces of tattooed flesh and flushed them down the toilet; and finally, set fire to his own church to burn the body beyond all recognition. We conclude that the defendant's post-mortem acts occurred in close temporal proximity to the victim's death, were incident to the murder as part of a plan, and were of such a despicable nature that a rational jury could easily infer the defendant's depraved mind at the time of the murder.

Accordingly, after reviewing the evidence in the light most favorable to the State, we hold that the evidence is more than sufficient for any rational trier of fact to find, beyond a reasonable doubt, that the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind.

## IV. Murder to Prevent Arrest Aggravating Circumstance (i)(6)

The next issue is whether the (i)(6) aggravating circumstance was supported by the evidence in this case. This aggravating circumstance provides that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn.Code Ann. § 39-2-203(i)(6) (1982). At the sentencing hearing, the State theorized that the defendant killed the victim as part of his plan to avoid arrest or prosecution for his embezzlement of church funds. The defendant argues that this case presents a novel factual situation in which the murder did not involve a victim of, or a witness to, another crime, but rather, it involved an unsuspecting individual completely unaffiliated with the defendant's underlying crime of embezzlement. Thus, the defendant asserts, the evidence does not support the finding that this murder was committed to avoid arrest or prosecution for the embezzlement of church funds. In response, the State argues that this aggravator does not require that the murder victim know or be able to identify the defendant. Thus, the State argues, the aggravator was appropriately applied to the evidence in this case.

Again, we reiterate that the purpose of legislatively defined aggravating circumstances is to effectively narrow the class of death-eligible defendants. "If the sentencer fairly could conclude that an aggravating **\*162** circumstance applies to every

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                                      Page 10

defendant eligible for the death penalty, the circumstance is constitutionally infirm." *See Arave v. Creech,* 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993). We have held that the language of this aggravator is sufficiently clear to put defendants on notice of what homicides are punishable by death. *See State v. McCormick,* 778 S.W.2d 48, 53 (Tenn.1989). Moreover, this statute is sufficiently definite to inform the jury of the evidence to be proven before a death sentence may be imposed. *Id.*

The defendant insists that because the victim in this case was not the victim of the defendant's crime of embezzlement, nor a witness to this crime, nor even a law enforcement officer attempting to arrest the defendant for the underlying crime, this aggravator may not be applied. We have previously held that this statute is not limited in its application to only these situations. *See State v. Hall,* 976 S.W.2d 121, 133 (Tenn.1998) (refuting the notion that (i)(6) applies only when a victim knows or can identify the defendant). Rather, the focus must remain on the defendant's motives for committing the murder. *See Hall,* 976 S.W.2d at 133 (citing *State v. Smith,* 868 S.W.2d 561, 580 (Tenn.1993)). We do not require that the desire to avoid arrest or prosecution be the sole motive for killing the victim. Instead, such a desire need only be one of the purposes motivating the defendant to kill.   *See State v. Carter,* 714 S.W.2d 241, 250 (Tenn.1986).

[14] While the facts giving rise to the crime of embezzlement are undisputed, (FN10) there is also evidence, when viewed in a light most favorable to the State, from which a reasonable jury could find that the defendant committed murder, at least in part, to prevent his apprehension for the theft. The record shows that the defendant painstakingly planned his escape to leave behind the "old David Terry" and start his life anew, under a new identity and indeed, with a new appearance such that he could remain "dead" forever. For several months, he purchased legal documents under a new name, purchased additional life insurance for the provision of his family, and carefully planned the murder itself to make it look like he died at the hands of James Matheney. Once the murder was committed, the defendant altered his appearance so as to avoid detection and possible apprehension. As Sergeant Moore testified,

> I had seen photographs ... of John David Terry ... [but] the person that I saw that morning, I had no idea who I was looking at. It was just a striking difference.... [H]is head was shaved, he had a dark tan, he was in casual khaki clothes and he just looked entirely **\*163** different. I wouldn't have known him on the street.

The defendant testified that he had considered creating the illusion that he had been brutally kidnapped, or that he otherwise suffered some brutality before "disappearing," leaving only his bloodstains as evidence of his questionable demise. Given these circumstances, a reasonable jury could conclude that because of his desire to avoid arrest or prosecution for his theft, he decided, at least in part, to commit murder and leave behind a body, charred beyond all recognition, to prevent any investigation that would have inevitably occurred had he merely "disappeared." As the State aptly phrases the

principle, "law enforcement officials do not look for dead men, and they are certainly not prosecuted." As the State theorized in its closing argument,

> He told you that he was thinking about committing suicide, but the evidence is not there to support it. The evidence is there to support that this man was going to selfishly leave his church, leave his family, steal the money, and start new somewhere else. There's no evidence to support that he was going to stick a gun in his mouth and pull the trigger like he told you he tried to do many times but simply couldn't do it. There's no evidence to support that, because he didn't have any qualms at all about pulling that trigger and shooting James Matheney.

> He's planning to leave because he's realized he stole the money, he's going to take out a big amount to plan his new life. But he has to leave behind the old David Terry so that he can't be prosecuted in his new life, so that he can't be found. So he plans the plan that you've heard about. He plans to murder James Matheney.

> ....

> ... The murder was absolutely committed for no other reason other than for Mr. Terry to get away, to get away from the church and start a new life, because he'd been stealing. And he knew that he'd eventually get caught and would be prosecuted.

Examining the evidence in the light most favorable to the State, we hold that a rational jury could have concluded beyond a reasonable doubt that the defendant committed this murder, at least in part, to prevent his arrest for the separate crime of theft.

### V. Proportionality Review

[15][16][17][18] We now conduct comparative proportionality review to determine whether the defendant's sentence of death for premeditated first degree murder "is disproportionate to the sentences imposed for similar crimes and similar defendants." *State v. Bland,* 958 S.W.2d 651, 664 (Tenn.1997); *see also* Tenn.Code Ann.   § 39-13-206(c)(1)(D) (requiring reviewing courts to determine whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant). The purpose of comparative proportionality review is to ensure that the death penalty is applied consistently and not arbitrarily or capriciously. The presumption is that a sentence of death is proportional to the crime of first degree murder,   *State v. Hall,*   958 S.W.2d 679, 699 (Tenn.1997), as long as sentencing procedures focus discretion on the " 'particularized nature of the crime and the particularized characteristics of the individual defendant,' " *McCleskey v. Kemp,* 481 U.S. 279, 308, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (quoting   *Gregg v. Georgia,* 428 U.S. 153, 206, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Applying the precedent-seeking approach, we undertake **\*164**  to compare this case to other cases in which the defendants were convicted of the same or similar crimes. *Bland,* 958 S.W.2d at 664.   We look at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved. *Id.* Because no two cases involve

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

identical circumstances, our objective cannot be to limit our comparison to those cases where a defendant's death sentence "is perfectly symmetrical," but only "to identify and to invalidate the aberrant death sentence." *Id.* at 665.

[19][20] In *Bland* and its progeny, we enumerated several nonexclusive factors relevant to the process of identifying and comparing similar cases. These include: (1) the means of death; (2) the manner of death (*e.g.,* violent or torturous); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances including age, race, and physical and mental conditions; and the victim's treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. *Id.* at 667. Moreover, we have identified several nonexclusive factors relevant to the comparison of the characteristics of defendants: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of victim(s); (8) the defendant's capacity for rehabilitation.

[21] Applying these factors, we note that the evidence in this case demonstrates that the victim was most likely shot in the back of the head. There is no evidence of provocation. At least one motivation for this killing was for the defendant to stage his death and escape into obscurity, thereby avoiding arrest or prosecution for his underlying crime of embezzlement. The defendant killed the victim in his own church. The record indicates that the defendant had planned this murder for months. He ordered books to learn about how to change his identity and, using this information, he extensively researched obituaries at the library until he located a decedent whose identity he could easily adopt. Putting his plan into motion, he created or otherwise procured documents necessary to establishing his new identity. The defendant also carefully selected the murder victim--a man approximately the same size as himself--whose body would appear to be his own. For weeks prior to the murder, the defendant fostered a close relationship with the victim while simultaneously hiding weapons, clothes, and money taken from the church in anticipation of committing the murder and making a clean escape. Once the victim was dead, the defendant expertly dismembered the body and disposed of the body parts in a lake. After setting the church on fire, the defendant escaped to Memphis.

The defendant, a middle-aged Caucasian male, was the pastor of a local church and has no prior record of criminal activity. Although the defense presented expert proof that he suffered from major depression at the time of the murder, the proof also demonstrates that he did not suffer from such a severe mental illness so as not to understand the criminality of his acts. Moreover, the record reflects that upon arrest, the defendant, while cooperative with authorities, was devoid of any feelings of remorse. While incarcerated, however,

the defendant has shown remorse and has demonstrated a continuous effort to rehabilitate *165 himself by participating in religious activities, counseling fellow inmates, and working hard at his job in prison to send money on a monthly basis to his wife and daughter.

While the facts of this case are admittedly unique, our research nevertheless reveals several cases containing similar circumstances. In        *State v. Carter,* 714 S.W.2d 241 (Tenn.1986), the jury found that the defendant's motive for the murder was to kill the victim to avoid arrest for another crime. The defendant had been planning to steal an automobile and decided upon the victim's truck. The defendant shot the victim--a stranger to the defendant and completely unsuspecting of the impending crime--and disposed of the body in a lake in an attempt to conceal the murder and to avoid arrest. The jury imposed the sentence of death after finding the (i)(6) and (i)(7) aggravating circumstances beyond a reasonable doubt.

In *State v. Smith,* 868 S.W.2d 561 (Tenn.1993), the death penalty was imposed and upheld for a forty-year-old defendant who murdered his estranged wife and two stepsons. Witnesses testified that for several months prior to the murder, the defendant had publicly plotted to kill his family. Expert testimony revealed that he mutilated two of the bodies shortly after the victims' deaths, and the jury concluded that the evidence was sufficient to support the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn.Code Ann. § 39-2-203(i)(5). Moreover, the jury found that the proof supported a finding that at least one motive for killing the step-sons was the threat they posed of the defendant's apprehension. Tenn.Code Ann. § 39-2-203(i)(6).

In *State v. Zagorski,* 701 S.W.2d 808 (Tenn.1985), two victims died from gunshot wounds at the hand of the defendant. The defendant and the victims planned to meet at a designated location in the woods and conduct a drug transaction; however, upon arriving at the meeting place, the victims were shot and their money stolen. The defendant also slit their throats and left them in the woods. Due to the advanced stage of decomposition of the bodies, the pathologist performing the autopsy was unable to tell whether the victims died before or after their throats had been cut. The jury found the evidence of the needless mutilation of the victims sufficient to infer that the defendant possessed a depraved state of mind at the time of the killings. Therefore, the jury imposed a sentence of death for each killing, finding that (1) the murders were committed by the defendant while he was engaged in robbing the victims, Tenn.Code Ann. § 39-2-203(i)(7); and (2) that the murders were especially heinous, atrocious, or cruel in that they involved torture or depravity of mind, Tenn.Code Ann. § 39-2-203(i)(5).

In *State v. Bondurant,* 4 S.W.3d 662 (Tenn.1999), the defendant beat an unarmed and unsuspecting victim to death after a card game. The beatings continued for thirty minutes after the victim had died. Immediately thereafter, the defendant and his brother dismembered the victim's body, transported the pieces to their parents' home, and burned the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                    Page 12

corpse. Mitigating evidence portrayed the defendant as an exemplary son, a good family man, and a hard-working employee. The jury convicted the defendant of first degree premeditated murder and arson and sentenced the defendant to death; the defendant's convictions were reversed and the case remanded for a new trial on other grounds.

Moreover, the sentence of death has been affirmed in cases containing similar mitigating evidence. *See State v. Burns,* 979 S.W.2d 276 (Tenn.1998) (upholding a **\*166** death sentence in spite of evidence of the defendant's religious faith and involvement); *State v. Pike,* 978 S.W.2d 904 (Tenn.1998) (upholding a death sentence even though defendant had no significant history of criminal activity and was apparently mentally disturbed at the time of the murder); *State v. Hall,* 958 S.W.2d 679 (Tenn.1997) (upholding a death sentence even though defendant had no prior criminal record and had a personality disorder and severe emotional problems at the time of the murder).

We have also found one somewhat similar case in which the death penalty was not imposed. In *State v. Harris,* 989 S.W.2d 307 (Tenn.1999), the jury found the defendant guilty of first degree murder and imposed a sentence of life imprisonment without the possibility of parole. The defendant and her friends had carjacked the victim's truck late one night. The victim started screaming for help. Afraid that someone would hear the screams, one of the defendant's friends shot and killed the victim. The group then took the body to a deserted area, dismembered it, and buried it. At trial, the defendant presented evidence that she suffered from psychological disorders, was chemically dependent, and had been abused as a child. A clinical psychologist opined that the defendant participated in the murder of the victim because she is dependent upon men and was following her boyfriend's directions that night. The State sought the death penalty upon the basis of the (i)(5) and (i)(6) aggravating circumstances. The jury, based upon the extensive mitigating proof and the fact that the defendant was not the actual killer, returned a verdict of life imprisonment.

[22] Although the death penalty may be imposed for an offense involving circumstances similar to those of an offense in which only a sentence of life imprisonment is imposed, the death sentence is not disproportionate if this Court can ascertain some basis for the imposition of the lesser sentence. *Hall,* 958 S.W.2d 679, 699 (Tenn.1997). We find several factors that distinguish *Harris* from the case at bar: the defendant's extensive mitigating evidence consisting of her psychological disorders, substance abuse, and traumatic childhood involving sexual abuse occurring at an early age; the fact that the defendant did not fire the shot that killed the victim; and finally, the absence of the extreme premeditation that occurred in this case. Nevertheless, even if this case could not be distinguished, "the isolated decision of a jury to afford mercy does not render a death sentence disproportionate." *State v. Keen,* 31 S.W.3d 196, 222 (Tenn.2000).

The defendant argues that his situation is unique because, unlike the defendants in these other cases, he had selflessly served the community for many years prior to suffering a mental breakdown. Although the exact combination of facts and circumstances in this case is not replicated in our comparative pool of similar cases, no two cases are identical. Indeed, we have identified cases involving circumstances similar to the crime in this case, *i.e.,* extreme premeditation, an unarmed victim, mutilation of the victim's body, and concealment of the crime to avoid detection and arrest. Furthermore, we have identified cases containing similar mitigating evidence, *i.e.,* lack of prior criminal history, existence of mental illness, and involvement in religious activities. Based on our review of these cases in which the death penalty was upheld, we conclude that the defendant's case, taken as a whole, is not plainly lacking in circumstances that have previously justified death sentences. Accordingly, we conclude that the death sentence imposed for the premeditated murder of victim James Matheney was neither disproportionate **\*167** to the penalty imposed in similar cases, nor arbitrarily applied.

### CONCLUSION

In conclusion, we have carefully reviewed the record, and, based on the facts and circumstances of this case, we have determined that the defendant's allegations of error are without merit. There exists no evidence of prosecutorial misconduct; the evidence is sufficient to support the jury's finding of two statutory aggravating circumstances beyond a reasonable doubt; and the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating evidence beyond a reasonable doubt. With respect to issues not specifically addressed in this opinion, we agree with and affirm the decision of the Court of Criminal Appeals, authored by Judge David G. Hayes and joined by Judges David H. Welles and Norma McGee Ogle. Relevant portions of that opinion are attached as an appendix.

Therefore, we hold that the sentence of death was neither disproportionate, nor arbitrarily applied. The conviction and sentence of John David Terry is affirmed and shall be carried out on the 17th day of October, 2001, unless otherwise ordered by this Court or proper authority. As the record reflects that the defendant is indigent, costs of this appeal are assessed against the State of Tennessee.

BIRCH, J., filed a dissenting opinion.

ADOLPHO A. BIRCH, Jr., J., dissenting.

In a line of dissents beginning with *State v. Chalmers,* I have repeatedly emphasized my belief that Tennessee's comparative proportionality review protocol is inadequate and must be reformed. 28 S.W.3d 913, 923-25 (Tenn.2000) (Birch, J., concurring and dissenting); *see also, e.g., State v. Carruthers,* 35 S.W.3d 516, 581-82 (Tenn.2000) (Birch, J., concurring and dissenting); *State v. Keen,* 31 S.W.3d 196, 233-34 (Tenn.2000) (Birch, J., concurring and dissenting). I have pointed out three shortcomings of the current protocol: "the 'test' we employ [for comparative proportionality review] is so broad that nearly any sentence could be found proportionate; our review procedures are too subjective; and the 'pool' of cases which are

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                                            **Page 13**

reviewed for proportionality is too small." *Chalmers,* 28 S.W.3d at 923 (Birch, J., concurring and dissenting). These flaws, in my view, must be corrected if this Court is to provide genuine assurance that disproportionate sentences of death will not be upheld. I adhere to the views I have expressed in these previous cases.

As I have stated before in the context of other dissents, "I am unwilling to approve of results reached through the use of a procedure with which I cannot agree." *See Coe v. State,* 17 S.W.3d 193, 248-49 (Tenn.2000) (Birch, J., dissenting). To date, the majority has made no discernible effort to correct the flaws in our comparative proportionality review protocol. Therefore, I dissent from the Court's decision to impose the death penalty in this case.

APPENDIX

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

FEBRUARY SESSION, 2000

STATE OF TENNESSEE, Appellee,

vs.

JOHN DAVID TERRY, Appellant.

DAVIDSON COUNTY

Hon. J. Randall Wyatt, Jr., Judge

(Premeditated First Degree Murder)

*168  For the Appellant:*

Brock Mehler

Michael E. Terry

Nashville, TN

*For the Appellee:*

Michael E. Moore

Solicitor General

Tonya G. Miner

Assistant Attorney General Criminal Justice Division

Victor S. (Torry) Johnson III

District Attorney General

John Zimmerman

Asst. District Attorney General

Nashville, TN

AFFIRMED

DAVID G. HAYES, Judge.

*OPINION*

The appellant, John David Terry, appeals as of right, his punishment of death by electrocution. In 1989, the appellant was convicted by a Davidson County jury of the premeditated murder of James Matheney and was sentenced to death. At the motion for new trial, the trial court affirmed the appellant's conviction but, finding that it had erroneously charged an invalid aggravating circumstance, granted a new sentencing hearing. (FN1) The State appealed this decision and our supreme court affirmed the action of the trial court. (FN2) *See State v. Terry ,* 813 S.W.2d 420 (Tenn.1991). The appellant's case was remanded to the Criminal Court of Davidson County for re-sentencing. At the conclusion of the re-sentencing hearing in August 1997, the jury found the presence of two aggravating circumstances, *i.e.,* (1) that the murder was especially heinous, atrocious or cruel, Tenn.Code Ann. § 39-2-203(i)(5) (1982) ( *repealed* 1989), and (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution, Tenn.Code Ann. § 39-2-203(i)(6). (FN3) The jury further determined that the mitigating circumstances did not outweigh the aggravating circumstances and imposed a sentence of death by electrocution. The trial court approved the sentencing verdict. The appellant appeals presenting for our review the following issues:

I. Whether the heinous, atrocious, cruel aggravating circumstance, Tenn.Code Ann.   §   39-2-203(i)(5), is unconstitutionally vague;

II. Whether the evidence is sufficient to support application of the heinous, atrocious, cruel aggravating circumstance, *169  Tenn.Code Ann. § 39-2-203(i)(5);

III. Whether Tenn.Code Ann.   § 39-2-203(i)(6), murder perpetrated to avoid prosecution, is unconstitutionally vague;

IV. Whether the evidence is sufficient to support application of aggravating circumstance Tenn.Code Ann. §   39-2-203(i)(6), that the murder was perpetrated to avoid prosecution;

V. Whether prosecutorial misconduct during closing argument affected the verdict to the prejudice of the appellant;

VI. Whether Tennessee's death penalty statutes, Tenn.Code Ann. §  39-2-203 and  § 39-2-205 are constitutional;  and

VII. Whether the jury imposed an arbitrary and disproportionate sentence.

After review, we find no error of law requiring reversal. Accordingly, we affirm the jury's imposition of the sentence of death in this case.

Factual Background [DELETED]

Proof at the August 1997 Re-sentencing Hearing [DELETED]

I. Imposition of Aggravator (i)(5) [DELETED]

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)

II. Imposition of Aggravator (i)(6) [DELETED]

III. Prosecutorial Misconduct [DELETED]

IV. Constitutional Challenges to Death Penalty

The appellant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. The appellant concedes that these issues have been previously rejected by the Tennessee Supreme Court, however, he raises these challenges to preserve them for future appellate review. Specifically, included within his challenge that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and Article I, Sections 8, 9, 16, and 17, and Article II, Section 2 of the Tennessee Constitution are the following:

1. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, specifically, the statutory aggravating circumstances set forth in Tenn.Code Ann.      §39-2-203(i)(2), (i)(5), (i)(6), and (i)(7) have been so broadly interpreted whether viewed singly or collectively, fail to provide such a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. (FN14) This argument has been rejected by our supreme court. *See State v. Vann,* 976 S.W.2d 93, 117 118 (Tenn.1998) (Appendix),*cert. denied,* 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); *State v. Keen,* 926 S.W.2d 727, 742 (Tenn.1994).

2. The death sentence is imposed capriciously and arbitrarily in that

(a) Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has been rejected.   *See State v. Hines,*    919 S.W.2d 573, 582 (Tenn.1995), *cert. denied,* 519 U.S. 847, 117 S.Ct. 133, 136 L.Ed.2d 82 (1996).

(b) The death penalty is imposed in a discriminatory manner based upon economics, race, geography, and gender. This argument has been rejected. *See Hines,* 919 S.W.2d at 582; *State v. Brimmer,* 876 S.W.2d 75, 87 (Tenn.), *cert. denied,* 513 U.S. 1020,  *170 115 S.Ct. 585, 130 L.Ed.2d 499 (1994);     Cazes,* 875 S.W.2d at 268; *State v. Smith,* 857 S.W.2d 1, 23 (Tenn.), *cert. denied,*  510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993).

(c) There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter. This argument has been rejected.   *See State v. Caughron,* 855 S.W.2d 526, 542 (Tenn.),   *cert. denied,* 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993).

(d) The death qualification process skews the make-up of the jury and results in a relatively prosecution prone guilty-prone jury. This argument has been rejected.  *See State v. Teel,* 793 S.W.2d 236, 246 (Tenn.), *cert. denied,* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); *State v. Harbison,* 704 S.W.2d 314, 318 (Tenn.), *cert. denied,* 476 U.S. 1153, 106 S.Ct.

2261, 90 L.Ed.2d 705 (1986).

(e) Defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing,    *i.e.,*    the cost of incarceration versus cost of execution, deterrence, method of execution. This argument has been rejected. *See Brimmer,* 876 S.W.2d at 86 87;  *Cazes,* 875 S.W.2d at 268;  *Black,* 815 S.W.2d at 179.

(f) The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non-unanimous verdict. This argument has been rejected.  *See  Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268;  *Smith,* 857 S.W.2d at 22 23.

(g) Requiring the jury to agree unanimously to a life verdict violates    *Mills v. Maryland*    and *McKoy v. North Carolina.*   This argument has been rejected. *See Brimmer,* 876 S.W.2d at 87; *Thompson,* 768 S.W.2d at 250;    *State v. King,* 718 S.W.2d 241, 249 (Tenn.1986),  *superseded by statute as recognized by,   State v. Hutchison,* 898 S.W.2d 161 (Tenn.1994).

(h) The jury is not required to make the ultimate determination that death is the appropriate penalty. This argument has been rejected.   *See Brimmer,* 876 S.W.2d at 87; *Smith,* 857 S.W.2d at 22.

(i) The defendant is denied final closing argument in the penalty phase of the trial. This argument has been rejected.  *See Brimmer,* 876 S.W.2d at 87;   *Cazes,*   875 S.W.2d at 269; *Smith,* 857 S.W.2d at 24;     *Caughron,* · 855 S.W.2d at 542.

3. Death by electrocution constitutes cruel and unusual punishment. This argument has been rejected. *See Black,* 815 S.W.2d at 179; *see also Hines,* 919 S.W.2d at 582. (FN15)

4. The reasonable doubt instruction violates due process. This argument has been routinely rejected.  *See      Vann,* 976 S.W.2d at 116 (Appendix);  *State v. Nichols,*   877 S.W.2d 722, 734 (Tenn.1994);  *171.    State v. Bush,*     942 S.W.2d 489, 504-05 (Tenn.1997).

5. The appellate review process in death penalty cases is constitutionally inadequate in that (1) the reviewing court cannot properly evaluate the proof due to the absence of written findings concerning mitigating circumstances;  (2) the information relied upon for comparative review is inadequate and incomplete;  (3) the methodology is flawed because the pool of cases is unduly narrow, the determination is entirely subjective, and the review fails to properly function as a safeguard. This argument has been rejected by our supreme court on numerous occasions. *See Cazes,* 875 S.W.2d at 270-71; *State v. Harris,*    839 S.W.2d 54, 77 (Tenn.1992), *cert. denied,*    507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *Barber,* 753 S.W.2d at 664. Moreover, the supreme court has recently held that, "while important as an · additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                    P:

(FN10.) The record reflects that for several years prior to the murder, the defendant had committed a predicate crime, separate and distinct from the murder, of the embezzlement of church funds. The defendant testified that he first started "skimming money" out of the church's accounts in 1984. Although the evidence revealed that the

determine whether the State was permitted to assert a new aggravating circumstance, Tenn Ann. § 39-2-203(i)(6) upon remand. Under authority of *State v. Harris,* 919 S.W.2d (Tenn.1996), this court permitted the State to introduce proof of any aggravating circumst: which is otherwise legally valid. *See State v*

46 S.W.3d 147, Terry v. State, (Tenn. 2001)                    F

not constitutionally required." *See State v. Bland,* 958 S.W.2d 651, 663 (Tenn.1997), *cert. denied,* 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998).

Based upon the above case decisions, the appellant's constitutional challenges to Tennessee's death penalty statutes are rejected.

V. Proportionality Review [DELETED]

Conclusion

In accordance with the mandate of Tenn.Code Ann. § 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt.  Tenn.Code Ann.            § 39-13-206(c)(1)(A)(C).  A comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.  Likewise, we have considered the appellant's sentencing issues raised on appeal and have determined that none have merit. Accordingly, the appellant's sentence of death by electrocution is affirmed.  (FN16)

CONCUR:

DAVID H. WELLES, Judge

NORMA MCGEE OGLE, Judge
(FN1.) The defendant was originally convicted of first degree murder and arson in 1989. The jury sentenced the defendant to death after finding that the jury had proven the existence of two aggravating circumstances beyond a reasonable doubt:  (1) the murder was especially heinous, atrocious, or cruel in that it involved depravity of mind, Tenn.Code Ann.  § 39-2-203(i)(5) (1982); and (2) the murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit larceny, Tenn.Code Ann. § 39-2-203(i)(7) (1982).  The defendant filed a motion for a new trial and for a new sentencing hearing.  The trial court denied the motion for a new trial on the issue of guilt or innocence; however, the trial court found that it had erroneously charged to the jury the (i)(7) aggravating circumstance and, therefore, it granted a new sentencing hearing.  The State appealed; we affirmed the trial court's decision in  *State v. Terry,* 813 S.W.2d 420 (Tenn.1991).

(FN2.) The record reflects that Mr. Matheney was

some getaway clothes in the attic.  However record is unclear why Mr. Matheney went i attic in the first place.  On cross-examinatio prosecutor alluded to the fact that the defenc purposely sent him upstairs to perform some maintenance work; the defendant denied su allegation.

(FN4.) Although the defendant testified that I waited between one and two hours before removing parts of the body, medical examin Charles Warren Harlan, who conducted the autopsy on the victim's body, testified that t removal of these body parts could have occu as soon as ten to fifteen minutes after the tir death.

*171_ (FN5.) Because this offense occurred the 1989 amendments to the capital sentenci statute, the trial court should not have instru the jury regarding the weighing standard un language of the amended statute.  In    *St Brimmer,* 876 S.W.2d 75, 82 (Tenn.1994), held that the legislature intended that senten hearings must be conducted in accordance w law in effect at the time of the offense becau 1989 amendments contained no express or i: retroactivity clause.  However, as the instru required the jury to impose the death penalt; higher standard of proof, any irregularity is harmless.

(FN6.) *See* Tenn.Code Ann.  § 39-13-20( (1997) ("Whenever the death penalty is imp for first degree murder and when the judgm become final in the trial court, the defendan have the right of direct appeal from the trial to the court of criminal appeals.  The affirm of the conviction and the sentence of death : automatically reviewed by the Tennessee su court.").

(FN7.) Application of this pre 1989 version ( (i)(5) aggravating circumstance is proper as offense was committed in 1987.  *See     S Brimmer,* 876 S.W.2d 75, 82 (Tenn.1994).

(FN8.) The trial court correctly deleted "tort from the instruction, as both parties concede the evidence does not support a finding that murder involved torture.  *See State v. Van* 864 S.W.2d 465, 478-79 (Tenn.1993) (citin *v. Pritchett,* 621 S.W.2d 127, 139-40 (Tenn (holding that a trial court should charge only aspects of an aggravating circumstance supp by the evidence in a case)).

(FN9.) In *Houston v. Dutton,* the whole instr given to the jury regarding the "heinous, atr or cruel" aggravating circumstance was as f "The murder was especially heinous, atrocic cruel in that it involved torture or depravity mind."  *Houston,* 50 F.3d at 387.  The fec court found the trial court's jury instruction constitutional error.  Similarly, in *Coe v. Bi* federal court again found the trial court's in

71 [page number]

958 S.W.2d 799, Harries v. State, (Tenn.Crim.App. 1997)                    Page 1

**\*799** 958 S.W.2d 799

Court of Criminal Appeals of Tennessee,
at Knoxville.

Ronald Richard **HARRIES**, Appellant
v.
**STATE** of Tennessee, Appellee
July 30, 1997.
Permission to Appeal Denied by
Supreme Court Nov. 24, 1997.

Defendant was convicted before the Criminal Court, Sullivan County, Edgar P. Calhoun, J., of murder in the first degree, and was sentenced to death. Defendant appealed. The Supreme Court, 657 S.W.2d 414, affirmed. The Criminal Court, Lynn W. Brown, J., denied defendant's second motion for postconviction relief and appeal was taken. The Court of Criminal Appeals, Barker, J., held that: (1) when defendant is convicted of first-degree murder solely on basis of felony murder, aggravating factor that murder was committed during perpetration of felony may not be used to sustain death sentence; (2) trial court committed harmless error by allowing fact that murder was committed during perpetration of felony to serve as aggravating factor at penalty phase of capital murder case involving conviction for felony murder; (3) admission of evidence regarding nonviolent criminal acts of defendant, during penalty phase of capital murder case, did not undermine confidence that jury found as aggravating factor that defendant was convicted of violent felonies; (4) prosecutor did not urge that jury adopt invalid aggravating circumstance of felony murder in deciding whether to impose death sentence, when arguing that defendant killed victim to eliminate her as witness; and (5) mitigating factors did not outweigh aggravating factor that defendant had prior convictions for violent felonies.

