# ADDENDUM 1
## Volume 6

W2003-00669-CCA-R3-PD

# CIRCUIT COURT OF MADISON COUNTY
## – TO –
# COURT OF CRIMINAL APPEALS

JUDGE___ROY B. MORGAN_____ DIVISION__I____

CIRCUIT COURT CLERK____JUDY BARNHILL_____

VOLUME __VI____ OF __VIII____VOLUMES

STATE OF TENNESSEE

VS.

CASE NO. C-00-422

JON HALL_____ _____ _____

| | | | | | |
|---|---|---|---|---|---|
| FELONY | XX | MISDEMEANOR ☐ | ROR ☐ | TDOC | ☒ |
| BOND | ☐ | $_____ | INDIGENT ☐ | | |
| POST CONVICTION | XX | | HABEAS CORPUS | ☐ | |

MR. ALFRED EARLS
ASSISTANCE DISTRICT ATTORNEY
P.O. BOX 2825
JACKSON, TN  38302

MR. DANNY ELLIS
ATTORNEY AT LAW
P.O. BOX 3512
JACKSON, TN  38303

Attorney For: APPELLEE

Attorney For:  APPELLANT

Attorney For:

Attorney For:

OFFENSE: FIRST DEGREE MURDER

SENTENCE: DEATH

FILED
JUL 2 4 2003
Clerk of the Courts
Rec'd By

$Vol. 6$

Filed the _21ST___ day of _____JULY_____, __2003___.

COURT OF CRIMINAL APPEALS

BY:___T. ROBERSON_____

LAYCOOK, JACKSON

# I N D E X

CERTIFICATE & SEAL                                                      909

STATE'S BRIEF AT THE CLOSE OF EVIDENCE
(CONTINUED)                                                          759-908

no testimony, expert or otherwise, that any of these circumstances affected the appellant at the time of his offense or were otherwise responsible, directly or indirectly, for his behavior on March 17, 1990. Accordingly, we find that a rational jury could have concluded that both aggravating circumstances in this case outweighed any mitigating circumstances beyond a reasonable doubt.

## II. JURY INSTRUCTION ISSUES

The appellant raises two issues relating to the instruction of the jury during the sentencing phase. More specifically, he argues that the trial court erred in refusing to give an instruction on the sentence of life imprisonment without the possibility of parole and that the court erred in not submitting to the jury the appellant's special instruction with regard to circumstantial evidence. After reviewing the record and the applicable case law, we hold that the appellant's assignments of error are without merit.

### A. Life Without the Possibility of Parole Instruction

In 1993, the General Assembly amended the capital sentencing statutes to provide for the sentence of life imprisonment without the possibility of parole. *See* 1993 Tenn.Pub.Acts ch. 473. Section 16 of chapter 473 provides that "[t]his act shall take effect on July 1, 1993, the public welfare requiring it, and shall apply to all offenses committed on or after that date." The appellant argues that although his offense was committed before the effective date of the act--it was committed on March 17, 1990--he is nevertheless entitled to the instruction because his second sentencing hearing on remand occurred more than four years after the act was passed. The appellant also argues that the failure to instruct the jury on the punishment of life without parole violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections eight and sixteen of the Tennessee Constitution. For the reasons given herein, we hold that the appellant was not entitled to an instruction on life imprisonment without the possibility of parole and that such an instruction was not constitutionally required.

1. Plain Language of 1993 Tenn. Pub. Acts ch. 473, section 16.

[21] Before addressing the constitutional issues presented with respect to the propriety of this instruction, we first observe that the plain language of the statute **\*214** applies only to cases in which the *offense* was committed after July 1, 1993, and therefore, the appellant was not statutorily entitled to the instruction. We have previously addressed this issue in *State v. Cauthern,* 967 S.W.2d 726, 734-36 (Tenn.1998), in which we first held that the statutory language prohibited a jury from considering life without the possibility of parole as a sentencing option where the offense was committed before July 1, 1993. In denying the defendant relief on this basis, we first noted that according to the plain language of the statute, the instruction was not available to the defendant because his offense was committed "well before July 1, 1993." *Id.* at 735. We also held that the specific provisions of this act governed over the more general provisions of Tennessee Code Annotated sections 39-13-204(k)

(Supp.1996) and 39-11-112 (1991), which the defendant argued made the instruction a viable possibility for sentences imposed after July 1, 1993. (FN4) We concluded by finding "no indication that the legislature intended that the option of life without parole apply retrospectively to offenses occurring before July 1, 1993."

[22] The appellant in this case argues that *Cauthern* cannot directly resolve this issue because the statute is ambiguous as to whether it applies to sentencing hearings occurring after the effective date of the act. As such, the appellant contends, any ambiguity should be weighed in favor of allowing the life without parole instruction. We disagree. First, the statute is not ambiguous. Although the statute does not mention sentencing hearings specifically, the statute is clear that it applies only to *offenses* committed on or after that date. We will not construe the plain, unambiguous language of the statute to give "any forced or subtle construction which would extend or limit its meaning." *State v. Butler,* 980 S.W.2d 359, 362 (Tenn.1998); *see also State v. Davis,* 940 S.W.2d 558, 561 (Tenn.1997).

Second, as evidenced by Tennessee Code Annotated section 40-35-117(b) (1997), the General Assembly could have drafted the statute so as to apply the life without parole instruction to sentencing hearings if it had so desired. In stark contrast to the language of the statute at issue in this case, the language of section 40-35-117(b) specifically states that "[u]nless prohibited by the United States or Tennessee constitution, any person *sentenced* on or after November 1, 1989, for an offense committed between July 1, 1982 and November 1, 1989, shall be sentenced under the provisions of this chapter [the 1989 Criminal Sentencing Reform Act]." (emphasis added). We have recently reaffirmed that this language requires sentencing according to the 1989 Act, absent any violation of due process, even if the offense was committed before the effective date of the act. *See McConnell v. State,* 12 S.W.3d 795 (Tenn.2000). Because the General Assembly has demonstrated its ability to draft statutes that apply sentencing changes to sentencing hearings, its failure to do so in this case must work against allowing the appellant to receive the life without parole instruction.

Having reviewed our discussion of this issue in *Cauthern,* we see no justification to depart from the reasoning of that case. (FN5)    **\*215** The plain language of the statute permits the life without parole instruction to be given only in cases in which the *offense* was committed after July 1, 1993. The importance of the use of this language is reinforced by the fact that the corresponding language of the 1989 Criminal Sentencing Reform Act applies to all *sentences* imposed after its effective date. We further note that the General Assembly has made no effort to amend the life without parole statute since *Cauthern* to correct any apparent misunderstanding. Accordingly, we hold that the appellant was not entitled to receive an instruction on the punishment of life without the possibility of parole according to the plain language of the statute.

2. Evolving Standards of Decency

[23] The appellant next argues that the failure to give a life without the possibility of parole

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

instruction violates the federal and Tennessee Constitutions because it is contrary to society's "evolving standards of decency." As evidence that the life without parole instruction is part of the evolving standards of decency, the appellant cites this state's adoption of the instruction in 1993 as well as the fact that "of the thirty-eight states that currently have capital punishment schemes, at least thirty-five give the sentencing body the option of imposing life imprisonment without parole in lieu of a death sentence." The appellant also cites opinion polls and the purported practice of sentencing juries as further evidence of the nation's evolving standards of decency. Accordingly, Tennessee's own evolving standards of decency, the appellant argues, "mandate that the sentencing option [of life without parole] be given when requested in all sentencing hearings after the Act's effective date." Again, we must disagree.

A review of the federal case law on the application of the Eighth Amendment's "evolving standards of decency" doctrine reveals that doctrine provides both substantive and procedural protections against the imposition of cruel and unusual punishments. The substantive part of this doctrine ensures that no type of punishment will be inflicted that is "inhuman and barbarous," *see Weems v. United States,* 217 U.S. 349, 368, 30 S.Ct. 544, 54 L.Ed. 793 (1910), or that is "excessive [in] length or severity, [or] greatly disproportioned to the offenses charged," *id.* at 371, 30 S.Ct. 544 (citing *O'Neil v. Vermont,* 144 U.S. 323, 12 S.Ct. 693, 36 L.Ed. 450 (1892)). The substantive protections of the "evolving standards of decency" doctrine in capital cases may be seen in the following cases from the United States Supreme Court, in which certain types of executions were held to constitute cruel and unusual punishment: *Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (holding that the death penalty may not be imposed on persons fifteen years of age or younger); *Ford v. Wainwright,* 477 U.S. 399, 406, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (prohibiting the execution of mentally incompetent persons); *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (holding that a defendant convicted of rape, without more, cannot be given the death penalty); and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (limiting death eligibility based on accomplice liability).

[24] Beginning with *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Eighth Amendment's prohibition against cruel and unusual punishment also took on a *procedural* aspect to ensure that the death penalty was not, in the words of Potter Stewart, "wantonly" or "freakishly" imposed. (FN6) *Gregg* stated that **\*216** "the concerns expressed in *Furman [v. Georgia]* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." 428 U.S. at 195, 96 S.Ct. 2909. Since *Gregg,* these procedural aspects of the Eighth Amendment's evolving standards of decency doctrine have focused on ensuring that the system used to impose death is not one "of standardless jury discretion." *Id.* at 428 U.S. 153, 195 n. 47, 96 S.Ct. 2909, 49 L.Ed.2d 859. A review of the case law reveals that these procedural issues generally arise in two areas: (1)

issues related to the channeling of the jury's discretion to impose death, *see Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); and (2) issues related to the notion of individualized sentencing and consideration of mitigating evidence, *see Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). As these cases demonstrate, so long as the system used to impose death is not rendered arbitrary or capricious in that the sentencing authority lacks adequate information or guidance, the procedural protections of the Eighth Amendment in capital cases have no application.

Although the appellant argues that the failure to give an instruction regarding the punishment of life without the possibility of parole violates the "evolving standards of decency" doctrine, he has failed to show that his ineligibility for this instruction has rendered the Tennessee system of capital punishment arbitrary or capricious, or has in any way precluded the jury from considering his individual circumstances or the nature of his crime. For despite his ineligibility for the life without parole instruction, the appellant was given a full and fair opportunity to present to the jury evidence in mitigation of sentence, and from all indications, the jury carefully considered and weighed the mitigating evidence before imposing death. This instruction has never been required by the Eighth Amendment in capital cases, and we conclude that its absence in this case certainly did not turn otherwise constitutional procedures into ones infected with standardless discretion.

[25] The appellant argues that, given the option, juries in Tennessee have sentenced defendants to life without parole more times than they have imposed death. He draws from this statistic that "the reliability of death sentences actually imposed subsequent to inclusion of the life without parole option has been enhanced." Once again, though, the focus of the Eighth Amendment--and of Article I, section sixteen--is on the capital sentencing process as a whole. Simply stated, we can little see how the absence of this instruction has rendered the process so unreliable, or so arbitrary and capricious, as to violate the ban on cruel and unusual punishments. The jury in this case still heard all of the appellant's evidence presented in mitigation of sentence, and the jury was given constitutionally acceptable instruction and guidance as to the use of that evidence. Moreover, the jury independently considered and weighed this evidence against the two aggravating circumstances it found beyond a reasonable doubt, and it unanimously concluded that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. We simply are unable to conclude that the process by which the appellant was sentenced to death for his crimes was the result "of standardless jury discretion," even without the life without parole **\*217** instruction. Neither the Eighth Amendment, nor Article I, section 16, requires anything more. *Cf. Lockett,* 438 U.S. at 605, 98 S.Ct. 2954. (FN7)

3. The Need for Incapacitation

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[26][27] The appellant next argues that the life without parole instruction should have been given because death is in excess of that reasonably needed for incapacitation of the offender. Neither our statutes nor our case law has ever rested the overall philosophical justification for the death penalty upon the need for incapacitation. Rather, it is well recognized that the only two penological goals served by capital punishment are retribution and general deterrence of crime. *See State v. Black,* 815 S.W.2d 166, 190 (Tenn.1991); *see also State v. Middlebrooks,* 840 S.W.2d 317, 340 (Tenn.1992) (citing *Gregg v. Georgia,* 428 U.S. at 183, 96 S.Ct. 2909). In fact, our research has uncovered no Tennessee case in which incapacitation has even been cited as a legitimate penological goal supporting the death penalty, no doubt for the very reasons cited by the appellant.

In response, the appellant argues that even though incapacitation may not be a legitimate goal of capital punishment generally, "social science data indicate that it is reasonably likely that jurors return death sentences solely to prevent a defendant's release into the community." However, the appellant provides no support for this assertion, and even if taken as true, we see no indication from the record of this case that the appellant was sentenced to death by the jury, in whole or in part, for incapacitative reasons. The district attorney did not argue that the appellant needed to be incapacitated or removed from society, and the judge certainly gave no such instruction allowing incapacitation to be considered. Accordingly, we conclude that the appellant was not entitled to a life without parole instruction on the basis that juries impose death for reasons of incapacitation.

### 4. Equal Protection

[28] Last, the appellant argues that he has been denied the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution, because other defendants, whose crimes were committed before July 1, 1993, have received a life without parole instruction. Even if correct, the appellant has succeeded only in showing that others similarly situated have been treated differently. A successful equal protection claim, however, also requires a showing that the decision not to give a life without parole instruction "ha[d] a discriminatory effect and that it was motivated by a discriminatory purpose." *Cf. United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *see also McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *State v. Irick,* 762 S.W.2d 121, 129 (Tenn.1988). There is no indication in this record that the decision not to instruct the jury on the punishment **\*218** of life without parole was the result of any discriminatory purpose. Rather, it appears by all accounts that the trial court's actual reason for not instructing the jury on life without parole was because the court believed it had no jurisdiction to do so. This legitimate reason does not provide us with a sufficient basis to find discriminatory intent, and the appellant's assignment is accordingly overruled.

### *B. Instruction on Circumstantial Evidence*

[29] In the final assignment of error, the appellant

argues that the trial court incorrectly instructed the jury with regard to consideration of circumstantial evidence, because the instruction contained no information on how the jury was to weigh and consider circumstantial evidence. The instruction given by the trial court was as follows:

Any fact required to be proved may be established by direct evidence, by circumstantial evidence, or by both combined.

Direct evidence is defined as evidence which proves the existence of the fact in issue without inference or presumption. Direct evidence may consist of testimony of a person who has perceived by the means of his or her senses the existence of a fact sought to be proved or disproved.

Circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue but from which that fact may be logically inferred.

The appellant, on the other hand, specifically requested that the following special instruction be charged:

When evidence of a fact required to be proved is made up entirely of circumstantial evidence, then before you would be justified in finding the fact required to be proved, you must find that all of the essential facts are consistent with the finding of the fact required to be proved, and the facts must exclude every other reasonable theory except that of the fact required to be proved.

The State argues before this Court that the appellant was not entitled to his proposed instruction because the proof of the two aggravating circumstances was not made up entirely of circumstantial evidence. We agree with the State that the evidence supporting the (i)(1) aggravating circumstance was established from the testimony of witnesses with personal knowledge, and is therefore composed entirely of direct evidence. We agree with the appellant, however, that the evidence supporting the torture prong of the (i)(5) aggravating circumstance, was composed entirely of circumstantial evidence, as the jury had to infer from other evidence presented to them that Nikki suffered severe mental and physical pain. (FN8) Consequently, the trial court was required to instruct the jury on the weighing of circumstantial evidence. *Cf. State v. Thompson,* 519 S.W.2d 789, 792 (Tenn.1975). Although the instruction given by the trial court addressed the nature of circumstantial evidence generally, the instruction did not provide guidance on how the jury was to find a fact of consequence solely from circumstantial evidence. *Cf. Monts v. State,* 214 Tenn. 171, 379 S.W.2d 34, 41 (1964). Hence, we conclude that the trial court committed error in not granting the appellant's request for a special instruction on circumstantial evidence.

[30] Nevertheless, we conclude that this error was harmless as the error does not appear to have affirmatively affected **\*219** the outcome of the sentencing hearing. *See* Tenn.R.Crim.P. 52(a); *cf. State v. Hall,* 958 S.W.2d 679, 695 (Tenn.1997) (applying Rule of Criminal Procedure 52(a) to trial court's refusal to give instructions on non-statutory

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

mitigating circumstances). The instruction proposed by the appellant would have required the jury to make two specific findings before a more general finding of torture was justified: (1) that all of the essential facts presented were consistent with the victim suffering severe mental or physical pain; and (2) that the facts presented must have excluded every other reasonable theory except that the victim suffered severe mental or physical pain. When phrased in terms of the appellant's proposed instruction, we conclude the jury would still have found that Nikki was tortured through infliction of severe mental or physical pain. The evidence presented to the jury was certainly consistent with the fact that Nikki was extremely concerned about her own physical safety in the terrifying moments before she lost consciousness, and that she was in extreme physical pain as she was strangled so forcefully that she turned blue and lost consciousness. Moreover, the evidence does in fact exclude every other reasonable theory except that the child suffered extreme mental and physical pain, and the record contains no evidence whatsoever that would serve to contradict this finding. Accordingly, although we find technical error in failing to grant the appellant's special request for a jury instruction, we also conclude that because the error does not affirmatively appear to have affected the outcome of the sentencing hearing, this error does not warrant reversal of the sentence.

The appellant suggests that the error was not harmless because the jury was then required to weigh the finding of torture or serious physical abuse against any mitigating circumstances and then conclude that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. The appellant does not dispute, however, that the jury was properly instructed on its duty to find the aggravating circumstance beyond a reasonable doubt and on the proper weighing of aggravating and mitigating circumstances. As we concluded previously, a rational jury could have concluded that this aggravating circumstance was present beyond a reasonable doubt and that both aggravating circumstances in this case outweighed any mitigating circumstances beyond a reasonable doubt. Accordingly, any error in instructing the jury on the finding of a fact based upon circumstantial evidence was harmless.

### III. COMPARATIVE PROPORTIONALITY REVIEW (FN9)

[31][32][33] Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), "this Court conducts a comparative proportionality review of every death sentence for the purpose of 'determining whether the death penalty is unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime.' " *State v. Henderson,* 24 S.W.3d 307, 314 (Tenn.2000) (quoting *State v. Hall,* 8 S.W.3d 593, 604 (Tenn.1999)). This Court applies the precedent-seeking approach, in which we compare a particular case with other cases in which the defendants were convicted of the same or similar crimes. We conduct this comparison by examining the facts of the crimes, the characteristics of the defendants, **\*220** and the aggravating and mitigating circumstances involved. *See State v. Bland,* 958 S.W.2d 651, 664 (Tenn.1997). The

purpose of this analysis is to identify arbitrary, or capricious sentences by determining whether the death penalty in a given case is " 'disproportionate to the punishment imposed on others convicted of the same crime.' " *Henderson,* 24 S.W.3d at 315 (quoting *Bland,* 958 S.W.2d at 662). A death sentence will be considered disproportionate if the case, taken as a whole, is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." *Bland,* 958 S.W.2d at 665.

[34] Our first task in conducting comparative proportionality review is to identify the pool of similar cases--which includes all cases in which the defendant is convicted of first-degree murder and in which a capital sentencing hearing was actually conducted--to which we compare the appellant's case. *See Bland,* 958 S.W.2d at 666. After identifying a pool of similar cases, "we consider a multitude of variables, some of which were listed in *Bland,* in light of the experienced judgment and intuition of the members of this Court." *See Cribbs,* 967 S.W.2d at 790. Selection of similar cases from the general pool is, of course, not an exact science, because no two cases are identical with respect to either circumstances or defendants.

[35] With respect to the nature and circumstances of the offense, the relevant factors considered by this Court include, but are not limited to: (1) the means of death; (2) the manner of death, such as whether the death was violent or torturous; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims.

With respect to comparing the characteristics of the defendants, the following factors were listed in *Bland* as relevant: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation. Of course, these factors are not exhaustive, and this Court may consider other factors in comparing the characteristics of the appellant with other defendants in the pool of cases.

[36] In this case, the victim was an eight-year-old Caucasian female, who was murdered by ligature strangulation after forcible rape and manual strangulation. The offense was facilitated by an abuse of a position of trust, and the murder involved torture as well as serious physical abuse beyond that necessary to produce death. Separate and apart from the serious physical abuse resulting from the manual strangulation, substantial evidence exists that the victim was repeatedly assaulted prior to her death. The motivation of the appellant in killing the victim is unclear from the record, but there can be no dispute that death was intended and that it was brought about in the absence of any conceivable provocation or justification. The victim, who

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

weighed only 68 pounds, was rendered helpless by the appellant during her rape and murder.

The appellant is a Caucasian male, who was 27-years-old at the time of the murder, and who has no significant record of criminal history. The appellant does appear to have some history of mental disorder, although the appellant's psychologist indicated a slight possibility that the appellant had manipulated the testing results to achieve this finding. Moreover, no testimony, *221 expert or otherwise, established any causal link between these disorders and the appellant's crime. The appellant was the lone perpetrator of the crime, and although he later confessed to the crime and pleaded guilty to the murder, he deliberately deceived and misled the police detectives during the early stages of the investigation. The appellant's psychologist testified that the appellant expressed significant feelings of shame and remorse. Finally, because the appellant made repeated references to the fact that Nikki was "blue" and "not breathing," it is clear that the appellant was well aware of the helplessness of the victim before he strangled her with a shoelace. We see no indication from the record of a strong likelihood for rehabilitation.

In *State v. Coe,* 655 S.W.2d 903 (Tenn.1983), the defendant was convicted of the intentional killing of an eight-year-old female victim. The defendant lured the victim away under false pretenses, secreted her to a discrete and isolated location, raped her, manually strangled her, and then stabbed her in the throat. The jury found the presence of the (i)(1), (i)(5), (i)(6), and (i)(7) aggravating circumstances, and in mitigation, the defendant presented evidence that he had a dysfunctional family history, which included sexual abuse of siblings committed by his father. Furthermore, like the appellant in this case, the defendant in *Coe* was previously institutionalized for mental problems and various personality disorders. The jury imposed the sentence of death, which this Court affirmed.

In *State v. Vann,* 976 S.W.2d 93 (Tenn.1998), the defendant was convicted of murder in the perpetration of the rape of his eight-year-old daughter. Like the present case, the cause of death in *Vann* was determined to be ligature strangulation. The defendant presented mitigation evidence to the effect that he came from impoverished background, had nervous breakdowns, was addicted to medication, suffered physical abuse from his father, and was hospitalized for depression and suicidal tendencies. The jury imposed the death sentence after finding the presence of the (i)(1), (i)(2), and (i)(5) aggravating circumstances. This Court affirmed the convictions and sentence.

In *State v. Irick,* 762 S.W.2d 121 (Tenn.1988), the defendant was convicted of felony murder and two counts of aggravated rape of a seven-year-old female victim. The defendant was a close friend of the victim's mother, and he was entrusted to watch over the victim one evening while her mother was at work. During this time, the defendant brutally raped the victim and later killed her. The cause of death was asphyxiation and suffocation. The defendant was twenty-six years old with no prior criminal history, and he had been institutionalized for mental treatment before his crime. The defendant knew the victim, and he abused his

position of trust to facilitate the crime. The jury imposed the sentence of death after finding the (i)(1), (i)(5), (i)(6), and (i)(7) aggravating circumstances beyond a reasonable doubt. This Court affirmed the defendant's conviction and sentence of death.

In *State v. Teel,* 793 S.W.2d 236 (Tenn.1990), the defendant admitted to the rape and murder of a fourteen-year-old victim. The evidence established that the defendant drove the victim, a person with whom he was well acquainted, to a remote and secluded location by telling her that he was taking her to see her boyfriend. Once there, he forced her to perform fellatio and then vaginally raped her. The cause of death was some type of "neck trauma" consisting of either manual strangulation, ligature strangulation, or a blow or cut to the neck. The jury found the presence of the (i)(5) and (i)(7) aggravating circumstances, and the sentence of death was affirmed by this Court.

Several other cases in which death was imposed, though not as similar as the four preceding cases, also share significant and substantial similarities to the present case, both in terms of the nature of the crime *222 and in the circumstances of the defendant: *State v. Cauthern,* 967 S.W.2d 726 (Tenn.1998) (finding the presence of the (i)(5) aggravating circumstance in the rape and murder of the victim, who died from ligature strangulation); *State v. Hodges,* 944 S.W.2d 346 (Tenn.1997) (finding the (i)(5) aggravating circumstance in the strangulation murder of victim and imposing death despite fact that defendant exhibited antisocial personality disorder and was raped as a child); *State v. Hines,* 919 S.W.2d 573 (Tenn.1995) (finding the (i)(2), (i)(5), and (i)(7) aggravating circumstances, and imposing death despite evidence that defendant had a troubled childhood, was abandoned by his parents, had abused drugs and alcohol as teenager, and suffered from self-destructive behavior, paranoid personality disorder, dysthymia, and chronic depression); *State v. Shepherd,* 902 S.W.2d 895 (Tenn.1995) (finding the (i)(2), (i)(5), and (i)(7) aggravating circumstances in the rape and murder of sixteen-year-old victim, and imposing death despite fact that defendant came from impoverished family, was emotionally scarred as child, and was previously admitted to a mental health facility); *State v. Smith,* 868 S.W.2d 561 (Tenn.1993) (finding the (i)(5), (i)(6), (i)(7), (i)(12) aggravating circumstances, and imposing death despite fact that defendant had been hospitalized for depression, paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder).

We have also located three cases that are similar to the appellant's case in which the death sentence was not imposed. *See State v. James Lloyd Julian,* No. 03C01-9511-CR-00371, 1997 WL 412539 (Tenn.Crim.App. filed at Knoxville, July 24, 1997); *State v.. Paul Ware,* No. 03C01-9705-CR-00164, 1999 WL 233592 (Tenn.Crim.App. filed at Knoxville, April 20, 1999); *see also State v. John Edward Allen,* Shelby County, *cited in Vann,* 976 S.W.2d at 109. In *Ware and Allen,* however, the proof did not show that the defendant was either acquainted with the victim or abused a position of trust. In addition, the defendants in *Ware and Julian* were apparently under the influence of an intoxicant at the time of the crimes. By way of contrast, the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

appellant in this case was not under the influence of any foreign substance at the time of his crime, and it is a reasonable inference from the evidence that the appellant's crime was intentional. In addition, there is some evidence that the psychological testing and evaluations of the appellant were not reliable, either because the appellant "faked" or otherwise exaggerated the test results.

[37][38] A sentence of death is not disproportionate, however, merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. *State v. Smith,* 993 S.W.2d 6, 17 (Tenn.1999); *State v. Blanton,* 975 S.W.2d 269, 281 (Tenn.1998); *Bland,* 958 S.W.2d at 665 (citing *State v. Carter,* 714 S.W.2d 241, 251 (Tenn.1986)). As we have stated many times before, "the isolated decision of a jury to afford mercy does not render a death sentence disproportionate." *State v. Smith,* 993 S.W.2d 6, 21 (Tenn.1999); *see also Gregg v. Georgia,* 428 U.S. 153, 203, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." *Blanton,* 975 S.W.2d at 281; *see also Bland,* 958 S.W.2d at 665. Instead, our duty "is to assure that no aberrant death sentence is affirmed." *Bland,* 958 S.W.2d at 665.

In conducting this proportionality review, we have tried to identify cases from the comparative pool in which the defendant raped and murdered children or young victims. We looked for cases in particular in which the (i)(1) and (i)(5) aggravating circumstances were present and in which similar mitigating circumstances were raised by the evidence. We also searched for cases in which the defendant either was well acquainted with the victim or abused a position of trust to facilitate **\*223** the crime. Based on our review of these several cases in which the death penalty was upheld, we are unable to say that the appellant's case, taken as a whole, is plainly lacking in circumstances that have previously justified death sentences. Accordingly, we hold that the death sentence imposed in this case was neither disproportionate nor arbitrarily applied.

The dissent concludes that because of perceived shortcomings in our comparative proportionality review protocol, the death sentence in this case--and perhaps in all cases--should be set aside. The dissent apparently mischaracterizes the purpose of comparative proportionality review, as proportionality review is not the sole method by which we determine that a death sentence has been randomly or arbitrarily imposed. Indeed, the entire system of capital punishment in Tennessee is composed of extensive procedures which work to eliminate arbitrary imposition of death by ensuring that the sentencing authority is given sufficient information and guidance in making its decision.

Without attempting to provide a comprehensive review of our capital procedures, we note that in our system of capital punishment as set forth in our statutes and rules, the defendant, if indigent, is afforded effective assistance of counsel by the state in the guilt and sentencing phases, as well as for both automatic appeals; the defendant receives notice in advance of the state's intention to seek the death penalty; the sentencing process is separated

from the determination of the defendant's guilt; the defendant receives notice of the statutory aggravating circumstances upon which the state intends to rely in seeking death; the state and the defendant are both allowed to introduce proof and testimony relevant to punishment, which are not strictly subject to the rules of evidence; the defendant is permitted a fair opportunity to rebut any hearsay evidence presented by the state; the sentencing jury is given sufficient oral and written guidance, in the form of defined statutory aggravating circumstances, to consider the information presented; the jury is instructed that it may consider any additional mitigating circumstances raised by the evidence, whether raised during the guilt or sentencing hearing; the jury is instructed that it must unanimously agree that at least one aggravating circumstance is present and has been proven by the state beyond a reasonable doubt; the jury is instructed that it must unanimously agree that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt; and every juror must sign his or her name to the verdict form.

In addition, the defendant's conviction and sentence are reviewed by the Court of Criminal Appeals, irrespective of whether the defendant transmits the record. Tenn.Code Ann.      § 39-13-206(a)(2). If the Court of Criminal Appeals affirms the conviction and sentence, then the case is automatically docketed in this Court for review. Both appellate courts first review errors assigned by the defendant alleged to have occurred during the guilt phase. Each appellate court then reviews the evidence supporting the aggravating circumstance and whether evidence supports the jury's determination that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt.

Every one of the procedures is designed to prevent the random or arbitrary application of the death penalty. The sentencing authority is given adequate information so as to insure individualized sentencing, and the discretion of the sentencing authority is properly and adequately channeled through oral and written instruction on defined aggravating circumstances. It is through use of these extensive procedural hurdles--and not only through comparative proportionality review--that the system of capital punishment in Tennessee works to eliminate unfettered discretion and arbitrary imposition of death.

[39] It is *in addition* to all of these heightened protections against random **\*224** death sentences that we have instituted a review procedure to serve as a final check against arbitrary imposition of the death penalty. Proportionality review is not the sole, or even the constitutionally necessary, protection against imposition of arbitrary death sentences, and a death sentence may be presumed to be proportionate where "it is imposed under a system which furnishes sufficient guidance to the sentencer through constitutionally valid aggravating and mitigating circumstances." *Bland,* 958 S.W.2d at 663 (citing *McCleskey v. Kemp,* 481 U.S. 279, 306-08, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)).

[40] Nevertheless, this Court has long believed that

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

comparative proportionality review is an important component of our scheme of capital punishment, and we are constantly seeking methods by which to improve our review. Interestingly, while the dissent denounces the frailties of proportionality review, it does not cite to any example in which our review in this case has failed to expose the appellant's sentence as arbitrary or irrational. The dissent states that the comparative pool of cases is generally too small, but it has not suggested that we look to one single other case which would identify the appellant's sentence in this case as arbitrary or irrational. We look only to cases in which the death penalty was sought and a sentencing hearing was held "because the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses." *Id.* at 666. As such, "the only cases that could be deemed similar ... are those in which imposition of the death penalty was properly before the sentencing authority for determination." *Id.* The dissent does not state with specificity why any other cases are "equally relevant" to proportionality review, and we cannot agree that limitation of the pool to similar cases in which the death penalty was actually sought renders the review process practically useless.

The dissent also suggests that our review procedures are too subjective, but again, it does not suggest any method by which the procedures could be made more objective. We have followed the specific criteria as set forth in *Bland,* and we have objectively identified the types of cases used in our review with great specificity. While we have admittedly been guided by the unique facts in this case in conducting our review, this fact does not render the process too subjective. Without some sort of flexibility to consider unique facts and circumstances, the fundamental notion of individualized sentencing is lost.

Finally, the dissent states that the test for review is so broad that nearly any sentence could be found to be proportionate. To the contrary, we have narrowly tailored our proportionality review--as we have done in every case--to those factors which are specifically raised by the evidence. Because of the myriad of procedures in place to identify and eliminate arbitrary death sentences, it should come as no surprise that this Court has yet to reverse a case based solely on the proportionality review. The fact remains that this Court has reversed numerous death sentences for problems in evidence or proof supporting the conviction or sentence, and in this manner, we have also protected against arbitrary imposition of death. Indeed, we would remind the dissent that the appellant's original sentence was one such case, as it was initially reversed for inadequate jury instructions.

At the end of the day, the dissent's conclusion that the appellant's sentence be reversed solely for perceived defects in our proportionality review procedures makes little practical sense. The dissent cannot say with any certainty that its problems with the review procedure work to enshroud arbitrary sentences which are indiscoverable by the other procedural protections of the system. Without *some* evidence that the sentence in this case was arbitrarily imposed or was the result of unfettered discretion, we decline to reverse the sentence of death in this case based solely on conjecture and speculation.

**\*225** CONCLUSION

In summary, we affirm the sentence of death imposed by a Shelby County jury after a careful and extensive review of the record of the sentencing hearing in this case, the briefs and arguments of the parties, and the applicable legal authority. The two aggravating circumstances found by the jury are amply supported by the evidence, and we agree that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. The appellant was not entitled to an instruction on the possible punishment of life imprisonment without possibility of parole because his offense was committed before the effective date of the act, and we find no constitutional impediment to the General Assembly's discretion in this regard. Although we have found technical error in the jury instruction regarding the weighing of circumstantial evidence, we hold that the error did not affirmatively affect the outcome of the hearing given that the jury could not have arrived at a contrary conclusion using the appellant's proposed instruction. Finally, we have compared the nature of the crime and the circumstances of the appellant with other cases in which the death penalty has been imposed and affirmed, and we have concluded that the sentence of death was neither arbitrarily nor disproportionately applied in this case.

With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge David G. Hayes and joined by Judges Joe G. Riley and John Everett Williams. The relevant portions of that opinion are attached as an appendix to this opinion. The judgment of the Court of Criminal Appeals is affirmed.

It appearing from the record that the appellant is indigent, costs of this appeal are assessed to the State of Tennessee.

BIRCH, J., filed a dissenting opinion.

DROWOTA, J., not participating.

APPENDIX

IN THE COURT OF CRIMINAL APPEALS OF
TENNESSEE
AT JACKSON
JANUARY SESSION, 1999

State of Tennessee, Appellee,

v.

David M. Keen, Appellant.

No. 02C01-9709-CR-00365

SHELBY COUNTY

Hon. John P. Colton, Jr., Judge

(Sentencing)

FIRST DEGREE MURDER, CAPITAL CASE

For the Appellant:

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

W. Mark Ward
Asst. Shelby Co. Public Defender
201 Poplar Avenue, Suite 2-01
Memphis, TN 38103

A C Wharton, Jr.
Public Defender

For the Appellee:

John Knox Walkup
Attorney General and Reporter

Michael E. Moore
Solicitor General

Kenneth W. Rucker,
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

William L. Gibbons
District Attorney General

Thomas D. Henderson and Ms. Alonda Horne
Asst. District Attorneys General
Criminal Justice Complex, Suite 301
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED:

AFFIRMED

**\*226** OPINION

HAYES, Judge.

In this capital case, the appellant, David M. Keen
(FN1), appeals as of right the imposition of his
sentence of death by a Shelby County jury following
his guilty plea to first degree murder in the
perpetration of rape. (FN2) In his direct appeal to
the supreme court, *see State v. Keen*, 926 S.W.2d
727 (Tenn.1994), the appellant's conviction was
affirmed; however, the court reversed the sentence
of death due to invalid jury instructions. The
appellant's case was remanded to the Criminal Court
of Shelby County for a resentencing hearing at
which he again received the death penalty.

On appeal, the appellant raises the following
issues: (FN3)

I. Whether the trial court erred in denying the
appellant's request to allow the jury to consider the
sentencing option of life without parole;

II. Whether the trial court erred by not informing
the jury that the appellant would have been eligible
for parole after serving 25 years of a sentence of
life imprisonment;

III. Whether the evidence is sufficient to support
the especially heinous, atrocious, or cruel
aggravating circumstance pursuant to Tenn.Code
Ann. § 39-13-204(i)(5);

IV. Whether the (i)(5) jury instruction which
charged in the disjunctive "torture    *or*    serious

physical abuse" denied the appellant his
constitutional right to a unanimous jury verdict and
whether the instruction failed to narrow the class
for death eligibility;

V. Whether the trial court erred by refusing the
appellant's special request instruction for the
especially heinous, atrocious, or cruel aggravating
circumstance and the special request instruction
regarding circumstantial evidence;

VI. Whether the trial court erred in denying the
appellant's motion to instruct the jury that it could
consider sympathy based on the evidence presented
as a mitigating circumstance;

VII. Whether the prosecution exercised its
peremptory challenges in a racially discriminatory
manner;

VIII. Whether the trial court erred in refusing
individual voir dire as to the prospective jurors'
exposure to pre-trial publicity and as to the jurors'
beliefs and attitudes about the death penalty;

IX. Whether the appellant was prejudiced by the
State's introduction into evidence of a photograph
of the victim taken during her lifetime and a
morgue photograph of the victim;

X. Whether the trial court erred in allowing the
State to make victim impact references during its
closing argument;

XI. Whether Tennessee's death penalty statutes
are constitutional;

XII. Whether the jury imposed an arbitrary and
disproportionate sentence.

After a careful review of the briefs and record in
this appeal, we affirm the judgment of the trial
court.

RESENTENCING HEARING [DELETED]

I. Life without Parole Instruction [DELETED]

II. Failure to Inform Jury of Parole Eligibility in
Twenty Five Years

The appellant asserts that the trial court's failure to
inform the jury that he    **\*227**    would be required to
serve twenty-five years for a life sentence violated
his federal and state constitutional rights under the
Eighth and Fourteenth Amendments of the United
States Constitution and Article I §§ 8 and 16 of the
Tennessee Constitution. Also, he argues that the
omission of such an instruction violates due process
under *Simmons v. South Carolina,* 512 U.S. 154,
114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).
Specifically, he contends that such an omission
allows the jury to speculate and underestimate the
amount of time a defendant must serve.

In essence, this appellant invites us to overrule our
supreme court which we are unable to do.    *See
Keen,* 926 S.W.2d at 738;    *Smith,*  857 S.W.2d at
11;  *Bates,*  804 S.W.2d at 881-82.   Regarding the
extension of due process under *Simmons*, we decline
the appellant's invitation for the same reason.    *See
Bush,* 942 S.W.2d at 502-503;   *State v. Caughron,*

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

855 S.W.2d 526, 543 (Tenn.1993); *State v. Payne,* 791 S.W.2d 10, 21 (Tenn.1990), *aff'd,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Accordingly, the issue is without merit.

### III. Sufficiency of the Aggravating Circumstance [DELETED]

### IV. Heinous, Atrocious, or Cruel Jury Instruction [DELETED]

### V. Special Request Instructions [DELETED]

### VI. Sympathy Instruction

The appellant challenges the trial court's denial of the appellant's motion to instruct the jury that it could consider sympathy as established by the proof as a mitigating circumstance citing *Parks v. Brown,* 860 F.2d 1545 (10th Cir.1988). He cites no authority from this state on this issue. In addition, he asserts that the combined anti-sympathy charge (FN8) given by the judge in combination with this denial was a violation of the Eighth Amendment by limiting his mitigation evidence.

This very issue was rejected in the appellant's first direct appeal. *See Keen,* 926 S.W.2d at 739 (citing *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)); *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *Boyd,* 797 S.W.2d at 598. We conclude the trial court properly instructed the jury that it could not consider sympathy. This issue is without merit.

### VII. Batson Challenges

The appellant contends that the State excluded four African American jurors (FN9) with its peremptory challenges in violation of Article I, Section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. Under the authority of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), he urges reversal of the sentence. The appellant challenges the dismissal of Jurors McVay, Humphreys, Wilkes, and Houston.

To invoke the protections of *Batson,* the defendant must establish a prima facie case that a juror is being challenged on the basis of race or gender. *Batson,* 476 U.S. at 94, 106 S.Ct. at 1721; *Purkett v. Elem,* **\*228** 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71, 131 L.Ed.2d 834 (1995); *State v. Jones,* 789 S.W.2d 545, 548 (Tenn.1990). Once the defendant has presented a prima facie case, the trial court shall require the State to give a race-neutral reason for the challenge. *Batson,* 476 U.S. at 94, 106 S.Ct. at 1721; *Purkett,* 514 U.S. at 767, 115 S.Ct. at 1770-71. *See also State v. Bell,* 759 S.W.2d 651, 653. "The race or gender neutral explanation need not be persuasive, or even plausible.... Unless a discriminatory intent is inherent in the [proponent's] explanation, the reason offered will be deemed race neutral." *Purkett,* 514 U.S. at 767, 115 S.Ct. at 1770-71. If a race or gender neutral explanation is given, the court must then determine, given all the circumstances, whether the defendant has established purposeful discrimination. *Batson,* 476 U.S. at 96-98, 106 S.Ct. at 1723-24; *see also Purkett,* 514 U.S. at 767, 115 S.Ct. at 1770-71. Although a trial court

must accept a facially race-neutral explanation for purposes of determining whether the proponent has satisfied his burden of production, this does not mean that the Court is bound to believe the explanation in making its determination. In other words, while the court may find that a proffered explanation is race-neutral, the court is not required, in the final analysis, to find that the proffered explanation was the actual reason for striking the juror. If the court determines that a race or gender based motive was behind the challenge, the juror may not be excluded. *Woodson v. Porter Brown Limestone Co., Inc.,* 916 S.W.2d 896, 903 (1996).

In making its determination, the trial court must look to the totality of the circumstances for rarely will a party admit that its purpose in striking the juror was discriminatory. Accordingly, the trial court may infer discriminatory intent from circumstantial evidence. "The factfinder's disbelief of the reasons put forth by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination, and ... no additional proof of discrimination is required." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). Additionally, the court may consider whether similarly situated members of another race were seated on the jury or whether the race-neutral explanation proffered by the strikes' proponent is so implausible or fantastic that it renders the explanation pretextual. The trial court may also consider the demeanor of the attorney who exercises the challenge which is often the best evidence of the credibility of his proffered explanations. *See Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991).

Because a trial record alone cannot provide a legitimate basis from which to substitute an appellate court opinion for a trial court's findings, the trial court must carefully articulate its findings on the record. The trial court has the opportunity to both visually and auditorially observe the demeanor of both prospective jurors and counsel, and accordingly, evaluate their credibility. *See State v. Smith,* 893 S.W.2d 908, 914 (Tenn.1994), *cert. denied,* 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995) (citing *State v. Ellison,* 841 S.W.2d 824, 827 (Tenn.1992)). On appeal, the trial court's findings are to be accorded great deference and are not to be set aside by this court unless clearly erroneous. *See Woodson,* 916 S.W.2d at 906 (citing *In re A.D.E.,* 880 S.W.2d 241, 243 (Tex.App.1994) ; *Smith,* 893 S.W.2d at 914.

In the present case, in a hearing outside the presence of the jury, the trial court found that defense counsel had not demonstrated a pattern of discrimination; however, the court had the State place their reasons into the record. With regard to Juror McVay, the State challenged her because of her initial reservations about the death penalty. Juror Humphreys was **\*229** challenged because of her relationship with defense counsel and her concern for the care of her child and mother. Juror Wilkes was challenged because he smiled and laughed inappropriately when asked about the factors used in determining whether to impose the death penalty. He also stated that he would "rather

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

be out roofing."

Concerning Juror Houston, the appellant contends that the State's reason for exercising its challenge was simply unfounded. (FN10) The State contends that Juror Houston was uncertain in her response to impose the death penalty. Moreover, the State felt she was garrulous and would be an irritant in the jury room. The trial court did not "find any basis for any gender or race problems in the *Batson* matter and will overrule your objection." (Italics added). We agree with the trial court that the appellant has failed to establish a prima facie case of purposeful discrimination. In addition, the record reflects the trial court's finding that the proffered reasons for the peremptory strikes were not racially motivated and the trial court's finding was not clearly erroneous. Thus, this issue is without merit.

### VIII. Individual Voir Dire

Due to the trial court's denial of individual voir dire, the appellant contends that his right to an impartial jury and due process were violated as guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution because it impaired his right to use his peremptory challenges. The State contends the trial court acted appropriately.

The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial. *Cazes,* 875 S.W.2d at 262;    *State v. Howell,* 868 S.W.2d 238, 247 (Tenn.1993), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994) . "Individual voir dire is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." *Harris,* 839 S.W.2d at 65 (citing *Porterfield,* 746 S.W.2d at 447); *Howell,* 868 S.W.2d at 247. Here, the appellant does not allege the presence of any potentially prejudicial material. There is no support in the record of prejudice regarding group voir dire of the jurors' views of the death penalty.    *See Harris,* 839 S.W.2d at 65;    *Cazes,* 875 S.W.2d at 262. The Tennessee Supreme Court has repeatedly held that death qualification of jurors is not required to be conducted by individual, sequestered voir dire. *See State v. Stephenson,* 878 S.W.2d 530, 540 (Tenn.1994) (citing *Smith,* 857 S.W.2d at 19). The decision of the trial court denying individual voir dire of the venire remains within the sound discretion of the court, and will not be reversed by this Court absent a finding of "manifest error." *Howell,* 868 S.W.2d at 247-248.

The appellant filed a pre-trial motion requesting individual voir dire for pre-trial publicity and the juror's views on the death penalty. The motion was renewed before the beginning of the proceedings. The trial court denied the motion; however, the appellant concedes, that if necessary, the court would have allowed questioning at the bench. The appellant has failed to demonstrate any prejudice resulting from the trial court's decision. Therefore, we conclude that the trial court did not abuse its discretion in denying the motion for individual voir dire. This issue is without merit.

In addition, the appellant contends that his equal protection rights under the Fourteenth Amendment to the United States Constitution were violated because individual *230 voir dire is granted

routinely in counties other than Shelby County. The State contends this issue was waived pursuant to Tenn.Ct.Crim.App.R 10(b) because the appellant's brief and the record contain no evidence of these allegations. To prevail upon a claim of an equal protection violation, the appellant bears the burden of proving "the existence of purposeful discrimination ..." and that such discrimination had "a discriminatory effect on him." *Irick,* 762 S.W.2d at 129 (citing *McCleskey,* 481 U.S. at 279, 107 S.Ct. at 1766; *see also Keen,* 926 S.W.2d at 739. Here, the appellant has failed to carry the burden imposed upon him. For the above stated reasons, this issue is meritless.

### IX. Introduction of Photographs

The appellant contends that the trial court erred by allowing the State to introduce, over objection, two photographs of the victim, one taken before her death and the other a postmortem photograph, because the probative value was substantially outweighed by the unfair prejudice. The first picture was identified by the victim's grandfather which the court introduced solely for identification purposes. Thereafter, Officer Wilson identified the victim in the picture as the same person that was discovered in the Wolf River. The trial court admitted the picture into evidence finding the picture relevant to the identity of the victim and to the nature of the crime.

Through the testimony of Dr. Francisco, the State introduced a postmortem photograph of the victim. The picture corroborated the medical examiner's testimony of the cause of death and method of strangulation. The trial court admitted this picture into evidence based upon its relevance to the heinous, atrocious, or cruel aggravator and the other circumstances of the murder.

The appellant argues that the pictures should have been excluded because identity and the cause of death were uncontested issues. Moreover, he argues that the evidence of the second photograph was inflammatory and cumulative of the medical examiner's testimony.

Tennessee courts have followed a policy of liberality in the admission of photographs in both civil and criminal cases.    *State v. Banks,* 564 S.W.2d 947, 949 (Tenn.1978). "The admissibility of photographs lies within the discretion of the trial court." *Id.* The court's "ruling, in this respect, will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* (citations omitted); *see also Stephenson,* 878 S.W.2d at 542; *State v. Bordis,* 905 S.W.2d 214, 226 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1995). However, before a photograph may be admitted into evidence, it must be relevant to an issue that the jury must decide and the probative value of the photograph must outweigh any prejudicial effect that it may have upon the trier of fact. *State v. Braden,* 867 S.W.2d 750, 758 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1993) (citation omitted);    *see also* Tenn.R.Evid. 401 and 403. The record indicates that the first photograph was offered by the State to establish the victim's identity. We agree with the appellant that the identity of the victim was not at issue at the appellant's resentencing hearing; and,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

therefore, we find that this photograph was irrelevant (FN11). However, we conclude that its admission, although erroneous, was without prejudicial impact upon the jury and constitutes harmless error. *See* Tenn.R.Crim.P. 52(a).

With regard to the postmortem photograph, our supreme court has held that **\*231** photographs may be introduced in order to illustrate testimony. *Stephenson,* 878 S.W.2d at 542. Moreover, the decision to admit or limit cumulative evidence rests within the sound discretion of the trial court. *State v. Brown,* 836 S.W.2d 530, 553 (Tenn.1992) (photographs of victim's body admissible despite oral testimony "graphically" describing victim's injuries). *See also State v. Van Tran,* 864 S.W.2d 465, 477 (Tenn.1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994) (color photographs of deceased victims at scene of crime were admissible despite introduction of extensive color videotape showing victims' bodies as they were found). In any event, a relevant photograph is not rendered inadmissible merely because it is cumulative. *Bigbee,* 885 S.W.2d at 807; *Van Tran,* 864 S.W.2d at 477. *See Smith,* 893 S.W.2d at 924 (photographs of victim appropriately admitted for establishing "heinous, atrocious, cruel" aggravating factor).

All photographs of dead bodies, especially those involving death by a criminal agency, are disturbing to the average person. After viewing the postmortem photograph, we find nothing particularly gruesome in its nature beyond that which is accurately depicted. Here, the photograph was relevant to supplement and clarify the testimony of the medical examiner and the officer in establishing the cause of death, *see Stephenson,* 878 S.W.2d at 542, and to the show the brutality of the attack and extent of force used against the victim, from which the jury could infer the "heinous, atrocious, or cruel" aggravator. *See Brown,* 836 S.W.2d at 551; *see e.g., Payne,* 791 S.W.2d at 19-20; *State v. Miller,* 771 S.W.2d 401, 403-404 (Tenn.1989); *Porterfield,* 746 S.W.2d at 449-450; *State v. McNish,* 727 S.W.2d 490, 494-495 (Tenn.1987). We conclude that the probative value of this photograph far outweighed its prejudicial impact. Therefore, this issue is without merit.

### X. Victim's Impact Reference During Closing Argument

The appellant argues that the prosecutor used improper victim impact references during his closing argument to the jury. The State contends that since appellant's counsel offered testimony for the impact upon the appellant's family asking the jury to spare his life, the prosecutor's comment on the evidence was not inappropriate because it merely showed that the victim's family had also suffered.

The trial court excluded victim impact evidence as irrelevant in the case-in-chief and rebuttal, but allowed the State to argue inferences of proof in their closing argument. The contested portion of the argument is:

The defendant's family asks you to spare the defendant's life. Don't you think that Nicki Reed's family would have given anything they had to be out on that boat dock begging this defendant

not to kill Nicki? Don't you think they would give anything they had not to have to go to bed at night knowing that their little eight-year old baby died at the bottom of the Wolf River, naked, violated, cold and alone? Don't you think, ladies and gentlemen, they would give anything they had to be able to say--to tuck little Nicki in bed at night and say, honey, that monster wasn't real.

Specifically, the appellant contends this argument was improper because only evidence relating to the aggravating or mitigating circumstances is relevant in a sentencing hearing, and therefore "argument about irrelevant matters is improper" citing *Cozzolino v. State,* 584 S.W.2d 765, 768 (Tenn.1979). Additionally, he states that this "inflammatory argument" caused the jury to impose the death penalty in an "arbitrary and capricious manner" thereby diminishing his rights under the Eighth Amendment with an emotional appeal.

There exists no *per se* bar under the Eighth Amendment to the admissibility of victim's impact evidence. *Nesbit,* 978 **\*232** S.W.2d 872; *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Bigbee,* 885 S.W.2d at 811-812. Thus, the appellant's constitutional challenge is excluded. As to the appellant's challenge under our sentencing scheme, our supreme court recently observed, "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language *nature and circumstances of the crime.*" *Nesbit,* 978 S.W.2d 872; *see* Tenn.Code Ann. § 39-13-204(c). This holding in *Nesbit* permits only that victim impact evidence which is not so prejudicial "that it renders the trial fundamentally unfair," *Nesbit,* 978 S.W.2d 872 (citing *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608) or that which should be excluded under Tenn.R.Evid. 403. As well, prosecutorial argument of victim impact evidence must be exercised with restraint. *Nesbit,* 978 S.W.2d 872 ("inflammatory rhetoric that divert the jury's attention from its proper role or invites an irrational, purely emotional response to the evidence is not permissible and should not be tolerated by the court.").

In order to determine whether the prosecutor's comment requires reversal, we must determine whether the argument "affected the verdict to the prejudice of the defendant." *Bigbee,* 885 S.W.2d at 809 (quoting *Harrington v. State,* 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). Our supreme court has outlined the following factors for us to consider:

(1) the conduct complained of viewed in light of the facts and circumstances of the case:

(2) the curative measures undertaken by the court and the prosecution;

(3) the intent of the prosecutor in making the improper arguments;

(4) the cumulative effect of the improper conduct and any other errors in

the record; and

(5) the relative strength and weakness of the case.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*Nesbit,* 978 S.W.2d 872.

We conclude that the State did not over emphasize the victim impact evidence in its closing argument. Nothing in the record indicates that the prosecutor acted in bad faith. Even though the trial court allowed the prosecutor to argue victim's impact inferences from the evidence, the trial court instructed the jury,

> the court has read to you the aggravating circumstances which the law requires you to consider if you find that they have been established by the evidence beyond a reasonable doubt. You shall not take account of any other aggravating facts or circumstances as the basis for deciding whether the death penalty would be appropriate punishment in this case.

The jury was instructed not to consider victim impact evidence to determine whether or not to impose the death penalty. It is well settled in the state of Tennessee that a jury is presumed to have followed a trial court's instructions. *State v. Lawson,* 695 S.W.2d 202, 204 (Tenn.Crim.App.1985); *State v. Blackmon,* 701 S.W.2d 228, 233 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1985). In light of the strong evidence against the appellant in support of the aggravating factors, we believe the prosecutor's comment in no manner affected the verdict rendered by the jury. Therefore, this issue is without merit.

### XI. Constitutionality of the Death Penalty

The appellant concedes that the constitutionality of the death penalty has been upheld by the Tennessee Supreme Court, however, he raises the following issues in order to preserve them for later review. The appellant contends that (1) the death penalty statute fails to meaningfully narrow the class of eligible defendants (FN12); (2)    **\*233**    the prosecution has unlimited discretion in seeking the death penalty; (3) the death penalty is imposed in a discriminatory manner based upon economics, race, geography, and sex; (4) there are no uniform standards for jury selection; (5) juries tend to be prone to returning guilty verdicts; (6) the defendant is denied the opportunity to address the jury's popular misconceptions about parole eligibility, cost of incarceration, deterrence, and method of execution; (7) the jury is instructed that it must unanimously agree to a life sentence, and is prevented from being told the effect of a non-unanimous verdict; (8) courts fail to instruct the juries on the meaning and function of mitigating circumstances; (9) the jury is deprived of making the final decision about the death penalty; (10) the defendant is denied the final argument during the sentencing phase; (11) electrocution is cruel and unusual punishment; and (12) the appellate review process in death penalty cases is constitutionally inadequate.

These issues have repeatedly been rejected by our supreme court. *See Smith,* 893 S.W.2d at 908; *Brimmer,* 876 S.W.2d at 75; *Cazes,* 875 S.W.2d at 253; *Smith,* 857 S.W.2d at 1; *Black,* 815 S.W.2d at 166; *Boyd,* 797 S.W.2d 589; *State v. Teel,* 793 S.W.2d 236 (Tenn.1990); *Thompson,* 768 S.W.2d at 239. *See also Keen,* 926 S.W.2d at 741-44.

### XII. Proportionality Review [DELETED]

### CONCLUSION

After an extensive review of the record and the issues before us, as mandated by Tenn.Code Ann. § 39-13-206(b), and (c), and for the reasons stated herein, we affirm the appellant's sentence of death. We conclude that the sentence of death was not imposed in an arbitrary fashion, the evidence supports the jury's finding of the aggravating circumstances, and the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances. Moreover, a comparative proportionality review, considering both the "nature of the crime and the defendant," Tenn .Code Ann. § 39-13-206(c)(1)(D), convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. (FN16)

CONCUR:

/s/ JOE G. RILEY, Judge
/s/ JOHN EVERETT WILLIAMS, Judge

ADOLPHO A. BIRCH, Jr., J., dissenting.

In *State v. Chalmers,* I filed a separate Concurring and Dissenting Opinion to state my view that Tennessee's comparative proportionality review procedure is constitutionally inadequate. 28 S.W.3d 913 (Tenn.2000) (Birch, J., concurring and dissenting). Although a significant portion of that dissent was devoted to a discussion of the role of race in comparative proportionality review, I also raised three general concerns with regard to comparative proportionality review which are relevant here: "the 'test' we employ [for comparative proportionality review] is so broad that nearly any sentence could be found proportionate; our review procedures are too subjective; and the 'pool' of cases which are reviewed for proportionality is too small." *Id.* (Birch, J., concurring and dissenting). Based on those concerns, I concluded that our current comparative proportionality review protocol "fails to protect defendants from the arbitrary or    **\*234.** disproportionate imposition of the death penalty." *Id.* (Birch, J., concurring and dissenting). I adhere to this view.

As I have expressed on previous occasions in the context of other dissents, "I am unwilling to approve of results reached through the use of a procedure with which I cannot agree." *See Coe v. State,* 17 S.W.3d 193, 248-49 (Tenn.2000) (Birch, J., dissenting). Accordingly, because the flaws in our comparative proportionality review protocol have neither been addressed nor corrected, I dissent from the Court's decision to impose the death penalty in this case and would remand the cause for the imposition of a sentence of life imprisonment with or without the possibility of parole.

(FN1.) The specific statutory and non-statutory mitigating circumstances charged to the jury were (1) that the defendant has no significant history of criminal behavior; (2) that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (3) that the capacity of the defendant

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

to appreciate the wrongfulness of his conduct or to conform to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment; (4) that the defendant was physically abused as a child; (5) that the defendant was sexually abused as a child; (6) that the defendant was abandoned and neglected as a child; (7) that the defendant was emotionally deprived as an infant and during early childhood; (8) that the defendant was deprived of nutrition as a child; (9) that the defendant did not receive continued counseling and psychotherapy for persons who are sexually and physically abused; (10) that the defendant has been diagnosed with attention deficit disorder; (11) that the defendant has been diagnosed as having post-traumatic stress disorder; (12) that the defendant was a productive citizen in our society prior to his arrest; having served our community in the military and been employed; (13) that the defendant acknowledges the seriousness of the crime he has committed and accepts responsibility for his actions; and (14) that the defendant is ashamed of his actions. The trial court also included a "catch-all" instruction to the jury that it could consider any other mitigating circumstances not specifically recited in the charge.

(FN2.) *See, e.g., Willett v. State,* 335 Ark. 427, 983 S.W.2d 409, 411 (1998) (" 'Mental anguish' is defined as the victim's uncertainty as to his ultimate fate."); *State v. Jackson,* 186 Ariz. 20, 918 P.2d 1038, 1047 (1996) ("Mental anguish includes a victim's uncertainty as to her ultimate fate."); *State v. Spry,* 266 Kan. 523, 973 P.2d 783, 791 (1999) ("Mental anguish includes a victim's uncertainty as to [his] or [her] ultimate fate."); *Neill v. State,* 896 P.2d 537, 556 (Okla.Crim.App.1994) ( "Mental anguish includes the victim's uncertainty as to his ultimate fate.").

(FN3.) This is also the very task that is expected of a jury in virtually all other aspects of capital sentencing, such as evaluating the presence and strength of any mitigating circumstances and even when making the final determination of punishment. *Cf. State v. Nichols,* 877 S.W.2d 722, 731 (Tenn.1994) ("Once a capital sentencing jury finds that a defendant falls within the legislatively-defined category of persons eligible for the death penalty, the jury is free to consider a myriad of factors to determine whether death is the punishment appropriate to the offense and the individual defendant.") (citing *California v. Ramos,* 463 U.S. 992, 1005, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); *Barclay v. Florida,* 463 U.S. 939, 948, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)).

(FN4.) As we stated in *Cauthern,* Tennessee Code Annotated section 39-13-204(k) provides that if a defendant is granted a new trial, "either as to guilt or punishment or both, the new trial shall include the possible punishments of death, imprisonment for life without possibility of parole or imprisonment for life." Because this section was enacted as part of the same public act providing for the life without parole instruction, this provision is also governed by the act's effective

date as set forth in section 16.

**\*234_** (FN5.) We also note that the procedural history of *Cauthern* is virtually identical to that of the present case, a fact which strengthens our conclusion that *Cauthern* should control the outcome of this case. In *Cauthern,* the defendant was first convicted of first degree murder and sentenced to death in 1988. On automatic appeal, this Court affirmed the conviction but remanded the case for resentencing. The defendant was again sentenced to death at a second sentencing hearing, which occurred at some point after the life without possibility of parole instruction took effect on July 1, 1993. On a second automatic appeal to this Court, the *Cauthern* defendant argued that because his resentencing took place after the effective date of the act, he was entitled to the life without parole instruction.

(FN6.) *See Furman v. Georgia,* 408 U.S. 238, 310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J ., concurring in judgment) ("I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.").

(FN7.) Having concluded that neither the federal nor Tennessee Constitutions requires an instruction on life without parole--because its absence does not hinder the presentation, consideration, or weighing of mitigating evidence, or otherwise render the proceedings arbitrary and capricious--we find unpersuasive the appellant's argument that the instruction is required because most other states which have the death penalty also permit the life without parole instruction. We note that other states have not uniformly required the new instruction to take effect at sentencing hearings occurring after the effective date of the statute. At least two states other than Tennessee require that the life without parole instruction be given only when the *offense* was committed after the effective date of the act, *see State v. Alcorn,* 638 N.E.2d 1242, 1246 (Ind.1994); *Booth v. State,* 327 Md. 142, 608 A.2d 162, 173-174 (1992), and at least one state allows the instruction only if the *conviction* occurs after the effective date of the act, *see Salazar v. State,* 852 P.2d 729, 740 (Okla.Crim.App.1993). As the life without parole instruction is not constitutionally required in any scheme of capital punishment, the General Assembly was within its prerogative to apply the instruction only to offenses committed after July 1, 1993.

(FN8.) We note, though, that the evidence supporting the serious physical abuse prong of the (i)(5) circumstance is established by the appellant's own statements, and is therefore comprised only of direct evidence. Because we have already concluded that the jury could have possibly found the (i)(5) aggravating circumstance based solely on the torture prong, however, we conclude that the appellant was entitled have the jury instructed according to his special instruction.

(FN9.) We note that this Court previously conducted a comparative proportionality review of this case when we first heard the case on automatic appeal in 1994. *See State v. Keen,* 926 S.W.2d

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

727, 744 (Tenn.1994). Nevertheless, since that time, we have further elaborated on the procedures governing proportionality review, *see State v. Bland,* 958 S.W.2d 651 (Tenn.1997), and we therefore again conduct a comparative proportionality review to ensure that the capital sentence imposed in this case is not "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." *Bland,* 958 S.W.2d at 665.

(FN1.) At the time of the offense the appellant was twenty-seven years old.

(FN2.) The appellant's guilty plea was entered on February 12, 1991. Although the record does not contain a copy of the guilty plea, apparently the appellant also pled guilty to aggravated rape. However, the appellant does not challenge this conviction in this instant appeal.

(FN3.) Contained within the appellant's twelve general issues are other specific allegations of error set forth as sub-issues.

(FN8.) "You should in no case allow mere sympathy or prejudice solely to influence your verdict but should look to the law and all the facts and circumstances proven in the evidence to determine the verdict."

**\*234**_ (FN9.) As the State points out, the appellant only challenges the dismissal of three jurors in his motion for a new trial. Although the challenge to the fourth juror has been waived, this Court opts to consider this juror because of the qualitative .

difference between a death penalty sentence and other sentences. *See Bigbee,* 885 S.W.2d at 805.

(FN10.) We note, at this juncture, that the record reflects two jurors named Houston. The appellant does not specifically indicate which Juror Houston he is challenging. In his brief, it appears that he is challenging the first Juror Houston. However, the State refers to the second Juror Houston when exercising its peremptory challenge. The record reflects that the challenged juror was Rosie Houston.

(FN11.) This court has previously held that a photograph of the deceased during her lifetime is admissible *at the guilt phase of the trial*       to establish the *corpus delicti* in a homicide case when the question involves the subordinate issue of the identity of the deceased named in the indictment. *See State v. Nesbit,* 978 S.W.2d 872 (Tenn. 1998) (for publication), appendix at p. 10.

(FN12.) Within this issue the appellant challenges Tenn.Code Ann. § 39-13-204(i)(4), (i)(5), (i)(6), and (i)(7). In this case, the State only relied upon Tenn.Code Ann. § 39-13-204(i)(2) and (i)(5). Therefore, the appellant is without standing to challenge (i)(4), (i)(6), and (i)(7). The constitutionality of (i)(5) is addressed previously in this opinion.

(FN16.) No execution date is set. Tenn.Code Ann. § 39-13-206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty. If the death sentence is upheld by the higher court on review, the supreme court will set the execution date.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

**\*253** 875 S.W.2d 253

Supreme Court of Tennessee,
at Jackson.

STATE of Tennessee, Plaintiff-Appellee,
v.
Victor James CAZES, Defendant-Appellant.
Feb. 14, 1994.
Rehearing Denied April 4, 1994.

Defendant was convicted in the Shelby Criminal Court, Joseph B. McCartie, J., of first-degree felony-murder in perpetration of rape, and was sentenced to death. Defendant appealed. The Supreme Court, Anderson, J., held that: (1) evidence did not support claim that trial judge was biased against defendant and his counsel; (2) defendant was not entitled to individual sequestered voir dire of jury panel on both pretrial publicity and death penalty; and (3) instructing jury on invalid aggravating circumstance was harmless error.

Affirmed.

Reid, C.J., issued concurring and dissenting opinion.

West Headnotes

[1] Criminal Law ⬤═1160
  110 ----
    110XXIV Review
      110XXIV(P) Verdicts
        110k1160 Approval of Verdict by Trial Court.
    It is well-established that jury verdict, approved by trial judge, accredits testimony of witnesses for state and resolves all conflicts in favor of theory of state, and removes presumption of innocence.

[2] Criminal Law ⬤═494
  110 ----
    110XVII Evidence
      110XVII(R) Opinion Evidence
        110k492 Effect of Opinion Evidence
      110k494 Experts.
    Evidence supported conviction for murder and perpetration of rape; medical examiner testified that dilation of vagina and anus indicated that penetration occurred at time of death, within matter of minutes of death, or shortly after death.

[3] Criminal Law ⬤═633(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k633 Regulation in General
          110k633(1) In General.

[See headnote text below]

[3] Criminal Law ⬤═655(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k654 Remarks and Conduct of Judge
          110k655 In General
      110k655(1) In General.
    It is well-established that trial judge has broad

discretion in controlling course and conduct of trial, and that in exercising that discretion, he or she must be careful not to express any thought that might lead jury to infer that judge is in favor of or against defendant in criminal trial.

[4] Criminal Law ⬤═655(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k654 Remarks and Conduct of Judge
        110k655 In General
          110k655(1) In General.

[See headnote text below]

[4] Criminal Law ⬤═655(5)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k654 Remarks and Conduct of Judge
        110k655 In General
          110k655(5) Remarks and Conduct as to
              Argument and Conduct of Counsel.
    Capital murder defendant failed to show that trial judge displayed hostility and bias against him, even though trial judge refused to allow defense counsel to approach bench, refused to allow defense counsel to ask question previously asked on voir dire, and instructed defense counsel not to address prospective juror by her first name; trial judge did not allow either prosecution or defense to approach bench routinely or to ask repetitive questions of prospective jurors, and instructing defense counsel to refrain from calling prospective juror by her first name was entirely proper.

[5] Criminal Law ⬤═655(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
          General
        110k654 Remarks and Conduct of Judge
        110k655 In General
          110k655(1) In General.

[See headnote text below]

[5] Sentencing and Punishment ⬤═1781
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1781 Remarks and Conduct of Judge.

(Formerly 110k1213.7)
    Record did not support capital murder defendant's claim that trial judge did not appreciate heightened due process applicable in capital cases, even though trial judge admonished defense counsel that all trials were the same, capital or otherwise, required that attorney be prepared to go to trial on appropriate date, and stated that "press of business" is not good cause for granting continuance; taken in context used, those comments did not demonstrate mindset of indifference to requirements of Eighth Amendment as to deny defendant fair trial.
    U.S.C.A. Const.Amends. 6, 8, 14.

[6] Criminal Law ⬤═594(1)

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

110 ----
110XIX Continuance
110k588 Grounds for Continuance
110k594 Absence of Witness or Evidence in
General
110k594(1) In General.

[See headnote text below]

[6] Criminal Law ⟨key⟩614(1)
110 ----
110XIX Continuance
110k614 Second or Further Continuance
110k614(1) In General.
Court did not abuse its discretion in denying
capital murder defendant's motion for continuance to
obtain expert witnesses; public defender's office
had been handling case 13 months when present
counsel was appointed, many continuances had
already been granted at defendant's request, and
defendant's request for expert services was
accompanied by little more than undeveloped
assertions that services were needed to attempt to
counter state's proof, and by possibility that
defendant had been molested as juvenile while in jail
and needed further evaluation.  T.C.A.        §
40-14-207(b).

[7] Criminal Law ⟨key⟩586
110 ----
110XIX Continuance
110k586 Discretion of Court.

[See headnote text below]

[7] Criminal Law ⟨key⟩1151
110 ----
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1151 Continuance.
Decision to grant or deny motion for continuance
rests within sound discretion of trial judge and will
only be reversed upon clear showing of abuse of that
discretion and prejudice inuring to accused as direct
result of court's ruling.

[8] Jury ⟨key⟩131(1)
230 ----
230V Competency of Jurors, Challenges, and
Objections
230k124 Challenges for Cause
230k131 Examination of Juror
230k131(1) In General.
Ultimate goal of voir dire is to ensure that jurors
are competent, unbiased, and impartial, and decision
of how to conduct voir dire of prospective jurors
rests within sound discretion of trial court.

[9] Jury ⟨key⟩131(13)
230 ----
230V Competency of Jurors, Challenges, and
Objections
230k124 Challenges for Cause
230k131 Examination of Juror
230k131(13) Mode of Examination.
Where crime is highly publicized, better procedure
is to grant defendant individual, sequestered voir
dire, but it is only where there is significant
possibility that juror has been exposed to potentially
prejudicial material that individual voir dire is
mandated.

[10] Jury ⟨key⟩131(7)
230 ----
230V Competency of Jurors, Challenges, and
Objections
230k124 Challenges for Cause
230k131 Examination of Juror
230k131(7) Formation and Expression of
Opinion.
Questions regarding content of any publicity to
which jurors have been exposed may be helpful in
assessing whether juror is impartial; however, such
questions are not constitutionally required, and trial
court's failure to ask such questions is not reversible
error unless defendant's trial is    *253    thereby
rendered fundamentally unfair.  U.S.C.A.
Const.Amend. 6.

[11] Jury ⟨key⟩131(13)
230 ----
230V Competency of Jurors, Challenges, and
Objections
230k124 Challenges for Cause
230k131 Examination of Juror
230k131(13) Mode of Examination.
Trial court in capital murder prosecution did not
abuse its discretion in denying individual,
sequestered voir dire of prospective jurors' exposure
to pretrial publicity; of prospective jurors
examined, approximately 25% had been exposed to
some pretrial publicity about case, including two
jurors who heard case, and one alternate, but those
jurors stated they could and would render impartial
verdict based solely on evidence presented at trial.

[12] Criminal Law ⟨key⟩1166.16
110 ----
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1166.5 Conduct of Trial in General
110k1166.16 Impaneling Jury in General.
There was no reversible error in trial court's
refusal to sequester jurors in capital murder
prosecution for questions about death penalty;
defendant was allowed to voir dire jurors
individually as to their attitude about death penalty,
and defendant did not show that failure to sequester
defeated impartiality of jury, nor that any juror was
exposed to potentially prejudicial information.

[13] Homicide ⟨key⟩163(2)
203 ----
203VII Evidence
203VII(B) Admissibility in General
203k163 Character and Habits of Parties
203k163(2) Character and Habits of Person
Killed or Assaulted.

[See headnote text below]

[13] Homicide ⟨key⟩165
203 ----
203VII Evidence
203VII(B) Admissibility in General
203k165 Personal Relations of Parties.
Even if capital murder defendant had objected to
testimony about victim's grandchildren's
photographs and victim's personality, character, and
family, on grounds that it was inadmissible victim
impact proof, that testimony was still admissible, as
it occurred in guilt phase of proceedings, was
relevant background evidence, and established
identity of bedroom wall photographs later offered

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

as evidence.

[14] Criminal Law ☞1153(1)
   110 ----
    110XXIV Review
     110XXIV(N) Discretion of Lower Court
      110k1153 Reception of Evidence
    110k1153(1) In General.
   Trial court's decision regarding admissibility of
photographs will not be reversed on appeal absent
clear showing of abuse of discretion.

[15] Criminal Law ☞438(6)
   110 ----
    110XVII Evidence
     110XVII(P) Documentary Evidence
      110k431 Private Writings and Publications
      110k438 Photographs and Other Pictures
       110k438(5) Depiction of Injuries or Dead
               Bodies
    110k438(6) Purpose of Admission.
   Postmortem photographs of murder victim were
relevant at guilt phase to issues of identity of
perpetrator and cause of death, and were necessary
to illustrate testimony of many of state's experts.
Rules of Evid., Rule 403.

[16] Sentencing and Punishment ☞1767
   350H ----
    350HVIII The Death Penalty
     350HVIII(G) Proceedings
      350HVIII(G)2 Evidence
       350Hk1755 Admissibility
       350Hk1767 Documentary Evidence.

   (Formerly 203k358(1))
   Postmortem photographs of murder victim were
relevant at sentencing in capital murder prosecution
to establish especially heinous, atrocious or cruel
aggravating circumstance; although photographs
were graphic in some respects, their probative value
was not substantially outweighed by their prejudicial
effect. Rules of Evid., Rule 403.

[17] Sentencing and Punishment ☞1767
   350H ----
    350HVIII The Death Penalty
     350HVIII(G) Proceedings
      350HVIII(G)2 Evidence
       350Hk1755 Admissibility
       350Hk1767 Documentary Evidence.

   (Formerly 203k358(1))
   Photograph showing how murder victim's skull
was crushed, which illustrated massive force used
against her, was relevant at sentencing stage of
capital murder prosecution to establish especially
heinous, atrocious or cruel aggravating
circumstance.

[18] Sentencing and Punishment ☞1764
   350H ----
    350HVIII The Death Penalty
     350HVIII(G) Proceedings
      350HVIII(G)2 Evidence
       350Hk1755 Admissibility
       350Hk1764 Demonstrative Evidence.

   (Formerly 203k358(1))
   Murder victim's cleaned, reconstructed skull was
highly relevant in capital murder prosecution to
establish identity; skull was used to illustrate

testimony of forensic anthropologist who had
reconstructed it, as he explained injuries and how he
had found "signature" for murder weapon.

[19] Criminal Law ☞338(7)
   110 ----
    110XVII Evidence
     110XVII(D) Facts in Issue and Relevance
      110k338 Relevancy in General
       110k338(7) Evidence Calculated to Create
               Prejudice Against or Sympathy for
               Accused.

   [See headnote text below]

[19] Homicide ☞163(1)
   203 ----
    203VII Evidence
     203VII(B) Admissibility in General
      203k163 Character and Habits of Parties
    203k163(1) Character and Habits of Accused.
   Testimony of capital murder defendant's two
previous sexual partners about his propensity to bite
his partner during sex was relevant to establish
identity of person who had raped and murdered
victim, who had bite marks on her body, and its
probative value was not substantially outweighed by
its prejudicial effect. Rules of Evid., Rules 403,
406.

[20] Criminal Law ☞475.7
   110 ----
    110XVII Evidence
     110XVII(R) Opinion Evidence
      110k468 Subjects of Expert Testimony
    110k475.7 Bitemarks.

   [See headnote text below]

[20] Criminal Law ☞476.6
   110 ----
    110XVII Evidence
     110XVII(R) Opinion Evidence
      110k468 Subjects of Expert Testimony
    110k476.6 Miscellaneous Matters.
   Forensic serologist's testimony concerning pattern
of blood spatterings in victim's bedroom, forensic
anthropologist's testimony concerning number of
blows victim suffered and type of murder weapon,
and forensic odontologist's testimony matching bite
marks on victim with defendant's dental patterns
was admissible in capital murder prosecution,
despite lack of absolute certainty in testimony of
those witnesses; expert testimony is often
speculative to some degree, and all three witnesses
were qualified as experts in their individual fields
without objection by defendant.

[21] Sentencing and Punishment ☞1780(2)
   350H ----
    350HVIII The Death Penalty
     350HVIII(G) Proceedings
      350HVIII(G)3 Hearing
       350Hk1780 Conduct of Hearing
       350Hk1780(2) Arguments and Conduct of
               Counsel.

   (Formerly 110k730(14), 110k723(1))
   In reviewing alleged *Caldwell* violation, court must
first determine whether prosecutor's comments to
jury were such that they would minimize jury's role
and sense of responsibility for determining

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

appropriateness of death as sentence and, if so, whether trial judge sufficiently corrected impression left by prosecutor.

[22] Criminal Law ⬙1171.1(6)
  110 ----
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1171 Arguments and Conduct of Counsel
          110k1171.1 In General
          110k1171.1(2) Statements as to Facts,
            Comments, and Arguments
          110k1171.1(6) Appeals to Sympathy or
            Prejudice; Argument as to
            Punishment.
  Even though prosecutor violated *Caldwell* at sentencing phase of capital murder prosecution by making comments tending to minimize jury's role and allowing jurors to feel that responsibility for determining appropriateness of death sentence rested elsewhere, error was harmless; prosecutor's stronger statements made up small part of extensive voir dire held over number of days and, therefore, were made several days before sentencing deliberations, trial judge did not endorse improper remarks, which defense counsel had allowed to pass without objection, and other portions of state's final argument correctly set forth responsibility of jury under Tennessee's capital sentencing    *253 procedure.

[23] Homicide ⬙358(1)
  203 ----
    203XI Sentence and Punishment
      203k358 Sentencing Procedure
      203k358(1) In General.
  Capital murder defendant's right against self-incrimination was not violated by trial court's denial of his motion for limited cross-examination at penalty phase of bifurcated trial; defendant testified in direct examination about night of murder and said that he could not remember anything after becoming drunk until he awoke next morning, and it was thus proper for prosecutor to inquire specifically into defendant's memory of next day, including physical condition of his clothing, car, and tools when he awoke. U.S.C.A. Const.Amend. 5.

[24] Witnesses ⬙305(2)
  410 ----
    410III Examination
      410III(D) Privilege of Witness
        410k305 Waiver of Privilege
        410k305(2) Waiver by Accused in Criminal
          Prosecutions.
  In limited sphere of death penalty sentencing hearing, capital defendant's testimony regarding mitigating factors that are wholly collateral to merits of charges against him does not operate as complete waiver of privilege against self-incrimination; accordingly, defendant has right to limited cross-examination if he or she wishes to testify about only collateral mitigating circumstances at penalty phase of capital trial. U.S.C.A. Const.Amend. 5.

[25] Witnesses ⬙277(1)
  410 ----
    410III Examination
      410III(B) Cross-Examination
        410k277 Cross-Examination of Accused in
          Criminal Prosecutions
      410k277(1) In General.

At sentencing phase of capital murder prosecution, defendant may be completely and thoroughly cross-examined about all testimony given or fairly raised by defendant on direct examination. U.S.C.A. Const.Amend. 5.

[26] Sentencing and Punishment ⬙1780(2)
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
          350Hk1780(2) Arguments and Conduct of
            Counsel.

  (Formerly 110k721(3))
  Prosecutor's comments during closing argument at sentencing phase of capital murder prosecution did not violate *Griffin*, which held that Fifth Amendment bars prosecutor from commenting to jury on defendant's failure to testify at trial; prosecutor's comments that defendant did not volunteer any information about or explain how his fingerprints came to be on window screen and light bulb at crime scene cast doubts on defendant's testimony that he was drunk or blacked-out at time of offense, as those comments described calculated and intentional acts that were necessary to break into victim's home.

[27] Sentencing and Punishment ⬙1633
  350H ----
    350HVIII The Death Penalty
      350HVIII(A) In General
        350Hk1631 Retroactive Operation
        350Hk1633 Effect of Amendment or Other
          Modification.

  (Formerly 110k1208.1(6))
  Where offense is committed before effective date of 1989 statutory amendment requiring jury to find that aggravating circumstances proven by state outweigh, beyond reasonable doubt, any mitigating circumstances before jury may impose sentence of death, but trial and sentencing occur after that effective date, trial court does not err by instructing jury under statute as it existed at time offense was committed. T.C.A. § 39-13-204(f).

[28] Homicide ⬙311
  203 ----
    203VIII Trial
      203VIII(C) Instructions
      203k311 Punishment.
  Jury instruction in capital murder prosecution on aggravating circumstance that "the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind" was properly given pursuant to statute in effect at time offense occurred, rather than pursuant to statute as amended in 1989. T.C.A. § 39-2-203(i)(5) (Repealed).

[29] Sentencing and Punishment ⬙1625
  350H ----
    350HVIII The Death Penalty
      350HVIII(A) In General
        350Hk1622 Validity of Statute or Regulatory
          Provision
        350Hk1625 Aggravating or Mitigating
          Circumstances.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

(Formerly 203k351)

Aggravating circumstance that murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind was not unconstitutionally vague, particularly because jury was properly instructed on meaning of terms used in statute. T.C.A. § 39-2-203(i)(5) (Repealed).

[30] Homicide ⚖══343

203 ----
  203X Appeal and Error
    203k333 Harmless Error
  203k343 Sentence.

Any error in capital murder prosecution in charging all statutory mitigating circumstances, rather than only those mitigating circumstances raised by proof, was harmless, as no prejudice to defendant was shown.

[31] Sentencing and Punishment ⚖══1740

350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)1 In General
        350Hk1738 Decision to Seek Death Penalty
        350Hk1740 Authority or Discretion of Prosecutor.

(Formerly 110k1208.1(6))

Prosecutor's unlimited discretion in selecting candidates for death penalty does not result in arbitrary and capricious imposition of death penalty.

[32] Homicide ⚖══343

203 ----
  203X Appeal and Error
    203k333 Harmless Error
  203k343 Sentence.

Court erred in instructing sentencing jury in capital murder prosecution on aggravating circumstance that murder occurred while defendant was engaged in committing felony, as that circumstance duplicated elements of underlying felony-murder crime and failed to narrow class of death-eligible murderers; however, error was harmless, as prosecution also proved aggravating circumstances that defendant had previous convictions of violent felony offenses, and that murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. T.C.A. § 39-2-203(i)(7) (Repealed); Const. Art. 1, § 16.

[33] Sentencing and Punishment ⚖══1788(6)

350H ----
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)4 Determination and Disposition
        350Hk1788 Review of Death Sentence
        350Hk1788(6) Proportionality.

(Formerly 110k1208.1(6), 110k1134(1))

Tennessee Supreme Court's review of capital case was constitutionally adequate to afford meaningful proportionality review, even though sentencing jury was not required to make written findings concerning mitigating circumstances; although no Rule 12 report was available, such report would contain far less information than entire record, which Supreme Court thoroughly reviewed.

[34] Sentencing and Punishment ⚖══1681

350H ----
  350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
      350Hk1681 Killing While Committing Other Offense or in Course of Criminal Conduct.

(Formerly 203k357(7), 203k357(4))

[See headnote text below]

[34] Sentencing and Punishment ⚖══1684

350H ----
  350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
      350Hk1684 Vileness, Heinousness, or Atrocity.

(Formerly 203k357(4), 203k357(11))

Imposition of death penalty upon felony-murder defendant was neither arbitrary, excessive, nor disproportionate to penalty imposed for similar crimes; evidence showed torture and depravity, as victim was repeatedly and with tremendous force, beaten in head with welder's chipping hammer, victim's skull was virtually shattered from force of numerous blows, and victim was raped at or near time of death. T.C.A. § 39-13-206(c)(1)(D).

**\*256** James V. Ball, Dwight Duncan, Memphis, for defendant-appellant.

Charles W. Burson, Atty. Gen. and Reporter, Merrilyn Feirman, Asst. Atty. Gen., Nashville, James C. Beasley, Jr., Asst. Dist. Atty. Gen., Memphis, for plaintiff-appellee.

*OPINION*

ANDERSON, Judge.

In this capital case, the defendant, Victor James Cazes, was convicted of first-degree felony murder in the perpetration of a rape, aggravated rape, and first-degree burglary. In the sentencing hearing, the jury found **\*257** three aggravating circumstances: (1) that the defendant was previously convicted of one or more violent felonies; (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) that the murder was committed while the defendant was engaged in committing a felony. Tenn.Code Ann. § 39-2-203(i)(2), (5), and (7) (1982). (FN1) The jury found that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances and sentenced the defendant to death by electrocution. The defendant was also sentenced to twenty-five years and six years, respectively, for the aggravated rape and first-degree burglary.

On appeal, the defendant raises numerous issues for our review which involve alleged errors occurring during both the guilt and sentencing phases of trial. We have carefully considered the defendant's contentions as to errors occurring during the guilt phase and have decided that none have merit. We therefore, affirm the defendant's convictions.

As to the alleged errors occurring during the sentencing phase, we conclude that only one has merit--that application of the aggravating

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

circumstance set forth in Tenn.Code Ann.    §
39-2-203(i)(7), the murder occurred while the
defendant was engaged in committing a felony, is
invalid. That is so because it essentially duplicates
the elements of the offense of first-degree felony
murder and does not narrow the population of death-
eligible felony murder defendants, as required of an
aggravating circumstance under the Tennessee and
United States Constitutions. (FN2)

After carefully reviewing the record, however, we
conclude that the submission of the invalid felony
murder aggravating circumstance for jury
consideration in this case is harmless error beyond a
reasonable doubt. We, therefore, affirm the
defendant's sentence of death.

### FACTUAL BACKGROUND

The State's proof introduced at the guilt phase of
trial demonstrated that on Sunday morning, April
24, 1988, the body of Gladys Skinner, an older
woman (FN3) who lived alone, was found in her
home in the Frayser area of Memphis. She had last
been seen alive late Saturday night by Ben Harris, a
friend who brought her home from a card game.
After checking Ms. Skinner's house to make sure
everything was "safe and secure," Harris left around
12:10 a.m.

The next morning, because her telephone was busy
each time they called, Gladys Skinner's daughter
and grandson went to her house to check on her.
When they arrived, they noticed that a front window
screen had been removed, that the window was
broken, that blood was on the window blinds, and
that the doors to the house were locked. The
grandson and a neighbor entered the house through
the front window and found Gladys Skinner's body
lying beneath some bedcovers on the bedroom floor,
between the bed and the wall. The wall next to the
bed was spattered with blood as were several
pictures from the wall that lay broken on the floor.
Blood also stained the floor and the fitted sheet on
the bed. While the bedroom had been ransacked,
nothing of value was missing from the house.

*258 Gladys Skinner's nude body was lying face
down, her knees underneath her with her buttocks
"jacked up off the floor" and her legs spread apart.
Scrape marks were found on her inner legs and
vagina. Her right breast had been bitten and her left
breast was scraped. Dilation of the vagina and
rectum demonstrated penetration at or after the time
of death; however, no sperm were found.
Numerous marks and bruises were found on her
body, including defensive wounds to her arms and
hands, and a large bruise on her back that the proof
indicated could have been caused by a fist.

The Shelby County medical examiner testified that
the victim's death was caused by skull injuries that
were inflicted by multiple blows to the head with a
blunt instrument, like a welder's chipping hammer.
According to the medical examiner and a forensic
anthropologist who examined the skull, the number
of blows had ranged from eight to fifteen and the
skull had been "virtually shattered" by the force of
the blows. Their proof showed that one or more of
these injuries would have caused death within
minutes to an hour, but the victim would not
necessarily have lost consciousness immediately. A

forensic serologist's testimony indicated that the
assault may have continued for some time. The
serologist testified that some blows may have been
struck after the blood from some of the wounds had
begun clotting, and that it takes three to fifteen
minutes for blood to clot outside the body.

At the time of the murder, the defendant, Victor
Cazes, a welder, worked sporadically as a
handyman at an automotive repair garage owned by
Michael Lucas, Gladys Skinner's step-grandchild.
Before the murder, Cazes had been to Gladys
Skinner's house two or three times to work on her
car. On Saturday night, April 23, 1988, Cazes
attended a birthday cookout at Lucas's home, which
was a few blocks from Skinner's house. He left the
gathering alone around 10 or 11 p.m.

Circumstantial evidence tied the defendant, Victor
Cazes, to the offense. His finger and palm prints
were found on the front window screen and frame.
Two of his fingerprints were lifted from a light bulb
beside the back door and fresh pry marks were
found on the backdoor. Gladys Skinner routinely
left this back light on at night, and it was on when
Ben Harris left her house shortly after midnight
Sunday morning. When her body was found, the
light was off and the bulb was loose in its socket, as
if it had been unscrewed.

Michael Lucas testified that Victor Cazes owned
two or three chipping hammers, which Lucas
described as blunt instruments made entirely of steel
with a point on one end, a chisel flat on the other
end, and a coil-wired handle. A forensic
anthropologist testified that a pattern of depressions
located in the involved portion of the victim's skull
were consistent with ridges on the striking surface of
a particular welder's chipping hammer owned by
Cazes. The hammer had been crafted into a metal
knick-knack by Cazes after the crime and given to a
friend's mother. The forensic serologist also
testified that a transfer blood stain on the victim's
bedsheet was caused by contact with a wet, bloody
object which was consistent with the size and shape
of this same chipping hammer and another like it
that Cazes had left at the home of his friend's
mother.

Dr. Richard Souviron, a forensic odontologist,
testified that, based upon his comparison of the bite
marks on Gladys Skinner's breast with molds and
models of Cazes' teeth, he had concluded to a
reasonable degree of dental certainty that Cazes'
teeth had made the bite marks on the victim's body
at or about the time of her death. Another forensic
odontologist, Dr. Harry Mincer, testified that the
defendant Cazes could have made the bite marks on
the victim. Two women who had engaged in sexual
intercourse with Cazes testified that he had also
bitten them, and that the victim's body position was
one he preferred during sex.

The defendant presented no proof.

Based on this evidence in the guilt phase, the jury
found the defendant, Victor Cazes, guilty of first-
degree felony murder in the perpetration of a rape,
and also guilty of aggravated rape and first-degree
burglary.

In the sentencing phase of the trial, the State relied

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

upon the evidence presented during the guilt phase and also introduced **\*259** records of the defendant's previous convictions in Shelby County, Tennessee, in February 1990 for "assault to murder first degree with bodily injury" and for aggravated rape.

In mitigation, the defendant introduced medical records from the period of his incarceration in the Shelby County Jail to show that he had required medical treatment on several occasions as a result of fights, and that he had been placed on suicide watch twice while incarcerated. An acquaintance testified that the defendant was a heavy user of alcohol, marijuana and cocaine, and that he sometimes could not remember what he had done while he was intoxicated.

The defendant and two of his brothers testified about his background. One of twelve children, the defendant had been unable to control his urination until he was twenty. He testified that his father had beaten him when he was young. One brother described the defendant as "hot-tempered" and "always fighting." The defendant said that he fought because other people would tease him when he wet on himself. In the seventh grade, after being arrested for truancy, the defendant set fire to his jail cell. He underwent a psychiatric examination and was sent to reform school, where the fights continued. After his release from reform school, the defendant married twice. He has one child from his second marriage. The defendant had worked for a substantial wage as a welder in Louisiana, and a brother described him as a "hard-working man." The defendant testified he began drinking after his first divorce and admitted using various drugs and flying into rages.

As to the crime itself, the defendant testified that on Saturday night, April 23, 1988, he was "full of it" and "well on [his] way" to being drunk when he left the cookout at Michael Lucas's home. After leaving the cookout, he drank a bottle of Jim Bean on his way to a bar where he "got totally drunk." He stated that he remembered nothing more about the night.

Dr. Wyatt Nichols, a clinical psychologist, testified that while the defendant was competent to stand trial and not legally insane, there were signs to indicate psychological problems. Dr. Nichols specifically mentioned the defendant's long history of chemical dependency and multiple drug abuse. He also suggested that the defendant might have an impulse control problem which, along with the history of bedwetting, was possibly indicative of minimal neurological damage.

Based on the proof, the jury found the existence of three aggravating circumstances beyond a reasonable doubt, which were: (1) that the defendant had been previously convicted of violent felony offenses; (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) that the murder was committed while the defendant was engaged in committing a felony. Tenn.Code Ann. § 39-2-203(i)(2), (5), and (7) (1982). In addition, the jury found that the mitigating circumstances were not sufficiently substantial to outweigh the aggravating circumstances and as a result, sentenced the

defendant to death.

## PART I.

### GUILT PHASE--TRIAL ERRORS

#### A. Sufficiency of the Proof

The defendant first argues that the evidence is insufficient to support the jury's verdict of rape and therefore, insufficient to support a verdict of murder during the perpetration of rape, because the victim was dead at the time of penetration.

[1][2] It is well-established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the state, and removes the presumption of innocence.        *State v. Harris,* 839 S.W.2d 54, 75 (Tenn.1992). Where the sufficiency of the convicting evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.   Tennessee Rule of Appellate Procedure 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The medical examiner testified that the dilation of the vagina and anus indicated that **\*260** penetration occurred at the time of death, within a matter of minutes of death, or shortly after death.

This Court, in *State v. Brobeck,* 751 S.W.2d 828, 830-832 (Tenn.1988), held that a defendant is guilty of aggravated rape when the proof shows that, through use of force or coercion with a weapon, unlawful sexual penetration occurs at the time of death or shortly thereafter. Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the elements of the rape beyond a reasonable doubt.

We also find the evidence sufficient to establish murder in the perpetration of a rape. A conviction may be based entirely on circumstantial evidence "where facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone.' " *State v. Howell,*        868 S.W.2d 238, 253 (Tenn.1993). Here, the facts established by circumstantial evidence unerringly point the finger of guilt at the defendant alone.

#### B. Impartiality of Trial Judge

The defendant next insists that the trial judge displayed hostility and bias against him and his counsel as well as an indifference to the heightened standards of due process applicable in a capital case.

[3] It is well-established that a trial judge has broad discretion in controlling the course and conduct of the trial, and that in exercising that discretion, he or she must be careful not to express any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial. *State v. Caughron,* 855 S.W.2d 526, 536 (Tenn.1993).

[4] As an example of the trial judge's alleged bias,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Cazes points to occasions during voir dire when the trial judge refused to allow his counsel to approach the bench, refused to allow defense counsel to ask a question previously asked on voir dire, and instructed defense counsel not to address a prospective juror by her first name.

Initially, the record demonstrates that the trial judge did not allow either the prosecution or the defense to approach the bench routinely, or to ask repetitive questions of prospective jurors. Moreover, instructing defense counsel to refrain from calling a prospective juror by her first name was entirely proper. The record shows no bias was shown against the defendant or his counsel by the trial judge.

[5] Finally, the record does not support the defendant's claim that the trial judge did not appreciate the heightened due process applicable in capital cases. As examples of judicial insensitivity, the defendant points to occasions when the trial judge admonished defense counsel that all trials were the same, capital or otherwise, and require that an attorney be prepared to go to trial on the appropriate date, and that "press of business" is not a good cause for granting a continuance. In another setting the statement that a capital trial is no different from a misdemeanor trial is surely insensitive and inaccurate, in view of the heightened reliability required and the gravity of the ultimate penalty in capital cases. Taken in the context used, however, these and other comments by the trial judge do not demonstrate a mindset so indifferent to the requirements of the Eighth Amendment as to deny the defendant a fair trial.

### C. Motion for Continuance

[6] The defendant charges that the trial court erred by denying his motions for a continuance and request for expert services.

The history of defendant's representation shows that the Shelby County Public Defender's Office was originally appointed to represent him in November 1989. A trial date was first set for February 1990, but at the defendant's request, the case was continued and then reset and continued several times thereafter. On July 9, 1990, after serious conflicts developed between the defendant and his public defender attorney, the trial judge appointed two private attorneys. The public defender's office provided its files to the newly appointed attorneys, and by agreement the trial was set for September 10, 1990.

**\*261** Twelve days before trial the defendant filed a motion for a continuance and for advance expenses to hire fingerprint, pathological and dental experts to "attempt to counter" the State's expert proof, and to employ an expert to investigate whether the pretrial publicity justified a change of venue. The trial court denied the motion because of the length of time the case had been pending and because the defendant had not complied with Supreme Court Rule 13, § 2(B)(10), which requires specific information as to the prospective expert's name, examination date, place, and cost.

The judge, however, with the agreement of counsel continued the trial another two weeks to

September 24, 1990. On Wednesday, September 19, the defendant filed a motion to set an ex parte hearing to determine the necessity of investigative or expert services under Tenn.Code Ann.                      § 40-14-207(b), and for a continuance to retain and utilize any experts approved. The record reflects that the trial judge informed defendant's counsel over his objection that the ex parte hearing would be held the next day, Thursday, with the trial set to begin on the following Monday. At the ex parte hearing, the defendant renewed his request for fingerprint, dental and pathology experts and for the first time requested psychiatric, psychological or neurological experts. Defense counsel explained that the delay in the request for new experts was a result of the need to interview persons in Louisiana, defendant's initial unwillingness to open up to counsel, and counsel's busy schedule.

No evidence was presented at the ex parte hearing to demonstrate the need for these experts, except a statement by counsel indicating the possibility that the defendant had been molested while in jail on truancy charges. The trial court denied the motion on the grounds that numerous prior continuances had been granted at the defendant's request, and because defendant had not complied with Supreme Court Rule 13, § 2(B)(10).

[7] We observe that the decision to grant or deny a motion for continuance rests within the sound discretion of the trial judge and will only be reversed upon a clear showing of abuse of that discretion and prejudice inuring to the accused as a direct result of the court's ruling.   *Caughron,* 855 S.W.2d at 534;  *State v. Melson,*  638 S.W.2d 342, 359 (Tenn.1982). Likewise, the determination of whether provision of expert services to an indigent capital defendant is necessary to ensure that the constitutional rights of the defendant are properly protected is entrusted to the discretion of the trial court. Tenn.Code Ann.   § 40-14-207(b) (1990 & Supp.1992).

As to the motion for a continuance, the defendant has failed to show an abuse of discretion. The public defender's office had been handling the case thirteen months when present counsel was appointed. Many continuances had already been granted at the defendant's request. Out-of-state witnesses were scheduled to testify on behalf of the State and arrangements had already been made to accommodate these witnesses. We conclude that the trial court was acting within its broad discretion in denying the defendant's motion for a continuance.

Moreover, the trial court did not abuse its discretion in denying the defendant's request for expert services. Although compliance with Supreme Court Rule 13 is not mandatory when a defendant makes a specific showing at the ex parte hearing that expert services are necessary to protect an indigent defendant's constitutional rights, there was no such showing made by the defendant here. The defendant's request for expert services was accompanied by little more than undeveloped assertions that the services were needed to attempt to counter the State's proof, and by the possibility that the defendant had been molested as a juvenile while in jail and needed further evaluation.  *See Caldwell v. State,* 443 So.2d 806, 812 (1983);  *see also Ake*

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

*v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (When an indigent defendant demonstrates to the trial judge that his mental condition will be a significant issue in either the guilt or penalty phase of a capital trial, the State must provide the defendant access to one competent psychiatrist). (FN4)

**\*262 *D. Individual Sequestered Voir Dire***

The defendant next faults the trial court for not granting individual sequestered voir dire of the jury panel on both pretrial publicity and the death penalty. He also insists that the trial court's failure to allow him to question prospective jurors about their attitudes towards capital punishment impaired his right to intelligently exercise peremptory challenges.

[8] The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court. *Howell,* 868 S.W.2d at 247.

[9][10] Where the crime is highly publicized, the better procedure is to grant the defendant individual, sequestered voir dire, but it is only where there is a "significant possibility" that a juror has been exposed to potentially prejudicial material that individual voir dire is mandated. *Harris,* 839 S.W.2d at 65; *State v. Porterfield,* 746 S.W.2d 441, 447 (Tenn.1988). Likewise, questions regarding the content of any publicity to which jurors have been exposed may be helpful in assessing whether a juror is impartial. However, such questions are not constitutionally required, and a trial court's failure to ask such questions is not reversible error unless the defendant's trial is thereby rendered fundamentally unfair. *Mu'Min v. Virginia,* 500 U.S. 415, ----, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493 (1991).

[11] There is no indication in this record that the trial court abused its discretion in denying individual, sequestered voir dire of prospective juror exposure to pretrial publicity. Of the prospective jurors examined, approximately twenty-five percent had been exposed to some pretrial publicity about this case, including two of the jurors who heard the case, and one alternate. However, those jurors stated that they could and would render an impartial verdict based solely on the evidence presented at trial. A trial court's findings of juror impartiality may be overturned only for "manifest error." *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984). There is no such error in this record.

[12] Moreover, we find no reversible error in the trial court's refusal to sequester jurors for questions about the death penalty. The record shows that the defendant was allowed to voir dire jurors individually as to their attitude about the death penalty. The defendant has not established that the failure to sequester defeated the impartiality of the jury, nor that any juror was exposed to potentially prejudicial information. *State v. Smith,* 857 S.W.2d 1, 20 (Tenn.1993); *Porterfield,* 746 S.W.2d at 447.

*E. Admission of Evidence*

[13] The defendant next complains that the trial court erred in several respects in admitting certain evidence at trial. First, he contends that Ben Harris's testimony with respect to the victim's grandchildren's photographs and the victim's personality, character, and family was inadmissible as victim impact proof. The defendant did not contemporaneously object to this testimony.

Had there been an objection, the testimony complained of was still admissible because it occurred in the guilt phase of the proceedings, was relevant background evidence, and established the identity of the bedroom wall photographs later offered as evidence. *Cf.    State v. Miller,* 771 S.W.2d 401, 403 (Tenn.1989). We find this issue without merit.

[14] The defendant next argues that post-mortem photographs of the victim were improperly admitted because their prejudicial effect substantially outweighed their probative value. Specifically, the defendant points to separate photographs showing the victim's head injuries, breast bite marks, her body position at the scene, defensive wounds on her arms, and the dilation of the vagina and anus. We are guided by the rule that a trial court's decision regarding the admissibility of photographs will not be reversed on **\*263** appeal absent a clear showing of an abuse of discretion. *Harris,* 839 S.W.2d at 73.

[15][16][17] At the guilt phase, the photographs were relevant to the issues of the identity of the perpetrator and the cause of death, as well as necessary to illustrate the testimony of many of the State's experts. At sentencing, the photographs were relevant to establish the especially heinous, atrocious or cruel aggravating circumstance. A photograph showing how the victim's skull was crushed, which illustrated the massive force used against the victim, was properly introduced on that issue at sentencing as well. *State v. McNish,* 727 S.W.2d 490, 494-95 (Tenn.1987). Although the photographs were graphic in some respects, their probative value was not substantially outweighed by the prejudicial effect. Accordingly, we conclude that the photographs were properly admitted pursuant to Tennessee Rule of Evidence 403 and *State v. Banks,* 564 S.W.2d 947, 949 (Tenn.1978).

[18] The defendant next argues, on the same grounds, that the trial court abused its discretion in admitting into evidence the victim's cleaned and reconstructed skull. The skull was used to illustrate the testimony of the forensic anthropologist who had reconstructed it, as he explained the injuries and how he had found a "signature" for the murder weapon. The cleaned, reconstructed skull was highly relevant in establishing identity. The issue is without merit. *See    State v. Morris,* 641 S.W.2d 883, 888 (Tenn.1982).

[19] Equally without merit is the defendant's contention that the testimony of his two previous sexual partners about his propensity to bite his partner during sex was inadmissible. This evidence was relevant to establish the identity of the person who had raped and murdered the victim, and its probative value was not substantially outweighed by its prejudicial effect. *Banks,* 564 S.W.2d at 949; Tenn.R.Evid. 403 and 406.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[20] Finally, the defendant objected to the admissibility of the expert testimony--namely, the testimony of the forensic serologist concerning the pattern of the blood spatterings in the bedroom; the proof of the forensic anthropologist concerning the number of blows and type of murder weapon; and the testimony of Dr. Souviron, the forensic odontologist, matching the bite marks on the victim with the defendant's dental patterns. The defendant argues that the testimony of the serologist and anthropologist was speculative, and that the science of comparing bite mark patterns has not advanced to the level of certainty that is characteristic of fingerprinting.

The admissibility of expert testimony, its relevancy and competency are matters resting within the sound discretion of the trial court. Such testimony is often speculative to some degree. The jury was properly instructed on the speculative nature of expert proof. The lack of absolute certainty in the testimony of these witnesses, all three of whom were qualified as experts in their individual fields without objection by the defendant, did not preclude their testifying. *See Harris,* 839 S.W.2d at 69-70.

### PART II.

### SENTENCING

#### A. Caldwell Error

[21] The defendant argues that several remarks by the prosecutor during voir dire, opening statement, and closing argument at the sentencing phase of the trial violated the principles of        *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In reviewing an alleged *Caldwell* violation, this Court must first determine whether the prosecutor's comments to the jury were such that they would minimize the jury's role and sense of responsibility for determining the appropriateness of death as a sentence and, if so, whether the trial judge sufficiently corrected the impression left by the prosecutor.    *State v. West,* 767 S.W.2d 387, 399 (Tenn.1989).

[22] We have reviewed the record and agree with the defendant that such prosecutor's statements as "the law says its not your decision anymore" and "you're not making the finding of the death penalty. You're finding fact," and "the verdict is automatic," and "the law book says what the verdict shall be," arguably violate *Caldwell.* Such statements **\*264** tend to minimize the jury's role and allow the jurors to feel that the responsibility for determining the appropriateness of the death sentence rests elsewhere. *West,* 767 S.W.2d at 399.

First, however, we note that the stronger statements made up a small part of an extensive voir dire held over a number of days and, therefore, were made several days before the sentencing deliberations. Moreover, unlike the court in *Caldwell,* the trial judge in this case did not endorse the improper remarks, which defense counsel here had allowed to pass without objection. In addition, other portions of the State's final argument correctly set forth the responsibility of the jury under Tennessee's capital sentencing procedure, and the defendant's final argument repeated and re-enforced the State's correct argument. Finally, the trial

court, after argument, correctly instructed the jury immediately before they began deliberations as to their responsibility for determining the appropriateness of the death sentence under the law. *See West,* 767 S.W.2d at 399-400. For the foregoing reasons, we find the        *Caldwell* error harmless beyond a reasonable doubt. *Id.* at 400.

#### B. Right of Limited Cross-Examination

[23] After the guilt hearing and prior to the penalty phase of this bifurcated trial, defense counsel moved that the State be prohibited from cross-examining the defendant during the sentencing hearing with regard to the circumstances of the offense. The defendant insisted that such a ruling would be proper if he chose to take the witness stand for the limited purpose of testifying about mitigating factors unrelated to evidence of the crime for which he had been convicted. The State argued that cross-examination should be permitted on all matters relevant to sentencing, including the circumstances of the offense. The trial court agreed with the State and denied the motion.

The defendant, against the advice of counsel, testified at the sentencing hearing. During direct examination he said that he had been drunk the night of the murder and remembered nothing until he awoke Sunday morning. On cross-examination, the prosecuting attorney inquired about the defendant's reaction when he awoke on Sunday to find blood on his clothes, car, and tools. The defendant asserted his innocence and denied that there had been any blood on his clothing the morning after the crime. During closing argument, the prosecutor questioned the defendant's statement that he would black-out when he became drunk and that he had done so on the night of the murder. The prosecutor also skeptically pointed out that the defendant did not volunteer any information about or explain how his fingerprints came to be on the window screen and lightbulb at the crime scene.

The defendant contends in this appeal that the trial court erred by overruling his motion for limited cross-examination. He asserts that he retains his Fifth Amendment privilege not to incriminate himself by discussing the circumstances of the offense if he testifies only about his background and other mitigating circumstances unrelated to the offense itself. Relying on    *Lesko v. Lehman,*  925 F.2d 1527, 1542 (3d Cir.), *cert. denied*  502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991), the defendant also argues that the prosecutor's remarks during closing argument violated his state and federal constitutional rights against self-incrimination under *Griffin v. California,*  380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which held that the Fifth Amendment bars a prosecutor from commenting to the jury on the defendant's failure to testify at trial.

While agreeing that the trial court erred, the State argues that any error was harmless because the defendant was only questioned on cross-examination about matters that he reasonably raised during direct. The State further contends that the prosecutor's remark was not error because the defendant had attempted to explain some facts regarding the night of the murder, thereby waiving his *Griffin* rights on the subject.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, *see Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653 (1964), provides that "[n]o person ... shall be compelled in any criminal case to be a witness against **\*265** himself." The United States Supreme Court has held that the Fifth Amendment right against self-incrimination applies to a capital sentencing proceeding. *See Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

In *Estelle,* a psychiatrist testified for the state during the penalty phase, relating statements made by the defendant during a psychiatric examination, despite the fact that the defendant had not been advised of his*Miranda* rights before the examination. The Court ruled that the testimony violated the defendant's Fifth Amendment privilege against self-incrimination, stating that " 'the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.' " *Id.,* 451 U.S. at 462, 101 S.Ct. at 1873 (quoting *In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967)). The Court concluded that "[g]iven the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental guarantees." *Id.,* 451 U.S. at 462-63, 101 S.Ct. at 1873.

While this Court has never expressly addressed the specific self-incrimination issues raised here by the defendant, the United States Supreme Court held in *Harrison v. United States,* 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968), that "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination *with respect to the testimony he gives....*" (Emphasis added.) *See also Caminetti v. United States,* 242 U.S. 470, 494, 37 S.Ct. 192, 198, 61 L.Ed. 442 (1917) (It is permissible for the prosecutor or the court to advise the jury that it may draw an adverse inference from the defendant's silence when the defendant has testified as to some facts concerning the crime charged, but has refused to testify as to other facts within his knowledge). Similarly, our own intermediate Court of Criminal Appeals has ruled that:

A witness cannot discontinue testimony as to transactions already disclosed by the witness. Once he discloses a fact, though incriminatory, he must testify with respect to the details of that fact.... A witness who testifies on direct examination is bound to answer questions on cross-examination *with respect to the testimony that he gave on direct.*

*State v. Stapleton,* 638 S.W.2d 850, 855 (Tenn.Crim.App.1982) (Emphasis added).

*Harrison* and *Stapleton* emphasize that a defendant can waive the privilege against self-incrimination *regarding certain subjects* by discussing those subjects on direct examination. Other cases have decided more broadly "that once a defendant takes the witness stand he waives his Fifth Amendment privilege and makes himself liable to cross-examination as an ordinary witness." *United States v. Weber,* 437 F.2d 327, 334 (3d Cir.1970), *cert.*

*denied,* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971). *See also People v. Szabo,* 113 Ill.2d 83, 100 Ill.Dec. 726, 731, 497 N.E.2d 995, 1000 (1986), *cert. denied,* 479 U.S. 1101, 107 S.Ct. 1330, 94 L.Ed.2d 181 (1987) (testimony at sentencing hearing limited to defendant's good behavior since incarceration was subject to impeachment).

In *Lesko, supra,* 925 F.2d at 1542, however, the Third Circuit Court of Appeals held that a defendant's penalty phase testimony about mitigating factors that are wholly collateral to the charges against the individual does not operate as a complete waiver of the defendant's self-incrimination privilege or rights under *Griffin.* Explaining the rationale for its position, the *Lesko* court concluded:

Without the protection of *Griffin,* a capital defendant in the penalty phase of his trial could avoid prosecutorial comment about his failure to address the charges against him only at the price of not providing what may be his "life or death" testimony about collateral mitigating circumstances. This is too high a price to require the accused to pay for the maintenance of his fifth amendment privilege.

*Lesko,* 925 F.2d at 1543.

Significantly, the *Lesko* court recognized the interplay between the defendant's asserted right to be subjected to only limited cross-examination at the sentencing hearing and the defendant's Eighth Amendment right to **\*266** present evidence in mitigation of the crime for which that defendant stands convicted. As we have previously held, a sentencer in a capital case "must not be precluded from considering any relevant mitigating evidence." *State v. Thompson,* 768 S.W.2d·239, 251 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990). Likewise, the United States Supreme Court has recognized that the Eighth Amendment to the United States Constitution "*requires* States to allow consideration of mitigating evidence in capital cases." *McKoy v. North Carolina,* 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990) (emphasis in original). *See also Boyde v. California,* 494 U.S. 370, 377-78, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990). Moreover, as stated in *McKoy:*

Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, ...; by the sentencing court, ...; or by an evidentiary ruling,.... Whatever the cause, ... the conclusion would necessarily be the same: "Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett* [*v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973], it is our duty to remand this case for resentencing." *Eddings v. Oklahoma,* 455 U.S. [104] at 117, n. [102 S.Ct. 869, 878, n. 71 L.Ed.2d 1] ... (O'Connor, J., concurring)."

*McKoy v. North Carolina, supra,* (quoting *Mills v. Maryland,* 486 U.S. 367, 375, 108 S.Ct. 1860, 1865-66, 100 L.Ed.2d 384 (1988)) (citations omitted).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[24][25] We agree with the analysis set forth in *Lesko* that recognizes both the Fifth Amendment and Eighth Amendment implications raised in a decision whether to permit only limited cross-examination of a defendant at a capital sentencing hearing. Although we recognize the general Tennessee rule that "[a] witness may be cross-examined on any matter relevant to any issue in the case ...," Tenn.R.Evid. 611(b), we are also cognizant of the gravity of a capital sentencing proceeding and the constitutional mandate to ensure that all relevant mitigating circumstances be presented to a sentencing body. We thus conclude that, only in the limited sphere of a death penalty sentencing hearing, a capital defendant's testimony regarding mitigating factors that are wholly collateral to the merits of the charges against him does *not* operate as a complete waiver of the privilege against self-incrimination. (FN5) Accordingly, a defendant has a right to limited cross-examination if he or she wishes to testify about only collateral mitigating circumstances at the penalty phase of a capital trial. We reiterate, however, that even in such special situations, a defendant may be completely and thoroughly cross-examined about all testimony given or fairly raised by that defendant on direct examination.

Applying that rule to the present case, it is clear that the trial court's failure to limit cross-examination of the defendant did not result in prejudicial error. The defendant testified on direct examination about the night of the murder and said that he could not remember anything after becoming drunk until he awoke the next morning. It was, therefore, not error for the prosecutor to inquire specifically into the defendant's memory of the next day, including the physical condition of his clothing, car, and tools when he awoke. In view of the defendant's testimony during direct examination, the inquiries propounded by the prosecutor were proper.

[26] We further conclude that the comments made by the prosecutor during closing argument did not violate the principles set forth in *Griffin.* The United States Supreme Court has held that *Griffin* does not prohibit a prosecutor from commenting on a defendant's silence, if such comment is a fair response *267 to a position taken by either the defendant or defense counsel. *See United States v. Robinson,* 485 U.S. 25, 31-33, 108 S.Ct. 864, 868-70, 99 L.Ed.2d 23 (1988). Here, the prosecutor cast doubt on the defendant's testimony that he was drunk or blacked-out at the time of the offense by describing the calculated and intentional acts that were necessary to break into the victim's home. In addition, the prosecutor argued that the defendant "you know, didn't volunteer anything, you know, explain the fingerprints on the screen and things of that nature, which I thought was somewhat amazing." We conclude that such comments constitute, in this case, a fair response to the defendant's claim of innocence and his claim of memory loss.

### C. Instructional Errors

[27] The defendant challenges the jury instructions given at sentencing on five general grounds. Because only one of the alleged grounds for relief is contained in the defendant's motion for new trial, the State argues that the defendant has waived most of these challenges. We, however, have elected to

consider the five issues raised on the merits as set out below.

First, the defendant argues that the trial court erred in charging the jury according to the statute that existed at the time of the offense on the grounds that the defendant is entitled to have the jury charged according to the statute which is in effect at the time of sentencing. The offense occurred in 1988, and the statute in effect at that time required the jury to find that any aggravating circumstances were not outweighed by any mitigating circumstances in order to impose a death sentence. The sentencing occurred in 1990 and the statute, as amended in 1989, now requires the jury to find that the aggravating circumstances proven by the State outweigh, beyond a reasonable doubt, any mitigating circumstances before the jury may impose a sentence of death. Tenn.Code Ann. § 39-13-204(f) (1991).

We recently held in *State v. Brimmer,* --- S.W.2d ---- (Tenn.1994), that where an offense is committed before the effective date of the same 1989 amendment involved in this case, but the trial and sentencing occur after that effective date, a trial court does not err by instructing the jury under the statute as it existed at the time the offense was committed. Here, under the rationale of *Brimmer,* because the offense occurred in April of 1988, and the defendant was sentenced in 1990, the jury instruction under the pre-1989 statute was appropriate. This issue is without merit.

[28][29] Equally without merit is the defendant's complaint that the trial court erred by instructing the jury under the pre-1989 statute with regard to the aggravating circumstance that "the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind." Tenn.Code Ann. § 39-2-203(i)(5) (1982). The 1989 amended version provides that "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39-13-204(i)(5) (1991). Again, under our recent holding in *Brimmer,* instruction pursuant to the statute in effect at the time the offense occurred is entirely *proper.* We also find no merit in the defendant's argument that the aggravating circumstance set forth at Tenn.Code Ann. § 39-2-203(i)(5) (1982), is unconstitutionally vague. This Court has previously and repeatedly upheld the validity of this aggravating circumstance in the face of similar attacks, particularly where, as here, the jury has been properly instructed on the meaning of the terms used in the statute in accordance with *State v. Williams,* 690 S.W.2d 517, 526-30 (Tenn.1985). *See State v. Black,* 815 S.W.2d 166, 181 (Tenn.1991).

[30] The defendant next assigns as error the trial court's action in charging all statutory mitigating circumstances and refusing to charge non-statutory mitigating circumstances. We have in the past been critical of the practice of indiscriminately charging all statutory mitigating circumstances and have suggested instead that trial courts instruct juries only on those mitigating circumstances raised by the proof. *See Smith,* 857 S.W.2d at 15; *State v. Buck,* 670 S.W.2d 600, 608 (Tenn.1984). In the absence

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

of a showing of prejudice, however, any such error does not require reversal because the error generally **268** benefits the defendant. . *Smith, supra.*    No prejudice has been shown in this case.

The trial court did not commit error when it refused to charge nonstatutory mitigating circumstances as requested by the defendant. We have repeatedly held that:

> ... the only mandatory instructions with respect to mitigating circumstances are that those *statutory* circumstances which are raised by the evidence shall be expressly charged, and the jury must be told that they shall weigh and consider any other facts or circumstances that are raised by the evidence that they find to be mitigating circumstances, in making the determination of which circumstances, aggravating or mitigating, outweigh the other.

*Smith,* 857 S.W.2d at 15 (quoting from  *State v. Hartman,* 703 S.W.2d 106, 118 (Tenn.1985) (emphasis added)). The jury instructions in this case were in accord with the directives of     *Smith* and *Hartman.*

#### D. Prosecutorial Discretion in Seeking the Death Penalty

[31] The defendant argues that the prosecutor's unlimited discretion in selecting candidates for the death penalty results in arbitrary and capricious imposition of the death penalty and renders the entire process unconstitutional. This argument was rejected by the United States Supreme Court in *Gregg v. Georgia,*  428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976), in which the Court held that opportunities for discretionary action occurring during the processing of a murder case, including the authority of the state prosecutor to select those persons for whom he wishes to seek capital punishment do not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty arbitrary or freakish. We apply that rule in this case.  *Cf, Cooper v. State,* 847 S.W.2d 521, 536 (Tenn.Crim.App.1992) (discussing prosecutorial discretion in relation to a post-conviction challenge by a capital defendant).

#### CONSTITUTIONAL CHALLENGES

Out of an abundance of caution, the defendant next raises a number of issues that he says either render the Tennessee death penalty statute unconstitutional or result in the arbitrary and capricious imposition of the death penalty. Most of the arguments advanced by the defendant have been repeatedly rejected by this Court; therefore, we find it unnecessary to again discuss in detail the reasons for our holdings. For the resolution of those issues we rely upon the authority cited below.

The following arguments raised by the defendant were rejected in *Smith, supra:*

(1) the qualifiers "extreme" and "substantially" as used in the statutory mitigating circumstances set forth at Tenn.Code Ann.  § 39-2-203(j)(2) and (8) (1982), unconstitutionally limit the jury's consideration of relevant mitigating evidence;

(2) the "anti-sympathy" instruction violates a defendant's Eighth Amendment rights;

(3) the absence of an instruction advising the jury that the purpose of the weighing process is to determine whether death is the appropriate punishment;

(4) the statute is unconstitutional because the death penalty has been imposed in a discriminatory manner based on wealth, race, geography, and gender;

(5) the death sentence is imposed in an arbitrary and capricious manner because the jury is not instructed as to the effect of a non-unanimous sentencing verdict;

(6) the death penalty is imposed in an arbitrary and capricious manner because the defendant is not allowed to address issues such as parole eligibility, costs of incarceration, general deterrence, and the method of execution; and

(7) the death penalty is  *per se* cruel and unusual punishment under all circumstances.

The following arguments raised by the defendant were rejected in *Harris, supra:*

(1) there is a reasonable likelihood the jury understood the trial court's instructions as requiring unanimity on mitigating circumstances; and

**269** (2) appellate review of death penalty cases in Tennessee is constitutionally inadequate.

The following arguments raised by the defendant were rejected in *Caughron, supra:*

(1) the death penalty is arbitrary and capricious because the State has the right of final closing argument at the penalty phase; and

(2) the lack of uniform procedures mandating individual sequestered voir dire during jury selection renders the imposition of the death penalty arbitrary and capricious.

Finally, in  *State v. Groseclose,* 615 S.W.2d 142, 147-48 (Tenn.1981), we rejected the argument that an instruction defining and explaining mitigation is constitutionally required.

Likewise we find it unnecessary to repeat our analysis of the issues the defendant lists, without argument, regarding a number of other constitutional challenges which have been previously decided by this Court adversely to his position. (FN6)

[32] The defendant next argues that the Tennessee death penalty statute fails to sufficiently narrow the class of death eligible defendants under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution, because all persons convicted of felony murder are eligible for the death penalty on the sole basis that they committed the underlying felony. (FN7)

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

875 S.W.2d 253, State v. Cazes, (Tenn. 1994)                                          **Page 14**

In *State v. Middlebrooks,*    840 S.W.2d 317 (Tenn.1992), a majority of this Court held that it is unconstitutional under the Tennessee Constitution, Article I, Section 16, to use the felony murder aggravating circumstance, Tenn.Code Ann.    § 39-2-203(i)(7) (1982) or § 39-13-204(I)(7) (1991), to support imposition of the death penalty for a conviction of felony murder, although it can be used to support imposition of the death penalty for premeditated murder.  We determined that the use of the felony murder aggravating circumstance duplicated the elements of the underlying felony murder crime and failed to narrow the class of death-eligible murderers as required by Article I, Section 16, of the Tennessee Constitution and by the Eighth Amendment to the United States Constitution.  We must now determine whether, based on the facts in this case, the sentencing jury's consideration of the invalid felony murder aggravating circumstance is harmless error beyond a reasonable doubt where there are two remaining aggravating circumstances, namely the defendant's previous convictions of violent felony offenses, and that the murder was especially heinous atrocious or cruel in that it involved torture or depravity of mind.

In that connection, we recently held in    *Howell,* 868 S.W.2d at 260-61, that

[i]n order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed.  These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

Our examination of the record in this case in accordance with that analysis demonstrates    **\*270** that submission of the invalid felony-murder aggravating circumstance for jury consideration was harmless error beyond a reasonable doubt.  (FN8)

The record here fully supports the two remaining aggravating circumstances.  The State introduced proof without contradiction of the defendant's prior violent felony convictions of aggravated rape and "assault to murder first degree with bodily injury." Additionally, the evidence strongly supports the jury's finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, beyond a reasonable doubt.  The jury was fully and correctly instructed on this aggravating circumstance pursuant to *State v. Williams,* 690 S.W.2d 517 (Tenn.1985). Furthermore, no additional evidence, nor any evidence that was not already properly before the jury, was introduced in support of the invalid felony-murder aggravating circumstance.  A sentencing jury may properly hear evidence regarding the circumstances of the offense.  In addition, the prosecutor did not emphasize the invalid felony-murder aggravating circumstance. The argument primarily focused on the weaknesses of the defendant's proof in mitigation, with some

emphasis on the defendant's prior convictions and the heinous nature of the crime, but with little mention of the felony murder aggravating circumstance.  The proof in mitigation included background evidence about the defendant's childhood, evidence of the defendant's drug and alcohol problems that caused him to suffer blackouts, evidence about the defendant's inability to control his urination and its possible connection to a neurological problem and the fights that were brought about as a result of this problem.

Based on our thorough review of the record, we conclude, beyond a reasonable doubt, that the sentence would have been the same had the jury given no weight to the invalid felony murder aggravating factor; therefore, the    *Middlebrooks* error, in this case, was harmless.

[33] Finally, we address the defendant's contention that this Court's review of capital cases is constitutionally inadequate to afford a meaningful proportionality review.  The defendant bases his claim on the fact that the Tennessee capital sentencing juries are not required to make written findings concerning mitigating circumstances.  He also says that the information base for comparative review of all first degree murder convictions is inadequate and incomplete and he asserts that this Court's methodology for conducting comparative review is flawed.

We have emphasized on prior occasions that our comparative proportionality review is not rendered ineffective simply because we have "not chosen to formulate a rigid objective test" as the "standard of review for all cases."  *Harris,* 839 S.W.2d at 77, n. 2, quoting *Proffitt v. Florida,* 428 U.S. 242, 259, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976).  We do not, however, take lightly our duty to conduct a comparative review in each case to determine whether the penalty imposed is or is not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant.  We regularly and routinely review Rule 12 reports submitted by trial judges at the conclusion of all criminal trials for first degree murder.  The dissent points out that no Rule 12 report was available in this case.  That is correct; however, a Rule 12 report contains far less information than the entire record, which we have thoroughly reviewed in this case.  Accordingly, we are well able to conduct the comparative proportionality review based on that knowledge.  Because we do not find it necessary in every case to compare in writing, detail by detail, all the specific cases or circumstances which are considered in our proportionality review, it does *not* follow, as the defendant and the dissent seem to suggest, that we have failed to perform an effective comparative proportionality review as outlined **\*271**  in *State v. Barber,* 753 S.W.2d 659, 663-668 (Tenn.1988).  *See also Harris,* 839 S.W.2d at 77.  Accordingly, we reject the defendant's claim that this Court's appellate review is constitutionally inadequate.

[34] This Court is of the opinion that the first-degree felony murder of the victim in this case warrants imposition of the death penalty.  The record clearly established both of the remaining valid aggravating circumstances.  Court records were introduced at the penalty phase to establish the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

defendant's prior convictions. As to the aggravating circumstance (i)(5)--heinous, atrocious or cruel in that it involved torture or depravity of mind--this Court in *State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985), defined torture as the infliction of severe physical or mental pain upon the victim while he or she remains alive or conscious. We also said that depravity may be shown by acts occurring at or shortly after the victim's death. A majority of this Court has consistently upheld that aggravating circumstance, as so defined, against constitutional attack. *See State v. Oscar Franklin Smith,* 868 S.W.2d 561 (1993). Here, the jury instructions defined the aggravating circumstance according to *Williams,* and contrary to the conclusion reached by the dissent, the evidence in this record clearly established both torture and depravity. Gladys Skinner was repeatedly and with tremendous force, beaten in the head with a welder's chipping hammer. Her skull was virtually shattered from the force of the numerous blows. Evidence indicated that the assault may have continued for some time, and that the victim would not necessarily have lost consciousness immediately. Defensive wounds to Gladys Skinner's arms and hands indicate that she did not, in fact, lose consciousness immediately upon being assaulted, and that she was struggling to protect herself. Accordingly, the evidence showed torture, as defined in *Williams.* Moreover, the fact that Skinner was raped at or near the time of death is further evidence of the depravity of the crime. We have considered the character of the defendant, including the mitigating proof and his prior violent acts. We are convinced that the penalty imposed was neither arbitrary, excessive or disproportionate to the penalty imposed for similar crimes. *See State v. Hines,* 758 S.W.2d 515 (Tenn.1988); *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985); *State v. House,* 743 S.W.2d 141 (Tenn.1987); *State v. Campbell,* 664 S.W.2d 281 (Tenn.1984); *State v. Williams,* 657 S.W.2d 405 (Tenn.1983); *State v. Black, supra.*

### CONCLUSION

We have carefully considered the defendant's contentions as to the alleged errors occurring during the guilt and sentencing phases and conclude the defendant's conviction and death sentence should be affirmed.

In accordance with the mandate of Tenn.Code Ann. § 39-13-206(c)(1)(D) (1991) [formerly Tenn.Code Ann. § 39-2-205(c)(4) ], we find that the sentence of death was not imposed in an arbitrary fashion, that the evidence overwhelmingly supports the jury's finding of the statutory aggravating circumstances, and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance. Further, our comparative proportionality review reveals that the sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and character of the defendant.

We, therefore, affirm the conviction of first-degree felony murder and the sentence of death. The sentence will be carried out as provided by law on the 14th day of May, 1994, unless otherwise

ordered by this Court or by other proper authority. Costs of this appeal are assessed against the defendant, Victor James Cazes.

DROWOTA and O'BRIEN, JJ., concur.

REID, C.J., concurs and dissents.

DAUGHTREY, J., not participating.

REID, Judge, concurring and dissenting.

I concur in affirming the conviction of first degree murder. However, I would hold aggravating circumstance (i)(5) (T.C.A. § 39-2-203(i)(5) (1982)) invalid and find the sentence of death disproportionate.

**\*272** For the reasons discussed in *State v. Black,* 815 S.W.2d 166, 195-97 (Tenn.1991) (Reid, C.J., dissenting), aggravating circumstance (i)(5), "The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," is not a valid aggravating circumstance in this case. This aggravating circumstance can be established only by proof that the victim was *tortured* in the course of the murder or the murder demonstrated " *depravity of mind.* " The evidence shows the various physical injuries imposed upon the victim, including the cause of death, but there is no evidence of torture. The majority opinion, which dismisses the issue summarily, does not indicate whether the proof showed that the victim was tortured or the defendant depraved. *See supra* at 267-268. However, even the majority's description of the evidence relied upon in its comparative proportionality review shows clearly that the evidence proves neither torture nor depravity. That the "[e]vidence indicated that the assault *may have continued for some time,* and that the victim *would not necessarily* have lost consciousness immediately" (FN1) does not obviate the equally likely conclusion that death resulted from the first blows struck. This evidence is not sufficient to support a finding of torture or depravity.

Also, for the reasons discussed in *State v. Black,* aggravating circumstance (i)(5), prior to the 1989 amendment, is unconstitutionally vague, and, therefore, is invalid. Use of "depravity" in a jury instruction defining what can be used as an aggravator, without more than the *State v. Williams* (FN2) definition of that term, constitutes a violation of the state and federal constitutions and requires that the sentence be vacated. *See State v. Black,* 815 S.W.2d at 195-97, and *State v. Van Tran,* 864 S.W.2d 465, 485-90 (Tenn.1993) (Daughtrey, J., dissenting); *Shell v. Mississippi,* 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) ( *per curiam,* Marshall, J., concurring).

I also would hold that under the comparative proportionality review mandated by statute, the sentence of death is disproportionate to the sentences in similar cases. *See* T.C.A. § 39-13-206(c)(1)(D) (Supp.1993). Pursuant to the statute, the defendant and his criminal acts must be compared with other similar offenders and acts committed in order to determine if the defendant is one of those persons most deserving of the sentence of death. *See State*

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

875 S.W.2d 253, State v. Cazes, (Tenn. 1994)                    Page 16

*v. Harris,* 839 S.W.2d 54, 84 (Tenn.1992) (Reid, C.J., dissenting); *State v. Howell,* 868 S.W.2d 238, 265 (Tenn.1993) (Reid, C.J., concurring).

Even though the majority defends the failure of the Court "to formulate a rigid objective-test" and insists that the Court does not "take lightly [its] duty to conduct a comparative review in each case ..." and does "regularly and routinely review Rule 12 reports submitted by trial judges," the opinion does not reflect the basis on which it concludes that the sentence is not disproportionate, except to repeat the physical evidence. *See supra* at 270-271. The majority is not able to insist that the Rule 12 report was utilized in this case because contrary to the requirements of the Rules of the Supreme Court, it does not appear in the record nor was it transmitted to the Clerk of the Supreme Court. *See* Tenn.Sup.Ct.R. 12. To satisfy the statutory requirement of a comparative proportionality review, this Court must do more than restate the facts of the case. *See State v. Middlebrooks,* 840 S.W.2d 317, 354-55 (Tenn.1992) (Reid, C.J., concurring and dissenting); *State v. Harris,* 839 S.W.2d at 84-85.

The victim was 68 years old, the defendant was 27. There is no evidence as to the relationship between the defendant and the victim except that the defendant worked for the victim's step-grandchild, the defendant had repaired the victim's automobile at her residence several times, and on the night of the murder, the defendant had attended a party at the step-grandchild's house, which was located a few blocks from the victim's residence. The evidence of the murder is entirely circumstantial. It proves the defendant committed the murder; it shows how the murder was committed; but it does not show why. In my view, the record does not       **\*273.** contain sufficient proof to support the finding that the death sentence is warranted. I would reverse the sentence of death and impose a sentence of life imprisonment.

*ORDER ON PETITION FOR REHEARING*

PER CURIAM.

The appellant, Victor James Cazes, has filed a petition for rehearing in this cause, which the Court has considered and concludes should be denied.

It is so ORDERED.
(FN1.) Tenn.Code Ann.    §  39-2-203(i) [now Tenn.Code Ann. § 39-13-204(i) (1991) ]--No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:

(2) The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

(5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind;

(7) The murder was committed while the defendant was engaged in committing, or was an accomplice

in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb....

(FN2.) *See State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992).

(FN3.) In opening statements, the prosecutor indicated that Ms. Skinner was sixty-eight years old, but the record does not otherwise reflect her exact age.

(FN4.) Likewise without merit is the defendant's claim that the denial of expert services precluded him from presenting mitigating proof in violation of the Eighth Amendment. The defendant had a psychologist testify on his behalf, and no one knew better than the defendant, who also testified, whether he had been molested while in jail and the effect it had on him.

(FN5.) *Compare* Tenn.R.Evid. 104(d), which provides that an "accused does not by testifying upon a preliminary matter become subject to cross-examination as to other issues in the case." Preliminary questions include the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence. Tenn.R.Evid. 104(a); *see also* Tenn.R.Evid. 608(b)(3), accused does not waive the privilege against self-incrimination when testifying as to matters relating to credibility.

(FN6.) *Melson,* 638 S.W.2d at 366-368 (holding that neither written findings concerning mitigating circumstances, nor an instruction allowing the jury to impose a life sentence based on mercy are constitutionally required); *Black,* 815 S.W.2d at 185 (holding that the statute does not violate the constitutional rights of a defendant by mandating that a jury impose death upon finding that aggravating circumstances outweigh mitigating circumstances); *Smith,* 857 S.W.2d at 22-23 (holding that the statute does sufficiently limit exercise of the jury's discretion once matters in aggravation are found, and that the statute is not unconstitutional because it allows the admission of hearsay evidence at sentencing).

(FN7.) The defendant raised the same argument with regard to Tenn.Code Ann.  § 39-2-203(i)(6) (1982) [now  §  39-13-204(6) (1991) ], "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." This aggravating circumstance was not raised in this case. The issue is without merit.

(FN8.) Because we conclude that the jury's consideration of the invalid felony murder aggravating circumstance was harmless error beyond a reasonable doubt, we expressly reserve for later decision the issue raised by the State, to wit, whether it is error under *Middlebrooks* to submit for jury consideration the felony murder aggravating circumstance when an additional felony, other than the felony underlying the felony-

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

875 S.W.2d 253, State v. Cazes, (Tenn. 1994)                                    Page 17

murder conviction, also supports the aggravating
circumstance.

(FN1.) *Supra* at 270-271 (emphasis added).

(FN2.) 690 S.W.2d 517, 529-30 (Tenn.1985).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)                                    Page 1

**\*489**  942 S.W.2d 489

Supreme Court of Tennessee,
at Knoxville.

STATE of Tennessee, Appellee,
v.
Michael Dean BUSH, Appellant.
April 7, 1997.
Rehearing Denied April 28, 1997.

Defendant was convicted in the Circuit Court,
Cumberland County, Leon Burns, Jr., J., of murder
and burglary, and sentenced to death, and he
appealed. The Court of Appeals affirmed. The
Supreme Court, Drowota, J., held that: (1) finding
that defendant was not in custody at time of
questioning was supported by evidence; (2) finding
of validity of waiver of rights was supported, even
assuming that defendant's decision to execute waiver
could have been influenced by paranoid
schizophrenia; (3) findings of premeditation and
deliberation were supported by evidence; (4)
introduction of rebuttal testimony of state's
psychiatric experts did not violate defendant's Fifth
or Sixth Amendment rights; (5) aggravating factor
that murder was committed for purpose of avoiding
lawful arrest does not apply when only theory is that
victim was killed to prevent defendant from being
arrested for the killing; (6) error in instructing on
"serious physical abuse beyond that necessary to
produce death" rather than "depravity of mind"
language which applied at time of murder was
harmless; and (7) sentence of death was not
disproportionate.

Affirmed.

Reid, J., concurred and filed an opinion.

Birch, C.J., dissented and filed an opinion.

West Headnotes

[1] Criminal Law ☜═1158(4)
110 ----
  110XXIV Review
   110XXIV(O) Questions of Fact and Findings
    110k1158 In General
  110k1158(4) Reception of Evidence.
  Appellate court must uphold trial court's findings
of fact at suppression hearing unless evidence in the
record preponderates against those findings.

[2] Criminal Law ☜═412.2(3)
110 ----
  110XVII Evidence
   110XVII(M) Declarations
    110k411 Declarations by Accused
     110k412.2 Right to Counsel; Caution
     110k412.2(3) Informing Accused as to His
          Rights.
  *Miranda* requires police to inform person being
questioned that he has the right to remain silent, that
any statement made may be used as evidence against
him, that he has the right to presence of an attorney,
and that, if he can not afford attorney, one will be
appointed for him prior to questioning, if he so
desires.

[3] Criminal Law ☜═412.2(2)

110 ----
  110XVII Evidence
   110XVII(M) Declarations
    110k411 Declarations by Accused
     110k412.2 Right to Counsel; Caution
     110k412.2(2) Accusatory Stage of
          Proceedings.
  Relevant factors to determine whether reasonable
person would consider himself or herself in custody
include time and location of interrogation, duration
and character of questioning, officer's tone of voice
and general demeanor, method of transportation to
place of questioning, number of police officers
present, limitations on movement or other forms of
restraint imposed during interrogation, interactions
between officer and person being questioned,
including words spoken by officer and verbal or
nonverbal responses of person, extent to which
person is confronted with officer's suspicions of
guilt or evidence of guilt, and extent to which person
is aware that he or she is free to refrain from
answering questions or to end interview at will.

[4] Criminal Law ☜═412.2(2)
110 ----
  110XVII Evidence
   110XVII(M) Declarations
    110k411 Declarations by Accused
     110k412.2 Right to Counsel; Caution
     110k412.2(2) Accusatory Stage of
          Proceedings.
  Finding that defendant was not in custody at time
of questioning, so that *Miranda* warnings were not
necessary, was supported by evidence that defendant
initiated contact with sheriff, that he and his father
agreed to accompany sheriff to police department to
further discuss the case, that defendant was
transported in patrol car but was not restrained, that
he was not restrained upon arrival at police station
nor during interview, that only two officers were
present during interview and they did not accuse him
of the crime or question truth of his story, that he
did most of the talking and seemed eager to give the
statement, and that he was never told that he could
not leave.

[5] Criminal Law ☜═412.2(2)
110 ----
  110XVII Evidence
   110XVII(M) Declarations
    110k411 Declarations by Accused
     110k412.2 Right to Counsel; Caution
     110k412.2(2) Accusatory Stage of
          Proceedings.
  Undisclosed knowledge or suspicions of law
enforcement officials are irrelevant to question of
whether reasonable person in position of suspect
would have considered himself deprived of freedom
of movement during questioning to degree associated
with formal arrest, so as to make *Miranda* warnings
necessary.

[6] Criminal Law ☜═414
110 ----
  110XVII Evidence
   110XVII(M) Declarations
    110k411 Declarations by Accused
  110k414 Proof and Effect.
  State need not introduce expert proof that waiver
of rights was knowingly and intelligently executed
whenever defendant introduces expert testimony to
contrary, as state need only prove waiver by

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)                                    Page 2

preponderance of evidence.

[7] Criminal Law ☜414
  110 ----
    110XVII Evidence
      110XVII(M) Declarations
        110k411 Declarations by Accused
      110k414 Proof and Effect.
  In determining whether state has satisfied burden
of proving waiver of rights by preponderance of the
evidence, court must look to totality of
circumstances.

[8] Criminal Law ☜414
  110 ----
    110XVII Evidence
      110XVII(M) Declarations
        110k411 Declarations by Accused
      110k414 Proof and Effect.
  In view of testimony by law enforcement officials
that defendant appeared normal, was coherent and
responsive to questioning, and did not discuss
demons, vampires, or other delusions, and in
absence of police overreaching, finding of validity
of waiver of rights was supported, even assuming
that defendant's decision to execute waiver could
have been influenced by paranoid schizophrenia.

[9] Criminal Law ☜1144.13(3)
  110 ----
    110XXIV Review
      110XXIV(M) Presumptions
        110k1144 Facts or Proceedings Not Shown by
                Record
        110k1144.13 Sufficiency of Evidence
          110k1144.13(2) Construction of Evidence
          110k1144.13(3) Construction in Favor of
                Government, State, or Prosecution.

[See headnote text below]

[9] Criminal Law ☜1159.2(7)
  110 ----
    110XXIV Review
      110XXIV(P) Verdicts
        110k1159 Conclusiveness of Verdict
          110k1159.2 Weight of Evidence in General
        110k1159.2(7) Reasonable Doubt.
  Where sufficiency of convicting evidence is
challenged, relevant question for appellate court is
whether, after reviewing evidence in light most
favorable to state, any rational trier of fact could
have found defendant guilty beyond reasonable
doubt.  Rules App.Proc., Rule 13(e).

[10] Homicide ☜14(1)
  203 ----
    203II Murder
      203k14 Deliberation and Premeditation
        203k14(1) In General.

[See headnote text below]

[10] Homicide ☜14(2)
  203 ----
    203II Murder
      203k14 Deliberation and Premeditation
        203k14(2) Time Required.
  Premeditation and deliberation are not synonymous
terms and, while existence of both elements may be
established by circumstantial evidence alone,
"premeditation" requires  *489  proof of previous

intent to kill, while "deliberation" requires proof of
"cool purpose" that includes some period of
reflection during which the mind is free from
passion and excitement.  West's Tenn.Code,      §
39-2-202(a)(1) (Repealed).

[11] Homicide ☜160
  203 ----
    203VII Evidence
      203VII(B) Admissibility in General
        203k155 Intent, Malice, Deliberation, and
                Premeditation
      203k160 Preparations.
  Evidence of procurement of weapon is probative to
prove premeditation.  West's Tenn.Code,          §
39-2-202(a)(1) (Repealed).

[12] Homicide ☜232
  203 ----
    203VII Evidence
      203VII(E) Weight and Sufficiency
      203k232 Deliberation and Premeditation.
  Findings of premeditation and deliberation were
supported by evidence that defendant announced to
his wife that he knew "a woman he could knock in
the head and get some money," that he took board
with him to her house to accomplish his stated
intention, that he did not end assault after he broke
board by striking victim with it, but procured knife
from kitchen and proceeded to stab victim 43 times,
that he removed his shirt and wrapped his hand in
attempt to avoid leaving fingerprints, that he
maintained presence of mind and took time to collect
broken board, and that he then walked back to
designated place to meet his wife and immediately
directed her to drive him to lake, where he disposed
of the evidence.  West's Tenn.Code,          §
39-2-202(a)(1) (Repealed).

[13] Criminal Law ☜641.3(11)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
              General
      110k641 Counsel for Accused
        110k641.3 Stage of Proceedings as Affecting
                Right
        110k641.3(11) Mental Examination.

[See headnote text below]

[13] Criminal Law ☜641.12(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
              General
      110k641 Counsel for Accused
        110k641.12 Deprivation or Allowance of
                Counsel
      110k641.12(1) In General.
  Once capital defendant is formally charged, Sixth
Amendment right to counsel precludes psychiatric
examination by state to determine future
dangerousness unless defense counsel is first notified
that examination will encompass that issue, but there
is no Sixth Amendment violation where defense
counsel requests psychiatric evaluation and is on
notice that, if mental status defense is presented,
psychological evidence will be used by state in
rebuttal.  U.S.C.A. Const.Amend. 6.

[14] Criminal Law ☜393(1)

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)                                                    Page 3

110 ----
  110XVII Evidence
    110XVII(I) Competency in General
      110k393 Compelling Accused to Criminate
        Himself
  110k393(1) In General.

When capital defendant asserts mental status
defense, he waives right to raise Fifth Amendment
challenge to prosecution's use of evidence obtained
through psychiatric examination to rebut defense.
U.S.C.A. Const.Amend. 5.

[15] Criminal Law ⊛⊃393(1)
  110 ----
    110XVII Evidence
      110XVII(I) Competency in General
        110k393 Compelling Accused to Criminate
          Himself
        110k393(1) In General.

[See headnote text below]

[15] Criminal Law ⊛⊃641.12(1)
  110 ----
    110XX Trial
      110XX(B) Course and Conduct of Trial in
        General
      110k641 Counsel for Accused
        110k641.12 Deprivation or Allowance of
          Counsel
    110k641.12(1) In General.

Introduction of rebuttal testimony of state's
psychiatric experts did not violate defendant's Fifth
or Sixth Amendment rights, where defense counsel
requested first mental evaluation in case and was
notified of each subsequent psychiatric evaluation
which was ordered at request of either defendant or
state and where defendant relied upon his mental
status at time of offense as mitigating circumstance
in penalty phase. U.S.C.A. Const.Amends. 5, 6.

[16] Constitutional Law ⊛⊃270(2)
  92 ----
    92XII Due Process of Law
      92k256 Criminal Prosecutions
      92k270 Judgment and Sentence
      92k270(2) Matters Considered; Presentence
        Report.

Since Tennessee is state in which defendants
sentenced to life imprisonment are eligible for
parole, due process does not require that jury be
given information about parole availability.
U.S.C.A. Const.Amend. 14.

[17] Sentencing and Punishment ⊛⊃1682
  350H ----
    350HVIII The Death Penalty
      350HVIII(D) Factors Related to Offense
      350Hk1682 Escape or Other Obstruction of
        Justice.

(Formerly 203k357(8))

Aggravating factor that murder was committed for
purpose of avoiding lawful arrest or prosecution
logically can not and does not apply when the only
theory advanced by state is that victim was killed to
prevent defendant from being arrested or prosecuted
for the killing.   West's Tenn.Code,            §
39-13-204(i)(6).

[18] Sentencing and Punishment ⊛⊃1772
  350H ----

350HVIII The Death Penalty
  350HVIII(G) Proceedings
    350HVIII(G)2 Evidence
    350Hk1772 Sufficiency.

(Formerly 203k357(8))

Finding of aggravating factor that murder was
committed for purpose of avoiding lawful arrest or
prosecution for burglary was supported by evidence
that defendant intended to "get" money from victim,
with whom he was well-acquainted, that he refused
to reveal residence or identity of intended victim to
his wife in attempt to avoid having anyone witness
crime, and that victim recognized defendant.
West's Tenn.Code, § 39-13-204(i)(6).

[19] Sentencing and Punishment ⊛⊃1660
  350H ----
    350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in
        General
      350Hk1660 Dual Use of Evidence or
        Aggravating Factor.

(Formerly 203k357(10))

Where defendant was convicted of premeditated
first-degree murder, which required state to prove
beyond a reasonable doubt the willful, deliberate,
malicious, and premeditated killing of another and
state was not statutorily required to prove as part of
offense that one purpose motivating killing was
avoidance of arrest or prosecution, aggravating
circumstance that murder was committed for
purpose of avoiding lawful arrest or prosecution did
not duplicate elements of underlying offense and
sufficiently narrowed class of persons eligible for
death penalty. West's Tenn.Code, § 39-13-204(i)(6)

[20] Sentencing and Punishment ⊛⊃1774
  350H ----
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
      350HVIII(G)3 Hearing
      350Hk1774 In General.

(Formerly 203k358(1))

Sentencing hearing in capital murder case should
have been conducted in accordance with law in
effect at time of commission of offense.

[21] Homicide ⊛⊃343
  203 ----
    203X Appeal and Error
      203k333 Harmless Error
      203k343 Sentence.

[See headnote text below]

[21] Sentencing and Punishment ⊛⊃1625
  350H ----
    350HVIII The Death Penalty
      350HVIII(A) In General
      350Hk1622 Validity of Statute or Regulatory
        Provision
      350Hk1625 Aggravating or Mitigating
        Circumstances.

(Formerly 203k351)

[See headnote text below]

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)                                          Page 4

[21] Sentencing and Punishment ⊖➞1780(3)
  350H ----
   350HVIII The Death Penalty
    350HVIII(G) Proceedings
     350HVIII(G)3 Hearing
      350Hk1780 Conduct of Hearing
      350Hk1780(3) Instructions.

  (Formerly 203k351)
  Amendment to aggravating factor which
substituted phrase "serious physical abuse beyond
that necessary to produce death" for phrase
"depravity of mind" was substantive change which
imposed, not different level of proof upon state, but
different factors of proof, so that giving of
instruction based on new language is prosecution
governed by old language is not always beneficial to
defendant, but  **489  also does always requires
reversal and may be harmless.  West's Tenn.Code,
§ 39-13-204(i)(5).

[22] Homicide ⊖➞340(2)
  203 ----
   203X Appeal and Error
    203k333 Harmless Error
     203k340 Instructions
     203k340(2) Unnecessary and Inapplicable
        Instructions.
  Error in instructing jury at sentencing in capital
case on "serious physical abuse beyond that
necessary to produce death," rather than "depravity
of mind" language which applied at time of murder,
was harmless where aggravating circumstance was
sufficiently proven by evidence of torture
independent of the depravity or serious physical-
abuse prong and where jury would have found
evidence sufficient to establish depravity of mind
beyond reasonable doubt had they been properly
instructed.  West's Tenn.Code, § 39-13-204(i)(5).

[23] Sentencing and Punishment ⊖➞1684
  350H ----
   350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
     350Hk1684 Vileness, Heinousness, or Atrocity.

  (Formerly 203k357(11))
  State clearly established aggravating factor of
"torture" through evidence that victim was initially
assaulted and knocked to floor by defendant, that
defendant retrieved butcher knife while victim was
lying helpless on floor, returned to her, and began
stabbing her, that victim would have been alive and
conscious for at least three to five minutes during
assault and possibly as long as 30 minutes, and that
pain of stabbing during that period of consciousness
would have been comparable to undergoing surgery
without an anesthetic.  West's Tenn.Code,       §
39-13-204(i)(5).
[24] Sentencing and Punishment ⊖➞1684
  350H ----
   350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
     350Hk1684 Vileness, Heinousness, or Atrocity.

  (Formerly 203k357(11))
  Evidence that defendant beat and stabbed victim, a
person whom he knew, and later boasted about how
he had practiced karate on her clearly established
that defendant willfully inflicted severe physical pain
upon victim, thus establishing "depravity of mind"

aggravating factor.  West's Tenn.Code,       §
39-13-204(i)(5).
[25] Sentencing and Punishment ⊖➞1682
  350H ----
   350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
     350Hk1682 Escape or Other Obstruction of
         Justice.

  (Formerly 203k357(8))

[See headnote text below]

[25] Sentencing and Punishment ⊖➞1684
  350H ----
   350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
     350Hk1684 Vileness, Heinousness, or Atrocity.

  (Formerly 203k357(8), 203k357(11))

[See headnote text below]

[25] Sentencing and Punishment ⊖➞1727
  350H ----
   350HVIII The Death Penalty
    350HVIII(F) Factors Related to Status of Victim
     350Hk1727 Age.

  (Formerly 203k357(11))

[See headnote text below]

[25] Sentencing and Punishment ⊖➞1681
  350H ----
   350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
     350Hk1681 Killing While Committing Other
         Offense or in Course of Criminal
         Conduct.

  (Formerly 203k357(11), 203k357(8))
  Imposition of penalty of death was not
disproportionate, and evidence supported finding
that aggravating factors of torture and avoidance of
arrest outweighed mitigating factors; defendant
killed 79-year-old widow, whom he knew, by
stabbing her 43 times during course of burglary.
West's Tenn.Code, § 39-13-206(c)(1).

  **492  Martelia T. Crawford, Cookeville, Richard
McGee, Nashville, for appellant.

  John Knox Walkup, Attorney General and
Reporter, Michael E. Moore, Solicitor General,
Gordon W. Smith, Associate Solicitor General,
Amy L. Tarkington, Assistant Attorney General,
Nashville, William Edward Gibson, District
Attorney General, Owen G. Burnett, John A.
Moore, Lillie Ann Sells, David A. Patterson,
Assistant District Attorneys General, Cookeville, for
appellee.

OPINION

DROWOTA, Judge.

  In this capital case, the defendant, Michael Dean
Bush, was convicted of premeditated first degree
murder and first degree burglary.  (FN1)  In the
sentencing hearing, the jury     **493  found two

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

aggravating circumstances: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn.Code Ann. § 39-13-204(i)(5)ʾ and (6) (1991). Finding that the two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction and sentence, raising nineteen claims of error, each with numerous subparts. After fully considering defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn.Code Ann.    § 39-13-206(a)(1) (1996 Supp.), (FN2) the case was docketed in this Court.

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court, on October 14, 1996, entered an Order limiting review to seven issues and setting the cause for oral argument at the January 1997 term of Court in Knoxville.    *See* Tenn. S.Ct. R. 12. (FN3)

For the reasons explained below, we have determined that none of the alleged errors affirmatively appear to have affected the verdict of guilt or the sentence imposed. Moreover, the evidence supports the jury's findings as to aggravating and mitigating circumstances, and the sentence of death is not disproportionate or arbitrary. Accordingly, the defendant's conviction for first degree murder and sentence of death by electrocution are affirmed.

### FACTUAL BACKGROUND

The defendant was convicted of the premeditated murder of Jodie Lefever, a seventy-nine-year-old widow who lived alone in her home in the Silver Point community of Putnam County. (FN4) The evidence presented at the guilt phase of the trial established that Lefever's body was discovered by a neighbor on August 19, 1988, lying face down on the floor in her den next to the side door of the house. She had been stabbed numerous times. A large amount of blood was on her back, her head and the floor. Blood was also splattered on the door and nearby wall. Two holes of unknown origin were in the wall near Lefever's body.

Investigating officers found a piece of pressure-treated wood on the floor next to the den sofa and another piece of pressure-treated wood behind the television set in the same room. Officers also found drops of blood on a chair in the den, on the utility room floor leading from the den to the kitchen, on the kitchen floor, and on a rug in the hallway leading to the bedroom. One drawer in the bedroom dresser was open. The front door and windows of the house were locked, and there was no sign of forced entry. The house and its furnishings were

essentially undisturbed. The only item missing from the house was a butcher knife that was kept in a drawer next to the kitchen sink.

Dr. Gretel Harlan, assistant medical examiner with the State Medical Examiner's Office, testified that Lefever died as a result of being stabbed forty-three times. The **494** wounds extended down the left side of her face, down the back of her neck, across her shoulders, and down her back. They were consistent with wounds inflicted by a butcher knife like that taken from the kitchen. Several of the wounds were fatal and had passed through Lefever's back and penetrated various vital organs and blood vessels. The location of the injuries indicated that Lefever had probably been lying down during the attack. All the wounds had been made while Lefever was alive; but it was impossible to determine the order in which they had been inflicted. Some wounds would have resulted in unconsciousness in three to five minutes. However, if other wounds had been inflicted first, Lefever could have been alive and conscious for twenty to thirty minutes. Because the stab wounds did not damage Lefever's central nervous system, it was possible, according to Dr. Harlan, that Lefever felt the wounds as they were inflicted, a sensation that Dr. Harlan compared to undergoing surgery without anaesthetic. In addition to the stab wounds, there were two small "scrape areas" on the victim's left knee and elbow consistent with a fall onto those parts of her body before collapsing to the ground. Lefever's left collarbone had been bruised either shortly before the stabbing or during the fall. Contusions found around her eyes could likewise have been inflicted before she fell or could have resulted from one of the stab wounds that had penetrated the left eye.

Despite extensive investigation, law enforcement officials had no suspects on September 25, 1988, when Putnam County Sheriff Jerry Abston was notified by his office that eighteen-year-old Michael Dean Bush and his father were at the Sheriff's office and had information regarding Lefever's murder. Lefever had been the best friend of the defendant's grandmother, and Bush had mowed Lefever's lawn and helped her get groceries. In a series of statements recorded at the Cookeville police department and played for the jury at trial, Bush told law enforcement officers that on the afternoon of August 16, 1988, while he was living at his mother-in-law's trailer, he received a telephone call to go to the Silver Point community after dark, if he ever wanted to see his family again. After calling his parents' house and receiving no answer, the defendant concluded something was wrong.

Later that evening, after dark, the defendant instructed his wife to drive him to an area near Lefever's house. When his wife asked him what was going on, he told her that they "needed some money ... and [he] was going to go rob the old woman that lived down there." After his wife dropped him off and left, Bush said he was met by four men wearing black ski masks. One pulled a gun on him and said that they "needed somebody Jodie trusts." Bush said Lefever was on the telephone when he knocked on her side door. After Bush identified himself, Lefever unlocked the door. The men then pushed him inside the house and began to hit Lefever so hard that she fell back and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

hit the wall with her elbow. One of the men ran through the kitchen and the rest of the house. When the stick being used to beat the victim broke, the men quickly gathered the pieces and handed them to Bush and told him to go outside. A few minutes later the men came out and gave the defendant a knife. The defendant's hand was cut by the blade as he took the knife. The men instructed Bush to "take the stuff and get rid of it" and forget everything he had seen. As Bush was walking to meet his wife, one of the men drove up beside him and said "loose lips sink ships."

Shortly afterward the defendant's wife picked him up. He was crying and had blood all over him. When his wife asked him what had happened, he said, "I killed Jodie." They drove to Center Hill Lake, where he threw the knife and the pieces of the broken stick into the water and washed himself off. Bush then told his wife that he had not killed Lefever but blamed another man, Jackie Maxwell.

On the same day and approximately the same time as Bush was giving his statements to law enforcement officials at the Cookeville police department, his seventeen-year-old wife, Sheila Bush, made several statements to officers at the Putnam County sheriff's office. She testified to the substance of those statements at trial. While most of her story matched that of the defendant's, it was different in one vitally important aspect.    **495 Sheila Bush incriminated the defendant as the sole perpetrator of the offense. According to Sheila Bush, on the evening of August 16, 1988, the defendant told her that they needed money and that he knew "a woman he could knock in the head and get some money," but he would not tell Sheila Bush the name of the woman nor the location of her home. The defendant removed a piece of wood from the frame around his wife's bedroom door and directed his wife to drive him to an area in the Silver Point community. Once there, he got out of the car and told her to come back in twenty minutes. After driving to Center Hill Dam, Shelia Bush returned to find the defendant standing in the road. He had his shirt off and was covered with blood. As he got into the car, he excitedly told his wife that he had "killed her." The defendant said he had "stabbed her with a knife" and that he had cut his hand wide open. At the defendant's directions, Sheila Bush drove to a boat ramp near the dam, where the defendant threw his shirt, some pieces of wood, a knife and a pair of sunglasses into the lake. He then washed off the blood that was on him.

The next day, according to Sheila Bush, the defendant told her how he had killed Lefever, how he knocked on the door as the victim spoke on the phone, how she let him in once she recognized him, and how he had struck her in the head with the stick and caused her to fall. The defendant said that the victim told him to "get a hold of himself." When Lefever indicated that there was someone in the back of the house, the defendant searched the house. Finding no one there, he removed his shirt, wrapped it around his hand, and as he came back through the kitchen, took a knife out of the kitchen drawer. He took the knife into the den and stabbed Lefever thirty or forty times. The defendant demonstrated how he had killed Lefever by having his wife lie on her stomach on the floor as he pretended to stab her in the head and the back. The defendant, a karate

student and enthusiast, also told his wife that he practiced karate on Lefever. The next instant, however, he told his wife that he was "just kidding" and that Jackie Maxwell had killed Lefever. Sheila Bush explained that she had not reported this information earlier because the defendant told her that the Mafia was watching her and that something would happen if she mentioned anything.

Physical evidence supported the statement of Sheila Bush. Going to the spot where the defendant had allegedly thrown away the murder weapon, Tennessee Bureau of Investigation (T.B.I.) divers recovered a knife from the waters of Center Hill Lake. Lefever's grandson identified the knife as one his grandmother kept in a drawer next to the kitchen sink. A forensic scientist, who had analyzed the two pieces of wood discovered in Lefever's den, testified that they came from the top of a bedroom door in the trailer belonging to Sheila Bush's mother. A T.B.I. serologist testified that the blood found on the rug in the hallway and kitchen floor was consistent with that of the defendant. Only two percent of the Tennessee population have this blood-type.

Other witnesses tied the defendant to the killing. James Mullins, a friend of the defendant, testified that on the day after Lefever's body was found, the defendant brought a newspaper reporting the discovery of the body to Mullins' house. The defendant was excited and grinning, "all wound up like a kid that had too much Kool-Aid." Two of defendant's fellow inmates at the Putnam County jail, Jimmy Myers and William Roger Moore, testified that the defendant told them he had killed the victim. According to Myers, the defendant said that his wife had taken him to Lefever's house to borrow or get some money and, when the defendant could not find any money, he stabbed Lefever to death. After this first account, however, the defendant kept changing his story because, the defendant said his lawyers had told him that people in the jail might be witnesses against him. The defendant also told Myers that he would try to make people think he was crazy. The second inmate, William Roger Moore, testified that the defendant discussed the crime "at length" with him. The defendant said that he had gone to Lefever to get some money because he had borrowed money from her in the past. An argument erupted, he lost his temper, and stabbed her repeatedly with a knife he had taken from the kitchen.    **496 The defendant also told Moore that he was "going to make a ploy for craziness."

The defendant did not testify nor did he offer any evidence at the guilt phase of the trial. Based on the proof presented at the guilt phase, the jury found Bush guilty of premeditated first degree murder.

The State presented no additional proof during its case-in-chief at the sentencing phase of the trial, but instead relied upon the evidence presented during the guilt phase.

Through the videotaped deposition testimony of his grandmother and the live testimony of his father, sister, and uncle, the defendant presented evidence of his childhood and alleged mental illness. The defendant was the second of three children. His father, a Vietnam War veteran, was a truck driver, who abused alcohol and was away from home for

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)                                                              **Page 7**

long periods of time when the defendant was young. His father physically abused the defendant's mother and singled out the defendant, who was particularly strong-willed, for strict discipline, beatings and whippings. The defendant was placed on Ritalin, a medication for hyperactivity, at a very young age. At the age of three or four, he began sniffing gasoline. At the age of ten, he seriously injured his head in a bicycle accident. Afterwards, his personality seemed to change; he became nocturnal, distant and quick tempered. He was involved in fights at school. He expressed the wish to die, heard voices, suffered from nightmares, drew pictures of demons and monsters and became fascinated with death and twins. In 1987 the defendant dropped out of high school before completing his senior year. In March of 1988, his mother was diagnosed with terminal colon cancer. In May and June of 1988, he attempted suicide by overdosing on Tylenol and Advil. At that time he was referred to the Plateau Mental Health Center for treatment.

Following his arrest in September of 1988, the trial court, upon the request of his court appointed attorney, referred the defendant to the Middle Tennessee Mental Health Institute (M.T.M.H.I) for a competency and sanity evaluation. Three members of the evaluation team, a social worker, Rebecca Jane Smith, Dr. Gillian Blair, a clinical psychologist, and Dr. John Cain, a psychiatrist, testified that they had diagnosed the defendant as suffering from schizophrenia paranoid subtype sub chronic, an adjustment disorder, and substance abuse (inhaling solvents). Dr. Blair opined that the schizophrenia had begun before the defendant's admission to M.T.M.H.I. Dr. Cain said that the defendant had shown symptoms of schizophrenia beginning in high school. The evaluation team administered tests to determine whether Bush was malingering. Dr. Blair administered an "M" test, the results of which indicated that Bush was schizophrenic and not malingering. In addition, Dr. Cain administered sodium amitol, popularly known as truth serum. According to Dr. Cain, under the influence of that drug, Bush's psychotic symptoms became even more pronounced which indicated that Bush was not malingering. The Wexler Adult Intelligence Test showed that the defendant had a full scale I.Q. of 96.

In rebuttal the State presented two members of the M.T.M.H.I treatment team who had worked with the defendant from May to August of 1991 when he was again admitted for treatment and evaluation. One of these, Dr. Zillur Athar, a psychiatrist, testified that the defendant was not actively psychotic at that time but malingering. Dr. Athar diagnosed defendant as suffering from borderline personality disorder. Edean Gerdes, coordinator for the treatment ward, said that she had observed the defendant reading books about vampires, which he said had been given to him by his lawyers.

The State also presented a deputy with the Putnam County sheriff's department who had transported the defendant to mental health institutions on several occasions. He testified that in 1989 the defendant told him "some of the doctors were easy to fool." At a later time, the defendant told the deputy that a lot of the doctors were foreigners and asked silly questions. The defendant's former mother-in-law

testified that in 1988, when the defendant was married to her daughter, he was normal, intelligent and quick tempered. She had never observed any bizarre behavior on his part. A high school friend of the defendant testified that Bush had been a normal, happy person. On **\*497** cross-examination, however, he admitted telling the assistant district attorney in 1989 that in 1988 the defendant had begun to act strangely and talked about dreams of men killing people in the Silver Point area.

Based on the proof, the jury determined that the State had proven the existence of two aggravating circumstances beyond a reasonable doubt (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn.Code Ann. § 39-13-204(I)(5) and (6) (1991). In addition, the jury found that the aggravating circumstances outweighed the mitigating circumstances (FN5) beyond a reasonable doubt and, as a result, sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors alleged by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals.

I.

*MOTION TO SUPPRESS*

Prior to trial, defense counsel moved to suppress a series of statements given by Bush to police officers on September 25, 1988, alleging that the statements were obtained in violation of the defendant's rights under the Fifth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution. First, Bush alleged that he was not given warnings in accordance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before he gave the first tape-recorded statement even though he was subjected to custodial interrogation. As a result, Bush urged that the initial and all subsequent statements were tainted. Alternatively, Bush asserted that the waiver of his rights given prior to the second interview was not valid because he was mentally ill and not competent to knowingly and intelligently waive his *Miranda* rights. Finally, Bush contended that the officers continued to question him after he invoked his Fifth Amendment right to counsel.

An evidentiary hearing was held on the motion to suppress. Sheriff Abston testified that on Sunday, September 25, 1988, he was contacted by his office that Larry Bush wanted to bring his son to the jail to discuss the Jodie Lefever homicide. Defendant, along with his father, met Sheriff Abston at the county jail around 1:30 p.m. Larry Bush told Sheriff Abston that the defendant wanted to make a statement that he was with the **\*498** people who murdered Lefever. Because the jail was crowded with visitors on Sundays, and because Bush indicated that he also had information about an unrelated homicide that had occurred in the city of Cookeville, Sheriff Abston asked the defendant and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

his father if they would be willing to go with him to the Cookeville police station to discuss the case. They agreed. Larry Bush rode in the front passenger seat of a deputy sheriff's patrol car and the defendant rode, unrestrained, in the back seat of the same car.

At approximately 2:47 p.m., officer Bob Terry, Sheriff Abston, and the defendant entered an investigator's office, where the defendant gave a tape-recorded statement, admitting his presence during the murder of Lefever, but denying his involvement in the crime. Essentially, Bush told law enforcement officials that he had received a phone call, in which the unknown caller threatened to harm his family if he did not follow the caller's instructions. Bush believed the caller, and as instructed, went to Lefever's home where he was met by four unknown hooded men who forced him to knock on the door so they could gain entry to Lefever's home. Bush recounted how the hooded intruders beat and eventually murdered Lefever.

When this interview ended, Sheriff Abston and Officer Terry left the room, and were approached in the hallway by Deputy Doug Burgess and T.B.I. agent Larry O'Rear who told them that Shelia Bush, the defendant's wife, had given a statement at the Putnam County sheriff's office in which she had implicated Michael Bush and said that he had admitted to her that he had killed Lefever. Upon receiving this information, Sheriff Abston testified that he then considered the defendant to be a suspect in the homicide. Bush was given his *Miranda* warnings for the first time at approximately 4:17 p.m. He signed a waiver of those rights, and a second tape-recorded interview was conducted during which Bush basically repeated the information given in his first statement. In addition, Bush described the position in which Lefever was lying when he left her home, and he told officers that, at the direction of the hooded men, he had disposed of the pieces of the stick used to beat Lefever and a knife near a boat ramp on Center Hill Dam. This second interview ended when Bush and Officer Terry became involved in a heated discussion about the defendant's involvement in the murder.

A third interview began at approximately 6:04 in which Bush gave a statement about the unrelated Cookeville homicide. However, Bush requested an attorney during this session and the police officers testified that all questioning then ceased.

David Brady, the attorney appointed to represent Bush after he requested counsel testified that the trial judge contacted him around 10:00 p.m. and he saw Bush at approximately 11:00 p.m. According to Brady, Bush was strangely calm and detached and his answers to questions were vague and non-specific. Brady considered Bush's behavior unusual and requested a psychiatric evaluation.

Dr. Blair, the clinical psychologist who had examined Bush in early 1989 when he was first referred to M.T.M.H.I. for a competency evaluation also testified at the suppression hearing. Dr. Blair opined, based upon her examinations of the defendant and review of the taped statements, that the defendant was suffering from paranoid schizophrenia when he executed the waiver of his

rights prior to the second tape-recorded interview and that the waiver was not "a product of rational reasoning."

Law enforcement officials who conducted the interviews with Bush all testified that he was coherent and responsive to questioning and appeared normal. Bush did not, according to the officers, discuss demons, vampires, or other delusions. In addition, Sheriff Abston testified that neither the defendant nor Larry Bush indicated that there was any problem with the defendant's mental condition at the time he came in to give the statement.

Upon considering the proof, the trial judge denied the motion to suppress finding that (1) Bush was not entitled to *Miranda* warnings prior to the initial interview because he was not subjected to custodial interrogation; (2) Bush was not a suspect in the mind of Sheriff Abston until after the conclusion of **\*499** the initial interview; (3) Bush was advised of his *Miranda* rights before the second interview; and knowingly and intelligently waived those rights; and (4) Bush was not questioned further after he invoked his Fifth Amendment right to counsel. The trial court's denial of the motion was affirmed by the Court of Criminal Appeals.

### A. Custodial Interrogation

[1] Defendant first urges, in this Court, that the statements should have been suppressed because he was not advised of his *Miranda* warnings even though he was in custody when he gave the first tape-recorded statement. In reviewing this issue, we are mindful that an appellate court must uphold a trial court's findings of fact in a suppression hearing unless the evidence in the record preponderates against those findings. *State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996).

[2] We begin our analysis of this issue with the *Miranda* decision in which the United States Supreme Court held that a defendant's statements given during custodial police interrogation are inadmissible as evidence in the State's case-in-chief unless the State establishes that the defendant was advised of certain constitutional rights and waived those rights. Specifically, *Miranda* requires police to inform the person being questioned that (a) he has the right to remain silent; (b) any statement made may be used as evidence against him; (c) he has the right to the presence of an attorney; and (d) if he can not afford an attorney, one will be appointed for him prior to questioning, if he so desires. *Id.,* 384 U.S. at 444, 86 S.Ct. at 1612.

However, police officers are only obligated to administer *Miranda* warnings prior to "custodial interrogation" which has been defined as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). The United States Supreme Court has held that it is appropriate to apply an objective test to determine whether a person is in custody and therefore entitled to receive *Miranda* warnings. Courts must consider the totality of the circumstances of the interrogation and inquire "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 422, 104

S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984); *see also Stansbury*, 511 U.S. at 323, 114 S.Ct. at 1529. The United States Supreme Court has emphasized, however, that "any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda*." *Stansbury*, 511 U.S. at 325, 114 S.Ct. at 1530.

[3] Recently, this Court, in *State v. Anderson*, 937 S.W.2d 851 (Tenn.1996), expressly adopted the objective analysis employed by the United States Supreme Court and rejected as irrelevant to the determination of custody any inquiry into the subjective beliefs of law enforcement officials about the culpability or guilt of the person being questioned. We adopted several nonexclusive factors to aid in the objective assessment of whether a reasonable person would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. Relevant factors include (1) the time and location of the interrogation; (2) the duration and character of the questioning; (3) the officer's tone of voice and general demeanor; (4) the method of transportation to the place of questioning; (5) the number of police officers present; (6) limitations on movement or other forms of restraint imposed during the interrogation; (7) interactions between the officer and the person being questioned, including the words spoken by the officer and the verbal or nonverbal responses of the person being questioned; (8) the extent to which the person being questioned is confronted with the officer's suspicions of guilt or evidence of guilt; and finally (9) the extent to which the person being questioned is aware that he or she is free to refrain from answering questions or to end the interview at will. *Anderson*, 937 S.W.2d at 855.

[4][5] Considering the totality of the circumstances, including the factors delineated **\*500** in *Anderson*, the evidence in this record does not preponderate against the lower courts' finding that Bush was not in custody when he was initially interviewed by law enforcement officials. Bush initiated the contact with Sheriff Abston. He asked his father to go with him to the Putnam County Sheriff's office. Indeed, Sheriff Abston was called from the golf course on a Sunday by his office to meet Bush. He voluntarily sought to give information about the murder of Jodie Lefever. Bush and his father agreed to accompany Sheriff Abston to the Cookeville police department to further discuss the case. Although Bush was transported to the Cookeville police department in a patrol car, he was not restrained, and his father rode along in the front seat of the same car. Bush was not restrained upon arrival at the police station nor during the interview. Only two officers were present during the initial interview, and they did not accuse Bush of the crime or question the truth of his story. Indeed, Bush did most of the talking and seemed eager to give the statement, with the officers asking very few questions. While Bush was not told that he was free to leave, he was also never told that he could *not* leave, and he did not at any point attempt to leave. Finally, even assuming, as the defense argues, that law enforcement officials were aware of Shelia Bush's statement and considered the defendant a suspect from the moment he arrived at the sheriff's office, that has no bearing on the

determination of whether Michael Bush was in custody. The undisclosed knowledge or suspicions of law enforcement officials are irrelevant to the question of whether a reasonable person in the position of Michael Bush would have considered himself deprived of freedom of movement to a degree associated with a formal arrest. The evidence in the record does not preponderate against the trial court and Court of Criminal Appeals' determination that Bush was not in custody during the initial interview. Therefore, this issue is without merit.

### B. Waiver of Rights

Bush next contends that the statements resulting from the second, and any subsequent interviews, should have been suppressed because he presented expert testimony at the suppression hearing that he was not competent to make a knowing and intelligent waiver of his *Miranda* rights. Essentially **Bush** argues that because the **State** did not offer expert proof on his mental condition, the validity of the waiver was not established. As support for his argument, the defendant relies upon *State v. Hammock*, 867 S.W.2d 8 (Tenn.Crim.App.1993). In that case, defendant presented unequivocal expert testimony to establish that he was legally insane at the time he committed the murders. Rather than presenting expert proof to contradict the defendant's claim, the State relied upon lay witnesses who testified to the defendant's appearance and actions. Under those circumstances, the Court of Criminal Appeals reversed the defendant's convictions finding that the State had failed to prove sanity beyond a reasonable doubt. In *Hammock*, therefore, the Court of Criminal Appeals was concerned with the sufficiency of the evidence to establish the offense. No waiver issues were involved.

[6][7] Contrary to the defendant's assertion, *Hammock* should not be read as establishing the broad proposition that the State *must* introduce expert proof that a waiver was knowingly and intelligently executed whenever a defendant introduces expert testimony to the contrary. Unlike the element of sanity in *Hammock* which required proof beyond a reasonable doubt, the State need only prove waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 173, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986). In determining whether the State has satisfied that burden of proof, courts must look to the totality of the circumstances. *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn.1992). Applying those principles, the trial court in this case concluded that the waiver was valid. The evidence does not preponderate against that finding.

[8] Even assuming, as Dr. Blair testified, that Bush executed the waiver because he was suffering from paranoid schizophrenia, that fact does not render the waiver invalid. The United States Supreme Court in *Connelly, supra*, refused to adopt a "free will" rule **\*501** that would require a court to find a waiver invalid whenever a defendant feels compelled by a mental illness to waive his rights. In so holding, the Court stated

> *Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Respondent's perception of coercion flowing from the "voice of God," however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak.

*Connelly,* 479 U.S. at 174, 107 S.Ct. at 524. Here, as in *Connelly,* there is no proof of police overreaching. Law enforcement officials testified that Bush appeared normal, was coherent and responsive to questioning, and did not discuss demons, vampires, or other delusions. Therefore, in the absence of police overreaching, the trial court and Court of Criminal Appeals did not err in upholding the validity of the waiver, even assuming that the defendant's decision to execute the waiver could have been influenced by mental illness.

### C. Right to Counsel

In his final argument for suppression of his statements defendant contends that the Court of Criminal Appeals mistakenly characterized his right to counsel claim as an alleged violation of the Sixth rather than the Fifth Amendment. We disagree. The Court of Criminal Appeals simply noted that the Sixth Amendment right to counsel does not attach until after formal proceedings have begun. The intermediate court then recognized the applicability of the Fifth Amendment right to counsel. The Court of Criminal Appeals concluded that when the defendant invoked his Fifth Amendment right to counsel, questioning ceased and an attorney was appointed. The Court of Criminal Appeals therefore affirmed the trial court's finding that no violation of the defendant's Fifth Amendment right to counsel occurred. The evidence in the record does not preponderate against that finding. This issue is without merit.

### II.

### SUFFICIENCY OF THE EVIDENCE

[9] Relying upon *State v. Brown,* 836 S.W.2d 530 (Tenn.1992), defendant next contends that the trial court and Court of Criminal Appeals erred in finding the evidence sufficient to establish premeditation and deliberation. In considering this claim, we apply the familiar rule that where the sufficiency of the convicting evidence is challenged, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Tenn. R.App. P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Cazes,* 875 S.W.2d 253 (Tenn.1994).

[10] At the time the offense was committed, premeditated first degree murder was defined as the "willful, deliberate, malicious and premeditated killing of another." Tenn.Code Ann.        § 39-2-202(a)(1) (Supp.1988). (FN6) In        *Brown, supra,* we stated that premeditation and deliberation are not synonymous terms. While the existence of both elements may be established by circumstantial evidence alone, premeditation requires proof of a previous intent to kill, while deliberation requires proof of a "cool purpose" that includes some period of reflection during which the mind is free from

passion and excitement. *Id.* at 539.

[11][12] With respect to deliberation, the proof shows that the defendant announced to his wife that he knew "a woman he could knock in the head and get some money." Since Bush was acquainted with Lefever, he necessarily knew she was a frail, elderly lady. Despite that knowledge he took a board with him to her house to accomplish his stated intention. Evidence of procurement of a weapon is probative to prove premeditation. *Brown,* 836 S.W.2d at 541. After Bush broke the board by striking the victim with it, he did not end the assault but procured a second weapon, the butcher knife, from the kitchen and proceeded to stab Lefever forty-    **\*502** three times down the side of her head and on her back.

With respect to deliberation, the evidence shows that before opening the drawer to obtain the butcher knife, Bush removed his shirt and wrapped his hand in what reasonably can be inferred to be an attempt to avoid leaving fingerprints. After stabbing Lefever forty-three times, Bush maintained the presence of mind as shown by the time to collect the broken board. He walked back to the designated place and met his wife, and from there he immediately directed his wife to drive him to Center Hill Lake where he disposed of the evidence. These facts are sufficient to establish that the killing was committed with deliberation and in the absence of passion. *State v. West,*    844 S.W.2d 144, 148 (Tenn.1992).

Considering the proof in this record in the light most favorable to the State, as we are required to do, we agree with the Court of Criminal Appeals that the evidence is sufficient to establish premeditation and deliberation.

### III.

### REBUTTAL PSYCHIATRIC EVIDENCE

Defendant next contends that the testimony of Dr. Athar, a psychiatrist who had treated defendant in 1991 while he was a patient at M.T.M.H.I, and Endean Gerdes, the treatment coordinator at M.T.M.H.I., introduced at the sentencing hearing by the State to rebut the mitigating evidence that the defendant was mentally ill, was obtained in violation of his Sixth Amendment right to counsel and his Fifth Amendment right to remain silent.

[13][14] In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the United States Supreme Court held that the Fifth Amendment right against compelled self-incrimination precludes the State from subjecting a capital defendant to a psychiatric examination concerning future dangerousness without first informing the defendant that he has a right to remain silent and that anything he says can be used against him at the sentencing proceeding. *Id.,* 451 U.S. at 471, 101 S.Ct. at 1872-76. Once a capital defendant is formally charged, the Sixth Amendment right to counsel precludes such an examination unless defense counsel is first notified that the psychiatric examination will encompass the issue of the defendant's future dangerousness. *Id.,* 451 U.S. at 471, 101 S.Ct. at 1877;    *see also    Powell v. Texas,* 492 U.S. 680, 109 S.Ct. 3146; 106 L.Ed.2d 551 (1989). When a capital defendant asserts a

mental status defense, however, he waives the right to raise a Fifth Amendment challenge to the prosecution's use of evidence obtained through the psychiatric examination to rebut the defense. *Buchanan v. Kentucky,* 483 U.S. 402, 422-23, 107 S.Ct. 2906, 2917, 2918, 97 L.Ed.2d 336 (1987). Likewise, the United States Supreme Court has stated that there is no Sixth Amendment violation where defense counsel requests the psychiatric evaluation and is on notice that if a mental status defense is presented, psychological evidence will be used by the State in rebuttal. *Id.*

[15] Applying those principles to the facts in this case, we agree with the Court of Criminal Appeals' conclusion that the State's rebuttal testimony was appropriately introduced. Defense counsel requested the first mental evaluation in this case and was notified of each subsequent psychiatric evaluation which was court ordered at the request of either the defendant or the State. **Bush** relied upon his mental status at the time of the offense as a mitigating circumstance in the penalty phase of the trial. Accordingly, introduction of the rebuttal testimony did not violate the defendant's Fifth or Sixth Amendment rights.

IV.

### *LIFE IMPRISONMENT AND PAROLE ELIGIBILITY*

Approximately fifteen minutes after deliberations began in the sentencing phase of this case, the jury sent a note to the trial court asking, "How many years does the [defendant] serve if he gets life imprisonment and how long before parole?" Counsel for Bush requested that the jury be instructed that under present law the defendant would have to serve a minimum of thirty calendar **\*503** years before becoming eligible for parole. In addition, counsel requested that the jury be instructed that a life sentence is literally a life sentence since Bush has no absolute legal right to parole even though he might at some point become parole eligible. The trial judge denied defense counsel's request, and instead, instructed the jury that "parole eligibility is not an issue in a capital case...." The Court of Criminal Appeals affirmed the trial court's action.

Relying upon a recent United States Supreme Court decision, *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the defendant contends in this Court that the trial court's response to the jury question violated his right to Due Process. We disagree.

In *Simmons,* the prosecution was allowed to argue future dangerousness to the jury as a basis supporting imposition of the death penalty. Simmons sought to rebut the prosecution's generalized argument in two ways. First, he attempted to introduce proof that due to his unique psychological problems, his future dangerousness was limited to elderly women and would not be a threat in a prison setting where he would have no contact with such individuals. Secondly, Simmons sought to introduce proof that under South Carolina law, he would not be eligible for parole if sentenced to life imprisonment and therefore would never pose a future danger to elderly women. The trial judge

refused to allow Simmons to offer any rebuttal proof of his parole ineligibility and also refused Simmons requested jury instruction defining a life sentence as "imprisonment in the state penitentiary for the balance of his natural life."

After deliberating ninety minutes on the appropriate sentence, the jury sent a note to the judge asking, "Does the imposition of a life sentence carry with it the possibility of parole?" Over Simmons' objection, the trial judge instructed the jury "not to consider parole or parole eligibility in reaching your verdict. That is not a proper issue for your consideration. The terms life imprisonment and death sentence are to be understood in their plain [sic] and ordinary meaning." Twenty-five minutes later the jury returned to the courtroom with a sentence of death.

On appeal to the United States Supreme Court, Simmons claimed that the trial court's refusal to allow proof or instruction about his parole ineligibility violated his rights under the Due Process Clause. A majority of the Court in *Simmons* agreed and held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Simmons,* 512 U.S. at 155-56, 114 S.Ct. at 2190. If parole *is* an option for a defendant sentenced to life imprisonment, however, the *Simmons* Court emphasized that it will not second-guess the refusal of a State to allow proof, instruction, or argument to the jury on the availability of parole. *Simmons,* 512 U.S. at 168-69, 114 S.Ct. at 2196;    *see also Simmons,* 512 U.S. at 175-77, 114 S.Ct. at 2200 (O'Connor, J., concurring) ("In a state in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact.")

[16] Since Tennessee is a state in which defendants sentenced to life imprisonment are eligible for parole, *Simmons* does not require that the jury be given information about parole availability. (FN7) Indeed, the trial court's refusal to give defendant's requested response to the jury question was entirely consistent with prior decisions of this Court holding that the after-effect of a jury's verdict, such as parole availability, is not a proper instruction or consideration for the jury during deliberations. *State v. Caughron,*    855 S.W.2d 526, 543 (Tenn.1993); *State v. Payne,* 791 S.W.2d 10, 21 (Tenn.1990). (FN8) Accordingly,    **\*504**  we conclude that the trial court did not err by refusing to respond to the jury's question as the defendant requested.

V.

### *MURDER TO PREVENT ARREST--AGGRAVATING CIRCUMSTANCE (I)(6)*

With respect to this issue, defendant first argues that, if interpreted to apply under the facts of this case, the aggravating circumstance, "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another" violates the narrowing principles adopted by a majority of this Court in *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992) . The only basis for finding the aggravating

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

circumstance in this case, according to the defendant, is the theory that he killed the victim to prevent his arrest for killing her, a theory and circumstance arguably present in every first degree murder in which the victim knows the murderer. Defendant urges this Court to adopt a narrowing construction of the aggravating circumstance and find the evidence in this case insufficient to support its application.

[17] This Court has previously held that to establish the applicability of this aggravating circumstance, the State must prove that avoidance of prosecution or arrest was one of the purposes motivating the killing. *State v. Smith,* 868 S.W.2d 561, 581 (Tenn.1993). We have refused to narrow the application of the circumstance to only those killings which are solely or predominantly motivated by a desire to avoid arrest or prosecution. *State v. Carter,* 714 S.W.2d 241, 250 (Tenn.1986) (avoidance of arrest need not be sole motive for murder). While we agree with the defendant that the aggravating circumstance logically can not and does not apply when the only theory advanced by the State is that the victim was killed to prevent the defendant from being arrested or prosecuted for the killing, we do not agree that was the only theory advanced by the State and supported by the proof, in this record.

[18] Indeed, as the Court of Criminal Appeals observed, the evidence supports the conclusion that the victim was killed to prevent the defendant's apprehension and prosecution for the separate offense of burglary of which the defendant was convicted. The proof shows that the defendant intended to "get" money from a victim with whom he was well-acquainted. By refusing to reveal the residence or identity of the intended victim to his wife, the defendant was obviously attempting to avoid having anyone witness the crime. By his own statement, the defendant admitted that the victim recognized him. The proof therefore supports the jury's finding that one purpose of the murder was to avoid prosecution or arrest. *See also State v. Smith,* 857 S.W.2d 1, 14 (Tenn.1993); *State v. Evans,* 838 S.W.2d 185 (Tenn.1992); *State v. Thompson,* 768 S.W.2d 239 (Tenn.1989); *State v. Irick,* 762 S.W.2d 121 (Tenn.1988); *State v. Coe,* 655 S.W.2d 903 (Tenn.1983).

The facts of this case are distinguishable from *State v. Branam,* 855 S.W.2d 563 (Tenn.1993), on which the defendant relies. In *Branam,* the proof showed that the killer was a person whom the victim did not know, and the defendant, whom the victim knew, remained out of the victim's sight. Therefore, there was no proof that the victim could have identified the triggerman or the defendant, and therefore, no proof that one purpose motivating the killing was avoidance of prosecution or arrest.

Application of the aggravating circumstance also does not violate the narrowing principles of *Middlebrooks.* In *Middlebrooks,* a majority of this Court held that when a defendant is convicted of the statutory offense of felony murder, the felony murder aggravating circumstance, which duplicates **505** the elements of the underlying offense, does not sufficiently narrow the class of persons eligible for the death penalty and can not be relied upon as a basis for imposition of the death penalty.

[19] In this case, the defendant was convicted of premeditated first degree murder which required the State prove, beyond a reasonable doubt, the willful, deliberate, malicious and premeditated killing of another. The State was not statutorily required to prove, as part of the offense, that one purpose motivating the killing was the avoidance of arrest or prosecution. Therefore, the aggravating circumstance does not duplicate the elements of the underlying offense and sufficiently narrows the class of persons eligible for the death penalty. *Cf. State v. Stephenson,* 878 S.W.2d 530 (Tenn.1994) (murder for renumeration). Consequently, we decline the defendant's invitation to further limit application of the aggravating circumstance.

VI.

*JURY INSTRUCTION--AGGRAVATING CIRCUMSTANCE (i)(5)*

In his final issue, the defendant contends that the jury was not properly instructed with respect to the remaining aggravating circumstances. Jodie Lefever was murdered in 1988. At the time of the killing, one of the aggravating circumstances upon which the State relied was defined by statute as "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." *See* Tenn.Code Ann. § 39-2-203(I)(5)(1982). In 1989, the statute was amended and the aggravating circumstance redefined as "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or *serious physical abuse beyond that necessary to produce death.* " Tenn.Code Ann. § 39-13-204(I)(5)(1991)(emphasis added).

[20] The trial of this defendant was held in February of 1993. The trial court, without objection from the defense or the State, instructed the jury in the language of the 1989 statute, rather than in accordance with the law as it existed when the offense was committed in 1988. Under decisions of this Court rendered *after* the trial of this case, (FN9) it is clear that the sentencing hearing should have been conducted in accordance with the 1988 law, the law in effect at the time of the commission of the offense. *State v. Brimmer,* 876 S.W.2d 75, 82 (Tenn.1994).

Therefore, instructing the jury in the terms of the amended statute was erroneous. The defendant argues that he is entitled to a new sentencing hearing which must be conducted in accordance with the law in effect at the time the offense was committed. The State argues that the error was harmless and relies upon the decision of the Court of Criminal Appeals which held that the error was harmless beyond a reasonable doubt because the amended definition of the aggravating circumstance "required a higher burden on the State to prove that the act involved torture or serious physical abuse." . While we do not agree with the intermediate court that the amended definition imposed a higher burden upon the State, we have determined, for the reasons explained below, that the erroneous jury instruction is harmless beyond a reasonable doubt and does not "affirmatively appear to have affected the result of the trial on the merits." Tenn. R.App. P. 36(b); Tenn. R.Crim. P. 52(a).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

[21] The 1989 version of the aggravating circumstance is different from the 1982 version in that it substitutes the phrase "serious physical abuse beyond that necessary to produce death" for the phrase "depravity of mind." The aggravating circumstance is redefined. Unlike the Court of Criminal Appeals, we consider the amendment a substantive change which imposes not a different *level* of proof upon the State, but different *factors* of proof. Therefore, it is not accurate to broadly characterize an instructional error such as that complained of on appeal in this case as beneficial to the defendant. (FN10) Depending **\*506** upon the facts of the case, such an error could conceivably be beneficial to the State. We do not agree, however, with the defendant's argument that such an error always requires reversal and may never be harmless. The defendant's reliance upon *State v. Stephenson,* 878 S.W.2d 530 (Tenn.1994) is misplaced. The circumstances in *Stephenson* were unique and are not present in this case. The jury was instructed and returned a verdict in accordance with 1988 law, though the offense was committed after the statute was amended in 1989. The defendant was therefore deprived of the previously noted benefits of the 1989 law. When the error was called to the trial court's attention, the jurors were recalled, some two weeks after the trial, and questioned by the trial court to establish that the erroneous jury instructions had no impact on the verdict rendered, a procedure that was clearly inappropriate. Under such circumstances, this Court found that error required reversal. Unlike *Stephenson,* the instructional error in this case is harmless for two reasons.

[22][23] First, this aggravating circumstance was sufficiently proven by evidence of torture, independent of the depravity or serious physical abuse prong of the aggravating circumstance. *State v. Hines,* 919 S.W.2d 573, 587 (Tenn.1995). The trial court correctly instructed the jury as to the definitions of the terms "heinous," "atrocious," and "cruel" in accordance with this Court's decision in *State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985). Also in accordance with *Williams,* the trial court instructed the jury that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *Id.* The proof introduced by the State during the trial clearly established torture. The victim was initially assaulted and knocked to the floor by the defendant. While she was lying helpless on the floor, the defendant retrieved a butcher knife, returned to the den, and began stabbing her. Dr. Harlan testified that the victim would have been alive and conscious for at least three to five minutes during the assault, and possibly as long as thirty minutes. The pain of the stabbing during that period of consciousness would have been comparable, according to Dr. Harlan, to undergoing surgery without an anesthetic. Therefore, based upon the proof in this record, we are convinced beyond a reasonable doubt that had the sentencing jury given no weight to the invalid aggravating criteria [serious physical abuse], the defendant's sentence would have been the same.    *State v. Howell,* 868 S.W.2d 238, 260-61 (Tenn.1993). Therefore the error does not affirmatively appear to have affected the result of the sentencing hearing.

[24] Alternatively, we are convinced beyond a reasonable doubt that had the jury been properly instructed, it would have found the evidence sufficient to establish depravity of mind beyond a reasonable doubt. In *Williams,* this Court stated that depravity is inherent in the state of mind of a murderer who willfully inflicts severe physical or mental pain on a victim prior to death or at a time very close to the victim's death. *Id.,* 690 S.W.2d at 529. In this case the defendant beat and stabbed the victim, a person whom he knew, and later boasted about how he had practiced karate on Lefever. Such evidence clearly establishes that the defendant willfully inflicted severe physical pain upon the victim. Accordingly, we conclude that had the jury been properly instructed it would have found depravity of mind. Therefore, the instructional error in this case does not affirmatively appear to have affected the **\*507** verdict and is harmless beyond a reasonable doubt.

VII.

*PROPORTIONALITY REVIEW*

[25] In accordance with the mandate of Tenn.Code Ann. § 39-13-206(c)(1)(1991 Repl.), we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion; that the evidence supports, as previously discussed, the jury's findings of the statutory aggravating circumstances; and the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39-13-206(c)(1)(A)-(C)(1991 Repl.). Finally, comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases considering the nature of the crime and the defendant. Tenn.Code Ann. § 39-13-206(c)(1)(D) (1991 Repl.).

Our 1977 statute created a comparative proportionality review to serve as an additional safeguard against arbitrary or capricious sentencing. Such review of death cases insures rationality and consistency in the imposition of the death penalty. We have studied, compared, and analyzed cases and conducted a meaningful proportionality review as outlined in *State v. Barber,* 753 S.W.2d 659, 663-68 (Tenn.1988). We have reviewed Rule 12 reports from trial judges submitted over the past eighteen years in all criminal trials for first degree murder in which life imprisonment or a sentence of death has been imposed. We have made an independent, conscientious and thorough review of this case, as we have in every other capital case that has come before this Court. As a result of that review, we are of the opinion that the senseless, gruesome, premeditated killing of this innocent, helpless, elderly woman clearly warrants the imposition of the death penalty. Defendant's deliberate acts showed a total disregard for human life. The victim, a seventy-nine year old widow, was the best friend of the defendant's grandmother. The defendant used this relationship to gain access to her home. The defendant savagely beat the victim with a stick and then stabbed her forty-three times. This brutal murder places the defendant Bush into the class of defendants deserving capital punishment and is not disproportionate to the sentences imposed in similar cases. *See State v. Van Tran,* 864 S.W.2d 465 (Tenn.1993); *State v. McNish,* 727 S.W.2d 490

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)

(Tenn.1987); *State v. Harbison*, 704 S.W.2d 314
(Tenn.1986); *State v. Barnes*, 703 S.W.2d 611
(Tenn.1985); *State v. Cone*, 665 S.W.2d 87
(Tenn.1984); *State v. Campbell*, 664 S.W.2d 281
(Tenn.1984); *State v. Melson*, 638 S.W.2d 342
(Tenn.1982).

### CONCLUSION

We have considered the defendant's assignments of
error and determined that none affirmatively appear
to have affected the verdict of the trial or the
sentencing proceeding. With respect to issues not
specifically addressed herein, we affirm the well-
reasoned decision of the Court of Criminal Appeals,
authored by Judge David Hayes and joined in by
Judge Paul G. Summers and Judge William M.
Barker. Relevant portions of that opinion are
published hereafter as an appendix. The defendant's
conviction for first degree murder and sentence of
death by electrocution are affirmed. The sentence
of death will be carried out as provided by law on
the 7th day of July 1997 unless otherwise ordered by
this Court, or other proper authorities. Costs of this
appeal are adjudged against the defendant.

ANDERSON and HOLDER, JJ., concur.

REID, J., concurs by separate opinion.

BIRCH, C.J., dissents by separate opinion.

APPENDIX

(Excerpts from the Court of Criminal Appeals'
Decision)

IN THE COURT OF CRIMINAL APPEALS OF
TENNESSEE
AT KNOXVILLE
FEBRUARY SESSION, 1995

STATE OF TENNESSEE, Appellee

vs.

MICHAEL DEAN BUSH, Appellant

No. 03C01-9403-CR-00094
CUMBERLAND COUNTY
Hon. LEON BURNS, JR., Judge
**508** (First Degree Murder and First Degree
Burglary)

*For the Appellant:*

Martelia T. Crawford
BPR #10760
310-A East Broad St., Suite 1
Cookeville, TN 38501
(ON APPEAL and AT TRIAL)

Richard McGee
BPR #06181
222 Second Avenue, North
Nashville, TN 37201
(ON APPEAL)

J.H. Reneau III
Rt 3, Box 165
Celina, TN 38551
(AT TRIAL)

*For the Appellee:*

Charles W. Burson
Attorney General and Reporter

Amy L. Tarkington
Assistant Attorney General
Criminal Justice Division
450 James Roberterson Parkway
Nashville, TN 37243-0493

William Edward Gibson
District Attorney General

Owen G. Burnett
John A. Moore
Lillie Ann Sells
Asst. District Attorneys General
145 South Jefferson Avenue
Cookeville, TN 38501

David A. Patterson
Asst. District Attorney General
206 East 2nd Street
Crossville, TN 38555

AFFIRMED

David G. Hayes
Judge

3. THE MARITAL PRIVILEGE

A. WHETHER THE TRIAL COURT ERRED IN
OVERRULING THE APPELLANT'S MOTION
TO SUPPRESS THE TESTIMONY OF SHEILA
BUSH HAMMOCK

The appellant contends that the marital privilege
should have barred, at trial, the testimony of Sheila
Bush Hammock concerning statements made by the
appellant to Ms. Hammock during their marriage.
Specifically, the appellant argues that, because the
trial court restricted examination of Ms. Hammock
at the suppression hearing to "the circumstances
under which any statements were made that might
be attributable or not attributable to some marital
privilege," the court was unable to properly
determine whether the appellant could invoke the
privilege. In other words, according to the
appellant, testimony concerning "the details and
contents of the statements" was essential to the
resolution of the appellant's motion.

The suppression hearing was held on June 9, 1992.
At the hearing, Ms. Hammock testified that she had
married the appellant on August 13, 1988, three
days prior to the murder of Jodie Lefever. She
further testified that she and the appellant had been
dating "off and on two years" before their marriage.
Both before and after their marriage, the appellant
"threatened" and "beat" Ms. Hammock. Ms.
Hammock also stated, "He would always call me
names and make fun of me. I couldn't say anything
right." Moreover, following their marriage, while
the appellant and Ms. Hammock were living with
her mother, the appellant would not allow Ms.
Hammock to visit friends. After they moved to his
parents' house, the appellant would not allow her to
visit her mother.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

Ms. Hammock concluded that she "was just scared of Michael," and that her relationship with the appellant was a relationship built upon fear and threats. For example, after the appellant admitted to her that he had killed Ms. Lefever, he told Ms. Hammock that the Mafia was watching her, and that, if she ever told anyone what he had done, she would be killed. On the day that Ms. Hammock decided to leave the appellant, he again physically abused her. The State introduced into evidence a picture of bruises that Ms. Hammock suffered as a result of the appellant's abuse. At the time of the suppression hearing, Ms. Hammock and the appellant had been divorced for approximately two years.

**\*509** The rule of marital privilege applicable in the appellant's case was announced by our supreme court in *McCormick v. State,* 135 Tenn. 218, 186 S.W. 95 (1916). (FN1) In *McCormick,* 186 S.W. at 97, the supreme court held that "[s]ound public policy requires that neither the husband nor the wife shall be permitted to testify, in criminal cases, as to any matter coming to his or her knowledge by reason of the marital relation." *See also Burton v. State,* 501 S.W.2d 814, 817-819 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1973); *Bragan,* 920 S.W.2d 227. Under this rule, either the testifying or non-testifying spouse can invoke the privilege. *Bragan,* 920 S.W.2d 227. However, the privilege is not absolute. In *Adams,* 563 S.W.2d at 808, this court observed that the following conditions must exist before a communication between husband and wife can be considered privileged:

(1) The communications must originate in a confidence that they will not be disclosed.

(2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.

(3) The relation must be one which, in the opinion of the community, ought to be sedulously fostered.

(4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.

The court in *Adams* noted that exceptions to the marital privilege generally arise from the failure of the communication to meet these conditions. *Id.* "All four of these conditions must exist to protect the evidence by the marital privilege." *State v. Garland,* 617 S.W.2d 176, 183 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1981). Thus, testimony at the suppression hearing relevant to the first two conditions was unnecessary if sufficient evidence was presented to negate the last two conditions.

In *Garland,* 617 S.W.2d at 182-183, this court observed that the application of the marital privilege was inappropriate where the marriage between the parties was "extremely tumultuous." Similarly, in this case, the trial court denied the appellant's motion **\*510** to suppress on the basis of the following findings of fact:

Sheila (Bush) Hammock and the defendant were married on August 13, 1988. The Court further

finds that the parties separated on or about September 25, 1988. From the testimony, the Court further finds that a divorce was granted to the parties approximately two (2) years prior to the date of this hearing. The Court further finds that the marriage was extremely turbulent and disturbing from its beginning. The defendant regularly beat and physically abused the prospective witness. He subjected her to various forms of mental and verbal abuse on a regular basis. He threatened her with physical harm and death if she ever disclosed any of the crimes which he allegedly committed. The threats were made before and after the threats [sic] were allegedly committed.

The findings of fact made by the trial court after an evidentiary hearing are afforded the weight of a jury verdict; this court will not set aside the judgment of the trial court unless the evidence in the record preponderates against its findings. *State v. Stephenson,* 878 S.W.2d 530, 544 (Tenn.1994); *State v. Dick,* 872 S.W.2d 938, 943 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1993); *State v. Killebrew,* 760 S.W.2d 228, 233 (Tenn.Crim.App.1988). We conclude that the record supports the trial court's findings. Thus, as in *Garland,* 617 S.W.2d at 183, "we do not believe that the conditions 3 and 4 enumerated in *Adams* are met." Therefore, contrary to the appellant's argument in his brief, further testimony regarding the*contents* of the appellant's statements to Ms. Hammock was unnecessary to the proper resolution of the appellant's motion.

B. WHETHER THE TRIAL COURT'S LIMITATION AT THE SUPPRESSION HEARING OF CROSS-EXAMINATION OF SHEILA BUSH HAMMOCK VIOLATED THE APPELLANT'S RIGHT TO CONFRONTATION UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 9 OF THE TENNESSEE CONSTITUTION.

The appellant contends that, at the suppression hearing, he "was limited and restricted from confronting [his] accuser, Sheila Bush (Hammock), and thereby denied his rights under the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution." The right to confrontation set forth in the Sixth Amendment includes the right to conduct cross-examination. (FN2) However, we have previously observed, "[I]t is elementary that the exclusion of immaterial or irrelevant evidence does not abridge an accused's right to confrontation." *State v. Marquadis,* 649 S.W.2d 15, 17 (Tenn.Crim.App.1982). *See also Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"); Tenn. R. Evid. 611(a) ("[t]he court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel"). In other words, "the Confrontation Clause only guarantees 'an *opportunity* for effective

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)

cross-examination, not cross-examination that is
effective in whatever way, and to whatever extent,
the defense counsel might wish.' " *Pennsylvania v.
Ritchie,* **511**  480 U.S. 39, 53, 107 S.Ct. 989,
999, 94 L.Ed.2d 40 (1987) (citation omitted). We
have already concluded that the testimony at the
suppression hearing concerning the contents of the
appellant's statements to Ms. Hammock would have
been superfluous.

Moreover, this court has held that "the
'confrontation' guaranteed by the United States
Constitution is confrontation at trial." *Haggard v.
State,* 4 Tenn.Crim.App. 620, 475 S.W.2d 186, 187
(1971), *perm. to appeal denied,*       (Tenn.1971).
Similarly, in *Ritchie,* 480 U.S. at 52, 107 S.Ct. at
999, a plurality of the United States Supreme Court
observed that "the right to confrontation is a   *trial*
right."  *See also  United States v. Sasson,* 62 F.3d
874, 881 n. 5 (7th Cir.1995);   *United States v. De
Los Santos,* 819 F.2d 94, 97 (5th Cir.1987);  *United
States v. Boyce,* 797 F.2d 691, 693 (8th Cir.1986).
(FN3)  Defense counsel was able to fully and
extensively cross-examine Ms. Hammock at trial.
This claim is without merit.

4. WHETHER THE TRIAL COURT ERRED IN
OVERRULING THE APPELLANT'S MOTION
TO SUPPRESS THE TESTIMONY OF OTHER
INMATES.

The appellant contends that the trial court erred in
allowing jailhouse informants to testify against the
appellant concerning statements made by the
appellant during his incarceration.  The appellant
filed a motion on October 16, 1992, to exclude the
testimony of William Moore, Jimmy Myers, Billy
Goney, and other inmates, based on the allegation
that law enforcement officers asked the inmates to
elicit statements from the appellant in violation of
*Massiah v. United States,* 377 U.S. 201, 84 S.Ct.
1199, 12 L.Ed.2d 246 (1964).  On November 13,
1992, an evidentiary hearing was held to resolve the
appellant's motion.

Billy Goney and Jimmy Myers testified at the
hearing.  Billy Goney stated that he was incarcerated
with Michael Bush at the Putnam County Jail
between September or October of 1988 and April of
1989.  He further alleged that, approximately one
week after the appellant was placed in the jail,
Bobby Lane and Doug Burgess, investigators with
the Putnam County Sheriff's Department, asked
Goney and fellow inmates, Guy Ramsey and Jimmy
Myers, to tape conversations with Michael Bush.
The inmates were told that, if they cooperated with
the police, the police "would help [them] out."  The
inmates already had access to tape recorders and
tapes, and the inmates used the equipment to tape
conversations with the appellant.  However, Goney
added,

[W]hat we'd do was like Jimmy would ask
Michael a question, say, did you kill that old
woman, and we'd have the recorder playing and
we'd ease up off the play button.  Then they would
ask him another question like, do you like karate,
and he would say, yeah, and we'd push yeah when
he was saying yes.

Goney stated that he and his fellow informants
made approximately three tapes, and that Jimmy

Myers, his half-brother, delivered the tapes to
Deputy Lane.  Goney insisted that he never heard
the appellant admit to killing Jodie Lefever.

Jimmy Myers also testified at the hearing.  He was
also incarcerated at the Putnam County Jail in
September of 1988.  Indeed, he shared a cell with
the appellant.  However, Myers testified that neither
Deputy Burgess nor Deputy Lane asked the inmates
to record conversations with Michael Bush.  Rather,
Myers asserted that Goney and Ramsey first
suggested taping the appellant and first contacted
Deputies Lane and Burgess.  **512**  His testimony
is somewhat unclear as to whether the tapes were
made before or after the inmates contacted the
deputies.  Myers conceded that the officers may
have been aware that the tapes were being made.

In any event, before the tapes were made, Myers
heard the appellant admit to killing Ms. Lefever.

Well, one time he was telling me and Billy and
Ramsey all, I mean, he told us he tied Ms. Lefever
up and stuff and stabbed her and waited on his
wife.  His wife dropped him off and came back to
pick him up, and he went down to the dam and
washed blood off of him and stuff.  And, I mean,
that's about all he said.  And then some other
times he would tell a different story.

Again, Myers could not remember whether he and
the other inmates spoke to the deputies before or
after they overheard this statement.  Finally, Myers
conceded on cross-examination that it was common
knowledge at the jail that inmates could get help
from the police if they provided information.
However, he testified that he was not promised any
assistance in return for his testimony.

Deputy Burgess testified at the hearing that he
never asked any of the inmates to tape conversations
with Michael Bush, nor, to his knowledge, had any
other deputy made such a request.  Moreover, he
never received any tapes, nor was he aware that
tapes had been turned over to the Sheriff's
Department until he found a tape in Bobby Lane's
office the day before the hearing.  He was not aware
of any agreement between jailhouse informants and
the police.  He testified that Billy Goney and,
possibly, Jimmy Myers had asked to speak with him
several times.  He spoke with Goney privately
"maybe one or two" times.  He told Goney "to keep
his ears open and if he heard anything, let us know."
Goney was unable to provide any useful
information.  At a subsequent hearing, on December
10, 1992, Burgess stated that he would not have
turned to inmates to obtain incriminating statements
from Michael Bush because "[t]hat's no good in
court.  We can't use it."

At the December 10 hearing, Deputy Bobby Lane
testified that, during the course of his investigation
of the Lefever murder, he never asked inmates to
secretly record conversations with the appellant.
Goney approached him with two tapes, but "[t]he
tapes was garbage.  There wasn't any use in keeping
the tapes."  Lane did not have any subsequent
conversations with Goney about the tapes, nor did
Lane talk to any other inmate.  On December 22,
1992, the trial court denied the appellant's motion,
observing, "I think it's a question of credibility for
the jury to decide."

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)                                      Page 17

At trial, no tapes were introduced into evidence. However, Jimmy Myers and William Roger Moore testified. Jimmy Myers again stated that he had heard the appellant admit to killing Jodie Lefever. Bush also told Myers that "he was going to try to make people think he was crazy." Myers testified that these statements were not recorded, as the informants began taping the appellant only after the appellant's lawyers advised him against talking to fellow inmates about the murder. After the appellant was so advised, he changed his story several times. Finally, Myers insisted that he was never offered any form of compensation in return for his testimony. On cross-examination, he conceded that he had written a letter to an assistant district attorney, in which he stated, "If you can help me out in any way, I promise you that you will not be sorry."

Finally, William Roger Moore, another fellow inmate of Michael Bush following the appellant's incarceration at the Putnam County Jail, also testified at trial. Moore stated that, as there was very little to do at the jail, Bush approached him and initiated several conversations. The appellant admitted to Moore that he had killed Jodie Lefever. The appellant also stated that he was going to "make a ploy for craziness." Moore imparted this information to Special Agent O'Rear, an agent with the Tennessee Bureau of Investigation. Moore testified that he was not offered any compensation in return for his cooperation, nor did he ask for any compensation.

Again, the appellant argues that any incriminating statements made by the appellant **\*513** to fellow inmates were elicited in violation of *Massiah*. We note, initially, that, because only Jimmy Myers and William Moore testified at trial, the denial of the motion to suppress with respect to Goney and other inmates, even if erroneous, was harmless. *See Hartman v. State,* 896 S.W.2d 94, 100 (Tenn.1995); *State v. Sparks,* 727 S.W.2d 480, 482 (Tenn.1987), *post-conviction relief granted,* Sparks v. state, 03S01-9212-CR-00105, 1993 WL 151324 (Tenn. May 10, 1993). With respect to Myers and Moore, "the clear rule of · *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977). Thus, in order to find a *Massiah* violation, a court must first determine (1) whether adversary proceedings had commenced; (2) whether the informant was a government agent; and (3) whether the agent "interrogated" the appellant within the meaning of *Massiah.*

The initiation of adversary proceedings is "marked by formal charge, which [has been] construe[d] to be an arrest warrant, or at the time of the preliminary hearing in those rare cases where a preliminary hearing is not preceded by an arrest warrant, or by indictment or presentment." *State v. Mitchell,* 593 S.W.2d 280, 286 (Tenn.1980), *cert. denied,* 449 U.S. 845, 101 S.Ct. 128, 66 L.Ed.2d 53 (1980). Clearly, at the time the appellant allegedly made the incriminating statements to fellow inmates, he had been formally charged and, probably, indicted. (FN4)

It is arguably unclear whether Myers was acting as

a government agent. This court in *State v. Dunn,* No. 85-356-III, 1986 WL 6322 (Tenn.Crim.App. at Nashville, June 6, 1986) observed, "Although *Massiah* and it progeny do not explicitly define the term 'state agent,' the conduit in each of these cases was clearly a state agent, operating as such, when the conversations occurred." Thus, any admissions made by the appellant *before* law enforcement officers became involved would, of course, be admissible. *Hartman,* 896 S.W.2d at 100. "[T]he Sixth Amendment is not violated whenever--by luck or happenstance--the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985).

Again, at the suppression hearing, Goney testified that Deputies Burgess and Lane asked inmates, including Myers, to record conversations with the appellant. However, Goney's testimony was largely contradicted by the testimony of both deputies and by the testimony of Myers. (FN5) At trial, Myers recounted statements by the appellant, overheard prior to the recording of any conversations. At the suppression hearing, Myers could not remember whether he heard these statements before or after first talking to Burgess and Lane. Both deputies, for the most part, denied enlisting inmates to obtain statements from the appellant, although Deputy Burgess admitted that he might have asked *Goney* "to keep his ears open."

Even assuming that Myers was a state agent, the appellant at the suppression hearing also carried the burden of demonstrating "that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson,* 477 U.S. 436, 456, 459, 106 S.Ct. 2616, 2628, 2630, 91 L.Ed.2d 364 (1986). At the suppression hearing, Goney testified that he and Guy Ramsey recorded conversations with the appellant, during which they attempted, with Myers' assistance, to elicit and, indeed, fabricate a confession. (FN6) However, Myers testified that he did not participate in the recording of any statements. Rather, he testified both at **\*514** the suppression hearing and at trial that he merely overheard the appellant confess to the murder of Ms. Lefever. There is no evidence in the record that this statement was made in response to efforts by the other inmates to stimulate conversation about the crime charged.

Given the conflicting testimony adduced at the suppression hearing, the record supports the trial court's denial of the appellant's motion with respect to Jimmy Myers. The findings made by the trial court after an evidentiary hearing are afforded the weight of a jury verdict; this court will not set aside the judgment of the trial court unless the evidence in the record preponderates against its findings. *State v. Stephenson,* 878 S.W.2d 530, 544 (Tenn.1994); *State v. Dick,* 872 S.W.2d 938, 943 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1993); *State v. Killebrew,* 760 S.W.2d 228, 233 (Tenn.Crim.App.1988).

In any event, assuming for the sake of argument that Myers was a state agent *and* assuming that he "interrogated" the appellant within the meaning of *Massiah,* the admission at trial of Myers' testimony

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

was harmless error. *See Hartman,* 896 S.W.2d at 100; *Sparks,* 727 S.W.2d at 482. William Moore testified at trial concerning almost identical statements made by the appellant to him in the Putnam County Jail. The record is devoid of evidence that Moore was a state agent at the time of his conversations with Michael Bush, nor is there evidence that he made any effort to elicit statements from the accused about the crime charged. This issue is without merit.

## 5. WHETHER THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S OBJECTION TO THE INTRODUCTION OF CERTAIN PHOTOGRAPHS OF THE VICTIM.

The appellant contends that the trial court erred in overruling his motion to suppress certain photographs of the victim. Specifically, he insists that the pictures were admitted only for the purpose of inflaming the jury, thus, their prejudicial effect outweighed their probative value. Additionally, the appellant argues that the photographs had no probative value in light of the vivid description of the victim's body given in Officer Lane's testimony.

During a jury-out hearing, the State attempted to present four photographs of the victim. Exhibit 25 was a photograph of the victim as she was discovered by Officer Lane. Exhibit 26 was a photograph which showed wounds to the victim's head. Exhibit 27 was a photograph which showed the lower dental plate of the victim on the floor next to her body. Exhibit 28 showed a wound to the victim's left knee. The State argued that the photographs were relevant to corroborate medical testimony, to aid the jury in determining the extent of the wounds, and to establish the element of malice. The appellant responded that the pictures did not add to testimonial value as Officer Lane had already described the wounds in great detail. The appellant concluded that, moreover, the pictures were more prejudicial than probative.

The trial court accepted the State's argument that Exhibit 25 was probative to show the placement of the wounds on the body, Exhibit 27 was probative as to the amount of force that was used to dislodge the dental plate from the victim's mouth, and Exhibit 28 was probative to show additional wounds on the body. Furthermore, the trial court found that the probative value of these three photographs was not outweighed by their prejudicial effect. However, the trial court sustained the appellant's objection to Exhibit 26, finding it to be the most gruesome of the pictures, and finding it to not accurately depict the victim's wounds.

To be admissible, a photograph must be relevant to some issue at trial, and its prejudicial effect must not outweigh its probative value. *State v. Banks,* 564 S.W.2d 947, 951 (Tenn.1978); *see also* Tenn. R. Evid. 403. The discretion of a trial judge in allowing the admission of a photograph into evidence will not be overturned except upon a clear showing of an abuse of discretion. *State v. Bordis,* 905 S.W.2d 214, 226 (Tenn.Crim.App.1995) (citations omitted); *see also State v. Stephenson,* 878 S.W.2d 530, 542 (Tenn.1994).

*515 We conclude that it was not error to admit the photographs in this case. The photographs were

relevant to supplement the testimony of the medical examiner and the officer who initially investigated the crime scene in establishing the cause of death, *see Stephenson,* 878 S.W.2d at 542; and to show the brutality of the attack and extent of force used against the victim, from which the jury could infer malice. *See State v. Brown,* 836 S.W.2d 530, 551 (Tenn.1992). This issue is without merit.

## 6. WHETHER THE APPELLANT IS ENTITLED TO RELIEF BASED ON ALLEGATIONS OF PROSECUTORIAL MISCONDUCT.

### A. LACK OF REMORSE

The appellant first argues that the prosecutor erroneously elicited testimony concerning the appellant's lack of remorse from three witnesses. When questioned by the prosecutor as to whether the appellant had expressed any remorse for what he had done, William Roger Moore, an inmate who had been incarcerated with the appellant, answered that the appellant had expressed remorse only in that he had gotten caught. When asked whether he had observed any sadness on the part of the appellant when the appellant had shown him a newspaper account of the murder, James Mullins, a friend of the appellant, testified that he had observed no sadness. When asked whether the appellant had expressed any remorse or sadness for what he had done, Shelia Bush (Hammock) testified that he had expressed no remorse.

The failure of defense counsel to make a contemporaneous objection waives consideration of the issue on appeal. *See Teague v. State,* 772 S.W.2d 915, 926 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1989); *State v. Killebrew,* 760 S.W.2d 228, 235 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1988); Tenn. R.App. P. 36(a) . A review of the record reveals that of the three statements to which the appellant now objects, the appellant only objected to the prosecutor's question to James Mullins, and the objection was based on the fact that it was a leading question. We conclude that the appellant has waived this issue.

### B. IRRELEVANT OPINION EVIDENCE

The appellant next contends that the prosecutor erred in eliciting irrelevant opinion evidence from Jimmy Myers, another inmate who had been incarcerated with the appellant. On redirect examination, the prosecutor asked Myers why he was in court testifying. Myers responded that it "could be my mother or my grandmother, someone that's you know, laying there dead you know. I don't think someone should kill someone like that and just walk the streets. Get out scot free."

The appellant contends that the prosecutor deliberately brought before the jury evidence which was wholly irrelevant to the appellant's guilt or innocence. However, the record reveals that on cross-examination, appellant's counsel questioned Myers extensively concerning his true motivation for testifying. We conclude that the question asked by the prosecutor was appropriate, notwithstanding the witness' nonresponsive statement. This issue is without merit.

### C. CLOSING ARGUMENT

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)                    Page 19

### (1) MASSIVE INVESTIGATION

The appellant also argues that he is entitled to a reversal of his conviction due to prosecutorial misconduct during closing argument. He objects to the prosecutor's remark that the investigation was "the most extensive investigation ... that I've ever heard of" and to the prosecutor's statement that the appellant was the only suspect resulting from the investigation. The appellant contends that evidence of such an investigation was not before the jury, and that the prosecutor's comments exceeded the scope of proper argument.

Our supreme court has observed that "argument of counsel is a valuable privilege that should not be unduly restricted. Our courts seek to give great latitude to counsel in expressing their views of the case to the jury." *Smith v. State,* 527 S.W.2d 737, 739 (Tenn.1975). *See also State v. Bigbee,* 885 **\*516** S.W.2d 797, 809 (Tenn.1994). The trial judge has wide discretion in controlling the argument of counsel. *Smith,* 527 S.W.2d at 739. Generally, on appeal, this court will not interfere with the exercise of that discretion in the absence of abuse thereof. *Id.* However, if the prosecutor's remarks, in fact, "stray[ed] beyond the wide latitude afforded," this court should consider, among other factors, the intent of the prosecutor, any curative measures undertaken by the court, the improper conduct viewed in context and in light of the facts and circumstances of the case, the cumulative effect of the remarks with any other errors in the record, and the relative strength or weakness of the case. *Bigbee,* 885 S.W.2d at 809; *Judge v. State,* 539 S.W.2d 340, 344 (Tenn.Crim.App.1976). We note that "curative instructions will not render all improper comments harmless; the test is whether the conduct ... affected the results to the prejudice of the appellant." *State v. Byerley,* 658 S.W.2d 134, 139 (Tenn.Crim.App.1983). *See also Bigbee,* 885 S.W.2d at 809.

In arguing that the investigation was extensive, the prosecutor specifically referred to Deputy Richard Smith's testimony that the Sheriff's Department had interviewed between 200 and 250 people regarding this case. The prosecutor's observation, that the appellant was the only suspect, was similarly supported by the evidence introduced at trial. We conclude that the trial court did not abuse its discretion in allowing the argument.

### (2) PROSECUTOR'S PERSONAL VIEWS

The appellant next contends that the prosecutor erred in referring to this murder as being "a murder of the worst kind," "one of the worst kind of murders imaginable," and "a most heinous and brutal act." The appellant contends that the prosecutor expressed his personal views of the offense in an effort to inflame the passions of the jury.

However, evaluating the prosecutor's comments in light of his entire argument, we conclude that the comments referred to the fact that the appellant took advantage of a lady who was a close friend of his grandmother. Even if improper, we do not view this argument as being so prejudicial as to require a new trial. This issue is without merit.

### D. BOLSTERING

Finally, the appellant contends that the prosecutor erred by improperly bolstering the testimony of William Roger Moore and Shelia Bush (Hammock) by asking them if they were telling the truth. He also asked Ms. Bush if she was having dreams about the case.

In *State v. Carpenter,* 773 S.W.2d 1, 11 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1989), this court held that bolstering was permitted to rehabilitate an impeached witness to rebut the inference that the witness's testimony was a recent fabrication. Bolstering has also been permitted to allow seemingly inconsistent statements to be placed into context. *State v. Boyd,* 797 S.W.2d 589, 594 (Tenn.1990). We conclude that the prosecutor's questions were not inappropriate.

The question asked of Ms. Bush concerning whether she had dreams about the offense were posed in the context of remembering things that she had not thought of and explaining why there had been inconsistencies in previous statements. Again, we conclude that the prosecutor could use this question to rehabilitate his witness. This issue is without merit.

### 7. WHETHER THE PROSECUTOR'S STATEMENTS DURING THE CLOSING ARGUMENT OF THE PENALTY PHASE OF THE TRIAL DENIED THE APPELLANT A FAIR TRIAL. (FN7)

#### A. *CALDWELL* VIOLATION

The appellant first contends that the prosecutor, in violation of the Supreme Court's holding in *Caldwell v. Mississippi,* 472 U.S. 320, 328-29, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), "led the jury to believe that    **\*517** responsibility for determining the appropriateness of the defendant's death rests elsewhere." The appellant cites the following portion of the prosecutor's argument to the jury:

I submit to you that the most important day in the defendant's life was the day that he chose--not you; not I;--the day that he chose to go to the home of Jodie Lefever and murder her horribly, heinously, atrociously, in cold blood. They'll tell you that you have a choice to make here today, that is his life is literally in your hands. And I submit to you, ladies and gentlemen of the jury, that's not true. When he went to the home of Jodie Lefever and had her open the door as a friend, he took his life in his own hands. He took his life in his own hands.

When reviewing an alleged *Caldwell* error, this court must first determine whether the prosecutor's comments minimized the jury's role in determining the appropriateness of death. *State v. West,* 767 S.W.2d 387, 399 (Tenn.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3254, 111 L.Ed.2d 764 (1990). If the prosecutor's comments were improper, we must then decide whether the trial judge's instructions to the jury sufficiently corrected the error. *Id.* "If the Court cannot say the comments had no effect on the sentencing,, then the jury's decision does not meet the standard of reliability

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

required by the Eighth Amendment." *State v. Irick,*
762 S.W.2d 121, 131 (Tenn.1988), *cert. denied,*
489 U.S. 1072, 109 S.Ct. 1357, 103 L.Ed.2d 825
(1989).

We have previously observed that the State may
properly argue that a defendant is the "author of his
own fate." *Wright v. State,*     No.
01C01-9105-CR00149, 1994 WL 115955
(Tenn.Crim.App. at Nashville), *perm. to appeal
denied,* (Tenn.1994), *cert. denied,* 513 U.S. 1163,
115 S.Ct. 1129, 130 L.Ed.2d 1091 (1995). In any
case, the prosecutor's comments must be evaluated
in the context of the total argument by the parties
and, of course, the trial court's instructions to the
jury about its obligations under the law. *See State v.
Nichols,* 877 S.W.2d 722, 733 (Tenn.1994), *cert.*
*denied,* 513 U.S. 1114, 115 S.Ct. 909, 130
L.Ed.2d 791 (1995).

Immediately following the quoted portion of the
prosecutor's argument, the prosecutor reminded the
jurors that they had been asked during voir dire
whether they would be able to impose the death
penalty if the State were able to prove that
aggravating factors outweighed any mitigating
factors. The prosecutor then reviewed the
aggravating circumstances presented by the State.
During rebuttal argument, the prosecutor again
explained the weighing process, remarking, "You
have a job to do and it's a serious job. It's probably
one of the most tough things that you've ever been
called upon to do in your life." Defense counsel,
during closing argument, emphasized the importance
of the jury's role in determining the appropriate
punishment. Defense counsel observed, "The
verdict you render on the question you have today is
whether a young man lives or dies. You are the
supreme decision makers in this case." Finally,
immediately before the jury began deliberations, the
trial court correctly instructed the jury as to their
responsibility for determining the appropriate
punishment. We conclude, therefore, that even if
the prosecutor's comments, by themselves, violated
*Caldwell,* the error was harmless beyond a
reasonable doubt.

### B. PROSECUTORIAL EXPERTISE

The appellant next contends that the prosecutor
alluded to prosecutorial expertise when she asked
that the jury impose the death penalty. That is, the
prosecutor, according to the appellant, argued that
the jury should impose the death penalty because the
State, in its expertise, chose to seek the death
penalty. However, the record reveals that, in the
portion of the argument to which the appellant
refers, the prosecutor merely reviewed the facts of
the case and concluded that "[i]f that's not a set of
circumstances that deserves the death penalty, one
would wonder what it takes." We conclude that the
prosecutor's argument did not rely upon
prosecutorial expertise, and that this issue is without
merit.

### *518 C. DENIGRATION OF MITIGATING
EVIDENCE

The appellant also contends that the prosecutor
mislead and inflamed the jury by denigrating the
appellant's mitigating evidence, characterizing the
evidence as an "excuse" which should be

disregarded. First, our supreme court found
"nothing wrong with counsel's argument" in *State v.
Smith,* 893 S.W.2d 908, 922 (Tenn.1994), *cert.
denied,* 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d
53 (1995), a case in which the prosecutor similarly
referred to the defendant's mitigating evidence as an
excuse. *See also State v. Keen,* 926 S.W.2d 727
(Tenn.1994), *rehearing granted,* (Tenn. May 16,
1995). Second, the record reveals that, although the
State generally downplayed the mitigating evidence
presented by the appellant, the prosecutor, during
rebuttal, conceded that two mitigating factors, the
appellant's youth and his lack of a significant
criminal history, had been proven. During the
course of argument, the prosecutor also explained
that the appellant could "present proof on anything
[he] want[s] to and call it a mitigator. Whether it's
a mitigator or not is up to you." We conclude that
the challenged comments do not rise to the level of
reversible error.

### D. MERCY

The appellant next contends that the prosecutor
attempted to discourage the jury's consideration of
mercy. Specifically, in rebuttal, the prosecutor
argued, "We want you to use the same mercy that
this defendant used on Jodie Lefever as she lay
helpless in her floor." Our supreme court has
observed that this argument "encourage[s] the jury
to make a retaliatory sentencing decision, rather
than a decision based on a reasoned moral response
to the evidence," and is therefore improper.
*Bigbee,* 885 S.W.2d at 812. However, the record
reveals that the trial court sustained the appellant's
objection to the prosecutor's remark. Moreover, at
the conclusion of argument, the trial court instructed
the jury that they could "decide to sentence the
appellant to life imprisonment simply because based
on the evidence introduced at either the guilt/
innocence or sentencing phase at this trial you find it
appropriate to exercise mercy." We conclude that
the appellant was not unduly prejudiced by the
prosecutor's statement.

### E. MISCELLANEOUS

The appellant complains that the prosecutor waived
the murder weapon before the jury. He also asserts
that the prosecutor improperly argued that the death
penalty would protect all the "other Jodie Lefevers
of the world." Finally, the appellant argues that the
prosecutor, during argument, impermissibly
remarked that the appellant's expert witnesses
received a fee for their services.

First, the murder weapon was properly introduced
into evidence at trial and, therefore, could be
displayed to the jury and otherwise referred to
during the State's closing argument. Moreover, the
prosecutor is an advocate and is entitled to pursue
his role with thoroughness and vigor. *Post v. State,*
580 S.W.2d 801, 808 (Tenn.Crim.App.), *perm. to
appeal denied,* (Tenn.1979). Second, although
argument based on general deterrence and, perhaps,
deterrence of the defendant, is in fact improper, *see
Irick,* 762 S.W.2d at 131, the trial court sustained
the appellant's objection to the prosecutor's remark.
Finally, with respect to any remarks addressing fees
paid to expert witnesses, Tenn. R. Evid. 616
provides, "A party may offer evidence by cross-
examination, extrinsic evidence, or both, that a

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

witness is biased in favor of or prejudiced against a party or another witness." Thus, in cross-examining the appellant's expert witnesses during trial, the prosecutor properly inquired about fees. Therefore, the prosecutor's statements during closing argument were grounded in the proof presented at trial.

"Closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried." *State v. Odom,* No. 02C01-9305-CR-00080, 1994 WL 568433 (Tenn.Crim.App. at Jackson, October 19, 1994), *perm. to appeal granted,* (Tenn.1995). *See also State v. Tyson,* 603 S.W.2d 748, 754 (Tenn.Crim.App.1980). We conclude that the State's argument largely complied with this standard, and that the trial court did not abuse its discretion in controlling **\*519** closing argument during the penalty phase of the trial. This issue is without merit.

## 8. WHETHER THE TRIAL COURT PROPERLY CHARGED THE JURY REGARDING THE CREDIBILITY OF WITNESSES.

The appellant contends that the jury instructions given by the trial judge regarding the credibility of witnesses, the impeachment of witnesses, and the method of resolving conflicts in the testimony of witnesses unconstitutionally restrained the jury in their determination of credibility.

The instructions about which the appellant complains are the pattern jury instructions for the credibility of witnesses and the impeachment of witnesses. T.P.I.--Crim. §§ 37.01, 37.02. Both of these instructions have been held by this court to be a proper statement of the law. *See State v. Glebock,* 616 S.W.2d 897, 906 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1981). We conclude that this issue is without merit.

## 9. WHETHER THE APPELLANT WAS PROPERLY CONVICTED OF FIRST DEGREE BURGLARY.

### A. INSUFFICIENT EVIDENCE

The appellant contends that there was insufficient evidence to convict him of first degree burglary. He specifically claims that the State failed to prove that there had been a "breaking and entering" of the victim's house. The standard of review regarding the sufficiency of the evidence outlined in the appellant's second issue will be used to evaluate this contention also. *See, supra,* Section III, Issue # 2 "Whether the trial court erred in overruling the appellant's motion for judgment of acquittal as to the charge of premeditated murder.".

Tenn.Code Ann. § 39-3-401 (1988) defined first degree burglary as "the breaking and entering into a dwelling house ... by night, with intent to commit a felony." The trial court properly instructed the jury that "[a]ny person who after having entered the premises mentioned in § 39-3-401, with intent to commit a felony, shall break any premises, or any safe or receptacle therein, shall receive the same punishment as if he had broken into the premises in the first instance." *See* Tenn.Code Ann. § 39-3-402

(1988).

The appellant contends that the evidence demonstrated that the appellant had been granted entry by the victim. However, the breaking element can be either actual or constructive, and if entry was gained by either fraud or threat, the breaking will be considered constructive. *State v. Holland,* 860 S.W.2d 53, 58 fn. 11 (Tenn.Crim.App.1993). Since the appellant was armed with a piece of wood, there was at least circumstantial evidence that the appellant gained entry by threat. Likewise, because the victim knew the appellant, entry could have been gained by fraud if the appellant told her that he was there for legitimate business.

Moreover, in consideration of Tenn.Code Ann. § 39-3-402, the State proved that the top right-hand dresser drawer had been opened and that the appellant had opened the kitchen drawer to remove the butcher knife. Based upon these facts, we conclude that a rational trier of fact could have found the appellant guilty of first degree burglary.

### B. VARIANCE

The appellant next argues that he was denied notice of the charges being brought against him because the indictment charged the breaking and entering into the home while the proof demonstrated only the breaking into the drawers of the home. He further contends that he was denied due process and a fair trial because he was convicted on a charge never made in the indictment.

In order to satisfy constitutional requirements, an indictment must provide the defendant with notice of the offense charged, provide the court with an adequate ground upon which a judgment may be entered, and provide the defendant with protection against double jeopardy. *State v. Byrd,* 820 S.W.2d 739, 741 (Tenn.1991). Moreover, in *State v. Moss,* 662 S.W.2d 590, 592 (Tenn.1984), the Tennessee Supreme Court held that a variance between the proof and the indictment did not prejudice the defendant's rights if the indictment sufficiently informed the defendant of the charges against him so that he could properly prepare his defense and not **\*520** be misled or surprised at trial and if the variance was not such that it would present a danger that the defendant could be prosecuted a second time for the same offense.

In this case, the appellant was aware of the facts surrounding the entry into Ms. Lefever's home and the entry into the two drawers of her home. Although the appellant contends that he was surprised at trial, he has not demonstrated how he could have better defended had he been given prior notice that the breaking involved breaking into the drawers. All of the activity was involved in one criminal episode. For these reasons we conclude that, even if a variance existed, it was harmless under these circumstances. This issue is without merit.

## 11. WHETHER THE APPELLANT WAS GIVEN PROPER NOTICE OF THE AGGRAVATING CIRCUMSTANCES UPON WHICH THE STATE INTENDED TO RELY.

The appellant contends that he was not provided

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

sufficient notice of the facts supporting the aggravating circumstance that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Although the appellant requested a bill of particulars for information concerning this circumstance, the State did not reply.

Tenn. R.Crim. P. 7(c) allows the court to direct the filing of a bill of particulars "so as to adequately identify the offense charged." "This provision is to be construed to serve that *singular purpose,* and is not meant to be used for purposes of broad discovery." (emphasis added) Advisory Commission Comments, Tenn. R.Crim. P. 7. *See also State v. Stephenson,* 878 S.W.2d 530 (Tenn.1994); *State v. Wiseman,* 643 S.W.2d 354 (Tenn.Crim.App.1982). Therefore, Rule 7(c) is not applicable to the sentencing phase of the proceedings.

Tenn. R.Crim. P. 12.3(b) requires the State to provide notice of its intent to seek the death penalty no less than thirty days prior to trial. The rule also requires the State to specify the aggravating circumstances upon which it tends to rely at the sentencing hearing. Specification may be satisfied by a citation to the aggravating circumstance. Tenn. R.Crim. P. 12.3(b).

In the present case, the State amended its notice to seek the death penalty to include the subsection (i)(6) aggravating factor on November 5, 1992, well within the statutorily mandated time period. (FN8) This issue is without merit.

14. WHETHER THE TRIAL COURT PROPERLY INSTRUCTED THE JURY "REGARDING REASONABLE DOUBT."

The appellant contends that he was denied his rights under Article I, Sections 6, 7, 8, 16, 17, and 18 of the Tennessee Constitution, and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the jury was unconstitutionally instructed concerning the meaning of "reasonable doubt" at the guilt and sentencing phase of the trial. At the guilt phase of the trial, the jury received the following instruction concerning the meaning of "reasonable doubt."

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every element of proof necessary to constitute the offense.

(charge of the court, transcript of the evidence, vol. five, § III, p. 681). (FN9)

The appellant argues that this instruction equating "beyond a reasonable doubt" with "a moral certainty" violated his due process rights under the new standard set forth in *\*521 Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). In *Victor,* the United States Supreme Court

ruled that the phrase "moral certainty" may have lost its historical meaning, and that a jury might "understand it to allow conviction on proof that does not meet the beyond a reasonable doubt standard." *Victor,* 511 U.S. at 13, 114 S.Ct. at 1247. It reasoned that " 'moral certainty,' standing alone, might not be recognized by modern jurors as a synonym for 'proof beyond a reasonable doubt,' " but "something less than the very high level of probability required by the Constitution in criminal cases." *Id.* While the Court stated that it did not condone the use of the "moral certainty" phrase, the Court held that the phrase could pass constitutional muster if used in conjunction with a modifying instruction that lent meaning to the phrase. *Victor,* 511 U.S. at 15, 114 S.Ct. at 1248. (FN10) In order to meet the requirements of due process, the jury instructions must be examined as a whole, without considering particular phrases out of context. *Victor,* 511 U.S. 5, 114 S.Ct. at 1243, 127 L.Ed.2d at 590.

The instruction provided to the jury in the present case used the term "moral certainty" in conjunction with "let the mind rest easily" and "arise from possibility." Though neither of these phrases have been before the United States Supreme Court, (FN11) the courts of this state have consistently upheld the constitutionality of this instruction. *See State v. Nichols,* 877 S.W.2d 722 (Tenn.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); *Pettyjohn v. State,* 885 S.W.2d 364 (Tenn.Crim.App.),*perm. to appeal denied,* (Tenn.1994); *State v. Beckham,* No. 02C01-9405-CR-00107, 1995 WL 568471 (Tenn.Crim.App. at Jackson, Sept. 27, 1995); *Caldwell v. State,* No. 02C01-9405-CR-00107, 1994 WL 716266 (Tenn.Crim.App. at Jackson, Dec. 28, 1994), *perm. to appeal granted in part, denied in part,* (Tenn. May 30, 1995); *State v. Voaden,* No. 01C01-9305-CC-00151, 1994 WL 714223 (Tenn.Crim.App. at Nashville, Dec. 22, 1994), *perm. to appeal denied,* (Tenn. May 1, 1995); *Smith v. State,* No. 03C01-9312-CR-00393, 1994 WL 330132 (Tenn.Crim.App. at Knoxville, July 1, 1994). Specifically, the Tennessee Supreme Court noted in *State v. Nichols,* 877 S.W.2d at 734, that "the use of the phrase 'moral certainty' by itself is insufficient to invalidate an instruction on the meaning of reasonable doubt." The court distinguished the Tennessee instruction from the one invalidated in *Cage v. Louisiana* because the Tennessee instruction does not require "grave uncertainty" to support acquittal. Moreover, the court concluded that:

[w]hen considered in conjunction with an instruction that "[r]easonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict," we find that the instruction properly reflects the evidentiary certainty required by the "due process" clause of the federal constitution and the "law of the land" provision in our state constitution.

*Nichols,* 877 S.W.2d at 734. We, therefore, conclude that the charge given by the trial court, although containing the phrase "moral certainty," did not violate the appellant's rights under the United States or the Tennessee Constitutions.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

15. WHETHER THE TRIAL COURT'S INSTRUCTIONS IN THE PENALTY PHASE PROHIBITED THE JURY FROM CONSIDERING AND GIVING FULL EFFECT TO THE APPELLANT'S MITIGATING EVIDENCE.

A. MODIFIER "EXTREME"

The appellant first contends that the jury instructions precluded the jury from considering *522 mitigating evidence of mental or emotional disturbance which did not rise to the level of extreme mental or emotional disturbance. In its jury instructions, the trial court recited the language of Tenn.Code Ann. § 39-2-203(j)(2) in instructing the jury that in arriving at the punishment the jury shall consider the mitigating factors including, but not limited to that "[t]he murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." The appellant contends that use of the modifier "extreme" misled the jury in its consideration of the evidence.

The Tennessee Supreme Court rejected this same argument in *State v. Smith,* 857 S.W.2d 1, 16-17 (Tenn.), *cert. denied,* 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993). Moreover, in the case at bar, the jury was also instructed that it could consider any mitigating factor raised by the evidence at either the guilt or penalty phase of the trial. This issue is without merit.

B. MODIFIER "SUBSTANTIALLY"

The appellant also contends that the jury instructions precluded the jury from considering mitigating evidence of mental illness and intoxication which did not rise to the level of "substantially" affecting the appellant's ability to conform his conduct to the law. Again, this argument was rejected in *Smith,* 857 S.W.2d at 16-17, and we find the issue to be without merit.

C. UNANIMOUS AGREEMENT ON MITIGATING CIRCUMSTANCES

Lastly, the appellant contends that the trial court unconstitutionally limited the consideration of mitigating evidence by requiring the jury to unanimously agree on a verdict of life or death. This argument was rejected in *Smith,* 857 S.W.2d at 18, and we agree that "nothing in the Tennessee statutes, and the instructions given the jury, or in the verdict form submitted to the jury, was likely to lead any juror to believe that he or she was precluded from considering mitigating circumstances unless all jurors agreed that the circumstances existed." This issue is without merit.

16. WHETHER THE TRIAL COURT FAILED TO PROVIDE THE JURY WITH PROPOSED INSTRUCTIONS NECESSARY FOR THE PROPER DETERMINATION OF SENTENCE.

The appellant contends that the trial court erred in refusing to give certain requested jury instructions during the penalty phase of the trial. The trial court rejected the following special instructions:

1. (2) Burden of proof--generally;

2. (4) Life means life--death means death--

sentence will be carried out;

3. (5) Definition of life and death--sentencing;

4. (6) Jury has responsibility for final decision--sentencing;

5. (7) Decision to be made by individual jurors--sentencing;

6. (9) Aggravating circumstance--definition--sentencing;

7. (10) Weighing aggravation and mitigation--defining mitigation-- sentencing;

8. (13) Aggravating circumstance--standards for consideration-- sentencing;

9. (14) Presumption regarding aggravating circumstances--sentencing;

10. (15) Aggravating circumstances--unanimity--sentencing;

11. (16) Aggravating circumstance--individual consideration but requirement of unanimity--sentencing;

12. (18) Sentence--crime in society;

13. (19) Deterrence--cost sentencing;

14. (20) Definition--weight and unanimity--sentencing;

15. (21) Definition--mitigating circumstances--sentencing;

16. (22) Mitigating circumstance--definition--sentencing;

17. (23) Mitigating circumstance--definition--sentencing;

18. (24) Standard of proof--sentencing;

19. (26) Weighing aggravating and mitigating circumstances--sentencing;

20. (27) Doubt inures to the benefit of the defendant--sentencing;

*523 21. (28) Mercy--sentencing;

22. (29) Consideration for sentence less than death--sentencing;

23. (30) Mitigation--reason for sentence less than death--sentencing;

24. (31) Sympathy--sentencing;

25. (32) Compassion--mercy--sentencing;

26. (33) Mitigation--reason for sentence less than death--sentencing;

27. (34) Mitigating circumstances--basis for sentence less than death--sentencing;

28. (35) Imposing a sentence less than death;

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

29. (36) May vote life--sentencing;

30. (37) Finding beyond a reasonable doubt that death is appropriate--sentencing;

31. (38) Lingering doubt--sentencing;

32. (39) Jury verdict--inability to agree--sentencing;

33. (40) No evidence except that introduced at trial--sentencing;

34. (42) Mitigating circumstance--age--sentencing;

35. (44) Mitigating circumstance--mental illness--sentencing;

36. (46) Mitigating circumstance--capacity to appreciate criminality--sentencing;

37. (47) Mitigating circumstance--emotional development--sentencing;

38. (50) Mitigating circumstance--adolescent--sentencing;

39. (51) Mitigating circumstance--parental expectations--sentencing;

40. (53) Mitigating circumstance--health of another--sentencing;

41. (54) Mitigating circumstance--domination--sentencing;

42. (55) Mitigating circumstance--planning of crime--sentencing;

43. (56) Mitigating circumstance--death of victim--sentencing;

44. (57) Mitigating circumstance--lingering doubt--sentencing;.

When a trial court's instructions correctly charge the applicable law, the court does not err by refusing special requests. *Tillery v. State,* 565 S.W.2d 509, 511(Tenn.Crim.App.1978). Nor is it error to refuse to give an inaccurate special request. *State v. Moore,* 751 S.W.2d 464, 467 (Tenn.Crim.App.), *perm. to appeal denied,* (Tenn.1988). After reviewing the instructions given by the trial court, we conclude that the instructions adequately charge the applicable law. This issue is without merit.

17. WHETHER THE DEATH PENALTY UNCONSTITUTIONALLY INFRINGES UPON THE APPELLANT'S FUNDAMENTAL RIGHT TO LIFE.

The appellant contends that the Tennessee death penalty statute is unconstitutional in that the right to life is fundamental and the punishment of death is not necessary to promote any compelling state interest. The appellant argues that less severe penalties are available to serve the state's interest in punishing the appellant. Moreover, the appellant asserts that "compelling state interests are those which secure our democratic institutions and/or insure national security." While this argument is

somewhat novel in its approach, we note that one of the state's most basic functions is to enforce the penal laws as established by the legislature. We quote from the United States Supreme Court decision, *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976):

> [C]apital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

The Tennessee Supreme Court has held that the state's death penalty statute, *per se,* meets due process requirements. *See State v. Black,* 815 S.W.2d 166, 190 (Tenn.1991); *see also State v. Groseclose,* 615 S.W.2d 142 (Tenn.), *cert. denied,* 454 U.S. 882, 102 S.Ct. 366, 70 L.Ed.2d 193 (1981). This issue is therefore without merit.

**\*524** 18. WHETHER THE STATE'S DEATH PENALTY STATUTE IS CONSTITUTIONAL.

The appellant raises several constitutional objections to the Tennessee death penalty statute. Specifically, the appellant contends that the death penalty statute is unconstitutional in that:

(a) it provides insufficient guidance to the jury concerning who has the burden of proving whether mitigation outweighs aggravation and what standard the jury should use in making that determination;

(b) it fails to sufficiently narrow the class of death penalty eligible defendants;

(c) it insufficiently limits the jury's discretion in that once it finds an aggravating circumstance beyond a reasonable doubt, it can impose death, regardless of what mitigation is shown;

(d) it requires that if the jury finds that the aggravating circumstances outweigh the mitigating circumstances, it must impose death;

(e) it allows the jury to afford too little weight to non-statutory mitigating factors. The statute requires that the jury consider "any mitigating circumstances";

(f) it does not require the jury to make the ultimate determination that death is appropriate in that it is "merely filling in the blanks" in determining and comparing mitigating and aggravating circumstances.;

(g) it does not inform the jury of its ability to impose mercy;

(h) it provides no requirement that the jury make findings of fact as to the presence or absence of mitigating circumstances, thereby preventing effective appellate review;

(i) it prohibits the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase of the trial;

(j) it allows the imposition of a cruel and unusual

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

punishment and in that it allows death to be imposed by electrocution;

(k) it has been imposed discriminately on the basis of race, sex, geographic region, and economic and political status of the defendant;

($l$) the proportionality of arbitrariness review conducted by the Tennessee Supreme Court pursuant to Tenn. Code Ann.   § 39-13-205 is inadequate and deficient;

(m) it permits the introduction of relatively unreliable evidence in the State's proof of aggravating circumstances and in its rebuttal of mitigating circumstances;

(n) it allows the State to make final closing arguments to the jury in the penalty phase of the trial;

All of the appellant's arguments except (g) have been rejected by the Tennessee Supreme Court. *See State v. Cazes,* 875 S.W.2d 253, 268-269 (Tenn.1994);. *State v. Smith,* 857 S.W.2d 1, 16-17, 23 (Tenn.1993); *State v. Howell,* 868 S.W.2d 238, 258 (Tenn.1993); *State v. Black,* 815 S.W.2d 166, 185, 187 (Tenn.1991); *State v. Boyd,* 797 S.W.2d 589, 596 (Tenn.1990); *State v. Melson,* 638 S.W.2d 342, 366, 368 (Tenn.1982); *State v. Groseclose,* 615 S.W.2d 142, 150 (Tenn.1981). With respect to the argument in (g), in consideration of the jury instructions given in a capital case, we find this issue to be without merit.

19. WHETHER THE CUMULATIVE EFFECT OF ALL ERRORS VIOLATE THE APPELLANT'S CONSTITUTIONAL RIGHTS.

As his final argument, the appellant contends that the cumulative effect of all errors alleged both at trial and at sentencing violates his constitutional rights. As this court has not found any error with respect to the appellant's previous eighteen issues, we find this final issue to be without merit.

David G. Hayes
David G. Hayes, Judge

CONCUR:

/s/ Paul G. Summers

Paul G. Summers, Judge

/s/ William M. Barker

William M. Barker, Judge

*525 REID, Justice, concurring.

I concur in affirming the conviction of first degree murder and the sentence of death in this case.

I write separately to state my reasons for not finding as prejudicial error the trial court's charging of the 1989 version of aggravating circumstance (i)(5), to express my continuing concern regarding the Court's comparative proportionality review, and to comment on a disturbing aspect of the case which is insulated from review.

First, I repeat an observation made in   *State v. Howell,* 868 S.W.2d 238, 263 (Tenn.1993) (Reid, C.J., concurring), which is applicable to the performance of the trial judge in this case: "The trial judge demonstrated the qualities critically important in conducting a highly emotional and legally exacting trial. The record shows that the case was decided by a competent and impartial jury. The record demonstrates that capital cases can be tried relatively free of error." Counsel pressed to the line the wide latitude necessary for effective advocacy but were appropriately restrained by the cool hand of the judge. The case also demonstrates that having a review by the Court of Criminal Appeals of all assignments of error in capital cases, with a final review by this Court of a limited number of issues in addition to those issues mandated by statute, is an efficient utilization of judicial resources.

The State relied upon, and the jury found, aggravating circumstance (i)(5). The offense in this case was committed in 1988; the trial was held in 1993. At the time the offense was committed, aggravating circumstance (i)(5) was defined as a murder that "was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann.   § 39-2-203(i)(5) (1982). In 1989, that definition was amended by deleting "depravity of mind" and substituting "serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1991). Without objection, the trial court charged the 1989 version of the statute.

The Court held in *State v. Brimmer,* 876 S.W.2d 75, 82 (Tenn.1994), that in capital cases the applicable law is the law that was in effect at the time the offense was committed. The defendant insists that charging the 1989 definition was reversible error. There can be no denying that under the authority of *Brimmer,* the instruction was erroneous. (FN1) However, in my opinion, the effect of the error was ameliorative rather than prejudicial, and, therefore, does not constitute reversible error.

I have dissented in every case decided by this Court since September 1990 in which there was reliance for the sentence of death on a finding that the murder involved depravity of mind. The basis of those dissents is that every first degree murder is "especially heinous, atrocious or cruel in that it involved depravity of mind"; consequently, that instruction has no reasonably precise meaning and does not aid the jurors in determining if death is an appropriate punishment. In the first case,   *State v. Black,* 815 S.W.2d 166, 196-97 (Tenn.1991) (Reid, C.J., concurring and dissenting), I suggested that:

a proper limiting construction of "depravity of mind" to be given in those cases where torture is absent would be established by adopting the definition of that term set forth by the New Jersey Supreme Court in *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188, 230-231 (1987), where it held that this phrase marks

society's concern to punish severely those who murder without purpose or meaning as distinguished from those who murder for a

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

purpose (albeit a completely unjustified purpose). This term isolates conduct that causes the greatest abhorrence and terror within an ordered society, because citizens cannot either in fact or in perception protect themselves from these random acts of violence. The killer who does it because he likes it, perhaps even because it makes him feel better, who kills bystanders without reason, who kills children and others whose helplessness would indicate that **526 there was no reason to murder, evinces what we define as depravity of mind.

.    .    .    .    .

What society is concerned with here ... is the complete absence--from society's point of view--of any of the recognizable motivations or emotions that ordinarily explain murder.

In *State v. Van Tran,*    864 S.W.2d 465, 488 (Tenn. 1993) (Daughtrey, J., dissenting), I joined Justice Daughtrey in stating: "Because the "depravity of mind" prong of aggravated circumstance (i)(5) is so vague, the instruction given in this case allowed the jury to exercise the sort of unguided discretion condemned by the United States Supreme Court in *Godfrey v. Georgia,*   446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and *Maynard v. Cartwright,*   486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)."

Having obviously failed to convince my colleagues of the correctness of my position, I stated the matter a bit more firmly in *State v. Shepherd,* 902 S.W.2d 895, 909 (Tenn. 1995) (Reid, J., dissenting):

As stated in prior dissents, the words "heinous, atrocious or cruel" are so bereft of particular meaning that this aggravating circumstance does not accomplish the constitutional mandate of directing and limiting the jury's discretion "so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia,*  428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976); *see State v. Black,* 815 S.W.2d 166, 195 (Tenn. 1991). The precariousness of the Court's persistent reliance upon this patently invalid aggravating circumstance is indicated by the opinion of Justice Stevens in *Barber v. Tennessee,* 513 U.S. 1184, 115 S.Ct. 1177, 130 L.Ed.2d 1129 (1995). In denying the capital defendant's petition for certiorari from the judgment of this Court denying post-conviction relief, Justice Stevens stated:

... In this case, for example, there are valid reasons for the Court's decision to deny review. But this does not mean petitioner's challenge to his death sentence, based in part upon the trial judge's definition of an aggravating circumstance, lacks merit. Under the trial court's instruction, a jury could find an aggravating circumstance sufficient to impose the death penalty merely by concluding that a murderer's state of mind was "wicked or morally corrupt." Because such a state of mind is a characteristic of every murder, the instruction is plainly impermissible under this Court's holdings in *Godfrey v. Georgia,*  446 U.S. 420, 428-429 [100 S.Ct. 1759, 1764-65, 64 L.Ed.2d 398] (1980) (striking down instruction allowing jury to

find aggravating circumstance if murder was " 'outrageously or wantonly vile, horrible and inhuman' "), and *Maynard v. Cartwright,*   486 U.S. 356, 363-364 [108 S.Ct. 1853, 1858, 100 L.Ed.2d 372] (1988) (" 'especially heinous, atrocious, or cruel' ").

(Footnotes omitted.)

While "depravity of mind," in my view, is fatally deficient in meaning, the language of the 1989 statute, "serious physical abuse beyond that necessary to produce death," is plain and provides a meaningful standard for determining the appropriateness of death as a penalty. As a practical matter, then, the substantive effect of the "error" in this case was to elide, or even to correct, the unconstitutional portion of this aggravating circumstance. The error was entirely technical and curative of those constitutional defects which I have previously found in this aggravating circumstance and, under the facts of this case, the instruction gave the jury a constitutional equivalent to the prior unconstitutional version of aggravating circumstance (i)(5) found in Tenn.Code Ann. § 39-2-203(i)(5). I have not in any prior case, and I do not now, find that definition deficient as an aggravating circumstance. Consequently, I agree with the main opinion that giving the erroneous instruction to the jury is not grounds for reversal of the sentence.

Also, in some prior cases, I have insisted that the evidence did not support a finding of torture as an aggravating circumstance. *See e.g., State v. Cazes,* 875 S.W.2d 253, 272 (Tenn. 1994) (Reid, J., concurring and dissenting); *State v. Van Tran,* 864 S.W.2d 465, 483 (Tenn. 1993) (Reid, C.J., concurring and dissenting); **527   *State v. Black,* 815 S.W.2d at 196. The facts of this case, as stated in the main opinion, clearly support a finding of torture as that term is generally understood. Perhaps it is noteworthy that the sufficiency of the evidence supporting this aggravating circumstance, though mandated by statute for review, Tenn.Code Ann. § 39-13-206(c)(1)(B) (Supp. 1996), was not raised by the defendant. Consequently, I concur in the holding that the evidence is sufficient to support the jury's finding of the torture component of aggravating circumstance (i)(5).

Another issue which, in my view, requires further discussion is the comparative proportionality review mandated by Tenn.Code Ann. § 39-13-206(c)(*l* )(D) (Supp. 1996); this issue has been the basis for prior dissent. There is no methodology to the majority's analysis. The review consists entirely of conclusory, and defensive, statements followed by a further recitation of the facts. *See State v. Nichols,* 877 S.W.2d 722, 744 (Tenn. 1994) (Reid, C.J., dissenting); *State v. Hurley,*   876 S.W.2d 57, 71 (Tenn. 1993) (Reid, C.J., dissenting);    *State v. Howell,* 868 S.W.2d at 271-72 (Reid, C.J., concurring); *State v. Van Tran,*    864 S.W.2d at 484-85 (Reid, C.J., concurring and dissenting); *State v. Harris,* 839 S.W.2d 54, 84-85 (Tenn. 1992) (Reid, C.J., dissenting).

Nevertheless, as in *State v. Howell*  and *State v. Smith,* 868 S.W.2d 561, 585 (Tenn. 1993) (Reid, C.J., concurring), the record establishes that upon comparison of the character of the defendant and the

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

nature of his crime, to other defendants and other first degree murders, by any rational standard, the defendant is among the worst of the bad.

The character of the defendant and the circumstances of the killing in this case would justify the sentence of death judged by the definition of "depravity of mind" urged in *State v. Black, see supra,* at ---- [p. 4]. The defendant's conduct in killing an aged and helpless victim, who surrendered her last means of protection by opening the door of her home to the grandson of her best friend, is conduct which causes the greatest abhorrence and terror within an ordered society. There is no protection against a random killing by a trusted acquaintance. The character of the defendant shows more than a calculated robbery which got out of hand. The evidence shows a person of intelligence who is fascinated with vampires and demons, who dreams of killing, and whose life is inhabited by demons and monsters. His explanation of the homicide is disturbing; he was compelled by an underworld group. But that fanciful compulsion is belied by his manner of performing the act so that he literally became drenched with the victim's blood and by the relish with which he recounted the crime to acquaintances. As stated in *Howell,* 868 S.W.2d at 272, "comparison of the character of the defendant in this case and the nature of his crime, by any standard of analysis, would show that he is among the worst of the bad."

It is, in fact, the abundant evidence of the defendant's maleficence that is disturbing. The record contains significant evidence beyond the circumstances relating directly to the crime. The defendant has been exhibiting symptoms of schizophrenia since he was in high school and was diagnosed as a schizophrenic while awaiting trial. The record discloses that, based upon the assessment of court-appointed mental health experts, the trial court found that the defendant was incompetent to stand trial. Those same mental health professionals also found that an insanity defense could be supported. However, the defendant has not challenged the court's subsequent determination of competency, and the record discloses no facts upon which plain error can be found in this regard. Apparently, counsel was content to present evidence of the defendant's mental condition at the sentencing hearing. Since the record does not facially establish that the mental condition of the defendant is disproportionate to that of other defendants sentenced to death, this aspect of the case cannot effectively be reviewed on the record before the Court.

In conclusion, the record does not disclose reversible error, but rather, supports the judgment rendered in the trial court and affirmed by the Court of Criminal Appeals and this Court.

**\*528** BIRCH, Chief Justice, dissenting.

The majority concludes that aggravating factor (i)(6) (FN1) has been sufficiently demonstrated in the instant case. In my view, the evidence is not sufficient to warrant its application. Because I find that this error more probably than not affected the jury's decision to impose the death sentence, I would vacate the sentence of death and remand this cause for a new sentencing hearing.

Although this is a close case, I do not find that the State presented sufficient evidence for the jury to conclude that Bush killed the victim in order to avoid arrest or prosecution for the robbery. When the evidence is entirely circumstantial, as in this case, then that evidence must preclude every other reasonable theory or hypothesis except that which it tends to support, i.e., that the killing was, in fact, motivated by a desire to eradicate a witness. *State v. Zirkle,*      910 S.W.2d 874, 882 (Tenn.Crim.App.1995)(citing *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451, 456 (1958)). (FN2)

The majority relies in part on the fact that the defendant and the victim knew one another. Such is not sufficient, without more, to establish the (i)(6) aggravating factor. In many cases, the victim either knows the defendant or has observed the defendant sufficiently to be able to later identify that person. This circumstance is so prevalent that to allow it to establish the (i)(6) aggravating factor would unduly and unconstitutionally enlarge the class of defendants subject to the death penalty.

Moreover, our prior application of the (i)(6) aggravator in similar cases has not been consistent. *See State v. Evans,* 838 S.W.2d 185 (Tenn.1992) (aggravating factor (i)(6) applied where defendant, a former employee, returned, robbed market, and killed a clerk whom he knew). *But see State v. Van Tran,* 864 S.W.2d 465 (Tenn.1993)(aggravating factor (i)(6) not applied where defendant, former employee, returned, robbed restaurant, and killed owner whom he knew). *State v. West,* 767 S.W.2d 387 (Tenn.1989)(aggravating factor (i)(6) applied where defendant and co-defendant were convicted of the murder of a girl who knew co-defendant and could identify defendant). *But see State v. Branam,* 855 S.W.2d 563 (Tenn.1993)(aggravating factor (i)(6) not applied where defendant and co-defendant were convicted for the murder of a woman who knew defendant and could identify co-defendant).

Because of the inconsistent application of the (i)(6) aggravating factor and the danger of unconstitutionally enlarging the class of defendants subject to the death penalty, I would hold that the fact that the victim knew the assailant, without more, is not sufficient to prove that the killing was in fact motivated by a desire to evade arrest or avoid prosecution. By requiring additional evidence, we would screen out those cases in which a defendant initially intended to commit a non-capital offense but for a reason other than witness elimination, escalated the conduct to include an unlawful killing.

In this case, the  **State's** theory was that  **Bush** killed Lefever so that she could not identify him as the individual who broke into her house and robbed her. From my review, however, there is substantial evidence that Bush did not kill Lefever in order to eliminate her as a witness to the burglary/robbery. First, Bush made no attempt to conceal the intended crime from his wife; rather, he told her that he was going to hit the old woman over the head and take her money. The majority finds it significant that the defendant withheld from his wife the name or address of the intended victim concluding that Bush wished to prevent her from "witnessing the burglary." However, there is no dispute that Bush told his wife of his intent to commit the burglary and

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)    Page 28

asked *529. her to drive him to the scene. In my view, this evidence indicates that Bush was not concerned about concealing the burglary. I find that this testimony indicates that Bush simply did not want to implicate his wife in the crime. Hence, I find this evidence insufficient to support the majority's conclusion that the defendant killed the victim to eliminate her as a witness. '

More to the point, Bush related versions of what happened to two fellow inmates who testified as witnesses for the State. The first testified that Bush told him that he had killed the victim when he could not find any money. The second testified that Bush told him that he killed the victim when he lost his temper after an argument erupted. In these two versions, Bush clearly identifies himself as the killer. Given this disclosure, there was no reason for him to lie about his motivation for the killing. In both versions, Bush killed Lefever because he was angry and frustrated. In my view, this evidence clearly indicates that Bush was not concerned about Lefever's ability to identify him as the burglar/robber when he killed her. This evidence raises, in the very least, a reasonable doubt as to whether the defendant was motivated by a desire to avoid arrest or prosecution.

We have previously held that the State does not have to prove that avoidance of arrest or prosecution was the defendant's sole or predominant motivation to establish the applicability of the (i)(6) aggravating factor. *State v. Carter*, 714 S.W.2d 241, 250 (Tenn. 1986). However, we should require that the State prove that a desire to avoid arrest or prosecution was at least *a* motivation for the crime. In my view, the State failed to carry that burden in this case.

To reiterate, I would restrict the application of the (i)(6) aggravating circumstance to cases where the evidence clearly establishes that the defendant was motivated by a desire to avoid arrest or prosecution by eliminating the witness. To illustrate, the (i)(6) aggravator was appropriately applied in *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993)(victim killed while dialing 911); *State v. McCormick*, 778 S.W.2d 48 (Tenn. 1989)(undercover agent testified that defendant confessed that he killed victim to prevent her from "spilling her guts" about property defendant had stolen); *State v. Adkins*, 725 S.W.2d 660 (Tenn. 1987)(evidence that defendant eliminated the victim who was to testify against defendant for the shooting of defendant's girlfriend); and *State v. Johnson*, 632 S.W.2d 542 (Tenn. 1982)(defendant told friend that he was going to rob a market and that he intended to leave no witnesses).

In conclusion, I find that under the facts of this case, the evidence is not sufficient to establish the (i)(6) aggravating factor. I find also that the erroneous use of this aggravating factor more probably than not affected the jury's decision to impose the death sentence. Accordingly, I would vacate the sentence of death and remand the cause for a new sentencing hearing.

(FN1.) Although not relevant to this appeal, the trial judge imposed a three-year sentence concurrent to the death penalty for the burglary conviction.

(FN2.) "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

(FN3.) Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it will review. Selection of such issues will be based on the criteria of T.R.A.P. 11(a)." This is the first capital case using this new procedure.

(FN4.) Although the crime occurred in Putnam County, Bush was tried in Cumberland County following the trial court's grant of his motion for a change of venue.

(FN5.) The jury was instructed to consider the following mitigating circumstances:

(1) The defendant has no significant history of prior criminal activity;

(2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. Extreme mental or emotional disturbance is a temporary state of mind so enraged, inflamed or disturbed as to overcome one's judgment and to cause one to act from the compelling force of the disturbance rather than for evil or malicious purposes. It is not a mental disturbance in itself and an enraged, inflamed or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse for it;

*529. (3) The youth of the defendant at the time of the crime;

(4) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental illness or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment;

(5) The defendant was subjected to physical and/or psychological abuse or cruelty during his formative years;

(6) That the defendant has considerable poetic abilities;

(7) That the defendant can be treated in a prison setting;

(8) That at a very early age the defendant exhibited signs of mental or emotional disturbance that went untreated;

(9) That the defendant was immature for his age and lacked the normal emotional development at

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

the time of the commission of the offense; and

(10) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

(FN6.) That statute has now been replaced by Tenn.Code Ann. § 39-13-202(a)(1) (Supp.1996).

(FN7.) We also note that unlike *Simmons,* the trial judge in this case appropriately did not allow the State to argue future dangerousness to the jury as a basis for imposition of the death penalty. At one point during the closing argument prosecution counsel commented, "It's not going to protect the other Jodie Lefevers of the world." Defense counsel immediately objected and the trial judge sustained the objection.

(FN8.) Effective July 1, 1993, the available punishments for first degree murder are now (1) death; (2) imprisonment for life without possibility of parole; or (3) imprisonment for life. Tenn.Code Ann. § 39-13-202(b) (1996 Supp.). Prior to that enactment, the only available punishment for first degree murder were death and life with the possibility of parole. Another part of the recent legislative enactment requires that jurors now be instructed "that a defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five (25) full calendar years of such sentence." In addition, jurors must be informed that "a defendant who receives a sentence of imprisonment for life without possibility of parole shall never be eligible for release on parole." Tenn.Code Ann. § 39-13-204(e)(2) (1996 Supp.).

(FN9.) We emphasize that the record in this case reflects that the trial court conscientiously applied current and available law to ensure that this defendant received a fair trial.

(FN10.) The entire sentencing hearing in this case was conducted in accordance with the 1989 law. Clearly, portions of that statute are beneficial to the defendant in all cases and impose a higher burden upon the State. For example, the 1989 statute explicitly requires the State to prove the existence of aggravating circumstances beyond a reasonable doubt and must establish that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39-13-204(f) & (g) (1991 Repl). In contrast, the 1982 statute required only a showing that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances. Tenn.Code Ann. § 39-2-203(g)(2)(1982 Repl.). In addition, unlike the 1982 statute, the 1989 statute entitles a defendant to instructions on non-statutory mitigating circumstances. Tenn.Code Ann.     § 39-13-204(e) (1991 Repl) & *Odom, supra.* Given the overall benefits, it is certainly conceivable that a defendant would prefer instructions in accordance with the 1989 statute. We again

emphasize that the instruction now complained of as error was not challenged in the trial court.

(FN1.) The appellant in his brief suggests that the trial court's decision to deny the appellant the marital privilege implicates the     *ex post facto* provisions of the United States and Tennessee Constitutions. We disagree. Between the time of the offense and the time of trial, there were no significant changes in the law of marital privilege in criminal cases. Although the Tennessee Rules of Evidence were adopted in 1990, Tenn. R. Evid. 501 simply states,

Except as otherwise provided by constitution, statute, common law, or by these or other rules promulgated by the Tennessee Supreme Court, no person has a privilege to:

(1) Refuse to be a witness;

(2) Refuse to disclose any matter;

(3) Refuse to produce any object or writing;  or

(4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

The Advisory Commission Comments to Rule 501 refer one to  *McCormick*  for the rule governing spousal communications in criminal cases. Clearly, Rule 501 also encompasses the exceptions to the marital privilege implicit in this court's opinion in  *Adams v. State,*     563 S.W.2d 804 (Tenn.Crim.App.1978).

In *State v. Hurley,*     876 S.W.2d 57, 64 (Tenn.1993), *cert. denied,* --- U.S. ----, 513 U.S. 933, 115 S.Ct. 328, 130 L.Ed.2d 287 (1994), our supreme court modified the marital privilege in criminal cases so that the testifying spouse alone had the right to invoke the privilege. However, the opinion was filed on April 5, 1993, approximately two months before the appellant's trial. Thus, obviously, the trial court did not apply the *Hurley* rule in this case. In any event, even had the trial court applied the new rule, we have held that the *Hurley* rule is a procedural rule that does not affect any substantial rights of a defendant in a criminal case and, therefore, does not implicate *ex post facto*  constitutional provisions. *State v. Bragan,*     920 S.W.2d 227 (Tenn.Crim.App. at Knoxville, 1995).

Finally, we note that the  *Hurley*  modification of the common law rule was superseded by statute when the legislature, in 1995, amended Tenn.Code Ann. § 24-1-201, which had previously only applied in civil cases. Section 24-1-201 now provides,

(a) In either a civil or criminal proceeding, no married person has privilege to refuse to take the witness stand solely because that person's spouse is a party  **\*529**  to the proceeding.

(b) In either a civil or criminal proceeding, confidential communications between married persons are privileged and inadmissible if either spouse objects.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

942 S.W.2d 489, State v. Bush, (Tenn. 1997)                                              Page 30

(FN2.) The Sixth Amendment to the United States Constitution is applicable to the states through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). Moreover, our supreme court has largely adopted the standards of the United States Supreme Court under the Sixth Amendment in determining whether there has been a violation of the Tennessee Constitution. *State v. Middlebrooks,* 840 S.W.2d 317, 332 (Tenn.1992) (however, with respect to the right to *physically* confront one's accusers, our supreme court has observed that "[t]he 'face-to-face' language found in the Tennessee Constitution has been held to impose a higher right than that found in the federal constitution," *State v. Deuter,* 839 S.W.2d 391, 395 (Tenn.1992)).

**\*529** (FN3.) In *Kentucky v. Stincer,* 482 U.S. 730, 738, 107 S.Ct. 2658, 2663 n. 9, 96 L.Ed.2d 631 (1987), Justice Blackmun stated that, in *his* opinion, denying a defendant access to information before trial *may* hinder that defendant's opportunity for effective cross-examination, thereby implicating the Confrontation Clause. However, our supreme court in *Middlebrooks,* 840 S.W.2d at 332, noted that "[t]he right to cross-examine witnesses ... does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." In any event, the State in this case followed a policy of open file discovery and, prior to trial, informed the appellant's counsel of the statements made by the appellant to Sheila Bush Hammock.

(FN4.) The appellant was arrested on September 25, 1988, and indicted the next day. The record does not reflect precisely when the appellant made the incriminating statements. However, the statements were made after the appellant's arrest and consequent incarceration in the Putnam County Jail.

(FN5.) In any event, no tapes were ever introduced either at the suppression hearing or at trial.

(FN6.) Deputy Lane testified at the suppression hearing that the resultant tapes contained no incriminating evidence.

(FN7.) *See supra* Section III, Issue # 6 "Whether the Appellant is Entitled to Relief Based on

Allegations of Prosecutorial Misconduct," (C)(1) Closing Argument, Massive Investigation, for a general discussion of the standard to be applied in reviewing counsel's argument.

(FN8.) The appellant's trial was set for February of 1993.

(FN9.) We also note that, at the sentencing phase of the trial, the jury was likewise instructed as to "a moral certainty" regarding the finding of aggravating circumstances "beyond a reasonable doubt." (charge of the court, transcript of the evidence, vol. eight, § III, pp. 1153-1154).

(FN10.) The United States Supreme Court, in *Cage v. Louisiana,* 498 U.S. 39, 41, 111 S.Ct. 328, 329, 112 L.Ed.2d 339, 341 (1990), held that "moral certainty" modified by the phrases "grave uncertainty" and "actual substantial doubt" did not meaningfully convey the definition of reasonable doubt, and, thus, violated the due process clause.

(FN11.) We note, however, that a federal district court has recently held that the phrase "let the mind rest easily," when used to qualify "moral certainty," does not sufficiently convey to the jury the requisite burden of proof required by the Constitution. *See Rickman v. Dutton,* 864 F.Supp. 686 (M.D.Tenn.1994). We are not, however, bound by that court's decision.

(FN1.) As noted in the main opinion, *Brimmer* was decided after this case had been tried.

(FN1.) (i) No death penalty shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which are limited to the following:

....

(6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another.

Tenn.Code Ann. § 39-13-204(i)(6)(1991).

(FN2.) Although *Zirkle* refers to the standard of proof required to establish guilt when the evidence against the defendant is entirely circumstantial, I think it is equally applicable here.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

**\*93**   976 S.W.2d 93

Supreme Court of Tennessee,
at Knoxville.

STATE of Tennessee, Appellee,
v.
Gussie Willis VANN, Appellant.
Sept. 21, 1998.
Rehearing Denied Oct. 19, 1998.

Defendant was convicted in the Criminal Court, McMinn County, R. Steven Bebb, J., of first-degree felony murder of his eight-year-old daughter in the perpetration of aggravated rape, and two counts of incest, and was sentenced to death. Defendant appealed. The Court of Criminal Appeals affirmed. On automatic review, the Supreme Court, Drowota, J., held that: (1) evidence did not support jury charge on offenses of second degree murder and facilitation of a felony; (2) probative value of photographs and testimony regarding prior sexual abuse of victim was not outweighed by the danger of unfair prejudice; (3) evidence supported finding of aggravating circumstance that murder was especially heinous, atrocious, or cruel; (4) affidavit set forth sufficient facts from which magistrate reasonably could have concluded that nexus existed between crime and place to be searched, and that facts were sufficiently recent to establish probable cause; and (5) indictment charging defendant with counts of incest was not void for failure to specifically allege mental state.

Affirmed.

Birch, J., filed a dissenting opinion in which Reid, Special Justice, joined.

West Headnotes

[1] Criminal Law ⬅795(2.50)
 110 ----
  110XX Trial
   110XX(G) Instructions:  Necessity, Requisites,
     and Sufficiency
   110k795 Grade or Degree of Offense;  Included
     Offenses
   110k795(2.25) Particular Cases and Offenses
     Charged
   110k795(2.50) Homicide Charges.

[See headnote text below]

[1] Homicide ⬅308(3)
 203 ----
  203VIII Trial
   203VIII(C) Instructions
    203k306 Grade or Degree of Offense
    203k308 Murder
     203k308(3) Applicability to Issues and
       Evidence in General.
 Evidence did not support jury charge on offenses of second-degree murder and facilitation of a felony in addition to charge given on first-degree felony murder; evidence established that victim either had been killed during perpetration of rape, that victim had died from accidental choking on popcorn, or that victim had committed suicide.

[2] Criminal Law ⬅823(1)

[2] Criminal Law ⬅823(1)
 110 ----
  110XX Trial
   110XX(G) Instructions:  Necessity, Requisites,
     and Sufficiency
   110k823 Error in Instructions Cured by
     Withdrawal or Giving Other
     Instructions
   110k823(1) In General.

[See headnote text below]

[2] Criminal Law ⬅823(9)
 110 ----
  110XX Trial
   110XX(G) Instructions:  Necessity, Requisites,
     and Sufficiency
   110k823 Error in Instructions Cured by
     Withdrawal or Giving Other
     Instructions
   110k823(9) Presumptions and Burden of Proof.
 Jury instruction as to proximate cause, although not warranted by evidence in case, did not prejudice defendant despite his claims that it relieved prosecution of burden of proving criminal intent, deprived him of his right to unanimous jury verdict, and shifted burden of proof to defendant, in light of instructions given which clearly stated that burden of proof never shifted and was always on state and that verdict had to be unanimous, and which correctly informed jury of the intent required to convict defendant of first-degree felony murder.

[3] Criminal Law ⬅1172.1(1)
 110 ----
  110XXIV Review
   110XXIV(Q) Harmless and Reversible Error
    110k1172 Instructions
     110k1172.1 In General
   110k1172.1(1) Instructions in General.
 Jury charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law.

[4] Criminal Law ⬅1153(1)
 110 ----
  110XXIV Review
   110XXIV(N) Discretion of Lower Court
    110k1153 Reception of Evidence
   110k1153(1) In General.
 In determining whether evidence of other crimes has been erroneously admitted, court reviews the record of the jury-out hearing to determine if the trial court abused its discretion.  Rules of Evid., Rule 404(b).

[5] Criminal Law ⬅438(1)
 110 ----
  110XVII Evidence
   110XVII(P) Documentary Evidence
    110k431 Private Writings and Publications
     110k438 Photographs and Other Pictures
   110k438(1) In General.
 Photograph is admissible if it is relevant to an issue in dispute and if its probative value is not outweighed by its prejudicial effect.  Rules of Evid., Rule 403.

[6] Criminal Law ⬅1153(1)
 110 ----
  110XXIV Review
   110XXIV(N) Discretion of Lower Court
    110k1153 Reception of Evidence

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                    Page 2

110k1153(1) In General.
Decision of a trial judge to admit a photograph into
evidence will not be overturned on appeal absent a
clear showing of an abuse of discretion.

[7] Criminal Law ☞369.2(4)
   110 ----
   110XVII Evidence
      110XVII(F) Other Offenses
         110k369 Other Offenses as Evidence of Offense
            Charged in General
         110k369.2 Evidence Relevant to Offense, Also
            Relating to Other Offenses in General
         110k369.2(3) Particular Offenses, Prosecutions
            for
            110k369.2(4) Assault, Homicide, Abortion
               and Kidnapping.

   [See headnote text below]

[7] Criminal Law ☞438(7)
   110 ----
   110XVII Evidence
      110XVII(P) Documentary Evidence
         110k431 Private Writings and Publications
         110k438 Photographs and Other Pictures
         110k438(7) Photographs Arousing Passion or
            Prejudice;  Gruesomeness.
   Probative value of photographs and testimony
regarding prior sexual abuse of victim to explain
that victim could have been penetrated anally at time
of her murder without sustaining evident injury was
not outweighed by the danger of unfair prejudice,
and it did not have a tendency to suggest decision on
improper or unfair basis.  Rules of Evid., Rules 403
, 404(b).

[8] Criminal Law ☞1169.1(6)
   110 ----
   110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
         110k1169 Admission of Evidence
         110k1169.1 In General
         110k1169.1(6) Character or Reputation of
            Accused.
   Error in admitting irrelevant testimony
enumerating items seized from defendant's
residence, including petroleum jelly, pornographic
videotape and magazines, and unused condoms, was
harmless, where state did not elicit testimony
characterizing videotape and magazine as
pornographic and relating title of videotape, neither
tape nor magazines were presented to jury, and
investigator related no information to jury regarding
the contents of videotape and magazines.  Rules
Crim.Proc., Rule 52(a).

[9] Sentencing and Punishment ☞1684
   350H ----
   350HVIII The Death Penalty
      350HVIII(D) Factors Related to Offense
      350Hk1684 Vileness, Heinousness, or Atrocity.

   (Formerly 203k357(11))
   Evidence supported finding of aggravating
circumstance that murder was especially heinous,
atrocious, or cruel in that it involved torture or
serious physical abuse beyond that necessary to
produce death; eight-year-old victim was murdered
by her own father as he raped her both anally and
vaginally, victim had blood in both her vaginal and
anal regions, sustained a tear to her vaginal opening,

bruising in vaginal region, and contusion on her
head which was one inch in diameter, and victim
was strangled with such force that muscles in her
neck were literally torn. T.C.A.          §    *93
39-13-204(i)(5).

[10] Criminal Law ☞1171.1(6)
   110 ----
   110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
         110k1171 Arguments and Conduct of Counsel
         110k1171.1 In General
         110k1171.1(2) Statements as to Facts,
            Comments, and Arguments
         110k1171.1(6) Appeals to Sympathy or
            Prejudice;  Argument as to
            Punishment.
   Prosecutor's isolated reference to past anal and
physical abuse of victim while urging jury to find
aggravating circumstance for especially heinous,
atrocious or cruel murder, though technically
improper, was not error which could be deemed to
have affected verdict; prosecutor's argument as a
whole did not imply that past injuries were proof of
serious physical injury beyond that necessary to
produce death and addressed victim's injuries in a
general sense.

[11] Searches and Seizures ☞114
   349 ----
   349II Warrants
      349k113 Probable or Reasonable Cause
      349k114 Particular Concrete Applications.
   Affidavit set forth sufficient facts from which
magistrate reasonably could have concluded that
nexus existed between crime and place to be
searched, and that facts were sufficiently recent to
establish probable cause required for issuance of
search warrant; affidavit stated that child victim had
been chronically abused anally and vaginally, that
sexual penetration of victim had occurred within 48
hours of death, that defendant's wife had solicited
another child to have sexual relations with
defendant, that defendant had made statements
indicating condoms might have been used to
perpetrate abuse, that wife stated she had found
victim with rope around her neck, thus necessitating
search for murder weapon, and that, within previous
five days, affiant and another officer observed
enumerated items related to sexual abuse and
bondage in premises. U.S.C.A. Const.Amend. 4.

[12] Incest ☞10
   207 ----
   207k9 Indictment or Information
   207k10 Requisites and Sufficiency.
   Indictment charging defendant with counts of
incest was not void for failure to specifically allege
mental state, where mens rea of "knowingly" could
be logically inferred from language of indictment
charging sexual penetration of victim known to be
defendant's daughter. T.C.A.    § § 39-11-301(c),
39-11-302.

[13] Incest ☞4
   207 ----
   207k3 Elements of Offenses
   207k4 In General.

   [See headnote text below]

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

821

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                    **Page 3**

[13] Incest ☞5
  207 ----
    207k3 Elements of Offenses
    207k5 Relationship, and Knowledge Thereof.
    Statutory definition of incest does not expressly
require, nor plainly dispense with a culpable mental
state, and thus, intent, knowledge, or recklessness
will suffice to establish the culpable mental state for
commission of the offense.  T.C.A. §§ 39-11-301(c)
, 39-11-302.

[14] Sentencing and Punishment ☞1668
  350H ----
    350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
      350Hk1666 Nature or Degree of Offense
      350Hk1668 Murder.

  (Formerly 203k357(1))
  Sentence of death is proportional to the crime of
first-degree murder.

[15] Sentencing and Punishment ☞1657
  350H ----
    350HVIII The Death Penalty
    350HVIII(C) Factors Affecting Imposition in
          General
      350Hk1657 Proportionality in General.

  (Formerly 110k1208.1(4.1))
  If case is plainly lacking in circumstances
consistent with those in similar cases in which the
death penalty has previously been imposed, the
sentence of death is disproportionate, but a sentence
of death is not disproportionate merely because the
circumstances of the offense are similar to those of
another offense for which the defendant has received
a life sentence.

[16] Sentencing and Punishment ☞1788(6)
  350H ----
    350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)4 Determination and Disposition
        350Hk1788 Review of Death Sentence
        350Hk1788(6) Proportionality.

  (Formerly 110k1134(3))
  Role of Supreme Court in conducting
proportionality review is not to assure that a
sentence less than death was never imposed in a case
with similar characteristics, but rather to assure that
no aberrant death sentence is affirmed.

[17] Sentencing and Punishment ☞1788(6)
  350H ----
    350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)4 Determination and Disposition
        350Hk1788 Review of Death Sentence
        350Hk1788(6) Proportionality.

  (Formerly 110k1134(2))
  In choosing and comparing similar cases to
determine the proportionality of a death sentence,
the Supreme Court considers many variables, some
of which include: (1) the means of death;  (2) the
manner of death;  (3) the motivation for the killing;
(4) the place of death;  (5) the similarity of the
victim's circumstances, including age, physical and
mental conditions, and the victims' treatment during
the killing;  (6) the absence or presence of

premeditation;  (7) the absence or presence of
provocation;  (8) the absence or presence of
justification;  and (9) the injury to and effects on
nondecedent victims.

[18] Sentencing and Punishment ☞1788(6)
  350H ----
    350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)4 Determination and Disposition
        350Hk1788 Review of Death Sentence
        350Hk1788(6) Proportionality.

  (Formerly 110k1134(2))
  When reviewing the characteristics of the
defendant to determine the proportionality of a death
sentence, the Supreme Court considers:  (1) the
defendant's prior record or prior criminal activity;
(2) the defendant's age, race, and gender;  (3) the
defendant's mental, emotional or physical condition;
(4) the defendant's involvement or role in the
murder;  (5) the defendant's cooperation with
authorities;  (6) the defendant's remorse;  (7) the
defendant's knowledge of the helplessness of the
victim;  and (8) the defendant's capacity for
rehabilitation.

[19] Sentencing and Punishment ☞1700
  350H ----
    350HVIII The Death Penalty
    350HVIII(E) Factors Related to Offender
      350Hk1700 In General.

  (Formerly 203k357(5))

  [See headnote text below]

[19] Sentencing and Punishment ☞1681
  350H ----
    350HVIII The Death Penalty
    350HVIII(D) Factors Related to Offense
      350Hk1681 Killing While Committing Other
            Offense or in Course of Criminal
            Conduct.

  (Formerly 203k357(7))

  [See headnote text below]

[19] Sentencing and Punishment ☞1661
  350H ----
    350HVIII The Death Penalty
    350HVIII(C) Factors Affecting Imposition in
          General
      350Hk1661 Determinations Based on Multiple
            Factors.

  (Formerly 203k357(11))
  Considering nature of crime and defendant,
imposition of death penalty for cruel killing of
defendant's young daughter was not disproportionate
to penalty imposed in similar cases, and murder
placed defendant into class of defendants for whom
death penalty was appropriate punishment; defendant
strangled his eight-year-old daughter while he anally
and vaginally raped her in their home, he had prior
conviction for violent felony, he suffered no mental
or emotional defect and was not intoxicated at time
of murder, he showed little emotion after victim's
death and no remorse at trial, and he did not offer
any other insight on events of evening of murder.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)

**\*96**  Brock Mehler, Nashville, Ashley L. Ownby, Cleveland (Trial on Appeal), Kenneth Miller, Cleveland (Trial Only), for Appellant.

John Knox Walkup, Attorney General and Reporter, Michael E. Moore, Solicitor General, John P. Cauley, Assistant Attorney General, Nashville, Jerry N. Estes, District Attorney General, Athens, for Appellee.

## OPINION

DROWOTA, Justice.

In this capital case, the defendant, Gussie Willis Vann, was convicted of first degree felony murder in the perpetration of aggravated rape, and two counts of incest. In the sentencing hearing, the jury found three aggravating circumstances: (1) "[t]he murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age or older;" (2) "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;" and (3) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39-13-204(i)(1), (2), and (5) (1991 Repl.). Finding that the three aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction and sentence, raising eleven claims of error, some with numerous subparts. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn.Code Ann.    § 39-13-206(a)(1) (1997 Repl.), (FN1) the case was docketed in this Court.

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court, on December 15, 1997, entered an Order setting the cause for oral argument at the January 1998, term of Court in Knoxville, and limiting oral argument to eight issues. *See* Tenn. S.Ct. R. 12. (FN2)

For the reasons explained below, we have determined that none of the alleged errors affirmatively appear to have affected the verdict of guilt or the sentence imposed. Moreover, the evidence supports the jury's findings as to aggravating and mitigating circumstances, and the sentence of death is not disproportionate or arbitrary. Accordingly, the defendant's convictions for first degree murder and incest (FN3) and the sentence of death by electrocution are affirmed.

### FACTUAL BACKGROUND

The proof presented by the State at the guilt phase of this trial established that on July 30, 1992, at approximately 11:39 p.m., Bernice Vann, the defendant's wife, made an emergency call to 911.

She reported that her eight-year-old daughter, Necia Vann had fallen in the bedroom with a rope around her neck and was not breathing. The paramedics arrived at the scene at 11:54 to find Bernice Vann crying hysterically on the front porch. The defendant was inside the mobile home holding the victim and attempting to perform CPR. Except for a blanket covering **\*97** his lap, the defendant was nude. The defendant told the paramedics that he was not sure what had happened, but that earlier in the evening the victim had been eating popcorn. He had left to go to the market, and the unconscious victim had been discovered in her room by his wife shortly after his return. He said the victim possibly had choked on popcorn.

The victim, clothed only in panties, had no vital signs when the paramedics arrived on the scene. Despite their efforts to revive her, the victim was pronounced dead upon her arrival at the hospital. Dr. Robert L. Martin, the attending emergency room physician, performed a post-mortem examination of the victim's body, which paramedic Robert West observed. The victim's panties were removed and a broken gold necklace fell onto the examination table. Both West and Dr. Martin observed bruises on the victim's neck and a slight tear at the opening of her vagina. West testified that he observed a small trace of blood near the tear. Both West and Dr. Martin described the victim's anus as extremely dilated, with no muscle tone, indicating multiple episodes of anal penetration over a prolonged period of time. Dr. Martin testified that in his prior fifteen years practicing obstetrics and gynecology, he had never seen the anus of a female child in such a condition. Dr. Martin testified that he did not discover a "hangman's fracture" on the victim's neck, indicating the victim had been strangled rather than hanged. Dr. Martin described Bernice Vann as visibly upset, and the defendant as "totally nonchalant" when informed of their daughter's death. When asked by Dr. Martin what had happened, the defendant replied that he had gone out for cigarettes and did not know. Photographs of the victim's vaginal and anal openings were admitted into evidence.

Also admitted into evidence was a statement given by the defendant to Tennessee Bureau of Investigation Agent Richard Brogan in which the defendant said that from about 4:30 p.m. on the afternoon of July 30, he, his wife, and their four children (including the victim) had watched videotaped movies on their television. They had eaten popcorn as they watched the movies. Later in the evening the victim had gone into her bedroom. The defendant had gone to a local convenience store and purchased cigarettes and two pieces of "Chico" candy. Upon returning home, he undressed to take a shower and then heard his wife screaming from the other room. He ran into the hallway and saw his wife carrying the victim in her arms. After taking the victim into his arms and determining that she was not breathing, the defendant told his wife to go to a neighbor's house to call 911. (FN4) The defendant began performing CPR on the victim. Shortly thereafter, Bernice Vann returned to the residence, along with a neighbor. Bernice Vann obtained a blanket for the defendant since he had not been able to dress before beginning CPR on the victim. The defendant said he had ridden in the front of the ambulance on the way to the hospital

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

and did not ask his wife what had happened until they arrived at the hospital. According to the defendant, Bernice Vann said she had found the victim sitting beside her dresser with a rope tied around her neck. The defendant said the victim had never given him any indication that she wanted to hang herself. The defendant also volunteered information to police that the victim often spent the night with an uncle, a male friend of his, and a person named Linda Rogers, with whom he had been having an affair.

Ruby Crittenden, clerk at the "Mr. Zip" convenience store where the defendant purportedly purchased cigarettes and candy on the night of the murder testified that she did not recall whether or not the defendant had come into the store that evening. Cash register tapes for the time the defendant claimed to have been at the store did not reflect a purchase of the items he claimed to have bought.

Jerry Tate, a criminal investigator with the McMinn County Sheriff's Department, testified that he had been dispatched to the emergency room to investigate the purported suicide of the eight-year-old victim in this case. Upon viewing her body, Tate noticed red marks around her neck, her severely enlarged anus, the tear at the opening of her *98 vagina, and blood near the victim's vaginal opening. As a result of his observations, Tate asked Dr. Martin to obtain rape kit samples from the victim's body. Tate then obtained verbal consent from Bernice Vann and the defendant to visit their home and investigate the victim's death. Tate described the mobile home as dirty and unsanitary. Upon inspection, he found a strip of bed sheet tied to a knob on a drawer of a dresser in the victim's bedroom. Tate noticed that the knot was very tight, signifying that perhaps an adult, rather than a child, had tied the knot. Tate found another sheet with a portion torn from it in a back bedroom. Tate seized as evidence the two torn sheets, the sheets from the victim's bed, and some of the victim's clothing. Approximately two weeks later, after the defendant and Bernice Vann had been arrested for the murder, rape, and incest of Necia Vann, (FN5) Tate obtained a warrant to search the Vann residence. During the ensuing search, a pornographic videotape, various pornographic magazines, unopened packages of condoms, a partially used jar of petroleum jelly, a rope tied into a noose, and the victim's dresser were seized. These items, along with the rape kit samples from the victim, the items seized in the consent search, samples of blood, saliva, pubic hair, head hair, and a penile swab obtained from the defendant's person the morning after the victim's death, and similar samples obtained from Bernice Vann during the two weeks preceding the arrest, were submitted to the Tennessee Bureau of Investigation (T.B.I.) for testing and analysis.

Linda Littlejohns, a T.B.I crime laboratory expert in the trace evidence section, testified that she had conducted a physical comparison of the torn bed sheet found in the victim's bedroom and the portion of sheet found in the back bedroom. According to her analysis, the parts had at one time been joined. She found no trace evidence on the torn sheet or on the anal swab taken from the victim, however, which related to the partially used container of

petroleum jelly or unopened condoms found in the defendant's residence.

Raymond Depriest, a T.B.I. expert in serology, testified that his analysis of a pair of jeans and a t-shirt believed to have been worn by the victim on the day of the murder, a blue and white jumper, the victim's underwear, two packages of condoms taken from the defendant's home, and an anal swab taken from the victim all proved negative for the presence of sperm, saliva, or blood. However, his analysis of sheets taken from the victim's bed revealed the presence of semen stains which were consistent with the blood, saliva, and semen samples taken from the defendant.

Chester Blythe, an expert in hair and fiber comparisons from the Federal Bureau of Investigation, (F.B.I.) Forensic Science Training Unit testified that he had compared the hair samples taken from the victim and Bernice Vann to hair debris from the rope seized from the defendant's residence and believed to have been used to strangle the victim. Blythe concluded that the hair debris from the rope matched the samples taken from the victim and Bernice Vann. He also found hairs that were microscopically similar to the hairs of the victim on the torn piece of sheet taken from the residence. A number of hairs on the bed sheet were microscopically unlike the hair samples taken from the victim or Bernice Vann. Examination of these hairs revealed that they came from an adult. Because the envelope labeled as containing the defendant's hair samples had been empty when he opened it, Blythe had been unable to compare the recovered hair evidence to samples of the defendant's hair.

John Mertens, an F.B.I. agent specializing in DNA analysis testified that the DNA profiles of the semen stains found on the victim's bed sheet matched the DNA profile of the defendant. The odds of finding another individual whose DNA profile matched that of the semen stains found on the sheet are one in ten thousand.

*99 The medical examiner for McMinn County, Dr. William Foree, Jr., testified that he examined the victim's body at approximately 5:30 a.m. on July 31, 1992. Dr. Foree said he observed blood both in the victim's vaginal and anal areas. He also observed a laceration in the vaginal area, a contusion on her forehead, and abrasions on her lower extremities. He noted signs of asphyxiation, and based upon the angle of depression on the victim's neck, concluded that the cause of death had been strangulation rather than hanging. Due to the markings on the victim's neck, he further concluded that the strangulation had been accomplished from behind the victim.

Dr. Ronald Toolsie, a pathologist at Bradley Medical Center, performed the autopsy and agreed with Dr. Foree that the cause of death had been strangulation. According to Dr. Toolsie, the quarter-inch depression in the victim's neck indicated ligature strangulation consistent with the rope found in the defendant's home. Torn muscles in the victim's neck indicated that considerable force had been applied to strangle the victim. Dr. Toolsie also had found evidence of repeated sexual abuse. Based on his observation of a tear to the victim's

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

vaginal opening and fresh bruising on the inside of her vaginal wall, Dr. Toolsie concluded that the most recent abuse had occurred around the time of death. Dr. Toolsie said the victim's anus had been dilated three or four times larger than normal, indicating she had suffered repeated anal penetration over some period of time. Because of the marked lack of anal muscle tone, Dr. Toolsie said that anal penetration could have been accomplished at the time of death even though there was no evident injury to the victim. Dr. Toolsie said the victim's hymen had been intact, but stated that penetration with something other than a penis could have occurred without breaking the hymen. Dr. Toolsie also noted that the victim had a one inch contusion on her scalp "of very recent time duration," and a one quarter inch cut inside her mouth. Finally, Dr. Toolsie testified that he had found no material resembling popcorn in the victim's stomach.

The defendant's neighbor, Troy Lee Jones, testified that he had assisted Bernice Vann call 911 on the night of the murder. Jones said that when he arrived at the Vann residence, the defendant, in his opinion, had been doing everything within his power to save the victim's life. Jones said that Bernice Vann had told him that the victim had been eating popcorn and might have choked on it. Jones also stated on cross-examination that Bernice Vann had been hysterical and had said something about the victim hanging herself.

At the close of the proof, the State dismissed the charge of premeditated murder and the case was submitted to the jury on the charges of first degree felony murder and two counts of incest. The jury found the defendant guilty of felony murder, one count of incest by vaginal penetration, and one count of incest by anal penetration.

At the sentencing phase of the trial, the State produced the birth certificates of both the defendant and the victim to establish that the murder had been committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age or older. The State also introduced copies of two prior judgments dated January 6, 1994. These judgments reflected that the defendant had been previously convicted of two counts of aggravated rape. Finally, the State relied upon the medical proof introduced at the guilt phase of the trial to establish that the murder had been especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.

Testifying in his own behalf, the defendant stated that he had been one of fifteen children. His family had farmed the land of others and had been poor, but loving. From the age of ten, the defendant had farmed the land. When his oldest brother left home, the defendant assumed the responsibility of caring for his younger siblings. As an adult, the defendant had worked in a carpet mill and as a truck driver. In 1980 he had been injured on the job at the carpet mill and placed on prescription pain medication. He had become addicted to the medication, and as a result, had a nervous breakdown, and had to be hospitalized. In 1982, the defendant married **\*100** Bernice Vann. After the victim had been born, according to the defendant, Bernice "went to pieces," so he took over the responsibilities for all

the household chores and child care. In 1989 the defendant had sustained severe injuries in an attempted truck hijacking. He had been beaten in the head with a tire iron, causing head injuries and a dislocated disk in his back. As a result of the injuries, he suffers recurrent seizures. The defendant denied killing the victim or knowing how, or at whose hands, she had died. He also denied sexually abusing the victim.

The defendant's brother, Eston Allen Gene Vann, testified that the defendant and his father did not have a harmonious relationship, that the defendant had not been "wanted," and that their father often had beaten the defendant with a broom handle. He also testified that the defendant had been the primary caretaker of his children, who all appeared to love the defendant, particularly the victim.

Lisa Marie McMahan, the defendant's sister testified that the defendant had provided food and support to his siblings. McMahan expressed her belief that the defendant definitely had not committed the crimes of which he had been convicted. Finally, the defense introduced medical records concerning the defendant's hospitalization and treatment for depression and suicidal tendencies.

Based upon the proof presented, the jury determined that the State had proven the existence of three aggravating circumstances beyond a reasonable doubt: (1) "[t]he murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age or older;" (2) "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;" and (3) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39-13-204(i)(1), (2), and (5) (1991 Repl.). Finding that the three aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors assigned by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals.

*JURY INSTRUCTIONS ON OTHER OFFENSES*

[1] The defendant asserts that the trial court's failure to instruct the jury on any degree of homicide other than first degree felony murder deprived him of his state and federal constitutional rights to trial by jury, due process, and heightened reliability required in capital cases. The defendant asserts that under the proof in this case the jury should have been given an instruction on the offense of second degree murder. He also asserts that the jury could have concluded from the proof that Bernice Vann, rather than the defendant, actually had committed the murder, and that the defendant had merely furnished substantial assistance in the commission of the felony. Accordingly, he contends that the jury should have been given an instruction on the offense of facilitation of a felony. The State responds that the evidence in this case did not warrant an instruction on either offense.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                    **Page 7**

In this case, the indictment charged the defendant in count one with premeditated first degree murder, and in count two with first degree murder during the perpetration of rape. Before the case was submitted to the jury for decision, the State dismissed count one, premeditated murder, and proceeded on the theory of first degree felony murder. The trial court then instructed the jury solely on the offense of first degree felony murder.

Reviewing the evidence in this record, we agree with the Court of Criminal Appeals that the trial court did not err in failing to give a jury instruction on second degree murder and facilitation of a felony. The evidence in this record establishes that the victim had been killed during the perpetration of a rape, or that the victim had died from an accidental choking on popcorn, or **\*101** that the victim had committed suicide. The record in this case is devoid of evidence to support a jury charge on the offenses of second degree murder and facilitation of a felony. *State v. Boyd,* 797 S.W.2d 589, 593 (Tenn.1990); *State v. King,* 718 S.W.2d 241, 245 (Tenn.1986). Therefore, failure to instruct the jury on these offenses was not error.

### *JURY INSTRUCTIONS*

[2] The defendant next contends that the trial court's instruction as to proximate cause relieved the prosecution of its burden of proving criminal intent, deprived him of his right to a unanimous jury verdict, and shifted the burden of proof to the defendant. The State concedes that the instructions complained of should not have been given in this case because the issue of proximate cause had not been raised by the proof. The State argues, however, that the error is harmless because the instructions given were correct statements of the law and, considered as a whole, the jury instructions were not misleading, contradictory, or confusing.

[3] We have recently stated that, in determining whether jury instructions are erroneous, this Court must review the charge in its entirety and read it as a whole. *State v. Hodges,* 944 S.W.2d 346, 352 (Tenn.1997); *State v. Stephenson,* 878 S.W.2d 530, 555 (Tenn.1994). The United States Supreme Court has observed that in evaluating claims of error in jury instructions, courts must remember that

> [j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California,* 494 U.S. 370, 380-81, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990); *see also State v. Van Tran,* 864 S.W.2d 465, 479 (Tenn.1993). A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law. *State v. Forbes,* 918 S.W.2d 431, 447 (Tenn.Crim.App.1995); *Graham v. State,* 547 S.W.2d 531 (Tenn.1977). Applying that standard to the instructions in this case, we have determined that the instruction did not mislead or confuse the jury as to the applicable law.

The instruction challenged as error by the defendant is as follows:

> Before the Defendant can be convicted of any degree of homicide, the State must have proven beyond a reasonable doubt that the death of the deceased, Necia Vann, was brought about as a result of the criminal agency of the Defendant; that is, that the death of the deceased was due to the unlawful act of the Defendant.

> One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause.

> To convict the Defendant, it is not necessary that his act or failure to act be the sole cause, nor the most immediate cause of death. It is only necessary that the Defendant unlawfully contributed to the death of the deceased.

> Death following a wound from which death might ensue, inflicted with intent to kill, is presumed to have been caused by such wound, and the burden of proceeding by offer of proof is upon the Defendant to show that death resulted from some other cause not attributable to the Defendant. However, while the burden of proceeding may shift, the burden of proof never shifts and is always upon the State to prove beyond a reasonable doubt that the death of the deceased was brought about by the unlawful act of the Defendant.

> If you find the Defendant's acts, if any, did not unlawfully cause or contribute to the death of the deceased, or if you have a reasonable doubt as to this proposition, then you must acquit him.

Though we agree with the defendant that the evidence in this case did not warrant giving the proximate cause instruction, we do not agree that the instruction relieved the **\*102** prosecution of its burden of proving criminal intent, deprived him of his right to a unanimous jury verdict, and shifted the burden of proof to the defendant. The instruction clearly did not shift the burden of proof to the defendant. In fact, the instruction informed the jury that "the burden of proof never shifts and is always upon the State to prove beyond a reasonable doubt that the death of the deceased was brought about by the unlawful act of the Defendant." Moreover, there is nothing in the instruction which would have deprived the defendant of his right to a unanimous verdict. In fact, the trial court specifically instructed the jury that "[t]he verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous, that is, twelve votes for a verdict finding guilty or twelve votes for a verdict finding not guilty." Finally, with respect to the defendant's argument that the instruction relieved the State of the burden of proving intent, we disagree. The trial court correctly instructed the jury as follows on the elements of felony murder:

> For you to find the defendant guilty of this offense,

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant unlawfully killed the alleged victim; and

(2) that the killing was committed in the perpetration of or attempt to perpetrate the alleged rape; that is, that the killing was closely connected to the alleged rape and was not a separate, distinct and independent event; and

*(3) that the defendant intended to commit the alleged rape; and*

*(4) that the killing was the result of a reckless act by the defendant.*

(Emphasis added). Clearly, the charge, read as a whole correctly informed the jury of the intent required. For the previously explained reasons, we conclude that the jury instructions read as a whole were not prejudicially erroneous; therefore, this issue is without merit.

### OTHER CRIMES EVIDENCE

The defendant next contends that the trial court erred by admitting the photographs and the testimony concerning past sexual abuse because it is irrelevant and excluded by Tenn. R. Evid. 404(b). Alternatively, the defendant asserts the trial court erred by admitting the evidence because its minimal probative value was outweighed by its prejudicial effect.

The State responds that the photograph was highly relevant to prove that anal penetration could have occurred at the time of the murder with no evident injury to the victim because the anal muscle tone had been destroyed by prior and repeated episodes of anal penetration. We agree.

Tennessee Rule of Evidence 404(b) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

[4][5][6] In determining whether evidence of other crimes has been erroneously admitted, we review the record of the jury-out hearing to determine if the trial court abused its discretion. *State v. DuBose,* 953 S.W.2d 649, 652 (Tenn.1997)(standard of appellate review is abuse of discretion where trial

court has substantially complied with the procedural requirements of Rule 404(b)). Similarly, under Tennessee Rule of Evidence 403 and previous decisions of this Court, a photograph is admissible if it is relevant to an issue in dispute and if its probative value is not outweighed by its prejudicial effect. *\*103 State v. Stephenson,* 878 S.W.2d 530, 542 (Tenn.1994); *State v. Banks,* 564 S.W.2d 947, 951 (Tenn.1978). The decision of a trial judge to admit a photograph into evidence will not be overturned on appeal absent a clear showing of an abuse of discretion. *Id.*

In this case, the State sought to prove that the defendant murdered the victim during the course of a rape, and that he committed incest by vaginal and anal penetration. The emergency room physician testified that he found no apparent fresh injuries to the victim's anal area, but described the condition of her anus as consistent with ongoing repeated anal penetration. Dr. Toolsie, the pathologist who performed the autopsy, testified that because of the condition of the victim's anus, penetration at the time of death could have occurred without a resulting evident injury. Dr. Toolsie, and Dr. Foree, the medical examiner, both testified that the victim had fresh injuries to her vaginal region indicative of penetration at the time of death. Photographs of the victim's anal and vaginal regions were introduced into evidence.

The record reflects that at the end of the jury-out hearing to determine admissibility of the photographs, the trial court stated, "I find the probative value outweighs the prejudicial effect, and do not deny prejudicial effect." The defendant asserts that since the trial judge recognized the prejudicial effect, the photographs should not have been admitted. The defendant's argument fails to recognize that most evidence introduced during the trial of any lawsuit, criminal or civil, has a prejudicial impact on the position of one party to the lawsuit. In determining whether exclusion is required by Rule 404(b), the issue is not whether the evidence is prejudicial, but whether it is *unfairly prejudicial. DuBose,* 953 S.W.2d at 655. This Court has emphasized that "unfair prejudice" is "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *DuBose,* 953 S.W.2d at 654, quoting *Banks,* 564 S.W.2d at 951.

[7] The probative value of the evidence challenged by the defendant in this case was not outweighed by the danger of unfair prejudice, and it did not have a tendency to suggest a decision on an improper or unfair basis. Instead the photographs and testimony regarding prior sexual abuse were necessary to support the State's position that the victim had been raped vaginally and anally at the time of the murder. They were necessary to explain that the victim could have been penetrated anally at the time of the murder without sustaining an evident injury. *Compare DuBose,* 953 S.W.2d at 654-55 (evidence relevant and admissible to show cause of death, intent, and lack of accident). Though the photographs are graphic, they are relevant to depict the testimony regarding the injuries in this case, and the consequences of prior sexual abuse. Accordingly, the defendant has failed to show that the trial court abused its discretion in admitting this evidence.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                     Page 9

[8] The defendant also alleges that the trial court erred by admitting into evidence the testimony of Detective Tate enumerating items seized from the defendant's residence, including a half-empty jar of petroleum jelly, a pornographic videotape, pornographic magazines, and unused condoms. The defendant asserts that the testimony regarding the items portrayed him as a sexual deviant and resulted in prejudice. While conceding that the testimony was irrelevant, the State argues that the error is harmless because it does not affirmatively appear to have affected the verdict. We agree.

A review of the record reveals that the State did not elicit the testimony of Detective Tate characterizing the videotape and magazine as pornographic and relating the title of the videotape. Instead, the State attempted to end Detective Tate's narrative and steer him down a different path. Neither the tapes nor the magazines were presented to the jury, and the investigator related no information to the jury regarding the contents of the videotape and magazines. Though this information was not relevant and should not have been admitted, we agree with the Court of Criminal Appeals that the error is harmless. Tenn. R.Crim. P. 52(a).

*AGGRAVATING CIRCUMSTANCE (i)(5)*

The defendant next asserts that the evidence is not sufficient to support application    **\*104**    of the aggravating circumstance set out in Tenn.Code Ann. § 39-13-204(i)(5) (1991), "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." The defendant also argues that the prosecution engaged in misconduct by urging the jury to find the aggravating circumstance based on the "repeated, repeated, repeated anal abuse of this child." He contends that only abuse of the victim which occurred in temporal proximity to the killing, is relevant to prove the aggravating circumstance.

[9] Pointing out the number of injuries observed on Necia **Vann's** body, the **State** argues that the evidence clearly establishes that the victim had been subjected to serious physical abuse contemporaneous with her death. The State also argues that the evidence shows torture because the rape and abuse of the victim by her father would have resulted in mental and physical pain. As to the alleged prosecutorial misconduct, the State argues that the prosecutor's argument, considered as a whole, was not erroneous.

In *State v. Williams,* 690 S.W.2d 517 (Tenn.1985), we defined "torture" as the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. *Id.* at 529. With respect to "serious physical abuse beyond that necessary to produce death," we stated in    *State v. Odom,* 928 S.W.2d 18 (Tenn.1996), that "serious" alludes to a matter of degree, and that the physical abuse must be "beyond that" or more than what is "necessary to produce death." *Id.* at 26.   The proof in this case established that the victim suffered multiple injuries during the course of her murder. She had been raped not once, but twice, both anally and vaginally. Witnesses observed blood in both her vaginal and anal regions. She had sustained a tear

to her vaginal opening, bruising in the vaginal region, and a contusion on her head which was one inch in diameter. In addition, the victim was strangled with such force that the muscles in her neck were literally torn. The pathologist described the resiliency of muscle tissue and stated that tearing, such as that present in this case, results only from the application of substantial force. He described the strangulation in this case as "violent." Based upon this proof, we conclude that the evidence is sufficient to establish that the murder was especially heinous, atrocious, or cruel in that it involved serious physical abuse beyond that necessary to produce death. Moreover, the evidence is sufficient to establish torture. The victim in this case was murdered by her own father, as he perpetrated anal and vaginal rape upon her. Certainly these facts are sufficient to establish that the victim suffered severe mental pain.

[10] We also disagree with the defendant's claim that the prosecutor's argument was improper. That portion of the prosecutor's argument complained of is follows:

The third is that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. You have also received evidence of that in this trial. This is the evidence you have received, these neck injuries, of what was necessary to produce death. You have also received into evidence other injuries that go beyond that necessary to produce death. These are just a few: the doctors have testified, the pathologist and others testified, there is the contusion to the head, there is the injury to the vaginal area that was probably under the evidence you heard contemporaneous or close to death, but there was repeated, repeated, repeated anal abuse of this child. There were fading injuries that have been testified too [sic]. There was a cut lip. All of this is evidence that at this point in this trial stands uncontradicted as to these injuries, and they were beyond that necessary to produce death.

We do not view the prosecutor's argument, taken as a whole, to imply that past injuries are proof that the victim sustained serious physical injury beyond that necessary to produce death. The argument addressed the victim's injuries in a general sense. The reference to past anal and physical abuse arose as the prosecutor was summarizing the testimony. This isolated reference though technically improper, is not error which could    **\*105**   be deemed to have affected the verdict. This issue is without merit.

*MOTION TO SUPPRESS*

[11] The defendant next contends that the trial court should have suppressed evidence about items seized from his home pursuant to a defective search warrant. The defendant says that the affidavit in support of the search warrant failed to allege a nexus between the crime and the place to be searched and failed to allege a time frame during which the facts in question occurred. Thus, the defendant argues, the affidavit fails to establish probable cause and the evidence seized pursuant to it should have been suppressed. The State responds that the information alleged to be missing is, in fact, in the affidavit attached to the search warrant.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

In *State v. Longstreet,*    619 S.W.2d 97, 99 (Tenn.1981), this Court held that to establish probable cause an affidavit must set forth facts from which a reasonable conclusion may be drawn that the evidence will be found in the place to be searched pursuant to the warrant. *Id.* Likewise, the affidavit must contain information which will allow a magistrate to determine whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought. *Id.* ; *see also  Welchance v. State,* 173 Tenn. 26, 114 S.W.2d 781 (1938). *State v. McCormick,*    584 S.W.2d 821, 824 (Tenn.Crim.App.1979).

Applying those rules to the facts of this case, we conclude that the Court of Criminal Appeals properly affirmed the trial court's judgment denying the defendant's motion to suppress. Approximately two weeks after the murder, a warrant to search the Vann residence issued. Several items seized pursuant to the warrant were admitted into evidence at trial. The affidavit in support of the warrant stated that the victim had been chronically sexually abused anally and vaginally; that the pathologist who examined the victim had determined that sexual penetration of the victim had occurred within forty-eight hours of death; that another child had provided a sworn statement that Bernice Vann had solicited her to have sexual relations with the defendant, and when the child refused, Bernice Vann had procured a vibrator from the bathroom and solicited the child to use the vibrator; that the defendant had told several people that no semen would be found on the victim, indicating condoms may have been used to perpetrate the abuse; and that Bernice Vann had told authorities the victim was found with a rope around her neck, thus necessitating a search for the rope or another object that served as the murder weapon. Furthermore, the affidavit stated that "[t]he mobile home of Gussie Willis Vann and Bernice Vann is equipped with a satellite dish which provides access" to adult television programming. The affidavit referred to the premises as the "death scene," and stated that photographs of the "death scene" had shown videotapes which appeared to have been non-commercially copied, an open jar of vaseline, and a booklet titled "How to Help Your Kids Say No To Sex." With respect to the time frame during which the facts in question had occurred, the affidavit stated that within the previous five days the affiant and another officer had observed the certain enumerated items related to sexual abuse and bondage in the named premises.

In our view, the trial court correctly found that the affidavit sets forth sufficient facts from which the magistrate reasonably could have concluded both that a nexus existed between the crime and the place to be searched, and that the facts were sufficiently recent to establish probable cause *See Hicks v. State,* 194 Tenn. 351, 250 S.W.2d 559 (1952); *Waggener v. McCanless,* 183 Tenn. 258, 191 S.W.2d 551 (Tenn.1946); *State v. McCormick,* 584 S.W.2d 821 (Tenn.Crim.App.1979). The defendant's assertion that the evidence should have been suppressed is without merit.

### MENS REA--INCEST

[12] The defendant next argues that the indictment charging him with two counts of incest did not

allege the proper  *mens rea*  and is therefore void. We disagree. Recently, in     *State v. Hill,*    954 S.W.2d 725 (Tenn.1997), we held that for offenses which neither expressly require, nor plainly dispense with a culpable mental state, an indictment which fails to specifically allege a mental state will be sufficient **\*106**  so long as the mental state required can be logically inferred from the allegations in the indictment so as to satisfy constitutional and statutory requirements of notice and form.' *Id.* at 727.

[13] The offense of incest is defined by Tenn.Code Ann. § 39-15-302 (1991 Repl) as follows:

(a) A person commits incest who engages in sexual penetration as defined in    §  39-13-501, with a person he or she knows to be, without regard to legitimacy:

(1) The person's natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, adoptive child;  or

(2) The person's brother or sister of the whole or half-blood or by adoption.

(b) Incest is a Class C felony.

With respect to commission of the offense, the definition of incest does not expressly require, nor plainly dispense with a culpable mental state.  (FN6) Accordingly, intent, knowledge, or recklessness will suffice to establish the culpable mental state for commission of the offense. Tenn.Code Ann.     § 39-11-301(c) (1991 Repl). Therefore, under our recent decision in  *Hill,*  if any one of those three culpable mental states can be logically inferred from the allegations in the indictment, the defendant's argument must fail. *Id.* at 727.

The indictment at issue in this case charged the following:

GUSSIE WILLIS VANN AND BERNICE ANN VANN on or about the 30th day of July, 1992, in McMinn County, Tennessee, and before the finding of this indictment did unlawfully engage in sexual penetration of the vaginal opening as defined in T.C.A. 39-13-501, of Necia Vann, a person the said Defendants know to be their daughter, in violation of T.C.A. 39-15-302, all of which is against the peace and dignity of the State of Tennessee.

\* \* \* \*

On or about the 30th day of July, 1992, in McMinn County, Tennessee, and before the finding of this indictment did unlawfully engage in sexual penetration of the anal opening as defined in T.C.A. 39-23-501, of Necia Vann, a person the said Defendants know to be their daughter, in violation of T.C.A. 39-15-302, all of which is against the peace and dignity of the State of Tennessee.

We agree with the Court of Criminal Appeals that the *mens rea*  of "knowingly" can be logically inferred from the language of the indictment. The

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

nature of the criminal conduct alleged, sexual penetration, and the phrase, "know[n] to be their daughter," gives rise to the inference. The defendant's claim that the indictment is void is without merit.

*PROPORTIONALITY REVIEW*

[14][15][16] Finally, we consider whether the defendant's sentence of death is comparatively disproportionate considering the nature of the crime and the defendant. We begin, as always, with the proposition that the sentence of death is proportional to the crime of first-degree murder. *State v. Bland,* 958 S.W.2d 651 (Tenn.1997). If this case is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed," the sentence of death is disproportionate. *Id.* at 665. However, a sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence.    *Id.*    Our role, in conducting proportionality review is not to assure that a sentence "less than death was never imposed in a case with similar characteristics."    *Id.*    Instead, our duty "is to assure that no aberrant death sentence is affirmed."    *Id.*

[17][18] In performing this duty, we do not utilize a mathematical formula or scientific grid. The test is not rigid.    *Id.*    In choosing and comparing similar cases, we consider many variables, some of which include, (1)    **\*107**    the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. *Id.* at 667.    When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. *Id.*

[19] Applying these factors, we note that the proof reflects that the helpless, eight-year-old victim was strangled to death by her own father. The strangulation was violent, which is evidenced by the torn muscles in the victim's neck. There is no apparent motive for the killing. It is simply a senseless murder perpetrated by the defendant while he anally and vaginally raped his own daughter. The victim was murdered in her own home, the place in which citizens of our society ordinarily feel most secure. There is certainly no proof that the killing was provoked or justified. The defendant had a criminal record. He had been previously convicted of two counts of aggravated rape. There is no proof that the defendant suffered any mental or emotional defect at the time the crime was committed, although he had apparently been addicted to prescription drugs in the past. There is

also no proof that the defendant was intoxicated at the time of the killing. In fact, the State introduced evidence to show that the blood samples taken from the defendant on the morning after the murder indicated that he had no alcohol or drugs in his system. According to the proof in this trial, the defendant was completely involved in the offense and was the actual perpetrator of the offense of murder during the course of rape. Witnesses testified that he showed little emotion at the hospital after the victim's death, though a witness for the defense testified that when he arrived at the Vann home, the defendant was doing everything he could to revive the victim. When the defendant testified during penalty phase of the trial of this case, he showed no remorse. The defendant cooperated with the authorities to a certain extent, by giving them verbal consent to search his residence on the morning after the murder, but, when his alibi was refuted, he did not offer any other insight on the events of the evening of the murder. There is nothing in the record to indicate the defendant's capacity for rehabilitation. Finally, the defendant had particular knowledge of the helplessness of the victim because he is her father. Considering the nature of the crime and the defendant, we conclude that imposition of the death penalty for the cruel killing of this young child is not disproportionate to the penalty imposed in similar cases, and that this murder places Vann into the class of defendants for whom the death penalty is an appropriate punishment.

In conducting our review, we have discovered only a few cases in which a jury imposed a sentence less than death for a factually similar murder. In *State v. James Lloyd Julian,* No. 03C01-9511-CR-00371, 1997 WL 412539 (Tenn.Crim.App., at Knoxville, July 24, 1997), the defendant kidnapped the three-year-old daughter of an acquaintance. He drove to a remote area of Tellico Lake, and after swimming for a time, undressed the victim and attempted penile penetration of her vagina, but was unable to do so. He then anally raped the victim, and when she began to scream and cry loudly, he attempted to muffle her screams with his right hand. When he was unsuccessful, he grabbed her neck and choked the victim to death. After cleaning himself and the victim in the lake, he tossed her naked body into the surrounding underbrush. Forensic examinations of the victim's body revealed bruising and soft tissue injury consistent with strangulation, as well as bruising on her forehead, knees, and back. Swelling and severe tissue damage to the vaginal and anal openings was also evident, and semen was found in the victim's mouth, vagina, and anus. Based upon the proof, the defendant    **\*108**    was convicted by a jury of first degree felony murder. The State sought the death penalty, and at the sentencing phase, the jury found two aggravating circumstances: (1) that the victim was less than twelve (12) years of age and the defendant was over eighteen (18); and (2) that the murder was especially heinous, atrocious and cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn.Code Ann. § 39-13-204(i)(1) and (5) (1997 Repl.). However, the jury determined that the aggravating circumstances did not outweigh the mitigating circumstances and sentenced the defendant to imprisonment for life without the possibility of parole. Tenn.Code Ann.    §

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

39-13-204(f)(2) (1997 Repl.). (FN7) The mitigation proof showed that the twenty-three-year-old single male defendant had a longstanding history of drug and alcohol abuse. He had some history of criminal behavior, primarily drug possession and driving under the influence offenses. He had been sexually abused as a child by his maternal grandfather and his mother had been an alcoholic. His parents were divorced and the defendant had an unstable family history. He had emotional problems and had been diagnosed with depressive disorder and a mixed personality disorder with borderline features. The defendant said he had smoked marijuana and consumed a fifth of bourbon in the hours before the murder. The defendant had turned himself into the police for committing the offense.

Though the means and manner of death in this case are quite similar to the murder in *State v. Julian*, other differences are apparent and striking. Unlike this case, the jury in *Julian* did not find that the defendant had been previously convicted of a violent felony offense. Moreover, substantial mitigation proof was introduced regarding Julian's mental and emotional condition, his abusive and unstable family background, and his drug and alcohol addiction, including proof that he was under the influence of drugs and alcohol at the time of the killing. In this case, little proof in mitigation was offered, and proof was offered to show that the defendant was not under the influence of drugs and alcohol when the offense was committed. Julian cooperated with the authorities by turning himself into the police. In fact, he returned from a work trip to Chattanooga by renting a car when he was informed by his mother that the police were looking for him. In this case, the defendant cooperated little with the authorities. While Julian was acquainted with the victim, he was not related to her. In this case, the defendant perpetrated the crime upon his own daughter.

In *State v. Paul William Ware*, a Hamilton County case, the twenty-four-year-old defendant was convicted of first degree murder for killing a four-year-old female child. She died of asphyxiation. The victim had been anally and vaginally raped, as in this case. She sustained abrasions to the vaginal and anal areas of her body. The murder occurred, as in this case, in the victim's home, where the defendant was visiting the roommate of the victim's mother. The jury found two aggravating circumstances: (1) that the victim was less than twelve (12) years of age and the defendant was over eighteen (18); and (2) that the murder was especially heinous, atrocious and cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn.Code Ann. § 39-13-204(i)(1) and (5) (1997 Repl.). However, the jury determined that the aggravating circumstances did not outweigh the mitigating circumstances and sentenced the defendant to imprisonment for life without the possibility of parole. Tenn.Code Ann. § 39-13-204(f)(2) (1997 Repl.). Again, unlike this case, substantial mitigation proof was introduced regarding Ware's family background, including a history of abuse and instability, his mental, emotional, and psychological history, his history of alcohol and drug related problems, his prior good conduct and lack of a prior record of violent felonies, and finally, his conduct since the offense, including efforts at rehabilitation and feelings of remorse and regret. Proof was also introduced to show that Ware was under the influence of an intoxicant or drug at the time the offense was committed. Also, while acquainted with the victim, Ware was not *109 related to her unlike the defendant in this case.

Finally, in *State v. John Edward Allen*, a Shelby County case, the seventeen-year-old defendant was convicted of first degree murder for the ligature strangulation and rape of a three-year-old child. The jury found one aggravating circumstance, that the killing was committed during the course of a felony, rape. Tenn.Code Ann. § 39-2-203(i)(7) (1982). The jury was instructed, but did not find that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn.Code Ann. § 39-2-203(i)(5) (1982). The jury imposed a sentence of life imprisonment. The Rule 12 report reflects that substantial mitigation proof was introduced, including that the defendant had no prior criminal record. Again unlike the defendant in this case, Allen was not related to the victim. In fact, Allen was not even acquainted with the victim. On the Rule 12 report, the trial judge noted, "[a]lthough this was a horrible case involving sexual abuse, ligature strangulation, and hiding the body of a three year old child, I feel the life sentence was proper in view of the youth and prior good record of the defendant."

In each of the similar cases in which a sentence less than death was imposed, there is a discernible basis for the lesser sentence. *State v. Carter*, 714 S.W.2d 241, 251 (Tenn.1986). Indeed, the differences are not only discernible, they are striking. None of the defendants sentenced to life imprisonment or life imprisonment without the possibility of parole had been previously convicted of violent felony offenses. Two of the three had no prior criminal record. All three of the defendants in those cases introduced substantial mitigation proof. None of the three had a familial relationship with the victim of the offense. Accordingly, there is a discernible basis for the lesser sentence in each similar life case. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In *State v. Keen*, 926 S.W.2d 727 (Tenn.1994), the twenty-seven-year-old boyfriend of the victim's mother held his hand over the eight-year-old victim's mouth and raped her until she defecated. He then tied a shoe string around the victim's throat so tightly that it cut into her neck, and threw her body into the Wolf River. After the defendant pled guilty to felony murder and aggravated rape, a sentencing hearing was held. The jury found three aggravating circumstances (FN8) and imposed a sentence of death.

In *State v. Irick*, 762 S.W.2d 121 (Tenn.1988), the twenty-six-year-old defendant was babysitting a friend's children, including the victim. As in this case, the defendant raped the seven-year-old victim vaginally and anally. The victim suffocated as he held his hand over her mouth to keep her from screaming. The defendant was convicted by a jury of first degree felony-murder and aggravated rape. Following a sentencing hearing, the jury found four

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

aggravating circumstances (FN9) and sentenced the defendant to death. The defendant had offered mitigating evidence that he had been under the influence of marijuana or alcohol at the time he committed the offense, and that he had a past mental impairment.

In *State v. Coe,* 655 S.W.2d 903 (Tenn.1983), the defendant was a stranger to the eight-year-old victim. He lured her into his car, drove to an isolated spot, and raped her. When Coe completed the rape, the victim told him that Jesus loved him. At that point, **\*110** the defendant strangled the victim until she turned blue. When the victim did not immediately die from the strangulation, he stabbed her in the neck with a pocket knife and watched as she suffered agonizing death throes. Eventually, he left her to die in the wooded area. Coe was convicted of first degree felony murder, kidnaping and aggravated rape. Following the sentencing hearing the jury found the presence of four aggravating circumstances (FN10) and sentenced the defendant to death. The defendant had offered as mitigating evidence the theory that he had been under the influence of extreme mental or emotional disturbance at the time he committed the offense.

In these three cases, as in the present case, the defendant murdered and raped a child victim. The victim in each case was particularly helpless to the attack, as was the victim in this case. The disparity of strength between the victim and the defendant in each of the three cases was great, as it was in this case. In two of the three cases, the victim was acquainted with her assailant. In this case, the victim not only was acquainted with her killer, she was related to him. He was her father. Certainly, that fact exacerbates the horrific nature of this killing. In two of the three cases, the assault occurred in the victim's own home, as in this case. In all three of the prior cases, the jury found that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. Similarly, in this case, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. After reviewing the cases discussed above and many other cases not herein detailed, (FN11) we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

### CONCLUSION

In accordance with the mandate of Tenn.Code Ann. § 39-13-206(c)(1) (1997 Repl.), and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann.              § 39-13-206(c)(1)(A)--(C) (1997 Repl.). We have considered the defendant's assignments of error and determined that none require reversal. With respect to issues not specifically addressed herein, we affirm

the decision of the Court of Criminal Appeals, authored by Judge Thomas T. Woodall, and joined in by Judge David G. Hayes and Judge David H. Welles. Relevant portions of that opinion are published hereafter as an appendix. The defendant's sentence of death by electrocution is affirmed. The sentence shall be carried out as provided by law on the 29th day of January, 1999, unless otherwise ordered by this Court or other proper authorities.

ANDERSON, C.J., and HOLDER, J., concur.

BIRCH, J., dissents with separate opinion, and REID, Special Justice, joins.

**\*111** APPENDIX

(Excerpts from the Court of Criminal Appeals' Decision)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
DECEMBER SESSION, 1996

State of Tennessee, Appellee,

v.

Gussie Willis Vann, Appellant.

C.C.A. NO. 03C01-9602-CC-00066.

McMINN COUNTY, HON. R. STEVEN BEBB, JUDGE (FELONY MURDER--DEATH PENALTY; INCEST)

*FOR THE APPELLANT:*

KENNETH MILLER
Attorney at Law
P.O. Box 191
Cleveland, TN 37364-0191
(At Trial)

ASHLEY L. OWNBY
Attorney at Law
180 N. Ocoee Street
P.O. Box 176
Cleveland, TN 37364-0176
(At Trial and On Appeal)

BROCK MEHLER
Attorney at Law
751 Roycroft Place
Nashville, TN 37203
(On Appeal)

*FOR THE APPELLEE:*

JOHN KNOX WALKUP
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

KATHY MORANTE
Deputy Attorney General

JOHN P. CAULEY
Assistant Attorney General
450 James Robertson Parkway

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                          Page 14

Nashville, TN 37243-0493

JERRY N. ESTES
District Attorney General
203 East Madison Avenue
P.O. Box 647
Athens, TN 37371

OPINION FILED:  June 10, 1997.

AFFIRMED

THOMAS T. WOODALL, JUDGE.

*OPINION*

*ANALYSIS*

WHETHER THE EVIDENCE WAS SUFFICIENT
TO SUSTAIN THE DEFENDANT'S
CONVICTIONS FOR FELONY MURDER AND
TWO COUNTS OF INCEST.

The Defendant contends that the evidence was
insufficient to sustain the Defendant's convictions
for felony murder and incest.  First, the Defendant
argues that the evidence failed to prove he was the
perpetrator of the crime.  He states that the proof
was entirely circumstantial and the circumstances
were not so strong and cogent as to exclude every
other reasonable hypothesis by a reasonable doubt.
He asserts that the State failed to exclude the
reasonable hypothesis that Ms. Vann committed the
murder.  Second, he contends that the evidence
failed to prove that the killing was committed in
furtherance of a rape.

When the sufficiency of the evidence is questioned
on appeal, the standard of review is "whether, after
viewing the evidence in the light most favorable to
the prosecution, any rational trier of fact could have
found the essential elements of the crime beyond a
reasonable doubt." *Jackson v. Virginia,*  443 U.S.
307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
This means that the State is entitled to the strongest
legitimate view of the evidence and all reasonable
inferences which may be drawn from it.    *State v.
Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).
Likewise, the determination of the weight and
credibility of the testimony of witnesses and
reconciliation of conflicts in that testimony are
entrusted exclusively to the trier of fact, in this case,
the jury.  *State v. Sheffield,*  676 S.W.2d 542, 547
(Tenn.1984);  *Byrge v. State,* 575 S.W.2d 292, 295
(Tenn.Crim.App.1978).  Further, the standard for
appellate review is the same whether the conviction
is based upon direct    **\*112**    or circumstantial
evidence.  *State v. Johnson,*  634 S.W.2d 670, 672
(Tenn.Crim.App.1982).

An offense may be proven by circumstantial
evidence alone.  *Price v. State,*  589 S.W.2d 929,
931 (Tenn.Crim.App.1979).  However, where a
conviction is based upon entirely circumstantial
evidence, as the State concedes in this case, the jury
must find that the proof is not only consistent with
the guilt of the accused but inconsistent with his
innocence.  There must be an evidentiary basis upon
which the jury can exclude every other reasonable
theory or hypotheses except that of guilt.  *Pruitt v.
State,* 3 Tenn.Crim.App. 256, 460 S.W.2d 385, 390
(1970).

In this case, the evidence against the Defendant
began with his own statements.  His account of his
whereabouts on the evening of the victim's death
was directly contradicted by the testimony of the
store clerk and the cash register receipts showing
that the items he claimed to purchase had not been
purchased.  He also made odd comments, unrelated
to the event, concerning other individuals when he
stated that he never suspected that his daughter
would commit suicide but that she had on a few
occasions spent the night with her Uncle Dan, Linda
Rogers, and a male friend of his.  He also admitted
to having an affair with Linda Rogers.

The jury could certainly have viewed his
statements as self-serving and an attempt to deflect
suspicion.  He was seemingly offering other suspects
who could have raped his daughter and some
explanation for why he would have no sexual motive
to rape her.

The behavior of the Defendant before and after
being told of the victim's death also supported the
State's theory.  The Defendant told the paramedic at
the scene that the victim had apparently choked on
popcorn.  However, the autopsy revealed that no
popcorn was ingested by the victim.  Dr. Martin,
the emergency room physician, described the
Defendant as "really cool" and "totally oblivious to
the fact that he was just informed that his daughter
was dead."

The medical evidence also pointed to the
Defendant as the perpetrator.  Dr. Toolsie, the
pathologist who performed the autopsy on the
victim, testified that the tearing of the muscle tissue
in the victim's neck could only have resulted from
the exertion of great force upon the victim.  When
asked if it would have been possible for a woman to
exert such force, his response was that "[i]t would
depend on how athletic she is."

Although Chester Blythe, the F.B.I. expert in hair
and fiber comparisons, testified that hair found on
the rope believed to have been used to strangle the
victim matched those of Ms. Vann and the victim,
hair samples taken from the Defendant were
apparently lost.  Consequently, no comparison was
conducted.

In essence Defendant's argument is that either
Bernice Vann or Defendant killed Necia Vann in the
perpetration of rape, to the mutual exclusion of each
other.  He argues that the preponderance of the
evidence indicates Bernice Vann committed the
homicide.

With the jury being entitled to reject Defendant's
alibi in his statement due to contradictory testimony
contained in this record, the proof overwhelmingly
shows that Defendant and his wife were the only
adults present in the home when Necia Vann died.
Furthermore, the jury was entitled to infer from the
evidence that an adult male exerted the excessive
force necessary to do the damage resulting from the
ligature strangulation.  The proof indicates that it
was Defendant's sperm on the victim's bed sheet.  It
was the Defendant who was essentially nude with
the victim when a neighbor and paramedics arrived.
The jury, as the trier of fact, was entitled to reject
certain evidence brought out through Defendant's

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

cross-examination and direct examination which attempted to give an innocent explanation of the incriminating evidence against him.

In *Pruitt v. State, supra,* this Court quoted from *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451 (1958), wherein it held,

Weight of circumstantial evidence is a question for the jury to determine. The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent *113 with innocence are questions primarily for the jury.

*Pruitt* at 391.

The most damaging evidence against the Defendant was perhaps the medical testimony related to the sexual assault upon the victim. He asserts that the State failed to prove that the murder was committed during the commission of rape. However, much of the medical and forensic testimony supports the State's theory.

The medical examiner, the paramedic who arrived at the scene, and the criminal investigator who was dispatched to the emergency room each testified that they observed blood coming from the victim's genital area. Dr. Toolsie, the medical examiner who performed the autopsy of the victim, testified that there was evidence of repeated sexual abuse, and that there was strong evidence that the most recent of the abuse "probably occurred at about the time of death." There was a tear to the lining of the vagina, fresh bruising was apparent on the inside of the vaginal wall, and the marked lack of muscle tone in the anal area made rectal penetration possible without leaving any appreciable injury. Dr. Toolsie also testified that the magnitude of the injury, including the tearing of muscles, with associated bleeding underlying the rope mark on the victim's neck, indicated that substantial pressure must have been applied to the ligature. He testified that the magnitude of the force required to produce the injury could not have been inflicted by a child and only by a female who was quite athletic.

Physical evidence also pointed to the Defendant as the perpetrator of the sex offenses. Except for a blanket wrapped around him, the Defendant was nude when paramedics arrived at his house on the night of the child's death. Semen stains found on the victim's bed sheets matched those of the Defendant, and an F.B.I. Agent specializing in DNA analysis testified that the odds of finding another individual whose DNA profile would match those found on the sheet were one in ten thousand.

In summary, while the evidence of the elements of the crimes was circumstantial, the conduct of the Defendant, the medical evidence, and the physical evidence were proof from which the jury could have concluded that the Defendant strangled the victim during the perpetration of rape. Also, proof of anal and vaginal penetration was sufficient to support the two convictions of incest. Accordingly, this issue is without merit.

REFUSING TO INSTRUCT THE JURY THAT THE STATE'S CASE WAS ENTIRELY CIRCUMSTANTIAL.

At the conclusion of the guilt phase of the trial, the Defendant requested the trial court to instruct the jury that there had been no direct evidence presented linking the Defendant to the charged offenses. The trial court refused such request and instead gave the following instruction:

The guilt of the Defendant as well as any fact required to be proved may be established by direct evidence, by circumstantial evidence, or by both combined.

Direct evidence is defined as evidence which proves the existence of the fact in issue without inference or presumption. Direct evidence may consist of testimony of a person who has perceived by the means of his senses the existence of a fact, sought to be proved or disproved.

Circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue but from which that fact may be logically inferred.

When the evidence is made up of entirely circumstantial evidence, then before you would be justified in finding the Defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; the facts must exclude every other reasonable hypotheses except that of guilt; and the facts must establish such a certainty of guilt of the Defendant as to convince the mind beyond a reasonable doubt that the Defendant is the one who committed the offense. It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury beyond a reasonable doubt of all the facts necessary *114 to constitute the crime charged. Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the Defendant, and no one else, committed the offense.

These instructions were taken from the Tennessee Criminal Pattern Jury Instructions, 37.06, and are accurate statements of the law. *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451, 456-57 (1958). Where the trial court's instructions on a matter are proper, its denial of a special request is not error. *Shell v. State,* 584 S.W.2d 231, 235 (Tenn.Crim.App.1979). We conclude that the trial court's thorough instruction of the law was sufficient to counter the Defendant's request for a specific instruction that the State's case was based entirely upon circumstantial evidence. This issue is without merit.

THE "SEXUAL PENETRATION" INSTRUCTION

The Defendant next asserts that the trial court's instruction on sexual penetration was in error. Specifically, he asserts that because the court defined sexual penetration as "[a]nal intercourse, or any other intrusion, however slight of ... [t]he anal opening of another person's body," the jury could thereby convict the Defendant of felony murder based on evidence of anal penetration. He contends

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                                Page 16

that the jury should not have been allowed to convict the Defendant of felony murder based on anal penetration because the evidence of anal penetration was based upon past incidents of sexual abuse not connected with the murder.

The Defendant has quoted in his brief only part of the trial court's instruction which in its entirety states the following:

Sexual penetration means sexual intercourse, or any other intrusion, however slight, of any pat [sic] of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required.

The Defendant is thereby incorrect in asserting that the trial court instructed the jury that only evidence of anal penetration would allow him to be convicted of felony murder. Moreover, we have previously determined that the evidence was sufficient to convict the Defendant of felony murder and incest by anal penetration. This issue is without merit.

WHETHER PRETRIAL PUBLICITY
PREJUDICED THE DEFENDANT.

The Defendant next claims that the trial court erred in failing to change venue, in failing to inquire regarding the nature of each juror's exposure to prejudicial publicity, and in failing to admonish the jury pursuant to Rule 24(f), Tenn. R.Crim. P. We disagree.

CHANGE OF VENUE

The Defendant contends that the trial court erred by denying his motion for a change of venue due to pretrial publicity. He claims that because only four (4) prospective jurors in the entire venire had not heard of the case and the trial court excused more than twenty-five (25) persons initially for cause, the trial court should have been aware of the prejudicial nature of the pretrial publicity and should have granted the motion. In support of his argument, the Defendant cites *State v. Hoover*, 594 S.W.2d 743 (Tenn.Crim.App.1979). The matter of change of venue addresses itself to the sound discretion of the trial court, and a denial of a change of venue will only be reversed on appeal for an affirmative and clear abuse of discretion. *State v. Bates*, 804 S.W.2d 868, 877 (Tenn.1991), *cert. denied*, 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 98 (1991). In this case we find no abuse of discretion on the part of the trial court.

In *Hoover*, 594 S.W.2d at 746, this court listed a group of seventeen (17) factors to be considered in determining whether to grant a change of venue. Among these are the nature, extent, and timing of the pretrial publicity, the degree of care exercised in the selection of the jury, the venire's familiarity with the publicity and its effect upon them as shown through their answers on voir dire, and the Defendant's utilization of his peremptory challenges.

**\*115** In this case, we conclude that the trial court carefully and meticulously orchestrated the jury selection process to insure the Defendant a fair trial. He instructed the prospective jurors as to their responsibilities, questioned them extensively as to pretrial publicity, excused jurors for cause, and

allowed *voir dire* in panels of three-(3) prospective jurors. Moreover, the Defendant only exercised five (5) of his fifteen (15) peremptory challenges. This issue is without merit.

FAILURE TO INQUIRE AS TO THE NATURE
OF EACH JUROR'S EXPOSURE TO PRETRIAL
PUBLICITY.

The Defendant asserts that no efforts were made to assess the likelihood of prejudice from pretrial exposure and that the trial court should have been exceptionally vigilant to ensure that prospective jurors had not been exposed to inadmissible matters contained in the media reports. However, as previously stated, we conclude that the trial court thoroughly discussed the presumption of innocence and the State's burden of proof with each of the potential jurors. Each of the jurors who served on the jury indicated that they either had no prior opinion of the case or that they could set that opinion aside. This issue is without merit.

FAILURE TO ADMONISH THE JURY
PURSUANT TO RULE 24(F),TENN. R. CRIM. P.

The Defendant contends that the trial court erred in admonishing the jury only once. He contends that the admonishment given the evening before the trial commenced and before the jury was sworn was insufficient to protect against the risk that the jurors would be exposed to media coverage of the case. We disagree.

When the potential jury was selected, the trial court instructed the jury as follows:

At this point since we have a jury, and I want to say to you that you are embarking upon tomorrow morning a case that is very important, very important to the State of Tennessee and very important to Gus Willie Vann, and as I said to you this morning, all I ask and that we all ask is that you try your very best to do what you believe justice is under the facts of this case, that you listen hard to the evidence and make the best decision you can make and we will all be happy. Since at this point the jury has not been sworn and no evidence has been presented we are going to allow you to go to your home this evening. However, let me say to you that you need to feel as if you were under oath because these lawyers in both sides are depending on you for justice, as well as Mr. Vann **and** the witnesses that the State is using in their prosecution. They and myself are depending on you for justice. And in order to do justice I would ask that you refrain tonight from watching the television news reports, from reading the newspapers, and discussing this case with your spouse or girlfriend or boyfriend. I don't mean you can't say, 'I'm on the jury,' but I think that needs to be it really. One of the hardest things that you will be required to do I guess is not talk about it. But just tell them, if it [is] your friends or somebody who wants to know, or your husband or wife, 'Hey, I've been instructed not to talk about it and I will tell you about it when its over.'

Here, the trial court was commendably concerned that the jury understand its duty to-not discuss the case. The trial court had previously spent a great deal of time during *voir dire* insuring that the jurors

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                                    Page 17

had not formed and would not form an opinion until
the case was submitted to the jury. The Defendant
has failed to show that any of the jurors who
actually sat on the case were prejudiced by any
publicity or the trial court's failure to repeatedly
admonish them. *See State v. Garland,* 617 S.W.2d
176, 187 (Tenn.Crim.App.1981); *State v. Kyger,*
787 S.W.2d 13, 18-19 (Tenn.Crim.App.1989).
This claim is also without merit.

WHETHER THE EVIDENCE WAS SUFFICIENT
TO SUPPORT THE FINDING OF THE "PRIOR
VIOLENT FELONY" AGGRAVATOR.

The Defendant argues that the introduction of his
two (2) prior convictions for aggravated rape are
insufficient to support the jury's reliance on the
aggravating circumstance which states that "[t]he
Defendant **\*116** was previously convicted of one
(1) or more felonies, other than the present charge,
whose statutory elements involve the use of violence
to the person." Tenn.Code Ann. § 39-13-204(i)(2).
The Defendant contends that since aggravated rape
may be proved by a showing that there was unlawful
sexual penetration of a victim less than thirteen (13)
years old, aggravated rape does not necessarily
involve violence to the person.

At sentencing, the State relied upon two (2)
judgments of conviction for aggravated rape against
the Defendant. Defense counsel objected,
contending that in a case of aggravated rape where
the child is under thirteen, there could be a
consensual relationship in which there would be no
violence. The trial court overruled the objection.

The Defendant's argument is without merit. In
*State v. Hoyt,*      928 S.W.2d 935, 948
(Tenn.Crim.App.1995), this court stated
unequivocally that "rape is a serious offense which
is injurious to both the body and mind of the
victim." The Tennessee Supreme Court has
impliedly acknowledged the use of aggravated rape
as an aggravating circumstance. *See    State v.
Nichols,* 877 S.W.2d 722, 737 (Tenn.1994), *cert.
denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d
791 (1995). This issue is without merit.

IMPROPER JURY INSTRUCTION

Citing *State v. Williams,* 690 S.W.2d 517, 529
(Tenn.1985), the Defendant maintains that the jury
was improperly instructed on this aggravator
because the instruction omitted "any requirement
that the jury find that severe physical or mental pain
was 'willfully' inflicted by the Defendant." The
following instruction, in pertinent part, was given by
the trial court:

Tennessee law provides that no death penalty
shall be imposed by a jury but upon a unanimous
finding that the State has proven beyond a
reasonable doubt the existence of one or more of
the statutory aggravating circumstances which shall
be limited to the following:

...

(3) The murder was especially heinous,
atrocious, or cruel in that it involved torture or
serious physical abuse beyond that necessary to
produce death.

You are instructed that the word:

...

'Torture' means the infliction of severe physical
or mental pain upon the victim while he or she
remains alive and conscious.

The Defendant has misconstrued the holding in
*Williams.* No saving restriction that the Defendant
must have "willfully" inflicted severe pain on the
victim was placed upon Tennessee Code Annotated
section 39-13-204(i)(5), but rather the court has
repeatedly held that the instruction sufficiently
narrows the class of death-eligible defendants. *See
State v. Odom,* 928 S.W.2d 18, 26 (Tenn.1996);
*State v. Black,* 815 S.W.2d 166, 181 (Tenn.1991);
*State v. Cazes,* 875 S.W.2d 253, 267 (Tenn.1994),
*cert. denied,* 513 U.S. 1086, 115 S.Ct. 743, 130
L.Ed.2d 644 (1995). This issue is without merit.

WHETHER THE "REASONABLE DOUBT"
INSTRUCTION VIOLATES DUE PROCESS.

The Defendant contends that he was denied his
rights under the Due Process Clause of the
Fourteenth Amendment to the United States
Constitution because the jury was unconstitutionally
instructed concerning the meaning of "reasonable
doubt" at the guilt and sentencing phase of the trial.
However, as the Defendant accurately notes, the
supreme court and this court have consistently
upheld the constitutionality of the instruction. *See
State v. Nichols,* 877 S.W.2d 722, 734 (Tenn.1994),
*cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130
L.Ed.2d 791 (1995); *State v. Michael Dean Bush,*
942 S.W.2d 489, 504-05 (Tenn.1997)(for
publication)(petition for reh'g, filed 4/14/97). This
issue is also without merit.

**\*117** WHETHER THE CUMULATIVE EFFECT
OF ALL ERRORS VIOLATES THE
DEFENDANT'S CONSTITUTIONAL RIGHTS.

The Defendant contends that the cumulative effect
of all errors alleged both at trial and at sentencing
violates his constitutional rights. However, as this
court finds no reversible error with respect to the
Defendant's prior issues, this issue is without merit
also.

WHETHER TENNESSEE'S DEATH PENALTY
STATUTE IS CONSTITUTIONAL.

The Defendant submits that the "Tennessee death
penalty statute and the imposition of the sentence of
death in this State violate the Fifth, Sixth, Eighth
and Fourteenth Amendments to the United States
Constitution, as well as Article I, Sections 8, 9, 16
and 17, and Article II, Section 2 of the Tennessee
Constitution" because (a) the statute fails to narrow
the class of death-eligible defendants; (b) the
sentence is imposed arbitrarily and capriciously; (c)
electrocution is cruel and unusual punishment; and
(d) the appellate review process is constitutionally
inadequate. Defendant has acknowledged in his
brief "that the majority of the issues raised"
regarding the constitutionality of the Tennessee
death penalty statute have been decided adversely to
his arguments by the Tennessee Supreme Court.
Defendant also admits he raised the issues "in order

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                     **Page 18**

to preserve them for later review."

THE STATUTE FAILS TO NARROW THE
CLASS OF DEATH ELIGIBLE DEFENDANTS.

The Defendant first asserts that the aggravating
circumstances set forth in Tennessee Code
Annotated section 39-13-204, "have been so broadly
interpreted that they fail to provide such a
'meaningful basis' for narrowing the population of
those convicted of first degree murder to those
eligible for the sentence of death" as mandated in
*Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct.
2726, 33 L.Ed.2d 346 (1972). We disagree.

THE "PRIOR VIOLENT FELONY"
AGGRAVATING CIRCUMSTANCE IS
UNCONSTITUTIONAL.

The Defendant contends that this aggravating
circumstance is overly broad and contrary to the
legislative intent in the manner in which it interprets
"prior conviction" for purposes of capital
sentencing. However, this issue has been previously
addressed by our Supreme Court in        *State v.
Caldwell,* 671 S.W.2d 459, 465 (Tenn.1984), as
correctly noted by the Defendant in his brief, in
which "prior conviction" was defined as the date of
the conviction for purposes of capital sentencing,
and, therefore, is neither overly broad nor contrary
to legislative intent. This issue is without merit.
*See also  State v. Nichols,*  877 S.W.2d 722, 736
(Tenn.1994), *cert. denied,*  513 U.S. 1114, 115
S.Ct. 909, 130 L.Ed.2d 791 (1995).

THE "AVOIDING, INTERFERING WITH, OR
PREVENTING THE LAWFUL ARREST OR
PROSECUTION OF THE DEFENDANT"
AGGRAVATING CIRCUMSTANCE IS
UNCONSTITUTIONAL.

The Defendant maintains that because this
circumstance has been applied in cases where a
victim "could have identified the perpetrator" the
circumstance in itself does not sufficiently narrow
the population of death eligible defendants. The
trial court directed a judgment against the
application of this aggravating circumstance.
Therefore, this circumstance was neither found by
the jury nor charged in this case, and the issue is
moot.

THE "HEINOUS, ATROCIOUS, OR CRUEL"
CIRCUMSTANCE IS VAGUE AND
OVERBROAD.

The Defendant asserts that this circumstance is
unconstitutional in that it does not include an
element of intent, but we have previously addressed
this claim in this opinion and found it to be without
merit. *See* § III(8)(C).

IN COMBINATION, SUBSECTIONS (I)(2), (5),
(6), AND (7) DO NOT NARROW THE CLASS OF
DEATH ELIGIBLE DEFENDANTS.

The Defendant argues that, in combination, these
aggravating circumstances encompass the majority
of homicides committed in  *118  this State, and the
statute does not therefore narrow the class of death
eligible defendants. Again, the supreme court has
repeatedly rejected this argument.    *See     State v.*

*Keen,* 926 S.W.2d at 742.

THE DEATH SENTENCE IS IMPOSED
CAPRICIOUSLY AND ARBITRARILY.

On multiple grounds, the Defendant asserts that the
death penalty is imposed capriciously and
arbitrarily, but all grounds have been previously
addressed by our supreme court. He asserts that (1)
unlimited discretion is vested in the prosecutor as to
whether or not to seek the death penalty; (2) the
death penalty is imposed in a discriminatory manner
due to economics, race, geography, and gender; (3)
there is a lack of uniform standards for jury
selection; (4) the death qualification process skews
the make-up of the jury and results in a
prosecutorially prone jury; (5) defendants are
prohibited from addressing jurors' misconceptions
about such matters as cost of incarceration versus
execution, deterrence, and method of execution; (6)
the jury is required to agree unanimously in order to
impose a life sentence; (7) the jury is required to
unanimously agree that mitigating circumstances are
applicable in violation of  *Mills v. Maryland,*  486
U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)
and *McKoy v. North Carolina,*  494 U.S. 433, 110
S.Ct. 1227, 108 L.Ed.2d 369 (1990); (8) the jury is
not instructed on the meaning and function of
mitigating circumstances; (9) the jury is not
required to make the ultimate determination that
death is the appropriate penalty because of the
"mechanistic" procedure for guiding the jury's
decision making; and (10) the defendant is denied
final closing argument in the penalty phase of the
trial. We find the Defendant's arguments to be
without merit. They have been specifically rejected
in *State v. Smith,* 893 S.W.2d 908, 926 (Tenn.1994)
, *cert. denied,*  516 U.S. 829, 116 S.Ct. 99, 133
L.Ed.2d 53 (1995), and their substance rejected in
*State v. Thompson,*  768 S.W.2d 239 (Tenn.1989),
*cert. denied,* 497 U.S. 1031, 110 S.Ct. 3288, 111
L.Ed.2d 796 (1990); *State v. Boyd,* 797 S.W.2d 589
(Tenn.1990), *cert. denied,*  498 U.S. 1074, 111
S.Ct. 800, 112 L.Ed.2d 861 (1991);  *State v. Teel,*
793 S.W.2d 236 (Tenn.1990);  *State v. Black,*  815
S.W.2d 166 (Tenn.1991);   *State v. Smith,*     857
S.W.2d 1 (Tenn.1993), *cert. denied,* 510 U.S. 996,
114 S.Ct. 561, 126 L.Ed.2d 461 (1993); and *State
v. Cazes,* 875 S.W.2d 253 (Tenn.1994).

ELECTROCUTION IS CRUEL AND UNUSUAL
PUNISHMENT.

The Defendant contends that electrocution is an
unnecessarily painful and torturous form of
execution. However, this issue has also been
previously determined by our Supreme Court, and
accordingly, we conclude that this issue is without
merit. *See State v. Black,* 815 S.W.2d at 179.

THE APPELLATE REVIEW PROCESS IS
CONSTITUTIONALLY INADEQUATE.

The Defendant asserts that the appellate review
process is not meaningful and is conducted in
violation of due process. The Defendant notes that
no death sentence has been overturned on the
grounds that it was disproportionate. He attacks the
absence of written findings concerning mitigating
circumstances, the inadequacy of the information
found in forms completed by trial courts as required
by Tennessee Supreme Court Rule 12, and the lack

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)    **Page 19**

of any published indicia or criteria for consideration which can be addressed by the Defendant.

Numerous cases, however, have held that Tennessee's proportionality review is adequate to meet State constitutional standards. *See   State v. Coleman,* 619 S.W.2d 112, 115-16 (Tenn.1981); *State v. Barber,*   753 S.W.2d 659, 663-668 (Tenn.1988); *State v. Keen,*   926 S.W.2d 727, 743-44 (Tenn.1994). Moreover, in this particular case, published opinions and available trial court reports prepared pursuant to Rule 12 of the Tennessee Supreme Court have been reviewed, and this examination revealed that the Defendant's death sentence is neither excessive nor disproportionate considering both the nature of the crime and the Defendant. *See   State v. Coe,*   655 S.W.2d 903 (Tenn.1983); *State v. Irick,*   762 S.W.2d 121 (Tenn.1988); *State v. Cauthern,*   778 S.W.2d 39 (Tenn.1989) (death sentence reversed and remanded for new sentencing hearing on ground of trial court error in admitting statement by the defendant during sentencing hearing); *State v. Keen,*   926 *119 S.W.2d 727 (Tenn.1994) (death sentence reversed and remanded for new sentencing hearing due to error in jury instruction).

The sentence of death in this case was not imposed in an arbitrary fashion. The evidence in the record supports the jury's finding of the statutory aggravating circumstances, and that the aggravating circumstances clearly outweighed the evidence introduced to establish any mitigating factors beyond a reasonable doubt. Tenn.Code Ann.         § 39-13-206(c)(1).

### CONCLUSION

The Defendant has offered no grounds that warrant relief from his convictions of felony murder, incest by vaginal penetration, and incest by anal penetration. Moreover, we conclude that the Defendant has failed to establish any ground warranting relief from his sentence of death. The judgment of the trial court is affirmed.

/s/ Thomas T. Woodall
Thomas T. Woodall, Judge

Concur:

/s/ David H. Welles

David H. Welles, Judge

(See Separate Concurring)

David G. Hayes, Judge

BIRCH, Justice, dissenting.

I agree with the majority's resolution of every issue in this case but one: the effect of the trial court's failure to instruct the jury on second-degree murder. The majority concludes that the trial court's failure to instruct the jury on the offense of second-degree murder is not error because the evidence in the record does not support that offense. Because I find the evidence can indeed support a conviction of second-degree murder, I respectfully dissent.

As the majority explained, the State charged the defendant with both premeditated first-degree murder and first-degree murder in the perpetration of rape. Before the case was submitted to the jury, the State requested that the charge of premeditated murder be dismissed. The trial court dismissed that charge, and the case was submitted to the jury on the theory of felony-murder. The trial court instructed the jury solely on the offense of felony-murder.

In *State v. Cleveland,*   959 S.W.2d 548, 553 (Tenn.1997), this Court held that trial courts are statutorily required to instruct juries on all lesser-included and "lesser-grade or class" (FN1) offenses, if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offenses. If the record is devoid of such evidence, then failure to charge a lesser offense does not constitute error.

The evidence in the instant case is legally sufficient to support a conviction for the lesser offense of second-degree murder. Under Tenn.Code Ann.   § 39-13-210(a)(1) (1991), second-degree murder requires proof of a knowing killing. The act of strangulation with a rope, the probable murder instrument, is certainly an act which suggests the intent to kill, particularly in this case, where the strangulation was described as "violent." Thus, the jury could infer from the evidence presented that the strangulation was perpetrated knowingly or intentionally. Indeed, the State proceeded on the theory of premeditated murder up to the point when closing arguments were made and the case was submitted to the jury for deliberation. Clearly, then, the State interpreted the evidence as having established intentional conduct. (FN2)

Furthermore, the forensic evidence of the rape and strangulation injuries does not conclusively show that they were inflicted at the same time. Ron Toolsie, M.D., who performed *120. the autopsy on the victim, testified that the injuries to the vagina had occurred "very shortly" prior to her death. An estimation of how much time the phrase "very shortly" encompassed is not provided. And because there was no evidence of recent injury to the anus, he could not determine when the anus had last been penetrated. Thus, the evidence supports the inference that the sexual injuries were prior to, and separate from, the strangulation, just as well as it supports the inference that the injuries were inflicted concurrently.

Because the evidence could support a conviction for second-degree murder, the trial court erred in failing to instruct the jury on that offense. The next question is, of what effect is the error? The majority in *State v. Williams*   applied a harmless error analysis and affirmed the conviction in that case. 690 S.W.2d 517.

In my view, however, the right to a jury instruction on lesser offenses supported by the evidence is not merely a statutory right provided by Tenn.Code Ann.   §   40-18-110(a) (1990). Essentially, it is an inherent component of the basic constitutional right to trial by jury, the violation of which can never be treated as harmless error. *Williams,* 690 S.W.2d at 532 (Birch, J., dissenting); *see also* Tenn. Const. art. I, § 6 ("the right of trial

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                                          **Page 20**

by jury shall remain inviolate"); *State v. Bobo,* 814 S.W.2d 353, 358 (Tenn.1991); *State v. Staggs,* 554 S.W.2d 620, 626-27 (Tenn.1977); *Strader v. State,* 210 Tenn. 669, 679-82, 362 S.W.2d 224, 229-30 (1962). Thus, I would hold that the failure to provide such instruction is not subject to harmless error analysis.

Moreover, even if the harmless error analysis is applied, the error in this case would still require reversal. In *Williams,* the finding of harmlessness was predicated on the fact that the trial court provided instructions on two lesser offenses, second-degree murder and reckless homicide. The defendant argued that the trial court committed reversible error by refusing to also instruct the jury on voluntary manslaughter, an offense the State conceded was supported by the evidence. The majority disagreed, reasoning that "by finding the defendant guilty of the highest offense, to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter." In contrast, here the jury did not have an opportunity to reject the "immediately lesser offense," or any other lesser offense. They instead were offered the choice of first-degree murder or acquittal. Surely, one must conclude that this error more probably than not affected the judgment to the defendant's prejudice, particularly in light of the sordid facts before the jury.

Perhaps the majority's reluctance to recognize that a conviction for second-degree murder is supportable may be attributable, at least in part, to the sordid nature of the facts involved. But constitutional rights must be protected with equal vigor for every defendant, regardless of the heinousness of the crime for which he or she is charged. Consequently, under the circumstances of this case I would be constrained to remand the case for retrial. Thus, I must respectfully dissent.

I am authorized to state that Special Justice Reid joins this dissenting opinion.

*ORDER ON PETITION FOR REHEARING*

A petition for rehearing has been filed on behalf of appellant. After consideration of the same, a majority of the Court is of the opinion that the petition should be and the same is hereby denied at the cost of appellant.

Justice Birch and Special Justice Reid adhere to the views expressed in their original dissenting opinion.

/s/ Frank F. Drowota, III
Frank F. Drowota, III, Justice

(FN1.) "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

(FN2.) Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument."

(FN3.) The defendant was sentenced to three years on each count of incest, which are to be consecutive to the death sentence. He does not challenge those sentences in this appeal.

*120_ (FN4.) The Vann family did not have a telephone in their home.

(FN5.) Upon motion of Bernice Vann, the trials were severed. The defendant's trial was held first. Bernice Vann later pled guilty to accessory after the fact to felony murder, facilitation to commit aggravated rape, and aggravated child abuse and neglect. She received a total effective sentence of twenty-five years.

(FN6.) However, the definition of the offense specifically requires that the perpetrator have knowledge of the familial relationship between himself or herself and the victim. In this case, the indictment contains a specific allegation of the knowledge requirement.

(FN7.) The trial judge commented on the Rule 12 report that the sentence should have been death.

(FN8.) (1) The murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age or older; (2) The murder was especially heinous, atrocious or cruel in that it involved torture, or depravity of mind;  (3) The murder was committed while the defendant was engaged in committing or attempting to commit rape. Tenn.Code Ann.     § 39-2-203(i)(1);(5) & (7) (1982).

(FN9.) (1) The murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age or older; (2) The murder was especially heinous, atrocious or cruel in that it involved torture, or depravity of mind;  (3) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;  and (4)The murder was committed while the defendant was engaged in committing or attempting to commit rape. Tenn.Code Ann.  §  39-2-203(i)(1),(5),(6) & (7) (1982).

(FN10.) The murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age or older; (2) The murder was especially heinous, atrocious or cruel in that it involved torture, or depravity of mind;  (3) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;  and (4)The murder was committed while the defendant was engaged in committing or attempting to commit rape. Tenn.Code Ann.  §  39-2-203(i)(1),(5),(6) & (7) (1982).

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

976 S.W.2d 93, State v. Vann, (Tenn. 1998)                                    Page 21

(FN11.) There are certainly other cases in
Tennessee in which the defendant has been
sentenced to death which are similar to this one in
terms of the method and manner of death,
strangulation and violence.    *See e.g.*    *State v.*
*Hodges,* 944 S.W.2d 346 (Tenn.1997);    *State v.*
*Cauthern,* 778 S.W.2d 39 (Tenn.1989);    *State v.*
*Johnson,* 743 S.W.2d 154 (Tenn.1987);    *State v.*
*O'Guinn,* 709 S.W.2d 561 (Tenn.1986).
However, we deem it unnecessary to discuss in
detail the facts of these cases, since the
circumstances in the three cases discussed above
are so closely similar to the circumstances of this
case.

(FN1.) An offense is "lesser-included" if it contains
no elements that are not contained in the greater
offense.  A "lesser-grade" offense is "established
by the legislature and is determined simply by
looking at the offenses set forth in a statutory
chapter and part."  A "lesser-grade" offense may
contain elements not contained in the greater
offense.  *Cleveland,* 959 S.W.2d at 553.

(FN2.) If the evidence shows intent, then
necessarily it also shows knowledge.  Tenn.Code
Ann. §  39-11-301(a)(2) (1991)("When acting
knowingly suffices to establish an element, that
element is also established if a person acts
intentionally.")

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

state.

In *State v. Nichols*, 877 S.W.2d 722 (Tenn.1994), the defendant moved for a change of
venue from Hamilton County. The trial court granted the motion, but only for the limited
purpose of selecting a jury from another county. The jury, over the defendant's objection,
was then transported to Hamilton County for the trial. *Id.* at 727. Our supreme court
concluded that filing a motion for a change of venue constituted a waiver of the
defendant's constitutional right to have a jury selected from the county where the crime
was committed, noting that case law has interpreted this right to include being tried in the
county where the crime was committed. *Id.* The court held that "unless the defendant is
prejudiced, the administration of justice harmed, or the trial court abuses its discretion, no
reversible error occurs when a trial court" has a jury selected from another county and
then brought to the county of the indictment for trial. *Id.* at 728. The court encouraged the
legislature to address this issue to "ensure uniformity and fairness

**Westlaw Attached Printing Summary Report**
**for**
**EARLS, ALFRED 3569690 Monday, September 16, 2002 09:15:46 Central**

(C) 2002. Copyright is not claimed as to any part of the original work prepared by a U.S. government officer or employee as part of that person's official duties. All rights reserved. No part of a Westlaw transmission may be copied, downloaded, stored in a retrieval system, further transmitted or otherwise reproduced, stored, disseminated, transferred or used, in any form or by any means, except as permitted in the Westlaw Subscriber Agreement, the Additional Terms Governing Internet Access to Westlaw or by West's prior written agreement. Each reproduction of any part of a Westlaw transmission must contain notice of West's copyright as follows: "Copr. (C) 2002 West Group. No claim to orig. U.S. govt. works."Registered in U.S. Patent and Trademark Office and used herein under license: KeyCite, Westlaw and WIN. WIN Natural Language is protected by U.S. Patent Nos. 5,265,065, 5,418,948 and 5,488,725.

| | |
|---|---|
| Request Created Date/Time: | Monday, September 16, 2002 09:15:00 Central |
| Client Identifier: | OGI |
| DataBase: | TN-CS-ALL |
| Citation Text: | Slip Copy |
| Query Text: | CHANGE /3 VENUE /S WAIV! |
| Print Command: | Current document,Complete result |
| Lines: | 10011 |
| Lines Charged: | 10011 |
| Documents: | 1 |
| Documents Charged: | 0 |
| Images: | 0 |
| Images Charged: | 0 |

Slip Copy                                                                      Page 1
**(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))**

**H**
Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF
OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee,
at Knoxville.

STATE of Tennessee,
v.
Thomas Dee HUSKEY.
and
State of Tennessee,
v.
Thomas Dee Huskey.

**No. E1999-00438-CCA-R3-CD E1999-00481-CCA-R3-CD.**

June 28, 2002.

Appeal from the Criminal Court for Knox County, Nos. 49828, 49829, 49830, 50090; Richard
Baumgartner, Judge.

Herbert S. Moncier and Gregory P. Isaacs, Knoxville, Tennessee, for the appellant, Thomas
Dee Huskey.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Erik
W. Daab, Assistant Attorney General; and Randall E. Nichols, District Attorney General,
for the appellee, State of Tennessee.

OPINION [FN1]

FN1. Trial court Case Number 49828 was originally docketed for appeal as
E1999-00481-CCA-R3-CD. This court ordered that E1999-00481-CCA-R3-CD be consolidated
with E1999-00438-CCA-R3-CD for appeal and that the consolidated appeal proceed under
number E1999-00438-CCA-R3-CD.

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and
DAVID G. HAYES, JJ., joined.

*1 The defendant, Thomas Dee Huskey, appeals as of right from his convictions and
sentences for aggravated rape, rape, aggravated robbery, robbery, especially aggravated
kidnapping, and aggravated kidnapping, for which he received an aggregate sentence of
sixty-six years. The convictions relate to four victims and result from two trials that
were consolidated for this appeal. The defendant raises numerous issues. Although we
conclude that several errors occurred, only one requires reversal of any convictions.
Because of improper consolidation, we reverse the judgments for the three aggravated rape
convictions and one especially aggravated kidnapping conviction relating to the victim,
D.C., but we affirm the remaining judgments of conviction.

The defendant was convicted in the Knox County Criminal Court in two cases, which will be
referred to as the first rape case and the consolidated rape case. On October 20, 1995,
the defendant was convicted by a jury in the first rape case for two counts of aggravated
rape, a Class A felony, and one count of aggravated robbery, a Class B felony. The trial

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                    Page 2
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

court sentenced the defendant as a Range I, standard offender to twenty-two years for each aggravated rape and eleven years for the aggravated robbery, ordering the sentences to run concurrently for an effective sentence of twenty-two years.

On May 24, 1996, in a consolidated trial, the defendant was convicted by a jury on three counts of aggravated rape and one count of especially aggravated kidnapping, a Class A felony, of one victim; two counts of rape, a Class B felony, and one count of aggravated kidnapping, a Class B felony, of a second victim; and two counts of rape and one count of robbery, a Class C felony, of a third victim. The jury deadlocked on charges relating to a fourth victim. The trial court sentenced the defendant as a Range I, standard offender to twenty- two years for each aggravated rape and twenty years for the especially aggravated kidnapping of the first victim, ordering the sentences to run concurrently for an effective twenty-two-year sentence. It sentenced the defendant to eleven years for each rape and ten years for the aggravated kidnapping of the second victim, ordering the sentences to run concurrently for an effective eleven-year sentence. For the third victim, the trial court sentenced the defendant to eleven years for each rape and three years for the robbery, ordering the sentences to run concurrently for an effective eleven- year sentence. The trial court also ordered the sentences relating to each victim in the consolidated rape trial to run consecutively to each other as well as to the sentence from the first rape trial, establishing an effective sentence of sixty-six years.

On appeal, the defendant raises the following issues, many of which relate to both the first rape case and the consolidated rape case and many of which have several subissues. [FN2] We will first address the issue of whether the trial court properly consolidated all of the cases in the consolidated rape case because our holding affects our analysis of many of the other issues before us. We will next address the issues that relate to both cases, then the issues that relate only to the first rape case, and finally the issues that relate only to the consolidated rape case.

    FN2. Judge Ray L. Jenkins initially presided over the defendant's cases but recused himself on October 18, 1995 before opening statements in the first rape trial. Judge Richard Baumgartner replaced Judge Jenkins and presided over both rape trials.

*2 1. Whether the trial court erred in consolidating the cases in the consolidated rape trial.

                              ISSUES RELATING TO BOTH CASES
II. Whether the trial court erred in denying the defendant's motion to dismiss for the denial of a speedy trial.
3. Whether the trial court erred in denying his motion to suppress evidence obtained as the product of his unlawful arrest and the illegal search of his home.
4. Whether the trial court erred in denying his motion to suppress his statements.
5. Whether the trial court erred in allowing the state to determine the order of his trials.
6. Whether reversible error occurred because the state failed to provide him with timely discovery and whether the trial court erred in refusing to review discovery materials.
7. Whether the state withheld exculpatory evidence.
8. Whether the trial court erred by refusing to hear certain of his pretrial motions.
9. Whether the trial court erred in limiting his proof regarding his insanity defense.
10. Whether the trial court erred in denying him a change of venue.
11. Whether the trial court improperly denied him access to various records relating to the victims.
12. Whether the trial court erred by allowing the state to use improper leading questions on direct and redirect examination and by allowing improper redirect examination.
13. Whether the trial court erred in admitting evidence not disclosed to him in

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 3
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

discovery and not listed in the state's notice of intention to use evidence.
14. Whether the trial court erred by prohibiting the testimony of Henrietta Ogle
regarding the character traits of persons addicted to cocaine.
15. Whether the trial court erred in denying his motions for a mistrial.
16. Whether the state made improper comments in its opening statements and closing
arguments.
17. Whether the trial court properly sentenced him.
18. Whether the trial court erred in delaying and/or failing to rule on his post-trial
motions.
19. Whether the trial court erred by failing to rule on his motions in arrest of
judgment.
20. Whether the trial judge was disqualified from presiding over the cases.
21. Whether the misconduct of the prosecutor requires dismissal of the charges or that
the prosecutor is disqualified.

                ISSUES RELATING ONLY TO THE FIRST RAPE TRIAL
XXII. Whether the trial court erred in staying all other proceedings against him until
completion of the first rape case.
23. Whether the trial court erred in limiting his questioning on voir dire and in
refusing to dismiss for cause potential jurors who knew about his cases.
24. Whether the trial court erred by refusing to have a hearing during trial on his
motion to suppress a photographic line-up.
25. Whether the trial court erred in admitting into evidence the victim's statements
that were contained in a hospital record.
26. Whether the trial court erred in allowing the state's improper cross- examination of
Officer Chuck Whitson, whom the defendant had called as an adverse witness.
*3 27. Whether the trial court erred by failing to rule as the thirteenth juror.

                ISSUES RELATING ONLY TO THE CONSOLIDATED RAPE TRIAL
28. Whether the trial court erred in denying his motion to sever his factual defenses
from his insanity defense.
29. Whether the trial court erred in the number of peremptory challenges it allowed the
parties.
30. Whether the trial court erred by allowing jurors to have telephone contact while
sequestered.
31. Whether the trial court erred by allowing the state to elicit new testimony in its
redirect examination of Detective Tom Pressley.
32. Whether the trial court erred in failing to grant his motion for judgments of
acquittal due to the variance between the dates in the bill of particulars and those
proven by the state and to instruct the jury on the dates alleged in the bill of
particulars.
33. Whether the trial court erred in denying his motions for judgment of acquittal.
  We hold that some error exists with regard to Issues I, III, VI, XVI, XVII, XXV, and
XXVI. With respect to these errors, only the consolidation error requires reversal.

                                    FACTS
A. First Rape Trial

  The victim testified that on July 17, 1992, she spent the night at the East Fifth Avenue
apartment of Tina Kelly, a friend. The morning of July 18, she walked to the Krystal on
Magnolia Avenue to buy breakfast. She said that as she was walking back to her friend's
apartment, the defendant, who was driving in the opposite direction, stopped his car and
asked her for directions to Esau's Auction Company. She gave him directions, but the
defendant said that he could not hear her. She went to the driver's side of the car, and
as she raised her right arm to point the direction, the defendant pointed a gun under her

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                      Page 4
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

arm. The defendant then pulled her through the window of his car and drove away while her
legs were hanging outside the window. The defendant told her that he would kill her if she
did not get her feet into the car. Although she tried to lift her head, the defendant kept
pushing her down into the seat.

The victim testified that when the defendant stopped the car, she recognized that they
were at a barn in Chilhowee Park. The defendant told her to get out of the car, but when
she opened the passenger's door, the defendant became very angry. The defendant told her
that if she did not do everything he told her to do, he would kill her. The defendant, who
called her derogatory names throughout, told her that she was going to perform oral sex on
him and that he was going to have sexual intercourse with her. The defendant ran to the
passenger's side of the car and told her to get on her knees. When she did not comply, the
defendant, who had her hair wrapped in his hand, threw her against the car and then forced
her to her knees. She began praying, and the defendant told her to shut up and grabbed her
necklace, bearing a cross. The defendant then said, "Even God can't help you now." The
defendant exposed his penis and put it in her mouth. The defendant was not satisfied and
told her to do it right or he would kill her. She then performed oral sex on the
defendant.

*4 The victim testified that she had a pocketknife in her shorts pocket and that after
she had left the car, she took the knife out of her pocket and opened the blade. However,
when the blade locked, the knife clicked, which the defendant heard. She swung the knife
at the defendant, but the defendant threw her to the ground, causing her to drop the
knife. The defendant picked up the knife, told her that she had made a big mistake, and
threw the knife behind him.

The victim testified that the defendant forced her to crawl into the barn, where he took
$42.55 and a diamond tennis bracelet from her. The defendant had her take off her clothes,
except for her socks and shoes, and crawl into a stall, where he vaginally raped her. The
defendant made her change positions several times and had her stay in each position for
the same amount of time, using his watch to keep time. The defendant attempted to rape her
anally but was unsuccessful. The victim said that she did not see the defendant's gun
after she got out of the car.

The victim testified that a rope was hanging from a board in the stall and that the
defendant tried to put it around her throat. The rope, which she identified, was
introduced into evidence. She said that the rope was too short for the defendant to put it
around her throat, which upset him greatly. The defendant continued to rape her, and at
some point, the defendant saw a shadow on the wall, causing him to stand and pull up his
pants. The defendant said, "If it's the law, I'll protect you." The defendant then left
the barn, and when she heard his car start, she opened the door and ran. Still nude, she
ran through the parking lot next to the zoo, past the children's museum, and out the
Beaman Lake gate. Before she got to Fifth Avenue, she stopped and put on her clothes,
which she had been carrying. She said that she left her underwear in the barn.

The victim testified that she ran to Ms. Kelly's apartment and that she did not see a
person from the time that she ran from the barn until she got to the apartment, where she
passed Ms. Kelly's boyfriend on the steps. She did not tell him that she had been raped.
She went inside the apartment and took a bath. Ms. Kelly was at work, and there was no
telephone in her apartment. The victim could not move her arm and was in severe pain.
Around 10:30 p.m., she telephoned her aunt, told her that she fell down the steps, and
asked if she would drive her to the hospital. Her aunt took her to St. Mary's Emergency
Room, where the victim initially complained only about her shoulder pain. She eventually
told a nurse that she had been raped, and shortly thereafter, Jean Spangler from the
Sexual Assault Crisis Center (SACC) [FN3] interviewed her. She told Ms. Spangler what
happened. Later, Knoxville Police Detective Stan McCroskey came to the hospital in the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                    Page 5
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

early morning hours of July 19. She described her attacker to him and agreed to meet him
at the police station later that day. At the station, she again described her attacker,
stating that he had a beard that was trimmed, not long and scraggly, and that his hands
were neat and his fingernails were clean. She told the detective that her attacker's eyes
were "too close together," and she also described the clothes that her attacker was
wearing--jeans, a brown belt with a set of keys hooked around it, and a black T-shirt that
had elephants and the words "T.I.G.E.R. Zoo" on it.

      FN3. The parties, witnesses, and the trial court frequently refer to the agency as
      the Rape Crisis Center. The records from the center as well as the motion to quash
      the defendant's subpoena filed by the center reveal the Sexual Assault Crisis Center
      to be the correct name.

  *5 The victim testified that on the afternoon of July 19, she went to the barn with
Detective McCroskey, another police officer, and a woman from the SACC. In the stall where
she had been raped, they found her underwear as well as a brassiere that was not hers.
They could not find her pocketknife. The victim stated that she returned to the police
station sometime in October and was shown a series of photographs, from which she
identified the defendant as her attacker. This same photograph array was shown to her in
court, and she identified the photograph of the defendant. The victim also identified the
defendant in court as her attacker.

  The victim testified that she was not a prostitute and that she had never sold her body.
She stated that she was addicted to cocaine and that before July 18, 1992, she had been in
outpatient treatment once and inpatient treatment in January 1992, after which she stayed
clean for several months before relapsing about three weeks before the rape. During that
three-week period, she used mostly cocaine but also marijuana. She denied using Valium or
Xanax during that time, and she could not remember if she drank alcohol. She stated that
she was sober when she awoke the morning of the 18th. About four or five days after the
rape, she returned to treatment, but she relapsed again after she got out. She stated that
she was sober at the trial.

  On cross-examination, the victim testified that on July 18, 1992, at the hospital, she
described her attacker to Detective McCroskey, who completed a police report. According to
the report, she had described her attacker as five feet, eight inches tall and weighing
two hundred twenty pounds. She also described her attacker's hair as "collar length." On
July 19, Detective McCroskey interviewed her at the police station, recording the
interview. During this interview, she stated, "He wasn't that much taller than me. I'm
about five seven. He was maybe 1 or 2 inches taller than me." Regarding her attacker's
weight, she said, "I'm pretty sure it was over two hundred, but judging weight is not one
of my better things." After Detective McCroskey told her that he was five feet, eight
inches tall and weighed two hundred fifteen pounds, she responded that her attacker "was
about [his] size, maybe." Also during the interview, she said that her attacker "seemed to
be clean-cut .... [H]is hair wasn't shaggy or anything, and his beard and mustache were
pretty even." She said that on October 27, 1992, Detective McCroskey showed her a
photograph of the defendant with a ruler in the background. She acknowledged that the
photograph showed that the defendant was over six feet tall and that the defendant had
shoulder-length or longer hair.

  The victim acknowledged that in an interview with defense counsel on May 14, 1995, she
gave a different description of her assailant than the one she had given on July 18 and
19, 1992. During the May 14th meeting, she had stated, "I would say [he was] at least six
inches taller than me. I'm about five seven.... He's around six foot, six one, something
like that." She also said that her attacker's hair was "about down to his shoulders" and
that the defendant looked "nasty. He had brown hair and a beard. He had Band-Aids all over
his hands." She also stated that according to the transcript of the May 1995 interview,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

she had said that she was addicted to cocaine but had been clean for about a year and a half at the time of the attack. However, she testified that she may have said a month and a half. She also acknowledged that she had told defense counsel that she had been clean for at least six months before the attack and had relapsed after the attack. At trial, she testified that she did not use cocaine the day of the attack but admitted to using it the day before the attack. Also, she said in the May 1995 interview that she did not drink alcohol or use any drugs other than cocaine. She explained at trial that she was referring to the time when she made the statement, not the time of the attack. Defense counsel also questioned her in the interview about how she supported her drug habit, to which she responded that she worked and wrote bad checks for about fifteen hundred dollars, although she paid the checks later. She admitted at trial that she only had three warrants for writing bad checks, totaling about seventy dollars, and that these warrants were from 1993.

*6 The victim testified that she had been treated at the Detoxification and Rehabilitation Institute (DRI) three times, once as an outpatient and twice as an inpatient, the last being on July 22, 1992. She acknowledged that according to the DRI intake records, the July 22, 1992 admission was her fourth. The records also showed that she stated that she had legal problems relating to writing bad checks and failing to appear in court. She could not explain why the only warrants for writing bad checks were from 1993. The DRI records also provided that she went to the emergency room on July 18, 1992, because she was " 'jumped'/raped." She testified, however, that she did not use the word "jumped" and that she did not know that "jumped" was a street term for agreeing to have sex for money but not getting paid. Regarding her recent drug use, the intake records showed that she had stated that she both used marijuana and drank alcohol one week ago. She also acknowledged that the DRI records indicated that she had her first "blackout" at age twenty-five, but she testified that this was the only time she had ever had one. In response to being asked about the DRI records showing that she said she had experienced drug-induced hallucinations, she stated that the writing on the records was not hers. Regarding her drug history for the previous six months, the DRI records showed that she had been doing two and one-half grams of cocaine per day. The victim said that this amount of cocaine would cost about two hundred dollars.

The victim testified that she had a job driving a school bus for handicapped children and that she wrecked the bus while under the influence of drugs. She was not fired for this, but she voluntarily quit. She said that she had never been fired from a job because of her drug habit, but her habit had caused her to quit jobs. She said that she worked at Walgreen's during the six months before the attack but could not remember if she quit that job before July 18, 1992. She stated that she financed her drug habit from money earned by working and from money that she received in a settlement. She said that she also got drugs from friends.

The victim testified that she did not know what medication she received at the hospital on July 18, 1992, but she acknowledged that her DRI records indicated that she took Percocet while there. She admitted that the DRI records showed that she had stated that her reasons for wanting to quit doing drugs was "to refresh [her] memory." She testified that by this she did not mean that she was having trouble with her memory or with hallucinations. Rather, she meant that she wanted to clear her "head of any kind of fog, depression, so on and so forth." She acknowledged that her response on the DRI form to whether she had a problem remembering things was, "Yes, short-term memory loss."

The victim also testified on cross-examination that she did not know if the Magnolia Avenue area was a high-crime, high prostitution area. Regarding July 18, 1992, she said that she was not carrying any personal identification but that she was carrying a knife. She stated that when the defendant stopped his car and asked her for directions, they were

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                              Page 7
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

only a few blocks from Esau's. She said that the defendant pulled her into the car through
the driver's window with one hand, while his other hand held the gun. The defendant held
herhead down as he drove away, and she did not know which hand the defendant used to steer
the car. After she got out of the car, the defendant knocked her down, and then he grabbed
her upper right arm and pulled her close to him. At that time, she reached into her right
shorts pocket with her right hand and grabbed her knife. She said that she could not open
the knife to the point that the safety would catch with one hand, but she was able to use
her fingers to open the knife and then use her leg to extend the blade. When the safety
clicked, the defendant threw her against the car, causing her to drop the knife. She said
that the defendant was violent, hitting her and ramming her head into the side of the
barn.

*7 The victim testified that when she ran from the barn, she did not see anyone in
Chilhowee Park. She did not stop at any of the houses on Fifth Avenue to ask for help or
tell anybody about the attack once she reached Ms. Kelly's apartment. She also did not
tell her aunt about the attack but told her that her shoulder hurt from falling down the
stairs. She admitted that she had arthritis in her shoulder as well as in other parts of
her body but said she went to the hospital because her shoulder was injured during the
attack. She said that she did not have medical insurance at that time but acknowledged
that the hospital records indicated that she said she had insurance. After being admitted
and talking to a nurse for some time, the victim told her that she had been raped. The
nurse was the first person whom she told that she had been raped.

On redirect examination, the victim testified that when she was running from the barn to
her friend's apartment, she did not stop at a house to ask for help because she was
terrified and in shock. She stated that she initially did not reveal her real reason for
being at the hospital because she did not want to tell anybody about the rape. She just
wanted to be able to move her arm and go home. The victim again identified the defendant
as the person who attacked and raped her. The State rested its case.

The defense called Henrietta Ogle, a certified alcohol and drug counselor, who testified
that she was familiar with the general characteristics of individuals who are addicted to
cocaine. She stated that crack cocaine was extremely addictive, physically and
psychologically. She said that two and one-half grams of cocaine would have a street value
of three to four hundred dollars and that smoking that amount per day would be a severe
addiction.

Dr. Roger Allen Hubbard, the director of molecular pathology at Blount Memorial Hospital,
testified that he specialized in DNA analysis. He stated that a rape kit would include a
comb to obtain the victim's pubic hair, which would likely contain hairs from the rapist;
tubes to store the victim's blood; tubes to store the victim's vaginal secretions; and
cotton swabs to obtain semen from the vagina. Through DNA analysis, the rape kit evidence
can identify individuals with a very high probability of accuracy. He stated that the
standard procedure for preserving DNA evidence involved allowing the swabs to air dry for
twenty-four to forty-eight hours and then storing them in a non- plastic envelope. He said
that once the sample was dry, the DNA was very stable and would not spoil, unless it was
subjected to adverse conditions such as sunlight or extreme heat. Dr. Hubbard said that
the samples did not need to be refrigerated and that allowing the swab to stay wet for an
extended period of time, like in a plastic bag or in a refrigerator, can compromise the
integrity of the DNA. He testified that bathing would not affect the ability to find DNA
in the vaginal canal because the quantity of DNA needed to perform a test was very small.

*8 Ralph E. Green testified that he owned and operated Esau, Incorporated, which included
Esau's Antiques and Collectibles Market. He said that Esau's Antique and Collectible
Extravaganza was at Chilhowee Park in the Jacobs Building on the third weekend of most
months. He stated that an Extravaganza, which included approximately three hundred fifty

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          Page 8
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

vendors and drew about eight thousand customers, was held on Saturday, July 18, 1992. He
said that the vendors set up on Friday from 11:00 a.m. to 8:00 p.m. as well as on Saturday
starting at 7:00 a.m. He said the Extravaganza opened at 9:00 a.m. and customers would
usually line up at the front and back entrances before it opened. On cross-examination,
Mr. Green testified that most customers would not enter the park through the Beaman Lake
gate because they would have to walk farther to get to the Jacobs Building.

Knoxville City Police Officer Chuck Whitson was listed as a state's witness but was
called by the defense. He testified that the rape kit from the victim had been kept by the
police department since July 18, 1992, and that it had never been sent to the laboratory
for analysis. He stated that he took photographs during his investigation of the case but
that he did not have any photographs of the victim showing bruises or abrasions. He said
that he did not remember any bruises or abrasions on the victim, who was wearing a
hospital gown when he first saw her, and that none were brought to his attention. He said
if he had seen any bruises or abrasions, he would have taken photographs of them.

On cross-examination, Officer Whitson testified that he never examined the victim for
bruises or abrasions. He stated that when he went to the hospital, he only talked briefly
with the victim, who appeared to be really nervous, upset, and reluctant. He stated that
on the following day, he accompanied the victim to the crime scene, and he identified the
rope that had been entered into evidence as the rope that he removed from the stall. He
said that the rape kit was not sent to the laboratory because no one requested that it be
sent. Then, after about one year, the samples were taken out of the refrigerator and
stored in a non-refrigerated warehouse. Subsequently, he talked to a person at the Federal
Bureau of Investigation (FBI) Laboratory and determined that there was no need to send the
samples for analysis.

Dr. Paul E. Kaufman was qualified as an expert in forensic medicine and testified that he
had reviewed the victim's DRI records. He stated that if the records were accurate, the
victim had a serious addiction. He said about if the victim ingested two and one-half grams
of cocaine per day for six months, she would have a substantially impaired judgment,
memory, and concentration ability. She would also have a substantially impaired ability to
accurately recall and describe events. On cross-examination, Dr. Kaufman testified that he
had never interviewed the victim and had never interviewed a cocaine addict who had been
brutally raped.

*9 Dr. John Bruce Irwin testified that he treated the victim in the emergency room at St.
Mary's Hospital on July 18 and early July 19, 1992. He stated that according to the
hospital records, he did not find any abrasions or bruises on the victim. The victim
complained about tenderness in her right shoulder and right elbow, and his examination
revealed tenderness in her right shoulder, elbow, and hip. He stated that arthritis was
consistent with pain and can be consistent with tenderness. He said that the victim's
injuries could have been consistent with falling down stairs. He testified that he did not
find any evidence of a disturbance or redness around the victim's vaginal or anal areas.
He also did not find any evidence of forceful entry in either the vagina or anus. He
stated that the records did not show that the victim was given Percocet, which is a
strong, highly addictive, oral pain medication.

On cross-examination, Dr. Irwin testified that he did not have an independent
recollection of the victim. He said that his records did not indicate that the victim was
under the influence of drugs but did state that the victim was tearful and upset.

The parties stipulated that a complete search of all pertinent records revealed that
there were no charges against the victim with theexception of the three warrants for
writing bad checks in 1993, which were introduced into evidence. In the state's rebuttal
proof, it introduced a settlement sheet from a civil case involving the victim. The sheet

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                   Page 9
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

showed that the victim received approximately $36,000 in April 1991. The jury found the
defendant guilty of two counts of aggravated rape and one count of aggravated robbery.

B. Consolidated Rape Trial

  The defendant was tried for offenses against four victims, D. C., G. T., D. L., and
A.D.D.C. was the state's first witness and testified that during the second week of August
1991, she was working as a prostitute outside the Circle- In, a bar in Knoxville. She said
that around dusk, after the defendant drove past her a few times, she asked him if he was
looking for a date and told him that she charged twenty dollars for oral sex and thirty
dollars for vaginal intercourse. She stated that the defendant was driving a small, yellow
Toyota truck and was wearing corduroy pants, a flannel shirt, and work boots, on which
there was red clay. The defendant accepted her offer, although he did not give her any
money at that time. She got into the passenger's side of the truck, and as the defendant
drove away, he pulled out a pistol. She reached to open her door, and the defendant told
her to jump because she was going to die anyway. The defendant drove on Magnolia Avenue,
not stopping for red lights, to Chilhowee Park, where he parked his truck near a barn. The
defendant got out of the truck, and as he was walking to the passenger's side, she tried,
unsuccessfully, to get out the driver's side. The defendant opened the passenger's door,
grabbed her hair, pulled her out of the truck, and took her into the barn, locking it once
inside. The defendant told her to cooperate or he would snap her neck.

  *10 D.C. testified that once inside the barn, the defendant, who had his hand around her
throat, told her to remove all of her clothes. She complied. The defendant then made her
stand against a wall with her arms and legs spread, and he hit her several times. He then
forced her to her knees and made her perform oral sex. The defendant, still holding her
throat, made her stand next to a wire fence in the barn. He told her to spread her arms
and legs, which she did, and the defendant tied her hands and feet to the fence and
had sexual intercourse with her. The defendant pulled his penis out of her vagina,
ejaculated on her stomach, and had intercourse with her again. The defendant then put his
hand on her throat, untied her, and took her to a trough in the barn. He forced her to
bend over the trough, and he anally raped her. The defendant then made her lie on the
ground, where he held her with his knees on her arms and both hands on her throat. He
started choking her, but stopped when they saw lights from a car. The defendant then
stood, kicked her, gathered her clothes, and left the barn, locking it and telling her
that if she screamed or moved, he would shoot her. The defendant called her derogatory
names throughout the episode, which lasted four to five hours, and told her that he was
going to get and kill "all you whores."

  D.C. testified that after the defendant left the barn, she stayed in the barn for about
two hours because she could not move her legs. After regaining movement in her legs, she
was able to unlock the barn and started walking, still naked, toward Magnolia Avenue. A
man gave her a coat and drove her to the Circle-In. D.C. identified the defendant as the
person who raped her.

  D.C. testified that after returning to the Circle-In, she spoke with Knoxville Police
Officers Mark Pressley and Doug Stiles but that she did not file a formal complaint. On
November 2, 1992, while incarcerated on charges for forgery, fraud, and aggravated
robbery, she told Knox County Sheriff's Lieutenant Larry Johnson and Detective Mike
Upchurch what the defendant had done to her. They showed her an array of six photographs,
from which she identified the defendant as her attacker.

  D.C. testified that she was in jail at the time of her testimony for violating her
probation by failing to appear in court and that she had been convicted of soliciting
prostitution, forgery, fraud, robbery, driving under the influence, driving on a suspended
license, and driving on a revoked license. She stated that in August 1991, she frequently

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

851

Slip Copy                                                                    Page 10
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

used drugs and alcohol but that she was not under the influence of drugs or alcohol the day she was raped.

On cross-examination, D.C. acknowledged that she had testified at a hearing on April 15, 1996, and that before both that hearing and the trial, she talked with the prosecuting attorneys. She said that before the April 15 hearing, she and the other victims--G. T., D. L., and A. D.--attended a meeting in the district attorney's office, where they were shown a chart containing facts relating to each of their cases. She was friends with the other victims, who were also prostitutes, and they watched out for each other on the street.

*11 D.C. admitted that at the April 15, 1996 hearing, she said the rape occurred during the first or second week of August. She explained that she was now certain that it occurred during the second week of August because she was making "regular" money when the rape occurred, stating that the first week of the month the prostitutes made "good" money. She acknowledged that in her previous testimony, she had stated that after the rapes, she talked to Mark Pressley and "papers [were] filed, but nothing happened at that time." She admitted that nothing was filed regarding her case in 1991. Also, in her April 15 testimony, she stated that she stopped prostituting herself in 1994 and that she did not have a charge for prostitution in 1995. At trial, she testified that she was simply mistaken, acknowledging that she was arrested for prostitution on September 15, 1995. In her hearing testimony, she said that she had never robbed anybody. She testified, however, that in 1992, she had helped set up dates in order that two men could then rob people and that she had taken a woman's car after fighting with her, although the charges relating to this event were dismissed. She also stated that she pled guilty to robbing a food market in 1994 but explained that she was driving the car and did not know that the two men accompanying her were going to rob the store. D.C. said that she also pled guilty to fraud and forgery charges for cashing stolen checks, although she stated that she did not steal the checks.

D.C. testified that she first gave a statement to police on November 2, 1992, while in jail on six charges. She said that shortly after giving her statement, her bond was reduced from $50,000 per charge to $1,500 per charge, which enabled her to make bond. She said the police sometimes go lighter on people who help them. She acknowledged that although in her November 2 statement she said the defendant threatened her by saying he would break every bone in her body, she had said on direct examination that the defendant threatened her by saying he would snap her neck. She explained that "it all happened." She also admitted that her November 2 statement did not mention the defendant telling her to take off her clothes. Further, in her statement, she stated that the defendant said he was going to hit her and commented, "like this--all you boys do." At trial, she explained that this comment referred to men's general tendency to hit women. She admitted that events, specifically being forced to perform oral sex, were not in the correct chronological order in her statement, stating that the events occurred as she testified on direct examination.

D. C.'s November 2 statement also provided that she saw the defendant about one week after the rapes. She said that he was driving a blue, four-door Chevrolet Impala and was wearing a gold and black band uniform that had tassels on the shoulders. According to her statement, when the defendant propositioned her, she grabbed him and tried to stab him, at which point the defendant punched her in the face. She testified that the statement was incorrect because although she did try to stab him, she did not grab him and he did not punch her in the face. She explained that she tried to grab him and that the defendant "punched the gas" and drove away. D.C. admitted that her statement said that she had been barred from the Circle-In for "pulling knives." She explained that she was barred only for twenty-four hours for pulling a knife on a man who had hit her.

*12 D.C. testified that after she made bond in November 1992, she went to the Detoxification and Rehabilitation Institute (DRI). On her admission form, she stated that

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                          Page 11
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

her occupation was cleaning houses. She testified that this statement was not a lie because although she was a prostitute, she also cleaned houses at that time. She said that the admission form correctly stated that she was having hallucinations and blackouts at that time as a result of heavy drinking and using cocaine. Her admission form indicated that she was using three-fourths of an ounce of cocaine per day as well as Dilaudid and Demoral. She had also stated on the form that she had been raped when she was an adult.

D.C. testified that she pled guilty in 1994 to five counts of fraud and one count of robbery, receiving eight years of probation. On September 15, 1995, she was arrested for prostitution. Although she told her probation officer about the arrest, her probation was not revoked. On December 28, 1995, she was arrested for driving under the influence (DUI). Her prostitution case was continued until May 16, 1996, just three days before the defendant's trial began. She received a five-day sentence, which was ordered to run concurrently with her DUI sentence.

G.T. testified that in February 1992, she encountered the defendant while working as a prostitute. One Tuesday morning around 8:00 a.m., she was on the Gay Street viaduct when the defendant stopped his car near her. She asked him what kind of date he wanted, but he did not respond. Without discussing the type of date or payment, she got into the defendant's car and suggested that he drive to Cahaba Lane, which the defendant did. She testified that she intended to have sex with the defendant for money.

G.T. testified that when they arrived at Cahaba Lane, she and the defendant walked into the woods. She was carrying a pocketbook and was walking in front of the defendant. The defendant eventually told her to stop and asked her to remove her shirt, which she did. The defendant then asked her to put her arms behind her back. She complied, and the defendant tied her wrists together with a rope. When she turned around to face the defendant, he "started ripping out" her brassiere with a pocketknife and then told her to get on her knees. She got on her knees with her face to the ground. The defendant pulled down her pants and underwear and inserted his penis into her anus, which hurt and caused her to cry. She "bucked up" on him, kicking him with her left foot, at which point he stopped and told her to turn around. The defendant then attempted to have vaginal intercourse with her, but he could not achieve an erection. The defendant did touch her clitoris. After telling her that she was "too tight down there," the defendant grabbed the back of her head and her throat and forced her to perform oral sex. Afterward, he told her that if she screamed, he would shoot her. Although she never saw the defendant with a gun, she "took his word" that he had one. The defendant then left her in the woods.

*13 G.T. testified that the defendant called her derogatory names throughout the rape and told her that she was just like all the others. She said that after the defendant left, she was able to free her hands. After putting on her torn brassiere and shirt, she found her pocketbook, which the defendant had taken from her, with twenty-five dollars missing. She walked to Dimension 3, a hair salon, and asked for a glass of water. The police were called, and she told Officer Mark Young and later Detective Tom Pressley what happened. G.T. stated that she had rope burns on her wrists and scratches on her knees. Photographs of these injuries were introduced into evidence. She testified that she rode in Detective Pressley's car and directed him to the crime scene. When they arrived, they saw a car, which she believed was the defendant's, and as they approached the car, they saw the defendant, whom she identified as the person who raped her.

On cross-examination, G.T. testified that she had been a prostitute for about ten years as of February 1992, when she initiated contact with the defendant and got into his car without an agreement as to the type of date they were going to have. She admitted that her intention was to have sex for money and that she suggested that they drive to Cahaba Lane, which was a "long way" from the Gay Street viaduct but a common place to take dates.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 12
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

G.T. stated that she had talked to the district attorney since she testified in a hearing on April 16, 1996, but that he only told her to tell the truth. She acknowledged that in her April 16 testimony, she stated that she never saw a weapon at any time and she never mentioned the defendant having a knife or cutting her brassiere. She admitted that in her April 16 testimony, she never said that the defendant penetrated her anally or that she experienced pain from being penetrated anally. She stated that she previously testified that she performed oral sex before the defendant unsuccessfully attempted to vaginally rape her. She said that her testimony on direct examination was accurate, conceding that the defendant did not penetrate her vagina. G.T. testified that she attended a meeting with the other victims at the district attorney's office but that the district attorney did not discuss the facts of the other victims' cases with her. She acknowledged, though, that in her April 16 testimony, she stated that she remembered the district attorney telling her about a matrix that summarized each of the victims' cases.

G.T. testified that she did not tell the people in Dimension 3 that she was a prostitute. Likewise, she did not reveal to police that she was a prostitute in her February 27, 1992 statement. In that statement, she said that she had been kidnapped, raped, and robbed by a man who had picked her up on Jackson Avenue, that he drove her to a wooded area and forced her to perform oral sex, and that she then walked to a nearby business and called the police to report the crime. She admitted that her statement did not mention being anally or vaginally raped.

*14 The state offered Knox County Sheriff's Detective Dan Stewart and Knoxville Police Detective Thomas Pressley for cross-examination, submitting that their testimony would be cumulative. In cross-examination, Detective Pressley testified that his department has reported that prostitutes in Knoxville are often drug addicts, thieves, and liars, especially when they want something. On February 26, 1992, around 2:00 p.m., he went to the Dimension 3 hair salon regarding a dispatch that Knox County Sheriff's deputies had G.T. When he arrived, G.T. told him that she had been applying for a job at Southeastern Janitorial Service on Jackson Avenue and that as she was leaving, a white male, driving a gray car with a child restraint seat on the backseat, offered her a ride to her job. G.T. told him that the man kidnapped her, drove her to Cahaba Lane, and forced her to perform oral sex on him. Detective Pressley said she did not tell him that she was a prostitute, that she voluntarily got into the defendant's car, or that she suggested going to Cahaba Lane. He stated that Cahaba Lane was a remote area about two miles from Dimension 3. Because the complaint was made at 2:00 p.m., he assumed that the incident occurred around 1:00 p.m. Later that day, after he learned that G.T. was a prostitute, he confronted her, and she admitted that she was a prostitute and that she had lied about being abducted after leaving a job interview on Jackson Avenue.

Detective Pressley testified that G.T. directed him to the crime scene and that the defendant was there when they arrived. He arrested the defendant and took him to jail, but Knox County was responsible for charging him. He stated that he was subpoenaed four times regarding the defendant's case relating to G. T., but each time G.T. did not appear in court. The charges relating to G.T. were ultimately dismissed.

On redirect examination, Detective Pressley testified that the car he saw when he arrived at Cahaba Lane matched the description G.T. had given him, including that a child restraint seat was on the backseat. He later determined that the car had been driven by the defendant. He stated that as they walked into the woods, they saw the defendant, whom G.T. identified without hesitation as her attacker.

D.L. testified that she had been working as a prostitute for about two weeks when she met the defendant at the Circle-In on a day in the middle of September 1992. She asked him if he wanted a date, to which he responded that he wanted oral sex performed on him and that he would pay her fifty dollars. She agreed and got into his car, which she believed was a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 13
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

blue Buick. It was around 1:30 or 2:00 p.m. at this time. The defendant told her that he
was going to drive to where he took P. J., another prostitute whom they both knew. While
in the car, the defendant gave her fifty dollars, which she put in one of her socks. The
defendant drove to a dead end street, where he parked in front of a billboard, and then
they walked to a mattress that was a few feet into some woods. He told her to remove her
shirt and to get on her knees, which she did. She did not remove her brassiere or her
shorts. The defendant then went to his car and got something out of his trunk, and when he
returned, he pulled her up, put her hands behind her back, and tied them with twine or
rope. At this point, the defendant took money out of her sock, but he did not take the
fifty dollars that he had given her. Instead, from her other sock, he took over one
hundred dollars that she had made earlier in the day.

*15 D.L. testified that as the defendant led her further into the woods, he had his hands
around her neck and said, "I hate all prostitutes" and "I am going to kill you, bitch."
She begged for her life, telling the defendant that she had two children and that she
wanted to see her father again. At some point, she escaped from the defendant and ran
toward the car, but the defendant caught her. She then told him that somebody had driven
up and seen them. The defendant then untied her hands, put her in the car, and told her to
put her shirt on. As he was driving, he told her that if she got out of the car at a stop
light, he would find her and get her. The defendant dropped her off at the NAPA store on
Magnolia Avenue. She was able to get the defendant's license plate number when he drove
away. D.L. stated that she did not call the police at that time because she was scared
that she would be arrested. However, two or three weeks later, she saw the place where she
had been robbed in the newspaper, and she then went to the Tennessee Bureau of
Investigation's (TBI) office and told them what had happened to her. She stated that she
was not under the influence of drugs or alcohol on the day of this incident.

On cross-examination, D.L. testified that when she knelt on the mattress at Cahaba Lane,
she intended to perform oral sex on the defendant. She stated that everything was fine
until the defendant jerked her up and tied her hands behind her back. She said that as the
defendant pushed her up the hill, he had one hand on the back of her neck and one hand
holding her hands behind her back. After unsuccessfully trying to run away from the
defendant, she told him that she saw a car and that they would be discovered. At that
point, she asked the defendant to untie her, which he did, and then the defendant told her
to put on her shirt. She then asked the defendant to drive her back to the Circle In, to
which he responded that he would drop her off on Magnolia Avenue. She stated that she
never had sex with the defendant and that she thought that the defendant was trying to
take back the fifty dollars he had given her but mistakenly took the money from the wrong
sock. She said that the defendant never hit her and that she never saw the defendant with
a weapon. D.L. stated that she continued to prostitute herself after this incident.

Knox County Sheriff's Detective Michael Grissom testified that during his investigation
of the defendant's cases, D.L. gave him a license plate number. As a result of checking
the license plate number through the Records Division, he went to the house of Frank
Huskey, the defendant's father, in Pigeon Forge, Tennessee. When he arrived, he saw a 1983
Buick LeSabre with a license plate number of VLZ-894. On cross-examination, Detective
Grissom stated that information concerning his department's investigation of events on
Cahaba Lane would not have appeared in the newspaper until October 20, 1992.

A.D. testified that on October 5, 1992, around 5:00 to 5:30 a.m., she was working as a
prostitute on Magnolia Avenue when the defendant, who was wearing a beige work uniform,
drove into the KFC parking lot in a small, beige truck. When she approached the
defendant's truck, he offered her fifty dollars to go to a location that was farther away
than where she normally went. The defendant told her it was a secluded area near a church.
The defendant did not say what sexual act he wanted for the fifty dollars. After talking

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                              Page 14
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

to the defendant for some time, she agreed to go with him, feeling comfortable with him
because he knew people she knew.

*16 A.D. testified that they had a friendly conversation on the drive to Cahaba Lane, a
place where she had never been. The defendant parked the truck and came to the passenger's
door. He opened the door, hit her in the face, grabbed her hair, and pulled her out of the
truck. The defendant pulled her toward the woods, and she struggled and begged him not to
take her into the woods. The defendant told her there was a mattress in the woods, to
which she responded that she would do whatever he wanted outside the woods. The defendant
eventually agreed and told her to remove her clothes, which she did. The defendant stood
over her, took a knife out of his pocket, called her derogatory names, and said, "I will
cut your throat if you don't do what I tell you to." The defendant forced her to perform
oral sex and vaginally raped her, although he did not ejaculate. The defendant said that
he was going to take her to the mattress, and she again begged him not to, at which point
he forced her to perform oral sex until he ejaculated. As the defendant was fastening his
pants, she asked him to take her back to Magnolia Avenue, to which the defendant responded
that he would not because she would jump out at a red light and scream rape. She asked
again, explaining that she did not know where she was, and the defendant told her to get
dressed and he would take her. However, as she was getting dressed, the defendant got in
his truck and left. She said that when the defendant left, it was daylight.

A.D. testified that she walked toward Asheville Highway. She was crying, her hair was
wet, and she had mud all over her. A woman in a car stopped, and she asked the woman for a
ride home. The woman refused but called the police to help her. The parties stipulated
that a telephone call was made from telephone number 524-5499 at 8:02 a.m., on October 5,
1992, regarding A.D. to the 9-1-1 authority in Knox County. She continued walking until
she reached a gas station. While telephoning a friend, she saw police officers, but she
did not ask them for help because she was on parole. She stated that she reported the
rapes to the police two or three weeks later, after she saw a picture of Cahaba Lane while
watching the news on television. A.D. identified the defendant as the person who raped
her.

A.D. testified that at the time of trial, she was in jail because she had violated her
parole. She had been on parole three times, and each time she had violated the terms of
her parole by using cocaine. She stated that she had her senses when she encountered the
defendant the morning of October 5, 1992, although she admitted that she had used cocaine
earlier in the morning around midnight.

On cross-examination, A.D. testified that she was not friends with the other victims but
that they did help each other survive on the streets. When she approached the defendant,
she was hoping to get paid for having sex with him. Although her usual practice was to
receive payment in advance, the defendant did not pay her before she got into his truck.
She stated that the knife with which the defendant threatened her was a pocketknife and
that the defendant never opened the blade. She said that the defendant never bound her.
When questioned about whether not getting paid after having sex angered her, she stated,
"Usually, if you don't get paid, and then you have sex, then it is forced sex." She stated
that sometimes dates were rough with her.

*17 A.D. testified that in October 1992, she was using about two hundred dollars worth of
cocaine per day. She admitted that she used cocaine about five hours before she met the
defendant but stated that cocaine did not affect her ability to remember what happened to
her. She said that after being raped by the defendant, she was concerned for her safety,
but she acknowledged that she asked the defendant for a ride back to Magnolia Avenue,
approximately a fifteen minute drive, because she did not know where she was.

A.D. testified that she did not report the rapes on October 5, 1992, and that she did not

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

8 3€

Slip Copy                                                                Page 15
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

go to the hospital or see a doctor on that date. She said that no one from the sheriff's department ever asked for the clothing that she was wearing when she was raped. She said that on October 26, 1992, the police came to the Circle-In, and she told Detective Tommy Stiles that a man had taken her to Cahaba Lane and raped her a few weeks earlier. Later that night, she went to the Knox County Sheriff's Department and talked to Dan Stewart and Mike Upchurch. When they asked her if she would testify before the grand jury regarding what the defendant did to her, she asked "Would it help a friend?"

A.D. testified that she and the other victims met with the district attorney before testifying at the April 16, 1996 hearing. She said that the district attorney talked to each victim individually and that they did not discuss the facts of the cases. She stated that there was a chart regarding all of the cases but that she did not see it.

A.D. testified that in November 1988, she was indicted for eleven counts of drug-related offenses. She said that she received an effective sentence of eight years for agreeing to plead guilty to possession of cocaine with intent to sell, possession of marijuana, possession of diazepam with intent to sell, possession of methyprylon with intent to sell, and possession of glutethimide with intent to sell. She stated that she was not a drug dealer but was living with one at that time and that she pled guilty on the advice of her attorney. A.D. acknowledged that a statement she made to the Community Alternatives to Prison Program (CAPP) regarding the convictions provided,

I was told to plead guilty of the current offense. I was staying at a friend's house .... I did not know he had coke and pot in his house, but I did know about the Valium and other pills. On the sale and delivery charges, I did those. I sold an eight-ball to an undercover agent and about an ounce of pot. I was selling for money.

She testified that she did not remember what she told the people at CAPP but that she sold the drugs for a friend, reiterating that she was not a drug dealer.

A.D. testified that she was released from jail on November 5, 1995, but that she was arrested on April 26, 1996. She said that she entered a plea bargain and that she hoped to receive help from the state regarding her parole violation. She admitted that the district attorney sent a letter to the parole board asking them to consider her drug problem when determining whether to revoke her parole. On redirect examination, A.D. testified that the district attorney was not at her last parole board hearing and that she did not know that he was going to write a letter on her behalf.

*18 The defendant's first witness was Knox County Sheriff's Detective Michael Freeman, who testified that as part of the investigation of the incidents that occurred at Cahaba Lane, he went to Teague's Statuary in Sevier County, Tennessee on October 23, 1992, to recover employment records regarding the defendant, including his time cards. According to the time cards, on Monday, October 5, 1992, the defendant clocked in at 7:58 a.m., clocked out at 12:11 p.m., and then back in at 1:08 p.m. On Tuesday, September 22, 1992, the defendant clocked in at 7:52 a.m., clocked out at 11:56 a.m., back in at 12:55 p.m., and then out at 4:43 p.m. He stated that to drive from Teague's to Cahaba Lane would take about fifty minutes to one hour.

On cross-examination, Detective Freeman testified that on November 2, 1992, he took a statement from D. C., in which she described what the defendant had done to her and that she identified the defendant from a photograph array. He said that when he was at Teague's Statuary, he saw a reddish color rope that was "twine-like" but thicker. He stated that the amount of time it would take to drive from Teague's Statuary to Cahaba Lane would depend upon how fast the person drove and the traffic conditions. He said that if the defendant left work at 4:43 p.m. on September 22, 1992, then he should have arrived in Knoxville approximately one hour later.

On redirect examination, Detective Freeman testified that if D.C. described the twine

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                Page 16
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

that was used on her as brown and smaller than a pen, then it would not have been the same
rope that he saw at the Teague's Statuary. On recross- examination, he stated that there
were other colors of twine at Teague's.

James Wesley Sanderson testified that he acquired Teague's Statuary on September 1, 1992.
He said that to drive from Knoxville to Teague's Statuary involved traveling through or
around Gatlinburg, Pigeon Forge, and the Great Smokey Mountain National Park. He said that
the traffic in this area was hectic, especially during the tourist season, including
October. He said that the twine that Detective Freeman saw was in a shed behind his
property and that he did not use twine in conducting his business. He stated that he
normally arrived at work between 7:45 and 8:00 a.m. and would see the defendant. He said
that if the defendant had come to work with mud on his clothes, he would have noticed.

On cross-examination, Mr. Sanderson stated that because of the nature of the defendant's
job, the defendant would have been greasy and would have had cement on him by the end of
each day. He said that the shed behind his property was about one hundred yards from the
statuary.

James David Gill, a librarian and records custodian for the *Knoxville News Sentinel*,
testified that the paper reported that sunrise on October 5, 1992, occurred at 7:34 a.m.
He stated that the newspaper's first article regarding the investigations of the Cahaba
Lane incidents occurred on October 21, 1992.

*19 Dr. Paul Kaufman was qualified as an expert about to how alcohol and drugs affect a
person's perception of and ability to recall events. He testified that he reviewed records
pertaining to D.C. dated November 19, 1992, and referring to her past drug usage. He
stated that D.C. had a serious, extensive drug abuse problem in the early 1990's, using
cocaine, Dilaudid, Demerol, and alcohol in staggeringly-high doses. He said that a person
abusing drugs at D. C.'s level would have a substantially impaired memory, judgment, and
ability to recall and restate events that had happened. He also stated that people with
serious drug problems tend to lie to maintain their lifestyle.

Dr. Kaufman testified that he had not interviewed A.D. Defense counsel provided Dr.
Kaufman with a hypothetical in which he described a person that used two hundred dollars of
cocaine per day, used acid, injected Demerol, and drank alcohol excessively. Dr. Kaufman
stated that assuming the facts in the hypothetical were true, the person had a serious
drug dependency and would have characteristics similar to the ones he described relative
to D. C.

The jury convicted the defendant of three counts of aggravated rape and one count of
aggravated robbery for the offenses against D.C. It convicted him of two counts of rape
and one count of robbery for the offenses against G.T. It convicted him of two counts of
rape and one count of aggravated kidnapping with regard to A.D. The jury deadlocked on all
counts relating to D. L.

I. CONSOLIDATION

The defendant contends that the trial court erred in consolidating the four rape cases,
arguing that the state's motion to consolidate was untimely, that the offenses were not
part of a common scheme or plan, and that evidence of each offense would not have been
admissible in the trials of the other offenses. The state contends that the trial court
properly consolidated the cases.

On March 21, 1996, the state moved to consolidate the presentments relating to D. C., A.
D., D. L., and G.T. pursuant to Rules 8(b) and 13(a), Tenn. R.Crim. P. The defendant
opposed this motion, which had the same effect as asking for a severance under Rule

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

14(b)(1), Tenn. R.Crim. P. *See Spicer v. State*, 12 S.W.3d 438, 444 (Tenn.2000). Thus, consolidation was proper only if a severance was not required under Rule 14(b)(1), which states,

> If two or more offenses have been joined or consolidated pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

Because the trial court's decision regarding consolidation is determined from the evidence presented at the hearing, "appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses." *Spicer*, 12 S.W.3d at 445.

**\*20** At the consolidation hearing on April 15 and 16, 1996, all four victims testified about their encounters with the defendant. The victims' testimony was substantially similar to their testimony at trial. Testimony particularly relevant to the issue of consolidation included the following: D.C. testified that in the first or second week of August 1991, she was twenty-five years old and working as a prostitute when the defendant picked her up on the corner of Central Avenue and Magnolia Avenue around 6:30 or 7:00 p.m. As the defendant drove away, he pulled out a pistol. During the drive, he told her that she could jump out of the truck because she was going to die anyway. The defendant drove to a barn near the zoo, where he then raped her. The defendant pulled her hair, hit her, and choked her during the episode. The defendant tied her hands together with rope at one point and called her derogatory names throughout the encounter. She said that it was not common for dates to call her derogatory names. The defendant also told her that he was going "to kill all you pretty whores" and "all you bitches."

A.D. testified that in the first week of October 1992, she was twenty-five years old and working as a prostitute when the defendant approached her around 5:30 a.m. She was on Magnolia Avenue, and the defendant suggested that they go to Cahaba Lane, offering her fifty dollars, which was more than she usually made. She stated that the defendant mentioned people she knew, which made her more comfortable about going with the defendant. Once at Cahaba Lane, the defendant hit her and called her derogatory names. The defendant threatened to kill her, stating that he had a knife, although she said she never saw a knife. She stated that it was not common for dates to hit her or to call her derogatory names, although she said that it sometimes happened. She said that the defendant did not tie her up with rope.

D.L. testified that in September 1992, she was nineteen years old and working as a prostitute when the defendant picked her up at the Circle Inn around 1:00 p.m. The defendant offered to pay her fifty dollars if she performed oral sex, for which she normally charged twenty-five dollars. The defendant told her he wanted to go where he took P. J., who was someone she knew. She accepted the defendant's offer, and then he drove to Cahaba Lane. During the encounter, the defendant tied her up with rope, choked her, and threatened to kill her, stating that he hated all prostitutes. She did not remember if the defendant used profanity.

G.T. testified that in February 1992, she was twenty-five years old and working as a prostitute when the defendant picked her up on the Gay Street viaduct around 3:00 or 3:30 a.m. She suggested that they go to Cahaba Lane, and the defendant drove there without her giving him directions. She stated that the defendant tied her hands together with rope and attempted to rape her anally. He then grabbed her by her hair and forced her to perform fellatio on him. He also attempted to have vaginal intercourse with her. During the rapes, the defendant threatened to shoot her, although she did not see a gun. She stated that she had never been tied up before and that it was unusual for dates to hit her, although it

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 18
**(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))**

happened "at times." She also said that dates did not usually curse her.

*21 Based upon the testimony of these four victims, the trial court found that there was a common scheme or plan and that the evidence in each case would be admissible in the other cases if they were to be tried separately. Regarding the common scheme or plan, the trial court stated,

These are the things that struck me about the testimony: First of all, the time frame. The time frame we have here are offenses occurring between August of 1991 and October 1992, a period of, approximately, fourteen months....

The cases, of course, speak to time frames. I recall time frames of nineteen months and greater periods of time than this in the cases where consolidation was granted. But, in any event, it is a fourteen-month time frame that we are dealing with here.

In each case, we have a young, white female prostitute between the ages of eighteen and twenty-two years old, who were all picked up either on or adjacent to Magnolia Avenue or on the Gay Street viaduct, ... approximately a quarter mile from Magnolia Avenue, all within, I would estimate, a one-mile radius of one another within the downtown area of Knoxville, Tennessee.

Of course, three of these victims were taken to Cahaba Lane. One of them was taken to the Chilhowee Park area, zoo area, general area around the zoo, or the animal barns out there.

In each case--or in many of the cases--again now these next remarks that I address, I would point out that these did not necessarily happen in all four cases, but they happened in a minimum of two, sometimes in three, sometimes four of the cases.

The testimony of these victims was that Mr. Huskey used profanity, and a great deal was made about this. Particularly, he used the phrase "bitch" and "whore" and "slut" and made references to prostitutes on a number of occasions with a number of these different victims.

We talked about that a good deal, and the testimony was that this was not common. Despite what some people might think, that the use of profanity and the use of derogatory comments to prostitutes engaged in their profession or on "dates" is not a common thing for them to experience.

Further, there was physical violence in virtually every case--in all cases-- and threatened violence either with a weapon or the threatened use of a weapon with virtually all of these victims. The defendant pulled the hair of three of the four victims. His nature was abusive.

A particularly interesting aspect, I thought, was the characteristic-- personal characteristic that, if the victim cried or begged, this would anger the perpetrator, and he would react by either physically assaulting and/or threatening to physically assault the victim, if they engaged in that kind of conduct.

The type of sex acts. Oral sex in each case, the attempted and/or accomplished vaginal sex; the attempted or accomplished anal sex of these individuals. Three of the four were left at the scene of the crime; one was returned to town. He robbed some of these victims ... at least, in two of the cases....

*22 There was the force--the commonality of the forced removal of clothing of all these victims, again something that you would think not uncommon. But the testimony that was elicited was that it was somewhat uncommon; that many times clothing is not removed to accomplish the sex act.

The practice of tying these victims up. He tied three of the four victims up during the perpetration of the crime.

Again, with some of these victims he put them at ease by mentioning other prostitutes that the victims knew, in an effort to give them a sense of security, so that they would be at ease, in terms of going with him on a date-- a prostitute date.

Also, in a couple of the cases, he increased the price that would normally be demanded for the type of service, in an effort to convince the prostitutes-- these victims--that

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 19
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

they should go to a location that they would not otherwise have agreed to go to.
Like I say, there are some differences here. These things that I have mentioned
certainly don't apply in each and every case. Some of them do; many of them don't apply
in every case. The time of day, for instance, was different. The exact sexual acts.
There was some differences. There is no question that there are some differences, but I
don't think that the case law requires a finding of identical acts throughout the
course.
The question is whether or not the similarities outweigh the differences and lead to the
conclusion that the defendant was the individual who committed the offenses. I think,
when you examine all the facts in these cases and look at the overall picture, which I
think you are required to do by the case law, that the manner and method--the acts of
the perpetrator provide a commonality in these cases that runs throughout the cases.
   The trial court also analyzed whether the evidence of each case would be admissible in
trials of the others using Rule 404(b), Tenn. R. Evid., stating that one of the exceptions
to the general rule prohibiting evidence of other crimes is identifying the defendant as
the perpetrator based upon the fact that the acts are part of a common scheme or plan. The
court stated that it then considered, pursuant to Rule 404(b), whether the probative value
of the evidence of the other crimes or wrongs was outweighed by the danger of unfair
prejudice. In its ruling regarding the admissibility of the evidence of the other
offenses, the trial court stated that the "probative value of the evidence outweighs any
unfair prejudice; or to say it another way, the probative value is not outweighed by the
unfair prejudice, and the evidence in these cases is so related that the proof of one
tends to establish the proof of the other."

   The defendant first contends that the state's March 21, 1996 consolidation motion was
untimely, arguing that the motion violated Rule II of the Knox County Criminal Court Local
Rules of Practice, which provides that pretrial motions be filed no later than thirty-one
days after arraignment. The state contends that the motion was filed timely pursuant to
Rule 12(b)(5), Tenn. R.Crim. P., and that the local rule relied upon by the defendant is
applied with flexibility, does not preclude a court from considering motions after the
operative date, and does not provide any remedy for a violation.

   *23 Rule 12(b)(5), Tenn. R.Crim. P., provides that requests for consolidation must be
made "prior to trial," which has been interpreted to mean "sometime earlier than 'the day
of the trial when the jury is waiting in the hall.' " *Spicer*, 12 S.W.3d at 444 n. 6
(quoting *State v. Hamilton*, 628 S.W.2d 742, 744 (Tenn.Crim.App.1981)). In the present
case, the state filed its motion for consolidation almost two months before trial. Thus,
the state correctly argues that it complied with Rule 12(b)(5). However, the defendant
asserts that the state failed to comply with Rule II of the Knox County Criminal Court
Local Rules of Practice, which states in pertinent part,
   Time for Filing Pretrial Motions. All pre-trial motions made pursuant to Rule 12(b) and
   Rule 21 Tenn. R.Crim. P. must be filed and served no later than 31 days after
   arraignment.
   Obviously, the state did not comply with this rule.

   The state argues that the rule is applied flexibly and does not preclude a court from
considering motions after the operative date. It states that nearly all of the defendant's
pretrial motions were filed after the time allowed by the local rule. We note that on one
occasion during pretrial motion hearings, the trial court commented, in response to an
argument by the defendant concerning the local rules, "What you are urging this court to
do at this time is to enforce local rules that are not uniformly enforced in this court or
in any other court. Both sides in this litigation have violated the local rules on a
number of occasions, continue to do so.... I am going to rule on this motion on its
merits." Furthermore, we note that Rule XI of the Knox County Criminal Court Local Rules
of Practice provides that the "Court may modify or abstain, in its discretion, from

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                    Page 20
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

applying any of the foregoing rules when to follow the rules would be unfair or would work
any injustice." Considering the trial court's comments regarding the local rules and the
fact that almost every motion, both from the state and from the defendant, was filed after
the thirty- one day deadline, the trial court must have opted to exercise its discretion
by not applying Rule II. Accordingly, the state's motion to consolidate was not untimely
due to violating the local rule.

The defendant next argues that the trial court erred in consolidating the indictments
because the offenses were not parts of a common scheme or plan. In Tennessee, there are
three categories of common scheme or plan evidence:
    (1) offenses that reveal a distinctive design or are so similar as to constitute
"signature" crimes;
    (2) offenses that are part of a larger, continuing plan or conspiracy; and
    (3) offenses that are all part of the same criminal transaction.
    State v. Moore, 6 S.W.3d 235, 240 & n. 7 (Tenn.1999) (noting that common scheme or plan
evidence for consolidation or severance purposes is the same as common scheme or plan
evidence for evidentiary purposes). At the motion hearing, the parties and the trial court
focused on the first category. On appeal, the state also asserts that the victims'
testimony establishes a larger, continuing plan to terrorize prostitutes.

*24 For the offenses to reveal a distinct design, the "modus operandi employed must be so
unique and distinctive as to be like a signature." Moore, 6 S.W.3d at 240 (quoting State
v. Carter, 714 S.W.2d 241, 243 (Tenn.Crim.App.1986)). Although the offenses do not have to
be identical in every respect, a common scheme or plan is not found merely because there
was evidence that the defendant committed the multiple offenses or because the
similarities of the offenses outweigh the differences. Id. at 240-41. "Rather, the trial
court must find that a distinct design or unique method was used in committing the
offenses." Id. at 241. The method of perpetrating the crimes must employ " 'such unusual
particularities' " that a reasonable person could believe it unlikely that different
people were using this method. Id. at 240 (quoting Harris v. State, 189 Tenn. 635, 644,
227 S.W.2d 3, 11 (1950)).

In this case, the trial court stated, "The question is whether or not the similarities
outweigh the differences and lead to the conclusion that the defendant was the individual
who committed the offenses." As noted above, our supreme court in Moore stated that this
was not the proper test to determine whether multiple offenses reveal a distinct design.
The trial court did not specifically find that a distinct design or unique method was used
in committing the crimes. Thus, we consider whether the evidence establishes the use of a
distinct design or unique method.

First, we do not believe that the trial court's piecemeal approach to considering the
similarities of the offenses was appropriate. See, e.g., Shirley, 6 S.W.3d at 249. In
other words, we do not believe a trial court can use events that happened in some of the
cases to support consolidation of all of the cases. Id. (noting, for example, the fact
that the perpetrator wore a green army jacket in two robberies and a black shirt and grey
sweatshirt in the other two did not support the presence of a distinct design). With this
in mind, we note that the similarities found in all four cases include that the defendant
picked up young, white female prostitutes in the same area; that the defendant treated
them violently, which A.D. and G.T. testified was not common for dates to do; and that the
defendant threatened to kill the victims. Also, D.C. and A.D. testified that the defendant
called them derogatory names. G. T.'s testimony at the consolidation hearing implies that
the defendant called her derogatory names. This implication is confirmed by her trial
testimony. We note that although D.L. said at the hearing that she could not remember if
the defendant used profanity, she testified at trial that the defendant called her
"bitch." Regardless, we do not believe that these similarities establish a distinct design

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                      Page 21
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

or unique method in committing the offenses relative to all four victims.

However, we believe that additional similarities in D. L.'s, A. D .'s, and G. T.'s cases establish that the crimes relative to these victims were committed with a distinct design or unique method. First, these crimes occurred in February, September, and October 1992, shrinking the time period in which the crimes were committed. Moreover, and more importantly, although all four victims were hired for sex and voluntarily got into the defendant's car, D. L., A. D., and G.T. had pleasant drives with the defendant, who drove them to the same, remote location, the dead end area of Cahaba Lane, where he then attacked them. We believe that this method--"hiring" young, female prostitutes from the same area and driving them, under the pretense that they would perform sex for money, to a specific, remote area, where the defendant could then attack them without the risk of detection--is sufficiently unique to establish a common scheme or plan.

*25 We note that another panel of this court has determined that similarities in the victims, the location, the timing, and the means by which the perpetrator committed the crimes established a distinct design. *State v. Marcus Fitzgerald*, No. W2000-02669-CCA-R3-CD, Shelby County, slip op. at 5 (Tenn.Crim.App. Jan. 15, 2002). In *Fitzgerald*, both victims were African- American females who lived in the same neighborhood and knew the defendant as "Bubba." The offenses, aggravated rapes, occurred in different abandoned houses on the same street and within twenty-four hours of each other. The perpetrator, who was undisguised, had brief conversations with the victims before each offense. He then grabbed the victims by the neck from behind and dragged them into the vacant houses. Although only one victim saw the defendant with a knife, he threatened both victims with a knife and both were released after the offense. In the present case with respect to D. L., A. D., and G. T., the defendant chose similar victims from the same area and took them to the same, remote location. Although the offenses occurred over seven months, the undisguised defendant "hired" each victim to provide sex for money and had pleasant drives with each to Cahaba Lane. Once there, the defendant hit or choked the victims or pulled their hair, threatened to kill them, and called them derogatory names. As in *Fitzgerald*, the crimes against D. L., A. D., and G.T. reveal a distinctive design.

In contrast, when D.C. got into the defendant's car, the defendant pulled out a gun and then drove erratically, not stopping for red lights, to a barn at the zoo. Although the defendant threatened the other victims with the use a weapon, he did not display a weapon to any of the other victims and did not threaten them until he had reached this isolated destination. Thus, the offenses against D.C. were accomplished differently than the offenses in the other cases. Accordingly, we conclude that the trial court abused its discretion in consolidating D. C.'s case with the other three cases under the distinct design category of common scheme or plan evidence.

The state contends on appeal that the offenses fall within the second category of common scheme or plan--the larger, continuing plan or conspiracy category-- and argues that the defendant's threats to kill all prostitutes combined with the abusive nature of the offenses reveal a larger, continuing plan to terrorize prostitutes. With respect to this contention, we note that the defendant told D.L. that he hated all prostitutes and that he was going to kill her. He told D.C. that he was going "to kill all you pretty whores" and "all you bitches." D.C. and D.L. testified that the defendant tied their wrists together with rope, which was not common for dates to do. All four victims testified that the defendant treated them violently, threatened to kill them, and called them derogatory names. The state argues that the defendant used violence in perpetrating the offenses in order to frighten the victims, who were willing to have sex with him without force. It maintains that the defendant committed all of the offenses in order to promote his goal of terrorizing prostitutes.

*26 "The larger, continuing plan category encompasses groups or sequences of crimes

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                 Page 22
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

committed in order to achieve a common ultimate goal or purpose." *State v. Hallock*, 875
S.W.2d 285, 290 (Tenn.Crim.App.1993); Neil P. Cohen et al., *Tennessee Law of Evidence* §
404[12][c], at 4-93 (4th ed. 2000) ("The unifying concept of crimes admitted under this
theory is not their high degree of similarity but the common goal or purpose toward which
each crime is directed."). This theory was not argued at the hearing, and the defendant's
reply brief addresses the state's argument by merely stating that it was rejected in *State
v. Rickman*, 876 S.W.2d 824 (Tenn.1994). We disagree with the defendant's interpretation of
*Rickman*, in which our supreme court held that there was no sex crimes exception to the
general rule that evidence of other crimes is not admissible in criminal prosecutions. *Id.*
at 829. *Rickman* does not involve, or mention, common scheme or plan evidence. Thus,
*Rickman* did not reject the state's argument that the defendant's larger, continuing plan
to terrorize prostitutes established a common scheme or plan.

On the other hand, case law reveals that the larger, continuing plan category is
difficult to separate from the distinct design category, especially in the area of sex
crimes. This court has rejected the contention that sex crimes against different victims
in the same household can be consolidated based upon a common goal of achieving sexual
gratification. *Hallock*, 875 S.W.2d at 290. *Hallock* provides the following example to
illustrate the fallacy in classifying such crimes as a larger, continuing plan: "X is on
trial for three counts of burglary, each involving a different building, a different form
of entry, and a different day. His overall purpose, however, was to acquire money for
college. Clearly, without more, X is entitled to severance under Rule 14(b)(1)." *Id.* at
290; *see also State v. Adams*, 859 S.W.2d 359, 362 (Tenn.Crim.App.1992) (holding that a
shared motivation is insufficient to prove a common scheme or plan even when the offenses
share some similarities). Despite defining the larger, continuing plan category as
focusing on the perpetrator's purpose in committing the crimes, this example in *Hallock*
reveals that, at least when evidence of the other crime is being offered to prove
identity, a distinctive design is required. The fact that a defendant has a common goal in
committing crimes does not mean that proof of the individual, disparate crimes will reveal
his identity. This conclusion is supported by the holding in *State v. Ronald Prentice*,
cited by the defendant as supplemental authority, in which this court concluded that a
common motive to terrorize the victim, the defendant's estranged wife, was insufficient to
show a common scheme or plan when the assaults were otherwise unrelated in time, location,
and character. No. M2000-02937-CCA-R3, Davidson County, slip op. at 4 (Tenn.Crim.App. Dec.
28, 2001).

*27 Our review of Tennessee cases in which the larger, continuing plan was the category
of common scheme or plan also supports our conclusion that only the signature crimes
category can be used when the basis for 404(b) admissibility is identity. In the wake of
*Hallock* and *Adams*, the larger, continuing plan category has typically been applied to
cases involving crime sprees, when the defendant commits several crimes close in time to
each other. *See, e.g., State v. Hall*, 976 S.W.2d 121. 146 (Tenn.1998) (appendix) (holding
the burglaries, larcenies, and murders committed by the defendants during the week
following their escape from a Kentucky prison were part of a larger plan to flee the
country and the Kentucky authorities); *State v. Joe N. Anderson, Jr.*, No.
E1998-00378-CCA-R3-CD, Hamilton County (Tenn.Crim.App. Dec. 9, 1999), app. *denied* (Tenn.
Sept. 11, 2000) (concluding that the perpetrators had a larger goal to rob and murder
after they attempted to rob and then shot the first victim at his home then killed a
sleeping truck driver in the early morning of the same day). In those cases that mention
identity as one of the bases for 404(b) admissibility, it is not proof of the other crime
itself which provides evidence of identity but evidence found at the other crime scene
that tends to connect the defendant to other crimes in the scheme. *See, e.g. Hall*, 976
S.W.2d at 146 (appendix) (discussing that evidence found at some of the crime scenes
linked the defendants to other crimes in the spree); *Joe N. Anderson, Jr.*, slip op. at 8
n. 3 (noting that the evidence of the other crime was relevant to identity because proof

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                Page 23
**(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))**

that the defendant fired the gun at the victim in the first crime tended to establish that
he was the shooter in the second crime). Additionally, our supreme court has observed that
identity is the most frequent basis for using evidence of a distinctive design. *Moore*, 6
S.W.3d at 239; *Shirley*, 6 S.W.3d at 248.

 Based upon *Hallock* and its progeny along with our supreme court's current trend to
disfavor the consolidation of cases, we do not believe that a generalized goal to
terrorize prostitutes occurring over a fourteen-month period provides a sufficient basis
to consolidate D. C.'s case with the others. As discussed above, the similarities in D.
C.'s case do not amount to a signature crime. We do not believe that a generalized goal to
terrorize prostitutes can establish the identity of the defendant as the perpetrator in D.
C.'s case, especially given the differences in location and abduction in her case. Thus,
the trial court erroneously found D. C .'s case to be part of a common scheme or plan.

 We next address whether evidence of each offense would have been admissible in the trials
of the others if they had not been joined. We first consider the admissibility of the
other crimes evidence as it relates to D. L., A. D., and G.T. The primary issue in a
severance case under Rule 14(b)(1), Tenn. R.Crim. P., is "whether evidence of one offense
would be admissible in the trial of the other if the two offenses remained severed."
*Spicer*, 12 S.W.3d at 445 (noting that in its most basic sense, whether offenses should be
tried separately is "really a question of evidentiary relevance"); *Moore*, 6 S.W.3d at 239.
The evidentiary rule at issue is Rule 404(b), Tenn. R. Evid., which excludes evidence of
other crimes, wrongs, or acts committed by the defendant when offered only to show
propensity to commit those crimes, wrongs, or acts. However, Rule 404(b) does not bar such
evidence when offered at trial to prove another relevant issue such as to show motive of
the defendant, intent of the defendant, identity of the defendant, absence of mistake or
accident if that is a defense, or "a common scheme or plan for commission of two or more
crimes so related to each other that proof of one tends to establish the other." *Collard
v. State*, 526 S.W.2d 112, 114 (Tenn.1975). However, our supreme court has noted that
admission of common scheme or plan evidence has expanded by circular argument in that the
evidence is often considered relevant and admitted "merely because it is evidence of a
common scheme or plan," and it has concluded that admission of common scheme or plan
evidence is proper only when introduced to show motive, identity, intent, absence of a
mistake or accident if that is a defense, or some other relevant issue. *Moore*, 6 S.W.3d at
239 n. 5.

 **\*28** The state contends that evidence of each offense would have been admissible in the
trials of the others because the evidence established identity, intent, and motive. We
agree that the other crimes evidence would have been admissible to establish identity
because of the unique method in which the defendant committed the crimes against D. L., A.
D., and G.T. The defendant asserts that the other crimes evidence would not have been
admissible in the trials of the other cases because each victim identified the defendant
as the perpetrator. *See Moore*, 6 S.W.3d at 239 (holding that consolidation was improper
because the evidence of the other crimes was not relevant to any issue at trial, noting
that identity of the perpetrator was not an issue). In this case, however, identity was an
issue. Simply because the state had other evidence--victim identification--to indicate
that the defendant was the perpetrator does not mean that identity was not a material
issue.

 At trial, the defendant, as could be anticipated from his cross-examination of the
victims at the consolidation hearing, vigorously cross-examined the victims, impeaching
their testimony and arguing to the jury that they could not be believed. Moreover, the
defendant argued relative to each victim that he was not the perpetrator of the offenses.
Indeed, the defendant requested that the jury be instructed regarding identification. The
instruction submitted by the defendant, which the trial court used, began, "One of the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          Page 24
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

issues in this case is the identification of the defendant as the person who committed the
crime." Accordingly, we conclude that the other crimes evidence was relevant to establish
identity relative to offenses committed against D. L., A. D., and G.T. However, because of
the factual differences in D. C.'s case, we cannot conclude that the evidence of the
offenses against her were admissible in the trials of the others to establish identity or
for any other reason. Likewise, the evidence of the offenses against the other three
victims would have been inadmissible in a separate trial of the offenses against D. C.

The defendant next argues that the trial court erred in finding that the probative value
of the other crimes evidence outweighed the danger of unfair prejudice. Factors to
consider in determining the evidence's probative value include "the prosecution's need for
the evidence, the likelihood the defendant committed the other crimes, and the degree of
its relevance. The similarity of the acts makes the probative value particularly
significant." State v. Edwards, 868 S.W.2d 682, 691 (Tenn.Crim.App.1993). In this case,
the evidence was important to establish identity. Little or no physical evidence of the
offenses existed, and the victims' identifications were subject to attack, as demonstrated
by the defendant's cross-examination of the victims at the hearing. Also, the evidence
presented at the hearing indicated that it was likely that the defendant committed the
offenses. Finally, the similarity of the offenses adds to the probative value. We hold
that the probative value of admitting the evidence of the other offenses was significant.

*29 We note that the other crimes evidence, though probative, is certainly prejudicial.
However, the test requires balancing probative value with the danger of unfair prejudice.
See State v. DuBose, 953 S.W.2d 649, 654-55 (Tenn.1997). "Because the test of Rule 404(b)
is one of balance, when evidence of prior acts is highly probative of a material issue at
trial, the chance of unfair prejudice to the defendant is correspondingly diminished."
State v. Mallard, 40 S.W.3d 473, 488 (Tenn.2001). In this respect, we believe that the
other crimes evidence in this case was highly probative of identity, and we cannot say
that the danger of unfair prejudice outweighed its value. Accordingly, we do not believe
that the trial court abused its discretion in admitting such evidence. In summary, we
conclude that the state's motion was timely, the offenses relative to D. L., A. D., and
G.T. were parts of a common scheme or plan, and the evidence of each of these offenses
would have been admissible in the trials of the others. We hold that the defendant's
offenses relative to D. L., A. D., and G.T. were properly consolidated.

We must now determine whether the error in consolidating D. C.'s case more probably than
not affected the judgments. See T.R.A.P. 36(b). Whether to grant a severance under Rule
14(b)(1), Tenn. R.Crim. P., is primarily an evidentiary question, and thus, "the effect of
a denial of that right is weighed by the same standard as other non-constitutional
evidentiary errors: the defendant must show that the error probably affected the judgment
before reversal is appropriate." Moore, 6 S.W.3d at 242. Our supreme court has stated that
in most severance cases, " 'the line between harmless and prejudicial error is in direct
proportion to the degree ... by which proof exceeds the standard required to convict.' "
Spicer, 12 S.W.3d at 447-48 (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn.1979)).

In this case, the evidence supporting the convictions consisted almost exclusively of the
testimony of the victims. While this evidence was sufficient to support the convictions,
it did not provide overwhelming proof of the defendant's guilt. See Spicer 12 S.W.3d at
448. With respect to the perceived propensity to commit similar crimes, we recognize that
although a different method was used in committing the offenses against D. C., the fact
that the defendant was accused of committing the same types of crimes against all of the
victims created the strong potential for the jury to consider the other crimes evidence
improperly as propensity evidence. The unfair prejudice resulting from the jury learning
of the crimes against the other victims outweighs any probative value that could be
derived from the evidence in the other cases. Thus, the consolidation of D. C.'s case with

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 25
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

those of the other victims probably affected the judgments in D. C.'s case.

  On the other hand, with regard to the offenses against the other three victims, we do not
believe that the defendant was harmed by the evidence relating to D. C.'s case.
Importantly, the jury properly heard evidence relating to three victims, and thus, we
believe it unlikely that the evidence relating to a fourth victim would sway the jury
based upon the defendant's propensity to commit the crimes. The defendant was not harmed
by the erroneous consolidation of D. C.'s case with the other three cases.

                       ISSUES RELATING TO BOTH CASES
II. SPEEDY TRIAL

  *30 The defendant contends that he was denied speedy trials in all of his cases,
including both the first and the consolidated rape cases. We note that much of defendant's
argument concerns the denial of his right to a speedy trial in the homicide cases, which
are not before this court in this appeal. We address below whether the defendant was
denied his right to a speedy trial in both rape cases.

  Pursuant to the Sixth Amendment of the United States Constitution and to article 1,
section 9 of the Tennessee Constitution, a criminal defendant has the right to a speedy
trial. See also Tenn.Code Ann. § 40-14-101; Tenn. R.Crim. P. 48(b). The right is meant to
protect the defendant "against oppressive pre-trial incarceration, the anxiety and concern
due to unresolved criminal charges, and the risk that evidence will be lost or memories
diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn.1997). In Barker v. Wingo, 407 U.S.
514, 530, 92 S.Ct. 2182, 2192 (1972), the Supreme Court devised a balancing test to
determine speedy trial issues and identified the following factors for consideration: (1)
the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of
his right to a speedy trial, and (4) the prejudice to the defendant. None of the four
factors are "either a necessary or sufficient condition to the finding of a deprivation of
the right of speedy trial." Id. at 533, 92 S.Ct. at 2193. Rather, the factors must be
"considered together with such other circumstances as may be relevant." Id. In State v.
Bishop, 493 S.W.2d 81 (Tenn.1973), our supreme court implicitly adopted the Barker
balancing test for our state constitutional and statutory rights to a speedy trial. The
remedy for the denial of a speedy trial is dismissal of the charges. Strunk v. United
States, 412 U.S. 434, 439, 93 S.Ct. 2260, 2269 (1973).

  On April 29, 1996, well after the first rape trial and three weeks before the
consolidated rape trial, the defendant moved to dismiss the charges against him for the
denial of a speedy trial. Although the motion only stated that the defendant was seeking
dismissal of the homicide cases, the defendant argued that demanding a speedy trial in the
homicide cases necessarily meant that he was demanding one in the rape cases. On May 9,
1996, the trial court considered this argument and stated that the defendant's motion to
dismiss would apply to all of his cases. On December 12, 1998, the trial court denied the
defendant's motion to dismiss. We note, however, that the court's order, on its face,
relates to the homicide cases. Regardless, the defendant's failure to secure a ruling on
his motion to dismiss as it relates to the rape cases does not waive the issue on appeal.
Indeed, even the failure to demand a speedy trial does not constitute a waiver of the
issue. See Barker, 407 U.S. at 528, 92 S.Ct. at 2191; Bishop, 493 S.W.2d at 84. Thus, we
consider whether the defendant was denied a speedy trial.

  *31 The defendant argues that the length of delay between charges being filed and his
trials was unreasonable, that the state caused the delay, that he timely demanded a speedy
trial, and that he was prejudiced as a result of the delay. The state argues that the
defendant specifically stated that his demand for a speedy trial related only to his
pending homicide cases and that, regardless, the defendant was the cause of the delay and
was not prejudiced.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

Page 26

The first factor, the length of the delay, is a threshold factor, serving as the triggering mechanism that will necessitate consideration of the other three factors. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192. If the length of the delay is not presumptively prejudicial, then the other factors need not be considered. *Id.* Although what constitutes an ordinary length of delay depends on the complexity of the case, delays of one year or longer are usually enough to trigger the *Barker* inquiry. *See Doggett v. United States*, 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 2691 n. 1 (1992); *see also State v. Turnbill*, 640 S.W.2d 40, 42 (Tenn.Crim.App.1982) (concluding that a thirteen- month delay was presumptively prejudicial so as to apply the balancing test). In this case, the first rape trial occurred in October 1995, three years after the defendant was charged, and the consolidated rape trial occurred in May 1996, three years and seven months after he was charged. Although these cases were complex, the lengths of these delays trigger consideration of the other *Barker* factors.

In *State v. Wood*, 924 S.W.2d 342, 346-47 (Tenn.1996), our supreme court stated that the second *Barker* factor, the reason for the delay, generally falls into one of four categories:
  (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. The first type, intentional delay, is weighed heavily against the State. The second type, negligent delay, is also weighed against the State although not as heavily as deliberate delay. The third type of delay is, by definition, justifiable and is not weighed against either party. The fourth type of delay, which is caused or acquiesced in by the defendant, is weighed against the defendant.
  Not surprisingly, the defendant and the state differ greatly in their views regarding the reasons for the delay--the defendant asserting that the state was to blame for the delay and the state asserting that the delay was caused entirely by the defendant.

Our review of the record reveals that the reasons for the delays fall into categories (3) and (4). Most of the delay can be attributed to the complexity of the defendant's cases, which required extensive discovery and resulted in a prolific motion practice, largely by the defendant. We note that the trial court granted the defendant numerous extensions of time to file motions. Likewise, the court granted the state extensions of time to respond to the defendant's motions, to which the defendant did not object. We also note that the first rape trial was continued twice at the defendant's request. We conclude that much of the delay associated with both rape trials was necessary to the fair and effective prosecution of the cases. This delay is justifiable and weighed against either party.

*32 The state argues that the defendant caused the delays by requesting continuances and extensions of time and by his prolific motion practice. Given the number of charges and the complexity of the cases, we do not believe that the defendant's actions were unreasonable. However, the defendant's demand for a speedy trial, or lack thereof, indicates that the defendant acquiesced in the delay. The defendant did not demand a speedy trial until January 1995, and at that time he requested a speedy trial in the homicide cases. Importantly, he specifically stated at that time and even as late as January 16, 1996, that he was not requesting a speedy trial in the rape cases. Indeed, the defendant's argument was based upon his wanting the homicide cases tried before the rape cases to avoid any resulting conviction in the rape cases being used as an aggravating factor in sentencing for the homicide cases. On April 29, 1996, the defendant moved to dismiss all of the charges against him for the denial of a speedy trial. At this time, he argued, and the court accepted, that his motion applied to the rape cases as well as the homicide cases. In summary, the defendant specifically stated that he was not demanding a speedy trial in the rape cases, and he did not change this position until after the first rape trial and only weeks before the consolidated rape trial. We conclude that the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                     Page 27
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

defendant acquiesced in the delay, which weighs against the defendant.

Furthermore, we note that the record does not reveal that the state acted intentionally to gain a tactical advantage or to harass the defendant. While the extended time that it took for the state to respond to the defendant's motions could be, in some cases, characterized as neglect or bureaucratic indifference, we believe that in these cases, in light of the number and content of the defendant's motions, the amount of time taken to respond was not unreasonable. Thus, regarding the second *Barker* factor, we conclude that most of the delay was necessary to the fair adjudication of the cases. Additionally, we conclude that the defendant acquiesced in the delay. Accordingly, this factor weighs against the defendant.

The third *Barker* factor is the defendant's assertion of his right to a speedy trial. While failure to demand a speedy trial does not result in a waiver of the right, "evidence that the defendant did not want a speedy trial would never warrant the finding of a constitutional violation except in 'extraordinary circumstances.' " *State v. Baker*, 614 S.W.2d 352, 355 (Tenn.1981); *see also Barker*, 407 U.S. at 532, 92 S.Ct. at 2193 ("We emphasize that failure to assert the [speedy trial] right will make it difficult for a defendant to prove that he was denied a speedy trial."). In this case, the defendant first orally demanded a speedy trial on January 12, 1995, about nine months before the first rape trial. However, that request was specifically for the homicide charges against the defendant. In fact, defense counsel stated that "we are not requesting a speedy trial in the other cases." The defendant's written demand for a speedy trial, filed February 13, 1995, also referred only to the homicide cases. The defendant restated this position on January 16, 1996. On that date, the parties were discussing the setting of trial dates, and when the state asked the defendant whether he was waiving his right to a speedy trial, the following exchange occurred:
   *33 THE COURT: Do you waive speedy trial, gentlemen?
   . . . .
   [DEFENSE COUNSEL]: On the February case, yeah. It doesn't make any difference. We still have the same trial schedule.
   [DISTRICT ATTORNEY]: Now--but, now, they've got a speedy trial motion down, you see.
   [DEFENSE COUNSEL]: On the death case only. The only case we have a motion for a speedy trial is on the death case.
The defendant's first demand for a speedy trial relative to both rape cases occurred April 29, 1996, well after the first rape trial and about three weeks before the consolidated rape trial. On this date, the defendant filed a motion to dismiss for the denial of a speedy trial in all of his cases. In that motion, he argued that because the state had elected to try the rape cases before the homicide cases, his demand for a speedy trial in the homicide cases was also a demand for a speedy trial in the rape cases. We note that this argument was contrary to his January 12, 1995 oral demand and his February 13, 1995 written demand. In light of the timing of and circumstances surrounding the defendant's assertion of his right to a speedy trial, we conclude that this factor weighs against the defendant.

The fourth factor, whether the defendant has been prejudiced by the delay, is the most important factor. *See Baker*, 614 S.W.2d at 355-56. Prejudice "should be assessed in the light of the interests ... the speedy trial right was designed to protect," which are (1) to prevent oppressive pretrial confinement, (2) to minimize the defendant's anxiety and concern that accompanies prosecution, and (3) to limit the possibility of the defense being impaired--the last being considered the most serious interest because of its potential to skew the fairness of the entire system. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193.

The defendant does not fully explain how he was prejudiced by the delay in his brief,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                                    Page 28
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

stating that the "prejudice is so enormous it cannot be adequately summarized."
Nonetheless, his brief contains numerous complaints regarding prejudice, and he also
incorporates by reference lists from his speedy trial motion and amendments to that
motion. In all, the defendant lists eighty-seven items of prejudice. We note that many of
these items relate to alleged prejudice resulting from delays that occurred after one or
both of the rape trials. With respect to this appeal, the defendant's complaints regarding
prejudice include the following:

(1) He was denied full and fair consideration of his pretrial motions in the
consolidated rape case. Motion hearings were pushed back to the eve of trial, and then
after the trial court granted consolidation a few weeks before the trial, the trial
court and state rushed to trial (i.e., insisted on keeping the set trial date),
preventing full and fair hearings on numerous of his motions.

(2) He suffered from health problems resulting from living in an unsuitable jail cell
and being subjected to an unhealthy diet.

*34 (3) Prosecutors changed and as a result, procedures changed during the course of the
proceedings.

(4) Lifestyles of witnesses changed to the detriment of the defense and to the benefit
of the state.

(5) The proceedings were affected because parties became involved in political
campaigns.

(6) The law regarding peremptory challenges changed to the defendant's detriment.

(7) There were changes to the defendant's detriment in the judicial philosophy and
public opinion regarding crime.

(8) His insanity defense was stricken in the rape cases because he did not receive the
report from the state's expert on insanity until December 22, 1998.

(9) Witnesses could not be found or could not remember important information.

(10) Scientific evidence that was available earlier was no longer available.

(11) 911 tape recordings were destroyed.

(12) The defendant could not reconstruct his whereabouts to present an alibi offense
because he did not receive the bill of particulars until March 1996.

(13) The Knox County Sheriff's office misplaced materials.

(14) The trial court's and counsel's memory of rulings were inconsistent and unreliable.

(15) Defense counsel was frustrated, discredited, and ridiculed for insisting that the
defendant's motions be heard.

(16) Exculpatory, favorable, and impeaching evidence was withheld.

These assertions do not prove that the defendant was prejudiced. While some of the
assertions, if taken as true, would be prejudicial, the assertions are broad and
conclusory. They do not describe which witnesses, what evidence, what materials, etcetera
form the bases of the complaints. Furthermore, it is not clear how some assertions, even
if true, prejudiced the defendant. For example, the defendant does not specify how
political campaigns or changes in defense funding prejudiced him. In any event, after
reviewing the record and considering the defendant's assertions as they relate to the
interests the speedy trial right is designed to protect, we conclude that the defendant
suffered minimal prejudice as a result of the delay in his trials.

In this case, the defendant was incarcerated while awaiting trial. However, the defendant
had a multitude of serious charges pending against him, including charges for four
homicides. Because of these charges, the defendant would have been incarcerated at least
for some of the time period in question, reducing the prejudice resulting from his
incarceration. See United States v. Grimmond, 137 F.3d 823, 830 (4th Cir.1998). Also,
while we may assume that the defendant experienced anxiety and had concerns regarding the
rape cases while awaiting trial, his actions demonstrate that his main concern was the
pending homicide cases, in which the state had provided notice that it would be seeking
the death penalty. See id. In light of these circumstances and the fact that the defendant
did not take steps to expedite his rape trials, we conclude that the prejudice resulting

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 29
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

from the defendant's incarceration and from his anxiety and concern relating to the rape charges is minimal.

*35 The final interest of the defendant that we consider regarding prejudice is whether his defense was impaired by the delay. While the defendant has offered many broad, conclusory allegations of prejudice, he has not shown particularized prejudice. We note that courts have recognized that particularized proof regarding prejudice to one's defense is difficult to prove. See Wood, 924 S.W.2d at 348 (stating that it "is often extremely difficult ... for a defendant to demonstrate specifically how the delay has impaired his ability to defend himself"). Accordingly, "affirmative proof of particularized prejudice is not essential to every speedy trial claim." Doggett, 505 U.S. at 655, 112 S.Ct. at 2692. Moreover, "the presumption that pretrial delay has prejudiced the accused intensifies over time." Id. In this case, we presume that the delay impaired the defendant's ability to present a defense. However, this presumption of prejudice is weakened by the defendant's acquiescence in the delay. See Wood, 924 S.W.2d at 349. In summary, although the defendant was prejudiced by the delay, the prejudice was minimal in light of the defendant's other pending charges and the fact that he acquiesced in the delay.

Summarizing the Barker factors, we conclude that the defendant suffered minimal prejudice. However, most of the delay was necessary to the fair and effective prosecution of the cases. Moreover, the defendant acquiesced in the delay, and he specifically stated that he was not demanding a speedy trial in the rape cases, a position he did not change until after the first rape trial and just before the consolidated rape trial. Upon balancing the factors, we conclude that the defendant was not denied a speedy trial in either the first rape case or in the consolidated rape case.

III. UNLAWFUL ARREST, SEARCH, AND SEIZURE

The defendant contends that the trial court erred in refusing to suppress evidence seized from his bedroom and his statements, which were gained as a result of his unlawful arrest. The defendant's contentions with regard to his arrest fall into four general categories: he argues that (1) his thirty-day jail sentence for solicitation of prostitution was illegal, (2) the capias upon which he was arrested is invalid, (3) theKnox County detectives lacked jurisdiction to arrest him in Sevier County upon a capias addressed to the Knoxville Chief of Police, and (4) the officers lacked probable cause to arrest him in the absence of the capias. He also contends that the trial court should have suppressed evidence gained in the search of his residence almost three hours after his arrest because the search warrant was invalid and no exception to the warrant requirement applied.

The state contends that the defendant has waived the claims relating to the validity of his arrest, including that of an invalid capias, by pleading guilty to the charge of soliciting prostitution and failing to appeal or collaterally attack that conviction. It also argues summarily that the capias was valid and that the defendant was arrested by a Sevier County deputy. It asserts that the defendant has failed to show that a procedural defect in his arrest requires the suppression of his statements. Finally, it contends that even if the arrest had been unlawful, neither the evidence gathered at the defendant's home nor his statements were introduced in the rape cases and that, therefore, he can prove no prejudice resulting from the arrest. With regard to the search of the defendant's residence, the state argues that the trial court properly admitted the evidence because it was discovered in a search incident to arrest and was in the officers' plain view.

*36 We conclude that the issues of the defendant's arrest and search are moot with regard to the cases that we are affirming because none of the evidence gained from the arrest or search was improperly used in either rape trial. In the event of a retrial of D. C.'s case, we hold that the capias upon which the officers based the arrest was void. We affirm

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 30
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

the trial court's ruling that the search warrant was invalid due to its failure to list
the executing officer.

We begin by reviewing the facts surrounding the defendant's arrest and the search of his
home on October 21, 1992. At a February 7, 1996 suppression hearing, Knox County Sheriff's
Detective Michael Upchurch testified that he was in charge of investigating the homicides,
which occurred near Cahaba Lane in Knoxville in October 1992. His investigation caused him
to focus on the defendant as a suspect, and he checked for outstanding warrants against
the defendant. He found an outstanding capias for failure to appear in Knoxville Municipal
Court on a charge of solicitation of prostitution. Knowing that the defendant had been
employed at Teagues Statuary in Sevier County, Detective Upchurch asked the Sevier County
Sheriff's Department to have an officer meet him and Detectives Darrell Johnson, Dan
Stewart, Mike Freeman, and Mike Grissom to arrest the defendant on the capias and for
questioning about the homicides. They first went to the statuary and then proceeded to the
defendant's parents' mobile home, where Detective Upchurch saw a truck matching a
description given in conjunction with his investigation parked in the driveway.

Detective Upchurch testified that at 9:30 p.m., he and Officer Jerry Huskey of the Sevier
County Sheriff's Department went to the front door of the mobile home and that the other
officers went to the back door. Officer Huskey was in uniform and had parked his cruiser
in front of the mobile home. The defendant's mother answered the door, and he and Officer
Huskey identified themselves. Detective Upchurch told her that he wanted to see the
defendant, that a court had issued a capias for the defendant for failure to appear in
court, and that they were taking the defendant into custody at that time. Mrs. Huskey told
him that her husband and the defendant were in their beds and that she would get the
defendant. She invited them inside. The defendant came into the living room and asked what
they wanted. Detective Upchurch told him why they were there and that they wanted to talk
to him. The defendant said, "Fine. I need to get my shoes." Detective Upchurch told the
defendant that he could get his shoes but that they would have to accompany him to his
bedroom because he was in custody. The defendant agreed to this and walked ahead of them
down the hallway.

Detective Upchurch testified that while he and Detective Stewart were standing just
inside the doorway of the defendant's bedroom, he saw an orange hay-baling rope on the
defendant's floor. He recognized it as the type of rope used to bind the rape victims. As
the defendant sat on his bed putting on his shoes, Detective Upchurch illuminated a
dresser with his flashlight and saw a pair of women's earrings and a necklace on the top.
The day before, one of the homicide victims' boyfriends had told him that the victim had
earrings in her purse. He did not confront the defendant with the rope and jewelry at this
point. The defendant refused to sign a consent to search form and was then transported to
the Sevier County Jail.

*37 Detective Upchurch testified that Detective Stewart remained at the defendant's
bedroom door to make sure that nothing was moved. The other detectives waited in their
unmarked cars. Although the defendant's father had given his consent to search the whole
residence, the Assistant District Attorney advised him by telephone that he should get a
search warrant for the defendant's bedroom. The Sevier County Sheriff's Office provided
him with a search warrant form. He consulted with the Assistant District Attorney again
and drafted the affidavit and warrant. He acknowledged that he was not familiar with Rule
41, Tenn. R.Crim. P., but that he had undergone training relating to search warrants and
was familiar with probable cause. Nevertheless, at the time of the hearing, he had written
only a few search warrants. He admitted that the search warrant affidavit did not mention
the jewelry that he had seen in the defendant's room. He said that he noted the jewelry on
the list of items for which he was searching because he had seen it in the room and knew
it was there.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          Page 31
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

Detective Upchurch testified that he told Officer Huskey that he needed to go to a judge or magistrate to get a search warrant signed, and Officer Huskey agreed to take him. He was taken to Bruce Baker, who was introduced as a Sevier County magistrate. He handed the warrant to Mr. Baker and asked if he needed to do anything else before Mr. Baker signed it. Mr. Baker signed the warrant, and Detective Upchurch made three copies. He gave one of the copies to Mr. Baker, and the other two copies were for the defendant and his father. Once he obtained the signed search warrant, he returned to the defendant's parents' home and conducted the search. When Detective Stewart picked up the earrings to bag them, Detective Upchurch saw a blonde hair entwined with the necklace and the earrings. In addition to the items found in the defendant's bedroom, he found a knife on the bathroom sink. He said that the defendant's parents never objected to the search of their mobile home, and the defendant never objected to the officers entering his bedroom at the time of his arrest.

Detective Upchurch testified that the defendant arrived at the Knox County Jail at 4:00 a.m. on October 22. Detective Upchurch was not at municipal court when the defendant appeared and did not speak to anyone associated with that charge. He did not consider the defendant to be under arrest for the death of Patricia Rose Anderson until the Knox County Grand Jury returned an indictment for that charge.

Jerry Huskey testified that on October 21, 1992, he was a patrolman with the Sevier County Sheriff's Department, when Knox County officers asked him to help them in investigating the defendant. He confirmed the truth of his affidavit, which stated that the officers showed him a folded capias and told him that it was for the defendant, but said that he did not read it. He took them to the statuary and then to the Huskey residence. He thought that the defendant's father invited them inside. The defendant was not wearing shoes when he first saw the defendant. He heard the detectives ask the defendant's father if they could search the mobile home. The defendant's father agreed to let them search but told them that they would have to ask the defendant about his room. The detectives asked the defendant if they could search his room. The defendant said they could not search his room, and they got a search warrant. He did not see the detectives violate the defendant's rights, and he believed that they acted in a professional manner. He acknowledged that his report states that he transported the defendant to the Knox County line where the defendant was charged with homicide.

*38 Knox County Sheriff's Detective Daniel Stewart testified that on October 21, 1992, he went to the defendant's house with Detective Upchurch. When the defendant walked into his parents' living room, Detective Upchurch announced that the defendant would be taken into custody for failure to appear in court. Detective Stewart considered the defendant to be in custody at that point. He said he accompanied the defendant to his bedroom for shoes or a shirt. He was standing either in the doorway or just inside the room, and Detective Upchurch stood beside him. He noticed a piece of orange baling twine on the floor by the bed. Detective Stewart said that a rhinestone necklace with a hair entangled in it and a pair of costume pearl earrings were found on a piece of furniture immediately on the left through the doorway, but he did not remember if he saw the jewelry when the defendant was getting his shoes or when they executed the search warrant. The top of the piece of furniture was cluttered, and the jewelry was either on top of or near the edge of some newspapers. When the defendant was taken to jail, Detective Stewart remained at the mobile home to ensure that the defendant's bedroom was not disturbed. He did not search the room while the other officers were away. During that time, the defendant's mother entered the room to turn off a light or radio, and as she left, the rope caught on her foot and was dragged a few inches.

Jessie Huskey, the defendant's mother, testified that she was awakened by knocking after 9:00 p.m. on October 21, 1992. When she opened the door, men wearing police uniforms asked

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 32
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

if her husband was there. She said that he was there and called for him. One of the men
asked if the defendant was there. She said yes and knocked on the wall adjacent to the
defendant's bedroom. She did not ask the officers to come inside. The officers stood in
the door until her husband arose. When the defendant entered the living room in his pajama
bottoms, the officers walked over to him. At that point, she went to her bedroom to get a
housecoat, and when she returned, the officers and the defendant were gone. She never
heard the officers ask her husband for permission to search their home or say that they
were there to arrest the defendant because he failed to appear for court. The defendant
had previously told her that he went to court.

Mrs. Huskey testified that she was frightened and nervous because the officers had taken
the defendant. One officer remained standing at the defendant's bedroom door. She denied
offering a stool to the officer, who stood the entire time. The officer watched her go
into the defendant's bedroom and asked what she was going to do. She told him that she was
going to turn the radio off, which she did and then left the room. She noted that a chest
of drawers was built into the wall in the defendant's bedroom and that one could not see
the chest unless he or she stepped into the room. The officers returned and searched the
trailer, but she did not hear her husband give them permission to search. She did not know
what was in the defendant's room because she never went in his room except to leave his
clean laundry on the bed.

*39 Bruce Dale Baker testified that on October 21, 1992, he was a Sevier County Judicial
Commissioner and issued his first search warrant, which authorized a search of the
defendant's residence. Detective Michael Upchurch told him that Detective Upchurch had
arrested the defendant on a capias, which Commissioner Baker believed to be a state
capias. He said he would have given more thought to the legality of the search warrant if
he had known that it was a city rather than a state capias. The officers told him that
they were arresting the defendant for murder but had taken him into custody on the capias
because he was wanted in Knoxville on another charge. He read the affidavit written by
Detective Upchurch and filled out the search warrant but overlooked the blank line for the
executing officer's name.

Phyllis Davis, secretary for the Knoxville Municipal Court judge, testified that she
maintains the records for the municipal court. City judges serve four- year terms, and
Judge John Rosson, Jr., was the city judge in 1992. On June 12, 1992, the city judge
issued a warrant for the defendant for solicitation for prostitution on that day. The
defendant posted bond and was to appear for trial on June 16, 1992. The trial was
continued to July 7, 1992, but the defendant failed to appear. On July 7, the City of
Knoxville issued a capias directing the Knoxville Chief of Police to bring the defendant
before the City Court judge to answer a charge of failure to appear for a charge of
solicitation of prostitution. She said that a capias does not expire and that it is given
to the jail, the Police Department, and the Sheriff's Department to keep on file. Also,
the Sheriff's Department can access any outstanding process by computer. She said that the
capias does not require the Chief of Police to report back to the court.

Ms. Davis testified that she learned the defendant had been arrested on the morning of
October 22, 1992, but she did not recall knowing at that time that the police suspected he
was the "Zoo Man." The defendant was brought to municipal court around 10:00 a.m. Ms.
Davis heard the judge explain the defendant's rights to him. She did not recall the
defendant asking any questions or stating that he understood his rights. He did not object
to the legality of his arrest or ask for a lawyer. He did not appear to be intoxicated.
The city warrant for solicitation of prostitution reflects that the defendant pled guilty
and waived his right to an attorney. Special Judge Carlton Bryant, appointed by Judge
Rosson as a substitute judge, signed the judgment portion of the warrant on October 22,
1992. Although the signature for the waiver of attorney reads "Kyle Huskey," Ms. Davis was

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

8/4

Slip Copy                                                                                                    Page 33
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

in the courtroom when the waiver was signed, and the defendant was the one who signed it. Apparently, no one noticed that the defendant had signed his name as "Kyle" or else the defendant would have been asked to reconsider his plea and sign again. A lot of defendants give aliases in municipal court, and the warrant gives the defendant's name as "Thomas D. Husky (alias)." The defendant did not deny that he was Thomas D. Huskey.

*40 Carlton Bryant testified that in October 1992, he was an attorney in private practice and sometimes presided as a substitute city judge. Judge Rosson would ask him to serve in that capacity, and then either Judge Rosson or the clerk would administer an oath. He did not independently recall serving as a substitute judge in the defendant's case, but he identified his signature on the city warrant, indicating that he accepted the defendant's guilty plea on October 22, 1992. He would not sign a warrant without discussing the defendant's rights with him or her and witnessing the defendant sign the warrant. If the defendant had said that he was intoxicated or did not know what he was doing, then he would not have accepted the plea. He typically makes an "X" to show defendants where to sign, and he noted that "Kyle Huskey" was signed by an "X." He did not recall whether it was in fact the defendant who signed.

Mr. Bryant testified that after the defendant pled guilty, he ordered the defendant to pay court costs and a fifty-dollar fine and to serve thirty days in jail. He admitted that he did not check the box requiring the defendant to serve thirty days in jail, but typically the clerk checks the boxes after he enters the fine and jail period. Ordinarily, a conviction for solicitation for prostitution in municipal court would result in a fine only. He sentenced the defendant to thirty days in jail based upon something that KPD Officer Torres told him in open court before he accepted the guilty plea that made this case worse than the typical case. He gave the defendant the maximum sentence based upon the guilty plea and the facts given by the officer. No one, including the homicide detectives, had approached him, told him about the "Zoo Man," or asked him to be particularly harsh on the defendant. This was not the only time he had sentenced a defendant to jail based upon the facts of a prostitution case.

On April 1, 1996, the trial court denied the defendant's motion to declare the arrest invalid and his motions to suppress the evidence gained from the search of his residence and his statements. Regarding the defendant's arrest, the trial court found that the capias was "a valid capias issued by a duly-operating court; that it carried the force of law, and that Mr. Huskey could be arrested on that capias, as it stood in October 1992." It found that the defendant was properly arrested in Sevier County based upon the Knoxville capias because a warrant or capias issued in one jurisdiction can be served in another. With regard to the search of the defendant's residence, it found that the search warrant was invalid because it did not list the executing officer. Nevertheless, it found the search of the defendant's bedroom to be incident to his arrest and that the items seized were in the officer's plain view.

A. Lack of Prejudice

It is well-settled that a defendant enjoys "no constitutional immunity from an unlawful arrest." State v. Dulsworth, 781 S.W .2d 277, 282 (Tenn.Crim.App.1989). Instead, the fact of an unlawful arrest is relevant only if the state seeks to present evidence tainted by the arrest. Id. at 282-83; see also State ex rel. Wood v. Johnson, 216 Tenn. 531, 534-35, 393 S.W.2d 135, 136 (1965) (noting that even if evidence from the search of the petitioner or his room was illegally obtained, the petitioner's trial was not tainted because none of the evidence was used). Furthermore, the remedy for an unconstitutional search is exclusion of the evidence obtained therefrom. See Murray v. United States, 487 U.S. 533, 536-37, 108 S.Ct. 2529, 2533 (1988) (holding that the exclusionary rule requires exclusion of tangible, testimonial, and derivative evidence acquired through an unlawful search); State v. Clark, 844 S.W.2d 597, 600 (Tenn.1992). In the present case, the state did not

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                      Page 34
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

use the rope or the jewelry discovered in the defendant's bedroom in either of the rape trials, nor did it use the defendant's statements, as we discuss in Issue IV. The record reveals that the only piece of evidence used at the rape trials and stemming from the arrest or search was a photograph of the defendant taken following his arrest.

1. Photograph

*41 The defendant complains that in the first rape trial, the state used a photograph of him that was taken following his arrest. At the suppression hearing before the consolidated rape trial, Detective Upchurch testified that the defendant arrived at the Knox County Jail at 4:00 a.m. on October 22, 1992. The defendant introduced an October 22, 1992 arrest report from the Knox County Jail Intake Center, with a photocopy of the defendant's photograph on the back. Phyllis Davis testified that the defendant pled guilty to solicitation of prostitution in municipal court around 10:00 a.m. on October 22, 1992. During the first rape trial, the victim identified the defendant as her attacker but testified that his appearance had changed since the time of the offenses when he had a beard and longer hair and was thinner. The state introduced the defendant's photograph during the victim's testimony relating to her identification of the defendant as her attacker to illustrate the way that the defendant looked at the time of the offenses. The victim testified that in October 1992, she went to the police station and picked the defendant's picture out of a photograph array. The defendant cross-examined the victim about discrepancies between her initial descriptions of her attacker and the photograph of the defendant. On cross-examination, the victim agreed that Detective McCroskey showed her the defendant's photograph on October 27, 1992.

In Tennessee, a photograph of a defendant is admissible for purposes of identification even if taken following an illegal arrest. See State v. Miller, 608 S.W.2d 158, 160 (Tenn.Crim.App.1980). This is so because the identification of the defendant from his picture is not the fruit of the arrest. Id. "The basis of the identification is not the arrest but the witness's perception of the accused during the crime.... The arrest merely provided the means for the confrontation with the victim .... The arrest contributed neither to the knowledge of the witness nor to the accuracy of her identification." Id. Thus, under Tennessee case law, the defendant's photograph, taken after his arrest and used by the victim to identify him as the perpetrator, was admissible to identify the defendant without regard to the legality of the arrest.

We note, though, that the United States Supreme Court has suggested that a photograph taken as the result of an illegal detention may be inadmissible. See United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244 (1980). In Crews, the Court addressed the question of whether an in-court identification of the defendant by the victim is the product of an illegal arrest. In that case, several women were robbed at gunpoint in the women's restroom on the grounds of the Washington Monument. Based upon the victims' description of the perpetrator, officers saw the teenage defendant in the area, unsuccessfully attempted to photograph him at the scene, took him into custody for truancy, photographed him, and released him. The victims identified the defendant from a photograph array and again in a line-up. Finding that the police lacked probable cause to detain the defendant initially, the trial court suppressed the photograph and line-up identifications as products of the illegal detention but allowed the victims to identify the defendant at trial. The Court held that the in-court identifications of the defendant were not the products of his illegal arrest because (1) the victims were present to testify about the offenses, (2) the victims could reconstruct the crimes and their identification of the defendant from their own knowledge and recollection, and (3) the defendant was physically present. Id. at 471, 100 S.Ct. at 1250. The Court held that none of these three circumstances resulted from the exploitation of the Fourth Amendment. Id. In so holding, it noted that the parties conceded that the intervening photograph and line-up identifications were the product of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

the Fourth Amendment violation. It observed that in some circumstances, these intervening identifications could be so suggestive as to render the in-court identification unreliable and, therefore, inadmissible. *Id.* at 472, 100 S.Ct. at 1250. Based upon *Crews,* the photograph taken of the present defendant would be subject to this analysis, if the arrest was illegal.

**\*42** Nevertheless, we believe that law enforcement would have inevitably obtained defendant's photograph without regard to the legality of his arrest. Evidence obtained as the result of an illegal arrest is not subject to exclusion if it would have been inevitably discovered through lawful means. *State v. Ensley,* 956 S.W.2d 502, 511 (Tenn.Crim.App.1996); *see also Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509 (1984). In the present case, the defendant arrived at the Knox County Jail at 4:00 a.m. on October 22, 1992, and his photograph was taken. Around 10:00 a.m., the defendant was taken to municipal court and pled guilty to solicitation of prostitution. At that point, the defendant was legally detained pursuant to his conviction for the municipal offense, and any photograph taken following this conviction would not be subject to exclusion based upon the legality of his arrest. The victim was not shown the defendant's photograph until October 27, 1992. Because it was inevitable that the police would acquire a photograph of the defendant, the exclusionary rule does not apply. *See Howard v. State,* 599 S.W.2d 280, 283- 84 (Tenn.Crim.App.1980) (holding that a line-up identification of the defendant for the present offense did not have to be suppressed, even if the defendant had been illegally arrested on an unrelated charge, because the police would have inevitably discovered the defendant's identity from descriptions and a license plate number given by eyewitnesses to the present offense).

2. Mootness

 With the exception of the photograph discussed above, the state contends that none of the evidence flowing from the arrest or search was used at either rape trial. The defendant contends that in the first rape trial, the trial court admitted descriptions of a truck and license plate number discovered by officers illegally trespassing on his property to serve the capias. He claims that these descriptions matched another description given in the first rape trial. Unfortunately, the defendant fails to cite to the portions of the record where any of these descriptions were given or even to mention the witnesses who gave the description of a truck. The defendant does cite to a jury-out discussion during the consolidated rape trial for this contention, but this portion of the record does not contain a description of a truck. Our own review of the record in the first rape trial reveals that the victim, the sole witness for the state, testified that the defendant was driving a car. None of the detectives who participated in the defendant's arrest and the search of his home on October 21, 1992, testified in the first rape trial. Other than the photograph discussed above, the defendant has failed to show that the state used any evidence resulting from his arrest or search in the first rape trial.

 The defendant contends that in the consolidated rape trial, Detective Upchurch testified regarding a car and its license plate, which were seen at the defendant's residence at the time of his arrest. For this contention, the defendant refers us to Detective Upchurch's testimony at the February 7, 1996 suppression hearing. Detective Upchurch did not testify at the consolidated rape trial. We note that at the consolidated rape trial, Detective Michael Grissom testified that he went to the home of the defendant's father after checking a license tag number provided by one of the victims in the consolidated rape trial. Detective Grissom stated that while there, he saw a 1983 Buick LeSabre with the license tag number VLZ-894. This testimony does not relate to or stem from evidence gathered as a result of the defendant's arrest or the search of his home within a few hours of his arrest.

**\*43** Regarding the illegal search issue, the defendant argues that in the consolidated

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

rape trial, the trial court should have suppressed certain photographs of him, of certain
vehicles, and of the rope. In support of this contention, he cites to a jury-out
discussion regarding the admissibility of two photographs depicting twine found at two
locations at Teagues Statuary, the defendant's employer. The defendant does not explain
and the cited discussion does not reveal how the photographs relate to evidence gained
from the search of the defendant's home. Instead, during the discussion, the trial court
noted its previous ruling that the state could not introduce photographs of brown twine in
the back of a pickup truck taken during the October 21, 1992 search. The court determined
that the state was limited to the two photographs of the twine taken at Teagues Statuary.
Although the detectives went to Teagues Statuary before going to the defendant's home on
the night of the arrest, the jury-out discussion reveals that the photographs in question
were made at a different time. We fail to see how the passage to which the defendant has
cited relates to this issue. Furthermore, we agree with the state that none of the
evidence gained in the search of the defendant's home was introduced in the rape trials.

Finally, with regard to the search of his home, the defendant also challenges the
admission of certain photographs, a necklace and earrings, and testimony regarding the
rope found in his bedroom, which were introduced in his murder trial. As previously noted,
the murder case is not a part of this appeal.

The legality of the arrest and search is not in controversy in this appeal of the first
rape trial and G. F.'s and A. D.'s cases because the resulting evidence was either not
used or, in the case of the photograph, was properly used even if stemming from an illegal
arrest. The issue is moot in these cases. *See State ex rel. Lewis v. State,* 208 Tenn. 534,
537-38, 347 S.W.2d 47, 48- 49 (1961); *State v. Doe,* 813 S.W.2d 150, 152
(Tenn.Crim.App.1991). On the other hand, the issue remains viable in D. C.'s case, which
we are reversing due to its improper consolidation, because the state could attempt to use
evidence stemming from the arrest or the search in the event that the case is retried. At
the suppression hearing before the consolidated rape trial, Detective Upchurch testified
that upon looking into the defendant's bedroom, he saw a piece of orange hay-baling rope,
which he recognized as the type of rope used to bind the rape victims. D.C. testified that
the defendant bound her with rope, although she did not describe its color or size at
either the consolidation hearing or at trial. In ruling upon the suppression issues, the
trial court found that the detectives noticed a piece of rope on the defendant's bedroom
floor "that they suspected was the same type of string or twine that had been used to tie
one or more of the victims that they were investigating--homicides that they were
investigating in Knox County ." Although this finding suggests that the rope is relevant
to the murder case rather than the rape cases, the state might be able to show that the
rope is relevant to the retrial of D. C.'s case. In the event of a retrial of D. C.'s
case, we will review the trial court's rulings on the legality of the arrest and search in
light of the defendant's contentions.

B. Collateral Attack

**\*44** The state contends that the defendant may not collaterally attack his conviction and
sentence for solicitation of prostitution in this appeal. "The rule has been firmly
established in Tennessee that a facially valid, unreversed judgment in a court with
jurisdiction over the subject matter and the person cannot be collaterally attacked in a
subsequent proceeding except by the authorized routes of attack." *State v. McClintock,* 732
S.W.2d 268, 271 (Tenn.1987).

In the present case, the Knoxville Municipal Court had jurisdiction over the defendant
for the municipal offense of solicitation of prostitution occurring within the city. *See*
Tenn.Code Ann. § 16-17-103 (providing that municipal court judges in home rule
municipalities have "full power and authority to try and dispose of violations of
municipal ordinances"); Knoxville, Tenn., Charter, art. V, § 503 (1982); *see also* Code of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                        Page 37
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

Ordinances, City of Knoxville, Tenn. § 19-190(c) (1982) (prohibiting the patronizing of
prostitution); *State ex rel. Boone v. Torrence*, 63 Tenn.App. 224, 242, 470 S.W.2d 356, 364
(1971) (noting that the "primary function of Corporation or Municipal Courts is
enforcement of municipal ordinances"). Article V, section 503 of Knoxville's city charter
grants the municipal judge concurrent jurisdiction with the Knox County general sessions
judges over violations of state criminal laws committed in the city and "exclusive power
to impose fines for the breach of any city ordinance." The defendant contends that his
sentence was illegal because the municipal court lacked jurisdiction to sentence him to
incarceration for the violation of a city ordinance.

Initially, we note that the defendant failed to secure a ruling from the trial court on
this issue before either of the rape trials. The defendant raised the issue of the
municipal court's jurisdiction to impose a jail sentence in a memorandum of law filed
three months before the consolidated rape trial arguing that because the municipal court
is not a constitutional court, it lacked jurisdiction to jail or arrest the defendant. He
presented evidence regarding his thirty-day jail sentence for the solicitation conviction
at the suppression hearing through the testimony of Carlton Bryant, the substitute
municipal judge who accepted the defendant's guilty plea. Although the trial court ruled
that the capias was issued from a "duly-operating court," it did not speak to the
municipal court's jurisdiction to sentence the defendant to incarceration.

In any event, we note that the Knoxville City Code and Tenn.Code Ann. § 6- 54-306 reveal
that the municipal court had jurisdiction to impose the jail sentence. The state
legislature has empowered home rule municipalities "to set maximum penalties of thirty
days imprisonment and/or monetary penalties and forfeitures up to five hundred dollars
($500), or both, to cover administrative expenses incident to correction of municipal
violations." Tenn.Code Ann. § 6-54-306; *see also City of Knoxville ex rel. Roach v.
Dossett*, 672 S.W.2d 193, 194 (Tenn.1984) (noting that Knoxville is a home rule
municipality). Section § 19-190(c) of the Knoxville City Code, which prohibits the
patronizing of prostitution, does not specify a penalty for the offense. *See* Code of
Ordinances, City of Knoxville, Tenn. § 19-190(c) (1982). Section 1-9 of the Knoxville City
Code provides that if the penalty is not specified in the individual ordinance, the
violation of the ordinance shall be punished as follows:
**45 Any person violating any of the provisions of this general penalty article shall be
guilty of a misdemeanor, and conviction thereof shall result in the penalties of a
monetary fine not to exceed fifty dollars ($50.00) and the repayment of administrative
costs incident to the correction of the municipal violation in an amount not to exceed
five hundred dollars ($500.00) and/or by imprisonment not to exceed thirty (30) days, or
both for each separate offense.
Both section 6-54-306 of the state code and section 1-9 of the city code reflect that
the municipal court has the power to impose a jail sentence.

In contrast with the municipal court's legislatively granted power to incarcerate, a
defendant enjoys an inviolate constitutional right to a jury trial in Tennessee. Tenn.
Const. art. I, § 6. This right to a jury trial does not extend to small or petty offenses,
which are those offenses punished with a fine not to exceed fifty dollars and no term of
confinement. *State v. Dusina*, 764 S.W.2d 766, 767 (Tenn.1989). "For violation of general
criminal statutes, ... where a fine of more than $50.00 or any confinement of the accused
may be imposed, the right to jury trial under the Tennessee constitution is
well-established." *Id.* at 768. A municipal court has no power to empanel a jury. *City of
Chattanooga v. Davis*, 54 S.W.3d 248, 267 (Tenn.2001) (stating that "only courts of general
jurisdiction have the power to empanel a jury to determine facts or to impose
punishment"). The constitutional right to a jury trial limits, but does not eliminate, a
municipal court's ability to impose a sentence of incarceration. A defendant may waive his
or her constitutional rights and plead guilty to an offense in municipal court. *See, e.g.*,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

*State ex rel. Newsom v. Biggers,* 911 S.W.2d 715, 718-19 (Tenn.1995) (holding that the defendant could not collaterally attack the city court's judgment by arguing that the court lacked jurisdiction when the defendant had acquiesced to the court's authority in pleading guilty to shoplifting). We conclude that once the constitutional bar to the jail sentence in the absence of a jury trial is removed by the defendant's plea, the municipal court may impose such a sentence pursuant to its legislatively granted power.

The record reveals that the defendant waived his right to a jury trial for the solicitation of prostitution offense. The city warrant in the present case contains the following, entitled "WAIVER AND PLEA":

I UNDERSTAND THAT I HAVE THE RIGHT TO BE TRIED IN COURT UPON AN INDICTMENT OR PRESENTMENT BY THE GRAND JURY. I ALSO HAVE THE RIGHT TO A TRIAL BY JURY. I VOLUNTARILY AND KNOWINGLY DESIRE TO WAIVE THESE RIGHTS AND TO BE TRIED IN THIS COURT ON THIS CASE BY THE CITY JUDGE WHO WILL DECIDE MY INNOCENCE OR GUILT AND SET THE SENTENCE IF FOUND GUILTY.

The warrant also informs the defendant that he is waiving his right to counsel and his right to appeal. The written waiver of the right to counsel is necessary for the facial validity of the judgment because the United States Supreme Court has determined that in the context of using a prior conviction against a defendant to show guilt or to enhance punishment, a record of conviction that fails to show the existence or waiver of counsel is presumptively void. *State v. Tansil,* 72 S.W.3d 665, 667 (Tenn.Crim.App.2001); *see Burgett v. Texas,* 389 U.S. 109, 114-15, 88 S.Ct. 258, 261-62 (1967). Although the defendant signed the city warrant "Kyle Huskey," the warrant authorizes the arrest of "Thomas D. Husky (alias)." Furthermore, Phyllis Davis, who was in the courtroom at the time the defendant pled guilty, testified that the defendant was the person who signed the warrant. She stated that the municipal judge explained the defendant's rights to him and that the defendant did not ask any questions about his rights. Carlton Bryant testified that he would not have signed the city warrant if he had not discussed the defendant's rights with him and witnessed the defendant sign the warrant. Thus, the defendant waived his right to a jury trial and agreed that the city judge would set his sentence.

**\*46** In summary, the Knoxville Municipal Court had jurisdiction over the defendant for violating the municipal offense of solicitation of prostitution. The defendant pled guilty and waived his constitutional right to a jury trial. In the absence of this constitutional bar, the municipal court was empowered to impose a jail sentence upon the defendant. The warrant contains the signed judgment of conviction for solicitation of prostitution. A warrant with the judgment entered thereon enjoys, "like any judgment, a presumption of regularity in the proceedings ... upon becoming final." *McClintock,* 732 S.W.2d at 270. Thus, we perceive no problem with the defendant's conviction and sentence for solicitation of prostitution, and he may not collaterally attack the legality of his sentence for solicitation of prostitution in this appeal of his rape convictions.

All of the defendant's claims relating to his conviction for solicitation of prostitution, including his allegation that his statements resulted from his illegal confinement, amount to a collateral attack on his solicitation conviction. The defendant contends that the municipal court lacked authority to issue a capias for failure to appear and that his sentence was illegal because (1) the box on the warrant for his thirty-day jail sentence was not checked, (2) the substitute judge who accepted his guilty plea had not taken the constitutionally required oath of office, (3) a private attorney (the substitute judge) has no authority to sentence him to jail, and (4) the judge's secretary, who has no authority to put him in jail, signed the mittimus. These claims, if meritorious, would only make the judgment for his conviction for solicitation of prostitution voidable rather than void. *See id.* at 271 (holding that a facially valid judgment issued by a court with jurisdiction cannot be attacked in a subsequent proceeding except by an authorize route of collateral attack such as a petition for post-conviction

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                 Page 39
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

relief). Regarding the statements that he gave while confined, the defendant had been convicted of the municipal offense and was serving his sentence for solicitation of prostitution at the time he gave statements to law enforcement officers. Thus, the statements do not flow from his arrest. On the other hand, although the defendant may not attack the validity of his conviction for solicitation of prostitution, he can and does challenge the legality of his arrest as it relates to the suppression of the evidence gained as a result of that arrest, i.e., the rope. Thus, we do have cause to address the legality of the arrest.

C. Validity of the Capias

  The Knox County detectives arrested the defendant based upon an outstanding capias for his failure to appear in Knoxville Municipal Court. We begin by noting that "[u]nder our criminal procedure, a capias is a mesne or intermediate process having the sole purpose of securing the presence of the defendant." *Moore v. State*, 578 S.W2d 78, 81 (Tenn.1979).

  *47 The defendant contends that the capias used to arrest him is invalid because it was not issued in the name of the State of Tennessee as required by the Tennessee Constitution and the Knoxville City Charter. "All writs and other process shall run in the name of the State of Tennessee and bear test and be signed by the respective clerks." Tenn. Const. art. VI, § 12. This constitutional requirement "applies to all process, civil or criminal, issued by any court, or tribunal established by law having authority to issue process; to process issued under a valid corporation ordinance, or by-law, as much as to process from a court of record, or justice of the peace." *Mayor of Nashville v. Pearl*, 30 Tenn. 249, 251 (1850) (holding that a distress warrant in the name of the Corporation of Nashville was prop erly quashed); *see McLendon v. State*, 92 Tenn. 520, 525, 22 S.W. 200, 202 (1893) (holding that the criminal court's order that the sheriff rearrest the defendant and confine him in the workhouse was facially void because it ran in the name of the criminal court rather than in the name of the state). Additionally, article V, section 503, of the Charter of the City of Knoxville states that all "process shall be issued in the name of the State of Tennessee, with proper designation thereon to show that the same are also issued under the authority of the City of Knoxville." Process that does not properly run in the name of the state is void. *See McClendon*, 92 Tenn. at 525, 22 S.W. at 202.

  In the present case, the capias does not contain a reference to the State of Tennessee but, instead, is headed by the words "City of Knoxville." The notice that the document runs in the name of the state may appear in the body of the document rather than the caption. *City of Murfreesboro v. Bowles*, 187 Tenn. 134, 137, 213 S.W.2d 35, 37 (1950). The present capias gives no indication that it runs in the name of the state anywhere in the document. For this reason, the capias is void.

  The defendant contends that in the absence of the capias, the record is devoid of probable cause that he failed to appear on his solicitation charge. The record does not reveal that the detectives had a valid basis upon which to arrest the defendant for his failure to appear aside from the capias. A misdemeanor arrest without a warrant may occur only for an offense committed or threatened to be committed in the officer's presence. Tenn.Code Ann. § 40-7- 103(a)(1). Here, no evidence exists that the Knox County detectives or the Sevier County officer witnessed the defendant's failure to appear in municipal court. On the other hand, we note that the trial court's erroneous finding that the capias was valid pretermitted any rulings on other legal bases for the arrest. Upon remand of D. C.'s case, the trial court must consider the legality of the arrest in light of our holding that the capias was void.

  The defendant also argues that the capias is invalid because: (1) it fails to state an offense since the city code contains no offense of failure to appear; (2) it was not a lawful process upon which he could be arrested; and (3) it does not state an expiration

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                           Page 40
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

date and, being four months old, was stale. Although our holding that the capias is void
eclipses these other challenges to its validity, we will address them briefly in turn due
to the possibility of an appeal on this issue. *See Jacobs v. State,* 224 Tenn. 106, 107,
450 S.W.2d 581, 581 (1970) (stating that the Court of Criminal Appeals may not pretermit
duly raised issues).

*48 The defendant contends that the capias is void on its face for failing to charge an
offense because the Knoxville City Code does not contain an offense of failure to appear.
The present capias directs the Knoxville Chief of Police to bring the defendant before the
city court "to answer a charge of the City of Knoxville exhibited against him by Failure
to Appear, for a charge of Sol. for Prostitution...." As discussed above, the Knoxville
City Code does prohibit the solicitation of prostitution. *See* Code of Ordinances, City of
Knoxville, Tenn. § 19-190(c) (1982). Furthermore, a defendant's failure to appear in
municipal court is also a violation of the city code. *See* Code of Ordinances, City of
Knoxville, Tenn. § 19-33(i) (providing that the intentional, knowing, or willful failure
to appear in court on the date and time designated in one's citation is a violation of the
municipal code without regard to the disposition of the original charge). Thus, the
present capias does state an offense.

The defendant next contends that the capias was not a valid process in this state or in
the City of Knoxville because the Knoxville City Charter does not provide for the arrest
of persons who fail to appear in city court for charges of municipal offenses. He also
argues that the capias cannot be construed as a subpoena for a witness because it was not
issued by a judge or as an arrest warrant because it contains no affidavit of complaint or
finding of probable cause. Although the Knoxville City Charter is silent regarding whether
a defendant may be arrested for failure to appear, the Knoxville city code provides that
if "the person cited [for committing a misdemeanor in the presence of an officer] fails to
appear in court on the date and time specified ..., the court shall issue a bench warrant
for such person's arrest." Code of Ordinances, City of Knoxville, Tenn. § 19-33(f). An
identical provision appears at Tenn.Code Ann. § 40-7-118(f). Thus, the city and state
codes provide for the arrest of persons who fail to appear in court.

We note that in the present case, the defendant was arrested upon a capias issued by the
city court clerk rather than a bench warrant from the city court. The judge of a municipal
court in a home rule municipality has "full power and authority to try and dispose of
violations of municipal ordinances." Tenn.Code Ann. § 16-1-101. The choice to use a
capias, a warrant, or an attachment are all means by which a court can control the
proceedings before it. *See State v. Cazes,* 875 S.W.2d 253, 260 (Tenn.1994) ("It is well-
established that a trial judge has broad discretion in controlling the course and conduct
of the trial."); *State v. Bragan,* 920 S.W.2d 227, 239 (Tenn.Crim.App.1995) (noting that
"the courts of this state have the inherent power to supervise and control their own
proceedings"). On the other hand, the fact that the city court clerk rather than the
municipal court judge issued the capias is significant. The city court clerk does not
share the municipal court's inherent power to control the proceedings before it. Although
the rule for courts of record permits their clerks to issue a capias for failure to
appear, we can locate no similar rule for a capias upon a failure to appear in municipal
court. *See* Tenn. R.Crim. P. 9(e) (providing that the clerk of the criminal or circuit
court may issue a capias when a defendant, who is a natural person, fails to appear in
response to a criminal summons). Thus, the present capias is also invalid because it was
issued by the city court clerk rather than the city court judge.

*49 Finally, the defendant contends that the capias is invalid because it contains no
time period for its return and was nearly four months old at the time of his arrest. In
*State v. Michael Laymance,* No. 180, McMinn County (Tenn.Crim.App. July 17, 1990), the
court addressed the question of whether a capias issued by the circuit court and directing

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                              Page 41
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

that the defendant be arrested and brought before the court on a specific date to answer a contempt of court charge authorized his arrest six months later. Noting that little precedent exists regarding the expiration of a capias, the court deemed that a capias should not exist indefinitely but that "the safe and fair administration of justice" requires that a capias expire at a specified date or within a reasonable time from its issuance. *Id.* at 2. Commenting that it lacked the authority to compose rules for the expiration of a capias when no time limit is given internally, it held that the capias at issue in that case expired on the date provided therein. *Id.* at 3.

The present case is distinct from the situation in *Laymance* because the present capias does not contain a specific date upon which the defendant was to be brought to city court. We contrast the reasoning in *Laymance* with the unlimited validity of a capias issued when a defendant has forfeited his bond. "Any capias issued pursuant to a forfeit, whether the forfeit is conditional or final, shall remain in full force and effect until the defendant is apprehended and returned to the criminal justice system, and a disposition is entered in the defendant's case." Tenn.Code Ann. § 40-11-33(c) (providing for the arrest of the defendant by the bail bondsman or surety). This statute suggests that the legislature intended an indefinite life for a capias issued because the defendant forfeited his bond. In the present case, Phyllis Davis testified that the city warrant reflects that the defendant posted bond but failed to appear for trial on July 7, 1992. This testimony reveals that the defendant forfeited his bond on the solicitation of prostitution charge. Finally, we note that the capias was issued on July 7, 1992, and the defendant was arrested on October 21, 1992. We cannot say that the three and one-half month time period was unreasonable.

In summary, the capias is void due to its failure to run in the name of the state. Additionally, the fact that the city court clerk, rather than the city court judge, issued the capias renders it invalid.

D. Authority of Knox County Officers

The defendant contends that the Knox County officers lacked jurisdiction to arrest him in Sevier County on a municipal capias. Although we have determined that the capias is void, we touch briefly upon this issue in the event of an appeal of our holding on the capias. Tenn.Code Ann. § 40-6-212 provides in pertinent part:
  When the sheriff, deputy sheriff, coroner or any other officer of any county in this state has possession of a warrant or capias for the arrest of any person charged with the commission of a crime, it is lawful for the sheriff, deputy sheriff, coroner or any other officer to execute such process, and arrest the person so charged in any county in this state.
  *50 Thus, the Knox County detectives could lawfully execute the capias in Sevier County. We also note that a Sevier County officer was present at the time of the defendant's arrest.

The defendant also complains that Knox County officers cannot act upon a capias directed to the Knoxville Chief of Police. With regard to arrest warrants, the issuing magistrate is not limited to county officers but "may empower any law enforcement officer to execute the warrant anywhere in the state." Tenn.Code Ann. § 40-6-213. Furthermore, arrest warrants "should be directed to any lawful officer of the state, but if executed by any officer having authority, it is valid without regard to its direction." Tenn.Code Ann. § 40-6-209. Although these statutes involve arrest warrants, section 40-6-212, quoted above, empowers an officer of any county to execute an arrest warrant *or a capias* in any county in Tennessee. Reading sections 40-6-209, - 212, and -213 together, the Knox County detectives had the authority to arrest the defendant upon the present capias if it had been a valid process.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                     Page 42
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

The defendant also argues that the Knox County officers were using the capias as a
pretext to take him into custody for the homicide investigation. As long as the capias was
valid, the Knox County officers could lawfully take the defendant into custody without
regard to their subjective reasons for wanting to arrest him. *See State v. Duer*, 616
S.W.2d 614, 616 (Tenn.Crim.App.1981) ( "Where an officer makes an arrest which is properly
supported by probable cause to arrest for one offense, neither his subjective reliance on
an offense for which no probable cause exists nor his verbal announcement of the wrong
offense vitiates the arrest."). If the capias was valid, the Knox County officers had the
authority to arrest the defendant.

E. Illegal Search

The defendant contends that the trial court should have suppressed evidence gained in the
search of his residence almost three hours after his October 21, 1992 arrest because the
search warrant was invalid and no exception to the warrant requirement applied. He argues
that the search warrant was invalid because the judicial commissioner lacked authority to
issue it, the affidavit contained in the search warrant was defective and failed to state
probable cause, and the judicial commissioner did not list the name of the officer to whom
the search warrant was issued for execution. He maintains that the seizure of the items
from his home does not fall within any of the exceptions to the warrant requirement,
arguing that the officers were not lawfully within plain view of the items nor was the
search incident to a legal arrest, that his father did not consent to the search of his
bedroom, and that no exigent circumstances existed. The state contends that none of the
evidence discovered during the search of the defendant's bedroom was used against the
defendant in either of the rape trials. Alternatively, it argues that even if the evidence
had been introduced, the trial court did not rely upon the illegal search warrant but
properly held that the items seized were in plain view of the officers, who were legally
on the property arresting the defendant. It also maintains that the items were seized
pursuant to a search incident to the defendant's arrest even though the officers did not
take possession of the items until three hours later. We affirm the trial court's ruling
that the search warrant was invalid due to its failure to list the executing officer. Our
holding that the capias is void calls into question the trial court's bases for the
validity of the search--that it was incident to the defendant's arrest and that the items
seized were in plain view--which both require the arrest to be valid.

*51 With regard to the search of the defendant's bedroom, the trial court found the
following: The detectives went to the defendant's home to arrest him. They told one of his
parents why they were there and then stepped into the living area of the home. The
defendant came into the living area, and the detectives explained their presence and took
him into custody. The defendant wanted to return to his bedroom to get some additional
clothing, the detectives explained that they would have to go with him, and the defendant
did not object to this. One or more of the detectives went into the defendant's bedroom
and another stood in the doorway. The detectives saw twine, which they suspected to be the
same type as that used to bind one or more of the murder victims, on the bedroom floor.
They also saw a necklace and earrings lying on a dresser in the bedroom.

The trial court found that the detectives did not seize the twine or the jewelry at that
time but that one of the detectives remained at the home while Detective Upchurch got a
search warrant. The court determined that the warrant was invalid due to its failure to
list the executing officer. It found that Detective Upchurch returned to the defendant's
home approximately two hours later with the warrant. At that point, the detectives spoke
with the defendant's father and asked if they could search his home. The defendant's
father signed a form consenting to the search. He placed no limitations on the search in
the written consent. A Sevier County officer recalled the defendant's father saying that
the detectives were free to search the residence but that they would have to get the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 43
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

defendant's permission to search his bedroom. The trial court noted that the testimony of the defendant's mother established that the defendant's parents did have the right to enter his room when they wanted to do so. The detectives searched the defendant's bedroom, collected evidence, and photographed the residence. The trial court found that the search was valid as incident to a lawful arrest and that the items in question were in the detective's plain view at the time that they affected the lawful arrest.

A search warrant must list the name of the executing officer:
The magistrate shall endorse upon the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution; and the exact copy of the warrant and the endorsements thereon shall be admissible evidence. Failure of said magistrate ... to endorse thereon the date, and time of issuance and the name of the officer to whom issued, ... shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.
Tenn. R.Crim. P. 41(c). In the present case, the line in the search warrant for the executing officer's name is blank. Judicial Commissioner Baker testified that he overlooked the blank line when filling out the search warrant. The search warrant fails to comply with Rule 41(c) and is invalid. *See State v. Stephenson,* 15 S.W .3d 898, 902 (Tenn.Crim.App.1999) (holding that the magistrate's listing of the incorrect executing officer violated Rule 41(c) and was fatal to the warrant's validity). The failure to list the executing officer on the search warrant renders the subsequent search illegal unless an exception to the warrant requirement applies.

*52 Initially, we note that a trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996); *State v. Jones,* 802 S.W.2d 221, 223 (Tenn.Crim.App.1990). The application of the law to the facts as determined by the trial court is a question of law which is reviewed *de novo* on appeal. *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997).

The analysis of any warrantless search must begin with the proposition that such searches are *per se* unreasonable under the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. This principle against warrantless searches is subject only to a few, specifically established and well-delineated exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514 (1967); *State v. Tyler,* 598 S.W.2d 798, 801 (Tenn.Crim.App.1980). Before the fruits of a warrantless search are admissible as evidence, the state must establish by a preponderance of the evidence that the search falls into one of the narrowly drawn exceptions to the warrant requirement. *State v. Shaw,* 603 S.W.2d 741, 742 (Tenn.Crim.App.1980). One such exception is for a search incident to a valid arrest. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477 (1973). Another exception is made for an item within the plain view of an officer who has a right to be at a particular vantage point. *Armour v. Totty,* 486 S.W.2d 537, 538 (Tenn.1972) (relying upon the plurality opinion in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022 (1971)). A third exception is when the property owner voluntarily consents to a search of the property. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043- 44 (1973); *State v. Brown,* 836 S.W.2d 530, 547 (Tenn.1992).

In the present case, the trial court's application of both the search incident to an arrest and the plain view exceptions require that the defendant's arrest be valid. Our holding that the capias upon which the defendant was arrested is void calls the trial court's reliance on these exceptions into question. Upon a retrial of D. C.'s case, the trial court must reexamine the propriety of the warrantless search. In this regard, we note that although the trial court found that the defendant's father consented to the search of his home, it did not determine whether the defendant's father's consent to the search removed the need for a warrant. The trial court noted that the defendant's parents

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 44
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

had the right to enter the defendant's bedroom as revealed by the defendant's mother
entering the room to turn down the radio or to leave laundry in the room but stated that
it "just include[d] that as [the court's] recollection of the facts in this case." We do
not foreclose the state from showing upon remand that the search was valid.

IV. SUPPRESSION OF STATEMENTS

    The defendant contends that the trial court erred in not suppressing the four statements
that he gave to law enforcement officers on November 9, 10, and 11, 1992. He argues that
the statements were the product of his illegal arrest, illegal confinement, and the
illegal search of his residence. He also contends that law enforcement took his statements
in violation of his right to remain silent and his right to counsel. He argues that he did
not knowingly or voluntarily give the statements due to his mental illness and that the
statements are unreliable. Finally, with regard to the first rape trial, he asserts that
the trial court erroneously refused to hold a hearing on his motion to suppress the
statements before the first rape trial.
    *53 The state contends that the defendant's statements were not used in either of his
trials and that, therefore, the defendant has failed to prove that he was prejudiced by
the trial court's decision not to exclude the statements. It also argues that the
statements were admissible and that the defendant's reasons for suppression lack legal
support. With regard to the first rape trial and the consolidated convictions for
offenses against A.D. and G. T., we conclude that the issue is moot because the state
did not use the statements at trial. With regard to the offenses against D. C., we
conclude that we are unable to review the defendant's contentions because the trial
court did not make sufficient findings of fact relative to all of the evidence
pertaining to the issue.
    The defendant gave four statements while incarcerated in the Knox County Jail serving
the thirty-day sentence for solicitation of prostitution. In the first three statements,
he purported to be "Kyle" and confessed to murdering four women and to raping others. He
gave the fourth statement as "Phillip Daxx," who talked about protecting the defendant
from Kyle. The defendant executed rights waiver forms before each of the statements. The
trial court ruled that although the defendant had requested a lawyer on October 30, 1992,
the statements were admissible because the defendant initiated contact with law
enforcement on each occasion. It also found that law enforcement officers advised the
defendant of his rights before each statement. It ruled that although the defendant's
conduct while in custody was unusual, no evidence existed that when the defendant gave the
statements, he did not know what he was doing or that they were involuntary.

    The admissibility of the statements is not an issue in controversy with regard to the
first rape trial and the convictions relating to the offenses against G.F. and A.D.
because the statements were not introduced in either rape trial. For this reason, the
issue is moot in this appeal of the rape trials. See State ex rel. Lewis v. State, 208
Tenn. 534, 537-38, 347 S.W.2d 47, 48-49 (1961); State v. Doe, 813 S.W.2d 150, 152
(Tenn.Crim.App.1991). The defendant argues that although the state did not introduce the
statements in its case-in-chief, the fact that the state could have used the statements
affected how he approached his defense in terms of strategy, proof, or the potential for a
plea agreement. The defendant fails to specify how the admissibility of the statements
affected the defense strategy except to suggest that he might have testified by referring
to the threat of the state using the statements in cross-examination during the
consolidated rape trial. The argument that the defendant did not testify because of the
admissibility of the statements is speculative. We conclude that the issue is moot with
regard to the first rape trial and the cases relating to G.T. and A. D.

    With regard to the reversal of D. C.'s case due to its improper consolidation, the issue
of the statements may still be viable in the event of a retrial. Despite the potential use

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 45
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

of the statements, we are unable to review their admissibility because the trial court's findings on the issue are insufficient. For example, the trial court has made no findings regarding members of law enforcement having contact with the defendant on November 4 and 5, 1992, in relation to Lieutenant Larry Johnson's testimony that the defendant initiated contact with him and TBI Agent David Davenport on November 9, 1992. For instance, meetings with the defendant on November 4 and 5 may cast doubt upon the credibility of Lieutenant Johnson's testimony regarding the questioning of the defendant. If the suppression of the statements is raised upon the retrial of D. C .'s case, the trial court should make complete findings, and take proof if appropriate, with regard to the issues surrounding the suppression of the statements.

V. ORDER OF TRIALS

*54 The defendant contends that the trial court erred in allowing the state to set the order of his trials with the homicide cases being last, and that, consequently, his convictions in the first rape case should be reversed and a new trial should be granted. The defendant states that this issue is closely related to the issue relating to the trial court staying other proceedings against him and that the order of trials set by the state coupled with the stay significantly prejudiced him. He also complains that he was denied his right to a speedy trial as a result of the order of his trials as set by the state.

In *State v. Nichols,* 877 S.W.2d 722, 735-36 (Tenn.1994), our supreme court held that the state has discretion to determine the order of prosecutions and that it was not an abuse of discretion to choose an order of trials that results in an earlier trial "creating" an aggravating circumstance in a subsequent capital trial. In the present case, the defendant initially objected to the order chosen by the state on the grounds that a conviction in one of the rape trials would create an aggravating circumstance if the capital cases reached sentencing. The defendant now acknowledges the *Nichols* holding but argues that this case is distinguishable because he had demanded a speedy trial and the trial court had stayed all other proceedings against him until the completion of the first rape case. We have already concluded that the defendant was not denied a speedy trial in the first rape case, noting the timing of and circumstances surrounding his demand as it related to that case. As we discuss in Issue XXII on the stay of other proceedings during the first rape trial, our review of the rape cases reveals no prejudice to the defendant from this practice. While the order chosen by the state to try the defendant's cases may not have been the order preferred by the defendant, we cannot say that the state abused its discretion in setting the rape trials before the homicide trials.

Also within this issue, the defendant complains that by not consolidating the cases initially and then staying the proceedings in the other cases, the state effectively forced the defendant to declare his insanity defense pursuant to Rule 12.2, Tenn. R.Crim. P ., before the trial court ruled on pending motions and before discovery was completed. As a result of the defendant's notice, the state requested a mental evaluation at a time when the defendant had no ability to discover the nature of the state's case, making it impossible to evaluate his insanity defense meaningfully. The defendant complains that the state's May 4, 1995 request for a mental evaluation was untimely and that the state manipulated the process to get his insanity defense stricken. We address the merits of these complaints in the defendant's ninth issue, concluding that the defendant's insanity defense was not improperly stricken.

The defendant also complains within this issue that the state abused its discretion in consolidating the remaining rape cases after the first rape trial. He contends that if consolidation were permissible, then the state should have consolidated the cases, including the first rape case, earlier. The defendant contends that if the cases had been consolidated earlier, then he would have defended the first rape case differently. Although the defendant concedes that he does not know what he would have done differently,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                            Page 46
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

he states that he would have had the benefit of the additional discovery and rulings on motions that occurred before the consolidated rape trial.

*55 Initially, we note that because the defendant's insanity defense was similarly limited in the consolidated rape trial, it is unclear how the defendant was prejudiced in the first rape trial by not consolidating it with the other rape cases from the beginning. We also note that the defendant does not state what additional discovery or rulings would have helped his defense in the first rape case. In any event, the consolidation of the rape cases remaining after the first rape case was permissible. *See* Tenn. R.Crim. P. 8(b), 13(a). Thus, at no point, before or after the first rape trial, was the state required to consolidate any of the cases. Moreover, the record does not reveal that the first rape case could have been consolidated with the other rape cases. The victim testified that she was not a prostitute. The defendant did not proposition her; he pulled her off the street and into his car through the driver's side window. These facts are not consistent with those of the victims in the consolidated rape case, in which consolidation was based, in part, upon the defendant's common scheme or plan to seek dates from prostitutes and then rape them. We conclude that the trial court did not err, relative to the first rape case, by consolidating the remaining rape cases after the first rape trial.

VI. DISCOVERY

The defendant contends that the state's failure to provide complete discovery in either of the rape cases affected his defense of these cases. The state contends that the defendant has waived this issue by failing to cite to the record and, with regard to the consolidated rape trial, by failing to specify what items the state failed to provide. It also argues that the defendant has failed to show how the missing items were material to his case. Arguing that the penalty for failure to provide discovery is exclusion of that item at trial, it contends that, even if meritorious, this issue does not require reversal because the state did not introduce any of the allegedly withheld items at either trial. We conclude that the defendant has failed to show that most of items were discoverable and that he was not harmed by state's failure to disclose discoverable items.

Rule 16, Tenn. R.Crim. P., governs the discovery process. It provides in pertinent part that upon the defendant's request, the state
shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general; the substance of any oral statement which the state intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogations by any person then known to the defendant to be a law-enforcement officer; and recorded testimony of the defendant before a grand jury which relates to the offense charged.
*56 (C) Documents and Tangible Objects. Upon request of the defendant, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the state, and which are material to the preparation of the defendant's defense or are intended for use by the state as evidence in chief at the trial, or were obtained from or belong to the defendant.
(D) Reports of Examinations and Tests. Upon request of a defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Tenn. R.Crim. P. 16(a)(1)(A), (C)-(D). The state is not required to disclose "reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law-enforcement officers in connection with the investigation or prosecution of the case, or of statements made by state witnesses or prospective state witnesses" except to the extent required by Rule 16(a)(1)(A) and (D). Tenn. R.Crim. P. 16(a)(2). Both the state and the defendant have a continuing duty to disclose evidence previously requested and subject to discovery under Rule 16. Tenn. R.Crim. P. 16(c). When arguing that the state violated Rule 16, the defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown*, 836 S.W.2d 530, 548 (Tenn.1992).

The state contends that because it did not introduce any of the items listed by the defendant in either of the rape cases, the penalty of exclusion of evidence in Rule 16(d) is not available. The defendant argues that because Rule 16 entitles him to items material to the preparation of his defense, he was prejudiced by the lack of discovery without regard to the fact that the undiscovered evidence was not introduced at trial. Rule 16 provides the following regarding a party's noncompliance:
  If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

Tenn. R.Crim. P. 16(d)(2). The "such other order" provision of the rule includes the ability to dismiss the indictment. *State v. Collins*, 35 S.W.3d 582, 585 (Tenn.Crim.App.2000). The trial court should refrain from excluding evidence for noncompliance with discovery rules "except when it is shown that Defendant is actually prejudiced by the state's failure and the prejudice cannot be otherwise eradicated." *State v. Payne*, 791 S.W.2d 10, 16 (Tenn . 1990). We agree with the state that the penalties provided in Rule 16(d)-- penalties to be imposed by the trial court upon finding a discovery violation-- are not available to the defendant at this juncture because they are premised upon the trial being forthcoming or ongoing. Yet, the defendant argues that the state's failure to provide discovery in a timely fashion deprived him of his rights to due process and a fair trial. *See State v. Ferguson*, 2 S.W.3d 912, 916-17 (Tenn.1999) (holding that due process under the Tennessee Constitution requires us to inquire whether a trial conducted without evidence lost or destroyed by the state would be fundamentally fair). For this reason, we will examine the defendant's specific contentions regarding the withholding of discovery.

A. Discovery Violations in the First Rape Case

*57 The defendant contends that the state failed to provide discovery materials in time for him to be able to consider those materials in formulating his defenses for the first rape trial. He claims that in early September 1995-- about a month before the October 1995 trial--the state provided Knoxville Police Department files, which included a photograph array shown to the victim, numerous photographs of the crime scene, the victim's clothing, and the victim's rape kit made on the day of the offenses. He argues that the belated provision of the photograph array resulted in the trial court's refusal to entertain a motion to suppress those photographs. He contends that if he had received the rape kit during the discovery process in 1993, he could have obtained DNA testing to prove his innocence. Instead, he contends that by 1995, the vaginal swab in the kit had deteriorated and could not be tested. He also argues that the state introduced a rope during the first rape trial that was not provided in discovery. The state contends that these items were provided to the defendant before trial and that he cannot demonstrate prejudice with regard to belated discovery.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                      Page 48
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

With the exception of the photograph array, the defendant has failed to substantiate in
the record that the items he lists were in fact not provided until early September 1995.
Although in the interest of justice we have tolerated less than exemplary citation to the
record for other issues in this appeal, here we are also limited by the defendant's
failure to challenge the discovery of the listed items in his motion for a new trial or
the amendments thereto. *See* T.R.A.P. 3(e) (requiring for appellate review that a defendant
have raised an issue alleging error in the admission of exclusion of evidence in the
motion for new trial). The closest the defendant comes to raising the issue of belated
discovery is an unnumbered amendment to the motion for new trial filed on July 29, 1996,
which generally alleges that the state failed to disclose exculpatory and favorable
evidence to the defense. The motion does not specify the evidence that was not disclosed
but states that the defense will "offer proof of exculpatory and favorable evidence the
Defense discovered after the trial" and that he would offer the proof at evidentiary
hearings beginning on July 30, 1996. Because this amendment addresses exculpatory or
favorable evidence and evidence discovered after the trial, it is a stretch to apply it to
photographs of the crime scene, rope allegedly used to bind the victim, or the victim's
clothing or untested rape kit discovered a month before trial.

At the August 26, 1996 hearing on the motion for new trial, the defendant mentioned the
rape kit when arguing that the state should have provided discovery in all cases before
the first rape trial. He argued that he first learned of the rape kit's existence in
September 1995, that it had been placed in Detective Tom Pressley's desk drawer, and that
the police department said that it had spoiled for purposes of serology. He argued that
had the rape kit been tested, it could have excluded him as the rapist and that evidence
should be presumed to be adverse to the party who spoils evidence in its possession. The
defense counsel's argument regarding the rape kit does not constitute proof, and this
court's review of the record does not reveal that the defendant presented proof regarding
the rape kit in the hearings between July 30 and August 26, 1996. Although the defendant
asked Detective Pressley about the rape kit from the victim in the first rape trial at an
August 7, 1996 hearing, Detective Pressley testified that he was not involved in that
case. Defense counsel's argument also contradicts the trial testimony of Officer Whitson
that he collected the rape kit from the hospital on July 18, 1992, and a year later, moved
it from the refrigerator where it was stored to a warehouse. Finally, the trial court made
no findings or ruling regarding the rape kit. We conclude that the defendant has failed to
present the issue properly for our review. Thus, we will examine the defendant's
contentions only with regard to the photograph array.

*58 In a September 20, 1995 motion hearing, the defendant contended that a photograph
array containing a photograph of the defendant taken after his arrest should be suppressed
because the arrest was illegal. He noted that he had not received the array in discovery
but had located it himself on September 1, 1995. The prosecutor challenged this
contention, indicating that he had talked about the array with the defendant in his
office. The defendant clarified that the state had given him a series of six pictures but
that he did not know how they related to the array in this case because the state had
provided a lineup form in all cases except this one. During the hearing, he acknowledged
that the state had allowed him to interview the victim and argued that the interview
confirmed that the victim viewed a photograph array and picked out his photograph taken as
a result of his illegal arrest.

The defendant contends that the state's failure to provide the photograph array before
September 1995 resulted in the trial court refusing to entertain a motion to suppress the
array. The record belies this contention. The defendant argued for the suppression of the
array at the September 20, 1995 hearing. Citing *State v. Miller*, 608 S.W.2d 158
(Tenn.Crim.App.1980), the state argued that the photograph array was admissible for
purposes of identification even if taken following an illegal arrest. The trial court

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

declined to address the suppression issue at that time, ruling that it would take up the
suppression of the array on the morning of trial. Before the jury was selected, the
defendant again argued that his photograph should be suppressed because it resulted from
an illegal arrest. The trial court overruled the motion. This course of events does not
reveal that the defendant was unable to attempt to suppress the array based upon the
timing of its disclosure.

The defendant also argues that the trial court should have required the state to provide
discovery for all of the rape cases and the murder cases before the first rape trial. In
this regard, he argues that the state did not provide the following discovery until after
the first rape trial:
  (1) the defendant's November 11, 1992 note to Corrections Officer Birnbaum, asking "Who
is Kyle?";
  (2) TBI recordings of his statements of October 29 and 30 and November 9, 1992;
  (3) the defendant's oral statements made to Detective Johnson;
  (4) the defendant's medical records from the Knox County Sheriff's Office;
  (5) the defendant's records from Helen Ross McNabb Center;
  (6) the defendant's employment records;
  (7) property receipts for property examined by laboratories;
  (8) the statements of five women relating offenses similar to those on trial;
  (9) documents relating to the prior criminal activities of the victims in his cases;
  (10) documents concerning prior law enforcement inquiries about the defendant;
  (11) the pathologist's records;
  *59 (12) the medical examiner's records;
  (13) the "bug expert's" reports;
  (14) FBI laboratory or scientific reports;
  (15) TBI laboratory or scientific reports;
  (16) numerous pictures;
  (17) Knox County Probation Office records for victims and state witnesses;
  (18) Tennessee Department of Corrections records concerning victims and state witnesses;
  (19) Tennessee Board of Paroles records concerning victims and state witnesses;
  (20) Knox County Sheriff's Department records concerning victims and state witnesses;
and
  (21) Knoxville Police Department records relating to the credibility of victims and
state witnesses.
  He does not explain how potential defenses in the first rape trial were compromised by
the absence of this discovery. Although he argues that all of his rape and murder cases
were "inextricably intertwined," he does not specify how he could have defended the
first rape case if the state had provided the listed items. Instead, he urges this court
to interpret the phrase "material to the defendant's preparation of his defense" from Rule
16(a)(1)(C) and (D) using the standard for the scope of civil discovery, which requires
disclosure of anything "relevant to the subject matter involved in the pending action,"
Tenn. R. Civ. P. 26.02(1). The defendant argues that any piece of evidence that the state
collected during its investigation must have some relevance to the cases or else the state
would not have collected it.

We decline the defendant's invitation to adopt the civil standard for the criminal rule.
In determining the proper standard, we believe that it is appropriate to refer to federal
authority interpreting Rule 16(a), Fed.R.Crim.P., because our Rule 16 conforms with and
was greatly derived from its federal counterpart. *See State v. Hicks*, 618 S.W.2d 510, 514
(Tenn.Crim.App.1981). " 'Materiality means more than that the evidence in question bears
some abstract logical relationship to the issues in the case.... There must be some
indication that the pretrial disclosure of the disputed evidence would have enabled the
defendant significantly to alter the quantum of proof in his favor.' " *United States v.
Buckley*, 586 F.2d 498, 506 (5th Cir.1978) (quoting *United States v. Ross*, 511 F.2d 757,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

762-63 (5th Cir.1975)); *see also United States v. Maniktala*, 934 F.2d 25, 28 (2d
Cir.1991); *United States v. RMI Co.*, 599 F.2d 1183, 1188 (3d Cir.1979); *United States v.
Lloyd*, 992 F.2d 348, 351 (D.C.Cir.1993); *Moore's Federal Practice--Criminal* § 616.05
(2002); Timothy M. Hall, Annotation, *Books, Papers, and Documents Subject to Discovery by
Defendant Under Rule 16 of Federal Rules of Criminal Procedure*, 108 A.L.R. Fed. 380, 400
(1992). This definition of materiality is not restricted to exculpatory evidence because
the discovery of inculpatory evidence may enable the defendant to " 'alter the quantum of
proof in his favor' in several ways: by preparing a strategy to confront the damaging
evidence at trial; by conducting an investigation to attempt to discredit that evidence;
or by not presenting a defense which is undercut by such evidence." *United States v.
Marshall*, 132 F.3d 63, 68 (D.C.Cir.1998). In order to be material, the discoverable item
must "significantly help[ ] in 'uncovering admissible evidence, aiding witness
preparation, corroborating testimony, or assisting impeachment and rebuttal.' " *United
States v. Gaddis*, 877 F.2d 605, 611 (7th Cir.1989) (quoting *United States v. Felt*, 491
F.Supp. 179, 186 (D.D.C.1979)); *Lloyd*, 992 F.2d at 350 (relying upon *Felt's* definition of
materiality). This court has previously defined the phrase "material to the preparation of
the defendant's defense" using this definition: a tangible object under Rule 16(a)(1)(C)
is material " 'if there is a strong indication that [the evidence] will play an important
role in uncovering admissible evidence, aiding witness preparation, corroborating
testimony or assisting impeachment and rebuttal.' " *State v. Hershel Clark*, No.
02C01-9112-CR-00273, Shelby County, slip op. at 12 (Tenn.Crim.App. June 2, 1993) (quoting
*Felt*, 491 F.Supp. at 186).

*60 The defendant does not explain what role the twenty-one listed items would have
played in his preparation for the first rape trial but, instead, argues only that he could
not prepare his defenses in the first rape trial until he had received discovery in all of
his cases. He relies heavily upon a comment by the trial court in a January 16, 1996
scheduling conference following the first rape trial but before the remaining rape trials
were consolidated. In that conference, the defendant contended that the bulk of his
motions related to the murder trials, which were set to be tried after the rape trials.
The state argued that the defense was attempting to address motions relating to the later
set cases before the next scheduled rape trial. The trial court commented:
   Well, and they [the defense] say, though, that--that depending on the outcome of those
   motions that can have significant impact upon the way they that they approach the trials
   before September. I think that's a valid concern.
   The defendant argues that this comment supports his assertion that he could not prepare
his defenses in the first rape trial in the absence of discovery from all cases. The
defendant must do more than emphatically state that he needed certain discovery. He must
show how the discoverable items were material to the preparation of his defenses.

The defendant points to the trial court's order for a mental evaluation in the
consolidated rape case, which directed the parties to provide the defendant's medical
records, employment records, school records, and psychological and psychiatric records, as
proof that these items were relevant to his defenses in all of the cases. As examined in
depth in Issue IX, the defendant refused to submit to a court-ordered mental evaluation
before the first rape trial, lost the ability to present expert testimony on insanity due
to this refusal, and announced before trial that he was not going to pursue an insanity
defense based upon lay testimony because the expert testimony had been excluded. The
defendant has failed to explain how the twenty-one items he lists would have helped him
prepare a defense he ultimately elected not to present.

The defendant also contends that the trial court's consolidation of the other rape cases
and its ruling that evidence of the remaining rape cases was admissible pursuant to Rule
404(b), Tenn. R.Crim. P., in the trials of those cases as well as in the murder case show
that he needed discovery on the consolidated rape and murder cases before the first rape

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                    Page 51
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

trial. Notably, no ruling exists that the other rape cases or the murder case were admissible pursuant to Rule 404(b) in the first rape trial. We are unable to make the mental leap that the defendant requests, and we conclude that he is not entitled to relief on this issue.

B. Discovery Violations in the Consolidated Rape Case

The defendant contends that the trial court applied the wrong standards to the discovery process during the consolidated rape trial. He asserts that the trial court misapplied Rule 16 by restricting discovery to exculpatory evidence that the state intended to introduce in its case-in-chief. He maintains that the trial court erroneously required him to obtain discoverable materials from a source other than the state if the other source also had the records. He also states that the trial court refused to conduct a Rule 16(d) *in camera* review of the state's files in order to determine whether the state was withholding discoverable evidence. He contends that the state's discovery violations violated his rights to a fair trial and to due process of law. The state responds that the defendant has waived this issue by failing to cite to the record regarding the evidence that was allegedly withheld. It also argues that the defendant has failed to show that he was prejudiced by the withholding of evidence.

*61 The defendant asserts that the consolidated rape trial ended on May 24, 1996, and that from July 1996 through the homicide trial in early 1999, he received thousands of pages of materials that the state should have provided in discovery before the consolidated rape trial. He argues that "[it] is impossible to discuss all of the suppressed items of discovery in this brief. A review of the receipts of discovery and the record best reflects the information withheld and the efforts of the defense required [to] obtain fundamental disclosures." He claims that the fact that the state's July 3, 1996 open-file discovery policy, which occurred over one month after the consolidated rape trial, resulted in the disclosure of two thousand pages of additional material is alone sufficient reason to reverse his convictions. As examples of items that the state should have provided, he points to TBI summaries of his statements; TBI and FBI laboratory reports revealing that none of the victims' fingerprints were found in his vehicles nor did his vehicles, shoes or clothing contain fibers or debris matching Cahaba Lane; and the complaints of other rape victims whose rapes were similar to those described by the consolidated rape victims. It is the defendant's responsibility to specify which items the state should have provided as well as the reasons why these items were material to the preparation of his defense. *See* T.R.A.P. 27(7) (requiring that the appellant's brief set forth his or her contentions with respect to the issue, the reasons that those contentions require relief, citations to authorities, and appropriate references to the record); Tenn. Ct.Crim.App. R. 10(b). We decline the defendant's invitation to sift through the voluminous record in search of the purported discovery violations. In this respect, we will consider only the specific examples of discovery violations that the defendant mentions.

The defendant contends that the state failed to provide TBI Agent David Davenport's summaries of the defendant's statements before the consolidated rape trial. In support of this contention, the defendant cites only to Agent Davenport's handwritten notes and typed summaries admitted as exhibits. Rule 16(a)(1)(A) requires the state to disclose "the substance of any oral statement which the State intends to offer in evidence at trial made by the defendant whether before or after arrest in response to interrogations by any person then known to the defendant to be a law enforcement officer." Otherwise, reports or memoranda of law enforcement officers made in connection with the investigation of a case are not discoverable. Tenn. R.Crim. P. 16(b) (providing that reports, memoranda, and internal state documents pertaining to the investigation or prosecution of the case are not discoverable except as provided in subsections (A), (B), or (D) of Rule 16(a)(1)).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                          Page 52
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

In the present case, the state did not offer any of the defendant's statements at trial
but noted its intention to use the defendant's statements in a February 6, 1996 pretrial
hearing. At that hearing, the defendant acknowledged that he had received at least six
different statements attributed to the defendant. In his brief, the defendant argues that
he "did not even know of many of [his] statements until TBI Agent Davenport's summaries
were provided" after the rape trials and therefore could not move to suppress these
statements. The defendant's brief fails to explain what new statements by him Agent
Davenport's notes and summaries contained. We note that our own review of the record
reveals that during a July 30, 1996 motion hearing on the state's failure to provide
exculpatory evidence in the consolidated rape trial, the defendant attempted to explain
what new statements the summaries by Agent Davenport, exhibits 118 and 119, contained
beyond the reports by Agent Davenport received in 1993, exhibits 116 and 117. The state
argued that exhibits 118 and 119 were merely Agent Davenport's reports to his superiors
paraphrasing other statements by the defendant that had already been litigated in this
case. Exhibits 116 and 117 are not contained in the record, and, therefore, we cannot
compare the reports discovered before the consolidated rape trial with those discovered in
the open-file discovery. In any event, even if the notes and summaries contained new
statements, the defendant was not harmed by his inability to attempt to suppress them
because the state did not use any statements by the defendant at trial.

*62 The defendant also states that the state did not disclose until after the
consolidated rape trial TBI and FBI laboratory reports which revealed that none of the
victims' fingerprints were found in his vehicles. In his reply brief, he argues that this
information was important to his defense in the consolidated rape trial because all of the
victims testified that they were inside one of his vehicles.

The defendant also argues that the state failed to disclose TBI and FBI laboratory
reports revealing that his vehicles, shoes, and clothing did not contain fibers or debris
matching Cahaba Lane. He maintains that these reports would have been important in the
consolidated rape trial because three of the victims claimed that the offenses occurred at
Cahaba Lane.

In support of these arguments, the defendant points us to exhibit 208 in the murder
trial, which is a two-inch-thick binder filled primarily with multiple copies of
handwritten and typed logs of items collected from the homicide victims, Cahaba Lane, the
defendant's residence, and his vehicles. The binder also contains the FBI's results from
textile fiber comparisons, DNA testing, blood and semen testing, and hair comparisons
relating to the items collected. Unfortunately, the reports do not contain a complete key
for the numbers assigned to the items tested, and therefore, we are unable to evaluate the
defendant's contentions regarding what the test results prove and their value to his
defense in the consolidated rape trial. See Brown, 836 S. W.2d at 548 (holding that the
defendant's failure to provide the discovery in dispute in the record on appeal prevented
the court from determining whether the state's failure to provide these items affected the
outcome of the trial).

Initially, we note that it is not clear which materials in the black notebook the
defendant lacked. The defendant's argument at a hearing on exculpatory evidence held a
month and one-half before the consolidated rape trial revealed that he knew about
fingerprint and DNA testing relating to the rape and murder cases. At this hearing, he
referred to specific results concerning DNA testing contained within the reports located
in the black notebook, but he did not refer to the results that he raises in this appeal.
Assuming that the defendant did not have the FBI reports that he now argues the state
should have disclosed, we turn briefly to the record to attempt to discern whether the
results of those reports support the defendant's contentions regarding their materiality
to his defense.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                      Page 53
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

The record reveals that at the August 26, 1996 hearing on the motion for new trial in the first rape case, the defendant stated that he received FBI laboratory reports after the open file discovery permitted by the state in June 1996. He said that these reports concerned testing of "Huskey's clothes, of dust, debris, dirt off of his shoes ... compared with the soil, and the sample, and the fabrics taken from the persons at Cahaba Lane, particularly [one of the murder victims]." He stated that he was arrested on the day that this particular victim was allegedly killed, and yet his shoes bore no dirt. When the trial court questioned the relevance of that test result beyond the murder prosecution, the defendant argued that the jurors in the first rape trial knew about the murders. He contended that his ability to cast doubt upon him being the Zoo Man was relevant to the first rape trial and all of the other cases.

*63 At a September 10, 1996 motion hearing concerning the defendant's motion to compel discovery in the murder case, the defendant argued that he received laboratory reports relating to the processing of his vehicles in the open file discovery but that he still did not have the photographs related to this processing or the items removed from his vehicles. The state questioned the materiality of photographs of the defendant's truck. He stated that the laboratory tests on items taken from his truck revealed that those items had no evidentiary value. He asked whether the state realized that this result "might be exculpatory to the defense."

At the September 16, 1996 hearing on the motion for new trial in the consolidated rape trial, the defendant argued that once he got the laboratory information from the FBI, he found that the FBI could exclude Thomas Dee Huskey, or at least offer evidence to exclude him as being the person that was in the area of Cahaba Lane on the day he was arrested, because they had his shoes. They had the fibers; they had all of those things, and none of them matched that area. Had we had that information, that would have been important.
  The defendant also adopted the arguments that he made at the hearing on the motion for new trial in the first rape case.

When the state requests the FBI laboratory to conduct scientific tests, the FBI is the state's agent and "reports in its possession are in the state's possession for the purposes of Rule 16(a)(1)(D)." State v. Goodman, 643 S.W.2d 375, 379 (Tenn.Crim .App.1982). Assuming that the FBI and TBI reports revealed that dirt or debris from the scene of the crimes were not found on a defendant's clothing or shoes or in his vehicles, they could be material to the preparation of the defense as such evidence could contradict the victims' testimony that the defendant took them to a specific location, Cahaba Lane. Because the FBI and TBI reports in question were in the state's possession and contained the results of scientific tests that were material to the preparation of the defendant's defense, they were discoverable under Rule 16(a)(1)(D). We believe that the state should have disclosed these laboratory reports.

However, even taking the defendant's claims about what the FBI and TBI tests prove as true, we believe that the state's failure to provide the tests before the consolidated rape trial was harmless. The rape closest in time to the defendant's October 21, 1992 arrest occurred on October 5, 1992. The absence of material from Cahaba Lane in the defendant's vehicles or on his clothing or shoes sixteen days after the most recent crimes is of limited significance. In the most specific argument that he made to the trial court on the subject, the defendant argued that the absence of dirt on his shoes was important to show that he did not commit the murders on Cahaba Lane, which were not at issue in the consolidated rape trial. We are not persuaded that the defendant's inability to present the FBI laboratory results more probably than not affected the judgments in the consolidated rape trial. See T.R.A.P. 36(b).

*64 With regard to the absence of fingerprints in the defendant's vehicles, our

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                Page 54
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

exploration of the record has revealed no instance in which the defendant argued that the
FBI/TBI laboratory reports revealed the absence of fingerprints in the defendant's
vehicles. The black binder cited by the defendant reveals that latent fingerprints were
taken from his vehicle. The binder contains a request from Detective Mike Freeman to the
TBI for the comparison of the finger and palm prints of the homicide victims with "any
fingerprints found during processing." It contains an April 4, 1993 TBI report, which
states that one of the latent fingerprints from the defendant's vehicle matched the
defendant's right thumb print. The binder does not contain the results of fingerprint
tests conducted by the FBI. An October 28, 1996 FBI letter, which is attached to the
defendant's October 31, 1996 notice of partial receipt of discovery, states that the FBI
conducted fingerprint examinations with regard to the homicide victims. Neither this
notice nor the black binder reveal that any fingerprint analysis involved the fingerprints
of the rape victims. These documents reveal that latent fingerprints were taken from the
defendant's vehicle and were compared to the homicide victims' fingerprints and that one
of the latent fingerprints was identified as being that of the defendant. With the reports
cited by the defendant not revealing that the fingerprints taken from his vehicle were
ever compared to those of the rape victims, we cannot assess any potential for prejudice.
In any event, we cannot say that the failure to disclose more probably than not affected
the judgments. See T.R.A.P. 36(b).

   The defendant contends that the state failed to disclose the complaints of other rape
victims whose rapes were similar to those described by the consolidated rape victims. In
his reply brief, he argues that the detectives investigating him looked into these
complaints because of their similarity to the offenses on trial but excluded him as the
perpetrator in these cases. He claims that had he been provided these statements earlier,
he could have located and interviewed the complainants. His argument with regard to the
usefulness of these complaints is threefold: (1) that he could have used the complaints to
argue against consolidation, (2) that he could have used the claims of one of the
complainants to show that the defendant's confessions were false or unreliable, and (3)
that he could have used the complaints in two of these cases to argue at trial that
someone who looked like him was committing the offenses. In support of these contentions,
the defendant cites us to the police report of T. S., who was raped on February 19, 1992,
and to a letter from the KPD to the FBI requesting that the defendant's blood and hair be
compared to evidence from T. S.'s rape kit. He cites to a search warrant for Billy D.
Foster's hair and blood samples for comparison to evidence in the rape of A.P. He also
cites to the statements of T. M., B. B., and A.R. taken in conjunction with the
investigation of the murder case.

   *65 Generally, a defendant may not discover police reports before trial. See State v.
Daniel, 663 S.W.2d 809, 811 (Tenn.Crim.App.1983). To the extent that officers investigated
other rape complaints to determine whether the defendant committed those offenses, Rule
16(a)(2) provides that they are not subject to disclosure under the discovery rules
because they are "reports, memoranda, or other internal State documents made by ... law
enforcement officers in connection with the investigation or prosecution of the case."
Furthermore, the statements of witnesses taken during the investigation of the murder case
are likewise not discoverable under Rule 16(a)(2). In this respect, we note that Rule
16(a)(2), dealing with information not subject to disclosure to the defendant, excludes
discovery under Rule 16(a)(1)(A), (B), and (C) from non-disclosure but not subsection (C)
that authorizes the discovery of documents and tangible objects. We will address whether
the state had an obligation to disclose these complaints as exculpatory evidence without
regard to the discovery rules in the next issue, which deals with alleged Brady
violations.

   Finally, the defendant contends that the trial court erroneously refused to examine the
state's files pursuant to Rule 16(d) to determine if the state had failed to disclose any

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 55
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

discoverable evidence. Rule 16(d)(1) provides as follows:
  Upon a sufficient showing the court may at any time order that the discovery or
  inspection be denied, restricted, or deferred, or make such other order as is
  appropriate. Upon a motion by a party, the court may permit the party to make such
  showing, in whole or in part, in the form of a written statement to be inspected by the
  judge alone. If the court enters an order granting relief following such an ex parte
  showing, the entire text of the party's statement shall be sealed and preserved in the
  records of the court to be made available to the reviewing courts in the event of an
  appeal.
  The plain language of this provision does not authorize a defendant to request that the
court conduct an *in camera* examination of the state's files in order to ferret out
discoverable information. Instead, the *in camera* review contemplated in this section is of
a party's written statement explaining why the court should order the denial, restriction,
or deferral of discovery. Nevertheless, the trial court may perform an *in camera*
inspection of evidence in the event of a discovery dispute. *See State v. Butts*, 640 S.W.2d
37, 39 (Tenn.Crim.App.1982) (holding that although defendants are not entitled to routine
access to police personnel records, upon a strong showing that the records contain
information material to the defendant's case, the trial court should inspect the records
*in camera* and release the items material to the defense).

  In the present case, before the consolidated rape trial, the trial court noted that the
defendant had asked it to review the state's files for discoverable evidence because past
conduct indicated that the state did not comply with the discovery rules and the state's
view of exculpatory evidence differed from the defendant's. The court noted that it had
inspected the files of one of the victims *in camera*, but it declined to inspect the
state's entire file or all law enforcement files. The court re-instructed the state to
disclose to the defendant all information discoverable under the discovery rules and all
exculpatory information, including information about witnesses not equally available to
the defendant and any promises made to witnesses in exchange for their testimony. It
stated that it was confident that the state had done this. Regarding the broad review
requested by the defendant, the court stated, "It is not called for by the rules. It is
unprecedented, and I don't think it is appropriate. It is not this Court's function to
perform that task." In light of the defendant's general allegations that the files must
contain discoverable evidence, we do not believe that the trial court abused it's
discretion in declining to perform the review of the state's files that the defendant
requested.

  *66 In summary, the defendant is not entitled to relief on his claimed discovery
violations. The alleged violations in the first rape case are either unsubstantiated in
the record or unsupported by an explanation of how they were material to the preparation
of the defense. Of the purported examples of violations in the consolidated rape trial,
the defendant has failed to demonstrate that he was not provided with some of his
statements until after the trial, nor was he harmed by the inability to suppress any
undisclosed statements if they existed because the state did not introduce his statements
at trial. With regard to the TBI and FBI laboratory reports, the state's failure to
disclose these reports before the consolidated rape trial was harmless error. Finally, the
complaints of other rape victims investigated as a part of this case were not subject to
discovery under Rule 16(a)(1)(C) as limited by Rule 16(a)(2).

  VII. EXCULPATORY EVIDENCE

  The defendant contends that the state failed to disclose evidence favorable to the
defense before the rape trials. He argues that he could have used this evidence in the
first rape trial to show that someone else committed the offenses, to prove that his
statements were false, and to decide whether he should use an insanity defense or agree to

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                      Page 56
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

consolidate all the rape cases. With regard to the consolidated rape trial, he claims that
he could have used the withheld evidence to argue against consolidation and to argue for
suppression of his statements. He summarily argues that the failure to provide this
evidence denied his federal and state constitutional rights to due process of law, a fair
trial, and the effective assistance of counsel. The state contends that it did not
withhold exculpatory evidence and that the evidence allegedly withheld was not material to
the rape cases.

Approximately a year and one-half before the first rape trial, the defendant filed a
detailed motion for disclosure of exculpatory evidence in all of the rape cases. In this
motion, the defendant asked the court to order the state to furnish any evidence that was
favorable, exculpatory, or tended to establish a defense, to aid in avoiding a conviction,
or to mitigate punishment. The defendant listed twenty-two examples of evidence that he
was requesting, including evidence linking another person to the crimes; information
suggesting that his oral or written statements were illegally or unconstitutionally
obtained, evidence showing that he has a mental disease; and evidence from examinations,
tests, or experiments that failed to implicate him in the crimes. On October 16, 1995,
before the parties began selecting a jury, the defendant argued that the state had only
provided a boilerplate response that it had provided all exculpatory evidence to him. The
trial court denied the defendant's motion, ruling that the state acted at its peril in
failing to provide anything to which the defendant was entitled. In the consolidated rape
trial, the trial court directed the state to disclose all exculpatory information to the
defendant, although it was confident that the state had done this. It declined to
determine whether evidence that the defendant was seeking in discovery was favorable or
exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97
(1963), ruling that those issues would come into play after the trial.

*67 In *Brady*, the United States Supreme Court determined that "suppression by the
prosecution of evidence favorable to an accused upon request violates due process where
the evidence is material either to guilt or to punishment, irrespective of the good faith
or bad faith of the prosecution." *Id.*; *see also Hartman v. State*, 896 S.W.2d 94, 101
(Tenn.1995). In order to establish a due process *Brady* violation, the defendant must
establish the following:
1. The defendant must have requested the information (unless the evidence is obviously
exculpatory, in which case the State is bound to release the information whether
requested or not);
2. The State must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.
*State v. Edgin*, 902 S.W.2d 387, 390 (Tenn.1995) (opinion on rehearing). Evidence is
considered material under this standard only if there is a reasonable probability that had
the evidence been disclosed to the defense, the results of the proceeding would have been
different. *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565 (1995); *Edgin*, 902
S.W.2d at 390. The "touchstone of materiality"
is a "reasonable probability" of a different result, and the adjective is important. The
question is not whether the defendant would more likely than not have received a
different verdict with the evidence, but whether in its absence he received a fair
trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable
probability" of a different result is accordingly shown when the Government's
evidentiary suppression "undermines confidence in the outcome of the trial."
*Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566 (citations omitted) (quoting *United States v.
Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381 (1985)); *see also Edgin*, 902 S.W.2d at
390-91. Impeachment evidence, as well as exculpatory evidence, falls under the *Brady* rule.
*Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380. The burden of proving a *Brady* violation rests
with the defendant, and the violation must be proved by a preponderance of the evidence.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                          Page 57
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

*Edgin*, 902 S.W.2d at 389; *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn.Crim.App.1993).

A. The First Rape Trial

The defendant contends that the state withheld the following exculpatory evidence in the first rape trial: (1) evidence of similar rapes that he did not commit, (2) TBI Agent David Davenport's memoranda, (3) the "Who is Kyle?" note, (4) a statement by his ex-wife that she thought he had a "split personality," and (5) Detective Mike Freeman's notes stating that the medical examiner's preliminary examination concluded that one of the murder victims was killed while the defendant was in jail. He argues that this evidence was favorable to his defense and preparation of the first rape trial. The state contends that exculpatory evidence, not otherwise discoverable under the discovery rules, must be disclosed only if its absence undermines confidence in the verdict. It argues that the listed evidence was not material to the first rape trial.

(1) Other Rape Complaints

*68 The defendant contends that the state should have disclosed the complaints of other rape victims, T. S., B. M., A. P., T. M., and B. B., who described offenses similar to those in the first rape trial. He argues that because he was excluded as the perpetrator in these other rapes, he could have used this evidence to show that someone else who looked like him was committing these offenses. The state contends that the only similarity between the complaints cited by the defendant and the offenses in the first rape trial is that the perpetrator cursed the victims. It argues that evidence of these dissimilar rapes was not favorable, material, or relevant to the first rape case. The defendant replies that evidence that another person may be responsible for the crime undermines confidence in the verdict. We will review these victims' statements.

On February 19, 1992, T.S. complained that she had been raped. She said that she was walking home at 5:00 a.m. when a white male in a dark green, blue, or black Monte Carlo with a child restraint seat in the back offered her a ride. She said that en route, he turned into a driveway and began cursing her. She said that he made her get out of the car and remove her clothes and that he tied her hands behind her back with rope. She stated that he forced her to perform oral sex, then forced her into the woods, and hit her in the stomach. He penetrated her vaginally, forced her to perform oral sex again, and ejaculated in her mouth. He returned to his car, brought her clothes to her, and then left in his car. She described her attacker as a white male in his early thirties, weighing about 190 pounds, with black collar-length hair, and a black beard and moustache. Attached to the complaint is a search warrant for hair and blood samples from the defendant for DNA comparison.

Detective Tom Pressley of the KPD testified that he showed T.S. a photograph array containing the defendant's picture but that T.S. identified another person in the array as her attacker. He said that T.S. later called him and changed her identification to the defendant after seeing the defendant on television. Detective Pressley said that he did not charge the defendant in T. S.'s case because he believed her second identification was tainted. He said that he did not know the location of the laboratory results from the DNA comparison of the defendant's samples with T. S.'s rape kit. He said that T.S. was not a known to be a prostitute.

The complaint of T.S. contains a photocopy of a photograph array with the notation "looks like person who raped me" and signed by B.M. An arrow extends from this notation to the defendant's photograph. This is the only evidence relating to B.M. cited by the defendant. Detective Pressley testified that he was also involved in investigating B. M.'s case, which he said was similar to T. S.'s case. He said that the perpetrator picked up B.M. while she was walking home on Woodbine Avenue, which is near Magnolia Avenue, after

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 58
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

visiting a neighbor. Detective Pressley testified that the car driven by the perpetrator
was similar to that in T. S.'s case and that the rape of B.M. was also violent. He stated
that although prostitutes frequent Woodbine Avenue, B.M. was not a known prostitute. He
said that he did not charge the defendant in B. M.'s case because the victim was afraid of
the defendant and did not want to proceed with a prosecution. The record contains a
request from the KPD for a comparison of the defendant's hair and blood samples with B.
M.'s rape kit. Detective Pressley stated that he did not know where the results of that
comparison were.

 *69 The defendant argues that A. P., a German tourist raped in the Bluff Mountain area of
Sevier County, is the foreign girl that Kyle confessed in his statements to raping. The
defendant refers us to the November 20, 1991 statement of Lea Mynear, who aided A.P. after
the rape. Ms. Mynear said that A.P. described her attacker as being in his mid-thirties;
having short blonde hair, a beard, and blonde body hair; and driving a beige or
cream-colored truck. She said that A.P. said the man was wearing a necklace, which she
described as a claw holding a crystal orb on a leather or cloth cord. She said that A.P.
told her that the man was giving A.P. a ride to the Smoky Mountains National Park when he
stopped the truck and dragged A.P. into woods. She said that A.P. told her that the man
removed A. P.'s and his clothes, tied A. P.'s hands with her necklace, raped A.P. orally
and vaginally, repeatedly called her a "whore," and asked her to call him "master." Ms.
Mynear said that A.P. stated that the man told her that she would get off easier if she
didn't fight like the others who ended up with broken teeth and cuts all over.

 The record also contains a report by Detective Mark Turner, who met the victim and Lea
Mynear at the Sevier County Medical Center on November 20, 1991. In the report, Detective
Turner relates Ms. Mynear's account of what the victim told her about the offenses. This
account substantially conforms to Ms. Mynear's statement except that it relates that the
victim told Ms. Mynear that the perpetrator performed oral and anal sex on her and then
forced her to perform oral sex on him. Ms. Mynear also told the detective that the victim
saidthe perpetrator picked her up at the Greyhound Bus Terminal in Knoxville. The report
also states that the victim described her attacker as a well-groomed man in his
mid-thirties with blonde hair and a blonde beard. She states that he was approximately
five feet, eight inches tall and weighed approximately 200 pounds. The report states that
a sexual assault evidence collection kit was taken on the victim.

 Agent David Davenport testified that before the defendant's statements, the defendant was
a suspect in A. P.'s case because he lived in Sevier County, A.P. was a transient, and
A.P. was picked up on Magnolia Avenue. Agent Davenport said that he did not know the
results of the comparison of the samples from Billy Foster with A. P's rape kit or if A.P.
ever identified the defendant in a photograph array. Lieutenant Larry Johnson testified
that after speaking with a captain from the Sevier County Sheriff's Department, it was his
understanding that A.P. had identified the defendant from a photograph array.

 Also with regard to A. P., the defendant cites to a search warrant requesting blood and
hair samples from Billy Foster, who is described as weighing 160 to 180 pounds; being five
feet and six or eight inches tall, and having light reddish-brown, shoulder-length hair
and a light reddish-brown beard. The samples were to be compared to the A. P.'s rape kit.
Citing only to this search warrant, the defendant claims that he was excluded as the
perpetrator in this case. In a hearing following the consolidated rape trial, Lieutenant
Johnson stated that he did not believe that any laboratory work regarding the defendant
was done on A. P.'s samples. Without introducing the laboratory reports, the defendant
argued in another hearing that laboratory tests neither included nor excluded him as the
perpetrator in A. P.'s case.

 *70 On November 5, 1992, T.M. gave a statement to Detective Dan Stewart concerning one of
the victims in the murder case. T.M. stated that about two years earlier, she was working

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                    Page 59
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

as a prostitute and went with a man to his apartment, which contained numerous small statues of elephants. The man forced her at knife point to disrobe and attempted to tie her hands behind her back. He pulled her hair and forced her to perform oral sex. When he laid down his knife, she threw it out an open window, grabbed her clothes, and ran out the door. The statement reflects that T.M. identified an individual in a photograph array as her attacker, but it does not give the identity of the person identified. Lieutenant Johnson testified that although the array that T.M. viewed contained the defendant's picture, he did not know if it was in the fourth position. He stated that he did not know what became of the array in T. M.'s case but that the defendant was not charged in that case.

On October 29, 1992, B.B. gave a statement relating to the murder investigation. She stated that on September 2, 1991, Fred Allen Sexton picked her up at the bus station on Magnolia Avenue, took her to Jefferson County, and raped her when she refused to smoke cocaine with him. She stated that he pulled her to the back of the van by her neck, strangled her, took her clothes off, forced her to perform oral sex, and had sexual intercourse with her. She said that he told her he was going to kill her. She said that when she regained consciousness, she jumped from the van and ran away. She described Sexton as white and in his early thirties and stated that she thought Sexton suspected her of telling the police that his cousin sold drugs. She said that she knew two other women who had been taken to the murder crime scene, raped, and beaten. She said that they had said their perpetrator had been arrested.

The defendant claims that his DNA had been compared in other cases and that he had been excluded as the perpetrator. To support this contention, he refers us to the two-inch-thick notebook discussed above in Issue VI on discovery. Our review of the materials in the binder does not reveal any comparison of the defendant's DNA with that of T. S., B. M., A. P., T. M., or B.B. In fact, the meager evidence in the record relating to these other rapes reveals that samples were collected only from T. S., B. M., and A.P. The record does contain requests from the KPD to the FBI for a comparison of the defendant's DNA with the rape kits of T.S. and B. M., but the defendant has not cited, nor have we discovered, the results of those comparisons. Additionally, although the defendant does not cite to results from or a request for a comparison of his DNA with A. P.'s rape kit, we note that during argument in a September 16, 1996 hearing, he argued that the results of such a comparison neither included nor excluded him as the perpetrator.

The state argues that these rapes are not similar to the offenses in the first rape trial because none of these victims were snatched off the street or taken to a barn, nor was a firearm used in these offenses. It also argues that the victims' hands were not tied in these offenses, but we note that T.S. did say her hands were tied and that T.M. said her attacker attempted to tie her hands. The defendant argues that these rapes are just as similar as those offenses in the consolidated rape trial. He also notes that the police investigated these cases while investigating the defendant. We agree with the state that these other rapes were dissimilar to the facts of the first rape case. We conclude that they are not material to the first rape trial.

(2) Agent Davenport's Memoranda

*71 The defendant contends that the state withheld memoranda by TBI Agent David Davenport. In the open-file discovery following the consolidated rape trial, the defendant received the typed summaries of the notes of Agent Davenport. The notes included in the record state that Agent Davenport met with the defendant in the Knox County Jail and advised him of his rights but that the defendant declined to speak with the officers and wanted a lawyer. Without further explanation, the defendant contends that these notes were favorable to his decisions on his mental defense and to his motion to suppress his statements.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 60
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

The defendant also argues that Agent Davenport's November 10, 1992 memorandum, also disclosed after the consolidated rape trial, was exculpatory. The memorandum reveals that an assistant district attorney had asked Agent Davenport to be available to serve indictments on the defendant to see if the defendant would talk with the agent. The defendant contends that this information is relevant to the suppression of his statements because it is proof that the assistant district attorney directed an officer to reestablish contact with him after he had requested a lawyer. The defendant speculates that if the trial court had suppressed the statements and the evidence gained in the search of his home before the first rape trial, "then the capital murder cases were gone." He argues that if the murder cases had not been pending, then he might have agreed to be evaluated by the court-appointed expert before the first rape trial and had an insanity defense to present in that case. He asserts that he might have also agreed to consolidate all of the rape cases.

Neither the defendant's statements nor a mental defense were used in the first rape trial. Thus, Agent Davenport's notes and memorandum are not material to the first rape trial. Moreover, the defendant's contentions that he might have agreed to a mental evaluation or to consolidate all of the rape cases are speculative at best and fall far short of undermining our confidence in the verdict in the first rape trial.

(3) "Who is Kyle" Note

During the suppression hearing in the consolidated rape trial, the defendant discovered a note that was given to Correctional Officer Terry Birnbaum by the defendant. The note reads as follows:
Who is Kyle? Kile?
Time Loss? How Much? today? And Kyle?
I'm told Kyle Hates me? Why?
I was told they wanted to talk to Kyle & not me!
I'm told that "Kyle" said *he* killed 4 wemon! [sic] Raped Many others?
Trying to trap me! Why? ?
Am I 2 people? ? ? more? ?
I know not one of these wemon [sic] I saw in Photos!
Who is Kyle? Kile? Me? ? ?
Why does he hate Me?
The trial court ruled that although it understood the state's argument that it did not intend to introduce the unsigned note and that it had no proof that it bore the defendant's handwriting, the state should have disclosed the note to the defendant. It then stated that the defendant had the note at that time and directed the parties to move on with the proceedings.

*72 The defendant contends that this note was favorable to his insanity defense and his attempt to suppress his statements. He argues that it was critical for him to know all of the evidence supporting his insanity defense before the first rape trial because if he determined that his only defense was insanity, then he might have agreed to consolidation of all of the rape cases. The state contends that trial strategy is not relevant to a *Brady* claim. It also argues that the notes are not material or favorable to the defendant because the statements were not introduced in the first rape trial.

In discussing the standard for materiality in the *Brady* analysis, the United States Supreme Court has noted that a standard that focused on the withheld evidence's affect on the defendant's ability to prepare for trial would be unworkable in part because "knowledge of the prosecutor's entire case would always be useful in planning the defense." *United States v. Agurs*, 427 U.S. 97, 112 n. 20, 96 S.Ct. 2392, 2401 n. 20 (1976). Instead, as stated above, we must determine whether the absence of the withheld evidence undermines our confidence in the verdict. Neither the statements nor the insanity

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 61
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

defense were used in the first rape trial, and thus, the "Who is Kyle?" note was not material.

(4) Statement of Sherry Ball

The defendant contends that the state should have provided the statement of Sherry Ball, his ex-wife, in which she describes the defendant as having a "split personality" because he would be nice and calm and then become angry within an expanse of one minute. Although not entirely clear, the defendant apparently argues that this statement was favorable to his insanity defense. Because the defendant did not present an insanity defense in the first rape trial, this statement was not material in that case.

(5) Notes of Detective Mike Freeman

The defendant contends that the state should have disclosed Detective Mike Freeman's notes, which reveal that one of the murder victims was killed while the defendant was in jail. The notes state, in pertinent part, that a doctor, who's name is illegible, "preliminary sez [sic] vict. has not been at location more than 1 or 2 days." The defendant summarily argues that this information was exculpatory because it shows that his confessions are false and that someone else was committing crimes similar to the ones with which he was charged. He also suggests in passing that the murders were potential Rule 404(b), Tenn. R.Crim. P., evidence in the first rape trial. The state contends that the defendant fails to explain how this information, which was only a preliminary finding, was material to the first rape case. We agree with the state that evidence of the murders was not introduced in the first rape trial and, therefore, was not potential Rule 404(b) evidence. Detective Freeman's notes are not material to the first rape trial.

B. Consolidated Rape Trial

The defendant contends that the state withheld the following exculpatory evidence in the consolidated rape trial: (1) the rape complaints of other victims alleging conduct similar to the offenses in the consolidated cases and a description that fit the defendant, who was subsequently excluded as the perpetrator, (2) Agent Davenport's memorandum, and (3) TBI and FBI laboratory reports.

(1) Other similar rape complaints.

*73 The defendant contends that the state withheld evidence of the rapes of B. M., A.P. and Lea Mynear, who described similar conduct by a person fitting his description. He states that he was excluded as the perpetrator of these other rapes. He argues that this evidence was material to his opposition to the state's motion to consolidate to show that the offenses were not signature crimes as the state alleged. He also argues that the fact that he was excluded in the rape of A.P. shows that his statements are false and unreliable. The state argues that the defendant does not explain how these rapes are similar, nor does he cite to support for his claim that he was excluded as the perpetrator. It also argues that the evidence does not exculpate the defendant with regard to the consolidated rape offenses, nor is it impeachment evidence in those cases.

Initially, we note that the record reflects that Ms. Mynear was not a rape victim but, instead, was the person who aided A.P. after she was raped. Ms. Mynear's statement, relating what A.P. told her about the offenses against her, is related above. We have already described the evidence relating to the rapes of B.M. and A.P. Additionally, although the defendant does not mention the state's failure to provide the statements of A.R. in this issue, he does challenge the state's failure to provide A. R.'s statement before the consolidated rape trial in Issue VI on discovery. In light of our analysis on the discovery issue, we will also review the evidence relating to A. R.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 62
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

On October 21, 1992, A.R. gave a statement to Detective Mike Upchurch, who was investigating the murder cases. After describing her attempt to find one of the murder victims, who was her friend, A.R. stated that about one month before the interview, she encountered a man driving a small yellow pickup truck on Magnolia Avenue around 1:00 or 2:00 p.m. She said that the man asked about P. J., a prostitute who frequented the Magnolia Avenue area. She said that she felt more comfortable with him because he knew P.J. and that he offered her around $75 for oral and vaginal sex, which she thought was a lot of money in light of the fact that he did not know her.

A.R. said that the man drove her to a dead end road in a wooded area where she believed that the murder victims were later found. She said that they got out of the truck and he insisted that she remove her clothing. She said that although she did not want to take off all of her clothes because her ankle was in a splint, she did so because she could tell that the man was getting "edgy." She said that the man tied her hands behind her back with a two-foot length of smooth, off-white, braided cord. She said that he did not have a weapon and that he told her that she would not be hurt unless she tried to fight or untie herself. She said that he made her walk several hundred yards into the woods where he forced her to perform "all different kinds of sex." She said that the man had track marks on the inside of his wrist and that she believed him to be an intravenous drug user. She said that he slapped her face and punched her in the chest, breaking a couple of her ribs.

*74 A.R. said that after an hour, the man questioned whether he should let her go because she could have him arrested. She said that she assured him that she would not contact the police and that he said she would go to the graveyard if she did. She said that he left her in the woods and told her to stay there until she could no longer see him. She said that when she finally found her way out of the woods, the man drove away and that she saw the license tag on his truck. She said that in addition to raping her, the man took fifty dollars from her shoe. She said that when she saw a picture of the man before the interview, she immediately recognized him. The record does not reflect who showed A.R. the picture or the identity of the person in the picture.

With regard to thesuppression of his statements, again we hold that the evidence relating to other rapes is not material because the statements were not used. As for the defendant's argument that he could have used this evidence to oppose the consolidation of the cases in the second rape trial, we conclude that the rapes of A.P. and B.M. were not similar to the offenses in the consolidated rape case. The record does not reflect that A.P. or B.M. were prostitutes and neither were taken to Cahaba Lane or to the barn at Chilhowee Park. Furthermore, the record does not support the defendant's contention that he was excluded as the perpetrator in these cases. Detective Pressley testified that the defendant was not charged in B. M.'s case because she was afraid of him and did not want to press charges. With regard to A. P., although the record contains evidence that another person, Billy Foster, was pursued as a suspect in A. P.'s case, Lieutenant Johnson testified that he believed that A.P. also identified the defendant's picture from a photograph array. With regard to A. R.'s case, we can understand how the defendant would deem her statement relevant. On the other hand, nothing in her statement undermines our confidence in the jury's verdict in the consolidated rape trial so as to make it material.

(2) Agent Davenport's Memorandum

The defendant again contends that the state should have disclosed Agent Davenport's memorandum that stated that an assistant district attorney wanted Agent Davenport to serve indictments on the defendant to see if the defendant would talk. The defendant argues that this memorandum contradicts the testimony of Lieutenant Larry Johnson that he did not serve the capias as a pretext to get the defendant to talk and that it was a coincidence that Agent Davenport accompanied him to serve the capias. The trial court did not suppress the statements in the consolidated rape trial because it found that the defendant

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 63
**(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))**

initiated contact with the officers, who were properly serving the capias. The defendant
argues that the withheld memorandum shows that the assistant district attorney
intentionally violated his right to counsel. We agree with the state that Agent
Davenport's memorandum might have been relevant had the statements been introduced at
trial but that the memorandum itself is not exculpatory nor does it have any impeachment
value outside of the context of the suppression of the statements. Thus, the memorandum is
not material to the consolidated rape trial.

(3) TBI and FBI Laboratory Reports

*75 The defendant summarily contends that the state withheld exculpatory TBI and FBI
laboratory reports and other impeaching materials until after the rape trials. Citing only
to the black notebook discussed in Issue VI on discovery, he argues that all of the TBI
and FBI tests were exculpatory because no fibers or soil from Cahaba Lane matched his
clothes or cars. He argues that the tests revealed no matching fingerprints and that DNA
tests excluded him as the perpetrator of crimes similar to those charged. The state
contends that the tests cited by the defendant do not appear to be related to the
consolidated rape cases. It argues that the record does not reflect that any samples were
obtained in conjunction with the consolidated rape cases and that no reason exists to
believe that these laboratory reports are exculpatory or material in this case.

As discussed in Issue VI, the state should have disclosed the FBI and TBI reports under
Rule 16(a)(1)(D) because they contained the results of scientific tests that were material
to the preparation of the defendant's defense. Nevertheless, we have already concluded
that the state's failure to disclose the reports was harmless due to the passage of time
between the last of the consolidated rape offenses on October 5, 1992, and the defendant's
October 21, 1992 arrest and the fact that the reports cited by the defendant do not reveal
that the fingerprints taken from his vehicle were ever compared to those of the rape
victims. Furthermore, our review of the notebook does not reveal that it contains any
comparisons of the defendant's DNA with that of any surviving rape victim. The defendant
has failed to show by a preponderance of the evidence that the FBI and TBI reports are
sufficiently exculpatory to the consolidated rape case so as to undermine our confidence
in the verdict.

VIII. HEARING OF PRETRIAL MOTIONS

The defendant asserts that he was not able to prepare his defenses properly in both
trials because the trial court refused to rule on certain motions until the day of trial.
He contends that the trial court denied him due process of law by not ruling on all of his
pretrial motions relating to all of his cases before the rape trials. The state contends
that the trial court did not commit reversible error by refusing to rule on the
defendant's motions at the precise time that the defendant requested. We conclude that the
defendant has failed to show that he suffered any prejudice from the timing of the trial
court's rulings on his various motions.

Rule 12(e), Tenn. R.Crim. P., provides in pertinent part that a
motion made before trial shall be determined before trial unless the court, for good
cause, orders that it be deferred for determination at the trial of the general issue or
until after the verdict, but no such determination shall be deferred if a party's right
to appeal is adversely affected.
The rationale behind Rule 12(e) is to avoid inconveniencing the jury and witnesses; to
apprise both parties of the evidence admissible at trial, which might affect plea
negotiations or trial strategy; and to preserve the state's right to appeal an adverse
ruling. *State v. Aucoin*, 756 S.W.2d 705, 709 (Tenn.Crim.App.1988); *State v. Feagins*, 596
S.W.2d 108, 110 (Tenn.Crim.App.1979). In light of these purposes, this court has
interpreted "before trial" in Rule 12(e) to mean "sometime earlier than the day the trial

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                              Page 64
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

is to commence." *Aucoin,* 756 S.W.2d at 709. If "the defendant asks for a hearing prior to trial, but the trial judge refuses to grant the defendant a hearing, the trial judge commits error unless the record reflects good cause for deferring the hearing on the motion." *Id.*

A. The First Rape Trial

**\*76** The defendant states that although he appeared in court on several occasions ready to argue and present proof on his motions, the trial court chose, at the state's urging, to defer hearing motions until the day of trial. He argues that the trial court's refusal to hear motions until the day of trial simply because that was the court's traditional practice was an insufficient reason to deny him rulings necessary to prepare his defense. He speculates that the delayed rulings were part of the state's plan to force him to plead guilty before he had sufficient information to make informed decisions. He contends that by delaying rulings until the day of trial, the trial court violated his rights to due process, a fair trial, and the effective assistance of his counsel. The state contends that the defendant fails to specify which motions the trial court refused to hear or to explain how he was prejudiced by the timing of the court's rulings.

We agree with the state that the defendant's general references to motions filed pretrial but not ruled upon until the day of trial are insufficient to support his argument. *See* T.R.A.P. 27(a)(1)(7). In his reply brief, the defendant refers us to his summary of all of the pretrial proceedings located in the procedural facts in his brief. The only specific contentions regarding how he was harmed by the allegedly belated rulings are his assertions that the state was able to show the jury a photograph of him, a photograph array with the word "homicide" on the back, some rope, and some previously undisclosed pictures without him having the benefit of the trial court's rulings regarding Rule 12, Tenn. R.Crim. P., or Rule 104, Tenn. R. Evid., on this evidence. The defendant does not state the nature of the undisclosed pictures, nor do his references to the record relate to any undisclosed pictures. We will address the defendant's contentions only with regard to the specific allegations of prejudice concerning his photograph taken at the time of his arrest, the photograph array from which the victim identified him, and a piece of rope identified by the victim as the rope that the defendant used to bind her during the offenses.

On the day trial was to begin but before the jury was selected, the trial court denied the defendant's motion to suppress his photograph taken at the time of his arrest and placed in a photograph array from which the victim identified him as her attacker. Without addressing the question of whether the trial court had good cause to defer ruling on this issue and assuming that the trial court should have ruled upon this issue before the day of trial, we conclude that the defendant suffered no prejudice from the belated ruling. As discussed in Issue III on suppression of the evidence stemming from the defendant's arrest and Issue XXIV relating to the admissibility of the defendant's photograph and the photograph array in the first rape trial, the defendant was not entitled to suppression of this photograph. With respect to the photograph array from which the photograph was removed, as we previously note, the record contains no evidence that the jury saw the word "homicide" written on the back of the array. The defendant is not entitled to relief.

**\*77** With respect to the rope, the state asked the victim to identify a piece of rope. The defendant objected that the state had not laid a proper foundation nor proven the chain of custody with respect to the rope and that the rope was more prejudicial than probative. He also stated that the rope was the subject of a motion to suppress that had not been ruled upon before trial, but he did not give the basis upon which the rope should have been suppressed. The trial court ruled that the rope was admissible through the victim if she could identify it. We are unable to determine that the defendant attempted to suppress this rope before trial. He did file a motion to suppress evidence gained in the search of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 65
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

his home following his arrest and, as we note in Issue III on the propriety of defendant's arrest and the search of his home, rope was taken from the defendant's bedroom floor pursuant to that search. The rope at issue in the first rape trial was taken from the stall in the barn in which the victim was raped. We can discern no error with respect to the timing of the trial court's rulings on the piece of rope from the barn stall.

B. Consolidated Rape Trial

The defendant asserts that the trial court failed to rule on the state's motion for a mental evaluation until the eve of trial and did not rule until after the consolidated rape case on his motions for dismissal due to the violation of his right to a speedy trial, severance of the murder cases, or a new trial in the first rape case. He also states generally that the trial court failed to rule on numerous motions relating to the homicide cases before the consolidated rape trial. He contends that the delay in ruling prevented him from incorporating the rulings into his theory of defense. The state argues that the defendant has failed to show that he was prejudiced by the timing of the trial court's rulings.

The defendant argues that the trial court's failure to order him to submit to a mental examination until three days before trial precluded the opportunity for a meaningful mental evaluation and ultimately resulted in the striking of his insanity defense. Initially, we note that the trial court ruled upon this issue on May 9, 1996, several days before the May 13, 1996 trial date, thereby complying with Rule 12(e). As discussed in detail in the next issue relating to the limitation of the defendant's insanity defense, the trial court ordered Dr. Clifton Tennison to examine the defendant, but Dr. Tennison found that he lacked sufficient experience and expertise to complete the examination. On May 9, 1996, the trial court ordered that the defendant be examined by Dr. Phillip Coons. The defendant refuse to submit to this examination because he objected to Dr. Coons. As noted by the state, the defendant's primary objection to the mental examination was unrelated to the timing of the court's order. Furthermore, as discussed in the next issue, the delay in reaching the mental examination issue was largely due to the numerous motions that the trial court had to address. We can discern no error.

*78 Citing to five volumes of transcript from the hearings preceding the murder trial, the defendant states that the trial court failed to rule before the consolidated rape trial on over fifty motions relating to the murder cases that had been pending since 1994. He summarily argues that the lack of rulings on these numerous motions affected his ability to make informed decisions about his defenses in the consolidated rape trial. Without stating which motions would have enhanced his ability to make decisions regarding the mental evaluation, he also contends that the inability to make meaningful decisions resulted in the striking of his right to offer expert testimony on insanity in the consolidated rape trial. We deem these contentions too general to review. As with the first rape trial, we will address only the specific motions that the defendant offers as examples in his brief.

The defendant argues that he was prejudiced by the trial court's failure to rule on his motion for a speedy trial until December 1998 because, as time passed, the amount of time and money invested in his trials placed pressure upon the trial court not to dismiss his cases for denial of a speedy trial. The state contends that the defendant is not entitled to relief on this issue because he told the trial court that he was not pursuing a motion for speedy trial in the rape cases but only in the murder case. As discussed in Issue II relating to the violation of the defendant's right to a speedy trial, the defendant moved to dismiss the charges against him for a denial of a speedy trial on April 29, 1996, three weeks before the consolidated rape trial. Although the motion only requested the dismissal of the homicide case, the defendant argued that his demand for a speedy trial in the homicide case necessarily meant that he was also demanding speedy trials in the rape

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                Page 66
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

cases, which were to be tried before the homicide case. The trial court considered this argument on May 9, 1996, and stated that the defendant's motion to dismiss would apply to all of his cases. On December 12, 1998, the trial court denied the defendant's motion to dismiss in an order that on its face relates to the homicide cases. Assuming that the trial court should have ruled on this issue before the consolidated rape trial, we conclude that its failure to do so is harmless in light of our holding in Issue II that the defendant was not denied his right to a speedy trial in either of the rape cases.

The defendant contends that the trial court erroneously deferred its ruling on his motion to sever the murder charges before the consolidated rape trial. He argues that he suffered prejudice from this delay because the state could have introduced evidence of the murder cases as Rule 404(b) evidence, on cross- examination, or on rebuttal during the consolidated rape trial. He also argues that had he prevailed on his motion to sever, he could have used this as a basis to exclude his statements in the consolidated rape trial because evidence of the different murders was intertwined in the statements. We agree with the state that the defendant has failed to show any harm from the trial court's failure to rule on this motion pretrial. Neither evidence of the murder cases nor his statements were introduced in the consolidated rape case. Furthermore, the defendant ultimately failed to prevail on his motion to sever the murder charges.

*79 Finally, in his reply brief, the defendant notes in passing that the trial court erroneously failed to rule on his motion for a new trial in the first rape case before the consolidated rape trial. Other than the general assertions discussed above, he gives no explanation of how he was prejudiced by the trial court's failure to rule upon this motion before the consolidated rape trial. Furthermore, we note that the defendant amended his motion for a new trial in the first rape case five times after the consolidated rape trial and that, ultimately, the trial court denied his motion for new trial in the first rape case, relying primarily upon the rulings it made during the rape trials themselves. We cannot conclude that the defendant is entitled to relief on this issue.

IX. LIMITATION OF INSANITY DEFENSE

The defendant contends that the manner in which the trial court conducted the mental evaluation process in both trials violated his rights to present a defense and to due process of law. He argues that the trial court erroneously excluded defense experts on the defendant's mental condition in both trials and the insanity defense in the first rape trial. The state contends that the trial court properly excluded the testimony of defense experts on the defendant's mental condition because he refused to comply with the trial court's orders that he undergo a mental evaluation by a court-appointed expert. The defendant insists that in order for any waiver of the insanity defense to be valid, he had to refuse to undergo the evaluation personally, either orally or in writing. We believe that the trial court properly sanctioned the defendant in both cases.

A defendant seeking to present an insanity defense or expert testimony of his or her mental condition as it relates to guilt must notify the district attorney general in writing within the time provided for pretrial motions. Tenn. R.Crim. P. 12.2(a), (b). Rule 12.2(c) permits the state to seek a mental evaluation of the defendant by a court-appointed expert:

In an appropriate case, the court may, upon motion of the district attorney, order the defendant to submit to a mental examination by a psychiatrist or the other expert designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except for impeachment purposes or on an issue respecting mental condition on which the defendant has

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

CERTIFICATE & SEAL

STATE OF TENNESSEE

COUNTY OF MADISON

I, Judy Barnhill, Clerk of the Circuit Court for the County of Madison, in the State

aforesaid, do certify that the foregoing is a correct transcript of the record and proceedings had

in said Court in the case heretofore prosecuted and determined therein between

**JON HALL** APPELLANT **and STATE OF TENNESSEE ,**   APPELLEE,  as the same

remains of record in said Court.

STATE OF TENNESSEE

COUNTY OF MADISON

In testimony whereof, I subscribe my name and affix the seal of said Court at office, in

Jackson, Tennessee  the  **21ST**  DAY  OF  **JULY**  in the year Two Thousand  Three  in the

224th year of American Independence.

_Judy Barnhill_
JUDY BARNHILL, CLERK