# ADDENDUM 1
## Volume 7

# CIRCUIT COURT OF MADISON COUNTY
## – TO –
# COURT OF CRIMINAL APPEALS

JUDGE _____ROY B. MORGAN_____ DIVISION _I_

W2003-00669-CCA-R3PD

CIRCUIT COURT CLERK_____JUBY BARNHILL_____

VOLUME __VII__ OF __VIII__ VOLUMES

STATE OF TENNESSEE

VS.                                          CASE NO. C-00-422

JON HALL

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| FELONY | ☒ | MISDEMEANOR ☐ | ROR ☐ | TDOC | ☒ |
| BOND | ☐ | $_____ | INDIGENT ☐ | | |
| POST CONVICTION | ☒ | | HABEAS CORPUS | | ☐ |

MR. ALFRED EARLS
ASSISTANCE DISTRICT ATTORNEY
P.O. BOX 2825
JACKSON, TN 38302

MR. DANNY ELLIS
ATTORNEY AT LAW
P.O. BOX 3512
JACKSON, TN 38303

Attorney For: APPELLEE

Attorney For: APPELLANT

Attorney For:

Attorney For:

OFFENSE: FIRST DEGREE MURDER

SENTENCE: DEATH

**FILED**
JUL 2 4 2003
Clerk of the Courts
Rec'd By

Vol. 7

Filed the __21ST__ day of _____JULY_____, _2003_.

COURT OF CRIMINAL APPEALS

BY: __T. ROBERSON__

LAYCOOK, JACKSON

I N D E X

CERTIFICATE & SEAL                                                  1059

STATE BRIEF AT THE CLOSE OF EVIDENCE                    910-959

MOTION TO WAIVE COUNSEL & REINSTATE ALL OF
THE PETITIONER'S PREVIOUS FILED PLEADINGS            960-962

ORDER DISMISSING POST CONVICTION PETITION           963-1015

NOTICE OF APPEAL                                             1016-1017

MOTION TO ALTER AND AMEND  JUDGMENT
(MARCH 13, 2003)                                              1018-1048

MOTION TO ALTER AND AMEND JUDGMENT
(MARCH 17, 2003)                                              1049-1058

Slip Copy                                                                Page 67
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

introduced testimony.
  The purpose behind Rule 12.2(c) is "to provide the prosecution with a means to obtain
necessary information to rebut evidence of mental condition presented by the defendant,
while at the same time safeguarding the defendant's right against self-incrimination."
*State v. Huskey,* 964 S.W.2d 892, 889 (Tenn.1998). If the defendant fails to give notice or
refuses to submit to a court-ordered examination, "the court may exclude the testimony of
any expert witness offered by the defendant on the issue of the defendant's mental
condition." Tenn. R.Crim. P. 12.2(d). The court may also sanction the defendant by
precluding the insanity defense. *Huskey,* 974 S.W.2d at 896.

  *80 The following factual overview of the mental evaluation process in the defendant's
cases is taken from our supreme court's opinion stemming from the defendant's
interlocutory appeal of the trial court's Rule 12.2(c) orders in the homicide case:
  In March and April of 1994, Huskey filed notice of his intent to use expert testimony
with regard to a mental condition and to rely on an insanity defense with respect to all
the cases. When the State filed a motion to compel Huskey to undergo a mental
examination under Rule 12, Huskey moved for a protective order requiring, among other
things, that counsel and a defense expert be permitted to attend the examination and
that the examination be recorded. Huskey argued that these measures were necessary to
preserve his right to counsel and his right against self-incrimination.
  The trial judge, Judge Ray Lee Jenkins, denied the motion for a protective order and
entered three written orders in all cases compelling Huskey to undergo a mental
examination at the Helen Ross McNabb Mental Health Center in Knoxville. Although orders
were entered on May 17, 1994, May 8, 1995, and May 11, 1995, no examinations were
conducted because the defense refused. Judge Jenkins later ruled that because of the
refusal to be examined, the defense could not rely on an insanity defense or introduce
expert testimony as to a mental condition in [the first rape case], which was finally
tried in October of 1995. Huskey was convicted of rape and related offenses.
  With regard to [the consolidated rape case and the homicide case], more hearings were
held on the mental examination issues in February, April, and May of 1996. On May 2,
1996, Judge Baumgartner ordered that Huskey was to be examined by Dr. Clifton Tennison
at the McNabb Mental Health Center. After a two-hour interview with Huskey, Tennison
reported to the trial court that he needed more sessions with Huskey, additional
background information, and also "someone with substantive experience and demonstrated
expertise," specifically in the field of disassociative identity disorder.
  The trial court instructed Tennison to inquire into the availability of additional
experts in the field after finding that someone with further expertise and experience
was necessary to effectively complete the examination:
  [Dr. Tennison] advised us that due to the nature of the illness that Mr. Huskey may
suffer from, that he felt that he was not personally capable of providing the Court with
the best evaluation that could be accomplished. And that he felt the appropriate thing
for him to do within the discipline that he's an expert in is to employ the services of
an individual who was more qualified, had more experience, [and] had studied in this
specific area of disassociative identity disorder.
  At a later hearing, Tennison related the qualifications and experience of several
experts in the field of disassociative identity disorder, including Dr. Phillip Coons, a
psychiatrist in Indiana who had been brought to Tennison's attention by the prosecution.
  *81 On May 9, 1996, the trial court ordered in all the cases that Huskey be examined by
Tennison and Coons. The order required the examination to be recorded but stated that no
one could be present during the examination unless approved by Tennison and Coons. The
order required counsel for the State and the defense to make available Huskey's medical
records, employment records, school records, psychological/psychiatric records, and
witnesses with knowledge of Huskey's conduct. The order stated that upon completion of
the examination, the defense would have "a reasonable period" in which to decide whether
it intended to proceed with an insanity defense or evidence respecting a mental

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                      Page 68
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

condition; if it did, the State would be provided with the "evaluation and test results
from the examination."
Huskey objected to the participation of Coons, and argued that the order violated his
right to counsel, right against self-incrimination, and right to due process. With
regard to the four capital cases, the trial court granted Huskey's request for an
interlocutory appeal of the May 9, 1996 order pursuant to Tenn. R.App. P. 9. After the
Court of Criminal Appeals denied the appeal, [the Supreme Court] granted Huskey's
application for permission to appeal ..., finding that review of the May 9th order prior
to conducting the examination would provide guidance to the trial court on these issues
and avoid the possibility of serious errors that potentially would require retrials of
four complex capital cases.
Huskey, 974 S.W.2d at 893-94 (footnotes omitted).

The defendant refused to submit to the May 9, 1996 order, and pursuant to Rule 12.2.(d),
Tenn. R.Crim. P., the trial court precluded him from presenting expert testimony regarding
his mental condition in the consolidated rape trial. Following the consolidated rape trial
in May 1996, the trial court entered an order for a mental evaluation in the homicide case
on August 12, 1996, which superceded the May 9, 1996 order. This order directed Middle
Tennessee Mental Health Institute (MTMHI) to examine the defendant and prohibited defense
counsel from attending the examination but did not mandate that defense counsel disclose
records or witnesses. Instead, the order encouraged the parties to cooperate with MTMHI's
information requests "subject to the attorney-client or other applicable privileges." The
supreme court held that the May 9, 1996 and August 12, 1996 orders did not violate the
defendant's right against self-incrimination or right to counsel. Id. at 897-98.

A. The First Rape Case

The defendant contends that the trial court's striking of his insanity defense in the
first rape case violated his constitutional rights to present a complete defense and to
due process. He asserts that he did not have a meaningful opportunity to comply with the
trial court's order for a mental examination before the trial court imposed sanctions and
that he did not personally refuse to undergo the examination. He also challenges the
harshness of the trial court's sanction, arguing that Rule 12.2(d) does not permit the
striking of his insanity defense but only his expert testimony and that his constitutional
right to present a defense trumps the state's procedural right to seek a mental
examination. Finally, he argues that the trial court arbitrarily denied his subsequent
motion for a mental examination, which was made over forty-five days before the trial
began on October 18, 1995. The state contends that the trial court properly imposed Rule
12.2(d) sanctions after the defendant repeatedly refused to comply with its orders. It
argues that the record does not reflect that the trial court struck the insanity defense
as opposed to expert testimony, but striking the entire defense was within the trial
court's authority.

*82 In order to address the defendant's contentions, we begin by reviewing the tangled
Rule 12.2 proceedings in the first rape case in some detail. As noted above, on March 3,
1994, the defendant filed notice pursuant to Rule 12.2(b) of intent to use expert
testimony relating to his mental condition bearing upon guilt. By written motion on April
7, 1994, and orally at an April 8, 1994 hearing, the state moved that the defendant
undergo a mental examination pursuant to Rule 12.2(c). On April 15, 1994, the defendant
filed a Rule 12.2(a) notice of intent to rely upon the insanity defense. On April 26,
1994, the defendant moved for a protective order, requesting that counsel and defense
experts be present at the examination, that the examination be recorded, that only one
examination be conducted by a single examiner, and that the trial court impose controls on
the release of any information gathered in the process and not release any information to
the state until such time as it becomes relevant for impeachment or rebuttal. On April 27,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1994, the trial court denied the defendant's motion for a protective order and denied his request for an interlocutory appeal of the issue. The court directed the state to prepare an order for a mental examination. On May 17, 1994, the trial court entered an order directing that the defendant be examined at the Helen Ross McNabb Center and overruling the defendant's motions for a protective order. On December 22, 1994, this court denied the defendant's application for an extraordinary appeal on the trial court's denial of a protective order.

On January 12, 1995, the state again asked the trial court to order the defendant to submit to a mental evaluation. The trial court agreed and asked the state to submit a written order. The defendant responded that he intended to apply for permission to appeal this court's denial of his extraordinary appeal to the supreme court and believed that he had an agreement with the state not to "push" the mental examination matter. The trial court declined to listen to additional argument if the parties had nothing more of substance to add. The record does not reflect that the defendant pursued an appeal to the supreme court.

On May 5, 1995, the court held a hearing on the state's renewed motion for a mental examination of the defendant. The state asked the court to reenter its earlier order that the state could have the defendant examined. It noted that defense counsel had apparently instructed the defendant not to participate in an examination pending the extraordinary appeal on the protective order. The court agreed to reenter its order, noting that it had not permitted the conditions requested by the defendant. The defendant asked if the examination would be limited to the first rape case. The court agreed with the state that the earlier order for a mental examination applied to all cases. The defendant objected to the state learning his defenses in the other cases through a mental examination conducted in the first rape case. The parties and the court agreed that the May 15, 1995 trial date was no longer viable in light of the time needed for a mental examination.

*83 On May 8, 1995, by a written order entered in all cases, the court again ordered that the defendant submit to a mental examination and directed defense counsel to provide pertinent information to Helen Ross McNabb Center for the evaluation. On May 10, 1995, the defendant moved for a stay of the mental examination, noting that the state had informed him that Helen Ross McNabb Center would examine the defendant at the jail on May 11, 1995. The defendant objected to the court ordering the mental examination in all cases while proceedings on motions had been stayed in all cases except the first rape case. He also contested the standard questions asked by the Helen Ross McNabb Center as infringing upon the attorney-client privilege and renewed his previous objections to the examination. The motion states that in the event that the court denies relief, "counsel respectfully has no alternative but to invoke Mr. Huskey's constitutional protections and decline to have the Defendant participate in an unlimited, uncontrolled mental examination at this time." On May 11, 1995, the court entered a corrected order for mental examination, which did not contain the provision requiring defense counsel to provide information.

On May 15, 1995, the state informed the trial court that on May 12, 1995, the defendant had refused to participate in a mental examination. It requested that the court exclude defense experts on mental condition under Rule 12.2(d) or hold defense counsel in contempt for their willful interference with the court's order. The defense argued that it did not decline to participate in a mental examination but that disputes existed over whether the examination applied to all cases and over the scope and nature of the examination. The defendant contended that standard questions asked by the Helen Ross McNabb Center violated the attorney-client privilege. Defense counsel stated that he had written the center requesting certain conditions, and that the center had agreed to some of his requests. He stated that he had filed a motion for a stay the previous week but that the state had instructed the center to proceed with the examination. He said that he was aware that he

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 70
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

was risking the striking of the mental responsibility defense in this case but that the
defense refused to participate in a mental examination that applied in the defendant's
other cases. The state reminded the court that it previously had ruled that the mental
examination applied to all cases. The court noted that Rule 12.2(c) contained safeguards
to protect information revealed by a defendant in a mental examination. The court struck
defense experts regarding mental condition pursuant to Rule 12.2(d).

 On September 1, 1995, the defendant moved the court to order a mental examination of the
defendant pursuant to Rule 12.2. At a September 7, 1995 hearing, the court sustained its
earlier Rule 12.2(d) sanction. The defendant insisted that he was consenting to a mental
examination at the May 15, 1995 hearing but that the trial court had misunderstood. The
court ordered a transcript of the May 15 hearing. On September 20, 1995, the court quoted
the portion of the May 15 hearing in which it read Rule 12.2(d) striking the defendant's
experts. It stated that its May 15 ruling left no room for interpretation and that the
defendant's pending motion for a Rule 12.2 mental examination "comes too late."

 *84 The defendant contends that the trial court's administration of the Rule 12.2
proceedings denied him the right to due process. He states that the trial court required
him to file notice of intent to use mental defenses under Rule 12.2 in 1994 before he had
received discovery in order to evaluate his defenses. Even if the defendant's assertion
were true, it would not entitle him to refuse to submit to a court-ordered mental
examination and, as such, is not relevant to our review of the propriety of the limitation
of his insanity defense in the first rape case. Furthermore, the record does not support
his contention: In a December 15, 1993 discussion on scheduling discovery and motions, the
state requested that the defendant file notices of defenses and notices relating to expert
witnesses under the discovery rules by December 21, 1993, in order to facilitate the
scheduling of any evaluations before the May 1994 trial date. The defense stated that it
had no problem with the state's request but asked that the deadline be December 24, 1993.
The trial court agreed to that time frame. At a February 22, 1994 hearing, the defendant
requested until March 3, 1994, to give "a notice of mental responsibility" in order that
the defense could review discovery materials with its experts. The trial court said that
the notice should be given as close to March 3, 1994, as possible as the trial date
neared. The defense agreed it could do that by March 3, 1994. The defendant gave his
12.2.(b) notice on March 3, 1994, and his 12.2(a) notice on April 15, 1994. This course of
events does not reveal that the defendant was forced to file his 12.2(a) and (b) notices
prematurely.

 The defendant also contends that he did not have a meaningful opportunity to comply with
the mental examination order before the trial court imposed sanctions on May 15, 1995. He
states that he had no notice that the state would seek Rule 12.2(d) sanctions at the May
15 scheduling conference. He argues that he did not have a meaningful opportunity to
oppose the sanctions. The record again belies the defendant's contentions. The trial court
ordered that the defendant undergo a mental evaluation on May 17, 1994, almost a year
before it imposed sanctions. During that year, the defendant requested that the
examination be conducted under certain conditions, which the trial court denied. The
defendant failed in his efforts to obtain interlocutory and extraordinary appeals
regarding the denied conditions. On May 8, 1995, and on May 11, 1995, the trial court
again ordered the examination. The defendant objected to the examination applying to all
of his cases and to certain questions he believed the examiners would ask regarding his
representation. The trial court heard and rejected the defendant's arguments on these
issues on May 5, 1995. The defendant's May 10, 1995 motion for a stay of the examination
states that the state informed him that the examination would occur on May 11, 1995. The
defendant continued to object to the terms of the examination even after the state
proposed sanctions on May 15, 1995, and, in no uncertain terms, declined to submit to an
examination that applied in all cases. Thus, the record reveals that the defendant was

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                           Page 71
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

given a meaningful opportunity to submit to the mental evaluation after the trial court had ruled on his objections.

*85 The record also reveals that on May 15, 1995, the trial court again heard the defendant's arguments regarding the conditions under which he would submit to an examination. The defendant stated that he was aware that he was risking sanctions by insisting upon the conditions. In light of the fact that the trial court had already denied these conditions in the May 5, 1995 hearing, we believe that the defendant had no reason to be surprised by the court's imposition of sanctions. The defendant's right to due process was not violated by the Rule 12.2 proceedings in this case.

The defendant contends that the imposition of Rule 12.2(d) sanctions violated his constitutional right to present a defense because he did not personally refuse to submit to a mental evaluation. He argues that he had no personal knowledge of the rapidly evolving proceedings from May 5 through 15, 1995. He contends that the events of May 12, 1995, relating to his refusal to see Rick Sawyer, a forensic social worker from the Helen Ross McNabb Center, at the jail are disputed. Citing to *State v. Ricky Thompson*, No. 03C01-9406-CR- 00198, McMinn County (Tenn.Crim.App. Jan. 24, 1996), *app. denied* (Tenn. July 1, 1996) (concurring in results only), he maintains that a defendant must willfully and deliberately refuse to submit to a mental examination before sanctions are warranted. He argues that no evidence exists that he personally, willfully, and deliberately refused the examination. He argues that at a minimum, he is entitled to notice, the right to be heard, and the presentation of evidence in order to resolve this dispute.

We begin by noting that the imposition of Rule 12.2(d) sanctions to preclude the testimony of defense experts in the appropriate circumstances does not violate a defendant's right to present a defense. *See Taylor v. Illinois*, 484 U.S. 400, 416, 108 S.Ct. 646, 656 (1988) (holding that the exclusion of a defense witness as a sanction for a discovery violation does not violate the defendant's Sixth Amendment right to compulsory process, which embodies the right to present a defense); *see also United States v.. Nobles*, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171 (1975) (holding that the exclusion of the testimony of a defense investigator because the defendant refused to provide the state with the investigator's "highly relevant" report did not violate the defendant's Sixth Amendment rights to compulsory process and cross- examination). The United States Supreme Court has held that a trial court does not have to determine whether the defendant or defense counsel was at fault before imposing a sanction for a discovery violation:

In responding to discovery, the client has a duty to be candid and forthcoming with the lawyer, and when the lawyer responds, he or she speaks for the client. Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision to forego cross-examination, to decide not to put certain witnesses on the stand, or to decide not to disclose the identity of certain witnesses in advance of trial.

*86 *Taylor*, 484 U.S. at 418, 108 S.Ct. at 658. Although defense counsel may not waive certain basic rights, such as the right to plead not guilty and the right to a trial, counsel necessarily "has full authority to manage the conduct of the trial." *Id.* at 417-18 & n. 24, 108 S.Ct. at 657 & n. 24.

No Tennessee case examining the propriety of Rule 12.2(d) sanctions has ever held or even suggested that the defendant must personally refuse to submit to a mental examination as opposed to refusing to comply with Rule 12.2(c) through counsel. *See State v. Gerald Leander Henry*, No. 01C01-9505-CR-00161, Davidson County (Tenn.Crim.App. Feb. 25, 1999), *overruled in part on other grounds*, 33 S.W.3d 797 (Tenn.2000); *State v. John Parker Roe*, No. 02C01- 9702-CR-00054, Shelby County (Tenn.Crim.App. Jan. 12, 1998), *app. denied* (Tenn. Jan. 4, 1999); *see also Huskey*, 964 S.W.2d at 896 (noting the trial court may sanction a defendant's failure to comply with Rule 12.2 by precluding the insanity defense or the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

testimony of defense experts); *State v. Martin*, 950 S.W.2d 20, 25-27 (Tenn.1997) (noting that the defendant has a right to counsel's advice in deciding whether to present an insanity defense but holding that the defendant is not constitutionally entitled to have counsel present during a court-ordered mental examination). We note that "the right to a defense belongs to the defendant." *Zagorski v. State*, 983 S.W.2d 654, 658 (Tenn.1998) (holding that defense counsel did not provide ineffective assistance in declining to present mitigating evidence at the insistence of a competent capital defendant). Our supreme court has required trial courts toinquire of the capital defendant personally whether he or she understands the right to present mitigating evidence and wants to forego presentation of mitigating evidence at the sentencing phase. *Id.* at 660-61. However, a defendant has no state or federal constitutional right to conduct his own defense pro *se* and, at the same time, be represented by counsel. *State v. Burkhart*, 541 S.W.2d 365, 371 (Tenn.1976). Typically, with the exception of certain basic constitutional rights, the represented defendant communicates with the court through counsel. Thus, we cannot agree that the trial court had to inquire of the defendant himself whether he intended to submit to the mental examination. Defense counsel spoke for the defendant when he declined to have the defendant submit to a mental examination as ordered by the trial court. The trial court was entitled to rely upon defense counsels' repeated and emphatic refusals regarding the defendant's participation in any mental examination that did not conform to defense specifications.

The defendant challenges the harshness of the Rule 12.2(d) sanctions, contending that the rule does not provide for the striking of his insanity defense but only for the striking of experts. He argues that the trial court lacked authority to strike his insanity defense, which could have been proven through lay testimony. As the state points out, our supreme court has determined that a trial court may sanction a defendant who fails to submit to a Rule 12.2(c) mental examination by striking defense experts on mental condition and by striking the insanity defense. *Huskey*, 974 S.W.2d at 896. Although the state correctly points out that at the May 15, 1995 hearing the trial court stated that it was striking defense experts, we note that at a September 7, 1995 hearing, the court agreed with the defendant that he had voluntarily foreclosed his insanity defense. At the September 20, 1995 hearing, the trial court reaffirmed that it was striking defense experts pursuant to Rule 12.2(d). Although these events could suggest that the trial court was striking the insanity defense as well as defense expert testimony, we note the following dialogue, which occurred just before selection of the jury:
*87 [Defense Counsel]: If it please the Court, in light of the Court's ruling concerning not being permitted to call a psychiatrist to testify as to the mental illness of multiple personality disorder and the Court's declining to bifurcate the case, the defendant is going to enter a plea of not guilty but not--he is not going to enter a plea of not guilty by reason of insanity.
We are--based on those rulings, we're--we're--in other words, we--we don't think we can offer just lay testimony without--without the jury being told that there is a mental illness or a mental disease known as this.
[The Court]: All right.
[Defense Counsel]: And if we're in error on that, we are. We--so--so based upon that, we are not going to offer the testimony that we have as to the defendant's insanity.
[The Court]: All right.....
We view this exchange to reveal that the defendant chose not to offer lay testimony on insanity due to the absence of expert testimony on multiple personality disorder rather than that the trial court prohibited lay testimony.

Citing to *State v. Brown*, 29 S.W.3d 427 (Tenn.2000), the defendant also argues that the Rule 12.2(d) sanction was excessive because his constitutional right to present a defense trumps the state's procedural rights under Rule 12.2. *Brown* provides that in order to determine whether an evidentiary or procedural rule that excludes evidence violates a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                Page 73
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

defendant's constitutional right to present a defense, courts must carefully consider the facts of the case in light of the following considerations: "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id.* at 434. Without providing any argument regarding these considerations, the defendant summarily states that the trial court mechanically struck his insanity defense upon the state's oral motion.

Initially, we note that Rule 12.2 does not prevent the defendant from presenting an insanity defense or expert witnesses on the issue of his mental condition. The rule does attach certain conditions to his pursuit of a defense based upon his mental condition, but our supreme court has found those conditions to withstand certain constitutional challenges. *See Huskey,* 964 S.W.2d at 897-98 (holding that Rule 12.2(c) does not violate a defendant's right against self-incrimination or right to counsel). Unlike the situation in *Brown,* in which the rule against hearsay excluded evidence critical to the defendant's defense, Rule 12.2 does not exclude the defense of insanity or the defendant's experts. Instead, it was the defendant's refusal to comply with the trial court's order for a mental examination under Rule 12.2(c) that led to the exclusion of defense experts.

Although declining to create a specific standard to guide the trial court's discretion in sanctioning a defendant for a discovery violation by preclusion of a witness, the United States Supreme court has noted the following considerations:
**88 It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.
*Taylor,* 484 U.S. at 414-15, 108 S.Ct. at 656. In the same vein, this court has stated that exclusionary rules for discovery violations should not be used simply to punish a defendant who has failed to comply with the requirements of the discovery rules. *State v. Garland,* 617 S.W.2d 176, 185 (Tenn.Crim.App.1981). Instead, in determining whether to exclude defense evidence for a failure to comply with discovery rules, the trial court must determine that the state would be prejudiced and that the prejudice cannot be mitigated by other means. *Id.* On the other hand, this court has not shied away from affirming a Rule 12.2(d) sanction when the failure to comply would prejudice the state. *See John Parker Roe,* slip op. at 13-14 (analyzing defendant's refusal to discuss the facts of the killing during his Rule 12.2(c) examination). The defendant may not raise the issue of his mental condition at the time of the offenses and then "tie the hands of the prosecutors" by refusing to participate in a Rule 12.2(c) exam. *John Parker Roe,* slip op. at 14. The state would be seriously disadvantaged if it were not able to present expert testimony stemming from an examination of the defendant to respond to the defendant's expert testimony regarding his mental condition. *Huskey,* 964 S.W.2d at 897 (citing Wayne R. LaFave, *Criminal Practice and Procedure,* § 19.4 at 517 (1984)). The state is also "entitled to a fair trial." *John Parker Roe,* slip op. at 14.

In the present case, we believe that the trial court properly precluded the defendant's experts because of his failure to submit to a mental examination by a court-appointed expert. Although the defendant suggests that the state could have acquired an expert to review the reports of defense experts, we question whether that procedure could have approximated an actual examination of the defendant. We believe that limiting the state to review of the defense expert's reports would have undermined the truth-determining function of the trial and would have been insufficient to mitigate the prejudice to the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                 Page 74
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

state. The state was entitled to obtain evidence to rebut the defendant's assertions
regarding his mental state. The defendant's refusal to comply with Rule 12.2(c)
effectively foreclosed the state's access to rebuttal evidence. The sanction imposed by
the trial court was not excessive.

*89 The defendant also suggests that the trial court had a number of other, less severe
alternatives to imposing Rule 12.2(d) sanctions, including:
  (1) addressing the issues in his motion for a protective order,
  (2) calling Dr. Tennison to testify about how the mental examination would be performed,
  (3) scheduling a definite time for the examination so that he would know what was
  happening and could be prepared to videotape it,
  (4) ordering an evidentiary hearing to resolve the factual disputes surrounding the
  events of Mr. Sawyer's attempt to examine the defendant on May 12, 1995,
  (5) addressing the defendant personally and informing him that he would lose the right
  to present an insanity defense if he did not submit to an evaluation, and
  (6) ordering defense counsel to permit the examination and holding them in civil or
  criminal contempt if they failed to do so.
  Of these, the first three appear to be alternatives to the conditions for the
examination that the defendant requested and the trial court denied. At the time it
imposed sanctions, the trial court had already declined to impose these conditions. The
fourth and fifth alternatives relate to the defendant's contention that he personally had
to waive the examination. We have already determined that the trial court was entitled to
rely upon counsels' representations that the defendant would not submit to an examination
as ordered by the court. Finally, while the trial court did consider the alternative of
holding defense counsel in contempt, it declined to do so in favor of Rule 12.2(d)
sanctions. In light of the prejudice to the state in having no rebuttal evidence regarding
the defendant's mental condition as the trial approached, we cannot determine that the
trial court abused its discretion.

Next, the defendant contends that the trial court arbitrarily refused to grant his
September 1, 1995 motion for a Rule 12.2(c) mental evaluation due to the closeness of
trial. He argues that the trial court had granted the state's motion for a mental
examination on May 5, 1995, just ten days before the May 15, 1995 trial date. We agree
with the state that the defendant misconstrues the trial court's comment that his motion
came too late. When taken in the context of the entire September 20, 1995 hearing on the
matter, we conclude that the trial court denied the defendant's motion because it had
already imposed Rule 12.2(d) sanctions due to his failure to submit to a mental
examination.

Nevertheless, we are concerned about the trial court's terse denial of the defendant's
motion when the record reflects that sufficient time existed to accomplish the examination
before trial. As discussed above, a trial court should not exclude defense evidence
pursuant to exclusionary rules simply to punish the defendant for a discovery violation.
*Garland*, 617 S.W.2d at 185. Instead, the trial court should apply exclusionary rules only
if the state would otherwise be prejudiced and other means for mitigating the prejudice do
not exist. *Id.* In the present case, we question whether the state would have been
prejudiced by the trial court's permitting the defendant to submit to a mental examination
in early September before the trial in mid-October. On the other hand, the record of the
Rule 12.2 proceedings leading up to the consolidated rape trial reveals that, had the
trial court permitted a mental examination in September 1995, the defendant would not have
submitted to a full examination. In the consolidated rape trial, the defendant submitted
to an examination by Dr. Tennison but refused to allow an additional expert, Dr. Phillip
Coons, to complete the examination when Dr. Tennison lacked the experience and expertise
to do so. Nothing in the record suggests that the defendant's response would have been
different if the initial examination by Dr. Tennison had occurred before the first rape

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                      Page 75
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

trial rather than before the consolidated rape trial. Moreover, the defendant's argument
regarding his motion for a mental examination before the first rape trial reveals that he
was still insisting upon some of the conditions that formed the basis for his refusal to
participate in the examination on May 15, 1995--in particular, that the examination apply
to only the first rape case. Thus, although the time might have been adequate to have an
examination in early September 1995, we are not convinced that the defendant would have
submitted to it.

   *90 Finally, the defendant argues that, the trial court, Judge Jenkins, was disqualified
to rule upon the Rule 12.2(c) and (d) issues because he had *ex parte* communications with
Rick Sawyer, the social worker who sought to examine the defendant. He contends that the
trial court received a letter from Mr. Sawyer and that he did not discover this letter
until 1998. The state contends that the record contradicts this assertion and reveals that
the letter from Mr. Sawyer was given to the defendant before the May 15, 1995 hearing and
contained no privileged information. First, even if the defendant's contentions were true,
this would not have justified his refusal to comply with the court- ordered mental
examination. Furthermore, as we note in Issue XX regarding the disqualification of Judge
Baumgartner, a trial court may properly communicate *ex parte* for scheduling and
administrative purposes that do not deal with substantive matters. *See* Tenn. S.Ct. R. 10,
Canon 3(A)(7). In this respect, we do not believe that the trial court's receipt of a
letter from an expert, relating that the defendant sought to impose unworkable conditions
upon a court-ordered mental examination, was improper. Additionally, the record reflects
that the state attached a copy of the letter to its May 4, 1995 renewed motion for a
mental examination of the defendant. Thus, the defendant was aware of and had access to
the letter before the trial court imposed sanctions on May 15, 1995. Finally, the court
again addressed the matter of the conditions that applied to the mental examination at the
May 5, 1995 hearing after hearing arguments from both the state and the defendant. Thus,
the trial court did not deal with the matter of the conditions *ex parte.*

   B. Consolidated Rape Trial

   The defendant also challenges the trial court's limitation of his insanity defense in the
consolidated rape trial in which jury selection began on May 14, 1996. He contends that he
was denied his rights to present a defense and to due process because the state and the
trial court abused the Rule 12.2(c) process. He also argues that the trial court's May 9,
1996 order for the defendant to submit to a mental examination violated his rights under
the state and federal constitutions, the attorney-client privilege, the attorney work
product doctrine, and an ethical rule. Finally, he argues that Rule 12.2(d) sanctions are
not mandatory and were unwarranted in this case because he did not willfully and
deliberately waive the mental examination. The state contends that the trial court
properly sanctioned the defendant because he refused to submit to a court-ordered mental
examination.

   Due to the nature of the defendant's contentions, we begin by reviewing the  Rule 12.2
proceedings in the consolidated rape case in some detail. At a February 7, 1996 hearing,
the state requested that the defendant be examined under Rule 12.2(c). The trial court
asked the defendant if mental responsibility was going to be an issue at trial, and he
replied that he would not know until he received the court's ruling on his motion to
suppress his statements. He reminded the court that his motion pursuant to Rule 12.2(a)
and (b) was still pending from the first rape trial.

   *91 The following day, February 8, 1996, the court discussed the need for a mental
examination in light of the defendant's suggestion that the court appoint each of his
alternate personalities an attorney. After the defendant raised a number of questions
regarding the manner in which the examination would be conducted, the court stated that it
would question Dr. Clifton Tennison, who would be the court's expert, about the need for

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                      Page 76
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

certain questions pertaining to the defendant's competency. The state asked the court if it would be allowed to have the defendant examined by an expert of its choice. The court stated that Dr. Tennison would be the court's designated expert and that Dr. Tennison would determine if other experts needed to be consulted. The state pointed to the language in Rule 12.2(c), which states that the court may order an examination "upon motion of the District Attorney," and noted that the state was not making that motion. The defendant argued that the state had already moved for a mental examination during the proceedings in the first rape trial and asked if the state was withdrawing that request. At that point, before the state responded, the court took a recess and then returned and announced that it would reserve any further rulings on the Rule 12.2 issue until it had heard from Dr. Tennison. The hearing then continued on other matters.

Almost a month later, on April 2, 1996, the defendant asked the trial court to rule upon the voluntariness of his statements to the police in light of his mental capacity at the time. The state requested that the defendant submit to a mental examination, and the trial court asked whether the defendant was putting his mental capacity at issue. The defendant argued that the state had no pending Rule 12.2(c) request because it had withdrawn its request in early February. He contended that any request for a mental examination at this point would be untimely. The state responded that the defendant had yet to decide if he were going to rely upon a mental defense at trial and that if he chose to do so, it was entitled to an examination. The defendant asserted that his Rule 12 .2 notices filed during the proceedings in the first rape trial were still pending. The trial court ruled that the state was making a Rule 12.2(c) request at this time, that the state file its written request that day, and that the defendant respond the following week.

On April 17, 1996, the trial court asked the state if it had filed a Rule 12.2 request that the defendant be examined. The state responded that it was awaiting the defendant's notice of whether he was going to rely on a mental defense. The court stated that it believed that the defendant had announced that he was relying on a mental defense at the April 2 hearing. The court told the state that if it wanted to request a mental examination, it needed to do so forthwith. The state agreed to file a written request.

At an April 25, 1995 hearing, the state asked for reciprocal discovery of the reports of defense mental health experts, Dr. Sadoff and Dr. McCoy, because it anticipated that the trial court would soon order a mental examination of the defendant. The defendant objected that the state had withdrawn its Rule 12.2(c) request for a mental examination and had not filed a new request despite the court ordering it to do so on several occasions. The state argued that its April 7, 1994 request made during the proceedings in the first rape trial was still pending, that it had never withdrawn this request, and that it did not need to file a new request with the 1994 request still pending. It noted that although it was not questioning Dr. Tennison's competence to perform the examination, it had been in contact with other experts and had located only three people nationwide who were competent in the area of multiple personality disorder other than Dr. Sadoff, who had been retained by the defendant.

*92 The trial court reminded the defendant that he had wanted to wait until it had ruled on some of his motions before deciding whether he would rely upon an insanity defense in this case. As evidence that the state had withdrawn its Rule 12.2(c) request, the defendant stated that, at the time, the trial court had recessed the hearing and then met with the parties in chambers and pleaded with the state not to withdraw the request. The defendant argued that the state's contention regarding the scarcity of experts on multiple personality disorder revealed that the state had delayed in refiling a Rule 12.2(c) motion because it was shopping for an expert. The court essentially agreed with the defendant's account of the Rule 12.2 proceedings in February, March, and April of 1996. It was perplexed by the defendant's insistence that it hold the state to its verbal withdrawal of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 77
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

the Rule 12.2(c) request but not hold the defendant to his previous refusal to be
evaluated under Judge Jenkins's order for an examination in all his cases. The court
stated that it did not object to the state filing a request at this time. The state agreed
that it was renewing its motion for a mental exam. On that same day, the state filed a
renewed motion for a mental examination of the defendant, asking the court to order him to
submit to an exam pursuant to Rule 12.2(c).

On April 29, 1996, the trial court noted that the state had filed a motion for a mental
examination and stated that it planned to call Dr. Tennison into court for questioning
regarding the examination. The defendant objected to the court devoting time to the
state's procedural motion instead of his constitutionally based motions. He also objected
to having to devote his time to the examination so close to the trial date. The state agreed
that it was renewing its motion for a mental exam. He denied that
he was withdrawing his notice of intent to rely upon the insanity defense at trial. The
court disagreed with the defendant that the state had caused the delay in attaining the
examination, noted that the state had filed a request for mental examination, and repeated
that it was going to question Dr. Tennison on whether he could perform the examination.
The state argued that it was entitled to an expert of equal stature to the defense expert,
Dr. Sadoff, but that the Administrative Office of the Courts (AOC) had refused to disclose
how much money it gave the defendant for his experts. The court noted that it had
instructed the AOC not to disclose that information and ruled that if pretrial motions
were not completed before the May 13, 1996 trial date, then it would continue the trial
from day to day until the motions were completed.

The following day, April 30, 1996, the court held a hearing on the state's renewed motion
for a Rule 12.2(c) mental evaluation. Dr. Tennison was present, and the court directed him
to conduct an initial examination, advised him about the scope of the evaluation, and
asked him to report back to the court on the need for additional assistance or
information. The court stated that Dr. Tennison could conduct a survey of other experts to
determine their availability and that he could but was not required to consider the
state's recommendations on whom to select. The court denied the defendant's request that
defense experts be present during the examination but left the issue of videotaping the
examination to Dr. Tennison's discretion. It instructed the defendant not to send Dr.
Tennison any letters with conditions for the examination and, instead, to direct all his
requests to the court.

*93 On May 2, 1996, the trial court entered an order for the defendant to submit to a
mental evaluation by the Helen Ross McNabb Center to determine his mental condition at the
time of the offenses and at the time he gave statements during November 1992. The
defendant submitted to the examination that day. On May 8, 1996, Dr. Tennison reported
that after interviewing the defendant for two hours, he determined the need for an
additional examination by a "mental health professional who has substantial experience and
demonstrated expertise in the areas of dissociation and dissociative identity disorder."
Dr. Tennison identified two persons whom he believed could perform the examination, Dr.
Phillip Coons and Dr. Seymour Halleck. The state noted that Dr. Coons's schedule would
allow an immediate examination.

The court directed Dr. Tennison to contact these experts and to select one based upon
availability and qualification. The defendant objected to this process, arguing that a
Tennessee statute directed the way in which experts were to be selected, that the statute
required that the defendant be examined by an approved mental health facility, and that
the state should not be allowed to shop for an expert. The court ruled that based upon Dr.
Tennison's testimony, it was satisfied about the need for an additional examination by an
expert with more experience and expertise. The court ordered that an additional
examination take place and that Dr. Tennison select one of the two identified individuals
to conduct the evaluation. It declined to permit a hearing for the defendant to question

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                    Page 78
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

the expert, once selected, on his qualifications and the manner in which he would conduct
the examination. It encouraged the parties to supply Dr. Tennison and the selected expert
with information that Dr. Tennison had suggested would be helpful. It also suggested that
the defendant give the selected expert the records generated by defense experts in order
to facilitate a complete and valid examination. It asked Dr. Tennison to advise the court
about whether the selected expert would object to videotaping the examination before he
scheduled the expert's participation. The court denied the defendant's requests that
defense counsel and defense experts be present during the additional examination.

On May 9, 1995, the defendant again objected to the additional examination, arguing that
he needed to question any new experts on their qualifications and that the court was
delegating its responsibilities under Rule 12.2 to Dr. Tennison. The state also objected
to the Rule 12.2(c) proceedings, contending that it should be able to select the expert of
its choice for the evaluation because it had the burden of proving the defendant's sanity
beyond a reasonable doubt once the defendant raised the issue of sanity at trial. The
court ruled that it was proceeding properly under the rules and that it was not delegating
its responsibilities but was merely enlisting the assistance of qualified individuals in
selecting an expert to complete the examination.

*94 The trial court then conducted a conference telephone call with the parties and Dr.
Tennison. Dr. Tennison reported that he had eliminated Dr. Halleck as a possibility
because Dr. Halleck had disclosed that his philosophical position regarding dissociative
identity disorder (DID) would impair his ability to evaluate the disorder fairly. Dr.
Tennison said that Dr. Coons was available, could begin interviewing the defendant the
following Sunday, and could possibly complete the evaluation by the next Tuesday, the day
of trial. Dr. Tennison stated that Dr. Coons had requested access to the defendant, to the
detectives who took the defendant's statements in November 1992, and perhaps to the jail
nurse who had observed the defendant's behavior in 1992. Dr. Coons had also asked for a
list of the charges and for the defendant's psychiatric and psychological records,
including any existing videotaped examinations. Dr. Tennison advised that Dr. Coons did
not object to videotaping the examination but did not have the equipment to do the taping.
The court told Dr. Tennison that it would issue an order directing Dr. Coons to perform
the examination.

After the conference call, the trial court heard the defendant's arguments regarding the
examination, although it had already made a preliminary ruling. The defendant again
objected to the process by which Dr. Coons was obtained, arguing that Tenn.Code Ann. §
33-7-301 required that the court turn to the Commissioner of Mental Health for designation
of an additional expert or to the state Forensic Services Unit for an evaluation of the
defendant. The defendant also sought to question Dr. Coons regarding any bias against DID
and the details of the examination, including the fee arrangements, whether defense
counsel and experts could be present, and the degree of confidentiality to be used by Dr.
Coons. The defendant asked the court to set the deadline for his decision on whether he
would rely upon evidence of mental condition at trial, which, under the trial court's
proposed order for a mental examination, would trigger the state's receipt of the
examination results. The court again ruled that it was proceeding appropriately. It noted
that the Commissioner of Mental Health had designated Dr. Tennison to conduct
court-ordered mental examinations in Knox County. The court reviewed its findings
regarding the need for an additional expert and Dr. Tennison's role in locating that
expert. Regarding confidentiality, it observed that Rule 12.2(c) guided the disclosure and
use of information gathered in a court-ordered mental evaluation. It repeated that Dr.
Coons would be the court's, rather than the state's, witness and again denied the
defendant's request to question Dr. Coons, noting that the examination would be videotaped
and Dr. Coons could be cross-examined. It stated that Dr. Coons would determine who, if
anyone, could be present during the examination.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          Page 79
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

The trial court stated that the defendant should provide Dr. Coons with the defendant's school records, medical records, psychological and psychiatric records, and employment records. The defendant objected that these records were protected by the attorney-client privilege and work product doctrine because they were developed and maintained during defense counsels' representation of the defendant. The court took this matter under advisement. The court ordered that Dr. Coons would have priority to the defendant over defense counsel during the time needed for the examination. Defense counsel announced that once the court ruled upon the defendant's remaining questions regarding the mental evaluation, they would announce whether the defendant would participate in the evaluation. The defense stated that if the defendant refused to submit and the court prevented the use of mental responsibility evidence, the defendant would seek an interlocutory appeal. The state sought to clarify the record by adding that it had previously had a brief conversation with Dr. Coons regarding his fees but had not had a detailed conversation with him. The court stated that it did not question the state's ethics in that regard.

*95 Later that day, the trial court reported that it had spoken with Dr. Tennison, who had communicated with Dr. Coons and had related the following information to the court: Dr. Coons did not object to the videotaping of his interviews with the defendant or other witnesses, defense attorneys and experts could not attend the interviews of the defendant, and the records that the court had requested the parties provide were necessary for a valid examination. The trial court emphasized that these records did not include conversations between defense counsel and the defendant or information the defendant told defense counsel. The court stated that it considered these records to be protected, that it would disclose them only to Dr. Tennison and Dr. Coons, and that they would be ultimately disclosed only upon the defendant's election to proceed with the defense. The court related that Dr. Coons would need the defendant to be available for interviews between 8:00 a.m. and 5:00 p.m.on Monday, May 13 and 8:00 a.m. and noon on Tuesday, May 14 with appropriate breaks. The results of the evaluation would be available the morning of Wednesday, May 15.

The court recessed to prepare the order for the mental evaluation. The May 9, 1996 order provided that the defendant submit to a mental examination by Dr. Tennison and Dr. Coons, the court's experts. The order directed both parties
 to supply any medical records, employment records, school records, psychiatric and psychological records including test results and prior mental evaluations they have in their possession to the court so that the court can deliver those materials to Drs. Tennison and Coons to aid in their evaluation.
 The order instructed the state to supply the charging instruments and both parties to make the witnesses under their control available to Drs. Tennison and Coons for interviews if the witnesses had personal knowledge of the defendant's conduct at any material time. The order stated that once Drs. Coons and Tennison completed the examination, the court would give the results to the defendant who would have a reasonable time in which to decide if he would use a mental responsibility defense at trial. If the defendant elected to use that defense, the state would get the evaluation and reports of defense experts as well as the those of the court-appointed experts. The state would also be permitted to interview the court-appointed experts in preparation for trial.

The May 9 hearing resumed, and the court read the order to the parties. Defense counsel stated that in the rape cases, the defendant would comply with the order as it related to Dr. Tennison, but they refused to have the defendant participate in the examination by Dr. Coons. The defense stated that the defendant would also cooperate with an expert appointed by the Commissioner of Mental Health. The state asked the court to question the defendant to determine if he understood that he would forfeit a potential defense if he refused to comply with the court's order. Defense counsel refused to allow the defendant to be questioned on the record, stating that his counsel was making the decision. The court

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 80
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

declined to question the defendant personally. Pursuant to Rule 12.2(d), it ruled that the
defendant would not be permitted to present expert testimony relating to mental
responsibility but that he could present lay testimony on that issue if it were otherwise
admissible. The court agreed to permit the defendant to seek an interlocutory appeal on
this issue as long as the proceedings in the consolidated rape trial were not stayed.

(1) Abuse of the Rule 12.2(c) Process

*96 The defendant contends that the state and the trial court abused the  Rule 12.2(c)
process, thereby denying his rights to due process and to present a defense. He argues
that the trial court arbitrarily applied the rule by denying his motion for a Rule 12.2(c)
examination in the first rape case, which was filed forty-six days before trial, as
untimely but granting the state's Rule 12.2(c) request in the consolidated rape case,
although made only eighteen days before trial. He contends that this was an abuse of
discretion. Even if true, the defendant's contention that the trial court arbitrarily
applied Rule 12.2(c) is only relevant to this appeal if it relates to his refusal to
submit to the mental examination by Dr. Coons or to the trial court's imposition of Rule
12.2(d) sanctions for this refusal. The defendant has failed to relate this contention to
either event. Nor do we believe that an arbitrary application of the rule would justify
the defendant's refusal to comply with the court-ordered evaluation in the consolidated
rape case.

Next, the defendant argues that the state's pattern of delay regarding its  Rule 12.2(c)
request for a mental examination denied him a meaningful opportunity to present his
insanity defense in the consolidated rape trial. He argues that the state delayed in
bringing a Rule 12.2(c) request in order to shop for the expert of its choice and to
manipulate the proceedings to force the striking of defense expert testimony. The state
contends that the defendant was not prejudiced by the timing of the state's Rule 12.2(c)
motion and that the trial court properly allowed the state to request a mental evaluation
of the defendant.

Again, even if the state did deliberately delay its pursuit of a mental examination for
the nefarious purposes envisioned by the defendant, it would not have justified the
defendant's refusal to comply with a court-ordered examination. Furthermore, the record
does not reveal that the state's rule 12.2(c) request was untimely. Rule 12.2(c) does not
specify a time for the filing of a request for a mental examination of the defendant. Rule
12.2(c) is triggered by the defendant's filing a notice pursuant to Rule 12.2(a) or (b),
which must be filed "within the time provided for the filing of pretrial motions or at
such later time as the court may direct." Tenn. R.Crim. P. 12.2(a), (b). A Rule 12.2(c)
request for a mental examination is not listed among those motions that our rules of
procedure require be filed before trial. See Tenn. R.Crim. P. 12(b). Generally, the time
for making pretrial motions is within the discretion of the trial court. See Tenn. R.Crim.
P. 12(c). The state filed a renewed motion for a mental examination of the defendant on
April 25, 1996, two and one-half weeks before the scheduled trial date. The granting of
that motion was within the trial court's discretion.

Moreover, although the state could have and, indeed, should have more vigorously pursued
the mental examination, the record does not reveal that the state intentionally delayed
the Rule 12.2(c) proceedings. As evidence of a pattern of delay, the defendant contends
that the state said that it was not making a Rule 12.2(c) request on February 8, 1996. He
asserts that the trial court directed the state to file a Rule 12.2(c) request on three
separate occasions but that the state did not file the request until April 25, 1996, only
eighteen days before trial. The defendant summarily argues that this chronology of events
reveals a clear pattern of abuse by the state and the trial court as well as an
intentional disregard for the Tennessee Rules of Criminal Procedure, the local rules, and
the defendant's rights.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 81
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

*97 We disagree with the defendant's interpretation of the chronology of events as showing a pattern of delay on the part of the state. As previously discussed, the state initially filed a written request for a mental examination of the defendant on April 7, 1994, a year and one-half before the first rape trial began in October 1995. The state renewed this motion on May 4, 1995, but the defendant ultimately refused to participate in the examination in May 1995. The record does not reflect that the state affirmatively withdrew its Rule 12.2(c) request on February 8, 1996, before the consolidated rape trial. Furthermore, in subsequent hearings on the matter, the state repeatedly denied that it had withdrawn its request and resisted the court's direction that it file a new request for a mental examination, arguing that its April 7, 1994 request was still pending. Although the defendant persistently argued and the trial court on at least one occasion found that the state had withdrawn its 12.2(c) request on February 8, 1996, we believe the record supports the trial court's subsequent finding that the state did not cause the delay.

In discussing the need for Rule 12.2(d) sanctions during the May 9, 1996 hearing, the trial court found that the delay in reaching the Rule 12.2(c) examination was due to the number of issues being considered in the months leading up to trial. It noted that in early February 1996, the defendant had asked for rulings on other motions before electing to proceed with an insanity defense in the consolidated rape trial. It stated that it had gotten to the mental evaluation issue as soon as possible in this case. In particular, the court noted that since February 7, 1996, it had spent eighteen days hearing arguments and testimony on the defendant's motions. It stated that it simply had not gotten to the mental responsibility issue until the last thirty days and that it "had no option, based on the timing of ... things, but to proceed in the way that [it] did." We do not detect a pattern of delay on the part of the state regarding the mental examination of the defendant, in particular no delay calculated to force the defendant to refuse to submit to the mental evaluation.

The defendant contends that he was justified in refusing to participate in the examination by Dr. Coons because, due to the closeness of the May 13, 1996 trial date, he did not have a meaningful opportunity to comply with the May 9 order. He argues that submitting to the examination with Dr. Coons would have prevented him from working with his attorneys in the days immediately preceding his trial. He also contends that the trial court's deadline of twenty-four hours to decide whether to pursue his insanity defense at trial upon receipt of the examination results violated his right to due process. The state contends that the trial court offered to continue the trial to give the defendant additional time to prepare. The defendant replies that by requesting a continuance he would have had to give up his right to a speedy trial that he had demanded since January 1995 in order to deal with the state's last minute request for a mental examination. He claims that it is unconstitutional to require him to give up his right to a speedy trial in order to gain a fair trial.

*98 In light of the circumstances surrounding the May 9 order, we do not believe that the defendant's right to due process was violated. We note that the trial court, at length and on several occasions, entertained the defendant's arguments regarding his objections to an examination by Dr. Coons. Although the trial court noted that it did not believe inability to prepare was the reason behind the defendant's refusal to submit to the mental examination, the trial court offered to continue the trial day to day for up to a week in order to give the defendant time to prepare. The defendant cannot, upon filing numerous pretrial motions, disparage the trial court for the time that it takes to address them. As discussed in Issue II, the defendant did not assert his right to a speedy trial in the rape cases until April 29, 1996, only ten days before the trial court's May 9 order. In light of the time needed to address the extensive motion practice in this case and the defendant's recent speedy trial challenge, we do not believe that the defendant was faced with an unconstitutional choice between a fair trial and a speedy one.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                          Page 82
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

The defendant also contends that the trial court's appointment of Dr. Coons to complete
Dr. Tennison's examination violated Tenn.Code Ann. § 33-7-301(a) because Dr. Coons was not
designated by the Commissioner of the Tennessee Department of Mental Health as required by
the statute. He argues that the procedures specified by section 33-7-301(a) help ensure
that court-ordered mental examinations are performed by qualified, unbiased experts at a
reasonable cost. He also asserts that trial court violated Rule 706, Tenn. R. Evid.,
because it did not give him a meaningful opportunity to determine Dr. Coons's
qualifications to conduct the examination so that he could properly challenge Dr. Coons's
appointment. Even if the trial court improperly appointed Dr. Coons, this does not justify
the defendant's refusal to submit to the examination. The trial court struck defense
experts on mental condition due to the defendant's refusal to participate in the
examination. In this respect, the propriety of Dr. Coons as the examiner is irrelevant
unless it justified the defendant's refusal to comply with the court-ordered examination.

Furthermore, we do not believe that the trial court's appointment of Dr. Coons was
improper. The decision of whether to grant a mental examination under section 33-7-301 is
within the trial court's discretion, and this court will not reverse that decision on
appeal except for an abuse of that discretion. *State v. Lane*, 689 S.W.2d 202, 204
(Tenn.Crim.App.1984). The "trial court has the authority to designate in its order ... the
expert who is to perform the examination...." *Martin*, 950 S.W.2d at 23. At the time of the
trial court's May 9, 1996 order, section 33-7-301(a) [FN4] instructed the trial court to
appoint an expert designated by the commissioner to conduct a mental examination. In the
present case, the trial court's appointment of Dr. Tennison, who was designated by the
commissioner, complied with the statute. If an expert designated by the commissioner could
not perform the evaluation, the statute directed that the defendant be examined as an
outpatient by a designated state or state--supported hospital. Tenn.Code Ann. § 33-7-
301(a) (1996, amended 1998). Before the homicide case, experts at Middle Tennessee State
Mental Health Institute (MTMHI) examined the defendant. Although the staff had some
experience with DID cases, the state mental hospital was unable to complete a mental
examination of the defendant. The plain language of the statute does not address a
situation in which the designated expert believes that he cannot complete the evaluation
of mental capacity due to his lack of experience and expertise and that no one in
Tennessee is qualified to perform the evaluation. Importantly, in the defendant's
interlocutory appeal of the Rule 12 .2(c) proceedings in the homicide case, our supreme
court did not disapprove of the trial court appointing an out-of-state expert, Dr. Richard
Kluft, upon the advice of Dr. Tennison once MTMHI could not complete the examination.
*Huskey*, 964 S.W.2d at 894. Similarly, we do not view the trial court's appointment of Dr.
Coons in the consolidated rape trial to be improper under section 33-7-301(a) as it
existed in 1996.

> FN4. We note that the legislature amended section 33-7-301(a), effective July 1,
> 1998, adding provisions that allow the trial court to permit the district attorney
> general "to designate a qualified expert" to examine the defendant if in "the case
> of a pre-trial proceeding the court receives notice from an inpatient evaluator
> under subdivision (a)(1) that ... [t]he type or extent of assessment required
> exceeds the expertise or resources available to the evaluator...." Tenn.Code Ann. §
> 33-7- 301(a)(2)(A)(i).

*99 Pursuant to Rule 706(a), Tenn. R. Evid., a trial court "may not appoint expert
witnesses of its own selection on issues to be tried by a jury except as provided
otherwise by law." The defendant's mental state at the time of the offenses is an issue to
be determined by the jury. Section 33-7-301 and Rule 12.2(c) govern the trial court's
appointment of an expert to conduct the court-ordered mental evaluation. Thus, the
selection of the court- appointed expert in this case was "provided otherwise by law." *See*
Tenn.Code Ann. § 33-7-301(a); Tenn. R.Crim. P. 12.2(c); *see also* Neil P. Cohen, *Tennessee*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 83
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

*Law of Evidence* § 7.06[3][b] at 7-77 (noting that the trial court may select an expert appointed to examine a defendant who raises a defense of mental condition in a criminal trial). Also with regard to Rule 706, the defendant argues that the trial court's order appointing Dr. Coons failed to prescribe the standards by which Dr. Coons was to conduct the evaluation or to ask Dr. Coons to give opinions. The May 9 order fixed the conditions under which the examination was to take place and required Dr. Coons to submit a report on the examination. Additionally, the trial court directed Dr. Tennison to continue to participate in the examination of the defendant. Thus, the trial court communicated to Dr. Coons the parameters of the examination and the need for his opinion. We perceive no error with regard to Rule 706.

The defendant also contends that the state manipulated the Rule 12.2 proceedings in order to select the expert of its choice. Even if true, the defendant fails to explain how this would justify his refusal to participate in the court-ordered examination, and, indeed, we conclude that it would not. Furthermore, as previously discussed, the trial court acted within its discretion in appointing Dr. Coons. Although the state repeatedly argued that it should be allowed to select the expert who would perform the court-ordered examination, the trial court rejected this request. From the inception of the Rule 12.2 proceedings in this case, the court firmly and consistently ruled that the Rule 12.2(c) examination would be conducted by the court's expert. When Dr. Tennison, the court-appointed expert, reported that he lacked the necessary experience and expertise in DID to complete the defendant's evaluation, the court directed Dr. Tennison to suggest an expert who was qualified to complete the examination. The court permitted but did not require Dr. Tennison to consider the state's recommendations. Dr. Tennison testified that he did not recognize Dr. Coons when the state gave him Dr. Coons's vita prior to Dr. Tennison's initial examination of the defendant. When Dr. Tennison subsequently recommended Dr. Coons to complete the examination, he stated:

I looked into my own educational and training materials and found that particular doctor has a very high stature in forensic psychiatry and in the diagnosis and treatment of dissociative identity disorder. In fact, several of his papers are ones that I have used myself. And when I was asked if I remembered him and didn't remember him, I'm embarrassed to say that I actually had been trained with materials that he had produced.
*100 Thus, the record reflects that Dr. Tennison suggested Dr. Coons based upon his qualifications rather than upon the state's recommendation. The trial court found the proposed examination by Dr. Coons to be "extremely fair." Our review of the Rule 12.2 proceedings in this case does not reveal that Dr. Coons, although preferred by the state, was in any way affiliated with the state or biased in the state's favor. We do not believe that the evolution of the Rule 12.2 proceedings in this case were crafted to provide the state with the expert of its choice.

Finally, the defendant argues that the trial court's *ex parte* communications with Drs. Tennison and Coons reveal that the trial court and the District Attorney were manipulating the Rule 12.2(c) evaluation to ensure that the defendant was examined by the state's chosen expert. This assertion likewise provides no justification for the defendant's refusal to submit to the May 9 order. As discussed in Issue XX on disqualification, the record does not reflect that the trial court communicated *ex parte* with Drs. Tennison and Coons in order to provide the state with its preferred expert. The defendant is not entitled to relief on this issue.

(2) Constitutionality of the May 9, 1996 Order

The defendant contends that the May 9, 1996 order directing that he submit to a mental examination by Dr. Coons violated his rights under the state and federal constitutions; the attorney-client privilege; the attorney work product doctrine; and disciplinary rule 4-101 of the Code of Professional Responsibility, Tenn. S.Ct. R. 8. In this regard, he

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                              Page 84
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

challenges the order's requirement that he turn over certain records to Drs. Tennison and
Coons and make the witnesses under his control available to these experts. He argues that
he rightfully declined to be examined under an unconstitutional and unlawful order and
that the resulting sanctions erroneously denied him a meaningful opportunity to present
his insanity defense. The state contends that the defendant has failed to specify how the
disclosure of the records enumerated in the May 9 order would violate any privileges. It
argues that the supreme court's rulings in *Martin* and *Huskey* control this claim. It also
argues that the defendant did not object to giving this information to Dr. Tennison but
only refused to give it to Dr. Coons. Although the records in question are the work
product of the defense, the record does not reflect that the trial court's order that the
defendant provide these records was the basis for his refusal to submit to the
examination.

Without further explanation, the defendant argues that the trial court's order that he
provide medical, school, employment, psychological, and psychiatric records as well as
make witnesses available to the experts violates his Fifth and Sixth Amendment rights
under the United States Constitution and his article I, section 7, 8, and 17 rights under
the Tennessee Constitution. We decline to speculate in what way. *See* Tenn. Ct.Crim.App. R.
10(b) (providing that issues unsupported by argument are waived). We note, though, that as
long as the protections built into Rule 12 .2(c) are scrupulously followed, "statements
made by [the defendant] during the examination, any expert testimony based on such
statements, and any 'fruits' derived from the statements are admissible" without violating
the defendant's right against self-incrimination or right to counsel. *Huskey*, 964 S.W.2d
at 897-98; *see also Martin*, 950 S.W.2d at 24, 27.

*101 The defendant contends that the attorney-client privilege and the work product
doctrine protect the requested materials because defense counsel obtained all of the
materials subject to the order as a result of communications with the defendant. We agree
with the defendant that our supreme court's ruling in *Huskey* did not address this specific
issue with regard to the May 9 order. *Huskey*, 964 S.W.2d at 900. Instead, the court noted
that the trial court's superceding August 12 order directed the disclosure of materials to
the examining experts " 'subject to' " any relevant privileges. *Id.* The supreme court held
that the defendant could "on remand, object to disclosure of specific materials to the
state following a Rule 12.2(c) examination and attempt to establish the applicability of a
privilege or other basis for non-disclosure." *Id.; see also Martin*, 950 S.W.2d at 25.

The May 9 order does not directly violate the attorney-client privilege. *See* Tenn.Code
Ann. § 23-3-105 (providing that an attorney may not disclose communications made by a
client). The attorney-client privilege does not apply if a third party is present during
the communication. *See Bryan*, 848 S.W.2d 72, 80 (Tenn.Crim.App.1992); *see also Hazlett v.
Bryant*, 192 Tenn. 251, 257, 241 S.W.2d 121, 124 (1951). The nature of the requested
materials suggests that third parties were necessarily involved in their creation as well
as their being obtained by the defense.

To the extent that the defense had the requested records in its possession, they were
collected by defense counsel or their agents in preparation for the defendant's trials.
Thus, they were work product. *See State v. Hunter*, 764 S.W.2d 769, 770
(Tenn.Crim.App.1988) (defining work product as the "internal reports, documents,
memoranda, etc. prepared or collected by the attorney or his representatives in
preparation for trial"); *see also* Tenn. R.Crim. P. 16(b)(2). Nevertheless, work product
does not enjoy an absolute privilege and may be disclosed if the failure to do so would
impose a hardship on the other party by depriving it of relevant, non-privileged facts
essential to its case. *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 394 (1947);
*Southeastern Fleet Leasing, Inc. v. Gentry*, 57 Tenn.App. 162, 172, 416 S.W.2d 773, 778
(1967). In the present case, we question the trial court's order that the defendant

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                Page 85
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

provide records because no evidence exists that the experts were unable to obtain these
documents from another source. Furthermore, with the exception of expert witnesses, a
defendant may not be required to disclose his or her witnesses before trial. *See generally*
Tenn. R.Crim. P. 16(b)(2).

    In any event, the record reveals that the trial court's ordering the defendant to produce
work product did not influence his decision to refuse an examination by Dr. Coons. At the
May 9 hearing, the defendant offered to comply with the order as it related to Dr.
Tennison but refused to comply with regard to Dr. Coons. He made this statement
immediately after clarifying that the records required by the order included those that he
did not intend to introduce at trial. In this respect, we believe that the defendant's
argument that the order threatens defense confidences is somewhat disingenuous as he would
have willingly provided the records to Dr. Tennison. The defendant's stance on this issue
at the May 9 hearing reveals that the heart of the defendant's objection was to the trial
court's appointment of Dr. Coons as the examiner. Furthermore, on August 12, 1996, after
the consolidated rape trial, the trial court entered a superceding order, which deleted
the offensive provisions and, instead, "encouraged [prosecution and defense counsel] to
cooperate with requests for information from [MTMHI], subject to the attorney-client or
other applicable privileges." This suggests that violations of the work product rule will
not be an issue in a retrial of D. C.'s case.

    *102 Finally, the defendant contends that the May 9 order's provision for the disclosure
of the listed materials required defense counsel to violate DR 4-101, Tenn. S.Ct. R. 8.,
which prohibits an attorney from revealing a secret or confidence of a client or from
using such to the client's disadvantage. The materials listed in the order do not fall
within the disciplinary rule's definition of a confidence, which is "information protected
by the attorney-client privilege under applicable law." DR 4-101(A). Under DR 4-101(A), a
secret "refers to other information gained in the professional relationship that the
client has requested be held inviolate or the disclosure of which would be embarrassing or
would be likely to be detrimental to the client." Assuming arguendo that the listed
materials fall within this definition, the rule provides that a lawyer may reveal
confidences or "secrets when permitted under ... court order." DR 4-101(C)(2). Thus, this
disciplinary rule does not prevent compliance with the May 9 order.

(3) Rule 12.2(d) Sanctions Unwarranted

    The defendant contends that Rule 12.2(d) sanctions were unwarranted in this case because
the trial court imposed the sanctions for his attorneys' actions rather than those of the
defendant, who did not personally, deliberately, and willfully refuse to participate in
the court-ordered examination by Dr. Coons. He also argues that the trial court
erroneously concluded that Rule 12.2(d) required that it impose sanctions. The state
contends that the sanctions were proper. We agree with the state.

    The defendant again faults the trial court for failing to ask the defendant personally
whether he refused to submit to the Rule 12.2(c) evaluation rather than sanctioning him
for the actions of his attorneys. As discussed above with regard to the proceedings in the
first rape trial, a trial court does not have to question the defendant personally with
regard to his or her refusal to submit to a Rule 12.2(c) mental examination. Instead, the
trial court is entitled to rely upon the representations of defense counsel that the
defendant will not participate in the examination. Furthermore, we note that in the
consolidated rape case, the state requested that the trial court question the defendant
personally to insure that he understood the ramifications of his refusal to submit to the
examination. Defense counsel objected to the court questioning the defendant, and the
trial court observed:
    Mr. Huskey is present in the courtroom as we speak. He's been present at every
    proceeding that I've had with respect to this case. He's familiar with what his lawyers

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

are representing to the Court. I assume if Mr. Huskey at some point in time disagrees
with their counsel, that he will let me know about it. I don't hear anything from him at
this time, and I'm not going to ... personally address myself to Mr. Huskey. He's
represented by counsel, and I think the appropriate thing for me to do is to address
myself to counsel.
    *103 The defendant cannot object to the trial court questioning him at trial and then
argue on appeal that the trial court should have done so. *See State v. Miller,* 668 S.W.2d
281, 285 (Tenn.1984). The trial court did not err in relying upon the defense counsels'
representations that the defendant would not participate in the examination.

    The defendant also contends that the trial court erroneously determined that imposition
of Rule 12.2(d) sanctions was mandatory rather than discretionary. We agree with the
defendant that Rule 12.2(d) sanctions are discretionary. *See* Tenn. R.Crim. P. 12.2(d)
(providing that the trial court "may exclude" defense expert testimony on mental condition
for the defendant's failure to comply with Rule 12.2). We differ, though, in our
interpretation of the trial court's comments regarding the imposition of sanctions. After
declining to be examined by Dr. Coons, the defendant argued that the court should not
impose sanctions due to the circumstances surrounding the Rule 12.2(c) proceedings in this
case. He argued that because of the state's belated request, the timing of the examination
would leave him with inadequate time to prepare for trial, to consider the results of Dr.
Coons's examination, or to consult with defense experts about the results. He objected to
his inability to investigate Dr. Coons and to delaying the trial. Finally, he argued that
his constitutional right to a defense should take precedence over the state's statutory
right to a mental examination so close to trial.

    The trial court responded to these arguments by noting the defendant's desire to wait
until the court had ruled on other motions before deciding whether he would proceed with a
defense of mental responsibility in this case. It found that due to the amount of time
needed for motions on this case, it had only addressed the issue of mental responsibility
within the last thirty days. It stated that although it had attempted to protect the
defendant's rights, it would not allow the defendant to thwart the rules to gain an unfair
advantage. The court stated that if the defendant sought to use expert testimony to
present a mental defense, then a fair and true determination of that issue required that
he be examined by the court's experts. It stated that the defendant had refused to submit
to an extremely fair evaluation. Then, it ruled that as "a result of that, it's my opinion
that the rules and the law in this state direct this court, mandate the court under the
facts of this case to exclude any testimony by expert witnesses with respect to the mental
responsibility of this defendant." We do not interpret the trial court's use of the term
"mandate" to mean that it mistakenly believed that Rule 12.2(d) sanctions were mandatory.
Instead, taking this statement in the context of the defendant's arguments and the court's
findings, we believe that the court ruled that the impact of the defendant's refusal to be
examined by Dr. Coons justified the striking of defense experts in this case. The
defendant is not entitled to relief on this issue.

    *104 Finally, the defendant contends that the trial court abused its discretion in
striking his experts pursuant to Rule 12.2(d) in this case. He argues that the state was
not harmed by his refusal to submit to the examination. He states that the state could
have presented expert testimony through experts who had reviewed Dr. Tennison's videotaped
examination, the defendant's audiotaped statements, and information about him from the
detectives, other inmates, and a background investigation. As discussed with regard to the
proceedings in the first rape trial, we do not believe that an examination limited to these
sources could approximate one conducted with the defendant. The defendant notes that in
the homicide case, the state relied upon the testimony of Dr. Herbert Speigel, who never
examined the defendant. We would point out that in the homicide case, the defendant did
submit to a complete examination by the court-appointed experts. In imposing sanctions in

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                 Page 87
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

the consolidated rape trial, the court noted that a complete examination by a
court-appointed expert was necessary to a fair determination of the mental responsibility
issue. We agree and do not believe that the trial court abused its discretion in imposing
sanctions.

IX. CHANGE OF VENUE

  The defendant contends that the trial court erred in its rulings regarding his motions
for change of venue. In the first rape case, the trial court denied the defendant's
motion, and the defendant was tried in Knox County by a Knox County jury. In the
consolidated rape case, the trial court ruled that a jury was to be selected from Hamilton
County but then transported to Knoxville for the trial. The defendant contends that the
trial court erred in moving the Hamilton County jury to Knox County. The state contends
that the trial court properly denied the defendant's motion in the first rape case and
that the trial court properly held the consolidated rape trial in Knox County with a
Hamilton County jury.

  In support of his motion for a change of venue, the defendant offered the affidavit of
Dr. Charles C. Bebber, a psychologist and trial behavior consultant. The affidavit
provided the following: Dr. Bebber had reviewed the indictments and information in the
defendant's cases. He had also reviewed transcripts of television and radio newscasts and
copies of newspaper articles from Knox County and surrounding counties regarding the
defendant's cases. Dr. Bebber discussed four factors to support his opinion that pretrial
publicity was prejudicial and had influenced prospective jurors. First, he said that an
imagery-learning factor made the defendant and the charges against him especially
memorable. He explained that the use by the media of terms such as "Zoo Man" and "Cahaba
Lane murders" with photographs of the defendant when he appeared "wolfman-like"
established a strong and unforgettable mental image of a person associated with the
allegations of violence. Second, an isolation- effect factor also made the defendant and
the charges against him more memorable. Dr. Bebber explained that referring to the case as
Knoxville's first serial murder and the case "that shocked East Tennessee" made the case
unique and, thus, made it stand out. Third, a dramatic exposition variable made the case
stand out from other criminal cases in the area. Dr. Bebber stated that the dramatic
manner in which the media reported the investigation from start to finish, including the
fact that prominent forensic experts were involved, would cause people to remember the
events reported in the media more vividly than any facts the defense presented at trial to
dispute the charges. Finally, he said that a sensationalism factor also made the
defendant's case more memorable, stating that the substance of the news reports was of a
highly sensational quality. Based upon his research, experience, exposure to people in the
community, and review of the publicity, Dr. Bebber believed that an unbiased jury could
not be selected in Knox County or a contiguous county.

  *105 At the hearing on the motion for a change of venue, Thomas Kohntopp, an industrial
psychologist, testified that he conducted a public opinion survey relative to the
defendant and his cases. He admitted that this survey was only the second one he had
conducted relating to fair jury selection. He reviewed the defendant's motion for a change
of venue, the state's response to that motion, the newspaper articles regarding the
defendant's cases, and the criteria for a person to be eligible to serve on a Knox County
jury, and based upon all of this information, he developed a questionnaire. He determined
that the number of potential jurors in Knox County was approximately two hundred thousand.
Based upon this number, he determined that five hundred people should be polled, which was
done via telephone. He stated that the margin of error for the survey was plus or minus
five percent.

  Mr. Kohntopp testified that in order to insure that the interviewees were potential
jurors, the interviewers first asked whether the interviewee was at least eighteen years

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                    Page 88
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

old, was registered to vote, and had lived in Knox County for at least twelve months. He
said that he received five hundred seventy-three qualified responses, of which 82.2
percent responded that they had read or heard something about a Knoxville legal case
involving Thomas Dee Huskey, also referred to as the "Zoo Man," and the 1992 serial
murders of women at Cahaba Lane. Mr. Kohntopp stated that he found this percentage to be
extremely high. The interviewees were then asked about their impression of Thomas Huskey,
the Zoo Man. The responses were written down and then classified as favorable, neutral, or
unfavorable. The results were 52.3 percent unfavorable, 41.4 percent neutral, and 6.3
percent favorable. The next question was "Based upon what you have read or heard about the
case, do you think the defendant, Thomas Huskey, also known as the Zoo Man, is definitely
not guilty, probably not guilty, probably guilty, or definitely guilty," to which 61.9
percent stated they thought the defendant was either definitely guilty or probably guilty.
Mr. Kohntopp stated that although "no opinion" was not given as a possible response, 31.6
percent of people surveyed said that they did not have an opinion as to the defendant's
guilt or innocence. Finally, the interviewees who answered that they believed the
defendant was definitely or probably guilty were asked whether the defendant should
receive life in prison or the death penalty if convicted. About 38 percent responded that
the defendant should receive life in prison, about 44 percent said that he should be
sentenced to death, and about 18 percent responded that they had no opinion.

On cross-examination, Mr. Kohntopp testified that he had only seen a jury selected one
time. He stated that he hired students to conduct the telephone surveys and that they were
trained but that the phone calls were not monitored. He said that the telephone calls were
not recorded and that the students wrote down the interviewees answers. He stated that he
and a clerk of one of the defendant's attorneys reviewed the answers to the question
regarding the interviewee's impression of the defendant, and they decided how to classify
the answers. He said that he included the Zoo Man reference in the questions because it
was the general label applied to the defendant in the newspaper articles.

A. The First Rape Trial

*106 The defendant argues that the evidence shows that a fair trial was not possible in
Knox County and that the trial court did not properly apply Rule 21, Tenn. R.Crim. P., or
Tenn.Code Ann. § 20-4-201. Thus, the defendant contends, the trial court improperly denied
his motion for a change of venue. The state responds that the trial court properly denied
the defendant's motion. It argues that the defendant failed to present any legitimate
reason to change the venue and that the evidence presented did not indicate that a fair
and impartial jury was not selected in Knox County.

The decision of whether to grant a motion for a change of venue based on pretrial
publicity rests within the sound discretion of the trial court and will not be reversed on
appeal absent a clear abuse of discretion. *State v. Howell,* 868 S.W.2d 238, 249
(Tenn.1993). Furthermore, the defendant must show that the jurors were biased or
prejudiced against him before his conviction will be overturned on appeal. *State v.
Melson,* 638 S.W.2d 342, 360-61 (Tenn.1992).

The defendant contends that the trial court failed to determine whether "a fair trial
probably could not be had" as required by Rule 21(a), Tenn. R.Crim. P, which provides:
 In all criminal prosecutions the venue may be changed upon motion of the defendant, or
 upon the court's own motion with the consent of the defendant, if it appears to the
 court that, due to undue excitement against the defendant in the county where the
 offense was committed or any other cause, a fair trial probably could not be had.
 (Emphasis added); *see also* Tenn.Code Ann. § 20-4-201(1) (stating venue "may be changed
... upon good cause shown") (emphasis added). The defendant insists that the trial court
erred in denying his motion and in waiting to see if a fair jury could be selected. He
argues that the pretrial publicity regarding his cases was so pervasive and inflammatory

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                Page 89
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

that a fair trial could not be had in Knox County. The state argues that the trial court did not abuse its discretion in denying a change of venue.

Initially, we emphasize, as indicated above, that Rule 21 gives the trial court discretion regarding decisions to change venue. We do not believe the trial court abused this discretion. Regarding the defendant's expert's survey, we note that most of it was of questionable relevance as applied to the rape cases. The questions concerned the defendant's homicide cases, asking whether the interviewee had heard about the serial murders and whether, if the defendant were convicted, they would impose a sentence of life in prison or death. Also, although 82 percent of the 573 people polled had heard of the defendant, the Zoo Man, or the serial murders at Cahaba Lane, that fact does not mean that a fair trial probably could not be had. Indeed, mere exposure to news accounts of the incident does not, standing alone, establish bias or prejudice. Prospective jurors can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury. *State v. Bates*, 804 S.W.2d 868, 877 (Tenn.1991). Also, whether a person's impression of the defendant was favorable or unfavorable does not reflect whether the person could be an impartial juror, although we note that 47.7 percent of the people surveyed responded that they had a neutral or favorable impression of the defendant even after they had been asked questions about the Zoo Man and serial murders. We are also skeptical of the value of the question regarding the defendant's guilt or innocence. The interviewees were not even given the option of "no opinion." Nevertheless, 31.6 percent of the people questioned said that they did not have an opinion regarding the defendant's guilt or innocence. We do not believe that the defendant's proof established that a fair trial probably could not be had.

*107 The defendant relies upon *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn.Crim.App.1979), in which this court listed seventeen factors to consider when determining whether to grant a change of venue:
 (1) Nature, extent, and timing of pre-trial publicity.
 (2) Nature of publicity as fair or inflammatory.
 (3) The particular content of the publicity.
 (4) The degree to which the publicity complained of has permeated the area from which the venire is drawn.
 (5) The degree to which the publicity circulated outside the area from which the venire is drawn.
 (6) The time elapsed from the release of the publicity until the trial.
 (7) The degree of care exercised in the selection of the jury.
 (8) The ease or difficulty in selecting the jury.
 (9) The veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire.
 (10) The defendant's utilization of his preemptory challenges.
 (11) The defendant's utilization of challenges for cause.
 (12) The participation by police or by prosecution in the release of publicity.
 (13) The severity of the offense charged.
 (14) The absence or presence of threats, demonstrations or other hostility against the defendant.
 (15) Size of the area from which the venire is drawn.
 (16) Affidavits, hearsay or opinion testimony of witnesses.
 (17) Nature of the verdict returned by the trial jury.
 The defendant argues that all of these factors either favored changing venue or were neutral.

While we agree with the defendant that some of the publicity was inflammatory, we note that much of the publicity was fair reporting of the facts. More importantly, we note the timing of the articles and reports cited by the defendant. The first rape trial occurred

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 90
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

in October 1995. In reviewing all of the articles and reports cited by the defendant that
were published before the first rape trial, we note that most of them were published in
October or November 1992. Furthermore, the latest article cited by the defendant--but
still before the first rape trial--was published on April 9, 1994, about eighteen months
before the first rape trial. Thus, the timing of the publicity supports the trial court's
decision. Moreover, five of the *Hoover* factors relate to the jury selection. In this
respect, we cannot say that the trial court erred in denying the defendant's motion for a
change of venue at the pretrial hearing and in opting to wait and see the jury selection
process before determining whether a change of venue was warranted. Significantly, as we
discuss in Issue XXIII, the defendant failed to use his peremptory challenges to strike
jurors with knowledge of his other charges despite having an opportunity to do so.
Furthermore, the jury was selected in the first rape case after a lengthy and thorough
voir dire. We cannot conclude that the trial court abused its discretion in denying the
defendant a change of venue in the first rape case.

B. Consolidated Rape Trial

  *108 On April 29, 1996, the trial court ruled on the defendant's motion for a change of
venue in the consolidated rape case. Because of the considerable amount of recent
publicity about the case, the trial court ruled that a jury be selected from Hamilton
County but returned to Knox County for the trial. The defendant contends that the trial
court erred in returning the jury to Knox County. He complains that because the trial
venue was not also changed to Hamilton County, eleven potential jurors were dismissed for
cause because they stated that traveling to Knox County for a trial would be a hardship.
Thus, the defendant argues, he was denied the opportunity of having these jurors sit on
his jury. The defendant contends that moving the jurors exposed them to a prejudiced Knox
County community through motel clerks, restaurants, and Knox County court personnel. The
defendant also complains that the Knox County Sheriff's Department "hosted" the jurors and
"cared for their every need," prejudicing him because part of his defense was that the
sheriff's investigators rushed to judgment. The state contends that the trial court did
not abuse its discretion and the defendant was not prejudiced by transporting the jury to
Knox County for trial, a procedure expressly permitted by case law and statute. We agree
with the state.

  In *State* v. *Nichols*, 877 S.W.2d 722 (Tenn.1994), the defendant moved for a change of
venue from Hamilton County. The trial court granted the motion, but only for the limited
purpose of selecting a jury from another county. The jury, over the defendant's objection,
was then transported to Hamilton County for the trial. *Id.* at 727. Our supreme court
concluded that filing a motion for a **change** of **venue** constituted a **waiver** of the
defendant's constitutional right to have a jury selected from the county where the crime
was committed, noting that case law has interpreted this right to include being tried in
the county where the crime was committed. *Id.* The court held that "unless the defendant is
prejudiced, the administration of justice harmed, or the trial court abuses its
discretion, no reversible error occurs when a trial court" has a jury selected from
another county and then brought to the county of the indictment for trial. *Id.* at 728. The
court encouraged the legislature to address this issue to "ensure uniformity and fairness
across the state and to avoid error from excessive experimentation." *Id.* at 729. The
following year, the statute relating to change of venue was amended, allowing the
procedure used in *Nichols*. Effective May 30, 1995, in all criminal cases,
  (1) The venue may be changed, at any time before trial, upon good cause shown, as
  prescribed in this part; or
  (2) A court may issue an order for a special venire of jurors from another county if in
  its discretion it determines the action to be necessary to insure a fair trial.
  Tenn.Code. Ann. § 20-4-201. Thus, although we recognize that selecting a jury from
another county and returning it to the county where the defendant was indicted increases

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

the possibility of the jury being exposed to prejudicial information, this procedure has been expressly approved by our supreme court and our legislature. The defendant does not allege, and the record does not reflect, that the jurors actually selected were unfair or unbiased or that the court officers acted improperly or influenced the jury in any way. Therefore, we conclude that the trial court properly ordered a special venire from Hamilton County as authorized by Tenn.Code Ann. § 20-4-201(2) and *Nichols*.

XI. ACCESS TO VICTIMS' RECORDS

*109 The defendant contends that the trial court's failure to allow him access to various records of the victims violated his right to compulsory process under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. He argues that drug and alcohol treatment records, Sexual Assault Crisis Center (SACC) records, Department of Paroles records, Knoxville Police Department records, Knox County District Attorney's Office records, and various medical or psychiatric records from the Knox County Jail and the Community Alternatives to Prisons Program (CAPP) enjoyed no privilege and were material to the victims' testimony. He maintains that he was entitled to review these records without regard to their admissibility. The state contends that the trial court allowed the defendant to view the victim's drug treatment records in the first rape case although they were privileged under federal law. It argues that the trial court properly denied access to the victim's SACC records upon determining that they contained nothing beneficial to the defense. It maintains that the defendant has shown no prejudice resulting from the denial of either set of records. With regard to the consolidated rape case, the state contends that the defendant has waived this issue because his claims are wholly unsubstantiated.

A "defendant has a fundamental constitutional right to compulsory process for the obtaining of witnesses and when the witness is shown to be material, the trial court has no discretion as to the issuance of such process." *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn.Crim.App.1991); *see* U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. In Tennessee, the right to compulsory process is extended by statute as well as the constitution. *See* Tenn.Code Ann. § 40- 17-105 (providing that all criminal defendants have the right to compulsory process in order to acquire favorable witnesses). Unless granted a privilege or right by constitution, statute, common law, or rule, no one "may refuse to be a witness," "to disclose any matter," or "to produce any object or writing." Tenn. R. Evid. 501(1)-(3). Procedurally, a defendant may exercise the right to compulsory process through subpoenas for witnesses or documents as provided by Rule 17, Tenn. R.Crim. P. Tenn.Code Ann. § 40-17-122. A court may issue a subpoena for the production of documents, may require the documents be produced before trial, and may permit the parties and their attorneys to inspect the documents once produced. Tenn. R.Crim. P. 17(c).

On the other hand, a defendant's right to compulsory process is not without limit: "A court is not required to issue compulsory process for anyone whom accused may designate as a witness; the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible. Within these limitations accused may obtain the attendance of any witnesses he cares to use...."
*110 *Bacon v. State*, 215 Tenn. 268, 273, 385 S.W.2d 107, 109 (1964) (quoting 97 C.J.S. *Witnesses* § 9); *State v. West*, 767 S.W.2d 387, 401 (Tenn.1989). The trial court "has the power and the duty to prevent abuse of its process by abating subpoenas for witnesses whose testimony would be immaterial." *State v. Womack*, 591 S.W .2d 437, 443 (Tenn.Crim.App.1979). This court will reverse the trial court's decision to abate a subpoena only if it has abused its discretion. *State v. Connie Easterly*, No. M2000-00077-CCA- R10-CO, Sequatchie County, slip op. at 8 (Tenn.Crim.App. Mar. 1, 2001); *see, e.g., State v. Burrus*, 693 S .W.2d 926, 929 (Tenn.Crim.App.1985); *Womack*, 591 S.W.2d

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 92
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

at 446; c.f. *Morgan*, 825 S.W.2d at 117 (noting that a trial court's denial of a
continuance to secure a witness is reviewed for an abuse of discretion).

A. The First Rape Trial

Before trial, the defendant sought the victim's Drug and Rehabilitation Institute (DRI)
and SACC records. On October 5, 1995, the trial court gave the defendant an excerpt from
the DRI records but filed the balance of the DRI records under seal after reviewing them
*in camera*. The court denied the defendant access to the victim's SACC records, determining
that federal regulations did not require their release. During trial, the defendant renewed
his motion for the SACC records and the remaining DRI records. After reviewing all of the
records *in camera*, the court ruled that it would not release the SACC records because they
were not relevant to the case. It noted that the SACC records were not covered by any
statutory privilege but stated that, as a matter of policy, a general privacy protection
should apply unless the information became relevant to the issues at trial. The court
noted that it would reverse its ruling if the cross-examination of the victim caused it to
believe that the information in the SACC records was relevant.

Before the defendant's cross-examination of the victim, the trial court gave the
defendant the remaining records pertaining to the victim's DRI treatment from July 1992 to
September 1992 that were not released before trial. The trial court denied the defendant's
motion for a continuance to investigate matters in the records, stating that the records
did not contain any astounding new information. The court also obtained and reviewed
additional DRI records relating to treatment of the victim before July 1992. It determined
that these earlier DRI records were not relevant to the case and stated that it would file
them in the record under seal.

We believe that the trial court properly denied the defendant access to most of the
victim's SACC records and to her earlier DRI records. Despite the defendant's contentions
to the contrary, the admissibility of the records is relevant to the trial court's
disclosure of the records under his right to compulsory process. *See Bacon*, 215 Tenn. at
273, 385 S.W.2d at 109. The trial court reviewed the records *in camera* and determined that
they were not relevant to the issues at trial. We agree with the trial court's
determination with regard to the DRI records and most of the SACC records.

*111 Regarding the SACC records, the defendant contends that the victim testified that
she was approached by an SACC employee before she spoke with the police about the rape on
July 18, 1992. Thus, he speculates that the SACC records contain prior statements to the
SACC about the rape. The only account of the offenses contained in the SACC records is the
following, which was entered on a form entitled Criminal Justice Support Log Form and
dated November 9, 1992: Victim "apprehended by assailant after he had stopped and asked
her for directions. July 18, 1992. Assailant assaulted [the victim] in barn [at the]
Knoxville Zoo." This brief account is consistent with the victim's testimony and was
written almost four months after the offenses. The account is followed by the rather
cryptic statement that "SACC/Jean Spangler accompanied to St[.] Mary's ER.". It is unclear
whether Ms. Spangler accompanied the victim to the emergency room, some unnamed person
accompanied Ms. Spangler to the emergency room, or the statement merely refers to Ms.
Spangler's support of the victim while at the emergency room. The first possibility
conflicts with the victim's testimony that her aunt took her to St. Mary's emergency room
where she met with Jean Spangler from the SACC after telling a nurse that she had been
raped. As noted by the trial court, the remaining SACC records consist primarily of
scheduling notations.

We believe that the phrase regarding Ms. Spangler going to the emergency room could be
exculpatory to the defense. The trial court did not hold an evidentiary hearing regarding
the SACC records, and we do not have the benefit of any findings from the trial court as

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          Page 93
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

to what the phrase in question means. If the victim told someone at the SACC that Ms. Spangler accompanied her to the emergency room, the defendant could have used this statement to impeach the victim's account of her trip to the emergency room. On the other hand, if the statement refers to someone else--perhaps the person who prepared the Criminal Justice Support Log Form--accompanying Ms. Spangler to the hospital, the form would not be exculpatory. Even if exculpatory, the statement would have to be material before the defendant's right to due process compelled disclosure of the form. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97 (1963); *see also Hartman v. State*, 896 S.W.2d 94, 101 (Tenn.1995). Evidence is considered material under the standard announced in *Brady* only " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383 (1985)); *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn.1995).

In the present case, although the statement about Ms. Spangler is potentially exculpatory, we do not believe it to be material. The defendant thoroughly cross-examined the victim about her delay in telling anyone about the rape. Also, he emphasized that she had spoken with a rape counselor before she spoke with the police at the hospital. Thus, the defendant was able to present to the jury the possibility that the rape counselor colored the victim's account of what happened in light of the fact that the victim had not previously claimed to have been raped. Furthermore, the records of the victim's treatment at St. Mary's Hospital state that the victim said that she had been raped, that she complained of a shoulder injury, and that x-rays were subsequently taken at 11:30 p.m. The hospital records reveal that a police officer interviewed the victim after midnight and that she met with the "Rape Crisis Lady" after 1:30 a.m. The state introduced the hospital records during the victim's direct examination. Thus, the defendant had an opportunity to impeach the victim's order of events but did not use the records to this end. Because we see no reasonable basis to believe that the statement relating to Ms. Spangler would probably have changed the outcome of the trial, we conclude that the trial court's failure to release the Criminal Justice Support Log Form to the defense was at most harmless error. As for the remainder of the SACC records, we affirm the trial court's determination that they were irrelevant to the case.

*112 Regarding his need for the DRI records, the defendant states only that the victim was addicted to cocaine and treated before and after the offenses on July 18, 1992. The defendant received the DRI records from July 1992 through September 1992 and thoroughly cross-examined the victim with these records at trial. We note that the defendant originally requested only those records relating to the period from July through October 1992, arguing the victim's drug addiction was relevant to the credibility and reliability of her identification of her attacker. During trial, the defendant requested the victim's earlier DRI records. The trial court found the earlier DRI records to be irrelevant. We cannot locate these earlier DRI records within the record on appeal in order to review them. The defendant does not point to the location of the sealed DRI records. *See* T.R.A.P. 27(a)(7) (requiring that the appellant's brief shall contain appropriate references to the record relied upon in the argument). In the jury out hearing on the records, the trial court designated the undisclosed DRI records as exhibit ten for identification. Exhibit ten to the first rape trial is three unsealed pages of the DRI records of one of the victims in the Consolidated Rape case. Our review of the record has not revealed the earlier DRI records of the victim in the first rape trial in another location. Although we appreciate the difficulties in dealing with a record of this magnitude, it remains the responsibility of the appealing party to make sure that the record is complete. *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn.1993) (holding that the appealing party has a "duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal."). In the absence of a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

complete record, we must presume the trial court correctly found that the earlier DRI records were irrelevant. *See State v. Boling*, 840 S.W.2d 944, 951 (Tenn.Crim.App.1992) ("Absent an essential part of the record, this court must presume that the trial court's determination is correct.").

 The state contends that the DRI records were privileged under 38 U.S.C. § 7332(b)(2)(D). This United States Code section is inapplicable to this case as it deals with the confidentiality of medical records generated for programs by or for the Veteran's Health Administration. *See* 38 U.S.C. § 7332(a)(1). The record contains no indication that the victim's DRI records fall within that category. On the other hand, we note that federal law provides that

 [r]ecords of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research, which is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall ... be confidential and be disclosed only for the purposes and under the circumstances expressly authorized under subsection (b).

**\*113** 42 U.S.C. § 290dd-2(a). Subsection (b)(2)(C) permits disclosure without the patient's consent in the following circumstance:

 If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefore, including the need to avert a substantial risk of death or serious bodily harm. In assessing good cause the court shall weigh the public interest and need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

 In the present case, the record does not reveal whether the programs offered by DRI were "conducted, regulated, or directly or indirectly assisted" by a federal department or agency, but the parties and trial court acted as though the records were covered by this section and the related federal regulations. The defendant sought a court order for the release of the records and the trial court evaluated the need for disclosure. As discussed in the preceding paragraph, due to the absence of the earlier DRI records in the record, we must presume the trial court correctly determined that they need not be disclosed.

 Finally, we note that in his reply brief, the defendant summarily states that a public policy concern for privacy cannot trump the defendant's state and federal constitutional rights to confront and cross-examine witnesses and to a fair trial. Other than this brief mention of these other constitutional rights, the defendant makes no argument about how the trial court's failure to disclose the victim's SACC records and early DRI records violate his rights to confrontation, cross-examination, and a fair trial. We view these issues to be waived. *See* Tenn. Ct.Crim.App. R. 10(b).

B. Consolidated Rape Case

 With regard to the consolidated rape case, the defendant contends that the trial court violated his right to compulsory process by withholding the following unprivileged records: DRI records, medical records from the Knox County Jail, psychiatric or medical records from the Community Alternative to Prisons Program, Department of Paroles Records, and unspecified records from the Knoxville Police Department and Knox County District Attorney's Office relating to the victims. He argues that these records are relevant because two of the victims testified on direct examination about their drug usage, criminal histories, and current probation or parole status. Without further explanation, he states that the requested records were material to the testimony of these two victims.

 Regarding the DRI records, at a May 6, 1996, hearing, the trial court disclosed three

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 95
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

pages of these records to the parties. The court ruled that the remainder of the records contained no information relating to the case and were protected from disclosure by federal regulations. The trial court sealed the remainder of the DRI records and made them a part of the record. As noted earlier, the right to compulsory process extends only to admissible, relevant evidence. *See Bacon*, 215 Tenn. at 273, 385 S.W.2d at 109. In the present case, neither party has discussed the federal statute and corresponding regulations that extend confidentiality to drug treatment records. *See* 42 U.S.C. § 290dd-2(a); 42 C.F.R. § 2, *et seq*. We view the parties briefs to be inadequate in this regard, especially in light of the fact that this federal privilege formed one of the trial court's two bases for non-disclosure. In any event, we have reviewed the sealed DRI records and agree with the trial court's ruling that they are not relevant to the case.

*114 The defendant obtained the victims' files from the Knox County Sheriff's Department and CAPP under Tenn.Code Ann. § 10-7-503(a), which generally permits the public to inspect all state, county, and municipal records. The trial court determined that the defendant was not entitled to medical records contained within the files because those records were protected by a statutory exception. *See* Tenn.Code Ann. § 10-7-504(a)(1). The court initially delayed ruling upon a psychological report contained within the CAPP file in order to determine whether the victim had waived any privilege with regard to the report by including it in materials that she submitted to the court in relation to the CAPP program. Although the defendant does not point us to the trial court's subsequent ruling on this issue, we observe that the trial court later noted that it had ruled that the medical and psychological records were protected by statute.

The exception relied upon by the trial court provides in pertinent part as follows:
The medical records of patients in state, county and municipal hospitals and medical facilities, and the medical records of persons receiving treatment, in whole or in part, at the expense of the state, county or municipality, shall be treated as confidential and shall not be open for inspection by members of the public.
*Id.* The defendant argues that the Knox County Jail is not a hospital. The defendant never challenged the application of this exception on this ground before the trial court. In fact, at the hearing on this matter, the defendant agreed that the exception applied but argued that discovery rules and the state's duty to produce exculpatory material required the disclosure of these records despite the exception. The defendant may not argue that he is entitled to the medical and psychological records despite the exception before the trial court and then argue that the exception does not apply on appeal. *See State v. Miller*, 668 S.W.2d 281, 285 (Tenn.1984). Based upon the scant record before us, which contains neither evidence of the treatment facilities at the jail nor the medical or psychological records in question, we believe that the records would at least be those of a person receiving treatment at government expense. In any event, nothing in the record contradicts the trial court's finding that this exception applies to exclude these records. The defendant's right to compulsory process was not violated by the trial court's withholding of these records.

Regarding the Department of Paroles records, the record does not reflect that the requested information was withheld from the defendant. During the April 17, 1996 consolidation hearing, the defendant requested the state's files on any new arrests of one of the victims. The defendant argued that he spoke with the victim's parole officer and learned that the parole officer was requesting a warrant to arrest the victim for violation of her parole for new charges against her. He stated that he wanted to present the trial court with this information to show that the victim had lied during her testimony at the consolidation hearing. After making these statements, the defendant began to argue other matters without securing a ruling on his request.

*115 After a protracted discussion of other matters, the trial court turned to the issue

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

of what documents qualified as public records and had to be disclosed pursuant to the
Public Records Act. The state asserted that it had made its closed files on the victim in
question available to the defendant. The defendant responded that he was satisfied with
the closed files that had been provided but wanted the District Attorney's computer file
on that victim. The state argued that its computer files were confidential but that it had
told the defendant that any charges against the victim were brought in Knox County. The
court noted that a statutory exception to disclosure of public records existed for
confidential information in the District Attorney's files relating to contemplated or
pending legal proceedings. See Tenn.Code Ann. 10-7- 504(a)(5). The trial court observed
that a party seeking information in the possession of the District Attorney's office and
also in the possession of another public official must seek that information from the
other public official. See Tenn.Code Ann. § 10-7-504(a)(5)(A)(v). It ruled that the
defendant would have to get any information that could be obtained from the clerks of the
General Sessions Court and the Criminal Court from those sources. It also ordered the
state to comply with the Public Records Act, and the cases interpreting it, and to give
the defendant any information discoverable under the Act. It stated that this information
included arrests and closed files relating to the victims. From this account, it is not
apparent to us that the defendant was denied the Department of Paroles Records. The
defendant has not pointed to subsequent requests for these records or rulings of the trial
court on this matter. In any event, we note that the defendant ought to have been able to
retrieve information on new charges against the victim from the court clerks. In fact,
during her cross-examination at trial, the victim admitted that she had been arrested on
April 26, 1996; had entered a plea bargain; and hoped to receive help from the state
regarding her parole violation. The record does not reflect that the defendant's right to
compulsory process was violated with regard to the parole records.

   Finally, regarding the unspecified records of the Knoxville Police Department and Knox
County District Attorney's Office relating to the victims, the defendant points again to
the May 10, 1996 hearing on the Knox County Sheriff's Department inmate files and a CAPP
file of one of the victims. We are hard- pressed to guess to which records from the
Knoxville Police Department and the District Attorney's office the defendant refers. To
the extent that the defendant is referring to the information sought at the April 17, 1996
hearing, the state noted its disclosure of closed files on the victim to the defendant,
and the trial court ordered the District Attorney to comply with the Public Records Act.
Otherwise, this issue is too generally presented for us to give a proper review. We cannot
grant any relief.

XII. IMPROPER EXAMINATION

   *116 The defendant contends that the trial court erred by allowing the state to use
improper leading questions on direct and redirect examination of the victims and by
allowing improper redirect examination of the victims. The state's only argument regarding
the merits of these complaints is that the trial court did not err in its handling of the
defendant's objections during the state's redirect examination of the victim in the first
rape trial. As to the defendant's other arguments, the state asserts that the defendant
has waived this issue for failure to cite to any specific objection improperly overruled
by the trial court. We agree with the state that the defendant's citations to the record
were inadequate. Nonetheless, we conclude that the trial court did not err relative to
these complaints.

   The propriety, scope, manner and control of the examination of witnesses is a matter
within the discretion of the trial court, whose ruling will not be disturbed absent an
abuse of discretion. State v. Caughron, 855 S.W.2d 526, 540 (Tenn.1993); see also State v.
Chearis, 995 S.W.2d 641, 645 (Tenn.Crim.App.1999) ("The admissibility of testimony and
other evidence, as well as the scope of redirect examination, is within the discretion of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                Page 97
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

the trial court ."). Rule 611(c), Tenn. R. Evid., provides that "[l]eading questions should not be used on direct examination of a witness except as may be necessary to develop testimony. Leading questions should be permitted on cross-examination." Although the Tennessee Rules of Evidence do not address the scope or manner of redirect examination of a witness, "Tennessee law is well- settled that redirect examination can broach topics raised on cross-examination even though those matters were not inquired into on direct examination." *State v. Baker*, 966 S.W.2d 429, 433 (Tenn.Crim.App.1997).

A. The First Rape Trial

The defendant contends that the trial court erred by (1) allowing the state to make speaking objections and comments in the presence of the jury, (2) allowing the state to ask improper leading questions during its direct examination of the victim, (3) sustaining the state's objections during his cross-examination of the victim, (4) allowing the state to ask improper leading questions during its redirect examination of the victim, and (5) allowing the state to offer evidence during its redirect examination that was not rebuttal to his cross- examination. The state contends that the defendant has waived these complaints for failure to cite to the record. The state also asserts that the trial court did not err in its handling of the defendant's objections during the state's redirectexamination. The state does not address the merits of the defendant's other complaints.

In his first complaint, the defendant asserts that throughout the first rape trial, the district attorney general made speaking objections and comments in the presence of the jury and that the trial court did not sustain a single defense objection to the district attorney's actions. Initially, we note that in support of this claim, the defendant cites to the entire trial transcript and does not provide any argument. We agree with the state that the defendant has not complied with Rule 27(a)(7), T.R.A.P., regarding references to the record. In any event, the record reveals that on the few occasions the defendant objected on these grounds, the trial court did not sustain or overrule the objections. Instead, the trial court told the parties to move on, which they did without further discussion, or objection by the defendant, at that time. We fail to see any error relative to this complaint.

*117 The defendant next complains that the trial court erred in overruling his objections to the state asking leading questions during its direct examination of the victim. The defendant's citation in support of this contention is to the entire direct examination. He does not provide any argument relative to this complaint. Our review of the testimony reveals that the defendant objected five times to the state asking a leading question. Two objections were overruled, and one objection was sustained. The trial court responded to the other two objections by instructing the prosecutor to "be careful," at which point the prosecutor continued questioning without any further objection from the defense at that time. We conclude that the trial court did not abuse its discretion in its handling of the defendant's objections to the state's leading questions during the direct examination of the victim.

The defendant next contends that the trial court erroneously sustained the state's objections during his cross-examination of the victim. The defendant's citation in support of this contention is to the entire cross-examination. He does not specify which objection was improperly sustained, and he does not provide any argument relative to this complaint. Our review of the cross- examination of the victim reveals that the trial court overruled many of the state's objections, did not rule on several objections with the cross-examination continuing after brief comments by the court or counsel, and sustained only one of the state's objection--that objection being to the phraseology of a defendant's question. This complaint is without merit.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          Page 98
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

The defendant's last two complaints involve the state's redirect examination of the victim. Of the defendant's five objections to leading questions on redirect, the court sustained one of the defendant's objections, the court allowed two of the questions--"Are you embarrassed?" and "Did you attempt to give the best description of your assailant to Detective McCroskey?"--and the prosecutor offered to rephrase on the other two occasions. We cannot conclude that the trial court abused its discretion in this regard. Regarding the defendant's contention that the state improperly offered evidence in its redirect examination, we note that the defendant does not provide a specific citation to the record or argument on this issue. In any event, the record reveals that the state's redirect examination addressed matters raised in the defendant's cross-examination, as the trial court found. The trial court did not abuse its discretion in controlling the examination of the victim.

B. Consolidated Rape Trial

  The defendant contends that the trial court erred by (1) allowing the state to make speaking objections and comments in the presence of the jury, (2) allowing the state to ask improper leading questions during its direct examination of the victims, (3) allowing the state to ask improper leading questions during its redirect examination of the victims, and (4) allowing the state to offer evidence during its redirect examination of the victims that was not rebuttalto his cross-examination. The state argues that the defendant has waived these issues for failure to cite to the record and to provide argument.

  *118 The defendant states that he "cannot summarize the improper manner that [the state] examined [the four victims]. A reading of the transcript is required for a full understanding of this issue." Accordingly, the defendant cited to the entire testimony of the four victims. Also, and importantly, the defendant does not provide any argument regarding any specific errors. We agree with the state that the defendant's "argument" on this issue was inadequate. In any event, from our review of the record, we fail to see any reversible error relative to these complaints.

XIII. EVIDENTIARY ISSUES RELATING TO DISCOVERY

  The defendant contends that the trial court erred in admitting certain evidence that was not disclosed to him during discovery and/or was not listed in the state's notice of intention to use evidence. Rule 12(d)(2), Tenn. R.Crim. P., requires that upon the defendant's request, the state will provide the defendant notice of its "intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16." *See also State v. Louis Francis Giannini*, No. 36, Shelby County, slip op. at 9 (Tenn.Crim.App. June 12, 1991), *app. denied* (Tenn. Nov. 12, 1991) ("The purpose of Rule 12(d)(2) is to afford the accused an opportunity to suppress any evidence that (a) the State intends to use in its case-in-chief and (b) is discoverable pursuant to Rule 16."). Rule 16, Tenn. R.Crim. P., governs discovery and includes a provision concerning sanctions for failure to comply with a discovery request. *See* Tenn. R.Crim. P. 16(d)(2). One possible sanction for noncompliance is exclusion of the evidence. *Id.* The rules do not provide a sanction for noncompliance with Rule 12(d)(2). Moreover, given the rule's purpose, we question the defendant's position that the remedy for failure to disclose evidence pursuant to this rule is exclusion of the evidence. In any event, we address the defendant's contentions below.

A. The First Rape Trial

  The defendant complains about the introduction of a rope, a photograph of him taken after his arrest, and a photograph array that included him. The state contends that all of these items were properly admitted, arguing that all of them were included in its notice of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

941

intention to use evidence, which listed eight items, including "22 photographs," "1 rope,"
and "one picture line-up form."

The defendant first complains that the "six-foot rope" was not disclosed to him in
discovery and not listed in the state's Rule 12(d)(2) notice. Although the notice did not
specify the length of the rope, it did list "a rope." Moreover, the arguments of defense
counsel at trial indicate that counsel had known about the rope for some time. Indeed,
counsel argued that there was no foundation for the victim to identify the rope, that the
state could not establish a chain of custody, and that they had filed motions regarding
the admissibility of rope. They also argued that the defendant had moved to suppress this
rope. We note that the defendant's motion to suppress relates to other rope discovered in
his bedroom, not to the rope removed from the barn where the first rape victim was
attacked. Although defense counsels' argument is confusing in this respect, the state
consistently argued before trial that it did not intend to introduce any evidence from the
search of the defendant's home in the first rape trial. Thus, the only rope at issue was
the rope recovered from the barn. We cannot conclude, relative to the defendant's
complaint regarding discovery and Rule 12(d)(2), that the trial court erred in admitting
the rope into evidence.

*119 The defendant also contends that a photograph of him was improperly admitted. The
photograph about which the defendant complains was introduced through the victim's
testimony to show how the defendant looked around the time of the crime. The defendant's
complaint within this issue specifically relates to the state's failure to provide Rule
12(d)(2) notice of the photograph. While the state's notice on its face is unclear in that
it merely lists "22 photographs," we note that the defendant moved pretrial to suppress
this particular photograph. We do not believe that the defendant was prejudiced by any
deficiency in the state's Rule 12(d)(2) notice.

The defendant next contends that the photograph array, about which the victim testified
she viewed to identify the defendant as her attacker, was not listed in the state's
Rule12(d)(2) notice. The state contends that it was listed, citing the reference to the
"one picture line-up form." In his reply brief, the defendant asserts that this listed
item referred to a form that was completed after the victim identified the defendant from
the photograph array but not to the photograph array itself. While it is possible that the
state's notice was unclear in this regard, we note that the defendant had sought pretrial
to suppress the photograph array. Thus, as this complaint relates to Rule 12(d)(2), we
cannot conclude that the trial court erred in admitting this evidence.

B. Consolidated Rape Trial

The defendant complains about the introduction of a photograph array, testimony about a
rope, photographs of a rope, photographs of a car, and "new" evidence during the redirect
examination of Detective Pressley. The state contends that the defendant has waived this
issue for failure to cite to any authority supporting his position. The state only
addresses the merits of the defendant's last complaint, asserting that no new evidence was
introduced during the redirect examination of Detective Pressley.

The record does not include a written notice of intention to use evidence; however, the
state orally provided the defendant with such notice on February 7, 1996, stating that it
intended to introduce in its case-in-chief only the testimony of the four victims and the
photograph array that it had used in the first rape trial. It did introduce this
photograph array during its direct examination of D.C. Although the defendant complains
that the trial court erred in admitting this evidence, he presents no argument as to how
this admission was error relative to discovery or Rule 12(d)(2), and we fail to see any.

The defendant next complains about the trial court allowing D.C. to testify about rope.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 100
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

The defendant and the state disagreed about whether the state had to provide notice of its intention to present testimony regarding suppressible evidence. The state argued that Rule 12(d)(2) only required it to provide notice if it intended to introduce the rope but not if it merely elicited testimony about the rope. We agree with the defendant that testimony regarding items of evidence that could be suppressed must also be included in a Rule 12(d)(2) notice. However, in this case, the state did not present testimony in its case-in-chief, through D.C. or any of its witnesses, about rope used by the defendant, other than the victims' testifying that they were bound or that their hands were tied together with rope. Testimony about the type and color of rope used by the defendant was elicited during the state's cross-examination of Detective Michael Freeman, who was called as a defense witness. Because this testimony was not presented in the state's case-in-chief, we conclude that allowing this testimony was not error relative to Rule 12(d)(2). Similarly, the defendant complains about the introduction of photographs of rope. These photographs, however, were introduced by the defendant during its redirect examination of Detective Freeman. Accordingly, the trial court did not err in admitting these photographs.

*120 The defendant's next two complaints relate to evidence introduced through Detective Pressley, whom the state tendered for cross-examination. First, although within this issue the defendant asserts that new evidence was introduced in the state's redirect examination of Detective Pressley, he provides his argument relative to this complaint in Issue XXXI, in which we conclude that no new evidence was introduced during the redirect examination of Detective Pressley. Regarding the defendant's complaint about the photographs of the car that Detective Pressley and G.T. saw when they arrived at Cahaba Lane, we note that the trial court only admitted one photograph, that being a photograph of the outside of the car. The defendant acknowledged that the state had shown him this photograph before. The photographs of the interior of the car were not admitted. We note that G.T. testified earlier in the trial, without objection, that the defendant was driving a gray car and that the car was at Cahaba Lane when she and Detective Pressley returned to the crime scene. We question whether the photograph of the outside of the car that G.T. and the detective saw when they arrived at Cahaba Lane is evidence which could be the subject of a motion to suppress. See *Giannini*, slip op. at 9. In any event, we fail to see how the defendant could have been prejudiced by a photograph of a car whose presence at the scene and description were not contested. We cannot conclude that the trial court abused its discretion in admitting this evidence.

Finally, in his reply brief the defendant lists numerous items of evidence that he claims were not disclosed to him in discovery or were not listed in the state's Rule 12(d)(2) notice. The additional items, as listed by the defendant, are: (1) pictures on May 21, 1996; (2) G. T.'s statement; (3) uncharged conduct of the defendant on February 27, 1992; (4) reading from D. C.'s statements; and (5) a car license number on the defendant's property. First, we note that the defendant does not provide argument as to these items. Second, we note that some of these complaints do not relate to discovery or Rule 12(d)(2) notice. For example, the defendant's complaint at trial regarding G. T.'s statement was that she should not be allowed to read from her statement while he was cross-examining her about it. Third, we note that the defendant's arguments at trial indicate that he knew about all of the items of evidence about which he now complains. Our review of the record reveals no discovery or Rule 12(d)(2) violation relative to any of the above-listed complaints.

XIV. ADMISSIBILITY OF EXPERT TESTIMONY ON CHARACTER TRAITS

The defendant contends that the trial court erroneously excluded the testimony of defense expert Henrietta Ogle on the character traits of persons addicted to cocaine to the extent of the victims. He argues that Rules 702 and 703, Tenn. R. Evid., permit experts to

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                              Page 101
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

testify to their opinions on relevant character traits of witnesses. With regard to the
first rape trial, he asserts that the expert's proffered testimony--that people who used
as much cocaine as the victim are untruthful, manipulative, and have a distorted view of
reality-- was relevant to impeach the victim's testimony. He also argues that similar
testimony should have been permitted in the consolidated rape trial with regard to two
victims, who testified about their drug use on direct examination. Pointing to the fact
that the expert never examined any of the victims, the state contends that general expert
testimony regarding the credibility of witnesses is inadmissible. We agree with the state.

*121 In the first rape trial, the defendant called Henrietta Ogle as an expert in
diagnosing, evaluating, and treating individuals addicted to drugs. The victim's
Detoxification and Rehabilitation Institute (DRI) records reflect that she reported using
two and one-half grams of cocaine daily from January.1992 through July 1992. Ms. Ogle
testified that two and one-half grams of cocaine would have a street value of three to
four hundred dollars and that smoking that amount per day would be a severe addiction. The
defendant sought to question her about the character for honesty in persons addicted to
that extent, and the state objected. In a jury-out hearing, Ms. Ogle testified that
persons with a severe addiction are very manipulative, have a distorted view of reality
and honesty, and are unreliable. She stated that she did not know the victim and based her
opinion only upon persons that she had previously treated and the victim's DRI records.
She denied that everyone addicted to cocaine was dishonest but said that, generally,
people using cocaine were very unreliable and untruthful. Following this proffer, the
trial court determined that Ms. Ogle was speaking generally and was not in a position to
testify about the victim's truthfulness. It also found her testimony on the victim's
truthfulness to be untrustworthy information under Rule 703, Tenn. R. Evid. In the
consolidated rape case, the defendant asked the court whether it would permit Ms. Ogle to
testify as an expert in alcohol and drug counseling about the effects of drugs and alcohol
on the drug addict's ability to function. Noting that the defendant was seeking the same
testimony that he sought in the first rape trial, the trial court ruled that it continued
to believe that the expert was not qualified to give this testimony.

Rule 702, Tenn. R. Evid., permits an individual qualified by experience, training, or
education to testify to his or her opinion if "scientific, technical, or other specialized
knowledge will substantially assist" the jury in understanding the evidence or determining
a fact in issue. The Tennessee Supreme Court has broadly held that expert testimony
regarding the credibility of witnesses is inadmissible because juries do not need
assistance in assessing a witness's credibility. *See State v. Coley*, 32 S.W.3d 831, 835
(Tenn.2000) (emphasizing that "the assessment of witness credibility ..: is always left to
the jury"); *State v.. Ballard*, 855 S.W.2d 557, 562 (Tenn.1993) (holding that expert
testimony that the victims exhibited symptoms of post-traumatic stress syndrome generally
found in child sex abuse victims "invades the province of the jury to decide on the
credibility of the witness").

In *Coley*, our supreme court determined that "general and unparticularized expert
testimony concerning the reliability of eyewitness testimony, which is not specific to the
witness whose testimony is in question, does not substantially assist the trier of fact."
32 S.W.3d at 838. Similarly, in the present case, Ms. Ogle's general testimony that
persons using two and one-half grams of cocaine daily are untruthful and unreliable is
relevant only to the victim's credibility and is, therefore, inadmissible. The defendant
cross- examined the victims about their drug addictions. Under *Coley*, the jury was capable
of weighing the credibility of their testimony in light of the victims' addictions without
the aid of an expert. Furthermore, as the state points out, the jury heard Dr. Paul E.
Kaufman, an expert in forensic medicine, testify in the first rape case about the effects
of ingesting two and one-half grams of cocaine per day for six months: substantially
impaired judgment, memory, and ability to concentrate or recall and describe events

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 102
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

accurately. In the consolidated rape trial, Dr. Kaufman testified that a person abusing
drugs to the extent that one victim admitted would have a substantially impaired memory,
judgment, and ability to recall and restate events and that people with serious drug
problems tend to lie to maintain their lifestyle. With regard to another victim, Dr.
Kaufman addressed a hypothetical regarding a person that used two hundred dollars of
cocaine per day, used acid, injected Demerol, and drank alcohol excessively, concluding
that the person would have characteristics similar to the ones he described relative to
the other victim.

   *122 The defendant relies upon *State v. Shuck,* 953 S.W.2d 662  (Tenn.1997), to argue that
experts may give opinions on a person's relevant character traits. In *Shuck,* the supreme
court held that expert testimony that a defendant's mental condition rendered him
susceptible to inducement was admissible although it related to the ultimate issue of
whether the defendant was entrapped. *Id.* at 669; *see* Tenn. R. Evid. 704. In so holding,
the court observed that although expert testimony is not inadmissible because it embraces
an ultimate issue, it must still be otherwise admissible, e.g., it cannot invade the
jury's determination of credibility. *Id.* (noting that *Ballard* held that expert testimony
relating to an ultimate issue was inadmissible because it attempted "to evaluate the
credibility of witnesses, a task which a jury is capable of performing without expert
testimony"). In the present case, the defendant argues that Ms. Ogle's testimony is
relevant to the jury's weighing of the victims' credibility and, thus, the holding in
*Shuck* avails him no relief. We hold that the trial court properly excluded Ms. Ogle's
testimony that individuals who used cocaine to the extent of the victims were untruthful.

   XV. MOTIONS FOR MISTRIAL

   The defendant contends that the trial court erred in denying three of his motions for
mistrial, two of which were made in the first rape trial and one of which was made in the
consolidated rape trial. The state contends that the trial court properly refused to grant
mistrials.

   The decision of whether to grant a mistrial is within the sound discretion of the trial
court, and this court will not disturb that decision absent a finding of abuse of
discretion. *State v. Adkins,* 786 S.W.2d 642, 644 (Tenn.1990); *State v. Williams,* 929
S.W.2d 385, 388 (Tenn.Crim.App.1996). The entry of a mistrial is appropriate when the
trial cannot continue, or, if the trial does continue, a miscarriage of justice will
occur. *State v. McPherson,* 882 S.W.2d 365, 370 (Tenn.Crim.App.1994); *see also State v.
Seay,* 945 S.W.2d 754, 764 (Tenn.Crim.App.1996) ("The purpose for declaring a mistrial is
to correct damage done to the judicial process when some event has occurred which
precludes an impartial verdict."). A mistrial will be declared in a criminal case only
when there is a "manifest necessity" requiring such action by the trial court. *State v.
Millbrooks,* 819 S.W.2d 441, 443 (Tenn.Crim.App.1991). A manifest necessity is shown only
when there is "no feasible alternative to halting the proceedings." *State v. Knight,* 616
S.W.2d, 593, 596 (Tenn.Crim.App.1981). The defendant has the burden of establishing a
manifest necessity. *Seay,* 945 S.W.2d at 764.

   A. The First Rape Trial

   The defendant contends that the trial court erred in denying two motions for mistrial.
The defendant complains that a mistrial should have been granted after the jury was
confronted by protestors against the defendant on its way to lunch. He argues that the
confrontation constituted a break in the sequestration of the jury. The defendant also
contends that the trial court erred by denying a mistrial after it called a defense
argument "bullshit" in the presence of the jury.

   *123 After lunch on October 18, 1995, which was before any witnesses had testified, the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                    Page 103
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

trial court asked the jurors whether any of them had heard any comments about the case
while on their way to lunch. Four jurors indicated that they had, and the attorneys were
allowed to question them. Juror Shelton stated that as she and the other jurors were
waiting for the bus to take them to lunch, two females ran behind them and said " 'give
him life' or something like that." She stated that she could put the comments completely
out of her mind and that the comments did not have any impact on her and would not affect
her ability to listen to the evidence and render a fair and impartial verdict. Juror
Rogers said that two females ran past them, and one shouted "put him away for life." He
stated that the comments would not affect him or his ability to serve as a juror in the
case. He also stated that none of the jurors talked about this incident during lunch.
Juror McKenzie stated that two females ran behind them as they were waiting for the bus
and shouted "give him life." He said that the comments would not affect him in any way.
Juror Varner stated that two females ran out the door behind them and said "put him away
for life, put him away for life" as they ran around the corner. She said that the comments
did not have an impact on her and would not affect her ability to make a decision based
upon the evidence.

  The defendant contends that a mistrial should have been granted because of the prejudice
to him resulting from this incident. He argues that the prejudice was heightened because
the Knox County jury had knowledge about the defendant, the murders, and the other rapes.
We disagree. As soon as the jurors returned from lunch, the trial court, which had been
advised of the incident, questioned the jurors about it. All of the jurors who heard the
comments were then questioned by both parties, and each juror stated that the incident
would not affect his or her ability to listen to the evidence and render a fair and
impartial verdict. We cannot conclude that this incident constituted a manifest necessity
requiring a mistrial. The trial court did not abuse its discretion in denying the
defendant's motion for a mistrial based upon the jury's exposure to these protestors.

  The defendant also argues that this incident constituted a separation of the sequestered
jury and that once a separation is shown, the state has the burden of showing that such
separation did not result in prejudice to the defendant, otherwise a new trial must be
granted. We conclude that the defendant has not shown that the jury separated. The key in
determining whether there was jury separation is whether "a juror was outside the presence
and control of a court officer." *State v. Bondurant*, 4 S.W.3d 662, 673 (Tenn.1999). The
defendant does not allege, and there is no proof in the record, that any juror was not
with the group going to lunch or that the jurors were not under the supervision of the
court officers when this incident occurred. To the extent the event should be viewed as
giving extraneous information to jurors, the testimony of the jurors reflects that no
prejudice was incurred.

  *124 The defendant next contends that the trial court erred in failing to grant a
mistrial after the trial court commented that a defense argument was "bullshit." During
the state's redirect examination of the victim in the first rape trial, the state asked
her why she did not run to a stranger and tell him or her what had happened. The victim
responded, "I was terrified. I was in shock. I have never been in this position before,
and I'd never had anything like that happen to me." Defense counsel then asked to approach
the bench, but what occurred thereafter--the defense counsel's comments, the court's
remark, and the parties' responses--were not recorded by the court stenographer because of
an equipment malfunction. After learning of the missing portion of the transcript, the
defendant filed a proposed statement of the evidence on December 14, 1998, which provided
the following: Both defense attorneys approached the bench, but the district attorney
remained at the state's counsel table. One of the defense attorneys stated to the court
that the victim had opened the door for questioning about her Sexual Assault Crisis Center
(SACC) records. The trial court responded, "Bullshit," loudly enough for the jury to hear,
and the jury laughed. The court then stated, "Ladies and gentlemen, I should not have said

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                              Page 104
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

that and I apologize." The district attorney then said, "The state agrees with your
Honor," to which the jury laughed again. At this point, the defendant moved for a
mistrial, which the court denied, stating that it was sorry for the comment, that it told
the jury that it should not have said it, that it apologized, and that "is all that is
necessary." The defendant then requested a limiting instruction, but the court refused,
stating that it "apologized and that is it."

 The state did not file an objection to the statement of the evidence, and on January 5,
1999, the defendant sought the trial court's approval of the statement. However, the trial
court stated that it had instructed the jury to disregard the remark in addition to
apologizing. The trial court stated that he would consider what the defendant filed but
added that the defendant's version of what occurred was not accurate.

 On July 8, 1999, the trial court amended its order denying the defendant's motion for a
new trial. The court acknowledged making the remark and that the remark was inappropriate
but provided a slightly different version of the incident. The amendment provides that
defense counsel was objecting to every question asked by the state on its redirect
examination of the victim and that after she answered that nothing like "that" had
happened to her, both defense counsel simultaneously stood and said that she had "opened
the door." The court responded "bullshit," and the jury laughed. In the amendment, the
court stated that it did not believe the remark affected the jury in any material way,
noting that it apologized and instructed the jury to disregard the remark at that time.
The trial court added that in its final jury instructions, it had instructed the jury to
disregard any evidentiary rulings made by the court.

 **125** Although the defendant and the trial court remember the incident differently, the
trial court's rendition controls. *See* T.R.A.P. 24(3). In any event, we do not believe the
remark constituted a manifest necessity requiring a mistrial. The trial court's comment
was clearly inappropriate, which the state concedes and the court admitted. Importantly,
however, the court immediately addressed the jury after making the remark, stating that it
should not have made it and that it was sorry. We do not believe, given the context of the
remark and the court's apology, that the remark prejudiced the defendant or damaged the
judicial process such that an impartial verdict was precluded. *See Seay*, 945 S.W.2d at
764. We conclude that the trial court did not abuse its discretion in denying the
defendant a mistrial on this ground.

B. Consolidated Rape Trial

 The defendant contends that the trial court erred in refusing to grant a mistrial based
upon the prosecutor's misconduct. The defendant's complaints about the prosecutor's
conduct include the following:
 (1) He made improper and inflammatory arguments, including referring to the consolidated
cases as a "reign of terror" and the defendant as "evil personified" during his opening
statement.
 (2) He made facial expressions toward the state's witnesses when the defendant was
conducting his cross-examination.
 (3) He turned his chair to face the defendant and glared at him with "an angry and
disgusted expression."
 (4) He did not attend bench conferences and, instead, while the defense attorneys were
at the bench, glared at the defendant or smiled at the jury.
 (5) He demeaned defense counsel and the defendant.
 (6) He spoke in a voice loud enough for the jury to hear when sitting at the state's
counsel table.
 (7) He walked to the back of the courtroom in disgust.
 (8) He referred to the witnesses by their first names.
 (9) He displayed evidence to the jury prior to the defense having an opportunity to

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

object.
   The state contends that none of the prosecutor's actions warrant a reversal.

   We note that the defendant has not cited to the record regarding most of these alleged
acts of misconduct. Nonetheless, from our review of the record, we cannot say that a
mistrial was warranted based upon the prosecutor's conduct. We address in detail the
defendant's complaints regarding the state's opening statement and closing argument in his
next issue, in which we recognize that some of the prosecutors comments were improper but
conclude that the improper comments did not affect the verdict to the prejudice of the
defendant. Likewise, we cannot say that the prosecutor's improper comments amounted to
manifest necessity for a mistrial.

   The defendant next complains that the prosecutor made facial expressions toward the
state's witnesses when he was cross-examining them. Although the defendant does not cite
to the specific instances about which he complains, our review of the record reveals three
occasions when the defendant voiced an objection to the prosecutor's "expressions." At a
bench conference during the cross-examination of D. L., defense counsel stated, "I don't
know if it is inadvertent, but she keeps looking at Detective Johnson, and he keeps
nodding his head." The court responded that it had been watching and had not seen this,
stating that he did not believe that the state would coach its witnesses. A second time,
defense counsel, after asking D.L. a question, told her not to look at the prosecutor.
D.L. said she was not, and the court stated that it did not see her look anywhere.
Finally, at a bench conference during the cross- examination of A. D., one of the
defendant's attorneys moved for a mistrial, stating that after he asked a question but
before A.D. answered, A.D. looked at the prosecutor, who shook his head to indicate no.
Before the court responded, the defendant's other attorney complained that at that very
moment the prosecutor was staring at the jury. The court then asked defense counsel where
he wanted the prosecutor to look, to which defense counsel asked why the prosecutor was
not at the bench. The court then instructed, "Let's go on," and the defendant complied
without further comment. We note that the defendant did not move for a mistrial on the
first two occasions and did not secure a ruling on the third occasion. In any event, we
conclude no proof is in the record of any improper conduct in this regard. Accordingly, a
mistrial was not warranted based upon the prosecutor's alleged facial expressions to
witnesses.

   *126 The defendant next complains that the prosecutor turned his chair to face the
defendant and glared at him with an angry and disgusted expression on various occasions
throughout the trial. Of course, from the record before us, we cannot view the expression
about which the defendant complains. However, the court did view the prosecutor's conduct.
Indeed, on one occasion, the defendant voiced his objection to the prosecutor's rocking
and glaring. The court stated that it saw what the prosecutor was doing but that "sitting
there looking at the defendant, to me, is not offensive.... If I see something that I
consider to be offensive, I will address it." The court later stated that it would not
order the prosecutor not to look at the defendant. Although we question the
professionalism of the prosecutor's conduct, in light of the fact that the trial court did
not believe it to be offensive, we cannot say that the trial court abused its discretion
in refusing to grant a mistrial based upon this conduct.

   The defendant also contends that the trial court should have granted him a mistrial
because the prosecutor did not attend bench conferences and, instead, while the defense
attorneys were at the bench, glared at the defendant or smiled at the jury. First, we
cannot say that it was prosecutorial misconduct not to approach the bench each time the
defendant asked if he could approach. Indeed, the prosecutor asked the trial court if he
were required to come to the bench with defense counsel, and the trial court said that he
was not. Additionally, as noted above, the trial court stated that it had seen the manner

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                Page 106
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

in which the prosecutor faced and looked at the defendant, that it was not offensive, and
that it would address the conduct if it became offensive. Regarding the prosecutor's
smiling at the jury, again, we cannot view the conduct about which the defendant
complains. This conduct occurred when defense counsel was at a bench conference during the
cross-examination of A.D. During the bench conference, defense counsel complained that the
prosecutor was staring at the jury, to which the court asked where defense counsel wanted
the prosecutor to look. At this point, the defendant complained that the prosecutor should
be at the bench conference, and then the transcript reflects that the remainder of the
conference was inaudible because the defense attorneys were speaking at the same time. The
court then stated, "Let's move on," and the defendant complied without voicing any further
objection. The record contains no proof that the prosecutor behaved improperly in looking
at the jury. We cannot conclude that the trial court abused its discretion in refusing to
grant a mistrial based on the prosecutor not attending bench conferences and, instead,
looking at the defendant or the jury.

The defendant next contends that a mistrial should have been granted because the
prosecutor demeaned defense counsel and the defendant. Initially, we note that although
the defendant moved for a mistrial on numerous occasions, he never moved for one on these
vague grounds. We presume that the defendant's other complaints within this issue, e.g.,
staring at the defendant and walking to the back of the courtroom while defense counsel
was talking, encompass the prosecutor's behavior which he believes demeaned him and his
counsel. In any event, the record does not reveal behavior by the prosecutor demeaning the
defendant or his attorneys that warranted the granting of a mistrial.

*127 The defendant also contends that the trial court should have granted a mistrial
because the prosecutors spoke loudly enough for the jury to hear when they were sitting at
the state's counsel table. The defendant objected to the prosecutors whispering to each
other "while facing the jury" statements like "they are going to get it in before the
jury." The court refused to impose a rule preventing co-counsel from talking, noting that
when one of the defense attorneys "whispered" to his co-counsel, which he did frequently,
everybody in the courtroom heard him. However, the court ordered the prosecutors to
control their whispering and not to make any inappropriate comments. The defendant did not
raise this issue again during the trial. Moreover, there is no proof that any of the
jurors heard what the prosecutors whispered or that what they whispered was inappropriate.
We conclude that a mistrial was not warranted based upon this ground.

The defendant next contends that the trial court should have granted a mistrial because
the prosecutor walked to the back of the courtroom in disgust. During a jury-out hearing,
defense counsel suggested to the court that some Knox County Sheriff's deputies, including
some who had been subpoenaed in the case, had talked amongst each other about the
proceedings and their testimony. The district attorney stated, "I choose not to hear
this." After a brief exchange between the attorneys, the district attorney asked the court
if he could be excused, to which the court responded, "Go ahead. We are going to take a
little recess." Defense counsel continued talking, stating, "My objection-- could the
record reflect [the prosecutor] is walking out of the courtroom?" The prosecutor replied,
"In utter disgust." This incident did not occur in the presence of the jury, and the
defendant did not move for a mistrial at this time. Moreover, before the prosecutor walked
to the back of the courtroom, the trial court specifically excused him, stating that it
was taking a recess. Although defense counsel continued to voice an objection, the court
recessed almost immediately thereafter. We conclude that a mistrial was not warranted
based upon this conduct.

The defendant contends that the trial court should have granted a mistrial because the
prosecutor referred to the witnesses by their first names. Although the defendant fails to
cite to the specific instances of which he complains, the record reveals that the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 107
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

prosecutor addressed A.D. by a nickname on two occasions. The first time, on direct
examination, the defendant did not object. At the beginning of his redirect examination,
the prosecutor mentioned the nickname and the defendant immediately objected. The
prosecutor apologized and continued his questioning, addressing the witness as A.D. Again,
we note that the defendant did not move for a mistrial. In any event, we cannot say that
these two instances amount to prosecutorial misconduct. This complaint is without merit.

*128 The defendant also complains that the prosecutor displayed evidence to the jury
before the defense had an opportunity to object. The defendant does not cite to the record
the instance or instances underlying this complaint. However, the complaint appears to be
referring to the prosecutors displaying a rope and a photograph of the defendant in the
first rape trial. Conduct from the first rape trial would not be grounds for a mistrial in
the consolidated rape trial. Furthermore, to the extent that the defendant is complaining
about the evidence used by the state in the consolidated rape trial, we addressed those
complaints in the defendant's thirteenth issue regarding the admissibility of evidence not
disclosed in discovery or in the state's Rule 12(d)(2) notice.

Although we conclude that the trial court did not abuse its discretion in denying any of
the defendant's motions for a mistrial, we recognize that the cumulative effect of
prosecutorial misconduct warrants a reversal when the misconduct affected the verdict to
the prejudice of the defendant. See State v. Buck, 670 S.W.2d 600, 609 (Tenn.1984).
However, as set forth above, almost all of the defendant's complaints did not involve
misconduct by the prosecutor. Moreover, we cannot say that the few instances of improper
conduct, specifically the prosecutor's improper remarks in his opening statement and
closing argument, as discussed within the next issue, more probably than not affected the
verdict to the defendant's prejudice.

XVI. OPENING STATEMENTS AND CLOSING ARGUMENTS

The defendant contends that the state made improper and prejudicial comments during its
closing argument in the first rape trial, requiring reversal of his convictions and a new
trial. He also contends that he should be granted a new trial because of the state's
improper comments in both its opening statement and closing argument in the consolidated
rape trial. The state contends that its closing argument in the first rape trial was
proper. It also contends that most of the alleged improper comments in the consolidated
rape trial were proper and that none of the improper ones require reversal.

When a defendant raises the issue of prosecutorial misconduct based upon improper
comments, the defendant is required to show that the argument was so inflammatory or so
improper that it affected the verdict to his or her detriment." State v. Seay, 945 S.W.2d
755, 763 (Tenn.Crim.App.1996). Factors relevant to that determination include:
    1. The conduct complained of viewed in context and in light of the facts and
    circumstances of the case.
    2. The curative measures undertaken by the court and the prosecution.
    3. The intent of the prosecutor in making the improper statement.
    4. The cumulative effect of the improper conduct and any other errors in the record.
    5. The relative strength or weakness of the case.
    Judge v. State, 539 S.W.2d 340, 344 (Tenn.Crim.App.1976). Our supreme court has
recognized that closing argument is a valuable privilege for both the state and the
defense and that counsel is afforded wide latitude in presenting final argument to the
jury. See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn.1998); State v.. Cone, 665 S.W.2d 87,
94 (Tenn.1984).

A. The First Rape Trial

*129 The defendant contends that the prosecutor's closing argument was improper because

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                Page 108
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

he
   (1) referred to the defendant as the "human predator";
   (2) bolstered the victim's credibility by praising her and thanking her for her courage;
   (3) stated personal opinions;
   (4) implied that the defendant had the burden of proof or an obligation to produce
evidence;
   (5) invited the jury to return to the sentencing hearing and watch the defendant go to
prison;
   (6) characterized the defendant's case as a "big, big lie";
   (7) made inflammatory comments about defense counsel;
   (8) referred to a juror by name; and
   (9) made inflammatory comments appealing to the jury's sympathy for the victim or her
family.
  The defendant's first complaint is that the prosecutor referred to him as the "human
predator." The prosecutor argued, "The big, big truth is that Thomas Dee Huskey, cruising
down Fifth Avenue on Saturday morning, the human predator, snatched her in and had his
way." The state contends that this phrase was not derogatory and accurately described the
defendant's actions. We disagree. We believe that describing the defendant as a human
predator was derogatory and improper. *See People v. Peeples*, 616 N.E.2d 294, 322
(Ill.1993) (referring to the defendant as the human predator as improper); *see also State
v. Cauthern*, 967 S.W.2d 726, 737 (Tenn .1998) (using epithets to characterize the
defendant is improper).

  The defendant next contends that the prosecutor improperly bolstered the victim's
credibility by praising and thanking her for her courage. The prosecutor argued, "And now
you know why [rapes] oftentimes [are] not reported, because you are now--you've had the
opportunity to see what happens. Thank you [victim] for being strong. Thank you [victim],
for getting in front of these people that you don't know and reliving this ordeal and
embarrassing yourself beyond all measure." At this point, the defendant objected, and the
court told the prosecutor, who was apparently facing the victim, who was sitting in the
audience, to address the jury. We conclude that these comments, especially considering
that the prosecutor was addressing the victim and not the jury, were inappropriate.

  The defendant also contends that the prosecutor stated his personal opinions regarding
the credibility of witnesses and the guilt of the accused during his closing argument.
Although the defendant does not cite the specific instances about which he complains, the
basis of this complaint appears to be that the prosecutor repeatedly used "I" and "we"
during his argument. Our review of the closing argument does not reveal any misconduct in
this respect. Initially, we note that although it is improper for a prosecutor to express
a personal belief or opinion, this court has noted that if the "argument is predicated by
the words 'I think' or 'I submit,' it is unlikely to be adjudged as a personal opinion."
*Coker v. State*, 911 S.W.2d 357, 368 (Tenn.Crim.App.1995). Thus, it is not necessarily
misconduct each time a prosecutor uses "I" or "we." Moreover, in this case, the
defendant's first objection to the prosecutor's argument was when the prosecutor stated,
near the beginning of his argument, "Now, we're asking you to convict him .... I'm asking
you to convict him...." After the defendant objected, the prosecutor volunteered to
rephrase and stated, "The State of Tennessee, the people of the county of Knox are asking
you to convict" the defendant. Even though the prosecutor used the words "I" and "we"
after this incident, we do not believe their context was of significance.

  *130 The defendant next contends that the prosecutor implied that the defendant had the
burden of proof or an obligation to produce evidence. At the end of the prosecutor's
closing argument, the prosecutor encouraged the jury to listen closely to the defendant's
argument, stating,
  You listen and then you think about, while they're talking to you, in your mind you--you

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

**(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))**

think and you let them know by the way you're thinking, we want to know where the big
lie is in the stall. We're not concerned about 1991. We're not concerned about 1989.
We're concerned with July the 18th, 1992, at 7:30 to 8 o'clock in the morning at a stall
at the zoo. Now, you talk about that, and you convince us of the big, big lie on those
activities, and we'll acquit him.

This argument was a response to the defendant's opening statement and proof. The
defendant claimed in his opening statement that the victim's story was a "big, big lie."
Moreover, the defendant vigorously attacked the victim's credibility during the trial. The
prosecutor's argument here asked the jury to focus on the facts of the offense, suggesting
that although the defendant had attacked the victim's credibility, he had not impeached
her relative to her story of being raped by the defendant. We conclude that this argument
was proper.

The defendant's next complaint relates to the prosecutor's inviting the jury to return to
the sentencing hearing and watch the defendant go to prison. The prosecutor ended his
rebuttal closing argument by asking the jury to find the defendant guilty and "then come
back at sentencing and watch him go to prison." The defendant contends that this was a
comment on the general problem of crime in the community and that it implied that the jury
had a duty to protect the community. We disagree that this comment produced such an
implication, and we note that the defendant does not explain how such an implication is
derived from this comment. However, because the comment was not based upon the evidence
and was totally irrelevant to the defendant's innocence or guilt, it was inappropriate.
*See Cauthern*, 967 S.W.2d at 737.

The defendant contends that the prosecutor improperly referred to his defense as a "big,
big lie." As noted above, in the defendant's opening statement, he stated that the case
was a big, big lie. In the state's closing argument, the prosecutor played on this phrase,
discussing the evidence and then asking where the big lie was and commenting that the big
lie never showed up. We cannot conclude that this was improper argument.

The defendant also contends that the prosecutor made inflammatory comments about defense
counsel, arguing that it was improper to comment about what "Herb" did. While it is true
that the prosecutor referred to one of the defendant's attorneys by his first name, the
defendant does not explain how this was inflammatory.

The defendant next argues that the prosecutor improperly referred to a juror by name. The
prosecutor argued, ·
**\*131** And whomever is elected the foreperson of this jury walk back in in a few minutes,
and whoever it is will sit here where Mr. Gorman is, and the judge is going to ask you
to rise. And rise up, foreman--foreperson of this jury, and when he tells him to stand,
look him in the eye and say, we, the jury, find Thomas Dee Huskey guilty.

Generally, it is improper to address a juror individually or by name during argument.
*See Pendleton v. Evetts*, 611 S.W.2d 607, 608 (Tenn.Ct.App.1981); *see also Johnson v.
State*, 453 N.E.2d, 365, 369 (Ind.Ct.App.1983) (holding that it was improper to address a
juror by name because in doing so a juror would be "especially likely to be influenced by
a direct appeal to his or her individual fears or prejudices"); Annotation, *Prejudicial
Effect of Counsel's Addressing Individually or by Name Particular Juror during Argument*,
55 A.L.R.2d 1198, 1199 (1957) (stating that the reason for not allowing counsel to address
jurors by name is the "fact that it brings to bear a collateral influence which may tend
to prejudice the mind on the basis of something irrelevant to the real issues of a case").
However, in this case, the prosecutor did not use the juror's name to make a direct appeal
to him or to try to influence him in any way. Rather, the prosecutor used the juror's name
only to indicate where the foreperson would sit. Thus, although the prosecutor used a
juror's name, it was in the context of informing the entire jury of a particular location.
We conclude that the prosecutor's using the juror's name in this way did not constitute an

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                              Page 110
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

improper argument.

The defendant's last contention regarding the prosecutor's closing argument in the first rape trial is that the prosecutor made inflammatory comments appealing to the jury's sympathy for the victim or her family. Again, the defendant does not cite the portion of the argument that supports this claim. However, we note that the prosecutor questioned the defense's theory that the victim was simply maintaining a lie, arguing,

  [I]t was a terrible trade, wasn't it, [T.H.], to stand here on this stand before people that you have never seen before in your life, your mother, members of the press, the citizens of this county and relate this horrific story? You're going to go through that. You're going to go through that to maintain the big, big lie.

We do not believe that this argument was improper. Moreover, from our review of the prosecutor's argument, we fail to see any other improper argument in this regard.

Finally, we must determine whether the prosecutor's improper comments-- referring to the defendant as the "human predator"; addressing the victim, who was in the audience, and thanking her for her courage; and inviting the jury to return to watch the defendant go to prison--warrant a reversal in this case. First, the prosecutor referred to the defendant as the human predator only one time. The defendant did not object at the time or at the end of the arguments when additional objections were made, *see State v. Little*, 854 S.W.2d 643, 651 (Tenn.Crim.App.1992) (holding that a complaint of improper argument is waived "for failure to make an objection during argument"), and thus, the trial court did not provide a curative instruction regarding this comment. Also, although inviting the jury back to the sentencing hearing was improper, because of the nature of the charges, the jury almost certainly knew that the defendant would go to prison if convicted. Indeed, the trial court instructed the jury about the range of punishment for each charged offense. Considering the improper comments in this light, as well as the trial court's instructions to the jury that arguments of counsel were not evidence and that its decision was to be based upon the evidence, we cannot say that the improper argument affected the verdict to the prejudice of the defendant.

B. Consolidated Rape

*132 The defendant contends that the prosecutor made improper statements in his opening statement and closing argument. The defendant complains that the prosecutor
(1) referred to the cases as a "reign of terror";
(2) stated his personal opinions;
(3) argued that victims were saved "by the grace of god";
(4) stated that the evidence would include "the most sordid details of decadence and pure evil that you have ever seen, that you have ever heard";
(5) referred to the defendant as "evil personified";
(6) stated, "The necessity of evil to prevail is for good people not to come forward.";
(7) provided the jury with an improper standard of reasonable doubt;
(8) referred to the defendant as the "human predator";
(9) stated that the defendant preyed 'on the weakest of the weak";
(10) described the defendant's conduct as "brutalization";
(11) acknowledged that he made a mistake relative to the bill of particulars;
(12) stated that he was paid by the people of Knox County and that prosecuting was a full-time job;
(13) stated that he was "not ashamed of this prosecution, and these ladies have told you the truth";
(14) made inflammatory comments regarding defense counsel; and
(15) implied that the defendant had the burden of proof or an obligation to produce evidence.

Regarding the defendant's first complaint, the prosecutor described the defendant's

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                      Page 111
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

course of conduct as a "reign of terror" in his opening statement and closing argument.
The state argues that this phrase accurately described the evidence as outlined in the
opening statement and then produced during the trial. Although we do not believe it was
appropriate in an opening statement, we believe it was proper in closing argument. An
opening statement is for the purpose of advising the jury of the salient facts expected to
be proved in the framework of the party's theory of the case. It is not argument.
Describing the defendant's conduct as a "reign of terror," given the evidence in this
case, was not outside the bounds of proper argument. *See People v. Poree,* 456 N.E.2d 950,
955-56 (Ill.App.Ct.1983) (concluding that prosecutor's reference to the defendants as
"professionals" and their conduct as a "reign of terror" was not improper when supported
by the evidence).

The defendant contends that the prosecutor stated personal opinions throughout his
opening statement and closing argument. Initially, we note that the basis for some of the
above-listed complaints--for example, the prosecutor's use of "weakest of the weak" and
"brutalization"--is that the statements were personal opinions. We address the merits of
these below. However, we note that at trial the defendant complained that the prosecutor
repeatedly stated his personal opinion because he used "I" throughout his opening
statement and closing argument. The defendant argued that it was improper for the
prosecutor to say, "I am going to argue to you," "I am going to speak to you," "I called
her in to testify," and "I am going to persuade you." Again, we note that if the "argument
is predicated by the words 'I think' or 'I submit,' it is unlikely to be adjudged as a
personal opinion." *Coker v. State,* 911 S.W.2d 357, 368 (Tenn.Crim.App.1995). To the extent
that the defendant's complaint regarding the prosecutor stating personal opinions is based
upon his using "I," we conclude that the argument was not improper.

*133 The defendant next complains that the prosecutor improperly stated that the victims
were "saved by the grace of god." "It is well-established in Tennessee law that references
to biblical passages or religious law during the course of a criminal trial are
inappropriate." *State v. Cribbs,* 967 S.W.2d 773, 784 (Tenn.1998). The state argues,
however, that this phrase is not biblical but a common phrase devoid of any religious
significance. Although the phrase "saved by the grace of god" may be one of common usage
among all people, regardless of their faith, if any, we acknowledge that in this case the
phrase could have been used as a contrast to calling the defendant evil, as discussed in
the next paragraph. In this respect, the prosecutor's use of "saved by the grace of god"
borders on impropriety.

The defendant's next three contentions involve the prosecutor's use of the word evil. In
his opening statement, the prosecutor, in discussing what the state believed D. C.'s
testimony would be, stated, "This wasn't a regular date. There was problems early on, and
then she is going to tell you, I suggest to you, the most sordid details of decadence and
pure evil that you have ever seen, that you have ever heard. Evil personified, there he
sits." We agree with the defendant that these comments were improper. *See State v.
Cauthern,* 967 S.W.2d 726, 737 (Tenn.1998) (referring to the defendant repeatedly as the
"evil one," used as an epithet to characterize the defendant, was improper); *State v.
Griffis,* 964 S.W.2d 577, 599 (Tenn.Crim.App.1997) (referring to defendants as "evil,
despicable human beings" was improper). The defendant also complains about the
prosecutor's reciting a quote from Sir Edmond Burke. In his closing argument, the
prosecutor attempted to explain the delay between D.C. being raped and her filing a formal
complaint. He argued,
  [D.C.] testified to you first, and she said to you that, in August of 1991-- and she has
  trouble on the date--the first couple of weeks in August. Okay. As you know, she didn't
  go to the police formally until October of 1992--about a fourteen-month swing, as you
  will remember, on the testimony. Although she did say something to, I believe it was
  Stiles or Pressley--somebody said, "Don't file a report." Something to the effect that,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

954

Slip Copy                                                              Page 112
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

"Well, you know, after all, you are a prostitute, and probably nothing is going to happen."
It reminds me of Sir Edmond Burke, a great Englishman, said, "The necessity of evil to prevail is for good people not to come forward." They did.
In its context and on its face, this argument was proper rhetoric. However, because the prosecutor twice characterized the defendant as evil in his opening statement, we question the propriety of using this quote, in which the prosecutor indirectly characterized the defendant as evil. Nevertheless, as discussed below, we conclude that the prosecutor's referring to the defendant as evil did not affect the verdict to the prejudice of the defendant.

**\*134** The defendant also contends that the prosecutor provided the jury with an improper standard of reasonable doubt. The prosecutor argued,
He made [G.T.] then, as she was still on her knees, to lean back over, and attempted to penetrate her vaginally unsuccessfully. I think you could probably figure out that, if you are on your knees, and your hands are bound, and you are trying to lean back, and somebody is trying to penetrate you vaginally, that would be difficult to do. And let me tell you--you know what she said. You remember the words.
Now, you know, let me just be square with you. You know, I think this is a perfect example of reasonable doubt. Is there reasonable doubt that he actually penetrated her? You know there is a doubt. Did he really penetrate her vaginally?
Now, that is the pure--pure definition of reasonable doubt. Am I satisfied to a moral certainty that he raped her vaginally? I think there is reasonable doubt. The Judge is going to instruct you on attempted rape. Hit him on that.
THE COURT: That is incorrect, General.
DISTRICT ATTORNEY: I am sorry?
THE COURT: That is incorrect.
DISTRICT ATTORNEY: Thank you, Your Honor. Not going to be charged. Acquit him of it. Say not guilty on that count on vaginal rape. Then use that as your standard for reasonable doubt. Convict him--convict him in regard to [G.T.] on what you know to be the truth. Rape by anal intercourse, rape by fellatio, the first and second counts.
In *Ledford v. State*, 568 S.W.2d 113, 117 (Tenn.Crim.App.1978), the prosecutor argued that "if the jury 'knows' the defendant is guilty, but concludes that the State has failed to prove its case, the jury must nevertheless convict the defendant because the State has actually proved its case otherwise the jury could not 'know' the defendant was guilty." This court held that the argument was a "prejudicially erroneous explanation of the reasonable doubt standard. *Id.* In this case, though, we cannot say that the argument, in which the prosecutor used "moral certainty" to describe the reasonable doubt standard and told the jury to convict the defendant on what it knew to be the truth, provided the jury with a prejudicially erroneous explanation of reasonable doubt. Moreover, the trial court properly instructed the jury regarding the reasonable doubt standard.

The defendant's next complaint is that the prosecutor referred to the defendant as the human predator. As we already concluded in the analysis relating to the first rape trial, this comment was improper.

The defendant contends that the prosecutor improperly commented that the defendant preyed "on the weakest of the weak." Although the defendant does not explain how this statement was improper, at trial he objected that this was a statement of personal opinion. The victims were four prostitutes, and the evidence showed that in their profession, they were susceptible to sexual assaults and rapes. Also, there was evidence that prostitutes would not always report rapes and that their claims of rape were not credible. In this respect, the victims were weak. We cannot say that this was outside the bounds of the wide latitude afforded counsel for closing arguments.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 113
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

*135 The defendant also contends that the prosecutor's describing the defendant's conduct
as "brutalization" was improper, asserting that this was a statement of the prosecutor's
personal opinion. Given the victims' testimony, we cannot conclude that the prosecutor's
use of the words brutalize and brutalization was improper closing argument.

The defendant next complains that the prosecutor improperly acknowledged that he made a
mistake relative to the bill of particulars. In the defendant's closing argument, he
questioned the dates listed in the state's bill of particulars, arguing,
   Now, when [the district attorney] gets up in his closing argument to you, ladies and
   gentlemen of the jury--on August 8th of 1996, [the district attorney] filed a bill of
   particulars in this case. That is eight days before August the 16th, 1996. [FN5]

       FN5. The record reveals that the actual dates to which the defendant was referring
       were April 8th and 16th, 1996.

In that bill of particulars ... [he] alleged under his signature that the date of [D.
C.'s] crime was August 23, 1991, until September the 6th of 1991....
   What happens, all of a sudden when he gets [D.C.] in on August the 16th, says, you know,
   "Whatever happened to me happened to me in the first of August."
   So, [district attorney], possibly in your closing argument, you could tell the ladies
   and gentlemen of the jury why you told the defense, on August the 8th, that it happened
   after August the 23rd.
   In his rebuttal closing argument, the prosecutor responded to the defendant's argument,
   I made a mistake when I told them that we believed the crime in regard to [D.C.] was
   this date. I said that. There is no doubt about it. I said it back in early April, and
   then what we did is we called her into this courtroom before this Judge. She testified
   from right there to this Judge when it happened, under oath.
   She said it happened the first couple of weeks in August of 1991. Lo and behold, the
   indictment that you see that was filed on the 9th day of November, 1992, says it
   happened in August of 1991. That is what she always said.
   The defendant argues that the prosecutor's explanation for the variance in the dates in
the bill of particulars and the trial testimony constituted material not in evidence and
the prosecutor's personal opinion. Although we agree that a prosecutor may not express his
or her personal opinion or discuss matters not in evidence, we believe that the defendant
invited the prosecutor's remarks by challenging him to explain the dates in the bill of
particulars. After the defendant issued this challenge, we do not view the prosecutor's
response to be improper argument.

   The defendant's next two complaints involve the prosecutor's response to the defendant's
argument that the prosecutor had put a "political spin" on the facts of the cases to cover
the state's mistakes. The prosecutor argued,
   So you know, this political spin that we are talking about that we are here-- that there
   is something peculiar that we are here makes no sense. The people of Knox County pay me
   to prosecute. That is my full-time job.
   *136 Nobody wants to do that every day. Nobody wants to talk about forced anal
   intercourse, and forced oral sex, and forced vaginal intercourse, and robbery, and
   kidnapping. Goodness, nobody would want to do that every day, would they? But, ladies
   and gentlemen, as I stand here with this front row, I am not ashamed of this
   prosecution, and these ladies have told you the truth.
   The defendant does not explain how the prosecutor's reference to his job and how he was·
paid--something the jury almost certainly knew--was improper. We cannot conclude that this
statement was improper. Moreover, contrary to the defendant's assertion, the statement
that "these ladies have told you the truth" was not a statement of the prosecutor's
personal opinion. We cannot conclude that this statement was improper.

   In the defendant's last two contentions, he complains about the prosecutor arguing that

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

the defendant wanted the jury to believe that the prosecutor and the victims "have orchestrated and planned this prosecution. We have made it up." The defendant asserts that these statements were inflammatory toward his counsel and that it implied that he had the burden of proof or an obligation to produce evidence. The defendant does not explain either of these assertions. Nonetheless, this argument, a response to the defendant's questioning the victims about their meeting with the prosecutor before the trial, was not improper.

In summary, we conclude that the prosecutor should not have referred to the defendant's "reign of terror" and as being evil in his opening statement, as evil (through quoting Sir Edmond Burke), and as a "human predator" in his closing argument. Also, the prosecutor questionably argued that the victims were "saved by the grace of god." However, given that these were the only comments of concern, we cannot conclude that the prosecutor's argument was so inflammatory or so improper that it more probably than not affected the verdict to the prejudice of the defendant.

XVII. SENTENCING

The defendant contends that the trial court erroneously enhanced his sentences based upon conduct that occurred while he was insane and failed to sentence him as an especially mitigated offender for his convictions in both rape trials. He also argues that Tenn.Code Ann. § 33-6-302 required that the trial court commit him to an institution as a mentally ill person rather than sentencing him to incarceration in the Department of Correction. The state contends that the defendant is not insane, that section 33-6-302 does not apply to this case, and that the defendant's sentences are appropriate. We agree with the state.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn.Code Ann. § 40-35- 401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn.Crim.App.1991).

*137 However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn.1991). In this respect, for the purpose of meaningful appellate review,
    the trial court must place on the record its reasons for arriving at the final
    sentencing decision, identify the mitigating and enhancement factors found, state the
    specific facts supporting each enhancement factor found, and articulate how the
    mitigating and enhancement factors have been evaluated and balanced in determining the
    sentence. T.C.A. § 40-35-210(f) (1990).
    State v. Jones, 883 S.W.2d 597, 599 (Tenn.1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. Tenn.Code Ann. §§ 40-35-102, 103, 210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn.1986).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 115
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

Because the present offenses were committed in 1991 and 1992, the sentence to be imposed
by the trial court is presumptively the minimum in the range if neither enhancement nor
mitigating factors are present. [FN6] Tenn.Code Ann. § 40-35-210(c) (amended 1995).
Procedurally, the trial court is to increase the sentence within the range based upon the
existence of enhancement factors and then reduce the sentence as appropriate for any
mitigating factors. Tenn.Code Ann. § 40-35-210(d), (e). The weight to be afforded an
existing factor is left to the trial court's discretion so long as it complies with the
purposes and principles of the 1989 Sentencing Act and its findings are adequately
supported by the record. Tenn.Code Ann. § 40-35-210, Sentencing Commission Comments; *Moss*,
727 S.W.2d at 237; *see Ashby*, 823 S.W.2d at 169. We will first briefly set forth the facts
relating to sentencing for each rape trial, and then we will examine the defendant's
contentions.

FN6. The legislature amended the statute to provide that for offenses committed on
or after July 1, 1995, the presumptive sentence for Class A felonies is the midpoint
of the range. Tenn.Code Ann. § 40-35-210(c).

A. The First Rape Trial

In the first rape trial, the jury convicted the defendant of two counts of aggravated
rape and one count of aggravated robbery. At the sentencing hearing, the state introduced
the presentence report as an exhibit. The defendant presented the May 14, 1995 statement
of the victim and sought to introduce the report of Dr. Robert Sadoff. The state objected
to the introduction of the report, arguing that it was hearsay, that the state had not
examined it, and that the defendant had refused to submit to a court-ordered mental
examination before trial thereby preventing the state from gaining any evidence to respond
to the report. The defendant denied that he wanted to use Dr. Sadoff's report as notice of
a mental disease or defect but instead assured the court that he wanted to use it in
support of the mitigating factor that he was suffering from a mental condition that
significantly reduced his culpability for the offense. *See* Tenn.Code Ann. § 40-35-113(8).
The trial court agreed that it could consider the report as evidence appropriate to
sentencing but expressed concern that the report was hearsay and asked the state whether
it wanted the opportunity to cross-examine Dr. Sadoff. The state did not insist upon Dr.
Sadoff testifying at the hearing, and the court concluded that it would consider the
report.

*138 In the November 1, 1995 report, Dr. Sadoff diagnosed the defendant as having
Dissociative Identity Disorder (DID) and stated that his review of the records and
examinations of the defendant revealed that the defendant's "alter" personality Kyle was
responsible for the rapes and murders. He concluded with reasonable medical certainty that
because the defendant had no knowledge of Kyle and could not control Kyle's emergence, the
defendant lacked substantial capacity to conform his conduct to the law when Kyle emerged.

The trial court noted that the defendant was a Range I, standard offender. It applied the
following enhancement factors to all three convictions:
 (5) The defendant treated or allowed a victim to be treated with exceptional cruelty
during the commission of the offense;
 (6), The personal injuries inflicted upon or the amount of damage to property sustained
by or taken from the victim was particularly great; [and]
 ...;
(16) The crime was committed under circumstances under which the potential for bodily
injury to a victim was great....
 Tenn.Code Ann. § 40-35-114(5), (6), (16). It applied enhancement factor (7), that the
"offense involved a victim and was committed to gratify the defendant's desire for
pleasure or excitement," to the defendant's two convictions for aggravated rape. Tenn.Code
Ann. § 40-35-114(7). It also applied mitigating factor (8), that the "defendant was

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                      Page 116
(Cite as: 2002 WL 1400059 (Tenn.Crim.App.))

suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense." Tenn.Code Ann. § 40-35-113(8). Finding that the enhancement factors substantially outweighed the mitigating factors, the court sentenced the defendant to twenty-two years for each aggravated rape conviction and to eleven years for the aggravated robbery conviction to be served concurrently in the Department of Correction.

B. Consolidated Rape Trial

At the consolidated rape trial, the defendant was convicted of the following with regard to the three victims:
D.C. three counts of aggravated rape, Class A felonies, especially aggravated kidnapping, a Class A felony,
A.D. two counts of rape, Class B felonies, aggravated kidnapping, a Class B felony,
G.T. two counts of rape, Class B felonies, robbery, a Class C felony.
The state again presented no witnesses at the sentencing hearing but relied upon the presentence report and the evidence presented at trial. The defendant likewise presented no witnesses but asked the court to consider, in addition to Dr. Sadoff's report, an affidavit from Dr. Diana McCoy and the pretrial testimony of Dr. Clifford Tennison and Jailor Terry Birnbaum on his mental condition. Also on this issue, he asked the court to consider the fact that at the suppression hearing, Detective Johnson testified that he addressed the defendant as Kyle while interrogating him.

The trial court sentenced the defendant as a Range I, standard offender. It applied enhancement factor (5), that the defendant treated the victim with exceptional cruelty, to all of the rape and kidnapping convictions. See Tenn.Code Ann. § 40-35-114(5). Finding that enhancement factor (6), that the victims sustained particularly great personal injuries, includes both physical and mental injuries, the court also applied this factor to all the various rape and kidnapping convictions. See Tenn.Code Ann. § 40-35-114(6). Looking to the manner in which the defendant carried out the sexual acts, it enhanced the various rape convictions with factor (7), that the defendant committed the offense involving a victim to gratify his desire for pleasure or excitement. Tenn.Code Ann. § 40-35-114(7). It applied factor (9), that the defendant possessed or employed a deadly weapon during the commission of the offenses, to the rape convictions relating to A.D. and the rape and robbery convictions relating to G.T. See Tenn.Code Ann. § 40-35-114(9). Finally, it enhanced all of the various rape and kidnapping convictions with factor (16), that the circumstances under which the crimes were committed carried great potential for bodily injury to the victims. See Tenn.Code Ann. § 40-35-114(16). The trial court stated that after reading Dr. Sadoff's report and listening to Dr. Tennison's testimony, it believed that the defendant suffers from a mental illness, and it applied mitigating factor (8), that the defendant was suffering from a mental condition, which significantly reduced his culpability for the offense. See Tenn.Code Ann. § 40-35-113(8).

*139 The trial court found that the enhancement factors substantially outweighed the mitigating factor. With respect to the offenses against D. C., it sentenced the defendant to concurrent sentences of twenty-two years for each aggravated rape conviction and to twenty years for the especially aggravated kidnapping conviction for an effective sentence of twenty-two years. For the offenses against A. D., it sentenced the defendant to concurrent sentences of eleven years for each rape conviction and ten years for the aggravated kidnapping conviction for an effective sentence of eleven years. With regard to the offenses against G. T., the trial court sentenced him to concurrent sentences of eleven years for each rape conviction and to three years for the robbery conviction for an effective sentence of eleven years. The court ruled that the defendant would serve all sentences in the Department of Correction.

In light of the defendant's multiple convictions for rape, kidnapping, and robbery of four victims, the trial court found that the defendant had an extensive record of criminal

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

IN THE CIRCUIT COURT OF THE TWENTY-SIXTH JUDICIAL DISTRICT

JACKSON, TENNESSEE

JUDY BARNHILL, CIRCUIT COURT CLERK

FILED

DEC 19 2002

DEPUTY CLERK

A.M. 3:15 P.M.

JON DOUGLAS HALL,                    *

    PETITIONER,                      *

                         *

Vs.                                  *    CASE NO. C-00-422

                         *

STATE OF TENNESSEE,                  *

    RESPONDENT.                      *

---

### MOTION TO WAIVE COUNSEL & REINSTATE ALL OF THE PETITIONER'S PREVIOUSLY FILED PLEADINGS

COMES NOW THE PETITIONER, JON HALL, AND MOVES THIS HONORABLE COURT TO ALLOW THE PETITIONER TO WAIVE COUNSEL PURSUANT TO THE FIFTH, AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, § 8, 9, & 17 OF THE TENNESSEE CONSTITUTION AND TENN. R. SUP. CT., RULE 13 (H) TO REINSTATE THE ORIGINAL "MOTION FOR POST-CONVICTION RELIEF" FILED ON 12/7/00, WITH SUPPLEMENTAL PLEADINGS AND SUPPORTING AFFIDAVITS MARKED FILED BY THE COURT. IN SUPPORT OF THIS MOTION THE PETITIONER WILL SHOW:

1. I HAVE BEEN ADVISED THAT I HAVE THE RIGHT TO COUNSEL AND THAT IF I CANNOT AFFORD COUNSEL, AN ATTORNEY WILL BE APPOINTED TO REPRESENT ME. KNOWING THESE RIGHTS I WISH TO WAIVE MY RIGHT TO A LAWYER AND WISH TO REPRESENT MYSELF. MY DECISION IS BASED UPON THE FOLLOWING ISSUES:

2. THAT THE PETITIONER HAS JUST RECENTLY REALIZED THAT A CONFLICT OF INTEREST IS INVOLVED IN HIS CASE PURSUANT TO TENN. R. SUP. CT., RULE 8, DR 5-105 (D), BECAUSE THE PETITIONER'S COUNSEL MR. PAUL BUCHANAN WAS ONCE EMPLOYED BY THE POST-CONVICTION PUBLIC DEFENDER'S OFFICE, (AN OFFICE WHERE THE PETITIONER'S FIRST POST-CONVICTION PUBLIC DEFENDER WAS EMPLOYED, AND REQUIRED TO WITHDRAW PURSUANT TO SUP. CT. RULE 8, DR 5-105 (B) BY COURT ORDER ON MARCH 23, 2001). SEE: 11/15/02 "MOTION TO CORRECT AND / OR DETERMINE LEGITIMACY OF COUNSEL'S REPRESENTATION OF THE PETITIONER BY COURT," FOR SUPPORTING GROUNDS OF THE PETITIONER'S BELIEF THAT COUNSEL HAS WILLFULLY FAILED TO REPRESENT HIM ZEALOUSLY.

3. THAT AFTER THE FILING OF THE AFOREMENTIONED MOTION, MR. BUCHANAN SENT THE PETITIONER AN ADVERSELY VERSED LETTER WITH AN ANTAGONISTIC VIEWPOINT THAT ALLUDES TO THE PLACEMENT OF A NEEDLE IN THE PETITIONER'S ARM, THE LETTER IS DATED 12/5/02 AND SIGNED BY "PAUL." IF COUNSEL WAS UP-TO-DATE ABOUT THE JUDGEMENT IN THIS CASE, HE WOULD HAVE KNOWN THE JUDGEMENT BY THE JURY IS ELECTROCUTION.

4. THAT DURING THE HEARING ON MARCH 23, 2001, AND MARCH 15, 2002, THE PETITIONER OBJECTED TO THE APPOINTMENT OF COUNSEL AND / OR THEIR CAPACITY, ALL TO NO AVAIL. SEE: 5/15/02 POST-CONVICTION HEARING TRANSCRIPT PAGES 20-21 (OBJECTION TO COUNSEL). COMPARE; STATE V. CARRUTHERS, 35 S.W.3D 516, 548 (TENN. 2000) (WAIVER, THE INTENTIONAL RELINQUISHMENT OR ABANDONMENT OF A KNOWN RIGHT [COUNSEL]).

5. THAT THIS COURT'S ORDER TO APPOINT COUNSEL OVER THE PETITIONER'S OBJECTION, VIOLATES THE PRINCIPLES FOUND IN FARRETTA V. CALIFORNIA, 95 S.CT. 2525, 2534, 806 U.S. AT 821 (1975) (AN UNWANTED COUNSEL REPRESENTS THE DEFENDANT ONLY THROUGH A TENUOUS AND UNACCEPTABLE LEGAL FICTION).

6. THAT BY FORCING COUNSEL ON THE PETITIONER, THE COURT HAS IMPROPERLY OVERRIDDEN ALL OF THE PETITIONER'S ISSUES THAT HE PROPERLY RAISED IN HIS PLEADINGS TO BE ADDRESSED BY THE COURT, WITH THE ASSISTANCE OF COURT APPOINTED COUNSEL, MR. BUCHANAN, WHEN HE FILED AN AMENDED PETITION. SEE: E.G., CASTELLI V. LEIN, 910 S.W.2D 420, 429 (TENN. APP. 1995) (PLEADINGS GIVE NOTICE TO THE PARTIES AND THE TRIAL COURT OF THE ISSUES TO BE TRIED. * * *). THUS, THE STATE & THE COURT HAVE HAD ADEQUATE NOTICE.

7. THAT MR. BUCHANAN WAS NOT AUTHORIZED BY THE PETITIONER TO FILE AN AMENDED PETITION, IN FACT, THE PETITIONER EXPRESSLY STATED TO MR. BUCHANAN [VIA LETTER], NOT TO FILE AN AMENDED PETITION, BUT RATHER A SUPPLEMENTAL BRIEF, (BECAUSE COUNSEL WAS FORCED ON THE PETITIONER OVER HIS OBJECTION). NOTE: THE PETITIONER HAS IN HIS POSSESSION (1) A JULY 3, 2001 LETTER TO FILE A "SUPPLEMENTAL POST-CONVICTION PETITION," RATHER THAN AN AMENDED PETITION AND (2) A DRAFT COPY OF MR. BUCHANAN'S AMENDED PETITION SIGNED BY APRIL HIGUERA ON 10/26/01, FOR MR. BUCHANAN, WITH THE WORD "AMENDED" PETITION SCRATHED THROUGH & THE WORD "SUPPLEMENTAL" WROTE IN ITS PLACE. SEE: S.CT. RULE 8 DR 7-101 (A)(4)(A).

8. THAT MR. BUCHANAN'S PLEADING ILLEGALLY BREATHS LIFE INTO AN OTHERWISE VOID JUDGEMENT, BECAUSE THE ORIGINAL TRIAL COURT JUDGE ILLEGALLY ENGAGED IN COLLUSION TO TRY THE PETITIONER BY A MADISON COUNTY COURT, RATHER THAN BY A HENDERSON COUNTY JURY, IN VIOLATION OF THE PETITIONER'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES AND PARALLEL TENNESSEE STATE CONSTITUTIONAL RIGHTS. SEE: MOTION FOR POST CONVICTION RELIEF, PAGES 17-19 (JURISDICTION). COMPARE: PAUL'S PETITION ON SAME.

9. THAT BASED UPON THESE FACTS, THE PETITIONER MOVES THIS COURT TO WITHDRAW MR. BUCHANAN'S AMENDED PETITION AND / OR ACCEPT COUNSEL'S PETITION AS A "SUPPLEMENT," BECAUSE THE COURT HAS ALREADY HEARD TESTIMONY ON COUNSEL'S DEFENSE BASED UPON THE "DISCOVERY" CLAIMS RAISED IN THAT PETITION. SEE: KOHL & CO. V. DEARBORN & EWING, 977 S.W.2D 528, 532 (TN. 1998) ("DISCOVERY" OF ADDED GROUNDS).

10. THE PETITIONER MOVES THIS COURT TO ACCEPT THE PETITIONER'S OWN "MOTION FOR POST-CONVICTION RELIEF" AND ALL SUBSEQUENTLY FILED PLEADINGS AS THE CONTROLLING CLAIMS RAISED IN THIS PETITION.

11. FINALLY, PURSUANT TO TENN. R. EVID. RULE 201, THE PETITIONER GIVES NOTICE TO THE FACT, THAT THE TRANSCRIPT PROVIDED BY MR. BUCHANAN ON 12/5/02, OF THE PETITIONER'S POST-CONVICTION HEARING, HELD ON 9/4/02, VOLUME TWO OF TWO VOLUMES, ENDING ON PAGE 282, IS NOT A VERBATIM REPRODUCTION OF THE PETITIONER'S TESTIMONY AS REQUIRED BY LAW. THUS, THE PETITIONER MOVES THIS HONORABLE COURT TO REQUIRE THE COURT REPORTER TO SUBMIT THE ORIGINAL AUDIO TAPES AND WRITTEN NOTES OF THE 9/4/02 HEARING BE PLACED INTO EVIDENCE FOR THE REVIEWING COURT AS PART OF THE RECORD. SEE: E.G., ANTIONE V. BYERS & ANDERSON INC., 113 S.CT. 2167, 2172 (1993) (COURT REPORTER DUTIES / NON-JUDICIAL ACTS).

- 2 -

961

WHEREFORE, THE PETITIONER MOVES THIS HONORABLE COURT TO ACKNOWLEDGE THE PETITIONER AS COUNSEL OF RECORD AND HOLD A HEARING TO ADDRESS THIS MOTION OR ADDRESS ALL THE VIABLE ISSUES IN THIS MATTER IN ITS FINAL ORDER SO THE COURT CAN GRANT THE APPROPRIATE RELIEF AVAILABLE AS REQUIRED BY LAW.

I _Jon Hall_, HEREBY SWEAR UNDER THE PENALTY THAT THE AFOREMENTIONED FACTS ARE TRUE AND CORRECT AND BASED UPON PERSONAL KNOWLEDGE. FURTHER AFFIANT SAYETH NOT.

RESPECTFULLY SUBMITTED,

Jon Douglas Hall

JON DOUGLAS HALL # 238941
R.M.S.I. U-2 C-103
7475 COCKRILL BEND BLVD.
NASHVILLE, TENN. 37209-1048

CERTIFICATE OF SERVICE

I _Jon Hall_, HEREBY CERTIFY THAT I HAVE MAILED A TRUE AND EXACT COPY OF THE FOREGOING "MOTION TO WAVE COUNSEL & REINSTATE ALL OF THE PETITIONER'S PREVIOUSLY FILED PLEADINGS," TO: (1) THE OFFICE OF THE 26TH JUDICIAL DISTRICT ATTORNEY GENERAL, C/O ALFRED EARLS AT P.O. BOX 2825 JACKSON, TENNESSEE 38302-2825; AND (2) OFFICE OF THE CLERK FOR THE CIRCUIT COURT OF MADISON COUNTY, JACKSON, TENNESSEE 38301, VIA PREPAID MAIL ON THIS THE 19th DAY OF DECEMBER 2002.

XC: FILE                      - 3 OF 3 -

962

IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE
AT JACKSON

JON HALL                          )
                                  )
                                  )
v.                                )     NO.   CO422
                                  )     (Capital Case)
                                  )
STATE OF TENNESSEE                )

## ORDER DISMISSING POST-CONVICTION PETITION

Following his direct appeal, petitioner filed a post-conviction petition as well as an amended post-conviction petition in which he alleged that numerous constitutional errors were committed during his 1997 trial for the murder of his wife. In response, the State urged this Court to deny the requested relief. On May 15-16, September 4, and November 4, 2002, the Court permitted the parties to present proof regarding their respective positions. At the conclusion of those hearings, the parties filed legal memoranda. After carefully considering the pleadings, trial record, and evidence presented during the post-conviction proceedings, the Court finds petitioner's petitions to be without merit.

Although the parties provided the Court with a copy of the trial transcript, they did not provide the Court with copies of the trial exhibits or technical record. Likewise, they did not provide the Court with a copy of the transcript of the hearing on the motion for a new trial. However, the Court has the authority to take judicial notice of those records and chooses to do so in this case. See Delbridge v. State, 742 S.W.2d 266, 267 (Tenn. 1987) (noting that "courts may take judicial notice of the court records in an earlier proceeding of the same case and the actions of the courts thereon") Therefore, when relevant, the Court will refer to those items despite their absence from the post-conviction record.

### PROCEDURAL HISTORY

On February 5, 1997, a Madison County jury sentenced petitioner to death after convicting him of the first degree premeditated murder of his estranged wife, Billie Jo Hall, who was killed on July 29, 1994. On direct appeal, the Tennessee Court of Criminal Appeals and Tennessee Supreme Court affirmed petitioner's conviction and sentence. State v. Hall, 8 S.W.3d 593 (Tenn. 1999), reh'g

1

denied (Dec. 27, 1999); State v. Hall, No. 02C01-9703-CC-00095 (Tenn. Crim. App. April 29, 1998). Likewise, the United States Supreme Court denied petitioner's petition for a writ of certiorari. Hall v. Tennessee, 531 U.S. 837 (2000). Following his unsuccessful appeal, petitioner filed a *pro se* post-conviction petition, which appointed counsel amended on November 1, 2001.

### FACTS FROM 1997 TRIAL

On direct appeal, the Tennessee Supreme Court summarized the facts of this case as follows:

When she met the defendant, Billie Jo Hall had two daughters, Jennifer and Cynthia, from a former relationship. After their marriage, she and the defendant had two more daughters, Stephanie and Jessica. The youngest, Jessica, suffered from cerebral palsy. At the time of her murder, Mrs. Hall and the defendant were estranged and living separately.

On the night of July 29, 1994, the defendant went to Mrs. Hall's house to discuss a reconciliation. He brought a $ 25.00 money order made out to Mrs. Hall as a payment toward child support. Prior to entering the house, the defendant disconnected the telephone line at the utility box on the outside wall of the house.[1] When Mrs. Hall answered the door, the defendant pushed his way into the room where she and the children were watching television. The defendant told the girls to go to bed. When they did not immediately obey his order, the defendant tipped over the chair in which Mrs. Hall was sitting. The defendant and Mrs. Hall then went back into her bedroom. The children, who had gone into their bedrooms, could hear 'things slamming around' and their parents yelling at each other. When the children tried to enter the room, they found the door blocked. The three oldest children, Jennifer, Cynthia and Stephanie, persisted in their efforts to get into the room and finally succeeded. They attempted to stop the defendant from hurting their mother. When Mrs. Hall told the children to go to a neighbor's house, the defendant told them that if they went for help, 'he was going to kill Mama.' He also told Mrs. Hall, a college student, that she would never live to graduate. Cynthia and Stephanie tried to use the telephone to call for help, but they discovered the telephones would not work. At that point, they went to a neighbor's house where they called 911. Jennifer, the oldest child, was the last to leave the house, carrying her sister Jessica. Before she left, she saw her mother and the defendant leave the bedroom and go outside. She watched the defendant drag her mother, 'kicking and screaming,' to the small pool in the back yard.

The first officer to arrive on the scene was Chief Jerry Bingham of the Henderson County Sheriff's Department. Upon his arrival, he was directed by a neighbor to check the pool where he found Mrs. Hall's body floating face down in the water. He immediately called Emergency Medical Services and a Tennessee Bureau of Investigation (TBI) investigator. TBI Agent Brian Byrd arrived on the scene shortly after midnight.

Agent Byrd entered the house and found the master bedroom in disarray. Bloodstains marked the bed, a counter top, and a wedding dress. The telephones inside the house were off their hooks. A $ 25.00 money order made out to Mrs. Hall and dated the day

---

[1]The photographs of the utility box show that the telephone lines are plugged into a jack in the utility box in the same way that individual telephones are plugged into the wall jacks inside the home. Thus, disconnecting the telephone lines involved no more than simply unplugging the connecting wire from the jack in the utility box. (footnote in original)

2

of the murder was found inside the house. No weapons were found. A trail of drag
marks and bloodstains led from the master bedroom, out the front door, over the
driveway, past the sandbox, and down to the pool in the back yard. Mrs. Hall's t-shirt
was lying beside the pool. Clumps of grass ripped from the ground floated in the
blood-tinged water of the pool. Outside the front door of the house the telephone
junction box was opened and the phone line was disconnected. The grass and weeds
near this box were matted down.

Dr. O'Brien Clay Smith, the forensic pathologist who performed the autopsy on Mrs.
Hall, testified that the primary cause of death was asphyxia resulting from a
combination of manual strangulation and drowning. He could not say with certainty
that either strangulation or drowning was the exclusive cause of death. Evidence
supporting strangling as a contributing cause of death included bruising on the left
and right sides of Mrs. Hall's neck, hemorrhaging in the neck muscles around the
hyoid bone in the neck, and bleeding in the thyroid gland, which indicated that
extensive compression had been applied to the neck. Evidence supporting drowning
as a contributing cause of death was water found in both Mrs. Hall's stomach and in
her bloodstream. The water in her stomach could have collected when Mrs. Hall
swallowed water as she was being drowned. The water in her bloodstream would
have entered when she took water into her lungs, and the water passed through the
lungs into her bloodstream.

Before dying, Mrs. Hall sustained at least eighty-three separate wounds, including
several blows to the head, a fractured nose, multiple lacerations, and bruises and
abrasions to the chest, abdomen, genitals, arms, legs and back. Abrasions on Mrs.
Hall's back were consistent with having been dragged across pavement. Dr. Smith
used a mannequin during his testimony to demonstrate the size and location of the
various wounds on Mrs. Hall's body, marking each wound with a black magic
marker. He described some of the injuries to Mrs. Hall's arms, legs and hands as
defensive wounds. He characterized the injuries to the neck, face and head as
intentional 'target' wounds. Except for the physical trauma associated with the
strangulation, however, none of the injuries would have proven fatal.

Chris Dutton, who was confined in a cell next to the defendant, testified that while
both men were incarcerated, the defendant confided in him about his wife's murder.
When describing what happened on the night of the murder, the defendant told
Dutton that he had tried to talk with Mrs. Hall about reconciling but 'all she was
interested in was the money.' When she refused to consider his plea for reconciliation
and demanded that he leave, 'his temper got the best of him and he began to strike
her.' According to Dutton, the defendant had determined, even before he arrived at
his wife's house, 'to make her feel as he did. He wanted her to suffer as he did, feel
the helplessness that he was feeling because she took his world away from him.' The
defendant told Dutton that he hit his wife in the head until he panicked, threw her in
the swimming pool, then re-entered the house, took the car keys, and drove away in
Mrs. Hall's minivan.

On cross-examination, Dutton admitted that the defendant also told him that he was
depressed and had been drinking since he telephoned his wife earlier that day. The
defendant also told Dutton that he was very concerned about the welfare of his two
daughters, especially Jessica. The defendant explained that he disconnected the
telephone line, because, when he and his wife argued in the past, she had called the
police.

Two witnesses testified on the defendant's behalf during the guilt phase of trial. Dr.
Lynn Donna Zager, a clinical psychologist, interviewed the defendant several times
after his arrest. She diagnosed him as depressed and suffering from alcohol
dependence. In addition, she noted personality characteristics of paranoia and
dependency. In Dr. Zager's opinion, at the time of the killing the defendant suffered

3

965

from depression and alcohol intoxication. These factors were compounded by his
personality characteristics and various psycho-social stressors, including a sick child,
loss of employment with the resulting financial problems, his impending divorce, and
the terminal illness of a brother. Dr. Zager testified that, in her opinion, the defendant
acted in an impulsive manner in killing his wife, rather than pursuant to a
preconceived plan.

On cross-examination, Dr. Zager admitted that she based her opinion concerning the
defendant's intoxicated state on statements he made to her and statements of other
witnesses who saw him drinking on the day of the murder. She agreed that no one she
interviewed remarked on whether the defendant exhibited any of the typical physical
signs of intoxication, such as slurred speech or lack of coordination.

Randy Helms, the defendant's prior employer, also testified on behalf of the
defendant. According to Helms, prior to the killing the defendant had been severely
depressed because of his family problems.

The defendant attempted to call his sister, Cheryl.Arbogast, to testify regarding his
state of mind at the time of the murder, but she had no first-hand knowledge of the
defendant's state of mind on the night of the murder. In fact, Ms. Arbogast admitted
she had not spoken to the defendant for several months prior to the murder. Her
testimony regarding the defendant's state of mind was based on a conversation she
had with her brother, Jeff Hall, since deceased, on the day of the murder. The trial
court would not permit this hearsay testimony to be admitted before the jury.[2] At the
conclusion of the evidence, the jury found the defendant guilty as charged of first
degree premeditated murder.

During the sentencing phase the State recalled Dr. Smith to testify in more detail
concerning the extent of Mrs. Hall's injuries. The State introduced photographs of the
injuries taken at the autopsy to illustrate Dr. Smith's testimony. These photographs
depicted the numerous external wounds the defendant inflicted while struggling with
Mrs. Hall.

The defendant called Dr. Zager and Dr. Joe Mount, a psychological examiner who
counseled defendant at Riverbend Maximum Security Institution. Both described the
defendant as depressed, remorseful, suicidal and extremely concerned about his
children. Dr. Mount testified that the defendant had been diagnosed as suffering from
an adjustment disorder with mixed emotional features (anxiety and depression) and
'substance abuse of dependence by history.'

Helms also testified again. He described the defendant as a good, dependable
employee and told how the defendant had cared for his children when he brought
them to work with him. Helms stated that the defendant loved his wife and children
and had hoped to reconcile with Mrs. Hall.

The defendant also presented his three sisters and his mother to recount the history
of the defendant and his family. The defendant was the youngest of seven children.
His father, an alcoholic, physically and verbally abused his wife until he died from

---

[2]The court did, however, elicit the following information during an offer of proof: on the day of the
murder the defendant had called his brother Jeff in Texas. He was crying and distraught over the state of his
personal affairs. His brother Jeff was dying of AIDS; the defendant had lost his job; now he was facing the
possibility of divorce and losing his children. Jeff was concerned about the defendant and called Ms.
Arbogast who lived in Cincinnati. They discussed arranging psychiatric counseling for the defendant on an
urgent basis. Ms. Arbogast attempted to call the defendant on the night of the murder but was unable to reach
him.  (Footnote in original)

4

a heart attack in 1974 when the defendant was ten. The defendant's father denied that
the defendant was his son and snubbed the defendant. The witnesses' descriptions of
the fights between the defendant's parents eerily paralleled the defendant's final
confrontation with his own wife. All of the defendant's relatives described him as a
good father who loved his children.

Hall, 8 S.W.3d at 596-599.

## FACTS FROM POST-CONVICTION HEARING

### DEBBIE DAVIS

Debbie Davis, one of petitioner's six siblings, stated that she, her mother, and her sister
testified during the penalty phase of petitioner's trial but were not called as witnesses during the guilt
phase. When asked if she and petitioner were raised together, she responded "[y]es and no" and then
explained that she lived with her grandparents, who lived next door to her parents' home. With
regard to petitioner's childhood, Davis testified that her father did not believe petitioner was his son
and showed him little affection. Petitioner's mother attempted to compensate for this by showing
petitioner a great deal of affection. Davis also testified that her father would often come home
drunk, her parents would fight, and her father would beat her mother. Davis noted that her mother
"pick[ed] at" her father until he reached his breaking point, and explained that her grandparents'
violent relationship was very similar to that of her parents.

Davis described one particularly-violent incident between her parents. During that incident,
her father ripped the phone off the wall and petitioner attempted to use a fly swatter to stop him from
beating his mother. On another occasion, her mother pointed an unloaded gun at her father in the
presence of the children. Davis recalled that after these incidents her parents would "be all lovey
dovey". After Davis' father died, her mother married an "awful" man who was only interested in
her mother's money and home.

Davis testified that petitioner was a "perfect", sweet child who never got into trouble and,
therefore, never required discipline. She acknowledged that he has a history of angry outbursts, that
he is a "hot head", and that he was involved in some incidents when he lived in Pennsylvania. In
her opinion, though, his behavioral problems did not begin until his discipline-free childhood ended
and people attempted to impose authority on him.

Davis lived in North Carolina from 1976 to 1990 and in Connecticut from 1994 to 1997, and
thinks petitioner lived with her from 1984 to 1987. Petitioner met and began dating the victim

5

during that time period. When asked if the victim had ever been abusive toward petitioner, Davis described one incident she witnessed where the victim hit and kicked petitioner and petitioner put the victim "in a headlock". When Davis confronted them, they "pretended they were horsing around." She explained that they "did that kind of stuff all the time."

With regard to verbal/emotional abuse, Davis explained that petitioner just "went along with everything [the victim] said", stayed calm when she provoked him, and "wouldn't go against her". She noted that petitioner believed the victim to be more intelligent than himself, that he permitted her to handle their financial affairs, and that the victim told petitioner he was stupid and ordered him around like he was a child. She explained that petitioner's relationship with the victim was similar to their parents' relationship in the sense that they were very much in love but would often fight and then reconcile.

When asked about the victim's character, Davis responded, "I don't like to say bad things because I don't believe she deserves to be dead." She did explain, however, that in her opinion the victim would sometimes exaggerate when she talked about her education. Davis further testified that she liked petitioner's ex-girlfriend better than she liked the victim because the victim had two children and because petitioner and the victim sometimes took drugs when they were together. According to Davis, petitioner becomes angry when Davis speaks negatively about the victim.

Davis initially testified that petitioner took care of his children.[3] However, she subsequently clarified that he cared for the children when he lived in North Carolina but that she had no personal knowledge regarding what occurred in Tennessee.

Davis explained that petitioner and his brother Jeff, who died of AIDS on July 4, 1995, were very close confidants at the time of the victim's July 29,1994, murder. Despite the family's efforts, petitioner's attorneys did not preserve Jeff's testimony prior to his death. According to Davis, Jeff could have testified regarding petitioner's mental state following the murder as well as the fact that petitioner did not initially realize the injuries he had inflicted upon the victim were fatal.

With regard to the trial testimony that petitioner disconnected the victim's phone lines prior to killing her, Davis testified that petitioner had a habit of disconnecting phone lines. When petitioner lived in North Carolina, he disconnected his neighbor's phone after the neighbor

---

[3]When the Court refers to "his children" or "petitioner's children", the Court is referring to all four children despite the fact that petitioner is the biological father of only two of the children.

6

threatened to call the police because petitioner was having an excessively-noisy party. On another occasion, petitioner and his mother were having a discussion and he disconnected her phone line so she could not call her sister. Davis speculated that petitioner disconnected phone lines in an effort to secure the undivided attention of the person with whom he was speaking. She explained that petitioner never hurt anyone after disconnecting their phone lines, and that she informed petitioner's attorneys of petitioner's habit when she spoke with them following the guilt phase of the trial.

In response to a question about petitioner's paranoia regarding police officers, Davis explained that petitioner began to distrust police officers after an officer sold him a car that was a "lemon". Davis stated, "I think they ended up in some altercation later at another time," but then observed, "I shouldn't say that."

With regard to petitioner's character, Davis stated that she never observed petitioner being abusive toward an animal, but noted that the family had a pet dog whose personality was similar to petitioner's in the sense that it was very loving but did not like to be controlled. When asked if petitioner ever did anything "noble", Davis stated that petitioner "was always for the underdog" and would help people in need by doing such things as working on their cars without being paid for his services.

Davis also testified briefly regarding petitioner's medical history. According to Davis, petitioner was involved in a car or motorcycle accident after she left home for college. She explained that he has several scars as a result of that accident.

With regard to petitioner's mental state at the time of the murder, Davis testified that petitioner was "hopelessly in love" with the victim and that he would not have premeditatedly killed her. Davis was not aware that petitioner had been arrested on multiple occasions for domestic assault, nor was she aware that the children testified that petitioner forced his way into the victim's home on the night of the murder.

Although investigator Glori Shettles made contact with petitioner's family prior to his trial, the first time Davis spoke with petitioner's trial attorneys was the night before she testified.[4] She believes that she spoke with Clayton Mayo and that he explained what he did and did not want her to say during her testimony. Specifically, Davis recalled that Mayo "asked us not to say anything

---

[4]Shettles' first name is spelled "Gloria" in the transcript, but in Exhibit 7, which was drafted by Shettles, her first name is spelled "Glori".

7

negative about [the victim] because it would not – she was already a victim, and that there were going to be mannequins and bad pictures and everybody would already feel pretty bad about it, as did we, and that it would be in our best interest not to bring up anything negative about [the victim] because it would make us look bad to the Court."

Davis explained that petitioner was a wonderful father who was the primary caretaker for the children, and stated that she could have provided petitioner's attorneys with photographs and videos depicting petitioner as such if the attorneys had requested those items. Davis was not aware that defense counsel had questioned the children during the trial about their relationship with petitioner. However, she expressed her opinion that children can be "prepped" to say things which are not true. She admitted that prior to the victim's murder the children accused petitioner of abusing them, but she does not believe the accusations.

Davis was not present in the courtroom during much of the trial because she was expected to be called as a witness. However, during a break in the proceedings she observed a juror hugging a member of the victim's family. She thinks she mentioned this to petitioner's attorneys, but does not know if they pursued the matter.

With regard to the attitude of petitioner's attorneys, Davis noted that they told her they did not expect petitioner to receive the death penalty and that the State had offered petitioner a plea. When the jury returned a verdict of death, petitioner's family and the attorneys went to the attorneys' office. When they arrived, one of the attorneys said he wanted to show them something so they wouldn't "feel so bad". After showing the family a letter or statement petitioner had written, the attorney stated, "So you can see that this was intentional."

## CLARENCE STANFILL

Clarence Stanfill met petitioner through his father, who lived near petitioner prior to the victim's murder. Stanfill described petitioner as a friend and explained that petitioner was an excellent father who quit his job to take care of a daughter who had cerebral palsy. He also stated that petitioner remained calm when things were not going his way. Finally, he testified that neither the police nor petitioner's trial attorneys questioned him about the victim's murder.

8

970

**JOE HENRY STANFILL**

Joe Henry Stanfill testified that he is a friend of petitioner's and that petitioner is a good father. He also explained that petitioner was always happy and that the victim treated petitioner like a child because he did not financially support his family. Stanfill acknowledged, however, that he was often out of town and knew little about petitioner's personal life.

**VALENE FOREMAN**

Valene Foreman was petitioner's neighbor, but indicated that her father, who is now deceased, knew petitioner better than she did. Although she did not know petitioner well, she said that he was a nice person as far as she knew. She also noted that petitioner often had his children with him when he visited her father. On the night of the victim's murder, petitioner gave Foreman $25.00 as payment for a debt he owed her father and said he would pay the remaining balance later. Foreman did not talk with the police or petitioner's trial attorneys about this information, and does not think they spoke with her father.

**PAULA FOREMAN**

Paula Foreman spent some time at her family's home, which was near petitioner's home, prior to the victim's murder. Although she babysat for petitioner's children, she had not had many opportunities to interact with petitioner. Based upon her limited contact with petitioner and the victim, she testified that the victim worked, petitioner sometimes worked on cars, and petitioner drank beer. According to Foreman, petitioner was nice to her. Finally, she stated that petitioner liked his children, that his children liked him, and that petitioner sometimes took care of the children when she was not taking care of them.

**SHERYL ABROGAST[5]**

Sheryl Abrogast, who lives in Ohio, is one of petitioner's six siblings. She testified during the penalty phase of petitioner's trial. Although she attempted to testify during the guilt phase of the trial regarding testimony her deceased brother Jeff could have presented, the trial court excluded her

---

[5]The trial transcript spells this witness' first name "Cheryl", but she stated at the post-conviction hearing that the correct spelling is "Sheryl".

9

971

testimony and the appellate courts affirmed that decision based upon hearsay considerations.

Following petitioner's arrest, she spoke frequently with petitioner and attempted to call his attorneys on multiple occasions. She explained that her siblings were intimidated by attorneys and that she became the family's spokesperson. The attorneys were somewhat cooperative and would provide her with dates of relevant court proceedings. Despite the fact that she believed she was entitled to more detailed information, the attorneys would often decline to speak with her about substantive matters because petitioner had not waived the attorney-client privilege. Abrogast believed that petitioner was deprived of information regarding such basic things as the names of his attorneys and the dates of his hearings. Abrogast stated that she called the attorneys who ultimately represented petitioner at trial but also spoke "extensively" with Mr. Googe and Mr. Spracher – two of petitioner's previous attorneys.[6]

Although Abrogast spoke with the attorneys by phone on multiple occasions, she did not meet with them in person prior to petitioner's trial. She explained that she spoke with them by phone the night before her testimony and met with them in person fifteen minutes before she testified. They did not ask her if the victim had ever provoked petitioner or request that she bring photographs or videos of petitioner and his children. Moreover, although she had previously told them about petitioner's background and his relationship with his children, they did not ask her about those matters during her testimony. She also told them about physical altercations between petitioner and the victim, including one incident following which someone observed a bite mark on petitioner's arm. Abrogast admitted that she did not personally see a bite mark on petitioner's arm, but explained that her mother had mentioned it to her.

Abrogast testified that she spent the night at the home of petitioner and the victim on a couple of occasions during a trip to visit her brother Jeff, but admitted that she had not seen petitioner and the victim interact on too many occasions. According to Abrogast, she left for college and got married before petitioner married the victim, and she did not attend their wedding. Despite her

_____

[6] Abrogast apparently kept detailed notes regarding her conversations with petitioner's attorneys. For instance, she testified that she had a six-page journal entry summarizing a conversation she had with Mr. Googe on November 15, 1994. According to various records reviewed by the Court, it appears that petitioner was represented by Jack Hinson, Frank Stanfill, George Googe, Steven Spracher, Carthel Smith, and Mike Mosier at various points prior to trial. Jesse Ford and Clayton Mayo represented petitioner at trial, and Mark Donahoe represented petitioner during a portion of his direct appeal. There is some evidence that Scott Petrowski also represented petitioner on appeal, but his name does not appear in the appellate courts' opinions.

limited contact with the pair, she expressed an opinion that the victim said negative things to and/or about petitioner regarding his inability to provide for his family financially. In Abrogast's opinion, petitioner pulled his weight by cooking, cleaning, and taking care of the children.

In addition to spending time with petitioner during the two days that she stayed at his home during her trip to Texas, she observed him with two of his children when he stayed with her on his way to his mother's home at an unspecified time.[7] Citing various examples, she explained that petitioner was very attentive and related well to the children. He was especially fond of his daughter who suffered from cerebral palsy and made every attempt to assist her with her physical therapy and other special needs.

Abrogast corroborated the testimony of her sister Debbie Davis regarding their father's drinking problem as well as the volatile relationship between their parents, and described one violent altercation which required police intervention. Abrogast admitted that she testified regarding this incident at petitioner's trial, but said that she did not go into detail or testify that petitioner was present at the time of the incident. She also corroborated Davis' testimony that petitioner's father essentially disowned petitioner. With regard to conflict resolution, Abrogast testified that an argument between her parents would either be resolved with violence or her father would simply turn his back on her mother and refuse to discuss the matter.

Abrogast added to Davis' testimony regarding an argument between petitioner and his mother. According to Abrogast, the two were involved in an argument and petitioner's mother stated that she was upset, that she did not wish to argue anymore, and that she wanted to call her sister so she could visit her and cool off. In response, petitioner disconnected his mother's phone line so she could not contact her sister and he could keep her attention. Petitioner did not want his mother to leave until they had resolved their issues to his satisfaction. To Abrogast's knowledge, petitioner never hurt anyone after disconnecting their phone lines. Instead, he merely took this action because "he want[ed] to resolve the conversation rather than have them leave him hanging, and he want[ed] to have the attention and not be ignored or walked away from."[8]

---

[7]Abrogast testified that she spent time with petitioner during various holidays after she left for college. However, her contact with him after he left home appears to have been quite limited.

[8]A mitigation assessment prepared for trial counsel by Dr. Ann Charvat includes an interview with petitioner's mother. Describing what appears to be the same event related by Abrogast during the post-conviction hearing, the report states, "Jon just couldn't drink. When he was sober he was really sweet but he couldn't handle his alcohol. He would be very upset with his mother, very controlling. If she would try

11

Prior to petitioner's trial, Abrogast spoke with defense investigator Glori Shettles on one or two occasions, during which she "told [Shettles] all this family history and everything". During one conversation, Shettles expressed her opinion that petitioner might suffer from Intermittent Explosive Disorder (IED). Abrogast, who is a registered nurse, thought the criteria were consistent with petitioner's behavior and agreed that this was something petitioner's attorneys should look into. She testified that petitioner was normally a "very tender-hearted, easygoing guy" and that he would have to be provoked to become angry. She never saw him get angry with his children, but was aware that he had had disagreements with his mother and with siblings.

To her knowledge, petitioner's attorneys did not hire a psychiatrist or otherwise pursue the IED theory. According to Abrogast, a psychiatrist would have been more appropriate than a psychologist because a psychiatrist can prescribe medication and treat the patient. Abrogast conceded that petitioner was evaluated at Western Mental Health and was determined to be both sane and competent, that he was evaluated at Middle Tennessee Mental Health Institute, and that the Court appointed a psychologist to examine him.[9] She was excluded from the courtroom prior to her testimony, so she does not know if expert witnesses testified on petitioner's behalf.

Abrogast testified that petitioner was very close to his brother Jeff at the time of the victim's murder and that she attempted to convince petitioner's attorneys to preserve Jeff's testimony prior to his anticipated death from AIDS. Although the attorneys informed her that they intended to speak with Jeff, they did not do so. When her attempts to convince petitioner's lawyers to preserve Jeff's testimony were unsuccessful, she flew to Jeff's home in Texas three months before his death and had him sign a notarized legal document which stated that nobody had ever attempted to contact him.

According to Abrogast, Jeff could have testified that the victim pointed a gun at petitioner when he attempted to pick up some mail from the house. Abrogast believed that the mail included a $250.00 check from petitioner's mother that petitioner was going to use to start a new life in Texas. Jeff also would have testified that petitioner had not been able to work because he was depressed, crying, and could not carry on a conversation without breaking down. Petitioner was heartbroken

---

to leave, Jon would disconnect the phone or disable the car. He didn't hit her, but he did put his fist through the walls, etc." This assessment is Exhibit 8 to the post-conviction proceedings.

[9]Although petitioner was evaluated at MTMHI, the Court did not notice a reference to "Western Mental Health" in the trial record.

because he thought the victim did not love him and was involved with someone else.[10] He was also upset because the victim wanted to divorce him and take his children, his brother was dying, and he missed his mother. All of these stressors made him very depressed and made it difficult for him to function or work.

Jeff also would have testified about what occurred following the victim's murder. Petitioner fled to Texas following the murder and Jeff contacted the police so petitioner could be arrested without a violent confrontation.[11] Finally, Jeff would have testified that petitioner did not realize the victim's injuries were fatal and "had a terrible breakdown" when he learned of her death.

Abrogast notes that she called Jeff to check on his health at some unspecified time prior to the murder and that he spent the entire conversation telling her that he was worried about petitioner. Abrogast was concerned that "Jon was about to have a psychotic breakdown [and] needed to be hospitalized", so she and Jeff attempted to locate an available mental health facility.

Abrogast testified that she was not in Tennessee on the night of the victim's murder and that she did not observe the incident. She attempted to reach petitioner by phone that night, but was unsuccessful. Although she does not believe that petitioner would have killed the victim in a premeditated fashion, she acknowledged that the victim had obtained an order of protection against petitioner prior to her murder.

**PAMELA FOREMAN**

Pamela Foreman was petitioner's neighbor and she occasionally babysat for his children. She explained that she had "not really" had a chance to see the victim and petitioner interact with each other and that she had not had a chance to interact with petitioner. Foreman stated that although petitioner sometimes watched his children, she watched them "most of the time" when the victim was at work. She agreed that petitioner treated the children "fairly well" on the occasions she observed him interacting with them. Petitioner sometimes cooked for the children. He also fixed

---

[10]According to Glori Shettles' report, which is Exhibit 7 to the post-conviction hearing, petitioner admitted to "having various affairs" during his marriage to the victim.

[11]The report of Dr. Stalford, who testified during the post-conviction hearing, elaborates on petitioner's post-murder actions: "He reports taking the back streets as he felt the police would be coming. He drove into a ditch sometime after midnight. Then, a motorist, William Smith and his wife stopped to offer assistance. The defendant stole their car, which had their 12-year-old son, Clint, in the back. He states that he did not know that the child was in the car until the young man struck him. He states that he pulled over and let the child out of the car."

13

975

neighbors' cars, but she did not know if he was compensated for his services.

## JACKIE BRITTAIN

Jackie Brittain and petitioner met through Brittain's wife, and he considers petitioner a friend. Brittain did not interact with petitioner and the victim prior to their separation, but petitioner lived with the Brittains after the victim obtained a restraining order against him.

Brittain testified that he was present in court when the victim obtained an order of protection against petitioner, and that he heard some discussion about "a gun being pulled on him or something". Although he was aware that the victim carried a gun, he never saw her "pull the gun". Brittain claimed that the victim violated a restraining order by asking petitioner to work on vehicles at her residence.[12]

Brittain stated that he was scheduled to testify for the State at trial and was present in the courthouse, but that the State ultimately chose not to call him as a witness. Petitioner's trial attorneys also spoke to Brittain about his relationship with petitioner.[13] With regard to petitioner's character, Brittain told petitioner's attorneys that a few days before the victim's death he saw petitioner protect a woman whose husband intended to hit her during an argument. As to petitioner's other good deeds, Brittain noted that petitioner provided assistance when Brittain was stranded during the early morning hours of an unspecified date and later repaired Brittain's car. Petitioner told Brittain to pay him when he could and not to worry about it if he could not pay him at all. Brittain did not tell counsel about that incident because they did not ask.

Britain also testified briefly regarding petitioner's temperament and his relationship with his children. Brittain never saw petitioner lose his temper, and stated that petitioner played with his own children as well as with Brittain's son.

On cross-examination, Brittain admitted that he gave a statement to the TBI in which he stated that petitioner threatened to hurt the victim. However, he claims that he and petitioner were just "joking around" at the time and added:

Well I – like – what I started to say, I've been mad and I've threatened [my wives].

---

[12] It appears that Brittain may have been using the terms "order of protection" and "restraining order" interchangeably, but it is possible that he was discussing separate orders.

[13] It is unclear when they spoke. Brittain initially testified that he spoke with the attorneys prior to trial but later stated that he did not speak with them until he walked into the courthouse.

14

I've had three. I've got two different – had two different wives, and in a fit of anger, just about any man in this room, if they'd tell the truth, they'd probably made the same remark, that they would hurt their wife or kill their wife.

Brittain did not recall that the State attempted to serve a subpoena on him prior to trial or that he told the State he would only testify if he could testify on petitioner's behalf.

## PAMELA BRITTAIN[14]

Pamela Brittain, the wife of Jackie Brittain, testified that she was not contacted by petitioner's trial counsel prior to petitioner's trial.[15] She admitted that she had a negative opinion of petitioner and cautioned post-conviction counsel not to call her as a witness because she did not think she "would be the best witness for [petitioner] at this time."

Brittain met petitioner in 1990, when she leased him a bay in which to work on automobiles. She stated that she never saw petitioner get angry and that he was flexible when customers had trouble paying their bills. According to Brittain, petitioner did not drink alcohol on a regular basis nor did he smoke marijuana. She had seen him become giddy/drunk, but never saw him become violent.

Brittain described petitioner as "the sweetest guy in the whole world" and said she "never saw him have a temper." According to Brittain, petitioner was a great father who had more interaction with the children than the victim did. Brittain also echoed her husband's testimony concerning petitioner' intervention in a domestic altercation between a man and woman days prior to the victim's murder. She does not recall telling a TBI agent that petitioner "was like a volcano about to explode." Likewise, she does not recall telling the agent that petitioner "wanted to grind [the victim] up into hamburger meat."[16]

With regard to petitioner's relationship with the victim, Brittain expressed her opinion that

---

[14]In various documents this witness is referred to as both Pamela Brittain and Darlene Brittain.

[15]Trial counsel clearly were aware of the Brittains prior to trial. Their names are listed on the first page of the indictment. Moreover, defense investigator Glori Shettles mentioned them in her initial report, which is Exhibit 7 to the post-conviction hearing. Likewise, Mike Mosier, one of petitioner's pretrial attorneys, mentioned Jackie Brittain during the November 8, 1995, pretrial motion hearing. Finally, Dr. Stalford mentions on page 7 of her report that both Brittains were interviewed by the Tennessee Bureau of Investigation. According to that report, the Brittains told the TBI that petitioner "had spoken of making hamburger meat out of his wife."

[16]Although the TBI's report was referred to by various witnesses and in various documents, the report itself does not appear to be in the record.

15

977

the victim treated petitioner "like shit". She described the victim as "extremely commanding and demanding and abusive" toward petitioner, and stated that she had seen the victim hit and kick petitioner. When the victim would verbally abuse petitioner, he would sometimes ignore it and sometimes become angry. Brittain expressed her opinion that the victim violated a restraining order by visiting the Brittain's home when petitioner was living there.

Brittain recalls speaking with the State's investigator but does not recall that the State attempted to subpoena her for trial or that she told the State she intended to testify on petitioner's behalf. With regard to petitioner's trial attorneys, she recalls them telling her, "We don't want to use you because of the ground hamburger meat deal."

**KATHY HUGO**

Kathy Hugo, one of petitioner's six siblings, lived in Pennsylvania at the time of petitioner's trial. Although she testified at petitioner's trial, she stated that petitioner's attorneys did not contact her prior to the trial. Her first contact with them was at 11:00 p.m. the night before she testified. The person with whom she spoke instructed her to testify "about what it was like growing up in our home", but cautioned her not "to say anything bad about Billie." Although she testified at trial concerning violence between her parents, she did not testify that petitioner was present during some of the incidents. Hugo stated that on one occasion when he was young, petitioner witnessed an altercation between his parents and attempted to come to his mother's assistance by hitting his father with a fly swatter.

According to Hugo, petitioner was a "sweet little boy" when he was younger. Although he "got in trouble in his teenage years like pulling fire alarms and things like that," he generally treated people with respect. She agreed that petitioner would "stand up for the small person or the little guy or the underdog." However, she also noted that petitioner, like his father and grandfather, resolved conflict with rage. On one occasion, he punched a hole in the wall when his girlfriend took some speakers that belonged to him. As her sisters had testified, Hugo stated that petitioner often disabled people's telephones to get their attention. She does not know why he did it, but he never hurt anyone after doing it.

According to Hugo, the victim's children called petitioner "Daddy Jon" and had a good relationship with him. When asked how she knew this, she testified that she observed them at

16

petitioner's wedding reception.[17]  Hugo conceded that she had never been to petitioner's home, and acknowledged that of all of petitioner's sisters, she knew the least about his relationship with the victim. Most of what she knows was conveyed to her by her mother or one of her sisters. Despite her apparent lack of personal knowledge, Hugo testified that she did not observe any conduct which would have led her to believe that petitioner killed the victim with premeditation.

If petitioner's trial counsel had asked her, she could have produced photographs of petitioner as a child and with the victim as an adult. She did not call petitioner's attorneys prior to trial because her sister Sheryl was the liaison between the family and the attorneys. She stated that an investigator for the defense team did not call her either.[18]

Finally, Hugo testified that when she was in the hallway during petitioner's trial she saw one of the jurors "go over to the [victim's] family and hug them." She conveyed this information to petitioner's attorneys, but she does not know if they followed up on the issue.

### CLAYTON MAYO AND JESSE H. FORD III

Mayo and Ford were petitioner's trial attorneys. The Court will discuss the relevant portions of their testimony during its analysis of petitioner's claims.

### MARTIN ESKEW

Martin Eskew was apparently married to the victim's sister at the time of the victim's murder. When asked to describe petitioner, Eskew stated, "Spoiled brat, self-absorbed, only him. Nothing else mattered." He could not recall if he had previously characterized petitioner as a "complete idiot." Petitioner and the victim fought quite a bit, but Eskew "usually saw the aftermath more than the fights or what instigated them." He never saw the victim "egg [petitioner] on, belittle him, hit him, or punch him." He referred to petitioner's attorneys as "idiot lawyers" because he does not "have a high regard for attorneys." Although Eskew did not appear to have any personal

---

[17]According to the mitigation assessment prepared by Dr. Charvat, petitioner married the victim on May 15, 1988, approximately nine years before petitioner killed the victim.

[18]Based upon its careful review of the trial transcripts, trial technical record (which includes, among other things, investigator affidavits), exhibits, and post-conviction record, the Court does not find this assertion to be credible. Although petitioner's trial attorneys may not have spoken with Hugo before she arrived in Tennessee shortly before she testified, the Court finds it very unlikely that a defense investigator did not contact her.

17

knowledge regarding whether petitioner had a substance abuse problem, he noted that petitioner
"drank a lot" and often appeared "[g]lazed-eyed or whatever." When asked if the victim could be
difficult to deal with, Eskew stated that he "never had any problem with her.".

**DR. PAMELA AUBLE AND DR. KEITH A. CARUSO**

Dr. Auble and Dr. Caruso are mental health experts who testified on behalf of petitioner
during the post-conviction hearing. For the reasons stated during the Court's analysis, their
testimony was largely irrelevant.

**DIANA PEARSON**

Diana Pearson "somewhat" recalled being in a bar on July 29, 1994, which is the night of the
victim's death. When asked if she remembered petitioner, she responded, "Very little." She gave
the same response when asked if she remembered drinking with petitioner. Finally, she stated that
she did not remember hearing petitioner say that he intended to kill the victim.

**ALICE PEARSON**

When asked if she recognized petitioner, Alice Pearson stated, "Not really." However, she
then appeared to recall having drinks with petitioner at a bar but could not recall the date of that
event. She testified that she had two or three beers over the course of the evening, but did not testify
regarding the amount consumed by petitioner. She did not recall hearing him say that he was going
to kill his wife.

**JON DOUGLAS HALL**

Petitioner testified on his own behalf during the post-conviction hearing. His testimony
regarding what he would have testified to if he had been given the opportunity to testify at trial was
irrelevant because he voluntarily chose not to testify after being advised by trial counsel as well as
the trial court of his right to do so. In any event, the Court may refer to portions of his testimony
during its analysis of his complaints.

18

**DR. KIMBERLY STALFORD**

Dr. Stalford is a mental health expert who testified on behalf of the State during the post-conviction hearing. The Court will periodically refer to the relevant portions of her testimony and/or report.

## LEGAL ANALYSIS

Petitioner raised numerous issues in his post-conviction petitions and the Court will address the merits of every issue which has not been waived or previously determined. Although the Court is considering the cumulative effect of the alleged errors, the Court will address each issue separately for the purpose of clarity.

As is often the case when a post-conviction petition is considered years – in this case approximately seven years – after the trial at issue, trial counsel in this case found it difficult to recall the trial and/or pretrial events in great detail. Moreover, although the trial court granted several of petitioner's trial attorneys' motions to withdraw prior to his trial, none of those lawyers testified during the post-conviction hearing. Similarly, petitioner did not present the testimony of the investigators or expert witnesses appointed to assist him at the trial level. Therefore, the record is somewhat unclear regarding what transpired between petitioner's arrest and conviction. Nevertheless, the Court has carefully reviewed the trial record, appellate opinions, and post-conviction record, and has attempted to determine the merits of each of the claims upon which petitioner presented proof.[19]

### A. Burden Of Proof

Petitioner filed his petition subsequent to May 10, 1995, and is therefore required to prove his claims by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997 Repl.). With regard to petitioner's ineffective counsel claim, the Tennessee Supreme Court recently reiterated the circumstances under which a petitioner is entitled to relief on such a claim:

> To establish ineffective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, § 9 of the Tennessee Constitution, a petitioner must show that counsel's performance was deficient and that the deficiency

---

[19]Petitioner waived many issues raised in the petitions by failing to present any proof in support of those claims during the hearing.

19

prejudiced the defense. Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.

To prove a deficiency in counsel's performance, a petitioner must show that counsel's acts or omissions were so serious that they fell below an objective standard of reasonableness under prevailing professional norms. As this Court has observed:

> The assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . .. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interests, undeflected by conflicting considerations. . ..

In reviewing counsel's conduct, a 'fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'

A key aspect of counsel's performance [is their duty to investigate]. Defense counsel 'must conduct appropriate investigations, both factual and legal,' and 'must assert them in a proper and timely manner.' As the United States Supreme Court has said, 'counsel has the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' Although a defendant's statements or confessions do not eliminate counsel's duty to investigate, the reasonableness of counsel's actions 'may be determined or substantially influenced by the defendant's own statements or actions.' Moreover, counsel's conduct must be 'assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'

To establish that a deficiency resulted in prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' In short, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome.

Nichols v. State, 90 S.W.3d 576, 586-87 (Tenn. 2002) (citations omitted).

### B.   Guilt Phase Of The Trial

During the post-conviction hearing, petitioner focused primarily upon his claim that his attorneys were ineffective during the trial and during their pretrial preparation. The Court finds this claim to be without merit.

As previously noted, petitioner was represented by multiple attorneys prior to trial and by Jesse Ford and Clayton Mayo during his trial. During his opening statement, Ford informed the jurors that petitioner and the victim had experienced domestic problems for a number of years and that both suffered from high levels of stress, in part because they were attempting to raise a child

20

with special needs. Ford did not deny that petitioner killed the victim – a tactic which undoubtedly would have been unsuccessful – but asserted that petitioner did not plan to kill the victim. According to Ford, petitioner was merely attempting to pay child support and reconcile with the victim. Ford informed the jurors that petitioner did not bring a weapon to the scene and characterized the incident as an emotional "domestic situation that merely escalated and got out of control".

Through their questioning of the witnesses at trial, Ford and Mayo presented several facts which were consistent with the defense's opening statement. For instance, during the cross-examination of TBI Agent Brian Byrd, counsel established that a money order made out to the victim from petitioner was discovered in the victim's home during the investigation; that the authorities found no weapons in the victim's home or on petitioner's person at the time of his arrest; that petitioner cried at one point following his arrest and appeared remorseful; that petitioner and the victim were in the process of getting a divorce; and that the disconnected phones easily could have been reconnected.

Although Chris Dutton's testimony was quite damaging, counsel skillfully extracted some defense-friendly information during cross-examination. Dutton acknowledged telling the authorities that petitioner said he started drinking after he spoke with the victim on the telephone on the day of the murder and that he was drunk at the time of this incident. Dutton also agreed that petitioner told him that he was merely attempting to pay child support and reconcile with the victim; that petitioner was extremely depressed about his family situation, particularly because he had a child with cerebral palsy; that petitioner did not bring any weapons with him to the victim's home; and that petitioner had disconnected the victim's phone when he met with her on previous occasions.

Given the fact that the children watched petitioner attack their mother and unsuccessfully attempted to help her, their testimony was also quite damaging. Defense counsel recognized that the jury would not look favorably upon an aggressive cross-examination of the children. However, they conducted a somewhat successful cross-examination of each child by establishing that the children were young at the time of the incident, that they had spoken with multiple people concerning the incident and/or their proposed testimony, and that it was possible that some of their testimony reflected information conveyed to them by others as opposed to being their own recollections of the incident. Counsel also established that, although the victim and petitioner were separated, petitioner

21

spent time at their home attempting to repair the victim's automobile in the days prior to the murder.

Finally, one of the children admitted during cross-examination that petitioner brought beer with him

to the victim's home and that he started drinking one of the beers in her presence.

The medical examiner's testimony concerning the victim's extensive injuries was quite

persuasive. Due to the brutality of the crime, this was a witness that any attorney would have had

difficulty cross-examining. Nevertheless, counsel attempted to support the theory that this was an

emotional domestic incident as opposed to a premeditated murder by establishing that the attack took

place over a relatively short period of time and that the "aggressive wounds" around the victim's

facial area could have been a result of the perpetrator's emotional state escalating into violence.

After the State rested, defense counsel attempted to present the testimony of petitioner's

sister, Sheryl Abrogast, regarding her deceased brother's observations concerning petitioner's state

of mind on the night of this incident. The trial court sustained the State's hearsay objection to this

testimony and the appellate courts subsequently affirmed that ruling.

Defense counsel next presented the testimony of Dr. Lynn Zager, a clinical psychologist. In

addition to interviewing petitioner on multiple occasions, Dr. Zager conducted psychological testing

and also reviewed records from the Middle Tennessee Mental Health Institute's forensic team's one-

month evaluation of petitioner, mental health records from Riverbend Maximum Security Institution,

and "reports of interviews that were conducted with people who knew [petitioner]." With regard to

petitioner's mental state during the relevant time periods, Dr. Zager informed the jury as follows:

> [B]asically he suffers from depression, and he meets the criteria for a diagnosis of
> depression. This was prior to the incident and after the incident. It's not as acute
> right now as it was before. Evidence of that included things like that he had a
> depressed mood, he had crying spells, he had thoughts of death and suicide, he had
> difficulty concentrating, disturbed sleep pattern and was noted psycho-social
> retardation which means that things that he normally did at a much quicker pace he
> was doing at a much slower pace.

                                        *    *    *

> In addition, he had an alcohol dependence problem. There is a strong family history
> of alcohol problems in his family, both his father and paternal grandfather had very
> significant alcohol problems, and that was true in Mr. Hall's case also. In addition
> I found some personality characteristics which I think are important in terms of
> understanding his functioning. These include paranoia and dependency.

                                        *    *    *

> It's my opinion that at the time of the incident, that Mr. Hall was suffering from
> depression. In addition, he was intoxicated on alcohol. When that is put together

22

with the depression and the personality characteristics, when that occurs, and some
of the stressors, the psycho-social stressors, that he was under at that time, I feel like
his abilities were compromised.

* * *

There were a number of stressors. He had a daughter who was born prematurely and
suffers from cerebral palsy. For approximately two years he was her primary
caretaker, including doing medical-type things she needed, breathing treatments and
other things like that. She had other health-related problems, had been hospitalized,
and I believe that was a significant stressor for her that went on over time. He had
lost his job. His wife had lost her job. They had financial stressors that were
operating. His brother, one of his brothers that he was very close to, Jeff, had been
diagnosed with AIDS and he was deteriorating around that time. So those stressors
were operating.

* * *

It's my impression, based on everything that I know about the case, that Mr. Hall was
acting in an impulsive manner versus a well-thought out plan.

On cross-examination, the State attempted to establish that Dr. Zager's testimony regarding

petitioner's intoxication was based solely upon petitioner's "self report". However, Dr. Zager

clarified that she expressed this concern to Mike Mosier, who represented petitioner during the initial

phases of her employment, and that she was subsequently "given the opportunity to review notes and

information from interviews of other people who were there at that time, and that helped support

what he had to tell me." She explained that the people who had been interviewed were with

petitioner "shortly before the incident". Those people stated that petitioner was drinking beer, that

there was a beer missing from the refrigerator, and that petitioner drank beer at a "pub". She also

based her opinion on the family history provided by petitioner's family regarding petitioner's

"alcohol problem", which began when petitioner was approximately fifteen years of age.

During the State's cross-examination, Dr. Zager admitted that, to her knowledge, none of the

witnesses observed slurred speech, lack of coordination, unsteady gait, nystagmus, or other physical

manifestations of intoxication. In response, defense counsel questioned Dr. Zager concerning the

fact that the forensic team at MTMHI, which evaluated petitioner prior to Dr. Zager's evaluation,

diagnosed petitioner as suffering from alcohol dependence.

Finally, counsel presented the testimony of Randy Helms, who formerly employed petitioner.

Helms saw petitioner on a frequent basis prior to the victim's murder, including two days prior to

the murder. Helms described petitioner as "severely depressed, just down and out, [without] a real

good outlook on life." Helms based this opinion on his conversations with petitioner regarding the

23

986

problems between himself and the victim, including petitioner's concern that these problems were having an effect on the children. Petitioner "was just having a hard time dealing with it."

During the defense's closing argument, both counsel presented argument to the jury. Instead of focusing upon a particular lesser-included offense of first degree murder, counsel attempted to convince the jurors that the State had failed to meet its burden of proving premeditation and deliberation beyond a reasonable doubt, thus rendering a verdict of first degree murder an impossibility. Although the Court does not intend to summarize the arguments, they were excellent and were as persuasive as they could have been given the horrific facts of this case.

Petitioner's counsel presented numerous witnesses during the post-conviction hearing, but it was not always clear whether counsel was alleging that trial counsel should have presented those witnesses during the guilt phase, penalty phase, or both. Likewise, the memorandum submitted by counsel following the hearing was somewhat ambiguous. Therefore, the Court can do nothing more than consider the issues in the manner the Court believes petitioner was attempting to raise them.

Petitioner alleges in his memorandum that the "most damaging evidence" against him was the fact that he disconnected the victim's phone line, and that trial counsel were ineffective for allowing that act to be referred to as "cutting", which "is worse than disconnecting in that it implies a permanent disconnection." Petitioner has the burden of proving his claims by clear and convincing evidence, and he has failed to refer this Court to the portion of the trial transcript in which a witness testified that petitioner "cut" the victim's phone line.

Although it is not the Court's responsibility to examine the record for proof in support of petitioner's claims, the Court briefly reviewed the trial testimony and notes that both TBI Agent Brian Byrd and Chris Dutton testified that petitioner "disconnected" the victim's phone line. Indeed, during his cross-examination of Agent Byrd, defense counsel established that the phone line "could have easily been reconnected". Moreover, a photograph in Collective Exhibit 4 from the trial clearly shows that the phone line was merely unplugged as opposed to being cut. Finally, during his closing argument the prosecutor stated that petitioner "unhooked the telephone." While it is possible someone testified that petitioner "cut" the victim's phone line, petitioner has not proven that fact to the Court. Further, because numerous other references to this incident clearly demonstrated that petitioner did not cut the phone lines, he has failed to establish that he suffered prejudice as a result of counsel's failure to object to any reference to the contrary.

24

In a related issue, petitioner asserts that trial counsel should have informed the jury that he had a habit of disconnecting phone lines and that he often did so in an effort to guarantee the undivided attention of the person to whom he was speaking as opposed to being an indication that he intended to cause any physical harm. In this case, the fact that petitioner disconnected the victim's telephone line was relevant to the issue of premeditation.

During his cross-examination of Chris Dutton, petitioner's trial counsel elicited the fact that petitioner had disconnected the victim's phone lines during some of their previous arguments, and neither party presented proof that petitioner inflicted any harm upon the victim during those arguments. Therefore, contrary to petitioner's assertion, the relevant information was conveyed to the jury.

In contrast to this relatively innocuous way of presenting this information, the manner in which this information was presented during the post-conviction hearing made petitioner appear to be very controlling and "sinister", as the State asserts.[20] In the Court's opinion, it would not have been in petitioner's best interest to cite multiple incidents during which he felt it was necessary to disable someone's phone to keep their attention and/or prevent them from calling the police. Moreover, having reviewed some of the mitigation/investigation reports to which trial counsel had access, the Court is convinced that counsel were aware of these incidents and simply chose not to present them.[21] In the Court's opinion, there is no question that it was the correct decision.

Petitioner also alleges that trial counsel had "no real defensive theory" other than "intoxication and a hope for mercy", and that counsel advanced no proof to support a defense. The Court disagrees. As the evidence discussed above demonstrates, through their witnesses, cross-examination of the State's witnesses, opening statement, and closing arguments, trial counsel attempted to convince the jury that petitioner was distraught, depressed, and intoxicated, that his behavior reflected an impulsive act as opposed to a planned act, that the State failed to meet its burden of proving premeditation and deliberation beyond a reasonable doubt, and that petitioner,

---

[20]As with many aspects of their testimony, the witnesses who testified on this issue did not appear to have personally observed the incidents about which they testified. Although the Court chooses to address the merits of the majority of petitioner's claims, his witnesses' lack of personal knowledge likely would have been a basis for the exclusion of much of their testimony at trial.

[21]As previously noted, the parties did not provide the Court with all of the reports of the mitigation specialists and/or investigators. However, Dr. Charvat's mitigation assessment and Glori Shettles' initial report were made exhibits to the post-conviction hearing.

25

although guilty of a lesser-included offense, did not possess the requisite *mens rea* for first degree murder.

Petitioner contends that trial counsel did not discover or present evidence which supported their theory that he was intoxicated. On the contrary, through his cross-examination of Cynthia Lambert, trial counsel presented evidence that petitioner was carrying beer when he arrived at the victim's home and that he began drinking one of the beers prior to killing the victim. Moreover, Dr. Zager testified that petitioner and other persons informed her that petitioner had been drinking beer prior to arriving at the victim's home. Finally, through his cross-examination of Chris Dutton, defense counsel established that petitioner "was drunk and had been drinking since he called [the victim] earlier [on the date of the offense]".

At the post-conviction hearing, petitioner presented the testimony of Diana Pearson, who "somewhat" recalled being at a bar on the evening of the victim's death and appeared to be unsure whether she drank with petitioner that evening or remembered him at all. Alice Pearson, who also testified during the post-conviction hearing, did "[n]ot really" recognize petitioner but appeared to recall talking and drinking with him at a bar on a previous occasion, although she could not recall the date. Pearson drank two or three beers over the course of the evening, but she did not indicate how many alcoholic beverages petitioner consumed.

Because the Pearsons failed to testify regarding how much alcohol petitioner consumed, how quickly he consumed it, or how it affected him, their testimony was largely irrelevant to the intoxication theory and petitioner cannot demonstrate that he suffered prejudice as a result of their absence at trial.[22] During his post-conviction testimony, petitioner testified regarding the extent of his alcohol consumption on the night of the victim's murder. While it may have been helpful for petitioner to communicate that fact to the jury at trial, he made an informed, voluntary decision not to testify. Therefore, trial counsel cannot be faulted for the absence of any information he could have conveyed during his testimony.[23]

In addition to their testimony regarding petitioner's presence in a bar prior to the victim's murder, the Pearsons testified that petitioner did not tell them he intended to kill his wife.

---

[22]Petitioner testified during the post-conviction hearing that the Pearsons had been subpoenaed and were present at trial, but that defense counsel chose not to call them as witnesses.

[23]Although petitioner certainly had a right to testify, in the Court's opinion he would have made a very poor witness.

26

989

Presumably, petitioner believes that fact to be relevant to the issue of premeditation. In the Court's opinion, the fact that petitioner did not tell two strangers that he intended to kill his wife had no probative value whatsoever.

Petitioner also asserts that trial counsel erred by failing to inform the jury that he did not use a sewing machine to block the bedroom door as Stephanie and Jennifer Lambert testified.[24] Petitioner testified at the post-conviction hearing that he inadvertently blocked the door with his foot and that the testimony about the sewing machine made it appear as if his actions were more deliberate. Although petitioner is the only person other than the victim who was present in that room during the relevant time period and trial counsel could not have garnered this information from other witnesses, petitioner failed to testify during the post-conviction hearing that he provided his attorneys or any other member of the "defense team" with this information.

Petitioner argues that the crime scene video establishes that the sewing machine was not near the bedroom door or, apparently, in the bedroom at all. Assuming counsel were ineffective for failing to notice the absence of the sewing machine in the video, petitioner has not adequately explained how counsel would have utilized that information if they had been aware of it. First, because petitioner re-entered the home after killing his wife, it is entirely possible that he moved the sewing machine before the police arrived. In any event, in the absence of petitioner's testimony, which he declined to present because the trial court refused to remove the "flag of war" from the courtroom, the jury would have been left to speculate regarding what was blocking the door if the sewing machine was not. Because all three children testified that the door was blocked when they heard a commotion and tried to rescue their mother, counsel would have lost credibility with the jury if they had attempted to argue that nothing was blocking the door.

Assuming arguendo that petitioner had agreed to testify and had informed the jurors that his foot inadvertently blocked the door, that testimony would not have helped him. Regardless of how the door was blocked, any assertion that the act which prevented the victim from leaving the room during this vicious attack was inadvertent in nature would not have been credible. This is particularly true if the information came from petitioner, who is not a credible witness.

Petitioner also argues that trial counsel failed to hire a psychiatrist to pursue the theory that

---

[24]Jennifer testified that both a vacuum cleaner and sewing machine were blocking the door.

27

he suffered from Intermittent Explosive Disorder (IED). He also attempts to establish that trial counsel did not compile an adequate social history or provide their expert witness, Dr. Zager, with sufficient information to make an accurate diagnosis. The Court disagrees.

Again, petitioner has the burden of proving each of his claims. Although he presented some witnesses who testified that defense counsel did not contact them, it does not necessarily follow that counsel conducted an inadequate investigation. Petitioner did not present the testimony of his pre-trial attorneys, the investigators, or Dr. Zager. Therefore, the true extent of the investigation and the nature of the materials provided to Dr. Zager are unknown, and that fact does not benefit petitioner.

The Court first notes that three investigators and/or mitigation experts provided services to petitioner prior to his trial. Dr. Ann Charvat, with the Capital Case Resource Center of Tennessee, prepared a thorough mitigation assessment, which is included in the post-conviction record. Contrary to the affidavit of petitioner's mother, which states that nobody from the defense team ever contacted her, Dr. Charvat's report contains a summary of her interview with petitioner's mother. Dr. Charvat also conducted extensive interviews with petitioner and his sister, Sheryl Abrogast, and prepared a lengthy social history. Finally Dr. Charvat provided guidance regarding the existence of certain potential witnesses and the manner in which defense counsel should prepare for a capital murder trial. Petitioner did not provide the Court with any information regarding whether Dr. Charvat provided additional services. However, according to Glori Shettles' report, which will be discussed below, petitioner, Abrogast, and Shettles all reviewed copies of Dr. Charvat's initial mitigation assessment. Indeed, Shettles noted that petitioner and Abrogast even "corrected" the assessment and petitioner subsequently forwarded the amended version to Shettles.

In addition to utilizing the services of Dr. Charvat, trial counsel also employed mitigation specialist Glori Shettles. The post-conviction record includes one of Shettles' reports, which was mentioned above, and that report provides a great deal of useful information. It also notes that "[c]orrespondence has been forwarded to Jon's family for the purpose of separate interviews and additional background information." Because petitioner did not call Shettles as a witness or provide the Court with copies of any additional reports prepared by her, the Court has no way of knowing which potential witnesses she did or did not interview and/or unsuccessfully attempt to locate. Multiple post-conviction witnesses testified that Shettles communicated with them prior to petitioner's trial. Therefore, it is clear that Shettles did not merely draft this initial report and then

28

abandon petitioner.[25]

Finally, the Court examined the trial record and discovered multiple orders granting funds for private investigator Tammy Askew. There is a dearth of information in the post-conviction record regarding the extent to which her reports were or were not helpful in preparing for petitioner's trial. However, the Court is confident that the trial court would not have continued to grant additional funds unless trial counsel established that Askew was in fact conducting the investigation for which she was hired.

Although petitioner provided little information regarding the extent of these investigations and did not provide the Court with testimony or documentation from Dr. Zager regarding which reports she had access to at the time of her evaluation, trial counsel testified that they provided Dr. Zager with all relevant investigative materials and reports, and the Court accredits that testimony. Dr. Zager noted during her trial testimony that she had reviewed, among other things, "reports of interviews that were conducted with people who knew [petitioner]." Moreover, according to a letter which was made an exhibit during the post-conviction hearing, Dr. Zager requested additional information from one of petitioner's pretrial attorneys after conducting her initial interview with petitioner. In the Court's opinion, this letter reflects that Dr. Zager, who was characterized during the post-conviction hearing as a very experienced defense witness in capital murder cases, understood the importance of having access to all relevant information and would not have expressed her expert opinion in the absence of such information. Given these circumstances, the Court finds that petitioner has failed to prove by clear and convincing evidence that trial counsel conducted an inadequate investigation or that they failed to provide Dr. Zager with sufficient information.

In a related issue, petitioner appears to argue that trial counsel did not secure the services of the appropriate type of mental health expert and/or that Dr. Zager did not accurately diagnose petitioner. In one of her reports, Glori Shettles expressed her opinion that petitioner might suffer from Intermittent Explosive Disorder (IED). Sheryl Abrogast, petitioner's sister, testified that she and Shettles spoke about this issue and that she agreed with Shettles' assessment.

---

[25]In support of a motion for a continuance of the trial, defense counsel submitted affidavits drafted by Glori Shettles, mitigation specialist Tammy Askew, and their jury consultant. In her affidavit, Shettles stated, "Jon Hall's family members have been interviewed, with the exception of a brother." Shettles also noted that she intended to conduct additional interviews of "collateral persons and former employers." Finally, she discussed various documents and records which had been sought and/or received by the defense. This affidavit is on page 160 of the technical record of petitioner's trial. In an affidavit on page 159 of that same record, defense investigator Tammy Askew also discusses the progress of her investigation.

29

Petitioner has failed to establish that counsel did not provide Dr. Zager with the report in which Shettles expressed this opinion, so the Court will assume that Dr. Zager did in fact have access to it. With all due respect to Shettles, whom the Court recognizes to be a respected mitigation expert in Tennessee, a clinical psychologist is not bound by the opinion of an investigator regardless of the extent of that investigator's education and experience. Likewise, a psychologist is not bound by the opinion of an accused's sister.

Moreover, contrary to what petitioner appears to believe, the question in this case is not whether Dr. Zager expressed the "wrong" opinion and different experts – such as Dr. Caruso and Dr. Auble – would have expressed the "right" opinion. Instead, the question is whether petitioner's trial attorneys were ineffective for employing Dr. Zager as opposed to another expert and/or inadequately informing her regarding the relevant social and factual aspects of this case.

Petitioner failed to present any proof that defense counsel did not adequately investigate Dr. Zager's education or experience before requesting her services or that Dr. Zager was in fact lacking in adequate education or experience.[26] Trial counsel believed Dr. Zager to be an experienced and respected defense expert, and petitioner offered no evidence to the contrary. Moreover, assuming that trial counsel did not provide Dr. Zager with all of the relevant background information as petitioner contends, petitioner failed to call Dr. Zager as a witness during the post-conviction hearing and, therefore, did not establish that she would have rendered a different opinion if she had been provided with this "new" information at the time of her evaluation.

Petitioner suggests that trial counsel should have employed a psychiatrist as opposed to a psychologist. The Court finds several problems with this assertion. First, if Dr. Zager believed that petitioner had IED and that a serotonin test would be useful in confirming that theory, she could have informed trial counsel that she did not have the authority to order such a test or that she believed a psychiatrist would be more qualified to conduct further evaluations of petitioner. See State v. Huskey, 964 S.W.2d 892, 898-99 (Tenn. 1998) (allowing multiple examinations at the request of an expert witness under certain circumstances). She did not do so and petitioner has not established that she would have done so if she had been provided with additional information.

Additionally, the Court notes that the MTMHI forensic team, which included a psychiatrist,

---

[26]As previously noted, it appears that Dr. Zager was retained by the defense prior to the appointment of Mayo and Ford.

30

993

evaluated petitioner for a month and did not diagnose him with IED.[27] Given the fact that petitioner had been evaluated by a very qualified psychiatrist, he has failed to establish that the trial court would have granted additional funds for a second psychiatrist. Although this Court did not preside over petitioner's trial, if it had it would have concluded that petitioner failed to establish a particularized need for a second psychiatrist. A defendant is certainly entitled to an adequate defense, but he is not entitled to "shop" for an expert who will provide a particular opinion. Moreover, given the fact that neither MTMHI's psychiatrist nor Dr. Kimberly Stalford, the State's post-conviction psychiatrist, diagnosed petitioner with IED, petitioner has not demonstrated that it was Dr. Zager's status as a psychologist which caused her to reject the IED theory.

Although petitioner presented the testimony of Dr. Auble and Dr. Caruso in support of his theory that he suffered from IED, the Court again notes that he is not entitled to relief merely because he found two experts who agree with his theory. Moreover, Dr. Caruso's testimony regarding serotonin was based in part upon studies whose significance was disputed by Dr. Stalford and, more importantly, did not exist at the time of petitioner's trial. Clearly, neither trial counsel nor Dr. Zager can be held accountable for being unaware of studies which did not exist. Further, in the Court's opinion the State effectively impeached both Dr. Auble and Dr. Caruso through cross-examination as well as through the testimony of its own expert witness. Additionally, Dr. Auble and Dr. Caruso testified regarding many less-than-flattering facts about petitioner and the circumstances of the victim's murder that were not brought out during petitioner's trial, so their testimony was clearly a double-edged sword. Given these circumstances, the Court believes that Dr. Zager's testimony was much more helpful to petitioner than the testimony which petitioner now contends his attorneys should have presented.

Petitioner also makes much of the fact that the victim treated him poorly both physically and emotionally at times, and appears to contend that this fact was relevant to the issues of passion and provocation. Having reviewed the investigative reports and the post-conviction testimony, the Court is convinced that counsel were aware of the relevant facts and made a tactical decision not to attack the victim at trial. Petitioner forced his way into the victim's home, attacked her as her children

---

[27]During his testimony during the penalty phase of petitioner's trial, Dr. Joe Mount, who is a psychological examiner at Riverbend Maximum Security Institution, testified regarding a diagnosis made by "the psychiatrist and the mental health treatment team". That diagnosis did not include Intermittent Explosive Disorder. However, it is not clear if this "treatment team" is the same team that evaluated petitioner at MTMHI or a separate team employed by Riverbend.

31

994

Case 1:05-cv-01199-JDB-egb   Document 144-7   Filed 02/04/14   Page 89 of 153
PageID 2854


watched in horror, told the children that he would kill their mother if they called for help, chased her
after she escaped, dragged her down the walkway to the children's swimming pool as she grasped
at the grass, struggled, and screamed in an unsuccessful attempt to save herself, and held her under
the water in the children's swimming pool. The Court finds it extremely doubtful that the jury would
have looked favorably upon any theory which included an attack on the character of the victim.[28]

Moreover, assuming counsel somehow could have obviated the emotional impact this theory
would have on the jurors, the Court is not convinced that it would have had much legal significance.
It is true that the psychological impact these facts and incidents had on petitioner may have been
useful in furthering the defense's theory that petitioner was emotionally distraught and acting in a
state of passion, this aspect of the defense's theory was adequately communicated to the jury through
the testimony of Dr. Zager and Randy Helms. Additionally, any allegations of previous acts of
violence toward petitioner by the victim would not have assisted counsel in establishing that the
victim was the initial aggressor or that petitioner was guilty of voluntary manslaughter as opposed
to first degree murder. While trial counsel attempted to establish that petitioner acted in a state of
passion in an effort to negate the elements of premeditation and deliberation, they did not argue that
that passion was "produced by adequate provocation" as required for voluntary manslaughter.[29] This
was a wise decision. There is no proof whatsoever that the victim provoked petitioner at the time
of her murder, and any attempt to argue to the contrary would have resulted in the immediate and
irrevocable alienation of the jurors.

The Court also notes that the State possessed a great deal of negative information about
petitioner which, to the surprise of defense counsel, it chose not to introduce into evidence during

---

[28]Petitioner also has not established that he would have permitted his attorneys to present a defense
which reflected poorly on the victim. Debbie Davis, petitioner's sister, testified during the post-conviction
hearing that petitioner becomes angry when she speaks negatively about the victim. Because it is likely that
petitioner possessed even stronger feelings on that issue at the time of trial, which was much closer to the
time of the victim's death, it is doubtful that he would have approved of a trial tactic which cast her in a
negative light.

[29]During the post-conviction hearing, various references were made to voluntary manslaughter.
However, the trial record reflects that defense counsel did not mention that offense to the jury during their
opening statement or closing argument. Moreover, defense counsel agreed with the trial court's assessment
that the jury should only be instructed on first and second degree murder. Although the court ultimately
instructed the jury on voluntary manslaughter, defense counsel did not focus upon that offense at trial.
Instead, despite counsel's references to voluntary manslaughter during the post-conviction hearing, which
occurred many years after the trial, the trial record clearly reflects that defense counsel utilized intoxication
and mental health issues in an effort to negate the elements of first degree murder as opposed to attempting
to prove that passion and provocation had been established for the purpose of a voluntary manslaughter
verdict. In the Court's opinion, counsel pursued the best theory under the circumstances.

32

petitioner's trial. Although some of these incidents were discussed at the post-conviction hearing, the defense investigators' reports from the trial also contain information concerning many negative aspects of petitioner's social history, including violent acts toward the victim. If trial counsel had attempted to portray petitioner as the victim and the victim as the aggressor, thereby opening the door to evidence which proved otherwise, the Court has no doubt that the State would have taken the opportunity to reveal many facts which would have harmed petitioner much more than presenting the proposed evidence concerning the victim's past behavior would have benefitted him.

Petitioner also argues that trial counsel were ineffective for failing to interview his brother, Jeff Hall, and preserve his testimony for trial. Hall, who spoke to petitioner prior to the victim's murder, suffered from AIDS and passed away prior to petitioner's trial. This issue is somewhat difficult to address because petitioner failed to call his pretrial attorneys as witnesses during the post-conviction hearing. By failing to give the attorneys an opportunity to explain their reasons for failing to interview Hall, if they did in fact fail to do so, the Court believes that petitioner has failed to meet his burden of proving this claim by clear and convincing evidence. Nevertheless, the Court will attempt to address the merits of the claim.

Given the absence of adequate information in the record, it is difficult for the Court to determine if petitioner's pretrial attorneys were ineffective for failing to interview Hall and preserve his testimony. Although pretrial counsel did not testify at the post-conviction, there can be no real dispute that they were aware of Hall's existence. Indeed, in her cost estimate, which is included in her initial mitigation assessment, Dr. Charvat lists Hall as someone who should be interviewed by the defense. The assessment also includes the fact that Hall was dying from AIDS. According to the memorandum included in the assessment, Dr. Charvat forwarded the entire assessment to Steve Spracher, who was one of petitioner's pretrial attorneys.

In his affidavit, which he drafted prior to his death, Hall notes that neither George Googe, who was one of petitioner's pretrial attorneys, nor petitioner's previous attorneys contacted him. Notably, the affidavit does assert that he was never contacted by a defense investigator.[30] Regardless of whether an investigator interviewed Hall, though, the Court tends to agree with petitioner that his

---

[30]Based upon the Court's review of the relevant pleadings, it appears that investigators Askew and Shettles were appointed to this case following Jeff Hall's death. Dr. Charvat forwarded her memorandum to defense counsel prior to Hall's death. It is not clear if any other investigators were employed by the attorneys who represented petitioner prior to the appointment of Clayton Mayo and Jesse Ford.

33

996

attorneys should have preserved Hall's testimony out of an abundance of caution even if they were unsure whether it would ultimately prove to be relevant to their theory of the case.

Assuming counsel were ineffective for failing to preserve Hall's observations, petitioner has failed to demonstrate prejudice. In his affidavit, Hall states that petitioner was very depressed during his visit to Hall's home approximately one month prior to the victim's death. Nowhere in the affidavit does Hall state that he spoke with petitioner on the day of the victim's murder, as Abrogast testified during her offer of proof at trial. Assuming arguendo that Hall did in fact speak with petitioner on the day of the victim's murder and that petitioner was distraught as Abrogast alleged, it appears that this is information which may have assisted the jury in understanding petitioner's mental state.

Because petitioner did not call petitioner's pretrial attorneys as witnesses during the post-conviction hearing, the Court has no way of knowing if there was a tactical reason to withhold this information from the jury. According to petitioner's post-conviction testimony, TBI Agent Brian Byrd took Jeff Hall's statement following petitioner's arrest at Jeff's home. The record reflects that the State had an "open file" policy in this case, so the Court is convinced that trial counsel had access to this statement. Because Jeff was aware of both negative and positive aspects of petitioner's past behavior, it is entirely possible that petitioner's attorneys read Jeff's statement and decided that the potential usefulness of his testimony was greatly outweighed by the harm the State could cause during cross-examination.

Assuming counsel did not have a sound strategic reason for failing to preserve Hall's testimony, it does not follow that petitioner is entitled to relief. Given the fact that the defense established petitioner's mental state through both Dr. Zager and Randy Helms, the additional detail Hall's testimony would have provided on this issue was not so significant that any alleged prejudice resulting from its absence rose to the level required to obtain relief on an ineffective counsel claim.

In addition to challenging the effectiveness of his pretrial attorneys on this issue, petitioner appeared to suggest during the post-conviction hearing that his trial attorneys, who were appointed after Hall's death, were ineffective for failing to make the argument that Hall's information constituted a dying declaration which was admissible through Abrogast pursuant to Tenn. R. Evid. 804(b)(2). The Court disagrees. The Court does not dispute that Hall was an unavailable witness under Tenn. R. Evid. 804(a)(4). However, a dying declaration under Rule 804 does not encompass

34

every statement made by a person who has died, even if the Court accepts petitioner's argument that his brother's death was imminent when he made the statements at issue. The rule itself sets forth its very narrow scope: "In a prosecution for homicide, a statement made by the victim while believing that the declarant's death was imminent and *concerning the cause or circumstances of what the declarant believed to be impending death.*" See Tenn. R. Evid. 804(b)(2) (emphasis added). As the supreme court concluded during petitioner's direct appeal, his brother's statements clearly do not fall within this hearsay exception. See Hall, 8 S.W.3d at 603. Therefore, trial counsel were not ineffective for failing to argue to the contrary.

Petitioner also complains that his trial should not have been conducted in Madison County because the victim's murder did not occur there. Any allegation that the trial court erred by granting a change of venue has been waived by petitioner's failure to raise it on direct appeal. See House v. State, 911 S.W.2d 705, 714 (Tenn. 1995) ("Waiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney"). The Court likewise finds any complaints about petitioner's attorneys' actions to be without merit.

Petitioner's attorneys filed a motion to change venue from Henderson County to Madison County due to extensive publicity. Although the Court was unable to locate this motion in the trial's technical record, during a November 8, 1995, motion hearing, Carthel Smith and Mike Mosier, who were petitioner's attorneys at that time, argued the venue motion, which Mosier indicated was "Defense Motion Number 15."[31] Although neither of these attorneys testified during the post-conviction hearing and, therefore, were not given the opportunity to explain whether they filed the motion at petitioner's request, the Court notes that at no point during Mosier's argument did petitioner indicate that the issue was being raised over his objection. Moreover, although it is not clear if the motion was ever filed in the clerk's office, the State presented this Court with a *pro se* motion for a change of venue which was signed by petitioner and notarized on May 2, 1995. On that same date, petitioner filed a pleading entitled, "Withdrawl (sic) of Counsel - Replacement by Court", which can be found on page 21 of the technical record. In that pleading, petitioner expresses his dissatisfaction with George Googe's representation. Among the complaints is an allegation that Googe failed to file a motion for a change of venue despite petitioner's request that he do so. Under

---

[31]The transcript of this hearing was admitted as Exhibit 21during the post-conviction proceedings.

35

998

these circumstances, petitioner has not convinced the Court that his attorneys filed the venue motion against his wishes. In any event, the trial court denied Mosier's motion but stated that it might reconsider its ruling at a later date.

On September 12, 1996, Jesse Ford, one of petitioner's trial attorneys, filed a motion renewing the motion for a change of venue. On September 23, 1996, the trial court issued an order granting the motion and setting the case for trial in Madison County.[32] Ford testified that he filed the motion with petitioner's permission after discussing the issue with petitioner "at length". Although petitioner's testimony contradicted Ford's on this issue, the Court accredits Ford's testimony.

With regard to petitioner's change of heart on this issue, Ford testified that, consistent with his habit of changing his mind depending on his mood, petitioner decided "right before the trial" that he did not want to be tried in Madison County. Because the trial court granted the change of venue at petitioner's request and Ford's experience led him to believe that the court would not grant a last-minute request to return the trial to Henderson County, he apparently did not convey petitioner's concerns to the trial court. Extensive preparation is necessary to prepare for jury selection in a capital case and the trial court's staff had proceeded under the assumption that jury selection would be conducted in Madison County, so counsel is probably correct that any efforts to withdraw the motion would have been futile.

Assuming that counsel had an obligation to present the request regardless of his belief regarding the likelihood of its success, petitioner has failed to establish that he suffered prejudice as a result of counsel's inaction. In other words, if the trial court would have denied the request, petitioner was not harmed by counsel's failure to make it. On February 3, 1997, petitioner asked the trial court "why we're holding this hearing in Madison County when I was charged in Lexington." The trial court informed petitioner that it granted a change of venue due to publicity and that the court was overruling the motion petitioner appeared to be making on the issue of venue. Given the fact that the trial court did in fact deny a request that the trial be moved back to Henderson County, petitioner has not proven that his attorneys caused him prejudice by failing to make that request.

Petitioner next claims that his trial attorneys were ineffective for failing to follow up on a

---

[32]The motion and order are both included in the trial's technical record.

36

report concerning alleged juror misconduct. Two of petitioner's siblings testified that, during a break in the trial proceedings, they saw a juror hugging a member of the victim's family and that they conveyed this fact to petitioner's attorneys. Because the siblings were excluded from the courtroom prior to their testimony, they did not know if petitioner's attorneys brought the matter to the trial court's attention. This Court examined the trial record and found no reference to this alleged incident.

With all due respect, the Court does not find petitioner's siblings' allegations to be credible. The jury in this case was sequestered, as are all juries in capital murder trials. See Tenn. Code Ann. § 40-18-116 (Supp. 2002). Given this fact, the Court finds it extremely unlikely that jurors were wandering the halls during the trial. Neither the alleged juror nor the victim's family member(s) at issue testified regarding this matter during the post-conviction hearing and, to the best of the Court's recollection, post-conviction counsel did not question petitioner's trial counsel about it. Under these circumstances, petitioner has not proven by clear and convincing evidence that the alleged incident occurred.

Petitioner next argues that trial counsel were ineffective for failing to request that all opening statements and closing arguments be transcribed for purposes of the direct appeal and any future proceedings. As a general rule, appellate courts only wish to see those portions of the record which are relevant to the issues raised on appeal. Because none of the direct appeal issues in this case dealt with opening statements or closing arguments, the Court finds that counsel were not ineffective for failing to have those portions of the record transcribed. While the Court is cognizant of the fact that courts in future proceedings may wish to view various transcripts which were not at issue during the direct appeal, petitioner's post-conviction attorneys have established that those courts can secure a copy of all relevant transcripts by simply making a request. In this case, petitioner's counsel requested that the court reporter transcribe the opening statements and closing arguments for post-conviction review, and she did so. Under these circumstances, petitioner has not established that his trial attorneys were ineffective or that he has suffered any prejudice as a result of their actions.

Finally, during the post-conviction hearing, petitioner mentioned the fact that his attorney waived his preliminary hearing on a kidnapping charge. Although the Court does not believe that petitioner's attorney behaved inappropriately, the Court notes that petitioner was not tried for kidnapping and that he was granted a preliminary hearing on the murder charge. Therefore, he has

37

1000

not established that he suffered prejudice as a result of counsel's alleged ineffectiveness.[33]

## C. Penalty Phase Of The Trial

During the penalty phase of the trial, petitioner's attorneys presented the testimony of both lay and expert witnesses. Petitioner now takes issue with what counsel failed to present. As the Court previously noted, petitioner was not clear during the post-conviction hearing regarding which witnesses should have been presented during the guilt phase of the trial and which should have been presented during the penalty phase. Therefore, the Court can do nothing more than attempt to address the issues in the manner the Court believes they were being raised.

Dr. Lynn Zager, who testified on petitioner's behalf during the guilt phase of the trial, also offered testimony during the penalty phase. Dr. Zager reiterated her previous testimony that petitioner had been depressed and suicidal, that he was an alcoholic, and that he had significant stressors in his life at the time of the victim's death, including the fact that he and the victim had been having domestic problems for "quite some time". In addition, Dr. Zager testified that petitioner's father and grandfather both had alcohol problems, that petitioner "did not have much of a relationship with his father" because petitioner's father did not believe petitioner was his son, that petitioner was close with his mother, that petitioner's parents had an abusive relationship, and that all of these factors had an impact on petitioner's development. Dr. Zager explained, "[C]hildren grow up and you expect that the household is going to be a place where you have love and security. That's not something this man grew up with. There was conflict, and he didn't have very good role models in terms of how to deal with relationships or how to deal with conflict."

Dr. Zager expressed her opinion that petitioner felt remorse for what he had done, and that he was very sad and cried every time she met with him. With regard to petitioner's feelings toward his children, Dr. Zager stated, "They meant everything to him, all four of the children. He was the primary caretaker for the younger children for I think approximately two years. And, you know, given his history in terms of the family, I think he was very protective of the children." As to

---

[33]On page 19 of the amended petition, petitioner states, "Counsel failed to properly file motions to preserve the testimony produced at the preliminary hearing. Had they done so, valuable impeachment testimony would have been preserved for future use." Although petitioner did not present any testimony regarding this issue during the post-conviction hearing, the Court notes that a transcript of the preliminary hearing appears to exist. Indeed, petitioner attached a copy of what appears to be the transcript to one of the many *pro se* motions he filed prior to his trial. The transcript can be found on page 85 of the technical record from the trial.

38

petitioner's special relationship with his daughter who suffered from cerebral palsy, Dr. Zager noted that "he loved her, cared for her and misses the relationship he had with her."

Dr. Joe Mount, a psychological examiner at Riverbend Maximum Security Institution, also testified on petitioner's behalf. Dr. Mount testified that petitioner was depressed, distraught, and, at times, suicidal over his wife's death. Moreover, petitioner often cried and expressed "extreme remorse" for his actions.[34] According to Dr. Mount, a psychiatrist diagnosed petitioner with "substance abuse of dependence by history" as well as with an adjustment disorder with mixed emotional features, which included depression and anxiety. As a result of petitioner's mental health issues, he was prescribed Memphromene, which is an anti-depressant, and Dr. Mount believed that petitioner's condition began to improve over time.

With regard to petitioner's feelings toward his children, Dr. Mount stated that petitioner was "[e]xtremely concerned about his children, not being able to see them. In my opinion I think he cared a great deal about his children." He also recalled petitioner being particularly concerned about a daughter who had special needs.

Randy Helms, who testified during the guilt phase of the trial, also offered penalty phase testimony. Helms, who formerly employed petitioner, spoke about petitioner's good work habits.[35] He also expressed his opinion that petitioner "took excellent care" of his children. Finally, Helms stated:

> I talked to Jon quite a bit when he and Billie were having family problems, and I talked to Billie quite a bit. And I liked Billie and I thought a lot of her, and I considered her a friend just like I do Jon. Jon loved his wife and kids. I mean, he told me that time and time again. His wife and his kids were his life. He sat there and told me how much he cared and how much he loved his family and how much it meant to him and all on there, and, I mean, you don't make that up. He was telling

_____

[34]In contrast to Dr. Mount's testimony, the trial court observed in its Rule 12 report, which is included in the trial's technical record, that petitioner "showed little of (sic) any remorse during [the] entire proceeding." Consistent with the poor attitude petitioner apparently displayed during the trial, the Court notes that the trial and post-conviction records are replete with examples of the difficulties both judges and petitioner's numerous attorneys have had in their dealings with him. While the Court can certainly understand that petitioner is concerned about his fate, that does not change the fact that he is a very opinionated person who is extremely difficult to satisfy and often reacts to situations without considering the ramifications of his actions. During one of his multiple outbursts during his trial, petitioner exclaimed during the State's closing argument that "[t]his is all a bunch of bullshit." It is unlikely that petitioner's behavior at trial, which trial counsel characterized as "very bad, very scary", endeared him to the jurors.

[35]Helms also testified that petitioner voluntarily left his employment because his personal problems were interfering with his ability to do his job properly. He indicated that petitioner was "man enough to quit". This testimony is contrary to Dr. Charvat's notes of her interview with petitioner, in which she stated, "Randy Helms, who had fired him right before Father's Day, helped Jon get [a new job]." Dr. Charvat's assessment is Exhibit 8 to the post-conviction hearing and this information is from the 7/5/1994 notation in her summary of her interview with petitioner.

39

me the truth when he told me that. His hopes in life and all was they could work out whatever their problems were and hopefully go on and make a good life and raise these kids, you know. It just didn't turn out that way.

Debbie Davis, petitioner's older sister, also testified on petitioner's behalf. According to

Davis, petitioner was exposed to a great deal of violence between his parents when he was a child.

Davis explained that the children often worried that one of their parents would kill the other, and that

the children hid bullets and sharp objects to prevent their parents from using them as weapons.

Davis discussed one incident in great detail:

> There was one particular fight that was very bad. I don't know what started it. I never knew what started most of them. But my father came in, and I guess he hit me, and I told him that – He was using very bad language, and I had come from living with my grandparents who were rather religious, and he was using very bad language, and I said, 'Dad, God's not going to like you for this.' So he hauled off and hit me, and then my mother jumped in and said, 'Don't lay your hands on the kids,' and then they were off and running, and they just started hitting. He started hitting Mom, and he took her hair and he was pounding her head on the floor, and I remember there were big handfuls of hair on the floor and blood coming out of her nose and out of her ears, and it splashed on the cupboards and on the floor. And we had tried to go and get help, even tried calling the police, but the police wouldn't come back then because they said they couldn't get involved in domestic problems, that they couldn't come unless an actual crime was committed. So later someone else – I think Mom was screaming and someone tried to call for help, and they tore the phones off the wall so that we couldn't call out. But I think whoever we were talking to heard us and called my Uncle Wes who was part of the sheriff's department and went and got help and sent help over and got word to us that the constable was on his way. And Jon was just a little boy. He was the youngest one in the family. And he had a little fly swatter, and he was hitting Daddy and trying to tell Daddy to let Mom alone and get away from her. And after he did that, then the constable came and they got Dad, and I remember, this is so bizarre, my sister and I, I think, I don't even remember who, maybe my brother, Jay, were trying to clean the blood up because we didn't want Dad to get in trouble. Even though we didn't like what he was doing, we loved them both, but we didn't want them to be in too much trouble.

With regard to petitioner's relationship with his father, Davis testified that petitioner's father

did not believe petitioner was his child and often treated him cruelly as a result. She also explained

that her mother remarried following their father's death, and that their stepfather was "abusive and

very mean to [petitioner]." In an effort to help petitioner escape from this situation and expose him

to positive role models, Davis subsequently invited him to live with her and her new husband in

North Carolina. Although petitioner only lived with her for approximately one year, Davis stated

that he "was a wonderful person at home, very helpful. He would help anybody do anything."

Davis also explained that she was very excited when petitioner met the victim and that

petitioner "really loved the two little girls that [the victim] already had." When asked if petitioner

talked about the children, Davis stated:

40

1003

Yes, how wonderful they were. He would bring them over to the house. Even in the
wedding, I believe it was Jennie, wanted to be with Jon and wouldn't even let them
walk down the aisle. She just kept going, 'My Jon. My Jon. My Jon.' He just
adored the children. He was always with them. He used to bring them over to my
house for dinner. The first house when Jon came down, I had a swimming pool, and
they liked to come over and go swimming at my house, and then we moved and there
was a little playground right beside my house, and they would come and play in the
playground all the time. Billie was going at that time to school, so she wasn't home
a lot.

When asked if petitioner took good care of the children, Davis described petitioner's special

relationship with his daughter who had cerebral palsy and also noted:

He was a wonderful daddy. He was just absolutely wonderful. He didn't always
dress them appropriately because you could tell he was one of those proud dads that
would bring their little girls over and put the pretty little dress on with the little patent
leather shoes and the little socks because he wanted them to look pretty, but you'd
be like, 'Jon, why don't you put some pants on or some sweat pants. Let them go out
and just have fun.' But he was just so proud of them and always – He was a
wonderful dad. He played with all of them. Even though he had two children of his
own with Billie, the other two I don't think would have ever felt like they didn't also.
He loved them equally. He loved them all.

Kathy Hugo and Sheryl Abrogast, two of petitioner's other sisters, also testified on his behalf.

Both reiterated that there were verbal threats and physical violence between their parents, including

the particular incident recounted by Davis. Hugo also stated that her father treated the boys in the

family poorly and was particularly hard on petitioner. Their stepfather, who had drug and alcohol

problems, was also abusive toward their mother, and the children never felt as if he liked them.

Finally, petitioner's mother, Carol Alexander, testified. According to Alexander, petitioner's

father drank heavily, was physically abusive, and pulled telephones out of the wall. She noted that

the children sometimes called 911 at her request during violent incidents. With regard to petitioner's

relationship with his children, two of which were not his biological children, Alexander testified,

"He took care of them the whole time they were [at the family reunion]. Jessie was – Well, she had

cerebral palsy, and she had breathing problems, and he had a breathing machine that he would give

her these breathing treatments . . . [a]nd he changed her diapers . . . ." When asked if petitioner loved

his children, Alexander responded, "Yes, he did. It always surprised me that all my boys took such

good care of their kids when their father never changed a diaper or fed one of them a bottle or ever

picked them up and held them. He was always going to do something with them when they got to

be teenagers."

In addition to these penalty-phase witnesses, Chris Dutton conveyed some relevant mitigation

information during the guilt phase of the trial. During cross-examination by defense counsel, Dutton

41

1004

agreed that petitioner was "extremely depressed about his family situation", that he had attempted to repair the victim's car days prior to this incident, that he was concerned about his children, and that he was especially concerned about his daughter who suffered from cerebral palsy. Likewise, during his examination of Agent Byrd during the guilt phase of the trial, defense counsel elicited the fact that petitioner was remorseful for causing his wife's death.

In Goad v. State, 938 S.W.2d 363 (Tenn. 1996), the supreme court delineated the manner in which courts should analyze a claim that trial counsel failed to present appropriate mitigating evidence during the penalty phase of a capital murder trial. For petitioner's claim to succeed, this Court must first find that trial counsel's "failure to investigate, explore, and prepare" the proposed mitigating evidence was not "the result of reasonable professional judgment" and "fell outside the wide range of professionally competent assistance." Id. at 371. If the Court so finds, it must then evaluate "the nature and extent of the mitigating evidence that was available but not presented," determine "whether substantially similar mitigating evidence was presented", and consider whether "there was such strong evidence of [an] aggravating factor[] that the mitigation evidence would not have affected the jury's determination." Id.

At the conclusion of the penalty phase of the trial, the jury found that the victim's "murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." See Tenn. Code Ann. § 39-13-204(i)(5) (Supp. 2002). To say that the evidence of physical and mental torture in this case was overwhelming would be an understatement.

As discussed above, trial counsel called seven witnesses on petitioner's behalf during the penalty phase of the trial. For the same reasons the Court expressed during its guilt-phase analysis, the Court finds that petitioner has failed to establish that trial counsel were ineffective in conducting their investigation, selecting Dr. Zager as their expert witness, preparing her for trial, or presenting her testimony. Additionally, contrary to petitioner's memorandum, the Court disagrees that counsel focused exclusively upon the negative aspects of petitioner's life and neglected to present proof which portrayed petitioner as "human as opposed to [an] animal". In the Court's opinion, through both their proof and their closing arguments, counsel portrayed petitioner in the most positive light possible under the circumstances.

Moreover, the post-conviction testimony that petitioner loved his wife and children, had no

42

positive role models during his formative years, was raised in a violent and abusive environment, and felt remorse for causing the death of his wife was virtually identical to the testimony offered at trial.[36] Petitioner makes much of the fact that his sisters' testimony was more lengthy during the post-conviction hearing than during the penalty phase of the trial. Although this is an accurate assessment, it has no bearing on the merits of his ineffective counsel claim. The Court first notes that the post-conviction testimony includes not only penalty-phase type proof, but a great deal of guilt-phase information which the Court has now concluded was irrelevant. More importantly, although the Court recognizes that Debbie Davis' trial testimony was more lengthy than that of her siblings and mother, more is not always better. In other words, although trial counsel presented the testimony of multiple family members in an attempt to establish certain facts and to demonstrate that petitioner was supported by a family which loved him enough to testify on his behalf despite the fact that he had committed a horrific crime, there was no reason for each family member to repeat the testimony of the other family members as they did during the post-conviction hearing. For instance, Davis testified at length at trial concerning a violent incident during which petitioner attempted to rescue his mother by hitting his father with a fly swatter. If counsel had asked each family member to recount the same incident, it would have added nothing to the defense and likely would have frustrated the jurors, who undoubtedly understood the incident the first time it was explained to them. The Court does not fault trial counsel for presenting the relevant testimony in a thorough and effective, but not unreasonably lengthy, manner.[37]

In addition to presenting the post-conviction testimony of his siblings, petitioner submitted affidavits from his mother, sister-in-law, and brother. Each affidavit states, "No one representing Jon ever contacted me." Based upon the Court's thorough review of the record, including Dr. Charvat's summary of her interview with petitioner's mother, Glori Shettles' statement in her initial

---

[36]During the post-conviction hearing, witnesses testified that petitioner did not realize he had killed the victim until after he was arrested in Texas, and that he was shocked by the news. The Court does not know if petitioner believed that fact to be relevant to the guilt phase or penalty phase of the trial, and the Court does not find it particularly relevant to either phase. In any event, the Court finds it very difficult to believe that petitioner, who inflicted eight-three separate wounds on the victim, held her under the water, and left her lifeless body in the children's swimming pool, was surprised to hear that she had perished. The jury likely would have found it equally difficult to believe.

[37]After hearing the post-conviction testimony, the Court was left with the impression that petitioner and the majority of his family members were not particularly close prior to the victim's murder, that they did not speak to or see each other as often as one would expect, and that they at times lacked a sufficient basis of knowledge for their opinions. The Court was not left with this same impression after reading the transcripts of the trial testimony. For this reason as well as the others discussed by the Court, the more lengthy testimony proposed at the post-conviction hearing was less persuasive than the trial testimony.

43

report that she sent letters to all members of petitioner's family for the purpose of arranging interviews, Glori Shettles' previously-discussed affidavit which indicates that she interviewed all of petitioner's siblings except one brother, and the testimony of Sheryl Abrogast and Debbie Davis that they were contacted by a defense investigator, the Court finds it likely that these potential witnesses were contacted by a defense investigator at some point and that their affidavits are referring to the fact that they did not personally speak with one of petitioner's attorneys. In any event, petitioner's mother testified at trial and the relevant penalty-phase information included in each of the three affidavits was conveyed to the jurors during the trial. Any additional testimony regarding those facts was cumulative and unnecessary.

Petitioner contends that trial counsel erred by failing to present any photographs or videos of himself, his wife, and their children. During its review of the technical record from petitioner's trial, the Court noticed a *pro se* motion in which petitioner requested, *inter alia*, that the trial court preclude the State from introducing any "life" photographs of the victim at trial.[38] Given that fact, the Court is not convinced that petitioner would have permitted his attorneys to introduce photographs or videos in which his wife was depicted. Assuming that petitioner would have been in favor of introducing these items and assuming further that counsel were ineffective for failing to present them, petitioner still would not be entitled to relief.

Although the Court has no way of gauging how the jurors would have reacted to this evidence, the Court viewed the video and examined the photographs, and found them to be quite disturbing given the nature of this crime. While showing a defendant enjoying the company of his wife and children shows his "human" side and might be persuasive in certain cases, the facts of this case establish that petitioner viciously attacked his wife in front of her children when she rejected his attempt at reconciliation. Further, he thwarted the children's efforts to help their mother, told them he would kill their mother if they sought help, and carried out this threat when they defied him. In the Court's opinion, seeing petitioner with his wife on their wedding day and with the children during happier times merely emphasized the tragic ramifications of his actions.

Again, the Court has had difficulty discerning which witnesses and/or portions of their testimony were presented for the purpose of offering proposed penalty-phase testimony as opposed

---

[38]This motion is entitled "Motion To Prohibit Display Of Photogrpahs (sic) Of The Deceased" and is on page 27 of the technical record.

1007

to guilt-phase testimony. In addition to the family members and expert witnesses, the witnesses who appeared to testify at least in part regarding mitigation issues were Clarence Stanfill, Joe Henry Stanfill, Valene Foreman, Paula Foreman, Pamela Foreman, Jackie Brittain, Darlene Brittain (a.k.a. Pamela Brittain), and Martin Eskew.

Although much of Eskew's testimony appeared to relate to the guilt phase of the trial, the Court notes that he described petitioner as follows: "Spoiled brat, self-absorbed, only him. Nothing else mattered." Obviously this testimony would not have benefitted petitioner.

Jackie and Darlene Brittain, with whom petitioner briefly lived after he and the victim separated, also testified at the post-conviction hearing. Although some of their testimony dealt with issues related to the guilt phase of the trial, a small portion of their testimony was arguably relevant to the penalty phase of the trial. However, as trial counsel concluded in a very reasonable strategic decision, any positive testimony they could have offered would have been greatly outweighed by the fact that the State intended to cross-examine them concerning their statements to the TBI that petitioner had threatened to hurt the victim and had expressed an interest in making "hamburger meat" out of her.

In addition to offering proposed guilt-phase testimony through the Stanfills and Foremans, petitioner offered their mitigation-type testimony that he was a nice person and a good father, and that he repaid debts when he was financially able to do so.[39] This testimony added very little to the testimony trial counsel presented during the penalty phase of petitioner's trial. Moreover, because the vast majority of these witnesses indicated that they did not know petitioner very well, the witnesses trial counsel presented were much more effective than these witnesses would have been. Finally, some of the witnesses' testimony appears to contradict petitioner's assertion that he always cared for the children when the victim was at work or school.

Various witnesses testified at the post-conviction hearing that trial counsel did not contact them prior to the trial, and the Court has referred to the fact that the defense's three investigators likely interviewed many of these witnesses. By making these comments, the Court is not suggesting

---

[39]Some of these witnesses testified that neither the police nor petitioner's trial attorneys contacted them. Petitioner's trial counsel testified that, in addition to pursuing leads which they believed might be fruitful, the defense investigators attempted to locate and interview every potential witness named by petitioner. Counsel testified that the witnesses' statements are in the defense file, but neither petitioner nor the State provided the Court with copies of these statements. The Court accredits counsel's testimony that the file contains statements made to the defense investigators by the Foremans and Stanfills.

45

that trial attorneys have no obligation to speak with potential witnesses. The Court is merely noting that a witness' statement that he or she was not contacted by anyone representing petitioner does not necessarily establish that the defense investigators did not contact that person or that the defense attorneys were unaware of his or her existence. Although trial courts provide investigators to assist trial attorneys in interviewing witnesses and narrowing the scope of potentially-relevant evidence and this process sometimes leads to a clear indication that particular witnesses can offer no helpful testimony, it is important for trial attorneys to effectively use this information and to conduct any necessary follow-up interviews. In this case, the Court is not convinced that trial counsel failed in this regard.

Without question, it would have been helpful if the parties had provided the Court with all of the investigators' reports, the investigators' time sheets indicating which witnesses they interviewed or attempted to interview, Dr. Zager's report, and the testimony of petitioner's pretrial attorneys, among other things. However, based upon the information before it, the Court is satisfied that trial counsel performed effectively and, despite the family's concerns, adequately communicated with petitioner's family through its investigators as well as through counsel's direct contact with Sheryl Abrogast, who by all accounts was the family's "spokesperson".

Although the Court is sympathetic to Abrogast's concerns that the attorneys did not speak with her as often as she would have liked, the fact remains that she was not their client, they owed no duty to her, and, as they told her, much of the information she was seeking was protected by attorney-client privilege. The Court will note, however, that if they did not do so, trial counsel should have spoken directly with the family members prior to the night before their testimony. However, because the information conveyed by the family members during the penalty phase of the trial was virtually identical to the testimony offered at the post-conviction hearing, the Court can discern no prejudice from counsel's alleged failure to speak with the family earlier concerning their proposed penalty-phase testimony. Having carefully evaluated the trial record and post-conviction record, the Court concludes without hesitation that petitioner has failed to establish that he is entitled to relief under the factors set forth in Goad.

### D. Cumulative Effect Of Errors

Although the Court attempted to address each of petitioner's complaints individually, the

46

1009

Court also examined the record as a whole and concludes that petitioner received a fair trial with the assistance of two competent attorneys whose representation was well within the permissible bounds of effective counsel. Petitioner has not proven that he suffered prejudice as a result of any of the alleged deficiencies in counsel's performance.

### ISSUES WHICH ARE PREVIOUSLY DETERMINED OR WAIVED

In Issue IV (Other Constitutional Rights Violated) of the amended petition, petitioner raises multiple issues upon which he presented no proof at the post-conviction hearings and/or which are clearly previously determined or waived pursuant to Tenn. Code Ann. §§40-30-206(g) and (h) and House v. State, 911 S.W.2d 705 (Tenn. 1995).[40]

In his first issue, petitioner challenges the sufficiency of the convicting evidence as well as the evidence presented in support of the aggravating circumstance. Sufficiency issues are not cognizable in post-conviction proceedings. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990), app. denied (Tenn. 1990). In any event, these issues were addressed by the Tennessee Supreme Court on direct appeal and, therefore, are considered previously determined for post-conviction purposes. See Hall, 8 S.W.3d 599-601.

Petitioner also argues that the jury erred by concluding that the statutory aggravating circumstance outweighed the mitigating circumstances.[41] The Tennessee Supreme Court rejected this claim during petitioner's direct appeal. Id. at 601. Therefore, it is considered previously determined for post-conviction purposes.

Petitioner next argues that the proportionality review conducted by the Tennessee Supreme Court violated his constitutional rights. Petitioner waived this issue by failing to present any proof regarding it at the post-conviction hearing and by failing to raise it on direct appeal. In any event, the supreme court has repeatedly rejected these claims. See State v. Godsey, 60 S.W.3d 759 (Tenn. 2001); State v. Stout, 46 S.W.3d 689 (Tenn. 2001); State v. Keen, 31 S.W.3d 196 (Tenn. 2000).

Petitioner asserts that death by electrocution and/or lethal injection constitutes cruel and unusual punishment. Petitioner waived his argument regarding the constitutionality of electrocution

---

[40]Although petitioner challenges the holdings in House, this Court is bound by opinions issued by the Tennessee Supreme Court.

[41]Although petitioner refers to five statutory aggravating circumstances, that is clearly a clerical error. The jurors found that the State proved one aggravating circumstance beyond a reasonable doubt in this case.

47

by failing to raise it on direct appeal and failing to present any proof at the post-conviction hearing. Moreover, although the merits of that claim have been rejected repeatedly by Tennessee's appellate courts, this Court need not address its merits because the default method of execution in Tennessee is now lethal injection as opposed to electrocution. See State v. Morris, 24 S.W.3d 788, 797 (Tenn. 2000) ("The result of the legislation is this – the defendant is no longer under a penalty of death by electrocution, but rather, death by lethal injection. The issue of whether electrocution is cruel and unusual punishment is no longer properly before the Court"). Additionally, although lethal injection was not a method of execution in Tennessee at the time of petitioner's conviction, it was a method of execution when his direct appeal was pending before the Tennessee Supreme Court. Id. at 796-97 (Noting that the statute at issue was amended in May of 1998 to include lethal injection as a method of execution in Tennessee). Therefore, petitioner waived his complaint regarding lethal injection by failing to raise it on direct appeal. He also waived it by failing to present any proof regarding it during the post-conviction proceedings.

Petitioner raises five complaints regarding the propriety of the trial court's jury instructions. Petitioner waived these issues by failing to raise them on direct appeal and also by failing to present any evidence regarding them during the post-conviction proceeding. With regard to petitioner's complaint about the unanimity instruction during the penalty phase of his trial, it appears that he raised a similar issue during his direct appeal. To the extent those arguments are consistent, petitioner's post-conviction complaint must be considered previously determined.

Petitioner waived the following issues by failing to raise them on direct appeal: (1) The conviction and death sentence are unconstitutional due to flaws in the jury-selection process as well as the jurors' exposure to extraneous and prejudicial information; and (2) The conviction and death sentence are unconstitutional for various reasons, including defects in Tennessee's murder and death penalty statutes. With regard to the latter, the Court notes that petitioner's claims have been rejected by Tennessee's appellate courts on numerous occasions. See State v. McKinney, 74 S.W.3d 291 (Tenn. 2002); State v. Stout, 46 S.W.3d 689 (Tenn. 2001); State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000); State v. Smith, 993 S.W.2d 6 (Tenn. 1999); State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998); State v. Hall, 976 S.W.2d 121 (Tenn. 1998); State v. Vann, 976 S.W.2d 93 (Tenn. 1998).

Finally, petitioner raises constitutional challenges to the heinous, atrocious, or cruel aggravating circumstance found by the jury in this case. Petitioner raised a similar issue in the Court

48

of Criminal Appeals on direct appeal. To the extent the arguments are consistent, this issue must be considered previously determined. To the extent the arguments are inconsistent, petitioner waived his new complaints by failing to raise them on direct appeal and failing to present any proof during the post-conviction proceedings.

## ISSUES UPON WHICH PETITIONER FAILED TO PRESENT PROOF

Although the Court has attempted to address the issues raised by petitioner in his petitions, he raised numerous issues upon which he failed to present any proof. The Court finds that petitioner waived those issues.[42] They include, but are not necessarily limited to, the following:[43]

### *PRO SE* PETITION

Petitioner raised numerous issues in his *pro se* post-conviction petition and appointed counsel subsequently incorporated those issues into the amended petition. Although the Court will not list each issue separately, the Court notes that it addressed the merits of all issues upon which petitioner presented proof. The remaining issues in the *pro se* petition are previously determined or are waived for one of two reasons – failure to present proof on them during the post-conviction hearing or failure to raise them on direct appeal.

In addition to filing this *pro se* petition, petitioner filed numerous other *pro se* pleadings. Because petitioner is represented by counsel, he has no right to file *pro se* pleadings and this Court has no obligation to read them. However, out of an abundance of caution the Court has considered those pleadings and finds that none of petitioner's allegations entitle him to relief.

The Court also notes that petitioner mentioned that he requested permission to represent himself during the post-conviction proceedings. The transcript of the March 22, 2001, proceedings to which petitioner was referring clearly reflects that he wished to consult with his newly-appointed counsel and did not wish to proceed *pro se* as he now states. It is unclear if a criminal defendant has an absolute right to represent himself during a post-conviction proceeding. See Cole v. State, 798 S.W.2d 261, 263-64 (Tenn. Crim. App. 1990); State v. Cole, 629 S.W.2d 915, 917 (Tenn. Crim.

---

[42]Although the Court finds that petitioner waived these issues, the Court notes that the majority of them are clearly without merit and petitioner could not have met his burden of proving them by clear and convincing evidence.

[43]The Court is listing these issues in the order in which they were raised in the petitions.

App. 1981); State v. Reeves, 610 S.W.2d 730, 731 (Tenn. Crim. App. 1980); Tipton v. State, No.

E2001-00001-CCA-R3-PC (Tenn. Crim. App. June 28, 2002), app. denied (Tenn. Dec. 23, 2002);

Panyanouvong v. State, No. M2000-03152-CCA-R3-PC (Tenn. Crim. App. Nov. 16, 2001) (Tipton,

J., concurring); Johnson v. State, No. 02C01-9111-CR-00237 (Tenn. Crim. App. March 27, 1997).

Assuming petitioner wished to proceed *pro se*, which in the Court's opinion he did not, the Court

would not have granted the request if it had the authority to deny it, and some of the relevant

authorities appear to suggest that the Court had that authority. Post-conviction proceedings are very

complicated in capital murder cases, and the Court has no doubt that petitioner was incapable of

competently presenting his issues.

### AMENDED PETITION - ISSUES UPON WHICH PETITIONER FAILED
### TO PRESENT PROOF

ISSUE I - INEFFECTIVE ASSISTANCE OF COUNSEL: (1) Counsel failed to maintain their
workload at the level acceptable to handling a capital murder trial; (2) Counsel failed to identify,
gather and examine the necessary documents, records and physical evidence including but not
limited to arrest reports, reports of forensic testing, any recorded or memorialized version of
statements made by Petitioner and others, autopsy reports, physical evidence seized by the state,
viewing the crime scene, and prior criminal records of Petitioner and other witnesses; (3) Counsel
failed to file sufficient pre-trial motions challenging the constitutionality of the sentencing provisions
of Tennessee's murder statute;[44] (4) Counsel filed inadequate pre-trial motions seeking the state's
compliance with constitutional, statutory and local discovery obligations. (5) Counsel failed to file
pre-trial motions seeking preservation of all law enforcement rough notes and a complete copy of
the District Attorney General's file, both for *in camera* inspection and later use on post-conviction;
(6) Counsel filed inadequate and untimely pretrial motions seeking . . . jury selection assistance;[45]
(7) Counsel filed inadequate pre-trial motions seeking special voir dire rules; (8) Counsel failed to
file pre-trial motions charging the prosecution with abuse of discretion in seeking the death penalty
and asserting the disproportionate application of the death penalty in Petitioner's case; (9) Counsel
failed to file pre-trial motions challenging the proportionality of the death sentence in Petitioner's
case; (10) Counsel failed to file objections challenging jury instructions and failed to file proposed
jury instructions; (11) Counsel failed to file pre-trial motions seeking the right to allocution for
petitioner; (12) Counsel failed to file pre-trial motions seeking to limit the state's proof at the
sentencing hearing to specific aggravating circumstances; (13) Counsel failed to timely subpoena
witnesses or evidence;[46] (14) Counsel failed to file pre-trial sufficient motions challenging
Petitioner's illegal arrest, detention, and interrogation in Texas, and his subsequent transfer from
Texas to Tennessee; (15) Counsel failed to file pre-trial motions challenging the constitutionality of
Tennessee's murder statute; (16) Counsel failed to file a pre-trial motion seeking a bill of particulars
pursuant to Tenn. R. Crim. P. 7(c); (17) Counsel failed to file adequate pre-trial motions seeking the

[44]Although petitioner waived this issue by failing to present any proof in support of his allegations,
the Court notes that the constitutional challenges set forth by petitioner have been rejected by Tennessee's
appellate courts on numerous occasions.

[45]Contrary to this assertion, counsel requested the services of a jury consultant and the trial court
granted that request.

[46]Petitioner did present proof that counsel erroneously failed to present the testimony of various
witnesses and the Court has addressed those concerns. However, petitioner did not present any proof that
counsel's failure to present witnesses and/or evidence was a result of a failure to subpoena them.

50

state's compliance with constitutional, statutory and local rules governing the disclosure of discovery; (18) Counsel failed to file pre-trial motions challenging the legality and constitutionality of the process by which the grand and petit juries were selected in Petitioner's case; (19) Counsel failed to file objections to the jury instructions proffered by the state and given by the court and failed to file proposed jury instructions; (20) Counsel failed to file an adequate motion for judgment of acquittal; (21) Counsel failed to file a motion seeking an order which would have required the state to elect which of two murder counts as to each deceased would go to the jury; (22) Counsel failed to file necessary post-trial motions; (23) Counsel failed to file a motion to dismiss and/or a motion to arrest the judgment on the ground that Tennessee's murder statute was unconstitutional; (24) Counsel failed to competently select the jury for the trial; (25) Counsel failed to competently argue motions at the pre-trial and post-trial motions hearings; (26) Counsel did not competently perform during opening and closing arguments during the guilt/innocence phase of the trial; (27) Counsel failed to adequately object to the state's presentation of prejudicial, misleading, false and inappropriate evidence at the guilt/innocence phase of the trial; (28) Counsel failed to adequately cross-examine the state's witnesses during the guilt/innocence phase of the trial; (29) Counsel failed to conduct post-trial juror interviews in order to develop potential issues for Petitioner's motion for a new trial; (30) Counsel failed to raise the objections necessary to preserve issues for appellate review; (31) Counsel failed to withdraw from this case; (32) Counsel held numerous hearings without fully informing Petitioner; and (32) Counsel asked for continuances against the wishes of Petitioner.

ISSUE II - INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL: This Court was not provided with copies of the briefs from petitioner's direct appeal. Moreover, to the best of the Court's recollection petitioner did not present any proof regarding counsel's performance during the direct appeal. Therefore, other than the previously-discussed issue regarding trial counsel's alleged failure to provide the appellate court with transcripts of the opening statements and closing arguments, the Court finds that petitioner has waived his complaints regarding the effectiveness of counsel on direct appeal.

ISSUE III - COUNSEL WERE INEFFECTIVE FOR FAILING TO MOVE TO STRIKE THE DEATH PENALTY AS A PUNISHMENT BECAUSE IT VIOLATES TREATIES WHICH HAVE BEEN RATIFIED BY THE UNITED STATES, AND VIOLATES ESTABLISHED INTERNATIONAL LAW: In this issue, petitioner asserts violations of the following international agreements: (1) International Covenant on Civil and Political Rights; (2) The International Convention on the Elimination of All Forms of Racial Discrimination; (3) The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; (4) The American Convention on Human Rights; (5) The Convention on the Elimination of All Forms of Discrimination Against Women; (6) The International Covenant on Economic, Social and Cultural Rights; (7) The American Declaration of the Rights and Duties of Man; and (8) Universal Declaration of Human Rights.[47]

---

[47]Although petitioner waived these issues by failing to present any proof in support thereof, the Court notes that at least one trial court in Tennessee has rejected these claims after hearing expert testimony. That case, Ronnie Michael Cauthern v. State, No. M2002-00929-CCA-R3-PD, is currently pending in the Court of Criminal Appeals. The Court also notes that many of these arguments were rejected by the Court of Criminal Appeals in a recently-filed opinion. See State v. Odom, No. W2000-02301-CA-R3-DD (Tenn. Crim. App. Oct. 15, 2002).

51

1014

## CONCLUSION

For the previously-discussed reasons, the Court finds petitioner's petitions to be without merit. Therefore, the Court declines to grant the requested relief.

ENTERED this the __20th__ day of February, 2003.

ROY B. MORGAN, JR.
Judge

52

1015

IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE
DIVISION ONE

**FILED**

JUDY BARNHILL, CIRCUIT COURT CLERK

JON HALL

VS.                     MAR 04 2003        CASE NO. C0422

STATE OF TENNESSEE
                        DEPUTY CLERK

                A.M. 2:23 P.M.
                NOTICE OF APPEAL

Notice is hereby given that PLAINTIFF, JON HALL, hereby
appeals to the Court of Criminal Appeals from the final judgment
entered in this action on the 20th day of February, 2003.

Respectfully Submitted,

DANNY R. ELLIS, 020747
Attorney for PLAINTIFF
P.O. Box 3512
Jackson, TN 38303
731-988-9900

1016

## CERTIFICATE OF SERVICE

I certify that I have personally delivered or mailed, first class postage prepaid, a copy of the foregoing to:

Office of the District Attorney General
P.O. Box 2825
Jackson, Tennessee 38302

Office of the Attorney General of Tennessee
425 Fifth Ave. North
Nashville, TN 37243-0485

Court of Criminal Appeals
P.O. Box 909
Jackson, TN 38302

this the ___4ᵗ___ day of ___March___, 200_3_.

Danny Ellis
Attorney for Plaintiff

2

1017

IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE
AT JACKSON

FILED C

JUDY BARNHILL, CIRCUIT COURT CLERK

MAR 13 2003

DEPUTY CLERK

A.M. 1:05 P.M.

JON HALL,

Vs.

STATE OF TENNESSEE.

NO.  C0422
(CAPITAL CASE)

## MOTION TO ALTER AND AMEND JUDGEMENT

COMES NOW THE PETITIONER, JON HALL, AND MOVES THIS COURT PURSUANT TO TENN. R. CIV. P., RULE 59.04 TO ALTER AND AMEND THE JUDGEMENT ENTERED ON FEBRUARY 20, 2003, AND GRANT THE APPROPRIATE RELIEF. IN SUPPORT OF THIS MOTION, THE PETITIONER WILL SHOW FORTH THE FOLLOWING:

1. THE COURT ERRED IN FINDING THAT THE PETITIONER DID NOT WANT TO REPRESENT HIMSELF DURING THE MARCH 23, 2001 HEARING. SEE: E.G., MAY 15, 2002 HEARING PAGES 20-21 (OBJECTION TO COUNSEL).

ON MARCH 23, 2001, THE PETITIONER MADE IT CLEAR THAT HE WANTED TO REPRESENT HIMSELF AND ACQUIRE ALL OF THE PREVIOUS ATTORNEY'S WORK PRODUCT FROM THEIR FILE AS INDICATED BY THE "MOTION FOR THE SURRENDER OF ATTORNEY WORK PRODUCT", FILED ON MARCH 8, 2001 AND HEARD ON MARCH 23, 2001. HOWEVER, THE PETITIONER CANNOT PROVE THIS, BECAUSE NOBODY HAS PROVIDED THE PETITIONER WITH A COPY OF THE MARCH 23, 2001 PROCEEDINGS TRANSCRIPTS. EVEN IF THE COURT HAD PROVIDED THE PETITIONER WITH A COPY OF THE MARCH 2001 PROCEEDINGS, THIS COURT WOULD PROBABLY HAVE ALTERED IT IN A WAY THAT IT THAT OMITS KEY POINTS TO THE PREVENT THE PETITIONER FROM FILING A MERITORIOUS APPEAL. FOR EXAMPLE, ON AUGUST 22, 1994, THE PETITIONER'S PRELIMINARY HEARING WAS HELD, BUT THE STATE PREPARED A FALSE TRANSCRIPT ON A KEY ISSUE. SEE TR. TECH. RECORD, PAGE 85-93 (PRELIMINARY HEARING TRANSCRIPT) AT PAGE 92 [COUNSEL'S WAIVER OF A PRELIMINARY HEARING OVER THE PETITIONER'S OBJECTION OMITTED], COMPARE: TR. TECH RECORD PAGE 94 (NEWS ARTICLE 8/23/94) [PETITIONER'S OBJECTION TO COUNSEL'S WAIVER OF A PRELIMINARY HEARING). SEE ALSO: SEPT. 4, 2002, HEARING PAGE 219-220 (UNCONTRADICTED PROOF OF THE STATE CREATING FALSE TRANSCRIPTS). NOTE: SEPT. 4, 2002 HEARING TRANSCRIPT, PAGES 174-282 (HALL'S WITNESS STAND TESTIMONY NOT VERBATIM). SEE ATTACHED:  LARRY GIDCOMB'S ANALYSIS OF AUDIOTAPES FROM JDH'S TRIAL DATED FEBRUARY 15, 2001, (VIOLATION OF COURT REPORTER'S OATH, ANTIONE V. BYERS & ANDERSON INC., 113 S.CT. 2167, 2172 (1993)). NOTE: SEPT. 4, 2002 HEARING TRANSCRIPT PAGES 174-282 (HALL'S WITNESS STAND TESTIMONY NOT VERBATIM).

2. THE COURT ERRED IN DENYING THE PETITIONER THE RIGHT TO PERSONALLY CONDUCT AN EXAMINATION OF HIMSELF AS A WITNESS TO SUPPORT THE CLAIMS MADE IN HIS POST CONVICTION PETITION. SEE: SEPT. 4, 2002 HEARING PAGES 210, 214, 218, & 219 (I HAVE QUESTIONS FOR THIS WITNESS). SEE ALSO: UNITED STATES V. CONDER, 423 F.2D 904, 908 (6TH CIR. 1970) (SHOW SPECIFIC INSTANCE WHERE DEFENDANT WAS DENIED THE RIGHT TO EXAMINE A WITNESS); AND LONG V. STATE, 510 S.W.2D 83 (TENN. CRIM. APP. 1974) (THE BURDEN OF PROOF IS ON THE PETITIONER TO PROVE HIS ALLEGATIONS ATTACKING THE VALIDITY OF HIS CONVICTION).

3. THE COURT ERRED IN FINDING THAT COUNSEL'S CONDUCT WAS APPROPRIATE SURROUNDING THE FILING OF FORD'S CHANGE OF VENUE, TO WIT THE TRIAL COURT ILLEGALLY USURPED A DE FACTO JURY FROM MADISON COUNTY TO DETERMINE THE MERITS OF THE PETITIONER'S CASE. SEE: JUDGE MORGON'S OPINION PAGES 35-36 (VENUE).

A. ARGUMENT CHALLENGING THE COURT'S DETERMINATION OF WAIVER REGARDING THE ILLEGAL CHANGE OF VENUE

THERE IS EVIDENCE IN THE RECORD THAT THIS ISSUE WAS PRESERVED FOR APPEAL. DUE TO THE OFFICERS' OF THE COURT DERELICTION OF DUTY WHEN REVIEWING THE RECORDS SUBMITTED IN THE COURT, HAS CREATED THE PROBLEM IN WHICH THE COURT NOW COMPLAINS. THUS, THE ISSUES HAVE NEVER BEEN PREVIOUSLY DETERMINED. SEE: E.G., TR. TECH. RECORD, PAGES 200-201 (2/24/97 LETTER TO COUNSEL ADDRESS MY ISSUES IN MY MOTIONS; SEE ALSO: TR. TECH. RECORD, PAGES 188, 192, & 198 (POST-TRIAL MOTIONS ATTACKING JURISDICTION).

AN ATTEMPT WAS MADE BY THE PETITIONER TO HAVE THE TENNESSEE SUPREME COURT ADDRESS HIS APPELLATE BRIEF, CAPTIONED "BRIEF OF THE PROPER PARTY" AND ITS SUPPORTING APPENDIX ATTACKED THE VALIDITY OF THE COURT'S JURISDICTION ON PAGE 43 WITH CITES TO THE RECORD. SEE: SEPT. 4, 2002 HEARING PAGES 215-216 (HALL'S TESTIMONY ASKING POST-CONVICTION COUNSEL TO SUBMIT RECORDS TO SUPPORT HIS CLAIMS), ALL TO NO AVAIL, IN VIOLATION OF TENN. R. SUP. CT. RULE 8, DR 7-101 (A) (4) (A).

TO ENSURE THAT THE PETITIONER'S OWN SUPREME COURT BRIEF WOULD BE HEARD AS STATED ABOVE, THE PETITIONER FILED TWO MOTIONS ON MAY 12, 1999, IN THE SUPREME COURT: (1) "MOTION TO WITHDRAW COUNSEL – REPLACEMENT BY THE COURT," CITING U.S. v. McDOWELL, 814 F.2D 245, 251-253 (6TH CIR. 1987) (KNOWING & INTENTIONAL WAIVER OF RIGHT TO COUNSEL); AND (2) "T.R.A.P. 13 (B) CONSIDERATION OF ISUES NOT PRESENTED FOR REVIEW", ALL TO NO AVAIL, AS WELL AS POST-CONVICTION COUNSEL'S ASSISTANCE ON 9/4/02 SURROUNDING THE PRESENTATION OF THESE RELEVANT RECORDS.

B. ARGUMENT AGAINST THE COURT'S FINDING THAT NO OBJECTION WAS MADE TO CHANGE OF VENUE ON NOV. 8, 1995

CARTHEL SMITH & MIKE MOSIER (PREVIOUS ATTORNEYS), FILED A MOTION FOR A CHANGE VENUE. THIS COURT UTILIZES THE NOV. 8, 1995 MOTIONS HEARING TRANSCRIPT TO POINT OUT THAT THE PETITIONER NEVER OBJECTED TO MR. MOSIER'S MOTION. THIS COURT FROWNS UPON LITIGANTS FOR ASSERTING THEIR RIGHTS. SEE: MAY 15, 2002 HEARING, PAGE 20-21 (YOUR HONOR, I'D LIKE TO TALK. HAVE HIM REMOVED). ANYHOW, THE COURTS RELIANCE UPON THIS IS FUTILE. SEE: STATE v. ELLIS, 953 S.W.2D 216, 221, FN. 7 (TN. CRIM. APP. 1997) (ACCORDINGLY, A JUDGE MAY NOT ASSUME THAT AN ATTORNEY WHO WAIVES A JURY NECESSARILY INVOKES THE WISHES OF HIS CLIENT. THE ASSERTION BY COUNSEL OF A DEFENDANT WAIVER IS LESS RELIABLE THAN THE EXPRESS WRITTEN OR ORAL CONSENT OF THE ACCUSED EVEN WHEN COUPLED WITH AN INFERENCE OF ACQUIESCENCE DRAWN FROM THE DEFENDANT'S FAILURE TO PROTEST). THE RECORD SHOWS, THAT THE TRIAL COURT OVERRULED SMITH & MOSIER'S VENUE MOTION BECAUSE, THEIR MOTION DID NOT MEET THE REQUIREMENTS OF TN. R. CRIM. P., RULE 21 (B) (NO AFFIDAVITS). IF THIS COURT REALLY CONSIDERED THE VENUE AFFIDAVIT, ITS SUPPORTING APPENDIX & THE ARGUMENTS FILED ON NOV. 1, 2001, AS IT CLAIMS AT (OPINION PAGE 49), THE COURT'S FINDINGS WOULD HAVE BEEN DIFFERENT.

- 2 -

1019

C. ARGUMENT REGARDING PETITIONER'S MAY 2, 1995 MOTION FOR A CHANGE OF VENUE OUTSIDE THE 26TH DISTRICT

The Court reliance upon the petitioner's own May 2, 1995 Motion For A Change Of Venue, to draw a conclusion that petitioner wanted a change of venue to Madison County is misplaced. Granted, the petitioner did file a Motion for a change of venue OUTSIDE the 26th district more than a year prior to Mr. Ford's appointment, but it is irrelevant to the matter at hand, because it had the petitioner's express or implied consideration stated in it. Furthermore, the Court never afforded the petitioner a hearing in order to comply with Tenn. R. Crim. P., Rule 21 (F), to discern what happened. See: e.g., Sept. 4, 2002 hearing, pages 220 - 223 (Testimony surrounding May 2, 1995 venue motion, exhibit 16).

The Court points out that Mr. Smith & Mr. Mosier were not given an opportunity to explain whether they filed the first motion for a change of venue (WITHIN the 26th district) at the petitioner's request. The petitioner contends, that the state has waived that opportunity and now has to look at the uncontested proof presented in his Nov. 1, 2001 Venue Affidavit § (1-3), & its supporting appendix in regards to previous counsel's conduct. See: e.g., DAVIS v. STATE, 673 S.W.2d 171, 174 (Tenn. Crim. App. 1984) (The state should present attacked counsel to show what occurred). See: Sept. 4, 2002, pages 265 - 268 (I was wanting to give the state a chance to rebut my affidavits).

D. ARGUMENT SURROUNDING THE FILING OF MR. FORD'S MOTION FOR A CHANGE OF VENUE ON SEPTEMBER 12, 1996

On Sept. 3, 1996, Mr. Ford served a "Motion To Renew Motion For A Change Of Venue" on the State filed 9/12/96. See: Tr. Tech. Record, page 150 (Venue Motion). The motion didn't provide any type of new information that was relevant to warrant relief on the merits; nor did it comply with Tn.R.Civ.P., Rule 11.01 & 11.02; Tn.S.Ct. Rule 8, Canon 7 EC 7-25; & Tn.R.Crim.P., Rule 21 (B) (no affidavits — reason why the trial court didn't grant Smith & Mosier's motion on 11/8/95). See: T.C.A. § 20-4-203 (application for a change of venue); and WEAKLEY EX. REL. USSERY v. PEARCE, 52 Tenn 401 (1871) (The correct practice is to hear the witnesses for and against the change of venue in open court, or cause their depositions to be taken as in any other cases, and affidavits in opposition to circumstances).

On Sept. 6, 1996, (6) days BEFORE the [HENDERSON CO. CLERK, KENNY CAVESS] had time to file Ford's venue motion, the Assistant Dist. Attorney, AL EARLS, serves Mr. Ford with a motion FILED directly to the [MADISON CO. CLERK, JOE GAFFNEY'S OFFICE]. The Court did not even have time to conduct a lawful evidentiary hearing to determine the merits of Ford's change of venue motion. See: Tr. Tech. Record, page 151 (Motion To Determine Prior To Trial The Competency Of Witnesses — filed by Madison Co. Clerk, Joe Gaffney on 9/18/96). The trial court's change of venue order filed (5) days AFTER the State's competency motion was filed, establishes collusion. COMPARE: Tr. Tech. Record, pages 151 & 152 (Venue Order & Competency Motion). The State must be psychic by assuming that the trial court would ABUSE ITS POWER and grant Ford's venue motion without a hearing and the required affidavits under Rule 21 (B).

- 3 -

## PROOF THAT TRIAL COUNSEL WAS NOT KEEPING THE PETITIONER PROPERLY INFORMED

ITS ESSENTIAL TO POINT OUT, THAT THE PETITIONER WAS NOT INFORMED OF THE TRIAL COURT'S ARBITRARY DECISION TO CHANGE THE SITUS OF THE TRIAL TO MADISON COUNTY, AND NEITHER MR. FORD OR MR. MAYO HAD INFORMED HIM OF THIS POINT UNTIL JAN. 21, 1997. SEE: SEPT. 4, 2002 HEARING (PETITIONER - Q. WERE YOU EVER PRESENT AT A CHANGE OF VENUE HEARING ? A. NO, SIR. I WASN'T ADVISED OF A CHANGE OF VENUE UNTIL JAN. 21, 1997 ... I TOLD THEM TO GET IT CHANGED BACK). IN ORDER TO ILLUSTRATE THIS, THE PETITIONER REFERS TO TR. TECH. RECORD, PAGES 170, 171, 172, & 173 (MOTIONS CAPTIONED AND DIRECTED TO THE CIVIL & CIRCUIT COURT IN HENDERSON CO., FILED ON NOV. 12, 1996 & DECEMBER 4, 1996). THESE MOTIONS SHOW THAT TRIAL COUNSEL WAS NOT KEEPING HIM INFORMED. SEE: SEPT. 4, 2002 HEARING, PAGE 205 (THEY WERE NOT KEEPING ME INFORMED). ONE OF THE REASONS MAYBE THAT COUNSEL WAS TOO INTOXICATED. SEE: MAY 15, 2002 HEARING, PAGES 347-353 (MAYO'S SUBSTANCE ABUSE PROBLEM AT TIME OF TRIAL). COMPARE: BRIMMER V. STATE, 29 S.W.3D 497, 509-11 (TN. CR. APP. 1998) (SUBSTANCE ABUSE AFFECTING TRIAL - LACK OF COMMUNICATION).

ONE OF THE LISTED MOTIONS (TR. TECH. RECORD, PG. 170) HAS CASE NUMBER 96-589 LISTED, AND WAS MARKED FILED BY THE MADISON CO. CLERK. AN INTERESTING TALE CAN BE SHOWN BY THIS. BY LOOKING AT THE SERVICE DATE ON THE BOTTOM OF THE MOTIONS AND FIGURING UP THE DELAY ON THE CLERK'S FILE DATE, YOU CAN ASSUME THAT IT WAS TRANSFERRED TO THE MADISON CO. CLERK, BY SOME TYPE OF INTER-DEPARTMENTAL MAIL SERVICE AVAILABLE TO THE COURT. ALTHOUGH A PERSON MAY ASSUME THAT THE PETITIONER WAS INFORMED OF THIS BY LOOKING AT THE CASE NUMBER, BUT THIS ASSUMPTION WOULD BE WRONG. LOOK AT THE HEADING TO (HENDERSON COUNTY). THE PETITIONER CONTENDS, THE RECORD SHOWS HOW HE RETRIEVED THE CASE NUMBER FROM THE 11/4/96 STATE'S RESPONSE. SEE: TR. TECH. RECORD, PAGE 169 (STATE'S RESPONSE 11/4/96 - "[1] THE DEFENDANT'S MOTION IS SO MUCH NONSENSE; AND [2] THE STATE WILL ONLY RESPOND TO MOTIONS FILED BY COUNSEL").

THE PETITIONER THOUGHT THE STATE'S RESPONSE WAS CHALLENGING HIS OWN MOTIONS THAT ARE BURIED AT THE HENDERSON CO. CLERK'S OFFICE, SPECIFICALLY A MOTION FOR HABEAS CORPUS RELIEF. SEE: TRIAL TECH. RECORD, PAGE 146 (STATE'S RESPONSE [NOTICE OF MOTIONS, § 9]). CHECK WITH THE HENDERESON CO. CLERKS OFFICE. THIS COURT WILL FIND (53) PRETRIAL MOTIONS FILED BY SMITH & MOSIER (E.G., THE VENUE MOTION HEARD ON 11/8/95, THIS COURT REFERS VIA OPINION). TRIAL COUNSEL WAS INEPT, BECAUSE THEY DIDN'T MOVE THE RECORDS TO ACCOMPANY THEIR JOINDER MOTION, IN VIOLATION OF TN. S.CT. RULE 8, DR 6-101 (A)(2 & 3). SEE: TR. TECH. RECORD, PAGE 134 (MOTION TO BE INCLUDED IN PRIOR COUNSEL'S MOTIONS); AND PETITIONER'S "MOTION FOR POST-CONVICTION RELIEF," PAGE 27 § 11 (POOR MOTION PRACTICE / VENUE PREJUDICE).

THE PETITIONER'S FACTS ARE CLEAR AND CONVINCING, THAT THE TRIAL COURT DENIED THE PETITIONER AN OPPORTUNITY TO BE PRESENT AT ANY EVIDENTIARY OR CONFERENCE HEARING TO DETERMINE THE LEGITIMACY OF MR. FORD'S VENUE MOTION, WHEN THE TRIAL COURT CHANGED THE SITUS OF THE TRIAL TO MADISON COUNTY. SEE: MAY 15, 2002 HEARING, PAGE 385 (FORD ON VENUE HEARING: Q. DO YOU REMEMBER THE HEARING ? JUDGE LAFON GRANTED THAT ON HIS OWN - HE SAID - HE DREW THE - HE SAID DRAW THE ORDER).

- 4 -

1021

HERE, THE RECORD INDICATES THAT THE PETITIONER DID NOT HAVE NOTICE THAT A MOTION FOR A CHANGE OF VENUE HAD BEEN APPLIED FOR BY FORD, AND THE RECORD IS SILENT AS TO WHETHER THE PETITIONER WAIVED HIS RIGHT TO A HEARING ON FORD'S MOTION TO RENEW MOTION FOR A CHANGE OF VENUE. SEE: E.G. ELLIS, SUPRA AT 221 (AN ORAL STIPULATION ON THE RECORD MAY SATISFY THE RULE ABSENT A WRITTEN WAIVER, IT MUST APPEAR FROM THE RECORD THAT THE DEFENDANT PERSONALLY GAVE EXPRESS CONSENT IN OPEN COURT); AND ELLIS, SUPRA AT 221 FN 7 (A JUDGE MAY NOT ASSUME THAT AN ATTORNEY WHO WAIVES A JURY NECESSARILY INVOKES THE WISHES OF HIS CLIENT. THE ASSERTION BY COUNSEL OF A DEFENDANT IS LESS RELIABLE THAN THE EXPRESS WRITTEN OR ORAL CONSENT OF THE ACCUSED). SEE ALSO: SCOTT V. FORT ORD. FEDERAL CREDIT UNION, (IN RE G. WEEKS SEC. INC), 5 BANKR. 220 (BANKR. W.D. TN. 1980) (JURISDICTION AND NOTICE – PROCEDURAL DUE PROCESS MANDATES THAT A LITIGANT RECEIVE NOTICE AND AN OPPORTUNITY TO BE HEARD).

IN SPITE OF THE PETITIONER'S POST-CONVICTION TESTIMONY AND HIS UNCONTESTED VENUE AFFIDAVIT, THIS COURT HAS ERRED IN ACCREDITING FORD'S TESTIMONY. THE LAW THAT THE PETITIONER HAS PROVIDED IN REGARD TO WAIVER RIGHTS AS STATED IN ELLIS, SUPRA, MAKES THE COURT'S FINDING ACCREDITING MR. FORD'S FALSE TESTIMONY IRRELEVANT. EVEN IF IT WAS TRUE THAT THE PETITIONER HAD A HABIT OF CHANGING HIS MIND DEPENDING ON HIS MOOD AND COUNSEL BELIEVED THIS, IT MEANS THAT MR. FORD WAS DERELICT IN HIS DUTY BY HIS FAILURE TO ENSURE THAT THE PETITIONER SIGNED A WAIVER FORM OR MADE AN ORAL STIPULATION ON THE RECORD, IN VIOLATION OF TN.R.CRIM.P., RULE 43 (A); TN. R. CIV. P., RULES 11.01 & 11.02; AND TN. S.CT. RULE 8, CANON 7, EC 7 – 25. SEE: PETITIONER'S VENUE AFFIDAVIT AND SUPPORTING APPENDIX, EXHIBIT G, PAGES 12–16 (MR. FORD'S ATTY. WORK PRODUCT – SUPPLEMENT MOTION FOR A CHANGE OF VENUE & WAIVER FORM); AND MAY 15, 2002 HEARING, PAGES 456–462 (FORD'S TESTIMONY REGARDING EX. G OF THE APPENDIX OR POST-CONVICTION EX. # 9 ATTY. WORK PRODUCT). MR. FORD KNEW THE PROPER WAY TO BRING FORTH AN APPLICATION FOR A CHANGE OF VENUE, BUT HE KNEW THE PETITIONER WOULD NOT SIGN IT, AND ALLOWED THE COURT TO VIOLATE THE PETITIONER'S SIXTH AMENDMENT RIGHT TO A TRIAL IN HENDERSON COUNTY. SEE: E.G., STATE V. MUSE, 967 S.W.2D 764, 766 (TN. 1998) (DEFENDANT HAS A DUE PROCESS RIGHT UNDER THE STATE & FEDERAL CONSTITUTIONS TO BE PRESENT. THE RIGHT TO PRESENCE IS PROTECTED BY THE DUE PROCESS CLAUSE IN SOME SITUATIONS WHERE THE DEFENDANT IS NOT ACTUALLY CONFRONTING WITNESSES OR THE EVIDENCE AGAINST HIM. [CITATION OMITTED]. THE DEFENDANT HAS A CONSTITUTIONAL RIGHT TO BE PRESENT AT ANY HEARING "WHENEVER HIS PRESENCE HAS A RELATION, REASONABLY SUBSTANTIAL, TO THE FULLNESS OF HIS OPPORTUNITY TO DEFEND AGAINST THE CHARGE").

ALSO, RULE 43 OF THE TENNESSEE RULES OF CRIMINAL PROCEDURE EXPLICITLY GIVES A DEFENDANT THE RIGHT TO BE PRESENT "AT EVERY STAGE OF THE TRIAL INCLUDING THE IMPANELING OF THE JURY." THE RULE WAS ADOPTED WITH MODIFICATIONS FROM RULE 43 OF THE FED. R. CRIM. P. [CITATIONS OMITTED]. RULE 43 EMBODIES THE PROTECTIONS AFFORDED BY THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT, THE RIGHT TO BE PRESENT DERIVED FROM THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS, AND THE COMMON LAW PRIVILEGE OF PRESENCE. 8B MOORES FED. PRACTICE ¶ 43.02[1] (2D ED. 1996). THUS, ITS SCOPE IS BROADER THAN THE CONSTITUTIONAL RIGHT ALONE. [CITATION OMITTED]. SEE: E.G., MUSE, SUPRA, AT 766-767.

- 5 -

E. WHETHER THE TRIAL COURT PROVIDED THE PETITIONER WITH PROCEDURAL DUE PROCESS FOR A CHANGE OF VENUE

A COURT'S JURISDICTION AT THE BEGINNING OF TRIAL MAY BE LOST IN COURSE OF PROCEEDINGS DUE TO ITS FAILURE TO AFFORD THE DEFENDANT DUE PROCESS OF LAW. CITED: STATE EX. REL. ANGLIN V. MITCHELL, 575 S.W.2D 284, 287 (TN. 1979). THE RECORD BEFORE THE COURT IS CLEAR, THE "OFFICERS" OF THE COURT," DID NOT FOLLOW THE WELL ESTABLISHED LAW AS REQUIRED BY TN. R. CRIM. P., RULE 18 (A); 21 (B); 21 (F); AND 43 (A), AND THUS ABUSED ITS POWER. SEE: E.G., STATE V. SHIRLEY, 6 S.W.3D 243, 247 (TN. 1999) (DISCRETION ESSENTIALLY DENOTES THE ABSENCE OF A HARD AND FAST RULE). TO SHOW THE SIGNIFICANCE OF THE PROCEDURAL DUE PROCESS VIOLATION FOR THIS ARGUMENT, HE RELIES UPON FUENTES V. SHEVIN, 407 U.S. 67, 92 S.CT. 1983, (1972) (PROCEDURAL DUE PROCESS – CITED BY DEFINITION IN BLACK'S LAW DICTIONARY), WHICH PROVIDES THE FOLLOWING:

FOR MORE THAN A CENTURY THE CENTRAL MEANING OF "PROCEDURAL DUE PROCESS" HAS BEEN CLEAR, "PARTIES WHOSE RIGHTS ARE TO BE AFFECTED ARE ENTITLED TO BE HEARD; AND IN ORDER THAT THEY MAY ENJOY THAT RIGHT THEY MUST FIRST BE NOTIFIED." [CITATIONS OMITTED]. IT IS EQUALLY FUNDAMENTAL THAT THE RIGHT TO NOTICE AND AN OPPORTUNITY TO BE HEARD "MUST BE GRANTED AT A MEANINGFUL TIME AND IN A MEANINGFUL MANNER." HOUSE V. STATE, 911 S.W.2D 705, 711 (TENN. 1995) (ADDED TO FUENTES BY THE PETITIONER FOR THIS ISSUE).

THE CONSTITUTIONAL RIGHT TO BE HEARD IS A BASIC ASPECT OF THE DUTY OF GOVERNMENT TO FOLLOW A FAIR PROCESS OF DECISION MAKING WHEN IT ACTS TO DEPRIVE A PERSON OF HIS POSSESSIONS. THE PURPOSE OF THIS REQUIREMENT IS NOT [_8] ONLY TO ENSURE ABSTRACT FAIR PLAY TO AN INDIVIDUAL. ITS PURPOSE, MORE PARTICULARLY, IS TO PROTECT HIS USE AND POSSESSION OF PROPERTY FROM ARBITRARY ENCROACHMENT – TO MINIMIZE SUBSTANTIVELY UNFAIR OR MISTAKEN DEPRIVATIONS OF PROPERTY, A DANGER THAT'S ESPECIALLY GREAT WHEN THE STATE SEIZES GOODS SIMPLY UPON THE APPLICATION OF AND FOR THE BENEFIT OF A PRIVATE PARTY. SO VIEWED, THE PROHIBITION AGAINST THE DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW REFLECTS THE HIGH VALUE, EMBEDDED IN OUR CONSTITUTIONAL & POLITICAL HISTORY, THAT WE PLACE ON A PERSON'S RIGHT TO ENJOY WHAT IS HIS, FREE OF GOVERNMENTAL INTERFERENCE. [CITATION OMITTED].

THE REQUIREMENT OF NOTICE AND AN OPPORTUNITY TO BE HEARD RAISES NO IMPENETRABLE BARRIER TO THE TAKING OF A PERSON'S POSSESSIONS. BUT THE FAIR PROCESS OF DECISION MAKING THAT IT GUARANTEES WORKS, BY ITSELF, TO PROTECT AGAINST ARBITRARY DEPRIVATION OF PROPERTY. FOR WHEN A PERSON HAS AN OPPORTUNITY TO SPEAK UP IN HIS OWN DEFENSE, AND WHEN THE STATE MUST LISTEN TO WHAT HE HAS TO SAY, SUBSTANTIVELY UNFAIR AND SIMPLY MISTAKEN DEPRIVATIONS OF PROPERTY INTERESTS CAN BE PREVENTED. IT HAS LONG BEEN RECOGNIZED THAT "FAIRNESS CAN RARELY BE OBTAINED BY SECRET, ONE SIDED DETERMINATION OF FACTS DECISIVE OF RIGHTS .... [AND] NO BETTER INSTRUMENT HAS BEEN DEVISED FOR ARRIVING AT TRUTH THAN TO GIVE THE PERSON IN JEOPARDY OF SERIOUS LOSS NOTICE OF THE CASE AGAINST HIM AND AN OPPORTUNITY TO MEET IT." [CITATION OMITTED].

IF THE RIGHT TO NOTICE AND A HEARING IS TO SERVE ITS FULL PURPOSE, THEN, IT IS CLEAR THAT IT MUST BE GRANTED AT A TIME WHEN THE DEPRIVATION CAN STILL BE PREVENTED. AT A LATER HEARING, AN INDIVIDUAL'S POSSESSIONS CAN BE RETURNED TO HIM IF THEY WERE UNFAIRLY OR MISTAKENLY TAKEN IN THE FIRST PLACE. DAMAGES MAY EVEN BE [_82] AWARDED TO HIM FOR THE WRONGFUL DEPRIVATION. BUT NO LATER HEARING AND NO DAMAGE AWARD CAN UNDO THE FACT THAT THE ARBITRARY TAKING THAT WAS SUBJECT TO RIGHT OF PROCEDURAL DUE PROCESS HAS ALREADY OCCURRED. "THIS COURT HAS NOT ... EMBRACED THE GENERAL PROPOSITION THAT A WRONG MAY BE DONE IF IT CAN BE UNDONE." [CITATION OMITTED].

THIS IS NO NEW PRINCIPLE OF CONSTITUTIONAL LAW. THE RIGHT TO A PRIOR HEARING HAS LONG BEEN RECOGNIZED BY THIS COURT UNDER THE FOURTEENTH AND FIFTH AMENDMENTS. ALTHOUGH THE COURT HAS HELD THAT DUE PROCESS TOLERATES VARIANCES IN THE FORM OF A HEARING "APPROPRIATE TO THE NATURE OF THE CASE," [CITATION OMITTED], AND "DEPENDING UPON THE IMPORTANCE OF THE INTERESTS INVOLVED AND THE NATURE OF THE SUBSEQUENT PROCEEDINGS [IF ANY]," [CITATION OMITTED] THE COURT HAS TRADITIONALLY INSISTED THAT, WHATEVER ITS FORM, OPPORTUNITY FOR THAT HEARING MUST BE PROVIDED BEFORE THE DEPRIVATION AT ISSUE TAKES EFFECT. E.G. [CITATION(S) OMITTED]. END OF RELEVANT DISCUSSION IN FUENTES, SUPRA.

- 6 -

THE WAIVER OF ANY CONSTITUTIONAL RIGHT IS ALWAYS A SERIOUS MATTER AND SHOULD ONLY BE ACCEPTED AFTER A CAREFUL DETERMINATION BY THE COURT THAT THE WAIVER WAS KNOWINGLY AN INTENTIONALLY MADE. THE FINDING OF WAIVER BY THE TRIAL COURT MAY NOT BE ASSUMED FROM A SILENT RECORD, NOR MAY IT BE IMPLIED. ELLIS, AT 221. THE RIGHT OF THE ACCUSED TO OBJECT TO LOCALITY OF TRIAL IS A PERSONAL PRIVILEGE. STATE V. BROWN, 64 S.W.2D 841 (TN. 1933). ONLY THE ACCUSED CAN SIGN A WRITTEN WAIVER OF HIS RIGHT TO A JURY TRIAL WHERE THE CRIME WAS ALLEGEDLY COMMITTED, IT IS INCONGRUOUS TO HOLD THAT COUNSEL MAY ACCOMPLISH ORALLY WHAT HE MAY NOT ACCOMPLISH BY WRITTEN WORD. ELLIS, SUPRA, AT 221.

AS DEMONSTRATED, THE RECORD IS SILENT AS TO WHETHER THE PETITIONER PERSONALLY RELINQUISHED HIS RIGHT TO BE TRIED IN HENDERSON COUNTY. THE TRIAL COURT'S ACTION IN CHANGING THE VENUE TO MADISON COUNTY OVER THE PETITIONER'S OBJECTION (PRE-TRIAL OBJECTION AT TR. TRANSCRIPT PAGES 7-8), IS CLEARLY IN CONTRADICTION OF WELL ESTABLISHED LAW. SEE ALSO: STATE V. UPCHURCH, 620 S.W.2D 540 (TN. CR. APP. 1980) (TRIAL COURT IMPROPERLY TRANSFERRED THE SITUS OF TRIAL, OVER DEFENDANT'S OBJECTION, FROM COUNTY IN WHICH CRIMES WHERE COMMITTED TO DIFFERENT COUNTY, THE CONVICTION IS VOID).

THIS COURT CANNOT FAULT THE PETITIONER FOR THIS FUNDAMENTAL PLAIN ERROR, BECAUSE HE FILED A RULE 12 "MOTION TO DISMISS BASED UPON NEWLY DISCOVERED EVIDENCE." SEE: TECH. RECORD, PAGE 153-155 (PRE-TRIAL MOTION ATTACKING SUBJECT-MATTER JURISDICTION). ADDITIONALLY, THE PETITIONER FILED HIS OWN POST-TRIAL MOTIONS ATTACKING THE TRIAL COURTS JURISDICTION. SEE: TECH. RECORD, PAGES 188, 192, 198, 200, & 201 (POST-TRIAL MOTIONS AND LETTER TO COUNSEL TO ADDRESS CLAIMS). IT IS THE TRIAL COURT'S FAILURE TO FOLLOW THE RULES OF THE COURT AND PROVIDE THE PETITIONER WITH HIS "PROCEDURAL DUE PROCESS" RIGHTS AS DISCUSSED IN FUENTES V. SHEVIN, THAT CAUSED THIS PROBLEM.

FURTHERMORE, THE TENNESSEE SUPREME COURT WAS SUPPOSED TO REVIEW THE ENTIRE RECORD FOR ERRORS ON DIRECT APPEAL, AND FAILED TO NOTICE THAT THE TRIAL COURT FAILED TO FOLLOW THE RULES, I.E., TENN. R. CRIM. P., RULE 21 (F). SEE: E.G., RICKMAN V. DUTTON 864 F.SUPP. 686, 707-708 (M.D. TENN. 1994) (CITING TN. SUP. COURT CASES ON REVIEW). THE COURT SHOULD HAVE REVIEWED THE RECORD FOR ERRORS AND TOOK JUDICIAL NOTICE OF THE PETITIONER'S PLEADINGS. SEE E.G., DELBRIDGE V. STATE 742 S.W.2D 266, 267 (TN. 1987) (TN. R. EVID., RULE 201 & 202 JUDICIAL NOTICE). TO ESTABLISH THAT THE PETITIONER HAS NOT WAIVED HIS CLAIMS AND IS ENTITLED TO RELIEF, HE RELIES UPON STATE V. SEAGRAVES, 837 S.W.2D 615, 617, 618 (TN. CR. APP. 1992) (REFERENCE TO THE LAW ON SUBJECT-MATTER JURISDICTION), WHICH PROVIDES:

WHILE APPELLATE REVIEW IS GENERALLY LIMITED TO THE ISSUES PRESENTED FOR REVIEW, AN APPELLATE COURT OF THIS STATE IS EMPOWERED TO CONSIDER ISSUES WHICH HAVE NOT BEEN PRESENTED FOR REVIEW. T.R.A.P., RULE 13 (B) [CITATIONS OMITTED].

RULE 13 (B), T.R.A.P., ALSO PROVIDES THAT AN APPELLATE COURT "MAY IN ITS DISCRETION CONSIDER OTHER ISSUES IN ORDER, AMONG OTHER REASONS: (1) TO PREVENT NEEDLESS LITIGATION; (2) TO PREVENT INJURY TO THE INTERESTS OF THE PUBLIC; AND (3) TO PREVENT PREJUDICE TO THE JUDICIAL PROCESS." IN ADDITION, RULE 52 (B) TN. CRIM. P., PROVIDES THAT THIS COURT MAY NOTICE PLAIN ERROR AT ANY TIME, EVEN THOUGH NOT RAISED IN THE MOTION FOR A NEW TRIAL OR ASSIGNED AS ERROR ON APPEAL.... WHERE NECESSARY TO DO SUBSTANTIAL JUSTICE." [CITATIONS OMITTED].

1024

In summary, this Court is required by law to determine whether the trial court had subject-matter jurisdiction of the offense in question. The word "shall" when used in a statute or rule, is the equivalent of the word "must." [citation omitted]. Furthermore, the issue in question is plain, and / or fundamental error on the face of the record; and the resolution of this issue is necessary to do substantial justice. Finally, this is the type of issue an appellate court should consider in the exercise of its discretion.

Moreover, in VEACH V. STATE, 491 S.W.2d 81, 83 (Tenn. 1973), our Supreme Court said, "A constitutional question may be raised at any time." SEE ALSO: STATE V. REECE, 637 S.W.2d 858 (Tenn. 1982) (fundamental errors). END OF RELEVANT DISCUSSION IN SEAGRAVES, SUPRA.

This Court's reliance upon HOUSE V. STATE, 911 S.W.2d 705, 714 (Tn. 1995), regarding the waiver of the petitioner's claim to a right to a Henderson County jury, by the failure of counsel to raise the issue on direct appeal, is misplaced. SEE: e.g., HOUSE, at 714 fn. 20 ("We are not confronted with an alleged relinquishment of a fundamental constitutional trial right WHICH MAY ONLY BE WAIVED PERSONALLY BY A DEFENDANT. We have stated on numerous of occasions that the relinquishment of certain constitutional rights will not be presumed from a silent record). SEE ALSO: STATE V. MUSE, supra, at 767-768 (citing HOUSE supra, at 714 n. 20); MOMON 18 S.W.3d 152, 166 (Tn. 99) (MUSE structural error).

In Tennessee, habeas corpus relief is available only "if it appears upon the face of the record of the proceedings upon which the judgement is rendered; that a convicting court is without jurisdiction to sentence a defendant, or that a defendant's sentence of imprisonment or restraint has expired." ARCHER V. STATE, 851 S.W.2d 157, 164 (Tn. 1993). If the face of the record shows that the court did not have jurisdiction, then the judgement is void. DYKES V. COMPTON, 978 S.W.2d 528, 529 (Tn. 1998).

The record before the trial court record is clear that the PETITIONER WAS NOT AFFORDED HIS RIGHT TO BE HEARD on Ford's motion for a change of venue. It is also clear, that the record is silent in regards to whether the petitioner had made a KNOWING AND INTELLIGENT RELINQUISHMENT OF HIS RIGHT TO BE TRIED IN HENDERSON COUNTY. It is clear, that the petitioner objected to the Court's change of venue pretrial. Additionally, it is clear, that the "officer(s) of the court," did not follow the well established law as provided by the rules of court, in order to grant a change of venue. This action is not an abuse of discretion, it is an ABUSE OF POWER. SEE: e.g., STATE V. SHIRLEY, 6 S.W.3d 243, 247 (Tn. 1999) (discretion essentially denotes the absence of a hard and fast rule). In this light a reasonable jurist can find, that the trial court's collusion with Mr. Ford, & the Assistant Dist. Attorney, constitutes the inference of actual or constructive fraud to obtain jurisdiction. SEE: e.g., Title 18 U.S.C. § 1359 (parties collusively joined or made). In other words, the Court's finding that a withdraw motion would have been futile, is an incorrect interpretation of the law. It was mandatory. SEE: e.g., BOSTON, BATES & HOLT V. TENN. FARMER'S MUTUAL, 857 S.W.2d 32 (Tn. 1993). (Attorney owes duty to his client to protect all claims to which client is entitled).

- 8 -

WHEREFORE, THE PETITIONER CONTENDS, THAT DUE TO COUNSEL'S FAILURE TO FOLLOW THE RULES OF COURT, THE PETITIONER WAS PREJUDICED BY COUNSEL'S ILLEGAL CHANGE OF VENUE IN THE FOLLOWING WAYS: (1) THAT A VARIETY OF MOTIONS COULD NOT BE PROPERLY ARGUED ON APPEAL WITHOUT A RECORD OF THEM BEING FILED, AS DEMONSTRATED BY POST-CONVICTION EXHIBIT 21 (11/5/95 MOTIONS HEARING TRANSCRIPTS); (2) THIS COURT IS UNABLE TO DISCERN WHAT PREVIOUS EXPERTS WERE MOTIONED FOR PRIOR TO COUNSEL'S APPOINTMENT; AND (3) THE PETITIONER WAS DENIED THE RIGHT TO TESTIFY ON HIS OWN BEHALF IN FRONT OF THE JURY FOR HIS DEFENSE, BECAUSE OF JOINDER ISSUES. SEE: SEPT. 4, 2002 HEARING, PAGES 192 – 193 ("I WANTED TO TESTIFY TO A HENDERSON COUNTY JURY). SEE E.G., STATE V. ZIMMERMAN, 823 S.W.2D 220, 227 (TENN. CRIM. APP. 1991) (ONLY THE PETITIONER COULD PRESENT A FULL VERSION OF HIS THEORY OF FACTS).

4. THE JURY INSTRUCTION ON VOLUNTARY INTOXICATION RELIEVED THE STATE OF ITS BURDEN OF PROOF AND PRECLUDED JON HALL FROM PRESENTING A FULL DEFENSE.

### ARGUMENT REGARDING INTOXICATION INSTRUCTIONS MISTAKE BY TRIAL COUNSEL

IN STATE V. HALL, 8 S.W.3D 593, 596 N. 1 (TN. 1999), THE SUPREME COURT ADDRESSED MARK DONAHOE'S SUPREME COURT ORAL ARGUMENT AND SAID:[1]

"DURING ORAL ARGUMENT, THE DEFENDANT RAISED TWO ADDITIONAL ISSUES FOR THE FIRST TIME: FIRST, ..., AND SECOND, WHETHER THE TRIAL COURT ERRED DURING THE GUILT PHASE BY INSTRUCTING THE JURY, IN REFERENCE TO THE TO THE INTOXICATION DEFENSE, THAT "[I]NTOXICATION IS IRRELEVANT TO THE ISSUE OF THE ESSENTIAL ELEMENT OF DEFENDANT'S CULPABLE MENTAL STATE." NEITHER ..., NOR THE MISSTATEMENT OF THE PATTERN JURY INSTRUCTION WERE OBJECTED TO AT TRIAL. MOREOVER, THEY WERE NOT LISTED AS ERRORS IN EITHER THE MOTION FOR NEW TRIAL OR IN THE APPEAL TO THE COURT OF CRIMINAL APPEALS. WE FIND THAT THE FAILURE TO RAISE THESE ISSUES IN PREVIOUS PROCEEDINGS CONSTITUTES WAIVER, AND WE DECLINE TO ADDRESS THEM AT THIS TIME. T.R.A.P., RULE 3 (E); T.R.A.P., RULE 36 (A)."

---

1. THIS ERROR WAS PROPERLY REVIEWABLE BY AN APPEALS COURT FOR SEVERAL REASONS, EVEN IF IT WAS PRESENTED LATE.
FIRST, APPELLATE COURTS ARE OBLIGATED TO REVIEW ALL PLAIN ERROR ARISING IN THE TRIAL RECORD WHEN "NECESSARY TO DO SUBSTANTIAL JUSTICE." TENN. R. CRIM. P., 52(B). SEE STATE V. STEPHENSON, 878 S.W.2D 530 (TN. 1994) (FINDING PLAIN ERROR IN JURY INSTRUCTIONS IN CAPITAL TRIAL); STATE V. CAUTHERN, 778 S.W.2D 39 (TN. 1989) (PLAIN ERROR); STATE V. SUTTLES, 767 S.W.2D 403 (TENN. 1989) (PLAIN ERROR); STATE V. HINES, 758 S.W.2D 515, 523 (TN. 1988) (PLAIN ERROR IN CAPITAL CASE); STATE V. OGLE, 666 S.W.2D 58 (TN. 1984); STATE V. MACKEY, 553 S.W.2D 337 (TENN. 1977).
SECOND, BECAUSE THIS IS A CAPITAL CASE, THIS COURT IS OBLIGATED TO REVIEW ANY AND ALL ERRORS IN THE RECORD, AS REQUIRED BY CASELAW AND BY STATUTE. "IN CASES WHERE THE DEFENDANT IS UNDER SENTENCE OF DEATH, THIS COURT IS UNDER THE DUTY TO 'AUTOMATICALLY' REVIEW THE SENTENCE, WHICH IMPOSES THE BURDEN ON THIS COURT TO CONSIDER ANY ALLEGED ERROR, WHETHER CALLED TO THE TRIAL COURT'S ATTENTION OR NOT." RICKMAN V. DUTTON, 864 F.SUPP 686, 708 (TN. 1994); STATE V. DUNCAN, 698 S.W.2D 63, 67-68 (TN. 1985). STATE V. BIGBEE, 885 S.W.2D 797 (TN. 1994).
THIRD, BECAUSE THESE ARE CONSTITUTIONAL QUESTIONS, THEY MAY BE PROPERLY RAISED FOR THE FIRST TIME ON APPEAL. VEACH V. STATE, 491 S.W.2D 81, 83 (TN. 1973) ("GENERALLY APPELLATE COURTS REVIEW ONLY QUESTIONS PRESENTED FOR DETERMINATION IN THE TRIAL COURT. HOWEVER, GENERALLY A CONSTITUTIONAL QUESTION MAY BE RAISED AT ANY TIME. ALSO THE RULE WILL BE WAIVED IN CASES INVOLVING THE DEPRIVATION OF LIFE OR LIBERTY."; CAPRI ADULT CINEMA V. STATE, 537 S.W.2D 896, 900 (TN. 1976) ("CONSTITUTIONAL ISSUES MAY BE RAISED FOR THE FIRST TIME ON APPEAL.")
FOURTH, BECAUSE THIS AND OTHER ERRORS CITED ARE FUNDAMENTAL ERRORS, THEY CANNOT BE WAIVED. ON APPEAL, THIS COURT IS OBLIGATED TO REVIEW ANY AND ALL CLAIMS OF FUNDAMENTAL ERROR. SEE E.G., STATE V. REECE, 637 S.W.2D 858 (TN. 1982); STATE V. THOMPSON, 519 S.W.2D 789 (TN. 1975); STATE V. STAFFORD, 670 S.W.2D 243 (TN. CR. APP. 1984) STATE V. BARGER 612 S.W.2D 485 (TN. CR. APP. 1980) HILL V. STATE, 513 S.W.2D 142 (TN. CR. APP. 1974); TAYLOR V. STATE, 369 S.W.2D 385 (TN. CR. APP. 1963).

- 9 -

## A. THE MISSTATEMENT OF LAW ON INTOXICATION    PRECLUDED THE JURY FROM CONSIDERING THE DEFENSE'S THEORY

The trial court instructed the jury concerning voluntary intoxication as a defense to the charge of first degree murder:

> Included in the Defendant's plea of not guilty is his plea of intoxication as a defense. You have heard evidence concerning the alleged intoxication of the Defendant the time of the alleged offense.
>
> Intoxication itself is generally not a defense to prosecution for an offense. If a person voluntarily becomes intoxicated and while in that condition commits an act which would be a crime if he or she were sober, he or she is fully responsible by his or her conduct. It is the duty of persons to remain from placing themselves in a condition which poses a danger to others.
>
> Intoxication means a disturbance of mental or physical capacity resulting from the introduction of any substance in the body.
>
> Voluntary intoxication means intoxication caused by a substance that a person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known.
>
> Intoxication is IRRELEVANT to the issue of the essential element of the Defendant's culpable mental state.
>
> In this case, the State must prove beyond a reasonable doubt the required culpable, C-U-L-P-A-B-L-E, mental state of the Defendant as defined in each offense listed in the charge.
>
> If you find that the Defendant was intoxicated to the extent that he could not have possessed the required culpable mind, then he cannot be guilty of the offense charged.
>
> If recklessness establishes an element of the offense and the Defendant is unaware of a risk because of voluntary intoxication, the Defendant's unawareness is immaterial and is no defense to that element in the prosecution of said offense.

(Exhibit 1, Vol. III, pp. 366-368).

During the opening arguments, trial counsel did not deny Mr. Hall's involvement in the alleged homicide, nor did they enter a plea of insanity. See Ex. 1, pages 179-180 (opening statement). Trial counsel's theory of defense was intoxication and to try to get it down to manslaughter, due to the fact it's domestic. See: May 15, 2002 hearing, pages 390-392 (Ford's theory of defense at trial). A reasonable juror would have concluded, that voluntary intoxication had no bearing on the culpable mental state of the petitioner. Thus, the jury instructions effectively precluded the jury from being able to consider the full effect of his intoxication upon forming the requisite mens rea.

In State v. Phipps, 883 S.W.2d 138, (Tn. Cr. App. 1994), the Court of Criminal Appeals, reversed Mr. Phipps first degree murder conviction, due to a "comment on the non-existence of the [defense] of post-traumatic stress disorder did not clearly reflect the law in Tennessee. Moreover, it sugguested that the evidence was IMPERTINENT. As such it served to exclude from jury consideration defendant's theory of the case." Id. at 150. The judge's instruction served to obviate consideration by the jury relevant evidence essential to the defense theory and amounted to an impermissible comment on the evidence. Tenn. Const. Article VI, § 9. Id. at 151. Taken as a whole, the jury charge given by the trial court does not provide the clear and distinct exposition of the law required in Tennessee and as such interferes with the right to trial by jury. [citation omitted]. The judgement of the trial court must, therefore, be reversed and the case remanded for a new trial. Id. at 151.

- 10 -

In criminal cases, there is a positive duty upon the trial judge to give the jury a complete charge on the applicable law to the facts of the case. State v. Harris, 839 S.W.2d 54, 73 (Tn. 1992). A defendant has a right to have every issue of fact raised by the evidence & material to his defense submitted to the jury upon proper jury instructions by the trial court. Casey v. State, 491 S.W.2d 90, 94 (Tn. Cr. App. 1972). Cited: State v. Phipps, 883 S.W.2d 138, 149-150 (Tn. Cr. App. 1994).

Article VI., § 9 of the Tennessee Constitution prohibits judges from making any comment "with respect to matters of fact...." [citation omitted]. The aims of this provision are to guarantee the reliability of an impartial judge and preserve for the jury the resolution of the facts. [citation omitted]. Cited State v. Eaves, 959 S.W.2d 601, 605 (Tn. Cr. App. 1997).

Provision of Tennessee Constitution, that judges are not to charge juries "with respect to matters of fact, but may state the testimony & declare the law," is designed to provide all litigants with an impartial trial judge and to preserve the jury's role as finders of fact; purposes are accomplished by preventing the trial court from influencing jury's deliberations by "summing up" evidence in a manner of English Courts commenting on the weight of the evidence, or instructing jury concerning factual conclusions to be drawn from the evidence. Wests Tenn. Code, Const. Article VI, § 9. Cited: State v. Odom, 928 S.W.2d 18, 32 (Tn. 1996).

Tennessee has long adhered to the rule that a defendant's intoxication may reduce first-degree to second-degree murder. State v. Pirtle, 28 Tenn. 663 (1849). This is so, because intoxication may be sufficient to preventing the forming of a premeditated or deliberate design to kill. State v. Bullington, 532 S.W.2d 556 (Tn. 1976). See e.g., Sept. 4, 2002 hearing, page 67 (Dr. Auble - Hall "told me that he doesn't remember it very clearly because he was intoxicated."); and page 72 (Dr. Auble - "It's my opinion that his actions were not deliberate and that he was not weighing options in any kind of cool manner at all."); Sept. 4, 2002 hearing page 118 (Dr. Caruso - "At the time of the offense he had a global assessment of functioning score of about 40." ... that's on a scale of 100 where someone with a scale of 31 - - a score of 31 to 40 would be seriously impaired.")

In State v. Brown, 553 S.W.2d 94, 96 (Tn. 1977), the Supreme Court of Tennessee concluded that: "Instructions given in first-degree murder prosecution on intoxication defense was erroneous that omitted rule that intoxication can negate finding of premeditation, essential for conviction in first degree murder. [ citation omitted]. Failure to apply intoxication to the issue of premeditation and the mental state of the appellant could easily mislead the jury. This is fundamental error.")

- 11 -

B. THE MISSTATEMENT OF LAW ON INTOXICATION RELIEVED THE STATE OF ITS BURDEN OF PROOF, DENIED THE
   PETITIONER DUE PROCESS, AND VIOLATED HIS RIGHT TO COMPULSORY PROCESS

The jury was given jury instructions which precluded them from considering the petitioner's intoxication defense, which reduced his culpability and which militated against a finding of first degree murder. This violated the petitioner's constitutional rights under Article I, §§ 6, 8, 9, 16, & 17, and Article VI., § 9 of the Tennessee Constituion, and the Fifth, Sixth, Eighth, & Fourteenth Amendments of the United States Constitution.

Because the State bore the burden of proving all of the elements of the crime of first-degree murder, including premeditation and deliberation, the proper inquiry for the jury was not whether Jon Hall had the capacity to premeditate and deliberate, but whether as a matter of fact he actually formed these elements of intent at the time of the killing. As the Washington Supreme Court has explained, "Voluntary intoxication is not a defense, as such, but a factor the jury may consider in determining, if the defendant acted with the specific mental state necessary to commit the crime charged." State v. Furman, 858 P.2d 1092, 100-1101 (Wash. 1993). The relevant issue is "whether the [intoxicated] defendant in fact performed the mental operations which the state must prove" in order to establish the elements of the offense. State v. Trantino, 209 A.2d 117, 122, 44 N.J. 358 (1965).

The jury must "consider his state of intoxication in determining if [he] had the specific intent or mental state required." People v. Clark, 5 Cal. 4th 950, 1021, 857 P.2d 1099, 1144 (Cal. 1993) (emphasis added); See California Pattern Instruction, CALJIC No. 4.21 ("If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if the defendant had such specific intent. If from all the evidence you have a reasonable doubt whether defendant formed such specific intent, you must give the defendant the benefit of the doubt and find that he did not have such specific intent"), quoted People v. Cox, 221 Cal. App.3d 980, 988 n. 5, 270 Cal. Rptr. 730, 734 n. 5 (1990).

As these courts have recognized, there is indedeed a clear distinction between the question whether a defendant was capable of forming the requisite intent, and whether as a matter of fact, he actually formed the criminal intent under the circumstances surrounding the charged crime. See People v. Matta 57 Cal. App. 3d 472, 484 n. 1, 129 Cal. Rptr. 205, 212 n. 1 (citing CALJIC 8.77 (1974 ed.), which provides that acquittal is required if either there is "a reasonable doubt whether he was able to form the mental states" or "as a result of mental illness, mental defect, or unconsciousness caused by voluntary intoxication, [the defendant's] mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill.")

- 12 -

1029

THE JURY INSTRUCTIONS HERE, HOWEVER, IMPROPERLY FAILED TO ACKNOWLEDGE THE VITAL DISTINCTION BETWEEN INTOXICATION AFFECTING THE CAPACITY TO PREMEDITATE & DELIBERATE, & THE EFFECT OF INTOXICATION UPON THE ACTUAL OCCURRENCE OF PREMEDITATION UNDER THE CIRCUMSTANCES. EVERY COMPETENT, NON-INSANE, CONSCIOUS PERSON IS PHYSICALLY AND MENTALLY CAPABLE OF PREMEDITATING AND DELIBERATING, BUT, IN A FIRST-DEGREE MURDER PROSECUTION, THE ONLY RELEVANT QUESTION IS WHETHER THAT PERSON ACTUALLY PERFORMED THE ACTS OF PREMEDITATION AND DELIBERATION. HAVING PRESENTED EVIDENCE OF INTOXICATION, IN COMPLIANCE WITH TN. R. EVID., RULE 702 (E.G., TR. TRANS. EXHIBIT 1, VOLUME III., PAGES 334-335 DR. LYNNE DONNA ZAGER'S EXPERT OPINION THE DEFENDANT WAS INTOXICATED AND SUFFERING FROM DEPRESSION). THE PETITIONER WAS ENTITLED TO HAVE A DE JURE JURY CONSIDER THAT EVIDENCE FOR THE PURPOSE OF DEMONSTRATING THAT HE DID NOT, IN FACT, PREMEDITATE AND DELIBERATE. THE TRIAL COURT'S JURY INSTRUCTIONS, HOWEVER, PRECLUDED THE DE FACTO JURY,  FROM FULLY CONSIDERING THE EFFECTS OF VOLUNTARY INTOXICATION IN NEGATING THE ESSENTIAL ELEMENTS OF INTENT, PREMEDITATION, AND DELIBERATION.


THE STATE BEARS THE BURDEN OF PROVING ALL ELEMENTS OF AN OFFENSE BEYOND A REASONABLE DOUBT, IN RE WINSHIP, 397 U.S. 358 (1967), AND IS THEREFORE UNCONSTITUTIONAL TO INSTRUCT THE JURY NOT TO FULLY CONSIDER EVIDENCE WHICH IS DIRECTLY RELEVANT TO THOSE ELEMENTS WHICH THE STATE MUST PROVE. SEE E.G. YATES V. EVATT, 111 S.CT. 1884 (1991). FURTHER, UNDER PRINCIPLES OF COMPULSORY PROCESS, THE PETITIONER WAS ENTITLED TO PRESENT AND TO HAVE THE JURY CONSIDER EVIDENCE WHICH IS "RELEVANT, AND MATERIAL, AND VITAL TO THE DEFENSE." UNITED STATES V. VALENZUELA-BERNAL, 458 U.S. 858, 867, 102 S.CT. 3440, 3446 (1982); WASHINGTON V. TEXAS,  388 U.S. 14 (1967). HE WAS DENIED THAT OPPORTUNITY THROUGH THE JURY INSTRUCTIONS ON INTOXICATION WHICH LIMITED THE JURY'S CONSIDERATION OF HIS DEFENSE. UNDER PRINCIPLES OF DUE PROCESS & CONFRONTATION, A CRIMINALLY CHARGED DEFENDANT IS LIKEWISE ENTITLED TO "A MEANINGFUL OPPORTUNITY TO PRESENT A COMPLETE DEFENSE." CRANE V. KENTUCKY, 476 U.S. 683, 693, 106 S.CT. 2142, 2146 (1986). THIS IS ESPECIALLY CRITICAL IN A CAPITAL CASE, WHERE A JURY FINDING OF A CAPITAL MURDER MUST BE HELD TO THE MOST RIGOROUS STANDARDS OF FAIRNESS. BECK V. ALABAMA, 447 U.S. 625  (1980). NOTE: STATE V. PHIPPS, 883 S.W.2D 138, 148-149 (TN. CR. APP. 1994) (LAW ON TN. INTOXICATION DEFENSE).


CONSISTENT WITH THESE CONSTITUTIONAL PRINCIPLES, THE STATE MAY NOT LIMIT THE JURY'S FULL CONSIDERATION ONLY WHEN THE INTOXICATION RISES TO THE LEVEL WHERE THE DEFENDANT IS PHYSICALLY INCAPABLE OF FORMING ANY MENS REA. THE STATE MUST PERMIT CONSIDERATION OF ALL SUCH EVIDENCE, EVEN WHERE IT DOES NOT RISE TO A LEVEL OF TOTAL INCAPACITY, SEE NETHERY V. COLLINS, 993 F.2D 1154, 1164 (5TH CIR. 1993) (KING, J., DISSENTING) (UNCONSTITUTIONAL IN CAPITAL SENTENCING TO INSTRUCT JUROR THAT EVIDENCE OF INTOXICATION COULDN'T BE CONSIDERED AT ALL UNLESS DEFENDANT SO INTOXICATED HE'S RENDERED TEMPORARILY INSANE).

- 13 -

1030

In YATES v. EVATT, SUPRA, INVOLVED CONSTITUTIONALLY INFIRM PRESUMPTIONS ON AN ISSUE THAT WAS THE CRUX OF THE CASE - THE DEFENDANT'S INTENT. BUT IN THE CASE OF AN OMITTED ELEMENT, AS THE PRESENT ONE, THE JURY INSTRUCTIONS PRECLUDE ANY CONSIDERATION OF EVIDENCE RELEVANT TO THE OMITTED ELEMENT, AND THUS THERE COULD BE NO HARMLESS ERROR ANALYSIS. CITED: NEDER v. UNITED STATES, 527 U.S. 1, 17-18, 119 S.CT. 1827, 1838 (1999); SEE ALSO: MOMON v. STATE, 18 S.W.3D 152 165-166 (TN. 1999) (STATE OF TENNESSEE CASES ILLUSTRATING "STRUCTURAL ERRORS," THAT DEFY HARMLESS ERROR ANALYSIS).

AN IMPROPER JURY INSTRUCTION WILL RARELY JUSTIFY A REVERSAL OF A CRIMINAL CONVICTION WHEN NO OBJECTION HAS BEEN MADE AT TRIAL, AND AN OMITTED OR INCOMPLETE INSTRUCTION IS EVEN LESS LIKELY TO JUSTIFY REVERSAL, SINCE SUCH AN INSTRUCTION IS NOT AS PREJUDICIAL AS A MISSTATEMENT OF LAW. CITED: HENDERSON v. KIBBE, 431 U.S. 145, 154-155, 97 S.CT. 1730, 1736-1737 (1977).

PREMEDITATION IS A QUESTION OF FACT TO BE DETERMINED BY THE JURY FROM ALL THE CIRCUMSTANCES OF THE CASE. STATE v. STORY, 608 S.W.2D 599, 601 (TN. 1980). THE ISSUE OF THE DEFENDANT'S INABILITY TO CONTROL HIS CONDUCT ACCORDING TO THE LAW IS A QUESTION TO BE DETERMINED BY A JURY. STATE v. STATCEY, 601 S.W.2D 696 (TN. 1980). THE DEFENSE OF INTOXICATION NEGATING SPECIFIC INTENT IS A QUESTION FOR THE JURY TO DETERMINE. STATE v. GIVENS, 631 S.W.2D 720, 721 (TN. CR. APP. 1982).

TO CONFORM TO DUE PROCESS OF THE LAW, DEFENDANT'S ARE ENTITLED TO HAVE THE VALIDITY OF THEIR CONVICTIONS APPRAISED ON CONSIDERATION OF THE CASE ... AS THE ISSUES WERE DETERMINED IN THE TRIAL COURT. COLE v. ARKANSAS, 332 U.S. 196, 202, 68 S.CT. 514, 517 (1948). A TRIAL THAT WAS FUNDAMENTALLY UNFAIR AT THE TIME IT TOOK PLACE, BECAUSE THE JURY WAS NOT COMPELLED TO PERFORM ITS CONSTITUTIONALLY REQUIRED ROLE, CANNOT BE RENDERED FUNDAMENTALLY FAIR IN RETROSPECT BY WHAT AMOUNTS TO NOTHING MORE THAN AN APPELLATE REVIEW OF THE SUFFICIENCY OF EVIDENCE. ID. COMPARE: T.C.A. § 16-3-403 (RULE 52).

THE RIGHT TO AN IMPARTIAL JUDGE IS GUARANTEED BY ARTICLE § 17, OF THE TENNESSEE CONSTITUTION, WHICH PROVIDES THAT EVERY CITIZEN SHALL HAVE HIS CASE TRIED BY DUE COURSE OF LAW - THE DENIAL OF AN IMPARTIAL JUDGE DEFIES HARMLESS ERROR ANALYSIS. STATE v. BENSON, 973 S.W.2D 202, 205 (TN. 1998); SEE ALSO: STATE v. BOBO, 814 S.W.2D 353, 357 (TN. 91) (DENIAL OF JURY TRIAL - DEFIES HARMLESS ERROR).

THE SYNERGY OF THE PETITIONER'S PASSION AND INTOXICATION WERE CRITICAL TO ANY DETERMINATION OF HIS GUILT; THE JURY INSTRUCTIONS ON INTOXICATION, HOWEVER, EFFECTIVELY PRECLUDED THE JURORS FROM CONSIDERING THE FULL EFFECT OF HIS INTOXICATION UPON FORMING THE REQUISITE MENS REA. BECAUSE THE JURY INSTRUCTIONS PRECLUDED THE JURY'S CONSIDERATION OF THE PETITIONER'S EVIDENCE OF INTOXICATION, HIS FIRST-DEGREE MURDER CONVICTION VIOLATED THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, AND ART. I, § 6, 8, 9, 10, 16, & 17; AND ART. VI., § 9 OF THE TENNESSEE CONSTITUTION AND MUST THEREFORE BE REVERSED.

- 14 -

5. THIS COURT ERRED IN FINDING THAT: "THE COMPLAINTS REGARDING THE PROPRIETY OF THE TRIAL COURT"S
JURY INSTRUCTIONS HAVE BEEN WAIVED, BY FAILING TO RAISE THEM ON DIRECT APPEAL AND ALSO BY FAILING
TO PRESENT ANY EVIDENCE REGARDING THEM DURING POST-CONVICTION PROCEEDINGS." (OPINION PAGE 48).

NOTHING IN THE PETITIONER'S COMPLAINT SHOULD BE CONSIDERED WAIVED OR PREVIOUSLY DETERMINED,
BECAUSE: (1) THE COURT'S HAVE LACKED JURISDICTION OVER THE SUBJECT-MATTER, E.G., CARTER V. STATE,
958 S.W.2D 620, 624 (TN. 1997); AND (2) THE STATE"S ILLEGAL ACTIONS IN ACQUIRING JURISDICTION IS THE
RESULT OF BAD FAITH CONDUCT. SEE: E.G., STATE V. GOLDEN, 941 S.W.2D 905, 908 (TN. CR. APP. 1996)
(BAD FAITH MAY BE DEFINED AS THE STATE OF MIND INVOLVED WHEN ONE IS NOT BEING FAITHFUL TO ONE"S DUTY
OR OBLIGATION, BLACK"S LAW DICTIONARY). THE COURT ACTED IN "BAD FAITH," WHEN THE OFFICERS' OF THE
COURT ENGAGED IN COLLUSION TO VIOLATE THE PETITIONER'S RIGHT TO BE TRIED IN HENDERSON CO., WITHOUT
FOLLOWING THE RULES OF COURT. SEE: E.G., SUPRA 3., (A-E), REGARDING THE ILLEGAL CHANGE OF VENUE.

THIS COURT IS CLEARLY MISTAKEN THAT, THE PETITIONER HAS FAILED TO PRESENT ANY EVIDENCE REGARDING
THE FAULTY JURY INSTRUCTIONS ON INTOXICATION DURING THE POST CONVICTION PROCEEDING. SEE: E.G., SEPT.
4, 2002 HEARING, PAGES 225-226 (HALL - "THEY BASICALLY RUINED THE INTOXICATION DEFENSE ..., THAT"S A
STRUCTURAL ERROR" PURSUANT TO MOMON V. STATE, 18 S.W.3D 152, 165-166 (TN. 1999)). SEE E.G., AFFIDAVIT
FILED NOVEMBER 1, 2001, "AFFIDAVIT TO SUPPORT DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL REGARDING
MISSTATEMENT OF LAW." COMPARE: E.G., COLON V. COUGHLIN, 58 F.3D 865 (1995)   (A VERIFIED COMPLAINT
UNDER THE PENALTY OF PERJURY IS TO BE TREATED AS AN AFFIDAVIT FOR SUMMARY JUDGEMENT PURPOSES, IF IT
MEETS RULE 56 (E)); AND THE PETITIONER"S "MOTION FOR POST-CONVICTION RELIEF," PAGE 27, § 15.

THIS COURT CITED A CASE REGARDING JUDICIAL NOTICE, THAT NOTED IF A JURY INSTRUCTION "TRIGGERED
THAT ERROR, DEFENDANT"S COUNSEL"S FAILURE TO ASSERT THAT ISSUE AT TRIAL AND ON DIRECT APPEAL WAS A
PLAIN EXAMPLE OF INEFFECTIVE ASSISTANCE OF COUNSEL." SEE: STATE V. DELBRIDGE, 742 S.W.2D 266, 267
(TN. APP. 1987) ("IF SANDSTORM, TRIGGERED THAT ERROR, THEN DEFENDANT"S COUNSEL"S FAILURE TO ASSERT
THAT ISSUE AT TRIAL AND ON DIRECT APPEAL WAS A PLAIN EXAMPLE OF INEFFECTIVE ASSISTANCE OF COUNSEL.")

MOREOVER, ON NOVEMBER 1, 2000, THE PETITIONER HAD FILED HIS "AFFIDAVIT TO SUPPORT DENIAL OF
EFFECTIVE ASSISTANCE OF COUNSEL & APPEAL, WHICH LAYS THE FOUNDATION TO SHOW THE PREJUDICE PRONG OF
STRICKLAND, AT § 14. SEE E.G., CAMPBELL V. STATE, 904 S.W.2D 594 S.W.2D 594, 596-597 (TENN. 1995)
(PETITIONER THAT CLAIMS INEFFECTIVE ASSISTANCE OF COUNSEL CAN ESTABLISH THE PREJUDICE PRONG UNDER
STRICKLAND, BY A DEMONSTRATION SHOWING THAT IF A SPECIFIC ISSUE WOULD HAVE BEEN ADDRESSED PROPERLY
IN THE APPELLATE BRIEF, IT WOULD HAVE AFFECTED THE OUTCOME OF THE APPEAL). IF THE PETITIONER"S (ELBOW
COUNSEL), WOULD HAVE ASSERTED THESE ISSUES IN THEIR ARGUMENT FILED ON 12/2/02, AND IF THIS COURT
WOULD MADE THE STATE ANSWER THE PETITION, AS REQUIRED BY THE RULES, THIS COURT WOULDN"T HAVE TO RE-
WRITE ANOTHER OPINION AND SET ASIDE ITS ERRONEOUS (50) PAGE OPINION FILED ON 2/2/03.

- 15 -

1032

6. THIS COURT ERRED IN FINDING THAT HE "FAILED TO ESTABLISH A PARTICULARIZED NEED FOR A (SECOND) PSYCHIATRIST." SEE (OPINION PAGE 31); AND STATE V. HOLDER, 15 S.W.3D 905, 910-11 (TN. CR. APP. 1999).

A. COMPARISON OF PRIOR AND CURRENT TENNESSEE CODE ANNOTATED § 39-11-501 (INSANITY).

THE DEFENSE OF INSANITY BECAME AN AFFIRMATIVE DEFENSE EFFECTIVE JULY 1, 1995. THE STATUTE NOW PROVIDES:

> IT IS AN AFFIRMATIVE DEFENSE TO PROSECUTION THAT, AT THE TIME OF THE COMMISSION OF THE ACTS CONSTITUTING THE OFFENSE, THE DEFENDANT, AS A RESULT OF A SEVERE MENTAL DISEASE OR DEFECT, WAS UNABLE TO APPRECIATE THE NATURE OR THE WRONGFULNESS OF SUCH DEFENDANT'S ACTS. MENTAL DISEASE OR DEFECT DOES NOT OTHERWISE CONSTITUTE A DEFENSE. THE DEFENDANT HAS THE BURDEN OF PROVING THE DEFENSE OF INSANITY BY CLEAR AND CONVINCING EVIDENCE.

TENN. CODE ANN. § 39-11-501 (A) (1997) (EMPHASIS ADDED).

DEFENDANT CONTENDS THAT HE MET HIS BURDEN OF PROOF, AND THE TRIAL COURT ERRED IN CONCLUDING OTHERWISE. UPON OUR REVIEW OF THE RECORD, WE CONCLUDE THE EVIDENCE IS SUFFICIENT TO SUPPORT THE DETERMINATION OF THE TRIAL COURT. (TAKEN VERBATIM FROM HOLDER, SUPRA).

THE CURRENT VERSION OF TN. CODE ANN. § 39-11-501 (1997) IS FUNDAMENTALLY DIFFERENT THAN THE PRIOR VERSION. SEE TN. CODE ANN. § 39-11-501 (1991). THE PRIOR VERSION PROVIDED THAT INSANITY WAS SIMPLY A "DEFENSE" AND NOT AN "AFFIRMATIVE DEFENSE" AS PROVIDED IN THE CURRENT VERSION. ID. FURTHERMORE, THE PRIOR VERSION ALLOWED THIS DEFENSE "IF, AT THE TIME OF SUCH CONDUCT, AS A RESULT OF MENTAL DISEASE OR DEFECT, THE PERSON LACKED SUBSTANTIAL CAPACITY EITHER TO APPRECIATE THE WRONGFULNESS OF THE PERSON'S CONDUCT [OR] TO CONFORM THAT CONDUCT TO THE REQUIREMENTS OF LAW." ID. THE CURRENT VERSION PROVIDES THAT THIS "AFFIRMATIVE DEFENSE" APPLIES WHEN "THE DEFENDANT, AS A RESULT OF A SEVERE MENTAL DISEASE OR DEFECT, WAS UNABLE TO APPRECIATE THE NATURE OR WRONGFULNESS OF SUCH DEFENDANT'S ACTS. MENTAL DISEASE OR DEFECT DOES NOT OTHERWISE CONSTITUTE A DEFENSE." TENN. CODE ANN. § 39-11-501 (A) (1997) (EMPHASIS ADDED). FURTHERMORE, AND MOST SIGNIFICANTLY, THE NEW STATUTE PROVIDES THAT THE BURDEN OF PROOF IS UPON THE DEFENDANT TO ESTABLISH INSANITY BY "CLEAR AND CONVINCING EVIDENCE." ID.

UNDER THE PRIOR STATUTE, IF THE EVIDENCE ADDUCED RAISED A REASONABLE DOUBT AS TO THE DEFENDANT'S SANITY, THE BURDEN OF PROOF THEN FELL UPON THE STATE TO ESTABLISH SANITY BEYOND A REASONABLE DOUBT. STATE V. JACKSON, 890 S.W.2D 436, 440 (TENN. 1994). IN ORDER FOR THE STATE TO MEET ITS BURDEN OF PROVING SANITY, IT COULD PROVIDE ANY "EVIDENCE WHICH IS CONSISTENT WITH SANITY AND INCONSISTENT WITH INSANITY." STATE V. SPARKS, 891 S.W.2D 607, 616 (TENN. 1995) (CITING EDWARDS V. STATE 540 S.W.2D 641, 646 (TENN. 1976), CERT. DENIED 429 U.S. 1061, 97 S.CT. 784, 50 L.ED.2D 777 (1977)).

B. LEGISLATIVE INTENT

THE 1995 AMENDMENT WAS AN OBVIOUS EXPRESSION OF LEGISLATIVE INTENT TO RESTRICT [ 911 THE DEFENSE OF INSANITY. THE MENTAL DISEASE OR DEFECT MUST NOW BE SO "SEVERE" AS TO MAKE THE DEFENDANT "UNABLE TO APPRECIATE THE NATURE OF THE WRONGFULNESS OF [HIS / HER] ACTS." TN. CODE ANN. § 39-11-501 (A) (1997). FURTHERMORE, THE BURDEN IS NOW ON THE DEFENDANT TO ESTABLISH INSANITY BY "CLEAR AND CONVINCING EVIDENCE." MEANS EVIDENCE IN WHICH THERE IS NO SERIOUS OR SUBSTANTIAL DOUBT ABOUT THE CORRECTNESS OF THE CONCLUSIONS DRAWN FROM THE EVIDENCE." HODGES V. S.C. TOOF & CO., 833 S.W.2D 896, 901 FN. 2 (TENN. 1992); SEE ALSO T.P.I. CRIM. 40.16 (B) 4TH ED. 1995). THIS IS MUCH DIFFERENT AND HIGHER STANDARD OF PROOF PLACED ON A DEFENDANT.

C. FEDERAL LEGISLATION

THE LANGUAGE OF THE CURRENT VERSION OF TENN. CODE ANN. § 39-11-501 (1997) IS PATTERNED AFTER AND VIRTUALLY IDENTICAL TO THE FEDERAL INSANITY DEFENSE REFORM ACT OF 1984, WHICH PROVIDES:

> (A) AFFIRMATIVE DEFENSE. — IT IS AN AFFIRMATIVE DEFENSE TO THE PROSECUTION UNDER ANY FEDERAL STATUTE THAT, AT THE TIME OF THE COMMISSION OF THE ACTS CONSTITUTING THE OFFENSE, THE DEFENDANT, AS A RESULT OF A SEVERE MENTAL DISEASE OR DEFECT, WAS UNABLE TO APPRECIATE THE NATURE AND QUALITY OF THE WRONGFULNESS OF HIS ACTS. MENTAL DISEASE OR DEFECT DOES NOT OTHERWISE CONSTITUTE A DEFENSE.

> (B) BURDEN OF PROOF. — THE DEFENDANT HAS THE BURDEN OF PROVING THE DEFENSE OF INSANITY BY CLEAR AND CONVINCING PROOF.

18 U.S.C. § 17. SEE ALSO RAYBIN, TENNESSEE CRIMINAL PRACTICE AND PROCEDURE, § 28.40 (SUPP. 1997).

- 16 -

1033

D. SIGNS OF IMPROPER STANDARDS / EX POST FACTO LAW APPLIED TO THIS CASE BY EXPERTS

AT THE TIME OF THE ALLEGED OFFENSE JULY 29, 1994, THE PETITIONER CONTENDS THAT THE APPLICABLE LAW WAS T.C.A. § 39-11-501 (1991). SEE: E.G., STATE V. HALL, 8 S.W.3D 593, 596 (TN. 1999) (7/29/94). THE FOLLOWING EXCERPTS DEMONSTRATE THAT BOTH THE STATE AND DEFENSE EXPERTS DID NOT APPLY THE CORRECT STANDARD OF LAW, AND MISLED THE COURT TO BELIEVE, THAT AN INSANITY DEFENSE COULD NOT BE SUPPORTED. THIS IS A PLAIN ERROR AND WORKS AS AN EX POST FACTO LAW. IN SUPPORT OF THIS CLAIM, THE PETITIONER WILL SHOW FORTH THE FOLLOWING:

### TESTIMONY OF DR. KEITH CARUSO

DR. CARUSO - Q. WHAT DID YOU - - WHAT BECAME YOUR ULTIMATE CONCLUSION AS TO WHAT - - YOUR EVALUATION OF JON UNCOVERED ?

A. I FELT HE MET CRITERIA FOR A NUMBER OF DIAGNOSES. I WANT TO MAKE SURE I LIST THEM ALL. I FELT THAT AT THE TIME OF THE OFFENSE HE HAD MAJOR DEPRESSION, INTERMITTENT EXPLOSIVE DISORDER. I FELT THAT HE WAS DEPENDANT ON ALCOHOL, SO HE HAD ALCOHOL DEPENDENCE. .... SEE: 9/4/02 P.C. TRANS. PAGE 116.

DR. CARUSO - Q. ALL RIGHT. DO YOU - - YOU SAID IN EFFECT THAT YOU'RE NOT SAYING HE'S INSANE ?

A. THAT IS CORRECT. WELL I DON'T KNOW THAT I - - DON'T - - I DON'T SEE EVIDENCE THAT WOULD SUPPORT AN INSANITY DEFENSE. SEE: 9/4/02 P.C. TRANS. PAGE 122.

DR. CARUSO - Q. NOW, THAT STATEMENT, "I WILL SHOW YOU WHAT A BEATING IS," DOESN'T THAT TELL YOU THAT HE'S THINKING ABOUT WHAT HE'S ABOUT TO DO ?

A. WELL, AGAIN, I THINK ONE OF THE POINTS THAT I WAS MAKING BEFORE WAS THAT HE MAY RECOGNIZE WHAT HE'S DOING. THAT'S NOT AN INSANITY DEFENSE. HE RECOGNIZES THE NATURE OF HIS BEHAVIOR. HE MAY EVEN - - RECOGNIZES ITS WRONG, BUT THE CAPACITY TO STOP STOP HIMSELF ISN'T THERE. I THINK PEOPLE SHOUT A LOT OF INDISCREET THINGS WHEN THEY ARE VERY, VERY ANGRY. SO I DON'T SEE THAT AS BEING INCONSISTENT BY VIRTUE OF HE WAS ABLE TO STATE WHAT HE WAS DOING THAT HE HAD ANYMORE CONTROL OVER WHAT HE WAS DOING. 9/4/02 P.C. TRANS. PAGE 149-150. NOTE: DR. CARUSO MAKES OTHER STATEMENTS LIKE THIS.

### TESTIMONY OF DR. KIMBERLY STAHLFORD

DR. STAHLFORD - Q. CAN WE AGREE THAT THAT IS AN EXTREMELY LOW SEROTONIN LEVEL ?

A. I'M NOT SURE THAT THERE'S VERY CLEAR EVIDENCE AS TO WHAT NORMAL IS. .... 9/4/02 P.C. TRANS. PAGE 35.

DR. STAHLFORD - Q. YOU FOUND OUT THAT - - YOU DIDN'T THINK HE WAS DEPRESSED IN YOUR REPORT. IS THAT FAIR TO SAY ?

A. WHEN I SAW HIM OR AT THE TIME OF THE OFFENSE ?

Q. BOTH.

A. AT THE TIME OF THE OFFENSE, YES. I DO THINK HE HAD SOME DEPRESSIVE SYMPTOMS. I THINK I WROTE I DON'T THINK HE MET THE CRITERIA FOR MAJOR DEPRESSION. IT'S HARD TO REALLY SAY WITHOUT HAVING THE CHANCE TO HAVE INTERVIEWED HIM AT THE TIME, BUT I DO THINK HE HAD SYMPTOMS OF DEPRESSION. I DO THINK HE HAD A LOT OF STRESS, BUT I DON'T THINK HE MET THE CRITERIA FOR MAJOR DEPRESSION.

- 17 -

1034

In Ake, the U.S. Supreme Court determined that the defendant's sanity at the time of the offense must be a significant factor at trial to trigger due process protections. We must now consider the threshold showing which an indigent defendant must establish in order to obtain appointment of a psychiatric expert. State v. Barnett, 909 S.W.2d 423, 430 (Tn. 1995) (Particularized necessity).

Other state courts have also discussed the threshold showing required. For example, the North Carolina Supreme Court has, in several cases, more fully developed what is required to establish the constitutional right to appointment of an expert. That court has said that:

> In order to make a threshold showing of specific need for the expert sought, the defendant must demonstrate that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his case. Id. ....

We adopt the principles developed by the North Carolina Supreme Court, as well as those enunciated in our prior cases interpreting our statute requiring the furnishing of state funded experts. Id.

NOTE: The acronym "NOS" stands for "Not otherwise specified," a term used by treating doctors when a good explanation for the PSYCHOTIC CONDITION has not yet been determined. CITED: State v. Brian Val Kelley, 2002 WL 927610 @ page 13 (Tenn. Crim. App. 2002). See: e.g. Nov. 4, 2002 hearing, page 60-61 (Dr. Stahlford - "NOS.")

MISC.: "Borderline personality disorder," Dr. Meyer testified at the penalty phase that he believed the defendant to have a borderline personality disorder and that such people could have brief episodes of rage during "temporary states of mental illness; he did not state that the defendant was experiencing such an episode when he committed the murder. CITED: State v. Leroy Hall, 958 S.W.2d 679, 691 (Tn. 1997). See: e.g. Nov. 4, 2002 hearing, page 69 (Dr. Stalford - Borderline personality disorder); and Sept. 4, 2002 hearing, page 255 (MTMHI Results-Ex. 17-20 (Borderline personality disorder).

THEREFORE, trial counsel's failure to know and understand the law on insanity, and the deprivation of the appointment of a competent psychiatric expert deprived the petitioner of a right to a fair trial guaranteed by the Due Process Clause of both the Tennessee and United States Constitution. See: State v. Holder, 15 S.W.3d 905 (Tn. Cr. App. 1999) and State v. Barnett, 909 S.W.2d 423 (Tn. 19999). See also May 15, 2002 hearing pages 217-218 (Mayo - No I don't remember ever seeking a psychiatrist).

7. This Court erred in accrediting trial counsel's testimony that the file contains statements made to the investigators.... Thus, the Court's not convinced that counsel failed in this regard.

Pursuant to Tn. R. S.Ct. Rule 8, DR 7-102 (A) (3), & (B) (2), appointed counsel has a good faith duty to reveal the fraud to this tribunal. See e.g., May 15, 2002 hearing, page 395, (Q. "Anyway you don't remember talking to the Stanfills or the Foremans or the Brittains, do you?" A. No. But I'll tell you this, if they'd been available and they had something good to say about Mr. Hall, we would have used them at trial.") COMPARE: May 15, 2002, hearing page 395 ("Our investigator sought out every — we - every time I'd see Jon He'd have a list of people that he wanted us to run down, and we ran down every one of them that was available, and, I mean, you've got the file).

- 18 -

1035

THE PETITIONER CONTENDS, THAT APPOINTED COUNSEL WAS DERELICT IN HIS DUTY, BY FAILING TO IMPEACH THE WITNESS WITH INFORMATION AVAILABLE TO THEM. FOR EXAMPLE, POST-CONVICTION COUNSEL INVESTIGATOR, APRIL HIGUERA'S NOTES 5-05-02 (SUMMARY OF WITNESSES), DEMONSTRATES THAT HE HAD INFORMATION AVAILABLE FOR IMPEACHMENT PURPOSES AND FAILED TO PRESENT THE FACTS PROPERLY. THE PROPER WAY WOULD HAVE BEEN TO CALL MS. HIGUERA, TO DEMONSTRATE WHAT INFORMATION A PRIVATE INVESTIGATOR WOULD HAVE DISCOVERED THAT WAS NOT KNOWN BY TRIAL COUNSEL AS A RESULT OF THEIR INVESTIGATION. SEE ZAGORSKI V. STATE, WL 311926 PAGE 14 (TN. CR. APP. 1997); ZAGORSKI, 983 S.W.2D 654 (TN. 1998) (WAIVER & PREJUDICE BY PC COUNSEL). THUS VIOLATING S.CT. RULE 8, DR 7 102 (A) (3), & (B) (2). SEE E.G., SEPT. 4, 2002 HEARING, PAGE 217. IN SHORT, APPOINTED COUNSEL IS GOING TO FALL FOR FORD & MAYO'S LIES IF NOTHING IS DONE ABOUT THESE LIES AND THE DECEIT CREATED IN THE TRIAL AND 9/4/02 PC TRANSCRIPTS !!!

ONE OF THE MOST IMPORTANT WITNESSES THAT WAS NEVER INTERVIEWED, WOULD HAVE BEEN THE ONLY ADULT WITNESS, HERMAN MCKINNEY. SEE: TR. TECH. RECORD, PAGE 1 (HERMAN MCKINNEY LISTED ON THE INDICTMENT); TR. TECH. RECORD, PAGE 57, (THE PRELIMINARY HEARING TRANSCRIPT TESTIMONY OF BYRD - YOU ALSO INDICATED THAT I THINK YOU SPOKE TO A NEIGHBOR ? A. I BELIEVE HIS NAME WAS MR. MCKINNEY); TR. TRANSCRIPT, PAGE 193 (BINGHAM - A. IT WAS NIGHT, P.M. AFTER GETTING OUT OF THE CAR, THERE WAS AN OLDER GENTLEMAN UP ON THE BLACKTOP AT HIS HOUSE OUT IN THE YARD. WHEN I GOT OUT OF THE CAR HE HOLLERED AND TOLD ME TO GO DOWN BY THE POOL."); AND MAY 15, 2002 HEARING, PAGES 121-24 (EXHIBIT # 4 SUBPOENA FOR HERMAN); AND GROSECLOSE V. BELL, 895 F.SUPP. 935, 942 (M.D. TN. 1995) (FAILED TO INTERVIEW OR PRESENT THE CRIME INCIDENT WITNESSES). THIS EYEWITNESS MAY HAVE HAD FAVORABLE INTOXICATION OR INSANITY DEFENSE EVIDENCE AVAILABLE TO THE PETITIONER AND WAS IGNORED BY COUNSEL, THUS VIOLATING THE RIGHT TO A SPEEDY TRIAL.

THEREFORE, THE PETITIONER CONTENDS, THAT POST-CONVICTION COUNSEL IS RESPONSIBLE FOR FAILING TO UTILIZE INFORMATION IN THEIR CONTROL TO IMPEACH A LYING WITNESS, THAT HAS PERPETRATED A FRAUD UPON THE COURT, ALL TO THE PREJUDICE OF THE PETITIONER, IN VIOLATION OF TN. S.CT., RULE 8, DR 7-101 (A)(4) (A) (REPRESENTING CLIENT ZEALOUSLY). SEE E.G., (OPINION PAGE 17, N. 18); & (OPINION PAGE 45, N. 39).

<u>CONCLUSION</u>

IT HAS BEEN SHOWN THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL PRETRIAL, TRIAL, AND ON APPEAL. THAT BASED UPON THE BAD FAITH CONDUCT OF THE OFFICERS OF THE COURT ACTING IN CONCERT TO THWART THE PRESENTATION OF MERITORIOUS ISSUES PROPERLY, THAT HAS CREATED A IRRECONCILABLE CONFLICT IN THE PRESENTATION OF THESE CLAIMS. THIS HAS CAUSED A SIGNIFICANT AMOUNT OF THE PETITIONER'S CLAIMS REGARDING TRIAL AND APPEAL COUNSEL'S ERRORS, ALONG WITH THE VIOLATIONS OF THE PETITIONER'S CIVIL RIGHTS TO HAVE PRIVILEGED COMMUNICATIONS WITH HIS POST-CONVICTION INVESTIGATOR, MS. HIGUERA, TO BE IGNORED BY POST-CONVICTION COUNSEL.

- 19 -

DESPITE THE PETITIONER"S REPEATED REQUESTS TO POST-CONVICTION COUNSEL TO HAVE A VARIETY OF ISSUES BROUGHT UP IN COURT IN A TIMELY MEANINGFUL MANNER, COUNSEL HAS IGNORED THE PETITIONER, AND CREATED AN IRRECONCILABLE CONFLICT. IN OTHER WORDS, IT IS DIFFICULT FOR THE PETITIONER TO SHOW THE DENIAL OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL AND APPELLATE COUNSEL, WHEN POST-CONVICTION WON"T EFFECTIVELY ASSERT MERITORIOUS ISSUES TO THE COURT. HAD POST-CONVICTION COUNSEL SUBMITTED A SATISFACTORY MEMORANDUM, THAT WAS NOT SO AMBIGUOUS (OPINION PAGE 24), THEY COULD HAVE SHOWN HOW THE STATE"S EVIDENCE IS BEING IMPROPERLY CONSTRUED, THEN THIS COURT WOULD NOT HAVE HAD TO DRAFT ANOTHER OPINION. NOTWITHSTANDING THE ALTERED TRANSCRIPT OF THE PETITIONER"S WITNESS STAND TESTIMONY, EFFECTIVE COUNSEL COULD HAVE SHOWN HOW THE EVIDENCE PRESENTED BY THE STATE DEMONSTRATES A DIFFERENT SET OF FINDINGS OF FACTS. FURTHERMORE, COMPETENT COUNSEL COULD"VE SHOWN HOW TRIAL COUNSEL WAS INEFFECTIVE, AS SHOWN BY THE LEGAL ISSUES PRESENTED IN THIS MOTION.

WHEREFORE, THE PETITIONER MOVES THIS COURT TO ACCEPT THIS TENN. R. CIV. P., RULE 59.04 "MOTION TO ALTER AND AMEND JUDGEMENT," OR TREAT THIS MOTION AS A "MOTION FOR NEW TRIAL," UNDER TN. R. CRIM. P., RULE 33 (A); OR "MOTION FOR APPEAL AS OF RIGHT," UNDER T.R.A.P., RULE 3, WHICHEVER APPLIES. ALSO, IF THIS COURT HAS TO TREAT THIS AS A "MOTION FOR NEW TRIAL," THE PETITIONER MOVES THIS COURT TO GRANT A DELAY FOR FILING ANOTHER "MOTION FOR NEW TRIAL," AFTER THE PETITIONER HAS HAD A CHANCE TO SPEAK WITH A COMPETENT ATTORNEY, PURSUANT TO T.R.A.P., RULE 4.

RESPECTFULLY SUBMITTED,

*Jon Hall*

JON HALL # 238941
7475 COCKRILL BEND BLVD.
NASHVILLE, TENN. 37209

APPROVED FOR ENTRY BY COUNSEL
TN.R.S.CT. RULE 8, DR 7-101 A4A

I _Jon Hall_, HEREBY SWEAR UNDER THE PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE AND CORRECT TO THE BEST OF THE PETITIONER"S KNOWLEDGE AND BELIEF, AND ARE BASED UPON THE PERSONAL KNOWLEDGE OF THE AFOREMENTIONED FACTS. SWORN ON THIS THE _18th_ DAY OF MARCH 2003.

### CERTIFICATE OF SERVICE

I _Jon Hall_, HEREBY CERTIFY THAT I HAVE MAILED A COPY OF THE FORGOING "MOTION TO ALTER AND AMEND JUDGEMENT, TO: (1) MS. JUDY BARNHILL, MADISON COUNTY CIRCUIT COURT CLERK, CRIMINAL JUSTICE COMPLEX, 515 S. LIBERTY ST. JACKSON, TENN. 38301; (2) ATTORNEY PAUL BUCHANAN, 1526 CROCKETT HILLS BLVD., BRENTWOOD, TENN. 37027; (3) ATTORNEY DANNY ELLIS, 1289 N. HIGHLAND AVE., JACKSON TENN. 38301; AND (4) INVESTIGATOR, MS. APRIL HIGUERA, P.O. BOX 198683 NASH., TENN. 37219, VIA U.S. MAIL ON THIS THE _18th_ DAY OF MARCH 2003. THE PETITIONER HAS MAILED THESE PARTICIPANTS THIS MOTION IN ORDER TO ENSURE THAT COUNSEL PROPERLY ADDRESS THESE ISSUES, BECAUSE THE COURT IS FORCING HIM TO WORK THROUGH THESE COURT APPOINTED ATTORNEYS. THIS MOTION COMPLIES WITH TN.R.EVID. 201 & 202.

NOTE: AL EARLS WAS SERVED TOO AT P.O. BOX 2825 JACKSON, TN. 38302 (SAME DAY AS LISTED ABOVE).

XC: FILE                                   - 20 -



# ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

# JDH TRIAL AUDIOTAPES

To:        Jon Hall File
From:      Larry Gidcomb
Subject:   Analysis of audiotapes from JDH's trial
Date:      February 15, 2001

On the 3rd, 4th, and 5th days of February, 1997, Jon Douglas Hall went on trial for his life in the 26th Judicial District of the State of Tennessee. The trial was held in Division I of the Criminal Court of Madison County in Jackson, Tennessee with the Honorable Whit LaFon presiding. Jerry Woodall and Al Earls prosecuted the case; Jesse Ford and Clayton Mayo served as Mr. Hall's defense attorneys. The Official Court Reporter for the proceedings was Amy Mays.

Our files contain audiocassette tapes of Jon's trial, but, since a special machine is required to play the tapes, we had not as yet listened to them. On Monday, February 5, 2001, I visited area court reporter Tim Clay at his home. Mr. Clay loaned me a **BM-147 TRANSCRIBER**, and, as he explained its use, he also provided insight into how court reporters ordinarily do their jobs.

The **BM-147 TRANSCRIBER** has five channels capable of playing four different tracks of a recorded tape. During a trial, microphones are placed around the courtroom. The judge, witnesses, and attorneys might each have separate microphones. The "ALL" channel of the BM-147 TRANSCRIBER allows the listener to hear all the recorded action at once. Pressing Channels 1, 2, 3, or 4 isolates the sounds recorded from specific microphones. For example, during Jon's trial, Judge LaFon appears to be on Channel 2. Pressing that channel isolates the Judge's voice, enabling the listener to, in some cases, hear comments by the Judge that may be virtually undetectable when tuned to the "ALL" channel. Though it is sometimes very difficult to tell for sure, the attorneys for the prosecution and defense seem to resonate more clearly through Channel 3, while the witnesses appear to be speaking into the microphone recorded on Channel 1. Channel 4 was apparently not used for these proceedings. Court reporters record only one side of an audiocassette tape.

According to Mr. Clay, court reporters do not necessarily use their recordings of the trials unless they discover a problem or have a question concerning their own typed narration. Occasionally, if Mr. Clay gets behind in his work, he might send his tapes out to be transcribed by someone else.

Mr. Clay admitted that many court reporters like to "clean up" their finished transcripts, leaving out judges' and attorneys' stutters, false starts, and extraneous remarks, and correcting faulty

I:\PCDC\Hall_Jon\TranscriptSumry\TrialTapes.wpd                                Page 1 of 11

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

grammar and sentence structure. Though Mr. Clay said some attorneys and judges like having their language cleaned up, Mr. Clay himself rarely changes anything he has recorded from a court proceeding. Mr. Clay does not wish to have the authenticity of his transcripts questioned.

The court reporter at Jon's trial could have been more accurate on occasion. For example, during the direct examination of **Brian Byrd** on page 203, line 14, the transcript reads: **"you've got - the service is in the ground here."** According to the tape, Byrd is actually referring to **"the disturbance in the ground here."** During the direct examination of **Chris Dutton** on page 225, line 25, Mr. Woodall poses a question that includes the phrase: **"but when you were in an exercise period or guard period..."** Mr. Woodall actually says **"yard period."** The court reporter's transcription of Clayton Mayo's examination of **Dr. Lynn Zager** substitutes the term **"psycho-social retardation"** for the term Dr. Zager actually used: **"psycho-motor."** Errors like these pop up throughout the transcript, appear to be honest mistakes, and do not significantly alter the content of the text.

Also, unlike Mr. Clay, the court reporter here was quite a housekeeper. While many of her efforts to clean up the transcript are harmless enough, like when she leaves out the occasions when the Judge, unable to hear a comment, has to ask for it to be repeated, other omissions on her part may, in the context of the upcoming analysis, seem at worst suspicious, at best questionable.

Jon has always had problems with the copy of the transcript provided to him. He vividly recalls times during the trial when he voiced his complaints concerning his defense to Judge LaFon. However, many of these exchanges are not in the transcript. One such exchange, the one that occurred during Mr. Woodall's closing argument is easily explained. Our copy of the transcripts does not include Woodall's opening statement or either side's closing arguments. But two other verbal encounters between Jon and Judge LaFon are inexplicably missing from the transcript. Later, I will include the transcriptions I made of these encounters from the tapes.

The first two tapes contain the jury voir dire. The voir dire takes place in two parts. Jurors answer general questions in open court, and they are asked the more sensitive questions regarding their feelings toward the death penalty and their personal experiences with domestic violence in the privacy of the jury room. The tape made in the jury room is recorded on both sides, creating an unusual effect when the listener tunes into the "ALL" channel. In the background, the garbled voices on the opposite side of the tape can be heard playing backwards. In the cozy confines of the jury room, however, all the proceedings can be heard clearly by tuning to other channels.

In the jury room, on page 193 of the transcript after line 7, Mr. Woodall complains: **"I didn't get to question the other ten."** Judge LaFon responds: **"Okay."** This exchange is omitted from the transcript, as is another similar conversation from later in the jury room. After Mr. Ford had completed his examination of Luanne Nelson (page 161, line 15), the following exchange

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

between Mr. Woodall and the Judge is not reported in the transcript:

| | |
|---|---|
| **Woodall:** | **That's what you said earlier...And we have 12...** |
| **Judge:** | **I thought you said to go ahead and qualify these on the death penalty.** |
| **Woodall:** | **No, you Honor.** |
| **Judge:** | **All right.** |

On page 117, after line 8, a discussion of removing Jon's leg restraints before he returns to open court is omitted from the transcript.

The swearing in of the jurors and court officers, the Judge's preliminary instructions to the jury, the indictment as read by Mr. Woodall, Mr. Ford's entering of Jon's not guilty plea, and Woodall's opening statement are not included in this transcript.

On page 186, after Mr. Ford's opening statement and in the absence of the jury, Jon tries to fire Ford. Most of this exchange between Jon and Judge LaFon is in the transcript, except for a clearly audible comment Jon makes as the attorneys approach the bench for a sidebar: **"The way these proceedings have been running, a five minute opening statement is a joke."**

On page 346, after the defense has rested and in the absence of the jury, Jon is questioned by Judge LaFon concerning his decision not to testify. The transcript reports this incident, but is not entirely accurate. Page 347, lines 1 and 2 read: **THE DEFENDANT: Your Honor, they're trying to take my life away. I have my constitutional rights.** The tape records Jon's lines this way: **"You're already trying to take my life. Why are you trying to violate my constitutional rights?"**

On page 348 between lines 16 and 17, there is a lot of unreported discussion between the attorneys and the Judge concerning time frames and charging the jury. When Jon interrupts again after line 17, Judge LaFon responds: **"Talk to your lawyers,"** an exchange that is not in the transcript. After line 25 when the Judge says: **"Call the jury back. The case is already closed,"** there is an inaudible comment by someone followed by laughter in the courtroom.

Closing arguments are not included in the transcript. The court reporter describes them in this way: **Arguments were heard on behalf of the State and the Defendant without objection.** This omits any mention of Mr. Woodall's emotionally-charged closing argument, one in which both Billie's mother and Jon would be removed from the courtroom.

First, Billie's mother begins crying and wailing, necessitating her removal. Then, when Woodall makes a reference to Jon leaving Billie in the pool and going back into the house to get her van keys, Jon loudly objects. The following transcription is taken from the tape:

**ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL**

| | |
|---|---|
| Jon: | I had my own van keys...This is all a bunch of bullshit... |
| Judge: | Mr. Ford, talk to him. Tell him what I'm fixing to do... |
| Jon: | ...None of my testimony could have been brought in...You're not trying to represent me; you're trying to hang me... |
| Woodall: | Your Honor, could we remove him from the courtroom? |
| Judge: | Let me talk to him a moment...If he says another word that I can hear... |
| Jon: | ...Can't you bring any testimony... |
| Judge: | Okay. Take him in...Take him into his office, please... |

Later, in the absence of the jury, Jon is returned to the courtroom. The following exchange between Jon and Judge LaFon is missing from the transcript:

| | |
|---|---|
| Judge: | Mr. Hall, remain standing just a moment. They've finished the argument and it's my duty now to give the charge of law. Ah...If you will tell me you will behave I'm willing for you to come back in here. There will be more testimony...If you are not willing to behave, I'll send you back out... |
| Jon: | I just couldn't stand listening to that speculation when my attorneys... |
| Judge: | Inaudible |
| Jon: | ...There's a lot more evidence... |
| Judge: | Mr. Hall... |
| Jon: | ...There's a lot more evidence... |
| Judge: | ...Mr. Hall, Mr. Hall... |
| Jon: | ...I had my own set of keys to that van...There's a whole bunch of issues that should have been brought up and I didn't see that they were... |
| Judge: | Mr. Hall...Would you stop a minute, Mr. Hall? Now listen to me...I'm not talking about what has happened either the night of the so-called murder or anything else...I'm talking about right now on. And I'm gonna ask you if you'd wish to come back into the courtroom. We'd like to have you provided you'll behave yourself... |
| Jon: | Yes, sir. I'm sorry, your Honor... |
| Judge: | That's all right... |
| Jon: | But it is a matter of the heart and I don't... |
| Judge: | I can understand that... |
| Jon: | ...And I don't like them saying that I didn't take care of my kids, that I didn't love my kids. I can't stand that kind of... |
| Judge: | Let's close that door...But I understand that, sir, if you'll just have a seat...I'll just... |
| Jon: | ...I'm more sorry about Billie's death than anybody, because that was the best thing I ever had...And that's why...And they pull some convict |

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

|        | that I talked to...I never even talked on that dad-goned intercom... |
|--------|---------------------------------------------------------------------|
| Judge: | Mr. Hall, have a seat...                                            |
| Jon:   | ...And he strikes a deal with that son-of-a-bitch to try to infer premeditation. That's bull! |
| Judge: | ...I want to be sure that you are telling me now that your are gonna behave yourself because if there are any more... |
| Jon:   | I'm sorry...                                                        |

After the jurors return to the courtroom, Judge LaFon proceeds to read pages of jury instructions in such a rapid, staccato fashion as to render them almost incomprehensible. As we already knew, when the Judge finally gets to his instruction regarding the intoxication defense (pp. 366-368) he makes a mistake (p. 367, line 18) and says "Intoxication is **irrelevant** to the issue of the essential element of the Defendant's culpable mental state" instead of **relevant**. The tape reveals that Judge LeFon stumbles over the word **irrelevant**, repeating it. Saying the word twice actually gives it more weight, making it stand out in the context of the Judge's otherwise lifeless delivery. Of course, this repetition is not reported in the transcript.

After completing the instructions and sending the jury to the jury room, Judge LaFon tries to dismiss the alternates, but is stopped by Mr. Woodall in this exchange not included in the transcript:

|          |                                                                         |
|----------|-------------------------------------------------------------------------|
| Judge:   | Normally I dismiss them...                                               |
| Woodall: | I'd wait until they actually start deliberating, your Honor, before I would dismiss these three... |
| Judge:   | All right.                                                              |

Then, in a sidebar:

|          |                                                           |
|----------|-----------------------------------------------------------|
| Judge:   | They're deliberating right now when they start electing... |
| Woodall: | They don't have the instructions back there...             |
| Judge:   | Yes they do...Send them back...                            |

Then, after the sidebar, this exchange occurs on tape:

|          |                                                                                                  |
|----------|--------------------------------------------------------------------------------------------------|
| Woodall: | Before you do that, the court needs to ask if there are any exceptions to the charge. The State has none. |
| Judge:   | All right...Do you have any exceptions?                                                            |
| Ford:    | No, sir.                                                                                          |

This was in the transcript, but was reported this way:

**ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL**

| THE COURT: | Any exceptions to the charge? |
|---|---|
| MR. WOODALL: | No, Your Honor. |
| MR. FORD: | No, sir. |

During the sentencing hearing, after **Dr. Joe Mount** testifies, Judge LaFon recesses for lunch. When court reconvenes, but before the jury returns, Jon speaks to the Judge again, requesting to say something **"on the record."** In spite of Judge LaFon's affirmative reply, this exchange is also missing from the transcript:

| Jon: | Your Honor, I'd like to say something on the record... |
|---|---|
| Judge: | ...All right...Yes, sir. |
| Jon: | ...Ah, When I was up there... |
| Judge: | Stand up if you will, please, sir. |
| Jon: | When I was up there, I tried to get my legal work from out of the shed because they wouldn't let me keep all my legal work back in the cell because there's too many people in it in a 13 by 8 cell...They got 6 people in there... |
| Judge: | Where was that? Here? |
| Jon: | ...They wouldn't let me have my legal work. Whenever I came here they put half of it out in storage...I needed some papers from Sarah Fowler that proved, there's a medical report that proves that I took care of the kids as the main provider for two years while... |
| Judge: | Mr. Hall...We call a motion...But you...At the moment I got a pro se motion and...you can confer with your lawyers; they're the ones who have to make any motion...Now call the jury... |
| Jon: | ...But this is important evidence... |
| Judge: | I said you talk to your lawyer; that's what you... |
| Jon: | ...That should have been pursued during the guilt-innocence phase... |
| Judge: | Mr. Hall...Have a seat or I'm gonna send you back out. |

In spite of Judge LaFon's occasional frustration with Jon, the Judge apparently has his own doubts about the State's case.

When **Chris Dutton**, the inmate informer, testifies against Jon (pp. 222-236), Mr. Woodall asks Dutton if Jon told him what he planned to do when he went out to the house that night. Dutton answers: **"That he wanted to make her feel as he did. He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him."** This was too much for Judge LaFon. On Channel 2, he can be heard saying to someone, probably his clerk: **"They've given this guy something..."**

I:\PCDC\Hall_Jon\TranscriptSumry\TrialTapes.wpd                              Page 6 of 11

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

Later, after **Jennifer**, the last of the three children to testify for the State, has been dismissed,
Judge LaFon can be heard on Channel 2 whispering: **"This ought to have been a plea for
second degree murder...(inaudible)...about three years..."**

After the jury returns with its verdict in the guilt-innocence phase, a short recess is called before
the sentencing hearing begins. During this recess, the court reporter neglects to turn off the
recording device. Channel 1 picks up bits and pieces of conversation between the court reporter,
Jerry Woodall, and a third unidentified man who may be a bailiff. I took this tape to sound
engineer **Ron Kristy**. In his studio at **Kristy Productions**, we ran the tape through his sound
board, and he did everything he could to enhance its quality. The following transcription
represents our best efforts to glean what we could from the tape:

| | |
|---|---|
| Court Reporter: | (whispering) Well, after I talked to Ardis...I wouldn't be surprised if they do give him...if they do come back with the death penalty...<br>{Ardis was a juror, an alternate who was dismissed before the deliberations began.} |
| Unknown Man: | **I was thinking that that verdict sheet needs to come in...She's got it; Has she got it?...She needs to take charge of it...** |
| | (Inaudible whispering) |
| Court Reporter: | Ardis said...Ardis said...Ah...(Inaudible)...If we've got to pay for it...I want him on death row... |
| | (Inaudible whispering) |
| Court Reporter: | ...That crazy woman in the back row; she's acting kind of strange... |
| Unknown Man: | I'll tell Holland... |
| Woodall: | **Them old gals hung tough, didn't they?** {He appears to be talking about the jurors here.} |
| Unknown Man: | Uh huh...I...Yesterday...They had some kind of question awhile ago...Before someone got back there...knocked on the door, said forget the question, we found it... |
| | (Breathing, inaudible whispering) |
| Woodall: | Well... |
| Unknown Man: | Those exhibits we took off the board...We need them... |
| Woodall: | What I'm gonna do is take the mannequin and bring it over here...(inaudible)...pictures...(inaudible)...One at a time...Of course, they are just horrible...(inaudible)...And I'm not gonna |

**ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL**

| | |
|---|---|
| | make an opening statement... |
| Court Reporter: | ...What could you say?...(inaudible)...Because of the duplication...(inaudible)...pictures... |
| Woodall: | ...Your Honor, I'd just like to say that a picture is worth a thousand words...Talk about cruel, atrocious, and tortuous... Keep those pictures in mind as you read those definitions... |
| Court Reporter: | ...We just said the words...(inaudible)... |
| Woodall: | ...Said the words and we used the green ink and now you are gonna see...{O. C. Smith used a green marker during his testimony to mark the injuries on the mannequin.} |
| Unknown Man: | Is the family gonna stay outside? |
| Court Reporter: | Yes. |
| Woodall: | Just the mother... |
| Court Reporter: | This is awful, and I don't mean it like it sounds, but she really...she started crying on cue yesterday... |
| Woodall: | Well, I've often said at the office that he killed the wrong one...He should have killed his sister-in-law and his mother-in-law...(inaudible)...Those bitches...Like they're so torn up about it...(inaudible)...But this little gal has done...(inaudible)...get married two or three damn times... |
| Court Reporter: | I've got a question. No one ever told me those kids...They would just sit there... |
| Woodall: | Well, the mother and the father have adopted the two older children that were her children by a former marriage...the two young ones...so their last name would be...whatever their last name is... |
| Unknown Man: | It would be Lambert... |
| Woodall: | Lambert...But the two youngest ones, the one who did so well yesterday and the one with CP are his kids... |
| Court Reporter: | Okay... |
| Woodall: | ...Two and two... |
| Court Reporter: | ...Two and two...yeah, I figured that out, but I didn't know what last names to use...Are they on the indictment? |
| Woodall: | Ah...Yeah, they may be... |
| Court Reporter: | I'll look after awhile, but... |

(Inaudible whispering)

| | |
|---|---|
| Woodall: | Those little gals came through, didn't they? |
| Unknown Man: | Uh huh... |

{This time I believe Mr. Woodall is referring to the children. This is followed by

1045

**ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL**

inaudible whispering between Woodall and the court reporter. They appear to be
discussing the children.}

| | |
|---|---|
| Woodall: | Oh, yeah...(inaudible) |
| Court Reporter: | And...(inaudible)...It kind of worries me about ...(inaudible)...lady...(inaudible)... |
| Woodall: | (Inaudible)...If she was weak, they wouldn't have gotten into the car... |
| Court Reporter: | I know it. I agree... |

(More inaudible whispering about the children which seems to turn into a discussion of
the jury. Someone says: White lady...

| | |
|---|---|
| Court Reporter: | She was the last one... |
| Woodall: | I never would have thought...(inaudible)... |
| Unknown Man: | What's that? The foreman? |
| Woodall: | Yeah, the...(inaudible)... |
| Unknown Man: | (Inaudible) |
| Woodall: | Yeah. What did she do? I can't remember. |
| Unknown Man: | I don't know what...(inaudible)... |
| Woodall: | Smith was good, but the best witness of them all was that first little girl... |
| Unknown Man: | Uh huh... |
| Court Reporter: | Absolutely... |
| Woodall: | ...She knocked his brains out... |
| Court Reporter: | Yes she did...Ardis said... |
| Woodall: | That's her daughter... |
| Court Reporter: | Ardis said they were very upset...said they were not going to cry, but when they got in there a lot of them cried... |

(This is followed by inaudible whispering amid background noise and a discussion about
someone, possibly a co-worker. The unknown man tells the others that the Judge was
talking to someone yesterday about how these trials should be held at the end of the term
because the jurors have gotten used to each other at the end. Then the unknown man tells
a story about the jurors going out to dinner the night before and a female juror bringing
attention to a male waiter's legs. Woodall changes the subject back to the jury voir dire
and the Judge, but much of the following conversation is inaudible)

| | |
|---|---|
| Woodall: | You notice that I didn't ask...except would you enforce the death penalty? |

(Inaudible whispering between Woodall and the court reporter, apparently about the voir
dire.)

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

Woodall:          There's...(inaudible)...death penalties...(inaudible)...It doesn't
                  make any difference...
Court Reporter:   And this will probably be the last one the Judge has...
Woodall:          I hope so...
Court Reporter:   Yeah...
Woodall:          Well...Thank goodness he'll do what I tell him to do; he won't
                  do what anyone else tells him to do...

(More inaudible whispering between Woodall and the court reporter, apparently about the
Judge, followed by several minutes of inaudible discussion)

(Later, the unknown man compliments Woodall's tie, which Woodall reminds him he
wears only on "special occasions" like this. Then the three discuss President Clinton's
State of the Union address the night before. They are obviously not "Friends of Bill.")

(Then there is a largely inaudible discussion in which the number **"98"** is repeatedly
used. We could not bring up enough of the conversation to even guess what it was
about. Later, the following conversation could be heard more clearly)

Court Reporter:   ...Regardless of what their mind set was...
Woodall:          They may just go murder one, but it would not surprise
                  me...(inaudible)...life without parole...
Court Reporter:   Oh, I'm convinced they will now...But I am now, at the very
                  least...It will be one or the other...and it...(inaudible)...anything
                  you did...(inaudible)...what he did...
Woodall:          I agree...

(The court reporter then tells the other two about her friend Charlotte, another court
reporter who came up to see her yesterday and stayed for Woodall's closing argument
because Charlotte always enjoys Jerry's closing arguments.)

Woodall:          ...I am convinced that subconsciously, if not consciously...When
                  they're deciding murder one, they're deciding punishment...
Court Reporter:   I think you're right (laughs); I would be...

(Inaudible whispering)

Woodall:          ...I told them to take that mother out {said in derogatory manner:
                  Take that mutha out...}
Court Reporter:   ...She needs to go, too...

# ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

| | |
|---|---|
| Unknown Man: | Is she a sister? |
| Court Reporter: | No!  Un uh...No.  That's that Darlene...Jackie Brittain... |
| Woodall: | Oh, yeah...They're sorry as hell... |
| Court Reporter: | Oh, yeah! |
| Woodall: | ...Henderson County trash... |
| Court Reporter: | ...They're just sitting there...(inaudible)... |
| Unknown Man: | ...(inaudible)...tried to get a hacksaw blade into prison... |
| Court Reporter: | Ohhhh! {Loud, surprised} Oh my! |
| Unknown Man: | You didn't know that? |
| Court Reporter: | No. |
| Unknown Man: | ...Wasn't here...(inaudible)... |
| (Inaudible conversation) | |

(Later, the court reporter and the unknown man begin the process of ordering pizza for lunch for themselves and the jurors.  They discuss the timing and the quantity of the order)

| | |
|---|---|
| Court Reporter: | {Referring to the jurors} Are they hungry?  Okay...Well, they're not going to be hungry after... |
| Unknown Man; | What did you say? |
| Court Reporter: | After they hear all this evidence, they're not gonna be hungry... |

(Later, Woodall receives some sort of message and instructs someone: "Call over there, and have them put him in protective custody over there...")

Court reconvenes soon after, and Mr. Woodall does give an opening statement during the sentencing hearing.

When I completed my analysis of the tapes, I was able to successfully copy the portions of the tapes that are missing from our transcript onto another cassette tape at normal speed using a regular cassette recorder.  Though the quality of the copy is so poor as to render it unusable for anything other than in-house use, the opening statements and closing arguments are audible.



IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE
AT JACKSON

JON HALL,                              *
                                       *
Vs.                                    *      NO.  C0422
                                       *      (CAPITAL CASE)
STATE OF TENNESSEE.                    *

FILED C
JUDY BARNHILL CIRCUIT COURT CLERK
MAR 1 7 2003
DEPUTY CLERK
A.M. ____ P.M.

---

MOTION TO ALTER AND AMEND JUDGEMENT

---

COMES NOW THE PETITIONER, JON HALL, AND MOVES THIS COURT PURSUANT TO TENN. R. CIV. P., RULE 59.04 TO ALTER AND AMEND THE JUDGEMENT ENTERED ON FEBRUARY 20, 2003, AND GRANT THE APPROPRIATE RELIEF. IN SUPPORT OF THIS MOTION, THE PETITIONER WILL SHOW FORTH THE FOLLOWING:

1. THE COURT ERRED IN FINDING THAT THE PETITIONER DID NOT WANT TO REPRESENT HIMSELF DURING THE MARCH 23, 2001 HEARING. SEE: E.G., MAY 15, 2002 HEARING PAGES 20-21 (OBJECTION TO COUNSEL).

ON MARCH 23, 2001, THE PETITIONER MADE IT CLEAR THAT HE WANTED TO REPRESENT HIMSELF AND ACQUIRE ALL OF THE PREVIOUS ATTORNEY'S WORK PRODUCT FROM THEIR FILE AS INDICATED BY THE "MOTION FOR THE SURRENDER OF ATTORNEY WORK PRODUCT", FILED ON MARCH 8, 2001 AND HEARD ON MARCH 23, 2001. HOWEVER, THE PETITIONER CANNOT PROVE THIS, BECAUSE NOBODY HAS PROVIDED THE PETITIONER WITH A COPY OF THE MARCH 23, 2001 PROCEEDINGS TRANSCRIPTS. EVEN IF THE COURT HAD PROVIDED THE PETITIONER WITH A COPY OF THE MARCH 2001 PROCEEDINGS, THIS COURT WOULD PROBABLY HAVE ALTERED IT IN A WAY THAT IT THAT OMITS KEY POINTS TO THE PREVENT THE PETITIONER FROM FILING A MERITORIOUS APPEAL. FOR EXAMPLE, ON AUGUST 22, 1994, THE PETITIONER'S PRELIMINARY HEARING WAS HELD, BUT THE STATE PREPARED A FALSE TRANSCRIPT ON A KEY ISSUE. SEE TR. TECH. RECORD, PAGE 85-93 (PRELIMINARY HEARING TRANSCRIPT) AT PAGE 92 [COUNSEL'S WAIVER OF A PRELIMINARY HEARING OVER THE PETITIONER'S OBJECTION OMITTED], COMPARE: TR. TECH RECORD PAGE 94 (NEWS ARTICLE 8/23/94) [PETITIONER'S OBJECTION TO COUNSEL'S WAIVER OF A PRELIMINARY HEARING]. SEE ALSO: SEPT. 4, 2002, HEARING PAGE 219-220 (UNCONTRADICTED PROOF OF THE STATE CREATING FALSE TRANSCRIPTS). NOTE: SEPT. 4, 2002 HEARING TRANSCRIPT, PAGES 174-282 (HALL'S WITNESS STAND TESTIMONY NOT VERBATIM). SEE ATTACHED:  LARRY GIDCOMB'S ANALYSIS OF AUDIOTAPES FROM JDH'S TRIAL DATED FEBRUARY 15, 2001, (VIOLATION OF COURT REPORTER'S OATH, ANTIONE V. BYERS & ANDERSON INC., 113 S.CT. 2167, 2172 (1993)). NOTE: SEPT. 4, 2002 HEARING TRANSCRIPT PAGES 174-282 (HALL'S WITNESS STAND TESTIMONY NOT VERBATIM).

2. THE COURT ERRED IN DENYING THE PETITIONER THE RIGHT TO PERSONALLY CONDUCT AN EXAMINATION OF HIMSELF AS A WITNESS TO SUPPORT THE CLAIMS MADE IN HIS POST CONVICTION PETITION. SEE: SEPT. 4, 2002 HEARING PAGES 210, 214, 218, & 219 (I HAVE QUESTIONS FOR THIS WITNESS). SEE ALSO: UNITED STATES V. CONDER, 423 F.2D 904, 908 (6TH CIR. 1970) (SHOW SPECIFIC INSTANCE WHERE DEFENDANT WAS DENIED THE RIGHT TO EXAMINE A WITNESS); AND LONG V. STATE, 510 S.W.2D 83 (TENN. CRIM. APP. 1974) (THE BURDEN OF PROOF IS ON THE PETITIONER TO PROVE HIS ALLEGATIONS ATTACKING THE VALIDITY OF HIS CONVICTION).

3. The Court erred in finding that counsel's conduct was appropriate surrounding the filing of Ford's change of venue, to wit the trial court illegally usurped a de facto jury from Madison County to determine the merits of the petitioner's case. See: Judge Morgan's opinion pages 35-36 (Venue).

A. ARGUMENT CHALLENGING THE COURT'S DETERMINATION OF WAIVER REGARDING THE ILLEGAL CHANGE OF VENUE

There is evidence in the record that this issue was preserved for appeal. Due to the officers' of the court dereliction of duty when reviewing the records submitted in the court, has created the problem in which the court now complains. Thus, the issues have never been previously determined. See: e.g., Tr. Tech. Record, pages 200-201 (2/24/97 letter to counsel address my issues in my motions; See also: Tr. Tech. Record, pages 188, 192, & 198 (post-trial motions attacking jurisdiction).

An attempt was made by the petitioner to have the Tennessee Supreme Court address his appellate brief, captioned "Brief of the Proper Party" and its supporting appendix attacked the validity of the Court's jurisdiction on page 43 with cites to the record. See: Sept. 4, 2002 hearing pages 215-216 (Hall's testimony asking post-conviction counsel to submit records to support his claims), all to no avail, in violation of Tenn. R. Sup. Ct. Rule 8, DR 7-101 (A) (4) (A).

To ensure that the petitioner's own Supreme Court brief would be heard as stated above, the petitioner filed two motions on May 12, 1999, in the Supreme Court: (1) "Motion To Withdraw Counsel - Replacement By The Court," citing U.S. v. McDowell, 814 F.2d 245, 251-253 (6th Cir. 1987) (knowing & intentional waiver of right to counsel); and (2) "T.R.A.P. 13 (b) Consideration Of Issues Not Presented For Review", all to no avail, as well as post-conviction counsel's assistance on 9/4/02 surrounding the presentation of these relevant records.

B. ARGUMENT AGAINST THE COURT'S FINDING THAT NO OBJECTION WAS MADE TO CHANGE OF VENUE ON NOV. 8, 1995

Carthel Smith & Mike Mosier (previous attorneys), filed a motion for a change venue. This Court utilizes the Nov. 8, 1995 motions hearing transcript to point out that the petitioner never objected to Mr. Mosier's motion. This Court frowns upon litigants for asserting their rights. See: May 15, 2002 hearing, page 20-21 (Your honor, I'd like to talk. Have him removed). Anyhow, the courts reliance upon this is futile. See: STATE v. ELLIS, 953 S.W.2d 216, 221, fn. 7 (Tn. Crim. App. 1997) (Accordingly, a judge may not assume that an attorney who waives a jury necessarily invokes the wishes of his client. The assertion by counsel of a defendant waiver is less reliable than the express written or oral consent of the accused even when coupled with an inference of acquiescence drawn from the defendant's failure to protest). The record shows, that the trial court overruled Smith & Mosier's venue motion because, their motion did not meet the requirements of Tn. R. Crim. P., Rule 21 (b) (no affidavits). If this Court really considered the Venue Affidavit, its supporting Appendix & the arguments filed on Nov. 1, 2001, as it claims at (opinion page 49), the Court's findings would have been different.

- 2 -

1050

C. ARGUMENT REGARDING PETITIONER'S MAY 2, 1995 MOTION FOR A CHANGE OF VENUE OUTSIDE THE 26TH DISTRICT

THE COURT RELIANCE UPON THE PETITIONER'S OWN MAY 2, 1995 MOTION FOR A CHANGE OF VENUE, TO DRAW A CONCLUSION THAT PETITIONER WANTED A CHANGE OF VENUE TO MADISON COUNTY IS MISPLACED. GRANTED, THE PETITIONER DID FILE A MOTION FOR A CHANGE OF VENUE OUTSIDE THE 26TH DISTRICT MORE THAN A YEAR PRIOR TO MR. FORD'S APPOINTMENT, BUT IT IS IRRELEVANT TO THE MATTER AT HAND, BECAUSE IT HAD THE PETITIONER'S EXPRESS OR IMPLIED CONSIDERATION STATED IN IT. FURTHERMORE, THE COURT NEVER AFFORDED THE PETITIONER A HEARING IN ORDER TO COMPLY WITH TENN. R. CRIM. P., RULE 21 (F), TO DISCERN WHAT HAPPENED. SEE: E.G., SEPT. 4, 2002 HEARING, PAGES 220 - 223 (TESTIMONY SURROUNDING MAY 2, 1995 VENUE MOTION, EXHIBIT 16).

THE COURT POINTS OUT THAT MR. SMITH & MR. MOSIER WERE NOT GIVEN AN OPPORTUNITY TO EXPLAIN WHETHER THEY FILED THE FIRST MOTION FOR A CHANGE OF VENUE (WITHIN THE 26TH DISTRICT) AT THE PETITIONER'S REQUEST. THE PETITIONER CONTENDS, THAT THE STATE HAS WAIVED THAT OPPORTUNITY AND NOW HAS TO LOOK AT THE UNCONTESTED PROOF PRESENTED IN HIS NOV. 1, 2001 VENUE AFFIDAVIT § (1-3), & ITS SUPPORTING APPENDIX IN REGARDS TO PREVIOUS COUNSEL'S CONDUCT. SEE: E.G., DAVIS V. STATE, 673 S.W.2D 171, 174 (TENN. CRIM. APP. 1984) (THE STATE SHOULD PRESENT ATTACKED COUNSEL TO SHOW WHAT OCCURRED). SEE: SEPT. 4, 2002, PAGES 265 - 268 (I WAS WANTING TO GIVE THE STATE A CHANCE TO REBUT MY AFFIDAVITS).

D. ARGUMENT SURROUNDING THE FILING OF MR. FORD'S MOTION FOR A CHANGE OF VENUE ON SEPTEMBER 12, 1996

ON SEPT. 3, 1996, MR. FORD SERVED A "MOTION TO RENEW MOTION FOR A CHANGE OF VENUE" ON THE STATE FILED 9/12/96. SEE: TR. TECH. RECORD, PAGE 150 (VENUE MOTION). THE MOTION DIDN'T PROVIDE ANY TYPE OF NEW INFORMATION THAT WAS RELEVANT TO WARRANT RELIEF ON THE MERITS, NOR DID IT COMPLY WITH TN.R.CIV.P., RULE 11.01 & 11.02; TN.S.CT. RULE 8, CANON 7 EC 7-25; & TN.R.CRIM.P., RULE 21 (B) (NO AFFIDAVITS - REASON WHY THE TRIAL COURT DIDN'T GRANT SMITH & MOSIER'S MOTION ON 11/8/95). SEE: T.C.A. § 20-4-203 (APPLICATION FOR A CHANGE OF VENUE); AND WEAKLEY EX. REL. USSERY V. PEARCE, 52 TENN 401 (1871) (THE CORRECT PRACTICE IS TO HEAR THE WITNESSES FOR AND AGAINST THE CHANGE OF VENUE IN OPEN COURT, OR CAUSE THEIR DEPOSITIONS TO BE TAKEN AS IN ANY OTHER CASES, AND AFFIDAVITS IN OPPOSITION TO CIRCUMSTANCES).

ON SEPT. 6, 1996, (6) DAYS BEFORE THE [HENDERSON CO. CLERK, KENNY CAVESS] HAD TIME TO FILE FORD'S VENUE MOTION, THE ASSISTANT DIST. ATTORNEY, AL EARLS, SERVES MR. FORD WITH A MOTION FILED DIRECTLY TO THE [MADISON CO. CLERK, JOE GAFFNEY'S OFFICE]. THE COURT DID NOT EVEN HAVE TIME TO CONDUCT A LAWFUL EVIDENTIARY HEARING TO DETERMINE THE MERITS OF FORD'S CHANGE OF VENUE MOTION. SEE: TR. TECH. RECORD, PAGE 151 (MOTION TO DETERMINE PRIOR TO TRIAL THE COMPETENCY OF WITNESSES - FILED BY MADISON CO. CLERK, JOE GAFFNEY ON 9/18/96). THE TRIAL COURT'S CHANGE OF VENUE ORDER FILED (5) DAYS AFTER THE STATE'S COMPETENCY MOTION WAS FILED, ESTABLISHES COLLUSION. COMPARE: TR. TECH. RECORD, PAGES 151 & 152 (VENUE ORDER & COMPETENCY MOTION). THE STATE MUST BE PSYCHIC BY ASSUMING THAT THE TRIAL COURT WOULD ABUSE ITS POWER AND GRANT FORD'S VENUE MOTION WITHOUT A HEARING AND THE REQUIRED AFFIDAVITS UNDER RULE 21 (B).

- 3 -

1051

## PROOF THAT TRIAL COUNSEL WAS NOT KEEPING THE PETITIONER PROPERLY INFORMED

ITS ESSENTIAL TO POINT OUT, THAT THE PETITIONER WAS NOT INFORMED OF THE TRIAL COURT'S ARBITRARY DECISION TO CHANGE THE SITUS OF THE TRIAL TO MADISON COUNTY, AND NEITHER MR. FORD OR MR. MAYO HAD INFORMED HIM OF THIS POINT UNTIL JAN. 21, 1997. SEE: SEPT. 4, 2002 HEARING (PETITIONER - Q. WERE YOU EVER PRESENT AT A CHANGE OF VENUE HEARING ? A. NO, SIR. I WASN'T ADVISED OF A CHANGE OF VENUE UNTIL JAN. 21, 1997 ... I TOLD THEM TO GET IT CHANGED BACK). IN ORDER TO ILLUSTRATE THIS, THE PETITIONER REFERS TO TR. TECH. RECORD, PAGES 170, 171, 172, & 173 (MOTIONS CAPTIONED AND DIRECTED TO THE CIVIL & CIRCUIT COURT IN HENDERSON CO., FILED ON NOV. 12, 1996 & DECEMBER 4, 1996). THESE MOTIONS SHOW THAT TRIAL COUNSEL WAS NOT KEEPING HIM INFORMED. SEE: SEPT. 4, 2002 HEARING, PAGE 205 (THEY WERE NOT KEEPING ME INFORMED). ONE OF THE REASONS MAYBE THAT COUNSEL WAS TOO INTOXICATED. SEE: MAY 15, 2002 HEARING, PAGES 347-353 (MAYO'S SUBSTANCE ABUSE PROBLEM AT TIME OF TRIAL). COMPARE: BRIMMER V. STATE, 29 S.W.3D 497, 509-11 (TN. CR. APP. 1998) (SUBSTANCE ABUSE AFFECTING TRIAL - LACK OF COMMUNICATION).

ONE OF THE LISTED MOTIONS (TR. TECH. RECORD, PG. 170) HAS CASE NUMBER 96-589 LISTED, AND WAS MARKED FILED BY THE MADISON CO. CLERK. AN INTERESTING TALE CAN BE SHOWN BY THIS. BY LOOKING AT THE SERVICE DATE ON THE BOTTOM OF THE MOTIONS AND FIGURING UP THE DELAY ON THE CLERK'S FILE DATE, YOU CAN ASSUME THAT IT WAS TRANSFERRED TO THE MADISON CO. CLERK, BY SOME TYPE OF INTER-DEPARTMENTAL MAIL SERVICE AVAILABLE TO THE COURT. ALTHOUGH A PERSON MAY ASSUME THAT THE PETITIONER WAS INFORMED OF THIS BY LOOKING AT THE CASE NUMBER, BUT THIS ASSUMPTION WOULD BE WRONG. LOOK AT THE HEADING TO (HENDERSON COUNTY). THE PETITIONER CONTENDS, THE RECORD SHOWS HOW HE RETRIEVED THE CASE NUMBER FROM THE 11/4/96 STATE'S RESPONSE. SEE: TR. TECH. RECORD, PAGE 169 (STATE'S RESPONSE 11/4/96 - "[1] THE DEFENDANT'S MOTION IS SO MUCH NONSENSE; AND [2] THE STATE WILL ONLY RESPOND TO MOTIONS FILED BY COUNSEL").

THE PETITIONER THOUGHT THE STATE'S RESPONSE WAS CHALLENGING HIS OWN MOTIONS THAT ARE BURIED AT THE HENDERSON CO. CLERK'S OFFICE, SPECIFICALLY A MOTION FOR HABEAS CORPUS RELIEF. SEE: TRIAL TECH. RECORD, PAGE 146 (STATE'S RESPONSE [NOTICE OF MOTIONS, § 91]). CHECK WITH THE HENDERESON CO. CLERKS OFFICE. THIS COURT WILL FIND (53) PRETRIAL MOTIONS FILED BY SMITH & MOSIER (E.G., THE VENUE MOTION HEARD ON 11/8/95, THIS COURT REFERS VIA OPINION). TRIAL COUNSEL WAS INEPT, BECAUSE THEY DIDN'T MOVE THE RECORDS TO ACCOMPANY THEIR JOINDER MOTION, IN VIOLATION OF TN. S.CT. RULE 8, DR 6-101 (A)(2 & 3). SEE: TR. TECH. RECORD, PAGE 134 (MOTION TO BE INCLUDED IN PRIOR COUNSEL'S MOTIONS); AND PETITIONER'S "MOTION FOR POST-CONVICTION RELIEF," PAGE 27 § 11 (POOR MOTION PRACTICE / **VENUE PREJUDICE**).

THE PETITIONER'S FACTS ARE CLEAR AND CONVINCING, THAT THE TRIAL COURT DENIED THE PETITIONER AN OPPORTUNITY TO BE PRESENT AT ANY EVIDENTIARY OR CONFERENCE HEARING TO DETERMINE THE LEGITIMACY OF MR. FORD'S VENUE MOTION, WHEN THE TRIAL COURT CHANGED THE SITUS OF THE TRIAL TO MADISON COUNTY. SEE: MAY 15, 2002 HEARING, PAGE 385 (FORD ON VENUE HEARING: Q. DO YOU REMEMBER THE HEARING ? JUDGE LAFON GRANTED THAT ON HIS OWN - HE SAID - HE DREW THE - HE SAID DRAW THE ORDER).

- 4 -

HERE, THE RECORD INDICATES THAT THE PETITIONER DID NOT HAVE NOTICE THAT A MOTION FOR A CHANGE

OF VENUE HAD BEEN APPLIED FOR BY FORD, AND THE RECORD IS SILENT AS TO WHETHER THE PETITIONER WAIVED

HIS RIGHT TO A HEARING ON FORD'S MOTION TO RENEW MOTION FOR A CHANGE OF VENUE. SEE: E.G. ELLIS, SUPRA

AT 221 (AN ORAL STIPULATION ON THE RECORD MAY SATISFY THE RULE ABSENT A WRITTEN WAIVER, IT MUST APPEAR

FROM THE RECORD THAT THE DEFENDANT PERSONALLY GAVE EXPRESS CONSENT IN OPEN COURT); AND ELLIS, SUPRA

AT 221 FN 7 (A JUDGE MAY NOT ASSUME THAT AN ATTORNEY WHO WAIVES A JURY NECESSARILY INVOKES THE WISHES

OF HIS CLIENT. THE ASSERTION BY COUNSEL OF A DEFENDANT IS LESS RELIABLE THAN THE EXPRESS WRITTEN OR

ORAL CONSENT OF THE ACCUSED). SEE ALSO: SCOTT V. FORT ORD. FEDERAL CREDIT UNION, (IN RE G. WEEKS SEC.

INC), 5 BANKR. 220 (BANKR. W.D. TN. 1980) (JURISDICTION AND NOTICE - PROCEDURAL DUE PROCESS MANDATES

THAT A LITIGANT RECEIVE NOTICE AND AN OPPORTUNITY TO BE HEARD).

IN SPITE OF THE PETITIONER'S POST-CONVICTION TESTIMONY AND HIS UNCONTESTED VENUE AFFIDAVIT,

THIS COURT HAS ERRED IN ACCREDITING FORD'S TESTIMONY. THE LAW THAT THE PETITIONER HAS PROVIDED IN

REGARD TO WAIVER RIGHTS AS STATED IN ELLIS, SUPRA, MAKES THE COURT'S FINDING ACCREDITING MR. FORD'S

FALSE TESTIMONY IRRELEVANT. EVEN IF IT WAS TRUE THAT THE PETITIONER HAD A HABIT OF CHANGING HIS MIND

DEPENDING ON HIS MOOD AND COUNSEL BELIEVED THIS, IT MEANS THAT MR. FORD WAS DERELICT IN HIS DUTY BY

HIS FAILURE TO ENSURE THAT THE PETITIONER SIGNED A WAIVER FORM OR MADE AN ORAL STIPULATION ON THE

RECORD, IN VIOLATION OF TN.R.CRIM.P., RULE 43 (A); TN. R. CIV. P., RULES 11.01 & 11.02; AND TN. S.CT.

RULE 8, CANON 7, EC 7 - 25. SEE: PETITIONER'S VENUE AFFIDAVIT AND SUPPORTING APPENDIX, EXHIBIT G,

PAGES 12-16 (MR. FORD'S ATTY. WORK PRODUCT - SUPPLEMENT MOTION FOR A CHANGE OF VENUE & WAIVER FORM);

AND MAY 15, 2002 HEARING, PAGES 456-462 (FORD'S TESTIMONY REGARDING EX. G OF THE APPENDIX OR POST-

CONVICTION EX. # 9 ATTY. WORK PRODUCT). MR. FORD KNEW THE PROPER WAY TO BRING FORTH AN APPLICATION

FOR A CHANGE OF VENUE, BUT HE KNEW THE PETITIONER WOULD NOT SIGN IT, AND ALLOWED THE COURT TO VIOLATE

THE PETITIONER'S SIXTH AMENDMENT RIGHT TO A TRIAL IN HENDERSON COUNTY. SEE: E.G., STATE V. MUSE, 957

S.W.2D 764, 766 (TN. 1998) (DEFENDANT HAS A DUE PROCESS RIGHT UNDER THE STATE & FEDERAL CONSTITUTIONS

TO BE PRESENT. THE RIGHT TO PRESENCE IS PROTECTED BY THE DUE PROCESS CLAUSE IN SOME SITUATIONS WHERE

THE DEFENDANT IS NOT ACTUALLY CONFRONTING WITNESSES OR THE EVIDENCE AGAINST HIM. [CITATION OMITTED].

THE DEFENDANT HAS A CONSTITUTIONAL RIGHT TO BE PRESENT AT ANY HEARING "WHENEVER HIS PRESENCE HAS A

RELATION, REASONABLY SUBSTANTIAL, TO THE FULLNESS OF HIS OPPORTUNITY TO DEFEND AGAINST THE CHARGE").

ALSO, RULE 43 OF THE TENNESSEE RULES OF CRIMINAL PROCEDURE EXPLICITLY GIVES A DEFENDANT THE

RIGHT TO BE PRESENT "AT EVERY STAGE OF THE TRIAL INCLUDING THE IMPANELING OF THE JURY." THE RULE WAS

ADOPTED WITH MODIFICATIONS FROM RULE 43 OF THE FED. R. CRIM. P. [CITATIONS OMITTED]. RULE 43 EMBODIES

THE PROTECTIONS AFFORDED BY THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT, THE RIGHT TO BE PRESENT

DERIVED FROM THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS, AND THE COMMON LAW

PRIVILEGE OF PRESENCE. 8B MOORES FED. PRACTICE ¶ 43.02[1] (2D ED. 1996). THUS, ITS SCOPE IS BROADER

THAN THE CONSTITUTIONAL RIGHT ALONE. [CITATION OMITTED]. SEE: E.G., MUSE, SUPRA, AT 766-767.

1053

E. WHETHER THE TRIAL COURT PROVIDED THE PETITIONER WITH PROCEDURAL DUE PROCESS FOR A CHANGE OF VENUE

A COURT'S JURISDICTION AT THE BEGINNING OF TRIAL MAY BE LOST IN COURSE OF PROCEEDINGS DUE TO ITS FAILURE TO AFFORD THE DEFENDANT DUE PROCESS OF LAW. CITED: STATE EX. REL. ANGLIN V. MITCHELL, 575 S.W.2D 284, 287 (TN. 1979). THE RECORD BEFORE THE COURT IS CLEAR, THE "OFFICERS" OF THE COURT," DID NOT FOLLOW THE WELL ESTABLISHED LAW AS REQUIRED BY TN. R. CRIM. P., RULE 18 (A); 21 (B); 21 (F); AND 43 (A), AND THUS ABUSED ITS POWER. SEE: E.G., STATE V. SHIRLEY, 6 S.W.3D 243, 247 (TN. 1999) (DISCRETION ESSENTIALLY DENOTES THE ABSENCE OF A HARD AND FAST RULE). TO SHOW THE SIGNIFICANCE OF THE PROCEDURAL DUE PROCESS VIOLATION FOR THIS ARGUMENT, HE RELIES UPON FUENTES V. SHEVIN, 407 U.S. 67, 92 S.CT. 1983, (1972) (PROCEDURAL DUE PROCESS - CITED BY DEFINITION IN BLACK'S LAW DICTIONARY), WHICH PROVIDES THE FOLLOWING:

FOR MORE THAN A CENTURY THE CENTRAL MEANING OF "PROCEDURAL DUE PROCESS" HAS BEEN CLEAR, "PARTIES WHOSE RIGHTS ARE TO BE AFFECTED ARE ENTITLED TO BE HEARD; AND IN ORDER THAT THEY MAY ENJOY THAT RIGHT THEY MUST FIRST BE NOTIFIED." [CITATIONS OMITTED]. IT IS EQUALLY FUNDAMENTAL THAT THE RIGHT TO NOTICE AND AN OPPORTUNITY TO BE HEARD "MUST BE GRANTED AT A MEANINGFUL TIME AND IN A MEANINGFUL MANNER." HOUSE V. STATE, 911 S.W.2D 705, 711 (TENN. 1995) (ADDED TO FUENTES BY THE PETITIONER FOR THIS ISSUE).

THE CONSTITUTIONAL RIGHT TO BE HEARD IS A BASIC ASPECT OF THE DUTY OF GOVERNMENT TO FOLLOW A FAIR PROCESS OF DECISION MAKING WHEN IT ACTS TO DEPRIVE A PERSON OF HIS POSSESSIONS. THE PURPOSE OF THIS REQUIREMENT IS NOT [_ 81 ONLY TO ENSURE ABSTRACT FAIR PLAY TO AN INDIVIDUAL. ITS PURPOSE, MORE PARTICULARLY, IS TO PROTECT HIS USE AND POSSESSION OF PROPERTY FROM ARBITRARY ENCROACHMENT - TO MINIMIZE SUBSTANTIVELY UNFAIR OR MISTAKEN DEPRIVATIONS OF PROPERTY, A DANGER THAT'S ESPECIALLY GREAT WHEN THE STATE SEIZES GOODS SIMPLY UPON THE APPLICATION OF AND FOR THE BENEFIT OF A PRIVATE PARTY. SO VIEWED, THE PROHIBITION AGAINST THE DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW REFLECTS THE HIGH VALUE, EMBEDDED IN OUR CONSTITUTIONAL & POLITICAL HISTORY, THAT WE PLACE ON A PERSON'S RIGHT TO ENJOY WHAT IS HIS, FREE OF GOVERNMENTAL INTERFERENCE. [CITATION OMITTED].

THE REQUIREMENT OF NOTICE AND AN OPPORTUNITY TO BE HEARD RAISES NO IMPENETRABLE BARRIER TO THE TAKING OF A PERSON'S POSSESSIONS. BUT THE FAIR PROCESS OF DECISION MAKING THAT IT GUARANTEES WORKS, BY ITSELF, TO PROTECT AGAINST ARBITRARY DEPRIVATION OF PROPERTY. FOR WHEN A PERSON HAS AN OPPORTUNITY TO SPEAK UP IN HIS OWN DEFENSE, AND WHEN THE STATE MUST LISTEN TO WHAT HE HAS TO SAY, SUBSTANTIVELY UNFAIR AND SIMPLY MISTAKEN DEPRIVATIONS OF PROPERTY INTERESTS CAN BE PREVENTED. IT HAS LONG BEEN RECOGNIZED THAT "FAIRNESS CAN RARELY BE OBTAINED BY SECRET, ONE SIDED DETERMINATION OF FACTS DECISIVE OF RIGHTS .... [AND] NO BETTER INSTRUMENT HAS BEEN DEVISED FOR ARRIVING AT TRUTH THAN TO GIVE THE PERSON IN JEOPARDY OF SERIOUS LOSS NOTICE OF THE CASE AGAINST HIM AND AN OPPORTUNITY TO MEET IT." [CITATION OMITTED].

IF THE RIGHT TO NOTICE AND A HEARING IS TO SERVE ITS FULL PURPOSE, THEN, IT IS CLEAR THAT IT MUST BE GRANTED AT A TIME WHEN THE DEPRIVATION CAN STILL BE PREVENTED. AT A LATER HEARING, AN INDIVIDUAL'S POSSESSIONS CAN BE RETURNED TO HIM IF THEY WERE UNFAIRLY OR MISTAKENLY TAKEN IN THE FIRST PLACE. DAMAGES MAY EVEN BE [_ 82 AWARDED TO HIM FOR THE WRONGFUL DEPRIVATION. BUT NO LATER HEARING AND NO DAMAGE AWARD CAN UNDO THE FACT THAT THE ARBITRARY TAKING THAT WAS SUBJECT TO RIGHT OF PROCEDURAL DUE PROCESS HAS ALREADY OCCURRED. "THIS COURT HAS NOT ... EMBRACED THE GENERAL PROPOSITION THAT A WRONG MAY BE DONE IF IT CAN BE UNDONE." [CITATION OMITTED].

THIS IS NO NEW PRINCIPLE OF CONSTITUTIONAL LAW. THE RIGHT TO A PRIOR HEARING HAS LONG BEEN RECOGNIZED BY THIS COURT UNDER THE FOURTEENTH AND FIFTH AMENDMENTS. ALTHOUGH THE COURT HAS HELD THAT DUE PROCESS TOLERATES VARIANCES IN THE FORM OF A HEARING "APPROPRIATE TO THE NATURE OF THE CASE," [CITATION OMITTED], AND "DEPENDING UPON THE IMPORTANCE OF THE INTERESTS INVOLVED AND THE NATURE OF THE SUBSEQUENT PROCEEDINGS [IF ANY]," [CITATION OMITTED] THE COURT HAS TRADITIONALLY INSISTED THAT, WHATEVER ITS FORM, OPPORTUNITY FOR THAT HEARING MUST BE PROVIDED BEFORE THE DEPRIVATION AT ISSUE TAKES EFFECT. E.G. [CITATION(S) OMITTED]. END OF RELEVANT DISCUSSION IN FUENTES, SUPRA.

- 6 -

THE WAIVER OF ANY CONSTITUTIONAL RIGHT IS ALWAYS A SERIOUS MATTER AND SHOULD ONLY BE ACCEPTED AFTER A CAREFUL DETERMINATION BY THE COURT  THAT THE WAIVER WAS KNOWINGLY AN INTENTIONALLY MADE. THE FINDING OF WAIVER BY THE TRIAL COURT MAY NOT BE ASSUMED FROM A SILENT RECORD, NOR MAY IT BE IMPLIED. ELLIS, AT 221.  THE RIGHT OF THE ACCUSED TO OBJECT TO LOCALITY OF TRIAL IS A PERSONAL PRIVILEGE. STATE V. BROWN, 64 S.W.2D 841 (TN. 1933). ONLY THE ACCUSED CAN SIGN A WRITTEN WAIVER OF HIS RIGHT TO A JURY TRIAL WHERE THE CRIME WAS ALLEGEDLY COMMITTED, IT IS INCONGRUOUS TO HOLD THAT COUNSEL MAY ACCOMPLISH ORALLY WHAT HE MAY NOT ACCOMPLISH BY WRITTEN WORD. ELLIS, SUPRA, AT 221.

AS DEMONSTRATED, THE RECORD IS SILENT AS TO WHETHER THE PETITIONER PERSONALLY RELINQUISHED HIS RIGHT TO BE TRIED IN HENDERSON COUNTY. THE TRIAL COURT'S ACTION IN CHANGING THE VENUE TO MADISON COUNTY OVER THE PETITIONER'S OBJECTION (PRE-TRIAL OBJECTION AT TR. TRANSCRIPT PAGES 7-8), IS CLEARLY IN CONTRADICTION OF WELL ESTABLISHED LAW. SEE ALSO: STATE V. UPCHURCH, 620 S.W.2D 540 (TN. CR. APP. 1980) (TRIAL COURT IMPROPERLY TRANSFERRED THE SITUS OF TRIAL, OVER DEFENDANT'S OBJECTION, FROM COUNTY IN WHICH CRIMES WHERE COMMITTED TO DIFFERENT COUNTY, THE CONVICTION IS VOID).

THIS COURT CANNOT FAULT THE PETITIONER FOR THIS FUNDAMENTAL PLAIN ERROR, BECAUSE HE FILED A RULE 12 "MOTION TO DISMISS BASED UPON NEWLY DISCOVERED EVIDENCE." SEE: TECH. RECORD, PAGE 153-155 (PRE-TRIAL MOTION ATTACKING SUBJECT-MATTER JURISDICTION). ADDITIONALLY, THE PETITIONER FILED HIS OWN POST-TRIAL MOTIONS ATTACKING THE TRIAL COURTS JURISDICTION. SEE: TECH. RECORD, PAGES 188, 192, 198, 200, & 201 (POST-TRIAL MOTIONS AND LETTER TO COUNSEL TO ADDRESS CLAIMS). IT IS THE TRIAL COURT'S FAILURE TO FOLLOW THE RULES OF THE COURT AND PROVIDE THE PETITIONER WITH HIS "PROCEDURAL DUE PROCESS" RIGHTS AS DISCUSSED IN FUENTES V. SHEVIN, THAT CAUSED THIS PROBLEM.

FURTHERMORE, THE TENNESSEE SUPREME COURT WAS SUPPOSED TO REVIEW THE ENTIRE RECORD FOR ERRORS ON DIRECT APPEAL, AND FAILED TO NOTICE THAT THE TRIAL COURT FAILED TO FOLLOW THE RULES, I.E., TENN. R. CRIM. P., RULE 21 (F). SEE: E.G., RICKMAN V. DUTTON 864 F.SUPP. 686, 707-708 (M.D. TENN. 1994) (CITING TN. SUP. COURT CASES ON REVIEW). THE COURT SHOULD HAVE REVIEWED THE RECORD FOR ERRORS AND TOOK JUDICIAL NOTICE OF THE PETITIONER'S PLEADINGS. SEE E.G., DELBRIDGE V. STATE 742 S.W.2D 266, 267 (TN. 1987) (TN. R. EVID., RULE 201 & 202 JUDICIAL NOTICE). TO ESTABLISH THAT THE PETITIONER HAS NOT WAIVED HIS CLAIMS AND IS ENTITLED TO RELIEF, HE RELIES UPON STATE V. SEAGRAVES, 837 S.W.2D 615, 617, 618 (TN. CR. APP. 1992) (REFERENCE TO THE LAW ON SUBJECT-MATTER JURISDICTION), WHICH PROVIDES:

WHILE APPELLATE REVIEW IS GENERALLY LIMITED TO THE ISSUES PRESENTED FOR REVIEW, AN APPELLATE COURT OF THIS STATE IS EMPOWERED TO CONSIDER ISSUES WHICH HAVE NOT BEEN PRESENTED FOR REVIEW. T.R.A.P., RULE 13 (B) [CITATIONS OMITTED].

RULE 13 (B), T.R.A.P., ALSO PROVIDES THAT AN APPELLATE COURT "MAY IN ITS DISCRETION CONSIDER OTHER ISSUES IN ORDER, AMONG OTHER REASONS: (1) TO PREVENT NEEDLESS LITIGATION; (2) TO PREVENT INJURY TO THE INTERESTS OF THE PUBLIC; AND (3) TO PREVENT PREJUDICE TO THE JUDICIAL PROCESS." IN ADDITION, RULE 52 (B) TN. CRIM. P., PROVIDES THAT THIS COURT MAY NOTICE PLAIN ERROR AT ANY TIME, EVEN THOUGH NOT RAISED IN THE MOTION FOR A NEW TRIAL OR ASSIGNED AS ERROR ON APPEAL.... WHERE NECESSARY TO DO SUBSTANTIAL JUSTICE." [CITATIONS OMITTED].

- 7 -

In summary, this Court is required by law to determine whether the trial court had subject-matter jurisdiction of the offense in question. The word "shall" when used in a statute or rule, is the equivalent of the word "must." [citation omitted]. Furthermore, the issue in question is plain, and / or fundamental error on the face of the record; and the resolution of this issue is necessary to do substantial justice. Finally, this is the type of issue an appellate court should consider in the exercise of its discretion.

Moreover, in Veach v. State, 491 S.W.2d 81, 83 (Tenn. 1973), our Supreme Court said, "A constitutional question may be raised at any time." See also: State v. Reece, 637 S.W.2d 858 (Tenn. 1982) (fundamental errors). End of relevant discussion in Seagraves, supra.

This Court's reliance upon House v. State, 911 S.W.2d 705, 714 (Tn. 1995), regarding the waiver of the petitioner's claim to a right to a Henderson County jury, by the failure of counsel to raise the issue on direct appeal, is misplaced. See: e.g., House, at 714 fn. 20 ("We are not confronted with an alleged relinquishment of a fundamental constitutional trial right which may only be waived personally by a defendant. We have stated on numerous of occasions that the relinquishment of certain constitutional rights will not be presumed from a silent record). See also: State v. Muse, supra, at 767-768 (citing House supra, at 714 n. 20), Momom 18 S.W.3d 152, 166 (Tn. 99) (Muse structural error).

In Tennessee, habeas corpus relief is available only "if it appears upon the face of the record of the proceedings upon which the judgement is rendered, that a convicting court is without jurisdiction to sentence a defendant, or that a defendant's sentence of imprisonment or restraint has expired." Archer v. State, 851 S.W.2d 157, 164 (Tn. 1993). If the face of the record shows that the court did not have jurisdiction, then the judgement is void. Dykes v. Compton, 978 S.W.2d 528, 529 (Tn. 1998).

The record before the trial court record is clear that the petitioner was not afforded his right to be heard on Ford's motion for a change of venue. It is also clear, that the record is silent in regards to whether the petitioner had made a knowing and intelligent relinquishment of his right to be tried in Henderson County. It is clear, that the petitioner objected to the Court's change of venue pretrial. Additionally, it is clear, that the "officer(s) of the court," did not follow the well established law as provided by the rules of court, in order to grant a change of venue. This action is not an abuse of discretion, it is an abuse of power. See: e.g., State v. Shirley, 6 S.W.3d 243, 247 (Tn. 1999) (discretion essentially denotes the absence of a hard and fast rule). In this light a reasonable jurist can find, that the trial court's collusion with Mr. Ford, & the Assistant Dist. Attorney, constitutes the inference of actual or constructive fraud to obtain jurisdiction. See: e.g., Title 18 U.S.C. § 1359 (parties collusively joined or made). In other words, the Court's finding that a withdraw motion would have been futile, is an incorrect interpretation of the law. It was mandatory. See: e.g., Boston, Bates & Holt v. Tenn. Farmer's Mutual, 857 S.W.2d 32 (Tn. 1993). (Attorney owes duty to his client to protect all claims to which client is entitled).

- 8 -

1056

WHEREFORE, THE PETITIONER CONTENDS, THAT DUE TO COUNSEL'S FAILURE TO FOLLOW THE RULES OF COURT, THE PETITIONER WAS PREJUDICED BY COUNSEL'S ILLEGAL CHANGE OF VENUE IN THE FOLLOWING WAYS: (1) THAT A VARIETY OF MOTIONS COULD NOT BE PROPERLY ARGUED ON APPEAL WITHOUT A RECORD OF THEM BEING FILED, AS DEMONSTRATED BY POST-CONVICTION EXHIBIT 21 (11/5/95 MOTIONS HEARING TRANSCRIPTS); (2) THIS COURT IS UNABLE TO DISCERN WHAT PREVIOUS EXPERTS WERE MOTIONED FOR PRIOR TO COUNSEL'S APPOINTMENT; AND (3) THE PETITIONER WAS DENIED THE RIGHT TO TESTIFY ON HIS OWN BEHALF IN FRONT OF THE JURY FOR HIS DEFENSE, BECAUSE OF JOINDER ISSUES. SEE: SEPT. 4, 2002 HEARING, PAGES 192 - 193 ("I WANTED TO TESTIFY TO A HENDERSON COUNTY JURY). SEE E.G., STATE V. ZIMMERMAN, 823 S.W.2D 220, 227 (TENN. CRIM. APP. 1991) (ONLY THE PETITIONER COULD PRESENT A FULL VERSION OF HIS THEORY OF FACTS).

4. THE JURY INSTRUCTION ON VOLUNTARY INTOXICATION RELIEVED THE STATE OF ITS BURDEN OF PROOF AND PRECLUDED JON HALL FROM PRESENTING A FULL DEFENSE.

### ARGUMENT REGARDING INTOXICATION INSTRUCTIONS MISTAKE BY TRIAL COUNSEL

IN STATE V. HALL, 8 S.W.3D 593, 596 N. 1 (TN. 1999), THE SUPREME COURT ADDRESSED MARK DONAHOE'S SUPREME COURT ORAL ARGUMENT AND SAID:[1]

> "DURING ORAL ARGUMENT, THE DEFENDANT RAISED TWO ADDITIONAL ISSUES FOR THE FIRST TIME: FIRST, ..., AND SECOND, WHETHER THE TRIAL COURT ERRED DURING THE GUILT PHASE BY INSTRUCTING THE JURY, IN REFERENCE TO THE TO THE INTOXICATION DEFENSE, THAT "[I]NTOXICATION IS IRRELEVANT TO THE ISSUE OF THE ESSENTIAL ELEMENT OF DEFENDANT'S CULPABLE MENTAL STATE." NEITHER ..., NOR THE MISSTATEMENT OF THE PATTERN JURY INSTRUCTION WERE OBJECTED TO AT TRIAL. MOREOVER, THEY WERE NOT LISTED AS ERRORS IN EITHER THE MOTION FOR NEW TRIAL OR IN THE APPEAL TO THE COURT OF CRIMINAL APPEALS. WE FIND THAT THE FAILURE TO RAISE THESE ISSUES IN PREVIOUS PROCEEDINGS CONSTITUTES WAIVER, AND WE DECLINE TO ADDRESS THEM AT THIS TIME. T.R.A.P., RULE 3 (E); T.R.A.P., RULE 36 (A)."

---

1. THIS ERROR WAS PROPERLY REVIEWABLE BY AN APPEALS COURT FOR SEVERAL REASONS, EVEN IF IT WAS PRESENTED LATE.

FIRST, APPELLATE COURTS ARE OBLIGATED TO REVIEW ALL PLAIN ERROR ARISING IN THE TRIAL RECORD WHEN "NECESSARY TO DO SUBSTANTIAL JUSTICE." TENN. R. CRIM. P., 52(B). SEE STATE V. STEPHENSON, 878 S.W.2D 530 (TN. 1994) (FINDING PLAIN ERROR IN JURY INSTRUCTIONS IN CAPITAL TRIAL); STATE V. CAUTHERN, 778 S.W.2D 39 (TN. 1989) (PLAIN ERROR); STATE V. SUTTLES, 767 S.W.2D 403 (TENN: 1989) (PLAIN ERROR); STATE V. HINES, 758 S.W.2D 515, 523 (TN. 1988) (PLAIN ERROR IN CAPITAL CASE); STATE V. OGLE, 666 S.W.2D 58 (TN. 1984); STATE V. MACKEY, 553 S.W.2D 337 (TENN. 1977).

SECOND, BECAUSE THIS IS A CAPITAL CASE, THIS COURT IS OBLIGATED TO REVIEW ANY AND ALL ERRORS IN THE RECORD, AS REQUIRED BY CASELAW AND BY STATUTE. "IN CASES WHERE THE DEFENDANT IS UNDER SENTENCE OF DEATH, THIS COURT IS UNDER THE DUTY TO 'AUTOMATICALLY' REVIEW THE SENTENCE, WHICH IMPOSES THE BURDEN ON THIS COURT TO CONSIDER ANY ALLEGED ERROR, WHETHER CALLED TO THE TRIAL COURT'S ATTENTION OR NOT." RICKMAN V. DUTTON, 864 F.SUPP 686, 708 (TN. 1994); STATE V. DUNCAN, 698 S.W.2D 63, 67-68 (TN. 1985). STATE V. BIGBEE, 885 S.W.2D 797 (TN. 1994).

THIRD, BECAUSE THESE ARE CONSTITUTIONAL QUESTIONS, THEY MAY BE PROPERLY RAISED FOR THE FIRST TIME ON APPEAL. VEACH V. STATE, 491 S.W.2D 81, 83 (TN. 1973) ("GENERALLY APPELLATE COURTS REVIEW ONLY QUESTIONS PRESENTED FOR DETERMINATION IN THE TRIAL COURT. HOWEVER, GENERALLY A CONSTITUTIONAL QUESTION MAY BE RAISED AT ANY TIME. ALSO THE RULE WILL BE WAIVED IN CASES INVOLVING THE DEPRIVATION OF LIFE OR LIBERTY."; CAPRI ADULT CINEMA V. STATE, 537 S.W.2D 896, 900 (TN. 1976) ("CONSTITUTIONAL ISSUES MAY BE RAISED FOR THE FIRST TIME ON APPEAL.")

FOURTH, BECAUSE THIS AND OTHER ERRORS CITED ARE FUNDAMENTAL ERRORS, THEY CANNOT BE WAIVED. ON APPEAL, THIS COURT IS OBLIGATED TO REVIEW ANY AND ALL CLAIMS OF FUNDAMENTAL ERROR. SEE E.G., STATE V. REECE, 637 S.W.2D 858 (TN. 1982); STATE V. THOMPSON, 519 S.W.2D 789, (TN. 1975); STATE V. STAFFORD, 670 S.W.2D 243 (TN. CR. APP. 1984) STATE V. BARGER 612 S.W.2D 485 (TN. CR. APP. 1980) HILL V. STATE, 513 S.W.2D 142 (TN. CR. APP. 1974); TAYLOR V. STATE, 369 S.W.2D 385 (TN. CR. APP. 1963).

- 9 -

A. THE MISSTATEMENT OF LAW ON INTOXICATION    PRECLUDED THE JURY FROM CONSIDERING THE DEFENSE'S THEORY

THE TRIAL COURT INSTRUCTED THE JURY CONCERNING VOLUNTARY INTOXICATION AS A DEFENSE TO THE CHARGE

OF FIRST DEGREE MURDER:

> INCLUDED IN THE DEFENDANT'S PLEA OF NOT GUILTY IS HIS PLEA OF INTOXICATION AS A DEFENSE.
> YOU HAVE HEARD EVIDENCE CONCERNING THE ALLEGED INTOXICATION OF THE DEFENDANT THE TIME OF THE
> ALLEGED OFFENSE.
> INTOXICATION ITSELF IS GENERALLY NOT A DEFENSE TO PROSECUTION FOR AN OFFENSE. IF A PERSON
> VOLUNTARILY BECOMES INTOXICATED AND WHILE IN THAT CONDITION COMMITS AN ACT WHICH WOULD BE A
> CRIME IF HE OR SHE WERE SOBER, HE OR SHE IS FULLY RESPONSIBLE BY HIS OR HER CONDUCT. IT IS
> THE DUTY OF PERSONS TO REMAIN FROM PLACING THEMSELVES IN A CONDITION WHICH POSES A DANGER TO
> OTHERS.
> INTOXICATION MEANS A DISTURBANCE OF MENTAL OR PHYSICAL CAPACITY RESULTING FROM THE
> INTRODUCTION OF ANY SUBSTANCE IN THE BODY.
> VOLUNTARY INTOXICATION MEANS INTOXICATION CAUSED BY A SUBSTANCE THAT A PERSON KNOWINGLY
> INTRODUCED INTO THE PERSON'S BODY, THE TENDENCY OF WHICH TO CAUSE INTOXICATION WAS KNOWN OR
> OUGHT TO HAVE BEEN KNOWN.
> INTOXICATION IS IRRELEVANT TO THE ISSUE OF THE ESSENTIAL ELEMENT OF THE DEFENDANT'S
> CULPABLE MENTAL STATE.
> IN THIS CASE, THE STATE MUST PROVE BEYOND A REASONABLE DOUBT THE REQUIRED CULPABLE,
> C-U-L-P-A-B-L-E, MENTAL STATE OF THE DEFENDANT AS DEFINED IN EACH OFFENSE LISTED IN THE CHARGE.
> IF YOU FIND THAT THE DEFENDANT WAS INTOXICATED TO THE EXTENT THAT HE COULD NOT HAVE
> POSSESSED THE REQUIRED CULPABLE MIND, THEN HE CANNOT BE GUILTY OF THE OFFENSE CHARGED.
> IF RECKLESSNESS ESTABLISHES AN ELEMENT OF THE OFFENSE AND THE DEFENDANT IS UNAWARE OF A
> RISK BECAUSE OF VOLUNTARY INTOXICATION, THE DEFENDANT'S UNAWARENESS IS IMMATERIAL AND IS NO
> DEFENSE TO THAT ELEMENT IN THE PROSECUTION OF SAID OFFENSE.

(EXHIBIT 1, VOL. III, PP. 366-368).

DURING THE OPENING ARGUMENTS, TRIAL COUNSEL DID NOT DENY MR. HALL'S INVOLVEMENT IN THE ALLEGED

HOMICIDE, NOR DID THEY ENTER A PLEA OF INSANITY. SEE EX. 1, PAGES 179-180 (OPENING STATEMENT). TRIAL

COUNSEL'S THEORY OF DEFENSE WAS INTOXICATION AND TO TRY TO GET IT DOWN TO MANSLAUGHTER, DUE TO THE

FACT IT'S DOMESTIC. SEE; MAY 15, 2002 HEARING, PAGES 390-392 (FORD'S THEORY OF DEFENSE AT TRIAL).

A REASONABLE JUROR WOULD HAVE CONCLUDED, THAT VOLUNTARY INTOXICATION HAD NO BEARING ON THE CULPABLE

MENTAL STATE OF THE PETITIONER. THUS, THE JURY INSTRUCTIONS EFFECTIVELY PRECLUDED THE JURY FROM BEING

ABLE TO CONSIDER THE FULL EFFECT OF HIS INTOXICATION UPON FORMING THE REQUISITE MENS REA.

IN STATE V. PHIPPS, 883 S.W.2D 138, (TN. CR. APP. 1994), THE COURT OF CRIMINAL APPEALS, REVERSED

MR. PHIPPS FIRST DEGREE MURDER CONVICTION, DUE TO A "COMMENT ON THE NON-EXISTENCE OF THE [DEFENSE] OF

POST-TRAUMATIC STRESS DISORDER DID NOT CLEARLY REFLECT THE LAW IN TENNESSEE. MOREOVER, IT SUGGUESTED

THAT THE EVIDENCE WAS IMPERTINENT. AS SUCH IT SERVED TO EXCLUDE FROM JURY CONSIDERATION DEFENDANT'S

THEORY OF THE CASE." ID. AT 150. THE JUDGE'S INSTRUCTION SERVED TO OBVIATE CONSIDERATION BY THE JURY

RELEVANT EVIDENCE ESSENTIAL TO THE DEFENSE THEORY AND AMOUNTED TO AN IMPERMISSIBLE COMMENT ON THE

EVIDENCE. TENN. CONST. ARTICLE VI, § 9. ID. AT 151. TAKEN AS A WHOLE, THE JURY CHARGE GIVEN BY THE

TRIAL COURT DOES NOT PROVIDE THE CLEAR AND DISTINCT EXPOSITION OF THE LAW REQUIRED IN TENNESSEE AND

AS SUCH INTERFERES WITH THE RIGHT TO TRIAL BY JURY. [CITATION OMITTED]. THE JUDGEMENT OF THE TRIAL

COURT MUST, THEREFORE, BE REVERSED AND THE CASE REMANDED FOR A NEW TRIAL. ID. AT 151.

1058

## CERTIFICATE & SEAL

**STATE OF TENNESSEE**

**COUNTY OF MADISON**


I, Judy Barnhill, Clerk of the Circuit Court for the County of Madison, in the State aforesaid, do certify that the foregoing is a correct transcript of the record and proceedings had in said Court in the case heretofore prosecuted and determined therein between **JON HALL** APPELLANT **and STATE OF TENNESSEE ,** APPELLEE, as the same remains of record in said Court.


**STATE OF TENNESSEE**

**COUNTY OF MADISON**


In testimony whereof, I subscribe my name and affix the seal of said Court at office, in Jackson, Tennessee the **21ST** DAY OF **JULY** in the year Two Thousand Three in the 224th year of American Independence.


_Judy Barnhill_
JUDY BARNHILL, CLERK

1059