# ADDENDUM 1
## Volume 8

W2003-00668-CCA-R3-PD

# CIRCUIT COURT OF MADISON COUNTY
## – TO –
# COURT OF CRIMINAL APPEALS

JUDGE___ROY B. MORGAN_____ DIVISION___I____

CIRCUIT COURT CLERK_____JUDY BARNHILL_____

VOLUME _VIII____ OF _VIII____ VOLUMES

STATE OF TENNESSEE

VS.

CASE NO. C-00-422

JON HALL_____

| | | | | | | |
|---|---|---|---|---|---|---|
| FELONY | ☒ | MISDEMEANOR | ☐ | ROR | ☐ | TDOC ☒ |
| BOND | ☐ | $ | | INDIGENT | ☐ | |
| POST CONVICTION | ☒ | | | HABEAS CORPUS | | ☐ |

MR. ALFRED EARLS
ASSISTANCE DISTRICT ATTORNEY
P.O. BOX 2825
JACKSON, TN 38302

MR. DANNY ELLIS
ATTORNEY AT LAW
P.O. BOX 3512
JACKSON, TN 38303

Attorney For: APPELLEE

Attorney For: APPELLANT

Attorney For:

Attorney For:

OFFENSE: FIRST DEGREE MURDER

SENTENCE: DEATH

**FILED**
JUL 2 4 2003
Clerk of the Courts
Rec'd By

Vol. 8

Filed the _21ST__ day of ____JULY_____, _2003__.

COURT OF CRIMINAL APPEALS

BY: _T. ROBERSON_____

LAYCOOK, JACKSON

INDEX

CERTIFICATE & SEAL                                      1083

MOTION TO ALTER AND AMEND JUDGMENT
(MARCH 17, 2003)  CONTINUED                   1061-1080

DESIGNATION OF RECORD                          1081-1082

IN CRIMINAL CASES, THERE IS A POSITIVE DUTY UPON THE TRIAL JUDGE TO GIVE THE JURY A COMPLETE CHARGE ON THE APPLICABLE LAW TO THE FACTS OF THE CASE. STATE V. HARRIS, 839 S.W.2D 54, 73 (TN. 1992). A DEFENDANT HAS A RIGHT TO HAVE EVERY ISSUE OF FACT RAISED BY THE EVIDENCE & MATERIAL TO HIS DEFENSE SUBMITTED TO THE JURY UPON PROPER JURY INSTRUCTIONS BY THE TRIAL COURT. CASEY V. STATE, 491 S.W.2D 90, 94 (TN. CR. APP. 1972). CITED: STATE V. PHIPPS, 883 S.W.2D 138, 149-150 (TN. CR. APP. 1994).

ARTICLE VI., § 9 OF THE TENNESSEE CONSTITUTION PROHIBITS JUDGES FROM MAKING ANY COMMENT "WITH RESPECT TO MATTERS OF FACT...." [CITATION OMITTED]. THE AIMS OF THIS PROVISION ARE TO GUARANTEE THE RELIABILITY OF AN IMPARTIAL JUDGE AND PRESERVE FOR THE JURY THE RESOLUTION OF THE FACTS. [CITATION OMITTED]. CITED. STATE V. EAVES, 959 S.W.2D 601, 605 (TN. CR. APP. 1997).

PROVISION OF TENNESSEE CONSTITUTION, THAT JUDGES ARE NOT TO CHARGE JURIES "WITH RESPECT TO MATTERS OF FACT, BUT MAY STATE THE TESTIMONY & DECLARE THE LAW," IS DESIGNED TO PROVIDE ALL LITIGANTS WITH AN IMPARTIAL TRIAL JUDGE AND TO PRESERVE THE JURY"S ROLE AS FINDERS OF FACT; PURPOSES ARE ACCOMPLISHED BY PREVENTING THE TRIAL COURT FROM INFLUENCING JURY"S DELIBERATIONS BY "SUMMING UP" EVIDENCE IN A MANNER OF ENGLISH COURTS COMMENTING ON THE WEIGHT OF THE EVIDENCE, OR INSTRUCTING JURY CONCERNING FACTUAL CONCLUSIONS TO BE DRAWN FROM THE EVIDENCE. WESTS TENN. CODE, CONST. ARTICLE VI, § 9. CITED: STATE V. ODOM, 928 S.W.2D 18, 32 (TN. 1996).

TENNESSEE HAS LONG ADHERED TO THE RULE THAT A DEFENDANT"S INTOXICATION MAY REDUCE FIRST-DEGREE TO SECOND-DEGREE MURDER. STATE V. PIRTLE, 28 TENN. 663 (1849). THIS IS SO, BECAUSE INTOXICATION MAY BE SUFFICIENT TO PREVENTING THE FORMING OF A PREMEDITATED OR DELIBERATE DESIGN TO KILL. STATE V. BULLINGTON, 532 S.W.2D 556 (TN. 1976). SEE E.G., SEPT. 4, 2002 HEARING, PAGE 67 (DR. AUBLE - HALL "TOLD ME THAT HE DOESN"T REMEMBER IT VERY CLEARLY BECAUSE HE WAS INTOXICATED."); AND PAGE 72 (DR. AUBLE - "IT"S MY OPINION THAT HIS ACTIONS WERE NOT DELIBERATE AND THAT HE WAS NOT WEIGHING OPTIONS IN ANY KIND OF COOL MANNER AT ALL."); SEPT. 4, 2002 HEARING PAGE 118 (DR. CARUSO - "AT THE TIME OF THE OFFENSE HE HAD A GLOBAL ASSESSMENT OF FUNCTIONING SCORE OF ABOUT 40." ... THAT"S ON A SCALE OF 100 WHERE SOMEONE WITH A SCALE OF 31 - - A SCORE OF 31 TO 40 WOULD BE SERIOUSLY IMPAIRED.")

IN STATE V. BROWN, 553 S.W.2D 94, 96 (TN. 1977), THE SUPREME COURT OF TENNESSEE CONCLUDED THAT: "INSTRUCTIONS GIVEN IN FIRST-DEGREE MURDER PROSECUTION ON INTOXICATION DEFENSE WAS ERRONEOUS THAT OMITTED RULE THAT INTOXICATION CAN NEGATE FINDING OF PREMEDITATION, ESSENTIAL FOR CONVICTION IN FIRST DEGREE MURDER. [ CITATION OMITTED]. FAILURE TO APPLY INTOXICATION TO THE ISSUE OF PREMEDITATION AND THE MENTAL STATE OF THE APPELLANT COULD EASILY MISLEAD THE JURY. THIS IS FUNDAMENTAL ERROR.")

1060

B. THE MISSTATEMENT OF LAW ON INTOXICATION RELIEVED THE STATE OF ITS BURDEN OF PROOF, DENIED THE
   PETITIONER DUE PROCESS, AND VIOLATED HIS RIGHT TO COMPULSORY PROCESS

THE JURY WAS GIVEN JURY INSTRUCTIONS WHICH PRECLUDED THEM FROM CONSIDERING THE PETITIONER'S INTOXICATION DEFENSE, WHICH REDUCED HIS CULPABILITY AND WHICH MILITATED AGAINST A FINDING OF FIRST DEGREE MURDER. THIS VIOLATED THE PETITIONER'S CONSTITUTIONAL RIGHTS UNDER ARTICLE I, §§ 6, 8, 9, 16, & 17, AND ARTICLE VI., § 9 OF THE TENNESSEE CONSTITUTION, AND THE FIFTH, SIXTH, EIGHTH, & FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

BECAUSE THE STATE BORE THE BURDEN OF PROVING ALL OF THE ELEMENTS OF THE CRIME OF FIRST-DEGREE MURDER, INCLUDING PREMEDITATION AND DELIBERATION, THE PROPER INQUIRY FOR THE JURY WAS NOT WHETHER JON HALL HAD THE CAPACITY TO PREMEDITATE AND DELIBERATE, BUT WHETHER AS A MATTER OF FACT HE ACTUALLY FORMED THESE ELEMENTS OF INTENT AT THE TIME OF THE KILLING. AS THE WASHINGTON SUPREME COURT HAS EXPLAINED, "VOLUNTARY INTOXICATION IS NOT A DEFENSE, AS SUCH, BUT A FACTOR THE JURY MAY CONSIDER IN DETERMINING, IF THE DEFENDANT ACTED WITH THE SPECIFIC MENTAL STATE NECESSARY TO COMMIT THE CRIME CHARGED." STATE v. FURMAN, 858 P.2D 1092, 100-1101 (WASH. 1993). THE RELEVANT ISSUE IS "WHETHER THE [INTOXICATED] DEFENDANT IN FACT PERFORMED THE MENTAL OPERATIONS WHICH THE STATE MUST PROVE" IN ORDER TO ESTABLISH THE ELEMENTS OF THE OFFENSE. STATE v. TRANTINO, 209 A.2D 117, 122, 44 N.J. 358 (1965).

THE JURY MUST "CONSIDER HIS STATE OF INTOXICATION IN DETERMINING IF [HE] HAD THE SPECIFIC INTENT OR MENTAL STATE REQUIRED." PEOPLE v. CLARK, 5 CAL. 4TH 950, 1021, 857 P.2D 1099, 1144 (CAL. 1993) (EMPHASIS ADDED); SEE CALIFORNIA PATTERN INSTRUCTION, CALJIC NO. 4.21 ("IF THE EVIDENCE SHOWS THAT THE DEFENDANT WAS INTOXICATED AT THE TIME OF THE ALLEGED OFFENSE, THE JURY SHOULD CONSIDER HIS STATE OF INTOXICATION IN DETERMINING IF THE DEFENDANT HAD SUCH SPECIFIC INTENT. IF FROM ALL THE EVIDENCE YOU HAVE A REASONABLE DOUBT WHETHER DEFENDANT FORMED SUCH SPECIFIC INTENT, YOU MUST GIVE THE DEFENDANT THE BENEFIT OF THE DOUBT AND FIND THAT HE DID NOT HAVE SUCH SPECIFIC INTENT"), QUOTED PEOPLE v. COX, 221 CAL. APP.3D 980, 988 N. 5, 270 CAL. RPTR. 730, 734 N. 5 (1990).

