# ADDENDUM 1
## Volume 9

1              IN THE CIRCUIT COURT OF

2          MADISON COUNTY, TENNESSEE

3            AT JACKSON, DIVISION I

4    _____

5    JON HALL,

6          Petitioner,

7    vs.                      No. C00-422

8    STATE OF TENNESSEE,

9          Defendant.

10   _____

11         HEARING ON POST-CONVICTION

12            RELIEF PETITION

13             MAY 15, 2002

14            VOLUME I OF IV

15   _____

16

17

18

19

20              AMY MAYS

21         OFFICIAL COURT REPORTER

22    MADISON COUNTY JUSTICE COMPLEX

23      JACKSON, TENNESSEE  38301

24             (731)423-6039

FILED

JUL 2 4 2003

Clerk of the Courts
Rec'd By

Vol. 9 ORIGINAL

1

```
 1                    A P P E A R A N C E S

 2    Before the Honorable:

 3         JUDGE ROY B. MORGAN, JR.

 4    For the Petitioner:

 5         MR. PAUL N. BUCHANAN

 6         Attorney at Law

 7         1526 Crockett Hills Boulevard

 8         Brentwood, Tennessee  37027

 9                   -and-

10         MR. DANNY ELLIS

11         Hardee & Martin

12         213 East Lafayette

13         Jackson, Tennessee  38301

14    For the State:

15         MR. AL EARLS

16         Assistant District Attorney General

17         Lowell Thomas State Office Building

18         P. O. Box 2825

19         Jackson, Tennessee  38302

20                   *  *  *  *  *

21

22

23

24
```

1                          **TABLE OF CONTENTS**

2    DEBBIE DAVIS

3              Direct Examination       Page 36

4              Cross-Examination        Page 95

5              Redirect Examination     Page 105

6    CLARENCE STANFILL

7              Direct Examination       Page 109

8    JOE HENRY STANFILL

9              Direct Examination       Page 114

10   VALENE FOREMAN

11             Direct Examination       Page 119

12   PAULA FOREMAN

13             Direct Examination       Page 124

14   EXHIBIT 1                          Page 33

15   EXHIBIT 2                          Page 57

16   EXHIBIT 3                          Page 60

17   EXHIBIT 4                          Page 124

18                          *   *   *   *   *

19

20

21

22

23

24

3

1            THE COURT:  We're ready for Mr.

2  Hall's matter.  Just preliminarily a

3  couple of comments I want to make and see

4  if I've thought out something in the past

5  accurately.

6            This is Docket Number C00-422,

7  matter of Jon Hall vs. State of Tennessee.

8  It's a post-conviction matter.

9            I want to back up to last week and

10  see where I stand on something because

11  maybe I was confused.  I want to find out

12  today.  I understand from counsel for Mr.

13  Hall, Mr. Buchanan, as a result of last

14  Friday's phone call initiated by Mr. Ellis

15  that there's certain expert testimony

16  that's not ready yet because there's not

17  been an examination conducted.  Is that

18  right?

19            MR. BUCHANAN:  Yes, sir.

20            THE COURT:  And the reason was

21  because of delay in getting orders back

22  from AOC.  That's why an examination was

23  not done.

24            MR. BUCHANAN:  That's part of the

                                                    4

1    reason, yes, sir.

2            THE COURT:  And as a result of that

3    and the phone call last week, you were

4    calling me to let me know that but also

5    the very afternoon, Friday afternoon, last

6    Friday, you were going to contact the AOC

7    to get a copy of the order which you

8    needed to get the doctor to proceed on

9    with the examination.  Correct?

10           MR. BUCHANAN:  Yes, sir.

11           THE COURT:  And that was Dr. --

12           MR. BUCHANAN:  Pam Auble.

13           THE COURT:  Now, I followed up

14   because I wanted to know.  I could not

15   recall during the phone conversation,

16   because I didn't know it was going to

17   occur ahead of time, when orders were

18   signed, but the way I understand it, Pam

19   Auble's order, which also included Dr.

20   Caruso, was signed by me on March the 13th

21   of this year.

22           MR. BUCHANAN:  Yes, sir.

23           THE COURT:  And for Pam Auble it

24   was a sum less than $5,000.  Correct?

5

1          MR. BUCHANAN:  Yes, sir.

2          THE COURT:  Now, further proof was

3    not necessary for her to get paid in that

4    case.  Right?

5          MR. BUCHANAN:  That's not true

6    anymore, Your Honor.  That used to be the

7    case, but now they all have to go to the

8    Supreme Court, they all have to go to the

9    Chief Justice of the Supreme Court,

10   according to Holly Kirkum.

11         THE COURT:  I didn't realize that.

12   I thought that amount was automatic once I

13   signed it because of the sum of money

14   involved.

15         MR. BUCHANAN:  Used to be.

16         THE COURT:  But Ms. Kirkum has told

17   you different.

18         MR. BUCHANAN:  Yes, sir.

19         THE COURT:  So you had to wait then

20   on an order by the Supreme Court.

21         MR. BUCHANAN:  Yes, sir.

22         THE COURT:  Now, the order you were

23   going to get Friday I thought was an order

24   that was just being signed if it was

6

1    ready.   But is it true that the order you

2    were getting Friday is an order that I

3    actually had previously approved in March

4    but was approved by the Supreme Court and

5    you got a copy faxed, to co-counsel at

6    least, on April the 18th?

7            MR. BUCHANAN:   There was a copy

8    faxed to Mr. Ellis on the 18th.

9            THE COURT:   Why didn't you just use

10   that to follow up and get things started?

11           MR. BUCHANAN:   I did not know we

12   had that.   Mr. Ellis says that he had

13   turned around and faxed it to Dr. Auble.

14   Dr. Auble claims she doesn't have it,

15   didn't have it.   And I've run all this

16   down since Friday.   She has it now.   She

17   has it as of yesterday.

18           THE COURT:   Mr. Ellis, update me on

19   that.

20           MR. ELLIS:   Your Honor, I did not

21   fax it to Dr. Auble.   I immediately put it

22   in the mail to Mr. Buchanan.   I don't know

23   if it got lost in the mail, but ...

24           THE COURT:   You didn't get it back.

7

1          MR. ELLIS:  I didn't get it back.

2          THE COURT:  But you immediately --

3     When you say "immediately", you mailed it

4     that very day?

5          MR. ELLIS:  That day or the very

6     next day, Your Honor.  And I don't have a

7     copy of it.  I didn't keep a copy.  I

8     should have.

9          THE COURT:  I understand.

10          Mr. Buchanan, what do you say?  He

11     says he mailed it to you.

12          MR. BUCHANAN:  Your Honor, I don't

13     have it, but -- you know, if he did, I

14     didn't get it, but if I had gotten it,

15     say, about the 23rd of April, she would

16     have gotten it about the 26th or '7th, and

17     she would still be, as far as assigning

18     him a place in her docket book, about the

19     same time she is now.

20          THE COURT:  My concern was, you

21     didn't have that order.  You were telling

22     me you called AOC, and I found out later

23     the order was, in fact, signed April the

24     18th.  It was faxed to you.  And this is

                                              8

```
 1  where I want to clear up that confusion.

 2  I like to know where I stand with people

 3  and when they tell me something, that it

 4  be accurate and truthful.

 5          MR. BUCHANAN:  I think it was

 6  signed April 14th, Judge, as a matter of

 7  fact.

 8          THE COURT:  And you're telling me

 9  now that Ms. Kirkum told you that no

10  longer was it automatically approved if

11  the sum was $5,000, that you had to still

12  get a Supreme Court order.

13          MR. BUCHANAN:  Yes, sir.

14          THE COURT:  When did she tell you

15  that?

16          MR. BUCHANAN:  January.

17          THE COURT:  Of this year?

18          MR. BUCHANAN:  Yes, sir.

19          THE COURT:  In person or by phone

20  call?

21          MR. BUCHANAN:  By phone.

22          THE COURT:  And when the March 13th

23  order was signed by me, she didn't call

24  you and tell you anything different about
```

9

1    it being automatically approved as to Dr.

2    Auble?

3            MR. BUCHANAN:  No, sir.  Has it

4    changed?

5            THE COURT:  I'm just asking you

6    what she told you or didn't tell you based

7    on what you've told me.

8            MR. BUCHANAN:  It used to be that

9    up to 5,000 you didn't have to get it

10   approved.  I've had that direct experience

11   with Ms. Higuera on another case.

12           THE COURT:  And so the only one

13   we're waiting on now is Dr. Auble.

14           MR. BUCHANAN:  We're waiting on Dr.

15   Auble, and I had an affidavit from Dr.

16   Caruso.  We need a serotonin test.  I'm a

17   little hesitant to talk about this in

18   front of Mr. Earls, but I suppose it's not

19   really going to hurt anything.

20           THE COURT:  Well I thought you said

21   Friday that you had no problem with it.

22   He wasn't in the phone conversation

23   Friday, it was ex parte, and you had no

24   problem talking to him.

                                              10

1          MR. BUCHANAN:  Right.

2          THE COURT:  So I'm just relying on

3     what you told me.

4          MR. BUCHANAN:  No, I understand,

5     Judge.  I just want to make the record to

6     make sure that I understand what I'm doing

7     here.

8          THE COURT:  If you need Mr. Earls

9     to step out, if we need to do this in

10    chambers, now is the time to change your

11    mind from last Friday's conversations.

12         MR. BUCHANAN:  No.  No, that's

13    okay.  I don't have any problem with

14    telling him that we -- because I know that

15    I have Dr. Caruso to come and testify at

16    least just to the mitigation part of the

17    trial, the punishment phase.  He has to

18    complete -- Pam Auble has to complete her

19    work, and a Dr. Solomon, who I found, has

20    to complete his work on the serotonin

21    levels before he can testify as to the

22    intermittent explosive disorder.  That's

23    where we're at.

24              THE COURT:  What's the status of

11

1    Dr. Auble as far as appointments,

2    scheduling?

3         MR. BUCHANAN:  July 31st.

4         THE COURT:  She couldn't do any

5    better than that scheduling?

6         MR. BUCHANAN:  Judge, I begged.  I

7    sent e-mails saying, please, if there's

8    any way.  The one thing she did tell me is

9    that if there was a cancellation in her

10   schedule, that she might be able to shove

11   it up before that.  She could only

12   guarantee July 31st.  She said it takes

13   about two weeks to do all of her work, and

14   she also said that she was now turning

15   down work; she wasn't scheduling anything

16   anymore.

17        THE COURT:  So based on the July

18   31st date, you're saying that although we

19   might proceed for three days here, that

20   the final hearing would have to occur

21   sometime after the middle of August.

22        MR. BUCHANAN:  Yes, sir.

23        THE COURT:  And the main reason is

24   going to be the scenario with the experts.

12

1          MR. BUCHANAN:  Yes, sir.

2          THE COURT:  But now you have made

3    yourself available for Friday, I

4    understand, of this week.

5          MR. BUCHANAN:  Yes, sir.

6          THE COURT:  One other thing.  When

7    I schedule something -- I don't know how

8    other judges do it.  I just always assume

9    they do it the same.  When I schedule

10   something for May 15, my experience has

11   been there's no guarantee something's

12   going to finish on one day.  You

13   understand that.

14         MR. BUCHANAN:  Yes, sir.

15         THE COURT:  And you're well aware

16   that this case -- since you're the one

17   that's representing the Petitioner, would

18   not finish this case in one day or maybe

19   two days or maybe even three days.

20         MR. BUCHANAN:  Well, I think I told

21   the Court a week would probably be the

22   neighborhood of what it would take.

23         THE COURT:  So you've taken care of

24   the air ticket that you had for Friday.

13

1          MR. BUCHANAN: Oh, yes, sir. That

2    never was a big problem. I threw it out

3    to the Court to let you know because Mr.

4    Ellis and I both were under the impression

5    that -- Well, actually when I left here I

6    thought it was one day but it became two

7    quickly, but I have never had any problem

8    with the Court telling me, "My Friday is

9    free. Let's go three." I mean, that's --

10   every time I schedule a ticket for an

11   airline -- This is not the first time this

12   has happened, Judge, and it never upsets

13   me. We've got to move -- We've got to

14   move the docket along. I understand that.

15          THE COURT: Mr. Ellis, thanks for

16   clearing up that you mailed that order to

17   Mr. Buchanan instead of faxing it to Dr.

18   Auble. I appreciate that.

19          MR. ELLIS: Well, Your Honor, I

20   think through the whole course that's what

21   we said. I think even on the phone

22   conversation Friday, that's what I said.

23          THE COURT: Well I don't question

24   what you said. I just wanted to clear it

                                                14

1   up because it was in conflict with what he

2   was saying.  That's why I appreciate you

3   speaking up to clear it up today.

4          MR. ELLIS:  Well, again, I think

5   Mr. Buchanan just -- he's known that all

6   along and he's said that all along.  This

7   is just --

8          THE COURT:  Said it different

9   today.

10         MR. ELLIS:  Exactly, and I don't

11  think it was intentional at all.  I think

12  it's just a matter of -- I mean, we've got

13  -- we've been staying -- we stayed up 'til

14  midnight last night getting ready for this

15  thing.  Basically it was inadvertent.

16         MR. BUCHANAN:  Well, Judge, Friday

17  I knew I didn't have it.  I mean, I think,

18  you know, it's clear I had not seen it and

19  was not under the impression it was even

20  finished.  The lag time had been about six

21  weeks.  This one came back in just about

22  four.

23         THE COURT:  I guess, too, the phone

24  call Friday to me between you and Mr.

15

1    Ellis was the result of me running into

2    Mr. Ellis, and I appreciate him getting on

3    that call, but all along, this is Friday

4    before we started a hearing of this nature

5    which is a very important hearing to all

6    involved in this courtroom. I was well

7    available long before Friday afternoon to

8    discuss problems or potential problems

9    with this case and expert testimony and

10   delay of the case in the future, and that

11   phone call wouldn't even have taken place

12   Friday afternoon except for Mr. Ellis

13   initiating the call after talking to me.

