# ADDENDUM 1
# Volume 10

W2003-00669-CC-A-R3-PD

FILED

JUDY BARNHILL, CIRCUIT COURT CLERK

BY

JUN 03 2003

DEPUTY CLERK

AM

PM

1          IN THE CIRCUIT COURT OF

2        MADISON COUNTY, TENNESSEE

3         AT JACKSON, DIVISION I

4    _____

5    JON HALL,

6         Petitioner,

7    vs.                     No. C00-422

8    STATE OF TENNESSEE,

9         Defendant.

10   _____

11        HEARING ON POST-CONVICTION

12           RELIEF PETITION

13            MAY 15, 2002

14           VOLUME II OF IV

15   _____

16

17

18

19

20              AMY MAYS

21         OFFICIAL COURT REPORTER

22    MADISON COUNTY JUSTICE COMPLEX

23      JACKSON, TENNESSEE  38301

24           (731)423-6039

130



FILED

JUL 2 4 2003

Clerk of the Courts
Rec'd By

Vol. 16 ORIGINAL

1 **TABLE OF CONTENTS**

2 **VOLUME II**

3 SHERYL ARBOGAST

4         Direct Examination      Page 133

5         Cross-Examination       Page 197

6         Redirect Examination    Page 208

7 PAMELA FOREMAN

8         Direct Examination      Page 212

9 JACKIE BRITTAIN

10         Direct Examination      Page 217

11         Cross-Examination       Page 239

12         Redirect Examination    Page 242

13 PAMELA BRITTAIN

14         Direct Examination      Page 245

15         Cross-Examination       Page 256

16         Redirect Examination    Page 258

17 SHERYL ARBOGAST (recalled)

18         Direct Examination      Page 265

19 KATHY HUGO

20         Direct Examination      Page 271

21         Cross-Examination       Page 287

22              *  *  *  *  *

23

24

1                    <u>E X H I B I T   I N D E X</u>

2    EXHIBIT 5                            Page 145

3                        *   *   *   *   *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

132

1          **SHERYL ARBOGAST** was called and

2     being first duly sworn, was examined and

3     testified as follows:

4     **DIRECT EXAMINATION**

5     **BY MR. BUCHANAN:**

6     Q       Would you state your name for

7     the record, please?

8     A       Sheryl Arbogast.

9     Q       And would you spell your last

10    name, please?

11    A       A-r-b-o-g-a-s-t.

12    Q       And why don't you spell your

13    first name, if you don't mind.

14    A       It's with an "S", S-h-e-r-y-l.

15    Q       All right.  Ms. Arbogast, where

16    do you live?

17    A       Cincinnati, Ohio.

18    Q       And what is your relationship to

19    Jon Hall?

20    A       I'm his older sister.  I am the

21    fifth of seventh children.  He's the

22    seventh child.

23          MR. BUCHANAN:  Judge, in

24    connection with this testimony, I want

133

1    to direct the Court's attention to her

2    testimony at the trial in Volume IV,

3    Page 430 and 431, taking up some 20 plus

4    lines total in the punishment phase.

5    Q        Now, Ms. Arbogast, you have been

6    Jon's sister working on this case almost

7    from the beginning; have you not?

8    A        Done a lot of bookkeeping, yes,

9    sir.

10   Q        And would you tell the Court

11   what you've done in terms of

12   bookkeeping?

13   A        When I received phone calls from

14   Jon, I would take notes and try to help

15   him find out information about his case

16   because he was not being informed of

17   hearing dates or wasn't certain of who

18   was assigned to represent him.  There

19   were calls that I placed to his

20   attorneys trying to find out that

21   information, and I took notes from those

22   calls, too.

23   Q        All right.  Did anyone ever come

24   see you in person or interview you in

134

1    person before the trial itself?

2    A        No, sir.

3    Q        Did you make attempts to talk to

4    the attorneys that were involved in the

5    case?

6    A        Repeatedly.

7    Q        How successful were you?

8    A        Not at all really.  I was given

9    a couple of dates on a few occasions.  I

10   know in one instance I was told that

11   they weren't allowed to give out any

12   information to me without Jon's

13   permission, and I said, "But Jon has

14   called me to ask you this, and he has

15   called your office, but you won't accept

16   his calls, so he's not able to notify

17   you to speak with me, and so that's the

18   purpose of my calling you now," and they

19   just wouldn't give me any information.

20   Q        Prior to the time that you

21   testified, if you had been asked, -- Did

22   you know Jon and Billie?

23   A        Yes.

24   Q        Did you know somewhat the

135

1  history of their relationship and how

2  they inter-reacted with each other?

3  A        Yes, I had spent the night at

4  their home.

5  Q        If you had been asked the

6  question at guilt or innocence, "Do you

7  know of any reason in the world why Jon

8  would have premeditatedly thought to

9  kill Billie," what would have been your

10  answer?

11  A        Can you ask the question again?

12  Q        If you were asked, "Do you know

13  of any reason why Jon would

14  premeditatedly kill Billie," what would

15  have been your answer?

16  A        If I had been asked at that

17  time?

18  Q        Uh-huh.

19  A        I'm still not sure if I

20  understand what you're asking me.

21  Q        Do you have any personal

22  knowledge that would lead you to think

23  that Jon would, in a premeditated

24  manner, ever have killed Billie?

136

1    A        Oh, no.

2    Q        Would that testimony have been

3    available for you to testify to in 1997?

4    A        Yes, I suppose so.

5    Q        Have you ever felt that there's

6    anything, either before then or even up

7    to today, that would lead you to believe

8    that Jon would, in a premeditated

9    manner, have killed Billie?

10   A        No.

11   Q        Did you know something about --

12   Can you tell the Judge a little bit

13   about the -- Now, when you testified at

14   the punishment phase, your testimony

15   took up about 20 to 25 lines; did it

16   not?

17   A        Yes, I believe that's correct,

18   on the transcript.

19   Q        Did you grow up with Jon?

20   A        Until I went to college I did.

21   Until I was 18 I was in the home with

22   Jon.

23   Q        And that was at a home where?

24   A        In Ligonier, Pennsylvania.

137

1   Q         Ligonier, Pennsylvania, and it's
2   close to what big city?

3   A         Close to Pittsburgh.

4   Q         In what years was it that you
5   lived with Jon there in the home?

6   A         From the time I was eight years
7   old, I came back home to live from my
8   grandparents, and I stayed there until I
9   went to college, and Jon was living
10  there that entire time.

11  Q         Did you have occasion to see the
12  inter-reaction of Jon's father and your
13  mother during that time?

14  A         Yes.

15  Q         Would you tell the Judge how
16  they inter-reacted with each other?
17  Especially regarding conflict
18  resolution, in other words, when they
19  would get into arguments.

20  A         It was a very difficult
21  environment growing up because they did
22  fight all the time.  They argued
23  incessantly.  It occurred every night.
24  It frequently led to pushing and

1    shoving, and on a number of occasions

2    there were just horrible knock-down

3    drag-out fights where bones would be

4    broken and blood would be flying and

5    hair was being ripped out by the roots,

6    and we would be scrambling to try and

7    find someone to break up the fight for

8    fear that one of them would be killed,

9    generally for fear of my mother's life

10   because my father was so violent.   He

11   was a heavy drinker, and it was just

12   constant conflict and angst for all of

13   us to have to live through that.

14   Q       Did you want to get with the

15   attorneys and tell them about this?

16   A       Oh, I remember as a child

17   begging them to please separate, and my

18   mom always would say, "If it weren't for

19   you kids, I would never stay with him,"

20   and I was like, "But I don't want you to

21   stay with him for my sake.  I don't want

22   this guilt.  I want you to be free of

23   him and not to be beaten all the time,

24   and I would be happy to testify in court

139

1    if you would divorce him so that you can

2    leave.  Even if we have to stay with

3    relatives, I'd rather have the family

4    broken up than to live like this," and I

5    said that as a child, and I was made fun

6    of, and I remember it because I was so

7    little and saying that, and I still

8    believe it today.

9    Q       Would Jon witness these fights

10   that your parents would have?

11   A       Uh-huh, sure.

12   Q       Did your parents -- did they

13   resolve conflict ever in a peaceful

14   manner, or sit down and talk it out,

15   anything like that?

16   A       No.  Usually if there wasn't a

17   physical fight that ended the arguments,

18   my father would simply shut down and not

19   speak.  He would turn his back on her.

20   He would put a pillow over his head on

21   the couch, and he would just stop

22   listening to her and stop interacting

23   with her, and that would end it, but it

24   was never something that we observed

140

1   them to sit and hold hands and make up

2   or to come to any sort of a compromise

3   on anything.

4   Q     Now you didn't actually see Jon

5   and Billie inter-react very much, did

6   you?

7   A     No, because I was gone at

8   college, and then I got married, and he

9   met her and married her.  I didn't go to

10  the wedding, so I didn't know them at

11  that point.  I did stay at his home on a

12  couple of occasions, and he came to my

13  home.

14  Q     Well I want to direct your

15  attention to, say, August of 1994.  Tell

16  the Court -- First tell the Court, how

17  many brothers and sisters are there?

18  A     There are seven total children.

19  There are three girls and four boys, and

20  the order of birth is two girls, two

21  boys, myself, a brother, and then Jon is

22  the last in the lineup.

23  Q     Jon is the baby.

24  A     Right.

1  Q        Jeff is -- Are all of them alive

2  now except Jeff?

3  A        Yes.  Jeff is the only one who

4  is deceased.  He's the one next older

5  than me in the birth order.

6  Q        In the period from May until

7  July of 1994, of the siblings, who was

8  probably the closest to Jon?

9  A        Jeff.

10  Q        And this is the brother that had

11  AIDS?

12  A        Right.

13  Q        Did you ever make any attempt to

14  tell his attorneys that he had at the

15  time between 1994 and '95 that you had

16  Jeff down there and he had AIDS and we

17  needed to get something done about it?

18  A        I did, yes.  I went to great

19  lengths to do that.

20  Q        Would you tell the Court what

21  you did?

22  A        I flew to Texas, and even though

23  he was quite ill, I went together with

24  him to have a legal document notarized

142

1    properly so that it could be preserved,

2    that no one ever contacted him for any

3    information on Jon's behalf.

4    Q        And when did you do that?

5    A        It was within three months of

6    his death.

7    Q        Did you do that under the

8    direction of an attorney?

9    A        I believe there was somebody in

10   the prison that Jon knew who was

11   advising him that that testimony was

12   critical and we needed to preserve it

13   any way we could, and I believe that's

14   how the idea came about.  But before

15   that ever happened, I had made repeated

16   phone calls and tried to speak with the

17   attorneys in person, or on the

18   telephone, to make them understand that

19   it was critical that they interview

20   Jeff.

21   Q        And were you ever successful in

22   getting anybody to do anything about it?

23   A        Nobody ever did contact him, no.

24            MR. BUCHANAN:  Your Honor, I'd

1    like to have this marked, please.

2         MR. EARLS:  I haven't seen that,

3    Your Honor.

4         Well, Your Honor, I object to

5    the hearsay.  This is the first time

6    I've seen the document, Your Honor.

7         MR. BUCHANAN:  Your Honor, I'm

8    not offering it at this point for the

9    truth of the matter asserted.  I'm

10   offering it to show what was available

11   had somebody gone and tried to do

12   something and get this testimony

13   memorialized.

14        THE COURT:  I'm going to let the

15   affidavit at this point be marked

16   Exhibit 5 and let you proceed on

17   questioning this witness and give it

18   what consideration I feel would be

19   appropriate.

20        MR. ELLIS:  Your Honor, could I

21   briefly address the Court?  Your Honor,

22   in post-conviction hearings, as you well

23   know, if -- any time a witness is

24   unavailable to be called and counsel

144

1 makes that argument in front of the

2 trial court and doesn't present any type

3 of proof to preserve what would have

4 been said or what that person could have

5 testified to, then basically the appeals

6 court overlooks it. So I want to stress

7 that there should be due weight given in

8 the fact that these attorneys had an

9 opportunity to call him and they missed

10 that opportunity. He is now deceased.

11 He made this affidavit actually I

12 believe in contemplation of death, which

13 would satisfy Rule of Evidence

14 804(b)(2), and, therefore, would be

15 allowed to be under -- be admitted into

16 the rules of evidence without any

17 prejudice against him.

18         THE COURT:  Again, I've ruled it

19 can come in and be marked at this time

20 as Exhibit 5.

21         **(Exhibit 5 was marked**

22         **and entered.)**

23         MR. BUCHANAN:  Your Honor, may I

24 approach?

145

1              THE COURT:   Certainly.

2    Q       I want to show you what's been

3    marked Exhibit Number 5 and ask you if

4    you can identify that document.

5    A       Yes.   I was with him when he

6    signed that.

7    Q       All right, that's my next

8    question.   Is that his signature?

9    A       Yes.

10   Q       And you were there when he

11   actually signed it and swore to it in

12   front of a notary public in Texas?

13   A       Right.   I drove him.

14   Q       All right, thank you.

15           MR. BUCHANAN:   Your Honor, I

16   would tender Exhibit Number 5, if I

17   might address the Court from the podium.

18   Following up somewhat on Mr. Ellis'

19   eloquent argument, that is -- there are

20   several reasons why I'm tendering it to

21   the Court, and the Court may want to

22   withhold judgment at this point or not,

23   but the purpose of tendering it is this:

24           Number 1, to show that this, as

                                            146

1   best we can tell, is what testimony

2   would have been produced had it been

3   able to been memorialized.  Number 2,

4   that, in fact, this record will show

5   that they never attempted to introduce

6   that at the trial under 804, I believe

7   it is, 804 (b)(2), which we, of course,

8   will be arguing that that is something

9   that should have been done.

10          THE COURT:  All right.  It has

11  been marked Exhibit 5, and you can

12  proceed in questioning the witness.

13  Q       All right.  Why did you do this

14  instead of the attorneys?  Do you know?

15  A       Why did I do this what?

16  Q       Why did you do this instead of

17  the attorneys?

18          MR. EARLS:  Your Honor, I object

19  to the form of the question.  She can't

20  speculate.

21          THE COURT:  Objection sustained.

22  Q       Why did you feel you had to go

23  do this on your own?

24  A       I believed that Jon didn't have

147

1    any witnesses that could give the other

2    side of the story.  I felt like in the

3    trial that only one side was presented,

4    and what I came to be aware of through

5    Jeff was critical to his defense, and it

6    hadn't been presented, and I felt like I

7    needed to do something to try and help

8    Jon should he ever get an appeal where

9    it could be heard.

10   Q       Well I'm not sure you understand

11   my question.  I'll try to state it a

12   little better.  What's the date on the

13   affidavit?

14   A       I don't know.

15   Q       Well about how long was it

16   before he died?

17   A       It was within three months, I

18   believe, of his dying that I had this

19   done.

20   Q       What kind of shape was he in?

21   A       He was emaciated and was hardly

22   able to eat anything.  He was exhausted,

23   tired.  He was not able to walk a very

24   long distance.  He had a handicap thing

148

```
 1   for his vehicle.  He was disabled,
 2   unable to work.
 3   Q       What did you personally feel
 4   like his days were left?  Did you feel
 5   like he was close to death?
 6   A       Yes, I did.  I absolutely did.
 7   He was about 113 pounds when he died, I
 8   believe.  He was wasting away from AIDS.
 9   Q       And you had tried to get the
10   attorneys to do this.  They hadn't done
11   anything, so you took it upon yourself
12   to do it.
13   A       Yes, sir.
14   Q       And you did that because you
15   were afraid he was fixing to die.
16   A       Yes, and as a nurse, I honestly
17   knew with some certainty that his time
18   was extremely limited.  I knew what his
19   blood counts were, his T-cell counts,
20   and I can tell you that if somebody is
21   -- you know, their ribs are sticking out
22   and they're not eating anything -- I
23   mean, he was like dying of starvation,
24   if you will.  That's what he looked
```

149

1    like.

2    Q        And do you know, did any

3    attorney ever tell you why or give you a

4    reason why they would not petition the

5    Court to do a deposition to preserve his

6    testimony?

7    A        I had been told on a couple of

8    occasions that they intended to talk to

9    him, but they never did.

