# ADDENDUM 1
# Volume 11

W2003-00669-CCA-R3-PD

FILED
JUDY BARNHILL, CIRCUIT COURT CLERK
JUN 05 2003
DEPUTY CLERK

1          IN THE CIRCUIT COURT OF

2        MADISON COUNTY, TENNESSEE

3           AT JACKSON, DIVISION I

4    _____

5    JON HALL,

6          Petitioner,

7    vs.                    No. C00-422

8    STATE OF TENNESSEE,

9          Defendant.

10   _____

11        HEARING ON POST-CONVICTION

12            RELIEF PETITION

13            MAY 15, 2002

14          VOLUME III OF IV

15   _____

16

17

18

19

20            AMY MAYS

21        OFFICIAL COURT REPORTER

22    MADISON COUNTY JUSTICE COMPLEX

23     JACKSON, TENNESSEE  38301

24          (731)423-6039


289

FILED
JUL 2 4 2003
Clerk of the Courts
Rec'd By

ORIGINAL

Vol. II

1                    **TABLE OF CONTENTS**

2                      **VOLUME III**

3    CLAY MAYO

4            Direct Examination        Page 292

5            Cross-Examination         Page 353

6            Redirect Examination      Page 361

7            Recross-Examination       Page 362

8    MARTIN ESKEW

9            Direct Examination        Page 364

10   JESSE H. FORD III

11           Direct Examination        Page 373

12           Cross-Examination         Page 428

13           Redirect Examination      Page 445

14           Recross-Examination       Page 460

15           Further Redirect Examination

16                                     Page 461

17                    *  *  *  *  *

18

19

20

21

22

23

24

1                          **EXHIBIT INDEX**

2    EXHIBIT 6                           Page 361

3    EXHIBIT 7                           Page 415

4    EXHIBIT 8 ID                        Page 423

5    EXHIBIT 8                           Page 424

6    EXHIBIT 9 ID                        Page 459

7                        *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          **CLAY MAYO** was called and being

2    first duly sworn, was examined and

3    testified as follows:

4    <u>**DIRECT EXAMINATION**</u>

5    <u>**BY MR. BUCHANAN:**</u>

6    Q        Would you state your name for

7    the record, please, sir?

8    A        Clay Mayo.

9    Q        And, Mr. Mayo, how are you

10   employed?

11   A        I'm self-employed.  I have my

12   own law office.  I'm a lawyer, attorney.

13   Q        And how long have you been an

14   attorney?

15   A        Since 1990.

16   Q        And, are you licensed here in

17   the State of Tennessee?

18   A        That's correct.

19   Q        And you were the trial counsel

20   for Jon Hall; were you not?

21   A        I was one of them.

22   Q        One of them.  And who was the

23   other?

24   A        Jesse Ford.

1  Q       And were you -- At that time how
2  were you employed?
3  A       At that time, Mr. Ford and I had
4  a partnership.
5  Q       And when you received this
6  appointment, did you receive it when you
7  and him had the partnership?
8  A       That's correct.
9  Q       All right.  Do you remember
10 about when you received it?
11 A       I don't.  1995 approximately.
12 Q       Late '95, early '96?
13 A       Yes, yes.
14 Q       Fair to say you had the case a
15 little over a year or -- a little over a
16 year before it actually went to trial?
17 A       Yes.
18 Q       Okay.  When you get a case like
19 this where it's been through some other
20 attorneys, what exactly do you do to
21 bring yourself up to speed on the case?
22 A       Read over the file, copies of
23 motions that are in the file, obtain the
24 court file in case the file we obtained

293

1    -- Well, first of all, obtain the file

2    from the other attorneys who had it,

3    then compare the court file, the file

4    that exists in the court, courthouse,

5    with what we've been provided, or what

6    I've been provided, make sure that it's

7    complete, and then review the file at

8    that point.  Now obviously, in this

9    case, we did a lot more than that, but

10   that's standard.

11   Q        What extra did you do?

12   A        Well, we had -- there were

13   investigative reports.  There was an

14   investigator appointed by the Court,

15   mitigation investigator, fact

16   investigator, and a jury consultant.  So

17   we had those to review as well.

18   Q        And what do you do after you

19   review those reports?

20   A        Well, if there are problems in

21   the file that we see, we --

22   hypothetically we would have, in most

23   cases, filed -- let's say if there were

24   motions missing that we thought should

1  have been filed, we would have filed

2  that.  If there were witnesses that

3  should have been interviewed, we would

4  have contacted the fact investigator if

5  it was a fact witness and asked her in

6  this case to interview that witness.  If

7  there was mitigation information that

8  should have been obtained and was not,

9  we would have asked the mitigation

10  investigator to obtain that.

11  Q        What exactly had -- How many --

12  Had you tried any capital murder cases

13  prior to this?

14  A        Yes.

15  Q        And which cases were those?

16  A        Well, I was thinking about that

17  earlier.  I had tried State versus Jeff

18  Bivens.  It was a double homicide murder

19  trial.  Mike Mosier and I tried that

20  together.  Mr. Bivens was spared the

21  death penalty.  He was convicted of

22  first degree murder.  I had represented

23  State versus Richard Redmond, again with

24  Mr. Mike Mosier of the Madison County

295

1   bar, he may have been Chester County bar

2   at that time, or both, that ended in a

3   second degree plea.  It did not go to

4   trial.  I think there were one or two

5   others, and I can't think of their names

6   right now.  There were several other

7   first degree murder trials but not death

8   penalty cases.

9   Q       Were you first or second chair

10  in this Jon Hall --

11  A       Second chair.  That was made

12  very clear to me by Judge LaFon.

13  Q       All right.  Did you feel like

14  you were qualified to be second chair in

15  a capital murder case at that time with

16  what experience you did have?

17  A       Absolutely.

18  Q       You had familiarized yourself

19  with most of the Tennessee Supreme Court

20  opinions in capital murder cases

21  previous to that time?

22  A       Previous to that time, that's

23  correct.

24  Q       You had probably seen the

296

1    phrase, "Death is different," on more

2    than one occasion in reading those; had

3    you not?

4    A        State that again.

5    Q        You had probably seen the

6    phrase, "Death is different," on at

7    least one or more occasions in reading

8    those opinions; had you not?

9    A        Yeah.  Yes, that -- at least the

10   substance of that statement.  Yes.

11   Q        Had you been to any seminars on

12   trying a capital murder trial?

13   A        Yes, the TACDL, Tennessee

14   Association of Criminal Defense Lawyers'

15   seminar.  I attended their death penalty

16   seminar at least once, maybe twice prior

17   to that, if I'm not incorrect.  I'm not

18   absolutely sure but I'm darn near sure.

19   It was in Nashville one time and may

20   have been there the second time as well.

21   Q        Then you were familiar with the

22   general push by the profession that

23   attorneys were to take the penalty phase

24   of a capital case especially serious.

297

1    A          That's correct.

2    Q          If as a group we had all fallen

3    down, it seemed like that has been a

4    place where lawyers as a group had

5    fallen down, and there was a push about

6    the time of this case to make lawyers

7    aware to make sure that that part of the

8    case was covered.  Is that fair to say?

9    A          I think, yes, there was.  The

10   position of the criminal defense bar at

11   that time was -- I certainly felt -- I

12   agree with that statement, that the

13   position was that in general, we had

14   failed to properly investigate and

15   present the mitigation phase of death

16   penalty cases.

17   Q          Okay.  Now, knowing all this,

18   you had -- I guess your opinion was that

19   you should leave no reasonable stone

20   unturned in trying to find a defense and

21   mitigation.  Would that be fair to say?

22   A          Yes.

23   Q          And I'd like to put out this.

24   You didn't feel like you needed to maybe

298

1  interview the 347th cousin, but probably

2  the immediate family would be a good

3  place to start?  Would that be fair to

4  say?

5  A         Immediate family of who?

6  Q         Of the Defendant.

7  A         In regards to the mitigation.

8  Q         Yes.  Well in regards to

9  mitigation and maybe even guilt or

10  innocence.

11  A         Yes, that's generally true, to

12  the best of my recollection.  This has

13  been a while, but to the best of my

14  recollection, I spoke with a lot of Mr.

15  Hall's family members on the telephone.

16  They were out of state.  Some were

17  interested at that time in helping.

18  Some were -- None were antagonistic, but

19  some were a lot more interested in

20  assisting than others.  And, yes, I did

21  feel that that was necessary.

22  Q         Do you remember there being a

23  problem, by the time you got the case,

24  with Jeff Hall's testimony being gone,

299

1   being as how he was dead by the time you

2   got the case?

3   A       Yes.

4   Q       Did you have any theory or

5   tactics that you thought you would use

6   in trying to get that testimony into the

7   court some way?

8   A       Quite honestly, I don't recall.

9   I recall the issue.  I know that Mr.

10  Hall, Jon Hall, was interested in that

11  and had -- was concerned about it and

12  wanted it presented.  I remember

13  discussing it with Mr. Hall and I

14  believe with Mr. Ford.

15  Q       How many times did you talk to

16  -- or do you remember how many times you

17  talked to anybody other than Sheryl

18  Arbogast by telephone?  Sheryl being one

19  of his sisters.

20  A       I don't remember.

21  Q       Okay.

22  A       I don't remember.  I remember

23  speaking with them long distance.  It

24  may have only been Sheryl.  I don't

1    remember, but I also remember when they

2    came into town, they were at motel rooms

3    and speaking with them at that time as

4    well.  Of course, in addition, we had

5    Gloria Shettles, I believe was the

6    mitigation expert that we had asked the

7    Court to appoint and was appointed, and

8    she, to the best of my recollection, had

9    spoken with them.

10   Q        She had talked with Sheryl; had

11   she not?

12   A        I believe so.

13   Q        And you had talked with Sheryl.

14   A        I believe so, yes.

15   Q        Do you know of any report that

16   Gloria ever did where it indicated that

17   she talked to anybody else in the family

18   as far as --

19   A        I don't recall.  I mean,

20   obviously with your questions, you're --

21   I think you're getting at that it's not

22   there.  I don't recall.

23   Q        Yeah, and I'm not trying to

24   trick you.  I just --

301

1  A        I understand.

2  Q        If you just -- whatever your

3  best recollection is.

4  A        Yeah, I really don't remember.

5  Q        Okay.  When we get down to the

6  trial itself, do you remember what your

7  theory was of how you were going to

8  defend this man?

9  A        We had -- We were worried about

10  that.  There were so many problems with

11  any theory that we tried to develop that

12  it seemed almost impossible to develop a

13  fact defense based upon what occurred

14  there.  We had seriously considered the

15  voluntary intoxication defense to

16  nullify the intent on first degree.  Mr.

17  Hall I remember wanted us to argue self-

18  defense, but that was -- I think would

19  have definitely alienated the jury and

20  inflamed them, which we didn't want to

21  do.  There was again -- The primary

22  theory to be -- as -- from the best of

23  my recollection this long after was that

24  it was at least arguably a second degree

1   murder case.  You know, we had the

2   problems I remember, the telephone line

3   being cut prior to Mr. Hall going into

4   the house.

5   Q        That was a problem, wasn't it?

6   A        Absolutely.

7   Q        And that was basically left

8   naked in the record, that he had cut or

9   disconnected those lines.

10  A        That's correct.  And there were,

11  you know, numerous problems, the

12  multiple wounds, the lack of injury, to

13  the best of my recollection, on Mr.

14  Hall, the evidence that he had dragged

15  her from the house to the swimming pool

16  and then drowned her there.  It was a

17  difficult, very difficult, case to

18  defend.

19  Q        So as I understand it, your

20  first thought was in trying to drag it

21  down from first degree, --

22  A        Absolutely.

23  Q        -- and move it down on the --

24  down that road of lesser includeds.

1  A        Exactly.  Exactly.  And if we

2  made some headway, then, you know, who

3  knows.  But, yeah, that was the primary

4  theory.

5  Q        Okay.  Did you rule out insanity

6  at some point early on?

7  A        Yeah.  Mr. Hall, to the best of

8  my recollection, did not want an

9  insanity plea.  I spoke with -- if I'm

10 not mistaken it was Lyn Zager.  Dr.

11 Zager was the expert that had been

12 appointed by the Court to evaluate Mr.

13 Hall.  She -- I spoke with her several

14 times.  She did a report.  She made it

15 very clear that -- And Dr. Zager is very

16 liberal.  I mean, she's -- you know,

17 she's a capital case kind of expert.

18 That it was not supported.  It just

19 simply wasn't supported by her

20 interviews with Mr. Hall.

21 Q        For insanity.

22 A        Correct.

23 Q        Okay.  Going back to the part

24 where we were talking about

                                        304

1    premeditation and the phone wires.

2    Would you agree with me that if you

3    could have somehow ameliorated or put a

4    salve on the fact that those phone wires

5    were disconnected, that that would have

6    been a big move towards getting you on

7    past the possibility of premeditated

8    murder and on down?

9    A        No, I don't think it would have

10   been a big step.  I think it certainly

11   would have been probably the first thing

12   you -- you know, we would have wanted to

13   cast doubt upon, but --

14   Q        Would you agree with me that

15   that looks sinister in and of itself?

16   A        I agree with that, yes.

17   Q        The wires are cut.  Looks like

18   there's some planning to do some

19   mischief.

20   A        Certainly looks like that.

21   Q        Did you realize that there was

22   testimony available that Jon had

23   disconnected wires as a matter of course

24   all his life when trying to talk with

1  people and had never done them any harm?

2  A       I vaguely remember that

3  assertion, I believe by Mr. Hall.   I

4  don't remember it by anyone else.   I may

5  have been told that by Sheryl Arbogast

6  or one of the sisters.   I'm not sure.

7  Q       Well if you were, and let's

8  assume for a moment you were --

9  A       Yeah.  I don't really distinctly

10  remember that, though.

11  Q       Can you think of a theory why

12  you wouldn't use that, to let the jury

13  know that he had, in fact, done that on

14  many occasions in the past and never

15  hurt anybody?  That when he wanted to be

16  -- when he wanted to talk with somebody

17  and get their attention, he got the

18  phones disconnected?  I mean, you would

19  have put that in you would have thought;

20  would you not?

21  A       Well, --

22  Q       To take away the sinisterness of

23  what it appeared to be of sneaking up

24  there and pulling those wires off?

306

1    A          You know, in a vacuum, yeah,

2    that takes away some of the

3    sinisterness.  When you look at what

4    happened out there that day, evening,

5    and you take that away, it doesn't

6    change things very much, quite honestly.

7    Q          But it wouldn't hurt anything,

8    would it?

9    A          No, it wouldn't have hurt

10   anything I suppose.  I don't remember --

11   It seems to me that I remember vaguely

12   that the only reason -- the only way

13   that we thought we could have gotten

14   that into evidence was from Mr. Hall's

15   testimony.  I can't tell you exactly

16   why; it's just a vague memory.  Mr. Hall

17   -- I'm not sure if he asked to testify

18   or didn't.  I believe he took the stand

19   and said he wouldn't.  I'm not sure

20   about that.  Mr. Hall's demeanor in the

21   courtroom was very bad, very scary, and

22   having him on the stand, strategically

23   would have been horrible.  So, you know,

24   the only way that it could have come in

307

1  that I would see is if somebody else

2  would testify to it.

3  Q        And you're telling me that if

4  you had known about that or reasonably

5  could have, you don't know of any reason

6  why you wouldn't have used it, to take

7  away the sting of the wires being

8  disconnected.

9  A        Today, right now, I would say it

10  sounds -- what you're saying sounds

11  correct, that -- that I -- I don't -- I

12  can't think of any reason right now why

13  I wouldn't have used it other than I

14  wasn't lead counsel and was admonished

15  repeatedly not to make decisions about

16  the case.

17  Q        But if that had come to you, you

18  would have said, "Mr. Ford, we've got

19  this great testimony from John Doe out

20  here that says that Jon's done this four

21  or five times before and nobody ever got

22  hurt."  I mean, you would have let him

23  know about it, wouldn't you?

24  A        Yeah, I feel certain I would

308

1   have done that.

2   Q        Okay.  It appeared to me, and I

3   want you to correct me if I'm wrong,

4   that the defense put on Lyn Zager to

5   kind of put forth the idea that this was

6   a rage incident.  Would that be fair to

7   say?

8   A        To the best of my recollection,

9   that sounds correct.

10  Q        Just to reflect -- referring to

11  about Page 335 of Dr. Zager's testimony,

12  she said, "It's my impression based on

13  everything I know about the case, that

14  Mr. Hall was acting in an impulsive

15  manner versus a well thought out plan."

16  Is that fair to say that that was

17  integral to what y'all were trying to

18  do?

19  A        Yes.

20  Q        Was that presented in order to

21  take away the idea that this was

22  premeditated?

23  A        Yes.

24  Q        Was it put forth with the idea

```
 1   of even hopefully going as far as

 2   voluntary manslaughter?

 3   A       Yes.

 4   Q       Now with voluntary manslaughter,

 5   we have to have provocation; do we not?

 6   A       Yes.

 7   Q       Okay.  And that provocation's

 8   got to be reasonable provocation.

 9   Correct?

10   A       Yes.  I believe that's correct.

11   Q       So in that regard, if you'd had

12   any testimony that Billie had been

13   violent toward Jon, you would have

14   probably reasonably used that; would you

15   not?

16   A       You know, again, that's -- I

17   think that my recollection again is not

18   real specific.  I can't tell you exactly

19   what occurred back then, but I think

20   that we're getting into the area of

21   strategy, and I can think of reasons

22   that we would not have tried to develop

23   any past incidences of violence between

24   the two of them.  For example, if I may,
```

310

1  if they weren't very severe, and we

2  tried to promote or imply that Mr.

3  Hall's conduct was reasonable, you know,

4  strategically I think we're looking at

5  the jury, trying to convince them that

6  what he did that day was reasonable in

7  light of the provocation, and I think

8  that would have been impossible.  So,

9  yeah, you know, you want to move

10  downward.  You want to move down past

11  second degree and get voluntary, but

12  realistically, I mean, come on.  There

13  was no chance.

14  Q        Well I understand.  In the

15  record, there really wasn't -- and you

16  correct me if you remember differently

17  -- there really wasn't anything about

18  any evidence about provocation, was

19  there?

20  A        I believe that's correct, yes.

21  I think the only -- again, the only

22  person that could have -- could have

23  stated that would have been Mr. Hall,

24  and he would have had to have taken the

1    stand.

2    Q        And if you'd have had anybody

3    else that would have said that she was,

4    in fact, violent toward him on past

5    occasions, you would have at least

6    considered using it, wouldn't you?

7    A        Would have considered it.

8    Q        As you're standing on the stand

9    right now, you don't know of any.  Is

10   that fair to say?

