# ADDENDUM 1
# Volume 12

W2003 00669-CCA-R3-PD

FILED

JUDY BARNHILL, CIRCUIT COURT CLERK

JUN 03 2003

BY

DEPUTY CLERK

AM

PM

1          IN THE CIRCUIT COURT OF

2      MADISON COUNTY, TENNESSEE

3        AT JACKSON, DIVISION I

4    _____

5   JON HALL,

6         Petitioner,

7   vs.                          No. C00-422

8   STATE OF TENNESSEE,

9         Defendant.

10   _____

11        HEARING ON POST-CONVICTION

12           RELIEF PETITION

13           MAY 16, 2002

14          VOLUME IV OF IV

15   _____

16

17

18

19

20
21              AMY MAYS

22      OFFICIAL COURT REPORTER

23   MADISON COUNTY JUSTICE COMPLEX

24      JACKSON, TENNESSEE   38301

25            (731)423-6039

FILED

JUL 2 4 2003

Clerk of the Courts
Rec'd By

472

ORIGINAL



Vol. 12

1

2          THE COURT:  We left off with Mr.

3    Ford yesterday, and I believe it's

4    anticipated to start with Mr. Hall this

5    morning.

6          MR. ELLIS:  Actually, Your

7    Honor, we want to ask to call Diana

8    Pearson.

9          THE COURT:  Diana Pearson then

10   come forward.

11         Is Diana Pearson probably in the

12   hall?

13         MR. ELLIS:  Yes, Your Honor.

14         THE COURT:  We need to call her

15   in.

16         COURT OFFICER:  She's not here.

17         MR. ELLIS:  We want to get her

18   here the next time, if we can.

19         THE COURT:  Well now I want to

20   get an understanding.  Of course, we're

21   available, and I offered to get them

22   last night.  I don't want to come back

23   in September and we've got a whole bunch

24   more witnesses that should be put on.

                                        473

1    We've got an understanding on that.

2    That's why I'm here today and offered to

3    be here tomorrow.  State for the record.

4    Is that agreed?

5              MR. ELLIS:  Yes, Your Honor.

6              MR. BUCHANAN:  Yes, sir.

7              THE COURT:  Okay.  She's

8    obviously not here.

9              MR. ELLIS:  Your Honor, I'm also

10   going to understand that probably Alice

11   Pearson won't be here as well.

12             THE COURT:  Let's ask, though.

13             Alice Pearson.

14             Let's call her name out also.

15             COURT OFFICER:  She's not here.

16             MR. ELLIS:  Your Honor, then to

17   preserve their testimony, we would ask

18   that we call April Higuera just for an

19   offer of proof.  She's our investigator.

20   We understand everything she would say

21   would be totally hearsay, but yet to

22   preserve the record of what was

23   available.

24             THE COURT:  Does the State want

1    to comment on it?

2          MR. EARLS:  It's obviously

3    hearsay, but if the Court wants to allow

4    them a proffer, it's the Court's

5    discretion on that.

6          THE COURT:  Note again, I

7    offered last evening as we quit, since

8    they were in violation of subpoena, to

9    have law enforcement go find them, if at

10   all possible, and defense has indicated

11   they didn't want that, Petitioner's

12   counsel has, and then I also heard that

13   same comment this morning that you

14   didn't want that either.  I'll let you

15   make the offer of proof.  I just don't

16   know what value it will be later when

17   other efforts were turned down.  So let

18   her come around as an offer of proof and

19   be sworn.  I guess it will be determined

20   later whether it's of any value.

21          **(April Higuera was**

22          **called and duly sworn.)**

23          MR. ELLIS:  Your Honor, before

24   we begin, my esteemed counsel has asked

475

1    that we do ask for a writ of attachment

2    on Diane Pearson and Alice Pearson.

3             THE COURT:  That means two that

4    -- We're going to give that 'til in the

5    morning, so we'll need to be here in the

6    morning, because if it takes that long

7    to find them to get them on, that's the

8    purpose of these three days.

9             MR. ELLIS:  Yes, Your Honor.

10            THE COURT:  I'm going to let her

11   step down then at this time, and let's

12   try to get them here.  Okay.  Let's get

13   Ms. Page in here and tell her what we

14   need to do when we get an officer that

15   can go find her.  We just need the names

16   and addresses written down, and we might

17   find them today, it might be in the

18   morning, but it'll go to law

19   enforcement.  If they're not found

20   today, we will be here at eight a.m. in

21   the morning to determine whether they've

22   been found to testify.

23            MR. ELLIS:  Your Honor, before

24   we -- can we have just about five

476

1    minutes?  I want to make sure that they

2    were served.

3              THE COURT:  Okay.  You just said

4    they were served yesterday I thought.

5    Double-check, that's correct.

6              MR. ELLIS:  Well I called the

7    process server, I told him if he didn't

8    get anybody served to call me back and

9    he has not.

10             THE COURT:  Double-check that.

11             MR. ELLIS:  I want to double-

12   check that before we --

13             THE COURT:  That's real

14   important, yes.

15             MR. ELLIS:  -- throw anybody in

16   jail.

17             THE COURT:  Could we proceed on

18   with anything else?

19             MR. BUCHANAN:  Yes, sir, he can

20   be checking that.  I have a couple of

21   housekeeping things.

22             Judge, I'd like to request, the

23   Court is familiar with the testimony

24   wherein Mr. Ford said that they did not

477

1    have the opening statements or the final

2    arguments typed up.  I would like to

3    formally request that be done and made a

4    part of this record.

5              THE COURT:  Does the State have

6    any comment?

7              MR. EARLS:  Opening statement

8    and final on what?

9              MR. BUCHANAN:  On the trial

10   itself.

11             MR. EARLS:  Oh, okay.  That's

12   fine.

13             THE COURT:  I certainly would

14   approve it.

15             MR. BUCHANAN:  Thank you.  And

16   if it's not too much trouble, Judge, at

17   some point I'd like to get this hearing

18   typed up sometime in the future, if

19   that's possible.

20             The most important thing I have

21   to tell the Court this morning is,

22   Judge, you'll remember I had expressed

23   to you last Friday that I had some

24   reservations about calling Mr. Hall.

1    That changed as of Monday because I saw

2    a window of opportunity with Mr. Hall.

3    I think the Court's aware, Mr. Hall can

4    sometimes -- and the testimony's been

5    pretty clear -- can sometimes go from A

6    to Z in his feelings about different

7    things.

8        I left here fully intending to

9    call him this morning.  Mr. Ellis and I

10   spent about an hour and a half with him

11   in the jail last night, and I honestly

12   feel that opportunity has closed itself

13   at this point for several reasons.

14       What I thought I had control, an

15   ability to reasonably predict, as any

16   lawyer needs to, how the testimony will

17   come off, I lost that ability last

18   night.  I'm not saying that I wouldn't

19   want to call him in the future, but I

20   would want Dr. Caruso here in case what

21   happens -- what might happen happens so

22   that I could have Dr. Caruso to explain

23   that.  It has to do with very much what

24   you saw at about 8:00 yesterday morning.

1    Sometimes Mr. Hall gets almost

2    incompetent, is the word for it.    I

3    don't say that he's legally incompetent,

4    but the ability to communicate just

5    leaves him.    It's like when the Court

6    told him yesterday to hush, and he has

7    it in his mind that you just have to

8    hear something that he has to say, and

9    as the Court -- the Court immediately

10   lost control of him.    I've had the

11   similar experience, and I'd like an

12   opportunity to discuss that also with

13   Dr. Caruso and see if there is some

14   medication perhaps that could stabilize

15   this situation because, when I go into

16   the jail or the penitentiary and I talk

17   to Jon, sometimes it's a really good

18   meeting and I couldn't even in a remote

19   way say that he's incompetent.    He can

20   cooperate with counsel and he knows what

21   he's talking about.    Then there's those

22   other times, very similar to what you

23   saw yesterday morning, in which it would

24   be a nightmare to have him take the

480

1  stand.  Whatever point I would score on

2  direct, -- and this is actually where I

3  lost him last night.  I had direct down

4  pretty good, but cross-examination, I

5  don't believe he'd survive it for -- not

6  after last night.

7       So I have to tell you this

8  morning, I have no evidence to go

9  forward on short of Mr. Ellis coming

10  back and seeing about the Pearsons.

11       THE COURT:  You're telling me at

12  this point in time -- you know we've got

13  all day today and we've got all day

14  tomorrow and you're not putting on your

15  client because of the reasons you just

16  stated.

17       MR. BUCHANAN:  For the reasons I

18  just stated, yes, sir.  And I --

19       THE COURT:  Knowing this is his

20  opportunity as part of his case on his

21  petition to testify.  We've got two full

22  days if we need it.

23       MR. BUCHANAN:  Oh, I -- I never

24  anticipated he'd be on the stand that

481

1   long, but I left here, I told the Court,

2   I told <u>The Jackson Sun</u>.  I thoroughly

3   intended to put him on this morning.

4   Mr. Ellis and I went to the jail last

5   night to do the last finishing touches,

6   and without going into it too deep, it

7   became a disaster.  I don't know any

8   other word to use.  And it's beyond my

9   feeble knowledge that I have to control

10  him in what I would consider a normal

11  manner.

12          THE COURT:  Do you want to

13  question your client under oath as to

14  whether he wants to testify today?

