# ADDENDUM 1
# Volume 13

W2003-00669-CCA-R3-PD

IN THE CRIMINAL COURT FOR MADISON COUNTY

TENNESSEE, AT JACKSON, DIVISION I

JON DOUGLAS HALL,

PETITIONER,

VS.                          CASE NO. 96-589

STATE OF TENNESSEE,

RESPONDENT.

TRANSCRIPT OF POST CONVICTION RELIEF

HEARING ON SEPTEMBER 4, 2002

VOLUME ONE OF TWO VOLUMES

THE HONORABLE ROY MORGAN

PRESIDING JUDGE

JUDY LASTER, COURT REPORTER

158 JAYCEE DRIVE, BELLS, TN 38006

(731) 663-9757

ORIGINAL 

1

FILED

JUL 2 4 2003

Clerk of the Courts
Rec'd By

## A P P E A R A N C E S

**FOR THE PETITIONER:**

**MR. DANNY ELLIS**

ATTORNEY AT LAW

213 E. LAFAYETTE

JACKSON, TN  38301

**MR. PAUL N. BUCHANAN**

ATTORNEY AT LAW

1526 CROCKETT HILLS BLVD.

BRENTWOOD, TN  37027


**FOR THE RESPONDENT:**

**MR. AL EARLS**

ASSISTANT DISTRICT ATTORNEY

LOWELL THOMAS STATE OFFICE BLDG.

JACKSON, TN  38301

# TABLE OF CONTENTS

## VOLUME I

                                                    **PAGE**

Appearances                                         2

Table of Contents                                   3

List of Exhibits                                    5

Style                                               6

**PETITIONER'S PROOF**

DR. PAMELA AUBLE
        Direct Examination          13
        Cross Examination           32
        Re-Direct Examination       77
        Re-Cross Examination        79

DR. KEITH A. CARUSO
        Direct Examination          85
        Cross Examination           123

## TABLE OF CONTENTS

## VOLUME II

|                                        | PAGE |
|----------------------------------------|------|
| DR. KEITH A. CARUSO (Continued)        |      |
| Re-Direct Examination                  | 165  |
| DIANA PEARSON                          |      |
| Direct Examination                     | 170  |
| ALICE PEARSON                          |      |
| Direct Examination                     | 171  |
| Cross Examination                      | 173  |
| JON DOUGLAS HALL                       |      |
| Direct Examination                     | 174  |
| Cross Examination                      | 219  |
| Re-Direct Examination                  | 232  |
| Re-Cross Examination                   | 249  |
| PETITIONER RESTS                       |      |
| **RESPONDENT'S PROOF**                 |      |
| INTRODUCTION OF EXHIBITS               | 254  |
| Reporter's Certificate                 | 281  |
| Certificate of the Court               | 282  |

4

## **LIST OF EXHIBITS**

| **NUMBER** | **DESCRIPTION** | **PAGE** |
|---|---|---|
| 10 | Affidavit | 9 |
| 11 | Affidavit | 9 |
| 12 | Affidavit | 9 |
| 13 | Affidavits, Collective | 10 |
| 14 | WAS MARKED BEFORE HEARING BUT NOT INTRODUCED | |
| 15 | Deed of Trust and Warranty Deed | 9 |
| 16 | Change of Venue Motion | 222 |
| 17 | Letter | 255 |
| 18 | Letter | 255 |
| 19 | Letter | 255 |
| 20 | Letter | 255 |
| 21 | Transcript of Motion Hearing 11/08/95 | 256 |

1        **IN THE CRIMINAL COURT OF MADISON COUNTY,**

2          **TENNESSEE, AT JACKSON, DIVISION I**

3

4    **JON DOUGLAS HALL**

5

6    **VS.**                    **CASE NO. 96-589**

7

8    **STATE OF TENNESSEE**

9

10           This Post Conviction Relief

11   Hearing came on to be heard on the 4th

12   day of September, 2002, before the

13   Honorable Roy Morgan, Judge, in the

14   Criminal Court for Madison County, at

15   Jackson, Tennessee, Division I, and the

16   following proceedings were had, to-wit:

17           MR. BUCHANAN:  May I approach

18   the Court Reporter to mark some

19   exhibits?

20           THE COURT:  Certainly.

21           **(WHEREUPON, exhibits were marked**

22   **by Court Reporter.)**

23           THE COURT:  Mr. Buchanan, I'm

24   trying to refresh my recollection, too.

                                              6

1    Was there a journal at one time you

2    wanted to offer that the sister had kept

3    -- marked as an offer of proof?  I

4    cannot remember and I don't know that

5    you got it marked or in -- just as an

6    offer of proof.

7         MR. BUCHANAN:  I think she

8    testified in summary fashion.

9         THE COURT:  As long as you're

10    satisfied.  I wanted to give you that

11    opportunity if you wanted to make it as

12    an offer.  Okay.  Gentlemen, are we

13    ready to call the next witness?

14         MR. ELLIS:  Your Honor, before

15    we begin, there is a matter of another

16    exhibit we would like to introduce.  I

17    presented it to Mr. Al Earls and he has

18    noted that he would like to object to

19    it.  Your Honor, what we have, if I may

20    approach is a Deed of Trust and a

21    Warranty Deed on the residence in

22    question.  We wanted to submit those as

23    evidence to the Court and they are

24    certified copies so they meet all the

7

1    hearsay exception rules.  I believe Mr.

2    Earls will object.

3           GENERAL EARLS:  I don't see that

4    that's relevant to any issue before the

5    Court, Your Honor.

6           MR. ELLIS:  Your Honor, it is

7    very relevant.  That information was

8    available to the attorneys at the time.

9    It would have fit very nicely into a

10   trial strategy of manslaughter,

11   provocation and the fact that she held

12   all the family assets and held all the

13   family -- held the family dwelling and

14   could hold that over his head and use

15   that as a means to incite passion.

16          THE COURT:  If you want to make

17   it a collective exhibit --

18          MR. ELLIS:  Yes, Your Honor.

19          THE COURT:  -- I'll let it be

20   marked.  I'll note the State's

21   objection, but let me pass it to the

22   Court Reporter and let it be marked and

23   it'll be the next exhibit, gentlemen.

24          MR. BUCHANAN:  That would be 15.

8

1          **(Exhibit** ~~15 duly marked.)~~

2                  MR. ELLIS:  Your Honor, if we

3          could have a minute.  We were making

4          copies for Mr. Al Earls on the reports

5          of our experts.  If I could just check

6          to see if they've been done.

7                  MR. BUCHANAN:  Judge, due to the

8          cooperation of Mr. Earls we've

9          streamlined this hearing today, I think

10         significantly.  We want to at this time

11         tender Exhibit 10, 11, 12 and 13 by

12         agreement.  They consist of affidavits

13         of Joel, Beth Hall and Jon's mother as

14         well as some relevant parts of the

15         record of attorneys' files that were

16         available to them at the time.

17                 THE COURT:  Noting there's no

18         agreement, they'll be tendered then --

19         they will be marked by the Court

20         Reporter as Exhibits 10, 11 and 12.  Is

21         that correct?

22                 **(Exhibit 10, 11 and 12 duly**

23         **marked.)**

24                 MR. BUCHANAN:  Yes, sir, and

                                                    9

1   that will dispense with the necessity

2   for a deposition or anything so we are

3   streamlining.  Judge, you'll note in

4   Exhibit Number --

5          THE COURT:  Mr. Earls stepped

6   out.  I don't -- let's be cautious and

7   let him get back in and I'll let you

8   proceed.

9          **(WHEREUPON, Mr. Earls returned**

10         **to the courtroom.)**

11         THE COURT:  Which is an

12  affidavit of the investigator.

13         MR. BUCHANAN:  Yes, sir.  That's

14  selected excerpts.  Mr. Earls has agreed

15  to put those in, too, and rather than

16  having Ms. Higuera testify, we've just

17  got an affidavit of it telling what they

18  are.

19         **(Exhibit 13 duly marked.)**

20         THE COURT:  Mr. Buchanan, I

21  believe you had a tape of some sort?

22         MR. BUCHANAN:  Yes, sir.  We'll

23  play this later.  It's very short.  It's

24  a crime scene video and actually we

10

1    don't need to play but about two or

2    three minutes of it, but we'll do that

3    later with the Court's permission.

4              THE COURT:  Are you marking it

5    Exhibit 14?

6              MR. BUCHANAN:  It's part of that

7    pack, but it doesn't fit well into it.

8              THE COURT:  When you say part of

9    the pack, does it need a separate

10   exhibit number?

11             MR. BUCHANAN:  I don't think so,

12   Judge, because it's referred to in the

13   affidavit.

14             THE COURT:  Okay, that's fine.

15   We'll leave it there and eventually,

16   I'll just advise staff, we'll need the

17   video machine in here.  Correct?

18             MR. BUCHANAN:  Yes, sir.

19             THE COURT:  Okay, they can make

20   arrangements for that then.   Which

21   number is it a part of now?  Which

22   affidavit?

23             MR. BUCHANAN:  Exhibit 13.

24             THE COURT:  The investigator's

11

1  affidavit. Okay.

2          MR. BUCHANAN:  We're ready to

3  proceed, Your Honor.  We'll call Pam

4  Auble.

5          THE COURT:  Is the rule called

6  for before we start again?

7          GENERAL EARLS:  Yes, sir.

8          THE COURT:  The rule's called

9  for so any and all witnesses must remain

10  outside the courtroom.  You're reminded

11  not to discuss your testimony with those

12  going and coming from the courtroom.

13  Dr. Auble will come forward.  You'll be

14  called in as you're needed to testify.

15  The rule applies throughout the day to

16  all witnesses.

17          **(WHEREUPON, the witnesses left**

18          **the courtroom.)**

19          MR. BUCHANAN:  Judge, could we

20  have Dr. Caruso sit in on her testimony

21  since he's an expert?

22          THE COURT:  General, do you

23  agree with that?

24          GENERAL EARLS:  Yes, sir.

12

1          THE COURT:  Okay, please call

2    him back in.

3          GENERAL EARLS:  Your Honor, at

4    this time the State wants to offer an

5    objection to this evidence.  This issue

6    was gone into on the trial, litigated on

7    appeal and it's a previously determined

8    issue and we're objecting on that basis.

9          THE COURT:  Mr. Buchanan?

10         MR. BUCHANAN:  It has been

11   spoken to, Judge, but it's not

12   previously determined in terms of

13   ineffective assistance of counsel in

14   terms of what could've been done had

15   they properly sought the proper medical

16   opinions.

17         THE COURT:  I'm going to

18   overrule the State's objections and let

19   you proceed.  Let the witness be sworn.

20              **PETITIONER'S PROOF**

21         **DR. PAMELA AUBLE** was called and

22   having been duly sworn was examined and

23   testified as follows:

24   **DIRECT EXAMINATION**

13

1    **BY MR. BUCHANAN:**

2    Q.      Would you state your name for

3    the record, please, ma'am?

4    A.      My name is Pamela Mary Auble.

5    Q.      And what do you do for a living,

6    Ms. Auble?

7    A.      I'm a clinical

8    neuropsychologist.

9    Q.      And in that connection what are

10   your qualifications to be a

11   psychologist?

12   A.      I received my Bachelor's Degree

13   from Vanderbilt in 1977, my Master's

14   Degree from the University of Toronto in

15   1978 and my Ph.D. in 1984 from

16   Vanderbilt.  As part of my training I

17   did an internship in Boston in

18   neuropsychology from 1983 to 1984.  I've

19   been licensed in Tennessee as a

20   psychologist since 1985 and I've been

21   Board Certified in clinical

22   neuropsychology since 1994.

23            MR. BUCHANAN:  I submit she's

24   qualified, Your Honor.

14

1                THE COURT:   Anything from the

2        State?

3                GENERAL EARLS:   No, sir.

4                THE COURT:   She's declared to be

5        an expert for those purposes.   Go ahead.

6        Q.      Dr. Auble, what exactly was the

7        role you played in Jon Hall's case?

8        A.      I did a neuropsychological

9        evaluation at the request of you and Dr.

10       Keith Caruso.

11       Q.      Would you tell the Court what a

12       neuropsychological evaluation is?

13       A.      It's an evaluation to determine

14       whether there are any deficits or

15       problems in memory or thinking which

16       might be due to brain injury and it also

17       includes an evaluation of personality

18       and emotional functioning.

19       Q.      And in connection with this,

20       what do you do to prepare yourself to

21       give this -- these sorts of tests?

22       A.      Generally, my evaluations stand

23       on three legs.   One is my interviews

24       with Mr. Hall.   The second is the

                                              15

1    standardized testing that I do, and the

2    third is a social history or a review of

3    relevant legal, medical, psychological

4    school records, you know, information

5    about the defendant.

6    Q.      How important is the social

7    history to your process?

8    A.      It's critical to it because it

9    provides information about the patient

10   that sometimes the person can't or won't

11   or doesn't know, can't tell you, won't

12   tell you, doesn't know.  It flushes out

13   the evaluation.  It provides different

14   perspectives.  It provides documentation

15   of abnormalities.  You really have to

16   have it to do an adequate evaluation.

17   Q.      As the psychological

18   professional that's hired in any case of

19   this nature, who do you rely upon to

20   supply you that information?

21   A.      The attorneys usually in the

22   case.

23   Q.      And is that standard in terms of

24   all the cases that you handle?

16

1    A.        Yes.  Sometimes I get

2    information directly from the mitigation

3    specialist, but, basically, it's the

4    attorneys or the mitigation people that

5    send it to me.

6    Q.        And were you given such material

7    in this case?

8    A.        Yes.  I was.

9    Q.        Why is it important -- we've had

10    testimony that -- I believe Dr. Zager

11    had done a social history.  Why is it

12    important that you have something more

13    than just you going out and interviewing

14    the defendant?

15    A.        Because the defendant sometimes

16    doesn't know all the information that

17    you need to come up with adequate

18    conclusions.  Sometimes the defendant

19    isn't aware of what's important or

20    what's not important.  Sometimes

21    additional evaluations need to be done -

22    - different, you know, kinds of medical

23    evaluations need to be done to provide

24    you with additional information.

17

1    Q.        Do sometimes the defendants, for

2    lack of a better phrase, are less than

3    candid with you?

4    A.        Sometimes they are.  Yes.

5    Q.        So the social history allows you

6    to verify some facts to some extent

7    then.

8    A.        It does, and it provides

9    different perspectives on the defendant

10   which, you know, by definition the

11   defendant can't do himself.

12   Q.        When you're talking about a

13   social history, tell the Court what a

14   minimum social history might be

15   comprised of.

16   A.        Interviews with families and

17   friends, medical records, any

18   psychiatric or psychological records,

19   school records.  There probably is other

20   things that would be helpful as well,

21   but I would say those would be the

22   minimum.

23   Q.        Hypothetically, if a defendant

24   had several sisters and several

18

1    brothers, would you consider it

2    necessary that those brothers and

3    sisters be interviewed by somebody and

4    that you be able to have access to what

5    they had to say about his past?

6    A.      Yes, very much so.  It would

7    provide information about the family.

8    In Mr. Hall's case he's one of the

9    youngest children, and so, his older

10   siblings, you know, conceivably might

11   know more about what was going on in the

12   family when he was a young child than he

13   would.

14   Q.      Would you consider it an

15   incomplete social history to not have

16   the siblings interviewed?

17   A.      Yes.  I would.

18   Q.      Did you -- you conducted

19   standardized tests, did you not?

20   A.      Yes.

21   Q.      Would you tell the Court exactly

22   what tests you administered on Mr. Hall?

