# ADDENDUM 1
# Volume 14

W2003-00669-CCA-R3-PD

IN THE CRIMINAL COURT FOR MADISON COUNTY

TENNESSEE, AT JACKSON, DIVISION I


JON DOUGLAS HALL,

      PETITIONER,

VS.                       CASE NO. 96-589

STATE OF TENNESSEE,

      RESPONDENT.


## TRANSCRIPT OF POST CONVICTION RELIEF

## HEARING ON SEPTEMBER 4, 2002

VOLUME TWO OF TWO VOLUMES

THE HONORABLE ROY MORGAN

PRESIDING JUDGE


JUDY LASTER, COURT REPORTER

158 JAYCEE DRIVE, BELLS, TN 38006

(731) 663-9757

ORIGINAL

Vol. 14



FILED

JUL 2 4 2003

Clerk of the Courts
Rec'd By

```
 1     could he control himself, and I think

 2     that's where the Intermittent Explosive

 3     Disorder comes in and the inability to

 4     stop himself from doing what he knows is

 5     wrong.

 6     Q.      The statement in your report is,

 7     "He stated he lost control and began

 8     beating her with his fists numerous

 9     times.  Billie cried out, 'All right.

10     That's enough.'  Hall replied, 'I'll

11     tell you when it's enough.'  He

12     continued beating her severely.  Billie

13     called to the girls for help, but they

14     could not get into the bedroom at first

15     because the defendant held the door shut

16     with his foot."

17     A.      Yes.

18     Q.      Now, why would he do that?

19     A.      While he's beating her?

20     Q.      Yes.

21     A.      I think -- you know, I think

22     again he was beating her and he was --

23     at that point he -- he knew he was

24     beating her.  He just couldn't stop
```

1    himself from beating her and I think
2    also it wasn't the type of thing that
3    required a great deal of planning.  He
4    was there in the doorway.  It wasn't a
5    long reach to put his -- to wedge his
6    foot there and to continue doing what he
7    was doing.  I don't think that that was
8    a great exercise of reflection in
9    judgment.
10   Q.      How long does it take to
11   premeditate murder under the laws of the
12   State of Tennessee?
13   A.      I don't know that it's
14   specified, but I think again it does
15   specify that one must be in a state
16   where they are in the absence of passion
17   and excitement.
18   Q.      He wasn't under so much passion
19   and excitement that he couldn't realize
20   that he needed to block this door, was
21   he?
22   A.      Well, I think, again, it was --
23   you know, you have to think about how
24   sophisticated is the action.  You know,

1    is it a plan to stick your foot out when

2    you're standing there virtually in the

3    doorway to hold the door shut?  I don't

4    know that that's a plan.  Was there some

5    acknowledgement that that would allow

6    him to continue doing it?  Yes.  I guess

7    so.  But in terms of a plan, you know,

8    it's not like -- it's not like the guy -

9    - he's a mechanic.  It's not like the

10   guy showed up with a screwdriver in his

11   pocket and used that weapon on her or

12   something of that nature or, you know,

13   found some other way to keep the door

14   shut.  It was just sticking out his foot

15   real quickly.

16   Q.      The fact remains, he blocked her

17   escape.

18   A.      Yes, or blocked others from

19   coming to her assistance.  Yes.

20   Q.      And that requires reflection and

21   judgment, doesn't it?

22   A.      Again, I think it's a momentary

23   thing, and again, it's a momentary thing

24   done, you know, in the state of passion

153

1    and excitement.

2    Q.      Passion and excitement as he's

3    beating his wife.  The reflection in

4    judgment is, I've got to keep somebody

5    from helping her or her escaping, so I

6    block the door.  Is that not correct?

7    A.      You know, I think as you look at

8    the whole act there is a -- I don't

9    think that he didn't know that he was

10   beating his wife.  I think he knew he

11   was beating his wife.  I think his

12   ability to stop himself from doing that,

13   that's where the breakdown was.  I think

14   again, you know, his ability to control

15   himself -- you know, it's -- again,

16   we're talking about episode -- discreet

17   episodes of violence and it's -- you

18   know, it doesn't mean that one does not

19   have a target for that violence.  I

20   mean, Intermittent Explosive Disorder

21   doesn't say that it is random untargeted

22   violence.

23   Q.      Now, while he's beating her

24   testimony at trial was Jon told Billie,

154

1    "You'll never live to graduate."  Now,

2    Doctor, doesn't that tell you that he

3    knows he's going to kill this woman?

4    A.      Well, again, if, in fact, that's

5    what he -- again, there are divergent

6    accounts of whether he said that or not.

7    If, in fact, that's what he said, there

8    may be some awareness, but again the

9    ability to control himself, I think, is

10   where the Intermittent Explosive

11   Disorder and the other conditions come

12   in that, you know, essentially he wasn't

13   able to control himself from stopping.

14   Q.      He knew he was going to kill

15   her.  Is that correct?

16   A.      I think he knew -- I think he

17   understood the nature of his actions and

18   I think he understood the wrongfulness

19   of his actions.  I've already testified

20   that that was the case.  So, I think

21   that he knew this was a serious assault.

22   Q.      And that's what he wanted to do.

23   A.      I think at the moment he

24   couldn't -- couldn't resist that

155

1    impulse.  So, I guess, in that regard

2    that's what he wanted to do.

3    Q.      Testimony at trial was also that

4    when the girls are trying to get help he

5    made the statement that "If you try to

6    get help I will kill your momma."

7    A.      Uh huh.

8    Q.      Does that not tell you that that

9    is a man who is weighing his options?

10   A.      Well, again, I think -- I think

11   that this is someone who is -- you know,

12   was well aware of the nature of his

13   actions in assaulting her severely.  You

14   know, whether he actually had the intent

15   to carry through that action by making

16   this statement is unclear.  I think it

17   can be looked at either way.  I think

18   again, you know, the whole issue is

19   about the capacity to control his

20   impulses and not the awareness of them.

21   Q.      He was aware of his options, was

22   he not?

23   A.      Well, I don't think that he was

24   coolly considering his various options.

156

1    I think that he had -- you know,

2    essentially because -- essentially,

3    someone with Intermittent Explosive

4    Disorder is someone who's -- for

5    biological reasons has less control of

6    their temper and once, essentially, it

7    has been lit, it's much harder to turn

8    it off.  So I think that, you know, he

9    may have been aware, but in terms of

10   could he control his impulses and could

11   he control his actions, I think that's

12   where the deficit was.

13   Q.      The statement, "If you go for

14   help I will kill your mother," implies

15   that if you do not go for help I will

16   let her live.  Is that correct?

17   A.      Well, it implies that.  Whether

18   he would've been able to control himself

19   anyway I think is open to debate.

20   Q.      And who did he direct that to?

21   A.      I believe to the girls, at least

22   according to the trial transcript.

23   Q.      What was the purpose of

24   directing that statement to the girls?

157

```
 1    A.       I -- I think there -- you know,
 2    there could've been various -- I'd have
 3    to speculate about -- he didn't say that
 4    he said that.  So I don't have anything
 5    directly from him.  You know, again, it
 6    was along the lines of -- I think he --
 7    you know, he certainly -- I think he
 8    recognized he'd gone over the line and
 9    he'd done something wrong when he was
10    doing this.  He still couldn't stop
11    himself and I think similarly he's
12    trying to give himself, you know, an
13    opportunity to get away.
14    Q.       Give himself an opportunity to
15    get away?
16    A.       Yes.
17    Q.       Does that not tell you that he
18    is considering the consequences of his
19    conduct and he's making choices about
20    his conduct?
21    A.       Again, I'm coming back to the
22    issue of I think that he was unable to
23    stop himself because of his emotional
24    state that was related to the conditions
```

158

1    that he has.  I don't think that he was

2    unable to appreciate the nature of his

3    actions and I don't think he was unable

4    to appreciate the wrongfulness of his

5    actions.  The whole issue was in terms

6    of stopping himself in this course of

7    action.  And I think again that we have,

8    you know, the issue of --I --I don't

9    know what was said, but I -- I -- you

10   know, I think it's -- I think you -- I

11   acknowledge you are giving an accurate

12   representation of what was in the

13   transcript.

14   Q.     After he's beating his wife the

15   testimony was that his daughters jumped

16   on him.

17   A.     Yes, sir.

18   Q.     Why didn't he assault them?

19   A.     I think again the issue is he's

20   unable to -- he's unable to control his

21   rage with his wife, and that's who the

22   assault was directed on.

23   Q.     Why was he able to control his

24   rage with his daughters?

1    A.       I think there are a number --

2    well, I don't know necessarily how long

3    the girls held onto him or how

4    successful they were in trying to

5    restrain him.

6    Q.       Doctor --

7    A.       It might've been --

8    Q.       You --

9    A.       Relatively minor.

10   Q.       -- testified that a mere

11   statement from Billie is what set him

12   off.

13   A.       Yes.

14   Q.       Why wouldn't a person jumping on

15   your back and biting on you do the same

16   thing?

17   A.       What if they fell off while you

18   were struggling to get free?

19   Q.       No, sir.  Don't ask questions.

20   You answer them.

21   A.       Okay.

22   Q.       Why --

23   A.       If -- let me answer it this way

24   then.  If you -- if you were focused on

160

```
 1    continuing your assault on somebody and
 2    you broke free of whatever interference
 3    other people -- these small girls --
 4    were trying to introduce, it may be
 5    inconsequential to you in terms of
 6    pursuing the person that you're still
 7    enraged with.
 8    Q.      Now, she escaped, didn't she?
 9    A.      Yes, she did.
10    Q.      He chased her down, didn't he?
11    A.      Yes, sir.
12    Q.      Why?
13    A.      He was still enraged with her
14    and was still assaulting her.  I believe
15    she fled outside and he caught her near
16    the steps, karate chopped her in the
17    neck.  She called out to the girls,
18    "Call 911."  He shouted, "I'll teach you
19    to call 911," and dragged her to the
20    pool and grabbed her around the neck
21    with both hands and held her underwater.
22    So he intended -- I think he was
23    continuing his assault.
24    Q.      "I will teach you --"
```

161

1    A.       He had not regained control of

2    his impulses over attacking her.

3    Q.       "I will teach you to call 911."

4    A.       Uh-huh.

5    Q.       That is consistent with the

6    reason he disconnected the phone box,

7    isn't it?

8    A.       I don't know that -- no.  I

9    think -- I -- I can understand how you

10   would present -- you would present it as

11   such.  His presentation of the same

12   events differs.  He says that he had

13   disconnected the phone lines because he

14   knew he was breaking the Restraining

15   Order.  He believed that the police

16   would be called as a result of that and

17   he wanted an opportunity to try and

18   speak with her.  So his version is that

19   this was not done in preparation for a

20   murder.  I understand that you view it

21   differently.

22   Q.       But the fact is one reason at

23   least by his own confession that he beat

24   her, held her under that water, was

162

1    because she wanted help.

2    A.    I don't know that -- I don't

3    know that he was reasoning that clearly.

4    I think that -- I think he'd lost

5    control and I think he was again unable

6    to stop himself from his assaults on

7    her.   I mean, it seemed like -- in his

8    account to me it seemed as if everything

9    that she said just provoked him further

10   and he just was unable to -- again, once

11   he lost control of his impulses he was

12   unable to get control of them again.

13   Q.    Now, again, the defense at trial

14   was he was acting in a rage as a result

15   of impulse.  Is that right?

16   A.    I believe Dr. Zager had some

17   testimony on that issue.

18   Q.    And, basically, that's what

19   you're telling us.

20   A.    Well, yes, but I don't believe

21   that the defense in any way presented an

22   alternative explanation of why he may

23   have pulled the phone lines.  That was

24   essentially just left pretty much

1    unchallenged that that was evidence of

2    premeditation.  Again, I don't have --

3    I'm not the Fact Finder.  I can't say

4    what it was, but I -- I have -- I have

5    heard from him and from various other

6    people that that may be interpreted

7    differently.

8    Q.        Okay.  But let's assume, Doctor,

9    that he did go out there with the intent

10   to kill her and he has this habit of

11   isolating people he intends to harm.

12   Would he not also unplug the phone line?

13   A.        Well, I think that's -- that's

14   going to require a lot of exposition to

15   answer that, but I think there are

16   various times when he's disconnected

17   phone lines previously where that wasn't

18   the intent, that wasn't the plan.  The

19   fact that other things have proceeded

20   from that action previously doesn't mean

21   that absolutely if he -- if he lets a --

22   were in a cool state of mind that -- in

23   a cool state of mind that he couldn't

24   have done that as part of premeditation

164

1    for that, and, again, that's -- you

2    know, that's not my place.  It's a --

3    it's a Fact Finder interpretation of the

4    meaning of that.

5    Q.       The unplugging of the phone line

6    is consistent with premeditation.

7    A.       In some circumstances the

8    unplugging of the phone line may be

9    viewed as evidence of premeditation.

10   There are alternate explanations for

11   that behavior.

12           GENERAL EARLS:  That's all I

13   have, Your Honor.

14   **RE-DIRECT EXAMINATION**

15   **BY MR. BUCHANAN:**

16   Q.       Doctor, maybe I'm mistaken and

17   if I am I'll be more than happy to admit

18   it.  Mr. Earls said that Dr. Zager at

19   trial said that this was a result of

20   rage.  I don't ever remember that being

21   in the transcript.  Do you know in your

22   notes where that was?

