# ADDENDUM 1
# Volume 15

W2003-00669-CCA-R3-PD

JUDY BARNHILL, CIRCUIT COURT CLERK
FILED
BY
JUN 03 2003
DEPUTY CLERK
AM
PM

1          IN THE CIRCUIT COURT OF

2         MADISON COUNTY, TENNESSEE

3          AT JACKSON, DIVISION I

4    _____

5    JON HALL,

6          Petitioner,

7    vs.                    No. C00-422

8    STATE OF TENNESSEE,

9          Defendant.

10   _____

11         HEARING ON POST-CONVICTION

12            RELIEF PETITION

13           NOVEMBER 4, 2002

14   _____

15

16

17

18

19

20              AMY MAYS

21        OFFICIAL COURT REPORTER

22   MADISON COUNTY CRIMINAL JUSTICE COMPLEX

23        JACKSON, TENNESSEE  38301

24            (731) 423-6039



FILED

JUL 2 4 2003

Clerk of the Courts
Rec'd By

1



ORIGINAL

Vol. 15

```
 1                     A P P E A R A N C E S

 2   Before the Honorable:

 3           JUDGE ROY B. MORGAN, JR.

 4   For the Petitioner:

 5           MR. PAUL N. BUCHANAN

 6           Attorney at Law

 7           1526 Crockett Hills Boulevard

 8           Brentwood, Tennessee  37027

 9                     -and-

10           MR. DANNY ELLIS

11           Hardee & Martin

12           213 East Lafayette

13           Jackson, Tennessee  38301

14   For the State:

15           MR. AL EARLS

16           Assistant District Attorney General

17           Lowell Thomas State Office Building

18           P. O. Box 2825

19           Jackson, Tennessee  38302

20                   *  *  *  *  *

21

22

23

24
```

1                    **TABLE OF CONTENTS**

2    DR. KIMBERLY STALFORD

3          Direct Examination          Page 8

4          Cross-Examination           Page 27

5          Redirect Examination        Page 72

6          Recross-Examination         Page 73

7          Further Redirect Examination

8                                      Page 77

9    COLLECTIVE EXHIBIT 14             Page 7

10   EXHIBIT 22                        Page 8

11   EXHIBIT 23                        Page 79

12   COLLECTIVE EXHIBIT 24             Page 79

13   CERTIFICATE OF THE REPORTER       Page 89

14   CERTIFICATE OF THE COURT          Page 90

15                    - - - - - -

16

17

18

19

20

21

22

23

24

                                                    3

1        THE COURT:  All right.  We're

2   ready to continue with the hearing in

3   the matter of Jon Hall versus State of

4   Tennessee.

5        At the time of the last hearing,

6   on or about September 4th, the

7   Petitioner had rested, and the State had

8   asked for a continuance to have the

9   opportunity for examination review.

10       General Earls, I guess we start

11  with you.

12       MR. EARLS:  Yes, sir.  The State

13  would call Dr. Kimberly Stalford.

14       THE COURT:  Is there any reason,

15  as she's coming forward, to call for the

16  rule?  Should anybody need to be

17  excluded at this point?

18       MR. BUCHANAN:  Because myself

19  and Ms. Higuera were present when she

20  interviewed him, let's ask Ms. Higuera

21  to step outside in case there's some

22  kind of conflict that pops up.

23       THE COURT:  Okay.  I appreciate

24  your caution on that.

4

1          General, anything for the State

2  as far as exclusion?

3          MR. EARLS:  No, sir.

4          THE COURT:  Call that witness

5  then.

6          **DR. KIMBERLY STALFORD** was called

7  and being first duly sworn, was examined

8  and testified as follows:

9          MR. ELLIS:  Your Honor, before

10  we begin, Mr. Hall has indicated he

11  wants to look at the report before she

12  begins testifying.  He just recently got

13  it.  Can we take about three minutes?

14  We have a copy over here.

15          THE COURT:  He's not had an

16  opportunity to see it?

17          MR. ELLIS:  No, Your Honor.

18          THE COURT:  Sure.  You're

19  welcome to take a moment and share that.

20          THE PETITIONER:  I didn't get to

21  see Dr. Caruso's report before he turned

22  it in.

23          MR. ELLIS:  Your Honor, to save

24  time, on the -- when we were here on the

```
 1   4th, we had assumed that we had put into
 2   evidence the closing arguments, opening
 3   arguments and the mitigation arguments
 4   from the original trial date.  I talked
 5   to the court reporter.  She said that
 6   she had checked her notes, checked the
 7   record, and she didn't see where they
 8   were formerly introduced.  However, they
 9   were marked.  As you will recall, Your
10   Honor, you agreed in the summer, and I
11   believe it was the May hearing, to allow
12   those to be typed up to enter into the
13   record.  We just want to put them in, I
14   guess under the prior hearing date as
15   Exhibit 14 just for simplicity sake, or
16   we can enter them today, however you
17   want to do it.
18          MR. EARLS:  I have no objection
19   to them coming in, whatever is
20   convenient for the Court.
21          THE COURT:  Would it be a
22   collective exhibit?
23          MR. ELLIS:  They are, Your
24   Honor.
```

1              THE COURT:  And again, it's

2    opening argument, closing argument and

3    --

4              MR. ELLIS:  May I approach the

5    court reporter, Your Honor?

6              THE COURT:  Make sure we've got

7    it properly marked.

8              MR. ELLIS:  Your Honor, for the

9    record, these are the closing arguments

10   of February 4th, 1997, the opening

11   statements and closing arguments,

12   penalty phase, February 5th, 1997, the

13   State's opening statement, February 3rd,

14   1997.

15             THE COURT:  Let those be made

16   the next exhibit.

17             **(Collective Exhibit 14**

18             **was marked and entered.)**

19             MR. EARLS:  Your Honor, also by

20   agreement, the State has a document

21   that's the order transferring venue to

22   Madison County.  I don't think there's

23   any objection to that.

24             MR. ELLIS:  There's no

7

1   objection, Your Honor.

2            THE COURT:  That's a copy of the

3   previous order.  Is that correct?

4            MR. EARLS:  Yes, sir.

5            THE COURT:  It was referred to

6   at the last hearing as part of the

7   record?

8            MR. EARLS:  Yes, sir.

9            THE COURT:  Okay.  By agreement,

10  it will be marked an exhibit also.

11           **(Exhibit 22 was marked**

12           **and entered.)**

13           MR. ELLIS:  We're going to let

14  the General start questioning her about

15  her credentials and work through the

16  C.V. just to save time.

17           THE COURT:  Go ahead.  Start and

18  state her name and proceed, General.

19  **DIRECT EXAMINATION**

20  **BY MR. EARLS:**

21  Q        Would you state your name for

22  the record, please?

23  A        Kimberly Stalford.

24  Q        And are you licensed to practice

                                              8

```
 1   a profession here in the State of

 2   Tennessee?

 3   A       Yes, I'm licensed to practice

 4   medicine in the States of Tennessee and

 5   Kentucky.

 6   Q       In conjunction to that, do you

 7   have any specialties in the field of

 8   mental sciences or anything of that

 9   nature?

10   A       Yes.  I'm a board certified

11   adult psychiatrist.

12   Q       And, Dr. Stalford, if you will,

13   tell us a little bit about your

14   employment history.

15   A       After completing my psychiatric

16   residence in Baltimore, Maryland, I

17   stayed on there and worked at a mental

18   health outpatient clinic and stayed

19   there for two years.

20           We then moved to Tennessee where

21   I was in private practice for a short

22   time.  I now serve as a consultant, and

23   I work as a consulting liaison

24   psychiatrist to Gateway Hospital,
```

9

1   Tennessee Christian Medical Center in

2   Nashville and Cumberland Hall in

3   Kentucky.

4   Q       Okay.  Tell us a little bit

5   about your education if you would.

6   A       I studied microbiology and

7   biochemistry at Wesleyan University in

8   Middleton, Connecticut.  I entered the

9   University of Virginia Medical School

10  and completed their four-year program,

11  and then I entered a four-year

12  psychiatric residency at Sheppard and

13  Enoch Pratt Hospital which is a large

14  psychiatric hospital outside of

15  Baltimore, Maryland.

16  Q       And, have you passed any boards

17  or anything of that nature?

18  A       Yes, I am fully board certified.

19  I passed my boards, Part I, which is a

20  written test, and if you pass that, you

21  go on to your oral boards, and I passed

22  that as well.

23  Q       Now, you are board certified in

24  psychiatry.  Is that correct?

1   A       That's correct.

2   Q       Anything else?

3   A       No.

4   Q       Now, tell us about honors or

5   awards you may have received in your

6   academic career or your work -- pursuant

7   to your work.

8   A       In college I was Phi Beta Kappa,

9   which is an academic award, and in

10  medical school I graduated with Alpha

11  Omega Alpha honors, and in residency I

12  had -- I can't remember specifically

13  what they were but teaching awards and

14  advisor resident of the year award.

15  Q       And do you have any research

16  experience?

17  A       I have some research experience,

18  mostly with aggression in rats and

19  lesions, and I did some work with the

20  Navy with the dengue virus.

21  Q       And do you belong to any

22  professional societies?

23  A       Yes.  I'm a member of the

24  American Psychiatric Association and the

11

1  Tennessee Psychiatric Association.

2  Q       Okay.  And, pursuant to your

3  present employment -- Well let me ask

4  you this.  In the past, have you been

5  called upon from time to time to

6  evaluate or consult with people who are

7  charged with crimes?

8  A       Yes, I have.

9  Q       And on how many occasions have

10 you done that?

11 A       Probably about six.

12 Q       Six.  And, have you been

13 qualified as an expert before in court?

14 A       Yes, I have.

15 Q       Where is that?

16 A       In the State of Maryland, State

17 of Tennessee and the State of West

18 Virginia.

19          MR. EARLS:  Your Honor, I'd

20 tender the witness as an expert in the

21 field of psychiatry.

22          MR. BUCHANAN:  We agree to that,

23 Your Honor.

24 Q       Dr. Stalford, in September and

12

1    October of this year, were you contacted

2    by my office to conduct an evaluation on

3    Jon Hall?

4    A        Yes.

5    Q        And did you conduct such an

6    evaluation?

7    A        Yes, I did.

8    Q        Tell the Court what resources or

9    source information you -- was supplied

10   to you or that you obtained in doing

11   your evaluation of Jon Hall, please.

12   A        I reviewed the Transcript of

13   Evidence, Number 96-589, dated 2/4/97.

14   I interviewed the Defendant on October

15   23, 2002 for three and a half hours in

16   the presence of his attorney and April

17   Higuera.  I reviewed the psychiatric

18   evaluation of Jon Hall by Keith Caruso;

19   the forensic neurological evaluation of

20   Jon Hall by Pamela Auble.  I read the

21   indictment for first degree murder,

22   theft of property and especially

23   aggravated kidnapping.  I read multiple

24   interviews by the TBI, a report of his

13

1  criminal history, a report of his

2  disciplinary action; various letters

3  written by Jon Hall to someone who is

4  just Brent, Judge and Valerie.    I

5  reviewed two --

6            THE PETITIONER:    That's illegal

7  information.    That stuff should have

8  been --

9            THE COURT:    Mr. Hall, talk to

10  your counsel rather than blurt out in

11  the middle of the testimony.

12            THE PETITIONER:    Well, I've been

13  telling them and they haven't been

14  saying anything.

15            THE COURT:    Go ahead, General.

16            THE PETITIONER:    State v. Bank,

17  --

18            THE COURT:    Mr. Hall, ...

19  Q        Talking about reviewing certain

20  letters to the TBI -- or from the TBI?

21  A        Letters written by Jon Hall to

22  Brent, Judge and Valerie.    And I did

23  review interviews of the TBI of Cindy

24  Connor, Jeffrey Hall, Jackie Brittain

14

1    and Michelle Johnson, Carol Eason,

2    Darlene Brown.  I reviewed two Petitions

3    for Orders of Protection, one filled out

4    by Billie Hall on 3/10/94, the second on

5    7/5/94.  I read a civil summons

6    regarding the divorce.  I reviewed a

7    bill from Baptist Memorial Hospital; a

8    police report of domestic disturbance

9    from 5/31/91.  Mr. Hall gave me a

10   document entitled "Specific Instances of

11   Acts or Omissions of Counsel";

12   procedural history of State of Tennessee

13   versus Jon Hall.  I reviewed the autopsy

14   report of Billie Hall and was able to

15   get the medical records from Middle

16   Tennessee Mental Health Institute and

17   reviewed all of those.

18   Q        And, did you go over his social

19   history?

20   A        I did.

21   Q        And from that, could you just

22   summarize what you learned about his

23   social history, please?

24   A        Anything in particular?

15

1   Q       Well, let me go on.  You did

2   look at his social -- Jon Hall's social

3   history.  Is that correct?

4   A       Yes, I did.

5   Q       In looking at his social

6   history, what do you normally look at?

7   A       We get a biographical

8   description on where a person's born,

9   their childhood, their educational

10  experience, their work history, their

11  interpersonal relationships throughout

12  their life, drug and alcohol use, issues

13  such as that.

14  Q       And, did you look at his medical

15  history?

16  A       Yes, I did.

17  Q       Was there anything significant

18  about his medical history?

19  A       No, nothing very significant.

20  He does complain of kind of chronic back

21  pain for which he's not receiving any

22  treatment right now.

23  Q       To your knowledge, is he on any

24  medications?

16

1   A       No, he told me he was not taking

2   any medications.

3   Q       And did you talk about his work

4   history?

5   A       Yes, I did.

6   Q       And family history?

7   A       Yes.

8   Q       And did you consider his past

9   psychiatric history?

10  A       Yes.

11  Q       Okay.  And how did you obtain

12  that?

13  A       By reviewing the records I just

14  discussed and also by interviewing Mr.

