# ADDENDUM 2
# Document 1

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

JON HALL,                          )
                                   )          No. W2003-00669-CCA-R3-PD
                                   )
          Petitioner-Appellant,    )
                                   )
                                   )          MADISON COUNTY
v.                                 )          Case No.: COO-422
                                   )
STATE OF TENNESSEE,                )          Post-Conviction
                                   )
          Appellee.                )          (CAPITAL CASE)

ON APPEAL AS OF RIGHT FROM THE JUDGEMENT OF THE
CIRCUIT COURT, DIVISION I FOR MADISON COUNTY, TENNESSEE

---

BRIEF OF THE APPELLANT

---

Paul N. Buchanan, 017697
1526 Crockett Hills Blvd.
Brentwood, Tennessee 37027
(615) 370-4503

Danny R. Ellis, 020747
1289 N. Highland Ave.
P.O. Box 3512
Jackson, Tennessee 38303-3512
731-988-5350

Counsel for Appellant

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PROCEDURAL INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    1.       THE TRIAL COURT ERRED IN RULING THAT THE PETITIONER
              RECEIVED THE EFFECTIVE ASSISTANCE OF COUNSEL BOTH
              AT THE GUILT/INNOCENCE PHASE OF THE TRIAL AND THE
              PUNISHMENT PHASE OF THE TRIAL. . . . . . . . . . . . . . . . . . . 15

    2.       THE HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING
              FACTOR AS USED  IN THE INSTANT CASE IS
              UNCONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    3.       THE SENTENCE OF DEATH IN THE INSTANT CASE MUST BE
              SET ASIDE AS   THE IMPOSITION OF DEATH IS UNRELIABLE
              AND VIOLATES THE VALUES   RECOGNIZED AND
              PROTECTED BY THE EIGHTH AND FOURTEENTH
              AMENDMENTS TO THE CONSTITUTION OF THE UNITED
              STATES AND   ARTICLE I § 16 OF THE TENNESSEE
              CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    4.       THE DEATH SENTENCE IS UNCONSTITUTIONAL, BECAUSE IT
              INFRINGES  UPON MR. HALL'S FUNDAMENTAL RIGHT TO
              LIFE, AND IS NOT NECESSARY TO PROMOTE ANY
              COMPELLING STATE INTEREST. . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

## CASES

Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)...................17,28

Barber v. Tennessee, 513 U.S 1184, 115 S.Ct. 1177, 130 L.Ed. 2d 1129 (1995).........34

Barnhill v. Flannigan, 42 F.3d 1074, 1079 (7th Cir. 1994)............................................. 35

Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975). ........................................................... 16

Beasley v. United States, 491 F.2d 687 (6th Cir. 1974)................................................. 19

Berryman v. Morton, 100 F.3d 1089, 1105 (3rd Cir. 1996)............................................ 23

Bryant v. Scott, 28 F.3d 1411, 1418 (5th Cir. 1994)...................................................... 25

Callins v. Collins, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994)................. 36

Chambers v. Armontrout, 907 F.2d 825, 833 (8th Cir.) (en banc), cert. denied, 498 U.S.
950 (1990).............................................................................................................. 25,26

Cook v. Lynaugh, 821 F.2d 1072, 1078 (5th Cir. 1987)............................................... 25

Cooper v. State, 847 S.W.2d 521, 527 (Tenn. Crim. App. 1992)...:.......................... 19,20

Crandell v. Bunnell, 144 F.3d 1213, 1217 (9th Cir. 1998)............................................ 24

Cunningham v. Zant, 928 F.2d 1006, 1018 (11th Cir. 1991).......................................... 25

Deutscher v. Whitley, 884 F.2d 1152, 1160 (9th Cir. 1989), vacated on other grounds,
500 U.S. 901 (1992), reaffirmed, 16 F.3d 981, 984 (9th Cir. 1994)............................... 26

Dobbs v. Turpin, 142 F.3d 1383, 1388 (11th Cir. 1998)............................................... 24

Furman v. Georgia, 408 S.Ct. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)............. 35,37

Gardner v. Florida, 430 U.S. 349, 357, 358, 97 S.Ct. 1197,
51 L.Ed.2d 353 (1977).......................................................................................... 15,16

Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 944 (1976).............. 15

Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759,
64 L.Ed.2d 38 (1980) ............................................................................ 32, 33, 34, 35

Groseclose v. Bell, 130 F.3d 1161, 1169-1170 (6th Cir. 1997), *cert. denied*,
523 U.S. 1132 (1998) ............................................................................................. 23

Hall v. Washington, 106 F.3d 742, 749-50 (7th Cir.),
cert. denied, 522 U.S. 907 (1997).......................................................................... 25

Harris v. Dugger, 874 F.2d 756, 764 (11th Cir.),
cert. denied, 493 U.S. 1011 (1989)................................................................... 22, 25

Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)...................................................... 16, 19

Henderson v. Sargent, 926 F.2d 706, 711, amended in other part,
939 F.2d 586 (8th Cir. 1991), cert. denied, 502 U.S. 1050 (1992).......................... 23, 24

Houston v. Dutton, 50 F.3d 781 (6th Cir. 1995) ............................................................ 33

Hyman v. Aiken, 824 F.2d 1405, 1416 (4th Cir. 1987)................................................... 24

Joubert v. Hopkins, 75 F.3d 1232 (8th Cir. 1996.) ................................................. 34, 35

Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir.),
cert. denied, 502 U.S. 964 (1991). ...................................................................... 24, 25

Kimmelman v. Morrison, 477 U.S. 365, 385 (1986)............................................... 24, 25

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 1566,
131 L.Ed.2d 490 (1995) ....................................................................................16, 21, 26

Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)........................................................... 21

Loyd v. Whitley, 977 F.2d 149, 157 & n.16 (5th Cir. 1992), cert. denied,
508 U.S. 911 (1993)................................................................................................. 24

Maynard v. Cartwright, 486 U.S. 356, 362-364,
108 S.Ct. 1853, 1858-1859, 100 L.Ed.2d 372 (1988)....................................... 33, 34, 35

Magill v. Dugger, 824 F.2d 879, 886 (11th Cir. 1987)................................................... 24

McGee v. State 739 S.W.2d 789 (Tenn.Cr.App. 1987).............................................. 16

Michel v. Louisiana, 350 U.S. 91, 101 (1955).............................................................. 23

Middleton v. Dugger, 849 F.2d 491, 494 (11th Cir. 1988). ............................ 23, 24, 25

Montgomery v. Peterson, 846 F.2d 407, 413 (7th Cir. 1988)...................................... 25

Nix v. Whiteside, 475 U.S. 157, 175 (1986)................................................................. 21

Profitt v. Waldron, 831 F.2d 1245, 1249 (5th Cir. 1987) ...................................... 23, 26

Reid v. Covert, 354 U.S. 1, 45,46, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957)................... 16

Richmond v. Lewis, 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed 2d 411 (1992)................... 33

San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 33-34 (1973). ......
37

Sanders v. Ratelle, 21 F.3d 1446, 1457 (9th Cir. 1994)................................................ 25

State v. Hodges, 944 S.W2d 346, 361 (Tenn. 1997)................................................... 32

State v. Odom, 928 S.W.2d 18 (Tenn. 1996)................................................................ 32

State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985)................................................. 32

Strickland v. Washington, 466 U.S. 668, 693;
104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984) .................... 16, 20, 21, 22, 23, 24, 26,
28

Stringer v. Black, 503 U.S. 222 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33,35

Thomas v. Kemp, 796 F.2d 1322, 1325 (11th Cir. 1986), cert. denied,
479 U.S. 996 (1987)................................................................................................ 22

United States v. DeCoster, 487 F.2d 1197, 1203-1204 (D.C.Cir. 1973)...................... 19

Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978,
49 L.Ed.2d 944 (1976) ..................................................................................... 15, 35, 36

Zant v. Stephens, 462 U.S. 862, 885, 886,
103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983)............................................................ 35

## CITATIONS TO CONSTITUTIONS AND STATUTES

Sixth and Fourteenth Amendments to the United States Constitution and Article I,
Section 9 of the Tennessee Constitution...................................................................... 15

Article I, § 16 of the Tennessee Constitution, and the Eighth and Fourteenth
Amendments to the Constitution of the United States. ............................................. 31

U.S. Const. Amend. V................................................................................... 31,37

U.S. Const. Amend. XIV. ................................................................................. 38

Article I § 8 of the Tennessee Constitution............................................31, 38
T.C.A. § 39-13-204(I)(5).............................................................................. 32

## MISCELLANEOUS

ABA Guidelines in Death penalty Cases, ...................................... 18, 19, 28

