# ADDENDUM 2
# Document 2

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

JON HALL,                          )
                                   )
    *Appellant,*                  )
                                   )          MADISON COUNTY
vs.                                )          No. W2003-00669-CCA-R3-PD
                                   )
STATE OF TENNESSEE,                )
                                   )
    *Appellee.*                   )

ON APPEAL AS OF RIGHT FROM THE JUDGMENT
OF THE MADISON COUNTY CIRCUIT COURT

BRIEF OF THE STATE OF TENNESSEE

PAUL G. SUMMERS
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

MARK A. FULKS
Assistant Attorney General
ATTORNEY GENERAL'S OFFICE
Criminal Justice Division
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-7859
B.P.R. No. 19387

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I. THE DEFENDANT'S PROOF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A. *Debbie Davis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B. *Clarence Stanfill.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C. *Joe Henry Stanfill.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        D. *Valene Foreman.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        E. *Paula Foreman.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        F. *Sheryl Arbogast.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        G. *Pamela Foreman.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        H. *Jackie Brittain.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        I. *Darlene Brittain.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        J. *Kathy Hugo.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        K. *Clay Mayo.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        L. *Martin Eskew.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        M. *Jesse H. Ford, III.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        N. *Dr. Pamela Auble.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

        O. *Dr. Keith Caruso.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

P.  *Margie Diana Pearson.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Q.  *Alice Pearson.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

R.  *The defendant.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

II. STATE'S PROOF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

A.  *Documentary Proof.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

B.  *Dr. Kimberly Stalford.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

I. THE  DEFENDANT  RECEIVED  EFFECTIVE  ASSISTANCE  OF
COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

A.  *The defendant's trial counsel developed and presented a theory of
defense (Defendant's subsection G).* . . . . . . . . . . . . . . . . . . . . . . . 58

B.  *The defendant's trial counsel raised the issue of the defendant's
habit of disconnecting telephone lines (Defendant's subsection D).* . . . . . . . . 61

C.  *The defendant's attorneys presented the theory of intoxication
(Defendant's subsection A).* . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

D.  *The defendant's counsel investigated and presented a mental
health claim based upon the diagnoses and testimony of qualified
professionals.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

E.  *The defendant's trial counsel made a strategic decision not to
portray the victim as the aggressor (Defendant's subsection B).* . . . . . . . . 66

F.  *The defendant was not prejudiced by the failure of his pre-trial
counsel to preserve the defendant's brother's testimony (Defendant's
subsection C).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

G.  *The defendant's trial counsel developed and presented a theory
of mitigation (Defendant's subsections F and H).* . . . . . . . . . . . . . . . . 68

*H. Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

II.    THE DEFENDANT'S REMAINING ISSUES ARE WAIVED
(Defendant's Issues II, III, and IV). . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

# TABLE OF AUTHORITIES

## CASES

*Bates v. State,*
    973 S.W.2d 615 (Tenn. Crim. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Clenny v. State,*
    576 S.W.2d 12 (Tenn. Crim. App. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Fields v. State,*
    40 S.W.3d 450, 457-58 (Tenn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 56,57

*Hicks v. State,*
    983 S.W.2d 240 (Tenn. Crim. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 56

*State v. Benson,*
    973 S.W.2d 202 (Tenn. Crim. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 72

*State v. Burns,*
    6 S.W.3d 453, 461 (Tenn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*State v. Honeycutt,*
    54 S.W.3d 762, 766-67 (Tenn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*State v. Jon Douglas Hall,*
    8 S.W.3d 593, 596-97 (Tenn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Strickland v. Washington,*
    466 U.S. 668, 104 S. Ct. 2052 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 57,58

## STATUTES

Tenn. Code Ann. § 40-30-106(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Tenn. Code Ann. § 40-30-210(f) (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## STATEMENT OF THE ISSUES

### I.

Was the defendant denied the right to effective assistance of counsel?

### II.

Are the defendant's remaining issues waived?

## STATEMENT OF THE CASE

The defendant was convicted of first degree murder in the Circuit Court of Madison County, Judge Whit Lafon presiding. *State v. Jon Douglas Hall*, 8 S.W.3d 593, 596-97 (Tenn. 1999). The proof at trial established that the defendant forced his way into his estranged wife's home, attacked her in her bedroom, and then dragged her to a small pool in the backyard where he strangled and drowned her. During the attack, the defendant inflicted at least 83 separate wounds on the victim, including "several blows to the head, a fractured nose, multiple lacerations, and bruises and abrasions to her chest, abdomen, genitals, arms, legs, and back." The defendant's children watched while the defendant murdered their mother, afraid to call for help because of the defendant's threats. *Id.* at 596-97.

The defendant was sentenced to death upon a finding of the jury that the especially heinous, atrocious, or cruel aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt. *Id.* On November 15, 1999, his conviction and sentence were affirmed by the Tennessee Supreme Court on direct appeal. *Id.* at 607. The defendant file a petition for rehearing, which was denied on December 27, 1999. *Id.*

On December 7, 2000, the defendant filed a *pro se* petition for post-conviction relief, which was followed by an amended petition on November 1, 2001. (I, 1; II,

226.)[1]  A hearing was held in the Madison County Circuit Court, Judge Roy B. Morgan,

Jr., presiding.  (IX—XV.)  On February 20, 2003, the post-conviction court denied relief

and dismissed the petition.  (VII, 963.)  The defendant filed a timely notice of appeal

on March 4, 2003.  (VII, 1016.)

---

[1] The record on appeal consists of an eight-volume technical record (I—VIII) and an eight-volume transcript of the proceedings (IX—XVI).

## STATEMENT OF THE FACTS

### I. THE DEFENDANT'S PROOF.

#### A. *Debbie Davis*

Debbie Davis, the defendant's sister, testified she previously testified during the penalty phase of the defendant's trial, but she did not testify during the guilt phase. Between July 1994 and February 1997, she was never contacted by the defendant's trial counsel. She testified she had information pertinent to the issue of the defendant's guilt.

Davis testified about the physically violent nature of the defendant's relationship with the victim. She saw the victim physically abuse the defendant on many occasions. She described one incident at her home in which the victim, who was apparently angry, instigated a fight with the defendant by kicking and hitting him, but the defendant had the victim in a headlock by the time she went outside and interrupted them. She testified the victim and the defendant had a relationship that involved regular bouts of violence, which the victim and the defendant attempted to hide from other people. (IX, 36-45.)

Davis also testified about verbal abuse the victim directed toward the defendant. She said the victim was in charge of everything in the relationship because she was smarter than the defendant. She said the victim told the defendant he was stupid. (IX, 45.) She testified that she saw the victim belittle the defendant over the fact that she was in control of the relationship. She claimed the victim henpecked and belittled the

defendant over various things, such as where the defendant needed to be, which car he should have driven, how much he was working, and who should be the breadwinner. The belittling also involved the victim's pursuit of an education and the couple's financial problems. (IX, 53-54.)

Davis testified that, when she was finally contacted by the defendant's trial counsel on the night before she was scheduled to testify, the defendant's counsel told her not to portray the victim negatively. The defendant's counsel explained that the victim "was already a victim, and that there were going to be mannequins and bad pictures and everybody would already feel pretty bad about it . . . and that it would be in [her] best interest not to bring up anything negative about [the victim] because it would make [her] look bad." (IX, 46, 61.)

Davis testified she did not like the victim because the victim exaggerated and lied, came between the defendant and another woman named Hope, and abused drugs with the defendant. Davis was also apprehensive about the defendant's relationship with the victim because the victim had two children from a previous relationship. (IX, 51-52.) She thought the defendant's relationship with the victim was the wrong path for the defendant to be going down. The defendant was trying to turn his life around. (IX, 79-80.)

Davis testified the defendant often disconnected telephone lines to prevent people from calling the police. On one occasion, the defendant disconnected his neighbors

5

telephone line to prevent them from calling the police about a party the defendant and

the victim were having.  (IX, 47-48.)  On another occasion, the defendant disconnected

his mother's telephone line.  She said she could have testified to other occasions of the

defendant disconnecting telephone lines as well.  She believed it was a way for the

defendant to get attention and prevent people from making telephone calls.  (IX, 49-51.)

Davis testified the defendant was a baptized Christian and a loving father.  She

said she could have provided the defendant's trial counsel with photographs and

videotapes to support her contention that the defendant was a good father.  (IX, 55.)

Davis testified the defendant was "a wonderful father," and was the nurturing parent.

She said, "He's the one that always took care of the kids.  He's the one that dressed

them, and he's the one that always brought them . . . over to the house to play."  (IX,

85-86.)  Several photographs of the defendant in "stages of family life and his children

and his family" were introduced as an exhibit to Davis' testimony.  (IX, 56; Ex. 2.)  A

three-minute videotape, which depicted the defendant interacting with his children, was

also introduced.  (IX, 57-60; Ex. 3.)

Davis testified about their parents' abusive relationship.  She said their father

would come home drunk, argue with their mother, and then abuse her.  She also testified

their mother would aggravate their father until  he would become enraged and violent.

On one occasion, when the defendant was two or three, their father "pinned [their

mother] down on the floor, and he was beating her head on the floor, and there were big

clumps of hair laying on the floor and there was a lot of blood." Davis claimed, during

that incident, the defendant "got a fly swatter and was trying to hit [their father] to

make him stop." (IX, 62-65.) On another occasion, the defendant's father "ripped the

phone off the wall," preventing Davis and the other children from calling for help. (IX,

82.) Davis said their parent would fight and then be "lovey-dovey." She compared their

parent's relationship with the defendant's relationship with the victim. (IX, 66.)

Davis testified the violence between their mother and father occasionally involved

"gun play." During one incident, Davis watched as the defendant's mother aimed a gun

at the defendant's father and told him she would give him until she counted to 10 to

run. Davis' boyfriend disarmed her and discovered that the gun was not loaded. Davis

testified she did not know if the guns were ever loaded. (IX, 81-82.)

Davis testified their father treated the defendant as if the defendant was not his

son. Their father accused their mother of having the defendant as a result of an

adulterous affair. Their father shared his belief with the defendant and neglected the

defendant. But their mother would "overcompensate" for that and be more loving with

the defendant. (IX, 78-79.)

Davis testified the defendant's brother Jeff knew the defendant better than any

of the others siblings. She said Jeff and the defendant were confidants. In July, August,

and September of 1994, the family knew Jeff was dying of AIDS. She testified Jeff died

on July 4, 1995. She claimed the defendant's attorneys did not contact Jeff to preserve

his testimony. She testified it was Jeff who called the police about the defendant after the victim was murdered. She said the defendant went to Jeff's house immediately after murdering the victim and apparently did not know that he had killed the victim. She said Jeff had first-hand knowledge of the defendant's demeanor and state of mind at that time. (IX, 67-71.)

Davis testified the defendant was afraid of police officers. When police officers would eat at her restaurant, the defendant would avoid them. She claimed the defendant "was just totally terrified of police officers." This fear apparently originated when the defendant bought a rusted-out used car from a police officer. Davis testified that the encounter over the car ended with an altercation between the defendant and the police officer. (IX, 72-74.)

