1    IN THE CRIMINAL COURT OF MADISON COUNTY, TENNESSEE

2            AT JACKSON, DIVISION I

3    STATE OF TENNESSEE

4

5    VS.                    No. 96-589

6

7    JON DOUGLAS HALL

8

9    _____

10            TRANSCRIPT OF EVIDENCE

11            FEBRUARY 4, 1997

12            VOLUME II

13    _____

14

15

16

17

18

19

20

21            AMY MAYS

22        OFFICIAL COURT REPORTER

23    MADISON COUNTY COURTHOUSE - THIRD FLOOR

24        JACKSON, TENNESSEE  38301

25            (901) 423-6039

181

FILED
JUL 2 3 1997
JOE COURTNEY, CIRCUIT COURT CLERK
A.M. ___ DEPUTY CLERK

FILED
AUG 0 7 1997
Clerk of the Courts
Rec'd By _____

```
 1                        APPEARANCES

 2    For the State:

 3              MR. JERRY WOODALL

 4              MR. AL EARLS

 5              District Attorney General's Office

 6              Lowell Thomas State Office Building

 7              Jackson, Tennessee  38301

 8    For the Defendant:

 9              MR. JESSE H. FORD, III

10              MR. CLAYTON F. MAYO

11              Ford & Mayo

12              618 North Highland

13              Jackson, Tennessee  38301

14                        *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

                          182
```

1                        **<u>WITNESS INDEX</u>**

2       JURY OUT HEARING                        Page 186

3       JERRY BINGHAM

4               Direct Examination              Page 192

5               Cross-Examination               Page 194

6       BRIAN BYRD

7               Direct Examination              Page 195

8               Cross-Examination               Page 212

9               Redirect Examination            Page 222

10      CHRIS DUTTON

11              Direct Examination              Page 222

12              Cross-Examination               Page 232

13              Redirect Examination            Page 236

14      BRIAN BYRD (recalled)

15              Recross-Examination             Page 237

16      STEPHANIE LAMBERT

17              Direct Examination              Page 240

18              Cross-Examination               Page 247

19              Redirect Examination            Page 249

20              Recross-Examination             Page 251

21              Further Redirect Examination    Page 252

22      CYNTHIA LAMBERT

23              Direct Examination              Page 258

24              Cross-Examination               Page 264

25              Recross-Examination             Page 272

                             183

1                    **WITNESS INDEX** (con't)

2     JENNIFER LAMBERT

3             Direct Examination            Page 275

4             Cross-Examination             Page 280

5     DR. O'BRIEN CLARY SMITH

6             Direct Examination            Page 282

7             Cross-Examination             Page 307

8     MOTION FOR JUDGMENT OF ACQUITTAL       Page 309

9                         - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **EXHIBIT INDEX**

2    EXHIBIT 1, Photograph                Page 194

3    EXHIBIT 2, Diagram                   Page 206

4    COLLECTIVE EXHIBIT 3, Photographs    Page 208

5    COLLECTIVE EXHIBIT 4, Photographs    Page 210

6    COLLECTIVE EXHIBIT 5, Photographs    Page 210

7    EXHIBIT 6, Money Order               Page 238

8    EXHIBIT 7, Autopsy Report            Page 296

9                              - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (On February 4, 1997, court was

2              resumed at 8:30 a.m.; and out

3              of the hearing and presence of

4              the jury, the following proceedings

5              were had to-wit:)

6         THE COURT:  Bring the jury in.

7         DEFENDANT HALL:  Your Honor, I would like to

8    dismiss Jesse Ford from my case.

9         THE COURT:  What you've had is, in times past

10   we've appointed the Public Defender to you and you

11   became dissatisfied with him, and I at your request

12   replaced those with two more lawyers, Mr. Smith and

13   someone else, and then you became dissatisfied with

14   them.

15        DEFENDANT HALL:  Well he --

16        THE COURT:  Wait just a minute now.  I'll let

17   -- just 'til I get through.  And then I then appointed

18   a third set of lawyers, had you transferred here where

19   that you'd be available to these people, and now in the

20   middle of the trial to say you want to discharge a

21   lawyer is probably too late.  But on what grounds do

22   you want to discharge him?

23        DEFENDANT HALL:  Well, because we made that

24   issue back in chambers on --

25        THE COURT:  What issue?

186

1          DEFENDANT HALL:  On a suppression of

2    statements and the illegally seized evidence at Jackie

3    and Darlene's residence, and in opening statements he

4    made mention of that.  I can't trust -- I can't have a

5    Benedict Arnold on my defense team.

6          THE COURT:  Well what do you say he said?  I

7    heard -- I sat here and I was in the same courtroom and

8    I heard everything he said, and I found nothing wrong

9    with what he said.

10          DEFENDANT HALL:  He made reference to the

11    statements that --

12          THE COURT:  What did he say?  What did he

13    say?  What is it Mr. Ford said?

14          DEFENDANT HALL:  I believe you'll need to

15    check the record, but it was said.

16          THE COURT:  Well your motion to have him

17    excused is overruled, and you can note your exception,

18    and sooner or later, should you be convicted, then

19    you'll have a right to take an appeal from my ruling.

20    Have a seat.

21          DEFENDANT HALL:  Let me clarify this lawyers

22    issue.  The first two lawyers quit.

23          THE COURT:  Well I don't want to clarify

24    them.  It's too late to talk about them now.  You

25    should have done that before the trial started.

187

1          DEFENDANT HALL:  I have done it.

2          THE COURT:  Be seated.

3          DEFENDANT HALL:  I want to object to this.

4          THE COURT:  Just a minute.  I want to say

5    this to you now again to make the situation clearly.

6    You're not to make statements in this courtroom in the

7    presence of the jury unless I allow you to, and these

8    witnesses -- if you want something asked, you confer

9    with your lawyers, and if you don't want to do that, if

10   you misbehave, the law allows me to just take you out

11   of the room and the trial goes on.

12         DEFENDANT HALL:  Your Honor, I'm not

13   misbehaving.

14         THE COURT:  All right.

15         DEFENDANT HALL:  But, you know, you're

16   sitting there making all these rules and stuff about

17   witness tampering, but I want a motion to voir dire the

18   jury at the end of these proceedings for the pre-trial

19   publicity.  I want -- Bill and Delere Lambert sat

20   amongst the jurors the whole time that they were being

21   seated, and I don't think that that was right.  And

22   when the grand jury was in session, they brought around

23   -- I believe it was grand jury witnesses in the jail

24   while I was put in a strip cell, while Jason

25   Blankenship made off-the-record comments to the jurors

                            188

1   as they were walking through.

2           THE COURT:  All right, I'll take that into

3   consideration.  We'll take it up after the trial.

4           DEFENDANT HALL:  Thank you, Your Honor.

5           MR. EARLS:  Your Honor, can I ask for a side

6   bar on this issue?  I think it's important enough we

7   need to.

8           **(There was a conference at the**

9           **bench out of the presence of the**

10          **jury as follows:)**

11          MR. EARLS:  Your Honor, he has asked to

12  represent himself in the past.

13          THE COURT:  He hasn't asked to represent

14  himself to me now, and I'm not going to allow you to

15  raise it.  He may want to raise it, but he hadn't said

16  that to me.

17          MR. EARLS:  But what I'm saying, if he raises

18  that issue on appeal and they find that that's what he

19  was asking for --

20          THE COURT:  Well, may be, but we're going to

21  go with this trial.

22          **(End of conference at the bench.)**

23          THE COURT:  Mr. Hall, you've requested that

24  Mr. Ford be dismissed from your -- as one of your

25  lawyers due to some statement he made in opening

                                189

1    statement.  Well Mr. Ford didn't make any opening

2    statement.

3              MR. FORD:  Yes, I did, Your Honor.

4              MR. WOODALL:  He did in response to mine.

5              THE COURT:  He made the response.  All right.

6    But I found nothing wrong with it.  And now do you have

7    any problem with Mr. Ford?

8              DEFENDANT HALL:  Well did he waive that

9    statement motion?  Is that the ruling, that he's

10   waiving that statement motion that we just ruled on in

11   private chambers --

12             THE COURT:  Well if you're talking about the

13   one --

14             DEFENDANT HALL:  -- that you --

15             THE COURT:  Just a minute now.  If you're

16   talking about the one where you made some officer or

17   something like that, why I've already ruled that that's

18   not going to be admitted.  I ruled with you in there.

19             DEFENDANT HALL:  Then there should have been

20   a petition for writ for certiorari on the probable

21   cause of a preliminary hearing and --

22             THE COURT:  That comes too --

23             DEFENDANT HALL:  And my motion to dismiss and

24   abate should be considered.

25             THE COURT:  I'm considering it and it came to

                              190

1    late.  Your motion is overruled.

2            DEFENDANT HALL:  Why?  It was filed November

3    8th of '95, before the other motion hearing, and you

4    overruled it then.

5            THE COURT:  Well I'm still overruling it.

6            DEFENDANT HALL:  That's all I wanted to get,

7    was your ruling on it.

8            THE COURT:  I've ruled.

9            DEFENDANT HALL:  But I believe you're

10   violating my constitutional rights.

11           THE COURT:  In the morning, the Court

12   suggests you get here about 8:00 if you wish to confer

13   with your client.  Now you can tell him that there will

14   be a recess at 10:30 and he can write out anything he

15   wants to or confer with you, but there's 12 jurors and

16   three more, that's 15 jurors, and we got them up here

17   and got them here at 8:30, and it's 10 minutes 'til

18   nine.  So in the morning now we'll start on time, and

19   if you want to confer with him, that's fine.

20           And, you, sir, if you've got anything you

21   need to take up with your lawyer, they'll be here

22   before trial, and if you want to take it up, you tell

23   them then.  You understand?

24           DEFENDANT HALL:  Yes, sir.

25           THE COURT:  All right.  Bring the jury in.

                            191

```
 1              (The jury was brought into open

 2              court, and the following proceedings

 3              were had to-wit:)

 4              THE COURT:  All right, General, you may call

 5      your first witness.

 6              MR. EARLS:  The State calls Chief Bingham.

 7              JERRY BINGHAM was called and being first duly

 8      sworn, was examined and testified as follows:

 9      DIRECT EXAMINATION

10      BY MR. EARLS:

11      Q       State your name for the record, please.

12      A       Jerry Bingham.

13      Q       How are you employed?

14      A       Henderson County Sheriff's Department.

15      Q       Pursuant to your duties with the Henderson

16      County Sheriff's Department on or about the 29th day of

17      July of 1994, did you participate in the investigation

18      of a death that occurred in Henderson County?

19      A       I did.

20      Q       And did you go to the scene of that death?

21      A       I was the first on the scene.

22      Q       Briefly describe for the Court what you

23      observed at the scene.

24      A       I arrived on the scene approximately 11:55.

25      Q       Is that in the night or morning?
```

1   A        It was in the night, p.m.  After getting out

2   of the car, there was an older gentleman up on the

3   blacktop at his house out in the yard.  When I got out

4   of the car he hollered and told me to go down by the

5   pool.

6   Q        Did you go down to the pool?

7   A        Yes.

8   Q        And when you got to the pool, what did you

9   observe?

10  A        I found the body in the pool.

11           MR. EARLS:  Your Honor, may I approach?

12           THE COURT:  Yes, sir.  No, you can hand it to

13  the officer.  They'll ...

14  Q        I show you a photograph, Chief Bingham, and

15  ask if you can identify that.

16  A        This is the body that I found.

17           MR. EARLS:  Your Honor, I'd ask that that

18  photograph be made an exhibit to this witness'

19  testimony.

20           THE COURT:  Does that fairly and accurately

21  represent the condition that was out there when you

22  found it?

23           THE WITNESS:  That's the condition I found

24  her.

25           THE COURT:  All right, let it be entered,

193

1   marked and entered.

2              **(Exhibit 1 was marked and entered.)**

3   Q        Did you see any children at the scene?

4   A        No, sir.

5   Q        After you observed the body what did you do?

6   A        Called EMS.

7   Q        Did they arrive while you were at the scene?

8   A        Yes, sir.

9   Q        How long did you stay on the scene?

10  A        Well I called the EMS, called the

11  investigator, so it was probably -- It was 1:00 before

12  I left.  After the investigator had got there I left.

13  Q        Do you know who the investigators were?

14  A        Brent Booth.

15  Q        And did you preserve or protect the crime

16  scene until they arrived?

17  A        Yes, sir.

18  Q        That was in Henderson County?

19  A        Henderson County.

20           MR. EARLS:  Pass the witness.

21                      - - - - -

22  **CROSS-EXAMINATION**

23  **BY MR. MAYO:**

24  Q        Chief Bingham, did you do a crime scene

25  search?

1    A        No, sir.

2    Q        Who performed that?  Do you know, first-hand

3    knowledge, who performed that?

4    A        Investigator Booth.

5             MR. MAYO:  Thank you.

6             **(WITNESS EXCUSED.)**

7                              - - - - -

8             **BRIAN BYRD** was called and being first duly

9    sworn, was examined and testified as follows:

10   **DIRECT EXAMINATION**

11   **BY MR. EARLS:**

12   Q        State your name for the record, please.

13   A        My name is Brian Byrd.

14   Q        How are you employed?

15   A        I'm employed with the State of Tennessee for

16   the Tennessee Bureau of Investigation.

17   Q        Pursuant to your duties with the Tennessee

18   Bureau of Investigation, on or about the 29th day of

19   July of 1994, did you participate in the investigation

20   of a death of a Billie Jo Hall?

21   A        I did.

22   Q        Where was the scene of that death?

23   A        It was in Henderson County on Pleasant Hill

24   Road.

25   Q        Now, what time of day or night did you arrive

                                195

1   at the scene?

2   A        I initially received the call sometime around

3   midnight.  Actually I think I arrived on the early

4   morning hours of the 30th.

5   Q        Upon arrival at the scene, did you go over to

6   the crime scene area?

7   A        Yes.

8   Q        And during your process of going over that

9   area, did you collect evidence and participate in the

10  making of certain photographs?

11  A        I did.

12  Q        Briefly describe for the Court what you

13  observed at the scene.

14  A        Primarily there was a house which sat off the

15  road on top of a small knoll.  Inside the house there

16  was some disarray.  Obviously there had been sort of a

17  struggle in the master bedroom.  There was a trail of

18  skids and blood stains leading down to a pool.

19  Q        Now when you say skids, what do you mean by

20  that?

21  A        It would be large obvious -- Obviously there

22  were like drag marks or disturbances in the dirt that

23  were abnormal to the other dirt that was around it in a

24  consistent trail from the driveway down to the pool.

25  Q        Did you prepare a sketch of this crime scene

196

1    area?

2    A        I did.

3    Q        I'll ask if you can identify that.

4            THE COURT:  Mr. Ford, are you familiar with

5    the sketch?

6            MR. FORD:  Yes, sir.

7            THE COURT:  Do you have any objection to it?

8            MR. FORD:  No, sir.

9            THE COURT:  All right, go ahead.

10           MR. EARLS:  Your Honor, if we could use the

11   easel so the jury can observe --

12           THE COURT:  All right, get the easel.  You

13   can come around and help him with the easel if you

14   wish.

15           MR. EARLS:  Your Honor, I'd ask that the

16   witness be allowed to step down and point to certain

17   areas on the diagram.

18           THE COURT:  All right, step down.  Stay to

19   the side now so you won't block the jury's view.

20           Mr. Ford, if you want to come around it'll be

21   all right.

22   Q        Now you have three diagrams to put up here.

23   Briefly tell us what the top diagram represents.

24   A        This is basically a representation of the

25   lay-out of the residence.  You enter from a driveway

197

1    here.  There was a light-colored Chrysler car parked

2    here, a walk down to a deck and then the residence

3    which is here (indicating).

4    Q        Now, is that to scale?

5    A        No, sir.

6    Q        What does the diagram in the bottom left-hand

7    -- the jury's left-hand illustrate?

