02501. 9805- ~~ 2048

IN THE CRIMINAL COURT OF MADISON COUNTY, TENNESSEE

AT JACKSON

**FILED**

JUL 2 3 1997

JOE GAFFNEY, CIRCUIT COURT CLERK

A.M. _____ DEPUTY CLERK

STATE OF TENNESSEE

vs.                          No. 96-589

JON DOUGLAS HALL

_____

**TRANSCRIPT OF EVIDENCE**

**FEBRUARY 4, 1997**

**VOLUME III**

_____

**AMY MAYS**

**OFFICIAL COURT REPORTER**

**MADISON COUNTY COURTHOUSE**

**JACKSON, TENNESSEE   38301**

**(901)423-6039**

311

**FILED**

AUG 0 7 1997

Clerk of the Courts
Rec'd By

1                           **WITNESS INDEX**

2    CHERYL ARBOGAST

3            Direct Examination              Page 313

4            Cross-Examination               Page 327

5    DR. LYNN DONNA ZAGER

6            Direct Examination              Page 331

7            Cross-Examination               Page 336

8            Redirect Examination            Page 340

9            Recross-Examination             Page 342

10   RANDY HELMS

11           Direct Examination              Page 343

12   RENEWED MOTION FOR JUDGMENT OF ACQUITTAL Page 346

13   CHARGE OF THE COURT                     Page 351

14

15

16

17

18

19

20

21

22

23

24

25

1          **(The jury returned into open court,**

2          **and the following proceedings were**

3          **had to-wit:)**

4          THE COURT:  Ladies and gentlemen, the

5    Defendant doesn't have to prove anything, as I've

6    already stated to you, but in this instance they choose

7    to put proof on.  But they don't have to prove

8    anything.  It's up to the State to prove the case

9    beyond a reasonable doubt, but they may put on proof,

10   which they elected to do.

11         Proceed.

12         **CHERYL ARBOGAST** was called and being first

13   duly sworn, was examined and testified as follows:

14   **DIRECT EXAMINATION**

15   **BY MR. MAYO:**

16   Q       Would you state your name for the Court,

17   please, ma'am?

18   A       Cheryl Arbogast.

19   Q       Ms. Arbogast, how are you related to Jon

20   Hall?

21   A       My brother's sister.

22   Q       How old are you, Ms. Arbogast?  If you don't

23   mind me asking.

24   A       No, I'm 37.

25   Q       Ms. Arbogast, where do you live?

313

1   A       Cincinnati.

2   Q       And what do you do for a living?

3   A       I'm a registered nurse.

4   Q       Ms. Arbogast, you know why you're here.  You

5   know what's occurred; is that occurred?  What occurred

6   on July 29th, 1994?

7   A       I believe I do.

8   Q       Ms. Arbogast, I want to ask you a few

9   questions about Mr. Hall and about your knowledge of

10  his life at that particular time.

11          MR. WOODALL:  Your Honor, may we approach the

12  bench?

13          THE COURT:  Yes, sir.

14          **(There was a conference at the**

15          **bench, out of the hearing of**

16          **the jury, as follows:)**

17          MR. WOODALL:  Your Honor, what I anticipate

18  she's getting ready to testify might be proper if we

19  get to the mitigation stage, but unless she was in town

20  and was with him prior to this occurring, or with him

21  while it occurred, this is not admissible in evidence

22  at this time.

23          Now, in order to prevent error, I would

24  suggest that Your Honor excuse the jury and hear her

25  testimony before it's allowed to go to the jury, but I

314

1    just don't -- She may say he was upset and all this

2    kind of stuff and --

3           THE COURT:  Are you introducing her as a

4    character witness?

5           MR. MAYO:  No, sir.

6           THE COURT:  Well what kind of witness?

7           MR. MAYO:  Your Honor, I didn't get to my

8    questions.

9           THE COURT:  Well I'm asking now.

10          MR. MAYO:  It's her brother here, and she

11   knew his state of mind and --

12          THE COURT:  How could she know state of mind

13   if she wasn't here?

14          MR. MAYO:  Your Honor, she had talked to a

15   lot of folks, had talked to him, talked to his deceased

16   brother, and she is a nurse herself, so she would have

17   some --

18          THE COURT:  I'm going to let the jury go.

19          **(End of conference at the bench.)**

20          **(The jury was excused from open**

21          **court, and the following proceedings**

22          **were had to-wit:)**

23          THE COURT:  I'm going to let you put this in

24   the record, but now, I want you to confine yourself to

25   something that's not hearsay.  I don't want you to be

1    asking, did she say and did he say.  Those are clearly

2    hearsay questions.  So I want you to confine yourself

3    now without hearsay.

4          MR. MAYO:  Yes, sir.

5          THE COURT:  And, young lady, I don't want you

6    repeating conversations that somebody else had with

7    you, other than perhaps the Defendant.  We'll cross

8    that bridge.  But anybody else's conversation is not

9    admissible.

10          MR. WOODALL:  Your Honor, I would suggest to

11    the Court that even any conversation that she may have

12    had with the Defendant would not be admissible since

13    his credibility is not in issue.

14          THE COURT:  I'm going to listen to it,

15    General.  I'm telling her at the outset I don't want

16    the hearsay.

17          Go ahead.

18    Q          Ms. Arbogast, I'm going to ask you a question

19    directly about July 29th of 1994, the night that this

20    occurred.  On that particular night were you attempting

21    to do anything for Jon Hall?

22    A          Absolutely.  I was --

23          THE COURT:  Where were you at that night?

24          THE WITNESS:  At my house.

25          THE COURT:  Where is your house?

316

1          THE WITNESS:  Cincinnati.

2          THE COURT:  You were in Cincinnati and you

3    were not in Tennessee; is that right?

4          THE WITNESS:  That's correct.

5          THE COURT:  All right, go ahead.

6    A      Can you please restate the question?

7    Q      On July 29th of 1994, were you trying to do

8    anything or get anything done for Jon Hall?

9    A      I was trying to find a way to get him some

10   psychiatric counseling on a very urgent basis.  He was

11   crying and distraught.

12         THE COURT:  Well did you talk to him on the

13   phone that night?

14         THE WITNESS:  It was that night that I was on

15   the phone talking with my brother.

16         THE COURT:  With Mr. Hall.

17         THE WITNESS:  With Jeff.

18         MR. MAYO:  Jeff, the deceased brother, Your

19   Honor.

20         THE COURT:  Oh, the deceased brother.

21         MR. MAYO:  Yes, sir.

22         THE COURT:  Well that's not admissible.

23         MR. MAYO:  Yes, sir.  I'm strictly asking her

24   what she was doing herself, and I'm only trying to

25   introduce it as far as state of mind.  That's the only

1  purpose for it.

2          THE COURT:  State of her mind, but we're not

3  interested in her state of mind.  It's his state of

4  mind.

5          MR. MAYO:  Yes, sir, as to -- That's why

6  we're trying to introduce it, Your Honor.

7          THE COURT:  Go right ahead.

8  Q       Continue, please, Ms. Arbogast.

9  A       Jon had been very distraught, upset over

10 Jeff's impending death, about his relationship with

11 Billie and wanting to work out problems in their

12 marriage.  He was flighting from one idea to another.

13 He was upset because Mom was so far away and he had no

14 family support, and he was concerned what would happen

15 with his family.  If he did end up getting a divorce,

16 he was going to be devastated over missing his

17 children, and he was going from one topic to another

18 and crying, sobbing over each of those things, from one

19 topic back to the next back to another and just --

20         THE COURT:  Are you talking about your dead

21 brother or are you talking about Mr. Hall here?

22         THE WITNESS:  Jon.

23         THE COURT:  Jon, here.

24         All right, go ahead.

25 Q       Ms. Arbogast, based upon his condition at

318

1    that time, were you attempting in that conversation

2    with your deceased brother to work out some kind of

3    plan to get him committed?

