02301. 9895- CC- 000 98

1    IN THE CRIMINAL COURT OF MADISON COUNTY, TENNESSEE

2                    AT JACKSON, DIVISION I            **FILED**

3    STATE OF TENNESSEE

4                                           JUL 2 ? 1997

5    VS.                    No. 96-589    JOE GAFFNEY, CIRCUIT COURT CLERK
                                          DEPUTY CLERK
6                                          A.M.

7    JON DOUGLAS HALL

8

9    _____

10                   **TRANSCRIPT OF EVIDENCE**

11                     **FEBRUARY 5, 1997**

12                        **VOLUME IV**

13   _____

14

15

16

17

18

19

20

21                        **AMY MAYS**

22                **OFFICIAL COURT REPORTER**

23      **MADISON COUNTY COURTHOUSE - THIRD FLOOR**

24          **JACKSON, TENNESSEE   38301**

25                   **(901)423-6039**

                            372

FILED
AUG 0 7 1997
Clerk of the Courts
Rec'd By _____

1                          __WITNESS INDEX__

2     VERDICT                              Page 375

3     DR. O. C. SMITH

4              Direct Examination          Page 380

5     DR. LYNN DONNA ZAGER

6              Direct Examination          Page 399

7     DR. JOE MOUNT

8              Direct Examination          Page 405

9     RANDY HELMS

10             Direct Examination          Page 411

11    DEBBIE DAVIS

12             Direct Examination          Page 415

13    KATHY HUGO

14             Direct Examination          Page 427

15    CHERYL ARBOGAST

16             Direct Examination          Page 430

17    CAROL ALEXANDER

18             Direct Examination          Page 431

19    CHARGE OF THE COURT                  Page 438

20    VERDICT                              Page 449

21                          - - - - -

22

23

24

25

1                          **EXHIBIT INDEX**

2    EXHIBIT 8, Mannequin              Page 380

3    EXHIBIT 9, Photograph             Page 381

4    EXHIBIT 10, Photograph            Page 384

5    EXHIBIT 11, Photograph            Page 384

6    EXHIBIT 12, Photograph            Page 384

7    EXHIBIT 13, Photograph            Page 385

8    EXHIBIT 14, Photograph            Page 386

9    EXHIBIT 15, Photograph            Page 387

10   EXHIBIT 16, Photograph            Page 388

11   EXHIBIT 17, Photograph            Page 388

12   EXHIBIT 18, Photograph            Page 389

13   EXHIBIT 19, Photograph            Page 389

14   EXHIBIT 20, Photograph            Page 390

15   EXHIBIT 21, Photograph            Page 390

16   EXHIBIT 22, Photograph            Page 391

17   EXHIBIT 23, Photograph            Page 391

18   EXHIBIT 24, Photograph            Page 392

19   EXHIBIT 25, Photograph            Page 392

20                          - - - - -

21

22

23

24

25

                              374

```
 1              (Court was reconvened at 8:30 a.m.;

 2              the jury continued deliberation;

 3              the jury returned into open court

 4              at 10:59 a.m. to report their verdict

 5              as follows:

 6              THE COURT:  Will the foreman or forelady

 7    please stand?

 8              Ma'am, has the jury reached a verdict?

 9              FORELADY:  Yes, sir.

10              THE COURT:  What is the verdict?

11              FORELADY:  We, the jury, find the Defendant

12    Jon Douglas Hall guilty of first degree murder.

13              THE COURT:  First degree murder?

14              FORELADY:  Yes, sir.

15              THE COURT:  All right, ladies and gentlemen,

16    be seated.

17              Members of the jury, you have now found the

18    Defendant guilty beyond a reasonable doubt of murder in

19    the first degree as charged in the indictment Number

20    96-589.  It is now your duty to determine within the

21    limits provided by law the penalty which shall be

22    imposed as punishment for this offense.

23              Tennessee law provides that a person

24    convicted of murder in the first degree shall be

25    punished by death, by imprisonment for life without the
```

375

1   possibility of parole, or by imprisonment for life.

2   The defendant who receives a sentence of imprisonment

3   for life shall not be eligible for parole consideration

4   until the Defendant has served at least 25 years, 25

5   full calendar years of such sentence.

6          The defendant who receives a sentence of

7   imprisonment for life without parole shall never be

8   eligible for release or parole.

9          In arriving at this determination, you are

10  authorized to weigh and consider any mitigating

11  circumstances and any aggravating -- statutory

12  aggravating circumstances which may have been raised by

13  the evidence throughout the entire course of this

14  trial, including the guilt-finding phase or sentencing

15  phase or both.

16         The jury is the sole judge of the facts and

17  the law as it applies to the facts in this case.  In

18  arriving at your verdict you will consider the law in

19  connection with the facts, but the Court is the proper

20  source from which you are to get the law.  In other

21  words, you are the judges of the law as well as the

22  facts, under the direction of the Court.  The burden of

23  proof is upon the State to prove any statutory

24  aggravating circumstances or circumstances beyond a

25  reasonable doubt.  A reasonable doubt is a doubt based

1    upon reason and common sense after careful and

2    impartial consideration of all the evidence in this

3    case.  It is not necessary that the aggravating

4    circumstance or circumstances be proved beyond all

5    possible doubt, as an absolute certainty is not

6    demanded by the law.  Reasonable doubt is just that, a

7    doubt that is reasonable after examination of all the

8    facts in this case.  The law makes you, the jury, the

9    sole and exclusive judges of the credibility of the

10   witnesses and the weight to be given to the evidence.

11          Each side will be given the opportunity to

12   make an opening statement and present any proof as to

13   their respective position.  At the end of the proof,

14   the lawyers will again have an opportunity to make a

15   closing argument.  At that time I'll instruct you as to

16   the law as it applies in the penalty phase.

17          **(The jury was polled as to their**

18          **verdict by the Court, and all**

19          **jurors answered in the affirmative;**

20          **the jury was excused from open court;**

21          **and the following proceedings were**

22          **had to-wit:)**

23          MR. WOODALL:  My understanding, Your Honor

24   had -- or your clerk had some question as to number

25   seven, whether we could rely upon it as an aggravating

377

1  circumstance, theft and burglary.  I called the State

2  Attorney General's office and have the latest case on

3  that which seems to be on point.  It's a murder,

4  premeditated murder, which is alleged here and found by

5  the jury here, where they used felony murder

6  aggravating circumstances, and that's what we're doing.

7          I'll give you the citation, if it please the

8  Court.  I didn't bring the book with me.  The phone

9  call came before I --

10          THE COURT:  Well what is the book?

11          MR. WOODALL:  It will be 876 S.W.2d, 75, and

12  it's a Brimmer case.  I suggest the Court look at Page

13  77 with the following Pages 83 and 84.  The State

14  Attorney General's office said that's well-settled that

15  that was a --

16          THE COURT:  Well after we decide that, I'm

17  going to allow an opening statement, as it says, by

18  each one of you, and will you please be ready after I

19  look at this law.

20          **(There was a short recess, and out**

21          **of the hearing and presence of jury,**

22          **the following proceedings were**

23          **had to-wit:)**

24          THE COURT:  Gentlemen, after consideration

25  and particularly considering the case of the State vs.

1    Brimmer, 876 S.W.2d, 75, the Court is of the opinion

2    that the third aggravating circumstance should not be

3    charged.

4           Now in the Brimmer case, the question of

5    robbery was used in the guilt phase and was not used in

6    the sentencing phase, and if I were to allow point

7    three, it would appear to the Court that the jury would

8    have to find the Defendant guilty of burglary or

9    attempt to commit burglary, and that would mean that

10   we're using something in the sentencing phase that

11   should have properly been used in the guilt phase.  For

12   that reason I'm going to disallow number three.  The

13   other two I will allow.

14          So what we'll do is call the jury in, and I'm

15   going to advise them that they now will have opening

16   statements, and they can consider, as I've stated,

17   what's already taken place, along with anything else.

18          MR. WOODALL:  Fine, Your Honor.

19          **(The jury returned into open court;**

20          **opening statements were made on**

21          **behalf of the State and the Defendant;**

22          **and the following proceedings were**

23          **had to-wit:)**

24          MR. WOODALL:  Your Honor, the State would

25   call Dr. O. C. Smith.

1          **DR. O. C. SMITH** was called and being first

2    duly sworn, was examined and testified as follows:

3    **DIRECT EXAMINATION**

4    **BY MR. WOODALL:**

5    Q        Dr. Smith, you've already been identified to

6    the jury and again been sworn, and I formally will ask

7    you to look at the mannequin on which you utilized

8    yesterday to draw in with green pen certain injuries

9    received by Billie Jo Hall and ask you if that is the

10   one and the same mannequin?

11   A        Yes, sir, it is.

12   Q        I would like to ask that at this time that

13   that be made an exhibit for your testimony today and

14   marked as State's Exhibit Number 8.

15           **(Exhibit 8 was marked and entered.)**

16   Q        Now, Doctor, did you take or did you have

17   taken or were you provided with a group of photographs

18   which were taken concerning the remains of Billie Hall

19   that you have examined and have utilized in preparation

20   for your testimony in the penalty phase of this trial

21   A        Yes, sir, these are photographs that I took

22   by my own hand during the conduct of the autopsy on

23   Mrs. Hall.  Additionally, I did prepare enlargements of

24   those using our digital camera and computer set-up.

25   Q        I'll hand to you which I will ask be marked

380

1    as State's Exhibit Number 9 and ask you if you can

2    identify that photograph.

3              **(Exhibit 9 was marked and entered.)**

4    A         Yes, sir.

5    Q         And what does that photograph depict, and if

6    you would, I'll ask you -- and this question even not

7    asked applies to each and every one of these

8    photographs -- did you take them and did you prepare

9    them for use in court today?

10   A         Yes.

11   Q         And is that the photograph, and each and

12   every photograph which will be shown to you, are they

13   photographs made by you of Billie Jo Hall?

14   A         Yes, sir, these are photographs prepared by

15   my own hand.  The originals were Polaroid photographs,

16   again made by my own hand at the time of the autopsy.

17   The photograph I'm holding in my hand and the others

18   like it are enlargements that, again, I made by my own

19   hand.

20   Q         Now what does that photograph show?

21   A         This exhibit depicts the front of Mrs. Hall's

22   body from her head to about the mid-thigh region and

23   depicts the body in the condition it was received at

24   the Regional Forensic Center.

25   Q         All right.  And does it depict on there any

381

1    injuries?

2    A        Yes, sir.

3    Q        And are those also demonstrated on your

4    mannequin?

