IN THE CRIMINAL COURT

OF MADISON COUNTY, TENNESSEE

AT JACKSON, DIVISION I

---

STATE OF TENNESSEE


VS.                           No. 96-589


JON DOUGLAS HALL

---

CLOSING ARGUMENTS

FEBRUARY 4, 1997

---

AMY MAYS

OFFICIAL COURT REPORTER

MADISON COUNTY CRIMINAL JUSTICE COMPLEX

JACKSON, TENNESSEE 38301

(731)423-6039

1



**ORIGINAL**

```
 1                    A P P E A R A N C E S

 2    Before the Honorable:

 3          WHIT LAFON, Judge

 4    For the State:

 5          MR. JERRY WOODALL

 6          MR. AL EARLS

 7          District Attorney General's Office

 8          Lowell Thomas State Office Building

 9          Jackson, Tennessee  38301

10    For the Defendant:

11          MR. JESSE HILL FORD, III

12          MR. CLAYTON F. MAYO

13          Ford & Mayo

14          618 North Highland

15          Jackson, Tennessee  38301

16                    *  *  *  *  *

17

18

19

20

21

22

23
```

2

1                    **TABLE OF CONTENTS**

2    Closing Argument - Woodall       Page 4

3    Closing Argument - Mayo          Page 24

4    Closing Argument - Ford          Page 37

5    Closing Argument - Woodall       Page 38

6                     *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    MR. WOODALL: Ladies and
2    gentlemen of the jury, as you know from
3    being on jury duty for several weeks,
4    it's now time to make closing arguments
5    in this case.
6    I'm going to say that
7    irrespective of all the different
8    witnesses that we heard over the past
9    couple of days, it boils down very
10   simply to, is this Defendant guilty of
11   murder in the first degree. I think
12   that's what we're talking about, and
13   that's what we have to examine the proof
14   with, to see if this is a deliberate
15   premeditated murder or if it's some
16   other form of homicide. I'd say to you
17   that based upon the evidence and the law
18   that will be given to you by the Court,
19   that this was a deliberate premeditated
20   murder showing intent on the part of the
21   Defendant.
22   Now, we'll talk about the
23   Judge's charge in a minute, but let's
24   look at what shows premeditation, that

4

1 shows that this is a deliberate,

2 thought-out, calculated act.

3      THE COURT: Move it back a

4 little bit.

5      MR. WOODALL: I'm going to write

6 on it.

7      THE COURT: Go right ahead.

8      MR. WOODALL: Thank you.

9      THE COURT: Yes, sir. That's

10 all right.

11      MR. WOODALL: Number one, we've

12 got to look at the people that came in

13 contact with the Defendant, that he

14 either told about what happened or were

15 present and observed what happened.

16 That's how we can determine whether or

17 not this is a deliberate, premeditated,

18 planned murder.

19      Now to start with, the Defendant

20 goes out to that house, and what does he

21 do? Unhooks the phone. Deliberate,

22 premeditated, intentional. It's very

23 obvious why the Defendant unhooked the

24 telephone. He didn't want his wife to

5

1    be able to call out for help, ask for

2    the police to come out there, because --

3    and this is the second thing that shows

4    premeditation, as he related to his

5    buddy who was also in maximum security,

6    that he was going to go out there and

7    try to reconcile with his wife. First

8    he unhooks the telephone. What does

9    that tell you? That tells you he

10   doesn't think the reconciliation's going

11   to work, and if it doesn't work, he's

12   going to do something about it, and he's

13   going to make sure that she can't call

14   anybody and get any help.

15        And what does he tell his

16   friend? And this is the second thing

17   that shows premeditation, intent and

18   deliberation. He said that he went out

19   there to reconcile, but if that didn't

20   work out, what was he going to do? He'd

21   made his mind up before he got out there

22   and before he unhooked that telephone,

23   the lifeline as it turned out for this

24   woman. He unhooked the lifeline, but he

1    had in his mind, and he told his friend

2    in prison that, "If the reconciliation

3    doesn't work out, I want her to suffer

4    like she had made me suffer."  His

5    mind's made up.  Make her suffer.  And

6    these are deliberate, premeditated,

7    intentional, willful acts, and acts that

8    are committed with reflection and with

9    cool purpose.

10          Now the Judge is going to

11   instruct you at the appropriate time on

12   premeditated killing.  I think that

13   he'll show you -- or tell you that

14   premeditation means that the intent to

15   kill must have been formed prior to the

16   act itself.  Cut off the lifeline.  If

17   she doesn't go along with the

18   reconciliation, make her suffer.

19   Deliberation, premeditation.  The intent

20   to kill was formed prior to the act

21   itself.

