Case 1:05-cv-01199-JDB-egb    Document 159-12    Filed 02/07/18    Page 1 of 37
PageID 5013

ORDER EXTENSION TO 10-21-97.

FILED

OCT 2 1 1997

Clerk of the Courts

Rec'd By _ll_

STATE OF TENNESSEE,    )
                       )
        Appellee,      )
                       )
VS.                    )    No. 02C01-9703-CC-00095
                       )    DEATH PENALTY CASE
JON HALL,              )
                       )
        Appellant.     )

---

BRIEF OF APPELLANT
JON HALL

---

ORAL ARGUMENT REQUESTED

FORD & MAYO, P.A.
Jesse H. Ford, III
Clayton F. Mayo
Attorneys for Appellant
618 N. Highland
P. O. Box 1625
Jackson, TN  38302-1625
(901) 422-1375

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES PRESENT FOR REVIEW . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 35

i

TABLE OF AUTHORITIES

CASES CITED

Clark vs. State, 402 S.W.2d 863 (Tenn. 1966) . . . . . .  26

Drye v. State, 184 S.W.2d 10 (Tenn. 1944) . . . . . . .  26

Mullendoor v. State, 191 S.W.2d 149, (Tenn. 1945) . . .  24

Rickman v. Dutton, 854 F. Supp. 1305,
(M.D. Tenn. 1994) . . . . . . . . . . . . . . . . . .  33

Winton v. State, 151 Tenn. 177, 268 S.W.2d 633,
(Tenn. 1925) . . . . . . . . . . . . . . . . . . . .  25

State v. Banks, 564 S.W.2d 947, (Tenn. 1978) . . . . . .  29

State v. Brown, 836 S.W.2d 530, (Tenn. 1992) . . . . . .  27

State v. Bullington, 532 S.W.2d 556, (Tenn. 1966) . . .  26

State v. Davis, 28 S.W.2d 993, (Tenn. 1930) . . . . . .  28

State v. Fugate, 776 S.W.2d 541,
(Tenn, Cir. App. 1988) . . . . . . . . . . . . . . .  25

State v. Phipps, 883 S.W.2d 138,
(Tenn. Crim. App. 1994) . . . . . . . . . . . . 24, 25, 28

State v. Odem, 928 S.W.2d 18, (Tenn. 1996) . . . . . . .  31

State v. Thornton, 730 S.W.2d 309, (Tenn. 1987) . . . .  32

Tennessee Rules of Evidence
Rule 403 . . . . . . . . . . . . . . . . . . . . . . .  29

Tennessee Code Annotated §39-13-204(i)(5) . . . . . 2, 30, 31, 33

Tennessee Code Annotated §39-2-205(c)(4) . . . . . . . . 2,32

MAY IT PLEASE THE COURT:

This is an appeal from the Circuit Court of Madison County, Tennessee, from a verdict of guilty of first degree murder and a sentence of death. Reference to the technical record will be designated by the abbreviation (R)·_____ and reference to the transcript of evidence will be designated by the abbreviation (T)·_____ (with the blank being the page number to be supplied). This matter is properly before this Honorable Court.

1

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.   Whether or not the evidence was insufficient to support the verdict of murder in the first degree during the guilt phase of the trial?

II.   Whether or not the trial court erred during the guilt phase of the trial in failing to allow Cheryl Arbogast to testify regarding the Defendant's state of mind prior to the date of the alleged incident?

III.   Whether or not the trial court erred when it allowed autopsy photographs of the victim into evidence during the penalty phase of the trial which were gruesome and inflammatory and had a prejudicial effect on the outcome?

IV.   Whether or not the evidence during the penalty phase was sufficient to support the aggravated circumstance that "the murder was heinous, atrocious or cruel within the meaning of Tennessee Code Annotated §39-13-204(i)(5)"?

V.   Whether or not the imposition of the death penalty, under the facts and circumstances of this case, imposes a disproportionate punishment on the Defendant in violation of Tennessee Code Annotated §39-2-205(c)(4)?

VI.   Whether or not the trial court erred in the penalty phase of the trial by charging the aggravating circumstances set out in Tennessee Code Annotated §39-13-204(i)(5), because it is vague, overbroad, and incapable of being properly understood and applied by laid jurors?

STATEMENT OF THE CASE

On October 3, 1994, the Henderson County Grand Jury returned one (1) Indictment against Defendant, JON HALL, of which charged him with First Degree Murder, Two (2) Counts of Theft of Property, and Especially Aggravated Kidnapping (R. 1-5).  On December 19, 1994, the District Attorney filed a Notice of Intent to Seek the Death Penalty (R. 6).

On February 3, 1997, through February 5, 1997, the trial was held in the Circuit Court of Madison County, Tennessee, before the Honorable Whit LaFon and a jury of twelve (T. I-VI).  After hearing the proof, the jury found the defendant guilty of First Degree Murder and sentenced him to death (T. 375); (T. 449), as written in the Judgement filed February 25, 1997 (R. 179).  Defendant filed a Motion for New Trial or Verdict of Acquittal and the Court ruled that the sentencing of the death penalty should be carried out (R. 202-203).

