IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | MADISON COUNTY |
| v. | ) | C.C.A. NO. |
| | ) | 02C01-9703-CC-00095 |
| JON DOUGLAS HALL, | ) | |
| | ) | DEATH PENALTY |
| Appellant. | ) | |

ON APPEAL AS OF RIGHT FROM THE JUDGMENT
OF THE MADISON COUNTY CIRCUIT COURT

---

BRIEF OF THE STATE OF TENNESSEE

---

JOHN KNOX WALKUP
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

KENNETH W. RUCKER
Assistant Attorney General
425 5th Avenue North
Cordell Hull Building, 2nd Floor
Nashville, Tennessee 37243-0493
615-741-5648
B.P.R. No. 18208

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.  THE EVIDENCE SUPPORTS THE FINDING OF THE JURY THAT
    THE DEFENDANT COMMITTED FIRST DEGREE PREMEDITATED
    MURDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    II.  THE TRIAL COURT PROPERLY REFUSED TO ALLOW THE
    DEFENDANT'S SISTER, CHERYL ARBOGAST, TO TESTIFY
    REGARDING THE DEFENDANT'S STATE OF MIND PRIOR TO THE
    MURDER SINCE SHE HAD NOT SPOKEN TO HIM IN SEVERAL
    MONTHS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    III.  THE AUTOPSY PHOTOGRAPHS, RELEVANT TO ESTABLISH
    THE (i)(5) AGGRAVATING CIRCUMSTANCE, WERE PROPERLY
    ADMITTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    IV.  THE EVIDENCE SUPPORTED THE JURY'S FINDING OF
    AGGRAVATING CIRCUMSTANCE (i)(5) . . . . . . . . . . . . . . . . . . . 27

    V.  HALL'S SENTENCE OF DEATH IS NEITHER EXCESSIVE NOR
    DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR
    CASES, CONSIDERING BOTH THE NATURE OF THE CRIME AND
    THE DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    VI. TENN. CODE ANN. § 39-13-204(i)(5) IS CONSTITUTIONAL. 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## CASES

*Jackson v. Virginia,*
443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) . . . . . . . 16,27

*Maynard v. Cartwright,*
486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988) . . . . . . . 37

*Rickman v. Dutton,*
854 F. Supp. 1305 (M.D. Tenn. 1994) . . . . . . . . . . . . . . . . . . . 37,38

*State v. Austin,*
618 S.W.2d 738 (Tenn. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Banks,*
564 S.W.2d 947 (Tenn. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State v. Banks,*
664 S.W.2d 947 (Tenn. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Barber,*
753 S.W.2d 659 (Tenn. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 33,37

*State v. Black,*
815 S.W.2d 166 (Tenn. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*State v. Brimmer,*
876 S.W.2d 75 (Tenn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Brown,*
836 S.W.2d 530 (Tenn. 1992) . . . . . . . . . . . . . . . . . . . . . . 18,19,20

*State v. Cabbage,*
571 S.W.2d 832 (Tenn. 1978) . . . . . . . . . . . . . . . . . . . . . . . . 16,27

*State v. Caldwell,*
671 S.W.2d 459 (Tenn. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Caughron,*
    855 S.W.2d 526 (Tenn. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Cazes,*
    875 S.W.2d 253 (Tenn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Darnell,*
    905 S.W.2d 953 (Tenn. Crim. App. 1995) . . . . . . . . . . . . . . . . . . 18

*State v. Gentry,*
    881 S.W.2d 1 (Tenn. Crim. App. 1993) . . . . . . . . . . . . . . . . . . . . 21

*State v. Harbison,*
    704 S.W.2d 314 (Tenn. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

State *v. Henley,*
    774 S.W.2d 908 (Tenn. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Hodges,*
    944 S.W.2d 346 (Tenn. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 28,31,38

*State v. Hutchinson,*
    898 S.W.2d 161 (Tenn. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 23,34

*State v. Laney,*
    654 S.W.2d 383 (Tenn. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Martin,*
    702 S.W.2d 560 (Tenn. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Matson,*
    666 S.W.2d 41 (Tenn. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. McCormick,*
    778 S.W.2d 48 (Tenn. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. McNish,*
    727 S.W.2d 490 (Tenn. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 26,34

*State v. Miller,*
    771 S.W.2d 401 (Tenn. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 25,34

*State v. O'Guinn,*
    709 S.W.2d 561 (Tenn. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Odom,*
    928 S.W.2d 18 (Tenn. 1996) . . . . . . . . . . . . . . . . . . . . . . . 28,37,38

*State v. Payne,*
    791 S.W.2d 10 (Tenn. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Porterfield,*
    746 S.W.2d 441 (Tenn. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Sheffield,*
    676 S.W.2d 542 (Tenn. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*State v. Shelton,*
    854 S.W.2d 116 (Tenn. Crim. App. 1992) . . . . . . . . . . . . . . . . 21

*State v. Simon,*
    635 S.W.2d 498 (Tenn. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Smith,*
    695 S.W.2d 954 (Tenn. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Smith,*
    868 S.W.2d 561 (Tenn. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Smith,*
    893 S.W.2d 908 (Tenn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Williams,*
    657 S.W.2d 405 (Tenn. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . 27

*State v. Williams,*
    690 S.W.2d 517 (Tenn. 1985) . . . . . . . . . . . . . . . . . . . . . . 28,37,38

*State v. Wright,*
    756 S.W.2d 669 (Tenn. 1988) .......................... 34

## STATUTES

Tenn. Code Ann. § 39-13-204(i)(5) ...................... 1,2,25,27,37

Tenn. Code Ann. § 39-13-204(j)(2) ............................. 35

Tenn. Code Ann. § 39-13-206(c)(1)(A)-(D) ...................... 32

Tenn. Code Ann. § 39-13-204(i)(5) ............................. 37

Tenn. Code Ann. § 39-2-203(i)(5) ............................. 37

Tenn. Code Ann. § 39-11-503(a) ............................. 21

Tenn. Code Ann. § 39-13-201(b)(1) ............................. 18

Tenn. Code Ann. § 39-13-201(b)(2) ............................. 18

Tenn. Code Ann. § 39-13-202(a)(1) (1991 Repl.) .................... 16

## RULES

Tenn. R. Evid. 602 ....................................... 24,26

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.

Whether the evidence supports the finding of the jury that the defendant committed first degree premeditated murder?

