Not Reported in S.W.2d                                                                Page 42
Not Reported in S.W.2d, 1998 WL 208051 (Tenn.Crim.App.)
**(Cite as: 1998 WL 208051 (Tenn.Crim.App.))**

Only the Westlaw citation is currently available.

SEE RULE 19 OF THE RULES OF THE COURT OF CRIMINAL APPEALS RELATING TO PUBLICATION OF OPINIONS AND CITATION OF UNPUBLISHED OPINIONS.

Court of Criminal Appeals of Tennessee, at Jackson.
STATE of Tennessee, Appellee,
v.
Jon Douglas HALL, Appellant.
No. 02C01-9703-CC-00095.

April 29, 1998.

MADISON COUNTY (TRANSFERRED FROM HENDERSON COUNTY) HON. WHIT LAFON, JUDGE (First-Degree Murder--Death Penalty).

JESSE H. FORD, III, CLAYTON F. MAYO, 618 N. Highland, Jackson, TN 38301.

JOHN KNOX WALKUP, Attorney General and Reporter, KENNETH W. RUCKER, Asst. Attorney General, 425 Fifth Ave. N., Cordell Hull Bldg., 2nd Fl., Nashville, TN 37243-0493, JAMES G. WOODALL, District Attorney General, ALFRED LYNN EARLS, Asst. District Attorney General, Lowell Thomas State Office Bldg., Jackson, TN 38301.

*OPINION*

PEAY, Judge

*1 The defendant was indicted for the premeditated first-degree murder of his estranged wife, Billie Jo Hall. Upon the defendant's motion, the case was transferred from Henderson County to Madison County. On February 5, 1997, the jury returned a guilty verdict on the charge of first-degree murder. After a sentencing hearing held that same day, the jury sentenced the defendant to death. The jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. T.C.A. § 39-13-204(i)(5). In this appeal as of right, the defendant raises the following issues:

I. Sufficiency of the convicting evidence;
II. Exclusion of witness testimony;
III. Admission of photographs;
IV. Constitutionality of the aggravating circumstance;
V. Sufficiency of the aggravating evidence; and
VI. Appropriateness of the death penalty.

Following our review of the record in this matter, we affirm the defendant's conviction and sentence.

FACTS
(Guilt/Innocence Phase)

On the evening of July 29, 1994, the defendant went to the victim's house, ostensibly to deliver a twenty-five dollar ($25.00) traveler's check. Although still married, the defendant and the victim were no longer living together. When he arrived, the victim was there with her four daughters, the youngest two of which were also the defendant's. According to Stephanie Lambert, eight years old at the time of trial and one of the defendant's daughters, the victim and one of the other children answered the defendant's knock. Stephanie testified that her mother had "told [the defendant] not to hurt her, but then he pushed his way through." The defendant then went into the kitchen and the victim sat down in a chair. Stephanie testified, "She was sitting in the chair, then [the defendant] told us to go to bed. We didn't go. Then he told us again. Then we didn't go. So he told us again, and then he tipped my mama over in the chair." Following this, Stephanie testified, her mother and the defendant had gone into the victim's bedroom, where she heard her mother yelling. Stephanie testified that she and her sisters had tried to get into the bedroom but that the defendant "had the sewing machine by the door and we couldn't get in." The children eventually managed to get into the bedroom and Stephanie testified that one of them had given the victim a rag. She further testified that they had tried to stop the defendant from hurting their mother, and that she had heard the defendant tell the victim that she would never live to graduate (the victim was apparently taking classes in Jackson). The victim told the children to go up to a neighbor's house. Stephanie testified that she and Cynthia had both gone to the household phone and tried to use it, but that the defendant "had it where we couldn't use it." Without having seen her mother leave the bedroom, Stephanie and her older sister Cynthia left for the neighbor's.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*2 Cynthia Lambert, ten years old at the time of trial, also testified that the defendant had "pushed his way in" the door of the house, and told the girls to go to bed. She testified that the defendant had been drinking and that she had heard "[t]hings slamming around" in her mother's bedroom and that she and her sister had tried to get in there but, "It was hard ... because there was stuff blocking the door." Cynthia succeeded in getting into her mother's room where she saw the victim and the defendant "fighting." She testified that she had "jumped on [the defendant's] back and bit him" in an effort to stop the fight. She testified that she and Stephanie had tried to call 911 but that "the phones were off the hook." She further testified that the defendant had told them that "if [they] went for help he was going to kill Mama." In spite of the defendant's threat, she testified, she and Stephanie went to a neighbor's house and called 911.

Jennifer Lambert, another of the victim's daughters and eleven years old at the time of trial, testified that she had gotten into her mother's bedroom after the fight started and that she had tried to stop it. She saw her mother leave the bedroom and go outside; she testified that the defendant had followed her and "[d]ragged her to the pool." Her mother kicked and screamed while being dragged, according to Jennifer. She testified further that the defendant had said he would kill her mother if anyone went for help. After watching the defendant drag her mother to the pool, Jennifer went to the neighbor's house, carrying her little sister with her.

