# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

---

| | |
|---|---|
| STATE OF TENNESSEE, | ) |
| | ) |
| Appellee, | ) |
| | ) No. ~~02C01-9703-CC-00095~~ O2S01-9805-CC·00048 |
| VS. | ) |
| | ) DEATH PENALTY CASE |
| | ) ORAL ARGUMENT REQUESTED |
| JON DOUGLAS HALL, | ) |
| | ) |
| Appellant. | ) |

---

## BRIEF OF APPELLANT
## JON DOUGLAS HALL

---

**FILED**

AUG 0 3 1998

Clerk of the Courts
Rec'd By MH

ORDER EXTENSION TO 8-1-98
(SAT)

C. MARK DONAHOE - B.P.R. # 14049
ATTORNEY FOR THE DEFENDANT
312 EAST LAFAYETTE STREET
P.O. BOX 2004
JACKSON, TENNESSEE 38302-2004
(901) 424-0461

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iii

STATEMENT OF THE ISSUES ...................................... 1

STATEMENT OF THE CASE ........................................ 2

STATEMENT OF THE FACTS ...................................... 3

SUMMARY OF THE ARGUMENT ................................ 4

ARGUMENT ............................................................... 6

    I.    THE EVIDENCE FAILS TO SUPPORT THE FINDING OF
        THE JURY THAT JON DOUGLASS HALL COMMITTED
        FIRST-DEGREE PREMEDITATED MURDER .................. 6

        i.    More Than The Mere Fact Of Repeated Blows Must
            Be Shown To Establish First-Degree Murder ............. 11

        ii.   There Was No Absence Of Passion Which Is Required
            To Satisfy The Elements Of Deliberation And
            Premeditation ................................................ 12

        iii.  Jon Douglas Hall Was Incapable Of Forming The
            Requisite Culpable Mental State Due To Voluntary
            Intoxication .................................................. 13

    II.   THE TRIAL COURT COMMITTED REVERSIBLE
        ERROR WHEN IT ALLOWED HORRIFYING AND
        GRUESOME PHOTOGRAPHS TO BE INTRODUCED
        INTO EVIDENCE AT THE PUNISHMENT PHASE ........... 16

    III.  THE EVIDENCE PRESENTED DURING THE PENALTY
        PHASE WAS INSUFFICIENT TO SUPPORT THE
        AGGRAVATED CIRCUMSTANCE THAT THE MURDER
        WAS HEINOUS, ATROCIOUS OR CRUEL WITHIN THE
        MEANING OF TENN. CODE ANN. § 39-13-204(I)(5) .......... 20

        i.    The Statutorily Mandated Proportionality Review
            Is Conducted In Violation Of Due Process And The
            Law Of The Land ............................................ 24

IV.    THE TRIAL COURT ERRED IN INSTRUCTING THE
       JURY THAT IT MUST AGREE UNANIMOUSLY IN
       ORDER TO IMPOSE A LIFE SENTENCE ............................    26

V.     THE TRIAL COURT ERRED DURING THE GUILT PHASE
       OF THE TRIAL BY NOT ALLOWING CHERYL ARBOGAST
       TO TESTIFY AS TO JON HALL'S STATE OF MIND
       IMMEDIATELY PRIOR TO AND ON JULY 29, 1994 .............    28

VI.    THE TRIAL COURT'S FAILURE TO HONOR JON HALL'S
       REASONABLE REQUEST FOR REMOVAL OF THE FLAG
       VIOLATED THE DEFENDANT'S FIFTH, SIXTH, AND
       FOURTEENTH AMENDMENT RIGHTS TO TESTIFY
       ON HIS OWN BEHALF ...............................................    30

CONCLUSION ..............................................................................    33

CERTIFICATE OF SERVICE ........................................................    34

# TABLE OF AUTHORITIES

## CASES

Berry v. State,
    718 S.W.2d 447 (Ark. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Clark v. State,
    402 S.W.2d 863 (Tenn. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

Drye v. State,
    184 S.W.2d 10 (Tenn. 1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Faretta v. California,
    422 U.S. 806 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Ford v. Wainwright,
    477 U.S. 399 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Furman v. Georgia,
    408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Godfrey v. Georgia,
    446 U.S. 420 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Gregg v. Georgia,
    428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Harrell v. State,
    593 S.W.2d 664 (Tenn. Crim. App. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Harris v. New York,
    401 U.S. 222 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Jackson v. Virginia,
    443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

McKlesky v. Kemp,
    481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

McKoy v. North Carolina,
    494 U.S. 333 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Mills v. Maryland,
    486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Olim v. Wakinkona,
    461 U.S. 238 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pulley v. Harris,
    465 U.S. 37 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Rock v. Arkansas,
    483 U.S. 44 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Spence v. Washington,
    418 U.S. 405 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

State v. Banks,
    564 S.W.2d 947 (Tenn. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

State v. Brooks,
    880 S.W.2d 390 (Tenn. Crim. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 8

State v. Brown,
    836 S.W.2d 530 (Tenn. 1992) . . . . . . . . . . . . . . . . . 6, 7, 8, 9, 11, 12, 18, 19

State v. Bullington,
    532 S.W.2d 556 (Tenn. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

State v. Cabbage,
    571 S.W.2d 832 (Tenn. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

State v. Collins,
    No. 03C01-9704-CR-00143, 1998
    Lexis 254 (Tenn. Crim. App. at Knoxville, March 3, 1998) . . . . . . . . . . . 16, 17, 18

State v. Crawford,
    470 S.W.2d 610 (Tenn. 1971) . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 10, 13

State v. Crenshaw,
    659 P.2d 488 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

State v. Davis,
    28 S.W.2d 993 (Tenn. 1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

State v. Duncan,
    698 S.W.2d 63 (Tenn. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

State v. Frugate,
    776 S.W.2d 541 (Tenn. Crim. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

State v. Gentry,
    881 S.W.2d 1 (Tenn. Crim. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

State v. Hatchett,
    560 S.W.2d 627 (Tenn. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

State v. Middlebrooks,
    840 S.W.2d 317 (Tenn. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

State v. Odom,
    928 S.W.2d 18 (Tenn. 1996) . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 21, 22, 23

State v. Phipps,
    883 S.W.2d 138 (Tenn. Crim. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . 13, 28

State v. Shelton,
    854 S.W.2d 116 (Tenn. Crim. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

State v. Tharpe,
    726 S.W.2d 896 (Tenn. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

State v. West,
    844 S.W.2d 144 (Tenn. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

State v. Williams,
    657 S.W.2d 405 (Tenn. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

State v. Williams,
    690 S.W.2d 517 (Tenn. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Texas v. Johnson,
    491 U.S. 397 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Eichman,
    486 U.S. 310 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

