Case 1:05-cv-01199-JDB-egb   Document 159-17   Filed 02/07/14   Page 1 of 63
PageID 5152

ORDER EXTENSION TO  9/22/98

IN THE SUPREME COURT OF TENNESSEE

**FILED**
Clerk of the Courts
SEP 23 1998
MAILED
CERTIFIED  9/22/98
REGISTERED
REC'D BY

AT JACKSON

STATE OF TENNESSEE,                    )
                                       )
        Appellee,                      )
                                       )
                                       )   MADISON COUNTY
v.                                     )   S.CT. No.
                                       )   02S01-9703-CC-00095
JON DOUGLAS HALL,                      )
                                       )   DEATH PENALTY
        Appellant.                     )

ON APPEAL AS OF RIGHT FROM THE JUDGMENT OF THE
COURT OF CRIMINAL APPEALS

---

BRIEF FOR THE STATE

---

**JOHN KNOX WALKUP**
Attorney General & Reporter

**MICHAEL E. MOORE**
Solicitor General

**KENNETH W. RUCKER**
Assistant Attorney General
Criminal Justice Division
425 5th Avenue, North
Nashville, Tennessee 37243
(615) 741-4349
B.P.R. No. 18208

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE ISSUES TO BE PRESENTED . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    I. THE EVIDENCE SUPPORTS THE FINDING OF THE
    JURY THAT HALL COMMITTED FIRST DEGREE
    PREMEDITATED MURDER. . . . . . . . . . . . . . . . . . . . . . . . . . 17

    II. THE TRIAL COURT PROPERLY ADMITTED
    PHOTOGRAPHS OF THE VICTIM'S INJURIES DURING
    THE SENTENCING PHASE, SINCE THEY WERE
    RELEVANT AND ESSENTIAL TO ESTABLISH THE (i)(5)
    AGGRAVATING CIRCUMSTANCE. . . . . . . . . . . . . . . . . . . . 23

    III. THE EVIDENCE PRESENTED DURING THE GUILT
    AND SENTENCING PHASE OF THE TRIAL
    SUPPORTED THE JURY'S FINDING OF THE (i)(5)
    AGGRAVATING CIRCUMSTANCE. . . . . . . . . . . . . . . . . . . . 26

    IV. THE SENTENCE OF DEATH IS NEITHER
    EXCESSIVE NOR DISPROPORTIONATE TO THE
    PENALTY IMPOSED IN SIMILAR CASES,
    CONSIDERING BOTH THE NATURE OF THE CRIME
    AND THE DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    V. HALL WAIVED HIS CHALLENGE TO THE
    INSTRUCTION THAT THE JURY MUST AGREE
    UNANIMOUSLY IN ORDER TO IMPOSE A LIFE
    SENTENCE; BUT, IN ANY EVENT, THIS CONTENTION
    IS WITHOUT MERIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

i

VI.  THE TRIAL COURT PROPERLY EXCLUDED THE
TESTIMONY OF THE DEFENDANT'S SISTER, CHERYL
ARBOGAST, ON THE ISSUE OF THE DEFENDANT'S
STATE OF MIND PRIOR TO THE MURDER SINCE SHE
HAD NOT SPOKEN TO HIM IN SEVERAL MONTHS.  . .  40

VII.  THE TRIAL COURT DID NOT VIOLATE THE
DEFENDANT'S  RIGHT  TO  TESTIFY  BY  NOT
REMOVING  THE  AMERICAN  FLAG  FROM  THE
COURTROOM AND, FURTHERMORE, HALL WAIVED
THIS ISSUE BY FAILING TO RAISE IT IN HIS MOTION
FOR NEW TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

## CASES

*Franks v. State,*
     187 Tenn. 174, 213 S.W.2d 105 (1948) . . . . . . . . . . . . . . . . . . . . . 19

*Jackson v. Virginia,*
     443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) . . . . . . . 17,26

*Leonard v. State,*
     155 Tenn. 325, 292 S.W. 849 (1927) . . . . . . . . . . . . . . . . . . . . . 19

*McKoy v. North Carolina,*
     494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) . . . . . . . 38

*Mills v. Maryland,*
     486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988) . . . . . . . 38

*Pressley v. State,*
     30 S.W.2d at 232-233 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rock v. Arkansas,*
     483 U.S. 44, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) . . . . . . . . . 44

*State v. Banks,*
     564 S.W.2d 947 (Tenn. 1978) . . . . . . . . . . . . . . . . . . . . . . 23,25,41

*State v. Brimmer,*
     876 S.W.2d 75 (Tenn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*State v. Brown,*
     836 S.W.2d 530 (Tenn. 1992) . . . . . . . . . . . . . . . . . . . . . . 18,19,21

*State v. Cabbage,*
     571 S.W.2d 832 (Tenn. 1978) . . . . . . . . . . . . . . . . . . . . . . . . 17,26

*State v. Cazes,*
     875 S.W.2d 253 (Tenn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State v. Cooper,*
      718 S.W.2d 256 (Tenn. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,36

*State v. DePriest,*
      697 S.W.2d 597 (Tenn. Crim. App. 1985) . . . . . . . . . . . . . . . . . 44

*State v. Hall,*
      958 S.W.2d 679 (Tenn. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 34,35,39

*State v. Hodges,*
      944 S.W.2d 346 (Tenn. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 27,30

*State v. Howell,*
      698 S.W.2d 84 (Tenn. Crim. App. 1985) . . . . . . . . . . . . . . . . . . 22

*State v. Hutchinson,*
      898 S.W.2d 161 (Tenn. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*State v. Jesperson,*
      Monroe County, No. 03C01-9206-CR-00212
      (Tenn. Crim. App., filed August 11, 1993, at Knoxville) . . . . . . . . 19

*State v. Johnson,*
      743 S.W.2d 154 (Tenn. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*State v. Jon Douglas Hall,*
      Madison County, No. 02C01-9703-CC-00095
      (Tenn. Crim. App., filed, April 29, 1998, at Jackson) . . . . . . . . . . . 4

*State v. King,*
      718 S.W.2d 241 (Tenn. 1986),here . . . . . . . . . . . . . . . . . . . . . . . 39

*State v. McNish,*
      727 S.W.2d 490 (Tenn. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*State v. Melson,*
      638 S.W.2d 342 (Tenn. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*State v. Miller,*
      674 S.W.2d 279 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*State v. Miller,*
    771 S.W.2d 401 (Tenn. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,35

*State v. OGuinn,*
    709 S.W.2d 561 (Tenn. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,37

*State v. Odom,*
    928 S.W.2d 18 (Tenn. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*State v. Payne,*
    791 S.W.2d 10 (Tenn. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State v. Porterfield,*
    746 S.W.2d 441 (Tenn. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State v. Sheffield,*
    676 S.W.2d 542 (Tenn. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Shelton,*
    854 S.W.2d 116 (Tenn. Crim. App. 1992) . . . . . . . . . . . . . . . . . . . 21

*State v. Smith,*
    857 S.W.2d 1 (Tenn. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*State v. Smith,*
    868 S.W.2d 561 (Tenn. 1993) . . . . . . . . . . . . . . . . . . . . . . 23,24,25,35

*State v. Smith,*
    893 S.W.2d 908 (Tenn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State v. Williams,*
    657 S.W.2d 405 (Tenn. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*State v. Williams,*
    690 S.W.2d 517 (Tenn. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Grayson,*
    438 U.S. 41, 98 S. Ct. 2610, 57 L. Ed. 2d 582 (1978) . . . . . . . . . 44

**STATUTES**

Tenn. Code Ann. § 39-11-503(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Tenn. Code Ann. § 39-13-202(a)(1) (1991 Repl.) . . . . . . . . . . . . . . . . . . . 17

Tenn. Code Ann. § 39-13-204(i)(5), (6), & (7) . . . . . . . . . . . . . . 3,23,26,35

Tenn. Code Ann. § 39-13-206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,32

**COURT RULES**

Tenn. Rule Evid. 804(b)(1)-(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## STATEMENT OF THE ISSUES TO BE PRESENTED

### I.

Was the evidence sufficient to convict Hall of premeditated first degree murder?

### II.

Did the trial court properly admit photographs of the victim's injuries taken by the medical examiner since they were relevant and essential to establish the (i)(5) aggravating circumstance?

### III.

Was the evidence sufficient to support the jury's finding of aggravating circumstance (i)(5)?

### IV.

Is the sentence of death excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant?  (Defendant's issue III. i.)

### V.

Did Hall waive any challenge to the instruction that the jury must agree unanimously in order to impose a life sentence and, if not, was the trial court's instruction proper?  (Defendant's issue IV)

VI.

Did the trial court properly exclude the testimony of the defendant's sister, Cheryl Arbogast, on the issue of the defendant's state of mind prior to the murder since she had not spoken to him in several months?  (Defendant's issue V)

VII.

Did Hall waive his claim that, by not removing the American flag from the courtroom, the trial court violated his right to testify, and, if not, is this issue without merit?  (Defendant's issue VI)

2

## STATEMENT OF THE CASE

On October 3, 1994, the Grand Jury of Henderson County indicted Jon Douglas Hall for the premeditated murder of Billie Jo Hall, two counts of theft of property, and especially aggravated kidnapping. (I, 1-5).[1] The State filed its notice of intent to seek the death penalty, citing three aggravating circumstances.[2] (I, 6). The trial court granted a change of venue, and the case was moved from Lexington, Henderson County, Tennessee to Jackson, Madison County, Tennessee. (II, 152).

On February 3-5, 1997, the court conducted a trial on the first degree premeditated murder charge. The jury found the defendant guilty as charged. (VI, 375). During the penalty phase, the trial court instructed the jury on two aggravating circumstances[3], and the jury, finding the heinous, atrocious, or cruel aggravating circumstance applicable and no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance, sentenced the defendant to death. (VI, 449). On February 25, 1997, the trial court approved

---

[1] The record consists of seven volumes. The two volumes of the Technical Record will be referred to as "I" and "II," respectively. The four volumes containing the transcript of the trial and sentencing hearing will be referred to as "III," "IV," "V," and "VI." The motion for new trial transcript will be referred to as "VII." References will be made to the appropriate volume and page number. The parties will be referred to as the "defendant" or "Hall" and the "State."

[2] Tenn. Code Ann. § 39-13-204(i)(5), (6), & (7).

[3] Tenn. Code Ann. § 39-13-204(i)(5) & (6).

3

the jury's verdict and sentenced the defendant to death. (II, 179).          O     n
March 7, 1997, the defendant filed a motion for new trial. (II, 202-203). After
a hearing, the trial court overruled the motion. (II, 215). The defendant filed a
timely notice of appeal. (II, 229).

After the filing of briefs from both parties and hearing oral
argument, the Court of Criminal Appeals affirmed Hall's conviction for first
degree murder and his sentence of death by electrocution. *State v. Jon Douglas
Hall*, Madison County, No. 02C01-9703-CC-00095 (Tenn. Crim. App., filed,
April 29, 1998, at Jackson). This case is properly before this Court pursuant to
the automatic review procedure set forth in Tenn. Code Ann. § 39-13-206(a)(1)
and Supreme Court Rule 12.

4

# STATEMENT OF THE FACTS

## GUILT PHASE

## STATE'S PROOF

During the late hours of July 29, 1994, Jon Hall, the defendant, arrived at the residence of his estranged wife, Billie Jo Hall. (IV, 241, 260, 277). Before making his presence known, the defendant opened the phone junction box and disconnected the phone line. (IV, 201, 228). Mrs. Hall and her daughters sat in the living room watching television when the defendant knocked at the front door. (IV, 241). Mrs. Hall and her daughter, Cynthia, went to the door. (IV, 241, 260). The defendant pushed his way into the residence and entered the kitchen. (IV, 242). Mrs. Hall sat in a kitchen chair, and the defendant ordered the children to go to bed. (IV, 242-243, 277). Eventually, the children went to their bedrooms but, before going to bed, Stephanie Lambert observed the defendant knock her mother out of the kitchen chair. (IV, 243). After being pushed from the chair, Mrs. Hall went to her bedroom and the defendant followed her. (IV, 243).

