ORDER SUBMISSION 90    4/21/99

IN THE SUPREME COURT OF TENNESSEE

AT JACKSON

FILED

Clerk of the Courts

APR 2 3 1999

MAILED
CERTIFIED    4/21/99
REGISTERED
REC'D BY

STATE OF TENNESSEE          )
                            )
        Appellee,           )
                            )
                            )    MADISON COUNTY
v.                          )    S CT NO
                            )    02S01-9805-CC-00048
                            )
JON DOUGLAS HALL,           )
                            )    DEATH PENALTY
        Appellant           )

ON APPEAL AS OF RIGHT FROM THE JUDGMENT
OF THE COURT OF CRIMINAL APPEALS

SUPPLEMENTAL BRIEF OF THE STATE OF TENNESSEE

MICHAEL E. MOORE
Solicitor General

ALICE B. LUSTRE
Assistant Attorney General
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, Tennessee 37243
615-741-4349
B.P.R. No. 11232

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      I.   THE EVIDENCE IS SUFFICIENT TO SUPPORT THE FINDING OF THE JURY THAT APPELLANT COMMITTED FIRST DEGREE PREMEDITATED MURDER. . . . . . . . . . . . 3
      II.  THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR WHEN IT ALLOWED PHOTOGRAPHS ILLUSTRATING THE NATURE OF THE VICTIM'S INJURIES TO BE INTRODUCED INTO EVIDENCE AT THE PUNISHMENT PHASE. . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      III.  THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE FINDING THAT THE MURDER WAS HEINOUS, ATROCIOUS AND CRUEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      IV.  THE SENTENCE IS NEITHER EXCESSIVE OR DISPROPORTIONATE.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

i

# TABLE OF AUTHORITIES

## CASES

*State v. Farris Genner Morris, Jr.*, Madison County,
    No. 02C01-9801-CC-00012 (Tenn.Crim.App., filed February 5, 1999, at
    Jackson) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7,8

*State v. Nesbit,*
    978 S.W.2d 872 (Tenn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,8

*State v. Smith,*
    868 S.W.2d 561 (Tenn. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5

*State v. Williams,*
    690 S.W.2d 517 (Tenn. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATUTES

Tennessee Code Annotated §39-13-204(i)(5) . . . . . . . . . . . . . . . . . . . . . . . 1

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I

Does the evidence fail to support the finding of the jury that Jon Douglas Hall committed first degree premeditated murder?

II

Did the trial court commit reversible error when it allowed photographs illustrating the nature of the victim's injuries to be introduced into evidence at the punishment phase?

III

Was the evidence presented during the penalty phase sufficient to support the aggravating circumstance that the murder was heinous, atrocious, or cruel within the meaning of Tennessee Code Annotated §39-13-204(i)(5)?

IV

Was the sentence of death excessive and disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant?

## STATEMENT OF THE CASE

The State relies upon the Statement of the Case as previously submitted.

## STATEMENT OF THE FACTS

The State relies upon its Statement of the Facts as previously submitted.

## ARGUMENT

I.   THE EVIDENCE IS SUFFICIENT TO SUPPORT THE
FINDING OF THE JURY THAT APPELLANT COMMITTED FIRST DEGREE
PREMEDITATED MURDER.

In his supplemental brief, appellant focuses on his failure to take a weapon with him to his wife's home, and asserts that, because the statements he made to John Dutton while incarcerated made no mention of an intent to strangle or drown the victim, those statements do not support an inference that the killing was deliberate and premeditated.  Appellant argues that these factors indicate merely that he intended to take legal steps to take away the home and children, not that he intended to kill the victim.

Appellant ignores, however, the testimony of Stephanie and Cynthia Lambert, appellant's daughters.  They testified that he told the victim she would not live to graduate; and, he told them he would kill their mother if they went for help, which they subsequently did, in spite of the threat.  These statements, especially when considered in conjunction with the appellant's actions in cutting the phone lines, forcing his way into the home, and barricading himself and the victim in her bedroom, provide more than sufficient evidence to support the jury's findings.

This issue is without merit

3

II.  THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR WHEN IT ALLOWED PHOTOGRAPHS ILLUSTRATING THE NATURE OF THE VICTIM'S INJURIES TO BE INTRODUCED INTO EVIDENCE AT THE PUNISHMENT PHASE.

Appellant submits that this Court's decision in *State v. Smith*[1] is inapplicable to the issue of the admissibility of the photographs for two reasons. First, he argues that the cases are distinguishable because in *Smith*, two photographs were allowed in during the guilt phase to illustrate the testimony of the medical examiner.  Next he posits that the *Smith* case involved knife and stab wounds which were relevant to show the heinous, atrocious and cruel nature of the crime, unlike this case where, he contends, the results of the beating are irrelevant as the blows neither did, nor would, cause death.  His reasoning is unsound.

In *Smith*, while it is true that some of the photographs introduced during the guilt phase of the case were for the purpose of "illustrating" the testimony of the medical examiner, that is not true of all of the photos admitted. A second set of four photographs showed the bodies of two of the victims and the condition of the crime scene, including bloody hand and foot prints.  The State contended, and this Court agreed, that the photographs were probative during the guilt phase to show the violence of the struggle and the assault on one victim and

---

[1]*State v. Smith*, 868 S.W.2d 561 (Tenn. 1993).

4

to show the relationship between where the hand print was found and the body of another victim.[2]

During the sentencing phase, two additional color photos were introduced showing the bodies of the children at the crime scene. In upholding the admission of the photos, this Court stated:

> Both photographs are undeniably gruesome; however, we are of the opinion that the trial court did not err in admitting the photographs, which reflect directly upon the issues of torture and depravity. The photograph of Jason Burnett reveals the full extent of the abdominal wound and illustrates the mistreatment suffered by the victim. The photograph of Chad Burnett shows the multiplicity and viciousness of the wounds inflicted upon him. Their probative value was not substantially outweighed by the danger of unfair prejudice.[3]

Contrary to appellant's assertion, the photographs admitted during the sentencing phase were for the purpose of proving the elements of the heinous, atrocious and cruel aggravator, and were in addition to the photos which were admitted during the guilt phase to illustrate the testimony of the medical examiner.

The second prong of appellant's attempt to distinguish *Smith* is based upon his assertion that the beating is irrelevant to the aggravator since the blows, in and of themselves, were not, and could not have been, the cause of

---

[2]*Smith* at 575.

[3]*Smith,* at 579 (The wounds inflicted on one child allowed his intestines to protrude from his stomach. The other child had been shot three times, stabbed several times, and had his neck slashed.)

5

death.  Again, his reliance is misplaced.  While he correctly notes that the aggravating factor requires "torture or serious physical abuse beyond that necessary to cause death," nothing in the statute mandates that the harm which supports those elements be a cause of the victim's death.  This Court has recently addressed this issue in *State v. Nesbit*.[4]  In that case, the victim was burned six times and the soles of her feet were beaten causing bruises.  The cause of death was a gunshot wound to the head.  In addressing a challenge to the sufficiency of the evidence supporting the heinous, atrocious and cruel aggravator, this Court stated, "There is no requirement that the cause or mode of death also be the cause or mode of the 'serious physical abuse beyond that necessary to produce death.'"[5] Since the fact of the beating can clearly serve as the torture or serious physical abuse contemplated by the statute, photographs which illustrate the extent and severity of the beating must be probative and therefore, the decision of the trial court and the Court of Criminal Appeals should be upheld.

This issue was also recently addressed, on very similar facts, by the Court of Criminal Appeals in *State v. Farris Genner Morris, Jr.*[6]  In that case, as

---

[4]*State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998).

[5]*Nesbit*, at 887.

[6]*State v. Farris Genner Morris, Jr.*, Madison County, No. 02C01-9801-CC-00012 (Tenn.Crim.App., filed February 5, 1999, at Jackson), petition to rehear filed February 16, 1999 (copy attached).

here, the medical examiner utilized a mannequin as part of his testimony. The

defendant in that case argued unsuccessfully that the ten photos admitted on

sentencing were unduly prejudicial and cumulative. The Court of Criminal

Appeals noted that Tennessee has a policy of liberality in admitting photographs,

and held that they were relevant to prove the aggravating circumstance of

heinous, atrocious and cruel citing numerous Supreme Court cases.[7] In upholding

the admissibility of the photographs, the Court stated:

> Although any such photographs would be prejudicial to the
> appellant's case, the photographs introduced at the
> sentencing hearing were highly probative in determining an
> aggravating circumstance. We cannot conclude that the trial
> court abused its discretion by admitting these photographs
> during the sentencing process.[8]

This issue is without merit.

III. THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE
FINDING THAT THE MURDER WAS HEINOUS, ATROCIOUS AND
CRUEL.

As noted above, appellant's primary argument rests on his

unsupported assertion that there is some requirement that the injuries which

constitute "torture" or "serious physical abuse" must also contribute directly to

the victim's death. As *Nesbit* shows, this clearly is not the case in assessing serious

---

[7]*Id.*, slip op. at 19-20.

[8]*Id.*, slip op. at 20

physical abuse.[9]  Further, when one considers cases addressing "torture" where

mental torture was sufficient to satisfy that prong, appellant's argument fails

completely.[10]

Appellant's assertion that "no evidence exists that [the victim] was

conscious when some or all of the blows were inflicted" is simply wrong.  The

record shows that the children observed appellant inflicting blows upon their

mother and that she told them to go get help. [Vol. IV at 243, 244, 262, and

278] Jennifer Lambert observed appellant dragging the victim, who was kicking

and screaming, to the pool where he continued to beat her.  Law enforcement

personnel testified to signs of a struggle in the bedroom and along the path to the

pool. [Vol. IV at 196-199 and 204-205] A review of appellant's own pleadings in

this matter contradict his assertion as well.  In his original brief in this Court,

appellant points to testimony that, "his temper got the best of him and he began

to strike her." [Vol. IV at 228] He also notes that, "unable to control his rage and

passion, [he] drug his wife to a swimming pool in their backyard where the fight

continued and Billie ultimately died." [Brief of appellant at 3] It seems unlikely

---

[9]*See also, State v. Ferris Genner Morris, Jr., supra.* (heinous, atrocious and cruel aggravator upheld where victim stabbed 23 times, only one of which was life threatening and cause of death was crushing blow to the skull)

[10]*See, e.g., State v. Williams*, 690 S.W.2d 517 (Tenn. 1985)(Torture is defined as the infliction of sever physical **or mental** pain upon the victim); *State v. Nesbit, supra* at 885 (evidence sufficient because victim suffered a "great degree of distress" anticipating repeated burns and bruises).

that **fighting** would **continue** with an unconscious victim.

This issue is without merit.

IV.    THE SENTENCE IS NEITHER EXCESSIVE OR DISPROPORTIONATE.

The State relies upon its argument as set forth in its original brief.

9

## CONCLUSION

For the reasons set forth in this, and in the State's original brief, the

decision of the trial court and the Court of Criminal Appeals should be affirmed.


Respectfully submitted,

MICHAEL E. MOORE
Solicitor General


ALICE B. LUSTRE
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Second Floor, Cordell Hull Building
Nashville, Tennessee 37243-0493
(615) 741-4349
B.P.R. No. 11232

10

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded by first class mail, postage paid, to C. Mark Donahoe, 312 East Lafayette Street, P.O. Box 2004, Jackson, TN 38302-2004; and Assistant District Attorney Al Earls, 225 Martin Luther King Drive, P.O. Box 2825, Jackson, TN 38202-2825 on this the 21st day of April, 1999.

ALICE B. LUSTRE
Assistant Attorney General

11

Slip Copy
(Cite as: 1999 WL 51562 (Tenn.Crim.App.))

Page 1

SEE RULE 19 OF THE RULES OF THE COURT
OF CRIMINAL APPEALS RELATING TO
PUBLICATION OF OPINIONS AND CITATION
OF UNPUBLISHED OPINIONS.

STATE of Tennessee, Appellee,
v.
Farris Genner MORRIS, Jr., Appellant.

No. 02C01-9801-CC-00012.

Court of Criminal Appeals of Tennessee, at Jackson.

Feb. 5, 1999.

George Morton Googe, District Public Defender,
Jackson, TN, Daniel J. Taylor, Asst. Public
Defender, Jesse H. Ford, III, Attorney at Law,
Jackson, TN, for Appellant.

John Knox Walkup, Attorney General and
Reporter, Michael E. Moore, Solicitor General,
Elizabeth T. Ryan, Assistant Attorney General,
Criminal Justice Division, Nashville, TN, James G.
(Jerry) Woodall, District Attorney General, Al
Earls, Asst. District Attorney General, Jackson,
TN, for Appellee.

OPINION

HAYES.

*1 The appellant, in this capital case, Farris Genner
Morris, Jr., was convicted by a Madison County
jury of two counts of first degree murder in the
deaths of Erica Hurd and Charles Ragland and the
aggravated rape of Angela Ragland. At the
sentencing hearing for the premeditated murder
convictions, the jury sentenced the appellant to death
by electrocution for the death of fifteen year old
Erica Hurd and to life without the possibility of
parole for the death of Charles Ragland. In fixing
the appellant's punishment at death for the murder
of Erica Hurd, the jury found two aggravating
circumstances: (1) the murder was especially
heinous, atrocious, or cruel in that it involved
torture or serious physical abuse beyond that
necessary to produce death and (2) the murder was
committed while the appellant was engaged in
committing "first degree murder, rape, burglary or
kidnapping." Tenn.Code Ann. § 39-13- 204(i)(5)
and (7) (1991). At a separate sentencing hearing, the
trial court imposed a sentence of twenty-five years
for the aggravated rape conviction and ordered the
appellant to serve this sentence consecutive to his
sentence of life without the possibility of parole.
[FN1] The court further ordered that these sentences
run concurrent with the appellant's sentence of death
by electrocution.

