8 S.W.3d 593                                                              **Page 29**
8 S.W.3d 593
**(Cite as: 8 S.W.3d 593)**
▷

Supreme Court of Tennessee,
at Jackson.
STATE of Tennessee, Appellee,
v.
Jon Douglas **HALL**, Appellant.
W1997-00023-SCDDTDD.

Nov. 15, 1999.
Rehearing Denied Dec. 27, 1999.

Defendant was convicted in the Circuit Court, Madison County, Whit Lafon, J., of first-degree murder, and he was sentenced to death. On appeal, the Court of Criminal Appeals affirmed. On automatic review, the Supreme Court, Barker, J., held that: (1) evidence was sufficient to support conviction; (2) evidence supported especially heinous, atrocious, or cruel aggravating circumstance; (3) graphic autopsy photographs were relevant to aggravating circumstance; (4) statements by defendant's brother regarding defendant's mental state did not come within hearsay exception for statements by unavailable declarant; (5) refusal to remove the United States flag from the courtroom during trial did not violate defendant's rights; and (6) death sentence was not disproportionate.

Affirmed.

West Headnotes

[1] Criminal Law ⚖1144.13(3)
110k1144.13(3)

[1] Criminal Law ⚖1159.2(7)
110k1159.2(7)
When the sufficiency of the evidence is challenged, the standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

[2] Criminal Law ⚖1144.13(3)
110k1144.13(3)

[2] Criminal Law ⚖1144.13(5)
110k1144.13(5)
On appeal from conviction, state is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.

[3] Criminal Law ⚖1159.2(8)
110k1159.2(8)

[3] Criminal Law ⚖1159.2(9)
110k1159.2(9)
In determining the sufficiency of the evidence to support conviction, appellate court does not reweigh the evidence or substitute its inferences for those drawn by the trier of fact.

[4] Criminal Law ⚖308
110k308

[4] Criminal Law ⚖1160
110k1160
A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the state, and a presumption of guilt replaces the presumption of innocence.

[5] Criminal Law ⚖1141(2)
110k1141(2)
On appeal, defendant bears the burden of proving that the evidence is insufficient to support the jury verdict.

[6] Homicide ⚖915
203k915
(Formerly 203k152)

[6] Homicide ⚖933
203k933
(Formerly 203k152, 203k147)

[6] Homicide ⚖936
203k936
(Formerly 203k152)
A homicide, once proven, is presumed to be second-degree murder, and state has the burden of proving the elements of premeditation and deliberation to raise the offense to first-degree murder. T.C.A. § 39-13-202(a)(1) (1994).

[7] Homicide ⚖535
203k535
(Formerly 203k14(1))
Proving premeditation for murder requires evidence of a previously formed design or intent to kill, and the exercise of reflection and judgment. T.C.A. §§

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 S.W.3d 593                                                    **Page 30**
(Cite as: 8 S.W.3d 593)

39-13-201(b)(2), 39-13-202(a)(1) (1994).

[8] Homicide ⬦535
203k535
    (Formerly 203k14(1))

[8] Homicide ⬦536
203k536
    (Formerly 203k14(2))
Proving deliberation for murder requires evidence
of a cool purpose formed in the absence of passion
or provocation, as well as some period of reflection
during which the mind is free from the influence of
excitement.    T.C.A.    §§    39-13-201(b)(1),
39-13-202(a)(1) (1994).

[9] Homicide ⬦542
203k542
    (Formerly 203k14(1))
A killing committed during a state of passion may
rise to the level of first-degree murder if state can
prove that premeditation and deliberation preceded
the struggle.    T.C.A.    §§ 39-13-201(b)(1, 2),
39-13-202(a)(1) (1994).

[10] Homicide ⬦1213
203k1213
    (Formerly 203k238)
Premeditation and deliberation required for first-
degree murder were established, despite claim of
intoxication, by evidence that defendant used child
support as ruse to meet with estranged wife to
attempt reconciliation, intended to make her "feel
the helplessness" that he felt, disconnected
telephone lines to her house, threatened to kill her if
her children went for help, severely beat her and
inflicted at least 83 separate wounds, and caused her
death through combination of strangulation and
drowning.    T.C.A.    §§  39-  11-503(a);    §§
39-13-201(b)(1, 2), 39-13-202(a)(1) (1994).

[11] Sentencing and Punishment ⬦1684
350Hk1684
    (Formerly 203k357(11))
Evidence that defendant inflicted mental torture
upon his estranged wife by beating her in her
children's presence and threatening to kill children
if they went for help, as well as evidence of extent
and severity of beating, during which estranged
wife sustained at least 83 separate wounds before
her death through combination of strangulation and
drowning, supported especially
heinous,    atrocious,    or    cruel    aggravating

circumstance during penalty phase of capital murder
trial.    T.C.A. § 39-13-204(i)(5).

[12] Sentencing and Punishment ⬦1767
350Hk1767
    (Formerly 203k358(1))
Graphic photographs taken of victim's body during
autopsy were admissible during sentencing phase of
capital murder trial as relevant to the existence of
torture and serious physical abuse, necessary
elements of the especially heinous, atrocious or
cruel aggravating circumstance.    T.C.A. § 39-13-
204(i)(5).

[13] Criminal Law ⬦438(1)
110k438(1)

[13] Criminal Law ⬦1153(1)
110k1153(1)
The admissibility of photographs is generally within
the sound discretion of the trial judge, and his or
her ruling on admissibility will not be disturbed on
appeal absent an abuse of that discretion.

[14] Criminal Law ⬦872.5
110k872.5
Unanimity instruction given during sentencing phase
of capital murder trial, in referring to state's burden
to prove aggravating circumstances outweighed
mitigating circumstances beyond a reasonable
doubt, did not improperly limit jury's consideration
of mitigating circumstances, in violation of Eighth
Amendment, where jury was further instructed that
there was no requirement of jury unanimity as to
any particular mitigating circumstance or of
agreement as to same mitigating circumstances.
U.S.C.A. Const.Amend. 8.