Affirmed.

West Headnotes

[1] Criminal Law ⚖1144.17
   110 ----
      110XXIV Review
         110XXIV(M) Presumptions
            110k1144 Facts or Proceedings Not Shown by Record
            110k1144.17 Judgment, Sentence, and Punishment.
   Factual findings of postconviction trial court inherent in harmless error analysis are entitled to presumption of correctness.

[2] Criminal Law ⚖1139
   110 ----
      110XXIV Review
         110XXIV(L) Scope of Review in General
            110k1139 Additional Proofs and Trial De Novo.

[See headnote text below]

[2] Criminal Law ⚖1144.17
   110 ----
      110XXIV Review
         110XXIV(M) Presumptions
            110k1144 Facts or Proceedings Not Shown by Record
            110k1144.17 Judgment, Sentence, and Punishment.
   Postconviction trial court's ultimate conclusion that error was harmless is not entitled to presumption of correctness, but rather requires *de novo* review.

[3] Sentencing and Punishment ⚖1660
   350H ----
      350HVIII The Death Penalty
         350HVIII(C) Factors Affecting Imposition in General
            350Hk1660 Dual Use of Evidence or Aggravating Factor.

   (Formerly 203k357(10))
   When defendant is convicted of first-degree murder solely on basis of felony murder, aggravating factor that murder was committed during perpetration of felony duplicates element of offense and may not be used to sustain death sentence; at least one of other statutory aggravating factors must be found to support death as penalty for felony murder.

[4] Homicide ⚖343
   203 ----
      203X Appeal and Error
         203k333 Harmless Error
      203k343 Sentence.
   In determining whether presence of invalid aggravating circumstance, in sentencing phase of capital murder trial, was harmless beyond reasonable doubt, courts are to consider (1) number and strength of remaining valid aggravating circumstances, (2) extent to which prosecutor emphasized invalid aggravating circumstance during closing argument, (3) evidence admitted to establish invalid aggravator, and (4) nature, quality, and strength of mitigating evidence.

[5] Homicide ⚖343
   203 ----
      203X Appeal and Error
         203k333 Harmless Error
      203k343 Sentence.
   Application of felony-murder aggravating circumstance in sentencing defendant to death for first degree felony murder was error but was harmless beyond a reasonable doubt where defendant had previous convictions of felonies involving use or threat of violence, prosecutor did not emphasize the invalid aggravator in argument, there was no inadmissible evidence regarding the invalid aggravator, and mitigating evidence offered was of little consequence in lowering defendant's culpability. T.C.A. § 39-2404(i)(2) (1980).

[6] Homicide ⚖343
   203 ----
      203X Appeal and Error
         203k333 Harmless Error
      203k343 Sentence.
   Admission of evidence regarding nonviolent criminal acts of defendant, during penalty phase of capital murder case, did not undermine confidence in jury's finding as aggravating circumstance that defendant had been convicted of previous violent felonies; trial court instructed that only violent felonies could serve as aggravators, and there was overwhelming proof submitted that defendant was

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

958 S.W.2d 799, Harries v. State, (Tenn.Crim.App. 1997)                    Page 2

guilty of violent felonies. T.C.A.. § 39-2404(i)(2)
(1980).

[7] Sentencing and Punishment ⬥⬤ 1780(2)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
          350Hk1780(2) Arguments and Conduct of
                Counsel.

  (Formerly 110k723(1))
  Prosecutor did not urge that jury adopt invalid
felony murder aggravating circumstance in deciding
whether to impose death sentence on defendant
convicted of first degree felony murder, when
prosecutor argued that defendant killed victim to
eliminate her as witness; perpetration of murder to
eliminate witness was a separate aggravator.
T.C.A. § 39-2404(g), (i)(6, 7) (1980).

[8] Sentencing and Punishment ⬥⬤ 1661
  350H ----
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in
          General
        350Hk1661 Determinations Based on Multiple
            Factors.

  (Formerly 203k357(4))

[See headnote text below]

[8] Sentencing and Punishment ⬥⬤ 1705
  350H ----
    350HVIII The Death Penalty
      350HVIII(E) Factors Related to Offender
        350Hk1703 Other Offenses, Charges,
            Misconduct
        350Hk1705 Nature, Degree, or Seriousness of
            Other Offense.

  (Formerly 203k357(4))

[See headnote text below]

[8] Sentencing and Punishment ⬥⬤ 1681
  350H ----
    350HVIII The Death Penalty
      350HVIII(D) Factors Related to Offense
        350Hk1681 Killing While Committing Other
            Offense or in Course of Criminal
            Conduct.

  (Formerly 203k357(4))
  Factors mitigating against death penalty for first
degree felony murder did not outweigh aggravating
factor that defendant had committed prior violent
offenses; drug addiction claim was supported by
"virtually no factual proof," and was of "little, if
any" value, claim that shooting was accidental was
belied by testimony of witnesses, and showing of
remorse came well after event.

  *800 Michael J. Passino, Lassiter, Tidwell &
Hildebrand, Nashville, Peter Alliman, Lee &
Alliman, Madisonville, for Appellant.

  John Knox Walkup, Attorney General and
Reporter, Amy Tarkington, Assistant Attorney

General, (On Appeal), Glenn R. Pruden, Assistant
Attorney General (At Hearing), Nashville, H.
Greeley Wells, Jr., District Attorney General,
Blountville, for Appellee.

OPINION

BARKER, Judge.

  In this capital case, appellant, Ronald Richard
Harries, appeals as of right the denial by the
Sullivan County Criminal Court of his second
petition for post-conviction relief. He argues that
the trial court erred in finding that the jury's
application of the felony-murder aggravating
circumstance in violation of the rule announced in
*State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992)
, was harmless beyond a reasonable doubt. In that
respect, he also contends the trial court erred by
concluding that evidence of his alcohol and drug
intoxication at the time of the offense was not a
mitigating factor within the statute and that
appellant's history of drug addiction was not
sufficient mitigating evidence which would have
resulted in a lesser punishment absent the application
of the invalid aggravating circumstance.

  After a thorough review of the record, including
the trial transcript and the transcript from the
hearing on appellant's first post-conviction petition,
we are of the opinion that the use of the invalid
felony-murder aggravating circumstance was
harmless beyond a reasonable doubt. The trial
court's denial of appellant's petition is affirmed.

PROCEDURAL HISTORY

  Appellant was convicted in 1981 of the felony
murder of Rhonda Greene, an eighteen-year-old
cashier at a convenience store in Kingsport. (FN1)
At the sentencing phase of the trial, the jury
imposed a sentence of death, finding the presence of
two statutory aggravating circumstances which were
not outweighed by the mitigating evidence.
Specifically, the jury found that the defendant had
been previously convicted of one or more felonies,
other than the present charge, which involved the
use or threat of violence to the person, and the
murder was committed while the defendant was
engaged in committing a robbery. *See* Tenn.Code
Ann. § 39-2404(i)(2), (7) (Supp.1981). On direct
appeal to the supreme court, appellant's conviction
and death sentence were affirmed. *State v. Harries*,
657 S.W.2d 414 (Tenn.1983). No permission was
sought for a writ of certiorari to the United States
Supreme Court.

  Appellant's first post-conviction petition was filed
in March of 1986. That petition raised thirty-five
(35) issues, including claims of ineffective assistance
of counsel at trial and on appeal; unconstitutionality
of the Tennessee death penalty statute; numerous
errors in voir dire and the selection of grand and
petit juries in Sullivan County; inadequate    *801
evaluation of appellant's mental condition; and
incorrect application of the felony-murder
aggravating circumstance. Following a three-day
evidentiary hearing, the trial court denied relief on
the petition. On appeal, that judgment was affirmed
by this Court. *Ronald Richard Harries v. State* ,
No. 833, 1990 WL 125023 (Tenn.Crim.App. at
Knoxville, August 29, 1990),    *perm. to appeal*

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*denied* (Tenn.1991).

The current petition was filed September 9, 1993, alleging constitutional error in the application of the felony-murder aggravating circumstance to appellant's conviction for felony murder. *See State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992). No other grounds for relief were raised. After conducting an evidentiary hearing, the trial court issued a thorough statement of its findings of fact and conclusions of law.

The trial court found: (1) that the evidence supporting the remaining valid aggravating factor was uncontradicted and overwhelming; (2) that the prosecutor placed little emphasis on the invalid aggravator during his closing argument; and (3) that no additional evidence supporting the invalid aggravating circumstance was introduced at the sentencing phase. In evaluating the evidence offered in mitigation, the trial court found that any mitigation from appellant's drug addiction was negated by proof that appellant committed numerous crimes to support his habit. The trial court further found that evidence that appellant was under the influence of drugs and alcohol at the time of the crime was insufficient to demonstrate that he was substantially impaired. *See* Tenn.Code Ann. § 39-2404(j)(8) (Supp.1981). It also found that appellant's claims of remorse for the crime were belated and lacked sincerity and were not supported by the factual record. However, the trial court did accord some weight to that claim and also to appellant's claim that the shooting was accidental. The trial court also considered a list of ten additional mitigating factors submitted after the filing of the petition. Considering all the above, the trial court concluded that the *Middlebrooks* error was harmless beyond a reasonable doubt. *See State v. Howell,* 868 S.W.2d 238 (Tenn.1993), *cert. denied* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). Appellant's petition for relief was denied.

STANDARD OF REVIEW

The parties have raised the question of the proper standard of review for this Court to apply in reviewing the *Howell* harmless error analysis performed by the trial court. A review of Tennessee case law reveals that this question has not been squarely addressed. Our supreme court has had eight opportunities to consider whether application of the felony-murder aggravator in violation of *Middlebrooks* was harmless beyond a reasonable doubt. *See State v. Hines,* 919 S.W.2d 573 (Tenn.1995), *cert. denied* 519 U.S. 847, 117 S.Ct. 133, 136 L.Ed.2d 82 (1996); *State v. Walker,* 910 S.W.2d 381 (Tenn.1995), cert. denied 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 45 (1996); *Hartman v. State,* 896 S.W.2d 94 (Tenn.1995); *State v. Smith,* 893 S.W.2d 908 (Tenn.1994), *cert. denied* 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995); *Barber v. State,* 889 S.W.2d 185 (Tenn.1994), *cert. denied* 513 U.S. 1184, 115 S.Ct. 1177, 130 L.Ed.2d 1129 (1995); *State v. Nichols,* 877 S.W.2d 722 (Tenn.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *State v. Cazes,* 875 S.W.2d 253 (Tenn.1994), *cert. denied* 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); *State v. Howell,* 868 S.W.2d 238 (Tenn.1993), *cert. denied* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). Procedurally,

however, it has not had the opportunity to review findings of fact and conclusions of law following a trial court's *Howell* harmless error analysis. In fact, the supreme court has reviewed the issue in the context of post-conviction only twice and both times without the benefit of a post-conviction court's findings on the issue. *See Hartman,* 896 S.W.2d at 96; *Barber,* 889 S.W.2d at 186.

This Court has rendered decisions in capital cases in this procedural posture at least twice. *See Tommy L. King v. State,* No. 01C01-9512-CC-00415, 1997 WL 59464 (Tenn.Crim.App. at Nashville, February 12, 1997), *appeal granted* (Tenn. July 7, 1997); *Michael J. Boyd v. State,* No. 02C01-9406-CR-00131, 1996 WL 75351 (Tenn.Crim.App. at Jackson, February 21, 1996), *appeal granted* (Tenn. November 25, 1996). In *Boyd,* a panel of this Court discussed the trial court's analysis of the *Howell* issue, but did not explicitly rely upon the trial court's findings or discuss the standard of review. The trial court's findings were not addressed in *King.*

We are mindful of the well-established standard of review generally applicable to denials of post-conviction petitions. The trial court's findings of fact and conclusions of law are given the weight of a jury verdict and accorded a presumption of correctness. This Court is bound by those factual findings unless the evidence within the record preponderates against the judgment. *See, e.g., Davis v. State,* 912 S.W.2d 689, 697 (Tenn.1995); *Cooper v. State,* 849 S.W.2d 744, 746 (Tenn.1993); *Adkins v. State,* 911 S.W.2d 334, 354 (Tenn.Crim.App.1994); *Alley v. State,* 882 S.W.2d 810, 817 (Tenn.Crim.App.1994); *Rhoden v. State,* 816 S.W.2d 56, 59-60 (Tenn.Crim.App.1991); *Bankston v. State,* 815 S.W.2d 213, 215 (Tenn.Crim.App.1991); *Black v. State,* 794 S.W.2d 752, 755 (Tenn.Crim.App.1990); *Teague v. State,* 772 S.W.2d 932, 933-34 (Tenn.Crim.App.1988); *Brooks v. State,* 756 S.W.2d 288, 289 (Tenn.Crim.App.1988); *Vermilye v. State,* 754 S.W.2d 82, 84 (Tenn.Crim.App.1987); *State v. B uford,* 666 S.W.2d 473, 475 (Tenn.Crim.App.1983); *Clenny v. State,* 576 S.W.2d 12, 14 (Tenn.Crim.App.1978), *cert. denied* 441 U.S. 947, 99 S.Ct. 2170, 60 L.Ed.2d 1050 (1979); *Long v. State,* 510 S.W.2d 83, 86 (Tenn.Crim.App.1974). The supreme court recently applied this standard of review in a capital case when reviewing a lower court's determination on the ineffective assistance of counsel. *Goad v. State,* 938 S.W.2d 363, 368-69 (Tenn.1996).

[1] Applying these principles, we conclude that the factual findings of the trial court inherent in a harmless error analysis are entitled to a presumption of correctness. For example, the emphasis that the prosecutor placed on the invalid aggravating circumstance in closing argument, as well as the number of remaining valid aggravating circumstances, should be considered factual findings. Determinations on the quality of mitigating evidence are also entitled to the presumption. *See Parker v. Dugger,* 498 U.S. 308, 316-19, 111 S.Ct. 731, 737-38, 112 L.Ed.2d 812 (1991) (concluding that a state appellate court's determination that the trial judge found no mitigating circumstances in a capital trial is an issue of historical fact in habeas corpus proceedings and

entitled to presumption of correctness if fairly supported by the record).

[2] However, a trial court's ultimate conclusion of harmlessness is not entitled to a presumption of correctness, but rather requires a *de novo* review. *See Yates v. Evatt,* 500 U.S. 391, 405-06, 111 S.Ct. 1884, 1894, 114 L.Ed.2d 432 (1991) (evaluating the harmlessness of a constitutional error requires consideration of the entire record) (citations omitted); *Arizona v. Fulminante,* 499 U.S. 279, 294-96, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991) (stating that the Supreme Court has power to review the record *de novo* to determine error's harmlessness). This is due, in part, because the issue of harmlessness is a mixed question of law and fact. *See Deputy v. Taylor,* 19 F.3d 1485, 1496 (3d Cir.), *cert. denied* 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994) (finding that state court's conclusion of harmlessness is a mixed question of law and fact, not entitled to a presumption of correctness); *Suniga v. Bunnell,* 998 F.2d 664, 667 (9th Cir.1993) (determination by state appellate court that instructional error was harmless is mixed question of law and fact to be reviewed *de novo* ). *See also Cremeans v. Chapleau,* 62 F.3d 167, 169 (6th Cir.1995), *cert. denied* 516 U.S. 1096, 116 S.Ct. 822, 133 L.Ed.2d 765 (1996) (finding that mixed question of law and fact is not entitled to deference).

Furthermore, it is impossible to determine the impact of an error and evaluate its harmlessness without evaluating it in the context of the entire record. Our rules of appellate procedure require as much: "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, *considering the whole record,* error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." *See* Tenn. R.App. P. 36(b) (emphasis added). Moreover, *Howell* directs the reviewing ***803** court to examine the entire record for factors which potentially influenced the jury's decision. 868 S.W.2d at 260. This is necessary to satisfy the constitutional demand of individualized sentencing considerations in capital cases. *Stringer v. Black,* 503 U.S. 222, 229-30, 112 S.Ct. 1130, 1136, 117 L.Ed.2d 367 (1992).

In reaching these conclusions, we are guided by the approach used in federal courts for habeas corpus proceedings. (FN2) In such proceedings, factual findings of the state courts are entitled to a presumption of correctness, just as we grant deference to the post-conviction court. *See* 28 U.S.C. § 2254(e)(1) (Supp.1997). This deference is equally applicable to findings of a state appellate court. *Sumner v. Mata,* 449 U.S. 539, 546-48, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). However, when determining the harmlessness of an error, review of the record should be *de novo* with no presumption of correctness. *See Miller v. Fenton,* 474 U.S. 104, 110-12, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985) (concluding that ultimate question of admissibility of confession is not factual determination entitled to presumption of correctness). It is within this context that we review appellant's assigned errors.

## *MIDDLEBROOKS* ERROR

Appellant argues that his death sentence is infirm as a result of the jury's application of the felony-murder aggravating circumstance to his conviction for first degree felony murder. He contends that such error cannot be considered harmless in light of the substantial mitigating evidence presented at trial and the presence of only one valid aggravating circumstance. We disagree.

[3] When a defendant is convicted of first degree murder solely on the basis of felony murder, use of the aggravating circumstance that the murder was committed during the perpetration of a felony fails to sufficiently narrow the class of death-eligible murderers. *State v. Middlebrooks,* 840 S.W.2d 317, 346 (Tenn.1992). Because use of this aggravating circumstance in a felony-murder conviction to assess the death penalty duplicates the elements of the offense, it violates the Tennessee Constitution. *Id.* Thus, in order to support death as a penalty for the crime of felony murder, a finding of at least one of the other statutory aggravating circumstances is necessary. *Id* at 346-47. This rule has been held to apply retroactively. *Barber v. State,* 889 S.W.2d 185, 186 (Tenn.1994), *cert. denied* 513 U.S. 1184, 115 S.Ct. 1177, 130 L.Ed.2d 1129 (1995). (FN3)

It is apparent on the face of the record that a *Middlebrooks* error occurred in appellant's case. Appellant shot and killed Rhonda Greene during the course of a robbery of the Jiffy Market where she worked. As a result, the jury found him guilty of first degree felony murder. The jury's application of the felony-murder aggravating circumstance was duplicative of the elements of the crime. As a result, this circumstance cannot be used to support appellant's death sentence.

[4] Such error, however, does not automatically mandate a reversal of appellant's death sentence or require a new sentencing hearing. This Court must review the record of the evidence at trial and evaluate whether the error is harmless beyond a reasonable doubt. *See State v. Howell,* 868 S.W.2d 238, 259 (Tenn.1993), *cert. denied* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). To perform that analysis, our supreme court delineated certain factors which potentially influence the sentence imposed at trial. *Id* at 260. These relevant factors include: (1) the number and strength of the remaining valid aggravating circumstances; (2) the extent to which the prosecutor emphasized the invalid aggravating circumstance during closing ***804** argument; (3) the evidence admitted to establish the invalid aggravator; and (4) the nature, quality, and strength of the mitigating evidence. *Id* at 260-61. If the reviewing court determines that the jury would have imposed the same sentence had it given no weight to the invalid aggravating circumstance, the error is harmless and the sentence may be affirmed. *Id* at 262.

## *HOWELL* ANALYSIS

### A. Remaining Aggravators

[5] At appellant's trial, the jury found one other aggravating circumstance in addition to the felony-murder aggravator: appellant had previous convictions of felonies involving the use or threat of violence to the person. (FN4) Tenn.Code Ann. §

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

39-2404(i)(2) (Supp.1981). In support of this aggravating circumstance at the sentencing phase, the State introduced testimony and certified copies of convictions to substantiate three previous violent felonies from the state of Ohio: robbery, armed robbery and kidnapping. (FN5)

Although the number of valid aggravators is relevant, the crucial inquiry is the qualitative nature of the aggravating circumstance, its substance and persuasiveness, and the quantum of proof supporting it. *Howell,* 868 S.W.2d at 261. In this respect, our supreme court has determined that the prior violent felony aggravator is more qualitatively persuasive and objectively reliable than others. *Id.* Moreover, the influence of this aggravating circumstance increases if there is proof of multiple felony convictions. *Id. See also State v. Nichols,* 877 S.W.2d 722, 738 (Tenn.1994), *cert. denied* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995).

Appellant's previous robbery conviction arose from the hold-up of a dairy store in Cuyahoga Falls, Ohio. The victim, an eighteen-year-old clerk at the store, testified that appellant entered the store and demanded money. He had his hand in his pocket and she was unsure if he was armed. (FN6) The armed robbery conviction and kidnapping arose in Canton, Ohio. Appellant was armed and entered a restaurant. As he was robbing a waitress, a police cruiser drove into the restaurant parking lot. Appellant took the waitress hostage to make his escape. He and his accomplice held her for ten hours and then released her. The victim testified at trial, stating that appellant threatened her life more than once while she was being held, but that she was not physically harmed. She added that appellant did not want to release her and her accomplice eventually convinced him to do so. Appellant pled guilty to all three crimes and served approximately seven and one half years in an Ohio state prison. (FN7)

The record supports the trial court's finding that the remaining aggravating circumstance in appellant's case was supported by uncontradicted and overwhelming proof. The appellant testified to the substance of these crimes during the guilt phase, the State introduced certified copies of the convictions, and the victims of the crimes testified at the sentencing phase of appellant's trial. Due to the objective nature of this aggravating circumstance and the quantum of proof supporting it, we believe it significantly influenced the jury's verdict.

[6] Appellant argues that the admission of non-violent criminal acts during the penalty phase of the trial undermines confidence in the jury's determination on the previous violent felony aggravating circumstance. At the sentencing phase, the State introduced proof of convictions for malicious breaking and mail fraud. The circumstances surrounding **805** those offenses demonstrate that they did not involve violence or the threat of violence. A panel of this Court recently held that the admission of non-violent felonies at the penalty stage of a capital trial does not necessarily require a new sentencing hearing, but may be considered harmless error. *State v. Perry A. Cribbs,* No. 02C01-9508-CR-00211, 1997 WL 61507 (Tenn.Crim.App. at Jackson, February 14, 1997). *See also State v. Campbell,* 664 S.W.2d

281, 284 (Tenn.1984), *cert. denied* 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984). *But see State v. Johnson,* 661 S.W.2d 854 (Tenn.1983) (determining that admission of non-violent felonies in support of the aggravating circumstance was so prejudicial that it required a new sentencing hearing). In holding that any error at appellant's trial in this respect was harmless, we concur in the conclusion of *Cribbs* that the rationale of *Johnson* is inapplicable in light of subsequent United States Supreme Court holdings.    *See Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (permitting harmless error review when jury has relied on invalid aggravating circumstance in imposing death penalty).

We are confident in the jury's finding on this aggravating circumstance in light of the substantial proof offered to support it. Moreover, the trial court instructed the jury to only consider the robbery, armed robbery and kidnapping convictions when evaluating the aggravating circumstance. It specifically directed that no other previous convictions could be considered on the aggravator. (FN8) In light of these attendant facts and the overwhelming proof submitted on the prior violent felonies, we do not find that the introduction of these two non-violent crimes affected the jury's verdict. Any error in their admission was harmless. (FN9)

B. Prosecution's Closing Argument

[7] We next consider the prosecutor's closing argument and the extent to which it emphasized the invalid felony-murder aggravating circumstance. Our review of the record does not indicate that the district attorney placed any undue emphasis on this aggravating circumstance. The State sought to prove six statutory aggravating circumstances. The prosecutor's argument walked the jury through each of the aggravators and also addressed the mitigating circumstances. The prosecutor referred to the felony-murder aggravator only twice.

If any emphasis can be detected in the argument, it was devoted to the "witness killing" aggravator. Tenn.Code Ann. § 39-2404(i)(6) (Supp.1981) ( "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another"). This theory was a substantial component to the State's proof, beginning at the guilt phase of the trial. In response to questions by the prosecution, appellant acknowledged that the victims of his previous violent crimes identified him as the perpetrator. In light of that, the State implied that appellant intended to leave no witnesses to the robbery of the Jiffy Market to reduce the possibility of identification. That theory was additionally supported by proof that the appellant fired upon the other cashier at the market and circumstantial proof that appellant believed Greene was the only clerk in the store at the time of the robbery.    *See State v. Harries,* 657 S.W.2d 414, 417 (Tenn.1983).

Appellant acknowledges that only a small portion of the State's argument focused on the felony-murder aggravating circumstance, but argues that a substantial portion of the argument was devoted to the "witness elimination policy of the felony murder aggravator." He attempts to equate the felony-

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

murder aggravator with the witness-elimination aggravator. (FN10)   *Compare*  Tenn.Code Ann. **\*806**  § 39-2404(i)(7) (Supp.1981) *and* Tenn.Code Ann. § 39-2404(i)(6) (Supp.1981). This Court has previously rejected such a contention.   *State v. Leroy Hall, Jr.,*  No. 03C01-9303-CR-00065, 1996 WL 740822 (Tenn.Crim.App. at Knoxville, December 30, 1996). Similarly, claims that use of these two aggravators constitute double weighing have also been rejected.   *State v. James Blanton,*  No. 01C01-9307-CC-00218, 1996 WL 219609 (Tenn.Crim.App. at Nashville, April 30, 1997).

The legislature's delineation of these two separate aggravators is sufficient to rebut appellant's claim. A finding of either can be used to support the imposition of the death penalty.   *See*  Tenn.Code Ann. § 39-2404(g) (Supp.1981). In addition, the plain language of these aggravating circumstances signify that they seek to target two different groups of murderers. The witness-elimination aggravating circumstance, Tennessee Code Annotated section 39-2404(i)(6), enhances the punishment when it can be proven that at least one motive for the killing was the threat of defendant's apprehension.   *State v. Smith,*  868 S.W.2d 561, 580 (Tenn.1993),   *cert. denied,*  513 U.S. 960, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994). In contrast, the felony-murder aggravator is used to target those murderers who cause the death of the victim while committing, attempting to commit or fleeing from certain enumerated felonies. Tenn.Code Ann.           § 39-2404(i)(7) (Supp.1981). As such, different proof is necessary to support the imposition of each. Although it may be argued that in many felony murders the purpose is to eliminate witnesses, *State v. Terry,*  813 S.W.2d 420, 423 (Tenn.1991), such a blanket assertion does not apply to every felony murder. It cannot be said that every murder committed during the course of a felony is for the purpose of eliminating witnesses.   *State v. Teresa Deion Smith Harris,*  No. 02C01-9412-CC-00265, 1996 WL 654335 (Tenn.Crim.App. at Jackson, November 12, 1996). Each case must stand on its individual factual circumstances. Appellant's argument on this issue fails.

C. Evidence Supporting Invalid Circumstance

Also relevant to our determination is the evidence which was admitted to establish the invalid aggravating circumstance. We must consider whether an invalid aggravator was established by evidence that was materially inaccurate or admissible only to support the invalid aggravator, or whether the evidence was otherwise admissible in the guilt or sentencing phases. *Howell,*  868 S.W.2d at 261. Evidence that the murder was committed during the commission of a felony came during the State's case-in-chief at the guilt phase and resulted in appellant's conviction of felony murder. No additional evidence to support the invalid aggravator was introduced in the sentencing phase of the trial. An aggravating factor which duplicates the elements of the underlying crime, as in appellant's case, has less relative tendency to prejudicially affect the sentence imposed.   *Id.*   Appellant conceded this point at the post-conviction hearing.

D. Mitigation Evidence

[8] Finally, we must consider all the relevant mitigating evidence, including its nature, strength, and quality.   *Howell,*   868 S.W.2d at 262. Appellant's case is replete with information offered as mitigation, primarily pertaining to his history of drug and alcohol abuse and addiction. Indeed, at trial, drug and alcohol abuse was the primary theory of appellant's defense. Appellant contended that he was high on drugs at the time of the offense and unaware of his actions.

Appellant testified during the guilt phase of the trial. In addition to testimony of his previous crimes and periods of confinement, appellant detailed his use of drugs and alcohol during his teenage years that continued throughout his adult life. He stated that he unsuccessfully tried to overcome his drug habit while incarcerated. (FN11) In addition to alcohol, appellant provided detailed descriptions of the amount and types of drugs he was using in the days before and the day of    **\*807**  the shooting. Appellant's convicted accomplice and alleged drug supplier, Charles Wade Stapleton, attested to appellant's use of drugs and alcohol before the crime. (FN12)

Furthermore, appellant testified that he did not intend to kill Greene and that the shooting was accidental. He explained that the gun was cocked when he entered the store. As he pointed the gun at Greene, he claimed that another patron in the store startled and jostled him, causing the gun to discharge. Another aspect of appellant's testimony intended to be mitigating was that the gun did not belong to him. Appellant claimed that he obtained the gun from Ralph Page, a mutual friend of appellant and Stapleton, and that Page was the moving force behind the robbery. Appellant concluded his testimony by expressing remorse for the crime.

Appellant did not testify at the sentencing portion of the trial, relying on his earlier testimony as mitigation. Instead he introduced documentary evidence in mitigation at the sentencing phase. A report from Dr. Herbert Bockian, a psychiatrist who evaluated appellant's competency to stand trial and screened him for drug use, was read into the record. That drug screen, performed the week of the trial, revealed a trace amount of barbiturates in appellant's blood. The test was performed in response to appellant's claims that he was obtaining and taking drugs while confined. Apparently, the report was intended to corroborate appellant's testimony of his drug addiction.

A report from the Southern Ohio Correctional Facility was also introduced. The 1977 report reflected that appellant possessed a syringe and one pill of Creptodigin while in jail. Prison guards also observed fresh needle marks on appellant's arms at that time. Again, this was intended to corroborate appellant's testimony of drug abuse and addiction, specifically his claims that it continued throughout his confinement in penal institutions.

We view such evidence as having little, if any, value in lessening appellant's culpability in the eyes of the jury. Most of the evidence depicted an undesirable lifestyle, painting a picture of a man who "caroused" at night, slept during the day, and failed to maintain employment. In contrast, there

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

was absolutely no evidence introduced in support of appellant's good character. *State v. Howell,* 868 S.W.2d 238, 262 (Tenn.1993), *cert. denied* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994)

The jury obviously gave little weight to appellant's testimony that he was "spaced out" or high on drugs at the time of the crime. Appellant possessed a clear recollection of the events of that evening. Proof reflected that appellant and his accomplice drove around for some time before the crime to find a good place to rob. Appellant entered the store and waited for another customer to leave before he committed the crime. In addition, he had no difficulty fleeing from the crime scene, meeting his accomplice at an appointed place, and later counting the money and separating it from food stamps. After counting the money, he buried the money bags behind Stapleton's house and later that night gave the food stamps to Stapleton's niece. Those activities indicate a keen appreciation for the wrongfulness of his conduct. Moreover, the day following the crime, appellant, Stapleton, and Page traveled to North Carolina to dispose of the gun used in the murder. Following that trip, they had planned an elaborate scheme for the three of them to rendezvous in Florida.