AS THESE COURTS HAVE RECOGNIZED, THERE IS INDEED A CLEAR DISTINCTION BETWEEN THE QUESTION WHETHER A DEFENDANT WAS CAPABLE OF FORMING THE REQUISITE INTENT, AND WHETHER AS A MATTER OF FACT, HE ACTUALLY FORMED THE CRIMINAL INTENT UNDER THE CIRCUMSTANCES SURROUNDING THE CHARGED CRIME. SEE PEOPLE v. MATTA 57 CAL. APP. 3D 472, 484 N. 1, 129 CAL. RPTR. 205, 212 N. 1 (CITING CALJIC 8.77 (1974 ED.), WHICH PROVIDES THAT ACQUITTAL IS REQUIRED IF EITHER THERE IS "A REASONABLE DOUBT WHETHER HE WAS ABLE TO FORM THE MENTAL STATES" OR "AS A RESULT OF MENTAL ILLNESS, MENTAL DEFECT, OR UNCONSCIOUSNESS CAUSED BY VOLUNTARY INTOXICATION, [THE DEFENDANT'S] MENTAL CAPACITY WAS DIMINISHED TO THE EXTENT THAT HE NEITHER HARBORED MALICE AFORETHOUGHT NOR HAD AN INTENT TO KILL.")

- 12 -

THE JURY INSTRUCTIONS HERE, HOWEVER, IMPROPERLY FAILED TO ACKNOWLEDGE THE VITAL DISTINCTION BETWEEN INTOXICATION AFFECTING THE CAPACITY TO PREMEDITATE & DELIBERATE, & THE EFFECT OF INTOXICATION UPON THE ACTUAL OCCURRENCE OF PREMEDITATION UNDER THE CIRCUMSTANCES. EVERY COMPETENT, NON-INSANE, CONSCIOUS PERSON IS PHYSICALLY AND MENTALLY CAPABLE OF PREMEDITATING AND DELIBERATING, BUT, IN A FIRST-DEGREE MURDER PROSECUTION, THE ONLY RELEVANT QUESTION IS WHETHER THAT PERSON ACTUALLY PERFORMED THE ACTS OF PREMEDITATION AND DELIBERATION. HAVING PRESENTED EVIDENCE OF INTOXICATION, IN COMPLIANCE WITH TN. R. EVID., RULE 702 (E.G., TR. TRANS. EXHIBIT 1, VOLUME III., PAGES 334-335 DR. LYNNE DONNA ZAGER'S EXPERT OPINION THE DEFENDANT WAS INTOXICATED AND SUFFERING FROM DEPRESSION). THE PETITIONER WAS ENTITLED TO HAVE A DE JURE JURY CONSIDER THAT EVIDENCE FOR THE PURPOSE OF DEMONSTRATING THAT HE DID NOT, IN FACT, PREMEDITATE AND DELIBERATE. THE TRIAL COURT'S JURY INSTRUCTIONS, HOWEVER, PRECLUDED THE DE FACTO JURY, FROM FULLY CONSIDERING THE EFFECTS OF VOLUNTARY INTOXICATION IN NEGATING THE ESSENTIAL ELEMENTS OF INTENT, PREMEDITATION, AND DELIBERATION.

THE STATE BEARS THE BURDEN OF PROVING ALL ELEMENTS OF AN OFFENSE BEYOND A REASONABLE DOUBT, IN RE WINSHIP, 397 U.S. 358 (1967), AND IS THEREFORE UNCONSTITUTIONAL TO INSTRUCT THE JURY NOT TO FULLY CONSIDER EVIDENCE WHICH IS DIRECTLY RELEVANT TO THOSE ELEMENTS WHICH THE STATE MUST PROVE. SEE E.G. YATES V. EVATT, 111 S.CT. 1884 (1991). FURTHER, UNDER PRINCIPLES OF COMPULSORY PROCESS, THE PETITIONER WAS ENTITLED TO PRESENT AND TO HAVE THE JURY CONSIDER EVIDENCE WHICH IS "RELEVANT, AND MATERIAL, AND VITAL TO THE DEFENSE." UNITED STATES V. VALENZUELA-BERNAL, 458 U.S. 858, 867, 102 S.CT. 3440, 3446 (1982); WASHINGTON V. TEXAS, 388 U.S. 14 (1967). HE WAS DENIED THAT OPPORTUNITY THROUGH THE JURY INSTRUCTIONS ON INTOXICATION WHICH LIMITED THE JURY'S CONSIDERATION OF HIS DEFENSE. UNDER PRINCIPLES OF DUE PROCESS & CONFRONTATION, A CRIMINALLY CHARGED DEFENDANT IS LIKEWISE ENTITLED TO "A MEANINGFUL OPPORTUNITY TO PRESENT A COMPLETE DEFENSE." CRANE V. KENTUCKY, 476 U.S. 683, 695, 106 S.CT. 2142, 2146 (1986). THIS IS ESPECIALLY CRITICAL IN A CAPITAL CASE, WHERE A JURY FINDING OF A CAPITAL MURDER MUST BE HELD TO THE MOST RIGOROUS STANDARDS OF FAIRNESS. BECK V. ALABAMA, 447 U.S. 625 (1980). NOTE: STATE V. PHIPPS, 883 S.W.2D 138, 148-149 (TN. CR. APP. 1994) (LAW ON TN. INTOXICATION DEFENSE).

CONSISTENT WITH THESE CONSTITUTIONAL PRINCIPLES, THE STATE MAY NOT LIMIT THE JURY'S FULL CONSIDERATION ONLY WHEN THE INTOXICATION RISES TO THE LEVEL WHERE THE DEFENDANT IS PHYSICALLY INCAPABLE OF FORMING ANY MENS REA. THE STATE MUST PERMIT CONSIDERATION OF ALL SUCH EVIDENCE, EVEN WHERE IT DOES NOT RISE TO A LEVEL OF TOTAL INCAPACITY, SEE NETHERY V. COLLINS, 993 F.2D 1154, 1164 (5TH CIR. 1993) (KING, J., DISSENTING) (UNCONSTITUTIONAL IN CAPITAL SENTENCING TO INSTRUCT JUROR THAT EVIDENCE OF INTOXICATION COULDN'T BE CONSIDERED AT ALL UNLESS DEFENDANT SO INTOXICATED HE'S RENDERED TEMPORARILY INSANE).

- 13 -

In YATES V. EVATT, SUPRA, INVOLVED CONSTITUTIONALLY INFIRM PRESUMPTIONS ON AN ISSUE THAT WAS THE CRUX OF THE CASE – THE DEFENDANT'S INTENT. BUT IN THE CASE OF AN OMITTED ELEMENT, AS THE PRESENT ONE, THE JURY INSTRUCTIONS PRECLUDE ANY CONSIDERATION OF EVIDENCE RELEVANT TO THE OMITTED ELEMENT, AND THUS THERE COULD BE NO HARMLESS ERROR ANALYSIS. CITED: NEDER V. UNITED STATES, 527 U.S. 1, 17-18, 119 S.CT. 1827, 1838 (1999); SEE ALSO: MOMON V. STATE, 18 S.W.3D 152 165-166 (TN. 1999). (STATE OF TENNESSEE CASES ILLUSTRATING "STRUCTURAL ERRORS," THAT DEFY HARMLESS ERROR ANALYSIS).

AN IMPROPER JURY INSTRUCTION WILL RARELY JUSTIFY A REVERSAL OF A CRIMINAL CONVICTION WHEN NO OBJECTION HAS BEEN MADE AT TRIAL, AND AN OMITTED OR INCOMPLETE INSTRUCTION IS EVEN LESS LIKELY TO JUSTIFY REVERSAL, SINCE SUCH AN INSTRUCTION IS NOT AS PREJUDICIAL AS A MISSTATEMENT OF LAW. CITED: HENDERSON V. KIBBE, 431 U.S. 145, 154-155, 97 S.CT. 1730, 1736-1737 (1977).

PREMEDITATION IS A QUESTION OF FACT TO BE DETERMINED BY THE JURY FROM ALL THE CIRCUMSTANCES OF THE CASE. STATE V. STORY, 608 S.W.2D 599, 601 (TN. 1980). THE ISSUE OF THE DEFENDANT'S INABILITY TO CONTROL HIS CONDUCT ACCORDING TO THE LAW IS A QUESTION TO BE DETERMINED BY A JURY. STATE V. STATCEY, 601 S.W.2D 696 (TN. 1980). THE DEFENSE OF INTOXICATION NEGATING SPECIFIC INTENT IS A QUESTION FOR THE JURY TO DETERMINE. STATE V. GIVENS, 631 S.W.2D 720, 721 (TN. CR. APP. 1982).

TO CONFORM TO DUE PROCESS OF THE LAW, DEFENDANT'S ARE ENTITLED TO HAVE THE VALIDITY OF THEIR CONVICTIONS APPRAISED ON CONSIDERATION OF THE CASE ... AS THE ISSUES WERE DETERMINED IN THE TRIAL COURT. COLE V. ARKANSAS, 332 U.S. 196, 202, 68 S.CT. 514, 517 (1948). A TRIAL THAT WAS FUNDAMENTALLY UNFAIR AT THE TIME IT TOOK PLACE, BECAUSE THE JURY WAS NOT COMPELLED TO PERFORM ITS CONSTITUTIONALLY REQUIRED ROLE, CANNOT BE RENDERED FUNDAMENTALLY FAIR IN RETROSPECT BY WHAT AMOUNTS TO NOTHING MORE THAN AN APPELLATE REVIEW OF THE SUFFICIENCY OF EVIDENCE. ID. COMPARE: T.C.A. § 16-3-403 (RULE 52).