14   We've had discussions, if you'll read

15   transcripts, where I made it very clear I

16   was available if you needed me, if there

17   were problems I wanted to know, and the

18   scheduling of these experts on behalf of

19   the Petitioner was very important and we

20   had to stay on schedule, and I got a call

21   Friday afternoon before this hearing today

22   of something causing a delay of this

23   nature, sometime now after July 31st.

24          Enough said, gentlemen. We're

16

1  ready to proceed with the petition itself.

2  I have reviewed the file.  We're not

3  dealing with a jury here.  I feel like

4  we're ready to proceed with the proof.

5           MR. ELLIS:  Your Honor, before we

6  begin, I'm going to make an objection on

7  the record.

8           Your Honor, throughout the course

9  of this proceeding, Mr. Hall is objecting

10 to the Court having venue, that this Court

11 -- that these proceedings going back from

12 the trial setting to now taking place in

13 Madison County.

14           If you'll look at Criminal Rule of

15 Procedure, Criminal Procedure Number 21, I

16 believe the rule states that there are two

17 ways to have a change of venue; one is by

18 petition of the -- upon the motion of the

19 Defendant, or, two, by the Court's own sua

20 sponte motion with the Defendant's

21 consent.

22           Having perused the file, Your

23 Honor, I do see that there is a motion to

24 change venue from counsel that was filed,

17

1   which I think the proof will show, against

2   the Defendant's wishes.  He did not wish

3   to have his case moved from where it took

4   place to Madison County.

5          Second, Your Honor, if you'll look

6   at Section F of the rule, "If a change of

7   venue is ordered, the clerk shall make out

8   a full and complete transcript of the

9   record and the proceedings in this cause

10  and transmit the same, together with the

11  indictment and all other papers on file,

12  to the clerk of the receiving court, which

13  transcript shall be entered on the minutes

14  of the receiving court."

15         Your Honor, I -- this is an

16  extensive and vast record.  From what I'm

17  going through, I do not see a transcript

18  of the change of venue motion.  So that

19  section has not been complied with, and as

20  I am almost -- well, no, I am positive

21  that if that were the case and if there

22  was a hearing held, Mr. Hall would be

23  standing up screaming, "I don't want to

24  move it."  And, Your Honor, we're going to

18

1    argue that this Court doesn't have

2    jurisdiction, that the trial court that

3    conducted the trial didn't have

4    jurisdiction, and as you know -- excuse

5    me, venue.  Venue and jurisdiction go hand

6    in hand.  They are both synonymous with

7    power.  If a court does not have power to

8    act, then a court cannot rule and its

9    rulings are void, and, therefore, we ask

10   that this verdict be set aside and a new

11   trial be scheduled.

12        THE COURT:  General?

13        MR. EARLS:  I think the record

14   shows the Defendant filed a motion for

15   change of venue and it was granted.  I

16   think the Court has jurisdiction.  As far

17   as the district, based upon his own

18   motion, it just moved counties, selected a

19   jury in Madison County rather than

20   Henderson County.  I'd ask that that

21   objection be overruled.

22        THE COURT:  That would have been a

23   matter addressed on appeal, would it not,

24   during the regular course of appeal?

19

1        MR. EARLS:  Yes, sir, it should

2   have been.

3        MR. ELLIS:  Your Honor, I think he

4   has preserved that issue for appeal all

5   the way through.

6        THE PETITIONER:  Your Honor, I

7   would like a chance to talk.

8        THE COURT:  Well now, I can't keep

9   going around including the Petitioner as

10  well as counsel.  So counsel -- You can

11  talk to your lawyer if you need to talk to

12  your lawyer, but you've got two lawyers

13  there, and we'll go through them in these

14  proceedings.  If you want to take a minute

15  and talk to Mr. Ellis you can.

16       THE PETITIONER:  According to

17  Article I, Section 9, I have a right to be

18  heard.

19       THE COURT:  If you want to talk to

20  Mr. Ellis you can.

21       THE PETITIONER:  I remember I

22  objected to having counsel appointed on

23  March 23rd, 2001, and you appointed

24  counsel for me anyhow.  So I consider them

20

1    elbow counsel, so I think I have a right

2    to be heard.

3            THE COURT:  Mr. Hall, if you want

4    to talk to Mr. Ellis or Mr. Buchanan, you

5    can.  Otherwise, I'm going to move on.

6            THE PETITIONER:  Are you going to

7    violate my civil rights to be heard?

8            THE COURT:  Mr. Hall, I'll let you

9    talk to your attorneys if you want to talk

10   to them.

11           THE PETITIONER:  Are you a de facto

12   judge?  Is your oath of office current?

13           THE COURT:  Mr. Hall, I ask you to

14   be quiet at this time.

15           Gentlemen, under the circumstances,

16   the venue question --

17           THE PETITIONER:  I ask that you

18   recuse yourself.

19           THE COURT:  Have him removed from

20   the courtroom.  I'm not going to start it

21   out this way.  This is not a jury trial.

22   If we have to conduct it without Mr. Hall

23   --

24           THE PETITIONER:  You don't even

                                              21

1  have jurisdiction over me, and I got a lot
2  more proof --

3          THE COURT:  Have him removed.

4          THE PETITIONER:  -- pursuant to
5  Tennessee Rules of Evidence 201 and 202,
6  you got notice of the law and the facts.

7          THE COURT:  I'm disappointed so
8  early in the proceedings that we're having
9  such difficulty, but this is not a jury
10 trial, and we all have a job to do, and I
11 cannot tolerate nor will we make any
12 progress if the Petitioner in this case is
13 going to continue to act in such a nature.
14 So, at this time, gentlemen, we're going
15 to proceed on.

16         As to the venue question, there is
17 a difference in venue and jurisdiction,
18 but I agree with counsel, that either one
19 can cause some problems as to whether or
20 not the Court can handle the case.

21         For purposes of this proceeding
22 today, I'm going to deny the request that
23 Mr. Ellis has made on behalf of the
24 Petitioner, and we're going to proceed on.

22

1    The venue issue is something I assume was

2    addressed at another point in time by

3    other courts, but it's not proper for

4    purposes of this proceeding in that I find

5    I do have venue to handle -- and

6    jurisdiction to handle the post-

7    conviction.

8            Go ahead, Mr. Buchanan.

9            MR. BUCHANAN:  Judge, just to try

10   to clear up a couple of preliminary

11   matters, is there any piping of any oral

12   -- of what goes on here to where the

13   Defendant is now?

14           THE COURT:  I don't have anything.

15   If you want to talk to your client very

16   briefly and if he will calm down, you know

17   he's welcome to come back in this

18   courtroom.  That's up to you.

19           MR. ELLIS:  I'd ask the Court for a

20   five-minute recess.

21           THE COURT:  Five minutes, okay.

22           MR. BUCHANAN:  Well, if you'll let

23   Mr. Ellis go do that, I'd like to address

24   just a couple of things so we can move

1  along here.

2          THE COURT:  Certainly.

3          MR. BUCHANAN:  Judge, I want the

4  Court to know this so -- I really feel bad

5  about a couple of things, and I want the

6  Court to know this.  I swear on a stack of

7  Bibles that when I left here, I thought we

8  had a one- or two-day hearing, and I

9  thought -- and I really thought, and Mr.

10  Ellis did, too, that we had a -- that we

11  had two days scheduled for us for sure,

12  and I think Mr. Ellis made that clear to

13  you on Friday, that he thought it was just

14  two days.  The reason that I did not

15  contact the Court as opposed to -- I want

16  you to understand how I'm trying to work

17  with this Court.  You had told me, "If you

18  have any problems, Mr. Buchanan, get with

19  me ahead of time."  I have two days of

20  testimony, and I saw no reason to not take

21  full advantage of it and move along what

22  we could, and by the time you question the

23  lawyers and put on some of these other

24  witnesses, I didn't see how that wouldn't,

1    and I was ready for them, even in spite of

2    the fact that the psychiatrist is not

3    through with his work, and that's why I

4    didn't contact the Court.  I wasn't trying

5    to spring any last minute thing.  I just

6    assumed we had two days set aside and that

7    we would be adjourning to some extent and

8    re-evaluating when things would be

9    finished.  That's the only reason I didn't

10   contact the Court.  I didn't see any need

11   for a continuance.  I thought, if the

12   Court needs two days of testimony, we're

13   going to give it to him, and that's -- and

14   when you moved it to three, we redoubled

15   our efforts and got together everything

16   that we think we can to make it three.

17   So, I just want the Court to know, I know

18   you want to move this case.

19          THE COURT:  I think I have a duty

20   to move it.

21          MR. BUCHANAN:  Absolutely.

22          THE COURT:  I know I have a duty to

23   move it.

24          MR. BUCHANAN:  Absolutely you do.

                                              25

1          THE COURT:  We've talked about this

2     enough I think.  We've made clear where we

3     all stand and we're ready to proceed.  I

4     don't need three days of stuff you don't

5     need to put on.  If I take three days,

6     it's because we can utilize what you're

7     putting on to make a fair decision on

8     post-conviction.  So, do what you can do

9     with three days, just know we're available

10    for three days obviously, and I know now

11    that we're looking at sometime after July

12    31st as far as experts.

13          MR. BUCHANAN:  And I'm sorry I

14    didn't tell the Court that, but I left

15    here with the impression that the Court

16    knew it would be about a week probably for

17    total, but you had set aside two days and

18    we would get started at that point.

19          THE COURT:  I start a lot of cases

20    and then go on for some time beyond the

21    day it was set for.  That's just the way

22    it works.  That's been the way I've had it

23    for 20-something years, practicing law and

24    on the bench.  It's just that way.

1          MR. BUCHANAN:   Okay.

2          THE COURT:   And it's always up to

3    checking with the Court to determine

4    whether we're going to stop prematurely

5    from a final result.   So, enough said on

6    it.   We need to move on to the merits of

7    the petition itself.

8          MR. BUCHANAN:   Yes, sir.

9          MR. ELLIS:   Very briefly, Your

10   Honor.   Mr. Hall would like to come back

11   into the courtroom.   He has asked that he

12   can show me something from his file

13   records to argue in addition on his motion

14   against the venue.   Your Honor, I believe

15   if he is allowed to do that, I think I

16   have his agreement that he will conduct

17   himself accordingly during the hearing.

18   So we're going to ask that Mr. Hall be

19   allowed to be brought back in, and if I

20   could just briefly revisit what he wants

21   to be argued.

22          THE COURT:   On venue?

23          MR. ELLIS:   On venue, Your Honor.

24   I know you've already ruled, but I would

1  ask that you reconsider just ...

2          THE COURT:  Let him step in.

3          MR. ELLIS:  Thank you, Your Honor.

4          THE COURT:  And I want to give him

5  one comment as he comes back in.

6          Mr. Hall, if your disruptive

7  behavior continues, then you waive your

8  right to be present in this courtroom.

9          THE PETITIONER:  My rights have

10 been violated.

11         THE COURT:  Let me finish.  I just

12 want to make that very clear.  Disruptive

13 behavior continuing will waive your right

14 to be present in this courtroom.  You can

15 return as you have now if you're willing

16 to cooperate and behave in a proper manner

17 in the courtroom.  Now Mr. Ellis has been

18 kind enough on your behalf to talk with

19 you, and that's why you're back in here.

20         Enough said, and, Mr. Ellis, you

21 may continue.

22         MR. ELLIS:  I just want to pass --

23 if you'll look in the trial book, there is

24 an affidavit in support -- filed on

28

```
1   November 1st, 2001 to support the argument
2   that this Court has lost jurisdiction
3   because it has failed to afford the
4   Defendant due process rights.   Mr. Hall
5   would like us to argue that under Article
6   1, Section 9 in the Tennessee
7   Constitution, it grants that in all
8   criminal prosecutions, that the defendant
9   has a right to be heard by himself and his
10  counsel to demand the nature and
11  accusations against him, to have a copy of
12  it -- therefore, to meet the witnesses
13  face to face, to have a compulsory process
14  for obtaining witnesses in his favor, to
15  have an impartial jury trial in the county
16  in which the trial has been committed, and
17  that he had asked his counsel not to file
18  a motion to change venue, that he wanted
19  to have his case heard in the county in
20  which this crime was alleged to have been
21  committed; that these attorneys through
22  their actions violated his wishes,
23  therefore, violating the constitution;
24  that as agents of the State, through being
```

1    appointed through the Public Defender's

2    office and as counsel, that they were

3    acting on behalf of the State and that

4    under Article I, Section 9, his due

5    process rights were violated.

6          Your Honor, he has got several

7    cases that he would like me to present to

8    the Court.  I will not forward you copies

9    of them; I will just give you the cites.

10   Your Honor, I have not had a chance to

11   check these to see if these are updated

12   law, and I have not had a chance to

13   Shepardize them.

14          First one is 101 US 494, <u>Baker v.</u>

15   <u>Humphrey</u>.  The next one, Your Honor, is

16   <u>Weakly ex rel. Usery v. Pierce</u>.  That's 52

17   Tenn 401.  <u>Tennessee ex rel. Anglin v.</u>

18   <u>Mitchell</u>, 575 S.W.2d 284, <u>Tennessee v.</u>

19   <u>Eaves</u>, 959 S.W.2d 601, <u>State of Tennessee</u>

20   <u>v. Upchurch</u>, 620 S.W.2d 540, <u>Tennessee v.</u>

21   <u>Ellis</u>, 953 S.W.2d 216, <u>Tennessee v. Muse</u>,

22   967 S.W.2d 764, <u>Hull v. Cunningham</u>, 133 US

23   107, <u>Kentucky v. Stinsor</u>, 107 S. Ct.

24   2685(a), <u>Jones v. Zerbst</u>, 304 US 458, and

30

1    he also cites his own case, <u>State v. Jon</u>

2    <u>Hall</u>, 8 S.W.3d 593.

3            Your Honor, I'd also point you to

4    Mr. Hall's appendix that was filed on

5    November 1st, 2001, to Page 37 for his

6    argument.