10   Q        How many times would you call --

11   Just say in a month's period, say a

12   typical three-month period, how many

13   times would you call whoever his

14   attorney was trying to get in touch with

15   them?

16   A        For a while there I was trying

17   to call every week or every two weeks to

18   try and reiterate that this needed to be

19   done and to see how far they had

20   progressed with it before a hearing

21   date, for example.

22   Q        To your knowledge, as of the

23   date of his death, had anybody,

24   investigator, attorney, anybody,

150

1    contacted Jeff?

2    A        No, I'm sure they didn't.

3    Q        Now, when were you talked to by

4    an attorney for the first time?  Do you

5    remember?

6    A        I made telephone calls to their

7    offices.  And you mean with regard to

8    Jon's actual trial?

9    Q        Yes.

10   A        The instructions and prepping of

11   witnesses, if that's what you're

12   inferring or asking me about, it took

13   place the night before by telephone, and

14   the actual face-to-face took place 15

15   minutes prior to testifying.

16   Q        So no attorney sat down and got

17   a long history from you or anything of

18   that nature?

19   A        No.

20   Q        And you are a sister of Jon.

21   A        Yes.

22   Q        And what are the names of --

23   We've already heard from Debbie Davis,

24   and you're Sheryl Arbogast.  Would you

1  tell the Court the names of the other

2  brothers and sisters?

3  A        Kathy Hugo and -- She's the

4  oldest girl; Jay Hall is the oldest boy;

5  Jeff Hall who died; I have a younger

6  brother, Joel Hall, and then Jon.

7  Q        All right.  And was there

8  anybody else in the family that would

9  have, to your knowledge, done this if

10  you hadn't gone down there and done it?

11  That is, get the statement from Jeff.

12  A        Probably not.  I can't say for

13  certain.  I had the most contact with

14  Jeff, and he and I were very close

15  siblings, and because of his health, I

16  had taken on a very active role to just

17  support him through the dying process.

18  As a nurse, I have a lot of experience

19  in this unfortunately, and I thought I

20  could be of help, and I made two

21  different trips down to Texas, once with

22  my son and my husband, and another time

23  I flew down alone.

24  Q        Do you know who Gloria Shettles

1   is?

2   A       I believe she's a private

3   investigator.

4   Q       And do you know what role she

5   served in this case?

6   A       I believe she was supposed to

7   conduct a mitigation assessment.  Is

8   that correct?  To try and gather facts

9   into Jon's background and perhaps give

10  the Court more insight about the man he

11  was.

12  Q       Now you did have occasion to

13  talk to her; did you not?

14  A       By telephone.

15  Q       All right.  How many occasions

16  did you talk to her?

17  A       Maybe one or two.  I think there

18  was like phone tag.  I think I called

19  her, she called back.  Probably just one

20  time.

21  Q       Okay.  What kind of nurse are

22  you?

23  A       I'm a registered nurse working

24  in intensive care.  I have over 20 years

153

1    experience, about 22 or '3 now years

2    experience and most of it in intensive

3    care and five years experience where I

4    worked at Blue Cross & Blue Shield and

5    did medical authorizations for hospital

6    admissions, be they medical or

7    psychiatric.  As a nurse, my direct care

8    of people who are suicidal led me to be

9    concerned about Jon's situation, and I

10   was recognizing problems that needed to

11   be addressed there that were going on.

12   Q        Do you know what the DSM is?

13   A        It is a classification of

14   diagnoses and definitions of medical

15   terms, I believe.  It helps categorize

16   illnesses for insurance purposes and

17   other just general medical textbook

18   reference materials.

19   Q        During the course of this

20   conversation you had with Gloria, did

21   you and her discuss the DSM?

22   A        Yes, sir.

23   Q        And what section of the DSM did

24   y'all discuss?

                                    154

1    A         Intermittent explosive disease.

2    Q         All right.  And were y'all both

3    fairly much on the same page that that

4    was something that needed to be looked

5    into with Jon?

6    A         Absolutely.

7    Q         And this was well before trial;

8    was it not?

9    A         Yes, sir.

10   Q         All right.  Did you ever know of

11   any, any, psychiatrist that was ever

12   employed for Jon?

13   A         No, sir.

14   Q         Did you bring up this -- And I'm

15   going to call it IED instead of

16   intermittent explosive disorder so we

17   won't drag out too much here today.  Who

18   brought up the idea of looking at the

19   IED in the DSM?

20   A         Ms. Shettles did in a phone

21   conversation.  She actually read it to

22   me out of the book.

23   Q         And you and her went over that

24   together?

155

1    A        Yes.  I have notes detailing the

2    conversation.

3    Q        Did you assume that she would be

4    relating that to the attorneys?

5    A        Absolutely.

6    Q        Did you have any reason to think

7    that she would hide anything from the

8    attorneys?

9    A        I couldn't see why she would.

10   Q        Did she identify herself as

11   working on behalf of Jon and his staff

12   counsel?

13   A        Yes, sir.

14   Q        Now, do you remember some of the

15   things that were in the DSM about IED?

16   A        Basically that different people

17   are more predisposed to it based on --

18            MR. EARLS:  Your Honor, I object

19   to her testimony about this.  She's not

20   qualified on that.

21            MR. BUCHANAN:  Judge, I'm not

22   asking her for an opinion.  I'm asking

23   her if she remembers what it states, and

24   then I'm going to ask her if she's seen

156

1    any of these things in Jon.

2            MR. EARLS:  We'd object to the

3    hearsay on it, Your Honor.

4            THE COURT:  I'm going to sustain

5    the objection.  There are other ways I

6    take it counsel can pursue this.

7            MR. BUCHANAN:  Oh, yes.

8            THE COURT:  But the State's

9    right in their objection at this point

10   in time, and I'm going to sustain the

11   objection.

12   Q    Have you ever seen what you

13   thought was something like IED in Jon?

14            MR. EARLS:  Same objection, Your

15   Honor.  She's not qualified to diagnose

16   him as anything.

17            THE COURT:  At this point in

18   time, I find that she has not been

19   established to be a witness that can

20   testify further regarding that

21   particular question.  I'm going to

22   sustain the objection.

23            MR. BUCHANAN:  All right.  Can I

24   proffer it as just a proffer, Judge?

157

1              THE COURT:  Do you want in your

2    proffer to qualify her to some extent,

3    or are you just going to ask that one

4    question and let her respond?

5              MR. BUCHANAN:  Well, I --

6              THE COURT:  I'll let you

7    proffer.  Ask that one question if

8    that's what you want to do.

9    Q        Let me try something else.  Is

10   part of your nursing psychiatric

11   nursing?

12   A        I did have to evaluate

13   psychiatric admissions to see if it was

14   an appropriate set of circumstances to

15   admit somebody to the hospital.

16   Q        So you would do, as I understand

17   it, kind of a triage, so to speak?

18   A        It was a medical review

19   technically, and, yes.  I would get a

20   phone call from a hospital

21   representative who would tell me the

22   facts of the admission.  For example,

23   somebody who was making threats to

24   commit suicide, particularly if weapons

1   became involved in this, what their

2   family circumstances were, triggering

3   events, stressors, and whether these

4   were such that it would lead to harm to

5   the patient or to those people around

6   them, and if it satisfied those

7   criteria, then the admission would be

8   authorized.  And so I was taking the

9   data for the insurance company and

10  making approvals based on that kind of

11  data.

12  Q       And you had to be a nurse to do

13  that.

14  A       Yes.

15  Q       So, if somebody exhibited the

16  symptoms of IED, for instance, you

17  wouldn't make a diagnosis, but you would

18  make an admittance and refer it to a

19  doctor saying, at least look at this,

20  and it might be this, could be that, et

21  cetera, things like that?

22  A       I actually was authorized to

23  approve those admissions if it satisfied

24  the criteria without the doctor's

159

1    referral.  If it was borderline, I would

2    refer it and the doctor would make a

3    judgment call, but if it clearly was

4    stating that the person was suicidal or

5    they went into McDonald's and pulled a

6    gun on the people at the restaurant, for

7    example, and there's weapons involved,

8    those sort of things happening in

9    conjunction with emotional distress,

10   crying jags and lability of emotions

11   being demonstrated over and over again

12   in different circumstances, those were

13   clear-cut cases that there was real

14   trouble brewing and that the best

15   situation for them would be to

16   hospitalize them and remove them from

17   those circumstances where they could

18   hurt themselves or hurt those around

19   them.

20   Q        So, I'm not trying to be tacky

21   here, but I want to make certain, you

22   were making kind of like a pre-

23   diagnosis?

24   A        Yes.

160

1    Q        Before the doctor actually got

2    there?

3    A        Uh-huh.

4    Q        Okay.  And I assume that your

5    notes would steer the doctor in whatever

6    directions that you felt were

7    appropriate.

8    A        Right.

9    Q        All right.  So, were you

10   familiar with the criteria of what made

11   up someone with IED?

12   A        It was right on line, too, but,

13   yes, I knew it very well.

14   Q        Have you seen any of those

15   things that are consistent with what IED

16   is in Jon?

17   A        Yes, sir.

18   Q        All right.  And what are those

19   things?

20   A        A quick temper, depression,

21   emotional lability, crying, and not just

22   crying but like hours at a time and not

23   being able to stop crying, just loss of

24   control over your emotions.  He had not

161

1    been able to hold a job because of that,

2    and it was affecting everything in his

3    life.  He, as I understand it, had

4    weapons pulled on him, and the situation

5    was becoming more and more volatile.  I

6    was afraid for his life and for the

7    situation that they were in, that it

8    could only have a bad outcome.  We

9    wanted him to get out of the marriage

10   and leave that situation.  I wanted to

11   hospitalize him.

12   Q       Well as a psychiatric nurse,

13   once you were to move a case like that

14   on down the line and admit them into the

15   hospital, who best to actually make that

16   diagnosis, a psychologist or a

17   psychiatrist?

18   A       A psychiatrist has more --

19   Q       And why is that?

20   A       Well, they're medical doctors,

21   and they can prescribe medications, and

22   they have more medical training than a

23   psychologist does.  A psychologist is

24   more into counseling, whereas a

162

1    psychiatrist is an actual physician who

2    can prescribe and treat.

3    Q        And again, do you know of any

4    psychiatrist that's ever been employed

5    on this case?

6    A        No, sir.

7    Q        At least before the trial.

8    A        Correct.

9    Q        Okay.  Did you know that Jon had

10   a thing about telephone wires, telephone

11   lines?

12   A        I knew that when he was at home,

13   that an argument with my mother resulted

14   in him going down to disconnect a

15   telephone so that she wouldn't call her

16   sister.

17   Q        So he could have her attention.

18   A        Right.  She said to Jon, "I'm

19   upset.  I'm done arguing with you.  I'm

20   going to call Arlene, and I'm just going

21   to go over there until you cool off,"

22   and he disconnected the telephone line,

23   and she wasn't able to place the call.

24   Q        And you knew about this prior to

163

1    February of 1997?

2    A        Yes, I did.

3    Q        If any attorney had asked you

4    about it, would you have been free to

5    talk to them about it?

6    A        Sure.

7    Q        Been willing to?

8    A        Uh-huh.

9    Q        And when you do know of Jon

10   having disconnected phone lines in the

11   past, has he ever done violence to

12   anybody?

13   A        No.

14   Q        Well why does he disconnect the

15   phone lines?  Do you know?

16   A        Because he wants to resolve the

17   conversation rather than have them leave

18   him hanging, and he wants to have the

19   attention and not be ignored or walked

20   away from.

21   Q        But to your knowledge, he had

22   never hurt anybody when he had done this

23   in the past.

24   A        No.

164

```
 1   Q        Did any attorney ever talk to
 2   you about coming in telling the jury
 3   about his proclivity to disconnect phone
 4   lines just to get the attention of the
 5   person he wanted to talk to?
 6   A        No, sir.
 7   Q        Did you know much about Billie
 8   and his relationship as far as the
 9   turbulence of it, the marital relations?
10   Did you know much about that?
11   A        I did have occasion to stay
12   overnight on two different nights with
13   him and Billie at their home when I was
14   traveling to see my brother Jeff.  I
15   stayed there as a halfway point on the
16   trip down and back, and I did see them
17   interact during that time.
18   Q        Is that the only time you
19   actually laid eyes on them in the
20   marriage?
21   A        No.
22   Q        Okay.  Were there other times?
23   A        He came to my house with her.
24   Actually I think it was just him and his
```

1   children.  She stayed behind, so I have

2   to recant that because I think that Jon

3   just brought the girls out to my mom's

4   and stayed at my house on that trip, you

5   know, as a halfway point there

6   traveling, and I'm thinking that Billie

7   didn't come along on that trip.  So I

8   suppose I saw them in his home.

9   Q      Did you see any of the

10  storminess in that relationship when you

11  saw them?

12  A      Yes, I did.

13  Q      How would Billie treat Jon?

14  A      She berated him all the time.

15  She just constantly was saying negative

16  things about him, whether he was in the

17  room or whether he wasn't.  She was

18  brow-beating him.  She was saying things

19  like he wasn't able to provide for the

20  family and that he wasn't pulling his

21  weight and she had to do everything, but

22  what I observed was Jon doing the child

23  care and the cooking and the cleaning of

24  the house and all of those things.  I

166

1   saw him doing it, but she was telling me

2   that he wasn't doing it.

3   Q      Were you ever asked by any

4   attorney before trial, during trial,

5   about provocation in the way she treated

6   him and provoked him?

7   A      No.

8   Q      Were you ever asked by any

9   attorney to provide pictures?

10  A      No, sir.

11  Q      Would you have done so if you'd

12  been asked?

13  A      Yes.

14  Q      Do you know if any pictures were

15  even introduced in the sentencing phase

16  of this capital murder sentencing trial?

17  A      There were no pictures.

18  Q      Did any attorney ever tell you

19  any reason why they weren't going to put

20  pictures in?

21  A      Well, there was almost no

22  interchange.  No, no one explained

23  anything like that.

24  Q      Had you seen Jon act as a father

1   in his inter-reaction with the children?

2   A       Yes, I did witness that pretty

3   extensively.

4   Q       Would you tell the Judge what

5   you observed as regards him being a

6   father?

7   A       What I observed was not only at

8   Jon's house but on a visit to my

9   mother's home that he made with the two

10  younger children, his natural children,

11  and he was extremely attentive and

12  loving with them.  He picked them up and

13  gave them physical care and attention a

14  lot.  He prepared special foods for the

15  toddler and for the infant, you know,

16  that no one else could do, and he was

17  very well-versed in what their likes and

18  dislikes were and how to feed and cook

19  for them.  He dressed them very -- He

20  always made sure that they looked their

21  best and would put dresses on the girls

22  and would work especially with Jessica.

23  I was always impressed with how he was

24  able to do therapy with the baby who had

168

1   a lot of medical needs because of her

2   cerebral palsy.  He would do physical

3   therapy exercises with her, and I would

4   watch him actually counting out the reps

5   and going through an actual routine that

6   he had been trained to do by medical

7   staff, and speech therapy exercises that

8   he would do with her, and above all, he

9   made sure that nobody in the family

10  would exclude her from activities.  He

11  wanted her to be present and be part of

12  everything, even if it was difficult for

13  him to include her in such things

14  because he wanted her not to feel

15  singled out or be kept apart from those

16  kinds of activities.