11   A        Yeah, as of right now I don't

12   know.  I don't recall specifically.  I

13   do remember, and I think it came from

14   Mr. Hall, but I remember the idea that

15   they had been into fights before.  I

16   don't remember it ever being very

17   severe, and I don't remember

18   specifically where that came from.  I

19   thought it was Mr. Hall, but it's

20   possible that it came from other sources

21   as well.

22   Q        I was curious.  You had Lyn

23   Zager.  She was a psychologist, wasn't

24   she?

312

1    A        Yes.

2    Q        Did it ever -- And you did have

3    plenty of evidence that Jon had this --

4    this burst of rage or something of that

5    nature; did you not?

6    A        Yes.

7    Q        And Gloria Shettles, in one of

8    her reports in 1995, she mentions

9    intermittent explosive disorder.  Did

10   you ever pursue that?

11   A        Pursue it.  I remember that now

12   that you say it, intermittent explosive

13   disorder.  I can't tell you if we

14   pursued that or not.  I feel confident

15   that we did, but I'm not sure how or to

16   what degree we did.

17   Q        Okay.

18            MR. BUCHANAN:  Can I have just a

19   second, Your Honor?

20   Q        Well, were you familiar back in

21   1996 with -- were you -- did you do any

22   research or reading up on intermittent

23   explosive disorder?

24   A        I don't recall.

313

1  Q        In any of your seminars, had you

2  been told that it was an up and coming

3  thing, so to speak, and that there were

4  serotonin levels that could be taken on

5  the person and things of that nature?

6  Were you familiar with any of that?

7  A        I don't recall that.  I don't

8  recall that.  I mean, I believe that I

9  did do some looking into it.  I vaguely

10  seem to remember that.  I don't remember

11  the serotonin level studies.

12  Q        'Cause you realize that inter-

13  -- or do you realize that intermittent

14  explosive disorder is something that

15  plays right into voluntary manslaughter

16  in terms of the elements of voluntary

17  manslaughter?  You didn't understand

18  that; did you not?

19  A        Plays right into it.

20  Q        Consistent with it.

21  A        You know, I don't want to say I

22  don't -- I don't agree with that.  I

23  don't think I have enough information or

24  enough recollection right now to respond

1  to that accurately.  Maybe if you

2  rephrase the question I could do better.

3  Q     Well I'm interested, what

4  tactical reason was there not to seek

5  the services of a psychiatrist?

6  A     Well --

7  Q     And the reason I say that is

8  since -- I don't know if you knew it or

9  not because -- I'm not being critical.

10 I know it's five or -- five plus years

11 ago, but if you're into the serotonin

12 level thing where you're going to have

13 medical doctors do invasive things into

14 a person's body, why would you not seek

15 the help of an M. D. psychiatrist as

16 opposed to relying on people that can't

17 even prescribe drugs?

18 A     Well, like I said to begin -- or

19 in response to your last question, the

20 serotonin level studies, if there are

21 any, and I'm assuming that what you

22 propose in your questioning is true,

23 that if that existed, I don't recall

24 ever coming across that specifically.  I

315

1   don't recall that.  It's not to say I

2   didn't.

3   Q        Now, --

4   A        Yeah, you know, a psychologist

5   is not an M. D., obviously; a

6   psychiatrist is.  Tactically why I

7   wouldn't have at least suggested that we

8   -- we try to get a psychiatrist as

9   opposed to a psychologist, I suppose the

10  only answer I can give to that today

11  with my recollection is that Mr. Hall, I

12  recall, didn't want to.  He specifically

13  did not want to argue insanity or --

14  but, you know, when you're talking about

15  as it plays into voluntary manslaughter,

16  you know, --

17  Q        No, I --

18  A        -- you have a hard time with

19  that one, but I guess you can --

20  Q        And where I wanted to lead this

21  is that, as best you can remember, you

22  and Gloria at least had some

23  conversation about it, and I think what

24  you're telling me is that for whatever

316

1   reason, you don't remember going much

2   past that.  Is that fair to say?

3   A        That's -- To the best of my

4   recollection, that's correct.

5   Q        Do you know of any downside or

6   any reason strategically why you

7   wouldn't have asked for a psychiatrist

8   in the capital murder case?

9   A        I don't even recall whether --

10  that necessarily we didn't.  I'm

11  assuming we didn't, that it's in the

12  record, or you wouldn't be asking me

13  these questions, so --

14  Q        Well I can't find it.  If you

15  tell me there is, I'd look -- you know,

16  I'd look through it, but --

17  A        No, I don't remember.  I don't

18  remember ever seeking a psychiatrist.

19  Q        Can you think of a good reason

20  in a death penalty case why you wouldn't

21  get the -- Would you agree with me that

22  in the food chain of the world of

23  shrinkdom, that the psychiatrist kind of

24  sets atop the food chain?  With maybe

1    the psychologist being a little bit

2    below.

3    A        You know, I wouldn't agree with

4    that.  I know where you're coming from.

5    Medically speaking I would agree with

6    that.  One's a physician and one's not.

7    But the inner-workings of the mind and,

8    you know, understanding theories and how

9    people react to their past or what's

10   occurring, I think probably

11   psychologists are better with that than

12   psychiatrists are.  To my -- My

13   experience with psychiatrists is that

14   they are a lot more apt to look at

15   somebody and prescribe medicines and not

16   get down to the root, and they are going

17   to refer those people to counselors or

18   psychologists to deal with the real

19   issues.

20   Q        Do you agree with me that it's

21   the lawyer that has the responsibility

22   of getting the social history together

23   for his experts?  I mean, isn't that the

24   reason you have a Gloria Shettles?

318

1   A        Well, yeah, you have her to

2   develop it as well.

3   Q        So that she can compile the best

4   history possible to give to your

5   psychiatrist or psychologist or whoever

6   to get to the bottom of the problem with

7   the Defendant, if there is one.  Would

8   that be a fair summation of why you hire

9   these people?

10  A        Well not exclusively, no.

11  Q        Well, that and to find great

12  evidence for you obviously, but --

13  A        Yeah, and mitigation evidence.

14  I mean, are you asking in regards to a

15  fact defense or mitigation defense?

16  Q        Well, as I understand it, a

17  mitigation expert kind of walks both

18  those lines because --

19  A        Yeah.

20  Q        And you'd agree with me; would

21  you not?

22  A        Yeah, I would.

23  Q        Because what they do is go out

24  and just talk to everybody they possibly

319

1    can that had some dealings, or

2    peripheral dealings, with the Defendant

3    so that they can compile the social

4    history, and a lot of it's useful, a lot

5    of it's not, but -- fair to say?

6    A        Uh-huh, it is.

7    Q        You pass on the most that you

8    can to your psychiatrist, and if you can

9    fish a little out of it to help you on

10   guilt or innocence or on punishment, you

11   fish that out.  Is that a fair way to

12   say the way you would use it?

13   A        Yeah, I agree with that.

14   Q        Okay.  So you had Gloria

15   Shettles, and you know of no reason why

16   you wouldn't be using everything that

17   she would give you.  Correct?

18   A        Right.  That's correct.

19   Q        And, you would have forwarded --

20   or you would have thought you would have

21   forwarded it to Ms. Zager; would you

22   not?  If she had done all her work and

23   you had forwarded that to her in part of

24   the social history; would you not?

1   A        I suppose so.  If she wasn't

2   aware of it, if it was something new

3   that hadn't already been accounted for,

4   I can think of no reason that we

5   wouldn't have forwarded it.

6   Q        I notice that in the punishment

7   phase there was a lot of talk about Jon

8   growing up in a house where there was a

9   lot of fighting.  I suppose that was

10  something y'all wanted to try to put on

11  as evidence.

12  A        Yes.

13  Q        But I also noticed that there

14  wasn't much good about Jon, being a good

15  father and things like that.  Was there

16  any reason why you would ignore evidence

17  of him being a good guy?

18  A        No reason.  It's got to be

19  there, though.

20  Q        Okay.

21  A        I don't recall anyone coming

22  forward or ever anyone being found that

23  would say things that were that positive

24  that didn't also have negative things to

321

1    say.  I mean, that's always what you

2    look at, is after cross-examination, is

3    this going to be effective at all, is

4    the good going to outweigh the bad.

5    Q        Would you agree with me that

6    somebody that might say something bad

7    about your client at first, if you spend

8    a little time with them, you can find

9    out that maybe they come around and give

10   you a whole lot of good?

11   A        Sometimes.

12   Q        That plays directly into how

13   much time you spend with them.  Would

14   that be fair to say?

15   A        With the witness?

16   Q        Uh-huh.  You or your

17   investigator.

18   A        Yes.  It's not necessarily so,

19   but, yes, that certainly occurs.  If you

20   spend more time and try to cut

21   underneath the antagonism or the bad

22   feelings, you may find some good

23   feelings there as well, or some good

24   evidence as well.

1   Q       You wouldn't consider it

2   sufficient in a death penalty case to

3   walk up to a witness that says, "I ain't

4   got nothing to say good about Jon.  I

5   don't want to talk to you.  I mean, I'll

6   talk to you, but I ain't got nothing

7   good to say about Jon."  It's not

8   appropriate to just turn around and say,

9   "Well, okay.  See you later," is it?

10  A       Well, if we're supposing that

11  the witness says, "Yes, I will talk to

12  you, but I don't have anything good to

13  say about Jon," you know, it's possible

14  that a long-term sit-down with that

15  person might produce some positive

16  things about him.  In a best case

17  scenario, that's possible.

18  Q       Okay.  Any reason why you

19  wouldn't put in some pictures of Jon

20  being a father or being something less

21  than a monster?  I notice there were no

22  pictures put in the record.  Was that a

23  strategy?

24  A       I don't even recall that.  I do

323

1    seem to recall we didn't put any

2    pictures in.  I don't recall there -- I

3    don't recall that.  I don't know if we

4    decided not to, if we didn't have the

5    pictures or what.  I really don't.

6    Q        Was there any -- If you had had

7    people that knew Jon intimately all his

8    life that could have testified that from

9    everything they had ever seen of Jon and

10   Billie that they knew of no reason or

11   had ever seen him exhibit anything that

12   would lead them to think that he would

13   be premeditatedly plotting to kill her,

14   would you have used that?

15   A        Well, --

16   Q        Again, take it out of first

17   degree and try to shove it on down the

18   road.

19   A        You know, that depends.  It

20   depends on what else that witness knows.

21   It depends on what cross-examination

22   could produce from that, what kind of

23   evidence can come in if somebody opens

24   the door on that.  If somebody gets up

1    there and says, "I've never known that,"

2    what can a prosecutor do to them at that

3    point?  "Have you heard about this?  Did

4    you know about that?  Did you know about

5    this?  Did you know about the time he

6    did this?"  You know, do you want to

7    strategically put somebody on if the

8    prosecutor is going to be able to just

9    slice them apart and get in even

10   possibly more evidence than they could

11   have gotten in to begin with?  I can't

12   say either way, you know.

13   Q        Okay.  Well my question then in

14   this case is:  Do you ever remember

15   saying, "Well, you know, I've got a

16   sister or two that can say that they've

17   never seen him exhibit anything that

18   would lead him to believe he'd do that,

19   but I --"  Do you remember ever

20   thinking, "I don't want to put them on

21   there for some particular downside"?

22   A        I don't remember.  I remember at

23   some point offering an offer of proof on

24   one of the sisters.  I think it was

325

1  Sheryl Arbogast's testimony.  Judge

2  LaFon wouldn't allow it in.  You know,

3  this was a struggle for me with Judge

4  LaFon throughout this trial.  He and I

5  were on good terms before and after, but

6  we did not get along during this trial,

7  and I had a difficult time.

8  Q       I think the record reflects that

9  was what -- she was trying to get in

10  what Jeff had said.

11  A       What Jeff had said?  Was that --

12  Okay.

13  Q       It was addressed on appeal,

14  also, just to refresh your memory.

15  A       Okay, well thank you.  Yeah.

16  Q       Do you know of any reason in the

17  world why you wouldn't have asked her,

18  you know, "Anything in your past, your

19  dealings with Jon, that would lead you

20  to believe that he would ever

21  premeditatedly hurt this woman?"  If she

22  would have been willing to tell you no,

23  do you know of any downside to using her

24  in that way?

326

1  A        Cross-examination by the

2  prosecution.

3  Q        What would they have had that

4  would have hurt you as opposed to

5  leaving the premeditated phone wire

6  setting there being cut in the record

7  with no rebuttal, no nothing?  I mean,

8  what --

9  A        You know, there were a lot of

10  instances of violent behavior by Jon

11  towards Billie that I think that -- To

12  the best of my recollection, Mr. Woodall

13  and I believe Mr. Earls tried the case,

14  Mr. Woodall and someone anyhow, an

15  assistant.  I think it was Mr. Earls.

16  Didn't use simply because they had such

17  a good case they didn't need it.  But I

18  can imagine testimony of, for example,

19  damaging cars, running into her car with

20  the children inside the car.  So if we

21  put her up there and say he's a good dad

22  and then, boom, here they come after

23  her.  "Did you know that he slammed her

24  car with the children inside?  Did you

327

1    know he did this?"  So, yeah, there were

2    things in the file that weren't in the

3    record yet that we did not want in and

4    that could have been asked on cross-

5    examination, depending on what we asked

6    her, obviously.  I see what you're

7    saying, and, you know, you got a point

8    there, but --

9    Q        Well you'd have to know about it

10   first before you apply that test to it.

11   Right?

12   A        Sure.  Yeah, you'd have to know

13   about what they had.  That's correct.

14   Q        And then -- But we're still in

15   agreement that we don't really see -- if

16   we could have found any downside

17   explaining those phone wires had been

18   done like that in the past and nobody

19   had been hurt.  We're still in agreement

20   on that one; are we not?  That if you

21   could have found that testimony, there's

22   not a -- Well, "You don't know of any

23   times --" or, "Were you familiar with

24   the time he did cut the phone wires and

328

1    hurt somebody?"  I mean, there's nothing
2    like that --
3    A         I don't -- You know, quite
4    honestly, I don't see why that helps so
5    much.
6    Q         I thought we agreed that it
7    looked pretty sinister to have those
8    phone wires off there.
9    A         It does.
10   Q         I thought we also agreed that if
11   we could explain that he had done that
12   in the past and never hurt anybody, that
13   that was just his way of directing your
14   attention, that that would at least take
15   some sting out of it.  Are we in disa-
16   -- And you're free to disagree with me.
17   Don't get me wrong, but I thought we
18   were in agreement on that.  Would you --
19   Are we not in agreement on that?
20   A         That it would take some sting
21   out if you could produce someone that
22   said he'd done this before to get the
23   attention of the person that was, for
24   example, inside the house.  You know, I

329

1   don't know how to answer that right now.

2   You know, sting out of it or -- You

3   know, I get your drift.

4   Q        Well I guess what I'm asking,

5   can you see a downside in using it all?

6   I mean, you had said that the reason you

7   wouldn't use the --

8   A        Well, you know, it paints a

9   picture of someone who is on the edge?

10  Someone is going around to other people

11  cutting their phone lines just so he can

12  have their attention?  I don't know how

13  that's really that helpful.  And on this

14  particular occasion, arguably,

15  conviction-wise, he kills them and on

16  the other occasions he didn't actually

17  kill them?

18  Q        And didn't even actually hurt

19  them.

20  A        I don't see why that helps so

21  much.

22  Q        No, I mean, didn't even actually

23  hurt them.

24  A        Yeah.  But still, it looks like

330

1  someone who has got --

2  Q        Yeah, but don't -- And I don't

3  want to get into a long diatribe here,

4  but --

5  A        All right.

6  Q        -- did we not agree that leaving

7  it in the record like it was looked very

8  sinister, that it was a cold, calculated

9  act to get her away from any emergency

10  help, et cetera, et cetera?

11  A        I agree it looks sinister.  I

12  think it looks sinister doing it without

13  ever hurting anybody, too.

14  Q        I understand, but if you don't

15  -- if you do it in the past and you're

16  not hurting anybody --

17        MR. EARLS:  Your Honor, we're

18  getting argumentative now.  This

19  question's been hashed out thoroughly.

20        THE COURT:  I agree, Mr.

21  Buchanan, it is getting to the point of

22  argument, because I heard him several

23  times say that it looked sinister, and

24  you're being repetitive and getting to

1    the point of arguing with the witness.

2              MR. BUCHANAN:  All right.

3              THE COURT:  Let's move along.

4    Q       Were you the attorney that

5    handled the change of venue hearing?

6    A       I don't recall that.  Change of

7    venue hearing.

8    Q       Yeah.  I got another question I

9    guess while I'm at it.  Do you know why

10   there was any -- There's no change of

11   venue hearing that was ever typed up.

12   There was no opening argument that was

13   ever typed up, no closing argument that

14   was ever typed up.  Was there any theory

15   that that was a good idea not to do

16   that?

17   A       Not to have an opening or

18   closing argument --

19   Q       In a capital murder case not

20   typed up for the record?

21   A       Typed up.  The question is not

22   to have it typed up or not to have it

23   period?

24   Q       Not to have it transcribed so

332

1    that it could be looked upon later for

2    purposes of appeal and things of that

3    nature.

4    A       I don't know why that -- If that

5    occurred, I don't know why it would have

6    occurred.

7    Q       You can't think of a reason off

8    the top of your head that it would be

9    strategically good to not type up as

10   much of the record as possible, can you?

11   A       For appeal I assume we're

12   talking about, obviously.

13   Q       Yes.

14   A       Post-conviction relief, et

15   cetera.  No.  No, I can't think right

16   now of a good reason for that.

17   Q       Okay.

18   A       And the venue as well.

19   Honestly, I don't even recall a venue

20   hearing.

21   Q       Okay.  Do you remember at the

22   trial that Jon was objecting that he was

23   -- he made some kind of reference to the

24   fact that he was in the wrong court

333

1   because he had never agreed to a venue

2   change?

3   A       I don't recall that.  I'm not

4   saying he didn't do it.  I just don't

5   recall that.

6   Q       Do you remember having any

7   discussions with him about venue and

8   change of venue?

9   A       Don't recall it.  You know, I'm

10  not saying I didn't, but I handled a lot

11  of cases then and continue to, and this

12  is Mr. Hall's only case, so ...  I don't

13  remember Mr. Hall making it clear to me

14  that he did not want this trial to occur

15  in Madison County prior to the trial.

16  If he said it on the record at trial,

17  you know, he may have.

18  Q       Okay.

19          MR. BUCHANAN:  May I approach,

20  Your Honor?

21          THE COURT:  Certainly.

22  Q       I want to show you what's been

23  marked Exhibit 5 and give you a chance

24  to look it over, and then I'll ask you a

                                            334

1   couple of questions about it.