15          MR. BUCHANAN:  I -- Judge, I

16  have no doubt he wants to testify, and I

17  want him to testify.

18          THE COURT:  Is it not his

19  decision if he wants to testify?

20          MR. BUCHANAN:  It absolutely is,

21  and I don't want the record to even

22  think for a minute I'm taking that away

23  from him.  I'm not.  But I do think -- I

24  would like the opportunity to get with

482

1  Dr. Caruso and see if there is some

2  medication that could stabilize him a

3  little bit, number one; number two, if

4  he does go --

5        THE COURT:  Have you not had an

6  opportunity to work with Dr. Caruso

7  already on this case?

8        MR. BUCHANAN:  Yes, sir, I have.

9        THE COURT:  You talk about your

10  client on numerous occasions?

11        MR. BUCHANAN:  Yes, sir, I have.

12        THE COURT:  Knowing how far in

13  advance this case has been set?

14        MR. BUCHANAN:  Judge, I can't

15  predict his -- I can't predict Jon all

16  the time.  I mean, --

17        THE COURT:  Well you've known

18  that all along; have you not?

19        MR. BUCHANAN:  I understand, but

20  --

21        THE COURT:  He's had numerous

22  lawyers in the past, and you all seem to

23  communicate well on that problem; do you

24  not?

483

1          MR. BUCHANAN:  We have, we

2    absolutely have.  But I --

3          THE COURT:  So why haven't you

4    done something, after telling everybody

5    differently, before 8:30 this morning?

6    Knowing your client wants to testify.

7          MR. BUCHANAN:  Judge, I don't

8    like telling you this.  I went and

9    talked to his family, and Danny doesn't

10   like telling you.  None of us like

11   telling you this, but he -- we -- he --

12   you know, I just think it would be a

13   disaster to put him on this morning in

14   light of what happened yesterday.  And

15   we had him under control yesterday all

16   during the course of the trial.

17         THE COURT:  But you're

18   describing -- Are you not describing to

19   me this morning the same type behavior

20   you've been experiencing with Mr. Hall

21   along, that you've described prior to

22   this morning?

23         MR. BUCHANAN:  On and off.

24         THE COURT:  Okay.  So we're in

484

1   agreement with that; are we not?

2        MR. BUCHANAN:  We are.

3        THE COURT:  So why haven't you

4   -- if you've got these other areas you

5   want to look to as to him possibly

6   testifying later is what you're telling

7   me, why haven't you already addressed

8   those problems with Dr. Caruso prior to

9   today's date?

10       MR. BUCHANAN:  I have tried, but

11  everything that --

12       THE COURT:  Tell me specifically

13  what you have done to try to address

14  these problems with Dr. Caruso, when and

15  what.

16       MR. BUCHANAN:  I met -- Ms.

17  Higuera and I met with him last Friday

18  and asked him if there was some kind of

19  medication or something.  He said he

20  would like to get the serotonin levels

21  back before he could come to anything

22  like that.  He had spent two hours with

23  him, and he -- without -- I -- I don't

24  mind them knowing my expert.

485

1          THE COURT:  If you want to talk

2    ex parte, I'll do it because I want to

3    hear from you.

4          MR. BUCHANAN:  Yes, sir, I would

5    like to talk ex parte on this.

6          THE COURT:  We're going to step

7    into chambers.  Give me just a few

8    minutes before you come back there.

9          **(After a recess, the**

10         **following proceedings**

11         **were had:)**

12         THE COURT:  What I've decided to

13   do since Mr. Buchanan has announced that

14   his client wants to testify but he's not

15   in a position to put him on today and he

16   wants to consult with Dr. Caruso that

17   he's had some opportunities in the past

18   to work with on this case and talked to

19   as recently as last Friday about

20   medication for his clients and some

21   other reasons he stated, I'm going to go

22   ahead, noting that further medical

23   examinations are July 31st and those

24   experts need approximately two weeks to

486

1   conclude their matters and submit

2   reports, and I'm going to schedule this

3   for September.

4          I'm going to schedule it for two

5   weeks' time, gentlemen.  You're going to

6   be with me starting September the 4th,

7   and you're going to be with me for two

8   weeks, cancelling everything you've got

9   if that's what it takes, starting

10  September 4th, two weeks.  I'm going to

11  work it in with everything else I've

12  got, and you'll sit here and wait 'til

13  we can get to it.  That's my criminal

14  docket.  We'll start it when I can start

15  it because it's going in with everything

16  else.  I've tried to accommodate you on

17  special days.  I've tried to work with

18  you in every way possible, and you tell

19  me one thing, and then you tell me

20  another.  I question sometimes what

21  direction you are going and whether

22  you've told me the right and truthful

23  thing in the first place, but I -- I'm

24  taking you at your word today again.

487

1   I'm trying to give you everything

2   necessary time-wise to do what you need

3   to do.  This will fulfill your desire

4   today.  But I want you here at 7:30 on

5   September 4th, 7:30 a.m., and we will be

6   here, and plan on it -- we will be here

7   at least, at least, through September

8   the 13th, but you could go the full two

9   weeks which would be into the next week.

10  And again, I have other cases scheduled,

11  jury trials, but I have a busy docket,

12  and I've got to tend to it, and this is

13  one of them I've got to tend to.

14          Now, with that having been said,

15  I want -- I want monthly reports between

16  now and then.  If this needs to be about

17  the experts, certainly it will be ex

18  parte.  The State understands that.  I

19  will not continue this case.  We've got

20  those two weeks scheduled, and we will

21  start as I've stated.  I want an order

22  to go down to that effect.  I want you

23  to draw up that order, and I want Mr.

24  Buchanan to draw it up, and I want it

488

1    submitted to me within seven days.

2            MR. BUCHANAN:  Yes, sir.

3            THE COURT:  Now, any questions

4    about what I've said?

5            MR. ELLIS:  The ending, Your

6    Honor?  I'm just trying to block it out.

7    The ending date?

8            THE COURT:  Oh, the ending date.

9    I want you to be committed for two full

10   weeks.

11           MR. ELLIS:  Through the 18th,

12   Your Honor?

13           THE COURT:  That would be

14   through the 18th.  And just for an

15   example, I've got a first degree murder

16   trial on the 17th, among other things.

17           MR. BUCHANAN:  So there is no

18   misunderstanding, --

19           THE COURT:  Oh, yeah, be

20   prepared.  We'll proceed on Saturdays

21   and Sundays.  Sundays have been declared

22   to be legal.  We'll just do whatever it

23   takes to get this case heard.  Mr. Jon

24   Hall is entitled to that.

489

1          MR. BUCHANAN:  Yes, sir.  Judge,

2    if I --

3          THE COURT:  Any questions?

4          MR. BUCHANAN:  No, sir.  I want

5    the Court to know, if I schedule

6    something on the 20th and for some

7    reason we've got to go the 20th, I'm

8    prepared to cancel the 20th.

9          THE COURT:  I understand.  We're

10   going to start on the 4th at eight a.m.

11   Put in the order again that will include

12   remaining here and being available on

13   Saturdays and Sundays for purpose of a

14   hearing.

15         Does the State have any

16   questions?

17         MR. EARLS:  No, sir.

18         THE COURT:  Okay.  Monthly

19   reports in that order, too, to me.  Ex

20   parte is fine dealing with experts.  And

21   I want to hear from you.  That means, I

22   assume, monthly reports -- let's see --

23         MR. BUCHANAN:  First of each

24   month?

490

1          THE COURT:  Well you're going to

2    be calling me the first of June then.  I

3    just don't want any confusion about it,

4    so let's say by the -- between the 1st

5    and the 5th, so that will give you some

6    latitude there in case the 1st falls on

7    the weekend.

8          MR. BUCHANAN:  I would prefer to

9    do a phone call and follow up with a

10   written memo of that phone call.  Would

11   that be appropriate?

12         THE COURT:  Conference call is

13   fine.  I've got no problem with that as

14   long as we're staying on track and you

15   understand what the significance of

16   these September dates are.

17         MR. BUCHANAN:  I do, Your Honor.

18         THE COURT:  And all of your

19   experts understand that.  Get your

20   subpoenas out.  Everybody's got to be

21   committed for September 4th.  You just

22   have to remain with me until we finish

23   the case.

24         Now, as far as these two missing

1  witnesses, the two missing witnesses,

2  I'll take up their testimony tomorrow at

3  1:00, give us plenty of time to find

4  them if that's what you want to do.

5        But Mr. Ellis has got to go

6  across the hall and see if they were

7  actually served.  Right?

8        MR. ELLIS:  Yes, Your Honor.

9  I'll be back in five minutes to report.

10        THE COURT:  We can stand in

11  recess if that's the last matter we have

12  before you gentlemen leave today.  Is

13  there anything else?

14        MR. BUCHANAN:  Judge, since our

15  telephone conversation was off the

16  record, I don't want Mr. Ellis to leave

17  yet.  I do want the record to reflect

18  that as of last Friday, I did express to

19  the Court that I did not want to call

20  Mr. Hall without Mr. Caruso having

21  completed his things, and I -- honest to

22  goodness, Judge, it was an accommodation

23  to the Court because the Court had set

24  aside so much time --

1          THE COURT:  I recall it somewhat

2     differently, but you go ahead and put

3     what you want on the record.  And I

4     certainly don't even recall that intent

5     yesterday or desire that you wanted to

6     put it off.  But you go ahead and put on

7     the record today what you think last

8     weekend's phone call was.