23   A.      I administered a number of tests

24   of mental abilities and memory and

19

1    attention and other things that your

2    brain does in terms of thinking and

3    reasoning.  Those included the Wechsler

4    Adult Intelligence Scale, the Wechsler

5    Memory Scale, the Test of Memory

6    Malingering, the Halstead Reitan

7    Battery, which is comprised of a number

8    of tests.  I administered six of them.

9    The Delis Kaplan Executive Functioning

10   System, the Boston Naming Test and the

11   Grooved Pegboard Test.  I also

12   administered three tests of personality

13   and emotional functioning.  Those

14   included the Rorschach, the MMPI and the

15   Incomplete Sentences Blank.

16   Q.      What does the Wechsler Adult

17   Intelligence Scale tell you?

18   A.      It's an IQ test.

19   Q.      And the Wechsler Memory Scale?

20   A.      It's a test of your ability to

21   learn new information.

22   Q.      And the Test of Memory

23   Malingering?

24   A.      It's a test that is given to

20

1    evaluate whether the defendant is

2    putting forth an adequate effort on the

3    test procedures.  It's a test to see if

4    they're faking problems.

5    Q.      And the Halstead Reitan Battery

6    and you said you administered six from

7    it.  What do they tell you?

8    A.       There's six tests that I

9    administered.  The Halstead Reitan

10   overall is a test of neuropsychological

11   functioning of things that your brain

12   does and that -- so the person can be

13   compared with other people of their age

14   and education to see if they're

15   performing up to par on these things.

16   The tests that I administered included

17   the Booklet Category Test, which is a

18   test of mental flexibility and executive

19   functioning or reasoning; Trailmaking,

20   which is a test of attention and also

21   mental flexibility; the Seashore Rhythm

22   Test, which is a test of attention and

23   has something to do with right

24   hemisphere functioning as well; the

21

1   Speech Perception Test, again, a test of

2   attention and concentration and also

3   language -- comprehension of non

4   sentence syllables; the Finger

5   Oscillation Test, which is a test of

6   fine motor speed; the Tactual

7   Performance Test, which is a test of

8   spatial reasoning and also memory, and

9   those were the tests I administered from

10  the Halstead Reitan.

11  Q.      All right.  And then the Delis

12  Kaplan Executive Functioning System,

13  what does that tell us?

14  A.      It's a relatively new set of

15  tests that are designed to determine the

16  adequacy of a person's frontal lobe

17  functioning.  In other words, what is

18  their thinking and reasoning, their

19  flexibility, their ability to adapt

20  their behavior to new situations, their

21  capacity to inhibit responses.  The

22  things that your frontal lobes do.

23  Q.      And the Boston Naming Test.

24  What value is that to us?

22

1    A.        It's a test of language.   It is

2    a test designed to determine the person

3    can come up with the correct names for

4    pictures.   If there's language

5    dysfunction, naming is usually one of

6    the things that is hit or affected

7    first.

8    Q.        And the Grooved Pegboard Test.

9    What does that tell us?

10   A.        It's another test of motor speed

11   and it also measures motor dexterity.

12   Q.        And the Rorschach test.   That's

13   the old inkblot test, is it not?

14   A.        That's right.   That's the famous

15   inkblot test.

16   Q.        What does that tell us?

17   A.        It's a test of personality style

18   and personality functioning.   Obviously,

19   it doesn't tell anything very specific

20   about what an individual is doing at a

21   certain time, like on October 15th, but

22   it does tell general response styles,

23   general personality style.

24   Q.        And the Minnesota Multiphasic

23

1    Personality Inventory-II.  What does

2    that tell us?

3    A.      It's a very long questionnaire

4    which is designed to measure personality

5    and emotional functioning.

6    Q.      And the Incomplete Sentences

7    Blank?

8    A.      That's really more like a

9    structured interview.  It's the

10   beginnings of sentences and the person

11   finishes sentences however they want to.

12   Q.      Can you tell the Court just in

13   summary fashion what records you

14   interviewed in terms of a social history

15   and background on Jon Hall before

16   embarking on this?

17   A.      I reviewed various interviews,

18   both of Mr. Hall and his family,

19   friends, people he associated with by

20   April Higuera, by Tammy Askew, by Glori

21   Shettles.  I reviewed a Mitigation

22   Assessment done by Ann Charvat, a

23   summary of the testimony of Lynn Zager

24   and Joe Mount, records from Middle

24

1    Tennessee Mental Health Center, records

2    from the Newborn Intensive Care

3    Discharge Summary, a summary of

4    audiotapes of the trial, the Tennessee

5    Department of Employment Security Appeal

6    Decision, the Tennessee Department of

7    Correction progress notes, the report of

8    Dr. Caruso, Inmate Grievance Forms,

9    material prepared by Mr. Hall regarding

10   ineffective assistance of counsel and a

11   genealogy chart.

12   Q.      Then did you also interview Mr.

13   Hall himself?

14   A.      I did.

15   Q.      And on how many occasions and

16   for roughly how long?

17   A.      All together I have spent nine

18   hours with Mr. Hall.  Some of that was

19   in interview and some of that was the

20   administration of the tests.  I don't

21   have it broken down by what was what.

22   It's on three different occasions.

23   Q.      Tell the Court exactly in terms

24   of a -- where does your -- the test that

25

1    you performed, where does that fit in to

2    the overall scheme of determining the

3    mental state of Mr. Hall in terms of --

4    how does your work supplement, for

5    instance, Dr. Caruso's or Dr. Salomon's?

6    A.      My work would supplement their

7    work in that it would -- because of the

8    testing that I -- some of my work

9    overlaps theirs.  Dr. Caruso also

10   reviews records.  He also interviews the

11   defendant.  In that way, I just, you

12   know, am adding -- review of the records

13   in some ways is redundant because

14   presumably we would read and find the

15   same things.  In the interviews we may

16   find slightly different things.  We both

17   cover the same ground.  The difference

18   between my evaluation is really in the

19   standardized testing, in that I do both

20   an evaluation of the person's mental

21   capacities to see if there's evidence in

22   this case of brain injury or frontal

23   lobe damage that would cause lack of

24   control that would cause impulsive

26

1    behavior.  You ~~know,~~ ~~that~~ can be a cause

2    of a person acting without thinking or

3    losing control of their anger.  I also

4    do personality testing to document

5    whether there is evidence of personality

6    malfunctioning, depression and other

7    problems of that nature.  It's a way of

8    documenting what's going on.

9    Q.     In addition to your evaluations,

10   the results of your tests and the

11   opinions you form, do you forward those

12   results on to Dr. Caruso?

13   A.     Yes.

14   Q.     And do you know what role that

15   plays in his work?

16   A.     It would -- I would think it

17   would help him come to a final

18   diagnostic formulation.  In this

19   particular case there was a question of

20   low brain serotonin levels and/or

21   possibly brain injury.  Both of those

22   can cause impulsive violence and my work

23   was to see if there was evidence of

24   brain injury that could be accounting

27

1    for this.  So my work was being

2    conducted at the same time as the

3    evaluation of the brain's serotonin

4    levels.

5    Q.      So your tests can provide some

6    meaningful information as regards to

7    impulsivity control, and when we say

8    impulsivity control are we talking about

9    what's known as Intermittent Explosive

10   Disorder?

11   A.      Yes.

12   Q.      And also low serotonin levels

13   can also be an indicator of that?

14   A.      That's right, and they don't

15   overlap necessarily.  A lot of times you

16   get normal neuropsychological

17   functioning with evidence of low brain

18   serotonin and you can get vice versa as

19   well.  You can get impairments in

20   neuropsychological functioning in normal

21   brain serotonin levels or you can get

22   both.  They're independent factors,

23   really.

24   Q.      Are you familiar with Dr.

28

1    Salomon's results on his tests that he

2    did on the serotonin levels?

3    A.       I have not seen the report.   I

4    understand from Dr. Caruso's report that

5    they were very low.

6    Q.       And what does that indicate to a

7    psychologist?

8    A.       Well, that -- evidence of low

9    brain serotonin can be a factor that

10   puts a person at risk for Intermittent

11   Explosive Disorder.

12   Q.       Do you remember in terms of --

13   in your profession you like to state

14   where someone is in a percentile in the

15   population of people generally, as I

16   understand it.  Is that correct?

17   A.       In my test results, yes.

18   Q.       So, for instance, if someone has

19   an IQ of "x" you can say that he's

20   within a certain percentile of the

21   general population.

22   A.       That's right.

23   Q.       Do you happen to know what

24   percentile of the serotonin levels came

29

1       out on Jon?

2       A.      No.  I -- from Dr. Caruso's

3       report his was reported as 70 and the

4       normal range is much higher than that,

5       but I don't know what the percentile is.

6       Q.      Okay.  Well, let's talk a little

7       bit about your test results.  Will you

8       tell the Court exactly in summary

9       fashion what your test results showed?

10      A.      The results of the

11      neuropsychological testing were

12      essentially normal in most areas.  There

13      was no evidence of malingering or

14      faking.  The neuropsychological testing

15      did indicate some difficulties with

16      attention and response speed, something

17      that I -- in my opinion was consistent

18      with attention deficit disorder, most

19      likely.  The personality testing

20      revealed a person who does have

21      difficulty controlling his emotions in

22      emotional situations.  His responses are

23      likely to be unmodulated.  Mr. Hall has

24      low self-esteem.  There was evidence of

30

1    internal anger.  He may have trouble

2    understanding people and perceiving them

3    in accurate ways.  At the time I saw him

4    he did not appear clinically depressed,

5    though there was evidence of some

6    tension from his current situation.

7    Q.      If someone is, in fact,

8    extremely low in their serotonin levels

9    is that an objective test that people in

10   the profession can use to make

11   determinations?

12   A.      Yes, and it has been used in

13   Tennessee for a number of years.

14   Q.      It's been used at least since

15   1995, has it not?

16   A.      Yes.  I've worked on cases that

17   -- where that was used that were, I

18   think, before that or at least right

19   around that time, and that was -- that

20   was being used then.

21   Q.      Is there any way that test can

22   be faked and by that, I mean, is there

23   any way that a person can control their

24   serotonin levels so that they can have

31

1    the test come out a certain way?

2    A.    No.

3    Q.    If, in fact, you have someone

4    that you suspicion or you're trying to

5    rule out Intermittent Explosive Disorder

6    and you get a low serotonin reading, is

7    that consistent with Intermittent

8    Explosive Disorder?

9    A.    Yes, it would be.

10    MR. BUCHANAN:    Pass the witness,

11    Your Honor.

12    **CROSS EXAMINATION**

13    **BY GENERAL EARLS:**

14    Q.    Dr. Auble, are you a member of

15    or associated with any organizations or

16    associations whose primary function is

17    to assist criminal defense lawyers, such

18    as, the Tennessee Association of

19    Criminal Defense Lawyers?

20    A.    Yes.

21    Q.    And what are those?

22    A.    That I'm an associate member of

23    the Tennessee Association of Criminal

24    Defense Lawyers.

32

1    Q.        And do you lecture for that

2    organization?

3    A.        I have.  Not recently, but, yes.

4    Q.        And part of the purpose of your

5    lectures is to instruct them on how to

6    win cases.  Is that correct?

7    A.        No.  I don't know how to win

8    cases.  I instruct them on psychological

9    and neuropsychological functioning.

10   Q.        Do you ever give those lectures

11   to prosecutors?

12   A.        I would if I were invited to.

13   Q.        Ms. Auble, have you ever

14   manipulated data or information in any

15   case that you've testified in an

16   unprofessional manner?

17   A.        I don't believe I have.  No.

18   Q.        Do you recall the case of Cribbs

19   versus State in Shelby County?

20   A.        Yes.  I do.

21   Q.        In that case did you not testify

22   that the defendant had a low IQ?

23   A.        He had an IQ of 75.

24   Q.        Isn't it true that you testified

33

1    that you threw out the high scores on

2    that IQ test?

3    A.      No.  I didn't do that.  His IQ

4    was 75.  That was his full scale IQ.

5    Okay.  Let me tell you what I testified

6    to.  I testified that if you look at --

7    many people who have very low IQs do

8    best on very simple tasks, and that was

9    true of Mr. Cribbs.  His best

10   performance was on two tests -- two sub-

11   tests -- there's 13 sub-tests comprising

12   the IQ -- of digit symbol and digit span

13   which are very simple, repetitive tasks

14   where he only has to repeat back what

15   he's told.  If one had considered only

16   the tests that involved thinking and

17   reasoning, his IQ would've been a couple

18   of points lower.  It would've been 72,

19   73, something like that.  That really

20   wasn't the main point of my testimony,

21   however.  Mr. Cribbs had had a previous

22   IQ that was obtained during, I think,

23   the developmental period of 70.  He had

24   been tested a number of times with the

34

```
 1    Wechsler Intelligence Scale and there is
 2    some practice effect on that.  Over the
 3    years his IQ crept upward very slightly
 4    from 70 to 73 to 75.  The main thrust of
 5    my testimony was that there's a practice
 6    effect and it was my opinion that his
 7    true IQ was, in fact, 70 or around that
 8    range, consistent with the first
 9    estimate of IQ obtained when, I think,
10    he was 17.
11    Q.      But to arrive at that point you
12    disregarded the higher figure, didn't
13    you?
14    A.      No.  No.  The IQ of 70 was
15    obtained by the -- an evaluation that
16    was done when he was 17 and I didn't
17    change that or alter it in any way.
18    Q.      Did you disregard any scores on
19    the test?
20    A.      No.
21    Q.      Discount them or anything like
22    that?
23    A.      Not at all.  No.
24    Q.      Do you recall the State's
```

35

1    witness testifying after you did that

2    the manner that you arrived at those

3    scores was very questionable if not

4    unethical?  Do you recall that?

5    A.      I didn't see the State's witness

6    testify.  You know, he may have -- I

7    mean, I said very clearly in my

8    testimony that his IQ that was obtained

9    in 1999 was an IQ of 75, and if you

10   consider the sub-tests only that involve

11   thinking and reasoning, that would've

12   made his IQ somewhat lower, but I --

13   that was not the main point of my

14   testimony.  It was just a very small

15   part of it.  The main point was -- is

16   that his IQ had been measured at 70 back

17   in 1989 or something of that nature when

18   he was under the age of 18.

19   Q.      Isn't it true, Dr. Auble, that

20   after the State's witness testified you

21   retook the stand?

22   A.      Yes.

23   Q.      And that you testified after the

24   State's witness that the procedures you

36

1    used in that case you would never use in

2    your own personal practice?

3    A.      Well, in my personal practice

4    and in general, I give the full adult

5    intelligence scale.  The question in

6    that case was very specific.  I was

7    asked what are his levels of thinking

8    and reasoning, and -- so for that reason

9    and I -- you know, I explained all this

10   to the Court, actually, two or three

11   times during the course of my testimony

12   exactly what I did or why I did it.  I

13   certainly never said that one should

14   always omit those sub-tests, but if the

15   question is thinking and reasoning or in

16   that case his functional intelligence,

17   it could be thought of as that some of

18   the sub-tests that involve only

19   repetition do not involve functional

20   intelligence.

21   Q.      Your -- you talk about low

22   serotonin levels.  Is that correct?

23   A.      Yes.

24   Q.      They can be found in people with

37

1    Intermittent Explosive Disorder.  Is

2    that correct?

3    A.      They can.

4    Q.      But it's not necessarily there,

5    is it?

6    A.      No.  It's not necessary there.

7    Q.      And the fact that a person has

8    low serotonin doesn't mean that they

9    have Intermittent Explosive Disorder,

10   does it?