23   A.       Please indulge me for a moment.

24   Q.       Okay.

165

1    A.        Okay.  From my notes and this is

2    not -- these are my notes from her

3    transcript.  She talked about when she

4    saw him, the testing that she did,

5    records she reviewed, that she thought

6    he had depression, that she thought he

7    was alcohol dependent, that she thought

8    he had dependent paranoid personality

9    traits, if not a personality disorder,

10   that there were various psychological

11   stressors including his daughter with

12   cerebral palsy, his unemployment, his

13   wife's unemployment and their subsequent

14   money problems, his brother dying of

15   AIDS, and she viewed this as impulsive

16   action rather than a well thought out

17   plan.  She had a question of alcohol

18   intoxication, but I don't know

19   necessarily beyond that.  So I'm --

20   Q.        No rage that you know of.

21   A.        I'm sorry?

22   Q.        No -- not use of the word rage,

23   was there?

24   A.        I can't confirm that that was

                                              166

1    part of her testimony. I don't have --

2    I don't -- I didn't record that in my

3    notes.

4    Q.       Can we agree that she certainly

5    didn't put forth a diagnosis of IED?

6    A.       Yes, we may.

7    Q.       Referring back to that portion

8    of the cross-examination that had to do

9    with Jon allegedly saying, "Make her

10   feel as helpless as he did." Now, for

11   whatever he was, he was alive, was he

12   not, when he said that?

13   A.       Yes.

14   Q.       Is there anything that you in

15   your evaluation of Jon that would tend

16   to make you believe in any way that if

17   Jon wanted to say I want to go kill that

18   so-and-so or I want to do harm, that he

19   has any trouble verbalizing that?

20   A.       I guess not.

21   Q.       Did he express surprise to you

22   that she had, in fact, died?

23   A.       Yes. He had and I believe that

24   that was also recorded in -- it's

167

1    escaping me now.  It was not the first

2    time that I'd read that he was surprised

3    about that.  I think he might've

4    expressed surprise when he learned about

5    it in Texas.

6    Q.      If you're planning to

7    premeditatedly kill someone and you go

8    out and you beat them and then later on

9    you're surprised that they're dead, is

10   that some indication that maybe that

11   wasn't part of your plan to begin with?

12   A.      That may be.

13   Q.      Mr. Earls asked you how he could

14   control any rage at his daughters.  Was

15   there ever any indication that he had

16   any rage at his daughters?

17   A.      I don't believe so.

18   Q.      In fact, what did you find as

19   far as Mr. Hall's feelings towards his

20   daughters, step and natural daughters?

21   A.      He expressed a lot of affection

22   for his step and natural daughters.

23   Q.      Did you find anything in the

24   social history or anything about your

168

1    interview that would tend to make you

2    think that he had ever had any ill will

3    toward his daughters?

4    A.        No.  I did not.

5    Q.        As far as -- back to the

6    premeditation, you had mentioned

7    something about he could avail himself

8    of a screwdriver.  Is there anything in

9    your evaluation that would tend to make

10   you believe that if Mr. Hall, in fact,

11   set about to actually do a killing --

12   and I'm not talking about after the rage

13   has taken him over.  I'm talking about

14   hours before or even minutes before he

15   came to the house -- that he could not

16   affect a plan such as that, i.e., get a

17   weapon and do the sorts of things a

18   murderer normally does?

19   A.        There was nothing to indicate

20   that he was unable to do those kinds of

21   things.

22           MR. BUCHANAN:  No further

23   questions.

24           GENERAL EARLS:  Nothing further,

169

1    Your Honor.

2             (WITNESS EXCUSED.)

3                    * * *

4             **(WHEREUPON, a recess was**

5             **had, after which the**

6             **following proceedings**

7             **were had:)**

8             **DIANA PEARSON** was called and

9    having been duly sworn was examined and

10   testified as follows:

11   **DIRECT EXAMINATION**

12   **BY MR. ELLIS:**

13   Q.      For the record, would you please

14   state your full name for the Court?

15   A.      Margie Diana Pearson.

16   Q.      Ms. Pearson, do you remember

17   being in a bar on July 29th, 1994?

18   A.      Yes, somewhat.

19   Q.      Do you remember this man sitting

20   right here?  (Indicating.)

21   A.      Very little.

22   Q.      Do you remember drinking with

23   this man at that time?

24   A.      Very little.

170

1    Q.        And did you ever remember this

2    man saying he was going to kill his

3    wife?

4    A.        Not that I can remember.

5    Q.        Were you -- is there something

6    wrong with your hearing --

7    A.        No.

8    Q.        -- that would've prevented you

9    from hearing that?

10   A.        No.

11            MR. ELLIS:  That's all I've got,

12   Your Honor.

13            THE COURT:  Any questions from

14   the State?

15            GENERAL EARLS:  Could I have a

16   second, Your Honor?

17            THE COURT:  Yes.

18            GENERAL EARLS:  I don't have any

19   questions.

20            (WITNESS EXCUSED.)

21                        *  *  *

22            **ALICE PEARSON** was called and

23   having been duly sworn was examined and

24   testified as follows:

171

1    **DIRECT EXAMINATION**

2    **BY MR. ELLIS:**

3    Q.      For the record, would you please

4    state your name for the Court?

5    A.      Alice Jo Pearson.

6    Q.      Ms. Pearson, do you recognize

7    this man right here?  (Indicating.)

8    A.      Not really.

9    Q.      But you've seen him before,

10   though.  Right?

11   A.      I -- yes.

12   Q.      Do you remember being with him

13   in a bar on July 29th, 1994?

14   A.      Not the exact date.  I just know

15   I was at a bar -- at the bar.  The exact

16   date I cannot tell you because I really

17   don't know.

18   Q.      Okay.  But you remember being at

19   a bar --

20   A.      Uh-huh.

21   Q.      -- and having some drinks with

22   him?

23   A.      Uh.

24   Q.      Do you ever remember him saying

172

1    he was going to kill his wife?

2    A.        Huh-uh.

3    Q.        Is there anything wrong with

4    your hearing that if he'd have said it

5    outloud in the bar that you wouldn't

6    have been able to hear it?

7    A.        I -- yeah.  I would've heared

8    (sic) it if he'd said it.

9    Q.        And you never heard that?

10   A.        I never heard it.

11             MR. ELLIS:  That's all I've got.

12   **CROSS EXAMINATION**

13   **BY GENERAL EARLS:**

14   Q.        How much had you had to drink?

15   A.        About -- I guess I'd drunk about

16   three beers altogether that night.

17   About two or three beers.

18   Q.        Were you paying that much

19   attention to him?

20   A.        Well, we was sitting there

21   talking.

22             GENERAL EARLS:  That's all I

23   have, Your Honor.

24             (WITNESS EXCUSED.)

173

1                     * * *

2              (WHEREUPON, the noon

3              break was had, after

4              which the following

5              proceedings were had:)

6              JON DOUGLAS HALL was called and

7    having been duly sworn was examined and

8    testified as follows:

9    DIRECT EXAMINATION

10   BY MR. BUCHANAN:

11   Q.       Would you state your name for

12   the record, please, sir?

13   A.       Jon Douglas Hall.

14   Q.       Are you the same Jon Douglas

15   Hall that is the Petitioner in the cause

16   of action that we're here before the

17   Court on?

18   A.       Yes.

19   Q.       Mr. Hall, I want to ask you some

20   questions.  You were present when Mr.

21   Mayo and Mr. Ford testified, were you

22   not?

23   A.       On the 15th of May this year?

24   Q.       Yes, sir.

1   A.        Yes, sir.

2   Q.        Except for one brief moment

3   you've been present the whole time we've

4   had this hearing, have you not?

5   A.        Other than maybe a second or two

6   outside before the proceedings began.

7   Q.        Right.  I just want to make it

8   clear for the record, you've been here

9   for this proceeding -- for the Post-

10  Conviction Hearing you've been present

11  the whole time.

12  A.        From everything I read in that

13  first part of the transcript, yes, sir,

14  that's already made for the record.

15  Q.        All right.  Did you hear -- so

16  you heard Mr. Ford and Mr. Mayo testify?

17  A.        Yes.

18  Q.        They weren't the only people

19  that represented you, were they?

20  A.        No.  They were Number 7 and

21  Number 8.

22  Q.        Just briefly tell the Court the

23  chronology of lawyers you had from the

24  beginning to the trial where you ended

175

1    up with Mr. Ford and Mr. Mayo.  Who all

2    did you have?

3    A.      On August 22nd, 1994 I was in a

4    holding cell in the Henderson County

5    Jail and I was in there with a group of

6    inmates and I saw these two guys talking

7    to Frank Booth, which was the guy that

8    helped extradite me from Texas to

9    Tennessee, and --

10    Q.      Well, if I can -- and I don't

11    mean to cut you off.  I'm not doing

12    that, but I do -- really all my question

13    is is could you give the Judge, you

14    know, John Doe and Mary Roe first, and

15    then I lost Mary Roe and John Doe and

16    got -- that's what I'm looking for is a

17    kind of a chronology like that.

18    A.      Okay.  Jack Hinson and Frank

19    Stanfill were appointed.  I heard that

20    Frank Stanfill never had any in court

21    experience at the time, and that Jack

22    Hinson was the Public Defender at the

23    time, but he was going into private

24    practice and Frank Stanfill was just

176

1    taking over that position.

2    Q.       Then who did you get next?

3    A.       Well, the next time I went into

4    court I went in for my Grand Jury

5    appearance and they asked me did I have

6    an attorney and I had not spoken to my

7    attorney and the people at the

8    courthouse told me that Jack Hinson was

9    no longer with the Public Defender's

10   Office.  So the Judge asked me, you

11   know, "Do you plead guilty or not

12   guilty," and --

13   Q.       Mr. Hall, again, I --

14   A.       -- and I said no and he said --

15   or he asked me if my attorneys were

16   present and I said --

17   Q.       Mr. Hall --

18   A.       -- "No.  I don't know who they

19   are."

20   Q.       Again, we'll get to all that

21   maybe in a minute.  I just want you to

22   tell the Judge what lawyers you had --

23   A.       Okay. The next --

24   Q.       -- in the order you had them.

1    That's -- for right now.

2    A.      Okay.  After Frank Stanfill and

3    Jack Hinson I went through George Googe

4    and Steven Spracher.

5    Q.      All right.

6    A.      And after that I had Carthel

7    Smith and Mike Mosier.

8    Q.      All right.

9    A.      And then I went through my trial

10   attorneys, Jesse Ford and Clayton Mayo.

11   Q.      All right.

12   A.      And then I had on direct appeal

13   at the Court of Criminal Appeals level -

14   - I had Mark Donahoe and Scott

15   Petrowski.

16   Q.      All right.  Now, I'm primarily

17   interested in everybody -- when did your

18   -- your brother in Bell County, Texas,

19   what was his name?

20   A.      Jeffery Franklin Hall.

21   Q.      Jeffery Franklin Hall, and he

22   was suffering what at the time of his

23   death?

24   A.      AIDS.

178

1    Q.        And did -- had he been suffering

2    that for a while?

3    A.        He told me, I guess, it was

4    either '92 or -- he stopped by when I

5    first moved to Tennessee in 1990 and

6    told me that he had AIDS.

7    Q.        And back in the early '90s it

8    was pretty much considered to be a fatal

9    disease like malignant cancer, was it

10   not?

11   A.        I assumed everybody knew that

12   once they said that you had AIDS that

13   you were destined to die.  I mean,

14   that's my belief.  They didn't know of

15   any cure.

16   Q.        So you knew that Jeffery was in

17   that sad shape as of August of 1994.

18   A.        In August of '94?

19   Q.        Yes.

20   A.        Back to my preliminary hearing.

21   Yes, I knew he was sick.

22   Q.        Okay.  Just listen to my

23   question and I think if you listen to it

24   closely you'll get the gest of what I'm

179

1    asking you.  So, at that time did you

2    make any attorneys that you had aware of

3    the fact that you had a brother that

4    needed to be talked to because he was in

5    danger of dying sometime before maybe

6    your trial got started?

7    A.       Yes.  I talked to 'em.

8    Q.       And did you make all your

9    attorneys aware of the fact that this

10   brother needed to be talked to before he

11   died?

12   A.       When I talked to my attorneys --

13   like I said, I talked to them five

14   minutes before the Preliminary Hearing.

15   A couple of days after my preliminary

16   hearing Frank Stanfill come to the

17   Henderson County Jail and had a

18   conference with me and he took notes,

19   and I've seen those notes in some of the

20   attorney files that I've reviewed.

21   Q.       Okay.  Let me back up.  Hold on,

22   Mr. Hall, let me just -- 'cause I really

23   would like to make this orderly, if we

24   could.  My question is, did you make all

1    of your attorneys -- from August 1994,

2    did you make all of them aware that you

3    had a brother down in Texas that needed

4    to be talked to and that he was in not

5    maybe eminent fear of dying but

6    certainly he could die before trial came

7    to pass?

8    A.    I remember speaking to Frank

9    Stanfill about the fact that I was in

10    Texas and Jeff, but I'm not specific of

11    whether or not I told Frank Stanfill and

12    Jack Hinson -- before Frank Stanfill

13    ever got done, I did eventually tell

14    him, yes.  But I don't mean -- on that

15    first occasion I talked to 'em I don't

16    know if I told 'em that he was dying of

17    AIDS.

18    Q.    Mr. Hall, try real hard to

19    listen to my question because we can

20    move a lot faster if you will and I

21    don't want to keep you from saying

22    something you need to say, but, on the

23    other hand, let's wait until the end and

24    we can get back to what you need to say

1    and try to follow what I'm asking you.

2           My only question is, did you

3    make all your attorney -- I don't need

4    to know when you made them aware, but

5    did you make all your attorneys aware at

6    some point that you had a brother in

7    Bell County, Texas that needed to be

8    interviewed because his health was such

9    that he might be dead by the time the

10   trial came up?

11   A.       I'm absolutely sure that I made

12   George Googe and Steven Spracher aware

13   of it before he died, and I'm pretty

14   sure that I made Frank Stanfill aware of

15   it.