15  Hall.

16  Q       Now some of those records were

17  records obtained from Middle Tennessee

18  Mental Health.  Is that correct?

19  A       That's correct.

20  Q       And did you also look at any

21  past legal problems he had?

22  A       Yes, I have.

23  Q       And did you denote those

24  incidents in a report that you prepared

17

1    for our office?

2    A        I did.

3    Q        Dr. Stalford, expressly, were

4    you asked by my office to consider a

5    disorder designated in the Diagnostic &

6    Statistical Manual of Mental Disorders,

7    Volume IV, known as intermittent

8    explosive disorder?

9    A        Yes.

10   Q        And did you consider Jon Hall in

11   interviewing him and looking at his past

12   records with regards to that disorder?

13   A        That disorder and any other

14   psychiatric disorder.

15   Q        Okay.  Now, what is the

16   Diagnostic & Statistical Manual of

17   Mental Disorders?

18   A        It is a book which is a

19   guideline for medical professionals in

20   diagnosing psychiatric illnesses, and

21   it's divided in groups of mood

22   disorders, psychotic disorders, impulse

23   control disorders, personality

24   disorders, and it has a criteria for

18

1    which to make those diagnoses.

2    Q        Is that a resource that is

3    commonly used by people in the

4    psychiatric or psychology -- or field of

5    psychology in making diagnoses?

6    A        Yes.

7    Q        Tell us what intermittent

8    explosive disorder is, or what the

9    diagnostic criteria are according to the

10   DSM-IV.

11   A        Intermittent explosive disorder

12   is a psychiatric disorder that falls

13   under the impulse control disorders like

14   cleptomania, and it is classified by

15   impulsive outbursts which usually

16   inflict harm on objects or people.  The

17   diagnosis is -- describes -- The second

18   criteria includes the outbursts in

19   excess of what one would expect, and the

20   third aspect of that diagnosis is that

21   it can't be better explained by another

22   psychiatric illness.

23   Q        Now, in your evaluation of Jon

24   Hall, what conclusion did you reach with

19

1    regards to intermittent explosive

2    disorder as to whether or not Mr. Hall

3    had that disorder?

4    A         I do not think he has that

5    disorder because I think that his

6    behaviors are better described by other

7    psychiatric illnesses.

8    Q         And that is one of the

9    diagnostic criteria of the DSM-IV.  Is

10   that correct?

11   A         Yes, that the aggravated assault

12   acts are not better explained by another

13   psychiatric illness.

14   Q         What psychiatric illnesses are

15   you talking about that, in your opinion,

16   better explain Mr. Hall's conduct?

17   A         I believe that he has what we

18   would describe as a personality

19   disorder, and very much as Middle

20   Tennessee described it, where he has

21   some passive/aggressive traits,

22   dependent traits, but I think the most

23   notable traits are what we call anti-

24   social traits or sociopathy, and within

                                        20

1  that diagnosis, there is a reckless

2  disregard of other people and agitated

3  and potentially violent acts, and I

4  think his behavior is better explained

5  under that diagnosis than intermittent

6  explosive disorder.

7  Q      And, reviewing the record in

8  this case and all the documents you've

9  referred to, did you also consider the

10  use of alcohol?

11  A      Yes, I did.

12  Q      And what affect, in your

13  opinion, did the role of alcohol play in

14  Mr. Hall on the date alleged where he

15  killed -- or alleged -- or did kill

16  Billie Jean Hall?

17  A      Well I also gave him a diagnosis

18  of alcohol dependence.  Mr. Hall has a

19  very long history of abusing alcohol and

20  had told me that he had been drinking

21  daily for at least a year prior to that.

22  So, certainly the alcohol can affect

23  one's behavior.

24      He could not really report how

21

1   much he drank that night.  I do believe

2   he was very tolerant to alcohol.  If you

3   drink 12 beers every day for a year, you

4   become very tolerant to the effects of

5   it.  So I did diagnose him with alcohol

6   dependence as well.

7   Q      Now, Doctor, what is serotonin?

8   A      Serotonin· is a chemical in our

9   brains.  It is the way that nerves

10  connect.  When you have a nerve and the

11  nerve stops, you need that nerve to talk

12  to the next nerve, and the way it does

13  it is the ·nerve releases a chemical that

14  causes what we call the synapse to the

15  next nerve, and that's how the nerves

16  talk.  And one of the chemicals in the

17  brain that does that is serotonin.

18  There's Dopamine or epinephrine, GABA,

19  but serotonin is what we call a

20  neurotransmitter which basically is the

21  way· that nerves talk to each other.

22  Q      Doctor, with regards to being

23  able to diagnose Mr. Hall, or any other

24  person for that matter, using serotonin,

22

1   tell the Court what some of the inherent

2   problems of using serotonin to make a

3   diagnosis are.

4   Q        Well we don't actually do a

5   blood test.  There is some research that

6   has been an area of active research for

7   several years now that they study the

8   serotonin levels in the spinal fluid or

9   in the CSF, and we can do a lumbar

10  puncture and measure the serotonin in

11  the CSF.  The inherent problem is that

12  when you measure the serotonin in that

13  area, you're not necessarily measuring

14  how much serotonin is actually between

15  the nerves, you're measuring serotonin

16  in a fluid that bathes the spinal cord

17  and the brain.  So that's probably one

18  inherent problem.

19          The other inherent problem is

20  you're only getting a serotonin level at

21  that exact moment.  It doesn't

22  necessarily say what was true a week

23  ago, a day ago or a month ago.

24          And the third inherent problem

23

1    with that test is that there's so many

2    medical, neurological and psychiatric

3    conditions that have been linked to

4    altered serotoninergic levels that it's

5    really not a terribly useful diagnostic

6    test, which is why the forensic unit at

7    Middle Tennessee doesn't even do it.

8    Q        Could you tell us some of the

9    physical or psychological problems that

10   are associated with low serotonin

11   levels?

12   A        Some of the things

13   psychiatrically associated with low

14   serotonin classically has been

15   depression.  We treat depressed patients

16   with what's called SSRI's or selective

17   serotonin reuptake inhibitors, and these

18   drugs increase serotonin in the brain.

19   They've connected low serotonin levels

20   to folks that suicide.  They've

21   connected low serotonin levels to

22   patients with schizophrenia.  And, in

23   fact, one of the classic anti-psychotics

24   we use is Clozaril which increases

                                        24

1    serotonin in the brain.  Bipolar

2    disorder or manic depressives have been

3    known to have low serotonergic levels.

4    We've seen it with impulsive acts of

5    violence.  We've seen it with mood

6    disorders.  We've seen it with·

7    personality disorders.  It's been seen

8    with anti-social personality disorders,

9    and there is some research that we've

10   seen it with borderline personality

11   disorder.  Neurologically it's been

12   connected to myoclonus, dementia, sleep

13   disorders, and medically it's been

14   connected to malnutrition.

15   Q       And I didn't keep count with the

16   number that you went over there, but --

17   that you testified to, but to do a

18   serotonin test and their -- based upon

19   whatever the results are to say he,

20   therefore, has this disease, would that

21   be a valid conclusion?

22   A       No.

23   Q       Because it could be one of

24   dozens --

25

1   A       It could be any one of those

2   things.

3   Q       Did you review the serotonin

4   tests that were done on Jon Hall?

5   A       I reviewed the results that were

6   described in Dr. Caruso's report.   I

7   never actually saw the lab of that test.

8   Q       Okay.   And, Doctor, did you,

9   pursuant to our request, consider

10  diminished capacity, or the area of

11  diminished capacity, in your evaluation

12  of Jon Hall?

13  A       Yes.

14  Q       And tell the Court about your

15  conclusion, please.

16  A       It is my opinion that based on

17  several instances and aspects that

18  happened that night, that Mr. Jon Hall

19  was able to think clearly and was able

20  to plan certain aspects of that night

21  and was not -- was not grossly affected

22  by drugs or alcohol or any psychiatric

23  condition that would explain a loss of

24  control.

26

1   Q        Now, Doctor, just one last

2   question.   The diagnostic criteria you

3   went over in the DSM-IV, you said there

4   were three I believe, is that correct,

5   for intermittent explosive disorder?

6   A        That's correct.

7   Q        Was one of those low serotonin?

8   A        No.   No.

9            MR. EARLS:   Pass the witness.

10           THE COURT:   Mr. Buchanan.

11   **CROSS-EXAMINATION**

12   **BY MR. BUCHANAN:**

13   Q        Doctor, when did they start

14   writing the DSM-IV?   Do you know?

15   A        I actually don't know exactly

16   when.   It's been several revisions, and

17   this is the IV.   I don't know when the

18   very first one was written.

19   Q        If you were to find out that the

20   DSM-IV -- they started writing it in

21   1988, do you know of anything that would

22   contradict that?

23   A        No, I wouldn't.

24   Q        And do you know the publish date

27

1   of it?

2   A        No, I don't.

3   Q        Would you look in the front of

4   it and see if we can agree that it's

5   1994?

6   A        I'm missing the top, so

7   hopefully it won't be -- Yes, 1994.

8   Second printing, July 1994.

9   Q        Okay.  And you would assume

10  there would be some input on it some

11  years before that, before they came up

12  with the final draft; would you not?

13  A        Right.  It's a constantly

14  changing manual.

15  Q        In fact, there is under

16  consideration a DSM-V as we speak; is

17  there not?

18  A        I'm sure there is.

19  Q        Okay.  Are you familiar -- I

20  just want to ask you a few things about

21  your background.  Are you a member of

22  either the Attorney General's Conference

23  or the Defense Lawyer's Conference?

24  A        No, I'm not.

28

1   Q        Okay.  Have you ever made any

2   presentations at either one of the --

3   either the Defense Lawyer's seminars or

4   the Attorney General's seminars?

5   A        No, I haven't.

6   Q        How many times have you

7   testified in court?  Feel free to give

8   me an approximation.  I'm not ...

9   A        I'd say between eight and ten.

10  Q        Between eight and ten?  How many

11  times for the defense?

12  A        Probably four.

13  Q        So your testimony then pretty

14  much is even-handed in terms of

15  testifying for defense, testifying for

16  the State.

17  A        Usually I interview the patient

18  and write my report, and I don't really

19  necessarily work for one side or the

20  other.  I am evaluating a patient.

21  Q        Did you see in -- The social

22  history that you had to go on was

23  primarily social history that was

24  contained in Dr. Caruso's report.  Is

29

1  that fair to say?

2  A        No, because I also drew records

3  from Middle Tennessee as well as from

4  interviewing Jon Hall.

5  Q        Okay.  Middle Tennessee didn't

6  have one reference to anybody

7  interviewing any sibling, did it?

8  A        No.  I believe they interviewed

9  his mother, Mr. Helms, Billie Hall's

10  mother, and I believe there was one

11  other person I'm blanking on.

12  Q        No siblings.  Do you know how

13  many siblings he has?

14  A        I believe he has seven.

15  Q        Would you agree with me that all

16  of the psychotic disorders that are

17  spelled out by the DSM, by and large

18  these are conditions that normal-looking

19  people walk around with every day?  It's

20  not like there's a wart on their nose or

21  anything else that sticks out that you'd

22  see walking down the street.  Is that

23  fair to say?

24  A        For psychotic disorders?

30

1    Q        Yes.

2    A        No, that's not fair to say.

3    There is such a huge range with the

4    psychotic disorders from folks that are

5    medicated and doing wonderful and you

6    would never to know to folks who are at

7    the corner screaming and talking to

8    themselves and you immediately would

9    know.

10   Q        All right.

11   A        There's a great variance.

12   Q        But for instance, intermittent

13   explosive disorder and impulse control

14   disorder and anti-social disorder, you

15   -- that's something that you're going to

16   have to diagnose after a professional

17   gets a history and interviews the person

18   and things of that nature.  You're not

19   going to see those by and large when

20   you're just walking down the street for

21   those types of things, are you?

22   A        Those would be non-psychotic

23   disorders.  The anti-social personality

24   disorder, intermittent explosive

31

1  disorder and impulse controls are not

2  psychotic disorders.  And, yes,

3  traditionally if you walk down the

4  street and you saw someone who had

5  cleptomania or was a sociopath, you

6  wouldn't be able to make that diagnosis

7  by looking at them.

8  Q        That's the same exact way we

9  actually diagnose Alzheimer's, isn't it,

10 through interviews and social history

11 and medical history?

12 A        Yes.

13 Q        Now we can tell someone had

14 Alzheimer's after they died.  We can

15 actually look at the brain and see the

16 evidence of it, but we don't have a

17 clinical test for it, at least as of

18 now, do we?

19 A        No, we don't.  We do do CT's and

20 MRI's of the head, and we can see

21 cortical atrophy, and we can get a good

22 history, but you can't make that final

23 diagnosis until after death.

24 Q        And would you agree with me that

1  the psychiatry and the psychology field

2  is grasping, even as we speak, for those

3  types of tests that are biological

4  markers that help diagnose these sorts

5  of things?

6  A        Yes.  Psychiatry is a non-

7  science.

8  Q        Okay.  Are you familiar with the

9  writings of Emil Coccaro?

10  A       I am not.

11  Q       All right.  Did you review Dr.

12  Caruso's testimony before you did your

13  report?

14  A       Yes, I did.

15  Q       After you read -- Do you

16  remember what he said about Emil

17  Coccaro?

18  A       I don't.

19  Q       Well, if he said on Page 93 that

20  he had done significant research into

21  this serotonin level being a biological

22  marker for intermittent explosive

23  disorder, did you find anything to

24  contradict Emil Coccaro specifically on

33

1    his research, or anybody that -- any

2    article that said Emil Coccaro is wrong?

3    A        Well, no, I do think -- and the

4    DSM-IV actually says -- it says it quite

5    clearly in there, in our manual, that in

6    some individuals, -- and I can read it

7    to you.

8            "In some individuals with

9    intermittent explosive disorder, they

10   have found low serotonin levels."

11           In some, not all, and they do

12   not know what the meaning of that is.