ABA Standards for Criminal Justice, Second Edition.
The Defense Function Standard 5-1.4............................................. 18, 28,29

Champion, the magazine of the National Association of Criminal Defense Lawyers.... 20

Goodpaster, The Trial for Life: Effective Assistance of
Counsel in Death Penalty Cases, 58 N.Y.U. L.Rev. 299 (1983)............................ 15, 29

Guidelines for the Appointment and Performance of
Counsel in Death Penalty Cases, February, 1989...................................................... 17

Note, The Eighth Amendment and Effective Assistance
of Counsel in Capital Trials, 107 Harv. L.Rev. 1923 (1994)........................................ 15

Rule 8, CANON 7, Rules of the Tennessee Supreme Court........................................ 28

R. 13 § 3, Tenn.S.Ct.R.(1997)................................................................................. 17

Standards for Criminal Justice:  The Defense Function ............................................. 16

Tennessee Association of Criminal Defense Lawyers
(TACDL.)  Tools for the Ultimate Trial, 2nd edition(1987)............................................ 20

## PROCEDURAL INTRODUCTION

Designations to the materials in this case shall be as follows:

PC (Date,          =    transcript of the evidence at the post-conviction hearing,
Volume) ___:___         date, transcript volume number, page, lines,
                        e.g., PC (Dec. 9-11, 1996, Vol. 9): 431-2;

T Volume           =    transcript of the evidence at the original trial,
___:___                 transcript volume number, page, lines, e.g., T 7 696:5-8;

Ex.                =    exhibit introduced in the post-conviction hearing;

T Ex.              =    exhibit introduced at the original trial;

PC-TR              =    "technical" record of proceedings on post-conviction
                        petition;

TTR                =    "technical" record of proceedings at trial;
A-____             =    appendix.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this appeal because this appeal is taken as a matter of right from a final judgment.  See Tenn. Code Ann. § 29-21-127 (2002); see also Tennessee Rule of Appellate Procedure 3.

## STATEMENT OF THE ISSUES

1.  THE TRIAL COURT ERRED IN RULING THAT THE PETITIONER RECEIVED THE EFFECTIVE ASSISTANCE OF COUNSEL BOTH AT THE GUILT/INNOCENCE PHASE OF THE TRIAL AND THE PUNISHMENT PHASE OF THE TRIAL.

2.  THE HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING FACTOR AS USED IN THE INSTANT CASE IS UNCONSTITUTIONAL.

3.  THE SENTENCE OF DEATH IN THE INSTANT CASE MUST BE SET ASIDE AS THE IMPOSITION OF DEATH IS UNRELIABLE AND VIOLATES THE VALUES RECOGNIZED AND PROTECTED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I § 16 OF THE TENNESSEE CONSTITUTION.

4.  THE DEATH SENTENCE IS UNCONSTITUTIONAL, BECAUSE IT INFRINGES UPON MR. HALL'S FUNDAMENTAL RIGHT TO LIFE, AND IS NOT NECESSARY TO PROMOTE ANY COMPELLING STATE INTEREST.

## STATEMENT OF THE CASE

Appellant properly filed a petition for post-conviction relief following the exhaustion of his direct appeals. A hearing was conducted on three separate dates, May 15, 2002, September 4, 2002, and November 4, 2002. (PC, Vol 9-15.) At the conclusion of the hearing, the trial court entered an order denying the petitioner's post-conviction petition. (PC-TR: Vol. 7); 963-1015. Counsel for Mr. Hall timely filed a notice of appeal. (PC-TR, Vol. 7); 1016.

3

## STATEMENT OF FACTS

Almost every witness we produced said they were never contacted by either trial counsel. Yet, four were the siblings of the Petitioner. The mother of Petitioner and another brother appeared by stipulated affidavit. They were full of a wealth of information, both on guilt-innocence and punishment. It is summarized below.

## TESTIMONY OF DEBBIE DAVIS

Ms. Debbie Davis, a sister of Jon Hall, was the first witness called on behalf of Jon Hall. No one ever contacted her before Petitioner's trial. . (PC, Vol. 9.); 37. Her testimony lasted some 72 pages, telling a story that made the Petitioner seem human as opposed to the animal that trial counsel let stand in the record. Time after time defense counsels have heard at seminars that in the punishment phase, it is not enough to call someone from the family to say he was a good boy and put pictures into evidence. Trial counsel did neither, yet post-conviction counsel produced a powerful video showing the Petitioner to be a fine father, (PC, Vol. 9.); P. 58 as well as powerful testimony showing the good side of the Petitioner. By contrast, when she was called at the trial on punishment only, her testimony was only 12 pages long, focusing on the violence that Petitioner was exposed to as a child as opposed to the numerous positives elicited in the post-conviction hearing. Petitioner would argue that, had she been talked to in the pretrial investigation, counsel would have been better prepared to produce this testimony and put these pictures on the video into evidence. She had personally seen the deceased use violence against the Petitioner. (PC, Vol. 9.); 40.

4

She also produced testimony that Petitioner had a habit of disconnecting phone lines to
talk to people and get their undivided attention, without ever doing any harm to anyone.
. (PC, Vol. 9.); 7. This is particularly important as trial counsel left it unrebutted in the
trial record that these lines were "cut" with no explanation. The Supreme Court of
Tennessee cited this phone line disconnection as one of the most powerful things which
established the critical "premeditation" to establish first-degree murder. Petitioner
believes that had this witness been talked to in the pretrial investigation, they would
have had this evidence to use.

## TESTIMONY OF CLARENCE STANFILL

Mr. Clarence Stanfill testified that he observed Jon Hall and his children while at
Mr. Clarence Stanfill's father's house. Mr. Clarence Stanfill characterized Jon Hall as
an excellent father. (PC, Vol. 9.); 111:19-21. Mr. Stanfill testified that Jon Hall had to
care for his child with cerebral palsy. (PC, Vol. 9.); 112:1-12. Lastly, Mr. Clarence
Stanfill characterized Jon Hall as a gentleman. (PC, Vol. 9.); 114:5-7. No one ever
contacted him prior to the trial. (PC, Vol. 9.); 113. He was not called at trial. There was
no strategical reason not to call this witness, yet he greatly humanized the Appellant.·

## TESTIMONY OF HENRY STANFILL

Mr. Henry Stanfill testified that he observed Jon Hall and children at Mr. Stanfill's
residence on several occasions. (PC, Vol. 9.); 115:17-20. Mr. Henry Stanfill testified
that Jon Hall treated his children well and made sure they had something to eat. (PC,
Vol. 9.); 116:4-7. Mr. Stanfill testified that Petitioner was a good father. (PC, Vol. 9.);PP.
115-116. He was not called at trial. There was no strategical reason not to call this

witness.

## TESTIMONY OF VALENE FOREMAN

Ms. Valene Foreman testified that Jon Hall visited her father on several occasions, and that he would bring his children with him. (PC, Vol. 9.); 121:11-14. In addition, Ms. Valene Foreman testified that she witnessed Jon Hall play with his children and care for his children. (PC, Vol. 9.); 122:14-20. Ms. Foreman, testified that he always provided for the children and their needs and that he was always nice. (PC, Vol. 9.) 119-124. There was no strategical reason not to call this witness at the trial.

## TESTIMONY OF PAULA FOREMAN

Ms. Paula Foreman testified that she used to babysit for Jon Hall. (PC, Vol. 9.); 126:6-7. Jon Hall allowed Ms. Paula Foreman to baby sit as a means of earning money because Ms. Foreman did not have a job. (PC, Vol. 9.); 127:22-24. She testified that Jon Hall was a good father providing the essentials for his children and that Jon Hall's children liked him. (PC, Vol. 9.); 128:8-21. Paula Foreman testified that he was good at taking care of the kids. (PC, Vol. 9.); P. 128. She was not called at trial. Paula Foreman testified that Petitioner treated the children well and that no one contacted her from the trial team. (PC, Vol. 9.); PP.214-216. There was no strategical reason not to call this witness.

## TESTIMONY OF SHERYL ARBOGAST

In his proof, Jon Hall presented the testimony of his sister Sheryl Arbogast. She was called at both phases of the trial. Her testimony took up ONE PAGE in the punishment phase. Yet it took up 79 pages at the post conviction hearing. She is the

6

only sister called or contacted before trial by the trial counsel. Arbogast testified that she had served in a bookkeeping role related to Jon Hall's case since the case's inception. (PC, Vol. 10.); 134:10-22. She testified that she took notes, received phone calls, and tried to find out information from Jon Hall's several attorneys regarding the case. (PC, Vol. 10.);134:12-22. When asked specifically about being interviewed before trial by a member of the defense team, Ms. Arbogast responded she was not interviewed before trial. (PC, Vol. 10.); 134-35:23-24, 1-2.