Davis testified the defendant's trial investigator, Gloria Shettles, told her the defendant had been diagnosed with intermittent explosive disorder. She said Shettles read the description of that disorder to her. Davis testified the symptoms of that disorder "described [the defendant] to a T." Yet she saw no follow up on that diagnosis by the defendant's attorneys. (IX, 76-77.)

Davis testified their mother remarried after their father died. She said their step-father was abusive and was only after their mother's money. She testified their sister Kathy and Kathy's husband went to marital counseling and alcoholics anonymous. The defendant's brother Jay was diagnosed with manic depression and had attempted suicide.

8

She testified that the defendant was a "perfect child," who apparently started having problems with authority figures after their father died. Davis testified their paternal grandfather was also an alcoholic wife-abuser. (IX, 71, 86-95.)

Davis testified that she saw one of the jurors hug the victim's family during the trial.

On cross-examination, Davis was asked about the defendant's prior arrests for domestic assault. She conceded that the defendant had "gotten into trouble in Tennessee." She acknowledged that, at the time of the murder, the victim had an order of protection against the defendant. She also acknowledged that she had heard allegations that the defendant had abused his children. She testified the defendant is a "hothead" who is prone to angry outbursts. Finally, she acknowledged again that she gave similar testimony during the penalty phase, except that she was "not allowed to say anything about [the victim]." (IX, 96-105.)

### B. *Clarence Stanfill.*

Clarence Stanfill, the defendant's neighbor, testified he was a friend of the defendant's and an acquaintance of the victim. He said the defendant was an excellent father. The defendant told him he had to quit his job to stay home and take care of his little girl because she had cerebral palsy. Stanfill testified that he was not contacted by any of the police officers regarding the victim's murder, nor was he contacted by the

9

defendant's attorneys at that time. Finally he testified that the defendant "always carried himself as a gentleman around me." (IX, 109-114.)

### C. *Joe Henry Stanfill.*

Joe Henry Stanfill testified he was a neighbor and friend of the defendant's as well as a neighbor. He also knew the victim and the defendant's children. Stanfill testified the defendant always had the children and he treated them well. Stanfill also testified the defendant was always happy. He never saw the defendant upset. (IX, 114-119.)

### D. *Valene Foreman.*

Valene Foreman testified she knew the defendant through the interaction of their children. She said her daughter visited the defendant's children all the time. She also said the defendant lived nearby. The defendant and the defendant's children visited her daughter in her home. Foreman also testified she knew the victim and she saw the victim and the defendant interact.

Regarding the night of the victim's murder, Foreman testified she knew about the $25 debt the defendant owed to her father. On the night of the murders, the defendant came to her home and handed her $25 and said, "Will you give this to Herman?" The defendant told Foreman he owed the money to her father and asked her to tell her father he would pay the rest later. She testified the victim worked for the ambulance service and, while she was at work, the defendant stayed with the children. She also testified that, as far as she knew, the defendant always provided for the needs of his children.

10

Foreman testified she was never contacted by the police officers about the murder, nor was she contacted by the defendant's attorneys. (IX, 119-124.)

### E. Paula Foreman.

Paula Foreman testified her family lived in the defendant's neighborhood. She got to know the defendant when she would babysit for him occasionally. She also testified she knew the victim. She testified that, when the victim worked, either the defendant or she would take care of the children. She testified the defendant treated her well and that the defendant hired her to babysit because she needed a job and was otherwise unemployed. The defendant allowed her to babysit to help her earn some extra money. She testified she saw the defendant take care of the kids. She said the defendant was good at taking care of them and interacted well with them. She said the children appeared to like him and he appeared to like them. (IX, 124-128.)

### F. Sheryl Arbogast.

Sheryl Arbogast, the defendant's sister, testified she worked on the defendant's case for him at the time of his trial. She described her role as that of a bookkeeper. She testified she would receive telephone calls from the defendant, take notes regarding those telephone calls, and try to help the defendant get information about his case. She testified the defendant claimed he was not being informed of hearing dates and was not certain of who was appointed to represent him. She also testified she called attorneys on his behalf trying to find out information for him. She testified she repeatedly made

attempts to contact the attorneys that were representing the defendant, but she said those attempts were not successful. She testified that, on a couple of occasions, she was given dates and, on another occasion, she was told the attorneys were not allowed to provide her with any information without the defendant's permission. She testified she told them the defendant had called her and asked for her help in getting the information from the attorneys. She also said she told them that the defendant had told her that they would not accept his calls. Consequently, he was not able to notify them to speak with her. She testified the defendant's attorneys would not give her any information.

Arbogast testified she knew the nature of the relationship between the defendant and the victim. She testified she had no knowledge or information that would lead her to think the defendant would murder the victim. Arbogast also testified about the defendant's childhood. She said they were raised in a very difficult environment because their parents fought all the time. Their parents argued incessantly every night. She said the arguing frequently lead to pushing and shoving and, on a number of occasions, "horrible knock-down-drag-out fights where bones would be broken and blood would be flying and hair was being ripped out by the roots." She testified the children would scramble around in search of someone to break up the fight for fear that their mother would be killed because their father was so violent. She described her father as a heavy drinker. Arbogast testified she begged her mother to divorce her father because of the violence.

12

Arbogast testified that, during the period from May 1994 until July 1994, of all the seven siblings, their brother Jeff was the closest to the defendant. She testified Jeff had AIDS. She said she attempted to alert defendant's attorneys of Jeff's illness to prompt them to preserve his testimony. Despite her efforts, the defendant's attorneys did not contact Jeff before his death.

During her testimony, the defendant's post-conviction counsel showed her exhibit number 5, an affidavit from Jeff Hall, and asked her to identify it. She testified she was with Jeff when he signed the affidavit. She said she got the affidavit from Jeff because the defendant's attorneys had not preserved Jeff's testimony. She testified she had been told by the defendant's attorneys that they intended to talk to Jeff. She claimed they never did.

Arbogast testified she talked to the defendant's attorneys for the first time on the night before she was to testify. The defendant's attorneys prepared her to testify by telephone and then they met face-to-face the next day for about fifteen minutes prior to her testimony. She testified the defendant's attorneys did not sit down with her to get a long social history of the defendant. She also testified she knew Gloria Shettles, the private investigator working for the defendant at the time of his trial. She testified Shettles was supposed to conduct a mitigation assessment and gather facts about the defendant's background to give the court more insight about the defendant. She testified she talked to Shettles by telephone one or two times.

13

Arbogast testified she was a registered nurse with over twenty years of experience. She said she was familiar with the DSM and described it as a classification of diagnoses and definitions of medical terms. She recalled a conversation with Shettles during which they discussed the section of the DSM dealing with Intermittent Explosive Disorder. She testified that Shettles brought up the subject of Intermittent Explosive Disorder during their telephone conversation during which Ms. Shettles read the excerpt about that disorder from the book. She said she and Shettles agreed that IED was something that needed to be pursued in the defendant's case.

Arbogast testified that her experience as a registered nurse included evaluating psychiatric admissions. She said she was authorized to approve those admissions without a doctor's referral if the admission satisfied certain criteria. The criteria she looked for were whether the person was suicidal or whether the person used weapons in conjunction with heavy emotional distress. She testified those criteria represented clear-cut cases in which the best resolution was to remove the person from the dangerous circumstances so they could not hurt themselves or others. She testified she was familiar with the criteria of Intermittent Explosive Disorder. She also testified those criteria were consistent with the defendant's behavior. She described the defendant as having a quick temper, depression, emotional instability, and loss of control over his emotions. She testified that the defendant had not been able to hold a job because of his problems and that his unemployment was affecting everything in his life. She testified she wanted the

14

defendant to get out of his marriage, to leave the situation. She also said she wanted to have the defendant hospitalized. (X, 153-163.)

Arbogast testified she knew the defendant had a habit of disconnecting telephone wires. She testified that, on one occasion during an argument with the defendant's mother, the defendant disconnected the telephone lines to prevent his mother from calling her sister so he could have her full attention. She testified that, on past occasions when the defendant disconnected the telephone lines, he had never hurt anybody. She testified the defendant would disconnect telephone lines because he wanted to resolve the situation rather than have someone ignore him or get away from him. (X, 163-165.)

Arbogast testified that, on two occasions, she had stayed overnight with the defendant and the victim at their home. Arbogast testified the defendant's relationship with the victim was a stormy one. She testified the victim berated and belittled the defendant constantly. She testified the victim belittled the defendant because the defendant was unable to provide for his family and she had to do everything. However, Arbogast testified she observed the defendant doing all of the childcare and the cooking and the cleaning of the house. (X, 165-168.)

Arbogast testified the defendant was extremely attentive and loving with the children. She said he gave them physical care and attention. He prepared special foods for the toddler and for the infant that no one else could prepare. The defendant was very well-versed in what their likes and dislikes were and how to feed and cook for them.

15

He always made sure they looked their best. Arbogast testified she was impressed with how the defendant was able to do therapy with Jessica, the baby, who had cerebral palsy. She testified the defendant would do physical therapy exercises and speech therapy exercises with her. Arbogast testified the defendant made sure nobody in the family excluded her from activities. Arbogast testified that, when she testified during the defendant's trial, she was not asked to testify about his relationship with his children. (X, 167-173.)

Arbogast testified that her trial testimony was limited to the fact that the defendant came from a home where there were a lot of fights. She said she did not testify about his habit of disconnecting telephone lines, his Intermittent Explosive Disorder, or his relationship with his children. (X, 173.)

Arbogast testified the defendant's father drank every day. She said he would stop at a bar on his way home from work before coming home for dinner. She testified that, on some occasions, the defendant's father would stay out late and not come home for dinner. On those occasions, the children were not allowed to eat until he came home. On one such occasion, Arbogast testified the defendant's father walked into the house, approached their mother, took her glasses from her face, and threw them against the wall, shattering them. Then their father punched their mother in the face with his fist. Arbogast testified this fight continued until their father pinned their mother on the floor and was pounding her head on the floor. She testified she saw their father take a

16

handful of hair and rip it out of their mother's head, leaving a bald spot. Arbogast testified their mother was bleeding from her nose, and her eyes were blackened. She also said she would not have been surprised if their mother's ribs were broken. She said her mother could not hear for several days after the fight because of the repeated blows to her head. Arbogast testified she jumped on their father's back and tried to pull him off their mother, but he threw her against the wall, knocking the wind out of her. During that fight, their father had torn the phone off the wall. Arbogast testified she previously testified about this incident at the defendant's trial but she did not go into great detail at that time. (X, 177-182.)

Arbogast testified their father disowned the defendant, denying that the defendant was his son. She testified their father treated the defendant differently. He was cold to the defendant and never gave the defendant any attention at all. She testified that "to drag home the point" the defendant's father would "shower special affection on the other child next older than Jon on to Joel and treat Joel with special favors and take him for ice cream or just to play with him. And then if Jon was in the room he would make a big production about removing himself and not giving any attention to the defendant acting as though he wasn't in the room." (X, 182-183.)