8    A        This would illustrate a basic, again, not to

9    scale, representation of the house showing the general

10   lay-out inside of the residence.

11   Q        Now in that diagram you just identified,

12   where is the bedroom you testified to where the

13   struggle occurred?

14   A        It would have been in here (indicating).

15   Q        Okay.  Now, what is the diagram to the jury's

16   right?

17   A        This right here is another diagram, again,

18   not to scale, of the bedroom itself where I believe the

19   struggle had taken place.

20   Q        Now, if you will, beginning with this diagram

21   in the bottom left, the jury's left, describe for the

22   jury what physical evidence you found in the bedroom.

23   A        There was a number of blood stains and

24   spatters over the room.  There was some here in this

25   corner (indicating), some on the bed.  There was a

198

1    transfer stain on a white wedding gown in the closet

2    and large amounts of spatter here (indicating) and on

3    this counter top.  You can see it much more clearly on

4    this diagram where I've illustrated the approximate

5    locations of the stains.

6    Q       Now, moving -- Was any other physical

7    evidence located in that bedroom with blood on it?

8    A       There was an ashtray with a red stain on it

9    that come back inconclusive, and then there was a

10    lighter and a cigarette pack on top of the bed.

11    Q       Now briefly, using the diagram to the right,

12    the jury's right, would you describe for the jury what

13    these items are represented here, these squares, what

14    they represent?

15    A       Of course, this was a bath, and I didn't

16    notice anything in there but your regular ...  This

17    would be a bed (indicating).  There was a comforter on

18    top of the bed that was twisted and messed up.  Here

19    was some blood spatters (indicating).  Of course, here

20    -- there was an item here (indicating), and I'd have to

21    look at the list to identify it.  Then there was a --

22    the wedding dress here with a transfer smear on it and

23    then the stains here (indicating).  This was like a

24    dresser and this was a small bench or a shelf sitting

25    next to the ...

1    Q        Now, if you will, directing your attention
2    back to the diagram that shows the general outlay or
3    floor plan of the entire house.
4    A        Yes.
5    Q        As you exit the bedroom, what room would you
6    come into, or what area was that?
7    A        This would be, I guess, the foyer or the
8    entry.  Here is a living room, and this was an area
9    where you walk through to go to the kitchen
10   (indicating).
11   Q        Is that all one open space?
12   A        Yes, sir.
13   Q        Now in that area that you just depicted, that
14   general open space, did you find any other blood?
15   A        There was another blood splotch which was
16   here and identified as C1 (indicating).
17   Q        Was there any other evidence that indicated a
18   struggle or any kind of violent acts occurred in that
19   room?
20   A        There was very little in disarray there that
21   I could notice.  There was a weight pin laying on the
22   floor.  But I didn't see any other signs of struggle
23   there.
24   Q        Now while you were in that area that I'm
25   going to call the living area, did you observe any

1   telephones?

2   A        Yes.

3   Q        And what was the condition of those phones?

4   A        They were off the hook.

5   Q        Now, if you leave this living area and step

6   out the front door, tell the jury what you would be

7   stepping onto.

8   A        There's a deck basically that goes around the

9   house.  This is a much larger area like a large front

10  porch.  If you look down to your right, you would have

11  seen the phone junction box that connects to the

12  residence, and then you would have proceeded down the

13  steps onto the walkway which takes you back to the

14  driveway.

15  Q        Okay.  Now you've mentioned the phone

16  junction box.  Did you observe that?

17  A        Yes.

18  Q        Was there anything unusual about that phone

19  junction box?

20  A        It was open and the phone was disconnected.

21  Q        Was there anything unusual about the ground

22  or the area underneath the phone?

23  A        There was the vegetation -- The grass and

24  weeds that were underneath that area right here

25  (indicating) were matted down.

201

1    Q        And you've already testified that leaving the

2    deck area there is a walkway up to the driveway area;

3    is that correct?

4    A        Yes.

5    Q        In your diagram at the top you have

6    illustrated a car.

7    A        Yes.

8    Q        Tell the jury about that, please.

9    A        Okay.  This was -- Later we were to learn

10   that this was Mrs. Hall's car.  This was a Le Baron I

11   believe, and the transmission was out.  It was out.  It

12   was up on jacks being worked on.

13   Q        Now, you have some lines drawn around that

14   car.  What is that?

15   A        Okay.  Right here (indicating) would have

16   been a storage shed, and here (indicating) was an empty

17   parking space with two skids in this direction, kind of

18   curving like that, where obviously tires had broke

19   tracks.  It's not on the diagram, but in this place was

20   a yellow Dodge K car, or light-colored K car.

21   Q        In between the two cars you testified about

22   are the skid marks.

23   A        Yes, sir.

24   Q        Now, are there any other marks on the

25   pavement that indicate tire tracks or anything of that

202

1    nature?

2    A        Again, there's another skid where tires had

3    broke traction going down the driveway in basically

4    this direction (indicating).

5    Q        Is that the direction to the road?

6    A        Yes, sir.

7    Q        Now, in the driveway area did you locate any

8    blood?

9    A        Yes.

10   Q        Where was that?

11   A        There was one spot here and another spot here

12   (indicating) which totaled out to about 106 feet from

13   the front door to the house, and then, of course,

14   you've got -- the service is in the ground here.  There

15   was another blood stain or spot near the sandbox, the

16   second one.  There were two more down by the pool,

17   along with some grass that was pulled up out of the

18   ground, and then there was a pinkish tint color to the

19   water in the pool.

20   Q        Now, you've indicated that there was a trail

21   from the blood on the driveway to the pool.

22   A        Yes.

23   Q        Now describe the ground and the grass in the

24   area of that path that you've marked out.

25   A        The ground was sparsely covered with grass.

203

1    It was a lot of dead grass.  It was very dry.  The

2    ground was -- had disturbances in it where like --

3    looking as if someone had been drug for a while.  There

4    were impressions in the ground which resembled

5    footprints, but they were twisted and turned as if

6    there was a great struggle going on along this trail.

7    Q        Is there anything in particular about the

8    grass you talked about being pulled up?

9    A        This grass that was pulled up in this area,

10   there were similar grass and like it floating in the

11   pool.  Now this had roots attached to it.  It was not

12   clippings that had been blown in there from lawnmowers.

13   Q        What is the distance from the driveway area

14   to the pool?

15   A        I measured 80 feet to the central area of the

16   pinkish colored water.

17   Q    .    And from the blood back to the house, from

18   the blood on the driveway back to the entrance of the

19   house, is 106 feet?

20   A        Yes, sir.

21   Q        Now, describe this pool for the jury, please.

22   A        The pool was level.  There was an embankment

23   here, but someone had taken a shovel and leveled out

24   the area.  It sat erect about -- probably three feet,

25   at least this high.  Across it is probably 20 or 25

204

1    feet, and it was full of water to the top.

2    Q        Now, did you observe any blood or drag marks

3    on the side of the pool?

4    A        No.

5    Q        What kind of material is that pool made of?

6    A        It was a very rigid fiberglass or possibly

7    some sort of aluminum material.  I didn't -- I felt of

8    it, but I didn't take a sample of it.

9    Q        Is that a collapsible pool?

10   A        It quite possibly would have collapsed if a

11   lot of pressure was put against it.

12   Q        Now, did you develop -- As a result of your

13   investigation, did you develop any suspects in this

14   case?

15   A        Yes.

16   Q        And who is that?

17   A        Jon Hall.

18           MR. EARLS:  Your Honor, I'd ask that the

19   witness be allowed to retake the stand, and if we could

20   move the exhibit into evidence.

21           THE COURT:  Do what?

22           MR. EARLS:  Your Honor, I'd ask that this --

23   this exhibit -- diagram be made an exhibit to this

24   witness' testimony.

25           THE COURT:  You offer that as an exhibit to

205

```
 1   his testimony?

 2              MR. EARLS:  Yes, sir.

 3              THE COURT:  All right, without objection it

 4   will be introduced and will be the next-numbered

 5   exhibit.

 6              Proceed.

 7              (Exhibit 2 was marked and entered.)

 8   Q        You've already stated that you developed a

 9   suspect in this case.  Once again, who was that?

10   A        Jon Hall.

11   Q        And do you see Jon Hall in the courtroom?

12   A        Yes, I do.

13   Q        Would you point him out, please?

14   A        He's right there.

15              MR. EARLS:  I'd ask the record to reflect he

16   has identified the Defendant.

17   Q        And did you participate in the arrest of Mr.

18   Hall?

19   A        Yes.

20   Q        Where did you go to arrest him?

21   A        Bell County, Texas.

22   Q        Agent Byrd, I want to show you a series of

23   photographs and ask if you can identify these

24   photographs for the jury.

25              THE COURT:  Have you seen these?
```

1          MR. FORD:  Yes, sir.

2     A          This, of course, is a representation of --

3     Here is a darkened spot which is a blood stain on

4     pavement and the sandbox and the pool which I've been

5     referring to.

6     Q          And do you have another photograph?

7     A          Yes.  This is looking back from Mr.

8     McKinney's residence up on the hill down into the

9     ravine area where the pool was located.

10    Q          Does that reflect the pool?

11    A          Yes.

12    Q          And what is the next photograph, please?

13    A          This is a side view from the rear end of the

14    Chrysler which was up on jacks looking back down the

15    driveway toward Pleasant Hill Road showing the sandbox

16    and the slope of the hill.

17    Q          And is the pool in that photograph?

18    A          No, sir.

19    Q          Do you have another photograph?

20    A          This is a representation of the grass that

21    was floating inside the pool so that you may see what

22    it looked like when I saw it.

23               This is a close-up representation of the pool

24    as it -- looking back on the house.

25               This is a view of the pool up close to give

207

1    you some idea of the -- of its height and width.

2    Q        Is there something else reflected in that

3    besides the pool?

4    A        Oh, yes, sir.  This here is a black t-shirt

5    which was later identified to us by family members as

6    what she was wearing that night when she went to bed.

7    Q        When you say "she", is that Billie Hall?

8    A        Yes.  This picture is looking out of the --

9    off of the front porch back toward the area where the

10   cars were parked.  This shows the white or light-

11   colored Le Baron that was jacked up being repaired.

12            And this is a daylight view of the driveway

13   back toward Pleasant Hill Road.

14   Q        Is that your last photograph in that series?

15   A        Yes, sir.

16   Q        And do those photographs accurately reflect

17   the scene as you observed it?

18   A        Yes, sir.

19            MR. EARLS:  Your Honor, I'd ask that those be

20   made a collective exhibit to his testimony.

21            THE COURT:  Let them be marked and entered

22   without objection, collective exhibit for the next

23   number.

24            **(Collective Exhibit 3 was marked**

25                  **and entered.)**

1    Q         Agent Byrd, I'd like to hand you another

2    series of photographs and ask if you can identify

3    those.

4    A         Yes, sir, this is the area of the entry of

5    the residence.

6    Q         And is the deck reflected in that photograph?

7    A         Yes, it is, also the phone junction box which

8    I was referring to earlier.

9    Q         Would you point that out, please?

10   A         It's right here (indicating).

11   Q         Okay.  And what does the next photograph

12   depict?

13   A         This is a close-up view of the phone box and

14   the disconnected wire leading into it.

15   Q         In that photograph, Agent Byrd, can you tell

16   if there is any damage to the wire?

17   A         No, it has a clip which allows a person to

18   press in and release it, and it appears that's what has

19   happened, it's just been pulled from its connector.

20   Q         Now, what is the next photograph?

21   A         This photograph depicts the trampled

22   vegetation that was underneath the phone box.

23   Q         And do those accurately reflect the area that

24   you observed on that day?

25   A         They do.

209

1          MR. EARLS:  Your Honor, I'd ask that those be

2    made Collective Exhibit -- whatever the next number is

3    to his testimony.

4          **(Collective Exhibit 4 was marked**

5          **and entered.)**

6    Q         Now, Agent Byrd, I'd also ask you if you can

7    identify these photographs.

8    A         This particular picture is a view from the

9    storage building near the driveway looking back on the

10   residence and showing the slope of the hill and the

11   basic lay-out as you approach it from the storage area.

12         This is a view again from the entry or the

13   front porch of the residence looking down on the

14   swimming pool.

15   Q         And do those accurately reflect the scene as

16   you observed it on that date?

17   A         They do.

18         MR. EARLS:  Your Honor, I'd ask that those be

19   made a collective exhibit, Number 5, to this witness'

20   testimony.

21         THE COURT:  So ordered.

22         **(Collective Exhibit 5 was marked**

23         **and entered.)**

24   Q         Now, Agent Byrd, did you observe anything at

25   the scene in the way of footprints on the deck or any

1    of that area?

2    A        I did.

3    Q        And describe those for the jury, please.

4    A        When we first arrived, there were wet

5    footprints on the carpet in the house and wet

6    impressions on the wooden deck on the front porch

7    outside leading out to the pathway leading up to the

8    driveway.

9    Q        When you say wet, how wet?

10   A        They were well-soaked.  They were still there

11   later at 10 a.m. in the hot sun.

12   Q        Were you able to determine if anything was

13   taken from the scene that did not belong to Jon Hall?

14   A        No small items; we were going to allow family

15   members to do that, but there was a red van or mini-van

16   which was gone from the scene.

17   Q        Now, did that happen in Henderson County?

18   A        Yes.

19   Q        And this is the Defendant Jon Hall

20   (indicating)?

21   A        Yes.

22            MR. EARLS:  Pass the witness, Your Honor.

23                         - - - - -

24

25

1    **CROSS-EXAMINATION**

2    **BY MR. MAYO:**

3    Q        Good morning, Investigator Byrd.

4    A        Good morning, Counselor.

5    Q        Investigator Byrd, there was never any

6    question that Jon Hall committed this act; is that

7    correct?

8    A        In my mind, yes.

9    Q        And you started off with that assumption and

10    it just was reinforced as time went on.

11    A        Yes.

12    Q        When you arrived at the residence, did you do

13    a crime scene search?

14    A        Yes.

15    Q        And in that search, did you find a money

16    order?

17    A        Yes.

18    Q        What was that money order?

19    A        I believe the amount was 25 or five dollars.

20    I haven't looked at it in some time, but it was, you

21    know, a moderate amount of money.

22    Q        Who was the money order to?

23    A        I think it was probably to Billie Hall.  I'd

24    have to look at it again to verify that.

25    Q        Who was it from?

212

```
 1   A          I believe it was from Mr. Hall.

 2   Q          Do you know the date on that money order?

 3   A          No, sir, I don't.  Again, I haven't seen it

 4   in a while.

 5   Q          Do you have it with you?

 6   A          Yes, sir.  It would be probably in this box

 7   over here I think (indicating).

 8              MR. MAYO:  Your Honor, if we could --

 9              THE COURT:  Let him tell you which box it is

10   and bring it over here to him and let him look for it.

11              THE WITNESS:  Counselor, it may be in the --

12   I may have a copy of it in that file there

13   (indicating).

14              THE COURT:  Do you have a copy of this?  Do

15   you have a copy yourself maybe you could find, if you

16   have one?

17              MR. FORD:  Your Honor, we don't have a --

18   we've seen it, but we don't have a copy.

19              THE COURT:  Well I was just trying to --

20              THE WITNESS:  Your Honor, I did provide a

21   copy to the Public Defender's office, but obviously

22   they probably did not get it to --

23              THE COURT:  Well he says he don't have a copy

24   of it.  Step it along.

25              Go on, Mr. Ford, and let him search for that
```

1    later.

2            MR. MAYO:  Your Honor, I don't know if he'll

3    be able -- if Investigator Byrd can do both, answer

4    questions and search for that.

5            THE COURT:  Well, whatever you want to do.

6    Mr. Ford said you had a copy, seen a copy of the

7    statement, and no question that --

8            MR. MAYO:  It's not a statement, Your Honor;

9    it's a money order.

10           THE COURT:  It's a money order that's been

11    furnished to you, and I say, what else do we need?