4    A        Yes.  I had discussed with Jeff that he had

5    symptoms of acute depression, and that it was so

6    severe, from his description, he needed to have

7    counseling on an urgent basis, if not hospitalization

8    and professional treatment.  He says, "I can't make him

9    go."  I said, "I --"

10            THE COURT:  Well now obviously -- I've told

11   you before, you're not to -- Let me ask you this.  When

12   you say, "I can't make him not to go," you told me a

13   moment ago you were talking to Jon Hall.  Is that what

14   Jon Hall, "I cannot make him go"?

15            THE WITNESS:  No, sir.

16            MR. WOODALL:  The deceased brother said that,

17   Your Honor.

18            THE COURT:  Well that's not admissible.

19            Go ahead.

20            MR. MAYO:  Yes, sir.  Your Honor, this is an

21   offer of proof, if Your Honor will.  The deceased

22   brother obviously is not here.  He died in July of

23   1995, prior to Mr. Ford and I being on the case, and

24   his statement was not taken, no deposition.  So we have

25   no proof as to what the brother would have said.

319

```
 1              THE COURT:  Tell her not to say what the
 2    brother said.  That's what I'm trying to get you to.
 3    At least that's not admissible.
 4    Q         Ms. Arbogast, as you discussed this matter
 5    with your brother, Jeff Hall, the deceased brother,
 6    based upon that conversation you had, did you do
 7    anything else?
 8    A         I made a series of phone calls trying to find
 9    Jon.  I had called his home the night of July 29th
10    repeatedly.  He doesn't have an answering machine.  I
11    was not able to leave any messages.  I had no way to
12    get in touch with him.  I tried to call the Lambert
13    home, and I did call them the next morning.  At first I
14    got a busy signal and then the answering machine kicked
15    on shortly thereafter, and I didn't know what to say.
16    I knew that he was so depressed and that they had been
17    having a lot of problems in their marriage.  I didn't
18    know what kind of message to leave, and so I just hung
19    up on their answering machine.  I tried to figure out
20    an 800 number for crisis intervention that could be
21    called in Tennessee, and I was hoping to find a way to
22    get Jeff to coerce him to go to a hospital to have
23    perhaps a 72-hour hold placed on him so that he could
24    be evaluated by medical professionals.
25    Q         Jeff is the who you were talking to during
```

320

```
1   this entire time.  Jeff is the one also who had had a
2   lot of contact during that time period with Mr. Hall,
3   Mr. Jon Hall.
4            THE COURT:  Don't lead her.  Don't lead her.
5   A        He was --
6            THE COURT:  Just ask her.  Don't lead her.
7            MR. MAYO:  I'm trying to avoid hearsay.  I
8   can ask her that question.
9            THE COURT:  Well you said this.  "You had a
10  lot of conversations with him."  If that isn't leading,
11  I don't know what leading is.
12           MR. MAYO:  Well, Your Honor, I would ask you
13  to allow me to make an offer of proof then at this
14  moment as to what Jeff Hall would have said since he is
15  no longer with us and no statement was taken from him.
16  I'd like to make an offer of proof as to that, Your
17  Honor.
18           THE COURT:  Are you saying Jeff Hall's
19  statement is admissible?
20           MR. MAYO:  Through her?
21           THE COURT:  Yes.
22           MR. MAYO:  No, sir.
23           THE COURT:  Well how can you -- How otherwise
24  can you get it in?
25           MR. MAYO:  I'm not stating that we can get it
```

1   in, Your Honor.

2           THE COURT:  Well then why ask her about it

3   then if you can't get it in and you admit it's not

4   admissible?

5           MR. MAYO:  Because I'd like to make an offer

6   of proof on it, Your Honor.  The jury is not here.

7           THE COURT:  Well if you admit it's not

8   admissible, why make --

9           MR. MAYO:  Your Honor, it would be admissible

10  --

11          THE COURT:  Wait a minute.  Wait a minute.

12  Why waste our time with something that's not

13  admissible?

14          MR. MAYO:  Because it would be admissible if

15  there was a deposition that had been taken at the time.

16          THE COURT:  But it wasn't taken.

17          MR. MAYO:  That's correct, Your Honor.

18          THE COURT:  So you concede it's not

19  admissible.

20          MR. MAYO:  It's not admissible now.  That's

21  correct.

22          THE COURT:  Well is there any way to make it

23  admissible legally?

24          MR. MAYO:  Your Honor, this is an offer of

25  proof.

322

```
 1            THE COURT:  I asked you a question.  I know
 2    it's an offer of proof, but it's a waste of time when
 3    it's something that is not concerned in the case.
 4            MR. MAYO:  Your Honor, this is a death
 5    penalty case.  We have a right to make an offer of
 6    proof as to something that is extremely material.  Mr.
 7    Jeff Hall is the first person who saw Jon Hall after
 8    this occurred.  He went straight down to Texas and saw
 9    Mr. Hall.  He was the only person that talked to Mr.
10    Hall the day that this occurred, three or four days
11    previous to this occurring.  His testimony would have
12    been extremely relevant at this hearing.  He is not
13    with us, and someone did not take his statement.  We
14    think it's very important to make an offer of proof as
15    to what Jeff Hall would have said at this trial on
16    behalf of Mr. Jon Hall.
17            THE COURT:  Go ahead.  You concede it's not
18    admissible, so I don't know why you want to make an
19    offer of proof of something that's not admissible, but
20    I'm going to let you do it.  Go ahead.
21            MR. MAYO:  Thank you, Your Honor.
22    Q       Ms. Arbogast, if I can get back to where we
23    were, if I can remember.
24    A       I had asked Jeff to please just take him to
25    the hospital, and he said, "I don't think I can.  I
```

323

1    can't make him go."  And I said that people who are in

2    this situation can't realize for their own self that

3    they need that kind of help.  He was so distraught.  He

4    didn't have any hope.  He didn't know where to turn.

5    Q        Are these things that Jeff Hall told you?

6    A        He had no support.

7             MR. WOODALL:  Yes or no?  These are things

8    that Jeff told you?

9    Q        On the record just please say yes or no.

10            MR. MAYO:  Your Honor, Mr. Woodall needs to

11   make an objection if he wants to talk to the witness at

12   this point.

13            THE COURT:  Well, Mr. Woodall is trying to

14   help.  The jury is not here.  Go ahead.  Go ahead, Mr.

15   Mayo.  Put in what you want to.  I'm going to allow it

16   all in.

17            MR. MAYO:  Yes, sir.

18   Q        Ms. Arbogast, would you continue?

19            THE COURT:  Let me ask you this, ma'am.

20   Prior to this event, had you ever at any time tried to

21   have the Defendant committed or anything of that sort?

22            THE WITNESS:  It was not until after I --

23            THE COURT:  I'm not asking --

24            THE WITNESS:  -- knew about this.

25            THE COURT:  Listen to my question.  Prior to

324

1    this event, had you ever attempted to have him

2    committed?

3              THE WITNESS:  No, sir.

4              THE COURT:  All right, go ahead.

5    Q        I don't remember where you were.  If you

6    would just continue.

7    A        I'm not sure I do, sir.

8              THE COURT:  She was telling you about what

9    his brother said at some time a year or two after --

10   not a year or two after, but this man who's dead whose

11   statement cannot be admitted, on my ruling, she's

12   telling you what he said to her.  So that's where she

13   was.

14             MR. MAYO:  Thank you, sir.

15             THE COURT:  You're welcome.

16   A        I suggested trickery.  I suggested Jeff fake

17   a stomach illness or some reason that he needed to be

18   taken to the emergency room so that Jon could drive him

19   there and then have the doctor put him on a 72-hour

20   hold for emergency psychiatric counseling.

21   Q        Did you also understand after this occurred

22   that Jon went to see Jeff --

23             THE COURT:  Now, Mr. -- ask her what does she

24   know about what he did, not, "Do you understand ...".

25   This is clearly leading and suggestive.  Rephrase your

1  question.