5    A        Yes, sir.

6    Q        And would you please come around to the

7    mannequin and show --

8             MR. WOODALL:  May I somewhat approach this

9    witness during this?

10            THE COURT:  Yes, sir.

11   Q        And if you'll hand me that photograph.  And

12   show us what injuries -- Come around and show us what

13   injuries are depicted on this photograph.

14   A        The injuries on the photograph are depicted

15   up here from the top of the head showing the injuries

16   to the eye and the brow, the fracture of the nose, the

17   tear underneath the chin and the bruises and skin

18   scrapes associated with that.  Additionally, there was

19   this pattern or group of bruises over the right chest

20   region, and some of the skin scrapes and bruises on the

21   upper extremities, the arms, are seen in that

22   photograph.  The photograph goes down to about mid-

23   thigh region, and I believe some of those areas of

24   bruising are also indicated in that photograph.

25            MR. WOODALL:  I'd like to pass this to the

1    jury for their consideration, Your Honor.

2            THE COURT:  Have you seen it, Mr. Ford?

3            MR. FORD:  I've seen them, Your Honor.

4            THE COURT:  All right, sir.  Mr. Ford, unless

5    there's some objection made, I'm going to -- if you --

6            MR. FORD:  Your Honor, we object, but --

7            THE COURT:  Well overruled for now.

8            MR. FORD:  Yes, sir, I understand.

9            THE COURT:  But I'm saying, as you go along,

10   if you want to object, why you need to do it.

11   Otherwise I'm going to --

12           MR. FORD:  We'll have a standing objection.

13   We understand it's overruled, Your Honor.

14           THE COURT:  General, as a suggestion, go

15   ahead and show the pictures so they can all be looking

16   at them at the same time, up to a point.

17           MR. WOODALL:  Well, I'll do that if -- I'll

18   put several of them together, but I need to, if I may

19   do it --

20           THE COURT:  All right, go ahead.  I was just

21   trying to ...

22   Q        Doctor, I want to show you which will become

23   State's Exhibit Number 10 which is a photograph of the

24   face and ask you to point out on the mannequin the

25   injuries displayed in that photograph.

383

1          **(Exhibit 10 was marked and entered.)**

2    A          This photograph, Exhibit 10, depicts the face

3    and neck region from the front of Mrs. Hall.  It shows

4    in particular the areas of bruising to the top of the

5    head and areas of pattern bruising to the brow which

6    shows a circular-type injury, a triangular-type area of

7    bruising to the left brow, areas of bruising about each

8    eye, the area of the fracture of the nose, shows some

9    of the bruising of the left cheek and shows some of the

10   bruising of the right neck.

11         MR. WOODALL:  I'd like to ask that that be

12   passed to the jury for their consideration.

13   Q          I'd like to show you two photographs, the

14   first of which will be State's Exhibit Number 11,

15   showing the left side of the forehead, what will become

16   State's Exhibit 12 which is the frontal view showing

17   the nose and the forehead and ask you if you can tell

18   the jury -- point out where they are displayed on the

19   mannequin, please.

20         **(Exhibits 11 and 12 were marked**

21         **and entered.)**

22   A          Yes, sir.  Exhibit 11 shows the left side of

23   the brow and the upper face showing, again, the

24   triangular pattern of bruising over the brow with some

25   skin scrapes or abrasions immediately above and to the

384

1  side, another area of bruising next to that area of

2  bruising above the brow, areas of skin scrape here

3  adjacent to the cheek and the bruising around that area

4  of injury as well as the left eye and the attendant

5  bruising.  It also shows the deformity of the tip and

6  the base of the nose.

7      MR. WOODALL:  Pass those to the jury, please.

8  A      Exhibit 12 shows a close-up of the forehead

9  region depicting once again the triangular injury here

10  and a pattern circular injury between the eyes slightly

11  to the left.  Additionally, it has a close-up area

12  showing the area of damage to the nose and the

13  discoloration around the eye which are due to both skin

14  scrapes and the bruises.

15  Q      I hand you what will become State's Exhibit

16  Number 13, that photograph displaying the full left

17  side of the face, upper neck and lower neck and ask you

18  if you can show the jury where those injuries are.

19      **(Exhibit 13 was marked and entered.)**

20  A      Yes, sir.  The left side of the face and neck

21  are depicted here, again showing the previously

22  described injuries to the brow, the eyes, the cheek.

23  The chin area is more thoroughly displayed, as well as

24  some skin scrapes immediately below the left ear, some

25  of the bruises to the left side of the neck.

1   Additionally, it shows the area that was covered by her

2   hair, but it shows the area of bleeding underneath the

3   scalp behind the left ear.

4   Q        Now would these bruises to the neck, every

5   time you describe them, would that relate to the

6   strangulation that you referred to in your testimony

7   yesterday?

8   A        The area of bruising in the upper portion of

9   the neck would more likely relate to the strangulation

10  as opposed to the injuries that are depicted on the

11  side and the base of the neck on the left.

12  Q        All right.  In conjunction with this, I hand

13  you what will become State's Exhibit Number 14, and

14  does that clearly reflect the injuries to the underside

15  of the lip of the deceased as well as the chin

16  injuries?

17          **(Exhibit 14 was marked and entered.)**

18  A        Yes, sir.  This photograph, Exhibit 14, shows

19  bruising at the inside of the lips of the right center

20  and left, as well as depicting the areas of bruising

21  and skin tears and skin abrasions, or skin scrapes,

22  underneath her chin.  Eventually the bruises to the

23  left and right side of the neck are depicted more

24  thoroughly.  Also depicted are the abrasions and

25  bruises of the right jaw line.

1    MR. WOODALL:  I'd pass those to the jury.

2    Q    I show you what will be Exhibit 15 and ask

3    you if that depicts the left side of the victim's face,

4    and would you point out those injuries to the jury?

5    **(Exhibit 15 was marked and entered.)**

6    A    Yes, sir.  This photograph depicting the left

7    side of the face prominently displays the defamation of

8    the nose due to the fracture, the skin scrapes and

9    bruises about the eye, up on the brow.  It shows some

10    of the bleeding into the ear and the scalp behind it as

11    well as some abrasions or skin scrapes in front of the

12    ear, nearly down below the ear, at the jaw line,

13    bruising along the cheek, and areas of bruising on the

14    right side of the neck.

15    MR. WOODALL:  Pass that to the jury.

16    THE COURT:  Mr. Woodall, how many more

17    pictures have we got?

18    MR. WOODALL:  Oh, in the neighborhood of

19    eight to ten.

20    THE COURT:  Several of these pictures are

21    almost the same, and I wonder if you could pick them

22    out and reduce the number.

23    MR. WOODALL:  I've already done that, Your

24    Honor.  I have a stack underneath here that I've done

25    that.  I'm trying to do that as I go through.

387

1          THE COURT:  All right.  If you will, please

2    ...  I'm not --

3          MR. WOODALL:  Your Honor, I understand.

4    Q          I hand to you which will become State's

5    Exhibit Number 16, and you mentioned yesterday in your

6    testimony some pattern injuries above the victim's left

7    breast, and I ask you what that photograph depicts.

8          **(Exhibit 16 was marked and entered.)**

9    A          Yes, sir.  Exhibit 16 depicts some of the

10   bruising up here in the collarbone region, as well as

11   this pattern of bruising that has a letter designated

12   "K" next to it, indicating four bruises in a line and

13   one bruise back behind that line depicted here

14   (indicating).

15          MR. WOODALL:  Pass that to the jury.

16   Q          I want to hand you what will become State's

17   Exhibit 17 and which purports to be photographs of the

18   back of the victim and ask you if you can show the jury

19   where those injuries are.

20          **(Exhibit 17 was marked and entered.)**

21   A          Yes, sir.  Exhibit 17 depicts the back

22   showing areas of skin scraping along the back of the

23   upper left shoulder, areas of skin scrapes along the

24   line of the upper right shoulder, areas of bruising as

25   indicated here in the center of the back, and some of

1    the line, parallel line, skin scrapes in the center of

2    the back and in the lower portion of the back, as well

3    as some more bruising and some more skin scraping on

4    the lower left.  Additionally, it shows some of the

5    bruising here and some of the scrapes of the back of

6    the left elbow.

7              MR. WOODALL:  Pass that to the jury.

8    Q         You mentioned yesterday in your testimony

9    that there was a wound to the groin area of the victim,

10   and I hand you what is State's Exhibit Number 18 and

11   ask you if you can identify that photograph.

12             **(Exhibit 18 was marked and entered.)**

13   A         Yes, sir.  This photograph depicts the wound

14   that I gave the letter designator "L" to.  It is in the

15   left groin about in this area (indicating) and shows it

16   depicted in the photograph.

17   Q         We'll just save that one and pass it along

18   with that one.  I hand you what will become State's

19   Exhibit 19, and I believe that will be a photograph of

20   the right hand; is that correct?

21             **(Exhibit 19 was marked and entered.)**

22   A         Yes, this is a photograph of the right hand

23   and the forearm showing bruises up on the forearm and

24   located between the knuckle on the back of the hand and

25   a bruise further up the back of the hand on the little

389

1    finger side.

2    Q        Do these demonstrate what you testified to

3    yesterday and pointed out on the mannequin as which you

4    refer to as defensive wounds?

5    A        Yes, sir, these could be interpreted as

6    defensive wounds.

7            MR. WOODALL:  Pass those at this time.

8    Q        I hand you what will become State's Exhibit

9    20 which will be the inside of the right arm.  Is hat

10   correct?

11   A        Yes, sir.

12           **(Exhibit 20 was marked and entered.)**

13   Q        And also Number 21 which will show the left

14   arm, upper arm, lower arm and hand, and ask you to show

15   the jury on those exhibits.

16           **(Exhibit 21 was marked and entered.)**

17   A        This Exhibit 20 shows the inside of the right

18   forearm depicting injuries to the palm side of the

19   thumb, a bruise right were the thumb joins the wrist,

20   and then as not depicted on the mannequin, an area of

21   red scraping where the skin sort of had been scraped

22   away.

23   Q        Is that consistent with being drug on either

24   asphalt or hard surface?

25   A        Yes, sir, it would indicate pressure of that

390

1    type, some hard or abrasive surface.  It's on the

2    inside of the right elbow extending onto the forearm,

3    and it's not depicted on the mannequin but it is

4    depicted on the photograph.