22          The Court will also instruct you

23   it is not necessary that the purpose to

24   kill pre-exist in the mind of the

7

1  accused for any definite period of time.

2  Now you said that you would look at

3  those instructions and you'd look to the

4  Court for the law and you'd follow those

5  instructions.  The Court's going to tell

6  you it is not necessary, it is not

7  necessary, that the purpose to kill pre-

8  exist in the mind of the accused for any

9  definite period of time.  It is

10  sufficient that it preceded the act,

11  however short the interval, as long as

12  it was the result of reflection and

13  judgment.  Went out there and the first

14  thing that tells you he's reflecting, he

15  has judgment, he unhooks the lifeline.

16  He unhooks the lifeline.  And we know

17  what he tells those kids later on, don't

18  we?  And we'll get to that in just a

19  minute, but that also shows reflection

20  and premeditation and trying to keep the

21  woman from the only other lifeline that

22  she had available, and that was to have

23  those kids go get help from the

24  neighbors.  It is sufficient that it

1  precede the act, however short the

2  interval, as long as it was the result

3  of reflection and judgment.

4        Now, I guess the defense team is

5  going to argue to you, well he was just

6  excited and he lost his emotions, and

7  that's what they told you on opening

8  statement, if you'll recall that.  But

9  now, the Court is going to charge you

10  this.  If the design to kill was formed

11  with deliberation and premeditation,

12  deliberation, premeditation, it is

13  immaterial that the accused may have

14  been in a state of passion or excitement

15  when the design was carried into effect.

16  Deliberation, reflection.  If the design

17  to kill was formed with deliberation and

18  premeditation, it is immaterial that the

19  accused may have been in a state of

20  passion or excitement when the design

21  was carried into effect.

22        Now let's look at the different

23  interruptions and things that shows that

24  this Defendant continued even after he

9

1  unhooked the phone, after he decided
2  that he was going to make her suffer
3  like he perceived that she had made him
4  suffer.
5         What's the next thing that we've
6  got? Then he went and knocked on the
7  door. The children tell us that the
8  mother told him that he couldn't come
9  in. "You can't come in." What did the
10 Defendant do? He forced his way into
11 the house, a conscious decision, a
12 conscious decision, and it is a design
13 to kill formed with deliberation and
14 premeditation. He had -- She knew -- He
15 knew that she didn't want to
16 reconciliate. She didn't even want him
17 in the house, and he forced his way in
18 the house. Deliberation, premeditation,
19 reflection.
20        Now what's the next thing he
21 did? She wouldn't talk reconciliation.
22 Everybody's in the living room. He
23 knocked her out of the chair. Made the
24 kids go to bed before he knocked her out

1   of the chair.  And why did he make the

2   kids go to bed?  He didn't want any

3   witnesses.  Deliberation, reflection,

4   contemplation, premeditation, intent.

5   Kids go in the bedroom, Mama's knocked

6   out of the chair.  Mama is then taken

7   into the bedroom, and the little girls

8   hear beating and Mama crying out.

9           Now what's the next thing that

10  we know that this Defendant showed

11  reflection and cool purpose and

12  premeditation and intent and

13  deliberation?  He puts stuff up next to

14  the door to keep the little girls he

15  thought from getting in the room.

16  Barricaded door.  Reflection,

17  deliberation, premeditation, cool

18  purpose.  So, he's got the doors so the

19  little girls can't get in.  Can you

20  imagine how those little girls were

21  feeling and how scared they were?  And

22  what did they?  Then went in there and

23  they went to try to save their mama and

24  said, "Daddy, don't hurt Mama anymore."

11

1    One of them even jumps on his back, and

2    he slings her off, and the other little

3    girl can't stop him from hitting Mama,

4    and he's hitting her, and he's hitting

5    her, and he's hitting her.  One of them

6    even tries to give her a little

7    handkerchief or a napkin or something to

8    wipe the blood off, and we know from

9    looking at what Dr. Smith has told us,

10   we've got at least 83 separate blows.

11        THE COURT:  You'll have to take

12   her outside, please.

13        MR. WOODALL:  83 separate blows.

14   Deliberate, premeditated, conscious

15   reflection, targeted.  Now all 83 of

16   these blows didn't occur in the bedroom,

17   did they?  No, they didn't.

18        MR. FORD:  Your Honor, I can

19   still hear this wailing out here.

20        THE COURT:  Well I've asked him

21   to take her out.  I --

22        MR. FORD:  I hate to interrupt

23   the General.

24        THE COURT:  Take her downstairs

1    or someplace.

2          MR. WOODALL:  How many blows

3    we've got in the bedroom, I don't know.