On April 25, 1997, Defendant filed a Notice of Appeal, and the matter is now properly before the court for consideration (R. 229).

3

<u>STATEMENT OF FACTS</u>

Prior to beginning the trial of this matter a jury out hearing was had on whether of not Defendant's statement to the T.B.I. Agent Brian Byrd would be used during the trial.  The Attorney General stated that the statement would not be used and the Court granted Defendant's request to suppress that particular statement.  (T. 5-11)

Also prior to the selection of the jury Mr. Hall was sworn in and stated under oath that he had been extended an offer of life with the possibility of parole and that he acknowledged that the offer was made by the State of Tennessee through his attorneys and that he had rejected that offer.  (T. 8-9)

Extensive voir dire and individual voir dire was conducted concerning death penalty issues and issues of domestic abuse with the presence of the Defendant, Defendant's attorneys and Julie Fenyes, a jury consultant expert.  A jury of twelve was duly impaneled along with two alternates.  There are no issues raised herein regarding selection of the jury. (T. 9-178)

After the jury was selected the Defendant made was sworn and several pro se motions regarding the opening statement which was overruled by the Court.  (T. 186-191)

The First witness called on behalf of the State of Tennessee was Jerry Bingham of the Henderson County Sheriff's Department.  He stated that on July 29, 1994, he was called to investigate a death

4

in Henderson County.   He arrived on the scene at approximately
11:55 p.m.   (T. 192)

He was directed to a swimming pool and found a body in the
pool.   A photograph of the body lying face down in the pool was
admitted as Exhibit 1.   (T. 193)

Deputy Bingham stated that he called Emergency Medical
Services and Investigator Brent Booth of the Henderson County
Sheriff's Department.   He indicated that he did not conduct a
search of the crime scene.   (T. 193-195)

The next witness called on behalf of the State of Tennessee
was  Brian  Byrd,  an  agent  with  the  Tennessee  Bureau  of
Investigation, who was also involved in the investigation of the
death of Billie Hall.  Agent Byrd arrived sometime after midnight
on July 30, 1994, took pictures of the crime scene.  He described
the house as being in disarray and noticed that there was evidence
of a struggle in the master bedroom.   He also found a trail of
blood stains and "skids" to a swimming pool.   The "skids" were
described as drag marks in the dirt.   (T. 196)

Agent Byrd prepared a sketch of the crime scene both inside
and outside of the residence.   He described blood spatters and
blood stains in the master bedroom. (T. 197-198)

Agent Byrd also noticed an ash tray, a wedding dress and a
cigarette pack with blood stains. (T. 199)

According to Agent Byrd the telephone in the living room area
was off the hook and upon examining the phone junction box he found
that the box had been opened and the phone disconnected.  The grass

5

under the phone junction box was matted down according to his observation. (T. 201)

In the yard there appeared to be a vehicle that was being worked on near the house and there also appeared to be skid marks on the driveway. (T. 202)

Agent Byrd took some measurements which included a blood spot 106 feet from the house, a blood spot near the sand box, two blood spots by the pool and he further indicated that the pool water had a pinkish tint to it. He also found a blood trail from the driveway to the swimming pool. (T. 203)

The trail appeared to Agent Byrd as if someone was dragged along it "struggling along the way". Agent Byrd testified that it was 80 feet from the driveway to the swimming pool and 106 feet from the driveway to the house, indicating that the blood trail was 186 feet. (T. 204)

Agent Byrd described the swimming pool as 20 to 25 feet wide and approximately 3 feet deep. It was a fiberglass or aluminum pool. Agent Byrd developed Jon Hall as a suspect in this particular case. Diagrams of the premises were marked as the next Exhibit. (T. 205)

Agent Byrd identifies Jon Hall whom he stated he arrested in Bell City, Texas. Photographs of the blood stains, the pool, the vehicle being worked on in the yard and grass floating in the pool were next identified by Agent Byrd. (T. 207)

Also there was a picture of the victim wearing a black t-shirt. This was the shirt she was wearing prior to the time she

went to bed.   All photographs were marked as State's collective
Exhibit 3. (T. 208)

Another series of photographs was handed to Agent Byrd which
depicted the entryway of the residence and the phone junction box.
A close up of the phone junction box showed where the wires had
been disconnected or a clip had been pulled out of the junction
box.   Agent Byrd stated that there was no damage to the wires
inferring that they could easily be reconnected. All the above was
marked as collective Exhibit 4. (T. 209)

Agent Byrd was handed another set of photographs which
depicted a storage area and the swimming pool.  This was marked as
Exhibit 5. (T. 210)

Agent Byrd described wet footprints on the carpet and wet
footprints on a wooden deck on the exterior of the home.  He said
that a red minivan was taken from the crime scene. (T. 211)

Agent Byrd also found a twenty-five dollar money order at the
crime scene with the payee being Billie Hall and the remitter being
Jon Hall. Agent Byrd could not locate the money order at this time
but would be recalled stating that it was in his file in his
vehicle. (T. 212-214)

All fingerprints taken at the crime scene were inconclusive
and Agent Byrd stated he did not need fingerprint evidence in that
he had witness statements to prove his case. (T. 216)