II.

Did the trial court properly refuse to allow the defendant's sister, Cheryl Arbogast, to testify regarding the defendant's state of mind prior to the murder since she had not spoken to him in several months?

III.

Did the trial court properly admit the autopsy reports which were relevant to establishing the (i)(5) aggravating circumstance?

IV.

Did the evidence support the jury's finding of aggravating circumstance (i)(5)?

V.

Is Hall's sentence of death excessive or disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant?

VI.

Is Tenn. Code Ann. § 39-13-204(i)(5) constitutional?

1

## STATEMENT OF THE CASE

On October 3, 1994, the Grand Jury of Henderson County indicted Jon Douglas Hall for the premeditated murder of Billie Jo Hall, two counts of theft of property, and especially aggravated kidnapping. (I, 1-5).[1]   The State filed its notice of intent to seek the death penalty citing three aggravating circumstances.[2]  (I, 6). The trial court granted a change of venue, and the case was moved from Lexington, Henderson County, Tennessee to Jackson, Madison County, Tennessee. (II, 152).

On February 3-5, 1997, the trial court conducted a trial on the first degree premeditated murder charge. The jury found the defendant guilty as charged. (VI, 375). During the penalty phase, the trial court instructed two aggravating circumstances[3], and the jury, finding the heinous, atrocious, or cruel aggravating circumstance applicable and no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance, sentenced the defendant

---

[1]The record consists of seven volumes. The two volumes of the Technical Record will be referred to as "I" and "II," respectively. The four volumes containing the transcript of trial and sentencing hearing will be referred to as "III," "IV," "V," and "VI." The motion for new trial transcript will be referred to as "VII." References will be made to the appropriate volume and page number. The parties will be referred to as the "defendant" or "Hall" and the "State."

[2]Tenn. Code Ann. § 39-13-204(i)(5), (6), & (7).

[3]Tenn. Code Ann. § 39-13-204(i)(5) & (6).

2

to death. (VI, 449). On February 25, 1997, the trial court approved the jury's

verdict    and    sentenced    the    defendant    to    death.    (II,    179).

On March 7, 1997, the defendant filed a motion for new trial. (II,

202-203). After a hearing, the trial court overruled the motion. (II, 215). The

defendant filed a timely notice of appeal. (II, 229).

3

## STATEMENT OF THE FACTS

During the late hours of July 29, 1994, Jon Hall, the defendant, arrived at the residence of his estranged wife, Billie Jo Hall. (IV, 241, 260, 277). Before making his presence known, the defendant opened up the phone junction box and disconnected the phone line. (IV, 201, 228). Mrs. Hall and her daughters sat in the living room watching television when the defendant knocked at the front door. (IV, 241). Mrs. Hall and her daughter, Cynthia, went to the front door. (IV, 241, 260). The defendant pushed his way into the residence and entered the kitchen. (IV, 242). Mrs. Hall sat in a kitchen chair, and the defendant ordered the children to go to bed. (IV, 242-243, 277). Eventually, the children went to their bedrooms but, before going to bed, Stephanie Lambert observed the defendant knock her mother out of the kitchen chair. (IV, 243). After being pushed from the chair, Mrs. Hall went to her bedroom followed by the defendant. (IV, 243).

From their bedrooms, the children heard their mother yelling and objects being slammed around in the master bedroom. (IV, 243, 261, 277). The defendant placed a vacuum cleaner and sewing machine by the door evidently to prevent Mrs. Hall's escape and to prevent the children from entering the room. (IV, 244, 262, 277). Nonetheless, the children eventually gained entrance into the master bedroom and observed the defendant and their mother engaged in a

4

fight. (IV, 262, 278). Both Jennifer and Cynthia attempted to stop the fight, and Cynthia even jumped on the defendant's back and bit him. (IV, 262, 278). Mrs. Hall told her daughters to go to the neighbor's house next door, and the defendant threatened that he would kill their mother if they went for help. (IV, 244, 262). Cynthia and Stephanie attempted to call 911 from their residence, but the phones did not work. (IV, 262). The two girls then proceeded to their neighbor's home and called 911. (IV, 263).

After the children unsuccessfully attempted to stop the altercation, Mrs. Hall went outside the house with the defendant chasing her. (IV, 278). Jennifer Lambert observed the defendant drag a kicking and screaming Mrs. Hall to the pool.[4] The defendant continued the extensive beating which consisted of eighty-three separate blows. (IV, 302). Mrs. Hall ultimately died from asphyxia as a result of compressive forces applied about the neck with a possible contribution of drowning. (IV, 291). After killing his wife, the defendant grabbed the keys to Mrs. Hall's van and fled the scene. (IV, 211, 229).

Jerry Bingham of the Henderson County Sheriff's Department arrived at the Hall residence at approximately 11:55 p.m. (IV, 192-193). Upon exiting his patrol car, Officer Bingham heard a gentleman yelling for him to go to

---

[4]Jennifer Lambert was taking care of her little sister, Jessica, who suffered from cerebral palsy. Jennifer took her little sister next door to the neighbor's home. (IV, 279-280).

the pool. (IV, 193). Bingham went to the pool and found a body floating in the water. (IV, 193).

Brian Byrd, an agent with the Tennessee Bureau of Investigation, investigated the murder of Billie Jo Hall. (IV, 195). Byrd found the Hall residence to be in disarray. (IV, 196). When Byrd first arrived, he noticed wet footprints on the carpet in the house and wet impressions on the wooden deck. (IV, 211). Byrd also noticed signs which indicated a struggle had occurred in the master bedroom. (IV, 196). Byrd observed blood stains and spatters covering the room. (IV, 198). Specifically, Byrd found blood in a corner of the room, on the bed, a transfer stain on a white wedding gown, and an ashtray with a red stain. (IV, 199). The comforter on the bed was twisted and messed up. (IV, 199). Byrd exited the room and observed a blood spot in the home's entrance hall and a weight pin lying on the floor. (IV, 200). In the living area, Byrd found that the telephones had been taken off of the hook. (IV, 200-201).