Chief Jerry Bingham of the Henderson County Sheriff's Department was the first officer to arrive at the scene of the crime around midnight. He was directed behind the house where he found the body of the victim lying face down in a swimming pool. Upon his discovery, Chief Bingham called EMS and the investigator.

Agent Brian Byrd of the Tennessee Bureau of Investigation arrived on the scene shortly after midnight. He found wet footprints on the carpet inside the house and wet impressions on the wooden deck off the front porch leading to the driveway. Agent Byrd testified that the master bedroom had been in disarray and appeared as if a struggle had taken place. There did not appear to be any other signs of struggle elsewhere in the house. A trail of skid or drag marks and blood stains led from the master bedroom, out the front door, toward the driveway, and down to the pool in the back yard. There were also two blood spots on the driveway, the furthest being approximately 106 feet from the house. The pool was about eighty feet from the driveway. Agent Byrd found a number of blood stains and spatters in various areas of the bedroom, including on the bed, a counter top, and a wedding dress. He also observed a blood splotch outside the bedroom in the foyer area.

Agent Byrd noticed that the telephones inside the living room of the house were off their hooks. Also, the telephone junction box on the outside of the house was opened and the phone line was disconnected. Agent Byrd testified that the grass and weeds near this box had been matted down. Agent Byrd also found at the scene a money order in the amount of twenty-five dollars ($25.00), dated the day of the murder, made out to the victim from the defendant. No weapons were found and Agent Byrd testified that fingerprints taken from the scene were never compared against the defendant's because he had believed they had enough evidence otherwise.

*3 Agent Byrd observed tire skid marks in the driveway leading in the direction toward the road. He found two blood spots in the driveway, a spot near a sandbox in the backyard, and two spots by the pool. Agent Byrd testified that the grass next to the pool had been pulled out of the ground. Also, Agent Byrd testified that the ground from the driveway to the pool was sparsely covered in grass and there had been disturbances in the ground as if someone had been dragged and a struggle had occurred. The water in the pool had a pinkish tint and there were clods of grass similar to that which was pulled out of the ground next to the pool. The t-shirt, later identified as the one the victim was wearing that evening, was found next to the pool.

Agent Byrd testified that the defendant had become a suspect as the result of his investigation. The defendant was arrested at his brother's residence in Bell County, Texas. It was later discovered that the defendant had taken the victim's minivan and driven it to Texas. Agent Byrd first encountered the defendant at the Justice Complex in Bell County. Agent Byrd testified that the defendant had been calm but at one point had started crying and seemed remorseful.

Chris Dutton, a fellow inmate of the defendant's at Riverbend Maximum Security Institution, testified

that he had been placed in a cell next to the defendant and that he and the defendant had confided in one another. Dutton had not known the defendant before his imprisonment and testified that he had not initiated any conversations concerning the defendant's conviction or circumstances thereof.

Dutton testified that the defendant had told him that he had contacted the victim earlier in the day of the murder and made arrangements to take her money. When he had arrived at the victim's residence, he tried to talk to the victim about reconciliation, but she was only interested in receiving the money. The victim had not wanted to talk to the defendant and told him to leave. According to Dutton, the defendant had explained that he lost his temper at this point and began striking the victim. Dutton testified that the defendant had told him he "wanted to make her feel as he did. He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him."

According to Dutton, the defendant had stated that the assault had started in the house and continued into the yard. He told Dutton that he had hit the victim in the head until he panicked and then threw her into the pool. He then went back into the house, grabbed the victim's van keys, and left. Dutton also testified that the defendant had said that he had disconnected the telephone before entering the residence so the victim could not call the police. Apparently, the defendant had disabled the phone on several previous occasions because the victim had, at times, called the police. According to Dutton, the defendant had been unarmed the day of the murder and had been at the victim's earlier in the week working on one of her cars.

*4 Dutton testified that the defendant had told him that he was drunk and extremely depressed when he went to visit the victim that day. Dutton said the defendant had been concerned about his children, especially his youngest, who had cerebral palsy, and wanted to reconcile with the victim for their sake. Dutton received the impression that the defendant had gone to the victim's home to reconcile, and to "make her hurt the way she made him hurt" if she was not willing. Dutton did not believe the defendant went to visit only for the purpose of giving the victim money.

Dutton testified that he had mailed a letter to the Attorney General's office in Nashville a week or two upon hearing this information. The District Attorney informed Dutton that he would speak on his behalf at his parole hearing when the time came. No other promises or benefits were offered and Dutton testified that he was not motivated to talk by the return of favorable treatment.

Dr. O'Brien Clary Smith performed the autopsy on the victim. The victim was 5'4" tall and weighed 122 pounds and had suffered a fractured nose and numerous contusions, abrasions, and lacerations. Dr. Smith determined that the primary cause of death was asphyxia resulting from manual strangulation and drowning. However, Dr. Smith could not determine whether the strangulation or drowning was the exclusive cause of death. Water was found in the victim's stomach and her blood stream, both of which indicated that she may have drowned. In conjunction with the strangulation, Dr. Smith found bruises on the left and right sides of the victim's neck and hemorrhaging about the neck muscles around the hyoid bone in the neck. Also, the thyroid gland had bleeding on the left side which indicated extensive compression to the neck.