<u>United States v. Valenzuela-Bernal</u>,
    458 U.S. 858 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>Winton v. State</u>,
    268 S.W. 633 (Tenn. 1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Zant v. Stephens</u>,
    462 U.S. 862 (Tenn. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## STATUTES

T.C.A. § 39-11-106(a)(18) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

T.C.A. § 39-13-201(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

T.C.A. § 39-13-201(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

T.C.A. § 39-13-202(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19

T.C.A. § 39-11-503(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

T.C.A. § 39-13-204(i)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

T.C.A. § 39-13-206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

T.C.A. § 39-13-204(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

T.C.A. § 39-2-203(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

T.C.A. § 39-13-204(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## RULES

T.R.A.P. 13(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Tenn. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Tenn. R. Evid. 804(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

**OTHER AUTHORITIES**

Wharton's Criminal Law § 140 (14th ed. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Black's Law Dictionary 11 (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Handbook of Federal Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Tennessee Pattern Jury Instructions § 20.03 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Weinstein's Evidence Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.   Did the State's evidence support the jury's conclusion that Jon Douglass Hall committed first-degree premeditated murder?

    i.   Did the State improperly support its conviction for first-degree premeditated murder based on the number of blows received by the victim?

    ii.   Did Jon Douglass Hall experience an absence of passion which is required to satisfy the elements of deliberation and premeditation?

    iii.   Was Jon Douglass Hall incapable of forming the requisite culpable mental state due to his intoxicated state?

II.   Did the trial court improperly admit gruesome autopsy photographs, which were needlessly cumulative, and served no purpose other than to inflame and impassion the jury?

III.   Was the State's proof at the penalty phase sufficient to support the aggravated circumstance of a heinous, atrocious or cruel within the meaning of T.C.A. § 39-13-204(i)(5)?

    i.   Is the statutorily mandated proportionality review conducted in violation of Jon Douglass Hall's right to due process?

IV.   Did the trial court err when it instructed the jury that it must unanimously agree to impose a life sentence?

V.   Did the trial court err when it improperly excluded the testimony of Cheryl Arbogast, who had knowledge regarding Jon Douglass Hall's state of mind on January 29, 1994?

1

## STATEMENT OF THE CASE

On October 3, 1994, the Grand Jury of Henderson County indicted Jon Douglass Hall for the premeditated murder of Billie Jo Hall, two counts of theft of property, and especially aggravated kidnaping. The State filed its notice of intent to seek the death penalty. The trial court granted a change of venue, and the case was eventually moved from Lexington, Henderson County, Tennessee to Jackson, Madison County, Tennessee.

On February 3 through February 5, 1997, the trial court conducted a trial on the first-degree premeditated murder charge. The jury found the defendant guilty as charged. During the penalty phase, the trial court instructed two aggravating circumstances[1], and the jury, finding the heinous, atrocious, or cruel aggravating circumstance applicable, sentenced Hall to death. On February 25, 1997, the trial court approved the jury's verdict and sentenced Hall to death by electrocution.

On March 7, 1997, Jon Douglass Hall filed a motion for a new trial. After a hearing, the trial court overruled the motion. Next, Hall filed an appeal with the Tennessee Criminal Court of Appeals, which affirmed the ruling of the trial court. Consequently, Jon Douglass Hall respectfully appeals to this Honorable Court for fair and just relief.

---

[1] Tenn. Code Ann. § 39-13-204(i)(5) & (6).

2

## STATEMENT OF THE FACTS

For several weeks prior to July 29, 1994, Jon Hall and his wife, Billie, were having marital difficulties, resulting in the separation of the couple. (R. 221, 228)[2]. This separation had Jon extremely depressed and worried about his children, especially his youngest daughter who suffered from Cerebral Palsy. (R. 234). On July 29, 1994, after drinking all day, (R. 234), Jon was desperate to reconcile his marriage with his wife. (R. 234). Therefore, late in the evening of July 29, 1994, while delivering child support money to his wife, Jon attempted to discuss the possibility of reconciliation. (R. 228). Prior to entering his home, however, Jon disconnected the phone lines to prevent his wife from calling the police on him, as she so often did. (R. 201, 235). Given the relationship between Jon and his wife, Jon disconnecting the phone lines was a matter of course, and not something extraordinary. (R. 235).

Eventually, Jon began discussing reconciliation. However, when "he tried to talk about reconciliation . . . all [Billie] was interested in was the money, and when she refused to listen to him . . . his temper got the best of him and he began to strike her." (R. 228). Tragically, Jon was unable to control his sudden onset of passion and rage and a fight ensued which began in the house and spilled over into the front yard. (R. 260-62, 196-99, 202). Jon, unable to control his rage and passion, drug his wife to a swimming pool in their backyard where the fight continued and Billie ultimately died. (R. 203-05, 288-92). Billie Hall suffered some eighty-three blows to her body during this fight. (R. 260-62, 296-302).

Crying and remorseful, Jon Hall was later arrested at his brother's house in Texas. (R. 218-19). Shortly thereafter, legal proceedings were initiated against Jon Hall.

---

[2] The Transcript of Evidence is referred to as the 'Record,' denoted by 'R.'

3

## SUMMARY OF THE ARGUMENT

On February 3 through February 5, 1997, the first-degree premeditated murder trial of Jon Douglass Hall was held in the Criminal Court of Madison County, Tennessee at Jackson, Division I. The State bore the burden of proving its case beyond a reasonable doubt. The State failed to meet its burden.

The record before this Honorable Court is insufficient to support the finding of the jury that Hall committed first-degree premeditated murder. The record merely shows a domestic dispute that got tragically out of hand. A drunk, passionate, and enraged Jon Hall murdered his wife, not a reflecting and deliberate man. The State, knowing it would have an extremely difficult time turning this second-degree case into a first-degree case, thought it would have a better chance of conviction by inflaming the jury. And, inflame the jury it did.

The State relied almost entirely on the fact that Billie Hall received eighty-three blows to her body to support its aggravating factor. To put icing on the State's weak first-degree case, the State introduced seventeen gruesome autopsy photographs that were needlessly cumulative, for no other purpose than to inflame the jury so that it could get a conviction. Moreover, the State attempted to do the best it could to keep from the jury the fact that Jon Hall was intoxicated the night his wife died, thereby rendering him incapable of forming the requisite culpable mental state. Finally, when the defendant offered proof as to his state of mind, the State successfully, but reversibly, convinced the trial court to keep out the testimony of Hall's sister, Ms. Arbogast, the only person with knowledge of his state of mind on that fateful night.