From their bedrooms, the children heard their mother yelling and objects being slammed around in the master bedroom. (IV, 243, 261, 277). The defendant placed a vacuum cleaner and sewing machine by the door, evidently to prevent Mrs. Hall's escape and to prevent the children from entering the room.

(IV, 244, 262, 277). Nonetheless, the children eventually gained entry into the master bedroom and observed the defendant and their mother engaged in a fight. (IV, 262, 278). Both Jennifer and Cynthia attempted to stop the fight, and Cynthia even jumped on the defendant's back and bit him. (IV, 262, 278). Mrs. Hall told her daughters to go to the neighbor's house next door, but the defendant threatened that he would kill their mother if they went for help. (IV, 244, 262). Cynthia and Stephanie attempted to call 911 from their residence, but the phones did not work. (IV, 262). The two girls then proceeded to their neighbor's home and called 911. (IV, 263).

After the children unsuccessfully attempted to stop the altercation, Mrs. Hall fled the house with the defendant chasing her. (IV, 278). Jennifer Lambert observed the defendant drag a kicking and screaming Mrs. Hall to the pool.[4] The defendant continued the extensive beating which consisted of eighty-three separate blows. (IV, 302). Mrs. Hall ultimately died from asphyxia as a result of compressive forces applied to the neck, with a possible contribution of drowning. (IV, 291). After killing his wife, the defendant grabbed the keys to Mrs. Hall's van and fled the scene. (IV, 211, 229).

Jerry Bingham of the Henderson County Sheriff's Department

---

[4]Jennifer Lambert was taking care of her little sister, Jessica, who suffered from cerebral palsy. Jennifer took her little sister next door to the neighbor's home. (IV, 279-280).

6

arrived at the Hall residence at approximately 11:55 p.m. (IV, 192-193). Upon exiting his patrol car, Officer Bingham heard a gentleman yelling for him to go to the pool. (IV, 193). Bingham went to the pool and found a body floating in the water. (IV, 193).

Brian Byrd, an agent with the Tennessee Bureau of Investigation, investigated the murder of Billie Jo Hall. (IV, 195). Byrd found the Hall residence in disarray. (IV, 196). When Byrd first arrived, he noticed wet footprints on the carpet in the house and wet impressions on the wooden deck. (IV, 211). Byrd also noticed signs that indicated a struggle had occurred in the master bedroom. (IV, 196). Byrd observed blood stains and spatters covering the room. (IV, 198). Specifically, Byrd found blood in a corner of the room and on the bed, a transfer stain on a white wedding gown, and an ashtray with a red stain. (IV, 199). The comforter on the bed was twisted and messed up. (IV, 199). Byrd exited the room and observed a blood spot in the home's entrance hall and a weight pin lying on the floor. (IV, 200). In the living area, Byrd found that the telephones had been taken off of the hook. (IV, 200-201).

Byrd exited the residence through the front door onto a large front porch. (IV, 201). To the right of the porch, Byrd observed that the phone junction box was open and that the phone line had been disconnected. (IV, 201). Byrd also noticed that the vegetation underneath the box was matted down. (IV,

7

201).  The porch led to the driveway area where he found a spot of blood over one hundred feet from the front door.  (IV, 203).  Byrd followed an eighty-foot trail from the driveway to the pool that appeared to have been caused by someone being dragged across the ground.  (IV, 203-204).  Byrd found the ground to be sparsely covered with dry grass and observed impressions which resembled footprints.  (IV, 204).  The footprints appeared twisted and turned as if there had been a great struggle along the trail.  (IV, 204).  Byrd also found grass that had been pulled up by the roots along the trail, which further indicated a struggle.  (IV, 204).  At the end of the trail, Byrd located a swimming pool full of water.  (IV, 204-205).  Byrd observed that the pool water had a pinkish color and found grass with the roots still attached floating in the pool.  (IV, 203-204).

During the criminal investigation, the defendant developed as a suspect.  (IV, 205).  Law enforcement officials arrested the defendant at his brother's residence in Bell County, Texas.  (IV, 206, 218).  Byrd first observed the defendant in an interview room at the Bell County justice complex.  (IV, 219).  In Texas, Byrd located the vehicle which had been driven by the defendant to Texas.  (IV, 220).

Chris Dutton, an inmate incarcerated next to the defendant at Riverbend Maximum Security Institution, testified that Hall had discussed the killing of his wife with him.  (IV, 223-225).  Hall related that, on the day that he

8

killed his wife, he had contacted her early in the day and made arrangements to take her some money. (IV, 227). Hall told Dutton that he went to Mrs. Hall's residence because "he wanted to make her feel as he did. He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him." (IV, 228). Upon arriving at Mrs. Hall's residence, Hall disconnected the phone line so that she could not call the police. (IV, 228). Hall delivered the money and attempted to get her to listen to him. (IV, 227). Hall related that his estranged wife only wanted the money and refused to listen to him. (IV, 228). When Mrs. Hall refused to listen to the defendant's apparent desire to reconcile, he began to strike her. (IV, 228). Hall told Dutton that his children were present and, also, that the altercation started in the house and proceeded into the yard. (IV, 229). Hall related that he beat his wife on the head until he panicked and threw her into the swimming pool. (IV, 229). Afterwards, Hall went back into the residence, picked up Mrs. Hall's keys, and left in her van. (IV, 229).

Dr. O'Brien Clary Smith performed the autopsy on Billie Jo Hall as a part of his duties as Assistant Medical Examiner. (IV, 285). A visual inspection of Mrs. Hall's body showed various contusions, abrasions, and lacerations. (IV, 288). Smith opined that Mrs. Hall died from asphyxia, a condition in which oxygen has been denied to the body. (IV, 288). Smith found evidence of manual

9

strangulation and also physical changes in the body which indicated that Mrs. Hall might have drowned or drowned while being strangled at the same time. (IV, 288-289). However, the most profound physical changes in the body were those consistent with strangulation by the hand. (IV, 307).

When Dr. Smith examined the contents of Mrs. Hall's stomach, he found two ounces of water on top of the normal gastric contents. (IV, 289). Smith explained that water does not readily mix with gastric contents, and such a finding is common in drowning victims or if a person drank a glass of water shortly before death. (IV, 289). Besides the water in the stomach, Smith testified that the laboratory findings indicated that some dilution of the blood occurred. (IV, 290). Dilution in the blood is caused when a person takes water into the lungs, and the water enters the blood stream. (IV, 290). While the lab results showed dilution, Smith opined that the dilution was not extensive enough to indicate that drowning was the exclusive cause of death. (IV, 290). Based upon all of the results of the autopsy, Smith concluded that Mrs. Hall died as a result of a lack of oxygen caused by compressive forces applied about the neck with a possible contribution of drowning as well. (IV, 291).

In concluding that manual strangulation contributed to Mrs. Hall's death, Smith observed bruises on the front of the neck, in the deep muscles in the neck, and in tissues surrounding the hyoid bone. (IV, 291). Smith also found

10

hemorrhaging around the neck muscles and the hyoid bone. (IV, 291). Smith testified that this indicated extensive compression to the neck. (IV, 291). In the retro-pharyngeal space, the neck area in the back of the throat in the front of the spine, Smith discovered about two ounces of blood. (IV, 291-292). Smith further observed small pin-head size hemorrhages in the whites of Mrs. Hall's eyes and in the various surfaces of the internal organs which are common in asphyxial-type deaths. (IV, 292). The right side of the heart was dilated which can be consistent with both drowning and strangulation. (IV, 292).

Smith also found various injuries to the body not associated with strangulation and drowning. (IV, 292). Smith testified that Mrs. Hall suffered blows to the head and a fracture of the nose. (IV, 292-293). Mrs. Hall swallowed some blood and also breathed blood into her windpipe and lungs. (IV, 293). The body contained multiple skin tears and bruises along with skin scrapes to the chest, abdomen, genitals, arms, legs, and back. (IV, 293). Smith found bruising in the scalp area and behind both ears, but he testified that these injuries did not result in any skull fracture or injury to the brain. (IV, 297). Smith related that these injuries could have been caused by being struck or being propelled into a broad, flat object. (IV, 297). These injuries could also have been caused by grabbing and pulling the hair, which would create a separation of the scalp from the skull. (IV, 297-298). These injuries may have played some role

11

in her death, but the injuries taken by themselves would not be sufficient to produce death.  (IV, 293).

Smith also found various defensive wounds to the forearms and the back of the hands.[5]  (IV, 295).  Additionally, certain injuries to the front of the thighs, knees, and shin area could be interpreted as defensive wounds.

Smith counted eighty-three areas distinguishable enough to suggest that they were inflicted by separate blows.  (IV, 302).  Because of the close proximity of most of the injuries, Smith testified that a precise number was difficult to determine.  (IV, 302).  Smith stated that the body had not produced an inflammatory response, indicating that the injuries had been inflicted within two hours of death and likely over a period of several minutes to a quarter of an hour.  (IV, 304, 308).  Besides a bruise on the right thigh, all of the injuries had the appearance of being contemporaneous.  (IV, 304-305).

DEFENSE PROOF

Dr. Lynn Donna Zager, a clinical psychologist, testified on behalf of the defendant.  (V, 331).  After interviewing the defendant and reviewing his medical records, Zager determined that he suffered from depression both prior to and after the crime.  (V, 333).  Zager opined that at the time of the incident the

_____

[5]Dr. Smith defined a defensive wound as "a forensic term which is used to describe a pattern of injury on various body surfaces indicating that person was trying to ward off a certain type of assault."  (IV, 294-295).

12

defendant was suffering from depression and was intoxicated on alcohol causing his abilities to be compromised. (V, 334-335). Zager testified that she believed that the defendant was acting in an impulsive manner versus a well-thought-out plan. (V, 335).

During cross-examination, Zager admitted that, at first, she was concerned that the intoxication claim came only from the defendant's own statement. (V, 336-337). Zager testified that the diagnostic criteria for alcohol intoxication required a finding of alcohol ingestion and an additional physiological sign such as slurred speech and unsteady gait. (V, 339). Zager could not recall any proof of physiological signs that supported intoxication, except for the defendant's own statements. (V, 340). Zager inferred that the defendant was intoxicated at the time of the offense due to his own statements, information from his family that he started using alcohol at age 15, and that the family saw him intoxicated at times. (V, 338).

Randy Helms, the owner of Helms Motor Company, testified that the defendant had worked for him for about a year and a half. (V, 343-344). Helms last observed the defendant two days before the murder as the defendant prepared to start a new job at Columbus-McKinnon, a chain factory in Lexington. (V, 345). Helms testified that the defendant was severely depressed and talked about his family problems. (V, 345-346).

13

**SENTENCING PHASE**

STATE'S PROOF

Dr. Smith, the medical examiner who conducted the autopsy on Billie Jo Hall, testified again on behalf of the State. As Smith described the injuries suffered by Mrs. Hall, he identified several autopsy photographs that depicted the injuries suffered by Mrs. Hall during the course of the beating. *See* Exhibits 9-25. Smith reiterated that the injuries were intentional and concentrated in the head, face, and neck areas. (VI, 396). Smith identified eighty-three separate injuries on the external skin surface. (VI, 397). The eighty-three external injuries did not include the injuries to the tongue, deep neck, muscles, and the thyroid and hyoid glands. (VI, 397).

DEFENSE PROOF

Dr. Lynn Zager, a psychologist, testified that she interviewed the defendant three times. (VI, 399). Zager also reviewed the defendant's history and interviews of his family members. (VI, 399). Zager testified that the defendant had an alcohol problem just as his father and grandfather. (VI, 399, 402). The defendant was closer to his mother, and the defendant observed spousal abuse occurring between his parents. (VI, 400). Zager opined that the defendant suffered from depression and had suicidal thoughts. (VI, 401). Zager testified that the defendant cared for his children especially his younger daughter

14

who was born with a significant handicap. (VI, 402-403). During the period
before the offense, the defendant and his wife were having domestic problems,
which was one of the stressors the defendant was experiencing at the time of the
offense. (VI, 404-405).