  FN1. The appellant does not challenge his
  conviction or his sentence for the aggravated rape
  of Angela Ragland.

In this appeal as of right, the appellant raises the
following issues for our review:
I. Whether the trial court erred in denying the
appellant's motion to suppress his statement to law
enforcement officials;
II. Whether the trial court's exclusion of two
jurors for cause violated Witherspoon;
III. Whether the evidence was sufficient to
establish that the appellant had the requisite
culpable mental state to sustain his convictions for
the premeditated first degree murders of Erica
Hurd and Charles Ragland and whether the
evidence was sufficient to support his sentence of
death by electrocution;
IV. Whether the trial court properly admitted
testimony regarding the appellant's statements of
his future intent to kill Eckford, rob a bank, and
leave town and allegations of his involvement in
another rape incident;
V. Whether the photographs of victim Erica Hurd
introduced at the sentencing phase were more
prejudicial than probative;
VI. Whether the State committed prejudicial error
during its closing argument at the sentencing phase
by arguing about the pain of the families of the
victims;
VII. Whether a separate jury should have
determined the appellant's sentence; and
VIII. Whether Tennessee's death penalty statute is
constitutional.

Having carefully considered the appellant's claims,
we find no error of law requiring reversal.
Accordingly, we affirm the appellant's convictions,
his sentences, and the imposition of the death
penalty in this case.

Background
A. Guilt/Innocence Phase

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          **Page 2**
(Cite as: 1999 WL 51562, *1 (Tenn.Crim.App.))

In September 1994, twenty-one year old Angela Ragland lived with her husband of six months, Charles, in a duplex located at 120 Ridgemont in Jackson, Tennessee. On September 16, Charles Ragland made plans to socialize with a few friends at the Mary-Lane Courts Project in Jackson. Because she did not like to stay at home by herself, Angela Ragland visited her aunt and uncle, Charlie and Virginia Hurd, who also lived in Jackson. She stayed at the Hurds' home watching television with her family until approximately 3:00 a.m. when she decided to go home. Erica Hurd, Angela's fifteen year old cousin, who wanted to spend the night at the Raglands' Ridgemont duplex, left with Angela. The two drove back to the Ridgemont duplex in Angela's car. At home, Angela parked her car in front of the duplex and the two young women entered the residence. Angela found her husband in bed, but awake, with the light turned on. Shortly thereafter, Erica went outside to get a cassette tape she had left in Angela's car.

*2 Angela heard Erica reenter the duplex. Angela also thought that she heard Erica scream. Erica then appeared at the bedroom door accompanied by the appellant, the couple's neighbor from the adjoining duplex, who was holding a shotgun to Erica's head.

The appellant confronted Charles Ragland and demanded to know "where the dope was." Charles replied that he did not have any "dope." By this time, the appellant, who was aiming the shotgun at Charles, had shoved Erica onto the bed with Angela and Charles. Charles, in an effort to appease the appellant, asked if he wanted money. However, the appellant said he did not want money and that he would look for the "dope" himself. Angela observed that the appellant was talking fast, was sweating, and appeared intoxicated. The appellant then ordered Charles onto the floor, placed a pillow against his head, and fired one shot, instantly killing Charles Ragland.

The appellant then placed fifteen year old Erica into a closet and instructed Angela to lay in her son's bedroom on her stomach with her face towards the window. [FN2] The appellant removed the mattress from the bed and placed it against the window "so nobody could see if they walked by." Meanwhile, he had Angela warn Erica that, if she came out of the closet, he would "blow her head off." He tied Angela's wrists and ankles with a belt, shoe strings,

and some clothes, preventing her from leaving the bedroom. The appellant walked out of the bedroom and took Erica out of the closet. Although Angela could not see them, she could hear Erica pleading with the appellant not to kill her and that "she would not tell anybody." Angela also heard the appellant tell Erica "to shut up." Then, the hitting began. Angela heard the appellant hitting Erica with "something;" the beating lasting for about twenty minutes. Angela could hear Erica screaming, then gasping. "She was trying to breathe, then it went quiet." Erica was later found to have died from multiple stab wounds and blunt trauma to the head inflicted during this assault.

> FN2. The record indicates that Angela Ragland's children were not at the Ridgemont duplex at the time of the murders.

The appellant, still armed with the shotgun, returned to the bedroom where Angela remained bound to the bed. He told Angela that he had been working all day and that he needed a bath. He forced Angela to bathe him. The appellant dried himself with a sheet from one of the beds. He told Angela that he wanted her to wear something "sexy," and proceeded to rummage through Angela's dresser drawers looking for satisfactory attire. The appellant finally emerged holding a negligee and made Angela change. The appellant then stated that he was hungry and asked Angela to make him something to eat. Angela prepared the appellant "a sandwich and some Kool-Aid," which he ate, all the while maintaining a tight hold on the shotgun.

When the appellant finished eating, he, again, led Angela into the child's bedroom, laid the shotgun on a nearby bed, and forced Angela to have sexual intercourse with him three to four times. He also forced Angela to perform oral sex upon him.

*3 At some point during the ordeal, the appellant remarked that "he had been [falsely] accused of raping someone ... and if he was going to go to jail, he was going to go to jail for doing something." He also told Angela that "society was the reason that he was doing what he did. He said that society made him the way he was." The appellant continued to state:

    ... the woman that had accused him of rape didn't
    know his name and that another guy, Marvin

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                            **Page 3**
(Cite as: 1999 WL 51562, *3 (Tenn.Crim.App.))

Eckford, had told the woman his name, .... [h]e said he was going to go home, tell his kids goodbye, kill Marvin, rob a bank and leave.

Around 6:30 a.m., the appellant heard his wife moving around in their adjoining duplex. He began to panic because he knew that she would be looking for him as he had not been home since getting off from work the previous day. The appellant told Angela that he was going to let her go. He advised her to tell the police that she found the dead bodies of her husband and fifteen year old cousin when she arrived home that morning. The appellant then "took a cloth and he wiped down stuff that he had touched, [e.g.,] the television, the vacuum cleaner, door knobs, [for fingerprints.]" Before leaving out the back door, he threatened Angela that he would kill her if she went to the police.

As the appellant left out the back door, Angela escaped through the front door, got into her car, and drove to a friend's house around the corner. When Angela arrived at the residence of Shawn Edwards, Edwards and his brother noticed that Angela was wearing "something skimpy" and was hysterical and crying. She was mumbling something about her husband. Edwards then drove Angela to the Jackson Police Department.

At approximately 7:50 a.m., Officer Becky Davis noticed Edwards pull into the police station parking lot. After talking with Edwards and Angela, she advised Angela to go to the hospital and sent officers and an ambulance to the Raglands' Ridgemont address.

Officer Ronnie Wyatt, a hostage negotiator and crime scene technician with the Jackson Police Department, was among the officers that responded to 120 Ridgemont. Upon Wyatt's arrival, no attempt had yet been made to communicate with the appellant, who had returned to his residence. Officer Wyatt contacted the appellant by telephone. Pursuant to this conversation, the appellant agreed to come out of his duplex. When the appellant emerged from his residence, he appeared "normal" and "relaxed." He was taken into custody and transported to the City Jail.

Upon entering the Raglands' residence, officers discovered the body of Charles Ragland in the master bedroom and the body of Erica Hurd in the

living room. The shorts of the fifteen year old Hurd were unzipped. After a search of the apartment, they located a blood stained steak knife behind the couch and a blood stained butcher-type knife behind a teddy bear in a chair. [FN3] In the appellant's adjoining duplex, law enforcement officers found the appellant's pistol grip 12-gauge pump action shotgun hidden underneath the bottom of his dresser drawer.

> FN3. Angela Ragland testified that neither the steak knife nor the butcher knife belonged to her or her husband.

*4 Later that day, at approximately 5:20 p.m., Jackson Police Department Officers Patrick Willis and James Golden advised the appellant of his rights, witnessed the appellant's waiver of those same rights, and proceeded to interview the appellant. Willis and Golden both observed that the appellant was "acting normal," appeared "calm," and did not appear to be under the influence of any illegal substance. During this interview, the appellant made the following statement:
On September 16, 1994, I got off of work at 1:00 [p.m.]. I bought $250 worth of cocaine during the evening. I made several purchases. I smoked the whole $250 worth up.
Around 1:00 a.m. on September the 17th, 1994, I was sitting on my porch at 120 Ridgemont. My next door neighbor rode up with someone. He got out and came to the duplex. I asked him what was up. I asked dude, 'Why don't you sell me something?' He said he didn't sell dope. I asked him why he would walk out of his house every day and not speak to me, why he didn't show me any respect? He said he didn't have to listen to me and that he was going in his house and going to bed. I told him he was going to regret disrespecting me.
I went into my house. I knew that his wife wasn't at home yet. I knew that she would come in sooner or later. I got my shotgun from my bedroom. I loaded two shells into it. I sat in my living room waiting to hear her pull up.
I heard his wife and someone else pull up, but I missed them. They went in the house and locked the door behind them, I assumed.
I heard someone go out to the car. I looked out and it was his wife. When she opened the door, I got behind her with the shotgun. I pointed it at her and walked in behind her. A young girl was on the couch. I told her to get up. I told them to walk on

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    **Page 4**
(Cite as: 1999 WL 51562, *4 (Tenn.Crim.App.))

back to the bedroom. They went into the bedroom and got onto the bed. The girl's husband was lying on the bed. I told him to give me the dope. He said he didn't have any. I fired the shotgun into the floor. He rolled off the bed. I asked him again for the dope. He said he didn't have any. He asked me if I wanted money. I told him, 'No, I don't want your money.'

I picked a pillow up off of the bed and put it over the barrel of the shotgun and I shot him. The girls were on the bed under a blanket or something. I tried to put the young girl in the closet. She started acting crazy. We were in the hallway. She picked up a knife from somewhere. We struggled from the hallway into the front room. We wrestled on the couch. I took the knife from her. I laid the shotgun on the couch. I stabbed her down low with the knife. I hit her with my hand. I think I broke my finger. I can't raise it back up.

Before the struggle with the young girl, I had put her in the hall closet. I took the dude's wife into the other bedroom. I had her tied down on the big bed to the right as you walk into the bedroom. I used a black belt and some type of material to tie her hands and feet. It was dark in the room.

*5 I went to the closet and got the young girl out. That's when she started to struggle and acting crazy, as I explained earlier. My intentions for getting her out of the closet was to tie her up, but she got to struggling and got the knife. After I stabbed her and she was lying there on the couch, I went and got a blanket that was already in the living room. I covered the young girl up. The dude's wife didn't want to see her.

I went into the bedroom and untied the other girl and we talked. We talked in the bedroom for a while. I told her I wanted to take a bath. We went into the bathroom. I undressed by taking off my pants and shirt…. I got in the tub and I told her to take my shorts off of me. She did. She gave me a bath. I held a gun in my hand.

We went back to the bedroom. I dried off with a sheet. I asked her if she had anything to eat. She fixed me a sandwich and Kool-Aid. I ate and then I laid the shotgun on the other bed and we had sex. We had sex three or four times. She gave me oral sex. I took the mattress off the other bed and put it up against the window because of the light coming through. She didn't act afraid.

About 6 or 7 this morning I told her I was going to let her go. I told her not to try and make a story up, just do what she was supposed to do.

I put my clothes in a plastic bag and took them home. I put the bag in the trash can in the bedroom where my dope was. I put the shotgun up under the chest of drawers in my bedroom.

Dr. O.C. Smith, the Deputy Chief Medical Examiner for Western Tennessee, performed the autopsies on the bodies of Charles Ragland and Erica Hurd. Dr. Smith concluded:

Mr. Ragland died as a result of a shotgun wound to the head. The wound was sufficiently characteristic to indicate that there was a presence of an intermediate target between the muzzle of the weapon and his head at the time the shot was fired…. The entire top of the head was damaged by fractures and a large amount of the contents of the head were absent…. Death for all intents and purposes would be instantaneous because the brain is destroyed….

Smith also testified that Charles Ragland had a blood alcohol level of .06 at the time of death. A drug screen performed on the deceased's body was negative.

After examining the body of Erica Hurd, Dr. Smith determined:

Ms. Hurd died as a result of multiple injuries, primarily stab wounds, both before and after death and a blunt trauma to the head, or blows to the head, that produced skin tears, skull fractures and damage to the brain…. In this case cause of death would be blunt trauma to the head and stab wounds to the chest.

…

In the conduct of the autopsy, wounds were found that were inflicted during life, stab wounds were found that were inflicted after death. She was alive at the time her skull was fractured and she was alive at the time that many of the stab wounds were received, but of the stab wounds received during life only one would be sufficiently life threatening.

*6 He continued to explain that Ms. Hurd had sustained thirty-seven stab wounds within a fifteen to twenty minute period. Twenty-three of these wounds were sustained prior to death, while fourteen were post-mortem. Twenty-five of the wounds were to the neck and the face area. Dr. Smith testified:

[t]he number of superficial wounds and the location … does indicate that there may be some circumstances of the assault that have not yet come to life, but what they imply is the sites of selection

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    **Page 5**
(Cite as: 1999 WL 51562, *6 (Tenn.Crim.App.))

are head, neck, chest, and back. These are vital target areas .... a lot of them just could be inflicted with the point or the tip of the knife and what their purpose is is not exactly clear and I cannot state with a medical certainty what their intent is, but this is seen in instances where an element of control may be attempted or in assaults in which an element of torment is present.