[15] Criminal Law ⬦419(6)
110k419(6)
Statements by defendant's brother regarding
defendant's mental state on day of murder did not
come within hearsay exception for statements by
unavailable declarant, though brother died before
trial; statements were not made in court, were not
under belief of impending death, were not against
interest, and were
not of personal and family history. Rules of Evid.,
Rule 804(a)(4).

[16] United States ⬦5.5
393k5.5
Trial court's refusal to remove the United States

8 S.W.3d 593
(Cite as: 8 S.W.3d 593)

flag from the courtroom during capital murder trial did not violate defendant's right to testify, despite his refusal to testify in presence of alleged "flag of war."

[17] United States ⬥⟳5.5
393k5.5
Gold fringe appearing on the United States flag in a courtroom has no inherent or established symbolism, and has nothing to do with the jurisdiction of the court or with martial law, but is purely a decorative addition to enhance the appearance of the flag.

[18] Sentencing and Punishment ⬥⟳1684
350Hk1684
        (Formerly 203k357(11))
Death sentence imposed upon defendant who severely beat his estranged wife in presence of her children, inflicted at least 83 separate wounds, and caused her death through combination of strangulation and drowning, without any provocation, was not disproportionate to penalty imposed in similar cases. T.C.A. § 39-13-206(c)(1)(D).

[19] Criminal Law ⬥⟳1134(3)
110k1134(3)
Comparative proportionality is for the purpose of determining whether the death penalty is unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime. T.C.A. § 39-13-206(c)(1)(D).

[20] Criminal Law ⬥⟳1134(3)
110k1134(3)
In theory, comparative review of capital cases insures rationality and consistency in the imposition of the death penalty. T.C.A. § 39-13- 206(c)(1)(D)

[21] Criminal Law ⬥⟳1134(2)
110k1134(2)
In addition to backgrounds of defendants and aggravating and mitigating factors applicable, other factors relevant to identifying and comparing cases for proportionality review of death sentence include: means of death; manner of death; motivation for the killing; place of death; similarity of the victims' circumstances and treatment; absence or presence of premeditation; absence or presence of provocation; absence or presence of

justification; and injury to and effects on surviving victims. T.C.A. § 39-13-206(c)(1)(D).

[22] Criminal Law ⬥⟳1134(2)
110k1134(2)
Matters relevant when comparing cases for proportionality review of death sentence include defendant's prior criminal record or prior criminal activity; defendant's age, race, and gender; defendant's mental, emotional or physical condition; defendant's involvement or role in the murder; defendant's cooperation with authorities; defendant's remorse; defendant's knowledge of helplessness of the victim; and defendant's capacity for rehabilitation. T.C.A. § 39-13-206(c)(1)(D).

*595 Jesse H. Ford, III, Clayton F. Mayo, Jackson, Tennessee (At Trial), C. Mark Donahoe Jackson, Tennessee (On Appeal), for Appellant.

Paul G. Summers, Attorney General and Reporter, Michael C. Moore, Solicitor General, Alice B. Lustre, Assistant Attorney General, Nashville, Tennessee, James G. Woodall, District Attorney General, Alfred Lynn Earls, Asst. District Attorney General, Jackson, Tennessee, for Appellee.

*OPINION*

BARKER, J.

   The defendant, Jon Douglas Hall, was indicted for first degree premeditated murder in the strangulation and drowning death of his wife, Billie Jo Hall. The State filed notice of its intent to seek the death penalty. Pursuant to the defendant's motion for a change of venue, the case was transferred from Henderson County to Madison County for a trial by jury. Following presentation of evidence in the guilt phase, the jury found the defendant guilty of first degree murder as charged. After a sentencing hearing, the jury concluded that the evidence established one aggravating circumstance: that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39-13-204(i)(5) (1991). Finding that this aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death. On appeal, the Court of Criminal Appeals affirmed both the conviction and sentence. Thereafter, pursuant to Tenn.Code Ann. § 39-13-206(a)(1) (1997), the case

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 S.W.3d 593                                                                    **Page 32**
(Cite as: 8 S.W.3d 593, *595)

was docketed in this Court for automatic review.

The defendant raises the following issues for our review:

1. Whether the evidence was sufficient to convict the defendant of first degree premeditated murder;
2. Whether the evidence was sufficient to support the finding of aggravating circumstance (i)(5)(torture or serious physical abuse);
3. Whether the trial court erred in admitting photographs of the victim's body at sentencing;
**\*596** 4. Whether the trial court erred in instructing the jury that it must agree unanimously to impose a life sentence;
5. Whether the trial court erred in excluding the testimony of Cheryl Arbogast at the guilt phase;
6. Whether the trial court's refusal of defendant's request to remove the United States Flag from the courtroom violated the defendant's right to testify on his own behalf under the Fourth, Fifth, and Sixth Amendments to the United States Constitution; and
7. Whether the sentence of death is disproportionate to the penalty in similar cases; [FN1]

> FN1. During oral argument, the defendant raised two additional issues for the first time: first, whether the trial court erred in permitting the State to use a mannequin as demonstrative evidence to document the location and extent of the victim's injuries, and second, whether the trial court erred during the guilt phase by instructing the jury, in reference to the intoxication defense, that "[i]ntoxication is irrelevant [sic] to the issue of the essential element of the Defendant's culpable mental state." Neither the use of the mannequin nor the misstatement of the pattern jury instruction were objected to at trial. Moreover, they were not listed as errors in either the Motion for New Trial or in the appeal to the Court of Criminal Appeals. We find that the failure to raise these issues in previous proceedings constitutes waiver, and we decline to address them at this time. Tenn. R.App. P. 3(e); Tenn. R.App. P. 36(a).

After thoroughly reviewing the record of the trial, the legal principles at issue, and the arguments of the parties, we find no error. The defendant's conviction and sentence are affirmed.