The appellant argues that the trial court erred by finding the proof insufficient to sustain a determination that appellant was substantially impaired. Tenn.Code Ann.    §    39-2404(j)(8) (Supp.1981). As stated, we find the trial court's conclusion on substantial impairment supported by the record. However, he argues that even if the proof did not satisfy that statutory mitigator, the information could still have been considered in mitigation. *See*    Tenn.Code Ann.    §    39-2404(j) (Supp.1981) (mitigation evidence not limited   **\*808** to statutory mitigating circumstances). (FN13) *See also Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (holding that evidence at the sentencing phase cannot be limited to statutory mitigating circumstances). Contrary to appellant's assertion, the trial court did not find that the evidence could not be considered in mitigation. Rather, it gave it little weight in mitigation when considering it in light of the quality of the proof supporting the valid aggravating circumstance. *Howell,* 868 S.W.2d at 262. Even though the evidence may have been considered by the jury, its questionable value was necessarily considered by the trial court in weighing the harmlessness of the *Middlebrooks* error. *Hartman v. State,* 896 S.W.2d 94, 104 (Tenn.1995) (concluding that credibility of witness is relevant when weighing harmlessness of invalid aggravating factor).

Moreover, the trial court found that evidence of appellant's drug addiction was not persuasive in mitigation; there was virtually no factual proof offered in support of that claim. There was no medical evidence that appellant was addicted to drugs or alcohol, nor did the psychological evaluations indicate that appellant was addicted. His testimony on the issue, corroborated only by accomplice testimony and thin documentary evidence from four years before the crime, is hardly convincing or significant in light of the other proof.

The trial court also found by the appellant committing violent crimes to support a drug habit, any mitigation from which the appellant might benefit was negated. Appellant characterizes this conclusion as rank conjecture. Again, it was the trial court's duty to consider the quality and persuasiveness of the mitigating evidence in the weighing of harmless error. *Howell,* 868 S.W.2d at 262.

Other mitigation evidence offered by appellant lacked credibility. Appellant never disputed that he shot Rhonda Greene, but claimed that it was accidental. However, this was contradicted by other witnesses. Appellant claimed that Scott Fletcher, another store patron, startled him and jostled his arm causing the gun to fire. In contrast, Fletcher's statements to law enforcement and unequivocal testimony at trial reflected that he was standing outside the store in the parking lot at his car when he heard the gunshots. Additionally, the surviving store cashier testified that she saw Fletcher exit the store and moments later heard the gunshot.

Finally, appellant's remorse for Greene's death was of little value in mitigation. As the post-conviction trial court noted, this sorrow developed well after the crime was committed. After shooting Greene, appellant exhibited no remorse. He did not attempt to aid the victim, but instead fired a shot at the other clerk. He then repeatedly demanded the money from her and did not permit her to seek medical assistance for Greene.

We are aware that appellant has offered evidence throughout his post-conviction proceedings that he suffers from brain damage. He argues that this should be considered in mitigation of his crime. However, we note that such evidence was not before the jury and could not have played a role in its decision. In addition, the evidence of brain damage primarily consists of a letter from a New York psychiatrist, (FN14) dated five years after the crime. Although appellant has been evaluated on numerous occasions by both psychologists and psychiatrists, (FN15) the record before us   **\*809** does not indicate that other doctors have reached a similar conclusion. (FN16)

Appellant broadly attacks the    *Howell*   harmless error analysis because the jury is not required to specify the mitigating circumstances it considered. He contends that it is virtually impossible to determine harmlessness without knowing which facts the jury considered in mitigation. Our supreme court, acknowledging that juries do not specify mitigating circumstances, has nevertheless found that a harmless error analysis can be performed. The court quoted with approval from    *Clemons v. Mississippi,* 494 U.S. 738, 756, 110 S.Ct. 1441, 1452, 108 L.Ed.2d 725 (1990):

Nor are we impressed with the claim that without written jury findings concerning mitigating circumstances appellate courts cannot perform their proper role. In    *Fonzeo* and *Proffit,* we upheld the Florida death penalty scheme permitting a trial judge to override a jury's recommendation of life, even though there were no written jury findings. An appellate court also is able adequately to evaluate any evidence relating to mitigating factors without the assistance of written

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

jury findings.

*Howell,* 868 S.W.2d at 260.   Appellant's argument is without merit.

Appellant argues that his death sentence cannot be upheld in light of the supreme court's ruling in *State v. Walker,* 910 S.W.2d 381 (Tenn.1995). In *Walker,* a direct appeal of a death sentence, the court was unable to find the *Middlebrooks* error harmless where the only valid remaining aggravator was a previous violent felony conviction. *Id* at 398. However, *Walker* is readily distinguishable from appellant's case. At the Walker trial, the remaining aggravator was supported by only one voluntary manslaughter conviction. *Cf. Michael J. Boyd v. State,* No. 02C01-9406-CR-00131, 1996 WL 75351 (Tenn.Crim.App. at Jackson, February 21, 1996), *appeal granted* (Tenn. November 25, 1996) (finding in review of post-conviction proceeding that use of felony-murder aggravating circumstance harmless beyond a reasonable doubt where remaining valid aggravator, prior violent felonies, was supported by one conviction for second degree murder). Here, however, the aggravator at appellant's trial was supported by proof of three previous violent felonies and a portion of that proof was appellant's own testimony. Therefore, the nature and the quantum of proof supporting the aggravator was far more substantial than in *Walker.*

In fulfilling our duty to evaluate the mitigating evidence, we find that the evidence proffered was of little consequence in lowering appellant's culpability. Appellant admitted shooting the victim and his claims in mitigation did little to ameliorate his liability for the crime. On two separate occasions, the supreme court has considered similar mitigating evidence presented on behalf of defendants and found it insufficient to require a new sentencing hearing in the context of harmless error. *See State v. Hines,* 919 S.W.2d 573, 584 (Tenn.1995); *Howell,* 868 S.W.2d at 262. Considering the substantial proof presented on the remaining valid aggravator and the nature of that proof, coupled with the prosecutor's argument and absence of inadmissible proof of the invalid aggravator, we find that the jury would have imposed the death penalty had it not considered the invalid felony-murder aggravating circumstance.

CONCLUSION

The trial court's findings of fact on the individual factors considered in *Howell* are fully supported by the record. Moreover, our *de novo* review indicates that the error in applying the felony-murder aggravator to appellant's case was harmless beyond a reasonable **\*810.** doubt. The judgment of the trial court dismissing the appellant's post-conviction petition is affirmed. Unless stayed by a court of competent jurisdiction, the appellant's sentence of death by electrocution shall be carried out on February 10, 1998.

WADE and CURWOOD WITT, JJ., concur.

(FN1.) A full recitation of the factual circumstances surrounding the offense is contained in the supreme court's opinion in appellant's case on direct appeal. *State v. Harries,* 657 S.W.2d 414 (Tenn.1983).

(FN2.) This Court has previously held that post-conviction review is comparable in scope to federal habeas corpus review. *Luttrell v. State,* 644 S.W.2d 408, 409 (Tenn.Crim.App.1982).

(FN3.) Ordinarily, the statute of limitations would have expired on July 1, 1989, thereby preventing this late-filed post-conviction petition. Tenn.Code Ann. § 40-30-102 (repealed 1995). *See also State v. Masucci,* 754 S.W.2d 90, 91 (Tenn.Crim.App.1988). However, with regard to affording appellant the right to litigate the *Middlebrooks* issue, his present petition was timely under the rule announced in *Burford v. State,* 845 S.W.2d 204 (Tenn.1992).

(FN4.) At trial, appellant conceded the presence of these two aggravators in his closing argument.

(FN5.) Appellant testified about his previous convictions during his direct testimony at the guilt phase of the trial.

(FN6.) The characterization of this crime as a violent felony used to support the aggravating circumstance was challenged on direct appeal. The victim's testimony was that she was placed in fear because appellant's hand was in his pocket in a manner indicating that he had a weapon. Considering that fact, our supreme court found that it was not error to admit the conviction. *Harries,* 657 S.W.2d at 421.

(FN7.) Upon release, appellant was immediately incarcerated in federal prison for mail fraud. Appellant committed the instant offense less than two months after his December 12, 1980, release from confinement.

(FN8.) As a corollary, the trial court further instructed the jury that all of appellant's previous convictions could be considered to rebut any claim or potential claim in mitigation that appellant had no significant history of prior criminal activity. *See* Tenn.Code Ann. § 39-2404(c) (Supp.1981).

(FN9.) Introduction of the mail fraud conviction was challenged on direct appeal. The supreme court found that its admission was harmless error. *Harries,* 657 S.W.2d at 421-22.

(FN10.) Although argued by the State, the jury did not find the witness-elimination aggravating circumstance.

(FN11.) Appellant testified that when he was nearing release from prison, he sought methadone treatment from the prison doctor. This claim was not corroborated by any other evidence in the record.

(FN12.) The State contended that this was in exchange for favorable testimony appellant had already given on behalf of Stapleton at his trial.

(FN13.) Appellant's brief cites "Section 39-2404(j)(9)" which allegedly "provided that the jury could consider 'any other evidence you find to be mitigating circumstances.' " We note that subsection (j)(9) was not a part of the 1981 statute.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

72C

958 S.W.2d 799, Harries v. State, (Tenn.Crim.App. 1997)                    Page 9

However, the trial court's instructions to the jury advised that the jury could consider any facts or circumstances in mitigation.

(FN14.) This evaluation was the basis of a 1984 ruling by a federal district court that appellant was incompetent to waive his post-conviction rights and proceed to execution.   *See    Groseclose ex rel. Harries v. Dutton,    594 F.Supp. 949, 956 (M.D.Tenn.1984).*

(FN15.) Appellant's competency to stand trial was evaluated twice before the trial, as well as his ability to appreciate the wrongfulness of his

conduct at the time of the offense.  No personality disorders or defects were discovered.  We also note that, according to testimony from appellant's trial counsel, appellant was vehemently opposed to pursuing an insanity defense and instructed his attorneys not to consider it.  Moreover, appellant's competency to proceed in the instant proceeding was evaluated at the trial court level.

**\*810_**   (FN16.) We acknowledge that a report from a boys' home may have alluded to brain damage. However, this testing was done in 1962 and testimony at the first post-conviction hearing attacked the credibility of this finding.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                                                                          Page 1

**\*797** 885 S.W.2d 797

Supreme Court of Tennessee,
at Nashville.

STATE of Tennessee, Appellee,
v.
Roosevelt BIGBEE, Appellant.
Oct. 3, 1994.

Defendant was convicted in the Criminal Court, Sumner County, Fred A. Kelly, III, J., of felony murder during attempted robbery and was sentenced to death. Defendant appealed. The Supreme Court, Anderson, J., held that: (1) informant's testimony sufficiently corroborated testimony by accomplice; (2) defendant failed to establish that juror was racially biased; (3) appeal to jury's sympathies during guilt phase was not so inflammatory as to require reversal; (4) prosecutorial misconduct during penalty phase required reversal of sentence; and (5) state's use of felony murder as aggravating circumstance during penalty phase violated state constitution.

Conviction affirmed, sentence reversed, and remanded for resentencing.

Reid, J., filed concurring opinion.

O'Brien, C.J. and Drowota, J., filed concurring and dissenting opinions.

West Headnotes

[1] Criminal Law ⬥511.1(9)
110 ----
  110XVII Evidence
    110XVII(S) Testimony of Accomplices and
        Codefendants
      110XVII(S)2 Corroboration
        110k511 Sufficiency
          110k511.1 In General
          110k511.1(6) Particular Offenses
          110k511.1(9) Larceny; Burglary; Robbery;
              Receiving Stolen Goods.
  Testimony of informant sufficiently corroborated testimony of accomplice implicating defendant in murder during robbery attempt; informant testified that he overheard defendant's conversation in jail in which defendant described how he shot victim, although jailer testified that layout of jail would have precluded defendant from having alleged conversation.

[2] Criminal Law ⬥785(4)
110 ----
  110XX Trial
    110XX(G) Instructions: Necessity, Requisites,
        and Sufficiency
      110k785 Credibility of Witnesses
      110k785(4) Police Officers, Detectives, and
          Informers.
  Trial court was not required to instruct jury to consider testimony of informer or accomplice with greater care and caution than that used to examine testimony of other witnesses; jury already had been informed that conviction could not be based upon unsupported testimony of accomplice, and that jury was to reconcile conflicting testimony of witnesses in light of presumption that all witnesses were

truthful.

[3] Criminal Law ⬥788
110 ----
  110XX Trial
    110XX(G) Instructions: Necessity, Requisites,
        and Sufficiency
      110k788 Failure to Call Witness or Produce
          Evidence.
  Missing witness instruction was not required for accomplice, in light of facts that accomplice was equally available to either side as witness, and that nothing in record indicated relationship between state and accomplice which would naturally incline accomplice to testify favorably for state.

[4] Jury ⬥97(1)
230 ----
  230V Competency of Jurors, Challenges, and
      Objections
    230k97 Bias and Prejudice
    230k97(1) In General.
  Defendant failed to establish that juror had racial bias or prejudice against defendant in violation of defendant's right to impartial jury; juror expressly stated he could be impartial during voir dire, but juror appeared at court house wearing shirt displaying "southern justice" which was name of juror's band, juror allegedly gestured as if pulling electric switch at time that death sentence was announced, and juror hugged victim's family in hallway of court house after trial. Const. Art. 1, §§ 8, 9; U.S.C.A. Const.Amends. 6, 14.

[5] Jury ⬥132
230 ----
  230V Competency of Jurors, Challenges, and
      Objections
    230k124 Challenges for Cause
    230k132 Evidence.
  Burden is on defendant to show that juror is in some way biased or prejudiced if juror is not legally disqualified or there is no inherent prejudice.

[6] Criminal Law ⬥1043(2)
110 ----
  110XXIV Review
    110XXIV(E) Presentation and Reservation in
        Lower Court of Grounds of Review
      110XXIV(E)1 In General
        110k1043 Scope and Effect of Objection
        110k1043(2) Necessity of Specific Objection.
  Defendant failed to establish claim of deceptive interrogation by informant, absent objection or motion at trial to focus proof and fully delineate critical issue of whether informant was acting as agent for state.

[7] Criminal Law ⬥1169.1(10)
110 ----
  110XXIV Review
    110XXIV(Q) Harmless and Reversible Error
      110k1169 Admission of Evidence
        110k1169.1 In General
        110k1169.1(10) Documentary and
            Demonstrative Evidence.
  Admission of irrelevant evidence of loaded pistol and holster found under backseat of patrol car in which defendant and codefendant were transferred from jail was harmless error, in light of defense attorney's wide latitude in demonstrating how difficult it would have been for either defendant or

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

722

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                                    Page 2

codefendant to smuggle loaded gun out of jail.
Rules Crim.Proc., Rule 52(a).

[8] Criminal Law ⬅═404.65
  110 ----
    110XVII Evidence
      110XVII(K) Demonstrative Evidence
        110k404.35 Particular Objects
      110k404.65 Weapons and Related Objects.
  Probative value of revolver's admission into
evidence was not substantially outweighed by its
prejudicial effect even though state's firearms expert
testified that bullets found at scene of robbery and
murder could not come from revolver admitted
at trial, in light of evidence that another gun of same
caliber was used in crime but not fired. Rules of
Evid., Rule 403.

[9] Criminal Law ⬅═438(8)
  110 ----
    110XVII Evidence
      110XVII(P) Documentary Evidence
        110k431 Private Writings and Publications
          110k438 Photographs and Other Pictures
          110k438(8) Special Types of Photographs;
                 Enlargements, Motion and Sound
                 Pictures, X-Rays.
  Admissibility of videotapes of crime scene is
within sound discretion of trial judge whose ruling
will not be overturned without clear showing of
abuse of discretion.

[10] Criminal Law ⬅═438(8)
  110 ----
    110XVII Evidence
      110XVII(P) Documentary Evidence
        110k431 Private Writings and Publications
          110k438 Photographs and Other Pictures
          110k438(8) Special Types of Photographs;
                 Enlargements, Motion and Sound
                 Pictures, X-Rays.
  Trial court did not abuse its discretion in allowing
videotape of crime scene to be played at trial even
though portion of tape showing victim's body and
face was unpleasant and showed postmortem lividity
and rigor mortis. Rules of Evid., Rule 403.

[11] Criminal Law ⬅═700(2.1)
  110 ----
    110XX Trial
      110XX(E) Arguments and Conduct of Counsel
        110k700 Rights and Duties of Prosecuting
                 Attorney
        110k700(2) Disclosure or Suppression of
                 Information
      110k700(2.1) In General.
  In order to prove *Brady* violation, defendant must
establish that prosecutor suppressed discoverable
information, that information was of favorable
character for defendants, and that suppressed
information was material.

[12] Criminal Law ⬅═700(2.1)
  110 ----
    110XX Trial
      110XX(E) Arguments and Conduct of Counsel
        110k700 Rights and Duties of Prosecuting
                 Attorney
        110k700(2) Disclosure or Suppression of
                 Information
      110k700(2.1) In General.
  No *Brady* violation occurred from state's failure to

disclose existence of fingerprints and footprint which
did not implicate defendant, absent any evidence of
intentional withholding of exculpatory evidence, and
in light of fact that evidence at issue was brought out
at trial; state did  **797** not disclose existence of
fingerprints and footprints due to misunderstanding
between state and defense lawyers.

[13] Criminal Law ⬅═726
  110 ----
    110XX Trial
      110XX(E) Arguments and Conduct of Counsel
      110k726 Responsive Statements and Remarks.
  Prosecutor's statement in argument that defense
counsel had known of lack of fingerprints matching
defendant for years was fair rebuttal to defense
counsel's remarks suggesting that defense counsel
had not been told ahead of time that prints excluded
defendant.

[14] Homicide ⬅═169(1)
  203 ----
    203VII Evidence
      203VII(B) Admissibility in General
        203k169 Circumstances Preceding Act
      203k169(1) In General.
  Testimony of murder victim's daughter was
relevant to show that daughter had spoken with her
father by telephone at specific time on night of his
death.

[15] Homicide ⬅═338(1)
  203 ----
    203X Appeal and Error
      203k333 Harmless Error
      203k338 Admission of Evidence
      203k338(1) In General.
  Error, if any, from admission of potentially
irrelevant testimony of store manager about
employee who was murdered in store was harmless,
in light of brief and straight forward nature of
testimony.

[16] Criminal Law ⬅═1171.1(6)
  . 110 ----
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1171 Arguments and Conduct of Counsel
          110k1171.1 In General
          110k1171.1(2) Statements as to Facts,
                 Comments, and Arguments
          110k1171.1(6) Appeals to Sympathy or
                 Prejudice; Argument as to
                 Punishment.
  State's improper argument about murder victim
which appealed to emotions and sympathies of jury,
taken in context and read as a whole, was not so
inflammatory that it more probably than not
prejudiced jury's verdict; state reminded jury of
children victim had left behind, fact that victim was
working during holidays to support his family when
murdered during attempted robbery, and suggesting
that holding defendant accountable would do justice.
Rules App.Proc., Rule 36(b); Rules Crim.Proc.,
Rule 52(a).

[17] Sentencing and Punishment ⬅═1780(2)
  · 350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

350Hk1780(2) Arguments and Conduct of
    Counsel.

(Formerly 110k722.5)
Prosecutor engaged in misconduct during closing
argument in penalty phase of capital murder trial by
informing jury that defendant had received life
sentence as punishment for prior conviction for
another murder.

[18] Sentencing and Punishment ⬥1780(2)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
            350Hk1780(2) Arguments and Conduct of
                Counsel.

(Formerly 110k722.5)
Prosecutor engaged in misconduct during closing
argument in penalty phase of capital murder trial by
extensively referring to facts of prior murder of
which defendant had been convicted, including
character of prior victim and impact of her death
upon her family.

[19] Sentencing and Punishment ⬥1762
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)2 Evidence
          350Hk1755 Admissibility
            350Hk1762 Other Offenses, Charges, or
                Misconduct.

(Formerly 110k1208.1(6))
Evidence of facts regarding previous conviction to
show that it involved violence or threat of violence
to person is admissible at sentencing hearing of
capital case in order to establish aggravating
circumstance, but evidence regarding specific facts
of prior crime is not admissible if conviction on its
face shows that it involved violence or threat of
violence.

[20] Sentencing and Punishment ⬥1762
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)2 Evidence
          350Hk1755 Admissibility
            350Hk1762 Other Offenses, Charges, or
                Misconduct.

(Formerly 110k1208.1(6))
Evidence and argument regarding victim of crime
other than crime for which defendant is being
sentenced is irrelevant and inadmissible in penalty
phase of capital murder trial.

[21] Sentencing and Punishment ⬥1780(2)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
            350Hk1780(2) Arguments and Conduct of
                Counsel.

(Formerly 110k722.5)
Prosecutor engaged in improper closing argument

during penalty phase of capital murder trial by
strongly implying that imposition of death penalty
would be appropriate way to further punish
defendant for prior killing for which defendant
already had received life sentence.

[22] Sentencing and Punishment ⬥1780(2)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
            350Hk1780(2) Arguments and Conduct of
                Counsel.

(Formerly 110k723(1))
Prosecutor engaged in misconduct during closing
argument of penalty phase of capital murder trial by
making thinly veiled appeal to vengeance through
reminder to jury that no one had been able to ask for
mercy for murder victims, and by encouraging jury
to give defendant same consideration he had given
victims, although prosecutor could counsel jury to
avoid emotional responses not rooted in evidence;
argument improperly encouraged jury to make
retaliatory sentencing decision rather than reasoned
moral response to evidence.

[23] Criminal Law ⬥1171.1(3)
  110 ----
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1171 Arguments and Conduct of Counsel
          110k1171.1 In General
            110k1171.1(2) Statements as to Facts,
                Comments, and Arguments
            110k1171.1(3) Particular Statements,
                Comments, and Arguments.

Cumulative effect of improper prosecutorial
argument during closing argument and admission of
irrelevant evidence about defendant's prior murder
conviction affected jury's determination in penalty
phase of capital murder trial, and thus required
reversal of sentence of death and remand for new
sentencing hearing.

[24] Sentencing and Punishment ⬥1780(2)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
            350Hk1780(2) Arguments and Conduct of
                Counsel.

(Formerly 110k723(3))
State should avoid subject of general deterrence
during argument in penalty phase of capital murder
trial.

[25] Sentencing and Punishment ⬥1780(3)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
            350Hk1780(3) Instructions.

(Formerly 110k796)
Instruction that jury must take into account only
those aggravating circumstances proven beyond
reasonable doubt, and no other facts or

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                   Page 4

circumstances, as basis for deciding whether to
impose death penalty in capital murder trial
sufficiently foreclosed consideration of irrelevant
matters including deterrent effect of death penalty
and cost of maintaining prisoner for life in prison,
despite lack of specific instruction not to consider
such matters.

[26] Sentencing and Punishment ☞ 1780(3)
350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)3 Hearing
        350Hk1780 Conduct of Hearing
        350Hk1780(3) Instructions.

  (Formerly 110k1213.7)
  Eighth Amendment does not require instruction in
penalty phase of capital murder trial to suggest that
jury consider as mitigating circumstance any
residual or lingering doubt it may have about
defendant's guilt. U.S.C.A. Const.Amend. 8.

[27] Homicide ☞ 311
  203 ----
    203VIII Trial
      203VIII(C) Instructions
      203k311 Punishment.
  Specific instruction informing jury to consider
criminal justice system's treatment of codefendants
involved in attempted robbery and murder *797 as
mitigating circumstance was not required in penalty
phase of murder trial, in light of fact that jury
learned during course of trial about codefendants'
sentences and cooperation with authorities.

[28] Sentencing and Punishment ☞ 1780(3)
350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)3 Hearing
        350Hk1780 Conduct of Hearing
        350Hk1780(3) Instructions.

  (Formerly 203k311)
  Trial court could charge jury pursuant to capital
punishment statute in effect at time of offense,
rather than pursuant to statute in effect at time of
penalty phase of capital murder trial which applied
standard of beyond reasonable doubt to issue of
whether aggravating circumstances outweighed
mitigating circumstances. T.C.A. § 39-13-204(g);
§ 39-2-203(g) (Repealed).

[29] Sentencing and Punishment ☞ 1660
350H ----
  350HVIII The Death Penalty
    350HVIII(C) Factors Affecting Imposition in
            General
      350Hk1660 Dual Use of Evidence or
            Aggravating Factor.

  (Formerly 203k357(10))
  State's use of felony murder as aggravating
circumstance for penalty phase of capital murder
trial violated state constitution in light of fact that
felony-murder aggravating circumstance merely
duplicated crime itself without narrowing class of
felony murderers eligible for death penalty. T.C.A.
§ 39-2-203(i)(7); §   39-2-204(i)(7) (Repealed);
Const. Art. 1, § 16.

[30] Constitutional Law ☞ 268(3)
  92 ----
    92XII Due Process of Law
      92k256 Criminal Prosecutions
        92k268 Trial
          92k268(2) Particular Cases and Problems
          92k268(3) Time of Trial in General;
              Opportunity to Obtain Counsel and
              Prepare.

  [See headnote text below]

[30] Criminal Law ☞ 577.10(5)
  110 ----
    110XVIII Time of Trial
      110XVIII(B) Decisions Subsequent to 1966
        110k577.10 Factors Affecting Application of
            Requirements in General
          110k577.10(5) Multiple Charges or
              Defendants.
  Defendant's due process rights were not violated
by state's delay of capital murder trial until
completion of another murder trial against defendant
in order to provide aggravating circumstance of
previous conviction of felony involving violence,
regardless of chronological order in which crimes
actually were committed. U.S.C.A. Const.Amends.
5, 14.

  *800 Broch Mehler, Capitol Case Resource
Center, Nashville, William B. Vest (deceased),
Niceville, FL, for appellant.

  Charles W. Burson, Atty. Gen. & Reporter,
Rebecca L. Gundt, Asst. Atty. Gen., Nashville, for
appellee.

OPINION

ANDERSON, Justice.

  In this capital case, the defendant, Roosevelt
Bigbee, was convicted of first-degree felony murder
in an attempt to perpetrate a robbery. In the
sentencing hearing, the jury found two aggravating
circumstances: (1) that the defendant was
previously convicted of one or more violent felonies;
and (2) that the murder was committed while the
defendant was attempting to commit a robbery.
Tenn.Code Ann. § 39-2-203(i)(2), and (7) (1982).
(FN1) The jury found that there were no mitigating
circumstances sufficiently substantial to outweigh the
aggravating circumstances and sentenced the
defendant to death by electrocution.

  On appeal, the defendant raises numerous issues
for our review which involve alleged errors
occurring during both the guilt and sentencing
phases of trial. We have carefully considered the
defendant's contentions as to errors occurring during
the guilt phase and have decided that none require
reversal. We therefore affirm the defendant's
conviction.

  However, we conclude that the sentence of death
must be reversed and the case remanded for a new
sentencing hearing. Irrelevant evidence was
admitted regarding the defendant's previous
conviction of first-degree felony murder, and that
error, combined with improper prosecutorial
argument, resulted in plain error that affected the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

substantial rights of the defendant. Tenn.R.Crim.P. 52(b). Those errors were also compounded by the use in this case of the felony murder aggravating circumstance, which was held to be error under *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992) (Drowota, J. and O'Brien, J., dissenting). After reviewing the record, we are unable to conclude that the cumulative effect of the errors was harmless beyond a reasonable doubt. Accordingly, the sentence of death is reversed and the case remanded for resentencing.

## *FACTUAL BACKGROUND*

The defendant was convicted of the felony murder of Monty Clymer, a relief clerk at a Delta Express Market in Hendersonville, Tennessee. Clymer, who worked the midnight shift, was killed sometime between 12:50 and 1:30 a.m. on December 28, 1988. Disarray about the store's counter and injuries to Clymer's body indicated a struggle had occurred. He had been beaten about the face and shot four times: one wound through the back left thigh, one through the back right shoulder, one graze wound to the right shoulder, and one contact wound to the left chest. The wound to the chest had been fatal. No money was missing from the market and $82.00 was found in the victim's wallet.

The key State's evidence in this case was testimony from the defendant's brother-in-law and co-defendant, Joe T. Baker, who had previously pled guilty to Clymer's murder and received a life sentence. Baker testified that on the evening of December 27, 1988, he and the defendant had picked up Chris and Joel Hoosier at a poolroom in Clarksville around 6:30 p.m. According to him, the four **\*801** men rode around for awhile and discussed robbing a convenience store "somewhere away from Clarksville." Baker said that the group drove to Springfield, where Baker borrowed four pistols from a man named Tom Sircy, and that Chris Hoosier took a .25 caliber gun, Joel Hoosier a .22, the defendant a .38, and Baker a second .22. Baker related that the four then drove around for hours, wandering between Nashville and Springfield, smoking marijuana mixed with cocaine and looking for an "easy target" until they arrived at the Delta Market in Hendersonville.

When the four entered the market, Baker testified, Joel Hoosier, who was standing by the door, told Clymer to give him the money. Thinking Clymer was reaching for something other than cash, Baker stepped forward and began pistol whipping Clymer about the face. Chris Hoosier was standing behind Baker on the left; the defendant was to Baker's right. According to Baker, he struggled with Clymer until he felt his pistol slipping from his grasp and heard a gun fire. At that point, Clymer loosened his grip on Baker's wrist and fell to the floor. Firing his own pistol, Baker fled the market. Baker testified that for some unknown reason his gun stopped working during this time.

After the other three men returned to the car, Baker testified, Joel Hoosier tried to give Baker some money. Baker testified that before entering the market, none of the group had any money. Baker said that he had refused the money. Baker also told the jury that his companions had agreed with him when he had remarked that he hoped the clerk was dead because he had seen all of them. The four next drove to Springfield, according to Baker, where they gave the defendant's cousin, Lewis Mason, all of the guns except the .25, which Baker kept. Mason was to return the guns to Sircy. After leaving the Hoosiers at their house in Clarksville, Baker said, he and the defendant talked about what had happened. Baker said that when he asked the defendant if he had shot the clerk, the defendant replied that he had and claimed that he had done it because he was afraid the clerk would get Baker's pistol and Baker would be shot. "[H]e done it for me," explained Baker.