THE RIGHT TO AN IMPARTIAL JUDGE IS GUARANTEED BY ARTICLE § 17, OF THE TENNESSEE CONSTITUTION, WHICH PROVIDES THAT EVERY CITIZEN SHALL HAVE HIS CASE TRIED BY DUE COURSE OF LAW – THE DENIAL OF AN IMPARTIAL JUDGE DEFIES HARMLESS ERROR ANALYSIS. STATE V. BENSON, 973 S.W.2D 202, 205 (TN. 1998); SEE ALSO: STATE V. BOBO, 814 S.W.2D 353, 357 (TN. 91) (DENIAL OF JURY TRIAL – DEFIES HARMLESS ERROR).

THE SYNERGY OF THE PETITIONER'S PASSION AND INTOXICATION WERE CRITICAL TO ANY DETERMINATION OF HIS GUILT; THE JURY INSTRUCTIONS ON INTOXICATION, HOWEVER, EFFECTIVELY PRECLUDED THE JURORS FROM CONSIDERING THE FULL EFFECT OF HIS INTOXICATION UPON FORMING THE REQUISITE MENS REA. BECAUSE THE JURY INSTRUCTIONS PRECLUDED THE JURY'S CONSIDERATION OF THE PETITIONER'S EVIDENCE OF INTOXICATION, HIS FIRST-DEGREE MURDER CONVICTION VIOLATED THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, AND ART. I, § 6, 8, 9, 10, 16, & 17; AND ART. VI., § 9 OF THE TENNESSEE CONSTITUTION AND MUST THEREFORE BE REVERSED.

1063

5. THIS COURT ERRED IN FINDING THAT: "THE COMPLAINTS REGARDING THE PROPRIETY OF THE TRIAL COURT"S JURY INSTRUCTIONS HAVE BEEN WAIVED, BY FAILING TO RAISE THEM ON DIRECT APPEAL AND ALSO BY FAILING TO PRESENT ANY EVIDENCE REGARDING THEM DURING POST-CONVICTION PROCEEDINGS." (OPINION PAGE 48).

NOTHING IN THE PETITIONER"S COMPLAINT SHOULD BE CONSIDERED WAIVED OR PREVIOUSLY DETERMINED, BECAUSE: (1) THE COURT"S HAVE LACKED JURISDICTION OVER THE SUBJECT-MATTER, E.G., CARTER V. STATE, 958 S.W.2D 620, 624 (TN. 1997); AND (2) THE STATE"S ILLEGAL ACTIONS IN ACQUIRING JURISDICTION IS THE RESULT OF BAD FAITH CONDUCT. SEE: E.G., STATE V. GOLDEN, 941 S.W.2D 905, 908 (TN. CR. APP. 1996) (BAD FAITH MAY BE DEFINED AS THE STATE OF MIND INVOLVED WHEN ONE IS NOT BEING FAITHFUL TO ONE"S DUTY OR OBLIGATION, BLACK"S LAW DICTIONARY). THE COURT ACTED IN "BAD FAITH." WHEN THE OFFICERS" OF THE COURT ENGAGED IN COLLUSION TO VIOLATE THE PETITIONER"S RIGHT TO BE TRIED IN HENDERSON CO., WITHOUT FOLLOWING THE RULES OF COURT. SEE: E.G., SUPRA 3., (A-E), REGARDING THE ILLEGAL CHANGE OF VENUE.

THIS COURT IS CLEARLY MISTAKEN THAT, THE PETITIONER HAS FAILED TO PRESENT ANY EVIDENCE REGARDING THE FAULTY JURY INSTRUCTIONS ON INTOXICATION DURING THE POST CONVICTION PROCEEDING. SEE: E.G., SEPT. 4, 2002 HEARING, PAGES 225-226 (HALL - "THEY BASICALLY RUINED THE INTOXICATION DEFENSE ..., THAT"S A STRUCTURAL ERROR" PURSUANT TO MOMON V. STATE, 18 S.W.3D 152, 165-166 (TN. 1999)). SEE E.G., AFFIDAVIT FILED NOVEMBER 1, 2001, "AFFIDAVIT TO SUPPORT DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL REGARDING MISSTATEMENT OF LAW." COMPARE: E.G., COLON V. COUGHLIN, 58 F.3D 865 (1995) (A VERIFIED COMPLAINT UNDER THE PENALTY OF PERJURY IS TO BE TREATED AS AN AFFIDAVIT FOR SUMMARY JUDGEMENT PURPOSES, IF IT MEETS RULE 56 (E)); AND THE PETITIONER"S "MOTION FOR POST-CONVICTION RELIEF," PAGE 27, § 15.

THIS COURT CITED A CASE REGARDING JUDICIAL NOTICE, THAT NOTED IF A JURY INSTRUCTION "TRIGGERED THAT ERROR, DEFENDANT"S COUNSEL"S FAILURE TO ASSERT THAT ISSUE AT TRIAL AND ON DIRECT APPEAL WAS A PLAIN EXAMPLE OF INEFFECTIVE ASSISTANCE OF COUNSEL." SEE: STATE V. DELBRIDGE, 742 S.W.2D 266, 267 (TN. APP. 1987) ("IF SANDSTORM, TRIGGERED THAT ERROR, THEN DEFENDANT'S COUNSEL"S FAILURE TO ASSERT THAT ISSUE AT TRIAL AND ON DIRECT APPEAL WAS A PLAIN EXAMPLE OF INEFFECTIVE ASSISTANCE OF COUNSEL.")

MOREOVER, ON NOVEMBER 1, 2000, THE PETITIONER HAD FILED HIS "AFFIDAVIT TO SUPPORT DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL & APPEAL, WHICH LAYS THE FOUNDATION TO SHOW THE PREJUDICE PRONG OF STRICKLAND, AT § 14. SEE E.G., CAMPBELL V. STATE, 904 S.W.2D 594 S.W.2D 594, 596-597 (TENN. 1995) (PETITIONER THAT CLAIMS INEFFECTIVE ASSISTANCE OF COUNSEL CAN ESTABLISH THE PREJUDICE PRONG UNDER STRICKLAND, BY A DEMONSTRATION SHOWING THAT IF A SPECIFIC ISSUE WOULD HAVE BEEN ADDRESSED PROPERLY IN THE APPELLATE BRIEF, IT WOULD HAVE AFFECTED THE OUTCOME OF THE APPEAL). IF THE PETITIONER"S (ELBOW COUNSEL), WOULD HAVE ASSERTED THESE ISSUES IN THEIR ARGUMENT FILED ON 12/2/02, AND IF THIS COURT WOULD MADE THE STATE ANSWER THE PETITION, AS REQUIRED BY THE RULES, THIS COURT WOULDN"T HAVE TO RE-WRITE ANOTHER OPINION AND SET ASIDE ITS ERRONEOUS (50) PAGE OPINION FILED ON 2/2/03.

- 15 -

1064

6. THIS COURT ERRED IN FINDING THAT HE "FAILED TO ESTABLISH A PARTICULARIZED NEED FOR A (SECOND) PSYCHIATRIST." SEE (OPINION PAGE 31); AND STATE V. HOLDER, 15 S.W.3D 905, 910-11 (TN. CR. APP. 1999).

A. COMPARISON OF PRIOR AND CURRENT TENNESSEE CODE ANNOTATED § 39-11-501 (INSANITY).

THE DEFENSE OF INSANITY BECAME AN AFFIRMATIVE DEFENSE EFFECTIVE JULY 1, 1995. THE STATUTE NOW PROVIDES:

> IT IS AN AFFIRMATIVE DEFENSE TO PROSECUTION THAT, AT THE TIME OF THE COMMISSION OF THE ACTS CONSTITUTING THE OFFENSE, THE DEFENDANT, AS A RESULT OF A SEVERE MENTAL DISEASE OR DEFECT, WAS UNABLE TO APPRECIATE THE NATURE OF THE WRONGFULNESS OF SUCH DEFENDANT"S ACTS. MENTAL DISEASE OR DEFECT DOES NOT OTHERWISE CONSTITUTE A DEFENSE. **THE DEFENDANT HAS THE BURDEN OF PROVING THE DEFENSE OF INSANITY BY CLEAR AND CONVINCING EVIDENCE.**

TENN. CODE ANN. § 39-11-501 (A) (1997) (EMPHASIS ADDED).

DEFENDANT CONTENDS THAT HE MET HIS BURDEN OF PROOF, AND THE TRIAL COURT ERRED IN CONCLUDING OTHERWISE. UPON OUR REVIEW OF THE RECORD, WE CONCLUDE THE EVIDENCE IS SUFFICIENT TO SUPPORT THE DETERMINATION OF THE TRIAL COURT. (TAKEN VERBATIM FROM HOLDER, SUPRA).

THE CURRENT VERSION OF TN. CODE ANN. § 39-11-501 (1997) IS FUNDAMENTALLY DIFFERENT THAN THE PRIOR VERSION. SEE TN. CODE ANN. § 39-11-501 (1991). THE PRIOR VERSION PROVIDED THAT INSANITY WAS SIMPLY A "DEFENSE" AND NOT AN "AFFIRMATIVE DEFENSE" AS PROVIDED IN THE CURRENT VERSION. ID. FURTHERMORE, THE PRIOR VERSION ALLOWED THIS DEFENSE "IF, AT THE TIME OF SUCH CONDUCT, AS A RESULT OF MENTAL DISEASE OR DEFECT, THE PERSON LACKED SUBSTANTIAL CAPACITY EITHER TO APPRECIATE THE WRONGFULNESS OF THE PERSON"S CONDUCT [OR] TO **CONFORM THAT CONDUCT TO THE REQUIREMENTS OF LAW.**" ID. THE CURRENT VERSION PROVIDES THAT THIS "AFFIRMATIVE DEFENSE" APPLIES WHEN "THE DEFENDANT, AS A RESULT OF A SEVERE MENTAL DISEASE OR DEFECT, WAS UNABLE TO APPRECIATE THE NATURE OR WRONGFULNESS OF SUCH DEFENDANT"S ACTS. MENTAL DISEASE OR DEFECT DOES NOT OTHERWISE CONSTITUTE A DEFENSE." TENN. CODE ANN. § 39-11-501 (A) (1997) (EMPHASIS ADDED). FURTHERMORE, AND MOST SIGNIFICANTLY, THE NEW STATUTE PROVIDES THAT THE BURDEN OF PROOF IS UPON THE DEFENDANT TO ESTABLISH INSANITY BY "CLEAR AND CONVINCING EVIDENCE." ID.