7            THE COURT:  I reviewed that

8    appendix just this week.

9            General, comment further?

10           MR. EARLS:  I think the Court's

11   already properly ruled, Your Honor.

12           THE COURT:  I'll stand on my ruling

13   for the reasons previously stated, but I

14   appreciate counsel's argument.

15           Now are we ready to proceed?

16           MR. BUCHANAN:  Just a couple of

17   matters, preliminary matters.

18           I'd like the witnesses placed under

19   the rule.

20           THE COURT:  The rule is going to be

21   called for.  That means all witnesses to

22   this proceeding will have to remain

23   outside.  You'll be called as you're

24   needed to testify, and you're instructed

31

1    not to discuss your testimony with those

2    going and coming from the courtroom.

3    That's the purpose of the rule.  So all

4    witnesses must be excused at this time and

5    remain outside.

6              MR. BUCHANAN:  Another preliminary

7    thing, I think Mr. Earls and I have agreed

8    that a copy of the transcript as typed for

9    the purposes of appeal should be placed in

10   the record at this time.  I believe he's

11   taken care of that.

12             Have you not, Mr. Earls?

13             MR. EARLS:  Yes, sir.

14             MR. BUCHANAN:  And I certainly

15   concur with him, no objection to it, and

16   would ask that it be placed into the

17   record at this time.

18             THE COURT:  That's the trial

19   transcript?

20             MR. BUCHANAN:  Yes, sir.

21             THE COURT:  If y'all agree, that

22   can be marked Exhibit 1.  By agreement

23   then the trial transcript will be passed

24   up, and give the court reporter time to

1    mark it Exhibit 1.

2                (Exhibit 1 was marked

3                and entered.)

4           THE COURT:  Go ahead.

5           MR. BUCHANAN:  Your Honor, if I

6    might, these are a little bit more

7    informal that obviously when a jury is

8    here.  May I inquire of the Court exactly

9    where the Court is in its study of this

10   record?  And the only reason I ask that is

11   because, if the Court's read the

12   transcript, that would change some of the

13   way I conduct this proceeding.  If the

14   Court hasn't read the transcript, then it

15   would change a few things.

16          THE COURT:  If you want to make

17   reference to the transcript, at any time

18   you make reference to it.  You've got to

19   do your job.  I am somewhat familiar with

20   the case.  I assume I'll be a lot more

21   familiar by the time you conclude, but you

22   proceed how you feel like you need to

23   proceed in representing Mr. Hall.

24          MR. BUCHANAN:  Would the Court mind

33

1  telling me, has the Court read this

2  transcript?

3        THE COURT:  I have looked at

4  portions of the transcript.  I have looked

5  at a lot of things in their entirety but

6  portions of the transcript.  Now, whether

7  I've looked at something you --

8        MR. BUCHANAN:  Yes, sir.

9        THE COURT:  -- and would recall it,

10  you still might need to refresh my

11  recollection.  You do what you feel like

12  you need to do.  I'm obviously going to

13  have additional time after this week to

14  look at other things, sometime between now

15  and July 31st I take it.

16        MR. BUCHANAN:  Your Honor, may I

17  make a brief opening statement then?

18        THE COURT:  I don't see the purpose

19  in that unless you feel like there's --

20  Tell me why an opening statement would be

21  necessary at this point.  I've reviewed --

22  Do you feel like you need to because of

23  the transcript question?

24        MR. BUCHANAN:  No, sir.  I thought

34

1  I would like to tell you where we're

2  headed, but if the Court feels we don't

3  need to make one, then that's fine with

4  me, too.

5         THE COURT:  I've reviewed your

6  pleadings which I feel like give me a

7  pretty good idea of where you're headed.

8  Let's go ahead and proceed unless there's

9  something else preliminarily.

10        MR. BUCHANAN:  All right.  Then

11  I'll --

12        MR. ELLIS:  Your Honor, I don't

13  mean to interrupt, but I would like to

14  know if we could unshackle Mr. Hall's

15  hands so that he can write and communicate

16  with us.

17        THE COURT:  That's up to security.

18        COURT OFFICER:  No, sir, that is

19  against policy and procedure.

20        THE COURT:  Go ahead.

21        MR. BUCHANAN:  Then I'd call Debbie

22  Davis to the stand, Your Honor.

23        **DEBBIE DAVIS** was called and being

24  first duly sworn, was examined and

35

1    testified as follows:

2    **DIRECT EXAMINATION**

3    **BY MR. BUCHANAN:**

4    Q        Would you state your name for the

5    record, please?

6    A        My name is Debbie Davis.

7    Q        And, Ms. Davis, where do you live?

8    A        I live in Farmington, Connecticut.

9    Q        And what is your relationship to

10   Jon Hall?

11   A        I'm his sister.

12   Q        And are you the same Debbie Davis

13   that testified previously in this case in

14   the trial, in the punishment phase of that

15   trial, in Volume IV, Pages 415 to 426?

16   A        Yes, I am.

17   Q        Approximately some 11 pages.

18   A        I -- Yes, I guess.

19   Q        Ms. Davis, were you called at the

20   guilt or innocence phase of that trial?

21   A        No, I was not.

22   Q        And I wanted to ask you. You're

23   one of how many brothers and sisters and

24   siblings of Jon Hall?

36

1  A        I'm one of seven children, and I'm

2  the next to the oldest, Jon being the

3  youngest.

4  Q        And were you raised with him?

5  A        Yes.  Yes and no.  We had such a

6  large family that my grandparents lived

7  right beside my parents.  So, it was

8  connected by a sidewalk.  So we were

9  together and would eat meals sometimes,

10  but I slept at my grandparents' house.  I

11  stayed at my grandparents' house.

12  Q        Ms. Davis, were you ever -- in the

13  time between July of 1994 and February of

14  1997, were you ever contacted by any

15  counsel representing Jon Hall?  Save and

16  except the night before you were put on at

17  the punishment phase --

18  A        No, I was not.

19  Q        -- by telephone.

20  A        No, I was not.

21  Q        Did you have information that would

22  have gone to the punishment phase as well

23  as the guilt or innocence phase concerning

24  Jon?

1   A        I certainly would have thought so,

2   yes.

3   Q        Do you know of any reason why you

4   could not have been contacted and had this

5   information extracted from you during that

6   time?

7   A        No.

8   Q        Now, where did you live back in

9   1994 through 1997?

10  A        In Connecticut.

11  Q        Had Jon lived with you?

12  A        He lived with me in North Carolina.

13  I lived in North Carolina.  I taught

14  school for 13 years and owned a restaurant

15  in Fayetteville, North Carolina.  I think

16  that was from 1976 to 1990.

17  Q        1990 what?

18  A        1976 to 1990 I lived in

19  Fayetteville, North Carolina.

20  Q        In what periods of time did Jon

21  talk to you -- I mean, live with you?

22  A        I'm not exactly sure of the years.

23  He came down I know -- I guess it was -- I

24  have to think about this.  We left about

1   the same time.  I left a little after him

2   to go to -- So, I'd say it went '84

3   through '87 or somewhere in that time

4   frame.

5   Q     Were you there when Jon met Billie?

6   A     Yes, I was.

7   Q     And Jon met Billie where?

8   A     Jon was staying with me, but he

9   started dating this girl named Hope at an

10   apartment complex, and Billie was this

11   girl's next door neighbor, and I thought

12   he was dating Hope, but, in fact, he

13   somehow got hooked up with Billie, and

14   somehow they got together, and that's

15   where he met her, I believe over at that

16   apartment complex.

17   Q     And this was about when?

18   A     Are you asking me for dates?

19   Q     Just roughly.

20   A     In that same time period.  I'll be

21   honest.  I'm not really sure.  I -- '84,

22   '85, somewhere in there, '86.  I think

23   it's in that time frame.

24   Q     Have you had occasion to see Jon

1  and Billie intereact [sic] with each

2  other?

3  A       Sure, lots of times.

4  Q       Have you ever seen Billie be

5  abusive to Jon or use physical force and

6  violence against him?

7  A       Yes, I have.

8  Q       And how many occasions?

9  A       Just -- Their relationship was kind

10 of funny.  I can tell you one instance

11 where they were in the driveway.  Jon was

12 working on our van.  Billie came over to

13 the house.  The kids were already with Jon

14 at my house, and Jon was working on the

15 van.  Billie came over.  She was upset

16 about -- I don't know whether he had the

17 wrong car or what was going on.  But

18 anyway, I saw her get out of the car.  I

19 was in the house.  And she was angry about

20 something.  I've seen her -- then she

21 started like kicking at him at his groin

22 area, and then he just kind of like pushed

23 her away and was turning around and then

24 she would go after him, hitting --

40

1        MR. EARLS:  I'm going to object to

2    this evidence.  I don't see what this has

3    to do with anything in a post-conviction

4    petition.

5        MR. BUCHANAN:  Your Honor, it has

6    to do with adequate investigation.  That's

7    why I'd asked for an opening statement.

8    Adequate investigation, determining issues

9    that were available to them at the time of

10   trial.  In a murder case, the relations

11   between the parties are all relevant.  In

12   this particular trial, this case was left

13   with the State producing the testimony

14   that there was phone lines disconnected

15   and that this woman was beaten severely to

16   death.  There appeared, by the testimony

17   of Dr. Zager, that these attorneys were

18   trying to shoot for the lesser included

19   offense of voluntary manslaughter.  There

20   are several problems with that, and I

21   think Mr. Woodall even said it in the

22   record, he alluded to it, he said, you

23   know, "You can put it in there, Judge.  I

24   don't know if there's any evidence of it."

41

1   They did put Dr. Zager on that attempted,

2   it looked like, to see where they were

3   going.  My point in bringing her up is to

4   show that had they interviewed her, which

5   my position would be a minimum of people

6   that you would interview would be the

7   immediate family members, they would have

8   found that, in fact, instead of painting

9   the picture that Billie was the poor

10  innocent person, that, in fact, there was

11  evidence that she was violent toward Jon

12  as he was to her.

13         THE COURT:  I did some advance

14  thinking about this as I reviewed your

15  pleadings, and I agree with you to some

16  extent because this is the situation where

17  the State would normally be right, if

18  they're trying to exclude testimony being

19  offered to controvert facts or events

20  which brought about the original

21  conviction, but you're trying to offer

22  this testimony I find to show that there

23  was available to the attorneys, that you

24  are accusing of being ineffective, that

42

1    could have been brought forward for

2    purposes of a defense.  And I say

3    "defense", something lesser possibly than

4    what he was convicted of.  So I'm going to

5    let you proceed at this point based on

6    that logic.

7            And, General, you understand the

8    basis of my ruling.

9            MR. EARLS:  Yes, sir.

10           THE COURT:  Go ahead, Mr. Buchanan.

11   A       So whenever he was putting her in a

12   headlock, I came out of the house and

13   said, "What are you guys doing," and then

14   they just pretended they were horsing

15   around.  So, it was like they didn't

16   exactly want you to know that they were

17   fighting or arguing.  That was just the

18   nature of their relationship.  They did

19   that kind of stuff all the time.  And on

20   occasions I would see her kick -- go try

21   to kick him in the groin or -- They just

22   were like that.

23   Q       Have you ever witnessed her -- I'm

24   going to use a southern term -- pick at

                                                  43

1    him, that is, try to run him down and

2    belittle him and things of that nature?

3         MR. EARLS:  Object to leading, Your

4    Honor.

5         THE COURT:  Objection sustained.

6    Q    Would you state whether or not

7    you've seen occasions such as that?

8    A    Billie and Jon's relationship was a

9    little bit different.  Billie -- Jon

10   always felt that Billie was much smarter

11   than himself, so Billie was always in

12   charge of everything.  Billie was in

13   charge of all the bills.  Everything was

14   always in Billie's name.  Jon handed

15   Billie his paycheck.  She did everything.

16   If they were working and he was getting

17   too many hours that would affect his

18   Social Security or whatever, anything like

19   that, Jon wouldn't go to work, but Billie

20   was in charge.  Billie wanted -- She was

21   very proud of her education.  She was very

22   proud of going to school to be an EMT.

23   Those were the things -- And that was her

24   goal, and that's the goal she was going

44

```
 1  after, but Jon was the one that stayed and
 2  took care of the kids.  Jon is the one
 3  that -- at least in North Carolina.  I
 4  don't know about in Tennessee.
 5  Q        Okay.
 6  A        But, yes, she did put Jon down.
 7  She would tell him he was stupid, yes.
 8  Q        Did the attorneys -- Well the
 9  attorneys never talked to you before they
10  put you on.  Did they --
11  A        No, they did not.
12  Q        When they did talk to you the night
13  before, who was it that talked to you?
14  A        I believe -- It wasn't Mayo.  It
15  was the other one.  God, I just had a
16  brain warp here.  It's not Ford.  What is
17  his --
18  Q        Mr. Mayo?
19  A        Is it Mr. Ford?  There were two of
20  them.  There's been so many attorneys with
21  my brother, I swear, I get confused.
22  Q        That's okay.  Whoever it was that
23  called you the night before --
24  A        Right.  It was one of the two of
```

45

1   them.  I know it was Mr. Mayo, and it was

2   the older one of the two.  And he spoke to

3   -- He called about -- between 11 and 11:30

4   at night to just -- he said, "Let me just

5   go over some testimony with you that we're

6   going to be presenting tomorrow," and kind

7   of gave us what we should or should not

8   say.

9   Q       What did he go over with you that

10  night?

11  A       He asked us not to say anything

12  negative about Billie because it would not

13  -- she was already a victim, and that

14  there were going to be mannequins and bad

15  pictures and everybody would already feel

16  pretty bad about it, as did we, and that

17  it would be in our best interest not to

18  bring up anything negative about Billie

19  because it would make us look bad to the

20  Court.

21  Q       Have you had occasion -- You said

22  that Billie and Jon lived with you for a

23  while.

24  A       Jon and Billie did not live with me

46

1  together.  Jon lived with me, and then he

2  and Billie got together and then they were

3  married.  They had their own place.