17  Q        How severely handicapped is

18  Jessica?

19  A        I haven't seen her since she was

20  three, I suppose, but at that time she

21  had a deformity of her arm, and she held

22  it out like this (indicating), and she

23  couldn't really move it much beyond

24  that.  She couldn't grasp onto things,

169

1    and she didn't have normal range of

2    motion.   It was almost frozen in this

3    position on her one arm.   She had the

4    abnormal toe-walking gait that's common

5    with cerebral palsy, and she was late in

6    learning how to walk.   I believe at the

7    time I saw her she was able to hold onto

8    what was equivalent to a walker or some

9    kind of a toy with wheels on it that she

10   would be able to maneuver, but she was

11   I'm sure well over two before she was

12   able to walk.   She seemed of normal

13   intelligence, though.   She did have

14   speech therapy, but she was actually a

15   very bright and loving little girl.   He

16   gave her treatments for her breathing

17   problems.   She was so premature she had

18   lung damage that resulted in stiffness

19   of her lungs.   She was prone to

20   congestive heart failure and frequently

21   had to take steroids to get her over

22   illnesses, and she needed to have

23   breathing treatments as a maintenance

24   daily program to keep her lungs properly

170

1    humidified and aerated so she could

2    excrete the mucus that would collect in

3    there.  If she didn't do that

4    aggressively, she would be prone worse

5    to develop pneumonia.  So they had to do

6    a regimen with her on a daily basis,

7    about four times a day, to give her

8    nebulized breathing treatments with

9    saline to keep her able to mobilize her

10   secretions so she wouldn't get

11   infections.  In spite of that, she did

12   get infections a lot of the times, and

13   then there were medications that would

14   have to be added to these treatments,

15   and Jon was very religious about making

16   sure that those treatments were done on

17   proper schedule.  He would listen to her

18   breathing and assess if she needed

19   medical attention, if she might need to

20   be seen by a doctor or get on

21   antibiotics to get her over an illness.

22   He was very alert and attuned to doing

23   that.  He was able to provide total care

24   for a complicated medical problem.

1  Q       In the 18 lines of testimony

2  heard by you -- the jury -- And when I

3  say 18 lines, I mean what's in the

4  record as far as questions back and

5  forth.  I know part of them are

6  questions from the attorneys, but it

7  takes up 18 lines.  Were you ever asked

8  any question about him being a father

9  and him doing these sorts of things for

10  this poor child?

11  A       No.

12  Q       Were you ever -- Did the

13  attorneys ever say, "We don't want to go

14  into that?  We've got a good reason for

15  it."  Did they ever tell you that?

16  A       No.

17  Q       Would you have been willing had

18  you been asked to tell the jury about

19  this father side of him as opposed to

20  the monster side that's obviously in the

21  record by this time?

22  A       I tried very hard to, yes.

23  Q       How did you try?

24  A       I tried calling his attorneys

172

1    and explaining these types of things to

2    them, and I really didn't feel that they

3    were interested in knowing anything

4    about Jon's background.  They seemed to

5    not know much about him at all.  When I

6    would talk to them, they were unaware of

7    a lot of things that I would think they

8    would certainly have known at that

9    point.

10   Q       So you didn't testify about his

11   proclivity on disconnecting phone lines;

12   you didn't testify about IED; you didn't

13   testify about his care as a father.

14   A       Correct.

15   Q       You testified, what, that he

16   came from a house where there was a lot

17   of fights?  Is that correct?

18   A       That's -- Yes.

19   Q       It in a nutshell.  Okay.  Did

20   you ever get an opportunity to talk to

21   the attorneys regarding bite marks that

22   you'd seen on Jon or that any of your

23   family had seen on Jon from Billie?

24   A       I told attorneys on the phone,

173

1  and I'm not sure which ones.  At this

2  point it's getting a little fuzzy, but I

3  told them that there had been

4  altercations where she had left marks on

5  him, but I don't think anything came of

6  it.  They never asked me at trial.

7  Q        Did you call -- I know Mr. Mayo

8  and Mr. Ford handled the trial in the

9  courtroom, but you -- you called -- and

10  you made phone calls to them over time;

11  did you not?

12  A        I did.

13  Q        Did you also make phone calls to

14  the attorneys appointed prior to them?

15  A        I had a lot of phone contact

16  with Mr. Googe and Spracher, if I'm

17  saying his name right.  I apologize if

18  I'm not.

19  Q        All right.

20  A        Yeah, extensively.

21  Q        Were you available for any of

22  these attorneys at any time to call you

23  at your home and talk to you?

24  A        Sure, yes.

174

1   Q        In fact, you were asking for

2   that to happen; were you not?

3   A        Over and over.

4   Q        Had you been talking to Jeff

5   prior to his death on the telephone?

6   A        Yeah, regularly.  I kept real

7   close contact with him, probably from

8   about 1993 on.

9   Q        Is that how you knew that he had

10  material things to tell the attorneys?

11  A        Yes.

12  Q        Your mother currently is in

13  Pennsylvania; is she not?

14  A        Yes, she is.

15  Q        Would you tell the Court what

16  her medical situation is, just for the

17  record?

18  A        My mother is diagnosed with

19  emphysema and COPD, and she nearly died

20  two times since January.  She had to be

21  taken to the hospital emergency room and

22  both times was being debated by her

23  physicians whether or not to intubate

24  and place her on life support because

175

1   her breathing was so dire that they

2   thought she would die without it.  On

3   the first occasion, she was hospitalized

4   about a week and spent over two weeks

5   convalescing in a nursing home before

6   she was able to return home, and after

7   that admission, she was on oxygen

8   permanently, and currently she's not

9   able to go more than 15 minutes without

10  the oxygen, without struggling to

11  breathe and getting into dire problems.

12  On the second admission she had

13  pneumonia, she spent the night on a

14  machine called a BiPAP that they strap

15  onto your face and it forces air into

16  your lungs.

17          MR. EARLS:  Your Honor, I assume

18  this is being offered to show why she

19  can't be here, but I don't know if we

20  need to go into her medical history.

21          THE COURT:  Well we've gone

22  sufficiently into.  I don't know --

23          MR. BUCHANAN:  I'll sum it up

24  later on down the road.

176

 1   Q       But anyway, she can't medically

 2   be here as of this date, can she?

 3   A       No.   She can't be without oxygen

 4   at all, so it's impossible for her to

 5   travel.

 6   Q       And she's just recently taken

 7   this turn for the worse.   She had

 8   planned to be here but could not.

 9   A       Yes, sir.

10   Q       Just recently we found that out.

11   A       Yes.

12   Q       She did testify at the trial;

13   did -- at the punishment phase of the

14   trial, didn't she?

15   A       Yes.   Not during the first part.

16   Q       Okay.   Referring back to your

17   testimony about the terrible fights,

18   your father was also Jon's father.

19   Correct?

20   A       Yes.

21   Q       All right.   Can you tell the

22   Judge a little bit about the father?

23   And especially his drinking and his

24   inter-reaction with your mother and

1   their conflict resolution.

2   A       Dad drank every day.  He would

3   stop at a bar on his way home from work

4   every day and typically spend about two

5   hours a day there before he would come

6   home for dinner.  On a number of

7   occasions, I'll say maybe once a month

8   or -- I don't know.  It's hard to

9   estimate times.  But, he would stay out

10  even later and not come for dinner.  On

11  those occasions we were not allowed to

12  sit down at the table and eat because if

13  we ate without him, we would -- we

14  thought that he was going to be angry

15  with us, so we had to wait for him to

16  come home.  There was one time when he

17  didn't come home.  It got to be after

18  eight at night, and no one had had

19  dinner, and it was a school night, and

20  we were loaded into the car to go

21  looking for him at a bar, and she found

22  him, and there was words exchanged

23  there, and he did come home after that.

24  He was driving crazy.

1        And one occasion there was a

2    terrible, terrible fight where he came

3    home late, and we knew there was just

4    going to be a fight.  There was no words

5    exchanged.  He came into the house, and

6    it was, like I said, in the evening

7    sometime, well after dinner.  We had all

8    been waiting for him to come home so we

9    could eat.  He walked in the house and

10   looked at her, and she looked at him,

11   and nobody said anything, and then he

12   walked over, and he took her glasses

13   from her face and threw them at the wall

14   and they shattered, and then he started

15   punching her in the face with his fists,

16   and this fight continued to where he had

17   her pinned on the floor, was pounding

18   her head on the floor.  I saw him take a

19   handful of hair and rip it out, and it

20   left a bald spot there was so much hair.

21   I never saw anything so horrible in my

22   life.  Bleeding from her nose.  Her eyes

23   were blackened.  I wouldn't be surprised

24   if ribs were broken during this fight.

179

1    She may have had -- well, I'm sure she

2    had a concussion.  She couldn't hear for

3    several days afterwards from the blows

4    to her head.  I climbed on his back and

5    tried to pull him off of her at one

6    point, and he just turned around and

7    slung his arm, and I was -- my weight

8    was on his back, and it took me through

9    the air and threw me into the wall, and

10   then I slid down the wall to the floor,

11   and it knocked the wind out of me and

12   scared me that he would hurt the kids,

13   hurt me as well.  That one ended with

14   the police coming out, and I think he

15   might have known they were coming, and

16   he laid off before they arrived.  But

17   there was blood everywhere.  The phone

18   was torn out of the wall.  Back then

19   there was not a jack but rather a hard-

20   wired phone cord, and he just tore that

21   and ripped it right out of the phone so

22   that they had to come out from the phone

23   company to rewire it.

24        MR. EARLS:  Your Honor, I

1    understand the Court's previous ruling,

2    but we're getting into a narrative here.

3    If he could ask questions, we might get

4    this testimony over.

5            MR. BUCHANAN:  That's fair.

6            THE COURT:  I agree with the

7    State.  Move along.  So of this she has

8    testified to, there was fighting in the

9    relationship, even since this witness

10   has been on the stand, when she first

11   started.

12           MR. BUCHANAN:  Yes, sir, I

13   understand.

14           THE COURT:  How she wanted them

15   to be divorced, et cetera, et cetera.

16           MR. BUCHANAN:  I wanted to refer

17   back to the fact that she --

18   Q       This was summarized as the fight

19   with fistfuls of hair when you testified

20   here at the trial; was it not?

21   A       Yes.

22   Q       You didn't go into any of the

23   detail you just went into, did you, at

24   the trial?

1  A       No.

2  Q       Was Jon -- And I don't believe

3  this was asked at the trial.   Was Jon

4  present when this terrible fight

5  happened?

6  A       Yes, sir.

7  Q       Was he in a position to see the

8  phone being ripped off the wall?

9  A       Yes.

10  Q       And all the blood and

11  everything?

12  A       Yes.

13  Q       How did your father treat Jon?

14  A       He disowned him.   He denied that

15  Jon was his son.

16  Q       Would he do that to his face or

17  just behind his back?

18  A       No, it was blatantly apparent to

19  everyone in the family and common

20  knowledge to everyone in our family,

21  that Dad didn't believe Jon was his son.

22  He treated him differently.   He was cold

23  to him.   He never gave him any attention

24  at all, and to drag home the point, he

182

1    would shower special affection on the

2    other child next older than Jon, onto

3    Joel, and treat Joel with special favors

4    and take him for ice cream or just to

5    play with him, and then if Jon was in

6    the room, he would make a big production

7    about removing himself and not giving

8    any attention to Jon, acting as though

9    he wasn't even in the room, in a very

10   hurtful way that Jon got the message

11   that, "Daddy doesn't love you."

12   Q        Okay.  When you had the

13   conversations that you had with Jeff,

14   Jon and the attempted conversations with

15   the lawyer and Sheryl and Gloria

16   Shettles, did you journalize those

17   conversations?

18   A        Yes, I did.

19   Q        Did you make contemporaneous

20   entries with what had happened in a

21   running journal?

22   A        Yes, soon as I would hang up.

23   Q        And were those entries made

24   about the time that you actually had the

1    conversation?

2    A        Yes.

3    Q        And did you have personal

4    knowledge of what you were putting down

5    in your journal?

6    A        Yes.

7    Q        And that journal is available

8    here today; is it not?

9    A        Yes.

10   Q        Do you have that journal with

11   you?

12   A        I have a series of notebooks,

13   yes, the journal, my conversations --

14   Q        Would you mind pulling them out?

15   And I'm specifically talking about those

16   things that we just questioned you

17   about, that being where you would make

18   entries contemporaneous with your

19   knowledge of what had happened with your

20   conversations on a running basis.

21   A        This could take a while.

22   Q        That's okay.  Just get to those

23   portions if you don't mind, please.

24            MR. EARLS:  Your Honor, the

```
 1   State objects to any journal being

 2   entered into evidence.  She certainly

 3   hasn't needed it to refresh her

 4   recollection, and it's not a business

 5   document.

 6           THE COURT:  That was my first

 7   thought.  Is she pursuing some notes now

 8   to refresh her recollection, or is

 9   counsel intending to attempt to

10   introduce this as an exhibit?

11           MR. BUCHANAN:  Well, I was

12   thinking it qualified, Your Honor, as a

13   business record with the contemporaneous

14   entries.  I was going to tender it that

15   way.

16           THE COURT:  It's clearly not a

17   business record exception.  Go ahead if

18   you have another thought on the matter.

19   Q       Ms. Arbogast, do you refer and

20   have you referred to these to refresh

21   your memory to come here to testify

22   today?

23   A       I'm sorry?

24   Q       Have you referred to these
```

185

1   journals to --

2   A       Yes.

3   Q       -- refresh your memory to

4   testify here today?

5   A       Yes, sir.  I just located about

6   a six-page journal summarizing a

7   conversation with Mr. Googe here on

8   11/15/94.

9           MR. BUCHANAN:  I'll tell you

10  what I'm going to do, Your Honor.  I'm

11  going -- To save some time, I'm going to

12  wait 'til we have an evening recess, and

13  I'll Xerox what I think may be needed to

14  be as a court's exhibit, perhaps.

15          THE COURT:  Under what basis

16  will you offer it as an exhibit?

17          MR. BUCHANAN:  That it was used

18  to refresh her recollection.

19          THE COURT:  You're saying that's

20  the basis to allow it in as an exhibit?

21          MR. BUCHANAN:  Well, yes, sir.

22  I -- I --

23          THE COURT:  Let me hear from the

24  State on that.

                                              186

 1         MR. EARLS:  Your Honor, first of

 2    all, she's testified here from the

 3    stand.  She hasn't referred to those

 4    notes until he brought them up.  Second

 5    of all, that exception does not make the

 6    document an exhibit.

 7         THE COURT:  It allows you the

 8    opportunity to review what she might

 9    have used to refresh her recollection.

10         MR. EARLS:  That's correct.

11         THE COURT:  But not coming in as

12    an exhibit.  So that's not a theory

13    under which the Court would accept it as

14    an exhibit.

15         Go ahead if you have further

16    argument on it.

17         MR. BUCHANAN:  Well, I guess

18    what I'm saying, I may have it -- I may

19    have it submitted as an exhibit just for

20    the record, and the reason I say that,

21    Your Honor, is that I know now that --

22    after the 1996 anti-terrorism and

23    effective death penalty act, this is the

24    last time you can get anything into the

                                        187

1   record, essentially.  I'm not saying you

2   can't but for most purposes.  So, if

3   there is a reason, I'll probably try to

4   tender it later, but I'm --

5         THE COURT:  If you do tender it,

6   then we'll talk about the State's

7   objection because they are objecting to

8   it, and so far you've not given me a

9   theory under which it can come in.

10        MR. BUCHANAN:  Right, and I

11   don't want to take time to just sit here

12   and --

13        THE COURT:  Go ahead and let's

14   finish with this witness.

15   Q     Did you have an occasion to see

16   what you thought was some conduct

17   involving a juror during the course of

18   the trial?

19   A     Yes, sir.

20   Q     Would you tell the Court about

21   that?

22        MR. EARLS:  Your Honor, the

23   State's objecting.  I don't believe

24   there's anything in the petition about

188

1    any juror misconduct that they're trying

2    to get into, and I don't think that's

3    ever been raised.

4         THE COURT:  I don't recall

5    reviewing any but go ahead and --

6         MR. BUCHANAN:  It's not the jury

7    misconduct; it's the lawyers not

8    bringing it to the Court's attention.

9    I'm not offering to show that there's

10   jury misconduct.  I'm offering it to

11   show that they have a continued pattern

12   of being told about things and then they

13   don't do anything about it.  I mean,

14   there's no way I'm ever going to be able

15   to prove misconduct.  I'm not saying

16   that.  What I am saying is that at the

17   time they were told, just like with

18   Jeff, if they had of done something

19   about it, maybe we could have.  And I

20   think that's the whole reason we're

21   here, is to show what the attorneys did

22   and what they did not do.

23        THE COURT:  I'm going to sustain

24   the objection at this point in time from

189

1    this witness.  The State didn't object

2    to what's already come in.  I'm going to

3    sustain the objection.  Move on.