2   A        Okay, I've reviewed it.

3   Q.       Do you know of any reason why

4   you didn't attempt to tender that into

5   evidence at the trial itself?

6   A        This document itself here.

7   Yeah, I don't remember right now, you

8   know, why we didn't do it.  In reading

9   it now, I see problems with it, trying

10  to introduce it, but --

11  Q        But you don't know why there

12  wasn't a try made.

13  A        Well, what I'm saying is that, I

14  don't specifically remember, back when

15  the trial occurred, making a decision

16  not to try to introduce this, you know,

17  the reasons we would have.  But as I

18  review it, I can think of a couple of

19  reasons why we may have decided not to

20  do it, for what that's worth.

21  Q        Well, to take you off the hook

22  for a minute, Jeff died in I believe

23  July of 1995, which was before you got

24  the case.

1   A        Uh-huh.

2   Q        Had you had the case in -- from

3   the beginning, let's say, July of '94,

4   if you have a witness that's going to

5   die, you know they're dying of AIDS, for

6   instance, or cancer or something, you

7   know they're not going to make it to the

8   trial, is there any reason in the world

9   why you don't try to preserve that

10  testimony?

11  A        I can't think of any reason why

12  you wouldn't try to preserve it.

13  Q        Okay.

14  A        You know, right now I can't.

15  Like you -- You know, like you said, I

16  wasn't his attorney at that time.  I

17  don't know if the attorneys at that time

18  spoke with him and decided there wasn't

19  anything there.  I don't know.

20  Q        Okay.  But you would agree with

21  me, once he dies, --

22  A        In theory.

23  Q        -- it's virtually gone.

24  A        Yeah.

336

1    Q        And it would be equally, or even

2    at least as negligent, if you knew that

3    he had something out there and you sat

4    around and didn't get it done knowing he

5    was dying.  That would be just flat-out

6    negligence; would it not?  And again,

7    you weren't the lawyer, but I'm asking

8    you for a legal opinion.

9    A        If you knew that there was --

10   that he had positive or exculpatory

11   information, knew that he was going to

12   die.  Yeah, it'd at least be close to

13   negligence if you didn't try to preserve

14   it, again, if you knew that it was

15   exculpatory.

16   Q        And it's just that much more

17   important in a capital case than it

18   would be in a burglary.  Correct?

19   A        I agree.

20   Q        Maybe I didn't make myself

21   clear, but when I say exculpatory, maybe

22   even you said exculpatory, at this point

23   I can't remember who says what, but when

24   we're talking exculpatory, we're not

337

1    necessarily talking about testimony that

2    proves he didn't do it, or tends to show

3    he didn't do it, but testimony that

4    would mitigate it perhaps down to second

5    degree, voluntary, things of that

6    nature.  That also is considered

7    exculpatory, at least as far as you and

8    I are talking.  Is that fair to say?

9    A        Yes, as long as -- Again,

10   though, if Jeff Hall -- you know, if

11   Jeff Hall were to say, "I know Jon

12   didn't do it because he just would have

13   never done anything like that, and I

14   know he acted under provocation," and

15   the attorneys at that time spoke and

16   they said, "Well what provocation?"

17   "Well I don't know.  I just know Jon,

18   and he would have had to have been

19   provoked," you know, that's not what I

20   would consider worth -- or I don't know

21   that I wouldn't try to preserve that

22   anyhow, but I don't know if I'd call it

23   negligence not to.

24   Q        Well let's back up one more

338

```
 1   step.   To be told that that's there and

 2   not even talk to Jeff probably is

 3   negligence, isn't it?

 4   A       To be told that he possesses

 5   that type of information --

 6   Q       And know that he's dying.

 7   A       And know that he's dying.

 8   Q       And not even talk to him.

 9   A       And not know what he's going to

10   say.  Not having anybody else that's

11   talked to him and made a determination,

12   this really isn't even good.

13   Q       Right.

14   A       Oh, yeah, you should have talked

15   to him.  The attorney should have talked

16   to him.

17   Q       Do you remember having a

18   conversation with Jon about the

19   positives and negatives of him

20   testifying?

21   A       Not distinctly, but I'm sure we

22   did.

23   Q       'Cause it said in the record --

24   there's some statement that the Judge
```

339

1  finds that he's been fully briefed.  Do

2  you remember what you told Jon regarding

3  the negatives and the positives of him

4  testifying?

5  A       I don't remember.  All things

6  considered, it would have been a

7  catastrophe to have him testify at that

8  time, you know, not just cross-

9  examination but his demeanor, his

10  attitude, his lack of remorse.  It would

11  have been horrible.  Now, knowing the

12  result that occurred anyhow, I suppose

13  you could argue it didn't -- you know,

14  it wouldn't have hurt anything, but at

15  the time we were hoping for better than

16  we got.

17  Q       Well there's a lot of stuff

18  actually in your file that -- some of

19  which I'm assuming you forwarded to Lyn

20  Zager, that showed he did have quite a

21  bit of remorse, wasn't there?

22  A       But not at trial.  By the time

23  we were in that courtroom, Mr. Hall was

24  on the verge of a violent outburst all

1    the time, and had a couple and was taken

2    out of the courtroom in shackles, had

3    guards posted behind us.

4    Q        He was angry at the proceeding,

5    but did he ever stop and say, "I no

6    longer have any remorse about Billie

7    dying"?

8    A        No.  No, he didn't say that.

9    Q        He pretty much has maintained

10   from day one that he never intended to

11   kill her; did he not?

12   A        I think that's fair.

13   Q        And that he truly -- he broke

14   down and cried when he first heard she

15   was dead.  You do remember that, don't

16   you?

17   A        I don't remember that.

18   Q        Do you remember him expressing

19   remorse to you that he never intended to

20   kill her and that he felt bad that she

21   was, in fact, dead?

22   A        I remember Mr. Hall saying he

23   never meant to kill her, or at least

24   implying that in our conversations.  I

341

1    don't remember -- again, a judgment call

2    I guess -- any sincere remorse.  I mean,

3    you know, to be quite honest, Mr. Hall

4    seemed to be narcissistic in the

5    extreme.  I was amazed that Dr. Zager

6    didn't find out something, quite

7    honestly.  I -- You know, I know with

8    the guidelines that you had to work

9    with, the law at that time, she was

10   limited, but Mr. Hall was difficult and

11   --

12   Q      You were surprised -- I can't

13   tell you how much I would agree with

14   you, having represented him myself.

15   A      Yeah, you know what I'm talking

16   about.

17   Q      Exactly.  If you -- If somebody

18   came back and told me Jon was a normal

19   human being, I'd go, "You obviously

20   haven't spent much time with him."  So

21   you were shocked, or at least you were a

22   little baffled as to her coming back and

23   not being able to help you more.

24   A      Yes.  And I know what you would

                                      342

1  say or the questions of why we didn't

2  get a psychiatrist to look at the

3  serotonin.

4  Q        That would be my next question.

5  A        Again, we already -- I don't

6  know that we didn't ask for another

7  independent evaluation.  We may not

8  have.  I don't remember asking for it.

9  I'll say that as well.

10  Q        I don't see it anywhere in the

11  record, too, for whatever that's worth.

12  A        I remember Mr. Hall did not want

13  to proceed with that defense.  He wasn't

14  interested in that.

15  Q        Insanity.

16  A        Right.  Said he wasn't.

17  Q        But we've already agreed, as far

18  as you know, there was never any

19  investigation or going down the road on

20  IED.

21  A        Right.

22  Q        That you remember.

23  A        Right.  That's right.  And again

24     --

1    Q        And you don't remember asking

2    for a psychiatrist to try to do the

3    serotonins and whatnot that might have

4    been necessary to do that.

5    A        That's correct.

6    Q        And again, correct me if I'm

7    wrong, you don't know of any reason why

8    you wouldn't have, other than Mr. Hall

9    didn't want to be known as an insane

10   person.

11   A        Well, you know, the -- you know,

12   there's a fine line of I guess the

13   dynamics of what was going on and what

14   you've experienced as well as I've

15   experienced in meeting with Mr. Hall.

16   Q        Yeah.  If you in good faith

17   thought he was truly insane, you

18   wouldn't have cared what he said.  You'd

19   have tried to --

20   A        Yeah.

21   Q        -- beat that bush as hard as you

22   could.

23   A        That's exactly right.  And I

24   guess the bottom line is, I really

344

1    didn't think he was insane.  I thought

2    he was mean as hell, I mean, quite

3    honestly.  That did not influence the

4    way I prepared for the case or the way I

5    tried the case.  I did everything I

6    could for him, but Mr. Hall seemed like

7    a five-year-old brat in an adult's body

8    that, you know, wanted to run the show

9    from start to finish and --

10   Q       Well, is it --

11   A       -- didn't exhibit any real

12   remorse.  I mean, you know, he -- I'm

13   not saying he didn't say, "I'm sorry,"

14   but -- so, yeah, it was hard to decide

15   exactly what was going on, but I didn't

16   see insan- -- you know, the crazy

17   insanity.

18   Q       Would it be fair to say that you

19   had come to a point where you really

20   didn't like him very much?

21   A       Yeah, that'd be fair to say.

22   Q       And while you try not to let

23   that color anything, you'd at least tell

24   me he was one of the least pleasant

345

1   people you had to deal with through the

2   day.

3   A        For the most part, yeah.  You

4   know, there were times he and I

5   discussed things that we weren't arguing

6   about them, but Mr. Hall was difficult

7   to deal with and was --

8   Q        But your testimony is also that

9   you would have never let that stop you

10  from --

11  A        Absolutely.

12  Q        -- fully investigating a solid

13  defense that might have been available.

14  A        That's correct.  Yes.

15  Q        At least you wouldn't have

16  knowingly let that interfere.

17  A        Yes.  I mean, you know, you're

18  in this business.  I represented a lot

19  of people, especially when I did a lot

20  of appointed work at the beginning, that

21  I may not have liked personally, but a

22  lot of them had been found not guilty

23  because I did them such a good job,

24  whether I liked them or not.

346

1 Q        Correct, okay.  You tried not to

2 let it color you in any way.

3 A        That's correct.

4          MR. BUCHANAN:  Your Honor, may I

5 have just a moment with Mr. Ellis?

6          THE COURT:  Yes.

7          MR. BUCHANAN:  Your Honor, may

8 we approach?

9          THE COURT:  Certainly.

10         **(There was a conference**

11         **at the bench as follows:)**

12         MR. BUCHANAN:  Your Honor, we

13 have something we'd like to ask him in

14 chambers because I have no desire

15 whatsoever to ask that with the

16 newspaper and everybody else in here,

17 and yet I've got some indication if I

18 don't ask it, I think I'm dropping the

19 ball in his -- dealing with substance

20 abuse on his part, and that's not a

21 question I want to ask.  I don't know

22 him from Adam, but I have no ill will

23 toward him nor any desire to do him

24 harm.  I would love to do that in

347

1  chambers just so that the federal boys

2  can't say, "Well why didn't you --"  "I

3  asked him, that's all, you know --"  I

4  have no idea what he's going to answer,

5  but it's all over my file about rumors.

6        MR. EARLS:  I don't see how it's

7  connected to the hearing.  If he wants

8  to try and lay some foundation for it,

9  how it had something to do with this

10  case, but --

11        MR. BUCHANAN:  If he says it

12  wasn't a problem for him during that

13  case, then I'm going to drop -- I'm not

14  going to go beat him up.

15        THE COURT:  Why can't we just

16  approach him and ask.  The court

17  reporter is able to approach, and just

18  ask it now and get it over with.

19        MR. BUCHANAN:  Just over there

20  in front of him quietly?

21        THE COURT:  Yes.

22        MR. BUCHANAN:  Okay.

23        THE COURT:  Counsel wanted to

24  ask you questions about substance abuse,

348

1   and rather than just do it in open

2   court, I'm going to let him just ask you

3   here, and we'll move on from there.    I

4   just feel like that is the proper way.

5           THE WITNESS:   Whatever Your

6   Honor says.

7           THE COURT:   If you're

8   comfortable with that, I am.

9           THE WITNESS:   Sure.

10          THE COURT:   Just go ahead, Mr.

11  Buchanan.

12  Q       Mr. Mayo, I asked that we do it

13  this way because I have no desire to

14  make this anything, but it's all over my

15  file and I have to ask you.

16          Did you have a substance abuse

17  problem during this period of time, 1996

18  to 1997?

19  A       You know, those are very

20  difficult questions.   That's a very

21  difficult question to answer.   In

22  retrospect, I would say that I was an

23  alcoholic during that time period, but,

24  you know, certainly a functional one.   I

349

1    think we've got a huge portion of our

2    bar that are, but I decided to do

3    something about it as opposed to most

4    people who don't. At that time, though,

5    substance abuse? No. I became addicted

6    to pain pills in the fall of 1998 after

7    a motorcycle wreck. That's what led me

8    to the point of realizing that, yeah, I

9    was addicted to substances. Now as I

10   worked my way through it, looking back

11   over the course of my life, what I

12   learned about the disease of alcoholism,

13   I would say that, yes, I probably was.

14   Now during the trial, no. I never came

15   to court under the influence. Even at

16   my worst I never did. I was not what

17   you -- You know, I know so much about

18   this stuff, I could sit here and talk to

19   you for hours about it. So maybe you

20   just ought to ask me questions.

21   Q       I guess I'm asking you this from

22   the standpoint of kind of covering

23   myself. You've been in the position --

24   A       I understand.

350

1    Q       You don't feel that any time you

2    ever performed any duties in this case

3    with any substance, be it legal or

4    illegal, interfering in any way?

5    A       No.  I never drank in the

6    morning.  I never did drugs, you know,

7    other than those as -- you know, as I

8    went along but never when I was in

9    court.  I was always able to postpone it

10   until afterwards.  And during this

11   trial, I distinctly remember not doing

12   anything because after it was over, I

13   remember getting drunk that night

14   because I was so upset that he got the

15   death penalty, quite honestly.  As much

16   as I didn't like him, I still didn't

17   want him to get the death penalty.

18          MR. BUCHANAN:  I'm happy with

19   that, Judge.  That's fine.

20          THE COURT:  Mr. Earls, any

21   questions?

22          MR. EARLS:  Did intoxication and

23   drugs -- they had no affect on your

24   ability to try this case?

351

```
 1              THE WITNESS:  None whatsoever,
 2  none on my ability to try any case that
 3  I ever tried.
 4              MR. EARLS:  That's all I have.
 5              THE COURT:  Thank you.  Counsel
 6  may have other questions for you.
 7              (End of conference at
 8              the bench.)
 9  Q        I myself get a little punchy at
10  this point, but I did want to ask you:
11  Do you remember any of the conver- --
12  did you tell me earlier you don't
13  remember ever having a confrontation or
14  a memorable conversation with Jon
15  regarding the change of venue, getting
16  him to sign an affidavit agreeing to it
17  or not agreeing to it or anything like
18  that?  Do you remember anything about a
19  sit-down with Jon on the change of
20  venue?
21  A        I don't remember that.  I'm not
22  saying it didn't occur.  I just don't
23  independently remember that.  It seems
24  like that Mr. Ford had more to do with
```

352

1   the venue than I did, but -- and I don't

2   know why I say that.  For one thing, he

3   was lead counsel.  For another, I seem

4   to remember that he was really strong

5   about the change of venue.  He really

6   wanted it out of Henderson County.

7   Q      Mr. Ford did?

8   A      Yes.  I believe that's correct.

9   And, you know, as far as my personal

10  feelings or my meetings with Mr. Hall

11  and any memorable conversation I had

12  with him, I don't recall that.

13  Q      All right.

14         MR. BUCHANAN:  We want to pass

15  the witness at this time, Your Honor,

16  subject to further ...

17  **CROSS-EXAMINATION**

18  **BY MR. EARLS:**

19  Q      Mr. Mayo, in your preparation of

20  this case, did you come across any

21  witness who would give evidence at trial

22  of any provocation in this matter?

23  A      I don't recall ever receiving

24  any information like that.  I don't

353

1  remember anybody else that -- I mean,

2  nobody else was there, first of all, and

3  I don't remember being told by anyone

4  that they knew distinctly that there was

5  provocation.

6  Q        Isn't it true that everyone who

7  was there testified other than Mr. Hall?

8  A        That's correct.

9  Q        Now, I'll hand you a document as

10 part of the court's record and ask if

11 you remember that.

12 A        Yes.

13 Q        Okay.  Is that document a

14 letter?

15 A        Yes.  The first two pages of it

16 are a letter to Judge LaFon from Larry

17 Southard, Director of Forensic Services

18 at Middle Tennessee Mental Health

19 Institute.

20 Q        Basically, in a nutshell, that

21 letter says that he's competent and

22 insanity can't be supported.

23 A        That's correct.

24 Q        You also had the services of Dr.

354

1    Zager.   Is that right?

2    A        That's correct.

3    Q        And, there was an individual who

4    also testified at the sentencing hearing

5    other than those two.   Is that correct?

6    On behalf of Mr. Hall, another

7    psychologist.   Well, the record speaks

8    for itself.

9    A        Yeah, I don't -- I'm sorry.

10   Other than Dr. Zager and other than

11   someone from mental health, I'm not

12   sure.

13   Q        Mr. Mayo, obviously hindsight's

14   20/20, isn't it?

15   A        Uh-huh.   That's correct.

16   Q        When you're preparing for this

17   case, there are a lot of potential

18   defenses until you eliminate them.

19   Right?

20   A        Absolutely.   That's correct.

21   Q        One of which may be this

22   intermittent explosive disorder.   Is

23   that right?

24   A        That's what I understand, yes.

1    Q        But based upon your study of the

2    case file, discussions with the doctors

3    and your reliance upon the determination

4    by the Middle Tennessee, you determined

5    that insanity wasn't a defense.

6    A        That's correct.

7    Q        Now, did you discuss all this

8    with Jon Hall?

9    A        Yes.

10   Q        And you discussed other

11   defenses; did you not?

12   A        Yes.

13   Q        And I think you testified one of

14   the other was intoxication.

15   A        Correct.

16   Q        The other one, I think that --

17   the way you decided to go with this was

18   try to mitigate it down to second degree

19   or a lesser included.

20   A        Correct.

21   Q        All that was discussed with Mr.

22   Hall.

23   A        Yes.

24   Q        And the decision was ultimately

356

1   made.   Is that right?

2   A       Correct.

3   Q       Based upon everybody's

4   understanding of the facts of the case.