9          MR. BUCHANAN:  I thought last

10    Friday's phone call I had expressed that

11    I preferred not to put Jon on until

12    Caruso was through with his testimony as

13    of last Friday.  As of Monday when I

14    talked to you, I thought I had

15    sufficient control of him, that since

16    you had this time set aside, I could, in

17    fact, put him on.  And I just wanted the

18    record to reflect that.  And quite

19    frankly, Judge, I would like to question

20    Mr. Ellis about the phone call on

21    Friday, too, because -- I just would

22    like to do it for the record, if that's

23    all right.

24          THE COURT:  Do you want to swear

493

1    him in, or do you just want to hear his

2    testimony?  I want to do what you want

3    to do on that.

4         MR. BUCHANAN:  He's an officer

5    of the Court.

6         THE COURT:  I'm satisfied.  I

7    just wanted to make sure you were, Mr.

8    Buchanan.

9         MR. BUCHANAN:  Mr. Ellis, you

10   are Danny Ellis; are you not?

11        MR. ELLIS:  Let me go --

12        THE COURT:  You don't have to

13   get up there, Mr. Ellis.  Wherever

14   you're comfortable.

15        MR. BUCHANAN:  Mr. Ellis, were

16   you a party to a three-way phone call

17   with yourself, myself and the Court on

18   Friday?

19        MR. ELLIS:  Yes, I was.

20        MR. BUCHANAN:  Would you please

21   state your recollection as to what I had

22   to say about Jon testifying in

23   relationship to Dr. Caruso?

24        MR. ELLIS:  I remember speaking

494

1   with Judge Morgan at the Law Day

2   luncheon and was told that we would have

3   a three-day hearing.  That was the first

4   I'd heard of that.  I immediately

5   contacted you.

6           MR. BUCHANAN:  Was it the first

7   time I'd heard of it, to your knowledge?

8           MR. ELLIS:  Yes.  I immediately

9   called you, called Judge Morgan back.

10  He had asked that I call him for a

11  three-way call.  We placed that call.  I

12  remember discussions about Dr. Caruso

13  not being able to testify.  I also

14  remember discussions about whether

15  orders were forwarded on to the experts.

16  I remember specifically stating that

17  we'd received the orders, that they'd

18  been faxed down, that we had forwarded

19  those on after we received the order

20  from the AOC.  I think the testimony was

21  -- or the conversation was that you had

22  not received them.

23          MR. BUCHANAN:  I'm specifically

24  wanting to know about anything you

495

1  remember about me saying Jon would or

2  would not testify.

3          THE COURT:  Thank you, Mr.

4  Buchanan.

5          MR. ELLIS:  I'm trying to ...  I

6  think at that time it was questionable

7  whether he would or he wouldn't.

8          MR. BUCHANAN:  Do you remember

9  me raising a concern about that at that

10  time?

11          MR. ELLIS:  I remember -- I

12  remember that we were concerned about

13  putting him on at that time.

14          MR. BUCHANAN:  When's the first

15  time I told you that I wanted to put him

16  on?  Do you remember that?  Just between

17  you and me as attorneys.

18          MR. ELLIS:  We discussed that --

19          THE COURT:  If I can interrupt

20  just a minute.  I don't have to get into

21  your private strategy where you're

22  talking about your case with your

23  client.  I think you're getting into a

24  dangerous area, but now if you want to

496

1    delve into it and feel it necessary or

2    not, that's up to you.

3         I will say this.  I think it was

4    very clear from the phone conversation,

5    if I may interrupt, that you even

6    discussed the fact you could follow up

7    with more testimony from Mr. Hall after

8    Dr. Caruso testified.  And that was -- I

9    mean, you explained it all to me, and,

10   "Yeah, I'm not worried because I can

11   follow up and put him on if I need to

12   after Dr. Caruso," and I said, "Yeah, I

13   understand that.  That'd be fine."

14        Is that not right, Mr. Ellis?

15        MR. ELLIS:  I think that's -- I

16   think we were concerned about putting

17   him on, but if we put him, could we put

18   him back on later.  I'm not -- Your

19   Honor, what I was worried about at the

20   time was, was the order forwarded or

21   not.

22        THE COURT:  I understand that.

23        MR. ELLIS:  And --

24        THE COURT:  If he wants to

                                         497

1   question you further he can.

2        MR. BUCHANAN:  No, I --

3        THE COURT:  It put Mr. Ellis on

4   the spot, and I understand that.

5        MR. BUCHANAN:  I just don't -- I

6   don't want the Court to think I'm

7   misleading you.

8        THE COURT:  Do you recall my

9   conversation with you where you said you

10  could put him on after Dr. Caruso, too,

11  to follow up some stuff if you needed

12  to?

13       MR. BUCHANAN:  That that would

14  be one way we might could do it.

15       THE COURT:  And you recall that

16  as part of the phone call.

17       MR. BUCHANAN:  Yes, sir, I do.

18  You're right.  And that's why I went

19  that weekend to talk with Jon.

20       THE COURT:  I think we've solved

21  our problem for September, gentlemen, if

22  you're in agreement.

23       MR. BUCHANAN:  Yes, sir.

24       THE COURT:  Mr. Ellis, go check

498

1  the subpoenas.

2          MR. ELLIS:  Yes, Your Honor.

3          THE COURT:  If we need to delay,

4  I'll step down and let you call.  Again,

5  it's an effort to accommodate to get

6  whatever you need.

7          MR. ELLIS:  I know, Your Honor.

8          THE COURT:  Do you want me to

9  step down and you can make some calls to

10  your process server?

11          MR. ELLIS:  Your Honor, I've

12  already called him.  I would like you to

13  step down so we can try to get them in

14  today.

15          THE COURT:  Let me give you --

16  You think 15 minutes you can find him

17  and find out if we need to have them --

18          MR. ELLIS:  Your Honor, I paged

19  him, I called his cell phone, I called

20  his work.  I think it's just a matter of

21  him returning my phone call.

22          THE COURT:  Let's take 15

23  minutes, and we'll just see if you can

24  get a'hold of him so we'll know what to

499

1   do.

2        MR. ELLIS:  Your Honor, before

3   we recess, I -- I think I need to put

4   this on the record.

5        First and foremost, I do not

6   appreciate being placed in the position

7   I was just placed in.

8        THE COURT:  I understand that.

9   That's why I interrupted when I did.

10       MR. ELLIS:  Second of all, I've

11  thought about the conversation.  What I

12  remember the conversation was, I believe

13  we were concerned about placing Mr. Hall

14  on the stand.  I don't want to go into

15  specifics about that because I don't

16  want to taint this record.  But what I

17  can remember is, we discussed it.  We

18  were concerned about it.  I think it was

19  left with, well, you weren't going to

20  allow outbursts, is what I can remember,

21  that basically what would happen the

22  other morning is what would happen if he

23  did not present himself the way it was

24  supposed to be.

500

1          Other than my concern with the
2   orders and getting extra time for Dr.
3   Caruso, I -- and the fact that we were
4   concerned with Mr. Hall and his decorum
5   in the courtroom, it's just --
6          THE COURT:  I understand.  I
7   appreciate your good faith effort to try
8   to remember, but I -- I've stated what I
9   specifically remember regarding the
10   narrow issue of your client testifying.
11   It's nothing new that you've been
12   concerned about your client and his
13   decorum and actions in the courtroom,
14   and I understand that.  Other lawyers
15   have expressed that concern.  I have no
16   recollection about that being any
17   concern about him testifying different
18   from any other time that he might
19   testify.  You know, that's just always
20   been a concern.
21          But I apologize that you were
22   chosen by Mr. Buchanan to be put on the
23   spot like that.  I'm not mad at anyone,
24   but we do have a job to do, and I've

501

1    said it a hundred times.  And the main

2    thing is that you leave here today, once

3    we decide what to do with these two

4    witnesses, there'll be no continuances.

5    You follow through this time.  I don't

6    even want to rehash the concern about

7    those orders and the mix-up and the fact

8    that somebody supposedly was to get the

9    order like Mr. Buchanan yet he never got

10   it, those type things.  It's behind us

11   now.  We move forward.  We've got

12   September dates.  There will be no

13   delay.

14           MR. ELLIS:  Exactly, Your Honor,

15   but I would like to show -- have the

16   opportunity to show to the Court without

17   exposing the contents of them, based on

18   work product privilege, E-mails that

19   I've received from Mr. Buchanan and Ms.

20   Higuera regarding their efforts to get

21   these experts along, and I have saved

22   every E-mail that I've received and

23   would like to show them to the Court if

24   he has Internet access.

502

1           THE COURT:  If you at some point

2      want to, you can do that.  That's not my

3      concern now because, again, that's water

4      under the bridge.  We're wasting time.

5      You're wasting effort.  You've got to

6      represent this gentleman, and that means

7      move forward now on whatever you've done

8      in the past.

9           MR. ELLIS:  Right.

10          THE COURT:  My concern again,

11     I've already expressed, expressed it the

12     first day of this hearing yesterday.

13     Okay.  But I appreciate your kindness

14     again in thinking about bringing it up.