11   A.      It would certainly put them at

12   much higher risks for Intermittent

13   Explosive Disorder.

14   Q.      How long does low serotonin last

15   in the human body?

16   A.      It's a fairly stable trait over

17   time over their adult life.  It's my

18   understanding of it.

19   Q.      Now, what are the diagnostic

20   criteria for finding someone to have

21   Intermittent Explosive Disorder?

22   A.      I don't have my DSM4 here with

23   me.  I can give you a paraphrase of it

24   or I --

1    Q.        Let me -- -- the DSM4 that you

2    referred to, *The Diagnostic and*

3    *Statistical Manual of Mental Disorders*,

4    is that a standard used in the

5    profession of psychiatry and psychology?

6    A.        Yes, it is.

7    Q.        Now, you testified on direct

8    that you found evidence of attention

9    deficit disorder.  Is that correct?

10   A.        I did find that he had

11   difficulties with attention and

12   concentration.

13   Q.        I believe your testimony was

14   that's consistent with attention deficit

15   disorder.

16   A.        Yes, it is.

17   Q.        If *The Diagnostic and*

18   *Statistical Manual, Volume 4*, says that

19   you first have to eliminate attention

20   deficit disorder before you can diagnose

21   someone with Intermittent Explosive

22   Disorder, would you agree or disagree

23   with that?

24   A.        I guess I'd want to see it.

39

1    Q.        Well --

2             **(General Earls hands**

3             **book to witness.)**

4    A.        I don't see it here where it

5    says that.

6             GENERAL EARLS:  May I approach,

7    Your Honor?

8             THE COURT:  Certainly.

9    A.        Yeah.  Maybe I'm not looking in

10   the right place.  Okay.  This says --

11   okay.  I see where you are.  It says

12   that the diagnosis of Intermittent

13   Explosive Disorder is made only after

14   other mental disorders that might

15   account for episodes of aggressive

16   behavior have been ruled out and it

17   includes attention deficit disorder in

18   there.  My testing, of course, is not

19   definitive about whether he actually

20   does or doesn't have attention deficit

21   disorder and it's really not my opinion

22   that the attention deficit disorder,

23   even if it exists, is accounting for his

24   episodes of aggressive behavior.

40

1    Q.        What did you do to eliminate

2    attention deficit disorder?

3    A.        I didn't do anything to

4    eliminate attention deficit disorder.

5    The results that I obtained showed that

6    he has some difficulty on tasks that

7    require quick responding.

8    Q.        Dr. Auble, the truth is you

9    didn't follow that diagnostic criteria

10   of ADD, did you?

11   A.        Well, it's my -- I did and it's

12   my opinion that the attention deficit

13   disorder, if it exists, is not

14   accounting for the episodes of

15   aggressive behavior.

16   Q.        If it exists how does that

17   eliminate it?  You said you eliminated

18   it.  How did you do that?

19   A.        I didn't -- I don't think I said

20   I eliminated it.

21   Q.        Okay, but you knew it was a

22   potential.

23   A.        I think it is a potential, yes.

24   Q.        That's one thing that this book,

41

1    the manual, says you've got to

2    eliminate.

3    A.      It says that it can't account

4    for the episodes of aggressive behavior.

5    Q.      And you didn't do anything to

6    eliminate it, did you?

7    A.      I haven't eliminated it, no.  I

8    mean, it's -- he's got difficulties with

9    his concentration and his quick

10   responding.  He does.

11   Q.      Now, in your conclusion, you

12   testified that at the time of the crime

13   there was evidence of Intermittent

14   Explosive Disorder, adjustment disorder,

15   major depression, alcohol dependence,

16   and cannabis abuse.  Is that correct?

17   A.      Yes.

18   Q.      Isn't it also true that in the

19   DSM4 that before you reach the

20   conclusion that a person has

21   Intermittent Explosive Disorder you've

22   got to rule out the possible cause of

23   that anger being the alcohol or drug

24   abuse?

42

1    A.        Yes.   That's right, and from the

2    social history there's evidence of loss

3    of control, of anger and angry outbursts

4    even when Mr. Hall is not intoxicated.

5    Q.        On the date in question Mr. Hall

6    was intoxicated, wasn't he?

7    A.        Yes.

8    Q.        And he was under the influence

9    of alcohol and marijuana?

10   A.        Yes.

11   Q.        What did you do to eliminate

12   substance abuse as a source of that

13   anger?

14   A.        Well, it's my opinion that the

15   intoxication would have exacerbated the

16   Intermittent Explosive Disorder.   It did

17   exacerbate it.   It made it worse.

18   Q.        In other words, you couldn't

19   eliminate it.

20   A.        I didn't try.

21   Q.        You didn't follow the manual,

22   did you?

23   A.        No.   The manual says that the

24   episodes, the angry outbursts, cannot

43

1    only occur during intoxication and, in

2    fact, in my -- and from the social

3    history, they do not only occur during

4    intoxication.

5    Q.       Now, what other mental problems

6    did Mr. Hall have according to your

7    conclusion?

8    A.       At the time of the crime?

9    Q.       Yes, ma'am.

10   A.       Intermittent Explosive Disorder.

11   He had depression, either adjustment

12   disorder or major depression, alcohol

13   dependence and cannabis abuse.

14   Q.       What did you do to eliminate the

15   antisocial disorder?

16   A.       I think he does have evidence of

17   antisocial personality.

18   Q.       My question to you is what did

19   you do to eliminate that as a source of

20   anger?

21   A.       People with antisocial

22   personality disorder do have aggressive

23   episodes, but there -- it's

24   differentiated from Intermittent

44

1    Explosive Disorder in this case because

2    the -- in Intermittent Explosive

3    Disorder there is a complete loss of

4    control of anger which I felt was

5    stronger than is usually seen in

6    antisocial personality disorder.  So I

7    thought it was more severe than would

8    simply be associated with antisocial

9    personality.

10   Q.      That's one of the things you've

11   got to eliminate according to this book,

12   isn't it?  Antisocial disorder?

13   A.      The angry outbursts cannot be

14   due only to antisocial personality.

15   That's right.

16   Q.      And what steps did you take to

17   eliminate antisocial personality

18   disorder?

19   A.      I don't eliminate it.  I think

20   he does have characteristics of

21   antisocial personality disorder.

22   Q.      But the DSM4 says it has to be

23   eliminated.

24   A.      Well, the episodes of anger

45

1    cannot be due to it.  That's right.

2    Q.       So we've got antisocial

3    personality disorder that could have

4    contributed to his anger.  Is that

5    correct?

6    A.       It -- there is associated with

7    antisocial personality disorder

8    impulsivity.  Yes.

9    Q.       There is alcohol and drug abuse

10   which contributed to his anger.

11   A.       At the time of the crime, yes.

12   Definitely.

13   Q.       Depression?  Did that contribute

14   to it?

15   A.       I don't see that as contributing

16   to it, no.

17   Q.       Okay.

18   A.       I mean, it contributes -- he

19   feels stressed.  He feels unhappy which

20   --

21   Q.       And attention deficit disorder.

22   Three things which you're required to

23   eliminate that you did not eliminate.

24   A.       No.  I don't think major

46

1    depression is one of those things, and I

2    didn't diagnose him with attention

3    deficit disorder.  I say that he may

4    have had it because he does have some

5    difficulty on timed tasks.  I didn't

6    give him a diagnosis of attention

7    deficit disorder.

8    Q.      Now, summing up your conclusion

9    -- "It is my opinion that in this

10   particular situation, his mental disease

11   of Intermittent Explosive Disorder and

12   adjustment disorder --."  What did you

13   do to eliminate that?  Adjustment

14   disorder.

15   A.      It's either adjustment disorder

16   or major depression, but, I mean, I

17   don't know that I eliminated that.  I'm

18   saying that he has it.

19   Q.      Okay.  "...resulted in a rage

20   reaction in which Mr. Hall was unable to

21   premeditate this crime and in which his

22   actions were not knowing in that he was

23   unaware that his conduct was reasonably

24   certain to cause his wife's death."  How

47

1    is that testimony different or how is

2    that statement different from what Dr.

3    Zager testified to at the trial?

4    A.      I don't have -- I have not read

5    her testimony and I don't -- I've not

6    had that.  From the summary that I read,

7    she did not diagnose him with

8    Intermittent Explosive Disorder.

9    Q.      That's correct.  She said that

10   he was acting as a result of an impulse

11   brought on by his anger.

12   A.      She testified toward diminished

13   capacity.  Yes.

14   Q.      That's right, and basically

15   that's what you're saying, isn't it?

16   A.      Yes.

17   Q.      Now, have you read -- you have

18   not read the transcript of this trial,

19   have you?

20   A.      No.

21   Q.      Isn't it true that according to

22   the DSM4 that if a person is acting in a

23   purposeful manner that you do not give

24   the diagnosis of Intermittent Explosive

                                              48

1     Disorder?

2     A.      I'm not sure what you're saying.

3     Q.      Aggressive behavior may, of

4     course, occur when no mental disorder is

5     present.  Purposeful behavior is

6     distinguished from Intermittent

7     Explosive Disorder by the presence of

8     motivation to gain or an aggressive act.

9     A.      I think -- okay.  I -- I -- from

10    what you've just read to me it sounds

11    like what it is saying is that one can

12    act aggressively, for instance, while

13    robbing a store, say, to obtain money,

14    and that that wouldn't be evidence of an

15    Intermittent Explosive Disorder, and I

16    would agree with that.

17    Q.      Why did Jon Hall go to that

18    house that night?

19    A.      From what I understand about the

20    case, he went to the house to talk to

21    his wife.

22    Q.      Did you talk to him about why he

23    went there?

24    A.      Yes.

49

1    Q.        What did he tell you?

2    A.        He had gone there earlier in the

3    evening.  He wanted to talk about the

4    Department of Human Services and what he

5    and his wife were going to talk to the

6    Department of Human Services about.

7    Q.        Did he tell you he wanted to

8    reconcile?

9    A.        He had hopes of reconciling with

10   his wife during this period, yes.

11   Q.        When he went there he had hopes

12   of reconciling, did he not?

13   A.        I think -- yes.  That was part

14   of -- partly.  I think during this whole

15   period he did, yes.

16   Q.        Now, that is purposeful conduct,

17   is it not?

18   A.        I don't know.  I mean, if --

19   does it have -- did he go there with a

20   reason?  Yes.  He was not just driving

21   around randomly.  That's right.

22   Q.        That's purposeful conduct.

23   A.        But that's very different from

24   what you've read me in the DSM4 and that

50

1    really wouldn't apply.

2    Q.    Why wouldn't it apply?

3    Purposeful behavior.

4    A.    What they're talking about is

5    using aggression to gain something like

6    money and that's not what happened in

7    this case.

8    Q.    Where does it say it's used to

9    gain money in a DSM4?

10    A.    If you could bring it to me?

11    **(General Earls hand witness**

12    **book.)**

13    A.    It says that "Aggressive

14    behavior can occur when there's no

15    mental disorder," and purposeful

16    behavior means that the presence of

17    motivation and gain an aggressive act so

18    that they're using the aggression to get

19    something else.  It's not a loss of

20    control.  It's -- it's purposeful.  It's

21    more what the law would call cool and

22    considered, and -- and so, that's --

23    that's different than did he have a

24    purpose to go to the house.  That's --

51

```
 1    that's -- that really doesn't apply.

 2    Q.      Let me ask you this.  Do you

 3    know where Jon Hall left -- the location

 4    he left from before he went to his

 5    house?

 6    A.      A bar.

 7    Q.      A bar.  That's where he got

 8    drunk.

 9    A.      Yes.  He -- several bars is my

10    understanding.

11    Q.      When he left there was he angry?

12    A.      I think Mr. Hall is -- is often

13    angry and I think when he's drinking

14    that his control over his anger becomes

15    even more impaired.

16    Q.      And was he angry when he left

17    the bar?

18    A.      Yes.

19    Q.      And how do you know that?

20    A.      From what I've just said.  That

21    he is generally upset -- an angry kind

22    of person and at that time he had a

23    number of things going on in his life

24    that were upsetting him even further.
```

                                          52

1    Q.        Was he explosive?

2    A.        I think yes.  He was very likely

3    to be explosive at that time in those

4    circumstances.

5    Q.        And isn't it true or if the

6    testimony at trial was from his cellmate

7    that he went there for the purpose of

8    either forcing her to reconcile or

9    making her feel helpless, that is

10   purposeful conduct, is it not?

11   A.        As we've discussed, I've not

12   read the testimony from the trial, so I

13   don't know what his cellmate said.  It's

14   my understanding that he went there and

15   perhaps with some hope of reconciling

16   with her.  I think he was also angry

17   with her.

18   Q.        But he went there with a motive.

19   A.        I don't think he just went there

20   randomly, no.

21   Q.        All right.  So at that point we

22   rule out the explosive disorder, do we

23   not?

24   A.        No.  Not at all.

53

1    Q.        According to the DSM4 he's

2    acting on motive.

3    A.        No.  He's not -- what the DSM4

4    says is that the presence of motivation

5    and gain in the aggressive act and that

6    is not at all what happened.

7    Q.        Now, when he arrived at the

8    house was he angry?

9    A.        As we've discussed, yes.  He was

10   -- he's a general -- he generally is

11   angry and the circumstances in which he

12   found himself, he -- he had -- he was

13   upset.  I think he was angry and I think

14   he lost control of himself.

15   Q.        When he arrived at the house one

16   of the first things he did was

17   disconnect the phone line.  How is that

18   impulsive behavior?

19   A.        By itself, that is not impulsive

20   behavior and Mr. Hall says that the

21   reason he disconnected the phone line is

22   because -- to prevent his wife from

23   calling the police and interfering in

24   their relationship.

                                          5 4

1    Q.        He had motive, didn't he, in

2    disconnecting the phone line?

3    A.        Yes, he did.

4    Q.        So we rule out Intermittent

5    Explosive Disorder.

6    A.        That by itself does not rule out

7    Intermittent Explosive Disorder.

8    Q.        Now, you just testified that

9    when he left there he was explosive.

10   When he left the bar you said he was

11   explosive.

12   A.        I said he had the potential to

13   become explosive, yes.

14   Q.        But he was not explosive when he

15   arrived at the house and disconnected

16   the phone line.

17   A.        I don't think he was in a rage

18   attack at that time, no.

19   Q.        You said he had low serotonin.

20   A.        Yes, he does.

21   Q.        And that that is a lifelong

22   condition?

23   A.        It is a lifelong condition.

24   Q.        So if he was not in a rage when

                                                    55

1      he disconnected the phone line, the

2      serotonin then was not affecting his

3      ability to control his anger.

4      A.      No.  You're -- that's twisting

5      what I'm saying.  Having low serotonin

6      puts one at risk for explosive episodes.

7      It does not mean that a person is

8      continually in an explosive episode.

9      Q.      Okay, but the fact that he had

10     low serotonin when he disconnected the

11     phone line did not cause him to be in an

12     explosive rage, did it?

13     A.      No, but that's not the point

14     either.

15     Q.      Now, the testimony at trial was

16     that when he came to the door he forced

17     himself into the house.

18     A.      I've not read the trial

19     transcript.  I don't --

20     Q.      Well, did Mr. Hall tell you

21     about that?

22     A.      I don't know that he told me he

23     forced himself into the house, no.

24     Q.      Wouldn't that be important in

56

1    your diagnosis?

2    A.       I don't know.

3    Q.       Now, is that purposeful conduct?

4    A.       You're confused in thinking that

5    having purposeful conduct rules out

6    Intermittent Explosive Disorder.  It

7    does not.