16          GENERAL EARLS:  Your Honor, this

17   issue has been litigated at trial and on

18   appeal and --

19          MR. BUCHANAN:  Not ineffective

20   assistance.

21          THE COURT:  I'm going to let it

22   be asked and answered and I do

23   appreciate Counsel directing the

24   Defendant as he's been doing to try to

182

1    answer the question and focus in in his

2    response -- in response to the question.

3            MR. BUCHANAN:  Thank you Judge.

4    We're going to try to do just that.

5    Q.      All right.  So, do you know of

6    any reason why your brother could not

7    have had a statement taken from him or a

8    deposition taken before he died?

9    A.      No.  TBI Agent Brian Byrd took

10   statements of him when he was down in

11   Texas and stuff.

12   Q.      Really, all I needed was -- all

13   right.  Did you, in fact, have to go to

14   trial without the benefit of a statement

15   from him?

16   A.      Yes.

17   Q.      Okay.

18   A.      Except for the one in that

19   Affidavit which I -- which I had sent to

20   him and he provided.

21   Q.      I understand that.  I understand

22   that, but I think we've already gone

23   over that, that that statement's

24   probably not in any kind of admissible

```
 1    form.  So please, again, just listen to
 2    my question and I think we can move
 3    along a little better.
 4              All right.  Did you at anytime
 5    waive your right to a Preliminary
 6    Hearing?  Tell any of your lawyers at
 7    anytime I don't need a Preliminary
 8    Hearing.  I don't want a Preliminary
 9    Hearing?
10    A.        No, sir.
11    Q.        Did you at anytime tell your
12    lawyers that you wanted to change venue
13    to Madison County?
14    A.        No, sir.
15    Q.        Did you, in fact, tell them that
16    you wanted any motion filed on your
17    behalf to be withdrawn for a change of
18    venue?
19    A.        There was motions filed previous
20    by attorneys and they were -- they --
21    they were dismissed, and then all of a
22    sudden it come up that Mr. Ford filed a
23    motion to have me transferred to the
24    Penal Farm to prepare for the case.
```

184

1    This was on, I believe, it was March

2    9th, 1996, and I told Mr. Ford and Mr.

3    Mayo, because they were sitting beside

4    me, I said, "What are we doing here?"  I

5    said, "I do not want a trial here," and

6    I told them that Mr. Helms was a very

7    well liked and respected businessman up

8    there in Henderson County.  I told 'em

9    that the Jackson Sun newspaper was

10   creating all the bad publicity in my

11   case and --

12   Q.      Well, hold on a minute.

13   A.      -- and that Billie had worked at

14   the ambulance service --

15   Q.      Hold on a minute.

16   A.      -- in Jackson.

17   Q.      Listen to my question again

18   because you're kind of getting far

19   afield again.  Did you ever give your

20   attorneys any permission to agree to

21   change venue to Madison County?

22   A.      No, sir.

23   Q.      Did you, in fact, ask them that

24   if a motion had been filed by some other

185

1    attorney on your behalf to please

2    abandon that motion?

3    A.      Yes.

4    Q.      Were you ever present at a

5    change of venue hearing?

6    A.      No, sir.  I wasn't advised of a

7    change of venue until January 21st,

8    1997.  That's the first that I was told

9    that -- that they had granted a change

10   of venue and I told Mr. Mayo, I said,

11   "What --."  I told him to get it changed

12   back.  He come back the next week and

13   told me that, "Well, the Judge is

14   retiring.  He don't care.  He's not

15   changing it back."  This, that and the

16   other, and --

17   Q.      Okay.

18   A.      -- I told 'em I was going to get

19   with Whit and he told me --

20   Q.      Mr. Hall.  Mr. Hall.  Let -- I'm

21   trying to keep this just as relevant as

22   possible.  Please listen to what I've

23   got to say because I know you want to

24   put a lot of fluff in, Mr. Hall, but the

186

1    truth of the matter is, there's kind of

2    some ultimate things the Judge needs to

3    know, and one of them is did you agree

4    to this change of venue?  Yes or no?

5    A.        No, sir.

6    Q.        And did you attempt to get your

7    attorneys to withdraw any motion that

8    had been filed on your behalf?

9    A.        I told Clay Mayo that I didn't

10   want one, and then on January 27th--

11   Q.        Okay.

12   A.        -- Mr. Mayo came and told me --

13   Q.        All right.

14   A.        -- that the Judge wasn't going

15   to do it.

16   Q.        Okay.  Then, are you telling

17   this Court that the first time you heard

18   the venue had been changed that it

19   already had been changed without you

20   being at any hearing?

21   A.        Yes, sir.

22   Q.        By the way, were you intoxicated

23   on the night that this occurred?

24   A.        Yes.

187

1    Q.       Were the beer bottles that we

2    saw in the video, were they beers that

3    you had drank?

4    A.       They were beers that I had

5    purchased at a gas station and I think

6    the Bud Lite I purchased at the bar.

7    Q.       But both of the empties that

8    were shown in that video were yours?

9    A.       The empties?

10   Q.       Yes.

11   A.       There was two fresh ones in the

12   bag --

13   Q.       I understand the bag.

14   A.       -- but, yes.  Yes.  All the beer

15   bottles were mine.  I don't remember

16   Billie having anything to drink that

17   night.

18   Q.       How many beers would you say you

19   had at the bar before you come over to

20   the house?

21   A.       Well, see it started when I got

22   off work.  I picked up a six pack of

23   Bush Ponies and I got -- I filled my gas

24   tank up and there was a woman in front

188

1   of me and she was getting a money order

2   and I thought, "Gee, I need to get a

3   money order to pay Billie half the money

4   for child support." So I purchased the

5   money order.

6   Q.      If you had testified at your

7   trial would you have testified that

8   money order -- you legitimately bought

9   that to give to her not intending to

10  kill her?

11  A.      No. I did not intend to use

12  that as a key to get into my own home --

13  Q.      All right.

14  A.      -- or into Billie like the State

15  had argued at trial.

16  Q.      I understand. Like my other

17  question, though, and I'm going to get

18  back to my other question. Just give me

19  an idea, roughly, how many beers you

20  think you had before you got home that

21  night?

22  A.      Well, after I purchased that I

23  drove out to the house.

24  Q.      No. No, not really, honest to

189

1    goodness. Just tell me how many beers

2    you think you had before you got to the

3    house?

4    A.      I drank that six pack of Bush.

5    Okay.  And I went out to the house.

6    Billie wasn't home, so I went back to

7    Lexington.  I said, "Well, she's not

8    here.  I can't work on the car."  So I

9    went back to Jackie and Darlene's and I

10   guess I had some more beers there after

11   I -- I ended up drinking that six pack.

12   Q.      So you had six or more beers by

13   the time you got to Billie that night?

14   A.      Six more beers?

15   Q.      Six or more beers.

16   A.      This is before I even started at

17   the bar.  These were just 7-ounce Pony

18   Bush bottles that I -- before I went

19   out.  I drank them before I even went to

20   the three bars that I visited that

21   night.

22   Q.      Then listen to my question

23   again.  What, roughly -- how many beers,

24   and if you would count two Ponies as a

190

1   beer. Okay?  Because they're 7-ounces.

2   How many beers do you roughly think you

3   had by the time you saw Billie that

4   night?

5   A.    Like I said, I drank that six

6   pack, then I had --

7   Q.    No.  No.  No.  Please.  I'm

8   asking you, add it up in your head and

9   think about it and give me a number,

10  roughly.

11  A.    I estimated that I had about

12  three or four beers at each bar, and

13  those were full 12-ounce bottles.

14  Q.    And there were three bars?

15  A.    There was three bars.

16  Q.    So we're talking 9 to 12 beers.

17  Correct?

18  A.    Plus the six pack that I had

19  bought, plus the other six pack that I

20  bought that was out at Billie's -- that

21  other six pack of Bush Ponies.

22  Q.    So you had a lot of beer.

23  A.    I had enough beer.  That wasn't

24  a lot.

191

1      Q.        During your case did your

2      attorneys -- after the State put their

3      evidence on did they ever have a

4      conversation with you about the pros and

5      cons of you testifying?

6      A.        They did a mock examination of

7      me and then they told me that they

8      didn't feel that I should testify.

9      Q.        And what was your position in

10     the matter?

11     A.        Well, I didn't trust them, and

12     so, I just told them don't prepare my

13     testimony in light of my testimony.

14     That way that you can get all the

15     witnesses that you need to make the

16     case.

17     Q.        Did you want to testify?

18     A.        I wanted to testify to a

19     Henderson County jury.

20     Q.        Mr. Hall, really, I seriously

21     ask you one more time, listen to my

22     questions.  Assuming that you're in a

23     courtroom where you don't want to be,

24     but you're there, did you want to

192

1    testify at the close of the State's

2    evidence and before your Counsel rested?

3    A.       Yes, I did.

4    Q.       Did you make that known to your

5    attorneys?

6    A.       Yes, I did.

7    Q.       And what did they tell you?

8    A.       That was part of the record.  I

9    -- I was also arguing an issue about the

10   fact that the flag had a gold fringe and

11   an eagle on it, and I told 'em that I

12   felt that it was a -- a --

13   representative of a war court and,

14   therefore, I felt that that's how they

15   were suspending my rights, like my right

16   to be present at a change of venue

17   hearing.

18   Q.       Okay.  You heard Mr. Mayo

19   testify that you objected to being

20   evaluated by a psychiatrist.  Did you

21   ever object to your attorneys to being

22   evaluated by a psychiatrist?

23   A.       No, and if you look at the

24   Middle Tennessee Mental Health records,

193

1    they said that I got upset whenever they

2    couldn't find a -- that I met the

3    insanity defense.

4    Q.        Have you -- I have, and I think

5    the record's pretty clear, hired Dr.

6    Salomon, hired Dr. Auble, hired Dr.

7    Caruso.  Have you ever failed to

8    cooperate with them coming to see you

9    about your mental health?

10    A.        I have not failed to cooperate

11    with anybody that's come to visit me

12    about this case in any capacity.

13    Q.        How many times did Mr. Mayo and

14    Mr. Ford come see you while you were in

15    Nashville?

16    A.        He come and visited me twice.

17    Q.        Two times during the entire time

18    they represented you?

19    A.        Yeah.  They -- they -- they were

20    basically appointed February 9th, 1996

21    and I went to trial February 3rd, 1997.

22    Q.        They came to Nashville two times

23    in a year?

24    A.        I was transferred to Madison

194

1    County in December, but up until

2    December they only visited me twice in

3    Nashville.

4    Q.        How many times did they visit

5    you here in Madison County?

6    A.        I'm roughly guesstimatting, but

7    I think both of 'em probably visited me

8    separately maybe five times each.

9    Q.        Did you -- were you ever

10   explained by your attorneys what the

11   theory of their defense was?

12   A.        No.  I'm still dumbfounded at

13   what their defense theory was now.

14   Q.        Well, did you know that it was

15   to hope for a lesser-included offense?

16   A.        Yes.

17   Q.        Did you -- would you have been

18   in a position to provide them, had they

19   asked, with prior instances of Billie

20   having assaulted you?

21   A.        Yes.

22   Q.        Do you know why that was not

23   brought up by them in the trial?  Do you

24   know of any reason why it was not?

195

1    A.        The attorneys told me that they

2    didn't want anything negative said about

3    Billie.

4    Q.        How about the intoxication?  You

5    heard the ladies testify earlier here

6    today and you said you were intoxicated.

7    Did you let them know that you were

8    intoxicated?

9    A.        The ladies?

10   Q.        The two ladies that came up here

11   earlier today and at least said that

12   there was some drinking going on there

13   that night.

14   A.        The Pearsons?

15   Q.        Yes.

16   A.        Yeah.  I was drinking with them

17   that night.

18   Q.        I understand that, but they

19   didn't testify at your trial, did they?

20   A.        I believe they were there, but

21   they were -- had been subpoenaed.  They

22   showed up and they didn't put 'em on.

23   Q.        I understand that.  So even

24   though they were there your attorneys --

196

1    and could have testified that they had

2    seen you drinking that night, do you

3    know why the attorneys did not call

4    them?

5    A.      I have no reason -- they were --

6    they -- they closed the case and I

7    objected to them closing the case.  I

8    thought that there was more witnesses.

9    They let me believe that there was going

10   to be a whole lot more witnesses.  I

11   thought my family was going to be

12   testifying at the guilt phase and all.

13   Q.      Did you -- you heard Mr. Ford

14   say that you rejected any mental defect

15   mitigation strategy.  Do you remember

16   rejecting any mental defect mitigation

17   strategy?

18   A.      No, I didn't.

19   Q.      If you had been --

20   A.      I have a note where I took phone

21   records where I had talked to Mr. Mayo

22   and -- no, it was Mr. Ford.  Mr. Ford

23   told me that I needed to leave the

24   psychs alone.  They couldn't help me.

197

1    Q.       My question is if you had been

2    presented a mental defect mitigation

3    strategy of some sort, do you know if

4    any reason why you would've objected to

5    that -- to the use of that?

6    A.       I always felt that I went insane

7    because of what happened.  That's the

8    only thing that explains what happened

9    to my wife.

10   Q.       You -- we presented evidence

11   that you're a -- you've done some pretty

12   good work as a father.  Do you know of

13   any reason why the attorneys would not

14   have put on evidence that you were a

15   good father?  That you've nursed that

16   one child that wasn't even yours by

17   blood, had cystic fibrosis and things

18   like that?

19   A.       Jessica is my baby --

20   Q.       I'm sorry.  You're right.  Do

21   you know of any --

22   A.       -- and has cerebral palsy.

23   Q.       Yeah.  Do you know of any reason

24   why that they would not put that on

198

1    showing that -- your care of that child?