13   So there are people who have

14   intermittent explosive disorder who do

15   not have low serotonin levels, and there

16   are some that may.  The challenging

17   thing is that there are so many other

18   things that can cause low serotonin

19   levels, and the bulk of the research is

20   really with depression and suicidal --

21   on patients who have committed suicide.

22   So, there are patients who have

23   intermittent explosive disorder who have

24   low CSF, serotonin levels, but it's

34

1   some, and it's not an exclusive aspect.

2   Q        Do you remember what Dr. Caruso

3   -- And, now, we have established, have

4   we not, that we agree that you did not

5   see the actual serotonin report itself?

6   A        No, I did not see the actual

7   report itself.

8   Q        Do you remember when you read

9   Dr. Caruso's testimony where Jon fell in

10  the general population for serotonin

11  level on a percentile basis?

12  A        I believe it was five percent.

13  Q        As low as five percent of the

14  population.  Correct?

15  A        Yes.

16  Q        Can we agree that that is an

17  extremely low serotonin level?

18  A        I'm not sure that there's very

19  clear evidence as to what normal is.  I

20  believe there's very -- For instance,

21  like a white blood count.  We have

22  ranges of white blood counts that the

23  lab gives us as normal, from five to

24  ten, but many people live at four, and

35

1   some people live at eleven.  So if you

2   have a white count of four or five, I'm

3   not really sure that means that much.

4   Q       Well at least we can agree, can

5   we not, that there's 95 percent of the

6   population that has higher serotonin

7   levels that Jon Hall?

8   A       If that report says that.  I'm

9   not necessarily sure that I think that's

10  -- believe that report, but I think this

11  is an area of such tremendous research

12  -- And one of the problems is that when

13  they do do these CSF levels, they're

14  drawing them on patients who may have

15  psychiatric illnesses and medical

16  illnesses.  Most of us who have

17  relatively good health aren't having our

18  CSF level checked for serotonin.  So I

19  think it's just a very challenging area

20  right now.

21  Q       Do you have any article or

22  documentation that disputes what Emil

23  Coccaro came up with in his published

24  findings?

36

1    A        No, I do not.  I do have
2    articles, though, on some of the other
3    medical and psychiatric conditions that
4    can cause low serotonin.
5    Q        You said that you believe he
6    does not have intermittent explosive
7    disorder.  Would you allow any chance
8    that he may have it?
9    A        No, I don't think he has it.
10    Q        Well I understand you don't
11    think he has it, but are you saying that
12    Dr. Caruso's absolutely wrong, or would
13    you at least allow that he perhaps might
14    be right?
15    A        I think he's wrong.
16    Q        You think he's wrong?
17    A        I do.
18    Q        I don't mean to argue with you,
19    but we're back to that think thing
20    again.  Are you prepared to testify that
21    he is wrong, or do you allow chance that
22    he might be right?
23    A        Psychiatry -- I think you could
24    have 20 psychiatrists and all 20 could

37

1    testify on 20 different things.  It is

2    so not an exact science.  But, --

3    Q        I'm so glad you said that.

4    That's going to take care of about 20

5    questions I had at some point.

6    A        But I believe he's wrong, and I

7    would testify to that, because Mr.

8    Hall's personality structure -- And this

9    has been supported through the MMPI.  I

10   believe that his violence and his

11   disregard of life of others and his

12   disregard of the rights of others is

13   related to a personality disorder, not

14   to an intermittent explosive disorder.

15   Q        Did you ever read anything in

16   his social history, in the social

17   history that you were provided, about

18   what a kind person he was and the kind

19   things that he did throughout his life?

20   A        I don't recall reading very much

21   about that.

22   Q        Okay.  And would you agree with

23   me that a social history -- For

24   instance, it would be almost foolish for

38

1    any professional, either a psychologist

2    or a psychiatrist, to just interview a

3    patient and not get some kind of history

4    about what really is going on in his

5    life?

6    A        And certainly when I met with

7    Jon Hall and also spoke with you, Jon

8    Hall talked about some of the positive

9    things that he has done.  We talked

10   about taking care of the children when

11   his wife worked, and my assessment --

12   certainly I reviewed the records, but I

13   also spoke with him for three and a half

14   hours, and I got a pretty good history

15   of some of the kind things he has done

16   in the past.

17   Q        Well I understand that, but

18   whether it's good or bad, just relying

19   on the defendant is not a good

20   procedure, is it?  I mean, you do, in

21   fact, want to get social histories that

22   talk to family members and --

23   A        That's right.

24   Q        -- co-workers and things of that

39

1    nature.

2    A        That's right.   And as I told

3    you, and I think this -- I would read

4    whatever was handed to me.

5    Q        But you as a professional, if

6    you're not handed it, then that

7    obviously doesn't go into your

8    diagnosis.   Correct?

9    A        It doesn't go into the

10   diagnosis, but hopefully it would go

11   into the diagnosis by your interview of

12   the patient.

13   Q        Would you normally expect an

14   attorney that would hire you to

15   interview his client, -- would you

16   expect him to provide you with some

17   background material and social history

18   on the individual?

19   A        I'm not sure I understand your

20   question.

21   Q        If I called you up today and

22   hired you as my expert to give me your

23   best diagnosis of Defendant X, would you

24   expect me to provide you with some

                                        40

1  background or some social history, some

2  something about him as opposed to just

3  interviewing him?

4  A      Yes.  I would want everything

5  you had.

6  Q      Okay.  And you would hope that I

7  had done a thorough -- as thorough as

8  possible job; would you not?

9  A      Yes.

10  Q      Because your diagnosis is

11  directly related, in many regards, to

12  the quality of the background

13  information you have.  Is that correct?

14  A      No.  The diagnosis ultimately is

15  going to be based on I think that

16  clinician doing an interview.  The

17  background information is very useful,

18  but you also have to take everything you

19  get with a certain grain of salt because

20  you may be hearing things -- I've heard

21  so many contradictory things, and if you

22  read, that's very different from what

23  someone reports.  So, you take it all in

24  and you put weight on it, but ultimately

1   it's your meeting with that person that

2   will help you make that decision.

3   Q       Okay.  But if you're not given

4   anything about the good side of a

5   person, or if bad things are left out,

6   that, to some extent, hurts you in your

7   attempt to come up with a diagnosis;

8   does it not?

9   A       The more information that a

10  clinician has, the better they will be

11  able to come up with a most accurate

12  diagnosis.

13  Q       Okay.  You said in your report

14  on Page 11 that he had a history of

15  deceitfulness.  Can you tell me the

16  deceitfulness things that you saw and

17  the background that you saw that caused

18  you to say that he had instances of

19  deceitfulness?

20  A       Well just directed with me, he

21  reported to me that he struck his wife

22  five or six times, which I think is --

23  when you look at the coroner's report,

24  is in polar opposite of what I believe

42

1   must have happened there.  Also, he had

2   reported to the staff at Middle

3   Tennessee that he put his wife's body in

4   the water to revive her, and when I

5   asked him when he left the scene, did he

6   remove her or did he take her out of the

7   water, and he said no.  Things like that

8   don't make sense.

9   Q        And you characterized it as not

10  making sense but as him being deceitful?

11  A        Yes.  I don't think he was being

12  honest with me.

13  Q        Did he not tell you that he only

14  remembered hitting her five or six

15  times?

16  A        I don't recall whether he -- I

17  said, "How many times did you hit her,"

18  and I recall him saying, "Five or six

19  times."

20  Q        Okay.  And you think that's --

21  Did you go any further than that in

22  trying to cross-examine him?

23  A        Yes.  I asked him about the

24  coroner's report and that there were 83

43

1    separate blows and contusions, and I

2    believe his response was that the

3    coroner was -- I can't remember how he

4    phrased it but --

5            THE PETITIONER:  Was a quack.

6    A       Was a quack.

7    Q       Okay.  And you took this to be

8    deceitful.

9    A       Yes.

10   Q       Okay.  Is there anything in the

11   social history, other than what you've

12   testified to, as -- that gives you the

13   conclusion that he's deceitful?

14   A       I think he's done behaviors in

15   the past that demonstrate distrust -- I

16   mean, untruthfulness.  I think

17   disconnecting phone wires and -- I have

18   questions as to his truthfulness with

19   previous restraining orders and what

20   truthfully happened in those restraining

21   orders.

22   Q       Well this is what I want to take

23   up with you.  You saw in the histories

24   that you looked at, even some State's

                                           4 4

1    material, that there were instances in
2    the past that this man had disconnected
3    phone wires at residences in which
4    nobody was killed.  Correct?
5    A      Yes, that's correct.
6    Q      Nobody was beaten severely.
7    A      Sometimes people were severely
8    injured.  The one instance, I believe
9    he, while rolling a marijuana joint, lit
10   the couch on fire with one of the
11   children in the house.  So sometimes
12   when he cut the phone lines, people were
13   injured, and sometimes -- not cut but
14   disconnected, and sometimes when the
15   phone wires were disconnected, there was
16   a fight, and I assume nobody was harmed.
17   Q      Well, I'll concede with you he
18   killed a couch, but I'm asking about
19   violence toward people.  You didn't see
20   any disconnecting the phone lines and
21   then hurting any person in particular,
22   did you?
23   A      I don't know if he disconnected
24   the phone wire on the incident in July

45

1  where Billie Hall may or may not have

2  been hit with a bottle and went to the

3  hospital with supposed injuries.  I

4  don't know if the phone line was

5  disconnected that day.

6  Q        Yeah, but what I'm asking you

7  is, can you remember any instances in

8  which the phone lines were disconnected

9  that it was followed up with some sort

10 of a grand plan to hurt the person?

11 A        I can't answer that because I

12 don't know if he disconnected the phone

13 wires in July of '94.

14 Q        Okay.  Ma'am, I take from that

15 that you have instances wherein he did,

16 in fact, disconnect the phone wires and

17 no one was hurt.

18 A        Yes, that's true.

19 Q        Okay.  You say this CSF

20 serotonin level is an area of active

21 research and in no means is a diagnostic

22 tool for any psychiatric condition.  Is

23 that what you believe?

24 A        Yes.

46

1    Q        But you have not -- you also

2    said you had not read or were familiar

3    with Dr. Emil Coccaro's research.  Is

4    that --

5    A        No, there's many researchers,

6    and I have many reports here, but that

7    is one I may have read but the name is

8    not ringing a bell for me.

9    Q        Okay.  That is -- Taking

10   serotonin levels and trying to make it a

11   biological marker so that, say, when the

12   DSM-V comes out -- The DSM's are put

13   together by a panel of psychiatrists;

14   are they not?

15   A        I believe that's true.

16   Q        And to where that would be

17   accepted, you have to do research so

18   that if a DSM-V or -VI or -VII is ever

19   written, you can go to that panel and

20   say, "I have the research which I would

21   like included as a diagnostic tool," and

22   then that panel has to decide whether or

23   not your research was valid or not

24   before they put it in.

47

1    A        That research is already done

2    and included in the DSM-IV with low

3    serotonin levels and various psychiatric

4    illnesses.

5    Q        Well you're not saying that

6    since 1988 or 1994 that we haven't made

7    a little progress, are you?

8    A        Oh, we have made progress.

9    Absolutely.

10   Q        Okay.  I mean, there's research

11   going on as we're standing here today.

12   Isn't that correct?

13   A        Yes.

14   Q        And you would expect, would you

15   not, that five years from now we'll know

16   more than we know today?

17   A        Absolutely.

18   Q        "NOS", just for the record,

19   that's not otherwise specified?  Is that

20   --

21   A        "NOS" is not otherwise

22   specified.

23   Q        You also said in your report

24   that you believe he was fully capable of

48

1   premeditation.

2   A       Yes.

3   Q       It was also possible that he was

4   capable of a very impulsive act.  Is

5   that correct?

6   A       I don't believe that his actions

7   that night and some of the evidence is

8   based upon --

9   Q       Excuse me.  Let me remind you of

10  my question.  Capable.  He was capable

11  of an impulsive act; was he not?

12  A       Yes.

13  Q       Just as capable as he was of

14  premeditation.

15  A       Yes.

16  Q       And we have to look to, do we

17  not, and you have to look to, the

18  surrounding facts and figures before you

19  come up with idea of whether you think

20  it was premeditation or you think it was

21  an impulse control problem or whatnot?

22  A       That's correct.

23  Q       Okay.  You say he has no mental

24  disorder that prevents him from

49

1   premeditation, but impulse control --

2   you're not diagnosing him with impulse

3   control disorder, are you?

4   A       No, I'm diagnosing him with two

5   drug use problems, alcohol and

6   marijuana, and a personality disorder

7   that includes passive/aggressive,

8   dependent and sociopathic traits.

9   Q       Okay.  Going back to the DSM-IV,

10  the 1994 DSM-IV, you have said there

11  were diagnostic criteria, number one of

12  which is outbursts in excess of what one

13  would normally expect.

14  A       Well the first one is failure to

15  resist aggressive outbursts.  The second

16  criteria is that those outbursts are in

17  excess of what one would expect, and the

18  third one is that it's not better

19  explained by another disorder.

20  Q       Am I understanding you that you

21  basically don't have that much of a

22  disagreement that Jon might have number

23  one and number two, but where you really

24  think he falls off of that diagnosis is

50

1    with number three?  Is that correct?

2    A        I do think he has demonstrated

3    in the past to be impulsive, and that's

4    been shown on his personality testing.

5    I don't believe two -- I don't know that

6    -- I don't know that his response was in

7    excess of what -- You know, that's like

8    a small thing, something small happens

9    and then, boom, you know, the person

10   explodes, and I don't think that

11   happened.

12   Q        Where you really find

13   disagreement, though, is with number

14   three.  Is that fair to say?  That you

15   think it's better explained by other

16   things?

17   A        Yes, I do think that what

18   impulsive behaviors he does have are

19   better explained by other psychiatric

20   disorders.