Ms. Arbogast testified about Jon Hall's propensity to disconnect phone lines before the victim's death in this case. Specifically, she testified about an incident that occurred between Jon Hall and his mother. (PC, Vol. 10.); 163: 12-16. Arbogast testified that Jon Hall would disconnect the phone lines so he could keep the person's attention. (PC, Vol. 10.); 164: 16-20. Arbogast further explained that no time before the victim's death had violence resulted during a period a telephone line was disconnected. (PC, Vol. 10.); 164: 21-24.

Arbogast also testified about the relationship between Jon Hall and the victim. Arbogast stated that she had witnessed the relationship between the two persons. Commenting on the victim's treatment of Jon Hall, Arbogast stated the Billie (the victim) would constantly say negative things about Jon Hall. (PC, Vol. 10.): 166; 14-16. In stating negative things about Jon Hall, the victim would exacerbate Jon Hall's inability to provide for the family and his inability to "pull his weight." (PC, Vol. 10.); 164: 19-21. At no time before trial did any of the attorney discuss or question Arbogast about the relationship between Jon Hall and the victim. (PC, Vol. 10.); 167: 3-7.

Arbogast further testified about Jon Hall's ability to care for his children. She

7

testified that she observed Jon Hall be an attentive and loving father. (PC, Vol. 10.);
168:10-11. Arbogast explained that Jon Hall prepared special foods for his children
based upon their likes and dislikes. (PC, Vol. 10.); 168: 17-19. In addition, Jon Hall
provided therapy for the baby who had cerebral palsy. (PC, Vol. 10.); 169: 1-2. Jon
Hall was cable of performing this therapy after having received medical instruction, and
included a specific routine with a certain number of repetitions. (PC, Vol. 10.); 169: 1-8.
More importantly, Arbogast testified that Jon Hall made certain that the family did not
exclude this child, afflicted with cerebral palsy, from any activities. (PC, Vol. 10.) 169:
9-10.

At the penalty phase of Jon Hall's trial, Sheryl Arbogast testified about the general
family background of Jon Hall. (PC, Vol. 10.); 137: 11-18. This testimony included the
general nature of the relationship of Jon Hall's father and mother, and the fact that Jon
Hall grew up in a violent home. (PC, Vol. 10.); 198:7-10. However, Arbogast testified
about Jon Hall's father's belief that Jon Hall was not his child. (PC, Vol. 10.); 182: 13-
15. Specifically, Arbogast testified that Jon Hall's father went out of his way to
communicate to Jon Hall that Jon Hall was not wanted or loved by his father. (PC, Vol.
10.); 182-183: 18-24, 1-11.

Arbogast testified that she was responsible for securing the affidavit of Jeff Hall.
(PC, Vol. 10.); 142: 22-24. Jeff Hall was the brother of Jon Hall, and died as a result of
complications with AIDS. (PC, Vol. 10.) 143: 5-6. After the victim's death, Jon Hall
went to Texas and stayed with his brother Jeff Hall. During this time frame, Jeff Hall
was the sibling with the closest relationship with Jon Hall. (PC, Vol. 10.); 142:6-9.
Arbogast informed Jon Hall's trial attorney's of Jeff Hall's illness and deteriorating

8

condition. (PC, Vol. 10.); 142: 13-17. Arbogast finally took it upon herself to fly to Texas and memorialize Jeff Hall's testimony in the form of an affidavit. (PC, Vol. 10.); 142: 22-24. Arbogast testified that she took such great pains because she had informed the attorneys of Jeff Hall's condition and they had done nothing. (PC, Vol. 10.); 9-13.

## TESTIMONY OF PAMELA FOREMAN

Pamela Foreman lived next door to Jon Hall near the time the victim died. (PC, Vol. 10.); 213: 7-8. On several occasions Ms. Foreman babysat the Hall children. (PC, Vol. 10.); 214: 3-6. Foreman testified that she observed Jon Hall interact with his children. (PC, Vol. 10.); 214:18-20.) Specifically, she testified that Jon Hall treated his children fairly well. (PC, Vol. 10.); 214:23-24. In addition, Ms. Foreman testified that Jon Hall fixed the cars of neighbors. (PC, Vol. 10.): 216: 1-2. Ms. Foreman did not testify at any portion of Jon Hall's trial, nor was she contacted by the trial team.

## TESTIMONY OF JACKIE BRITTAIN

Jackie Brittain testified that he was friends with Jon Hall. (PC, Vol. 10.); 218:21-22. Jon Hall lived with Mr. Brittain for a brief period of time when the victim and Jon Hall separated. (PC, Vol. 10.); 219: 7-11. Mr. Brittain testified that on several occasions, the victim would violate her restraining order by visiting and communicating with Jon Hall at the Brittain's residence. (PC, Vol. 10.); 219:22-24. Specifically, the victim would request Jon Hall come can fix vehicles at her house or other things at the house. (PC, Vol. 10.) 221: 2-7.

Mr. Brittain also testified about Jon Hall's interaction with his children. He testified

9

that Jon Hall played with his children. (PC, Vol. 10.): 231:4-6. In addition, Mr. Brittain

testified that on several occasions, Jon Hall would play with Mr. Brittain's son. (PC, Vol.

10.); 231:10-13.

Mr. Brittain also provided testimony about Jon Hall doing good deeds for

individuals in the community. Specifically, Mr. Brittain recalled an incident in which a

man was standing over his wife ready to hit her. Jon Hall restrained the man from

beating his wife. (PC, Vol. 10.); 231-32: 18-24. 1-4. Mr. Brittain informed trial counsel

of this event. (PC, Vol. 10.); 232: 5-7. Also, Mr. Brittain testified regarding Mr. Hall

fixed his car for free. (PC, Vol. 10.); 233: 1-3. Mr. Brittain did not testify at any portion

of Jon Hall's trial.

## TESTIMONY OF PAMELA BRITTAIN

Pamela Brittain testified that she knew Jon Hall from working with him in 1990.

(PC, Vol. 10.); 247:1-2. She stated that she never saw Jon Hall get angry. In addition,

she stated that on several occasions, Jon Hall was very lenient about people paying

him for work he performed. (PC, Vol. 10.); 247-48: 17-24, 1-6.

Ms. Brittain testified that she had watched Jon Hall and the victim interact. (PC,

Vol. 10.); 250: 5-6. Ms. Brittain stated that the victim treated Jon Hall "[l]ike shit."  (PC,

Vol. 10.); 250:6. Elaborating on this statement, Ms. Brittain stated the victim was very

demanding and abusive to Jon Hall. (PC, Vol. 10.); 250:9-10. According to Ms.

Brittain, the victim "was constantly bitching at him, you know. She would downgrade

him, like he wasn't worth anything, that he couldn't do anything right." (PC, Vol. 10.);

250-51: 23-24, 1-2. In addition, Ms. Brittain stated that on several occasions she had

witnessed the victim kick Jon Hall. (PC, Vol. 10.); 250:14-15.

10

Ms. Brittain also provided testimony regarding Jon Hall's interaction with his

children. She characterized Jon Hall as the caregiver. (PC, Vol. 10.); 254:18. She

stated that many times when Jon Hall visited her home that Jon Hall would have his

infant with him. (PC, Vol. 10.); 254:19-20. Ms. Brittain stated that Jon Hall interacted

with the children more than the victim interacted with the children. (PC, Vol. 10.);

254:21-23.

Ms. Brittain also testified about good deeds Jon Hall performed in the

neighborhood. She recounted the same incident in which Jon Hall broke up a domestic

violence altercation about which Jackie Brittain testified. (PC, Vol. 10.); 255:8-19. No

member of the defense team contacted Ms. Brittain, nor Ms. Pamela Brittain did not

testify at any portion of the Jon Hall trial.

There was no strategical reason not to call this witness.

## TESTIMONY OF KATHY HUGO

Kathy Hugo, another sister of the Petitioner, whose testimony only took up **3**

**pages** in the original record, testified in some 17 pages that she was never contacted

by trial counsel before trial. (PC, Vol. 10); 272. She said she told counsel before she

testified of the Petitioner's being a good father to the children. (PC, Vol. 10); 274. Yet,

that was never used at trial. She, too, had testimony that the disconnecting of the wires

was NOT an indication of premeditation. (PC, Vol. 10); 279. Of course, trial counsel

never talked to her until the guilt/innocence phase was over.