### G. Pamela Foreman.

Pamela Foreman, the defendant's neighbor, testified she used to babysit for the defendant and the victim. She testified the victim asked her to babysit while the victim

and the defendant were at work and after she got home from school. She also testified
she saw the defendant with the children. She said he treated his children "fairly." (X,
212-217.)

### H. Jackie Brittain.

Jackie Brittain testified he was a friend of the defendant and the victim. He
testified he did not interact with the victim very much because the defendant and the
victim had started having problems. At that time, the defendant started staying with
him. Brittain testified that his understanding was that the victim had asked the
defendant to leave and that she had a restraining order against the defendant. He
testified the victim came to his house to see the defendant during the time the
restraining order was in place. He said the victim would come by the house on those
occasions and ask the defendant to work on cars that were at their house. Brittain also
testified he was subpoenaed to testify at the defendant's trial by the District Attorney
General's Office. However, although he did appear in court, he did not testify. Brittain
testified he talked to the defendant's attorneys and the attorneys asked him about
"running around together" with the defendant.

Brittain also testified he never saw the defendant lose his temper. Brittain said
the defendant acted just like other fathers would with their children. He said the
defendant sat and played with them. Brittain testified he knew of one occasion when
the defendant was "a white knight." On that occasion, which Brittain placed two days

18

before the murder of the victim, one of their neighbors and his wife were involved in a domestic dispute. Brittain said their neighbors were arguing and the man was about to hit his wife. At that moment, the defendant stopped the fight. The defendant told the man he had no reason to beat her. Brittain testified he told the defendant's counsel about that story but he was not called to testify. Brittain testified that, on another occasion, he and his wife were stranded at 1:30 or 2:00 in the morning. Brittain's wife called the defendant and the defendant picked them up and took them home. Then, the next day, the defendant went and got their car and fixed it for them.

Brittain also testified he was in general sessions court at the time the protection order was issued. He said the defendant got upset because "they wouldn't listen. They wasn't listening to what he was having to say." Brittain said the defendant wanted to know how the restraining order worked and wanted clarification about why he could not go to his house but the victim could come and visit him. Finally, Brittain testified the victim owned and carried a gun. (X, 217-244.)

I. *Darlene Brittain.*

Darlene Brittain testified she knew the defendant very well. She met the defendant in 1990 when the victim approached her looking for a job for the defendant. At that time, Brittain had an automobile detail clean up shop. She leased the defendant a bay in her shop so he could do mechanic work. During the time they worked together, she saw the defendant interact with customers on many occasions. She often saw him

"cut people a break" and never saw the defendant angry with anybody. Brittain testified she had seen the defendant drink beer on occasion. She testified beer made the defendant giddy and intoxicated, but she never saw him violent after he had been drinking. Brittain testified she had seen the defendant and the victim interacting with each other. She testified that the victim treated the defendant "like shit, excuse my language." She testified the victim was extremely "commanding and demanding and abusive to him." She testified she had seen the victim hit and kick the defendant. She also testified the victim was constantly "bitching at him." She said the victim would downgrade him, tell him he was not worth anything, and tell him that he could do nothing right. She testified the victim basically ran the defendant down. She testified the defendant would take this abuse for a long time before getting mad. She testified she never saw the defendant have a temper. She said the defendant was the sweetest guy in the world.

Brittain claimed she did not recall telling TBI Special Agent Brian Bird that the defendant was "like a volcano about to explode." She also claimed she did not remember telling Special Agent Bird that the defendant "wanted to grind [the victim] up into hamburger meat." Brittain also testified that, during the time that defendant lived with her and her husband, there was an order of protection in place against the defendant. She said the victim came over to her house and "broke it" on several

occasions. She testified the victim would come over and push the defendant's buttons in an attempt to provoke him.

Brittain also testified she had occasion to see the defendant interact with his children. She said the defendant was a great father. She also testified, "as a matter of fact [the defendant] was really basically the care giver . . . He'd come to the house a lot of times and he'd have the baby or he'd have one of the little kids not [the victim]. Seemed like he had more interaction with the children than she did." Brittain also testified that two or three nights before the defendant murdered the victim "there was a couple next door to us that the boy was beating up on his . . . there was a violent altercation between . . . a man and a wife and the guy . . . had her down on the ground and was beating her up and [the defendant] broke up the fight and told the man . . . you don't have a right to do that to her that's your wife and [the defendant] literally stopped the fight." (X, 245-256.)

On cross-examination, Brittain testified that, at the time of the defendant's trial, the defendant's attorneys told her they did not want to call her as a witness because of the "ground hamburger meat" statement she made to the TBI agent. (X, 258.)

*J. Kathy Hugo.*

Kathy Hugo, one of the defendant's sisters, testified she testified during the defendant's trial. She said the substance of her testimony focused on the violence in their home when the defendant was growing up. She testified she was not contacted by

21

the defendant's attorneys about her testimony until the night before she testified. She said the defendant's attorneys contacted her about 11:00 p.m. that night and told her not to say anything bad about the victim. She said she was "supposed to talk about what it was like growing up in our home". She also testified she told the defendant's attorneys that the defendant was a good father. But she also testified that she believed she was asked that question during her testimony. (X, 271-276.)

Hugo testified the victim had children prior to marrying the defendant. She said the defendant's relationship with those children was good. The children referred to the defendant as "Daddy Jon." She testified the defendant's attorneys did not ask her to testify about that at trial. She also testified that she could have presented some pictures of the defendant and the victim and of the defendant when he was younger. She also testified she never contacted the defendant's attorneys. She left all of the contact with the defendant's attorneys to her sister Sheryl. (X, 276-278.) Hugo testified to one instance in particular in which the defendant's father had the defendant's mother down on the floor. She testified all of the children were trying to get their father off their mother. The defendant, who was very small, was hitting their father with a fly swatter and telling him to get off his mother. (X, 282.)

Hugo testified she knew of the defendant's penchant for disconnecting telephone lines. She said it was commonly known that the defendant disconnected telephone lines in an attempt to get people's attention. More particularly, she testified the defendant

had disconnected his mother's telephone lines on one occasion, but on that occasion nobody was hurt. (X, 278-280).

Hugo testified she spoke with the defendant's attorneys about interaction between one of the jurors from the defendant's trial and one of the victim's family members. She said she told the defendant's attorneys she saw one of the jurors go over to the victim's family and hug them in the hall outside the courtroom. Hugo could not recall whether the defendant's attorneys told her they were going to do anything about that juror.

Hugo testified the defendant was a sweet little boy who generally treated people with respect. As a teenager the defendant got in trouble for pulling fire alarms and things like that. Hugo also testified the defendant was the type of person who would stand up for "the small person or the little guy or the underdog." Hugo also testified she had seen the defendant's explosive or rage type behavior. She said, on one occasion, after one of the defendant's girlfriends took some speakers that belonged to him, he became very angry about it and punched a hole in the wall. Hugo testified she never saw the defendant hit anybody, just things. She testified the defendant learned to use rage to resolve problems from his father and his grandfather. She said the defendant never had a male role model who resolved conflicts in a peaceful, civilized manner. (X, 280-287.)

    K. *Clay Mayo.*

23

Clay Mayo, one of the defendant's trial attorneys, testified he has been a licensed attorney in Tennessee since 1990. Mayo testified he had previously tried three or four death penalty cases and several other first-degree murder cases. In the defendant's case, Mayo served as the second-chair attorney. He testified he felt he was qualified as second chair in a death penalty based upon his previous trial experience and his familiarity with opinions of the Tennessee Supreme Court in death penalty cases. Mayo also testified he had attended seminars on trying death penalty murder cases. He testified he was familiar with the "general push by the profession that attorneys were to take the penalty phase of a [death penalty] case especially serious." With that in mind, Mayo testified it was his opinion that he should leave no stone left unturned in trying to find a defense and a mitigation theory. (XI, 292-299.)

Mayo testified he represented the defendant at trial along with Jessie Ford. He and Ford were appointed to represent the defendant a little over a year before the case actually went to trial. They were appointed to replace the defendant's previous attorneys. Mayo testified that, in order to bring themselves up to speed with what had previously transpired in the case, they obtained the case file from the defendant's previous attorneys and they compared that to the court's file to verify that they received a complete copy of everything that had been filed. In addition to reviewing the attorneys' file and the court's file, there were many reports to be reviewed from an investigator, a mitigation expert, and a jury consultant. Based on their review of the file

and those reports, they proceeded to fill in any gaps that they perceived by filing

motions, interviewing witnesses, and pursuing additional mitigation information.

Mayo testified about the pursuit of mitigation evidence in the defendant's case.

He said he spoke with many of the defendant's family members on the telephone. Some

of them were interested in helping at that time and, while none of them were

antagonistic, some were a lot more interested in assisting than others. Mayo recalled a

problem arising during the preparation of the defendant's case because of the death of

the defendant's brother Jeff. He could not recall any theory or tactics by which he

would have attempted to get the testimony introduced, but he did recall discussing that

with the defendant and with his co-counsel. Mayo also recalled meeting with the

defendant's family when they came into town for the defendant's trial. He said the

court-appointed mitigation expert, Gloria Shettles, had also spoken with the defendant's

family members. (XI, 298-302.)

Mayo testified about the theory of defense at trial. He said they were worried

about the defense theory. He said, "there were so many problems with any theory that

we tried to develop that it seemed almost impossible to develop a fact defense based

upon what occurred there." He said they considered voluntary intoxication and the

defendant wanted to pursue a claim of self-defense. However, Mayo testified claiming

self-defense would have alienated the jury and inflamed them. Mayo testified the case

was at least a second-degree murder case and that the defendant's disconnecting the

25

telephone lines presented them with a big problem. He also testified that the other problems included the multiple wounds inflicted upon the victim, the lack of any injuries to the defendant, and the evidence that the defendant had dragged the victim from the house to the swimming pool and then drowned her. Mayo testified it was a very difficult case to defend. Their first thought in developing a defense theory was in trying to mitigate the case from first degree murder into the range of the lesser-included offenses. That was the primary defense theory. He also testified that they ruled out insanity. He said the defendant did not want to pursue an insanity defense. He consulted with the court-appointed mental health expert who told him the defense of insanity was not supported in the defendant's case. Mayo testified he vaguely recalled being informed, possibly by the defendant, that the defendant did in fact have a history of disconnecting telephone lines. He also said he may have received that information from Sheryl Arbogast or one of the defendant's other sisters. He testified that, although evidence of that nature may have mitigated the case if viewed in a vacuum, when considered in the context of what actually happened in the case, introducing that evidence would not have changed the result. (XI, 302-309.)