12           MR. MAYO:  We need to know who it's from and

13    who it's to, the amount of the money order and the date

14    on the money order.

15           THE COURT:  Wasn't it shown on it when you

16    were shown it?

17           MR. MAYO:  Your Honor, the jury needs to know

18    about it.

19           THE COURT:  Well can you tell us?

20           MR. MAYO:  I can't testify, Your Honor.

21           THE COURT:  All right.  Go ahead and look.

22    Can you find it?

23           THE WITNESS:  No, sir.  I may have to --

24           THE COURT:  He don't find it.

25           THE WITNESS:  If it's not in that, it's

1   possibly locked up in my vehicle downstairs.  I don't

2   have all the evidence here.

3           THE COURT:  He doesn't have it today, I mean,

4   have it here.

5           MR. MAYO:  Well, Your Honor, I can ask --

6           THE COURT:  Go ahead and ask what you want

7   to.

8           MR. MAYO:  I can finish the cross-examination

9   without it here, but I would ask to be allowed to call

10  Investigator Byrd back to the stand to establish that.

11          THE COURT:  That will be allowed, yes, sir.

12          MR. MAYO:  Thank you, Your Honor.

13          THE COURT:  I instruct you after you get off

14  the stand to go look and find that item if you can and

15  bring it back.

16          THE WITNESS:  Yes, sir.

17  Q       In the crime scene search, did you determine

18  whether there were fingerprints in the home?

19  A       We took several samples of articles which we

20  believe would have been handled by Mr. Hall and other

21  people, and there were fingerprints identified on some

22  of them, yes, sir.

23  Q       Did you dust it for fingerprints?

24  A       I sent it to the Nashville crime lab for

25  dusting.

215

```
 1    Q          Did you get the results of those back?

 2    A          Yes.

 3    Q          And what did it reveal?  Whose were they?

 4    A          Again, a large amount of them were

 5    inconclusive.  I think there was one identifiable print

 6    which was identified, but I never sent it for

 7    comparison.

 8    Q          Why is that?

 9    A          At that time, this was six months after my --

10    The report came in six months after Mr. Hall's arrest.

11    I had numerous statements from family members and other

12    people pertaining to -- he was the only one

13    participating in this event.

14    Q          So you didn't need them, in your opinion.

15    A          Yes, sir.

16    Q          There was plenty of evidence without those

17    fingerprints.

18    A          Yes.

19               THE COURT:  Well did you find any you could

20    use except this possible one?

21               THE WITNESS:  No other ones that I know of.

22               THE COURT:  In other words, the condition --

23    you could not develop them with any certainty; is that

24    right?

25               THE WITNESS:  Yes, sir.
```

```
 1              THE COURT:  Go ahead.

 2    Q         Did you determine if there were any weapons

 3    in the home?

 4    A         There was -- I didn't see any firearms.

 5    There was a putter in front -- right next to the front

 6    door which was probably there for personal protection,

 7    but I don't know.  A golf putter.

 8    Q         Had that been used?

 9    A         Not to my -- It was still in position there

10    near the front door.  It didn't appear to be used in

11    any way.  There were no stains or anything noted on it.

12    Q         Did you find any other -- Was there anything

13    that had been used as a weapon, a stick or anything

14    like that?

15    A         I found an ashtray, again, that had what I

16    thought was blood on it, a speck of red stain, which

17    come back inconclusive, and a weight pin near a weight

18    bench there in the entry area of the residence, but no

19    other signs of a weapon.

20    Q         The struggle that you spoke of that occurred

21    out at the residence, that occurred throughout the

22    house.  Is that fair to say?

23    A         From what I observed, it started -- or a

24    large amount of it occurred in the master bedroom.

25    Some event occurred near the entry area and then on out
```

217

1    through the trail that I described along the driveway

2    and down to the pool.

3    Q        So it went through the -- from the bedroom,

4    through the home, through the entry area, outside the

5    home, driveway to the pool.

6    A        Most likely, yes.

7    Q        Did you travel to Texas to apprehend Mr.

8    Hall, or to bring him back?

9    A        I did.

10   Q        He had already been arrested; is that

11   correct?

12   A        Yes.

13   Q        And he was arrested by Texas authorities; is

14   that also correct?

15   A        Yes, sir.

16   Q        He was arrested at his brother's house; is

17   that also correct?

18   A        Yes.

19   Q        He was on the porch at his brother's house.

20   Isn't that correct, too?

21   A        I don't know where he was at the residence.

22   Q        Do you know if he had a weapon on him when he

23   was arrested?

24   A        No, I don't think he had a weapon on him at

25   the time of his arrest.

```
 1    Q         Did he have any money on him?

 2    A         I'm unaware of what he -- the amount of money

 3    he had on him.

 4    Q         Were you able to determine what he had on

 5    when he was arrested, what kind of clothes?

 6    A         Very normal clothing, jeans and I think a t-

 7    shirt possibly, or a shirt of some sort and possibly

 8    some shoes, I'm quite certain.

 9    Q         What was he wearing when you first saw him?

10    A         I can't remember.

11    Q         Where did you first see him?

12    A         I first saw him in an interview room there at

13    the Bell County justice complex.

14    Q         How would you describe his condition?  How

15    did he appear?

16    A         He was calm.  He had some injury to his

17    hands.  He had minor cuts that I believe probably had

18    come from what I believe may have been an accident

19    which he was involved in.

20    Q         He was crying, wasn't he?

21    A         Yes, sir, at one point he did cry.

22    Q         Seemed to be remorseful?

23    A         Yes, sir.

24    Q         Did you talk with his brother?

25    A         Yes.
```

219

1    Q          His brother is now deceased; is that correct?

2    A          Yes.

3    Q          Did you find a vehicle that he had gone to

4    Texas in and search the vehicle?

5    A          Yes.

6    Q          Did you find anything in that vehicle?

7    A          Yes.  There were articles which belonged to

8    the owners of the vehicle.  There were some clothes in

9    the back.  I think there was a pair of pants that were

10   soiled and torn.  There was a photograph on the --

11   Q          Let me ask you, Investigator Byrd, as far as

12   it relates to Mr. Hall, were you able to determine if

13   the pants were Mr. Hall's?

14   A          No.

15   Q          You said they were soiled?

16   A          Yes.

17   Q          Were they jeans?

18   A          Yes.

19   Q          Could you tell what they had been soiled

20   with?

21   A          Brown stains.  Didn't appear to be blood.

22   Most likely it was some sort of dirt, grime of some

23   sort.

24   Q          Did you find any maps in the vehicle?

25   A          Yes, I think there were maps found.

220

```
 1   Q          What about credit cards?  Did Mr. Hall have
 2   any credit cards with him?
 3   A          Not that I'm aware of.
 4   Q          Did your investigation reveal that Mr. Hall
 5   was a mechanic?
 6   A          Yes.
 7   Q          And you stated that one of the vehicles at
 8   the Hall residence was set up as if it had been worked
 9   on, on jacks.
10   A          Yes.
11   Q          The van, did your investigation reveal that
12   was the van of the Halls, Mr. and Mrs. Hall?
13   A          I believe it was registered to Billie Jo
14   Hall.
15   Q          They were married though, weren't they?
16   A          They were in the process of getting a
17   divorce.  I don't know what the status would be in
18   Chancery Court, but they had been married, yes.
19   Q          Investigator Byrd, the phone that you stated
20   was disconnected, that could have easily been
21   reconnected; is that correct?
22   A          Yes, sir.
23   Q          And the money order that you found, I know
24   you're going to have to look and make sure, but you do
25   recall that it was made out to Billie Hall.
```

1    A        To the best of my recollection, yes, sir.

2             MR. MAYO:  Thank you, Investigator Byrd.

3                       - - - - -

4    **REDIRECT EXAMINATION**

5    **BY MR. EARLS:**

6    Q        Investigator Byrd, you testified about the

7    van that was taken and that that belonged or was titled

8    to Billie Jo Hall; is that correct?

9    A        Yes, sir.

10   Q        Was there anything in that --

11            MR. EARLS:  That's all I have.

12            **(WITNESS EXCUSED.)**

13                       - - - - -

14            **CHRIS DUTTON** was called and being first duly

15   sworn, was examined and testified as follows:

16   **DIRECT EXAMINATION**

17   **BY MR. WOODALL:**

18   Q        State your name, please, sir.

19   A        Chris Dutton.

20   Q        Mr. Dutton, where are you currently

21   incarcerated?

22   A        Cole Creek Correctional Facility.

23   Q        Now are you the same Chris A. Dutton that's

24   been convicted in Bradley County of burglary, theft of

25   property, burglary, theft of property and burglary of

                          222

1    an automobile?

2    A        Yes, sir.

3    Q        And also the same Chris A. Dutton that was

4    convicted again in Bradley County of a theft of

5    property and then in Hamblin County of theft,

6    aggravated assault and escape?

7    A        Yes, I am.

8    Q        How old are you, Chris?

9    A        I'm 37 years old.

10   Q        How many years of your life have you spent

11   behind bars?

12   A        Approximately I'd say about 14 or 15.

13   Q        Now, I notice that there was an escape charge

14   in this from Hamblin County.

15   A        Yes, sir.

16   Q        And as a result of that conviction, what

17   level of incarceration did you receive?

18   A        Maximum security.

19   Q        And where were you in maximum security?

20   A        Riverbend.

21   Q        And where is Riverbend located?

22   A        Nashville, Tennessee.

23   Q        Now you said that currently you're at is it

24   Cole Water?

25   A        Cole Creek.

223

1  Q        Cole Creek Institution.  What level of

2  security are you there?

3  A        Minimum restricted.

4  Q        All right, now, what is the -- tell us what

5  the levels of security are in the institution.

6  A        That would be minimum trustee, minimum

7  direct, minimum restricted, medium, close, levels one

8  through five, and then max.

9  Q        Okay.  So you started out at max as a result

10  of your escape and last conviction and you've worked

11  your way down to --

12  A        Minimum restriction.

13  Q        Now, at the time that you were incarcerated

14  at Riverbend in maximum security, tell us how prisoners

15  are confined in maximum security.

16        MR. FORD:  I object to the relevancy of that,

17  Your Honor.  I don't know.  Are we going to have a

18  prison lecture here?

19        THE COURT:  I don't see the relevancy of it.

20  General, if he had some contact with this man, you

21  could ask him where, but how they're restricted and

22  what ...

23        MR. WOODALL:  Thank you, Your Honor.  I'll

24  try to move this along.

25  Q        Are there one-man cells?

```
1   A         Yes, sir.

2   Q         Now, can you see who is in the cell next to

3   you when you're in your cell?

4   A         No.

5   Q         Can you communicate with the individual in

6   the cell next to you?

7   A         Yes.

8   Q         And how can you communicate?

9   A         Through the ventilation system by standing on

10  the sink.

11  Q         Is this common practice?

12  A         Yes, it's our telephone system.

13  Q         That's the prisoners' telephone system.

14  A         Yes.

15  Q         Now, did you come in contact as a result of

16  this ventilation system with the individual who was

17  incarcerated next to you?

18  A         Yes, sir.

19  Q         And did he identify himself to you?

20  A         Yes, sir.

21  Q         And what name did he give you?

22  A         Jon Hall.

23  Q         And did you have the occasion to put a face

24  with the name, not while you were actually in the bars

25  but when you were in an exercise period or guard
```

1    period?

2    A          Yes, sir, and also I worked in the general

3    area where the officers worked, and I came in and out

4    of my cell on regular occasions.  I went to the doors

5    certain times running errands.

6    Q          Now, do you see the individual in this

7    courtroom that you know to be Jon Hall?

8    A          Yes, sir.

9    Q          Can you point that individual out, please?

10   A          Right here.

11              MR. WOODALL:  Let the record reflect the

12   witness identifies the Defendant.

13   Q          Had you ever heard of or seen or talked to

14   Jon Hall in your entire life prior to coming into

15   contact with him at Riverbend?

16   A          No, sir.

17   Q          Did you have any idea of what he was in there

18   for or what he had done or anything at all?

19   A          No.

20   Q          Now, did the Defendant provide certain

21   information to you concerning charges pending against

22   him in Henderson County?

23   A          Yes, sir.

24   Q          Was this as a result of questions that you

25   directed to him or as a result of him confiding in you?

226

```
 1    A         I never asked him.  You don't ask questions

 2    in prison like that.  He confided in me.

 3    Q         Why would he confide in you?

 4    A         Loneliness.

 5              MR. MAYO:  Your Honor, I want to object to

 6    that.  That's speculation.

 7              THE COURT:  Why, General, I believe that's --

 8    You can ask him what he did or what he said, but you're

 9    asking him an opinion now as to why this man --

10    somebody else did something.

11    Q         Just go ahead and irrespective of why he

12    confided in you, tell us --

13    A         I confided in him also.

14    Q         As a result of your mutual confiding in one

15    another, tell us at this time what he confided in you

16    about his pending charges in Henderson County,

17    Tennessee.

18    A         That he was facing charges of murder, that he

19    had killed his wife.

20    Q         Did he tell you how this came about and what

21    he did the day of her death?

22    A         I didn't -- He said that he had contacted her

23    earlier in the day and made arrangements to take her

24    some money.  When he took the money out there to her

25    house, that he tried to get her to listen to him.  All
```

1    she was interested in was the money.  He tried to talk

2    about reconciliation - that's the word I was looking

3    for - but all she was interested in was the money, and

4    when she refused to listen to him and demanded that he

5    leave, his temper got the best of him and he began to

6    strike her.

7    Q        All right, now, let's back up a little bit.

8    Did he say that -- Did he tell you that he did anything

9    prior to entering her home?

10   A        Yes.

11   Q        What did he tell you that he did?

12   A        He disconnected the wires on the pole hooked

13   to the telephone outside the trailer.

14   Q        Did he tell you why he did that?

15   A        So she couldn't call the cops.

16   Q        Did he tell you anything that he had planned

17   to do before he even got there?

18   A        That he wanted to make her feel as he did.

19   He wanted her to suffer as he did, feel the

20   helplessness that he was feeling because she took his

21   world away from him.

22   Q        Now, did he tell you how many times that he

23   struck her or where he struck her or if there was

24   anyone else present in the house at the time?

25   A        The girls were there, his two girls.  It

228

1   started in the house and ended up in the yard.  She was

2   -- He hit her on the head until he panicked, and then

3   he threw her in the swimming pool.  He then went into

4   the house and got her keys and took her van and left.

5   Q        After he threw her in the pool, let me see if

6   I understand you, he went back in the house, got the

7   keys to her van and left.

8   A        Yes.

9   Q        Did he tell you how he got up there?

10  A        I'm not certain of that.

11  Q        Now after you received this information --

12  And do you remember approximately when it was?

13  A        Probably better than a year ago, going on a

14  year.

15  Q        How long have you been transferred -- Or how

16  long has it been since you and the Defendant were side

17  by side at Riverbend?

18  A        It's been a long time, about a year, maybe a

19  little more.

20  Q        Now, after you received this information, did

21  you transmit it to anybody?

22  A        Yes.  I sent a letter to the Attorney

23  General's office.  I think it was Nashville.

24  Q        Did you send it to me?

25  A        No.

229

1    Q         Now, after you sent the information to the

2    Attorney General's office in Nashville, did you hear

3    from anybody?

4    A         No, not until a week ago.

5    Q         Where were you when someone contacted you?

6    A         Cole Creek Correctional Facility.

7    Q         And who contacted you?

8    A         It was you.

9    Q         All right.  And did we discuss your

10   testimony?

11   A         Yes, sir.

12   Q         In exchange for your truthful testimony, did

13   I make any promises to you?

14   A         You told me as long as I testified truthfully

15   that you would speak at my parole hearing when the time

16   came.

17   Q         Is that the only promise you received from

18   me?