2  Q        Do you know where Jon went on July 29th?

3  A        Back to Jeff's house.

4  Q        Where was that, Ms. Arbogast?

5  A        Out in Texas.  He had been visiting with Jeff

6  for about I think eight days, and it occurred maybe a

7  week, two weeks maybe, before Billie's death on the

8  29th, and when he was visiting with Jeff, it was quite

9  apparent he was suicidal and that he just did not know

10  how to make everything that was wrong in his life

11  right, and the stress of Jeff's health failing at that

12  point was only that much more difficult for us to all

13  bear, and before Jon started a new job, he wanted to

14  have one last opportunity to take that time that he had

15  free to see Jeff, because every time we saw him we

16  thought it would be our last.

17  Q        Ms. Arbogast, you just stated that Jon went

18  to see Jeff.  Was Jeff alive at that time in Texas on

19  July 29th, July 30th of 1994?

20  A        Yes.  He was supposed to have gone --

21           THE COURT:  Just answer yes or no, please,

22  ma'am.  Answer his question and then stop.

23           THE WITNESS:  I'm sorry.

24           THE COURT:  Go ahead.

25  Q        Ms. Arbogast, when did he die, Jeff Hall?

326

1    A        July 4th, 1995.

2            MR. MAYO:  That's all, Your Honor.

3            THE COURT:  Mr. Mayo, the Court is going to

4    exclude any conversations with Jeff and anything she

5    doesn't know.

6            MR. MAYO:  Yes, sir, absolutely, Your Honor.

7            THE COURT:  It's going to be excluded.

8            MR. MAYO:  I just offered it as an offer of

9    proof, and that's all.

10           THE COURT:  It's in.

11           General, do you want to ask her anything?

12   The Court is excluding the matter.

13           MR. EARLS:  Just a couple of questions, Your

14   Honor.

15   **CROSS-EXAMINATION**

16   **BY MR. EARLS:**

17   Q        Did you ever talk to Jon Hall yourself?

18   A        You mean in the days prior to Billie's death?

19   Q        Yes.

20   A        No, sir.

21   Q        Did you ever observe his person?

22   A        No.

23   Q        Everything that you're testifying to is based

24   upon what someone else told you; is that right?

25   A        That's right.

327

1          MR. EARLS:  That's it, Your Honor.

2          THE COURT:  Let me ask you one more question.

3    How long was it prior, before this event, that you had

4    talked to your brother, Jon?

5          THE WITNESS:  It had been several months.

6          THE COURT:  Several months.  All right.  Then

7    what you're speaking about is something that you

8    discussed with your brother who is now deceased, and

9    this discussion was several months since you had seen

10   him; is that right?

11         THE WITNESS:  Up until then.  We lived in

12   different states, so we saw each other very little.  We

13   would speak on the phone every few months.

14         THE COURT:  And it had been several months

15   since you had spoke to him, spoke to Jon Hall before

16   you talked to this brother who is now deceased.

17         THE WITNESS:  That's correct.

18         MR. WOODALL:  Your Honor, I understand the

19   offer of proof.  That having been made and excepted by

20   the Court, it's now the State's position that none of

21   this is admissible into evidence on their proof in

22   chief, none of it.

23         MR. MAYO:  No argument, Your Honor, just an

24   offer of proof.

25         THE DEFENDANT:  Just argument ineffective

1    assistance of counsel.

2            THE COURT:  Are you ready to excuse her?

3            MR. WOODALL:  Your Honor, Jon Hall keeps

4    running his mouth over there about his lawyers and

5    about these girls.  I don't think Your Honor is hearing

6    him.

7            THE COURT:  Mr. Hall, if you don't keep your

8    mouth shut, I'm either going to put a gag on you --

9    I'll give you a choice.  I'm going to put you back in

10   here where you can't hear.  Now you've got a choice.

11   You understand?  I don't want you to open your mouth or

12   say anything to anybody except the lawyers.  You

13   understand that?

14           THE DEFENDANT:  I just want to make it on the

15   record that my counsel -- that they could have

16   preserved it before he died, and that's why I've been

17   claiming ineffective assistance of counsel.

18           **(WITNESS EXCUSED.)**

19           MR. MAYO:  Your Honor, that's the only

20   witness we have that is available at this present time.

21   We'd ask for a brief recess.

22           THE COURT:  Well now if you've got any other

23   witnesses, and you, too, Mr. Woodall, with the

24   exception of that doctor, I expect you to have them

25   here ready.

1          MR. MAYO:  That's all we have is the doctor,

2     an expert, that's on her way from Memphis.

3          THE COURT:  Well the rules say if you don't

4     have them here when you're supposed to you can proceed

5     on.

6          MR. MAYO:  Your Honor, we're not asking for a

7     continuance --

8          MR. WOODALL:  Your Honor, in all fairness to

9     them, we've sped this thing right along, and I can

10    appreciate their problem not having this doctor here

11    right on time.

12         THE COURT:  When do you expect to have him?

13         MR. MAYO:  2:30 to 3:00, Your Honor.

14         THE COURT:  Well, in the future, Mr. Woodall,

15    starting in the morning, and all you people, I want

16    your witnesses here and waiting, starting in the

17    morning.  I didn't make that clear before, but this

18    jury is being inconvenienced with regard to having to

19    wait around here, but I'm saying in the morning now,

20    I'm expecting you people to have your witnesses,

21    whatever you want, here present at 8:30 in the morning.

22         MR. MAYO:  Yes, sir.

23         THE COURT:  All right, we're in recess 'til

24    your doctor comes.

25             **(There was a short recess; and with**

330

1          the jury in open court, the

2          following proceedings were had

3          to-wit:)

4          DR. LYNN DONNA ZAGER was called and being

5    first duly sworn, was examined and testified as

6    follows:

7    **DIRECT EXAMINATION**

8    **BY MR. MAYO:**

9    Q       Would you state your name for the Court,

10   please?

11   A       My name is Lynn Donna Zager.

12   Q       And, Dr. Zager, what is your occupation?

13   A       I'm a clinical psychologist.

14   Q       How did you become a clinical psychologist?

15   A       I received my Bachelor's Degree from the

16   University of Tennessee in 1976.  I received a Masters

17   of Science and a Doctorate from Florida State

18   University in 1978 and 1981.  In addition to that I

19   completed an internship under the supervision of other

20   psychologists.

21   Q       Have you done any lectures or written any

22   treatises or anything of that nature?

23   A       Yes, I have.

24   Q       Would you please tell us what they are?

25   A       The majority of my research and publications

```
 1    have to do with individuals who have issues with the

 2    criminal justice system.  I've written a number of

 3    articles, especially about a personality inventory, the

 4    MMPI.

 5              MR. MAYO:  Your Honor, I would move to

 6    qualify her as an expert at this point.

 7              THE COURT:  Any objection, General?

 8              MR. EARLS:  Your Honor, could I ask just one

 9    question?

10              THE COURT:  If you wish.

11              MR. EARLS:  Do you have any training in the

12    field of medicine?

13              THE WITNESS:  No, I do not.

14              MR. MAYO:  Your Honor, I move her as an

15    expert in the field of psychology, Your Honor.

16              THE COURT:  All right, sir.

17    Q         Dr. Zager, did you have an opportunity to

18    interview a Jon Hall?

19    A         Yes, I did, on a number of occasions.

20    Q         This is Jon Hall here; is that correct?

21    A         That's correct, sitting at the table.

22    Q         Dr. Zager, when did you interview Mr. Hall?

23    A         I first saw Mr. Hall in November of 1995.

24    That was November 18th.  It was approximately a year

25    later I saw him again on November 1st of 1996, and I
```

1    most recently interviewed him on January 3rd of this

2    year.

3    Q        And have you had the opportunity to review

4    any records regarding Jon Hall?

5    A        Yes.  Not only did I have my own interview

6    and psychological testing that I completed, in addition

7    I reviewed records from the Middle Tennessee Mental

8    Health Institute, forensic services division, where Mr.

9    Hall was for approximately a month.  I also had an

10   opportunity to review records from the Riverbend

11   Institution, mental health records.  I had the

12   opportunity to review reports of interviews that were

13   conducted with people who knew Mr. Hall.

14   Q        Dr. Zager, based upon your interviews with

15   Mr. Hall, based upon your reviewing those records that

16   you just spoke of and based upon your own record that

17   you made and that you wrote up, were you able to

18   formulate any opinion as to whether Mr. Hall suffered

19   from any emotional or psychological condition?