5            Exhibit 21 shows the bruising that's present

6    on the left upper arm, abrasions or skin scrapes on the

7    left elbow and then the pattern of bruises on the left

8    forearm which are depicted on the mannequin in this

9    area (indicating).  It does not show the back of the

10   hand, but it does show the bruises and skin scrapes

11   here at the wrist area and then going up the forearm to

12   the elbow and at the biceps area.

13   Q        Are there any defensive wounds reflected in

14   those photographs?

15   A        The bruises that are on this side of the

16   forearm, the little finger side known as the ulnar

17   side, would be characteristic of defensive wounds and

18   could be defined as such.

19   Q        I hand you what will become State's Exhibit

20   22 and 23.

21            **(Exhibits 22 and 23 were marked**

22            **and entered.)**

23            MR. WOODALL:  Go ahead and pass these.

24   Q        And that shows the inside of --

25   A        Exhibit 22 shows the inside of the right hand

391

1    depicting with greater clarity the area of skin

2    scraping of the pad of the thumb, as well as the area

3    of bruising where the thumb joins the wrist.  It also

4    shows on the little finger another area of bruising at

5    the wrist.

6    Q          And Number 23, I ask you what that picture

7    depicts.

8    A          Exhibit 23 depicts the back of the left hand

9    showing the bruises over the knuckle of the left ring

10   finger and another smaller bruise directly up the back

11   of the hand from that.

12              MR. WOODALL:  Pass those.

13   Q          I hand you two final photographs and ask you

14   if they both depict injuries to the legs, and point out

15   where they are on your mannequin, please.

16              **(Exhibits 24 and 25 were marked**

17              **and entered.)**

18   A          Yes, sir.  Exhibit 24 depicts the front

19   surface of both legs showing the areas of bruising

20   depicted here where I'm pointing and skin scrapes above

21   the knee, as well as some of the bruises below the

22   know, at which point the photograph ends.  The left leg

23   shows the area of skin scraping here on the inside of

24   the left knee and the area of skin scraping on the left

25   ankle.

1          Exhibit 25 is a photograph which shows the

2     inside of the left leg showing the skin scraps at the

3     foot, ankle, shin where the letter designators of "A"

4     and "B" are visible.

5     Q          Do we see any defensive wounds there?

6     A          Some of these may be defensive wounds if a

7     person is trying to block a blow with their leg.

8     Others are skin scrapes going in an upward direction.

9     They may be related to being forcibly moved.

10          MR. WOODALL:   Pass those to the jury, please.

11    Q          I'd ask you to take the stand.

12          Dr. Smith, do State's Exhibits Number 9

13    through 25 reflect the 83 some-odd injuries that you

14    testified to yesterday that were visible to you by your

15    examination of the remains of Billie Jo Hall?

16    A          Yes, sir.

17    Q          And do these photographs also clearly reflect

18    the -- I forget the medical term, but where there's

19    more than one injury that occurs at or about the same

20    place, that they diffuse into one another or fuse?   I'm

21    not sure of the term that you used.   Do they reflect

22    those also?

23    A          Yes, sir.   I believe you're referring to

24    those areas where multiple blows to the same area would

25    cause the bruises to become confluent, or run together

393

1    so one wouldn't be able to distinguish.  The

2    photographs also depict those areas.

3    Q        Now, you testified yesterday that there was a

4    pattern wound above the left breast, and what did you

5    say or feel like from a medical standpoint caused these

6    particular injuries?

7    A        I believe I testified before that the pattern

8    would be consistent with that made by a fist; in other

9    words, the knuckle pattern was depicted in the bruising

10   on the skin surface.  However, that is merely one

11   suggestion that may be responsible for producing that

12   type of bruising pattern.  Certainly the mechanism and

13   the pattern fit.  But without better known

14   circumstances, it would be difficult to say that it was

15   that type of object and no other that produced that

16   bruising pattern.

17   Q        What types of instruments would be used, or

18   what type of surfaces would be present in the injuries

19   that were inflicted upon Billie Jo Hall?

20   A        There are multiple -- The skin scrapes to the

21   knee and to the inside of the elbows show contact with

22   a broad, abrasive-type surface.  There is a pattern

23   circular injury just to the left of the center of her

24   forehead which shows two circles within each other, a

25   concentric circular pattern, which would suggest

394

1   something like a cylinder which may be hollow or a

2   thick, long pipe.  Additionally, there is a triangular

3   surface -- or triangular bruise to her forehead which,

4   again, would indicate some object that had that type of

5   shape.  Specifically what I couldn't say, but something

6   that had a triangular shape.  There are the areas of

7   bruising to her check which, again, may suggest a type

8   of instrument.  As for the others, there are no other

9   injuries that have a characteristic pattern of the

10  instrument.  However, there may be some mechanism that

11  may be present based upon the injury pattern.   The

12  bleeding into the top of the head and on the sides may

13  be due to either blunt trauma or impact with a broad,

14  blunt surface, or the hair may have been pulled and the

15  scalp pulled away from the skull.

16  Q          Would the broad, blunt surface be consistent

17  with Billie Jo Hall's head being hit against the floor

18  that was carpeted?

19  A          Yes, sir, that could be one mechanism amongst

20  many that could produce that type of injury.  The skin

21  itself on the top of the head was not injured.  It was

22  not bruised or scraped away, and it may have been

23  protected somewhat by hair, or it may have resulted in

24  the sudden shifting of the scalp, tearing the scalp

25  away from the skull.  Additionally, a blow with an

395

1    object may cause such an injury, as well as being

2    propelled into some type of object.  But those are the

3    various mechanisms that could be responsible for that

4    type of injury.

5    Q        There are a number of these injuries.  Could

6    they be inflicted as a result of being drug across

7    asphalt or being drug across hard ground?

8    A        Yes, sir.

9    Q        Are some of them also consistent with having

10   been caused by the hair of Billie Jo Hall being grabbed

11   and jerked and used to pull her with?

12   A        Yes, sir, some of those injuries could,

13   especially the ones I described about the top of the

14   head and the side.

15   Q        You testified yesterday that in these

16   injuries you saw a pattern or patterns of targeting.

17   What's reflected in the injuries in the photographs as

18   well as on the mannequin as to that?

19   A        Yes, sir.  There is a concentration of areas

20   of damage to the head and the face and the neck which

21   would be far in excess of anything that could be --

22   could occur by accidental means.  They are intentional,

23   and they appear to be focused in the head, neck and

24   face region.  Additionally, the areas of the back show

25   a focus of attention beyond which accidental means

1    could produce that type of injury.

2    Q        Does this type of targeting and injuries not

3    caused obviously by accidental means, is this from a

4    medical standpoint, forensic pathology standpoint,

5    indicate to you that torture was present in the beating

6    of Billie Jo Hall?

7    A        Yes, sir.

8    Q        Now, due to the magnitude of these injuries,

9    the 83 -- And when we talk about the 83, do we also

10   include the injuries that you uncovered as a result of

11   your surgical procedure that showed the strangulation

12   inside?

13   A        No, sir.  The 83 injuries were the injuries

14   that you could see from the skin surface.  They did not

15   specifically indicate the injuries to the tongue and

16   the structures of the deep neck, the muscles, the

17   thyroid gland, the area around the hyoid gland.

18   Q        If you take all these injuries in

19   combination, those applied to the outside to the arms

20   and the head and the stomach and the back and the groin

21   and the legs and the feet and the hands and the head --

22            MR. FORD:  Objection to being argumentative,

23   Your Honor.  We're not in closing, and this is --

24            THE COURT:  I believe, Mr. Woodall, that you

25   covered --

397

1          MR. WOODALL:  I'm trying to ask a question,

2   Your Honor.

3          THE COURT:  Well, rephrase it.

4   Q       Was there serious physical abuse inflicted

5   upon the remains of Billie Jo Hall beyond that

6   necessary to produce death?

7   A       It would be my medical opinion that that's

8   correct.

9          MR. WOODALL:  Your witness.

10         MR. FORD:  No questions, Your Honor.

11         **(WITNESS EXCUSED.)**

12         MR. WOODALL:  State rests.

13              - - - - -

14         **DR. LYNN DONNA ZAGER** was called and being

15   first duly sworn, was examined and testified as

16   follows:

17         MR. MAYO:  Your Honor, we have a stipulation,

18   that Dr. Zager is a qualified expert in the field of

19   psychology.

20         THE COURT:  Ladies and gentlemen, this same

21   witness was heard by you yesterday, and you remember

22   her qualifications.  She was qualified in --

23         What is it, psychology?

24         THE WITNESS:  A psychologist, that's correct,

25   Your Honor.

1          THE COURT:  All right, she's a qualified

2     psychologist.  She can testify in her field.

3          Go ahead.

4     **DIRECT EXAMINATION**

5     **BY MR. MAYO:**

6     Q          Dr. Zager, you testified earlier, and would

7     it be fair to say that you interviewed Jon on three

8     occasions; is that correct?

9     A          That's correct.  I saw him face to face on

10    three different occasions.

11    Q          Dr. Zager, did you take a history of Jon Hall

12    on at least one of those occasions?

13    A          In fact, on more than one occasion I took a

14    history, and I also was able to review records of

15    interviews that were conducted of family members and

16    others who knew Jon.

17    Q          Dr. Zager, what did you learn about Jon's

18    childhood and perhaps the way it would impact him as an

19    adult?

20    A          Jon was the youngest of the children in the

21    family.  His father, as I said yesterday, was an

22    alcoholic, or actually alcohol dependent is how a

23    professional would say it, and his grandfather also had

24    a significant alcohol problem.  From the time that he

25    was born, his father denied that he was his son, and he

                              399

1    did not have much of a relationship at all with his

2    father.  He as significantly close with his mother.

3    There was spousal abuse in the relationship between his

4    mother and his father, and he witnessed that, and all

5    these things I would say have an impact on his

6    development.

7    Q        Dr. Zager, in your opinion, your professional

8    opinion, what kind of impact would that have?  Would

9    you explain that a little bit for us?

10   A        For one thing, you know, children grow up and

11   you expect that the household is going to be a place

12   where you have love and security.  That's not something

13   that this man grew up with.  There was conflict, and he

14   didn't have very good role models in terms of how to

15   deal with relationships or how to deal with conflict.

16   Q        As you discussed the matter with Jon Hall,

17   did you have any opinion as to -- were you able to

18   formulate any opinion as to whether he felt remorse

19   over this incident?

20   A        Yes, he did.  In my opinion I think he does

21   feel remorse.

22   Q        How is it that that was expressed to you?

23   For example, did he cry?

24   A        Yes, he cried, as I said yesterday.  In my

25   opinion he suffers from depression.  He was

400

1    significantly more depressed I'd say the first time I

2    saw him, but each and every time that I saw him he was

3    sad and he cried.