4    But the little girls are in there and

5    they're saying, "Daddy, Daddy, don't

6    beat Mama anymore," and they tried to

7    use the telephone, tried to use the

8    telephone.  Wouldn't work.  Why wouldn't

9    it work?  Because the Defendant, knowing

10   what he was going to do after he went

11   out there if she didn't exceed to his

12   will, set about his plan to deliberately

13   and premeditatedly kill this girl and

14   cut off her lifeline.  Then the little

15   girls said, "Let's go across the street

16   to the neighbor's house," and if the

17   Defendant said anything that night

18   that's been borne out it was this,

19   shows premeditation, reflection,

20   deliberation.  "If you go across the

21   street and ask for help, I'll kill your

22   mama.  If you go across the street and

23   go for help, I'm going to kill your

24   mama."  Even some testimony by the

1  little girls, "Yeah, go ahead, use the

2  phone.  It won't work.  But if you cross

3  the street and get help, I'm going to

4  kill your mama," and he did.  He did.

5  One blow at a time.

6          Mama gets loose.  Billie runs

7  out through the house from the bedroom,

8  over the barricade, through the living

9  room and out that kitchen door and out

10  on the driveway.  Y'all heard the proof.

11  I want to say he said it was 90 feet or

12  something.  I don't know.  We don't know

13  how many blows she'd gotten from there.

14  What did he do?  Got outside, got her in

15  that driveway and inflicted some more

16  blows, more blows.

17          Dr. Smith, you know, -- Look up

18  here.  It's 14 minutes 'til 4 right now

19  by that clock.  He said it took several

20  minutes to 15 minutes to die probably,

21  and that's probably about right, to his

22  best medical opinion.  1, 2, 3, 4, 5, 6,

23  7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17.

24  17.  That's all 17 is.  Deliberation,

1    premeditation.

2           She gets away.  She goes

3    outside.  I don't know where 18 --

4           THE COURT:  General, go over

5    there and knock over yonder, please,

6    sir.

7           MR. WOODALL:  Well ...

8           THE COURT:  I don't object to

9    you knocking, but go back over there if

10    you will.

11           MR. WOODALL:  The point of it

12    is, it went on and on and on, and she

13    got away, and he pursued her, and he

14    continued to hit and hit and hit, 21,

15    22, 23, 24.  Well the little girl says

16    she gets up and she gets a few more feet

17    away, and then he hits her again, and he

18    drags her over to the swimming pool.

19    21, 22, 23, 24, 25.  Can you imagine how

20    long it was to her?  You know, we've got

21    25 blows there.  We've got two or three

22    minutes.  This went on and on and on,

23    and the pain increased, and she's

24    hearing him say to the little girls, "If

 1    you go get help, I'll kill you.  I'll

 2    kill you."

 3              Someone that had gone out there

 4    and already unhooked the lifeline, with

 5    his mind made up that, "I'll make her

 6    suffer like she's made me suffer," and

 7    then forced his way in the house,

 8    barricaded the room so the little girls

 9    couldn't come to her aid, and then he

10    pursued her outside.  Beat her.  She got

11    away.  Pursued her.  Beat her again and

12    then drug her down to the pool.  She's

13    got more than 83 injuries probably

14    because there was diffused bruising so

15    bad from the number of blows inflicted,

16    and the targeted areas, and she's trying

17    to save herself and defend herself the

18    best she can.  She's got bruises and

19    abrasions and beating all over her

20    little body everywhere, head, back of

21    head, top of head, broken nose,

22    defensive wounds, hands, arms, back,

23    crotch, legs, stomach.  He's beat and

24    beat and beat and beat, and she's trying

1    to get away.  And the last little girl

2    that testified said what was happening,

3    about where she stopped and trying to

4    get her breath and was drug to the

5    swimming pool, that Mama was screaming

6    and hollering and kicking, and he's

7    steady dragging and beating, and he gets

8    her to that pool, and he puts her in

9    that pool, and she's still alive.  Still

10   alive.  And he deliberately and

11   premeditatedly chokes what life that was

12   left in her out and left her face down

13   in that pool, sucking that water into

14   her lungs to end her life.  Beat and

15   beat and beat and beat.  Several

16   minutes, up to 15.  Five minutes have

17   gone by.  It seems like an eternity.

18   Billie Jo was just one-third of the way

19   through dying.  And those kids are

20   crying, begging, "Show some mercy.

21   Don't kill my Mama.  Please don't kill

22   my Mama."

23           And that oldest child, what'd

24   she do?  You know, it's like she knew

1    that she was the mama because she gets

2    that little three-year-old that can't

3    walk, can't get away, can't go for help,

4    'cause she can't walk, she has cerebral

5    palsy, and she carries this child away.

6    And this Defendant will have you believe

7    how much he loves these children.  Yeah,

8    "Go for help, I'll kill your mama."