There were no firearms or weapons at the crime scene and
according to Agent Byrd a struggle had occurred "all over the
house". (T. 217)

7

Agent Byrd stated that Jon Hall was arrested at his brother's home in Texas and he had no weapon on him at the time of his arrest. He further stated that Mr. Hall was crying and remorseful in the Bell County, Texas Jail on Agent Byrd's initial interview. (T. 218-219)

There appeared to be some stained blue jeans in the vehicle and some maps in the vehicle that Mr. Hall drove to Texas. (T. 219-220)

Agent Byrd stated he found no credit cards in Mr. Hall's possession and that Mr. Hall was working on Mrs. Hall's vehicle. According to Agent Byrd Mr. and Mrs. Hall were in the process of divorce. (T. 221)

Agent Byrd stated that the phone had been disconnected but it could have been easily reconnected. (T. 221)

The next witness called on behalf of the State of Tennessee was Chris A. Dutton, an inmate at Cold Creek Correctional Facility. Mr. Dutton is age 37 and had been incarcerated approximately fourteen to fifteen of his thirty-seven years. He was placed in a maximum security classification as a result of an escape conviction. He had been incarcerated at Riverbend in Nashville, Tennessee. (T. 222-223)

At the present time he is at Cold Creek, a minimum security facility. He describes the cells at Riverbend as one man cells. He states that inmates at Riverbend communicate through a ventilation system, that is how he came in contact with Jon Hall. (T. 224-225)

. Mr. Dutton identifies Jon Hall and states that Mr. Hall provided him with information concerning Mr. Hall's criminal charges. (T. 226)

According to Dutton, Hall confided in him and Dutton asked him no questions. Hall told Dutton he had killed his wife. Hall said he had contacted his wife about bringing her some money. He took it to her and tried to get her to listen to him. After no reconciliation occurred Mr. Hall stated that he lost his temper and began to strike his wife. (T. 226-227)

Hall told Dutton he disconnected the phone wire so that his wife could not call the police. (T. 228)

Hall said he wanted to "make her suffer because she took his world away from him". (T. 228)

Dutton stated that Hall told him his two children were present during the fight and that he hit her (Billie Hall) in the head until he panicked and threw her into the pool. He left in her van. (T. 229)

Dutton made this information available to the Attorney General's Office in Nashville and was told that Mr. Woodall would speak at his parole hearing if Dutton testified truthfully in the present case. Dutton testified he receives no present benefit for his testimony. He also stated that he testified in a North Carolina case. (T. 229-231)

Dutton denies being an informant in the prison system. He admits Hall told him that he had been drinking all day prior to going to Billie Hall's home. He also admitted that Hall was

9

concerned about his special needs child and had been working on his wife's car for her. The reason he went to her home on that night was to attempt reconciliation and pay child support. (T. 234)

Dutton also stated that Hall had told him on past occasions he had disconnected the phones because Mrs. Hall had called the police on prior occasions. Hall did not go armed out to see his wife according to Dutton. (T. 235)

Dutton denies the real reason Hall went to see his wife was to attempt reconciliation. Dutton says Hall wanted to make his wife feel helpless. (T. 236)

At this point Agent Byrd was recalled to the stand. He indicated that he had found the money order payable to Billie Hall from Jon Hall which was dated July 29, 1994, in the amount of twenty-five dollars. It was marked at the next Exhibit and passed to the jury. The money order was found inside the Billie Hall residence on a night stand at the end of a couch. (T. 237-238)

The next witness called on behalf of the State of Tennessee was Stephanie Lambert, eight years old. Voir dire was conducted by the Court regarding her ability to understand the oath. She stated that she would get a "whippin" if she does not tell the truth. The Court finds she is qualified as a witness. (T. 239)

Stephanie has lived with her maternal grandparents for the past two and one-half years. She stated "her dad" came to her home in July, 1994. At that time she, her mother and sisters were watching TV. She said that "Jon" came into the kitchen. Jon told the children to go to bed three times. Jon and Mrs. Hall went into

10

the bedroom. At that point she heard yelling in the bedroom. (T. 240-243)

Billie Hall told the children to go to Pam's up the road. They were not able to use the telephone in the Hall home. As she was leaving to go Pam's Stephanie stated she saw her mother come out of the bedroom and run through the door. (T. 244-245)

According to Stephanie, Billie Hall had a job and went to school. She said Jon said "you will never live to graduate". (T. 246)

According to Stephanie, Jon Hall worked at Helms Motor Company when he lived with them. Stephanie does not remember whether or not he kept the children when Billie Hall had class or whether he fixed meals for them. She also doesn't remember whether or not he took them out to eat when he lived with them. (T. 247)

Stephanie stated that her sister Jennifer had given a rag to Billie Hall and tried to get Jon to "stop hurting their mother". Stephanie stated that she had talked with the police and a lady downstairs and her grandparents about her testimony and that she was only repeating what she had been told. (T. 249-251)

At this point a request is made on behalf of the Defendant to remove the victim's mother from the courtroom. There is an out of jury discussion regarding whether or not Mr. Hall will leave the courtroom during testimony of his step-children. (T. 254-257)