Byrd exited the residence through the front door onto a large front porch. (IV, 201). To the right of the porch, Byrd observed that the phone junction box was open and that the phone line had been disconnected. (IV, 201). Byrd also noticed that the vegetation underneath the box was matted down. (IV, 201). The porch led to the driveway area where he found a spot of blood over one hundred feet from the front door. (IV, 203). Byrd followed an eighty-foot

trail from the driveway to the pool which appeared to have been caused by someone being drug across the ground. (IV, 203-204). Byrd found the ground to be sparsely covered with dry grass and observed impressions on the ground which resembled footprints. (IV, 204). The footprints appeared twisted and turned as if there was a great struggle along the trail. (IV, 204). Byrd also found grass that had been pulled up by the roots along the trail which further indicated a struggle. (IV, 204). At the end of the trail, Byrd located an approximately three-feet high, twenty to twenty-five feet in width swimming pool full of water. (IV, 204-205). Byrd observed that the pool water had a pinkish tint color and found grass with the roots still attached floating in the pool. (IV, 203-204).

During the criminal investigation, the defendant developed as a suspect. (IV, 205). Law enforcement officials arrested the defendant at his brother's residence in Bell County, Texas. (IV, 206, 218). Byrd first observed the defendant in an interview room at the Bell County justice complex. (IV, 219). In Texas, Byrd located the vehicle which had been driven by the defendant to Texas. (IV, 220).

Chris Dutton, an inmate incarcerated next to the defendant at Riverbend Maximum Security Institution, testified that Hall had discussed the killing of his wife with him. (IV, 223-225). Hall related that, on the day that he killed his wife, he had contacted her early in the day and made arrangements to

7

take her some money. (IV, 227). Hall told Dutton that he went to Mrs. Hall's

residence because "he wanted to make her feel as he did. He wanted her to suffer

as he did, feel the helplessness that he was feeling because she took his world

away from him." (IV, 228). Upon arriving at Mrs. Hall's residence, Hall

disconnected the phone line so that she could not call the police. (IV, 228). Hall

delivered the money and attempted to get her to listen to him. (IV, 227). Hall

related that his estranged wife only wanted the money and refused to listen to

him. (IV, 228). When Mrs. Hall refused to listen to the defendant's apparent

desire to reconcile, he began to strike her. (IV, 228). Hall told Dutton that his

children were present and, also, that the altercation started in the house and

proceeded into the yard. (IV, 229). Hall related that he beat his wife on the

head until he panicked and threw her into the swimming pool. (IV, 229).

Afterwards, Hall went back into the residence, picked up Mrs. Hall's keys, and

left in her van. (IV, 229).

Dr. O'Brien Clary Smith performed the autopsy on Billie Jo Hall as

a part of his duties as Assistant Medical Examiner. (IV, 285). A visual inspection

of Mrs. Hall's body showed various contusions, abrasions, and lacerations. (IV,

288). Smith opined that Mrs. Hall died from asphyxia, a condition in which

oxygen has been denied to the body. (IV, 288). Smith found evidence of manual

strangulation and also physical changes in the body which indicated that Mrs.

8

Hall might have drowned or drowned while being strangled at the same time.
(IV, 288-289). However, the most profound physical changes in the body were
those consistent with strangulation by the hand. (IV, 307).

When Dr. Smith examined the contents of Mrs. Hall's stomach, he
found two ounces of water on top of the normal gastric contents. (IV, 289).
Smith explained that water does not readily mix with gastric contents, and such
a finding is common in drowning victims or if a person drank a glass of water
shortly before death. (IV, 289). Besides the water in the stomach, Smith
testified that the laboratory findings indicated that some dilution of the blood
occurred. (IV, 290). Dilution in the blood is caused when a person takes water
into the lungs, and the water enters the blood stream. (IV, 290). While the lab
results showed dilution, Smith opined that the dilution was not extensive enough
to indicate that drowning was the exclusive cause of death. (IV, 290). Based
upon all of the results of the autopsy, Smith concluded that Mrs. Hall died as a
result of a lack of oxygen caused by compressive forces applied about the neck
with a possible contribution of drowning as well. (IV, 291).

In concluding that manual strangulation contributed to Mrs. Hall's
death, Smith observed bruises on the front of the neck, in the deep muscles in the
neck, and in tissues surrounding the hyoid bone. (IV, 291). Smith also found
hemorrhaging around the neck muscles and the hyoid bone. (IV, 291). Smith

9

testified that this indicated extensive compression to the neck. (IV, 291). In the
retro-pharyngeal space, the neck area in the back of the throat in the front of the
spine, Smith discovered about two ounces of blood. (IV, 291-292). Smith
further observed small pin-head size hemorrhages in the whites of Mrs. Hall's eyes
and in the various surfaces of the internal organs which are common in asphyxial-
type deaths. (IV, 292). The right side of the heart was dilated which can be
result of both drowning and strangulation. (IV, 292).

Smith also found various injuries to the body not associated with
strangulation and drowning. (IV, 292). Smith testified that Mrs. Hall suffered
blows to the head and a fracture of the nose. (IV, 292-293). Mrs. Hall
swallowed some blood and also breathed blood into her windpipe and lungs. (IV,
293). The body contained multiple skin tears and bruises along with skin scrapes
to the chest, abdomen, genitals, arms, legs, and back. (IV, 293). Smith found
bruising in the scalp area and behind both ears, but he testified that these injuries
did not result in any skull fracture or injury to the brain. (IV, 297). Smith
related that these injuries could be caused by being struck or being propelled into
a broad, flat object. (IV, 297). These injuries could also have been caused by
grabbing and pulling the hair which would create a separation of the scalp from
the skull. (IV, 297-298). These injuries may have played some role in her death,
but the injuries taken by themselves would not be sufficient to produce death.

10

(IV, 293).

Smith also found various defensive wounds to the forearms and the back of the hands.[5] (IV, 295). Additionally, certain injuries to the front of the thighs, knees, and shin area could be interpreted as defensive wounds.

Smith counted eighty-three areas distinguishable enough to suggest that they were inflicted by a separate blow. (IV, 302). Because of the close proximity of most of the injuries, Smith testified that a precise number was difficult to determine. (IV, 302). Smith stated that the body had not produced an inflammatory response which indicated that the injuries had been inflicted within two hours of death and likely over a period of several minutes to a quarter of an hour. (IV, 304, 308). Besides a bruise on the right thigh, all of the injuries had the appearance of being contemporaneous. (IV, 304-305).