According to Dr. Smith, all of the associated injuries, the blunt trauma or blows to the head, multiple skin tears, bruises and scrapes to the chest, abdomen, genitals, extremities, arms, legs, and back, had occurred during life. The approximately eighty-three areas of separate wounds to the body indicated that the victim had received an extensive and painful beating, but Dr. Smith stated that none of these associated wounds were sufficient in and of themselves to cause death. The abrasions on the victim's back were consistent with being dragged on pavement. Moreover, the wounds to the neck, face and head were target or aggressive wounds and could have been caused by anger. Dr. Smith also found defensive wounds on the forearms, the back of the hands, and the front of the thighs, knees and shins. All of the injuries occurred within several minutes to two hours before death and Dr. Smith, therefore, was unable to determine a sequence of the wounds.

The defendant called his sister, Cheryl Arbogast, to testify on his behalf. Arbogast had not spoken to her brother for several months prior to the murder. The substance of her testimony, elicited during an offer of proof, was based upon statements concerning the defendant which her other brother, now deceased, had made to her. Arbogast was in Cincinnati the

Not Reported in S.W.2d									Page 45
(Cite as: 1998 WL 208051, *4 (Tenn.Crim.App.))

night of the murder, but stated she had been trying to arrange psychiatric counseling for the defendant on an urgent basis because her other brother had conveyed to her that the defendant was crying and was very distraught. Arbogast had attempted to contact the defendant the night of the murder but had been unable to reach him. Arbogast testified that the defendant had been upset about his brother's impending death, his divorce and losing his children. Arbogast stated that she had never attempted to commit the defendant prior to the night of the murder. The trial court did not allow the jury to hear her testimony.

*5 The defendant also called Dr. Lynn Donna Zager, a clinical psychologist. Dr. Zager's evaluation of the defendant was based upon the three interviews she conducted and the information she received from the prison and the Middle Tennessee Mental Health Institute where the defendant spent a month. She concluded that the defendant suffered from depression and alcohol dependence. The depression was more acute prior to the murder. Dr. Zager also observed some personality disorders such as paranoia. Dr. Zager testified that at the time of the murder the defendant had been suffering from depression and was intoxicated. She also stated that he had been under stress due to his youngest daughter's medical condition (cerebral palsy), his loss of employment, his wife's job loss, financial problems, and his brother who was dying. In her opinion, the defendant had acted in an impulsive manner rather than pursuant to a well-thought-out plan. Dr. Zager testified that she had interviewed people with whom the defendant spent the day of the murder who stated the defendant had been drinking beer. However, no one that she interviewed remarked about slurred speech or any other signs of intoxication.

Randy Helms was the last witness called by the defendant during the guilt phase of the trial. Helms owned a motor company in Lexington, Tennessee, and employed the defendant from 1993 to June 1994. The defendant stopped by Helms' workplace two days before the murder to inform Helms that he had obtained a new job. Helms testified that the defendant had seemed severely depressed and suspected that family problems were the cause.

(Sentencing Phase)
The State called Dr. Smith as its only witness during the sentencing phase. Dr. Smith identified autopsy photos which depicted the approximately eighty-three injuries sustained, not including the internal injuries caused by the strangulation. The photos depicted areas where multiple blows had caused bruises to become confluent so as to be indistinguishable. Dr. Smith stated that the scrapes on the back of the shoulders, parallel line scrapes in the middle and lower portion of the back, and the scrapes on the elbows and legs were consistent with being dragged or moved across pavement or a similar hard surface. The wound about the left breast was consistent with the knuckle pattern of the fist. One injury to the forehead was indicative of a pipe-like object. The triangular bruises to the forehead were consistent with an object of that shape. The other injuries reflected no specific characteristic pattern of an instrument but were blunt trauma injuries consistent with a blunt force. Dr. Smith testified that the head injuries could have been caused by hitting the head against the ground or being pulled by the hair across the ground. According to Dr. Smith, the concentration of the injuries to the head, face and neck, which were intentional and focused, indicated the infliction of torture.

The defendant called Dr. Zager again during the sentencing phase. Dr. Zager testified that several factors had had an impact on the defendant's development, including his status as youngest child, his father's alcoholism, his father's denial of him as his son, and his witnessing spousal abuse between his parents. According to Dr. Zager, the defendant had not had good role models during his youth. Dr. Zager testified that the defendant's alcohol dependency had led to problems with his employment and in his relationships with others. Moreover, the defendant's judgment was compromised when he was intoxicated. Dr. Zager stated that the domestic problems experienced by the defendant at the time of the murder had had an effect on his mental condition. Dr. Zager further testified that the defendant suffers from depression and had thoughts of suicide. She said the defendant was remorseful for what had happened and that his children meant everything to him.