After the State was able to get a conviction during the guilt phase by inflaming the jury to the detriment of Jon Hall's rights, the State, nevertheless, failed to produce evidence sufficient to support

4

the aggravated circumstance of heinous, atrocious or cruel within the meaning of Tenn. Code Ann. § 39-13-204(i)(5). Similarly, the statutorily mandated proportionality review is being conducted in violation of Hall's constitutional right to due process. Finally, the trial court, itself, erred when it instructed the jury that it must agree unanimously in order to impose a life sentence on Jon Hall.

Because the State failed to carry its burden beyond a reasonable doubt, and because the trial in the court below was conducted in violation of Jon Hall's constitutional rights, a new trial should be granted so that the defendant can have an unimpassioned jury fairly determine his fate. In the alternative, this Honorable Court should commute Hall's sentence to second-degree murder.

## ARGUMENT

**I.  THE EVIDENCE FAILS TO SUPPORT THE FINDING OF THE JURY THAT JON DOUGLASS HALL COMMITTED FIRST-DEGREE PREMEDITATED MURDER.**

A guilty verdict delivered by the jury and approved by the trial court accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978). Therefore, on appeal, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In short, this Court does not reweigh or reevaluate the evidence. Id. However, *the jury's verdict will be disturbed, if after a consideration of the evidence in the light most favorable to the State, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt.* See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); T.R.A.P. 13(e). (Emphasis added).

A criminal offense may be proven through direct evidence, circumstantial evidence, or a combination of the two. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). See also State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). However, before a defendant may be convicted of a criminal offense based upon circumstantial evidence alone, *the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt."* State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). (Emphasis added). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable

inference save the guilt of the defendant beyond a reasonable doubt." Id. at 613.

On July 29, 1994, first-degree murder was defined by Tenn. Code Ann. § 39-13-202(a)(1)(Supp. 1994) as "[a]n intentional, premeditated and deliberate killing of another." Importantly, given the case at bar, once a homicide is proven, it is presumed to be a second-degree offense, which may only be rebutted by the State proving premeditation and deliberation beyond a reasonable doubt. Brown, 836 S.W.2d at 543.

The Tennessee Code defines intentional as "the conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18)(1991). Next, the Code states that premeditation requires "the exericse of reflection and judgment," Tenn. Code Ann. § 39-13-201(b)(2)(1991), necessitating "a previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). Finally, the Code posits that a deliberate act means one performed with a cool purpose. Tenn. Code Ann. § 39-13-201(b)(1). In Brown, the Supreme Court added clairty to the elements of premeditation and deliberation:

> 'Premeditation' is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and 'deliberation' is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. 'Deliberation' is present if the thinking, i.e. the 'premeditation,' is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a 'careful weighing' of the proposed decision.

Id. at 541, quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979). "While it remains true that no specific length of time is required for the formation of a cool, dispassionate intent to kill, Brown requires more than a 'split-second' of reflection in order to satisfy the elements of premeditation and deliberation." West, 844 S.W.2d at 147. Accordingly, before a jury can convict

7

the defendant of first-degree murder, it must find that the defendant consciously engaged in the conduct to cause death, and killed only "upon reflection, 'without passion or provocation,' and otherwise free from the influence of excitement." State v. Gentry, 881 S.W.2d 1, 4 (Tenn. Crim. App. 1993). See State v. Brooks, 880 S.W.2d 390, 392 (Tenn. Crim. App. 1993).

The first-degree murder conviction of Jon Douglass Hall was predicated on circumstantial evidence. Therefore, before the verdict of the jury can be sustained, the facts and cirumstances "must be so strong and cogent as to exclude *every other reasonable hypotheses* save the guilt of the defendant . . . beyond a reasonable doubt." Crawford, 470 S.W.2d at 612. (Emphasis added). It must also be proven beyond a reasonable doubt that Hall killed upon reflection, after carefully weighing his decision, without passion, and free from excitement. Gentry, 881 S.W.2d at 4; Brown, 836 S.W.2d at 541. The record on appeal in no way reflects either facts or cirumstances so strong and cogent as to exclude every other hypotheses that Billie Hall's death was premeditated first-degree murder beyond a reasonable doubt. Similarly, the record in no way reflects a cool and premeditated murder conducted only after reflection and a careful weighing of the circumstances. Quite the contrary, the record offered for review shows a killing premised on anger, passion, and alcohol.

For several weeks prior to July 29, 1994, Jon Hall and his wife, Billie, were having marital difficulties, resulting in the separation of the couple. (R. 221, 228). This separation had Jon Hall extremely depressed and worried about his children, especially his youngest daughter who suffered from Cerebral Palsy. (R. 234). On July 29, 1994, after drinking all day, (R. 234), Jon Hall was desperate to reconcile with his wife. (R. 234). Therefore, late that evening, Hall, delivering child support money to Billie, attempted to discuss the possibility of reconciliation. (R. 234). However, when "he tried to talk about reconciliation . . . all [Billie] was interested in was the money, and when

she refused to listen to [Jon] . . . his temper got the best of him and he began to strike her." (R. 228).

There was no pause during the fight; it was a continuous event according to the only eyewitnesses,

Hall's children. (R. 260-62). Further, the State's witness, Dr. Smith, testified that the wounds to the

head and neck were indicitive of anger. (R. 308).

A conviction for first-degree murder requires that "the mind be free from the influence of

excitement or passion, as to be capable of reflecting and acting with a sufficient degree of coolness

and deliberation or purpose . . . ." Clark v. State, 402 S.W. 863, 868 (Tenn. 1966). Passion is

defined as "any of the human emotions known as anger, rage, sudden resentment or terror rendering

the mind incapable of cool reflection." Drye v. State, 184 S.W.2d 10, 13 (Tenn. 1944). As the

record reflects, Jon Hall's 'temper got the best of him' when his wife refused to discuss reconciliation.

(R. 228). Only at this point, did Hall become enraged or experience sudden resentment towards his

wife. Again, the record clearly reflects that Jon's temper got the best of him, (R. 228), and that the

blows inflicted upon Billie were indicitive of anger. (R. 308). The testimony in the record, however,

is void of evidence of premeditation and deliberation. Mr. Hall acted out of anger and in the heat of

passion which renders him not guilty of first-degree premeditated murder, but guilty of a lesser degree

of homicide. See Brown, 836 S.W.2d at 537-39.