Dr. Joe Mount, a psychological examiner at Riverbend Maximum
Security Institution, testified that he conducted six to eight mental health
evaluations of the defendant. (VI, 405-406). Mount witnessed the defendant
express remorse for the commission of the crime. (VI, 407). The psychiatric
team in the institution diagnosed the defendant as suffering from adjustment
disorder with mixed emotion features. (VI, 408). Mount testified that
depression was included in this diagnosis, and the defendant received a
prescription for an anti-depressant. (VI, 408-409). During his involvement with
the defendant, Mount stated that the defendant showed signs of improvement.
(VI, 409).

Randy Helms, a former employer of the defendant, testified that he
had known the defendant for one and a half to two years before the crime. (VI,
411). Helms related that the defendant was a dependable worker and a good
mechanic. (VI, 412). The defendant sometimes brought his children to work
when he worked on Saturday, and he always took care of them. (VI, 413).
During the last couple of months that the defendant worked for him, his

15

performance dropped. (VI, 414). Helms did not fire the defendant because of his family situation - he departed his job voluntarily. (VI, 415).

The defendant's mother and sisters testified that he grew up in an abusive family. His mother and father fought often, and some of the fights were extremely brutal. The defendant's father also rejected him as his son. (VI, 416-433). The defendant's mother testified that the defendant took very good care of his children. (VI, 432-433).

## ARGUMENT

### I. THE EVIDENCE SUPPORTS THE FINDING OF THE JURY THAT HALL COMMITTED FIRST DEGREE PREMEDITATED MURDER.

The statute applicable at the time that the defendant committed this crime defined first degree premeditated murder as "[a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1991 Repl.). The proof at trial supported all of the elements for first degree premeditated murder, and the jury properly found the defendant guilty of this offense.

When the sufficiency of the evidence is challenged, the standard of review on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This Court does not reweigh the evidence, but presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Hall argues that he beat his wife during an impassioned rage and, therefore, the elements of premeditation and deliberation cannot be met. But the record supports the Court of Criminal Appeals' determination that Hall formed

the requisite premeditation and deliberation prior to the beginning of the brutal attack upon his estranged wife. *See Op.* at 16-17. Moreover, the evidence quite clearly demonstrates that Hall had more than an ample period of time to reflect during the course of beating, dragging, and the manual strangulation of Billie Jo Hall. And, while circumstantial evidence alone can establish the mental state of first degree murder, the record contains both direct and circumstantial evidence of Hall's premeditation, deliberation, and intent to kill. *See State v. Brown,* 836 S.W.2d 530, 541 (Tenn. 1992).

Prior to the murder, Hall had made an implicit threat on his wife's life. Stephanie Lambert, one of their children, testified that Hall had told the victim, who was attending classes in Jackson, "You'll never live to graduate." (IV, 246, 264). After the murder, Hall confided with a fellow prisoner his intentions in going over to his wife's house. Hall told his confidant that he sought reconciliation with his wife but, in the event that she was not receptive to his plan, "he wanted to make her feel as he did. He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him." (IV, 228). Further, prior to entering the home, Hall disconnected the phone lines so that she could not contact the police. (IV, 201, 228).

The Court of Criminal Appeals properly concluded that this evidence showed that Hall had coolly reflected over his intention to murder his

18

wife. Hall had made plans to visit his wife that night and, prior to beginning the beating, Hall intended to hurt her if she was not receptive to his views. This satisfies the requisite premeditation and deliberation since it is well recognized that "if the intent to kill was formed as a result of premeditation and deliberation prior to the crime, it is immaterial that the act was carried out in a state of passion." *State v. Jesperson*, Monroe County, No. 03C01-9206-CR-00212 (Tenn. Crim. App., filed August 11, 1993, at Knoxville) (copy attached); *Slip op.* at 7, *citing Leonard v. State,* 155 Tenn. 325, 292 S.W. 849, 852-853 (1927); *Pressley v. State*, 30 S.W.2d at 232-233; *Franks v. State*, 187 Tenn. 174, 213 S.W.2d 105, 107 (1948); *See also, Brown*, 836 S.W.2d at 542.

Moreover, the proof shows that Hall reflected upon his decision to murder his wife during the course of the attack. On the night of the murder, Hall knocked on the front door of the house and, after Billie Jo Hall told him not to hurt her, he pushed his way into the residence. (IV, 241-242, 260). Hall entered the kitchen while Mrs. Hall seated herself in a chair. (IV, 242). Hall repeatedly told the children to go to their bedrooms and knocked over the chair in which Mrs. Hall was seated. (IV, 243). Mrs. Hall then went to her bedroom followed by the defendant. (IV, 243). Once inside the bedroom, Hall placed a sewing machine and a vacuum cleaner in the bedroom doorway to prevent the escape of Mrs. Hall and to keep the children from entering the room. (IV, 244, 262, 277).

19

The children heard their mother's screams coming from the bedroom and heard objects being thrown against the wall. (IV, 243, 261, 277). The children ultimately gained entrance to the bedroom and found Hall beating his wife. (IV, 262). The children unsuccessfully attempted to stop the beating, but their mother told her daughters to go for help. (IV, 244, 262, 278). In response Hall stated that, if the children went for help, he would kill their mother. (IV, 262, 279).

The children proceeded next door and called for help since the phones in the residence did not work. (IV, 244, 262). Mrs. Hall then exited the bedroom and fled the house. (IV, 278). Hall chased and caught his wife outside the house. (IV, 278). Hall then dragged his wife eighty-feet towards the pool as she kicked and screamed. (IV, 204, 280). Once at the pool, Hall continued to beat his wife and manually strangled her to the point of asphyxiation. (IV, 229, 288-289). Although the exact sequence of events is unclear, Hall, at some point, placed his wife in the pool, causing her to swallow and breathe water into her lungs, which contributed to her asphyxiation. (IV, 289-291).

This evidence shows that, upon entering the house, Hall anticipated and planned a confrontation with Mrs. Hall. The evidence surrounding Hall's entrance in the house suggests that Hall was confrontational from the minute he entered the home. During the beating, Hall stated his intention to kill Mrs. Hall

if the children went for help.  This statement shows that Hall reflected on his decision to kill Mrs. Hall and that her death was not simply a consequence of an enraged beating.  Further, a break in the struggle occurred when Mrs. Hall ran from the residence.  Hall, making good on his threat to kill her, chased Mrs. Hall out the door, caught her, and then dragged her eighty feet to the pool.  The fact that Hall dragged his wife eighty feet to the pool shows not only that Hall reflected upon killing his wife but, also, the manner in which he would commit the murder.  Hall's prior threats against his wife and the cruelty of the killing are all circumstances that can further be considered in determining Hall's state of mind.  *State v. Brown*, 836 S.W.2d at 541-42.  From all this proof, a reasonable juror could conclude that Hall committed an intentional, premeditated, and deliberate murder.

Hall also contends that he could not form the requisite mental state because of his voluntary intoxication.  While voluntary intoxication is not a defense, it is admissible to negate the culpable mental state. *See* Tenn. Code Ann. § 39-11-503(a); *State v. Shelton*, 854 S.W.2d 116, 121 (Tenn. Crim. App. 1992). The only proof of the defendant's intoxication at the time of the offense came from his own self-serving statements.  After the murder, Hall related to his prison confidant that he drank to the point of intoxication on the day of the murder. (IV, 234).  The other evidence of intoxication came from the testimony of Dr.

Zager, who conceded the lack of any physiological evidence of intoxication, and testified that she "inferred" that Hall was intoxicated at the time of the murder because of his own statements and the fact that he had a documented history of alcohol abuse.  (V, 342-343).

The trial court instructed the jury on voluntary intoxication.  A part of this instruction was as follows:  "If you find that the Defendant was intoxicated to the extent that he could not have possessed the required culpable mind, then he cannot be guilty of the offense charged."  (V, 367-368).  The question of whether the appellant was intoxicated to such a degree as to be incapable of forming the requisite specific intent is one for the jury.  *State v. Howell*, 698 S.W.2d 84 (Tenn. Crim. App. 1985).  Here, a properly instructed jury rejected the assertion that Hall's intoxication negated his ability to form the requisite mental state, and the record supports this determination.

The record shows that Hall planned and reflected upon killing his estranged wife prior to entering her home and beginning the extensive beating.  During the course of the attack, Hall stated his intention of killing her, and the attack involved approximately eighty-three separate blows, dragging the victim eighty-feet, and manual strangulation with a contribution of drowning causing Billie Jo Hall's asphyxiation.  This evidence supports the jury's finding that Hall committed an intentional, premeditated, and deliberate murder.

22

II.    THE    TRIAL    COURT    PROPERLY    ADMITTED
PHOTOGRAPHS    OF    THE    VICTIM'S    INJURIES    DURING    THE
SENTENCING PHASE, SINCE THEY WERE RELEVANT AND ESSENTIAL
TO ESTABLISH THE (i)(5) AGGRAVATING CIRCUMSTANCE.

During the sentencing phase of trial, the State admitted photographs that showed the extent of Billie Jo Hall's external injuries. The State sought to prove that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). Dr. O. C. Smith testified that the pictures were taken at the time of the autopsy and showed the external injuries inflicted upon Mrs. Hall's body. (VI, 380-381). These photographs provided the best evidence for the jury to consider the nature and extent of the injuries inflicted upon the victim. Therefore, the trial court did not abuse its discretion in admitting these highly probative photographs during the penalty phase of trial. *See State v. Banks*, 564 S.W.2d 947 (Tenn. 1978).,

This Court has on numerous occasions sustained the trial court's discretion in admitting gruesome and graphic photographs at the sentencing phase of trial to establish aggravating circumstance (i)(5). *See State v. Smith*, 893 S.W.2d 908, 924 (Tenn. 1994); *State v. Cazes*, 875 S.W.2d 253, 263 (Tenn. 1994); *State v. Smith*, 868 S.W.2d 561, 579 (Tenn. 1993); *State v. Payne*, 791 S.W.2d 10, 19-20 (Tenn. 1990)(videotape); *State v. Miller*, 771 S.W.2d 401, 403-404 (Tenn. 1989); *State v. Porterfield*, 746 S.W.2d 441, 449-450 (Tenn.

23

1988); *State v. McNish*, 727 S.W.2d 490, 494-495 (Tenn. 1987). In upholding the admission of photographs to support aggravating circumstance (i)(5), the *McNish* Court stated that "[w]hile undoubtedly prejudicial to the accused, at this stage of the proceedings and in view of the aggravating circumstance alleged, [the photographs] were highly probative of the nature and extent of the injuries inflicted upon the helpless victim." *McNish*, 727 S.W.2d at 495.

Hall argues that the photographs were cumulative of the testimonial evidence of Dr. Smith and served merely to inflame the jury. However, the State had to prove beyond a reasonable doubt that the murder was "especially heinous, atrocious or cruel" and that the murder involved "torture or serious physical abuse beyond that necessary to cause death." The proffered photographs were essential to show the jury the nature and extent of the injuries inflicted on the victim.

In *State v. Smith, supra*, this Court upheld the admission of gruesome photographs that related directly to the issues of torture or depravity. 868 S.W.2d at 579. In so doing, the *Smith* Court stated:

> Both photographs are undeniably gruesome; however, we are of the opinion that the trial court did not err in admitting the photographs. . .The photograph of Jason Burnett reveals the full extent of the abdominal wounds and illustrates the mistreatment suffered by the victim. The photograph of Chad Burnett shows the multiplicity and viciousness of the wounds inflicted upon him. Their probative value was not

24

> substantially outweighed by the danger of unfair
> prejudice.

*Id.* [*citations omitted*].  Likewise, in this case, the photographs evinced the nature

and extent of the injuries suffered by Billie Jo Hall during the extensive beating,

dragging, and strangulation that occurred at the hands of the defendant.