Additionally, Dr. Smith opined that the force used upon the victim was so great that it caused the blades of the steak knife and the butcher knife to bend upon striking the bone. Dr. Smith also explained that he had to perform a alcohol content analysis upon the victim's urine as there was not enough blood left in the body to perform the test.

In addition to the State's proof, the appellant introduced evidence that, on September 16, 1994, around 5:15 p.m., the appellant was at his brother's house with Darryl Godwin. Russell Morris, the appellant's brother, testified that the appellant and Godwin were sitting in a car outside of his house smoking crack cocaine. Both men appeared intoxicated. Russell Morris also related that his brother informed him that he had already spent $200 on crack cocaine and was going to buy some more crack. Morris stated that his brother left around 5:30 p.m.

To explain the effects of crack cocaine, the defense introduced the testimony of Dr. Robert Parker, a doctor of pharmacology at the University of Tennessee, and Dr. William Bernet, the medical director of the Psychiatric Hospital at Vanderbilt University. Specifically, Dr. Parker testified:

Crack cocaine is a purified form of cocaine that is typically smoked, usually in a small pipe.... It's a very purified form of the drug and it has very powerful effects....

...

The acute effects ... occur within ten or fifteen seconds after they've smoked the drug and the primary effect is an intense--what's called 'euphoria', or high, that they experience with the drug.

In addition to that euphoria, they may experience a number of other symptoms as well. Particularly, they become very excited, they may talk very rapidly, they may sweat a lot, they can become suspicious, they can become paranoid, they lose some of their inhibitions, their judgment is impaired and it can also lead to enhanced sexual

drive and sexual performance as well.

The euphoria, or the high, usually only lasts anywhere from ten or fifteen, maybe up to thirty minutes. The other effects, however, can persist longer.

*7 ...

... Most users of crack cocaine ... ingest a number of rocks over a period of time in what's called a "cocaine run" or a "cocaine binge." What they're trying to do is they're trying to maintain their high. As I said earlier, the high doesn't last very long, ten to fifteen, maybe thirty minutes. When they go on these runs or binges, they'll usually continue to use drugs until they don't have any more.... [T]he euphoric effects are diminished, they can't ever achieve the high that they got with that first dose and a lot of the euphoric effects, or the high, is replaced by feelings of intense anxiety and irritability, tremendous fear, suspiciousness, paranoia.

Again, their judgment can be impaired, there's an increased risk of violent or homicidal behavior, and, again, these effects can persist long after the high is gone. They also can experience delusions, again, as mentioned earlier, paranoia, fear, and they can even have hallucinations as well during these runs or binges.

...

In general, the larger the dose and the longer the duration that someone uses the drug in one of these runs, the more intense these symptoms are going to be and the longer that they're going to last after they stop using the drug.

It can cause mania.... Mania is a state of heightened, both mental, as well as physical, activity. Typically, the individuals would be moving around a lot, they can't sit still, their thoughts are racing....

Psychosis can also occur with these runs or binges.... Psychosis is when one sort of loses their concept, or idea, of what reality is so they're not able to perceive reality essentially.

When they stop using the drug, they'll usually go into what's called the "crash phase," or an acute withdrawal phase. And this is generally characterized first by an intense craving for using more cocaine. That's their primary objective, to try to obtain more drugs. In addition to that, these feelings of intense cocaine craving are accompanied by profound depression and exhaustion, suicidal thoughts. They can also be accompanied by paranoia or feeling that someone

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          **Page 6**
(Cite as: 1999 WL 51562, *7 (Tenn.Crim.App.))

is out to get them, as well as exhaustion and fatigue, extreme anxiety and irritability.

[The crash phase] can last up to four days and that is going to be dependent on how long they've been using drugs before that and how much they used. Essentially, the more you use and the longer you use it, the longer this crash phase would last, but its described in the literature to last up to four days.

Dr. Parker estimated that, in 1994, $250 worth of crack cocaine would be "anywhere from 100 to maybe 200 of the individual rocks of cocaine...." Moreover, Dr. Parker concluded that the statement provided by the appellant, Mrs. Ragland's testimony, and the police reports of the double murder "were consistent with the ingestion of cocaine."

Dr. Bernet, forensic psychiatrist, evaluated the appellant, which included interviewing the appellant in prison and reviewing various documents. Based on the information obtained during the evaluation process, Dr. Bernet concluded that, prior to the September 1994 accusation of rape, the appellant had a fairly stable life. Dr. Bernet surmised that, because of the extreme disturbance caused by the rape accusation, the appellant became suicidal and began using crack cocaine. On the date of the murders, the appellant's cocaine ingestion combined with the stress of the rape accusation caused the appellant to "becom[e] paranoid and agitated and delusional." He concluded that, at the time the appellant entered the Raglands' duplex, "the cocaine intoxication affected him mentally and it may have prevented him from forming the intent to murder [Charles] Ragland." Likewise, Dr. Bernet concluded that "[the appellant] may have lacked the specific intent [for premeditation regarding Erica Hurd.]" Finally, Dr. Bernet testified that it was his opinion that "a combination of everything ... the accusation of rape, the tremendous stress and troubles with his family, with his wife and his children, and then feeling suicidal, and then the large amount of cocaine. I think all of these together create an enormous amount of mental stress" and that the appellant's ingestion of such a large amount of cocaine "affected his judgment and his ability to inhibit himself, his impulses, and created confusion."

*8 No further proof was introduced at the guilt

phase. The jury was instructed as to the applicable law and, following deliberation, found the appellant guilty of the premeditated first degree murders of Charles Ragland and Erica Hurd and the aggravated rape of Angela Ragland.

B. Penalty Phase

At the sentencing phase of the trial, the State recalled Dr. O.C. Smith as a witness. Again, through the use of numerous photographs and a mannequin, Dr. Smith described the wounds inflicted upon Erica Hurd. When the State posed the hypothetical question of whether this murder was "especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," Dr. Smith responded that the numerous stab wounds would have been painful and that the stab wounds involving injury to the bones would cause severe pain, particularly those wounds injuring the ribs, the lungs, and the spine. He explained that

... there are certain patterns or characteristics of injuries that may imply some certain circumstances. In Erica Hurd's case, first the wounds are intentional. These are not the type wounds one gets from an accident. These wounds are very magnitude. [sic]. The ones during life, some are severe and some are very superficial. They are in areas that may be targeted, the face, the head, the chest, the back, showing sites of selection, as opposed to a random pattern of distribution. That may imply an element of control ... or it may imply an element of torment by being very superficial in nature.

This concluded the State's proof at the penalty phase.

The appellant presented numerous character witnesses to testify on his behalf. Mickey Granger, the funeral director of Griffin Funeral Home and a former employer of the appellant, stated that "Farris was a good employee, very dependable." Mr. Granger explained that, when the appellant was accused of rape in September 1994, he began to notice a "downward slide as far as [the appellant's] work and performance." Granger eventually became aware of the appellant's drug problem when he found evidence at work, i.e., a Coke can with little holes punched in it, an item commonly converted into a crude crack pipe. Jack Thomas, a friend of the appellant, testified that he visited with the

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

appellant at Northwest Correction Center. During this visit, the appellant admitted responsibility for the deaths of both Charles Ragland and Erica Hurd and, although he denied that he raped Angela Ragland, he admitted to having sex with her. The appellant explained to Thomas that he had ingested a large amount of cocaine that night in an effort to overdose. He let Angela go because "reality had come on him." In addition to this testimony, numerous teachers and employees at Northwest Correction Center testified that the appellant is a good student, that he participates in class and is punctual, and that he helps other inmates, studies frequently in the library, and uses the available reference materials including the encyclopedias and dictionaries.

*9 The appellant elected not to testify and no further proof was presented. Closing arguments were heard and the jury was instructed on the following statutory aggravating factors:

With regard to the murder of Charles Ragland:
(1) That the defendant knowingly created a great risk of death to two or more persons other than the victim murdered during the act of the murder; and
(3) The murder was committed while the defendant was engaged in committing or was an accomplice in the commission of or was attempting to commit or was fleeing after having committed or attempted to commit any first degree murder, rape, burglary or kidnapping.

With regard to the murder of Erica Hurd:
(2) The murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and
(3) The murder was committed while the defendant was engaged in committing or was an accomplice in the commission of or was attempting to commit or was fleeing after committing or attempting to commit any first degree murder, rape, burglary or kidnapping.
The jury was also instructed that it should consider the following mitigating circumstances:
(1) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;
(2) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was

substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime, but which substantially affected his judgment;
(3) The defendant was a good worker and employee at Ridgecrest Cemetery, performing his duties at work well and faithfully;
(4) The defendant surrendered to the authorities peacefully, without resistance, and did not attempt to leave the area to avoid arrest, but rather, went home to tell his family goodbye;
(5) The defendant cooperated with the police investigators, giving a full confession;
(6) The defendant has acknowledged and never denied his responsibility for these crimes;
(7) The crimes committed were out of character for this defendant;
(8) The defendant can adapt well to a correctional setting if he is ordered to serve a sentence of life or life without parole;
(9) The defendant changed his behavior and exhibited remorse and mercy toward the victim, Angela Ragland. He left the premises, allowing her to live and allowing her to go free knowing she was the only witness to the crime and that she could identify him and testify against him;
(10) Any other mitigating factor which is raised by the evidence, produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

*10 Following submission of the instructions, the jury retired to consider their verdict. After a little over five hours of deliberations, the jury returned a verdict recommending a sentence of life imprisonment without the possibility of parole for the murder of Charles Ragland. Specifically, the jury found that the State had proven the two instructed aggravating circumstances beyond a reasonable doubt, however, they found that the aggravating circumstances did not outweigh any mitigating circumstances beyond a reasonable doubt. As to the murder of Erica Hurd, the jury again found that the State had proven the two submitted aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. In accordance with their verdict, the jury sentenced the appellant to death by

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                        **Page 8**
(Cite as: 1999 WL 51562, *10 (Tenn.Crim.App.))

electrocution for the murder of Erica Hurd and fixed the appellant's punishment for the murder of Charles Ragland at life without the possibility of parole.

At a separate sentencing hearing on March 11, 1997, the trial court sentenced the appellant to twenty-five years incarceration for the aggravated rape of Angela Ragland. The court ordered this sentence to run consecutive to the sentence of life without parole. These sentences were ordered to be served concurrent to the appellant's sentence of death by electrocution. As the basis for its decision, the trial court found that the appellant had a previous history of criminal convictions, that the appellant allowed the victim to be treated with exceptional cruelty, that the appellant has a previous history of unwillingness to comply with a condition of release into the community, and that the felony was committed while on bail or probation. The court found no significant evidence in mitigation. Furthermore, the court imposed consecutive sentences finding the appellant to be a dangerous offender with little regard for human life and little hesitation about committing an offense when the risk to human life was high and because he committed these offenses while on probation.

### I. Motion to Suppress

Nine hours after his arrest on September 17, 1994, the appellant executed a written waiver of his Miranda rights and provided law enforcement officers a complete statement of his involvement in the deaths of Charles Ragland and Erica Hurd and the aggravated rape of Angela Ragland. See supra. Prior to trial, the appellant filed a motion to suppress this statement alleging that the statement was not knowingly and voluntarily given due to the fact that he was under the influence of crack cocaine. A hearing on the motion was heard on September 10, 1996.

The evidence at the suppression motion revealed that the appellant had been smoking crack cocaine on the evening of Friday, September 16, 1994. Russell Morris, the appellant's brother, verified that, when he saw the appellant at 5:30 p.m. that evening, the appellant had informed him that he had spent $200 on crack cocaine and was going to obtain more. He also testified that the appellant appeared to be intoxicated. Next, the defense attempted to call the victim, Angela Ragland, to the stand to testify

regarding the appellant's appearance and actions during the commission of these offenses. The State objected on the basis that Angela Ragland was not "in any position to know anything about the condition that [the appellant] was in at the time that the statement was given." The trial court sustained the State's objection on the same ground, expressly finding that Ms. Ragland had no knowledge of the appellant's state of mind or whether he was under the influence of cocaine when he gave his statement some fourteen hours after he committed these offenses.

**\*11** Dr. Robert Parker was called as an expert witness on the effects of crack cocaine on the human body. See supra. Specifically, Dr. Parker testified that mania was present during the "crash phase" when the appellant's statement was given. He explained that, during the "crash phase," one's judgment was impaired and usually was accompanied with confusion and suicidal thoughts. Moreover, "crash phase" symptoms could cause one not to care about or understand the consequences of their actions.

At the conclusion of Dr. Parker's testimony, the defense again attempted to introduce the testimony of Angela Ragland. However, the trial court refused to admit such testimony finding that "there's been no proof here presented, notwithstanding the use of cocaine, that he, because of the ingestion of cocaine, didn't understand what he was doing when he gave his statement. There's been no proof of that." [FN4]

> FN4. At the conclusion of the appellant's proof, the trial court permitted defense counsel to make an offer of proof regarding the proffered testimony of Angela Ragland. Specifically, defense counsel stated that Angela Ragland would testify that she observed the appellant sweating and in an agitated state, talking and moving at a rapid pace, and looking for drugs when he came to her residence. Defense counsel contended that this testimony was corroborative of Dr. Parker's testimony regarding the effects of crack cocaine on a person.