### FACTS

When she met the defendant, Billie Jo Hall had two daughters, Jennifer and Cynthia, from a former relationship. After their marriage, she and the defendant had two more daughters, Stephanie and Jessica. The youngest, Jessica, suffered from cerebral palsy. At the time of her murder, Mrs. Hall and the defendant were estranged and living separately.

On the night of July 29, 1994, the defendant went to Mrs. Hall's house to discuss a reconciliation. He brought a $25.00 money order made out to Mrs. Hall as a payment toward child support. Prior to entering the house, the defendant disconnected the telephone line at the utility box on the outside wall of the house. [FN2] When Mrs. Hall answered the door, the defendant pushed his way into the room where she and the children were watching television. The defendant told the girls to go to bed. When they did not immediately obey his order, the defendant tipped over the chair in which Mrs. Hall was sitting. The defendant and Mrs. Hall then went back into her bedroom. The children, who had gone into their bedrooms, could hear "[t]hings slamming around" and their parents yelling at each another. When the children tried to enter the room, they found the door blocked. The three oldest children, Jennifer, Cynthia and Stephanie, persisted in their efforts to get into the room and finally succeeded. They attempted to stop the defendant from hurting their mother. When Mrs. Hall told the children to go to a neighbor's house, the defendant told them that if they went for help, "he was going to kill Mama." He also told Mrs. Hall, a college student, that she would never live to graduate. Cynthia and Stephanie tried to use the telephone to call for help, but they discovered the telephones would not work. At that point, they went to a neighbor's house where they called 911. Jennifer, the oldest child, was the last to leave the house, carrying her sister Jessica. Before she left, she saw her mother and the defendant leave the bedroom and go outside. She watched the defendant drag her mother, "kicking and **\*597** screaming," to the small pool in the back yard.

> FN2. The photographs of the utility box show that the telephone lines are plugged into a jack in the utility box in the same way that individual telephones are plugged into the wall jacks inside the home. Thus, disconnecting the telephone lines involved no more than simply unplugging the connecting wire from the jack in the utility box.

The first officer to arrive on the scene was Chief Jerry Bingham of the Henderson County Sheriff's

Department. Upon his arrival, he was directed by a neighbor to check the pool where he found Mrs. Hall's body floating face down in the water. He immediately called Emergency Medical Services and a Tennessee Bureau of Investigation (TBI) investigator. TBI Agent Brian Byrd arrived on the scene shortly after midnight.

Agent Byrd entered the house and found the master bedroom in disarray. Bloodstains marked the bed, a counter top, and a wedding dress. The telephones inside the house were off their hooks. A $25.00 money order made out to Mrs. Hall and dated the day of the murder was found inside the house. No weapons were found. A trail of drag marks and bloodstains led from the master bedroom, out the front door, over the driveway, past the sandbox, and down to the pool in the back yard. Mrs. Hall's t-shirt was lying beside the pool. Clumps of grass ripped from the ground floated in the blood-tinged water of the pool. Outside the front door of the house the telephone junction box was opened and the phone line was disconnected. The grass and weeds near this box were matted down.

Dr. O'Brien Clay Smith, the forensic pathologist who performed the autopsy on Mrs. Hall, testified that the primary cause of death was asphyxia resulting from a combination of manual strangulation and drowning. He could not say with certainty that either strangulation or drowning was the exclusive cause of death. Evidence supporting strangling as a contributing cause of death included bruising on the left and right sides of Mrs. Hall's neck, hemorrhaging in the neck muscles around the hyoid bone in the neck, and bleeding in the thyroid gland, which indicated that extensive compression had been applied to the neck. Evidence supporting drowning as a contributing cause of death was water found in both Mrs. Hall's stomach and in her bloodstream. The water in her stomach could have collected when Mrs. Hall swallowed water as she was being drowned. The water in her bloodstream would have entered when she took water into her lungs, and the water passed through the lungs into her bloodstream.

Before dying, Mrs. Hall sustained at least eighty-three separate wounds, including several blows to the head, a fractured nose, multiple lacerations, and bruises and abrasions to the chest, abdomen, genitals, arms, legs and back. Abrasions on Mrs. Hall's back were consistent with having been dragged across pavement. Dr. Smith used a mannequin during his testimony to demonstrate the size and location of the various wounds on Mrs. Hall's body, marking each wound with a black magic marker. He described some of the injuries to Mrs. Hall's arms, legs and hands as defensive wounds. He characterized the injuries to the neck, face and head as intentional "target" wounds. Except for the physical trauma associated with the strangulation, however, none of the injuries would have proven fatal.

Chris Dutton, who was confined in a cell next to the defendant, testified that while both men were incarcerated, the defendant confided in him about his wife's murder. When describing what happened on the night of the murder, the defendant told Dutton that he had tried to talk with Mrs. Hall about reconciling but "[a]ll she was interested in was the money." When she refused to consider his plea for reconciliation and demanded that he leave, "his temper got the best of him and he began to strike her." According to Dutton, the defendant had determined, even before he arrived at his wife's house, "to make her feel as he did. He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him." The defendant told Dutton that he hit his wife in the head until he panicked, threw her in the swimming pool, then re-entered the house, took the car *598 keys, and drove away in Mrs. Hall's minivan.

On cross-examination, Dutton admitted that the defendant also told him that he was depressed and had been drinking since he telephoned his wife earlier that day. The defendant also told Dutton that he was very concerned about the welfare of his two daughters, especially Jessica. The defendant explained that he disconnected the telephone line, because, when he and his wife argued in the past, she had called the police.