The State offered testimony in corroboration from another witness, Sandy Womack, who said that, on Father's Day 1989, while incarcerated in the Montgomery County Jail, he overheard a conversation between the youngest Hoosier brother, Eric, and the defendant, during which Eric had asked the defendant to tell him some things about the Hendersonville killing. When asked how many people Joe [Baker] said had had a gun in Hendersonville, the defendant told Eric, "We all got one." When asked how far away he had been standing when he shot, the defendant replied, "Two, three, four feet." The defendant also made a remark about his having held the gun "so high" during the episode that it could be seen from any car passing by the market. Womack said that the conversation occurred in the law library at the jail, which was accessible to all the prisoners. Womack also said that, although the defendant was in another wing of the jail, Hoosier was able to converse with the defendant because the steel doors in the law library separating the two wings had a one to two inch space all the way around them. Womack said he was able to overhear the conversation because he was standing near the door.

In addition to Baker and Womack, the State also called the defendant's cousin, Lewis Mason, as a witness. Mason testified that Baker and the defendant borrowed a .22 caliber gun from him twice near the end of 1988. When the gun was returned to him the second time, Mason said, it had a screw missing from the hammer. Mason specifically contradicted Baker's statement that he had given Mason the guns to return to Sircy on December 28, 1988.

None of the fingerprints found at the market nor any other physical evidence from the scene or the automobile driven by the offenders on the night of the killing connected the defendant, Baker, or the Hoosiers to the killing. The murder weapon was never found.

At the scene of the crime, police discovered two spent .22 caliber bullets, two spent .38 caliber bullets, and pieces of a broken trigger **\*802** guard. A third .38 caliber bullet was removed from the fatal wound in Clymer's chest. A ballistics expert testified that the fatal wound was a contact wound. He said he was able to make that determination because the bullet had passed through five folds of the victim's shirt fabric. This indicated that the gun was being pressed against the shirt at the time it was fired.

Defense strategy at the guilt phase consisted, for the most part, of testimony or impeachment that

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

726

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                                      Page 6

called into question the credibility of Baker and
Womack and raised doubts about the evidence
collected at the crime scene. On cross examination,
the defense attorney questioned Baker closely and
Baker acknowledged that he had lied repeatedly to
both Clarksville and Hendersonville authorities, that
he had been convicted of perjury as a result of his
testimony at Joel Hoosier's preliminary hearing, that
he looked upon the Hendersonville case as a way out
of his problems in Clarksville where he was facing a
capital trial, that he was willing to say almost
anything to avoid the death penalty, that his
testimony against Bigbee was part of a plea
agreement with the State whereby he received a life
sentence, and that he had been dishonorably
discharged from the Marines after pleading guilty to
forgery, making false statements, and conspiracy to
possess and distribute cocaine.

Responses to cross-examination questions revealed
that Womack had been convicted of two robberies in
Montgomery County in March of 1989 and
sentenced to 15 years and 50 years, that he had six
robbery charges and an habitual criminal charge
pending in Robertson County, and that he was under
indictment in Davidson County. Womack admitted
that, at least initially, he had cooperated with
authorities in hopes of bettering his own situation;
however, he denied ever receiving a deal. In
response to questions that revealed the charges in
Robertson County had been retired after Womack
began cooperating with authorities in Sumner
County, Womack insisted that retirement of the
Robertson County charges was unrelated to his
cooperation with Sumner County authorities.

As substantive evidence aimed at destroying the
credibility of Baker and Womack, the defense
offered the testimony of Tonya Baker, wife of Joe
Baker and the defendant's sister. She testified that
in either January or February of 1989, her husband
instructed her to call the Hendersonville police
department and ask them whether it was a man or a
woman who had been killed at the Delta Market.
She also testified that her husband had asked her to
go to the library in Springfield and obtain newspaper
articles about the Hendersonville killing. Tonya
Baker further testified that she had determined the
gender of the victim and related that information to
her husband but had not obtained the newspaper
accounts he had requested.

With respect to the credibility of Womack, a jailer
at the Montgomery County jail testified that in May
of 1989, when Womack said he had overheard the
conversation between the defendant and Eric
Hoosier, the law library was accessible to prisoners
only during GED classes or other special programs
and that during those times guards were in the room.
The jailer also testified that communication between
the steel doors separating the two wings of the jail
could only be accomplished by screaming because
there was no two-inch space around the doors as
Womack had testified.

Finally, to show that Baker and Womack's
accounts of the killing were in conflict with the
physical evidence, the defense relied upon the
State's ballistic expert, who testified that the fatal
wound, fired from the .38 caliber gun, had been a
contact wound. Both Womack and Baker had
testified that the defendant was at least two feet

away from Clymer when the shot was fired.

Based on all the evidence presented in the guilt
phase, the jury found the defendant, Roosevelt
Bigbee, guilty of first-degree felony murder during
an attempted robbery.

In the sentencing phase of the trial, the State relied
upon the evidence presented during the guilt phase
and also introduced certified copies of the
defendant's previous convictions of first degree
felony murder and robbery by use of a deadly
weapon in August of 1990, in Montgomery County,
Tennessee. In addition to the certified copies of the
**803 convictions, the State presented testimony
from Jay Runyon, one of the detectives in charge of
investigating the murder in Montgomery County.
Runyon informed the jury that the Clarksville
murder occurred in a convenience store; that the
victim, a forty-year-old female with four children,
was the clerk of the store; that the murder occurred
at 1:17 a.m.; and that the victim was shot twice
but had three bullet wounds to her body, two in her
chest and one, a defensive wound, in the palm of
her hand.

The defendant presented no proof at the sentencing
phase; however, the trial judge allowed his attorney
to convey to the jury that the defendant wanted them
to know that he was innocent of the murder.

Based on the proof, the jury found the existence of
two aggravating circumstances beyond a reasonable
doubt. These were: (1) that the defendant had been
previously convicted of a violent felony offense and
(2) that the murder was committed while the
defendant was engaged in attempting to commit a
felony, robbery. Tenn.Code Ann. § 39-2-203(i)(2)
and (7) (1982). In addition, the jury found that the
mitigating circumstances were not sufficiently
substantial to outweigh the aggravating
circumstances and, as a result, sentenced the
defendant to death.

*PART I.*

*GUILT PHASE--TRIAL ERRORS*

*A. Sufficiency of the Proof*

*1. Corroboration of Accomplice Testimony*

[1] The defendant argues that the evidence is
insufficient to support the jury verdict finding him
guilty of first degree felony murder because there
was insufficient evidence to corroborate the
testimony of Baker, an accomplice.

It is well-established that a jury verdict, approved
by the trial judge, accredits the testimony of the
witnesses for the State, resolves all conflicts in favor
of the theory of the State, and removes the
presumption of innocence. *State v. Harris,* 839
S.W.2d 54, 75 (Tenn.1992). On appeal, the State is
entitled to the strongest legitimate view of the
evidence and all reasonable inferences which might
be drawn therefrom. *State v. Cabbage,* 571 S.W.2d
832, 835 (Tenn.1978). Where, as here, the
sufficiency of the convicting evidence is challenged,
the relevant question for an appellate court is
whether, after viewing the evidence in the light most
favorable to the State, any rational trier of fact could

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                    Page 7

have found the defendant guilty beyond a reasonable doubt. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

It is beyond dispute that in Tennessee a conviction may not be based upon the uncorroborated testimony of an accomplice. *Monts v. State,* 214 Tenn. 171, 379 S.W.2d 34, 43 (1964); *Stanley v. State,* 189 Tenn. 110, 222 S.W.2d 384 (1949). Whether a witness' testimony has been sufficiently corroborated is a matter entrusted to the jury as the trier of fact. *Id.* Tennessee courts have discussed the nature of the rule as follows:

[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*State v. Gaylor,*    862 S.W.2d 546, 552 (Tenn.Crim.App.1992), quoting *Hawkins v. State,* 4 Tenn.Crim.App. 121, 469 S.W.2d 515 (1971); *see also State v. Henley,*    774 S.W.2d 908, 913 (Tenn.1989); *State v. Sparks,* 727 S.W.2d **\*804** 480, 483 (Tenn.1987); *State v. Carter,* 714 S.W.2d 241, 244-45 (Tenn.1986).

The defendant says that the only evidence in this case corroborating Baker and implicating the defendant in the commission of the crime is Womack's testimony, which should be disregarded as false because it was physically and logically impossible for the conversation between the defendant and Eric Hoosier to have occurred as Womack said it had. These questions about Womack's credibility were presented to the jury during the trial. The credibility of the testimony of the witnesses is entrusted exclusively to the jury as the triers of fact. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn.1984). Likewise, whether a witness's testimony has been sufficiently corroborated is a matter entrusted to the jury. *Stanley v. State,* 222 S.W.2d at 386. The defendant's challenge to the sufficiency of the convicting evidence is without merit.

### 2. Inadequate Instructions

[2] Defendant next says the verdict is invalid because the trial court judge did not instruct the jury to consider the testimony of an informer (Womack) or an accomplice (Baker) with greater care and caution than that used to examine the testimony of other witnesses. In the present case, the defendant did not object to the instructions given regarding accomplice testimony or credibility of witnesses, and no special requests were made for the cautionary instructions defendant now argues were necessary. Although, as the State notes, the defendant's failure to object or assert the issues now assigned as error amounts to waiver of these issues for purposes of appellate review, we have considered them and find that the court's charge fully and fairly stated the applicable law.    *See* Tenn.R.App.P. 3(e) and 36(a); Tenn.R.Crim.P. 30(b). Thus, the defendant's argument is without merit.

In *Stanley v. State, supra,*    this Court concluded that it is not necessary that a jury be charged to receive accomplice testimony with caution, because "[i]t seems to us that when the trial judge charges the jury as he did, that conviction could not be had upon the unsupported testimony of [an accomplice], that this within itself was tantamount to telling the jury that the testimony was not favored in the law to the same extent as that of an unbiased witness...." 222 S.W.2d at 388;  *see also    State v. Hutchison,* 1994 WL 242632 (Tenn.1994).

Likewise, when viewed in context, the charge given the jury regarding the credibility of other witnesses fully and fairly states the law. In the event of conflicting statements made by different witnesses the jury was charged to "reconcile them, if you can, without just rashly concluding that any witness has sworn falsely, for the law presumes that all witnesses are truthful." The instruction given by the trial court was a correct statement of the law. *See e.g.    State v. Lee,*    634 S.W.2d 645 (Tenn.Crim.App.1982); *State v. Glebock,*    616 S.W.2d 897 (Tenn.Crim.App.1981); *Hull v. State,* 553 S.W.2d 90 (Tenn.Crim.App.1977).

### 3. Missing Witness Instruction

[3] The defendant last argues that the trial court judge erred in denying his request that the missing witness instruction be given with regard to Joel Hoosier. In support of this argument, the defendant says that Hoosier had earlier received immunity from prosecution by the State, that this grant of immunity indicates his testimony would have "favored" the State and that his testimony would have been material because he was an accomplice. The trial court denied the defendant's request because Joel Hoosier was available to either side as a witness.

Before the missing witness rule can be invoked, the evidence must show that "the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for trial." *State v. Middlebrooks,* 840 S.W.2d at 334-35, quoting  *Delk v. State,*    590 S.W.2d 435, 440 (Tenn.1979). Since Hoosier was equally available to either party and there is nothing in the record to indicate that a relationship existed between the State and Hoosier that would naturally incline Hoosier to testify favorably for the State, the trial **\*805** court's ruling was correct, and the defendant's claim is without merit.

### B. Impartial Jury

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[4] The defendant next insists that he was denied his right to an impartial jury under the 6th and 14th Amendment to the United States Constitution and Article I, §§ 8 and 9, of the Tennessee Constitution. Essentially, the defendant, a black man, claims that juror Ricky Gregory demonstrated racial prejudice against him. He bases that claim on Gregory's wearing a T-shirt that read "Southern Justice" and on Gregory's actions when the sentencing verdict was announced.

On March 14, 1991, the next-to-last day of trial, Gregory appeared at the court house wearing a T-shirt with the words "Southern Justice" noticeably printed on it. At the court's request, Gregory changed his shirt; however, Gregory informed the court that he was a member of a band named "Southern Justice." The defendant refused the court's offer to replace Gregory with an alternate juror.

On the next day, when the sentence was announced, Gregory was allegedly seen raising his right arm with his fist clenched and quickly lowering it as if pulling the handle on an electric switchbox. At the same time he allegedly uttered the word, "Yeah." Gregory and three other jurors were later seen hugging the victim's sister-in-law and brother in the hallway of the courthouse. In its findings on this issue at the hearing on the Motion for New Trial, the court interpreted Gregory's actions as his reaction to the verdict, which the court felt was the result of adequate deliberation; therefore, the trial court overruled the defendant's request for a new trial on this issue.

[5] During his individual voir dire, Gregory expressly stated that he could be impartial. Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced. *State v. Caughron,* 855 S.W.2d 526, 539 (Tenn.1993). The record in this case does not support the defendant's claim of bias or prejudice. This issue is without merit.

### C. Suppression of Statement to Eric Hoosier

[6] The defendant contends that even assuming he made statements to Eric Hoosier which were overheard by Sandy Womack, testimony regarding those statements should have been suppressed because Womack was acting as an agent for the State when he instigated the deceptive interrogation of the defendant while the defendant was in custody and represented by counsel. Defendant says the statements were obtained in violation of his rights of due process, assistance of counsel, and against self-incrimination. He also urges the Court to exercise its supervisory powers to "remedy the improprieties that have occurred in the prosecution of this case."

The defendant filed no pretrial motion to suppress these statements. He did not object to Womack's testimony on these grounds at trial, nor did he raise this issue in his motion for new trial; therefore, the State argues waiver. Tenn.R.App.P. 3(e) and 36(a); *State v. Coker,* 746 S.W.2d 167, 173 (Tenn.1987).

Relying on *State v. Duncan,* 698 S.W.2d 63, 67-68 (Tenn.1985), and *State v. Martin,* 702 S.W.2d 560, 564 (Tenn.1985), the defendant argues

that the appellate review mandated by Tenn.Code Ann. § 39-2-205 [now § 39-13-206] requires this Court to consider any alleged error, whether called to the trial court's attention or not.

As in *State v. Duncan, supra,* we have reviewed the record in this case in light of the defendant's complaint and conclude that here, as in that earlier case, there is nothing in the record to support the contentions of the defendant. In the absence of an objection or motion challenging the evidence on the grounds now asserted, the proof was not focused by either party so as to delineate fully the critical issue of whether or not Womack was acting as an agent for the State. *See State v. Duncan,* 698 S.W.2d at 68. On this record, the defendant's claim is without merit.

#### *806 D. Admission of Evidence

The defendant next complains that the trial court erred in several respects in admitting certain evidence at trial. Initially we note that the admissibility of evidence is a matter within the discretion of the trial court, whose decision will not be reversed on appeal absent a showing of abuse of discretion. *State v. Harris,* 839 S.W.2d 54, 66 (Tenn.1992).

[7] The first piece of evidence objected to is a loaded .22 caliber pistol and holster found under the back seat of a patrol car in which the defendant and Chris Hoosier had been seated before they were transferred to Hendersonville from the Montgomery County Jail on September 16, 1989. The gun could not be traced to any of the suspects or to anything at the crime scene. The trial court ruled, nevertheless, that the gun was admissible for the reasons given by the State at the suppression hearing--flight, attempt to escape, consciousness of guilt--to show intent, mental status "and so forth, without elaborating." This gun and its discovery during the transfer of the defendant are irrelevant, as the State concedes on appeal. *See* Tenn.R.Evid. 401, 404(b). The State argues, however, that any error was harmless since proof of the defendant's guilt was overwhelming.

We agree with the State that the error in this instance was harmless. Tenn.R.Crim.P. 52(a). The defense attorney was given wide latitude in eliciting statements on cross-examination and in offering substantive testimony for the purpose of demonstrating how extremely difficult, if not impossible, it would have been for either the defendant or Chris Hoosier to smuggle a loaded gun and holster out of the Montgomery County jail. Therefore, we conclude that the error in admitting the irrelevant evidence was harmless because it does not "affirmatively appear to have affected the result of the trial on the merits." (FN2) Tenn.R.Crim.P. 52(a).

We observe, however, that this case illustrates the utility and purpose of Tennessee Rule of Evidence 404(b) which provides that before evidence of prior bad acts is admitted, the trial court must hold a jury out hearing, determine that the evidence is relevant to a material issue other than character, state on the record the *specific* issue to which the evidence is relevant, and conclude that the prejudicial effect of the evidence does not outweigh its probative value. Not only does the admission of irrelevant bad acts

evidence have a high potential for prejudice, the testimony required to establish, as well as rebut, the prior bad act can substantially lengthen a trial, as this case demonstrates. Rule 404(b) should be followed closely to avoid prejudicing the rights of the accused and to maintain the focus of the trial.

[8] Next, the defendant complains of the admission into evidence of a .22 caliber revolver twice loaned to Baker and the defendant by defendant's cousin, Robert Mason, at the end of 1988. Although bullets fired from .22 and .38 caliber weapons were found at the crime scene, the State's TBI firearms expert testified that none of the .22 bullets could have been fired from the .22 admitted at trial. The trial court ruled on the admissibility of this evidence at a hearing on a pre-trial motion in limine made on behalf of Baker by his attorney. With regards to Baker, the trial court found the evidence admissible to show that Baker had access to guns when the offense occurred. The present defendant's lawyer asked whether this ruling applied to the defendant, and the court said it could only rule on that question at trial. The defendant made no objection to this evidence at trial. The State argues waiver. We have considered the defendant's argument and conclude it is without merit.

The record shows that two .22 caliber weapons were used in the crime and that Robert Mason was involved in their procurement. All .22 bullets retrieved from the crime scene were fired from the same gun; therefore, the failure to connect Mason's .22 to these bullets did not eliminate it as one of *807 the two .22 caliber guns used in the robbery. There was no testimony Joel Hoosier had fired the .22 revolver he had gotten from Sircy and Baker. Thus, although the relevancy of the evidence was marginal, we cannot say that its probative value was substantially outweighed by its prejudicial effect. Accordingly, we conclude that the trial court judge did not abuse his discretion in admitting the evidence. *See* Tenn.R.Evid. 403; *State v. Harris, supra.*

[9][10] Finally, defendant says that the trial court erred in allowing the jury to see a video of the crime scene, a short portion of which showed the victim's body and face as they appeared several hours after the murder. Defendant asserts that this part of the tape was cumulative in light of the numerous photographs of the body and that it was inflammatory and lacked probative value. The admissibility of videotapes of a crime scene is within the sound discretion of the trial judge, and his ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion. *State v. Van Tran,* 864 S.W.2d 465, 477 (Tenn.1993). Though the challenged portion of the tape is unpleasant because it shows postmortem lividity and some rigor mortis, the trial court did not abuse its discretion in allowing that part of the videotape to be played. *See* Tenn.R.Evid. 403; *State v. Evans,* 838 S.W.2d 185 (Tenn.1992); *State v. Banks,* 564 S.W.2d 947 (Tenn.1978).

*E. Failure to Supply Exculpatory Evidence*

Defendant claims that because the police, prior to trial, withheld from the defense knowledge of the existence of identifiable fingerprints and a footprint, he could not effectively use this evidence in his

defense at trial. The defendant alleges that this action by the police violated his statutory right to discovery, orders of the trial court, and his constitutional rights under *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), which held that impeachment evidence falls within the *Brady* rule.

A hearing was held on this issue, which was raised in the motion for new trial. The record discloses that two conferences were held between the attorneys for defendant (FN3) and representatives of the State, including the State's attorneys and law enforcement officers, to review the materials sought in discovery by the defendants. Defendant was informed that none of the fingerprints found at the crime scene implicated the defendant, Baker or any other suspect named by Baker.

Apparently there was a misunderstanding between defense counsel and the State concerning the nature of the fingerprints that had been found. Defense counsel testified that police had led them to believe that the latent prints lifted at the scene were unidentifiable smudges when there were actually identifiable prints among them, although none were ever matched with any known individual. The officers denied they had told defense counsel that the prints were smudges and testified that they had never showed defense counsel the photographs of the fingerprints because counsel had never asked to see them. The fact that there were identifiable prints taken from the scene that had not been identified as belonging to any person was brought out at trial.

In his brief on appeal, the defendant argues that the evidence *excludes* him and the other suspects, and says that if he had known there were identifiable fingerprints not belonging to the four suspects he would have pursued those fingerprints. Defendant also contends that, had he known that an examination of the prints by the Metropolitan Nashville Police Department had excluded him as the person who had made the fingerprints, he would have called the Department's latent fingerprint examiner as a defense witness and he would have cross-examined Joe Baker in detail as to where he had been in the store and what he had touched.

Defendant also apparently complains of not being advised until the middle of the trial that the police had excluded the four suspects as the persons who had left two footprints *808 at the scene of the crime. The police had reached this conclusion after seizing all tennis shoes owned by the four men and comparing them to the footprint patterns.

The trial court found that the evidence alleged to have been withheld by the State was not suppressed and had in fact been brought out at the trial; therefore, the defendant's motion for a new trial on that ground was overruled.

[11][12] In order to prove a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defendant must establish that the prosecutor suppressed discoverable information, that such information was of a favorable character for the defense, and that the suppressed information was material. *State v. Evans,* 838 S.W.2d at 196. We find no evidence in this record to support a *Brady* violation. The record shows no intentional

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)    Page 10

withholding of any exculpatory evidence but rather a misunderstanding between the State and the defense lawyers. The evidence allegedly withheld was in fact brought out at trial. The evidence did not exclude the defendant; it merely did not implicate him. Having found no prosecutorial misconduct, this issue is without merit.

[13] Defendant also complains that argument by the State at the guilt phase concerning the defendant's lack of knowledge of these prints prejudiced him. During closing argument defense counsel had argued that the fingerprint photographs had suddenly appeared at trial and that it would have been "nice to have known ... ahead of time" that these prints excluded the defendant and his companions. The State responded by arguing that defense counsel would have the jury believe that he had just learned that there had been fingerprints taken by the Metropolitan police that did not match the defendant's prints and that the State had withheld evidence. The prosecutor added that in actuality defense counsel had known for two years that the State had found no prints matching the defendant's. Defendant says the State was arguing that defense counsel was lying, but the record shows that the prosecutor's statement was fair rebuttal of defense counsel's remarks. See State v. Workman, 667 S.W.2d 44, 51 (Tenn.1984); State v. Sutton, 562 S.W.2d 820, 823-824 (Tenn.1978). This issue is without merit.

### F. Victim Character & Impact Evidence

The defendant argues that the admission of evidence and argument concerning the victim's character and the impact of his death at the guilt phase of his trial violated his rights under the 14th Amendment to the United States Constitution and Article I, §§ 8 and 9, of the Tennessee Constitution. The defendant first complains of the testimony of the victim's seventeen-year-old daughter concerning herself and her family and of the introduction of a photograph of her father. Defendant also complains of testimony from the store manager about the victim's job, his wages and his status as a good employee. No objection was made to this evidence at trial and this issue was not raised on motion for new trial. The defendant argues waiver.    See Tenn.R.App.P. 3(e). We have considered the defendant's complaint, however, and find any error to be, at most, harmless.

[14][15] A reading of the record reveals that the evidence complained of was far from extensive, and it was not prejudicial. The daughter's testimony was properly introduced to show that she had spoken with her father by telephone around 11:30-11:45 p.m. the night of his death.    See State v. Hurley, 876 S.W.2d 57, 67 (Tenn.1993). The relevance of the store manager's testimony is not entirely clear from the record, primarily because the defendant never challenged its admission and thereby require that its relevance be established. However, the testimony was brief and straightforward, and any error in its admission was harmless.    See State v. Hensley, 656 S.W.2d 410 (Tenn.Crim.App.1983).

A cause for greater concern is the State's argument to the jury about the victim, reminding them of the children he had left behind, of the fact that he was working during the holidays to support his family

when the crime occurred, and suggesting that holding the defendant accountable was a way to do justice.

*809 [16] It is beyond dispute that the State may risk reversal by engaging in argument which appeals to the emotions and sympathies of the jury,    see, e.g., Sparks v. State,    563 S.W.2d 564, 569 (Tenn.Crim.App.1978); 23A C.J.S. Criminal Law § 1270(c) (1989). Taken in context and read as a whole, however, the argument in this case, although error, was not so inflammatory that it more probably than not prejudiced the jury's verdict. See Tenn.R.App.P. 36(b); Tenn.R.Crim.P. 52(a). We do not approve this argument by our holding, however, and caution the State against repeating it in the future.

### PART II.

### SENTENCING

#### A. Prosecutorial Misconduct

Defendant contends that prosecutorial argument during the penalty phase led to an arbitrary and unreliable sentence in violation of the 8th and 14th Amendments to the United States Constitution and Article I, § § 8 and 16, of the Tennessee Constitution.

In particular, the defendant says that his sentence should be reversed because of prosecutorial argument: 1) portraying him as the actual killer in both the Sumner County murder and the murder in Montgomery County for which he had been previously convicted of first-degree felony murder; 2) emphasizing the character of the victim of the Montgomery County murder and the impact of her death on her family; 3) informing the jury that the defendant had received a life sentence for the Montgomery County murder and pointing out the futility of imposing a second life sentence; 4) implying that the defendant should be sentenced to death in this case as punishment for the Montgomery County killing; 5) appealing to the jury to react out of vengeance; 6) claiming that the death penalty is a general deterrent; and 7) comparing imposition of the death penalty with the juror's civic and patriotic duty. The State correctly points out that, with the exception of the victim character and impact argument, no objection was raised to any of these occurrences at trial, nor were they raised in the motion for new trial.

Courts have recognized that closing argument is a valuable privilege for both the State and the defense and have allowed wide latitude to counsel in arguing their cases to the jury. State v. Cone, 665 S.W.2d 87, 94 (Tenn.1984). When a prosecutor's argument strays beyond the wide latitude afforded, the test for determining whether reversal is required is whether the impropriety "affected the verdict to the prejudice of the defendant." Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). Factors relevant to that determination include:

(1) the conduct complained of viewed in light of the facts and circumstances of the case;

(2) the curative measures undertaken by the court

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                    Page 11

and the prosecution;

(3) the intent of the prosecutor in making the
improper arguments;

(4) the cumulative effect of the improper conduct
and any other errors in the record; and

(5) the relative strength and weakness of the case.

   *State v. Buck,* 670 S.W.2d 600, 609 (Tenn.1984);
*Judge v. State,* 539 S.W.2d 340, 344
(Tenn.Crim.App.1976). We have adhered to these
guiding principles in our evaluation of the
defendant's claims.

   [17] We have examined the record in light of the
claims of error and conclude that the sentence must
be reversed. Tenn.R.Crim.P. 52(b). Informing
the jury that the defendant received a life sentence as
punishment for his conviction of first-degree felony
murder in Montgomery County was in direct
contravention of this Court's holding in  *State v.
Smith,* 755 S.W.2d 757, 767 (Tenn.1988) ("Smith
I"). That error was further compounded by
admitting into evidence the underlying facts of the
defendant's previous conviction of first-degree
murder, including testimony from Jay Runyon, one
of the detectives in charge of investigating the
Montgomery County murder. Specifically, Runyon
informed the jury that the murder occurred around
1:17 a.m. in a Montgomery County convenience
store when Vada Langston, the clerk and forty-year-
old mother of four, had been shot and killed.
Runyon explained that, while only two shots had
been **\*810** fired, Langston had been wounded three
times, once in her hand and twice in her chest.

   During closing argument, the prosecutor not only
discussed the sentence imposed as a result of the
Montgomery County conviction but also extensively
referred to the facts of the Montgomery County
murder, the character of the victim of that killing
and the impact of her death upon her family, and,
finally, implied that imposition of the death penalty
in this case would be an appropriate way to punish
the defendant's previous conviction of the
Montgomery County murder. Excerpts of the
improper prosecutorial closing argument are set
forth below.

   Ladies and gentlemen, Vada Langston was killed
on January 9th, 1990--1989, excuse me, just 12
days, 12 days, after Monty Clymer was killed
here. She was 40 years old. She had four
children. She was found lying behind the counter
with two bullet holes in her chest and one bullet
hole in her hand. Two shots had been fired, one
through the chest and the other was a defensive
measure or covering her chest. She'd been shot
twice. She was, like I told you about Monty
Clymer, she was innocent as the driven snow.
Seventy-three dollars was taken for her death....
He was convicted on August 24th, 1990, for first-
degree murder and received a life sentence.

             ....

   I anticipate in a few minutes the defense will ask
for mercy for the life of Roosevelt Bigbee....
There was nobody there on January 9th 1990, to
ask for mercy for Vada Langston, none of her

children, none of her family. Nobody was there
when she was shot the first time to ask for mercy
for her life. There was nobody there from her
family to ask for mercy when she was shot the
second time. Nobody to ask for mercy for her.

   Ladies and gentlemen, you can't escape the fact
that Roosevelt Bigbee has killed two completely
innocent human beings, never to see their families
again, never afforded the opportunity to ask for
mercy. Were [sic] not talking about one life,
ladies and gentlemen. We're talking about two
lives.

             ....

   Ladies and gentlemen, the death penalty is the
ultimate punishment in society. It's a punishment
and for the protection of society. The only way to
stop the Roosevelt Bigbees of this world who have
killed more than one person, for those who have
no respect for law and order and doing right, and
for the lives of others, and to stop the madness and
the innocent slaughter of convenience store clerks
making an honest, decent living completely
unprotected is the death penalty.

   Later, in rebuttal, the State argued:

   We have got two people that are dead because of
what Mr. Bigbee did, and Mr. Baker--Mr. Bigbee
is here on trial. Two people that are dead. Seven
children that are left without parents.

             ....

   Now, ladies and gentlemen, another thing is Mr.
Bigbee has already received a life sentence, a life
sentence. He's in prison now serving a life
sentence. What's another life sentence going to
do? Nothing. He's already got a life sentence.
Another life sentence is no skin off his nose. What
does the death of Monty Clymer mean if he gets a
life sentence under these circumstances? How
many people would it take to be killed at a cash
register before Roosevelt Bigbee would be
deserving of the death penalty?

             ....

   The death of Vada Langston and armed robbery,
three wounds that she suffered, a defensive wound
or clutching wound, think of that. Think of Monty
Clymer. Decide what is the proper punishment in
this case. Is it enough just to give him another life
sentence? he already has a life sentence. Is it
enough? To say we value the human life of
Monty Clymer, of Vada Langston, and any human
life that's being taken under these circumstances so
much that we're imposing the appropriate
punishment **\*811** as set out in Tennessee law,
that's the death penalty.