UNDER THE PRIOR STATUTE, IF THE EVIDENCE ADDUCED RAISED A REASONABLE DOUBT AS TO THE DEFENDANT"S SANITY, **THE BURDEN OF PROOF THEN FELL UPON THE STATE TO ESTABLISH SANITY BEYOND A REASONABLE DOUBT.** STATE V. JACKSON, 890 S.W.2D 436, 440 (TENN. 1994). IN ORDER FOR THE STATE TO MEET ITS BURDEN OF PROVING SANITY, IT COULD PROVIDE ANY "EVIDENCE WHICH IS CONSISTENT WITH SANITY AND INCONSISTENT WITH INSANITY." STATE V. SPARKS, 891 S.W.2D 607, 616 (TENN. 1995) (CITING EDWARDS V. STATE 540 S.W.2D 641, 646 (TENN. 1976), CERT. DENIED 429 U.S. 1061, 97 S.CT. 784, 50 L.ED.2D 777 (1977)).

B. LEGISLATIVE INTENT

THE 1995 AMENDMENT WAS AN OBVIOUS EXPRESSION OF LEGISLATIVE INTENT TO RESTRICT _|_ 911 THE DEFENSE OF INSANITY. THE MENTAL DISEASE OR DEFECT MUST NOW BE SO "SEVERE" AS TO MAKE THE DEFENDANT "UNABLE TO APPRECIATE THE NATURE OF THE WRONGFULNESS OF [HIS / HER] ACTS." TN. CODE ANN. § 39-11-501 (A) (1997). FURTHERMORE, **THE BURDEN IS NOW ON THE DEFENDANT TO ESTABLISH INSANITY BY "CLEAR AND CONVINCING EVIDENCE,** MEANS EVIDENCE IN WHICH THERE IS NO SERIOUS OR SUBSTANTIAL DOUBT ABOUT THE CORRECTNESS OF THE CONCLUSIONS DRAWN FROM THE EVIDENCE." HODGES V. S.C. TOOF & CO., 833 S.W.2D 896, 901 FN. 2 (TENN. 1992); SEE ALSO T.P.I. CRIM. 40.16 (B) 4TH ED. 1995). THIS IS MUCH DIFFERENT AND HIGHER STANDARD OF PROOF PLACED ON A DEFENDANT.

C. FEDERAL LEGISLATION

THE LANGUAGE OF THE CURRENT VERSION OF TENN. CODE ANN. § 39-11-501 (1997) IS PATTERNED AFTER AND VIRTUALLY IDENTICAL TO THE FEDERAL INSANITY DEFENSE REFORM ACT OF 1984, WHICH PROVIDES:

> (A) AFFIRMATIVE DEFENSE. — IT IS AN AFFIRMATIVE DEFENSE TO THE PROSECUTION UNDER ANY FEDERAL STATUTE THAT, AT THE TIME OF THE COMMISSION OF THE ACTS CONSTITUTING THE OFFENSE, THE DEFENDANT, AS A RESULT OF A SEVERE MENTAL DISEASE OR DEFECT, WAS UNABLE TO APPRECIATE THE NATURE AND QUALITY OF THE WRONGFULNESS OF HIS ACTS. MENTAL DISEASE OR DEFECT DOES NOT OTHERWISE CONSTITUTE A DEFENSE.

> (B) BURDEN OF PROOF. — THE DEFENDANT HAS THE BURDEN OF PROVING THE DEFENSE OF INSANITY BY CLEAR AND CONVINCING PROOF.

18 U.S.C. § 17. SEE ALSO RAYBIN, TENNESSEE CRIMINAL PRACTICE AND PROCEDURE, § 28.40 (SUPP. 1997).

- 16 -

D. SIGNS OF IMPROPER STANDARDS / EX POST FACTO LAW APPLIED TO THIS CASE BY EXPERTS

AT THE TIME OF THE ALLEGED OFFENSE JULY 29, 1994, THE PETITIONER CONTENDS THAT THE APPLICABLE
LAW WAS T.C.A. § 39-11-501 (1991). SEE: E.G., STATE V. HALL, 8 S.W.3D 593, 596 (TN. 1999) (7/29/94).
THE FOLLOWING EXCERPTS DEMONSTRATE THAT BOTH THE STATE AND DEFENSE EXPERTS DID NOT APPLY THE CORRECT
STANDARD OF LAW, AND MISLED THE COURT TO BELIEVE, THAT AN INSANITY DEFENSE COULD NOT BE SUPPORTED.
THIS IS A PLAIN ERROR AND WORKS AS AN EX POST FACTO LAW. IN SUPPORT OF THIS CLAIM, THE PETITIONER
WILL SHOW FORTH THE FOLLOWING:

## TESTIMONY OF DR. KEITH CARUSO

DR. CARUSO - Q. WHAT DID YOU - - WHAT BECAME YOUR ULTIMATE CONCLUSION AS TO WHAT - - YOUR EVALUATION
OF JON UNCOVERED ?

A. I FELT HE MET CRITERIA FOR A NUMBER OF DIAGNOSES. I WANT TO MAKE SURE I LIST THEM
ALL. I FELT THAT AT THE TIME OF THE OFFENSE HE HAD MAJOR DEPRESSION, INTERMITTENT
EXPLOSIVE DISORDER. I FELT THAT HE WAS DEPENDANT ON ALCOHOL, SO HE HAD ALCOHOL
DEPENDENCE. .... SEE: 9/4/02 P.C. TRANS. PAGE 116.

DR. CARUSO - Q. ALL RIGHT. DO YOU - - YOU SAID IN EFFECT THAT YOU"RE NOT SAYING HE"S INSANE ?

A. THAT IS CORRECT. WELL I DON"T KNOW THAT I - - DON"T - - I DON'T SEE EVIDENCE THAT
WOULD SUPPORT AN INSANITY DEFENSE. SEE: 9/4/02 P.C. TRANS. PAGE 122.

DR. CARUSO - Q. NOW, THAT STATEMENT, "I WILL SHOW YOU WHAT A BEATING IS," DOESN"T THAT TELL YOU THAT
HE"S THINKING ABOUT WHAT HE"S ABOUT TO DO ?

A. WELL, AGAIN, I THINK ONE OF THE POINTS THAT I WAS MAKING BEFORE WAS THAT HE MAY
RECOGNIZE WHAT HE"S DOING. THAT"S NOT AN INANITY DEFENSE. HE RECOGNIZES THE NATURE
OF HIS BEHAVIOR. HE MAY EVEN - - RECOGNIZES ITS WRONG, BUT THE CAPACITY TO STOP
STOP HIMSELF ISN"T THERE. I THINK PEOPLE SHOUT A LOT OF INDISCREET THINGS WHEN THEY
ARE VERY, VERY ANGRY. SO I DON"T SEE THAT AS BEING INCONSISTENT BY VIRTUE OF HE WAS
ABLE TO STATE WHAT HE WAS DOING THAT HE HAD ANYMORE CONTROL OVER WHAT HE WAS DOING.
9/4/02 P.C. TRANS. PAGE 149-150. NOTE: DR. CARUSO MAKES OTHER STATEMENTS LIKE THIS.

## TESTIMONY OF DR. KIMBERLY STAHLFORD

DR. STAHLFORD - Q. CAN WE AGREE THAT THAT IS AN EXTREMELY LOW SEROTONIN LEVEL ?

A. I"M NOT SURE THAT THERE"S VERY CLEAR EVIDENCE AS TO WHAT NORMAL IS. ....
9/4/02 P.C. TRANS. PAGE 35.

DR. STAHLFORD - Q. YOU FOUND OUT THAT - - YOU DIDN"T THINK HE WAS DEPRESSED IN YOUR REPORT. IS THAT
FAIR TO SAY ?

A. WHEN I SAW HIM OR AT THE TIME OF THE OFFENSE ?

Q. BOTH.

A. AT THE TIME OF THE OFFENSE, YES, I DO THINK HE HAD SOME DEPRESSIVE SYMPTOMS.
I THINK I WROTE I DON"T THINK HE MET THE CRITERIA FOR MAJOR DEPRESSION. IT"S
HARD TO REALLY SAY WITHOUT HAVING THE CHANCE TO HAVE INTERVIEWED HIM AT THE
TIME, BUT I DO THINK HE HAD SYMPTOMS OF DEPRESSION. I DO THINK HE HAD A LOT OF
STRESS, BUT I DON"T THINK HE MET THE CRITERIA FOR MAJOR DEPRESSION.

- 17 -

1066

IN AKE, THE U.S. SUPREME COURT DETERMINED THAT THE DEFENDANT'S SANITY AT THE TIME OF THE OFFENSE MUST BE A SIGNIFICANT FACTOR AT TRIAL TO TRIGGER DUE PROCESS PROTECTIONS. WE MUST NOW CONSIDER THE THRESHOLD SHOWING WHICH AN INDIGENT DEFENDANT MUST ESTABLISH IN ORDER TO OBTAIN APPOINTMENT OF A PSYCHIATRIC EXPERT. STATE V. BARNETT, 909 S.W.2D 423, 430 (TN. 1995) (PARTICULARIZED NECESSITY).

OTHER STATE COURTS HAVE ALSO DISCUSSED THE THRESHOLD SHOWING REQUIRED. FOR EXAMPLE, THE NORTH CAROLINA SUPREME COURT HAS, IN SEVERAL CASES, MORE FULLY DEVELOPED WHAT IS REQUIRED TO ESTABLISH THE CONSTITUTIONAL RIGHT TO APPOINTMENT OF AN EXPERT. THAT COURT HAS SAID THAT:

> IN ORDER TO MAKE A THRESHOLD SHOWING OF SPECIFIC NEED FOR THE EXPERT SOUGHT, THE DEFENDANT MUST DEMONSTRATE THAT: (1) HE WILL BE DEPRIVED OF A FAIR TRIAL WITHOUT THE EXPERT ASSISTANCE, OR (2) THERE IS A REASONABLE LIKELIHOOD THAT IT WILL MATERIALLY ASSIST HIM IN THE PREPARATION OF HIS CASE. ID. ....