4  Q       Well, but I mean, you had an

5  opportunity to see them actually

6  intereact.

7  A       Correct.

8  Q       Do you know anything at all

9  concerning --

10       MR. BUCHANAN:  And I'm going to

11  make this question a little long, Judge,

12  directing the Court's attention to that

13  portion of the trial which is unrebutted

14  that the phone lines were disconnected

15  going into the house, which I assume was a

16  factor in premeditation.

17  Q       Did you have any information for

18  these attorneys concerning those phone

19  lines and Jon's penchant for disconnecting

20  phone lines?

21  A       Jon has a habit of disconnecting

22  phone lines.  The first time that I was

23  made aware of him doing this was in

24  Fayetteville, North Carolina, and what was

47

```
 1   happening was he was having a -- he and
 2   Billie were having a party at their
 3   apartment complex.  Apparently it was a
 4   loud party, and the neighbors were going
 5   to call the police, or had told them that
 6   if they didn't keep the noise down they
 7   would call the police.  Jon went and
 8   disconnected their phone so that they
 9   could not call the police.  This angered
10   these people that he had done this, and
11   somehow a window got broken out in
12   someone's car.  It was not Jon that had
13   done it, but somebody at the party
14   apparently had done this.  The police were
15   being called anyway, and I don't know
16   whether Jon called me or Billie called me.
17   One of them called me to come over to the
18   apartment complex because I knew a lot of
19   the policemen from them eating at our
20   restaurant in Fayetteville, and I think
21   they were hoping that we could help them
22   because they might be in trouble because
23   the police were called, and the phones
24   were disconnected and there was some
```

48

1    damage done to this particular car.  I

2    believe it was all thrown out of court

3    because the lady's testimony as to the

4    excess in damages that she said she had

5    didn't hold up in court.

6    Q        Okay.  Do you have any other

7    instances that you know of that Jon

8    disconnected phone lines before he would

9    engage in conversations with people?

10   A        My mother.  He disconnected my

11   mother's telephone.

12   Q        On one or more occasions?

13   A        I know of one particular.  He was

14   coming home, and my mom was going to call

15   her sister, to go over to her house, and

16   he -- he doesn't cut the phone lines, he

17   knows how to just disconnect them, and

18   then you can connect them back up.  So, he

19   just -- that's what he does.

20   Q        Why does he do that?

21   A        My sisters and I were talking about

22   this, and what -- but he's one of seven

23   kids.  He's the youngest one, and I'd say

24   vying for attention in that sometimes we

49

1    don't listen to Jon, or Jon will rant and

2    rave, and, you know, we'll be like, "Jon,

3    just shut-up.  Just stop.  Just whatever,"

4    and he wants you to listen to him because

5    no one -- you know, being the last of

6    seven kids, we're all vying for attention

7    there, but Jon, he wanted your attention.

8    He wanted you to listen to him, and then,

9    you know, if you needed to call somebody

10   or whatever, but he just wanted you to

11   just listen to what he had to say.

12   Q        On any of these occasions that he's

13   disconnected with your mother or neighbors

14   or whatnot, has he ever hurt anybody?

15   A        No.

16   Q        Was the purpose seemingly to get

17   the undivided attention of the person?

18   A        So that they would listen to what

19   he had to say, yes.

20   Q        So, if the attorneys had talked to

21   you before trial, you would have been able

22   to furnish them with this explanation for

23   the disconnection of the phones.

24   A        Yes.

50

1    Q        And that he had, in fact, on

2    previous occasions disconnected the phone

3    lines of other people with no intent to

4    hurt them whatsoever.

5    A        That's correct.

6    Q        Did you have opinions, based on

7    your observations of Billie, about

8    Billie's character?

9    A        I don't like to say bad things

10   because I don't believe she deserves to be

11   dead.

12   Q        I understand that, but --

13   A        I know --

14   Q        -- I'm talking about what attorneys

15   could have found out from you had they

16   come and done -- and interrogated you

17   previous to putting on their guilt or

18   innocence case.  And I know this may be

19   some of it unpleasant, but if you would,

20   just -- we need to get it down in the

21   record.

22   A        I did not like Billie for a couple

23   of reasons.  It's not that I didn't like

24   her.  We got off to a rocky start.

51

1  Whenever he started dating Billie and she

2  came over to the house, the -- right out

3  of the fence, you know when you're sitting

4  there and you're introduced to someone,

5  she told us that she was getting her

6  Masters in premed at college, and I said,

7  "You are," and so I started asking her

8  about it, and, of course, as it came out,

9  that's not the case.  It was an EMT.  And

10  that doesn't matter.  I understand that

11  doesn't matter.  It's just that from the

12  start, she would just tell stories.  You

13  didn't have to lie or fabricate on

14  anything.  She would just tell stories,

15  for instance, on that.

16        The other thing is, I was upset

17  because Jon was dating this other girl

18  named Hope at this apartment complex.  She

19  was a lovely girl.  And somehow Billie got

20  involved.  I was concerned that she

21  already had two children.  Jon was just

22  now getting -- He was brought to my house

23  getting his life together.

24        MR. EARLS:  Your Honor, again, I'm

1    objecting to this because I don't see it

2    has any relevance to anything.

3           THE COURT:  Do you want to comment

4    before I rule?

5           MR. BUCHANAN:  I'll move along,

6    Judge.

7           THE COURT:  Thank you.

8    Q      Now, specifically, though,

9    regarding Billie and her belittling of

10   Jon, have you seen and witnessed her

11   belittle Jon?

12   A      Yes.

13   Q      All right.  Would you tell the

14   Court, without telling him every

15   conceivable thing because we don't really

16   need to know every conceivable thing but,

17   some examples and what you did observe

18   about that?

19   A      Basically that she was the one in

20   control.  If he was over at our house, it

21   was -- she would like, "You need to be

22   here," or, "You took the wrong car," or,

23   "You," -- she'd be angry with him about

24   going to work.  They would have fights

1   about whether or not -- you know, him

2   working or not working, and who -- you

3   know, who was going to be -- I think they

4   were kind of vying whether he should be

5   the one -- the breadwinner having the job

6   and it would fluctuate or was she going to

7   be the one, you know, and her going to

8   school, and I think that was a lot of

9   where all there tensions were.  They got

10  in to where they were having financial

11  difficulty, and I think that was a lot of

12  their problems, was all their money

13  problems that they had.

14          But, yes, she did belittle him.

15  She said he was stupid.  She said he

16  couldn't -- that she needed to be in

17  charge because of -- she was better able

18  at handling money.  I wouldn't maybe

19  disagree with that at the time.

20  Q       When you would see her do this sort

21  of thing, what would be Jon's reaction?

22  A       Jon went along with everything

23  Billie said.  Even now, we call on the

24  telephone, and if I say anything negative

54

1  about Billie, Jon's angry with me.

2  Q      He's still defensive of her.

3  A      Very.

4  Q      Did you have occasion to know

5  whether or not Jon was a Christian?

6  A      Jon, when he came to my house -- We

7  go to church on Sunday.  My husband's a

8  missionary, his family's missionary, from

9  African Inland Mission, and Jon came with

10 us, and he was baptized at my home -- at

11 our church.

12 Q      If the attorneys had come to you

13 sometime before, could you have produced

14 pictures for them and videos of him in the

15 position of being a loving father?

16 A      Yes.

17 Q      Do you know if any of those were

18 produced at trial?

19 A      Not to my knowledge.  We weren't

20 allowed in here, so I'm not sure what took

21 place in here.  Not to my knowledge.  No

22 one ever asked for any.

23        MR. BUCHANAN:  May I approach and

24 get this marked, Your Honor?

55

```
 1          THE COURT:  Has the State seen what

 2   you have?

 3          MR. EARLS:  No, I have not.

 4          (Exhibit 2 was marked.)

 5          MR. BUCHANAN:  Your Honor, may I

 6   approach the witness?

 7          THE COURT:  Certainly.

 8   Q      Ms. Davis, I want to show you

 9   what's been marked as Exhibit 2.

10   A      I took my glasses out.  Do you have

11   reading glasses?

12   Q      Yes, ma'am.

13   A      My age.

14   Q      And I ask you if those are pictures

15   that are accurate representations of what

16   they seek to depict.

17   A      Yes.

18   Q      And are they various pictures of

19   Jon in stages of family life and his

20   children and his family?

21   A      Yes.

22          MR. BUCHANAN:  Your Honor, I'd ask

23   that they be placed into evidence at this

24   time.
```

1          THE COURT:  Any objection?

2          MR. EARLS:  No, sir.

3          **(Exhibit 2 was entered.)**

4    Q        And in case I haven't asked this,

5    were those available at the time?  If the

6    attorneys had asked you for them, could

7    you have gotten those types of pictures

8    together?

9    A        Correct, yes.

10   Q        You have, in fact, produced a short

11   three-minute or less than three-minute

12   video; have you not?  On movies of him in

13   the family situation; have you not?

14   A        Yes.

15          MR. BUCHANAN:  May I have this

16   played, Your Honor?

17          MR. EARLS:  I've not seen that,

18   Your Honor.

19          MR. BUCHANAN:  I know you hadn't.

20   We just got it last night.

21          It's so short, Judge, I'd like to

22   show it to everybody and pass upon it.

23          THE COURT:  We're not dealing with

24   a jury, so I'll let it be shown and then

57

1   decide, General, if you have an objection

2   or not.

3   A      I brought this video.  It's kind of

4   where Jon's head's at with his family and

5   what we were doing with the family.

6   Q      I think what we're going to do is

7   watch it first and then --

8   A      All right.

9   Q      But quickly, it was produced by

10  you, and it accurately depicts Jon in the

11  family mode and doing things with the

12  children and things of that nature.  It

13  hadn't been doctored or anything to be

14  fake photos or anything, has it?

15  A      No.

16          MR. BUCHANAN:  And, Judge, it has

17  some background music, and we're just

18  going to go ahead and put it down

19  -- volume down to nothing.

20          **(Said videotape was shown.)**

21          THE COURT:  We've viewed the video

22  now.  Does the State have any objection or

23  comment?

24          MR. EARLS:  Yes, sir.  I think the

1   content of that, that I observed, looks

2   like two-thirds of it dealt with children

3   in the home and what they were doing, not

4   what Mr. Hall was.  There's no indication

5   that Mr. Hall is even in some of this

6   video.  I don't know that it accurately

7   depicts what it purports to depict.

8           THE WITNESS:  If the sound was --

9           THE COURT:  Hold on just a minute,

10  ma'am.

11          MR. ELLIS:  Your Honor, I observed

12  the tape.  The reason we turned down the

13  sound was there's a song in the background

14  which would not have been admissible.

15  However, there is conversations by Mr.

16  Hall on the tape to the kids, and that

17  would have been extremely relevant at the

18  mitigation phase, the fact that he's

19  interacting with the kids, that they're

20  interacting with him, that they like him,

21  that they get along with him and would --

22  and actually would have probably rebutted

23  some of the State's position during the

24  course of the trial, and it's very

59

1   relevant and should come in.

2            THE COURT:  Anything further,

3   General?

4            MR. EARLS:  No, sir.

5            THE COURT:  Of course, none of us

6   have had the advantage of hearing the

7   voice.  I understand the music might not

8   have been relevant.  The voice, I take it,

9   could be identified.  I can only assume

10  that since nobody's heard it and

11  identified any voice on the tape.

12           MR. ELLIS:  Your Honor, we could

13  replay it again with the sound for her to

14  identify the voice if you would like.

15           THE COURT:  General?

16           MR. EARLS:  If they say it's on

17  there, that's fine.  I'll take their word

18  for it.

19           THE COURT:  I'm going to let it in.

20  Do you want to have it marked Exhibit 3?

21           MR. BUCHANAN:  Yes, sir.

22           **(Exhibit 3 was marked**

23           **and entered.)**

24  Q        I realize I'm skipping around a

                                              60

1   little bit between family history and

2   things that relate to guilt or innocence,

3   but I do want to make sure that I'm clear

4   in the record.  The attorney -- The first

5   time you talked to an attorney was the

6   night before you went on in the punishment

7   phase.  Correct?

8   A        Correct, between 11 and 11:30 at

9   night.

10  Q        Is there anything that you know

11  about Jon, in his conduct or your

12  observations, that would have made you

13  think that he would have ever

14  premeditatedly killed Billie?

15  A        I don't believe that he would have

16  -- that he did premeditatedly kill her.

17  He loved her.  He was hopelessly in love

18  with her.  I wish -- We all wished that

19  they would have split up, but he loved her

20  so much.

21  Q        Well I'm not asking your opinion so

22  much as I'm asking, is there anything that

23  you observed in their relationship that

24  would lead you to believe that he could or

61

1   would ever premeditatedly kill this lady?

2   A        No.

3   Q        With that available, would you have

4   told the attorneys that had they come and

5   talked to you previous to when they did

6   talk to you?

7   A        Correct, yes.

8   Q        Now when Jon was growing up, would

9   you tell the Judge a little bit about his

10  father and his father's conduct of himself

11  as regards your mother?

12  A        My father would be -- would drink,

13  and when he drank, he would come home,

14  especially Thursday nights, -- so I'm

15  assuming now as an adult that that must

16  have been payday because on that

17  particular night he would be drunk, and he

18  would -- he and my mother would always get

19  into fights and they would start picking

20  at each other, and he would beat my

21  mother, and he -- We had one particular

22  fight at the --

23          MR. EARLS:  Your Honor, again, I'm

24  making the same objection.  I don't

1    understand how his father's treatment of

2    his mother is relevant to this Defendant's

3    post-conviction petition.

4         MR. BUCHANAN:  Well, Judge, social

5    history and background is going to be very

6    relevant.  When Dr. Caruso testifies,

7    he'll testify that the better one he has,

8    the more accurate the diagnosis.  I don't

9    know anybody that would even dispute him

10   on that.  They didn't talk to him.  I

11   think I've got to get into the record

12   everything they could have found out.