4    Q      All right.  What exactly did

5    Jeff tell you about Jon that you thought

6    was important that the Court should know

7    and that his attorney should know?

8    A         Specific details included that

9    she had pointed a gun in his face when

10   he came to the house to pick up some of

11   his things.  Actually he wanted to get

12   the mail, and my mom had sent some money

13   to him, and he was planning to use that

14   money to travel to Texas.  He was going

15   to move in with Jeff in Texas and try

16   and start over in another state and

17   separate from Billie, and Mom gave him

18   some startup money.  I think it was an

19   amount of $250 in the form of a check.

20             MR. EARLS:  Your Honor, I just

21   want to emphasize for the record that

22   we've got an objection on hearsay, and I

23   haven't -- I understand the Court's

24   ruling, but still --

1          THE COURT:  Well, now, you

2   haven't specifically objected to

3   hearsay.   When we first started this,

4   you were objecting to some extent to

5   relevancy and how was it relevant, and I

6   made my ruling on that.  Now you've not

7   objected to a lot of things that were

8   hearsay.

9          MR. EARLS:  I understand.  Well

10  at this point I'm objecting to anything

11  that's coming in that has anything to do

12  with conversations with third parties

13  that she was told about or anything of

14  that nature.

15         THE COURT:  Well, make your

16  objection timely.  Don't tell me now

17  you're making some blanket objection.  I

18  understand you've objected from this

19  point to what she just testified to.  Is

20  that correct?

21         MR. EARLS:  Yes, sir.

22         THE COURT:  Does counsel want to

23  respond?

24         MR. BUCHANAN:  Yes, sir, I do.

191

1    I appreciate Mr. Earls letting her

2    testify to this point.  I understand

3    exactly what he objected to.  I can

4    understand that it would normally be

5    hearsay.  I'm offering it only to show,

6    from here on in, what she's testifying

7    to from here forward, as to what the

8    attorneys might could have gotten had

9    they gotten on the ball and gotten this

10    testimony reduced down to some sort of

11    writing.

12        THE COURT:  Well I've allowed

13    the affidavit to come in, I believe it's

14    marked Exhibit 5, and stand on my ruling

15    on that.  But as far as any other

16    testimony at this point that she's

17    giving that someone else said at some

18    other point in time, I'm not allowing.

19    I'm going to sustain the objection.

20        MR. BUCHANAN:  And I understand

21    it would be hearsay, Your Honor, and I

22    would tender it as a proffer so I can at

23    least argue it on appeal.

24        THE COURT:  So you're beginning

192

1    your proffer now.  Go ahead and ask the

2    question, and tell me when the proffer

3    is over with.

4              MR. BUCHANAN:  I will, Your

5    Honor.

6    Q    Would you please continue about

7    what Jeff -- the things that Jeff had

8    told you that gave you pause for concern

9    that you thought the attorneys should be

10   aware of and perhaps reduced to some

11   sort of admissible form of testimony?

12   A         That Jon had not been able to

13   work because he was so distressed.  He

14   was depressed and crying, and he

15   couldn't carry on a conversation without

16   breaking down, and he was very labile.

17   He would, in his conversations, say to

18   Jeff that he was so heartbroken that he

19   thought Billie didn't love him, that she

20   was involved with someone else.  He was

21   afraid that she wanted to divorce him,

22   take his children from him, and he was

23   devastated because he loved his

24   children.  He would then jump streams

1    and be distraught about not being around

2    Mom because he missed her a lot, and

3    then he would cry because Jeff was dying

4    and he wished that he could take his

5    place.  He felt like Jeff's death was

6    just too much stress, and all these

7    things simultaneously bearing down on

8    him were causing him to be acutely

9    depressed, to the point where he

10   couldn't hardly function or hold a job

11   or anything.  That coupled with the fact

12   that Billie had somehow gotten this gun

13   and was pointing guns in his face and

14   trying to provoke him and --

15   Q       I believe that was testified to

16   before the proffer, so -- unless that's

17   something new.

18   A       Just that he was acutely

19   depressed and that this situation was

20   headed for a bad outcome.

21   Q       Was there anything --

22           MR. BUCHANAN:  And still again

23   on the proffer, this question on the

24   proffer.

194

1    Q        Was there anything regarding his

2    observations of Jon there in Texas

3    specifically regarding the way the

4    police handled him and about his shoes?

5    A        About his shoes?

6    Q        Uh-huh.

7    A        I know that Jeff phoned the

8    police to come and pick up Jon.  We knew

9    that there was an APB out.  We all had

10   spoken on the phone and knew that Jon

11   needed to be brought in.  We were afraid

12   that he would be shot on sight, and we

13   wanted to get him in voluntarily so that

14   that wouldn't happen.  If Jon -- I'm

15   trying to remember something about

16   shoes, that they might have come off

17   when he had the accident and didn't have

18   -- Shoes?  I don't know what you're

19   asking.

20   Q        If you don't remember, that's

21   fine, Sheryl.  Okay.

22            MR. BUCHANAN:  Just a moment,

23   Your Honor.  One more thing on the

24   proffer.

195

1    Q        What do you know that Jeff would

2    have testified to, or you think Jeff

3    would have testified to, as regards Jon

4    knowledge of whether or not Billie was

5    dead there in Texas, when he was there

6    in Texas?

7    A        He didn't know she was dead,

8    that he clearly stated that Jon felt

9    like the police were telling him that

10   she was dead to get him to say something

11   about the fight or incriminating, but he

12   honestly didn't know she was dead.  He

13   didn't know why Jeff called the police

14   on him.  He was totally confused

15   whenever they showed up.  He didn't

16   know.

17   Q        But he didn't know that --

18   According to him, Jon didn't know she

19   was --

20   A        As far as I'm aware, --

21   Q        I'm sorry.

22   A        -- Jon found out for certain

23   when he called home, which was about

24   five days later before he was allowed to

196

1    call and speak with my mother, and she

2    -- I guess he had tried to call, and we

3    were actually attending the funeral, and

4    when we got back from the funeral, he

5    did get a call through to Mom and found

6    out at that point after the funeral that

7    she was, in fact, dead, and he had a

8    terrible breakdown during the

9    conversation.

10           MR. BUCHANAN:  End of proffer,

11   Your Honor, and I pass the witness.

12           THE COURT:  Thank you.

13   **CROSS-EXAMINATION**

14   **BY MR. EARLS:**

15   Q      Ms. Arbogast, everything that

16   you've testified to here this morning as

17   regard to Jon Hall's family situation

18   while he was growing up, you testified

19   to at trial; did you not?

20           MR. BUCHANAN:  Your Honor, I

21   want to object.  The record speaks for

22   itself.  That's totally redundant.  It's

23   18 lines.  The Court can find out

24   everything she said in about a minute

197

1    and a half.

2            MR. EARLS:   I think I can ask

3    her that.  It's a yes or no question.

4            THE COURT:   I'm going to let him

5    ask.

6            Go ahead.

7    Q       This testimony was heard at

8    trial, wasn't it?

9    A       I have to answer yes or no.  No,

10   not what -- not in any detail.

11   Q       Are you telling me that you

12   didn't testify about his family history

13   and his daddy beating his mother?

14           MR. BUCHANAN:   Well, Your Honor,

15   then I'm going to object to the form of

16   the question because testifying --

17           THE COURT:   Objection sustained.

18           MR. BUCHANAN:   Thank you.

19   Q       You were called by defense

20   counsel to testify, weren't you?  You

21   were allowed to testify.

22   A       Yes.

23   Q       Now, from the time that you left

24   for college 'til the time that the

198

1    murder happened in '94, how many times
2    had you seen Jon Hall?
3    A        At Christmas time and in '93 for
4    about a half of a week when we were all
5    home for a large family reunion, perhaps
6    some on weekends when I would come home
7    from college.
8    Q        What period of time are we
9    talking about?  When did you go to
10   college?
11   A        1977 through '79.
12   Q        So, from 1977 'til the time of
13   the homicide in '94, you'd seen him,
14   what, three, four times?
15   A        I had lived in West Virginia.
16   During that period of time, I probably
17   saw him on holidays when I would travel
18   home.  I usually would go home about
19   twice a year and I would see him then.
20   I was living out of state.
21   Q        You testified on Direct -- you
22   said you'd spent a night with him, and
23   then he came up to your mother's house
24   on one occasion.

199

```
 1   A         Yes.

 2   Q         And that was three occasions.

 3   A         Well, yeah, in addition to what

 4   I'm telling you now.  When he and Billie

 5   were married, I believe it was '94 when

 6   I went down to visit Jeff the first

 7   time, I stayed at his home on the trip

 8   down, and then a week later on the

 9   return trip I spent one night at his

10   house, and at another time, Jon was

11   traveling to visit my mother, and he

12   stayed at my house with his two girls.

13   Q         You also testified on Direct

14   that no other family member seemed as

15   interested in this case as you did.

16   A         They're interested, but they are

17   somewhat intimidated by attorneys and

18   are not certain what to say on the

19   phone.  They feel they're not being

20   listened to, and I've been a little bit

21   braver, and, therefore, I've been

22   somehow appointed in the family to be

23   the spokesperson on Jon's behalf, but I

24   have constant communication with my
```

1   siblings and with my mother in regard to

2   this and what's being done to try and

3   get his side of the story told.

4   Q        So if I understand your answer,

5   several members of your family were in

6   contact with defense counsels then.

7   A        No.  I was the only person who

8   actually had telephone contact with

9   them.  I didn't understand your

10  question.  I apologize.

11  Q        I thought you said they were

12  intimidated by the phone conversations.

13  A        They never made any phone

14  conversations.  They wouldn't even dial

15  the phone.

16  Q        And you were contacted by the

17  investigator for the defense team,

18  weren't you?

19  A        Yes, once by phone.

20  Q        And you told her all this family

21  history and everything.

22  A        Yes.

23  Q        As a matter of fact, she's the

24  one that pointed out to you about the

1    DSM-IV and this intermittent explosive

2    disorder.

3    A        Yes, sir.

4    Q        Well, then prior to her pointing

5    it out, you really never even knew it

6    applied to Jon, did you?

7    A        No, you're stating an opinion,

8    but I had full knowledge.  I'm giving

9    her this information, and we were

10   discussing the fact that Jon definitely

11   has what I always referred to as

12   rage/control disorder or a problem with

13   controlling his behavior, getting angry

14   and having short temper, and she read

15   the DSM diagnosis, and I said, "That's

16   exactly what I'm talking about."  It's

17   not as though it was the first time I

18   ever had that thought.

19   Q        Now you said that to your

20   knowledge there had been no psychiatrist

21   hired for Jon.  To your knowledge, he

22   was interviewed and evaluated by Western

23   Mental Health, wasn't he?

24   A        He was in a facility.

1   Q        He was interviewed, determined
2   to be competent to stand trial, wasn't
3   he?
4   A        Yes.
5   Q        The insanity defense didn't
6   apply to him, did it?   That was the
7   evaluation.
8   A        That was their determination.
9   Q        Okay.  He also had a
10  psychologist that was appointed by the
11  Court, didn't he?
12  A        There was somebody who he talked
13  to.   I can't remember the person's name.
14  Q        Does the name Lynn Zagler mean
15  anything to you?
16  A        Yes, I remember her.
17  Q        That was the court-appointed
18  psychologist.
19  A        Psychologist, yes, sir.
20  Q        And she testified at trial,
21  didn't she?
22  A        I wasn't allowed in.   I --
23  Q        Well the record will speak for
24  itself.

1    A        Yes.

2    Q        He was also evaluated in Middle

3    Tennessee, wasn't he, at the Western --

4    at Western -- excuse me -- Middle

5    Tennessee Health Institute.

6    A        I -- I know that at one point he

7    was hospitalized for a couple of weeks.

8    That's all I'm recalling.

9    Q        And did those people testify at

10   trial?

11   A        I don't know.

12   Q        Now, you said he had the

13   intermittent explosive disorder.  So

14   that means he'd just kind of blow up,

15   have a -- what I call a temper fit or

16   just get angry all of a sudden?

17   A        He would be provoked.

18   Q        He'd have to be provoked?

19   A        Yeah, 'cause normally Jon was a

20   very tender-hearted, easygoing guy.

21   Q        Did you ever see him get angry

22   with his children?

23   A        No, I did not.

24   Q        Did you ever see him get angry

1   with anyone other than his wife?

2   A       Sibling fights with Joel

3   perhaps, yeah.  I didn't witness fights

4   with Jon and my mom.  I know they had

5   arguments.  I'd hear about them, but I

6   was not there.

7   Q       You also testified that he had a

8   tendency to disconnect phones when he

9   wanted people to pay attention to him.

10  A       Yes, sir.

11  Q       And on the incident where he

12  disconnected your mother's phone, it was

13  because she was trying to call her

14  daughter?

15  A       Her sister.

16  Q       Her sister.

17  A       Jon's aunt.

18  Q       He didn't want her getting any

19  help?

20  A       He didn't want her to leave.  He

21  wanted to resolve what they were arguing

22  about.

23  Q       So he was going to be in control

24  of that situation, wasn't he?

1  A        I su- -- I don't know how to

2  answer.  I believe he just wanted her to

3  stay and listen to him.

4  Q        You said that you -- Did you

5  ever observe bite marks on Jon?

6  A        Personally, no.

7  Q        You never saw that.

8  A        No.  I spoke with my mom.

9  Q        Did you know that Billie had an

10 order of protection against Jon Hall?

11 A        Yes, I did.

12 Q        And, you were not a witness to

13 anything that occurred on the night of

14 the homicide, were you?

15 A        No.  I was trying to reach him

16 by phone that night.

17 Q        Okay.  But you weren't present

18 when the homicide occurred.

19 A        No.

20 Q        You never saw Jon that night,

21 did you?

22 A        I was out -- in a different

23 state.

24 Q        Okay.  Didn't talk to him that

1    night either, did you?

2    A        I tried.

3    Q        You absolutely know nothing

4    about what happened on the night of the

5    homicide, personally.

6    A        How could I if I was out of

7    state?

8            THE COURT:  Ma'am, you're not to

9    ask questions, you're to answer

10   questions.

11           Go ahead, General.  Ask again.

12           THE WITNESS:  Sorry.

13   Q        You know absolutely nothing

14   about what happened on the night of the

15   homicide, do you?

16   A        I know what I've been told.

17   Q        But that's all you know.

18   A        I wasn't there.

19           MR. EARLS:  That's all I have.

20           THE COURT:  Anything further of

21   this witness?

22           MR. BUCHANAN:  Yes, sir.  We're

23   not going to do this ever again

24   probably, but I would ask that Mr. Ellis

207

1    be allowed to ask her about four

2    questions for a foundation on 804, which

3    he did the research on.  It'll be a lot

4    better to do it, if you don't mind.  I'd

5    have to stumble through it.

6             THE COURT:  Does the State

7    object?

8             MR. EARLS:  Yes, sir.

9             THE COURT:  It's not the normal

10   - -

11            MR. ELLIS:  I'll write it out,

12   Your Honor.  That's fine.  I'll write it

13   out.

14            THE COURT:  It's not the normal

15   procedure, but I'm going to allow it to

16   save time, even over State's objection.

17            MR. BUCHANAN:  That was my idea

18   to save a little time, Your Honor.

19   **REDIRECT EXAMINATION**

20   **BY MR. ELLIS:**

21   Q       Your brother had AIDS?  Or what

22   was his diagnosed condition?

23   A       He had AIDS.

24   Q       Okay.  And as a registered

208

1  nurse, what's usually the prognosis of

2  that?

3  A      It's a lot better now than it

4  was when he was diagnosed back in the

5  mid-eighties, but he survived nine

6  years.  I knew once his T-cell count hit

7  50, he would get infection after

8  infection until he died.

9  Q      So, did he --

10      THE COURT:  Let me interrupt a

11  second.  Is for purposes of the

12  affidavit that's been admitted as

13  Exhibit 5?

14      MR. ELLIS:  No, Your Honor.

15  This is going to be for purposes of the

16  offer of proof.  What I was going to do

17  to save time was when we break for

18  lunch, that we would take that back up

19  again and change that from an offer to

20  proof to actual admitted testimony.