5   A       That's correct as well.

6   Q       What experts you had.

7   A       Uh-huh, yes.

8   Q       And Mr. Hall was part of that.

9   A       Yes.  To the best of my

10  recollection, Mr. Hall wanted not

11  guilty, and, you know, as in a lot of

12  these difficult murder cases, you know,

13  that's difficult.  That's a stretch.  So

14  you have to kind of find a way that you

15  can agree to start moving down that way.

16  Q       A question was asked about

17  bringing in people who would talk about

18  the good things of Mr. Hall.

19  A       Yes, I remember that.

20  Q       And I think your response was,

21  you can do that but you open up other

22  doors.

23  A       Yes.

24  Q       All right.  Do you know of any

357

1  witness that you could have called that

2  would have testified to only good things

3  about Mr. Hall without allowing the

4  State to get into prior violent acts?

5  A        I don't know of anyone like

6  that.

7  Q        And, let me ask you this.  Do

8  you recall during the penalty -- the

9  guilt phase of the trial the children

10  testifying?

11  A        Yes.

12  Q        And wasn't it part of your

13  cross-examination, Mr. Ford's cross-

14  examination, about how Mr. Hall treated

15  them?

16  A        How Mr. Hall --

17  Q        Treated them, his children.

18  A        I believe that's correct.

19  Q        So you tried to get into that

20  through the children.

21  A        I think Mr. Ford did.  I think

22  he had that job.

23  Q        Mr. Mayo, let me ask you this.

24  Can you think of any motions that you

358

1  could have filed, that you shouldn't

2  have filed in this case, that would have

3  made any difference?

4  A        Could have filed -- No.

5  Q        Can you think of any witnesses

6  that you would have called that would

7  have made any difference?

8  A        No.

9  Q        Let me ask you.  Do you recall

10 how many hours you spent on this case?

11 A        I don't recall.  A lot, but I

12 don't recall.  A lot.  We spent a lot of

13 time on this case.

14 Q        And did you discover the State's

15 file in this case?

16 A        Yes.

17 Q        Okay.  Was that provided to the

18 Defendant?

19 A        Yes.

20 Q        Copies of it.  Were you in any

21 way surprised by anything the State had

22 at trial?

23 A        I don't remember being surprised

24 at all, no.  Now, surprised that you

1   didn't use more, quite honestly.

2   Q       Okay.   Matter of fact, there

3   were some statements made by the

4   Defendant; were there not?

5   A       Correct.

6   Q       And the State did not use those.

7   A       That's correct.

8   Q       Other than looking back with

9   20/20 hindsight, can you tell us

10  anything you should have done, could

11  have done that might have made any

12  difference in this?

13  A       No, other than looking back and

14  this IED possibility, I'd say,

15  possibility, no, I can't think of

16  anything that we would have done any

17  different.   No.

18          MR. EARLS:   That's all I have.

19          THE COURT:   Do you want that

20  letter returned back to you?

21          MR. EARLS:   Your Honor, I'd ask

22  that be made an exhibit to his

23  testimony.

24          MR. BUCHANAN:   No objection.

1          THE COURT:  Be marked Exhibit 6.

2          **(Exhibit 6 was marked**

3          **and entered.)**

4   **REDIRECT EXAMINATION**

5   **BY MR. BUCHANAN:**

6   Q       I believe there was some talk

7   while Mr. Earls was questioning you

8   about intoxication being a defense.  And

9   intoxication is not a defense as far as

10  you understand.  Is that fair to say?

11  A       Yes.

12  Q       Intoxication is a mitigator

13  perhaps --

14  A       Right.

15  Q       -- but not a defense.

16  A       Right.

17  Q       We left -- And just to make sure

18  I didn't get anything unscrambled there,

19  you ruled out insanity.

20  A       Yes.

21  Q       Feel comfortable with that.

22  A       Yes.

23  Q       You can't really remember about

24  intermittent explosive disorder.

1  A       Right.

2  Q       Okay.  And --

3  A       I remember the idea side of it.

4  Q       Right.

5  A       I remember it being brought up.

6  Q       Can't remember what follow up,

7  if any, was done on it.

8  A       Correct.

9  Q       All right.  And then as far as

10  if you could have found and talked to

11  people that could have told you about

12  the wires with no downside and the

13  premeditation with no downside, you

14  would have been glad to have used it, if

15  you could have determined there was no

16  downside to it.

17  A       If there was no downside, yes.

18          MR. BUCHANAN:  No further

19  questions.

20  **RECROSS-EXAMINATION**

21  **BY MR. EARLS:**

22  Q       If part of putting in the proof

23  about these other incidences of him

24  disconnecting phones was to prevent

362

1    police from being called, would you have

2    used that?

3    A        No.

4            MR. EARLS:  Thank you.

5            THE COURT:  Might I excuse Mr.

6    Mayo to return to work, or does he have

7    to remain?

8            MR. BUCHANAN:  To return to work

9    subject to something coming up, Judge,

10   which we'd try to give him some notice

11   of.

12           THE COURT:  Just be available if

13   they need to contact you through your

14   office and you're excused.  Just remind

15   you not to discuss the case with

16   anybody.  Thank you, sir.

17           Do you want to call the next

18   witness?

19           MR. BUCHANAN:  Like to take a

20   break if we could.

21           THE COURT:  Let's take one short

22   break 'til 3:30.  Start back at 3:30.

23           (After a recess, the

24           following proceedings

363

1          **were had:)**

2                 THE COURT:   Call your next

3    witness.

4                 **MARTIN ESKEW** was called and

5    being first duly sworn, was examined and

6    testified as follows:

7    <u>**DIRECT EXAMINATION**</u>

8    <u>**BY MR. ELLIS:**</u>

9    Q          Good afternoon, Mr. Eskew.   For

10   the record, would you please state your

11   name for the Court?

12   A          Martin Eskew.

13   Q          Mr. Eskew, where do you live?

14   A          Jackson here.

15   Q          In Jackson, Tennessee?

16   A          Yes.

17   Q          How long have you lived in

18   Jackson, Tennessee?

19   A          About seven or eight years.

20   Q          Did you ever live in Lexington?

21   A          No.

22   Q          Okay.  Do you know Jon Hall?

23   A          Yes.

24   Q          How do you know Jon?

1    A        Through misfortune.

2    Q        Through misfortune?

3    A        Yeah.  I was married to the

4    sister of the girl he killed.

5    Q        You were married to Donna I

6    believe?

7    A        Yes.

8    Q        So you know -- you knew Billie

9    for a while then I take it.

10   A        Yes, knew both of them.

11   Q        You knew Billie before she met

12   Jon?

13   A        Yes.

14   Q        Kind of grew up with Billie?

15   A        Not exactly.  She was, I don't

16   know, 13, 14 before I ever met her.

17   Q        Did you know her tendencies, the

18   way she acted?

19   A        Not that much.  I mean, I knew a

20   little bit about her, but I didn't like

21   follow her around or anything.

22   Q        Are you and Mrs. Donna -- are

23   you married?

24   A        No.

365

1   Q        You divorced?

2   A        I'm happily divorced.

3   Q        When were you divorced, sir?

4   A        '92 or '93.  I'm not for sure.

5   I'd have to look.

6   Q        Did you ever have a chance to

7   watch Jon and Billie interact?

8   A        Oh, yeah.

9   Q        Have you had a chance to be

10  around Jon?

11  A        Yes.

12  Q        How would you characterize Jon,

13  in your own words?

14  A        Spoiled brat.

15  Q        Complete idiot?

16  A        No.  Spoiled brat, self-

17  absorbed, only him.  Nothing else

18  mattered.

19  Q        You never used the word complete

20  idiot to describe Jon?

21  A        Well, I don't know.  I may have;

22  I may not have.  I don't know.

23  Q        How about Jon and Billie?  How

24  would you characterize their

1   relationship?  Did they get along?  Did

2   they fight a lot?

3   A        No, they fought a lot.

4   Q        And, who would usually instigate

5   it?

6   A        I don't know.  I wasn't there to

7   see it.

8   Q        You never saw them fight?

9   A        No, I wasn't there.  Usually --

10  I usually saw the aftermath more than

11  the fights or what instigated them.

12  Q        So you never saw her egg Jon on?

13  A        No.

14  Q        Belittle him?

15  A        No.

16  Q        Hit him?

17  A        No.

18  Q        Punch him?

19  A        No.

20  Q        Do you remember talking to April

21  Higuera?

22  A        Who?

23  Q        This lady right here.  Maybe by

24  telephone.  Let me ask you this.  Do you

367

1  remember talking to somebody on the

2  telephone about this case?

3  A      Yeah, about his idiot lawyers.

4  I remember that.

5  Q      Was that your words or was that

6  her words?

7  A      That was pretty much my words.

8  Q      Why do you characterize them

9  like that for?

10 A      I don't have a high regard for

11 attorneys.

12        MR. EARLS:  Your Honor, I want

13 to object to that at this point.  I

14 don't see that that's relevant.

15        THE COURT:  He's responded he

16 doesn't have a high regard for

17 attorneys.  We'll let it stand and move

18 along.

19 Q      Do you know if Jon drank?

20 A      A lot.

21 Q      How often would he drink?

22 A      Well, a lot of times when I was

23 around him he drank.  I mean, I didn't

24 -- I was not around Jon constantly.  We

368

1    didn't visit a lot, but a lot of the

2    times when I saw him he drank.

3    Q        Did he do anything besides

4    drink?  Did he have a substance abuse

5    problem?

6    A        I gather he did.  He many times

7    looked like he was glazed-eyed or

8    whatever.

9    Q        What do you do for a living, Mr.

10   Eskew?

11   A        What do I do for a living?

12   Q        Yes, sir.

13   A        I work on computers.

14   Q        On computers?

15   A        Yes.

16   Q        I see you have a <u>Jackson Sun</u> --

17   is that --

18   A        Yes, I work for the local

19   newspaper.

20   Q        What do you do for the local

21   newspaper?

22   A        I work on computers.

23   Q        Oh, okay.  Do you just do that

24   with them?

369

```
 1   A        Ma'am -- Sir?

 2   Q        Do you just do that with them?

 3   A        No, I do some outside consulting

 4   also.

 5   Q        Were you ever contacted by

 6   defense counsel before this hearing?

 7   A        No, not to my knowledge.

 8   Q        Were you ever contacted by

 9   another investigator besides the lady

10   that called you before this hearing?

11   A        No, I don't think so.

12   Q        Could Billie be kind of

13   difficult to deal with sometimes?

14   A        Who?

15   Q        Billie.

16   A        I never had any problem with

17   her.

18            THE COURT:  Does counsel pass

19   the witness?

20            MR. ELLIS:  Yes, Your Honor, I'd

21   pass the witness.

22            THE COURT:  Does the State have

23   any questions?

24            MR. EARLS:  No questions, Your
```

370

1    Honor.

2              MR. ELLIS:  Hold on, Your Honor.

3    I'm sorry.

4    Q        (By Mr. Ellis) What did your ex-

5    wife or what does your ex-wife do?

6    A        For?

7    Q        For a living?

8    A        Works for an attorney I

9    understand.

10   Q        Do you know which attorney?

11   A        No.  No, I really don't.  I try

12   to stay far away from Huntingdon, so --

13   I don't go down there very often.

14   Q        Did she draw up your divorce

15   papers in this case?

16   A        I believe so.

17   Q        And, to your knowledge, was she

18   advising Billie how to proceed with any

19   type of divorce against Jon?

20   A        I'm not sure.  We were divorced

21   at this time, and I really wasn't much

22   in their personal life at this time.  I

23   was living in Jackson, so I didn't have

24   a lot of access to them.  I -- It's

371

1    possible, but I do not know.  I have no

2    first-hand knowledge of it.

3              MR. ELLIS:  Pass the witness.

4              THE COURT:  Do you have any

5    questions?

6              MR. EARLS:  No questions.

7              **(WITNESS EXCUSED.)**

8              THE COURT:  Next witness.

9              MR. ELLIS:  Your Honor, I'd call

10   Alice Pearson.

11             THE COURT:  Alice Pearson.

12             COURT OFFICER:  She doesn't

13   answer.

14             THE COURT:  She doesn't answer.

15   Do you have another witness?

16             MR. ELLIS:  Diane Pearson.

17             THE COURT:  She's not out there

18   either.

19             MR. ELLIS:  Your Honor, I would

20   say to the Court that Alice Pearson and

21   Diane Pearson were properly served with

22   subpoenas.

23             THE COURT:  We'll take that up

24   later if you choose to do so as far as

372

1    having them address that to the Court.

2    And please remind me if you want some

3    action taken, and I'll be glad to

4    entertain the request.

5         **JESSE H. FORD III** was called and

6    being first duly sworn, was examined and

7    testified as follows:

8    **DIRECT EXAMINATION**

9    **BY MR. BUCHANAN:**

10   Q       Would you state your name,

11   please, for the record?

12   A       Jesse H. Ford III.

13   Q       Mr. Ford, how are you employed?

14   A       I'm an attorney.

15   Q       How long have you been an

16   attorney?

17   A       Since May of 1982.

18   Q       And are you licensed here in the

19   State of Tennessee?

20   A       Yes, I am.

21   Q       And, back in 1995, '6, '7 when

22   you represented Jon Hall, you were a

23   licensed attorney here in the State of

24   Tennessee?

1  A       Yes, sir.

2  Q       Were you familiar with the

3  formulation of the qualifications for

4  background for first -- for first chair

5  back then?

6  A       Yes, sir.

7  Q       Okay.  Did you -- I understand

8  the rule was not mandatory, but did you

9  roughly meet those minimum requirements

10 back -- in terms of your experience and

11 whatnot?

12 A       Well, Judge LaFon -- Yeah, I

13 thought I did.

14 Q       Can you just briefly, without

15 taking too long, tell me what you -- how

16 many capital trials you had tried?

17 A       I had not tried any.  I'd been

18 associated on two but hadn't tried any.

19 Q       Okay.  When you were associated

20 on them, did they go to trial?

21 A       Yes.

22 Q       Okay.  So you were like second

23 chair?

24 A       Yes.

374

1   Q        And had you had other felony

2   experience?

3   A        Quite extensive, other trial

4   work.  I -- When I first started and

5   back in the eighties, we didn't have a

6   public defender's office.  So most

7   lawyers, young lawyers, were required --

8   well weren't required, but were asked to

9   take appointed cases, and I -- about 60

10  percent of my practice was probably

11  criminal appointed cases, and so you get

12  your feet wet real quick.

13  Q        They were paying that big 40

14  bucks an hour and you couldn't resist,

15  could you?

16  A        And 20 out of court.

17  Q        Anyway, but that's basically

18  what led up to your experience for

19  trying cases, the more you got appointed

20  to, then you tended to step up and

21  things of that nature.

22  A        Right.  And I tried a murder

23  case.  I was co-counsel with Hughie

24  Ragan back in the late eighties, State

375

1  versus Michael Chamberlin.  And I think

2  it was Judge Todd's first murder case

3  when he took the state bench, and, you

4  know, I was second chair on that one.

5  Q       Had you done any particular

6  seminars that dealt primarily with

7  capital murder case preparation back

8  during that time?

9  A       I hadn't but Mr. Mayo had.

10  Q       Okay.

11  A       He'd handled a couple of cases

12  with co-counsel, and he'd been to a

13  couple of seminars.

14  Q       Okay.  Now you weren't the first

15  lawyer on the case, were you?

16  A       No.

17  Q       Do you know about -- remember

18  about when you were appointed?

19  A       Sometime in ninety -- I'd say

20  late '95.

21  Q       Late '95 or early '96?

22  A       I can't -- ninety -- February of

23  ninety -- I can't remember.

24  Q       At least a year before you

376

1    actually had to try the case.

2    A        Yes.

3    Q        Okay.  Tell the Court exactly

4    what you do when you get a case that's

5    in the middle of -- Were you in private

6    practice at the time?

7    A        Yes.

8    Q        Okay.  Tell the Court what you

9    do and what you did in this case in

10   terms of getting a'hold of a file when

11   you're assigned to it kind of halfway

12   through the preparation.

13   A        We got the file from the

14   previous attorneys, which I believe were

15   Carthel Smith and Mike Mosier.  Went

16   through the file, saw what they had

17   done, saw the motions they had filed.

18   We divided up the work.  Mr. Mayo was

19   going to do the -- mainly be responsible

20   for the mitigation, and I was going to

21   be mainly responsible for the trial work

22   because Clay -- Mr. Mayo had tried, or

23   been associated, on one or two capital

24   cases before, and he knew quite a bit

1  more about the mitigation -- or was more

2  -- let's say more qualified in that

3  area, and I felt that I had tried a lot

4  of cases and I was going to be more --

5  mainly responsible for the trial, the

6  guilt or innocence phase of the case.

7  Q      Is it fair to say, though, that

8  y'all welcomed each other's comments and

9  suggestions on each other's primary part

10 of preparation of your phase?  You

11 certainly didn't in any way say, "I

12 don't want to hear from you, Mr. Mayo."

13 You encouraged him.  Anything he had to

14 say, you at least were willing to hear;

15 were you not?

16 A      Well we were in the same office

17 together.

18 Q      Okay.

19 A      I mean, we saw each other on a

20 daily basis.  I mean, at the end of just

21 about every day, you know, we would have

22 a, you know, little discussion about

23 this case, about where we were and, you

24 know, update, you know, who he'd talked

378

1    to, who I'd talked to and that kind of

2    thing.

3    Q        My point is, there was no ego

4    between you and him.  If he had

5    something to say that you thought helped

6    you, you welcomed to hear -- at least

7    hearing it, didn't you, and vice versa?

8    A        No problem at all in that area.

9    Q        Did you -- In preparation for

10   this, did you yourself talk to the

11   family, the immediate brothers and

12   sisters involved in this case?

13   A        I think I talked to Mr. -- one

14   of Mr. Hall's sisters on occasion or

15   two.  I think Mr. Mayo talked to her a

16   whole lot because that was more of the

17   mitigation part of the case, penalty

18   phase, and I think he spent more time on

19   the phone with her than I did.

20   Q        And that's Sheryl Arbogast?

21   A        Yes.

22   Q        Does that name sound familiar?

23   A        Yeah.

24   Q        Okay.  You don't remember

379

```
 1   talking to any of the others in

 2   preparation for the case?

 3   A        I may have.  I don't remember.

 4   Q        Okay.  I want to go into

 5   something that I went into with Mr. Mayo

 6   and see what you think about it.  We had

 7   a discussion about getting -- Were you

 8   familiar with the brother than had AIDS

 9   down in Texas?

10   A        Yes, I -- Yes.

11   Q        Okay.  Do you remember what

12   state -- When you got it, he was already

13   dead, wasn't he?

14   A        I think that was the case.  I

15   think that when Mr. Smith and Mr. Mosier

16   had it, I think that had already

17   occurred, but I don't remember.  I think

18   that -- I'm pretty sure it had.

19   Q        I think I agree with you.  I

20   think he's dead by this time.  But my

21   question is:  You didn't have a -- When

22   you got the file, it didn't have his

23   testimony preserved in any -- in any for

24   sure admissible form.  Is that correct?
```

380

1  A        There may have been some notes

2  about him, but I -- no -- no deposition,

3  if that's what you're getting at.