15          Now I'm going to step down.

16     Let's step down 15 minutes.  See where

17     you stand with these witnesses.  If

18     we've got to send law enforcement after

19     them, I might just schedule this for

20     tomorrow at 1:00 and give everybody time

21     to try to find them, whatever it takes,

22     if that's what you want to do.  I'm not

23     compelling you to put them on or not put

24     them on.  You've got to decide what --

1   All right.  Thank you.

2           **(After a recess, the**

3           **following proceedings**

4           **were had:)**

5           THE COURT:  Just so we will have

6   it straight on the record so there won't

7   be any confusion, I understand Mr. Ellis

8   and Mr. Buchanan reported that the two

9   witnesses they had hoped to call were

10  actually not subpoenaed.  The subpoena

11  did not get served on the Pearsons,

12  Diana and I believe Alice Pearson.

13          MR. ELLIS:  Yes, Your Honor.

14          THE COURT:  And since it wasn't

15  served, the Court's not in a position,

16  as counsel knows and has acknowledged,

17  to have them brought in through the

18  assistance of law enforcement.  And what

19  we've agreed to do in summation is

20  certainly these are witnesses that you

21  attempted to have ready for the

22  scheduled hearing, so you're going to

23  try to re-subpoena them and have them

24  for the next hearing.  Is that correct?

504

1        MR. ELLIS:  Yes, Your Honor.

2        THE COURT:  Okay.  And we

3   appreciate your efforts in clearing it

4   up today so we certainly didn't take

5   action if he we didn't have them under

6   subpoena.

7        Now the other thing was, again

8   off the record, I understand you made

9   every effort to have all the witnesses

10  here for the hearing scheduled for

11  yesterday except we knew there was a

12  problem with experts, and we now know

13  Mr. Jon Hall would testify at a later

14  date also if he chooses.  Other than

15  that, you anticipate all other witnesses

16  were subpoenaed as they should have been

17  for the hearing as scheduled yesterday.

18  Is that correct?  Except for the --

19  there is a possibility, except for the

20  mother's --

21        MR. ELLIS:  Except for the

22  mother.

23        THE COURT:   -- potential

24  testimony.  Is that correct?

                                    505

1          MR. BUCHANAN:  That's correct.

2          MR. ELLIS:  They were

3    subpoenaed.  They're out of state.  I

4    understand that Mr. Joel is -- has some

5    issues concerning substance abuse.

6          THE COURT:  Those two then.  And

7    their names again?

8          MR. ELLIS:  Joe and Beth Hall.

9          THE COURT:  Joe and Beth Hall.

10   If you're able to get them here at a

11   later date, certainly I would consider

12   them testifying.

13         MR. ELLIS:  We'd like to reserve

14   the right, Your Honor.

15         THE COURT:  Just trying to clear

16   this up on the record, as I told Mr.

17   Buchanan, because there's always some

18   confusion, it seems to be, when we

19   don't.

20         Now, other than that, we will

21   conclude at this point in anticipation

22   that there are no continuances in any

23   other witnesses that we've mentioned

24   that will possibly testify at the next

506

1   hearing, and the State would have a

2   chance to put their proof on.  Is that

3   correct?

4            MR. BUCHANAN:  Yes, sir, I agree

5   with that.  I do want to make this

6   clear, Judge.  If I stumbled on

7   something I don't know about between now

8   and then, I at least want to reserve the

9   right to come and say, "Judge, I didn't

10  know about this guy, and he's here."  If

11  you want to say, "Fine.  I'm not going t

12  let him testify," that's fine, but I

13  don't want you --

14           THE COURT:  If you stumble into

15  something, certainly things can come up

16  suddenly that we didn't know.  That

17  happens in the middle of trial

18  sometimes.  I know -- I just want to

19  always leave knowing you made your good

20  faith best effort to be prepared for the

21  hearing that was scheduled for many

22  months that started yesterday.

23           MR. BUCHANAN:  Yes, sir.

24           THE COURT:  Always feel free if

507

1    there's some sudden situation you need

2    to address to bring it up.

3          MR. BUCHANAN:  Okay.

4          THE COURT:  That's part of

5    representing your client zealously, and

6    we want you certainly to continue to do

7    that.

8          MR. BUCHANAN:  Thank you, Judge.

9          THE COURT:  Okay.  Anything

10   further from State or Petitioner?

11         MR. BUCHANAN:  No, sir.

12         THE COURT:  We thank you,

13   everyone.  Good luck.  See you back in

14   September.  Look forward to the order

15   coming within the number of days I

16   specified and the monthly reports.

17         We stand in recess.

18               - - - - -

19   **END OF VOLUME IV.**

20

21

22

23

24

508

```
 1

 2

 3

 4

 5

 6

 7   EXHIBIT 1

 8              Identified and authenticated, this

 9
          18th
10   the __/8____ day of __July_____,

11

12   2003.

13

14

15   _____

16   JUDGE

17

18

19

20

21

22

23

24
```

509





Jessica

















1

2

3

4

5

6

7    EXHIBIT 2

8          Identified and authenticated, this

9

10   the ___18th___ day of ___July_____,

11

12   2003.

13

14

15   _____

16   JUDGE

17

18

19

20

21

22

23

24

510

```
 1

 2

 3

 4

 5

 6

 7    EXHIBIT 3

 8              Identified and authenticated, this

 9

10    the _____ day of _____,

11

12    2003.

13

14

15    _____

16    JUDGE

17

18

19

20

21

22

23

24
```

511

State Subpoena

McCOWAT-MERCER PRESS, JACKSON, TENN.

# The State of Tennessee, Madison County

## Circuit Court

Docket No. 96-589-36

FILED
FEB 0 4 1997
DEC. 1 9 Extd
JOE GAFFNEY, CIRCUIT COURT CLERK
DEPUTY CLERK

HENDERSON

To the Sheriff of ~~Madison~~ County — Greeting:

You are hereby commanded to summon _Herman McKinney_ _Rt # 2 Pleasant Hill Rd. Lexington_

personally to appear before Judge _La Fon_ of our Circuit Court of the County of Madison, to be held for said County in the courthouse _3rd_ floor in the City of Jackson, on the _3_ day of _Feb_ 19 _97_, at 9:00 A.M., to testify and the truth to speak, in the cause now pending in said Court, wherein the State of Tennessee is plaintiff, and _Jon Hall_ is defendant, on behalf of _State_ and this you shall in no wise omit under the penalty prescribed by law. Herein fail not, and have you then and there this writ.

WITNESS: JOE GAFFNEY, Clerk of our said Court, at office the _4_ day of _Dec._ 19 _96_

_____ Clerk

_____ D.C.

EXHIBIT

Came to hand _____ day of _____ 19 _____

and executed as within commanded.

000332

_Subject is Deceased_

This _17_ day of _Dec_ 19 _96_

_____ Sheriff

```
 1

 2

 3

 4

 5

 6

 7   EXHIBIT 4

 8              Identified and authenticated, this

 9

10   the ____18th____ day of _____July_____,

11

12   2003.

13

14

15   _____

16   JUDGE

17

18

19

20

21

22

23

24
```



Jon Hall # 238941
R.M.S.I. 7475 Cockrill Bend Indl. Rd.
Nashville, Tn. 37243-0471

J. Hall
Rt. 4 Box 4326B
Bolton, Tn. 76513

MSI. MAILROOM REQUEST YOU...
...
...ON AIR MAIL

※ See 4/6 must Have
Talked with Sheryl cause
I wrote in my Appointment
Book Sheryl Talked w/Lawyer
+ told them about JeFFS
Health + to Get a Deposition

I Talked w mom wed
4/5/95 wrote in book
so either mom told me
ON wed or I called
sheryl on thurs

Sent out 5/22/95
Same day as Googes
w/Draw

IN THE CIRCUIT COURT OF HENDERSON COUNTY
AT LEXINGTON TENNESSEE

EXHIBIT
5 a
5/10/02

STATE OF TENNESSEE        )
                          )
V.                        )        NO  94-342 94-452 94-454
                          )
JON HALL                  )
                          )

---

### SWORN AFFIDAVIT OF DECLARANT JEFF HALL - SUPRA

---

Comes now Jeff Hall, declarant, and moves this court pursuant
to Rule 804 of Tennessee Rules of Criminal Procedures, and would
respectfully show this court the following:

I_____first after being duly sworn hereby
depose the following to-wit:

I am the declarant in <u>State of Tennessee v. Jon Hall</u>; I am also the
brother of Jon Hall, and is believed that I have pertinent information
that may be favorable to his defense.

**Reputation Concerning Personal or Family History:**

Jon visited me between the dates of 6/19/94 - 6/26/94. Jon seemed to
be very depressed/suicidal over family and money problems.

**Reputation as to Character:** I know that Jon loved his Wife (Billie Hall
and childern very much. Our discussions over Jon's problems consisted
of Jon trying to get his family and finanical situations in order.

If Jon is guilty of the alleged crime of Murder, "I would have to
state it was invoked and induced by someone". I would also have to
testify that Jon acted under strong provacation, stress, pressure,and
seemed to be disfunctional during his visit with me on supra date.

**Character of Declarant:** If the question ever arises as to my credibilit
of this affidavit, let it be known to this court, that I am the person
who turned my brother (Jon Hall) over to the Belton Tx authorities.
My only concerns is that Justice is properly served in this matter,
and that my brother may receive a fair trial.

**Declarants Unavailability as a Witness:** Due to my present existing
physical condition, declarant is not able to travel the distance to
Tennessee to testify "personaly". Rule 804 (3) T.R.C.P.