8    Q.       What was his purpose in going

9    into the house then?

10   A.       From what -- my understanding of

11   this, he wanted to discuss with his wife

12   the allegations -- the DHS allegations.

13   Q.       Was he in a rage when he forced

14   his way into the house?

15   A.       I don't think he was at that

16   time, no.

17   Q.       Now, when he was in the house he

18   kicked the wife's chair over according

19   to the testimony.  Would he be in a rage

20   at that time?

21   A.       From my understanding of it, he

22   went into a rage when he and his wife

23   were in the bedroom.  I don't know when

24   he kicked the chair over.

57

1    Q.      If the kicking of the chair

2    occurred before he went in to the

3    bedroom, what does that mean to you,

4    Doctor?

5    A.      By itself it doesn't mean that

6    he was in a rage.

7    Q.      Well, your testimony was just

8    now that he went into the rage when he

9    went in the back bedroom.

10   A.      That's my understanding.

11   Q.      But here he is attacking this

12   woman in her chair before he's in a

13   rage.

14   A.      I don't know.

15   Q.      So that part of his violence was

16   not the result of Intermittent Explosive

17   Disorder.

18   A.      I've not read the trial

19   testimony.  I don't know about him

20   kicking the chair over and I don't know

21   what it represents.  My understanding --

22   Q.      You're the psychologist.

23   A.      -- from what -- from what --

24   Q.      You don't know what kicking a

1    chair over represents?

2    A.      I would have to read the

3    testimony at the time of the trial and

4    discuss it with Mr. Hall and then I

5    could give you an opinion.

6    Q.      Well, what does usually kicking

7    a chair over with someone in it mean?

8    A.      I think it could mean any number

9    of things.

10   Q.      Now, where did the rage begin?

11   A.      It's my understanding that it

12   began when he and his wife were in the

13   back bedroom.

14   Q.      Tell me how they came to be in

15   the back bedroom.

16   A.      I've read a couple of accounts

17   of it.  To discuss further without it

18   being in front of the kids, I guess, is

19   the one that --

20   Q.      And what happened when he got

21   back there?

22   A.      Apparently, his wife said

23   something to the effect of "Are you

24   going to beat me like you did last

1    time?"  Mr. Hall felt that he had never

2    beat her and this provoked him to

3    extreme anger.

4    Q.      And?

5    A.      And then he started beating her.

6    Q.      She never hit him?

7    A.      Well, she might have.  I don't

8    know.

9    Q.      Well, you talked with Jon Hall,

10   didn't you?

11   A.      He didn't -- I don't think he

12   told me that she hit him.

13   Q.      Okay.  She just made the

14   statement to him, "Are you going to beat

15   me like you did before," and then he

16   just started beating her.  Is that all

17   he told you occurred in that back

18   bedroom?

19   A.      He said that he remembers that

20   his wife was trying to make a telephone

21   call, asking him if he was going to beat

22   her like he did last time.  He felt that

23   he never did beat her and this enraged

24   him.  He remembers starting to hit her,

60

1    and then he remembers her running out of

2    the house.

3    Q.        All right.  Now, Dr. Auble, the

4    testimony at trial was Jon barricaded

5    the door to the bedroom.  Did he tell

6    you about that?

7    A.        Well, it's my understanding he

8    was holding the door closed with his

9    foot.

10   Q.        Why would he hold the door

11   closed with his foot?

12   A.        At the time he was hitting his

13   wife?

14   Q.        Why?

15   A.        To prevent -- I guess to prevent

16   people from stopping him.  I -- I don't

17   know exactly.

18   Q.        Isn't that the conduct of a man

19   who was thinking?

20   A.        Not thinking clearly.

21   Q.        Well, murder very seldom is

22   clear thinking, but the fact of the

23   matter is Jon Hall according to your

24   testimony and according to his statement

61

1    realized that people would be trying to

2    help her, didn't he?

3    A.       I -- I suppose.   Yeah.

4    Q.       And he put his foot against the

5    door to prevent that from happening,

6    didn't he?

7    A.       Yes.

8    Q.       That is purposeful conduct, is

9    it not?

10   A.       Intermittent Explosive Disorder

11   does not imply that a person is not

12   acting -- what you're trying to make it

13   sound like, you can only have

14   Intermittent Explosive Disorder is if

15   you just flail around and hit whoever's

16   around you without being aware in any

17   way of what's going on and that's really

18   not characteristic of it.

19   Q.       Isn't it an uncontrolled rage?

20   A.       It is an uncontrolled rage.

21   Q.       How is a man in an uncontrolled

22   rage able to think and reason, someone's

23   going to help this woman.  I've got to

24   block the door.  How is that an

62

1    uncontrolled rage?

2    A.    It's my opinion it was an

3    uncontrolled rage.

4    Q.    It was not so uncontrolled that

5    he could not manipulate the situation to

6    keep her isolated, was it?

7    A.    It's -- yeah.  I mean, that's

8    right.  He was able to do that -- I

9    mean, he was -- he was so angry that I

10   don't think he had control of his

11   actions at the time.

12   Q.    Did his foot accidentally block

13   the door?

14   A.    No.

15   Q.    He controlled that, didn't he?

16   A.    I think he put his foot in front

17   of the door, yes.

18   Q.    He made the conscious decision

19   to block that door to keep her from

20   getting help.

21   A.    People aren't unconscious when

22   they're in an intermittent explosive

23   rage.

24   Q.    And he was able to control his

63

1    conduct, wasn't he?

2    A.      It's my opinion that he could

3    not control his conduct.

4    Q.      Well, if he couldn't control his

5    conduct how was it he could make the

6    decision to block the door?

7    A.      I don't think he could stop

8    himself once he started beating his

9    wife.

10    Q.      From blocking the door?

11    A.      No.  I don't think he could stop

12    himself once he started from beating on

13    his wife.

14    Q.      Now, if the testimony at trial

15    was that Jon barricaded the door with a

16    sewing machine and vacuum cleaner,

17    that's inconsistent with what Jon told

18    you, isn't it?

19    A.      I don't know anything about

20    that.

21    Q.      Why didn't you review the

22    transcript?

23    A.      I wasn't provided with it.

24    Q.      Why didn't you ask your lawyer

64

1    for it?

2    A.      I did ask my lawyer for records

3    -- general records and he did provide me

4    with some.

5    Q.      Isn't it important to know the

6    facts of the case?

7    A.      It might be helpful, yes.

8    Q.      Might be helpful!  What, are you

9    going to make it up?

10   A.      No.  I had some access to the

11   facts of the case, but I did not have

12   the original transcript of the trial.

13   Q.      Fact of the matter is, Jon's

14   version is very inconsistent with what

15   happened at the trial, isn't it?

16   A.      I don't know if it's

17   inconsistent or not.

18   Q.      Well, the transcript will speak

19   for itself, but he didn't tell you about

20   forcing his way into the room and he

21   didn't tell you about barricading that

22   door, did he?

23   A.      No.  He didn't tell me about a

24   sewing machine.

1    Q.        Is that because he was being

2    untruthful with you?

3    A.        I -- I don't -- I don't think he

4    was being untruthful, no.

5    Q.        Aren't those two important

6    details that you would like to have

7    known about?

8    A.        I don't know.  Sure.  I would've

9    -- if that happened I would've liked to

10   have known about that.

11   Q.        What was Jon's purpose in --

12   after she escaped -- you testified she

13   escaped.  Is that correct?

14   A.        I don't think I testified to it,

15   but it's in my report that -- that she

16   ran out of the house.

17   Q.        How did she get away?

18   A.        Not from my interview with him,

19   but from the records that I reviewed, it

20   was because of the intervention of the

21   children.

22   Q.        As a matter of fact, one of

23   these girls jumped on his back.  Is that

24   correct?

66

```
 1    A.       That's my understanding, yes.

 2    Q.       And was biting him.

 3    A.       I don't know the details, but

 4    that's my understanding, yes.

 5    Q.       How does a -- did he ever attack

 6    her, the little girl?

 7    A.       I don't know.

 8    Q.       Well, if the proof at trial was

 9    that he did not, you don't dispute that,

10    do you?

11    A.       That he did not --

12    Q.       All right.  He didn't tell --

13    A.       He did not do what?

14    Q.       That he did not attack the

15    little girl who jumped on him and was

16    biting him.

17    A.       I -- I don't -- I wouldn't

18    dispute that, no.

19    Q.       Well, did Jon --

20    A.       I mean, one of the things about

21    interviewing Mr. Hall about this is that

22    he told me that he doesn't remember it

23    very clearly because he was intoxicated.

24    Q.       All right.  Now, why didn't he
```

67

1    attack this little girl who was

2    attacking him?

3    A.       His rage was directed toward his

4    wife.

5    Q.       So someone who has jumped on his

6    back and biting at him -- he could

7    control his rage with regard to her?

8    A.       It was focused on his wife, yes.

9    Q.       Doctor, if the truth -- if the

10   proof at trial was that while Jon was

11   beating his wife he made the statement,

12   "You will never live to graduate

13   college," does that not tell you that he

14   intended to kill her?

15   A.       I think -- at that time I don't

16   think he really knew what he was doing

17   and he didn't --

18   Q.       How can a man not know that he

19   is going to kill someone when he

20   expressly tells her "You will never live

21   to graduate college?"

22   A.       It's my opinion that he was

23   having an episode of rage in which he

24   could not control himself.

1    Q.        But he knew she was in college.

2    A.        Yes.  He knew she was in

3    college.

4    Q.        He knew that his actions were

5    killing her.

6    A.        It's my opinion that he did not

7    know that.

8    Q.        Well, why did he tell her that

9    she was going to die then?

10   A.        I think he could not control

11   himself.

12   Q.        Now, the proof at trial was that

13   when these children wanted to help their

14   mother and started to leave to get help

15   Jon told them, "If you go get help, I

16   will kill your mother."  How is that

17   explosive rage?

18   A.        I -- I think that at the time he

19   was enraged.  I don't know that he knows

20   exactly what he did or said during that

21   time.

22   Q.        That statement implies that he

23   knew the girls were going to get help,

24   does it not?

1    A.        I don't know.

2    Q.        The whole purpose of

3    disconnecting that phone was to prevent

4    her from getting help, wasn't it?

5    A.        From what he says, it was to

6    prevent her from calling the police and

7    interfering with their relationship

8    again.

9    Q.        Then his statement, "If you go

10   to get help I'll kill her," implies that

11   he was continuing in that line of

12   thought.  He was isolating that victim.

13   A.        I'm not sure.  I would need to

14   know more about it.  I'm not -- I don't

15   know.

16   Q.        And you don't know more about it

17   because you didn't bother reading the

18   transcript.

19   A.        I did not read the transcript.

20   Q.        Now, that statement that "If you

21   go to get help I will kill your mother"

22   also implies that Jon knows he had at

23   least two options, doesn't it?  To let

24   her live or to kill her.

70

1    A.        I don't think he was thinking

2    that clearly at the time.

3    Q.        Does that statement not imply

4    that?

5    A.        It implies that to you and me

6    who are not in the grip of this

7    Intermittent Explosive Disorder.  I

8    don't know that it implied that to him

9    at the time.

10    Q.        He directed that statement to

11    his three little girls who are trying to

12    help their mother.  Does that not imply

13    to you, Doctor, that he realized what

14    they were going to do and that he was

15    manipulating the situation to keep them

16    from helping their mother?

17    A.        It's my opinion that he was not

18    in control of himself during the time.

19    Q.        How was it that he was able to

20    weigh his options if he were not in

21    control?

22    A.        I don't think he was weighing

23    options.

24    Q.        I can kill her.  I can let her

71

1    live.  Are those not two options that he

2    weighed there?

3    A.      It's my opinion that his actions

4    were not deliberate and that he was not

5    weighing options in any kind of cool

6    manner at all.

7    Q.      What fact witness did you talk

8    to other than Jon Hall?

9    A.      I have not talked to any of --

10   any of the fact witnesses.  I've read

11   some interviews.

12   Q.      Other than Jon Hall what person

13   have you talked to that ever told you

14   that he was angry that day?

15   A.      I've only talked to Jon Hall.

16   I've read interviews and summaries other

17   than his, but I've not -- the only

18   person I've talked to in this case has

19   been Mr. Hall.

20   Q.      So you don't know of any one

21   person other than the defendant, who we

22   all know has already told you or misled

23   you on two occasions that he was even

24   angry that day.  Is that correct?

72

1    A.        I've not talked to them.  I've

2    read reports and summaries.

3    Q.        Why didn't you talk to them?

4    A.        Because I've read reports and

5    summaries.

6    Q.        Dr. Zager in her testimony said

7    she talked to them.

8    A.        Yes.  I know.

9    Q.        That's a better procedure, isn't

10   it?

11   A.        Not necessarily.

12   Q.        Well, when you talk to someone

13   you get a better feel for what they

14   actually mean and what they saw, do you

15   not?

16   A.        No, not necessarily.  If you've

17   -- if you obtain that information

18   through a reliable source, you can get

19   just as good of information from a third

20   party.

21   Q.        What happened according to Mr.

22   Hall when the victim escaped?

23   A.        He said that he caught her and

24   dumped her into the pool.

73

1    Q.      Dumped her in?

2    A.      I don't know if he used the

3    words dumped.  I used the words dumped.

4    Q.      Isn't it true that he was

5    standing in the pool forcing her head in

6    the water?

7    A.      He told me that he held her

8    under water, yes.

9    Q.      How did he catch her?

10   A.      I guess he ran after her.

11   Q.      Do you mean she had gotten away

12   and he made the conscious decision to

13   pursue her?

14   A.      Yes.  Being -- having an

15   Intermittent Explosive Disorder does not

16   mean that you're unconscious.

17   Q.      He made a choice to chase his

18   wife down.

19   A.      Well, you can -- he was -- yes.

20   He was enraged and he was focused on her

21   and she was the object of his rage and

22   he chased her.

23   Q.      And the purpose of chasing her

24   was what?

1    A.        To catch her.

2    Q.        And?

3    A.        I don't know that he thought

4    through what exactly he was going to do

5    when he caught her.

6    Q.        Couldn't it be that he was going

7    to follow through on that threat, "You

8    will never live to graduate college?"

9    A.        I don't believe he was capable

10   of making a deliberate and rational

11   decision at that point.

12   Q.        What fact during the homicide do

13   you base that opinion on?

14   A.        I base it not only on the -- the

15   -- the events that happened at and

16   around the time of the killing but also

17   his history.

18   Q.        Isn't it true, Dr. Auble, that

19   the things that a person does and says

20   during the time of a crime are most

21   essential to making a determination as

22   to their mental condition at the time?

23   A.        Yes.  They are very essential.

24   Q.        Now, at the time of this crime

1    what fact or what statement of Jon Hall

2    do you rely upon to say that he was not

3    capable of premeditation?

4    A.        It's my opinion that he was not

5    capable of premeditation because of the

6    mental disorders from which he suffers -

7    -

8    Q.        In other words --

9    A.        -- and because of the

10   circumstances in which he found himself.

11   Q.        In other words, Doctor, the

12   answer to my question is that you don't

13   know of any fact or any statement from

14   the defendant during the time of the

15   crime that you can rely upon to justify

16   your opinion, do you?

17   A.        I don't think that's what I

18   said.  I said that I -- in making that

19   determination I take into account the

20   mental disorders, the circumstances in

21   which he finds himself, his intoxication

22   and his behavior.

23            GENERAL EARLS:  That's all I

24   have.