2    A.      I have no -- I have no reason.

3    I -- I -- I -- they -- they weren't

4    letting me know anything hardly.  I

5    don't know why they did what they did.

6    Q.      Okay.  They never sat down and

7    said, Jon, we know that you've done some

8    good work as a father and as a

9    stepfather, but we're just going to --

10   for some reason we're not going to use

11   that.  Did they ever have any kind of

12   conversation with you like that?

13   A.      That they're not going to

14   present that type of evidence?

15   Q.      Yes.

16   A.      No.  They never told me that

17   they weren't going to present that type

18   of evidence.

19   Q.      If they had come to you and

20   said, we have evidence of you being a

21   good father and we have pictures of you

22   being a good father, would you have

23   objected to those pictures being used in

24   the punishment or the guilt or innocence

199

1    phase of the trial?

2    A.    I wouldn't have objected and I'd

3    actually given pictures to George Googe

4    and Steven Spracher and I don't know if

5    they didn't get passed down to

6    Ford/Mayo, but I had given them pictures

7    and they had talked about making prints

8    and stuff with the pictures.

9    Q.    In your trial no one even put in

10   any pictures showing you being a daddy,

11   did they?

12   A.    My children even denied that I

13   took care of 'em.

14   Q.    Let's get back to answering my

15   questions again.  There was no pictures

16   put in of you being -- in the act of

17   being a daddy like -- similar to the

18   videotape we put in earlier.  There was

19   nothing like that in your trial, was

20   there?

21   A.    No, there wasn't.

22   Q.    In fact, the only pictures that

23   were in evidence were those pictures of

24   Billie in a state of being beat.  Is

1    that correct as far as pictures?

2    A.        That's correct.  Wait.  Wait.

3    Wait.  There was the crime scene

4    pictures.

5    Q.        Well, yeah.  Other than the

6    crime scene pictures.  All right.  Mr.

7    Hall, do you feel like that you received

8    adequate representation at your trial

9    both before and after?

10   A.        Before and after?  No.  They

11   wouldn't -- anything I said they

12   disregarded.  They had an animosity

13   toward me and, you know, I -- I

14   basically -- I couldn't deal with 'em.

15   Q.        Did you tell them that you had

16   brothers -- we've already talked about

17   the brother from Belton, but did you

18   talk to them about the other sisters

19   that you had and other brother that you

20   had that they could talk to?  Did you

21   make them aware that those people were

22   out there to be talked to?

23   A.        I believe they did talk to all

24   my -- three of my sisters.  The one that

201

```
 1    come to trial and they were at trial.

 2    Q.      I understand when they came to

 3    trial, but I'm talking about --

 4    A.      But my brothers I don't think

 5    they talked to.

 6    Q.      I'm talking about before trial.

 7    I'm talking about -- I'm not talking

 8    about coming and talking to you right

 9    before you go on the stand at

10    punishment.  I'm talking about way ahead

11    of time.

12    A.      Well, I can't -- I can't testify

13    when they talked to 'em because I wasn't

14    there.

15    Q.      Okay.

16    A.      I'd heard --

17    Q.      No. No.

18    A.      -- whenever my sister --

19    Q.      That's okay.

20    A.      -- talked with me --

21    Q.      That's all right.

22    A.      -- and told me that she had --

23    Q.      It's not --

24    A.      -- heard things --
```

1    Q.    What you heard ~~is~~ hearsay.

2    Okay.  If you don't know, you don't know

3    and that's all right.

4    A.    I wasn't there.

5    Q.    All right.  Did they ever

6    produce to you any evidence that they

7    had talked to these brothers and sisters

8    pre-trial, and by that I mean, let's

9    say, middle of 1996?

10   A.    They showed me Glori Shettles'

11   phone interviews.

12   Q.    They showed Glori Shettles.  Did

13   they ever show you any statement they

14   had taken or any -- and any indication

15   of times that they had talked to anybody

16   other than Cheryl Arbogast?

17   A.    No.

18   Q.    Okay.  Do you feel like you were

19   ready to go to trial in 1997 when you

20   went to trial?

21   A.    Me, myself, I was going to

22   testify and I was prepared way long

23   before they ever went to trial.

24   Q.    Well, when I say you --

203

1    A.        I wanted a speedy trial.

2    Q.        Well, my apologies because I

3    wasn't real clear on that.  When I say

4    you were ready, did you feel like your

5    team was ready?

6    A.        They didn't spend much time with

7    me at all to get to know the facts.

8    Q.        Do you ever think -- did you --

9    were you ever made aware of any real

10   strategy they had to defend you?

11   A.        Other than to -- that for some

12   reason the jury would think that it was

13   a lesser-included offense.  Other than

14   that, I have no idea what their defense

15   strategy is.

16   Q.        Well, let me ask you that.  Did

17   they ever sit down and say anything like

18   this?  Jon, we're going go for a lesser-

19   included offense.  To do that we've got

20   to have some evidence.  Now here's what

21   we're going to put on to try to show

22   that you're guilty of murder two or

23   manslaughter.  Did they ever have any

24   kind of conversations similar to that?

204

```
 1    A.        No.  They didn't tell me what I

 2    had needed to present.

 3    Q.        If they had have had a

 4    conversation with you like that, would

 5    you have been willing to cooperate with

 6    them and give them the names of people

 7    that could help out to show your past

 8    experiences and your past behaviors?

 9    A.        I tried to speak to them on many

10    occa -- on every occasion about anything

11    that they wanted to talk to.  Any

12    questions that they'd ask I tried to get

13    out what I thought that they were

14    asking.

15    Q.        Would you tell the Court --

16    A.        Despite the animosity that they

17    showed towards me.

18    Q.        I understand that.  My question

19    is this, did -- what do you feel like

20    personally is the biggest failure of

21    your attorneys at trial time?

22    A.        They weren't keeping me

23    informed.  They weren't showing me

24    documents.  I was complaining about my
```

1    rights at a Preliminary Hearing, how I

2    had ineffective assistance of counsel

3    and they just basically closed their

4    ears and turned their backs on me.

5    Q.       Like they did getting your

6    brother's statement down there in

7    Belton?

8    A.       They didn't even get one from

9    him.

10   Q.       That's what I'm saying.  I mean,

11   did they show it as much attention as

12   they showed that?

13   A.       Well, since they talked to me

14   that shows a small amount of initiative,

15   but not going down to talk to my

16   brother, that shows no initiative at

17   all.

18   Q.       Did you try to call them from

19   the penitentiary and from the jail and

20   ever have your phone calls rejected by

21   them?

22   A.       On several occasions.  I've got

23   calendars that every time I tried to

24   call 'em -- which either they wouldn't

206

1    accept, they wouldn't pick up, they

2    wouldn't answer, the secretary said they

3    weren't in.

4    Q.      Jon, when you -- were you aware

5    enough -- were you communicating by

6    letter with your -- with at least Sheryl

7    during the time you were locked up?

8    A.      I really hate to write.  I was

9    talking with Sheryl mostly by phone.

10   Q.      Okay.

11   A.      But every once in a while I got

12   her a letter off.

13   Q.      Well, what I'm driving at, were

14   you kept up to date on the family

15   business as far as how your brother

16   Jeffery was doing?

17   A.      Oh, I knew about it, yes.

18   Q.      Did you know when it started

19   getting real bad, i.e., when he started

20   really getting super sick to the point

21   where they knew that death was getting

22   pretty close?

23   A.      Yes, I knew.

24   Q.      When that happened did you try

207

1    to get ahold of Mr. Mayo or Mr. Ford or

2    -- when did your brother die?

3    A.        July 4th, 1995.

4    Q.        I don't believe Mr. Ford would

5    have represented you then, would he?

6    A.        That was the time when Mr. Googe

7    and Mr. Spracher were on the case.

8    Q.        Did you make --

9    A.        And, yes, I did tell Mr. Googe

10   and Mr. Spracher and they said that they

11   were doing whatever they could.  That

12   they wanted to file -- to take

13   depositions and stuff and they never --

14   they never come through on it.

15   Q.        Do you ever know of any motion

16   they filed to try to get that deposition

17   of your brother?

18   A.        I think the entire time that Mr.

19   Googe and Mr. Spracher, there was -- I

20   believe there's only like three motions

21   filed on my behalf before that time by

22   the Public Defender's Office or any

23   attorney before that time.

24   Q.        Okay.  Well, back to what my

1     question is.  My question is do you know

2     of any motion filed on your behalf after

3     you told your lawyers, "I've got a

4     brother down there that's dying," do you

5     know of any motion filed on your behalf

6     that says something to the effect of

7     Hey, Court.  We need a deposition of

8     this man.  He's dying.  Do you know of

9     any motion that even remotely addressed

10    that kind of thing?

11    A.      No.

12    Q.      And your brother did, in fact,

13    die in --

14    A.      July 4th of 1995.

15    Q.      And the only remembrance we have

16    or the only recordation we have of what

17    he might've said was this Affidavit that

18    we tendered back in May.  Is that

19    correct?

20    A.      Exhibit 5, I believe it is.

21          MR. BUCHANAN:  May I have just a

22    moment with Mr. Ellis, Your Honor?

23          THE COURT:  Certainly.

24    A.      Before the Post-Conviction

209

1    Hearing.

2         MR. BUCHANAN:  Your Honor, I'm

3    going to pass Mr. Hall at this time.

4         WITNESS:  I've got questions for

5    this witness.

6         MR. BUCHANAN:  Maybe I should

7    hold up and ask just a broad question

8    here, Judge.

9    Q.    Mr. Hall, is there something

10   that I missed that I needed to ask you

11   that you feel like it's sticking in your

12   craw that you need to let the Court

13   know?

14   A.    My trial attorneys filled out a

15   claim for attorney fees claiming that

16   they spent more time with me than what I

17   had recorded their visit was while they

18   were at -- in Nashville.  When I was at

19   Riverbend I had access to my watch and I

20   knew what time they came and then

21   whenever I looked at these attorney fees

22   I think the one visit he overbilled the

23   State -- they both did for an hour, and

24   then on the second visit they overbilled

210

1    the State from my records an hour and

2    the way they put it was 1.75, so I

3    reckon that's an hour and 45 minutes.

4    Q.      All right.  Now I've got one

5    other question for you that I had

6    forgotten and Mr. Ellis reminded me of.

7    Was Mr. Dutten ever in a cell next to

8    you?

9    A.      No, sir.  He was in the same

10   pod.

11   Q.      In the same pod, but not in the

12   cell next to you.

13   A.      That is correct.

14   Q.      And you could have testified to

15   that fact and could that have been

16   verified by records back then if

17   somebody had looked at the records to

18   see where he was?

19   A.      Certainly, could have.  I

20   could've impeached Chris Dutten if I

21   would've testified.

22   Q.      When did you know Billie was

23   dead?

24   A.      I called my mom and I was in

211

1    Texas and I asked her how was Billie

2    doing and she said, "What do you mean?"

3    I said, "Well, how is she doing," and

4    she told me that she was dead and that

5    she had just been to the funeral and

6    that -- 'cause I couldn't talk to her.

7    Q.    You did not know in Texas --

8    A.    I couldn't -- I didn't talk to

9    my mother.

10    Q.    You did not know in Texas --

11    after you got down there, you did not

12    know that Billie had died as a result of

13    this.

14    A.    No, I did not.

15    Q.    So why did you leave if you

16    thought she was alive, Jon?

17    A.    I heard -- after we got into the

18    argument and fight I -- we were outside

19    and I heard voices and it ended up

20    scaring me and, you know, I -- I was --

21    I -- that whole month of July I was very

22    paranoid.  I was extremely paranoid and,

23    you know, you could've said boo to me

24    and I probably would've been nervous

212

1    because--- it --- it stems back to a

2    earlier incident and the police told me

3    that I needed to make a $200.00 donation

4    and I didn't make that $200.00 donation

5    and I figured -- I -- and they -- they'd

6    reduce these charges and -- and --

7    Q.      That incident got you --

8    A.      -- the Judge told me that --

9    Q.      Hold on a minute.  Hold on a

10   minute.

11   A.      -- that they couldn't enforce

12   that $200.00.  I thought it was kind of

13   like a payoff, so I was very paranoid at

14   the police.

15   Q.      You had an experience that made

16   you very paranoid, but my question is

17   you did not know in Texas -- when you

18   called back to talk to your mother you

19   did not know you had left your wife in a

20   position that she was going to die.  Is

21   that correct?

22   A.      No.  I didn't think that she was

23   going to die.

24            MR. BUCHANAN:  Pass the witness,

                                              213

1    Your Honor.

2         WITNESS:   I still have got

3    questions for this witness.

4    Q.      (by Mr. Buchanan)  Is there

5    something else sticking in your craw

6    'cause I want you to get it out if it

7    is.

8    A.      Well, I need to get the

9    technical record admitted into the

10   evidence where there is no written

11   waiver of my consent to a change of

12   venue.

13   Q.      Mr. Hall, we'll do that.  That's

14   Mr. Ellis and my problem and our

15   bailiwick and I assure you we'll do it,

16   but is there anything else of a

17   testimonial nature that you need to tell

18   the Judge that I'm forgetting 'cause I

19   want you to have your say today.  I know

20   you haven't had it heretofore.

21   A.      My trial transcripts were not

22   verbatim.  I still have not seen all the

23   pages to the Motion for New Trial

24   Transcript and in that I -- on March

214

1       20th, 1997, I told Whit LaFon that I

2       thought that Jesse Ford violated the

3       Supreme Court Rule ADR4-101,

4       attorney/client --

5           GENERAL EARLS:  He's rambling.

6       Q.      (by Mr. Buchanan) Mr. Hall,

7       you're just going to have to trust me

8       when I tell you that we can bring all

9       that up to the Court.  Those transcripts

10      are going to be in the record.  This

11      Judge has said every transcript -- he's

12      even gone back and had things typed up

13      that were never typed up before.  You're

14      going to have all that, and then Mr.