21   Q        Okay.  Serotonin levels vary

22   somewhat, but they don't rise from the

23   lower five percent to the highest five

24   percent over a lifetime, do they?

1    A        I can't answer that because

2    they've done no research, and again,

3    most of the studies that they've ever

4    done are on medically ill,

5    neurologically ill, psychiatrically ill.

6    So I don't think we have a really good

7    lifespan study or normal study or

8    anything of that nature.

9    Q        So when Dr. Caruso -- if he were

10   to have said that the serotonin levels

11   don't vary a lot over a lifetime, you'd

12   disagree with that.

13   A        I would because we know that

14   those serotonin levels can drop in some

15   patients with depression.  So if you

16   test the person when they're depressed,

17   you could expect a low serotonin level.

18   If you test them when they're not

19   depressed, that serotonin level could be

20   normal.  I think it's such an area of

21   research, we don't know.  The truth is,

22   we just don't know, and as much as I

23   would love to have a lab test and make a

24   psychiatric diagnosis, we are so far

52

1   from that.

2   Q       At least -- Do you think if you

3   read the research of Dr. Coccaro that

4   that could affect your opinion on that?

5   A       No, I don't because the -- there

6   are so many things that research has

7   shown to cause a low serotonin level.

8   Q       So I guess it is fair to say

9   that there's not much that's going to

10  change your mind on that.

11  A       No.

12  Q       Okay.  If I'm understanding you

13  correctly, you're saying that one of

14  your problems with the serotonin

15  research is that they're pulling it from

16  people who are a population that are

17  full of problems to begin with.  Is that

18  a shorthand of what you're saying?

19  A       Well the bulk of the research is

20  with neurological issues, sleep

21  disorders and some psychiatric issues.

22  Q       So you're saying that these

23  people have these sorts of issues, and

24  they're primarily the ones they're

53

1   pulling the serotonin from?

2   A        Many of the studies, yes.

3   Q        But again, you're not familiar

4   with Dr. Coccaro.

5   A        No.  I am familiar with the

6   studies connecting intermittent

7   explosive disorder with low serotonin

8   levels.  Now who actually the name

9   behind that research is, I'm not

10  familiar.

11  Q        Do you know that he made a

12  presentation at the American Psychiatric

13  Association convention just in the last

14  two years?

15  A        No, I did not know that.

16  Q        That's basically how a person

17  that has left medical school and left

18  their residency -- seminars are

19  basically how you as a professional keep

20  up with the latest -- that and your own

21  reading, keep up with the latest things

22  that are going on in your profession.

23  Is that fair to say?

24  A        No.  I receive weekly journals,

54

1   <u>American Psychiatric Journals</u>, the

2   newsletters, the magazines, the -- we

3   get monthly a big journal, and you would

4   have to read that information monthly to

5   keep up.  The conference is once a year

6   in various parts of the country, and

7   there are hundreds and hundreds of

8   seminars going on.  You may be lucky if

9   you can go to a handful.  So really, a

10  psychiatrist will keep up with the

11  current information by reading their

12  weekly journals.

13  Q       Okay.  I thought my question

14  said that and reading.  But that is the

15  way you catch up and stay up, is you go

16  occasionally to a seminar and you do

17  your reading of whatever journals you

18  subscribe to.  Is that --

19  A       That's right.

20  Q       Okay.  Would it surprise you for

21  a certain defendant to give you a

22  history and then you talk to immediate

23  family members and siblings and things

24  of that nature and find that what he has

55

1   told you, or she has told you, is in

2   many ways contradictory to what you're

3   hearing from so many other people in the

4   family?

5   A        Frequently when I get a social

6   history there is differences in how

7   people recall things.

8   Q        And again, that's why, as you

9   said, you'd read anything that's given

10  you on the theory that the more you

11  read, the more you're helped.  Is that

12  fair to say?

13  A        That's fair to say.

14  Q        You would not expect an attorney

15  to hire you and not provide you

16  anything, would you?

17  A        No, I would not.

18  Q        And, just for the record, you

19  conducted no family interviews yourself

20  with any of the siblings.

21  A        No, I did not.

22  Q        Your family history, as I read

23  your report, takes up about two inches

24  on Page 4; does it not?

1    A        Right.

2    Q        Do you think if you'd have

3    interviewed Sheryl -- By the way, did

4    you read Sheryl Arbogast's testimony

5    from this proceeding?

6    A        I do not believe I did.  I think

7    we talked about that and you were going

8    to send me the hospital -- that and the

9    records from Middle Tennessee, and I did

10   not receive those.

11   Q        I had offered to send you a

12   digest of the original trial, but what

13   I'm referring to is Sheryl Arbogast's

14   testimony in this proceeding, which I

15   don't think -- I've never digested.

16   A        I don't believe I read that.

17   Q        I'm just asking you, did you

18   read it?

19   A        No, I do not believe I have.

20   Q        Okay.  Do you think if you'd

21   have read it and the other two sisters

22   that testified, or if you had talked to

23   them, that your family history might

24   take up a little bit more than two

1    inches?

2    A        I don't know.

3    Q        Refresh my memory.  I'm at the

4    age where I worry every day about

5    Alzheimer's in my own self because I

6    don't remember things so well, but

7    didn't I remember you telling me that

8    you thought it was clear that he acted

9    impulsively that night?

10   A        No, what I said is, I think he's

11   an impulsive young man, and I do think

12   that he is someone who doesn't

13   necessarily think through the actions.

14   For instance, when he lit the couch on

15   fire, I'm not really sure he thought

16   that that house could burn down, and he

17   did go back and help his wife put that

18   fire out.  We did discuss whether I

19   thought that night whether that was an

20   impulsive or a premeditated act, but I

21   do think he has a tendency to be

22   impulsive, yes.

23   Q        But what you're telling me is

24   that at least as regards the killing --

1    I'm calling it the killing of the couch,
2    but we're talking about the fire that
3    engulfed the couch, that didn't appear
4    to be premeditated to you, did it?
5    A        No, it did not.  I think his
6    wife said something to the effect that
7    the house was in her name, and he
8    thought he'd rather burn it down than
9    have her have it, and so I do think that
10   was -- appeared to me to be a relatively
11   impulsive act.
12   Q        You thought in that particular
13   instance, that something the wife said
14   set him off.  Is that fair to say?
15   A        I don't think he went to the
16   house that day planning to light the
17   couch on fire, no.
18   Q        Nothing was premeditated as far
19   as hurting the couch.
20   A        Right, killing the couch.
21            MR. BUCHANAN:  No further
22   questions.
23            Well, just a minute, Your Honor.
24   My learned co-counsel ...

59

1  Q        The killing of the couch, would

2  that be an example of an outburst beyond

3  the norms of what society would consider

4  appropriate?

5  A        Yes, and I think that's a good

6  example of his sociopathy.

7  Q        But it also meets that second

8  prong of the DSM on IED, does it not,

9  that it's an outburst that you would

10  normally expect?

11  A        Not for a sociopath.

12  Q        Not for what?

13  A        Not for a sociopath.  For

14  somebody who has a disregard for the

15  rights of others, who has a tendency

16  towards aggressiveness and violence, a

17  sociopath -- part of that diagnosis is

18  violence and aggression.

19  Q        Doctor, I don't remember you

20  saying he was a sociopath anywhere.

21  A        I said he has personality

22  disorders with dependent,

23  passive/aggressive, anti-social traits.

24  Q        But, you don't diagnose him as a

60

1   sociopath.

2   A        Yes, I do.

3   Q        Where do you do that in your

4   report?

5   A        Well, personality disorder, I

6   think he has the traits of anti-social

7   personality disorder, but I think he

8   also has significant dependent traits

9   and passive/aggressive traits.  So I

10  think because it's a more complicated

11  picture than just straight anti-social

12  personality disorder, we give the

13  diagnosis of personality disorder NOS.

14  Q        Doesn't the American Psychiatric

15  Association kind of frown on the use of

16  the term sociopath?

17  A        No.

18  Q        In diagnosis?

19  A        No.

20  Q        Okay.

21  A        I mean, in the research here, --

22           MR. BUCHANAN:  No further

23  questions.

24  A        -- it's extensively used.

61

1  Q        Ma'am?

2  A        In research, it's extensively

3  used.

4  Q        Okay, that's fine.

5           Mr. Learned Young Co-Counsel has

6  got some questions.  I'm going to feed

7  them to you if you don't mind.

8  A        I don't mind.

9  Q        You found out that -- You didn't

10 think he was depressed in your report.

11 Is that fair to say?

12 A        When I saw him or at the time of

13 the offense?

14 Q        Both.

15 A        At the time of the offense, yes,

16 I do think he had some depressive

17 symptoms.  I think I wrote I don't think

18 he met the criteria for major

19 depression.  It's hard to really say

20 without having the chance to have

21 interviewed him at the time, but I do

22 think he had some symptoms of

23 depression.  I do think he had a lot of

24 stress, but I don't think he met the

62

1    criteria for major depression.  As

2    indicated, he was working, and although

3    albeit slower, was still going out to

4    the bars with his friends.  This is not

5    someone that was in bed and having a

6    difficult time.

7    Q        Don't think he was depressed

8    now?

9    A        Now?  He denied the classic

10   symptoms of depression, although he did

11   report that he had thoughts of suicide.

12   So I don't think he met the criteria for

13   major depression, but I do think this

14   has been difficult for him.

15   Q        Did you see any indication that

16   he was a schizophrenic?

17   A        No.

18   Q        Now you'd said that the low

19   serotonin levels were quite often

20   associated with bouts of major

21   depression and schizophrenia, but you

22   didn't see those two things in him, did

23   you?

24   A        Not at the time I saw him, no.

63

1   Q        So, at least, a low serotonin

2   level is not inconsistent with IED, is

3   it?

4   A        No, low serotonin level is not

5   -- we do see it in some patients with

6   IED.

7   Q        Do you think he was drunk the

8   night of the offense?

9   A        You know, I truly can't answer

10  that.  I don't know exactly how much he

11  drank.  I'm not sure he knows exactly

12  how much he drank.  He reported that he

13  was, I think, trashed.  I do know that

14  -- I'm sure he had some tolerance to

15  alcohol after drinking 12 beers every

16  night, but I truly can't answer that.

17  Q        Do you have a -- Did you get

18  anything from the State in your

19  materials that indicated that he was

20  intoxicated that night?

21  A        You mean a lab report or --

22  Q        No, not even a lab report.  Just

23  anything from the State that indicated

24  he was drunk that night or intoxicated.

64

1   A        Yes.    There have been reports

2   that he reported that he had been

3   drinking, and that one of the daughters

4   said, "You're drunk."  So I have read

5   reports, and he said he was trashed,

6   that he'd been drinking that night.  We

7   know he'd been drinking.  I just don't

8   know how much he had.

9   Q        You saw a report from one of the

10  children that said he was drunk.

11  A        I read in one of the daughter's

12  -- had testified that he -- and he told

13  me that when he walked in the door, one

14  of the girls said, "You're drunk."

15  Q        Well, -- And I know this is

16  difficult for you to do, but my question

17  centers on things you were supplied by

18  the State.  Do you remember anything

19  supplied by the State that indicated he

20  was intoxicated?

21  A        Sure, absolutely.  Some stuff I

22  got from Middle Tennessee, and what I

23  got from the State was the Transcript of

24  Evidence, February 4, and I don't know

1    that it said anything in there -- Oh,

2    yes.  There was the testimony of a

3    doctor that said that he'd been

4    drinking, and that led him to be

5    impulsive.  I read that.  And I read Dr.

6    Caruso's and Auble's report where he

7    reported that he had been drinking.  And

8    in the State, I have letters that Jon

9    Hall wrote where he reports that he was

10   intoxicated.

11          Does that answer your question?

12   Q      That's fine.

13   A      I know he was drinking; I just

14   don't know how intoxicated he was.

15   Q      Just a point on the

16   premeditation.  You knew that he was a

17   mechanic of sorts; did you not?

18   A      Yes.

19   Q      And there was a shed on the

20   premises that had steel tools that you

21   could use on a car for purposes of

22   working on one.

23   A      Yes.

24   Q      Would you agree with me that if

66

1    you're going to premeditate a killing,

2    that it would make awfully good sense

3    with those type of blunt trauma objects

4    available, to avail yourself of one to

5    make the job a little easier?

6    A        I don't --

7    Q        I mean, that would certainly be

8    an indication, would it not, that you'd

9    planned it if you'd gone out in the shed

10   and you picked up a blunt object, say a

11   big old wrench, pipe wrench, and came in

12   the house?  That'd be a pretty good

13   indication that at least by the time you

14   got to the tool shed, you were

15   premeditating some violence; would it

16   not?

17   A        Is your question -- Could you

18   repeat your question?  I got lost.

19   Q        All right.  If  you were going

20   to premeditatedly kill someone and you

21   had available to you fairly easily tools

22   that would help that situation along as

23   opposed to your bare fists, if you, in

24   fact, availed yourself of those tools,

67

1  that would be an indication of

2  premeditation; would it not?

3  A       Yes.

4  Q       And, of course, if you didn't,

5  then that's not an indication that you

6  were premeditated in your actions.

7  Would that be also fair to say?

8  A       That you could premeditate a

9  murder without getting a tool?

10  Q       Yes.  Now I understand you

11  could, but if you didn't, then that

12  would be one more thing that would tend

13  to say, well maybe this was a more

14  impulsive, spur-of-the-moment type

15  thing.  Is that fair to say?

16  A       I don't think that's fair to

17  say.

18  Q       Okay.  I've got one --

19          MR. BUCHANAN:  I better check

20  with my co-counsel, Your Honor.

21  Q       Looking at the DSM on -- the one

22  we're talking about that the episodes

23  are not better accounted for by another

24  mental disorder, and which one of those

1   -- I'll just go through them with you.

2   A       Okay.

3   Q       Anti-personality disorder, are

4   you saying he's got that?