11

## TESTIMONY OF ATTORNEY CLAYTON MAYO

Attorney Mayo testified that he handled the punishment phase, while Ford handled

the guilt/innocence phase. He admits that the Petitioner's immediate family should

have been interviewed. (PC, Vol. 11); 299. He admits that he probably only spoke to

Ms. Arbogast. (PC, Vol. 11); 300 He remembers the phone lines being a "problem",

but left it naked in the record. (PC, Vol. 11); 303. He remembers that he thought that

only Petitioner could testify about the phone wires, (PC, Vol. 11); 306. but, as we have

shown, it could have been proved by several other witnesses. His "hope" was to get

manslaughter, yet no provocation testimony was produced. (PC, Vol. 11); 311. A

theory with no evidence is unacceptable when the evidence could have been

discovered through a reasonable investigation. He testified that they never asked the

Court for a psychiatrist because the Petitioner did not want to go with an insanity

defense. (PC, Vol. 11); 315 He has no excuse for not using the "good guy" testimony

that we produced in this hearing. (PC, Vol. 11); 321. There was no strategy in not using

pictures showing the Petitioner in a good light. (PC, Vol. 11); 323.

## TESTIMONY OF ATTORNEY JESSE FORD III

Attorney Ford testified, like Mr. Mayo, that getting the testimony of brother Jeff Hall

is something that should have been done. (PC, Vol. 11); 383. In what may be the most

honest thing to which Ford testified, he said that one of their theories was to "hope for

mercy." (PC, Vol. 11); 392. Surely it is trial counsel's duty to do more than hope. His

other idea for a defense was "intoxication", but he produced no evidence on the matter.

(PC, Vol. 11); 390.

12

Attorney Ford demonstrated a commanding **lack** of knowledge of the case. He thought the only way to prove that the deceased was abusive to Petitioner was through the Petitioner. This record shows otherwise.

He, too, admits that the phone line testimony in the record appears sinister, but balked at any explanation showing that it had been done before on many occasions with NO violence. (PC, Vol. 11); 403.

He never talked to the siblings. (PC, Vol. 11); 404. Then, he says that he thinks talking to them would not have helped. (PC, Vol. 11); 405 Not only does this record show the contrary, one must ask how an attorney can know if talking to the siblings helps unless he tries

He testified that the Petitioner has to supply the history for the experts. (PC, Vol. 11); 410. His explanation of IED (intermittent explosive disorder) versus insanity demonstrates a total lack of knowledge and understanding of the two. (PC, Vol. 11); 414.

Attorney Ford's veracity must be questioned when he says he read all the "reports" of the witnesses that were never contacted by him or his team. If he means that he read some of the State's statements, if any, isn't it the duty of a defense attorney to do more than read the State's file and give up?

Lastly, Ford says he never asked for good pictures of the Petitioner, because he was having a hard enough time dealing with the autopsy pictures. (PC, Vol. 11); 420. It sounds as if he is saying that when he saw the autopsy pictures, he gave up. It is the very essence of his duty to find a way to stem the damage done by such pictures. Yet, he appears to be in a trance at the viewing of those pictures.

13

## TESTIMONY OF DR. KEITH A. CARUSO

It is Petitioner's position that had trial counsel done a thorough background on the Petitioner, he would have more likely recognized the need for a psychiatrist. Then, as Dr. Caruso testified, the thorough history would have keyed the investigation by the expert into IED. (PC, Vol. 12);119-121. However, if trial counsel sees no duty to provide this thorough history, it is understandable that diagnoses will be missed.

Dr. Caruso testified that this science was available at the time. (PC, Vol. 12);122. He testified that knowing that Petitioner had disconnected phone lines in the past was important to his findings. (PC, Vol. 12);119-121. Since trial counsel had never talked to most of the siblings, they never knew this to pass along to the professional that they hired. Surely, this testimony would have been helpful both in an effort to show manslaughter and mitigation in punishment. The failure stems back to lack of contacting the siblings.

## TESTIMONY OF DIANA PEARSON

Ms. Pearson testified that  she remembered drinking with the Appellant on the day in question. (PC, Vol. 13);170-171.

## TESTIMONY OF ALICE PEARSON

Ms. Pearson testified that  she remembered drinking with the Appellant on the day in question. (PC, Vol. 13);172-173.

14

## ARGUMENT

### ISSUE I.
THE TRIAL COURT ERRED IN RULING THAT THE PETITIONER RECEIVED THE EFFECTIVE ASSISTANCE OF COUNSEL BOTH AT THE GUILT/INNOCENCE PHASE OF THE TRIAL AND THE PUNISHMENT PHASE OF THE TRIAL.

### THE LAW

Petitioner was entitled at both the trial and direct appeal of his capital murder case to the effective assistance of counsel pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Petitioner submits that since this was a capital case for which the State sought the death penalty and from which Petitioner has been sentenced to death, he was entitled to an enhanced reliability of the decision-making process, enhanced confidence in the verdict and enhanced due process under the Eighth Amendment to the United States Constitution and Article I, Sections 8 and 16 of the Constitution of Tennessee. See, Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1966); Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 944 (1976); Gardner v. Florida, 430 U.S. 349, 357, 358, 97 S.Ct. 1197, 51 L.Ed.2d 353 (1977); See also Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L.Rev. 299 (1983); Note, The Eighth Amendment and Effective Assistance of Counsel in Capital Trials, 107 Harv. L.Rev. 1923 (1994).

The appropriate standard for evaluating a claim of ineffective assistance of counsel is whether the advice given or the services rendered were within the range of competence demanded of attorneys in criminal cases and whether counsel's deficient

performance undermines confidence in the verdict.  Strickland v. Washington, 466 U.S.
668, 693, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); Kyles v. Whitley, 514 U.S. 419,
115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (Petitioner need show only that the
errors undermine the confidence in the outcome of the trial); Baxter v. Rose, 523
S.W.2d 930 (Tenn. 1975).  Moreover, tactical and strategic choices made by trial
counsel are not valid if those choices were uninformed due to inadequate preparation.
Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).  The burden of proof for Petitioner is a
preponderance of evidence.  McGee v. State 739 S.W.2d 789 (Tenn.Cr.App. 1987).

The American Bar Association's Standards for Criminal Justice:  The Defense
Function instructs that counsel must establish a relationship with his or her client.  The
Defense Function § 4-3.1.  Counsel must interview his or her client.  The Defense
Function § 4-3.2.  Counsel must promptly pursue available procedure and engage in a
motions practice to protect his or her client's rights.  The Defense Function § 4-3.6.
Counsel must conduct a prompt investigation of the circumstances of the case and
explore all avenues leading to facts relevant to the merits of the case and the penalty,
including efforts to secure information in the possession of the prosecution and law
enforcement authorities.  The Defense Function § 4-4.1.

Counsel's statutory and ethical obligations are heightened in this case due to the
fact that Petitioner faces the death sentence.  See e.g. Gardner v. Florida, 430 U.S.
349, 357-358; 97 S.Ct. 1197, 1204; 51 L.Ed.2d 393, 402 (1977)("Death is a different
kind of punishment.")(plurality opinion); Reid v. Covert, 354 U.S. 1, 45,46, 77 S.Ct.
1222, 1 L.Ed.2d 1148 (1957)("The taking of life is irrevocable.")(Frankfurter, J.
concurring)  The Tennessee Supreme Court has recognized that capital representation

16

is a comprehensive, complicated and specialized effort for which ordinary professional

qualifications and ordinary efforts are inadequate. *See* R. 13 § 3, Tenn.S.Ct.R.(1997).

The appropriate standards for trial counsel in a capital case are derived from

court precedent, guidelines for practice generated by the American Bar Association and

other professional organizations, the code of ethics established by the Supreme Court,

and the practice standards developed through the knowledge and performance of

attorneys who practice in the area of capital defense. Prior to the trial of this case, the

American Bar Association produced its Guidelines for the Appointment and

Performance of Counsel in Death Penalty Cases, February, 1989. These guidelines

establish attorney eligibility standards (Guideline 5.1), attorney work load standards

(Guideline 6.1), standards for supporting services (Guideline 8.1) and performance

standards (Guidelines 11.1 through Guideline 11.9.5.)

It is important to note that these standards recognize the unique character of

defense in a case in which the state is seeking the death penalty.

Guideline 8.1 stresses the need for supporting services not only for the preparation

of an adequate defense in the guilt/innocence phase but also the importance of

adequate supporting services for all phases of the proceedings including the sentencing

phase. With regard to support services, the commentary to the guidelines cites Ake v.

Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and notes that the court

reaffirmed that "fundamental fairness entitles indigent defendants to the 'basic tools for

an adequate defense.'" The commentary then cites Ake in saying:

> We recognized long ago that mere access to the courthouse doors does
> not by itself assure a proper functioning of the adversary process, and that
> a criminal trial is fundamentally unfair if the State proceeds against an

17

indigent defendant without making certain that he has access to the raw
materials integral to the building of an effective defense.

ABA Guidelines, at 73. The commentary also cites to the ABA Standards, providing

defense services, standard 5-1.4 which provides that adequate supporting services

include:

> . . . expert witnesses capable of testifying at trial and at other proceedings,
> personnel skilled in social work and related disciplines to provide
> assistance at pre-trial release hearings and at sentencings, and trained
> investigators to interview witnesses and to assemble demonstrative
> evidence.

ABA Standards for Criminal Justice, Second Edition. The Defense Function Standard
5-1.4, Commentary (1980). The commentary to guideline 8.1 continues by noting that:

> Counsel assigned to represent defendants in capital cases must
> engage in ongoing research in order to keep abreast of the rapidly
> changing legal developments in the complex body of law
> surrounding death penalty issues. In order to make use of
> sophisticated jury selection techniques... the defense requires
> access to social scientists and other experts who can assist in voir
> dire questioning and the profiling of prospective jurors. . .
> **Additionally, counsel in a capital case is obligated to conduct
> a thorough investigation of the defendant's life history and
> background** and, if it is in the best interest of the client, to present
> mitigating evidence uncovered during the course of that
> investigation at the penalty phase of the trial.

ABA Guidelines, p. 74; (emphasis added).

In addition to the previously mentioned guidelines, the guidelines for performance

standards, guideline 11.4.1, regarding investigation makes very clear the need to

prepare thoroughly for mitigation, including the preparation of a thorough life history or

what Petitioner's counsel refers to as a social history. Guideline 11.4.1,C states:

> The investigation for preparation of the sentencing phase
> should be conducted regardless of any initial assertion by
> the client that mitigation is not to be offered. This

18

> investigation should comprise efforts to discover all
> reasonably available mitigating evidence and evidence to
> rebut the aggravating evidence that may be introduced by
> the prosecutor.

ABA Guidelines, p. 93.

Guideline 11.8.6,B indicates that the topics that counsel should consider presenting

include, inter alia, medical history, educational history, employment and training history,

family and social history, the rehabilitative potential of the client and "expert testimony

concerning any of the above and the resulting impact on the client, relating to the

offense and to the client's potential at the time of sentencing." ABA Guidelines, p. 26.

In Cooper v. State, 847 S.W.2d 521, 527 (Tenn. Crim. App. 1992), this court noted

with approval that in United States v. DeCoster, 487 F.2d 1197, 1203-1204 (D.C.Cir.

1973), the court stated, " In general -- Counsel should be guided by the American Bar

Association Standards for the Defense Function. They represent the legal profession's

own articulation of guidelines for the defense of criminal cases."    The court also

noted that while post-conviction courts should not measure trial counsel by "20-20

hindsight", "deference to tactical choices only applies if the choices are informed ones

based upon adequate preparation. Cooper v. State, 847 S.W.2d at 528 (citing Hellard

v. State, 629 S.W.2d 4, 9 (Tenn. 1982); and United States v. DeCoster, 487 F.2d at

1201). Cooper, citing Beasley v. United States, 491 F.2d 687 (6th Cir. 1974), further

stated,

> [T]he assistance of counsel required under the Sixth
> Amendment is counsel reasonably likely to render and
> rendering reasonably effective assistance. It is a violation of
> this standard for defense counsel to deprive a criminal
> defendant of a substantial defense by his own
> ineffectiveness or incompetence.... Defense counsel must

19

> perform at least as well as a lawyer with ordinary training
> and skill in the criminal law and must conscientiously <u>protect
> his client's interest</u>, undeflected by conflicting
> considerations.... <u>Defense counsel must investigate all
> apparently substantial defenses available to the defendant
> and must assert them in a proper and timely manner.</u>

847 S.W. 2d at 696 (emphasis added).

Additional material available to define the standard for representation in capital

cases at the time this case was tried include the death penalty defense manual that

was prepared by the Tennessee Association of Criminal Defense Lawyers (TACDL.) In

this manual, Tools for the Ultimate Trial, 2nd edition(1987), at least two articles fully

describe the need for a social history and the need for a mitigation specialist to develop

an appropriate social history. These articles appear in appendix C to the chapter on the

sentencing hearing and were reprinted from the Champion, the magazine of the

National Association of Criminal Defense Lawyers. It is evident that, by the time of the

trial of this matter, the production of a thorough social history was not new in the area of

capital defense but rather was a well-known requirement for the preparation for the

sentencing hearing.

THE PREJUDICE PRONG: A "REASONABLE PROBABILITY" THAT "THE RESULT OF THE
PROCEEDINGS WOULD HAVE BEEN DIFFERENT."

Discussion of the prejudice prong of the Strickland test is first because it has

proved a great obstacle for capital defendants. Strickland encourages courts "to

dispose of an ineffectiveness claim on a ground of lack of sufficient prejudice" if it is

"easier" to do so.[1] Thus, in many cases, courts will deny relief on a claim of ineffective

---

[1]    *Strickland v. Washington*, 466 U.S. at 697, 104 S. Ct. at 2069.

20

assistance of counsel for insufficient prejudice without ever considering whether

counsel's actions were professionally unreasonable.[2]

In order to satisfy the prejudice prong, we must establish that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable

probability is a probability sufficient to undermine confidence in the outcome." Id.  That

is, "a criminal defendant alleging prejudice must show 'that counsel's errors were so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' "

Lockhart v. Fretwell, 506 U.S. 364, 369 (1993) (quoting Strickland, 466 U.S. at 687).

This is not an outcome-determinative test. Nix v. Whiteside, 475 U.S. 157, 175 (1986).

The question is not whether the defendant would have more likely than not received a

different verdict but for counsel's performance, but whether "he received a fair trial,

understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514

U.S. 419, 454 (1995).[3]

As applied to sentencing in a death penalty case, prejudice requires a showing that

a reasonable probability exists that, but for counsel's deficient performance, the

---

[2]    See, e.g., Williams, 52 F.3d at 1470 (commending district court for denying for
lack of prejudice ineffectiveness claim raised in capital case).

[3]    Although Kyles involves the determination of prejudice following the state's
suppression of evidence favorable to the defense (Brady error), the standard for prejudice
employed in such cases is adopted from, and is identical to, that in Strickland. United States v.
Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); id. at 685 (White, J., concurring in
part and concurring in the judgment). In both circumstances, to demonstrate prejudice a
petitioner must show that "'there is a reasonable probability that . . . the result of the proceeding
would have been different.'" Kyles, 514 U.S. at 433-434 (quoting Bagley, 473 U.S. at 682
(opinion of Blackmun, J.); id. at 685 (White, J., concurring in part and concurring in the
judgment)).

21

sentencer "would have concluded that the balance of aggravating and mitigating

circumstances did not warrant death." Strickland, 466 U.S. at 695. Thus, where

through trial counsel's unprofessional errors, the jury fails to learn of mitigating

evidence, prejudice may be shown. See, e.g., Harris v. Dugger, 874 F.2d 756, 764

(11th Cir.), cert. denied, 493 U.S. 1011 (1989); Thomas v. Kemp, 796 F.2d 1322, 1325

(11th Cir. 1986), cert. denied, 479 U.S. 996 (1987).

Because the prejudice inquiry is so fact-intensive and case-specific, it is almost

impossible to generalize about the showing necessary to demonstrate prejudice under

Strickland.

How do we demonstrate prejudice? First, by negating a core component of the

State's case, focusing on what was the most damaging evidence against Petitioner. In

this case, Petitioner believes it was the disconnecting of the phone lines, which trial

counsel allowed to be referred to as "cutting". "Cutting" is worse than disconnecting in

that it implies a permanent disconnection. The true facts are indeed different in critical

ways from those presented to the trial court.

However, Petitioner is not contending that the true picture would have resulted in

a complete exoneration of the Petitioner, but certainly that he would have been found

"not guilty" of first degree murder and guilty of some lesser charge.

Second, Petitioner submits that he has proven prejudice by filling an evidentiary

void in the trial record. Trial counsel presented no real defensive theory, but

contemplated using intoxication and a hope for mercy. However, they put on no

testimony to support either theory, yet the post-conviction investigation uncovered

credible witnesses to demonstrate prejudice from counsel's failure to investigate. This

22

testimony has been presented to the Court.