Mayo testified about the testimony about Dr. Zager. He said Zager was called to testify that the murder occurred as a result of the defendant's rage. He said Dr. Zager's testimony was offered in order to mitigate the element of premeditation and in hopes of reducing the offense of conviction to voluntary manslaughter. However, he

testified they did not introduce evidence of prior violence between the defendant and

the victim because they were trying to demonstrate that the defendant's conduct was

reasonable on the day of the murder.  But he said there was no real chance of

establishing that.  He testified they had plenty of evidence that the defendant had this

burst of rage or something of that nature and that in one of her reports Gloria Shettles

had mentioned Intermittent Explosive Disorder.  He testified he remembered the subject

of Intermittent Explosive Disorder coming up.  He was confident they pursued that as

much as they could.  When Mayo was asked why they would pursue this defense theory

based solely upon the court appointed psychologist without also requesting a

psychiatrist, he testified that in his opinion a psychologist was better for determining

how and why people react to their past and the things that are occurring.  He said

psychiatrists were more apt to simply prescribe medicine and refer their patients to

counselors or psychologists to deal with the real issues.  (XI, 309-318.)

    Mayo testified it was the responsibility of the attorney to have a complete social

history compiled.  He said that is one of the reasons that mitigation experts were

appointed to cases.  He also testified that the mitigation expert was also used to compile

evidence for a factual defense as well as a mitigation defense.  He said the role of the

mitigation expert is to interview every witness with knowledge of the defendant so a

complete social history can be created.  As for the defendant's social history, Mayo

testified he did not recall anyone coming forward or any witness being located who had

positive things to say about the defendant who did not also have negative things to say. He explained that, in evaluating the effectiveness of any testimony, an attorney must decide whether the "good" outweighs the "bad".

Mayo testified a determination of whether to call a particular witness would depend upon what could be produced through cross-examination. He explained that testimony from a witness who says, "I have never known that . . .", could lead to a prosecutor asking a series of damaging questions about things that the defendant had done. He testified that cross-examination by the prosecutor was always a consideration in whether or not to present a witness. In the defendant's case, he testified there were a lot of instances of violent behavior by the defendant towards the victim that he could recall. He said the prosecution had a strong case and simply did not use a lot of that evidence because they did not need to. He recalled evidence of an incident in which the defendant rammed the victim's car while the children were inside. He explained that, if they had called a witness to testify that the defendant was a good father, on cross-examination the prosecution could have asked about that particular incident.

Mayo explained they had information that was not presented because they did not want to risk a damaging cross-examination. When asked about not presenting evidence that the defendant had previously disconnected other people's telephone lines without hurting them, Mayo testified evidence of other instances would not have helped

28

the defendant's case. He said disconnecting telephone lines looked sinister, whether or not anybody was hurt. (XI, 33). (XI, 309-333.)

Mayo reviewed the affidavit signed by the defendant's brother Jeff Hall. He testified he could think of a couple of reasons they may have decided not to attempt to introduce that affidavit. He said Jeff Hall died before he and his co-counsel were appointed to the case. He could think of no reason why counsel would not have preserved Jeff Hall's testimony knowing that he was dying of AIDS.

Mayo testified he could not specifically recall talking with the defendant about the defendant testifying at trial. However, to his recollection it would have been "a catastrophe to have him testify at that time . . . not just cross-examination, but his demeanor, his attitude, his lack of remorse. It would have been horrible." Mayo said, by the time the case went to trial, the defendant was constantly on the verge of a violent outburst. He said the defendant had a couple of outbursts during his trial and was removed from the courtroom. The court even posted guards behind him. (XI, 333-353.)

On cross-examination, Mayo testified that, while preparing to try the defendant's case, he uncovered no evidence of provocation on the part of the victim. He also testified that, in addition to the defendant's psychologist, the defendant was also examined at Middle Tennessee Mental Health Institute (MTMHI). The MTMHI examination determined that the defendant was competent and that an insanity defense could not be supported. He testified they eliminated a lot of potential defenses as they

29

prepared for trial. One of the defenses they may have considered was Intermittent

Explosive Disorder. Another was insanity, another still was intoxication. Ultimately,

the defense theory was to mitigate the level of the offense down to second-degree murder

or another lesser-included offense. Mayo testified that the decisions on all of these

issues were discussed with the defendant. As for the prospects of calling witnesses to

testify only to good aspects of the defendant's personality, Mayo said he was unaware

of any witness that would have only testified to good things without giving the

prosecution the opportunity to cross-examine them regarding the defendant's prior

violent acts. Mayo also testified their strategy was to cross-examine the defendant's

children about the fact that the defendant was a good father. (XI, 353-359.)

Mayo testified he spent a lot of time preparing the defendant's case. He received

discovery from the prosecution and provided copies of that information to the

defendant. He testified that, in his estimation, there were no witnesses who were not

called who could have made a difference in the defendant's case. He also testified that,

other than the possibility of Intermittent Explosive Disorder as a defense, there was

nothing that he could think of that would have been done any different. (XI, 359-360.)

*L. Martin Eskew.*

Martin Eskew, the defendant's former brother-in-law, testified he met the

defendant through his marriage to the victim's sister. He had known the victim since

she was about thirteen or fourteen years old. He described the defendant as a "spoiled

brat" and testified that he may have referred to the defendant as a "complete idiot." He testified the defendant and the victim fought a lot but he did not know who instigated their fights. He said he was never present when the defendant and the victim fought and that he only saw the aftermath of those fights. He testified he never saw the victim belittle the defendant, hit the defendant, or punch the defendant. He also testified he knew the defendant drank a lot and that he believed the defendant had a substance abuse problem. Eskew testified he never had any problem with the victim. (XI, 364-372.)

   M. *Jesse H. Ford, III.*

Jesse Ford, one of the defendant's trial attorneys, testified he has been a licensed attorney in the State of Tennessee since 1982. He testified that in 1995, 1996, and 1997, he represented the defendant. Ford testified he had served as second-chair attorney on two previous death penalty cases. He also testified he had "quite extensive" felony trial experience. When he began practicing law, about 60 percent of his practice was appointed work in criminal cases. That is how he got his criminal trial experience. Ford testified he was appointed to the case after it had already started the litigation process but at least a year before the case was tried. (XI, 373-377.)

Ford testified that, upon being appointed to the case with Mayo, they got the file from the previous attorneys, went through that file, reviewed what had been done, reviewed the motions that had been filed, and then divided up the work. He said Mayo

31

was mainly responsible for mitigation evidence and he was going to be mainly responsible for the trial work. That decision was made because Mayo knew quite a bit more about mitigation in death penalty cases, but he had tried a lot more cases. He said he and Mayo shared an office and saw each other on a daily basis. At the end of just about every day they would discuss the defendant's case. Ford testified he recalled speaking with the defendant's sister Sheryl Arbogast on at least one occasion, but he said Mayo talked to her more often because he was handling the mitigation part of the case. (XI, 377-380.)

Ford testified he was familiar with the defendant's brother Jeff who had AIDS and lived in Texas. As he recalled, when they were appointed to the case the defendant's brother was already dead. He testified that, when they received the file on the defendant's case, the defendant's brother's testimony had not been preserved. He said there may have been some notes in the file about the defendant's brother, but there was no deposition. (XI, 380-384.)

Ford testified about the change of venue in the defendant's case. He said the file contained numerous newspaper articles about the victim's murder when they received it. Based on informal conversations around the county, they felt a change of venue was absolutely necessary. He testified he discussed the necessity of a change of venue with the defendant. He said the defendant was in agreement with the decision to request a change of venue. He said he would not have filed the motion if the defendant had not

32

agreed to it. Ford also testified there was no hearing on the change of venue motion. He testified the motion was not opposed and that the judge granted it when it was filed. (XI, 384-386.)

Ford testified that, after the motion for change of venue was granted, the defendant told him that he was unhappy about it. Ford said he did not relay the defendant's change of heart to the trial judge because the motion had already been granted and the defendant had a habit of changing his mind. He said the defendant would say whatever would suit his needs. Ford further testified that his position was that the motion had been granted and that was what the defendant wanted and the judge was highly unlikely to change his mind. (XI, 387-391.)

Ford testified the opening statements and closing arguments were not transcribed in the appellate record because the common practice for as long as he could remember was not to include them in the appellate record. He testified that it may or not be a good idea to include them in the appellate record. He said it would depend upon whether or not there was something in the opening statements or closing arguments that was inflammatory. He testified he did not think it was necessary to have that part of the record preserved. (XI, 386-387.)

Ford testified the theory of defense during the guilt phase of the defendant's trial was voluntary intoxication. He said the defendant claimed to have consumed many beers before he went to the victim's home. Based upon the defendant's claim, they tried

to locate witnesses who had seen the defendant drinking prior to the murder and knew that he had a drinking problem. He said the defense of voluntary intoxication was based upon what the defendant had told them. But, he explained that defense was hard to present because the defendant refused to testify. Ford testified another theory of defense involved trying to get the level of the offense reduced to some form of manslaughter because it was a domestic dispute, emotions were high, and the defendant lost control. (XI, 390-392.)

Ford testified they also tried to establish that the murder was actually voluntary manslaughter. However, he said, under the circumstances of the case that was a difficult thing to do. He testified the defense attempted to show that the defendant "was acting in an impulsive manner versus a well thought out plan." He reiterated that the defense trial strategy was to establish that the killing was "some form of manslaughter" rather than first degree murder. He testified it is difficult to accomplish that task "when you have four fact witnesses, or five, and one of them's not going to testify." He said he has only had one case in which the defendant did not testify and the result was in the defendant's favor. (XI, 392-393.) Ford testified the jury wants to hear defendants testify. He explained that to the defendant in great detail when they were discussing whether or not the defendant should testify. He told the defendant that in his experience in a case such as this one the jury was going to want to hear from the defendant. He explained it is hard to establish the theory of defense when the defendant

does not testify. In this case, the defendant refused to testify and was not going to testify.

Ford testified the defense was attempting to establish that the defendant had an explosive personality and that the crime was a passionate event arising from the defendant's rocky relationship with the victim. Ford testified they investigated evidence that would have established provocation. He said their investigator interviewed all of the potential witnesses identified by the defendant. But, after reviewing their statements, he did not think those witnesses were very helpful to the defendant's case. Ford testified they talked to the defendant's brothers and sisters. To his recollection, the defendant's siblings had not had much contact with the defendant. He could not recall specifically which of the defendant's siblings he spoke with. However, Ford testified the information the defendant's brothers and sisters could provide was covered during the penalty phase. He explained the problem during the guilt phase was that, although Arbogast wanted to testify, she had not talked to the defendant in two years. (XI, 393-398.)

Ford testified the element of premeditation was a "big problem" in the defendant's case. The evidence showed that the defendant cut the victim's telephone line and subsequently had several opportunities to withdraw from what he was doing. He said one of the defendant's children was on the defendant's back telling him, "Daddy, please stop." And then the defendant dragged the victim out of the house and

down the driveway. Then, he said, the defendant took the victim over to a swimming pool and either choked her to death or drown her. Ford testified this offense "took a little time. This didn't happen in two or three seconds." (XI, 398-399.)