19   A         Yes.

20   Q         Now since you left Riverbend -- Let me back

21   up.  How long after you received this information in

22   terms of days or weeks did you relate it to the D.A. in

23   Nashville?

24   A         Week or two.

25   Q         Was the Defendant still in the adjacent cell

230

1    when you transmitted this information to the D.A.'s

2    office in Nashville?

3    A        No, he had been moved to another unit.

4    Q        Have you seen or talked to the Defendant

5    since that time?

6    A        No, sir.

7    Q        Have not.

8    A        No, sir.

9    Q        Have you received any benefit at all at this

10   point from providing that information to the

11   authorities?

12   A        No, sir.

13   Q        Have you provided any information to any

14   other law enforcement agency which has required your

15   testimony?

16   A        Yes, sir.

17   Q        And was that information -- When did you

18   transmit that information?

19   A        In 1989.  It would have been probably middle

20   of 1990.

21   Q        So you helped the authorities once in 1989 or

22   '90.

23   A        Yes, sir.

24   Q        And when you transmitted the information

25   concerning the Defendant Jon Hall to the Attorney

231

1    General's office in Nashville, did you also convey

2    information involving any other area or state or

3    individual?

4    A        Yes, sir.

5    Q        And what would that be?  Which state?

6    A        North Carolina.

7    Q        And as a result of that information provided

8    to the Attorney General in Nashville, have you

9    testified in the state of North Carolina?

10   A        Yes.

11            MR. WOODALL:  Your witness.

12                          - - - - -

13   **CROSS-EXAMINATION**

14   **BY MR. FORD:**

15   Q        Mr. Dutton, would it be a safe assumption

16   that you would be classified as an informant in the

17   prison system?

18   A        I'm not sure of the definition of that, sir.

19   Q        Isn't that your role?

20   A        Excuse me?

21   Q        Isn't that your role with the authorities, to

22   inform them of certain things that you have heard?

23   A        No.

24   Q        In exchange for favorable treatment in the

25   prison system?

232

```
 1    A        No, sir.

 2    Q        That had nothing to do with your motivation,

 3    did it?

 4    A        No.

 5    Q        When is your parole hearing?

 6    A        June of '99.

 7    Q        And Mr. Woodall is going to testify at your

 8    parole hearing.  Is that what you were to understand?

 9    A        Excuse me?

10    Q        Mr. Woodall, he is --

11    A        Yes, sir.

12    Q        -- going to come and testify on your behalf.

13    Did he say what he was going to say about you?

14    A        No.

15    Q        Jon told you that he was drunk when he got to

16    the trailer, didn't he?

17    A        I'm not certain, sir.  I ...

18             MR. FORD:  Approach the witness, Your Honor?

19             THE COURT:  Pass it up.

20    A        Yes.

21    Q        Did that refresh your recollection, Mr.

22    Dutton?

23    A        Yes, sir.

24    Q        That he had been drinking all day before he

25    had contacted Billie to come out and pay his child
```

1    support?

2    A          I wrote here that he was drunk and had been

3    drinking since he called Billie earlier.

4    Q          He was extremely depressed about his family

5    situation; was he not?

6    A          Yes, sir.

7    Q          And that he'd been out there earlier in the

8    week working on Billie's car for her, trying to repair

9    her vehicle?

10   A          That's what I recall.

11   Q          And that he was concerned about his children?

12   A          Yes, especially the little girl.  I think she

13   had M.D.

14   Q          C.P. or muscular dystrophy?  A special needs

15   -- They had a special needs child, didn't they?

16              THE DEFENDANT:  Cerebral palsy.

17   A          Yes, sir.

18   Q          He was really concerned about the child, and

19   he went out there to try to reconcile with Billie, to

20   try to discuss their problems.

21   A          Yes.

22   Q          And that's why he went out there.

23   A          To give her money.

24   Q          Yes, sir.  And also did he tell you that on

25   past occasions when he had gone out there that he had

                              234

1    disconnected the phone because sometimes there would be

2    arguments and that Billie would call the police and

3    things of that nature?

4    A        Yes, sir.

5    Q        He didn't go out there with any weapons, did

6    he, that you know of or did he tell you about?

7    A        No.

8    Q        So now you've been transferred to a minimum

9    security.

10   A        No, I'm still in regular security.  I'm on

11   minimum restricted status.

12   Q        What is your security status now?

13   A        Minimum, which means I have two more levels

14   to go down, minimum direct and minimum trustee.

15   Q        And when were you reclassified?  Was it after

16   you communicated with the Attorney General?

17   A        No, it was the first of January.  I can't

18   remember what date for sure, first week.

19   Q        Mr. Dutton, from what you gathered in your

20   conversations with Mr. Hall, and I'm assuming you had

21   more than one.

22   A        Yes.

23   Q        That you fellows had plenty of time to talk.

24   That's really all you had, wasn't it?

25   A        Yes.

235

1    Q        Did you gather that the real reason he went

2    out there was to try to reconcile with his wife and pay

3    child support?

4    A        No.

5    Q        No?  That's what he told you, didn't he?

6    A        Yes.

7             MR. FORD:  That's all.

8                           - - - - -

9    **REDIRECT EXAMINATION**

10   **BY MR. WOODALL:**

11   Q        That question having been asked by Mr. Ford,

12   what did he tell you what was the reason that he went

13   out there?  What was he going to do?

14   A        Make her feel the way she made him feel.

15   Q        If she didn't reconcile with him, what was he

16   going to do to her?

17   A        He was going to make her hurt the way she

18   made him hurt, feel as helpless as he felt.

19            MR. WOODALL:  Thank you.

20            **(WITNESS EXCUSED.)**

21                           - - - - -

22

23

24

25

1          **BRIAN BYRD** being recalled, was duly reminded

2  of his oath and testified further as follows:

3  **RECROSS-EXAMINATION**

4  **BY MR. MAYO:**

5  Q          Investigator Byrd, did you find that money

6  order we were talking about?

7  A          Yes, sir, I did.

8  Q          Investigator Byrd, who was the money order

9  to, please, sir?

10  A          The money order is to Billie Hall from Jon

11  Hall.

12  Q          And the date on the money order, please?

13  A          Would be July, appears to be, the 29th, '94.

14  The ink is a little messed up, but I think it's the

15  29th.

16  Q          Thank you, sir.  Is that the date that this

17  occurred?

18  A          Yes.

19  Q          Where is the money order from?

20  A          It just says Travelers Express International

21  Money Order.  It doesn't give a business or anything

22  that I can see.

23          THE COURT:  How much?

24          THE WITNESS:  For $25.00.

25  Q          Does it say what it's for, what it

237

```
 1    represents, or did you find any receipt or anything

 2    like that in Mr. Hall's wallet that would indicate

 3    that?

 4    A        No.  If the receipt was present I don't have

 5    it.

 6              THE COURT:  Let me see it.

 7              THE WITNESS:  Yes, sir.

 8              MR. MAYO:  Your Honor, we'd like that marked

 9    as an exhibit, please, sir, and passed to the jury.

10              THE COURT:  Just a minute.  You want it

11    introduced as the next exhibit to this man's testimony

12    and passed to the jury?

13              MR. MAYO:  Yes, sir, please.

14              THE COURT:  All right, let it be marked and

15    entered.

16              (Exhibit 6 was marked and entered.)

17    Q        Investigator Byrd, where did you find the

18    money order?

19    A        I believe it was on a nightstand at the end

20    of the couch, to the best of my recollection; but it

21    was inside the residence.

22              MR. MAYO:  Thank you, Investigator Byrd.

23              (WITNESS EXCUSED.)

24                      - - - - -

25
```

1            **STEPHANIE LAMBERT** was called and being first

2      duly sworn, was examined and testified as follows:

3            THE COURT:  Young lady, what's your name?

4            THE WITNESS:  Stephanie.

5            THE COURT:  Stephanie, you're here to answer

6      some questions, and you see the jury there, that's the

7      jury.  See those people sitting over there?  And you

8      want to look at them and speak up so they can hear you.

9      You understand?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Now do you know -- You've sworn

12     to tell the truth.  Do you know that if you testify

13     you're supposed to tell the truth?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  What'll happen to you if you

16     don't tell the truth?

17           THE WITNESS:  I'll get a whippin'.

18           THE COURT:  You'll get a whippin'.

19           All right, I believe she's qualified,

20     General.

21           MR. WOODALL:  Thank you, Your Honor.  Could I

22     stand up here, Your Honor?

23           THE COURT:  Yes, sir.  Not to close because

24     the --

25           MR. WOODALL:  Well I'm not going to get in

239

1    the way of the jury.

2    **<u>DIRECT EXAMINATION</u>**

3    **<u>BY MR. WOODALL:</u>**

4    Q       Tell us what your name is.

5    A       Stephanie.

6    Q       Stephanie, how old are you?

7    A       Eight.

8    Q       Who do you live with, Stephanie?

9    A       My grandma and my grandpa.

10   Q       How long have you lived with them?

11   A       Two and a half years.

12   Q       Now two and a half years ago where did you

13   live?

14   A       With my mom.

15   Q       And your daddy, stepdaddy?  Your mama and

16   your daddy, is that who you lived with two and a half

17   years ago?

18   A       No, my dad lived somewhere else, but he came

19   and visited.

20   Q       All right, but your mama and who else was

21   there?

22   A       And my sisters.

23   Q       How many sisters do you have?

24   A       Three.

25   Q       Three.  And how old are your sisters now?

```
 1   A           Jessica's five, Cynthia's 10 and Jennifer is

 2   11.

 3   Q           Okay.  Now let's go back to July of 1994, and

 4   something happened that night, didn't it?

 5   A           Uh-huh.

 6   Q           Now, tell me, did somebody come over to your

 7   house that night?

 8   A           Yes, sir.

 9   Q           And who would that be?

10   A           My dad.

11   Q           He wasn't living there at the time?

12   A           He was living somewhere else.

13   Q           Now, where were you when he got there?

14   A           I was in the living rom.

15   Q           And who all was in the living room?

16   A           My sisters and my mom.

17   Q           And what were y'all doing?

18   A           Watching t.v.

19   Q           Okay.  And how did you first realize that

20   your daddy had come over there?

21   A           Because he knocked at the door, and then we

22   went there, and then ...

23   Q           Did your mama go to the door or did one of

24   the kids go to the door?

25   A           Mama and Cynthia.
```

                              241

1    Q          Could you see your mama at the door?  Could

2    you see her?

3    A          I don't remember.

4    Q          That's okay.  What happened after that?

5    A          My mom told Jon not to hurt her, but then he

6    pushed his way through and then ...

7    Q          That's okay.  You're doing fine.  All right,

8    now, did your mama want Jon to come in?  Did she want

9    him to come in the house or did she tell him not to

10   come in the house?

11   A          I don't know.

12   Q          Okay.  You said that Jon pushed his way in.

13   What do you mean by that?

14   A          He pushed his way in.

15   Q          Okay.  Now, what happened after he came in?

16   And which room would that be?

17   A          He came in the kitchen.

18   Q          Is the kitchen and the living room where the

19   t.v. was, are they all kind of together or ...

20   A          They are close together.  They have two steps

21   separating them.

22   Q          Okay.  Now, did your mama -- After Jon you

23   said he forced his way in, what happened to your mama

24   after that?

25   A          She was sitting in the chair, then Jon told

242

1    us to go to bed.  We didn't go.  Then he told us again.

2    Then we didn't go.  So he told us again, and then he

3    tipped my mama over in the chair.

4    Q        Okay.  He told y'all to go to bed three

5    times.

6    A        Uh-huh.

7    Q        And then your mama was sitting in a chair?

8    A        Uh-huh.

9    Q        And he pushed the chair over?

10           THE COURT:  Now don't -- General, don't lead

11   her.  Just say, what did he -- what did --

12           MR. WOODALL:  That's what she said, if it

13   please the Court.

14           THE COURT:  Well I know.

15   Q        Okay, sweetie, go ahead.  Now, after your

16   mother's chair was pushed over, where did she go?

17   A        Into the bedroom.

18   Q        And who did she go with?

19   A        With Jon, and I don't know what happened, how

20   they got in there though.

21   Q        Okay.  Now after they went in the bedroom,

22   did you hear something?

23   A        Uh-huh.

24   Q        What did you hear?

25   A        My mom yelling.

243

```
 1   Q        What was she saying?

 2   A        I don't know.  I couldn't tell.

 3   Q        What did you do and your sisters do?

 4   A        We tried to get in there but we couldn't.

 5   Q        Tried to get in where?

 6   A        The bedroom.

 7   Q        Why couldn't you get in the bedroom?

 8   A        Because he had the sewing machine by the door

 9   and we couldn't get in.

10   Q        All right.  Did you hear anything after that?

11   Did you hear your mama say anything after you tried to

12   get in?

13   A        She told us to go up Pam's.

14   Q        Go where?

15   A        Up Pam's.

16   Q        Now where did Pam live?

17   A        Just up the road -- not up the road but

18   beside us.

19   Q        Did anybody try to use the telephone?

20   A        Yes, sir.

21   Q        Who did?

22   A        I don't know which one; it was either me or

23   Cindy.  We both went to the telephone.

24   Q        Were you able to use the telephone?

25   A        No.
```

```
1    Q         What was wrong with it, or do you know?

2    A         Jon had it where we couldn't use it.

3    Q         All right, now, did Jon tell you what he

4    would do to you if you went to Pam's, or do to

5    somebody?

6    A         No, sir.

7    Q         Okay.  Now, did you ever see your mama come

8    out of the bedroom?

9    A         No, sir, but my sister told me that she --

10   Q         Well don't tell me what your sister said.

11   Now, you left and went over to Pam's.

12   A         Yes, sir.

13   Q         Did anybody go with you?

14   A         Cynthia did.

15   Q         Okay.  And how old is Cynthia?

16   A         She's 10.

17   Q         All right.  Now where was your little sister?

18   A         She was with Jennifer in the bedroom.

19   Q         Did Jennifer come out, too, out of the

20   bedroom?

21   A         She came out when Mama came out and ran

22   through the door, and then she went to Pam's.

23   Q         All right.  Did you see what your -- Did you

24   see your mama come out of the bedroom?

25   A         No, sir.
```

245

```
 1    Q         Did you ever see your mama in the yard?

 2    A         No, sir.

 3    Q         Okay.  Do you have any idea how long Jon was

 4    there before you went over to Pam's?

 5    A         No, I don't.

 6    Q         Okay, I understand.  Now, was your mama doing

 7    something outside of the home?  Did she have a job?

 8    A         Yes, sir.

 9    Q         What was her job?

10    A         She worked at the health department or

11    something like that.

12    Q         Did she also go to school?

13    A         Yes, sir.

14    Q         Where was she going to school?

15    A         Jackson.

16    Q         Was it a college?

17    A         I don't know.

18    Q         Did Jon say anything to your mama about her

19    college work or her school work?

20    A         He said that, "You'll never live to

21    graduate."

22    Q         Said she would never live to graduate, okay.

23              MR. WOODALL:  Your witness.

24    Q         One other question.  Do you see Jon in the

25    courtroom?
```

246

```
1    A          No, sir.

2    Q          Would you stand up and see if he's in the

3    courtroom, honey?

4    A          Yes, sir.

5    Q          Can you point him out, please?

6    A          (Pointing).

7    Q          Thank you, dear.

8               MR. WOODALL:  Let the record so reflect.

9                         - - - - -
```

10    **CROSS-EXAMINATION**

11    **BY MR. FORD:**

```
12   Q          Stephanie, my name is Jay Ford, and I'm Jon's

13   lawyer.  Do you recognize that as your dad?

14   A          Yes, sir.

15   Q          Okay.  And when you and your sisters were all

16   living with your mother and Jon, Jon was your dad.

17   A          Yes, sir.

18   Q          Did Jon go to work down at Helms Motor

19   Company, or do you know?

20   A          He went -- I don't know if he still did, but

21   he used to.  I don't know if he still did though.

22   Q          Did Jon keep you and your sisters when your

23   mother had to go to school at night or work nights?

24   A          Sometimes and sometimes he didn't.

25   Q          Y'all had a babysitter sometimes?
```

1    A        Uh-huh.

2    Q        Did Jon ever fix any meals for y'all or take

3    you to McDonald's and get some food or things of that

4    nature?