20   A        Yes.  My diagnosis or my -- what I thought

21   that Mr. Hall suffers from, basically he suffers from

22   depression, and he meets the criteria for a diagnosis

23   of depression.  This was prior to the incident and

24   after the incident.  It's not as acute right now as it

25   was before.  Evidence of that included things like that

333

1    he had a depressed mood, he had crying spells, he had

2    thoughts of death and suicide, he had difficulty

3    concentrating, disturbed sleep pattern and was noted

4    psycho-social retardation which means that things that

5    he normally did at a much quicker pace he was doing at

6    a much slower pace.

7    Q      Were you able --

8    A      In addition, he had an alcohol dependence

9    problem.  There is a strong family history of alcohol

10    problems in his family, both his father and paternal

11    grandfather had very significant alcohol problems, and

12    that was true in Mr. Hall's case also.  In addition I

13    found some personality characteristics which I think

14    are important in terms of understanding his

15    functioning.  These include paranoia and dependency.

16    Q      Dr. Zager, based upon what you learned, were

17    you able to formulate any opinion as to what Jon Hall's

18    state of mind was on July 29th, 1994?

19    A      It's my opinion that at the time of the

20    incident, that Mr. Hall was suffering from depression.

21    In addition, he was intoxicated on alcohol.  When that

22    is put together with the depression and the personality

23    characteristics, when that occurs, and some of the

24    stressors, the psycho-social stressors, that he was

25    under at that time, I feel like his abilities were

1   compromised.

2   Q          What were the stressors that you're speaking

3   of?

4   A          There were a number of stressors.  He had a

5   daughter who was born prematurely and suffers from

6   cerebral palsy.  For approximately two years he was her

7   primary caretaker, including doing medical-type things

8   she needed, breathing treatments and other things like

9   that.  She had other health-related problems, had been

10  hospitalized, and I believe that was a significant

11  stressor for her that went on over time.  He had lost

12  his job.  His wife had lost her job.  They had

13  financial stressors that were operating.  His brother,

14  one of his brothers that he was very close to, Jeff,

15  had been diagnosed with AIDS and he was deteriorating

16  around that time.  So those stressors were operating.

17  Q          Do you have any opinion as to whether he was

18  able to formulate a plan and carry that plan out on

19  July 29th in regards to a murder?

20  A          It's my impression, based on everything that

21  I know about the case, that Mr. Hall was acting in an

22  impulsive manner versus a well-thought out plan.

23             MR. MAYO:  Thank you, Dr. Zager.

24                         - - - - -

25

335

1    **CROSS-EXAMINATION**

2    **BY MR. EARLS:**

3    Q        Dr. Zager, the first time you interviewed Mr.

4    Hall was November 18th of 1995; is that correct?

5    A        Yes, it is.

6    Q        And the date of the homicide is July the 29th

7    of 1994; is that correct?

8    A        That's correct.

9    Q        So your interview was well over a year after

10   the incident; is that correct?

11   A        That's correct.

12   Q        Doctor, what is the psychiatric definition of

13   malingering?

14   A        Malingering, according to the <u>Diagnostic and</u>

15   <u>Statistical Manual of Mental Illness</u>, has to do with a

16   person feigning symptoms, a person attempting to

17   present themselves in a light where they have an

18   illness when they do not have that illness.

19   Q        Okay.  And, Doctor, did you prepare a report

20   that you mailed or presented to Mr. Mike Mosier on

21   November 19th, 1995?

22   A        Yes, I did.

23   Q        And in that report did you make the following

24   statement:

25              "I am somewhat concerned at this time that

336

1    the only information to suggest that he was intoxicated

2    is Mr. Hall's self report."

3    A       I made that statement, and then I was given

4    the opportunity to review notes and information from

5    interviews of other people who were there at that time,

6    and that helped support what he had to tell me.

7    Q       What other people did you interview, or what

8    notes did you review, of people who were there?

9    A       People who were with him around the time.

10    Q       People who were at the scene during the

11    homicide?

12    A       No, that's not correct.  People who were with

13    him shortly before the incident.

14    Q       And did any of those people -- were they able

15    to indicate what his manner or actions were?

16    A       To some regard, yes, they were.

17    Q       When you say "To some regard," what do you

18    mean?

19    A       What I mean is there were people who were

20    with him who will say that he was drinking beer, that

21    there was beer missing from the refrigerator, that he

22    was at a pub and he had beer there.

23    Q       Is that all they said?

24    A       That's what I recall.

25    Q       And that's what they said.  And based upon

1    that you believed he was intoxicated.

2    A        It's more than that.  Given the family

3    history of alcohol dependence, it's not unusual that he

4    had that problem.

5    Q        But that doesn't necessarily mean he had that

6    problem, does it?

7    A        No, but I think he did.

8    Q        Okay.  Based upon the fact that some people

9    say --

10            THE COURT:  Is that your opinion?

11            THE WITNESS:  That is my opinion, yes.

12    Q        Based on the fact that people said he was

13    drinking beer.

14    A        It's more than that.  I base that on the

15    information from the family about he started using

16    alcohol at approximately age 15, as I recall, times

17    when the family saw him intoxicated.  There was a lot

18    of information to suggest that it's not just something

19    he was making up.  He had an alcohol problem.

20    Q        Doctor, what is the Diagnostic Statistical

21    Manual for Mental Disorders?

22    A        That's a manual that mental health

23    professionals use.  It's put out by the American

24    Psychiatric Association, and it's a way that

25    professionals can use specific criteria to go about

338

1    deciding if someone has a disorder or not.

2    Q        And is that a manual that is widely

3    recognized and accepted in the field of psychology?

4    A        Yes, it is.

5    Q        Doctor, what is the diagnostic criteria for

6    determining alcohol intoxication?

7    A        What you would have is alcohol ingestion, and

8    you would have to be drinking in order to have alcohol

9    intoxication.  In addition, their needs to be a

10   physiological sign like slurred speech, unsteady gait,

11   things like that, and in addition, there's usually a

12   change in behavior where the person behaves in a way

13   that's different from when they're not intoxicated.

14   Q        Isn't it also true that you have to

15   eliminate medical conditions and other mental

16   disorders?

17   A        For intoxication?

18   Q        Yes, ma'am.

19   Q        Sure.

20   Q        And you're not trained in the field of

21   medicine, are you?

22   A        No, I'm not.

23   Q        Okay.  Now, in the reports and the statements

24   that you reviewed, what person talked about him having

25   slurred speech?

339

```
 1    A          I don't recall that.

 2    Q          What person talked about his incoordination?

 3    A          I don't recall that.

 4    Q          What person talked about his unsteady gait?

 5    A          I don't recall that.

 6    Q          What person talked about him having a

 7    nystagmus?

 8    A          I don't recall that.

 9    Q          What person talked about an impaired

10    attention or memory?

11    A          I don't recall that, except for him.

12    Q          He did.

13    A          Uh-huh.

14    Q          And what person talked about him being in a

15    stupor or coma?

16    A          That was not said.

17    Q          And are those the recognized determining

18    factors for intoxication as stated in the Diagnostic

19    and Statistical Manual?

20    A          Yes, they are.

21               MR. EARLS:  That's all.

22                         - - - - -

23    REDIRECT EXAMINATION

24    BY MR. MAYO:

25    Q          Dr. Zager, Mr. Earls was asking you about the
```

1   various notes and things that you reviewed to determine

2   whether Mr. Hall was an alcoholic.  You mentioned that

3   you had read notes or interviews of people that had

4   been with Mr. Hall prior to this; is that correct?

5   A        That is correct.

6   Q        And you mentioned that you had read medical

7   records of other facilities also.

8   A        That's correct.

9   Q        You mentioned Middle Tennessee Health

10  Institute.

11  A        Mental Health Institute.

12  Q        Would you tell us just a little bit about

13  what that is?

14  A        Middle Tennessee Mental Health Institute is

15  one of five regional mental health institutes in the

16  state.  It normally serves people in the Davidson

17  County area.  They have a unit where people who face

18  very serious charges are oftentimes sent for

19  evaluation.