4    Q        When you say depression, and I don't want to

5    go over what you said yesterday, but could you tell us

6    what clinical depression -- how it affected Mr. Hall?

7    A        Most people have moods.  That's not anything

8    that's very significant.  You feel good or you feel

9    bad.  When somebody suffers from depression, it lasts

10   over a period of time.  It has to be at least 30 days.

11   The person has a sad feeling, crying spells.  There's a

12   change in appetite; either people eat too much or don't

13   eat enough.  There's a change in sleep pattern where

14   they sleep too much or they don't get enough sleep or

15   they can't stay asleep.  They have difficulty

16   concentrating, and they have thoughts of death or

17   suicide.  At least five of those need to be met, and

18   that was the case in Mr. Hall.

19   Q        Did Mr. Hall have thoughts of suicide?

20   A        Yes, he did.

21   Q        Would you consider those significant?

22   A        Yes, I would.

23   Q        You stated earlier also in your testimony

24   that he suffered from, in your opinion, alcoholism.  Do

25   you think this affected the way that he behaved?

401

1    A          Alcohol dependence is a diagnosis, but there

2    are a number of things that go along with the

3    personality of someone who is dependent on alcohol.

4    Q          Did you speak to Jon about his family, his

5    children?

6    A          Yes.  We spoke about his relationship with

7    the children.  They meant everything to him, all four

8    of the children.  He was the primary caretaker for the

9    younger children for I think approximately two years.

10   And, you know, given his history in terms of the

11   family, I think he was very protective of the children.

12   Q          Dr. Zager, do you have children yourself?

13   A          Yes, I do.

14   Q          Dr. Zager, in talking to Jon, based upon your

15   experience as a psychologist and as a parent, were you

16   able to determine if this love that he had was sincere?

17   Could you tell that?

18   A          It was my impression that it was sincere,

19   that this is not somebody just trying to create an

20   impression.  I felt like we had very candid and open

21   discussions.

22   Q          Did he talk about his youngest daughter with

23   you, Jessie?

24   A          Yes, he did.

25   Q          And what did he talk about?

402

1    A        He talked about the difficulties that she

2    had.  You know, you have hopes and dreams for your

3    children, and she was born with a significant handicap,

4    and he loved her, cared for her and misses the

5    relationship he had with her.

6    Q        Dr. Zager, you had mentioned earlier -- we

7    had discussed alcohol dependency.  What were the

8    symptoms in Jon Hall that you observed?  And if you

9    could expand a little bit, how would that affect his

10   judgment capability?

11   A        In terms of somebody who has an alcohol

12   dependence, there's something known as alcohol abuse

13   where somebody periodically drinks to excess, and with

14   alcohol dependence, the person drinks to excess and

15   develops something called tolerance, or they have

16   withdrawal, and in his case, as he described it, he

17   didn't see any -- the point of drinking was to drink to

18   the point that you're intoxicated, or until you passed

19   out.  Along with that, an individual who has alcohol

20   dependence has problems in their relationships with

21   others, by definition, and also has problems in terms

22   of their occupation, and he demonstrated all of this as

23   a result of his dependence on the alcohol.  I'd say

24   also, not criteria for diagnosis, but he also has

25   personality characteristics that are very dependent --

403

1   he's very dependent on others, not only alcohol but on

2   significant people in his life.

3   Q       Do you feel that the alcohol dependency that

4   he exhibited was of a degree that could have

5   substantially affected his judgment?

6   A       That's difficult to answer.  Certainly in an

7   intoxicated state his judgment I'd say is compromised.

8   In terms of from the dependency, I'm not sure that that

9   would be the case.

10  Q       Primarily from -- if he was intoxicated,

11  that's when the problems would arise.

12  A       Correct.  That's when his judgment would be

13  more compromised.

14  Q       Dr. Zager, based upon your interviews with

15  Jon Hall, were you able to develop any opinion as to

16  whether he was having domestic problems at the time the

17  offense was committed?

18  A       Without a doubt he was having domestic

19  problems around the time this happened and for quite

20  some time before it happened.

21  Q       In your opinion, did those domestic problems

22  also have a bearing in his mental condition at the

23  time?

24  A       Yes.  That was one of the stressors.  I

25  talked about stressors yesterday that he was

1    experiencing around the time.  The domestic problem was

2    one of those stressors.

3              MR. MAYO:  Thank you, Dr. Zager.

4              MR. WOODALL:  No questions.

5              **(WITNESS EXCUSED.)**

6                          - - - - -

7         **DR. JOE MOUNT** was called and being first duly

8    sworn, was examined and testified as follows:

9    **DIRECT EXAMINATION**

10   **BY MR. MAYO:**

11   Q        Would you state your name for the Court,

12   please, sir?

13   A        Joe Mount.

14   Q        Dr. Mount, what is your occupation?

15   A        I'm a psychological examiner at Riverbend

16   Maximum Security.

17             MR. WOODALL:  We'll stipulate he's an expert

18   psychological examiner.

19             MR. MAYO:  We'll accept the stipulation, Your

20   Honor.

21             THE COURT:  All right, you'll consider him an

22   expert in his field.

23   Q        Dr. Mount, you continue to work at Riverbend;

24   is that correct?

25   A        Yes, sir.

                          405

1    Q        At some point did you come in contact with

2    Jon Hall?

3    A        Yes, sir.

4    Q        Dr. Mount, what was your relationship with

5    Jon Hall?  Why did you begin talking to him?

6    A        I'm a mental health professional there at

7    Riverbend, and Jon requested services.

8    Q        Did you speak to him?

9    A        Yes, I did.

10   Q        Did you interview him?

11   A        Yes.

12   Q        How many times did you interview Mr. Hall?

13   A        We had approximately six to eight formal

14   counseling sessions, approximately six to eight what

15   are called mental health screening evaluations that are

16   required and numerous other just informal cell visits.

17   While I would happen to be in his pod he might call me

18   over and have a word or two or whatever.

19   Q        What seemed to be his concerns at that time,

20   Dr. Mount?

21   A        Main concern was that he was extremely

22   distraught and depressed regarding his case.

23   Q        And what was he depressed and distraught

24   about?

25   A        The episode that led to his charges.

406

1   Q           Were you able to determine, Dr. Mount, if he,

2   in your professional opinion, expressed remorse over he

3   death of his wife?

4   A           I believe he did, extreme remorse.

5   Q           Extreme remorse.  How did that manifest

6   itself to you?

7   A           During the counseling sessions that were held

8   in the triage room and in the unit, there were episodes

9   of crying, of appearing extremely sad, statements of

10  regret and so forth.

11  Q           Did he appear to be sincere in your opinion?

12  A           Yes, sir.

13  Q           Was there anything else such as suicidal

14  thoughts, anything of that nature?

15  A           Yes, sir.  He was admitted to the clinic on

16  at least two separate occasions back in '94, I believe

17  September and October, with some suicidal thoughts,

18  statements of some effect that were brought to the

19  attention of the staff there, and he was admitted to

20  the clinic for observation.

21  Q           Was that what could be called suicide watch?

22  A           Right.

23  Q           Were you able to determine in your opinion

24  what the cause of his wishing to end his life was?

25  A           Yes, sir, I think it was certainly related to

                                407

1    his case and the episode that occurred that, you know,

2    resulted in his charges, you know, regarding his wife,

3    extremely distraught about that and depressed for a

4    long time.  I think that would result in that.

5    Q        Dr. Mount, in your screenings of him and your

6    formal interviews and your informal cell visits, at

7    some point did you make a diagnose on what you thought

8    Jon Hall suffered from?

9    A        His diagnosis actually was given by the

10   psychiatrist and the mental health treatment team that

11   meets regarding someone that receives services.  So

12   that was really the psychiatrist that made the

13   diagnosis.

14   Q        What was the diagnosis?  Did you have a

15   chance to review those records?

16   A        Yes, I did.  It was adjustment disorder with

17   mixed emotional features, and if I recall correctly, a

18   substance abuse of dependence by history, is what was

19   on his last treatment plan, mental health treatment

20   plan.

21   Q        What about depression?  Is that what you've

22   already spoken of?

23   A        That was in the initial evaluation.  Well the

24   depression would be -- When I said mixed emotional

25   features, that would include depression and anxiety.

1    Q        Did you develop or did the psychiatrist

2    develop any treatment plan?

3    A        Yes, we did.

4    Q        And what was that, Dr. Mount?

5    A        It was to involve our individual counseling

6    sessions which we had, the ones that I mentioned, and

7    he was also prescribed medication.

8    Q        What was that medication?

9    A        Memphromene.

10   Q        What kind of medication?

11   A        It's an anti-depressant.

12   Q        During the counseling sessions, Dr. Mount,

13   did you feel that Jon Hall was getting better or

14   dealing with his problems any better?

15   A        I believe he improved as we began to

16   establish rapport.  I think he certainly appreciated my

17   visits.  He was sincere in terms of discussing the

18   problems that he had on his mind.  I do believe that

19   overall he did show some improvement.

20   Q        Did you discuss with Mr. Hall his family, in

21   particular his children?

22   A        Yes, sir.

23   Q        Did he express any feelings for them in your

24   opinion?

25   A        Yes, sir.

1    Q        And in your opinion did he seem to be sincere

2    about those feelings?

3    A        Yes, sir.

4    Q        What were those feelings?

5    A        Extremely concerned about his children, not

6    being able to see them.  In my opinion I think he cared

7    a great deal about his children, just based on our

8    interviews.

9    Q        Did you talk to him about any of his children

10    in particular?

11    A        There was -- One that comes to mind is one

12    that was handicapped.  I'm not sure of the diagnosis

13    that the child has, but I vaguely remember his concern

14    about that child.

15            MR. MAYO:  Thank you, Dr. Mount.

16            MR. WOODALL:  No questions.

17            **(WITNESS EXCUSED.)**

18            **(There was a recess for lunch from**

19            **1:20 p.m. until 2:30 p.m., and the**

20            **following proceedings were had**

21            **to-wit:)**

22

23

24

25

410

1          **RANDY HELMS** was called and being first duly

2     sworn, was examined and testified as follows:

3     **DIRECT EXAMINATION**

4     **BY MR. FORD:**

5     Q        State your name, sir.

6     A        Randy Helms.

7     Q        And your address, please, sir.

8     A        Lexington, Tennessee.

9     Q        Mr. Helms, you were here yesterday, and you

10    understand that we're in a different part of this trial

11    today.