9    Beat, beat, beat, beat.  Deliberate,

10   premeditated, willful.  Presence of mind

11   from the time he got there.

12          Now we have in the law something

13   called voluntary intoxication.  The

14   Defendant would have you believe through

15   his expert witness that he was

16   intoxicated, and he was so intoxicated

17   that he couldn't conform his conduct to

18   the law and he couldn't form the intent

19   to commit murder in the first degree.

20   The Court will charge you on that at the

21   proper time.

22          Now let me tell you, voluntary

23   intoxication so that you can't form your

24   conduct, can't form intent.  Let me tell

1  you what that is.  A fellow goes out on

2  a night on the town, gets drunk.  He

3  knows he's going to be in trouble when

4  he gets home.  Knows he's going to be in

5  trouble.  And when he gets home, he gets

6  his keys out and tries to open the door

7  and the door won't open.  He finally

8  crawls through some window in the house

9  and gets in the house, and all of a

10  sudden the lights come on.  It's a

11  neighbor's house.  He didn't even know

12  which house he was in, where he is.

13  That's when you're so intoxicated that

14  you can't have the requisite intent to

15  commit a felony or voluntary

16  intoxication reduces it from first

17  degree murder to second.

18          A man who unhooked the phone and

19  made sure that she would suffer like he

20  imagined and went there with the intent

21  to do that, that she had made him

22  suffer; forces his way into the house,

23  barricades the door, pursues his wife.

24  I mean, he tells the children, "If you

1    go for help, I'll kill your mama."  He

2    knew where he was, why he was there and

3    what he was going to accomplish when he

4    got there.  And he went out there, and

5    when she wouldn't reconciliate or let

6    him in the house, he'd already cut the

7    lifeline to the police department, and

8    he thought he could intimidate these

9    kids in not extending the lifeline, and

10   he told them he'd kill her if they went

11   for help, and that's exactly what they

12   did.  They went for help.  Oh, me.

13          The design to kill is formed

14   with deliberation and premeditation,

15   it's immaterial that the accused may be

16   in a state of passion or excited when

17   the design was carried into effect.

18          Ten minutes.  She's still being

19   beaten.  Where are we now?  Up to 55,

20   60?  She's got five minutes to live.

21   She'd been outside.  Said it could have

22   gone up to two hours, but we know it

23   didn't go up to two hours, but he beat

24   and beat, targeted, deliberately,

20

1    premeditatedly, committed the offense of

2    murder in the first degree.

3            And here's what the Court's

4    going to tell you, that before you can

5    find the Defendant guilty of

6    premeditated murder or murder in the

7    first degree, you've got to find that

8    the Defendant unlawfully killed the

9    victim.  Two, that the Defendant acted

10   intelligently.  And a person acts

11   intelligently with respect to the nature

12   of the conduct or to the result of the

13   conduct when it is the person's

14   conscious objective or desire to engage

15   in the conduct that caused the result,

16   and that the killing was deliberate, one

17   formed with a cool purpose and was

18   premeditated after the exercise of

19   reflection and judgment, the intent to

20   kill being formed prior to the act

21   itself.  It's not necessary the purpose

22   to kill pre-exist in the mind of the

23   accused for any definite period of time.

24           You know, we don't have to have

21

1   a Mafia hit killing where you plan it

2   all out and then assassinate somebody

3   with a high-powered rifle from a

4   distance away before it's premeditated.

5   What we have here is the Defendant

6   unlawfully killed his wife.  He did it

7   intentionally, he did it deliberately,

8   he did it premeditated, he did it with

9   reflection.  He had several different

10  opportunities to reflect on what he's

11  doing throughout the entire chain of

12  events.  The proof is the Defendant

13  deliberately, premeditatedly beat and

14  beat and beat and beat and beat his

15  wife.  He drug her down to that pool.

16  She's got one minute to live.  Her 15

17  minutes are almost up.  I guess the only

18  thing that she had left was that she

19  knew that the little girls had gotten

20  away and run across the street.

21          And there's one other thing that

22  shows that the Defendant knew what he

23  was doing.  He went back after he killed

24  her, after he'd finally choked the life

22

1    out of her, her time is up, and he went

2    back in the house, got the keys to her

3    car --

4         THE DEFENDANT:  I had my own

5    damn keys.

6         MR. WOODALL:  Your Honor, --

7         THE DEFENDANT:  This is all a

8    bunch of bullshit.

9         THE COURT:  Mr. Ford, talk to

10    him a minute there and tell him what I'm

11    fixing to do.

12         THE DEFENDANT:  Your Honor, my

13    testimony could have been brought in.