The next witness called on behalf of the State of Tennessee is Cynthia Lambert, daughter of the victim. She is voir dired by the Court and found qualified. She lives with her grandparents,

11

however, she did reside with her mother and Jon Hall in Lexington,
Tennessee, until "Jon" moved out. (T. 257-259)

According to Cynthia, Jon pushed his way into the house and
told the children to go to bed. Cynthia stated her mother had on
night clothes at the time, a t-shirt and black pants. She said she
and her sisters went into their bedroom and heard things slamming
around and as a result went into their mother's bedroom. (T. 260-
261)

Cynthia stated it was hard to get in in that there was "stuff"
blocking the door. Cynthia saw Jon and Billie Hall fighting. She
stated she jumped on Jon Hall's back and bit him, tried to call 911
but the phones would not work. Cynthia stated that Jon Hall told
her that if they went for help he would kill their mother. (T. 261-
262)

According to Cynthia, she and Stephanie went to a neighbor's
home and called 911. At that point the neighbor took Cynthia and
her sister for a ride. (T. 263)

Cynthia denied that Jon Hall took care of she and her sisters
and stated that he never took them anyplace and that he just worked
on cars. In fact, he had worked on her mother's car two to three
times the week before this incident occurred. (T. 265-266)

Cynthia denies remembering a prior statement made to police
officers in which she said Billie Hall let Jon Hall in that night
and that he did not push his way into the home. (T. 267)

After reviewing the statement Cynthia now with her memory
refreshed testifies not remembering telling police officers that

12

Jon pushed his way into the house.  She testifies that when Mr.
Hall initially got to the home that her mother and Mr. Hall did not
fight. (T. 269)

According to Cynthia, Jon Hall brought beer with him to the
home and drank "one" in the presence of Cynthia Lambert.  Cynthia
never saw Mr. Hall show her mother any affection in the five or six
years they were married. (T. 270-271)

The next witness called on behalf of the state was Jennifer
Lambert, age eleven, a student at Huntingdon Elementary School.
She is voir dired regarding the oath and is qualified. (T. 275)

She is asked to tell what happened on that night in July.  She
stated that Mr. hall told the children to go to bed.  That Jon Hall
and her mother went into the bedroom and a fight started.  She said
that a vacuum cleaner and a sewing machine were blocking the door
into her mother' bedroom.  She tried to stop the fight and saw Jon
hall drag her mother to the pool. (T. 276-278)

According to Jennifer, Hall said he would kill Billie Hall if
the children went for help.  She went to a neighbor's house and
took Jessica with her.  She admits that Mr. Hall had taken the
girls swimming and other places. (T. 279-281)

The next witness called on behalf of the State of Tennessee
was Dr. O'Brien Clary Smith, an expert in the field of pathology.
(T. 282-284)  Dr. Smith testified he examined the body of Billie
Hall on July 30, 1994.  He had previously received and reviewed a
copy of the  local  medical examiner's report.  According  to Dr.

Smith the purpose of an autopsy is to determine the cause of death.
(T. 282-287)

A visual inspection revealed that Mrs. Hall sustained numerous
injuries to her body including scrapes and bruises. Her skin and
clothing were wet. (T. 288)

According to Dr. Smith, Billie Hall died primarily as a result
of asphyxia either by manual strangulation or she may have drowned
or the cause of death could have been a combination of both manual
strangulation and drowning resulting in denial of oxygen to the
body. There were approximately two ounces of water in her stomach.
(T. 288-289)

Dr. Smith cannot say for certain that drowning was the
exclusive cause of Billie Hall's death. He found bleeding in the
neck muscles and from the thyroid gland indicative of compression
to the neck. In addition there were two ounces of blood in the
throat area which supported his theory that death was either caused
by drowning or strangulation. (T. 291-292)

The victim's nose was fractured and blood was breathed into
the lungs. There are also other external injuries. The external
injuries in and of themselves were not sufficient to produce death,
however, the external injuries did occur while the victim was
alive. (T. 293)

Dr. Smith defines defensive wounds as those incurred in trying
to ward off a certain type of assault. It is his opinion that
defensive wounds were present on Mrs. Hall. (T. 294-295)

14

Dr. Smith then methodically documents eighty-three (83) blows to the body of Mrs. Hall each according to him resulting in a painful wound. (T. 296-302)  The external injuries were not the cause of death.  All external injuries were inflicted within two hours of death. (T. 303-304)

According to Dr. Smith beating is a fairly common mechanism of homicide and Mrs. Hall had an extensive beating but it was not life threatening.  His findings were insufficient to support a theory of "effort to control".  According to Dr. Smith the combination of strangulation and drowning can be painful. (T. 305-307)

Upon his observation of the external wounds Dr. Smith stated that they either occurred over a two hour period or within several minutes to a quarter of an hour.  He said the wounds to the head and neck were targeted and made out of "anger". (T. 308)

At this time the State rests and a motion for judgment of acquittal is overruled.

The first witness called in the defense of this matter was Cheryl Arbogast, age thirty-seven and the sister of Jon Hall.  She is a registered nurse.  At this point the State objects to her testimony based on the fact that she is going to testify as to the state of mind of Jon Hall prior to July 29, 1994.  The Court excludes this evidence from the jury and an offer of proof is submitted. (T. 315-316)

She testifies that she had been talking to her deceased brother about getting Jon Hall some emergency psychological counseling a day or two prior to July 29, 1997.  She describes Mr.