DEFENSE PROOF

Dr. Lynn Donna Zager, a clinical psychologist, testified on behalf of the defendant. (V, 331). After interviewing the defendant and reviewing his medical records, Zager determined that he suffered from depression both prior to and after the crime. (V, 333). Zager opined that at the time of the incident the defendant was suffering from depression and was intoxicated on alcohol causing

---

[5]Dr. Smith defined a defensive wound as "a forensic term which is used to describe a pattern of injury on various body surfaces indicating that person was trying to ward off a certain type of assault." (IV, 294-295).

11

his abilities to be compromised. (V, 334-335). Zager testified that she believed

that the defendant was acting in an impulsive manner versus a well-thought out

plan. (V, 335).

During cross-examination, Zager admitted that, at first, she was

concerned that the intoxication claim came only from the defendant's own

statement. (V, 336-337). Zager testified that the diagnostic criteria for alcohol

intoxication required a finding of alcohol ingestion and an additional

physiological sign such as slurred speech and unsteady gait. (V, 339). Zager

could not recall any proof of physiological signs which supported intoxication

except for the defendant's own statements. (V, 340). Zager inferred that the

defendant was intoxicated at the time of the offense due to his own statements,

information from his family that he started using alcohol at age 15, and that the

family saw him intoxicated at times. (V, 338).

Randy Helms, the owner of Helms Motor Company, testified that

the defendant had worked for him for about a year and a half. (V, 343-344).

Helms last observed the defendant two days before the murder as the defendant

prepared to start a new job at Columbus-McKinnon, a chain factory in Lexington.

(V, 345). Helms testified that the defendant was severely depressed and talked

about his family problems. (V, 345-346).

12

SENTENCING PHASE

STATE'S PROOF

Dr. Smith, the medical examiner who conducted the autopsy on Billie Jo Hall, testified again on behalf of the State. As Smith described the injuries suffered by Mrs. Hall, he identified several autopsy photographs which depicted the injuries suffered by Mrs. Hall during the course of the beating. *See* Exhibits 9-25. Smith reiterated that the injuries were intentional and concentrated in the head, face, and neck areas. (VI, 396). Smith identified eighty-three separate injuries on the external skin surface. (VI, 397). The eighty-three external injuries did not include the injuries to the tongue, deep neck, muscles, and the thyroid and hyoid glands. (VI, 397).

DEFENSE PROOF

Dr. Lynn Zager, a psychologist, testified that she interviewed the defendant three times. (VI, 399). Zager also reviewed the defendant's history and interviews of his family members. (VI, 399). Zager testified that the defendant had an alcohol problem just as his father and grandfather. (VI, 399, 402). The defendant was closer to his mother, and the defendant observed spousal abuse occurring between his parents. (VI, 400). Zager opined that the defendant suffered from depression and had suicidal thoughts. (VI, 401). Zager testified that the defendant cared for his children especially his younger daughter

13

who was born with a significant handicap. (VI, 402-403). During the period before the offense, the defendant and his wife were having domestic problems which was one of the stressors the defendant was experiencing at the time of the offense. (VI, 404-405).

Dr. Joe Mount, a psychological examiner at Riverbend Maximum Security Institution, testified that he conducted six to eight mental health evaluations upon the defendant. (VI, 405-406). Mount witnessed the defendant express remorse for the commission of the crime. (VI, 407). The psychiatric team in the institution diagnosed the defendant as suffering from adjustment disorder with mixed emotion features. (VI, 408). Mount testified that depression was included in this diagnosis, and the defendant received a prescription for an anti-depressant. (VI, 408-409). During his involvement with the defendant, Mount stated that the defendant showed signs of improvement. (VI, 409).

Randy Helms, a former employer of the defendant, testified that he had known the defendant for one and a half to two years before the crime. (VI, 411). Helms related that the defendant was a dependable worker and a good mechanic. (VI, 412). The defendant sometimes brought his children to work when he worked on Saturday, and he always took care of them. (VI, 413). During the last couple of months that the defendant worked for him, his

14 .

performance dropped. (VI, 414). Helms did not fire the defendant because of his family situation, and he departed his job voluntarily. (VI, 415).

The defendant's mother and his sisters testified that he grew up in an abusive family. His mother and father fought often, and some of the fights were extremely brutal. The defendant's father also rejected him as his son. (VI, 416-433). The defendant's mother testified that the defendant took very good care of his children. (VI, 432-433).

## ARGUMENT

### I. THE EVIDENCE SUPPORTS THE FINDING OF THE JURY THAT THE DEFENDANT COMMITTED FIRST DEGREE PREMEDITATED MURDER.

The statute applicable at the time that the defendant committed this crime defined first degree premeditated murder as "[a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1991 Repl.). The proof at trial supported all of the elements for first degree premeditated murder, and the jury properly found the defendant guilty of this offense.

When the sufficiency of the evidence is challenged, the standard of review on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This Court does not reweigh the evidence, but presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

During the late hours of July 24, 1994, the defendant arrived at the residence where his wife from whom he was separated and his children lived. (IV,

16

241, 260, 277). Upon arriving at the residence, the defendant disconnected the phone line from the junction box so that Mrs. Hall could not call law enforcement officials. (IV, 201, 228). The defendant knocked on the door and, when Mrs. Hall went to the door, he pushed his way into her home. (IV, 241-242, 260). Mrs. Hall entered the kitchen and sat in a chair until the defendant knocked her to the floor. (IV, 243). Mrs. Hall then went into her bedroom followed by the defendant. (IV, 243). The defendant placed a sewing machine and vacuum cleaner against the door to prevent Mrs. Hall's escape and to prevent the children from entering the room. (IV, 244, 262, 277). Eventually, the children managed to enter the bedroom and observed the defendant and their mother involved in a fight. (IV, 262-278).

During the altercation, Mrs. Hall told her children to go next door. The defendant told the children that if they went for help he would kill their mother. (IV, 244, 262). After sustaining a significant beating inside the bedroom, Mrs. Hall exited the residence with the defendant chasing her. (IV, 278). Once the two reached the driveway,[6] the defendant dragged a kicking and screaming Mrs. Hall to the pool in the backyard. (IV, 280). The defendant continued to beat his wife in the head and also strangled her. (IV, 229, 307). At

---

[6]Jennifer Lambert referred to the driveway as "the parking lot." (IV, 278).