*6 Dr. Joe Mount, a psychological examiner at Riverbend Maximum Security Institution, also testified on behalf of the defendant. At the defendant's request, Dr. Mount had had six to eight formal counseling sessions with the defendant and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                                      Page 46
(Cite as: 1998 WL 208051, *6 (Tenn.Crim.App.))

numerous other informal cell visits. Dr. Mount testified that the defendant had been extremely distraught and depressed about the circumstances surrounding his case. Dr. Mount also testified that the defendant had expressed extreme remorse and appeared very sincere in his expression. The defendant entertained suicidal thoughts in the fall of 1994 and was diagnosed with an adjustment disorder with mixed emotional features like depression and anxiety. Dr. Mount also stated that the defendant had been prescribed anti-depressant medication while in prison and seemed to show some improvement over time. Finally, Dr. Mount testified that the defendant was concerned about his children, especially the one suffering from cerebral palsy.

Randy Helms also testified again during the sentencing phase. Helms stated that he had known the defendant for about two years. The defendant had approached Helms about a job so that he could support his wife and children. Although Helms did not really have a position available, he stated he had hired the defendant because of his situation. Helms testified that the defendant had performed well, was dependable, worked overtime, and never caused any problems. Helms saw the defendant with his children two or three times and he testified that the defendant had seemed to take excellent care of them. Helms considered the defendant and his wife friends of his and even talked to the defendant about his domestic problems. Although the defendant left his employment with Helms voluntarily, Helms stated that he had noticed the defendant's domestic problems were starting to affect his work. Helms told the jury that he believes the defendant's life has value.

Three of the defendant's sisters testified on his behalf. Debbie Davis testified that their parents had fought all the time and that the children would hide any weapons so their parents would not kill each other. According to Davis, their parents had seemed to enjoy fighting because they never left each other alone. She remembered one occasion when their father hit their mother and banged her head on the floor to the point her nose and ears bled. Davis said the defendant, although very young, had hit their father with a fly swatter and tried to make him stop hitting their mother. Their parents separated for a while but eventually got back together. Davis testified that their father had denied the defendant was his son. Their father ultimately died and their mother remarried another man who also was abusive to the defendant. Davis stated the defendant had not had any good role models. The defendant lived with her and her husband for a while, but he moved away after less than a year. Davis testified that the defendant was a "wonderful" father and loved his children.

*7 Kathy Hugo, the defendant's oldest sister, also testified about the violence between their parents. She stated that their mother's second husband had been abusive to their mother and did not seem to like the children. Cheryl Arbogast also testified for the defendant, commenting on the terrible violence between their parents.

Carol Alexander, the defendant's mother, testified that the defendant's father had drunk a lot and abused her. She stated that her children had had to call the police on several occasions. She further testified she was surprised that her son took such good care of his children and how attentive he was toward them, especially given his father's character.

### ANALYSIS
#### I. Sufficiency of the Evidence

In his first issue, the defendant challenges the sufficiency of the convicting evidence. In part, the defendant contends that evidence of his intoxication at the time of the murder negated his capacity to form the requisite *mens rea* for premeditated and deliberate murder. The defendant also claims that there was insufficient time for him to form the requisite intent to commit the murder because the passion and anger he possessed during his fight with the victim had not subsided when he killed her.

A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978); *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973). On appeal, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). This Court does not reweigh or reevaluate the evidence. *Id.* The jury's verdict, therefore, will only be disturbed if, after a consideration of the evidence in the light most favorable to the State, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                                          Page 47
(Cite as: 1998 WL 208051, *7 (Tenn.Crim.App.))

443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983); T.R.A.P. 13(e).

A criminal offense may be proven through direct evidence, circumstantial evidence, or a combination of the two. *State v. Tharpe,* 726 S.W.2d 896, 899-900 (Tenn.1987). *See also State v. Brown,* 836 S.W.2d 530, 541 (Tenn.1992)( "the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence"). Before the defendant may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford,* 225 Tenn. 478, 470 S.W.2d 610, 612 (Tenn.1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613.

**\*8** At the time of this offense, first-degree murder was defined as "[a]n intentional, premeditated and deliberate killing of another." T.C.A. § 39-13-202(a)(1) (Supp.1994). Once a homicide has been proven, it is presumed to be a second-degree murder and the State has the burden of establishing premeditation and deliberation. *State v. Brown,* 836 S.W.2d 530, 543 (Tenn.1992).

Intentional is defined as "the conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-106(a)(18) (1991). Premeditation necessitates "the exercise of reflection and judgment," T.C.A. § 39-13-201(b)(2) (1991), requiring "a previously formed design or intent to kill." *State v. West,* 844 S.W.2d 144, 147 (Tenn.1992). A deliberate act is performed with a "cool purpose," "without passion or provocation." T.C.A. § 39-13-201(b)(1) and comments. "While it remains true that no specific length of time is required for the formation of a cool, dispassionate intent to kill, *Brown* requires more than a 'split-second' of reflection in order to satisfy the elements of premeditation and deliberation." *West,* 844 S.W.2d at 147. Accordingly, before a jury can convict the defendant of first-degree murder, it must find that the defendant consciously engaged in the conduct to cause the death, and killed "upon reflection, 'without passion or provocation,' and otherwise free from the influence of excitement." *State v. Gentry,* 881 S.W.2d 1, 4 (Tenn.Crim.App.1993). *See State v. Brooks,* 880 S.W.2d 390, 392 (Tenn.Crim.App.1993) ("the jury must find that the defendant formed the intent to kill prior to the killing, i.e., premeditation, and that the defendant killed with coolness and reflection, i.e., deliberation"); *State v. Bordis,* 905 S.W.2d 214, 221-22 (Tenn.Crim.App.1995).