The State's main proof supporting premeditation rests on the testimony of a prison inmate,

Chris Dutton. Inmate Dutton, who, coincidently, has recently been transferred from maximum

security to minimum restricted security, (R. 223-29), stated only once on direct examination "that he

[Jon Hall] wanted to make her [Billie] feel as he did. He wanted her to suffer as he did, feel the

helplessness that he was feeling because she took his world away from him." (R. 228). These 33

words alone are certainly insufficient evidence upon which to base the sentence of death on another

9

human being, and no reasonable, unimpassioned jury could have found otherwise. Nevertheless, the State seized upon this testimony to establish premeditation beyond a reasonable doubt. It requires little argument to conclude that the State's overwhelming reliance on this testimony was in error, and no reasonable jury was justified in relying on such.

Even if Dutton's recollections of Hall's statements are accurate, nothing in the words 'suffer' or 'helplessness,' given the circumstances and the time in which those words were uttered, indicate a premeditated intent to kill. The statements supposedly made by Jon Hall to Inmate Dutton were not made prior to the crime, but much later, in a very suspect setting within the confines of jail. Nonetheless, Jon Hall did not carry a weapon with him on the night of July 29, 1994, when he went to see his wife, (R. 217, 235), nor did he enter his residence and immediately begin to strike his wife. (R. 240-43). To the contrary, all Hall intended to do that night was give his wife a check for child support and attempt to reconcile their marriage (R. 237, 234). Merely 'wanting' someone to suffer for causing another to similarly suffer is not the same as 'planning' to kill someone. 'Wanting' someone to suffer for whatever reason is not evidence that is so strong and cogent as to exclude every other reasonable hypotheses save first-degree premeditated murder beyond a reasonable doubt. Crawford, 470 S.W.2d at 612. A reasonable, unimpassioned jury should have found likewise.

To a lesser degree the State also relies upon the fact that Hall had allegedly disconnected the phone lines to his residence prior to entering the home to support its conviction of first-degree premeditated murder. (R. 201, 235). The State's reliance on this circumstance is entirely misplaced. Because of the relationship between Hall and his wife, he often disconnected the phone lines to prevent Billie from calling the police when they would argue. (R. 235). Moreover, the phone junction box was located directly next to the door used as the main entrance of the Hall family home,

10

and law enforcement officials inferred that the wires to the junction could easily be removed and then reconnected with just the press of a button.  (R. 209).  Although it may seem odd that Hall disconnected his phone lines prior to entering his home, this appeared to be a matter of course for him given the relationship between him and Billie (R. 235).  Again, Hall did not carry a weapon when he went to deliver money to his wife, he did not immediately begin to strike his wife, and he did not lie in wait.  (R. 217, 235, 240-43).  No advanced planning or preparation of any kind is exhibited in the record.  Instead, Jon Hall, unarmed, knocked on the front door, entered when the door was opened, and presented his wife a check for child support.  Later, when Hall attempted to discuss reconciliation an argument ensued.  Unfortunately, the argument became so heated that Hall's temper got the best of him, (R. 228), and he did something he regretted.  (R. 219).  Morally, Hall's conduct and actions that fateful night are inexcusable.  Legally, however, the record does not reflect conduct rising to the level of premeditation.  In short, Hall's actions were not the type of conduct a reasonable jury would expect a man to portray who had allegedly planned and prepared to murder his wife.

### i.  More Than The Mere Fact Of Repeated Blows Must Be Shown To Establish First-Degree Murder.

More than the mere fact of repeated blows must be shown to establish first-degree murder. Brown, 836 S.W.2d at 543.  In it's case-in-chief, the State drew heavily upon the fact that Billie Hall, according to the State's expert, had been struck some eighty-three times.  As a matter of fact, the State's expert, Dr. Smith, used a life-sized mannequin to methodically illustrate each and every one of the eighty-three blows.  (R. 295-302).  It is clear that such a blow-by-blow synopsis did nothing more than improperly inflame the jury.  This is evident from the fact that the jury returned a verdict of first-degree murder and recommended the death penalty although the eighty-three blows

11

were ***not*** the cause of death. (R. 293, 303, 305).

Here again, the State offers the testimony of Inmate Dutton to establish that they did not rely solely on the eighty-three blows to prove premeditation beyond a reasonable doubt. The State, through Inmate Dutton, contends that Hall's alleged statement regarding wanting his wife to "feel helpless" justifies the jury's verdict. (R. 228). Inmate Dutton's testimony, alone, is insufficient to prove premeditation beyond a reasonable doubt, and no reasonable, unimpassioned jury could have found otherwise.

### ii. There Was No Absence Of Passion Which Is Required To Satisfy The Elements Of Deliberation And Premeditation.

More than a split-second intention to kill is required to constitute premeditation, which, by its very nature, is not instantaneous, but requires some time interval. Brown, 836 S.W.2d at 543. "[I]t is now abundantly clear that the deliberation necessary to establish first-degree murder ***cannot*** be formed in an instant." Id. (Emphasis added). Further, a conviction of first-degree murder requires that "the mind . . . [be] free from the influence of excitement, or passion, as to be capable of reflecting and acting with a sufficient degree of coolness and deliberation of purpose," i.e. to cause the death of another. Clark v. State, 402 S.W.2d 863, 868 (Tenn. 1966).

Mr. Hall's passion had not subsided. He was enraged and felt sudden resentment for his wife's failure to discuss reconciliation, which rendered him incapable of reflection. See State v. Bullington, 532 S.W.2d 556, 559 (Tenn. 1966). The child witnesses observed their parents 'fighting' and described one 'continuous event' which began in the house and ended at the pool outside the house. (R. 260-62). There was clearly no internval here or time frame in which Mr. Hall could have reflected upon murdering his wife, nor was there time to consider how to put that plan into effect.

12

State v. Fugate, 776 S.W.2d 541, 544 (Tenn. Crim. App. 1988). The domestic problems and the fact that the Halls were having a fight, as observed by the children, illustrate the presence of passion, which negates the presence of a cool purpose as required to meet the element of deliberation. See Winton v. State, 268 S.W. 633, 637 (Tenn. 1925). Moreover, the children's testimony support the State's expert's theory that all external wounds occured within several minutes to a quarter of an hour. It was a continuous event and the wounds were inflicted out of anger. (R. 260-62, 308).

In short, the State failed to carry its burden of proof. There was no time for reflection whatsoever between the time in which the fight began, and the time in which Billie was killed. There was no proof that Jon Hall was free from passion. To the contrary, all the record reflects is Jon Hall's sudden resentment and passionate attack upon his wife. The facts and the cirumstances presented as proof in the State's case-in-chief are not so strong and cogent as to exclude every other reasonable hypotheses save first-degree premeditated murder beyond a resonable doubt. Crawford, 470 S.W.2d at 612.