Additionally, in *Smith*, this Court upheld the admission of photographs during the

guilt phase of trial because they illustrated the testimony of the medical examiner.

*Id.* at 576.

Hall does not contend that the photographs admitted during the

penalty phase were irrelevant to the (i)(5) aggravating circumstance.  He simply

argues that the evidence was cumulative and unfairly prejudicial.  But "[t]he

admissibility of photographs lies within the discretion of the trial court whose

ruling in this respect will not be overturned on appeal except upon a clear showing

of an abuse of discretion."  *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978).

The trial court required the State to eliminate any photographs that would be

redundant.  (VI, 387-388).  And, as stated previously, the photographs illustrated

the testimony of the medical examiner and provided the best evidence regarding

the nature and extent of the injuries inflicted upon the victim.  The trial court did

not abuse its discretion in admitting these photographs, which were essential to

prove the aggravating circumstance relied upon by the State.

III.  THE EVIDENCE PRESENTED DURING THE GUILT AND SENTENCING PHASE OF THE TRIAL SUPPORTED THE JURY'S FINDING OF THE (i)(5) AGGRAVATING CIRCUMSTANCE.

On appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  This Court does not reweigh or reevaluate the evidence.  *Id*.  The jury's finding, therefore, will only be disturbed if, after a consideration of the evidence in the light most favorable to the State, a rational trier of fact could not have found the existence of the aggravating circumstance beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983).

In this case, the defendant contends that the State failed to prove aggravating circumstance (i)(5) beyond a reasonable doubt.  This aggravator applies when the State proves that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."  Tenn. Code Ann. § 39-13-204(i)(5).  The proof showed that the defendant used his hand to manually strangle Mrs. Hall to death. The medical proof also showed signs of drowning which may have been caused by the defendant strangling the victim in the small swimming pool.  Additionally, Mrs. Hall suffered eighty-three separate blows to her body besides the injuries

26

inflicted by the manual strangulation. The evidence showed that Mrs. Hall's murder was especially heinous, atrocious and cruel, and that the murder involved torture and serious physical abuse beyond that necessary to cause death.

The trial court properly instructed the jury as to the definitions of the terms, "heinous," "atrocious," and "cruel," as defined by this Court in *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985). (VI, 441). The trial court also correctly defined "torture" and "serious physical abuse." (VI, 441). The trial court defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *See State v. Hodges*, 944 S.W.2d 346, 357 (Tenn. 1997); *State v. Williams, supra*. The charge on "serious physical abuse" instructed that "serious" indicated a matter of degree. *See State v. Odom*, 928 S.W.2d 18, 26 (Tenn. 1996). The instruction further required that the abuse be physical as opposed to mental, and that it must be "beyond that" or more than what is "necessary to produce death." *Id.* Further, for the establishment of "abuse," the act must be excessive or must make use of a thing "in a manner contrary to the natural or legal rules for its use." *Id.*

Dr. Smith testified that the multiple blows inflicted upon Mrs. Hall occurred during her life.[6] (IV, 293). The autopsy revealed that the defendant

---

[6]Dr. Smith testified that all but one bruise on the leg appeared contemporaneous with the defendant's attack. (IV, 304-305). He opined that the injuries occurred in a two-hour period but likely within a period of several minutes to a quarter of an hour. (IV, 308).

struck Mrs. Hall at least eighty-three separate times. (IV, 302); (IV, 397). The defendant targeted the head, neck, and face areas during his attack. (IV, 306). The blows to the face caused a fracture of the nose, which resulted in Mrs. Hall breathing blood down her windpipe and into her lungs. (IV, 293). Besides the targeted areas, the defendant caused multiple skin tears, bruises and skin scrapes to the chest, abdomen, genitals, extremities, and back. (IV, 293). Smith found defensive wounds on the forearms, the back of the hands, and in the thigh, knee, and shin areas. (IV, 294-295).

During the course of the attack, the defendant dragged Mrs. Hall at least eighty feet from the driveway to the swimming pool. (IV, 204). Mrs. Hall kicked and screamed as she attempted to escape from the defendant. (IV, 280). Mrs. Hall suffered injury to the scalp area, which was consistent with being pulled by the hair. This caused the scalp to be pulled away from the skull. (VI, 395-396). A number of injuries were consistent with being dragged across asphalt or hard

ground. (VI, 390-391, 396).

The defendant caused Mrs. Hall's death by using his hand to manually strangle her to the point of asphyxiation. (IV, 307). Dr. Smith found bruising on the left and right sides of the neck, the deep muscles in the neck, and the tissues surrounding the hyoid bone. (IV, 291). On the left side, the autopsy

28

revealed that the thyroid gland bled. (IV, 291). All of these injuries indicated that the defendant used an excessive compression force to the neck. (IV, 291).

The proof also showed signs of drowning and, from this proof, the jury could have inferred that the defendant strangled Mrs. Hall while submerging her air passages in water. Dr. Smith could not state with a medical certainty that the strangulation occurred inside the pool, but the autopsy showed that drowning may have contributed to Mrs. Hall's death by asphyxiation. (IV, 289-290, 307). The water found in the stomach was inhaled in her body while she remained alive. (IV, 290). The autopsy showed that water had begun to enter the blood stream, a condition known as dilution. (IV, 290). The lungs had filled with some fluid and had begun to collapse. (IV, 292). This water entered Mrs. Hall's body while she remained alive and attempted to fill her body with life-giving oxygen. (IV, 290).

The infliction of all of these injuries constituted torture and serious physical abuse. The defendant caused both severe physical and mental pain during the course of the beating, dragging, and strangulation of the victim. The proof shows that Mrs. Hall remained alive during this attack as evinced by the ingestion of the pool water into her lungs. Also, the autopsy revealed multiple defensive wounds from the attack, and investigators found grass that had been pulled up by the roots by Mrs. Hall as she was drug to the pool. One cannot even

29

conceive the physical and mental pain suffered by Mrs. Hall in this attack but, certainly from this proof, a reasonable jury could find torture as defined by the courts in this state.

Moreover, Mrs. Hall also suffered serious physical abuse. The defendant inflicted eighty-three separate blows during the attack. Clearly, the jury could have found this to be "excessive." These injuries, alone, would be insufficient to cause death and, since death occurred by asphyxiation, were beyond that necessary to cause death. (IV, 293). In addition to the multiple blows, the proof showed that the defendant manually strangled the victim, shutting off her air passages. The strangulation caused hemorrhaging in the eyes and various internal organs. (IV, 292). The proof also suggests that the defendant strangled the victim while holding her submerged in the swimming pool. The body filled with water, the lungs began to collapse, and the right side of the heart dilated.

The facts and circumstances of this crime, including the strangulation, support the finding by the jury that the murder was especially heinous, atrocious, or cruel and that it constituted torture and severe physical abuse beyond that necessary to produce death. *See State v. Hodges*, 944 S.W.2d at 358. The record supports the jury's determination that the State proved aggravating circumstance (i)(5) beyond a reasonable doubt.

30

IV.    THE SENTENCE OF DEATH IS NEITHER EXCESSIVE NOR DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES, CONSIDERING BOTH THE NATURE OF THE CRIME AND THE DEFENDANT.  (Defendant's issue III. i.)

Hall contends that the statutorily mandated proportionality review in this State for all cases in which the sentence of death has been imposed is conducted in violation of due process.  He asserts that no meaningful method of review has been established.[7]  Contrary to the contention of Hall, the legislature has prescribed a guide for the review of cases in which the jury has returned a sentence of death.  The death penalty statute requires the courts that review death sentences to determine whether:

> (1)    The sentence of death was imposed in an arbitrary fashion;
>
> (2)    The evidence supports the jury's finding of a statutory aggravating circumstance or statutory circumstances;
>
> (3)    The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
>
> (4)    The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

---

[7]Hall also asserts that the failure of the Tennessee capital sentencing scheme to require that the jury report what mitigating circumstances were found prevents an adequate appellate review.  This issue has been rejected by this Court.  *See e.g., State v. Smith*, 857 S.W.2d 1, 22 (Tenn. 1993); *State v. Melson*, 638 S.W.2d 342, 368 (Tenn. 1982).

Tenn. Code Ann. § 39-13-206(c)(1)(A)-(D).

As discussed previously, the evidence overwhelmingly supports the jury's finding that the murder was especially heinous, atrocious, or cruel. The record also supports the conclusion of the jury that this aggravating circumstance outweighed the mitigation presented. Further, when considering the nature of this crime and defendant, one can easily conclude that the jury did not arbitrarily impose the sentence of death.

The statute also requires that the reviewing courts determine whether the sentence of death is excessive or disproportionate to similarly situated cases and defendants. This Court in *State v. Bland*, maintained the long-standing precedent-seeking method as the procedure utilized by the courts in this state for conducting a comparative proportionality review. 958 S.W.2d 651, 665 (Tenn. 1997). This Court clarified that a comparative review requires a comparison of only those cases "in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death by electrocution, regardless of the sentence actually imposed." *Id.* at 666 [*footnote omitted*].

Still, comparative proportionality review is not a rigid, objective test. *Id.* at 668, *citing State v. Cazes*, 875 S.W.2d 253, 270 (Tenn. 1994). This review "eliminate[s] the possibility that a person will be sentenced to death by the action

32

of an aberrant jury and to guard against the capricious or random imposition of the death penalty." *Id.* at 665. Accordingly, a proportionality review considers the nature and circumstances of the crimes that are claimed to be similar, including the statutory aggravating circumstances found by the jury and the evidence of mitigating circumstances. *Id.* at 667. Additionally, the character and record of the defendant involved should be considered. *Id.* "[T]he sentence of death is not disproportionate, unless, the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *Id.* at 668. A review of the nature and circumstances of this crime, along with the character and record of the defendant, supports the finding that the sentence of death by electrocution was not disproportionate in this case.

In this case, the proof showed that Hall planned to go to his estranged wife's home to settle their differences. Hall knew that a peaceful resolution to their difficulties would not occur so he disconnected the phone line before entering the home to prevent his wife from calling the police. (IV, 201, 235). Hall knocked on the door and, when his Mrs. Hall opened the door, he pushed his way into the house. (IV, 241-242, 260). After entering the house, Hall began the extensive beating of Mrs. Hall in her bedroom. Mrs. Hall fled the house only to be caught by Hall and dragged violently eighty feet through the backyard to the swimming pool. At the pool, Hall continued the beating,

33

manually strangled, and threw Mrs. Hall into the swimming pool. Mrs. Hall ultimately died of asphyxiation.

In mitigation, Hall presented expert testimony that he had an alcohol problem, that he was depressed, and that he had suicidal thoughts. (VI, 399, 402, 401). Hall also introduced proof that he observed spousal abuse between his parents, and his father rejected him as a son. (VI, 400, 416-433). Witnesses related that Hall was a good father. (VI, 413, 432-433). A former employer testified that Hall had been a dependable worker. (VI, 412).

Several cases in which the sentence of death has been imposed are similar to both the nature of the crime and the background of the defendant. For instance, in *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), the twenty-year-old defendant and the victim had resided together for several years until a few weeks before the murder when the victim moved out of the residence. *Id.* at 683. During the weeks prior to the murder, the defendant harassed the victim and set the victim's vehicle on fire twice. *Id.* at 684. Ultimately, the defendant murdered his ex-girlfriend by throwing a gasoline bomb on the victim as she sat in her vehicle. *Id.* at 683-84. The victim suffered burns over ninety-five percent of her body, and she remained conscious and in constant pain until shortly before her death. *Id.* As in this case, the defendant presented evidence that he was upset by the separation between him and the victim and, also, that he was intoxicated at

the time of the murder. *Id.* at 685. The jury sentenced Hall to death finding two aggravating circumstances, Tenn. Code Ann. § 39-13-204(i)(5) & (7).