The defense then offered to call the appellant to testify regarding "how [the drugs] affected his body, ... the way he was ... acting, how he was feeling about those things at the time he gave his statement and before that." Defense counsel asked the court to limit the examination of the appellant to these matters and to prohibit questioning as to the "facts

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                    **Page 9**
(Cite as: 1999 WL 51562, *11 (Tenn.Crim.App.))

of what happened on this alleged incident about the killings." The trial court refused this request, finding that there was no reason to prohibit the State from eliciting the contents of the statement on cross-examination and how it "reflects the truth of what occurred." Moreover, the trial court concluded that the appellant "can't exercise [his] Fifth Amendment privilege on examination of things which are relative to the things that he said...." After this ruling, the defense elected not to call the appellant to the stand. [FN5]

> FN5. At this point at the suppression hearing, the defense did make an offer of proof relative to the appellant's anticipated testimony. Specifically, the proof would show that the appellant and Darryl Godwin purchased $250 worth of crack cocaine on September 16, 1994. Later that same day, the appellant purchased an additional $200-$250 worth of crack cocaine. The appellant consumed the entire amount of crack cocaine, with his cocaine binge ending at approximately 11:00 p.m. The appellant would further allege that he was in the "crash phase" at the time he gave his statement to the police.

The defense next called Officer James Golden to the stand. Officer Golden testified that he first encountered the appellant between 8:30 and 9:00 a.m. on the morning of September 17, 1994. At this time, the appellant "appeared normal to [him]." Later that afternoon, approximately 5:20 p.m., Golden, accompanied by Officer Willis, advised the appellant of his Miranda rights, witnessed the appellant waive these rights, and proceeded to obtain a confession from the appellant. Investigator Golden testified that, at the time the statement was obtained, the appellant did not appear to be under the influence of crack cocaine.

No further proof was presented. Based on this evidence, the trial court denied the appellant's motion to suppress. The trial court stated:

> ... The basic premise here is that when he gave the statement, that statement was not the product of a free mind and rational intellect.
>
> ...
>
> ... The only proof that we have is from Officer Golden who said he was normal.
>
> ...
>
> Now to adopt your idea, I would have to say that the rule of law is that you could prove that a person has had drugs. There's an inference that he

didn't know--that he couldn't give a rational statement. There is no such inference that's drawn from the proof that a person has used drugs that they can't give a good statement. You've got to first give me some proof that he didn't give a good statement.

*12 ...

... Well, what you've done is given me the corroborative proof, but you don't have any proof--You have zero proof that the statement ... was the product of an irrational mind. You have zero proof of that.

The appellant now contests the ruling of the trial court arguing (1) that the trial court erred in refusing to permit Angela Ragland to testify at the hearing and (2) that the testimony of Dr. Parker was sufficient to show that the appellant was in the "crash phase" of cocaine intoxication, suffering from impaired judgment, confusion, and suicidal thoughts, at the time his statement was given to the police.

Analysis

The trial court's determination that a confession has been given voluntarily and without coercion is binding upon the appellate court unless the evidence preponderates against the ruling. See State v. Odom, 928 S.W.2d 18, 22 (Tenn.1996); State v. Stephenson, 878 S.W.2d 530, 544 (Tenn.), reh'g denied, (1994). Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact. Odom, 928 S.W.2d at 23. On appeal, the appellant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. See State v. Tate, No. 02C01-9605-CR-00164 (Tenn.Crim.App. at Jackson, Dec. 3, 1997), perm. to appeal denied, (Tenn. Oct. 5, 1998) (citation omitted).

The law in this state is well-established that "[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary." See State v. Robinson, 622 S.W.2d 62, 67 (Tenn.Crim.App.1980), cert. denied, 454 U.S. 1096, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981); see also State v. Beasley, No. 03C01-9509-CR-00268 (Tenn.Crim.App. at Knoxville, Oct. 10, 1996),

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy
**(Cite as: 1999 WL 51562, \*12 (Tenn.Crim.App.))**

reh'g denied, (Sept. 15, 1997), perm. to appeal denied, (Tenn. Apr. 27, 1998); State v. Teeters, No. 02C01-9304-CC-0051 (Tenn.Crim.App. at Jackson, Feb. 2, 1994). "It is only when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect that it should be suppressed." Robinson, 622 S.W.2d at 67 (citing Lowe v. State, 584 S.W.2d 239 (Tenn.Crim.App.1979)). The test to be applied in these cases is whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime. Beasley, No. 03C01-9509-CR-00268 (citations omitted).

In the present case, the defense presented the testimony of Officer Golden who stated that, at the time the appellant's statement was obtained, the appellant was acting normal, was calm, and did not appear to be under the influence of cocaine. He further testified that the appellant provided a complete narrative of the events surrounding the double homicides/aggravated rape. No proof was presented to rebut this observation other than the expert testimony of Dr. Parker whose testimony was limited to the general effects of cocaine intoxication and not those effects actually experienced by the appellant. Indeed, we find no proof that preponderates against the trial court's finding that the appellant made a voluntary and knowing statement to law enforcement officials.

**\*13** Moreover, we conclude that the trial court properly prohibited the defense from calling Angela Ragland to the stand. Per the appellant's offer of proof, Angela Ragland would only have been able to testify about the appellant's state of mind and physical condition during the actual perpetration of the crimes, which was not at issue at the suppression hearing. There is no dispute that the appellant had ingested a large amount of crack cocaine the prior evening and was intoxicated at the time the crimes were committed. However, Ms. Ragland was not present at the time the appellant's statement was given, some fourteen hours after the crimes occurred, and, therefore, could not testify regarding his demeanor during the police interview, i.e., the issue at the suppression hearing. See Tenn. R. Evid. 402 and 602. Accordingly, the motion to suppress was properly denied. This issue is without merit.

## II. Witherspoon Violations

The appellant next contends that the jury selection process in his capital trial violated Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Specifically, he argues that the statements of two of the prospective jurors, Barbara Brooks and Dennis Spellings, concerning the death penalty did not justify their excusal for cause.

"The right to trial by jury secured by our state and federal constitutions necessarily contemplates that the jury will be unbiased and impartial." See Wolf v. Sundquist, 955 S.W.2d 626, 629 (Tenn.App.), perm. to appeal denied, (Tenn.1997) (citing Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946); Ricketts v. Carter, 918 S.W.2d 419, 421 (Tenn.1996); Durham v. State, 182 Tenn. 577, 188 S.W.2d 555, 558 (Tenn.1945)). "In its constitutional sense, impartiality envisions not only freedom from jury bias against the defendant but also freedom from jury bias in the defendant's favor." Id. (citing Swain v. Alabama, 380 U.S. 202, 219- 20, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965); Hayes v. Missouri, 120 U.S. 68, 70-71, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887); Houston v. State, 593 S.W.2d 267, 272 (Tenn.1980), rev'd on other grounds, State v. Brown, 836 S.W.2d 530, 543 (Tenn.1992); Toombs v. State, 197 Tenn. 229, 270 S.W.2d 649, 650 (Tenn.1954)). Essentially, an impartial juror is one who is free from personal bias or prejudice and will find the facts and apply them to the law. See Wolf v. Sundquist, 955 S.W.2d at 629; see also Buchanan v. Kentucky, 483 U.S. 402, 417, 107 S.Ct. 2907, 2914 (1987); Wainwright v. Witt, 469 U.S. 412, 423, 105 S.Ct. 844, 851-52, 83 L.Ed.2d 841 (1985); Eason v. State, 65 Tenn. 466, 469 (1873).

**\*14** To ensure an impartial jury, the Tennessee Supreme Court has adopted the rationale of the United States Supreme Court in determining the eligibility of prospective jurors in a capital case. In Witherspoon v. Illinois, the Supreme Court held that a prospective juror may be excluded for cause because of his or her views on capital punishment. This standard was clarified in Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. at 852:
 That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 1999 WL 51562, *14 (Tenn.Crim.App.))

addition to dispensing with Witherspoon's reference to "automatic decision making," this standard likewise does not require that a juror's bias be proved with "unmistakable clarity."

See also State v. Alley, 776 S.W.2d 506 (Tenn.1989), cert. denied, 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990); State v. Williams, 690 S.W.2d 517, 522 (Tenn.1985). The Supreme Court also acknowledged that the questions asked and answered during the voir dire process do not always reveal a juror's bias with absolute certainty; "however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." See Wainwright v. Witt, 469 U.S. at 425-26, 105 S.Ct. at 853. Therefore, "deference must be paid to the trial judge who sees and hears the juror." Id. Indeed, in State v. Alley, our supreme court held that "the trial court's finding of bias of a juror because of his views of capital punishment shall be accorded a presumption of correctness and the burden shall rest upon the appellant to establish by convincing evidence that determination was erroneous." Alley, 776 S.W.2d at 518; see also Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

A. Prospective Juror Brooks

During individual voir dire, Barbara Brooks was called as a potential juror. When asked by District Attorney General Woodall whether she could impose the death penalty in this case, Ms. Brooks responded that she could not do so for religious reasons. Despite further questioning by General Woodall, Ms. Brooks maintained that she did not believe in the death penalty and that she could not and would not impose such a sentence.

The trial court, as well, questioned Ms. Brooks regarding whether she could impose the death penalty. In response to the court's questioning, she again stated that she could not impose the death penalty no matter what the crime was because she does not "believe that a person's life should be taken because of it." She further admitted that "the death penalty is out of the question for [her]" and she would never consider imposing the death penalty on the appellant or anyone else.

*15 Defense counsel, in an attempt to rehabilitate Ms. Brooks, asked her whether she could fairly

consider the aggravating and mitigating circumstances and keep an open mind as to the three possibilities for sentencing in this case, to which Ms. Brooks responded affirmatively. The court again questioned Ms. Brooks as to whether she could impose the death penalty if it was called for by the law and the facts. Although Ms. Brooks responded that she could consider the sentence of life without the possibility of parole and that she could hear the evidence, she stated "I don't think I could be fair at that because of the death penalty ... the only thing that hinders me is when you said death penalty. That's where it stops with me."

Despite this statement, defense counsel was again able to illicit answers from Ms. Brooks that raised concern as to her position on the death penalty. As a result, the trial court instructed Ms. Brooks to "just say how you feel." After further equivocation by the prospective juror, the trial court asked her point blank if the death penalty was out; she responded, "Forget it."

At that point, the State challenged Barbara Brooks for cause and the court sustained the challenge finding:

> ... I finally put it to her as blank, I said, "The death penalty is out?" She said, "The death penalty is out, the death penalty is out. I will not impose it" and she said it multiple, multiple times.

Although Ms. Brooks' position on the death penalty was ambiguous at certain times during her voir dire examination, we can reach no rational conclusion other than finding that Ms. Brooks had a definite opposition to imposing the death penalty. Giving deference to the trial court who was able to observe this prospective juror, we conclude that the constitutional standard for excusing jurors due to their views on the death penalty was met.

B. Dennis Spellings

Later that same day, Dennis Spellings was called for individual voir dire. The following dialogue occurred between Mr. Spellings and General Woodall:

> GENERAL WOODALL: ... Can you fairly consider the death penalty along with other forms of punishment?
> MR. SPELLINGS: That's a tough question.
> GENERAL WOODALL: As it should be.... [T]he

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 12
(Cite as: 1999 WL 51562, *15 (Tenn.Crim.App.))

law in the State of Tennessee is if the aggravating circumstances ... outweigh the mitigating circumstances, you shall impose the death penalty. Can you do that or do you have personal convictions or religious convictions that would prevent you from doing it?

MR. SPELLINGS: It's a tough question to ask straight forward. I really don't have an answer.
...

GENERAL WOODALL: Well, can you make that decision? Do you think that you could vote to impose the death penalty?

MR. SPELLINGS: Honestly I don't.

GENERAL WOODALL: Are you saying you don't think you could or maybe you could or you just don't know?

MR. SPELLINGS: When we're talking about when push comes to shove, I don't know.

**16** GENERAL WOODALL: ... So are you saying you don't know whether you could or you won't?

MR. SPELLINGS: I don't know.

Defense counsel also attempted to elicit a definite position from Mr. Spellings, but was unsuccessful. The trial court interrupted and asked Mr. Spellings, "After you hear all the proof, then you could make a decision as to whether or not death should apply?" Mr. Spellings responded, "I'll be honest with you. I'd rather not make that decision." During the court's discourse with Mr. Spellings, Mr. Spellings replied, at one point, that he could follow the law as instructed by the court, but later admitted that "he did not know" if he could follow the law as related to the death penalty.

The State challenged Mr. Spellings for cause, relying on Mr. Spellings admission that he did not know whether he would follow the law. The trial court sustained the challenge, explicitly finding:

This is the first time we've run into this where a person just ... won't answer the question or he feels like he can't answer the question. As I interpret the law that means that we have to get commitment from a juror that they would follow the law and that they would consider the death penalty under certain circumstances. I don't think that a juror is disqualified if they just continue to persistently say, "I don't know what I would do." That's like a juror who's really saying—will you affirm to uphold the law and he would say, "Well, I just can't answer that." If you had a juror and

you put him in the box and you say "Do you swear to tell the truth?" and he says, "I can't say whether I will or not," you wouldn't let him testify. It takes an affirmative statement by a juror that he would consider all the penalties ... and would not exclude the death penalty as a possibility. I think the statements by this juror render him unqualified to served on the jury.

Again, this court gives deference to the decision of the trial court who was able to observe the prospective juror. The record demonstrates that Mr. Spellings could not state with certainty that he could perform his duties as a juror in accordance with his oath. Accordingly, the trial court properly excused this juror for cause. This issue is without merit.