Two witnesses testified on the defendant's behalf during the guilt phase of trial. Dr. Lynn Donna Zager, a clinical psychologist, interviewed the defendant several times after his arrest. She diagnosed him as depressed and suffering from alcohol dependence. In addition, she noted personality characteristics of paranoia and dependency. In Dr. Zager's opinion, at the time of the killing the defendant suffered from depression and alcohol intoxication. These factors were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 S.W.3d 593
**(Cite as: 8 S.W.3d 593, \*598)**

Page 34

compounded by his personality characteristics and various psycho-social stressors, including a sick child, loss of employment with the resulting financial problems, his impending divorce, and the terminal illness of a brother. Dr. Zager testified that, in her opinion, the defendant acted in an impulsive manner in killing his wife, rather than pursuant to a preconceived plan.

On cross-examination, Dr. Zager admitted that she based her opinion concerning the defendant's intoxicated state on statements he made to her and statements of other witnesses who saw him drinking on the day of the murder. She agreed that no one she interviewed remarked on whether the defendant exhibited any of the typical physical signs of intoxication, such as slurred speech or lack of coordination.

Randy Helms, the defendant's prior employer, also testified on behalf of the defendant. According to Helms, prior to the killing the defendant had been severely depressed because of his family problems.

The defendant attempted to call his sister, Cheryl Arbogast, to testify regarding his state of mind at the time of the murder, but she had no first-hand knowledge of the defendant's state of mind on the night of the murder. In fact, Ms. Arbogast admitted she had not spoken to the defendant for several months prior to the murder. Her testimony regarding the defendant's state of mind was based on a conversation she had with her brother, Jeff Hall, since deceased, on the day of the murder. The trial court would not permit this hearsay testimony to be admitted before the jury. [FN3] At the conclusion of the evidence, the jury found the defendant guilty as charged of first degree premeditated murder.

> FN3. The court did, however, elicit the following information during an offer of proof: on the day of the murder the defendant had called his brother Jeff in Texas. He was crying and distraught over the state of his personal affairs. His brother Jeff was dying of AIDS; the defendant had lost his job; now he was facing the possibility of divorce and losing his children. Jeff was concerned about the defendant and called Ms. Arbogast who lived in Cincinnati. They discussed arranging psychiatric counseling for the defendant on an urgent basis. Ms. Arbogast attempted to call the defendant on the night of the murder but was unable to reach him.

During the sentencing phase the State recalled Dr. Smith to testify in more detail concerning the extent of Mrs. Hall's injuries. The State introduced photographs of the injuries taken at the autopsy to illustrate Dr. Smith's testimony. These photographs depicted the numerous external wounds the defendant inflicted while struggling with Mrs. Hall.

The defendant called Dr. Zager and Dr. Joe Mount, a psychological examiner who counseled defendant at Riverbend Maximum Security Institution. Both described the defendant as depressed, remorseful, suicidal and extremely concerned about his children. Dr. Mount testified that the defendant had been diagnosed as suffering from an adjustment disorder with mixed \*599 emotional features (anxiety and depression) and "substance abuse of dependence by history."

Helms also testified again. He described the defendant as a good, dependable employee and told how the defendant had cared for his children when he brought them to work with him. Helms stated that the defendant loved his wife and children and had hoped to reconcile with Mrs. Hall.

The defendant also presented his three sisters and his mother to recount the history of the defendant and his family. The defendant was the youngest of seven children. His father, an alcoholic, physically and verbally abused his wife until he died from a heart attack in 1974 when the defendant was ten. The defendant's father denied that the defendant was his son and snubbed the defendant. The witnesses' descriptions of the fights between the defendant's parents eerily paralleled the defendant's final confrontation with his own wife. All of the defendant's relatives described him as a good father who loved his children.

### SUFFICIENCY OF THE EVIDENCE

The defendant contends that the record establishes a killing premised on anger, passion, and alcohol rather than a premeditated and deliberate murder. His is a two-part argument: first, he claims that the passion and anger aroused by his fight with his wife had not subsided when he killed her; second, he claims that his intoxication rendered him unable to form the mental state necessary for first degree murder.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1][2][3][4][5] When the sufficiency of the evidence is challenged, the standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Burns,* 979 S.W.2d 276, 286- 87 (Tenn.1998); Tenn. R.App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. *See State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). In determining the sufficiency of the evidence, this Court does not reweigh the evidence, *see id.,* or substitute its inferences for those drawn by the trier of fact, *see Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *See Burns,* 979 S.W.2d at 287; *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973). On appeal, the appellant bears the burden of proving that the evidence is insufficient to support the jury verdict. *See State v. Pike,* 978 S.W.2d 904, 914 (Tenn.1998); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982).

[6] At the time of this homicide, the Code defined first degree murder as "[a]n intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39-13-202(a)(1) (1991). A homicide, once proven, is presumed to be second degree murder, and the State has the burden of proving the elements of premeditation and deliberation to raise the offense to first degree murder. *State v. Nesbit,* 978 S.W.2d 872, 898 (Tenn.1998).

[7][8][9] "Intentional" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn.Code Ann. § 39- 11-106(a)(18) (1991). Proving premeditation requires evidence of "a previously formed design or intent to kill," *Nesbit,* 978 S.W.2d at 898; *State v. West,* 844 S.W.2d 144, 147 (Tenn.1992), and "the exercise of reflection and judgment." Tenn.Code Ann. § 39-13- 201(b)(2) (1991) (repealed 1995). Proving deliberation requires evidence of a cool purpose formed in the absence of passion or provocation. *600 See* Tenn.Code Ann. § 39-13-201(b)(1) (1991)

(repealed 1995) & Sentencing Commission Comments; *State v. Brown,* 836 S.W.2d 530, 539-40 (Tenn.1992) (citations and internal quotations omitted). Deliberation also requires "some period of reflection during which the mind is free from the influence of excitement." *Brown,* 836 S.W.2d at 540. A killing committed during a state of passion, however, may still rise to the level of first degree murder if the State can prove that premeditation and deliberation preceded the struggle. *See Franks v. State,* 187 Tenn. 174, 213 S.W.2d 105, 107 (1948); *Leonard v. State,* 155 Tenn. 325, 292 S.W. 849 (1927).