   In *Smith I, supra,* this Court found that the failure
of a trial court to sever the trials of the defendant's
two charges of felony murder at two separate
markets was harmful error as to sentencing.
Primarily, the error resulted from the fact that the
sentencing jury was made aware that the defendant
had received a life sentence for one of the murders.
The prejudicial effect of making the jury aware of
the life sentence was discussed in  *Smith I,* as

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

follows:

We think it clear, as insisted by the defendant, that evidence of the defendant's involvement in the Pierce case necessarily affected the jury's deliberation concerning punishment in the Webb case. As a practical matter, making known to the jury the defendant's involvement in the Pierce case and his punishment in that case effectively eliminated the option of life imprisonment as a sentence for defendant in the Webb case. It opened the door for the State's attorney to argue in the sentencing phase of the Webb case that "to give life, a punishment of life, in this second killing is the equivalent of giving no punishment at all." We think that the prejudice to the defendant is obvious and the defendant's punishment in the Webb case should have been determined without regard to the Pierce case or the punishment to which the defendant was sentenced in that case. The only way to insure that the defendant's punishment in the Webb case would be determined on the merits of that case and without regard to the Pierce case was for the trial judge to have granted the motion for severance of the two offenses. In denying that severance, the trial judge committed reversible error.

*Id.* at 767.

Despite this Court's holding in *Smith I,* evidence of the life sentence was again admitted at the sentencing hearing conducted after remand. Once again, the defendant appealed and challenged admission of the evidence. This Court again reversed and remanded for a new sentencing hearing, stating, "[w]e are deeply troubled about the overall effect of the admission of evidence of the *sentence* in the Pierce case at the sentencing hearing in the second trial." *State v. Smith,* 857 S.W.2d 1, 24 (Tenn.1993) (*"Smith II "*).

Despite the State's contention in *Smith II* that the issue had been waived by the defendant's failure to object and despite "[t]he suggestion that the failure to object was a strategic maneuver by the defense to obtain a life sentence," *id.* at 25, we determined that the error had prejudicially affected the sentence and declined to attribute the failure to object to defense strategy stating, "[t]he issue of whether either or both counsel were attempting to sandbag the other is a matter of pure speculation." *Id.* We think that statement adequately addresses the arguments made by the State in this case as well. Admitting evidence of the sentence imposed upon the defendant as a result of the Montgomery County conviction was error in this case for the reasons stated in *Smith I* and *Smith II, supra. See also State v. Jones,* 789 S.W.2d 545, 552 (Tenn.1990); *State v. House,* 743 S.W.2d 141, 147 (Tenn.1987).

[18][19] The error was compounded, however, by the testimony of Detective Runyon. Evidence of facts regarding a previous conviction to show that it in fact involved violence or the threat of violence to the person is admissible at a sentencing hearing in order to establish the aggravating circumstance. *State v. Bates,* 804 S.W.2d 868, 879 (Tenn.1983); *State v. Moore,* 614 S.W.2d 348, 351 (Tenn.1981). (FN4) However, it is not appropriate to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the

conviction on its face shows that it involved violence or the threat of violence to the person. *Id.* In this case, Detective Runyon was permitted to testify as to the facts upon which the defendant's previous convictions were based.

[20] Furthermore, although argument and evidence regarding the victim of this    **\*812**    crime is not precluded by either the state or federal constitutions, *see Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v. Brimmer,* 876 S.W.2d 75, 86 (Tenn.1994), evidence and argument regarding the victim of a crime other than the crime for which the defendant is being sentenced is irrelevant and inadmissible. *Cf. Cozzolino v. State,* 584 S.W.2d 765, 767-68 (Tenn.1979) (State's evidence is limited to establishing statutory aggravating circumstances unless other evidence is necessary to respond to the defendant's proof). Here, Detective Runyon testified about the family situation of the victim of the Montgomery County murder, and the State seized upon that testimony in its closing argument to the jury. Detective Runyon's testimony and the prosecution's argument regarding the victim of an unrelated crime were inadmissible and improper.

[21] The prosecutor also engaged in improper argument by strongly implying during argument that imposition of the death penalty in this case would be an appropriate way to further punish the defendant for the Montgomery County killing, for which he had already received a life sentence. *See Lesko v. Lehman,* 925 F.2d 1527, 1545-46 (3d Cir.1991); *Cf. Rogers v. Lynaugh,* 848 F.2d 606, 611 (5th Cir.1988) (prosecutor's argument that jury's sentence should include punishment for prior felony convictions constituted violation of double jeopardy); *Knight v. State,* 190 Tenn. 326, 229 S.W.2d 501, 503-504 (1950) (reversible error in prosecutor's argument that defendant should be convicted for the good of society on general principles because he was guilty of crimes other than that for which he was being tried).

Obviously, the State may argue that the existence of the prior conviction as an aggravating circumstance supports imposition of the death penalty; however, in this case, the State's argument went beyond that limit and strongly implied, without flatly stating, that the defendant should be sentenced to death as additional punishment for the previous conviction. The defendant had already been tried, convicted and separately sentenced for that crime. Argument encouraging this jury to impose an additional punishment was improper.

[22] Finally, the prosecutor strayed beyond the bounds of acceptable argument by making a thinly veiled appeal to vengeance, reminding the jury that there had been no one there to ask for mercy for the victims of the killings in Sumner and Montgomery Counties, and encouraging the jury to give the defendant the same consideration that he had given his victims. Although the prosecutor could have properly counseled the jury to avoid emotional responses that were not rooted in the trial evidence, *see California v. Brown,* 479 U.S. 538, 542-43, 107 S.Ct. 837, 839-40, 93 L.Ed.2d 934 (1987), the argument here encouraged the jury to make a retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                                    Page 13

evidence. As such, the argument was improper. *Lesko v. Lehman,* 925 F.2d at 1545.

[23][24] Though each of the errors discussed above might have been harmless standing alone, we find that, considered cumulatively, the improper prosecutorial argument and the admission of irrelevant evidence affected the jury's sentencing determination to the defendant's prejudice. Therefore, we conclude that the sentence of death must be reversed and the case remanded for a new sentencing hearing. In addition to the specific areas of argument discussed above, the State should also avoid the subject of general deterrence during argument at the new sentencing hearing. *See State v. Irick,* 762 S.W.2d 121, 131 (Tenn.1988).

Due to the necessity of a remand, only those issues which may become relevant at the new sentencing hearing will be discussed below. Other issues are pretermitted.

### B. Instructional Errors

### 1. Deterrence

[25] The defendant avers that the trial court erred when it refused to instruct the jury not to consider during its deliberations the deterrent effect of the death penalty nor the cost of maintaining a prisoner for life in prison. While neither of these factors should enter a capital jury's sentencing determination, *cf., e.g., State v. Irick,* 762 S.W.2d 121, 131 (Tenn.1988); *State v. Johnson,* 632 **\*813** S.W.2d 542, 547-48 (Tenn.1982), this Court has never required such an instruction. We conclude that the trial court's instruction that the jury must only take into account those aggravating circumstances proven beyond a reasonable doubt and no other facts or circumstances as a basis for deciding whether to impose the death penalty was appropriate and sufficient to foreclose consideration of any irrelevant matters. There is no merit to this issue.

### 2. Lingering Doubt

[26] Defendant also insists that he was entitled to an instruction that the jury may consider as a mitigating circumstance "any residual or lingering doubt you may have about [defendant's] guilt, if in fact you have such doubt." The Eighth Amendment of the United States Constitution does not require a lingering or residual doubt instruction. *See Franklin v. Lynaugh,* 487 U.S. 164, 173-74, 108 S.Ct. 2320, 2326-28, 101 L.Ed.2d 155 (1988). In so concluding, the United States Supreme Court stated:

Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because "residual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. [Citations omitted.] "Residual doubt" is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty." Petitioner's "residual doubt" claim is that the

States must permit capital sentencing bodies to demand proof of guilt to "an absolute certainty" before imposing the death sentence. Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing.

*Id.,* 487 U.S. at 189, 108 S.Ct. at 2335 (O'Connor, J., concurring).

We agree with the U.S. Supreme Court's analysis of the issue and conclude that the trial court did not err in denying the defendant's request for an instruction on "lingering or residual" doubt.

We should point out, however, that "[a]t a resentencing hearing, both the State and defendant are entitled to offer evidence relating to the circumstances of the crime so that the sentencing jury will have essential background information 'to ensure that the jury acts from a base of knowledge in sentencing the defendant.' " *State v. Adkins,* 725 S.W.2d 660, 663 (Tenn.1987), quoting *State v. Teague,* 680 S.W.2d 785, 788 (Tenn.1984); *see also State v. Nichols,* 877 S.W.2d 722, 731 (Tenn.1994). On remand, that right should be afforded this defendant.

### 3. Disparity of Treatment of Co-Defendants

[27] The defendant next complains that he was entitled to an instruction informing the jury to consider, as a mitigating circumstance, the fact that Joe Baker had received a sentence less than death in exchange for his cooperation with authorities, despite the fact that he was equally blameworthy and had a prior history of criminal activity. Though not included in the special request, on appeal the defendant asserts that the jury should have been told about the disposition of the case with regard to Chris and Joel Hoosier as well. Again, we find no error with the trial court's denial of the instruction. The jury, during the course of the trial, did learn about Baker's prior criminal record and the fact that he had received a life sentence in exchange for his cooperation.

Moreover, the jury was told that Joel Hoosier had been granted immunity from prosecution and was informed that Chris Hoosier had not yet been tried. The catch-all instruction was given, which allowed the jury to consider any fact in evidence favorable to the defendant. There is no merit to this issue. On remand, however, the defense should not be precluded from presenting this information as part of the essential background necessary to an individualized sentencing determination.

### 4. Life Sentence Based on Mercy

Defendant next complains that the trial court erred in refusing to instruct the jury  **\*814**  that it could sentence the defendant to life based on mercy and also challenges the constitutionality of the standard "no-sympathy" instruction used in this and other cases. We have repeatedly held that no error occurs when a trial court refuses to give a mercy instruction. *See State v. Hartman,* 703 S.W.2d 106, 119 (Tenn.1985); *State v. Melson,* 638 S.W.2d 342, 366 (Tenn.1982). We have also on numerous occasions upheld the "no-sympathy" instruction against constitutional attack. *See State v. Cazes,* 875 S.W.2d 253, 268 (Tenn.1994); *State v. Harris,*

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

839 S.W.2d 54, 75 (Tenn.1992). There is no merit
to this issue.

#### 5. Definition of Life and Death Sentence

Defendant also claims that he was entitled to an
instruction informing the jury that a sentence of life
means life and death means death. This Court has
previously held that such an instruction is not
required. *State v. Caughron,* 855 S.W.2d 526, 543
(Tenn.1993); *State v. Payne,* 791 S.W.2d 10, 21
(Tenn.1990).

#### 6. Omission of the Beyond-a-Reasonable-Doubt Standard

[28] Equally without merit is the defendant's claim
that the trial court erred by charging the jury
according to the statute as it existed at the time of
the offense in 1988, rather than according to the
statute as amended in 1989 and in effect at the time
of the trial in 1991. The instruction given tracked
the language of the statute in effect at the time of the
offense and required the jury to conclude that there
were no mitigating circumstances sufficiently
substantial to outweigh the aggravating
circumstances before it could impose a sentence of
death. *See* Tenn.Code Ann. § 39-2-203(g) (1982).
The amended statute requires that, to impose a death
sentence, the jury must find that the aggravating
circumstances proven by the State outweigh, beyond
a reasonable doubt, any mitigating circumstances.
*See* Tenn.Code Ann. § 39-1-204(g) (1991).

We recently held in *State v. Brimmer,* 876 S.W.2d
75, 81-82 (Tenn.1994), that where an offense is
committed before November 1, 1989, the effective
date of the 1989 amendment changing the weighing
standard, but where the trial and sentencing occur
after that effective date, a trial court does not err by
instructing the jury under the statute as it existed at
the time the offense was committed. Here, under
the rationale of *Brimmer,* because the offense
occurred in December of 1988, instructing the jury
according to the pre-1989 statute was appropriate.
This issue is without merit.

#### 7. Meaning and Function of Mitigating Circumstances

Defendant also faults the trial court for failing to
inform the jury as to the meaning and function of
mitigating circumstances. We have previously
rejected the argument that such an instruction is
required. *See State v. Brimmer,* 876 S.W.2d at 83;
*State v. Groseclose,* 615 S.W.2d 142, 147-48
(Tenn.1981).

#### 8. Violation of Mills v. Maryland

The defendant lastly alleges that there is a
reasonable likelihood that the jury could have
understood the instruction given in this case as
requiring that it unanimously agree on the existence
of mitigating circumstances in violation of the
holdings of *Mills v. Maryland,* 486 U.S. 367, 108
S.Ct. 1860, 100 L.Ed.2d 384 (1988). This Court
has previously rejected the same argument and we
reaffirm those holdings and find this issue without
merit. *See e.g.,* *State v. Nichols,* 877 S.W.2d at
734-35; *State v. Harris,* 839 S.W.2d 54, 74

(Tenn.1992); *State v. Bates,* 804 S.W.2d 868, 882
(Tenn.1991).

#### C. Middlebrooks Error

[29] Sometime after the trial of this case, a Court
majority concluded in *State v. Middlebrooks,* 840
S.W.2d 317, 346 (Tenn.1992) (Drowota and
O'Brien, JJ., dissenting), that, when a defendant is
convicted of felony murder, the State's use of felony
murder as an aggravating circumstance at the
sentencing hearing violates Article I, Section 16, of
the Tennessee Constitution and the Eighth
Amendment of the federal constitution because the
aggravating circumstance is a duplication of the
crime itself and does not narrow the class of death-
eligible defendants **\*815** as is constitutionally
required. This Court, as presently constituted, has
reconsidered the *Middlebrooks* holding, and a
majority today re-affirms the principle announced in
*Middlebrooks.* Therefore, it is indisputable that the
sentencing jury's consideration of the invalid felony-
murder aggravating circumstance in this case was
state constitutional error. Because unrelated error
requires a remand for a new sentencing hearing in
this case, it is not necessary that we determine
whether the *Middlebrooks* error was harmless
beyond a reasonable doubt. *See State v. Howell,*
868 S.W.2d 238 (Tenn.1993). At the new
sentencing hearing, however, the State may not rely
on the felony murder aggravating circumstance.

Although conceding its inapplicability to this case,
the dissent argues that the Tennessee first degree
murder statute, as amended in 1989, is a
constitutionally valid narrowing device. According
to the dissent, inclusion of the term "reckless"
within the substantive definition of the offense of
first-degree murder, combined with a judicial
construction of the statute to require defendants to
have participated in a substantial way in the
underlying felony, comports with the proportionality
requirement enunciated by the United States
Supreme Court in *Enmund v. Florida,* 458 U.S.
782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and
*Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95
L.Ed.2d 127 (1987), and, therefore, accomplishes
narrowing.

Initially, we point out that the Court majority in
*Middlebrooks* considered the effect of the 1989
amendment and rejected the arguments that the
dissent now advances as novel. *See State v.
Middlebrooks,* 840 S.W.2d at 345. Moreover, the
"saving construction" urged by the dissent is not
consistent with the well-established rule that:

Criminal statutes must be strictly interpreted, both
with respect to the act charged as the offense and
the penalty imposed. It is axiomatic that statutes
creating and defining crimes cannot be extended by
intendment. Before a man can be punished, his
case must be plainly and unmistakably within a
statute. As liberty and perhaps life are involved,
every reasonable doubt must be resolved in favor
of the defendant.

*State ex rel. Inman v. Brock,* 622 S.W.2d 36, 46
(Tenn.1981), quoting 1*Wharton's Criminal Law And
Procedure* § 19 (12 Ed.1957).

Accordingly, we disagree with the analysis

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

employed by the dissent; however, even assuming, for purposes of argument and of federal constitutional law, that the finding required by *Tison* is sufficient narrowing, for the reasons stated below it is not sufficient as a matter of state constitutional law.

The defendant here, as was the case in *Middlebrooks,* was convicted of felony-murder under the pre-1989 law which defined first-degree murder as follows:

Every murder perpetrated by means of poison, lying in wait, or by other kinds of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb....

Tenn.Code Ann.   §   39-13-202(a) (1982 & Supp.1988) (emphasis added).

In 1989, the statute was amended to define first-degree murder as:

(2) A *reckless* killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, or aircraft piracy; [or]

(3) A *reckless* killing of another committed as the result of the unlawful throwing, placing, or discharging of a destructive device or bomb[.]

Tenn.Code Ann. § 39-13-202(a)(2) and (3) (1991).

The word "reckless" is defined as:

the actions of one who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard       **\*816** constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as reviewed from the accused person's standpoint.

Tenn.Code Ann. § 39-11-106(a)(31) (1991).

The dissent asserts that the legislative insertion of the term "reckless" into the substantive definition of first-degree felony murder in combination with a judicial interpretation of the statute to require substantial participation, accomplishes narrowing under the principles announced in      *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), *Enmund,* and *Tison, supra.*

Certainly, the United States Supreme Court in *Lowenfield* established that states may accomplish constitutional narrowing either by providing restrictive definitions of first-degree or capital murder or by utilizing aggravating circumstances at the sentencing hearing. As we stated in *Middlebrooks,* however, Tennessee has not chosen to narrow at the definitional stage. In fact, prior to

1989 Tennessee was a felony murder simpliciter state--one of only five with the broadest definition of first degree felony murder.

We also said in      *Middlebrooks,* that "since the absence of reckless indifference constitutionally immunizes a defendant from the death penalty, its presence cannot meaningfully further narrow the class of death-eligible defendants."       *State v. Middlebrooks,* 840 S.W.2d at 345.    Accordingly, unlike the dissent, we do not consider it "irrelevant as a matter of federal constitutional law" that the felony murder aggravating circumstance duplicates the elements of the underlying offense.

Moreover, assuming for argument's sake that, as a matter of federal constitutional law, the dissent is correct in asserting that minimal narrowing is accomplished by defining first-degree felony murder to require a *mens rea* of recklessness, that is not sufficient narrowing to satisfy Article I, Section 16, of the Tennessee Constitution. This is so because all felony murderers potentially meet a recklessness standard and are, therefore, potentially eligible for the death penalty. Compliance with Article I, Section 16 requires that the class of persons *eligible* for the death penalty be genuinely narrowed to justify imposition of a more severe sentence on the defendant as compared to others found guilty of murder. *State v. Middlebrooks,* 840 S.W.2d at 345.

When a defendant is convicted of first-degree felony murder, genuine narrowing as required by Article I, Section 16, is not accomplished by Tennessee's broad definition of first-degree felony murder. Thus, we reaffirm our holding in *Middlebrooks* that, when a defendant is convicted of first-degree felony murder, the aggravating circumstance set out in Tenn.Code Ann.       § § 39-2-203(i)(7) (1982) and 39-13-204(i)(7) (1991), which merely duplicates the elements of the offense and does not accomplish genuine narrowing as required by Article I, Section 16, of the Tennessee Constitution, may not be relied upon by the State to seek imposition of the death penalty.

We also disagree with the dissent's position that our holding in     *Middlebrooks* was not based on independent and adequate state grounds. Although federal authority was considered and discussed in our analysis, primary reliance for our interpretation of Article I, Section 16, of the Tennessee Constitution in *Middlebrooks* was placed upon similar decisions from North Carolina and Wyoming. *See State v. Middlebrooks,* 840 S.W.2d at 341-43 (citing and discussing *State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551 (1979) and     *Engberg v. Meyer,* 820 P.2d 70 (Wyo.1991)). In addition, we also relied upon Tennessee statutes that prohibit duplication in non-capital sentencing and concluded that Article I, § 16, imposed the same prohibition in capital cases. *State v. Middlebrooks,* 840 S.W.2d at 341 (citing Tenn.Code Ann. § 40-35-111 (1982) and § 40-35-114 (1990)). Simply put, the *Middlebrooks* decision was based adequately and independently on the Tennessee Constitution. We continue to adhere to its mandate.

### D. Chronological Order

[30] The defendant next avers that the district

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

attorney general deliberately delayed the trial of this offense in Sumner County **\*817** until after the trial in the Montgomery County case to provide an aggravating circumstance. The defendant contends that allowing a prosecutor this discretion to organize the order of trials violates his due process rights. We disagree. As we recently decided in *State v. Nichols, supra,* "[f]or purposes of this aggravating circumstance, [previous conviction of felony involving violence], the order in which the crimes were actually committed is irrelevant so long as the convictions have been entered before the sentencing hearing at which they were introduced." 877 S.W.2d at 736. This issue is without merit.

### CONCLUSION

We have carefully considered the defendant's contentions as to alleged errors occurring during the guilt phase of the trial and conclude that none have merit. The conviction is affirmed.

We have determined that the cumulative effect of errors occurring during the sentencing phase, including improper prosecutorial argument and the admission of irrelevant evidence, was prejudicial and more probably than not affected the sentence imposed. Accordingly, the sentence of death must be reversed and the case remanded for a new sentencing hearing. All aspects of the new sentencing hearing should be conducted in conformity with this Opinion.

Because of the remand for resentencing, we pretermit statutory review of the proportionality of the death sentence imposed against the defendant as otherwise required by Tenn.Code Ann.         §
39-13-206(c)(1)(D) (1991) [formerly Tenn.Code Ann. § 39-2-205(c)(4) ], and decline to address the defendant's challenges to the death penalty statute, all of which have been repeatedly and recently rejected by a majority of this Court.

BIRCH, J., concurs.

REID, J., concurs with separate opinion.

O'BRIEN, C.J. and DROWOTA, J., concur and dissent with separate opinions.

REID, Justice, concurring.

The procedure in Tennessee whereby the sentence of death is executed consists of three steps. *See State v. Howell,* 868 S.W.2d 238, 265 (Tenn.1993) (Reid, C.J., concurring). This case involves only the first two steps, which are not clearly delineated in the concurring and dissenting opinions.

The first step is the determination that the person to be executed is a member of the class of death-eligible murderers. Under the federal constitution a sentence of death may be imposed only,

where a defendant kills, attempts to kill, or intends that a killing take place, or that lethal force will be imposed, or where a defendant's personal involvement in the underlying felony is substantial and who exhibits a reckless disregard or indifference to the value of human life. *Tison v. Arizona,* 481 U.S. 137, 157-158, 107 S.Ct. 1676,

1688, 95 L.Ed.2d 127 (1987); *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982); *State v. Branam,*    855 S.W.2d 563, 570-71 (Tenn.1993);    *State v. Middlebrooks,* 840 S.W.2d 317, 338 (Tenn.1992).

*State v. Howell,*    868 S.W.2d 238, 265 (Tenn.1993) (Reid, C.J., concurring). Prior to the 1989 amendment to T.C.A.    §  39-13-202, that statute, which defines first degree murder, did not include the "reckless disregard" provision of the definition found to be essential in *Tison v. Arizona. See* T.C.A.  §  39-2-202 (1982). The 1989 amendment only conformed the statute to the minimum standard of death-eligible defendants required by the United States Constitution. Tennessee's first degree murder statute, as amended in 1989, remains the most unrestricted definition of a class of death-eligible defendants permitted under the federal constitution. (FN1)    *State v. Middlebrooks,* 840 S.W.2d 317, 337-38,    *cert. dismissed,* 510 U.S. 124, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993).

The federal constitution does not permit all death-eligible defendants to be executed. It requires that states adopt procedures for    **\*818**    selecting from among the death-eligible class, those for whom the sentence of death is most appropriate.    *Gregg v. Georgia,* 428 U.S. 153, 187-95, 96 S.Ct. 2909, 2932-35, 49 L.Ed.2d 859 (1976). Therefore, in Tennessee a second step is necessary. Tennessee accomplishes this second step by the application of enhancing and mitigating factors at the sentencing phase of the trial. *See* T.C.A. § 39-13-204(i), (j) (Supp.1994).

However, some states, unlike Tennessee, combine the first and second steps in a restrictive statutory definition of capital murder. The decision in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1987), was based upon a restrictive statutory definition of capital murder. In *Lowenfield,* the United States Supreme Court, after stating the result mandated by the constitution, described two methods which could be used to accomplish that result:

To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition.

·   ·   ·   ·   ·

It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person."

*Id.* 484 U.S. at 246, 108 S.Ct. at 554-55 (citations omitted). First degree murder in Louisiana, when *Lowenfield* was decided, required the finding of specific intent. *Id.* 484 U.S. at 241-43, 108 S.Ct. at 553. The culpability of the defendant in *Lowenfield* is similar to that of a defendant in Tennessee who is convicted of premeditated murder (T.C.A. § 39-13-202(a)(1)) and found at sentencing to have knowingly created a great risk of death to two or more persons other than the victim (T.C.A. § 39-13-204(i)(3)).

There is no "interaction of the principles" found in *Lowenfield* and *Enmund* and *Tison* 2. The class of death-eligible defendants defined in *Enmund* and *Tison* is not restricted or narrowed by the 1989 amendment to T.C.A. § 39-13-202(a). Further narrowing, by statute as in *Lowenfield,* or by the use of aggravating circumstances as in Tennessee, is constitutionally required before the sentence of death can be executed. The 1989 amendment to the Tennessee statute did not alter the constitutional principles on which *Middlebrooks* was based and provides no support for the proposition that this Court should retreat from the carefully crafted decision in *Middlebrooks.*

O'BRIEN, Chief Justice, concurring and dissenting.

While I agree in principle with the concurring and dissenting opinion by my colleague, Justice Drowota, I write separately to express my personal disagreement with the majority opinion in *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992). *Middlebrooks* held it to be in violation of the Tennessee Constitution, Article I, § 16, to use the felony murder aggravating circumstance, T.C.A. § 39-2-203(i)(7) (1982) or T.C.A. § 39-13-204(i)(7) (1991), to sustain imposition of the death penalty for a conviction of felony murder, although it can be used to support imposition **\*819** of the death penalty for premeditated murder. It was held that the use of the felony murder aggravating circumstance duplicated the elements of the underlying crime and failed to narrow the class of death-eligible murders as required by Article I, § 16 of the Tennessee Constitution. Since the Eighth Amendment of the United States Constitution and Article I, § 16 of the Tennessee Constitution are identical in language, it is incomprehensible to me how the use of the felony murder aggravating circumstance which duplicated the elements of the underlying crime could be construed to be constitutional under the United States Constitution and not under the Tennessee Constitution.

In this case defendant was found guilty of the offense of first degree felony murder in an attempt to perpetrate a robbery. The lead opinion mandates reversal for, among other reasons, the use of the felony murder aggravating circumstance, which was held to be error in the *Middlebrooks* case.

In *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), a case based on the Louisiana capital sentencing statute, the petitioner raised fundamentally the same charge of error under consideration here, that is that the sole aggravating circumstance found at the jury sentencing phase was identical to an element of the capital crime for which he was convicted. Louisiana has a very similar narrowing statute as that created by the legislature in this State. Tennessee has established five (5) statutory grades of homicide: First Degree Murder; Second Degree Murder; Manslaughter, Voluntary and Involuntary; and Vehicular Homicide. The punishments for these offenses are graded according to the nature of the offense. First degree murder is defined so as to include only a narrow class of homicide, the punishment for which is death or imprisonment for life with the sentence to be fixed by the jury in a separate sentencing hearing to determine which shall apply upon a finding of guilt. A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and outweighs any mitigating circumstance the jury may find. Otherwise the sentence shall be life imprisonment.

In discussing the exact same issue we have before us the *Lowenfield* court said:

"It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase ... Here the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of three (3) counts of murder under the provision that the 'offender had a specific intent to kill or to inflict great bodily harm upon more than one (1) person.' ... The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances in the exercise of discretion. (FN1) The Constitution requires no more."

The Legislature in this State has further narrowed the sentencing process in cases in which a sentence of death has been imposed. The statutes provide that the sentence of death is automatically reviewed by this Court even though a defendant convicted of first degree murder does not appeal the conviction. T.C.A. § 39-13-206. The Court first considers assigned errors and then proceeds to review the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

sentences of death. The statute requires the Court to
determine whether (1) the sentence of death was
imposed in any arbitrary fashion; (2) the evidence
supports the jury's finding of statutory aggravating
*820 circumstance or circumstances; (3) the
evidence supports the jury's finding that the
aggravating circumstance or circumstances outweigh
any mitigating circumstances; (4) the sentence of
death is excessive or disproportionate to the penalty
imposed in similar cases considering both the nature
of the crime and the defendant. In addition to its
other authority regarding correction of errors, the
Court, in reviewing the death sentence for first
degree murder, is authorized to: (A) affirm the
sentence of death; or (B) modify the punishment to
life imprisonment.

I am satisfied that the judgment in this case meets
both State and federal constitutional requirements.
Insofar as the narrowing function is concerned.
Otherwise, I concur in Justice Drowota's concurring
and dissenting opinion.

DROWOTA, Justice, concurring and dissenting.

I concur with part I, Sections A-F of the majority
opinion.

I agree that this case must be remanded to the trial
court for resentencing because of the prosecutorial
misconduct; therefore, I concur in Part II-A of the
majority opinion. However, I respectfully dissent
from Part II-C of that opinion, in which the Court
reaffirms its *State v. Middlebrooks,* 840 S.W.2d
317, 346 (Tenn.1992) holding that when a defendant
is convicted of felony murder, the State's use of the
felony murder aggravating circumstance to impose
the death penalty violates Art. I,      § 16 of the
Tennessee Constitution because the aggravating
circumstance duplicates the elements of the
underlying offense and thus fails to "narrow" the
class of death-eligible offenders. Although I filed a
dissent in *Middlebrooks,* I wish here to further
develop the grounds on which I believe the holding
of the *Middlebrooks* majority to be in error.

### DISCUSSION OF RELEVANT UNITED STATES
SUPREME COURT CAPITAL
PUNISHMENT JURISPRUDENCE

The capital punishment jurisprudence of the United
States Supreme Court since its landmark decision in
*Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726,
33 L.Ed.2d 346 (1972) may be described in terms of
two overarching objectives. First and foremost, the
Supreme Court has sought to    *standardize* capital
sentencing schemes by requiring the States to
formulate clear standards to guide and limit the
sentencing body's discretion in imposing the death
penalty. This process of standardization is intended
to "minimize the risk of wholly arbitrary and
capricious action" by the sentencing body in its
determination of whether to impose the death
penalty. *Gregg v. Georgia,* 428 U.S. 153, 189, 96
S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976); *see also
Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49
L.Ed.2d 913 (1976). Second, the Court has sought
to *individualize* capital sentencing schemes by
requiring the States to allow the sentencing body full
access to any evidence that might serve to assist in
the sentencing determination, such as evidence of
the defendant's character and the circumstances of

the crime. *See  Eddings v. Oklahoma,* 455 U.S.
104, 110-12, 102 S.Ct. 869, 874, 71 L.Ed.2d 1
(1982); *Lockett v. Ohio,* 438 U.S. 586, 601-605, 98
S.Ct. 2954, 2963-2965, 57 L.Ed.2d 973 (1978);
*Roberts (Harry) v. Louisiana,*     431 U.S. 633,
636-37, 97 S.Ct. 1993, 1995, 52 L.Ed.2d 637
(1977). This process of individualization serves to
increase the sentencing body's discretion.    *See
generally* Stephen Gillers, *Deciding Who Dies,* 129
U.Pa.L.Rev. 1 (1980).