WE ADOPT THE PRINCIPLES DEVELOPED BY THE NORTH CAROLINA SUPREME COURT, AS WELL AS THOSE ENUNCIATED IN OUR PRIOR CASES INTERPRETING OUR STATUTE REQUIRING THE FURNISHING OF STATE FUNDED EXPERTS. ID.

NOTE: THE ACRONYM "NOS" STANDS FOR "NOT OTHERWISE SPECIFIED," A TERM USED BY TREATING DOCTORS WHEN A GOOD EXPLANATION FOR THE PSYCHOTIC CONDITION HAS NOT YET BEEN DETERMINED. CITED: STATE V. BRIAN VAL KELLEY, 2002 WL 927610 @ PAGE 13 (TENN. CRIM. APP. 2002). SEE: E.G. NOV. 4, 2002 HEARING, PAGE 60-61 (DR. STAHLFORD - "NOS.")

MISC.: "BORDERLINE PERSONALITY DISORDER," DR. MEYER TESTIFIED AT THE PENALTY PHASE THAT HE BELIEVED THE DEFENDANT TO HAVE A BORDERLINE PERSONALITY DISORDER AND THAT SUCH PEOPLE COULD HAVE BRIEF EPISODES OF RAGE DURING "TEMPORARY STATES OF MENTAL ILLNESS, HE DID NOT STATE THAT THE DEFENDANT WAS EXPERIENCING SUCH AN EPISODE WHEN HE COMMITTED THE MURDER. CITED: STATE V. LEROY HALL, 958 S.W.2D 679, 691 (TN. 1997). SEE: E.G.: NOV. 4, 2002 HEARING, PAGE 69 (DR. STALFORD - BORDERLINE PERSONALITY DISORDER); AND SEPT. 4, 2002 HEARING, PAGE 255 (MTMHI RESULTS, EX. 17-20 (BORDERLINE PERSONALITY DISORDER).

THEREFORE, TRIAL COUNSEL'S FAILURE TO KNOW AND UNDERSTAND THE LAW ON INSANITY, AND THE DEPRIVATION OF THE APPOINTMENT OF A COMPETENT PSYCHIATRIC EXPERT DEPRIVED THE PETITIONER OF A RIGHT TO A FAIR TRIAL GUARANTEED BY THE DUE PROCESS CLAUSE OF BOTH THE TENNESSEE AND UNITED STATES CONSTITUTION. SEE: STATE V. HOLDER, 15 S.W.3D 905 (TN. CR. APP. 1999) AND STATE V. BARNETT, 909 S.W.2D 423 (TN. 19999). SEE ALSO MAY 15, 2002 HEARING PAGES 217-218 (MAYO - NO I DON'T REMEMBER EVER SEEKING A PSYCHIATRIST).

7. THIS COURT ERRED IN ACCREDITING TRIAL COUNSEL'S TESTIMONY THAT THE FILE CONTAINS STATEMENTS MADE TO THE INVESTIGATORS.... THUS, THE COURT'S NOT CONVINCED THAT COUNSEL FAILED IN THIS REGARD.

PURSUANT TO TN. R. S.CT. RULE 8, DR 7-102 (A) (3), & (B) (2), APPOINTED COUNSEL HAS A GOOD FAITH DUTY TO REVEAL THE FRAUD TO THIS TRIBUNAL. SEE E.G., MAY 15, 2002 HEARING, PAGE 395, (Q. "ANYWAY YOU DON'T REMEMBER TALKING TO THE STANFILLS OR THE FOREMANS OR THE BRITTAINS, DO YOU ?" A. NO. BUT I'LL TELL YOU THIS, IF THEY'D BEEN AVAILABLE AND THEY HAD SOMETHING GOOD TO SAY ABOUT MR. HALL, WE WOULD HAVE USED THEM AT TRIAL.") COMPARE: MAY 15, 2002, HEARING PAGE 395 ("OUR INVESTIGATOR SOUGHT OUT EVERY - WE - EVERY TIME I'D SEE JON HE'D HAVE A LIST OF PEOPLE THAT HE WANTED US TO RUN DOWN, AND WE RAN DOWN EVERY ONE OF THEM THAT WAS AVAILABLE, AND, I MEAN, YOU'VE GOT THE FILE).

- 18 -

THE PETITIONER CONTENDS, THAT APPOINTED COUNSEL WAS DERELICT IN HIS DUTY, BY FAILING TO IMPEACH THE WITNESS WITH INFORMATION AVAILABLE TO THEM. FOR EXAMPLE, POST-CONVICTION COUNSEL INVESTIGATOR, APRIL HIGUERA'S NOTES 5-05-02 (SUMMARY OF WITNESSES), DEMONSTRATES THAT HE HAD INFORMATION AVAILABLE FOR IMPEACHMENT PURPOSES AND FAILED TO PRESENT THE FACTS PROPERLY. THE PROPER WAY WOULD HAVE BEEN TO CALL MS. HIGUERA, TO DEMONSTRATE WHAT INFORMATION A PRIVATE INVESTIGATOR WOULD HAVE DISCOVERED THAT WAS NOT KNOWN BY TRIAL COUNSEL AS A RESULT OF THEIR INVESTIGATION. SEE ZAGORSKI V. STATE, WL 311926 PAGE 14 (TN. CR. APP. 1997); ZAGORSKI, 983 S.W.2D 654 (TN. 1998) (WAIVER & PREJUDICE BY PC COUNSEL). THUS VIOLATING S.CT. RULE 8, DR 7 102 (A) (3), & (B) (2). SEE E.G., SEPT. 4, 2002 HEARING, PAGE 217. IN SHORT, APPOINTED COUNSEL IS GOING TO FALL FOR FORD & MAYO'S LIES IF NOTHING IS DONE ABOUT THESE LIES AND THE DECEIT CREATED IN THE TRIAL AND 9/4/02 PC TRANSCRIPTS !!!

ONE OF THE MOST IMPORTANT WITNESSES THAT WAS NEVER INTERVIEWED, WOULD HAVE BEEN THE ONLY ADULT WITNESS, HERMAN MCKINNEY. SEE: TR. TECH. RECORD, PAGE 1 (HERMAN MCKINNEY LISTED ON THE INDICTMENT); TR. TECH. RECORD, PAGE 57, (THE PRELIMINARY HEARING TRANSCRIPT TESTIMONY OF BYRD – YOU ALSO INDICATED THAT I THINK YOU SPOKE TO A NEIGHBOR ? A. I BELIEVE HIS NAME WAS MR. MCKINNEY); TR. TRANSCRIPT, PAGE 193 (BINGHAM – A. IT WAS NIGHT, P.M. AFTER GETTING OUT OF THE CAR, THERE WAS AN OLDER GENTLEMAN UP ON THE BLACKTOP AT HIS HOUSE OUT IN THE YARD. WHEN I GOT OUT OF THE CAR HE HOLLERED AND TOLD ME TO GO DOWN BY THE POOL."); AND MAY 15, 2002 HEARING, PAGES 121-24 (EXHIBIT # 4 SUBPOENA FOR HERMAN); AND GROSECLOSE V. BELL, 895 F.SUPP. 935, 942 (M.D. TN. 1995) (FAILED TO INTERVIEW OR PRESENT THE CRIME INCIDENT WITNESSES). THIS EYEWITNESS MAY HAVE HAD FAVORABLE INTOXICATION OR INSANITY DEFENSE EVIDENCE AVAILABLE TO THE PETITIONER AND WAS IGNORED BY COUNSEL, THUS VIOLATING THE RIGHT TO A SPEEDY TRIAL.

THEREFORE, THE PETITIONER CONTENDS, THAT POST-CONVICTION COUNSEL IS RESPONSIBLE FOR FAILING TO UTILIZE INFORMATION IN THEIR CONTROL TO IMPEACH A LYING WITNESS, THAT HAS PERPETRATED A FRAUD UPON THE COURT, ALL TO THE PREJUDICE OF THE PETITIONER, IN VIOLATION OF TN. S.CT., RULE 8, DR 7-101 (A)(4) (A) (REPRESENTING CLIENT ZEALOUSLY). SEE E.G., (OPINION PAGE 17, N. 18); & (OPINION PAGE 45, N. 39).

## CONCLUSION

IT HAS BEEN SHOWN THAT TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL PRETRIAL, TRIAL, AND ON APPEAL. THAT BASED UPON THE BAD FAITH CONDUCT OF THE OFFICERS OF THE COURT ACTING IN CONCERT TO THWART THE PRESENTATION OF MERITORIOUS ISSUES PROPERLY, THAT HAS CREATED A IRRECONCILABLE CONFLICT IN THE PRESENTATION OF THESE CLAIMS. THIS HAS CAUSED A SIGNIFICANT AMOUNT OF THE PETITIONER'S CLAIMS REGARDING TRIAL AND APPEAL COUNSEL'S ERRORS, ALONG WITH THE VIOLATIONS OF THE PETITIONER'S CIVIL RIGHTS TO HAVE PRIVILEGED COMMUNICATIONS WITH HIS POST-CONVICTION INVESTIGATOR, MS. HIGUERA, TO BE IGNORED BY POST-CONVICTION COUNSEL.