13        THE COURT:  I'm going to let you

14   proceed with it, again, because it's

15   taking the avenue not as evidence to

16   contradict the basis of the guilt or

17   innocence at the time but something that

18   his lawyers could have allegedly

19   discovered during the course of their

20   representation that could have been a

21   factor at the sentencing phase.  Go ahead.

22        MR. BUCHANAN:  And, Judge, that's

23   why I'm trying to preface some of the

24   questions because like the premeditated

63

1  question, I wanted that -- to direct the

2  Court's attention that that was available

3  for them there, for her to testify at the

4  guilt or innocence phase.  This is, of

5  course, much more mitigation, social

6  history.

7         THE COURT:  Go ahead.

8  Q       All right.  He drank.

9  A       Yes.

10  Q       And the mother and the father would

11  fight.

12  A       Correct.

13  Q       All right.  Would they pick at each

14  other?

15  A       Yes.  My mom would pick at him, and

16  then he would have a breaking point, yes.

17  Q       Now, would he appear to just lose

18  it, explode --

19  A       Yes.

20  Q       -- and walk on over to violence?

21  A       One particular night was very bad

22  in that he -- Sometimes you try to forget

23  this stuff.

24  Q       I understand.

```
 1   A        He would -- This one night in

 2   particular, he had pinned her down on the

 3   floor, and he was beating her head on the

 4   floor, and there were big clumps of hair

 5   laying on the floor and there was a lot of

 6   blood, and Jon was just little.  He was, I

 7   don't know, two or three years old.  I

 8   remember he went and got a fly swatter and

 9   was trying to hit Dad to make him stop,

10   and we all tried to make him stop.

11   Q        Living in that household, was he

12   ever exposed to a learned behavior of

13   conflict resolution peacefully, wherein

14   folks would talk things out calmly?

15   A        I think looking back now that it

16   was difficult to do because there was

17   seven children there.  So I don't know how

18   much alone-time they might have had to go

19   and work their problems out, or how much

20   of a support system my parents themselves

21   had to deal with all the issues and

22   responsibility of having seven kids.  My

23   mother and father, for whatever reason, it

24   was kind of this -- there would be this
```

1    violent thing and then they'd be all

2    lovey-dovey.  Then they'd be violent and

3    then they'd be lovey-dovey.  It was like

4    -- It was like they thrived on it, it gave

5    them something to do.  It would, you know,

6    -- When I was older, I would just take the

7    little kids and leave.  It got to the

8    point sometimes I'd say, "If you guys are

9    going to kill each other, please do it

10   while we're not here.  We don't want to

11   see it."

12   Q       When you say "the little kids",

13   that would include Jon; would it not?

14   A       Definitely Jon.  We always tried to

15   get him out of there, but he did witness a

16   lot.

17   Q       So his father reacted to his mother

18   in a similar fashion to the way he reacted

19   apparently to Billie this night.

20   A       Right, kind of a love/hate thing

21   that they -- And I think my mother thrived

22   on it.  I don't know why they would never

23   have gotten divorced and chose to live

24   like that.

66

1   Q      Who probably, at least as looking

2   at May to July of 1994, -- who probably in

3   the family knew Jon better or was more up-

4   to-date with Jon than the other siblings?

5   Who would be probably the number one

6   person that you would want to go to to

7   talk about Jon?

8   A      That would probably be me.  In

9   which years?  19- what?

10   Q      1994, before him and Billie -- say

11   May to July.

12   A      Oh, I -- that would have to be

13   probably my mother because that was in

14   Tennessee.  I lived in North Carolina at

15   that time, and so -- but Jon called my

16   mother regularly.

17   Q      Okay.  Of the siblings, who would

18   that probably be?

19   A      Probably Jeff.

20   Q      Okay, let's talk about Jeff.  Who

21   is Jeff?

22   A      Jeff was my brother.  He died of

23   AIDS, I believe in 1995.

24   Q      Was Jon a regular confidant of

67

1    Jeff?

2    A        They were very close, very close.

3    In fact, Jeff had a very calming effect.

4    He was a wonderful brother.

5    Q        In 1994, July of 1994, August of

6    1994, September of 1994, was it common

7    knowledge that everyone knew that Jeff was

8    dying of AIDS?

9    A        Right.  He apparently had had this

10   for ten years, and he was married and had

11   children.  We never knew he had AIDS.  He

12   -- Because of the stigma that was attached

13   to it, he never told any -- he told us at

14   a family reunion.  We kind of knew, and

15   then we had a family reunion because we

16   knew he was dying.

17   Q        Do you know of any attempt by any

18   attorney or investigator for an attorney

19   to ever get a'hold of Jeff to preserve his

20   testimony before he died?

21   A        No attorney tried to contact us.  We

22   were trying to contact him to get his

23   testimony put in, but no one would hear

24   us.

68

```
 1   Q        And, when did Jeff die?

 2   A        He died on July 4th, and I believe

 3   it was '95.

 4   Q        1995.

 5   A        Uh-huh.

 6   Q        So, between July of 1994, some

 7   attorney, some investigator, some

 8   somebody, Jeff was available from July of

 9   1994 on the date that this offense

10   occurred all the way up until July of '95.

11   A        Right.  I believe that Sheryl even

12   went to -- and got an affidavit notarized

13   by Jeff saying that no one's contacted him

14   and that we were trying to get his

15   testimony before he would die because we

16   knew his health was deteriorating.

17   Q        Were you and Sheryl and Kathy and

18   your mother in regular contact with each

19   other about Jon during the time from '94

20   to when Jeff died in '95?

21   A        Yes.

22   Q        Describe, if you will, how you feel

23   your efforts were at trying to get the

24   attention of the attorneys to get
```

69

1   something done regarding Jeff.

2   A        Well we were frustrated in that no

3   one would do anything about Jeff, and we

4   knew that Jeff was dying and that we

5   wouldn't get his testimony in.  We knew

6   that Jeff was the one that actually turned

7   him into the police after Billie was

8   killed.  We also know that when Jon went

9   to Jeff's house, he didn't realize he had

10  killed her, and his frame of mind and what

11  his demeanor -- all that information, Jeff

12  had first-hand knowledge of, but we

13  weren't -- no one would get that

14  information from Jeff, and Jeff is the one

15  that called the police and had them come

16  and pick Jon up.

17  Q        So that testimony was lost to the

18  world in July of '95.

19  A        Correct.

20  Q        Were you familiar with Jeff -- I

21  understand AIDS is a degenerative disease.

22  Was he healthy enough between July of '94

23  and July of '95 to at some time take his

24  statement?

70

1    A        Yes.  My sister Sheryl would

2    actually be better able.  She kept pretty

3    extensive notes on everything, a timeline.

4    Q        Okay.  Did your father ever -- You

5    said he was a drinking man and that he

6    would, after being provoked, resort to

7    violence with your mother.  Do you know if

8    he was ever treated for -- or given any

9    psychological counseling or anything of

10   that nature?

11   A        No, but his father was the same

12   way.

13   Q        His father was the same way?

14   A        Correct.  That was one of the

15   grandparents I lived with.  His father's

16   name was Chuck, and he also was an

17   alcoholic and he beat my grandmother, and

18   there was a particular night we came home,

19   and he had taken a knife and cut up all

20   her clothes and stuck the knife in the

21   door frame of the door, and we were afraid

22   because we didn't know what he was going

23   to do to us, and that was living at my

24   grandparent's house.  That was my father's

1   father.

2   Q       So Jon's paternal grandfather

3   resolved conflict in this nature and his

4   father did.

5   A       Correct.

6   Q       Could you have told an attorney's

7   investigator or an attorney that at any

8   time before you were called on the night

9   before you were called to testify?

10  A       Yes.

11  Q       Would you have been willing to do

12  so?

13  A       Yes.

14  Q       Would you tell the Court a little

15  bit about Jon's fears as regards police

16  officers?  Did Jon have any, what you

17  would have observed to be, more than

18  normal fears of police officers?

19  A       Yes.  My husband and I owned a

20  restaurant, Golden Corral Family

21  Steakhouse in Fayetteville, North

22  Carolina, and we had many police officers

23  that stopped and ate at our restaurant,

24  and we encouraged them to stop and eat at

72

1    our restaurant because we felt safer.  So
2    they would come into our restaurant, but
3    if Jon was there, Jon wouldn't stay out
4    and talk with the police.  He would always
5    go to the back of the house, and, in fact,
6    one of our best friends, his name was
7    Barry Fisher, is an officer, and we -- he
8    even noticed, "Why doesn't Jon talk to
9    me," or, "Why is Jon so aloof," and Jon
10   was just totally terrified of police
11   officers.
12          I know of several instances when he
13   was younger that he felt that he was
14   mistreated or -- Jon's kind of a black and
15   white person here, in justice or whatever,
16   and he feels that if they don't give you a
17   chance to talk or explain something the
18   way it is, then he gets angry and he just
19   -- Apparently a police officer sold him a
20   car, and it turned out that the whole
21   floorboard of the car was rusted out.
22   There was a hole in it.  So when he tried
23   to get a'hold of this officer to take it
24   back, that it was a lemon, the guy gave

73

1   him a hard time, and I think eventually

2   they ended up in some altercation later at

3   another time.  I shouldn't say that.  I

4   don't know what I'm trying --

5   Q        So you've witnessed, in layman's

6   terms, what seems to be kind of a paranoia

7   on his part.

8   A        He definitely had a paranoia of

9   police officers.

10  Q        Would you have been able to convey

11  that to the attorneys or their

12  investigators had they interviewed you

13  sometime in that three years, three and a

14  half years, they were waiting for trial?

15  A        Yes.

16  Q        Would you tell the Court how Jon

17  intereacted with pets?

18  A        He had -- We ended up with it.

19  It's a dog named Sampson.  It was a white

20  Samoyed, and it was a beautiful, beautiful

21  dog, but it was very much Jon's

22  personality.  He had gotten it as a little

23  puppy, and he never would put a collar or

24  a leash on it because he wanted it to be

74

1    free, and that was fine when you lived in

2    Pennsylvania with my mom where there was a

3    lot of acreage that you could just run

4    with the dog, but when he brought it up to

5    North Carolina, I lived in a little

6    suburban-type, you know, neighborhood, and

7    dogs had to be leashed and a collar on it,

8    and it was very difficult to control the

9    dog because Jon had always let it be free,

10   and the dog was very loving, and he loved

11   the dog, and, you know, he just pampered

12   it like a little baby, and the dog turned

13   out to be very much like Jon. It was kind

14   of hard to control.  You know, it was a

15   very loving -- he was very loving, but it

16   was hard to control when he didn't like

17   being controlled.

18   Q       Did you ever see Jon exhibit any

19   abusive conduct toward any animal?

20   A       No, he was always very loving.

21   Q       You made a statement to my

22   investigator that said that the dog did

23   not want to be controlled like Jon.  Can

24   you tell the Judge what you mean by Jon

75

1    didn't want to be controlled?

2    A        Unfortunately, just like his

3    behavior here in the courtroom, he wanted

4    to control the situation.  He wants to be

5    in charge and tell people -- try to get

6    his point across because he has all these

7    years of anger and frustration and

8    feelings that people haven't helped him or

9    whatever, and, so, you know, we're telling

10   him, "Jon, please be quiet.  Please allow

11   someone to help you," but he has no trust

12   for anyone anymore, and he's coming across

13   as angry and not exactly the same person I

14   remember from the video.  He -- It was

15   just very hard.  He probably felt like he

16   never had control because he was the last

17   one of seven kids.  He's the last one on

18   the totem pole, so ...

19   Q        When you were talking back and

20   forth between your mother and your other

21   sisters about getting the attorneys'

22   attention, do you know if any investigator

23   ever talked to any of the sisters?

24   A        I don't believe that that -- No

1    attorney talked to any of us.  I remember

2    the name Gloria, but I --

3    Q        Gloria Shettles?

4    A        Yes.  And we were excited that

5    someone was trying to contact us.  We kind

6    of got excited.  We thought, oh, good,

7    someone's going to try to help, but that

8    was it.

9    Q        When Gloria got on the case, is she

10   the one that read out of the DSM about

11   intermittent explosive disorder to you or

12   one of your sisters?

13   A        That would be to my sisters.

14   Q        So there appeared to be some kind

15   of diagnosis going on by whatever Gloria

16   was.

17   A        Correct.

18   Q        Did you ever notice any follow-up

19   on intermittent explosive disorder being

20   done by the attorneys?  At least as far as

21   your observations.

22   A        No.

23   Q        But when this term intermittent

24   explosive disorder cropped up in y'all's

77

1    conversations, that was well before any

2    trial; was it not?

3    A        Yes.  And it made sense because it

4    described Jon to a T.

5    Q        How would -- We've talked a little

6    about Jon's father and his alcoholism.

7    Would you tell the Court how Jon's father

8    treated Jon growing up?

9    A        Somewhere in my father's head he

10   got it that Jon wasn't his son.  So, he

11   would throw that up in my mother's face

12   all the time.  My brother Joel, who is

13   older than Jon, then would -- he would

14   take Joel around on his back, do piggyback

15   rides and all that wonderful fatherly

16   stuff and put him down, and Jon would come

17   up and he'd say, "Give me a piggyback

18   ride," and Dad would push him away, or Dad

19   would take Joel and get him ice cream and

20   bring it home and they would eat it in

21   front of Jon, and Jon wouldn't get any.  I

22   mean, he just pretty much said Jon's not

23   his child, and then my mother would

24   overcompensate and be more loving to Jon.

78

1   Q        Would he ever say that to Jon

2   directly, that, "Jon, you're not my son"?

3   A        Oh, he made it very clear to all of

4   us that Jon wasn't his son, and I'm not

5   sure that Jon remembers that.  I've talked

6   to him about that.

7   Q        But it was said directly to him.

8   A        Oh, yes.  It was said to all of us.

9   Q        So the father was not very loving

10  toward Jon.