21      THE COURT:  Regarding her

22  conversations with --

23      MR. ELLIS:  With Jeff.

24      THE COURT:  -- the deceased

1    brother which has already been made.

2         MR. ELLIS:  Right.

3         THE COURT:  You're just trying

4    to lay the foundation to argue to the

5    Court it should be accepted.

6         MR. ELLIS:  Exactly, Your Honor.

7         THE COURT:  Okay, go ahead.

8    Q    Did he know --

9         MR. EARLS:  Just to preserve the

10   State's objection on it, first of all,

11   it's hearsay.  It's also been ruled on

12   by the Court of Criminal Appeals.  That

13   issue was raised when -- They offered

14   this proof at trial.  Judge LaFon

15   refused to let it in.  That issue was

16   raised at the Court of Criminal Appeals

17   and they rejected it.  It's a previously

18   determined issue as to the admissibility

19   of her testimony about what Jeff would

20   have said.

21        MR. ELLIS:  Not the affidavit,

22   Your Honor, but -- The affidavit was not

23   ruled on.

24        THE COURT:  Well I've allowed

210

1    the affidavit in.

2            MR. ELLIS:  Right.  Your Honor,

3    I'm sorry.  Let me check.

4            THE COURT:  Does that conclude

5    this witness?

6            MR. ELLIS:  Yes, Your Honor.

7            THE COURT:  Anything further?

8    Is she free to go or stay in the

9    courtroom as she chooses?

10           MR. BUCHANAN:  She's free to be

11   released, Your Honor.

12           **(WITNESS EXCUSED.)**

13           MR. ELLIS:  Your Honor, we've

14   got two people I really need to get out

15   of here, actually three.  This may push

16   us past 12:30.

17           THE COURT:  That's fine.  Just

18   call your next witness, and I appreciate

19   the update.

20           **PAMELA FOREMAN** was called and

21   being first duly sworn, was examined and

22   testified as follows:

23           MR. BUCHANAN:  Your Honor, we're

24   going to ask Ms. Arbogast to get out and

211

1  check something at lunch, just to play

2  it safe.

3         THE COURT:  Ms. Arbogast, you

4  are to remain outside and instructed and

5  reminded not to discuss your testimony

6  with anyone.  The rule still applies to

7  you at this point in time.  Counsel has

8  changed their mind.  So just remember,

9  no discussion of your testimony and

10  remain outside.  Thank you.

11  **DIRECT EXAMINATION**

12  **BY MR. ELLIS:**

13  Q       For the record, please state

14  your name for the Court.

15  A       Pamela Foreman.

16  Q       Ms. Foreman, where do you live?

17  A       I live at 389 North Main Street

18  in Lexington, Tennessee.

19  Q       Ms. Foreman, on the night of all

20  these events, did you live at 480

21  Pleasant Hill Drive?

22  A       Yeah.

23  Q       And who lives there?

24  A       At my house?

212

1  Q       Yes, ma'am.

2  A       It was me, my mother and my

3  grandfather.

4  Q       Do you know Jon Hall?

5  A       Yeah.

6  Q       How do you know Jon?

7  A       Well, he was my neighbor, and

8  also I used to baby-sit for them.

9  Q       Did you have a chance to see --

10  Did you know who Billie Hall was?

11  A       Yeah.

12  Q       Okay.  Did you have a chance to

13  see them interact with each other?

14  A       Not with -- about like

15  arguments, that's about it, but not

16  really.

17  Q       Okay.  Did you ever have a

18  chance to just interact with Jon Hall?

19  A       No.

20  Q       You didn't talk to Jon or -- You

21  said you babysat his kids.  Did he just

22  drop them off and leave or ...

23  A       Well usually I went to the house

24  to baby-sit the kids.

213

1   Q        And why would you be the one to

2   baby-sit the children?

3   A        Well Billie asked me while they

4   was at work would I watch the kids like

5   when we get off -- you know, home from

6   school.  So ...

7   Q        Would you always watch the kids

8   or would somebody else watch the

9   children?

10  A        Well, I was there most of the

11  time, you know.

12  Q        Did Mr. Hall ever watch the

13  children?

14  A        Yeah, he did.

15  Q        Did you ever observe him with

16  the kids?

17  A        I observe?

18  Q        Did you ever watch him with his

19  children?

20  A        Yeah, sometimes.

21  Q        How did he treat his children?

22  A        I'll say fairly.

23  Q        Did he treat them fairly well?

24  A        Yeah.

1   Q       Would -- I think you stated one

2   reason was that you had babysat was they

3   worked.

4   A       Yeah.

5   Q       Would there be another reason

6   why Jon couldn't watch the kids and you

7   would have to baby-sit?

8   A       No.

9   Q       Do you know if Jon drank?

10   A       Yeah.

11   Q       Okay.   When Jon babysat the

12   kids, did you watch him cook and clean

13   or do anything like that?

14   A       Yeah, I was down there and he'd

15   been a cook.

16   Q       How about, did you ever watch --

17   did you ever watch Jon fix anybody's

18   cars?

19   A       Yeah.

20   Q       Did he ever fix your car?

21   A       No, I didn't have a car at the

22   time.

23   Q       How about anybody in your

24   family's?

215

1    A        Well, no.  Mostly like neighbors

2    I've seen him fix on the cars.

3    Q        And do you know if he took money

4    in exchange for that, or ...

5    A        I don't know.

6    Q        Did you talk to the D.A.'s

7    office about what happened that night?

8    A        No.

9    Q        Did you talk to any defense

10   counsel?

11   A        No.

12   Q        Did you talk to any private

13   investigators other than Ms. Higuera, I

14   believe this lady right here, about what

15   happened that night?

16   A        No.

17   Q        About Jon, about how they

18   interacted?

19   A        Unh-unh.

20   Q        Is that a -- She's got to write

21   this down, and I'm just asking you to

22   answer out loud so she can --

23   A        Okay, no.

24   Q        I'm sorry.  So you didn't talk

216

```
 1    to anybody about what you knew.
 2    A        No.
 3    Q        Did Mr. Hall ever work on your
 4    grandfather's car?
 5    A        Not to my knowledge.  I mean, I
 6    don't remember.
 7             MR. ELLIS:  Your Honor, I pass
 8    the witness.
 9             THE COURT:  Does the State have
10    any questions of this witness?
11             MR. EARLS:  No questions.
12             (WITNESS EXCUSED.)
13             JACKIE BRITTAIN was called and
14    being first duly sworn, was examined and
15    testified as follows:
16    DIRECT EXAMINATION
17    BY MR. ELLIS:
18    Q        For the record, sir, would you
19    please state your name?
20    A        Jackie Brittain.
21    Q        Can you spell your last name,
22    please?  There's some confusion about
23    that.
24    A        B-r-i-t-t-a-i-n.
```

217

```
 1  Q        Thank you, sir.  Where do you

 2  live, sir?

 3  A        255 Ayers Street.

 4  Q        And that's in Lexington,

 5  Tennessee?

 6  A        Yes, sir.

 7  Q        Did you live there on the night

 8  that all this stuff took place?

 9  A        No, sir, I lived at Chumney's

10  Trailer Court at the time.  It was on

11  Church Street.

12  Q        Thank you, sir.  Do you know Mr.

13  Jon Hall?

14  A        Sure do.

15  Q        How did you first meet Jon?

16  A        He knew my wife.  They run the

17  -- He done the mechanic work and my wife

18  and one of her ex-husband's had a

19  cleanup shop.  They was in business

20  together, and I met Jon through her.

21  Q        Were y'all friends?

22  A        Yeah, me and Jon was.

23  Q        Did you get to hang out with

24  them much?
```

218

1   A        Yeah, we run around together.

2   Q        Did you know his wife, Billie

3   Hall?

4   A        Yeah.

5   Q        Did you get to interact with

6   them?

7   A        No, not with Billie, not a whole

8   lot because him and her had started

9   having problems, and he had came -- he

10  started staying with us because he

11  needed a place to say.

12  Q        'Cause she asked him to leave?

13  A        That's the way -- That was my

14  understanding, she had asked him to

15  leave, had a restraining order against

16  him or whatever.

17  Q        So you -- But you had a chance

18  to hang around Jon a lot.

19  A        Uh-huh.

20  Q        So you got to see his moods and

21  how he acted?

22  A        Also got to see restraining

23  order being broke by the deceased coming

24  by to try to talk to him.

219

1           MR. EARLS:  Your Honor, that's

2    not responsive to any question.

3           THE COURT:  Instruct the witness

4    to please respond to the question asked.

5    Thank you.

6           You may ask, Counsel.  Ask the

7    question again if you wish.

8    Q      Did you have a chance to watch

9    Jon's moods?

10   A      Yes.

11   Q      Now you were going into -- Were

12   you there present when the restraining

13   order was served?

14   A      Well I wasn't there when the

15   restraining order was served on, no.

16   Q      Were you there -- Did you watch

17   him while -- during the course of that

18   time?

19   A      Yeah.  He was -- He was -- He

20   was in and out there at our house.

21   Q      Did Billie Hall ever come by

22   your house during the time of this

23   restraining order?

24   A      That's -- Yes.

1  Q       And what would she do?

2  A       She had come by the house, asked

3  him to come and work on vehicles that

4  was there at the house and one thing and

5  another, you know, which, you know,

6  that's all I can -- I can say 'cause I

7  don't -- I don't know what y'all want to

8  hear.

9  Q       We just want you to tell the

10  truth, Your Honor -- truth, Mr.

11  Brittain.

12  A       Well, I mean, whenever I start

13  to say something I'm cut off, so ...

14        THE COURT:  Instruct the witness

15  again just to simply answer the

16  question.  The question will be asked

17  and you'll respond to the question.

18  Q       Mr. Brittain, I apologize if I

19  cut you off.  Is there something that I

20  cut you off on that you would like to --

21  A       No.  The only thing I couldn't

22  understand was how there could be a

23  restraining order against a man but then

24  the person --

221

1           THE COURT:  Now the witness is

2    not to ask questions.  I'm going to let

3    counsel now ask the next question.  The

4    witness is not to ask questions; you're

5    to answer questions.

6           Go ahead, Mr. Ellis.

7    Q      Whose assets -- Whose name were

8    all the assets that the Halls owned in?

9    A      Supposably they was supposed to

10   been --

11          MR. EARLS:  Now I object to any

12   supposedly.

13          THE COURT:  Please instruct the

14   witness, you can testify of things of

15   your own personal knowledge, that you

16   know.  So with that instruction, I'll

17   let counsel ask the question again.

18   A      Well to my knowledge, what I had

19   been told --

20          MR. EARLS:  Now, objection, Your

21   Honor.

22          THE COURT:  The State's

23   objected.  He said what he'd been told.

24   Unless you have comment, I'll sustain

222

1    the objection.

2            MR. ELLIS:  Your Honor, actually

3    I'd ask for a little -- "Who told you?"

4    If he can correctly answer who told him

5    that, then it's going to come in maybe

6    under an exception.

7    Q       Who told you that?

8    A       Jon.

9            MR. EARLS:  Same objection.

10           THE COURT:  I'll sustain the

11   objection.  That will be stricken.  I

12   won't consider the response.

13   Q       Were you supposed to testify at

14   trial?

15   A       I was called and asked -- was

16   told to.

17   Q       Who called you, sir?

18   A       It was Jerry Woodall's office,

19   the District Attorney's office.

20   Q       Did you testify?

21   A       No.

22   Q       Did you come to court?

23   A       Yes.

24   Q       Did you have to wait outside

1   like you did?

2   A       Yes, but it was all different

3   then.

4   Q       Did you -- Do you know who Jerry

5   Woodall is?

6   A       I did at the time.  Yes, I seen

7   him.  I've seen him around.

8   Q       Did you see him outside before

9   -- outside interacting with people?

10  A       Yeah.

11  Q       Who did he interact with that

12  you can remember?

13          MR. EARLS:  Your Honor, object

14  to the relevancy.

15          MR. ELLIS:  Again, Your Honor,

16  may I?  Briefly, Your Honor, this is

17  something that defense counsel could

18  have inquired into if they had talked to

19  him.  He's going to talk about

20  interaction with the children, giving

21  them candy, the fact that Mr. Dutton had

22  fast food, which is not something that

23  is jail-issue food, and they could have

24  explored that.

224

1          THE COURT:  Who had fast food?

2          MR. ELLIS:  Mr. Dutton.

3          MR. EARLS:  I don't know what

4    that's got to do with anything, Your

5    Honor.  Jerry Woodall's the District

6    Attorney.  If he's not allowed to talk

7    to his witnesses, nobody is.

8          MR. ELLIS:  Well, Your Honor, --

9          THE COURT:  I'm going to sustain

10   the objection.  Move along with this

11   witness as to anything relevant he might

12   have.

13         MR. ELLIS:  Briefly for the

14   record, Your Honor, we would argue that,

15   giving Mr. Dutton food that's not

16   jailhouse-issue is more than just

17   talking with the witness, and also

18   giving candy to children is an improper

19   prompting of what to say and kind of a

20   reward, benefit reward.

21         THE COURT:  You're just making

22   those comments and further argument to

23   your position?

24         MR. ELLIS:  Yes, sir.

225

1          THE COURT:  I stand on my

2   sustaining the objection.  Move along.

3   Q          Did you have a chance to talk to

4   defense counsel in this case?

5   A          You talking about Jerry Woodall?

6   Q          No, sir.  Did you have a chance

7   to talk with Mr. Carthel Smith?

8   A          No.  Carthel Smith, I believe

9   they was dismissed before he ever really

10  got to talk to us about it.

11  Q          Did you talk to any of Jon's

12  attorneys?

13  A          The ones that represented him

14  here in Jackson.  I don't remember who

15  they was.

16  Q          Do you remember what you talked

17  about?

18  A          They just asked about me and Jon

19  running around together.

20  Q          When did they contact you?

21  A          I don't really remember what the

22  dates was it's been so long now.

23  Q          Did they talk to you before

24  trial?

226

1    A        Yeah.

2    Q        Did they talk to you -- Was the

3    first time they talked to you at the

4    courthouse?

5    A        I believe so.  It was like

6    whenever we walked in.

7    Q        So that was the first time you

8    spoke with any attorney for Jon.

9    A        Yeah.  They walked up -- Best of

10   my knowledge, they walked up and

11   introduced theirself then.

12   Q        Does anything stick out in your

13   mind about them being upset -- Well,

14   strike that.  Does anything stick out in

15   your mind about their demeanor towards

16   Jon?

17   A        I don't -- I guess I would be

18   biased about it because I know Jon.  I

19   just -- I just didn't think that it was

20   -- he was represented right.  I don't

21   know.  Just didn't seem right to me the

22   way it was done.  I don't know.

23           MR. EARLS:  Again, he's stating

24   his opinion and not responsive to the

227

1   question.

2           THE COURT:  Objection sustained.

3   Q       Did they specifically have issue

4   with Jon -- with any of Jon's issues

5   that you wanted raised?  Let me strike

6   that.  Did they ever talk about a flag,

7   something about a flag?

8   A       Yeah.  Yeah, that was brought

9   up, and the Judge -- I believe the Judge

10  -- best of my knowledge, the Judge told

11  him as long as he's sitting there -- it

12  was something to do with something --

13  the eagle or something that was on the

14  flag, and there was a big deal about

15  that, and I believe, if I'm not

16  mistaken, they told Jon that they could

17  remove him from the courtroom or

18  something but that was staying.

19  Q       What did counsel have to say

20  about Jon's flag issue, if you remember?

21  A       I don't really remember them --

22          MR. EARLS:  Objection hearsay.

23  A       -- saying a whole lot of

24  nothing.

228

1          THE COURT:  Hold on just a

2    minute.  He's objecting to hearsay.

3          MR. ELLIS:  That's a party

4    opponent, Your Honor.  We're attacking

5    the credibility or the effectiveness of

6    counsel.  They would be on the opposite

7    side, so that comes in under 801(b)(2).

8          MR. EARLS:  Your Honor, I don't

9    think --

10          THE COURT:  Do you want to

11    respond further?

12          MR. EARLS:  Well I don't think

13    he's a party opponent on that.  But it's

14    hearsay.  It's not relevant to anything

15    that --

16          THE COURT:  What's the relevancy

17    in what problem they had or discussion

18    they had on the flag issue?  Some judge

19    has already ruled on that prior to the

20    trial, I take it?