4  Q        Right.  And that's what I mean

5  when I say admissible form.

6  A        I don't think anybody went down

7  to Texas to take his deposition.

8  Q        Well, in a capital case, do you

9  know of any reason why, if you have

10 information that someone is dying and

11 will be dead soon from AIDS or cancer,

12 one of those degenerative-type diseases,

13 especially in a capital case, -- do you

14 know of any reason why you wouldn't

15 attempt to preserve that testimony?

16 A        I'd want to know what he was

17 going to say first.

18 Q        I understand that, but assuming

19 there was something useful, there's no

20 reason you can think of offhand not to

21 at least seek the Court's help in

22 getting a depo on something like that,

23 would you?

24 A        I think it probably would have

381

1    been granted if we could show that there

2    was something very useful, because it's

3    out of state deposition, and, of course,

4    the expense --

5    Q       Right.

6    A       -- of that would -- you know,

7    the -- both, you know, the State and the

8    defense attorney would have to be there,

9    and I think you'd have a pretty heavy

10   burden to show, first of all, you know,

11   is he not going to be available.  Well,

12   I don't think that death is something in

13   a case, in an AIDS case, that you can

14   predict.  You know, I don't think you

15   could predict that he wasn't going to be

16   available.  So that would have been our

17   first hurdle because he's there.  He's

18   alive now.

19   Q       No, I think you're missing my

20   hypothetical.  Assuming that you can

21   show he is on the last leg, assuming you

22   can get a doctor's certificate that

23   he's, you know, 60, 90, 100 days out,

24   something of that nature, and he's got

1  some valuable testimony, do you know of

2  any reason why you wouldn't at least try

3  and say, "Your Honor, I need some funds

4  to go get this done"?

5  A       Probably would have filed the

6  motion if we'd known what he was going

7  to -- what his testimony would have

8  been.

9  Q       And again, I think the record

10  reflects, it's over by the time you get

11  in.  But I was just asking you as an

12  attorney if that's what you do when

13  you've got testimony you want to hold on

14  to --

15  A       You want to preserve it.

16  A       -- that you know you've got

17  somebody fixing to die.

18  A       Or you've got somebody that's

19  not available, that's more than 100

20  miles from the courthouse, you're going

21  to try to get an evidentiary on them if

22  you possibly can, at some point.

23  Q       Now, you were -- I want to talk

24  to you a little bit about the change of

1    venue.

2    A        Uh-huh.

3    Q        Do you remember there being any

4    big problem with the change of venue or

5    any discussions you had with Jon on the

6    change of venue?

7    A        I know that we looked at the

8    newspaper articles, we preserved -- I

9    think that they were already in the

10   file.  I know they were.  I know that

11   when we got the file, there were

12   numerous newspaper articles in there,

13   and we felt that, you know, based on

14   informal conversations in Henderson

15   County, and you have to know what -- you

16   know, without practicing there and

17   knowing Henderson County, we felt that a

18   change of venue had -- was absolutely

19   necessary, and I discussed that with Mr.

20   Hall at length.

21   Q        And what did Mr. -- did Mr. Hall

22   agree with you?

23   A        Yes.  I mean, I'm not in the --

24   I wouldn't file the motion if my client

384

1    would -- did not give me permission.

2    I'm not in the habit of doing that.

3    Q        Well do you remember having the

4    hearing?

5    A        Judge LaFon granted that on his

6    own -- on his own -- he said -- he drew

7    the -- he said draw the order.

8    Q        He did it sua sponte?

9    A        Yes, from what I -- Yeah, from

10   what I can recall.

11   Q        With Jon's permission?

12   A        Well, we weren't opposed.  We

13   filed the motion.

14   Q        Okay, you filed a motion.

15   A        We filed the motion, and then he

16   said draw an order.

17   Q        Okay.  And you had Jon's

18   permission.

19   A        Yes.

20   Q        And was there ever a hearing

21   conducted then?

22   A        No.

23   Q        So there -- your testimony is

24   there was nothing to type up, other than

385

1    the order.

2    A        Motion and order.

3    Q        I mean, there was no hearing to

4    type up.

5    A        No, not that I remember.

6    Q        Do you know why the opening

7    statements and the final arguments were

8    never designated to be typed up in this

9    record?

10   A        That's just the common practice

11   since I've been in practice.

12   Q        To get them done or not get them

13   done?

14   A        Not to get them done.  It's not

15   really -- Well, I mean, it's -- I don't

16   consider it part of the record actually

17   really, argument.

18   Q        You don't think it's a good idea

19   to get them typed up in a capital murder

20   case?

21   A        Well, maybe, maybe not.  It

22   depends on if there's something in there

23   that may be inflammatory, but I didn't

24   think that there -- I can't remember

1   that there was.

2   Q       Well you didn't handle the

3   appeal, though.   Right?

4   A       Yeah, we handled part -- yes,

5   part of it.

6   Q       Okay.  Well you -- I thought Mr.

7   Donahoe handled the appeal.

8   A       No.  Well, we had to begin on

9   it, and then we had to get -- we had to

10  be relieved.

11  Q       You just didn't think it was a

12  good idea to have that maybe preserved

13  for someone else to look at down the

14  road?

15  A       I didn't think it was necessary.

16  Q       Even in a capital case.

17  A       Yes.

18  Q       All right.  So you're telling me

19  that you -- Do you ever remember having

20  a conversation with Jon wherein he told

21  you he was very, very unhappy about

22  anybody agreeing to a change of venue in

23  this case?

24  A       After the fact.

387

1   Q        Did you relay that to the Judge,

2   that he didn't want it moved?

3   A        Well it was already granted.

4   Q        Well, I know, but did you --

5   A        It was already granted, and

6   again, you got to understand Mr. Hall.

7   Mr. Hall will say one thing one day and

8   another thing two weeks, three weeks

9   later, whatever suits his need -- his

10  alleged -- whatever his needs are at

11  that time.  He's like a chameleon.  He

12  changes colors about as often as he

13  changed attorneys.

14  Q        So, what you're saying is that,

15  at one time he agreed to it and one time

16  he didn't.

17  A        At a later day.  Yeah, right

18  before the trial he -- you know, he --

19  he didn't want to go through with it

20  there in Madison County, but it was too

21  -- I mean, it was too late.  It was a

22  done deal.

23  Q        Okay.  Well, what was your --

24  Jon was difficult to deal with at times,

388

1    wasn't he?

2    A        I've had a lot of difficult

3    clients.  I've -- I became --

4    Q        That's not my question.  My --

5    A        I became an expert on difficult

6    clients.

7    Q        -- question is:  Jon was

8    difficult, wasn't he?

9    A        Every client's difficult.

10   Q        Every client you have is

11   difficult?

12   A        At times.  If you've ever been

13   in private practice, you would know that

14   it's hard to please your client 100

15   percent of the time.  It's very

16   difficult, 'cause there's a winner and a

17   loser in every case.

18   Q        Yes, sir.  Do you think I'm not

19   in private practice?  I just want to --

20   A        I don't know.

21   Q        Okay.

22   A        I don't know what you do.

23   Q        Okay.  You just said if I was --

24   "If you were in private practice you

389

1   would know," and I just wondered if you

2   thought I was not in private practice.

3   But anyway -- So, anyway, you're saying

4   that Jon changed his mind on the change

5   of venue, and because he was so likely,

6   like a chameleon, to change his mind

7   again, that you more or less just said,

8   "Okay, we had that hearing. It's over.

9   We're moving on." Would that be a fair

10  summation of what your position in it

11  was?

12  A       My position was that, "It was

13  granted. That's what you wanted. We're

14  here. The Judge is not going to change

15  his mind." They usually don't after

16  they rule. That's been my experience.

17  Q       Okay. All right. You had the

18  guilt or innocence phase. What was your

19  theory of defense?

20  A       Voluntary intoxication. Jon had

21  said he had consumed five, six -- a

22  number of beers before he went out

23  there, and that's a defense to

24  premeditated first degree murder. And

390

1  he had said -- And we tried to find

2  people who he had been with, who knew

3  that he had a drinking problem.

4  Q        Your defense to first degree

5  premeditated murder was that he was

6  voluntarily intoxicated.

7  A        That's what he told us.

8  Q        I mean, but once he told you

9  that, then you said, "That's my

10 defense"?

11 A        Well, that's one of the areas we

12 were going to explore.

13 Q        Okay.  Well, I guess what I'm

14 trying to say is, I didn't notice that

15 being in the record as being what you

16 really pushed.

17 A        That was one of our theories.

18 Q        Okay.  What theory --

19 A        But, see, he didn't -- when your

20 client refuses to testify, it's hard to

21 get that in.

22 Q        Okay.  So, I guess what -- I'm

23 back to my original question.  When you

24 got down to the actual trial, what was

391

1   your theory of defense?

2   A       Our theory was to hope that the

3   jury would show some mercy on Mr. Hall

4   and that he would have been in -- it's a

5   domestic situation.  He had to be -- We

6   were trying to get it down to maybe some

7   form of manslaughter due to the fact

8   that it's domestic, there are high

9   emotions here, and, you know, he lost

10  control, and it was one of those type

11  situations.

12  Q       Okay.  In my reading of the

13  record, it seemed like that getting it

14  down to voluntary manslaughter seemed to

15  be where you were headed with Ms. Zager.

16  Would that be fair to say?

17  A       Yeah, which under the

18  circumstances was difficult, to say the

19  least.

20  Q       If I can refresh your memory,

21  Dr. Zager testified at about Page 335,

22  and it -- the summation before Mr. Earls

23  crossed her was:  "It's my impression

24  based on everything I know about the

392

1    case that Mr. Hall was acting in an

2    impulsive manner versus a well thought

3    out plan."  Is that the sum and

4    substance of where you were headed?

5    A        That'd be correct.

6    Q        Okay.  So you were trying to get

7    it down from premeditated to --

8    A        Some form --

9    Q        -- second or voluntary.

10   A        Some form of manslaughter.

11   That's what we were shooting for.  It's

12   difficult when you have four fact

13   witnesses, or five, and one of them's

14   not going to testify.  I've only had one

15   case where the Defendant did not testify

16   that I got a good result.

17   Q        Okay.

18   A        The jury wants to hear from the

19   Defendant.

20   Q        Okay.  Did you tell Mr. Hall

21   that?

22   A        Yes.  Oh, I explained -- I went

23   into great detail with Mr. Hall about,

24   you know, whether he should testify or

393

1  not, and I told him that it's been my

2  experience that, you know, the jury is

3  going to want to hear from the

4  Defendant, especially in a case like

5  this.  If you're -- You know, it's hard

6  to prove that he was out of control,

7  this, that and the other unless he gets

8  up there and takes the stand.  He

9  refused to take the stand, was not going

10  to testify.  We had hearings on that.

11  We had a hearing on that, about, "Take

12  the flag down and I'll testify," and,

13  you know, that didn't happen.

14  Q        Okay.  So you're trying to show

15  that he's explosive, and this was a

16  passionate thing brought about by

17  provocation.

18  A        I don't know if it was adequate

19  provocation, but they had had a rocky

20  relationship, and I think that's evident

21  in the record.

22  Q        Well, okay.  If you're going to

23  show provocation, why wouldn't you put

24  on some testimony about Billie hitting

394

1   Jon at least in the past, being abusive

2   toward him?

3   A        That's what Jon said.   That's

4   what Jon said.

5   Q        And it's your recollection that

6   that's the only place you could find

7   that kind of testimony.

8   A        Well, reliable.

9   Q        Okay.

10  A        Our investigator sought out

11  every -- we -- Every time I'd see Jon,

12  he'd have a list of people that he

13  wanted us to run down, and we ran down

14  every one of them that was available,

15  and, I mean, you've got the file.   I

16  don't know if you've got the witness --

17  the potential witness statements in

18  there.   I don't know if you reviewed

19  them or not, but after I reviewed them,

20  I didn't think they were very helpful.

21  Q        Mr. Ford, wouldn't you agree

22  with me that in a capital murder case,

23  maybe at a minimum you might want to do

24  is talk to his brothers and sisters?   I

1  mean, wouldn't that be a good starting

2  spot?

3  A       Well, one of them hadn't talked

4  to him for two years.  What did they --

5  I mean, they didn't have much contact

6  with him, from what I knew.

7  Q       Well did you ever talk to them?

8  A       A couple of times.

9  Q       Who?

10  A       I think I talked to Ms.

11  Arbogast.  I'm not sure.  I don't

12  remember.

13  Q       Can you name anybody else you

14  talked to other than Sheryl Arbogast?

15  He had -- At one time he had six

16  brothers and sisters.  By the time you

17  got it he had five.

18  A       I don't remember.  Don't recall.

19  Q       Don't remember, don't recall.

20  Well would you agree with me that in a

21  normal case, that might be a good place

22  to start in a capital case, to talk to

23  the family?  They grew up with him and

24  knew him and brothers and sisters.

396

1    A       That was pretty much covered in

2    the penalty phase.  That was covered as

3    much as possible.  The problem we had

4    was that Ms. Arbogast wanted to testify

5    but she hadn't talked to him in two

6    years, up until the time -- you know,

7    until this happened, had no con- -- had

8    very little contact, and we had trouble

9    -- a lot of problems getting that into

10   the record.  Had to make an offer of

11   proof on it.

12   Q       Well now you made the offer of

13   proof in the guilt or innocence phase.

14   A       In the trial in chief we wanted

15   to try to get her in.

16   Q       Right.  You made that offer of

17   proof there.

18   A       Right.

19   Q       But in the punishment phase, she

20   took up 18 lines.  You said you went

21   into it real in depth.  Do you consider

22   18 lines in depth?

23   A       They -- She was only allowed to

24   answer the questions the Judge would

397

1    allow us to get in.

2    Q        In the punishment phase you only

3    asked 18 lines.  I mean, don't you know

4    there's a lot more to ask her than that?

5    A        Like I said in the beginning, we

6    divided up --

7    Q        So this is Mr. Mayo's bailiwick.

8    A        Yes.  Well, yeah.

9    Q        Okay.  Well let's go back to

10   your bailiwick.

11   A        Let's go.

12   Q        What -- You knew that

13   premeditation was a real problem for

14   you.  Correct?

15   A        We knew he cut the phone line,

16   and you have several opportunities to

17   withdraw from what you're doing, and one

18   of your children is on your back telling

19   you, "Daddy, please stop," and then

20   you're dragged out of your house,

21   dragged down the driveway, and this took

22   a little time.  This didn't happen in

23   two or three seconds.

24   Q        Uh-huh.

1  A       Then they bring you over to a

2  swimming pool, and either they choke you

3  to death or drown you.  Yeah, we had a

4  big problem with premeditation.

5  Q       I notice you mentioned the phone

6  lines.  That was a sinister-looking

7  thing, wasn't it?

8  A       If you're sitting in that jury

9  box it surely is.

10  Q       Looks like you decided to

11  disconnect those phone -- Actually they

12  weren't cut, were they?

13  A       They were disconnected.  They

14  couldn't make a call from the house.

15  Q       I understand.  They were

16  disconnected, which, of course, made it

17  easier to reconnect them as opposed to

18  cutting them.  Correct?

19  A       When somebody's beating you to

20  death, I think you'd have a hard time

21  reconnecting the phone line.

22  Q       My point is, there was no

23  evidence that they were cut.  They were

24  disconnected, weren't they?

399

```
 1   A        It doesn't matter.
 2   Disconnected, cut, they couldn't make a
 3   call from that house.  If he
 4   disconnected the phone line, that goes
 5   to premeditation, goes to planning.
 6   Q        You don't see any difference
 7   between a disconnected line and a cut
 8   line?
 9   A        Same result - you can't use the
10   phone.
11   Q        Okay.  All right.  So, you will
12   agree with me, that was very sinister
13   setting there for the jury to know
14   without explaining it some way.  Right?
15   A        It's very sinister, and it's
16   load- -- it's just perfect for the
17   prosecutor 'cause he -- you know, he can
18   run you all over the place with that.
19   Q        Yeah, he can infer that that was
20   all part of the grand scheme to kill
21   you, to disconnect phone lines.
22   Correct?
23   A        Correct.
24   Q        Okay.  And that was one of your
```

1  big problems, is he had that free rein

2  there.   Right?

3  A       Yeah.

4  Q       Okay.   Now if you could have

5  found evidence that Jon had on numerous

6  occasions in the past disconnected phone

7  lines to people just to get their

8  attention, just to talk to them, and

9  they had never done them any harm, would

10  that have been some evidence that could

11  have been used to show that that's not

12  any evidence of premeditation, he's done

13  this all his life?   Would you have used

14  it?

15  A       I don't agree with that.

16  Q       You don't agree with that.

17  A       No.   I don't think you can say

18  that that's a habit or custom when --

19  and convince a jury that he's got a

20  habit of cutting phone lines to get

21  people's attention when he has killed

22  his wife.   That just doesn't -- That's

23  not going to fly.   A jury's not going to

24  buy that.

401

1  Q      Well, you've got it in there
2  where he's just cut the one phone line
3  or disconnected the phone line this one
4  time.  You don't see any value
5  whatsoever in showing that that's the
6  way that he disconnects the phone, to
7  get to talk to other people and has so
8  that they won't be interrupted so that
9  Jon can command time alone with them and
10 never hurt them?  You don't see that
11 that would take away any premeditation
12 at all?
13 A      I see it goes the exact
14 opposite.  It goes to his wanting to
15 control the situation and have, just
16 like you said, complete control and be
17 one-on-one with them where there can be
18 no other interference.  It tells me that
19 he's planned to do something.
20 Q      Well, can't you just as easily
21 argue that the other times he cut the
22 phone lines or disconnected the phone
23 lines and he did not, in fact, hurt
24 anybody, so that, in fact, doesn't mean

402

1  that he's premeditatedly thinking about

2  killing anybody?

3  A       You could make that argument,

4  but that's a stretch.  That's a -- a

5  jury -- you got to de- -- you're dealing

6  with a jury.

7  Q       But you agree with me, as you've

8  got it, you've got it just in there that

9  it's this one occasion and it's a plot

10 for this one time.  Correct?

11 A       It's a -- It doesn't matter if

12 he -- It's the result.  It doesn't

13 matter what he did in the past.  It's

14 what he did on this occasion.  That's

15 what's relevant.