**Issues of Future Actions:** If a Malpractice suit is ever filed on behalf
of my brother Jon Hall for ineffective assistance of counsel, let it
be noted to this court that Jon's Attorney (George Googe) or his formal
Attorney's has never contacted me about testifying for Jon's defense
as a Character witness.

I_____Jeffrey F Hall_____ swear under the penalty of perjury
that the forgoing affidavit is true to the best of my knowledge
and belief. Signed this the ___6TH___ day of _____June_____1995.

                                        Respectfully Submitted,

                                        _____
                                        Declarant Jeff Hall
                                        RT 4 Box 4326 B
                                        Belton TX. 76513


SWORN TO ME THIS THE_____6th_____DAY OF_____June_____**1995.**

NOTARY PUBLIC_____

MY COMMISSION EXPIRES_____7-23-97_____



```
 1

 2

 3

 4

 5

 6

 7   EXHIBIT 5

 8             Identified and authenticated, this

 9
     the ___/8th___ day of ____July_____,
10

11

12   2003.

13

14

15   _____

16   JUDGE

17

18

19

20

21

22

23

24
```

513

*Mail to clerk
at Lexington - Piece
in Lexington fact
Circuit Court
Clerk
want had*

STATE OF TENNESSEE
DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION
**MIDDLE TENNESSEE MENTAL HEALTH INSTITUTE**
1501 MURFREESBORO ROAD
NASHVILLE, TENNESSEE 37217
(615) 366-7616

March 28, 1995

The Honorable Whit S. LaFon
Henderson County Circuit Court
P.O. Box 7411
Jackson, TN 38302

FILED
KENNY CAVNESS - CIRCUIT CT. CLRK.

APR 1 0 1995
BY_____
DEPUTY CLERK

RE:   State of Tennessee vs. Jon Douglas Hall
      Docket No.: 94-342, 94-452, 94-454
      Report of Competency Evaluation

Dear Judge Lafon:

Jon Hall was seen by staff from the Forensic Services Division
(FSD) of Middle Tennessee Mental Health Institute (MTMHI) in the
Department of Corrections on an outpatient basis at Riverbend
Maximum Security, and was subsequently admitted to FSD on
February 23, 1995, by order of your court.  He was sent here for
an evaluation of his ability to stand trial on the charge(s) of
first degree murder, kidnapping, vandalism, and for an assessment
of his mental condition at the time of the alleged offense(s).

After completion of the competency evaluation, the staff has
determined that Mr. Hall's condition is such that he is capable
of adequately defending himself in a court of law.  In making
this determination, it was concluded that he does understand the
charges pending against him and the consequences which might
follow, and he is able to advise counsel and participate in his
own defense.

With regard to Mr. Hall's mental condition at the time of the
alleged offenses, it is the opinion of the staff that he does not
meet the criteria for an insanity defense pursuant to the
provisions of T.C.A. 39-11-501.  Therefore, a defense of insanity
cannot be supported.



Judge Baron
March 28, 1995
Page 2

The order also specified that the evaluation would address
matters which relate to alcohol and/or drug dependence and the
defendent's intellectual functioning.  The evaluation staff are
of the opinion that the defendent does have an alcohol and drug
dependence which could affect his normal behavior, and he scored
in the low-average range of intellectual functioning.

The staff further determined that Mr. Hall does not meet the
standards of judicial commitment to a mental health institute
pursuant to the provisions of T.C.A. 33-7-301(b) and 33-6-104.

We have returned Mr. Hall to the custody of the officials at
Riverbend Maximum Security Correctional Facility as he is
currently in safekeeping status from the Henderson County Jail.
We did not recommend follow-up services, although he could
benefit from alcohol and drug rehabilitation.  We have also
notified the mental health center which serves the Henderson
County Jail of our recommendations.

If you have any questions about this case, please do not hesitate
to contact me at (615) 366-7973.

                                    Sincerely,

                                    Larry Southard, Director
                                    Forensic Services

cc:  James W. Thompson, District Attorney General's Office
     George Morton, Defense Attorney
     Richard Drewery, West Tennessee Behavioral Center

LS/bb

MOTION TO HAVE DEFENDANT TRANSFERRED TO MADISON COUNTY PENAL FARM
OR MADISON COUNTY JAIL                                                    147-148

MOTION FOR DEFENDANT'S PRESENCE DURING ALL PROCEEDINGS HELD               149

MOTION TO RENEW MOTION FOR CHANGE OF VENUE                                150

MOTION TO DETERMINE PRIOR TO TRIAL THE COMPETENCY OF WITNESSES            151

MOTION TO DISMISS/BASED ON NEWLY DISCOVERED EVIDENCE                      153-155

MOTION FOR HEARING ON TRANSFER OF DEFENDANT                               164-165

MOTION AND MEMORANDUM TO QUASH SUBPOENA OF TOM CLOUSE                     166-167

MOTION FOR DEFAULT JUDGEMENT PURSUANT TO THE ABOVE ACTION                 171

MOTION TO RESTRICT DEFENDANT MAIL AND PHONE CALLS FROM VICTIM'S
FAMILY                                                                    174

MOTION FOR TRANSCRIPT OF PRIOR TRIAL                                      182-183

MOTION FOR PRESERVATION OF RECORDS/EVIDENCE                               184-185

MOTION FOR JUDGEMENT OF ACQUITTAL                                         186-187

MOTION IN ARREST OF JUDGEMENT                                             188-189

MOTION FOR NEW TRIAL/AMENDMENT                                            190-192

MOTION FOR NEW TRIAL / PRO-SE / AMENDMENT                                 193-198

MOTION TO ALLOW COUNSEL AND CO-COUNSEL TO WITHDRAW                        199-201

MOTION FOR NEW TRIAL OR VERDIT OF ACQUITTAL                               202-203

MOTION TO CURE OR WAIVER OF DEFECT                                        205-214

MOTION TO DECLARE DEFENDANT INDIGENT AS TO FINES AND COURT COSTS          232-233

NOTICE OF INTENT TO SEEK DEATH PENALTY AND SPECIFICATION OF
AGGRAVATING CIRCUMSTANCES                                                 6

NOTICE OF MOTIONS                                                         145

NOTICE OF STATE'S INTENT TO USE PRIOR ASSAULT                             175

NOTICE OF APPEAL                                                          180-181, 229, 217

ORDER ALLOWING PUBLIC DEFENDER'S OFFICE TO WITHDRAW AND
APPOINTING PRIVATE COUNSEL                                                23-24

ORDER APPROVING EMPLOYMENT OF JURY SELECTION CONSULTANT                   30

ORDER (ATTORNEYS TO BE INCLUDED IN ALL MOTIONS PREVIOUSLY
FILED BY PRIOR ATTORNEYS)                                                 135

ORDER (DEFENDANT TO BE MOVED; ATTORNEY TO HAVE UNLIMITED TRAVEL)          136-137

ORDER (AUTORIZATION FOR PAYMENT OF COSTS FOR COPY OF TRANSCRIPT
AND MOTIONS)                                                              140

ORDER (CHANGE OF VENUE GRANTED)                                           152

ORDER ON MOTION FOR CONTINUANCE                                           168

ORDER (DEFENDANT DECLARED INDIGENT)                                       177

ORDER (FROM CRIMINAL COURT OF APPEALS)                                    204

ORDER OVERRULING MOTION FOR NEW TRIAL                                     215

ORDER OVERRULING MOTION FOR COUNSEL TO WITHDRAW                           216

ORDER (FROM CRIMINAL COURT OF APPEALS)                                    230, 231

ORDER TO DECLARE DEFENDANT INDIGENT AS TO FINES AND COURT COSTS           234

ORDER GRANTING STAY OF EXECUTION                                          235

REPORT OF TRIAL JUDGE IN FIRST-DEGREE MURDER CASES          218-228

STATE'S RESPONSE TO MOTION TO SUPPRESS DEFENDANT'S STATEMENT          64

STATE'S RESPONSE TO DEFENDANT'S PRO-SE MOTION          65

STATE'S RESPONSE (TO NOTICE OF MOTIONS)          146

STATE'S RESPONSE (TO MOTION)          169

STATE'S SPECIAL REQUEST NO. 1          176

STATE'S NOTICE OF APPEAL          217

WITHDRAWL OF COUNSEL - REPLACEMENT BY COURT          21-22, 98-103

WRIT OF MANDAMUS / COMPELLING JUDGE TO ORDER DEFAULT          170

I N D E X

AFFIDAVIT                                                                    144

AFFIDAVIT FOR ENTRY OF DEFAULT                                               172

AFFIDAVIT THAT RESPONDENT'S ARE NOT IN THE MILITARY SERVICE                  173

CERTIFICATE AND SEAL                                                         236

EX PARTE ORDER APPROVING EMPLOYMENT OF MITIGATION SPECIALIST                 141

EX PARTE MOTION FOR FURTHER INVESTIGATION SERVICES                           142

EX PARTE ORDER FOR FURTHER INVESTIGATION SERVICES                            143

EX-PARTE ORDER FOR ADDITIONAL JURY CONSULTANT SERVICES                       178

INDICTMENT                                                                   1-5

JUDGMENT                                                                     179

LETTER FROM MIDDLE TN MENTAL HEALTH INSTITUTE TO JUDGE                      19-20

MOTION FOR CONTINUANCE                                                7, 156-163

MOTION FOR THE COURT TO CONSIDER ALL MOTIONS AND OBJECTIONS BY
THE DEFENSE IN LIGHT OF A HIGHER STANDARDS OF DUE PROCESS AND
RELIABILITY THAT ATTACHES IN DEATH PENALTY CASES                             8