76

1    **RE-DIRECT EXAMINATION**

2    **BY MR. BUCHANAN:**

3    Q.        I wanted to refer you back to

4    the part of the cross-examination where

5    he said that both you and Dr. Zager, I

6    believe, were testifying as to

7    diminished capacity.  Dr. Zager did not

8    testify as to IED, did she?

9    A.        No.

10   Q.        And IED is an objective disorder

11   recognized by the DSM, is it not?

12   A.        Yes.

13   Q.        It is one of, I don't want to

14   say the few, but it is one of those

15   disorders that can be backed up by an

16   objective test showing low serotonin

17   levels.  Correct?

18   A.        It can -- certainly low

19   serotonin levels increase one's risk for

20   suffering from that disorder, yes.

21   Q.        If you -- that is an objective

22   indication that you may very well suffer

23   from it, in other words --

24   A.        That's correct.

77

1    Q.      -- as opposed to having to come

2    to some conclusion based on interviews

3    and what not.

4    A.      That's right.

5    Q.      Mr. Earls keeps asking about one

6    fact.  Was your opinion derived from any

7    one fact or from the colossus of facts

8    that were involved in the various social

9    histories, interviews and things that

10   you did to come to this conclusion?

11   A.      My opinion is derived from more

12   than one fact, yes.

13   Q.      And just briefly again, to get

14   to Intermittent Explosive Disorder would

15   you almost have to have a good social

16   history prepared for you to get to that?

17   A.      Yes, you would.

18   Q.      And why would you need that?

19   A.      Because you need evidence of

20   difficulties with anger control for a

21   long period of time, not just for that

22   one incident, and you need evidence of

23   difficulties with anger control that

24   occur when the person is not

78

1    intoxicated, you know, for instance, at

2    the time of this crime he was

3    intoxicated.  So you would need -- to

4    diagnose Intermittent Explosive Disorder

5    you would have to have evidence that

6    there had been other episodes when he's

7    sober, when he's not intoxicated.

8    Q.      Which is a good portion of what

9    Mr. Earls was questioning you about

10   ruling out intoxication as opposed to

11   IED.

12   A.      That's right.  The episodes

13   cannot only occur when the person's

14   intoxicated.

15   Q.      And, again, you can only find

16   that out by either yourself doing the

17   social history or having one provided

18   for you.

19   A.      That's right.

20           MR. BUCHANAN:  I have no further

21   questions.

22   **RE-CROSS EXAMINATION**

23   **BY GENERAL EARLS:**

24   Q.      Dr. Auble, isn't it true that

                                                79

1    there have been very little research in

2    the area of Intermittent Explosive

3    Disorder?

4    A.      I don't know if I would

5    characterize it as very little research,

6    but it's not as well researched as some

7    of the other disorders.

8    Q.      Let me read to you from the DSM4

9    and ask if you agree or disagree with

10   this statement. "Reliable information

11   is lacking but Intermittent Explosive

12   Disorder is apparently rare."

13   A.      That would be research on the

14   prevalence of it.

15   Q.      "Reliable information is

16   lacking."

17   A.      Well, the reliable information

18   is lacking regarding the prevalence

19   which is what that sentence is directed

20   toward. I don't -- the DSM4 does --

21   there's enough reliable evidence about

22   Intermittent Explosive Disorder for it

23   to be included in the DSM4.

24   Q.      What causes low serotonin?

80

1    A.        Childhood experiences are

2    associated with it.

3    Q.        Does that include post-traumatic

4    stress disorder -- syndrome?

5    A.        Can, yes.

6    Q.        What did you do to explore post-

7    traumatic stress disorder?

8    A.        Mr. Hall did have experiences

9    that -- as a child that could have

10   caused a post-traumatic stress disorder.

11   I don't see that in him, but it -- you

12   know, the experiences that he had are

13   capable of causing it.

14   Q.        You didn't eliminate that

15   diagnosis, though, did you?

16   A.        I didn't diagnose him as that.

17   Q.        But that's one that you should

18   eliminate, isn't it?  Post-traumatic

19   stress syndrome?

20   A.        Well, I did eliminate it.  I

21   mean, I -- I didn't -- he -- I didn't

22   give him that diagnosis.

23   Q.        Why not?

24   A.        Because I didn't think he met

81

1    the criteria for it.

2    Q.    Criteria are pretty limited to

3    that, isn't it?

4    A.    I'm sorry?

5    Q.    What is the criteria for that?

6    A.    There is three sets of criteria.

7    One is recurrent intrusive recollections

8    of the traumatic event.  The second set

9    involves kind of an emotional numbing

10   set.  The third set is hyperactive

11   autonomic reactivity.

12   Q.    And you said he didn't have

13   that?

14   A.    It's my opinion that he does not

15   meet the diagnostic criteria for D --

16   the DSM diagnostic criteria for post-

17   traumatic stress disorder, no.

18   Q.    So, his early childhood

19   experiences had no bearing upon his

20   conduct during the crime?

21   A.    I think his early childhood

22   experiences did have a bearing on his

23   conduct during the crime, yes --

24   Q.    Isn't that --

82

1    A.      -- but that doesn't necessarily

2    mean that he has a post-traumatic stress

3    disorder.

4             GENERAL EARLS:  That's all I

5    have.

6             THE COURT:  Nothing further for

7    this witness?

8             MR. BUCHANAN:  No, sir.

9             (WITNESS EXCUSED)

10                   * * *

11            **(WHEREUPON, a recess was had,**

12   **after which the following proceedings**

13   **were had:)**

14            THE COURT:  Is the Petitioner

15   ready to call his next witness?

16            MR. BUCHANAN:  Yes, Your Honor.

17   Judge, talking to Dr. Caruso, he would

18   like to see this tape that we have

19   tendered earlier.  This would be a great

20   time to play it.  It might take about

21   five minutes.

22            THE COURT:  Okay.  Be sure --

23   Mr. Hall.  We can ahead and get Dr.

24   Caruso in if you want to step -- he

83

1    wants to view the tape now.  Correct?

2        MR. BUCHANAN:  Dr. Caruso, do

3    you want to go ahead and take the stand.

4    You can view it better from there

5    anyway.

6        **DR. KEITH A. CARUSO** was called

7    and having been duly sworn was examined

8    and testified as follows:

9        MR. BUCHANAN:  Judge, just

10   briefly -- I've turned the audio down.

11   I don't think there's anything of

12   significance audio-wise.  This is just a

13   typical, for lack of a better word,

14   crime scene run through video by law

15   enforcement officials.

16       THE COURT:  No initial questions

17   for the Doctor?  You're just going to

18   let him view it?

19       MR. BUCHANAN:  Yes, sir.

20           **(WHEREUPON, the**

21           **videotape was played**

22           **without sound.)**

23       MR. BUCHANAN:  Your

24   Honor, the portion I intended to

                                            84

1       tender is really over, but if

2       the Court would like to see the

3       rest of it I certainly have no

4       objection.

5               THE COURT:  Does the

6       State want to comment at all?

7               GENERAL EARLS:  No.

8               THE COURT:  If the part

9       that you felt was relevant to

10      this witness has been shown,

11      then it's fine to stop.

12              MR. BUCHANAN:  Yes, sir.

13      The inside of the house.

14              THE COURT:  This is a

15      tape that's part of Exhibit 13.

16              MR. BUCHANAN:  Yes, sir.

17      **DIRECT EXAMINATION**

18      **BY MR. BUCHANAN:**

19      Q.      Would you state your name for

20      the record, please, sir?

21      A.      Keith Allen Caruso.

22      Q.      And, Dr. Caruso, how are you

23      employed?

24      A.      I'm in private practice.  I'm a

                                            85

1    forensic and general psychiatrist.

2    Q.       And how long have you been a

3    psychiatrist?

4    A.       I completed my psychiatry

5    residency training in 1994 at the

6    National Naval Medical Center, commonly

7    known as Bethesda Naval Hospital, and I

8    did my forensic psychiatry fellowship at

9    the Walter Reed Army Medical Center from

10   1996 through 1997.  So I've been a

11   forensic psychiatrist since that time.

12   Q.       Briefly, would you give us a

13   background as to your educational

14   background and qualifications and

15   service in the military?

16   A.       Sure.  Well, overall I have a BA

17   in Psychology from New York University.

18   I graduated Cornell University Medical

19   College in 1990.  I did my internship in

20   psychiatry at Bethesda from 1990 to '91.

21   '91 to '94 I was a resident in

22   psychiatry; spent two years as a

23   Division Psychiatrist at Camp Lejeune

24   and then returned for forensic

86

1    psychiatry training, which basically

2    consisted of two days a week at the

3    Walter Reed Army Medical Center doing

4    military cases and learning landmark

5    case law.  Some cases also at Bethesda.

6    Two days a week at the Clifton T.

7    Perkins Hospital Center, which is the

8    Maryland hospital for the criminally

9    insane.  One day a week at the FBI

10   Academy at the profiling and behavioral

11   analysis unit where I worked on some

12   unsolved crimes or crimes that had

13   recently been solved that had some

14   psychiatric component.  One of the

15   notable ones at that time was the

16   Kizenski case.  Also audited criminal

17   law at Georgetown University and spent

18   the final month of that year at the U.

19   S. Disciplinary barracks at Fort

20   Leavenworth, the military prison,

21   essentially.  Subsequently, I -- or

22   actually, in 1995 I passed my Boards in

23   general psychiatry.  In 1998 I passed my

24   Boards in forensic psychiatry.

1       Subsequently, I was Assistant Chief of

2       Inpatient Psychiatry at Walter Reed for

3       a year, then became Chief, and

4       similarly, at Bethesda for the Forensic

5       Service. I was Chief of that when I left

6       the military in 1999.  I've been in

7       private practice since that time.

8       Q.      When you left the military what

9       branch and what was your rank?

10      A.      I was a Lieutenant Commander.

11      That's an L-4.  It's equivalent of an

12      Army Major and I've been in the Navy, as

13      I said.

14      Q.      Yes.  And are you licensed to

15      practice psychiatry here in the State of

16      Tennessee?

17      A.      Well, I'm licensed to practice

18      medicine.  I was originally licensed in

19      Maryland in 1991.  I've let that go

20      inactive, I guess, as of '99.  I've been

21      licensed to practice medicine in

22      Tennessee since '99.

23              MR. BUCHANAN:  I would submit

24      his qualifications as an expert, Your

1     Honor.

2           THE COURT:  Any comment from the

3     State?

4           GENERAL EARLS:  No, sir.

5           THE COURT:  So accepted.  Go

6     ahead.

7     Q.     Would you tell the Court briefly

8     what is the difference in a forensic

9     situation between the use of a

10    psychiatrist versus a psychologist?

11    A.     Well, I think, although there's

12    some overlap, a psychiatrist is someone

13    who goes to medical school and has

14    medical training and would look at

15    organic causes or physical causes for a

16    disease and the behavior that may result

17    from those things, I guess is the

18    primary thing, and then we'll go from

19    there and also consider, you know, some

20    of the psychological causes and stresses

21    and things of that nature, but,

22    essentially, it's a medical background

23    that we come from originally.

24    Q.     A psychologist would then not be

89

1    licensed to, for instance, draw spinal

2    fluid to take serotonin levels, would

3    they?

4    A.       That's correct.  That would be a

5    medical procedure, so -- and I think

6    they may be less well versed.  Although,

7    I can't speak for all psychologists, but

8    they might be less well versed in those

9    kinds of procedures and tests.  They

10   wouldn't be able to order them and they

11   wouldn't be able to prescribe

12   medications, things of that nature.

13   Q.       How long has the serotonin level

14   as an indicator of possible Intermittent

15   Explosive Disorder -- how long is that -

16   - in the area in which you practice, how

17   long has that been fairly accepted?

18   A.       Well, it's been a number of

19   decades.  Actually, people became

20   interested in serotonin originally when

21   they began looking at the brains of

22   people who successfully completed

23   suicide and what they found was in a

24   subgroup of those persons that they had

90

1     had very low levels of serotonin in

2     their brains.  And, actually, they began

3     looking at that a little bit more

4     closely and they found in particular

5     that people who had chosen violent means

6     for committing suicide -- shooting

7     themselves, hanging themselves, stabbing

8     themselves, things of that nature --

9     actually had the lowest levels.  So,

10    although, initially, people were very

11    suspicious of -- about a relationship

12    between serotonin -- low serotonin and

13    depression, they also began to say, hey,

14    maybe there's something here in terms of

15    impulsivity and control of violence

16    because violence may be directed at the

17    self or it may be directed at others.

18    And, subsequently, one of the things

19    that they've looked at have been the

20    serotonin levels.  You, obviously, don't

21    want to be taking brain biopsies from

22    living individuals.  So what they've

23    been doing is looking at the fluid in

24    which the brain resides, the cerebral

91

1    spinal fluid, and that can give you an

2    idea of serotonin function in the brain

3    and what they've -- what we've

4    subsequently found is that people with

5    depression tend to have levels of

6    actually the major breakdown product of

7    serotonin, 5-hydroxyindoleacetic acid.

8    They tend to have lower levels of that

9    which kind of tells you how much

10   serotonin's been used.  They have lower

11   levels of that in depression, about 20

12   points lower than what normal people

13   would have, and people with problems

14   with impulsive violence and explosive

15   violence have levels that are much

16   lower, about half of that.  So that's

17   how the field has evolved, but this

18   concept's been around for a number of

19   years.

20   Q.    Would it have been available to

21   attorneys that had been looking for it,

22   say, in the years 1995 through 1997?

23   A.    Yes.

24   Q.    The serotonin test -- before we

92

1    had serotonin there was such a thing as

2    IED, was there not?

3    A.        Yes.  I believe so.

4    Q.        What does the serotonin --

5    A.        Well, let me clarify that.  More

6    recent research has focused on the issue

7    of looking for biological markers for

8    various psychiatric conditions.  One of

9    the things that we found, and one of the

10   things I think that the General was

11   pointing out, was that there are a

12   number of diagnoses that must be

13   considered in the differential diagnosis

14   of Intermittent Explosive Disorder, and

15   recent research by Emil Coccaro -- C-O-

16   C-C-A-R-O -- that was presented to the

17   American Psychiatric Association

18   Convention in the last few years has

19   focused on the issue of should we be

20   making the diagnosis of Intermittent

21   Explosive Disorder in people with

22   antisocial personality disorder and

23   Borderline Personality Disorder and

24   other conditions and one of the things

1    he began to look at was the issue of,

2    well, if people meet criteria for these

3    other diagnoses and they don't engage in

4    explosive violence either towards

5    themselves or towards other people, do

6    they have low levels of serotonin?  The

7    answer to that question was, no.  That

8    it's only -- only in the subset of

9    people who have inter -- who essentially

10   meet criteria for Intermittent Explosive

11   Disorder, that's the subgroup of people

12   with these other diagnoses that have

13   been listed in the differential

14   diagnosis that have that.  So there's a

15   very strong argument now that this is a

16   biological marker for Intermittent

17   Explosive Disorder.  Whereas, it's not

18   something that you routinely see in

19   antisocial personality disorder or you

20   routinely see in Borderline Personality

21   Disorder or that you see in Attention

22   Deficit Hyperactivity Disorder.  So this

23   is looking to be a more specific test.

24   It hasn't been incorporated into the DSM

94

1     yet because the DSM4 was written in 1994

2     and Dr. Coccaro's research is more

3     recent, but I think that we might start

4     seeing this in DSM5 and beyond so that

5     this -- you know, there are revisions of

6     the *Diagnostic and Statistical Manual* as

7     new information becomes available and we

8     do have this -- we do have a new edition

9     coming up, I believe, in the next few

10    years that, you know, most likely will

11    list things such as this.