15      Ellis and I are allowed to point those

16      sorts of things out to the Court, but is

17      there anything of a testimonial nature,

18      and by that I mean something other than

19      records that you need to tell the Court

20      that's in your mind and only in your

21      mind so we can't show it any other way?

22      A.      I -- I -- I need to enter

23      letters that I had certified and sent

24      off -- I had notarized and sent off

215

1    certified to the attorneys wanting them

2    to address the appeal.

3    Q.      Okay.  You've got letters where

4    you tried to contact your attorneys and

5    you didn't get any response on that.  Is

6    that what you're telling me?

7    A.      That's exactly what I'm telling

8    you, and then I -- and then I had tried

9    to get the technical record so that I

10   could assist Mark Donahoe in filing my

11   Supreme Court Appeal and he didn't give

12   me one, so I filed my own brief and I

13   added my own appendix in there and in

14   that I challenged the change of venue as

15   well as my pro se motions that are

16   attached to my change of venue

17   affidavit.

18   Q.      Again, Mr. Hall, that's all been

19   filed and it's all laying somewhere

20   where we can point out to Judge Morgan

21   if there's an irregularity, we can say,

22   Judge Morgan, look a here.  Here's where

23   it is in the record 'cause you filed it.

24   I'm asking you is there anything of a

216

1    testimonial nature, that means coming

2    out of your mouth, anything else that

3    you need to tell the Court before I pass

4    you over to Mr. Earls 'cause he'll have

5    some questions for you?

6    A.      Well, I'm not real happy about

7    how you're just going to throw a whole

8    bunch of testimony in there without me

9    explaining what it was.  I think you're

10   grouping too many things together and

11   the Appellate Court will not consider

12   this stuff in a lump sum because you're

13   -- you're creating a large record

14   without stating what this stuff is.

15   Q.      Okay.  All right.  Well, you're

16   going to have to trust me on some things

17   and you may be right.  I'm -- the only

18   perfect man there ever was they strung

19   Him up on a cross and I'm certainly not

20   Him, but other than that -- of a

21   testimonial nature, is there anything

22   else you've got to say before I pass

23   you?

24   A.      I never premeditatedly killed

1    Billie Hall.

2    Q.      I think that's an excellent way

3    to stop.

4          MR. BUCHANAN:   Pass the witness,

5    Your Honor.

6          WITNESS:   I'm not -- I've still

7    got other things to say.

8          THE COURT:   The General can ask

9    at this time.  Go ahead, General.

10          WITNESS:   Do you mean I don't

11    get to question myself about different

12    things where I can point out --

13          THE COURT:   Mr. Hall --

14          WITNESS:   -- the inconsistencies

15    in other people's testimony?

16          THE COURT:   Mr. Hall, your

17    Counsel has asked you questions and

18    you've responded.  He's given you

19    opportunity several times now to respond

20    further with testimony.  There are

21    several things that he's alluded to that

22    you'll have to discuss with him and

23    trust him at this point.  At this point

24    in time your attorney has passed you as

1    a witness to the State and the State

2    will ask you questions and you will

3    respond to the questions.  Then your

4    attorney will have an opportunity to

5    question you further if he feel

6    appropriate.

7              General Earls, you may ask.

8              WITNESS:  I still think that I

9    have a right to be heard.

10             THE COURT:  Mr. Hall, follow my

11    directive.  General Earls will ask now.

12    Go ahead, General.

13    **CROSS EXAMINATION**

14    **BY GENERAL EARLS:**

15    Q.      Mr. Hall, you've complained

16    because complained because you didn't

17    have a Preliminary Hearing.  Is that

18    correct?

19    A.      On the kidnapping charge, yeah.

20    Q.      You weren't convicted of

21    kidnapping, were you?

22    A.      No, but those witnesses were

23    relevant.

24    Q.      It doesn't matter then, does it?

219

1    A.        Sure it does because they

2    ordered the Preliminary Hearing

3    transcripts on the waiver deal of that.

4    It's a pattern of them creating

5    fraudulent records.

6    Q.        You did have a Preliminary

7    Hearing on a murder charge.  Is that

8    correct?

9    A.        Yeah, but they really didn't use

10   competent evidence as their prima facia

11   determination of probable cause.

12   Q.        Now, you were asked on direct

13   did you ever want to change venue.  Your

14   response was no, but isn't it true that

15   you're the one that asked for it?

16   A.        Can I see that document?

17   Q.        Yes, sir.

18             **(Document passed to**

19             **witness.)**

20   A.        Now what is your question about

21   this?

22   Q.        Did you not file that Motion for

23   Change of Venue and sign it yourself?

24   A.        Have you ever heard the term --

220

1       Q.        No, sir.

2       A.        -- express or implied --

3       Q.        Answer my question.

4       A.        -- consideration?

5       Q.        Did you sign that Motion for a

6    change of venue that you filed yourself?

7       A.        Like I said, it has express or

8    implied considerations that if I

9    would've -- that -- this case -- here,

10   let me read -- under Line A. "This case

11   has drawn such widespread publicity,

12   that prejudice against the defendant is

13   so great that the defendant cannot

14   obtain a fair and impartial trial in the

15   district --"

16      Q.        But you asked --

17      A.        "-- or division where the case

18   is pending."  That's the 26th Judicial

19   District.  That's Madison --

20      Q.        You personally asked Judge LaFon

21   for a change of venue, didn't you?

22      A.        (No response.)

23      Q.        Didn't you?

24      A.        He never even heard this Motion.

221

1    Q.       Did you ask for it or didn't

2    you?

3    A.       Out of the district.  Look at --

4    look at the express and implied

5    consideration.

6    Q.       I'll pass you another document.

7             **(Document passed to**

8             **witness.)**

9             GENERAL EARLS:  Your Honor, I'd

10   ask that this be made an exhibit to his

11   testimony.

12   A.       Do you have another one just

13   like that?

14            THE COURT:  Just one moment.

15   Give the Court Reporter a moment to mark

16   it and would that be Exhibit 14?

17            COURT REPORTER:  Sixteen.

18            THE COURT:  Sixteen.  It's

19   marked now?

20            **(Exhibit No. 16 was duly**

21            **marked.)**

22            THE COURT:  You may proceed.

23   A.       That is not a consent form.

24   Q.       Now --

1    A.        That's a request for a hearing

2    that I never received.

3    Q.        You testified the first thing

4    you knew about a change of venue was in

5    January of '97.  You asked for it

6    yourself in '95.

7    A.        It was never granted.  I never

8    had a hearing on it.

9    Q.        Now --

10   A.        And I told you I didn't want --

11   that -- that -- that has my express or

12   implied intent written in it --

13   Q.        Now --

14   A.        -- out of the district.  Can you

15   understand that?

16        THE COURT:  I instruct the

17   witness not to ask questions of the

18   State.  The State's not testifying.  The

19   witness is to respond to questions.

20   A.        I understand, Your Honor.

21   Q.        You were asked on direct whether

22   or not your attorneys talked to you

23   about your testifying at trial.  Is that

24   correct?

223

```
 1    A.      Yes.

 2    Q.      And they did discuss that with

 3    you, didn't they?

 4    A.      Not in very much detail.

 5    Q.      As a matter of fact Judge LaFon

 6    discussed it with you, didn't he?

 7    A.      He asked --

 8    Q.      And he told you you had the

 9    right to testify, didn't he?

10    A.      (No response.)

11    Q.      Didn't he?

12    A.      Yes, but I also wanted to --

13    Q.      And you refused to testify,

14    didn't you?

15    A.      No.  You -- if you look at the

16    record, I didn't say anything and he

17    said, "Move it along."

18    Q.      Was your response, "I will

19    testify if you will take the eagle off

20    the flag?"

21    A.      No, sir.  I said testify if the

22    war flag is removed.

23    Q.      And you --

24    A.      I went to school and the flag
```

224

1    was --

2    Q.      And you refused --

3    A.      -- red, white and blue.  They --

4    they never flew a gold braided American

5    flag in -- in -- any school that I went

6    to and pledged the allegiance to, not --

7    nor on the Tennessee flag.

8    Q.      You refused to testify even

9    though the Judge made it clear you could

10   do that, and your attorneys told you you

11   could.

12   A.      There's nothing in the statute

13   that says that there's suppose to be a

14   gold braid on it for the jurisdiction of

15   the court.  That's why I -- I'd say it's

16   a badge of fraud.

17   Q.      And you knew that the defense

18   that you were pursuing was to -- for

19   lesser-included offenses based upon

20   intoxication, didn't you?

21   A.      They basically ruined the

22   intoxication defense whenever Judge

23   LaFon instructed the jury that it was

24   irrelevant for the culpable mental

225

1    state, and that's a structural error --

2    Q.        You knew that your defense --

3    A.        -- pursuant to Boling v State,

4    18 Southwest 3d.

5    Q.        You knew that your defense was

6    intoxication and that you were hoping to

7    get lesser-included, didn't you?

8    A.        (No response.)

9    Q.        You knew that.

10   A.        Yes, sir.  I was also hoping to

11   get a fair shake.

12   Q.        The only way you could know that

13   is if somebody explained it to you and

14   that was your defense lawyers.  Right?

15   A.        Why?  I've read law books.  I

16   know it -- like I said, the psychiatrist

17   already testified I understood the legal

18   proceedings against me.  Jesse Ford and

19   them hardly gave me any type of

20   counseling.  They basically criticized

21   me most of the time.

22   Q.        Now, Mr. Hall, it's been brought

23   out that no proof was introduced about

24   Billie assaulting you, was it?

226

1    A.        No, there isn't.

2    Q.        Now, your story to Dr. Caruso

3    and Dr. Auble was that you started that

4    incident on the night of the murder.

5    All she did was ask if you're going to

6    beat me.  Is that right?

7    A.        I -- I reviewed that audiotape

8    that you showed and there's half of that

9    bedroom -- the mess in that bedroom I do

10   not have an answer for that -- what went

11   on in that bedroom.

12   Q.        My question was --

13   A.        Somebody's tampered with that

14   evidence.

15   Q.        She never touched you that

16   night, did she?

17   A.        (No response.)

18   Q.        She didn't assault you that

19   night, did she?

20   A.        I never told anybody that she

21   did.  I don't remember.

22   Q.        She was not the primary

23   aggressor, was she?  She was not the

24   first aggressor.

227

1     A.       As far as physical, no.

2     Verbally, yes.  I went there with good

3     faith in an attempt to try to talk to

4     her about what was going on.

5     Q.       To reconcile?

6     A.       To try to reconcile with Billie

7     was --

8     Q.       Then --

9     A.       -- was an ultimate goal.  It was

10    not -- it was not a necessity that

11    night.  I wanted to be husband and wife

12    with Billie, but I knew that -- that

13    after the fight that we had the day

14    before that there was no way that Billie

15    was ready to reconcile and let us move

16    back in husband and wife as we were.

17    Q.       Now, so when Mr. Dutten

18    testified that you went there with the

19    intent to reconcile, that testimony is

20    true.

21    A.       That -- that's a basic guess on

22    his -- any -- anytime you've got a

23    husband and a wife, most people think,

24    okay, we're -- we're going to reconcile.

228

1    Like I said, that was really secondary.

2    I -- I -- like I said, I wanted to

3    reconcile with my wife all along, but I

4    knew that it wasn't going to happen that

5    night.  Chris Dutten's a liar.  He had

6    17 felony criminal convictions and you

7    only put on like he only had like five

8    or six in the transcript is what it

9    indicates.  You weren't forthcoming and

10   I never -- and -- and -- and Jesse Ford

11   never even let me know that Chris Dutten

12   was going to testify until he come up on

13   the stand.

14   Q.      It was pointed out at trial that

15   he was a convicted felon, wasn't it?

16   A.      Yeah, but he only admitted to

17   about five criminal convictions.

18   Q.      And isn't it true that your

19   lawyers cross-examined your children

20   about what you did that night, didn't

21   they?

22   A.      My children do not have a sound

23   recollection and, in fact, if you look

24   at the --

229

```
 1    Q.       Sir --

 2    A.       -- witness statements from --

 3    Q.       Did they cross-examine --

 4    A.       -- Brian Byrd, they do not --

 5    Q.       -- your children or not?

 6    A.       -- they are inconsistent

 7    statements all through the trial --

 8    Q.       They cross-examined your

 9    children, didn't they?

10    A.       If you call that cross-examining

11    'em.

12    Q.       And they --

13    A.       My kids told -- told the jury

14    that I never even took care of 'em.

15    Q.       And they did that at the

16    response to questions asked by your

17    lawyer whether or not you were a good

18    father, didn't they?

19    A.       Before July 29th my children

20    loved -- they thought the world of me.

21    Q.       Before you killed their mother?

22    A.       I ended Billie's life, but it

23    was not intentional.

24    Q.       Now --
```

230

1    A.        And, yes, I have a whole lot

2    more remorse than you'll ever know.

3    Q.        Your lawyers cross-examined your

4    daughters about what kind of father you

5    were and they denied that you were a

6    good father, didn't they?

7    A.        They were coached.

8    Q.        I take that to be a yes?

9    A.        That's what they testified to,

10   but that's not the truth.  You know it.

11   I know it.

12   Q.        You were asked on direct whether

13   anyone was called to testify to anything

14   you said at the bar.  Is that correct?

15   A.        (No response.)

16   Q.        The Pearsons?  Is that right?

17   A.        Yeah.

18   Q.        Did anybody at trial ever say

19   you did say anything at the bar?