5   A       What page are you on?

6   Q       612.  Is there any supplement to

7   the DSM yet?

8   A       No, not that I know of.  I do

9   think he has anti-social personality

10  disorder.

11  Q       You think he has anti-social

12  personality disorder?

13  A       Yes.

14  Q       Do you think he has borderline

15  personality disorder?

16  A       I know Dr. Caruso does.  He's

17  got so many personality traits, I tend

18  to agree more with Middle Tennessee,

19  that they're more -- he's more

20  passive/aggressive and dependent.

21  Q       Okay.  Well, how about a

22  psychotic disorder?

23  A       He does not have a psychotic

24  disorder.

69

1   Q       A manic episode?

2   A       He does not have a manic

3   episode.

4   Q       Conduct disorder?

5   A       Conduct disorder is a diagnosis

6   of a child, so -- I think he probably

7   had that as a child, but you don't

8   diagnose that in an adult.

9   Q       You actually have very little

10  history on him as a child.  Isn't that

11  fair to say?

12  A       I had read -- I mean, I've read

13  pages and pages of social history.  I

14  feel like I have quite a bit.

15  Q       Do you feel like he has

16  attention deficit hyperactivity

17  disorder?

18  A       No, I don't.

19  Q       All right.

20          MR. BUCHANAN:  Let me check one

21  more thing, Your Honor.

22  A       You know, the other thing, if

23  you kept going, it says, "And are not

24  due to direct physiologically --"

70

1        MR. ELLIS:  Your Honor, I'm
2   going to object.
3   A        "-- effects of a substance, drug
4   abuse."
5   Q        Just a minute.  Can you hold up
6   'til I get you a question?
7   A        Okay, sorry.
8   Q        Just a couple of things.  You
9   didn't see -- You said that he didn't
10  remember a whole lot of seeing awful
11  conduct between his father and his
12  mother when he was young.
13  A        What I recall him saying is he
14  recalls three separate incidents, two
15  involving his mom and one involving one
16  of his brothers.
17  Q        You wouldn't be at all surprised
18  to hear that there were many instances
19  of that, would you?
20  A        I would not be surprised.  And I
21  think that's been shown in the record.
22  Q        Now, do you remember the Middle
23  Tennessee report, them talking about the
24  brother in Texas that had the HIV?

                                        71

1    A        Yes, I did read about that.

2    Q        And that report was dated

3    sometime in 1994, wasn't it?  1994,

4    1995?

5    A        When he was hospitalized?

6    Q        Uh-huh.

7    A        It was '95.

8    Q        So there was some indication in

9    the Middle Tennessee report that a

10   lawyer or anything else that saw it

11   could have found that he had a brother

12   that was, in fact, dying of AIDS.

13   A        That's correct.

14            MR. BUCHANAN:  No further

15   questions.

16            THE COURT:  General, any

17   questions?

18            MR. EARLS:  Just briefly.

19   **REDIRECT EXAMINATION**

20   **BY MR. EARLS:**

21   Q        You were asked several questions

22   about a report, whether or not you had

23   reviewed a report from another expert,

24   and did I -- am I correct in saying that

72

1  there are dozens of reports out there,

2  tests, or whatever, on serotonin?

3  A        Yes.  If you do a lit search on

4  a med consult, there's voluminous

5  amounts.

6  Q        You really can't pick one and go

7  with it, though, can you?

8  A        No, you cannot pick one.

9        MR. EARLS:  That's all I have.

10  **RECROSS-EXAMINATION**

11  **BY MR. BUCHANAN:**

12  Q        I don't know if I finished it,

13  but I know I started it, and I may have

14  gotten off, but if I am, I apologize.

15  But when we were talking about the

16  statistical sample of people that have

17  had serotonin drawn and you had concern

18  as to the validity of all of those

19  because you weren't convinced that the

20  population at large had been taken

21  enough that it could really

22  statistically tell us much about

23  psychiatric disorders, is that what I

24  understood you to say?

73

1   A        Well I have several big
2   concerns.   The first is that the
3   serotonin level in the spinal fluid that
4   bathes the brain and the spinal cord is
5   not an indication of the serotonin
6   activity in the synapses which is where
7   it works.   That's the first concern.
8   The second concern is that there are so
9   many illness that are affected by the
10  serotonergic activity, and thirdly is
11  that this is such an area of research
12  right now that even the question of what
13  are normal levels is very debatable.
14  Q        And I think I'm honing in on
15  that last thing you said.   You're
16  concerned that they haven't taken enough
17  samples of enough people that they could
18  really tell what's normal and what's
19  not.   Is that what I'm hearing you say?
20  A        Yeah.   Well we're still in the
21  very early experimental stage, and I
22  think that over time we will see more
23  and more patterns of serotonergic
24  activity, but I think it's important to

74

1     remember that you can have too floridly

2     depressed people; one has a very low CSF

3     serotonin level and the other will be

4     very high.  So the level -- You know,

5     you may see a certain percentage of

6     people with low serotonin level that are

7     depressed or low serotonin level that

8     has schizophrenia, but you can find just

9     as many that have normal serotonergic

10    levels and have psychiatric illnesses.

11    Q        And that's depression and

12    schizophrenia and not IED.  Correct?

13    A        Well IED, -- I mean, even in the

14    DSM-IV they say -- and this is seen if

15    you do med searches and you look it up,

16    that, "Signs of altered serotonin and

17    metabolism have been found in the spinal

18    fluid of some impulsive and temper-prone

19    individuals, but the specific relation

20    of these findings to intermittent

21    explosive disorder is unclear."  So,

22    yes, we've certainly seen it with

23    explosive and violent people but not

24    all.

75

1    Q        So this was a test they were

2    looking at fairly seriously in 1994.  Is

3    that fair to say?

4    A        Well I think the world of

5    psychiatry is aggressively trying --

6    they're studying Dopamine with

7    intermittent explosive disorder, they're

8    studying more epinephrine.  I think they

9    are desperately trying to learn more

10   about the brain and how it works.

11   Q        Is there a way to draw serotonin

12   from the brain?

13   A        Not that I know of, no.

14   Q        Can a person have, in your

15   opinion, low serotonin, let's say the

16   bottom five percent of the population,

17   and be normal?  And I use that term

18   meaning no psychiatric disorder.

19   A        Yes.

20            MR. BUCHANAN:  Thank you, Your

21   Honor.

22            MR. EARLS:  Just one quick

23   question, Your Honor.

24

76

1    **FURTHER REDIRECT EXAMINATION**

2    **BY MR. EARLS:**

3    Q        You were being asked about all

4    these different disorders that Jon did

5    not have, and you started to respond and

6    say that there was something else and

7    you were cut off.  What was that?

8    A        Well with intermittent explosive

9    disorder -- And again, the important

10   thing with intermittent explosive

11   disorder is it's a failure -- it is a

12   failure to resist aggressive impulses,

13   not an inability to resist those

14   aggressive impulses, but he was going

15   over with me -- I forget what page it is

16   now.  Under "C", "The aggressive

17   episodes are not better accounted for by

18   another mental disorder and are not due

19   to the direct physiological effects of a

20   substance, drug abuse, including

21   alcohol."  So, what they mean when --

22   the psychiatrist that wrote this is that

23   if someone's on cocaine and they have an

24   aggressive outburst, you can't say it's

77

1    intermittent explosive disorder because

2    you've got the cocaine complicating

3    things, and Mr. Hall has such a long,

4    long history of alcohol and marijuana

5    abuse, that truly you cannot make this

6    diagnosis.

7              MR. EARLS:   Thank you.

8              MR. BUCHANAN:   No further

9    questions.

10             THE COURT:   Is this witness free

11   to leave the building?

12             MR. EARLS:   Your Honor, I'd ask

13   her to stay around, probably about ten

14   minutes.

15             Your Honor, there's no objection

16   from counsel for the Petitioner.   The

17   State is going to ask that a copy of the

18   DSM-IV that we've talked about so much

19   is going to be made an exhibit, talking

20   about intermittent explosive disorder.

21             THE COURT:   That's just that

22   particular section of the DSM-IV that's

23   being offered by agreement.

24             MR. EARLS:   Yes, sir.

1          **(Exhibit 23 was marked**

2          **and entered.)**

3          MR. EARLS:  Also, there's no

4    objection to Dr. Stalford's curriculum

5    vitae and a copy of her report being

6    made an exhibit, and I don't -- if the

7    Court wants to make those collective, I

8    have no objection, or you can do them

9    separate.

10          MR. BUCHANAN:  That's fine, Your

11    Honor.

12          **(Collective Exhibit 24**

13          **was marked and entered.)**

14          MR. EARLS:  State rests.

15          MR. BUCHANAN:  Defense has no

16    rebuttal, Your Honor.

17          MR. EARLS:  Can I excuse Dr.

18    Stalford?

19          THE COURT:  Somebody can go out

20    there and tell her.

21          Gentlemen, at this point, of

22    course, this is a matter we've been

23    involved with for well over a year with

24    the proceedings regarding the PC

1   hearings.  Do you agree that it would be

2   better that I allow, first of all, the

3   Petitioner's side time to submit final

4   argument by brief form in making your

5   argument and then let the State have

6   time to respond but do the finality of

7   it that way?

8          MR. BUCHANAN:  That's fine, Your

9   Honor.

10         MR. EARLS:  Are you talking

11  about a written brief, Your Honor?

12         THE COURT:  Yes.  And give you

13  time because it has been, again, taking

14  place over a large span of months here

15  with everybody I know working hard on

16  it.  What I would like to suggest, I'd

17  like to go ahead and get everything in

18  our hands for final decision.  If

19  Petitioner's counsel could have

20  something to me in two weeks' time?

21         MR. ELLIS:  Your Honor, before

22  we do that, we'd like to have the

23  transcript first.

24         THE COURT:  Oh, that's right.

80

1   I'd forgotten.  I'd left Mrs. Mays out

2   of the loop.  We've got everything but

3   today, hadn't we?

4          MR. BUCHANAN:  But today.

5          MR. ELLIS:  Your Honor, I still

6   think that'd be very important.

7          THE COURT:  Oh, I agree.  I'd

8   like to get this in your hands, both of

9   you.  I don't want the two-week period

10  to start running until we know we can

11  have that, so I'll just ask Mrs. Mays,

12  depending on her schedule what she

13  thinks.

14          Would you have it to them within

15  a week or do we need longer?

16          COURT REPORTER:  No, I can't do

17  it this week.  I can do it next week.

18  I'll have it in two weeks, by the 18th.

19          THE COURT:  You would have it to

20  everybody by the 18th, and that includes

21  a copy then for our side, too, for this.

22          And after that, I know you've

23  got everything else and you can be

24  working.  You're down to just today's

81

1    hearing, so you can be working on it and

2    taking it into consideration that both

3    sides can be moving along.  Let's still

4    put two weeks from that date, December

5    2nd.  Have yours in hand by December 2nd

6    for Petitioner's side.

7            MR. BUCHANAN:  That's fair.

8            THE COURT:  And then could the

9    State have it in my hands by December

10   16th?

11           MR. EARLS:  Yes, sir.

12           THE COURT:  So Mrs. Mays will

13   have it to you by the 18th and then

14   Petitioner's side by the 2nd of December

15   and the State by the 16th of December in

16   response.

17           Now, gentlemen, will that --

18   Go ahead.

19           MR. BUCHANAN:  Judge, I just

20   wanted to make sure, I'm anticipating

21   submitting something that would be very

22   similar to what I would tell you if I

23   was here at this podium but with

24   footnotes or references to the record

82

1   that you could check if you wanted to.

2   Is that what the Court's looking for?

3          THE COURT:  Yes, sir.  I think

4   that's what you want to do, and I'm

5   agreeable to that.

6          And the State's agreeable to

7   that?

8          MR. EARLS:  Yes, sir.

9          THE COURT:  And there was a

10  missing page.  There was Page 29 I

11  believe of the amended petition.  After

12  some contact with Petitioner's counsel,

13  there was a page finally submitted, but

14  I'm understanding it was a renumbered

15  30.  Number 30 was made 29, and it

16  didn't add anything to what we thought

17  was missing.  So I just want you to know

18  I can only rule on -- I don't know

19  what's on the page, and I can only rule

20  on what I've got.

21          MR. ELLIS:  Well, Judge, I've

22  got the whole petition.  I'll just bring

23  --

24          THE COURT:  Well have you got it

1   with you?

2           MR. ELLIS:  I've got it in my

3   office.  I'll get it to you this

4   afternoon.

5           THE COURT:  You know what you

6   sent last time.  It was a page that was

7   renumbered from 30 to 29.

8           MR. ELLIS:  I'll just -- Your

9   Honor, I'll just -- to clear up any

10  questions, I'll bring the whole petition

11  this afternoon.

12          THE COURT:  That's something

13  we've been working on for quite some

14  time, since about two months ago.  So,

15  this afternoon.  No later.  If there's

16  something missing, I want to have it.

17          Anything further, gentlemen?

18          MR. BUCHANAN:  No, sir.

19          THE COURT:  Thank you,

20  gentlemen.  We'll stand in recess.

21                    - - - - -

22  **END OF REQUESTED PROCEEDINGS.**

23

24

1

2

3

4

5

6

7   COLLECTIVE EXHIBIT 14

8            Identified and authenticated, this

9

10  the ___/8_____ day of __July_____,

11

12  2003.

13

14

15  _____

16  JUDGE

17

18

19

20

21

22

23

24

Kimberly F. Stalford, M.D.
1771 Madison Street
Clarksville, TN 37043
(931) 647-1453

## PSYCHIATRIC EVALUATION

Name:                   Jon Hall
Date of Birth:          August 5, 1964
SSN:                    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
Date of Report:         November 1, 2002

## <u>IDENTYIFYING INFORMATION</u>

Mr. Jon Hall is a 38-year-old man who is currently incarcerated at Riverbend Maximum
Security Prison. He was convicted of first degree murder of his wife, Billie Hall, who
was beaten, strangled, and held under water on July 29, 1994 at her home in Madison
County, Tennessee.