## THE PERFORMANCE PRONG: COUNSEL'S REPRESENTATION WAS "OBJECTIVELY UNREASONABLE."

In addition to demonstrating prejudice, to obtain relief on an ineffectiveness claim,

Petitioner must also satisfy the performance prong -- that "counsel's representation fell

below an objective standard of reasonableness . . . considering all of the circumstances

. . . under prevailing professional norms." Strickland, 466 U.S. at 688.  That is,

Petitioner must overcome the presumption that, under the circumstances, trial counsel's

actions "'might be considered sound trial strategy.'"  Strickland, 466 U.S. at 689

(quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  Courts are supposed to defer

only to "true tactical decisions -- that is to say, choices between alternatives that each

have the potential for both benefit and loss."  Profitt v. Waldron, 831 F.2d 1245, 1249

(5th Cir. 1987)  The first question to ask is whether counsel had a strategy at all.  What

was it?  A complete lack of a discernable trial strategy is objectively unreasonable.

See, e.g, Groseclose v. Bell, 130 F.3d 1161, 1169-1170 (6th Cir. 1997), cert. denied,

523 U.S. 1132 (1998); Berryman v. Morton, 100 F.3d 1089, 1105 (3rd Cir. 1996);

Middleton v. Dugger, 849 F.2d 491, 494 (11th Cir. 1988).  Next, one must discern

whether counsel's decisions were informed.  "Reasonable performance of counsel

includes an adequate investigation of the facts of the case, consideration of viable

theories, and development of evidence to support those theories."  Henderson v.

Sargent, 926 F.2d 706, 711, amended in other part, 939 F.2d 586 (8th Cir. 1991), cert.

denied, 502 U.S. 1050 (1992).

Did counsel understand the controlling law and procedures?  Strickland's

presumption that counsel's actions are informed by a sound trial strategy does not

apply if counsel misunderstood the relevant procedures, or failed to do basic legal

research.  See Kimmelman v. Morrison, 477 U.S. 365, 385 (1986); Dobbs v. Turpin,

142 F.3d 1383, 1388 (11th Cir. 1998); Loyd v. Whitley, 977 F.2d 149, 157 & n.16 (5th

Cir. 1992), cert. denied, 508 U.S. 911 (1993); Hyman v. Aiken, 824 F.2d 1405, 1416

(4th Cir. 1987).   Or did counsel fail to uncover the critical facts from which a strategic

decision could be made?  "[C]ounsel has a duty to make reasonable investigations or to

make a reasonable decision that makes particular investigations unnecessary."

Strickland, 466 U.S. at 691.  When counsel makes a decision not to investigate further,

that decision is reasonable only to the extent professional judgment makes the

limitations placed on further investigation reasonable in the circumstances.  Id.  In

general, any trial "strategy" that flows "from lack of diligence in preparation and

investigation is not protected by the presumption in favor of counsel."  Kenley v.

Armontrout, 937 F.2d 1298, 1304 (8th Cir.), cert. denied, 502 U.S. 964 (1991).

Did counsel essentially conduct virtually no investigation in this case?  Then his

actions are likely unreasonable.  See Henderson, 926 F.2d at 711, 714; Crandell v.

Bunnell, 144 F.3d 1213, 1217 (9th Cir. 1998).  A thorough pretrial investigation is "[o]ne

of the primary duties defense counsel owes to his client."  Magill v. Dugger, 824 F.2d

879, 886 (11th Cir. 1987).  This duty includes the "investigation of the defendant's

background, for possible mitigating evidence." Middleton, 849 F.2d at 493.

Was it is apparent from evidence concerning the crime, from conversations with

24

the defendant, or from other readily available sources of information that there was

evidence to support a potential defense or that would have qualified as a mitigating

factor? Would simple investigatory steps, such as seeking pretrial discovery, have

revealed helpful information but counsel did not take those steps? Then counsel's

failure to investigate may be objectively unreasonable. See, e.g., Kimmelman, 477 U.S.

at 386; Middleton, 849 F.2d at 494; Hall v. Washington, 106 F.3d 742, 749-50 (7th Cir.),

cert. denied, 522 U.S. 907 (1997). The same is true if counsel failed to follow-up on the

information he already had. See, e.g., Harris, 64 F.3d at 1436; Kenley, 937 F.2d at

1304. "This does not mean that only a scorch-the-earth strategy will suffice, but it does

mean that the attorney must look into readily available sources of evidence." Hall,

106 F.3d at 749 (internal citation omitted). Moreover, if it never occurred to counsel to

investigate some critical fact, or he simply overlooked it, then the "decision" not to

investigate cannot be considered an informed strategic one. See, e.g., Cunningham v.

Zant, 928 F.2d 1006, 1018 (11th Cir. 1991); Cook v. Lynaugh, 821 F.2d 1072, 1078

(5th Cir. 1987).

Did counsel fail to locate and interview material witnesses, including witnesses

who could provide mitigating evidence? This failure may be objectively unreasonable.

See, e.g., Hall, 106 F.3d at 746; Bryant v. Scott, 28 F.3d 1411, 1418 (5th Cir. 1994);

Sanders v. Ratelle, 21 F.3d 1446, 1457 (9th Cir. 1994); Chambers v. Armontrout, 907

F.2d 825, 833 (8th Cir.) (en banc), cert. denied, 498 U.S. 950 (1990); Montgomery v.

Peterson, 846 F.2d 407, 413 (7th Cir. 1988).

Finally, if counsel describes a trial strategy, did counsel fail to investigate evidence

25

that would have supported the purported "strategy"? That failure may be objectively

unreasonable. See e.g., Deutscher v. Whitley, 884 F.2d 1152, 1160 (9th Cir. 1989),

vacated on other grounds, 500 U.S. 901 (1992), reaffirmed, 16 F.3d 981, 984 (9th Cir.

1994). The same is true if only one viable line of defense existed, and counsel failed to

investigate it. See, e.g., Chambers, 907 F.2d at 828; Profitt, 831 F.2d at 1249.

### Accumulation of Errors by Trial Counsel Results in Ineffective Assistance of Counsel

Finally, in Kyles v. Whitley, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme

Court recognized that the prejudice prong of any failure in the adversarial process could

be satisfied not only by one instance of egregious conduct on the part of an attorney or

trial official, but that the accumulation of those errors which tended to undermine the

confidence in the outcome of the verdict, which denied Petitioner any "meaningful

adversarial process", would satisfy the prejudice prong. In that regard, Petitioner

argues the following as examples of errors which perhaps singularly, but surely

cumulatively, satisfy the prejudice prong of Strickland v. Washington. Surely the

cumulation thereof pursuant to Kyles v. Whitley, satisfies the prejudice prong.


### A.    Trial Counsel Failed to Properly Present Intoxication Defense.

Intoxication while not a "defense" to murder, (as counsel Ford seemed to think)

was the "defense" of choice Mr. Ford. (PC, Vol. 11); 390. Assuming he was trying to

present evidence of intoxication to negate the ability of Petitioner to form the intent

requisite to establish first degree murder, he failed to produce one shred of evidence

regarding intoxication. As Post-Conviction counsel showed, there was at least evidence

of drinking earlier in the day by the Petitioner. (see testimony of the Pearsons at  (PC,

Vol. 13);170-173.)  However, with intoxication being his ONLY defense, he failed to put

on this evidence in support of his theory. Counsel Ford blamed Petitioner by saying

that he refused to testify. (PC, Vol. 11); 391.  If only he would have investigated, he

would have found the Pearsons, as Post-conviction counsel did.

      B.    Trial Counsel Failed to Show the Victim as the Aggressor.

This testimony of the sisters of Petitioner and the Brittians clearly establish that the

victim was capable of goading the Petitioner.  This being essential to show such

circumstances in a manslaughter case, there is no rational reason not to present this

testimony.

      C.    Trial Counsel Failed to Preserve the Testimony of Jeff Hall.

As noted above, one of the sisters, Ms. Arbogast, constantly asked counsel for

Petitioner to move to preserve this testimony.  No one lifted a finger to do so, and the

testimony is unquestionably favorable as the affidavit introduced shows.

      D.    Trial Counsel Failed to Present Evidence of Disconnecting
           Telephone

As noted in the factual section of this brief, it was common for Petitioner to

disconnect the phone lines to a home just to get the undivided attention of someone to

talk to.  Counsel never knew of this because of the poor investigation done in the case.

If he had, he could have shown that disconnection of the phones lines was NOT the

sinister act that the prosecution wanted the jury to believe.