Ford testified the fact that the defendant had disconnected the telephone lines made the offense look really sinister and tended to show premeditation. Ford said because the telephone lines were disconnected no telephone call could be made from the house. Although the telephone lines were disconnected, rather than cut, and could have been easily reconnected, Ford testified that "when somebody's beating you to death, I think you'd have a hard time reconnecting the phone line." He also said he did not see any difference between a disconnected telephone line and a cut telephone line because the result was the same. In either case, the victim could not use the telephone. (XI, 399-401.)

Ford testified he would not have introduced evidence that the defendant previously disconnected other people's telephone lines during the defendant's trial. Evidence of such a habit or custom would not have convinced the jury that this offense was not a premeditated murder. He testified, "that's not going to fly. A jury's not going to buy that." He explained the evidence tending to show the defendant disconnected telephone lines to gain people's undivided attention established that the defendant wanted to control the situations that he was in and be "one on one with them where there can be no other interference." Furthermore, Ford testified what the defendant had

36

done in the past regarding disconnecting telephone lines and not killing people would not have mattered. Ford said it was what mattered on the occasion of the murder that was relevant.

Ford testified he did not know how he could have introduced evidence of the defendant's history of disconnecting telephone lines. He said their main evidentiary problem was that the defendant was not going to testify. He also testified that they had reviewed police reports regarding previous domestic disputes between the defendant and the victim and that one of those reports made reference to the disconnection of the telephone lines. He did not introduce that evidence because he did not think it would help the defendant's case. Ford testified he did not talk to the defendant's sisters, except for a brief discussion with Arbogast, so he did not know what information they could have provided about the defendant's habit of disconnecting telephone lines. However, he knew what the defendant had told him. He said, if the defendant's sisters were going to testify that the defendant previously disconnected telephone lines in other situations, that there was still going to be a problem getting that testimony into evidence. (XI, 403-406.)

Ford testified again that the defense theory was to seek a conviction on a lesser-included offense of voluntary manslaughter. To that end, he acknowledged that the defense had to prove that there was provocation. Their theory of provocation was based on the fact that the defendant and the victim were having domestic problems. But they

37

had problems establishing provocation because the defendant would not testify that the victim provoked him. He explained that the defendant needed to testify to open the door for the introduction of additional testimony regarding other incidents of domestic abuse. Even so, Ford testified he did not know of any provocation that would justify retaliation of the nature inflicted on the victim by the defendant, except for perhaps complete self-defense. More particularly, Ford testified the information coming from the family members was not sufficient to amount to provocation that would justify the defendant killing his wife. (XI, 406-409.)

Ford testified he probably read the report from Gloria Shettles detailing her conversation with Sheryl Arbogast about the possibility that the defendant suffered from Intermittent Explosive Disorder. He explained that, if the defendant truly had Intermittent Explosive Disorder, Dr. Zager, the defendant's psychologist, would have identified it and would have recommended further evaluation. But Dr. Zager did not recommend any further evaluation of the defendant. Ford testified Dr. Zager's evaluation was based on the social history provided by the defendant as well as that provided by Gloria Shettles. He said the defendant's social history had been thoroughly investigated as a result of Shettles' and Dr. Zager's involvement in the case. Additionally, Ford testified the defendant did not want to raise an insanity type of defense. He said that the defendant resisted that from the very beginning. He said that

he relied upon the defendant's psychologist because she was a professional in that area. (XI, 409-417.)

Ford testified the defense attempted to establish that the defendant was a good father during the guilt phase. He said he questioned the defendant's children at length about whether or not the defendant was a good father. However, he noted, it is very difficult to cross-examine children. He also testified that, during the penalty phase, they tried to establish that the defendant was a good father. When questioned about the failure to introduce "some nice family pictures," Ford explained that such an omission may have been related to problems related to gathering that information. Regarding the defendant's sisters' testimony that they would have provided video tapes and photographs of the defendant, Ford testified, "If they had offered it at that time, it would have been accepted." Ford testified that he did not call the defendant's sisters and specifically ask for any photographs depicting the defendant as a good father because mitigation was co-counsel's responsibility. (XI, 417-420.)

Ford testified the defendant's investigator interviewed the defendant's neighbors, the Stanfills, the Foremans, and the Brittains. He reviewed the statements from those potential witnesses. Ford also testified that, if those people had been available and they had something good to say about the defendant, their testimony would have been introduced at the defendant's trial. On cross-examination, Ford explained that part of the statement taken from the Brittains included the defendant's statement to the

Brittains that he was going to grind the victim up as hamburger meat.  Ford said the defendant had made statements of his intentions to harm the victim to several different people.  He explained that when you call witnesses to testify about an individual's good character you open the door to testimony regarding negative aspects of their character. He said their investigation uncovered information about the defendant abusing the victim.  That information included police reports regarding domestic violence incidents which would not have been favorable to the defendant.  (XI, 423-430.)

Ford testified the defendant's defense team included two investigators, Ms. Eskew and Ms. Shettles.  He said their investigators contacted every person that the defendant wanted contacted that could be located.  After their investigation was completed, he reviewed their notes and statements and, based upon his years of experience as a trial attorney, made a decision about which witnesses to call.  One of the factors Ford considered was the ability of the prosecution to respond to the witnesses' testimony with evidence of the defendant's prior violent behavior toward the victim.  Ford said, "You're taking an extreme risk when you open that door about character."  (XI, 430-431.)

Ford testified the theory of defense during the defendant's trial was to mitigate the level of the offense to a lesser charge, particularly voluntary manslaughter.  To do this they hoped to use the provocation that arose during domestic violence instances between the victim and the defendant.  He discussed the theory of defense with the defendant.  He even discussed the prospects of raising Intermittent Explosive Disorder

as a defense with the defendant. Ford testified the defendant did not want to pursue Intermittent Explosive Disorder as a defense. He explained the defendant believed that he had not done anything wrong. The defendant believed that he was guilty at most of some form of criminally negligent homicide. But the option of pursuing a defense based upon a mental defect was presented to the defendant and the defendant rejected it. And based on Ford's discussions with the defendant's court-appointed experts and the State's experts, Ford made a decision with the defendant to pursue intoxication as a defense. By relying on intoxication, Ford testified he hoped to remove the specific intent and premeditation elements of first degree murder. (XI, 432-435.)

Ford testified the defendant's sisters did not have a very good relationship with the defendant prior to the victim's murder. He said it was after the murders that they became more a part of his life. (XI, 436.)

Ford testified all of the evidence that was obtained during the investigation of the defendant's case, including the discovery materials received from the State, were provided to the defendant's court-appointed psychologists. That information included the defendant's family history. Ford said he discussed all of the information with Dr. Zager. Ford testified Dr. Zager was a highly qualified psychologist with extensive experience as a trial expert. He said she did not emphasize in any way that Intermittent Explosive Disorder should have been pursued. (XI, 436-437.)

Ford testified he had information regarding the defendant's habit of disconnecting telephone lines but had no intention of using it. He explained that evidence of the defendant's prior disconnection of telephone lines would have established that the defendant planned the murder and premeditated the murder. He said the disconnecting of the telephone lines established the defendant's desire to control the victim, which he said was one of the prosecution's theories in the case. He said disconnecting the telephone lines was one of the ways the defendant exercised control over the victim. (XI, 437-438.)

Ford testified that, during the penalty phase, the defense team called one of the defendant's former employers, Randy Helms, in an attempt to humanize the defendant. Ford explained that Helms was the most credible of the witnesses they found on that particular issue. He explained that Mr. Helms' reputation in the community was unimpeachable. Ford testified that Helms humanized the defendant through his testimony and "did it sincerely." Ford also explained that they attempted to humanize the defendant during the guilt phase when they cross-examined the victim's daughters. However, he testified they had to be handled very carefully because they were witnesses for the prosecution who had witnessed the victim's murder. Ford testified that, because the defendant's own daughters testified as prosecution witnesses, it was very difficult to portray the defendant as a good father. (XI, 438-442.)

Ford testified allegations of child abuse arose during their handling of the defendant's case. He said introducing witnesses who testified about the defendant's good character would have opened the door to the introduction of evidence of abuse. He explained that they wanted to avoid opening the doors to such damaging testimony. (XI, 442-443.)

*N. Dr. Pamela Auble.*

Dr. Pamela Auble, a clinical neuropsychologist and an associate member of the Tennessee Association of Criminal Defense Lawyers, preformed a neuropsychological evaluation of the defendant at the request of the defendant's post-conviction counsel and Dr. Keith Caruso. As part of her evaluation, Dr. Auble reviewed various interviews of the defendant, the defendant's family, and the defendant's friends. She also reviewed a mitigation assessment done by Ann Charvat, summaries of the testimony of Dr. Zager and Dr. Mount, records from Middle Tennessee Mental Health Institute, a summary of audio tapes of the defendant's trial, progress notes from the Tennessee Department of Correction, the report of Dr. Caruso, and other records and materials pertaining to the defendant. Dr. Auble also interviewed the defendant and administered a battery of tests. (XIII, 13-30.)

Dr. Auble testified that the results of the neuropsychological testing of the defendant were "essentially normal in most areas." The personality testing revealed "a person who does have difficultly controlling his emotions in emotional situations." She

43

testified the defendant has low self-esteem, internal anger, and may have trouble understanding people accurately. Dr. Auble testified that psychologists use serotonin levels as an objective test upon which to base their determinations. She explained low levels of serotonin are consistent with Intermittent Explosive Disorder. (XIII, 13-33.)

### O. Dr. Keith Caruso.

Dr. Caruso, a forensic and general psychiatrist and a non-attorney member of the Tennessee Association of Criminal Defense Lawyers, claimed research regarding serotonin levels and Intermittent Explosive Disorder is approaching the point of demonstrating that serotonin level is an objective test indicating Intermittent Explosive Disorder. Dr. Caruso testified the defendant's serotonin level was 70, which he said is in the bottom five percent. Dr. Caruso also testified the normal serotonin level is 139.1. He said the defendant's level was roughly half the normal level. He testified the defendant's serotonin level was at the level he would expect to find in someone who has Intermittent Explosive Disorder. Dr. Caruso testified he reviewed materials about the defendant's case, including a video tape and a transcript of the testimony. He also reviewed mitigation information from Ann Charvat, correspondence with another attorney named Edward Martindale, some media clippings, Jessica Hall's medical records, TDOC mental health records, records from Middle Tennessee Mental Health, and disciplinary records from TDOC. He also reviewed memos from Gloria Shettles, a time line done by Denise Banks, and numerous interviews conducted by April Higuera.

44

He also interviewed the defendant on two occasions. Dr. Caruso testified that his first impression of the defendant included evidence of character pathology, a history of depression, and a history of explosive violent episodes that could not be accounted for by intoxication alone. (XIII, 84-114, 123.)

Dr. Caruso testified that, as a result of Intermittent Explosive Disorder, major depression, and intoxication the defendant was able to "achieve the mental state of the absence of passion and excitement." Dr. Caruso also testified people suffering from Intermittent Explosive Disorder who commit murder are doing so under a passion consistent with manslaughter. Dr. Caruso testified his ultimate conclusion from his evaluation of the defendant was that the defendant met the criteria of a number of diagnoses. He said the defendant had major depression, Intermittent Explosive Disorder, alcohol dependence, marijuana dependence, and a history of polysubstance abuse. He also said the defendant met the criteria for narcissistic personality disorder, borderline personality disorder, and antisocial personality disorder. (XIII, 114-123.)