5    A        I don't remember.

6    Q        Don't remember that because that was like

7    when you were six or five and a half back in July.

8    What grade are you in now?

9    A        Third.

10   Q        Third grade.  And where do you go to school?

11   A        Primary school.

12   Q        And that's -- What town is that?

13   A        Huntingdon.

14   Q        Your younger sister, she has some special

15   needs.  She needs special attention.  She has C.P.; is

16   that right?

17   A        Yes, sir.

18   Q        Was Jon, or your dad, was he concerned about

19   your younger sister and about her health?

20   A        I don't remember.

21   Q        You don't remember.  That's right, because

22   you were just six years old.  Okay.  If I could have

23   just one minute, I might have another question for you.

24            MR. FORD:  That's all.

25                           - - - - -

248

1    **REDIRECT EXAMINATION**

2    **BY MR. WOODALL:**

3    Q        Let me ask you one other thing, sweetie.  Did

4    you try to stop your daddy from --

5             MR. FORD:  Objection to leading.  Calls for

6    an answer.

7             THE COURT:  Sustained.  Just ask what she

8    did.

9             MR. FORD:  She's already said what she did,

10   Judge, and he's trying to just go over it again.

11            THE COURT:  Ask the question.

12            And, young lady, don't answer 'til I tell

13   you.

14            Ask your question.

15   Q        When your mama and daddy were in the bedroom,

16   did you finally get inside the bedroom?

17   A        Yes, sir.

18   Q        All right.  And after you got in the bedroom,

19   did anybody try to do anything to help your mama?

20   A        Yes, sir.

21   Q        And what did you do?

22   A        Jennifer got a rag out and tried to give it

23   to Mama.

24   Q        She did what?

25   A        She tried to get a rag out to give to Mama.

1    Q        Get a rag out to give it to Mama?

2    A        Uh-huh.

3    Q        Did anybody do anything else?

4             MR. FORD:  Your Honor, I object.  This is

5    outside the scope of Redirect.  I didn't ask her any

6    questions about what anybody did.

7             THE COURT:  Well I'm going to let that one

8    question now and then you can -- I believe that would

9    be true, but I think this is a child, and I'm going to

10   have a little leeway.  Go ahead.

11            You said you got a rag or something of that

12   sort.  Now what -- Anything -- Do you remember anything

13   else that you might have did with regard to your mother

14   and father?  What else do you remember?

15            THE WITNESS:  We tried to get Jon to stop

16   hurting her.

17            THE COURT:  I can't hear her.

18   Q        Turn around here and tell them what you just

19   said, sweetie.

20   A        We tried to get Jon to stop hurting her.

21            THE COURT:  Anything further?

22            MR. WOODALL:  No.

23            MR. FORD:  Yes, sir.

24                            - - - - -

25

1    **RECROSS-EXAMINATION**

2    **BY MR. FORD:**

3    Q        Now you're eight years old.

4    A        Yes, sir.

5    Q        And have you talked to anybody about coming

6    to court?

7    A        Yes, sir.

8    Q        Who did you talk to?

9    A        I talked to the lady downstairs, my grandma

10   and my sisters.

11   Q        Have you talked to the police, these police

12   right here (indicating)?  Is that who you call the

13   police?

14   A        Uh-huh.

15   Q        How many times did you talk to them?

16   A        Uh ...

17   Q        More than once?

18   A        Yes, sir.

19   Q        You talked to your grandmother about coming

20   to court?

21   A        Yes, sir.

22   Q        More than once?

23   A        Yes, sir.

24   Q        You talked to your sisters about it?

25   A        Yes, sir.

1    Q          And you really didn't remember a lot about

2    what happened because you were six years old, and you

3    just really know what somebody else told you about it,

4    don't you?

5    A          Yes, sir.

6               MR. FORD:  That's all.

7               THE COURT:  Well you were there and saw it;

8    is that correct?

9               THE WITNESS:  Yes, sir.

10                          - - - - -

11   **FURTHER REDIRECT EXAMINATION**

12   **BY MR. WOODALL:**

13   Q          Sweetie, what you told us happened, is that

14   something you saw and you heard?

15   A          Yes, sir.

16   Q          It's not something that somebody told you.

17              THE COURT:  Now, General, I think that's

18   sufficient.  She's already ...

19              MR. WOODALL:  Okay, thank you.  That's fine,

20   Your Honor.

21              THE DEFENDANT:  I love you, Stephanie.  Thank

22   you, Stephanie.  You're sweet.

23              **(WITNESS EXCUSED.)**

24              **(There was a conference at the**

25              **bench as follows:)**

                          252

1          MR. FORD:  I don't know what Mr. Woodall is

2     doing, but I do object to that.  It's highly improper.

3          THE COURT:  Well I don't know what you're

4     thinking.

5          But, you going out there and talking, there

6     could be an inference that you're out there talking to

7     them, so I would suggest that you -- I'm not being

8     critical of you.

9          MR. WOODALL:  Well I understand that, and, of

10    course, I have the right to talk to my own witnesses.

11         THE COURT:  You have the right, but normally

12    you don't do it between witnesses the day of the trial.

13    Of course you have a right to talk to them, but you

14    don't want to give that inference.

15         MR. WOODALL:  No.

16         MR. FORD:  We object and ask for a cautionary

17    instruction to the jury on that issue, Judge.

18         **(End of conference at the bench.)**

19         THE COURT:  Ladies and gentlemen, these young

20    ladies are being held in another place, and so what

21    General Woodall is not to be talking to these children

22    but to go out and be sure they know when to bring them

23    in.  That's the purpose, and I want to be sure that

24    that's understood.

25                              - - - - -

253

1          **CYNTHIA LAMBERT** was called and being first

2    duly sworn, was examined and testified as follows:

3          MR. FORD:  We need another side bar.

4          **(There was a conference at the**

5          **bench as follows:)**

6          MR. FORD:  Your Honor, at this time I would

7    ask that the grandmother be removed from the courtroom.

8    She approached one of the deputies over here and said

9    that Mr. Hall was trying to communicate with these

10   girls with sign language or whatever.  I think we need

11   to hear from the deputy.

12         THE COURT:  What's her name?

13         MR. FORD:  Mrs. Lambert.

14         THE COURT:  All right.

15         MR. WOODALL:  We don't need to do it in front

16   of the jury, Your Honor.

17         **(End of conference at the bench.)**

18         THE COURT:  Go in the jury room just a

19   minute, ladies and gentlemen.

20         **(The jury was excused from open court,**

21         **and the following proceedings were**

22         **had to-wit:)**

23         MR. WOODALL:  Let the little girl down,

24   rather than have her sit through this.

25         **(WITNESS EXCUSED.)**

1          THE COURT:  All right, Mr. Ford, what's your

2     request?

3          MR. FORD:  Your Honor, it's just come to my

4     attention that one of the spectators in the courtroom

5     has --

6          THE COURT:  Well which spectator?

7          MR. FORD:  I believe it's Mrs. Lambert.

8          THE COURT:  Mrs. Lambert, all right.  Did

9     what?

10         MR. FORD:  Had come up to one of the deputies

11    just a minute ago and had had a complaint about Mr.

12    Hall's conduct, and we feel like that we're trying to

13    have a trial here, and spectators should not interfere,

14    make comments, try to communicate --

15         THE COURT:  Mrs. Lambert, you go outside and

16    just remain outside.

17         THE DEFENDANT:  Your Honor, if it would make

18    everybody feel comfortable, my girls feel comfortable

19    if they don't want to see me when they testify, I'll go

20    out, because I don't want the girls to feel

21    uncomfortable.

22         THE COURT:  He said what now?

23         MR. FORD:  He says if it makes these young

24    ladies uncomfortable to see him, he'll position himself

25    in the courtroom where they won't see him.

                          255

1          THE DEFENDANT:  I can go to the chambers or

2    whatever.  I don't want to --

3          THE COURT:  Well it's up --

4          THE DEFENDANT:  I don't want them to think

5    that they are going to be intimidated --

6          THE COURT:  Mr. Hall, you can confer with

7    your lawyer, but, see the court is now that you're

8    entitled to be here, and if you request it, you can --

9    to go to the anteroom while your daughters are

10   testifying, I'll consider it.

11         THE DEFENDANT:  I just don't want them to

12   feel like that I'm threatening them or anything like

13   that, because my girls are innocent.

14         THE COURT:  Again, Mr. Ford, it's his choice.

15         MR. FORD:  Yes, sir, I understand, Your

16   Honor.

17         THE COURT:  If he desires thinking that it

18   might feel less threatening or whatever, if he desires,

19   I'm going to allow him to be removed to the anteroom.

20         MR. FORD:  I recommend --

21         THE COURT:  So you just ask him which he

22   desires.  I have no problem with it.

23         MR. FORD:  I recommend against that, Your

24   Honor.

25         THE COURT:  I don't see that that -- Mr.

                          256

1    Hall, unless you're uncomfortable, it may -- it might

2    be to your interest to sit here and listen to

3    everything that takes place.  You understand me?

4             THE DEFENDANT:  My girls were young, and --

5             THE COURT:  I'm going to tell your children

6    that everything is under control.  I'll talk to this

7    little girl, okay?

8             THE DEFENDANT:  Can I talk to them --

9             THE COURT:  No, sir.

10            THE DEFENDANT:  I mean afterwards, and tell

11   them that I love them and that everything's okay.

12            THE COURT:  Mr. Hall, we'll cross that bridge

13   when we get to it.  We're in a trial now.

14            Bring the jury in.

15            THE DEFENDANT:  Because I don't want it to

16   weigh on their conscious or feel that they've done

17   anything wrong because they haven't.

18            **(The jury returned into open court,**

19            **and the following proceedings were**

20            **had to-wit:)**

21            THE COURT:  Young lady, look at me just a

22   minute.  What's your name?

23            THE WITNESS:  Cynthia.

24            THE COURT:  Cynthia.  How old are you,

25   Cynthia?

257

1                THE WITNESS:  10.

2                THE COURT:  Do you go to school?

3                THE WITNESS:  Yes.

4                THE COURT:  What grade school are you in?

5                THE WITNESS:  Fourth.

6                THE COURT:  You know now that you're sworn to

7    tell the truth.  You're going to tell the truth.  You

8    know it's wrong to not tell the truth?

9                THE WITNESS:  Yes.

10                THE COURT:  You understand you could be

11    punished if you lie.

12                THE WITNESS:  Yes.

13                THE COURT:  All right.  What you'll be doing

14    is answering some questions.  There's nobody -- nothing

15    going to happen to you here.  I'm here, and we have

16    these officers here, and everything is under control.

17    If you will, you just understand when they ask you to

18    tell the truth.  You understand that?

19                THE WITNESS:  Yes.

20                THE COURT:  General, I might suggest that you

21    stand right there (indicating), and that a'way because

22    the jury can hear.

23    **DIRECT EXAMINATION**

24    **BY MR. WOODALL:**

25    Q        Tell us what your name is.

258

1    A        Cynthia.

2    Q        Okay, Cynthia, how old are you?

3    A        Ten.

4    Q        And where do you live, Cynthia?

5    A        In Huntingdon on Paris Street with my grandma

6    and grandpa.

7    Q        Okay.  And where did you live prior to moving

8    with your grandma and your grandpa?

9    A        On Hollow Rock.  I lived in Lexington.

10   Q        All right, now, when you lived in Lexington,

11   was your mama married to anybody?

12   A        Yes.

13   Q        Who was she married to?

14   A        Jon.

15   Q        Jon?  Now speak up where we can hear you,

16   okay?  And were Jon and your mother living together?

17   A        Yes.

18   Q        Did they have some problems?

19   A        Yes.

20   Q        And as a result of those problems, did Jon

21   move out?

22   A        He moved out once and then he didn't come

23   back.

24   Q        Now, let's talk about one night something

25   happened to your mama, didn't it?

259

1    A        Yes.

2    Q        And did anybody come to the house before

3    something happened to your mama?

4    A        Yes.

5    Q        Who?

6    A        Jon.

7    Q        And how did you know Jon was there?

8    A        Because I saw him at the door.

9    Q        Did you open the door?

10   A        No.

11   Q        Who went to the door?

12   A        Mama.

13   Q        Did she let him in?

14   A        No.

15   Q        What happened?

16   A        He pushed his way in.

17   Q        And what happened after he pushed his way in?

18   A        He went down to the living room and told us

19   to go to bed, so we went to bed.

20   Q        And how was your mama dressed?

21   A        In her night clothes.

22   Q        Do you remember what she had on, honey?

23   A        She had on a black and white t-shirt with

24   some black pants on.

25   Q        All right.  Who did you share a bedroom with?

260

```
 1    A          Jessica and Stephanie.

 2    Q          Now did all four girls go in the same

 3    bedroom?

 4    A          No.

 5    Q          Okay.  After you got in your bedroom, did you

 6    hear something?

 7    A          Yes.

 8    Q          And where was your bedroom in relationship to

 9    your mother's bedroom?

10               THE COURT:  Was it right by it or down the

11    hall or what?

12               THE WITNESS:  It was not very close to it.

13    It was right next to Jennifer's bedroom, and Jennifer's

14    bedroom was close to Mama's.

15    Q          Okay.  So did you hear something?  Did you

16    hear any noise coming from your mama's bedroom?

17    A          Uh-huh.

18    Q          What did you hear?

19    A          Things slamming around.

20    Q          And what did you do?

21    A          We all went in there where Mama and they

22    were.

23    Q          Where were they?

24    A          In her bedroom.

25    Q          Were you able to get into her bedroom?
```

                              261

```
 1    A          It was hard to get in there because there was
 2    stuff blocking the door.
 3    Q          Now what did you see after you got in there?
 4    A          Mama and Jon fighting.
 5    Q          And did you do anything, or you and the other
 6    girls do anything to stop the fight?
 7    A          Uh-huh.
 8    Q          What did you do?
 9    A          I jumped on his back and bit him.
10    Q          What did he do to you?
11    A          Not really anything because I fell off his
12    back.
13    Q          Did anybody try to call for help?
14    A          Me and Stephanie tried to.
15    Q          What did you try to do?
16    A          Called for 911, but the phones were off the
17    hook.
18    Q          Did you go anywhere to ask for help?
19    A          Uh-huh.
20    Q          Did Jon tell you anything would happen if you
21    went for help?
22    A          Yes.
23    Q          What did he tell you?
24    A          He told us if we went for help he was going
25    to kill Mama.
```

```
1    Q        Did you go for help anyway?

2    A        Uh-huh.

3    Q        Now, did you ever see your mama outside the

4    bedroom?

5    A        We were in the living room one time, and then

6    when we went to bed they went into their bedroom.

7    Q        All right, now, after you saw them fighting

8    in the bedroom, did you see your mama outside the

9    house?

10   A        No.

11   Q        And after you tried to use the phone, where

12   did you go?

13   A        Me and Stephanie went up to a neighbor's and

14   called 911.

15   Q        Now, whose house would that be?

16   A        I don't remember their last name, but it was

17   a neighbor's.  One of them was their daughter named

18   Pamela Foreman.  That's the only person I really know.

19   Q        And how did you know Pamela?

20   A        Because she was our friend.

21   Q        Did Pamela take you anywhere, or did anybody

22   take you anywhere?

23   A        Her mom did.

24   Q        And what did she do?

25   A        She got me and Stephanie and we went for a
```

263

1    ride.

2    Q         Now, so once you went and called or had 911

3    called, you didn't see your mama again or anything else

4    that happened.

5    A         Unh-unh.

6    Q         Now, did your mama have a job?  Did she work

7    during the daytime?

8    A         I don't remember unless -- All I remember is

9    that she didn't go to work for the last few days.