20  Q        And is that something -- Is that a private

21  institute or is that a state-run institute?

22  A        That's a state-run institute.

23  Q        Is it run by the Department of Corrections or

24  ...

25  A        It's run by the Department of Mental Health

341

1    and Mental Retardation.

2    Q        And in those records from Middle Tennessee

3    Mental Health Institute, did you find anything that

4    mentioned Mr. Hall's alcohol problem?

5    A        Yes.  They agreed with my diagnosis.

6    Actually they made it before, but they diagnosed him as

7    suffering from alcohol dependence.

8    Q        Thank you.

9    A        Which is different from alcohol intoxication.

10   Q        And that's what you're speaking of, is

11   alcohol dependence; is that correct?

12   A        Yes.

13   Q        You didn't actually make a determination that

14   he was --

15           MR. MAYO:  I'll withdraw that question.

16                        - - - - -

17   **RECROSS-EXAMINATION**

18   **BY MR. EARLS:**

19   Q        Did you actually make a determination that he

20   was intoxicated at the time?

21   A        I inferred that based on the information I

22   had available to me.

23   Q        And that's from Mr. Hall.

24   A        That's from Mr. Hall, and in addition, from

25   the other information I had available to me.  It was an

1    inference I made.

2    Q        An inference.

3    A        Uh-huh.

4            **(WITNESS EXCUSED.)**

5            **RANDY HELMS** was called and being first duly

6    sworn, was examined and testified as follows:

7    **DIRECT EXAMINATION**

8    **BY MR. MAYO:**

9    Q        Would you state your full name for the Court,

10   please?

11   A        Randy Helms.

12   Q        Mr. Helms, where do you live?

13   A        Lexington, Tennessee.

14   Q        How long have you lived in Lexington?

15   A        Forty-nine years.

16   Q        Mr. Helms, what do you do in Lexington?  What

17   is your occupation?

18   A        I own Helms Motor Company.

19   Q        Mr. Helms, do you know Jon Hall?

20   A        Yes, sir.

21   Q        Can you point Jon Hall out?

22   A        (Pointing)

23   Q        Mr. Helms, how do you know Mr. Hall?

24   A        He worked for me at one time.

25   Q        Mr. Helms, did you personally observe Mr.

343

1    Hall on occasions?

2            MR. WOODALL:  Your Honor, side bar.

3            **(There was a conference at the**

4            **bench, out of the hearing of the**

5            **jury, as follows:)**

6            MR. WOODALL:  Your Honor, I don't -- unless

7    this is close in time to the event which has occurred

8    here, I don't think this is admissible.  I think it's

9    just like his sister, and we would object to it.

10           THE COURT:  I would suggest that you would

11   ask him when --

12           MR. MAYO:  Oh, I am.  I haven't gotten there

13   yet.

14           THE COURT:  All right.  Well get there as

15   soon as you can.

16           MR. MAYO:  Yes, sir.

17           **(End of conference at the bench.)**

18           THE COURT:  Mr. Helms, when was it he worked

19   for you?

20           THE WITNESS:  It was about in '93 through

21   probably the middle part of '94.

22           THE COURT:  A year and a half or something

23   like that?

24           THE WITNESS:  Year, year and a half.

25           THE COURT:  All right, go ahead.

344

1    Q        Mr. Helms, the last time he worked for you

2    was sometime in June of '94; is that correct?

3    A        That would have been about right.

4    Q        And after that June of '94, did you see Mr.

5    Hall?

6    A        Yes, sir, I saw him quite regularly.

7    Q        Mr. Helms, when was the last time that you

8    saw him prior to July 29th?  Which I believe was a

9    Friday.

10   A        It would have been on Wednesday which I

11   assume was July the 27th.

12   Q        Mr. Helms, could you tell us, please, sir,

13   what kind of condition Mr. Hall was in?

14   A        He had been severely depressed, just down and

15   out, and didn't have a real good outlook on life.  The

16   reason that I saw him on that day, he had stopped by to

17   tell me that he had got a new job.  I'm sure I'm right

18   about this.  He was starting a new job, and I think it

19   was Columbus-McKinnon which is a chain factory there in

20   Lexington, and I think he just more or less stopped by

21   to let me know that he was fixing to go to work, and

22   hopefully, you know, that maybe he could get on with

23   his life.

24   Q        What was it that made you think or state to

25   this Court that you felt he was depressed?

345

1    A        Well, just in talking to him about the

2    problems, the family problems he'd been having and just

3    the trouble that him and his wife were having and the

4    affect it was having on him and his children and all,

5    he was just having a hard time dealing with it.  It was

6    just a depressive-type situation is all I can say.

7            MR. MAYO:  Thank you, Mr. Helms.

8            MR. WOODALL:  No questions.

9            **(WITNESS EXCUSED.)**

10           MR. MAYO:  Defense rests, Your Honor.

11           **(The jury was excused from open**

12           **court; the Motion for Judgment of**

13           **Acquittal was renewed and overruled;**

14           **and the following proceedings were**

15           **had to-wit:)**

16           MR. WOODALL:  Your Honor, I also think that

17   for the record that the Defendant needs to be put under

18   oath and asked if --

19           THE COURT:  Mr. Hall, would you please stand?

20   Would you stand and raise your right hand?

21           THE DEFENDANT:  Are you trying to coerce me

22   inside the bar -- the sanctuary of the bar?  See, you

23   didn't remove that flag of war.

24           THE COURT:  Mr. Hall, I order you to raise

25   your right hand.  You refuse?

346

```
 1              THE DEFENDANT:  Your Honor, they're trying to

 2    take my life away.  I have my constitutional rights.

 3    What do I have to be sworn in for?  You know who I am.

 4              THE COURT:  All right, just have a seat.

 5              Mr. Ford, will you please address the Court

 6    and tell me if this man has been -- has had a

 7    negotiated plea discussed with him and --

 8              MR. FORD:  Yes, sir.  We took that up, Your

 9    Honor, on the record earlier, if the Court will recall.

10              THE COURT:  Well what do you want?

11              MR. WOODALL:  Your Honor, I think it needs to

12    be on the record it's his decision not to testify in

13    his own behalf.

14              THE COURT:  Well, Mr. Ford, have you told

15    this man the possibility about testifying and not

16    testifying?

17              MR. FORD:  We fully discussed that, Your

18    Honor, and of course, we rested our case.

19              THE COURT:  And then what did he tell you?

20    What was his -- Did he agree, or did he tell you that

21    he agreed not to take the stand?

22              MR. FORD:  Well, Your Honor, that may be

23    privileged communication and a decision that we may

24    have arrived at discussing strategies of the case.  I

25    don't know if I'm allowed to --
```

1          THE COURT:  Well you go ahead.  Listen to

2    this.  Did you discuss it with him?

3          MR. FORD:  Yes, sir.

4          THE COURT:  And did you feel that he

5    understood what you were discussing?

6          MR. FORD:  Absolutely.

7          THE COURT:  And then after the discussion,

8    was he advised with regard to what the decision was

9    going to be as to whether he would testify or not?

10         MR. FORD:  Yes, sir.

11         THE COURT:  In your opinion was that made

12   freely?

13         MR. FORD:  Yes, sir, after -- We've discussed

14   that issue numerous -- on numerous occasions.

15         THE COURT:  Anything else, General?

16         MR. WOODALL:  No, sir, that's fine.

17         THE COURT:  Call the jury back.

18         THE DEFENDANT:  Your Honor, I'll testify if

19   you take down the flag of war or sign that judicial

20   contract.

21         THE COURT:  I don't know what -- Do you mind

22   advising your client I'm not aware of a --

23         THE DEFENDANT:  I sent it to you and you

24   signed it certified receipt.

25         THE COURT:  Call the jury back.  The case is

                              348

1    already closed.

2            **(The jury returned into open court,**

3            **and the following proceedings were**

4            **had to-wit:)**

5            THE COURT:  Members of the jury, now you have

6    heard all the evidence which is to be presented in this

7    case.  The next step is for the lawyers to give their

8    closing arguments.  Even though these arguments do not

9    constitute evidence, you should consider them very

10   carefully.