12    A        Yes, sir.

13    Q        You stated yesterday that you had known Jon

14    Hall for about two years.

15    A        Yes, sir, year and a half or two years.

16    Q        Up until the time of this incident regarding

17    Billie Hall.

18    A        Yes, sir.

19    Q        If you would, give us a brief summary of your

20    relationship with Jon and Billie Hall.

21    A        Kind of from when it started?

22    Q        Yes, sir.

23    A        Jon put an application in to go to work for

24    us, and then he came by later to talk to me and told me

25    the reason that he needed a job was that he had four

411

1   little girls, and his wife, I don't remember whether he

2   said she was working full-time or part-time at that

3   particular time, but he said he bad needed a job for

4   the income, of course, and we hired him because of the

5   circumstances.  At that time I didn't actually even

6   need anybody else right then, but I thought that was a

7   pretty good reason for a man needing a job, and that's

8   when we hired him and he went to work, and I'm thinking

9   that was probably sometime in '93, latter '92 or early

10  '93, somewhere along in there.

11  Q        And how did he perform as an employee?

12  A        He did a good job.  He did good work.  He was

13  a good mechanic.  I never had any problems with him.

14  He never missed any work, you know, as far as -- He was

15  always on time.  He didn't take off for being sick or

16  having to be off for different reasons.  He was

17  dependable and he did a good job.

18  Q        Did he ever work any overtime?

19  A        Yes, sir, at different times.  Of course, he

20  made time and a half when he worked any over 40 hours,

21  and he would work after 5:00 sometimes through the

22  week, but he would come in and he worked some on

23  Saturdays, half a day, sometimes a whole day on

24  Saturdays.

25  Q        Did you ever observe Jon Hall with his

412

1   children, with the four girls?

2   A      Yes, sir.

3   Q      And when and where would you observe them?

4   A      Three or four different times when he was

5   keeping the children like on Saturday, he brought them

6   with him to work, and he asked me because he knew that

7   wasn't in our policy, but he brought the kids with him

8   when he came in to work some on Saturdays, and a couple

9   of them would stay with him where he was working, and

10   maybe one or two stayed in the van and read or played

11   with toys or whatever.  But two or three different

12   times when he was there he had all four of the kids

13   with him.

14   Q      And how did he act or react with the

15   children?

16   A      I mean, normal, in a normal way that I could

17   tell.  He always -- Like I say, a couple of them came

18   in and stayed with him, and he kind of had to work and

19   see after them, and, you know, he would get a Coke or

20   something and carry it and give it to ever which two

21   were in the van or whatever.  But, I mean, the two or

22   three times -- the only two or three times I observed

23   him when he had his kids and all, he took excellent

24   care of them while they were there at work.

25   Q      Mr. Helms, in your opinion, is there value to

413

1  the life of Jon Hall?

2  A        Yes, sir.

3  Q        Why is that?  Why would you come here and say

4  that?

5  A        Can I have just a minute?

6  Q        Yes, sir.  Take your time.

7  A        I talked to Jon quite a bit when he and

8  Billie were having family problems, and I talked to

9  Billie quite a bit.  And I liked Billie and I thought a

10 lot of her, and I considered her a friend just like I

11 do Jon.  Jon loved his wife and kids.  I mean, he told

12 me that time and time again.  His wife and his kids

13 were his life.  He sat there and told me how much he

14 cared and how much he loved his family and how much it

15 meant to him and all on there, and, I mean, you don't

16 make that up.  He was telling me the truth when he told

17 me that.  His hopes in life and all was they could work

18 out whatever their problems were and hopefully go on

19 and make a good life and raise these kids, you know.

20 It just didn't turn out that way.

21 Q        Did he voluntarily leave employment with you?

22 A        Yes.  And I tell you what, that's another

23 thing.  The last probably couple of months that he

24 worked there, his performance wasn't very well.  He

25 couldn't help it though.  He couldn't do his work very

414

1    well, and I couldn't fire him.

2    Q        Why couldn't you fire him?

3    A        Because I knew what he was going through and

4    kind of the circumstances what was going on.  He knew I

5    couldn't fire him because he knew that I'd never fire

6    him under the circumstances, the problems that they

7    were having.

8    Q        He was man enough to quit.

9    A        He was man enough to quit, to keep me -- I

10   don't know whether I would ever have fired him.  I

11   would have eventually probably had to, only because of

12   the circumstances that he just couldn't perform his

13   job, but he couldn't help that.

14       MR. FORD:  Thank you, Mr. Helms.  Mr. Woodall

15   might have some questions.

16       MR. WOODALL:  I don't have any questions.

17   Thank you, Mr. Helms.

18       **(WITNESS EXCUSED.)**

19                    - - - - -

20       **DEBBIE DAVIS** was called and being first duly

21   sworn, was examined and testified as follows:

22   **DIRECT EXAMINATION**

23   **BY MR. MAYO:**

24   Q        State your name for the Court, please.

25   A        I'm Debbie Davis.

                            415

1    Q         Mrs. Davis, you're Jon's sister; is that

2    correct?

3    A         Yes.

4    Q         How many years older are you than Jon,

5    approximately?

6    A         Fifteen.  I'm nervous here.  Actually 11.

7    Q         Mrs. Davis, you grew up in the same household

8    where Jon did; is that correct?

9    A         Uh-huh.  Well, actually, we had two houses.

10   My parents lived in this little house.  Because there

11   were so many children, I lived with my grandparents in

12   the house where there was an adjoining sidewalk, and I

13   lived with my grandparents and my brother, Jay.  We

14   both lived with my grandmother and grandfather, and

15   then I had another sister who lived in Southtown with

16   another grandmother until we were able to -- My parents

17   were building a new home that would house all of us, a

18   four bedroom home about a mile and a tenth away from

19   that area.

20   Q         How many children were in the family?

21   A         Seven.

22   Q         And when they built this four-bedroom home,

23   did the whole family get together and live under the

24   same roof?

25   A         Yes.  It was kind of like blending a new

416

1    family together because we all knew each other, but we

2    all lived in these different houses, but then we moved

3    up to the other house, and we had to kind of get to

4    know everyone else.  Like Cheryl, my sister Cheryl,

5    lived with my grandparents for a long time, and she was

6    the last one to come in -- actually come in and blend

7    into the family.

8    Q        Mrs. Davis, I'm going to ask you a few

9    questions about Jon's childhood.  Did Jon witness any

10   violence between his parents?  They would be your

11   parents also, your mother and father.

12   A        Yes.

13   Q        Would you tell us what he was exposed to as a

14   child?

15   A        This is difficult because I tried to put a

16   lot of this out of my mind, and in my life, I have gone

17   on, and to bring up all these memories of these things

18   that happened as a child is very painful.  But I

19   remember as a child we used to be in bed at night and

20   hear our parents fighting, and we'd all get together in

21   one room because we were so worried than one of them

22   was going to kill the other one, that we would go and

23   take bullets and hide them under our mattress and go

24   get the sharp knives out of the drawer.  I can remember

25   thinking, and this is stupid, that should we take the

                           417

1    can openers.  Do you think they could hurt themselves

2    with a can opener?  So we'd be going around trying to

3    get rid of the sharp things that would cause them to

4    hurt each other because although they fought a lot, we

5    loved them both, but they just weren't very good

6    together.  And we would often comment on we wished that

7    they would just get divorced because we would rather be

8    from a broken home than have them fight like they did.

9    Q        What kind of fighting did they do in your

10   presence, Ms. Davis, in Jon's presence?

11   A        There was one particular fight that was very

12   bad.  I don't know what started it.  I never knew what

13   started most of them.  But my father came in, and I

14   guess he hit me, and I told him that -- He was using

15   very bad language, and I had come from living with my

16   grandparents who were rather religious, and he was

17   using very bad language, and I said, "Dad, God's not

18   going to like you for this."  So he hauled off and hit

19   me, and then my mother jumped in and said, "Don't lay

20   your hands on the kids," and then they were off and

21   running, and they just started hitting.  He started

22   hitting Mom, and he took her hair and he was pounding

23   her head on the floor, and I remember there were big

24   handfuls of hair on the floor and blood coming out of

25   her nose and out of her ears, and it splashed on the

418

1    cupboards and on the floor.  And we had tried to go and

2    get help, even tried calling the police, but the police

3    wouldn't come back then because they said they couldn't

4    get involved in domestic problems, that they couldn't

5    come unless an actual crime was committed.  So later

6    someone else -- I think Mom was screaming and someone

7    tried to call for help, and they tore the phones off

8    the wall so that we couldn't call out.  But I think

9    whoever we were talking to heard us and called my Uncle

10   Wes who was part of the sheriff's department and went

11   and got help and sent help over and got word to us that

12   the constable was on his way.  And Jon was just a

13   little boy.  He was the youngest one in the family.

14   And he had a little fly swatter, and he was hitting

15   Daddy and trying to tell Daddy to let Mom alone and get

16   away from her.  And after he did that, then the

17   constable came and they got Dad, and I remember, this

18   is so bizarre, my sister and I, I think, I don't even

19   remember who, maybe my brother, Jay, were trying to

20   clean the blood up because we didn't want Dad to get in

21   trouble.  Even though we didn't like what he was doing,

22   we loved them both, but we didn't want them to be in

23   too much trouble.

24           Anyway, there were other times when we'd get

25   together in the bedroom at night and put the pillows

419

1    over our ears so we wouldn't hear the fighting, and you

2    could hear them pushing each other off the wall and

3    down the hall, and you never knew whether or not one

4    was going to get killed.

5        So finally as we kept getting older and got

6    tired of the fighting -- It almost seemed like they

7    enjoyed fighting with each other because they would

8    never leave each other alone.  My father would say --

9    After that incident in particular they were separated

10   for a while, and it was actually wonderful because you

11   could see Dad at grandma's house, and it was good, and

12   you could see Mom at Mom's house, and it was good, but

13   then he would send her like this record on Englebert

14   Humperdink, *Please Release Me - Let Me Go*, and then he

15   would have some -- in some lady's car driving by

16   beeping the horn and letting Mom know that he was

17   having a good time, and then the next thing you'd know

18   he would be knocking on the door and Mom would be

19   taking him back.  I remember Mom took him back, and all

20   of us kids got in one room and said, "I don't want ..."

21   We weren't going to talk to either of them anymore.  We

22   were so angry that they got back together that we

23   didn't want to talk to either of them anymore.