14    You're not trying to represent me.

15    You're trying to hang me.

16         MR. WOODALL:  Your Honor, could

17    we remove him from the courtroom?

18         THE COURT:  Let him talk to him.

19    If he says another word that I can hear,

20    I'm going to --

21         THE DEFENDANT:  They're bringing

22    in testimony --

23         THE COURT:  Take him into my

24    office, please.

1          THE DEFENDANT:  Go ahead and

2     railroad me.

3          MR. WOODALL:  There's one more

4     thing.  You know, us lawyers think we're

5     so smart.  Well I got a wife that tells

6     me that's not true.  But jurors think

7     things out.  That's what you're there

8     for.

9               But there's one other major,

10    major thing that tells us that this was

11    done deliberately and premeditatedly and

12    with reflection and cool purpose.  And

13    what is that?  What is that?  "You will

14    not graduate.  You will not be a

15    graduate.  And why won't you be a

16    graduate?  Because I'm getting ready to

17    kill you."  "Your mama will never

18    graduate from college."  And this

19    Defendant, deliberately, premeditatedly,

20    of his cool purpose, upon reflection,

21    deliberately and premeditatedly killed

22    Billie Hall.  And you said that you

23    would render a verdict that truth

24    dictates and justice demands, and that

1    is a verdict of guilty of murder in the

2    first degree.

3            Thank you.

4            THE COURT:  General, you used 30

5    minutes.

6            All right, are you going to

7    split your argument?

8            MR. FORD:  Maybe reserve about

9    five minutes, Your Honor.

10           THE COURT:  All right, sir.

11           MR. MAYO:  Ladies and gentlemen

12   of the jury, that was powerful stuff.

13   Mr. Woodall was very good.  Mr. Hall is

14   difficult.  Y'all experienced that.

15   Y'all have seen that now.  But no matter

16   how much we try, Mr. Woodall tries, to

17   turn this into a first degree murder

18   case, it just isn't.  It's just not.

19   It's not the truth.  That's not how this

20   occurred.

21           What happened is inexcusable.

22   Inexcusable.  There's no excuse for it.

23   There's no legitimate explanation for

24   what occurred out there.  But Tennessee

1    has laws.  That's why the laws include

2    different degrees of murder and lesser

3    included offenses.  There's not just one

4    charge, first degree murder and that's

5    it.  There's a reason for that.  Our

6    legislators made these laws up for us.

7    We are bound to follow these laws, no

8    matter how much we may dislike what Mr.

9    Hall did.  No matter how bad we hate

10   what he did.  No matter how bad we

11   dislike him.  No matter how sorry we

12   feel for those children.  There is not a

13   person in this courtroom that almost

14   didn't shed a tear when those children

15   were testifying.  But just because the

16   children suffered, as bad as it may be,

17   that is not a reason to find Mr. Hall

18   guilty of first degree murder.

19            First degree murder has

20   elements, and the elements of first

21   degree murder, that I'll direct your

22   attention to, are premeditation and

23   deliberation.

24            Mr. Woodall referred to the

26

1   charge and told you about premeditation

2   and that it can be formed in an instant,

3   and he mentioned deliberation, cool

4   purpose and cited a couple of examples

5   from the conduct that could show perhaps

6   a cool purpose.  But if you look at all

7   the evidence, Mr. Hall did not commit

8   this act with a cool purpose after the

9   exercise of reflection and judgment.

10  We're not talking about someone who laid

11  in await a hundred yards away, hired a

12  killer, shot someone through the heart.

13  That may be cleaner than what this was.

14  It may not drive our passions as much as

15  this did, but it's different.

16        What Mr. Woodall -- and I

17  certainly don't intend to mean that he

18  did this on purpose, but there are parts

19  of this charge that I would ask you to

20  read that explain a little bit better

21  deliberation and premeditation.

22  Premeditation, by this charge, is an act

23  done after the exercise of reflection

24  and judgment.  It means that the intent

1    to kill must have been formed prior to

2    the act itself.  It also says that it's

3    not necessary that the purpose to kill

4    pre-exist in the mind of the accused for

5    any definite period of time.  But it

6    goes on to state that the mental state

7    of the accused at the time he allegedly

8    decided to kill must be carefully

9    considered in order to determine whether

10    the accused was sufficiently free from

11    excitement and passion as to be capable

12    of premeditation.

13             The evidence in this case does

14    not indicate that Mr. Hall was free from

15    excitement and passion.  To the

16    contrary.  Everything, every bit of the

17    evidence that has come out shows us how

18    excited he was, how passionate he was.

19    We think of passionate most of the time

20    in a positive context when we use that

21    word, but here it's used in a negative

22    context.  Mr. Hall's passion rose to the

23    level that most of our passion would

24    never rise to.