15

Hall as very distraught over his impending divorce. She is of the opinion that he was suffering from acute depression. (T. 317-319)

Her intent was to get him some type of immediate psychiatric help. (T. 320)

The Court allows the offer of proof and Ms. Arbogast testifies that she wanted her deceased brother to trick or deceive Jon Hall into a emergency room so that he could be held for seventy-two hours for psychological counseling. She stated that Jon had visited with his brother two weeks prior to the July 29, 1994, incident and was very depressed. (T. 323-326)

Ms. Arbogast never personally observed Jon Hall prior to Billie Hall's death but her opinion is based on what she was told by Jeff Hall, Jon Hall's deceased brother. She had not talked to Jon Hall for some months prior to July 29, 1994, incident. (T. 326-328)

At this point Mr. Hall claims ineffective assistance counsel because Jeff Hall, deceased, was not present. The testimony of Ms. Arbogast is excluded by ruling of the Court. (T. 329)

The next witness called by the Defendant is Dr. Lynn Donna Zager, a clinical psychologist. After testifying as to her qualifications she is qualified as an expert in the field of psychology. (T. 331)

She stated she interviewed Mr. Hall on a number of occasions beginning in November of 1995, November of 1996, and January 3, 1997. She has reviewed Mr. Hall's records from the Middle Tennessee Mental Health Institute where he was a patient for thirty

16

days and also has reviewed other mental health records and interviews conducted with people who where acquainted with Mr. Hall. (T. 332-333)

It is Dr. Zager's opinion that Jon Hall suffers from depression before and after the incident of July 29, 1994. He also has an alcohol dependence problem termed "paranoia and dependency" and a family history of alcohol problems. She states that his state of mind on July 29, 1994, was effected by depression combined with intoxication and other "stressors" including the fact that he had a child with cerebral palsy, had lost his job and Mrs. Hall had lost her job which were termed financial "stressors" by Dr. Zager.

Furthermore, his brother Jeff with whom he had a close relationship had just been diagnosed with aids and his death was eminent. (T. 334)

It is Dr. Zager's opinion that Mr. Hall on or prior to July 29, 1994, would be unable to formulate and carry out a plan that his conduct could be termed impulsive verses "a well thought out" plan. (T. 335)

Upon cross examination the Attorney General infers that Mr. Hall was malingering or feigning these symptoms and that the only evidence supporting Mr. Hall's intoxication was his self report of being intoxicated at the time of the incident. Dr. Zager states that she had interviewed other potential witnesses that support the fact that Mr. Hall had been drinking heavily before the incident. (T. 336-337)

17

Mr. Hall's psychiatric history and family history and various interviews with family members support the fact that he has an alcohol problem. The Attorney General attempts to impeach Dr. Zager as to her opinion that Mr. Hall was intoxicated at the time of the incident. (T. 340)

The records from Middle Tennessee Mental Health Institute, "a state run operation which evaluates people who face serious charges", support Dr. Zager's diagnosis and Middle Tennessee Mental Health Institute made the same diagnosis prior to Dr. Zager's diagnosis of alcohol dependency. (T. 341-342)

The next witness called is Randy Helms on behalf of the Defendant. He is the owner of Helms Motor Company in Lexington, Tennessee. Mr. Hall worked for him for a period of time beginning in 1993 until mid 1994. (T. 343-344)

Mr. Helms states that he saw Jon Hall on Wednesday, July 27, 1994, two days before the incident and reports that he seemed severely depressed to him. (T. 345)

Mr. Hall evidently had had a hard time dealing with his family situation according to Mr. Helms. (T. 346)

The Court asked Mr. Hall whether or not he understands that he has the right to testify. Mr. Hall states that he will testify if the Court will remove the "flag of war". The defense rests at that point. The Court charges the jury. (T. 348-374) A verdict of guilty to the charge of first degree murder is returned by the jury. (T. 375) The jury was polled and all answered affirmative as

to the verdict. (T. 377)   After discussion regarding the jury
charge the penalty phase begins. (T. 380)

The first witness called on behalf of the State of Tennessee
is Dr. O'Brien Clary Smith. He reviews a group of photographs of
the victim depicting various injuries which are introduced over
objection. They were enlarged by Dr. Smith in his office. Dr.
Smith describes the injuries depicted in the various photographs
and is of the opinion that Billie Hall's head injury was consistent
with her head hitting the floor that was carpeted and that other
injuries indicated she had been drug across asphalt or hard ground.
Some of her head injuries were due to having her hair pulled and
that her head, face and neck were "target areas" of her attacker.
(T. 380-396)

Dr. Smith is of the opinion that the pattern of injuries is
indicative of torture and serious abuse beyond that reasonably
necessary to produce death. (T. 397-398)   The State rests.