17

some point, the defendant threw Mrs. Hall into the small swimming pool. (IV, 229). Mrs. Hall ultimately died of strangulation by the hand with drowning possibly contributing to her death by asphyxiation. (IV, 306-307). The medical examiner could not determine whether the strangulation which caused her death occurred in the swimming pool, but his evaluation showed signs of drowning. (IV, 306-307). During the course of beating Mrs. Hall, the defendant struck her approximately eighty-three times. (IV, 302).

Premeditation and deliberation are two separate elements of first degree murder. *See State v. Brown*, 836 S.W.2d 530, 539 (Tenn. 1992); *State v. Darnell*, 905 S.W.2d 953, 961 (Tenn. Crim. App. 1995). A "deliberate act" means one performed with a cool purpose. Tenn. Code Ann. § 39-13-201(b)(1). A "premeditated act" means one done after the exercise of reflection and judgment. Tenn. Code Ann. § 39-13-201(b)(2).

The above enumerated facts show that the defendants acted with premeditation and deliberation. In *State v. Brown*, the Supreme Court stated the following:

> 'Premeditation' is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and 'deliberation' is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. 'Deliberation' is present if the thinking,

18

> i.e. the 'premeditation,' is being done in such a cool
> mental state, under such circumstances, and for such
> a period of time as to permit a 'careful weighing' of
> the proposed decision.

*Brown*, 836 S.W.2d at 541, *quoting* C. Torcia, *Wharton's Criminal Law* § 140 (14th ed. 1979).

The defendant argues that he committed the offense in a short interval of time which prevented any planning and that the crime was committed during a state of passion. At trial, the proof showed that the defendant committed a cold and premeditated murder. After the murder, the defendant related to a confidant that he went to the residence with the intention of "mak[ing] [Mrs. Hall] feel as he did. He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him." (IV, 228). Before forcing his way into the residence, the defendant disconnected the phone line so that his estranged wife could not call the police. Upon forcibly entering Mrs. Hall's residence, the defendant began carrying out the planned and cold-hearted murder.

Inside the residence, the defendant began striking Mrs. Hall. When Mrs. Hall sent her children for help, the defendant told them that, if they went for help, he would kill their mother. Mrs. Hall eventually escaped from the bedroom only to be caught outside the residence in the driveway. The defendant then dragged Mrs. Hall at least eighty feet from the driveway to the pool. (IV,

19

203-204). As the defendant drug her across the ground, Mrs. Hall kicked, screamed, and frantically attempted to grab hold of the grass in an attempt to prevent him from dragging her to the pool. In total, the defendant inflicted eighty-three separate blows. The defendant then accomplished his plan of making his wife feel helpless as he gained control of her by compressing her neck, depriving her of the oxygen necessary for survival.

More than the mere fact of "repeated blows" must be shown to establish first degree murder. *Brown*, 836 S.W.2d at 543. While this case showed that the defendant inflicted an enormous number of blows to the victim, the defendant also used his hand to manually strangle his wife to death. Additionally, the defendant later admitted he went to the residence with the intention of making his wife "feel helpless" for her refusal to reconcile. The defendant told his daughters that he would kill Mrs. Hall if they went for help, and he also disconnected the phone line in order to prevent anyone inside of the residence from calling for help. All of this proof shows that the defendant planned and premeditated the murder in this case.

Moreover, the proof showed that the defendant reflected on the manner and consequences of his act. As the defendant related to his confidant, Chris Dutton, he went to his wife's residence with the intention of making her suffer and feel helpless. Thus, the defendant's action did not occur in the "heat

20

of passion" as he asserts but was a cool and dispassionate murder after reflection.
Deliberation is present when the circumstances suggest that the murderer
reflected upon the manner and consequences of his act. *State v. Gentry*, 881
S.W.2d 1, 4 (Tenn. Crim. App. 1993). The jury could also reasonably infer that
the defendant predetermined to strangle Mrs. Hall in order to make her feel
helpless. Because the injuries from the multiple blows occurred in close proximity
to Mrs. Hall's death, the medical examiner could not determine the length of time
during which these injuries occurred, but he opined that the injuries occurred in
a matter of several minutes to a quarter of an hour. (IV, 308). The time frame
in which the defendant inflicted these blows as well as the time it took to strangle
Mrs. Hall, alone, shows that the defendant acted with deliberation. This time
frame along with the evidence of reflection before the crime satisfy the
premeditated and deliberate requirement under the statute.

Besides challenging the sufficiency of the evidence to support
premeditation and deliberation, the defendant contends that his intoxication
rendered him incapable of forming the requisite intent. While voluntary
intoxication is not a defense, it is admissible to negate the culpable mental state.
*See* Tenn. Code Ann. § 39-11-503(a); *State v. Shelton*, 854 S.W.2d 116, 121
(Tenn. Crim. App. 1992). First, the only proof of the defendant's intoxication at
the time of the offense comes from his own statements. In his brief, the

21

defendant relies extensively upon the testimony of Chris Dutton to support his intoxication at the time of the crime. (Appellant's brief, p. 24). But Dutton did not observe the defendant before or at the time of the crime. Dutton first met the defendant while incarcerated with him at Riverbend, after the commission of the crime. Thus, Dutton's only knowledge of the physical condition of the defendant at the time of the crime came from the defendant's own statements. Certainly, the jury could have disregarded this self-serving statement. The only other evidence of intoxication came from Dr. Zager. Dr. Zager testified that she inferred that the defendant was intoxicated from the defendant's statements and his prior alcohol problem. (V, 342-343).

The jury could have simply rejected this unreliable information regarding the defendant's physical condition at the time of the crime. Additionally, the jury could have inferred that his actions and statements during the commission of the crime showed the defendant's ability to form the required culpable mental state. Viewed in the light most favorable to the State, the proof overwhelmingly showed that the defendant intentionally killed Mrs. Hall with premeditation and deliberation.

22

## II. THE TRIAL COURT PROPERLY REFUSED TO ALLOW THE DEFENDANT'S SISTER, CHERYL ARBOGAST, TO TESTIFY REGARDING THE DEFENDANT'S STATE OF MIND PRIOR TO THE MURDER SINCE SHE HAD NOT SPOKEN TO HIM IN SEVERAL MONTHS.

During the guilt phase, the defendant called his sister, Cheryl Arbogast, to testify in his defense.[7] After an objection by the State, counsel for the defendant stated that Arbogast knew the defendant's state of mind. (V, 315). The trial court conducted a jury out hearing and, at the conclusion of the hearing, ruled Arbogast's testimony inadmissible. (V, 327).