The elements of premeditation and deliberation are questions for the jury and may be inferred from the circumstances surrounding the killing. *Gentry,* 881 S.W.2d at 3; *Taylor v. State,* 506 S.W.2d 175, 178 (Tenn.Crim.App.1973). The Supreme Court has delineated several relevant circumstances which may be indicative of premeditation and deliberation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations by the defendant of his intent to kill, and the making of preparations before the killing for the purpose of concealing the crime. *State v. Brown,* 836 S.W.2d 530, 541-42 (Tenn.1992). This Court has also recently noted several factors from which the jury may infer the two elements: facts about what the defendant did prior to the killing which would show planning; facts about the defendant's prior relationship with the victim from which motive may be inferred; and facts about the nature of the killing. *State v. Bordis,* 905 S.W.2d 214, 222 (Tenn.Crim.App.1995) *citing* 2 W. LaFave and A. Scott, Jr., *Substantive Criminal Law* § 7.7 (1986).

**\*9** The evidence in the present case, when viewed in the light most favorable to the State, as this Court is required to do on appeal, demonstrates that the defendant contacted the victim earlier in the day of the murder to arrange a meeting. According to the defendant's prisonmate, with whom the defendant had confided about the circumstances surrounding the killing, the defendant went to the victim's house with the intent to reconcile their marriage. In fact, the defendant brought a money order to the victim's residence, perhaps as a sign of reconciliation. However, the defendant had also indicated that if the victim was unwilling to reconcile, he intended to "make her hurt the way she made him hurt."

Prior to knocking on the victim's front door, the defendant disconnected the telephone lines on the outside of the house. The defendant wanted to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prevent the victim from calling the police for help, which the victim had apparently done or attempted to do on previous occasions. The defendant forced his way inside the residence and told his children several times to go to bed. The victim was apparently unwilling to reconcile and a fight ensued between the two in the victim's bedroom, where the defendant proceeded to block the bedroom door in order to prevent the children, or anyone else for that matter, from entering the room. Upon hearing the physical fight occurring in the bedroom, the children managed to enter the room and saw the defendant beating the victim. One of the defendant's children jumped on his back and bit him in an attempt to stop him from hitting the victim. At some point during the altercation, the defendant told his children that he would kill their mother if they went for help.

The fight between the defendant and victim continued outside the house, where the evidence showed that the defendant dragged the victim across the driveway and down to the back of the house. One of the children testified that the victim had been kicking and screaming as the defendant dragged her across the ground. The victim's body was found floating in a swimming pool in the backyard. The victim sustained approximately eighty-three separate wounds, including manual strangulation of the neck. Expert testimony revealed that the wounds to the face, neck and head were target wounds, meaning that they had been inflicted intentionally. After throwing the victim into the pool, the defendant went back inside the house, grabbed the keys to the victim's minivan, and sped out of the driveway. The defendant fled to his brother's place in Texas, where he was later apprehended by the authorities.

Given the circumstances surrounding this crime, the jury could reasonably have found that the killing was premeditated and deliberate:
> 'Premeditation' is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and 'deliberation' is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. 'Deliberation' is present if the thinking, i.e., the 'premeditation,' is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a 'careful weighing' of the proposed decision.

*10 *State v. Brown,* 836 S.W.2d 530, 540-41 (Tenn.1992) *quoting* C. Torcia, *Wharton's Criminal Law* § 140 (14th ed.1979) (emphasis deleted).

The defendant contends that he did not have time to deliberate because he killed the victim during the fight. The defendant argues that his passion [FN1] from the fight trumped any cool purpose or reflection. What the defendant fails to realize, however, is that the evidence amply demonstrates that he had had plenty of time in which to coolly reflect upon his intentions before he even arrived at the victim's home. The defendant told a fellow inmate that he had thought about his meeting with the victim earlier in the day; he even obtained a money order to take to her. He knew he was going to see her that night. The defendant wanted to settle his differences with the victim, but also wanted to hurt her if she was unwilling to talk. Thus, the defendant made his plans earlier in the day and therefore had more than just a few moments to think about what he was going to do. Even the time following his disconnection of the phone until he knocked on the front door would be a legally sufficient amount of time in which to plan and ponder the murder.

> FN1. " 'Passion' " has been defined as '[a]ny of the emotions of the mind [reflecting] anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection.' " *State v. Brown,* 836 S.W.2d 530, 543 n. 10 (Tenn.1992) (citations omitted).

The fact that a fight ensued upon the defendant's arrival does not discount the existence of premeditation and deliberation. The defendant had hoped to work things out with his wife, but he was also prepared to inflict pain upon her if she resisted reconciliation. The defendant suspected a confrontation could occur. As he had done before, he disconnected the telephone line prior to entering the house. Moreover, once inside and realizing the victim did not want to talk, in an apparent move to avoid any interference, the defendant told his children to go to bed and blocked the victim's bedroom door. Although the defendant may have been "passionate" during the fight with the victim, which is only natural, the defendant expected this to occur prior to his arrival.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                                                          Page 49
(Cite as: 1998 WL 208051, *10 (Tenn.Crim.App.))