<blockquote>iii.    <strong>Jon Douglas Hall Was Incapable Of Forming The Requisite Culpable Mental State Due To Voluntary Intoxication.</strong></blockquote>

The Tennessee Code provides ". . . intoxication itself is not a defense to prosecution for an offense. However, intoxication, whether voluntary or involuntary, is admissible in evidence if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39-11-503(a). See also State v. Phipps, 883 S.W.2d 138, 148 (Tenn. Crim. App. 1994); State v. Shelton, 854 S.W.2d 116, 121 (Tenn. Crim. App. 1992).

On July 29, 1994, prior to going to the family home to deliver child support money to his wife, Jon Hall had been drinking all day and had eventually become 'drunk.' (R. 233-34). When he

arrived at the family home he was still drinking and had brought beer into the house with him. (R. 270). At this point, Mr. Hall began to discuss the possibility of reconciliation with his wife. (R. 234). However, all Billie was interested in was the money. (R. 228). While under the influence of alcohol, Hall became angry at his wife and began striking her. (R. 228). Thus, the determinative question is not whether Mr. Hall was intoxicated, for that fact is clear, but whether because of his intoxication he lacked the mental capacity to form the necessary culpable mental state to commit first-degree premeditated murder. Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979).

In the case sub judice, Inmate Dutton's personal notes reflect a conversation in which Hall admitted that he was drunk when he went to visit his wife that fateful night. (R. 234). Additionally, one of the few eyewitnesses, Hall's daughter, Cindy Lambert, testified that Hall had actually brought beer into the house with him and had been drinking. (R. 270). Moreover, Dr. Zager, an expert clinical psychologist, testified that Hall suffered from alcohol dependence, and had a family history of alcohol problems. (R. 334). In addition, Dr. Zager opined that Hall was intoxicated on the night of July 29, 1994, and that he was acting in an impulsive manner versus a well-thought out plan. (R. 334-335).

The most valuable piece of evidence, however, supporting Hall's contention that he lacked the mental capacity to form the necessary culpable mental state to commit first-degree premeditated murder due to his intoxicated state was the fact that he did kill his wife. The record infers that Hall and his wife had a history of domestic disputes, eventually leading to divorce proceedings. (R. 221, 235, 346). However, despite the constant problems he and his wife experienced, Jon Hall never behaved in such a way that his wife's life was jeopardized. Not until he had consumed so much alcohol that he was unable to form a culpable mental state, did Hall snap and become enraged.

14

Because Hall was unable to form the requisite <u>mens rea</u> to support a conviction for first-degree premeditated murder due to his intoxicated state, the jury behaved unreasonably in not finding Hall guilty of a lesser-degree of homicide.

II.    **THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ALLOWED HORRIFYING AND GRUESOME PHOTOGRAPHS TO BE INTRODUCED INTO EVIDENCE AT THE PUNISHMENT PHASE.**

Rule 403 of the Tennessee Rules of Evidence provides:

> **Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403.

Photographs made during or after an autopsy should be scrutinized and examined prior to being shown to the jury. State v. Collins, No. 03C01-9704-CR-00143, 1998 Lexis 254 (Tenn. Crim. App. at Knoxville, March 3, 1998). If other considerations substantially outweigh the probative value of the evidence, photos should be excluded. Id. at ___. The Supreme Court, in State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978), discussed "the inherently prejudicial character of photographic depictions of a murder victim . . . ," and concluded that if the photos "are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Id. at 951. The Court, adopting the Federal Rules of Evidence 403 as its test for admissibility, suggested a number of factors that the trial judge should consider in determining admissibility. The "value of photographs as evidence, . . . their accuracy and clarity . . . whether they were taken before the corpse was moved . . . [and] the inadequacy of the testimonial evidence in relating the facts to the jury" are appropriate factors. Id.

The term "unfair prejudice" has been defined as "an undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." Banks, 564 S.W.2d at 951 (quoting Advisory

16

Committee Note to Federal Rule of Evidence 403). "One authority characterizes evidence that is unfairly prejudicial as that designed to appeal to sympathy, [a] sense of horror, or [an] instinct to punish." State v. Collins, No. 03C01-9704-CR-00143, 1998 Lexis 254 (Tenn. Crim. App. at Knoxville, March 3, 1998)(quoting J. Weinstein and M. Burger, Weinstein's Evidence Manual 6-20 to 6-21 (Student ed. 1987)). The issue presented on appeal is one of simple fairness. Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of "bias, sympathy, hatred, contempt, retribution, or horror." State v. Collins, No. 03C01-9704-CR-00143, 1998 Lexis 254 (Tenn. Crim. App. at Knoxville, March 3, 1998)(quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)). In short, our criminal justice system is designed to establish a forum for unimpaired reason, not emotional reaction. "Evidence which only appeals to sympathies, conveys a sense of horror, or engenders an instinct to punish should be excluded." Id. (quoting Weinstein and Berger, supra, at 6-20 to 6-21)).

The primary issue in the present case is whether the photographs introduced at trial were needed *in addition to* the testimonial evidence of Dr. Smith in relating the facts to the jury. Neither the fact that Billie Hall was beaten nor the fact that she died from asphyxiation and/or drowned were disputed issues. (R. 179-80) Thus, the admission of 17 gruesome autopsy photos were needlessly cumulative with no additional probative value beyond that already presented by Dr. Smith at the guilt phase. (R. 282-307). The State's witness, through the use of a life-sized mannequin, did a more than thorough job of depicting for the jury the injuries and beating Billie suffered. (R. 295-301). The state methodically provided a blow-by-blow synopsis of each and every bruise found on the victim's body. (R. 295-301). The State even had their expert use markers to draw on the mannequin, so that by the time the doctor had concluded his testimony, the mannequin was covered in ink.

The Collins Court, quoting Berry v. State, 718 S.W.2d 447 (Ark. 1986) further elaborated on the sensitivity of autopsy photographs:

> Other states have been . . . liberal in the admission of similar photographs where they were relevant to proof of the State's case. Like we do now, many have found it necessary, however, to stem the resulting influx of inflammatory pictures where the claims of relevance were increasingly tenuous in light of the prejudicial nature of the photographs.

Id. at 450. In desribing how the courts are becoming too liberal in their admission of inflammatory autopsy photographs, the Collins Court went on to cite the Arkansas Court:

> Prosecutors as well as trial courts must exericse their discretion in the use of gruesome photographs. The statement that 'the State had the right to prove its case up to the hilt in whatever manner it chose,' must be read to mean only that the State may present ample evidence to prove every element of the crime . . . . Prosecutors are not given a cart blanche to introduce every piece of admissible evidence if the cumulative effect of such evidence is inflammatory and unnecessary.

Id. at 451(quoting State v. Crenshaw, 659 P.2d 488 (1983)). Hence, as a general rule, where medical testimony adequately describes the degree or extent of an injury, graphic photographs should not be admitted. See State v. Duncan, 698 S.W.2d 63,69 (Tenn. 1985).