In *Hall*, this Court cited several cases that involved the murder of a spouse or girlfriend. *See State v. Johnson*, 743 S.W.2d 154 (Tenn. 1987); *State v. Miller*, 674 S.W.2d 279 and 771 S.W.2d 401 (Tenn. 1989); *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993). In *Johnson, supra,* the thirty-three year old defendant and his wife had difficulties during their marriage, and the defendant's wife had threatened separation on various occasions. 743 S.W.2d at 155. The *Johnson* Court, although declining to fully describe the manner in which the defendant killed his wife, stated as follows:

> It is sufficient to state that a large plastic garbage bag had been forced into her mouth, resulting in her strangulation and asphyxiation. She bled from the nose and ears, and traces of blood were found on a couch in the office where her death occurred. There was testimony that she would have been conscious during the terrifying ordeal and that from one to four minutes would have elapsed before she expired.

*Id.* at 156. As in this case, death resulted from strangulation and asphyxiation. In *Johnson*, the motive for the unprovoked murder arose from the defendant's desire to prevent his wife from learning of his affair with another woman and possibly leaving him. *Hall,* 958 S.W.2d at 700-01.

In *State v. Cooper*, 718 S.W.2d 256 (Tenn. 1986), the defendant was sentenced to death for murdering his wife who had previously filed for a divorce.

*Id.* at 257.   During the several weeks preceding the homicide, the defendant harassed, threatened and intimidated his wife.  *Id.*  The day before the homicide the defendant threatened his wife's life and stated his intention to purchase a gun.  *Id.*  On the day of the murder, the defendant acquired a shotgun and went to the service station where his wife worked numerous times.  *Id.* at 258.  While at the service station on one occasion, the defendant threatened to kill his wife and then left.  *Id.*  The defendant returned later with the shotgun and shot his wife four times in the small brick-and-glass booth in which she worked.  *Id.* at 257. As in this case, the defendant asserted that the death penalty was inappropriate because he committed the homicide under the influence of extreme mental or emotional disturbance.  *Id.* at 256-57.  This Court rejected this contention, and upheld the imposition of the death penalty based upon the (i)(5)aggravator.  *Id.*

In  *State v. O'Guinn*, 709 S.W.2d 561 (Tenn. 1986), the circumstances of the murder closely paralleled this case, and the jury found only the (i)(5) aggravating circumstance as found in this case.  At the hands of the defendant, the victim suffered a severe and brutal beating.  *Id.* at 563.  The victim's injuries consisted of both offensive and defensive wounds to her chest, arms, and head.  *Id.*  And, as in this case, death resulted from strangulation and not from the injuries received through the extensive beating.  *Id.*  The defendant used a halter top to cut off the victim's air supply and, once the force was applied

36

to the victim's neck, she would have remained conscious from three to four minutes. *Id.* The victim also had injuries consistent with having a tire tool forcefully inserted into her vagina. *Id.* Like the mitigation proof in this case, the proof showed that O'Guinn's father had essentially rejected him and forced him to run away from home at age thirteen or fourteen. *Id.* at 563-64.

A review of the circumstances of the murder in this case and the background of the defendant shows that the sentence of death is not disproportionate to other similarly situated cases. Twenty-nine year old Hall brutally beat his wife in front of their children and chased her as she attempted to escape. Hall caught his fleeing wife and dragged her eighty feet as she kicked and struggled to the pool located in the backyard. Upon reaching the pool, Hall placed his hands around his wife's neck and closed off her air passages, causing her to suffocate. Hall, at some point, threw his wife's body into the pool where she ingested water into her lungs. The facts and circumstances of this crime support the application of the death penalty in this case.

37

V.  HALL WAIVED HIS CHALLENGE TO THE INSTRUCTION THAT THE JURY MUST AGREE UNANIMOUSLY IN ORDER TO IMPOSE A LIFE SENTENCE; BUT, IN ANY EVENT, THIS CONTENTION IS WITHOUT MERIT.  (Defendant's issue IV)

Although not raised previously in his motion for new trial or to the Court of Criminal Appeals, Hall argues that the trial court erred by instructing the jury that they must agree unanimously in order to impose a sentence of life imprisonment.  He further asserts that this instruction intrudes on his right to have each juror consider and give effect to his mitigating circumstances.  Initially, the State submits that any challenge to this instruction has been waived by Hall's failure to raise it in his motion for new trial and to the Court of Criminal Appeals. T.R.A.P. 3(e) & T.R.A.P. 36(a).  Nonetheless, this Court has rejected these contentions repeatedly.

Hall asserts that instructing the jury that it must agree unanimously in order to impose a sentence of life imprisonment violates the holdings of the United States Supreme Court in *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) and *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).  This Court specifically rejected this argument in *State v. Brimmer*, 876 S.W.2d 75 (Tenn. 1994).  In *Brimmer*, this Court stated:

> These cases stand for the principle that any requirement that the jury must find a mitigating circumstance unanimously before it can be considered

38

> violates the Eighth Amendment. A requirement of a
> unanimous verdict does not violate these principles.
> As this Court said in *State v. King*, 718 S.W.2d 241,
> 249 (Tenn. 1986), '[t]here is no way a jury can
> impose a sentence if it is not unanimous in its
> decision.'

*Id.* at 87; *See also*, *State v. Hall*, 958 S.W.2d 679, 718 (Tenn. 1997) [*citing cases*].

Further, the trial court's charge stated: "There is no requirement of jury unanimity as to any particular mitigating circumstance or that you agree on the same mitigating circumstance." (VI, 443-444). The jury's verdict must be unanimous, but this requirement does not affect the ability of the jury to consider and give weight to mitigating circumstances. This issue, while waived, is likewise without merit.

39

VI.    THE TRIAL COURT PROPERLY EXCLUDED THE
TESTIMONY OF THE DEFENDANT'S SISTER, CHERYL ARBOGAST, ON
THE ISSUE OF THE DEFENDANT'S STATE OF MIND PRIOR TO THE
MURDER SINCE SHE HAD NOT SPOKEN TO HIM IN SEVERAL MONTHS.
(Defendant's issue V)

During the guilt phase, the defendant called his sister, Cheryl

Arbogast, to testify in his defense.[8]  After an objection by the State, counsel for

the defendant stated that Arbogast knew the defendant's state of mind at the

time of the murder.  (V, 315). The trial court conducted a jury-out hearing and,

at the conclusion of the hearing, ruled Arbogast's testimony inadmissible.  (V,

327).

During the offer of proof, Arbogast testified that she resided in

Cincinnati.  (V, 314).  On the night of the crime, Arbogast learned from her other

brother, Jeff Hall, that the defendant was crying and distraught.[9]  (V, 317).  Since

Jeff Hall lived in Texas, any information regarding the defendant's mental state

on the day of the murder would have been based upon a phone conversation with

the defendant and not Jeff Hall's personal observations.  *See* (IV, 218).  The offer

of proof involved an attempt by the defendant to have his sister testify as to the

statements of Jeff Hall.  Arbogast testified that she had not observed the

defendant personally and admitted that she based her testimony upon

---

[8]Arbogast was permitted to testify during the penalty phase.  (VI, 430-431).

[9]Jeff Hall died in July of 1995.  (V, 319).

40

information provided by another person. (V, 327). In fact, Arbogast admitted that she had not spoken with the defendant for several months prior to the time of the murder. (V, 328).

Trial courts have broad discretion in determining whether to admit evidence. *See State v. Hutchinson*, 898 S.W.2d 161, 172 (Tenn. 1995); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Furthermore, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tenn. R. Evid. 602. In this case, the proof showed that Arbogast did not have any personal knowledge as to the state of mind of the defendant before or at the time of the commission of the crime. On the date of the offense Arbogast was at her home in Cincinnati, and she had not spoken with the defendant in several months. Therefore, the trial court properly ruled her testimony inadmissible regarding the defendant's state of mind since she lacked any personal knowledge. Essentially, the defendant seeks to have statements made by him to his deceased brother, Jeff Hall, admitted through the testimony of Arbogast. No exception to the hearsay rule would allow Arbogast to testify to statements made by her deceased brother, Jeff Hall. *See* Tenn. R. Evid. 803 & 804.

The defendant argues that, because of Jeff Hall's death prior to trial, his brother meets the definition of being an unavailable witness under Rule

41

804(a)(4) and, therefore, his statements made about the defendant's state of mind should have been admissible through the testimony of Arbogast. The defendant asserts that merely because his brother was deceased at the time of trial that his statements are automatically non-hearsay under Rule 804. This analysis overlooks the fact that the Rules of Evidence only except four specific types of statements by an unavailable declarant from the hearsay rule -- (1) Former Testimony, (2) Statement Under Belief of Impending Death, (3) Statement Against Interest, and (4) Statement of Personal or Family History. Tenn. Rule Evid. 804(b)(1)-(4). As this Court noted in *State v. Causby*, "once the declarant is shown to be unavailable, some indicia of reliability must be shown." 706 S.W.2d 628, 631 (Tenn. 1986). The Rules of Evidence set forth four limited areas that satisfy this indicia of reliability and, are therefore, not excluded from the hearsay rule. None of which are applicable here. Thus, the defendant's assertions that the statements of his deceased brother Jeff Hall are automatically admissible because of his death before trial is without merit.

VII.    THE TRIAL COURT DID NOT VIOLATE THE
DEFENDANT'S RIGHT TO TESTIFY BY NOT REMOVING THE AMERICAN
FLAG FROM THE COURTROOM AND, FURTHERMORE, HALL WAIVED
THIS ISSUE BY FAILING TO RAISE IT IN HIS MOTION FOR NEW TRIAL.
(Defendant's issue VI)

Hall asserts that the trial court infringed upon his right to testify in

his own defense.  He argues this infringement occurred when the court refused to

remove the American flag from the courtroom.  Hall failed to raise this issue in

his motion for new trial and, therefore, waived this issue.  T.R.A.P. 3(e).

Moreover, the record shows that Hall and his attorneys discussed on numerous

occasions the possibility of his testifying on his own behalf.  Counsel indicated

that Hall had, after numerous discussions, made a tactical decision not to testify.

(V, 347-348).

Now, Hall contends that he would have testified but for the fact that

the American flag was in the courtroom.  Following the colloquy between the

court and Hall's counsel, Hall stated: "Your Honor, I'll testify if you take down

the flag of war or sign that judicial contract."  (V, 348).  No further offer of proof

was made.

Hall argues that these words indicated his desire to testify, and that

the trial court violated his right to testify by not removing the flag.  Hall classifies

his request as a "reasonable request."  (Appellant's brief, p. 31).  The argument

is absurd.  First, the defense had already rested, and the record shows that, after

43

discussing with his attorneys the possibility of testifying on numerous occasions,
Hall decided not to testify.  (V, 346-348).  Second, even assuming that this
statement asserts a desire to testify, the request that the flag be removed from the
courtroom was not "reasonable."  Hall also sought to have the trial judge sign
some sort of contract and, essentially, appeared to be attempting to control the
courtroom.  The trial court properly refused the requests.  *See State v. DePriest*,
697 S.W.2d 597, 602 (Tenn. Crim. App. 1985) (recognizing the trial court's duty
to control the proceedings).

Regardless, "[t]he right guaranteed by law to a defendant [to testify
on his own behalf] is narrowly the right to testify truthfully in accordance with
the oath." *United States v. Grayson*, 438 U.S. 41, 54, 98 S.Ct. 2610, 2617, 57
L.Ed.2d 582 (1978).  Further, there are limitations to the defendant's right to
present testimony, and this right may "bow to accommodate other legitimate
interests in the criminal trial process." *See e.g., Rock v. Arkansas*, 483 U.S. 44, 55,
107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987).  Although certain limitations may
be placed upon the defendant's right to testify, in this case the trial court placed
no restrictions on this right.  The defendant simply decided not to testify after
consultation with his attorneys.  Moreover, the trial court was under no
obligation to remove the American flag or to sign a judicial contract at the request
of the defendant.

44

## CONCLUSION

For these reasons, this Court should affirm the judgment of the trial court and Court of Criminal Appeals.