III. Sufficiency of the Evidence

The appellant asserts that the evidence adduced at trial is insufficient as a matter of law to sustain the jury verdicts returned in both the guilt and penalty phases of his trial. Specifically, the appellant argues that the evidence presented fails to establish, beyond a reasonable doubt, the requisite element of premeditation necessary to sustain his convictions for first degree murder. [FN6] Additionally, the appellant argues that the evidence does not support the jury's finding that the murder of Erica Hurd was "heinous, atrocious or cruel" or that the murder occurred while the appellant was "engaged in committing or attempting to commit any first degree murder, rape, burglary, or kidnapping."

> FN6. The appellant does not contest the sufficiency of the evidence regarding his conviction for the aggravated rape of Angela Ragland.

**17** When there is a challenge to the sufficiency of the convicting evidence, this court must review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn.1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); Tenn.R.App.P. 13(e). We do not reweigh or reevaluate the evidence; these are issues resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). Furthermore, a guilty verdict

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

accredits the testimony of witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn.1973). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn.1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). The appellant bears the burden of proving that the evidence was insufficient to support the jury verdict in his case. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982).

### A. Guilt Phase

Once a homicide has been proven, it is presumed to be second degree murder, and the State has the burden of establishing first degree murder. Brown, 836 S.W.2d at 543. First degree murder not committed in the perpetration of a statutorily designated crime requires the "intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39-13-202(a)(1) (1994 Supp.). [FN7] Thus, the State must prove premeditation and deliberation to raise the offense to first degree murder. Brown, 836 S.W.2d at 543.

> FN7. Effective July 1, 1995, "deliberation" is no longer an element of first degree murder. See Tenn.Code Ann. § 39-13-202(a)(1) (1995 Supp.).

Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn.1992), and "the exercise of reflection and judgment," Tenn.Code Ann. § 39-13-201(b)(2) (1991). Deliberation requires a "cool purpose ... formed in the absence of passion or provocation." Brown, 836 S.W.2d at 538 (citations and internal quotations omitted); Tenn.Code Ann. § 39-13-201(b)(1); Sentencing Commission Comments, Tenn.Code Ann. § 39-13-201. Deliberation also requires "some period of reflection during which the mind is free from the influence of excitement." Brown, 836 S.W.2d at 538; see also Tenn.Code Ann. § 39-13-201(b)(2).

Again, although the jury may not engage in speculation, State v. Bordis, 905 S.W.2d 214, 222 (Tenn.Crim.App.), perm. to appeal denied, (Tenn.1995), the jury may infer premeditation and deliberation from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3

(Tenn.Crim.App.1993), perm. to appeal denied, (Tenn.1994); Taylor v. State, 506 S.W.2d 175, 178 (Tenn.Crim.App.1973). Our supreme court has delineated several circumstances that may be indicative of premeditation and deliberation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations by the defendant of his intent to kill the victim, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998) (citing Brown, 836 S.W.2d at 541-42; West, 844 S.W.2d at 148). This court has also recognized several factors from which the jury may infer the two elements, including planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing.

*18 Bordis, 905 S.W.2d at 222 (quoting 2 W. LaFave and A. Scott, Jr., Substantive Criminal Law § 7.7. (1986)).

The evidence, in the light most favorable to the State, reveals that the appellant lived in the duplex adjoining that of his victims. Despite being neighbors, the Raglands and the appellant had only spoken to each other on a few occasions. According to the appellant's own statement, he had confronted Charles Ragland a few hours before the murders, warning Mr. Ragland, "[you are] going to regret disrespecting me." See Gentry, 881 S.W.2d at 4-5 (prior relationship and conduct with the victim from which motive can be inferred). The appellant then obtained a shotgun and loaded the weapon with two shells. See Brown, 836 S.W.2d at 541 (procurement of weapon long held to establish premeditation). He then, armed with the shotgun, proceeded to wait for Angela Ragland to arrive home to effectuate his revenge. See Dickey v. Dutton, 595 F.Supp. 1 (M.D.Tenn.1983) (fact of lying-in-wait is, of itself, evidence of a wilful, deliberate and premeditated purpose); State v. Bullington, 532 S.W.2d 556 (Tenn.1976) (premeditation is obvious in killing accomplished by lying-in-wait). Despite one missed opportunity, the appellant was able to abduct Ragland's cousin, Erica, at gunpoint to gain access to the inside of the Raglands' duplex. Once inside, he forced the family onto one bed and demanded that Charles Ragland give him the "dope." Despite

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 14
(Cite as: 1999 WL 51562, *18 (Tenn.Crim.App.))

Ragland's assertions that he did not have any "dope" and his pleas that the appellant take their money instead, the appellant proceeded to place a pillow on Ragland's head and fatally shot him. Gentry, 881 S.W.2d at 4-5 (the nature of the killing was so exacting that the defendant must have intentionally killed according to a preconceived design). After he successfully restrained Angela in a rear bedroom, the appellant forced Erica into a hall closet. Following an unsuccessful search for drugs, he retrieved Erica from the closet and stabbed the fifteen year old girl thirty-seven times in the face, head, chest and back. Id. After the appellant's perpetration of terror among this household, he carefully wiped his fingerprints from all items in the residence that he had touched, and warned the remaining victim, Angela Ragland, that he would kill her if she went to the police. He then returned home where he hid the shotgun and remained until police arrived. See West, 844 S.W.2d at 148 (citations omitted) (calmness immediately after a killing may be evidence of a cool, dispassionate, premeditated murder). There is sufficient evidence concerning motive, planning activity, and the nature of the killings to support the jury's findings of both premeditation and deliberation as to both counts. See generally Gentry, 881 S.W.2d at 4-5.

*19 Despite this proof, the appellant argues that, because of his severe cocaine intoxication, he was unable to form the specific intent to commit first degree murder. Tennessee law recognizes that, while voluntary intoxication is not a defense to prosecution for an offense, evidence of such may be admitted to negate a culpable mental state. See Tenn.Code Ann. § 39-11-503(a) (1991); see also State v. Phipps, 883 S.W.2d 138, 148 (Tenn.Crim.App.1994); State v. Shelton, 854 S.W.2d 116, 121 (Tenn.Crim.App.1992), perm. to appeal denied, (Tenn.1993); State v. Hall, No. 02C01-9703-CC-00095 (Tenn.Crim.App. at Jackson, Apr. 29, 1998). However, the mere fact that a defendant is drunk or intoxicated from alcohol or drugs does not render that defendant incapable of forming the requisite intent of the crime charged. Rather, if the proof establishes that the defendant was intoxicated at the time of the offense, the jury must determine the extent of its effect upon his mental state. Accordingly, an intoxicated person is criminally responsible for his conduct unless the condition of his intoxication is so extreme that it negates the existence of a mental state, that is to say,

that the accused's state of intoxication acts to suspend his power of reason and renders him incapable of forming the requisite intent of the crime charged. See generally State v. Bullington, 532 S.W.2d 556, 560-562 (Tenn.1976).

At trial, the trial court permitted into evidence testimony concerning the appellant's alleged intoxication immediately preceding and during the perpetration of the crimes. Likewise, the trial court instructed the jury as to voluntary intoxication. Thus, the only issue before this court is whether the evidence of intoxication was such that a reasonable jury could only have found that the defendant was unable to form the requisite mens rea. See Hall, No. 02C01-9703-CC-00095. Stated another way, the question remains what was the mental state of the defendant. Id.

Although there is ample proof of the appellant's intoxication, there is also overwhelming proof of his "intentional" mental state. [FN8] Supra. Intoxication is valuable to the defense only if it is of such a degree that it negates premeditation and deliberation. Hall, No. 02C01-9703-CC-00095. Whether the appellant was too intoxicated to form the requisite mental state was for the jury to determine. See State v. Bell, 690 S.W.2d 879, 882 (Tenn.Crim.App.1985). The weight and credibility of the witnesses' testimony are matters intrusted exclusively to the jury as the trier of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn.1984); Byrge v. State, 575 S.W.2d 292, 295 (Tenn.Crim.App.1978). The jury obviously chose not to accredit the proof presented regarding the appellant's intoxication in light of the other evidence establishing premeditation and deliberation, and this court will not interfere with that determination in this case. See, e.g., Hall, No. 02C01-9703-CC00095; Witherspoon v. State, No. 01C01-9204-CC-00137 (Tenn.Crim.App. at Nashville, Mar. 18, 1993), perm. to appeal denied, (Tenn. Jun. 7, 1993). This issue is without merit.

FN8. This is evidenced primarily by the appellant's detailed confession to the police that essentially mirrored the facts of the crimes provided by Angela Ragland. Additional circumstances indicative of the appellant's state of mind at the time of the offense include his obtaining a weapon, "lying-in-wait" to exact revenge, removing fingerprints from the crime scene, and statements regarding his intent to kill Marvin Eckford, say

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

goodbye to his kids, rob a bank and leave town.

### B. Penalty Phase

*20 Again, the appellant contends that the proof introduced at the penalty phase is insufficient, as to the capital sentence imposed for the murder of Erica Hurd, to support the jury's finding of aggravating circumstance Tenn.Code Ann. § 39-13-204(i)(5)(1994 Supp.) ("heinous, atrocious, or cruel"), and aggravating circumstance Tenn.Code Ann. § 39-13- 204(i)(7) (murder committed while committing a statutorily enumerated felony). [FN9]

> FN9. The appellant does not contest the imposition of his sentence of life without the possibility of parole.

#### i. Imposition of Aggravator (i)(5)
#### a. Sufficiency of the Evidence

Tenn.Code Ann. § 39-13-204(i)(5) provides that the death penalty may be imposed if the State proves beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." (Emphasis added). "Torture" has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Mann, 959 S.W.2d 503, 511 (Tenn.1997), reh'g denied, (1998), cert. denied, --- U.S. ----, 118 S.Ct. 2376, 141 L.Ed.2d 743 (1998); Odom, 928 S.W.2d at 24; Williams, 690 S.W.2d at 529. "[S]erious physical abuse beyond that necessary to produce death" means just that; there must be serious physical, not mental, abuse, i.e., "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.' " Odom, 928 S.W.2d at 26 (quoting BLACK'S LAW DICTIONARY 11 (6th ed.1990)).

In the present case, Erica Hurd and Angela Ragland were forced to watch the appellant execute Angela's husband by shooting him in the head. The appellant then locked Erica in a closet while he tied Angela to another bed. He eventually got Erica out of the closet and repeatedly stabbed the fifteen year old thirty-seven times in her face, head, chest, and back, as she pleaded with him for her life. The struggle ensued for fifteen to twenty minutes, or at

least that is the length of time Angela Ragland heard her cousin screaming and gasping for air.

Twenty-three of the wounds occurred prior to death, while fourteen occurred post-mortem. Only one such stab wound was, in and of itself, fatal. Several of the wounds reached the bone, bending the two knives wielded by the appellant. Dr. Smith explained that the wounds reaching the bone would be extremely painful. Moreover, Dr. Smith explained that the patterns of injury to Erica Hurd imply an element of control or torture and that the wounds were not randomly inflicted but purposefully chosen. The autopsy of Hurd also indicated that she had sustained crushing blows to her head, strong enough blows to fracture her skull in multiple places.

The "heinous, atrocious, or cruel" aggravating circumstance is "reserved for those cases that can be articulately determined to be the very 'worst of the worst.' " Odom, 928 S.W.2d at 26-27. The proof before this court indicates both an element of "torture" and of "serious physical abuse beyond that necessary to cause death." Indeed, the multiplicity of the wounds, the infliction of gratuitous violence and the evidence of both physical and mental torture amply support a finding of this aggravating circumstance. See State v. Blanton, 975 S.W.2d 269, 280 (Tenn.), reh'g denied, (1998); State v. Cauthern, 967 S.W.2d 726, 732 (Tenn.), cert. denied, --- U.S. ----, 119 S.Ct. 414, --- L.Ed.2d ---- (1998). This issue is without merit.

#### b. Constitutionality of Aggravator (i)(5)

*21 Next, the appellant asserts that "[t]he heinous, atrocious and cruel aggravator is unconstitutionally vague" and fails to narrow the class of persons eligible for the death penalty. This contention has been rejected by our supreme court. [FN10] See, e.g., State v. Hall, 958 S.W.2d 679, 715 (Tenn.1997), cert. denied, --- U.S. ----, 118 S.Ct. 2348, 141 L.Ed.2d 718 (1998); Odom, 928 S.W.2d at 26; State v. Hines, 919 S.W.2d 573, 587 (Tenn.1995), cert. denied, --- U.S. ----, 117 S.Ct. 133, 136 L.Ed.2d 82 (1996); State v. Black, 815 S.W.2d 166, 181-182 (Tenn.1991); State v. Barber, 753 S.W.2d 659, 670 (Tenn.), cert. denied, 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 236 (1988); Williams, 690 S.W.2d at 526-30; Thompson v. State, 958 S.W.2d 156, 174 (Tenn.Crim.App.),

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 16
(Cite as: 1999 WL 51562, *21 (Tenn.Crim.App.))

perm. to appeal denied, (Tenn.1997); Alley v. State,
958 S.W.2d 138, 155 (Tenn.Crim.App.), perm. to
appeal denied, (Tenn.1997).