[10] The evidence in this case, when viewed in the light most favorable to the State, demonstrates the following. The defendant contacted Mrs. Hall on the day of the murder to arrange for a meeting. Although the defendant arranged the meeting under the guise of delivering a child-support check, he actually wanted to meet with Mrs. Hall to attempt to persuade her to reconcile. As the defendant later told fellow prisoner Dutton, if Mrs. Hall were unwilling to reconcile, he intended "to make her feel as he did. He wanted her to suffer as he did, feel the helplessness that he was feeling because she took his world away from him." Prior to entering the house, the defendant disconnected the telephone lines to prevent Mrs. Hall from calling for help. At some point either before or during his attack, the defendant told Mrs. Hall that she "would never live to graduate." Finally, during the attack, the defendant told the children that he would kill their mother if they went for help. The evidence of planning, the expression of defendant's intent to kill or hurt Mrs. Hall, the severity of the beating, and the manner of death establish the existence of premeditation and deliberation and support a conviction for first degree murder beyond a reasonable doubt.

Our Code provides that while voluntary intoxication is not a defense to prosecution for an offense, evidence of such intoxication may be admitted to negate a culpable mental state. *See* Tenn.Code Ann. § 39-11-503(a) (1991); *see also State v. Phipps,* 883 S.W.2d 138, 148 (Tenn.Crim.App.1994). The defendant's argument that his intoxication rendered him unable to form the mental state necessary for first degree murder, however, is not persuasive. The defendant's own statements to Dutton and Dr. Zager constitute the only evidence of intoxication. No witness

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 S.W.3d 593                                                                 Page 36
(Cite as: 8 S.W.3d 593, *600)

described the defendant as drunk or intoxicated. Furthermore, the defendant's conduct in traveling to Mrs. Hall's house, disconnecting the telephone, barricading the bedroom door, and completing his escape after the killing belies the claim that he was incapable of premeditation and deliberation.

Having reviewed the entire record, we conclude that a rational trier of fact could have found the essential elements of premeditated and deliberate first degree murder beyond a reasonable doubt. Tenn. R.App. P. 13(e). This issue, therefore, is without merit.

### SUFFICIENCY OF (i)(5) AGGRAVATING CIRCUMSTANCE

[11] The defendant also contends that the evidence was insufficient to support the jury's finding of aggravating circumstance (i)(5) that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." [FN4] *601 Pursuant to Tenn.Code Ann. § 39-13-206(c) (1997), this Court must review the sufficiency of the aggravating evidence against the mitigating evidence offered and determine the following: whether the sentence of death was imposed in an arbitrary fashion; whether the evidence supports the jury's finding of the existence of each aggravating circumstance beyond a reasonable doubt; whether the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt; and whether the sentence of death is disproportionate.

> FN4. The defendant compares his case to that of Richard Odom whom a jury convicted of first degree felony murder committed in the course of a rape. State v. Odom, 928 S.W.2d 18 (Tenn.1996). The defendant reasons that stabbing and raping a murder victim is more "heinous" than merely beating and strangling the victim. Because Odom's death sentence was overturned on appeal, defendant urges this Court to do the same in his case. The defendant misconstrues this Court's ruling in Odom. A majority of the Court stated that, because Odom was convicted of felony-murder as opposed to deliberate, premeditated murder, the mere fact of the felony, i.e., the rape, alone would be insufficient to constitute "torture" or "serious physical abuse beyond that necessary to produce death" without further proof. Use of the underlying felony to both convict the defendant of first degree murder and to impose the death penalty would not sufficiently narrow the class of persons

eligible for the death penalty pursuant to Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Otherwise, all defendants convicted of murder in the perpetration of a rape would automatically be eligible for the death penalty under the (i)(5) aggravating circumstance without any further proof of torture or serious physical abuse. That is not to say that during re-sentencing the State could not have produced additional evidence of torture or serious physical abuse in addition to the rape, which would have possibly established the (i)(5) aggravator.

The "especially heinous, atrocious or cruel" aggravating circumstance may be proved under either of two prongs: torture or serious physical abuse. This Court has defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Williams, 690 S.W.2d 517, 529 (Tenn.1985). The terms "serious physical abuse beyond that necessary to produce death" are self-explanatory; the abuse must be physical rather than mental in nature. "Abuse" is defined as "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.' " Odom, 928 S.W.2d at 26 (quoting Black's Law Dictionary 11 (6th ed.1990)).

The evidence presented in this case supports a finding of the "heinous, atrocious or cruel" aggravating circumstance under either, or both, of the two prongs. We agree with the Court of Criminal Appeals that Mrs. Hall suffered mental torture over the welfare of her children as the defendant beat her in their presence. After hearing the defendant's threats to kill her if the children went for help, she most certainly would have feared for her own fate as well. This Court has repeatedly held that the anticipation of physical harm to one's self or a loved one constitutes mental torture. State v. Carter, 988 S.W.2d 145, 150 (Tenn.1999); Nesbit, 978 S.W.2d at 886-87; State v. Cauthern, 967 S.W.2d 726, 732 (Tenn.1998); State v. Hodges, 944 S.W.2d 346, 358 (Tenn.1997). The evidence here clearly supports a finding of mental torture.

Furthermore, the extent and severity of the beating support a finding of either physical torture or "serious physical abuse beyond that necessary to produce death" due to the pain Mrs. Hall suffered before she finally died. Therefore, we find the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence sufficient to support the existence of the (i)(5) aggravating circumstance beyond a reasonable doubt.

As proof of mitigating circumstances, the jury may reasonably have found that the defendant did not have a significant history of prior criminal activity, that he was a good worker and employee, and that he was a caring and nurturing father. Nevertheless, we agree with the jury's conclusion that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt. This issue is wholly without merit.