The Supreme Court has stated in several opinions
that the standardization of the States' capital
sentencing schemes serves the function mandated by
the Eighth Amendment of "narrowing" the class of
death-eligible offenders;  in other words,
standardization serves to circumscribe the unfettered
discretion that existed in the sentencing body prior to
*Furman. Zant v. Stephens,* 462 U.S. 862, 876-77,
103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). A
proper "narrowing device" must accomplish two
distinct objectives. First, it must provide standards
that are sufficiently determinate to guide and channel
the sentencing body's discretion. *Arave v. Creech,*
507 U.S. 463, ----, ----, 113 S.Ct. 1534, 1540-41,
123 L.Ed.2d 188 (1993); *Shell v. Mississippi,* 498
U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990);
*Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct.
3047, *821 3057, 111 L.Ed.2d 511 (1990); *Lewis
v. Jeffers,* 497 U.S. 764, 774, 110 S.Ct. 3092,
3099, 111 L.Ed.2d 606 (1990);    *Maynard v.
Cartwright,* 486 U.S. 356, 363-64, 108 S.Ct. 1853,
1858-59, 100 L.Ed.2d 372 (1988);    *Godfrey v.
Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1765,
64 L.Ed.2d 398 (1980). The fact that the narrowing
device is determinate, however, does not end the
inquiry because the device must also provide a
principled basis for distinguishing those defendants
convicted of murder who deserve capital punishment
from those who do not. *Arave,* 507 U.S. at ----,
113 S.Ct. at 1542. If the narrowing device is so
broad that it could be interpreted by the sentencing
body to apply to every murder, it is not
constitutionally valid. *Cartwright,* 486 U.S. at 364,
108 S.Ct. at 1859;  *Godfrey,* 446 U.S. at 428-29,
100 S.Ct. at 1765.

The Supreme Court has afforded the States a
significant amount of flexibility in fashioning
devices to narrow the class of death-eligible
offenders. The Court's decision in  *Lowenfield v.
Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d
568 (1988), exemplifies this commitment to
federalism in the realm of capital punishment
jurisprudence. In *Lowenfield,* the petitioner was
convicted under Louisiana's murder statute, which
enumerates a narrowly defined "laundry-list" of
first-degree murders. La.Rev.Stat.Ann. § 14:30 A
(West 1986). The subsection under which the
petitioner was convicted defined first-degree murder
as the killing of a human being "when the offender
has a specific intent to kill or inflict great bodily
harm upon more than one person."
La.Rev.Stat.Ann. § 14:30 A(3). After a separate
sentencing hearing, the jury found a sole aggravating
circumstance--that "the offender knowingly created
a risk of death or great bodily harm to more than
one person," La.Code Crim.Pro.Ann. Art.
905.4(d)--and sentenced the petitioner to death.
Because Louisiana law provided that these
provisions were to be construed in a "parallel

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

fashion," *see State v. Williams,* 480 So.2d 721,
726-27 (La.1985), there was no dispute that
evidence supporting a conviction under § 14:30 A(3)
automatically established the aggravating
circumstance enumerated in Article 905.4 of the
Louisiana Code of Criminal Procedure.

The petitioner challenged his conviction, arguing
that because the sole aggravating circumstance found
by the jury duplicated the elements of the underlying
offense, Louisiana's capital sentencing scheme failed
to meaningfully narrow the class of death-eligible
offenders as required by the Eighth Amendment. A
six-member majority of the Court rejected this
argument, holding that Louisiana's "laundry-list" of
first-degree murders satisfied the narrowing
requirement of the Eighth Amendment because it
rationally and meaningfully differentiated between
the defendants who deserved capital punishment and
those who did not. This holding therefore obviated
Louisiana's entire scheme of aggravating
circumstances as a matter of federal constitutional
law. The majority stated its holding as follows:

> It seems clear to us ... that the narrowing function
> required for a regime of capital punishment may
> be provided in either of these two ways: the
> legislature may itself narrow the definition of
> capital offenses, as ... Louisiana ha[s] done, so
> that the jury finding of guilt responds to this
> concern, or the legislature may more broadly
> define capital offenses and provide for narrowing
> by jury findings of aggravating circumstances at
> the penalty phase [citation omitted].

*Lowenfield,* 484 U.S. at 246, 108 S.Ct. at 555.

To further emphasize its holistic view of the
narrowing function, the Court stated:

> *The use of aggravating circumstances is not an end
> in itself, but a means of narrowing the class of
> death-eligible persons and thereby channeling the
> jury's discretion. We see no reason why this
> narrowing function may not be performed by jury
> findings at either the sentencing phase of the trial
> or the guilt phase.*

*Lowenfield,* 484 U.S. at 244-45, 108 S.Ct. at 554
(emphasis added).

With these fundamental principles of the narrowing
function required by the Eighth Amendment clearly
in mind, we now turn to an examination of the
Supreme Court's application of these principles to
the felony murder doctrine. Two cases-- *Enmund v.
Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d
**\*822** 1140 (1982), and *Tison v. Arizona,* 481 U.S.
137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)--are
crucial for a proper resolution of the issue addressed
by the Court in *Middlebrooks*.

In *Enmund* the petitioner was convicted under the
Florida felony-murder statute because of his
involvement in a robbery in which an elderly couple
was killed. The record in the case revealed that
petitioner Earl Enmund drove Sampson and
Jeannette Armstrong to the home of Thomas and
Eunice Kersey and remained in the car while the
Armstrongs knocked on the door. When Thomas
Kersey appeared, the Armstrongs grabbed him and
demanded his money. Mr. Kersey then yelled for

help, and Eunice Kersey came out of the house with
a shotgun. She fired the gun at Jeannette Armstrong
and wounded her. At that point, Sampson and
possibly Jeanette Armstrong shot and killed both the
Kerseys, took their money, and fled. Although the
evidence established that Earl Enmund drove the
Armstrongs away from the scene of the crime, there
was no evidence that he knew that the Armstrongs
had intended to kill the Kerseys.

Under the Florida felony murder statute and capital
punishment sentencing scheme, a defendant found
guilty of felony murder could be put to death
without any proof whatsoever as to his mental state.
The jury found Enmund guilty of felony murder,
and it recommended that he be put to death; the
trial court accepted this recommendation. The
Florida Supreme Court affirmed the conviction and
sentence of death.

Before the United States Supreme Court, Enmund
argued that the Eighth and Fourteenth Amendments
prohibited a State from imposing the death penalty
on a person convicted of felony murder when that
person did not kill, attempt to kill, intend to kill, or
know that lethal force would be used. In
determining whether the punishment was cruel and
unusual, the Court first sought to identify the
prevailing societal attitude as to whether the death
penalty was an excessive sanction for felony
murderers like Enmund by analyzing the actions of
state legislatures and lay juries on the issue. After
analyzing the states' felony murder and capital
sentencing statutes, the Court found that only eight
states allowed a person who was involved in a
robbery in which a person was murdered to be
sentenced to die simply for his involvement. The
Court then surveyed the actions of juries in
sentencing persons convicted of felony murder who
did not themselves commit the murder, and
discovered that only a tiny fraction of convicted
felony murderers had been sentenced to death in the
absence of evidence of their participation in the
killing or a finding of intent to kill. · With this
evidence in mind, the Court conducted its own
proportionality review and concluded that the
legitimate goals of capital punishment--deterrence
and retribution--were not served when a person
convicted of felony murder is sentenced to death in
the absence of proof that the person killed,
attempted to kill, or intended that life would be
taken. Specifically, the majority stated that because
American criminal law has always insisted that
punishment must be commensurate with the intent of
the perpetrator, Florida's capital sentencing scheme
was constitutionally deficient because it treated
Enmund, who did not intend that a killing take
place, in the same manner as the actors in the
underlying felony who did intend to kill.

The Court returned to the theme of culpability in a
felony murder situation five years later in *Tison v.
Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d
127 (1987). In     *Tison,* petitioners Ricky and
Raymond Tison brought several concealed weapons
into the Arizona State Prison to free Gary Tison,
their father, who was serving time for the murder of
a prison guard. The Tison brothers were successful
in freeing their father and Randy Greenawalt, their
father's cellmate. As the men were driving through
the desert, a tire on their Lincoln automobile blew
out. Raymond Tison then flagged down a Mazda,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                    **Page 20**

which was occupied by John Lyons, his wife, and
their young son and niece. The men forced the
Lyons' family into the Lincoln and drove both cars
off the road into the desert. At some point the men
transferred their belongings to the Mazda; however,
thereafter they parked the Mazda and continued to
drive the Lincoln deeper into the desert. After
stopping the Lincoln, **\*823** Gary Tison ordered the
Lyons' family out of the car. At that time, John
Lyons begged the group not to kill them; and he
asked that the group give them some water and leave
them in the desert. Gary Tison responded to the
plea by instructing Raymond and Ricky Tison to
return to the Mazda and get some water. As Ricky
and Raymond Tison returned with the container of
water, Gary Tison and Greenawalt opened fire on
the Lyons' family, killing all four. There was no
dispute that both Ricky and Raymond Tison saw the
murders and did nothing to assist the victims. The
group continued their escape attempt in the Mazda
until they were apprehended several days later by a
police roadblock.

Both Raymond and Ricky Tison were convicted
under the Arizona felony murder statute and were
sentenced to death; and the Arizona Supreme Court
affirmed the convictions. The Tisons then
collaterally attacked the convictions in post-
conviction proceedings, arguing that the Supreme
Court's decision in *Enmund v. Florida* required their
convictions to be reversed because they did not kill,
attempt to kill, or intend that the victims be killed.
A divided Arizona Supreme Court rejected this
argument, holding that the *Enmund* "intent to kill"
requirement had been satisfied because the Tisons
intended, contemplated, or foresaw that life would
be taken in the escape scheme.

The Supreme Court granted certiorari for the
purpose of determining whether the death sentence
was constitutionally valid under the dictates of
*Enmund.* In its analysis, a five-member majority of
the Court first disavowed the analysis employed by
the Arizona Supreme Court; it stated that the
Arizona court's definition of "intent" was more akin
to "foreseeability" than to the traditional notion of
specific intent as used in        *Enmund.* And the
majority conceded that the Tisons did not "intend to
kill" as that concept had been traditionally
understood. Therefore, it also conceded that
petitioners did not fall within the category of felony
murderers for whom the    *Enmund* court explicitly
held the death penalty to be constitutionally
permissible.

That admission, however, did not settle the issue
because the majority went on to state that the Tisons
also did not fit within the category of felony
murderers for whom the *Enmund* court had held the
death penalty to be constitutionally impermissible:
those felony murderers who, like Enmund, had not
participated in the crimes in a major way and who
had no culpable mental state. The Court contrasted
petitioners' actions of securing the weapons,
participating in the jailbreak, trapping the victims,
and failing to help them in the face of their
impending death with Enmund's comparatively
innocuous role as the driver of the "getaway" car.
Because it believed that the Tisons' actions could be
construed as exhibiting a reckless indifference to
human life, the Court recast the issue as whether the
Eighth Amendment prohibits the imposition of the

death penalty upon a person convicted of felony
murder who has exhibited recklessness and whose
participation in the underlying felony can be said to
have been major rather than minor.

The majority answered this question in the
negative. After surveying the state felony murder
and capital punishment statutes, the court held that
only a small minority--eleven states--forbade the
imposition of the death penalty where the defendant
acted with recklessness and played a substantial role
in the underlying felony. The majority then
specifically addressed the culpability issue that was
so essential to the holding in *Enmund.* Although it
agreed with the *Enmund* court that punishment must
be closely tailored to the culpable mental state of the
perpetrator, the majority rejected petitioners'
argument that only a classic intentional,
premeditated murder is deserving of the death
penalty. Justice O'Connor, writing for the majority,
reasoned as follows:

A narrow focus on the question of whether or not a
defendant "intended to kill," however, is a highly
unsatisfactory means of definitively distinguishing
the most culpable and dangerous of murderers.
Many who intend to, and do, kill are not
criminally liable at all--those who act in self-
defense or with other justification or excuse.
Other intentional homicides, though criminal, are
often felt undeserving of the death penalty--those
that are the result of provocation.   **\*824** On the
other hand, some nonintentional murderers may be
among the most dangerous and inhumane of all--
the person who tortures another not caring whether
the victim lives or dies, or the robber who shoots
someone in the course of a robbery, utterly
indifferent to the fact that the desire to rob may
have the unintended consequence of killing the
victim as well as taking the victim's property.
This reckless indifference to the value of human
life may be every bit as shocking to the moral
sense as an "intent to kill." Indeed it is for this
very reason that the common law and modern
criminal codes alike have classified behavior such
as occurred in this case along with intentional
murders [citation omitted].    *Enmund* held that
when "intent to kill" results in its logical though
not inevitable consequence--the taking of human
life--the Eighth Amendment permits the State to
exact the death penalty after a careful weighing of
the aggravating and mitigating circumstances.
Similarly, we hold that the reckless disregard for
human life implicit in knowingly engaging in
criminal activities known to carry a grave risk of
death represents a highly culpable mental state, a
mental state that may be taken into account in
making a capital sentencing judgment when that
conduct causes its natural, though also not
inevitable, lethal result.

.   .   .   .

We will not attempt to precisely delineate the
particular types of conduct and states of mind
warranting imposition of the death penalty here.
Rather, *we simply hold that major participation in
the felony committed, combined with reckless
indifference to human life, is sufficient to satisfy
the Enmund culpability requirement.*

*Tison,* 481 U.S. at 157-58, 107 S.Ct. at 1687-88

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

**741**

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                     Page 21

(emphasis added).

Several principles can be derived from the
*Lowenfield, Enmund,* and *Tison* decisions. First, it
is clear that a State need not employ a scheme of
aggravating circumstances in order to fulfill the
narrowing mandate of the Eighth Amendment; that
mandate can be fulfilled by a narrow definition of
the offenses themselves if the offenses are both
sufficiently determinate and provide a principled
basis for differentiating between convicted persons
who deserve capital punishment and those who do
not. Moreover, it is abundantly clear after    *Tison*
that the death penalty may be imposed in a felony
murder situation if the defendant exhibits
recklessness and plays a substantial role in the
underlying felony.

## PART I

In *Middlebrooks,* I applied these principles to our
felony murder aggravating circumstance, Tenn.Code
Ann. § 39-13-204(i)(7), (FN1) which, like the first
degree murder statute that included felony murder,
Tenn.Code Ann. § 39-13-202(a), (FN2) was at that
time (1987) unqualified by either the culpability or
participation requirements of *Tison.*   Although this
deficiency did serve to deprive the jury of the
opportunity to decide whether the felony murder
aggravating circumstance, as modified by the    *Tison*
requirements, applied in a defendant's case (because
the jury was not informed of the *Tison* requirements
in the charge), I did not believe this was sufficient to
render the aggravating circumstance unconstitutional
because I felt that any constitutional error made by
the jury in applying the open-ended felony murder
aggravating circumstance could be corrected by this
Court on direct appeal. *Middlebrooks,* 840 S.W.2d
at 349. Moreover, because we had rejected
essentially the same argument as      **\*825**    that
propounded by Middlebrooks in *State v. Smith,* 755
S.W.2d 757, 768 (Tenn.1988), a post- *Tison* case, I
believed that the doctrine of stare decisis demanded
that we adhere to the position previously taken on
this issue. *Id.* at 347. Because I continue to
believe that the felony murder aggravating
circumstance is constitutional, even when it and the
definition of felony murder are unqualified by any
culpability or participation requirement, I dissent
from the holding in Part II-C of the majority
opinion.

## PART II

As stated above, I still believe that my
*Middlebrooks* dissent was correct because of the
doctrine of stare decisis; and I also think that it was
a correct analysis of federal constitutional law.
However, I wish here to set forth another argument
which, although not specifically applicable to the
case at hand, (FN3) even more strikingly illustrates
the fallacy of the       *Middlebrooks*  majority's
conclusion that our felony murder aggravating
circumstance violates Art. I, § 16 of the Tennessee
Constitution because it duplicates the elements of the
underlying offense.

In 1989 the General Assembly amended        §
39-13-202(a) by defining as first degree murder:

(2) A *reckless* killing of another committed in the

perpetration of, or attempt to perpetrate any first
degree murder, arson, rape, robbery, burglary,
theft, kidnapping, or aircraft piracy;  [or]

(3) A *reckless* killing of another committed as the
result of the unlawful throwing, placing, or
discharging of a destructive device or bomb[.]

Tenn.Code Ann.   §   39-13-202(a)(2) and (3)
(emphasis added).

The legislative insertion of "recklessness" into the
felony murder portions of § 39-13-202(a) is crucial
because the interaction of the principles announced
in *Lowenfield, Enmund,* and *Tison* appears to lead
inexorably to one conclusion: that a definition of
felony murder which includes the           *Tison*
requirements of recklessness and a substantial
degree of participation in the underlying felony is a
constitutionally valid narrowing device because it is
both determinate and because it provides a
principled basis for distinguishing between those
defendants who deserve to die and those who do not.
As to the determinacy prong of the test, there is no
question that such a definition is sufficiently
determinate to guide and channel the sentencing
body's discretion--this is especially apparent when a
*Tison*-type definition of felony murder is contrasted
with the types of narrowing devices that have been
held to be unconstitutionally vague. See cases cited
on p. 3-4, *supra.*  As to the second prong of the
test, Justice O'Connor's opinion in  *Tison* explains
with remarkable lucidity and power the reasons that
such a definition does provide a rational, meaningful
method of separating those defendants who deserve
the death penalty from those who do not. Felony
murderers who recklessly engage in criminal activity
that poses grave danger to others may be much more
dangerous to society than some intentional
murderers. I am in total agreement with Justice
O'Connor's vigorous rejection of the simplistic view
that only intentional or premeditated murders are
deserving of the death penalty. *See Middlebrooks,*
840 S.W.2d at 347.

This does not settle this question, however, for
while Tennessee's current definition of felony
murder obviously includes the culpability
requirement set forth in *Tison,* it does not include
the second requirement of     *Tison*  --that the
defendant's participation in the felony have been
substantial. Therefore, standing alone, the statute
does not seem to satisfy the dictates of    *Tison* and
therefore does not qualify as a constitutionally valid
narrowing device.

However, it is a well-settled rule of statutory
construction that a court may, indeed must, apply a
saving construction to a statute of questionable
constitutionality if the saving construction is rational
and is within the realm of the intent of the
legislature. *State v. Lyons,*    802 S.W.2d 590
(Tenn.1990); *State ex rel Maner v. Leech,*      588
S.W.2d 534 (Tenn.1979). Because the General
Assembly **\*826**  amended the felony murder statute
in 1989 by inserting the word "reckless," it is
obvious that the legislature was attempting to ensure
the constitutionality of the statute by conforming it
to the dictates of *Tison.*  Therefore, given the
legislature's intent in amending the statute, it is but a
small step to construe the statute to require the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

defendant to have participated in a substantial way in
the underlying felony before he can be convicted of
felony murder and therefore become death-eligible.
Therefore, I would construe the statute in that
manner. And I would require that the jury be
charged to that effect.

With the aid of the above mentioned saving
construction, I believe that §§ 39-13-202(a)(2) and
(3) constitute a valid narrowing device under federal
constitutional law. While this conclusion does not
end the inquiry as a matter of state constitutional
law, it is of tremendous persuasive force,
particularly since we have rejected more restrictive
approaches to this issue in the past while deferring
to the pronouncements of the Supreme Court. *See
e.g., State v. Smith,* 755 S.W.2d 757, 768
(Tenn.1988).

I believe that when considered in light of my
argument dealing with the 1989 amendment to the
first degree murder statute, the weakness of the
*Middlebrooks* majority's analysis of the relevant
federal law becomes apparent. A primary reason
for this conclusion is the majority's treatment of the
*Tison* decision. Although the majority realized that
*Tison* provided a "nationwide threshold of
culpability at the reckless indifference level,
meaning that a defendant who acts without reckless
indifference is not constitutionally eligible for the
death penalty," *Middlebrooks,* 840 S.W.2d at 345, it
went on to say that the *Tison* requirement (the
majority did not mention the participation factor also
mandated by *Tison* ) did not serve the narrowing
function required by the Eighth Amendment because

[a]ll felony murderers ... potentially meet a
recklessness standard; that is, one who purposely
undertakes a felony that results in a death, almost
always can be found reckless. Therefore, the
narrowing devices in these states [states requiring
proof of recklessness before the defendant can
become death-eligible] are essentially no different
from those in pure felony murder states.

*Id.* at 345.

The majority concluded its argument by stating:
"[t]herefore, since the absence of reckless
indifference constitutionally immunizes a defendant
from the death penalty, its presence cannot
meaningfully *further* narrow the class of death
eligible offenders." *Id.* (emphasis added).

This analysis is flawed in two principal ways.
Initially, the majority's assertion that all or "almost
all" felony murderers can be found to be reckless--a
proposition for which it cited no authority--is simply
not the case. As *Tison* itself illustrated, there are
felony murderers, such as the petitioner in *Enmund,*
who cannot be found to have been reckless, and
those defendants are constitutionally immunized
from the punishment of death. Thus, the restrictive
definition of felony murder in our first degree
murder statute does narrow, to some extent, the
class of death-eligible defendants.

Second, my argument pertaining to the 1989
amendment of the first degree murder statute
substantially undermines another main pillar of the
*Middlebrooks* majority's analysis--its argument that
the felony murder aggravating circumstance does not

*further* narrow the class of death-eligible defendants.
Although the majority acknowledged that under
*Lowenfield* a State is not required to further narrow
the class of death-eligible defendants with the use of
aggravating circumstances if it has already
adequately narrowed that class by restrictively
defining the capital offenses, it determined that
*Lowenfield* was inapplicable because while Louisiana
had narrowly defined its capital offenses,
"Tennessee has a broad definition of murder and has
not narrowed in the definitional stage." *Id.* at 346.
While the majority is correct that Tennessee does
not have a comprehensive scheme of narrowly
defined capital offenses as does Louisiana, this fact
is immaterial because Tennessee's 1989 definition of
felony murder, when construed as I have urged in
this dissent, *is* an acceptable narrowing device under
the Eighth Amendment. **\*827** Therefore, the fact
that the felony murder aggravating circumstance
largely duplicates the elements (FN4) of the
definition of felony murder is irrelevant as a matter
of federal constitutional law. With this clearly in
mind, the majority's attempt to distinguish
*Lowenfield* on the ground that Tennessee has no
comprehensive list of narrowly defined capital
offenses loses all its persuasive force.

This failure of the analysis employed by the
*Middlebrooks* majority to accommodate the concerns
prompted by my argument concerning the 1989
amendment is of paramount importance because the
*Middlebrooks* majority failed to enunciate "adequate
and independent state grounds," *Michigan v. Long,*
463 U.S. 1032, 1037-45, 103 S.Ct. 3469, 3474-78,
77 L.Ed.2d 1201 (1983), for deviating from an
ascertainable Eighth Amendment standard. Indeed,
it would be extremely difficult to do so because
there is nothing in the Tennessee Constitution or in
our state's capital punishment jurisprudence that
compelled the *Middlebrooks* majority to deviate
from such a federal standard. This conclusion is
accentuated by the fact that the majority did not
discuss any Tennessee decision in its opinion; its
analysis was entirely based on federal law. This
reliance on federal law is underscored by the fact
that the United States Supreme Court granted
certiorari in this case; (FN5) and it was argued by
the parties before being dismissed as improvidently
granted. (FN6)

Viewed from this perspective, the *Middlebrooks*
majority's sole argument is, and must be, that it is
irrational and/or disproportionate for the *Tison*-type
felony murderer to enter the sentencing phase of the
proceedings with one aggravating circumstance in
place while the intentional murderer enters the
sentencing phase with no such burden. I would
reply only that this delicate, difficult matter is solely
one for the determination of the legislature--the most
direct link, other than the lay jury, to the moral well
of the community. *See Spaziano v. Florida,* 468
U.S. 447, 472-90, 104 S.Ct. 3154, 3168-78, 82
L.Ed.2d 340 (1984) (Stevens, J. dissenting). As
Justice O'Connor so ably pointed out in *Tison,* there
is nothing inherently irrational about the statement
that some felony murderers are much more
dangerous than some murderers who kill in an
intentional, premeditated fashion. Therefore, there
is nothing inherently irrational about the legislature's
choice to treat them differently. Moreover, under
the argument set forth above, the jury itself will
perform the narrowing function in its determination

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                                    **Page 23**

of whether the defendant is guilty of felony murder in the first place, not an appellate court. Because the jury is charged, in a capital case, with the primary sentencing responsibility in Tennessee, its determination as to whether the death penalty may be constitutionally imposed on a defendant is superior to that same decision made by on appellate review by judges, who are by definition more removed from the popular will than are juries. *Spaziano,* 468 U.S. at 486-87, 104 S.Ct. at 3176.

Furthermore, any error that the jury may commit in applying § § 39-13-202(a)(2) and (3) may still be remedied at another point in the sentencing process. As I pointed out in my        *Middlebrooks* dissent, although it is true that a person convicted of a *Tison*-type felony murder automatically has one aggravating circumstance established against him, this does not translate into an automatic sentence of death. The jury still must find that the aggravating circumstances outweigh the mitigating circumstances to impose a sentence of death. Tenn.Code Ann. § 39-13-204(f). And the mitigating circumstances include the statutory factors set forth in          § 39-13-204(j), plus any other relevant evidence.     § 39-13- *828.* 204(j)(9). Furthermore, in any case in which a sentence of death has been imposed, this Court must review that sentence to determine if: (1) the sentence was imposed in an arbitrary fashion; (2) the evidence supports the jury's findings as to the statutory aggravating circumstances;  and (3) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances.  § 39-13-206(c)(1)(A), (B) and (C). Finally, this Court must conduct a proportionality review to determine if the sentence of death is excessive or disproportionate when compared to the penalty imposed in similar cases.              § 39-13-206(c)(1)(D).  In short, the process of sentencing in Tennessee is extremely individualized to ensure that the death penalty is employed in only the most deserving of cases.

Because I believe that the portions of Tennessee's first degree murder statute dealing with felony murder, when construed as I have urged, serve to narrow the class of death-eligible defendants in accordance with federal constitutional requirements, and because I believe that the *Middlebrooks* majority failed to enunciate a compelling justification for deviating from this ascertainable federal standard, I must respectfully dissent from Part-II(C) of the majority opinion.

Notwithstanding that I firmly believe the majority's position on this important issue to be in error, its rejection of the argument set forth in Part II of this dissenting opinion at least serves to finally resolve the uncertainty which has shrouded the felony murder doctrine since the         *Middlebrooks* decision was released. Whatever other conclusions one may draw from *Middlebrooks* and the majority opinion in *Bigbee* (Part II-C), this much is now obvious: in the absence of other aggravating circumstances, Article I, § 16 of the Tennessee Constitution does not permit a defendant convicted of felony murder to be put to death without a showing that the defendant exhibited a mental state, with regard to the killing itself, of greater culpability than reckless indifference.

This now unequivocal message does not, however, mean that the felony murder aggravating circumstance, Tenn.Code Ann. § 39-13-204(i)(7), must disappear forever from our criminal law. Just as any statute that has been held to be unconstitutional may be remedied by legislative amendment, so too may § 39-13-204(i)(7). Because both the *Middlebrooks* and *Bigbee* majorities identify the mens rea component of our felony murder scheme as its constitutional deficiency, perhaps one way to remedy the scheme would be to insert a requirement in the aggravating circumstance that the defendant kill with either a "knowing" or "intentional" mental state. See Tenn.Code Ann. § 39-11-302(a) and (b). Although there may be other ways of ensuring the constitutionality of the scheme, this appears to me to be the most straightforward method. (FN7)

CONCLUSION

I had initially hoped by this dissent to convince the newest member of this Court, who did not participate in  *Middlebrooks,*  to join with the *Middlebrooks* dissenters in this decision and thereby correct what I believe to have been an erroneous interpretation of both the state and federal constitutions. I have failed in this endeavor. However, I chose to file this lengthy dissent in the hope that the members of this Court would further clarify their respective positions regarding the constitutionality of our felony murder scheme in light of the 1989 amendment to the felony murder statute. This they have done. I have also filed this dissent to point out that the holdings of the majorities in  *Middlebrooks*  and the present case should not be interpreted, in my opinion, as forever foreclosing capital punishment for felony murder in this state in the absence of some additional aggravating circumstance. It is abundantly clear, however, that any further action in this important and controversial area of our state's capital punishment jurisprudence will have to be taken by the legislature.

O'BRIEN, C.J., concurs.

(FN1.) Tenn.Code Ann.    §   39-2-203(i) [now Tenn.Code Ann. § 39-13-204(i) (1991) ]--No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:

(2) The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

(7) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb....

(FN2.) The defendant contends that even if the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

885 S.W.2d 797, State v. Bigbee, (Tenn. 1994)                                                                    Page 24

error is harmless as to guilt, it was not harmless as
to sentencing. We disagree. There was no
mention of the erroneously admitted evidence
during any portion of the penalty phase of the trial.
Thus, we conclude that its admission was harmless
as to sentencing as well.

**\*828_**  (FN3.) At the first conference on July 12,
1990, counsel for Baker and Chris Hoosier were
also present.

(FN4.) The law interpreted in *Bates* and *Moore* has
since been amended.   *See*   Tenn.Code Ann.   §
39-13-204(i)(2) (1991 & Supp.1993).

(FN1.) Tennessee has imposed by statute and court
decisions, other limitations on the imposition of the
sentence of death which exceed the minimum
standard required under the United States
Constitution. *See  State v. Howell,*  868 S.W.2d
238, 267-68 (Tenn.1993) (Reid, C.J., concurring).

FN2. Justice Drowota concurring and dissenting at
p. 825.

(FN1.) The Tennessee Legislative scheme follows
the same procedure.

(FN1.) In 1987, at the time Middlebrooks was
charged, § 39-13-204(i)(7) provided as follows:

The murder was committed while the defendant
was engaged in committing, or was an accomplice
in the commission of, or was attempting to
commit, or was fleeing after committing or
attempting to commit, any first degree murder,
arson, rape, robbery, burglary, theft, kidnapping,
aircraft piracy, or unlawful throwing, placing or
discharging of a destructive device or bomb[.]