- 19 -

DESPITE THE PETITIONER'S REPEATED REQUESTS TO POST-CONVICTION COUNSEL TO HAVE A VARIETY OF ISSUES BROUGHT UP IN COURT IN A TIMELY MEANINGFUL MANNER, COUNSEL HAS IGNORED THE PETITIONER, AND CREATED AN IRRECONCILABLE CONFLICT. IN OTHER WORDS, IT IS DIFFICULT FOR THE PETITIONER TO SHOW THE DENIAL OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL AND APPELLATE COUNSEL, WHEN POST-CONVICTION WON'T EFFECTIVELY ASSERT MERITORIOUS ISSUES TO THE COURT. HAD POST-CONVICTION COUNSEL SUBMITTED A SATISFACTORY MEMORANDUM, THAT WAS NOT SO AMBIGUOUS (OPINION PAGE 24), THEY COULD HAVE SHOWN HOW THE STATE'S EVIDENCE IS BEING IMPROPERLY CONSTRUED, THEN THIS COURT WOULD NOT HAVE HAD TO DRAFT ANOTHER OPINION. NOTWITHSTANDING THE ALTERED TRANSCRIPT OF THE PETITIONER'S WITNESS STAND TESTIMONY, EFFECTIVE COUNSEL COULD HAVE SHOWN HOW THE EVIDENCE PRESENTED BY THE STATE DEMONSTRATES A DIFFERENT SET OF FINDINGS OF FACTS. FURTHERMORE, COMPETENT COUNSEL COULD'VE SHOWN HOW TRIAL COUNSEL WAS INEFFECTIVE, AS SHOWN BY THE LEGAL ISSUES PRESENTED IN THIS MOTION.

WHEREFORE, THE PETITIONER MOVES THIS COURT TO ACCEPT THIS TENN. R. CIV. P., RULE 59.04 "MOTION TO ALTER AND AMEND JUDGEMENT," OR TREAT THIS MOTION AS A "MOTION FOR NEW TRIAL," UNDER TN. R. CRIM. P., RULE 33 (A); OR "MOTION FOR APPEAL AS OF RIGHT," UNDER T.R.A.P., RULE 3, WHICHEVER APPLIES. ALSO, IF THIS COURT HAS TO TREAT THIS AS A "MOTION FOR NEW TRIAL," THE PETITIONER MOVES THIS COURT TO GRANT A DELAY FOR FILING ANOTHER "MOTION FOR NEW TRIAL," AFTER THE PETITIONER HAS HAD A CHANCE TO SPEAK WITH A COMPETENT ATTORNEY, PURSUANT TO T.R.A.P., RULE 4.

RESPECTFULLY SUBMITTED,

*Jon Hall*

/ JON HALL, # 238941
7475 COCKRILL BEND BLVD.
NASHVILLE, TENN. 37209

APPROVED FOR ENTRY BY COUNSEL
TN.R.S.CT. RULE 8, DR 7-101 A4A

I _Jon Hall_ , HEREBY SWEAR UNDER THE PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE AND CORRECT TO THE BEST OF THE PETITIONER'S KNOWLEDGE AND BELIEF, AND ARE BASED UPON THE PERSONAL KNOWLEDGE OF THE AFOREMENTIONED FACTS. SWORN ON THIS THE 10th DAY OF MARCH 2003.

## CERTIFICATE OF SERVICE

I _Jon Hall_ , HEREBY CERTIFY THAT I HAVE MAILED A COPY OF THE FORGOING "MOTION TO ALTER AND AMEND JUDGEMENT, TO: (1) MS. JUDY BARNHILL, MADISON COUNTY CIRCUIT COURT CLERK, CRIMINAL JUSTICE COMPLEX, 515 S. LIBERTY ST. JACKSON, TENN. 38301; (2) ATTORNEY PAUL BUCHANAN, 1526 CROCKETT HILLS BLVD., BRENTWOOD, TENN. 37027; (3) ATTORNEY DANNY ELLIS, 1289 N. HIGHLAND AVE., JACKSON TENN. 38301; AND (4) INVESTIGATOR, MS. APRIL HIGUERA, P.O. BOX 198683 NASH., TENN. 37219, VIA U.S. MAIL ON THIS THE 10th DAY OF MARCH 2003. THE PETITIONER HAS MAILED THESE PARTICIPANTS THIS MOTION IN ORDER TO ENSURE THAT COUNSEL PROPERLY ADDRESS THESE ISSUES, BECAUSE THE COURT IS FORCING HIM TO WORK THROUGH THESE COURT APPOINTED ATTORNEYS. THIS MOTION COMPLIES WITH TN.R.EVID. 201 & 202.

NOTE: AL EARLS WAS SERVED TOO AT P.O. BOX 2825 JACKSON, TN. 38302 (SAME DAY AS LISTED ABOVE).

XC: FILE

1069



# COPY

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

## JDH TRIAL AUDIOTAPES

To:        Jon Hall File
From:      Larry Gidcomb
Subject:   Analysis of audiotapes from JDH's trial
Date:      February 15, 2001

On the 3rd, 4th, and 5th days of February, 1997, Jon Douglas Hall went on trial for his life in the 26th Judicial District of the State of Tennessee. The trial was held in Division I of the Criminal Court of Madison County in Jackson, Tennessee with the Honorable Whit LaFon presiding. Jerry Woodall and Al Earls prosecuted the case; Jesse Ford and Clayton Mayo served as Mr. Hall's defense attorneys. The Official Court Reporter for the proceedings was Amy Mays.

Our files contain audiocassette tapes of Jon's trial, but, since a special machine is required to play the tapes, we had not as yet listened to them. On Monday, February 5, 2001, I visited area court reporter Tim Clay at his home. Mr. Clay loaned me a **BM-147 TRANSCRIBER**, and, as he explained its use, he also provided insight into how court reporters ordinarily do their jobs.

The **BM-147 TRANSCRIBER** has five channels capable of playing four different tracks of a recorded tape. During a trial, microphones are placed around the courtroom. The judge, witnesses, and attorneys might each have separate microphones. The "ALL" channel of the **BM-147 TRANSCRIBER** allows the listener to hear all the recorded action at once. Pressing Channels 1, 2, 3, or 4 isolates the sounds recorded from specific microphones. For example, during Jon's trial, Judge LaFon appears to be on Channel 2. Pressing that channel·isolates the Judge's voice, enabling the listener to, in some cases, hear comments by the Judge that may be virtually undetectable when tuned to the "ALL" channel. Though it is sometimes very difficult to tell for sure, the attorneys for the prosecution and defense seem to resonate more clearly through Channel 3, while the witnesses appear to be speaking into the microphone recorded on Channel 1. Channel 4 was apparently not used for these proceedings.    Court reporters record only one side of an audiocassette tape.

According to Mr. Clay, court reporters do not necessarily use their recordings of the trials unless they discover a problem or have a question concerning their own typed narration. Occasionally, if Mr. Clay gets behind in his work, he might send his tapes out to be transcribed by someone else.

Mr. Clay admitted that many court reporters like to "clean up" their finished transcripts, leaving out judges' and attorneys' stutters, false starts, and extraneous remarks, and correcting faulty

I:\PCDC\Hall_Jon\TranscriptSumry\TrialTapes.wpd                     Page 1 of 11

On May 4, 2006, I saw this report, and it is not a complete and accurate copy of my trial transcripts of the false trial transcripts of my trial in February (new issue), and I spoke to Mr. Gidcomb regarding these people because this report is not complete and I swear under the penalty of perjury that I wanted to question the tape that push button sounds on it. I for that I swear under the penalty of perjury that I, Mr. Gidcomb, the Informed Me this information is true and correct. Sworn on this the 9th day of March 2005.

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

grammar and sentence structure. Though Mr. Clay said some attorneys and judges like having their language cleaned up, Mr. Clay himself rarely changes anything he has recorded from a court proceeding. Mr. Clay does not wish to have the authenticity of his transcripts questioned.

The court reporter at Jon's trial could have been more accurate on occasion. For example, during the direct examination of **Brian Byrd** on page 203, line 14, the transcript reads: **"you've got - the service is in the ground here."** According to the tape, Byrd is actually referring to **"the disturbance in the ground here."** During the direct examination of **Chris Dutton** on page 225, line 25, Mr. Woodall poses a question that includes the phrase: **"but when you were in an exercise period or guard period..."** Mr. Woodall actually says **"yard period."** The court reporter's transcription of Clayton Mayo's examination of **Dr. Lynn Zager** substitutes the term **"psycho-social retardation"** for the term Dr. Zager actually used: **"psycho-motor."** Errors like these pop up throughout the transcript, appear to be honest mistakes, and do not significantly alter the content of the text.

Also, unlike Mr. Clay, the court reporter here was quite a housekeeper. While many of her efforts to clean up the transcript are harmless enough, like when she leaves out the occasions when the Judge, unable to hear a comment, has to ask for it to be repeated, other omissions on her part may, in the context of the upcoming analysis, seem at worst suspicious, at best questionable.

Jon has always had problems with the copy of the transcript provided to him. He vividly recalls times during the trial when he voiced his complaints concerning his defense to Judge LaFon. However, many of these exchanges are not in the transcript. One such exchange, the one that occurred during Mr. Woodall's closing argument is easily explained. Our copy of the transcripts does not include Woodall's opening statement or either side's closing arguments. But two other verbal encounters between Jon and Judge LaFon are inexplicably missing from the transcript. Later, I will include the transcriptions I made of these encounters from the tapes.

The first two tapes contain the jury voir dire. The voir dire takes place in two parts. Jurors answer general questions in open court, and they are asked the more sensitive questions regarding their feelings toward the death penalty and their personal experiences with domestic violence in the privacy of the jury room. The tape made in the jury room is recorded on both sides, creating an unusual effect when the listener tunes into the "ALL" channel. In the background, the garbled voices on the opposite side of the tape can be heard playing backwards. In the cozy confines of the jury room, however, all the proceedings can be heard clearly by tuning to other channels.

In the jury room, on page 193 of the transcript after line 7, Mr. Woodall complains: **"I didn't get to question the other ten."** Judge LaFon responds: **"Okay."** This exchange is omitted from the transcript, as is another similar conversation from later in the jury room. After Mr. Ford had completed his examination of Luanne Nelson (page 161, line 15), the following exchange

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

between Mr. Woodall and the Judge is not reported in the transcript:

> Woodall:    That's what you said earlier...And we have 12...
> Judge:       I thought you said to go ahead and qualify these on the death penalty.
> Woodall:    No, you Honor.
> Judge:       All right.