11  A        Not at all.

12  Q        What about Jon's drug use?  Did you

13  ever notice it when you were in North

14  Carolina around him that he used drugs and

15  alcohol?

16  A        No one would ever do drugs in front

17  of me because I don't do drugs and I don't

18  drink, so -- but I did know that both he

19  and Billie did do drugs together, and that

20  was another reason why I didn't

21  particularly care for Billie, because I

22  thought that was the wrong path that he

23  was going down, and I was -- when he came

24  to live with us, we were trying to turn

79

1    his life around.

2    Q        Have you ever known Jon to do

3    anything, I'm going to use the term

4    "noble" but I'm going to give you an

5    example, wherein he would come to the

6    rescue of someone or some thing or

7    intervene on behalf of somebody, damsel-

8    in-distress type of thing or something of

9    that nature?

10   A        Jon always was for the underdog,

11   yes.  He would do that just like when he

12   was just a little baby trying to protect

13   Mom with the fly swatter.

14   Q        Have you seen him -- I know you

15   gave the example of the fly swatter and

16   your mother.  Have you ever seen him try

17   to intervene and help somebody that needed

18   help that was the underdog?

19   A        I'm sure I have because that's

20   Jon's personality.  It's escaping me right

21   here.  I could think about it for a minute

22   and come up with some.  That was Jon's

23   personality.  His personality -- The Jon

24   that sits before you is not exactly the

80

1    same Jon that we had years ago when this

2    whole thing happened.  Jon's life ended

3    when Billie's life ended, but he was -- he

4    would give you the shirt off his back.  He

5    would -- You know, he would work a whole

6    day of work, and then if your car was

7    broken down, -- people would bring it over

8    and leave it, and he would stay up 'til

9    two or three o'clock in the morning

10   working on their car and then charge them

11   nothing, which I think is one of the

12   reasons why Billie had a gripe about this

13   because, he was a mechanic, why not get

14   paid for this, but Jon just did it because

15   they were friends.

16   Q        Now your mother and father, you

17   talked about how they would use violence

18   on each other.  Did any of that ever

19   involve gun play?

20   A        Yes.

21   Q        Would you tell the Court about

22   that?

23   A        We used to -- at night we would

24   take the guns and put them under our beds.

81

1   We would take the shells, put them under

2   our beds.  We even took knives out of the

3   drawers and put those under our beds.

4   Q       When your mom and dad would fight,

5   you were talking about gun play, you did

6   see them use guns with each other?

7   A       Yes.  I saw my mother actually hold

8   one on my father and give him ten to get

9   across the yard, and my boyfriend actually

10  took the gun off of her, only to find out

11  that it was not loaded, but, of course, as

12  kids, we don't know whether the guns are

13  loaded or not loaded or what have you.  We

14  were just scared.

15  Q       Now, as regards disconnecting

16  phones, did your father ever pull the

17  phone or disconnect the phone so that your

18  mother couldn't make any phone calls?

19  A       The night that he beat her up, the

20  very worst time, and that was almost

21  really the last time that he ever really

22  beat her up because they -- the constable

23  came, and he ripped the phone off the

24  wall.

1    Q          And that disconnected it.

2    A          Yes.  We were trying to call out

3    for help.

4    Q          Did you ever know Jon to have

5    suffered anything when he was young of a

6    nature that was traumatic to his body,

7    like a bad fall, a bad wreck, a bad

8    accident, anything of that nature?

9    A          We had a car accident, and you'll

10   see scars on his side I think where there

11   was broken glass.  So he has quite a few

12   scars along his side from a car accident

13   or a motorcycle accident or something like

14   that when Jon was older, and I had already

15   left for college then, so I was not at

16   home.

17   Q          How long had the family known that

18   Jeff had AIDS?

19   A          To be honest with you, I only knew

20   it for like a year prior to his death.  He

21   kind of kept it -- at least -- unless he

22   talked to someone else.  I don't know how

23   long Jon knew.  I don't know.

24   Q          Were you at this family reunion in

83

1   1993?

2   A        Correct.  That's what that one

3   picture is in this grouping of --

4   Q        Who else was at the family reunion?

5   A        Just about everybody in the family,

6   on the Hall side.

7   Q        Was Billie there?

8   A        No.

9   Q        Was Jon there?

10  A        Yes.

11  Q        Were the kids there?

12  A        Yes.  Well, his -- Jon's two little

13  ones, the two little ones were.

14  Q        Okay.  And that's Jessica and

15  Stephanie?

16  A        Correct.

17  Q        And do those pictures show how they

18  were dressed and everything and what kind

19  of care he was giving them, at least as

20  far as you can tell by a picture?

21  A        Yes.  They were his little

22  princesses, yes.

23  Q        All right.  And, why was that

24  family reunion called together?  Was that

84

1    -- Did that have anything to do with Jeff?

2    A        Yes, because we knew he was dying,

3    and we knew that we all wanted to get

4    together and be together as a family.

5    Q        Do you know why --

6    A        As much violence as there was, we

7    do love each other, too.  I mean, that's

8    kind of a bizarre thing, but we do.

9    Q        How many brothers and sisters are

10   there to Jon?

11   A        Jon has three brothers and three

12   sisters.

13   Q        And is Jeff one of those brothers?

14   A        Correct.

15   Q        Who is now deceased.

16   A        Yes.

17   Q        And that family reunion was called

18   because of Jeff having AIDS.

19   A        Correct.

20   Q        Did you ever see Jon be in any way

21   shape or form anything other than a good

22   father?

23   A        He was a wonderful father.  That's

24   what was so surprising about this whole

1    thing, that Jon was the nurturing one, and

2    then later in court we found out that they

3    said that Jon never took care of the kids.

4    He was the one that always took care of

5    the kids.  He's the one that dressed them,

6    and he's the one that always brought them,

7    you know, over to the house to play.  When

8    I went over to his house, you know, Billie

9    was working.  Billie was working very hard

10   on getting her education, in her defense,

11   and getting her education and going to

12   school, but Jon was the caretaker.  He's

13   the one -- And they just loved him,

14   because he was like a big kid, kind of

15   like a big teddy bear, and they just

16   followed him around and -- you know,

17   because he played games.  Again, he was

18   like a kid.

19   Q        Did the violence between your mom

20   and dad reach a point where at some point

21   you or some of the other kids didn't live

22   with them?

23   A        Not my -- Not my father.  What

24   happened -- My stepfather.  My mother

86

1    remarried after my father died, and this
2    man was awful, and I had come home from
3    college, and I refused to live at the
4    house with this man.
5    Q        Was there a period of time when
6    Sheryl or Kathy or you or any of the other
7    boys didn't live in the house because of
8    your mother's living situation with either
9    your father or a subsequent husband?
10   A        Yes.  I think Jon and Joel were the
11   only ones that actually -- and Sheryl that
12   lived with the stepfather.  The rest of us
13   -- The other one -- Jay had gone to the
14   military, and Kathy was married and had
15   her own house, and I was away at school
16   and came back and got a place of my own.
17   Q        How about the stepfather?  Was he
18   abusive to the mother?
19   A        Yes, and we ended up finding out
20   that he was just kind of after her for her
21   money and her house.
22   Q        And Jon saw -- whatever that
23   relationship was, he was exposed to that.
24   A        Right.  There was a point in time

87

1    where they had gotten a house, and this

2    particular house was designed that -- part

3    of the house was over here, but Jon's

4    bedroom was outside.  You had to go

5    outside into another house to be where

6    Jon's room would be, so that he wouldn't

7    have access to any of the kids.

8    Q        Has anybody in the family been in

9    counseling for any mental illness that you

10   know of?

11   A        My sister Kathy went to counseling

12   with her husband.  They went to AAA, and

13   he went through rehab and totally

14   recuperated and he became a wonderful

15   person.  My brother Jay will not admit to

16   it, but I had him -- personally I had him

17   committed for -- and he was diagnosed with

18   manic depressant.  He tried to commit

19   suicide when he was in Fayetteville.

20   Q        Did you ever tell anybody that that

21   was on the defense team?

22   A        Yes.  Well, we tried.  I don't know

23   that it ever came up.

24   Q        Did anyone ever contact you and ask

1    you about that on the defense team other

2    than the night before trial, the night

3    before the punishment phase?

4    A        No.

5    Q        What kind of small child was Jon?

6    Was he well-behaved or was he a problem?

7    A        He was kind of perfect.  My mom

8    -- That's why we always laugh and say that

9    my sister Kathy, the oldest, and my

10   brother Jon was the golden children

11   because he was.  He was a sweet, sweet

12   little boy, and he never got in trouble,

13   and he didn't have to be disciplined

14   because he wasn't the disciplinary

15   problem.  Therefore, I'm wondering if

16   that's why the authority figure coming in

17   later in life was so tough because he

18   wasn't a bad kid.  Up until he got into

19   his teen years and Dad -- after Dad died

20   and Mom had to go to work, I think there

21   was a lot of things that came into play

22   there.  Then Jon was by himself because

23   Mom had to go to work, and then people

24   were imposing authority on him differently

89

1    than maybe what Mom had done, and I think

2    the problems started being created there.

3    Q        During the trial, did you notice

4    anything, any conduct, that you thought

5    was inappropriate as regards jurors and

6    witnesses?

7    A        The only thing that happened -- And

8    this is because we were down in the

9    basement.  We were trying to see Jon.  We

10   were trying to see if they would let us in

11   to see Jon.  And we saw Billie's family

12   out in the hallway, and there were

13   different people that came by and gave

14   them hugs and stuff, and we didn't think

15   anything of it because if the tables were

16   turned, I'm sure there would be a lot of

17   people there supporting us and giving them

18   a hug, but later when we were upstairs and

19   the jury came out, one of the jurors was

20   one of the people that was downstairs, you

21   know.  That was discussed.  And I can't

22   truly remember that we just all discussed

23   that and we -- I think we did bring it to

24   the attention of the attorneys, but --

1  Q        You don't know what they did with

2  it.

3  A        No, I don't know what they did with

4  it, nor do I know -- you know, I can't

5  remember what they looked like, so I'm not

6  the one that really should be asked that

7  question.  I just remember it being

8  remarked about.  I was there when they

9  were remarking about it.

10  Q        Did the attorneys ever express to

11  you their feeling about the case and Jon's

12  guilt?  Did any of the attorneys ever do

13  that?

14  A        After everything was said and done

15  and we were sitting down in that hallway

16  waiting for them to come back,

17  -- First of all, we thought we were here

18  to help in the guilt/innocent phase.  We

19  didn't know that by the time they asked

20  for our testimony, it was actually -- he'd

21  already been convicted and now we were --

22  it was sentencing phase that we were

23  actually here for.  So we didn't realize

24  that.  So then when we were waiting for

91

1   the sentencing, they were talking to us

2   and said that, "Well, don't worry.  I

3   don't think that they'll get the death

4   penalty," and I think they even said that

5   Billie's parents weren't even -- they

6   tried maybe to offer him something lesser,

7   you know, and we were thankful for that,

8   but when they came back with the guilt

9   verdict or the death penalty, we were

10   totally shocked.  So after everyone left

11   and they took Jon away, we went over to

12   their office, and they said, "Well, so you

13   don't feel so bad, here's a letter," or

14   something that Jon had written about the

15   events of that night, what had happened,

16   and they showed us this letter and read

17   excerpts from it and said, "So you can see

18   that this was intentional," and we were

19   kind of in shock.

20   Q     Was one of the things that was in

21   that letter had to do with the phone being

22   disconnected?

23   A     Uh-huh.

24   Q     And you still hadn't told him at

1    this point that disconnecting of the phone

2    was something that Jon did when he didn't

3    hurt people.

4    A        We did tell them that.  We did try

5    to tell them that, that --

6    Q        Try, but he still didn't know that,

7    as far as you know.

8    A        No, this is after the whole trial

9    is over.  Yes, we told them that he -- Jon

10   had disconnected phones before.

11   Q        But not before the trial.

12   A        Not before 11 or 11:30 that night.

13   Q        After the guilt or innocence

14   verdict had come back.

15   A        Right.

16            MR. BUCHANAN:  Can I have just a

17   moment, Your Honor?

18            THE COURT:  Yes.

19   Q        I want to make sure I'm clear in

20   the record here.  When Billie would appear

21   to be trying to provoke Jon, would the --

22   would he react sometimes very calmly and

23   just take it?

24   A        Yes.  He wouldn't go against her.

93

1    He was in love with her.

2    Q        Did you see any similarities

3    between his marriage to Billie and your

4    father's marriage to your mother?

5    A        A lot of similarities.

6    Q        And just briefly, what were those?

7    A        The similarities are that they

8    seemed to love each other, but then they

9    would have these massive fights, and then

10   they would make up and everything was

11   fine, and you would find yourself being

12   sucked into their arguments and thinking,

13   well, you're going to help them, and,

14   "Well, Jon, you need to get your things

15   together and you need to leave," or, "You

16   need to go home," and then only to find

17   out that now you're the bad guy and now

18   Billie's mad at you because you suggested

19   that he leave or, you know, -- they've

20   already made up their peace, and now

21   anything that you said that was negative

22   is now turned against you.  So the best

23   thing to do is try to stay out of their

24   business, but you'd get sucked into their

94

1    arguments and say, "Well why are you

2    living like this?  You have little kids.

3    Why --", you know, "Don't fight," you

4    know, "You know how it feels."

5          MR. BUCHANAN:  Pass the witness,

6    Your Honor.

7          THE COURT:  General.

8    **CROSS-EXAMINATION**

9    **BY MR. EARLS:**

10   Q       Would you give me your name again,

11   please?

12   A       Debbie Davis.

13   Q       Now, Ms. Davis, most everything

14   that you've testified to here today about

15   Jon's family you testified to at trial,

16   didn't you?

17   A       I testified mostly about my -- the

18   relationship with my mom and my dad and

19   their fighting, yes.

20   Q       All this information about his

21   family history and the fights and Dad

22   beating up on Mama and Granddaddy beating

23   Grandmama up and the guns and hair being

24   pulled, all that was brought out before

95

1    the jury, wasn't it?