21          MR. ELLIS:  Well, again, Your

22    Honor, it goes to they were upset with

23    Jon, that they weren't -- they didn't

24    have their whole heart into it.  It goes

229

1    to the ineffective assistance of

2    counsel.

3        THE COURT:  You're asking to

4    prove that through this witness.

5        MR. ELLIS:  I asked him

6    specifically what was their demeanor

7    about that issue, about their attitudes

8    toward Jon.

9        THE COURT:  Objection sustained.

10   Move along.

11   Q    Do you know Jon to have a

12   temper?

13   A    I have never -- Not up until

14   this time, this happened, because the

15   night in question when the law come to

16   my house looking for him, I thought that

17   they was looking for the wrong person.

18       MR. EARLS:  Your Honor, he's not

19   responding to the question again.

20       THE COURT:  Just respond to the

21   question asked.  That will be stricken.

22   I won't consider it.

23   A    No, I've never seen Jon lose his

24   temper.

```
 1            THE COURT:  Go ahead.
 2   Q        Did you ever see Jon interact
 3   with his children?
 4   A        Yes, and I seen him inter-react
 5   with my children, sit in the floor and
 6   play with my children.
 7   Q        And how would he interact with
 8   your children and his own children?
 9   A        Just like any other father would
10   with their kids, sit and play with them,
11   and, I mean, my son at the time, Jon sat
12   and was playing with cars with my son in
13   the floor just like I would.
14   Q        Do you ever -- Do you know of
15   any instances where what I would term
16   Jon being a white knight, where he
17   helped somebody out or ...
18   A        Two days before this incident
19   was supposably have happened, one of our
20   neighbors and his wife was into it,
21   fussing and arguing, and the man was
22   standing over his wife fixing to hit
23   her, and Jon walked out and stopped it,
24   and the man told him, "I've got a
```

                                              231

1  license for her.  She's my wife."  Jon

2  informed him then, "You may have a

3  license, but that don't give you the

4  reason to beat her."

5  Q      Did you tell defense counsel

6  that story?

7  A      Yes.

8  Q      And to your knowledge, did they

9  ever use that?  You weren't called to

10  testify at all.

11  A      I wasn't called to testify.

12  Q      So you never got to put into the

13  record what you saw.

14  A      Unh-unh.

15  Q      How about other incidences where

16  he helped people out with --

17  A      Well me and my -- the woman I'm

18  with now, married to now, we were

19  stranded one time.  It was like 1:30,

20  2:00 in the morning.  She called Jon.

21  Jon come picked us up, carried us home,

22  went back the next day, got our car,

23  fixed it for us.

24  Q      Did he charge you?

232

1  A        Told us to pay him when we

2  could; if we couldn't, not to worry

3  about it.

4  Q        Did you tell the defense counsel

5  that?

6  A        Defense counsel didn't ask me a

7  whole lot of anything.  Anything -- If

8  I'd go to answer them, they was -- just

9  cut me off.

10  Q        Mr. Brittain, were you present

11  during the hearing for the protection

12  order?

13  A        I was in General Sessions

14  whenever there was -- it was something

15  that was said about the protection that

16  was brought up because at the time,

17  there was a subject brought up about a

18  gun being pulled on him or something,

19  and there was a bunch of argument about

20  all that.  That was in General Sessions

21  in Lexington.

22  Q        Was Jon getting upset during

23  that hearing?

24  A        Yeah, he did kindly get upset a

233

1    little bit because they wouldn't listen,

2    they wasn't listening to what he was

3    having to say.  He was wanting to know

4    what the restraining order -- how did it

5    -- more or less how did it work, that it

6    was -- that the restraining order -- he

7    couldn't go to his house, but she could

8    come to where he was at.  He was wanting

9    to know how it worked.

10   Q        And I think you testified, but

11   just to make sure, did she come to his

12   -- over to your place?

13   A        She come to the trailer where he

14   was staying at and asked him to come to

15   the trailer -- to their house to work on

16   the car.

17   Q        While the order of protection

18   was in --

19   A        While the order of protection

20   was supposed to be in for us.

21   Q        Mr. Hall wants me to ask if Mrs.

22   Hall lied about the gun in order to get

23   the protection order.

24            MR. EARLS:  Objection, Your

234

1    Honor.   There's no basis of knowledge

2    laid first of all.   I'd like to hear the

3    basis.

4    Q      Do you know if Mrs. Hall had a

5    gun?

6    A      Yes, I do.

7    Q      Do you know if she carried that

8    gun?

9    A      Yes, I do.

10   Q      Do you know, was she asked

11   during the order of protection if she

12   had a gun?

13   A      Yes.

14          MR. EARLS:   Object to hearsay,

15   Your Honor.

16          MR. ELLIS:   Declarant's

17   unavailable.   It's also Mrs. Hall.

18          THE DEFENDANT:   Court of record.

19          MR. EARLS:   Well then produce

20   the record.

21          THE COURT:   I was fixing to say.

22   I don't have the record.   I think that's

23   the way it would come in, if at all.

24          THE DEFENDANT:   That's

                                        235

1    ineffective counsel.

2            MR. ELLIS:  Then, Your Honor, we

3    would ask time to grab this record, to

4    put it in, and that we preserve the

5    record today so that we --

6            THE COURT:  You wouldn't need

7    this record, you agree, to put in that

8    record.

9            MR. ELLIS:  Excuse me, Your

10   Honor?

11           THE COURT:  You're not saying

12   you need this witness to put in that

13   record.

14           MR. ELLIS:  No, Your Honor.

15           THE COURT:  So why are you

16   asking the right to reserve it if you

17   can get it?  You don't need this witness

18   who's on the witness stand.

19           MR. ELLIS:  But, Your Honor, I

20   do want to ask this witness questions

21   based on that hearing that could have

22   been used at trial to discredit Mrs.

23   Hall or been used potentially to --

24           MR. EARLS:  Your Honor, you

1    can't impeach someone who's dead and

2    never testified, Your Honor.  I don't

3    see the relevancy of that or how it

4    would even been admissible to impeach

5    her.

6        THE COURT:  You're talking about

7    impeaching her when she was -- for

8    testimony she made when she was alive at

9    a hearing, and whether or not she was

10   truthful at that hearing.  Of course,

11   she didn't later testify.  Obviously she

12   was deceased for the purposes of this

13   trial for which Mr. Hall is

14   incarcerated.

15       MR. ELLIS:  But, Your Honor, it

16   would also go to the fact that -- again,

17   it goes back to the theory that counsel

18   was -- what we appear to believe was

19   arguing voluntary manslaughter.  This

20   would have gone to the heart of

21   provocation, that there was a history of

22   this stuff going on, that at the time

23   that she testified, there's independent

24   recollection that she was lying under

1    oath, you know.  I think it goes -- it's

2    very germane to the issue.

3         THE COURT:  If I recall what

4    questions you've asked this witness, I

5    don't know -- there's proof in the

6    record at this point that this witness,

7    this particular witness, was there at

8    the time the alleged pulling of the gun

9    occurred.  So assume you bring the

10   transcript in and she says she didn't

11   have a gun.  I don't know that this

12   witness was there to say she had a gun.

13   I don't -- He's testified she owned one.

14   But we're talking about a specific time

15   in the past where this gentleman, Mr.

16   Hall, was accused of an incident

17   involving a gun with his wife.

18   Q       Did you see Mrs. Hall pull a

19   gun?

20   A       I did not see her pull the gun.

21   Q       During the course of the

22   hearing, was she asked specifically

23   whether she pulled the gun or did she

24   own the gun?

1              MR. EARLS:  Your Honor, again,

2    object to hearsay.

3              THE COURT:  I sustain the

4    objection.

5              Pass the witness?

6              MR. ELLIS:  Just a second, Your

7    Honor.

8              We pass the witness, Your Honor.

9              THE COURT:  Questions, General?

10   **CROSS-EXAMINATION**

11   **BY MR. EARLS:**

12   Q      Mr. Brittain, you gave a

13   statement to law enforcement right after

14   this homicide, didn't you?

15   A      Yes, sir.

16   Q      And you talked to the TBI,

17   didn't you?

18   A      Yes.

19   Q      Did you ever tell TBI that Mr.

20   Hall had threatened to kill his wife?

21             MR. BUCHANAN:  Your Honor, I

22   want to object.  That's outside the

23   scope of Direct.

24             MR. EARLS:  I don't think it is,

                                          239

1   Your Honor.   They called him to see what

2   he --

3   A        Well I was --

4            THE COURT:   Hold on --

5   A        I was threatened --

6            THE COURT:   -- a minute 'til I

7   tell you you can respond, sir.   Do you

8   understand?   Do you understand?

9            THE WITNESS:   This is not --

10  Yes, sir.

11           THE COURT:   General, go ahead.

12           MR. BUCHANAN:   Is that overruled

13  or --

14           THE COURT:   I want to -- We're

15  making argument right now.   When I said,

16  "Go ahead," he interrupted me by

17  responding.

18           Go ahead.

19           MR. EARLS:   Your Honor, I was

20  offering it to show that if he was

21  called to testify, one reason why

22  defense counsel wouldn't call him, and

23  after I establish this foundation, I'm

24  going to show why the State didn't call

1    him.

2            MR. BUCHANAN:   Well, Your Honor,

3    the main reason we tendered him up is to

4    show that he had relevant testimony as

5    to Jon being a white knight and would

6    come to the aid of other people and how

7    much he was interviewed by defense

8    counsel prior to.  I don't see how that

9    opens the door to what all has Jon ever

10   said to the TBI.

11           MR. EARLS:   Well, if he's a

12   white knight, Your Honor, and he's

13   threatening to harm his wife, it's --

14           THE COURT:   Overrule the

15   objection.  You may ask.  Go ahead.

16   Q      Did you make a statement to TBI

17   that Jon threatened to hurt his wife?

18   A      Yeah.

19           THE COURT:   I'm sorry, I didn't

20   hear.

21   A      Yes, sir.

22   Q      Now, subsequent to that

23   statement, do you recall -- Do you know

24   Jack Wilson, investigator for the

                                              241

1    District Attorney's office?

2    A        Not by name.

3    Q        Do you remember me?

4    A        I've seen you around.

5    Q        Do you remember myself and Jack

6    Wilson coming to your trailer in

7    Lexington, Tennessee and trying to serve

8    a subpoena on you?

9    A        No, I don't.

10    Q        Do you recall telling people

11    from the District Attorney's office that

12    you were not going to testify for the

13    State, that you were going to testify

14    for Jon?

15    A        No.

16    Q        Never made that statement?

17    A        No.

18            MR. EARLS:   That's all I have,

19    Your Honor.

20            THE COURT:   Anything further of

21    this witness?

22    **REDIRECT EXAMINATION**

23    **BY MR. ELLIS:**

24    Q        Actually, I believe you were

242

1    just asked whether you were -- both

2    threatened your wives?

3    A        Well I -- like -- what I started

4    to say, I've been mad and I've

5    threatened mine.  I've had three.  I've

6    got two different -- had two different

7    wives, and in a fit of anger, just about

8    any man in this room, if they'd tell the

9    truth, they'd probably made the same

10   remark, that they would hurt their wife

11   or kill their wife.

12   Q        Well, specifically when you and

13   Mr. Hall were talking about it, what was

14   the manner of the conversation?

15   A        Cutting up and going on.

16   Q        You were joking around?

17   A        Joking around.  There wasn't no

18   like -- like, I'm going to take a

19   machete or something and go do it, you

20   know.

21            MR. ELLIS:  Nothing further,

22   Your Honor.

23            THE COURT:  Questions, General?

24            MR. EARLS:  No, sir.

243

1          THE COURT:  Is this witness free

2     to leave?

3          MR. ELLIS:  Yes, Your Honor.

4          THE COURT:  You're free to go.

5          MR. EARLS:  I wish to recall

6     him, Your Honor.  I did not anticipate

7     him -- I've got his statement, and I may

8     want to recall him.

9          THE COURT:  You're to remain

10    outside.  You're not to discuss your

11    testimony with anyone, and we'll let you

12    know if you're released later, but

13    remain outside and do not discuss your

14    testimony.  Thank you.

15         **PAMELA BRITTAIN** was called and

16    being first duly sworn, was examined and

17    testified as follows:

18         MR. ELLIS:  Your Honor, before

19    we begin, I would ask that under the

20    rules of evidence, that Mrs. Brittain be

21    -- that I be allowed to cross-examine

22    her under 611 as a hostile and adverse

23    witness.  I know that I am the one that

24    subpoenaed her.  However, before we

                                        244

1    spoke, she conveyed some opinions to me

2    that would have me believe that she may

3    not be cooperative with me.

4              MR. EARLS:  I'd ask that he

5    establish that first.

6              THE COURT:  I agree with the

7    State.

8    **<u>DIRECT EXAMINATION</u>**

9    **<u>BY MR. ELLIS:</u>**

10   Q       Mrs. Brittain, did you talk with

11   me outside in the hall?

12   A       Yes, I did.

13   Q       And you told me that I better

14   not call you, didn't you?

15   A       No, I didn't say that exactly.

16   Q       What did you exactly say?

17   A       I said I don't think I would be

18   the best witness for you at this time.

19   Q       And you expressed to me your

20   opinion about Mr. Hall.

21   A       Yes, I did.

22   Q       And that was, what I would deem,

23   a negative opinion?

24   A       Yes, I would suggest that.

245

1  Q        And that you're pretty upset you

2  had to be here?

3  A        I was not upset that I had to be

4  here.  I was upset that y'all didn't

5  give us enough time to -- You subpoenaed

6  us yesterday afternoon.

7  Q        Right.

8  A        That's what I was upset about.

9  Q        But you are upset that you're

10 here right now.

11 A        No.

12 Q        Okay.  Well for the record,

13 what's your name?

14 A        Darlene Brittain.

15 Q        And where do you live?

16 A        255 Ayers, Lexington, Tennessee.

17 Q        And, where did you live on the

18 night in question when all this took

19 place?

20 A        500 West Church Street,

21 Lexington, Tennessee.

22 Q        Do you know Jon Hall?

23 A        Yes, very well.

24 Q        And how did you first meet Jon?

246

1    A        I met Jon back in 1990.  His

2    wife was coming -- was looking for him

3    for a job, and I had an automo-detail

4    clean up shop in Huntingdon, and I

5    leased him the bay next to me for him to

6    be a mechanic, and that's how I got to

7    know Jon.

8    Q        Did you watch him interact with

9    -- Well, did you guys talk a lot?

10   A        Oh, yes.

11   Q        Did you watch him interact with

12   customers?

13   A        Yes.

14   Q        Did you ever have occasion to

15   watch him, what I call, cut people a

16   break?

17   A        Oh, very much.  I never saw Jon

18   ever been angry with anybody ever.

19   Q        What about, would there be times

20   when individuals would come in and

21   couldn't pay right away?

22   A        Sure.

23   Q        And how would Jon handle that?

24   A        "Well, just do what you can."

247

```
 1   Q        And he was pretty lenient with

 2   them?

 3   A        Oh, absolutely.

 4   Q        So he would basically cut them a

 5   break.

 6   A        Oh, sure.

 7   Q        Did Jon drink?

 8   A        No, not on a regular basis.  I

 9   wouldn't call Jon -- Did he ever take a

10   drink?  Sure.

11   Q        Did you ever watch him get

12   drunk?

13   A        No.

14   Q        Did you ever watch him do pot?

15   A        No.

16   Q        Have you ever seen Jon drink

17   whiskey?

18   A        No.

19   Q        Hard liquor?  Do you remember

20   speaking with my investigator, April

21   Higuera, this lady right here?

22   A        Uh-huh.

23   Q        And when you talked to her, you

24   told her the truth, didn't you?
```

                                              248

1    A        Yeah.  I think I did, yeah.

2    Q        So if Ms. Higuera in her notes

3    stated that you'd seen Jon drink alcohol

4    and hard liquor, that'd be incorrect?

5    Would she be making it up?

6    A        No, she wouldn't be making it

7    up.  She caught me at a very bad time.