16 Q       Okay.

17 A       I don't know how we're going to

18 get past the relevancy of that.  We're

19 going to say, well that's just his

20 custom and habit.  Is that -- We're

21 going to have evidentiary problems

22 getting that in, 'cause he's not going

23 to testify.

24 Q       Okay.  Well I know, and if all

403

```
 1    you've done is talk to Jon, then you

 2    argue --

 3    A        Well we looked at the -- we

 4    looked at the sheriff -- we looked at

 5    the reports from Huntingdon and all that

 6    domestic -- whatever you want to call

 7    it, domestic problems he had up there,

 8    and I think that had been done on one

 9    occasion up there.   That was in -- That

10    was part of a police record.   But I did

11    not think it would help this case.

12    Q        You never talked to his sister

13    Debbie, did you?

14    A        No.

15    Q        You never talked to his sister

16    Kathy, did you?

17    A        I'm sure Mr. Mayo did; I didn't.

18    Q        I know, but we're talking about

19    your bailiwick now.   We're talking about

20    guilt or innocence.   You never talked to

21    any of the other sisters, did you?

22    A        No.

23    Q        Other than Sheryl briefly.

24    A        Sheryl; I talked to her.
```

404

1  Q        Okay.  So you don't know what

2  they could have told you about custom or

3  habit, do you?

4  A        I know what Mr. Hall told me.

5  Q        Well I understand what Mr. Hall

6  told you, but you would agree that your

7  job as a defense attorney goes beyond a

8  little bit just living up to just what

9  he tells you.  Correct?

10 A        I --

11 Q        You do have a duty to

12 investigate; do you not?

13 A        I agree that what -- if they're

14 going to say he did this or that, then

15 we're going to have a problem getting it

16 into evidence.

17 Q        Yeah, but you don't know 'til

18 you talk to them, do you?

19 A        I don't know.  I don't know.

20 Q        You -- So you agree with me, you

21 don't know until you talk to them.

22 A        From what I knew about this

23 case, I -- and as far as the guilt or

24 innocence, I don't think they could have

405

1  helped.

2  Q        But you never talked to them, so

3  we'll just have to hope that you're

4  right, won't we?

5  A        Yeah.

6  Q        Okay.  And you wanted to -- You

7  realized -- You said earlier you wanted

8  to try to get it down to voluntary

9  manslaughter or murder.  Now with

10  voluntary manslaughter, we've got to

11  show provocation.  Right?

12  A        And, that was based on the fact

13  they were having domestic problems, and

14  there's always provocation on both sides

15  when you have a domestic problem.

16  Q        But we never heard about any of

17  that in the trial, did we?  We never

18  heard that there was any kind of

19  provocation of Billie, of Billie ever

20  kicking Jon in the groin or Billie ever

21  hitting Jon.  We never heard about that

22  in the trial, did we?

23  A        Well, we needed Mr. Hall to

24  testify to that.

1    Q        But you've agreed you've never

2    talked to any of the siblings, the

3    family members that grew up with him

4    that knew him best.  You're saying that

5    Mr. Hall -- it stopped and ended with

6    Mr. Hall?

7    A        Mr. Hall needed to open the door

8    to that, yeah.

9    Q        And you're saying that you see

10   no way that you could have used other

11   people --

12   A        I don't --

13   Q        -- if you could have found them.

14   A        I think it would have been

15   tough.

16   Q        Okay.  But we'll never know

17   again 'cause you didn't talk to them,

18   did you?

19   A        I didn't talk to them about --

20   Q        About provocation of Billie.

21   A        Well let's get -- let's talk

22   about provocation.  I don't know of any

23   provocation that justifies, unless

24   you're in complete self-defense --

407

1  justifies this particular incident of

2  conduct.

3  Q        Well then why --

4  A        And what he did.  That's what

5  we're talking about, what he did.  Want

6  to know how he was provoked into killing

7  his wife the way he did.  You're saying

8  that some of these family members --

9  that if he was kicked in the groin, that

10 justified -- You want to get this before

11 a jury and say, that justifies his

12 killing his wife?

13 Q        Well, would you agree with me

14 that the way you left it, you had no

15 justification whatsoever, never showed

16 that there was any rancor between the

17 two people?  But again, you didn't talk

18 to these people, did you?

19 A        No, I --

20 Q        You never talked to anybody but

21 Sheryl Arbogast in the family.

22 A        I talked to Sheryl Arbogast.

23 Q        Other than that, you didn't talk

24 to anybody, did you?

408

1    A        No.

2    Q        All right.  Now, let me talk to

3    you about Sheryl Arbogast.  Did you

4    happen to read a report from Sheryl --

5    from Gloria Shettles wherein she talked

6    to Sheryl and they discussed in the DSM-

7    IV about intermittent explosive

8    disorder?

9    A        I probably read that.

10   Q        What'd you do about it?

11   A        What do you mean?

12   Q        Did you follow up on it in any

13   way trying to see if he really had that

14   disorder or not?

15   A        I think that Dr. Zager was

16   involved in that, and if that had been

17   the case, Dr. Zager would have

18   recommended that we did.

19   Q        Yeah, but Dr. Zager's not a

20   psychiatrist, is she?

21   A        No, but she's a psychologist,

22   and she can evaluate him and recommend

23   that he needs further evaluation, and

24   she did not make such a recommendation.

1   Q       Yeah, but you didn't give her

2   much of a history to work with either,

3   did you?

4   A       She took a history from Mr.

5   Hall.

6   Q       She took a history from Mr.

7   Hall.  Are you telling me that you think

8   that's all a defense attorney has to do,

9   is to put the man over -- the Defendant

10  over by the doctor and let him take a

11  history?  You're not really telling me

12  that you think that's --

13  A       I can't --

14  Q       -- that's the minimum standard,

15  do you?

16  A       I can't give his history.  He

17  has to give his history.  The patient

18  has to give the history to the doctor.

19  Q       Mr. Ford, you don't really

20  believe that, do you?

21  A       Yeah, I believe it.

22  Q       You don't believe that it's not

23  -- You don't believe --

24  A       Every time I --

410

```
 1   Q         -- that you have an obligation

 2   to go out and make that social history

 3   and put it together and not just rely on

 4   what the Defendant says?

 5   A         Make up --

 6   Q         You don't really think that you

 7   have an obligation to do that?

 8   A         Make up a social history?  Is

 9   that what you're saying?

10   Q         Yes, sir.

11   A         Make it up?

12   Q         To go investigate it.

13   A         It was investigated.  It was

14   investigated by Gloria Shettles, by Dr.

15   Zager, thoroughly investigated.

16   Q         Gloria Shettles says that we

17   ought to go forward on IED.  You didn't

18   think you ought to maybe go to the Judge

19   and say, "Judge, I need a psychiatrist

20   on this"?

21   A         He'd been examined by the state

22   psychiatrist.

23   Q         And you thought that was enough.

24   A         And, Mr. Hall did not want to be
```

                                          411

1    examin- -- he didn't want to throw up an

2    insanity-type defense.  He resisted that

3    from the very beginning.

4    Q        Have you ever read the capital

5    case guidelines of the American Bar

6    Association for what a lawyer ought to

7    do on one of these cases?

8    A        Yes, I have.

9    Q        And you're telling me that you

10   think that all you have to do for a

11   social history is put the man in front

12   of a state psychologist?

13   A        He was in front of the

14   psychologist that -- the expert that was

15   approved for the defense.

16   Q        And you think it stops there, I

17   mean, that you don't do anymore than

18   that.

19   A        That's where you start.

20   Q        Now I think we agree.  That's

21   where you start.  But then you will

22   agree with me, would you not, that it's

23   your job to make sure that a complete

24   social history is prepared so that the

412

1    Defendant may have told her some truth,

2    some not so truths, some delusions, some

3    not delusions?  You have to back that up

4    and go out and get an investigation

5    done; do you not?

6    A        I can't -- I have to rely on

7    what the doctor says.  I have to rely on

8    that.  If she -- She's the professional

9    in that area.  I have to rely on what

10   she says.

11   Q        Okay.

12   A        And I also have to rely on the

13   fact that Mr. Hall didn't want to go

14   down that road.

15   Q        Mr. Hall didn't want to go down

16   the insanity road.

17   A        He didn't want to -- He

18   certainly didn't.

19   Q        Okay.

20   A        He -- And, there was nothing --

21   Q        Do you understand the difference

22   between IED and insanity?

23   A        I sure do, and --

24   Q        Explain it to me.

413

1   A          You're talking about impulsive

2   behavior.   Is that what you're talking

3   about?  Uncontrolled, impulsive

4   behavior.   Insanity, you're talking

5   about a psychiatric disorder that

6   requires treatment.

7   Q          You don't think intermittent

8   explosive disorder is a psychiatric

9   disorder?

10  A          I'm not a doctor.

11  Q          Now, --

12  A          Don't know.

13             MR. BUCHANAN:  May I get this

14  marked, Your Honor?  And, Judge, I

15  apologize.  Got some notes on this.

16  I'll get you a cleaner copy later.  I'd

17  like to put it in and come bring a

18  cleaner copy later.  We've got some

19  marks on it.

20             THE COURT:  Has the State seen

21  it?

22             MR. EARLS:  No, sir.

23             MR. BUCHANAN:  It's the -- It's

24  Gloria Shettles.  It's one of her memos.

414

```
 1            THE COURT:  That will be marked

 2   Exhibit 7 I believe.  This is the memo

 3   from Gloria Shettles.

 4            (Exhibit 7 was marked

 5            and entered.)

 6            THE COURT:  Do you need the

 7   witness to have it first?

 8            MR. BUCHANAN:  Yes, sir, I'd

 9   like to approach him with it.

10   Q       Mr. Ford, does that appear to be

11   one of Gloria Shettles' reports that she

12   prepared for your file?

13   A       If you'll give me a minute I'll

14   tell you.

15   Q       Okay.

16   A       I remember reading that.

17   Q       You remember reading it.

18   A       Yeah.

19   Q       And this is the report that was

20   prepared for your file by Gloria

21   Shettles.

22   A       Right.

23   Q       All right.

24   A       In mitigation.
```

1   Q        All right.

2            MR. BUCHANAN:   May I carry it

3   back and question him from it, Your

4   Honor?

5   Q        Okay.  On Page 8 of that, she

6   couldn't be more clear that -- from

7   everything she's been able to uncover,

8   that he may suffer from IED.   Right?

9   A        That's what -- That's what she

10  says he may, yeah.

11  Q        Tell me one thing, one thing,

12  you did after reading this to try to

13  prove to a jury that he had IED.

14  A        Can't think of any.

15  Q        Thank you, Mr. Ford.  Okay.

16  I've talked at some length with Mr. Mayo

17  about there being no pictures introduced

18  of Jon, even pictures in the punishment

19  phase.  Are you here to tell me that

20  pretty much was his bailiwick, the

21  punishment phase?

22  A        Yes.

23  Q        Okay.

24  A        Well we -- I mean, we worked on

                                        416

1   it together, but, I mean, he had more

2   experience in that area.

3   Q       Well do you know of any reason

4   why you wouldn't try to put a few

5   pictures to show him to be a human

6   being?

7   A       I questioned his children at

8   length about whether or not he was a

9   good father, good provider, as best I

10  could.  It's very difficult to cross-

11  examine children.  But we tried to

12  present that to the jury in the

13  guilt/innocence phase.

14  Q       You didn't ask one of the

15  sisters about his abilities as a father,

16  did you?  You went into great depths

17  that he grew up in a household with tons

18  of fights in it.  You never talked one

19  thing about him being on a white horse

20  or being a good guy or being a human

21  being, did you?

22  A       What do you mean?

23  Q       You never asked them anything

24  about was Jon a good and kind person

417

1    ever, did Jon ever do anything good for

2    anybody.

3    A         Oh, I think I did.  I don't -- I

4    think I asked if he was a good father.

5    I know I did.

6    Q         Do you realize there was

7    testimony available to you that he had a

8    child with cerebral palsy, that he sat

9    there and did the exercises with that

10   child that were excruciatingly hard to

11   do and focused, and that he sat there

12   with that baby and did those things?

13   For what reason would you not let a jury

14   know something like that, Mr. Ford?

15   A         In which phase?

16   Q         In the punishment phase.  I know

17   it's not your bailiwick, but what

18   possible way would that hurt, to make

19   him look like something less than a

20   monster?

21   A         Well, I think we tried to do

22   that.

23   Q         Well, you examined extensively

24   on the fact he grew up in a monstrous

418

1  household.

2  A        And that go- -- and that can go

3  to show that that's why he has the -- he

4  had the problems he had at the time that

5  this occurred.

6  Q        But it didn't occur to you that

7  maybe showing some nice family pictures,

8  showing him being a good father, might

9  be a little bit better than just

10 reminding the jury that there's nothing

11 about Jon that's not violence-connected?

12 A        That might have been a good

13 thing to do, but looking back on it, I

14 don't know where we -- you know, it may

15 have been a problem to gather that

16 information.

17 Q        Well if I'd had un-rebutted

18 testimony from three sisters that they

19 would have provided you a videotape,

20 that they would have provided you

21 pictures, all you would have had to done

22 was talked to them and asked, --

23 A        If they had --

24 Q        -- do you have anything to rebut

419

1  them saying that?

2  A      If they had offered it at that

3  time, it would have been accepted.

4  Q      Well --

5  A      It's easy to go back -- you

6  know, go back and five years later and

7  say, yeah, you should have done this,

8  you should have done that.

9  Q      Mr. Ford, if they offered.

10 They're not his lawyer.  Did it ever

11 occur to you as his attorney that maybe

12 you might ought to call them and say,

13 "Hey, have you got a picture of this guy

14 doing anything other than beating the

15 holy wampum out of his wife?  You got a

16 picture of him being a good daddy

17 holding his little daughter?"  I mean,

18 did it ever occur to you to ask a

19 question like that?

20 A      No.  I was having a hard enough

21 time dealing with the autopsy pictures.

22 Q      You were having a hard time

23 dealing with the autopsy pictures?

24 A      Yes.  They were passed to the

420

1    jury, yeah.  Hurt your case.

2    Q        Well, you would agree with me

3    that it's your job -- is to see that

4    ahead -- to see the autopsy pictures

5    ahead of time and try to formulate a way

6    that maybe you can put some pictures in

7    to counteract them.  That's kind of

8    basically what we're hired to do, isn't

9    it?

10   A        Counteract the autopsy pictures?

11   Q        To try to take some of the sting

12   away from them, to do something.

13   A        I don't know how you take the

14   sting away from an autopsy picture.

15   Q        Okay.  You don't think that

16   showing him being a decent human being

17   and being a good father would in some

18   small way --

19   A        We tried to show that.

20   Q        But you never put a picture one

21   in, and you never talked to the sisters

22   about pictures, did you?

23   A        You've asked me that three or

24   four times, and I think the same -- I've

421

1  given the same answer.

2          MR. BUCHANAN:  Your Honor,

3  again, I want to put in this mitigation

4  assessment, and we've got some notes on

5  it, but I'll get you a clean copy, but I

6  wanted to go ahead and prove it up

7  through him, if the Court doesn't mind

8  while I've got him here.

9          MR. EARLS:  I haven't seen it,

10  Your Honor.

11          Your Honor, I'm going to object

12  to that document.  I don't know what it

13  is, who prepared it or -- well, for that

14  matter, how it's even relevant at this

15  point.

16          MR. BUCHANAN:  Well, I'm going

17  to prove it up through him that it was a

18  mitigation assessment prepared for his

19  file.

20          THE COURT:  By?

21          MR. BUCHANAN:  By Ann Charvat.

22          THE COURT:  General, let's let

23  him ask questions.  It'll be marked for

24  identification now, and then we'll argue

422

1    the battle, if there is one, whether

2    it's accepted or not.   Let's go ahead.

3    It's going to be marked Exhibit 8, and

4    then, General, I'll hear further on your

5    objection if you wish to make it.

6              **(Exhibit 8 for identification**

7              **was marked.)**

8              THE COURT:  Pass it to the

9    witness, and you may ask, Mr. Buchanan.

10             MR. BUCHANAN:  Yes, Your Honor.

11   At this time I'd ask the witness to take

12   a little time to review that and see if

13   he remembers it being prepared for his

14   file and ...

15   A        Yes, I can identify this.

16             THE COURT:  Witness is ready.

17   He's reviewed the document and responded

18   then that he can identify it.

19             MR. BUCHANAN:  He -- I'm sorry.

20   What did you say, Your Honor, that last?

21             THE COURT:  He's responded that

22   he can identify the document that you

23   passed him.

24   Q        And was it prepared for your

                                              423

```
 1   file for mitigation assessment?

 2   A       Yes.

 3   Q       All right.  And I take it that

 4   you read and familiarized yourself with

 5   that sometime during the course of the

 6   trial.

 7   A       Yes.

 8   Q       Okay.

 9           MR. BUCHANAN:  Your Honor, then

10   I would tender it.  I think it's

11   relevant.

12           THE COURT:  General, any further

13   argument on it?

14           MR. EARLS:  No.

15           THE COURT:  I'll let it be

16   accepted, and it will remain now Exhibit

17   8.

18           (Exhibit 8 was marked

19           and entered.)

20   Q       Did you ever talk to the

21   Stanfills or the Foremans or the

22   Brittains, the neighbors?

23   A       Our investigator did.

24   Q       Your investigator did.
```

424

1   A        Got statements.  Ms. Eskew took

2   statements from them.

3   Q        Okay.  And you --

4   A        And I reviewed those statements.

5   Q        And just couldn't find anything

6   in there that was worth putting them on

7   to show he was a decent, kind father,

8   human being?

9   A        We were looking for other type

10  evidence at that time.  I think that was

11  more of the provocation-type statements.

12  Q        Mr. Ford, would you not agree

13  that when it comes to witnesses in a

14  capital murder case, you look at them

15  for everything?  Do you not?

16  A        Yeah, you look at them for

17  everything, and you go with the ones you

18  think need to be there, the ones that

19  can help your case.

20  Q        Okay.  If -- You haven't been in

21  here, but you're going to have to assume

22  for a moment that I've produced some

23  neighbors that have come up and said

24  some pretty nice things about Jon.

425

```
 1   A        And I'd have to --

 2   Q        Assume that for me.

 3   A        I'd have to also assume that

 4   they were telling the truth, wouldn't I?

 5   Q        In a hypothetical.

 6            THE COURT:  Instruct the witness

 7   then not to ask questions.

 8            Go ahead.

 9   Q        If you could produce that

10   testimony, can you tell me where there

11   is a downside in trying to humanize Jon

12   at the punishment phase?

13   A        There's not a --

14   Q        Showing --

15   A        There's not a downside in trying

16   -- We tried to do that.

17   Q        Okay.

18   A        But --

19   Q        But you never talked to these

20   people yourself, did you?

21   A        No, but I read their statements,

22   and I didn't -- did not -- I mean, some

23   -- I don't remember exactly which were

24   used, which were not used.  I don't
```

426

1    remember.