MEMORANDIUM IN SUPPORT OF MOTION FOR THE COURT TO CONSIDER ALL
MOTIONS AND OBJECTIONS BY THE DEFENSE IN LIGHT OF A HIGHER
STANDARD OF DUE PROCESS AND RELIABILITY THAT ATTACHES IN DEATH
PENALTY CASES                                                              9-18

MOTION FOR EXCULAPTORY EVIDENCE - JENCKS ACT                               25-26

MOTION TO PROHIBIT DISPLAY OF PHOTOGRAPHS OF THE DECEASED                  27-28

MOTION TO PRESERVE EVIDENCE                                                  29

MOTION TO DISMISS AND ABATE THE INDICTMENT                        31-33, 104-105

MOTION TO DISMISS ALL SUPRA INDICTMENTS                           34-63, 68-97

MOTION TO DETERMINE EFFECTIVENESS OF COUNSEL                               66, 67

MOTION TO SUPPRESS                                                        106-114

MEMORANDIUM IN SUPPORT OF MOTION FOR THE COURT TO CONSIDER ALL
MOTIONS AND OBJECTIONS BY THE DEFENSE IN LIGHT OF A HIGHER STANDARD
OF DUE PROCESS AND RELIABILITY THAT ATTACHES IN DEATH PENALTY
CASES                                                                    115-124

MOTION TO LEAVE TO FILE FURTHER MOTIONS                                      125

MOTION FOR THE COURT TO CONSIDER ALL PRO-SE MOTIONS AND OBJECTIONS
BY THE DEFENSE IN LIGHT OF A HIGHER STANDARDS OF DUE PROCESS AND
RELIABILITY THAT ATTACHES IN DEATH PENALTY CASES                            126

MOTION TO ALLOW WITNESSES TO BE ACCOMPANIED BY GRANDPARENTS WHILE
TESTIFYING                                                                  127

MOTION FOR EARLY PRODUCTION OF WITNESSES' STATEMENT                         128

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR EARILY
PRODUCTIONS OF WITNESSES' STATEMENTS                                     129-131

MOTION TO TRANSFER TO MADISON COUNTY PENAL FARM                          132-133

MOTION (TO ALLOW ATTORNEYS TO BE CONSIDERED INCLUDED IN ALL MOTIONS
THAT HAVE BEEN PREVIOUSLY FILED BY DEFENDANT'S PRIOR ATTORNEYS)              134

MOTION FOR PRIOR AUTHORIZATION FOR PAYMENT OF COSTS FOR COPY OF
TRANSCRIPT                                                               138-139

```
 1

 2

 3

 4

 5

 6

 7   EXHIBIT 6

 8              Identified and authenticated, this

 9

10   the _____ day of _____,

11

12   2003.

13

14

15   _____

16   JUDGE

17

18

19

20

21

22

23

24
```

514

ALL
GJS  9-10-96
FILE _____

*Inquisitor Inc.*

## *PRIVILEGED AND CONFIDENTIAL-ATTORNEY WORK PRODUCT*

## MEMORANDUM

TO:        JON HALL FILE (CASE NO.: 4970-01-41950)

FROM:   GLORI J. SHETTLES

RE:        INTERVIEW OF JON HALL

DATE:     AUGUST 15, 1996

Jon Hall was interviewed at Riverbend Maximum Security Prison on August 15, 1996. He was cooperative and appeared to understand the purpose of the mitigation investigation. I advised I had seen an assessment prepared by **Ann Charvet** and Mr. Hall stated that his sister had forwarded him a copy, which they both had *"corrected."* The amended copy was forwarded to me later by Mr. Hall.

Hall's eye contact was unmoving throughout the interview. At times it was difficult to keep him *"focused"* relative to certain questions asked. He would, for instance, take a great deal of time to provide a response which had nothing to do with the question asked. He did not appear uncomfortable, however, he became very defensive when I told him the perception I had of him following the interview was different from the newspaper article previously given. Several times he attempted to explain how his words were taken out of context, and I am not certain if Hall understood that I agreed with him.

In addition to verifying background information, Hall's feelings and perceptions will be noted for use by an expert at a later time.

Jon stated he and his family grew up in a town fifty (50) miles east of Pittsburgh. The town was described as a *"rich retirement town"*, in which his parents were originally from, also. Jon's father drove fifty (50) miles each day to work as a metal lather. Jon stated that although he had numerous siblings, he *"didn't do without anything."*

Jon did not describe his relationship with his father as close, however, he was not aware that his father did not believe Jon to be his biological child, until he was told this as a result of Charvet's assessment. He stated that his brother, **Joel**, was his dad's *"favorite"*, however, he does not recall being emotionally or physically abused by his father.



Case No.: 4970-01-41950
August 15, 1996
Page Two

## *PRIVILEGED AND CONFIDENTIAL - ATTORNEY WORK PRODUCT*

He stated he had "*always been close to his mother*" and he noted her continuing support, no matter his circumstances. Later in the interview, he stated that he left his mother's home when he was around eighteen, due to the fact he was angry about something his present girlfriend had done, and he had "*slammed his hand into a wall*" at his mother's home. He made the comment that his mother "*could not do anything with him*" and he now has regrets relative to past actions toward his mother.

Jon stated little about his paternal grandparents and it was my impression his contact with them was minimal, although the grandparents lived approximately one mile away. Although no specific information was given, Jon's father had "*problems with (his) in-laws*" and it was my impression that Jon had minimal contact with his maternal grandparents. He did note, however, that his sister, **Cheryl**, lived with his maternal grandparents for some period of time, although the reason was not stated. Jon stated his maternal grandmother died in 1970 and his grandfather in 1974.

Jon can remember "*bits and pieces*" of arguments between his mother and father. He recalls his dad putting a rock through the window of their car, but does not remember what the argument was about. As a result of Charvet's assessment, he has learned that his older sister, **Debbie**, "*took them (siblings) in the car and into town to get away*", however, he does not independently recall this.

Jon stated that his brothers were all "*wrestlers*" and they tickled him and "*twirled him around*". He stated that they did "*pick on him*", but he felt their actions were normal, as he was the youngest boy.

Jon spoke with very little emotion in speaking of his father's death, which occurred when Jon was ten (10). He stated his father had been working out in the garden, and began "*throwing up.*" Jon related that he watched as his father "*laid down, was gasping, and turning blue.*" Jon related with a shrug that his father "*died before the ambulance came.*"

The only other comment Jon made about his dad was that he learned to "*do it right the first time;*" which he felt was a very positive aspect about himself and his work ethic.

Jon said little about his step father, **Ed**, except that at the time his mother met Ed, she was under the impression he had "*money.*" Jon's mother met Ed while working as a waitress at Sleepy Hollow Country Club and they married three (3) months after Jon's

Case No.: 4970-01-41950
August 15, 1996
Page Three

## PRIVILEGED AND CONFIDENTIAL - ATTORNEY WORK PRODUCT

father's death. Jon described Ed's drinking as "*moderate*" and was aware of one incident of a physical altercation between Ed and his mother. Although Jon did not witness the incident, he related how angry he was at Ed after learning of the incident.

Jon stated "*you'd be better off to do something to me than someone I love.*" This phrase was later repeated relative to his feelings about Billie and the children.

Jon also stated that he was not aware of the later reported sexual abuse by Ed toward his sister.

Jon stated that because of the location of their home, he traveled to a neighborhood "*a mile away*" to "*socialize*" with peers. Jon did not report being involved in any type of organized sports. He stated that because of his mother's work schedule, he was often left unsupervised, however, he was very "*independent*", learning at an early age how to cook, clean, etc.

At age thirteen (13), Jon began using "*pot and alcohol*", however, he stated he smoked pot, for the most part. He stated he enjoyed smoking marijuana, as "*it put him in another state of mind.*" Jon stated he had not experimented with other drugs.

He reported that he had not had hospitalizations, nor serious injuries or illnesses. He has had "*minor stitches but no broken bones.*" Interestingly, Jon reported that he is "*queasy*" and becomes "*sick at the site of blood.*" He considers himself very sensitive to others' illnesses or injuries.

Jon reported that he shared a room with various brothers when growing up. He related that he "*had no trouble sleeping*" until his last separation from Billie.

He described himself as "*not a mature child*" and he stated he was "*never prepared in school.*" Jon finds it somewhat humorous that although he did "*just enough to pass*", he is the only brother "*who didn't flunk.*"

Although I was not clear as to the circumstances surrounding the arrest, Jon was convicted of DWI, and for this reason was not allowed to join the Air Force. He could have joined the Navy, but he had observed how the Navy had allegedly mistreated his brother and for that reason, he is the only brother who did not join the service.