12    Q.      So serotonin is -- the serotonin

13    level is an objective test that

14    indicates IED the way a blood test might

15    indicate the person has an infection.

16    Is that fair to says?

17    A.      I think we're approaching that

18    point, yes.

19    Q.      So it becomes more than just an

20    opinion of an expert.  It -- you're

21    looking for biological markers that are

22    objective that back that up.

23    A.      Well, and one of the things that

24    in considering all of this I had been

95

1    saying among the diagnoses when you and

2    I conferred that we need to rule out

3    Intermittent Explosive Disorder and you

4    were saying, "Well, what do you need to

5    do that," and that's when I said, "Well,

6    I think there are two things that could

7    be causing someone to have impulsive

8    violence.  One that we're seeing is

9    Intermittent Explosive Disorder in

10   individuals such as this in a situation

11   such as this.  One would be Intermittent

12   Explosive Disorder and let's look at his

13   serotonin level.  The other could be

14   that he's got some neuropsychological

15   impairment from some -- you know, from a

16   brain abnormality.  So that was the

17   whole purpose for -- to bring Dr. Auble

18   into the case as well, to make sure that

19   it wasn't something that was otherwise a

20   problem with his brain.

21   Q.      And Dr. Auble was basically a

22   rule out.  She ruled out that it was

23   something of that nature.  Is that

24   correct to say?

96

1    A.        Well, I think there were other

2    things that came from her evaluation

3    that were helpful.  I think looking at

4    some of the Rorschach responses -- or

5    the scoring of the Rorschach indicating

6    things that this is someone who looks

7    for simple solutions to complex

8    problems.  This is someone who has

9    difficulty modulating his emotional

10   responses.  Again, here are other

11   measures that, okay, not just in this

12   particular case do we see evidence that

13   this individual acts in this way, but

14   even if we go in other unstructured

15   situations where other people with --

16   who have this diagnosis and have similar

17   problems controlling their emotions, how

18   do they respond and we started seeing

19   similar responses in Mr. Hall that we've

20   seen in some of these other cases as

21   well.

22   Q.        Tell the Court exactly how the

23   serotonin levels came out on -- when Jon

24   was tested.

97

1    A.        I have a report from Dr. Ronald

2    Salomon at Vanderbilt, and Jon Hall's

3    level of the major metabolite in

4    serotonin, CSF 5-HIAA, I guess is the

5    abbreviation we like to use, was 70.

6    That's -- and I think he rated that

7    being in the bottom five percent.

8    Q.        Is that --

9    A.        And the normal level is 139.1,

10   so it's roughly half the normal level.

11   He says here --

12   Q.        So he's in the bottom --

13   A.        I'm sorry.

14   Q.        I'm sorry.  So he's in the

15   bottom five percent of the general

16   population?

17   A.        Yes.

18   Q.        Is that what you would've

19   expected to find in someone that has

20   IED?

21   A.        Yes.

22   Q.        And is there any way that can be

23   faked by the individual that has the

24   test performed on them?

98

1     A.        I don't know of any way that

2     someone could fake it or manipulate

3     their level to come out that way.

4     Q.        Would you tell me exactly --

5     when you're called in as a forensic

6     expert, what is your role to serve in

7     the defense or for that matter the

8     prosecution of a case?

9     A.        Essentially, to -- there are

10    questions -- specific questions that I'm

11    asked by an attorney, whether it's a

12    defense attorney or prosecuting

13    attorney, relevant to the case.  For

14    example, in some cases there are

15    questions about competency.  Others

16    about insanity.  Others about mental

17    state at the time of the offense.

18    Others about mitigation.  Sometimes

19    there are questions depending on the

20    jurisdiction where a complaining witness

21    is complaining of rape or child sexual

22    abuse.  So, again, there would be issues

23    about seeing, for example, if those

24    individuals -- the complaining witness

99

1    has post-traumatic stress disorder that

2    essentially appear to begin at the time

3    -- just after the time that they alleged

4    that they were traumatized.  So there

5    are various questions like that, but

6    essentially there are questions that are

7    posed to me.  On occasions things, you

8    know, come up for me and I'll ask an

9    attorney about, would you like to pursue

10   an evaluation of this as well, but,

11   generally, there are questions that

12   people pose and I do an objective

13   evaluation and come up with findings

14   and, I guess, about two out of seven

15   times those are findings that the side

16   that has contacted me are interested in

17   having me testify about.

18   Q.        Have you testified for the

19   prosecution as well as the defense?

20   A.        Yes, as recently as last month

21   at Fort Campbell.

22   Q.        How important -- when you begin

23   a forensic evaluation, how important is

24   the social history that you are

100

1       provided?

2       A.        It's very important.  I think

3       one of the things in terms of -- I think

4       defendants or patients in general don't

5       always give accurate histories in terms

6       of what it was like for them growing up.

7       Sometimes there are things that had

8       occurred; there are family secrets that

9       they're unaware of or there are things

10      that occurred when they were too young

11      to have a fair recollection of that.  So

12      social history can be very critical.  It

13      also helps to -- you know, when I come

14      to a diagnosis I would like to look for

15      -- let's say, if I diagnose someone with

16      Borderline Personality Disorder, I would

17      like to see that there is a social

18      history that would fit with that type of

19      condition and that is not a condition

20      that arises in a vacuum.  Generally, we

21      see a situation in which there is abuse

22      and neglect and things of that nature

23      that tend to occur in the pasts of

24      people with this condition.  So I look

101

1     for something that's an internally

2     consistent theme throughout a person's

3     life.

4     Q.        In referencing back to Dr.

5     Auble's testimony, wherein she said

6     there needed to be enough social history

7     to see if these episodes occurred

8     outside of intoxication, is that exactly

9     the kind of things you're looking for in

10    a thorough social history?

11    A.        That would be one of the things,

12    yes.  I mean, essentially, if you're

13    looking at someone who's an alcoholic

14    and has episodes of violence while they

15    are drunk and doesn't have them at any

16    other times, then, yes.  That would be a

17    situation in which, I think, you would

18    rule out Intermittent Explosive

19    Disorder.

20    Q.        Would you have expected -- for

21    instance, I hired you and said, Doc,

22    just go get your social history from Mr.

23    Hall.  Would you have expected that to

24    be good enough?

                                        102

1    A.        I can't say that someone could

2    never provide a good social history

3    because, you know, you never say never,

4    but I think that in cases such as this

5    the standard of practice is that you

6    would -- that essentially -- one of the

7    things that I recommend is if someone

8    hasn't already done it, hiring a

9    mitigation specialist, investigators,

10   things of that nature, because they all

11   provide a lot of information that can be

12   useful in the formulation of the case.

13   Q.        Speaking of minimums in

14   performing a social history, I'm

15   assuming that, you know, you can't talk

16   to everybody in the United States that's

17   ever had any contact with the person,

18   but what are the minimum people that you

19   would think that you would need to

20   interview in compiling a social history

21   as far as people in relation to the

22   defendant?

23   A.        I think friends and family are

24   very important.  Past employers could be

103

```
 1    very important.  Certainly, friends, you

 2    know, and friends throughout the course

 3    of one's life, not just at one

 4    particular point, but -- as I think

 5    we've seen here, there were people that

 6    knew him when he was growing up.  There

 7    are people that knew Mr. Hall and Billie

 8    Hall, also, and knew about their

 9    relationship as well, so --

10    Q.       So if a person had immediate --

11    several brothers and sisters in the

12    immediate family, you would consider

13    that part of the minimums that needed to

14    be provided to you at least in the

15    social history?

16    A.       Sure.  I would want -- if they

17    weren't interviewed I'd want to

18    interview them myself.  One of the

19    reasons I don't interview them myself is

20    that the expenses -- that could be very

21    expensive.  I believe that a lot of

22    these investigators and mitigation

23    specialists are much less costly per

24    hour than I am.  So -- there are times
```

1    when I do interview other people but it

2    depends on the nature of the information

3    that I receive.

4    Q.        So, for instance, if you got

5    some confusing information about what

6    one sister said or something, you might

7    take it upon yourself to call the two

8    sisters and try to resolve whatever it

9    is that you think is cloudy, but, in

10   general, that's going to be left to the

11   attorneys getting that to you.

12   A.        That's correct.

13   Q.        In this case could you tell the

14   Court what materials that you were

15   provided and what materials you availed

16   yourself of --

17   A.        Sure.

18   Q.        -- in making this evaluation?

19   A.        I've just seen a video.  Also, I

20   had a transcript of State versus Jon

21   Hall from 1997.  The excerpts that I've

22   read included motions, testimony from

23   Jerry Bingham, testimony from Brian

24   Byrd, testimony from Chris Dutton,

105

1    Stephanie Lambert, Cynthia Lambert,

2    Jennifer Lambert, the medical examiner,

3    Dr. O. C. Smith, Dr. Zager.  Let's see,

4    psychologist Joe Mount, Randy Helms,

5    Debbie Davis, Kathy Hugo, Cheryl

6    Arbogast, Carol Alexander.  There was

7    also mitigation information from Ann

8    Charvat, correspondence with another

9    attorney, Edward Martindale, regarding a

10   civil suit.  There was some media

11   clippings.  There was Jessica Hall's

12   medical records.  There were TDOC mental

13   health records for the defendant.  There

14   were records from Middle Tennessee

15   Mental Health from, I believe, a

16   competency and sanity evaluation that

17   were done in '95, disciplinary records

18   from TDOC.  There were memos from Glori

19   Shettles who had been a mitigation

20   specialist previously in this case and

21   interviews that she had done with

22   various family members.  A time line

23   done by Danese Banks.  Numerous

24   interviews by Ms. April Higuera with the

106

1    defendant over a span of, I guess, about

2    two years.  Interviews by Ms. Higuera of

3    family and friends.  A genealogy memo

4    that Ms. Higuera had provided.  Written

5    materials that Ms. Arbogast had

6    provided.  More mitigation timelines.

7    Memos about the trial audiotapes.

8    Interview of Judge Whit LaFon by Ms.

9    Higuera and other witnesses.  Dr.

10   Auble's neuropsych eval and Dr.

11   Saloman's report.

12   Q.      Did you --

13   A.      I also -- I also interviewed the

14   Defendant on January 28, 2002 for three

15   and a-half hours and on March 19, 2002

16   for four hours.

17   Q.      All right.  And did you yourself

18   perform any objective tests yourself or

19   --

20   A.      I don't -- I'm not a

21   psychologist, so I don't do psychologist

22   testing.

23   Q.      So that was done by Dr. Auble

24   and Dr. Salomon as far as the neuropsych

107

1    testing and the serotonin level testing.

2    A.      That is correct, and there had

3    been some prior medical tests conducted

4    by Middle Tennessee when they did their

5    evaluation including a CT scan.  I think

6    there was an EEG and screen laboratory

7    studies such as blood tests that all

8    were within normal limits.

9    Q.      So after you've reviewed all

10   these materials and you interviewed Jon

11   Hall, what were your first impressions

12   concerning Mr. Hall?

13   A.      Well, I think there are a number

14   of things.  I think there was a lot of

15   evidence of character pathology which

16   one would expect in light of the

17   dysfunctional home that he grew up in,

18   but on top of that there are also -- and

19   there also seemed to be a great degree

20   of substance abuse, both in Mr. Hall and

21   also in family members.  There was a lot

22   of major depression in family members.

23   Mr. Hall had a history of depression.  I

24   -- I -- I felt that it wasn't just an

                                           108

1    adjustment disorder in that he seemed to

2    respond to some anti-depressant

3    medication that he'd received.  I

4    believe back in 1995 he was on

5    Imipramine and, although he couldn't

6    tolerate the side affects, had done

7    somewhat better and reported feeling

8    better on that medication.  In addition,

9    there was a history of numerous episodes

10   of Mr. Hall exploding into violence

11   either where he assaulted people or

12   where he destroyed property, and I

13   became suspicious on that basis of

14   Intermittent Explosive Disorder as it

15   seemed that there were times that that

16   could not be accounted for by

17   intoxication alone, and essentially --

18   also I have spoken to you about some of

19   the outbursts and I've read about some

20   of his outbursts in court, I believe, in

21   a prior trial.  And, again, there really

22   seemed to be a lot of difficulty

23   controlling his, you know, his behavior

24   -- controlling his emotions.  And, also,

 1    consistent with that, that the only

 2    thing that seemed to have changed

 3    between those explosions and then being

 4    more conciliatory in terms of speaking

 5    with you that he -- you know, only time

 6    had elapsed.

 7    Q.      What does intoxication do to

 8    someone that has IED?

 9    A.      And there's nothing mutually

10    exclusive also about being an alcoholic

11    and having Intermittent Explosive

12    Disorder.  In fact, there's a very high

13    co-occurrence of those two conditions,

14    and they can be cumulative.  So alcohol

15    reduces impulse control.  We --

16    individuals tend to do things when

17    they're intoxicated that they wouldn't

18    ordinarily do.  Similarly, I think folks

19    with Intermittent Explosive Disorder

20    also have poor control of their

21    impulses, so that you've got two things

22    now together.  One is intoxication.

23    It's the introduction of a foreign

24    substance into the body, but you've got

110

1    two conditions that can reduce impulse

2    control.  Also we've seen that violence

3    prone individuals when they are

4    depressed also tend to have problems.

5    Again, that's another factor that needs

6    to be considered, and these aren't

7    mutually exclusive.  It's not like

8    someone with Intermittent Explosive

9    Disorder can't be depressed and it's not

10   like they can't get drunk.

11   Q.       Someone with Intermittent

12   Explosive Disorder is not what you would

13   legally call insane, are they?

14   A.       That is correct.

15   Q.       Would you tell the Judge

16   basically what's the difference between

17   the culpable mental state with someone

18   with IED versus a person that's insane?

19   A.       Well, our insanity standard here

20   is if someone has a severe mental

21   disease or defect, and in that regard,

22   Intermittent Explosive Disorder would

23   qualify; however, as a result of that

24   severe mental disease or defect they are

111

1    unable to appreciate the nature or the

2    wrongfulness of their actions.  So they

3    either don't understand what they're

4    doing at the time of the offense or they

5    don't recognize that it's wrong.  They

6    may have a delusion.  Let's say that

7    they perceive they're acting in self-

8    defense when they attack somebody.  So,

9    therefore, if they thought they were

10   acting in self-defense, they wouldn't

11   think that they were doing the wrong

12   thing.  There is a recognition with

13   someone with Intermittent Explosive

14   Disorder that they should not be doing

15   this thing, but the ability to control

16   themselves, the ability to stop

17   themselves, the ability to turn down the

18   emotional thermostat to be able to

19   exercise judgment on that and follow

20   through is impaired.  That's where the

21   problem is for these individuals.  When

22   he puts his fist through a wall or kicks

23   through a wall, well, he knows it's not

24   a good thing to do but the capacity to

112

1    stop himself isn't there. I think it

2    may be similar in regard to someone in a

3    manic episode who has bi-polar disorder

4    who can't control themselves as well.

5    So they may recognize what they're doing

6    is wrong but the capacity to, you know,

7    to -- to use that impact upon their

8    actions and to make a -- to make a fully

9    reasoned choice about this is not --

10   isn't there.

11   Q.      So they're not insane, but how

12   does that affect what we in the law call

13   premeditation?

14   A.      Well, I think that there could

15   be two ways.  One is -- you know, I

16   think sometimes you have to look at the

17   issue of did someone pre-plan what they

18   did, and I think that's one leg of

19   premeditation, but the other is did they

20   commit their action in a cool state of

21   mind?  Is there an absence of -- I think

22   the statute says it must be -- the

23   mental state must be carefully

24   considered to be certain that there's an

113

1   absence of passion and excitement at the

2   time of the offense.