20   A.        No, but from what I understand

21   they didn't even show the jury the

22   pictures I -- I -- from what I

23   understand the pictures of the crime

24   scene that was submitted to the jury

231

1    don't even show the beer bottles so that

2    -- that -- that the crime scene pictures

3    don't accurately depict so the jury

4    couldn't think of -- there was nothing

5    shown that there was any intoxication

6    there and then you argued that I was

7    stupid.

8    Q.      My question to you was no one

9    ever did accuse you of saying anything

10   at the bar at trial, did they?

11   A.      Nobody -- well, there -- there's

12   written statements that somebody said

13   that I said something.

14   Q.      During the trial did any witness

15   testify that you said anything at the

16   bar?

17   A.      No.

18           GENERAL EARLS:   That's all I

19   have.

20   **RE-DIRECT EXAMINATION**

21   **BY MR. BUCHANAN:**

22   Q.      Did your lawyer ever ask the

23   jury any questions when he was

24   qualifying them about manslaughter?

232

1    A.        (No response.)

2    Q.        I'm not talking about second

3    degree.  I'm talking about manslaughter.

4    A.        Would you repeat that question?

5    Q.        Do you remember your lawyers

6    ever asking the jury -- when they were

7    asking the jury questions, do you

8    remember them ever asking them anything

9    about manslaughter?

10   A.        They asked -- they asked them if

11   they could consider lesser-included

12   offenses, some of 'em I think, in the

13   individual voir dires.

14   Q.        Okay.

15   A.        But I also got a jury of 11

16   women and one black man.

17   Q.        Okay.  All right.

18   A.        And I had no say in who was

19   there -- who got to be picked.  They

20   controlled everything.

21   Q.        Okay.  You think you remember

22   them talking about some lesser-includeds

23   but you don't remember which ones?  Is

24   that what you're telling me?

233

1    A.        You mean what lesser-included

2    offenses?

3    Q.        What lesser-included offenses.

4    Yes, sir.

5    A.        Just off the top of my head I've

6    got to say that they asked -- I don't

7    know if they asked every juror, but they

8    asked the jurors, "Would you be able to

9    keep an open mind to lesser-included

10   offenses?"

11   Q.        Mr. Hall --

12   A.        I don't know if they specified

13   manslaughter or not.

14   Q.        I understand that.  I understand

15   that.  Well --

16   A.        I'd have to look at the

17   transcript --

18   Q.        The record will speak for

19   itself.  We'll just leave it at that.

20   Okay?

21   A.        All right.

22   Q.        Was there evidence available to

23   show that you had been a good father, a

24   caring father, a nurturing father?  Was

234

1    that evidence available at the time of

2    trial?

3    A.      Yes.  I even tried to get some

4    records from -- from out in the shed

5    because the jail wouldn't let me keep a

6    lot of my papers --

7    Q.      Do you know --

8    A.      -- so I couldn't show that to

9    the attorneys and I had thought that

10   they were going to call Sarah Fowler to

11   demonstrate some different things.

12   There was a whole bunch of witnesses

13   that they never called.

14   Q.      Please listen to me.  I'm

15   referring to that part of the cross-

16   examination where Mr. Earls was asking

17   you about your children saying that, you

18   know, you were less than a stellar

19   father.  My question is, did the kinds

20   of things that we put up here showing

21   you taking care of the child that had

22   the cystic fibro --

23   A.      Cerebral palsy.

24   Q.      -- cerebral palsy, excuse me,

235

1    cerebral palsy, and things of that

2    nature, was that available to them had

3    they talked to anybody in your family at

4    the time of your trial?

5    A.       I'm sure there was, yes.

6    Q.       Do you know any reason in the

7    world why it wasn't presented to show

8    that either the children weren't telling

9    the truth or that they were mistaken or

10   that they had forgotten that you had, in

11   fact, done some pretty good father

12   nurturing?

13   A.       Repeat that question.

14   Q.       I said do you know of any reason

15   why they would not present that to show

16   that the children's memory was either

17   wrong or that there -- or they were

18   mistaken or something?  Do you know any

19   reason why your lawyers wouldn't have

20   put that on?

21   A.       The words that comes to mind is

22   perfunctory performance.  That's what

23   they showed me.  That's what they did.

24   They didn't care.  They -- they -- they

236

1    showed me no -- no care.  They -- they

2    gave -- anything that I tried to whisper

3    in their ear -- they -- they would not

4    ask the questions that I wanted to ask.

5    They -- you know --

6    Q.      Okay.

7    A.      -- I could've impeached those

8    children and I didn't mean to impeach

9    them.  I would've recalled their

10   memories -- like they said that I never

11   took them to the lakes and stuff like

12   that, and she's got -- I've given April

13   Higuera tapes of where I took the

14   children out to the lakes to show my mom

15   where we used to live and that we used

16   to visit the lakes.  I used to take the

17   girls swimming there.  I even -- I even

18   saved Jenny's life one time --

19   Q.      All right.  Let me ask you this.

20   A.      -- when she was swimming out

21   there in the lake.

22   Q.      There are some things about the

23   children's testimony that you would have

24   been able to clarify and point out to

237

1   the court wasn't consistent.  Isn't that

2   right?

3   A.      I would've been able to show

4   that my children were -- did not

5   understand the nature of their oath.

6   They were not competent to testify, yes.

7   Q.      And what would you have been

8   able to testify to that you thought

9   would show that some of the things they

10  were saying was inconsistent or not

11  true?

12  A.      Okay.  For example, they claimed

13  that I barricaded the bedroom door with

14  the vacuum cleaner and the sewing

15  machine.

16  Q.      And did you ever?

17  A.      No.  I did not.

18  Q.      And how would you have made it

19  clear to the jury that they were

20  mistaken about that?

21  A.      Well, they never showed me the

22  crime scene video.

23  Q.      One -- your lawyers never showed

24  you the video you saw here this morning?

238

```
 1    A.        Not my trial lawyers, no.  The

 2    first time I saw it was when Larry

 3    Gigcomb (spelled phonetically) showed it

 4    to me and Larry Gigcomb (spelled

 5    phonetically) showed me a different copy

 6    than what April showed me the other day.

 7    Larry Gigcomb (spelled phonetically)

 8    showed me a tape that had a -- a --

 9    Q.        Okay.

10    A.        -- big spot of blood --

11    Q.        Okay.

12    A.        -- down in the thing, and then

13    whenever we got this video --

14    Q.        Mr. Hall --

15    A.        -- this video doesn't show that

16    spot of blood.

17    Q.        All right.

18    A.        And I -- I -- and --

19    Q.        All right. But my question is --

20    A.        -- and it shows evidence

21    tampering.

22    Q.        All right.  I'm not talking

23    about evidence tampering.  I'm talking

24    about what in the video or what do you
```

239

1    know of that you could've testified to

2    that would have shown that the girls

3    were either mistaken or that it couldn't

4    have happened the way they said it did

5    about the barricade?

6    A.      At the time I wasn't aware of

7    what was on the videotape, so I wouldn't

8    have known.

9    Q.      All right.  Now that you've seen

10   the video what can you point out to the

11   Judge that had you been able to see the

12   video that you could've pointed out to

13   the children was inconsistent about

14   their testimony?

15   A.      I could show that that video

16   shows that when you go into the bedroom

17   there's no sewing machine around,

18   there's no vacuum cleaner.  See, the

19   children -- when me and Billie were

20   together -- the bedroom door does not

21   have a lock on it.  So the children --

22   our bed -- the master bedroom had a bath

23   in it and -- and the children were

24   welcome to use our bathroom, the main

240

1    bathroom, at anytime they wanted to and

2    they'd come in our bedroom and they'd

3    just fly in.  So we used the sewing

4    machine and the vacuum cleaner to slow

5    them down so that we knew that they were

6    coming in case if we were intimate or if

7    somebody was on the toilet or in the

8    bathtub, so that the children

9    automatically assumed that because they

10   couldn't get into the bedroom --

11   Q.        That it was being blocked by one

12   of those things.

13   A.        Yes.

14   Q.        And you would have liked -- if I

15   can kind of move along here -- I think I

16   catch your drift.  Tell me if I'm wrong.

17   You wished your lawyers had pulled that

18   video up and showed to the jury that

19   there apparently wasn't any vacuum

20   cleaner and apparently wasn't any sewing

21   machine close to that door.  Is that the

22   long and short of what you're trying to

23   say?

24   A.        Yes, and that there was no space

241

1    in between that doorway and that dresser

2    where me and Billie was fighting; that I

3    did not make a conscious effort to block

4    that door at all.  It was just the way I

5    was standing and the girls come in and

6    whenever it hit my foot I removed my

7    foot and that's how the girls got in and

8    that's how Billie got out.  There was no

9    attempt to barricade that.

10   Q.      And you could've testified to

11   that.

12   A.      I just testified now.

13   Q.      Yeah, but, Mr. Hall, that wasn't

14   my question.  My question was you

15   could've testified to that at the time.

16   Correct?

17   A.      Yes, sir.

18   Q.      One other thing.  When you were

19   arrested in Bell County -- we've

20   tendered some documents to the Court and

21   there's one of them that's a Bell County

22   Law Enforcement Center Inmate Incident

23   Report and it says in there that you are

24   photographed with scratches and

242

1    abrasions all over your body, aren't

2    you?

3    A.        Yes.

4    Q.        Were those abrasions and -- and

5    there were abrasions to your upper back.

6    Correct?

7    A.        To where?

8    Q.        Abrasions to your upper back.

9    Correct?  And on both your upper thighs.

10   A.        I don't remember all of my

11   injuries.  I remember having injuries to

12   my thighs.

13   Q.        Okay.

14   A.        I remember having a cut to my

15   left eye.

16   Q.        Were those injuries sustained to

17   you by Billie afflicting them on you

18   during this altercation?

19   A.        I have no recollection where I

20   got those injuries from.

21   Q.        All right.  But your attorneys

22   could have at least shown you were

23   picked up in that condition and you had

24   all those things on there if they would

1    have gotten those pictures, would they

2    not?

3    A.       Yes.  I believe that record that

4    you're talking about even says that I

5    was unstable at the time of my arrest

6    which is one thing that I want -- that

7    Jeff could've shown.  I also didn't have

8    shoes.  I let -- see, they -- they led

9    the jury to believe that -- that there

10   was maps in the car.  They didn't ask

11   the question, well, was the maps --

12   belonged to the owner of the car?  They

13   said that, you know, there was clothes

14   in the car like I packed an overnight

15   bag, and, heck, I -- the clothes that

16   were in that car most of 'em didn't fit

17   me.

18   Q.       Okay.

19   A.       They weren't mine.

20   Q.       All right.  Now, I'll just ask

21   you one other --

22   A.       So they misled the jury in that

23   fact, and they also told the jury that -

24   - that there was a -- Brian Byrd

                                              244

1    inferred or implied that there was a

2    weight pin that you saw on that video

3    was used -- was used as a weapon.  They

4    also implied a ashtray was used as a

5    weapon and they never told the jury that

6    I had wrecked the van.

7    Q.      And you would have liked to have

8    testified and told the jury that no

9    weapon was used, no blunt instrument.

10   Is that fair to say?

11   A.      I had -- I had a shed out there.

12   If I had the premeditated intent I

13   could've used any number of weapons --

14   tire iron -- I had about -- there was

15   tools -- it -- it --

16   Q.      Did you make your attorneys

17   aware that there were mechanic's tools

18   and blunt objects out in that little

19   shed?

20   A.      There was objects that --

21   Q.      Jon, I'm not --

22   A.      -- all over the house that

23   could've been used --

24   Q.      Mr. Hall --

                                          245

1     A.          -- if I had premeditated --

2     Q.          Mr. Hall --

3     A.          -- this murder.

4     Q.          Mr. Hall, my question is did you

5     make the attorneys aware that those

6     instruments were out there?

7     A.          I probably assumed that they

8     thought -- that they knew I was a

9     mechanic, but, yeah, I think I did -- I

10    let 'em know that I worked out of that

11    shed and, yeah, there -- yeah, I did --

12    I did let 'em know that I had worked --

13    I had tools there.

14    Q.          And you would've been glad to

15    tell the jury at the time that if you

16    would have premeditated this you

17    would've got you an instrument or a

18    blunt object out of that shed to do your

19    damage.  You would've testified to that,

20    would you not?

21    A.          I would have never taken an

22    instrument to Billie because then I

23    would have known what would happen.

24    Q.          Well, that's my point.  That's

                                                            246

1    my point, Jon, that you didn't because

2    you didn't intend to -- you didn't

3    premeditate to kill her.  It was not

4    your intent when you went in there, was

5    it?

6    A.      No.  I wanted to make sure that

7    -- that we could work things out so that

8    the DHS wouldn't come and take -- 'cause

9    I knew Billie was going to be pissed and

10   -- and the reason why DHS got involved

11   was because of the July 11th Protection

12   Order here and I told the Judge what had

13   -- what happened and he told me to go to

14   the DHS.  So I went to the DHS under J.

15   B. Johnson, Magistrate -- J. B.

16   Johnson's advice, and that was the worst

17   advice anybody could ever give.

18   Q.      All right.  Okay.  Now my

19   question is, before I let you go, is

20   there anything else of a testimonial

21   nature that you need to tell the Judge

22   before I let you go?

23   A.      All the stressors -- Billie lost

24   her job.  I lost my job.

247

1    Q.        We've got those in the record,

2    Mr. Hall, and I guarantee you there'll

3    come a time when some Judge will want us

4    to point those out and we'll do it.

5    Okay.  But is there anything else of a

6    testimonial nature that you need to tell

7    the Court that we haven't got in a

8    document somewhere?