## <u>CONFIDENTIALITY</u>

When I first went to meet with Mr. Hall on October 10, 2002 at 9:30 A.M., he refused to
meet with me. His attorney had set up this time, but was not present. Mr. Hall stated that
he would not meet with me without either his attorney present or videotape of the
interview. My evaluation was rescheduled for October 23, 2202. I explained to Mr. Hall
that I had been asked to see him by the Assistant District Attorney, Mr. Al Earls, and that
I would be providing a report to his office and Mr. Hall's attorney if requested. I also
explained that I might be asked to testify in court. He understood and accepted the non-
confidential nature of the interview and agreed to proceed.

## <u>SOURCES OF INFORMATION</u>

1.  Transcript of Evidence No. 96-589, State of Tennessee vs. Jon Hall – 2/4/97
2.  Interview of the defendant on October 23, 2002 for 3 1/2 hours
3.  Psychiatric Evaluation of Jon Hall by Keith Caruso, MD on August 30, 2002
4.  Forensic Neuropsychological Evaluation of Jon Hall by Pamela Auble, Ph.D. in
    August 2002.
5.  Indictment for First Degree Murder, Theft of Property, and Especially Aggravated
    Kidnapping

6. Memorandum of Complaint submitted by Jon Hall
7. Interview of Cindy Connor by TBI
8. Report of Criminal History
9. Report of Disciplinary Action
10. Letter written by Jon Hall to "Brent"
11. Letter written by Jon Hall to "Judge."
12. Petition for Order of Protection filled out by Billie Hall on 3/10/94
13. Petition for Order of Protection filled out by Billie Hall on 7/5/94
14. Letter by Jon Hall to "Valerie"
15. Motion for the setting of child support
16. Interview of Valerie Lambert by TBI
17. Attempted interview of Jon Hall by TBI
18. Interview of Jeffrey Hall by TBI
19. Interview of Jackie Brittan by TBI
20. Interview of Michelle Johnson by TBI
21. Interview of Carol Eason by TBI
22. Interview of Darlene Brown by TBI
23. Civil Summons regarding Divorce
24. Bill from Baptist Memorial Hospital
25. Police report of Domestic Disturbance from 5/31/91
26. Document titled "specific instances of acts or omissions of counsel."
27. Procedural History of State of Tennessee Versus Jon Hall
28. Autopsy Report of Billie Hall
29. Medical Records from Middle Tennessee Mental Health Institute

## SOCIAL HISTORY

The defendant was born in Pittsburgh and raised in Ligonier, Pennsylvania. He lived in
Pennsylvania until the age of 20.   He is the seventh child born to Jay Hall, Sr. and Carol
Hall. His mother was 15 when she married her husband who was 19 at the time. At
birth, the obstetrician removed the umbilical cord from the defendant's neck, but there
were no permanent injuries or asphyxia.   The defendant states that he would describe his
childhood as "pretty normal."   He denies any kind of physical or sexual abuse involving
his parents, but states that he does have a lot of memories of aggressive wrestling
matches with his brothers. He states that his brothers would "tickle me until I peed, give
me knuggies, and sit on my chest." He recalls some of these interactions as feeling
abusive. He recalls that he would "freak out" with aggressive temper tantrums in the hope
that this kind of behavior would "get my brothers off of me."   Although he states that

money was tight, he does not recall wanting of anything until he was in high school – and at that time, he wished for motorcycles, televisions, etc. He states that he did not feel deprived in any way. Mr. Hall graduated from highschool after attending high school for half of a day and auto mechanic school for the other half. He reports that he was a poor student and generally earned C's and D's in school. He began to demonstrate antisocial traits at an early age with drug and alcohol use starting at age 13 and brushes with the law. At age 13, he was charged with alluding police on a motorcycle, driving without a license, driving an unregistered motorcycle, and driving without a helmet. He later was charged with receiving stolen property when he knowingly bought a stolen stereo. He reports that he was placed in ARD. He has demonstrated problems with authority, irritability, theft, and frequent fights in his youth – again early indications of sociopathic behavior. He had difficulties in school as well stating that he "didn't listen" to his teachers and was suspended twice for drug possession. .

The defendant's father worked in construction. He was reportedly an alcoholic and Dr. Caruso's report states that he was physically abusive. However, Mr. Hall denied to me that his father was physically abusive to him. In fact, he can only recall three significant altercations involving his father – one where he damage a thunderbird, one where he "yanked the phone", and one involving his brother, Jeff. When the defendant was 10 years old, his father died of a heart attack. Mr. Hall reports that "I didn't know my father well." His mother remarried Mr. Ed Alexander shortly thereafter. There were allegations that Mr. Alexander was sexually abusing Sheryl and a divorce was pending when the defendant's stepfather died

The patient's mother worked as a bartender and waitress. She is still living and resides in the family home in Ligonier. The defendant reports that "she has been depressed all her life", but apparently has not sought psychiatric treatment. She does not drive, has COPD, and reportedly rarely leaves the home.

The defendant continued to have problems at home, at school, and with the law. He eventually moved to North Carolina in the early 1980's. The defendant met his wife in Fayetteville, North Carolina in August 1987 at their apartment complex. They began dating in November of the same year. Billie Hall became pregnant with Stephanie in March of 1988, and Billie and Jon were married on May 14, 1988. Billie Hall had two children from a previous marriage, Jennifer (born in 1985) and Cynthia (born in 1986) The Hall family moved to Tennessee in 1989 to be near Billie's family. Billie Hall began working as a telephone dispatcher at Jackson Memorial Hospital ambulance service in 1990. The defendant's youngest child is Jessicca and she was reportedly born prematurely and has had several medical problems. The patient reports staying home with the children from 1991 to 1993 while his wife worked as an ambulance dispatcher. The defendant demonstrated a previous history of aggressive and assaultive behavior towards his wife. In 1990, Mrs. Hall took her children and left the defendant. Mr. Hall became

3

enraged, chased her, and ultimately caused his wife's car to crash. Billie Hall fled to the house where Mr. Hall followed her after breaking down the door and disabling the phone. Billie Hall was able to call for assistance using a portable radio. When the police arrived, he climbed on top of the roof and began to pull shingles off. The couple separated and the defendant went to live with his mother in Ligonier, Pennsylvania. He began another relationship in PA. He returned to Tennessee over the 1990 Christmas Holidays and remained there. Billie Hall became pregnant in January 1991 with their second daughter who was born 15 weeks prematurely. She reportedly had an intraventricular hemorrhage and developed cerebral palsy and chronic respiratory problems. The defendant reportedly stayed home to care for the children from 1991 to 1993 while his wife worked as a dispatcher.

## MEDICAL HISTORY

Mr. Hall denies any significant medical problems. He states that he may have degenerative disc disease and that his back felt briefly better after having a lumbar puncture,

## MEDICATIONS

The defendant is not taking any medications at this time. He denies any known drug or food allergies.

## WORK HISTORY

The defendant has had difficulty holding a steady job because of his problems with authority, his repeated tardiness, his feelings that he was being picked on, and his desire for greater pay. In his youth, he worked washing dishes, being a caddy, demolishing barns, and assisting a brick mason. The longest job he held was in Fayetteville North Carolina where he worked "off and on" for three years. He worked for one week with Columbus-McKinson Chain Factory, one year for Helms Motor Company, one year for Chevrolet as a mechanic, and 5 months for Chapman Ford.

## FAMILY HISTORY

The defendant does describe a family history of depression in several siblings, including his brother Jay who reportedly attempted suicide. Jay died of HIV in 1994. There is also a family history of alcoholism in the defendant's father, paternal grandfather, and brother Jay. The defendant thinks that his sisters, Kathy and Sheryl, may have taken antidepressants, but he does not know which ones.

The defendant's grandparents are all deceased. His maternal grandfather died of colon cancer, and he believes the others died of "old age."

4

## PAST PSYCHIATRIC HISTORY

The defendant did not receive any psychiatric treatment until after the murder of his wife. He was seen by Joe Mount, M.A. on September 19, 1994, and he followed him over the next two years. He was diagnosed with major depression and noted at times to have suicidal ideation. He was started on imipramine by Dr. Ira Rothstein for depression and remained on this from 9/24/94 to 1/96. He states that the medication initially helped but that he became more bothered by side-effects (dizziness, constipation) and stopped taking it.

He was hospitalized at Middle Tennessee Mental Health Institute for competency to stand trial and criminal responsibility from February 23rd through March 22, 1995. His discharge diagnoses were Alcohol Dependence, Cannabis Dependence, Personality Disorder NOS with Dependent, Passive-Aggressive, and Antisocial Traits. He was seen daily, except on weekends, by a psychiatrist and engaged in the full program. He apparently became angry at the final staffing when the MTMHI failed to agree with his expectation to use the insanity defense. He had reported that he had read in a law book that this defense could be used if he was depressed at the time of the incident. He underwent psychological testing at MTMH, which demonstrated a Full Scale IQ of 85. He was noted to be easily angered, impulsive, deflected blame towards others, and to over-react to minor difficulties. He was seen as having some depressive symptoms, but of note, he was not given a diagnosis of major depression or even dysthymia. He was not diagnosed with intermittent explosive disorder after the 30-day evaluation. He was noted to consistently deflect blame and "did not take responsibility for his difficulties."

He reports having suicidal thoughts after he and his girlfriend broke up in highschool. He states that he had a suicide gesture at that time when "I jumped on my head." He has had intermittent suicidal thoughts while incarcerated.

The patient reports trying alcohol at age 13 and drinking more regularly starting at age 15. He describes his drinking as a teenager as "binge drinking" where he would drink heavily and sometimes pass out. Throughout his marriage, the patient drank regularly – usually having several beers every day. He reports drinking every day, usually 12 beers a day, prior to the death of his wife. He denied any kind of withdrawal symptoms – except " the sweats" – adding that he usually began drinking again when he developed this. The patient began smoking marijuana at the age of 13 and smoked daily after that. He reports that he would smoke marijuana any time that he could get it. He does not smoke tobacco. He tried cocaine in 1990, but spent less than $100 on this. He used LSD more than 50 times, but has not used in years. He denies IVDA, heroin use, PCP, ecstasy, or huffing. He has a history of using Max Alert so he could stay awake to drink.

5

## LEGAL PROBLEMS

1. DUI arrest in 1990
2. Charged with aggravated assault January 1991 after assaulting his wife's boss, Jimmy Kee. The defendant pled to simple assault and was placed on probation. The defendant states that Mr. Kee sold his wife a defective car. Mr. Hall demanded that Mr. Kee return the money and take the car back, and this was in fact done. However, Mr. Hall felt that Mr. Kee was not scheduling his wife for work, as he should. An argument ensued and Mr. Kee reportedly told Mrs. Hall that her husband wasn't "any type of a man and was welcome to get a piece of him." When Billie Hall reported this to her husband, he reportedly drove a mile and badly assaulted Mr. Kee.
3. Defendant was charged 3/10/1994 with aggravated arson and made a plea to reckless burning.
4. Defendant was arrested for possession of marijuana 3/5/94
5. Defendant stole his wife's gun - ? Charges
6. DUI in 1982 and 1991
7. Speeding and Trespassing Charges
8. While living at Hill Court in Huntington, the defendant was charged with disconnecting the outside telephone wires of a neighbor and breaking windows of her apartment and car. Mr. Hall left the state to avoid prosecution and fled to Delaware. He returned to face the charges 8 months later, and he reported that " I beat the case."

## EVENTS LEADING TO THE DEATH OF BILLIE HALL

The marriage had endured many stressors including their younger daughter's health problems, marital abuse, the defendant's drug and alcohol problems, and financial problems.   During an argument regarding finances, the defendant in March of 1994 lit the couch on fire. He reported to me that he went outside, but returned to the house to help his wife extinguish the fire. One of his children was in the house as the time he started the fire. Mrs. Hall subsequently placed an order of protection after reporting that he assaulted her, disabled the phone, disable the van, and threatened to kill her. Mrs. Billie Hall began divorce proceedings on March 11, 1994 citing inappropriate marital conduct and irreconcilable differences. She requested sole custody of the children with visitation for the defendant, alimony, child support, and a restraining order against the defendant. The latter was granted. The defendant's legal problems continued and he was arrested for possession of marijuana on April 18, 1994 and served 4 days in jail. The patient reportedly became angrier with his wife as he felt he was being manipulated and being sent mixed messages. The defendant reports that she would file an order of protection, but would then call him. Mr. Hall reports that he and Billie were together for the most part during April, May, and June. He reports that they were very short of money

6

and that Billie was "bitchy." In mid June of 1994, the defendant was changing the oil in a car at work and became angered. He ended up accidentally denting the car and expected to be fire. As a result, he left this job and took the time to visit his brother in Texas who was dying of AIDS. The defendant reports that things were not better when he returned and that his wife was belittling him and calling him a "worthless son of a bitch." He felt that Billie was looking at him with contempt and she allegedly told the defendant that she hated him. Mr. Hall at one point disabled the van so that she could not leave with the kids.   Billie Hall filed for a second order of protection citing that he assaulted her and that the defendant had threatened her life. The defendant stated that Billie hit him and he poured beer on her and threw a bottle at her.   Mr. Hall reports that his wife was usually the one who was hitting him and not vice-versa.   The defendant was again removed from the house. The defendant violated this order of protection when he went to the house on July 7, 1994 to reportedly pick up a check. After being allegedly met at the door by his wife with a gun, he received a police escort to retrieve the check. The defendant at this time was hoping to reconcile with his wife, and called his wife's mother on July 10th to gain her assistance. The defendant later broke into the house and stole the same gun. On July 20, Billie Hall again complained to the police (Officer Stanfill) that the gun had been stolen and that the defendant had threatened her life. The defendant reportedly returned the gun to his wife damaged and unusable on July 23.   He reports to me that he "slowed down" the gun by putting rocks and sand into it. He added that he had not wanted a gun around because he had a temper and she had threatened him with it.   The defendant's anger increased as he heard that his wife had kissed another man from Billie's daughter.   He was also frustrated when he learned that he would only receive $6/ hour working on an assembly line at Columbus-McKinson Chain Factory instead of $14/hour – which is what he thought he would be receiving. On July 28th, Billie Hall met with Officer Stanfill and agreed to press charges against her spouse. DCS became involved with the family after the defendant made reports that the children were left unattended. He later wrote that he hoped by reporting this to DCS that his wife would recognize that she needed him, and they would reconcile.