      E.    Trial Counsel Failed to Properly Present the Mental Health

27

## Issue

Dr. Caruso testified that the spinal test used and his evaluations were all available at the time of this trial. That the mental status of Petitioner was critical was admitted when counsel stated that they were using "hope for mercy" and "intoxication" as their strategies. (PC, Vol. 11); 390-392. Trial counsel knew this but accepted the only psychologist they believed was available to them. They never considered using a psychiatrist. A competent expert was essential and Mr. Hall had a right to a competent expert to assist in his defense. Ake v. Oklahoma, 470 U.S. 68, 77, 105 S.Ct. 1087,1093, 84 L.Ed. Ed 53 (1985) (state must provide competent psychiatric assistance). Clearly trial counsel had a duty to represent Mr. Hall zealously. Rule 8, CANON 7, Rules of the Tennessee Supreme Court. Counsel also had a duty to file pretrial motions to obtain necessary support services. ABA Guidelines in Death penalty Cases, Guideline 11.5.1 Failure to actively and zealously pursue necessary and competent psychiatric experts in the case denied Mr. Hall his right to effective assistance.

Further, The commentary to guideline 8.1 of the ABA Standards imposes the duty to investigate thoroughly a complete mitigation history of the client. Familiarity with this guideline was obviously lacking.

Clearly, the knowledge of how to direct a mitigation investigation is fundamental. There is a clear breakdown in the adversarial process when one side does not know the rules or possess the knowledge of how the investigation is supposed to be conducted.

There can be no question that it was the responsibility of trial counsel to ensure

28

that the social history was prepared and provided to the experts. As noted above, by 1989, the requirements for counsel in a capital case clearly included the production of a full social history or life history of the defendant. Stickland, supra. ABA Standards, guidelines 8.1, 11.4.1; Goodpaster, 58 N.Y.U. L. Rev. at 323-324.

### F.    Trial Counsel Failed to Present Proof that Jon Hall was a Good Father, and other good acts of Petitioner

A comparison of the trial record with the post-conviction record shows massive amounts of "good guy" and "good father" evidence essential to showing that the Petitioner was something other than the monster portrayed by the prosecution. Yet, with the utter failure to investigate having been shown, it is not surprising that none was ever produced.

### G.    Failed defensive strategy

Perhaps Mr. Ford was most candid when he said, "Our theory was to hope that the jury would show some mercy on Mr. Hall" . (PC, Vol. 11); 392. Then, he proceeded to fail to put on intoxication evidence, evidence that it was a continuing domestic dispute, or any other evidence favorable to Petitioner, despite there being a plethora of such evidence.

### H.    Failure to Investigate

No attorney ever talked to any of the family, except Mr. Mayo talking to Ms. Arbogast. All of the other siblings an mother and other witnesses were never talked to by the defense. As we have shown, it was there. It need only be investigated, which was not done. The MINIMUM an attorney must do in a death case is to talk to

29

members of the family.

Post conviction counsel produced the Stanfields, Brittians and Foremans; all of whom had valuable testimony. Most all of them stated that they were never talked to by the trial counsel or a representative of the trial team. Yet, trial counsel Ford stated that if they were available and had something good to say, they would have called them. (PC, Vol. 11) 428. How can you if you do not know about them or interviewed them? Why did trial counsel not investigate this case? Why were the siblings and the mother, save Ms. Arbogast, never contacted? It might be that they just did not like him much. (PC, Vol. 11); 340. Maybe he believed that he could rely on whatever was told to him by the client. (PC, Vol. 11); 455. However, that does not relieve counsel of his duty to investigate.

Attorney Mayo testified that he handled the punishment phase, while Ford handled the guilt/innocence phase. He admits that the Petitioner's immediate family should have been interviewed. (PC, Vol. 11); 299. He admits that he probably only spoke to Ms. Arbogast. (PC, Vol. 11); 300. He remembers the phone lines being a "problem", but left it naked in the record. (PC, Vol. 11); 303. He remembers that he thought that only Petitioner could testify about the phone wires, (PC, Vol. 11); 306 but, as post-conviction counsel has shown, it could have been proved by several other witnesses. His "hope" was to get manslaughter, yet no provocation testimony was produced. (PC, Vol. 11); 311. As discussed earlier, a theory with no evidence is unacceptable when the evidence could have been discovered through a reasonable investigation. He testified that they never asked the Court for a psychiatrist because the Petitioner did not want to go with an insanity defense. (PC, Vol. 11); 315. He has no excuse for not

30

using the "good guy" testimony that we produced in this hearing. (PC, Vol. 11); 321.

There was no strategy in not using pictures showing the Petitioner in a good light. (PC, Vol. 11); 323.

It is the position of Petitioner that not even the absolute minimum was done to benefit him. The investigation was almost non-existent. Post-conviction counsel has shown that the evidence was there. It is Petitioner's position that, properly presented, he had an excellent chance of something other than first-degree murder and SURELY a real chance at something less than the penalty of death.

Trial counsel admitted that he believed that his job was to believe what the Petitioner told him and not to go "much further" in his investigation. (PC, Vol. 11); 455. If that is the standard by which counsel is bound, innocent people will be executed.


## ISSUE II.

## THE HEINOUS, ATROCIOUS OR CRUEL AGGRAVATING FACTOR AS USED IN THE INSTANT CASE IS UNCONSTITUTIONAL.

### E.    Vague and Overbroad

Petitioner contends that over six additional years of capital case jurisprudence has continued to confirm that Tennessee's heinous, atrocious or cruel aggravating factor violates Article I, § 16 of the Tennessee Constitution and the Eighth and Fourteenth Amendments to the Constitution of the United States.

Our Supreme Court has continually recognized the problems of the failure of the

31

HAC aggravator to narrow the class eligible for death even though it has not struck the

aggravator entirely.

In State v. Odom, 928 S.W.2d 18 (Tenn. 1996), the Court found that the new

statutory provision is constitutional because it sufficiently narrows the class of offenders

subject to the death penalty.  However, the majority was compelled to narrow the

aggravating factor's new prong, "serious physical abuse beyond that necessary to

produce death" (T.C.A. § 39-13-204(l)(5)), which had been added by amendment in

1989, as a replacement for the former vague term "depravity of mind."  This new

language is arguably more capable of definition than the former "depravity of mind"

which applies to all first degree murders.  In the instant case, if the jury found depravity

of mind then the sentence of death is void due to the failure of depravity of mind to

narrow the class of murderer eligible for the death penalty.  Godfrey v. Georgia, 446

U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 38 (1980.)  In the alternative, "torture" although

equally vague for constitutional purposes has been the subject of some definition by our

Supreme Court.   "Torture" as instructed in this case means "the infliction of **severe**

physical or mental pain upon the victim while he or she remains alive and conscious."

See, State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985)(emphasis added.)  In his

dissent in the decision in State v. Hodges, 944 S.W2d 346, 361 (Tenn. 1997), Justice

Reid stated, "[Torture] necessarily involves the intent by the perpetrator to cause the

victim to suffer.  Suffering alone regardless of severity does not constitute torture."   If

Justice Reid's analysis is accurate then there was no evidence in this case that Mr. Hall

intended that the victim suffer.  All the proof is to the effect that the intention was that

she not die at all. Petitioner submits that if Justice Reid's analysis is correct, the HAC

aggravator is not present in this case.  On the other hand, if Justice Reid's analysis is

incorrect then the HAC aggravator as instructed here is over broad and vague.

B.    The Unconstitutionality of the "Heinous, Atrocious or Cruel" Aggravating
      Circumstance as Charged to the Jury in the Instant Case Is Dictated by
      United States Supreme Court Precedent and Therefore must Be Adopted by
      this Court.

The United States Court of Appeals for the  Sixth Circuit in Houston v. Dutton, 50

F.3d 781 (6th Cir. 1995), held that under Maynard v. Cartwright, 486 U.S. 356, 108

S.Ct. 1853, 100 L.Ed. 2d 372 (1988) and Richmond v. Lewis, 506 U.S. 40, 113 S.Ct.

528, 121 L.Ed 2d 411 (1992), the Tennessee heinous, atrocious or cruel aggravating

factor was unconstitutionally vague.  New case law leaves no doubt that the heinous,

atrocious or cruel aggravating factor as instructed in this case is unconstitutionally

vague as dictated by prior decisions of the United States Supreme Court.

The Eighth Amendment requires that a capital sentencer's discretion be channeled

and limited so as to minimize the risk of imposing the death penalty in a wholly arbitrary

and capricious manner. See, Maynard v. Cartwright, 486 U.S. 356, 361, 108 S.Ct.