*P. Margie Diana Pearson.*

Margie Diana Pearson testified she "somewhat" remembered being in a bar on July 29, 1994. She testified she remembered the defendant "very little." She also testified she remembered drinking with the defendant in that bar on that day "very little." Finally, she testified she could not recall the defendant saying that he was going to kill his wife. (XIV, 170-171.)

45

*Q. Alice Pearson.*

Alice Jo Pearson testified she did not really recognize the defendant but she had

seen him before. She testified she could not recall the exact date but she knew she was

at a bar having some drinks with the defendant. She testified she did not recall the

defendant saying that he was going to kill his wife during their conversation. (XIV, 171-

173.)

*R. The defendant.*

The defendant testified Mayo and Ford were not the only attorneys who

represented him during his trial. The defendant testified he was first represented by Jack

Hinson and Frank Stanfill. After Stanfill and Hinson, the defendant was represented by

George Googe and Steven Spracher. After Googe and Spracher, he was represented by

Carthel Smith and Mike Mosier. Finally, he was represented by Ford and Mayo at trial

and Mark Donahoe and Scott Petrowski on direct appeal. (XIV, 174-178.)

The defendant testified he knew his brother Jeff had AIDS in August of 1994.

At that time, he told his attorneys his brother needed to be interviewed because he was

in danger of dying before the defendant would go to trial. More specifically, the

defendant testified that he was absolutely sure that he told Googe and Spracher about

his brother before his brother died and that he was pretty sure that he told Frank Stanfill

about his brother. He said his attorneys did not get a statement from his brother and

46

he had to go to trial without the benefit of his brother's testimony, except for the affidavit that he provided to his attorneys. (XIV, 178-184.)

The defendant testified he did not tell his attorneys he wanted a change of venue. He claimed he asked his attorneys to abandon any motion that had been filed by his previous attorneys. The defendant claimed he was not informed of the change of venue until January 21, 1997. He said he told Mayo to get it changed back. The defendant said on January 27, Mayo told him that the judge was not going to withdraw the motion and change the venue back. (XIV, 184-187.)

The defendant testified he was intoxicated on the night of the murder. He said he started drinking after work. He picked up a six-pack of "Busch ponies." He also got a money order to pay the victim half the child support that he owed. Then he drove out to the victim's house. He drank the six-pack before he arrived. The victim was not home so he went back to Lexington. The defendant estimated he had nine to twelve full twelve-ounce beers that night in addition to the six-pack of "ponies." (XIV, 187-192.)

The defendant testified his attorneys discussed the advantages and disadvantages of testifying with him. He said "they did a mock examination of me and then they told me that they didn't feel that I should testify." The defendant claimed he wanted to testify to a Henderson County jury. He also testified that he did want to testify during his trial. He said he let his attorneys know he wanted to testify. However, the defendant testified he was "arguing an issue about the fact that the flag had a gold fringe

47

and an eagle on it, and I told 'em that I felt it was a . . . a . . . representative of a war

court and, therefore, I felt that that's how they were suspending my rights . . . ." (XIV,

192-193.)

The defendant testified he did not object to being evaluated by a psychiatrist. He

said, "if you look at the Middle Tennessee Mental Health records, they said that I got

upset whenever they couldn't find a . . . that I met the insanity defense." The defendant

said that he had never failed to cooperate with anybody that had visited him about his

case in any capacity.

The defendant testified Mayo and Ford only visited him twice before his trial.

He said Mayo and Ford were appointed in February of 1996 and he went to trial in

February of 1997. Between the time of their appointment and December of 1996, the

defendant testified Mayo and Ford only visited him twice. After he was transferred to

Madison County shortly before his trial, each of his attorneys visited him individually

five times. The defendant claimed his attorneys never explained the theory of defense

to him. However, he acknowledged that he knew the strategy was to hope for conviction

of a lesser-included offense. He testified he would have been able to testify regarding

prior instances in which the victim assaulted him. However, he said his attorneys told

him they did not want to present any negative testimony about the victim. The

defendant also testified that the Pearsons were subpoenaed to his trial but they were not

called by the defendant's attorneys to testify. The defendant testified that he objected

when his attorneys rested his case. He claimed he had been led to believe that his attorneys were going to call a lot more witnesses, including calling his family, to testify during both the guilt and penalty phases. (XIV, 194-197.)

The defendant testified he did not recall rejecting a mental defect mitigation strategy. He said he talked to Ford and Ford told him he needed to leave the "psychs" alone because they could not help him. The defendant testified that he "always felt that [he] went insane because of what happened." He said that was the only explanation for the murder of his wife. The defendant also testified he did not know why his attorneys did not present any evidence that he was a good father. He said his attorneys did not let him know anything about his case. The defendant said he gave pictures to his previous attorneys Googe and Spracher but he did not know if those photographs were passed on to Ford and Mayo. The defendant said Googe and Spracher had talked about using the photographs. The defendant also testified that his children denied that he took care of them when they testified during his trial. The defendant said there were no pictures introduced into evidence of him. (XIV, 197-201.)

The defendant testified his attorneys disregarded everything he said about his trial. He claimed they had an animosity toward him and that he could not deal with them. The defendant testified he did not know if his attorneys contacted his brothers and sisters. He said they showed him reports of Gloria Shettles' telephone interviews. But they did not show him any statements that indicated that they had talked to

anybody other than Sheryl Arbogast. The defendant claimed his attorneys did not spend enough time with him to get to know the facts. He said the only defense strategy was to pursue a conviction for a lesser-included offense. He said his attorneys did not tell him what type of evidence the defense needed to present. The defendant complained that his attorneys did not keep him informed, did not show him documents, and basically turned their backs on him. He also complained that they did not get a statement from his brother. The defendant testified he was kept informed of his brother's condition by his sister. As a result, he knew when his brother's condition was getting worse. When his brother's condition was worsening, he attempted to contact Googe and Spracher to tell them to do what they needed to do to preserve his brother's testimony. The defendant testified he was unaware of any attempts by Googe and Spracher to secure his brother's testimony. The defendant testified the only indication of his brother's potential testimony was the affidavit that was introduced as Exhibit 5. (XIV, 201-219).

On cross-examination, the defendant acknowledged that he filed a *pro se* motion for a change of venue in the trial court. Although the defendant testified he first heard about the change of venue in January of 1997, his *pro se* motion requesting a change of venue had been filed in 1995. (XIV, 220-223; Ex. 16.) The defendant acknowledged that his attorneys discussed testifying with him, although he claimed they did so "not in very much detail." He testified the trial judge informed him of his right to testify and

acknowledged that he refused to testify because of an objection he had to the American flag in the courtroom. The defendant testified he was aware that the defense theory was intoxication and that the defense was hoping to gain a conviction of a lesser-included offense.

The defendant testified there was no evidence introduced at his trial indicating that the victim assaulted him that evening. The defendant testified, "I never told anybody that she did." The defendant said the victim was not the aggressor in the physical assault that took place that evening. However, he claimed she was the aggressor in a verbal assault. He claimed he went to the victim's home that evening to reconcile with the victim. However, he acknowledged that, due to a fight he had with the victim the day before, he realized there was "no way that [the victim] was ready to reconcile and let us move back in husband and wife as we were." The defendant explained that he wanted to reconcile with the victim but he knew it was not going to happen that night. (XIV, 223-229.)

The defendant testified his attorneys cross-examined his children about the events of the murder. The defendant claimed his children did not have "sound recollection." He also questioned the sufficiency of the cross-examination that took place. The defendant testified that his children claimed that he never took care of them. He said before he murdered the victim his children "thought the world of me." The defendant

51

acknowledged that his children were questioned regarding whether or not he was a good father.  He claimed they were coached in their answers.  (XIV, 229-231.)

The defendant testified that no witnesses were called during his trial to testify regarding any statement that he allegedly made at the bar just prior to murdering the victim.  (XIV, 231-232.)

## II. STATE'S PROOF.

### A. *Documentary Proof.*

The State introduced documentary evidence from the Middle Tennessee Mental Health Institute in the form of a court order directing that an evaluation be conducted and a report of the results of that evaluation.  The State also introduced documentary evidence in the form of the results of Dr. Zager's evaluation.  (XIV, 254-255; Ex. 17, 18, 19, 20.)  The State also tendered as an exhibit a transcript of the motions hearing held on November 8, 1995.  (XIV, 255-256; Ex. 21.)

### B. *Dr. Kimberly Stalford.*

Dr. Kimberly Stalford, a board-certified adult psychiatrist, testified she conducted an evaluation of the defendant.  In conducting her evaluation, she reviewed the transcripts of the evidence in the defendant's trial, interviewed the defendant, reviewed the evaluation conducted by Dr. Caruso, reviewed the neurological evaluation conducted by Dr. Auble, and read numerous interviews conducted by the TBI.  She also reviewed

a report of the defendant's criminal history, a report of disciplinary actions against the defendant, and various letters written by the defendant. She reviewed two petitions for orders of protection filled out by the victim, a civil summons regarding divorce proceedings, a hospital bill, and a police report of domestic disturbance. She reviewed the autopsy report of the victim and records from Middle Tennessee Mental Health Institute. She also reviewed the defendant's social history. (XV, 8-15.)

Dr. Stalford testified she was specifically asked by the State to consider a disorder known as Intermittent Explosive Disorder. She considered that disorder as well as any other psychiatric disorder. Dr. Stalford did not believe the defendant suffered from Intermittent Explosive Disorder because his behaviors were better described by other psychiatric illnesses. She testified the defendant has a personality disorder. She said he has some passive/aggressive traits, dependent traits, and most notably antisocial traits, or sociopathy. (XV, 18-21.)

Dr. Stalford also diagnosed the defendant as suffering from alcohol dependence. She said the defendant has a very long history of abusing alcohol and that the defendant told her he had been drinking daily for at least a year prior to the murder. (XV, 21-22.)

Dr. Stalford testified about serotonin and its use in diagnosing psychiatric disorders. She explained that serotonin is a chemical in the human brain that connects the nerve endings. She said it is a neurotransmitter through which nerves talk to each other. She explained that there is some research in the field of psychiatry concerning

53

serotonin levels in spinal fluid. But she explained there are three problems with relying on serotonin as an indicator of a particular psychiatric disorder.