10   Q         Okay.  Did she also go to school?

11   A         Yes, she went for a while, and then she

12   wasn't going; she was still with us.

13   Q         Did Jon say anything about your mama's school

14   that night?

15   A         I don't know of anything that he was saying

16   to Mama.

17   Q         Okay.  Do you see Jon in the courtroom?

18   A         Uh-huh.

19   Q         Would you point him out, please?

20   A         (Pointing).

21             MR. WOODALL:  Let the record so reflect.

22                        - - - - -

23   **CROSS-EXAMINATION**

24   **BY MR. FORD:**

25   Q         Cindy, my name is Jay Ford, and I'm Jon's

                          264

```
 1    lawyer and I have to ask you a few questions.  You're

 2    in the fourth grade?

 3    A        Yes.

 4    Q        Who is your teacher?

 5    A        Ms. Pat.

 6    Q        Ms. Pat?

 7    A        Dillahunty.

 8    Q        What are y'all studying now?

 9    A        We're studying geography.

10    Q        Map reading and things of that nature?

11    That's a big word, isn't it?  Geography.  And I know

12    you're nervous, and what I want to do is try to put you

13    at ease to answer some questions.  Nobody is going to

14    try to threaten you or anything of that nature.  Okay?

15    But as part of my job I have to ask you some questions.

16             When you and your mother and your dad --

17    Y'all did refer to Jon as your dad when y'all were all

18    living together?

19    A        Yes.

20    Q        And why have y'all started calling him Jon

21    now?

22    A        Because of what he did.

23    Q        Okay.  When your mother would work or go to

24    school, would Jon take care of you and your sisters?

25    A        No.
```

265

1    Q        Never did.  Never fixed you any meals or

2    anything of that nature?

3    A        No.

4    Q        Did he ever take you all anywhere when your

5    mother worked?

6    A        Not that I know of.

7    Q        What did he do?

8    A        He would always be working outside on cars

9    and things like that.

10    Q        The week before this happened, did he come

11    over and work on your mom's car?

12    A        Yes.

13    Q        Was it up on a jack out in front of your

14    house?

15    A        Yes.

16    Q        How many times did he come that week to work

17    on the car?

18    A        Two or three times.  I'm not really for sure.

19    Q        Was your mom at home when he would come?

20    A        No.

21    Q        Was she working?

22    A        Yes.

23    Q        Do you remember talking to some police

24    officers about this?

25    A        Yes.

266

1    Q        Do you remember telling them that your mother

2    let Jon in?

3    A        No.

4    Q        That he wouldn't do anything to her?

5    A        No.

6    Q        You never made that statement?

7    A        Unh-unh.

8            MR. FORD:  Your Honor, if I could have her

9    review this.

10           THE COURT:  Yes, sir.

11           MR. WOODALL:  That's nothing she prepared.

12   If he wants to call and officer in and impeach her,

13   that's fine.

14           MR. FORD:  Your Honor, it's a statement.  I

15   think that she can review this and it may refresh her

16   memory.

17           THE COURT:  I'm going to allow her to review

18   it to refresh her memory.  Show it to her and ask her.

19           Young lady, read that, and he's going to ask

20   you whether or not you remember things in that.  If you

21   do, you answer it.  If you don't, you tell him you

22   don't know.

23           Young lady, do you remember the officers

24   talking to you?

25           THE WITNESS:  Yes.

                           267

```
 1              THE COURT:  All right.  Now, Mr. Ford is
 2    going to ask you about what you told them, and you've
 3    read that to refresh your memory, and if that makes you
 4    remember it, tell him it does, and if it don't, tell
 5    him it doesn't.
 6              Go ahead.
 7    Q         Do you remember what I asked?
 8              THE COURT:  Ask her a question, Mr. Ford.
 9              MR. WOODALL:  Your Honor, I don't have any
10    objection if she just reads the whole statement.
11              MR. FORD:  Your Honor, I'm running this
12    lawsuit.  If Mr. Woodall wants to get on the other
13    side, we can --
14              THE COURT:  Mr. Ford, neither one of you now.
15    Let's just go ahead.  I've told you to go ahead and
16    question her, Mr. Ford.
17              MR. FORD:  Yes, sir.  I apologize to the
18    Court.
19              THE COURT:  He said he had no objection to
20    all of it, but that's neither here nor there.  That's
21    his problem.
22              MR. FORD:  Yes, sir.
23    Q         Cindy, do you remember telling the officers
24    that your mother let Jon in and that she told him that
25    they didn't want to fight, they didn't want to have a
```

                                268

1   fight, they wanted to talk?

2           THE COURT:  Now he's asked you did that

3   happen?  If it didn't, tell him what -- explain it.

4   A       Well, I knew part of it.  The only thing I

5   understood was that Mama said not -- that she didn't

6   want to fight.  That's the only thing.

7   Q       All right.  And when Jon first got there,

8   they didn't fight, did they?

9   A       No.

10  Q       She let him in the house, didn't she?

11  A       Not really.  He pushed his way in.

12  Q       But you didn't tell the police that though,

13  did you?

14  A       I don't remember.

15  Q       Don't remember that.  Who have you talked to

16  about coming to court today?

17  A       My grandma.

18  Q       Who else?

19  A       Ms. Georgia.

20  Q       And did you tell them that Jon had pushed his

21  way in or did they tell you that?

22  A       I didn't remember that at that time.

23  Q       You didn't remember.  So that's really not

24  something that you recall from your memory, is it?

25  A       No.

                        269

```
1              THE COURT:  Excuse me?  What?

2    Q         Is it something that Ms. Georgia or your

3    grandmother told you probably happened?

4    A         No.

5    Q         But you really don't remember that part of

6    it?

7    A         No.

8    Q         Okay.  Do you remember whether or not Jon had

9    anything to drink, any beer or anything?

10   A         Yes.

11   Q         Was he drinking when he was there with your

12   mother?

13   A         He got one out and started drinking it.

14   Q         Did he bring some beer with him?

15   A         Uh-huh.

16   Q         Do you all have a younger sister that has

17   C.P.?

18   A         I don't know what that is.

19   Q         Is she sick?  Does she have some --

20   A         She has cerebral palsy.

21   Q         Okay, cerebral palsy.  All right.  Do you

22   remember Jon giving your mother a money order that

23   night or anything like that?

24   A         No.

25   Q         Don't remember that.  Was Jon concerned about
```

270

```
 1   your younger sister, about her health problems?

 2   A        Not that I know of.

 3   Q        You just don't remember.  Did Jon work?

 4   A        He once did and then he quit.

 5   Q        When he quit did he come home and babysit

 6   y'all while your mom went to classes at night or went

 7   to work at the hospital?

 8   A        Well, not really because we would always be

 9   having a babysitter.  He'd be out somewhere else.

10   Q        Did your mama and daddy love each other?

11            THE COURT:  Well, Mr. Ford, I don't think

12   that's a fair question to her.  You can ask how they

13   acted, but ...

14   Q        Were there times when they acted like they

15   cared about each other?

16   A        I have never seen anything.

17   Q        You never saw them kiss?

18   A        Unh-unh.

19   Q        In how many years?  Five or six?

20   A        I'm not sure.

21   Q        So Jon never had a kind word to your mother

22   in five years?  Is that what you're --

23   A        Maybe once in a while but not all the time.

24   Q        Okay.

25                         - - - - -
```

271

1          MR. WOODALL:  Your Honor, since Mr. Ford has

2    had her refresh her memory by reading that statement,

3    I'd like to go into that a little further.

4          THE COURT:  You can.  He opened it up.

5    **REDIRECT EXAMINATION**

6    **BY MR. WOODALL:**

7    Q          Now, sweetie, now you've had a chance to read

8    both pages of this statement.  Take your time and read

9    both pages.

10          MR. FORD:  Your Honor, side bar, Your Honor

11    please.

12          MR. WOODALL:  Could she be reading this while

13    --

14          THE COURT:  Yes.

15          **(There was a conference at the**

16          **bench as follows:)**

17          MR. FORD:  Your Honor, we questioned her

18    about two minutes on the first page of a statement.  We

19    didn't go into the statement on the second page.  Mr.

20    Woodall can go into what we questioned her about, not

21    the entire statement.

22          THE COURT:  Your motion is overruled.  When

23    you open the statement, you got a right to show this

24    other information what she said in the statement, so

25    I'm going to allow it.  Mr. Mayo says no, but I say

272

1    yes.

2            MR. MAYO:  Well I think it would lead to what

3    she -- what Mr. Ford questioned her on.  But he's

4    limited to what was put on.  Mr. Woodall can't just

5    open it back up and ask her about things we didn't ask

6    her about.

7            THE COURT:  Mr. Ford, I'm going to allow him

8    to allow her to look at that statement and ask her if

9    -- what else was -- anything else in the statement.

10           Now you're confined to the statement,

11    General.

12           MR. WOODALL:  I understand that.

13           **(End of conference at the bench.)**

14           THE COURT:  Now, young lady, he's going to

15    ask you some more questions, and you've read this, but

16    if you remember, answer him, and if you don't remember

17    what he asks you, then you don't remember.  You

18    understand me?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  Just tell what you remember to

21    any question he asks, and if you don't remember, just

22    say, "I don't remember."  Okay?

23           THE WITNESS:  Okay.

24           THE COURT:  All right, General.

25    Q        Cynthia, you told us that you talked to an

273

1    officer that night.

2    A        Yes, sir.

3    Q        And you told him some things, correct?

4    A        Yes.

5    Q        And he put it down in that statement, and you

6    have -- Did you get to read both pages of that

7    statement?

8    A        Some of it I read but not all of it.

9    Q        Well you finish reading all of it.  I want

10   you to go through everything and then we'll ask you

11   some questions.

12            Have you read it all?

13   A        Yes.

14   Q        Does that refresh your memory or remember

15   more now than you did while ago before you looked at

16   that?

17   A        I never knew anything about the second page

18   because I wasn't even around when that happened.

19   Q        All right.  So you don't remember anything

20   about that.

21            MR. WOODALL:  Well I don't think it would be

22   appropriate to ask her about it then.

23            THE COURT:  All right.

24            MR. WOODALL:  Thank you very much.

25            THE COURT:  Anything further, Mr. Ford?

274

```
1              MR. FORD:  No, sir, Your Honor.

2         (WITNESS EXCUSED.)

3                   - - - - -

4         JENNIFER LAMBERT was called and being duly

5    sworn, was examined and testified as follows:

6              THE COURT:  Young lady, I want you to speak

7    up so that those people over there can hear you.  The

8    lawyer is going to ask you questions.  You sort of look

9    at him when you answer and talk loud enough where you

10   think they can hear you.  You understand?

11             THE WITNESS:  Yes, sir.

12   DIRECT EXAMINATION

13   BY MR. WOODALL:

14   Q         Would you tell me your name?

15   A         Jennifer.

16   Q         Jennifer, how old are you?

17   A         Eleven.

18   Q         Where do you go to school?

19   A         Huntingdon Elementary.

20   Q         And what grade are you in?

21   A         Sixth.

22   Q         And do you know what it means to tell the

23   truth?

24   A         Yes, sir.

25   Q         What happens to you if you don't tell the
```

275

1    truth?

2    A        You get a spanking.

3             MR. WOODALL:  Your Honor, I --

4             THE COURT:  All right, go ahead.

5    Q        Now, back when you lived in Henderson County,

6    who did you live with?

7    A        My mom.

8    Q        Okay.  And did your mom have a husband that

9    she was separated from?

10   A        Yes, sir.

11   Q        Was your mom married to somebody when she

12   lived in Henderson County?

13   A        Yes, sir.

14   Q        What was the individual's name?

15   A        Jon.

16   Q        Now, was Jon living with you and your mama

17   and your sisters at the time this situation occurred?

18   A        I don't think so.

19   Q        Now, tell me what happened that night.  Just

20   go through from the very beginning.

21            THE COURT:  Young lady, were you there at

22   home that night?  Did your father come out there?

23            THE WITNESS:  Uh-huh.

24            THE COURT:  Tell what happened when he come

25   out there.  Just tell us about what happened.

276

1    Q        Just go ahead and tell me what happened,

2    honey.

3             THE COURT:  Anything you remember.

4    A        He told us to go to bed.  He went into the

5    bedroom and started a fight.

6    Q        Where were you when you were aware that there

7    was a fight?

8    A        My bedroom.

9    Q        And what did you do when you heard this fight

10   going on?

11   A        We were trying to go in their room.

12   Q        What room did you try to go into?

13   A        Bedroom.

14   Q        Whose bedroom?

15   A        My mother's.

16   Q        Were you able to get into the bedroom?

17   A        Barely.

18   Q        What caused you a problem?

19   A        The vacuum cleaner and sewing machine.

20   Q        And where were they?

21   A        Behind the door.

22   Q        Now, did you get inside your mama's bedroom?

23   A        Yes.

24   Q        What did you see when you got in there,

25   honey?

277

```
 1   A          Them fighting.

 2   Q          And did you do anything to try to stop the

 3   fight?

 4   A          Yes.

 5   Q          What did you do?

 6   A          I can't remember, but I tried to stop it.

 7   Q          Speak up just a little bit.  You can't

 8   remember but you tried to stop it.  Did you try to call

 9   anybody for help?

10   A          No, my sister did.

11   Q          Were you able to stop their fight?

12   A          No.

13   Q          Did your mama leave the bedroom?

14   A          Yes, sir.

15   Q          And where did she go?

16   A          Out in the parking lot.

17   Q          And did anybody go after her?

18   A          Yes.

19   Q          Who?

20   A          Jon.

21   Q          And what did he do?  What did he do to your

22   mama out on the parking lot?

23   A          Dragged her to the pool.

24   Q          Pardon me?

25   A          Dragged her to the pool.
```

```
 1   Q          Did he say what he would do to any of you

 2   kids if anybody went for help?

 3   A          He would kill her.

 4   Q          Kill?

 5   A          My mom.

 6   Q          Now you said he drug her down to the pool.

 7   A          Yes, sir.

 8   Q          All right.  Now, did you leave and go

 9   anywhere?

10   A          Yes, sir.

11   Q          Where did you go?

12   A          Up to the neighbor's house.

13   Q          And did you take anybody with you?

14   A          Yes, sir.

15   Q          Who did you take?

16   A          My little sister.

17   Q          And what's her name?

18   A          Jessica.

19   Q          And how did you get Jessica to your

20   neighbor's?

21   A          Carried her.

22   Q          Why did you have to carry her?

23   A          She wasn't able to walk.

24   Q          Why did you take her?  Why didn't you leave

25   her at the house?
```

1    A        I was taking care of her.

2    Q        When your mama was being drug down to the

3    pool, was she kicking and screaming or making any

4    noise?

5    A        Yes, sir.

6    Q        Now, do you see the person in this courtroom

7    today that did these things to your mama?

8    A        Yes, sir.

9    Q        Could you point that individual out, please?

10   A        Over there (indicating).

11            MR. WOODALL:  Let the record so reflect.

12            Your witness.

13                         - - - - -

14   **CROSS-EXAMINATION**

15   **BY MR. FORD:**

16   Q        Jennie, I'm Jay Ford, and I'm a lawyer, and I

17   have to ask you some questions.  That's part of my job.

18   Q        Do you remember swimming at Beech Lake?

19   A        No.

20   Q        Do you remember swimming in Cedar Lake?

21   A        No, sir.

22   Q        Have you ever done that?

23   A        Swimming in some lake, but I don't remember

24   what it was.

25   Q        Did Jon take you and the other girls down to

280

1   Beech Lake one time?

2   A        I don't remember.

3   Q        Did he take you to Cedar Lake?

4   A        I don't remember what lake it was, but it was

5   some lake.

6   Q        Y'all all went to the lake.  Did your mother

7   go with you or was it Jon and the girls?