11           In the argument, counsel will call to your

12   attention the evidence which they consider material and

13   will ask you to draw certain inferences from that

14   evidence.  Please keep in mind, however, that you're

15   not bound by their recollection of the evidence.  It is

16   your recollection of the evidence and your recollection

17   alone which must guide you -- guide your deliberations.

18   If there are discrepancies between the lawyers'

19   recollection and your recollection, you're bound by

20   your own recollection, nor are you limited in your own

21   consideration of the evidence to that which is

22   mentioned by the lawyers.

23           You must consider all of the evidence which

24   you consider material to the issues involved to the

25   extent that the inferences which counsel asks you to

1    draw are supported by the evidence and appeal to your

2    reason and judgment.  You may consider them in your

3    deliberations.

4         Lawyers may also call your attention to

5    certain principles of law in the arguments.  Please

6    remember now that you are not bound by any principle of

7    law mentioned by the lawyers.  You must apply the law

8    in which you are instructed by me and only that law to

9    the facts as you find them.

10        The State will make an opening argument, and

11   then the lawyer for the Defendant will argue and then

12   the State follows with a closing argument, and then

13   after the arguments I will instruct you as to the law

14   which you will apply to the facts as you find them.

15        Go to the jury room for a short recess, and

16   we're going to discuss the charge.

17        **(The jury was excused from open court,**

18        **and the following proceedings were had**

19        **to-wit:)**

20        MR. WOODALL:  Judge, you're charging first

21   and second, and I'm just wondering and ask the defense

22   lawyers what they think.  I don't see anything in there

23   and the evidence has been presented that's voluntary

24   manslaughter or criminally negligent homicide.

25        MR. FORD:  We have no problem with what the

                                350

```
 1   Court's charging, Your Honor, except for flight.  We

 2   don't feel that that's been shown.  There's no

 3   witnesses that said he had fled.

 4            THE COURT:  Well there is witnesses that he

 5   was located in Alabama.

 6            MR. FORD:  Texas, Your Honor, but there's

 7   been no proof that he ran to avoid arrest or anything

 8   like that.

 9            THE COURT:  I'm going to charge it

10            MR. FORD:  All right, sir.  On the expert

11   witness charge, we'd also ask that Dr. Lynn Zager, the

12   clinical psychologist, be added.

13            THE COURT:  Okay.  Ready for argument?

14            MR. WOODALL:  Yes, sir.

15            MR. FORD:  Yes, sir.

16            THE COURT:  Call the jury.

17            (Arguments were heard on behalf

18            of the State and the Defendant,

19            without objection; out of the hearing

20            and presence of the jury, there was

21            an agreement between the State and the

22            Defendant to waive the fines that could

23            be imposed by the jury; and the Court

24            charged the jury as follows:)

25            THE COURT:  The Defendant Jon Douglas Hall is
```

351

1    charged in the indictment with the crime of first

2    degree murder.  The Defendant pleads not guilty to this

3    offense.

4            The offense necessarily includes the lesser

5    offenses or grades of murder in the second degree,

6    voluntary manslaughter, reckless homicide and

7    criminally negligent homicide.  The Defendant pleads

8    not guilty to each and every offense embraced in the

9    indictment.

10           The evidence and arguments in this case have

11   been completed, and it is my duty now to instruct you

12   as to the law.  The law applicable to this case is

13   stated in these instructions, and it is your duty to

14   carefully consider all of them.  The order in which

15   these instructions are given is no indication of their

16   relative importance.  You should not single out any one

17   or more of them to the exclusion of another or others

18   but should consider each one in light of and in harmony

19   with the others.

20           At times during the trial I have ruled upon

21   the admissibility of evidence.  You must not concern

22   yourself with these rulings.  Neither by such rulings,

23   these instructions nor any other remarks which I have

24   made do I mean to indicate any opinion as to the facts

25   or as to what your verdict should be.

352

1          Statements, arguments and remarks of counsel
2     are intended to help you in understanding the evidence
3     and applying the law, but they are not evidence.   If
4     any statements were made that you believe are not
5     supported by the evidence, you should disregard them.
6          You are the exclusive judges of the facts in
7     this case.  Also, you are the exclusive judges of the
8     law under the direction of the Court.   You should
9     apply the law to the facts in deciding this case.   You
10    should consider all of the evidence in the light of
11    your own observations and experience in life.
12         The law presumes that the Defendant is
13    innocent of the charges against him.  This presumption
14    remains with the Defendant throughout every stage of
15    the trial, and it is not overcome unless from all the
16    evidence in the case you are convinced beyond a
17    reasonable doubt that the Defendant is guilty.
18         The State has the burden of proving the guilt
19    of the Defendant beyond a reasonable doubt, and this
20    burden never shifts but remains on the State throughout
21    the trial of the case.  The Defendant is not required
22    to prove his innocence.
23         Reasonable doubt is that doubt engendered by
24    an investigation of all the proof in the case and an
25    inability after such investigation to let the mind rest

353

1    easily as to the certainty of guilt.  Reasonable doubt
2    does not mean a capricious, possible or imaginary
3    doubt.  Absolute certainty of guilt is not demanded by
4    the law to convict of any criminal charge, but moral
5    certainty is required, and this certainty is required
6    as to every proposition of proof requisite to
7    constitute the offense.
8         The State must have proven beyond a
9    reasonable doubt all of the elements of the crime
10   charged and that it was committed before the finding
11   and returning of the indictment in this case.
12        If you have a reasonable doubt as to the
13   Defendant's guilt of first degree murder as charged in
14   the indictment, then your verdict must be not guilty as
15   to this offense, and then you will proceed to determine
16   his guilt or innocence of the lesser included offense
17   of murder in the second degree.
18        If you have a reasonable doubt as to the
19   Defendant's guilt of murder in the second degree, then
20   your verdict must be not guilty of this offense, and
21   then you would proceed to determine his guilt or
22   innocence to the lesser included offense of voluntary
23   manslaughter.  If you have a reasonable doubt as to the
24   Defendant's guilt of voluntary manslaughter, then your
25   verdict must be not guilty as to this offense, and then

1    you'll proceed to determine his guilt or innocence of

2    the lesser included offense or grade of reckless

3    homicide.  If you have a reasonable doubt as to the

4    Defendant's guilt of reckless homicide, then you must

5    proceed to determine his guilt or innocence of the

6    lesser included offense of criminally negligent

7    homicide.  The verdict must represent the considered

8    judgment of each juror.  In order to return a verdict,

9    it is necessary that each juror agree thereto.  Your

10    verdict must be unanimous.

11          It is your duty as jurors to consult with one

12    another and to deliberate with a view to reaching an

13    agreement, if you can do so without violence or

14    individual judgment.  Each of you must decide the case

15    for yourself, but do so only after an impartial

16    consideration of the evidence with your fellow jurors.

17    In the course of your deliberations, do not hesitate to

18    reexamine your own views and change your opinion if

19    convinced it is erroneous.  But do not surrender your

20    honest conviction as to the weight or effect of the

21    evidence solely because of the opinion of your fellow

22    jurors, or for the mere purpose of returning a verdict.

23          FIRST DEGREE MURDER (PREMEDITATED KILLING)

24          Any person who commits the offense of first

25    degree murder is guilty of a crime.

1        For you to find the Defendant guilty of this

2   offense, the State must have proven beyond a reasonable

3   doubt the existence of the following essential

4   elements:

5        (1)  That the Defendant unlawfully killed the

6   alleged victim; and, that the Defendant acted

7   intentionally.  A person acts intentionally with

8   respect to the nature of his conduct or the result of

9   the conduct when it is the person's conscious objective

10  or desire to engage in the conduct or cause the result;

11  and

12       (3)  That the killing was deliberate.  A

13  deliberate act is one performed with a cool purpose;

14  and, that the killing was premeditated.  A premeditated

15  act is one done after an exercise of reflection and

16  judgment.  Premeditation means that the intent to kill

17  must have been formed prior to the act itself.  It is

18  not necessary that the purpose to kill preexist in the

19  mind of the accused for any definite period of time.