24   Q        Mrs. Davis, in 1970, you left home, is that

25   correct, and went to college?

```
1    A         Yes.

2    Q         And you didn't see Jon from that point on for

3    any extended period of time until roughly 1984.  Is

4    that generally correct?

5    A         Yes.

6    Q         How did you come back into contact with Jon

7    on a frequent basis?

8    A         Jon didn't never really have any good role

9    models in his life.  My mother -- By the way, my father

10   -- If I could go back, my father died, and I remember

11   coming home -- I went out to get ice cream actually,

12   and when I came home the ambulance was in the driveway,

13   and when I pulled up, I thought that one of them had

14   already killed each other -- killed somebody, but it

15   was my father had died of a heart attack.  My mother

16   remarried again, another man.  I don't know anything

17   about this because I was away at college, but he also

18   was abusive and very mean to Jon, but I can't say.

19            THE COURT:  She says she doesn't know

20   anything about that, so let's move to something else.

21            MR. MAYO:  Yes, sir.

22   A         So anyhow, Jon, though, was having trouble at

23   home.  He was getting in trouble.  And I had married

24   this wonderful man, and he would be a great role model.

25   So we decided that it would be best if maybe we could
```

1    take Jon down to live with us in North Carolina where

2    my husband would be able to handle him.  My husband is

3    6'5", he was in the 82nd Airborne.  At that time we

4    owned a Golden Corral Restaurant and also I was

5    teaching school.  So we thought if he could come in and

6    be with us, we could be role models for Jon.

7        Q        Debbie, did you at that point have Jon come

8    to your home?

9        A        Yes, we asked him to come live with us.  We

10   went and picked him up.  My husband and another brother

11   that was living down in North Carolina went up and

12   picked Jon up to bring him down to live with us.

13       Q        How long did he live with you?

14       A        I'm not sure.  It was less than a year.  He

15   moved out and got a place of his own after a while

16   because our rules were pretty strict.  Drinking wasn't

17   allowed in our house or drugs or women spending the

18   night or anything like that, so, you know ... He was a

19   wonderful person at home, very helpful.  He would help

20   anybody do anything.  And then what he did was he

21   decided to get an apartment of his own.  So he moved in

22   with some guy, and he was so excited about this and got

23   all this nice stereo equipment, and he was doing very

24   well, got a job, but this guy that he was living with

25   had to -- couldn't afford it and moved out, which meant

1  that Jon then couldn't afford to live there, so he then

2  moved in with a girl in this apartment complex.

3  Anyhow, after moving in with her, Billie lived next

4  door to this girl, and Jon somehow got hooked up with

5  Billie, and then the next thing that we knew, they were

6  getting married.

7  Q        Billie became pregnant also; is that correct?

8  A        That's right.  And Jon really loved the two

9  little girls that she already had, and we were very

10  excited about the whole situation.

11  Q        Did he talk about the children?

12  A        Yes, how wonderful they were.  He would bring

13  them over to the house.  Even in the wedding, I believe

14  it was Jennie, wanted to be with Jon and wouldn't even

15  let them walk down the aisle.  She just kept going, "My

16  Jon.  My Jon.  My Jon."  He just adored the children.

17  He was always with them.  He used to bring them over to

18  my house for dinner.  The first house when Jon came

19  down, I had a swimming pool, and they liked to come

20  over and go swimming at my house, and then we moved and

21  there was a little playground right beside my house,

22  and they would come and play in the playground all the

23  time.  Billie was going at that time to school, so she

24  wasn't home a lot.

25  Q        Debbie, in your opinion did Jon take good

423

1    care of the children?

2    A        He was a wonderful daddy.  He was just

3    absolutely wonderful.  He didn't always dress them

4    appropriately because you could tell he was one of

5    those proud dads that would bring their little girls

6    over and put the pretty little dress on with the little

7    patent leather shoes and the little socks because he

8    wanted them to look pretty, but you'd be like, "Jon,

9    why don't you put some pants on or some sweat pants.

10   Let them go out and just have fun."  But he was just so

11   proud of them and always -- He was a wonderful dad.  He

12   played with all of them.  Even though he had two

13   children of his own with Billie, the other two I don't

14   think would have ever felt like they didn't also.  He

15   loved them equally.  He loved them all.

16   Q        Debbie, did Jon discuss his youngest daughter

17   with you, Jessie, the little girl who suffers from

18   cerebral palsy?

19   A        Yes.  The last five years when I was teaching

20   school I specialized in working with developmentally

21   handicapped children, and what he would do, we did a

22   lot of things with music for rehabilitation purposes,

23   and he knew that -- he had seen me doing these tapes

24   with the kids when he came home for -- We had this

25   little reunion with my brother, Jeff, who passed away,

424

1    and all the kids got together and did all these musical

2    things, and he saw how much fun they all had, so he

3    asked me if I would make these tapes up for Jessie to

4    help her with her rehabilitation, and I also told him

5    exercises that he could do with Jessie for her legs

6    because he said how wonderful -- you know, how strong

7    she was and how she would stand up at the table, and he

8    said -- and she just loved music.  So these particular

9    tapes would stop -- would allow you to, you know, move

10   the body parts and make your knees knock and shake your

11   hands, the Beanbag Boogie, the Body Rock, all these

12   little wonderful songs that would make her be able to

13   do things with her sisters that would be fun for all of

14   them that would really be therapeutic for Jessie, and I

15   regret that I never made the tape and sent it.

16   Q        Did Jon's father deny that Jon was his child?

17   A        My father was an alcoholic.

18            THE COURT:  Answer the question now that he

19   asked you, please, ma'am.  That's what you need to do.

20   Listen to what his questions are and answer those

21   questions.

22            THE WITNESS:  Yes, sir.

23   A        Yes, he did, because my grandfather told him

24   that Jon was not his.  And what happened is, he would

25   take the other boys and he would walk them around on

1    his shoulders like a piggy-back ride, and then when it
2    came time to be Jon's turn, Jon would be standing there
3    going, "Daddy, my turn, my turn," and Daddy would walk
4    away from him.  He denied him all the time.  He
5    wouldn't take him and put him on his back or anything.
6    There was definitely hostility.  He would take my
7    brother, Joel, out for ice cream cones, and instead of
8    letting him eat the ice cream cone at the place, he
9    would bring them back and eat them in front of Jon and
10   not give Jon any.  And so therefore my mother seemed to
11   be more prone to favoring Jon because of the lack of
12   love that my father was giving him.
13          MR. MAYO:  Thank you, Debbie.
14          MR. WOODALL:  No questions.
15          **(WITNESS EXCUSED.)**
16                    - - - - -
17          **KATHY HUGO** was called and being first duly
18   sworn, was examined and testified as follows:
19          THE COURT:  Ma'am, let me say this to you.  I
20   know this is -- you're under a terrific strain with the
21   situation.  Now if you'll listen to what the lawyer
22   asks you and answer that question and then stop, it'll
23   be better.  You understand?
24          THE WITNESS:  Yes, sir.
25          THE COURT:  All right, go ahead.

                              426

1    **DIRECT EXAMINATION**

2    **BY MR. MAYO:**

3    Q        Would you state your name for the Court,

4    please, ma'am?

5    A        Kathy Hugo.

6    Q        Ms. Hugo, you are one of Jon's sisters; is

7    that correct?

8    A        Yes.

9    Q        Ms. Hugo, are you the oldest of the children?

10   A        Yes.

11   Q        Ms. Hugo, did you live under the same roof

12   with Jon as he was growing up?

13   A        Yes.

14   Q        You were several years older than Jon; is

15   that right?

16   A        Yes.

17   Q        Once you moved out of the home, did you move

18   into another house that was close by to the family

19   home?

20   A        Yes.  We had a mobile home that was on the

21   same property.  My parents owned four acres of ground.

22   It was very close.

23   Q        Was there violence and abuse between your

24   mother and your father as Jon grew up?

25   A        Yes.

427

1    Q        Your sister, Debbie, just told us of some
2    episodes.  One episode was where your father pulled
3    your mother's hair out.
4    A        Yes.
5    Q        And beat her head into the floor.  To be
6    brief, Ms. Hugo, is it true that there were other
7    episodes like that?
8    A        Yes.
9    Q        Was there also a lot of verbal threats
10   between them?
11   A        Yes.
12   Q        Did your father threaten to kill your mother?
13   A        I don't know, but I know at one time I was
14   afraid he would.
15   Q        Is that based upon what you saw?
16   A        Yes.
17   Q        And what you heard?
18   A        Yes.
19   Q        There was a potentially bad day for the
20   family which was report card day.  Is that also true?
21   A        Yes, it was a day I always hated.
22   Q        Your father would be very upset and abusive
23   with the family.
24   A        With my brothers.  My sisters and I made
25   pretty good grades, but my brothers didn't, and he

                            428

1   always made us give him the report cards before we ate

2   dinner, and he always was so upset with them and yelled

3   at them so bad that I just always felt like it didn't

4   matter how good you did because it was so awful.

5   Q        Ms. Hugo, we're not talking about just a

6   father getting on to his children about bad grades; is

7   that correct?  He would be pretty rough with them.

8   A        Yes.  He made my brothers do things.

9   Q        He didn't treat Jon very well either, did he?

10  A        No.

11  Q        Once your father died in 1977, your mother

12  remarried.  Is that also correct?

13  A        He died in 1974.

14  Q        I'm sorry, 1974.

15  A        And my mother got remarried.

16  Q        The man that she remarried, did Jon live in

17  that house with them?

18  A        With my mother and her husband?

19  Q        Yes.

20  A        Yes.

21  Q        And in that house, did he also have an

22  alcohol problem?

23  A        It my opinion.  He was also on a lot of

24  different medications.

25  Q        Was he abusive with your mother?

429

1    A        Yes.  He was very verbally abusive, too, very

2    foul language.  I never felt like he liked any of us.

3    Q        Is there anything that you would like to say

4    to the Court before you end your testimony?

5            THE COURT:  Ask her a question if you will.

6            MR. MAYO:  Your Honor, I'll withdraw the

7    question.  That's all.

8            **(WITNESS EXCUSED.)**

9                      - - - - -

10           **CHERYL ARBOGAST** was called and being first

11   duly sworn, was examined and testified as follows:

12           THE COURT:  I know this is a fine

13   circumstance for you, but the lawyer is going to ask

14   you some questions.  If you will, try to pay attention

15   to those questions and answer them.  Just answer those

16   questions and stop, would you?

17           Go ahead.

18   **DIRECT EXAMINATION**

19   **BY MR. MAYO:**

20   Q        Would you state your name for the Court,

21   please?