1          It states also, furthermore,

2    premeditation can be found, if the

3    decision to kill is first formed during

4    the heat of passion, but, the accused

5    commits the act after the passion has

6    subsided, after the passion has gone.

7    The evidence in this case does not

8    indicate that the passion subsided.

9          When we look at premeditation and

10   cool deliberate purpose, I would point

11   your attention to evidence that came in

12   and was admitted in this trial.  Mr.

13   Hall had been drinking that day and was

14   drinking that night, brought beer over

15   to the house and popped a beer when he

16   got inside the house.  Once again,

17   that's no excuse for what he did, and

18   I'm not going to sit here and tell you

19   it was.  No weapon was used.  No weapon

20   was in the house.

21          You know, a premeditated act, if

22   you're going to pull off a murder,

23   premeditated and plan it, then surely

24   you would intend to get away with it.

1   How in the world was Mr. Hall going to
2   get away with this murder?  What kind of
3   plan was this?  His children.  He did
4   this in front of his kids.  I got kids.
5   It tears me up to think about that.  But
6   it happened.  I got a wife.  Never do
7   anything like this, but it happens.  As
8   terrible as it may be, it happens.  But
9   just because he did it in the presence
10  of the children, is certainly no reason
11  to believe that it was premeditated and
12  that it was carried out with a cool,
13  deliberate purpose, after exercising
14  reflection and judgment.  He loved his
15  children.  Now that night he certainly
16  did not show it, but, he had taken care
17  of his daughter who had cerebral palsy
18  every day for two years, gave her
19  breathing treatments.  A man who loves
20  his children, no matter how twisted his
21  logic may be, would never go over and
22  murder their mother in front of them on
23  purpose.

24          He took a money order over there

1  for child support, a $25 money order.

2  The money order, it said, to Billie Jo

3  Hall from Jon Hall.  It was dated July

4  29th, '94, the day this occurred.  He

5  left it at the house.  How cool is that?

6  What kind of judgment was that?  He was

7  excited.  He was passionate.  He was

8  lost.  He lost control.  He did

9  something that none of us would ever do

10  and that we can't understand, but it

11  doesn't mean that it's first degree

12  murder.  Maybe you think it should be,

13  but the law of Tennessee does not say

14  that it is, and we and you are bound to

15  follow the law.  You said you would, and

16  we have faith that you will.  And as

17  much as we may want it be first degree,

18  it just isn't.  He was screaming.  He

19  was in a rage.  Testimony came out about

20  that.  He left fingerprints there.  He

21  didn't wear any gloves.  He had no plan

22  of escape.  He took off in the family

23  van that would have been instantly

24  recognized.

1          Dr. Zager testified that he was

2    depressed and had an alcohol problem.

3    Mr. Helms testified that he was

4    significantly depressed.  We're not just

5    talking about depressed like we get

6    sometimes when the weather's bad and

7    things don't go our way.  This is

8    clinical depression.  This is quite

9    different.  He had -- His intelligence

10   was in the low/average range.  He acts

11   on emotions rather than cool, deliberate

12   thought.

13          This argument is not a cop-out.

14   This is an argument designed to have Mr.

15   Hall convicted of what he did, not what

16   the State wants you to believe he did.

17   Those children were sympathetic, but

18   just because they observed what

19   occurred, Mr. Woodall said imagine what

20   those little girls felt.  Imagine what

21   they felt, but that doesn't have

22   anything to do with what Mr. Hall did.

23          He beat her to death with his

24   fists.  With his fists.  And Mr.

1    Woodall's demonstration of that was very

2    effective.  It was horrible.  As I say

3    earlier, inexcusable.  But what he did

4    was not premeditated, planned out.  Mr.

5    Hall was a mechanic.  If he had wanted

6    to premeditate something, he could have

7    set Mrs. Hall's car up, he could have

8    cut her brake lines, he could have made

9    her fuel line explode.  He could have

10   done a number of things.  He could have

11   designed a self-defense situation and

12   taken a weapon over there, dropped it

13   off, left it in the house and then

14   killed her with a knife and then claimed

15   self-defense.  There was no defense to

16   this.  There is no defense to it.

17           Investigator Byrd stated from

18   the very beginning of this case they

19   knew who did it.  There was no hiding

20   this.  They didn't even check for

21   fingerprints.  They didn't need to.

22   Even anyone, I would submit someone,

23   even perhaps a -- someone with a very

24   low intelligence, even lower than Mr.

33

1    Hall's, even a child, could come up with

2    a plan better than this.  It wasn't

3    cool.  It wasn't cool at all.