The first witness called on behalf of the Defendant is Dr.
Zager. Her qualifications are stipulated to. She states that she
took a history from Mr. Hall, interviewed family members, found
that his father was an alcoholic and his grandfather had
significant alcohol problems. Mr. Hall basically had no
relationship with his father in that his father had denied that Jon
was his son. Jon Hall witnessed spousal abuse between his mother
and father on numerous occasions. (T. 399-400)

It is established that Mr. Hall had no stable home environment
and no good role models in terms of how to deal with conflict in

19

his life. Dr. Zager was of the opinion that Jon Hall felt remorse over this incident in that when he was interviewed he cried and was depressed. (T. 400)

It is Dr. Zager's opinion that Jon Hall had symptoms of depression and was very protective of his four children. A combination of depression and alcohol dependence had a very adverse effect on Jon Hall's behavior and caused problems with relationships. Alcohol dependency carried over to other relationships and he became dependent on significant people in his life that is Billie Hall and their four children. (T. 401-403)

Dr. Zager is of the opinion that your judgment is compromised when you are intoxicated and domestic problems had been present for some time prior to the incident of July 29, 1994. (T. 404)

The next witness called on behalf of Jon Hall is Dr. Joe Mount, a psychological examiner at Riverbend. The State stipulates to his expertise. (T. 405)

Dr. Mount saw Jon Hall in six to eight formal counseling sessions for mental health screening and other times through informal visits with Mr. Hall. Dr. Mount states that it is his opinion that Jon Hall is severely depressed, showed extreme remorse and appeared sincere. He was placed on suicide watch at Riverbend. (T. 406-407)

Dr. Mount describes Jon Hall's psychological condition as an adjustment disorder with mixed emotional features coupled with substance abuse as shown by a history of alcohol dependence along with depression and anxiety. Dr. Mount treated Jon Hall at

20

Riverbend with counseling and placed him on antidepressant medication. Dr. Mount states that Jon Hall was extremely concerned about his children especially his handicapped child. (T. 408-410)

The next witness called on behalf of the Defendant in the penalty phase was Randy Helms who had known Jon Hall for two and one-half years that he had worked for Mr. Helms. Mr. Helms stated that at the time he hired Jon Hall he didn't need him at that time but he hired him because Jon had a family to support. He was described as a good dependable employee. (T. 411-412)

Mr. Helms testifies that when Jon Hall had to work on Saturdays he would bring the children with him to work. He seemed to have a good "normal" relationship with the children and took excellent care of them. In Mr. Helms' opinion Jon Hall wanted to work out his family problems. He voluntarily quit the job at Helms Motor Company when he could not do the job. Randy Helms stated he could not fire Jon Hall because the domestic problems he was having were effecting his work. He felt that Jon recognized this and quit to save him from having to fire Jon. (T. 414)

The next witness called on behalf of Jon Hall was Debbie Davis, Jon Hall's sister. She stated that they grew up in a family of seven children and that her parents fought on numerous occasions causing the children to hide weapons and sharp objects. She stated that she witnessed her father severely beat her mother in Jon Hall's presence as a child. The children tried to clean up the blood to the keep their father from getting into trouble. (T. 415-419)

In fact the children, according to Ms. Davis, placed pillows over their ears so they would not have to hear the fighting, however, her parents always seemed to reconcile. (T. 420)

Ms. Davis stated that she took Jon Hall to North Carolina to live with she and her husband and he stayed with them about six months then moved in with Billie Hall and evidently married her. She states that Jon adored the children and was a good father even though Jon Hall's own father denied that Jon was his child. (T. 422-424)

The next witness called on behalf of the Defendant was Kathy Hugo, Jon Hall's oldest sister. She stated that she witnessed fights and spousal abuse between her parents. She stated that report card day was especially bad. After their father died her mother remarried, unfortunately, another abusive spouse. (T. 426-428)

The next witness called on behalf of the Defendant in the penalty phase is Cheryl Arbogast. She stated that she witnessed the same type of fights and abuse that her other two sisters had witnessed during their childhood at the Hall home and its effect on Jon Hall. (T. 430)

The next witness called on behalf of the Defendant was Carol Alexander, Mr. Hall's mother. She reviews a series of alcohol problems, spousal abuse and indicates that the telephones were pulled from the walls on numerous occasions during Jon's childhood. She states that Jon Hall took very good care of his children. (T. 431-433)

22

At the end of the proof Mr. Hall is asked whether he wishes to testify in the penalty phase.  He says he will if the "war flag" is removed.  That motion is overruled. (T. 435-436)

The jury is instructed and returned in the penalty phase with the punishment imposed to be death by electrocution.

ARGUMENT

ISSUES PRESENTED FOR REVIEW

I.  Whether or not the evidence was insufficient to support the verdict of murder in the first degree during the guilt phase of the trial?