During the offer of proof, Arbogast testified that she resided in Cincinnati. (V, 314). On the night of the crime, Arbogast learned from her other brother, Jeff Hall, that the defendant was crying and distraught.[8] (V, 317). The offer of proof involved an attempt by the defendant to have his sister testify as to the observations of his deceased brother. Arbogast testified that she had not observed the defendant personally, and that she based her testimony upon information provided by another person. (V, 327). In fact, Arbogast admitted that she had not spoken with the defendant for several months at the time of the murder. (V, 328).

Trial courts have broad discretion in determining the admission of evidence. *See State v. Hutchinson*, 898 S.W.2d 161, 172 (Tenn. 1995); *State v.*

---

[7]Arbogast testified during the penalty phase. (VI, 430-431).

[8]Jeff Hall died in July of 1995. (V, 319).

23

*Banks,* 564 S.W.2d 947, 949 (Tenn. 1978). Furthermore, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding the witness has personal knowledge of the matter." Tenn. R. Evid. 602. In this case, the proof showed that Arbogast did not have any personal knowledge as to the state of mind of the defendant before or at the time of the commission of the crime. On the date of the offense Arbogast was at her home in Cincinnati, and she had not spoken with the defendant in several months. Therefore, the trial court properly ruled her testimony inadmissible regarding the defendant's state of mind since she lacked any personal knowledge. Moreover, no exception to the hearsay rule would allow Arbogast to testify to statements made by her deceased brother, Jeff Hall. *See* Tenn. R. Evid. 803 & 804.

III.    THE AUTOPSY PHOTOGRAPHS, RELEVANT TO
ESTABLISH THE (i)(5) AGGRAVATING CIRCUMSTANCE, WERE
PROPERLY ADMITTED.

"The admissibility of photographs lies within the discretion of the
trial court whose ruling in this respect will not be overturned on appeal except
upon a clear showing of an abuse of discretion." *State v. Banks*, 664 S.W.2d 947,
949 (Tenn. 1978). During the sentencing phase of trial, the State admitted
photographs which showed the extent of Billie Jo Hall's injuries. Dr. O. C. Smith
testified that the pictures were taken at the time of the autopsy and showed the
external injuries inflicted upon Mrs. Hall's body. (VI, 380-381).

The State sought to prove that "[t]he murder was especially heinous,
atrocious, or cruel in that it involved torture or serious physical abuse beyond
that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). These
photographs were relevant to establish the aggravating circumstance relied on by
the State.

The Supreme Court of Tennessee has allowed gruesome and graphic
photographs to be used during the sentencing phase of trial to establish
aggravating circumstance (i)(5). *See State v. Smith*, 893 S.W.2d 908, 924 (Tenn.
1994); *State v. Cazes*, 875 S.W.2d 253, 263 (Tenn. 1994); *State v. Smith*, 868
S.W.2d 561, 579 (Tenn. 1993); *State v. Payne*, 791 S.W.2d 10, 19-20 (Tenn.
1990)(videotape); *State v. Miller*, 771 S.W.2d 401, 403-404 (Tenn. 1989); *State*

25

*v. Porterfield*, 746 S.W.2d 441, 449-450 (Tenn. 1988); *State v. McNish*, 727 S.W.2d 490, 494-495 (Tenn. 1987). In upholding the admission of photographs to support aggravating circumstance (i)(5), the *McNish* Court stated that "[w]hile undoubtedly prejudicial to the accused, at this stage of the proceedings and in view of the aggravating circumstance alleged, [the photographs] were highly probative of the nature and extent of the injuries inflicted upon the helpless victim." *McNish*, 727 S.W.2d at 495.

As in the cases cited above, the photographs admitted showed the jury the extent of the injuries inflicted upon the victim by the defendant. The photographs provided the best evidence of the nature of the crime committed. Although unpleasant, the photographs were not excessively grotesque. The photographs also assisted the jury's understanding of the medical examiner's testimony.

The photographs were highly probative of whether the "murder was especially heinous, atrocious, or cruel." Moreover, the probative value was not substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. The trial court did not abuse its discretion by admitting the autopsy photographs into evidence.

26

## IV. THE EVIDENCE SUPPORTED THE JURY'S FINDING OF AGGRAVATING CIRCUMSTANCE (i)(5).

On appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). This Court does not reweigh or reevaluate the evidence. *Id.* The jury's finding, therefore, will only be disturbed if, after a consideration of the evidence in the light most favorable to the State, a rational trier of fact could not have found the existence of the aggravating circumstance beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983).

In this case, the defendant contends that the State failed to prove aggravating circumstance (i)(5) beyond a reasonable doubt. This aggravator applies when the State proves that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). The proof showed that the defendant used his hand to manually strangle Mrs. Hall to death. The medical proof also showed signs of drowning which may have been caused by the defendant strangling the victim in the small swimming pool. Additionally, Mrs. Hall suffered eighty-three separate blows to her body besides the injuries inflicted by the manual strangulation. The evidence showed that Mrs. Hall's

27

murder was especially heinous, atrocious and cruel, and that the murder involved torture and serious physical abuse beyond that necessary to cause death.

The trial court properly instructed the jury as to the definitions of the terms "heinous," "atrocious," and "cruel" as defined by the Tennessee Supreme Court in *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985). (VI, 441). The trial court also correctly defined "torture" and "serious physical abuse." (VI, 441). The trial court defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *See State v. Hodges*, 944 S.W.2d 346, 357 (Tenn. 1997); *State v. Williams, supra*. The charge on "serious physical abuse" instructed that "serious" indicated a matter of degree. *See State v. Odom*, 928 S.W.2d 18, 26 (Tenn. 1996). The instruction further required that the abuse be physical as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death." *Id.* Further, for the establishment of "abuse," the act must be excessive or must make use of a thing "in a manner contrary to the natural or legal rules for its use." *Id.*

Dr. Smith testified that the multiple blows inflicted upon Mrs. Hall occurred during her life.[9] (IV, 293). The autopsy revealed that the defendant

---

[9]Dr. Smith testified that all but one bruise on the leg appeared contemporaneous with the defendant's attack. (IV, 304-305). He opined that the injuries occurred in a two-hour period but likely within a period of several minutes to a quarter of an hour. (IV, 308).