This Court has previously noted that in circumstances where the intent to kill is formed during a deadly struggle, the crime could still rise to the level of first-degree murder if the State proved that premeditation and deliberation preceded the struggle. *State v. Edwin Jesperson*, No. 03C01-9206-CR-00212, Monroe County (Tenn.Crim.App. filed Aug. 11, 1993, at Knoxville). "Also, if the intent to kill was formed as a result of premeditation and deliberation prior to the crime, it is immaterial that the act was carried out in a state of passion." *Id.* In *Jesperson,* the defendant became enraged and attempted to kill his wife upon arriving at her residence and finding another man there (who had been watching a movie with her). Although the defendant appeared to be in a state of passion at the time of the killing, the jury determined that premeditation and deliberation were established prior to the defendant's arrival. The facts of the case at hand are somewhat similar to *Jesperson*. Interestingly though, none of the defendant's children in the present case testified about the defendant's demeanor the night of the murder. They testified that the defendant and the victim had been "yelling" and "fighting," and that the victim had been kicking and screaming at times. However, they never mentioned whether or not the defendant had seemed angry or in a rage. The only evidence of the defendant's demeanor was the statement he made to his prisonmate that he had lost his temper when the victim refused to attempt a reconciliation.

*11 The evidence in the record fully supports the conclusion that the defendant had had more than enough time to premeditate and deliberate the consequences of his actions before he engaged in the fight with the victim. The evidence presented to the jury contains several of the above-listed circumstances which support a finding of premeditation and deliberation. *See, e.g., State v. Bullington,* 532 S.W.2d 556, 560 (Tenn.1976) (premeditation may be proven by showing past hard feelings between the defendant and victim). There was evidence of planning exhibited by the fact that the defendant disconnected the telephone line before entering the residence. The defendant also indicated his intent to kill the victim to his children, and even informed a fellow inmate afterwards that he had intended to hurt the victim. In addition, the killing of the victim in this case was particularly cruel in that it was accomplished through a severe beating, strangulation and drowning. The jury was justified in concluding that the evidence failed to show that the defendant's "reason [had been] dethroned by anger or any other 'passion.'" *Id.*

The defendant also contends that his alleged intoxication prevented him from carrying out an intentional murder. T.C.A. § 39-11-503(a) recognizes that voluntary intoxication is not a defense to prosecution for an offense, however, evidence of such may be admitted to negate a culpable mental state. *See also State v. Phipps,* 883 S.W.2d 138, 148 (Tenn.Crim.App.1994); *State v. Shelton,* 854 S.W.2d 116, 121 (Tenn.Crim.App.1992). In this case, the trial court allowed into evidence statements concerning the defendant's alleged intoxication at the time of the offense. Accordingly, the only issue before this Court is whether the evidence of intoxication was such that a reasonable jury could not have found anything but that the defendant was unable to form the requisite *mens rea*. Or, as this Court stated in *Harrell v. State,* 593 S.W.2d 664, 672 (Tenn.Crim.App.1979), "[t]he determinative question is not whether the accused was intoxicated, but what was his mental capacity."

In the present case, the only evidence of the defendant's intoxication were his own statements made to his prisonmate and Dr. Zager. Dr. Zager testified that the defendant's statement conveying his intoxication, taken in conjunction with his history of alcohol abuse and the stress from his domestic problems, led her to believe that the defendant had been acting in an impulsive manner rather than from a well-thought-out plan. Although one of the defendant's daughters testified that the defendant had been drinking beer, there was nothing else to indicate the defendant was actually intoxicated. [FN2] Of course, as discussed above, there was other evidence establishing the presence of the required mental state. The defendant was not so intoxicated that he could not drive to the victim's residence, disconnect the telephone line prior to entering the house, barricade the bedroom door, drag the victim down to the pool in the backyard, and return inside the house to grab the victim's car keys. *See State v. Joseph Troy Manuel,* No. 02C01-9301-CC-00007, Benton County (Tenn.Crim.App. filed Sept. 29, 1993, at Jackson) (fact that defendant took victim's truck keys after killing, in part, rebutted defendant's assertion that he was too intoxicated to form the requisite *mens rea*).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN2. Dr. Zager also testified that some persons who had spent time with the defendant on the day of the murder had told her that he had been drinking that day. Their statements, however, had not included other information which would indicate that the defendant had thereby become intoxicated.

*12 The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier of fact. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984); *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn.Crim.App.1978). Moreover, this Court has observed that passion and intoxication are valuable to the defense only if they are of such a degree that they negate premeditation and deliberation. *Wendall Ray Witherspoon v. State*, No. 01C01-9204-CC-00137, Maury County (Tenn.Crim.App. filed Mar. 18, 1993, at Nashville) (finding of mental state supported by fact that defendant stated his intent to kill victim and attempted to remove children from scene so they did not witness attack). The jury obviously decided not to believe the defendant's own accounts of his intoxication and anger (or other passion) in light of the other evidence establishing premeditation and deliberation, and this Court should not interfere with that determination in this case.