The record reflects that the State sought to introduce photographs of the victim contending that it showed the brutality of the attack and the condition of the victim. The State appears to suggest that because Jon Hall had inflicted so many blows to his wife, he must have wanted to murder her, and that this is evidence of the cruel, heinous, and atrocious aspect of the crime. (R. 396, 398).

Again, its important to note that our Supreme Court has held that the fact that repeated blows were inflicted on the vicitm is not sufficient, by itself, to establish premeditation and deliberation for a first-degree murder conviction. Brown, 836 S.W.2d at 542. The Court explained that repeated

blows can just as easily be delivered in the heat of passion without any design or reflection as they can in a premeditated murder. Id. Thus, only when the multiple "blows are inflicted as a result of premeditation and deliberation can they be said to prove first-degree murder." Id.

Of course, it is well settled that photographs of a victim may be admitted as evidence of brutality and to show the extent of force used against the victim, from which the jury may infer malice, either express or implied. Id. at 551. In the present case, the State was required to establish that the killing was intentional. See Tenn. Code Ann. § 39-13-202(a)(1). However, the blow-by-blow testimony of the State's expert more than adequately provided a detailed description of the beating suffered by the victim. (R. 282-307). Without question, given the adequacy of Dr. Smith's testimony regarding the condition of the victim's body, the inroduction of gruesome, color autopsy photographs was cumulative, serving no other purpose than to inflame the jury and unfairly prejudice Mr. Hall. The trial court's decision to admit these gruesome photographs and to allow the jury to view them was reversible error, which unfairly prejudiced Mr. Hall. Accordingly, this Honorable Court should grant Mr. Hall a new trial so an unimpassioned jury can decide his fate.

III.  **THE EVIDENCE PRESENTED DURING THE PENALTY PHASE WAS INSUFFICIENT TO SUPPORT THE AGGRAVATED CIRCUMSTANCE THAT THE MURDER WAS HEINOUS, ATROCIOUS OR CRUEL WITHIN THE MEANING OF TENN. CODE ANN. § 39-13-204(i)(5).**

"The State has a constitutional responsibility to tailor and apply its death penalty law in a manner that avoids the arbitrary and capricious infliction of this ultimate penalty." State v. Odom, 928 S.W.2d 18, 25 (Tenn. 1996)(quoting Godfrey v. Georgia, 446 U.S. 420, 427 (1980).  "An aggravating cirumstance must genuinely narrow the class of persons eligible for the death penalty," Zant v. Stephens, 462 U.S. 862, 877 (1983), and *provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not.*" Furman v. Georgia, 408 U.S. 238, 313 (1972).  (Emphasis added).

The Constitution, pursuant to the the Eighth Amendment, requires that the States narrow the sentencers' consideration of the death penalty to "a smaller, more culpable class of homicide defendants than the pre-Furman class of death eligible murderers." Odom, 928 S.W.2d at 25; See Pulley v. Harris, 465 U.S. 37 (1984).  By properly narrowing the sentencers' considerations, the courts insure that "those who receive it will be among the *worst murderers* - those whose crimes are particularly serious, or for whom the death penalty is peculiarly appropriate." Id.; See Gregg v. Georgia, 428 U.S. 153 (1976). (Emphasis added).

Tenn. Code Ann. § 39-13-204(i)(5) narrows and defines the meaning of "heinous, atrocious, or cruel" in that the act must involve "torture or serious physical abuse beyond that necessary to produce death." Odom, 928 S.W.2d at 26.  Torture is defined as the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985).  The word "serious" alludes to a matter of degree. Odom, 928

20

S.W.2d at 26.  Finally, "abuse" is defined as an act that is "excessive" or which makes "improper use

of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use." Id.

(citing Black's Law Dictionary 11 (6th ed. 1990)).

The issue remains whether the evidence in this case is sufficient to uphold the finding of the

(i)(5) aggravating circumstance.  Of course, it goes without saying that almost all murders are

"heinous, atrocious, and cruel" to some extent.  However, the facts supporting an (i)(5) aggravating

circumstance must clearly distinguish the defendant as "the worst of the worse" for whom the death

penalty is reserved.  Id.; See State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992).  As the Odom

Court explained:

> [W]e do not intend to diminish what surely must have been a terrifying
> and horror-filled experience for the victim.  Most assuredly, the
> murder was reprehensible in the purest sense of the word - nearly all
> murders are.  However, the aggravating circumstances under review
> must be reserved for application only to those cases which, by
> comparison or contrast, can be articulately determined to be the very
> 'worst of the worse.'

Id. at 26-27.  (Emphasis added).

Borrowing the phrasology of the Odom Court, when one compares the facts and the

cirumstances of the case at bar with other capital murder cases, it is clear that the trial court erred in

accepting the jury's recommendation of death.  For instance, take the Odom case itself, where the

defendant, Richard Odom stabbed his victim multiple times while she was still alive, "including

penetrating wounds to the heart, lung, and liver." Id. at 22.  Moreover, "the medical examiner noted

defensinve wounds on her hands." Id.  "Further examination revealed a tear in the vaginal wall and

the presence of semen inside the vagina." Id.  Police officers described Odom's conduct, based upon

his confession, as follows:

21

> He penetrated her vaginally; he felt that Johnson was then still alive
> because she spoke to him. Beyond the first wound, the defendant
> claimed not to have remembered inflicting the other stab wounds.
> Thereafter, the defendant climbed into the front seat and rifled through
> Johnson's purse. He found nothing of value to him . . . .

Id. Despite this horrific rape and stabbing, all of which occured while the victim was alive and still

communicating with the defendant, no doubt begging for her life, the Odom Court, nevertheless

found that "rape does not ordinarily constitute 'torture' or 'serious physical abuse' within the

meaning of the statute. In a similar vein, [the Court rejected] the conclusion that three stab wounds

. . . constitute 'torture' or serious physical abuse beyond that necessary to produce death." Id. at 26.

The Court explained further, in an attempt not to diminish the severity of the crime, that "the

aggravating circumstance under review must be reserved for application only to those cases, which

. . . can be articulately determined to be the very 'worst of the worse.'" Id. at 27-28.

 Jon Hall is not asking this Honorable Court to compare apples to oranges. However, Mr. Hall

would certainly ask that this Court to reconcile how a woman, who while being brutally raped, is also

being stabbed, does not constitute torture or serious physical abuse. Yet, Jon Hall, who had an

emotional domestic dispute with his wife, which lead to fisticuffs, does constitute torture and serious

physical abuse. Mr. Hall urges this Court to grant a new trial so that an unimpaasioned jury may

weigh the facts or, in the alternative, commute his sentence from first-degree premeditated murder

to second-degree murder.