Respectfully submitted,

JOHN KNOX WALKUP
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

KENNETH W. RUCKER
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue, North
Nashville, Tennessee  37243
(615) 741-4349
B.P.R. No. 18208

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded by first-class mail, postage paid, to C. Mark Donahoe, 312 East Lafayette Street, P.O. Box 2004, Jackson, Tennessee 38302-2004 and Assistant District Attorney Al Earls, 225 Martin Luther King Drive, P.O. Box 2825, Jackson, Tennessee 38302-2825 on this the 22nd day of September, 1998.

KENNETH W. RUCKER
Assistant Attorney General

46

Not Reported in S.W.2d                                                                     **Page 5**
(Cite as: 1993 WL 305781 (Tenn.Crim.App.))

SEE RULE 19 OF THE RULES OF THE COURT
OF CRIMINAL APPEALS RELATING TO
PUBLICATION OF OPINIONS AND CITATION
OF UNPUBLISHED OPINIONS.

**STATE of Tennessee, Appellee,**
**v.**
**Edwin JESPERSON, Appellant.**

Court of Criminal Appeals of Tennessee, at
Knoxville.

Aug. 11, 1993.

Permission to Appeal Denied by Supreme Court
Dec. 6, 1993.

Monroe County, No. 03C01-9206-CR-00212; R.
Steven Bebb, Judge (Attempt to commit first degree
murder).

Charles M. Corn, Dist. Public Defender,
Cleveland, for appellant.

Charles W. Burson, Atty. Gen., and Amy L.
Tarkington, Asst. Atty. Gen., Nashville, Jerry N.
Estes, Dist. Atty. Gen., Athens, Steven Weitzman,
Asst. Dist. Atty. Gen., Madisonville, for appellee.

OPINION

TIPTON, Judge.

*1 The defendant, Edwin Jesperson, appeals as of
right from his conviction in the Monroe County
Criminal Court for attempt to commit first degree
murder, a Class A felony. He received a twenty-
year sentence as a standard Range I offender and a
fifteen thousand dollar fine.

The following issues are presented for our review:
(1) Whether the evidence is sufficient to prove
beyond a reasonable doubt the elements of
premeditation and deliberation;
(2) whether the trial court erred in failing to
charge the jury on the lesser included offense of
aggravated assault;
(3) whether the defendant was denied due process
by the inadequacy of the court-appointed
psychiatrist's evaluation of the defendant's mental
status; and
(4) whether the trial court improperly enhanced

the sentence.

On the night of July 16, 1991, the defendant shot
his estranged wife, Barbara Jesperson, four times at
their home in Madisonville, Tennessee. Barbara
Jesperson testified that the couple had been
separated since January, 1991, and that the
defendant was living in Illinois with his sister. She
filed for divorce a month or two after the separation.
On June 1, 1991, Ms. Jesperson and their eleven-
year-old son, Shawn, drove with the defendant to
Illinois in order to get a car that the defendant had
purchased for them and to have him sign the divorce
papers. While at the defendant's sister's home in
Illinois, the defendant and Ms. Jesperson argued
because the defendant found birth control pills in her
luggage. The defendant took the car away from Ms.
Jesperson and told her that she could get home any
way she could. He threatened her by saying "I
ought to just kill you and get it over with." The
defendant finally gave the car back to Ms.
Jesperson, and she and her son traveled back to
Tennessee.

Two weeks later, on Father's Day, June 16, 1991,
Ms. Jesperson and her son arrived home between
9:30 and 10:00 P.M. after spending the day with
Ms. Jesperson's father. Rick Roberts, a friend of
Ms. Jesperson, came over around 10:30 P.M. As
Ms. Jesperson and Mr. Roberts were watching a
movie, Ms. Jesperson heard a vehicle speeding
down her gravel driveway. She looked out the
window and saw that it was the defendant. When
Mr. Roberts found out who it was, he hid in Shawn
Jesperson's bedroom.

Ms. Jesperson let the defendant in and he asked her
if she knew anyone who could help him get his van
out of a ditch. She testified that things were calm at
that point in the conversation. Then the defendant
asked her whose car was in the driveway and she
responded that it belonged to Mr. Roberts. He
asked her what Mr. Roberts was doing there at that
time of night and began yelling, saying he wanted
Mr. Roberts to come out into the kitchen where they
were. The defendant then pulled a gun from the
back of his pants and Ms. Jesperson told him to put
the gun away. She went towards the phone to call
the police. The defendant jerked the phone out of
the wall in the kitchen and followed Ms. Jesperson
into the bedroom where he jerked the remaining
phone out of the wall. The defendant then grabbed

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

Ms. Jesperson by the hair, threw her onto the bed, and went towards Shawn's bedroom where Mr. Roberts was hiding.

*2 The defendant kept insisting that Mr. Roberts come out of his son's bedroom. Ms. Jesperson continued to tell the defendant to put the gun away and at one point he went into the kitchen and unloaded the gun, putting the bullets in his pocket. The defendant then returned to his son's room and kicked the door, demanding that Mr. Roberts come out. When Mr. Roberts did not comply, the defendant returned to the kitchen and put the bullets back into the gun. Ms. Jesperson tried to take the gun away from the defendant when he was reloading it but stopped for fear that the gun would discharge. She told the defendant that if he was going to load the gun she was going to leave. She went to the door in the kitchen in an attempt to leave but the defendant came after her, slammed the door, grabbed her and threw her up against the refrigerator. The defendant put the gun to Ms. Jesperson's head and shot her. Ms. Jesperson then ran into the yard and, as she was running, she felt bullets hitting her in the back three times. She was sitting on the ground when one of the bullets hit her. Ms. Jesperson asked her son for help. While she was lying on the ground, the defendant kicked her in the side, said, "Are you dead yet" and cursed her.

The defendant's eleven-year-old son, Shawn Jesperson, testified that while he was at his aunt's house in Illinois, he heard his father threaten to kill his mother while his mother and father were arguing. On the evening of June 16, 1991, he was in his room asleep when Rick Roberts woke him up and told him his father was there. Shawn told Rick Roberts to stay in his room as he was afraid his father might hurt Mr. Roberts. Shawn saw Rick Roberts climb out his bedroom window.

Shawn testified that his father was waving around a gun while demanding that Mr. Roberts come out of his bedroom. His parents were arguing, and he saw his father shoot his mother while she was standing by the refrigerator in the kitchen. He said that his mother was trying to get out of the house at the time and that she had her hands down by her side when the defendant shot her the first time. Shawn saw his mother go out the kitchen door and run around in the yard. He testified that his father was shooting his mother while she was running and he heard the gun go off about three or four times. His mother came up to him and asked him to help her and then laid down. Shawn took his baseball bat out of the shed to protect himself and his mother. He asked his father why he was shooting his mother. He saw his father kick his mother in the ribs after she had been shot and heard him say "die, you bitch."

Rick Roberts testified that he had known the victim for two to three weeks prior to the crime. On the evening of June 16, 1991, he dropped in on the victim around 10:30 P.M. When the defendant drove up to the house Shawn Jesperson told him to step into his bedroom. While in the bedroom he heard the victim and the defendant arguing. He heard the defendant say "where's Rick, .... I'm going to blow his head off." When he heard the victim say "put the gun away" he climbed out of the bedroom window. While outside the home, Mr. Roberts heard the defendant and the victim fighting and struggling. He heard screaming and then he heard several shots--four or five--one right after the other. After about a minute he saw the defendant driving away. As the phones had been jerked out of the walls in the house, Mr. Roberts went to a neighbor's to call for an ambulance.

*3 Tommy Burris, a dispatcher for the Madisonville Police and Fire Department, testified that he received a call from the defendant on June 16, 1991, regarding a shooting. The conversation was tape-recorded and the tape was played to the jury. The defendant stated, "This is Ed Jesperson out on Big Creek Road. I just shot my wife five ... times. Send an ambulance out here. Hurry up." Mr. Burris then asked for directions which the defendant gave. At one point Mr. Burris asked what was wrong with his wife, and the defendant responded, "I shot her. Fighting over a damn gun." The defendant said he would be out on the road waiting for the ambulance to come to direct them to the house. Mr. Burris testified that there was a second call asking that a policeman be sent because there had been a shooting. He asked if it was Mr. Jesperson speaking and the voice responded, "Yeah." Mr. Burris asked for further directions which the caller gave. At one point in the tape an unidentified third person, not the defendant, came on the line and gave directions.

Mr. Kim Farrar, brother of the defendant, testified that on June 16, 1991, the defendant came to his

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in S.W.2d                                                                 **Page 7**
(Cite as: 1993 WL 305781, *3 (Tenn.Crim.App.))

home requesting that he help him get his van out of a ditch. Mr. Farrar worked with the defendant for approximately one hour attempting to get the van out but they were unsuccessful. They went to their father's home where Mr. Farrar left the defendant. Approximately thirty minutes later, Mr. Farrar received a call from the defendant telling him about the shooting and asking that he go to the defendant's house right away. Mr. Farrar went to the victim's home after picking up his father on the way. When he arrived, he saw the victim lying on the ground just outside the house. She was conscious and fearful that she would die. Mr. Farrar and his father stayed with the victim until the ambulance arrived.

Jeff Allen, an officer with the Monroe County Sheriff's Department, arrived at the scene of the crime in the early morning hours of June 17, 1991. Mr. Farrar, who was with the victim, told Officer Allen where he could find the defendant. When Officer Allen pulled up to the nearby house, he saw the defendant on his hands and knees crawling around in the front yard. Officer Allen testified that he thought the defendant might have been looking for something at first, but then after listening to him for a few minutes decided that the defendant had "just lost it."

As Officer Allen transported the defendant to the Monroe County Jail, the defendant told him that he and the victim were arguing and struggling over a gun and it went off and shot her in the head. He then said that he went crazy and just started shooting the victim. The defendant tried to convince Officer Allen that he should shoot him as he did not deserve to live. He repeated this request about two or three times. At one point after arriving at the police station Officer Allen found the defendant sitting on the floor and crying.

*4 Gregg Breedon of the Monroe County Sheriff's Department testified that he found a .22 caliber pistol just a few feet from where the victim was lying. He also found a baseball bat lying in the yard. He testified that the pistol was single action and that the hammer had to be pulled back each time before the weapon could be fired.

Detective Marty Cofelt of the Monroe County Sheriff's Department recovered three shell casings, two on the ground next to the weapon and one in the

weapon. The rounds found on the ground and in the weapon were .22 magnum rounds. He testified that an inmate at the jail named Donnie Rector had called him a couple of weeks after the incident with information regarding the crime. Detective Cofelt also testified that the tape that had been played to the jury did not contain another call by the defendant to the police on the night of the crime in which the defendant asked where the police and ambulance were.

Donnie Lynn Rector testified that he was an inmate at the Morgan County Regional Correctional Facility serving time for a stolen property conviction. He testified that he had been housed with the defendant for eight to twelve days in the Morgan County Jail and during that time the defendant told him details regarding the shooting. He testified that the defendant told him that he had called his ex-wife's house from Chicago, Illinois, and that his son had told him that Rick Roberts was at the house. The defendant got his pistol and a six-pack of beer and headed for Tennessee but wrecked his van in Monroe County. The defendant told him that he then got a truck from a relative and went to his wife's house and a car was in the driveway which the defendant thought belonged to Rick Roberts. The defendant told him that when he went into the house Rick Roberts ran into the bedroom and locked the door and that his wife tried to stop him from getting to Mr. Roberts. It was then that the defendant shot her in the head. The defendant told him that as his wife turned to run away he shot her three more times in the back and that his son had a baseball bat and told him to stop shooting his mother. The defendant then snapped out of it.

Mr. Rector testified that the defendant told him that he was going to hire a hit man from Chicago to kill his wife but he could not raise the one thousand dollars that it would cost. He went so far as to buy a .38 pistol from a co- worker in Illinois in preparation for the killing. Mr. Rector testified that the defendant talked to himself and paced the floor while relating the events and that he was "like a time bomb ready to go off." He said the defendant told him that if he made bond he would hire a hit man to kill Mr. Roberts and the victim.