> FN10. Although several federal decisions have
> found Tennessee's definitions of "heinous,
> atrocious, or cruel" unconstitutionally vague, see,
> e.g., Rickman v. Dutton, 854 F.Supp. 1305
> (M.D.Tenn.1994), rulings of federal district courts
> do not bind this court. The United States Supreme
> Court is the only federal court Tennessee courts
> are bound to follow. See Thompson v. State, 958
> S.W.2d 156, 174 (Tenn.Crim.App.), perm. to
> appeal denied, (Tenn.1997) (citing State v.
> McKay, 680 S.W.2d 447, 450 (Tenn.1984), cert.
> denied, 470 U.S. 1034, 105 S.Ct. 1412 (1985);
> State v. Bowers, 673 S.W.2d 887, 889
> (Tenn.Crim.App.1984).

The appellant also alleges that the jury instruction
denied the appellant his constitutional right to a
unanimous jury verdict. Our supreme court has held
that "[a]s used in circumstance (i)(5), the three
adjectives 'heinous,' 'atrocious,' and 'cruel' are
complimentary. Although listed disjunctively, they
state a unitary concept defined and limited by
'torture or depravity of mind.' " State v. Van Tran,
864 S.W.2d 465, 479 (Tenn.1993), cert. denied,
511 U.S. 1046, 114 S.Ct. 1377 (1994).
Accordingly, the appellant's right to a unanimous
jury verdict was not violated. This issue is without
merit.

ii. Aggravator (i)(7)
a. Sufficiency of Evidence

The jury also found that the murder of Erica Hurd
"was committed while [the appellant] was engaged
in committing, or was an accomplice in the
commission of, or was attempting to commit, or was
fleeing after committing or attempting to commit,
any first degree murder, rape, burglary, or
kidnapping." [FN11] Tenn.Code Ann. §
39-13-204(i)(7). The appellant argues that no
evidence exists to support the finding of this
aggravator. Specifically, he asserts that Mr. Ragland
was murdered prior to the murder of Erica Hurd;
there is no evidence that he was attempting to flee
the murder of Charles Ragland while committing the
murder of Erica Hurd; and the rape of Angela
Ragland did not occur until well after the murder of
Erica Hurd. Moreover, he contends that the jury
was never asked to make any findings regarding a

burglary or a kidnapping. Accordingly, the appellant
argues that the State failed to prove, beyond a
reasonable doubt, the applicability of aggravating
circumstance (i)(7).

> FN11. Concerning this aggravating circumstance,
> the trial court specifically instructed the jury on the
> definitions of burglary and kidnapping, in addition
> to reminding them that they had already been
> instructed as to the definition of first degree
> murder and rape.

*22 In State v. Terry, 813 S.W.2d 420, 423
(Tenn.1991), our supreme court addressed the
quantum of evidence necessary to support a finding
of aggravating circumstance (i)(7). In doing so, the
court noted:
> Whether the evidence supports a finding that the
> murder was committed in the course of, during, or
> while engaged in the commission of another felony
> … generally depends on an analysis of the
> temporal, spatial and motivational relationships
> between the capital homicide and the collateral
> felony, as well as on the nature of the felony and
> the identity of its victim.
Terry, 813 S.W.2d at 423 (quoting 67 A.L.R.4th
887, 892 (1989)). See also Hall, 958 S.W.2d at 693.
That is to say that the homicide must have a close
connection with the felony and not be separate,
distinct, and independent from it. Cf. State v.
Farmer, 201 Tenn. 107, 296 S.W.2d 879, 883
(Tenn.1956) (citing Wharton on Homicide § 126).
The collateral felony and the homicide may be a part
of a continuous transaction with the collateral felony
occurring either before or after the homicide. See,
e.g., People v. Johnson, 154 Ill.2d 356, 181
Ill.Dec. 926, 609 N.E.2d 294, 300 (Ill.1993);
People v. Ward, 154 Ill.2d 272, 181 Ill.Dec. 884,
609 N.E.2d 252, 275 (Ill.1992). Indeed, it is not
necessary to prove that the defendant formed the
criminal intent to commit the aggravating felony
before committing the murder. Ward, 181 Ill.Dec.
884, 609 N.E.2d at 275. Rather, the proof is
sufficient to establish the aggravating factor if the
State proves both the elements of the murder and the
elements of the accompanying felony and that they
were both part of the same criminal episode. Id.
(citations omitted).

Applying this standard to the circumstances of the
present case, we conclude that the jury properly
applied this aggravating circumstance to the murder
of Erica Hurd. The proof shows that the appellant,

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 1999 WL 51562, *22 (Tenn.Crim.App.))

armed with a weapon, forced himself into the Raglands' residence with the intent to seek revenge upon Charles Ragland for "disrespecting" him earlier that evening. Once inside the residence, the appellant, prior to his fatal attack on Erica Hurd, shot and killed Charles Ragland. Moreover, there is no dispute that, while the appellant was brutally stabbing the fifteen year old girl to death, Angela Ragland was confined in an adjoining bedroom. After Erica's murder, the appellant returned to the bedroom where he repeatedly raped Angela Ragland. We have already determined that the proof is more than sufficient to establish both the premeditated murder of Erica Hurd and the premeditated murder of Charles Ragland. See supra. The appellant's forceful entry into the Raglands' residence is sufficient to establish the offense of aggravated burglary. See Tenn.Code Ann. § 39-14-402(a)(3) (1991); Tenn.Code Ann. § 39-14-403(a) (1991). The appellant's forceful and knowing confinement of Angela Ragland is sufficient to establish the offense of kidnapping. [FN12] Finally, we conclude that the proof is likewise sufficient to establish his subsequent aggravated rape of Angela Ragland. See Tenn.Code Ann. § 39-13-502(a)(1) (1992 Supp.). Thus, the capital homicide and the collateral felonies occurred at the same time and at the same place; sufficient to support application of the (i)(7) aggravating factor. Hall, 958 S.W.2d at 693. This issue is without merit.

> FN12. "Kidnapping," as properly instructed by the trial court, is "the knowing removal or confinement of another so as to interfere substantially with the other's liberty. The removal or confinement must be under circumstances that expose the other to substantial risk of bodily injury." See Tenn.Code Ann. § 39-13-303(a)(1) (1991).

b. Narrowing of Factor (i)(7)

*23 The appellant contends that aggravating circumstance (i)(7), "committed while engaged in committing or fleeing a first degree murder, rape, burglary, or kidnapping" violates the principles of State v. Middlebrooks and fails to properly narrow the class of defendants subject to the death penalty. Specifically, he asserts that

the application of the aggravator of other felonies is vague, did not require election by the jury as to which other felonies were committed, and fails to

properly narrow the class of persons eligible for the death penalty or give the jury proper decision making guidance. Thus, the imposition of death from this factor would violate the Eighth and Fourteenth Amendments to the U.S. Constitution and Article One, Section Sixteen of the Tennessee Constitution.

In State v. Middlebrooks, 840 S.W.2d 317, 346 (Tenn.1992), our supreme court held that, when a defendant is convicted of felony murder, the aggravating circumstance set out in Tenn.Code Ann. § 39-13-204(i)(7) does not narrow the class of death eligible murderers sufficiently under the Eighth Amendment to the United States Constitution and Article I, § 16 of the Tennessee Constitution "because it duplicates the elements of the offense. " See Hall, 958 S.W.2d at 692 (emphasis in original). "Implicit in this statement is the recognition that the circumstance properly may be applied if a defendant is convicted of premeditated first degree murder." Hall, 958 S.W.2d at 692 (emphasis added). In the present case, the evidence sufficiently supports the jury's finding that the premeditated murder was committed during the appellant's burglary of the Ragland residence, his murder of Charles Ragland, and his kidnapping and rape of Angela Ragland. Id. at 697. Moreover, we fail to find the wording of the aggravating circumstance vague or that the court's failure to require an election of offenses was error. [FN13] See Blanton, 975 S.W.2d at 280. Accordingly, we conclude that factor (i)(7) sufficiently narrows the death eligible class of defendants by ensuring reliability and requiring particularization in the determination that death is the appropriate punishment in a specific case. The appellant's challenges to aggravating circumstance (i)(7) are without merit.

> FN13. In Blanton, the trial court charged every felony listed under aggravating circumstance (i)(7). Id. While the supreme court noted that the better practice is to charge only those felonies that may be supported by the facts, any error in charging all of the enumerated felonies is harmless if the application of (i)(7) is sufficiently supported by the evidence. Id. In the present case, the trial court only charged those enumerated felonies that were raised by the evidence. We have already concluded that the evidence is sufficient to support the aggravating circumstance that the murder was committed during a kidnapping. Any error, if error does exist, is harmless.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

### iii. Weighing of Aggravating and Mitigating Circumstances

With regard to the jury's finding that the aggravating circumstances in the murder of Erica Hurd outweighed any applicable mitigating circumstances, our supreme court has routinely held that "whether mitigation exists and the weight given aggravating and mitigating circumstances are issues within the province of the jury." Mann, 959 S.W.2d at 512 (citing Barber, 753 S.W.2d at 669); see also Bland, 958 S.W.2d at 661.

*24 Notwithstanding this basic premise, the appellant contends that "there is evidence of mitigating circumstances in this case." Specifically, the appellant argues that (1) the appellant let Mrs. Ragland, the only witness, go; (2) he was under extreme mental and emotional disturbance at the time of the crime; (3) he was under the influence of cocaine which impaired his judgment and his ability to inhibit himself; (4) he was a good worker; (5) he admitted his responsibility for the offenses; and (6) he is a good student and a good prisoner. Apparently, the appellant's argument is premised upon the contingency that this court would find insufficient evidence to support aggravating circumstances (i)(5) and (i)(7). However, as we have previously determined, the evidence is not only sufficient to support their application, but also compelling. See supra. We will not curtail the jury's role in weighing the aggravating and mitigating circumstances. It was well within the jury's prerogative to place great weight upon the aggravating circumstances. As such, we conclude that the evidence is sufficient to support the jury's finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. This issue is without merit.

### IV. Statement of Intent of Future Wrongdoing and Prior Bad Act

Prior to the testimony of Angela Ragland, a jury-out hearing was held to determine the admissibility of testimony regarding the appellant's prior rape charge and statements made by the appellant to Angela Ragland regarding his intent to kill Marvin Eckford, to rob a bank, and to leave town. The trial court permitted the introduction of the testimony, finding that

it would be rare that any statements made by any defendant during the course of a criminal enterprise to be excluded if there are crimes that require proof of culpability, state of mind, et cetera, they would usually be considered res gestae, so closely connected with the crime, with the offense, that they can't be separated from it. All of these statements reflect upon that, that he is on a killing spree, going to kill ... that clearly is some proof of the defendant's mental state, that he was on a violent binge. You know, he commits one murder, he commits two murders, he might as well commit three, what- difference-does-it-make sort of attitude. It's also proof of, of course, the mental state. Words like, "I've been accused of one rape" ... [w]ould serve as a motive. That's another thing, motive, intent, state of mind.... Certainly shows intent ... that he knew what he had done.... Arguably evidence that the defendant was coherent, that he knew what he had done, he knew what he was going to do and that he had presence of mind about all of these things.... In summary, all of these remarks are clearly admissible.... But all of these things, particularly when you're thinking about the requirements of culpability being proven, when you're thinking about the position that's going to be taken.... Statements made during the course of the crime or even afterwards which would reflect upon the defendant's thinking, mental state, what he had on his mind, and all of these things do that. So they're going to be admissible for these numerous reasons, not to mention res gestae.

### A. Statements of Future Intent

*25 Again, during the guilt phase of the appellant's trial, the trial court permitted the State to question Angela Ragland about statements made to her by the appellant. On direct examination, Angela Ragland testified that, between instances of rape, the appellant told her that he was going home to tell his children goodbye, that he was going to kill Marvin Eckford because Eckford had provided his name to the woman accusing the appellant of raping her, and that he was going to rob a bank and leave town. On appeal, the appellant contends that such evidence is irrelevant and is unduly prejudicial.

The trial court correctly found such testimony admissible under the "state of mind" exception to the hearsay rule. See Tenn. R. Evid. 803(3); State v. Roe, No. 02C01-9702-CR-00054 (Tenn.Crim.App.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 1999 WL 51562, *25 (Tenn.Crim.App.))

at Jackson, Jan. 12, 1998); Neil P. Cohen et al., Tennessee Law of Evidence § 803(3).2 (3d ed.1995). The testimony is relevant to show the appellant's existing state of mind at the time of the crimes, i.e., to show his intent, plan, and motive, including the fact that he was capable of understanding the import of his actions. Id.; see also Tenn. R. Evid. 402. Moreover, the trial court instructed the jury that the appellant did not kill Marvin Eckford, did not rob a bank, and did not leave town. Accordingly, we cannot conclude that introduction of this evidence was more prejudicial than probative. See Tenn. R. Evid. 403. This issue is without merit.

### B. Evidence of Prior Bad Act: Alleged Rape

Angela Ragland also testified that, during the crimes, the appellant told her that "[h]e had been accused of raping someone and that he didn't, and if he was going to go to jail, he was going to go to jail for doing something." The appellant objected and a jury-out hearing was held to conduct a Tenn. R. Evid. 404(b) analysis. The trial court found the testimony admissible, but determined that it should only be considered on the issue of mental intent. The trial court instructed the jury that "they're not to presume that he's guilty of any previous rape."

Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Nonetheless, such evidence may be admissible for other purposes. Id. Other acts may be admitted to prove such issues as motive, intent, knowledge, absence of mistake or accident, common scheme or plan, identity, completion of the story, opportunity, and preparation. Neil P. Cohen et al., Tennessee Law of Evidence § 404.6. Thus, the trial court properly found that testimony concerning the alleged rape was admissible pursuant to Tenn. R. Evid. 404(b), as it was highly relevant to the issue of intent and its probative value outweighed the danger of unfair prejudice.