### ADMISSION OF AUTOPSY PHOTOGRAPHS

[12] During the sentencing phase of the defendant's trial, the trial court admitted into evidence several photographs taken of Mrs. Hall's body during the autopsy. These photographs rather graphically depicted *602 the nature and extent of the external injuries sustained by Mrs. Hall prior to her death. The defendant argues that the photographs were unnecessary and cumulative to Dr. Smith's testimony and the demonstration done with the mannequin during the guilt phase of trial. The State argues, to the contrary, that the photographs were the best evidence of the nature and extent of the injuries and were necessary to support the State's position that the murder involved torture or serious physical abuse beyond that necessary to cause death.

[13] The admissibility of photographs is generally within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent an abuse of that discretion. *State v. Banks,* 564 S.W.2d 947, 949 (Tenn.1978). The admissibility of evidence at a capital sentencing hearing is controlled by Tenn.Code Ann. § 39-13-204(c) (1991), which allows the admission of any evidence "the court deems relevant to the punishment ... regardless of its admissibility under the rules of evidence," subject to a defendant's opportunity to rebut any hearsay statements and to constitutional limitations. [FN5]

> FN5. To decide this issue, the Court of Criminal Appeals applied Tenn. R. Evid. 401 and 403 and weighed the probative value of the photographs against their prejudicial effect upon the defendant's case.

Historically, photographs depicting a victim's injuries have been held admissible to establish torture or serious physical abuse under aggravating circumstance (i)(5). *See, e.g., State v. Smith,* 893 S.W.2d 908, 924 (Tenn.1994) (photographs depicting the victim's body, including one of the slash wound to the throat, which was "undeniably gruesome," were relevant to prove that the killing was "especially heinous, atrocious, or cruel" and were admissible for that purpose); *State v. McNish,* 727 S.W.2d 490, 494-95 (Tenn.1987) (photographs of the body of the victim who was beaten to death were relevant and admissible to show the heavy, repeated and vicious blows to the victim and to prove that the killing was "especially heinous, atrocious, or cruel").

The photographs in question depicted Mrs. Hall's body during the autopsy, prior to any surgical examination of her internal organs. While certainly not pleasant to view, they were illustrative of the testimony of Dr. Smith and highly relevant to the extent of abuse endured by Mrs. Hall prior to her death. They were not so gruesome as to have unduly inflamed the members of the jury. We find that the photographs were directly relevant to the existence of torture and serious physical abuse, necessary elements of the "especially heinous, atrocious or cruel" aggravating circumstance of Tenn.Code Ann. § 39-13-204(i)(5) (1991), and were properly admitted into evidence.

### UNANIMITY INSTRUCTION IN SENTENCING PHASE

[14] The defendant argues that the trial court's instruction to the jury that they must unanimously agree on whether the statutory aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt violates his Eighth Amendment right to have each juror consider and give effect to mitigating circumstances. *See McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In *McKoy* and *Mills,* the Court held that sentencing schemes that permit jurors to consider only unanimously found mitigating circumstances in determining whether the aggravating circumstances are sufficient to justify imposition of death penalty impermissibly limit the jurors' consideration of mitigating evidence in violation of the Eighth Amendment. *See McKoy,* 494 U.S. at 438-44, 110 S.Ct. 1227; *Mills,* 486

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 S.W.3d 593                                                                    Page 38
(Cite as: 8 S.W.3d 593, *602)

U.S. at 383-84, 108 S.Ct. 1860.

**\*603** The challenged instruction read as follows:
> If you unanimously determine that at least one
> statutory aggravating circumstance have [sic] been
> proven by the State beyond a reasonable doubt
> and said circumstance or circumstances have been
> proven by the State to outweigh any mitigating
> circumstance or circumstances beyond a
> reasonable doubt, the sentence shall be death.

We note that the defendant did not object to this
instruction when it was given, nor did he raise it as
an issue in his Motion for New Trial or in the Court
of Criminal Appeals.   Normally, the defendant's
failure to take any action to call this issue to the trial
court's attention will preclude review on appeal.
Tenn. R.App. P. 3(e), 36(a).   In any event, we
note that this instruction fully complied with the
requirements of Tenn.Code Ann. § 39-13-204(g)(1)
(1991), requiring proof of at least one aggravating
circumstance beyond a reasonable doubt and a
determination that such aggravating circumstances
outweigh any mitigating circumstances beyond a
reasonable doubt.   Furthermore, the trial court also
instructed the jurors that "[t]here is no requirement
of jury unanimity as to any particular mitigating
circumstance or that you agree on the same
mitigating circumstance."   This instruction satisfies
any Eighth Amendment concerns under *McKoy* or
*Mills*.   This issue is without merit.

### EXCLUSION OF CHERYL ARBOGAST TESTIMONY

[15]  During the guilt phase of his trial, the
defendant attempted to call his sister, Cheryl
Arbogast, to testify about statements his brother Jeff
had made to her concerning the defendant's mental
state around the time of the killing.   Because
Arbogast had no personal knowledge of facts
regarding her brother's mental state, the trial court
excluded her testimony as inadmissible hearsay.
The defendant argues that Jeff's statements were
admissible under Tenn. R. Evid. 804(a)(4) because
Jeff had died and was unavailable to testify.

Rule 804 provides for certain exceptions to the
hearsay exclusionary rule when a witness is
"unavailable."   "Unavailability" is defined at
subsection (a)(4) as including situations in which the
declarant "[i]s unable to be present or to testify at
the hearing because of the declarant's death or then
existing physical or mental illness or infirmity."

However, under subsection (b) of Rule 804, the
hearsay exception for unavailable witnesses applies
only to (1) former testimony, (2) statements under
belief of impending death, (3) statements against
interest, and (4) statements of personal and family
history.   *See* Tenn. R. Evid. 804(b). Jeff Hall's
descriptions to Arbogast of the defendant's mental
state do not fall within any of these exceptions.
The trial court properly excluded this testimony
during the guilt phase of defendant's trial.