(FN2.) In 1987,    §   39-13-202(a) provided as

follows:

Every murder perpetrated by means of poison,
lying in wait, or by other kinds of wilful,
deliberate, malicious, and premeditated killing, *or
committed in the perpetration of, or attempt to
perpetrate, any murder in the first degree, arson,
rape, robbery, burglary, larceny, kidnapping,
aircraft piracy, or the unlawful throwing, placing
or discharging of a destructive device or bomb* ...
(emphasis added).

(FN3.) The argument set forth in Part II is not
applicable to this case because Bigbee was indicted
prior to the effective date of the 1989 amendment.

(FN4.) Of course, the felony murder aggravating
circumstance does not totally duplicate the
post-1989 definition of felony murder because the
definition of felony murder now contains the
element of "recklessness" that the aggravating
circumstance does not have.

(FN5.) --- U.S. ----, 113 S.Ct. 1840, 123 L.Ed.2d
466 (1993).

(FN6.) Although the United States Supreme Court
had denied Middlebrooks's petition to dismiss for
lack of jurisdiction, --- U.S. ----, 114 S.Ct. 48, it
dismissed the petition, 510 U.S. 124, 114 S.Ct.
651, in apparent reliance on our subsequent
statement in *State v. Howell,* 868 S.W.2d 238, 259
n. 7 (Tenn.1993) that the decision in *Middlebrooks*
was based on Art. I,    §  16 of the Tennessee
Constitution.

(FN7.) Of course, the definition of felony murder
itself could be amended to include one of these
mental states. However, because Tennessee
already utilizes a scheme of aggravating and
mitigating circumstances, it would probably be
preferable to amend the aggravating circumstance.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Page 1

*196  31 S.W.3d 196

Supreme Court of Tennessee,
at Jackson.

STATE of Tennessee
v.
David M. KEEN.
Oct. 5, 2000.

Defendant pleaded guilty in the Criminal Court, Shelby County, John P. Colton, Jr., J., to capital murder and was sentenced to death by a jury. On automatic appeal, the Supreme Court, 926 S.W.2d 727, reversed and remanded. After a new sentencing hearing in the Criminal Court, Shelby County, a jury again sentenced defendant to death. Defendant appealed. The Court of Criminal Appeals affirmed. On automatic appeal, the Supreme Court, Barker, J., held that: (1) evidence supported jury's finding of "especially heinous, atrocious, or cruel" statutory aggravating circumstance; (2) defendant was not entitled to jury instruction on the sentence of life imprisonment without the possibility of parole; (3) error was harmless in defendant's not receiving proffered instruction on jury's use of circumstantial evidence; and (4) death sentence was not disproportionate to other cases in which the defendant received the death penalty.

Affirmed.

Birch, J., filed a dissenting opinion.

West Headnotes

[1] Sentencing and Punishment ☜1788(7)
350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)4 Determination and Disposition
        350Hk1788 Review of Death Sentence
          350Hk1788(7) Presumptions.

[See headnote text below]

[1] Sentencing and Punishment ☜1788(9)
350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)4 Determination and Disposition
        350Hk1788 Review of Death Sentence
          350Hk1788(9) Questions of Fact.
  In determining on appeal whether the evidence at the punishment phase of a capital murder trial supports the application of an aggravating circumstance, the proper standard to consider is whether, after reviewing the evidence in the light most favorable to the state, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. T.C.A. § 39-13-206(c)(1).

[2] Sentencing and Punishment ☜1714
350H ----
  350HVIII The Death Penalty
    350HVIII(E) Factors Related to Offender
      350Hk1714 Age.

[See headnote text below]

[2] Sentencing and Punishment ☜1727
350H ----
  350HVIII The Death Penalty
    350HVIII(F) Factors Related to Status of Victim
      350Hk1727 Age.
  Evidence supported jury's finding, at punishment phase of capital murder trial, of statutory aggravating circumstance that the victim was less than 12 years old and defendant was 18 years of age or older, as victim was 8 years old at the time of her death and defendant was 27 years old. T.C.A.    § 39-13-204(i)(1).

[3] Sentencing and Punishment ☜1684
350H ----
  350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
      350Hk1684 Vileness, Heinousness, or Atrocity.
  The "especially heinous, atrocious, or cruel" aggravating circumstance of capital murder sentencing statute may be proved under either of two prongs: torture or serious physical abuse. T.C.A. § 39-13-204(i)(5).

[4] Sentencing and Punishment ☜1684
350H ----
  350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
      350Hk1684 Vileness, Heinousness, or Atrocity.
  The phrase "serious physical abuse beyond that necessary to produce death," of the "especially heinous, atrocious, or cruel" aggravating circumstance of capital murder sentencing statute, is self-explanatory, in that the abuse must be physical rather than mental in nature; the word "serious" alludes to a matter of degree, and the term "abuse" is defined as an act that is excessive or which makes improper use of a thing, or which uses a thing in a manner contrary to the natural or legal rules for its use. T.C.A. § 39-13-204(i)(5).

[5] Sentencing and Punishment ☜1684
350H ----
  350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
      350Hk1684 Vileness, Heinousness, or Atrocity.
  Evidence supported jury's finding, at punishment phase of capital murder trial, of "especially heinous, atrocious, or cruel" statutory aggravating circumstance, in that defendant tortured victim, where defendant's statements established that he kidnaped the eight-year-old victim under the pretense that she was being taken to see her mother, defendant forcibly raped her in the car while crushing her throat with his left hand, and victim was alive and conscious at least through part of the rape. T.C.A. § 39-13-204(i)(5).

[6] Sentencing and Punishment ☜1684
350H ----
  350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
      350Hk1684 Vileness, Heinousness, or Atrocity.
  The anticipation of physical harm to oneself is torturous, so as to establish the "especially heinous, atrocious, or cruel" aggravating circumstance of capital murder sentencing statute. T.C.A.         § 39-13-204(i)(5).

[7] Sentencing and Punishment ☜1684

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

31 S.W.3d 196, State v. Keen, (Tenn. 2000)                                    Page 2

350H ----
350HVIII The Death Penalty
350HVIII(D) Factors Related to Offense
350Hk1684 Vileness, Heinousness, or Atrocity.
  The physical and mental pain suffered by the
victim of strangulation may constitute "torture"
within the meaning of the "especially heinous,
atrocious, or cruel" aggravating circumstance of
capital murder sentencing statute. T.C.A.        §
39-13-204(i)(5).

[8] Sentencing and Punishment ☜══1660
  350H ----
  350HVIII The Death Penalty
  350HVIII(C) Factors Affecting Imposition in
      General
  350Hk1660 Dual Use of Evidence or
      Aggravating Factor.
  A rape, in and of itself, cannot support imposition
of the death penalty when the crime charged is
murder in the perpetration of a rape.

[9] Sentencing and Punishment ☜══1684
  350H ----
  350HVIII The Death Penalty
  350HVIII(D) Factors Related to Offense
  350Hk1684 Vileness, Heinousness, or Atrocity.
  Evidence was sufficient to establish, at punishment
phase of capital murder trial, that the victim
suffered serous physical abuse beyond that necessary
to produce death, and thus, was sufficient to
establish "especially heinous, atrocious, or cruel"
statutory aggravating circumstance, even if
defendant's manually choking of eight-year-old
victim was not the cause of her death, where
defendant admitted that he choked the victim so
forcefully while he was raping her that she stopped
breathing, turned blue, and lapsed into
unconsciousness. T.C.A. § 39-13-204(i)(5).

[10] Sentencing and Punishment ☜══1684
  350H ----
  350HVIII The Death Penalty
  350HVIII(D) Factors Related to Offense
  350Hk1684 Vileness, Heinousness, or Atrocity.
  There is no requirement that the cause or mode of
death also be the cause or mode of the "serious
physical abuse beyond that necessary to produce
death" in order to establish the "especially heinous,
atrocious, or cruel" aggravating circumstance of
capital murder sentencing statute. T.C.A.        §
39-13-204(i)(5).

[11] Criminal Law ☜══872.5
  110 ----
  110XX Trial
  110XX(K) Verdict
  110k872.5 Assent of Required Number of Jurors.
  Permitting jurors, at capital murder trial, to find
either "torture" or "serious physical abuse beyond
that necessary to produce death," to establish the
"especially heinous, atrocious, or cruel" statutory
*196 aggravating circumstance did not deprive
defendant of his constitutional right to a unanimous
jury. U.S.C.A. Const. Art. 1,    § 6; T.C.A.    §
39-13-204(i)(5).

[12] Criminal Law ☜══872.5
  110 ----
  110XX Trial
  110XX(K) Verdict

110k872.5 Assent of Required Number of Jurors.
  The right to a unanimous jury verdict is
fundamental, immediately touching on the
constitutional rights of an accused. U.S.C.A.
Const. Art. 1, § 6.

[13] Criminal Law ☜══872.5
  110 ----
  110XX Trial
  110XX(K) Verdict
  110k872.5 Assent of Required Number of Jurors.

[See headnote text below]

[13] Sentencing and Punishment ☜══1684
  350H ----
  350HVIII The Death Penalty
  350HVIII(D) Factors Related to Offense
  350Hk1684 Vileness, Heinousness, or Atrocity.
  "Torture" and "serious physical abuse beyond that
necessary to produce death" are separate methods or
theories of establishing the "especially heinous,
atrocious, or cruel" aggravating circumstance of
capital murder sentencing statute and are not
separate aggravating circumstances by themselves;
so long as the proof is sufficient under either theory
for finding the aggravating circumstance beyond a
reasonable doubt, and so long as all jurors agree that
the aggravating circumstance is present and
applicable to the case at hand, different jurors may
rely upon either theory to reach their conclusion
without violating a defendant's constitutional right to
a unanimous verdict. U.S.C.A. Const. Art. 1, § 6;
T.C.A. § 39-13-204(i)(5).

[14] Criminal Law ☜══872.5
  110 ----
  110XX Trial
  110XX(K) Verdict
  110k872.5 Assent of Required Number of Jurors.
  Capital murder sentencing statute requiring
unanimity only requires that the jury unanimously
agree that an aggravating circumstance in question is
present; it does not require that the jury agree as to
all facts establishing the presence of that
circumstance when different theories are available
for consideration. T.C.A. § 39-13-204(i).

[15] Statutes ☜══188
  361 ----
  361VI Construction and Operation
  361VI(A) General Rules of Construction
  361k187 Meaning of Language
  361k188 In General.
  Where the language of a statute is clear and
unambiguous, courts will not extend the meaning of
that statute beyond its plain and obvious import.

[16] Sentencing and Punishment ☜══1625
  350H ----
  350HVIII The Death Penalty
  350HVIII(A) In General
  350Hk1622 Validity of Statute or Regulatory
      Provision
  350Hk1625 Aggravating or Mitigating
      Circumstances.
  The test for constitutional infirmity of an
aggravating circumstance of a capital murder
sentencing statute is whether one could fairly
conclude that the aggravating circumstance applies
to every defendant eligible for the death penalty.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[17] Sentencing and Punishment ⬥⟷1625
  350H ----
  350HVIII The Death Penalty
  350HVIII(A) In General
  350Hk1622 Validity of Statute or Regulatory
        Provision
  350Hk1625 Aggravating or Mitigating
        Circumstances.
  By defining "torture" to include "severe mental
pain," Supreme Court has not broadened the scope
of the "especially heinous, atrocious, or cruel"
aggravating circumstance of capital murder
sentencing statute so as to render it unconstitutional.
T.C.A. § 39-13-204(i)(5).

[18] Sentencing and Punishment ⬥⟷1684
  350H ----
  350HVIII The Death Penalty
  350HVIII(D) Factors Related to Offense
  350Hk1684 Vileness, Heinousness, or Atrocity.
  "Especially heinous, atrocious, or cruel"
aggravating circumstance of capital murder
sentencing statute does not require a mens rea on the
part of the defendant to inflict torture or serious
physical abuse upon the victim.  T.C.A.          §
39-13-204(i)(5).

[19] Sentencing and Punishment ⬥⟷1625
  350H ----
  350HVIII The Death Penalty
  350HVIII(A) In General
  350Hk1622 Validity of Statute or Regulatory
        Provision
  350Hk1625 Aggravating or Mitigating
        Circumstances.
  That the jury is allowed to use its common sense,
knowledge, and experience when deciding whether
the "especially heinous, atrocious, or cruel"
aggravating circumstance of capital murder
sentencing statute applies does not render the statute
constitutionally infirm as being too broad.  T.C.A. §
39-13-204(i)(5).

[20] Sentencing and Punishment ⬥⟷1684
  350H ----
  350HVIII The Death Penalty
  350HVIII(D) Factors Related to Offense
  350Hk1684 Vileness, Heinousness, or Atrocity.

[See headnote text below]

[20] Sentencing and Punishment ⬥⟷1710
  350H ----
  350HVIII The Death Penalty
  350HVIII(E) Factors Related to Offender
  350Hk1710 Emotional Distress or Disturbance.

[See headnote text below]

[20] Sentencing and Punishment ⬥⟷1727
  350H ----
  350HVIII The Death Penalty
  350HVIII(F) Factors Related to Status of Victim
  350Hk1727 Age.
  Evidence supported jury's finding, at punishment
phase of capital murder trial, that statutory
aggravating circumstances that the victim was less
than 12 years old and that the crime was especially
heinous, atrocious, or cruel outweighed the 15
mitigating circumstances proffered by defendant,
though defendant argued he was under extreme

mental stress; defendant secreted the eight-year-old
victim away by driving her to a discrete and remote
location, defendant then violently raped and
assaulted her, while manually strangling her with
such force as to render her unconscious.  T.C.A.  §
39-13-204.

[21] Sentencing and Punishment ⬥⟷1633
  350H ----
  350HVIII The Death Penalty
  350HVIII(A) In General
  350Hk1631 Retroactive Operation
  350Hk1633 Effect of Amendment or Other
        Modification.
  Defendant who committed capital murder before
effective date of amendment to sentencing statute
was not entitled to instruction, at punishment phase,
on the sentence of life imprisonment without the
possibility of parole, though original death sentence
was reversed and second sentencing hearing
occurred after effective date of amendment.  T.C.A.
§ 39-13-204.

[22] Statutes ⬥⟷190
  361 ----
  361VI Construction and Operation
  361VI(A) General Rules of Construction
  361k187 Meaning of Language
  361k190 Existence of Ambiguity.
  Courts will not construe the plain, unambiguous
language of a statute to give any forced or subtle
construction which would extend or limit its
meaning.

[23] Sentencing and Punishment ⬥⟷1780(3)
  350H ----
  350HVIII The Death Penalty
  350HVIII(G) Proceedings
  350HVIII(G)3 Hearing
  350Hk1780 Conduct of Hearing
  350Hk1780(3) Instructions.
  Defendant who was statutorily precluded from
receiving instruction, at punishment phase of capital
murder trial, on the sentence of life imprisonment
without the possibility of parole, on ground offense
occurred before effective date of amendment to
sentencing statute, was not entitled to the instruction
on contention that failure to so instruct would be
contrary to Eight Amendment's evolving standards
of decency doctrine.  U.S.C.A. Const.Amend. 8;
T.C.A.§ 39-13-204.

[24] Sentencing and Punishment ⬥⟷1616
  350H ----
  350HVIII The Death Penalty
  350HVIII(A) In General
  350Hk1613 Requirements for Imposition
  350Hk1616 Avoidance of Arbitrariness or
        Capriciousness.

[See headnote text below]

[24] Sentencing and Punishment ⬥⟷1736
  350H ----
  350HVIII The Death Penalty
  350HVIII(G) Proceedings
  350HVIII(G)1 In General
  350Hk1736 In General.
  So long as the system used to impose death is not
rendered arbitrary or capricious in that the
sentencing authority lacks adequate information or

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

31 S.W.3d 196, State v. Keen, (Tenn. 2000)

Page 4

**\*196** guidance, the procedural protections of the Eighth Amendment in capital cases have no application. U.S.C.A. Const.Amend. 8.

[25] Sentencing and Punishment ☞ 1780(3)
   350H ----
     350HVIII The Death Penalty
       350HVIII(G) Proceedings
         350HVIII(G)3 Hearing
           350Hk1780 Conduct of Hearing
   350Hk1780(3) Instructions.
   A jury instruction on the sentence of life imprisonment without the possibility of parole is not required under the Eighth Amendment in any scheme of capital punishment. U.S.C.A. Const.Amend. 8; T.C.A. § 39-13-204.

[26] Sentencing and Punishment ☞ 1780(3)
   350H ----
     350HVIII The Death Penalty
       350HVIII(G) Proceedings
         350HVIII(G)3 Hearing
           350Hk1780 Conduct of Hearing
   350Hk1780(3) Instructions.
   Defendant who was statutorily precluded from receiving instruction, at punishment phase of capital murder trial, on the sentence of life imprisonment without the possibility of parole, on ground offense occurred before effective date of amendment to sentencing statute, was not entitled to the instruction on contention that death was in excess of that reasonably needed for incapacitation of the offender. T.C.A. § 39-13-204.

[27] Sentencing and Punishment ☞ 1610
   350H ----
     350HVIII The Death Penalty
       350HVIII(A) In General
   350Hk1610 In General.
   The only two penological goals served by capital punishment are retribution and general deterrence of crime, and overall philosophical justification for the death penalty does not rest upon the need for incapacitation.

[28] Sentencing and Punishment ☞ 1780(3)
   350H ----
     350HVIII The Death Penalty
       350HVIII(G) Proceedings
         350HVIII(G)3 Hearing
           350Hk1780 Conduct of Hearing
   350Hk1780(3) Instructions.
   Defendant who was statutorily precluded from receiving instruction, at punishment phase of capital murder trial, on the sentence of life imprisonment without the possibility of parole, on ground offense occurred before effective date of amendment to sentencing statute, was not entitled to the instruction on contention he would be denied equal protection of the laws; even if others similarly situated received the instruction, defendant failed to show that the failure to provide the instruction had a discriminatory effect. U.S.C.A. Const.Amend. 14; T.C.A. § 39-13-204.

[29] Sentencing and Punishment ☞ 1780(3)
   350H ----
     350HVIII The Death Penalty
       350HVIII(G) Proceedings
         350HVIII(G)3 Hearing
           350Hk1780 Conduct of Hearing

350Hk1780(3) Instructions.
   Defendant should have received proffered instruction on jury's use of circumstantial evidence when a fact required to be proved was entirely made of such evidence, where state's proof of "torture" prong of "especially heinous, atrocious, or cruel" statutory mitigating circumstance was entirely by circumstantial evidence. T.C.A. § 39-13-204(i)(5).

[30] Sentencing and Punishment ☞ 1789(9)
   350H ----
     350HVIII The Death Penalty
       350HVIII(G) Proceedings
         350HVIII(G)4 Determination and Disposition
           350Hk1789 Review of Proceedings to Impose Death Sentence
   350Hk1789(9) Harmless and Reversible Error.
   Error was harmless in defendant's not receiving proffered instruction on jury's use of circumstantial evidence when a fact required to be proved was entirely made of such evidence; though defendant was entitled to such instruction on ground state's proof of "torture" prong of "especially heinous, atrocious, or cruel" statutory mitigating circumstance was entirely by circumstantial evidence, the error did not affirmatively affect the outcome of the sentencing hearing. T.C.A. § 39-13-204(i)(5); Rules Crim.Proc., Rule 52(a).

[31] Sentencing and Punishment ☞ 1788(6)
   350H ----
     350HVIII The Death Penalty
       350HVIII(G) Proceedings
         350HVIII(G)4 Determination and Disposition
           350Hk1788 Review of Death Sentence
   350Hk1788(6) Proportionality.
   Supreme Court applies the precedent-seeking approach when conducting its comparative proportionality review of a death sentence, in which it compares a particular case with other cases in which the defendants were convicted of the same or similar crimes; it conducts this comparison by examining the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating circumstances involved. T.C.A. § 39-13-206(c)(1).

[32] Sentencing and Punishment ☞ 1788(6)
   350H ----
     350HVIII The Death Penalty
       350HVIII(G) Proceedings
         350HVIII(G)4 Determination and Disposition
           350Hk1788 Review of Death Sentence
   350Hk1788(6) Proportionality.
   The purpose of the Supreme Court's comparative proportionality review of death sentences is to identify arbitrary or capricious sentences by determining whether the death penalty in a given case is disproportionate to the punishment imposed on others convicted of the same crime. T.C.A. § 39-13-206(c)(1).

[33] Sentencing and Punishment ☞ 1788(6)
   350H ----
     350HVIII The Death Penalty
       350HVIII(G) Proceedings
         350HVIII(G)4 Determination and Disposition
           350Hk1788 Review of Death Sentence
   350Hk1788(6) Proportionality.
   A death sentence will be considered disproportionate if the case, taken as a whole, is

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

31 S.W.3d 196, State v. Keen, (Tenn. 2000)                                                    Page 5

plainly lacking in circumstances consistent with
those in similar cases in which the death penalty has
previously been imposed. T.C.A. § 39-13-206(c)(1)

[34] Sentencing and Punishment ☞1788(6)
 350H ----
  350HVIII The Death Penalty
   350HVIII(G) Proceedings
    350HVIII(G)4 Determination and Disposition
     350Hk1788 Review of Death Sentence
  350Hk1788(6) Proportionality.
  Supreme Court's first task in conducting a
comparative proportionality review of a death
sentence is to identify the pool of similar cases,
which includes all cases in which the defendant is
convicted of first-degree murder and in which a
capital sentencing hearing was actually conducted, to
which it compares the defendant's case; it then
considers a multitude of variables, in light of the
experienced judgment and intuition of the Court's
members. T.C.A. § 39-13-206(c)(1).

[35] Sentencing and Punishment ☞1788(6)
 350H ----
  350HVIII The Death Penalty
   350HVIII(G) Proceedings
    350HVIII(G)4 Determination and Disposition
     350Hk1788 Review of Death Sentence
  350Hk1788(6) Proportionality.
  With respect to the nature and circumstances of the
offense, the relevant factors considered by the
Supreme Court when conducting its comparative
proportionality review of a death sentence include,
but are not limited to: (1) the means of death; (2)
the manner of death, such as whether the death was
violent or torturous; (3) the motivation for the
killing; (4) the place of death; (5) the similarity of
the victims' circumstances including age, physical
and mental conditions, and the victims' treatment
during the killing; (6) the absence or presence of
premeditation; (7) the absence or presence of
provocation; (8) the absence or presence of
justification; and (9) the injury to and effects on
non-decedent victims. T.C.A. § 39-13-206(c)(1).

[36] Sentencing and Punishment ☞1684
 350H ----
  350HVIII The Death Penalty
   350HVIII(D) Factors Related to Offense
    350Hk1684 Vileness, Heinousness, or Atrocity.

 [See headnote text below]

[36] Sentencing and Punishment ☞1727
 350H ----
  350HVIII The Death Penalty
   350HVIII(F) Factors Related to Status of Victim
  350Hk1727 Age.
  Death sentence imposed on defendant convicted of
first degree murder in perpetration of rape was not
disproportionate to similar cases in which the death
penalty was imposed,  **196  where jury found
statutory aggravating circumstances that the victim
was less than 12 years old and that the crime was
especially heinous, atrocious, or cruel. T.C.A. § §
39-13-204(i)(1, 5), 39-13-206(c)(1).

[37] Sentencing and Punishment ☞1657
 350H ----
  350HVIII The Death Penalty

   350HVIII(C) Factors Affecting Imposition in
    General
  350Hk1657 Proportionality in General.
  A sentence of death is not disproportionate merely
because the circumstances of the offense are similar
to those of another offense for which the defendant
has received a life sentence; the isolated decision of
a jury to afford mercy does not render a death
sentence disproportionate. T.C.A.              §
39-13-206(c)(1).

[38] Sentencing and Punishment ☞1788(6)
 350H ----
  350HVIII The Death Penalty
   350HVIII(G) Proceedings
    350HVIII(G)4 Determination and Disposition
     350Hk1788 Review of Death Sentence
  350Hk1788(6) Proportionality.
  Supreme Court's inquiry, when conducting a
comparative proportionality review of a death
sentence, does not require a finding that a sentence
less than death was never imposed in a case with
similar characteristics; instead, its duty is to assure
that no aberrant death sentence is affirmed. T.C.A.
§ 39-13-206(c)(1).

[39] Sentencing and Punishment ☞1788(6)
 350H ----
  350HVIII The Death Penalty
   350HVIII(G) Proceedings
    350HVIII(G)4 Determination and Disposition
     350Hk1788 Review of Death Sentence
  350Hk1788(6) Proportionality.
  Supreme Court's comparative proportionality
review of a death sentence is not the sole, or even
the constitutionally necessary, protection against
imposition of arbitrary death sentences, and a death
sentence may be presumed to be proportionate
where it is imposed under a system which furnishes
sufficient guidance to the sentencer through
constitutionally valid aggravating and mitigating
circumstances. T.C.A. § 39-13-206(c)(1).

[40] Sentencing and Punishment ☞1788(6)
 350H ----
  350HVIII The Death Penalty
   350HVIII(G) Proceedings
    350HVIII(G)4 Determination and Disposition
     350Hk1788 Review of Death Sentence
  350Hk1788(6) Proportionality.
  When conducting a comparative proportionality
review of a death sentence, the Supreme Court looks
only to cases in which the death penalty was sought
and a sentencing hearing was held, because the aim
of proportionality review is to ascertain what other
capital sentencing authorities have done with similar
capital murder offenses; the only cases that could be
deemed similar are those in which imposition of the
death penalty was properly before the sentencing
authority for determination. T.C.A.              §
39-13-206(c)(1).

*201  W. Mark Ward, Assistant Shelby County
Public Defender, Memphis, TN, for appellant,
David M. Keen.

Paul G. Summers, Attorney General and Reporter;
Michael E. Moore, Solicitor General;  Michael J.
Fahey, II, Assistant Attorney General, Nashville,
TN, for appellee, State of Tennessee.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

## OPINION

WILLIAM M. BARKER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and JANICE M. HOLDER, J., joined.

The appellant was sentenced to death for the murder of eight-year-old Ashley Nicole Reed in 1990. On automatic appeal, this Court reversed the sentence based upon improper jury instructions, and we remanded the case for resentencing. *See State v. Keen*, 926 S.W.2d 727 (Tenn. 1994). At the second sentencing hearing, the appellant was again sentenced to death, and the Court of Criminal Appeals affirmed. On automatic appeal from this second sentencing hearing, this Court has requested additional argument and briefing on the following five issues: (1) whether the evidence was legally insufficient to support the jury's finding of the "especially heinous, atrocious, or cruel" aggravating circumstance; (2) whether permitting the jurors to find *either* "torture" or "serious physical abuse beyond that necessary to produce death" denied the appellant his constitutional right to a unanimous jury finding of the basis for the "especially heinous, atrocious, or cruel" aggravating circumstance; (3) whether the jury instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance failed to narrow the class of persons eligible for the death penalty; (4) whether the trial court's failure to permit the jury to consider the sentencing option of life without parole violated the Eight and Fourteenth Amendments to the United States Constitution and Article I, sections eight and sixteen of the Tennessee Constitution; and (5) whether the trial court erred in refusing the defendant's special request for an instruction on circumstantial evidence. We hold that none of these issues warrants reversal of the sentence. We further hold that the two aggravating circumstances found by the jury are amply supported by the evidence, and we agree that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. Finally, we hold that the sentence of death was not arbitrarily or disproportionately applied in the appellant's case. With respect to all other issues not specifically discussed in this opinion, we agree with and affirm the judgment of the Court of Criminal Appeals.

The present appeal in this capital case arises from the resentencing of the appellant, David M. Keen, who pleaded guilty in February of 1991 to first degree murder in perpetration of the rape of eight-year-old Ashley Nicole (Nikki) Reed. The appellant was sentenced to death by a Shelby County jury, but this Court reversed the sentence on automatic appeal after finding reversible error in the "failure of the trial judge to properly include in the jury instructions that aggravating circumstances must be proven to outweigh any mitigating circumstances 'beyond a reasonable doubt.' " *See State v. Keen*, 926 S.W.2d 727, 736 (Tenn.1994). We remanded the **\*202** case to the Shelby County Criminal Court for a new sentencing hearing, and on August 15, 1997, a jury again sentenced the appellant to death for the murder of Nikki Reed. The Court of Criminal Appeals affirmed the sentence of death after this second hearing.

On automatic appeal pursuant to Tennessee Code Annotated section 39-13-206(a)(1), the appellant's

case was docketed in this Court. The appellant raised fourteen issues in his initial brief, and after carefully examining the entire record and the law--including the opinion of the Court of Criminal Appeals and the briefs of the appellant and the State--this Court entered an order limiting argument and requesting additional briefing on the following five issues:

(1) whether the evidence was legally insufficient to support the jury's finding of the "especially heinous, atrocious, or cruel" aggravating circumstance;

(2) whether permitting the jurors to find *either* "torture" *or* "serious physical abuse beyond that necessary to produce death" denied the appellant his constitutional right to a unanimous jury finding of the basis for the "especially heinous, atrocious, or cruel" aggravating circumstance;

(3) whether the jury instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance failed to narrow the class of persons eligible for the death penalty;

(4) whether the trial court's failure to permit the jury to consider the sentencing option of life without parole violated the Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections eight and sixteen of the Tennessee Constitution; and

(5) whether the trial court erred in refusing the defendant's special request for an instruction on circumstantial evidence.

For the reasons given herein, we find that none of the issues raised by the appellant merits reversal of the sentence, and we remand this case for enforcement of the judgment of this Court.

## EVIDENCE PRESENTED AT THE SENTENCING HEARING

The evidence presented at the second sentencing hearing was substantially similar to the evidence presented by the State and the appellant at the first sentencing hearing in 1991. Nevertheless, because many of the issues raised in an automatic appeal involve questions concerning the evidence supporting the applicable sentencing criteria, it is necessary to review anew all of the evidence presented during this second sentencing hearing.

At the time of the tragic events giving rise to this case, the appellant was living with his then-fiancée, Deborah Wilson, in a three-bedroom mobile home in Millington, Tennessee. Also living with the appellant and his fiancée were Deborah's four children, including Ashley Nicole, her mother, and her father. During the late afternoon of March 17, 1990, the appellant and Deborah met her mother and father at the VFW Club in West Memphis, Arkansas, to eat dinner and play bingo. All of Deborah's children were spending the night with various friends. Shortly after the appellant and Deborah arrived at the VFW Club, Deborah's father, Jessie Wilson, expressed some concern over Nikki's arrangements to sleep over at a friend's house. The appellant offered to go back to Millington to check on Nikki, and Mr. Wilson

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Page 7

allowed the appellant to borrow his car to make the short trip.