On page 117, after line 8, a discussion of removing Jon's leg restraints before he returns to open court is omitted from the transcript.

The swearing in of the jurors and court officers, the Judge's preliminary instructions to the jury, the indictment as read by Mr. Woodall, Mr. Ford's entering of Jon's not guilty plea, and Woodall's opening statement are not included in this transcript.

On page 186, after Mr. Ford's opening statement and in the absence of the jury, Jon tries to fire Ford. Most of this exchange between Jon and Judge LaFon is in the transcript, except for a clearly audible comment Jon makes as the attorneys approach the bench for a sidebar: **"The way these proceedings have been running, a five minute opening statement is a joke."**

On page 346, after the defense has rested and in the absence of the jury, Jon is questioned by Judge LaFon concerning his decision not to testify. The transcript reports this incident, but is not entirely accurate. Page 347, lines 1 and 2 read: **THE DEFENDANT: Your Honor, they're trying to take my life away. I have my constitutional rights.** The tape records Jon's lines this way: **"You're already trying to take my life. Why are you trying to violate my constitutional rights?"**

On page 348 between lines 16 and 17, there is a lot of unreported discussion between the attorneys and the Judge concerning time frames and charging the jury. When Jon interrupts again after line 17, Judge LaFon responds: **"Talk to your lawyers,"** an exchange that is not in the transcript. After line 25 when the Judge says: **"Call the jury back. The case is already closed,"** there is an inaudible comment by someone followed by laughter in the courtroom.

Closing arguments are not included in the transcript. The court reporter describes them in this way: **Arguments were heard on behalf of the State and the Defendant without objection.** This omits any mention of Mr. Woodall's emotionally-charged closing argument, one in which both Billie's mother and Jon would be removed from the courtroom.

First, Billie's mother begins crying and wailing, necessitating her removal. Then, when Woodall makes a reference to Jon leaving Billie in the pool and going back into the house to get her van keys, Jon loudly objects. The following transcription is taken from the tape:

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

| | |
|---|---|
| Jon: | I had my own van keys...This is all a bunch of bullshit... |
| Judge: | Mr. Ford, talk to him. Tell him what I'm fixing to do... |
| Jon: | ...None of my testimony could have been brought in...You're not trying to represent me; you're trying to hang me... |
| Woodall: | Your Honor, could we remove him from the courtroom? |
| Judge: | Let me talk to him a moment...If he says another word that I can hear... |
| Jon: | ...Can't you bring any testimony... |
| Judge: | Okay. Take him in...Take him into my office, please... |

Later, in the absence of the jury, Jon is returned to the courtroom. The following exchange between Jon and Judge LaFon is missing from the transcript:

| | |
|---|---|
| Judge: | Mr. Hall, remain standing just a moment. They've finished the argument and it's my duty now to give the charge of law. Ah...If you will tell me you will behave I'm willing for you to come back in here. There will be more testimony...If you are not willing to behave, I'll send you back out... |
| Jon: | I just couldn't stand listening to that speculation when my attorneys... |
| Judge: | Inaudible |
| Jon: | ...There's a lot more evidence... |
| Judge: | Mr. Hall... |
| Jon: | ...There's a lot more evidence... |
| Judge: | ...Mr. Hall, Mr. Hall... |
| Jon: | ...I had my own set of keys to that van...There's a whole bunch of issues that should have been brought up and I didn't see that they were... |
| Judge: | Mr. Hall...Would you stop a minute, Mr. Hall? Now listen to me...I'm not talking about what has happened either the night of the so-called murder or anything else...I'm talking about right now on. And I'm gonna ask you if you'd wish to come back into the courtroom. We'd like to have you provided you'll behave yourself... |
| Jon: | Yes, sir. I'm sorry, your Honor... |
| Judge: | That's all right... |
| Jon: | But it is a matter of the heart and I don't... |
| Judge: | I can understand that... |
| Jon: | ...And I don't like them saying that I didn't take care of my kids, that I didn't love my kids. I can't stand that kind of... |
| Judge: | Let's close that door...But I understand that, sir, if you'll just have a seat...I'll just... |
| Jon: | ...I'm more sorry about Billie's death than anybody, because that was the best thing I ever had...And that's why...And they pull some convict |

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

|          | that I talked to...I never even talked on that dad-goned intercom... |
|----------|----------------------------------------------------------------------|
| Judge:   | Mr. Hall, have a seat...                                             |
| Jon:     | ...And he strikes a deal with that son-of-a-bitch to try to infer premeditation. That's bull! |
| Judge:   | ...I want to be sure that you are telling me now that your are gonna behave yourself because if there are any more... |
| Jon:     | I'm sorry...                                                        |

After the jurors return to the courtroom, Judge LaFon proceeds to read pages of jury instructions in such a rapid, staccato fashion as to render them almost incomprehensible. As we already knew, when the Judge finally gets to his instruction regarding the intoxication defense (pp. 366-368) he makes a mistake (p. 367, line 18) and says "Intoxication is **irrelevant** to the issue of the essential element of the Defendant's culpable mental state" instead of **relevant**. The tape reveals that Judge LeFon stumbles over the word **irrelevant**, repeating it. Saying the word twice actually gives it more weight, making it stand out in the context of the Judge's otherwise lifeless delivery. Of course, this repetition is not reported in the transcript.

After completing the instructions and sending the jury to the jury room, Judge LaFon tries to dismiss the alternates, but is stopped by Mr. Woodall in this exchange not included in the transcript:

| Judge:    | Normally I dismiss them...                                          |
|-----------|--------------------------------------------------------------------|
| Woodall:  | I'd wait until they actually start deliberating, your Honor, before I would dismiss these three... |
| Judge:    | All right.                                                         |

Then, in a sidebar:

| Judge:    | They're deliberating right now when they start electing...         |
|-----------|--------------------------------------------------------------------|
| Woodall:  | They don't have the instructions back there...                     |
| Judge:    | Yes they do...Send them back...                                    |

Then, after the sidebar, this exchange occurs on tape:

| Woodall:  | Before you do that, the court needs to ask if there are any exceptions to the charge. The State has none. |
|-----------|--------------------------------------------------------------------|
| Judge:    | All right...Do you have any exceptions?                             |
| Ford:     | No, sir.                                                           |

This was in the transcript, but was reported this way:

**ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL**

| | |
|---|---|
| THE COURT: | Any exceptions to the charge? |
| MR. WOODALL: | No, Your Honor. |
| MR. FORD: | No, sir. |

During the sentencing hearing, after **Dr. Joe Mount** testifies, Judge LaFon recesses for lunch. When court reconvenes, but before the jury returns, Jon speaks to the Judge again, requesting to say something **"on the record."**  In spite of Judge LaFon's affirmative reply, this exchange is also missing from the transcript:

| | |
|---|---|
| Jon: | Your Honor, I'd like to say something on the record... |
| Judge: | ...All right...Yes, sir. |
| Jon: | ...Ah, When I was up there... |
| Judge: | Stand up if you will, please, sir. |
| Jon: | When I was up there, I tried to get my legal work from out of the shed because they wouldn't let me keep all my legal work back in the cell because there's too many people in it in a 13 by 8 cell...They got 6 people in there... |
| Judge: | Where was that?  Here? |
| Jon: | ...They wouldn't let me have my legal work.  Whenever I came here they put half of it out in storage...I needed some papers from Sarah Fowler that proved, there's a medical report that proves that I took care of the kids as the main provider for two years while... |
| Judge: | Mr. Hall...We call a motion...But you...At the moment I got a pro se motion and...you can confer with your lawyers; they're the ones who have to make any motion...Now call the jury... |
| Jon: | ...But this is important evidence... |
| Judge: | I said you talk to your lawyer; that's what you... |
| Jon: | ...That should have been pursued during the guilt-innocence phase... |
| Judge: | Mr. Hall...Have a seat or I'm gonna send you back out. |

In spite of Judge LaFon's occasional frustration with Jon, the Judge apparently has his own doubts about the State's case.

When **Chris Dutton**, the inmate informer, testifies against Jon (pp. 222-236), Mr. Woodall asks Dutton if Jon told him what he planned to do when he went out to the house that night.  Dutton answers:  **"That he wanted to make her feel as he did.  He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him."**  This was too much for Judge LaFon.  On Channel 2, he can be heard saying to someone, probably his clerk: **"They've given this guy something..."**

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

Later, after **Jennifer**, the last of the three children to testify for the State, has been dismissed, Judge LaFon can be heard on Channel 2 whispering: **"This ought to have been a plea for second degree murder...(inaudible)...about three years..."**

After the jury returns with its verdict in the guilt-innocence phase, a short recess is called before the sentencing hearing begins. During this recess, the court reporter neglects to turn off the recording device. Channel 1 picks up bits and pieces of conversation between the court reporter, Jerry Woodall, and a third unidentified man who may be a bailiff. I took this tape to sound engineer **Ron Kristy**. In his studio at **Kristy Productions**, we ran the tape through his sound board, and he did everything he could to enhance its quality. The following transcription represents our best efforts to glean what we could from the tape:

| | |
|---|---|
| Court Reporter: | (whispering) Well, after I talked to Ardis...I wouldn't be surprised if they do give him...if they do come back with the death penalty...<br>{Ardis was a juror, an alternate who was dismissed before the deliberations began.} |
| Unknown Man: | I was thinking that that verdict sheet needs to come in...She's got it; Has she got it?...She needs to take charge of it... |
| (Inaudible whispering) | |
| Court Reporter: | Ardis said...Ardis said...Ah...(Inaudible)...If we've got to pay for it...I want him on death row... |
| (Inaudible whispering) | |
| Court Reporter: | ...That crazy woman in the back row; she's acting kind of strange... |
| Unknown Man: | I'll tell Holland... |
| Woodall: | Them old gals hung tough, didn't they? {He appears to be talking about the jurors here.} |
| Unknown Man: | Uh huh...I...Yesterday...They had some kind of question awhile ago...Before someone got back there...knocked on the door, said forget the question, we found it... |