2    A        I did -- Yes, I did say that.

3    Q        The jury still gave him the death

4    penalty.

5    A        Yes.

6    Q        As a matter of fact, you testified,

7    didn't you?

8    A        Yes, I did.

9    Q        Who else testified to all this?

10   A        My sister Kathy and my sister

11   Sheryl and my mother I believe were here.

12   Q        Now, you testified somewhat about

13   the relationship between Billie and Jon

14   Hall.  Isn't it true that Jon was arrested

15   on several occasions for domestic assault?

16           THE PETITIONER:  Objection.

17           MR. EARLS:  Your Honor, if we're

18   going to go into family history, we're

19   going to have to take the good with the

20   bad.

21   A        Yeah.  Right, no, that's fine.

22           MR. BUCHANAN:  If it's offered for

23   that purpose, yes, sir.

24           THE COURT:  Go ahead.

1    A        I don't have a problem with that. I

2    don't remember him being arrested in

3    Fayetteville, North Carolina.

4    Q        No, I'm talking about arrested

5    period for domestic assault.

6    A        Well, I don't know. I don't have

7    any knowledge of that because when Jon was

8    at -- well, actually, that's whenever I

9    think we brought him to North Carolina, is

10   when he got in trouble in Pennsylvania,

11   and I don't know whether that was domestic

12   -- I don't know anything about that. I

13   wasn't living there.

14   Q        But you do know that the event

15   occurred.

16   A        I think he got in trouble in

17   Tennessee, yes.

18            MR. ELLIS: I'm going to object,

19   Your Honor. If the event occurred and he

20   was arrested, that's one thing. If the

21   event occurred that he didn't, that's

22   another.

23            THE COURT: I don't know what she

24   has personal knowledge of. She's

97

1   testifying she doesn't know what occurred

2   up there, so that's -- I'm going to

3   sustain the objection.

4   A       I think he --

5           THE COURT:  Hold on a second and

6   let him ask the next question.

7   Q       Now, at the time of the homicide,

8   Billie and Jon were estranged, going

9   through a divorce, weren't they?

10  A       Yes, they were.

11  Q       Was Jon precluded from contacting

12  her?

13  A       I don't know.  What do you mean?

14  Q       Was there an order of protection

15  against him?

16  A       I believe he did, but I also know

17  that Billie called him on the phone and

18  asked him to come over to the house.

19  Q       Now, isn't it also true that as

20  part of this family history and part of

21  all this divorce, the children had accused

22  him of abusing them?

23  A       You know, I don't know.  I'm not

24  aware of that until -- you know, I had

98

1    heard that, and I think that that is

2    totally wrong.

3    Q        Well, nevertheless, it's still part

4    of the family history, isn't it?

5    A        I don't know.  I wasn't part --

6             MR. BUCHANAN:  Your Honor, I

7    believe that would be argumentative.

8    A        Well, see, what I'm saying is --

9             THE COURT:  She's testifying she

10   didn't know.

11   Q        All right.  Now, --

12   A        I would be surprised.

13   Q        Were you ever contacted by

14   investigators for the defense team?

15   A        There was a Gloria Shettles, and I

16   remember her name, and we were trying to

17   get -- I don't remember ever going into

18   depth with Gloria.  We -- I think there

19   was a phone conversation and we were going

20   to try to get more information at another

21   time.

22   Q        But you were contacted by an

23   investigator.

24   A        Gloria, maybe.  I don't remember

99

1  whether it was her.

2  Q       Why didn't you relay all this

3  information to her?

4  A       We did -- I did try to, but she was

5  going to get back to me.

6  Q       So, when did you do that?  What was

7  the date?

8  A       I wouldn't have any way of knowing

9  that.  It would be like prior to Jon's

10  trial.

11  Q       Now, you said you tried to contact

12  the defense team and did contact them

13  about Jeff, didn't you?

14  A       I did not.  This isn't my -- These

15  are questions you need to be addressing to

16  my sister Sheryl.

17  Q       But efforts were made to contact

18  them about Jeff.

19  A       Yes.  I know that --

20  Q       Why didn't you make efforts to

21  contact them about you?

22  A       I did.  In fact, that's how I even

23  got up with Gloria is, she had -- I think

24  she had sent a letter and gave us her

1   telephone number, and I tried on several

2   occasions to get in touch with Gloria, and

3   then one time I finally did get up with

4   Gloria, and we had maybe a brief

5   conversation and we were going to go into

6   more depth at another time.

7   Q       Now, you said Jon has a history of

8   disconnecting phone lines.

9   A       Yes.

10  Q       And you were going to testify to

11  that at trial?

12  A       I don't know what you mean, am I

13  going to testify to that.

14  Q       Well, you're telling --

15  A       People have asked me if he has a

16  history of that.  Yes, he has a history of

17  that.

18  Q       Your testimony on Direct was, on at

19  least one occasion he disconnected the

20  phone lines to keep somebody from calling

21  the police.

22  A       Right.

23  Q       Remember that?

24  A       Yes.  That was at the apartment in

101

1   North Carolina, yes.

2   Q        And he would disconnect the phone

3   to keep his mother from calling the

4   police, wouldn't he?

5   A        I think she was trying to call Aunt

6   Arlene, yes.

7   Q        Okay.  And that's because he would

8   always get in fights with his mother?

9   A        No.  He was trying to make her

10  listen to him without her leaving or going

11  over to my aunt's house.  On that

12  particular fight, I don't know about that.

13  I just know about the one in North

14  Carolina.

15  Q        Your testimony was he disconnected

16  the phone lines to make sure people would

17  listen to him.

18. A        Correct.  That's my testimony.

19  Q        He didn't want anybody to have

20  help?  Is that what --

21  A        No, he wanted people to listen to

22  him.

23  Q        Well how is disconnecting a phone

24  line going to keep them or make them

102

1  listen to him?

2  A      I'm not disputing that this is a

3  bizarre behavior --

4        MR. BUCHANAN:  Objection, Your

5  Honor.  That's argumentative.

6        THE COURT:  It is.  The State was

7  certainly lenient on their objections, but

8  I sustain yours because you're exactly

9  right.

10  Q      Jon has a history of angry

11  outbursts, doesn't he?

12  A      Yes, he does.

13  Q      He is what some people would call

14  hothead.  Is that right?

15  A      I would say so, yes.

16  Q      If he doesn't get his way, he flies

17  off the handle.

18  A      That's what they said.  I only have

19  knowledge of when he came to live with me,

20  and we were trying to turn his life

21  around.  I had heard of his angry

22  outbursts from being in Pennsylvania, yes.

23  Q      Now, you are not a witness to

24  anything that occurred on the night of the

1  homicide, are you?

2  A       No, I'm not.

3  Q       You were not present, were you?

4  A       No, I was not.

5  Q       So, the testimony of all of Jon's

6  children where that he forced his way into

7  the house, you don't have anything to

8  dispute that, do you?

9  A       I do not.

10  Q       Now, isn't it also true, you were

11  asked and you responded that Jon was a

12  wonderful father?

13  A       Yes, in my -- The whole time I saw

14  him with his children, yes, he was.

15  Q       Now isn't it true that defense

16  counsel asked each child that while they

17  testified?

18  A       I don't know; I wasn't in here.

19  Q       You weren't present when that was

20  asked of each child?

21  A       No, we weren't allowed in the

22  courtroom.

23  Q       Well the transcript will speak for

24  itself.

1    A        I do know children say a lot of

2    things if they are prepped correctly

3    because I had a daycare center, and I know

4    you can make kids say a lot of things.

5    Q        Now, and just by clarification,

6    mostly everything you've talked about here

7    today was brought out at the sentencing

8    hearing by you.

9    A        The things that I brought up at the

10   sentencing phase was the domestic violence

11   between my parents, and that's what they

12   wanted me to get out.  I was not allowed

13   to say anything about Billie or -- I don't

14   know that I even testified about the

15   disconnected phones.  I'm not sure.  I

16   don't remember.

17        MR. EARLS:  That's all I have.

18        THE COURT:  Anything further, Mr.

19   Buchanan?

20        MR. BUCHANAN:  Yes, Judge, just

21   briefly.

22   **REDIRECT EXAMINATION**

23   **BY MR. BUCHANAN:**

24   Q        Was there ever a running joke in

                                             105

1   the family about Jon messing with phones?

2   A        Yes.

3   Q        Can you tell the Judge what that

4   was?

5   A        Well, I don't know if it was a

6   running joke or anything, it was just,

7   don't touch my phone.

8   Q        Because he --

9   A        He'd disconnect them.  But he'd put

10  them right back.  I mean, he didn't cut

11  the wires or he didn't do anything because

12  he would just -- he knows how to wire

13  phones and unwire phones.

14  Q        Would you tell the Court why he

15  disconnects as opposed to cuts?  Is there

16  something that you know of personally that

17  causes him to --

18          MR. EARLS:  Objection, Your Honor.

19          THE COURT:  Objection sustained.

20          MR. ELLIS:  Your Honor, do you have

21  an opinion -- I mean, Ms. Davis, do you

22  have any opinion why he doesn't --

23          THE COURT:  Hold on, gentlemen.

24  You're not going to get up and swap out on

                                            106

1   this witness.  That's highly improper

2   procedure, and I warn counsel one time.

3           Go ahead, Mr. Buchanan.  I

4   sustained the objection.

5           MR. BUCHANAN:  May I tender that,

6   Your Honor, as a proffer then?

7           THE COURT:  Tender it as a proffer?

8           MR. BUCHANAN:  Yes, sir.

9           THE COURT:  It's clearly

10  inadmissible.  If you want to put it on

11  the record as a proffer, go ahead.  This

12  is an offer of proof that will not be

13  considered for purposes of my decision.

14          MR. BUCHANAN:  Yes, sir.

15  Q       Would you tell the Court how you

16  know that he disconnects the phones by

17  actual disconnection as opposed to cutting

18  wires?

19  A       Because it costs money to -- If you

20  cut the phone wires, then you have to have

21  the phone company come out and reconnect

22  it and it costs money, and they didn't

23  have any money, he wouldn't have any

24  money.  So, if you just disconnect it, you

1    can connect it back yourself.

2    Q        And did he know that?

3    A        Of course, yes.

4             MR. BUCHANAN:  No further

5    questions.

6             THE COURT:  Those last comments or

7    questions and responses were an offer of

8    proof.

9             Anything else of this witness?

10            MR. EARLS:  No, sir.

11            **(WITNESS EXCUSED.)**

12            THE COURT:  Call your next witness.

13            MR. BUCHANAN:  Judge, may I ask you

14   one more question about procedure?

15   Because, quite frankly, every judge I've

16   done one of these for does it a little

17   different.  I think I'm reading you that

18   you're gathering evidence now.  You're

19   ready for an argument or a brief or

20   something later tying that evidence to the

21   issues.  Is that fair to say?

22            THE COURT:  Well, I'm going to hear

23   all the proof and render a decision, based

24   upon what you put on and what the State

1    puts on.  Other than that, I don't see any

2    need to comment further.  If you're asking

3    me whether I'm going to want you to give a

4    brief later, I'll tell you at the time,

5    when the thing's concluded.

6             MR. BUCHANAN:  All right.

7             MR. ELLIS:  Your Honor, we'd ask

8    that Clarence Stanfill be called.

9             **CLARENCE STANFILL** was called and

10   being first duly sworn, was examined and

11   testified as follows:

12   **DIRECT EXAMINATION**

13   **BY MR. ELLIS:**

14   Q        For the record, would you please

15   state your name for the Court?

16   A        Clarence Stanfill.

17            THE COURT:  Please speak up.

18   Q        Mr. Stanfill, where do you live?

19   A        Lexington, Tennessee.

20   Q        Can I have your address, please?

21   A        1066 Appleton Road.

22   Q        And do you know Mr. Jon Hall?

23   A        Yes.

24   Q        And when did you first meet Mr.

1    Hall?

2    A        1994.

3    Q        And how did you meet him?

4    A        My father introduced me to him.

5    Q        I'm sorry, I can't hear you.

6    A        My father introduced me to him.

7             THE COURT:  Please continue to

8    speak up.

9    Q        And where does your father live,

10   Mr. Stanfill?

11   A        830 Appleton Road, Lexington,

12   Tennessee.

13   Q        And what relation is that to where

14   Mr. Hall lived?

15   A        What relation?

16   Q        No, in what -- Did he live close to

17   Mr. Hall?

18   A        Yeah, we lived about a mile from

19   him.  He lived on, at the time, Pleasant

20   Hill Road.  That's just about a mile from

21   Appleton.

22   Q        How did your father know him?

23   A        He met him through -- He just met

24   him through I think just a casual

110

1    acquaintance.

2    Q        Did you have a chance to -- Well

3    did you know Mrs. Billie Hall?

4    A        Casually.

5    Q        Did you have a chance to see them

6    as a couple?

7    A        Yeah.

8    Q        And did you see Jon by himself or

9    her by herself?

10   A        Yeah, quite a few times.

11   Q        Would you consider yourselves

12   friends, acquaintances?

13   A        Well I was just more like a friend

14   to -- I was a friend to Jon.  She was just

15   like an acquaintance.

16   Q        Did you ever have a chance to watch

17   Jon interact with his children?

18   A        Yes.

19   Q        How would you characterize Jon as a

20   dad?

21   A        Excellent.

22   Q        Describe to the Court some of the

23   things that he did for his kids.

24   A        Well, quite a few times he worked

111

1    on some vehicles for me, and he often told

2    me that -- He worked at Helms Motor

3    Company in Lexington as a mechanic, and he

4    told me he quit his job 'cause his little

5    girl had cerebral palsy and that he had to

6    stay at home and take care of her.  His

7    insurance would not cover her, so he had

8    to stay at home and take care of her, and

9    quite a few times he would bring the kids

10   around with him.  I never heard him say --

11   you know, have a bad thought or say

12   anything out of the way to the kids.