8    I had been asleep, and I wasn't really

9    coherent at that time.

10   Q        Had you ever seen Jon drink

11   beer?

12   A        Yes.

13   Q        And what did beer do to Jon?

14   A        Made him giddy.

15   Q        In fact, made him drunk?

16   A        Yeah, but I never saw him

17   violent ever.

18            MR. ELLIS:  Again, Your Honor,

19   instruct the witness to answer the

20   questions asked, please.

21            THE COURT:  Instruct the witness

22   to answer the questions.

23   Q        Did you watch Jon and Billie

24   interact?

```
 1   A        Did I do what?

 2   Q        Did you ever watch Jon and

 3   Billie talk to each other?

 4   A        Oh, yes.

 5   Q        How would Billie treat Jon?

 6   A        Like shit.  Excuse my language.

 7   Q        What are some of the things that

 8   she would do?

 9   A        She was extremely commanding and

10   demanding and abusive to him.

11   Q        Did you ever see any physical

12   abuse?  Did she hit him?

13   A        Yeah.

14   Q        Did she kick him?

15   A        Yeah.

16   Q        Scratch, bite?

17   A        I never saw her scratch or bite.

18   Q        But she would hit him or kick

19   him?

20   A        Yes.

21   Q        How about, what would she say to

22   him?

23   A        She was constantly bitching at

24   him, you know.  She would downgrade him,
```

1    like he wasn't worth anything, that he

2    couldn't do anything right.

3    Q        So basically she ran him down in

4    front of you.

5    A        Oh, yeah, absolutely.

6    Q        How would Jon react to all this?

7    A        Basically he would take it and

8    take it and take it for a long time, and

9    sometimes he'd get mad.  Sometimes he'd

10   just ignore it.  It would depend on the

11   situation.

12   Q        Did you ever tell any of the

13   defense counsel this?  Any of Jon's

14   attorneys?

15   A        No, it was never asked of me.

16   Q        They never asked you about this

17   kind of thing.

18   A        No, never, never.

19   Q        I think you said something about

20   Jon's temper.  How would you

21   characterize his temper?

22   A        In my personal experience with

23   him, I never saw him have a temper ever.

24   Q        Right.

251

1  A        He was the sweetest guy in the

2  whole world.

3  Q        Did you ever talk to TBI Agent

4  Brian Byrd?

5  A        Yes.

6  Q        Okay.  Did you ever tell Brian

7  Byrd that Jon was like a volcano about

8  to explode?

9  A        I don't remember saying that.  I

10  may have, but I don't remember it.

11  Q        Okay.  Do you ever remember

12  telling TBI Agent Brian Byrd that Jon

13  wanted to grind Billie up into hamburger

14  meat?

15  A        No, I do not.

16  Q        Did you tell defense counsel

17  that?

18  A        No, I did not.

19  Q        Did they ask you?

20  A        No, they did not.

21  Q        Did an investigator ask you from

22  the defense team?

23  A        This whole thing about the

24  ground hamburger meat thing, I've no

252

1    memory of that at all in any way, shape

2    or form.

3    Q        I believe your husband testified

4    that Jon lived with y'all for a little

5    bit.

6    A        Yes.

7    Q        During the time that Jon lived

8    with you, do you know if there was a

9    restraining order in place against Jon?

10   A        There was an order of

11   protection.

12   Q        Order of protection, excuse me.

13   A        Yes.

14   Q        And, did Mrs. Hall come over?

15   A        She broke it, yes.

16   Q        And when she'd come over, would

17   she do some of the things that you

18   talked about earlier?

19   A        Be more specific.

20   Q        Well, did you see her, for lack

21   of a better term, push his buttons?

22   A        Yes.

23   Q        Run him down?

24   A        Yes.

253

1    Q        Try to provoke him?

2    A        Yes.

3    Q        Did the defense counsel ever

4    talk to you about that?

5    A        No.

6    Q        Did anybody ask you that from

7    the defense team?

8    A        No, they didn't use me.

9    Q        Okay.  Did you ever see Jon

10   interact with his kids?

11   A        Oh, yeah.

12   Q        How would you characterize Jon

13   as a father?

14   A        Great.

15   Q        What would he do with those

16   kids?

17   A        As a matter of fact, Jon was

18   really basically the caregiver.  He'd be

19   -- He'd come to the house a lot of times

20   and he'd have the baby, or he'd have one

21   of the little kids; not Billie.  Seemed

22   like he had more interaction with the

23   children than she did.

24   Q        Were there any examples of -- I

254

1   mean, you talked about -- testified

2   earlier about Jon cut people a break

3   with the mechanic.  Was there any other

4   time, you know, he would stand up for

5   anybody or take up somebody's cause?

6   A       Oh, yes, very much so.

7   Q       Can you explain one instance?

8   A       Yes.  Two nights or three nights

9   before this actual thing happened with

10  Billie, there was a couple next door to

11  us that the boy was beating up on his --

12  there was a violent altercation between

13  a man and a woman, man and wife, and the

14  guy was -- had her down on the ground

15  and was beating her up, and Jon broke up

16  the fight and told the man, said, "You

17  don't have a right to do that to her.

18  That's your wife," and Jon literally

19  stopped the fight.

20  Q       Again, did anybody from the --

21  did you ever tell anybody from the

22  defense team this?  Did you ever tell

23  any of Jon's --

24  A       The defense team did not talk to

255

1    me.

2    Q        Thank you, ma'am.  That's

3    exactly what --

4    A        Period.

5             MR. ELLIS:  Pass the witness.

6             THE COURT:  Questions?

7    **CROSS-EXAMINATION**

8    **BY MR. EARLS:**

9    Q        In your statement to TBI agents,

10   you were allowed to sign the statement,

11   weren't you?

12   A        I don't remember doing that.

13   The only statement I remember signing

14   was a search warrant statement.

15   Q        But you do not deny that in the

16   statement from Brian Byrd that you are

17   alleged to have said that Jon was going

18   to grind his wife up into hamburger

19   meat.

20   A        I don't remember anything about

21   hamburger meat.

22   Q        But that is part of your

23   statement.

24   A        Are you asking me did I say

256

1    that?

2    Q        Yes.

3    A        I'm telling you I don't remember

4    saying that.

5    Q        Okay.  Do you recall speaking

6    with an investigator with the District

7    Attorney's office, Jack Wilson?

8    A        Unh-unh.

9    Q        Well, do you remember myself

10   trying to serve a subpoena on you?

11   A        No.

12   Q        Do you recall making a statement

13   to me and Jack Wilson that you were not

14   going to testify for the State, that you

15   were going to testify for Jon Hall?

16   A        I don't even remember you.

17   Q        Do you remember talking to

18   anybody from the D.A.'s office?

19   A        The only people I remember

20   talking to is when I came to the trial,

21   the original trial, and them telling me,

22   "We don't want to use you because of the

23   ground hamburger meat deal," and that's

24   all I remember.  This has been so long

257

1  ago I can't remember peoples' faces and

2  places that far back.

3  Q       Who told you that?

4  A       Who told me what?

5  Q       That they didn't want to use you

6  because of the ground hamburger meat

7  deal?

8  A       Jon's attorneys.

9          MR. EARLS:  Thank you.

10         THE COURT:  Anything further of

11  this witness?

12         MR. ELLIS:  Yes, Your Honor.

13  **REDIRECT EXAMINATION**

14  **BY MR. ELLIS:**

15  Q       At the time that Jon's attorneys

16  said they didn't want to use you because

17  of the hamburger meat, did you tell

18  them, that, "Hey, I didn't say that,"

19  or, "I don't remember --"

20  A       I told them that I didn't --

21  They didn't even give me a chance to say

22  anything about that.

23         MR. ELLIS:  Nothing further,

24  Your Honor.

```
 1          (WITNESS EXCUSED.)

 2          (There was a recess for

 3          lunch from 12:35 to 1:35

 4          p.m., and the following

 5          proceedings were had:)

 6          THE COURT:  We'll take the next

 7  witness.

 8          MR. ELLIS:  May it please the

 9  Court, Your Honor, before we begin, I

10  believe we left off with Ms. Arbogast

11  about this issue of issue preclusion

12  about her testimony.

13          Looking at the opinion, State v.

14  Jon Hall, 8 S.W.3d, 593, there are two

15  paragraphs in particular that address

16  the testimony in question regarding Jeff

17  and what Jeff said to her, and the issue

18  specifically speaks to Mr. Hall's state

19  of mind.  It also addresses -- The

20  opinion does state that it excludes the

21  testimony under 804(a)(4) and also under

22  804(b)(2).  However, if you go back to

23  the trial transcript, Your Honor, that

24  would be Volume III, Pages 313 through
```

259

1    327, and again, Your Honor, I just

2    perused this before eating my hamburger

3    and right now, I do not see where

4    counsel laid the proper foundation to

5    have it admitted under either 804(a)(4)

6    or 804(b)(2).  Also, Your Honor, I don't

7    think it would be precluded, issue

8    precluded, as to facts that he observed

9    that he told Ms. Arbogast.  It would

10   only go as to state of mind, and,

11   therefore, Your Honor, we would ask for

12   the record that we be allowed to call

13   Ms. Arbogast to ask the qualifying

14   questions in regards to the question,

15   was he dying, did he know he was dying,

16   to get then in under 804(b)(2) and --

17          THE COURT:  Comments, General?

18   I'm looking at those sections, the rules

19   of evidence.  Go ahead.

20          MR. EARLS:  Your Honor, the law

21   is well settled on this issue.  Mr. Mayo

22   expressly tried to get this in.  He made

23   a proffer of proof before Judge LaFon,

24   and Judge LaFon excluded it, the same

1    testimony the Court heard.  It was

2    raised on appeal.  The Court of Criminal

3    Appeals considered the admissibility of

4    the testimony through Ms. Arbogast, and

5    they ruled it was not admissible.  Now

6    you can't just come back here and say,

7    "Well we want another shot at it under a

8    different rule."  The issue's been

9    raised, it's been considered, and it's a

10   barred issue.

11           THE COURT:  Go ahead.

12           MR. ELLIS:  Actually, Your

13   Honor, I believe if they had done it

14   correctly or presented it correctly to

15   the Court of Criminal Appeals, it would

16   be a different issue, if they had done

17   it correctly during the trial procedure,

18   i.e., "Your Honor, we're going to make

19   an offer of proof.  We're going to ask

20   the foundation questions or the founding

21   questions."  If they would have argued

22   specifically to Judge LaFon, "Your

23   Honor, we're going to try to get this in

24   under 804(a)(4) or 804(b)(2), this is

261

1   the proper foundation," then I think we

2   would be with Mr. Earls.  If anything,

3   it just goes to their ineffectiveness at

4   the time of trial.

5        THE COURT:  You're wanting to

6   put her back on.

7        MR. ELLIS:  Well, Your Honor,

8   just so we -- the last thing I want to

9   do, Your Honor, is get in front of Judge

10  Hays, Judge Glenn and Judge Smith and

11  have him look at me and say, "Mr. Ellis,

12  why didn't you do this at the hearing

13  stage when you knew it was an issue,"

14  which if you call them, that's what they

15  said to me the last time I was there.

16       THE COURT:  Of course, I'm not

17  going to prevent you from making some

18  offer, just to the proof of the matter,

19  but I find that the issue has been

20  previously raised and addressed,

21  precluded for that reason, and also, I

22  don't see how it could come in as far --

23  as far as any self-serving statements

24  that he made to this now deceased

1  brother, would have come in anyway.  I

2  don't see it happening then, and that's

3  another basis I'm not going to consider

4  at this time.

5       So I have two different reasons

6  which I'll stand on.  Now if you need to

7  make some offer of proof, again, we're

8  going to proceed on with the offer of

9  proof within the argument at this point.

10      MR. ELLIS:  Well, Your Honor,

11 we've already made the offer of proof as

12 to what -- and memorialized what Mr. --

13 Jeff would have testified to.

14      THE COURT:  That's what I was

15 thinking you had done, and that's why I

16 asked were you wanting to put her back

17 on for some reason.

18      MR. ELLIS:  Well the only thing

19 I want to put her back, though, is to

20 lay the foundation that he did tell her

21 this and --

22      THE COURT:  Just to lay the

23 foundation you think you need under

24 those two sections of 804.

1          MR. ELLIS:  Exactly.

2          THE COURT:  Does the State

3  object to that for any reason?

4          MR. EARLS:  No, sir.

5          THE COURT:  Okay, put her back

6  on.

7          MR. EARLS:  Well, yes, sir, I

8  do.  I'm not waiving the issue

9  preclusion, but I understand the Court's

10  ruling.

11          THE COURT:  Okay.  Because I've

12  kept it out.  This is strictly for an

13  offer of proof.

14          Do you want to call her back

15  around?

16          MR. ELLIS:  Yes, Your Honor.

17  We'd like to call Sheryl Arbogast very

18  quickly.

19          THE COURT:  You can just state

20  your offer of proof if you wish to do it

21  that way.

22          MR. ELLIS:  Okay, Your Honor.

23  We will just say that she would have --

24  under oath, she would have testified

1    that on -- well that she called -- that

2    she called Mr. -- that she called Jeff

3    -- Your Honor, counsel informs me that

4    the safe play is to put her on.

5              THE COURT:  Call her back in.

6              MR. ELLIS:  Let's call her back

7    in, Your Honor.

8          **SHERYL ARBOGAST** was recalled and

9    being duly reminded of her oath,

10   testified further as follows:

11             THE COURT:  Go ahead with your

12   offer of proof.

13             MR. ELLIS:  Thank you, Your

14   Honor.

15   **DIRECT EXAMINATION**

16   **BY MR. ELLIS:**

17   Q       Ms. Arbogast, I think before we

18   concluded your testimony you stated that

19   you had said that if the T-cell count

20   gets below 50 that death was preeminent

21   or was to follow shortly thereafter for

22   your brother Jeff.

23   A       It would be generally about two

24   years' prognosis at that point.

                                              265

1   Q       Did Jeff know that?

2   A       Yes.

3   Q       And at the time, was it pretty

4   much considered if you had AIDS, you had

5   a death sentence?

6   A       Yes.

7   Q       And when you talked to your

8   brother, did he convey that idea to you?

9   A       Uh-huh.

10  Q       She needs to take down yes and

11  no.  I'm sorry.

12  A       Yes, sir.

13  Q       And, when he called you and you

14  spoke about all these different issues,

15  was that -- what was the reason he

16  called you?

17  A       I called him to check on his

18  health, but he spent the entire

19  conversation telling me how worried he

20  was about Jon.  He was supposed to have

21  picked him up and -- on, I think, the

22  preceding Thursday.  Jon was supposed to

23  have called him and told him where to

24  meet him since he was under a

266

```
 1   restraining order, wasn't living at his

 2   home.  So he didn't know where to go and

 3   get him.

 4   Q       Let me do it this way.  You

 5   spoke with Jeff after Jon was arrested.

 6   A       I spoke with Jeff on the night

 7   that Billie died.

 8   Q       Right.  Did you speak with him

 9   afterwards?

10   A       Yeah.

11   Q       And he told you about things

12   that he recollected when Jon came down

13   to Texas.

14   A       Yes.

15   Q       And the reason -- was the reason

16   that he told you -- Well what was the

17   reason he felt like he needed to tell

18   you these things?

19   A       Because I was insistent that Jon

20   was about to have a psychotic breakdown;

21   he needed to be hospitalized, and I was

22   begging him to help me bring that about,

23   knowing that Jon had intended to move in

24   with Jeff.  So we needed to coordinate
```

267

1    where we could take him, what facilities

2    were available to hospitalize him.

3    Q      I understand.  And this all

4    happened before the night in question.

5    Right?  I'm talking about your

6    conversations with Jeff afterwards about

7    when Jeff called the police, or --

8    A      He --

9    Q      Why did he tell you about those

10   things?  Is what I'm asking about.  Not

11   about what happened before but what

12   happened afterwards.

13   A      Well, because, clearly, Jon had

14   no idea why the cops were called or what

15   had transpired.  He didn't have any

16   recollection, and he was confused.

17   Q      Did Jeff know that he was dying

18   at that time?