2    Q        Your investigator talked to Mr.

3    Brittain, to the Brittains.  If

4    contained in your very file dated

5    October 6th, 1996 you have a memorandum

6    from Gloria Shettles saying that she

7    couldn't find them, are you still

8    telling me that you looked at your

9    report from your investigator?

10   A        I could have been mistaken.

11   There were so many names that he gave.

12   He gave us about 20 to 30 names of

13   different people.  I, you know ...

14   Q        Would it surprise you to know

15   that we found the Brittains and we

16   brought them up here to testify and

17   they've said some things that I think

18   you could fairly characterize to say

19   were helpful?  Don't you think in a

20   capital case you've got to do a little

21   more than, "I can't find their phone

22   number"?

23   A        Did it say that she couldn't

24   find their phone number?  I think it

427

1    said couldn't find them.

2    Q        Couldn't find the address,

3    couldn't find the phone number.  Don't

4    you think -- Don't you think you need to

5    push a little further than that?  I'll

6    withdraw the question.

7             Anyway, you don't remember

8    talking to the Stanfills or the Foremans

9    or the Brittains, do you?

10   A        No.  But I'll tell you this, if

11   they'd been available and they had

12   something good to say about Mr. Hall, we

13   would have used them at the trial.

14            MR. BUCHANAN:  Your Honor, I'm

15   through with this witness.

16            THE COURT:  General, you may

17   ask.

18   **CROSS-EXAMINATION**

19   **BY MR. EARLS:**

20   Q        You were asked about the

21   Brittains.  Of course, the evidence is

22   that your investigator couldn't find

23   them.  You reviewed the State's file in

24   this matter, didn't you?

                                              428

1   A        Yes.

2   Q        And the statements.  Is that

3   correct?

4   A        Yes.

5   Q        If part of the statement of the

6   witnesses just spoken of, the Brittains,

7   was that before the murder, Jon Hall

8   said to the Brittains that he was going

9   to grind her up as hamburger meat, would

10  you have wanted that witness?

11  A        No, and that refreshes my memory

12  about that.  I think he had said to

13  several different people that he would

14   -- you know, intended to do harm to his

15  wife.

16  Q        Okay.  And you, of course,

17  reviewed those statements.

18  A        Yes.

19  Q        Now let me ask you this.  As

20  defense counsel, when you call someone

21  in to talk about how good a person is,

22  don't you open up certain doors?

23  A        Yes, sir.

24  Q        And, did you have information

429

1   about Mr. Hall abusing his wife?

2   A        Yes, sir.

3   Q        And, by calling those witnesses

4   and asking them those questions --

5   A        In fact, I think there were some

6   records, domestic records, that were

7   available that could have been used that

8   would not have been favorable to Mr.

9   Hall.  Police reports, et cetera.

10  Q        Okay.  So based upon you -- Wait

11  a minute.  You had an investigator in

12  this case, didn't you?

13  A        Yes.

14  Q        Two of them?

15  A        Ms. Eskew and Ms. Shettles, yes.

16  Q        Let me ask you.  Did that

17  investigator, to your knowledge, contact

18  every person that Mr. Hall wanted

19  contacted?

20  A        That she could find, every

21  single one of them.

22  Q        And did you review her notes and

23  any statements that were made?

24  A        Yes, sir.

1    Q        And based upon years experience

2    as a trial attorney, did you weigh the

3    good and the bad and the pro's and the

4    con's about calling a particular

5    witness?

6    A        I sure did.

7    Q        And, based upon the fact that

8    the State might have gotten into prior

9    violent behavior and things of that

10   nature, that's what you made your

11   decision whether or not to call a

12   witness?

13   A        That's correct.  And this

14   testimony would not have been that

15   helpful, and you're taking an extreme

16   risk when you open that door about

17   character.

18   Q        Okay.  Let me ask you this.  On

19   the date of the murder, the time of the

20   murder, do you know of any witness who

21   offered any evidence of provocation?

22   A        At the time of the murder?

23   Q        I'm talking about at the murder.

24   Do you know of any witness that said Jon

431

1  was provoked?

2  A      No.

3  Q      Now, --

4  A      Not on that occasion.

5  Q      Now, --

6  A      In fact, there were only a

7  handful of witnesses, fact witnesses, to

8  this whole event.

9  Q      And all of them testified except

10 Mr. Hall.

11 A      Yes.

12 Q      Now, touching on that, you did

13 discuss with him his option about

14 testifying?

15 A      At great length.

16 Q      And based upon your discussion

17 with him, -- There was even a hearing on

18 it in front of Judge LaFon, wasn't

19 there?

20 A      That's correct.

21 Q      He made the decision not to

22 testify.

23 A      Yes, sir, he did, and --

24 Q      If I recall, the basis of his

432

1    decision was the fringe on the flag or

2    the eagle.  Was that part of it?

3    A         Something to do with

4    international law.

5    Q         Maritime law or --

6    A         Maritime law.

7    Q         But he was clearly advised of

8    that right and all the consequences and

9    just made a choice.

10   A         Yes.  Yes, he was, and he made a

11   choice, and he was fully informed of his

12   rights.  In fact, he went to the books

13   himself, and I'm sure, if you look at

14   his pro se motions, yes, he was fully

15   informed.

16   Q         Now let me talk about the

17   defense.  You decided to use

18   intoxication to try to get the jury to

19   convict of a lesser charge.

20   A         Yes, the lesser charge.  We were

21   hoping for some form of manslaughter at

22   best, and provocation being from the

23   domestic side of the house.

24   Q         Okay.  Now, did you discuss this

433

```
 1   with Jon Hall?

 2   A       Yes.

 3   Q       And, you've looked at documents

 4   here where people have talked about this

 5   intermittent explosive disorder.

 6   A       Right.

 7   Q       You said you saw that document.

 8   A       Yes.

 9   Q       Did you discuss all that with

10   Mr. Hall?

11   A       Yes.

12   Q       And, did he want to pursue any

13   kind of defense like that?

14   A       No.  He --

15   Q       Clearly that was explained to

16   him.

17   A       Mr. Hall, in his mind, had not

18   done anything wrong.  Mr. Hall, in his

19   mind, was guilty of some form of

20   criminally negligent homicide.  That's

21   the way he perceived this.

22   Q       But the option was presented to

23   him about pursuing some kind of mental

24   defect.
```

434

1   A        Absolutely.

2   Q        And he rejected it.

3   A        He sure did.

4   Q        And based upon your discussion

5   with your experts and the State's

6   experts, you made -- together with him,

7   made a decision to pursue intoxication.

8   A        Other lines of defense, yes,

9   sir.

10  Q        Other lines of defense.  Now let

11  me correct something.  You will agree

12  with me, of course, that intoxication by

13  statute is not a defense, but it does

14  remove the premeditation.

15  A        Correct.

16  Q        Okay.

17  A        That's what I meant to say,

18  premedita- -- removes specific intent.

19  Q        Right.  Okay.  Now, these

20  sisters that have been talked about,

21  were they interviewed by your

22  investigators or other witness- -- or

23  other people working on the case?

24  A        To my knowledge, and I think Mr.

435

1  Mayo talked to them.

2  Q       Well, they obviously testified

3  at the sentencing phase, didn't they?

4  A       Yes.  And from what I

5  understood, they didn't have a very good

6  relationship with Mr. Hall, that they

7  weren't really a part of his life until

8  after he did what he did, and then they

9  became, you know, more a part of his

10  life at that point, from what I

11  understood.

12  Q       Now, all the evidence that was

13  obtained, to your knowledge, was that

14  provided to Dr. Zager?

15  A       Yes.  All the reports,

16  everything; all the discovery,

17  everything.

18  Q       Family history and all that?

19  A       Yes.

20  Q       And you discussed everything

21  with her?

22  A       Yes.  Mr. Mayo mainly met with

23  her, but I met with her, too.  We had --

24  We all met together.  Dr. Zager did a

436

1    very thorough job, as far as I'm

2    concerned, and she's very qualified.

3    Q        She has been an expert in how

4    many --

5    A        That's what she does.

6    Q        That's how she makes a living.

7    A        That's how she makes -- That's

8    the way I understand it.  She's done it

9    for years.

10   Q        And she did not emphasize to you

11   in any way that you needed to pursue

12   this intermittent explosive disorder.

13   A        No.

14   Q        Now, had you known about these

15   -- this evidence about Jon's tendency to

16   disconnect phones?

17   A        We had come across some police

18   reports I think from Carroll County that

19   that had happened on occa- -- maybe one

20   -- maybe once or twice.  I don't know

21   how many times.

22   Q        And particularly, if the

23   evidence shows that he had disconnected

24   phones to keep people from contacting

437

1    police, would you have used that?

2    A        No, sir, and I tried to explain

3    that, that it goes to planning, it goes

4    to premeditation, it goes to control,

5    and that was the -- one of the

6    prosecution's theory, was that he wanted

7    to control his wife, and that was one of

8    the ways that he exercised control over

9    her.

10   Q        Okay.  Now, in the penalty phase

11   of the trial, you called -- did you call

12   a former employer of Mr. Hall?

13   A        Randy Helms, certainly did.

14   Q        And what was the purpose of

15   that?

16   A        To try to humanize Mr. Hall.

17   Q        Okay.  And of all the witnesses

18   you came across, he was the best one to

19   do that with.

20   A        He was the most credible.  Mr.

21   Helms' reputation in Lexington is

22   unimpeachable.  He gave Mr. Hall a job

23   when he really didn't need anybody

24   because he felt sorry for Mr. Hall's

1    family.   He's opposed to the death

2    penalty.   He is an upstanding, upright,

3    good Christian man, and, yes, he

4    humanized Mr. Hall, and did it

5    sincerely.

6    Q        Now, during the guilt or

7    innocence phase, you and Mr. Mayo, of

8    course, cross-examined the daughters of

9    Billie Jean Hall and Jon Hall in this

10   matter; did you not?

11   A        Yes.

12   Q        And part of the cross-

13   examination, of course, was how he cared

14   for them.

15   A        Yes, sir.   And I explained in

16   depth just about every time I met with

17   Mr. Hall the dangers of child testimony.

18   Children inevitably tell the truth.

19   They don't have a reason to make --

20   especially at this age, this young age,

21   they don't have any reason to make

22   anything up.   They're thinking on a

23   concrete level.   And I told Mr. Hall

24   that if those children had to get up on

439

1    that witness stand and testify to what

2    they observed, that the jury was going

3    to have a tough time dealing with that,

4    and we were going to have a tough time

5    cross-examining them, not to further

6    inflame the jury.  I mean, those are

7    very -- that testimony was very damaging

8    to Mr. Hall, and I told him beforehand

9    that we were going to have some problems

10   because the jury would say, "You know,

11   what, Mr. Hall?  You have put your

12   children through this.  You put them

13   through it."

14   Q        All right.  So, you tried to

15   humanize him, as the term is, in the

16   penalty phase, tried to humanize him in

17   the guilt phase.

18   A        Absolutely, especially with the

19   -- I asked these -- you know, was he a

20   good father, but you don't want to go

21   too far with children who have just gone

22   through very traumatic testimony, having

23   to come into court and relive this

24   thing.  You've got to be careful with

440

1   children, child witnesses, very careful.

2   Q        As a matter of fact, one of the

3   witnesses testified that she jumped on

4   Jon Hall's back trying to get him off

5   her mother.

6   A        And begged -- That's correct,

7   and begged him to stop beating her.  And

8   I'll never forget Mr. Woodall's harping

9   on that during the closing of the penal-

10  -- of the guilt/innocence phase.  And

11  when you have that and you can go to the

12  jury and you can say, "His child was

13  begging her father to stop," it's very

14  damaging.

15  Q        Also, your opinion as trial

16  counsel, defense counsel, when the

17  Defendant's own daughter gives such

18  testimony about how he would treat or

19  allow his daughter to observe and go

20  through that, how can you make him look

21  like a good father?

22  A        It's very difficult.  It's very

23  difficult.  You have to -- These

24  children didn't -- I mean, they were

441

1    torn.  They were torn.  They didn't want

2    to be there, but, Lord knows, he put

3    them there.

4    Q        Let me ask you this.  Were you

5    aware also that the children had been

6    abused?

7    A        We had -- That had come up as

8    part of the case.  Well there were some

9    allegations of abuse, you know.  I don't

10   -- We tried to stay away from that.

11   Q        And in --

12   A        Mr. Hall wasn't on trial for

13   that.

14   Q        I understand, but in bringing in

15   witnesses and start asking about

16   character and opening doors, that's

17   certainly one of the doors that could be

18   opened.

19   A        It could have been opened.

20   Q        And you wanted to avoid that.

21   A        We wanted to avoid -- Yes, sir,

22   to say the least.  We had enough doors

23   that were already open we had to deal

24   with.

442

1    Q        You had the State's discovery,

2    State's evidence.  Were you surprised by

3    any witness's testimony?

4    A        Any of the State witnesses?

5    Q        Yes.

6    A        No, sir.

7    Q        Knew what all the evidence was

8    going to be.

9    A        Yes, sir.

10   Q        Explained it all to Mr. Hall.

11   A        Explained it to him?  I talked

12   to Mr. Hall -- When I would talk to Mr.

13   Hall, I would try to reason with him

14   about where this thing was going, and it

15   was his choice.  It was his choice.  He

16   was going to trial.  And, you know, the

17   family of the victim wanted leniency, so

18   to speak for Mr. Hall, because as part

19   of the discussions early on, or -- when

20   we got closer to the trial, the offer

21   was life with parole, that they didn't

22   want to have a hand in seeing that, you

23   know, Mr. Hall received capital

24   punishment because of these children.

443

1    So the family even showed him leniency.

2    Q        But Mr. Hall insisted on going

3    to trial.

4    A        Mr. Hall was put under oath and

5    was asked whether or not this offer was

6    conveyed to him, and he acknowledged

7    that it was, and he rejected that offer.

8            MR. EARLS:  Your Honor, could I

9    see the State's -- Exhibit 1?

10           THE COURT:  Exhibit 1 being the

11   transcript.

12           MR. EARLS:  If I could have just

13   a second, Your Honor.

14   Q        Of course, the record will speak

15   for itself, but if Volume I of the

16   transcript shows that Mr. Hall was

17   placed under oath by Judge LaFon and

18   questioned about whether or not he

19   received an offer and rejected it,

20   that's your testimony.

21   A        That's my testimony.

22   Q        Mr. Ford, can you think of

23   anything that you could have done,

24   should have done that any way would have

                                                    444

1   made a difference in the outcome of this

2   case?

3   A        No, sir.  And if he were tried

4   again tomorrow, I don't think there

5   would be a different outcome.

6           MR. EARLS:  That's all I have.

7           MR. BUCHANAN:  May it please the

8   Court:

9   **REDIRECT EXAMINATION**

10  **BY MR. BUCHANAN:**

11  Q        Mr. Ford, am I to -- I need to

12  clear up a few things.  In talking about

13  speaking with the sisters, that would be

14  Debbie Davis, Kathy Hugo, Sheryl

15  Arbogast and Carol Alexander.  I notice

16  that when he was questioning you you

17  said, "What I understood is that they

18  had been alienated for some time."  Is

19  that correct?

20  A        Yes.

21  Q        Because you never talked -- I

22  want the record very clear on this.  You

23  never talked to anybody but Sheryl, and

24  her in a very limited manner.  Correct?

445

1   A        Yes, but I think Mr. Mayo talked

2   to them at length.  I'm sure he did.

3   Q        Talked to who?

4   A        Sheryl Arbogast, at length,

5   numerous occasions.

6   Q        All right.

7   A        And she hadn't seen him for two

8   -- hadn't been in contact with Mr. Hall

9   for two years.  That was my

10  understanding.

11  Q        Okay.  Well, whatever she could

12  have testified to, we'll just let that

13  roll.  Okay?  Do you understand a

14  difference between a character witness

15  and a mitigation witness?

16  A        Yes.

17  Q        Do you understand the difference

18  between a capital punishment phase and a

19  regular punishment phase --

20  A        Yes.

21  Q        -- of a trial?  Well what's the

22  difference, in general?

23  A        Well, in mitigation, you've got

24  a lot of leeway.

446

1  Q        Whole lot more than you do --

2  A        Whole lot more than you do at a

3  general sentencing, but at a sentencing

4  hearing, most judges, in their

5  discretion, allow a lot of leeway

6  because you got lay witnesses coming in,

7  and, you know, the judge doesn't want to

8  appear -- you know, they want -- What

9  harm is it to let it in at the

10  sentencing hearing?  There's no harm.

11  Q        Would you agree with the

12  statement that the U. S. Supreme Court

13  and the Supreme Court of Tennessee has

14  said, if there's something good to say

15  about the boy come punishment phase, it

16  comes in in mitigation?

17  A        I agree, yes.

18  Q        And it doesn't trigger all this

19  character, have-you-heard stuff, when

20  you have someone testifying as to

21  general reputation, does it?

22  A        Not in the mitigation phase, but

23  what -- your question was directed at

24  the guilt/innocence phase.  You asked

447

1  me, "Did you not want to show the jury

2  that he was a good guy?"

3  Q        No, I -- I --

4  A        In the guilt/innocence phase.

5  Q        Well let me make it --

6  A        And that does open doors.

7  Q        -- make it clear to you.  I

8  meant the punishment phase.  I don't

9  know if you and I got off on the wrong

10  track there.

11  A        That's the way I perceived it.

12  Q        Okay.  But Dr. -- you put Dr.

13  Joe Mount on, and he testified that Jon

14  was extremely concerned about his

15  children, and in particular, the child

16  with CP, and nothing bad happened as a

17  result of that, did it?

18  A        No.

19  Q        Okay.  And, --

20  A        But he didn't get into the fact

21  that he had a habit of cutting phone

22  wires.

23  Q        I'm not talking about cutting

24  phone wires.  I --

448

1   A        You're talking -- Yeah, that's

2   what you -- excuse me, but I remember

3   that you insisted that we should show

4   that as a pattern of behavior.

5   Q        Sir, I haven't mentioned phone

6   wires since I've stood back up, I

7   believe the record will show.  So can we

8   just confine ourselves to my questions?

9            THE COURT:  Just answer the

10  questions.