Jon stated, "*If I don't get what I want, I don't want it.*"

Case No.: 4970-01-41950
August 15, 1996
Page Four

## PRIVILEGED AND CONFIDENTIAL - ATTORNEY WORK PRODUCT

In 1985, Jon moved to Fayetteville, North Carolina to assist his sister, Debbie, who owned a restaurant. Jon told me he also was working in "*mechanics*" while there. Although I was not certain how they met, Jon began living with a woman approximately ten (10) years his senior, who was employed as a nurse. Jon said this woman had a ten (10) year old son. Jon felt uncomfortable with regard to the son because the biological father was such a "*part of his (child's) life*" and also because of the fact that Jon was not that much older to the child.

While residing in the apartment complex with this woman, Jon met Billie in September, 1987. Jon and the older nurse had been living together for approximately three to four months at the time he and Billie met. At the time Billie and Jon met, she was estranged from her husband.

I asked Jon what qualities he found attractive in a woman, but especially in regard to Billie. He told me that he initially was attracted to Billie's wearing "*short shorts*". He then told me that he felt "*total trust, monogamy, and working together with the same goals to better (themselves)*" were the most important characteristics in a relationship.

Billie was pregnant with their first child at the time of their marriage in May, 1988. Billie's two daughters were two and three at the time of the marriage. Billie and her first husband were both in the Army at the time they met and later married. Billie told Jon that she married her husband "*out of a dare*" and there was "*no love*" in the marriage. Billie told Jon that she could "*count on one hand the number of times she and her husband had made love.*"

Jon stated that he had not been involved in many serious relationships and noted his "*first love*" was a girl named **Carla**, at age sixteen (16).

According to Jon, Billie was "*into pot and prescription drugs*", at the time they met, however, he never related what the prescription drugs were.

Also, at the time Billie and Jon married, he had major difficulties with "*credit card debts*", although again, no specific information was provided. Jon "*trusted (her) totally and gave everything to her.*" At the time of the marriage, Billie's husband owed a great deal of child support, which was rarely, if ever paid.

Case No. 4970-01-41950
August 15, 1996
Page Five

## PRIVILEGED AND CONFIDENTIAL - ATTORNEY WORK PRODUCT

Billie's only child delivered by "*natural*" childbirth, according to Jon, was "*Jennie*", Billie's oldest child. Jon's oldest daughter, **Stephanie**, was born on September 17, 1988, and Jon reported this to be "*one of the happiest days of his life.*"

It should be noted that throughout the interview Jon would provide conflicting information with regard to his feelings about Billie. As an example, he said on more than one occasion, that Billie was "*intellectually superior*" and that he relied on her as a "*counselor*" regarding any number of aspects about himself and their life together.

On another occasion, he was angry in relating information, and stated that at the time he met Billie, the "*girls were sleeping on the floor*" and his "*family had given them everything.*"

Jon later learned, for the most part through discussions with his family, that Billie "*exaggerated*" a great deal of her medical training and former education.

Billie told Jon that she had run away from home at age fifteen, (15), but he was never aware of the extent of the problems. They were not doing well financially in Fayetteville and Billie expressed a desire to return to Huntingdon to "*get to know her parents.*" Billie's father had been in the Navy, but was now a farmer, as well as being in the National Guard.

Jon said that Billie spoke of "*hating her sister*", however, she "*ran to her*" on numerous occasions once they returned to Tennessee. Jon described Billie's family as "*having airs*" and "*not family like.*" He stated that he and Billie made efforts to visit and get to know her parents, but her parents rarely reciprocated.

Jon further described Billie as being "*like a closed book*" and "*distant*", relative to her past.

Jon related that even at the beginning of his marriage to Billie, they had "*normal fights*", however, he perceived the relationship to be good until Billie lost her job.

Jon discussed the situation regarding their neighbors in Lexington, which is documented in the file material received and reviewed. It should be noted that although the events from the time he and Billie are previously documented both in the file and the time line, it was my purpose at this point of the interview to discuss Jon's feelings and perceptions relative to these events and circumstances.

Case No.: 4970-01-41950
August 15, 1996
Page Six

## PRIVILEGED AND CONFIDENTIAL - ATTORNEY WORK PRODUCT

Jon related that he "*didn't know the words can't or stop*". He did not consider himself a violent person, however, he often lost control. For the most part, he took out his anger on inanimate objects.

Jon stated his actions were dictated by "*all in the level you approach me with.*" He described himself more than once during the interview as "*easy going*" and a person who "*takes things as they come.*"

He discussed his past fights in situations with others and spoke at length of "*getting into other people's fights.*" He provided examples of being in bars and seeing a man mistreat a woman and fighting on behalf of the woman.

During the interview, I asked Jon how he disciplined his step-daughters and his own children, as he was the main caretaker. He responded immediately by saying "*I didn't abuse them.*" I told Jon I did not assume he had, I was asking about the form of discipline. Jon stated he used "*scare tactics*" and "*put fear in them.*"

Jon stated he would take the girls by the shoulders, shake them, yell at them, and throw them on the bed.

He also stated he "*made the girls independent*" as he had been, and the older girls were capable of taking care of themselves. He stated he talked with the girls as if they were adults and allowed them to watch television shows such as "*Tales from the Crypt*", if they wanted. He attempted to answer any questions they had in an explicit manner.

Jon stated that for the most part, he gave Billie "*total control and authority.*" Although both are stubborn, he said he "*put fear in Billie*" and "*gave her warnings*" about how far he was willing to be pushed. He does not appear to consider his past actions as part of domestic abuse, as Billie "*started it.*" He perceives that his physical altercations with Billie were a result of her being the initiator of the altercations.

Jon stated that he can "*compensate to a point, then (he) loses control.*"

Jon did admit to having various affairs during the time he and Billie resided in Huntingdon. His justification for his actions is that Billie "*had no time for him*". Billie's priorities were her job, the children, then him, according to Jon. He did say that he told the women with whom he had sex that he loved his wife and family and they should have no expectation regarding a relationship.

Case No.: 4970-01-41950
August 15, 1996
Page Seven

## *PRIVILEGED AND CONFIDENTIAL - ATTORNEY WORK PRODUCT*

There are several significant events on which Jon placed priority. He was very distressed with regard to their "*living in the projects*" in Huntingdon and took great pride in their purchase of a home in Lexington. He was not aware initially that his name was not listed on the mortgage, and this may have been because of past credit problems.

At the time Jon separated from Billie and resided with "*Jackie and Darlene*", he stated that their living situation was one of "*poverty*" and he spoke of his disgust relative to the housing environment, such as the numerous roaches observed.

It was Jon's feeling that he had to assert his role as the male and head of the household. He stated that Billie spoke of "*selling the house*" and this on its own, "*put him in a rage*." As a result of the protection order, he "*was thrown out of the house for a year*." He stated he had "*no money, no job, and no car*."

Jon spoke of Billie's desire to "*keep him separate from work*" as it is his feeling that he embarrassed her, as he came from a "*blue collar background*" and Billie "*never knew what would come out of his mouth*."

Although Jon was very angry over Billie's treatment at work, he acknowledged that he "*couldn't stand her job, because of her airs*."

An additional issue was the fact that he was being accused of sexually abusing Jessica and his counter complaint with Human Services. The thought that anyone could take advantage of a child like **Jessica** is inconceivable to Jon.

According to Jon, a "*flood of circumstances*" were taking place preceding his arrival at Billie's home. He states that he disabled the telephone because he did not want the police to be called. According to Jon, "*every time the police are involved, it costs money*", and this is what he wanted to avoid.

He maintains his intent was not to kill Billie and that he "*lost control*". He states his intent was to talk to Billie and have her realize his thoughts and feelings, but he "*totally lost it*."

Jon states he "*wants to understand*" any number of aspects about himself and his actions, but he admitted that "*when information doesn't compute, he does the opposite*."

Case No.: 4970-01-41950
August 15, 1996
Page Eight

## PRIVILEGED AND CONFIDENTIAL - ATTORNEY WORK PRODUCT

It should be noted that at one point during the interview Jon sobbed almost uncontrollably. The female guard on Unit 1 handed Jon several tissues, but said nothing.

Upon my leaving the unit, this guard commented that she had never seen Jon show any emotion. She may be utilized as a possible witness as she also commented she considered Jon a "*good inmate*". According to her, Jon spends almost his entire time "*working on his case*."

Correspondence has been forwarded to Jon's family for the purpose of separate interviews and additional background information.

Employment information and collateral interviews will also be conducted.

It appears as a result of this interview and from documents reviewed that Jon Hall may suffer from Intermittent Explosive Disorder. The essential features of disorders of impulse control are:

1.      Failure to resist an impulsive drive, or temptation to perform some act that is harmful to the person or others. There may or may not be conscious resistance to the impulse. The act may or may not be premeditated or planned.

2.      An increasing sense of tension or arousal before committing the act.

3       An experience of either pleasure, gratification, or release at the time of committing the act. The act is ego-syntonic in that it is consonant with the immediate conscious wish of the individual, immediately following the act there may or may not be genuine regret, self-reproach, or guilt.