3   Q.      Were you able to render an

4   opinion or have an opinion as to whether

5   or not Jon at the time was capable of

6   premeditation in this particular

7   episode?

8   A.      I felt that because of

9   Intermittent Explosive Disorder, major

10  depression, and intoxication, but I

11  think mostly Intermittent Explosive

12  Disorder, although, I don't know if I

13  can really separate how much out for

14  reach one -- that he was unable to -- he

15  was unable to achieve the mental state

16  of the absence of passion and

17  excitement.

18  Q.      The people that suffer from IED

19  and commit the killing of another

20  individual, is it quite often the fact

21  that they are doing it under a passion

22  consistent with manslaughter, for

23  instance?

24  A.      That would -- that's certainly a

114

1    possibi -- that certainly occurs in some

2    cases, yes.  I think that's a legal

3    matter more left to the Fact Finder than

4    myself.  I think it's a reasonable

5    argument, but how exactly to apply those

6    things I think goes beyond what a

7    psychiatrist does --

8    Q.       But it -- it --

9    A.       -- in terms of manslaughter in

10   that I guess we're talking about -- as I

11   understand that statute, it is that even

12   a reasonable person would be driven to

13   act irrationally under the circumstances

14   and I don't know that -- necessarily

15   that the Courts have specified yet about

16   the issue of if you've got an illness

17   does that necessarily -- is that

18   something that you count in -- you know,

19   if a -- if a reasonable person were

20   suffering the same thing.  I don't know

21   that that's been ruled on necessarily,

22   but I've certainly seen it argued and it

23   seems reasonable from a psychiatric

24   standpoint to make that analogy.

1    Q.        But, of course, a jury has -- a

2    Fact Finder has to hear this stuff

3    before they can make those conclusions.

4    Is that --

5    A.        Yes.

6    Q.        What did you -- what became your

7    ultimate conclusion as to what -- what

8    your evaluation of Jon uncovered?

9    A.        I felt that he met criteria for

10   a number of diagnoses.  I want to make

11   sure I list them all.  I felt that at

12   the time of the offense he had Major

13   Depression, Intermittent Explosive

14   Disorder.  I felt that he was dependent

15   on alcohol, so he had alcohol

16   dependence.  He had dependence on

17   marijuana.  Cannabis dependence.  I felt

18   that he also had a history of

19   polysubstance abuse where he abused a

20   lot of other substances, such as LSD and

21   Valium and other drugs, and I also felt

22   that at the time of the offense there

23   was evidence to indicate that he was

24   suffering from alcohol intoxication as

116

1    well.  I felt also that he had met

2    criteria for several personality

3    disorders, including Narcissistic

4    Personality Disorder, Borderline

5    Personality Disorder and Antisocial

6    Personality Disorder.  I didn't feel

7    that there was a medical condition

8    impacting upon his mental state other

9    than the ones I've specified here in

10   terms of the depression and the

11   Intermittent Explosive Disorder, et

12   cetera.  I also felt that there were a

13   number of stressors at the time of the

14   offense or that we list on Axis IV,

15   including his fears of abandonment by

16   his wife at the time of the offense, his

17   daughter's disability and her special

18   medical needs, the financial stressors

19   related to his earlier unemployment.  In

20   addition, his brother's dying of AIDS at

21   that time also were stressors operative

22   at the time and, I think, at this time

23   and not at that time we had the

24   stressors related to legal charges.  I

117

1      felt that at the time of the offense he

2      had a global assessment of functioning

3      score of about 40.  More recently it's

4      about 55, and that's on a scale of 100

5      where someone with a scale of 31 -- a

6      score of 31 to 40 would be seriously

7      impaired.

8      Q.        What -- and when you say Axis I

9      or Axis II, could you tell me in

10     layman's terms what that means?

11     A.        Axis I would indicate severe

12     psychiatric disorders.  If we're talking

13     about in legal terms severe mental

14     diseases, that's where they would be

15     listed, on Axis I.  On Axis II we would

16     have conditions such as personality

17     disorders which are generally

18     descriptions of an individual's manner

19     of interacting with and viewing the

20     world.  Things of that nature.   His

21     overall behavior patterns over a long

22     period of time.  You might also list

23     mental retardation on Axis II.  That's

24     not relevant here, but that's how those

                                        118

1    two Axises break out.

2    Q.      All right.  Did you notice in

3    the film that we viewed before you

4    testified that there was beer bottles

5    around the crime scene?

6    A.      There were numerous beer bottles

7    that I saw.

8    Q.      Is that consistent with your

9    feeling that he was intoxicated at the

10   time?

11   A.      I don't have an account that

12   anyone else put those beer bottles at

13   the crime scene.  It suggest that he was

14   in addition to accounts that he'd given.

15   Q.      Is -- Doctor, at the trial it

16   was virtually left in the record

17   uncontested that he had disconnected the

18   phone lines.  Were you able to rule that

19   out as evidence of premeditation or was

20   that, in fact, evidence of

21   premeditation?

22   A.      Well, I think the way that I --

23   the way that I -- rather than usurp the

24   Fact Finder's position about what it

119

1    really meant, I think -- I recognize the

2    State had an account that this was a

3    measure of premed -- an indication of

4    premeditation.  He also gave an account

5    of having done this essentially so that

6    he would not be interrupted when he went

7    over there, essentially that he -- he

8    knew he was breaking the Order of

9    Protection.  He didn't want the police

10   called on him because he wanted to speak

11   to his wife.  He also had indicated, and

12   others had indicated corroborating what

13   he said that there were numerous other

14   times that he'd disconnected phone

15   lines, both in that relationship, at

16   home with his mother, I guess, also in

17   another incident with Kim Whittaker, and

18   not only -- it wasn't just Mr. Hall that

19   had a habit of doing this, but this is

20   something that he learned at home from

21   his dad.  His dad would -- when his

22   father and mother would fight, which

23   occurred with some frequency according

24   to Mr. Hall and also his family members,

120

1      it wasn't uncommon for his dad to pull

2      the phone lines so that -- and the

3      children would have to go next door to

4      call the police or something of that

5      nature.

6      Q.      But you as a mental health

7      professional would not have known that

8      absent having a good thorough social

9      history background, would you?

10     A.      That's true.  In this case I

11     don't believe I would've known -- I

12     wouldn't have had the corroboration,

13     certainly.  I don't know that I would've

14     known about it.  I think something else

15     about Mr. Hall -- you know, this is

16     someone with a lot of personality

17     pathology who does not interpret things

18     the way that all the rest of us

19     interpret things and may be motivated to

20     do things for idiosyncratic reasons.

21     You know, I think there are numerous --

22     there are numerous things that indicated

23     that over the course of his life.  That

24     this is not someone who's walking to the

                                          121

1      same -- the beat of the same drummer as

2      the rest of us, and while that generally

3      looks like evidence of premeditation,

4      there seems to be some evidence here

5      that that could be interpreted in

6      another way.

7      Q.      All right.  Do you -- you said

8      in effect that you're not saying that

9      he's insane.

10     A.      That is correct.  Well, I don't

11     know that I -- I don't -- I don't see

12     evidence that would support an insanity

13     defense.

14     Q.      Right.  And you're not saying he

15     was incompetent.

16     A.      I don't believe that he's unable

17     to understand the nature of the

18     proceedings against him or assist in his

19     defense or weigh the consequences of the

20     trial at this point.

21     Q.      If you were hired in 1995, '96,

22     '97, could -- were these technologies

23     and tests, et cetera, available to you

24     that you could've produced this or

122

1      similar testimony --

2      A.      Yes.

3      Q.      -- in 1997?

4      A.      Yes.

5              MR. BUCHANAN:   Thank you.   Pass

6      the witness.

7      **CROSS EXAMINATION**

8      **BY GENERAL EARLS:**

9      Q.      Dr. Caruso, are you a member of

10     any organizations or associations that

11     are primarily made up of members of the

12     Defense Bar?

13     A.      Yes.  I was invited by the

14     Tennessee Association of Criminal

15     Defense Lawyers to join as a non-

16     attorney member and to participate, I

17     guess, in their E-mail string and offer

18     some consultation on those cases.  Sure.

19     I also consult with the prosecutors up

20     at Fort Campbell.

21     Q.      On one case?

22     A.      No.  Several, and I've given

23     lectures to them.

24     Q.      During your private practice?

                                          123

1    A.        Yes.

2    Q.        And you give lectures to the

3    Defense Bar, do you not?

4    A.        I give lectures to anyone who

5    invites me; University of Tennessee at

6    Chattanooga, undergraduate students,

7    graduate students.  Williamson Medical

8    Center has arranged for me to give talks

9    on various things.  Sure.  I mean

10   there's a degree of marketing that, you

11   know, you have to do.

12   Q.        The bulk of your cases come for

13   -- are testifying for the defense.  Is

14   that correct?

15   A.        I've been hired by more criminal

16   defense attorneys than by anyone else

17   over the last two, three years.  It was

18   about even before that, but that's the

19   way it's fallen, yes, and -- although, I

20   think it's somewhat misleading to say

21   the bulk of my testimony is for the

22   defense.  I decided to look at it and it

23   turned out in the first 70 cases I

24   completed I testified 20 times for the

                                        124

1    defense.

2    Q.      Have you ever had to alter your

3    opinion that you gave in Court?

4    A.      No.

5    Q.      You've never taken a stand and

6    sent a letter or --

7    A.      Oh.  Okay.  That's a good point.

8    No.  I didn't alter my opinion.  I was

9    mistaken about a fact in the Paul Reed

10   case.  I had said that Mr. Reed --

11   during a competency evaluation I had

12   said that during one of the interviews

13   he never -- never could remember the

14   charge of attempted murder, when, in

15   fact, he had remembered that initially

16   when -- the first time I asked him the

17   question, and then when I went back and

18   asked him later in the interview about

19   it he couldn't recall it.  I asked him

20   about it numerous times at that point

21   saying, "Well, what's the critical issue

22   in this case," and he wasn't able to

23   remember it.  But I -- I -- I -- you're

24   correct about that.  I misspoke myself a

125

1    moment ago in terms of the issue of did

2    I miss on a fact.  Yes, I did, and when

3    I reviewed my notes I wrote a letter to

4    Judge Blackburn stating such.  I also

5    stated in that that my opinion was not

6    affected.  That I still believed that he

7    -- well, that's irrelevant, but it

8    didn't affect my opinion.  I thought the

9    issue was much -- it was much more

10   important that he was unable to forget

11   that -- that he was unable to remember

12   that than that he remembered it only one

13   time.

14   Q.      Isn't it true that the Judge in

15   that case had to call another expert to

16   come in and give an opinion because you

17   altered your testimony?

18   A.      I don't believe that was the

19   reason why.

20   Q.      He did do that, though, didn't

21   he?

22   A.      She -- she went and got other

23   experts subsequently, yes.  But I

24   believe what her -- as I understood the

                                        126

1    reason was because she felt that I had

2    not been given all relevant information.

3    Q.      Now, if I can sum up your

4    conclusion here that as a result of

5    intoxication, drug use and this

6    Intermittent Explosive Disorder, that's

7    why Mr. Hall committed this act against

8    Billie Jean.  Is that correct?

9    A.      There were a number of factors

10   and I think that principally, as I state

11   in my report, that he was suffering from

12   two severe psychiatric disorders at the

13   time of the alleged offense;

14   Intermittent Explosive Disorder and

15   Major Depression, and that both were

16   linked to a deficit in serotonin

17   metabolism which has been demonstrated

18   here.  I think also that there -- you

19   know, I think certainly intoxication can

20   reduce one's impulse control as well.

21   Q.      Are you qualified to eliminate

22   all of these factors that you've just

23   testified to as a result or a cause of

24   this man's anger?

127

1    A.        Well, I think that that's -- I'm

2    qualified to make -- to do this

3    evaluation I'm qualified to weigh how

4    each of these things factor into it.  I

5    think you're missing the point, though,

6    sir, in terms of eliminate.  I don't

7    think it's eliminate.  You're suggesting

8    that this stuff -- that these things

9    must be mutually exclusive and that they

10   can never co-occur, and I believe that

11   you are mistaken in that assumption.

12   Q.        Let me read to you from the

13   DSM4.

14   A.        Yes.

15   Q.        "The degree of aggressiveness

16   expressed during the episode is grossly

17   out of proportion to any provocation or

18   precipitating psycho social stressor.  A

19   diagnosis of Intermittent Explosive

20   Disorder is made only after other mental

21   disorders that might account for episode

22   of aggressive behavior have been ruled

23   out."

24   A.        Yes.

                                              128

1    Q.         Did you rule these out?

2    A.         I ruled out that these were the

3    -- I ruled out that these were the

4    causes and one of the -- as I said in my

5    direct testimony, one of the things that

6    I looked at was the issue of people with

7    Borderline Personality Disorder and Anti

8    Social Personality Disorder who do not

9    have intermittent explosive -- who do

10   not have low serotonin do not tend to

11   commit these acts. So I think in terms

12   of looking for was it just that he had

13   these conditions that would've accounted

14   for this -- essentially, those

15   conditions alone because of what we know

16   about Mr. Hall's serotonin metabolism

17   would not have accounted for this.

18   Also, this is not carefully planned,

19   premeditated violence, let's say, in the

20   course of -- murder in the course of an

21   armed robbery or something of that

22   nature or a coolly considered plan to

23   murder someone to get the insurance

24   money or something of that nature.

129

1    Q.        Did -- he was drunk.  Is that

2    right?

3    A.        I believe so.

4    Q.        His intoxication contributed to

5    his anger, didn't it?

6    A.        I don't necessarily agree with

7    that statement.  I think that one may be

8    more prone to become more emotional when

9    one is intoxicated.  So I wouldn't say

10   that being drunk causes one to be angry

11   because I've seen people who drank and

12   became elated.  I've seen people who

13   drank and became sad.  So I don't think

14   that you can -- I don't think that

15   there's a direct linkage.  I think that

16   they are associated and I think that

17   someone has a greater tendency to

18   respond more emotionally and have a

19   lesser control over their emotions when

20   they are drinking.

21   Q.        Did Mr. Hall's intoxication have

22   anything to do with his anger?

23   A.        It has -- I believe it made it

24   more likely that he would become more

130

1    angry and have less control over his

2    anger.

3    Q.      So that affected it?

4    A.      Yes.  That would be one affect.

5    Q.      His consumption of marijuana,

6    did that affect his anger?

7    A.      That generally does not.

8    Marijuana has not been associated with -

9    - marijuana intoxication has not been

10   associated with aggressive behavior to

11   the degree that other drugs and alcohol

12   have.

13   Q.      Polysubstance abuse.  What

14   substance are you talking about?

15   A.      He's abused various substances

16   over the years.  If you'll indulge me

17   for a minute.  Now, abuse also like

18   alcohol dependence and marijuana

19   dependence -- that does not necessarily

20   indicate that at that particular time

21   the individual was intoxicated on those

22   substances.  It just means they have had

23   a pattern of using these substances in a

24   maladaptive way.  I don't have anything

131

1    to indicate at the time of the offense

2    he was abusing the following substances,

3    although, he had abused them in the

4    past:  LSD, powder cocaine,

5    amphetamines, Maxalert, Valium and

6    Demerol.

7    Q.        What did you do to rule out

8    Borderline Personality Disorder as

9    contributing to his anger?