9    A.        They said I had a lack of

10   remorse and I want to tell you what --

11   what I -- what reminds me of Billie now

12   to show you that I have remorse.  When

13   me and Billie went on our six months

14   anniversary, we was at Jerry Brown's new

15   house and Billie was telling the people

16   out there, the Browns, that she liked

17   this song and it was by Tim McGraw, and

18   it goes "Please Don't Take the Girl."  I

19   hear that song -- I'd never heard it

20   before until I was locked up, and now

21   that I've heard it that's exactly how I

22   feel.

23          MR. BUCHANAN:  I understand.

24   Thank you, Mr. Hall.

                                        248

1     **RE-CROSS EXAMINATION**

2     **BY GENERAL EARLS:**

3     Q.     You were asked about injuries

4     you had in Texas.  Isn't it true you

5     wrecked the family van?

6     A.     Yes.

7     Q.     And that was after you killed

8     Billie.

9     A.     I didn't realize that I killed

10    her, but yes.

11    Q.     And after you wrecked that van

12    you lay in the ditch and waited for

13    someone to come along and then you stole

14    their car, didn't you?

15    A.     I told you I was in a heightened

16    paranoia because of all the police stuff

17    that was going on, and, see, that's why

18    I disconnected the phone, is because

19    Billie was a 911 dispatch.  She was apt

20    to do that --

21    Q.     Mr. Hall --

22    A.     -- and -- and --

23    Q.     -- it's a yes or no question.

24    A.     -- she just --

249

```
 1    Q.        After you wrecked your van --

 2    A.        -- she made me nervous and --

 3    and -- and --

 4    Q.        -- you laid in the ditch --

 5    A.        -- and I'd seen all these movies

 6    about road cops that if you don't pay

 7    the bribe --

 8              THE COURT:  Mr. Hall --

 9    A.        -- that they beat you up.

10              THE COURT:  Mr. Hall, I'm going

11    to interrupt you a moment, please, if

12    you'll listen to me.  Please respond to

13    the question.  If the question and

14    response calls for an explanation you

15    can make it, but I'm telling you to

16    respond to the question.  Now, General,

17    ask the question --

18    A.        I'm trying to talk and then

19    whenever I try to say something and

20    explain to you why I feel the way I do -

21    -

22              THE COURT:  Mr. Hall --

23    A.        -- or how I feel or --

24              THE COURT:  Mr. Hall --
```

250

1    A.        -- you don't want to listen.

2            THE COURT:  When I speak you

3    don't speak.  Do you understand that?

4    Mr. Hall, do you understand that?

5    A.        (No response.)

6            THE COURT:  Mr. Hall, I'm going

7    to ask you one more time.  Do you

8    understand what I'm saying?

9    A.        I understand English.  Yes, sir.

10            THE COURT:  General, if you have

11    another question you can ask and the

12    defendant will respond.

13    Q.        (By General Earls) You laid in a

14    ditch after you wrecked that van, didn't

15    you?

16    A.        I don't know if I laid in that

17    ditch or not.  As far as I know, as soon

18    as it wrecked I was -- I had such an

19    adrenaline rush -- you know -- from the

20    time that Billie pissed me off I had

21    such an adrenaline rush that a lot of

22    things are a blur to me.  I -- I don't -

23    - you know -- I don't even know how the

24    van wrecked.

251

1    Q.       After you wrecked that van isn't

2    it true that you stole someone else's

3    van when they stopped to help you?

4    A.       Objection.  Due process

5    violations.  I've never been convicted

6    of that.

7    Q.       Did you take someone else's car

8    or not?

9    A.       (No response.)

10            THE COURT:  I would instruct the

11    witness to answer the question.

12            MR. BUCHANAN:  Judge, could I

13    interpose an objection to relevancy?  It

14    never came up at the trial.  It wasn't

15    part of the trial record and I don't see

16    what --

17            GENERAL EARLS:  It's showing the

18    source of these injuries that they

19    brought out coming up in Texas, Your

20    Honor.

21            THE COURT:  I'm going to

22    instruct that he answer the question.

23            MR. BUCHANAN:  I think I agree

24    with that.

252

1              THE COURT:  Go ahead.  Answer
2      the question.
3      A.      Could you repeat the question?
4      Q.      After you wrecked the van you
5      took someone else's car when they
6      stopped to help you, didn't you?
7              MR. ELLIS:  Your Honor, I am
8      going to object on this line, though.
9      If he wrecked -- it's fine that the
10     Counsel's point -- the General's pointed
11     out that he wrecked the van, but the
12     fact that he stole somebody else's car
13     unless he's --
14     A.      It has nothing to do with --
15             MR. ELLIS:  -- he can argue that
16     it was the van that caused the injuries.
17     I think after that point it's -- the
18     relevancy is gone.
19             THE COURT:  General, you've
20     heard what Mr. Ellis says.  Do you want
21     to comment further?
22             GENERAL EARLS:  Your Honor, I
23     think it's relevant to show the source
24     of these injuries that he took someone's

253

1    car, took it from them physically and --

2            THE COURT:  I'm going to direct

3    the witness to answer the question.

4    A.      I bumped into an empty car.

5    Well, what I had thought was an empty

6    car.  I didn't force anybody out of the

7    car --

8            GENERAL EARLS:  That's all I

9    have.

10   A.      -- at the time I took it.

11           GENERAL EARLS:  That's all I

12   have.

13           MR. BUCHANAN:  No further

14   questions, Your Honor.

15           (WITNESS EXCUSED.)

16               * * *

17           MR. BUCHANAN:  We rest subject

18   to rebuttal, Your Honor.

19           **RESPONDENT'S PROOF**

20           GENERAL EARLS:  Your Honor, the

21   State would ask to make certain

22   documents exhibits.  I've already shown

23   Counsel.

24           MR. BUCHANAN:  We have no

                                          254

1    objection, Your Honor.

2         GENERAL EARLS:  From the Middle

3    Tennessee Health Institute, one being a

4    Court Order to do an evaluation there

5    and the results of that.  Also, the

6    results from Dr. Zager -- the results of

7    her evaluation.

8         THE COURT:  Are these separate

9    exhibits or collective exhibits?

10        GENERAL EARLS:  We can make them

11   separate unless the Court has a --

12        THE COURT:  Let the Court

13   Reporter mark those two exhibits, noting

14   no objection from Defense.

15        **(Exhibit Nos. 17, 18,**

16        **19, and 20 were duly**

17        **marked.)**

18        THE COURT:  Okay, General.

19        GENERAL EARLS:  We'd also move,

20   if no objection, to a transcript of a

21   Motion Hearing heard on November the

22   8th, 1995 -- motions in the underlying

23   prosecution, Your Honor.

24        THE COURT:  Mr. Buchanan, you've

255

1    looked at that?

2            MR. BUCHANAN:  Yes, sir.  No

3    objection.

4            THE COURT: Okay.  Let it be

5    marked the next exhibit.

6            **(Exhibit No. 21 was duly**

7            **marked.)**

8            THE COURT:  Let me ask a

9    question, too, just to refresh my

10   recollection.  At the prior hearings

11   we've had regarding the post-conviction,

12   the trial transcript was -- a copy of it

13   was made an exhibit, was it not?

14           MR. BUCHANAN:  That's correct.

15   Yes, sir.  That was the first exhibit, I

16   believe.

17           THE COURT:  And that was a copy.

18   Okay.  Go ahead, General.

19           GENERAL EARLS:  Your Honor, at

20   this time, and I've already talked with

21   Counsel for the Petitioner on this, the

22   State's going to ask the Court to allow

23   it to have a continuance for this

24   reason.  I've spoken with Larry Southard

256

1    who is a Forensic Coordinator at Middle

2    Tennessee Institute in Nashville and he

3    has the records of Middle Tennessee

4    Institute's Evaluation and Assessment on

5    Jon Hall for trial purposes.  The reason

6    I need the Court to indulge me on that

7    continuance is I want Larry Southard to

8    review the documents that have been

9    testified to here today from Dr. Auble

10   and Dr. Carruthers (sic) about

11   Intermittent Explosive Disorder and see

12   what his assessment of that is.  I

13   understand the Court has already talked

14   about this on one prior occasion, but I

15   would point out to the Court that the

16   date of these findings, Dr. Auble's was

17   August the 21st, the last interview she

18   had -- testing interview and the date on

19   -- I think it's Dr. Carruthers' (sic)

20   report has today's date on it.  I've not

21   had opportunity to have any of the

22   State's experts review any of this and

23   I'd like that opportunity just to see

24   what -- how they would respond to it.

1          THE COURT:  Well, there's been

2     no request for that prior to.  You came

3     in today without any prior request or

4     discussion for disclosure at any point

5     in time to discuss what the State's

6     rights would be to get any of the

7     documents ahead of time for purposes of

8     review.

9          GENERAL EARLS:  That's true and

10    if the Court's going to gig me on that

11    I'll take it, but, Your Honor, under

12    Rule 28 of the Tennessee Supreme Court

13    they expressly state that the Rules of

14    Civil and Criminal Procedure do not

15    apply and that you have to follow the

16    rules as they are expressly laid out in

17    Rule 28.  The only discovery rule they

18    have is for the State to provide

19    discovery to the defendant.  It's my

20    understanding of that Rule I wasn't

21    entitled to ask for it until --

22          THE COURT:  Well, in conferring

23    -- the Defense has no -- I mean, the

24    Petitioner's side has no objection to

258

```
1    any of this.  Is that correct?

2              MR. BUCHANAN:  Whatever the

3    Court wishes to do is fine with us,

4    Judge.

5              THE COURT:  Okay.  Now, General

6    Earls, have you spoken to this

7    individual and you anticipate that they

8    would be looking at these documents and

9    reviewing same within a week's time or

10   ten days time or --

11             GENERAL EARLS:  Well, I spoke

12   with Larry -- let me correct that.  My

13   secretary spoke with him this morning.

14   They have those files but they've been

15   archived and he indicated it may take

16   two to three weeks to locate them.  So

17   that's the problem there, and I've tried

18   to talk with him at lunch but he was out

19   of the office.

20             THE COURT:  But you need those

21   files as opposed to just reviewing what

22   reports have been given to you today

23   from the Petitioner's side?

24             GENERAL EARLS:  Correct.
```

                                                    259

1          THE COURT:  And noting your

2     saying two or three weeks maybe to

3     locate them, you're talking about

4     passing this another couple of months to

5     continue this matter?

6          GENERAL EARLS:  Well, at least

7     30 days, Your Honor.

8          THE COURT:  And setting aside --

9     although Petitioner's rested, then

10    setting aside for an opportunity for you

11    to come in with possible testimony.

12         GENERAL EARLS:  Yes, sir.

13         THE COURT:  And you have nothing

14    to offer today as far as testimony.

15         GENERAL EARLS:  Well, the only

16    testi -- not as far as the experts are.

17    That's correct.

18         THE COURT:  But you have other

19    evidence I can hear today.

20         GENERAL EARLS:  Uh --

21         THE COURT:  That's what I'm

22    getting down to.  Do you have anything

23    today from the standpoint of testimony?

24         GENERAL EARLS:  Your Honor, the

1    only other testimony I would have had

2    would have been Mr. Ford, but I don't

3    think I need him with the stipulation on

4    those records.  So what we're getting

5    down to is what these experts would say

6    when they review these records.

7         THE COURT:  So the State is

8    saying they are limiting it -- you've

9    got an opportunity today to put on what

10   you have known this is scheduled for --

11        GENERAL EARLS:  Correct.

12        THE COURT:  -- and you're saying

13   if the continuance is granted then it'll

14   be for the sole purpose of any expert

15   testimony you may bring in as a result

16   of reviewing these documents.

17        GENERAL EARLS:  That's right.

18        THE COURT:  Let's take about a 5

19   or 10 minute -- 10 minute recess and

20   I'll get back with you.

21             **(WHEREUPON, a recess was**

22             **had, after which the**

23             **following proceedings**

24             **were had:)**

```
 1              THE COURT:  Gentlemen, I've
 2     given some thought to the State's
 3     request for the continuance for the
 4     reasons stated.  I think it's
 5     appropriate and I would've been glad to
 6     assist ahead of time with everybody's
 7     cooperation on some information if you
 8     could've looked at it in advance if we
 9     would have had some agreement, but I
10     understand the State's request.  There's
11     no opposition to it from the Petitioner,
12     so we've been looking at dates.  It
13     looks like in an abundance of caution we
14     need to move it to November 4th.  I'd
15     like to do it sooner, but I understand
16     that it could be some weeks before you
17     actually get the documents retrieved and
18     the review occurs.  So I think that
19     should be a safe date.  I understand
20     that Counsel is available on both sides
21     for November 4th.  That is the date that
22     I had jury orientation at 8:00 o'clock
23     and that means that we can't start at
24     our usual 8:00 o'clock time, but we will
```

262

1    start at 9:30.  In an abundance of

2    caution again, we might want to have

3    everybody here at 9:00 o'clock, have

4    your witnesses if there are going to be

5    witnesses here to testify live here at

6    9:00 o'clock, but certainly not 8:00

7    o'clock.

8              Do we need to put any type of

9    order down where we're agreeing to this,

10   state why and put the date or is

11   everybody satisfied just as is for the

12   reasons stated?

13             MR. BUCHANAN:  I don't see any

14   problem with just we're having a recess

15   until November 4th at 9:00 o'clock.

16   We'll be here.

17             GENERAL EARLS:  If the Court

18   wants one, I'll do one.  Otherwise --

19             THE COURT:  I'm comfortable with

20   y'all on this.  It's just a continuation

21   of the case for the reasons stated.  Mr.

22   Ellis?

23             MR. ELLIS:  Your Honor, if we

24   could, though, before we break, we would

                                          263

1    like to ask and I don't think Mr. Earls

2    is in opposition to make the technical

3    record of this case an exhibit for you

4    to review and also for any potential

5    appeal.