The state believes that the defendant committed premeditated murder. They cite that defendant's increasing anger and rage at his wife,   They have presented evidence that the defendant told an inmate that he intended to inflict serious harm on his wife. In addition, Mrs. Hall had repeatedly told the police her husband had threatened to kill her. Both Darlene Brown and Jackie Brittan told the TBI that the defendant had spoken of making hamburger meat out of his wife. Also, Billie Hall's mother reported that her daughter had said that Jon Hall was going to kill her.   The state believes that the defendant cut the phone wires in order to prevent his wife from calling the police. He reportedly forced his way into the house and asked the children to go to their bedrooms. The defendant and his wife entered the bedroom where it appears he blocked the door

7

with a sewing machine and a vacuum cleaner. There the state reports that he maliciously attacked his wife causing, according to the coroner, at least 83 distinct bruises or injuries. The daughters testified that they were able to force there way into the room where they were briefly able to free their mother. She apparently fled outside, but was caught by the defendant who subsequently dragged her to the children's pool. There, he allegedly strangled her and held her under the water until she died of asphyxiation. The coroner reported that she most likely died of a combination of manual asphyxiation and drowning. Mr. Hall fled the scene in a mini-van, driving on backstreets to avoid capture by the police. He crashed his car, and stole a motorist's car that stopped to offer assistance. He soon discovered that there was a 12-year-old boy in the car, and he released the child. Mr. Hall drove to his brother's home in Belton, Texas where he was quickly apprehended.

    According to the defendant, he worked from 7:30 am to 3:30 PM on the day of the murder. He stopped to get a 6 pack of Bush ponies and went to his wife's residence where no one was home.   He states that he went to her house to talk about how the meeting with DCS had gone the day before. He left the area around 4:15 PM, went to the home where he was staying (the Brittain's), and that he may have taken a nap. He then went to The Pub in Lexington where he drank beer and had dinner. He went to the Lucky Lady Lounge at 9:15 PM and then on to The BlockHouse at 10 PM.   He is not clear how much he drank, but estimates it was at least 12 beers. He reported feeling despondent over the marital problems and he called his wife. He asked to come over, and according to the defendant, she did not refuse. Before knocking on the door, the defendant stated that he looked in the window to see if another man was there. He then disconnected the phone line from the outside. He states that he had done this many times in the past, and he didn't want her to call the police as he was violating an order of protection. He acknowledges that he was breaking a court order. He reported that he knew they would fight. He states that Stephanie let him into the house and that Jenny said, "you're drunk." He was angered by this comment as she had never said anything like this before, and he feared that his wife was "badmouthing" him. He added that he saw a BB gun on the table and this also annoyed him as he felt this was dangerous for the children. The defendant reports that he went to his vehicle to get a money order for child support in the amount of $25. He subsequently asked to sleep on the couch, but Billie refused. He accused her of cheating on him and she allegedly accused him of molesting their daughter, Jessica. Billie reportedly denied having an affair, and Jon Hall reports that he didn't believe her. He doesn't recall tipping her chair, but states that the chairs were cheap, and he could have accidentally put weight on the back. The defendant reports that he followed his wife into the bedroom where she went to smoke a cigarette. She continued to ask him to leave and picked up the phone when he refused. She discovered that it had been disconnected. Mrs. Hall then allegedly asked the defendant if he was going to beat her

8

like last time. He reports that he flew into a rage and shouted, "Beat you? I'll show you what a beating is!". He then reports that he beat her with his fists 5 or 6 times and yelled to his wife "I'll tell you when it is enough" when she begged him to stop. The defendant reports that he did not block the door with the sewing machine, but that the door hit his foot when the children tried to get in. He states that when he and Billie wanted privacy, they would in the past block the door with the sewing machine – thus that is why he assumes the children thought the door was blocked with that. Eventually the children were able to get in and free their mother. The defendant does not believe that the children bit him and states that the injury attributed to this was old. She fled outside, but was caught shortly thereafter, and the defendant "Karate-chopped" her in the neck. The defendant reports that his wife called for the children to call 911. He shouted "I'll teach you to call 911" and dragged her to the pool where he held her underwater. He released her when a neighbor called out and Billie Hall "gave out." He left her floating in the pool and states that he fled the scene in his wife's mini-van in a panic and without his shoes. He reports taking the backstreets as he felt the police would be coming. He drove into a ditch sometime after midnight. Then, a motorist, William Smith and his wife stopped to offer assistance. The defendant stole their car, which had their 12-year-old son, Clint, in the back. He states that he did not know that the child was in the car until the young man struck him. He states that he pulled over and let the child out of the car. He drove to Brownsville, TN where he pulled into a field and went to sleep. When he woke up, he states he realized that he had committed a carjacking. He then drove on to his brothers where he was arrested 20 minutes after arriving. He reports being surprised to discover that he had killed her.

Of note, he apparently reported to the staff at MTMHI that "I became angry and started thinking if Billie got the divorce she would have control of the kids and the house and Jessie's settlement money."(He also reported that he held her in the pool to revive her.

Mr. Hall was initially jailed at the Henderson County Jail from august third to September 13th, 1994. On September 7, 1994, he attempted to escape by using a hacksaw blade on the bars. He was then transferred to Riverbend Maximum Security Institution. The patient does state that he had a small hacksaw given to him by another inmate, but that he believes he was "set up."

## AUTOPSY REPORT

The autopsy report demonstrated that Billie Hall died from asphyxia. Dr. Smith wrote, "this 29 year old white woman died as a result of a lack of oxygen arising from compressive forces applied about the neck with a possible contribution of drowning as well." Evidence for manual strangulation included contusions on the neck, hemorrhages in the deep strap muscles, peri-hyoid area, and in the thyroid gland. She also had

9

conjunctival and visceral petechiae, which one sees with strangulation. In addition, she
had multiple lacerations, contusions, and abrasions to the head, face, chest, abdomen,
genitals, and extremities. Her nose was fractured. Dr. Smith described the beating as "a
very extensive beating."

## CORRECTIONAL DISCIPLINARY HISTORY

1. January 19, 1996 - cited for repeatedly hitting a cal light button to complain of being
   cold.
2. January 20, 1996 – Creating a disturbance
3. February 5, 1996 – cited for assault on staff after head butting Sgt. Hunt and
   threatening a nurse after she reported he had a self-inflicted wound.
4. February 12, 2001 – Fighting

## MENTAL STATUS EXAMINATION

The defendant is a well-developed, well-nourished white male who was well-groomed
and wearing prison attire. He did not demonstrate any movement disorders and was
without psychomotor agitation, retardation, tics, or tremors. He sat comfortably in his
chair, occasionally standing to demonstrate something. He was cooperative with the
interview and allowed me to ask the questions and direct the interview. He seemed
anxious to report his version of the events and appears to have a good memory for dates
and details. His speech was within normal limits in terms of rate, volume, amount, and
cadence. He would raise his voice slightly when discussing emotionally laden issues
with his attorney. Both his P.I. and his attorney were present. He described his mood as
"ok" and he is hopeful that he will get a new trial. He spoke at length of areas he felt
previous attorneys had poorly represented him. His affect was generally euthymic and
appropriate to content. He did describe suicidal ideation at times, but denied homicidal
ideation. His affect was congruent with the subject matter, and at times he appeared to
fight back tears. His thoughts were logical and linear. He did not demonstrate any
psychotic symptoms whatsoever and was without hallucinations or delusions. He does
have some paranoid and narcissistic personality traits. He did not demonstrate or report
significant anxiety. He had full control of his behavior. He demonstrated average
intelligence. His insight and judgement would be described as poor.

## LAB VALUES

HIV test was negative
CT of head was within normal limits
CSF 5-HIAA level was reportedly 70 pM/ml.

**PSYCHOLOGICAL TESTING**

Please see results performed at MTMHI and by Dr. Pamel Auble.

**FORMULATION**

At the time of the offense, I believe that Jon Hall demonstrated Alcohol Dependence,
Cannabis Dependence, and Personality Disorder, NOS. He has consistently
demonstrated personality traits that include Dependency, Passive Aggressive, and
Antisocial traits. He describes some depressive symptoms at the time of his wife's death,
although I am not convinced he would have met the criteria for Major Depression. He
clearly was under stress at the time with financial difficulties, marital difficulties, and
ongoing alcohol use. I agree with the treatment team at MTMHI in that I do not believe
he has intermittent explosive disorder. The DSM-IV states that this diagnosis can only be
made if "the aggressive episodes are not better accounted for by another mental disorder
– including antisocial personality disorder- and are not due to the physiological effects of
a substance – like alcohol. Mr. Hall has a very long history of sociopathic behavior with
failure to conform to social norms with respect to lawful behaviors, deceitfulness,
impulsivity and failure to plan ahead, irritability and aggressiveness, reckless disregard
for the safety of others, and repeated failures at work. Also, Mr. Hall reported drinking
every day for at least a year prior to the event and reported to staff at MTMHI that he
would not have killed his wife if he had not been intoxicated. Mr. Hall's aggressive and
violent behavior is part of his personality structure. He has a tendency to react violently
to perceived rejection – and his only suicide attempt by his report (violence towards
himself) came with the breakup with a high school girlfriend.

As for the CSF serotonin level, this is an area of active research and in no means
is a diagnostic tool for any psychiatric condition. There are many psychiatric and
medical conditions that are believed to be related to low CSF serotonergic activity, and
these include but are not limited to schizophrenia, depression, bipolar disorder,
malnutrition, sleep disorders, myoclonus, neurological diseases, and many others. The
class of antidepressants called selective serotonin uptake inhibitors work by increasing
serotonin levels in the neuronal synapses. Also, clozaril, which is used in schizophrenia
and bipolar disorder, also affects the serotonergic system. Serotonin is believed to be an
integral part of the sleep cycle and can be dysregulated in a variety of sleep problems.
As per the DSM-IV, "signs of altered serotonin metabolism have been found in the CSF
of some impulsive and temper-prone individuals, but the specific relationship of these
findings to Intermittent Explosive Disorder is unclear."    There are also multiple articles
written on the connection of central serotonin activity and personality disorders. In an
article from Neuropsychopharmacology Jan 2002, it states"serotonergic abnormalities
may be present in individuals with either substance dependence or antisocial personality
disorder." This finding is reiterated in an article from the journal of Experimental and

Clinical Psychopharmacology from 1999. Moreover, there is no indication as to what the CSF serotonin level was at the time of the offense, as this was drawn years later. Since his incarceration, the patient had been diagnoses with major depression and suicidal thoughts – psychiatric symptoms also associated in research with low CSF serotonergic activity.

## COMPETENCY TO STAND TRIAL

This defendant is clearly competent to stand trial. He understands the nature of the proceedings against him and is quite able to assist his attorney in his defense.

## CRIMINAL RESPONSIBILITY

This defendant was able to appreciate the nature and wrongfulness of his behavior at the time of the offense.

## DIMINISHED CAPACITY

The state contends that this was a premeditated killing and the defense maintains that this was an impulsive and unplanned act. It is my opinion based on reviewing the records, evidence, and interviewing the defendant that he was fully capable of premeditation. He was able to engage in complex thought processes that included recognizing the illegality of his behavior and anticipated consequences. This is indicated by his disconnecting the phone wires and by taking a back route when fleeing the scene. Mr. Hall reports that he disconnected the phone wires so his wife wouldn't call the police – not in preparation for a murder. In either case, it demonstrates his ability to recognize that his behavior might lead to the police being called and to plan ahead and prevent that action from being taken. In addition, the coroner reported that there were 83 separate blows or contusions. The time period it must have taken to strike Mrs. Hall this many times, chase her 106 feet, drag her back to the pool, and then strangle her until she lost consciousness indicates an intent to harm and not a sudden and brief explosion. Moreover, Mr. Hall left his wife in the pool with knowledge that she had passed out – again indicating intent to harm. I believe he was able to exercise reflection and judgement of his actions. The defendant does not have a mental disorder that prevents him from premeditation, impulse control, or from recognizing that his conduct was reasonably certain to cause the death of his wife. He was not suffering from a psychiatric illness that would prevent him from exercising reflection, judgement, and control of his actions.

12



STATE OF TENNESSEE )
)
VS.                )        No. 94-342; 94-452
)        and 94-454
JON HALL,           )

---

ORDER

---

This matter came on for hearing on this the _____ day of
September, 1996, before the Honorable Whit S. LaFon.    After
considering the Motion for Change of Venue and Defendant's renewal
of the motion for change of venue, the Court finds that the motion
is well taken and should be granted.  The Court further finds that
the venue of the trial should be changed from Lexington, Henderson
County, Tennessee to Jackson, Madison County, Tennessee.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that the
Defendant's Motion for Change of Venue is well taken and is hereby
granted and that the venue of the matter is moved from Lexington,
Henderson County, Tennessee to Jackson, Madison County, Tennessee.

Enter, this the _16_ day of September, 1996.

_____
WHIT S. LAFON, Judge

APPROVED FOR ENTRY:

_____
AL EARLS
Assistant District Attorney
P. O. Box 2825
Jackson, TN  38302

_____
JESSE H. FORD, III    009775
Attorney for Defendant
P. O. Box 1625
Jackson, TN  38302



EXHIBIT
11/4/0...