1853, 1858, 100 L.Ed.2d 372 (1988.)   An aggravating factor as defined by state

statute and decision must "furnish principled guidance for the choice between death

and a lesser penalty." Richmond v. Lewis, 506 U.S. 40, 113 S.Ct. 528, 534, 121

L.Ed.2d 411 (1992.)   The Court in Richmond, in determining that Arizona's "especially

heinous, cruel or depraved" factor was constitutionally infirm, noted that the Eighth

Amendment law relevant to the decision was "well defined".  506 U.S. at 46 , 113 S.Ct.

at 534.  Similarly in Stringer v. Black,  the Court found that although Godfrey v. Georgia,

33

446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 38 (1980) and <u>Maynard</u> involved different

statutory language, "it would be a mistake to conclude that the vagueness ruling of

<u>Godfrey</u> was limited to the precise language before us in that case."   503 U.S. 222,

228, 229, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992.)  Thus, the Court found that

<u>Maynard</u> was controlled by <u>Godfrey</u> and did not announce a new rule of law.

More importantly, Justice Stevens, in his opinion respecting the denial of the

petition for a writ of certiorari in the case of <u>Barber v. Tennessee</u>,[4] 513 U.S 1184, 115

S.Ct. 1177, 130 L.Ed. 2d 1129 (1995), after observing that denial of certiorari does not

constitute a ruling on the merits, noted that:

> Under the trial court's instruction, a jury could find an
> aggravating circumstance sufficient to impose the death
> penalty merely by concluding that a murderer's state of mind
> was "wicked or morally corrupt."   Because such a state of
> mind is a characteristic of every murder, the instruction is
> plainly impermissible under the Court's holdings in *Godfrey
> v. Georgia*, [citation omitted] (striking down instruction
> allowing jury to find aggravating circumstance if murder was
> "'outrageously or wantonly vile, horrible and inhuman'"), and
> *Maynard v. Cartwright*, [citation omitted] ("'especially,
> heinous, atrocious, or cruel'".)

That striking down the HAC aggravator as instructed in the instant case is

mandated by Supreme Court precedent is illustrated by the case of <u>Joubert v.

Hopkins</u>,[5] 75 F.3d 1232 (8th Cir. 1996.)   The court, in refusing to hear Joubert claim

that the Nebraska statute violated the narrowing requirement noted that by the time

---

[4]  The instruction given in <u>Barber</u> included the definitions of the statutory terms as set out in <u>State v. Williams</u>, 690 S.W.2d 517, 526-530 (Tenn. 1985), and thus were identical to those given in the instant case.

[5]  <u>Joubert</u> held that failure to first attack the Nebraska "heinous, atrocious and cruel" aggravating factor in the Nebraska state courts constituted a procedural default for the purpose of federal habeas corpus and, further, that since the ruling in <u>Maynard</u> was dictated by precedent, there was no cause to avoid the procedural default.

34

Joubert filed his first state court appeal in 1985, the legal basis for arguing that

"exceptional depravity" was impermissibly vague was sufficiently developed so as he

was not excused from procedural default of having not first raised the issue in the state

court.   The Eighth Circuit noted that in Furman v. Georgia, 408 U.S. 238, 92 S.Ct.

2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court had invalidated all

death penalty procedures as being arbitrary and impermissibly vague.  The court further

observed that in Godfrey v. Georgia, 446 U.S. 420, 431, 100 S.Ct. 1759, 1766, 64

L.Ed.2d 398 (1980), the Court struck down an "outrageously or wantonly vile, horrible,

or inhuman" aggravator as unconstitutionally vague.  The Joubert court then noted that

in Maynard v. Cartwright, 486 U.S. 356, 362-364, 108 S.Ct. 1853, 1858-1859, 100

L.Ed.2d 372 (1988), "the Supreme Court found that there was no functional difference

between an 'especially heinous, atrocious, or cruel' aggravator and the

unconstitutionally vague aggravator in Godfrey."   Finally, the Joubert court observed

that in Stringer v. Black, supra, the Court held that Maynard had been dictated by

precedent.  75 F.2d at 1242.

In Barnhill v. Flannigan, 42 F.3d 1074, 1079 (7th Cir. 1994), the court quoted

Maynard (486 U.S. at 363, 108 S.Ct. at 1859), in its explanation that Godfrey "plainly

rejected the submission that a particular set of facts surrounding a murder, however

shocking they may be, were enough in themselves, and without some narrowing

principle to apply to those facts, to warrant the imposition of the death penalty."  In

refusing the invitation to extend Maynard's analysis to non-death cases, the Supreme

Court emphasized that "[T]he death penalty 'is qualitatively different from a sentence of

imprisonment, however long.'  Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct.

35

2978, 2991, 49 L.Ed.2d 944 (1976.) Given this qualitative difference, 'there is a
corresponding difference in the need for reliability in the determination that death is the
appropriate punishment in a specific case.' Zant v. Stephens, 462 U.S. 862, 885, 886,
103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983) (quoting Woodson, 428 U.S. at 305, 96
S.Ct. at 2991.)"

Therefore, this Court should hold that Mr. Hall's sentence of death is
constitutionally infirm.

## ISSUE III.

### THE SENTENCE OF DEATH IN THE INSTANT CASE MUST BE SET ASIDE AS THE IMPOSITION OF DEATH IS UNRELIABLE AND VIOLATES THE VALUES RECOGNIZED AND PROTECTED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I § 16 OF THE TENNESSEE CONSTITUTION.

Petitioner further submits that the death penalty is not and cannot be fairly
administered and is therefore unconstitutional. Both Justice Scalia, in his concurring
opinion, and Justice Blackmun, in his dissenting opinion, argue in Callins v. Collins, 510
U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994), that the death penalty as currently
structured is unworkable. The differences in the Justices' positions are that Justice
Scalia, concurring in the Court's denial of certiorari, argues that the Court has gone too
far in trying to both narrow the class of those eligible for the death penalty and maintain
individualized sentencing, while Justice Blackmun finds that the requirements to narrow
and individualize are constitutionally required but impossible to effectuate and thus the
death penalty must by abandoned. Fundamentally, capital case jurisprudence has now
come full circle and we are back to the problems that caused the Court to strike the

36

death penalty as unconstitutional as applied in <u>Furman v. Georgia</u>, 408 S.Ct. 238, 92

S.Ct. 2726, 33 L.Ed.2d 346 (1972). Mr. Hall, therefore, submits that this court should

hold that his sentence of death is unconstitutional.  Petitioner submits that this Court

should adopt the position articulated by Justice Blackmun.


## ISSUE IV.

### THE DEATH SENTENCE IS UNCONSTITUTIONAL, BECAUSE IT INFRINGES UPON MR. HALL'S FUNDAMENTAL RIGHT TO LIFE, AND IS NOT NECESSARY TO PROMOTE ANY COMPELLING STATE INTEREST.


Pursuant to the Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to

the United States Constitution, Article I §§ 6, 7, 8, 9, 16 and 17 of the Tennessee

Constitution, the death sentence should also be reversed because it unconstitutionally

impinges upon Mr. Hall's fundamental right to life, secured by the United States

Constitution and the Tennessee Constitution.  The death sentence must be reversed

because petitioner's right to life is a fundamental constitutional right, and the

punishment of death is not necessary to promote any compelling state interest in

punishing him, nor has the State shown that there are no less restrictive means of

punishing him.

Fundamental constitutional rights are those rights "explicitly or implicitly

guaranteed in the Constitution." <u>San Antonio Independent School District v. Rodriguez</u>,

411 U.S. 1, 33-34 (1973). The United States Constitution explicitly recognizes the right

37

to life as fundamental in both the due process clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment.  The Due Process Clause of the Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property without due process of law." U.S. Const. Amend. V.  Similarly, the due process clause of the Fourteenth Amendment provides, "nor shall any State deprive any person of life liberty, or property, without due process of law."  U.S. Const. Amend. XIV.  So, too, Article I § 8 of the Tennessee Constitution acknowledges life as a fundamental right.

## CONCLUSION

Wherefore, the above premises considered, the Appellant requests that this Court

reverse the trial court's denial of the petition and remand with instructions granting the

Appellant a new trial.

Respectfully submitted,

PAUL N. BUCHANAN, 017697
1526 Crockett Hills Blvd.
Brentwood, Tennessee 37027
(615) 370-4503

DANNY R. ELLIS, 020747
1289 N. Highland Ave.
P.O. Box 3512
Jackson, TN 38303-3512
(731)988-5350

39

## CERTIFICATE OF SERVICE

I hereby certify that I have mailed an exact and true copy of the above brief, by U.S.

Mail, postage prepaid, to the following:


Office of the Attorney General
c/o Ross Dyer
2nd Floor
425 Fifth Avenue North
Nashville, Tennessee 37243-0493


this the _____ day of February, 2004.


Danny R. Ellis
Attorney at Law

40