First, Dr. Stalford explained the serotonin level in spinal fluid was not necessarily indicative of the serotonin level that was actually present between the nerves. Second, she said the serotonin test only measures the serotonin level at the moment of the test. She said that serotonin level would not necessarily reflect what the level was a week ago, a day ago, or a month ago. Third, she explained that serotonin levels were unreliable as a diagnostic test because "there's so many medical, neurological, and psychiatric conditions that have been linked to altered serotonin levels." For those reasons, the forensic unit at Middle Tennessee Mental Health Institute did not rely on serotonin levels. Dr. Stalford testified that s low serotonin level has been connected to depression, suicidal tendencies, schizophrenia, bipolar disorder, impulsive violence, mood disorders, and personality disorders. She also testified that low serotonin levels have been associated with antisocial personality disorders and borderline personality disorder. She said in neurology low serotonin levels have been connected to myoclonus, dementia, and sleep disorders. She said medically, low serotonin levels have been connected to malnutrition. Dr. Stalford testified that low serotonin levels could be indicative of any of those diagnoses. (XV, 22-26.)

Dr. Stalford testified she considered diminished capacity in her evaluation of the defendant. She testified that several things indicate that the defendant was able to think

clearly on the night of the murder. The defendant was able to plan certain aspects of the night and was not grossly affected by drugs, alcohol, or any psychiatric condition. Finally, she testified that low serotonin levels are not one of the diagnostic criteria of Intermittent Explosive Disorder. (XV, 26-27.)

Dr. Stalford testified the DSM-IV says quite clearly that "in some individuals with Intermittent Explosive Disorder they have found low serotonin levels." She explained that some individuals diagnosed with that disorder had low serotonin levels but not all did. This means there are people who have Intermittent Explosive Disorder who do not have low serotonin levels. Thus, she explained, low serotonin levels are not an exclusive aspect of Intermittent Explosive Disorder. (XV, 33-35.)

Dr. Stalford testified that Dr. Caruso's diagnosis of Intermittent Explosive Disorder is "wrong." She testified the defendant's personality structure, as supported through the MMPI, indicates that his violence, disregard for the life of others, and disregard of the rights of others is related to a personality disorder and not to an Intermittent Explosive Disorder."

ARGUMENT

## I. THE DEFENDANT RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL.

The defendant challenges the post-conviction court's ruling on his claim that he was denied the right to effective assistance of counsel. He contends his trial counsel failed to present the issue of intoxication, failed to portray the victim as the aggressor, failed to preserve the testimony of the defendant's dying brother, failed to present evidence of his proclivity for disconnecting telephone lines, failed to present an undiagnosed mental disorder, failed to present evidence that he was a good father, employed a failed defense strategy, and failed to investigate his case. (Defendant's Brief at 15-31.)

In a post-conviction proceeding, the petitioner bears the burden of proving the allegations in his post-conviction petition by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-210(f) (1997). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). On appeal, the post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed *de novo* with a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). The

burden is on the petitioner to show that the evidence preponderated against those findings. *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. *Bates v. State*, 973 S.W.2d 615 (Tenn. Crim. App. 1997). "In reviewing the application of the law to those factual findings to determine whether counsel's performance was deficient or whether the defendant was prejudiced by that deficiency, appellate courts should conduct a purely *de novo* review, according the trial court's conclusions of law no deference or presumption of correctness." *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

A criminal defendant's claim that he was denied the right to effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution is evaluated in accordance with the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 695, 104 S.Ct. 2052, 2067 (1984). To successfully advance a claim under that test, the defendant must establish that his counsel's performance was deficient and that the deficiency prejudiced the defense. *Id*.

To establish deficient performance, the defendant must demonstrate that his counsel's conduct fell below an objective standard of reasonableness under prevailing professional norms considering all of the circumstances of the particular case. *Id.*, at 688, 104 S.Ct. at 2064. In making this determination, "judicial scrutiny of counsel's performance must be highly deferential." *Id.*, at 689, 104 S.Ct. at 2065. "A fair

57

assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.,* at 689, 104 S.Ct. At 2065.

In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

To establish prejudice emanating from counsel's deficient performance, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 694, 104 S.Ct. at 2068.

### A. The defendant's trial counsel developed and presented a theory of defense (Defendant's subsection G).

The defendant's contention that his trial counsel failed to present a theory of defense is incorrect. The defendant's trial counsel testified that they developed a theory of defense involving the domestic abuse and the defendant's intoxication, which was advanced in hopes of reducing the level of the offense of conviction. (XI, 302-309, 390-392.) After a review of the trial transcript and the testimony of trial counsel, the post-conviction court rejected this claim.

58

The trial court concluded the defendant's trial counsel developed a theory of defense and presented that theory to the jury. The defense theory was to rely on intoxication and mental health issues in an effort to negate the elements of first degree murder.[2] The court stated:

> through their witnesses, cross-examination of the State's witnesses, opening statement, and closing arguments, trial counsel attempted to convince the jury that [the] petitioner was distraught, depressed, and intoxicated, that his behavior reflected an impulsive act as opposed to a planned act, that the State failed to meet its burden of proving premeditation and deliberation beyond a reasonable doubt, and that [the] petitioner, although guilty of a lesser-included offense, did not possess the requisite *mens rea* for first degree murder.

(VII, 988-89, 995 n.29.) More particularly, the trial court found that trial counsel set their theory out during opening statements. In their statement they focused on the defendant's domestic problems with the victim, suggested that the defendant went to the victim's home to reconcile and pay child support, and emphasized the fact that the defendant did not take a weapon with him to the victim's home. (VII, 982-984.)

The court found that trial counsel supported the defense theory through their questioning of witnesses during the guilt phase. The defendant's trial counsel elicited testimony regarding the money order found at the crime scene, the absence of any weapon, the defendant's emotional and mental state, the on-going divorce proceedings, the ease of reconnecting the telephone lines, the defendant's claim of intoxication,

---

[2] Based upon a review of the trial record, the post-conviction court concluded that the defense theory was not to pursue a conviction of voluntary manslaughter. The court concluded that the defendant's trial counsel's recollection in that regard was mistaken. (VII, 995 n.29.)

evidence of the defendant's drinking, the defendant's proclivity for disconnecting telephone lines, the defendant's attempt to repair the victim's car shortly before the murder, and the possibility that the victim's wounds resulted from an emotionally charged frenzied assault. (VII, 982-987.)

The trial court also concluded that the defendant's trial counsel correctly concluded that the jury would have been repulsed by an aggressive cross-examination of the defendant's children, who had just given damaging eye-witness testimony regarding the murder. The court concluded that trial counsel tactfully elicited testimony regarding the children's youth at the time of the murder and their conversations with adults regarding their testimony. (VII, 984-985.)

The trial court also concluded that the defendant's trial counsel supported their theory of the case during the penalty phase. They attempted to present testimony regarding the defendant's deceased brother's statements but the trial court excluded that evidence. They presented the testimony of Dr. Zager, a clinical psychologist, who testified that the defendant was suffering from depression, alcohol dependence, paranoia, and dependency. Dr. Zager testified the defendant's mental faculties were compromised at the time of the murder and opined that the defendant was acting impulsively rather than purposefully. They also introduced the testimony of Randy Helms, who described the defendant as "severely depressed." Helms also testified that the defendant was a good employee and appeared to be a good father. (VII, 985-987.)

Finally, the court concluded that trial counsel's closing arguments focused on alleged failures in the state's proof. During "excellent arguments," they presented the defendant's case as persuasively as possible "given the horrific facts" of the victim's murder. (VII, 987.)

### B. The defendant's trial counsel raised the issue of the defendant's habit of disconnecting telephone lines (Defendant's subsection D).

The defendant's contention that his trial counsel failed to introduce evidence of his habit of disconnecting telephone lines is incorrect. The defendant's trial counsel testified the defendant's case would not have benefitted from additional evidence of his propensity for disconnecting telephone lines because such evidence looked sinister whether someone was hurt or not. (XI, 330-333, 398-406, 437-438.)

The post-conviction court agreed with trial counsel and rejected the defendant's claim. The court noted that the defendant's proclivity in that regard was presented "innocuously" through the testimony of Chris Dutton. In contrast, the court concluded the defendant's presentation of additional evidence on that point during the post-conviction hearing made the defendant appear sinister. The court found that the defendant would not have benefitted from emphasizing that point. The court also found that the defendant's trial counsel were aware of the additional evidence and made a strategic decision not to present that evidence. (VII, 987-988.)

*C.    The defendant's attorneys presented the theory of intoxication
(Defendant's subsection A).*

The defendant's contention that his trial counsel failed to present an intoxication

defense is incorrect.  The defendant's trial counsel testified that intoxication was part of

their defense theory and the presented evidence in support of that claim as best they

could.   However, the testified, their efforts in that regard were hampered by the

defendant's refusal to testify.  (XI, 302-309, 390-398.)

The post-conviction court rejected the defendant's claim.  After reviewing the trial

transcript, the court concluded that the defense was presented through the testimony

of Cynthia Lambert, Chris Dutton, and Dr. Zager.  Lambert testified the defendant was

carrying beer and began drinking before the murder.  Dutton testified the defendant

claimed he was drunk.   Dr. Zager testified the defendant suffered from alcohol

dependence and the information she received during her evaluation indicated that the

defendant had been drinking before the murders.  The court also concluded that the

testimony of post-conviction witnesses Diana and Alice Pearson was not helpful because

of the dearth of information that they possessed.  Finally, the court concluded that the

defendant's testimony would have been helpful but he elected not to testify.  (VII, 988-

989.)

### D. The defendant's counsel investigated and presented a mental health claim based upon the diagnoses and testimony of qualified professionals.

*(i) Investigation of Social History.*  The defendant's contention that his trial counsel failed to investigate his mental health is incorrect.  The defendant's trial counsel testified that they pursued that avenue with the assistance of investigators and mitigation experts.  They also testified that the defendant's did not want to pursue a mental health defense.  Ultimately, the presented the testimony of the defendant's court-appointed psychologist regarding the defendant's mental health in mitigation.  (XI, 309-333, 436-437.)

The post-conviction court rejected the defendant's claim.  The court concluded that the defendant failed to establish that his pre-trial counsel's investigation of his social history was inadequate.  The court noted that the defendant did not present the testimony of his pre-trial attorneys, his investigators, or Dr. Zager.  From a review of the record, the court concluded that the defendant had the assistance of three people who were either investigators or mitigation experts.  The court noted that Dr. Ann Charvat, who was not called to testify, conducted a thorough mitigation assessment, which included an interview of the defendant's mother, extensive interviews of the defendant's sister Sheryl Arbogast, and a lengthy social history.  The court noted that the report prepared by Glori Shettles included a great deal of useful information and indicated that she attempted to contact members of the defendant's family.  The court noted that the record included numerous orders granting funds for the services of Investigator Tammy Askew.  Finally, the court noted that the defendant's trial counsel testified that Dr.

Zager was given all of the relevant information that they had. Moreover, the defendant failed to present testimony from Dr. Zager to demonstrate that her diagnosis would have changed because of previously omitted information. For these reasons, the court concluded that the defendant failed to establish that the investigation conducted by his defense team was inadequate. (VII, 990-993.)