8   A        I don't remember.

9   Q        Do you know how long ago it was?

10   A        No, sir.

11   Q        But he did take you places?

12   A        Yes, sir.

13   Q        Did he ever make you meals?

14   A        I don't remember.

15   Q        Don't remember that.  Did he work?

16   A        I don't know.

17   Q        Have you talked to anybody about coming to

18   court today and testifying?

19   A        No, sir.

20   Q        You haven't talked to anybody?

21   A        I can't remember.

22   Q        Take your time.  Who did you talk to?

23   A        Mr. Woodall.

24   Q        Anybody else?

25   A        Police.

281

1    Q        You talked to the police.  Anybody else?

2    A        Not that I can recall.

3             MR. FORD:  That's all, Your Honor.

4             **(WITNESS EXCUSED.)**

5             **(There was a recess for lunch from**

6             **11:15 a.m. until 1:30 p.m.; and the**

7             **following proceedings were had**

8             **to-wit:)**

9             **DR. OBRIEN CLARY SMITH** was called and being

10   first duly sworn, was examined and testified as

11   follows:

12   <u>**DIRECT EXAMINATION**</u>

13   <u>**BY MR. WOODALL:**</u>

14   Q        Would you state your name, please?

15   A        Dr. Obrien Clary Smith.

16   Q        Dr. Smith, are you licensed to practice a

17   profession in the State of Tennessee?

18   A        Yes, I am.

19   Q        And what is that profession?

20   A        Physician.

21   Q        And when were you first licensed in

22   Tennessee?

23   A        1980.

24   Q        Would you tell us about your educational

25   background leading up to your current certifications

282

1    and positions with the University of Tennessee Medical

2    School as well as with the medical examiner's office?

3    A         Yes.  I received my Bachelor of Science

4    Degree from the University of Wisconsin in 1974 in the

5    field of bio-chemistry and chemistry.  I received my

6    Doctor of Medicine Degree from the Medical College of

7    Wisconsin in Milwaukee in 1978.

8              MR. FORD:  Your Honor, we'll stipulate to his

9    qualifications.

10             THE COURT:  All right, sir.

11             By agreement, this doctor's qualifications

12   are stipulated.  That means that he's a well-qualified

13   doctor who will be able to testify as to matters in

14   this case.

15             MR. WOODALL:  Thank you, Your Honor.  I'd

16   still like for the jury to understand his educational

17   background.

18             THE COURT:  Well go ahead if that's what you

19   want.

20   Q         Go ahead, Doctor.

21   A         After graduating from medical school I came

22   to the University of Tennessee at Memphis to receive

23   training in anatomic pathology, clinical pathology and

24   forensic pathology.  I became a Diplomate of the

25   American Board of Pathology in those three specialties

                            283

1    of anatomic, clinical and forensic pathology in 1983

2    and subsequently became a faculty member at the

3    University of Tennessee at Memphis.  I currently hold

4    the rank of associate professor of pathology in the

5    division of forensic pathology.

6    Q        Now, in addition to your civilian duties, do

7    you also have some military duties?

8    A        Yes, sir, I currently hold the rank of

9    captain in the United States Naval Reserve.

10   Q        Now, Doctor, would you please define the

11   three areas of pathology that you're board certified

12   in, clinical, anatomical and forensic?

13   A        Yes, sir.  Perhaps the best way to start off

14   is saying that pathology is the study of disease,

15   disease processes and how they affect the human body.

16           Anatomic pathology is that type of pathology

17   that's practiced when a patient is operated on in a

18   hospital, portions of the body that may be removed by

19   the surgeon are examined by an anatomic pathologist.

20           Clinical pathology is more the laboratory

21   testing where the blood specimens and urine specimens

22   that are taken at a hospital are analyzed in a

23   laboratory that is directed by a clinical pathologist.

24           Forensic pathology is additional training in

25   the area of physical injury, as well as the affects of

284

1    drugs, alcohol and poisons on the human body.

2    Q          Doctor, did you have the opportunity during

3    the performance of your official duties as a forensic

4    pathologist and assistant medical examiner to perform

5    an autopsy upon the remains of one Billie Hall?

6    A          Yes, sir, I did.

7    Q          And when were the remains of Billie Hall

8    received into your department?

9    A          On the 30th of July, 1994 at 6:30 in the

10   morning, the body identified to me as Billie Hall was

11   received by the Regional Forensic Center.  I first

12   examined and began to conduct the autopsy on Billie

13   Hall at 8:30 that morning.

14   Q          Now at the time you began and during the

15   course of the performance of your autopsy protocol, did

16   you have the use and the benefit of a report of

17   investigation from the county medical examiner for

18   Henderson County, Dr. Reggie Henderson?

19   A          Yes, sir.  Dr. Henderson had made several

20   documents available to me to review prior to the

21   autopsy.

22   Q          And did you do that?

23   A          Most certainly.

24   Q          Tell us what is involved in the autopsy

25   protocol.  What are the three different things that you

285

1    do and the order in which you conduct these

2    examinations.

3    A        Yes, sir.  Basically an autopsy has three

4    different phases.  The first is an external examination

5    phase in which the body is viewed both in clothed and

6    unclothed state, unwashed and then washed, to determine

7    the presence, first off, of any disease processes, as

8    well as to delineate or to identify any physical

9    injuries on the body.  Diagrams are prepared, notes may

10   be made and photographs taken to help document all the

11   things on the body that may be significant.

12            The next stage is a surgical stage in which

13   the body is opened through surgical incision, into the

14   head, the chest, the abdominal cavity and any other

15   portions of the body in which there is a specific

16   interest.  This is done for the purpose, again, of

17   finding how much natural disease progress has played a

18   role in the patient's death, as well as to identify the

19   extent or the type of body injuries received, as well

20   as to recover trace evidence such as knives or bullets,

21   knife tips or bullets and things like that.

22            Additionally, each organ is surgically

23   removed and surgically opened to be examined by a naked

24   eye, and if necessary, with low power magnification to

25   help identify any disease state or to examine the

286

1    injuries present.

2              The laboratory phase of the autopsy is the

3    third and final phase in which tissues that have been

4    removed in autopsy are examined under a high power

5    microscope, as well as body fluids such as blood and

6    urine and such may be removed at autopsy for

7    examination by a clinical laboratory.

8              When all those stages are complete, then

9    hopefully the autopsy can be complete enough to arrive

10   at a cause of death.

11   Q          Now, Doctor, let's address the toxicology

12   aspect of your examination first.  Were there any drugs

13   or alcohol found in the remains of Billie Hall?

14   A          As far as drugs, Billie Hall's blood tested

15   positive for caffeine, a substance which can be found

16   in many soft drinks, coffee, tea and such like that.

17   As far as alcohol, she had a level which was below our

18   level of detectability which means less than one-

19   hundredth of one gram per deciliter of blood.  So it's

20   really below the area which our laboratory can

21   identify.

22   Q          Would this level of alcohol be produced from

23   the inhaling of alcoholic beverages, or would it be as

24   a result of the normal processes of death?

25   A          At a level this low, it's -- first of all

287

1    it's a very trivial level.  It's, again, below our

2    level of detectability.  The next level below this

3    stage is negative.  A level this low may reflect some

4    decomposition of the body.  The body may actually begin

5    to ferment after death, or it may have indicated some

6    past exposure to alcohol.  But, again, it's an

7    insignificant amount.

8    Q        Now what did your visual inspection reveal?

9    A        Well the visual inspection revealed that Mrs.

10   Hall had sustained numerous injuries to her body,

11   predominantly bruises, which I may use the term

12   contusions to describe, skin scrapes also known as

13   abrasions, as well as skin tears, known as lacerations.

14   There was a fracture of her nose, and additionally the

15   body was received in a very wet condition.  The skin

16   was wet and the clothing that she was wearing was wet.

17   Q        Now what did your anatomical diagnosis

18   reveal?

19   A        The anatomic diagnosis revealed that Mrs.

20   Hall died primarily as a result of asphyxia, or a

21   condition in which oxygen has been denied to the body.

22   A person essentially does not get the air that is

23   necessary in order to breathe and live.  More than one

24   mechanism was found that could explain this.  First

25   off, Mrs. Hall had evidence of manual strangulation in

288

1    which a compressive force was applied to the neck that

2    could prevent her from breathing.  Additionally, in

3    conjunction with the finding of the body being very

4    wet, there were changes in Mrs. Hall's body that

5    indicated she also may have drowned or drowned and been

6    strangled at the same time.  Both findings showed that

7    there were two mechanisms present, and those would sort

8    of be a race between which one could actually cause her

9    death.  But both mechanisms killed by the same event,

10    which is asphyxia or denial of the body the oxygen

11    that's required to breathe and live.

12    Q        Now you said -- Was there any ingestion of

13    water into the remains of Billie Hall during her

14    lifetime?

15    A        Yes, sir.  When I examined her stomach

16    contents, I found about two ounces of water sitting on

17    top of her normal gastric contents, and water does not

18    readily mix with the gastric contents immediately.  It

19    can stay on top of those.  And when you autopsy

20    drowning victims, you'll see very frequently that they

21    have swallowed water and that water is present in the

22    gastric contents.  Additionally, if a person would

23    drink a glass of water shortly before they died, that

24    water also would not mix with the gastric contents.

25    But the findings of water in her stomach and the other

289

1   findings present in the body, again, would corroborate

2   or reinforce the finding that she may have -- that

3   drowning may have played a role in her death as well.

4   Q        Does that mean that at the time -- Let's

5   assume that her body was found floating face down in a

6   swimming pool.  Would the presence of water in her

7   stomach, along with the manual strangulation, would

8   that indicate to you that the person, that Billie Hall,

9   was alive in the swimming pool and died after being

10  placed in the swimming pool?

11  A        Yes, sir, if the water in her stomach truly

12  came from the swimming pool, which again would be

13  difficult to prove since they are both chlorinated

14  purified water.  But if the water in her stomach was

15  swimming pool water, then she would have -- that would

16  have entered her stomach after -- while she was still

17  alive.  Additionally, the other laboratory findings

18  indicate that there was some dilution of her blood.

19  When a person drowns and takes water into their lungs,

20  that water will enter the blood stream and will begin

21  to dilute it.  Such a finding was found in Mrs. Hall's

22  case, but that finding was not so extensive to say that

23  drowning was the exclusive cause of death.

24  Q        So basically if I understand what you're

25  saying, that you can't separate the manual

290

1  strangulation from the ingestion of water or the

2  drowning aspect because they both contribute to the

3  same thing and that's the inability to breathe.

4  A       That's correct, and that's stated in the

5  autopsy report and the narrative of findings where I

6  state that this 29-year-old white woman died as a

7  result of a lack of oxygen arising from compressive

8  forces applied about the neck with a possible

9  contribution of drowning as well.

10  Q       Did you find any other items during your

11  anatomical diagnosis?

12  A       Yes, sir.

13  Q       And what would that be?

14  A       In conjunction with the finding of manual

15  strangulation, there were bruises on left and right

16  sides of the front of the neck, the deep muscles in the

17  neck and in the tissues surrounding a bone known as the

18  hyoid bone which is frequently damaged in

19  strangulation.  There was hemorrhaging or bleeding

20  about those neck muscles and about that bone.

21  Additionally, her thyroid gland had bleeding about it

22  on the left side.

23  Q       What does that indicate to you?

24  A       That indicates extensive compression to the

25  neck.  Additionally, in the neck region, in back of the

1    throat and in front of the spine, there was about two

2    ounces of blood in what's known as the retro-pharyngeal

3    space.  That's the space where the back of the mouth

4    begins to contact the spine as it descends into the

5    chest cavity.  That area contained about two ounces of

6    blood.

7    Q          Is that further indication of manual

8    strangulation?

9    A          Yes, sir.

10   Q          Go ahead.

11   A          Also in support of an asphyxial-type death or

12   death by the denial of oxygen, there are small pin-head

13   size hemorrhages into the whites of her eyes and into

14   the various surfaces of the internal organs.  Those

15   hemorrhages or bleeding points are known as petechiae

16   and they can be seen in asphyxial-type deaths.

17           Additionally, the water was found in her

18   stomach.  Her lungs had filled with some fluid and had

19   also begun to collapse.  The right side of the heart

20   was dilated which can be seen both in drowning and

21   strangulation.

22           There are some associated findings also

23   present on the body that were not associated with

24   strangulation or the drowning mechanisms.  They

25   included blunt trauma or blows to the head, fracture of

292

1    the nose.  She swallowed some blood.  She also

2    aspirated blood, or breathed blood, down into her

3    windpipe and into her lungs.

4         There were also multiple skin tears, multiple

5    bruises and skin scrapes of the chest, abdomen,

6    genitals, extremities, arms and her legs, and her back.

7    Q        Now, you stated that these are associated

8    findings.  Were these associated findings, the blunt

9    trauma to the head, the fracture of the nose, the

10   ingestion and aspiration of blood, multiple

11   lacerations, contusions, abrasions to the chest,

12   abdomen, genitals, extremities and dorsum, are those

13   injuries that were inflicted that were not the cause of

14   death, would be in addition to the cause of death?

15   A        Yes, sir, that's correct.  While these

16   injuries may play some role in her death, the injuries

17   taken by themselves would not be sufficient to produce

18   death.

19   Q        Now could you tell whether these injuries

20   occurred during her lifetime or after death?

21   A        These injuries as I described occurred during

22   her life.  There were some injuries that actually

23   occurred after death, but they may have been due to

24   manipulation of the body or such.

25   Q        Now, what is a defensive wound?

293

1    A        A defensive wound is a forensic term which

2    was coined to describe the finding, the repeatable

3    finding, of injuries to the extremities or injuries to

4    the body part in which the person will try to protect

5    themselves.  Classically it is used when a person has

6    been attacked by a knife where they use their hands to

7    push away the sharp instrument and receive cuts across

8    the palm or the palm-side of the fingers in order to

9    protect their central body area.  That's one type of

10   defensive wound.

11          The second type of defensive wound is used

12   when a blunt trauma-type of assault or a blunt weapon

13   is used and the person tries to defend themselves from

14   blows or kicks by putting their arms up, and frequently

15   on the little finger side of the arms known as the

16   ulnar surface where a person will try to block and will

17   receive a series of injuries or even fractures in that

18   area to ward off the blow.  Additionally, if a person

19   is on their back or is able to put a leg up, they may

20   bring their legs up and protect their body by putting

21   the knees and the shin bone in front of the body to

22   protect it.

23          So defensive wounds is a forensic term which

24   is used to describe a pattern of injury on various body

25   surfaces indicating that person was trying to ward off

294

1    a certain type of assault.

2    Q        Were any of these defensive injuries present

3    upon the remains of Billie Hall?

4    A        Yes, sir, I believe some could be interpreted

5    as defensive wounds.

6    Q        And where were those?

7    A        They would be on the -- as I described, on

8    the forearms, on the ulnar side of the forearms and on

9    the back of the forearm and on the back of the hand.

10   Q        I'm sorry?  The back of the hands and where

11   else?

12   A        The back of the hands, the forearm, both on

13   the ulnar side and on the back of the forearm, and

14   additionally there are some bruises on the front of the

15   thighs, knee and shin area, some of which could have --

16   or could be interpreted as being defensive wounds.

17            MR. WOODALL:  Judge, I'd like to bring the

18   mannequin in and have Dr. Smith draw these injuries out

19   for us at this time.

20            THE COURT:  All right, bring it in.

21   Q        While they're setting that up, one phase that

22   you do in the autopsy protocol is what we refer to as

23   the microscopic summary; is that correct?

24   A        Yes, sir.

25   Q        And I'm noticing in looking in your autopsy

295

1    report you start with abrasions and continue with some

2    contusions starting with A through N; is that correct?

3    A        Yes, sir.

4    Q        I'll ask you as you go into your drawing to

5    explain that to the jury.

6    A        Yes, sir.

7    Q        If you'll come forward at this time.

8            MR. WOODALL:  Can everybody see this okay?  I

9    hesitate to try to turn it a little bit.

10   Q        If you'll come down here.  First, what was

11   the physical size of Billie Hall?