20  It is sufficient that it preceded the act, however

21  short the interval, as long as it was the result of

22  reflection and judgment.  The mental state of the

23  accused at the time he allegedly decided to kill must

24  be carefully considered in order to determine whether

25  the accused was sufficiently free from excitement and

356

1    passion as to be capable of premeditation.  If the

2    design to kill was formed with deliberation and

3    premeditation, it is immaterial that the accused may

4    have been in a state of passion or excitement when the

5    design was carried into effect.  Furthermore,

6    premeditation can be found if the decision to kill is

7    first formed during the heat of passion, but the

8    accused commits the act after the passion has subsided.

9           If you find from the proof beyond a

10   reasonable doubt the Defendant is guilty of murder in

11   the first degree, you will so report and your verdict

12   in that event shall be, "We, the jury, find the

13   Defendant guilty of murder in the first degree."

14          If you so find then, it shall be your duty

15   after a separate sentencing hearing to determine

16   whether the Defendant will be sentenced to death, life

17   imprisonment or without the possibility of parole, or

18   life imprisonment, but you will not consider the

19   punishment for this offense at this time.

20          The punishment for the offense is life

21   imprisonment, life imprisonment with parole or death by

22   electrocution.

23                    SECOND DEGREE MURDER

24          Any person who commits second degree murder

25   is guilty of a crime.

357

1        For you to find the Defendant guilty of this

2   offense, the State must have proven beyond a reasonable

3   doubt the existence of the following essential

4   elements:

5        (1)  That the Defendant unlawfully killed the

6   alleged victim; and

7        (2)  That the Defendant acted knowingly.

8        Knowingly means that a person acts knowingly

9   with respect to the conduct or circumstances

10  surrounding the conduct when the person is aware of the

11  nature of the conduct or that the circumstances exist.

12  A person acts knowingly with respect to a result of the

13  person's conduct when the person is aware that the

14  conduct is reasonably certain to cause the result.

15       The requirement of knowingly is also

16  established if it is shown that the Defendant acted

17  intentionally.

18              VOLUNTARY MANSLAUGHTER

19       Any person who commits voluntary manslaughter

20  is guilty of a crime.

21       For you to find the Defendant guilty of this

22  offense, the State must have proven beyond a reasonable

23  doubt the existence of the following elements:

24       (1)  That the Defendant unlawfully killed the

25  alleged victim; and

358

1      (2)  That the Defendant acted intentionally

2  or knowingly; and

3      (3)  That the killing resulted from a state

4  of passion produced by adequate provocation sufficient

5  to lead a reasonable person to act in an irrational

6  manner.

7      The distinction between voluntary

8  manslaughter and second degree murder is that voluntary

9  manslaughter requires that the killing result from a

10  state of passion produced by adequate provocation

11  sufficient to lead a reasonable person to act in an

12  irrational manner.

13      Intentionally means that a person acts

14  intentionally with respect to the nature of the conduct

15  or to a result of the conduct when it is a person's

16  conscious objective or desire to engage in the conduct

17  or cause the result.

18                    RECKLESS HOMICIDE

19      Any person who commits the offense of

20  reckless homicide is guilty of a crime.

21      For you to find the Defendant guilty of this

22  offense, the State must have proven beyond a reasonable

23  doubt the existence of the following essential

24  elements:

25      (1)  That the Defendant killed the alleged

359

1    victim; and

2            (2)   That the Defendant acted recklessly.

3            Recklessly means that a person acts

4    recklessly with respect to circumstances surrounding

5    the conduct or the result of the conduct when the

6    person is aware of but consciously disregards a

7    substantial and unjustifiable risk that the

8    circumstances exist or the result will occur.  The risk

9    must be of such a nature and degree that its disregard

10   constitutes a gross deviation from the standard of care

11   that an ordinary person would exercise under all the

12   circumstances as viewed from the accused person's

13   standpoint.

14           The requirement of recklessly is also

15   established if it is shown that the Defendant acted

16   intentionally or knowingly.

17                 CRIMINALLY NEGLIGENT HOMICIDE

18           Any person who commits criminally negligent

19   homicide is guilty of a crime.

20           For you to find the Defendant guilty of this

21   offense, the State must have proven beyond a reasonable

22   doubt the existence of the following essential

23   elements:

24           (1)   That the Defendant's conduct resulted in

25   the death of the alleged victim; and

360

1          (2)    That the Defendant acted with criminal

2    negligence.

3          Criminal negligence means that a person acts

4    with criminal negligence with respect to the

5    circumstances surrounding that person's conduct or the

6    result of that conduct when the person ought to be

7    aware of a substantial and unjustifiable risk that the

8    circumstances exist or the result will occur.  The risk

9    must be of such a nature and degree that the failure to

10   perceive it constitutes a gross deviation from the

11   standard of care that an ordinary person would exercise

12   under all the circumstances as viewed from the accused

13   person's standpoint.

14         The requirement of criminal negligence is

15   also established if it is shown that the Defendant

16   acted intentionally, knowingly or recklessly.

17         The Defendant has not taken the stand to

18   testify as a witness, but you shall place no

19   significance on this fact.  The Defendant is presumed

20   innocent, and the burden is on the State to prove his

21   guilt beyond a reasonable doubt.  He is not required to

22   take the stand in his own behalf, and his election to

23   do so cannot be considered for any purpose against him,

24   nor can any inference be drawn from such fact.

25

```
1                              FLIGHT
2              The flight of a person accused of a crime is
3    a circumstance which when considered with all the facts
4    may justify an inference of guilt.  Flight is a
5    voluntary withdrawal of oneself for the purpose of
6    evading arrest or prosecution for the crime charged.
7    Whether the evidence presented proves beyond a
8    reasonable doubt the Defendant fled is a question for
9    your determination.
10             The law makes no precise distinction as to
11   the manner or method of flight; it may be open or it
12   may be a hurried or concealed departure, or it may be
13   concealment within the jurisdiction.  However, it takes
14   both the leaving of the scene of the difficulty and
15   subsequently hiding out, evasion or concealment in the
16   community or leaving the community for parts unknown to
17   constitute flight.
18             If flight is proved, the fact of flight alone
19   does not allow you to find that the Defendant is guilty
20   of the crime alleged.  However, since flight by the
21   Defendant may be caused by a consciousness of guilt,
22   you may consider the fact of flight, if flight is so
23   proven, together with all of the other evidence when
24   you decide the guilt or innocence of the Defendant.  On
25   the other hand, an entirely innocent person may take
```

1    flight, and such flight may be explained by proof

2    offered or by the facts and circumstances of the case.

3        Whether there was a flight by the Defendant,

4    the reasons for it and the weight to be given it, are

5    questions for you to determine.

6                    CREDIBILITY OF WITNESSES

7        You will take all of the evidence adduced in

8    the case by the State and the Defendant and give it a

9    full, fair and impartial consideration.  If there are

10   any conflicts in the statements of the different

11   witnesses, it is your duty to reconcile them, if you

12   can, for the law presumes that every witness has sworn

13   to the truth, but if you cannot, the law makes you the

14   sole and exclusive judges of the credibility of the

15   witnesses and the weight to be given their testimony.

16   In forming your opinion as to the credibility of a

17   witness, you may look to the proof, if any, of his

18   general character, the manner and demeanor of the

19   witness, the consistency or inconsistency of his

20   statements, their probability or improbability, his

21   ability and willingness to speak the truth, his

22   intelligence and means of knowledge, his motive to

23   speak the truth or swear to a falsehood, his interest

24   or lack of interest in the outcome of the trial.

25       There are several modes of impeaching a

1    witness.  One mode is to prove that a witness has, at

2    different times, made conflicting statements as to the

3    material facts of the case as to which he testifies.

4    Still another mode is rigid and close cross-examination

5    to involve the witness in contradictions and

6    discrepancies as to material facts stated by him.