22   A        Cheryl Arbogast.

23   Q        Ms. Arbogast, we're going to need to be brief

24   here.  Did you grow up in the same household as Jon?

25   A        I did.

                          430

1    Q        Your sisters have already testified as to the

2    violence occurring in the house.  Is it true that there

3    was a lot of violence that occurred between you father

4    -- mainly by your father, committed upon your mother?

5    A        That's true.

6    Q        Were there terrible fights?

7    A        Yes, very terrible.

8    Q        With blood on the floor and the walls?

9    A        Yes, and fistfuls of hair.

10   Q        Was there a lot of verbal abuse between your

11   father and mother?

12   A        Constantly.

13            MR. MAYO:  That's all the questions I have,

14   Your Honor.

15            MR. WOODALL:  No questions.

16            **(WITNESS EXCUSED.)**

17                        - - - - -

18            **CAROL ALEXANDER** was called and being first

19   duly sworn, was examined and testified as follows:

20   **DIRECT EXAMINATION**

21   **BY MR. MAYO:**

22   Q        Would you state your name for the Court,

23   please, ma'am?

24   A        Carol Alexander.

25   Q        Ms. Alexander, are you Jon Hall's mother?

                              431

1    A        Yes, I am.

2    Q        Ms. Alexander, your daughters have already

3    testified that there was a lot of violence between --

4    or committed by your husband upon you.  Is that true,

5    Ms. Alexander?

6    A        Yes.

7    Q        Ms. Alexander, did he drink real heavy, your

8    husband?

9    A        Yes.

10   Q        Did you have fights that required calling the

11   police?

12   A        Yes.

13   Q        Were the kids requested to contact 911?

14   A        Yes.

15   Q        Telephones pulled out of the wall?

16   A        Yes.

17   Q        Ms. Alexander, did you observe Jon Hall with

18   his children roughly in 1993 at a family reunion?

19   A        Yes, I did.  My son that lived in Texas was

20   dying, and the kids hadn't seen each other all at the

21   same time for a long time, so they decided to get all

22   together as a surprise to me, and it was July the 3rd,

23   and they all came home, and Jon brought the two little

24   -- his older two girls was visiting his wife, Karen,

25   wherever they lived, and he brought the two younger

                              432

1    kids from Tennessee all the way to Pennsylvania.

2    Q        Ms. Alexander, did he take care of the

3    children in your presence?

4    A        He took care of them the whole time they were

5    there.  Jessie was -- Well she has cerebral palsy, and

6    she had breathing problems, and he had a breathing

7    machine that he would give her these breathing

8    treatments.

9    Q        Did Jon love his children?

10   A        And changed her diapers and --

11   Q        Ms. Alexander, did Jon love his children?

12   A        Yes, he did.  It always surprised me that all

13   my boys took such good care of their kids when their

14   father never changed a diaper or fed one of them a

15   bottle or ever picked them up and held them.  He was

16   always going to do something with them with when they

17   got to be teenagers.

18   Q        Ms. Alexander, thank you.

19            MR. WOODALL:  No questions.

20            **(WITNESS EXCUSED.)**

21            MR. MAYO:  That's all, Your Honor.

22            MR. FORD:  We rest.

23            THE COURT:  Anything further, General?

24            MR. WOODALL:  No, Your Honor.

25            **(The jury retired from open court,**

1          **and the following proceedings were**

2          **had to-wit:)**

3               MR. EARLS:  Just as a precautionary matter,

4     the defense has rested, and, of course, they know how

5     to prosecute their own case, but in light of the

6     complaints Mr. Hall has been making, I want to make

7     sure that he has a right to testify and that that's put

8     on the record.

9               THE COURT:  What do you say, gentlemen?

10              MR. FORD:  Your Honor, he understands that,

11    and I appreciate Mr. Earls' concern about that, but I

12    don't think it's necessary to go into that.

13              THE COURT:  All right.  Well you've explained

14    to him what his rights are, is that right, with regard

15    to testifying?

16              MR. FORD:  Yes, sir.

17              THE DEFENDANT:  Objection, Your Honor.

18    Remember I told you that --

19              THE COURT:  If you will, please, sir, listen

20    to me now.  Talk to your lawyers and let them talk.

21    I'm not going to let you talk.  Just have a seat.  And

22    I'm fixing to remove you from the room if you don't.

23              THE DEFENDANT:  The jury is not here.

24              THE COURT:  Talk to the lawyers.  I don't

25    care whether the jury is here or not.

434

1        THE DEFENDANT:  Here is the motion I told you

2   that if I wanted to testify you would remove the flags

3   of war, and here is the --

4        MR. MAYO:  Your Honor, Mr. Hall has brought

5   that to my attention, and I'd like to address Your

6   Honor on it.

7        THE COURT:  Yes, sir.

8        MR. MAYO:  Your Honor, Mr. Hall has filed a

9   motion in this court asking Your Honor to remove the

10  flag of war, which is the flag he claims -- the flag

11  behind you, the United States flag.  If Your Honor

12  would remove that flag from this courtroom, he states

13  that he would testify.  If Your Honor doesn't remove

14  the flag, then he won't bring himself inside the

15  sanctuary of the bar and he refused to testify.  So his

16  request is that Your Honor remove the flag.

17       THE COURT:  Mr. Mayo, that's the flag of the

18  United States and it's properly displayed here.  He has

19  in some of his motions alleged something about a war

20  flag, as I understand it maybe because the eagle is on

21  top of the flag.  It's not for him to determine whether

22  this is a legitimate flag or not.  The Court so holds

23  it's a legitimate flag.  He has the opportunity to

24  testify or not testify, and that flag will stay here as

25  long as I'm judge and sitting on this bench.

435

1          MR. MAYO:  Yes, sir.

2          THE COURT:  You're not the one to determine

3    what the flag is.  You're in court here, and if you

4    want to abide by the rules, I'll allow you to testify,

5    but if you don't, you will not testify.

6          MR. FORD:  Your Honor, one other matter, on

7    the State's notice regarding aggravating circumstances,

8    the heinous, atrocious, cruel, we don't object to that

9    one.  However, number two, the murder was committed for

10   the purpose of avoiding, interfering with or defending

11   a lawful arrest or prosecution of the defendant or

12   another, we object to that.

13         THE COURT:  Well wouldn't that be a question

14   for the jury?  If he eliminates her as a witness, that

15   she couldn't testify?  Wouldn't that be a question for

16   the jury about that second one?

17         MR. FORD:  Eliminate her as a witness, Your

18   Honor?

19         THE COURT:  Well I assume as a witness to

20   tell what happened.  That's what he's talking about,

21   isn't it?

22         MR. FORD:  That's avoiding or interfering

23   with the preventing of a lawful arrest.

24         THE COURT:  Hindering prosecution.

25         MR. FORD:  Yes, sir.  We object to that.

436

1    There's been no proof that he has avoided arrest.

2    There has been no proof that --

3         THE COURT:  Well there's been some proof he

4    did what he was charged with.  The jury found him

5    guilty, and he left there and fled to Texas.

6         MR. FORD:  I understand what the Court is

7    saying, Your Honor.  We would just object for the

8    record.

9         THE COURT:  What's your contention, General?

10        MR. WOODALL:  I think Your Honor is correct.

11        THE COURT:  Are you saying that I should not

12   allow that?

13        MR. WOODALL:  I'm saying you ruled properly.

14        THE COURT:  All right, sir.  My ruling is

15   that I'm going to allow that.  The other that we talked

16   about, the State finally accepted that -- my ruling and

17   said that they would make no objection for it, and I

18   think that was something that -- the attitude they've

19   had.  I'm going to overrule your motion.

20        MR. FORD:  Yes, sir.  Your Honor, Mr. Hall

21   wants to be removed during the arguments.

22        MR. WOODALL:  Fine.

23        THE COURT:  All right.  Bring Mr. Hall into

24   the office.  I don't have any problem with that.

25        When Mr. Woodall gets through, bring him

1    back.

2          **(The jury returned into open court;**

3          **and the following proceedings were**

4          **had to-wit:)**

5          THE COURT:  All right, ladies and gentlemen

6    of the jury, so there will be no misinterpretation by

7    the jury, this should not mean anything, the Defendant

8    himself requested he be allowed to wait in the other

9    room during the General's argument, and I allowed him

10   to do that.  He'll be brought back after the argument.

11   The fact he asked that should have no affect on you,

12   any of you, for any purpose.

13         **(Arguments were heard on behalf of**

14         **the State and the Defendant, without**

15         **objection; and the Court charged**

16         **the jury as follows:)**

17         THE COURT:  Members of the jury, you have

18   found the Defendant guilty beyond a reasonable doubt of

19   murder in the first degree as charged in the Indictment

20   Number 96-589.  It is now your duty to determine within

21   the limits prescribed by law the penalty which shall be

22   imposed as punishment for these offenses.

23         Tennessee Law provides that a person

24   convicted of murder in the first degree shall be

25   punished by death, by imprisonment for life without

438

1   possibility of parole, or by imprisonment for life.  A

2   defendant who receives a sentence of imprisonment for

3   life shall not be eligible for parole consideration

4   until the defendant has served at least 25 years of

5   such sentence.  A defendant who receives a sentence of

6   imprisonment for life without parole shall never be

7   eligible for release on parole.

8           In arriving at this determination, you are

9   authorized to weigh and consider any mitigating

10  circumstances and any statutory aggravating

11  circumstances which may have been raised by the

12  evidence in the entire course of this trial, including

13  the guilt phase or the sentencing phase or both.  The

14  jury is the sole judge of the facts and the law as it

15  applies to the facts in the case.  In arriving at your

16  verdict, you are to consider the law in connection with

17  the facts, but the Court is the proper source from

18  which you are to get the law.  In other words, you are

19  the judges of the law as well as the facts under the

20  direction of the Court.

21          The burden of proof is upon the State to

22  prove any statutory aggravating circumstance or

23  circumstances beyond a reasonable doubt.  A reasonable

24  doubt is a doubt based upon reason and common sense

25  after careful and impartial consideration of all the

439

1   evidence in this case.

2         It is not necessary that the aggravating

3   circumstance or circumstances be proved beyond all

4   possible doubt, as absolute certainty is not demanded

5   by the law.

6         A reasonable doubt is just that, a doubt that

7   is reasonable after an examination of all the facts of

8   this case.

9         The law makes you, the jury, the sole and

10  exclusive judges of the credibility of the witnesses

11  and the weight to be given to the evidence.