4           What I would ask you to pay

5    attention to as you read over the

6    instructions are the elements of first

7    degree murder.  The elements of it have

8    got to be proven beyond a reasonable

9    doubt, each and every element of this

10   case, each and every element.

11   Premeditation is one of those elements;

12   deliberation is another one of those

13   elements.  We've explained and defined

14   what those are.  I'm sure you know what

15   they are by now.  You can read in this

16   charge what they are.  But if you read

17   those elements and you use your common

18   sense that you all have and you think

19   about this from your common sense and

20   experience -- I'm not talking about

21   experience with something like this but

22   what you know to be people's mental

23   capacity and how people react in

24   situations, certainly we can be

1   convinced beyond a reasonable doubt that

2   the elements of this offense were

3   proven.

4          Dr. Zager testified. She is an

5   expert, and she testified that he was

6   not capable of forming the necessary

7   state of mind, the necessary elements of

8   premeditation of first degree murder.

9   That alone surely should be enough to

10  cast doubt as to the elements of first

11  degree murder, first degree murder. But

12  when you think about all the other bits

13  of evidence in this case, including, as

14  I ran over them with you earlier, he was

15  under the influence, he didn't have a

16  weapon, witnesses were left, not only

17  the children, of course he left the

18  children, but there were other witnesses

19  around. He left a money order out

20  there. He left his fingerprints. He

21  didn't wear any gloves. He didn't use a

22  weapon. There was no way to get away

23  with this. It's impossible to get away

24  with this.

1          Use your common sense and

2     experience and hold the State to the

3     burden of proof on first degree murder

4     of beyond a reasonable doubt, each and

5     every element, and I believe that if you

6     use your common sense and experience,

7     you'll be convinced that he didn't do

8     this with premeditation, and most

9     importantly, with deliberation and cool

10    purpose.  The passion never subsided.

11          Thank you.

12          THE COURT:  Mr. Ford.  Mr. Mayo

13    was fairly brief.

14          MR. FORD:  Mr. Mayo did an

15    excellent job, Your Honor, and I won't

16    be long.

17          THE COURT:  I'm not commenting

18    on what kind of job he did, but I'm

19    saying to you that he only used 25

20    minutes, so you have more than five.

21          MR. FORD:  Thank you, Your

22    Honor.

23          THE COURT:  You can tell the

24    jury what you think about his argument

36

1   if you wish.  That'd be your privilege.

2           MR. FORD:  Thank you, Your

3   Honor.

4           Ladies and gentlemen, it's been

5   a long day.  You've heard the arguments

6   of counsel.  You've been very patient in

7   sitting through the individual voir

8   dire.  I think now you understand why we

9   had to ask all those questions.  Now you

10  know we're at the end of the case.  I

11  want to thank you on behalf of the

12  defense team for your patience here

13  today.  This is our last opportunity to

14  speak to you.  I want to point out one

15  thing.

16          When the State of Tennessee has

17  to bring in someone who's a mole from

18  the penitentiary to make a case, that

19  pretty much tells you, you know, in a

20  first degree murder case, they're in

21  trouble.  Of all the witnesses out

22  there, they hang their hat on a fellow

23  in prison garb from the pen to come in

24  here and show this is a premeditated

1    first degree murder case.

2         Now what did he say?  He said

3    Jon Hall had been drinking all day.  I

4    asked him what did he want to do.  He

5    wanted to try to reconcile with his

6    family.  Did he take a money order?  He

7    took money out there.  He wanted to make

8    a child support payment, take money out

9    there and reconcile with his family.

10   That's what he wanted to do.  That was

11   his intent.  Things got out of control,

12   and here we are.

13        Mr. Mayo is absolutely correct.

14    The passion never subsided, never

15   subsided.  The passion has still not

16   subsided in Mr. Hall because he has to

17   live with this every day.  He destroyed

18   his family, his wife.  He has to live

19   with it every day.  The passion has

20   never subsided.

21        Thank you.

22        THE COURT:  General.

23        MR. WOODALL:  Ladies and

24   gentlemen, don't get caught up on the

1    passion never subsided.  Look at those

2    instructions.  The instructions that the

3    Court will give you is, the design to

4    kill was formed with deliberation and

5    premeditation.  It's immaterial,

6    immaterial, that the accused may have

7    been in a state of passion or excitement

8    when the design was carried into effect,

9    and the sentence that they key on is

10   just another option.  It's not -- It

11   just says, furthermore, premeditation

12   can be found, another way you can find

13   premeditation, if the decision to kill

14   is first formed during the heat of

15   passion but the accused commits the act

16   after the passion has subsided.

17          So, you know, they say we're in

18   trouble because we bring someone in from

19   the penitentiary.  Well, for right now

20   just strike out number two.  Was the

21   phone unhooked?  You betcha it was

22   unhooked.  Did he force his way in the

23   house?  Uncontroverted.  You bet he did.