Chris A. Dutton, a prison confidant of Mr. Hall's, testified that Hall contacted his wife about bringing her some money on the night of the incident and went out there to attempt reconciliation with her. (T. 234)

Mr. Dutton testified that Mr. Hall "lost his temper" after no reconciliation occurred and that he disconnected the phone wires as he had done on prior visits to his wife's residence so that his wife could not call the police. (T. 226-235)

Dutton stated that Hall had a fight with his wife, panicked and then threw her into the swimming pool.  He also testified that Hall had been drinking all day prior to going to his wife's home. (T. 234)  This testimony is also supported by that of Dr. Lynn Zager in that she found that Mr. Hall had a history of alcohol abuse. (T. 332-334)

Voluntary drunkenness or intoxication has been accepted as rendering one incapable of forming pre-meditation and the required state of mind for a conviction of first degree murder.  Voluntary intoxication would also tend to render one incapable of forming an intent or design to kill.  See Mullendoor vs. State, 191 S.W.2d 149, (Tenn. 1945)

Also Hall would rely on State vs. Phipps, 883 S.W.2d 138, (Tenn. Crim. App. 1994) which has a lengthy discussion regarding

24

voluntary intoxication which would negate the capacity to form a particular specific intent although "it would not exonerate one from all criminal responsible", see <u>Phipps</u> at p. 148.   There is ample proof in the record to negate the required culpable mental state for a finding of murder in the first degree.

There was physical evidence found at the scene of the crime which tends to show Hall's intent.  Agent Byrd testified that he found a money order at the scene in the amount of $25.00 payable to Billie Hall from Jon Hall.   The money order was dated July 29, 1994.  (T. 237-238)

The child witnesses observed their parents "fighting" and described one "continuous event" which began in the house and ended at the pool outside the house. (T. 260-262)

There was obviously no interval here or time frame which would have allowed Mr. Hall to plan the murder of his wife and to put this plan into effect.  <u>State v. Fugate</u>, 776 S.W.2d 541, (Tenn. Cir. App. 1988).

The domestic problems and the fact that the Halls were obviously having "fight" as observed by the children would tend to show that there was no "absence of passion" which is required to form a "cool" purpose which is a requisite part of the element of deliberation.  See <u>Winton v. State</u>, 151 Tenn. 177, 268 S.W.2d 633, (Tenn. 1925).

Dr. Smith testified that were numerous external wounds to the body of Billie Hall including wounds to the head and neck.   That these wounds occurred either over a two hour period or within

minutes to within fifteen minutes. The other evidence including the children's observations tend to support Dr. Smith's theory that all external wounds occurred within minutes to within fifteen minutes and during the "fight". There was no pause during the fight, it was a continuous event according to the children. Dr. Smith further testified that the wounds to the target areas of head and neck were out of anger. (T. 308)

A conviction of first degree murder requires that "the mind be free from the influence of excitement or passion, as to be capable of reflecting and acting with a sufficient degree of coolness and deliberation of purpose ie. to cause the death of another. Clark v. State, 402 S.W.2d 863, (Tenn. 1966).

Obviously Mr. Hall's passion had not "subsided" and that he had a period of anger or sudden resentment which rendered him incapable of "reflection". See State v. Bullington, 532 S.W.2d 556, (Tenn. 1966).

Passion is defined as "any of the human emotions known as anger, rage, sudden resentment or terror". The absence of passion renders the mind incapable of cool reflection, the element that the State has failed to prove in this particular matter beyond a reasonable doubt. Drye v. State, 184 S.W.2d 10, (Tenn. 1944).

The State through Dr. Smith showed that there were "repeated blows" to the victim, however, the State must show in order to establish premeditation and deliberation that the Defendant also acted with cool purpose and reflection. In this particular case Mr. Hall acted out of anger in the heat of passion which would

render him guilty of a lesser degree of homicide. See <u>State v.</u>
<u>Brown</u>, 836 S.W.2d 530, (Tenn. 1992). The State failed to carry the
burden on proof of murder in the first degree in that there was no
time lapse whatsoever between the fight which began between the
victim and Mr. Hall and Mrs. Hall's death which according to Dr.
Smith occurred within fifteen minutes. (T. 308)

There was no proof that Hall was free from passion. The blows
to the victim in and of themselves are not sufficient to show
premeditation and deliberation. See <u>Brown</u> at page 542.

Dr. Lynn Zager also testified that it was her opinion that the
Defendant had a history of alcohol abuse and was "incapable of
carrying out a well thought out plan". (T. 235)

Viewing all of the evidence and supporting authorities above
the State has failed to carry its burden of proof on the issue of
premeditation and deliberation and therefore the conviction of
first degree murder should be reversed.

27

II. Whether or not the trial court erred during the guilt phase of the trial in failing to allow Cheryl Arbogast to testify regarding the Defendant's state of mind prior to the date of the alleged incident?

The Defendant's sister, Ms. Arbogast, was called to the stand as the Defendant's first witness. The State objected to her testimony based on the fact that the State suspected that she would testify as to the state of mind of Jon Hall prior to July 29, 1994. The Court excluded that evidence from the jury and an offer of proof was submitted for the record. (T. 315-316)

In summary, it was Ms. Arbogast's opinion that her brother was suffering from acute depression regarding domestic problems and was in need of immediate psychiatric help. This testimony was excluded from the jury by the trial court.

Generally evidence of an accused's state of mind at the time of the offense is admissible to negate the existence of the requisite elements of intent. See State vs. Phipps, 883 S.W.2d 138, (Tenn. Crim. App. 1994). Courts have allowed this type of testimony from non-expert as well as expert witnesses regarding the defendant's state of mind in order to show the defendant was incapable of "reflection" an element of deliberation. See State v. Davis, 28 S.W.2d 993, (Tenn. 1930).