28

struck Mrs. Hall at least eighty-three separate times. (IV, 302); (IV, 397). The

defendant targeted the head, neck, and face areas during his attack. (IV, 306).

The blows to the face caused a fracture of the nose which resulted in Mrs. Hall

breathing blood down her windpipe and into her lungs. (IV, 293). Besides the

targeted areas, the defendant caused multiple skin tears, bruises and skin scrapes

to the chest, abdomen, genitals, extremities, and back. (IV, 293). Smith found

defensive wounds on the forearms, the back of the hands, and in the thigh, knee,

and shin areas. (IV, 294-295).

During the course of the attack, the defendant drug Mrs. Hall at

least eighty feet from the driveway to the swimming pool. (IV, 204). Mrs. Hall

kicked and screamed as she attempted to escape from the defendant. (IV, 280).

Mrs. Hall suffered injury to the scalp area which was consistent with being pulled

by the hair. This caused the scalp to be pulled away from the skull. (VI, 395-

396). A number of injuries were consistent with being drug across asphalt or hard

ground. (VI, 390-391, 396).

The defendant caused Mrs. Hall's death by using his hand to

manually strangle her to the point of asphyxiation. (IV, 307). Dr. Smith found

bruising on the left and right sides of the neck, the deep muscles in the neck, and

the tissues surrounding the hyoid bone. (IV, 291). On the left side, the autopsy

revealed that the thyroid gland bled. (IV, 291). All of these injuries indicated

29

that the defendant used an excessive compression force to the neck. (IV, 291).

The proof also showed signs of drowning and, from this proof, the jury could have inferred that the defendant strangled Mrs. Hall while submerging her air passages in water. Dr. Smith could not state with a medical certainty that the strangulation occurred inside the pool, but the autopsy showed that drowning may have contributed to Mrs. Hall's death by asphyxiation. (IV, 289-290, 307). The water found in the stomach was inhaled in her body while she remained alive. (IV, 290). The autopsy showed that water had begun to enter the blood stream, a condition known as dilution. (IV, 290). The lungs had filled with some fluid and had begun to collapse. (IV, 292). This water entered Mrs. Hall's body while she remained alive and attempted to fill her body with life-giving oxygen. (IV, 290).

The infliction of all of these injuries constituted torture and serious physical abuse. The defendant caused both severe physical and mental pain during the course of the beating, dragging, and strangulation of the victim. The proof shows that Mrs. Hall remained alive during this attack as evinced by the ingestion of the pool water into her lungs. Also, the autopsy revealed multiple defensive wounds from the attack, and investigators found grass that had been pulled up by the roots by Mrs. Hall as she was drug to the pool. One cannot even conceive the physical and mental pain suffered by Mrs. Hall in this attack but,

certainly from this proof, a reasonable jury could find torture as defined by the courts in this state.

Moreover, Mrs. Hall also suffered serious physical abuse. The defendant inflicted eighty-three separate blows during the attack. Clearly, the jury could have found this to be "excessive." These injuries, alone, would be insufficient to cause death and, since death occurred by asphyxiation, were beyond that necessary to cause death. (IV, 293). In addition to the multiple blows, the proof showed that the defendant manually strangled the victim, shutting off her air passages. The strangulation caused hemorrhaging in the eyes and various internal organs. (IV, 292). The proof also suggests that the defendant strangled the victim while holding her submerged in the swimming pool. The body filled with water, the lungs began to collapse, and the right side of the heart dilated.

The facts and circumstances of this crime, including the strangulation, support the finding by the jury that the murder was especially heinous, atrocious, or cruel and that it constituted torture and severe physical abuse beyond that necessary to produce death. *See State v. Hodges*, 944 S.W.2d at 358. The record supports the jury's determination that the State proved aggravating circumstance (i)(5) beyond a reasonable doubt.

31

V. HALL'S SENTENCE OF DEATH IS NEITHER EXCESSIVE NOR DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES, CONSIDERING BOTH THE NATURE OF THE CRIME AND THE DEFENDANT.

The death penalty statutes require the courts that review death sentences to determine whether:

(1) The sentence of death was imposed in an arbitrary fashion;

(2) The evidence supports the jury's finding of a statutory aggravating circumstance or statutory circumstances;

(3) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(4) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1)(A)-(D).

The defendant argues that a homicide arising out of a domestic venue can rarely, if ever, support a verdict for first degree murder. The jury rejected the theory that this crime arose from a suddenly arising and enraging passion. The evidence shows that the defendant went to Billie Jo Hall's residence intending to make her suffer. (IV, 228). The disconnecting of the phone line shows further signs of a cold, premeditated murder. Moreover, this crime was not the "typical" domestic dispute. The defendant no longer resided at the residence

32

and entered the home by forcefully pushing his way into the door. Upon entering the home, the defendant began his planned abusive treatment of his victim. From the evidence at trial, the jury could easily infer that the defendant entered the home with the sole purpose of killing his estranged wife. This murder is no different than any murder involving a party seeking to inflict revenge. The defendant seeks to create a defense based upon the status of the victim as the defendant's spouse. However, the proof showed a planned undertaking by the defendant to inflict suffering and pain upon his wife; fulfilling a plan preconceived well before arriving at her residence. In reviewing this case, the premeditated and deliberate nature of the crime controls rather than the fact that the victim happened to be the defendant's wife.

A comparative proportionality review is conducted by the reviewing appellate court in all death penalty cases. *State v. Barber*, 753 S.W.2d 659, 668 (Tenn. 1988). As was previously noted, the Code requires this Court to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

The jury found that the (i)(5) aggravating circumstance outweighed the mitigating proof presented by the defendant. In determining the murder to be especially heinous, atrocious, or cruel, the jury considered the nature of the

33

crime. The crime involved an extensive beating, strangulation, and drowning. Moreover, the jury considered the status of the defendant as the husband of the victim. The jury also determined that the mental or emotional condition of the defendant did not outweigh the horrific nature of the murder. .

The courts of this State have upheld the death penalty in several cases where one aggravating circumstance has been found.[10] In at least five cases, the (i)(5) aggravating circumstance was the sole circumstance found by the jury. *See State v. Miller*, 771 S.W.2d 401 (Tenn. 1989); *State v. O'Guinn*, 709 S.W.2d 561 (Tenn. 1986); *State v. McNish*, 727 S.W.2d 490 (Tenn. 1987); *State v. Henley*, 774 S.W.2d 908 (Tenn. 1989); *State v. Caughron*, 855 S.W.2d 526 (Tenn. 1993).