This issue is without merit.

## II. Exclusion of Testimony

Next, the defendant argues that the trial court erroneously excluded Arbogast's testimony during the guilt phase of the trial. The defendant contends her testimony was relevant to establish his state of mind on the night of the murder and should have been admitted to negate the existence of the requisite intent. The State argues that the trial court properly excluded her testimony.

Upon the prosecution's objection, the trial court heard an offer of proof from the defense prior to the questioning of this witness in front of the jury. Arbogast stated that she had not personally spoken with the defendant for several months prior to the murder. All of her testimony was based upon information she had obtained from her other brother, who was deceased at the time of trial. Arbogast, who was in Cincinnati the night of the murder, stated that her deceased brother had told her the defendant had been crying and seemed distraught earlier in the evening of the murder. The trial court, based on this information, held Arbogast's testimony inadmissible.

The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse. *See State v. Howard*, 926 S.W.2d 579, 585 (Tenn.Crim.App.1996). In addition, our rules of evidence provide that a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tenn. R. Evid. 602. It was clear from Arbogast's statements that she had not talked with or seen the defendant for several months prior to the crime. Obviously, she was in no position to comment on his condition the night of the murder. Her testimony was based upon statements made to her by her deceased brother which were being offered to prove the truth of the matter asserted, i.e., that the defendant was crying and distraught prior to the murder. Her testimony, therefore, was based on hearsay. Tenn. R. Evid. 801(c).

*13 The defendant seems to suggest that the evidence falls within the state of mind exception to the hearsay rule. *See* Tenn. R. Evid. 803(3). [FN3] However, as the Advisory Commission Comments note, Rule 803(3) contemplates that only the declarant's (the deceased brother's) state of mind or condition, not some third party's (the defendant's), is provable by this hearsay exception. *See also State v. Hutchison*, 898 S.W.2d 161, 171 (Tenn.1994); *State v. John David Rankin, Jr.*, No. 03C01-9511-CC00369, Sullivan County (Tenn.Crim.App. filed Aug. 18, 1996, at Knoxville) (at note 2). The defense was attempting to prove the defendant's state of mind through the statement of an out-of-court witness. Rule 803(3) does not encompass this. Accordingly, the trial court properly excluded this evidence from the jury. This issue is without merit.

> FN3. "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

## III. Admission of Photographs

The defendant also contends that the trial court erroneously admitted autopsy photographs of the

victim into evidence during the penalty phase of the trial. The defendant argues that the photos were "shocking and horrifying" and had a "designed effect" upon the jury. The State asserts that the photos were relevant to prove the existence of the aggravating circumstance and to assist the jury in understanding the expert testimony. According to the State, the probative value of the evidence was not substantially outweighed by any unfair prejudicial effect.

The admissibility of relevant photographs of the victim is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978). *See also, State v. Bigbee*, 885 S.W.2d 797, 807 (Tenn.1994); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn.1993). Moreover, the modern trend is to vest more discretion in the trial judge's rulings on admissibility. *See Banks*, 564 S.W.2d at 949; *State v. Michael Carlton Bailey*, No. 01C01-9403-CC-00105, Dickson County (Tenn.Crim.App. filed July 20, 1995, at Nashville).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Of course, simply because evidence is prejudicial does not mean the evidence must be excluded as a matter of law. *See State v. Gentry*, 881 S.W.2d 1, 6 (Tenn.Crim.App.1993). The Court must still determine the relevance of each photograph to the sentencing issue and weigh its probative value against any undue prejudice.

*14 The photographs at issue here depicted the body of the victim during the autopsy exam. Some of the photos showed close-ups of the external wounds sustained by the victim. None of the pictures depicted the surgical examination of the body. The State sought to establish that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. T.C.A. § 39-13-204(i)(5). The medical examiner testified that several of the wounds were target wounds and represented the intentional infliction of torture. The photographs in this respect, as the State notes, assisted the jury in viewing the result of the alleged tortuous activity. And although the wounds are somewhat gruesome, the depiction of them was relevant in proving the aggravating circumstance. Their probative value appears to clearly outweigh any undue prejudicial effect. This issue is without merit.

IV. Constitutionality of the Aggravating Circumstance

The defendant argues that the language of T.C.A. § 39-13-204(i)(5) (Supp.1994) is unconstitutionally vague. In his brief, the defendant relies upon *Rickman v. Dutton*, 854 F.Supp. 1305 (M.D.Tenn.1994), a federal district court opinion interpreting the language of the pre-1989 aggravating circumstance. The defendant in this case was sentenced under the new language of this aggravator. The *Rickman* opinion, therefore, is inapplicable here. Moreover, our Supreme Court has recently found the language of this aggravating circumstance constitutionally sufficient to narrow the class of offenders eligible for the death penalty. *State v. Odom*, 928 S.W.2d 18, 26 (Tenn.1996). The jury was properly instructed according to the wording of the statute and the definitions provided in *State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985) and *Odom*, 928 S.W.2d at 26. Thus, there is no error.