 In proving the first aggravated cirumstance - "the murder was heinous, atrocious, or cruel,"

Tenn. Code Ann. § 39-13-204(i)(5) - the State relied upon the evidence adduced during both the guilt

phase and the sentencing phase. (R. 302, 305, 307, 397, 398). Further, to narrow the definition of

'heinous, atrocious, or cruel,' the State appeared to ilicit testimony from their expert that suggests

that Billie Hall was struck by some object, such that it would be the 'improper use of a thing in a manner contrary to the natural or legal rules for its use.' Odom, 928 S.W.2d at 26. (R. 298, 394). However, no such object was ever produced or introduced into evidence by the State. As additional proof, the State reversibly introduced autopsy photographs of the victim's body taken after it had been removed from the crime scene.

It cannot be stressed enough to this honorable Court that the blows inflicted upon Billie Hall were not the cause of her death. (R. 288, 303, 305). Dr. Smith stated on several occasions that Billie Hall's cause of death was asphyxiation, but "the injuries taken by themselves would not be sufficient to produce death." (R. 288, 293). Moreover, Dr. Smith's testimony, alone, is insufficient to support the heinous, atrocious, and cruel aggravating factor. There is no doubt that Dr. Smith's conclusions that Billie Hall was tortured was merely an individual assumption on his part, offered only after being prompted by the State. For instance, the State inquired of Dr. Smith, "Does this type of targeting . . . from a medical standpoint . . . indicate to you that torture was present in the beating of Billie Jo Hall?" (R. 397). Of course, Dr. Smith replied, "Yes, sir." (R. 397). It was reversible error to rely upon this testimony to meet the heinous, atrocious, and cruel aggravating factors. Other than Dr. Smith's personal hunches, the record is void of supporting evidence that Billie was tortured. Again, all the record reflects is that a fight occured. (R. 260-62). Dr. Smith has no independent evidence of torture. Dr. Smith is a forensic pathologist, not a mind reader. He was not there on July 29, 1994. Other than the fact that the body Dr. Smith examined was bruised, he had no other evidence of torture, and, therefore, the jury behaved irrationally when relying upon this flimsy evidence to support the aggravating factor of heinous, atrocious, or cruel. Accordingly, this Court should grant Jon Hall a new trial so that an unimpassioned jury may weigh the issues.

23

### i.    The Statutorily Mandated Proportionality Review Is Conducted In Violation Of Due Process And The Law Of The Land.

Tenn. Code Ann. § 39-13-206 provides that the Tennessee Supreme Court shall conduct a proportionality review of all death sentences. With the passage of Tenn. Code Ann. § 39-13-206 came the responsibility of the courts that the proportionality review be conducted consistent with the elements of due process. The United States Supreme Court has held that when a State places substantive limitations or requirements on official discretion, it thereby creates a liberty interest protected by the due process clause. See Ford v. Wainwright, 477 U.S. 399 (1986); Olim v. Wakinkona, 461 U.S. 238 (1983).

Tennessee's proportionality review process is not conducted in a manner sufficient to satisfy the federal due process clause or the state constitutional law of the land clause (Article I, Section 8) or the cruel and unusual clause of either constitution. Specifically, the proportionality review is flawed for the following reasons:

1.    The jury verdict form mandated by Tenn. Code Ann. § 39-13-204(f) does not allow the jury to report mitigating circumstances found during the course of its deliberation, thus the decision of the jury concerning mitigating circumstances is not reviewable by the Court.

2.    The nature of the proportionality review process is unknown and no published criteria exists that can be addressed by Jon Hall or his counsel.

Tennessee's death penalty statute does not require the jury to make written findings of mitigating circumstances. See Tenn. Code Ann. § 39-2-203(g). The absence of such findings make it difficult for the Court to conclude that any arbitrary factor is harmless beyond a reasonable doubt because, by the very nature of the weighing process, mitigating circumstances must be considered. The Court is required to make an individualized determination on the basis of the actual record of the

accused's character and background that the death penalty is the appropriate punishment in the case.

In short, there is no meaningful body of collected data, to which Mr. Hall can refer, and no standard,

upon which Mr. Hall can rely in order to plead his case.  Thus, until such standards are articulated,

Mr. Hall should be granted a new trial or his first-degree murder conviction should be commuted.

IV.    **THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT IT MUST AGREE UNANIMOUSLY IN ORDER TO IMPOSE A LIFE SENTENCE.**

Tenn. Code Ann. § 39-13-204(f) provides that the jury must unanimously agree that the aggravating circumstances proved by the State do not outweigh the mitigating circumstances in order to impose the death sentence.   The jury is instructed that, "The verdict must be unanimous." Tennessee Pattern Jury Instructions § 20.03 (1988).  Moreover, Tenn. Code Ann. § 39-13-204(h) provides that if the jury cannot ultimately agree as to punishment, the judge shall impose a sentence of life imprisonment, but that the jury shall not be instructed on the effect of their failure to agree on a punishment.

However, in McKoy v. North Carolina, 494 U.S. 333 (1990), the Court interpreting its holding in Mills v. Maryland, 486 U.S. 367 (1988) required that, "each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death."  The Supreme Court's prohibition against requiring jurors to reach unanimous decisions as to the existence of mitigating circumstances applies equally to the jury's decision of whether the mitigating circumstances outweigh the aggravating circumstances.

By requiring the jury to reach a unanimous decision that the aggravation does not outweigh mitigation, Tenn. Code Ann. § 39-13-204(f) intrudes on Hall's right to have each juror consider and give effect to his mitigating circumstance.  By requiring such a unanimous decision, the prosecution has an easier time obtaining the unanimous verdict required for a death sentence.  For instance, a juror, who after considering the mitigating circumstances, believes that they are not outweighed by the aggravating circumstances cannot give effect to that belief because of the misleading instruction that the jury must be unanimous to impose a life sentence.  Accordingly, these provisions of the death

penalty statute violate one of the basic tenets of Eighth Amendment jurisprudence: "In contrast to the carefully defined standards that must narrow a sentencer's discretion to impose the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence." McKlesky v. Kemp, 481 U.S. 279, 304 (1987).

Therefore, since the scales are tipped in favor of the State because of the requirement of unanimity, Jon Hall should be granted a new trial such that the jury can be properly and fairly instructed.