Dr. Kimball Maull testified regarding the victim's injuries. The victim had been shot once in the left temple with the bullet exiting the left eye, and three

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in S.W.2d
(Cite as: 1993 WL 305781, *4 (Tenn.Crim.App.))

times in the back. Dr. Maull testified that two of the bullet wounds could have been instantly fatal if the bullets had deviated less than one-half an inch. One bullet passed so close to the heart that it caused significant hemorrhaging into the lining around the heart. The victim lost her left eye.

*5 The defendant testified that about two weeks prior to the shooting he drove to Tennessee from Illinois and picked up his wife and son and drove them back to Illinois. The purpose of the trip was to give his wife a car he had ready for her and spend time with his son. While his wife was there the two argued over the divorce papers his wife had brought for him to sign. His wife received a phone call and the defendant jerked the phone out of her hand only to find that his wife's boyfriend was the caller. The defendant hung up the phone and told his wife that her boyfriend could get her a car. The defendant finally gave the car to his wife and she and their son drove back to Tennessee.

The defendant decided on the morning of Father's Day, June 16, 1991, that he would drive to Tennessee to see his son. Around 11:00 P.M. his van got stuck in a ditch after he had swerved to avoid a cow in the road near his house. He walked to his brother's house to get help. After his brother tried unsuccessfully to help him get the van out, they went to their parents' home. From there, the defendant drove in his father's truck to his house to see if his wife or his son could help him pull the van out of the ditch with their tractor.

When he drove into the driveway the defendant noticed there was another car parked by the house. He asked his wife for help getting his van out of the ditch and then asked whose car was sitting in the driveway. When his wife responded that it belonged to Rick Roberts the defendant asked where he was. His wife told him that Mr. Roberts was hiding in the bedroom. She told him Mr. Roberts was a friend and they were watching TV. The defendant said his son told him that his mother and Mr. Roberts had locked him in his room "again." The defendant testified that he and his wife continued to argue and it got out of hand.

The defendant admitted having a pistol with him but it was not loaded. He planned to return the gun to his son who had used it previously for target practice. He testified that he gave the gun to his

wife initially but sometime during their argument he got the gun back. He did not know where the shells came from and he did not remember shooting his wife. He recalled becoming angrier and angrier out of concern for his son's welfare because his wife's boyfriend was in the house late at night. He testified that his wife started hanging onto him and punching him and that he told Mr. Roberts to get out of the house and kicked his son's door a couple of times. The next thing he remembered he was outside with his son standing by him with a ball bat. His son told him that he had shot his mother four or five times. He recalled going to his mother's home and calling the sheriff's department and that the authorities were slow about taking the call. He remembered giving them directions to his house but did not remember Officer Allen coming and getting him out of his mother's yard and taking him to the jail.

*6 The defendant testified that he had conversations with Donnie Rector about the shooting but denied ever telling him that he had tried to hire a hit man in Chicago or that he had bought a .38 pistol to kill his wife. The defendant testified that he did not go to his house with the intention of killing his wife and expressed remorse over the shooting. On cross-examination he admitted to threatening to kill his wife while she was in Illinois but stated that it was just a figure of speech spoken while they were arguing and he was angry.

Vera Farrar, the defendant's mother, testified that the defendant came to her home on the night of June 16, 1991, and told her to call the police and ambulance because he had shot his wife. She testified that the defendant was acting strange and that his eyes which are brown, were blue, and his skin looked gray. She testified that there was literally fire around him and that he looked like the devil. She saw the defendant crawling around her front yard on his hands and knees when the police came. Earlier in the evening when the defendant came to get help pulling out his van he had acted strange. Ms. Farrar testified that the defendant did not acknowledge her presence upon entering the house.

In rebuttal the state called Barbara Jesperson who testified that the defendant talked to her twice during the month of June, 1991, about selling an automobile they owned. The first time the

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in S.W.2d                                                         **Page 9**
**(Cite as: 1993 WL 305781, \*6 (Tenn.Crim.App.))**

defendant brought it up was during a phone conversation and then again when Ms. Jesperson was in Illinois. The defendant told her he wanted her to sell the car, and no matter how much she made off of it, he had to have a thousand dollars from the sale. She also testified that the gun was loaded when the defendant came to her house because she saw the defendant take the bullets out of the gun.

Shawn Jesperson was also recalled and testified that there was no lock on his bedroom door, and he did not tell his father on the night of the shooting that he had been locked in his room. Also, the last conversation he had with his father about giving him the gun was in January when his father left to live in Illinois.

                                  I

In his first issue the defendant argues that the state failed to prove beyond a reasonable doubt the elements of premeditation and deliberation necessary to sustain the verdict of attempt to commit first degree murder. He claims the shooting was not performed with a cool purpose but rather resulted from provocation sufficient to reduce the offense to attempt to commit voluntary manslaughter. He likens the circumstances in this case to those in State v. Thorton, 730 S.W.2d 309 (Tenn.1987), where the Tennessee Supreme Court reversed a conviction for first degree murder concluding that the facts, which included the defendant finding his wife engaged in sexual intercourse with the victim, could only support a verdict of voluntary manslaughter.

When the sufficiency of the evidence is challenged on appeal our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). Further, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). Also, we recognize that a culpable mental state may be shown by circumstantial evidence. State v. Brown, 836 S.W.2d 530, 541 (Tenn.1992).

**\*7** The defendant was convicted of attempt to

commit first degree murder. To be guilty of criminal attempt the defendant must have acted with the kind of culpability necessary for first degree murder. See T.C.A. § 39-12-101. First degree murder is defined as an "intentional, premeditated and deliberate killing of another." T.C.A. § 39-13-202. Our criminal code defines a deliberate act as "one performed with a cool purpose" and a premeditated act as "one done after the exercise of reflection and judgment. Premeditation may include instances of homicide committed by poison or by lying in wait." T.C.A. § 39-13-201. Thus the state had the burden of proving beyond a reasonable doubt that the defendant thought about killing the victim before the shootings, see State v. Brown, 836 S.W.2d at 540-541, then acted with a "cool purpose ... free from the passions of the moment," State v. West, 844 S.W.2d 144, 147 (Tenn.1992), in the absence of adequate provocation. State v. Brown, 836 S.W.2d at 543.

We disagree with the defendant's contention that there was adequate provocation sufficient to reduce the attempted murder to attempted voluntary manslaughter. The provocation necessary for voluntary manslaughter must be sufficient to lead a reasonable person to act in an irrational manner. See T.C.A. § 39-13-211(a). Not every provocation will reduce killing to manslaughter, for the resentment must bear a reasonable proportionality to the provocation. See Rader v. State, 73 Tenn. 610, 620 (Tenn.1880). The circumstances in this case do not rise to the level of provocation necessary to reduce the attempted murder to attempted manslaughter. The defendant did not observe Ms. Jesperson and Mr. Roberts engage in any type of intimate activity. Ms. Jesperson told the defendant that Mr. Roberts was a friend and they were watching a movie. The defendant had signed the couple's divorce papers two weeks previously and had known since that time that the victim had a relationship with Mr. Roberts. Under these circumstances, Mr. Roberts' presence in his wife's residence was not sufficient to provoke passion which would cause a reasonable person to act in an irrational manner. See Pressley v. State, 161 Tenn. 310, 30 S.W.2d 231, 232 (1930); Baxter v. State, 503 S.W.2d 226, 229 (Tenn.Crim.App.1973).

Although the defendant's testimony indicated that the reason he became enraged was out of concern for his son's welfare, it was contradicted by his

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in S.W.2d                                           Page 10
(Cite as: 1993 WL 305781, *7 (Tenn.Crim.App.))

son's testimony about not telling his father on the
night of the crime that he had been locked in his
room. Obviously, the jury did not believe the
defendant's theory of adequate provocation. It is not
this Court's function to reweigh the evidence, and
the guilty verdict, approved by the trial judge,
resolves all conflicts in the testimony in favor of the
state's theory. State v. Hatchett, 560 S.W.2d 627,
630 (Tenn.1978).

  When homicide is attempted in the heat of passion
without adequate provocation, the perpetrator is
guilty of attempt to commit second degree murder.
See State v. Brown, 836 S.W.2d at 543. However,
not all forms of passion possessed at the time of a
homicide prevent premeditation and deliberation.
Deliberation entails reflection and a careful
weighing of the decision to kill which necessarily
requires an appreciable amount of time. Id. at 541.
Only passion or anger rendering the mind incapable
of cool reflection would prevent deliberation
necessary for first degree murder. See Id. at 543 n.
10; State v. Bullington, 532 S.W.2d 556, 559-560
(Tenn.1976). Also, if the intent to kill was formed
as a result of premeditation and deliberation prior to
the crime, it is immaterial that the act was carried
out in a state of passion. Leonard v. State, 155
Tenn. 325, 292 S.W. 849, 852-853 (1927);
Pressley v. State, 30 S.W.2d at 232-233; Franks v.
State, 187 Tenn. 174, 213 S.W.2d 105, 107 (1948).
In circumstances where the intent to kill is formed
during a deadly struggle, the crime could be first
degree murder if the state proved that premeditation
and deliberation preceded the struggle. See Rader
v. State, 73 Tenn. at 620, cited approvingly in State
v. Brown, 836 S.W.2d at 542.

  *8 Viewing the evidence in the light most favorable
to the state, the jury could have found that the
defendant premeditated, deliberated and formed the
intent to kill the victim prior to arriving at the
victim's residence. Mr. Rector testified that the
defendant planned on hiring a hit man to kill his
wife but could not raise the one thousand dollars that
it would cost. He testified that the defendant went
so far as to buy a .38 pistol in preparation for the
crime. The defendant told Mr. Rector that upon
learning from his son that Mr. Roberts was at the
victim's residence, the defendant got his pistol and a
six-pack of beer and drove from Illinois to
Tennessee. The record reflects that the defendant
threatened to kill the victim two weeks prior to the

shootings. He drove to Tennessee from Illinois with
a loaded weapon which he concealed behind him in
the back of his pants before entering the victim's
residence. The defendant put the weapon to the
victim's temple and fired, even though the victim
was unarmed and had her hands down at her side.
When the victim survived the shot to her head and
fled, the defendant pursued her, shooting her in the
back three times and finally when she collapsed,
kicked her in the side and asked her if she was dead
yet. Circumstances such as a deadly weapon being
used upon an unarmed victim, a particularly cruel
killing, and threats to kill the victim are relevant to
prove the perpetrator's state of mind with regard to
premeditation and deliberation. State v. Brown, 836
S.W.2d at 541-542. The circumstances of the
shooting and the direct evidence of the defendant's
preconceived design to kill the victim are more than
sufficient to sustain the jury's finding of
premeditation and deliberation.

                          II

  The defendant contends that the trial court erred by
refusing to instruct the jury on the offense of
aggravated assault. He argues that the evidence
could support a finding that the defendant
intentionally, knowingly or recklessly inflicted
serious bodily injury upon another, circumstances
which prove commission of an aggravated assault.
See T.C.A. §§ 39-13-101(a)(1) and - 102(a)(1)(A).
We note, as well, that it could support an aggravated
assault finding because the assault was committed
with a deadly weapon. See T.C.A. §
39-13-102(a)(1)(B). He contends that the jury could
rationally conclude that he did not have the intent to
kill and relies upon State v. Atkins, 681 S.W.2d
571, 577 (Tenn.Crim.App.1984), in which this
Court stated that when "there is any evidence
reasonable minds could accept as to any such lesser
offenses, the accused is entitled to appropriate
instructions regarding the lesser offenses."