### V. Photographs of Victim at Sentencing Phase

*26 During the sentencing phase, the State was permitted, over objection, to introduce multiple photographs of the body of the deceased victim, Erica Hurd. [FN14] The trial court permitted the introduction of the photographs on the issue of establishing the aggravating circumstance "heinous, atrocious, or cruel." On appeal, the appellant complains that the admission of the photographs was error. Specifically, he argues that (1) the photographs were more prejudicial than probative and (2) the photographs were cumulative to the testimony of Dr. Smith and the demonstrative evidence of the mannequin.

> FN14. The State also sought to introduce photographs of Charles Ragland. The trial court refused to admit these photographs into evidence. The State later voluntary withdrew these photographs.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. State v. Banks, 564 S.W.2d 947, 949 (Tenn.1978) (citations omitted). Accordingly, "the admissibility of photographs lies within the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. However, before a photograph may be admitted into evidence, it must be relevant to an issue that the jury must decide and the probative value of the photograph must outweigh any prejudicial effect that it may have upon the trier of fact. See State v. Braden, 867 S.W.2d 750, 758 (Tenn.Crim.App.), perm. to appeal denied, (Tenn.1993) (citation omitted); see also Tenn. R. Evid. 401 and 403.

Of the ten photographs contested on appeal, two are of the victim at the crime scene and the remaining are photographs from the autopsy. Eight of the ten photographs depict wounds to the victim's face and neck. The appellant contends that the facial pictures are unduly prejudicial in that they are "gruesome and inflammatory" and the "facial expression on the victim's face ... could produce a terrible reaction in the jury." The appellant argues that the introduction of the photographs was unnecessary and cumulative due to the testimony of Dr. Smith describing the wounds and his use of a mannequin to demonstrate the various points of injury. The trial court permitted the photographs of Erica Hurd into evidence, finding that "[g]ruesome pictures are admissible in these situations if it would tend to show some of these factors that are involved in the heinous, atrocious or cruel category, torture, physical abuse."

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 1999 WL 51562, *26 (Tenn.Crim.App.))

Although we concede that the photographs are not pleasant to view, they accurately depict the nature and the extent of the victim's injuries. There is no dispute that the photographs were introduced to prove the aggravating circumstance of "heinous, atrocious, or cruel." This evidence was relevant to support the State's proof of the "heinous, atrocious, and cruel" aggravating circumstance. See, e.g., State v. Hall, 976 S.W.2d 121, 162 (Tenn.1998); State v. Smith, 893 S.W.2d 908, 924 (Tenn.1994), cert. denied, 516 U.S. 829, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995); State v. Smith, 868 S.W.2d 561, 579 (Tenn.1993), cert. denied, 513 U.S. 960, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994) (citing State v. Payne, 791 S.W.2d 10, 19-20 (Tenn.1990), judgment aff'd. by, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); State v. Miller, 771 S.W.2d 401, 403-404 (Tenn.1989), cert. denied, 497 U.S. 1031, 110 S.Ct. 3292, 111 L.Ed.2d 801 (1990); State v. Porterfield, 746 S.W.2d 441, 449-450 (Tenn.), cert. denied, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988); State v. McNish, 727 S.W.2d 490, 494-495 (Tenn.), cert. denied, 484 U.S. 873, 108 S.Ct. 210, 98 L.Ed.2d 161 (1987)).

*27 Notwithstanding, as a general rule, where medical testimony adequately describes the degree or extent of the injury, gruesome and graphic photographs should not be admitted. See State v. Duncan, 698 S.W.2d 63 (Tenn.1985), cert. denied, 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986). The photographs were used by the physician who performed the autopsy to assist in explaining his testimony about the manner and cause of death. The photographs clarify the complex testimony of Dr. Smith regarding the severity of the injuries. See Stephenson, 878 S.W.2d at 542; Smith, 868 S.W.2d at 576 (photographs used to illustrate witnesses' testimony admissible for this purpose). Moreover, a relevant photograph is not rendered inadmissible merely because it is cumulative. See State v. Bigbee, 885 S.W.2d 797, 807 (Tenn.1994); Van Tran, 864 S.W.2d at 477.

We conclude that the photographs were not especially gruesome or shocking in nature so as to preclude their admission. Although any such photographs would be prejudicial to the appellant's case, the photographs introduced at the sentencing hearing were highly probative in determining an aggravating circumstance. We cannot conclude that

the trial court abused its discretion by admitting these photographs during the sentencing process. See Tenn. R. Evid. 403; State v. Evans, 838 S.W.2d 185 (Tenn.1992); Banks, 564 S.W.2d at 947. See also State v. Brown, 756 S.W.2d 700, 704 (Tenn.Crim.App.1988); Freshwater v. State, 2 Tenn.Crim.App. 314, 453 S.W.2d 446, 451-52 (Tenn.1969); State v. Beckman, No. 02C01-9406-CR-00107 (Tenn.Crim.App. at Jackson, Sept. 27, 1995 ), perm. to appeal granted, (Tenn. July 8, 1996), perm. to appeal denied, (Tenn. Sept. 9, 1996). This issue is without merit.

VII. Victim Impact Evidence

During closing argument during the penalty phase, General Woodall made the following statements:

It's up. We know for sure that Erica is now gone, at peace and out of pain. There's a lot of other pain here and that's the families of these victims. That's what Angela Ragland went through and will have to go through and there are just not any mitigating circumstances that outweigh these aggravating circumstances, absolutely none. That's why we have this law and where the aggravating circumstances do not (sic) outweigh the mitigating circumstances, the punishment shall be death.

The appellant objects to this argument; contending that this statement constitutes victim impact evidence which is inadmissible, irrelevant to any aggravating or mitigating circumstance, and constitutes argument of matters not in evidence. [FN15] Additionally, he asserts that the inflammatory argument posed a substantial risk that the death penalty was imposed arbitrarily, jeopardizing the reliability requirements of the Eighth Amendment.

FN15. As correctly noted by the State and conceded by the appellant, the appellant failed to make a contemporaneous objection to the prosecutor's statements resulting in waiver of this issue. Tenn. R.Crim. P. 52(a); see State v. Renner, 912 S.W.2d 701, 705 (Tenn.1995); Teague v. State, 772 S.W.2d 915, 926 (Tenn.Crim.App.1988), cert. denied, 493 U.S. 874, 110 S.Ct. 210, 107 L.Ed.2d 163 (1989); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn.Crim.App.1988). Due to the qualitative differences between death and other sentences, the appellate courts of this state consider issues occurring during the sentencing hearing in a capital case. See Bigbee, 885 S.W.2d at 805; Duncan, 698 S.W.2d at 67-68; State v. Strouth, 620 S.W.2d

467, 471 (Tenn.1981), cert. denied, 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 692 (1982). Thus, notwithstanding waiver of this claim, this court elects to consider this issue on the merits.

**\*28** The issues raised by the appellant herein were recently addressed in detail by our supreme court in State v. Nesbit, No. 02S01-9705-CR-00043 (Tenn. at Jackson, Sept. 28, 1998) (for publication ). In a thorough review of the case law development of the admissibility of victim impact evidence, the supreme court reached several conclusions on the issue.

First, noting prior decisions of the United States Supreme Court and its own precedent, the court held that "victim impact evidence and argument is [not] barred by the federal and state constitutions." Nesbit, No. 02S01-9705-CR- 00043. See also Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597,2609, 115 L.Ed.2d 720 (1991) (holding that the Eight Amendment erects no per se bar against the admission of victim impact evidence and prosecutorial argument); State v. Shepherd, 902 S.W.2d 895, 907 (Tenn.1995) (holding that victim impact evidence and prosecutorial argument is not precluded by the Tennessee Constitution); State v. Brimmer, 876 S.W.2d 75, 86 (Tenn.), cert. denied, 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994) (same). Thus, the appellant's argument challenging the constitutionality of the admissibility of victim impact evidence and argument under the Eighth Amendment has been precluded by the Tennessee Supreme Court.

Additionally, the court addressed the relevancy of argument and evidence regarding the impact of the crime(s) on the victim's family. The court noted that, although "[Tenn.Code Ann. § 39-13-204(c) ] ... permits admission of all relevant mitigating evidence, whether or not the category of mitigation is listed in the statutory scheme," [FN16] "this Court repeatedly has held that the State may not rely upon nonstatutory aggravating circumstances to support imposition of the death penalty." Nesbit, No. 02S01-9705-CR-00043 (citing State v. Thompson, 768 S.W.2d 239, 251 (Tenn.1989), cert. denied, 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990); State v. Cozzolino, 584 S.W.2d 765, 768 (Tenn.1979)). Notwithstanding, the court stated that, "in several subsequent decisions we have expressly recognized that a sentencing jury must be permitted to hear evidence

about the nature and circumstances of the crime even though the proof is not necessarily related to a statutory aggravating circumstance." Nesbit, No. 02S01-9705-CR-00043 (citing State v. Harris, 919 S.W.2d 323, 331 (Tenn.1996); State v. Teague, 897 S.W.2d 248, 251 (Tenn.1995); Bigbee, 885 S.W.2d at 813; State v. Nichols, 877 S.W.2d 722, 731 (Tenn.1994), cert. denied, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995)). (Emphasis in original). Accordingly, the court concluded that "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language nature and circumstances of the crime." Id. (emphasis in original).

> FN16. See Nesbit, No. 02S01-9705-CR-00043 (citing Cazes, 875 S.W.2d at 266 (discussing McKoy v. North Carolina, 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990) and Mills v. Maryland, 486 U.S. 367, 375, 108 S.Ct. 1860, 1865-66, 100 L.Ed.2d 384 (1988))).

**\*29** In so holding, the court reasoned:
The Tennessee statute delineates a procedure which enables the sentencing jury to be informed about the presence of statutory aggravating circumstances, the presence of mitigating circumstances, and the nature and circumstances of the crime. The statute allows the sentencing jury to be reminded 'that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' Payne, 501 U.S. at 825, 111 S.Ct. at 2608 (internal citations and quotations omitted). As this Court emphasized in its decision in Payne, it would be 'an affront to the civilized members of the human race' to allow unlimited mitigation proof at sentencing in a capital case, but completely preclude proof of the specific harm resulting from the homicide. Accordingly, the defendant's claim that victim impact evidence is not admissible under the Tennessee capital sentencing statute is without merit.
Nesbit, No. 02S01-9705-CR-00043.

The supreme court, however, limited this ruling, by holding that "victim impact evidence may [not] be introduced 'that is so unduly prejudicial that it renders the trial fundamentally unfair,' thus implicating the Due Process Clause of the Fourteenth Amendment." Id. (citing Payne, 501

U.S. at 825, 111 S.Ct. at 2608). Moreover, the trial court, in its discretion, "may exclude victim impact proof if its probative value is substantially outweighed by its prejudicial effect." Id. (citing Tenn. R. Evid. 403). Indeed, "victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." Id. (internal citations omitted) (citing Payne, 501 U.S. at 822, 111 S.Ct. at 2607; Payne, 501 U.S. at 803, 111 S.Ct. at 2611 (O'Connor, J., concurring); Cargle v. State, 909 P.2d 806, 826 (Ok.Ct.Crim.App.1995)). Similarly, the court "cautioned the State against engaging in victim impact argument which is little more than an appeal to the emotions of the jurors as such argument may be unduly prejudicial." Id. (citing Shepherd, 902 S.W.2d at 907 (parenthetical omitted); Bigbee, 885 S.W.2d at 808 (parenthetical omitted)).

In the present case, the victim impact argument, in essence, is limited to "[t]hat's what Angela Ragland went through and will have to go through." It would be farfetched to conclude that this statement prejudiced the outcome of the sentencing phase as the effects of the double homicide on Angela Ragland were directly fashioned by the appellant and were clearly foreseeable. See Payne v. Tennessee, 501 U.S. at 838, 111 S.Ct. at 2615-2616 (Souter, J., concurring). Indeed, the fact that the death of a loved one is devasting requires no proof. Accordingly, the challenged argument was properly admitted. [FN17] This issue is without merit.

FN17. Although not applicable to the present case as the murders occurred prior to the supreme court's decision in Nesbit, we note that the supreme court established procedures under which victim impact evidence may be introduced during capital sentencing phases. See Nesbit, No. 02S01-9705-CR-00043.

VII. Separate Jury for Penalty Phase

*30 The appellant claims that a separate jury should have been impaneled for the penalty phase of his trial. He asserts that, by requiring the same jury to hear both the guilt and penalty phases of his capital

trial, he was deprived of his right to a fair and impartial jury under the Tennessee and United States Constitutions. Specifically, he contends that "he was denied a cross-section of the community because those jurors that could not enforce the death penalty were removed and he got a jury that was prone to give the death penalty."

This argument has been previously considered and rejected by our supreme court. In State v. Harbison, 704 S.W.2d 314, 318-319 (Tenn.1986), cert. denied, 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986), the court rejected a claim by the defendant that separate juries should have been sworn to hear the guilt and sentencing phases of the trial and held that a single jury in a capital case neither denied a fair cross section of the community nor resulted in a conviction prone process. See also State v. Teel, 793 S.W.2d 236, 246 (Tenn.), cert. denied, 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990) (guilt prone jury argument "has been rejected by both the Tennessee and United States Supreme Courts"); State v. Jones, 789 S.W.2d 545, 547 (Tenn.), cert. denied, 498 U.S. 908, 111 S.Ct. 280, 112 L.Ed.2d 234 (1990) (rejecting guilt prone jury claim); State v. Zagorski, 701 S.W.2d 808, 814-15 (Tenn.1985), cert. denied, 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986) (rejecting cross section claim);. This issue is without merit. [FN18]

FN18. Additionally, we note that Tennessee's statutory scheme for first degree murder mandates that the "same jury that determined guilt" "shall fix the punishment in a separate sentencing hearing." See Tenn.Code Ann. § 39-13-204(a) (1994 Supp.).