### DENIAL OF RIGHT TO TESTIFY

[16][17]  At the conclusion of proof in both the
guilt phase and the penalty phase, the trial court
sought to have the defendant take the stand to
confirm that he knowingly and intelligently decided
not to testify at trial after consultation with his
attorneys.   On both occasions, the defendant
refused to be sworn to testify unless the trial court
removed "the flag of war," *i.e.,* the United States
flag, from the courtroom. [FN6]   The trial court
refused to remove **\*604** the flag and proceeded to
inquire of defense counsel whether counsel had
explained the defendant's right to testify and
whether the defendant had knowingly and
voluntarily waived this right.   Counsel indicated
that they fully explained to the defendant the
complementary rights to testify in one's own
defense and to be free from self-incrimination, after
which he chose not to testify.

> FN6.  Although the record is not completely clear,
> the defendant apparently perceived gold fringe
> ornamentation on the courtroom flag to be
> symbolic of martial law jurisdiction.  We note that
> the display of the United States flag with gold
> fringe is common in many ceremonial settings,
> including courtrooms.  From a historical and legal
> standpoint, the use of fringe on the flag has no
> inherent or established symbolism.  It has nothing
> to do with the jurisdiction of the court or with
> martial law.  It is purely a decorative addition to
> enhance the appearance of the flag.  *See Fringe on
> the Flag?,* New England Journal of Vexillology
> (Online edition, 1997);   *Data Summary Sheet No. 1
> 3/95 ,* Flag Research Center (1995);   *see also
> Schneider v. Schlaefer,* 975 F.Supp. 1160, 1163
> (E.D.Wis.1997) (finding that fringe on flag was
> not of any legal significance affecting the
> jurisdiction of the court and holding all future
> claims based on this argument "frivolous and
> sanctionable");   *Sadlier v. Payne,* 974 F.Supp.
> 1411, 1414 (D.Utah 1997) (holding yellow fringe
> on flag does not convert state courtroom into a
> "foreign state or power");   *McCann v. Greenway,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

952 F.Supp. 647, 650 (W.D.Mo.1997) (reviewing history of the American flag); *United States v. Greenstreet,* 912 F.Supp. 224, 229 (N.D.Tex.1996) (finding fringed flag did not limit federal district court's jurisdiction); *Vella v. McCammon,* 671 F.Supp. 1128, 1129 (S.D.Tex.1987) (holding yellow fringed flag did not divest federal court of jurisdiction to impose penalties for civil and criminal contempt).

The defendant now asserts that the trial court's refusal to remove the flag infringed on his right to testify in his own defense. We note that the defendant did not file any motion during either the guilt or sentencing phase expressly requesting removal of the flag so that he could exercise his right to testify. This issue was not raised in either the Motion for New Trial or in the Court of Criminal Appeals. Technically, the issue has been waived. Tenn. R.App. P. 3(e), 36(a). In any event, a trial court's refusal to remove the United States flag from the courtroom does not violate anyone's constitutional rights. This issue is wholly without merit.

### PROPORTIONALITY REVIEW

[18][19][20][21][22] The defendant next claims that his sentence is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. This Court's decision in *State v. Bland,* 958 S.W.2d 651 (Tenn.1997), set out the methodology for comparative proportionality review under Tenn.Code Ann. § 39-13-206(c)(1)(D) (1997). Comparative proportionality is for the purpose of determining whether the death penalty is unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime. Our Court applies the precedent-seeking approach, in which it compares a particular case with other cases in which the defendants were convicted of the same or similar crimes. The Court conducts the comparison by examining the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved. *See id.* at 664. In theory, comparative review of capital cases insures rationality and consistency in the imposition of the death penalty. *See id.* at 665 (citing *State v. Barber,* 753 S.W.2d 659, 665-66 (Tenn.1988); *State v. Kandies,* 342 N.C. 419, 467 S.E.2d 67, 86 (1996)). In addition to comparing the backgrounds of the various defendants and the aggravating and mitigating factors applicable to the

various cases, other factors relevant to the process of identification and comparison of similar cases include: (1) the means of death; (2) the manner of death, *e.g.,* violent or torturous; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on surviving victims. *See id.* at 667. Also relevant when comparing the various cases are: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; *605 (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of the victim; and (8) the defendant's capacity for rehabilitation. *See id.*

In conducting our proportionality review in this case we have attempted to review cases in which the defendant and victim shared a close relationship; the defendant used a similar method to cause the resulting death (beating/strangulation); and the jury found the (i)(5) aggravator. For example, in *State v. Smith,* 868 S.W.2d 561 (Tenn.1993), the defendant shot his estranged wife in the shoulder and neck, severing her spinal cord. The medical examiner testified that following the wound to the neck, the victim would have been immediately paralyzed from the neck down. She would have quickly lost consciousness, but may have lived from two to six minutes following the fatal wound. Following the victim's death, the defendant slit her throat, then stabbed her numerous times with both a knife and an "awl" or ice pick. After convicting the defendant of first degree premeditated murder, the jury found the existence of four aggravating circumstances, including the (i)(5) "especially heinous, atrocious or cruel" aggravator, and imposed a sentence of death by electrocution. This Court upheld such conviction and sentence on appeal.

In *State v. Johnson,* 743 S.W.2d 154 (Tenn.1987), the defendant forced a large plastic garbage bag into his wife's mouth, resulting in her strangulation and asphyxiation. She bled from the nose and ears, and traces of blood were found on a couch in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 S.W.3d 593                                                                          **Page 40**
(Cite as: 8 S.W.3d 593, *605)

office where her death occurred. There was testimony that she would have been conscious during the terrifying ordeal and that from one to four minutes would have elapsed before she expired. The jury found that Johnson had a previous record of committing violent offenses, and that the manner in which he committed his crime was "especially heinous, atrocious or cruel" in that it involved torture or depravity of mind. Accordingly, the jury sentenced him to death. This Court upheld the finding of the (i)(5) aggravating circumstance and affirmed both the conviction and sentence on appeal.