The appellant left the VFW Club at about 5:30, and he returned about two hours later. Upon returning, he told everyone that Nikki was spending the night with her friend, Shantell. The group stayed at the VFW Club until about 10:30 that evening, and on his way back home to Millington, Mr. Wilson noticed that the green blanket he usually kept in his car was missing. Mr. Wilson questioned the appellant about the blanket, but the appellant **\*203**  merely replied that he put the blanket in the back seat of the car because he did not want to sit on it.

The next morning, Deborah and the appellant went shopping at the local Wal Mart while Mrs. Wilson went to pick Nikki up for church. When Mrs. Wilson returned home, she told her husband that Nikki did not go to her friend's house the previous evening, and the two of them searched around the mobile home park for Nikki. When Deborah and the appellant returned from shopping, they joined the search for Nikki. After searching all day and finding no trace of his granddaughter, Mr. Wilson told Deborah to report Nikki's disappearance to the police. Deborah and the appellant then left on foot for the police station to file a missing persons report.

In the meantime, Mr. Wilson and his wife again searched the trailer park, and after waiting some time for Deborah and the appellant to return from the police station, they decided to drive to the police station themselves. As soon as Mrs. Wilson opened the door to get into her car, she saw a pair of panties lying on the passenger-side floorboard. Mr. Wilson told his wife not to move the panties, and they drove to the police station where they notified an officer about their discovery. When Mr. Wilson later approached the appellant about the panties in the car, the appellant was evasive and would not answer his questions.

The next day, a detective with the Millington Police Department asked the appellant and Deborah to come to the police station for questioning. Although the appellant initially denied any involvement in Nikki's disappearance, he admitted after further questioning by the police that he "threw her in the river." The appellant then took the detective and others officers to Memphis along the north end of Mud Island in the Wolf River, where the police found Nikki's naked body wrapped in a green blanket. Although the police found a blue denim skirt and a pink shirt wrapped with the body, the officers found no panties.

The appellant was taken to the Memphis Police Department where he again confessed to the murder of Nikki Reed. The appellant stated that when he found Nikki, he intended to take her back with him to West Memphis because he was unsure whether she could spend the night with her friend. In his initial statement to the Millington police, the appellant stated that on the return trip to West Memphis, he and Nikki argued about something concerning her seat belt. The appellant stated that during this argument, he became very angry, grabbed Nikki's throat, and covered her mouth until she turned blue. Although he admitted to wrapping

Nikki's body in the green blanket and throwing her into the river, he could not remember whether he struck her, took her clothes off, or raped her.

However, when questioned further in Memphis about the incident, the appellant admitted to his actions in gruesome detail:

I pulled off to the side of the road and undressed Ashley and undid my pants, and I held my hand over her throat and tried to penetrate [her]. I felt crap and I stopped, and Ashley had turned blue in the face. She wasn't breathing. I tied a shoe lace around her neck and she still was not breathing. I untied the shoe lace, wrapped her up in a blanket, tied the blanket together and dumped her off into the river off of the old Auction Street Boat Dock. Then I went back over to West Memphis and told Ashley's mother that Ashley was spending the night at her friend, Shantell's, house.

The appellant also stated that Nikki struggled "for a little while," although she did not scream or holler, because he "was practically on top of her with [his] hand on her throat." Nikki was eight years old and weighed sixty-eight pounds.

At the sentencing hearing, the State called Dr. Jerry Francisco, the Shelby County Medical Examiner, to testify as to   **\*204**  the results of the victim's autopsy. Dr. Francisco testified that Nikki suffered multiple scrapes and bruises to her face and neck, and that she had a deep ligature mark around the front of her neck caused by a tightly-pulled fabric cord, such as a shoelace. The medical examiner also found a bruise and scrapes around her genital area and a tear on the posterior wall of the vagina. Sperm heads were also found inside the vagina. Dr. Francisco determined that Nikki was alive while she was raped and suffered the various injuries, although he could not say with certainty that she was conscious during the entire episode.

In addition, the autopsy revealed that fluid was found in the lungs of the victim. Although Dr. Francisco stated that fluid in the lungs can be associated with either drowning or asphyxia, he testified that the left side of the heart was diluted, which "is the type of change you see in a person who is alive and submerged." Although the medical examiner stated that the ligature strangulation was the actual cause of death, he also stated that "[i]n my opinion, she was alive at the time she was placed in the water." ·

In mitigation, the defense called the appellant's adoptive parents, Robert and Evelyn Brieschke, who adopted the appellant and his older brother when the appellant was four years old. His adoptive parents testified that the appellant was malnourished when he was first adopted, and that he was very nervous and upset, had difficulty playing and interacting with others, and had difficulty sleeping. The appellant was diagnosed with Attention Deficit Disorder in fourth grade, and he was placed on Ritalin, which offered some improvement. The Brieschkes later learned from a psychological report completed before the appellant's adoption that the appellant was in need of immediate help and counseling, although this information was kept from them at the time of the adoption. In high school, the appellant skipped classes, smoked marijuana, and drank alcohol. At

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

one point, he was arrested for breaking into an automobile agency and stealing a car. In his junior year, the appellant dropped out of high school and joined the United States Navy.

The appellant's brother and two stepsisters testified that the appellant's natural father was physically and emotionally abusive. Because his father was wanted for theft and child neglect, he constantly moved his family to evade arrest, and during one two-year period, the family moved no less than twenty-six times. The children were beaten on a daily basis, sometimes with electrical cords and pieces of lumber. The father would also slaughter livestock in front of his children while threatening to do the same to them if they misbehaved. One of the appellant's sisters, who admitted being the victim of sexual abuse, described their childhood as "an environment of terror." Even after the appellant was abandoned by his natural parents, he was placed in an abusive foster home before being adopted by the Brieschkes.

The defense also called Dr. John Ciocca, a clinical psychologist, who conducted a psychological evaluation of the appellant and testified as to the results. Dr. Ciocca diagnosed the appellant as suffering from post-traumatic stress disorder, serious depression, and attention deficit disorder. Dr. Ciocca stated that the appellant also showed some signs of pedophilia, although he admitted that he found no indications of persistent and constant sexual interest in children, which is necessary for a proper diagnosis. One of the tests administered by Dr. Ciocca indicated that the appellant suffered from occasions "where he is not in good contact with reality," and that another test showed the "presence of psychotic-like symptoms."

Dr. Ciocca also interviewed the appellant and his family, and he reviewed numerous medical and psychological records, including an evaluation conducted at Winnebago State Hospital in Wisconsin. From an examination of these interviews **205 and records, Dr. Ciocca testified that the appellant was "born into a family of crisis," which "had fallen on hard times," and in which "physical abuse and sexual abuse were rather rampant." Although he was relocated to a foster home, the appellant remembered being abused and anally raped by his foster father. According to Dr. Ciocca, the absence of nurturing, along with the presence of general hostility or apathy toward the appellant significantly affected his normal childhood development. Dr. Ciocca also stated that the appellant was "extraordinarily distressed at what he's done," and that he "takes full responsibility for it."

The State argued to the jury that the facts supported the presence of two aggravating circumstances: (1) that the murder was committed against a person less than twelve years of age and the defendant was eighteen years of age or older, *see* Tenn.Code Ann. § 39-13-204(i)(1); and (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, *see* Tenn.Code Ann. § 39-13-204(i)(5). The appellant, on the other hand, argued that fourteen statutory and non-statutory mitigating circumstances applied and

should be considered. (FN1) The jury found that the State proved both aggravating circumstances beyond a reasonable doubt, and after finding that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt, the jury sentenced the appellant to death. The jury made no specific findings as to which, if any, mitigating circumstances were supported by the proof.

## I. REVIEW OF THE AGGRAVATING AND MITIGATING CIRCUMSTANCES

[1] Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), this Court is charged with independently determining whether the evidence supports the jury's finding of statutory aggravating circumstances and whether the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. In determining whether the evidence supports the application of an aggravating circumstance, the proper standard to consider is whether, after reviewing the evidence in the light most favorable to the State, "a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *State v. Henderson,* 24 S.W.3d 307, 313 (Tenn.2000); *State v. Keough,* 18 S.W.3d 175, 180-81 (Tenn.2000); *State v. Carter,* 988 S.W.2d 145, 150 (Tenn.1999). After a careful review of the testimony and evidence presented at the sentencing hearing, we conclude that the evidence fully supports **206 the jury's findings that both aggravating circumstances are present in this case and that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt.

### A. Tennessee Code Annotated section 39-13-204(i)(1)

[2] Tennessee Code Annotated section 39-13-204(i)(1) provides as a statutory aggravating circumstance that "[t]he murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." The record indisputably shows that the victim in this case, Nikki Reed, was eight years old at the time of her death and that the appellant was twenty-seven years old. Viewed in a light most favorable to the State, we conclude that a rational trier of fact could have found the existence of this aggravating circumstance beyond a reasonable doubt.

### B. Tennessee Code Annotated section 39-13-204(i)(5)

Tennessee Code Annotated section 39-13-204(i)(5) provides as a statutory aggravating circumstance that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." The appellant makes three arguments as to how this aggravating circumstance was improperly applied to the facts and circumstances of this case. First, he argues that the proof was insufficient to justify finding this aggravating circumstance beyond a reasonable doubt because the proof failed to demonstrate that the victim was conscious while she was tortured or suffered serious physical abuse beyond that necessary to cause death. Second, the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

appellant argues that his right to a unanimous jury was compromised by allowing the jury to consider either torture or serious physical abuse in finding the presence of this aggravating circumstance. Last, the appellant argues that the (i)(5) aggravating circumstance has been interpreted so broadly as to render it unconstitutional in that it fails to sufficiently narrow the class of death-eligible defendants. Having thoroughly considered each of the appellant's arguments, we find that none has merit, and we affirm the jury's finding of the presence of this aggravating circumstance beyond a reasonable doubt.

### 1. Evidentiary Sufficiency of the (i)(5) Aggravating Circumstance

[3][4] The "especially heinous, atrocious or cruel" aggravating circumstance "may be proved under either of two prongs: torture or serious physical abuse." *See   State v. Hall,*  8 S.W.3d 593, 601 (Tenn.1999). This Court has defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *State v. Morris,*  24 S.W.3d 788, 797 (Tenn.2000); *State v. Williams,*  690 S.W.2d 517, 529 (Tenn.1985). The phrase "serious physical abuse beyond that necessary to produce death," on the other hand, is "self-explanatory; the abuse must be physical rather than mental in nature." *Hall,* 8 S.W.3d at 601; *see also State v. Suttles,* 30 S.W.3d 252, 262 (Tenn.2000). The "word 'serious' alludes to a matter of degree," and the term "abuse" is defined as "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.' "   *State v. Odom,*      928 S.W.2d 18, 26 (Tenn.1996); *see also State v. Nesbit,* 978 S.W.2d 872, 887 (Tenn.1998); *Morris,* 24 S.W.3d at 797.

[5][6][7] Our case law is clear that "[t]he anticipation of physical harm to oneself is torturous" so as to establish this aggravating circumstance. *See State v. Carter,* 988 S.W.2d 145, 150 (Tenn.1999) (citing cases from other jurisdictions);     *see also Nesbit,* 978 S.W.2d at 886-87;   *State v. Hodges,* 944 S.W.2d 346, 358 (Tenn.1997). Our case law is also clear that the physical and mental pain suffered by the victim of strangulation may constitute torture within **\*207** the meaning of the statute.  *See State v. Cauthern,* 967 S.W.2d 726, 732-33 (Tenn.1998); *Hodges,* 944 S.W.2d at 358. The facts of this case, when viewed in a light most favorable to the State, easily satisfy both of these definitions. From the appellant's own statements, we know that this child was essentially kidnaped and secreted to a discrete and remote location--by someone in a position of trust--under the pretense that she was being taken to see her mother. The appellant stopped the car, and Nikki watched him take off his pants and then remove her own clothes. While still in the strict confines of the front seat of the car, the appellant climbed on top of her, covered her mouth, and began to forcibly rape her while crushing her throat with his left hand.

At some point while she was being violently raped, Nikki was struck in several parts of her face, and her head was smashed against the door handle. Although it is impossible to know how long Nikki remained conscious during this terrifying ordeal, it is uncontroverted that she was alive and conscious at

least through part of the rape, because even though the full weight of the appellant was crushing her and even though she was being manually strangled, the appellant admitted that Nikki struggled to get free with her arms and legs. In fact, the appellant candidly admitted that she struggled to get free for "a little while." When the appellant finished his gruesome act, he noticed that she was no longer breathing and had turned blue, a fact he attributed to putting "too much pressure on her [neck] where she couldn't breathe."

There can be no reasonable doubt that while she struggled to free herself, Nikki was alive and conscious, and a jury could rationally infer from its common sense and everyday experience that she was extremely concerned about her own physical safety. *Cf. Nesbit,* 978 S.W.2d at 886 (stating that juries in capital cases may still "use their common knowledge and experience in deciding whether a fact is logically deducible from the circumstances in evidence, or in making reasonable inferences from the evidence, and may test the truth and weight of the evidence by their own general knowledge and judgment derived from experience, observation, and reflection"). Moreover, the jury would have been fully justified in concluding that as the appellant gradually choked off all air to the child, Nikki was in an extreme state of mental pain and anxiety, as well as enduring and intense physical pain. A rational jury using common sense and judgment could clearly find that the proof established, beyond a reasonable doubt, the torture of the victim through infliction of severe mental and physical pain, and our cases require no more.

[8] The appellant cites this Court's decision in *State v. Odom* for the proposition that the proof was insufficient to establish "torture" because penile rape alone cannot establish torture. We agree with *Odom* to the extent that a rape, in and of itself, cannot support imposition of the death penalty when the crime charged is murder in the perpetration of a rape. The appellant ignores, however, that the mental anguish of the child in this case was not derived solely from the act of penile penetration. Rather, the severe mental and physical pain of the victim necessary to establish "torture" is derived from all of the surrounding circumstances of the *murder,* which necessarily include the kidnaping and forcible confinement of the victim by someone in a position of trust, the brutal rape of the victim, and the violent manual strangulation of the victim to the point that she lost consciousness and turned blue.

While the mere *fact of rape* could not be used to impose death under the facts of the appellant's case, the sentencing authority certainly could have inquired into the unique circumstances surrounding the offense to determine whether the victim was "tortured" within the meaning of the (i)(5) aggravating circumstance. Contrary to the appellant's assertions, we find nothing   **\*208**  in *Odom* which prevents a thorough examination of the circumstances surrounding the rape and murder. In fact, *Odom's*  legitimate concerns with sufficient narrowing of the death-eligible class of defendants are actually furthered by such an examination, and only in this manner can the sentence of death be reserved for the "worst of the worse." Based on our review of the entire record in the present case, we find that a rational jury could have concluded

from all of the surrounding circumstances that Nikki Reed was tortured through the infliction of severe mental and physical pain.

[9][10] The appellant also argues that the proof is insufficient to establish that the victim suffered serious physical abuse beyond that necessary to produce death. Again, we must disagree. By the appellant's own admission, he manually choked the victim so forcefully that she stopped breathing, turned blue, and lapsed into unconsciousness. A rational jury could certainly have found that this particular manual strangulation constituted serious physical abuse beyond that necessary to produce death, even though the manual strangulation was not determined to be an actual cause of death. The law is clear that "[t]here is no requirement that the cause or mode of death also be the cause or mode of the 'serious physical abuse beyond that necessary to produce death.' " *Nesbit,* 978 S.W.2d at 887. Accordingly, we have no hesitation in also concluding that a rational jury could have found beyond a reasonable doubt that this murder was especially heinous, atrocious, or cruel in that it involved serious physical abuse beyond that necessary to produce death.

2. Right to Unanimous Jury Finding as to Either "Torture" or
"Serious Physical Abuse Beyond That Necessary to Produce Death"

[11] The appellant next argues that by permitting the jurors to find *either* "torture" *or* "serious physical abuse beyond that necessary to produce death," the trial court denied him his constitutional right to a unanimous jury for the "especially heinous, atrocious, or cruel" aggravating circumstance. More specifically, the appellant notes that when the jury returned its verdict form, it indicated that it found that "the murder was especially heinous, atrocious, or cruel in that it involved torture     *or* serious physical abuse beyond that necessary to produce death." (emphasis added). The appellant argues that because the jury returned its verdict in the disjunctive, "there is no way to determine whether the twelve jurors unanimously agreed on either basis for finding the aggravating circumstances or the facts in support thereof." In essence, the appellant argues that unless a jury unanimously agrees as to a particular set of facts constituting guilt--or in this case, the particular set of facts constituting the presence of the (i)(5) aggravating circumstance--a defendant is denied his or her right to a unanimous jury. After reviewing the applicable case law, we hold that the appellant was not denied his constitutional right to a unanimous jury or that a special unanimity instruction was required.

[12] It is beyond question that the right to a unanimous jury verdict is "fundamental, immediately touching on the constitutional rights of an accused." *See, e.g., Burlison v. State,* 501 S.W.2d 801, 804 (Tenn.1973). Our research reveals no case, however, in which we have held that the right to a unanimous jury verdict encompasses the right to have the jury unanimously agree as to the particular theory of guilt supporting conviction for a single crime. *See, e.g., State v. Lemacks,* 996 S.W.2d 166, 170-71 (Tenn.1999) (holding that jury need not be unanimous as between

direct criminal liability or criminal responsibility arising out of the same transaction because criminal responsibility is not a "separate distinct crime"); *State v. Cribbs,* 967 S.W.2d 773 (Tenn.1998) (holding that general verdict of guilt on first degree murder poses no constitutional problem even though some jurors may     **\*209** have convicted the defendant based upon proof of felony murder or premeditated murder). In fact, we have recently reached just the opposite conclusion in *State v. Adams,* 24 S.W.3d 289 (Tenn.2000). In *Adams,* this Court was asked to decide whether a jury must unanimously agree on a specific serious bodily injury resulting from child neglect before it can properly return a guilty verdict for aggravated child abuse through neglect. In affirming the defendants' conviction and sentence, we stated,

> To adopt the appellants' argument that the jury must agree as to the specific serious bodily injury [supporting conviction for aggravated child abuse through neglect] requires, in essence, that the state elect the *facts to support elements* rather make an election of *offenses.* Our cases have not required that a jury unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the appellant is guilty of the crime charged.

24 S.W.3d at 297 (emphasis in original). The United States Supreme Court has also stated that "different jurors may be persuaded by different pieces of evidence, even when they agree on the bottom line. Plainly, there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *Schad v. Arizona,* 501 U.S. 624, 632, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

[13] It is clear that "torture" and "serious physical abuse beyond that necessary to produce death" are separate methods or theories of establishing the (i)(5) aggravator and not separate aggravating circumstances by themselves. We have stated previously that the phrase "especially heinous, atrocious, or cruel" is a unitary concept, *State v. Van Tran,* 864 S.W.2d 465, 479 (Tenn.1993), which "may be proved under either of two prongs: torture or serious physical abuse." *See Hall,* 8 S.W.3d at 601. Our cases simply do not require that jurors agree as to which theory supports the view that the murder is "especially heinous, atrocious, or cruel." So long as the proof is sufficient under either theory for finding the aggravating circumstance beyond a reasonable doubt, and so long as all jurors agree that the aggravating circumstance is present and applicable to the case at hand, different jurors may rely upon either theory to reach their conclusion. *See Suttles,* 30 S.W.3d at 266 ("This [ (i)(5) ] aggravating circumstance may be applied if the evidence is sufficient to support either torture or serious physical abuse beyond that necessary to produce death."), and cases cited therein.

As we have previously stated, the proof in this case was more than sufficient to allow a rational jury to find the (i)(5) aggravating circumstance beyond a reasonable doubt under either a theory of torture or a theory of serious physical abuse beyond that necessary to produce death. This is not a case where the gruesome acts by the appellant

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

**Page 11**

establishing either torture or serious physical abuse occurred at such different times or under such varying circumstances that they could be said to be separate in fact. Rather, the proof established that the victim's severe mental pain and manual strangulation occurred proximately in time and space. In addition, we note that the court properly instructed the jury that it had to unanimously agree that the State proved this aggravating circumstance beyond a reasonable doubt, and the jury clearly indicated from its verdict form that it unanimously found the (i)(5) aggravating circumstance to be present and applicable in this case. Based on these reasons, we conclude that the appellant was not deprived of his right to a unanimous jury verdict.

In response, the appellant quotes a passage from *State v. Brown,*        823 S.W.2d 576 (Tenn.Crim.App.1991), as standing for the proposition that a jury must understand "its duty to agree on a particular set of facts."  *Id.* at 583.  A closer reading of *Brown,* however, shows that this language **\*210** served only to reemphasize that "the purpose of election is to ensure that each juror is considering the same occurrence,"  *see State v. Shelton,* 851 S.W.2d 134, 138 (Tenn.1993), and it does not support the proposition that a jury must agree to the facts establishing a theory of an offense. The defendant in *Brown* was charged in an open-dated indictment with possession of cocaine, and the proof established that the defendant engaged in conduct constituting the charged crime on at least four separate occasions. In reversing the defendant's conviction, the Court of Criminal Appeals only required unanimous agreement as to the specific occurrence of the crime,  *id* at 583-84, not agreement as to the facts supporting different theories of guilt arising out of that one occurrence. Once a jury has agreed on the specific occurrence at issue, *Brown* cannot properly be read to require further agreement as to the particular facts supporting the elements of that offense when different theories are available for consideration.

[14][15] The appellant also cites the capital sentencing statute which states that no death sentence may be imposed "but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances...." Tenn.Code Ann. § 39-13-204(i). A plain reading of this statute only requires that the jury unanimously agree that the aggravating circumstance in question is present; it does not require that the jury agree as to all facts establishing the presence of that circumstance when different theories are available for consideration. Where the language of the statute is clear and unambiguous, we will not extend the meaning of that statute beyond its plain and obvious import.  *See, e.g., McClain v. Henry I. Siegel Co.,*        834 S.W.2d 295, 296 (Tenn.1992).  This issue is without merit.

### 3. Constitutionality of the (i)(5) Aggravating Circumstance

The appellant next argues that the meaning of the "especially heinous, atrocious, or cruel" aggravating circumstance has been so broadly interpreted by the courts of this state that it now fails to adequately narrow the class of death-eligible defendants. More specifically, the appellant refers to several cases from this Court which (1) allow "torture" to include

"severe mental pain,"  *see State v. Williams,* 690 S.W.2d 517 (Tenn.1985);  (2) allow a finding of torture without any intent on the part of the defendant to inflict torture or serious physical abuse beyond that necessary to produce death, *see State v. Blanton,* 975 S.W.2d 269 (Tenn.1998);  and (3) allow jurors to use their common knowledge and experience in finding that "physical and mental torture" was inflicted upon the victim,  *see State v. Nesbit,* 978 S.W.2d 872 (Tenn.1998).  Because of each of these "broadening constructions," the appellant argues, this aggravating circumstance "is applicable in virtually every first degree murder and fails to properly narrow that eligible for the death penalty."  Again, we must disagree.

[16] The very purpose of the consideration of aggravating circumstances within a scheme of capital punishment is to provide some principled guidance for the sentencing authority to choose between death and a lesser sentence.    *See, e.g., Godfrey v. Georgia,* 446 U.S. 420, 428-29, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980);  *see also State v. Middlebrooks,* 995 S.W.2d 550, 556 (Tenn.1999) .  Although a court could interpret an aggravating circumstance so broadly that it would allow the jury unlimited discretion in imposing the death penalty, *cf.  State v. Wood,* 648 P.2d 71 (Utah 1981), the test for constitutional infirmity is whether one could fairly conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, *see Maynard v. Cartwright,* 486 U.S. 356, 364, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (invalidating aggravating circumstance that "an ordinary person could honestly believe" described every murder);  *Godfrey,* 446 U.S. at 428-429, 100 S.Ct. **\*211** 1759 ("A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' ").  We have consistently upheld the constitutionality of Tennessee Code Annotated section 39-2-203(i)(5) in the face of arguments that it applies to all defendants, and we have repeatedly rejected the contention that it is vague or overbroad. *See, e.g., State v. Middlebrooks,* 995 S.W.2d 550, 556 (Tenn.1999);  *State v. Blanton,*    975 S.W.2d 269, 280 (Tenn.1998);  *State v. Black,* 815 S.W.2d 166, 181 (Tenn.1991).  Although the appellant's argument today differs somewhat from those previously advanced in other cases, we reaffirm the constitutionality of the "especially heinous, atrocious, or cruel" aggravating circumstance.

[17] First, it is clear that by defining "torture" to include "severe mental pain," this Court has not broadened the scope of the "especially heinous, atrocious, or cruel" aggravating circumstance so as to render it unconstitutional. In *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the United States Supreme Court upheld the application of Arizona's "especially heinous, cruel or depraved" aggravating circumstance. Although finding the wording of the circumstance facially vague, the Court nevertheless upheld its application because of the limiting constructions placed on the wording by the Arizona courts.  One of the limiting constructions placed upon this aggravating circumstance was that the crime must have been "committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death.'"  In upholding this circumstance as applied, the *Walton* Court expressly

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

stated that a limiting construction which defines "mental anguish" to include "a victim's uncertainty as to his ultimate fate" passes constitutional muster. *Id.* at 654, 110 S.Ct. 3047. In addition, several other states with a statutory aggravating circumstance virtually identical to our (i)(5) circumstance have held that the word "torture" necessarily includes "mental anguish" within its meaning. (FN2) Accordingly, we conclude that the inclusion of "severe mental pain" within the definition of "torture" has not rendered this aggravating circumstance unconstitutional.

[18] Second, the fact that the statute does not require an intent on the part of the defendant to inflict torture or serious physical abuse upon the victim also does not broaden the scope of the (i)(5) aggravating circumstance so as to render it unconstitutional. We have repeatedly rejected this argument in the past, *see State v. Carter*, 988 S.W.2d 145, 150 (Tenn.1999); *State v. Blanton*, 975 S.W.2d 269, 281 (Tenn.1998); *see also State v. Odom*, 928 S.W.2d 18, 26 n. 5 (Tenn.1996), and we do so again today. Once again, we note that "[c]ircumstance (i)(5) does not require a mens rea. The aspect of torture focuses on the circumstances of the killing." *Carter,* 988 S.W.2d at 150.

The United States Supreme Court has never held that the "especially heinous, atrocious, or cruel" circumstance is unconstitutional in the absence of any mental requirement, and we conclude that the absence of a mental state does not render this circumstance constitutionally infirm in this state. Nothing in our statutes or cases, however, precludes consideration of the defendant's mental state in mitigation of sentence. In fact, Tennessee Code Annotated section 39-13-204(j)(9) specifically provides that the jury shall consider "[a]ny other mitigating factor which is raised by     **\*212**     the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing." This broad catch-all provision necessarily includes consideration of the defendant's mens rea at the time the victim is tortured or receives serious physical abuse beyond that necessary to produce death. *Cf. State v. Zaragoza,* 135 Ariz. 63, 659 P.2d 22, 27 (1983). In addition, before a jury may impose death, it must conclude that the aggravating circumstance or circumstances outweigh any mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39-13-204(g)(1). This calculus also necessarily includes consideration of the circumstances of the offense and the defendant's mental state at the time he or she inflicts torture or serious physical abuse upon the victim. Accordingly, the fact that a mental state is absent from the "especially heinous, atrocious, or cruel" aggravating circumstance does not render this circumstance constitutionally infirm.

[19] Finally, we reject the contention that allowing a jury to use its common sense, knowledge, and experience somehow renders the (i)(5) aggravating circumstance constitutionally infirm. As the United States Supreme Court has noted, this aggravating circumstance "is not susceptible to mathematical precision," *Walton,* 497 U.S. at 655, 110 S.Ct. 3047, and so long as the jury is given some meaningful guidance in the sentencing process, it is anomalous to conclude that the jury cannot then reach its final determination through the use of its

collective knowledge, experience, and common sense. (FN3) If the appellant did not wish to have a jury use its collective knowledge and common sense to determine an appropriate sentence in his case, we observe that procedures were available for him to request sentencing without a jury. *See* Tenn.Code Ann. § 39-13-205(b). A jury's ability to use its collective knowledge, experience, and common sense to assist in reaching a determination in these weighty and complex matters is the very strength of the jury system, not evidence of its frailty or unconstitutionality.

In summary, we hold that a rational jury could have found the (i)(5) aggravating circumstance beyond a reasonable doubt. The evidence was more than sufficient to establish that the murder was "especially heinous, atrocious, or cruel" in that it involved both torture and serious physical abuse beyond that necessary to produce death. Further, the trial court was not required to give an additional unanimity instruction as to the particular theory supporting this aggravating circumstance, because its general unanimity instruction with regard to the aggravating circumstances as a whole was adequate. Finally, interpretations of this Court have not expanded the meaning of the (i)(5) aggravating circumstance beyond constitutional bounds. We affirm the application of this aggravating circumstance to the appellant's case.

### C. Review of the Weighing of the Aggravating and Mitigating Circumstances

[20] Having determined that a rational jury could have found the presence of two statutory aggravating circumstances beyond a reasonable doubt, we now undertake to determine whether the evidence supports the jury's finding that these aggravating **\*213** circumstances outweigh any mitigating circumstances beyond a reasonable doubt. The jury did not indicate which, if any, of the fifteen mitigating circumstances submitted to the trial court was properly supported by the evidence, but in undertaking this analysis, we will presume that the jury found all fifteen mitigating circumstances were raised and supported by at least some evidence.

Nevertheless, based upon our own review, we conclude that the jury could have rationally concluded that the two aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. Both aggravating circumstances were clearly present beyond a reasonable doubt and were properly considered by the jury. The evidence shows that the appellant secreted the victim away by driving her to a discrete and remote location. The appellant then violently raped and assaulted the victim, while manually strangling her with such force as to render her unconscious. Although the appellant argued that he was under extreme mental stress during his gruesome crime, the testimony of Mr. Wilson and others to the effect that the appellant appeared to be acting "normally" both before and after the murder, certainly weighs heavily against his position. Further, we are unable to say that the jury improperly weighed any evidence concerning the appellant's unfortunate childhood--or that it improperly weighed any evidence of depression, post-traumatic stress disorder, or attention deficit disorder--as there was

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

## CERTIFICATE & SEAL

**STATE OF TENNESSEE**

**COUNTY OF MADISON**

I, Judy Barnhill, Clerk of the Circuit Court for the County of Madison, in the State aforesaid, do certify that the foregoing is a correct transcript of the record and proceedings had in said Court in the case heretofore prosecuted and determined therein between

**JON HALL** APPELLANT **and STATE OF TENNESSEE ,** APPELLEE, as the same remains of record in said Court.

**STATE OF TENNESSEE**

**COUNTY OF MADISON**

In testimony whereof, I subscribe my name and affix the seal of said Court at office, in Jackson, Tennessee the **21ST** DAY OF **JULY** in the year Two Thousand Three in the 224th year of American Independence.

Judy Barnhill
JUDY BARNHILL, CLERK