(Breathing, inaudible whispering)

| | |
|---|---|
| Woodall: | Well... |
| Unknown Man: | Those exhibits we took off the board...We need them... |
| Woodall: | What I'm gonna do is take the mannequin and bring it over here...(inaudible)...pictures...(inaudible)...One at a time...Of course, they are just horrible...(inaudible)...And I'm not gonna |

**ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL**

|  |  |
|---|---|
|  | make an opening statement... |
| Court Reporter: | ...What could you say?...(inaudible)...Because of the duplication...(inaudible)...pictures... |
| Woodall: | ...Your Honor, I'd just like to say that a picture is worth a thousand words...Talk about cruel, atrocious, and tortuous... Keep those pictures in mind as you read those definitions... |
| Court Reporter: | ...We just said the words...(inaudible)... |
| Woodall: | ...Said the words and we used the green ink and now you are gonna see...{O. C. Smith used a green marker during his testimony to mark the injuries on the mannequin.} |
| Unknown Man: | Is the family gonna stay outside? |
| Court Reporter: | Yes. |
| Woodall: | Just the mother... |
| Court Reporter: | This is awful, and I don't mean it like it sounds, but she really...she started crying on cue yesterday... |
| Woodall: | Well, I've often said at the office that he killed the wrong one...He should have killed his sister-in-law and his mother-in-law...(inaudible)...Those bitches...Like they're so torn up about it...(inaudible)...But this little gal has done...(inaudible)...get married two or three damn times... |
| Court Reporter: | I've got a question. No one ever told me those kids...They would just sit there... |
| Woodall: | Well, the mother and the father have adopted the two older children that were her children by a former marriage...the two young ones...so their last name would be...whatever their last name is... |
| Unknown Man: | It would be Lambert... |
| Woodall: | Lambert...But the two youngest ones, the one who did so well yesterday and the one with CP are his kids... |
| Court Reporter: | Okay... |
| Woodall: | ...Two and two... |
| Court Reporter: | ...Two and two...yeah, I figured that out, but I didn't know what last names to use...Are they on the indictment? |
| Woodall: | Ah...Yeah, they may be... |
| Court Reporter: | I'll look after awhile, but... |

(Inaudible whispering)

|  |  |
|---|---|
| Woodall: | Those little gals came through, didn't they? |
| Unknown Man: | Uh huh... |

{This time I believe Mr. Woodall is referring to the children. This is followed by

## ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL

inaudible whispering between Woodall and the court reporter.  They appear to be
discussing the children.}

| | |
|---|---|
| Woodall: | Oh, yeah...(inaudible) |
| Court Reporter: | And...(inaudible)...It kind of worries me about ...(inaudible)...lady...(inaudible)... |
| Woodall: | (Inaudible)...If she was weak, they wouldn't have gotten into the car... |
| Court Reporter: | I know it.  I agree... |

(More inaudible whispering about the children which seems to turn into a discussion of
the jury.  Someone says: White lady...

| | |
|---|---|
| Court Reporter: | She was the last one... |
| Woodall: | I never would have thought...(inaudible)... |
| Unknown Man: | What's that?  The foreman? |
| Woodall: | Yeah, the...(inaudible)... |
| Unknown Man: | (Inaudible) |
| Woodall: | Yeah.  What did she do?  I can't remember. |
| Unknown Man: | I don't know what...(inaudible)... |
| Woodall: | Smith was good, but the best witness of them all was that first little girl... |
| Unknown Man: | Uh huh... |
| Court Reporter: | Absolutely... |
| Woodall: | ...She knocked his brains out... |
| Court Reporter: | Yes she did...Ardis said... |
| Woodall: | That's her daughter... |
| Court Reporter: | Ardis said they were very upset...said they were not going to cry, but when they got in there a lot of them cried... |

(This is followed by inaudible whispering amid background noise and a discussion about
someone, possibly a co-worker.  The unknown man tells the others that the Judge was
talking to someone yesterday about how these trials should be held at the end of the term
because the jurors have gotten used to each other at the end.  Then the unknown man tells
a story about the jurors going out to dinner the night before and a female juror bringing
attention to a male waiter's legs.  Woodall changes the subject back to the jury voir dire
and the Judge, but much of the following conversation is inaudible)

| | |
|---|---|
| Woodall: | You notice that I didn't ask...except would you enforce the death penalty? |

(Inaudible whispering between Woodall and the court reporter, apparently about the voir
dire.)

**ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL**

| Woodall: | There's...(inaudible)...death penalties...(inaudible)...It doesn't make any difference... |
| Court Reporter: | And this will probably be the last one the Judge has... |
| Woodall: | I hope so... |
| Court Reporter: | Yeah... |
| Woodall: | Well...Thank goodness he'll do what I tell him to do; he won't do what anyone else tells him to do... |

(More inaudible whispering between Woodall and the court reporter, apparently about the Judge, followed by several minutes of inaudible discussion)

(Later, the unknown man compliments Woodall's tie, which Woodall reminds him he wears only on "special occasions" like this. Then the three discuss President Clinton's State of the Union address the night before. They are obviously not "Friends of Bill.")

(Then there is a largely inaudible discussion in which the number "98" is repeatedly used. We could not bring up enough of the conversation to even guess what it was about. Later, the following conversation could be heard more clearly)

| Court Reporter: | ...Regardless of what their mind set was... |
| Woodall: | They may just go murder one, but it would not surprise me...(inaudible)...life without parole... |
| Court Reporter: | Oh, I'm convinced they will now...But I am now, at the very least...It will be one or the other...and it...(inaudible)...anything you did...(inaudible)...what he did... |
| Woodall: | I agree... |

(The court reporter then tells the other two about her friend Charlotte, another court reporter who came up to see her yesterday and stayed for Woodall's closing argument because Charlotte always enjoys Jerry's closing arguments.)

| Woodall: | ...I am convinced that subconsciously, if not consciously...When they're deciding murder one, they're deciding punishment... |
| Court Reporter: | I think you're right (laughs); I would be... |

(Inaudible whispering)

| Woodall: | ...I told them to take that mother out {said in derogatory manner: Take that mutha out...} |
| Court Reporter: | ...She needs to go, too... |

I:\PCDC\Hall_Jon\TranscriptSumry\TrialTapes.wpd         Page 10 of 11

1079

**ATTORNEY WORK PRODUCT - CONFIDENTIAL MATERIAL**

| | |
|---|---|
| Unknown Man: | Is she a sister? |
| Court Reporter: | No! Un uh...No. That's that Darlene...Jackie Brittain... |
| Woodall: | Oh, yeah...They're sorry as hell... |
| Court Reporter: | Oh, yeah! |
| Woodall: | ...Henderson County trash... |
| Court Reporter: | ...They're just sitting there...(inaudible)... |
| Unknown Man: | ...(inaudible)...tried to get a hacksaw blade into prison... |
| Court Reporter: | Ohhhh! {Loud, surprised} Oh my! |
| Unknown Man: | You didn't know that? |
| Court Reporter: | No. |
| Unknown Man: | ...Wasn't here...(inaudible)... |
| (Inaudible conversation) | |

(Later, the court reporter and the unknown man begin the process of ordering pizza for lunch for themselves and the jurors. They discuss the timing and the quantity of the order)

| | |
|---|---|
| Court Reporter: | {Referring to the jurors} **Are they hungry? Okay...Well, they're not going to be hungry after...** |
| Unknown Man: | **What did you say?** |
| Court Reporter: | **After they hear all this evidence, they're not gonna be hungry...** |

(Later, Woodall receives some sort of message and instructs someone: **"Call over there, and have them put him in protective custody over there..."**)

Court reconvenes soon after, and Mr. Woodall does give an opening statement during the sentencing hearing.

When I completed my analysis of the tapes, I was able to successfully copy the portions of the tapes that are missing from our transcript onto another cassette tape at normal speed using a regular cassette recorder. Though the quality of the copy is so poor as to render it unusable for anything other than in-house use, the opening statements and closing arguments are audible.

IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE
AT JACKSON



JON HALL,

       Petitioner,   )  Madison County No.  96-589
             )
v.             )
             )
STATE OF TENNESSEE,   )  Post-Conviction No.  CO422
             )
       Respondent.  ) DEATH PENALTY CASE
             )

### DESIGNATION OF RECORD ON APPEAL

Comes now the Plaintiff, JON HALL, pursuant to Rule 24 of the Tennessee Rules of Appellate Procedure and requests that the following items be included in the record of this Appeal:

1. Transcript of the entire post-conviction hearing; five volumes.

2. All evidence tendered during post-conviction hearing.

3. Technical record of the post conviction hearing.

4. All exhibits tendered as offers of proof.

                Danny R. Ellis
                Attorney for Plaintiff
                P.O. Box 3512
                Jackson, TN 38303-3512
                731-988-5350

CERTIFICATE OF SERVICE

     I hereby certify that I have either mailed or personally delivered a true copy of the foregoing to:

     Attorney General of Tennessee
     2nd Floor Cordell Hull Building
     425 Fifth Avenue North
     Nashville, Tennessee 37243-0493

     this the _17th_ day of _June_____, 2003.

                               Danny R. Ellis
                               Attorney at Law

2

## CERTIFICATE & SEAL

**STATE OF TENNESSEE**

**COUNTY OF MADISON**


I, Judy Barnhill, Clerk of the Circuit Court for the County of Madison, in the State

aforesaid, do certify that the foregoing is a correct transcript of the record and proceedings had

in said Court in the case heretofore prosecuted and determined therein between

**JON HALL** APPELLANT **and STATE OF TENNESSEE ,**   APPELLEE,   as the same

remains of record in said Court.


**STATE OF TENNESSEE**

**COUNTY OF MADISON**


In testimony whereof, I subscribe my name and affix the seal of said Court at office, in

Jackson, Tennessee the **21ST**  DAY OF  **JULY**  in the year Two Thousand  Three  in the

224th year of American Independence.


JUDY BARNHILL, CLERK

**1083**