13        MR. EARLS:  Your Honor, excuse me

14   for interrupting, but, again, without

15   having to interpose my same objection

16   about the relevancy of this to the post-

17   conviction, I assume the Court's ruling's

18   going to be the same, but I don't want to

19   jump up every time a witness is called.

20   If I could have that standing objection on

21   this.

22        THE COURT:  Certainly.  I'll

23   overrule you for the reasons previously

24   stated, and I'll let counsel continue to

1   ask questions of this witness regarding

2   his personal knowledge.

3   Q        Did you ever talk with somebody

4   from the D.A.'s office?

5   A        I talked to a P.I., if that's what

6   you're asking.

7   Q        Just for this hearing today, right?

8   A        About today, about this hearing

9   today?

10  Q        Yes.

11  A        I just talked to the guy that

12  subpoenaed me.  That was it.

13  Q        Have you ever had a contact from

14  the Henderson County Police Department?

15  A        About this case?

16  Q        About what happened on the night

17  that Mrs. Hall was killed.

18  A        No.

19  Q        Did you talk to any of Mr. Hall's

20  defense attorneys at that time?

21  A        No, I didn't.

22  Q        Have you talked to any other

23  investigators other than the gentleman

24  that served you the subpoena?

1    A        No, sir.

2    Q        Did you ever witness Jon's demeanor

3    in terms of if he got stressed or things

4    weren't going his way?

5    A        Never.  I was never -- When I was

6    around Jon, Jon always carried hisself as

7    a gentleman around me.

8            MR. ELLIS:  Your Honor, I pass the

9    witness.

10            MR. EARLS:  No questions.

11            **(WITNESS EXCUSED.)**

12            **JOE HENRY STANFILL** was called and

13    being first duly sworn, was examined and

14    testified as follows:

15    <u>**DIRECT EXAMINATION**</u>

16    <u>**BY MR. ELLIS:**</u>

17    Q        Mr. Stanfill, if you will, state

18    your name for the record, please, sir.

19    A        Joe Henry Stanfill.

20    Q        And where do you live, sir?

21    A        I live at Lexington, Tennessee, 830

22    Appleton Road.

23    Q        Do you know Mr. Jon Hall?

24    A        I do.

1    Q        When did you first meet Mr. Hall?

2    A        Well I don't recall, but I'm just

3    figuring maybe a couple of years he moved

4    there.  I was in and out of town quite a

5    bit.

6    Q        How did you first meet Mr. Hall?

7    A        He and I was working with some old

8    cars.  He's a mechanic and I did some

9    mechanic work.

10   Q        And did y'all become friends?

11   A        Yes, we did.

12   Q        How close did you live to Mr. Hall?

13   A        Real close.

14   Q        Did you have a chance to ever meet

15   Mrs. Billie Hall?

16   A        Yes, I did.

17   Q        And did you ever meet Jon's

18   children?

19   A        Yes, I did.  He always had the

20   children.

21   Q        And how would he treat his

22   children?

23   A        Good.

24   Q        Did you ever have a chance to watch

115

1  him be a father to his kids?

2  A        All the time.  He was nice to them.

3  Q        What would he do for his children?

4  A        All I saw, he would always bring

5  them over to my house, and he would make

6  sure they had something to eat and treat

7  them real good.

8  Q        Did Jon ever talk to you about

9  Billie Hall?

10 A        Not much.  I went and talked to

11 them one day together.

12 Q        What did you talk to them about?

13 A        About their place and how she

14 worked and how they got along.  We talked.

15 Q        Did you know that Jon and Billie

16 were having problems?

17 A        No, not no bad problems.  I never

18 asked him his personal business.

19 Q        Did Jon ever tell you that Billie

20 treated him like a child?

21           MR. EARLS:  Object to the leading

22 and to the hearsay.

23           THE COURT:  Objection sustained.

24 Q        Did Jon ever talk to you about how

                                            116

1    Billie treated him?

2    A        He did make a remark --

3             MR. EARLS:  Object to any hearsay,

4    Your Honor.

5             MR. ELLIS:  Your Honor, we're not

6    offering it for the truth of the matter

7    asserted.  We're offering, again, that

8    this was available, that the defense

9    counsel and investigators at the time

10   could have used this information and

11   probed it further.

12            THE COURT:  You're saying this

13   could have gotten in, this statement of

14   what was allegedly said?

15            MR. ELLIS:  No, I'm not saying that

16   this statement could have gotten in, but,

17   Your Honor, it could have led to other

18   information that would have been

19   discoverable.

20            THE COURT:  I'm going to sustain

21   the objection.

22            MR. ELLIS:  Your Honor, I'm going

23   to offer for a proffer then.

24            THE COURT:  Go ahead for those

117

1   purposes only.

2   Q       If you'll finish your comment, Mr.
3   Stanfill.

4   A       He made a remark to me one time
5   that his wife -- he couldn't work because
6   -- he couldn't afford to make enough money
7   to see after his family, his wife kind of
8   treated him like one of the kids.  He made
9   that remark to me.

10  Q       Did you have a chance to observe
11  his moods, Jon's moods?

12          THE COURT:  Are we still in the
13  proffer?

14          MR. ELLIS:  That's the end of the
15  proffer, Your Honor.

16          THE COURT:  Thank you.  Next
17  question.

18  Q       Did you ever have a chance to
19  observe Mr. Hall's moods?  Let me ask it
20  this way.  Did you ever see Jon happy?

21  A       All the time.

22  Q       Did you ever see him upset?

23  A       No.

24  Q       Did you ever see him frustrated?

                                    . 118

1    A        Didn't seem to be.  He and I got

2    along fine.

3            MR. ELLIS:  That's all I have, Your

4    Honor.

5            THE COURT:  Questions?

6            MR. EARLS:  No, sir.

7            **(WITNESS EXCUSED.)**

8            MR. ELLIS:  Your Honor, to

9    accommodate, we're going to call Valene

10   Foreman.

11           THE COURT:  Okay.  It's your

12   pleasure.

13           **VALENE FOREMAN** was called and being

14   first duly sworn, was examined and

15   testified as follows:

16   **DIRECT EXAMINATION**

17   **BY MR. ELLIS:**

18   Q        For the record, please, would you

19   state your name?

20   A        Valene Foreman.

21   Q        Ms. Foreman, where do you live?

22   A        480 Pleasant Hill Road, Lexington,

23   Tennessee.

24   Q        Do you know Jon Hall?

119

```
 1   A        Yes, I do.

 2   Q        How did you first meet Mr. Hall?

 3   A        Well, when they moved down there,

 4   my kid -- well, my daughter used to go

 5   down there all the time.  The kids came up

 6   there, and he came up there when my father

 7   was living.  That's how I met him.

 8   Q        And who is your father, ma'am?

 9   A        Herman McKinney.

10   Q        And 480 Pleasant Hill Drive, I

11   believe that's where you live?

12   A        Yes.

13   Q        How close is that to Mr. Hall's

14   house?

15   A        Well, right down the hill.

16   Q        So you were practically neighbors?

17   A        Neighbors, uh-huh.

18   Q        And did you know his wife, Mrs.

19   Billie Hall?

20   A        Yes, I did.

21   Q        Did you have a chance to see them

22   together?

23   A        Oh, yeah.

24   Q        Did you interact with Mr. Hall?
```

1    And by interact, did you hang out, did you

2    go over and talk or --

3    A        Well, he would come over there and

4    talk, you know, to my father.

5    Q        And did you see them together?

6    A        Well, I see them, you know,

7    passing.  Sometimes they, you know, down

8    in the yard.

9    Q        How about Mr. Hall?  Did you ever

10   see him just by himself?

11   A        Well, yeah.  Yeah, he come up there

12   when my father was living.  He'd come up

13   there and talk, and the kids, he'd have

14   them.  They'd come up there.

15   Q        Now your father is Herman McKinney.

16   Correct?

17   A        Yes.

18   Q        Did he -- Is he still living?

19   A        No, sir, he's dead.

20   Q        When did he pass, ma'am?

21   A        I can't exactly remember, but he's

22   been dead quite a while.

23   Q        Ms. Foreman, on the night that all

24   these events took place, do you have

1    knowledge about a $25 -- about $25 that

2    night?

3    A        Yes.  Well that evening he came by

4    and gave me -- he asked me was my father

5    there and I told him no, and he gave me --

6    he said, "Will you give this to Herman,"

7    $25.  He said he owed it to him.  He said,

8    tell him I'll give him the rest later.

9    That's the only thing I know about $25.

10   Q        Did Mrs. Billie Hall work?

11   A        Yeah, she worked for the -- I think

12   the ambulance service.  I think she told

13   me that's who she worked for.

14   Q        Who would babysit the kids while

15   she was working?

16   A        Most of the time he would have

17   them, he'd be out there with them.

18   Q        And would he provide for their

19   needs?

20   A        Far as I know he did.

21   Q        And you never saw him -- Did you

22   ever see him act out of the ordinary or --

23   A        No.  Far as I know he was always

24   nice.

1    Q        Ms. Foreman, did you ever talk to

2    anybody from the police department?

3    A        Let's see.

4    Q        About the events of that night.

5    A        No, I don't think so.

6    Q        Did you ever talk with any defense

7    counsel?

8    A        Two ladies came up there one Sunday

9    and asked me, you know.  That's the only

10   thing.

11   Q        When was that?  Would it be this

12   lady right here?

13   A        Yeah, uh-huh.

14   Q        And before she talked to you, did

15   anybody else talk to you about this case?

16   A        No.

17   Q        Do you know if anybody talked to

18   your father about this case?

19   A        Might have did.  I can't answer for

20   my father.

21   Q        Okay.  But to your knowledge, you

22   don't think they did.

23   A        I don't think they did.

24            MR. ELLIS:  Your Honor, that's all

123

1    I have.  Pass the witness.

2         MR. EARLS:  No questions.

3         **(WITNESS EXCUSED.)**

4         THE COURT:  Next witness.

5         MR. ELLIS:  Your Honor, if we could

6    approach.  This is a copy of the subpoena

7    of Herman McKinney.  Just pass this to the

8    court reporter to be marked.  Your Honor,

9    this is a subpoena of Mr. Herman McKinney.

10   It shows that he's deceased.  We just

11   wanted you to take judicial notice that he

12   was deceased.

13        THE COURT:  Do you want to have it

14   marked as Exhibit 4?

15        MR. ELLIS:  Yes, Your Honor.

16        **(Exhibit 4 was marked**

17        **and entered.)**

18        **PAULA FOREMAN** was called and being

19   first duly sworn, was examined and

20   testified as follows:

21   <u>**DIRECT EXAMINATION**</u>

22   <u>**BY MR. ELLIS:**</u>

23   Q        For the record, Ms. Foreman, would

24   you please state your name for the Court?

                                        124

1  A        Paula Foreman.

2  Q        Ms. Foreman, where do you live?

3  A        French's Trailer Park, Number 13.

4  Q        Where did you live on the night in

5  question when all these events took place?

6  A        When all that took place?

7  Q        Yes, ma'am.

8  A        I was living at French's Trailer

9  Park, Trailer 13.

10  Q        Ma'am, did you ever live at 480

11  Pleasant Hill Drive?

12  A        Yes.

13  Q        When did you live there?

14  A        About six or seven years ago.

15  Q        Did you stay there a lot while you

16  were at this other place, too?

17  A        Yeah, occasionally.

18  Q        Who lives there?

19  A        Now?

20  Q        Yes.  Well who lived there then?

21  A        My brother and my mother and my

22  granddaddy and my sister.

23  Q        So you would go back to visit

24  family?

125

```
 1   A        Uh-huh.

 2   Q        Spend the night?

 3   A        Yeah.

 4   Q        Do you know Mr. Jon Hall?

 5   A        Yes, I do.

 6   Q        How do you know Mr. Hall?

 7   A        I used to babysit off and on.

 8   Q        Did you ever -- You babysitted his

 9   children?

10   A        Uh-huh.

11   Q        Did you ever have a chance to

12   interact with Mr. Hall?

13   A        No.

14   Q        You never talked to him?

15   A        About?

16   Q        Just the weather or anything.  Did

17   you ever talk to him?

18   A        Yeah.

19   Q        Did you ever meet his wife, Billie

20   Hall?

21   A        Yeah.

22   Q        Did you ever see them together?

23   A        Yeah.

24   Q        Did you ever talk to them together?
```

```
 1   A        Yes, sometimes.

 2   Q        Did you ever -- Do you know if

 3   Billie worked?

 4   A        No, but he would work on cars

 5   sometimes.

 6   Q        "He" being Jon Hall?

 7   A        Uh-huh.

 8   Q        Do you know if his wife worked?

 9   A        Yes.

10   Q        When she worked, who would take

11   care of the kids?

12   A        Him or sometimes me.  I would

13   babysit.

14   Q        How did Jon treat you?

15   A        Good.

16   Q        Was he nice to you?

17   A        Uh-huh.

18   Q        Why would you babysit the kids

19   sometimes?

20   A        Why would I?

21   Q        Yes, ma'am.

22   A        Because I needed a job and I wasn't

23   doing anything else, so ...

24   Q        And he'd try to help you out?
```

127

1   A        Yeah.

2   Q        Give you a little extra cash?

3   A        Yeah.

4   Q        Do you know if Mr. Hall drank?

5   A        Sometimes beer.

6   Q        Did you ever watch him drink?

7   A        Yeah, sometimes.

8   Q        Did you ever watch him take care of

9   his kids?

10  A        Yeah.

11  Q        How would you characterize him?

12  Did he provide the essentials?

13  A        Yeah, he was good at taking care of

14  the kids.

15  Q        Did the kids interact well with

16  him?

17  A        Uh-huh.

18  Q        Did they like him?

19  A        Yes.

20  Q        And he liked his kids?

21  A        Uh-huh.

22           MR. ELLIS:   Your Honor, I have

23  nothing further.

24           THE COURT:   Questions?

128

1          MR. EARLS:   No questions.

2          (WITNESS EXCUSED.)

3   END OF VOLUME I.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23