19         MR. EARLS:  Object to leading.

20         MR. ELLIS:  That's not leading.

21   That's an open end question.  I'm not

22   suggesting the answer at all, Your

23   Honor.

24         THE COURT:  You're objecting

268

1    just to the fact that it's leading?

2            MR. EARLS:  Yes, sir.

3            THE COURT:  Overruled.  Go

4    ahead.

5    Q      Let me ask you this.  Did you

6    ever talk with Jeff about his condition?

7    A      Yes.

8    Q      Did he ever express to you his

9    opinion about what was going to happen

10   to him?  To Jeff.

11   A      Yes.

12   Q      What did he say?

13   A      He knew he was dying.

14   Q      Okay.  Now, did anybody ever

15   talk to him from the defense team?  I

16   think you ...

17   A      No.

18   Q      Now, the reason that -- was the

19   -- what was the reason that he told you

20   all this thing about Jon, about what

21   happened when Jon came down to Texas?

22   Not before but afterwards.  Why did Jeff

23   tell you?

24   A      So that somebody would know what

269

 1   had happened and -- from his

 2   perspective, because he had had a lot of

 3   contact with Jon prior to this event.

 4          THE COURT:  These are the things

 5   -- I'm going to interrupt because these

 6   are things we've been over.  It's

 7   cumulative.  It's already in the record.

 8          MR. ELLIS:  That's what I was

 9   just making sure of, Your Honor.  That's

10   all I have.

11          THE COURT:  Questions from the

12   State?

13          MR. EARLS:  No, Your Honor.

14          THE COURT:  Does this witness

15   need to remain outside?

16          MR. ELLIS:  No, Your Honor.

17          THE COURT:  The State have any

18   problem with her staying here or leaving

19   as she pleases?

20          MR. EARLS:  I'd ask she stay

21   out.

22          THE COURT:  Stay outside and be

23   reminded not to discuss the testimony.

24   You'll be called back as you're needed.

                                          270

1    Thank you.

2            Next witness.

3            **KATHY HUGO** was called and being

4    first duly sworn, was examined and

5    testified as follows:

6            MR. BUCHANAN:  Your Honor, for

7    purposes of the record, Ms. Hugo

8    testified in the punishment phase of the

9    previous trial in Volume IV at Page 427

10   to 430, for a reference point.

11           THE COURT:  Thank you.

12   **DIRECT EXAMINATION**

13   **BY MR. BUCHANAN:**

14   Q       Would you please state your name

15   for the record, please, ma'am?

16   A       Kathy Hugo.

17   Q       And, Ms. Hugo, where do you

18   live?

19   A       Ligonier, Pennsylvania.

20   Q       And where did you live at the

21   time of this trial which was back in

22   1997?

23   A       Ligonier, Pennsylvania.

24   Q       Were you present here at the

1    trial when it was held here before?

2    A        Yes.

3    Q        And are you the same Kathy Hugo

4    that testified on -- at Volume IV -- in

5    Volume IV, Pages 427, 430 in the record?

6    A        Yes.

7    Q        And that consisted of about

8    three and a half pages of testimony?

9    A        Okay, yes.

10   Q        Did you have an opportunity to

11   look over it last night?

12   A        Yes.

13   Q        Okay.  You primarily testified

14   that there were some beatings going on

15   in the house when Jon was growing up.

16   A        Yes.

17   Q        Is that it in a nutshell, fair

18   to say what you testified to?  Okay.

19   Did any attorney ever get a'hold of you?

20   You are Jon's sister; are you not?

21   A        Yes.

22   Q        Did any attorney for the defense

23   ever get a'hold of you prior to that

24   trial?

1  A        No.

2  Q        When is the first contact you

3  had with any attorney for Jon?

4  A        The night before we went to

5  court on the telephone.

6  Q        And where were you contacted?

7  A        In my hotel room.

8  Q        About what time of night?

9  A        Around 11:00.

10  Q        All right.  What were you told

11  by the attorney at that time?

12  A        That we weren't supposed to say

13  anything bad about Billie.  We were just

14  supposed to talk about what it was like

15  growing up in our home.  Basically that

16  was it.

17  Q        Okay.  Did you have knowledge

18  about your father actually engaging in

19  these fights that you alluded to in your

20  testimony?

21  A        Did I have knowledge of them?

22  Q        Uh-huh.

23  A        Yes.

24  Q        Did Jon watch those?

273

1    A        I know one in particular that he

2    did.

3    Q        Okay.  And he was subjected to

4    that household most of his life growing

5    up?

6    A        Yes.

7    Q        Okay.  Did they ever tell you

8    any reason why they'd say, "We don't

9    want to talk about Jon even being in the

10   house"?  Did they ever tell you anything

11   like that?

12   A        Could you repeat the question?

13   Q        Did the attorneys -- the

14   attorneys already said they told you

15   some things -- you said the attorneys

16   told you some things like don't say

17   anything bad about Billie.

18   A        Yes.

19   Q        Did they ever say, "We don't

20   even want to talk about Jon being in the

21   house, we just want to talk about the

22   house"?  In other words, did they ever

23   give you a reason why they wouldn't talk

24   about Jon actually being subjected to

274

1  this fighting?

2  A       I still don't think I understand

3  the question.  Say it one more time.

4  Q       No, I'm going to pass it on.

5  Did they talk to you anything about what

6  a good guy Jon was?

7  A       I believe they asked if I

8  thought he was a good father.

9  Q       Okay.  I don't notice that's in

10 your testimony.  Did they tell you any

11 reason why they weren't going to ask you

12 that on the stand?

13 A       No.

14 Q       So you're telling this Court

15 that you told them that Jon was a good

16 father prior to taking the stand, and

17 they should know that.

18 A       I think they asked me that in

19 the testimony.

20 Q       Okay.  Don't think they did, but

21 we'll let the record stand on its own,

22 okay?

23 A       Okay.

24 Q       Did you -- Were you ever -- Did

1    you ever tell them that -- Did you know

2    Billie had children prior to marrying

3    Jon?

4    A       Yes.

5    Q       All right.  And what was Jon's

6    relationship with those children?

7    A       It was good.

8    Q       And was that based on

9    observations you made?

10    A       I was at his wedding reception,

11    and they were there.

12    Q       Did those kids have a term of

13    affection for Jon?

14    A       Daddy Jon.  I think I heard them

15    call him Daddy Jon.

16    Q       Okay.  Do you know any reason

17    why you weren't asked that in the trial

18    testimony?

19    A       No.

20    Q       Okay.  You haven't been in here,

21    but you saw some pictures that had been

22    put together that we looked at last

23    night; did you not?

24    A       Yes.

276

1    Q        If you had been asked, could you

2    have presented and got together some

3    pictures for the attorneys?

4    A        Of Jon and Billie?

5    Q        Yes.

6    A        Uh-huh.

7    Q        Okay.  And of Jon when he was

8    younger?

9    A        Yes.

10    Q        Okay.  Would you have been

11    willing to do that if you'd been asked?

12    A        Yes.

13    Q        Were you ever asked?

14    A        No.

15    Q        Did you ever call -- In the

16    three and a half years that this case

17    pended, did you ever call any of Jon's

18    attorneys yourself?

19    A        No.

20    Q        Were you -- Did you -- Who did

21    you leave the calling of the attorneys

22    to?

23    A        Well my sister Sheryl was mostly

24    the one that talked to the attorneys.

277

1    Q        Okay.  And I just want to get it

2    in my mind.  Sheryl was kind of the go-

3    between to the lawyers, and you and your

4    other sister Debbie would -- she would

5    turn around and talk to y'all about what

6    was going on.  Is that --

7    A        Yes.

8    Q        Okay.  And, at all -- was there

9    at any time during those three and a

10   half years that you ever made it known

11   that you were not willing to cooperate

12   or not willing to help?

13   A        No, I was never asked.

14   Q        Okay.  During that three and a

15   half years, were at all times you

16   willing to help if the attorneys had

17   called?

18   A        I would have done whatever I

19   could do.

20   Q        Okay.  Did an investigator for

21   the attorneys ever call you or talk to

22   you?

23   A        No.

24   Q        Okay.  Did you have knowledge of

278

```
 1   the running joke in the family about Jon

 2   and his penchant for ripping telephone

 3   -- disconnecting telephone wires?

 4   A       Yes.

 5   Q       Okay.  That was a fairly common

 6   knowledge thing, was it not, that Jon

 7   liked to take telephone wires off of

 8   blocks to get peoples' attention?

 9   A       Yeah.

10   Q       If the attorneys had inquired of

11   you and asked you and said, "Is Jon --

12   Is that something Jon does all the time,

13   or is that something sinister he did

14   this one time," what could you have told

15   them?

16   A       He disconnected my mother's

17   telephone wires.

18   Q       And why does he do that?

19   A       I don't know.

20   Q       Okay.  But, heretofore, he had

21   done it and had anybody ever been hurt?

22   A       No.

23   Q       Had -- To your knowledge, had

24   anybody ever had it done to them with an
```

279

```
1    eye towards hurting them?

2    A       Unh-unh, no.

3    Q       Okay.  And if you had been

4    asked, would you have been willing to

5    testify to that at the trial?

6    A       Yes.

7    Q       Okay.  Did you ever talk to the

8    attorneys about any conduct you saw with

9    the jurors and one of Billie's family

10   members?

11   A       Yes.

12   Q       And who did you tell that to?

13   A       The attorneys at the -- Mr. Mayo

14   and Mr. Ford.

15   Q       Okay.  And what did you tell

16   them?

17   A       That when we were waiting in the

18   hall, that we saw one of the jurors go

19   over to the family and hug them.

20   Q       Okay.  And, did -- were you in

21   the courtroom to see if they ever did

22   anything about that?

23   A       I only came in the courtroom for

24   the very end.
```

                                                    280

1  Q      For your testimony?

2  A      Yes.

3  Q      Did Mr. Mayo or Mr. Ford tell

4  you they were going to do anything with

5  that information you gave them?

6  A      Not that I recall, no.

7        MR. EARLS:  Your Honor, just for

8  the record, that's not part of the

9  petition.  It's never been raised in the

10  petition, so I'm not going to waive that

11  issue as far as them failing to raise

12  it.  Now, if they're offering it for

13  some reason ...

14        MR. BUCHANAN:  Your Honor, and I

15  agree with Mr. Earls in this sense, that

16  I'm not taking that as a separate issue

17  of jury misconduct.  Don't ever expect

18  to prove it.  I do want to pile on on

19  showing a course and pattern of being

20  given information that they ignored and

21  didn't do anything with.

22        THE COURT:  I understand that

23  from being your previous argument, and I

24  still sustain the objection of the

281

1    State.   It came in once a few witnesses

2    back and there was no objection.   The

3    State's objecting again, and I think

4    it's a proper objection and sustain it.

5    Q        Did you know a lot about your

6    mother and Jon's father growing up?  Did

7    you stay in the house the whole time

8    that you were growing up?

9    A        'Til I got married, and I moved

10   next door.

11   Q        And, you did testify that there

12   were some fights that went on.   Did you

13   ever -- Did you -- Was Jon there when

14   these terrible fights were going on?

15   A        Probably for most of them.

16   Q        How would Jon react to it?

17   A        The one I remember in

18   particular, my dad had my mom down on

19   the floor, and I think all of us were

20   trying to get my dad off my mom.   Jon

21   was very small, and he had a fly swatter

22   and was hitting my dad and telling him

23   to get off my mother.

24   Q        What kind of boy was Jon when he

282

1    was younger?

2    A        A sweet little boy.

3    Q        Was he a trouble at school?  Was

4    he getting in trouble in any way, shape

5    or form, or was he nice -- nice young --

6    mannered young man?

7    A        I think he got in trouble in his

8    teenage years like pulling fire alarms

9    and things like that.

10   Q        But did he treat people with

11   respect in general?

12   A        Yes.

13   Q        And would you have been willing

14   to testify to that if you had been

15   asked?

16   A        Uh-huh, yes.

17   Q        Now you moved out when you were

18   19.  Is that right?

19   A        Yes.

20   Q        You are of the -- between you

21   and Debbie and Sheryl, you know the

22   least about what went on in the Jon

23   Hall/Billie Hall household.  Is that

24   fair to say?

1    A       I was never at their house.

2    Q       Okay.  Most of what you came in

3    to know as to what their relationship

4    was between them comes as a result of

5    what you've been -- something you've

6    been told.  Is that correct?

7    A       Mostly by my mother or Sheryl.

8    Well, Debbie, too.

9    Q       Okay.  Did -- Have you ever

10   known Jon to be the kind of person, by

11   anything that you've observed, that

12   would stand up for the small person or

13   the little guy or the underdog?

14   A       Jon is that type of person, yes.

15   Q       And would you have so testified

16   had you been asked back in 1997?

17   A       Yes.

18   Q       Okay.  This -- Had you ever seen

19   on your part this explosive or rage-type

20   behavior on Jon's part?

21   A       Yes.

22   Q       And when would that be that

23   you'd see stuff like that?  What would

24   trigger it?

284

1  A       Well, there was one time I think

2  one of his girlfriends took speakers

3  that belonged to him when he wasn't

4  there, and he was very angry about that.

5  I think he punched a hole in the wall.

6  Q       Didn't punch her, punched a hole

7  in the wall.

8  A       Punched a hole in the wall.  I

9  never saw him hit anybody, just things.

10  Q       Did Jon have plenty of this rage

11  to look at as he was growing up in terms

12  of the way to resolve problems and

13  conflict?

14  A       Yes.

15  Q       And that came from his dad?

16  A       And his grandfather.

17  Q       I was going to ask you that

18  next.  Was Granddad any different than

19  Dad as far -- And when I say Granddad, I

20  mean paternal grandfather.  Was he any

21  different than Jon as far -- not Jon but

22  was he any different than his son as far

23  as resolving conflict with rage?

24  A       My grandfather?

285

1    Q        Uh-huh.

2    A        He was worse.

3    Q        Worse even than your father.

4    A        I saw him do a lot of things,

5    yes.

6    Q        Did Jon ever, to your knowledge,

7    have a role model, a male role model, in

8    his life that calmly tried to resolve

9    conflict like you would think civilized

10   people would do?

11   A        No.

12            MR. BUCHANAN:  Just one moment,

13   Your Honor.

14   Q        And one last question.  I can't

15   believe I forgot this one.  If you had

16   been asked in 1994, '95, '96 and '97

17   that had you ever seen him exhibit any

18   conduct that would lead you to believe

19   that he would premeditatedly murder

20   Billie, what would have been your

21   answer?

22   A        No, I would never say that.

23   Q        And would you have so testified

24   to if asked?

1    A        Yes.

2            MR. BUCHANAN:   No further

3    questions, Your Honor.

4    **CROSS-EXAMINATION**

5    **BY MR. EARLS:**

6    Q        You don't know anything about

7    the facts of the murder, do you?

8    A        I know what my mother told me.

9    Q        Of your own personal knowledge.

10   You weren't there and you don't know

11   anything.  Is that right?

12   A        Just what I was told.

13   Q        Well, the only thing you know is

14   what somebody told you.

15   A        Uh-huh.

16   Q        Okay.  And you were given an

17   opportunity to testify at trial, weren't

18   you?  At the sentencing.

19   A        I was asked a few questions.

20   Q        But you basically -- you got to

21   testify about all this family history,

22   didn't you?

23   A        I wasn't asked very many

24   questions.

287

```
 1          MR. EARLS:  That's all.

 2          THE COURT:  May this --  Go

 3   ahead.

 4          MR. BUCHANAN:  Without

 5   belaboring the point, Your Honor, I

 6   would just -- or even object, and I'd

 7   just like to say, let the record speak

 8   for itself on what was asked and what

 9   wasn't, without going -- I don't want to

10   take her and go over everything again.

11          THE COURT:  I understand.

12   You're referring to Exhibit 1 which is

13   the transcript of that proceeding.

14          MR. BUCHANAN:  Yes, sir.  And

15   then those specific parts that I

16   enumerated before she took the stand.

17          THE COURT:  I understand.  Page

18   427 through 430.

19          Anything further of this

20   witness?

21          MR. BUCHANAN:  No, sir.

22          (WITNESS EXCUSED.)

23   END OF VOLUME II.

24
```