11           Go ahead.

12           THE WITNESS:  Yes, sir.  Sorry,

13  Your Honor.

14  Q        So, do you know of any reason

15  why you wouldn't put on more things

16  showing that Jon's a good father at the

17  punishment phase without, as Mr. Earls

18  said, the character witnesses coming in

19  and the wall come crashing down on a guy

20  and having all sorts of trepidations

21  about doing it?

22  A        We put on who we thought was

23  appropriate at the time.

24  Q        Without you or Mr. Mayo talking

                                        449

1    to all the sisters and brothers.

2    A        Mr. Mayo had.

3    Q        Mr. Mayo had only talked to Ms.

4    Arbogast.  Isn't that correct?

5    A        He may have -- I don't remember.

6    I mean, it's five years ago.

7    Q        Do you have any independent

8    knowledge that he talked to anybody

9    other than Sheryl Arbogast?

10   A        Can't remember.

11   Q        You can't remember?  Okay.  When

12   you said that your mind was triggered by

13   Mr. Earls that you read the report of

14   the Brittains, you read the State's

15   report.  Is that what you're saying?

16   A        Right.  And then they couldn't

17   be located.

18   Q        Well, you realize the State

19   located them.  Correct?

20   A        Correct, and --

21   Q        You realize that Ms. Higuera

22   located them.  Correct?

23   A        I don't real- --- I don't know

24   that.

450

1  Q        All right.

2  A        I don't realize that.  I don't

3  know that.

4  Q        All right.  You said, and

5  correct me if -- in fact, straighten me

6  out.  I thought you said when Mr. Earls

7  was questioning you that you were hoping

8  the provocation would be coming from the

9  domestic side of the house.  Did I

10 misunderstand that?

11 A        No.

12 Q        Is that what you said you were

13 hoping the provocation would come from?

14 A        Is that a question?

15 Q        Yes.  Where did you think the

16 provocation in voluntary manslaughter

17 was going to be coming from?

18 A        From their relationship.

19 Q        From their -- But you didn't put

20 anything on about their relationship you

21 said because you wanted to stay away

22 from it.  How can you hope about

23 something and not produce evidence on it

24 and expect the result to be that you're

451

1   proving anything?  Can you enlighten me

2   as to that?

3   A       I think we did.  I don't

4   remember, but I'm sure we did.

5   Q       Wasn't your testimony earlier

6   that you were trying to stay away from

7   that, from that domestic stuff?

8   A       Well, at certain -- on

9   character, yes.

10  Q       Well, now, we're not -- we're

11  not over to character.  We're not in the

12  punishment phase.  I'm talking about the

13  guilt or innocence phase.  Provocation

14  being a necessary element, you would

15  agree with me, on voluntary

16  manslaughter.  Correct?

17  A       And I asked Mr. Hall who we

18  could call on that, and no one was

19  available on that issue.

20  Q       And again, I want this record

21  real clear.  You didn't talk to Kathy

22  Hugo, Debbie Davis, the brothers, the

23  sisters, anybody but Sheryl Arbogast and

24  then only a couple of times.

452

```
 1   A        Me personally?

 2   Q        Yes.

 3   A        I didn't, but Mr. Mayo may have.

 4   He talked to Sheryl Arbogast at length.

 5   Q        And you think that's sufficient.

 6   A        I did at -- Yeah, I think that

 7   -- yeah.

 8   Q        You think that's sufficient to

 9   get ready for a capital murder trial,

10   for the lawyers not to talk to the

11   family members.

12   A        We did a lot -- We did a

13   tremendous amount of work to get ready

14   for that case.

15   Q        No, sir, but I want this Court

16   and a future appellate court to

17   understand what you were thinking.  You

18   were thinking that it's okay, it's not

19   necessary for you as an attorney to talk

20   to the immediate family members and

21   siblings.

22   A        When my understanding was they

23   hadn't had any contact with him in

24   years.  That was my understanding.
```

453

1    Q        Yeah, but, if you hadn't talked

2    to them and your investigators hadn't

3    talked to anybody but Sheryl Arbogast,

4    how could you understand that?

5    A        I got to talk -- I got to get my

6    information from Mr. Hall initially, and

7    he never -- he never -- he never brought

8    that up.

9    Q        I think we're -- I think we're

10   getting online here.  So what you're

11   telling me is what the Defendant tells

12   you about the family, whether they're in

13   touch or not --

14   A        I've got to --

15   Q        No, let me finish.  Is good

16   enough, and you don't really need to

17   call those family members to see if Jon

18   has given you faulty information or

19   wrong information or information that

20   can be contradicted in any way.  That's

21   your understanding.

22   A        Your question is:  Do I need to

23   investigate Mr. Hall's statement as

24   being truth -- true or not true or

                                          454

1  contradictory.  Is that the question?

2  Q       Yeah.  Things he tells you that

3  you -- that you're --

4  A       I think I have to believe the

5  things he tells me.

6  Q       And you don't think you have a

7  duty to go further than that?

8  A       No, not much further.

9  Q       And you didn't, did you?

10 A       Didn't feel it was necessary,

11 based on what he told me.

12 Q       Okay.  My young esteemed counsel

13 tells me I've got to pin you down.  You

14 said you didn't think it was necessary,

15 and I agree with him.  I need to ask

16 you:  You didn't think it was necessary,

17 so you didn't do it.  Correct?

18 A       Based on what Mr. Hall told me,

19 I did not --

20 Q       No, sir.  Really, let's get to

21 -- If you don't mind, please --

22         MR. BUCHANAN:  Judge, I'd like

23 to ask you to --

24         THE COURT:  Just listen to the

455

1    question and respond, and if he needs to

2    explain, he certainly has a right to do

3    that.  But listen to the question and

4    respond to the question first.

5           Go ahead, Mr. Buchanan.  Ask it

6    one more time.

7    Q      I'm not interested in your

8    justification for not going and talking

9    to them, other than Sheryl Arbogast.

10   You didn't do it, did you?

11   A      No.

12   Q      Thank you.  I just have one

13   quick little thing.  Do you --

14          MR. BUCHANAN:  May I -- I don't

15   -- I want to refresh his -- possibly his

16   recollection.  Can I just approach him

17   with this document, Judge?

18          THE COURT:  Have you seen it,

19   General?

20          MR. EARLS:  I don't know what it

21   is.

22          THE COURT:  Show it to the State

23   as to what you're showing him.

24          MR. BUCHANAN:  Let me show it to

456

1    him and see if he remembers anything at

2    all about it.

3    A         All right.

4    Q         Does that refresh your memory

5    any about a conversation you may have

6    had with Mr. Hall about whether or not

7    he agreed to sign that affidavit on the

8    back of what's in front of you?

9    A         No.

10   Q         It doesn't bring to mind any --

11   you trying to get him to sign it and him

12   refusing?

13   A         No, sir.

14   Q         Okay.

15             MR. BUCHANAN:   No further

16   questions, Your Honor.

17             THE COURT:   General, anything

18   further of this witness?

19             MR. EARLS:   Just a couple of

20   things.

21             MR. BUCHANAN:   Judge, I'd just

22   like to mark that as a court's exhibit

23   so we can refer to it in the future

24   because I've got another witness to talk

457

1    to about it.

2            THE COURT:   If the State has no

3    objection to that, be marked Exhibit 9

4    at this time.

5            MR. EARLS:   Wait a minute.   I

6    don't know that --

7            THE WITNESS:   I don't know that

8    I was the -- I don't know that that was

9    the motion that was filed.

10           MR. BUCHANAN:   No, not to put it

11   in evidence, just to mark it so that

12   when -- next time I say, "Can I have

13   Court's Exhibit Number 9," so we can

14   look at it.

15           THE WITNESS:   Judge, I don't

16   know if that's part of the record.

17           MR. BUCHANAN:   I just want it

18   marked in the record.   I don't want it

19   to be admitted into evidence yet.

20           MR. EARLS:   Well it's not been

21   identified.

22           THE COURT:   Do you want it

23   marked for ID purposes only?

24           MR. BUCHANAN:   Only, yes, sir.

458

1           THE COURT:  Okay.  Mark it for

2   ID purposes only.

3           MR. EARLS:  Well, I -- Nobody's

4   identified it yet.

5           MR. BUCHANAN:  And I haven't

6   asked for it to go into evidence yet.

7           THE COURT:  He's just asking it

8   be marked for identification purposes.

9   He's not asking it to be offered as a

10  trial exhibit for purposes of this

11  hearing for my consideration and

12  rendering final judgment.  Now, you're

13  welcome to it and ask further questions

14  if you want to pursue identification.

15  But at this point in time, the State is

16  correct, it's not been identified.  Mr.

17  Buchanan is only asking it be marked for

18  ID purposes only.

19          MR. EARLS:  Okay.

20          THE COURT:  Let it be marked for

21  identification purposes only, Exhibit 9.

22          **(Exhibit 9 for identification**

23          **was marked.)**

24          THE COURT:  And what is it?

                                        459

1           MR. EARLS:  Supplemental motion

2    for --

3           THE WITNESS:  It's a draft.

4           MR. EARLS:  -- change of venue.

5           THE WITNESS:  A possible draft,

6    which I don't know whether was filed or

7    not.

8           THE COURT:  Go ahead, General.

9    You want to ask?

10   **RECROSS-EXAMINATION**

11   **BY MR. EARLS:**

12   Q       You were asked about character

13   witnesses and mitigation witnesses.  Is

14   it your understanding of the law that

15   any mitigator that you prove or try to

16   prove during the penalty phase, the

17   State is entitled to rebut?

18   A       Oh, yes, absolutely.

19   Q       Now, and just so I'm real clear

20   on the record, you discussed everything

21   with Jon Hall.  Every witness he wanted

22   you to find and locate you tried to do

23   that.

24   A       Yes.

                                        460

```
 1          MR. BUCHANAN:  I object.  This

 2   is repetitious.

 3          THE COURT:  It really is.  It's

 4   cumulative.  And, again, General, I've

 5   been listening carefully to the

 6   testimony all day.

 7          MR. EARLS:  I understand.  I

 8   just wanted --

 9          THE COURT:  Now both sides have

10   been repetitious, and we've been liberal

11   with each other.

12          MR. EARLS:  That's my last

13   question.

14          THE COURT:  Okay, go ahead.

15   Q      Is that yes?

16   A      Yes.

17          MR. EARLS:  Okay.

18          MR. BUCHANAN:  Just one question

19   so hopefully I won't have to call him

20   back.

21          THE COURT:  And hopefully it's

22   not repetitious.  Go ahead.

23   FURTHER REDIRECT EXAMINATION

24   BY MR. BUCHANAN:
```

461

1    Q        Mr. Ford, do you remember when

2    you filed a motion for change of venue,

3    having an affidavit attached to it?

4    A        Don't remember.  I'd have to

5    look at the record.  I don't know.

6    Q        Fair enough to let the record

7    speak for itself on that?

8    A        Yeah.  I -- Yeah.

9        MR. BUCHANAN:  No further

10   questions.

11       MR. EARLS:  Nothing further.

12       **(WITNESS EXCUSED.)**

13       THE COURT:  If Petitioner's side

14   will update us on where we stand.  I can

15   stay and we can take more proof today,

16   if you're not down to this one witness

17   tomorrow.

18       MR. BUCHANAN:  We're -- We're --

19   I think we're down to Jon Hall, unless

20   somebody shows up that was subpoenaed

21   that didn't show up tomorrow, and if

22   they did, they're very, very short, but

23   as far as I know -- It went way faster

24   than I thought it would go, Judge.

1           THE COURT:  Well now, regarding
2   those two witnesses that were not here
3   when you called their names out and then
4   we moved on to Mr. Ford, are you seeking
5   any specific relief regarding that, or
6   are you going to pursue it on your own
7   tonight knowing they'd be brief
8   witnesses if they did come?
9           MR. BUCHANAN:  Let me let him
10  speak to that.  They were his witnesses.
11          THE COURT:  Okay.
12          MR. ELLIS:  Your Honor, I would
13  like -- I don't want to throw anybody in
14  jail.  I'd like to try to contact them
15  tonight by phone if I may.  I would like
16  to just reserve that, and if I'm unable
17  to do so, send somebody out tomorrow.
18          THE COURT:  I would still let
19  you put them on if they're here
20  tomorrow.  If it's cumulative, as we've
21  heard from several witnesses that were
22  prior neighbors, then I -- I don't --
23  that would be your decision.
24          MR. ELLIS:  Your Honor, and

                                        463

1   correct me -- Ms. Higuera will correct
2   me if I'm wrong, but I believe that
3   these people could testify of his
4   intoxication that night, which I think
5   --
6           THE COURT:  Well I'm offering --
7           MR. ELLIS:  Especially given the
8   testimony of Mr. Ford today, that's very
9   relevant.
10          THE COURT:  I'm offering, and
11  you say you don't want the help, to
12  bring these witnesses in through the
13  assistance of those that can get them
14  here, I take it, in violation of the
15  subpoena.  But if you want to do it on
16  your own, that's your choice now.
17          MR. ELLIS:  Your Honor, let us
18  try it on our own.
19          THE COURT:  So we anticipate
20  then possibly those other two witnesses
21  briefly and then your client.  Is that
22  correct?
23          MR. BUCHANAN:  Yes, sir.  And I
24  -- barring something unforeseen that the

464

1   Lord only knows could happen, I predict

2   we'll be out by noon.

3           THE COURT:  Of course, we still

4   have State's -- Well, --

5           MR. BUCHANAN:  Yeah, I mean our

6   side.

7           MR. EARLS:  I don't want to

8   belabor the point, Your Honor, but let

9   me -- because I've got a witness that's

10  on standby, are you going to take me out

11  of turn since they --

12          THE COURT:  That's why I wanted

13  to talk about this now.  That's my

14  point.  I mean, is the State going to go

15  tomorrow, or is the State asking to wait

16  until they come back with expert

17  witnesses?

18          MR. EARLS:  Well I want to wait,

19  Your Honor, because even if I go now,

20  I'm going to have to put on some more

21  proof.

22          THE COURT:  Well I think that --

23  I think I've got to accept that under

24  the circumstances.  I don't think the

465

1  Petitioner's side can say anything other

2  than we have to accept it.

3          MR. BUCHANAN:  No.  I want the

4  Court to know that if Mr. Earls has a

5  problem and needs to take somebody out

6  of course, I don't have any problem with

7  that.

8          THE COURT:  You'll be

9  cooperative.

10          MR. BUCHANAN:  Yes, sir.

11          THE COURT:  Certainly.  And I

12  appreciate and respect that, but you're

13  anticipating resting your case tomorrow

14  as we just discussed.

15          MR. BUCHANAN:  Yes, sir.

16          THE COURT:  Short of the experts

17  to come at the later date.

18          MR. BUCHANAN:  Yes, sir.

19          THE COURT:  With that having

20  been said then, gentlemen, let me point

21  out a couple of things.  We have two

22  exhibits that need to be cleaned up, so

23  to speak, Exhibits 7 and 8.  One's the

24  memo from an investigator, and the

466

1    other's the mitigation assessment.  Now

2    they've been offered today and marked as

3    exhibits.  We have an agreement clean

4    copies will be substituted.  Exhibit 8

5    is -- I think just stick 'em notes could

6    be taken off.

7             MR. BUCHANAN:  I think that's

8    probably true.

9             THE COURT:  And do that now.

10   And the other, I just assume y'all have

11   got a clean copy somewhere, but that's

12   Exhibit 8.  If you can just take the

13   stick 'em notes off, Exhibit 8 will be

14   taken care of.

15            MR. BUCHANAN:  I think that's

16   correct.

17            THE COURT:  Look at it then

18   before you leave.  Let's know that's

19   surrendered to the court reporter.  And

20   then take care of Exhibit 7 by tomorrow

21   if you would.  I just want to get

22   everything in order.

23            MR. BUCHANAN:  Exhibit 7 is?

24            THE COURT:  That's the memo from

467

1    Gloria Shettles.

2         MR. BUCHANAN:  Okay, yes, sir.

3    There's a clean copy in existence in

4    those nine boxes somewhere.

5         THE COURT:  Okay.  I have other

6    attorneys and a client reporting in at

7    7:45 in the morning, so I'll be here

8    earlier anyway.  Not because they're

9    coming, I just do that.  But I'm going

10   to try to clear that up at 7:45 so I'll

11   know whether I'm going to take a plea or

12   schedule a jury trial for Friday since

13   this case is not going to Friday.  But

14   I'll know that on time so hopefully we

15   can get started about 8:00 in the

16   morning.

17        MR. ELLIS:  May it please the

18   Court, Your Honor, I know Mr. Buchanan

19   is cleaning up evidence, but in terms of

20   resting, Your Honor, we were going to

21   take this up, and I think now would be

22   an appropriate time, about Mr. Hall's

23   mother.  We would -- Your Honor, we

24   would respectfully like to rest

468

1    tomorrow, however, we'd like to leave

2    open the ability to take Mrs. Hall's

3    deposition, considering her state, that

4    she's unable to travel.

5        THE COURT:  I think if you want

6    to take a deposition, you're leaving

7    your side open anyway, with the offer

8    from your side that the State could take

9    somebody out of order and they choose

10   not to do so at this point unless they

11   change their mind, but the deposition

12   issue should be -- you should give the

13   State notice that this is what you're

14   asking for.  She's located where?

15   Pennsylvania?

16       MR. BUCHANAN:  Pennsylvania.

17       THE COURT:  And that's something

18   I don't -- How long has she been

19   unavailable?  How long have you known

20   she's unavailable?

21       MR. BUCHANAN:  The testimony, I

22   went ahead and put it on.  I've known it

23   probably since the middle of last week,

24   and I didn't see any chance of getting a

1    depo done before, and actually I was

2    planning on hitting the Court with some

3    motions early next week to explain that,

4    but we can do it then or --

5          MR. ELLIS:  Your Honor, I was

6    just preserving for the record that when

7    we stopped tomorrow, that wasn't it.

8          THE COURT:  Well we already

9    decided it wasn't it, and I appreciate

10   you being cautious and letting us know

11   it wasn't in regard to that possible

12   issue, too, but that's something I'm

13   going to let you talk to the State

14   about, and we'll have to -- you'll have

15   to do something more formally than just

16   stand up orally now under the rules

17   before I can approve that.

18         MR. ELLIS:  Again, Your Honor, I

19   understand.  I just wanted to bring it

20   to your attention.

21         THE COURT:  Okay.  Anything else

22   today, gentlemen?

23         MR. BUCHANAN:  No, sir.

24         THE COURT:  All right.  We'll

470

1    stand in recess.  I'm going to give the

2    exhibits to the court reporter.  She'll

3    make sure she has all the exhibits.

4                    - - - - -

5    **END OF VOLUME III.**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24