Although interviews may or may not assist with this initial mitigation theme, the disorder would remove premeditation, if Hall's prior episodes and loss of control are documented and out of proportion.

```
 1

 2

 3

 4

 5

 6

 7   EXHIBIT 7

 8            Identified and authenticated, this

 9

10   the ___18th___ day of ___July_____,

11

12   2003.

13

14

15   _____

16   JUDGE

17

18

19

20

21

22

23

24
```

515

```
 1

 2

 3

 4

 5

 6

 7   EXHIBIT 8

 8           Identified and authenticated, this

 9              18th
10   the _____ day of _____,

11

12   2003.

13

14

15   _____

16   JUDGE

17

18

19

20

21

22

23

24
```

516

IN THE CIRCUIT COURT OF MADISON COUNTY, TENNESSEE
DIVISION I

STATE OF TENNESSEE,           )
                              )
        Plaintiff,            )
                              )        NO. 94-342
VS.                           )
                              )
JON HALL,                     )
                              )
        Defendant.            )

EXHIBIT
9 IO

Supplemental MOTION FOR CHANGE OF VENUE

Comes now your Defendant, JON HALL, and his attorney, CLAYTON
F. MAYO, and moves this Court to grant a motion for a change of
venue for the following reasons:

    1.    Defendant, JON HALL, is charged with the offense of:

        (a). First Degree Murder;

        (b). 2 counts of Theft of Property;

        (c). Especially Aggravated Kidnapping;

    2.    That the Court has jurisdiction to hear this case;

    3.    Defendant contends that he cannot receive a fair trial
for the following reasons:

        (a). That there is much and extreme public hostility over
this crime in this Court's jurisdiction;

        (b). That there is much public outrage over the nature of
this crime;

        (c). That prejudicial news reporting and editorials have
disclosed inadmissible evidence;

        (d). That the public assumes because of the newspaper
reporting, editorials and television coverage that Defendant is
guilty of this crime;

        (e). That there has been an extreme amount of publicity
regarding this case which cannot help but prejudice the people that
will be the jury pool in this Court's jurisdiction;

        (f). That the public is convinced as evidenced by many
conversations heard by Defendant and Defendant's attorneys that
Defendant is guilty of the charges he is facing;

        (g). That there is a reasonable likelihood that the
Defendant will not receive a fair trial as a result of pre-trial
publicity, see Sheppard v. Maxwell, 384 U.S. 333, 363 (1966);

COV - EXHIBIT [G]

000573

12

00057

4.    This Court has the authority and discretion to change the venue, pursuant to ~~Federal Rules of Criminal Procedure 21.~~

WHEREFORE, DEFENDANT PRAYS that this Court grant a change of venue to the Circuit Court of _____ County, in _____, Tennessee.

DATED this the ____ day of _____, 1996.

Respectfully submitted,

CLAYTON F. MAYO, BPR# 014138
Attorney at Law
618 N. Highland Avenue
P.O. Box 1625
Jackson, TN  38302-1625
(901) 422-1375

JESSE H. FORD, III BPR# 009775
Attorney for Defendant
618 N. Highland Avenue
P.O. Box 1625
Jackson, TN  38302-1625
(901) 422-1375

## CERTIFICATE OF SERVICE

I hereby certify that I have either mailed or personally delivered a true copy of the foregoing to Mr. Al Earls, Assistant District Attorney, P.O. Box 2825, Jackson, Tennessee 38302, this the ____ day of _____, 1996.

CLAYTON F. MAYO

JESSE H. FORD, III

## AFFIDAVIT

CLAYTON F. MAYO, being duly sworn, deposes and says:

1.    He is the attorney for the Defendant herein and makes this Affidavit in support of a Motion for a Change of Venue.

2.    Affiant asked fifty (50) individuals selected at random on the streets of Jackson, Tennessee and Bolivar, Tennessee whether they had or had not, seen or heard any of the pre-trial publicity concerning the case.  One hundred percent had seen and/or heard the publicity.

3.    Of those who had seen the pre-trial publicity, ninety

COV - EXHIBIT [G]

13

000574

percent believed that the Defendant was guilty and ten percent had formed no opinion. All stated that the vast majority of persons in Madison and Hardeman counties believed the Defendant guilty but refused to execute affidavits to that affect because of the criticism in the assistance rendered the Defendant, even in the mere obtaining a change of venue, would engender. All requested that their names not be used. In many of these conversations, it has been stated that if Dennis Harris committed these acts, he deserved to die.

4.   Included among those people interviewed were persons of the following applications:   store owners,  barbers,  teachers, clerks, farmers, factory workers, bankers, salesmen, and persons in a variety of management positions.

DATED this the _____ day of _____ 1992.

_____
CLAYTON F. MAYO

Sworn to and subscribed before me this the _____ day of _____, 1992.

_____
NOTARY PUBLIC

My Commission Expires: _____

COV - EXHIBIT [ G ]

14

## AFFIDAVIT

I, JON HALL, being first duly sworn, depose and say:

1.    I am the Defendant in the above titled action and I make this Affidavit in support of my motion for change of venue.  I can not have a fair and impartial trial in the City of Lexington, Tennessee, because of the publicity against me, public outrage over the offense of which I am charged, and prejudicial news reporting and editorials that have implicated me and disclosed inadmissible evidence.

2.    The Jackson Sun is a newspaper widely circulated in the City of Jackson; attached hereto, marked exhibits are news articles which appeared in The Jackson Sun on the following dates:

Exhibit #1 - 04/01/92;          Exhibit #13- 04/09/92;
Exhibit #2 - 04/01/92;          Exhibit #14- 04/10/92;
Exhibit #3 - 04/02/92;          Exhibit #15- 04/12/92;
Exhibit #4 - 04/02/92;          Exhibit #16- 04/14/92;
Exhibit #5 - 04/02/92;          Exhibit #17- 04/17/92;
Exhibit #6 - 04/02/92;          Exhibit #18- 04/27/92;
Exhibit #7 - 04/02/92;          Exhibit #19- 04/28/92;
Exhibit #8 - 04/03/92;          Exhibit #20- 05/01/92;
Exhibit #9 - 04/04/92;          Exhibit #21- 06/28/92;
Exhibit #10- 04/05/92;          Exhibit #22- 06/30/92;
Exhibit #11- 04/06/92;          Exhibit #23- 07/01/92;
Exhibit #12- 04/07/92;          Exhibit #24- 07/21/92.
                                Exhibit #38- 07/28/92

Furthermore, The Commercial Appeal is a newspaper widely circulated in the city of Jackson and all the various counties in which this court draws its jury pool; attached hereto, marked exhibits are news articles which appeared in The Commercial Appeal on the following dates:

Exhibit #25- 04/01/92;          Exhibit #30- 04/10/92;
Exhibit #26- 04/02/92;          Exhibit #31- 04/11/92;
Exhibit #27- 04/03/92;          Exhibit #32- 05/01/92;
Exhibit #28- 04/05/92;          Exhibit #33- 06/28/92;
Exhibit #29- 04/06/92;          Exhibit #34- 06/30/92.

Such inflammatory news stories could not help but prejudice the people of this Court's jurisdiction against me.

3.    Additionally, The Tennessean is a newspaper widely circulated in the City of Jackson; attached hereto, marked exhibits are news articles which appeared in The Tennessean on the following dates:

Exhibit #35- 04/01/92
Exhibit #36- 04/02/92

4.    Finally, the Hardeman County Leader is a newspaper that is widely circulated in this area; attached hereto, marked exhibit is a news article which appeared in the Hardeman County Leader on the following date:

COV - EXHIBIT [G]

15

Exhibit #37- 07/02/9

5.    That WBBJ, a television station that is in the city of Jackson, is broadcasted throughout the area from which the jurors are drawn.   On the 10th and 9th days of July, 1992 at 6 and 10 o'clock p.m. in a news broadcast transmitted over said station (Exhibit #39), coverage was broadcast regarding my case.

6.    In view of the adverse pre-trial publicity which has been given to the case I can not obtain a fair and impartial trial in the city of Lexington and request a change of venue.

_____

JON HALL

Sworn  to  and  subscribed  before  me  this  the  _____  day  of _____, 1992.

_____

NOTARY PUBLIC

My Commission Expires:_____

000577

1

2

3

4

5

6

7    EXHIBIT 9 ID

8           Identified and authenticated, this

9

10   the _____ day of _____,

11

12   2003.

13

14

15   _____

16   JUDGE

17

18

19

20

21

22

23

24

517

1       **CERTIFICATE OF THE REPORTER**

2           I, AMY MAYS, Official Court

3   Reporter, do hereby certify that the

4   foregoing is a true, accurate and

5   complete transcript, to the best of my

6   knowledge and ability, of all the

7   proceedings had and evidence introduced

8   in the trial of the captioned cause,

9   relative to appeal, in the Criminal

10  Court of Madison County, Tennessee, on

11  the 15th and 16th days of May, 2002.

12          I do further certify that I am

13  neither of kin, counsel nor interest to

14  any party hereto.

15

16

17      DATE

18

19

20

21      AMY MAYS

22

23

24

518

1            C E R T I F I C A T E   O F   T H E   C O U R T

2            THIS IS TO CERTIFY THAT THE

3  TRANSCRIPT OF EVIDENCE ADDUCED AT THE

4  TRIAL OF THIS CAUSE HAS BEEN FILED WITH

5  THE CLERK OF THE COURT.

6            The Court has examined this

7  Transcript of Evidence and has found it

8  to be a true and accurate record of the

9  proceedings.

10          Therefore, it is Ordered,

11  Adjudged and Decreed that the Transcript

12  of Evidence is hereby approved by the

13  Court and will be part of the record on

14  appeal in this case.

15  _____

16  DATE

17

18  _____

19                 JUDGE

20  _____

21  ATTORNEY FOR THE PETITIONER

22

23  _____

24  ATTORNEY FOR THE STATE

519