10   A.        As I said before, I think that

11   he does meet criteria for Borderline

12   Personality Disorder; however, I think

13   that essentially since we have seen that

14   patients with or individuals with

15   Borderline Personality Disorder who do

16   not have histories of explosive violence

17   don't tend to have the low levels of

18   serotonin.  I felt that the diagnosis of

19   Intermittent Explosive Disorder was

20   justified and did, in fact, account

21   better for this because I've seen plenty

22   of patients with Borderline Personality

23   Disorder who do not engage in extreme

24   impulsive violence.

132

1   Q.      The DSM4 says you've got to rule

2   that out. You're telling us you don't.

3   A.      I -- you are saying the DSM4

4   says you have to rule out Borderline

5   Personality Disorder as the cause of

6   that act, and I'm telling you how I

7   ruled out Borderline Personality

8   Disorder as the cause of that act and

9   also as the cause of numerous other acts

10  this man has engaged in.

11  Q.      And what did you do to -- tell

12  me again what you did to rule that out.

13  A.      What did I -- again, research

14  has shown that low levels of serotonin

15  are not seen in individuals with

16  Borderline and Antisocial Personality

17  Disorder who do not have problems with

18  impulsive explosive violence.

19  Q.      When was that research done?

20  A.      It was presented by Dr. Emil

21  Coccaro at the American Psychiatric

22  Association Convention, I believe, in

23  2001. He's also got a grand rounds on

24  the Internet that he did at the

133

1    University of Chicago that you can look

2    up. Right now I don't know the exact

3    date.  It might've been 2000 or later.

4    Q.      Then that information was not

5    available in 1995.

6    A.      Well, I think in terms of the

7    issue of how do you justify the

8    differentiation here, I don't know --

9    well, I don't know when Dr. Coccaro

10   began his research.  One of the things

11   in looking at patients with Borderline

12   Personality Disorder is we have begun to

13   suspect over the last several decades

14   that these individuals may have

15   biological abnormalities.  There is a

16   great co-occurrence of Borderline

17   Personality Disorder with other

18   psychiatric disorders, and one of the

19   things that we have begun to look at is

20   are there particular things that can

21   help us or, for example, associated

22   conditions, that might guide us in what

23   medications we may want to use or if we

24   should use medications at all.  So I

134

1    don't know when he started doing that.

2    I think certainly we have been using

3    medications in patients with Borderline

4    Personality Disorder and we've been --

5    they've been reserved for patients

6    generally who had problems with loss of

7    control over violent impulses, and I

8    think what we're seeing here is that,

9    you know, the diagnosis certainly

10   existed in 1994 and I think we're

11   certainly seeing here that it's

12   appropriate to make that additional

13   diagnosis.

14   Q.     But the bottom line is he didn't

15   talk about all that until 2001.

16   A.     He did not publish definitive

17   results, but I think it would've been

18   reasonable to pursue.

19   Q.     That is not part of the DSM4, is

20   it?

21   A.     It is not currently part of the

22   DSM4.

23   Q.     It wasn't when this case was

24   tried, was it?

135

1    A.        Well, I think there were some --

2    there's mention in there that there were

3    some links to things such as this, but

4    it wasn't -- it's not yet a definitive

5    diagnostic criteria; however, I think --

6    you know, I think now that we have DNA

7    testing we don't say that, well, DNA

8    testing didn't exist years ago, so let's

9    not consider whether or not it has any

10   bearing on this case.

11   Q.        Well, the fact of the matter is,

12   someone doing research on that in 1995

13   would not have had that information to

14   rely upon, would they?

15   A.        I don't know that -- well, no,

16   that's not necessarily true because one

17   of the things I talked about earlier

18   would have been the linkage of violent

19   suicide victims had the lowest levels of

20   serotonin in their brains.  So it really

21   would've been reasonable to begin

22   looking at this and I think that's

23   probably one of the reasons Dr. Coccaro

24   probably started doing research on this

136

1    issue, although, I haven't spoken to him

2    directly about that, but the linkage

3    between impulsive violence, whether

4    directed at the self or directed at

5    others, has been around for decades.

6    Q.      "Reliable information is lacking

7    but Intermittent Explosive Disorder is

8    apparently rare."  That's what the book

9    said.  Are you saying that the book is

10   wrong?

11   A.      I think it is, apparently, rare,

12   but that doesn't mean that I haven't

13   seen, you know, individuals who have it.

14   I've seen individuals who have

15   Tourette's Syndrome.  That's very rare.

16   Q.      Jon Hall -- it's been testified

17   he left the bar or pub before he

18   committed this act.  Is that correct?

19   A.      Yes.

20           MR. ELLIS:  I'm going to object,

21   Your Honor.  He did not testify at

22   trial.

23           GENERAL EARLS:  I didn't --

24           MR. ELLIS:  That's what you just

137

```
 1    said.  He testified.
 2              GENERAL EARLS:  I said it's been
 3    testified to and that was Dr. Auble.
 4              THE COURT:  Note stand
 5    corrected.  Okay.  I misunderstood him,
 6    too, Mr. Ellis, but he's corrected it
 7    now.  Ask the question.
 8    Q.       Dr. Auble testified that Jon
 9    Hall left the bar before he committed
10    this act.  Is that correct?
11    A.       That's what I heard her say and
12    I -- furthermore, that was his account
13    to me.
14    Q.       Was he in a rage then?
15    A.       Well, what he had told me was he
16    was preoccupied with his relationship
17    with Billie and he grew progressively
18    more depressed as he continued to drink.
19    He was crying over their relationship.
20    So, I think he was certainly upset, but
21    I don't -- I don't believe that he was
22    in a rage.
23    Q.       So the existence of this
24    serotonin level did not cause him to be
```

138

1    in a rage even though he was upset.

2    A.        That's not what I'm saying.

3    Essentially, having a low level of

4    serotonin -- serotonin is a chemical in

5    the brain that has an inhibitory

6    function.  It helps us essentially when

7    -- it helps us to control our impulses.

8    It's one of those -- if we look at -- if

9    we get down to the chemical basis of

10   what helps us control behavior, what's

11   been shown is that individuals who have

12   deficits in serotonin have deficits in

13   impulse control.  It also has been shown

14   that there tends to be a linkage between

15   depression and low serotonin function,

16   but that's not as pronounced as in the

17   folks who have problems with low impulse

18   control.

19   Q.        Proof at trial, according to the

20   transcript, according to the cellmate of

21   Jon Hall, is that he went to that house

22   for the purpose of forcing her to

23   reconcile and, if she refused to

24   reconcile, then he was going to make her

                                                    139

1    feel as helpless as she ~~made him~~ feel.

2    A.      I would agree that that was the

3    testimony.  I -- you know, I'm not the

4    Fact Finder.  I don't know exactly how

5    much credibility to assign to the

6    testimony of a, you know, jailhouse

7    snitch.

8    Q.      Why would you judge his

9    credibility at all?  Is that your

10   function?

11   A.      No.  I didn't and I think I -- I

12   think what I tried to outline in my

13   report also was that there were

14   divergent accounts of the events of that

15   night, and were someone to accept Mr.

16   Hall's account of what happened that

17   night, then these factors would

18   certainly apply.

19   Q.      Okay.  Taking that to be the

20   testimony, doesn't that indicate to you

21   that he had formed the intent to cause

22   her harm prior to this condition

23   occurring?

24   A.      Well, I think that there are a

140

1     number of things.  Again, one must

2     consider the credibility of the source.

3     One must consider the credibility of Mr.

4     Hall -- Mr. Hall's statement at the time

5     that he may have said that, if he said

6     it.  I don't know that he said it.  I

7     know that it's been reported that he

8     said it, but was it something that was

9     said in, you know, in a moment of

10    bravado?  Was he in with someone who he

11    thought was a murderer and he wanted to

12    appear tough?  I don't know necessarily

13    and I didn't examine specifically about

14    that issue, and I think that's something

15    that -- you know, there are various ways

16    of looking at that, but it appeared from

17    the trans -- I think you've done an

18    accurate representation of what I read

19    in the transcript.

20    Q.     Now, what did Mr. Hall tell you

21    about going over there?

22    A.     Could you be a little more

23    specific in the question, actually, sir?

24    Q.     Why did he go over to that

                                            141

1    house?

2    A.      Okay.  He initially called

3    Billie to discuss what they would say to

4    the DHS worker during her next visit.  I

5    think he also certainly wanted to see if

6    he could reconcile with her.

7    Q.      So the jailhouse snitch, as

8    you've labeled him, was pretty accurate.

9    A.      On one of the things I would

10   agree you're correct.

11   Q.      But you would agree at that

12   point, and that being the true proof at

13   trial, that he was capable of

14   premeditating an act of harm against

15   Billie Jean -- Billie.  Is that correct?

16   A.      Hold on.  Could you --

17   Q.      At the point he said I'm going -

18   - he determined to go out and either

19   reconcile or make her feel as helpless

20   as he felt, he was capable of

21   premeditation, was he not?

22   A.      Well, I think the question is

23   premeditation of what?

24   Q.      No, sir.  Was he capable of

                                                142

1    premeditated action?

2            MR. ELLIS:  I'm going to object,

3    Your Honor.  He's trying to answer the

4    question and he's cutting him off.

5            THE COURT:  Overruled.  Go ahead

6    and answer if you can, then he can

7    explain.

8    A.        I think at that point he may

9    have been capable of preplanning.  I

10   think at that point he probably was

11   already feeling somewhat emotional, but

12   if the question is would he have been

13   entirely unable to preplan anything or

14   premeditate anything, I don't know that

15   at that point he was so upset that he

16   would be unable to premeditate; however,

17   again, it comes down to the question of

18   make her feel as helpless as he felt.

19   That's kind of a -- an open ended

20   statement and I don't know exactly how

21   to interpret that.

22   Q.        He was capable of conceiving a

23   plan, was he not?

24   A.        To some degree.

                                         143

1    Q.       And he was capable of acting on

2    that plan, was he not?

3    A.       At that point in time.

4    Q.       Now, he drove out to the house

5    and he disconnected the phone lines.

6    A.       Yes.

7    Q.       What was the purpose of that?

8    A.       Well, I think we have divergent

9    accounts of that.  His account --

10   Q.       What was Jon's account?

11   A.       His account was he disconnected

12   the phone line.  He claimed he knew he

13   was breaking the Restraining Order.  He

14   believes an argument was eminent and did

15   not want the police to be called.

16   Q.       At that point he appreciated the

17   wrongfulness of his conduct, didn't he?

18   A.       In breaking the Restraining

19   Order, yes.

20   Q.       Well --

21   A.       But that doesn't necessarily

22   indicate that at that point he was

23   preplanning murdering her.

24   Q.       Well, it shows he's capable of

1    preplanning, doesn't it?

2    A.      Of some degree of preplanning,

3    yes.

4    Q.      And he was capable of acting

5    upon those plans, wasn't he?

6    A.      At that moment in time in terms

7    of disconnecting the phone lines, yes,

8    although there are divergent accounts of

9    what his motivation for doing that was.

10   Q.      Now, the proof at trial is also

11   that he forced his way into the house.

12   A.      Well, I believe there was some

13   testimony on that, but I think again --

14   as I understood it, Stephanie Lambert

15   said he pushed his way in the door.  As

16   I understood it, Cynthia Lambert said he

17   pushed his way in and then when she was

18   asked specifically on cross whether or

19   not she saw that, she said she didn't

20   remember him pushing his way in.

21   Q.      Now --

22   A.      And I don't know that I saw

23   testimony from Jennifer Lambert on that

24   issue.

                                         145

1    Q.        Assuming that's the testimony,

2    why would he push himself in the house?

3    A.        Well, that's the testimony.  The

4    question is did he push his way in the

5    house?  I think the other thing that

6    needs to be considered again, and

7    looking at this video, one of the things

8    that I wanted to ascertain was were

9    there inconsistencies and discrepancies

10   in what the girls had reported, and I

11   was expecting to see -- if their version

12   was 100 percent accurate, I was

13   expecting to see a sewing machine and

14   some other items in front of the door

15   that had been barricading the door.  I

16   didn't see that.  The sewing machine

17   appeared to be on the other side of the

18   room.  It didn't appear to be disturbed.

19   I don't -- you know, I guess the police

20   could have come around and neatened up,

21   but I don't suspect that's what

22   happened.  So, you know, again, I think

23   that there are -- you know, this is a

24   highly emotional situation for child

146

1    witnesses, and I think their testimony -

2    - you know, when they -- when they

3    witness something horrible I think, you

4    know, there is a difficulty -- these

5    girls are at risk for post-traumatic

6    stress disorder.  One of the things

7    about post-traumatic stress disorder is

8    that there may be, if you look closely

9    at the criteria, there may be some

10    psychogenic amnesia for some of the

11    things that occurred.  So, I believe,

12    you know, there's some testimony that

13    they have, but, again I think that -- I

14    -- you know, as far as I can see, you

15    know, with some discre -- there are some

16    discrepancies.  What weight should be

17    given to the testimony of each is not --

18    you know, I can't say, but I -- you

19    know, it's not a situation where I saw

20    there were no discrepancies and,

21    therefore, I had to say, well, look, you

22    know, the only discrepancy here is what

23    the defendant says and everyone else has

24    this absolutely right.

147

1    Q.        Now, testimony is also that he
2    pushed her chair over, knocked her chair
3    over.
4    A.        I believe that was the
5    testimony.
6    Q.        All right.  Why would he do
7    that?
8    A.        It could be because he was angry
9    at that point.  I'm not sure, you know,
10   whether that certainly occurred, again.
11   Q.        Dr. Auble testified he didn't
12   get angry until he went in the back
13   room.  Do you disagree with that?
14   A.        Well, I think -- he gave an
15   account -- let me check.  He did not
16   give an account of pushing the chair
17   over.  So that's one issue, but to
18   answer your question directly, I -- he
19   described flying into a rage once he was
20   back -- once he was in the back bedroom.
21   Q.        So you have no way of accounting
22   for the testimony or the fact that he
23   pushed her chair over before he flew
24   into a rage?

                                        148

1    A.        I realize that that's something

2    that's been testified to.  I -- you

3    know, once again, it's not something --

4    and again, what I've said in -- said in

5    my report is if you accept his version

6    of the events, and it wasn't in his

7    version of the events.

8    Q.        When he was in the back room

9    what caused him to fly into a rage?

10   A.        I believe she had said to him,

11   "What are you going to do?  Beat me like

12   the last time?" and he flew into a rage

13   and shouted, "Beat you.  I'll show you

14   what a beating is."

15   Q.        Now, that statement, "I will

16   show you what a beating is," doesn't

17   that tell you that he's thinking about

18   what he's about to do?

19   A.        Well, again, I think one of the

20   points that I was making before was that

21   he may recognize what he's doing.

22   That's not an insanity defense.  He

23   recognizes the nature of his behavior.

24   He may even -- he recognizes it's wrong,

149

```
 1    but the capacity to stop himself and the
 2    capacity to control himself isn't there.
 3    I think people shout a lot of indiscreet
 4    things when they are very, very angry.
 5    So I don't see that as being
 6    inconsistent by virtue of he was able to
 7    state what he was doing that he had
 8    anymore control over what he was doing.
 9    Q.       What was his purpose in blocking
10    the door if he was not able to control
11    himself?
12    A.       Okay.  Well, it was my
13    understanding that the assault began to
14    occur close to the doorway.  I think
15    that's where the jewelry box was and it
16    -- it wasn't like he was crossing the
17    room in order to wedge his foot against
18    the door from what I understand.  It was
19    just that he stepped -- he was beating
20    her.  I think she even yelled, "All
21    right.  That's enough."  He replied,
22    "I'll tell you when it's enough."
23    Again, continued beating her.  So, you
24    know, again, the issue comes down to
```

150