6            THE COURT:  I think if you do

7    that are you not going to have to copy

8    it.  You can't use the original?  You're

9    going to have to make a copy of it.

10   Who's going to be responsible for doing

11   all that?

12           MR. BUCHANAN:  Why don't I --

13   can't I just bring it back November 4th

14   and have it ready to go, Judge?  I'll

15   get it done some time between now and

16   then.

17           THE COURT:  You've got a copy of

18   everything where you can make your copy

19   from?

20           MR. BUCHANAN:  I sure do.

21           THE COURT:  Okay.  That's fine

22   with me and y'all make it that day.

23   Does the State have any comment on that?

24           GENERAL EARLS:  We're not,

1   obviously, not opposing the technical

2   records.

3          THE COURT:  Is there anything

4   further that we can take up today in the

5   matter Jon Hall versus State of

6   Tennessee?

7          MR. BUCHANAN:  No, sir.

8          GENERAL EARLS:  No, sir.

9          THE COURT:  Mr. Hall is waving

10  at me.  Do you want to talk to Mr. Hall

11  for a moment?

12         MR. HALL:  This Affidavit said I

13  filed November 1st -- the Affidavit that

14  I filed November 1st, 2001, and two

15  subsequent Affidavits, are those going

16  to be a part of the record as my

17  testimony because I wrote those down so

18  that there was specific testimony,

19  specific things that I wanted to do and

20  that's why I had typed all that stuff

21  up.

22         THE COURT: You'll need to ask

23  your attorneys now what they're putting

24  in.  I can't give you a response because

265

1     I don't know at this point. Let me take

2     a moment --

3          MR. HALL:  They've been marked

4     filed by the Court.  All the things that

5     were marked filed by the Court --

6          MR. BUCHANAN:  They are filed.

7     I'm satisfied they'll follow this case

8     from now on.

9          THE COURT:  Okay.  Sir, your

10    attorney's answered your question.

11         MR. HALL:  The only thing is I

12    was wanting to give the State a chance

13    to rebut any of my Affidavits or

14    anything.  I wanted to make sure it was

15    in the record properly and that those

16    are my statements whether or not I got

17    to give it on the stand or not.

18         MR. BUCHANAN:  Yesterday I

19    supplied the other side that stuff.

20    I'll be more than happy -- if they

21    contact me between now and then if they

22    think they're missing something, I'll

23    give it to them and if they feel the

24    need to call Mr. Hall back.

1              THE COURT:  The State can put

2      him on.  General, do you agree with

3      that?

4              GENERAL EARLS:  I object to the

5      Affidavits being made for substantive

6      record.  If they're part of a Brief, I

7      don't have a problem with that.

8              MR. BUCHANAN:  We just want them

9      filed in the record.  They're not

10     substantive, but my point was since they

11     are filed -- and I think he has copies

12     of them.  If he doesn't and he wants to

13     ask Mr. Hall about something on them,

14     it's okay with me if he calls him back.

15             MR. EARLS:  That's fine, Your

16     Honor.

17             THE COURT:  Thank you,

18     gentlemen.

19             MR. HALL:  I sent the State

20     copies as well as the Court.

21             THE COURT:  I'm sorry.

22             MR. HALL:  I sent the State

23     copies as well as the Court and they

24     were marked filed and they were sent to

                                            267

1    the attorneys and me, so I've got copies

2    of 'em marked filed.

3              THE COURT:  Okay.  Gentlemen,

4    anything further?

5              MR. BUCHANAN:  No, sir.

6              THE COURT:  I thank you both for

7    your presentations today and I'll see

8    you back on November 4th and in

9    anticipation we'll proceed to finalize

10   the matter that day.

11

12

13

14

15

16

17

18

19

20   **END OF REQUESTED TRANSCRIPT OF THE POST**

21        **CONVICTION RELIEF HEARING**

22

23

24

1

2

3

4        EXHIBIT # 10

5        IDENTIFIED AND AUTHENTICATED

6        THIS THE _____18ᵗʰ_____ DAY OF

7        _____July_____, _2003_

8

9        _____Kay B. May_____

10                       JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

269

1

2

3

4      EXHIBIT # 11

5      IDENTIFIED AND AUTHENTICATED

6      THIS THE ____18____ DAY OF

7      _____July_____, ____2003____

8

9      _____

10                    JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4          EXHIBIT # 12

5          IDENTIFIED AND AUTHENTICATED

6          THIS THE _____18th_____ DAY OF

7          _July____ , 2003 .

8

9          _____

10                      JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4      EXHIBIT # 13

5      IDENTIFIED AND AUTHENTICATED

6      THIS THE _____ DAY OF

7      _____ , 2003.

8

9      _____

10                     JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4              EXHIBIT # 14

5              MARKED BEFORE HEARING BUT

6              NOT INTRODUCED.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Paul

| | |
|---|---|
| STATE TAX | 34.85 |
| CLKS. FEE | $1.00 |
| RECORDING FEE | 28.00 |
| TOTAL PAID | 63.85 |

FILED FOR RECORDING THE 10 DAY
OF April 1992 10:35A
NOTED IN NOTE BOOK 13 PAGE 359
RECORDED in Book 259 PAGE 174-80

PREPARED BY:
LAW OFFICE OF W. KENT JONES
Huntingdon, Tennessee 38344

Register Henderson County, Tenn.

[Space Above This Line For Recording Data]

# DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on    April 9, 1992
The grantor is

BILLIE JO HALL AND HUSBAND, JON DOUGLAS HALL                ("Borrower"). The trustee is

THOMAS D. ENOCH, Paris, Tennessee 38242                    ("Trustee"). The beneficiary is
LIBERTY FEDERAL SAVINGS BANK
which is organized and existing under the laws of    the U.S.A.                , and whose address is
914 East Wood Street, Paris, Tennessee 38242

                                        ("Lender"). Borrower owes Lender the principal sum of
THIRTY-TWO THOUSAND THREE HUNDRED AND NO/100----
Dollars (U.S. $ 32,300.00    ). This debt is evidenced by Borrower's note dated the same date as this Security
Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on
May 1, 2017            . This Security Instrument secures to Lender: (a) the repayment of the debt
evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other
sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of
Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably
grants and conveys to Trustee, in trust, with power of sale, the following described property located in
the 3rd Civil District, Henderson                            County, Tennessee:

FOR FULL AND COMPLETE DESCRIPTION OF PROPERTY, SEE EXHIBIT A
ATTACHED HERETO AND MADE A PART HEREOF IN FULL BY REFERENCE.

which has the address of    Route #2, Box 152, East Pleasant Hill        Lexington
                                        [Street]                              [City]
Tennessee      38351                ("Property Address");
                [Zip Code]

TENNESSEE -- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3043  9/90  (page 1 of 6 pages)
ITEM 1965 (9012)
                                                    Great Lakes Business Forms, Inc. ■
                                            To Order Call: 1-800-530-9393 □ FAX 616-791-1131



EXHIBIT
15 9-9-62

For release see Misc. BK36 Page 487. This 31st day of March
1995. Denny Phillips, Reg. of t.

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.  **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.
2.  **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time. 12 U.S.C. § 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.
3.  **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.
4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.
5.  **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the

Form 3043  9/90  *(page 2 of 6 pages)*



periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any



condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as

Single Family -- Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT** -- Uniform Covenants  9/90  *(page 4 of 6 pages)*

applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**21. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Trustee shall give notice of sale by public advertisement in the county in which the Property is located for the time and in the manner provided by applicable law, and Lender or Trustee shall mail a copy of the notice of sale to Borrower in the manner provided in paragraph 14. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and under the terms designated in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. If the Property is sold pursuant to this paragraph 21, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant at will of the purchaser and hereby agrees to pay the purchaser the reasonable rental value of the Property after sale.

**22. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower.

**23. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

Form 3043  9/90  *(page 5 of 6 pages)*

**24. Waivers.** Borrower waives all right of homestead, equity of redemption, statutory right of redemption and relinquishes all other rights and exemptions of every kind, including, but not limited to, a statutory right to an elective share in the Property. .

**25.** Maximum principal indebtedness for Tennessee recording tax purposes is

THIRTY-TWO THOUSAND THREE HUNDRED AND NO/100--- Dollars.

**26. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

| [ ] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
|---|---|---|
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [ ] Other(s) [specify] | | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 6 of this Security Instrument and in any rider(s) executed by Borrower and recorded with it. IN WITNESS WHEREOF, Borrower has executed this Security Instrument.

Witnesses:

_____

_____      _____ (Seal)
                                        BILLIE JO HALL                     - Borrower

                                        Social Security Number _____

_____      _____ (Seal)
                                        JON DOUGLAS HALL                   - Borrower

                                        Social Security Number _____

                                        _____ (Seal)
                                                                           - Borrower

                                        Social Security Number _____

                                        _____ (Seal)
                                                                           - Borrower

                                        Social Security Number _____

STATE OF TENNESSEE,          CARROLL          County ss:

On this    9th      day of    April, 1992                    , before me personally appeared

BILLIE JO HALL AND HUSBAND, JON DOUGLAS HALL                          to me known to

be the person(s) described in and who executed the foregoing instrument, and who acknowledged the execution of the same to be   their          free act and deed. Witness my hand and official seal.

My Commission expires:

11-16-92                                    _____
                                                                    Notary Public

                                            Form 3843  9/90  (page 6 of 6 pages)

EXHIBIT A/DEED OF TRUST
BILLIE JO HALL/LIBERTY FEDERAL SAVINGS BANK


BEGINNING on a concrete marker on the North side of the Pleasant Hill
Cemetery Road and located 25 feet North of the center of this road
and being in the W. T. Garner heirs West boundary line, and being the
beginning most Southeast corner of the lot herein described; thence
South 71 degrees 45 min. 00 sec. West 100.00 feet with the North side
of this road; thence South 86 deg. 45 min. 00 sec. West 100.00 feet
with the North side of this road to an iron pin being the Carlton O.
Estes Southeast corner and being a Southwest corner of the lot herein
described; thence with the Estes East boundary line, North 09 deg. 15
min. 00 sec. West 325.00 feet crossing a hollow and over a hill to an
iron pin being Estes's Northeast corner and being the Northwest
corner of the lot herein described; thence North 79 deg. 15 min. 00
second East 200.00 feet over a hill to a metal stake on the Garner
heirs West boundary line and being the Northeast corner of the lot
herein described; thence with the remnants of an old fence and the
Garner heirs West boundary line South 08 deg. 56 min. 55 sec.  East
325.05 feet back to the point of beginning, containing 1.52 taxable
acres as surveyed on April 3, 1991, by Eddie Coleman, Jr., County
Surveyor, Henderson County, Tennessee, L.L.S. #1140.

For title see Deed Book 60, page 91-93, Register's Office of
Henderson County, Tennessee.

1

2

3

4          EXHIBIT # 15

5          IDENTIFIED AND AUTHENTICATED

6          THIS THE _____ DAY OF

7          _____, 2003.

8

9          _____

10                    JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

274

1

2

3

4          EXHIBIT # 16

5          IDENTIFIED AND AUTHENTICATED

6          THIS THE _____ DAY OF

7          _____, 2003.

8

9

10                    JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

275

1
2
3
4        EXHIBIT # 17
5        IDENTIFIED AND AUTHENTICATED
6        THIS THE _____ DAY OF
7        _____ , 2003.
8
9
10                  JUDGE
11
12
13
14
15
16
17
18
19
20
21
22
23
24

276

1

2

3

4        EXHIBIT # 18

5        IDENTIFIED AND AUTHENTICATED

6        THIS THE _____ DAY OF

7        _____, 2003.

8

9        _____

10                           JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

277

EXHIBIT # 19

IDENTIFIED AND AUTHENTICATED

THIS THE ___18___ DAY OF

_July_, _2003_.

_____

JUDGE

278

1
2
3
4        EXHIBIT # 20
5        IDENTIFIED AND AUTHENTICATED
6        THIS THE ___18___ DAY OF
7        _July_____, 2003
8
9
10                    JUDGE
11
12
13
14
15
16
17
18
19
20
21
22
23
24

279

1

2

3

4          EXHIBIT # 21

5          IDENTIFIED AND AUTHENTICATED

6          THIS THE _____18_____ DAY OF

7          _____July_____, 2003.

8

9          _____

10                    JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

280

1                        **CERTIFICATE** -

2            I, the undersigned, Judy Laster,

3    Court Reporter, do hereby certify that

4    the foregoing is a true, accurate and

5    complete transcript, to the best of my

6    knowledge and ability, of all the

7    proceedings had and evidence introduced

8    in the Post Conviction Relief Hearing,

9    in the Criminal Court of Madison County,

10   Tennessee, Division I, heard in Jackson,

11   Tennessee, on the 4th day of September,

12   2002.

13           I do further certify that I am

14   neither of kin, counsel nor interest to

15   any party hereto.

16                   _October 15_ , 2002

17

18                   _Judy Laster_

19                   JUDY LASTER

20                   Court Reporter

21

22

23

24

                                              281

1          ### CERTIFICATE OF THE COURT

2               THIS WAS ALL THE EVIDENCE

3     INTRODUCED AND PROCEEDINGS HAD RELEVANT

4     TO QUESTIONS RAISED ON THIS POST

5     CONVICTION RELIEF HEARING.

6               The Petitioner hereby tenders

7     this his Transcript of the Post

8     Conviction Relief Hearing heard on

9     September 4, 2002, in the Criminal Court

10    of Madison County, Tennessee, Division

11    I, which is signed, approved and ordered

12    to be made a part of the record by the

13    Court.

14

15    _____, 2003

16

17    _____

18    Trial Judge

19

20

21

22

23

24

282