1

2

3

4

5

6

7   EXHIBIT 22

8           Identified and authenticated, this

9

10  the _____ day of _____ ,

11

12  2003.

13

14

15  _____

16  JUDGE

17

18

19

20

21

22

23

24

86

# Impulse-Control Disorders Not Elsewhere Classified

EXHIBIT
23
11/4/02
PENGAD-Bayonne, N.J.

This section includes disorders of impulse control that are not classified as part of the presentation of disorders in other sections of the manual (e.g., Substance-Related Disorders, Paraphilias, Antisocial Personality Disorder, Conduct Disorder, Schizophrenia, Mood Disorders may have features that involve problems of impulse control). The essential feature of Impulse-Control Disorders is the failure to resist an impulse, drive, or temptation to perform an act that is harmful to the person or to others. For most of the disorders in this section, the individual feels an increasing sense of tension or arousal before committing the act and then experiences pleasure, gratification, or relief at the time of committing the act. Following the act there may or may not be regret, self-reproach, or guilt. The following disorders are included in this section:

**Intermittent Explosive Disorder** is characterized by discrete episodes of failure to resist aggressive impulses resulting in serious assaults or destruction of property.

**Kleptomania** is characterized by the recurrent failure to resist impulses to steal objects not needed for personal use or monetary value.

**Pyromania** is characterized by a pattern of fire setting for pleasure, gratification, or relief of tension.

**Pathological Gambling** is characterized by recurrent and persistent maladaptive gambling behavior.

**Trichotillomania** is characterized by recurrent pulling out of one's hair for pleasure, gratification, or relief of tension that results in noticeable hair loss.

**Impulse-Control Disorder Not Otherwise Specified** is included for coding disorders of impulse control that do not meet the criteria for any of the specific Impulse-Control Disorders described above or in other sections of the manual.

## 312.34 Intermittent Explosive Disorder

### *Diagnostic Features*

The essential feature of Intermittent Explosive Disorder is the occurrence of discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or

**610    Impulse-Control Disorders Not Elsewhere Classified**

destruction of property (Criterion A). The degree of aggressiveness expressed during an episode is grossly out of proportion to any provocation or precipitating psychosocial stressor (Criterion B). A diagnosis of Intermittent Explosive Disorder is made only after other mental disorders that might account for episodes of aggressive behavior have been ruled out (e.g., Antisocial Personality Disorder, Borderline Personality Disorder, a Psychotic Disorder, a Manic Episode, Conduct Disorder, or Attention-Deficit/Hyperactivity Disorder) (Criterion C). The aggressive episodes are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition (e.g., head trauma, Alzheimer's disease) (Criterion C). The individual may describe the aggressive episodes as "spells" or "attacks" in which the explosive behavior is preceded by a sense of tension or arousal and is followed immediately by a sense of relief. Later the individual may feel upset, remorseful, regretful, or embarrassed about the aggressive behavior.

## Associated Features and Disorders

**Associated descriptive features and mental disorders.** Signs of generalized impulsivity or aggressiveness may be present between explosive episodes. Individuals with narcissistic, obsessive, paranoid, or schizoid traits may be especially prone to having explosive outbursts of anger when under stress. The disorder may result in job loss, school suspension, divorce, difficulties with interpersonal relationships, accidents (e.g., in vehicles), hospitalization (e.g., because of injuries incurred in fights or accidents), or incarcerations.

**Associated laboratory findings.** There may be nonspecific EEG findings (e.g., slowing) or evidence of abnormalities on neuropsychological testing (e.g., difficulty with letter reversal). Signs of altered serotonin metabolism have been found in the cerebrospinal fluid of some impulsive and temper-prone individuals, but the specific relationship of these findings to Intermittent Explosive Disorder is unclear.

**Associated physical examination findings and general medical conditions.** There may be nonspecific or "soft" findings on neurological examinations (e.g., reflex asymmetries or mirror movements). Developmental difficulties indicative of cerebral dysfunction may be present (e.g., delayed speech or poor coordination). A history of neurological conditions (e.g., head injury, episodes of unconsciousness, or febrile seizures in childhood) may be present. However, if the clinician judges that the aggressive behavior is a consequence of the direct physiological effects of a diagnosable general medical condition, the appropriate Mental Disorder Due to a General Medical Condition should he diagnosed instead (e.g., Personality Change Due to Head Trauma, Aggressive Type; Dementia of the Alzheimer's Type, Early Onset, Uncomplicated, With Behavioral Disturbance).

## Prevalence

Reliable information is lacking, but Intermittent Explosive Disorder is apparently rare.

## Course

Limited data are available on the age at onset of Intermittent Explosive Disorder, but it appears to be from late adolescence to the third decade of life. Mode of onset may be abrupt and without a prodromal period.

## Differential Diagnosis

Aggressive behavior can occur in the context of many other mental disorders. A diagnosis of Intermittent Explosive Disorder should be considered only after all other disorders that are associated with aggressive impulses or behavior have been ruled out. If the aggressive behavior occurs exclusively during the course of a **delirium**, a diagnosis of Intermittent Explosive Disorder is not given. Similarly, when the behavior develops as part of a **dementia**, a diagnosis of Intermittent Explosive Disorder is not made and the appropriate diagnosis is dementia with the specifier With Behavioral Disturbance. Intermittent Explosive Disorder should be distinguished from **Personality Change Due to a General Medical Condition, Aggressive Type,** which is diagnosed when the pattern of aggressive episodes is judged to be due to the direct physiological effects of a diagnosable general medical condition (e.g., an individual who has suffered brain injury from an automobile accident and subsequently manifests a change in personality characterized by aggressive outbursts). A careful history and a thorough neurological evaluation are helpful in making the determination. Note that nonspecific abnormalities on neurological examination (e.g., "soft. signs") and nonspecific EEG changes are compatible with a diagnosis of Intermittent Explosive Disorder and only preempt the diagnosis if they are indicative of a diagnosable general medical condition.

Aggressive outbursts may also occur in association with **Substance Intoxication or Substance Withdrawal,** particularly associated with alcohol, phencyclidine, cocaine and other stimulants, barbiturates, and inhalants. The clinician should inquire carefully about the nature and extent of substance use, and a blood or urine drug screen may be informative.

Intermittent Explosive Disorder should be distinguished from the aggressive or erratic behavior that can occur in **Oppositional Defiant Disorder, Conduct Disorder, Antisocial Personality Disorder, Borderline Personality Disorder, a Manic Episode,** and **Schizophrenia.** If the aggressive behavior is better accounted for as a diagnostic or associated feature of another mental disorder, a separate diagnosis of Intermittent Explosive Disorder is not given. Aggressive behavior may, of course, occur when no mental disorder is present. **Purposeful behavior** is distinguished from Intermittent Explosive Disorder by the presence of motivation and gain in the aggressive act. In forensic settings, individuals may **malinger** Intermittent Explosive Disorder to avoid responsibility for their behavior.

612    Impulse-Control Disorders Not Elsewhere Classified

■ **Diagnostic criteria for 312.34 Intermittent Explosive Disorder**

A. Several discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property.

B. The degree of aggressiveness expressed during the episodes is grossly out of proportion to any precipitating psychosocial stressors.

C. The aggressive episodes are not better accounted for by another mental disorder (e.g., Antisocial Personality Disorder, Borderline Personality Disorder, a Psychotic Disorder, a Manic Episode, Conduct Disorder, or Attention-Deficit/Hyperactivity Disorder) and are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition (e.g., head trauma, Alzheimer's disease).

## 312.32    Kleptomania

### Diagnostic Features

The essential feature of Kleptomania is the recurrent failure to resist impulses to steal items even though the items are not needed for personal use or for their monetary value (Criterion A). The individual experiences a rising subjective sense of tension before the theft (Criterion B) and feels pleasure, gratification, or relief when committing the theft (Criterion C). The stealing is not committed to express anger or vengeance, is not done in response to a delusion or hallucination (Criterion D), and is not better accounted for by Conduct Disorder, a Manic Episode, or Antisocial Personality Disorder (Criterion E). The objects are stolen despite the fact that they are typically of little value to the individual, who could have afforded to pay for them and often gives them away or discards them. Occasionally the individual may hoard the stolen objects or surreptitiously return them. Although individuals with this disorder will generally avoid stealing when immediate arrest is probable (e.g., in full view of a police officer), they usually do not preplan the thefts or fully take into account the chances of apprehension. The stealing is done without assistance from, or collaboration with, others.

EXHIBIT 23

Identified and authenticated, this the 18 day of July, 2003.

JUDGE

FAX NO.    866 6891                    Oct. 26 2002 03:02PM  P1

EXHIBIT

## CURRICULUM VITAE

### Kimberly Frances Stalford

Current Address
1771 Madison Street
Clarksville, TN  37043

**EMPLOYMENT HISTORY:**

Consulting Psychiatrist to Gateway Hospital providing in-patient psychiatric consultations, evaluations, and treatment – March 2002 to present.

Attending Psychiatrist at Tennessee Christian Hospital's Psychiatric Unit at Gateway Health System, Clarksville, TN - April 2000 to January 31, 2002

Out-Patient Psychiatrist at the Clarksville Family Guidance Center, Clarksville TN - October 1998 to December 1999

Attending Psychiatrist at Sheppard and Enoch Pratt at Cockeysville - Community Mental Health Center, Baltimore, MD -  July 1, 1996 to June 1, 1998.

**EDUCATION:**

American Board of Psychiatry and Neurology Part I- Passed
    November 1996, 97th percentile rank (Psychiatry Major)
    Part II- Passed with Board Certification May, 1997

RESIDENCY, Sheppard and Enoch Pratt Hospital, Baltimore, MD
    Chief Resident - July 1995 - June 1996
    Completed a fully accredited, four year General
    Psychiatry Program June 30, 1996

M.D.,  University of Virginia School of Medicine
    Charlottesville, VA
    August 1988 - May 1992

B.A.,  Wesleyan University
    Middletown, CT
    August 1984 - May 1988
    Major: Molecular Biology and Biochemistry

**HONORS/AWARDS:**

The 1996 Pfizer Psychiatric Resident of the Year in
    recognition of outstanding academic and clinical
    achievement in the field of psychiatry
Alpha Omega Alpha
Janet M. Glasgow Memorial Achievement Citation -
    Awarded by the American Medical Women's
    Association for Scholastic Achievement at the
    University of Virginia School of Medicine

FROM : STALFORI                    FAX NO. : 906 6531                    Oct. 28 2002 03:03PM  P2

Teaching Excellence Award, University of Virginia School
    of Medicine
Phi Beta Kappa
National Honor Society

**RESEARCH**
**EXPERIENCE:**    Utilization of Monoclonal Antibodies to Dengue Virus for
    Rapid Diagnostic Assay.
    J. Opprandy, Ph.D., Director of Naval Medical
    Research Institute - Biotechnology Division,
    National Naval Medical Center, Bethesda Md.
    Abstract presented at Annual Meeting of American
    Society of Tropical Medicine, 1989.

Effect of Unilateral Lesioning of the Ventromedial
    Tegmentum on the Isolation-Induced Fighting of
    Male Rats.
    Advisor: D. Adams, Ph.D., Professor of
    Psychology, Wesleyan University, 1986.

Effects of Estrous and Hunger on Isolation-Induced Fighting
    of Female Rats.
    Advisor: D. Adams, Ph.D., Professor of
    Psychology, Wesleyan University, 1986.

**PROFESSIONAL**
**SOCIETY**
**MEMBERSHIPS:**    American Medical Association
    American Psychiatric Association
    Tennessee Psychiatric Association

**EXTRACURRICULAR**
**ACTIVITIES:**

Sheppard and Enoch Pratt
Health System:    Resident Representative on Committee evaluating
    establishment of centralized admission and crisis
    unit.
    Resident Representative on Committee evaluating discharge
    planning
    Residency Training Advisory Committee.

University of Virginia
School of Medicine:    Mulholland Society Council (Medical Student Government)
    Tutor for the Office of Academic Support
    Member of Share (Community Volunteer Organization)

```
1

2

3

4

5

6

7    COLLECTIVE EXHIBIT 24

8             Identified and authenticated, this

9

10   the _____ day of _____,

11

12   200 .

13

14

15   _____

16   JUDGE

17

18

19

20

21

22

23

24
```

```
 1                    C E R T I F I C A T E

 2          I,  the  undersigned  Amy  Mays,

 3    Official  Court  Reporter  for  the  26th

 4    Judicial  District  of  the  State  of

 5    Tennessee,  do  hereby  certify  that  the

 6    foregoing  is  a  true,  accurate  and

 7    complete  transcript,  to  the  best  of  my

 8    knowledge  and  ability,  of  the  requested

 9    proceedings  had  in  the  captioned  cause,

10    in  the  Criminal  Court  for  Madison

11    County,  Tennessee,  on  the  4th  day  of

12    November,  2002.

13          I  do  further  certify  that  I  am

14    neither  of  kin,  counsel  nor  interest  to

15    any  party  hereto.

16

17

18    ---------------------------------------

19    AMY  MAYS

20

21    ---------------------------------------

22    DATE

23

24
```

89

1         <u>C E R T I F I C A T E   O F   T H E   C O U R T</u>

2              **THIS IS TO CERTIFY THAT THE**

3    **TRANSCRIPT OF EVIDENCE ADDUCED AT THE**

4    **HEARING OF THIS CAUSE HAS BEEN FILED**

5    **WITH THE CLERK OF THE COURT.**

6              The Court has examined this

7    Transcript of Evidence and has found it

8    to be a true and accurate record of the

9    proceedings.

10             Therefore, it is Ordered, Adjudged

11   and Decreed that the Transcript of Evidence

12   is hereby approved by the Court and will be

13   part of the record on appeal in this case.

14

15   _____

16   JUDGE

17   _____

18   DATE

19   APPROVAL:

20   _____

21   ATTORNEY FOR THE PETITIONER

22

23   _____

24   ATTORNEY FOR THE STATE

90