*(ii) Intermittent Explosive Disorder.* The defendant's contention that his trial counsel were deficient in failing to present evidence of Intermittent Explosive Disorder is incorrect. The defendant's trial counsel testified they secured the services of a court-appointed psychologist who was qualified and reputedly a good defense expert. However, the defendant's psychologist did not diagnose the defendant as suffering from intermittent explosive disorder. Moreover, the defendant did not want to pursue Intermittent Explosive Disorder because he believed his actions were justified. They presented her diagnoses as mitigation during the penalty phase. (XI, 309-318, 409-417, 432-435.)

The court rejected the defendant's claim. The court concluded that the defendant was not entitled to a particular diagnosis. The court also noted that the psychologists and psychiatrists who evaluated the defendant before his trial did not diagnose him with that disorder.[3] The court concluded that the pertinent question was "not whether Dr.

---

[3] The court also noted that the only references to Intermittent Explosive Disorder were in the form of the opinions of an investigator and the defendant's sister. The court concluded that neither a psychologist nor a psychiatrist would be bound to follow such opinions in reaching a diagnosis. (VII, 993.)

Zager expressed the 'wrong' opinion and different experts—such as Dr. Caruso and Dr. Auble— would have expressed the 'right' opinion." (VII, 992-993.)

The court concluded that the issue was whether the defendant's trial counsel performed deficiently in retaining Dr. Zager as the defendant's expert. The court concluded that the defendant did not introduce any evidence to support a claim that his counsel did not adequately investigate Dr. Zager's qualifications. The defendant's trial counsel believed that Dr. Zager was an experienced and respected defense expert. The defendant offered nothing to contradict that testimony. (VII, 992-993.) Similarly, the court rejected the defendant's contention that his trial counsel did not provide Dr. Zager with adequate information. The defendant offered no proof that Dr. Zager received inadequate information. The defendant also offered no proof that Dr. Zager's diagnosis would have changed based upon additional information. (VII, 993.)

Finally, the court rejected the defendant's contention that his trial counsel should have employed a psychiatrist instead of a psychologist. The court noted that Dr. Zager could have recommended additional examination, which could have included a psychiatric examination and serotonin testing, and that the defendant had already been examined by one psychiatrist. The court concluded that the defendant failed to establish the need for a psychiatrist in addition to a psychologist. Moreover, the court concluded that the defendant was "not entitled to 'shop' for an expert who will provide a particular opinion. Finally, the court noted that neither Dr. Zager, nor the forensic

65

team at MTMHI, nor Dr. Stalford diagnosed the defendant with Intermittent Explosive

Disorder. Thus, the defendant failed to establish that it was Dr. Zager's status as a

psychologist that caused her to fail to diagnose that disorder. As for Dr. Auble and Dr.

Caruso—the only doctors to reach that diagnosis— the court concluded "the State

effectively impeached [them] through cross-examination as well as through the

testimony of its own expert witness." (VII, 994.)

> ### E. The defendant's trial counsel made a strategic decision not to portray the victim as the aggressor (Defendant's subsection B).

The defendant's contention that his trial counsel were deficient in failing to attack

the character of the victim is incorrect. The defendant's trial counsel testified that they

made a strategic decision not to attack the victim because doing so would have alienated

the jury. (XI, 302-309.) Moreover, the defendant testified that the victim was not the

aggressor physically and that he never told anybody that she had been. (XIV, 223-229.)

The post-conviction court rejected this claim. The court concluded that the

defendant's trial counsel were aware of instances of such abuse and made a strategic

decision not to attack the murder victim during the trial. In support of this conclusion,

the court reviewed the facts of the case:

> [The defendant] forced his way into the victim's home, attacked [the
> victim] as her children watched in horror, told the children that he would
> kill their mother if they called for help, chased [the victim] after she
> escaped, dragged [the victim] down the walkway to the children's
> swimming pool as she grasped at the grass, struggled, and screamed in an
> unsuccessful attempt to save herself, and held [the victim] under the water
> in the children's swimming pool.

(VII, 994-996.) The court concluded that, under these facts, the jury would have been repulsed by any defense theory that attacked the victim's character. The court noted that the defendant presented no proof in support of his contention that the victim provoked him and concluded that an argument that the victim was the provocateur would have alienated the jury. Moreover, the court concluded that the state had evidence to impeach or rebut any attacks on the victim's character. Furthermore, the court concluded that the defense theory that the defendant was emotionally distraught and acting in a state of passion was adequately presented through the testimony of Dr. Zager and Randy Helms. (VII, 994-996.)

Additionally, the court concluded that the defendant did not establish that he would have permitted his attorneys to present a defense that attacked the victim. Debbie Davis, one of the defendant's sisters, testified that the defendant is very protective of the victim and became angry with her when she recently spoke ill of the victim. (VII, 995, n.28.)

### F. The defendant was not prejudiced by the failure of his pre-trial counsel to preserve the defendant's brother's testimony (Defendant's subsection C).

The defendant's contention that his pre-trial counsel failed to preserve the testimony of his brother is without merit. The attorneys who tried the defendant's case were the only two of the defendant's eight attorneys to testify. They testified that the defendant's brother had already died when they were appointed to the case. (XI, 298-302, 380-384.)

The post-conviction court rejected this claim. The court noted that the defendant failed to present the testimony of his pre-trial counsel and concluded that, as a result, the defendant failed to meet his burden of proof. Nevertheless, the court addressed the issue on the merits on the assumption that the failure amounted to deficient performance. The court concluded that pre-trial counsel were aware of the defendant's brother and his illness. Dr. Charvat's mitigation assessment identified Jeff Hall as a potential witness who should be interviewed. That memorandum also informed the defendant's pre-trial counsel of the defendant's brother's illness. And a memorandum included in the assessment indicated that the entire assessment was forwarded to Steve Spracher, one of the defendant's pre-trial attorneys. (VII, 996.)

The court concluded that the defendant had failed to establish prejudice. The court concluded that Hall's testimony regarding the defendant's mental state would have been cumulative of the testimony of Dr. Zager and Randy Helms. Thus, Hall's testimony would have been of little probative value. The court also noted that Hall was aware of both negative and positive aspects of the defendant's past behavior, a fact that affected the potential usefulness of Hall's testimony. (VII, 996-997.)

G. *The defendant's trial counsel developed and presented a theory of mitigation (Defendant's subsections F and H).*

The defendant's contention that his trial counsel failed to introduce evidence that he was a good father and otherwise failed to investigate his case are without merit. The defendant's trial counsel testified that they attempted to portray the defendant as a good

father. However, they proceeded carefully down that road because they did not want to open the door to damaging cross-examination regarding the defendant's prior violent acts and allegations of child abuse. (XI, 309-333, 417-420, 442-443.) And they testified that the defendant's case was thoroughly investigated by the defense team. (XI, 423-431, 298-360, 373-384, 390-417, 432-443.)

The post-conviction court concluded that the defendant's trial counsel developed a mitigation theory and supported it with both expert and lay witnesses. Dr. Zager testified the defendant suffered from depression, suicidal thoughts, alcohol dependence, and significant stressors. Dr. Zager testified many factors in the defendant's social history impacted his development, including a family history of alcoholism, the lack of a meaningful relationship with his father because his father did not believe the defendant was his son, the abusive nature of the defendant's parents' relationship. Dr. Zager also testified the defendant had expressed remorse and indicated that his children were very important to him, that he was the primary care-giver for his children, and that he was very protective of his children. (VII, 1001-1002.)

Dr. Joseph Mount testified the defendant was depressed, distraught, and suicidal. He said the defendant expressed remorse. He diagnosed the defendant with substance abuse and dependence, and adjustment disorder with mixed emotional features including depression and anxiety. He testified the defendant cared for his children and was very concerned about them. (VII, 1002.)

Randy Helms testified the defendant was a good employee and a father who "took excellent care" of his children. He testified the defendant told him the victim and his children were his life. (VII, 1002-1003.)

Three of the defendant's sisters and the defendant's mother testified. They testified that their parents' relationship was violent, that the defendant received poor treatment from his father and stepfather, that the defendant took good care of his children, and that the defendant's father had a habit of disconnecting telephone lines. (VII, 1003-1004.)

The post-conviction court noted that, during the guilt phase, Chris Dutton testified the defendant was depressed, had been attempting to repair the victim's car before he murdered her, and that the defendant was concerned about his children. Special Agent Byrd of the Tennessee Bureau of Investigation testified the defendant had expressed remorse. (VII, 1004-1005.)

The court concluded that the defendant's trial counsel portrayed the defendant in the most positive light possible. The court also concluded that the additional mitigation evidence introduced during the post-conviction hearing was "virtually identical to the testimony offered at trial. The court noted that repetitive testimony from the defendant's family members was not necessary and potentially could have frustrated the jury. Moreover, the court found that attempting to present the defendant as a good father and a family man would have failed given the circumstances of the

offense. And, the court noted, the defendant had filed a *pro se* motion to exclude photographs of the victim from the trial. Furthermore, any 'good guy' testimony offered by the defendant would have been impeached or rebutted with more 'bad guy' testimony from the prosecution. Accordingly, the court concluded that the defendant's trail counsel presented a thorough and effective case for mitigation. (VII, 1005-1007.)

### H. Conclusion.

In this case, the post-conviction court made extensive findings of fact regarding the petitioner's claims. The evidence does not preponderate against any of the factual findings of the post-conviction court. Furthermore, the court's conclusions of law are correct. The defendant's counsel performed within the range of competence expected of attorneys. They were not deficient with respect to any of the defendant's claims. And the defendant has failed to establish prejudice resulting from any of his claims. This issue is without merit.

## II.  THE DEFENDANT'S REMAINING ISSUES ARE WAIVED (Defendant's Issues II, III, and IV).

The defendant also challenges the ruling of the post-conviction court on the following claims: the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague; the sentence of death violates the Eighth Amendment; and the death sentence infringes upon the defendant's right to life.  (Defendant's Brief, 31-38.)

In a post-conviction proceeding, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless" the claim is based upon a newly recognized constitutional right with retroactive application or the ground was not presented as the result of state action in violation of the federal or state constitution. Tenn. Code Ann. § 40-30-106(g); *see State v. Benson*, 973 S.W.2d 202, 208 (Tenn. Crim. App. 1998).

The post-conviction court rejected all of these claims because they were either previously determined, waived, or not supported with evidence.  (VII, 1010-1014.) Indeed, all of those claims could have been raised at trial and on direct appeal.  These issue are without merit.

72

## CONCLUSION

The judgment of the post-conviction court denying relief and dismissing the petition for post-conviction relief should be affirmed.

Respectfully submitted,

PAUL G. SUMMERS
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

MARK A. FULKS
Assistant Attorney General
Criminal Justice Division
P.O. Box 20207
Nashville, Tennessee 37201
(615) 741-7859
B.P.R. No. 019387

73

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded

via first class mail, postage prepaid, to the following:

Paul N. Buchanan
Attorney at Law
1526 Crockett Hills Blvd.
Brentwood, Tennessee 37027

Danny R. Ellis
Attorney at Law
1289 N. Highland Ave.
P.O. Box 3512
Jackson, Tennessee 38303-3512

on this the _6th_ day of July 2004

MARK A. FULKS
Assistant Attorney General