12   A        Mrs. Hall was five feet four inches tall and

13   weighed 122 pounds.

14   Q        Five foot four, 122.

15   A        Yes.

16   Q        I would like to ask you to make your autopsy

17   report an exhibit to your testimony and use it during

18   the course of your testimony.

19           MR. WOODALL:  I believe that will be State's

20   Exhibit Number 7.

21           **(Exhibit 7 was marked and entered.)**

22   Q        Doctor, if you'll come down here, with

23   permission of the Court.

24           THE COURT:  Step down, Doctor.

25   A        That's my original.

1    Q        Well we'll substitute a copy.

2             THE COURT:  What do you want him to do,

3    General?

4             MR. WOODALL: I want him to go through and

5    chart all the injuries as to blows, contusions and

6    abrasions, defensive wounds, every blow that she

7    received.

8    A        If I can, I'll use a green color to indicate

9    the area of injury on her body.  Starting at the top of

10   the head, using this green pencil, there is an area of

11   bruising of the scalp in that area (indicating).

12   Additionally, there is a bruise behind the left ear,

13   and there is a bruise behind the right ear that also

14   involves the right ear.

15   Q        Did these three bruised areas affect the

16   skull underneath or cause any subdural hematomas?

17   A        No, sir, there's no skull fractures and there

18   were no particular findings of injury to the brain.

19   Q        What type of instrument would cause the

20   injuries that you just pointed out?

21   A        It could be several things.  It could be a

22   blow with a broad, flat object.  The person could

23   either be struck by that object or they could be

24   propelled into a broad, flat object.  Additionally, if

25   one grabs the hair and pulls, it can separate the scalp

297

1    from the skull and leave very similar findings.

2          Continuing with the back, she had a skin

3    scrape about here, another skin scrape there and there,

4    an area of bruising here, here, skin scrapes here,

5    here, here and here are some skin scrapes, a bruise

6    here, a pattern of bruises here (indicating), which the

7    distance between the parallel lines is eight-tenths of

8    an inch.

9    Q        And what does that indicate to you?

10   A        It indicates some sort of object that had

11   parallel edges about eight-tenths of an inch apart, or

12   approximately that since the skin is elastic and does

13   not give precise measurements.  But it indicates that

14   the instrument or object used probably had parallel

15   sides and it may have been more of a square shape than

16   a rounded shape.  Adjacent to that is more skin

17   scrapings.

18   Q        Are any of these scrapings consistent with

19   being drug on pavement?

20   A        It's a possibility.  The abrasions or skin

21   scrapes did not -- I didn't find grit in them, but the

22   body having been wet, all of that may have been washed

23   out, but it's possible.  It's possible.  And another

24   skin scrape here, and on the back of the right arm is a

25   bruise here, back of the forearm, skin scrape and

                           298

1    bruise, another skin scrape and bruise here, bruise

2    here on the ulnar side of it, back of the forearm, a

3    bruise there and an abrasion above it here and here and

4    a bruise there (indicating).  These bruises were in

5    between the knuckles, not on top of the knuckles.

6    Q        Are these what we call defensive wounds?

7    A        The ones here (indicating), on the back of

8    the forearm and the ulnar side of the forearm and the

9    back of the hands could be.  This hand was bruised

10   here, and the base of the thumb was bruised, and then a

11   area of skin scraping right inside the base of the

12   right thumb.  A few abrasions here at the point of the

13   shoulder, skin scrapes to the back o the left elbow,

14   and to the forearm there is some bruising here, here,

15   here, here, here.  There is an abrasion or skin scrape

16   or a bruise to the back of the hand here (indicating).

17   Q        Any of those defensive wounds?

18   A        Yes, sir, again, they could be on the back of

19   the forearm, and on the back of the hand could be also.

20   Q        Okay.

21   A        On the front of the arms we have skin scrapes

22   and bruises here, here and here, bruise here, here and

23   here.  On the right there is an area of bruising and

24   some skin scraping, an area of bruising here.  I

25   already discussed the wrist and the hand.  In the chest

299

1    area, there was an area of skin scraping and bruising

2    here, a bruise here, a pattern of bruises here

3    (indicating).

4    Q        Can you tell us anything about what that

5    pattern of bruising indicates?

6    A          These are small round bruises.  The exact

7    mechanism of that is not discernible, but any time one

8    sees a cluster of bruises like this may think that it's

9    a possibility that a knuckle pattern could be there,

10   but again, that's just one possibility.  Nothing would

11   say that it'd have to be.  The front of the body shows

12   an area of bruising.  Let's see the back.  There is an

13   area of bruising here, bruise here, series of bruises

14   here, here, there and abrasion which goes upward

15   through all the way to the front of the body.  It shows

16   an area of bruising in the groin region here and

17   bruising adjacent to the labia here.  The front of the

18   thigh shows bruising here, here.  There is a long

19   bruise here, here.  This is skin scraping in this

20   direction next to her knee, bruising here, bruises

21   about in this position, about here.  On this foot there

22   is skin scraping and bruises here, more skin scrapes

23   here in this direction, another one here at the ankle,

24   skin scraping going up here, an area of skin scraping

25   and bruising here, bruise to the skin here, here and

300

1    here, skin scraping and bruising by the knee, bruises

2    on the outside of the knee, skin scrape above the knee

3    and some bruises here, here and there.  On the right

4    side of the head are areas of skin scrape here, with an

5    area of bruising up around here, across the nose.

6    There is a fracture of the nose.  There are abrasions

7    at the jaw line here and here.  There is an area where

8    the skin is torn, you know, laceration, as well as skin

9    scrapes and bruises in that area.  That extends back

10   behind the jaw line.  This is an area of bruising, area

11   of skin scrape behind that, more bruising there, skin

12   scraping in front of the left ear, areas of abrasions

13   here, skin scraping.  The bruising that occurred around

14   the front of the face on the right continued around the

15   left eye.  At the base of the neck here there is more

16   skin scrapes and bruises, and back to the front of the

17   face there is an area of bruising here, more bruising

18   here with a pattern of skin scrape here and another

19   pattern of skin scrape that had sort of a triangular

20   appearance to it here, more skin scrapes there.  There

21   is a bruise here, three bruises, skin scrapes and skin

22   tearing here, skin scrape here, (indicating).

23              I think that completes it.

24   Q          Take the stand, Doctor.  How many separate

25   blows, abrasions, contusions have been inflicted upon

1    Billie Jo Hall prior to her death?

2    A        In some areas it's difficult to say because

3    it's too close, right in the same area of the bruises,

4    that may become obscure.  They obscure each other.  It

5    may appear as one blow but...  In examining her body,

6    it was my opinion that there was -- I think I counted

7    83 areas that were separate enough to suggest them

8    having been inflicted by a separate blow, but again, I

9    can't always separate the blows if they come close to

10   one another.

11   Q        Could it be more than 83?

12   A        Yes, sir.  Additionally, in all fairness,

13   without knowing the specific as to what she may have

14   been injured with, it's difficult to say precisely it's

15   83 blows and no less.  So it could be less than that,

16   it could be more than that.  I'd have to have more

17   information regarding the types of things that were

18   done that may suggest an instrument that either had a

19   greater or lesser wounding power.

20   Q        Would each one of these wounds individually

21   be painful?

22   A        Yes, sir.

23   Q        And as each separate wound was inflicted,

24   would the level of pain increase?

25   A        Yes, each wound would be painful.  Some

302

1   wounds are more painful than others.  Others are

2   obviously more minor.  But they could all produce pain.

3   Q        And the more separate wounds that are

4   inflicted, the higher the experience of pain.

5   A        The interpretation of pain is not a simple

6   matter.  Pain is a two-fold phenomenon.  First off, the

7   body has to be intact enough to receive pain signals.

8   The nerves have to talk to the brain and say that this

9   area has received an injury.  Additionally, there has

10  to be an emotional interpretation of that signal,

11  without which the person would not actually experience

12  pain as you and I might commonly think.  So it's a two-

13  fold phenomenon.  Both of those have to be intact.  At

14  some point in time it's possible to have an emotional

15  override and not feel a cumulative sensation of pain.

16  But again, there's a very individualistic response, and

17  I could not testify as to whether that was working or

18  not in this case.

19  Q        Would the injuries caused by blunt force and

20  the abrasions and the contusions, individually while

21  they could add up to be more and more painful, would

22  they have produced death?

23  A        The injuries that I have described on the

24  mannequin would not in and of themselves produce death.

25  The bruises that are deep inside the body that weren't

303

1    seen, depicted on the mannequin, the ones that are

2    inside the lips, the ones that are on the tongue, but

3    more importantly, the ones that are deep inside the

4    neck, the fact that there was two ounces of blood in a

5    clot back behind her throat can cause enough pressure

6    to build up in the neck over a period of time to

7    actually cause death.  But again, the signs would be

8    very similar to those of strangulation.  So that injury

9    to the neck can be serious, if not fatal.

10   Q        Is there any way based upon the injuries that

11   you have observed and the extent of the internal

12   injuries, can you estimate how long it took to inflict

13   these types of injuries?

14   A        Not precisely.  In many instances I looked --

15   I removed these areas of injury from her body and

16   looked at them under the microscope and saw that there

17   was no inflammatory response.  That would indicate that

18   they were probably inflicted within two hours of death.

19   Now closer than that, I can't be precise.  There was

20   one injury which was older than two hours, but again,

21   that may not even have been a part of the pattern of

22   injury that led to her death.  It was a bruise on the

23   right thigh, and it was a little bit older.  And one

24   certainly can get one bruise in the course of daily

25   activity.  However, having said that, all the injuries

1    had the appearance of being contemporaneous, at or

2    about the same time, so that from a medical standpoint

3    of view, I couldn't separate them as far as time or

4    sequence.

5    Q        In terms of -- How many similar beating cases

6    having you participated in the autopsy in during the

7    years, Doctor?

8    A        I don't have a precise number, but it's a

9    fairly common mechanism of homicide.

10   Q        And based upon that, the injuries inflicted

11   or the total as the injuries compound one upon the

12   other, is this a light beating, a moderate beating, a

13   very severe beating?

14   A        As far as the extent goes, it's a very

15   extensive beating.  As far as the severity goes, except

16   for the injuries to the neck, they're not life-

17   threatening.

18   Q        Now does that indicate to you that there was

19   -- other than the injuries that actually produced

20   death, the strangulation, and if I told you that the

21   proof in this case has been that the beating started in

22   the bedroom, went outside to a driveway, continued as

23   there was a dragging approximately 100 feet from the

24   driveway to the swimming pool, and that Billie Hall was

25   seen and heard to be screaming, kicking and hollering

305

1    as she was drug down to the swimming pool, would the

2    non-death causing injuries indicate any effort of

3    control or any effort to inflict extreme pain or an

4    effort to control?

5    A        The pattern of injury suggests that there is

6    targeting present, the face, the head, the neck, in

7    particular are areas in which intent is demonstrated.

8    The bruises to the arms and the legs may indicate

9    intent upon the victim to defend or protect the body.

10   So there are defensive wounds.  We also have

11   progressive wounds of intent.  Whether that indicates

12   control in this instance, the findings would be

13   insufficient to state the specific motive for targeting

14   those areas.  However, the neck injuries would probably

15   go with the greatest weight of obtaining control

16   because it is a very easy area to gain either dominance

17   or total control of the individual by controlling their

18   airway.  But that's about as much as I can say from a

19   medical standpoint.

20   Q        Can you tell us from that -- The testimony is

21   that the body of Billie Jo Hall was found floating face

22   down in this swimming pool.  Can you tell us whether

23   the final means of strangulation and the preventing her

24   from breathing occurred in that swimming pool?

25   A        No, sir, I couldn't state specifically to

306

1    that.  She was able to swallow water into her stomach,

2    and there were changes, chemical changes, in her blood

3    indicating some dilution of her bloodstream by water,

4    as is typical of drowning.  If a person has total

5    control of her airway which prevented her from

6    breathing, then she would not be able to bring water

7    into her airway.  But again as I stated in the

8    narrative of my findings, that she died as a result of

9    asphyxia.  The most profound changes are those

10   consistent with strangulation by the hand, but there's

11   also an additional component of drowning which may be

12   contributory.

13   Q        Was Billie Hall's death a painful death?

14   A        Yes, sir.  These injuries and the mechanism

15   of strangulation and drowning can be painful.

16            MR. WOODALL:  That's all.

17                           - - - - -

18   **CROSS-EXAMINATION**

19   **BY MR. FORD:**

20   Q        Dr. Smith, I believe you stated that there

21   was very little time between the blows, that they were

22   contemporaneous, meaning that this all occurred in a

23   short period of time.  Would that be correct?

24   A        Partly correct.  It means that they occurred

25   in such a period of time that medically I can't say

                              307

1    this one is older than this one and imply a sequence.

2    A person could have findings very similar to this

3    having been injured over about a two-hour period.  But

4    again, the wounds are so close together, and we're

5    talking probably a matter of several minutes to a

6    quarter hour in which these injuries could occur

7    without that much difference between them.  It could be

8    somewhat longer; it could certainly be somewhat less.

9    But medically I can't separate out the age of the

10   injuries, with the exception of one bruise to the right

11   thigh that's several hours old.

12   Q        Several minutes to a quarter of an hour?

13   A        Yes, sir, that could be a reasonable length

14   of time to receive this number and extent of injuries

15   in which I wouldn't be able to tell you which one came

16   first and which one came second.

17   Q        My next question, you stated that there were

18   certain areas that were targeted in this episode, and

19   you've talked about aggressive wounds.  You're

20   referring to the wounds around the eyes, face and nose

21   as aggressive wounds, or to the throat?  I'm --

22   A        Yes, sir, I was referring predominantly to

23   the wounds of the head and neck, the top of the head,

24   the sides of the head involving the ears, the fracture

25   of the nose, the numerous bruises and skin scrapes

308

1  around the eyes and then the bruises to the inside of

2  the lips and under the chin and then the deep bruises

3  inside the neck.  These would be areas that aren't

4  normally injured by accident and would then indicate an

5  intent or a target.

6  Q        Would you say that aggression is equivalent

7  to anger?

8  A        Anger is an emotion.  Aggression is violent

9  behavior.

10  Q        But they are kind of intertwined when you

11  have a result such as this; are they not?

12  A        Certainly.  One can certainly lead to the

13  other.  Anger can progress into violent behavior.

14          MR. FORD:  Thank you, Your Honor.

15          MR. WOODALL:  That's all the State has at

16  this time.  I'd ask the witness to stay here just a

17  minute, outside the courtroom.

18          MR. WOODALL:  State rests, Your Honor.

19          THE COURT:  Mr. Ford, Mr. Mayo, are you ready

20  to proceed?

21          MR. FORD:  Yes, sir.  There's a matter we

22  need to take up outside the presence of the jury, Your

23  Honor.

24          THE COURT:  Let's move this mannequin back

25  over here out the way some place.

309

1          Let the jury go to the jury room.

2          **(The jury was excused from open**

3          **court, and the following proceedings**

4          **were had to-wit:)**

5          MR. FORD:  At this time we'd move for

6   Judgment of Acquittal.  We don't feel that the State

7   has made out a case of premeditated first degree

8   murder.

9          THE COURT:  The Court overrules your motion.

10         MR. FORD:  All right, Your Honor, we have a

11  witness who is in route, should be here we're told by

12  2:30.  We would ask the Court to indulge us.

13         THE COURT:  I'll indulge you, but let's go

14  with the other witness.

15         MR. MAYO:  Your Honor, we've got one witness

16  we can call.  That'd be fine.  It won't take until

17  2:30, but we can call one witness.

18         THE COURT:  Whatever witness you have I

19  request you put it on.

20         MR. FORD:  We're going to do that, but we may

21  need some additional time for this witness to come from

22  Memphis.

23         THE COURT:  Let's cross that bridge when we

24  get to it.

25         MR. FORD:  Yes, sir.