7    Immaterial discrepancies or differences in the

8    statements of witnesses do not affect their credibility

9    unless there is something to show that they originated

10   in a willful falsehood, and, you, members of the jury,

11   are to determine how far the testimony of any witness

12   has been impaired by the invalidating process.

13            The guilt of the Defendant as well as any

14   fact required to be proved may be established by direct

15   evidence, by circumstantial evidence or by both

16   combined.

17            Direct evidence is defined as evidence which

18   proves the existence of the fact in issue without

19   inference or presumption.  Direct evidence may consist

20   of testimony of a person who has perceived by the means

21   of his senses the existence of a fact, sought to be

22   proved or disproved.

23            Circumstantial evidence consists of proof of

24   collateral facts and circumstances which do not

25   directly prove the fact in issue but from which that

364

1    fact may logically inferred.

2          When the evidence is made up entirely of

3    circumstantial evidence, then before you would be

4    justified in finding the Defendant guilty, you must

5    find that all the essential facts are consistent with

6    the hypothesis of guilt, as that is to be compared with

7    all the facts proved; the facts must exclude every

8    other reasonable theory or hypothesis except that of

9    guilt, and the facts must establish such a certainty of

10   guilt of the Defendant as to convince the mind beyond a

11   reasonable doubt that the Defendant is the one who

12   committed the offense.  It is not necessary that each

13   particular fact should be proved beyond a reasonable

14   doubt if enough facts are proved to satisfy the jury

15   beyond a reasonable doubt of all the facts necessary to

16   constitute the crime charged.  Before the verdict of

17   guilty is justified, the circumstances, taken together,

18   must be of a conclusive nature and tendency leading on

19   the whole to a satisfactory conclusion and producing,

20   in effect, a moral certainty the Defendant and no one

21   else committed the offense.

22          The Court has charged the jury concerning

23   certain inferences that the jury may or may not make in

24   regard to certain evidence in this case.  However, the

25   jury is not required to make this inference.  It is the

1    exclusive province of the jury to determine whether the

2    facts and circumstances shown by all the evidence in

3    the case warrant the inference which the law permits

4    the jury to do.  The inference may be rebutted by

5    direct or circumstantial evidence or both, whether

6    offered by the Defendant or such exists in the evidence

7    of the State, and the burden of proof remains, as

8    always, upon the State to prove beyond a reasonable

9    doubt each and every element that constitutes the

10   offense before the Defendant can be convicted.

11   Although not required by law to do so, when the

12   Defendant offers proof of an explanation to rebut the

13   inference raised, you should consider such proof of

14   such explanation to rebut the inference.  You should

15   consider such proof along with all the evidence to

16   determine not only the correctness of the inference but

17   the reasonableness of the Defendant's explanation.  You

18   are not bound to accept either and, as aforesaid, the

19   burden of proving guilt of this offense charged beyond

20   a reasonable doubt is upon the State.

21                   DEFENSE:   INTOXICATION

22              Included in the Defendant's plea of not

23   guilty is his plea of intoxication as a defense.

24              You have heard evidence concerning the

25   alleged intoxication of the Defendant the time of the

366

1    alleged offense.

2            Intoxication itself is generally not a

3    defense to prosecution for an offense.  If a person

4    voluntarily becomes intoxicated and while in that

5    condition commits an act which would be a crime if he

6    or she were sober, he or she is fully responsible by

7    his or her conduct.  It is the duty of persons to

8    remain from placing themselves in a condition which

9    poses a danger to others.

10            Intoxication means disturbance of mental or

11    physical capacity resulting from the introduction of

12    any substance in the body.

13            Voluntary intoxication means intoxication

14    caused by a substance that the person knowingly

15    introduced into the person's body, the tendency of

16    which to cause intoxication was known or ought to have

17    been known.

18            Intoxication is irrelevant to the issue of

19    the essential element of the Defendant's culpable

20    mental state.

21            In this case the State must prove beyond a

22    reasonable doubt the required culpable, c-u-l-p-a-b-l-

23    e, mental state of the Defendant as defined in each

24    offense listed in the charge.

25            If you find that the Defendant was

1    intoxicated to the extent that he could not have

2    possessed the required culpable mind, then he cannot be

3    guilty of the offense charged.

4           If you are not satisfied beyond a reasonable

5    doubt that the Defendant possessed the culpable mental

6    state, then you must find him not guilty.

7           If recklessness establishes an element of the

8    offense and the Defendant is unaware of a risk because

9    of voluntary intoxication, the Defendant's unawareness

10   is immaterial and is no defense to that element in the

11   prosecution of said offense.

12                          EXPERT WITNESS

13          During the trial you heard the expert

14   testimony of Dr. O. C. Smith who was described to us as

15   an expert in the field of forensic pathology and Dr.

16   Lynn Donna Zager who was described to us an expert in

17   the field of clinical psychology.

18          The rules of evidence provide that if

19   scientific, technical or other specialized knowledge

20   might assist the jury in understanding the evidence or

21   in determining a fact in issue, a witness qualified as

22   an expert by reason of special knowledge, skill or

23   experience may testify and state his or her opinion

24   concerning such matters and giving such reasons for his

25   or her testimony.

                               368

1          Merely because an expert has expressed an

2     opinion does not mean, however, that you're bound by

3     it, bound to accept this opinion.  The same as with any

4     other witness, it is up to you to decide whether you

5     believe this testimony and choose to rely upon it.

6     Part of that decision will depend on your judgment

7     about whether the witness' background or training and

8     experience is sufficient for the witness to give their

9     expert opinion that you heard.  You must decide whether

10    the witness' opinions were based on sound reason,

11    judgment and information.

12          You are to give the testimony of an expert

13    witness such weight and value as you think it deserves

14    along with all the other evidence in the case.

15          Members of the jury, the Court charges you

16    that if any of you have been taking notes in this case,

17    that these notes are for your individual use only, and

18    you should not use these notes directly or indirectly,

19    explicitly or implicitly, to persuade other jurors as

20    to the accuracy of said notes.  They should not be

21    shown to the others or compared or referred to in any

22    way as an authority but should be used privately only

23    by the maker of said notes as an aid to his or her

24    individual memory.

25          You can have no prejudice or sympathy or

369

1    allow anything but the law and the evidence to have an

2    influence upon your verdict.  You must render your

3    verdict with absolute fairness and impartiality as you

4    think justice and truth dictate.  When you retire to

5    the jury room, you will first select one of your

6    members as foreperson who will preside over your

7    deliberations.

8         When you have reached a verdict, you will

9    return with it to this courtroom and your foreperson

10   will announce it.

11        The jury will not attempt to fix any

12   punishment or sentence at this time.  However, for your

13   information only, you are informed that the ranges of

14   punishment as the crimes involved herein are as

15   follows:

16        First degree murder, death, life in prison

17   without the possibility of parole, or life in prison

18   with the possibility of parole.

19        Murder in the second degree, not less than 15

20   nor more than 60 years imprisonment.

21        Voluntary manslaughter, not less than three

22   nor more than 15 year years imprisonment.

23        Reckless homicide, not less than two nor more

24   than four years imprisonment.

25        Criminally negligent homicide, not less than

1    one nor more than six years imprisonment.

2            If you find that the State has proven the

3    Defendant guilty a reasonable doubt, you will find the

4    Defendant guilty.  In that event your foreperson will

5    report that you find the Defendant guilty and will name

6    the offense agreed upon.

7            On the other hand, if you find that the State

8    has not proven beyond a reasonable doubt the

9    Defendant's guilt or if you have a reasonable doubt as

10   to guilt, then you will find him not guilty.  In that

11   event your foreperson will report that you find the

12   Defendant not guilty.

13           You will now retire and begin your

14   deliberations.

15           THE COURT:  Any exceptions to the charge?

16           MR. WOODALL:  No, Your Honor.

17           MR. FORD:  No, sir.

18           **(The jury retired to begin**

19           **deliberations at 5:05 p.m.;**

20           **the alternate jurors were excused;**

21           **the jury deliberated until 6:00**

22           **p.m. whereupon they returned into**

23           **open court, were admonished, and**

24           **court was recessed for the**

25           **day.)**