12              AGGRAVATING CIRCUMSTANCES

13        Tennessee law provides that no sentence of

14  death or sentence of imprisonment for life without

15  possibility of parole shall be imposed by a jury but

16  upon a unanimous finding that the State has proved

17  beyond a reasonable doubt the existence of one or more

18  of the following statutory aggravating circumstances

19  which are limited to the following:

20        (1)  The murder was especially heinous,

21  atrocious or cruel in that it involved torture or

22  serious physical abuse beyond that necessary to produce

23  death;

24        (2)  the murder was committed for the purpose

25  of avoiding, interfering with or preventing a lawful

                            440

1    arrest or prosecution of the Defendant.

2            In the instruction, heinous means grossly

3    wicked or reprehensible, abominable, odious or vile.

4            Atrocious means extremely evil or cruel,

5    monstrous, exceptionally bad, abominable.

6            Cruel means disposed to inflict pain or

7    suffering, causing suffering, painful.

8            Torture means the infliction of severe

9    physical or mental pain upon the victim while he or she

10   remains alive and conscious.

11           Serious physical abuse means or alludes to a

12   matter of degree.  The abuse must be physical as

13   opposed as mental, and it must beyond that or more than

14   what is necessary to produce death.  Abuse is defined

15   as an act that is excessive or which makes improper use

16   of a thing, or which uses a thing in a manner contrary

17   to the natural or legal rules for its use.

18           Members of the jury, the Court has read to

19   you the aggravating circumstances which the law

20   requires you are to consider if you find beyond a

21   reasonable doubt that the evidence was established.

22   You shall not take account of any other facts or

23   circumstances as the basis for deciding whether the

24   death penalty or imprisonment for life without

25   possibility of parole would be appropriate punishment

441

1    in this case.

2          Tennessee law provides that in arriving at

3    the punishment, the jury shall consider as previously

4    indicated any mitigating circumstances which shall

5    include, but are not limited to, the following:

6          (1)  The murder was committed while the

7    Defendant was under the influence of extreme mental or

8    emotional condition.

9          (2)  The capacity of the Defendant to

10    appreciate the wrongfulness of his conduct or to

11    conform his conduct to the requirements of the law was

12    substantially impaired as a result of mental disease or

13    defect or intoxication which is insufficient to

14    establish a defense to the crime but which

15    substantially affected his judgment.

16          (3)  The Defendant was a good worker and

17    employee.

18          (4)  The Defendant surrendered to the

19    authorities peacefully and without resistance.

20          (5)  The Defendant cooperated fully with the

21    police.

22          (6)  The Defendant has acknowledged and never

23    denied his responsibility for this crime.

24          (7)  The crimes committed were out of

25    character for the Defendant.

442

1          (8)   The Defendant has no significant history
2     of prior criminal activity.
3          (9)   The Defendant's judgment was
4     substantially impaired due to the extreme violence he
5     witnessed his father commit upon his mother.
6          (1)   That the Defendant was a caring and
7     nurturing father who loves his children and took
8     special care of the Defendant's youngest daughter who
9     has cerebral palsy.
10          (11)  That the Defendant immediately
11     confessed and showed remorse over the crime.
12          (12)  Any other mitigating factor which is
13     raised by the evidence produced by either the
14     prosecution or defense at either the guilt or
15     sentencing hearing; that is, you shall consider any
16     aspect of the Defendant's character or record, or any
17     aspect of the circumstances of the offense favorable to
18     the Defendant which is supported by the evidence.
19          The Defendant does not have the burden of
20     proving a mitigating circumstance.  If there is some
21     evidence that a mitigating circumstance exists, then
22     the burden of proof is upon the State to prove, beyond
23     a reasonable doubt, that the mitigating circumstances
24     do not exist.
25          There is no requirement of jury unanimity as

443

1   to any particular mitigating circumstance or that you

2   agree on the same mitigating circumstance.

3       VERDICT - LIFE IMPRISONMENT OR LIFE IMPRISONMENT

4               WITHOUT POSSIBILITY OF PAROLE

5           If you do not unanimously determine that a

6   statutory aggravating circumstance has been proved by

7   the State beyond a reasonable doubt, the sentence shall

8   be life imprisonment.  You will write your verdict upon

9   the enclosed form attached hereto and made a part of

10  this charge.

11          The verdict shall be as follows:

12          We, the jury, unanimously find that the

13  punishment shall be life imprisonment.

14          If you unanimously determine that a statutory

15  aggravating circumstance or circumstances have been

16  proved by the State beyond a reasonable doubt but that

17  said statutory aggravating circumstance or

18  circumstances have not been proved by the State to

19  outweigh any mitigating circumstances beyond a

20  reasonable doubt, you shall, in your considered

21  discretion, sentence the Defendant either to

22  imprisonment for life without possibility of parole or

23  to imprisonment for life.  In choosing between the

24  sentences of imprisonment for life without possibility

25  of parole and imprisonment for life, you shall weigh

444

1    and consider the statutory aggravating circumstance or

2    circumstances proven by the State beyond a reasonable

3    doubt and any mitigating circumstance or circumstances.

4    In your verdict you shall reduce to writing the

5    statutory aggravating circumstances so found and shall

6    return your verdict upon the enclosed form attached

7    hereto and made a part of the charge, and the verdict

8    should be as follows:

9         We, the jury, unanimously find that the State

10   has proven the following listed statutory aggravating

11   circumstance or circumstances beyond a reasonable

12   doubt.

13        We, the jury, unanimously find that such

14   statutory aggravating circumstance or circumstances do

15   not outweigh any mitigating circumstance or

16   circumstances beyond a reasonable doubt, therefore, you

17   shall then then indicate on the enclosed verdict form

18   either:

19        We, the jury, unanimously agree that the

20   Defendant shall be sentenced to imprisonment for life

21   without possibility of parole; or,

22        We, the jury, unanimously agree that the

23   Defendant shall be sentenced to imprisonment for life.

24        The verdict must be unanimous and signed by

25   each juror.

445

```
1                    VERDICT - DEATH
2              If you unanimously determine that at least
3    one statutory aggravating circumstance have been proven
4    by the State beyond a reasonable doubt and said
5    circumstance or circumstances have been proven by the
6    State to outweigh any mitigating circumstance or
7    circumstances beyond a reasonable doubt, the sentence
8    shall be death.  The jury shall reduce to writing the
9    statutory aggravating circumstance or statutory
10   aggravating circumstances so found, and signify that
11   the State has proven beyond a reasonable doubt that the
12   statutory aggravating circumstance or circumstances
13   outweigh any mitigating circumstances.
14             You will write your finding and verdict on
15   the enclosed form attached hereto and made a part of
16   this charge.  Your verdict shall be as follows:
17             We, the jury, unanimously find the following
18   listed statutory aggravating circumstance or
19   circumstances.
20             We, the jury, unanimously find that the State
21   has proven beyond a reasonable doubt that the statutory
22   aggravating circumstance or circumstances so listed
23   above outweigh any mitigating circumstances.
24             Therefore, we, the jury, unanimously find
25   that the punishment shall be death.
```

1           The verdict shall be unanimous and signed by

2    each juror.

3           Take the case, consider all the evidence

4    fairly and impartially, complete the three forms and

5    report your verdict to the Court.

6           You may retire and begin your deliberations.

7           Anything further for the State?

8           MR. WOODALL:  No, Your Honor.

9           THE COURT:  Anything further for the

10   Defendant?

11          MR. FORD:  Yes, Your Honor.  May we approach?

12          **(There was a conference at the**

13          **bench out of the hearing of the**

14          **jury as follows:)**

15          MR. FORD:  Your Honor, we had marked through

16   the last mitigating circumstance, and the Court read it

17   to the jury.

18          THE COURT:  Well, I didn't read it.

19          MR. WOODALL:  Yes, you weren't supposed to.

20          THE COURT:  Wasn't supposed to?

21          MR. FORD:  Yes, sir.

22          THE COURT:  Do you want me to tell them?  It

23   wasn't marked out here.  This is the one submitted to

24   me by you.

25          MR. FORD:  I understand.  I thought it was.

447

```
 1              THE COURT:  What do you want me to do?
 2              MR. FORD:  Just make sure it's marked
 3    through.
 4              THE COURT:  That will be satisfactory?
 5              MR. FORD:  Yes, sir.
 6              (End of conference at the bench.)
 7              (The jury retired to begin
 8              deliberations at 4:05 p.m.,
 9              and the following proceedings
10              were had to-wit:)
11              MR. WOODALL:  I think the jury should have
12    the photographs and the mannequin to take with them.
13              MR. FORD:  Only if they request them.  That's
14    our position.
15              THE COURT:  I'm going to send them.
16              MR. WOODALL:  We've also agreed, Your Honor,
17    to exchange photographs for the mannequin for the
18    purposes of this record.
19              MR. FORD:  Yes, sir.
20              THE COURT:  The Defendant agrees with that?
21              MR. FORD:  Yes, sir.
22              (The jury returned into open court
23              at 5:53 p.m., and the following
24              proceedings were had to-wit:)
25              THE COURT:  Will the foreman please rise?
```

448

1          What is the verdict of the foreman, ladies

2    and gentlemen?

3          FORELADY:  We find that the punishment should

4    be death.

5          THE COURT:  Sentenced to death?

6          FORELADY:  Yes.

7          THE COURT:  All right.  I'll call your name.

8          **(The jury was polled and all**

9          **jurors answered in the affirmative.)**

10          THE COURT:  Mr. Hall, please stand.

11          The jury having found you guilty of murder in

12    the first degree, I commit you to the Department of

13    Corrections to be returned here on --

14          Is it March the 19th?

15          March the 19th for sentencing.

16          You may take the prisoner.

17          MR. EARLS:  Your Honor, I don't believe he

18    comes back for sentencing.

19          MR. WOODALL:  I believe Your Honor is

20    supposed to impose the sentence at this time.

21          THE COURT:  Is that right?

22          MR. WOODALL:  Yes, sir.

23          THE COURT:  All right.  It is the judgment of

24    the Court that you be sentenced to die in the electric

25    chair, and your date for execution is set at July the

449

1    5th.

2              What's July the 5th on?

3              COURT OFFICER:  July the 5th is a Saturday,

4    Your Honor.

5              THE COURT:  All right, July the 3rd at six

6    a.m.

7              Take the prisoner.

8              THE DEFENDANT:  Don't I get to say anything?

9              THE COURT:  No, sir.

10             THE DEFENDANT:  Thank you.

11                        - - - - -

12   **END OF REQUESTED PROCEEDINGS.**

13

14

15

16

17

18

19

20

21

22

23

24

25