24   Did he barricade the door?  Absolutely.

1   Did he pursue this woman?  Yes.  And did

2   he tell the kids that, "Your mama will

3   never graduate?"  That tells you that he

4   made the decision to go ahead and kill

5   her right then.  And then he told them,

6   "Cross the street and go get some help,

7   I'll kill your mama.  I'll kill your

8   mama in front of you kids."  Yeah.

9           Get caught up on this drinking

10  all day.  I asked the good Dr. Zager.

11  She said, "Well now, we're just talking

12  about the fact that he has a drinking

13  problem," and you have to have one or

14  more of the following signs developing

15  during or shortly after this use of

16  alcohol.  Slurred speech?  She said,

17  "Well, uh, uh, don't recall that."  This

18  is a woman that's reviewed all these

19  statements.  "Uh, don't recall that,"

20  said the good doctor.  Incoordination?

21  "Don't recall that."  These 83 blows

22  don't show any incoordination, do they?

23  This pursuing doesn't show any

24  incoordination, does it?  This throwing

1   her in the pool doesn't show any

2   incoordination, does it?  Another one of

3   the following signs, unsteady gait.

4   Doctor doesn't recall that.  Any

5   problems with nystagmus recognition?

6   "Don't recall that."  What about

7   impairment in intention or memory?

8   "Don't recall that."  What about stupor

9   or coma, another element?  "Don't recall

10  that."

11          This Defendant is just simply

12  trying to escape the responsibility for

13  his own conduct.  He's simply trying to

14  escape his own conduct.  One who went

15  out there -- And they talk about the

16  money order.  The money order.  That was

17  his key to the house, he thought.  For

18  25 pieces of silver he was going to get

19  entry into the house, and when that

20  didn't work, he forced his way in.

21          And then the defense would have

22  you believe this can't be deliberate and

23  premeditated because it wasn't a good

24  plan, because he got caught?  You know,

41

1   you would -- what does it have to -- the

2   only way it can be first degree murder

3   is when it's a killing of Hoffa whose

4   body has never been recovered and nobody

5   charged?  Well of course not.  I can't

6   help it he got caught.  But he went out

7   there knowing that he was going to get

8   in the house with that check, that he

9   was going to get in there, and if she

10  didn't do what he wanted, make her

11  suffer like she'd made him suffer, and

12  so she couldn't call the police, he

13  unhooked the phone, and when she

14  wouldn't do what he wanted, he started

15  to beat on her, one blow at a time,

16  deliberately, premeditatedly.

17  Barricades the door so that the little

18  kids, the only remaining lifeline, can't

19  even get in there, and they scratch

20  their way in there and try to help their

21  mom, and he tells them, "She'll never

22  graduate.  If you girls go across the

23  street, I'll kill your mama."

24           And she gets away from him and

1    gets outside.  He pursues her.

2    Deliberation, premeditation.  And he

3    continues to beat and beat and beat and

4    beat.

5            He may not be the smartest

6    criminal in the world, but we don't have

7    anything in the instructions that the

8    Court will give you that says because he

9    was dumb enough to get caught, he ought

10   to be acquitted, or found guilty of a

11   lesser included offense.  What we've got

12   to look at is the facts and the proof

13   and the evidence that demonstrated that

14   he had the premeditation and the

15   deliberation and the reflection and the

16   cool purpose.  And it's here.  He

17   unhooked the phone.  Made his mind up

18   that if she didn't do what he wanted, he

19   was going to make her suffer.  Forced

20   his way into the house.  Made the kids

21   go to bed.  Took her into the bedroom

22   and barricaded the door.  The kids come

23   in, tells them, if they go for help --

24   "Use the phone.  Yeah, use the phone."

1  "If you go for help, I'm going to kill

2  her."

3          The Defendant, based upon the

4  proof that's been presented, is guilty

5  of murder in the first degree, and

6  that's what the jury should return,

7  guilty of murder in the first degree.

8          Thank you.

9              * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    C E R T I F I C A T E

 2          I, the undersigned Amy Mays,

 3    Official Court Reporter for the 26th

 4    Judicial District of the State of

 5    Tennessee, do hereby certify that the

 6    foregoing is a true, accurate and

 7    complete transcript, to the best of my

 8    knowledge and ability, of the requested

 9    proceedings had in the captioned cause,

10    in the Criminal Court for Madison

11    County, Tennessee, on the 3rd day of

12    February, 1997.

13          I do further certify that I am

14    neither of kin, counsel nor interest to

15    any party hereto.

16

17

18    _____

19    AMY MAYS

20

21    _____

22    DATE

23

24
```