The trial court's exclusion of Ms. Arbogast's testimony was prejudicial to the Defendant and the jury was not able to consider evidence of the Defendant's state of mind.

28

III.   Whether or not the trial court erred when it allowed autopsy photographs of the victim into evidence during the penalty phase of the trial which were gruesome and inflammatory and had a prejudicial effect on the outcome?

During the penalty phase of the trial Dr. O. C. Smith was called on behalf of the State of Tennessee.  Dr. Smith reviewed a group of autopsy photographs of the victim which were in color and had been enlarged or enhanced by Dr. Smith on his computer.  The photographs were gruesome and prejudicial to the Defendant. (T. 380-396)

The Defendant would rely on State v. Banks, 564 S.W.2d 947, (Tenn. 1978) and Rule 403 of the Tennessee Rules of Evidence in support of his position that the photos should not have been admitted in that the prejudicial impact of the photographs outweighed any probative value they would have.  The photographs can only be described as "shocking and horrifying" within the meaning of Banks at p. 952.  The photographs had a "designed effect" on the jury that the State desired based upon their verdict in the penalty phase of the trial.

IV.   Whether or not the evidence during the penalty phase was sufficient to support the aggravated circumstance that "the murder was heinous, atrocious or cruel within the meaning of Tennessee Code Annotated §39-13-204(i)(5)"?

The State relied upon the testimony of Dr. O. C. Smith and the photographs depicting the injuries of the victim.   The State solicited opinion testimony from Dr. Smith that the pattern of injuries were indicative of torture. (T. 397)

Dr. Smith's opinion was conclusory in nature and an objective review of his testimony can only lead to the conclusion that the State failed to carry its burden of proof on this particular aggravating circumstance.  According to Dr. Smith during the guilt phase all injuries occurred within a few minutes to fifteen minutes. (T. 308)   Also Dr. Smith was of the opinion that the external injuries or the blows to the body of Mrs. Hall would not in and of themselves be sufficient to produce death. (T. 293)

According to Chris Dutton, Hall panicked and threw his wife into the swimming pool where her body was eventually found. (T. 229)

According to Dr. Smith the cause of death was a combination of asphyxiation by strangulation and drowning. (T. 289)   Based on Dr. Smith's testimony the "torture" element of Tennessee Code Annotated §39-13-204(i)(5) has not been proven by the State beyond a reasonable doubt.   Neither has the allegation of serious physical abuse beyond that necessary to produce death been proven by the State in that the external injuries in and of themselves were not the cause of death. (T. 293)

30

State v. Odom, 928 S.W.2d 18, (Tenn. 1996) extensively discusses whether or not the application of the aggravating circumstance of heinous, atrocious and cruel within the meaning of Tennessee Code Annotated §39-13-204(i)(5) should be applied under a particular set of facts. Based on the State's medical proof the jury was not justified in making such a finding.

VI.    Whether or not the trial court erred in the penalty phase of the trial by charging the aggravating circumstances set out in Tennessee Code Annotated §39-13-204(i)(5), because it is vague, overbroad, and incapable of being properly understood and applied by laid jurors?

The aggravating circumstance codified in Tennessee Code Annotated §39-13-204(i)(5) provides as follows:

> "The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to cause death."

Defendant respectfully submits the foregoing aggravating circumstances unconstitutional because it is vague and incapable of being understood and applied by laid persons.

In the case of Rickman v. Dutton, 854 F. Supp. 1305 (M.D. Tenn. 1994), the Federal District Court for the Middle District of Tennessee held that the instruction that the jury could find as a statutory aggravating death penalty circumstance that the murder was especially heinous, atrocious, or cruel and that it involved torture or depravity of mind was unconstitutionally vague.    The Court went on to state that without further limiting instruction, the words, "heinous and depravity of mind" failed to impose "any inherent restraint on the arbitrary and capricious infliction of the death sentence".    Rickman, p. 1310.

The Trial Court in the instant case charged the jury with only the aggravating circumstance set out in Tennessee Code Annotated §39-13-204(i)(5).    The jury found that this circumstance was made out by the proof and accordingly sentenced Defendant to death (T. 449-450).    Have the jury not been charged with this circumstance, the Defendant would have received a sentence of life with the

possibility or without the possibility of parole.

The defendant respectfully submits that this Honorable Court should reduce his sentence from death to life without parole to the possibility of life with parole.

34

## CONCLUSION

Based on the foregoing the Defendant would ask to the Court to grant him a new trial or in the alternative to reduce the judgment to second degree murder or reduce his sentence to life with parole.

Dated, this the 21st day of October, 1997.

Respectfully submitted,

_____
CLAYTON F. MAYO   014138


_____
JESSE H. FORD, III   009775
Attorneys for Appellant
P. O. Box 1625
Jackson, TN   38302-1625
(901) 422-1375


## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was served on Ms. Amy Tarkington, Assistant State Attorney General, 500 Charlotte Avenue, Nashville, Tennessee 37243-0497 by mailing the same with sufficient postage to insure proper delivery this the 21st day of October, 1997.


_____
JESSE H. FORD, III

35