In *State v. O'Guinn, supra*, the Tennessee Supreme Court determined that the facts of the case supported the imposition of the death penalty. As in this case, the evidence showed that the victim suffered a severe and brutal beating

---

[10]*See State v. Austin*, 618 S.W.2d 738 (Tenn. 1981); *State v. Simon*, 635 S.W.2d 498 (Tenn. 1982); *State v. Laney*, 654 S.W.2d 383 (Tenn. 1983); *State v. Matson*, 666 S.W.2d 41 (Tenn. 1984); *State v. Caldwell*, 671 S.W.2d 459 (Tenn. 1984); *State v. Smith*, 695 S.W.2d 954 (Tenn. 1985); *State v. Martin*, 702 S.W.2d 560 (Tenn. 1985); *State v. Harbison*, 704 S.W.2d 314 (Tenn. 1986); *State v. O'Guinn*, 709 S.W.2d 561 (Tenn. 1986); *State v. McNish*, 727 S.W.2d 490 (Tenn. 1987); *State v. Wright*, 756 S.W.2d 669 (Tenn. 1988); *State v. Miller*, 771 S.W.2d 401 (Tenn. 1989); State *v. Henley*, 774 S.W.2d 908 (Tenn. 1989); *State v. McCormick*, 778 S.W.2d 48 (Tenn. 1989); *State v. Caughron*, 855 S.W.2d 526 (Tenn. 1993); *State v. Brimmer*, 876 S.W.2d 75 (Tenn. 1994); *State v. Hutchison*, 898 S.W.2d 161 (Tenn. 1994).

and that the cause of her death was strangulation. *Id.* at 563. The evidence also

showed the victim had been dragged across the ground. *Id.* at 562. The severity

of the beating and the manner in which the defendant committed the murder

justify the imposition of the death penalty in this case.

In addition to considering the circumstances of the offense, the court

must also consider the defendant. The trial court instructed the jury as a

mitigating circumstance that the murder was committed while the defendant was

under the influence of extreme mental or emotional disturbance. *See* Tenn. Code

Ann. § 39-13-204(j)(2). The jury also considered the family history of the

defendant and the testimony regarding his alcohol abuse. Still, the jury found the

aggravating circumstances outweighed this mitigation. For instance, the proof

showed that the defendant cared for his children. Yet, the defendant did not

hesitate to brutally beat the mother of his children before their very eyes and as

they attempted to stop the altercation.

The sentence of death is not excessive or disproportionate to the

sentences imposed in other cases. As stated above, the courts of this state have

repeatedly upheld death cases involving one aggravating circumstance as well as

only the (i)(5) aggravator. The jury rejected the theory of the defendant that the

murder occurred during a passionate argument between the spouses in both the

guilt and sentencing phases. The jury rightfully concluded that the defendant

35

committed a premeditated murder with a determination to exact revenge on his wife for their family problems. The defendant seeks to escape the full punishment for his crime because of the victim's status as his wife. But, the fact that the victim was his wife does not overshadow the atrocious nature of the crime that he committed nor the planned manner in which he carried out the crime. In considering similar cases, the sentence of death is not disproportionate or excessive in this case.

36

## VI. TENN. CODE ANN. § 39-13-204(i)(5) IS CONSTITUTIONAL.

The defendant contends that aggravating circumstance (i)(5), that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," is unconstitutionally vague and incapable of being understood and applied by lay persons. *See* Tenn. Code Ann. § 39-13-204(i)(5). Our Supreme Court rejected similar contentions in analyzing the former version of this factor, Tenn. Code Ann. § 39-2-203(i)(5), which read: "the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." *See State v. Black*, 815 S.W.2d 166, 181-82 (Tenn. 1991); *State v. Barber*, 753 S.W.2d 659, 670 (Tenn. 1988); *State v. Williams*, 690 S.W.2d 517, 526-30 (Tenn. 1985). Likewise, the Supreme Court has reviewed the current version of the statute and found it to be constitutional. *State v. Odom*, 928 S.W.2d 18, 24-26 (Tenn. 1996); *See also Maynard v. Cartwright*, 486 U.S. 356, 364-65, 108 S.Ct. 1853, 1859, 100 L.Ed.2d 372 (1988) (opining that "a heinous, atrocious or cruel aggravator would be constitutionally acceptable if construed to require torture or serious physical abuse").

The defendant relies upon *Rickman v. Dutton*, 854 F. Supp. 1305 (M.D. Tenn. 1994), in support of his position. In *Rickman*, the district court interpreted the pre-1989 (i)(5) aggravating circumstance and held that "heinous

37

and depravity of mind," without any further limiting instruction was insufficient. *Id.* at 1310. In this case, the trial court defined the terms "heinous," "atrocious," and "cruel" as defined by our Supreme Court in *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985); *See also State v. Hodges*, 944 S.W.2d 346, 357 (Tenn. 1997). The statute also narrows the meaning of "heinous, atrocious, or cruel" in that the act must involve "torture or serious physical abuse beyond that necessary to produce death." *Odom*, 928 S.W.2d at 26. The trial court also defined the terms "torture" and "severe physical abuse" as mandated by our Supreme Court. *Id.*; (VI, 441).

The trial court defined the terms contained in the (i)(5) aggravator as prescribed by the Tennessee Supreme court. These definitions define the terms in a manner that could be understood by jurors of common understanding. As stated above, the Supreme Court has considered the constitutionality of this aggravating circumstance and found it constitutionally sound. *Id.* at 24-26.

## CONCLUSION

For the reasons stated, this Court should affirm the judgment of the
trial court.

Respectfully submitted,

JOHN KNOX WALKUP
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

KENNETH W. RUCKER
Assistant Attorney General
Criminal Justice Division
425 5th Avenue North
Cordell Hull Building, 2nd Floor
Nashville, Tennessee 37243-0493
(615) 741-5648
B.P.R. No. 18208

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been

forwarded by first class mail, postage paid, to FORD & MAYO, P.A., Jesse H.

Ford, III, Clayton F. Mayo, 618 N. Highland, P.O. Box 1625, Jackson, Tennessee

38302-1625 on this the 3rd day of December , 1997.

KENNETH W. RUCKER
Assistant Attorney General

40