V. Sufficiency of the Aggravating Evidence

Next, the defendant contends that the evidence was insufficient to support the jury's finding of the especially heinous, atrocious or cruel aggravating circumstance. Specifically, the defendant claims that the State did not prove beyond a reasonable doubt that he tortured the victim prior to her death.

T.C.A. § 39-13-204(i)(5) provides that the death penalty may be imposed if the State proves beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." "Torture" has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious," *State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985), whereas "serious physical abuse beyond that necessary to produce death" means just that: there must be serious physical, not

Not Reported in S.W.2d                                                                      Page 52
(Cite as: 1998 WL 208051, *14 (Tenn.Crim.App.))

mental, abuse, i.e., "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.' " *State v. Odom,* 928 S.W.2d 18, 26 (Tenn.1996) *quoting Black's Law Dictionary* 11 (6th ed.1990).

*15 As noted above, the jury's verdict, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978); *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973). On appeal, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). This Court does not reweigh or re-evaluate the evidence. *Id.* The jury's verdict, therefore, will only be disturbed if, after a consideration of the evidence in the light most favorable to the State, a rational trier of fact could not have found the existence of the aggravating circumstance beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 309, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983).

The evidence presented clearly supports the jury's finding of the aggravating circumstance in this case. Death resulted from a combination of manual strangulation and drowning. Prior to her death, however, the victim received a very extensive and painful beating. There were approximately eighty-three separate wounds found on the victim's body, not including the internal injuries associated with the strangulation. The concentration of wounds to the face, neck, and head, classified as target wounds, had been intentionally inflicted and represent the presence of torture. The victim was dragged across the pavement and ground and sustained extensive scrapes on her back, arms and legs. Some of the victim's hair was pulled from her head and her nose was fractured. Also, numerous defensive wounds were found on her arms and legs. The medical examiner testified that the injuries had been inflicted within two hours prior to death and that the victim had been alive and conscious during the entire attack. Evidence demonstrated that the beating started in the victim's bedroom and continued along the outside of the house and into the back yard where the victim was manually strangled and thrown into a swimming pool to drown.

Apart from the physical abuse sustained in the presence of the children, the evidence also supports the presence of mental abuse. During the beating in the bedroom, the defendant told the children he would kill their mother if they called for help. Not only did the victim possibly fear for the safety of her children, she had to endure, during the period before her death, the thought that the defendant did in fact intend to kill her. Moreover, water was found in the victim's stomach and lungs, which, according to the medical examiner, indicated that the victim had been alive while lying face down in the pool. The evidence in this case seems to overwhelmingly prove beyond a reasonable doubt that the victim was tortured.

*16 This issue is without merit.

VI. Appropriateness of the Death Penalty
Finally, the defendant appears to be reasserting his position that the evidence in this case supports at most a conviction for second-degree murder. The defendant, citing *State v. Thornton,* 730 S.W.2d 309 (Tenn.1987), seems to suggest that the conviction and sentence here should be reversed because domestic homicides rarely are committed in the absence of passion. The State notes, however, that this case did not involve the "typical" domestic dispute. At the time of the murder, the couple was separated and they were not living together. Moreover, contrary to the authority cited by the defendant, there was no evidence in this case that the defendant had been reacting to an illicit sexual affair in which the victim was involved. The State argues that the defendant planned to kill his wife and the fact that the victim was his wife does not, in and of itself, discount the existence of premeditation and deliberation. As noted above, the evidence in this case clearly supports the conviction and sentence. Accordingly, the defendant's reliance solely upon the relationship between him and the victim is without merit. *See, e.g., State v. Cooper,* 718 S.W.2d 256 (Tenn.1986).

After a thorough review of the issues and the record before the Court as mandated by T.C.A. §§ 39-13-206(b), and (c), and for the reasons stated herein, we find that the defendant's conviction and sentence of death should be affirmed. The sentence of death was not imposed in an arbitrary fashion, the evidence supports the jury's finding of the aggravating circumstance, and the evidence supports

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                                        Page 53
(Cite as: 1998 WL 208051, *16 (Tenn.Crim.App.))

the jury's finding that the aggravating circumstance outweighs any mitigating circumstances. [FN4] Moreover, a comparative proportionality review, considering both the circumstances of the crime and the nature of the defendant, affirms that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. *See, e.g., State v. Bland*, --- S.W.2d ---- (Tenn.1997) (and cases cited therein); *State v. Mann*, --- S.W.2d ---- (Tenn.1997) (and cases cited therein); *State v. Poe*, 755 S.W.2d 41 (Tenn.1988) (victim suffered severe beating and was strangled); and *State v. O'Guinn*, 709 S.W.2d 561 (Tenn.1986) (victim suffered severe beating and was strangled).

FN4. During sentencing, the defendant introduced evidence relating to his substance abuse, depression, and suicidal thoughts. He also demonstrated that he was raised by an abusive father who would not acknowledge that the defendant was his son. The defendant's sister and mother testified that the defendant was a good father and cared for his children.

The conviction and sentence are hereby affirmed.

JONES, Presiding Judge, and WOODALL, Judge, concur.

Not Reported in S.W.2d, 1998 WL 208051 (Tenn.Crim.App.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.