27

V.    **THE TRIAL COURT ERRED DURING THE GUILT PHASE OF THE
TRIAL BY NOT ALLOWING CHERYL ARBOGAST TO TESTIFY
AS TO JON HALL'S STATE OF MIND IMMEDIATELY PRIOR TO
AND ON JULY 29, 1994.**

Hall's sister, Cheryl Arbogast, was called to the stand during the guilt phase of the trial as the

defendant's first witness. Hall knew that his sister's testimony was critical in that she was the only

person who could testify as to Hall's state of mind immediately prior to the murder. However, the

State objected to her testimony based on the fact that it was suspected that she lacked first-hand

knowledge, and her testimony would, therefore, be hearsay. (R. 314).

Generally, evidence of an accused's state of mind at the time of the offense is admissible to

negate the existence of the requisite elements of intent. See State v. Phipps, 883 S.W.2d 138 (Tenn.

Crim. App. 1994). Courts have allowed this type of testimony from non-expert as well as expert

witnesses regarding the defendant's state of mind in order to show that the defendant was incapable

of reflection - an element of deliberation. See State v. Davis, 28 S.W.2d 993 (Tenn. 1930).

On July 29, 1994, Ms. Arbogast had a phone conversation with her brother Jeff Hall, also the

brother of Jon. (R. 317). During that conversation, Jeff conveyed Jon's fragile state of mind to

Cheryl. Jeff and Cheryl agreed that Jon needed psychiatric help, and they were trying to devise a plan

to get him help. (R. 317, 319). Based on her conversation with her brother Jeff, Ms. Arbogast, a

registered nurse, opined that her brother was suffering from acute depression due to domestic

problems. (R. 319). Additionally, she, herself, felt that Jon was in need of immediate psychiatric

attention. (R. 317). However, all of this testimony was reversibly excluded by the trial court.

Rule 804 of the Tennessee Rules of Evidence provides an exception to the hearsay rule when

the declarant is unavailable. Rule 804(a)(4) provides, "'Unavailability of a witness' includes situations

28

in which the declarant is unable to be present, or to testify at the hearing because of the declarant's death or then existing physical or mental illness or imfirmity." In the present case, Cheryl was attempting to testify as to the conversation she had with her brother Jeff. Unfortunately, prior to the trial, Jeff had passed away, and was, therefore, unable to testify. (R. 315). Consequently, under Rule 804, Ms. Arbogast, as one who personally spoke with her brother, Jeff, regarding Jon's mental condition on the day of July 29, 1994, should have been allowed to testify. Ms. Arbogast was not testifying as to what Jon said, such that it would be hearsay. Instead, Ms. Arbogast testified as to the conversation between herself and her deceased brother Jeff. This testimony was not hearsay, and should have been allowed under Rule 804 of the Tennessee Rules of Evidence.

Accordingly, the trial court committed reversible error when it excluded this critical evidence relating to Jon Hall's state of mind immediately prior to Billie Hall's death.

29

VI.    **THE TRIAL COURT'S FAILURE TO HONOR JON HALL'S REASONABLE REQUEST FOR REMOVAL OF THE FLAG VIOLATED THE DEFENDANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS TO TESTIFY ON HIS OWN BEHALF.**

The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution.  It is one of the rights that "are essential to due process of law in a fair adversary process."  Faretta v. California, 422 U.S. 806 (1975).  The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony.  Rock v. Arkansas, 483 U.S. 44 (1987).

The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call "witnesses in his favor."  Id. (quoting U.S. Const. amend. VI.)  Included in the accused's right to call witnesses whose testimony is "material and favorable to his defense," United States v. Valenzuela-Bernal, 458 U.S. 858 (1982), is a right to testify himself, should he decide it is in his favor to do so.  Faretta, 422 U.S. 806 (1975).  As a matter of fact, the most important witness for the defense in many criminal cases is the defendant himself.  Id.  Moreover, in Faretta v. California, the Court recognized that the Sixth Amendment grants to the accused personally the right to make his defense.

The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony.  In Harris v. New York, 401 U.S. 222 (1971), the Court stated that "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so."  In short, "*there is no justification today for a rule that denies an accused the opportunity to offer his own testimony*." Rock, 483 U.S. 44 (1987).  (Emphasis added).

30

The question now before this honorable Court is whether Jon Hall's right to testify may be restricted by a trial court judge's decision denying Hall's reasonable request for removal of the American flag. During trial, Hall requested that he be allowed to testify. (R. 348). However, Hall perceived the American flag to be a flag of war and, therefore, refused to testify while the flag was being displayed in the courtroom. (R. 348). At this point during the trial, Hall requested that the flag be removed from the courtroom so that he may testify on his behalf. The trial court judge then refused to honor Hall's request, thereby denying him his consitutional right to testify.

The defendant understands that most Americans view the flag as a symbol of nationhood and national unity. Nonetheless, the Supreme Court has never held that the Government may ensure that a symbol be used to express only one view of that symbol or its referents. Texas v. Johnson, 491 U.S. 397 (1989). Similarly, in United States v. Eichman, 486 U.S. 310 (1990), the Court referred to the American flag as a mere "symbol of our Nation and certain national ideals." As such, the flag receives no special treatment under our system of jurisprudence. See Spence v. Washington, 418 U.S. 405 (1974); Texas v. Johnson, 491 U.S. 397 (1989); United States v. Eichman, 486 U.S. 310 (1990).

Jon Hall views the American flag as a flag of war. He is morally opposed to testifying while it flys in the courtroom. However, Hall wanted to testify in his own behalf. He respectfully requested that the flag be removed while he took the stand so that his constitutional rights could be protected. The trial court, however, without explanation, refused this reasonable request. (R. 348). Accordingly, the trial court judge's decision not to honor Hall's reasonable request resulted in a denial of his Fifth, Sixth, and Fourteenth Amendment rights to testify in his own behalf.

There can be little doubt that the trial court's refusal to honor Hall's reasonable request to

remove the flag resulted in the denial of his constitutional right to present evidence and testify on his own behalf. Therefore, this Honorable Court should grant a new trial so that Jon Hall may testify in his own behalf while in the absence of the symbol Hall considers to be a flag of war.

## CONCLUSION

For all the reasons stated above, this Honorable Court should grant Jon Douglass Hall a new trial, or in the alternative commute his sentence.

Respectfully submitted,

SPRAGINS, BARNETT, COBB & BUTLER, PLC

BY: _____

C. MARK DONAHOE
ATTORNEY FOR THE DEFENDANT
312 East Lafayette Street - P.O. Box 2004
Jackson, Tennessee 38302-2004
(901) 424-0461

33

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded by first-class mail, postage prepaid, to

John Knox Walkup
Attorney General
Criminal Justice Division
425 5th Avenue North
Cordell Hull Building - 2nd Floor
Nashville, Tennessee 37243-0493

on this the 3rd day of August, 1998.

C. MARK DONAHOE
ATTORNEY FOR THE DEFENDANT

34