  In response, the state relies upon cases holding that
the trial court is under no obligation to instruct on
lesser included offenses when there is no evidence to
support the verdict of guilt as to the lesser offense or
when the evidence shows the defendant to be either
guilty of the greater offense or of no offense at all.
State v. Lee, 618 S.W.2d 320, 323
(Tenn.Crim.App.1981); Judge v. State, 539
S.W.2d 340, 342 (Tenn.Crim.App.1976). It

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

Case 1:05-cv-01199-JDB-egb    Document 159-17    Filed 02/07/18    Page 60 of 63
PageID 5221

contends that there is no rational basis in the evidence to question the fact that the defendant intended to kill the victim, as opposed to intending only to injure her.

**\*9** The record reflects that the trial court instructed the jury about the elements of criminal attempts to commit first degree murder, second degree murder, voluntary manslaughter, and criminally negligent homicide. A trial court is under a duty to instruct the jury on all lesser included offenses shown by the evidence and included in an indictment. T.C.A. § 40-18-110. In Howard v. State, 578 S.W.2d 83, (Tenn.1979) our Supreme Court held that a defendant is not entitled to an instruction on any offense merely because it is proven by the evidence used to prove the indicted offense. In discussing what constituted a lesser included offense under the predecessor statute to T.C.A. § 40-18-110(a), the court adopted the following rule for jury instruction purposes:

[A]n offense is necessarily included in another if the elements of the greater offense, as those elements are set forth in the indictment, include, but are not congruent with, all the elements of the lesser. If there is evidence to support a conviction for such a lesser offense, it must be charged by the trial judge.

578 S.W.2d at 85. Thus, in this case, not only must there be evidence to support a conviction for aggravated assault, but aggravated assault must be viewed as a lesser included offense of attempt to commit first degree murder as that greater offense is alleged in the indictment.

The indictment provides as follows:

Edwin Jesperson, on or about the 17th day of June, 1991, in Monroe County, Tennessee, and before the finding of this indictment, did unlawfully, intentionally, deliberately and with premeditation attempt to kill Barbara Jesperson, in violation of T.C.A. 39-12-101, all of which is against the peace and dignity of the State of Tennessee.

Needless to say, the indictment is generally worded, failing to allege particular facts. It alleges the offense in the language of the mental state necessary for first degree murder and in terms of an "attempt," limited only by reference to the attempt statute. Thus, it, in effect, alleges the attempt in all ways covered by the attempt statute. T.C.A. § 39-12-101 defines criminal attempt as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense....

**\*10** Under Howard, we have serious doubts about aggravated assault being a lesser included offense to the attempt to commit first degree murder as charged in the indictment, although we view an ultimate conclusion to be problematic, at best. This is because, in one sense, by alleging the "attempt" without any limit other than that imposed by T.C.A. § 39-12-101, the indictment could be viewed as "necessarily" including all acts which could constitute an attempt, including the act of using a deadly weapon or the act of causing serious bodily injury. In another sense, though, such an allegation could be viewed as "necessarily" including no particular act, thereby excluding all acts and offenses committed by all acts from consideration as lesser included offenses. This last result appears to be the one indicated by Howard.

However, we need not resolve this perplexing problem because resolution either way would not affect the result in this case. By the jury's conviction of the defendant for attempted first degree murder when it was instructed about consideration of attempts to commit lesser degrees of homicide, including criminally negligent homicide for which no intent to kill must exist, the lack of the jury's consideration of aggravated assault may be viewed as wholly harmless. See State v. Atkins, 681 S.W.2d at 577 (finding of first degree murder instead of second degree murder makes failure to

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in S.W.2d                                    Page 12
(Cite as: 1993 WL 305781, *10 (Tenn.Crim.App.))

instruct as to manslaughter harmless). Therefore, we conclude that no prejudice has been shown under the facts in this case to have resulted from the trial court's failure to instruct the jury regarding the offense of aggravated assault.

III

In his next issue the defendant contends that he was denied his right to due process of law by the inadequacy of the mental examination performed by the court-appointed mental examiner, and specifically, her failure to determine the defendant's mental state at the time of the crime. He argues that this failure prejudiced him by precluding development of an insanity defense.

The record reflects that on October 19, 1991, approximately two and one-half months before trial, an order was entered directing the transfer of the defendant to a mental health center for evaluation of the defendant's sanity at the time of the crime. The record contains a letter to the trial court dated September 10, 1991, from Devi Deean, a psychiatrist with the Overlook Mental Health Center, and Max Williamson, the senior clinical supervisor, which states that the defense of insanity could not be supported under the standard adopted in Tennessee. See T.C.A. § 39-11-501; Graham v. State, 547 S.W.2d 531 (Tenn.1977).

At the new trial motion hearing, Dr. Deean testified that she evaluated the defendant for thirty minutes on September 5, 1991. She did not perform any psychological testing on the defendant because she did not think it was necessary. She based her opinion on her interview with the defendant and also on the evaluation that was performed by the social worker at the clinic on the same date. Her examination of the defendant revealed no psychosis, nor dangerous behavior towards himself or others. The defendant exhibited good insight and judgment, and was able to give a detailed account of the incident in which he stated that he did not intend to shoot his wife but that he got upset during an argument which escalated until he finally fired shots at the victim.

*11 Dr. Deean admitted that although it was very difficult to determine the defendant's mental state at the time of the crime, she based her opinion on the probabilities derived from the facts adduced from

the evaluation of the defendant. Although someone had written to her requesting a second opinion, she did not feel this was necessary because "it was clear" that the defense of insanity could not be supported. From her evaluation of the defendant, she concluded that the defendant was aware of what he was doing at the time of the crime, was able to narrate the details of the incident and what occurred following. He also admitted to her that what he did was wrong.

Even though at certain points in her testimony Dr. Deean stated that she evaluated the defendant for insanity at the time of the trial, it is obvious from the remainder of her testimony that Dr. Deean evaluated the defendant to determine whether he was legally insane at the time of the crime. She concluded that he was not.

With regard to the defendant's argument that the evaluation was inadequate, the trial court specifically questioned Dr. Deean regarding the need for psychological testing. She indicated that the purposes for such testing were not presented in her interview of the defendant and that if she had felt psychological testing was necessary, she would have recommended it to the court.

Upon a showing that a defendant's sanity at the time of the crime is to be a significant factor at trial, due process requires that an indigent defendant be given access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense. Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096 (1985). The thrust of the defendant's argument seems to be that although he had access to a psychiatrist, his right to due process was nevertheless violated because the psychiatrist was incompetent. We note that federal courts have rejected such an argument in the context of collateral habeas corpus review because it would require federal courts to engage in a form of "psychiatric medical malpractice" review which would result in a "never-ending battle of psychiatrists appointed as experts for the sole purpose of discrediting a prior psychiatrist's diagnosis." Harris v. Vasquez, 949 F.2d 1497, 1517 (9th Cir.1990), cert. denied, 503 U.S. 910, 112 S.Ct. 1275 (1992), quoting Silagy v. Peters, 905 F.2d 986, 1013 (7th Cir.1990), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024 (1991).

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

Nevertheless, for the Ake rule to have any meaning at all, a court- appointed expert must be competent. At the least, this would require that an examination be performed which is sufficient to allow for an informed professional opinion regarding a defendant's mental state at the time of the crime. See Silagy v. Peters, 905 F.2d at 1013. However, the defendant in the case before us has failed to demonstrate that Dr. Deean's mental evaluation of him was incompetent. There is no evidence in the record to support a finding that Dr. Deean could not have formed a professional opinion regarding the defendant's sanity or insanity at the time of the crime without psychological testing being performed or that the amount of time spent examining the defendant was not sufficient. See Dukes v. State, 578 S.W.2d 659, 663 (Tenn.Crim.App.1978); State v. Johnson, 673 S.W.2d 877, 880 (Tenn.Crim.App.1984). We therefore cannot say that the defendant's right to due process was violated.

IV

*12 Finally, the defendant argues that the trial court improperly enhanced his sentence by finding that the victim was treated with exceptional cruelty. See T.C.A. § 40-35-114(5). He contends that this enhancement factor should not have been applied as it is an element of the offense of attempt to commit first degree murder. Additionally, he argues that the sentence should have been mitigated by his calling the ambulance after the shooting, the fact that he has no criminal record, the unusual nature of the circumstances which negated a sustained intent to violate the law, his actions resulting from strong provocation and his mental condition at the time of the offense which significantly reduced his culpability. See T.C.A § 40-35-113(13), (11), (2), (8).

When a defendant challenges his sentence on appeal, our review is de novo on the record with a presumption that the determinations made by the trial court were correct. See T.C.A. § 40-35-401(d). The presumption of correctness applies only if the trial court considered the principles of sentencing and all of the relevant facts and circumstances in determining the sentence. State v. Ashby, 823 S.W.2d 166, 169 (Tenn.1991). In conducting our review, we must consider (1) the evidence if any received at the trial and sentencing

hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. State v. Fletcher, 805 S.W.2d 785, 786 (Tenn.Crim.App.1991); see T.C.A. § 40-35-210. The burden is now on the defendant to establish that his sentence was improper. See T.C.A. § 40-35-401, Sentencing Commission Comments.

The presumptive sentence is the minimum in the range if there are no enhancement and mitigating factors. T.C.A. § 40-35-210(c). Should the trial court find mitigating and enhancement factors, it must start at the minimum sentence in the range and enhance the sentence as appropriate for the enhancement factors, then reduce the sentence as appropriate for the mitigating factors. T.C.A. § 40-35-210(e). The weight afforded enhancement and mitigating factors is not statutory but rather is left to the trial court's discretion to determine on an individual basis provided the court complies with the 1989 Sentencing Reform Act and its findings are supported by the record. See T.C.A. § 40-35-210, Sentencing Commission Comments; State v. Ashby, 823 S.W.2d at 169; State v. Moss, 727 S.W.2d 229, 237 (Tenn.1986). The trial court's discretion is guided by balancing relative degrees of culpability within the totality of the circumstances of the case. State v. Moss, 727 S.W.2d at 238. The trial court must make specific findings of fact upon which it applied the sentencing principles to arrive at the sentence, and these must be preserved in the record. See T.C.A. §§ 40-35-210(f) and 40-35-209(c).

*13 The trial court specifically found that the circumstances of the offense were exceptionally cruel and fully justified the maximum sentence. It also considered the extent of the injuries to the victim and also to Shawn Jesperson in enhancing the sentence. See T.C.A. § 40-35-114(6). The court considered in mitigation the fact that the defendant had no prior record and "those other mitigating circumstances which were mentioned" during defense counsel's argument which included all the factors raised by the defendant on appeal. The court stated that the defendant was attempting to blame the victim partially for what had happened and found

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

that the defendant's behavior was inexcusable even if the victim had incited the violence.

T.C.A. § 40-35-114 provides that an enhancement factor may only be applied if it is not an essential element of the offense as charged in the indictment. Even though an attempt to commit murder in and of itself is an act of cruelty, the sentence may be enhanced where the degree of cruelty is exceptional. See T.C.A. § 40-35-114(5); State v. Witherspoon, 769 S.W.2d 880 (Tenn.Crim.App.1988). The trial court specifically found that the circumstances in this case were exceptionally cruel and the record supports this finding. We also find that the fact that the defendant possessed and employed a firearm during the commission of the offense could also be used to enhance his sentence. See T.C.A. § 40-35-114(9). However, it was inappropriate for the trial court to consider the extent of injuries to the defendant's son when the record contains no evidence to support such a finding. See T.C.A. § 40-35-210(b)(1). The record amply supports

application of this enhancement factor with regard to the victim.

The defendant's argument that his sentence should be mitigated because he acted under strong provocation cannot be supported. The jury found that the defendant acted with a premeditated and deliberate intent to kill without adequate provocation. The exceptional cruelty and severe injuries inflicted upon the victim in addition to the use of a firearm weigh heavily against the remaining mitigating factors considered by the trial court. We hold that the mid-range twenty-year sentence is not excessive and is justly deserved in relation to the seriousness of the offense. See T.C.A. § 40-35-102(1).

For the foregoing reasons, we affirm the judgment of conviction.

BIRCH and WADE, JJ., concur.

END OF DOCUMENT

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works