VIII. Constitutional Challenges

Finally, the appellant raises a myriad of challenges to the constitutionality of Tennessee's death penalty provisions. The appellant concedes that these issues have been previously rejected by the Tennessee Supreme Court, however, he raises these challenges to preserve them for future appellate review.

A. Death by Electrocution

The appellant first contends that "[t]he electric chair constitutes cruel and unusual punishment," emphasizing that "the Eighth Amendment forbids inhuman and barbarous methods of execution that go

Page 23

beyond the mere extinguishment of life and cause torture or a lingering death." (citing Glass v. Louisiana, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985)). As support for his argument, the appellant refers to recent legislation in this state moving beyond death by electrocution and substituting lethal injection. See Tenn.Code Ann. § 40-23- 114 (1998 Supp.) (changes the method of execution from electrocution to lethal injection for those persons sentenced to death after January 1, 1999). [FN19] We do not see how this amendment renders death by electrocution unconstitutional. The appellate courts of this state are of the opinion that electrocution is a constitutionally permissible method of execution and have routinely rejected this argument. See Black, 815 S.W.2d at 179; see also Hines, 919 S.W.2d at 582.

> FN19. The bill also provides that those persons sentenced to death prior to January 1, 1999, may choose to be executed by lethal injection by signing a written waiver. See Constitutionality of House Bill 2085 as amended--Change in Method of Execution, Tenn. Op. Atty. Gen. No. 98-074 (Mar. 31, 1998); Constitutionality of House Bill 2085--Change in Method of Execution, Tenn. Op. Atty. Gen. No. 98-068 (Mar. 25, 1998).

### B. Death penalty is cruel and unusual punishment.

**\*31** Within this challenge, the appellant makes numerous challenges alleging that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 8, 9, 16, and, 17, and Article II, Section 2 of the Tennessee Constitution. These arguments have previously been rejected by our supreme court:

1. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, specifically because Tenn.Code Ann. § 39-13- 204(i)(4), (5), (6), and (7) encompass a majority of the homicides committed in Tennessee, [FN20] have been rejected by our supreme court. See State v. Keen, 926 S.W.2d 727, 742 (Tenn.1994).

> FN20. We note that factors (i)(4) and (i)(6) do not pertain to this case as they were not relied upon by the State. Thus, any individual claim with respect to these factors is without merit. See, e.g., Hall,

958 S.W.2d at 715; Brimmer, 876 S.W.2d at 87.

2. The death sentence is imposed capriciously and arbitrarily in that:

(1) Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has been rejected. See Hines, 919 S.W.2d at 582.

(2) The death penalty is imposed in a discriminatory manner based upon economics, race, geography, and gender. This argument has been rejected. See Hines, 919 S.W.2d at 582; Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; State v. Smith, 857 S.W.2d 1, 23 (Tenn.), cert. denied, 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993).

(3) There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter. This argument has been rejected. See State v. Caughron, 855 S.W.2d 526, 542 (Tenn.), cert. denied, 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993).

(4) The death qualification process skews the make-up of the jury and results in a relatively prosecution prone guilt-prone jury. This argument has been rejected. See Teel, 793 S.W.2d at 246; Harbison, 704 S.W.2d at 318.

(5) Defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, i.e., the cost of incarceration versus cost of execution, deterrence, method of execution. This argument has been rejected. See Brimmer, 876 S.W.2d at 86-87; Cazes, 875 S.W.2d at 268; Black, 815 S.W.2d at 179.

(6) The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non- unanimous verdict. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d 22-23.

**\*32** (7) Requiring the jury to agree unanimously to a life verdict violates Mills v. Maryland and McKoy v. North Carolina. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Thompson, 768 S.W.2d at 250; State v. King, 718 S.W.2d 241, 249 (Tenn.1986), superseded by statute as recognized by, State v. Hutchinson, 898 S.W.2d 161 (Tenn.1994).

(8) The jury is not required to make the ultimate determination that death is the appropriate penalty.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                          Page 24
(Cite as: 1999 WL 51562, *32 (Tenn.Crim.App.))

This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Smith, 857 S.W.2d at 22.

(9) The defendant is denied final closing argument in the penalty phase of the trial. This argument has been rejected. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 24; Caughron, 855 S.W.2d at 542.

3. Appellate Review process in death penalty cases is constitutionally inadequate.

The defendant argues that the appellate review process in death penalty cases is constitutionally inadequate in its application. He contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete, and because the appellate courts' methodology of review is flawed. This argument has been specifically rejected by our supreme court on numerous occasions. See Caze s, 875 S.W.2d at 270-71; see also Harris, 839 S.W.2d at 77; Barber, 753 S.W.2d at 664. Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." Bland, 958 S.W.2d at 663.

XII. Proportionality Review

Finally, this court must consider whether the appellant's sentence of death is disproportionate to the penalty imposed in similar cases. See Tenn.Code Ann. § 39-13-206(c)(1)(D) (1997). If the imposition of a death sentence in the appealed case is "plainly lacking in circumstances with those in similar cases in which the death penalty has previously been imposed," the sentence of death will be deemed disproportionate. See Bland, 958 S.W.2d at 665. However, just because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence does not per se require a finding of disproportionately. Id. at 665. Thus, it is the duty of the appellate court, not to "assure that a sentence less than death was never imposed in a case with similar characteristics," but to "assure that no aberrant death sentence is affirmed." Id.

*33 In conducting our review, we begin with the presumption that the sentence of death is proportionate with the crime of first degree murder. See Hall, 958 S.W.2d at 699. Second, while there is no mathematical or scientific formula involved, this court, in comparing similar cases, should consider (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Nesbit, No. 02S01-9705-CR-00043 (citing Bland, 958 S.W.2d at 667). When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id.

Erica Hurd was a fifteen year old high school freshman at the time of her death. Her terror began when she was abducted by the appellant at gunpoint outside her cousin's duplex. After demanding "dope" from Charles Ragland, the appellant murdered Ragland execution style while Erica and Angela, Charles' wife, were forced to watch. After killing Charles, the appellant separated Erica and Angela, placing the terrified Erica in a closet and restraining Angela in another bedroom. He then returned and removed Erica from the closet. For the next fifteen to twenty minutes, Angela Ragland, who could not see her cousin, heard Erica pleading for her life, then she heard her gasping for air, then-- nothing. During the appellant's assault, thirty-seven stab wounds were inflicted to Erica's face and neck. Twenty-three wounds were inflicted prior to her death and of these, only one was life threatening. These wounds were particularly painful as they struck her ribs and other bones, bending the knives. Moreover, the superficial nature and placement of the wounds were indicative that the appellant intended to torment the victim. Despite the numerous stab wounds inflicted upon Erica's person, the cause of death proved to be a crushing blow to the skull by a blunt object, causing multiple

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 25
(Cite as: 1999 WL 51562, *33 (Tenn.Crim.App.))

fractures to the skull.

At the time of the offenses, the appellant was a married thirty-eight year old African-American male. Although at the time of this offense he was on bond for an unrelated rape charge, the appellant had no prior convictions for violent felonies. There is no dispute that, at the time of the murders, the appellant was under the effects of crack cocaine. Despite his assertions of remorse and accepted responsibility for these crimes, the record indicates otherwise. Specifically, his behavior with law enforcement officials immediately after the crime belie a finding of remorse. The appellant believes that his use of illegal substances and his "remorse" found after his incarceration render his death sentence disproportionate to his crime. However, the nature of his crime, his wanton infliction of violence upon innocent, unarmed human beings, and his complete disregard for human life places him into that class of criminals for whom a sentence of death is appropriate. See Blanton, 975 S.W.2d at 285.

*34 While no two capital cases and no two defendants are alike, we have reviewed the circumstances of the present case with similar first degree murder cases and conclude that the penalty imposed in the case sub judice is not disproportionate to the penalty imposed in similar cases. See, e.g.,
(1) State v. Bush, 942 S.W.2d 489 (Tenn.), cert. denied, --- U.S. ----, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997) (imposition of **death penalty** upheld based on aggravating circumstances (i)(6) and (i)(7) where defendant killed seventy- nine year old woman, whom he knew, by stabbing her forty-three times during burglary);
(2) State v. Smith, 868 S.W.2d 561 (Tenn.1993) **(death penalty** upheld based on aggravating circumstances (i)(5), (6), (7) and (12) where defendant found guilty of triple murder of **ex-wife** and her two children; defendant shot **wife** twice, slashed her throat, and stabbed with knife and ice pick; older son shot three times, stabbed with ice pick and knife; and younger son had been shot and stabbed in the chest);
(3) State v. Payne, 791 S.W.2d 10 (Tenn.1990) **(death penalty** upheld based on finding aggravating circumstances (i)(3) and (i)(5) where cocaine intoxicated defendant stabbed one victim forty-two times and death occurred within thirty minutes, other victim stabbed nine times);

(4) State v. Jones, 789 S.W.2d 545 (Tenn.1990) **(death penalty** imposed upon finding aggravating circumstances (i)(2), (5), (7), where defendant bound, gagged and blindfolded victim with duct tape; while victim pleaded for mercy, defendant stabbed victim six times);
(5) State v. Henley, 774 S.W.2d 908 (Tenn.1989) **(death penalty** affirmed based upon finding aggravating circumstance (i)(5), where defendant, intoxicated on drugs and alcohol, forced married couple to their house at gunpoint demanding money, defendant later refused offered money and without provocation shot husband and **wife, wife** shot two more times, defendant then poured gasoline on her body and set house on fire, **wife** died from burns and smoke inhalation);
(6) State v. West, 767 S.W.2d 387 (Tenn.1989) **(death penalty** affirmed based upon finding aggravating circumstances (i)(5),(6),(7), where intoxicated defendant and co-defendant forcefully obtained sex from mother and daughter, separated victims, and stabbed one victim seventeen times and other victim stabbed numerous times, evidence of torture type wounds inflicted prior to death, victims were restrained during the attack);
(7) State v. O'Guinn, 709 S.W.2d 561 (Tenn.1986) **(death penalty** affirmed based on aggravating circumstance (i)(5) where defendant, intoxicated on drugs and alcohol, assaulted and murdered girl whom he had picked up at nightclub, victim had been severely beaten, cause of death ligature strangulation with her halter top, victim was raped prior to death);
*35 (8) State v. Miller, 674 S.W.2d 279 (Tenn.1984), remanded for new sentencing hearing and sentence affirmed on remand by, 771 S.W.2d 401 (1989) **(death penalty** affirmed based upon finding aggravating circumstance (i)(5), where defendant, intoxicated and on LSD, stabbed mildly retarded female victim five times in chest with Bowie knife, struck her twice in the face with a poker, and bound victim with hemp rope);
(9) State v. Cone, 665 S.W.2d 87 (Tenn.1984) **(death penalty** affirmed based on aggravating circumstances (i)(2),(5) and (6), where defendant suffering from "chronic amphetamine psychosis" murdered elderly couple during commission of burglarizing their home, death of victims caused by crushing blows to the head, deaths were neither instantaneous nor simultaneous);
(10) State v. Melson, 638 S.W.2d 342 (Tenn.1982) **(death penalty** affirmed based on

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    **Page 26**
(Cite as: 1999 WL 51562, *35 (Tenn.Crim.App.))

aggravating circumstances (i)(5) and (i)(6) where defendant used hammer to repeatedly beat victim in head, victim had attempted to defend herself during ordeal, only motive was victim's discovery of defendant's theft, defendant had no significant prior history of criminal activity).

In the cases cited, the defendants tortured, stabbed and assaulted unresisting and defenseless victims without provocation. Upon comparing the facts of these cases with those now before this court, we conclude that the multiplicity of wounds and the manner of their infliction upon Erica Hurd were particularly heinous, atrocious, and cruel. Additionally, although the appellant had ingested "crack cocaine" at sometime preceding the crimes, his statement provided to the police and his actions after the murders are evidence of preparation and planning immediately before the crimes. Moreover, although motive is unclear from the facts, it is clear that he intended to enact revenge upon Charles Ragland, his neighbor, for "disrepectin' him." The infliction of gratuitous violence in this case appears to be equally as horrifying or worse than that inflicted in previous cases. The penalty imposed by the jury in the present case is clearly not disproportionate to the penalty imposed for similar crimes.

Conclusion

In accordance with the mandate of Tenn.Code Ann. § 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39-13-206(c)(1)(A)(C). A comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Likewise, we have considered the appellant's assignments of error as to each of his convictions on appeal and the respective sentences and determined that none have merit. Additionally, we conclude, in reference to the murder of Charles Ragland, that the jury appropriately found two statutory aggravating circumstances and did not arbitrarily impose a sentence of life without the possibility of parole as to that count. Thus, we affirm the appellant's conviction for the first degree murder of Charles Ragland and the accompanying sentence of life without the possibility of parole, his conviction for the first degree murder of Erica Hurd and the accompanying sentence of death by electrocution, and his conviction for the aggravated rape of Angela Ragland and the accompanying sentence of twenty-five years. [FN21]

> FN21. No execution date is set. Tenn.Code Ann. § 39-13-206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty. If the death sentence is upheld by the higher court on review, the supreme court will set the execution date.

RILEY and WILLIAM, JJ., concur.

END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works