In *State v. Cooper,* 718 S.W.2d 256 (Tenn.1986), the defendant, who was separated from his wife pending finalization of divorce proceedings, called his wife's mother and told her he was going to kill his wife. In the early morning hours of the following day, he went to his wife's place of employment and told her he was going to kill her. He then left the premises and purchased a shotgun. Later that morning, he returned and, in the presence of her supervisor, told her he was going to kill her. When the supervisor called the police during that incident, police advised the wife to take an arrest warrant out on her husband. Before she had the opportunity to do so, however, the defendant returned to her workplace and shot her four times with a single-action shotgun. Although death was instantaneous, or nearly so, this Court, found that the defendant's threats and harassment throughout the day had constituted mental torture and depravity of mind. We therefore upheld the jury's finding that the killing was "especially heinous, atrocious, or cruel" under Tenn.Code Ann. § 39-2-203(i)(5) (1982) (repealed 1989), and the imposition of the death penalty.

In *State v. Miller,* 674 S.W.2d 279 (Tenn.1984), *on remand,* 771 S.W.2d 401 (Tenn.1989), the defendant, possibly under the influence of LSD, beat his girlfriend to death with his fists and a fire poker, then stabbed her numerous times with a knife. The jury found as the sole aggravating circumstance that the murder was "especially heinous, atrocious or cruel," under the (i)(5) aggravator, and this Court affirmed the sentence of death on appeal.

In *State v. Teague,* 645 S.W.2d 392 (Tenn.1983), *on remand,* 680 S.W.2d 785 (Tenn.1984), the defendant struck his estranged wife in the head

rendering her unconscious and drowned her in her own bathtub. The motive for the killing was to prevent the victim from testifying against *606 him in an upcoming murder trial. After finding the defendant guilty of first degree premeditated murder, the jury found two aggravating circumstances: (1) that the defendant was previously convicted of a felony other than the present charge, which involved the use or threat of violence to the person, Tenn.Code Ann. § 39-2-203(i)(2) (1982) (repealed 1989), and (2) that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another, Tenn.Code Ann. § 39-2-203(i)(6) (1982) (repealed 1989), and sentenced Teague to death. This Court upheld both the conviction and sentence on appeal.

Although no two cases are identical, the cases discussed above are similar in many respects to this case. In each, domestic disagreements bred animosity between the defendant and the victim. As a result of the relationship between the parties, a heightened state of emotion suffused the events. In most of these cases, the defendant made prior threats to kill the spouse well before actually carrying out the threats. In each of the cases, the defendant attacked the victim mercilessly and without provocation, and each victim died a horrific death. The juries in most of these cases relied, at least in part, on the (i)(5) aggravating circumstance to justify the imposition of the death penalty. We have also examined other cases in which defendants convicted of the first degree murder of their spouse or significant other received a sentence of life imprisonment or life without parole. [FN7] After reviewing the body of cases as a whole, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

> FN7. *See, e.g., State v. Dick,* 872 S.W.2d 938 (Tenn.Crim.App.1993), *app. denied* (Defendant hit his estranged wife in the head with an object fracturing her skull, stabbed her three times, stuffed her into the back seat of her car, and poured gasoline over the body and interior of the car in an attempt to set the car on fire; State did not seek death penalty); *State v. Parks A. Bryan,* No. 01C01-9711-CC-00521, 1999 WL 22992 (Tenn.Crim.App. at Nashville, filed Jan. 22, 1999) (Defendant viciously beat his wife, causing extensive bruising all over her body and multiple fractured ribs; ribs penetrated lungs, causing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 S.W.3d 593                                                      **Page 41**
(Cite as: 8 S.W.3d 593, *606)

victim to slowly suffocate to death over the course of up to two days; State did not seek death penalty, and jury found killing was "especially heinous, atrocious or cruel," imposing a sentence of life without parole); *State v. Terry Lynn Anthony,* No. 02C01-9605-CC-00159, 1997 WL 119516 (Tenn.Crim.App. at Jackson, filed Mar. 18, 1997) (Jealous defendant shot his wife three times after finding her in another man's car; State did not seek death penalty, and defendant was sentenced to life in prison); *State v. Randall Pennell,* No. 19, 1991 WL 23515 (Tenn.Crim.App. at Jackson, filed Feb. 27, 1991) (Enraged defendant beat girlfriend to head with claw end of hammer, then shot her in the chest; jury found killing was "especially heinous, atrocious or cruel," but that the aggravating circumstance did not outweigh the mitigating circumstances beyond a reasonable doubt, and sentenced defendant to life imprisonment); *State v. Donald Ferguson,* Grainger Circuit No. 2922 (Rule 12 report filed Nov. 1, 1994) (Defendant beat estranged wife to death with aluminum baseball bat; he pled guilty to first degree murder in return for agreed sentence of life imprisonment); *State v. Terry Lee Hicks,* Shelby Co. No. 85-02764 (Rule 12 report filed Apr. 1, 1986) (Defendant beat his wife severely enough that she was hospitalized, then went to hospital and shot her to death; he pled guilty in return for agreed sentence of life imprisonment).

*CONCLUSION*

After thoroughly reviewing the record of the trial and the issues presented before us in accordance with Tenn.Code Ann. § 39-13-206(b), -(c) (1997), we conclude that the evidence is sufficient to support the finding of guilt of first degree premeditated and deliberate murder. The jury did not impose the death sentence in an arbitrary fashion. Furthermore, the evidence supports the jury's findings of the aggravating circumstance and that the aggravating circumstance outweighs any mitigating circumstances. Also, a comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that *607 the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, the decision of the Court of Criminal Appeals upholding the conviction and sentence of death is affirmed. The sentence of death will be carried out as provided by law.

ANDERSON, C.J., DROWOTA, BIRCH and HOLDER, J.J., concur.

8 S.W.3d 593

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.